**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
                                                    :
**In re**                                           :        **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,**                  :        **08-_____ (__)**
                                                    :
        **Debtor.**                                 :
                                                    :
-----------------------------------------------------------------x

**AFFIDAVIT OF IAN T. LOWITT**
**PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY**
**RULES FOR THE SOUTHERN DISTRICT OF NEW YORK IN**
**SUPPORT OF FIRST-DAY MOTIONS AND APPLICATIONS**

STATE OF NEW YORK          )
                           )    ss:
COUNTY OF NEW YORK         )

Ian T. Lowitt, being duly sworn, hereby deposes and says:

1.  I am the Chief Financial Officer, Controller, and Executive Vice President of Lehman Brothers Holdings Inc. (the "Debtor," and together with its non-debtor affiliates, "Lehman Brothers" or the "Company"), the debtor and debtor in possession in this chapter 11 case. In that capacity, I am familiar with the Company's day-to-day operations, businesses, and financial affairs.

2.  This affidavit is made pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of (i) the Debtor's petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") filed on the date hereof (the "Commencement Date") and (ii) the relief, in the form of motions and applications, that the Debtor has requested of the Court.

3. Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my discussions with other members of the Lehman Brothers' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this affidavit. I am authorized to submit this affidavit on behalf of the Debtor.

4. Section I of this affidavit provides an overview of Lehman Brothers' business. Section II describes the circumstances giving rise to the Debtor's commencement of this chapter 11 case. Section III describes certain information required by Local Bankruptcy Rule 1007-2, and also explains how exigent circumstances made it impracticable to furnish all of the schedules and lists required by that rule.

## I.

## The Lehman Brothers Business

5. Lehman Brothers is the fourth largest investment bank in the United States. For more than 150 years, Lehman Brothers has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide. Through its team of more than 25,000 employees, Lehman Brothers offers a full array of financial services in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity.

6. The Company has significant assets around the globe. The Company's worldwide headquarters in New York and regional headquarters in London and Tokyo are complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region. As of May 31, 2008, the Company's consolidated assets totaled approximately $639 billion, and its consolidated liabilities totaled approximately $613 billion.

7. Lehman Brothers operates in three business segments (each of which is described in greater detail below): Capital Markets, Investment Banking and Investment Management. During the Company's 2007 fiscal year, the Capital Markets segment represented 64% of consolidated net revenues. Investment Banking and Investment Management accounted for 20% and 16% of net revenues, respectively.

*Capital Markets*

8. The Capital Markets operation provides fixed income and equity investment services. For customers desiring fixed income services, Lehman Brothers markets and trades public sector bonds and similar instruments, interest rate and credit products, mortgage-related securities and loan products, currencies and commodities. For customers desiring equity investment services, Lehman Brothers markets and trades equities and equity-related products and enters into a variety of derivative transactions. To support these core functions, Lehman Brothers also provides related research covering economic, quantitative, strategic, credit, relative value, index and portfolio analyses. The Capital Markets segment also provides services to the hedge fund community which are known as prime brokerage services.

*Investment Banking*

9. Lehman Brothers takes an integrated approach to client coverage, organizing investment bankers into industry, product and geographic groups within the Investment Banking segment. Business services provided to corporations and governments worldwide can be separated into:

*Global Finance* — Lehman Brothers serves clients' capital raising needs through underwriting, private placements, leveraged finance and other activities associated with debt and equity products; and

*Advisory Services* — Lehman Brothers provides business advisory services with respect to mergers and acquisitions, divestitures, restructurings and other corporate activities.

*Investment Management*

10. The Investment Management business segment provides customized investment management services for high-net-worth clients, mutual funds and other institutional investors. This business segment also serves as the general partner for private equity and other alternative investment partnerships and has minority stake investments in certain alternative investment managers.

*Regulatory Oversight*

11. Many of Lehman Brothers' operations are subject to regulatory oversight in the various jurisdictions in which the Company does business. All Lehman Brothers entities are subject to group-wide supervision and examination by the SEC as a Consolidated Supervised Entity. Several of the Debtor's subsidiaries, including, without limitation, its Lehman Brothers, Inc. subsidiary, are registered with the SEC as broker-

dealers, derivatives dealers, and investment advisers.  As such, those entities are subject to regulation by the SEC and by self-regulatory organizations, including the Financial Industry Regulatory Authority ("FINRA"),[1] national securities exchanges such as the NYSE, and the Municipal Securities Rulemaking Board, among others.  Securities firms are also subject to regulation by state securities administrators in those states in which they conduct business.

12. Other subsidiaries of the Debtor hold national bank charters and therefore are subject to regulation by various federal and state authorities, including the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency of the United States.  The Debtor's insurance subsidiaries are subject to state insurance regulation in the states in which they are domiciled and in the other states in which they are licensed.

