## **Exhibit A**

Clearance Agreements

CLEARANCE AGREEMENT

Ladies and Gentlemen:

We agree to act as your non-exclusive clearance agent for securities transactions subject to the terms and conditions set forth below, and to any addenda which may be agreed upon, which shall constitute a part of this letter agreement, and to open and maintain a clearance account, as defined below.

1.   Securities.

The term "securities" shall include, without limitation, obligations of the United States Government and its agencies, bankers' acceptances, certificates of deposit, commercial paper, and such other certificated and uncertificated securities and other instruments as may be agreed upon by the parties hereto.

2.   Accounts.

We are hereby authorized to agree, and agree pursuant to your instructions to open and maintain a clearance account, which shall consist of one or more clearing accounts in which your Securities and funds will be credited for your benefit and will be segregated on our books and records and which we will hold as your custodian, free of our lien, claim or interest (the "Clearing Accounts"), one or more custody accounts in which your Securities and funds will be credited for your benefit and will be segregated on our books and records and which we will hold as your custodian, free of our lien, claim or interest (the "Custody Accounts"), one or more demand deposit accounts, and may also consist of one or more segregated accounts consisting of securities carried by you for the account of one or more of your customers as listed in Schedule E hereto, as amended from time to time by you subject to our approval, which shall not be unreasonably withheld (the "Segregated Accounts") (all of which accounts together are sometimes hereinafter referred to as the "Account"). You authorize us to debit, based upon your instructions, and credit all transactions to the Account daily.

3.   Authority.

We are hereby authorized, as your agent, and agree pursuant to your instructions, (a) to receive and transfer securities for any purpose whatsoever, including, without limitation, as a pledge of collateral; (b) to make payments and collections of monies; (c)

1

06/07/00

to permit you to make transfers between the Clearing Account(s),
Custody Account (s) and the Segregated Account(s) or other
accounts, it being understood that we shall only permit transfers
from the Clearing Account (s) to the Custody Account (s) or
Segregated Account (s) to the extent that after such transfer we
remain fully collateralized; have been fully paid with respect to
any securities being transferred into the Segregated Account(s) or
other accounts; and (d) to transfer securities which we hold for
you as such securities may be needed to secure loans with such
entities as you may specify; (e) to receive from such entities as
you may specify securities held as collateral for loans against
the payment of funds required to obtain the release of your
collateral; (f) to perform any other act incidental or necessary
to the performance of the above.

        In connection with the performance of our services hereunder,
we hereby agree to provide you with access to,   (i) to the extent
you provide us with a location, ten dedicated terminals and one
high speed printer, and (ii) to the extent we provide a location,
terminals and one high speed printer at a New York City location,
to be shared with our other clearance customers, giving due
consideration to your volume of business, at all times on and
after the conversion date, such terminals in both (i) and (ii) to
be connected to a securities transfer system and available to you
in the event of Lehman Brothers, regional or other system outage.
At least once each calendar year, we and you, at our respective
expense, shall jointly participate in disaster recovery testing,
pursuant to a plan to be mutually agreed upon.

        4.    Payment and Delivery.

        (a)    In the event we have no other reasonable choice we
agree to accept Fed Funds checks as payment if received prior
to 3:00 p.m. New York time, whether certified or not, as the
equivalent of cash and all risks of collectability and credit
responsibility with respect to such checks shall be borne by
you alone. We may accept as correct your specification of the
net proceeds to be paid or collected for any securities, and
we shall have no obligation to verify your computation of
such amount.

        (b)    When we are instructed to deliver physical
securities against payment, delivery of the securities and
the receipt of payment may not be completed simultaneously.
Subject to our obligation to attempt to collect payment and
performance of our obligations hereunder; the risk of non-
receipt of payment shall be yours, we shall have no
responsibility or liability therefor, and your risk shall

                            2

                                            06/07/00

continue until final payment (as defined below) has been
received.

(c)   For all purposes of this Agreement, payment with
respect to a transaction shall not be "final" until we have
received immediately available funds which under applicable
law are irreversible, which are not subject to any security
interest, levy, lien, or other encumbrance, and which funds
are specifically applicable, or are deemed by us to be
specifically applicable, to such transaction.   Any debit of
any account by us which creates an overdraft or, in the case
where securities have been delivered out from the Account,
which does not otherwise result in the receipt by us of
immediately available, irreversible and unencumbered funds,
shall not constitute final payment.

(d)   All credits to the Account in connection with tri-
party repurchase transactions and physical securities,
regardless of how characterized, are conditioned upon the
actual receipt of final payment and may be reversed to the
extent payment is not received.   Without limiting the
generality of the foregoing, in the event that we, as a
matter of bookkeeping convenience, credit the Clearing
Account with the proceeds from the sale, redemption or other
disposition of physical securities or in connection with tri-
party repurchase transactions prior to our actual receipt of
final payment therefor and notwithstanding that such
bookkeeping credits may also be reflected on our books, and
otherwise, as "immediately available" or "same day" funds or
by some similar characterization, all such credits shall be
conditioned upon our actual receipt of final payment and may
be reversed by us, after notice to you, to the extent that
such final payment is not received.   We may in our
discretion, but shall not be obligated to, permit you to use
any such funds prior to final payment.

(e)   Any and all securities which we may now or
hereafter hold in the Account, and which you may instruct us
to deliver against payment, may be delivered by us to the
party designated in such instructions against delivery to us
of the temporary receipt of such party in lieu of actual
payment.   We shall hold such temporary receipt until final
payment is received or the securities are returned to us for
your Account.   We agree to make all such deliveries in
accordance with operating procedures agreed upon from time to
time by you and us.

3

(f) With respect to any directions to receive securities at our account at another securities intermediary, we shall have no duty or responsibility, except upon special request, to advise you of non-receipt of, or take any steps to obtain delivery of, securities from brokers or other agents or other securities intermediaries either against payment or free of payment. It is understood that the Federal Reserve System or any depository used pursuant to this Agreement is not our agent and we are not responsible for any error made or loss caused by them or their employees or agents.

5.   Loans and Advances.

We may, solely at our discretion, permit you to use funds credited to the Account prior to final payment as contemplated by the second sentence of Section 4(d) hereof or otherwise advance funds to you prior to final payment. If we do permit you to use, or otherwise advance to you, such funds, you shall continue to bear the risk of non-receipt of final payment, and, to the extent that final payment for any securities delivered on any day is not received by the close of business on that day, you shall immediately upon demand reimburse us for the amount so used or advanced, plus interest thereon from that date at such reasonable rates as shall be determined by us. We are further authorized, with the receipt of instructions from you, to make other loans to you of either money or securities. In the event any Account maintained by you with us becomes overdrawn, we shall have the right, solely at our discretion, to lend you an amount equivalent to cover such overdraft. All loans, whether of money or securities, shall be payable on demand and shall bear interest at such reasonable rates as shall be determined by us. Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, with notice and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling.

6.   Listing of Securities.

(a) Business Records. We will make available to you, in accordance with the Performance Standards, as set forth in Schedule A, a daily listing of all securities held by us free or as collateral to secure any loans or advances of money or securities made by us to you. All listings supplied by us to you shall be conclusively presumed correct unless you notify us to the contrary by the close of business of the next

4

business day, except that this provision shall not apply in
the event (i) there is a communications failure between you
and us, or (ii) both parties hereto have made an error which
delays discovery of such error.  We shall maintain regular
business records documenting all instructions transmitted to
us in accordance with the terms of Section 7 hereof (or,
where applicable, Section 8 hereof) and any response by us.
Such records shall be determinative of the form, content and
time of all of your instructions and any response from us.
The record of each instruction and any response thereto shall
be retained by us for at least 45 days following the date of
the instruction.   Any claim against us for failure to
properly follow an instruction transmitted by you must be
made in writing and received by us within 45 days after the
date the instruction was received by us.

     (b)  Equipment. You shall make all site preparations
and provide all facilities on your premises necessary to
connect your computer system to our computer system.  In this
regard, you shall use the equipment, communications lines and
communications protocol identified in Schedule G.  Certain of
the equipment identified in Schedule G shall be located on
our premises and operated by us.  We shall be responsible for
the preparation of our own site and for the use of the
communications protocol identified in Schedule G.

7.    Instructions.

     Other than as specifically set forth herein, you and we have
agreed to act in accordance with and comply strictly with the
Performance Standards set forth in Schedule A hereto (the
"Performance Standards") and security procedures and to act upon
any instructions given in accordance therewith.  You have
authorized us to accept instructions from you via the following
means: (i) CPU, (ii) your on-line terminal, (iii) our on-line
terminal, (iv) magnetic tape, (v) telephone, and (vi) messenger or
fax; provided, however, that we shall only accept instructions via
method (iii) above if we mutually agree that methods (i) and (ii)
are not available, we shall only accept instructions via method
(iv) above if we mutually agree that methods (i), (ii) and (iii)
are not available, via (v) or (vi) provided (i), (ii), (iii) and
(iv) are not available. Such instructions, other than telephone,
messenger, or fax instructions, may be transmitted without two
manual signatures of authorized individuals, as set forth on
Schedule F hereto (each an "Authorized Individual").  We hereby
agree to act upon, execute and perform, and shall be protected in
acting upon, any instruction or request (written, electronic or
oral) and any notice, waiver, consent, receipt or other document

5

06/07/00

which we believe in good faith to be genuine and to have been
given by an Authorized Individual in accordance herewith and with
the Performance Standards and security procedures, as applicable.
When instructions are given orally or in writing, we will confirm
these instructions before acting on said instructions with a
representative designated by you as a confirming representative on
Schedule F hereto (each a "Confirming Representative"). In
addition, you will confirm any oral instructions to us in writing
with two authorized signers or electronically by the close of
business on the day on which they are given. The oral
instructions as understood by us will be deemed to be the
controlling and such proper instructions, unless you are able to
show such instructions were misunderstood by us. If we receive a
subsequent conflicting written or electronic instruction, we shall
be able to rely on the oral instruction as understood by us and we
will notify you promptly. When instructions are received via
magnetic tape, the magnetic tape is to be delivered to a vice
president or higher in our Dealer's Clearance department as listed
on Schedule C, we will confirm receipt of such tape with a
Confirming Representative before acting on the instructions
contained therein.

If you comply with the provisions of this Agreement and the
documentation referred to herein relating to delivery of
instructions, we guarantee delivery of Securities with respect to
each trade to which your instructions relate to within two minutes
after which instructions have been delivered and received for the
Account. If we fail to properly complete a delivery as provided
in this Section or in the Performance Standards after receiving
proper and timely instructions therein, we shall extend to you an
interest free overnight loan if, as a result of such failure, you
elect to finance the Securities. The principal amount of such
loan shall be less than or equal to the full net dollar amount
that you would have received from your counterparty if delivery
had occurred on the related trade.

Notwithstanding the foregoing paragraph, to benefit from the
guaranties contained in this Section and the Performance
Standards, computer instructions must be completed on each
settlement day no later than two minutes prior to the established
deadline of the book-entry wire system maintained by the Federal
Reserve Bank of New York for that settlement day.

In the event of any dispute between or conflicting claims by
you and any other person or persons with respect to the securities
and other property credited to or deposited in the Account, we
shall be entitled, in our best judgement, at our option, to refuse
to comply with any and all claims, demands or instructions with

6

06/07/00

respect to such securities and other property so long as such
dispute or conflict shall continue, and we shall not be or become
liable in any way for our reasonable failure or refusal to comply
with such conflicting claims, demands or instructions.  We shall
be entitled to refuse to act until either (i) such conflicting or
adverse claims or demands shall have been (A) finally determined
in a court of competent jurisdiction or (B) settled by agreement
between the conflicting parties and we shall have received
evidence in writing, satisfactory to us of such agreement, or (ii)
we shall have received security or an indemnity satisfactory to us
(from a party whose creditworthiness is satisfactory to us)
sufficient to keep us harmless against any and all loss, liability
or reasonable expense which we may incur by reason of our acting;
provided however, that to the extent we are not prohibited by law
or court order, we shall allow you to substitute cash or other
securities for the securities with respect to which there is a
conflict.

        8.    Remote Clearance.

        (a)    Where    applicable,    in    addition    to    giving
instructions as provided in the Agreement, you may give us
instructions by inputting instructions directly via a remote
terminal located on your premises linked to our premises
("Remote Clearance").  Remote Clearance shall be made only in
conformity with any operating manual as supplemented by the
Performance Standards and security procedures.  Subject to
prior consent from you with respect to changes relating to
the Performance Standards and security procedures, we reserve
the right to prescribe, and make changes in, rules of
operation, accessibility periods, authentication procedures,
type of terminal equipment, type of system equipment and
system programming with respect to Remote Clearance as we
deem necessary and appropriate.    Fees relating to Remote
Clearance may be set forth on Schedule D hereto, which may be
changed prospectively from time to time upon 30 days' advance
notice from us to you.

        (b)    Equipment.   The remote terminal shall be provided
at your expense and must be compatible with our system.   You
shall be solely liable for maintenance of such terminal and
for any interruption of Remote Clearance due to any problem
associated with the terminal not caused solely and directly
by us or within our control.   Additional terminals may be
added only upon our prior written consent.

        (c)    Training and Manuals.   We shall provide training
on the Remote Clearance system as we determine to be

                                7

                                                        06/07/00

#0245 P.008 /043

necessary. We shall provide to you an operating manual and notify you of any changes thereto.

    (d)   Instructions.

       (i)   In order to complete same-day settlements, we must receive timely Remote Clearance instructions in accordance with the Performance Standards on the date of settlement.

       (ii) It is your obligation and responsibility of all the parties hereto to complete all instructions in accordance with the procedures prescribed by us from time to time concerning information required, manner of delivery and timeliness of delivery.

       (iii) It is your obligation and responsibility to maintain a backup copy of all instructions given to us via Remote Clearance during the preceding 24 hours and to deliver such copies to us promptly upon our request.

       (iv) In the event we are unable to effect any instruction via Remote Clearance, we shall be authorized to receive such instruction via alternate means, in accordance with Section 7 hereof including without limitation, telephone, telecopy, or hand delivery, as may be specified by us as suitable under the circumstances.

       (v)  The security procedure for instructions issued to you via CPU link is encryption. To verify the authenticity of instructions issued via CPU link, we shall decrypt instructions issued to us in your name using encryption equipment to be located on our premises and identified in Schedule G, which shall be paired with encryption equipment to be located on your premises and identified in Schedule G. The parties agree that encryption is a commercially reasonable security procedure. We will not execute instructions received via CPU link which are not encrypted and decrypted as described herein unless approved in writing by two Confirming Representatives. You shall be responsible for access to and the security of your computer system and your transmission facilities. We shall be responsible for access to and the security of our computer system and our transmission facilities.

06/07/00

(vi) We shall take such reasonable precautions as we deem appropriate to prevent the loss, destruction or improper access to your information and data transmitted via Remote Clearance in accordance with the security procedures listed on Schedule H hereto (the "Security Procedures"). The parties agree that the Security Procedures are commercially reasonable security procedures. You assume the entire risk and responsibility for the fraudulent or unauthorized use of the hardware and the software on your premises, and you shall implement such security devices and /or procedures, as you deem necessary and appropriate. We may rely upon the genuineness of all information and data communicated to us over the Remote Clearance system and our records, kept in the normal course of business, shall be final and conclusive with respect to all matters involving such information and data provided we have acted in good faith and without negligence and in compliance with the Security Procedures.

(vii) The security procedure with respect to magnetic tape, oral and written instructions are as set forth in Section 7 hereof. The parties agree that the procedures in Schedule H are commercially reasonable security procedures.

(e) Confidentiality and Non-Disclosure. Except as required by applicable law, regulations or judicial or regulatory process, each of the parties hereto shall exercise reasonable care to, hold in confidence and not use for its own benefit or disclose to third parties information which is obtained or received by one of us from the other and which such party has reason to know is confidential or proprietary to the other, each party agreeing to use a standard of care at least equal to the care used to protect its own confidential information. It is agreed that all information pertaining to the performance or evaluation of Remote Clearance is confidential and proprietary to us, including without limitation any manuals or other training or descriptive material supplied to you.

9.    Tri-Party Custodian Services.

Subject to the terms and conditions hereof and effective on the conversion date, you hereby appoint and we agree to act as non-exclusive custodian with respect to your tri-party custody transactions. We agree to perform the services as set forth in

9

the form of tri-party custody agreement attached hereto as Exhibit
A (or other forms of tri-party Custody Agreement which may be
agreed upon from time to time) and act in accordance with and
strictly comply with the performance standards set forth on
Schedule B hereto. We, as non-exclusive tri-party custodian,
shall accept from you any securities permitted under the terms of
the relevant tri-party custody agreement, which securities may
include physical securities and securities held at the Federal
Reserve Bank of New York, DTC, PTC, First Chicago Clearing Center,
and any other depository or clearing corporation as we may
mutually agree upon. With respect to tri-party custody
agreements, we are authorized to accept instructions from you via
the means set forth in Section 7 hereof, without regard to the
priority of means itemized therein, and without having to contact
a Confirming Representative.

We hereby agree to enter into tri-party custody agreements
substantially in the form of Exhibit A hereto with such of your
customers which do not have existing tri-party custody contracts
in furtherance of their respective obligations hereunder, subject
to such modifications as we may mutually agreed upon.

Notwithstanding anything herein to the contrary, to the extent
of any conflict between this Agreement and any tri-party custody
agreement, whether now or hereafter existing, the terms of the
tri-party custody agreement will govern.

    10.  Representations and Warranties.

    You represent and warrant that (a) upon our making any
advance with respect to any securities delivered to us for your
Account (i) you will own such securities free of any security
interests, liens, claims and encumbrances (other than the security
interest granted to us hereunder) and have the right to
hypothecate or re-hypothecate such securities; (ii) any transfer
of such securities by you for value is effective and rightful;
(iii) such securities are genuine and have not been materially
altered; (iv) you know of nothing which might impair the validity
or transferability of such securities; and (v) such securities are
freely transferable on the books of the issuer in the form
delivered to us; (b) no delivery of securities by you to us, no
instruction of yours with respect to such securities and no loan
or advance secured by such securities will contravene Rule 8c-1,
Rule 15c2-1 or Rule 15c3-3 under the Securities Exchange Act of
1934 and a request by you to transfer securities from a Segregated
Account to the Clearing Accounts shall, with respect to such
securities, be deemed to be a representation and warranty to that
effect;

                               10

                                              06/07/00

Each of the parties hereto makes the following continuing respective representations and warranties:

(a)   You and we are duly organized and existing under the laws of the jurisdiction of our respective organizations with full power and authority to execute and deliver this Agreement and to perform all the duties and obligations to be performed by either of us hereunder.

(b)   This Agreement and the performance of all transactions contemplated hereunder have been duly authorized by you and us in accordance with all requisite action. This Agreement has been duly executed and delivered to you and us and constitutes a valid legal and binding obligation of you and us, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law.

(c)   The execution, delivery and performance of the Agreement by us does not and will not conflict with or result in a breach, violation of or constitute a default under any agreement, indenture, mortgage or instrument to which we are a party or are bound or to which any of our property is subject nor will such action result in any violation of the provisions of our charter or bylaws or any law, rule, regulation, judgment, order or decree binding on us.

(d)   No consent approval, authorization or order of, or filing, registration or qualification with, any authority is required for the execution, delivery and performance of the Agreement, except for those which have been obtained or made and which continue to be in full force and effect.

(e)   You and we are in material compliance with, and during the term of this Agreement will remain in material compliance with, all applicable laws, rules and regulations of any government, governmental agency or self-regulatory organization having authority or jurisdiction over you and us, respectively, or any transaction or other matter which may involve our performing services for or extending credit to or for you.

(f)   So long as such securities held by us are not, in fact, in a Segregated Account you shall not take any action with

11

06/07/00

respect to such securities which shall in any way affect our security interest therein; (i) you have, and will continue to have during the term of this Agreement, the authority to engage in and perform the transactions contemplated by this Agreement and with respect to such transactions will be in compliance with all applicable laws, rules and regulations (including but not limited to those of any self-regulatory organization having authority or jurisdiction over you); (ii) all credit extended to you hereunder shall be used by you solely and exclusively to facilitate the prompt clearance or settlement of the purchase or sale of readily marketable securities, and each such credit shall, at the time such credit is extended, be secured by readily marketable securities having a market value or principal face amount (whichever shall be less) of not less than the principal amount of such credit, and shall, unless payment thereof shall have previously been demanded in accordance with the provisions of Section 5, be repaid upon the settlement of such purchase or sale; and

(g) Custodian shall maintain and provide evidence of insurance protection for Lehman property and property of Lehman's customers consisting of a Blanket Bond with Fidelity, Premises, Transit, Forgery and Counterfeit coverage's: Computer Crime coverage and Professional Liability coverage. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies acceptable to Lehman.

11. Liens.

In consideration of any advances or loans we may extend to you pursuant to this Agreement (hereinafter the "Obligations"), you hereby:

(a) Grant to us a continuing security interest in, lien upon and right of set-off as to (i) the balance of every existing or future deposit, and account which you, now or in the future, maintain with us (except for any Segregated Account containing customer securities or funds) all securities, securities entitlement, instruments, financial assets and other investment property (except for customer securities or funds held in a Segregated Account), now or in the future, maintained or held in, or credited or relating to, any such securities accounts, or in which you have any right, title or interest that is in our possession or

12

control; and all income, profits, collections, distributions
and other proceeds, (both cash and non-cash and including
insurance proceeds thereof) replacements and substitutions of
any thereof (all of the foregoing being hereinafter
collectively referred to as the "Collateral"). The term
"investment property" shall have the meaning set forth in
Section 9-115 of the Uniform Commercial Code as adopted by
the State of New York (the "Code"). The terms securities
account, securities entitlement and financial assets shall
have the meanings set forth in Article 8 of the Code.
"Financial assets" shall consist of the property from time to
time contained in or credited to any of the Clearing
Accounts.

(b)   Agree that if any Obligations are outstanding at
the end of the business day (after Fed wire close), we are
authorized, with notice to you, on a best efforts basis, to
carry any Collateral in our general account(s) and to sell,
transfer, assign, pledge and re-pledge, and hypothecate and
re-hypothecate any Collateral separately or together with
securities or other property of any other customer(s) (except
for customer securities held in a Segregated Account),
without retaining in our possession or control a like amount
of similar securities or other property for delivery, to the
extent permitted by Rule 8c-1, Rule 15c2-1 and Rule 15c3-3
under the Securities Exchange Act of 1934.

(c)   Agree that if repayment of any advance or loan is
not made, or if any deposit relating to an advance or loan is
not received by us in accordance with the terms hereof, we
shall have the rights and remedies of a secured party under
the Code including the right to sell any of the Collateral on
any securities market, or at public or private sale in a
commercially reasonable manner, which will include notice to
you or prior tender, demand or call upon you. Subject to the
Code, we may purchase all or any part of the Collateral free
from any redemption right, but you will remain liable for any
deficiency, including reasonable brokerage fee commissions.

(d)   Agree that notwithstanding anything to the
contrary contained in this Agreement (i) all securities
constituting any part of the Collateral shall be in our
"possession" and under our "control" pursuant to Section 8-
106(e) of the Code, and (ii) we shall not be required to act
in accordance with your instructions (including, but not
limited to, any instruction to transfer a security to or into
a Segregated Account or any other account), and we shall not
be your agent with respect to any financial asset

13

constituting any part of the Collateral unless and until we
have received full and final payment for the Obligations or
we shall have determined, in our sole reasonable discretion,
that the payment and performance of your Obligations will be
adequately secured after giving effect to such instruction.

(e) Agree that nothing contained in this Section shall
be deemed to be inconsistent with, or to deny to us, our
status as a bona fide purchaser of all or any part of the
Collateral, and, in addition to whatever rights we may have
as such a purchaser, and not by way of limitation of such
rights, we shall have all the rights and remedies of a
secured party under applicable law.

(f) That Chase is your securities intermediary (as such
term is defined in Article 8 of the Code) with respect to any
securities accounts that you maintain with us, including
without limitation, the Clearing Accounts, that Chase has a
priority lien over all property maintained in or credited to
such accounts pursuant to Section 8-106(e) of the Code
securing the Obligations. Nothing contained in the Pledge
and Security Agreements or in any other document or agreement
between us relating to extensions of credit or our respective
rights and obligations in respect thereof shall negate, limit
or impair the security interest automatically granted to
Chase, as your "securities intermediary" pursuant to Section
9-116 of the Code or the priority accorded such security
interest by Section 8-106(e) of the Code.

(g) In addition to the rights and remedies provided to
us pursuant to the Agreement, we shall continue to have all
rights and remedies otherwise available to us under
applicable law, including the rights afforded to financial
intermediaries and secured creditors under the Uniform
Commercial Code.

12. Acting as Agent.

You hereby irrevocably appoint us as your true and lawful
agent and attorney-in-fact, with full power in your name and on
your behalf, with respect to the execution of all instruments and
the taking of all action necessary or desirable to effectuate the
rights and remedies provided hereunder and by applicable law. We
are acting under this Agreement only as agent, and are not
responsible or liable in any way for the genuineness or validity
of any security or instrument received, delivered or held by us
absent gross and manifest defect apparent on the face of the
certificate held by us in physical form. Notwithstanding the

14

06/07/00

foregoing, the parties agree that we shall not be deemed to be
acting as your agent with respect to executing your payment
orders.

    13.  Limited Liability.

    Notwithstanding anything to the contrary contained herein, we
shall not be liable for any error of judgment or for any act done
or omitted by us in good faith, or for any mistake of fact or law,
except for our own negligence or willful misconduct or the breach
of this Agreement for reasons other than those stated in this
Section 13.  Without limiting the generality of the foregoing, we
shall not be liable for any delay or failure to act as may be
required hereunder (including without limitation, any failure to
execute or resulting "DK's") when such delay or failure is due to
any of the following: an act of God; interruption, malfunction or
suspension of any communication or wire facilities or
services(other than those under our control); labor difficulties;
acts or omissions of third parties; war; emergency conditions;
equipment or mechanical failure (including computer or software
failure) (other than those under our control); delays or
processing delays on the book-entry wire system maintained by the
Federal Reserve Bank of New York; your failure to perform any of
your Obligations hereunder, including without limitation, your
Obligations set forth in Section 8  (d)(i), (ii) and (iii) hereof;
or other circumstances beyond our control, provided we exercise
such diligence as the circumstances may reasonably require,
provided that Chase Manhattan Bank has used due care and has
exercised due diligence in anticipating such event and has taken
all reasonable actions as may be necessary to respond to, correct
and circumvent the effects of such event on Chase Manhattan Bank's
performance of its duties and responsibilities hereunder.  IN NO
EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE OR
CONSEQUENTIAL DAMAGES, WHETHER OR NOT WE HAVE BEEN ADVISED AS TO
THE POSSIBILITY THEREOF AND REGARDLESS OF THE FORM OF ACTION.

    14.  No Duty to Investigate or Advise.

    You acknowledge that you are, and will continue to be, solely
responsible for making your own independent appraisal of and
investigation into the financial condition and creditworthiness of
each person to whom or for whose account you direct us to deliver
securities, or to whom you request us to make payment and you
confirm to us that we are under no obligation to you to assess or
review the financial condition or creditworthiness of any such
person or to advise you as to the results of any such appraisal or
investigation we may have conducted on our own or of any adverse
information concerning any such person that may in any way have

                                15

come to our attention.  Furthermore, you acknowledge that we are
under no duty to supervise, recommend or advise you relative to
the investment, purchase, sale, retention or other disposition of
any property held hereunder.

15.  Fees.

    Our fees for services rendered in connection with the service
provided hereunder are as set forth on Schedule D hereto and shall
be invoiced to you to pay such invoice daily, for the prior day's
activity.  You agree to pay such invoice by the close of business
on the day received.  In the event we do not receive payment in
immediately available funds by the end of day, we are authorized
to charge your Account, with the amount of such fees, and if the
Account does not include sufficient funds to cover the amount of
such fees, you will pay such amount upon demand.  All invoices
shall be conclusively presumed correct unless you notify us to the
contrary, in writing, within 30 days of receipt of any invoice
containing a discrepancy.

    Our fees for services rendered in connection with the service
provided hereunder are set forth on Schedule D hereto and may not
be increased by us during the term of this Agreement.  No other
compensation or reimbursement of expense shall be payable to us
except as specifically set forth in this Agreement, other than
(i) out of pocket expenses up to $1000 month, incurred by us in
connection with the services provided hereunder, and (ii) out of
pocket expenses that arise from customized or specialized
services provided to certain customers with the prior written
approval of two Confirming Representatives, except that we may
charge you for any new or increased external charge (e.g. DTC
charges) or expense incurred by us in performing this Agreement.
We shall notify you in the event of any such charges or expenses
promptly after the same are incurred by us and, to the extent
practicable, reasonably in advance of the same having been
incurred by us.  It is understood that such notices shall be one-
time notices for each type of charge or expense.

16.  Indemnification.

    Except where we are negligent or have engaged in willful
misconduct, or have breached this Agreement for reasons other than
those listed in Section 12 hereof, you will indemnify us and hold
us harmless against any and all losses, claims, damages,
liabilities or actions to which we may become subject, and
reimburse us for any expenses (including reasonable attorneys'
fees and expenses) incurred by us in connection therewith, insofar
as such losses, claims, damages, liabilities or actions arise out

of or are based upon or are in any way related to this Agreement. Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct. This indemnification obligation shall survive the termination of this Agreement.

We shall be responsible for performing the services as provided herein. We shall be liable to you for direct damages sustained by you to the extent such damages result from our negligence or malfeasance or our breach of any representations, warranties or agreements contained in this Agreement for reasons other than set forth in Section 13 hereof, including the terms of any Schedule for Exhibit of failure of our equipment or software. Except as otherwise expressly provided herein, we shall not be liable to you or any third person for any loss, expense or damage suffered by reason of delay or other interruption in receiving Securities or monies through the Federal Reserve's Book Entry or Wire System or from any clearing agent, issuer, broker, dealer or other third party. We shall not be liable for failures to execute or "DK's" due to incorrect, incomplete or untimely instructions or any other failure of you to provide proper instructions, as required by this Agreement.

