UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC.


      Debtor.


- - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          September 16, 2008

          5:13 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2  HEARING re Debtor's Motion, Pursuant to Section 105 of the

3  Bankruptcy Code, for an Order Enforcing the Protections of

4  Section 362 of the Bankruptcy Code

5

6  HEARING re Motion to Extend Deadline to File Schedules or

7  Provide Required Information :  Debtor's Motion Pursuant to

8  Bankruptcy Rules 1007(c) and 2002(d) (i) Extending the Time to

9  File Schedules of Assets and Liabilities, Schedules of Current

10 Income and Expenditures, Schedules of Executory Contracts and

11 Unexpired Leases, and Statements of Financial Affairs and (ii)

12 Waiving of the Requirements to File the Equity List and Provide

13 Notice to Equity Security Holders

14

15 HEARING re Debtor's Motion Pursuant to Section 105(a) of the

16 Bankruptcy Code and Local Bankruptcy Rule 1007-2(d) for Waiver

17 of the Requirements of Local Bankruptcy Rule 1007-2(a) and

18 1007-2(b)

19

20

21

22

23

24

25

1

2    HEARING re Debtor's Motion Pursuant to Sections 105(a), 342(a),

3    and 521(a)(1) of the Bankruptcy Code, Bankruptcy Rules 1007(a)

4    and 2002(a), (f) and (l), and Local Bankruptcy Rule 1007-1 for

5    (i) a Waiver of the Requirement to File a List of Creditors and

6    (ii) Approval of the Form and Manner of Notifying Creditors of

7    the Commencement of the Debtor's Chapter 11 Case

8

9    HEARING re Motion of Lehman Brothers Holdings Inc. for Order,

10   Pursuant to Section 105 of the Bankruptcy Code, Confirming

11   Status of Clearing Advances

12

13   HEARING re Motion to Authorize Application Pursuant to 28

14   U.S.C. 156(c) and Local Rule 5075-1(a) for Authorization to (i)

15   Employ and Retain Epiq Bankruptcy Solutions, LLC Claims and

16   Noticing Agent for the Debtor, and (ii) Appoint Epiq Bankruptcy

17   Solutions, LLC as Agent for the Bankruptcy Court

18

19   HEARING re Debtor's Motion Pursuant to Section 105(a) of the

20   Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Seeking

21   Authority to Implement Certain Notice and Case Management

22   Procedures

23

24

25   Transcribed by:  Lisa Bar-Leib

1

2     A P P E A R A N C E S :

3     WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtor

5          767 Fifth Avenue

6          New York, NY 10153

7

8     BY:   RICHARD P. KRASNOW, ESQ.

9          SHAI WAISMAN, ESQ.

10         MICHELE J. MEISES, ESQ.

11         GARRETT A. FAIL, ESQ.

12

13    WACHTELL, LIPTON, ROSEN & KATZ

14         Attorneys for JPMorgan Chase Bank, N.A.

15         51 West 52nd Street

16         New York, NY 10019

17

18    BY:   HAROLD S. NOVIKOFF, ESQ.

19         AMY R. WOLF, ESQ.

20

21

22

23

24

25

1

2   DEWEY & LEBOEUF LLP

3        Attorneys for Bank of New York and Mellon

4        125 West 55th Street

5        New York, NY 10019

6

7   BY:   SAMUEL S. KOHN, ESQ.

8        TIMOTHY Q. KARCHER, ESQ.

9

10  THOMPSON & KNIGHT LLP

11       Attorneys for Chevron

12       919 Third Avenue

13       39th Floor

14       New York, NY 10022

15

16  BY:   IRA L. HERMAN, ESQ.

17

18  CADWALADER, WICKERSHAM & TAFT LLP

19       Attorneys for Citibank, N.A.

20       One World Financial Center

21       New York, NY 10261

22

23  BY:   DERYCK A. PALMER, ESQ.

24       GEORGE DAVIS, ESQ.

25

COVINGTON & BURLING LLP

    Attorneys for Wilmington Trust Company as Indenture

    Trustee

    The New York Times Building

    620 Eight Avenue

    New York, NY 10016

BY:   SUSAN P. JOHNSTON, ESQ.

MAYER BROWN LLP

    1675 Broadway

    New York, NY 10019

BY:   BRIAN TRUST, ESQ.

DESHAW & CO.

    120 West Forty-Fifth Street

    39th Floor

    Tower 45

    New York, NY 10036

BY:   JO E. CHEN, ESQ.

1

2   FEDERAL RESERVE BANK OF NEW YORK

3        33 Liberty Street

4        New York, NY 10045

5

6   BY:   SHARI LEVENTHAL, ESQ.

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Office of the United States Trustee

10       33 Whitehall Street

11       Suite 2100

12       New York, NY 10004

13

14  BY:   DIANA G. ADAMS, TRUSTEE

15        TRACY HOPE DAVIS, ESQ.

16

17  HENNIGAN BENNETT & DORMAN

18       865 South Figueroa Street

19       Suite 2900

20       Los Angeles, CA 90017

21

22  BY:   SIDNEY P. LEVINSON, ESQ.

23        (TELEPHONICALLY)

24

25

GOULSTON & STORRS P.C.

    Attorneys for Interactive Data Corporation

    400 Atlantic Avenue

    Boston, MA 02110

BY:   DOUGLAS B. ROSNER, ESQ.

