**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, NY 10022
(212) 705-7000
Jeffrey S. Sabin
Ronald J. Silverman
Sabin Willett, *pro hac vice application pending*
Rheba Rutkowski, *pro hac vice application pending*

Counsel to Harbinger Capital Partners Special Situations Fund, L.P. and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund Ltd.)

Hearing Date:  September 19, 2008, 4:00 pm

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

LEHMAN BROTHERS HOLDINGS INC., *et al.*,

    Debtors.

Chapter 11 Case No. 08-13555 (JMP)
(Jointly Administered)

**LIMITED OBJECTION OF THE HARBINGER FUNDS TO DEBTORS' MOTION TO APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS**

    Harbinger Capital Partners Special Situations Fund, L.P. and Harbinger Capital Partners Master Fund I, Ltd., f/k/a Harbert Distressed Investment Master Fund, Ltd., (collectively, the "Harbinger Funds") submit this limited objection to the Debtors' Motion to Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the "Sale Motion").

    The Sale Motion filed by Debtors Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC (collectively, the "Debtors") contemplates the jurisdiction of the Court in a SIPA[1] case to approve on Friday, September 19, the sale (the "Proposed Sale") of LBI's assets to Barclays

---

[1] The Securities Investor Protection Act of 1970, 15 U.S.C. §§ 78aaa, *et seq.*

A/72658344.2

Capital Inc. ("Barclays"). The Harbinger Funds acknowledge the emergency nature of these proceedings. But given the complete absence of a factual record to justify the requested relief, they must object to the Sale Motion (the "Objection") and ask the Court to withhold approval of the Proposed Sale until LBHI and the other Sellers[2] have disclosed a basic set of fundamental, easily procured financial details necessary to understand the transaction's fairness. In support of their Objection, the Harbinger Funds state as follows:

## JURISDICTION AND VENUE

1.  This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

2.  LBHI commenced a voluntary bankruptcy case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on September 15, 2008 (the "Petition Date"). LB 745 LLC filed a voluntary chapter 11 petition on September 16, 2008. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. 11 U.S.C. §§ 1107(a), 1108.

3.  The Debtors filed their multi-billion dollar Sale Motion on Wednesday, September 17, 2008, seeking (among other relief) the Court's authorization and approval of the sale of the "Purchased Assets" free and clear of all liens, claims, encumbrances, and interests, and the assumption and assignment of certain pre-petition contracts and unexpired leases relating to the Purchased Assets. At Wednesday's hearing, the Court approved the Debtors' requested

---

[2] Unless otherwise indicated, capitalized terms have the meanings ascribed to them in the Sale Motion.

sale procedures and $100 million break-up fee and scheduled a hearing on approval of the Proposed Sale for Friday, September 19, 2008.

## FACTUAL BACKGROUND

4.  The Harbinger Funds are counterparties and creditors of Lehman Brothers Special Financing, Inc. ("LBSF"), a wholly owned subsidiary of Lehman's non-debtor registered broker-dealer Lehman Brothers, Inc. ("LBI"). LBSF has substantial indebtedness to the Harbinger Funds, in an amount today not less than $250 million,[3] pursuant to certain International Swap Dealers Association, Inc. ("ISDA") swap agreements, including that certain Master Agreement dated as of July 28, 2006 by and between LBSF and Harbinger Capital Partners Special Situations Fund, L.P., and that certain Master Agreement dated as of May 20, 2005 by and between LBSF and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund, Ltd.).[4] That indebtedness is, in turn, guaranteed by debtor LBHI.[5]

5.  Although accounts of LBHI's financial distress have long circulated in the financial press, the Debtors entered chapter 11 chaotically, and the Sale Motion has come on with a haste that is simply unprecedented for a sale of this magnitude. According to press accounts, LBHI attempted out of court to arrange a sale of its registered broker-dealer, LBI, and was unable to induce Barclays to buy.[6]

6.  Press accounts – and it must be stressed that press accounts are all we have,

---

[3] The final amount is being calculated.