*International Operations*

13. Lehman Brothers organizes its operations into three geographic regions:  (i) Europe and the Middle East; (ii) Asia-Pacific, inclusive of operations in Australia and India, and (iii) the Americas.  Lehman Brothers holds memberships or associate memberships on several principal international securities and commodities exchanges, including the London, Tokyo, Hong Kong, Frankfurt, Paris, Milan and Australian stock exchanges.

14. During 2007, Lehman Brothers entered or significantly expanded its presence in several international markets, including Australia, Canada, India, Turkey,

---

[1] FINRA was formed in 2007 by the consolidation of NASD, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange, Inc. ("NYSE").

Russia, Dubai, and Qatar. As a result of these investments in its global franchise, Lehman Brothers reported record results in Europe and the Middle East and Asia-Pacific regions, and 50% of the Company's net revenues for the year came from outside the Americas.

*Capital Structure*

15. The Debtor has issued various securities to the public. Approximately 700 million shares of the Debtor's common stock are publicly traded on the New York Stock Exchange. The Debtor has also issued several classes of preferred stock, warrants, and trust-preferred securities.

16. The vast majority of the Company's financing for operations arises from financing provided to the Debtor. As of May 31, 2008, the Debtor owed approximately $110.5 billion on account of senior unsecured notes, approximately $12.6 billion on account of subordinated unsecured notes, and approximately $5 billion on account of junior subordinated notes.

17. In addition to the cash borrowed to finance the operations of the Company, various entities within Lehman Brothers also enter into secured borrowing and lending transactions to finance inventory positions, obtain securities for settlement and meet clients' needs. Lehman Brothers receives collateral in connection with resale agreements, securities borrowed transactions, borrow/pledge transactions, client margin loans and derivative transactions. Lehman Brothers is generally permitted to sell or repledge these securities held as collateral and use them to secure repurchase agreements, enter into securities lending transactions or deliver to counterparties to cover short positions in the securities markets.

18.     As a general rule, Lehman Brothers purchases highly liquid securities (*i.e.*, government bonds, U.S. agency securities, corporate bonds, asset-backed securities and equity securities) using secured funding.  Illiquid assets (*e.g.*, fixed assets, intangible assets and margin postings) and less liquid inventory positions (*e.g.*, derivatives, private equity investments, certain corporate loans, certain commercial mortgages and real estate positions) are funded with cash.

19.     Lehman Brothers' secured funding for asset purchases is generally obtained through tri-party repurchase agreements in which a custodian bank or clearing organization acts as an intermediary between Lehman Brothers and its funding counterparties.  The outstanding amount owed under such tri-party repurchase agreements stood at $188 billion as of May 31, 2008.

## II.

## Events Leading to the Chapter 11 Case

20.     As a financial services firm, with interests in investment banking, stock brokerage, and investment management, Lehman Brothers is materially affected by conditions in the global financial markets and worldwide economic conditions.  For most of 2008, Lehman Brothers operated in an extremely unfavorable global business environment.  Conditions were characterized by a continued lack of liquidity in the credit markets, significantly depressed volumes in most equity markets, a widening in certain fixed income credit spreads compared to the end of the 2007 fiscal year, and declining asset values.

21.     These hardships were compounded by slowed growth in major economies as a result of declining business and consumer confidence.  Global inflation

rose amid slowing economic growth. Commodity prices rose significantly during the quarter, with oil and gold reaching record levels, raising costs of industrial production. Consumer spending was challenged by a combination of lower wealth from declining housing values, higher commodity prices impacting levels of disposable income, and falling private sector employment growth. Central banks' concerns about exacerbating inflationary conditions limited their ability to effect monetary policies intended to provide liquidity within the markets.

22. The combination of low levels of liquidity and the requirement that financial companies de-leverage their balance sheets resulted in downward pressure on financial asset prices. These global economic conditions, in the aggregate, depressed both the valuations of Lehman Brothers' inventory positions as well as transactional volumes and market activity levels in which Lehman Brothers' Capital Markets and Investment Banking business segments operated during recent fiscal quarters.

23. Ultimately, the onset of instability in the financial and credit markets over the past several months created significant liquidity problems for Lehman Brothers. Despite infusions of liquidity by central banks into the financial system, broad asset classes, particularly domestic subprime residential mortgages and structured credit products, remained thinly traded throughout this period. As noted above, Lehman Brothers purchases many of its assets using secured credit obtained under tri-party repurchase agreements. When the market value of the pledged assets began to deviate from the pledged value of those assets, secured lenders imposed "haircuts" (discounts) on Lehman Brothers.

24.     The devaluation of the Lehman Brothers' pledged assets also had an adverse impact on borrowing availability.  The reduced availability of secured financing forced Lehman Brothers to draw down on its liquidity pool in order to execute transactions.  This loss of liquidity created a chain reaction of adverse economic consequences.  With diminished cash to fund transactions, major credit rating agencies put the Company's credit ratings on negative watch with potential for multiple downgrades.