17. Termination.

The initial term of this Agreement shall commence on the date hereof and shall end on October 7, 2002. If, by the expiration of the initial term the parties have not entered into a written agreement extending this Agreement for an additional term, this Agreement shall be deemed automatically renewed for an additional one year period on the terms and conditions hereof and for the fees set forth herein. Notwithstanding the foregoing, in the event that we cease to perform the services which are the subject matter of this Agreement for substantially all of our customers, we may terminate this Agreement, provided that we have given you written notice of such termination at least 12 months prior to the effective date of termination. Notwithstanding the foregoing, (i) this Agreement may be terminated by either party, as the case may be, upon written notice if the other files an application for, or consents to, the appointment of any receiver, trustee, custodian, liquidator or similar person for all or any portion of its property, files a petition seeking a reorganization of its financial affairs or taking advantage of any bankruptcy reorganization, insolvency, readjustment or debt, dissolution or liquidation law or statute, or if it takes any corporate action for the purpose of effecting any of the foregoing, (ii) this

17

06/07/00

Agreement may be terminated by either party by written notice to
the other if such other party has failed to comply with any
material provision of this Agreement which failure shall continue
for (30) days after notice of such failure is delivered by the
non-breaching party to the breaching party, but only if the same
has not been cured in all material respects, (iii) this Agreement
may be terminated by either party by written notice to the other
party if any representation or warranty made in this Agreement by
such other party shall have proven to have been at the time made,
false or misleading in any material respect, and (iv) this
Agreement may be terminated by you upon thirty (30) days written
notice to us in the event we charge you for any new or increased
external charge or expense as permitted herein and you reasonably
believe such charge to be excessive, unless we rescind such charge
upon written notice to you prior to the expiration of such thirty
(30) day period.

Upon termination of this Agreement and provided that all the
Obligations have been paid in full, we shall transfer the
Collateral and other property in the Account as follows:

(a)  If not less than five (5) calendar days' prior to
the termination date, you shall have given us written
instructions for the delivery of such securities and
property, including instruction regarding method of delivery
and destination then in accordance with such instructions;

(b)  If no such instructions have been given by you,
then on the termination date, with respect to physical
securities, we shall deliver such physical securities and
other property to you at the address provided below, by
armored car at your reasonable expense, and we may obtain
special insurance policies covering such deliveries and you
will upon demand reimburse us for all reasonable premiums
payable for such policies.    With respect to Fedwire
book-entry securities, we may establish a custody account and
hold such securities in escrow for the benefit of and at your
expense.  Any and all cash may be delivered by Fed wire.

18.  <u>Reports and Certificates</u>.

(a)  Unless otherwise instructed by you in writing, we
may assume that we are exempt from filing on your behalf any
certificates of ownership or other reports which are, or may
hereafter be, required by any regulation of the Internal
Revenue Service or other authority of the United States, so
far as the same are required in connection with any property
which now or may hereafter be in our possession hereunder.

18

06/07/00

In the event that we are requested to prepare such reports, your status is to be described as a bank, trust company, financial institution, insurance company, corporation, partnership or otherwise as the case may be. You agree to notify us immediately in writing of any change in such status.

(b)  Whenever it becomes advisable to do so, we are authorized to exchange temporary for definitive certificates, and old certificates for new or overstamped certificates evidencing a change therein.

19.  Notice.

All notices or other communications required by this Agreement to be in writing shall be sufficiently given if mailed by registered mail, postage prepaid, or delivered:

(a)  to us at 4 New York Plaza, New York, New York 10004-2477, Attention:   Brokers and Dealers Clearance Department,

(b)  to you at Lehman Brothers, 101 Hudson Street, 31st floor, Treasury Operations, Jersey City, New Jersey 07302, Attention: Kathryn Bopp Flynn, Senior Vice President or to any other address or addresses of which written notice shall have been given in the foregoing manner by the respective parties.

20.  Assignments.

This Agreement may not be assigned by either party hereto without the prior written consent of the other.

21.  Captions.

The captions of the various sections and subsections of this Agreement have been inserted only for the purposes of convenience, and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

22.  Entire Agreement.

This Agreement together with the Credit Letter among the parties hereto, and the Funds Transfer Agreement among the parties hereto, contains the final, complete and exclusive understanding of, and supersedes all prior or contemporaneous, oral or written, agreements, understandings, representations and negotiations

06/07/00

between the parties relating to the subject matter of this Agreement. No amendment of any provision of this Agreement shall be enforceable against us unless in writing and signed by one of our authorized officers. Notwithstanding the foregoing, Schedule F may only be amended in writing executed by two individuals listed as Confirming Representatives on the Schedule F in effect directly before any such amendment. In the event of any conflict between this Agreement and any confirmation, instruction, custodian agreement or any other agreement between the parties, this Agreement shall control except as set forth in Section 8 hereof.

23. Severability.

If any provision of this Agreement shall be unenforceable, illegal or invalid, it shall not affect the validity of the remaining provisions of this Agreement.

24. Governing Law.

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of law principles thereof.

Very truly yours,

The Chase Manhattan Bank

By: _____

Name: ____ ANTHONY ISOLA
VICE PRESIDENT

Title: _____

Dated: ____ 6/15/00 _____

AGREED AND ACCEPTED:

Lehman Brothers Inc.

By: Kathryn Bopp Flynn

Name: KATHRYN Bopp FLYNN

Title: Senior Vice President / ASST. Treasurer

Dated ____ 6/7/00 _____

20

06/07/00

## AMENDMENT TO CLEARANCE AGREEMENT

WHEREAS, Lehman Brothers Inc. (the "Customer") and JPMorgan Chase Bank, N.A. (formerly The Chase Manhattan Bank, the "Bank") have entered into that certain Clearance Agreement dated as of June 15, 2000 (the "Agreement"); and

WHEREAS, the Customer and Bank desire to amend the Agreement to add Lehman Commercial Paper Inc. (together with Lehman Brothers Inc., the "Customer") as an additional Customer under the Agreement;

WHEREAS, Customer and Bank desire to amend Section 2 of the Agreement; and

WHEREAS, Customer and Bank agree to the amendments to Section 2 and the addition of the additional Customer;

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.      The Agreement is hereby amended by adding Lehman Commercial Paper Inc. as an additional Customer;

2.      Section 2 of the Agreement is hereby deleted in its entirety and replaced with the following:

> 2.      Accounts.    We are hereby authorized to open and maintain a clearance account, which shall consist of one or more clearing accounts (the "Clearing Accounts"), one or more custody accounts (the "Custody Accounts"), one or more demand deposit accounts, and may also consist of one or more segregated accounts consisting of securities carried by you for the account of one or more of your customers as listed in the Agreement, as amended from time to time by you subject to our approval (the "Segregated Accounts") (all of which accounts together are sometimes hereinafter referred to as the "Account").    The Segregated Account shall be free of our lien, claim and interest.    You authorize us to debit and credit all transactions to the Clearing Accounts and Custody Accounts daily.

3.      All other terms and conditions of the Agreement are hereby ratified, and the Agreement shall, except as expressly modified herein, continue in full force and effect.

4.      This Amendment shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

375122:v1

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment as of the ____ day of May, 2008.

LEHMAN BROTHERS INC.

By:_____
Title:

LEHMAN COMMERCIAL PAPER INC.

By:_____
Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Title:

## AMENDMENT TO CLEARANCE AGREEMENT

WHEREAS, Lehman Brothers Inc. and Lehman Commercial Paper Inc. (the "Customer") and JPMorgan Chase Bank, N.A. (formerly The Chase Manhattan Bank, the "Bank") have entered into that certain Clearance Agreement dated as of June 15, 2000, as amended by the Amendment to Clearance Agreement dated as of May 30, 2008 (the "Agreement"); and

WHEREAS, the Customer and the Bank desire to amend the Agreement to add Lehman Brothers Holdings Inc., Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc., Lehman Brothers Commercial Bank and Lehman Brothers Japan Inc. as additional Customers under the Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.      The Agreement is hereby amended by adding Lehman Brothers Holdings Inc., Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc. and Lehman Brothers Japan Inc. as additional Customers.

2.      The Agreement is hereby amended by adding a new Section 2.5 which will read as follows: "Notwithstanding anything provided for herein to the contrary, except for the obligations of Lehman Brothers Holdings Inc. under the Guaranty and Security Agreement dated August 26, 2008, the obligations and liabilities of each of the Lehman entities which are a party to this Agreement under this Agreement shall be several and not joint and any security interest, lien, right of set-off or other collateral accommodation provided by any Lehman entity pursuant to this Agreement shall not be available to support the obligations and liabilities of any other Lehman entity pursuant to this Agreement."

3.      All other terms and conditions of the Agreement are hereby ratified, and the Agreement shall, except as expressly modified herein, continue in full force and effect.

4.      This Amendment shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment as of the 26th day of August, 2008.

LEHMAN BROTHERS INC.

By:_____

Name

Title:

**Paolo Tonucci**
**Managing Director**
Global Treasurer

LEHMAN COMMERCIAL PAPER INC.

By:_____

**Paolo Tonucci**
**Managing Director**
Global Treasurer

#377228v3-clean

Name:
Title:

LEHMAN BROTHERS HOLDINGS INC

By:_____

Name:           Paolo Tonucci
Title:          Managing Director
                Global Treasurer

LEHMAN     BROTHERS     INTERNATIONAL
(EUROPE)

By:_____

Name
Title:

LEHMAN BROTHERS OTC DERIVATIVES INC.

By:_____

Name:           Paolo Tonucci
Title:          Managing Director
                Global Treasurer

LEHMAN BROTHERS JAPAN INC.

By:_____

Name:
Title:

JPMORGAN CHASE BANK, N.A.

By:_____

Name:
Title:

Title:

LEHMAN BROTHERS HOLDINGS INC

By:_____
Name:
Title:

LEHMAN        BROTHERS        INTERNATIONAL
(EUROPE)

By:_____
Name
Title:

LEHMAN BROTHERS OTC DERIVATIVES INC.

By:_____
Name:
Title:

LEHMAN BROTHERS JAPAN INC.

By: _____
Name: GREGORY ITO
Title: AUTHORIZED SIGNATORY

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

Title:

LEHMAN BROTHERS HOLDINGS INC

By:_____
Name:
Title:

LEHMAN        BROTHERS        INTERNATIONAL
(EUROPE)

By:_____
Name:        EMIL UPTON
Title:        AUTHORISED SIGNATORY

LEHMAN BROTHERS OTC DERIVATIVES INC.

By:_____
Name:
Title:

LEHMAN BROTHERS JAPAN

By:_____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

Name:
Title:

LEHMAN BROTHERS HOLDINGS INC

By:_____
Name:
Title:

LEHMAN    BROTHERS    INTERNATIONAL
(EUROPE)

By:_____
Name
Title:

LEHMAN BROTHERS OTC DERIVATIVES INC.

By:_____
Name:
Title:

LEHMAN BROTHERS JAPAN INC.

By:_____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:    EDWARD J. CORRAL
Title:    MANAGING DIRECTOR

#377228v3-clean

## AMENDMENT TO CLEARANCE AGREEMENT

WHEREAS, Lehman Brothers Inc., Lehman Commercial Paper Inc., Lehman Brothers Holdings Inc., Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc., and Lehman Brothers Japan Inc. (the "Customer" or "Customers")) and JPMorgan Chase Bank, N.A. (formerly The Chase Manhattan Bank, the "Bank") have entered into that certain Clearance Agreement dated  as of June 15, 2000, as amended by the Amendment to Clearance Agreement dated as of May 30, 2008 and as subsequently amended by the Amendment to Clearance Agreement dated as of August 26, 2008 (the "Agreement"); and

WHEREAS, the Customer and the Bank desire to amend the Agreement as set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed as follows:

1.      The first three lines of Section 11 of the Clearance Agreement shall be deleted in their entirety and replaced with the following:

"In consideration of any credit, advances, loans or other financial accommodations we may extend to you and in order to induce us from time to time, in our discretion, to extend or continue to extend credit, clearing advances, clearing loans or other financial accommodations to any of the Customers and/or to transact business, trade or enter into derivative transactions with any of the Customers and as security for the payment of all of your existing or future indebtedness, obligations and liabilities of any kind to us including, without limitation, arising in connection with trades, derivative transactions, settlement of securities hereunder or any other business (hereinafter the "Obligations"), you hereby:"

2.      All other terms and conditions of the Agreement are hereby ratified, and the Agreement shall, except as expressly modified herein, continue in full force and effect.

3.      This Amendment shall be governed by and construed in accordance with the laws of the State of New York without giving effect to the conflict of laws principles thereof.

IN WITNESS WHEREOF, the parties have caused their duly authorized representatives to execute this Amendment as of the 9th day of September, 2008.

,

LEHMAN BROTHERS INC.

By:_____
Name
Title:

LEHMAN COMMERCIAL PAPER INC.

By:_____

Name:

Title:

#377228v3-clean

LEHMAN BROTHERS HOLDINGS INC

By:_____
Name:
Title:

LEHMAN        BROTHERS        INTERNATIONAL
(EUROPE)

By:_____
Name
Title:

LEHMAN BROTHERS OTC DERIVATIVES INC.

By:_____
Name:
Title:

LEHMAN BROTHERS JAPAN INC.

By:_____
Name:
Title:

JPMORGAN CHASE BANK, N.A.

By:_____
Name:
Title:

# CLEARANCE AGREEMENT

Ladies and Gentlemen:

We agree to act as your non-exclusive clearance agent for securities transactions subject to the terms and conditions set forth below, and to any addenda which may be agreed upon, which shall constitute a part of this letter agreement, and to open and maintain a clearance account, as defined below.

1.    Securities.

The term "securities" shall include, without limitation, obligations of the United States Government and its agencies, bankers acceptances, certificates of deposit, commercial paper, and such other certificated and uncertificated securities and other instruments as may be agreed upon by the parties hereto.

2.    Accounts.

We are hereby authorized to open and maintain a clearance account, which shall consist of one or more clearing accounts (the "Clearing Accounts"), one or more custody accounts (the "Custody Accounts"), one or more demand deposit accounts, and may also consist of one or more segregated accounts consisting of securities carried by you for the account of one or more of your customers as listed in the Agreement, as amended from time to time by you subject to our approval (the "Segregated Accounts") (all of which accounts together are sometimes hereinafter referred to as the "Account"). The Segregated Account shall be free of our lien, claim and interest. You authorize us to debit and credit all transactions to the Account daily.

3.    Authority.

We are hereby authorized, as your agent, and agree pursuant to your instructions, (a) to receive and transfer securities for any purpose whatsoever, including, without limitation, as a pledge of collateral; (b) to make payments and collections of monies; (c) to permit you to make transfers between the Clearing Account(s), Custody Account(s) and the Segregated Account(s) or other accounts, it being understood that we shall only permit transfers from the Clearing Account (s) to the Custody Account (s) or Segregated Account (s) to the extent that after such transfer we remain fully collateralized; have been fully paid with respect to any securities being transferred into the Segregated Account(s) or other accounts; and (d) to transfer securities which we hold for you as such securities may be needed to secure loans with such entities as you may specify; (e) to receive from such entities as you may specify securities held as collateral for loans against the payment of funds required to obtain the release of your collateral; (f) to perform any other act incidental or necessary to the performance of the above.

In connection with the performance of our services hereunder, we hereby agree to provide you with access to, (i) to the extent you provide us with a location, ten dedicated terminals and one high speed printer, and (ii) to the extent we provide a location, terminals and one high speed printer at a New York City location, to be shared with our other clearance customers, giving due consideration to your volume of business, at all times on and after the

conversion date, such terminals in both (i) and (ii) to be connected to a securities transfer system and available to you in the event of Lehman Brothers, regional or other system outage. At least once each calendar year, we and you, at our respective expense, shall jointly participate in disaster recovery testing, pursuant to a plan to be mutually agreed upon.

4.    <u>Payment and Delivery</u>.

(a)    In the event we have no other reasonable choice we agree to accept Fed Funds checks as payment if received prior to 3:00 p.m. New York time, whether certified or not, as the equivalent of cash and all risks of collectability and credit responsibility with respect to such checks shall be borne by you alone. We may accept as correct your specification of the net proceeds to be paid or collected for any securities, and we shall have no obligation to verify your computation of such amount.

(b)    When we are instructed to deliver physical securities against payment, delivery of the securities and the receipt of payment may not be completed simultaneously. Subject to our obligation to attempt to collect payment and performance of our obligations hereunder; the risk of non-receipt of payment shall be yours, we shall have no responsibility or liability therefor, and your risk shall continue until final payment (as defined below) has been received.

(c)    For all purposes of this Agreement, payment with respect to a transaction shall not be "final" until we have received immediately available funds which under applicable law are irreversible, which are not subject to any security interest, levy, lien or other encumbrance, and which funds are specifically applicable, or are deemed by us to be specifically applicable, to such transaction. Any debit of any account by us which creates an overdraft or, in the case where securities have been delivered out from the Account, which does not otherwise result in the receipt by us of immediately available, irreversible and unencumbered funds, shall not constitute final payment.

(d)    All credits to the Account in connection with tri-party repurchase transactions and physical securities, regardless of how characterized, are conditioned upon the actual receipt of final payment and may be reversed to the extent payment is not received. Without limiting the generality of the foregoing, in the event that we, as a matter of bookkeeping convenience, credit the Clearing Account with the proceeds from the sale, redemption or other disposition of physical securities or in connection with tri-party repurchase transactions prior to our actual receipt of final payment therefor and notwithstanding that such bookkeeping credits may also be reflected on our books, and otherwise, as "immediately available" or "same day" funds or by some similar characterization, all such credits shall be conditioned upon our actual receipt of final payment and may be reversed by us, after notice to you, to the extent that such final payment is not received. We may in our discretion, but shall not be obligated to, permit you to use any such funds prior to final payment.

(e)    Any and all securities which we may now or hereafter hold in the Account, and which you may instruct us to deliver against payment, may be delivered by us to the party designated in such instructions against delivery to us of the temporary receipt of such party in lieu of actual payment. We shall hold such temporary receipt until final payment is

2

received or the securities are returned to us for your Account. We agree to make all such deliveries in accordance with operating procedures agreed upon from time to time by you and us.

(f)    With respect to any directions to receive securities at our account at another securities intermediary, we shall have no duty or responsibility, except upon special request, to advise you of non-receipt of, or take any steps to obtain delivery of, securities from brokers or other agents or other securities intermediaries either against payment or free of payment. It is understood that the Federal Reserve System or any depository used pursuant to this Agreement is not our agent and we are not responsible for any error made or loss caused by them or their employees or agents.

5.    Loans and Advances.

We may, solely at our discretion, permit you to use funds credited to the Account prior to final payment as contemplated by the second sentence of Section 4(d) hereof or otherwise advance funds to you prior to final payment. If we do permit you to use, or otherwise advance to you, such funds, you shall continue to bear the risk of non-receipt of final payment, and, to the extent that final payment for any securities delivered on any day is not received by the close of business on that day, you shall immediately upon demand reimburse us for the amount, so used or advanced, plus interest thereon from that date at such reasonable rates as shall be determined by us. We are further authorized, with the receipt of instructions from you, to make other loans to you of either money or securities. In the event any Account maintained by you with us becomes overdrawn, we shall have the right, solely at our discretion, to lend you an amount equivalent to cover such overdraft. All loans, whether of money or securities, shall be payable on demand and shall bear interest at such reasonable rates as shall be determined by us. Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, with notice and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling.

6.    Listing of Securities.

(a)    Business Records. We will make available to you, in accordance with the Performance Standards, as set forth in Schedule A, a daily listing of all securities held by us free or as collateral to secure any loans or advances of money or securities made by us to you. All listings supplied by us to you shall be conclusively presumed correct unless you notify us to the contrary by the close of business of the next business day, except that this provision shall not apply in the event (i) there is a communications failure between you and us, or (ii) both parties hereto have made an error which delays discovery of such error. We shall maintain regular business records documenting all instructions transmitted to us in accordance with the terms of Section 7 hereof (or, where applicable, Section 8 hereof) and any response by us. Such records shall be determinative of the form, content and time of all of your instructions and any response from us. The record of each instruction and any response thereto shall be retained by us for at least 45 days following the date of the instruction. Any claim against us for failure to properly follow an instruction transmitted by you must be made in writing and received by us within 45 days after the date the instruction was received by us.

3

(b)    Equipment.  You shall make all site preparations and provide all facilities on your premises necessary to connect your computer system to our computer system.  In this regard, you shall use the equipment, communications lines and communications protocol identified in Schedule G.  Certain of the equipment identified in Schedule G shall be located on our premises and operated by us.  We shall be responsible for the preparation of our own site and for the use of the communications, protocol identified in Schedule G.

7.    Instructions.

Other than as specifically set forth herein, you and we have agreed to act in accordance with and comply strictly with the Performance Standards set forth in Schedule A hereto (the "Performance Standards") and security procedures and to act upon any instructions given in accordance therewith.  You have authorized us to accept instructions from you via the following means: (i) CPU, (ii) your on-line terminal, (iii) our on-line terminal, (iv) magnetic tape, (v) telephone, and (vi) messenger or fax; provided, however, that we shall only accept instructions via method (iii) above if we mutually agree that methods (i) and (ii) are not available, we shall only accept instructions via method (iv) above if we mutually agree that methods (i), (ii) and (iii) are not available, via (v) or (vi) provided (i), (ii), (iii) and (iv) are not available.  Such instructions, other than telephone, messenger, or fax instructions, may be transmitted without two manual signatures of authorized individuals, as set forth on Schedule F hereto (each an "Authorized Individual").  We hereby agree to act upon, execute and perform, and shall be protected in acting upon, any instruction or request (written, electronic or oral) and any notice, waiver, consent, receipt or other document which we believe in good faith to be genuine and to have been given by an Authorized Individual in accordance herewith and with the Performance Standards and security procedures, as applicable. When instructions are given orally or in writing, we will confirm these instructions before acting on said instructions with a representative designated by you as a confirming representative on Schedule F hereto (each a "Confirming Representative").  In addition, you will confirm any oral instructions to us in writing with two authorized signers or electronically by the close of business on the day on which they are given.  The oral instructions as understood by us will be deemed to be the controlling and such proper instructions, unless you are able to show such instructions were misunderstood by us.  If we receive a subsequent conflicting written or electronic instruction, we shall be able to rely on the oral instruction as understood by us and we will notify you promptly.  When instructions are received via magnetic tape, the magnetic tape is to be delivered to a vice president or higher in our Dealer's Clearance department as listed on Schedule C, we will confirm receipt of such tape with a Confirming Representative before acting on the instructions contained therein.

If you comply with the provisions of this Agreement and  the documentation referred to herein relating to delivery of instructions, we guarantee delivery of Securities with respect to each trade to which your instructions relate to within two minutes after which instructions have been delivered and received for the Account.  If we fail to properly complete a delivery as provided in this Section or in the Performance Standards after receiving proper and timely instructions therein, we shall extend to you an interest free overnight loan if, as a result of such failure, you elect to finance the Securities.  The principal amount of such loan shall be less than or equal to the full net dollar amount that you would have received from your counterparty if delivery had occurred on the related trade.

LIBNY/4745995.1

Notwithstanding the foregoing paragraph, to benefit from the guaranties contained in this Section and the Performance Standards, computer instructions must be completed on each settlement day no later than two minutes prior to the established deadline of the book-entry wire system maintained by the Federal Reserve Bank of New York for that settlement day.

In the event of any dispute between or conflicting claims by you and any other person or persons with respect to the securities and other property credited to or deposited in the Account, we shall be entitled, in our best judgment, at our option, to refuse to comply with any and all claims, demands or instructions with respect to such securities and other property so long as such dispute or conflict shall continue, and we shall not be or become liable in any way for our reasonable failure or refusal to comply with such conflicting claims, demands or instructions. We shall be entitled to refuse to act until either (i) such conflicting or adverse claims or demands shall have been (A) finally determined in a court of competent jurisdiction or (B) settled by agreement between the conflicting parties and we shall have received evidence in writing, satisfactory to us of such agreement, or (ii) we shall have received security or an indemnity satisfactory to us (from a party whose creditworthiness is satisfactory to us) sufficient to keep us harmless against any and all loss, liability or reasonable expense which we may incur by reason of our acting; provided however, that to the extent we are not prohibited by law or court order, we shall allow you to substitute cash or other securities for the securities with respect to which there is a conflict.

8.    Remote Clearance.

(a)    Where applicable, in addition to giving instructions as provided in the Agreement, you may give us instructions by inputting instructions directly via a remote terminal located on your premises linked to our premises ("Remote Clearance"). Remote Clearance shall be made only in conformity with any operating manual as supplemented by the Performance Standards and security procedures. Subject to prior consent from you with respect to changes relating to the Performance Standards and security procedures, we reserve the right to prescribe, and make changes in, rules of operation, accessibility periods, authentication procedures, type of terminal equipment, type of system equipment and system programming with respect to Remote Clearance as we deem necessary and appropriate. Fees relating to Remote Clearance may be set forth on Schedule D hereto, which may be changed prospectively from time to time upon 30 days' advance notice from us to you.

(b)    Equipment. The remote terminal shall be provided at your expense and must be compatible with our system. You shall be solely liable for maintenance of such terminal and for any interruption of Remote Clearance due to any problem associated with the terminal not caused solely and directly by us or within our control. Additional terminals may be added only upon our prior written consent.

(c)    Training and Manuals. We shall provide training on the Remote Clearance system as we determine to be necessary. We shall provide to you an operating manual and notify you of any changes thereto.

(d)    Instructions.

(i)      In order to complete same-day settlements, we must receive timely Remote Clearance instructions in accordance with the Performance Standards on the date of settlement.

(ii)     It is your obligation and responsibility of all the parties hereto to complete all instructions in accordance with the procedures prescribed by us from time to time concerning information required, manner of delivery and timeliness of delivery.

(iii)    It is your obligation and responsibility to maintain a backup copy of all instructions given to us via Remote Clearance during the preceding 24 hours and to deliver such copies to us promptly upon our request.

(iv)    In the event we are unable to effect any instruction via Remote Clearance, we shall be authorized to receive such instruction via alternate means, in accordance with Section 7 hereof including without limitation, telephone, telecopy, or hand delivery, as may be specified by us as suitable under the circumstances.

(v)     The security procedure for instructions issued to you via CPU link is encryption.  To verify the authenticity of instructions issued via CPU link, we shall decrypt instructions issued to us in your name using encryption equipment to be located on our premises and identified in Schedule G, which shall be paired with encryption equipment to be located on your premises and identified in Schedule G.  The parties agree that encryption is a commercially reasonable security procedure.  We will not execute instructions received via CPU link which are not encrypted and decrypted as described herein unless approved in writing by two Confirming Representatives.  You shall be responsible for access to and the security of your computer system and your transmission facilities.  We shall be responsible for access to and the security of our computer system and our transmission facilities.

(vi)    We shall take such reasonable precautions as we deem appropriate to prevent the loss, destruction or improper access to your information and data transmitted via Remote Clearance in accordance with the security procedures listed on Schedule H hereto (the "Security Procedures").  The parties agree that the Security Procedures are commercially reasonable security procedures.  You assume the entire risk and responsibility for the fraudulent or unauthorized use of the hardware and the software on your premises, and you shall implement such security devices and /or procedures, as you deem necessary and appropriate.  We may rely upon the genuineness of all information and data communicated to us over the Remote Clearance system and our records, kept in the normal course of business shall be final and conclusive with respect to all matters involving such information and data provided we have acted in good faith and without negligence and in compliance with the Security Procedures.

*

6

(vii)    The security procedure with respect to magnetic tape, oral and written instructions are as set forth in Section 7 hereof. The parties agree that the procedures in Schedule H are commercially reasonable security procedures.

(e)    Confidentiality and Non-Disclosure.  Except as required by applicable law, regulations or judicial or regulatory process, each of the parties hereto shall exercise reasonable care to, hold in confidence and not use for its own benefit or disclose to third parties information which is obtained or received by one of us from the other and which such party has reason to know is confidential or proprietary to the other, each party agreeing to use a standard of care at least equal to the care used to protect its own confidential information. It is agreed that all information pertaining to the performance or evaluation of Remote Clearance is confidential and proprietary to us, including without limitation any manuals or other training or descriptive material supplied to you.

9.    Tri-Party Custodian Services.

Subject to the terms and conditions hereof and effective on the conversion date, you hereby appoint and we agree to act as non-exclusive custodian with respect to your tri-party custody transactions.  We agree to perform the services as set forth in the form of tri-party custody agreement attached hereto as Exhibit A (or other forms of tri-party Custody Agreement which may be agreed upon from time to time) and act in accordance with and strictly comply with the performance standards set forth on Schedule B hereto. We, as non-exclusive tri-party custodian, shall accept from you any securities permitted under the terms of the relevant tri-party custody agreement, which securities may include physical securities and securities held at the Federal Reserve Bank of New York, DTC, PTC, First Chicago Clearing Center, and any other depository or clearing corporation as we may mutually agree upon.  With respect to tri-party custody agreements, we are authorized to accept instructions from you via the means set forth in Section 7 hereof, without regard to the priority of means itemized therein, and without having to contact a Confirming Representative.

We hereby agree to enter into tri-party custody agreements substantially in the form of Exhibit A hereto with such of your customers which do not have existing tri-party custody contracts in furtherance of their respective obligations hereunder, subject to such modifications as we may mutually agreed upon.

Notwithstanding anything herein to the contrary, to the extent of any conflict between this Agreement and any tri-party custody agreement, whether now or hereafter existing, the terms of the tri-party custody agreement will govern.

10.    Representations and Warranties.

You represent and warrant that (a) upon our making any advance with respect to any securities delivered to us for your Account (i) you will own such securities free of any security interests, liens, claims and encumbrances (other than the security interest granted to us hereunder) and have the right to hypothecate or re-hypothecate such securities; (ii) any transfer of such securities by you for value is effective and rightful; (iii) such securities are genuine and have not been materially altered; (iv) you know of nothing which might impair the validity or

7

transferability of such securities; and (v) such securities are freely transferable on the books of the issuer in the form delivered to us; (b) no delivery of securities by you to us, no instruction of yours with respect to such securities and no loan or advance secured by such securities will contravene Rule 8c-l, Rule 15c2-l or Rule 15c3-3 under the Securities Exchange Act of 1934 and a request by you to transfer securities from a Segregated Account to the Clearing Accounts shall, with respect to such securities, be deemed to be a representation and warranty to that effect;

Each of the parties hereto makes the following continuing respective representations and warranties:

      (a)    You and we are duly organized and existing under the laws of the jurisdiction of our respective organizations with full power and authority to execute and deliver this Agreement and to perform all the duties and obligations to be performed by either of us hereunder.

      (b)    This Agreement and the performance of all transactions contemplated hereunder have been duly authorized by you and us in accordance with all requisite action. This Agreement has been duly executed and delivered to you and us and constitutes a valid legal and binding obligation of you and us, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law.