    (TELEPHONICALLY)

DUANE MORRIS LLP

    30 South 17th Street

    Philadelphia, PA 19103

BY:   MATTHEW E. HOFFMAN, ESQ.

    (TELEPHONICALLY)

P R O C E E D I N G S

THE COURT:  Please be seated.  Let's begin.  I'm sorry for those who can't sit down because we're so crowded.

MR. WAISMAN:  Good evening, Your Honor.  Shai Waisman of Weil, Gotshal & Manges on behalf of Lehman Brothers Holdings Inc.  I am joined today by my colleagues, Richard Krasnow, Michele Meises, and Garrett Fail.

Your Honor, Lehman Brothers Holdings Inc. commenced a Chapter 11 case in this court on September 15th with a petition and a number of pleadings.  If it pleases Your Honor, I propose we proceed in the following way.  Well, this is Your Honor's court.  Perhaps a bit of --

THE COURT:  I'll listen to the proposal.

MR. WAISMAN:  Perhaps a bit of background, then take Your Honor through the pleadings that have been filed and the request for relief and then scheduling matters.  Before we begin, of course, thank you to court personnel, chambers and Your Honor for accommodating us and, of course, to our colleagues here today who I feel we kept waiting for a little while in the delay in today's hearing and I do apologize.

Your Honor, by way of background, Lehman Brothers is the fourth largest investment bank in the United States.  The company was founded over a hundred and fifty years ago by the son of a cattle merchant who left his home in Bavaria to start a dry goods store in Montgomery, Alabama.  Today, the company

1   serves the financial needs of corporations, governmental units,

2   institutional clients and individuals worldwide.  The company

3   employs upwards of 25,000 people and has significant assets the

4   world over.  It has headquarters here in New York, regional

5   headquarters in London and Tokyo and a network of offices in

6   North America, Europe, the Middle East, Latin America and the

7   Asia Pacific region.  As of May 31st, 2008, Your Honor, the

8   company's consolidated assets totaled 639 billion dollars and

9   its consolidated liabilities totaled approximately 613 billion

10   dollars.

11        The company itself operates in three business

12   segments:  capital markets, investment banking and investment

13   management and I'm sure we'll be discussing a lot more about

14   those segments in the days and weeks to come.

15        The company, of course, is subject to regulatory

16   oversight.  All of the Lehman Brothers entities are subject to

17   group-wide supervision by the SEC.  Several of the

18   subsidiaries, including the subsidiary named Lehman Brothers

19   Inc., are registered with the SEC as broker dealers, others as

20   derivatives dealers and investment advisors.  Consequently,

21   those entities are subject to regulation by the SEC as well as

22   self-regulatory organizations, national securities exchanges,

23   such as the New York Stock Exchange, and Municipal Securities

24   Rulemaking Board.

25        Other subsidiaries of the debtor hold national bank

1  charters and are subject to regulation by federal and state

2  authorities, including the OTS, the Office of Thrift

3  Supervision, the FDIC, Federal Deposit Insurance Corporation,

4  and the Office of the Comptroller of Currency of the United

5  States.  The debtor's insurance subsidiaries are subject to

6  state insurance regulations in states in which they operate.

7        Lehman Brothers holds memberships or associate

8  memberships on several international securities and commodities

9  exchanges, including London, Tokyo, Hong Kong, Frankfurt,

10  Paris, Milan, Canada, India, Turkey, Russia, Dubai and Qatar.

11  As I said, the scope of this enterprise is global in nature.

12        The debtor has issued various securities to the

13  public and has various debt obligations which are disclosed in

14  the filings and will be disclosed in additional filings going

15  forward.

16        The events leading up to this Chapter 11 case have

17  been widely reported and there is nobody who is not familiar

18  with the global crisis.  Because Lehman Brothers is a financial

19  services firm, it is materially affected by conditions in the

20  global financial markets as well as worldwide economic

21  conditions.  For most of 2008, Lehman Brothers operated in an

22  extremely unfavorable global business environment.  The

23  conditions of this environment were characterized by continued

24  lack of liquidity in the credit markets, significantly

25  depressed volumes in most equity markets and declining asset

1    values.  The slowed growth in major economies all over the

2    world as a result of declining business and consumer confidence

3    only added to all of these hardships.  Commodity prices have

4    risen significantly with oil and gold reaching record levels

5    and the rising cost of industrial production.  Consumer

6    spending was challenged by a combination of lower wealth from

7    declining housing values, higher commodity prices, impacting

8    levels of disposable income and falling private sector

9    employment growth.  Low levels of liquidity combined with the

10   requirement that financial companies de-lever their balance

11   sheets resulted in downward pressure on financial asset prices

12   including at Lehman Brothers.  These global economic conditions

13   depressed both the valuations of Lehman's inventory position as

14   well as transactional volumes and market activity levels in

15   which Lehman Brothers capital markets and investment banking

16   business segments operated during the recent fiscal quarters.

17          The instability in the financial and credit markets

18   created significant liquidity problems for Lehman Brothers.

19   During this period, although central banks provided

20   liquidity -- every time I speak, for some reason --

21          THE COURT:  There seems to be somebody trying to jam

22   the line.