[4] The Harbinger Funds believe their status is undisputed, but will be prepared, at hearing, to address any disputes that may arise in respect of these points. Copies of these agreements are available on request.

[5] As part of the ISDA swap agreements, LBHI executed Guarantees that unconditionally guaranteed "the due and punctual payment of all amounts payable" by LBSF to the Harbinger Funds under those agreements. *See* Guarantee at ¶ A (Exhibit A to ISDA Agreement).

[6] *See* Ben White & Eric Dash, *Barclays Reaches $1.75 Billion Deal for Lehman Unit*, N.Y. Times, September 17, 2008 at C1.

A/72658344.2                        3

because there is no factual record before this Court, no disclosure of any kind about these points, and the schedule leaves no time to discover the facts – also suggest the following: (i) Seven days ago, on Friday, September 12, 2008, Lehman swept billions in cash and cash equivalents to LBHI from its London affiliate. *See* Exhibit 1 (David Cohen, *My Anger over Lehmans' $5 Billion "Betrayal" of London*, Evening Standard (London), September 17, 2008, at 18); and (ii) On Monday, September 15, 2008, Japan's Financial Services Agency ordered Lehman Brothers Japan to retain certain assets within Japan in order to prevent Lehman assets there from being transferred to other affiliates outside of Japan. *See* Exhibit 2 (*Lehman Brothers Japan Files for Bankruptcy Protection*, Japan Economic Newswire, September 16, 2008). With the cash transferred to Lehman, and perhaps then down-streamed to LBI (again, this is unknown because there is simply no disclosure before the Court) LBHI filed this chapter 11 case on Monday.

7.  LBI has *not* been placed into any proceeding under title 11 or the Securities Investor Protection Act of 1970, *see* 15 U.S.C. §§ 78aaa, *et seq.*, or otherwise exposed to creditor scrutiny its assets, liabilities, and recent cash movements. As of now there has been no scrutiny of LBI by any court or trustee. The creditors of LBHI and/or any other Lehman Brothers entity have no basis on which to assess the Proposed Sale. An official committee of unsecured creditors has scarcely had time to form. Only a special-purpose real estate holding company, and the parent that evidently acts as the hub in a hub-and-spoke cash-management system, filed chapter 11 petitions.[7]

8.  The Debtors now ask this Court to approve the Sale Motion on Friday, September

---

[7] The Debtors have not explained how LBHI, the parent, having evidently withdrawn billions from its affiliates on Friday, found itself in need of hundreds of millions of dollars of emergency debtor-in-possession financing simply to bridge the Proposed Sale.

A/72658344.2                                4

19, *two days after the Sale Motion was filed, and before (i) the non-debtor broker-dealer LBI even is within this Court's jurisdiction, and (ii) a SIPC[8] trustee has been appointed to review and consider the Proposed Sale*. *See* 15 U.S.C. § 78eee(b)(3). So far as we can understand the papers, only $250 million of the proceeds from the Proposed Sale of the assets of LBI could conceivably benefit the parent (although even that is not clear), while $1.3 billion in cash of the LBI "Seller" (defined by the Asset Purchase Agreement attached as Exhibit 2 to the Sale Motion ("Sale Agreement") as *both* debtor LBHI and non-debtor LBI), would go to Barclays. *See* Sale Agreement, §§ 1.1, 3.1.

9.     Cases of this kind typically begin with a cash-management motion. None was filed here. The first-day declaration typically describes the cash-management system. This information is conspicuously absent from Mr. Lowitt's declaration; nor is it provided elsewhere. There has been no disclosure of any kind as to the pre-petition cash movement. Yet the Sale Motion proposes to "sell" at least $1.3 billion of LBI's cash to Barclays, along with other assets, including $70 billion in "long" securities positions. Possibly some or all of the cash to be "sold" is securities customer cash of LBI customers that is appropriate for such a transaction. But there is no disclosure from which one can draw this conclusion. The Debtors' court filings also provide no disclosure to the Court or anyone else as to where the reported massive cash sweeps went, and whether LBI has recently received cash infusions from Lehman affiliates, in derogation of the rights of creditors of those affiliates, such as the Harbinger Funds.