25.     In response to the Company's deteriorating financial performance, management explored various options to restructure operations, reduce overall cost structure, and improve performance.  In recognition of the concerns caused by the Company's concentration of positions in real estate-related assets, management initiated steps to separate those assets from the rest of its operations.  The Company actively reduced its real estate portfolio in the third quarter of 2008, including a reduction in residential mortgage exposure by 31% to $17.2 billion.  Further, the Company formally engaged BlackRock Financial Management, Inc. to sell approximately $4.0 billion of the Company's residential-mortgage portfolio in the United Kingdom.  The Company also reduced staffing to improve operating efficiency.

26.     In an effort to minimize the effects of pervasive rumors in the marketplace, on September 10, 2008, Lehman Brothers reported a preliminary net loss of approximately $3.9 billion, or $5.92 per common share (diluted), for the third quarter ended August 31, 2008, compared to a net loss of $2.8 billion, or $5.14 per common share (diluted), for the second quarter of fiscal 2008, and net income of $887 million, or $1.54 per common share (diluted), for the third quarter of fiscal 2007.  The net loss in the

third quarter of 2008 was driven primarily by gross mark-to-market adjustments stemming from writedowns on commercial and residential mortgage and real estate assets.

27. At the same time, in light of the continuing diminution in the value of Lehman Brothers' assets, the increasing mark to market obligations, and the Debtor's plummeting stock price, management announced two major initiatives. One initiative involved an effort to sell the Company's Investment Management Division. Management's view was that the sale of the Company's Investment Management Division would generate in excess of $4 billion. Such funds would have enhanced the capital position of the Company and enabled it to operate the other divisions successfully through this difficult period in the market.

28. The second initiative involved the transfer of the Company's commercial loan assets to a new company which would be owned by the Debtor's shareholders. Management believed that divorcing the real estate assets from the rest of the Company would relieve the pressure on the Company, while permitting shareholders to benefit from the full value of such assets when the markets recover.

29. Unfortunately, the announcements made on September 10 did little to quell the rumors in the market and the concerns about the viability of the Company. The uncertainty, particularly among the banks through which the Company clears securities trades, ultimately made it impossible for the Company to continue to operate its business. The disruption to its business virtually guaranteed that the Company would not be able to sustain itself long enough to implement either of the initiatives.

30. The Company's liquidity crisis prompted an emergency meeting on September 12, 2008, between the Debtor's management, officials from the New York branch of the Federal Reserve Bank, the heads of major financial institutions, Treasury Secretary Henry Paulson, and SEC Chairman Christopher Cox. Government officials later indicated that emergency federal funding would not be forthcoming to stabilize Lehman Brothers and provide the liquidity needed for its operations.

31. The Debtor filed this chapter 11 case so that it could preserve its assets and maximize value for the benefit of all stakeholders. While the Company continued to explore a number of strategic alternatives, after the September 12 meeting no viable alternative was available.

### III.

### Information Required by Local Bankruptcy Rule 1007-2

32. In accordance with Local Bankruptcy Rule 1007-2(a)(3), and to the best of my knowledge, information, and belief, no creditors' committees were organized prior to the Commencement Date.

33. In accordance with Local Bankruptcy Rule 1007-2(a)(4), Schedule 1 hereto is a list of the names, addresses, and, where available, telephone numbers of the creditors holding the 30 largest unsecured claims (excluding insiders) against the Debtor.[2]

---

[2] The list of creditors reflects the thirty largest creditors of the Company on a consolidated basis, including non-debtors. A list reflecting the thirty largest unsecured creditors of the Debtor will be filed as soon as it is available.

34. Due to the size and complexity of its operations, and the relatively short time that the Debtor had to prepare to file its chapter 11 case, the Debtor is unable to provide the balance of the information required by Local Rules 1007-2(a) and 1007-2(b). The Debtor's business is global in nature with over 25,000 employees and hundreds of legal entities organized under domestic and foreign laws operating in numerous markets. That this case is large and complex is an understatement. Moreover, such information is otherwise publicly available or of little relevance.

35. As described above, the Debtor had only a few days to prepare for this filing. Given the size and complexity of the Debtor's global operations, the preparation of such lists requires weeks, not days. The Debtor requests that the Court waive the obligation for the Debtor to file the additional schedules as provided by Local Bankruptcy Rule 1007-2(d).

36. The foregoing is true and correct to the best of my knowledge, information, and belief.

                                                      /s/ Ian T. Lowitt
                                                      Ian T. Lowitt

Sworn to and subscribed before me, a notary public for the State of New York, County of New York, this 14th day of September, 2008.

                                                      /s/ John Ellsworth
                                                      Notary Public

John Ellsworth
Notary Public, State of New York
No. 01EL4995735
Qualified in New York County
Commission Expires June 6, 2010