      (c)    The execution, delivery and performance of the Agreement by us does not and will not conflict with or result in a breach, violation of or constitute a default under any agreement, indenture, mortgage or instrument to which we are a party or are bound or to which any of our property is subject nor will such action result in any violation of the provisions of our charter or bylaws or any law, rule, regulation, judgment, order or decree binding on us.

      (d)    No consent approval, authorization or order of, or filing, registration or qualification with, any authority is required for the execution, delivery and performance of the Agreement, except for those which, have been obtained or made and which continue to be in full force and effect.

      (e)    You and we are in material compliance with, and during the term of this Agreement will remain in material compliance with, all applicable laws, rules and regulations of any government, governmental agency or self-regulatory organization having authority or jurisdiction over you and us, respectively, or any transaction or other matter which may involve our performing services for or extending credit to or for you.

      (f)    So long as such securities held by us are not, in fact, in a Segregated Account you shall not take any action with respect to such securities which shall in any way affect our security interest therein; (i) you have, and will continue to have during the term of this Agreement, the authority to engage in and perform the transactions contemplated by this Agreement and with respect to such transactions will be in compliance with all applicable laws, rules and regulations (including but not limited to those of any self-regulatory organization having authority or jurisdiction over you); (ii) all credit extended to you hereunder shall be used

8

by you solely and exclusively to facilitate the prompt clearance or settlement of the purchase or sale of readily marketable securities, and each such credit shall, at the time such credit is extended, be secured by readily marketable securities having a market value or principal face amount (whichever shall be less) of not less than the principal amount of such credit, and shall, unless payment thereof shall have previously been demanded in accordance with the provisions of Section 5, be repaid upon the settlement of such purchase or sale; and

(g)     Custodian shall maintain and provide evidence of insurance protection for Lehman property and property of Lehman's customers consisting of a Blanket Bond with Fidelity, Premises, Transit, Forgery and Counterfeit coverage's: Computer Crime coverage and Professional Liability coverage. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies acceptable to Lehman.

11.     Liens.

In consideration of any advances or loans we may extend to you pursuant to this Agreement (hereinafter the : "Obligations"), you hereby:

(a)     Grant to us a continuing security interest in, lien upon and right of set-off as to (i) the balance of every existing or future deposit, and account which you, now or in the future, maintain with us (except for any Segregated Account containing customer securities or funds) all securities, securities entitlement, instruments, financial assets and other investment property (except for customer securities or funds held in a Segregated Account), now or in the future, maintained or held in, or credited or relating to, any such securities accounts, or in which you have any right, title or interest that is in our possession or control; and all income, profits, collections, distributions and other proceeds, (both cash and non-cash and including insurance proceeds thereof) replacements and substitutions of any thereof (all of the foregoing being hereinafter collectively referred to as the "Collateral"). The term "investment property" shall have the meaning set forth in Section 9-115 of the Uniform Commercial Code as adopted by the State of New York (the "Code"). The terms securities account, securities entitlement and financial assets shall have the meanings set forth in Article 8 of the Code. "Financial assets" shall consist of the property from time to time contained in or credited to any of the Clearing Accounts.

(b)     Agree that if any Obligations are outstanding at the end of the business day (after Fed wire close), we are authorized; with notice to you, on a best efforts basis, to carry any Collateral in our general account(s) and to sell, transfer, assign, pledge and re-pledge, and hypothecate and re-hypothecate any Collateral separately or together with securities or other property of any other customer(s) (except for customer securities held in a Segregated Account), without retaining in our possession or control a like amount of similar securities or other property for delivery, to the extent permitted by Rule 8c-l, Rule 15c2-l and Rule 15c3-3 under the Securities Exchange Act of 1934.

(c)     Agree that if repayment of any advance or loan is not made, or if any deposit relating to an advance or loan is not received by us in accordance with the terms hereof, we shall have the rights and remedies of a secured party under the Code including the right to

9

sell any of the Collateral on any securities market, or at public or private sale in a commercially reasonable manner, which will include notice to you or prior tender, demand or call upon you. Subject to the Code, we may purchase, all or any part of the Collateral free from any redemption right, but you will remain liable for any deficiency, including reasonable brokerage fee commissions.

(d)    Agree that notwithstanding anything to the contrary contained in this Agreement (i) all securities constituting any part of the Collateral shall be in our "possession" and under our "control" pursuant to Section 8-106(e) of the Code, and (ii) we shall not be required to act in accordance with your instructions (including, but not limited to, any instruction to transfer a security to or into a Segregated Account or any other account), and we shall not be your  agent with respect to any financial asset constituting any part of the Collateral unless and until we have received full and final payment for the Obligations or we shall have determined, in our sole reasonable discretion, that the payment and performance of your Obligations will be adequately secured after giving effect to such instruction.

(e)    Agree that nothing contained in this Section shall be deemed to be inconsistent with, or to deny to us, our status as a bona fide purchaser of all or any part of the Collateral, and, in addition to whatever rights we may have as such a purchaser, and not by way of limitation of such rights, we shall have all the rights and remedies of a secured party under applicable law.

(f)    That Chase is your securities intermediary (as such term is defined in Article 8 of the Code) with respect to any securities accounts that you maintain with us, including without limitation, the Clearing Accounts, that Chase has a priority lien over all property maintained in or credited to such accounts pursuant to Section 8-106 (e) of the Code securing the Obligations.  Nothing contained in the Pledge and Security Agreements or in any other document or agreement between us relating to extensions of credit or our respective rights and obligations in respect thereof shall negate, limit or impair the security interest automatically granted to Chase, as your "securities intermediary" pursuant to Section 9-116 of the Code or the priority accorded such security interest by Section 8-106 (e) of the Code.

(g)    In addition to the rights and remedies provided to us pursuant to the Agreement, we shall continue to have all rights and remedies otherwise available to us under applicable law, including the rights afforded to financial intermediaries and secured creditors under the Uniform Commercial Code.

12.    Acting as Agent.

You hereby irrevocably appoint us as your true and lawful agent and attorney-in-fact, with full power in your name and on your behalf, with respect to the execution of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law.  We are acting under this Agreement only as agent, and are not responsible or liable in any way for the genuineness or validity of any security or instrument received, delivered or held by us absent gross and manifest defect apparent on the face of the certificate held by us in physical form.  Notwithstanding the foregoing, the parties agree that we shall not be deemed to be acting as your agent with respect to executing your payment orders.

10

13.    Limited Liability.

Notwithstanding anything to the contrary contained herein, we shall not be liable for any error of judgment or for any act done or omitted by us in good faith, or for any mistake of fact or law, except for our own negligence or willful misconduct or the breach of this Agreement for reasons other than those stated in this Section 13. Without limiting the generality of the foregoing, we shall not be liable for any delay or failure to act as may be required hereunder (including without limitation, any failure to execute or resulting "DK's") when such delay or failure is due to any of the following: an act of God; interruption, malfunction or suspension of any communication or wire facilities or services (other, than those under our control); labor difficulties; acts or omissions of third parties; war; emergency conditions; equipment or mechanical failure (including computer or software failure) (other than those under our control); delays or processing delays on the book-entry wire system maintained by the Federal Reserve Bank of New York; your failure to perform any of your Obligations hereunder, including without limitation, your Obligations set forth in Section 8 (d) (i), (ii) and (iii) hereof; or other circumstances beyond our control, provided we exercise such diligence as the circumstances may reasonably require, provided that Chase has used due care and has exercised due diligence in anticipating such event and has taken all reasonable actions as may be necessary to respond to, correct and circumvent the effects of such event on Chase's performance of its duties and responsibilities hereunder.  IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WE HAVE BEEN ADVISED AS TO THE POSSIBILITY THEREOF AND REGARDLESS OF THE FORM OF ACTION.

14.    No Duty to Investigate or Advise.

You acknowledge that you are, and will continue to be, solely responsible for making your own independent appraisal of and investigation into the financial condition and creditworthiness of each person to whom or for whose account you direct us ,to deliver securities, or to whom you- request us to make payment and you confirm to us that we are under no obligation to you to assess or review the financial condition or creditworthiness of any such person or to advise you as to the results of any such appraisal or investigation we may have conducted on our own or of any adverse information concerning' any such person that may in any way have come to our attention.  Furthermore, you acknowledge that we are under no duty to supervise, recommend or advise you relative to the investment, purchase, sale, retention or other disposition of any property held hereunder.

15.    Fees.

Our fees for services rendered in connection with the service provided hereunder are as set forth on Schedule D hereto and shall be invoiced to you to pay such invoice daily, for the prior day's activity.  You agree to pay such invoice by the close of business on the day received. In the event we do not receive payment in immediately available funds by the end of day, we are authorized to charge your Account, with the amount of such fees, and if the Account does not include sufficient funds to cover the amount of such fees, you will pay such amount upon demand.  All invoices shall be conclusively presumed correct unless you notify us to the contrary, in writing, within 30 days of receipt of any invoice containing a discrepancy.

LIBNY/4745995.1

Our fees for services rendered in connection with the service provided hereunder are set forth on Schedule D hereto, and may not be increased by us during the term of this Agreement. No other compensation or reimbursement of expense shall be payable to us except as specifically set forth in this Agreement, other than (i) out of pocket expenses up to $1000 month, incurred by us in connection with the services provided hereunder, and (ii) out of pocket expenses that arise from customized or specialized services provided to certain customers with the prior written approval of two Confirming Representatives, except that we may charge you for any new or increased external charge (e.g. DTC charges) or expense incurred by us in performing this Agreement. We shall notify you in the event of any such charges or expenses promptly after the same are incurred by us and, to the extent practicable, reasonably in advance of the same having been incurred by us. It is understood that such notices shall be one-time notices for each type of charge or expense.

16.   Indemnification.

Except where we are negligent or have engaged in willful misconduct, or have breached this Agreement for reasons other than those listed in Section 12 hereof, you will indemnify us and hold us harmless against any and all losses, claims, damages, liabilities or actions to which we may become subject, and reimburse us for any expenses (including reasonable attorneys' fees and expenses) incurred by us in connection therewith, insofar as such losses, claims, damages, liabilities or actions, arise out of or are based upon or are in any way related to this Agreement. Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct. This indemnification obligation shall survive the termination of this Agreement.

We shall be responsible for performing the services as provided herein. We shall be liable to you for direct damages sustained by you to the extent such damages result from our negligence or malfeasance or our breach of any representations, warranties or agreements contained in this Agreement for reasons other than set forth in Section 13 hereof, including the terms of any Schedule for Exhibit of failure of our equipment or software. Except as otherwise expressly provided herein, we shall not be liable to you or any third person f or any loss, expense or damage suffered by reason of delay or other interruption in receiving. Securities or monies through the Federal Reserve's Book Entry or Wire System or from any clearing agent, issuer, broker, dealer or other third party. We shall not be liable for failures to execute or "DK's" due to incorrect, incomplete or untimely instructions or any other failure of you to provide proper instructions, as required by this Agreement.

17.   Termination.

The initial term of this Agreement shall commence on the date hereof and shall end on October 7, 2002. If, by the expiration of the initial term the parties have not entered into a written agreement extending this Agreement for an additional term, this Agreement shall be deemed automatically renewed for an additional one year period on the terms and conditions hereof and for the fees set forth herein. Notwithstanding the foregoing, in the event that we cease to perform the services which are the subject matter of this Agreement for substantially all of our customers, we may terminate this Agreement, provided that we have given you written

12

notice of such termination at least 12 months prior to the effective date of termination. Notwithstanding the foregoing, (i) this Agreement may be terminated by either party, as the case may be, upon written notice if the other files an application for, or consents to, the appointment of any receiver, trustee, custodian, liquidator or similar person for all or any portion of its, property, files a petition seeking a reorganization of its financial affairs or taking advantage of any bankruptcy reorganization, insolvency, readjustment or debt, dissolution or liquidation law or statute, or if it takes any corporate action for the purpose of effecting any of the foregoing, (ii) this Agreement may be terminated by either party by written notice to the other if such other party has failed to comply with any material provision of this Agreement which failure shall continue for (30) days after notice of such failure is delivered by the non-breaching party to the breaching party, but only if the same has not been cured in all material respects, (iii) this Agreement may be terminated by either party by written notice to the other party if any representation or warranty made in this Agreement by such other party shall have proven to have been at the time made, false or misleading in any material respect, and (iv) this Agreement may be terminated by you upon thirty (30) days written notice to us in the event we charge you for any new or increased external charge, or expense as permitted herein and you reasonably believe such charge to be excessive, unless we rescind such charge upon written notice to you prior to the expiration of such thirty (30) day period.

Upon termination of this Agreement and provided that all the Obligations have been paid in full, we shall transfer the Collateral and other property in the Account as follows:

(a)     If not less than five (5) calendar days' prior to the termination date, you shall have given us written instructions for the delivery of such securities and property, including instruction regarding method of delivery and destination then in accordance with such instructions;

(b)     If no such instructions have been given by you, then on the termination date, with respect to physical securities, we shall deliver such physical securities and other property to you at the address provided below, by armored car at your reasonable expense, and we may obtain special insurance policies covering such deliveries and you will upon demand reimburse us for all reasonable premiums payable for such policies.  With respect to Fed wire book-entry securities, we may establish a custody account and hold such securities in escrow for the benefit of and at your expense.  Any and all cash may be delivered by Fed wire.

18.    Reports and Certificates.

(a)     Unless otherwise instructed by you in writing, we may assume that we are exempt from filing on your behalf any certificates of ownership or other reports which are, or may hereafter be, required by any regulation of the internal Revenue Service or other authority of the United States, so far as the same are required in connection with any property which now or may hereafter be in our possession hereunder.

In the event that we are requested to prepare such reports, your status is to be described as a bank, trust company, financial institution, insurance company, corporation, partnership or otherwise as the case may be.  You agree to notify us immediately in writing of any change in such status.

LIBNY/4745995.1

(b)     Whenever it becomes advisable to do so, we are authorized to exchange temporary for definitive certificates, and old certificates for new or over stamped certificates evidencing a change therein.

19.    Notice.

All notices or other communications required by this Agreement to be in writing shall be sufficiently given if mailed by registered mail, postage prepaid, or delivered:

(a)     to us at 4 New York Plaza, New York, New York 10004-2477, Attention: Brokers and Dealers Clearance Department,

(b)     to you at Lehman Brothers Bank, FSB, 1000 West Street, Wilmington, DE 19801 or to any other address or addresses of which written notice shall have been given in the foregoing manner by the respective parties.

20.    Assignments.

This Agreement may not be assigned by either party hereto without the prior written consent of the other.

21.    Captions.

The captions of the various sections and subsections, of this Agreement have been inserted only for the purposes of convenience, and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

22.    Entire Agreement.

This Agreement together with the Credit Letter among the parties hereto, and the Funds Transfer Agreement among the parties hereto, contains the final, complete and exclusive understanding of, and supersedes all prior or contemporaneous, oral or written, agreements, understandings, representations and negotiations between the parties relating to the subject matter of this Agreement. No amendment of any provision of this Agreement shall be enforceable against us unless in writing and signed by one of our authorized officers. Notwithstanding the foregoing, Schedule F may only be amended in writing executed by two individuals listed as Confirming Representatives on the Schedule F in effect directly before any such amendment. In the event of any conflict between this Agreement and any confirmation, instruction, custodian agreement or any other agreement between the parties, this Agreement shall control except as set forth in Section 8 hereof.

23.    Severability.

If any provision of this Agreement shall be unenforceable, illegal or invalid, it shall not affect the validity of the remaining provisions of this Agreement.

14

24.    Governing Law.

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of law principles thereof.

Very truly yours,

JPMorgan Chase Bank, N.A.

By: _____
Name_____
Title:_____
Dated:_____

AGREED AND ACCEPTED:

Lehman Brothers Bank, FSB

By: _____
Name:    Michael Ferraro
Title:    CF, SVP
Dated:    9/10/08

LIBNY/4745995.1

# CLEARANCE AGREEMENT

Ladies and Gentlemen:

We agree to act as your non-exclusive clearance agent for securities transactions subject to the terms and conditions set forth below, and to any addenda which may be agreed upon, which shall constitute a part of this letter agreement, and to open and maintain a clearance account, as defined below.

1.    Securities.

The term "securities" shall include, without limitation, obligations of the United States Government and its agencies, bankers acceptances, certificates of deposit, commercial paper, and such other certificated and uncertificated securities and other instruments as may be agreed upon by the parties hereto.

2.    Accounts.

We are hereby authorized to open and maintain a clearance account, which shall consist of one or more clearing accounts (the "Clearing Accounts"), one or more custody accounts (the "Custody Accounts"), one or more demand deposit accounts, and may also consist of one or more segregated accounts consisting of securities carried by you for the account of one or more of your customers as listed in the Agreement, as amended from time to time by you subject to our approval (the "Segregated Accounts") (all of which accounts together are sometimes hereinafter referred to as the "Account").   The Segregated Account shall be free of our lien, claim and interest.   You authorize us to debit and credit all transactions to the Account daily.

3.    Authority.

We are hereby authorized, as your agent, and agree pursuant to your instructions, (a) to receive and transfer securities for any purpose whatsoever, including, without limitation, as a pledge of collateral; (b) to make payments and collections of monies; (c) to permit you to make transfers between the Clearing Account(s), Custody Account(s) and the Segregated Account(s) or other accounts, it being understood that we shall only permit transfers from the Clearing Account (s) to the Custody Account (s) or Segregated Account (s) to the extent that after such transfer we remain fully collateralized; have been fully paid with respect to any securities being transferred into the Segregated Account(s) or other accounts; and (d) to transfer securities which we hold for you as such securities may be needed to secure loans with such entities as you may specify; (e) to receive from such entities as you may specify securities held as collateral for loans against the payment of funds required to obtain the release of your collateral; (f) to perform any other act incidental or necessary to the performance of the above.

In connection with the performance of our services hereunder, we hereby agree to provide you with access to, (i) to the extent you provide us with a location, ten dedicated terminals and one high speed printer, and (ii) to the extent we provide a location, terminals and one high speed printer at a New York City location, to be shared with our other clearance customers, giving due consideration to your volume of business, at all times on and after the

conversion date, such terminals in both (i) and (ii) to be connected to a securities transfer system and available to you in the event of Lehman Brothers, regional or other system outage. At least once each calendar year, we and you, at our respective expense, shall jointly participate in disaster recovery testing, pursuant to a plan to be mutually agreed upon.

4.    Payment and Delivery.

(a)    In the event we have no other reasonable choice we agree to accept Fed Funds checks as payment if received prior to 3:00 p.m. New York time, whether certified or not, as the equivalent of cash and all risks of collectability and credit responsibility with respect to such checks shall be borne by you alone. We may accept as correct your specification of the net proceeds to be paid or collected for any securities, and we shall have no obligation to verify your computation of such amount.

(b)    When we are instructed to deliver physical securities against payment, delivery of the securities and the receipt of payment may not be completed simultaneously. Subject to our obligation to attempt to collect payment and performance of our obligations hereunder; the risk of non-receipt of payment shall be yours, we shall have no responsibility or liability therefor, and your risk shall continue until final payment (as defined below) has been received.

(c)    For all purposes of this Agreement, payment with respect to a transaction shall not be "final" until we have received immediately available funds which under applicable law are irreversible, which are not subject to any security interest, levy, lien or other encumbrance, and which funds are specifically applicable, or are deemed by us to be specifically applicable, to such transaction. Any debit of any account by us which creates an overdraft or, in the case where securities have been delivered out from the Account, which does not otherwise result in the receipt by us of immediately available, irreversible and unencumbered funds, shall not constitute final payment.

(d)    All credits to the Account in connection with tri-party repurchase transactions and physical securities, regardless of how characterized, are conditioned upon the actual receipt of final payment and may be reversed to the extent payment is not received. Without limiting the generality of the foregoing, in the event that we, as a matter of bookkeeping convenience, credit the Clearing Account with the proceeds from the sale, redemption or other disposition of physical securities or in connection with tri-party repurchase transactions prior to our actual receipt of final payment therefor and notwithstanding that such bookkeeping credits may also be reflected on our books, and otherwise, as "immediately available" or "same day" funds or by some similar characterization, all such credits shall be conditioned upon our actual receipt of final payment and may be reversed by us, after notice to you, to the extent that such final payment is not received. We may in our discretion, but shall not be obligated to, permit you to use any such funds prior to final payment.

(e)    Any and all securities which we may now or hereafter hold in the Account, and which you may instruct us to deliver against payment, may be delivered by us to the party designated in such instructions against delivery to us of the temporary receipt of such party in lieu of actual payment. We shall hold such temporary receipt until final payment is

2



received or the securities are returned to us for your Account. We agree to make all such deliveries in accordance with operating procedures agreed upon from time to time by you and us.

        (f)      With respect to any directions to receive securities at our account at another securities intermediary, we shall have no duty or responsibility, except upon special request, to advise you of non-receipt of, or take any steps to obtain delivery of, securities from brokers or other agents or other securities intermediaries either against payment or free of payment. It is understood that the Federal Reserve System or any depository used pursuant to this Agreement is not our agent and we are not responsible for any error made or loss caused by them or their employees or agents.

     5.      Loans and Advances.

     We may, solely at our discretion, permit you to use funds credited to the Account prior to final payment as contemplated by the second sentence of Section 4(d) hereof or otherwise advance funds to you prior to final payment. If we do permit you to use, or otherwise advance to you, such funds, you shall continue to bear the risk of non-receipt of final payment, and, to the extent that final payment for any securities delivered on any day is not received by the close of business on that day, you shall immediately upon demand reimburse us for the amount, so used or advanced, plus interest thereon from that date at such reasonable rates as shall be determined by us. We are further authorized, with the receipt of instructions from you, to make other loans to you of either money or securities. In the event any Account maintained by you with us becomes overdrawn, we shall have the right, solely at our discretion, to lend you an amount equivalent to cover such overdraft. All loans, whether of money or securities, shall be payable on demand and shall bear interest at such reasonable rates as shall be determined by us. Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, with notice and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling.

     6.      Listing of Securities.

        (a)      Business Records. We will make available to you, in accordance with the Performance Standards, as set forth in Schedule A, a daily listing of all securities held by us free or as collateral to secure any loans or advances of money or securities made by us to you. All listings supplied by us to you shall be conclusively presumed correct unless you notify us to the contrary by the close of business of the next business day, except that this provision shall not apply in the event (i) there is a communications failure between you and us, or (ii) both parties hereto have made an error which delays discovery of such error. We shall maintain regular business records documenting all instructions transmitted to us in accordance with the terms of Section 7 hereof (or, where applicable, Section 8 hereof) and any response by us. Such records shall be determinative of the form, content and time of all of your instructions and any response from us. The record of each instruction and any response thereto shall be retained by us for at least 45 days following the date of the instruction. Any claim against us for failure to properly follow an instruction transmitted by you must be made in writing and received by us within 45 days after the date the instruction was received by us.



LIBNY/4745993.1

(b)      Equipment. You shall make all site preparations and provide all facilities on your premises necessary to connect your computer system to our computer system. In this regard, you shall use the equipment, communications lines and communications protocol identified in Schedule G. Certain of the equipment identified in Schedule G shall be located on our premises and operated by us. We shall be responsible for the preparation of our own site and for the use of the communications, protocol identified in Schedule G.

7.      <u>Instructions.</u>

Other than as specifically set forth herein, you and we have agreed to act in accordance with and comply strictly with the Performance Standards set forth in Schedule A hereto (the "Performance Standards") and security procedures and to act upon any instructions given in accordance therewith. You have authorized us to accept instructions from you via the following means: (i) CPU, (ii) your on-line terminal, (iii) our on-line terminal, (iv) magnetic tape, (v) telephone, and (vi) messenger or fax; provided, however, that we shall only accept instructions via method (iii) above if we mutually agree that methods (i) and (ii) are not available, we shall only accept instructions via method (iv) above if we mutually agree that methods (i), (ii) and (iii) are not available, via (v) or (vi) provided (i), (ii), (iii) and (iv) are not available. Such instructions, other than telephone, messenger, or fax instructions, may be transmitted without two manual signatures of authorized individuals, as set forth on Schedule F hereto (each an "Authorized Individual"). We hereby agree to act upon, execute and perform, and shall be protected in acting upon, any instruction or request (written, electronic or oral) and any notice, waiver, consent, receipt or other document which we believe in good faith to be genuine and to have been given by an Authorized Individual in accordance herewith and with the Performance Standards and security procedures, as applicable. When instructions are given orally or in writing, we will confirm these instructions before acting on said instructions with a representative designated by you as a confirming representative on Schedule F hereto (each a "Confirming Representative"). In addition, you will confirm any oral instructions to us in writing with two authorized signers or electronically by the close of business on the day on which they are given. The oral instructions as understood by us will be deemed to be the controlling and such proper instructions, unless you are able to show such instructions were misunderstood by us. If we receive a subsequent conflicting written or electronic instruction, we shall be able to rely on the oral instruction as understood by us and we will notify you promptly. When instructions are received via magnetic tape, the magnetic tape is to be delivered to a vice president or higher in our Dealer's Clearance department as listed on Schedule C, we will confirm receipt of such tape with a Confirming Representative before acting on the instructions contained therein.

If you comply with the provisions of this Agreement and the documentation referred to herein relating to delivery of instructions, we guarantee delivery of Securities with respect to each trade to which your instructions relate to within two minutes after which instructions have been delivered and received for the Account. If we fail to properly complete a delivery as provided in this Section or in the Performance Standards after receiving proper and timely instructions therein, we shall extend to you an interest free overnight loan if, as a result of such failure, you elect to finance the Securities. The principal amount of such loan shall be less than or equal to the full net dollar amount that you would have received from your counterparty if delivery had occurred on the related trade.

4

Notwithstanding the foregoing paragraph, to benefit from the guaranties contained in this Section and the Performance Standards, computer instructions must be completed on each settlement day no later than two minutes prior to the established deadline of the book-entry wire system maintained by the Federal Reserve Bank of New York for that settlement day.

In the event of any dispute between or conflicting claims by you and any other person or persons with respect to the securities and other property credited to or deposited in the Account, we shall be entitled, in our best judgment, at our option, to refuse to comply with any and all claims, demands or instructions with respect to such securities and other property so long as such dispute or conflict shall continue, and we shall not be or become liable in any way for our reasonable failure or refusal to comply with such conflicting claims, demands or instructions. We shall be entitled to refuse to act until either (i) such conflicting or adverse claims or demands shall have been (A) finally determined in a court of competent jurisdiction or (B) settled by agreement between the conflicting parties and we shall have received evidence in writing, satisfactory to us of such agreement, or (ii) we shall have received security or an indemnity satisfactory to us (from a party whose creditworthiness is satisfactory to us) sufficient to keep us harmless against any and all loss, liability or reasonable expense which we may incur by reason of our acting; provided however, that to the extent we are not prohibited by law or court order, we shall allow you to substitute cash or other securities for the securities with respect to which there is a conflict.

8.    Remote Clearance.

(a)    Where applicable, in addition to giving instructions as provided in the Agreement, you may give us instructions by inputting instructions directly via a remote terminal located on your premises linked to our premises ("Remote Clearance"). Remote Clearance shall be made only in conformity with any operating manual as supplemented by the Performance Standards and security procedures. Subject to prior consent from you with respect to changes relating to the Performance Standards and security procedures, we reserve the right to prescribe, and make changes in, rules of operation, accessibility periods, authentication procedures, type of terminal equipment, type of system equipment and system programming with respect to Remote Clearance as we deem necessary and appropriate. Fees relating to Remote Clearance may be set forth on Schedule D hereto, which may be changed prospectively from time to time upon 30 days' advance notice from us to you.

(b)    Equipment. The remote terminal shall be provided at your expense and must be compatible with our system. You shall be solely liable for maintenance of such terminal and for any interruption of Remote Clearance due to any problem associated with the terminal not caused solely and directly by us or within our control. Additional terminals may be added only upon our prior written consent.

(c)    Training and Manuals. We shall provide training on the Remote Clearance system as we determine to be necessary. We shall provide to you an operating manual and notify you of any changes thereto.

(d)    Instructions.



LIBNY/4745993.1

(i)    In order to complete same-day settlements, we must receive timely Remote Clearance instructions in accordance with the Performance Standards on the date of settlement.

(ii)    It is your obligation and responsibility of all the parties hereto to complete all instructions in accordance with the procedures prescribed by us from time to time concerning information required, manner of delivery and timeliness of delivery.

(iii)    It is your obligation and responsibility to maintain a backup copy of all instructions given to us via Remote Clearance during the preceding 24 hours and to deliver such copies to us promptly upon our request.

(iv)    In the event we are unable to effect any instruction via Remote Clearance, we shall be authorized to receive such instruction via alternate means, in accordance with Section 7 hereof including without limitation, telephone, telecopy, or hand delivery, as may be specified by us as suitable under the circumstances.

(v)    The security procedure for instructions issued to you via CPU link is encryption. To verify the authenticity of instructions issued via CPU link, we shall decrypt instructions issued to us in your name using encryption equipment to be located on our premises and identified in Schedule G, which shall be paired with encryption equipment to be located on your premises and identified in Schedule G. The parties agree that encryption is a commercially reasonable security procedure. We will not execute instructions received via CPU link which are not encrypted and decrypted as described herein unless approved in writing by two Confirming Representatives. You shall be responsible for access to and the security of your computer system and your transmission facilities. We shall be responsible for access to and the security of our computer system and our transmission facilities.

(vi)    We shall take such reasonable precautions as we deem appropriate to prevent the loss, destruction or improper access to your information and data transmitted via Remote Clearance in accordance with the security procedures listed on Schedule H hereto (the "Security Procedures"). The parties agree that the Security Procedures are commercially reasonable security procedures. You assume the entire risk and responsibility for the fraudulent or unauthorized use of the hardware and the software on your premises, and you shall implement such security devices and /or procedures, as you deem necessary and appropriate. We may rely upon the genuineness of all information and data communicated to us over the Remote Clearance system and our records, kept in the normal course of business shall be final and conclusive with respect to all matters involving such information and data provided we have acted in good faith and without negligence and in compliance with the Security Procedures.



6

(vii)    The security procedure with respect to magnetic tape, oral and written instructions are as set forth in Section 7 hereof. The parties agree that the procedures in Schedule H are commercially reasonable security procedures.

(e)    <u>Confidentiality and Non-Disclosure</u>.    Except as required by applicable law, regulations or judicial or regulatory process, each of the parties hereto shall exercise reasonable care to, hold in confidence and not use for its own benefit or disclose to third parties information which is obtained or received by one of us from the other and which such party has reason to know is confidential or proprietary to the other, each party agreeing to use a standard of care at least equal to the care used to protect its own confidential information. It is agreed that all information pertaining to the performance or evaluation of Remote Clearance is confidential and proprietary to us, including without limitation any manuals or other training or descriptive material supplied to you.