23          MR. WAISMAN:  Yeah, exactly.

24          THE COURT:  I know that there are some people who are

25   participating telephonically through the court call service and

1    also there is another courtroom where I think we're being

2    connected.  But I don't think it's fair to Mr. Waisman to

3    proceed like this.  So if anybody is on the phone and has a

4    mute button, please push it now and let's see if that helps.

5    Maybe a little.

6              MR. WAISMAN:  I'm afraid to say anything.  Okay.

7              THE COURT:  Do you have a BlackBerry or any other

8    electronic device on you?

9              MR. WAISMAN:  No, I don't.

10             THE COURT:  Let's try again and hope for a better --

11             MR. WAISMAN:  Okay.  Picking up where we left off --

12             THE COURT:  -- reception.

13             MR. WAISMAN:  -- the instability in the financial and

14   credit markets, with which we're all familiar, created

15   significant liquidity problems for Lehman Brothers.  Central

16   banks provided additional liquidity to try and jump start the

17   financial systems but broad asset classes remained very thinly

18   traded.  This was particularly true of domestic subprime

19   residential mortgages and structured credit products.

20             The devaluation of the pledged assets adversely

21   impacted Lehman's borrowing availability.  As its secured

22   financing fell out of reach, Lehman Brothers was forced to draw

23   down on its liquidity pool in order to execute transactions.

24   At the same time, Lehman's clearing banks required Lehman to

25   post increasing amounts of collateral to secure against such

1    clearing banks' exposure to Lehman, and the loss of liquidity

2    created a chain reaction of adverse economic consequences.

3    Essentially, this began the stranglehold on Lehman Brothers, to

4    use an often-used cliche in this court, it was the perfect

5    storm.

6         The company's management responded by exploring

7    various options to restructure operations, to reduce overall

8    cost structure and to improve performance.  Management

9    recognized the concerns caused by the company's concentrated

10   position in real estate related assets and initiated steps to

11   separate those assets from the rest of Lehman Brothers'

12   operations.

13        To minimize the effect of pervasive rumors in the

14   marketplace, which have had significant impact to Lehman

15   Brothers' competitors recently, the company made several public

16   announcements on September 10th, 2008 as to its performance.

17   At the same time, in light of the continuing diminution in

18   value of Lehman Brothers' assets, the increasing to market

19   obligations and the debtor's plummeting stock price, management

20   announced several major initiatives to stabilize the business

21   as well as pursuing several strategical alternatives all on

22   multiple tracks.

23        The announcement that I just mentioned on September

24   10th unfortunately did little to quell the rumors in the market

25   and concerns about the company's viability.  The uncertainty,

particularly among the banks, through which the company clears

securities, trades, ultimately made it impossible for the

company to continue to operate its business.  The destruction

to its business virtually guaranteed that the company would not

be able to sustain itself long enough to implement all of the

initiatives that had just recently been undertaken.

The company's liquidity crisis prompted an emergency

meeting on September 12th, 2008 just down the block here at the

Federal Reserve between debtor's management, officials from the

New York branch of the Federal Reserve Bank, the heads of major

financial institutions, the treasury secretary and the SEC

chairman.  These emergency meetings, as was widely reported,

continued throughout the weekend, throughout the 13th and the

14th.  The company, in those meetings and outside, continued to

explore a number of strategic alternatives.  Unfortunately, at

the end of this weekend on Sunday, it became clear that no

viable alternative existed.  Lehman Brothers Holdings Inc. was

left with no alternative but to commence a Chapter 11 case in

this court so that it could preserve its assets and maximize

value for the benefit of all of its customers and all of its

stakeholders.

Those, Your Honor, are my introductory remarks about

the business and why we're here today, unfortunately.  With

that, I would propose we proceed with a few of the motions that

were filed.  These are mainly administrative in nature and I

1    will go through them as quickly as is possible.  Of course, if

2    Your Honor has any questions, you'll stop me and I will answer

3    them.

4            THE COURT:  That's fine.  Thank you.

5            MR. WAISMAN:  Your Honor has been provided, I

6    believe, with a binder that was dropped off at chambers and

7    I'll proceed in virtually the order in here with one exception.

8    Unfortunately, I know people in the courtroom have not had a

9    chance to review the outline of the binder but the pleadings

10   have been filed, have been publicly available.

11           THE COURT:  Let me ask you one question about what

12   typically occurs at the beginning of cases regardless of size.

13   And that is, some consultation with the United States trustee's

14   office concerning so-called first day pleadings and orders.

15   Has that happened here and, if not, is there anyone from the

16   U.S. trustee's office prepared to, in effect, sign off on the

17   relief you're requesting?

18           MR. WAISMAN:  Thank you, Your Honor.  There are

19   several members of the office here.  In fact, the U.S. trustee

20   herself is here.  In terms of consultation, we had obviously,

21   with a business the size and nature of Lehman Brothers, there

22   was great concern about any leaks that any preparations were

23   underway, particularly in light of the fact that there were so

24   many strategic alternatives that people were working on.  And

25   the genuine fear was that if there was too much discussion --

1          THE COURT:  To talk about it would make it worse, in

2     effect.