10.     Similarly lacking in disclosure is what, precisely, is being sold. Given the alternately vague and loose provisions of the Sale Agreement, a creditor cannot determine what is being sold. *See*, *e.g.*, Sale Agreement, § 1.1 at 6 (defining "Purchased Assets" as "all of the

---

[8] Securities Investor Protection Corporation. *See* 15 U.S.C.A. § 78ccc.

assets of Seller and its Subsidiaries used in connection with the Business"); *id.* at 2 (defining "Excluded Assets" as "(a) . . . equity interests of Seller and its Subsidiaries (other than . . . other equity interests of any other Subsidiary that Seller and Purchaser may agree prior to the entry of the Sale Order shall be a Purchased Asset)").

11. Questions like those raised in this Objection might have been resolved counsel-to-counsel, or with discovery, in an ordinary case.[9] But here there has been hardly a moment to breathe. The Sale Motion was filed on September 17, with a Sale Agreement that contains handwritten notations concerning highly substantive points, before a committee had formed, and just two days in advance of the hearing at which the Debtors seek to have the Proposed Sale approved by the Court. The Harbinger Funds did not receive the Sale Motion or a copy of the proposed Sale Agreement until early Wednesday, September 17, 2008. It has been impossible even for a highly sophisticated creditor to come up to speed on the Proposed Sale.

12. Given the extraordinary haste with which the Proposed Sale has come on, the crisis atmosphere in which it would be conducted, and the complete absence of disclosure in the Debtors' filings to date, Rule 2004 discovery and the appointment of an examiner will almost certainly be necessary after the fact. We understand that there is no time for that now. What is needed now is that the Proposed Sale, if approved, not prejudice the rights of creditors in the future. The transaction should proceed only if the Debtors make immediate, substantial disclosures as set forth below, and, if in light of those disclosures, the transaction appears nevertheless to be fair.

---

[9] By telephone call and letter of September 18, the undersigned counsel to the Harbinger Funds sought information on these points. *See* Exhibit 3. As of the time of this filing, none was provided.

**BASES FOR RELIEF**

13. A debtor must show that a sound business purpose justifies a sale of estate property outside the ordinary course of business pursuant to 11 U.S.C. § 363(b). *See generally Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d Cir. 1983); *see also In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992). A "bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Lionel*, 722 F.2d at 1071.

14. By their terms, sections 363(b) and (c) of the Bankruptcy Code apply only to *property of the estate*. *See* 11 U.S.C. §§ 363(c), (d). Section 363(f) applies only to sections 363(b) and 363(c). 11 U.S.C. § 363(f). The Bankruptcy Code contains no provision that authorizes a "free-and-clear" order, or any other deprivation of property rights in non-estate property, through a "free-and-clear" sale of that property.

15. The extent of notice is an important factor to be considered determining whether to approve such a sale. *Lionel*, 722 F.2d at 1071; *see In re The Bombay Co., Inc.*, 2007 Bankr. Lexis 3218, *8 (Bankr. N.D. Tex. Sept. 26, 2007) ("Even consideration of the [363 sale] Motion five days after its filing and mailing (or other service) is extraordinary. . . . The court is extremely concerned by this time-trap. The forced nature of its consideration of the Motion is inconsistent with the Code, due process of law, the exercise of the court's authority and simple common sense.").

**SPECIFIC OBJECTIONS TO THE SALE**

16. The Harbinger Funds acknowledge the genuinely emergent nature of the current

circumstances. But the Debtors have not mitigated that emergency by the provision of basic information necessary to protect creditor rights. Accordingly, the Harbinger Funds assert the following objections to the Proposed Sale.