9.    <u>Tri-Party Custodian Services</u>.

Subject to the terms and conditions hereof and effective on the conversion date, you hereby appoint and we agree to act as non-exclusive custodian with respect to your tri-party custody transactions. We agree to perform the services as set forth in the form of tri-party custody agreement attached hereto as Exhibit A (or other forms of tri-party Custody Agreement which may be agreed upon from time to time) and act in accordance with and strictly comply with the performance standards set forth on Schedule B hereto. We, as non-exclusive tri-party custodian, shall accept from you any securities permitted under the terms of the relevant tri-party custody agreement, which securities may include physical securities and securities held at the Federal Reserve Bank of New York, DTC, PTC, First Chicago Clearing Center, and any other depository or clearing corporation as we may mutually agree upon. With respect to tri-party custody agreements, we are authorized to accept instructions from you via the means set forth in Section 7 hereof, without regard to the priority of means itemized therein, and without having to contact a Confirming Representative.

We hereby agree to enter into tri-party custody agreements substantially in the form of Exhibit A hereto with such of your customers which do not have existing tri-party custody contracts in furtherance of their respective obligations hereunder, subject to such modifications as we may mutually agreed upon.

Notwithstanding anything herein to the contrary, to the extent of any conflict between this Agreement and any tri-party custody agreement, whether now or hereafter existing, the terms of the tri-party custody agreement will govern.

10.    <u>Representations and Warranties</u>.

You represent and warrant that (a) upon our making any advance with respect to any securities delivered to us for your Account (i) you will own such securities free of any security interests, liens, claims and encumbrances (other than the security interest granted to us hereunder) and have the right to hypothecate or re-hypothecate such securities; (ii) any transfer of such securities by you for value is effective and rightful; (iii) such securities are genuine and have not been materially altered; (iv) you know of nothing which might impair the validity or

LIBNY/4745993.1



transferability of such securities; and (v) such securities are freely transferable on the books of the issuer in the form delivered to us; (b) no delivery of securities by you to us, no instruction of yours with respect to such securities and no loan or advance secured by such securities will contravene Rule 8c-l, Rule 15c2-l or Rule 15c3-3 under the Securities Exchange Act of 1934 and a request by you to transfer securities from a Segregated Account to the Clearing Accounts shall, with respect to such securities, be deemed to be a representation and warranty to that effect;

Each of the parties hereto makes the following continuing respective representations and warranties:

(a)    You and we are duly organized and existing under the laws of the jurisdiction of our respective organizations with full power and authority to execute and deliver this Agreement and to perform all the duties and obligations to be performed by either of us hereunder.

(b)    This Agreement and the performance of all transactions contemplated hereunder have been duly authorized by you and us in accordance with all requisite action. This Agreement has been duly executed and delivered to you and us and constitutes a valid legal and binding obligation of you and us, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law.

(c)    The execution, delivery and performance of the Agreement by us does not and will not conflict with or result in a breach, violation of or constitute a default under any agreement, indenture, mortgage or instrument to which we are a party or are bound or to which any of our property is subject nor will such action result in any violation of the provisions of our charter or bylaws or any law, rule, regulation, judgment, order or decree binding on us.

(d)    No consent approval, authorization or order of, or filing, registration or qualification with, any authority is required for the execution, delivery and performance of the Agreement, except for those which, have been obtained or made and which continue to be in full force and effect.

(e)    You and we are in material compliance with, and during the term of this Agreement will remain in material compliance with, all applicable laws, rules and regulations of any government, governmental agency or self-regulatory organization having authority or jurisdiction over you and us, respectively, or any transaction or other matter which may involve our performing services for or extending credit to or for you.

(f)    So long as such securities held by us are not, in fact, in a Segregated Account you shall not take any action with respect to such securities which shall in any way affect our security interest therein; (i) you have, and will continue to have during the term of this Agreement, the authority to engage in and perform the transactions contemplated by this Agreement and with respect to such transactions will be in compliance with all applicable laws, rules and regulations (including but not limited to those of any self-regulatory organization having authority or jurisdiction over you); (ii) all credit extended to you hereunder shall be used

LIBNY/4745993.1



by you solely and exclusively to facilitate the prompt clearance or settlement of the purchase or sale of readily marketable securities, and each such credit shall, at the time such credit is extended, be secured by readily marketable securities having a market value or principal face amount (whichever shall be less) of not less than the principal amount of such credit, and shall, unless payment thereof shall have previously been demanded in accordance with the provisions of Section 5, be repaid upon the settlement of such purchase or sale; and

      (g)    Custodian shall maintain and provide evidence of insurance protection for Lehman property and property of Lehman's customers consisting of a Blanket Bond with Fidelity, Premises, Transit, Forgery and Counterfeit coverage's: Computer Crime coverage and Professional Liability coverage. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies acceptable to Lehman.

    11.    <u>Liens.</u>

    In consideration of any advances or loans we may extend to you pursuant to this Agreement (hereinafter the : "Obligations"), you hereby:

      (a)    Grant to us a continuing security interest in, lien upon and right of set-off as to (i) the balance of every existing or future deposit, and account which you, now or in the future, maintain with us (except for any Segregated Account containing customer securities or funds) all securities, securities entitlement, instruments, financial assets and other investment property (except for customer securities or funds held in a Segregated Account), now or in the future, maintained or held in, or credited or relating to, any such securities accounts, or in which you have any right, title or interest that is in our possession or control; and all income, profits, collections, distributions and other proceeds, (both cash and non-cash and including insurance proceeds thereof) replacements and substitutions of any thereof (all of the foregoing being hereinafter collectively referred to as the "Collateral"). The term "investment property" shall have the meaning set forth in Section 9-115 of the Uniform Commercial Code as adopted by the State of New York (the "Code"). The terms securities account, securities entitlement and financial assets shall have the meanings set forth in Article 8 of the Code. "Financial assets" shall consist of the property from time to time contained in or credited to any of the Clearing Accounts.

      (b)    Agree that if any Obligations are outstanding at the end of the business day (after Fed wire close), we are authorized; with notice to you, on a best efforts basis, to carry any Collateral in our general account(s) and to sell, transfer, assign, pledge and re-pledge, and hypothecate and re-hypothecate any Collateral separately or together with securities or other property of any other customer(s) (except for customer securities held in a Segregated Account), without retaining in our possession or control a like amount of similar securities or other property for delivery, to the extent permitted by Rule 8c-l, Rule 15c2-l and Rule 15c3-3 under the Securities Exchange Act of 1934.

      (c)    Agree that if repayment of any advance or loan is not made, or if any deposit relating to an advance or loan is not received by us in accordance with the terms hereof, we shall have the rights and remedies of a secured party under the Code including the right to

9



sell any of the Collateral on any securities market, or at public or private sale in a commercially reasonable manner, which will include notice to you or prior tender, demand or call upon you. Subject to the Code, we may purchase, all or any part of the Collateral free from any redemption right, but you will remain liable for any deficiency, including reasonable brokerage fee commissions.

(d)    Agree that notwithstanding anything to the contrary contained in this Agreement (i) all securities constituting any part of the Collateral shall be in our "possession" and under our "control" pursuant to Section 8-106(e) of the Code, and (ii) we shall not be required to act in accordance with your instructions (including, but not limited to, any instruction to transfer a security to or into a Segregated Account or any other account), and we shall not be your agent with respect to any financial asset constituting any part of the Collateral unless and until we have received full and final payment for the Obligations or we shall have determined, in our sole reasonable discretion, that the payment and performance of your Obligations will be adequately secured after giving effect to such instruction.

(e)    Agree that nothing contained in this Section shall be deemed to be inconsistent with, or to deny to us, our status as a bona fide purchaser of all or any part of the Collateral, and, in addition to whatever rights we may have as such a purchaser, and not by way of limitation of such rights, we shall have all the rights and remedies of a secured party under applicable law.

(f)    That Chase is your securities intermediary (as such term is defined in Article 8 of the Code) with respect to any securities accounts that you maintain with us, including without limitation, the Clearing Accounts, that Chase has a priority lien over all property maintained in or credited to such accounts pursuant to Section 8-106 (e) of the Code securing the Obligations. Nothing contained in the Pledge and Security Agreements or in any other document or agreement between us relating to extensions of credit or our respective rights and obligations in respect thereof shall negate, limit or impair the security interest automatically granted to Chase, as your "securities intermediary" pursuant to Section 9-116 of the Code or the priority accorded such security interest by Section 8-106 (e) of the Code.

(g)    In addition to the rights and remedies provided to us pursuant to the Agreement, we shall continue to have all rights and remedies otherwise available to us under applicable law, including the rights afforded to financial intermediaries and secured creditors under the Uniform Commercial Code.

12.    Acting as Agent.

You hereby irrevocably appoint us as your true and lawful agent and attorney-in-fact, with full power in your name and on your behalf, with respect to the execution of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law. We are acting under this Agreement only as agent, and are not responsible or liable in any way for the genuineness or validity of any security or instrument received, delivered or held by us absent gross and manifest defect apparent on the face of the certificate held by us in physical form. Notwithstanding the foregoing, the parties agree that we shall not be deemed to be acting as your agent with respect to executing your payment orders.

10



13.    <u>Limited Liability</u>.

Notwithstanding anything to the contrary contained herein, we shall not be liable for any error of judgment or for any act done or omitted by us in good faith, or for any mistake of fact or law, except for our own negligence or willful misconduct or the breach of this Agreement for reasons other than those stated in this Section 13.   Without limiting the generality of the foregoing, we shall not be liable for any delay or failure to act as may be required hereunder (including without limitation, any failure to execute or resulting "DK's") when such delay or failure is due to any of the following: an act of God; interruption, malfunction or suspension of any communication or wire facilities or services (other, than those under our control); labor difficulties; acts or omissions of third parties; war; emergency conditions; equipment or mechanical failure (including computer or software failure) (other than those under our control); delays or processing delays on the book-entry wire system maintained by the Federal Reserve Bank of New York; your failure to perform any of your Obligations hereunder, including without limitation, your Obligations set forth in Section 8 (d) (i), (ii) and (iii) hereof; or other circumstances beyond our control, provided we exercise such diligence as the circumstances may reasonably require, provided that Chase has used due care and has exercised due diligence in anticipating such event and has taken all reasonable actions as may be necessary to respond to, correct and circumvent the effects of such event on Chase's performance of its duties and responsibilities hereunder.   IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WE HAVE BEEN ADVISED AS TO THE POSSIBILITY THEREOF AND REGARDLESS OF THE FORM OF ACTION.

14.    <u>No Duty to Investigate or Advise</u>.

You acknowledge that you are, and will continue to be, solely responsible for making your own independent appraisal of and investigation into the financial condition and creditworthiness of each person to whom or for whose account you direct us ,to deliver securities, or to whom you- request us to make payment and you confirm to us that we are under no obligation to you to assess or review the financial condition or creditworthiness of any such person or to advise you as to the results of any such appraisal or investigation we may have conducted on our own or of any adverse information concerning' any such person that may in any way have come to our attention.  Furthermore, you acknowledge that we are under no duty to supervise, recommend or advise you relative to the investment, purchase, sale, retention or other disposition of any property held hereunder.

15.    <u>Fees</u>.

Our fees for services rendered in connection with the service provided hereunder are as set forth on Schedule D hereto and shall be invoiced to you to pay such invoice daily, for the prior day's activity.  You agree to pay such invoice by the close of business on the day received. In the event we do not receive payment in immediately available funds by the end of day, we are authorized to charge your Account, with the amount of such fees, and if the Account does not include sufficient funds to cover the amount of such fees, you will pay such amount upon demand.   All invoices shall be conclusively presumed correct unless you notify us to the contrary, in writing, within 30 days of receipt of any invoice containing a discrepancy.

11

Our fees for services rendered in connection with the service provided hereunder are set forth on Schedule D hereto, and may not be increased by us during the term of this Agreement. No other compensation or reimbursement of expense shall be payable to us except as specifically set forth in this Agreement, other than (i) out of pocket expenses up to $1000 month, incurred by us in connection with the services provided hereunder, and (ii) out of pocket expenses that arise from customized or specialized services provided to certain customers with the prior written approval of two Confirming Representatives, except that we may charge you for any new or increased external charge (e.g. DTC charges) or expense incurred by us in performing this Agreement. We shall notify you in the event of any such charges or expenses promptly after the same are incurred by us and, to the extent practicable, reasonably in advance of the same having been incurred by us. It is understood that such notices shall be one-time notices for each type of charge or expense.

16.    Indemnification.

Except where we are negligent or have engaged in willful misconduct, or have breached this Agreement for reasons other than those listed in Section 12 hereof, you will indemnify us and hold us harmless against any and all losses, claims, damages, liabilities or actions to which we may become subject, and reimburse us for any expenses (including reasonable attorneys' fees and expenses) incurred by us in connection therewith, insofar as such losses, claims, damages, liabilities or actions, arise out of or are based upon or are in any way related to this Agreement. Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct. This indemnification obligation shall survive the termination of this Agreement.

We shall be responsible for performing the services as provided herein. We shall be liable to you for direct damages sustained by you to the extent such damages result from our negligence or malfeasance or our breach of any representations, warranties or agreements contained in this Agreement for reasons other than set forth in Section 13 hereof, including the terms of any Schedule for Exhibit of our equipment or software. Except as otherwise expressly provided herein, we shall not be liable to you or any third person f or any loss, expense or damage suffered by reason of delay or other interruption in receiving. Securities or monies through the Federal Reserve's Book Entry or Wire System or from any clearing agent, issuer, broker, dealer or other third party. We shall not be liable for failures to execute or "DK's" due to incorrect, incomplete or untimely instructions or any other failure of you to provide proper instructions, as required by this Agreement.

17.    Termination.

The initial term of this Agreement shall commence on the date hereof and shall end on October 7, 2002. If, by the expiration of the initial term the parties have not entered into a written agreement extending this Agreement for an additional term, this Agreement shall be deemed automatically renewed for an additional one year period on the terms and conditions hereof and for the fees set forth herein. Notwithstanding the foregoing, in the event that we cease to perform the services which are the subject matter of this Agreement for substantially all of our customers, we may terminate this Agreement, provided that we have given you written

LIBNY/4745993.1



notice of such termination at least 12 months prior to the effective date of termination. Notwithstanding the foregoing, (i) this Agreement may be terminated by either party, as the case may be, upon written notice if the other files an application for, or consents to, the appointment of any receiver, trustee, custodian, liquidator or similar person for all or any portion of its, property, files a petition seeking a reorganization of its financial affairs or taking advantage of any bankruptcy reorganization, insolvency, readjustment or debt, dissolution or liquidation law or statute, or if it takes any corporate action for the purpose of effecting any of the foregoing, (ii) this Agreement may be terminated by either party by written notice to the other if such other party has failed to comply with any material provision of this Agreement which failure shall continue for (30) days after notice of such failure is delivered by the non-breaching party to the breaching party, but only if the same has not been cured in all material respects, (iii) this Agreement may be terminated by either party by written notice to the other party if any representation or warranty made in this Agreement by such other party shall have proven to have been at the time made, false or misleading in any material respect, and (iv) this Agreement may be terminated by you upon thirty (30) days written notice to us in the event we charge you for any new or increased external charge, or expense as permitted herein and you reasonably believe such charge to be excessive, unless we rescind such charge upon written notice to you prior to the expiration of such thirty (30) day period.

Upon termination of this Agreement and provided that all the Obligations have been paid in full, we shall transfer the Collateral and other property in the Account as follows:

(a)    If not less than five (5) calendar days' prior to the termination date, you shall have given us written instructions for the delivery of such securities and property, including instruction regarding method of delivery and destination then in accordance with such instructions;

(b)    If no such instructions have been given by you, then on the termination date, with respect to physical securities, we shall deliver such physical securities and other property to you at the address provided below, by armored car at your reasonable expense, and we may obtain special insurance policies covering such deliveries and you will upon demand reimburse us for all reasonable premiums payable for such policies. With respect to Fed wire book-entry securities, we may establish a custody account and hold such securities in escrow for the benefit of and at your expense. Any and all cash may be delivered by Fed wire.

18.    Reports and Certificates.

(a)    Unless otherwise instructed by you in writing, we may assume that we are exempt from filing on your behalf any certificates of ownership or other reports which are, or may hereafter be, required by any regulation of the internal Revenue Service or other authority of the United States, so far as the same are required in connection with any property which now or may hereafter be in our possession hereunder.

In the event that we are requested to prepare such reports, your status is to be described as a bank, trust company, financial institution, insurance company, corporation, partnership or otherwise as the case may be. You agree to notify us immediately in writing of any change in such status.

13

(b)    Whenever it becomes advisable to do so, we are authorized to exchange temporary for definitive certificates, and old certificates for new or over stamped certificates evidencing a change therein.

19.    Notice.

All notices or other communications required by this Agreement to be in writing shall be sufficiently given if mailed by registered mail, postage prepaid, or delivered:

(a)    to us at 4 New York Plaza, New York, New York 10004-2477, Attention: Brokers and Dealers Clearance Department,

(b)    to you at Lehman Brothers Bankhaus Aktiengesellschaft, Rathenauplatz 1, Frankfurt am Main D60313 Germany, or to any other address or addresses of which written notice shall have been given in the foregoing manner by the respective parties.

20.    Assignments.

This Agreement may not be assigned by either party hereto without the prior written consent of the other.

21.    Captions.

The captions of the various sections and subsections, of this Agreement have been inserted only for the purposes of convenience, and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

22.    Entire Agreement.

This Agreement together with the Credit Letter among the parties hereto, and the Funds Transfer Agreement among the parties hereto, contains the final, complete and exclusive understanding of, and supersedes all prior or contemporaneous, oral or written, agreements, understandings, representations and negotiations between the parties relating to the subject matter of this Agreement.   No amendment of any provision of this Agreement shall be enforceable against us unless in writing and signed by one of our authorized officers. Notwithstanding the foregoing, Schedule F may only be amended in writing executed by two individuals listed as Confirming Representatives on the Schedule F in effect directly before any such amendment.  In the event of any conflict between this Agreement and any confirmation, instruction, custodian agreement or any other agreement between the parties, this Agreement shall control except as set forth in Section 8 hereof.

23.    Severability.

If any provision of this Agreement shall be unenforceable, illegal or invalid, it shall not affect the validity of the remaining provisions of this Agreement.



LIBNY/4745993.1

24.    <u>Governing Law</u>.

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of law principles thereof.

Very truly yours,

JPMorgan Chase Bank, N.A.

By:    _____
Name _____
Title: _____
Dated: _____

AGREED AND ACCEPTED:

Lehman Brothers Bankhaus Aktiengesellschaft
By: _____    _____
Name: C. FISCHER    C. BINIA
Title: DIRECTOR    DIRECTOR
Dated:    10 - Sep - 2008

15

## CLEARANCE AGREEMENT

Ladies and Gentlemen:

We agree to act as your non-exclusive clearance agent for securities transactions subject to the terms and conditions set forth below, and to any addenda which may be agreed upon, which shall constitute a part of this letter agreement, and to open and maintain a clearance account, as defined below.

1.    Securities.

The term "securities" shall include, without limitation, obligations of the United States Government and its agencies, bankers acceptances, certificates of deposit, commercial paper, and such other certificated and uncertificated securities and other instruments as may be agreed upon by the parties hereto.

2.    Accounts.

We are hereby authorized to open and maintain a clearance account, which shall consist of one or more clearing accounts (the "Clearing Accounts"), one or more custody accounts (the "Custody Accounts"), one or more demand deposit accounts, and may also consist of one or more segregated accounts consisting of securities carried by you for the account of one or more of your customers as listed in the Agreement, as amended from time to time by you subject to our approval (the "Segregated Accounts") (all of which accounts together are sometimes hereinafter referred to as the "Account").   The Segregated Account shall be free of our lien, claim and interest.   You authorize us to debit and credit all transactions to the Account daily.

3.    Authority.

We are hereby authorized, as your agent, and agree pursuant to your instructions, (a) to receive and transfer securities for any purpose whatsoever, including, without limitation, as a pledge of collateral; (b) to make payments and collections of monies; (c) to permit you to make transfers between the Clearing Account(s), Custody Account(s) and the Segregated Account(s) or other accounts, it being understood that we shall only permit transfers from the Clearing Account (s) to the Custody Account (s) or Segregated Account (s) to the extent that after such transfer we remain fully collateralized; have been fully paid with respect to any securities being transferred into the Segregated Account(s) or other accounts; and (d) to transfer securities which we hold for you as such securities may be needed to secure loans with such entities as you may specify; (e) to receive from such entities as you may specify securities held as collateral for loans against the payment of funds required to obtain the release of your collateral; (f) to perform any other act incidental or necessary to the performance of the above.

In connection with the performance of our services hereunder, we hereby agree to provide you with access to, (i) to the extent you provide us with a location, ten dedicated terminals and one high speed printer, and (ii) to the extent we provide a location, terminals and one high speed printer at a New York City location, to be shared with our other clearance customers, giving due consideration to your volume of business, at all times on and after the

conversion date, such terminals in both (i) and (ii) to be connected to a securities transfer system and available to you in the event of Lehman Brothers, regional or other system outage. At least once each calendar year, we and you, at our respective expense, shall jointly participate in disaster recovery testing, pursuant to a plan to be mutually agreed upon.

4.    <u>Payment and Delivery</u>.

(a)    In the event we have no other reasonable choice we agree to accept Fed Funds checks as payment if received prior to 3:00 p.m. New York time, whether certified or not, as the equivalent of cash and all risks of collectability and credit responsibility with respect to such checks shall be borne by you alone. We may accept as correct your specification of the net proceeds to be paid or collected for any securities, and we shall have no obligation to verify your computation of such amount.

(b)    When we are instructed to deliver physical securities against payment, delivery of the securities and the receipt of payment may not be completed simultaneously. Subject to our obligation to attempt to collect payment and performance of our obligations hereunder; the risk of non-receipt of payment shall be yours, we shall have no responsibility or liability therefor, and your risk shall continue until final payment (as defined below) has been received.

(c)    For all purposes of this Agreement, payment with respect to a transaction shall not be "final" until we have received immediately available funds which under applicable law are irreversible, which are not subject to any security interest, levy, lien or other encumbrance, and which funds are specifically applicable, or are deemed by us to be specifically applicable, to such transaction. Any debit of any account by us which creates an overdraft or, in the case where securities have been delivered out from the Account, which does not otherwise result in the receipt by us of immediately available, irreversible and unencumbered funds, shall not constitute final payment.

(d)    All credits to the Account in connection with tri-party repurchase transactions and physical securities, regardless of how characterized, are conditioned upon the actual receipt of final payment and may be reversed to the extent payment is not received. Without limiting the generality of the foregoing, in the event that we, as a matter of bookkeeping convenience, credit the Clearing Account with the proceeds from the sale, redemption or other disposition of physical securities or in connection with tri-party repurchase transactions prior to our actual receipt of final payment therefor and notwithstanding that such bookkeeping credits may also be reflected on our books, and otherwise, as "immediately available" or "same day" funds or by some similar characterization, all such credits shall be conditioned upon our actual receipt of final payment and may be reversed by us, after notice to you, to the extent that such final payment is not received. We may in our discretion, but shall not be obligated to, permit you to use any such funds prior to final payment.

(e)    Any and all securities which we may now or hereafter hold in the Account, and which you may instruct us to deliver against payment, may be delivered by us to the party designated in such instructions against delivery to us of the temporary receipt of such party in lieu of actual payment. We shall hold such temporary receipt until final payment is

2

received or the securities are returned to us for your Account. We agree to make all such deliveries in accordance with operating procedures agreed upon from time to time by you and us.

(f)     With respect to any directions to receive securities at our account at another securities intermediary, we shall have no duty or responsibility, except upon special request, to advise you of non-receipt of, or take any steps to obtain delivery of, securities from brokers or other agents or other securities intermediaries either against payment or free of payment. It is understood that the Federal Reserve System or any depository used pursuant to this Agreement is not our agent and we are not responsible for any error made or loss caused by them or their employees or agents.

5.     Loans and Advances.

We may, solely at our discretion, permit you to use funds credited to the Account prior to final payment as contemplated by the second sentence of Section 4(d) hereof or otherwise advance funds to you prior to final payment. If we do permit you to use, or otherwise advance to you, such funds, you shall continue to bear the risk of non-receipt of final payment, and, to the extent that final payment for any securities delivered on any day is not received by the close of business on that day, you shall immediately upon demand reimburse us for the amount, so used or advanced, plus interest thereon from that date at such reasonable rates as shall be determined by us. We are further authorized, with the receipt of instructions from you, to make other loans to you of either money or securities. In the event any Account maintained by you with us becomes overdrawn, we shall have the right, solely at our discretion, to lend you an amount equivalent to cover such overdraft. All loans, whether of money or securities, shall be payable on demand and shall bear interest at such reasonable rates as shall be determined by us. Notwithstanding the fact that we may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to you, whether or not as a regular pattern, we may at any time decline to extend such credit at our discretion, with notice and if we are precluded from extending such credit as a result of any law, regulation or applicable ruling.

6.     Listing of Securities.

(a)     Business Records. We will make available to you, in accordance with the Performance Standards, as set forth in Schedule A, a daily listing of all securities held by us free or as collateral to secure any loans or advances of money or securities made by us to you. All listings supplied by us to you shall be conclusively presumed correct unless you notify us to the contrary by the close of business of the next business day, except that this provision shall not apply in the event (i) there is a communications failure between you and us, or (ii) both parties hereto have made an error which delays discovery of such error. We shall maintain regular business records documenting all instructions transmitted to us in accordance with the terms of Section 7 hereof (or, where applicable, Section 8 hereof) and any response by us. Such records shall be determinative of the form, content and time of all of your instructions and any response from us. The record of each instruction and any response thereto shall be retained by us for at least 45 days following the date of the instruction. Any claim against us for failure to properly follow an instruction transmitted by you must be made in writing and received by us within 45 days after the date the instruction was received by us.

3

        (b)    Equipment.  You shall make all site preparations and provide all facilities on your premises necessary to connect your computer system to our computer system.  In this regard, you shall use the equipment, communications lines and communications protocol identified in Schedule G.  Certain of the equipment identified in Schedule G shall be located on our premises and operated by us.  We shall be responsible for the preparation of our own site and for the use of the communications, protocol identified in Schedule G.

    7.   <u>Instructions</u>.

Other than as specifically set forth herein, you and we have agreed to act in accordance with and comply strictly with the Performance Standards set forth in Schedule A hereto (the "Performance Standards") and security procedures and to act upon any instructions given in accordance therewith.  You have authorized us to accept instructions from you via the following means: (i) CPU, (ii) your on-line terminal, (iii) our on-line terminal, (iv) magnetic tape, (v) telephone, and (vi) messenger or fax; provided, however, that we shall only accept instructions via method (iii) above if we mutually agree that methods (i) and (ii) are not available, we shall only accept instructions via method (iv) above if we mutually agree that methods (i), (ii) and (iii) are not available, via (v) or (vi) provided (i), (ii), (iii) and (iv) are not available.  Such instructions, other than telephone, messenger, or fax instructions, may be transmitted without two manual signatures of authorized individuals, as set forth on Schedule F hereto (each an "Authorized Individual").  We hereby agree to act upon, execute and perform, and shall be protected in acting upon, any instruction or request (written, electronic or oral) and any notice, waiver, consent, receipt or other document which we believe in good faith to be genuine and to have been given by an Authorized Individual in accordance herewith and with the Performance Standards and security procedures, as applicable. When instructions are given orally or in writing, we will confirm these instructions before acting on said instructions with a representative designated by you as a confirming representative on Schedule F hereto (each a "Confirming Representative").  In addition, you will confirm any oral instructions to us in writing with two authorized signers or electronically by the close of business on the day on which they are given.  The oral instructions as understood by us will be deemed to be the controlling and such proper instructions, unless you are able to show such instructions were misunderstood by us.  If we receive a subsequent conflicting written or electronic instruction, we shall be able to rely on the oral instruction as understood by us and we will notify you promptly. When instructions are received via magnetic tape, the magnetic tape is to be delivered to a vice president or higher in our Dealer's Clearance department as listed on Schedule C, we will confirm receipt of such tape with a Confirming Representative before acting on the instructions contained therein.

If you comply with the provisions of this Agreement and  the documentation referred to herein relating to delivery of instructions, we guarantee delivery of Securities with respect to each trade to which your instructions relate to within two minutes after which instructions have been delivered and received for the Account.  If we fail to properly complete a delivery as provided in this Section or in the Performance Standards after receiving proper and timely instructions therein, we shall extend to you an interest free overnight loan if, as a result of such failure, you elect to finance the Securities.  The principal amount of such loan shall be less than or equal to the full net dollar amount that you would have received from your counterparty if delivery had occurred on the related trade.

LIBNY/4745994.1

Notwithstanding the foregoing paragraph, to benefit from the guaranties contained in this Section and the Performance Standards, computer instructions must be completed on each settlement day no later than two minutes prior to the established deadline of the book-entry wire system maintained by the Federal Reserve Bank of New York for that settlement day.

In the event of any dispute between or conflicting claims by you and any other person or persons with respect to the securities and other property credited to or deposited in the Account, we shall be entitled, in our best judgment, at our option, to refuse to comply with any and all claims, demands or instructions with respect to such securities and other property so long as such dispute or conflict shall continue, and we shall not be or become liable in any way for our reasonable failure or refusal to comply with such conflicting claims, demands or instructions. We shall be entitled to refuse to act until either (i) such conflicting or adverse claims or demands shall have been (A) finally determined in a court of competent jurisdiction or (B) settled by agreement between the conflicting parties and we shall have received evidence in writing, satisfactory to us of such agreement, or (ii) we shall have received security or an indemnity satisfactory to us (from a party whose creditworthiness is satisfactory to us) sufficient to keep us harmless against any and all loss, liability or reasonable expense which we may incur by reason of our acting; provided however, that to the extent we are not prohibited by law or court order, we shall allow you to substitute cash or other securities for the securities with respect to which there is a conflict.

8.    Remote Clearance.

(a)    Where applicable, in addition to giving instructions as provided in the Agreement, you may give us instructions by inputting instructions directly via a remote terminal located on your premises linked to our premises ("Remote Clearance"). Remote Clearance shall be made only in conformity with any operating manual as supplemented by the Performance Standards and security procedures. Subject to prior consent from you with respect to changes relating to the Performance Standards and security procedures, we reserve the right to prescribe, and make changes in, rules of operation, accessibility periods, authentication procedures, type of terminal equipment, type of system equipment and system programming with respect to Remote Clearance as we deem necessary and appropriate. Fees relating to Remote Clearance may be set forth on Schedule D hereto, which may be changed prospectively from time to time upon 30 days' advance notice from us to you.