3          MR. WAISMAN:  -- could make it worse and could

4     overtake what was otherwise a viable alternative.  As a result

5     and, unfortunately and regrettably, there was no opportunity to

6     consult with any of the parties prior to the filing, not with

7     the Court and, regrettably, not with the Office of the United

8     States Trustee.  They are here and I'm sure they'll speak for

9     themselves.  I know they have the pleadings.  We did have a

10    brief conversation in the hallway.  They raised an issue with

11    us and I'm going to represent, I believe, a consensual

12    resolution on the one issue that was raised on the record.  And

13    that will necessitate an order to be submitted later this

14    evening reflecting that resolution.

15         MS. HOPE DAVIS:  Good evening, Your Honor.  Tracy

16    Hope Davis for Diana Adams, the United States trustee.  I'm

17    here with my colleague, Paul Schwartzberg.  Mr. Waisman's

18    comments are accurate.  We did have an opportunity to confer

19    with respect to the pleadings that have been filed.  And I will

20    allow him to articulate our resolution as to that pleading.

21    That is the 1007 motion seeking a waiver, if I'm correct, with

22    respect to compliance with that section.

23         THE COURT:  I had some concerns about that pleading

24    as well.

25         MS. HOPE DAVIS:  Yes.  And Mr. Waisman and I -- we

1   have spoken and I know that he will articulate our position

2   with respect to that or our resolution per se.

3           I have nothing further, Your Honor.

4           THE COURT:  Okay.  Thank you.

5           MS. HOPE DAVIS:  Thank you.

6           MR. WAISMAN:  One other point of information for the

7   Court before we do proceed.  As part of the conversations with

8   the Office of the United States Trustee, the debtors -- they

9   made a request or brought to the office's attention the events

10  that are going to occur here today and hopefully in the near

11  future.  And there was discussion about the immediate

12  appointment of an official committee of unsecured creditors.

13  And, in fact, the office has solicited acceptances to serve on

14  a committee and there will be a meeting, organizational

15  meeting, for the creditors' committee this evening at 6 p.m.

16  and the debtors very much hope that out of that there will be a

17  creditors' committee and professionals retained so that there

18  is somebody -- there is a committee to engage in the process

19  going forward on a very fast track.

20          THE COURT:  Okay.  Fine.

21          MR. WAISMAN:  Your Honor, the first motion, which

22  would appear in Your Honor's binder under Tab 4, which is the

23  Section 362 motion, otherwise known as the automatic stay

24  comfort order -- Your Honor, this is a motion that, in essence,

25  reflects precisely what the automatic stay provides and nothing

1   more.  This is a global business.  There are many parties-in-

2   interest, both in this country and abroad, that do not

3   understand the implications of the automatic stay and, in fact,

4   don't -- for some strange reason don't take the time to refer

5   back to the Bankruptcy Code when the debtor complains about

6   violations and insists on seeing orders.  Because of the nature

7   of the debtor's global business and the thousands, if not

8   hundreds of thousands, of parties-in-interest, this order is

9   very important to the debtors.

10          Two parties have raised concerns to make sure that

11  the order does not go beyond the limitations of Section 362,

12  including the United States Attorney's Office.  What we would

13  propose is this order be approved on the record.  We would

14  then, together with the two parties that have complained -- not

15  complained, but asked for clarifying language, work out a

16  consensual order and submit it to chambers when it has been

17  worked out among the parties.

18          THE COURT:  I will approve this motion subject to the

19  drafting process that you described.  It looks like there's

20  somebody who maybe doesn't want me to approve it because I see

21  Mr. Herman standing.  Or at least he wants to comment.

22          MR. HERMAN:  Thank you, Your Honor.  Just want to

23  comment --

24          THE COURT:  You'll have to speak up so you can be

25  heard by the recording system.

1    MR. HERMAN:  Sorry.  Can you hear me from here?  Or

2    should I come up?

3    THE COURT:  I can hear you but I'd like the record to

4    reflect what you have to say.  So you might want to struggle to

5    come forward.

6    MR. HERMAN:  Ira Herman, Thompson & Knight, for

7    Chevron, Your Honor.  Chevron would like to be involved in the

8    drafting of the order to make sure that the order does not go

9    on beyond the scope of Section 362.

10   THE COURT:  Well, I think I'm the person who's going

11   to confirm that it doesn't go beyond the scope of 362, not you.

12   MR. HERMAN:  Your Honor --

13   THE COURT:  So here's what I propose.  So that we

14   don't convert the drafting of an order which, by the

15   representations of counsel, will not go beyond Section 362, I

16   strongly urge that something this important to the debtor and

17   this routine, relatively speaking, in large Chapter 11 cases in

18   this district, not be converted into a drafting exercise.  So,

19   while I understand your request, you're not going to get

20   approval from me.

21   MR. HERMAN:  Fair, Your Honor.  My understanding was

22   that there were two parties who have raised objections and

23   would be reviewing the order, the form of order.  I was just

24   asking for the similar --

25   THE COURT:  If the debtor is willing to do that with

you, that's fine because I think consensual behavior is to be

encouraged.  But if what you're looking for is a statement from

me that you have that right simply because you stood up, I'm

not going to give you that.

MR. HERMAN:  Well, may I ask Mr. Waisman if it'll

accommodate Chevron?

MR. WAISMAN:  Perhaps there's a way to resolve this.

Maybe I should continue with these motions.  And perhaps Mr.