> *(i)  The Debtors must provide adequate information, and certify its accuracy, as to what cash has moved in and out of LBI and Debtor LBHI.*

Without disclosure as to the pre-petition cash transactions, neither the creditors nor the Court can ascertain whether the cash being sold is properly securities customer cash of the broker-dealer LBI. The Debtors must provide adequate assurance that the $1.3 billion actually represents securities customer property of LBI. The Debtors must disclose why any cash, specifically $1.3 billion (the "Purchased Cash"), is being included as part of the Purchased Assets sold to Barclays, and provide information sufficient to determine that this is indeed "customer property" of LBI customers.

> *(ii)  The Debtors must provide adequate information, and certify its accuracy, as to the customer liabilities of LBI.*

The Debtors' papers provide that at least $1.3 billion in cash and $70 billion in long-position securities will be transferred to the Purchaser. Missing is the necessary parallel disclosure of the extent of customer claims against that consideration. Without the latter, it is impossible for creditors to assess the fairness of the Proposed Sale.

> *(iii)  The Sale Agreement must clearly state which entity will in fact receive the cash consideration to be paid pursuant to the Proposed Sale.*

The Debtors must clarify what consideration is being provided to each Seller and what each Seller will do with any consideration received. *See* Sale Agreement, §§ 3.1-3.3. For example, (a) we understand that LBI 745 LLC is the owner of a building, located at 745 Seventh Avenue, New York, New York (the "Real Property"), with an appraised value of over $1 billion, subject to the mortgage of a Seller Affiliate and (b) we understand that $250 million is the

purchase price for the assets of LBI. Sale Agreement, § 3.1. However, the Sale Agreement defines "the Seller" collectively as LBI and LBHI. *Id.* at 1. Therefore, it is unclear which entity in fact will receive what consideration allocated to the Real Property and which "Seller" would receive the $250 million, or how it would be allocated. These basic, essential facts must be disclosed.

> *(iv) Any order approving a sale must make clear that nothing in the sale order will have absolved directors and officers of the Debtors and non-debtor affiliates with respect to their fiduciary duties pre-petition and rapid cash movements preceding the commencement of these bankruptcy cases.*

The extreme haste of these proceedings, and the absence of disclosure, leaves creditors entirely at the mercy of the estate fiduciaries (directors, officers, and counsel) and the fiduciaries of non-debtor affiliates (directors and officers) with regard to protection of the interests of creditors at the various Debtors and non-debtor affiliates. There must be no suggestion, explicit or implicit, in the Sale Order that any such fiduciary is absolved or released from her responsibilities concerning any pre-petition transfers, or other conduct, as yet unknown to the creditors.

> *(v) The Sale Agreement must disclose exactly what assets are being sold and pursuant to what authority. Section 363 of the Bankruptcy Code does not empower the Court to order an asset sale of a non-debtor.*

Under the Sale Agreement, the term "Purchased Assets" is defined as "all of the assets of the Seller and its Subsidiaries used in connection with the "Business . . ." Sale Agreement, § 1.1 at 6. The Debtors must confirm (a) what assets of the Debtor, and non-debtor Subsidiaries, are to be sold under the Transactions; (b) the basis for jurisdiction over any "Purchased Asset" of a non-debtor; (c) whether the "Purchased Assets" are subject to any liens (and, if so, a list of all such encumbered "Purchased Assets," the liens thereon, and the amount of such liens); and (d) whether the "Purchased Assets" are to be sold free and clear of any liens. To the extent the

Proposed Sale purports to authorize sale of property that is not property of a debtor's estate, the Court has no jurisdiction to authorize such a sale under section 363 of the Bankruptcy Code.