(b)    Equipment. The remote terminal shall be provided at your expense and must be compatible with our system. You shall be solely liable for maintenance of such terminal and for any interruption of Remote Clearance due to any problem associated with the terminal not caused solely and directly by us or within our control. Additional terminals may be added only upon our prior written consent.

(c)    Training and Manuals. We shall provide training on the Remote Clearance system as we determine to be necessary. We shall provide to you an operating manual and notify you of any changes thereto.

(d)    Instructions.

5

(i)    In order to complete same-day settlements, we must receive timely Remote Clearance instructions in accordance with the Performance Standards on the date of settlement.

(ii)    It is your obligation and responsibility of all the parties hereto to complete all instructions in accordance with the procedures prescribed by us from time to time concerning information required, manner of delivery and timeliness of delivery.

(iii)    It is your obligation and responsibility to maintain a backup copy of all instructions given to us via Remote Clearance during the preceding 24 hours and to deliver such copies to us promptly upon our request.

(iv)    In the event we are unable to effect any instruction via Remote Clearance, we shall be authorized to receive such instruction via alternate means, in accordance with Section 7 hereof including without limitation, telephone, telecopy, or hand delivery, as may be specified by us as suitable under the circumstances.

(v)    The security procedure for instructions issued to you via CPU link is encryption.  To verify the authenticity of instructions issued via CPU link, we shall decrypt instructions issued to us in your name using encryption equipment to be located on our premises and identified in Schedule G, which shall be paired with encryption equipment to be located on your premises and identified in Schedule G.  The parties agree that encryption is a commercially reasonable security procedure.  We will not execute instructions received via CPU link which are not encrypted and decrypted as described herein unless approved in writing by two Confirming Representatives.  You shall be responsible for access to and the security of your computer system and your transmission facilities.  We shall be responsible for access to and the security of our computer system and our transmission facilities.

(vi)    We shall take such reasonable precautions as we deem appropriate to prevent the loss, destruction or improper access to your information and data transmitted via Remote Clearance in accordance with the security procedures listed on Schedule H hereto (the "Security Procedures").  The parties agree that the Security Procedures are commercially reasonable security procedures.  You assume the entire risk and responsibility for the fraudulent or unauthorized use of the hardware and the software on your premises, and you shall implement such security devices and /or procedures, as you deem necessary and appropriate.  We may rely upon the genuineness of all information and data communicated to us over the Remote Clearance system and our records, kept in the normal course of business shall be final and conclusive with respect to all matters involving such information and data provided we have acted in good faith and without negligence and in compliance with the Security Procedures.

LIBNY/4745994.1

(vii)    The security procedure with respect to magnetic tape, oral and written instructions are as set forth in Section 7 hereof. The parties agree that the procedures in Schedule H are commercially reasonable security procedures.

(e)    <u>Confidentiality and Non-Disclosure</u>.  Except as required by applicable law, regulations or judicial or regulatory process, each of the parties hereto shall exercise reasonable care to, hold in confidence and not use for its own benefit or disclose to third parties information which is obtained or received by one of us from the other and which such party has reason to know is confidential or proprietary to the other, each party agreeing to use a standard of care at least equal to the care used to protect its own confidential information.  It is agreed that all information pertaining to the performance or evaluation of Remote Clearance is confidential and proprietary to us, including without limitation any manuals or other training or descriptive material supplied to you.

9.    <u>Tri-Party Custodian Services</u>.

Subject to the terms and conditions hereof and effective on the conversion date, you hereby appoint and we agree to act as non-exclusive custodian with respect to your tri-party custody transactions.  We agree to perform the services as set forth in the form of tri-party custody agreement attached hereto as Exhibit A (or other forms of tri-party Custody Agreement which may be agreed upon from time to time) and act in accordance with and strictly comply with the performance standards set forth on Schedule B hereto.  We, as non-exclusive tri-party custodian, shall accept from you any securities permitted under the terms of the relevant tri-party custody agreement, which securities may include physical securities and securities held at the Federal Reserve Bank of New York, DTC, PTC, First Chicago Clearing Center, and any other depository or clearing corporation as we may mutually agree upon.  With respect to tri-party custody agreements, we are authorized to accept instructions from you via the means set forth in Section 7 hereof, without regard to the priority of means itemized therein, and without having to contact a Confirming Representative.

We hereby agree to enter into tri-party custody agreements substantially in the form of Exhibit A hereto with such of your customers which do not have existing tri-party custody contracts in furtherance of their respective obligations hereunder, subject to such modifications as we may mutually agreed upon.

Notwithstanding anything herein to the contrary, to the extent of any conflict between this Agreement and any tri-party custody agreement, whether now or hereafter existing, the terms of the tri-party custody agreement will govern.

10.    <u>Representations and Warranties</u>.

You represent and warrant that (a) upon our making any advance with respect to any securities delivered to us for your Account (i) you will own such securities free of any security interests, liens, claims and encumbrances (other than the security interest granted to us hereunder) and have the right to hypothecate or re-hypothecate such securities; (ii) any transfer of such securities by you for value is effective and rightful; (iii) such securities are genuine and have not been materially altered; (iv) you know of nothing which might impair the validity or

LIBNY/4745994.1

transferability of such securities; and (v) such securities are freely transferable on the books of the issuer in the form delivered to us; (b) no delivery of securities by you to us, no instruction of yours with respect to such securities and no loan or advance secured by such securities will contravene Rule 8c-l, Rule 15c2-l or Rule 15c3-3 under the Securities Exchange Act of 1934 and a request by you to transfer securities from a Segregated Account to the Clearing Accounts shall, with respect to such securities, be deemed to be a representation and warranty to that effect;

Each of the parties hereto makes the following continuing respective representations and warranties:

(a)     You and we are duly organized and existing under the laws of the jurisdiction of our respective organizations with full power and authority to execute and deliver this Agreement and to perform all the duties and obligations to be performed by either of us hereunder.

(b)     This Agreement and the performance of all transactions contemplated hereunder have been duly authorized by you and us in accordance with all requisite action. This Agreement has been duly executed and delivered to you and us and constitutes a valid legal and binding obligation of you and us, enforceable in accordance with its terms subject to applicable bankruptcy, insolvency, and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity regardless of whether enforcement is sought in a proceeding in equity or at law.

(c)     The execution, delivery and performance of the Agreement by us does not and will not conflict with or result in a breach, violation of or constitute a default under any agreement, indenture, mortgage or instrument to which we are a party or are bound or to which any of our property is subject nor will such action result in any violation of the provisions of our charter or bylaws or any law, rule, regulation, judgment, order or decree binding on us.

(d)     No consent approval, authorization or order of, or filing, registration or qualification with, any authority is required for the execution, delivery and performance of the Agreement, except for those which, have been obtained or made and which continue to be in full force and effect.

(e)     You and we are in material compliance with, and during the term of this Agreement will remain in material compliance with, all applicable laws, rules and regulations of any government, governmental agency or self-regulatory organization having authority or jurisdiction over you and us, respectively, or any transaction or other matter which may involve our performing services for or extending credit to or for you.

(f)     So long as such securities held by us are not, in fact, in a Segregated Account you shall not take any action with respect to such securities which shall in any way affect our security interest therein; (i) you have, and will continue to have during the term of this Agreement, the authority to engage in and perform the transactions contemplated by this Agreement and with respect to such transactions will be in compliance with all applicable laws, rules and regulations (including but not limited to those of any self-regulatory organization having authority or jurisdiction over you); (ii) all credit extended to you hereunder shall be used

8

by you solely and exclusively to facilitate the prompt clearance or settlement of the purchase or sale of readily marketable securities, and each such credit shall, at the time such credit is extended, be secured by readily marketable securities having a market value or principal face amount (whichever shall be less) of not less than the principal amount of such credit, and shall, unless payment thereof shall have previously been demanded in accordance with the provisions of Section 5, be repaid upon the settlement of such purchase or sale; and

(g)    Custodian shall maintain and provide evidence of insurance protection for Lehman property and property of Lehman's customers consisting of a Blanket Bond with Fidelity, Premises, Transit, Forgery and Counterfeit coverage's: Computer Crime coverage and Professional Liability coverage. All such insurance shall be in amounts, with standard coverage and subject to deductibles, as is customary for insurance typically maintained by banks which act as Custodian and in amounts and with insurance companies acceptable to Lehman.

11.    Liens.

In consideration of any advances or loans we may extend to you pursuant to this Agreement (hereinafter the : "Obligations"), you hereby:

(a)    Grant to us a continuing security interest in, lien upon and right of set-off as to (i) the balance of every existing or future deposit, and account which you, now or in the future, maintain with us (except for any Segregated Account containing customer securities or funds) all securities, securities entitlement, instruments, financial assets and other investment property (except for customer securities or funds held in a Segregated Account), now or in the future, maintained or held in, or credited or relating to, any such securities accounts, or in which you have any right, title or interest that is in our possession or control; and all income, profits, collections, distributions and other proceeds, (both cash and non-cash and including insurance proceeds thereof) replacements and substitutions of any thereof (all of the foregoing being hereinafter collectively referred to as the "Collateral"). The term "investment property" shall have the meaning set forth in Section 9-115 of the Uniform Commercial Code as adopted by the State of New York (the "Code"). The terms securities account, securities entitlement and financial assets shall have the meanings set forth in Article 8 of the Code. "Financial assets" shall consist of the property from time to time contained in or credited to any of the Clearing Accounts.

(b)    Agree that if any Obligations are outstanding at the end of the business day (after Fed wire close), we are authorized; with notice to you, on a best efforts basis, to carry any Collateral in our general account(s) and to sell, transfer, assign, pledge and re-pledge, and hypothecate and re-hypothecate any Collateral separately or together with securities or other property of any other customer(s) (except for customer securities held in a Segregated Account), without retaining in our possession or control a like amount of similar securities or other property for delivery, to the extent permitted by Rule 8c-l, Rule 15c2-l and Rule 15c3-3 under the Securities Exchange Act of 1934.

(c)    Agree that if repayment of any advance or loan is not made, or if any deposit relating to an advance or loan is not received by us in accordance with the terms hereof, we shall have the rights and remedies of a secured party under the Code including the right to

9

sell any of the Collateral on any securities market, or at public or private sale in a commercially reasonable manner, which will include notice to you or prior tender, demand or call upon you. Subject to the Code, we may purchase, all or any part of the Collateral free from any redemption right, but you will remain liable for any deficiency, including reasonable brokerage fee commissions.

(d)    Agree that notwithstanding anything to the contrary contained in this Agreement (i) all securities constituting any part of the Collateral shall be in our "possession" and under our "control" pursuant to Section 8-106(e) of the Code, and (ii) we shall not be required to act in accordance with your instructions (including, but not limited to, any instruction to transfer a security to or into a Segregated Account or any other account), and we shall not be your agent with respect to any financial asset constituting any part of the Collateral unless and until we have received full and final payment for the Obligations or we shall have determined, in our sole reasonable discretion, that the payment and performance of your Obligations will be adequately secured after giving effect to such instruction.

(e)    Agree that nothing contained in this Section shall be deemed to be inconsistent with, or to deny to us, our status as a bona fide purchaser of all or any part of the Collateral, and, in addition to whatever rights we may have as such a purchaser, and not by way of limitation of such rights, we shall have all the rights and remedies of a secured party under applicable law.

(f)    That Chase is your securities intermediary (as such term is defined in Article 8 of the Code) with respect to any securities accounts that you maintain with us, including without limitation, the Clearing Accounts, that Chase has a priority lien over all property maintained in or credited to such accounts pursuant to Section 8-106 (e) of the Code securing the Obligations. Nothing contained in the Pledge and Security Agreements or in any other document or agreement between us relating to extensions of credit or our respective rights and obligations in respect thereof shall negate, limit or impair the security interest automatically granted to Chase, as your "securities intermediary" pursuant to Section 9-116 of the Code or the priority accorded such security interest by Section 8-106 (e) of the Code.

(g)    In addition to the rights and remedies provided to us pursuant to the Agreement, we shall continue to have all rights and remedies otherwise available to us under applicable law, including the rights afforded to financial intermediaries and secured creditors under the Uniform Commercial Code.

12.    <u>Acting as Agent</u>.

You hereby irrevocably appoint us as your true and lawful agent and attorney-in-fact, with full power in your name and on your behalf, with respect to the execution of all instruments and the taking of all action necessary or desirable to effectuate the rights and remedies provided hereunder and by applicable law. We are acting under this Agreement only as agent, and are not responsible or liable in any way for the genuineness or validity of any security or instrument received, delivered or held by us absent gross and manifest defect apparent on the face of the certificate held by us in physical form. Notwithstanding the foregoing, the parties agree that we shall not be deemed to be acting as your agent with respect to executing your payment orders.

LIBNY/4745994.1

13.    Limited Liability.

Notwithstanding anything to the contrary contained herein, we shall not be liable for any error of judgment or for any act done or omitted by us in good faith, or for any mistake of fact or law, except for our own negligence or willful misconduct or the breach of this Agreement for reasons other than those stated in this Section 13. Without limiting the generality of the foregoing, we shall not be liable for any delay or failure to act as may be required hereunder (including without limitation, any failure to execute or resulting "DK's") when such delay or failure is due to any of the following: an act of God; interruption, malfunction or suspension of any communication or wire facilities or services (other, than those under our control); labor difficulties; acts or omissions of third parties; war; emergency conditions; equipment or mechanical failure (including computer or software failure) (other than those under our control); delays or processing delays on the book-entry wire system maintained by the Federal Reserve Bank of New York; your failure to perform any of your Obligations hereunder, including without limitation, your Obligations set forth in Section 8 (d) (i), (ii) and (iii) hereof; or other circumstances beyond our control, provided we exercise such diligence as the circumstances may reasonably require, provided that Chase has used due care and has exercised due diligence in anticipating such event and has taken all reasonable actions as may be necessary to respond to, correct and circumvent the effects of such event on Chase's performance of its duties and responsibilities hereunder.   IN NO EVENT SHALL WE BE LIABLE FOR SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES, WHETHER OR NOT WE HAVE BEEN ADVISED AS TO THE POSSIBILITY THEREOF AND REGARDLESS OF THE FORM OF ACTION.

14.    No Duty to Investigate or Advise.

You acknowledge that you are, and will continue to be, solely responsible for making your own independent appraisal of and investigation into the financial condition and creditworthiness of each person to whom or for whose account you direct us ,to deliver securities, or to whom you- request us to make payment and you confirm to us that we are under no obligation to you to assess or review the financial condition or creditworthiness of any such person or to advise you as to the results of any such appraisal or investigation we may have conducted on our own or of any adverse information concerning' any such person that may in any way have come to our attention.  Furthermore, you acknowledge that we are under no duty to supervise, recommend or advise you relative to the investment, purchase, sale, retention or other disposition of any property held hereunder.

15.    Fees.

Our fees for services rendered in connection with the service provided hereunder are as set forth on Schedule D hereto and shall be invoiced to you to pay such invoice daily, for the prior day's activity.  You agree to pay such invoice by the close of business on the day received. In the event we do not receive payment in immediately available funds by the end of day, we are authorized to charge your Account, with the amount of such fees, and if the Account does not include sufficient funds to cover the amount of such fees, you will pay such amount upon demand.  All invoices shall be conclusively presumed correct unless you notify us to the contrary, in writing, within 30 days of receipt of any invoice containing a discrepancy.

LIBNY/4745994.1

Our fees for services rendered in connection with the service provided hereunder are set forth on Schedule D hereto, and may not be increased by us during the term of this Agreement. No other compensation or reimbursement of expense shall be payable to us except as specifically set forth in this Agreement, other than (i) out of pocket expenses up to $1000 month, incurred by us in connection with the services provided hereunder, and (ii) out of pocket expenses that arise from customized or specialized services provided to certain customers with the prior written approval of two Confirming Representatives, except that we may charge you for any new or increased external charge (e.g. DTC charges) or expense incurred by us in performing this Agreement. We shall notify you in the event of any such charges or expenses promptly after the same are incurred by us and, to the extent practicable, reasonably in advance of the same having been incurred by us. It is understood that such notices shall be one-time notices for each type of charge or expense.

16.    <u>Indemnification</u>.

Except where we are negligent or have engaged in willful misconduct, or have breached this Agreement for reasons other than those listed in Section 12 hereof, you will indemnify us and hold us harmless against any and all losses, claims, damages, liabilities or actions to which we may become subject, and reimburse us for any expenses (including reasonable attorneys' fees and expenses) incurred by us in connection therewith, insofar as such losses, claims, damages, liabilities or actions, arise out of or are based upon or are in any way related to this Agreement. Without limiting the generality of the foregoing indemnification, we shall be indemnified for all reasonable costs and expenses, including reasonable attorneys' fees, for our successful defense against claims by you that we were negligent or engaged in willful misconduct. This indemnification obligation shall survive the termination of this Agreement.

We shall be responsible for performing the services as provided herein. We shall be liable to you for direct damages sustained by you to the extent such damages result from our negligence or malfeasance or our breach of any representations, warranties or agreements contained in this Agreement for reasons other than set forth in Section 13 hereof, including the terms of any Schedule for Exhibit of failure of our equipment or software. Except as otherwise expressly provided herein, we shall not be liable to you or any third person f or any loss, expense or damage suffered by reason of delay or other interruption in receiving. Securities or monies through the Federal Reserve's Book Entry or Wire System or from any clearing agent, issuer, broker, dealer or other third party. We shall not be liable for failures to execute or "DK's" due to incorrect, incomplete or untimely instructions or any other failure of you to provide proper instructions, as required by this Agreement.

17.    <u>Termination</u>.

The initial term of this Agreement shall commence on the date hereof and shall end on October 7, 2002. If, by the expiration of the initial term the parties have not entered into a written agreement extending this Agreement for an additional term, this Agreement shall be deemed automatically renewed for an additional one year period on the terms and conditions hereof and for the fees set forth herein. Notwithstanding the foregoing, in the event that we cease to perform the services which are the subject matter of this Agreement for substantially all of our customers, we may terminate this Agreement, provided that we have given you written

LIBNY/4745994.1

notice of such termination at least 12 months prior to the effective date of termination. Notwithstanding the foregoing, (i) this Agreement may be terminated by either party, as the case may be, upon written notice if the other files an application for, or consents to, the appointment of any receiver, trustee, custodian, liquidator or similar person for all or any portion of its, property, files a petition seeking a reorganization of its financial affairs or taking advantage of any bankruptcy reorganization, insolvency, readjustment or debt, dissolution or liquidation law or statute, or if it takes any corporate action for the purpose of effecting any of the foregoing, (ii) this Agreement may be terminated by either party by written notice to the other if such other party has failed to comply with any material provision of this Agreement which failure shall continue for (30) days after notice of such failure is delivered by the non-breaching party to the breaching party, but only if the same has not been cured in all material respects, (iii) this Agreement may be terminated by either party by written notice to the other party if any representation or warranty made in this Agreement by such other party shall have proven to have been at the time made, false or misleading in any material respect, and (iv) this Agreement may be terminated by you upon thirty (30) days written notice to us in the event we charge you for any new or increased external charge, or expense as permitted herein and you reasonably believe such charge to be excessive, unless we rescind such charge upon written notice to you prior to the expiration of such thirty (30) day period.

Upon termination of this Agreement and provided that all the Obligations have been paid in full, we shall transfer the Collateral and other property in the Account as follows:

(a)     If not less than five (5) calendar days' prior to the termination date, you shall have given us written instructions for the delivery of such securities and property, including instruction regarding method of delivery and destination then in accordance with such instructions;

(b)     If no such instructions have been given by you, then on the termination date, with respect to physical securities, we shall deliver such physical securities and other property to you at the address provided below, by armored car at your reasonable expense, and we may obtain special insurance policies covering such deliveries and you will upon demand reimburse us for all reasonable premiums payable for such policies. With respect to Fed wire book-entry securities, we may establish a custody account and hold such securities in escrow for the benefit of and at your expense. Any and all cash may be delivered by Fed wire.

18.     Reports and Certificates.

(a)     Unless otherwise instructed by you in writing, we may assume that we are exempt from filing on your behalf any certificates of ownership or other reports which are, or may hereafter be, required by any regulation of the internal Revenue Service or other authority of the United States, so far as the same are required in connection with any property which now or may hereafter be in our possession hereunder.

In the event that we are requested to prepare such reports, your status is to be described as a bank, trust company, financial institution, insurance company, corporation, partnership or otherwise as the case may be. You agree to notify us immediately in writing of any change in such status.

LIBNY/4745994.1

(b)    Whenever it becomes advisable to do so, we are authorized to exchange temporary for definitive certificates, and old certificates for new or over stamped certificates evidencing a change therein.

19.    Notice.

All notices or other communications required by this Agreement to be in writing shall be sufficiently given if mailed by registered mail, postage prepaid, or delivered:

(a)    to us at 4 New York Plaza, New York, New York 10004-2477, Attention: Brokers and Dealers Clearance Department,

(b)    to you at Lehman Brothers Commercial Bank, Woodlands Business Park Tower 1, 4001 South 700 East, Suite 410, Salt Lake City, UT 84107, or to any other address or addresses of which written notice shall have been given in the foregoing manner by the respective parties.

20.    Assignments.

This Agreement may not be assigned by either party hereto without the prior written consent of the other.

21.    Captions.

The captions of the various sections and subsections, of this Agreement have been inserted only for the purposes of convenience, and shall not be deemed in any manner to modify, explain, enlarge or restrict any of the provisions of this Agreement.

22.    Entire Agreement.

This Agreement together with the Credit Letter among the parties hereto, and the Funds Transfer Agreement among the parties hereto, contains the final, complete and exclusive understanding of, and supersedes all prior or contemporaneous, oral or written, agreements, understandings, representations and negotiations between the parties relating to the subject matter of this Agreement. No amendment of any provision of this Agreement shall be enforceable against us unless in writing and signed by one of our authorized officers. Notwithstanding the foregoing, Schedule F may only be amended in writing executed by two individuals listed as Confirming Representatives on the Schedule F in effect directly before any such amendment. In the event of any conflict between this Agreement and any confirmation, instruction, custodian agreement or any other agreement between the parties, this Agreement shall control except as set forth in Section 8 hereof.

23.    Severability.

If any provision of this Agreement shall be unenforceable, illegal or invalid, it shall not affect the validity of the remaining provisions of this Agreement.

14

24.    Governing Law.

This Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of law principles thereof.

Very truly yours,

JPMorgan Chase Bank, N.A.

By: _____
Name _____
Title: _____
Dated: _____

AGREED AND ACCEPTED:

Lehman Brothers Commercial Bank

By: _____

Name: Julie Boyle_____
Title: President & CEO_____
Dated: September 10, 2008_____

15

THE CHASE MANHATTAN BANK

GLOBAL CUSTODY AND CLEARANCE AGREEMENT

between

LEHMAN BROTHERS INC.

and

THE CHASE MANHATTAN BANK

## CONTENTS

| Clause | | Page |
|---|---|---|
| 1. | Intention of the Parties | 2 |
| 2. | What Chase is required to do | 2 |
| 3. | Instructions and Authorised Persons | 5 |
| 4. | Borrowings and Foreign Exchange | 5 |
| 5. | Fees Expenses and Other Amounts Owing to Chase | 6 |
| 6. | Sub-Custodians and Securities Depositories | 6 |
| 7. | Brokers and other third parties | 7 |
| 8. | Omnibus Accounts | 7 |
| 9. | About the Customer | 7 |
| 10. | Conflicts of Interest | 8 |
| 11. | Standard of Care – How Chase is to perform its duties under this Agreement | 8 |
| 12. | When Chase is not liable to the Customer | 8 |
| 13. | Indemnity | 9 |
| 14. | United Kingdom Regulatory Matters | 9 |
| 15. | Termination | 10 |
| 16. | Miscellaneous | 10 |
| | SCHEDULE: List of Sub-Custodians and markets used by Chase | 13 |
| | EXHIBIT A: Persons authorised to give Instructions | 14 |
| | EXHIBIT B: Form of Board Resolution | 15 |

This Custody Agreement is made on the 14th day of March 200f between THE CHASE MANHATTAN BANK, a New York State member bank of the Federal Reserve System, acting through its London Branch ("Chase") of 125 London Wall, London –EC2Y 5AJ, a member of The Securities and Futures Authority Limited; and LEHMAN BROTHERS INC.

[2] (the "Client") whose registered office/principal place of business is at 3 World Financial Center, New York, NY   10285

[3]

1.   INTENTION OF THE PARTIES

This Agreement sets out the terms governing custodial, settlement and other associated services offered by Chase to the Client.

2.   WHAT CHASE IS REQUIRED TO DO

SET UP ACCOUNTS

A.   (i)   Subject to the receipt of such documentation as Chase may require (including, but not limited to, mandates and certified copies of the Client's constitutional documents), Chase shall open in its books and records in the name of the Client, or at its reasonable request in any other name, the following accounts (together the "Accounts"):

(a)   one or more securities accounts (the "Securities Accounts") evidencing any shares, stocks, debentures, bonds, notes, mortgages or other like obligations and any certificates, receipts, warrants or other instruments representing rights to receive, purchase or subscribe for the same ("Securities") held by Chase or any branch of Chase on behalf of the Client or held, as described and defined in clause 6, by a Sub-Custodian or Securities Depository for Chase on behalf of the Client, and which may include one or more segregated accounts ("Segregated Accounts") consisting of securities either (x) carried by the Client for the account of one or more of the Client's customers ("Customers") or (y) proprietary securities of the Client which have been fully paid for; and

(b)   one or more cash accounts (the "Cash Accounts") for all cash in any currency received by Chase or any Sub-Custodian or Securities Depository or other agents for the account of the Client.

(ii)   At the request of the Client, further Accounts may be opened in the future, which will be subject to the terms of this Agreement, unless otherwise agreed in writing otherwise at the time the further Account is opened.

MAINTENANCE OF SECURITIES AND CASH AT BANK AND SUB-CUSTODIAN LOCATIONS

B.   (i)   Unless Instructions (as detailed in clause 3) require another location acceptable to Chase:

(a)   securities will be held in the country or jurisdiction in which the principal trading market for the relevant Securities is located, where such Securities may be presented for payment, where such Securities were acquired, or where such Securities are held; and

(b)   cash will be held on the books of Chase or be credited to accounts of institutions chosen by Chase with Client's approval, in the country or jurisdiction where such cash is the legal currency for payment of public or private debts.

(ii)   Chase will only hold Securities in the countries and jurisdictions, and through such subcustodians, approved by the Client, as set forth in the Schedule attached hereto. Chase reserves the right to refuse to accept delivery of Securities or cash in countries and jurisdictions other than those referred to in the Schedule to this Agreement, which may be amended by Chase from time to time with the approval of the Client.

---

[1]   Date to be completed only when agreement is executed by Chase.

[2]   Prior to execution, Chase to complete full name of the Customer. The Customer should check this is correct.

[3]   Prior to execution, Chase to complete full address of registered office/principal place of business of the Customer.   The Customer should check this is correct.

**SETTLEMENT OF TRADES**

C. (i) When Chase receives an Instruction (per Section 3A(ii)) which includes all information required by Chase requesting settlement of a trade in Securities, Chase shall use reasonable endeavours to effect such settlement as instructed, save where Chase reasonably believes that such settlement would be contrary to applicable law, regulation or market practice.

(ii) In jurisdictions where true delivery-versus-payment is not practiced, when Chase is directed to deliver Securities against payment, delivery of the Securities and the receipt of payment might not be completed simultaneously. The risk of nonreceipt of payment shall be the Client's, and Chase will have no responsibility or liability therefor provided it shall have exercised the standard of care provided herein, and the Client's risk shall continue until final payment has been received.

(iii) For all purposes of this Agreement, payment with respect to a transaction shall not be "final" until Chase has received immediately available funds which under applicable law are irreversible, which are not subject to any security interest, levy, lien or other encumbrance, and which funds are specifically applicable, or are deemed by Chase to be specifically applicable, to such transaction. Any debit of any account by Chase which creates an overdraft or, in the case where Securities have been delivered out from the Account, which does not otherwise result in receipt by Chase of immediately available, irreversible and unencumbered funds, shall not constitute final payment.

(iv) All credits to the Account, regardless of how characterized, are conditional upon the actual receipt of final payment and may be reversed to the extent payment is not received.

[v] Chase is authorized to make transfers between Accounts on the instructions of Client, it being understood that Chase shall only permit transfers into the Customer's Accounts to the extent that the Securities being transferred have been fully paid.

**SEGREGATION OF ASSETS**

D. (i) Chase will identify in its books that the Securities belong to the Client and will separately identify the Securities belonging to its underlying Customers as identified by Client (save as otherwise agreed by Chase and the Client).

(ii) Chase will require that Sub-Custodians identify in their own books that the Securities belong to the Client and to separately identify the Securities belonging to Client's Customers as identified by Client (to the extent permitted by applicable law, regulation, or market practice).

**ACTUAL SETTLEMENT DATE ACCOUNTING**

E. (i) Chase shall debit or credit the Cash Account with cash paid or received in respect of securities settlement transactions for value on the date on which such proceeds or Securities are paid or received by Chase.

(ii) Chase may reverse any erroneous debit or credit made pursuant to paragraph (i) and the Client shall be responsible for any direct or indirect costs or liabilities resulting from such reversal not directly attributable to an error on the part of Chase. The Client acknowledges that the procedures described in this sub-clause are of an administrative nature and do not amount to an agreement by Chase to make loans and/or Securities available to the Client.

(iii) Chase will not process transactions which will result in a short position on Client's Securities Accounts in Chase's records. The Client agrees that delivery instructions will not be issued and acknowledges that Chase is not obligated to deliver any Securities unless instructions have been received by Chase for the receipt of the relevant Securities.

**INCOME COLLECTION/**

F. (i) Chase will credit the Cash Account with income and redemption proceeds on Securities in accordance with the times notified by Chase from time to time on or after the anticipated payment date, net of any taxes which are withheld by Chase or any third party. Where no time is specified for a particular market, income and redemption proceeds on Securities will only be credited after actual receipt and reconciliation.

(ii) Chase may reverse such entries upon written notification to the Client that Chase believes that

- 4 -

such amount will not be received by Chase within a reasonable period.

(iii) Neither Chase nor its Sub-Custodians shall be obliged to institute legal proceedings, file a claim or proof of claim in any insolvency proceeding or take any action with respect to collection of interest, dividends or redemption proceeds.