Herman could speak to my partner, Mr. Krasnow, and agree on

language.  And if not, we would come back and --

THE COURT:  Well, before you move on, because I think

that there's nothing more important, at least as I've seen

press reports, than confirming that the automatic stay applies

globally.  And we have a variety of important first day

motions.  And ordinarily, this would not be an important one.

But I don't want there to be any even scintilla of a hiccup

with respect to this issue.  So I don't want to move on and

make this a matter for discussion.

I'd like to understand what the issues are that have

been identified with the language of the order as it presently

exists.  And to the extent that all we are doing is carving

back something so that it fits neatly within the precise

language of 362, that should be a relatively simple

undertaking.  What's the issue or what are the issues?

MR. HERMAN:  Your Honor, to the extent the language

1    of the order is carved back so that it follows 362 and so

2    there's no question that the safe harbor provisions are

3    preserved, there is no issue.  To the extent the order goes

4    beyond Section 362, you just heard the concern.

5            THE COURT:  Okay.

6            MR. WAISMAN:  Your Honor --

7            THE COURT:  I think everybody is concerned about the

8    safe harbor provisions in this case.  So I can't imagine that

9    one client represented by one law firm would have a particular

10   interest in that beyond anybody else.

11           MR. WAISMAN:  That is the issue that has been raised

12   by the other parties and, in fact, of course we confirm this is

13   not meant to affect the safe harbor provisions in Section 362.

14   And I think that is an easy modification to be made very

15   quickly to the order.

16           THE COURT:  Fine.  Let's do the following.  I'm

17   approving your comfort order.  And I want it to provide that

18   comfort immediately and without reservation.  The

19   understanding, however, is that the language of the comfort

20   order will be so crafted as to fit neatly and thoroughly within

21   the scope of Section 362 as it's drafted including all of its

22   provisions.  Fair enough?

23           MR. WAISMAN:  Fair enough.

24           THE COURT:  Does that accurately state what the

25   debtor's intent is as well?

1          MR. WAISMAN:  Precisely.

2          THE COURT:  Fine.  Then I can't imagine that we're

3     going to have a major issue except for whether or not there was

4     a scribner's error.  So let's move forward.

5          MR. HERMAN:  Thank you, Judge.

6          MR. WAISMAN:  Under Tab 5, Your Honor, it's the

7     debtor's motion for the waiver of the requirements of local

8     Bankruptcy Rule 1007(2)(a) and 1007(2)(b).  Your Honor --

9          THE COURT:  This is the one the U.S. trustee spoke

10    to.

11         MR. WAISMAN:  That is correct, Your Honor.  And the

12    agreement with the Office of the United States Trustee is that

13    rather than make it an explicit waiver, we would have a forty-

14    five day extension -- the debtor would have a forty-five day

15    extension to come into compliance with the local rule, subject

16    to the debtor's right to come back and ask for a waiver or

17    additional time.  And I have, of course, represented to the

18    Office of the United States Trustee that we would, in fact,

19    endeavor to comply with the requirements of the local rule

20    during that time.

21         THE COURT:  Fine.  That resolution is satisfactory to

22    me.  Is it satisfactory to the office?

23         MS. HOPE DAVIS:  It is, Your Honor.  Thank you, Mr.

24    Waisman.

25         THE COURT:  I'll make this one comment.  We sought to

1   determine whether or not the representations made in this

2   motion were, in fact, true in terms of the ability to publicly

3   access most of the information anyway.  And we may not have

4   done it perfectly.  But the one item that seemed not to be easy

5   to locate publicly but seems to be relatively easy for you to

6   comply with is the identity of the holders of the five largest

7   secured claims.  I'm not proposing anything different from what

8   you've already agreed to with the Office of the U.S. Trustee.

9   But you might go a long way toward providing the public with

10  everything that they would ordinarily have with immediate

11  compliance by simply providing that information online.  So I

12  make that suggestion.

13          MR. WAISMAN:  Thank you, Your Honor.  The debtor

14  appreciates the suggestion and we'll endeavor to comply with

15  the Court's suggestion and the local rule.

16          From there, Your Honor, I would turn, actually, to

17  Tab 10, which is the extension of time to file schedules of

18  assets and liabilities and waiving the requirement to file an

19  equity list.  I simply do so so we don't pop up and down here

20  as my partner, Mr. Krasnow, will be handling the motion

21  confirming the status of clearing advances which appears under

22  Tab 10 -- under Tab 9, excuse me.

23          So, proceeding with the schedules motion under Tab

24  10, Your Honor, this is the standard waiver motion.  The debtor

25  here requests an additional forty-five days, that is, forty-

1    five days beyond the fifteen days for a total of sixty days

2    subject to the debtor's right to come back and request

3    additional time if the debtor cannot comply.  I'm happy to

4    answer any questions Your Honor has.

5         THE COURT:  I have no questions.  And I assume

6    because there's no comment from the U.S. trustee's office that

7    that's acceptable as well to your office.

8         MS. HOPE DAVIS:  It is, Your Honor.

9         THE COURT:  Thank you.

10        MR. WAISMAN:  Thank you.

11        THE COURT:  I'll grant that motion.

12        MR. WAISMAN:  Your Honor, finally, for me at least,

13   the application to retain Epiq Bankruptcy Solutions, LLC as

14   claims and noticing agent.  Your Honor this retention has been

15   vetted and cleared with the assistant clerk of the court.  It

16   is the standard retention application for Epiq Bankruptcy

17   Solutions and, in fact, they are up and running --

18        THE COURT:  It's fine.  I've also cleared this with

19   the clerk of the court.  So you're good to go.