To aid in the determination of what assets are being sold, the Debtors and LBI should provide (a) an organizational chart as of the Petition Date so that one can ascertain which entities constitute a "Subsidiary" of the "Seller" under the Sale Agreement and (b) schedules identifying with particularity which assets are to be sold by which entity, so as to make sure that the sale of such assets are within the jurisdiction of this Court.  In particular, upon information and belief, LBI is the parent of five wholly owned Subsidiaries.  It is not clear what entities were Subsidiaries of LBI as of the Petition Date or whether the equity in such Subsidiaries will be sold pursuant to the Transaction.

In addition, it is not clear how swaps, repos, and other securities agreements of any seller within the jurisdiction of this Court will be treated, including whether the Purchaser will have a right to mandate whether any such contract is assumed or rejected.  A list of all such Contracts is required to permit assessment of what Contracts are subject to assumption or rejection and what parties will be affected by any such assumption or rejection.  Moreover, it would appear that the Purchaser may elect to purchase assets after closing, again in a manner that would be outside this Court's review, and potentially outside its jurisdiction.

"Excluded Assets" under the Sale Agreement include "all intercompany receivables."  Sale Agreement, § 1.1 at 3.  It is impossible to ascertain what is meant by "intercompany receivables."  The Debtors must disclose a list of all "intercompany receivables," including the related counter-parties, the source of such intercompany receivables (*e.g.*, promissory note, contract, *etc.*), and the amount of such intercompany receivables.

There appears to be an unintended but inherent conflict between the definitions of

A/72658344.2         10

"Purchased Assets" and "Retained Cash" and the intended Transactions. "Retained Cash" includes all cash other than the Purchased Cash. "Purchased Assets" includes all Retained Cash. As drafted, Barclays would receive all cash other than the Purchased Cash (*i.e.*, cash in excess of the $1.3 billion Purchased Cash). The Debtors must clarify how Retained Cash can be both an Excluded Asset and a Purchased Asset.

The Debtors contend that a section 363(m) good-faith finding, *see* 11 U.S.C. § 363(m), carries with it the implicit conclusion that the protected director is not on notice of adverse claims, *see* Sale Motion at 16-17, ¶¶ 38-39 (citing *Licensing by Paoli, Inc. v. Sinatra (in re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997)). That broad reading illustrates why section 363(m) must be confined to its terms; that is, to sales of estate property, and not extended to the proposed asset sale of a nondebtor's assets. The point is particularly important here because the directors have not disclosed their pre-petition (or for that matter, post-petition) intercompany cash transfers, and thus, in the event of any intercompany transfers that are avoidable or would constitute a breach of duty, those directors certainly are on notice of adverse claims.

  (vi)  *Other ambiguities in the sale document must be clarified.*

The Debtors must disclose whether there are conditions to closing under the Sale Agreement that, as of today, may not be satisfied or are impossible to satisfy. For example, Section 10.1(b) of the Sale Agreement requires that a minimum number of employees must remain actively employed. The Debtors should also disclose whether Barclays will close in the event of an unstayed appeal of an order authorizing the sale of the Real Property. In addition, the Debtors must advise whether the intent of the Sale Agreement's definition of "Lien" is to cut off setoff and/or netting rights.

## CONCLUSION

For the foregoing reasons, the Harbinger Funds respectfully request that the Court (i) withhold approval of the Proposed Sale until the Debtors have disclosed financial details necessary to understand the transaction's fairness; and (ii) grant such other, further relief as the Court deems just and proper.

Dated: New York, New York
September 19, 2008

**Counsel to Harbinger Capital Partners Special Situations Fund L.P. and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund Ltd.)**

By their attorneys,

/s/  Ronald J. Silverman
Jeffrey S. Sabin
Ronald J. Silverman
Sabin Willett, *pro hac vice application pending*
Rheba Rutkowski, *pro hac vice application pending*
**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, New York 10022
Telephone No.:  (212) 705-7000
Facsimile No.:  (212) 752-5378