### PRESENTATION OF COUPONS/ ISSUE OF STATEMENTS ETC

**G.** Until Chase receives Instructions to the contrary, Chase is authorised to and shall:

(i) present, upon notice to Chase, all Securities called for redemption or otherwise matured, and all income and interest coupons and other income items which call for payment upon presentation;

(ii) execute in the name of the Client such ownership and other certificates as may be required to obtain payment in respect of Securities;

(iii) exchange interim or temporary documents of title held in the Securities Account for definitive ones; and

(iv) issue statements to the Client at times mutually agreed identifying the Securities in the Accounts.

### CORPORATE ACTIONS

**H.(i)** Chase will use reasonable endeavours to obtain information concerning the Securities which requires discretionary action by the beneficial owner of the Securities (other than a proxy - see paragraph (iv) below), including subscription rights, bonus issues, stock repurchase plans and rights offerings, or legal notices or other material intended to be transmitted to securities holders ("Corporate Actions"), Chase will use reasonable endeavours to give the Client notice of such Corporate Actions to the extent that Chase's corporate actions department in Bournemouth has actual knowledge of a Corporate Action in time to notify its customers.

(ii) When a rights entitlement or a fractional interest resulting from a rights issue, stock dividend, stock split, or similar Corporate Action requiring discretionary action by the beneficial owner of the Securities, is received which bears an expiration date, Chase will endeavour to obtain instructions from the Client, but if Instructions are not received in time for Chase to take timely action, or actual notice of such Corporate Action is received too late to seek Instructions, Chase is authorised to, and shall, sell the rights entitlement or fractional interest and credit the proceeds to the Cash Account (or a suspense account) or take such other action with respect to the relevant Corporate Action as is notified to the Client from time to time.

(iii) Corporate Actions notices dispatched to the Client may have been obtained from sources which Chase does not control and may have been translated or summarised. Although Chase believes such sources to be reliable, Chase has no duty to verify the information contained in such notices nor the faithfulness of any translation or summary and therefore does not guarantee its accuracy, completeness or timeliness, and shall not be liable to the Client for any loss that may result from relying on such notice.

(iv) Details of the proxy voting services offered by Chase are available on request. Neither Chase nor its Sub-Custodians or nominees shall execute any form of proxy, or give any consent or take any action, in relation to any Securities (other than as authorised under paragraph (ii) except upon the Instructions of the Client.

### TAX RECLAIMS

**I.(i)** Subject to the provisions of this sub-clause, Chase will apply for a reduction of withholding tax wherever appropriate upon receipt of the necessary documentation from the Client. Chase will assist the Customer to make reclaims of tax upon receipt of the necessary documentation from the Customer.

(ii) The provision of a tax reclaim service by Chase in accordance with this sub-clause is conditional upon Chase receiving from the beneficial owner of the Securities (a) a declaration on its identity and place of residence and (b) certain other documentation (pro forma copies of which are available from Chase). The Client acknowledges that, if Chase does not receive such declarations and information, additional United Kingdom taxation will be deducted from all income received in respect of the Securities issued outside the United Kingdom and that USA non-resident alien tax will be deducted from USA source income if the requisite documents are

not supplied to Chase. The Customer shall provide to Chase such documentation and information as it may require in connection with taxation, and warrants that, when given, this information is true and correct in every respect, not misleading in any way, and contains all material information. The Client undertakes to notify Chase immediately if any information requires updating or correcting.

(iii) Chase shall not be liable to the Client or any third party for any tax, fines or penalties payable by Chase or the Client (other than taxes on Chase's income or franchise or similar taxes payable by Chase), and shall be indemnified accordingly, whether these result from the inaccurate completion of documents by the Client or any other person, or as a result of the provision to Chase or any third party of inaccurate or misleading information or the withholding of material information by the Client or any other person, or as a result from any delay of any revenue authority or any other matter beyond the control of Chase.

(iv) The Client confirms that Chase is authorised to deduct from any cash received or credited to the Cash Account any taxes or levies required by any revenue or governmental authority for whatever reason in respect of the Client's Securities or Cash Accounts.

(v) Chase shall perform the services set out in this sub-clause only with respect to taxation levied by the revenue authorities of the countries notified to the Client from time to time and Chase may, by notification in writing, at its absolute discretion, supplement or amend the markets in which the tax reclaim services are offered. Other than as expressly provided in this sub-clause, Chase shall have no responsibility with regard to the Client's tax position or status in any jurisdiction.

(vi) The Client confirms that Chase is authorised to disclose any information requested by any revenue authority or any governmental body in relation to the Client or the Securities and/or Cash held for the Client.

3. INSTRUCTIONS AND AUTHORISED PERSONS

AUTHORISED PERSONS AND INSTRUCTIONS

A. As used in this Agreement:

(i) the term "Authorised Persons" means the individuals designated in a corporate resolution provided to and satisfactory to Chase. Chase shall continue to treat as Authorised Persons persons designated as such in accordance with this clause until such time as Chase receives Instructions from the Client that any such individual is no longer an Authorised Person. The Client confirms that, unless specified otherwise, each Authorised Person shall be authorised to give any Instructions (as defined in paragraph (ii)) in relation to all Securities and Cash Accounts and in relation to foreign exchange transactions and shall be authorised to give Instructions notwithstanding that they may result in an overdraft on any Cash Account; and

(ii) the term "Instructions" means instructions containing all necessary information required by Chase to enable Chase to carry out the Instructions received by Chase via telephone, telex, bank wire, SWIFT or other teleprocess or electronic instruction or trade information system acceptable to Chase which Chase believes in good faith to have been given by an two Authorised Persons or which are transmitted with proper testing or authentication pursuant to terms and conditions which Chase may specify. Unless otherwise expressly provided, all Instructions shall continue in full force and effect until cancelled or superseded.

CONFIRMATION OF ORAL INSTRUCTIONS/ SECURITY DEVICES

B. any Instructions delivered to Chase by telephone shall promptly thereafter be confirmed by Chase as provided in Appendix D hereto. Chase is authorised to follow such Instructions notwithstanding the failure to receive such confirmation in writing or the failure of such confirmation to conform to the telephone Instructions received and Chase shall be indemnified by the Client accordingly. Either party may electronically record any Instructions given by telephone, and any other telephone discussions. The Client shall be responsible for safeguarding any testkeys, identification codes or other security devices which Chase shall make available to the Customer or any Authorised Person.

ACTING ON INSTRUCTIONS/ UNCLEAR

C. The Client authorises Chase to accept and act upon any Instructions received by it without enquiry. Chase may (without prejudice to the foregoing) seek clarification or confirmation of an Instruction from an Authorised Person and may decline to act upon an Instruction if it does not

| INSTRUCTIONS | receive clarification or confirmation satisfactory to it. Chase shall not be liable for any loss arising from any delay whilst it obtains such clarification or confirmation or confirmation or from exercising its right to decline to act in the absence of such clarification or confirmation. |
|---|---|
| INSTRUCTIONS CONTRARY TO LAW/ MARKET PRACTICE | D. Chase need not act upon Instructions which it reasonably believes to be contrary to law, regulation or market practice but is under no duty to investigate whether any Instructions comply with any applicable law, regulation or market practice. Chase shall be entitled (but not bound), if it deems possible to do so to amend an Instruction in such a manner to comply with what Chase reasonably believes to be applicable law, regulation or market practice, so long as such amendment is intended to fulfill, in Chase's reasonable judgment, the Client's intent. In the event that Chase amends any such Instruction, it will notify the Client promptly within one Chase business day of such amendment. |

E.   Nothing in this Section or in Appendix D hereto shall be considered to limit the indemnity by the Client to Chase as set forth in Section 13 hereof with respect to matters outside the scope of Appendix D.

## 4.   BORROWINGS AND FOREIGN EXCHANGE

### A.—Loans and Advances.

**—NO OBLIGATION TO EXTEND CREDIT; LOANS AND ADVANCES BEAR INTEREST**

Chase may, solely at its discretion, permit the Client to use funds credited to the Account prior to final payment or otherwise advance funds to the Client prior to final payment. If Chase does permit the Client to use, or otherwise advances to the Client, such payment, the Client shall continue to bear the risk of non-receipt of final payment and, to the extent final payment for any Securities delivered on any day is not received by the close of business on that day, the Client shall immediately upon demand reimburse Chase for the amount so used or advanced, plus interest thereon from the date of such advance at such rates as shall be determined by Chase. Chase is further authorised, without the prior receipt of instructions from the Customer, to make other loans to the Client of either money or securities. In the event any Account of the Client maintained with Chase becomes overdrawn, Chase shall have the right, solely at its discretion, to lend the Client an amount equivalent to such overdraft. All loans, whether of money or securities, shall be repayable on demand and shall bear interest at such rates as shall be determined by Chase. Notwithstanding that Chase may from time to time make advances or loans pursuant to this paragraph or otherwise extend credit to the Client, whether or not as a regular pattern, Chase may at any time decline to extend such credit for any reason, including, but not limited to, if Chase believes the Client to be insecure or believes the Client's ability to perform its obligations hereunder may be impaired, or if Chase is precluded from extending such credit as a result of any law, regulation or applicable ruling or market conditions generally.

### B.   Foreign Exchange Transactions

**FX FACILITIES MAY BE GIVEN AT CHASE'S DISCRETION**

To facilitate the administration of the Client's trading and investment activity, Chase is authorised at its discretion only at the Client's Instruction, to enter into spot or forward foreign exchange contracts with the Client, or an Authorised Person for the Client, and may also provide foreign exchange contracts and facilities through its affiliates or Sub-Custodians. Instructions, including standing instructions, may be issued with respect to such contracts but Chase may establish rules or limitations concerning any foreign exchange facility made available. In all cases where Chase, its affiliates or Sub-Custodians enter into a foreign exchange contract related to Accounts, the terms and conditions then current for foreign exchange contracts of Chase, its affiliate or Sub-Custodians and, to the extent not inconsistent, this Agreement, shall apply to such transaction.

## 5.   FEES EXPENSES AND OTHER AMOUNTS OWING TO CHASE

**FEES – CHASE AUTHORISED TO DEDUCT FEES**

A.   The Client agrees to pay Chase for its services under this Agreement such amount as may be agreed in writing, together with Chase's reasonable out-of-pocket or incidental expenses, including, but not limited to, legal fees in connection with the enforcement of its rights and remedies hereunder. Chase may increase such fees by not less than sixty days' notice in writing to the Client. Chase is authorised to deduct amounts owing to it from the Cash Account monthly in arrears, at the end of each month in which a statement for such prior month is rendered to Client.

**CHASE'S RIGHTS OVER SECURITIES**

B.   Without prejudice to Chase's rights under applicable law, until satisfaction of all liabilities outstanding from time to time (whether actual or contingent) of the Client under or in connection with this Agreement ("Liabilities"), Chase shall have, and the Customer hereby grants to Chase, a continuing security interest in all its right, title and interest in and to (i) the Securities and financial assets credited to the Securities Account, (ii) all security entitlements relating to the Securities, financial assets and Securities Account, and (iii) all proceeds, substitutions and replacements of any of the aforesaid (the "Collateral"). The terms "Securities Account", "financial asset" and "security entitlement" shall, in addition to any other meanings contained in this Agreement, have the meanings set forth in Article 8 of the Uniform Commercial Code as adopted in the State of New York. (the "Code"). Chase shall have the rights and remedies of a secured party under the Code, including the right to withhold delivery of Securities, sell or otherwise realise any Collateral and to apply the proceeds and any other monies credited to the Cash Account in satisfaction of such Liabilities. For this purpose Chase may make such currency conversions as may be necessary at its then current rates for the sale and purchase of the relevant currencies. Notwithstanding anything to the contrary contained in this Agreement, the Client agrees that the Collateral shall be in Chase's "possession" and under Chase's "control" pursuant

to the Code.

**CHASE HAS A RIGHT OF SET OFF**

C.   Chase may set off, and appropriate and apply, any and all deposits of Client (general or special, but excluding any amounts held by Chase in a trustee and, if applicable to Client, any amounts held in customer accounts required by law to be segregated as identified by Client) against any amount owing by Client under this Agreement. For this purpose, Chase shall be entitled to accelerate the maturity of any fixed term deposits and to effect such currency conversions as may be necessary at its current rates for the sale and purchase of the relevant currencies.

## 6.  SUB-CUSTODIANS AND SECURITIES DEPOSITORIES

**APPOINTMENT**

A.   Chase is authorised under this Agreement to act through and hold the Client's Securities with sub-custodians, being at the date of this Agreement the entities listed in the Schedule ("Sub-Custodians"). In addition, Chase and each Sub-Custodian may deposit Securities with, and hold Securities in, any securities depository, settlement system, dematerialised book entry system or similar system (together a "Securities Depository") on such terms as such systems customarily operate. References to Sub-Custodians in this Agreement shall include branches and affiliates of Chase.

**LIABILITY FOR SUB-CUSTODIANS**

B.   (i)   Chase shall not be liable for any loss resulting from:

   (a)   the insolvency of any Sub-Custodian which is not a branch or affiliate of Chase; or

   (b)   any act or omission of any Sub-Custodian, save where such loss results directly from the failure by the Sub-Custodian to use reasonable care in the provision of custodial services by it in accordance with the standards prevailing in the relevant market or from the negligence or the wilful default of such Sub-Custodian in the provision of custodial services by it; or

   (c)   any act, omission or insolvency of any Securities Depository.

   (ii)   Chase reserves the right, with the prior consent of the Client, to add, replace or remove Sub-Custodians. Chase shall give notice, if practicable, of any such act.

**HOLDING OF REGISTERED AND BEARER SECURITIES**

C.   (i)   Chase is authorised to hold:

   (a)   in bearer form, such Securities as are customarily held in bearer form; and

   (b)   registered in the name of (at Chase's discretion) the Client or Chase or a Sub-Custodian or any nominee of Chase or a Sub-Custodian, such Securities as are customarily held in registered form.

   (ii)   Chase shall not be liable for any loss suffered howsoever caused as a result of an Instruction to hold Securities with, or have them registered in the name of, any person not chosen by Chase.

## 7.  BROKERS AND OTHER THIRD PARTIES

**BROKER/ THIRD PARTY DEFAULT**

A.   Chase shall not be responsible for any loss as a result of a failure by any broker or any other third party beyond the control of Chase. In particular, if a broker or any third party defaults in any obligation to deliver Securities or pay cash, Chase shall have no liability to the Client for such non-delivery or payment. Payments of income and settlement proceeds are at the risk of the account. If Chase, at the Client's request, appoints a broker or agent to effect any transaction on behalf of a Client, Chase shall have no liability whatsoever in respect of such broker's duties or its actions, omissions or solvency.

**DELIVERY TO BROKERS**

B.   Chase shall not be liable for losses arising from a direction to deliver Securities or cash to a broker, even if Chase might have information tending to show that this course of action, or the choice of a particular broker for a transaction, was unwise.

**SAME DAY RECEIPT AND DELIVERY OF**

C.   Chase shall not be responsible for any losses arising from their inability to redeliver Securities on the same day that they are received for the Client's account.

SECURITIES

8.  OMNIBUS ACCOUNTS

The Customer authorises Chase or its Sub-Custodian to hold Securities in fungible accounts and will accept delivery of Securities of the same class and denomination as those deposited with Chase or its Sub-Custodian.

- 10 -

## 9.   ABOUT THE CUSTOMER

THE CLIENT
STATES THAT

A.—The Client represents and warrants that:

IT HAS FULL
AUTHORITY
TO PERFORM
UNDER THIS
AGREEMENT

(i)   it has full authority and power, and has all obtained all necessary authorisations and consents, to deposit and control the Securities and cash in the Accounts, to use Chase as its custodian in accordance with the terms of this Agreement and to borrow money and enter into foreign exchange transactions;

(ii)   this Agreement is is legal, valid and binding obligation, enforceable in accordance with its terms and it has full power and authority to enter into and has taken all necessary corporate action to authorise the execution of this Agreement;[4]

(iii)   it has not relied on any oral or written representation made by Chase or any person on its behalf, and acknowledges that this Agreement sets out to the fullest extent the duties of Chase; and

(iv)   the Securities and cash deposited in the Accounts (other than the Segregated Accounts) are not subject to any encumbrance or security interest whatsoever and the Customer undertakes that, so long as Liabilities are outstanding, it will not create or permit to subsist any encumbrance or security interest over such Securities or cash other than the security interest in favor of Chase granted hereby.

CLIENT IS
LIABLE TO
CHASE EVEN
IF IT IS
ACTING FOR
ANOTHER
PERSON

B.   Even if the Client is acting as an agent in respect of any transaction, without affecting any rights Chase might have against the Client's principal, Chase shall treat the Client as a principal in respect of such transactions.

## 10.   CONFLICTS OF INTEREST

CHASE
PROVIDES
DIVERSE
FINANCIAL
SERVICES
AND MAY
GENERATE
PROFITS AS A
RESULT

The Client hereby authorises Chase to act hereunder notwithstanding that:

(i)   Chase or any of its divisions, branches or affiliates may have a material interest in the transaction or that circumstances are such that Chase may have a potential conflict of duty or interest including the fact that Chase or any of its affiliates may:

(a)   act as a market maker in the Securities to which the Instructions relate;

(b)   provide broking services to other customers;

(c)   act as financial adviser to the issuer of such Securities;

(d)   act in the same transaction as agent for more than one customer;

(e)   have a material interest in the issue of the Securities; or

(f)   earn profits from any of the activities listed herein;

[4]   The Customer, if a company incorporated in England and Wales, to attach a certified copy of a board resolution in terms satisfactory to Chase in the form of Exhibit C. Other Customers should in addition provide legal opinion or other evidence of due execution and enforceability acceptable to Chase.  Customers should also attach a copy of their constitutional documents e.g. certificate of incorporation, memorandum and articles of association, trust deeds etc.

- 11 -

CHASE HAS NO DUTY TO ADVISE IF IT IS AWARE THAT INSTRUCTIONS MAY BE UNWISE

(ii) Chase or any of its divisions, branches or affiliates may be in possession of information tending to show that the Instructions received may not be in the best interests of the Client. Chase is not under any duty to disclose any such information.

## 11. STANDARD OF CARE - HOW CHASE IS TO PERFORM ITS DUTIES UNDER THIS AGREEMENT

REASONABLE CARE

A. Chase will use reasonable care in performing its obligations under this Agreement in accordance with the standards prevailing in the market in which Chase or its Subcustodians provide such services and Chase will look after assets with the same degree of care as it does for its own similar assets in the relevant market.

CHASE CAN TAKE ADVICE

B. Chase shall be entitled to rely on, and may act upon the written advice of professional advisers in relation to matters of law, regulation or market practice (which may be the professional advisers of the Client), and shall not be liable to the Client for any action reasonably taken or omitted pursuant to such advice, save to the extent that Chase is able to recover from such professional advisers in respect of negligent advice given.

INSURANCE

C. Chase need not maintain any insurance cover for the benefit of the Client, but will maintain professional negligence insurance which provides cover against losses and claims in respect of negligence or loss consistent with that which would be reasonably be considered adequate given the nature of Chase's business .

## 12. WHEN CHASE IS NOT LIABLE TO THE CLIENT

MARKET AND COUNTRY RISK

A. Investing in foreign markets may be a risky enterprise. The holding of assets and cash in foreign jurisdictions may involve risks of loss or other special features. Chase accepts no liability whatsoever for any loss which results from:

   (i)  the general risks of investing; or

   (ii)  investing or holding assets in a particular country, including, but not limited to, losses arising from nationalisation, expropriation or other governmental actions; regulations of the banking or securities industries, including changes in market rules; currency restrictions, devaluations or fluctuations; market conditions affecting the orderly execution of securities transactions or affecting the value of assets.

FORCE MAJEURE

B. Chase shall not be liable to the Client for any loss due to forces beyond its control including, but not limited to, strikes, work stoppages, acts of war or terrorism, insurrection, revolution, nuclear fusion, fission or radiation or acts of God.

ACTING IN GOOD FAITH

C. Chase shall not be liable for acting on what it in good faith believes to be Instructions or in relation to notices, requests, waivers, consents, receipts, corporate actions or other documents which Chase in good faith believes to be genuine and to have been given or signed by the appropriate parties.

INVALID SECURITIES

D. Except to the extent that invalidity, fraud or forgery is manifest to Chase, Chase shall not be liable to the Client for the collection, deposit or credit of invalid, fraudulent or forged Securities. If Chase should become aware of any such fraud, forgery or invalidity, it will notify the Client.

DELIVERIES

E. Chase shall not be liable for losses arising out of effecting delivery or payment against an expectation of receipt, save where such delivery or payment was contrary to local market practice.

OTHER CASES WHEN CHASE IS NOT NEGLIGENT

F. Chase shall only be liable to the Client to the extent Chase has been negligent, or is in willful default, of its duties as set out in this Agreement and to the extent provided for in clause 6(B)(i). Chase and the Client agree that, as a genuine pre-estimate of loss, Chase's liability to the Client shall be determined based upon the value of any property as at the date of the discovery of loss and without reference to any special circumstances or indirect or consequential losses.

- 12 -

## 13. INDEMNITY

A.   The Client undertakes to indemnify Chase and its Sub-Custodians and their respective nominees, directors, officers, agents and employees (the "indemnitees"), and to keep them indemnified, from any costs, claims, losses, liabilities, damages, expenses, fines, penalties, taxes and other matters ("Losses") that may be imposed on, incurred by or asserted against the indemnitees or any of them:

(i)   in respect of the following of any Instructions or other directions upon which the indemnitee is authorised to act or rely pursuant to the terms of this Agreement; or

(ii)   arising as a result of their status as a holder of record of Securities.

B.   In addition to and without limitation to Clause 12A the Client also agrees to indemnify the indemnitees or any of them against all and any Losses that may imposed on, incurred by or asserted against the indemnitees:

(i)   arising as a result of a breach of the obligations, warranties and representations of the Client (or its agent) under this Agreement; or

(ii)   otherwise arising under or in connection with this Agreement including, without limitation, the costs of Chase defending itself successfully against alleged fraud, negligence or wilful default of itself or a Sub-Custodian

save in respect of the fraud, negligence or wilful default of Chase and save in respect of loss arising from the action of any indemnity for which Chase is liable pursuant to, and in accordance with, this Agreement.

## 14.   UNITED KINGDOM REGULATORY MATTERS

MEANING OF TERMS

A.   As used in this clause:

(i)   the term "Applicable SRO" means The Securities and Futures Authority Limited ("SFA"), the Investment Management Regulatory Organisation Limited ("IMRO") and any other self-regulating organisation (including, in each case, any successor or replacement organisation following amalgamation, merger or otherwise) recognised under the Financial Services Act, 1986 (including any statutory modification or re-enactment thereof or any regulations or orders made thereunder) of which, as the case may be, Chase or the Customer is for the time being a member and to whose regulatory authority it is subject; and

(ii)   the term "Applicable SRO Rules" means the rules and regulations of an Applicable SRO as amended, varied or substituted from time to time.

B.   Where the Customer is for the time being subject to any Applicable SRO Rules, Chase shall not have or claim any lien or right of retention or sale over any investments, securities or other property of or belonging to any client of the Customer (including without limitation, where the Customer is a member of SFA and/or IMRO, over any "Safe Custody Securities" and "Customer Title Documents relating to Investments" as respectively defined by such Applicable SRO Rules) otherwise than as permitted by such Applicable SRO Rules, and the provisions of clause 5(B) shall be limited accordingly.

C.   Where Chase is for the time being subject to any Applicable SRO Rules in the provision of services pursuant to this Agreement (including without limitation, in relation to the appointment of Sub-Custodians, Securities Depositories and agents) the rights and obligations of Chase under the provisions of this Agreement shall be read and construed as subject to and permitted by such Applicable SRO Rules, and the provisions of this Agreement shall be limited accordingly.

CUSTOMER – APPLICABLE SRO RULES

CHASE – APPLICABLE SRO RULES

SFA NOTIFICATIONS

D.   The Rules of the SFA require Chase to inform the Customer that:

(i)   where Securities are held overseas there may be different settlement legal and regulatory requirements from those applying in the UK, together with different practices for the separate identification of Securities. Chase will from time to time inform the Customer of matters relevant to each jurisdiction referred to in Schedule 1 as amended in accordance with this Agreement;

- 13 -

(ii)   in providing the services described in this Agreement, Chase intends holding Securities with Sub-Custodians who are in the same group as Chase. The Sub-Custodians who are in the same group as Chase are identified by an asterisk (*) next to their name in Schedule 1;

(iii)  although Securities will ordinarily be registered in the name of a nominee, Chase may from time to time (due to the nature of law or market practice or where it is in the Customer's best interests or it is not feasible to do otherwise) register or record securities in the name of a Sub-Custodian, the Customer, or Chase itself. If Securities are registered in Chase's name, the Securities in question may not be segregated from assets of Chase and in the event of default by Chase, customers' assets may not be as well protected. However, arrangements with the Sub-Custodians are such that our customer securities with them shall be in a separate account containing assets belonging only to the customers of Chase and not Chase's proprietary assets. In any event, Chase will notify the Customer of the registration name used in respect of Securities;

(iv)   Chase accepts the same level of liability for any nominee company controlled by Chase or an affiliate as for itself;

(v)    the omnibus accounts referred to in Clause 8 above are a form of pooling;

(vi)   if the Customer instructs Chase to hold Securities with or register or record Securities in the name of a person not chosen by Chase, the consequences of doing so are at the Customer's own risk and Chase shall not be liable therefor.

– 14 –

## 15. TERMINATION

Either party may terminate this Agreement on sixty days' notice in writing to the other party. If the Client gives notice of termination, it must provide full details of the persons to whom Chase must deliver Securities and cash. If Chase gives notice of termination, then the Client must, within sixty days, notify Chase of details of its new custodian, failing which Chase may elect (at any time after the sixty day notice period) either to retain the Securities and cash until such details are given, continuing to charge fees due, or deliver the Securities and cash to the Client. Chase shall in any event be entitled to deduct any amounts owing to it prior to delivery of the Securities and cash (and, accordingly, Chase shall be entitled to sell Securities and apply the sale proceeds in satisfaction of amounts owing to it). Termination shall not affect any of the liabilities either party owes to the other arising under this Agreement prior to such termination.

## 16. MISCELLANEOUS

**NOTICES**

A. Notices (other than Instructions) shall be in writing and shall be served by registered mail or hand delivery to the address of the respective parties as set out on the first page of this Agreement, unless notice of a new address is given to the other party in writing. Notice shall not be deemed to be given unless it has been received.

**SUCCESSORS AND ASSIGNS**

B. This Agreement shall be binding on each of the parties' successors and assigns, but the parties agree that neither party can assign its rights and obligations under this Agreement without the prior written consent of the other party, which consent shall not be unreasonably withheld.

**INTERPRETATION**

C. Headings, marginal notes and paragraphs are for convenience only and are not intended to affect interpretation. References to clauses are to clauses of this Agreement and references to sub-clauses and paragraphs are to sub-clauses of the clauses and paragraphs of the sub-clauses in which they appear.

**INTERPLEADER CLAUSE. WHAT HAPPENS IF THERE IS A DISPUTE IN RELATION TO THE ASSETS HELD IN THE ACCOUNT**

D. In the event of any conflicting claims by any person or persons with respect to Securities held in the Custody Account or cash in the Cash Account, Chase shall be entitled to apply to a court of law to determine the rights of such persons and meanwhile at its option to refuse to comply with any and all claims, demands or Instructions with respect to such Securities or cash and other property related thereto so long as such dispute or conflict shall continue. Chase shall not be liable or become liable in any way for its refusal to comply with such conflicting claims, or demands or Instructions. Chase shall be entitled to refuse to act until either:

(i) such conflicting or adverse claims or demands shall have been:

(a) finally determined in a court of competent jurisdiction; or

(b) settled by agreement between the conflicting parties and Chase shall have received evidence in writing satisfactory to Chase of such agreement; or

(ii) Chase shall have received an indemnity and/or security satisfactory to Chase sufficient to save it harmless from and against any or all loss, liability or expense which Chase may incur by reason of its actions.

**ENTIRE AGREEMENT**

E. This Agreement, including the Schedule and the Exhibits hereto, sets out the entire Agreement between the parties and this Agreement supersedes any other Global Custody and Clearance Agreement relating to custody, whether oral or written. Amendments must be in writing and signed by both parties.

**FRACTIONS/ REDEMPTIONS BY LOT**

F. The Client shall not be entitled to any fraction or other entitlement arising as a result of Chase holding Securities in omnibus accounts, as described in clause 8, which is not directly referable solely to the holding of the Client, and such fractions or entitlements shall be at the disposal of Chase. On partial redemptions, Chase shall use whatever method it deems fair to determine how shares will be redeemed.

| | |
|---|---|
| LONDON ACCOUNTS | G. Any amount standing to the credit of the Cash Accounts held with Chase is held by it as a banker and is payable exclusively by the London branch of Chase in its stated currency, subject to compliance with any applicable laws, regulations, governmental decrees or similar orders. Chase is a member of the United Kingdom Deposit Protection Scheme ("the Scheme") established under the Banking Act 1987 (as amended). The Scheme provides that in the event of Chase's insolvency payments may be made to certain customers of Chase's London branch. Payments under the Scheme are limited to 90% of a depositor's total cash deposits subject to a maximum payment to any one depositor of £18,000 (or ECU 20,000 if greater). Most deposits denominated in sterling and other European Economic Area Currencies and ECU made with Chase within the United Kingdom are covered. Further details of the Scheme are available on request. |
| STATEMENTS | H. Chase will issue statements to the Client at times mutually agreed identifying the securities in the Accounts, and otherwise on request. A certificate or statement by Chase as to any Liabilities or any Securities or cash held in any account shall be conclusive in the absence of manifest error. Prices and other information contained in any statement sent to the Client have been obtained from sources Chase believes to be reliable. Chase does not, however, make any representation as to the accuracy of such information, nor that the prices specified necessarily reflect the proceeds that would be received on a disposal of the relevant Securities. References in this Agreement to statements include any statements in electronic form. |
| DISCLOSURE OF INFORMATION | I. Chase shall be keep confidential and not disclose information relating to the Client or the Securities and/or cash held for the Client, except that Chase shall be entitled to disclose any such information as is required by any law, court, legal process, or banking or other regulatory or examining authorities (whether governmental or otherwise). |
| CONFIDENTIALITY | J. Both Chase and the Customer agree to keep this Agreement confidential and other than where disclosure is required by law or regulation will only disclose it (or any part of it) with the prior written consent of the other party. |
| ACCESS TO CHASE'S RECORDS | K. Chase shall, on written request allow the auditors of the Client such reasonable access to its records relating to the Accounts as such auditors may reasonably require in connection with the audit of the Client. |
| GLOBAL CUSTODY AGREEMENT AND MANDATE | L. If and to the extent that there is any inconsistency between the provisions of any mandate between Chase and the Client and this Agreement, the provisions of this Agreement shall prevail. |
| AFFILIATE AND SUBSIDIARY | M. In this Agreement the term "affiliate" of Chase means an entity that is a subsidiary or holding company, or a subsidiary of a holding company, of Chase and the terms "subsidiary" and "holding company" have the meanings given them in Section 736 of the Companies Act 1985 (or any statutory modification or re-enactment thereof). |
| GOVERNING LAW AND JURISDICTION | N. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflict of law principles thereof. |

AS WITNESS the hand of the duly authorised officers of the parties hereto:

SCHEDULE

List of Sub-Custodians and markets used by Chase
[To be client specific]

| Countries/Markets | Sub-Custodian |
|---|---|
| Ireland | The Bank of Ireland |
| United Kingdom | The Chase Manhattan Bank |

- 10 -

EXHIBIT A
Persons authorised to give Instructions

| Full Name and Official Position | Initial if authorised to give Oral Instructions[7] | Limitation in Authority[8] | Specimen Signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

If insufficient room, please attach further copies of this page duly completed.