20        MR. WAISMAN:  Upon the highest authority, Your Honor.

21   Thank you.

22        Your Honor, Richard Krasnow, my partner, will address

23   the clearing advances motion.

24        MR. KRASNOW:  I think it's still the afternoon so

25   good afternoon, Your Honor.

1          THE COURT:  Depends on what continent.

2          MR. KRASNOW:  Although I'm not sure what day it is,

3     Your Honor.

4          Your Honor, in his opening remarks, Mr. Waisman

5     referred to the various functions -- or to the functions and

6     critical functions that are provided by various financial

7     institutions in connection with clearing various securities

8     transactions.  Without these clearing entities, financial

9     transactions involving securities, derivatives and the like,

10    simply could not be implemented.  JPMorgan Chase, Your Honor,

11    is the main clearing agent for all transactions of, among

12    others, Lehman Brothers Inc., the broker dealer, the main

13    broker dealer of the holdings.  And as Mr. Waisman indicated,

14    it is a non-debtor.

15         On any one day, the level of securities transactions

16    that take place during the course of the day can amount to the

17    trillions.  This is one of those cases, Your Honor, when you

18    drop a zero with respect to the amounts of assets, the volume

19    of transactions and the liabilities, it almost seems like a

20    rounding error.  It doesn't seem real but it very much is.

21         Your Honor, JPMorgan Chase operates pursuant to a

22    variety of agreements, clearing agreements, and as well a

23    guaranty of the obligations of various Lehman entities

24    including, in particular, the broker dealer by holdings.  Those

25    obligations by the broker dealer as well as holdings are

1    secured.  And, Your Honor, in that regard, JPMorgan Chase holds

2    what we estimate to be collateral having the value of

3    approximately seventeen billion dollars in either securities or

4    cash, the cash amount being approximately 6.9 billion dollars.

5    Most of the collateral that JPMorgan Chase holds represent

6    assets of Lehman Brothers Inc.  The cash component, however,

7    represents monies which were posted, deposited as cash

8    collateral prior to the Chapter 11 case's commencing.

9         Your Honor, JPMorgan Chase has indicated that they

10   are prepared to continue to provide this critical function

11   without which, for example, customer transactions could not

12   happen.  But during the course of any day, as I understand

13   these transactions -- and Mr. Novikoff is here on behalf of

14   JPMorgan Chase and I encourage him to correct me or to fill in

15   any blanks with respect to exactly how this all works.  But

16   during the course of any one day, there are, in essence,

17   advances which are made by JPMorgan Chase with respect to the

18   transactions that occur.  Securities are delivered.  You

19   haven't yet received the cash with respect to the securities

20   and the like which is, in part, what these collateral secures

21   and what the guaranty that was issued by the holdings company

22   covers.

23        Your Honor, JPMorgan Chase has indicated that it is

24   willing to continue to act as the clearing agent.  However,

25   they do need a certain level of comfort, which is completely

1  understandable, that with respect to the ongoing transactions

2  that will take place that indeed the guaranty, which was issued

3  by Lehman Brothers, will continue to cover those transactions

4  and they will continue be secure with respect to their

5  existing collateral as to those future transactions.  In our

6  view, we believe that the guaranty and the collateral covers

7  not only those transactions which have already occurred but as

8  well the future transactions.  But given the amounts involved

9  here, we believe it is perfectly understandable that JPMorgan

10  Chase should want a level of comfort, slightly different

11  comfort order than we discussed earlier but just as key, if not

12  more critical, in terms of the broker dealer being able to

13  continue to operate in the ordinary course and customers to

14  continue to be protected.

15          Your Honor, we would request, therefore, that the

16  Court -- if you will confirm that indeed the collateral they

17  have and the existing guaranty will cover all future

18  transactions or, alternatively, confirm that the advances and

19  financial accommodations that JPMorgan Chase will be providing

20  to us on an ongoing basis are covered by Section 364 and that

21  their existing collateral can be looked to to secure those

22  obligations.  The lien which they assert with respect to the

23  collateral will have the same status it had pre-petition.  To

24  our knowledge, nobody else has a lien with respect to that

25  collateral.  This is not a situation of priming, junior liens

1    or the like. It is very straightforward, Your Honor.

2              THE COURT: We're talking about a possessory lien?

3              MR. KRASNOW: It's my understanding it is a

4    possessory lien. Your Honor, we have described somewhat in the

5    motion papers the nature of these transactions. As I've

6    indicated, Mr. Novikoff is here in case there are any questions

7    the Court has that I perhaps cannot answer. But for the

8    reasons I've indicated, we would request that the relief be

9    granted.

10             THE COURT: Fine. I would like to hear from Mr.

11   Novikoff, principally to confirm why this comfort is needed. I

12   realize that that's exactly what has been presented by counsel

13   for the debtor but it would be helpful to hear it from you as

14   counsel for JPMorgan Chase.