For and on behalf of

........................................

Name:
Position:

[7]   Rule out box if not authorised to give oral instructions.

[8]   "All", "No limit" or similar phrases would include authority to issue instructions relating to foreign exchange.

EXHIBIT B
Form of Board Resolution

To:    The Chase Manhattan Bank,
       London

We hereby certify that the following is a true copy of the minutes of the Board of Directors of
........................................................[9] (the "Company") which was duly called
and held on ........................, 19...... and at which a duly qualified quorum was present throughout
and entitled to vote.

1. There was produced to the meeting a form of Custody Agreement provided by The Chase Manhattan Bank,
   ("Chase") for use in connection with the opening of one or more cash and securities accounts and the conduct of
   such other transactions between the Company and Chase as referred to therein.  The form of Custody Agreement
   produced had been completed by an officer of the Company, and in particular it was noted that details of the
   Authorised Persons (as defined therein) and details of persons authorised to sign and/or give oral instructions on
   behalf of the Company had been completed in Exhibit A and also details of any Fund Managers and Advisers had
   been completed in Exhibit B.  The indemnities given to Chase in the Custody Agreement were also noted.  The
   meeting considered the form of the Custody Agreement.

2. IT WAS RESOLVED that the form of Custody Agreement (together with the Schedule and Exhibits), completed in
   the manner of the form produced at the meeting, be and it is hereby approved and that' ........................[10] be and he/she is
   ........................, for and on behalf of the Company, to sign and deliver the same together with such changes and
   hereby authorised, for and on behalf of the Company, to sign and deliver the same together with such changes and
   amendments thereto as he/she may in his/her sole discretion think fit.

3. There was produced to the meeting a form of power of attorney ("power of attorney") to be given by the Company
   to Chase to enable Chase to provide tax reclaim services as provided for in the Custody Agreement.  The meeting
   considered the form of the power of attorney and in particular the indemnities contained in it.  IT WAS
   RESOLVED that that power of attorney be and it is hereby approved and that it be executed under seal in
   accordance with the Company's constitution.

.......................................    Director

.......................................    Secretary

GCA.W4W

---
[9]    Name of Company in full.

[10]   Name of Officer(s) signing the document.

- 10 -

SIGNED by

For and on behalf of
THE CHASE MANHATTAN BANK,

Name: MICHAEL REECE
Position: ASSISTANT VICE PRESIDENT

SIGNED by

For and on behalf of
LEHMAN BROTHERS INC.

HEIDEMARE ECHTERMANN
SENIOR VICE PRESIDENT & ASSISTANT TREASURER

IAN LOWITT
MANAGING DIRECTOR & GLOBAL TREASURER

241256

## **Exhibit B**

Guarantee Agreements

# GUARANTY

**GUARANTY** dated as of August 26, 2008 made by the undersigned (the "Guarantor") in favor of JPMORGAN CHASE BANK, N.A. and any of its successors or assigns (hereinafter, the "Bank").

**PRELIMINARY STATEMENT**: Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc., Lehman Brothers Commercial Paper Inc. and Lehman Brothers Japan Inc. (collectively, with their respective successors, the "Borrowers"), each a wholly-owned direct or indirect subsidiary of the Guarantor, desire to transact business with and/or to obtain credit, clearing advances, clearing loans or other financial accommodation from the Bank or to continue such extensions of credit, clearing advances, clearing loans or other financial accommodation or such business in each case under or in connection with the Clearance Agreement (as defined below) or transactions pursuant thereto, and the Bank has requested that it receives the following guaranty of the undersigned before it will consider extending such credit.  The Guarantor derives, and expects to continue to derive, substantial direct and indirect benefits from the business of the Borrowers and the credit, clearing advances, clearing loans and other financial accommodations provided by the Bank to the Borrowers.

**THEREFORE**, for good and valuable consideration and in order to induce the Bank from time to time, in its discretion, to extend or continue credit, clearing advances, clearing loans or other financial accommodations to the Borrowers under the Clearance Agreement (as hereinafter defined) (all of the foregoing extensions of credit, advances, loans or accommodations under the Clearance Agreement being the "Facilities" and any writing evidencing, supporting or securing a Facility, consisting of (i) the Clearance Agreement, (ii) this Guaranty, and (iii) the Security Agreement as of even date hereof (the "Security Agreement") and entered into by Guarantor for the benefit of the Bank, as each such writing may be amended, modified or supplemented from time to time being a "Facility Document"), the Guarantor agrees as follows:

Section 1.  **Guaranty of Payment**.  The Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of all obligations and liabilities (including without limitation the "Obligations" as defined in the Clearance Agreement) of the Borrowers to the Bank of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by the Bank by assignment or otherwise, whether matured or unmatured and whether absolute or contingent, when the same are due and/or due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, fees, expenses, indemnification or otherwise (all of the foregoing sums being the "Liabilities"), pursuant to the Clearance Agreement, dated as of June 15, 2000, to which one or more of the Borrowers and the Bank are parties, as it may be further amended from time to time (the "Clearance Agreement") and subject to the last sentence of this Section 1. The Liabilities include, without limitation, (a) interest accruing after the commencement of a case or proceeding under bankruptcy, insolvency or similar laws of any jurisdiction at the rate or rates provided in the Facility Documents, regardless of whether such interest is allowed or allowable as a claim in such case or proceeding and (b) the obligations of the Borrowers under section 16 of the Clearance Agreement.  This Guaranty is a guaranty of payment and not of collection only.  The Bank shall not be required to exhaust any right or remedy or take any action against the Borrowers or any

other person or entity or any collateral. All moneys available to the Bank for application in payment or reduction of the Liabilities may be applied by the Bank to the payment or reduction of such of the Liabilities as the Bank may elect in its sole discretion and in such manner and in such amounts and at such time or times as it may see fit. The Guarantor agrees that, as between the Guarantor and the Bank, the Liabilities may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrowers and that in the event of a declaration or attempted declaration, the Liabilities shall immediately become due and payable by the Guarantor for the purposes of this Guaranty. The Guarantor's maximum liability under this Guaranty shall adjust each day and for each such day shall be equal to the dollar amount of cash and securities (based on the market value of such securities as determined by the Bank in its reasonable discretion) (i) held on such day in the accounts of the Guarantor subject to the Clearance Agreement and the Security Agreement and (ii) that the Bank has notified the Guarantor to be delivered to the Bank on such day in support of this Guaranty.

Section 2. **Guaranty Absolute**. The Guarantor guarantees that the Liabilities shall be paid strictly in accordance with the terms of the Facilities and any Facility Documents. The liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Facilities, the Facility Documents or Liabilities, or any other amendment or waiver of or any consent to departure from any of the terms of any Facility, Facility Document or Liability including, without limitation, any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any collateral, for all or any of the Facilities, Facility Documents or Liabilities; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Facility, Facility Document or Liability; (d) without being limited by the foregoing, any lack of validity or enforceability of any Facility, Facility Document or Liability; and (e) any other setoff, defense, or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) or circumstance whatsoever with respect to the Liabilities, the Facilities or the Facility Documents contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrowers or a guarantor; and the Guarantor irrevocably waives the right to assert such defenses, set-offs or counterclaims in any litigation or other proceeding relating to the Liabilities, the Facilities or the Facility Documents contemplated thereby.

Section 3. **Guaranty Irrevocable**. This Guaranty is a continuing guaranty of the payment of all Liabilities (absolute or contingent) now or hereafter existing and shall remain in full force and effect until the later of (hereinafter the "Termination Date") (i) payment in full of all Liabilities and other amounts payable under this Guaranty (ii) the expiration or termination of the Clearance Agreement and all of the Borrowers' accounts at the Bank in connection with the Clearance Agreement; and (iii) the fulfillment of all obligations and commitments of the Borrowers under the Facilities and any Facility Documents.

Section 4. **Reinstatement**. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Liabilities arising or

incurred prior to the Termination Date is rescinded or must otherwise be returned by the Bank on the insolvency, bankruptcy or reorganization of the Borrowers or otherwise (including, without limitation, on the grounds of preference or fraudulent transfer), all as though the payment had not been made.

Section 5. **Subrogation**. The Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until the Termination Date. If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time prior to the Termination Date, the amount shall be held in trust for the benefit of the Bank and shall be promptly paid to the Bank to be credited and applied to the Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Facilities. If the Guarantor makes payment to the Bank of all or any part of the Liabilities and the Termination Date shall have occurred, the Bank shall, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Liabilities resulting from the payment.

Section 6. **Subordination**. Without limiting the Bank's rights under any other agreement, any liabilities owed by the Borrowers to the Guarantor in connection with any extension of credit or financial accommodation by the Guarantor to or for the account of the Borrowers, including but not limited to interest accruing at the agreed contract rate after the commencement of a bankruptcy or similar case or proceeding (regardless of whether such interest is allowed or allowable as a claim in such case or proceeding), are hereby subordinated to the Liabilities, and such liabilities of the Borrowers to the Guarantor, if the Bank so requests, shall be collected, enforced and received by the Guarantor as trustee for the Bank and shall be paid over to the Bank on account of the Liabilities but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

Section 7. **Payments Generally**. All payments by the Guarantor shall be made in the manner, at the place and in the currency (the "Payment Currency") required by the Facility Documents; provided, however, that if the Payment Currency is other than U.S. dollars the Guarantor may, at its option (or, if for any reason whatsoever the Guarantor is unable to effect payments in the manner required by the Facility Documents, the Guarantor shall be obligated to) pay to the Bank at its office located at 277 Park Avenue, New York, New York 10017 the equivalent amount in U.S. dollars computed at the selling rate of the Bank, most recently in effect on or prior to the date the Liability becomes due or if such rate is unavailable, at a selling rate chosen by the Bank, for cable transfers of the Payment Currency to the place where the Liability is payable. In any case in which the Guarantor makes or is obligated to make payment in U.S. dollars, the Guarantor shall hold the Bank harmless from any loss incurred by the Bank arising from any change in the value of U.S. dollars in relation to the Payment Currency between the date the Liability becomes due and the date the Bank is actually able, following the conversion of the U.S. dollars paid by the Guarantor into the Payment Currency and remittance of such Payment Currency to the place where such Liability is payable, to apply such Payment Currency to such Liability.

Section 8. [Intentionally Omitted.]

#377227v3

Section 9. **Representations and Warranties**. The Guarantor represents and warrants that: (a) the execution, delivery and performance by the Guarantor under this Guaranty: (i) has been duly authorized by all necessary corporate action; (ii) does not, conflict with or violate any material agreement or instrument or any constitutive document, law, regulation or order applicable to the Guarantor; (iii) does not require the consent or approval of any person or entity, including but not limited to any governmental authority, or any filing or registration of any kind; and (iv) is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditor's rights generally; and (b) in executing and delivering this Guaranty, the Guarantor has (i) without reliance on the Bank or any information received from the Bank and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the Borrowers, the Borrowers' business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Borrowers or the obligations and risks undertaken herein with respect to the Liabilities; (ii) adequate means to obtain from the Borrowers on a continuing basis information concerning the Borrowers; (iii) has full and complete access to the Facility Documents and any other documents executed in connection with the Facility Documents; and (iv) not relied and will not rely upon any representations or warranties of the Bank not embodied herein or any acts heretofore or hereafter taken by the Bank (including but not limited to any review by the Bank of the affairs of the Borrowers). The Guarantor hereby further represents and warrants that the Guarantor owns (directly or indirectly) a substantial amount of the stock or other ownership interests of the Borrowers and is financially interested in its affairs.

Section 10. **Remedies Generally**. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law.

Section 11. **Setoff**. The Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Bank may otherwise have, the Bank shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of the Guarantor at any of the offices of the Bank, J.P. Morgan Securities Inc., or any other affiliate, in U.S. dollars or in any other currency, against any amount payable by the Guarantor under this Guaranty which is not paid when due (regardless of whether such balances are then due to the Guarantor), in which case it shall promptly notify the Guarantor thereof; provided that the Bank's failure to give such notice shall not affect the validity thereof.

Section 12. **Formalities**. The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty, notice of creation, renewal, extension or accrual of any Liability and notice of any other kind and any other formality with respect to any of the Liabilities or this Guaranty. The Guarantor also waives the right to require the Bank to proceed first against the Borrowers upon the Liabilities before proceeding against the Guarantor hereunder.

Section 13. **Amendments and Waivers**. No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be

#377227v3

effective unless it is in writing and signed by the Bank, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of the Bank to exercise, and no delay in exercising, any right or remedy under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right or remedy.

Section 14.  **Expenses**.  The Guarantor shall reimburse the Bank on demand for all costs, expenses and charges (including without limitation the reasonable and documented fees and charges of external legal counsel for the Bank) incurred by the Bank in connection with the preparation, performance or enforcement of this Guaranty.  The obligations of the Guarantor under this Section shall survive the termination of this Guaranty.

Section 15.  **Assignment**.  This Guaranty shall be binding on, and shall inure to the benefit of the Guarantor, the Bank and their respective successors and assigns; provided that the Guarantor may not assign or transfer its rights or obligations under this Guaranty.

Section 16.  **Captions**.  The headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction of this Guaranty.

Section 17.  **Governing Law, Etc.**  THIS GUARANTY SHALL BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  THE GUARANTOR CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK.  SERVICE OF PROCESS BY THE BANK IN CONNECTION WITH ANY SUCH DISPUTE SHALL BE BINDING ON THE GUARANTOR IF SENT TO THE GUARANTOR BY REGISTERED MAIL AT THE ADDRESS SPECIFIED BELOW OR AS OTHERWISE SPECIFIED BY THE GUARANTOR FROM TIME TO TIME.  THE GUARANTOR WAIVES ANY RIGHT THE GUARANTOR MAY HAVE TO JURY TRIAL IN ANY ACTION RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FURTHER WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY SUCH ACTION.  TO THE EXTENT THAT THE GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER FROM SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF A JUDGMENT, EXECUTION OR OTHERWISE), THE GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY.

Section 18.  **Integration; Effectiveness**.  This Guaranty and the Facility Documents sets forth the entire understanding of the Guarantor and the Bank relating to the guarantee of the Liabilities and constitutes the entire contract between the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.; provided, however, that notwithstanding anything to the contrary, this Guaranty shall not effect or impair any other Guaranty made by the Guarantor in support of any of the obligations or liabilities of the Borrowers with respect to or in connection

#377227v3

with extensions of credit or facilities other than those related hereto.  This Guaranty shall become effective when it shall have been executed and delivered by the Guarantor to the Bank.  Delivery of an executed signature page of this Guaranty by telecopy shall be effective as delivery of a manually executed signature page of this Guaranty.

        **IN WITNESS WHEREOF**, the Guarantor has caused this Guaranty to be duly executed and delivered by its authorized officer as of the date first above written.

By:

    Name: Ian Lowitt

    Title: Chief Financial Officer

    Address: 745 7th Ave. 31st Fl.

        New York, NY 10019

## GUARANTY

**GUARANTY** dated as of September 9, 2008 made by the undersigned (the "Guarantor") in favor of JPMORGAN CHASE BANK, N.A. and its affiliates, subsidiaries, successors and assigns (hereinafter, collectively and individually as the context may require, the "Bank"). This Guaranty shall be in addition to and does not replace that certain Guaranty dated August 26, 2008, made by the undersigned in favor of JPMorgan Chase Bank, N.A.

**PRELIMINARY STATEMENT**: The Guarantor and each of the direct or indirect subsidiaries of the Guarantor (collectively, with their respective successors, the "Borrowers"), desires to transact business and/or trade with and/or enter into derivative transactions with and/or to obtain credit, clearing advances, clearing loans or other financial accommodation from the Bank and to continue such business, trading, derivative activity and/or such extensions of credit, clearing advances, clearing loans or other financial accommodation and the Bank has requested that it receive the following guaranty of the undersigned before it will consider extending such credit.  The Guarantor derives, and expects to continue to derive, substantial direct and indirect benefits from the business of the Borrowers and the credit, trading, derivative transactions, clearing advances, clearing loans and other financial accommodations provided by the Bank to the Borrowers.

**THEREFORE**, for good and valuable consideration and in order to induce the Bank from time to time, to extend or continue to extend credit, clearing advances, clearing loans or other financial accommodations to the Borrowers and/or to transact business, trade or enter into derivative transactions with the Borrowers (all of the foregoing extensions of credit, advances, loans, accommodations, business, derivative transactions and trading being the "Facilities" and any writing evidencing, supporting or securing a Facility, consisting of (i) any agreement between a Borrower and the Bank, including without limitation any ISDA Master Agreement, (ii) this Guaranty and (iii) the Security Agreement as of even date hereof (the "Security Agreement") and entered into by Guarantor for the benefit of the Bank, as each such writing may be amended, modified or supplemented from time to time being a "Facility Document";

Section 1.  **Guaranty of Payment**.  The Guarantor unconditionally and irrevocably guarantees to the Bank the punctual payment of all obligations and liabilities of the Borrowers to the Bank of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by the Bank by assignment or otherwise, whether matured or unmatured and whether absolute or contingent, when the same are due and/or due and payable, whether on demand, at stated maturity, by acceleration or otherwise, and whether for principal, interest, fees, expenses, indemnification or otherwise (all of the foregoing sums being the "Liabilities") and subject to the last two sentences of this Section 1. The Liabilities include, without limitation, interest accruing after the commencement of a case or proceeding under bankruptcy, insolvency or similar laws of any jurisdiction at the rate or rates provided in the Facility Documents, regardless of whether such interest is allowed or allowable as a claim in such case or proceeding.  This Guaranty is a guaranty of payment and not of collection only.  The Bank shall not be required to exhaust any right or remedy or take any action against the Borrowers or any other person or entity or any collateral. All moneys available to the Bank for application in payment or reduction of the Liabilities may be applied by the Bank to the payment or reduction of such of the Liabilities as the Bank may elect in

its sole discretion and in such manner and in such amounts and at such time or times as it may see fit. The Guarantor agrees that, as between the Guarantor and the Bank, the Liabilities may be declared to be due and payable for the purposes of this Guaranty notwithstanding any stay, injunction or other prohibition which may prevent, delay or vitiate any declaration as regards the Borrowers and that in the event of a declaration or attempted declaration, the Liabilities shall immediately become due and payable by the Guarantor for the purposes of this Guaranty. The Guarantor's maximum liability under this Guaranty shall be THREE BILLION DOLLARS ($3,000,000,000) or such greater amount that the Bank has requested from time to time as further security in support of this Guaranty. Notwithstanding the foregoing, the Guarantor may upon three written days notice to the Bank transfer any Security (as defined in the Security Agreement), provided that the Guarantor shall not transfer any such Security if the Bank has exercised or been stayed or otherwise prohibited from exercising any of its rights under this Guaranty or the Security Agreement or in the event any default (as such term is defined in the Security Agreement) has occurred and is continuing, in any such case, prior to the end of the three day notice period.

Section 2. **Guaranty Absolute**. The Guarantor guarantees that the Liabilities shall be paid strictly in accordance with the terms of the Facilities and any Facility Documents. The liability of the Guarantor under this Guaranty is absolute and unconditional irrespective of: (a) any change in the time, manner or place of payment of, or in any other term of, all or any of the Facilities, the Facility Documents or Liabilities, or any other amendment or waiver of or any consent to departure from any of the terms of any Facility, Facility Document or Liability including, without limitation, any increase or decrease in the rate of interest thereon; (b) any release or amendment or waiver of, or consent to departure from, any other guaranty or support document, or any exchange, release or non-perfection of any collateral, for all or any of the Facilities, Facility Documents or Liabilities; (c) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of any Facility, Facility Document or Liability; (d) without being limited by the foregoing, any lack of validity or enforceability of any Facility, Facility Document or Liability; and (e) any other setoff, defense, or counterclaim whatsoever (in any case, whether based on contract, tort or any other theory) or circumstance whatsoever with respect to the Liabilities, the Facilities or the Facility Documents contemplated thereby which might constitute a legal or equitable defense available to, or discharge of, the Borrowers or a guarantor; and the Guarantor irrevocably waives the right to assert such defenses, set-offs or counterclaims in any litigation or other proceeding relating to the Liabilities, the Facilities or the Facility Documents contemplated thereby.

Section 3. **Guaranty Irrevocable**. This Guaranty is a continuing guaranty of the payment of all Liabilities (absolute or contingent) now or hereafter existing and shall remain in full force and effect until the latest of (hereinafter the "Termination Date") (i) payment in full of all Liabilities and other amounts payable under this Guaranty; (ii) the termination of all of the Borrowers' accounts at the Bank; and (iii) the fulfillment of all obligations and commitments of the Borrowers under the Facilities and any Facility Documents.

Section 4. **Reinstatement**. This Guaranty shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Liabilities arising or incurred prior to the Termination Date is rescinded or must otherwise be returned by the Bank on the insolvency, bankruptcy or reorganization of the Borrowers or otherwise (including, without limitation, on the grounds of preference or fraudulent transfer), all as though the payment had not been made.

Section 5. **Subrogation**. The Guarantor shall not exercise any rights which it may acquire by way of subrogation, by any payment made under this Guaranty or otherwise, until the Termination Date. If any amount is paid to the Guarantor on account of subrogation rights under this Guaranty at any time prior to the Termination Date, the amount shall be held in trust for the benefit of the Bank and shall be promptly paid to the Bank to be credited and applied to the Liabilities, whether matured or unmatured or absolute or contingent, in accordance with the terms of the Facilities. If the Guarantor makes payment to the Bank of all or any part of the Liabilities and the Termination Date shall have occurred, the Bank shall, at the Guarantor's request, execute and deliver to the Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to the Guarantor of an interest in the Liabilities resulting from the payment.

Section 6. **Subordination**. Without limiting the Bank's rights under any other agreement, any liabilities owed by the Borrowers to the Guarantor in connection with any extension of credit or financial accommodation by the Guarantor to or for the account of the Borrowers, including but not limited to interest accruing at the agreed contract rate after the commencement of a bankruptcy or similar case or proceeding (regardless of whether such interest is allowed or allowable as a claim in such case or proceeding), are hereby subordinated to the Liabilities, and such liabilities of the Borrowers to the Guarantor, if the Bank so requests, shall be collected, enforced and received by the Guarantor as trustee for the Bank and shall be paid over to the Bank on account of the Liabilities but without reducing or affecting in any manner the liability of the Guarantor under the other provisions of this Guaranty.

Section 7. **Payments Generally**. All payments by the Guarantor shall be made in the manner, at the place and in the currency (the "Payment Currency") required by the Facility Documents; provided, however, that if the Payment Currency is other than U.S. dollars the Guarantor may, at its option (or, if for any reason whatsoever the Guarantor is unable to effect payments in the manner required by the Facility Documents, the Guarantor shall be obligated to) pay to the Bank at its office located at 277 Park Avenue, New York, New York 10017 the equivalent amount in U.S. dollars computed at the selling rate of the Bank, most recently in effect on or prior to the date the Liability becomes due or if such rate is unavailable, at a selling rate chosen by the Bank, for cable transfers of the Payment Currency to the place where the Liability is payable. In any case in which the Guarantor makes or is obligated to make payment in U.S. dollars, the Guarantor shall hold the Bank harmless from any loss incurred by the Bank arising from any change in the value of U.S. dollars in relation to the Payment Currency between the date the Liability becomes due and the date the Bank is actually able, following the conversion of the U.S. dollars paid by the Guarantor into the Payment Currency and remittance of such Payment Currency to the place where such Liability is payable, to apply such Payment Currency to such Liability.

3

Section 8.  [Intentionally Omitted.]

Section 9.  **Representations and Warranties**.  The Guarantor represents and warrants that: (a) the execution, delivery and performance by the Guarantor under this Guaranty: (i) has been duly authorized by all necessary corporate action; (ii) does not, conflict with or violate any material agreement or instrument or any constitutive document, law, regulation or order applicable to the Guarantor; (iii) does not require the consent or approval of any person or entity, including but not limited to any governmental authority, or any filing or registration of any kind; and (iv) is the legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms except to the extent that enforcement may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditor's rights generally; and (b) in executing and delivering this Guaranty, the Guarantor has (i) without reliance on the Bank or any information received from the Bank and based upon such documents and information it deems appropriate, made an independent investigation of the transactions contemplated hereby and the Borrowers, the Borrowers' business, assets, operations, prospects and condition, financial or otherwise, and any circumstances which may bear upon such transactions, the Borrowers or the obligations and risks undertaken herein with respect to the Liabilities; (ii) adequate means to obtain from the Borrowers on a continuing basis information concerning the Borrowers; (iii) has full and complete access to the Facility Documents and any other documents executed in connection with the Facility Documents; and (iv) not relied and will not rely upon any representations or warranties of the Bank not embodied herein or any acts heretofore or hereafter taken by the Bank (including but not limited to any review by the Bank of the affairs of the Borrowers).  The Guarantor hereby further represents and warrants that the Guarantor owns (directly or indirectly) a substantial amount of the stock or other ownership interests of the Borrowers and is financially interested in its affairs.

Section 10. **Remedies Generally**.  The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law.

Section 11.  **Setoff**.  The Guarantor agrees that, in addition to (and without limitation of) any right of setoff, banker's lien or counterclaim the Bank may otherwise have, the Bank shall be entitled, at its option, to offset balances (general or special, time or demand, provisional or final) held by it for the account of the Guarantor at any of the offices of the Bank, J.P. Morgan Securities Inc., or any other affiliate, in U.S. dollars or in any other currency, against any amount payable by the Guarantor under this Guaranty which is not paid when due (regardless of whether such balances are then due to the Guarantor), in which case it shall promptly notify the Guarantor thereof; provided that the Bank's failure to give such notice shall not affect the validity thereof.

Section 12.  **Formalities**.  The Guarantor waives presentment, notice of dishonor, protest, notice of acceptance of this Guaranty, notice of creation, renewal, extension or accrual of any Liability and notice of any other kind and any other formality with respect to any of the Liabilities or this Guaranty.  The Guarantor also waives the right to require the Bank to proceed first against the Borrowers upon the Liabilities before proceeding against the Guarantor hereunder.

4

Section 13.  **Amendments and Waivers**.  No amendment or waiver of any provision of this Guaranty, nor consent to any departure by the Guarantor therefrom, shall be effective unless it is in writing and signed by the Bank, and then the waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of the Bank to exercise, and no delay in exercising, any right or remedy under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof or the exercise of any other right or remedy.

Section 14.  **Expenses**.  The Guarantor shall reimburse the Bank on demand for all costs, expenses and charges (including without limitation the reasonable and documented fees and charges of external legal counsel for the Bank) incurred by the Bank in connection with the preparation, performance or enforcement of this Guaranty.  The obligations of the Guarantor under this Section shall survive the termination of this Guaranty.

Section 15.  **Assignment**.  This Guaranty shall be binding on, and shall inure to the benefit of the Guarantor, the Bank and their respective successors and assigns; provided that the Guarantor may not assign or transfer its rights or obligations under this Guaranty.

Section 16.  **Captions**.  The headings and captions in this Guaranty are for convenience only and shall not affect the interpretation or construction of this Guaranty.

Section 17.  **Governing Law, Etc.**  THIS GUARANTY SHALL BE GOVERNED BY THE LAW OF THE STATE OF NEW YORK.  THE GUARANTOR CONSENTS TO THE NONEXCLUSIVE JURISDICTION AND VENUE OF THE STATE OR FEDERAL COURTS LOCATED IN THE CITY OF NEW YORK.  SERVICE OF PROCESS BY THE BANK IN CONNECTION WITH ANY SUCH DISPUTE SHALL BE BINDING ON THE GUARANTOR IF SENT TO THE GUARANTOR BY REGISTERED MAIL AT THE ADDRESS SPECIFIED BELOW OR AS OTHERWISE SPECIFIED BY THE GUARANTOR FROM TIME TO TIME.  THE GUARANTOR WAIVES ANY RIGHT THE GUARANTOR MAY HAVE TO JURY TRIAL IN ANY ACTION RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY AND FURTHER WAIVES ANY RIGHT TO INTERPOSE ANY COUNTERCLAIM RELATED TO THIS GUARANTY OR THE TRANSACTIONS CONTEMPLATED HEREBY IN ANY SUCH ACTION.  TO THE EXTENT THAT THE GUARANTOR HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER FROM SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OF A JUDGMENT, EXECUTION OR OTHERWISE), THE GUARANTOR HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS GUARANTY.

Section 18.  **Integration; Effectiveness**.  This Guaranty and the Facility Documents sets forth the entire understanding of the Guarantor and the Bank relating to the guarantee of the Liabilities and constitutes the entire contract between the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.; provided, however, that notwithstanding anything to

the contrary, this Guaranty shall not effect or impair any other Guaranty made by the Guarantor in support of any of the obligations or liabilities of the Borrowers with respect to or in connection with extensions of credit or facilities other than those related hereto.  This Guaranty shall become effective when it shall have been executed and delivered by the Guarantor to the Bank.  Delivery of an executed signature page of this Guaranty by telecopy shall be effective as delivery of a manually executed signature page of this Guaranty.

**IN WITNESS WHEREOF**, the Guarantor has caused this Guaranty to be duly executed and delivered by its authorized officer as of the date first above written.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

_____ Name

_____

_____ Title:

Address:

6

## **Exhibit C**

Security Agreements

## SECURITY AGREEMENT

In consideration of one or more loans, letters of credit or other financial accommodation made, issued or extended by JPMORGAN CHASE BANK, N.A. and any of its successors or assigns party to the Clearance Agreement referred to below (hereinafter, the "Bank"), the undersigned hereby agree(s) that the Bank shall have the rights, remedies and benefits hereinafter set forth.