15             And additionally, I've reviewed the statement which

16   you filed this afternoon. And there was one thing that I noted

17   that caught my eye and I'm interested in understanding a little

18   bit more about it. There was a reference in the statement to

19   Section 741 and the definition of securities contract and the

20   assertion that these documents all fit that definition. I'm

21   not quarreling with that assertion nor am I making a finding

22   now that the assertion is correct. But I'm interested in

23   knowing why that assertion is significant for purposes of the

24   relief that you're asking me to grant. And it may not be but

25   it caught my eye.

1          MR. NOVIKOFF:  Okay.  Your Honor, if I can put in

2     context why these advances were made, why it is that we are

3     seeking the comfort -- and first I should state for the record,

4     I'm Harold Novikoff of Wachtell, Lipton, Rosen & Katz.  I'm

5     here with my colleague, Amy Wolf, on behalf of JPMorgan Chase

6     Bank, N.A.

7          As Mr. Krasnow indicated, JPMorgan is the principal

8     clearing bank for the domestic broker dealer, Lehman Brothers

9     Inc., as well as for some of the foreign broker dealers.  The

10    way that Lehman Brothers Inc., the broker dealer, has

11    historically financed its dealer operations is that during the

12    course of a day, JPMorgan, under these clearance arrangements

13    which have been provided to the Court, provides intra-day

14    advances.  At the end of the day, overnight financing is

15    provided by third party investors through what's called tri-

16    party repurchase agreement arrangements.  Those investors are

17    principally mutual funds, money market funds, a whole host of

18    entities that are looking to either invest money overnight or

19    on a relatively short term basis.

20          On Monday morning, after the holding company had

21    commenced the Chapter 11 case, there was approximately eighty-

22    seven billion dollars that had been advanced by these various

23    investors and in the ordinary course would be -- they would get

24    their money back from an advance by JPMorgan Chase.  And that

25    is the way this has worked for quite a while.  JPMorgan Chase,

1    in theory, had the ability to say no, it's a discretionary

2    advance, we don't want to do it.  But there was a great amount

3    of concern and that concern was expressed as well to us by the

4    Federal Reserve Bank of New York and just by knowledge of the

5    market that we would be creating market havoc had we not made

6    an advance at that time.  So we did.  So eighty-seven billion

7    was advanced.  At the end of the day, a number of those tri-

8    party repo investors did not show up again and working with the

9    Federal Reserve Bank of New York, Lehman financed that position

10   overnight both with some tri-party investors as well as through

11   the primary dealer credit facility run by the Fed.

12        And then this morning, Your Honor, there was a

13   smaller advance had to be made for fifty-one billion dollars.

14   It became clear to us during the day yesterday, and we brought

15   this to the attention of Mr. Krasnow's partner, Mr. Miller,

16   that we realized that an argument may exist that because we

17   were making discretionary advances post-petition from the

18   perspective of the parent that there might be some argument

19   that we were effectively doing an extension of credit by the

20   parent.

21        THE COURT:  Even though the money is going to a non-

22   debtor?

23        MR. NOVIKOFF:  Absolutely.  The money is going to a

24   non-debtor.  And I'd like to point out, the advances we were

25   talking about are solely advances to non-debtors.  It was

1   incorrectly reported in the press just a while ago that the

2   advances were made to the holding company.  That's incorrect.

3   All the advances were made to non-debtor broker dealers.

4       Your Honor, we think the right result is that, in

5   fact, it does not amount to that but -- and it may be an

6   abundance of caution, but when you're talking about eighty

7   billion dollars or fifty billion dollars, it's difficult to be

8   overly cautious.  So we did seek comfort from this Court right

9   away before we are doing more advances and we came to the Court

10  as early as we could with this.  We wanted to come to the Court

11  so we knew that either -- so we knew that to the extent that

12  364 applies, what we're doing is authorized and we're not

13  violating anything.  We are not seeking to change the status of

14  where things would have been had it still been pre-petition.

15  We are not seeking a validation of our liens.  We are not

16  seeking a validation of the guaranty.  We are not even seeking

17  administrative expense status.  This is probably the only time

18  I will ever come to you post-petition and be able to say those

19  words.

20      THE COURT:  And you've done it in front of a very

21  large crowd.

22      MR. NOVIKOFF:  That's right.  But JPMorgan, in these

23  circumstances, does want comfort that we are not violating the

24  law in doing that and that what's going on is authorized.

25      The reason we mentioned securities contract and,

1    frankly, these particular pleadings went through some

2    differences in formulation over time, when Your Honor takes a

3    look at the definition of securities contracts, BAPCPA in 2005

4    amended the definition of securities contract to include within

5    the long list of transactions that are covered are advances

6    made in connection with the clearance of securities.  We think

7    that's exactly what this is.  In addition, near the end of the

8    definition, you will see that what is included as a securities

9    contract includes security arrangements and guaranties made in

10   connection with a securities contract.  So the parent guaranty

11   is itself a securities contract as is the security agreement

12   that governs that.

13           One item that we had thought about which deals with

14   this is the damages for termination, acceleration or

15   liquidation of securities contract, is different from what you

16   would normally see with a normal claim which would normally be

17   determined as of the petition date.  In the case of a

18   termination of a securities contract, it's determined as of the

19   date of the termination.  So under 562(a) of the Code, we think

20   also supports this but we did not want to simply rely on that

21   provision.  But that's why there is some mention of that in the

22   papers.  And we're not asking Your Honor for a determination on

23   that issue.  We are really just asking for a determination that

24   with respect to the advances we made today, the large advance

25   that we will have to make tomorrow morning, the advance that we

1    will make the day after that, that we are effectively in the

2    same position that we would have been pre-petition, that is,

3    that it remains covered by the parent guaranty and by the

4    collateral that secures that guaranty.  Whatever the legitimacy

5    of that guaranty, whatever the legitimacy of that collateral,

6    we are looking for that comfort.

7              THE COURT:  Is there any objection by any party to

8    the relief sought by the debtor that has just been explained in

9    greater detail by counsel for JPMorgan Chase?

10             MS. LEVENTHAL:  Your Honor, this is Shari Leventhal

11   for the Federal Reserve Bank of New York. We'd like to just

12   lend our support for the motion that has been made.  And we

13   would note that we believe that the services that Chase has

14   been providing are critical to the smooth functioning of

15   financial markets.

16             THE COURT:  And I am glad that was not an objection.

17             MR. KRASNOW:  As am I, Your Honor.

18             THE COURT:  That was that suspenseful moment when

19   someone stands and we're not sure what's going to happen next.

20   I believe that that -- Mr. Krasnow, do you have something to

21   add?

22             MR. KRASNOW:  No, Your Honor.  No, Your Honor.

23             THE COURT:  I believe that a comfort order, as we're

24   characterizing it, for the benefit of JPMorgan Chase under

25   these clearance agreements, while unusual in my experience, is

1  entirely appropriate and consistent with the need to provide

2  market liquidity for this debtor and its affiliates during the

3  early stages of this bankruptcy case and beyond, for that

4  matter.  And I'm perfectly prepared to grant the relief,

5  particularly since notwithstanding the short notice and a

6  packed courtroom, no one objects.  And I'm confident that no

7  one, even after further deliberation, would object.  I approve

8  that relief.

9       MR. KRASNOW:  Thank you, Your Honor.

10      MR. NOVIKOFF:  Thank you, Your Honor.

11      MR. WAISMAN:  Shai Waisman for Lehman Brothers

12  Holdings Inc.  Your Honor, that concludes the matters that have

13  been filed and with respect with which we seek to go forward

14  today.  The events in the financial markets continue to occur

15  on a daily basis.  And, you know, while Lehman Brothers has

16  succumbed to the distress in the market, it remains the fourth

17  largest investment bank and a significant player.  It intends

18  to prosecute these cases to preserve, as I said earlier, value

19  to its customers and the value of its enterprise for the

20  benefit of all stakeholders, its employees included.

21      We have been in touch with chambers and do have a

22  tentative hearing scheduled for tomorrow at 11 a.m.

23      THE COURT:  Yes.

24      MR. WAISMAN:  We hope to get on the docket additional

25  pleadings, both administrative in nature and possibly more

1    substantive in nature, but that is yet to be determined.  And I

2    believe people are working on that now.  And obviously, it goes

3    without saying that as soon as we know anything, it'll be

4    reflected on the docket.  It will be e-mailed and faxed to the

5    extent practicable to all of the parties-in-interest.  And to

6    the extent we go forward with anything tomorrow, we will have

7    copies available here in Court for parties to review.

8         With that, the debtor has nothing further other than

9    to thank the Court for its time this evening.

10        THE COURT:  That's fine.  I noted that you chose your

11   words very carefully in describing what may happen tomorrow at

12   11 a.m.  Just so you're aware of my calendar for tomorrow, I

13   have a 10:00 calendar that was previously listed for various

14   cases, before the Lehman Brothers case filed, at 10 a.m.  I'm

15   hopeful that I will conclude that by 11:00.  But I do note that

16   there is a lot of public interest in this case and for that

17   reason, would suggest that -- and I don't want to create a

18   crowd problem here -- that people not, in effect, file in to

19   try to get good seats while I'm in the middle of handling a

20   series of miscellaneous other matters.  So I would propose,

21   even though it may create some traffic congestion, that people

22   come after 10:30 for the 11:00 hearing, assuming it's going

23   forward.  And I also assume that you'll provide timely notice

24   to all parties if, in fact, there is no hearing.

25        MR. WAISMAN:  As soon as we know, a notice will be

1  posted to the docket.  And even if there is no hearing or as

2  soon as we conclude that there will be no hearing if that

3  should happen, a notice will be filed and that notice also will

4  be e-mailed and faxed to all parties-in-interest.

5          THE COURT:  Fine.  Just to let you know that you're

6  in the middle of a sandwich, I also have a 2 p.m. calendar

7  tomorrow.  So we'll do the best we can with the schedules that

8  exist.

9          MR. WAISMAN:  Absolutely.  Thank you, Your Honor.

10         THE COURT:  All right.  We're adjourned for the

11  evening.

12         (Whereupon these proceedings were concluded at 5:58 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtor's motion for an order enforcing protections of Section 362 of the Bankruptcy Code granted subject to language of the order fitting neatly within scope of Section 362 | 22 | 16 |
| Debtor's motion for waiver of the requirements of local Bankruptcy Rule 1007(2)(a) and 1007(2)(b) granted | 23 | 20 |
| Debtor's motion for extension of time to file schedules of assets and liabilities and waiving the requirement to file an equity list granted | 25 | 10 |
| Debtor's motion for order confirming status of clearing advances granted | 35 | 6 |

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

LISA BAR-LEIB


Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  September 17, 2008