The "Accounts" means (i) the securities account of the Guarantor at the Bank known as LCE or any subaccount or replacement accounts thereto (the "Securities Account"), (ii) DDA# 066-141-605 (the "Cash Account") and (iii) any other account at the Bank to which Guarantor transfers (A) cash from the Cash Account, (B) any interest, dividends, cash, instruments and other property from time to time received, receivable (including without limitation sales proceeds) or otherwise distributed in respect of or in exchange for any or all of the cash or securities in the Securities Account or the Cash Account or (C) any cash or securities from the Securities Account or the Cash Account during such time as the Guarantor or an Other Obligor has an outstanding obligation or liability to the Bank under the Guaranty or the Clearance Agreement.

The "Guaranty" means the Guaranty of even date herewith made by the undersigned in favor of the Bank.

The "Other Obligors" mean Lehman Brothers Inc., Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives Inc., Lehman Brothers Commercial Paper Inc. and Lehman Brothers Japan Inc. and their respective successors.

The "Clearance Agreement" means the Clearance Agreement dated as of June 15, 2000 to which one or more of the Other Obligors and the Bank are parties (as amended by (i) the Amendment to Clearance Agreement dated as of May, 30, 2008 and (ii) the Amendment to Clearance Agreement dated as of even date herewith and as it may be further amended from time to time).

The term "Liabilities" shall mean (a) all "Liabilities" as defined in the Guaranty, (b) all obligations of the undersigned under this Security Agreement and (c) without duplication of the foregoing, all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Bank and costs allocated by its internal legal department) incurred by the Bank in connection with the preparation, performance or enforcement of the Guaranty and this Security Agreement.

The term "Security" means (i) the Accounts, together with any security entitlements relating thereto and any and all financial assets, investment property, funds and/or other assets from time to time held in or credited to the Accounts or otherwise carried in the Accounts (or to be received for credit or in the process of delivery to the Account), (ii) any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all

of the then existing Security and (iii) all proceeds of any and all of the foregoing Security.

As security for the payment of all the Liabilities, the undersigned hereby grant(s) to the Bank a security interest in, and a general lien upon and/or right of set-off of, the Security. Further, for the avoidance of doubt and not in limitation of the rights of the Bank under Sections 9-104(a)(1), 9-106(a) and 8-106(e) of the Uniform Commercial Code as adopted by the State of New York (the "Code"), the undersigned and the Bank (acting as a bank with respect to any Accounts consisting of deposit accounts and as a securities intermediary with respect to any Accounts consisting of securities accounts), acknowledge and agree with respect thereto, that the Bank, as the secured party hereunder, may issue instructions to direct disposition of any and all of the funds in the deposit accounts (and acting as the bank will comply with such instructions) and may issue entitlement orders with respect to any and all securities accounts (and acting as the securities intermediary will comply with such entitlement orders), in either case, without the consent of the undersigned. Terms used herein and defined in Articles 1, 8 and/or 9 of the Code shall have the meanings set forth therein. The undersigned and the Bank agree that the jurisdiction of the Bank (including, without limitation, in its capacities as a bank, a securities intermediary and a commodity intermediary) for purposes of the Code is the State of New York.

The undersigned hereby represents and warrants to the Bank as follows: (a) it is duly organized and validly existing under the laws of the jurisdiction of its incorporation or organization and has all requisite power and authority to execute and deliver this agreement; (b) the execution, delivery and performance of this agreement has been duly authorized by all necessary corporate action of the undersigned and this agreement constitutes the legal, valid and binding obligation of the undersigned, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law); (c) the execution, delivery and performance of this agreement does not and will not conflict with the provisions of its governing instruments and will not violate any provisions of applicable law or regulation or any order of any court or regulatory body and will not result in the breach of, or constitute a default, or require any consent, under any material agreement, instrument or document to which the undersigned is a party or by which it or any of its property may be bound or affected; (d) it is the sole owner of the Security; (e) the Security is and will be free and clear of any lien, charge, security interest, claim, encumbrance or other adverse interest whatsoever, except for that created by this agreement, the Guaranty or the Clearance Agreement and other liens in favor of the Bank arising under applicable laws, and (f) it has not agreed to resell any of the Security pursuant to a repurchase agreement or similar arrangement.

The right is expressly granted to the Bank, in each case upon the occurrence and during the continuation of a Default or to preserve the Security or its value, to transfer to or register in the name of itself or its nominee any of the Security; to exchange any of the Security for any other property upon any reorganization, recapitalization or other readjustment and in connection therewith to deposit any of the Security with any committee or depositary upon such terms as it may determine; to notify any account debtor or obligor on an instrument to make payment to the Bank; and to exercise or cause its nominee to exercise all or any powers with respect to the Security with the same force and effect as an absolute owner thereof and to file one or more financing statements under the Uniform Commercial Code naming the undersigned as debtor and the Bank as secured party and indicating therein the types or describing the items of Security herein specified; all without notice (except such notice as may be required by applicable law and cannot be waived) and without liability except to account for property actually received by it. Without limiting the generality of the foregoing, payments, distributions and/or dividends, in securities, property or cash, including without limitation dividends representing stock or

liquidating dividends or a distribution or return of capital upon or in respect of the Security or any part thereof or resulting from any split-up, revision or reclassification of the Security or any part thereof or received in exchange for the Security or any part thereof as a result of a merger, consolidation or otherwise, shall be paid directly to and retained by the Bank and held by it until applied as herein provided, as additional collateral security pledged under and subject to the terms hereof. Without the prior written consent of the Bank the undersigned will not file or authorize or permit to be filed in any jurisdiction any such financing or like statement covering the Security in which the Bank is not named as the sole secured party.

The Bank upon the occurrence and during the continuation of a Default or to preserve the Security or its value may, whether any of the Liabilities may be due, in its name or in the name of the undersigned or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Security, but shall be under no obligation so to do, or the Bank may upon the occurrence and during the continuation of a Default or to preserve the Security or its value extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any of the Security, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of, the undersigned. Notwithstanding anything contained herein to the contrary, the Bank shall not be required to take any steps necessary to preserve any rights against prior parties to any of the Security. The Bank may upon the occurrence and during the continuation of a Default or to preserve the Security or its value use or operate any of the Security for the purpose of preserving the Security or its value in the manner and to the extent the Bank deems appropriate, but the Bank shall be under no obligation to do so.

Except as otherwise provided herein, at the end of a business day, if the undersigned has determined that no Obligations (as defined in the Clearance Agreement) remain outstanding, the undersigned may transfer to an account (the "Overnight Account") any and all Security held in or credited to or otherwise carried in the Accounts. Any determination of the undersigned or the Other Obligors that no Obligations remain outstanding shall not be binding upon the Bank.

The Bank shall have in addition to all other rights and remedies available to it under law or otherwise, the rights and remedies with respect to the Security of a secured party under the Uniform Commercial Code (whether or not the Code is in effect in the jurisdiction where the rights and remedies are asserted). In addition, with respect to any security or interest issued by an open-end management or investment company registered as such under the Investment Company Act of 1940 in which the Bank has a security interest hereunder, the Bank shall have upon the occurrence and during the continuation of a Default the right to redeem such securities or interests. Further, with respect to the Security, or any part thereof, upon the occurrence and during the continuation of a Default, the Bank may sell or cause to be sold in the Borough of Manhattan, New York City, or elsewhere, in one or more sales or parcels, at such price as the Bank may deem best, and for cash or on credit or for future delivery, without assumption of any credit risk, all or any of the Security, at any broker's board or at public or private sale, in any reasonable manner permissible under the Uniform Commercial Code (except that, to the extent permissible thereunder, the undersigned hereby waives the requirements of said Code), and the Bank or anyone else may be the purchaser of any or all of the Security so sold and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any equity of redemption, of the undersigned, any such demand, notice or right and equity being hereby expressly waived and released. In this regard, the undersigned recognizes that due to certain prohibitions contained in the Securities Act of 1933, as amended, or applicable state securities laws, the Bank may consider it advisable to resort to one or more private sales to a restricted

group of purchasers who will agree to acquire such of the Security consisting of securities for their own account for investment and not to engage in a distribution or resale thereof, and that private sales so made may be at prices and on other terms less favorable to the seller than if such Security were sold at public sale.  The undersigned agrees that private sales made under the foregoing circumstances shall be deemed to have been made in a commercially reasonable manner.  The undersigned acknowledges that the Security is of a kind that is customarily sold on a recognized market and is the subject of widely distributed standard price quotations.  The undersigned will pay to the Bank all expenses (including reasonable and documented attorneys' fees and legal expenses incurred by the Bank) of, or incidental to, the enforcement of any of the provisions hereof or of any of the Liabilities, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Security or receipt of the proceeds thereof, and for the care of the Security and defending or asserting the rights and claims of the Bank in respect thereof, by litigation or otherwise, including expense of insurance; and all such expenses shall be Liabilities within the terms of this agreement.  The Bank, at any time, at its option, may apply the net cash receipts from the Security to the payment of principal and/or interest on any of the Liabilities, whether or not then due, making proper rebate of interest or discount.  Notwithstanding that the Bank, whether in its own behalf and/or in behalf of another or others, may continue to hold Security and regardless of the value thereof, the undersigned shall be and remain liable for the payment in full of any balance of the Liabilities and expenses at any time unpaid. THE RIGHTS OF THE BANK SET FORTH HEREIN ARE WITHOUT LIMITATION OF, AND IN ADDITION TO, ANY OTHER RIGHT OF THE BANK UNDER ANY OTHER DOCUMENT EVIDENCING OR EXECUTED IN CONNECTION WITH THE LIABILITIES.

If at any time any sum payable upon any of the Liabilities shall not be paid when due (which, for sums payable by the Guarantor in respect of the Liabilities as defined under the Guaranty, are due on demand); or if the undersigned or the Other Obligors shall default in the payment or performance of the Guaranty, the Clearance Agreement, any of its agreements herein or in any instrument or document delivered pursuant hereto, or in connection herewith; or if a decree or order shall be entered for relief by a court having jurisdiction of the undersigned or the Other Obligors in an involuntary bankruptcy case under the federal bankruptcy laws, as now or hereafter constituted, or under any other applicable federal or state bankruptcy, insolvency, or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee or sequestrator of the undersigned or the Other Obligors or for any substantial part of its property, or ordering the reorganization, dissolution, winding-up of or liquidation of its affairs, and the continuation of any such decree or order shall be unstayed and in effect, or any case or other proceeding seeking any such decree or order shall continue undismissed, for a period of 60 consecutive days; or if the undersigned or the Other Obligors shall, or (if a corporation) shall take any corporate action to, commence a voluntary case under the federal bankruptcy laws, or now or hereafter constituted, or seek to take advantage of any other applicable federal or state bankruptcy, insolvency, or similar law, or apply for or consent to the appointment of or taking of possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator of the undersigned or the Other Obligors or for any substantial part of its property, or the making by the undersigned or the Other Obligors of any assignment for the benefit of creditors; or the undersigned or the Other Obligors shall admit in writing its inability, or be generally unable, to pay its debts as they become due; or if the undersigned or shall suspend the transaction of his, its or their usual business, or if any governmental authority (including, without limitation, the Securities Investor Protection Corporation or any successor) or any court at the instance thereof shall, or shall appoint a receiver or trustee to, take possession of any substantial part of the property of, or assume control over the affairs or operations of, or a receiver or trustee shall be appointed for, or with respect to any substantial part of the property of, or a writ or order of attachment or garnishment shall be issued or made against any substantial part of the property of, the undersigned or the Other Obligors; or if the

undersigned or any of the Other Obligors shall (x) default in the payment of any indebtedness (other than indebtedness incurred under the Clearance Agreement or the Guaranty) having an aggregate principal amount of $100,000,000 (or its equivalent in any other currency or currencies) or more beyond the period of grace (not to exceed 30 days), if any, provided in the instrument or agreement under which such indebtedness was created, or (y) default in the observance or performance of any agreement or condition relating to any indebtedness (other than indebtedness incurred under the Clearance Agreement or the Guaranty) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition shall exist, the effect of which default or other event or condition is to cause any such indebtedness to become due prior to its stated maturity in the aggregate principal amount of $100,000,000 (or its equivalent in any other currency or currencies) or more; or  any indebtedness of the undersigned or any of the Other Obligors in the aggregate amount of $100,000,000 (or its equivalent in any other currency or currencies) or more shall be declared due and payable prior to the stated maturity thereof; or if the undersigned shall be dissolved; thereupon, unless and to the extent that the Bank shall otherwise elect, it shall be a DEFAULT under this agreement.

The undersigned acknowledges and agrees that the Bank may from time to time request further security or payments on account of any of the Liabilities.

Upon the occurrence and continuation of a Default, the Bank may assign, transfer and/or deliver to any transferee of any of the Liabilities and/or any or all of the Security; and thereafter shall be fully discharged from all responsibility with respect to the Security so assigned, transferred and/or delivered. Such transferee shall be vested with all the powers and rights of the Bank hereunder with respect to such Security, but the Bank shall retain all rights and powers hereby given with respect to any of the Security not so assigned, transferred or delivered. No delay on the part of the Bank in exercising any power or right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right.  The rights, remedies and benefits herein expressly specified are cumulative and not exclusive of any rights, remedies or benefits which the Bank may otherwise have.  The undersigned hereby waive(s) presentment, notice of dishonor and protest of all instruments included in or evidencing the Liabilities or the Security and any and all other notices and demands whatsoever, whether or not relating to such instruments.

No provision hereof shall be modified or limited except by a written instrument expressly referred hereto and to the provision so modified or limited.  This agreement shall be binding upon the assigns or successors of the undersigned, shall constitute a continuing agreement, applying to all future as well as existing transactions applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this agreement, and if all transactions between the Bank and the undersigned shall be at any time closed, shall be equally applicable to any new transactions thereafter; and shall be governed by and construed according to the internal laws of the State of New York without reference to principles of conflicts of laws. By the execution hereof the undersigned hereby submits to the jurisdiction of the Federal and State courts located in New York.  The undersigned hereby consents to the service of process in any action or proceeding brought against it by the Bank by means of registered mail to the last known address to the undersigned.  Nothing herein, however, shall prevent service of process by any other means recognized as valid by law within or without the State of New York. Unless the context otherwise requires, all terms used herein which are defined in the Uniform Commercial Code shall have the meanings therein stated.  All references to agreements, guaranties, documents and other writings herein refer to such writings as the same may be hereafter amended, modified, supplemented and/or restated.

THE UNDERSIGNED HEREBY WAIVES AND AGREES TO WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM INSTITUTED WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS AGREEMENT.

New York, New York

LEHMAN BROTHERS HOLDINGS INC.

Dated:  As of August 26, 2008

By: _____

Name:

Title:

Paolo Tonucci
Managing Director
Global Treasurer

# SECURITY AGREEMENT

In consideration of JPMORGAN CHASE BANK, N.A. or any of its affiliates, subsidiaries, successors and assigns (hereinafter, collectively or individually as the context may require, the "Bank") extending credit to and/or transacting business, trading or engaging in derivative transactions with the undersigned and/or its subsidiaries, the undersigned hereby agree(s) that the Bank shall have the rights, remedies and benefits hereinafter set forth.

The "Accounts" means all accounts of the Guarantor at the Bank (including but not limited to the accounts included in the defined term "Accounts" set forth in the Existing Security Agreement (as defined below) or any shares or accounts held by or registered to the Guarantor or any nominee in any money market fund issued, managed, advised or subadvised by the Bank; provided that the term "Accounts" shall not include the Overnight Account as defined in the Existing Security Agreement, except to the extent any transfer of Security to the Overnight Account has been made pursuant to a determination that is not binding on the Bank.

The "Existing Security Agreement" means that certain Security Agreement dated as of August 26, 2008 and entered into by the undersigned for the benefit of JPMorgan Chase Bank, N. A. and its successor or assigns.

The "Existing Guaranty" means that certain Guaranty dated as of August 26, 2008 and entered into by the undersigned in favor of JPMorgan Chase Bank, N. A. and its successors or assigns.

The "Guaranty" means the Guaranty of even date herewith made by the undersigned in favor of the Bank.

The "Other Obligors" means each of the direct or indirect subsidiaries of the Guarantor and their respective successors.

The term "Liabilities" shall mean (a) all "Liabilities" as defined in the Guaranty, (b) all obligations of the undersigned under this Security Agreement and (c) without duplication of the foregoing, all costs, expenses and charges (including without limitation fees and charges of external legal counsel for the Bank and costs allocated by its internal legal department) incurred by the Bank in connection with the preparation, performance or enforcement of the Guaranty and this Security Agreement.

The term "Security" means (i) the Accounts, together with any security entitlements relating thereto and any and all financial assets, investment property, funds and/or other assets from time to time held in or credited to the Accounts or otherwise carried in the Accounts (or to be received for credit or in the process of delivery to the Account), (ii) any interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Security and (iii) all proceeds of any and all of the foregoing Security;.

As security for the payment of all the Liabilities, the undersigned hereby grant(s) to the Bank a security interest in, and a general lien upon and/or right of set-off of, the Security. Further, for the avoidance of doubt and not in limitation of the rights of the Bank under Sections 9-104(a)(1), 9-106(a) and 8-106(e) of the Uniform Commercial Code as adopted by the State of New York (the "Code"), the undersigned and the Bank (acting as a bank with respect to any Accounts consisting of deposit accounts and as a securities intermediary with respect to any

Accounts consisting of securities accounts), acknowledge and agree with respect thereto, that the Bank, as the secured party hereunder, may issue instructions to direct disposition of any and all of the funds in the deposit accounts (and acting as the bank will comply with such instructions) and may issue entitlement orders with respect to any and all securities accounts (and acting as the securities intermediary will comply with such entitlement orders), in either case, without the consent of the undersigned. Terms used herein and defined in Articles 1, 8 and/or 9 of the Code shall have the meanings set forth therein.  The undersigned and the Bank agree that the jurisdiction of the Bank (including, without limitation, in its capacities as a bank, a securities intermediary and a commodity intermediary) for purposes of the Code is the State of New York.

The undersigned hereby represents and warrants to the Bank as follows:  (a) it is duly organized and validly existing under the laws of the jurisdiction of its incorporation or organization and has all requisite power and authority to execute and deliver this agreement; (b) the execution, delivery and performance of this agreement has been duly authorized by all necessary corporate action of the undersigned and this agreement constitutes the legal, valid and binding obligation of the undersigned, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability (whether enforcement is sought in equity or at law); (c) the execution, delivery and performance of this agreement do not and will not conflict with the provisions of its governing instruments and will not violate any provisions of applicable law or regulation or any order of any court or regulatory body and will not result in the breach of, or constitute a default, or require any consent, under any material agreement, instrument or document to which the undersigned is a party (other than the Existing Security Agreement and the Existing Guaranty) or by which it or any of its property may be bound or affected; (d) it is the sole owner of the Security; (e) the Security is and will be free and clear of any lien, charge, security interest, claim, encumbrance or other adverse interest whatsoever, except for that created by this agreement or the Guaranty and other liens in favor of the Bank under the Existing Security Agreement, the Existing Guaranty and/or arising under applicable laws, and (f) it has not agreed to resell any of the Security pursuant to a repurchase agreement or similar arrangement.

The right is expressly granted to the Bank, in each case upon the occurrence and during the continuation of a Default (as defined below) or to preserve the Security or its value, to transfer to or register in the name of the Bank or its nominee any of the Security; to exchange any of the Security for any other property upon any reorganization, recapitalization or other readjustment and in connection therewith to deposit any of the Security with any committee or depositary upon such terms as it may determine; to notify any account debtor or obligor on an instrument to make payment to the Bank; and to exercise or cause its nominee to exercise all or any powers with respect to the Security with the same force and effect as an absolute owner thereof and to file one or more financing statements under the Uniform Commercial Code naming the undersigned as debtor and the Bank as secured party and indicating therein the types or describing the items of Security herein specified; all without notice (except such notice as may be required by applicable law and cannot be waived) and without liability except to account for property actually received by it.  Without limiting the generality of the foregoing, payments, distributions and/or dividends, in securities, property or cash, including without limitation dividends representing stock or liquidating dividends or a distribution or return of capital upon or in respect of the Security or any part thereof or resulting from any split-up, revision or reclassification of the Security or any part thereof or received in exchange for the Security or any part thereof as a result of a merger, consolidation or otherwise, shall be paid directly to and retained by the Bank and held by it until applied as herein provided, as additional collateral security pledged under and subject to the terms hereof.  Without the prior written consent of the

Bank the undersigned will not file or authorize or permit to be filed in any jurisdiction any such financing or like statement covering the Security in which the Bank is not named as the sole secured party.

The Bank upon the occurrence and during the continuation of a Default or to preserve the Security or its value may, whether any of the Liabilities may be due, in its name or in the name of the undersigned or otherwise, demand, sue for, collect or receive any money or property at any time payable or receivable on account of or in exchange for, or make any compromise or settlement deemed desirable with respect to, any of the Security, but shall be under no obligation so to do, or the Bank may upon the occurrence and during the continuation of a Default or to preserve the Security or its value extend the time of payment, arrange for payment in installments, or otherwise modify the terms of, or release, any of the Security, without thereby incurring responsibility to, or discharging or otherwise affecting any liability of, the undersigned.  Notwithstanding anything contained herein to the contrary, the Bank shall not be required to take any steps necessary to preserve any rights against prior parties to any of the Security.  The Bank may upon the occurrence and during the continuation of a Default or to preserve the Security or its value use or operate any of the Security for the purpose of preserving the Security or its value in the manner and to the extent the Bank deems appropriate, but the Bank shall be under no obligation to do so.

Notwithstanding anything provided for herein, the undersigned may upon three days written notice to the Bank transfer any Security, provided that the undersigned shall not transfer any such Security if the Bank has exercised or been stayed or otherwise prohibited from exercising any of its rights under this Security Agreement or the Guaranty or in the event any DEFAULT has occurred and is continuing, in either case, prior to the end of the three day notice period and upon any such transfer the security interest hereunder shall be released.

The Bank shall have in addition to all other rights and remedies available to it under law or otherwise, the rights and remedies with respect to the Security of a secured party under the Uniform Commercial Code (whether or not the Code is in effect in the jurisdiction where the rights and remedies are asserted).  In addition, with respect to any security or interest issued by an open-end management or investment company registered as such under the Investment Company Act of 1940 in which the Bank has a security interest hereunder, the Bank shall have upon the occurrence and during the continuation of a Default the right to redeem such securities or interests.  Further, with respect to the Security, or any part thereof, upon the occurrence and during the continuation of a Default, the Bank may sell or cause to be sold in the Borough of Manhattan, New York City, or elsewhere, in one or more sales or parcels, at such price as the Bank may deem best, and for cash or on credit or for future delivery, without assumption of any credit risk, all or any of the Security, at any broker's board or at public or private sale, in any reasonable manner permissible under the Uniform Commercial Code (except that, to the extent permissible thereunder, the undersigned hereby waives the requirements of said Code), and the Bank or anyone else may be the purchaser of any or all of the Security so sold and thereafter hold the same absolutely, free from any claim or right of whatsoever kind, including any equity of redemption, of the undersigned, any such demand, notice or right and equity being hereby expressly waived and released.  In this regard, the undersigned recognizes that due to certain prohibitions contained in the Securities Act of 1933, as amended, or applicable state securities laws, the Bank may consider it advisable to resort to one or more private sales to a restricted group of purchasers who will agree to acquire such of the Security consisting of securities for their own account for investment and not to engage in a distribution or resale thereof, and that private sales so made may be at prices and on other terms less favorable to the seller than if such Security were sold at public sale.  The undersigned agrees that private sales made under the foregoing circumstances shall be deemed to have been made in a commercially reasonable

manner.  The undersigned acknowledges that the Security is of a kind that is customarily sold on a recognized market and is the subject of widely distributed standard price quotations.  The undersigned will pay to the Bank all expenses (including reasonable and documented attorneys' fees and legal expenses incurred by the Bank) of, or incidental to, the enforcement of any of the provisions hereof or of any of the Liabilities, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Security or receipt of the proceeds thereof, and for the care of the Security and defending or asserting the rights and claims of the Bank in respect thereof, by litigation or otherwise, including expense of insurance; and all such expenses shall be Liabilities within the terms of this agreement.  The Bank, at any time, at its option, may apply the net cash receipts from the Security to the payment of principal and/or interest on any of the Liabilities, whether or not then due, making proper rebate of interest or discount.  Notwithstanding that the Bank, whether in its own behalf and/or in behalf of another or others, may continue to hold Security and regardless of the value thereof, the undersigned shall be and remain liable for the payment in full of any balance of the Liabilities and expenses at any time unpaid. THE RIGHTS OF THE BANK SET FORTH HEREIN ARE WITHOUT LIMITATION OF, AND IN ADDITION TO, ANY OTHER RIGHT OF THE BANK UNDER ANY OTHER DOCUMENT EVIDENCING OR EXECUTED IN CONNECTION WITH THE LIABILITIES.

If at any time any sum payable upon any of the Liabilities shall not be paid when due (which, for sums payable by the Guarantor in respect of the Liabilities as defined under the Guaranty, are due on demand); or if the undersigned or any of the Other Obligors shall default in the payment or performance of the Guaranty, any of its agreements herein or in any instrument or document delivered pursuant hereto, or in connection herewith; or if a decree or order shall be entered for relief by a court having jurisdiction of the undersigned or any of the Other Obligors in an involuntary bankruptcy case under the federal bankruptcy laws, as now or hereafter constituted, or under any other applicable federal or state bankruptcy, insolvency, or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee or sequestrator of the undersigned or any of the Other Obligors or for any substantial part of its property, or ordering the reorganization, dissolution, winding-up of or liquidation of its affairs, and the continuation of any such decree or order shall be unstayed and in effect, or any case or other proceeding seeking any such decree or order shall continue undismissed, for a period of 60 consecutive days; or if the undersigned or any of the Other Obligors shall, or (if a corporation) shall take any corporate action to, commence a voluntary case under the federal bankruptcy laws, or now or hereafter constituted, or seek to take advantage of any other applicable federal or state bankruptcy, insolvency, or similar law, or apply for or consent to the appointment of or taking of possession by a receiver, liquidator, assignee, trustee, custodian or sequestrator of the undersigned or any of the Other Obligors or for any substantial part of its property, or the making by the undersigned or any of the Other Obligors of any assignment for the benefit of creditors; or the undersigned or any of the Other Obligors shall admit in writing its inability, or be generally unable, to pay its debts as they become due; or if the undersigned or shall suspend the transaction of his, its or their usual business, or if any governmental authority (including, without limitation, the Securities Investor Protection Corporation or any successor) or any court at the instance thereof shall, or shall appoint a receiver or trustee to, take possession of any substantial part of the property of, or assume control over the affairs or operations of, or a receiver or trustee shall be appointed for, or with respect to any substantial part of the property of, or a writ or order of attachment or garnishment shall be issued or made against any substantial part of the property of, the undersigned or any of the Other Obligors; or if the undersigned or any of the Other Obligors shall (x) default in the payment of any indebtedness (other than indebtedness incurred under the Guaranty) having an aggregate principal amount of $100,000,000 (or its equivalent in any other currency or currencies) or more beyond the period of grace (not to exceed 30 days), if any, provided in the instrument or agreement under which such indebtedness was created, or (y)

default in the observance or performance of any agreement or condition relating to any indebtedness (other than indebtedness incurred under the Guaranty) or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition shall exist, the effect of which default or other event or condition is to cause any such indebtedness to become due prior to its stated maturity in the aggregate principal amount of $100,000,000 (or its equivalent in any other currency or currencies) or more; or any indebtedness of the undersigned or any of the Other Obligors in the aggregate amount of $100,000,000 (or its equivalent in any other currency or currencies) or more shall be declared due and payable prior to the stated maturity thereof; or if the undersigned or any of the Other Obligors shall be dissolved; thereupon, unless and to the extent that the Bank shall otherwise elect, it shall be a DEFAULT under this agreement.

The undersigned acknowledges and agrees that the Bank may from time to time request further security or payments on account of any of the Liabilities.

Upon the occurrence and continuation of a Default, the Bank may assign, transfer and/or deliver to any transferee of any of the Liabilities and/or any or all of the Security; and thereafter shall be fully discharged from all responsibility with respect to the Security so assigned, transferred and/or delivered. Such transferee shall be vested with all the powers and rights of the Bank hereunder with respect to such Security, but the Bank shall retain all rights and powers hereby given with respect to any of the Security not so assigned, transferred or delivered. No delay on the part of the Bank in exercising any power or right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any power or right hereunder preclude other or further exercise thereof or the exercise of any other power or right. The rights, remedies and benefits herein expressly specified are cumulative and not exclusive of any rights, remedies or benefits which the Bank may otherwise have. The undersigned hereby waive(s) presentment, notice of dishonor and protest of all instruments included in or evidencing the Liabilities or the Security and any and all other notices and demands whatsoever, whether or not relating to such instruments.

No provision hereof shall be modified or limited except by a written instrument expressly referred hereto and to the provision so modified or limited. This agreement shall be binding upon the assigns or successors of the undersigned, shall constitute a continuing agreement, applying to all future as well as existing transactions applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this agreement, and if all transactions between the Bank and the undersigned shall be at any time closed, shall be equally applicable to any new transactions thereafter; and shall be governed by and construed according to the internal laws of the State of New York without reference to principles of conflicts of laws. By the execution hereof the undersigned hereby submits to the jurisdiction of the Federal and State courts located in New York. The undersigned hereby consents to the service of process in any action or proceeding brought against it by the Bank by means of registered mail to the last known address to the undersigned. Nothing herein, however, shall prevent service of process by any other means recognized as valid by law within or without the State of New York. Unless the context otherwise requires, all terms used herein which are defined in the Uniform Commercial Code shall have the meanings therein stated. All references to agreements, guaranties, documents and other writings herein refer to such writings as the same may be hereafter amended, modified, supplemented and/or restated. At the request of the Bank the undersigned agrees to do all other things which the Bank may deem necessary or advisable in order to perfect and preserve the security interest and to give effect to the rights granted to the Bank under this Agreement, including, without limitation, entering into or causing an affiliated party to enter into, a "control agreement", or enable the Bank to comply with any applicable laws or regulations.

**THE UNDERSIGNED HEREBY WAIVES AND AGREES TO WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM INSTITUTED WITH RESPECT TO ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED TO THIS AGREEMENT.**

New York, New York

LEHMAN BROTHERS HOLDINGS INC.

Dated:  As of September 9, 2008

By:  _____
      Name:
      Title: