KOBRE & KIM LLP
800 Third Avenue
New York, New York 10022
Tel: (212) 488-1200
Fax: (212) 488-1220

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x
                                                :
In re                                           :    Chapter 11 Case No.
                                                :
LEHMAN BROTHERS HOLDINGS INC., et al.           :    08-13555 (JMP)
                                                :
            Debtors.                            :    (Jointly Administered)
                                                :
---------------------------------------------------------------------x

### OBJECTION BY ESSEX EQUITY HOLDINGS USA, LLC, M. BRIAN MAHER AND BASIL MAHER REQUESTING SEGREGATION OF SALES PROCEEDS PENDING AN ALLOCATION HEARING

Essex Equity Holdings USA, LLC, M. Brian Maher and Basil Maher (collectively, "Essex") are brokerage customers of Lehman Brothers, Inc., a securities broker-dealer registered with the National Association of Securities Dealers. Lehman Brothers, Inc. is a subsidiary of Lehman Brothers Holdings, Inc. ("LBHI"). Although LBHI is in bankruptcy, Lehman Brothers, Inc. is not, and the two have separate pools of creditors. Essex has an ongoing claim for damages suffered from Lehman Brothers, Inc.'s improper conduct relating to auction rate securities which it placed into Essex's brokerage account. We request that the Court order the sales proceeds to be segregated from the estate pending further hearing to determine how the proceeds should be allocated as between LBHI and Lehman Brothers, Inc.[1]

---

[1] We file this in response to the Motion to Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the

1

The proposed sale conflates the asset sales of Lehman Brothers, Inc. with that of the Debtors, and fails to provide adequate information to explain or justify how the sales proceeds are being allocated. Such a structure potentially confers on LBHI proceeds that should rightfully be sent to Lehman Brothers, Inc. and used to satisfy that entity's separate creditors, such as brokerage customers with claims. To ensure that proceeds belonging to one entity are not improperly allocated to another entity or commingled, the Court should order the sales proceeds to be segregated pending further proceedings to ensure that the proceeds are being allocated fairly and honestly between the Debtors and Lehman Brothers, Inc.

## BACKGROUND AND INTRODUCTION

1.    In approximately July 2007, Essex engaged Lehman Brothers, Inc.'s Corporate Cash Management Group, part of Lehman Brothers' Investment Management Division, to manage the proceeds of the sale of their family business, which specialized in the operation of certain marine terminals.

2.    Upon Essex's opening and funding an account with Lehman Brothers, Inc., to enrich itself, the brokerage firm used the funds to purchase Lehman-structured auction rate securities that were unauthorized and unsuitable for the account. Within a matter of weeks, approximately US $286 million of the auction rate securities purchased by Lehman Brothers, Inc. became illiquid because the auctions associated with these securities failed. As a result, Essex lost the ability to access approximately US $286 million of the family's money.

---

"Debtors' Motion") of LBHI and LB 745 LLC, as debtors and debtors-in-possession (collectively, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman" or "Sellers").

3.  In or about January 2008, Essex instituted an arbitration before the Financial Industry Regulatory Authority ("FINRA") against Lehman Brothers, Inc. and various Lehman Brothers representatives, asserting claims of, *inter alia,* fraudulent misrepresentation, unauthorized purchases, breach of contract, breach of fiduciary duty, unsuitability, conversion, gross negligence, and violations of the federal securities laws arising from Lehman Brothers, Inc.'s improper management of Essex's account. As such, any award against Lehman Brothers, Inc. would be enforceable against the assets of Lehman Brothers, Inc.

4.  The arbitration is currently pending before FINRA.

### The Proposed Order Improperly Fails to Explain or Justify Allocation of Proceeds As Between The Debtors and Lehman Brothers, Inc.

5. The Debtors have moved the Court for an Order permitting the Sellers to sell certain assets to Barclays on an emergency basis, pursuant to Title 11 U.S.C. § 363(b). However, the Motion does not identify in detail the relative value of the assets of Lehman Brothers, Inc. and the Debtors that are being sold in a single, conflated transaction. The proposed transaction would permit Barclays Bank, the purchaser, to pay the Debtors and Lehman Brothers, Inc. in the aggregate, but lacks sufficient detail to govern how the proceeds would be allocated or the rationale for doing so.[2]

6. Bankruptcy courts must scrutinize situations where a debtor is attempting to sell substantially all of its assets pursuant to the expedited provisions of 11, U.S.C. §

---

[2] The ambiguous nature of the Agreement provides for the possibility that proceeds of the sale rightfully belonging to Lehman Brothers, Inc. can be consumed by LBHI. Section 3.2 of the Asset Purchase Agreement provides: "On the Closing Date, Purchaser shall pay the Cash Amount to Seller." The preamble of the Agreement defines "Seller" as both LBHI (the "Debtor") and Lehman Brothers, Inc. Thus, under the terms of the contract, some or even all of the proceeds could bypass Lehman Brothers, Inc. entirely, resulting in the proceeds being used to satisfy the creditors of LBHI.

3

363(b), instead of waiting for confirmation of a reorganization plan and the safeguards that that process provides. Mission Iowa Wind Co. v. Enron Corp., 291 B.R. 39, 43 (S.D.N.Y. 2003). Moreover, "…the need for expedition…is not a justification for abandoning proper standards" in making a proper and just determination. In re Lionel Corporation, 722 F.2d 1063, 1071 (2d Cir. 1983) (citation and internal quotations omitted).

7. Where, as here, a debtor has one or more wholly owned subsidiaries, bankruptcy courts have a duty "to preserve the integrity of separate estates and allocate value to the estate that owns the asset sold, not its parent." Mission Iowa Wind Co., 291 B.R. at 43. Thus, in addition to determining whether the § 363 transaction results in the payment of a "fair price," this Court must also look to whether the "*allocation* [of the proceeds] was fair and reasonable." *Id.*.

8. Debtors cite Macarthur Co. v. Johns-Manville Corp, 837 F.2d 89, 94 (2d Cir. 1988) in support of the Motion, arguing that an asset sale for fair value protects creditors, even where the sale is free of liens, claims and encumbrances, because the creditors are simply able to assert claims against the proceeds of the sale. (Motion at Para. 26-27). However, Lehman Brothers, Inc. is a separate entity, with separate creditors, which is not debtor entity in this bankruptcy proceeding. The creditors of Lehman Brothers, Inc. are not the creditors of the Debtors or able to claim directly against the estate of the Debtors.

9. The proposed order fails to require the proceeds of the sale of Lehman Brothers, Inc.'s assets to be segregated or allocated for the creditors of that entity. Under the proposed order, there is simply nothing that would prevent LBHI from causing its

4

subsidiary to transfer the sale proceeds to LBHI, or for proceeds rightfully belonging to Lehman Brothers, Inc. from flowing to LBHI.

10.  In Mission Iowa Wind Co., *supra*, the U.S. District Court in New York, faced with similar facts, vacated a bankruptcy court order approving the asset sale of a debtor, holding that the Bankruptcy Court had failed to determine whether the allocation of sale proceeds amongst a parent company and its two wholly owned subsidiaries was fair and reasonable.  In that case, Enron Wind Corporation and its domestic subsidiaries filed for bankruptcy and simultaneously filed a proposed sale agreement, which was approved by the bankruptcy court.  Under the sale agreement, General Electric Co. purchased the assets of the bankrupt entities as well as the assets of certain solvent European subsidiaries of Enron Wind. Although the sale agreement allocated US $168 million in assumed liabilities amongst the European and U.S. subsidiaries, it did not purport to allocate the US $325 million cash payment.  The debtors and Mission Iowa, one of the creditors of the U.S. subsidiaries, disagreed over the appropriate formula for allocating the cash sale proceeds to the various subsidiaries. The Bankruptcy Court adopted the debtor's allocation proposal without deciding the merits of the controversy, holding instead that it fell within the scope of the debtor's business judgment.

11.  The District Court reversed, finding that the Bankruptcy Court has a duty not simply to analyze whether the overall price is fair and reasonable, but also to ensure that the parent company does not benefit to the detriment of the subsidiaries and their creditors.  The District Court held that the Bankruptcy Court must ensure that the debtor parent does not wind up holding the proceeds of the sale of the subsidiary's assets.  The District Court stated:

5

> [A]s it turns out, it was Enron Corp. and not Enron Wind or its U.S. subsidiaries that negotiated the deal with General Electric. Enron Corp. may have had a special interest in allocating more of the purchase price to the European Asset Sellers than to the U.S. Asset Sellers, because, as mentioned, monies paid to the European Asset Sellers would then flow back to Enron Wind – free, given the allocation, of further claims by the creditors of its subsidiaries (including appellants) – from whence such funds could flow to the parent Enron Corp and its creditors. [M]eaningful scrutiny of the allocation here in issue is needed . . . to address the possibility that the allocation may have been infected by self-dealing on the part of Enron Corp.

291 B.R. at 43 (citations omitted)

12. Thus, in addition to determining whether the 11 U.S.C. § 363 transaction results in the payment of a fair price, this Court must also look to whether the "*allocation* [of the proceeds] was fair and reasonable." Id.; see also Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc., 216 B.R. 371, 376 (S.D.N.Y. 1998) ("parent's *de facto* control does not mean it can use the subsidiary's assets to pay its own creditors"). Accordingly, we object to the proposed order because it does not set forth an allocation to Lehman Brothers, Inc. of the sale proceeds, nor does it set forth sufficient detail supporting a finding that a fair and reasonable allocation has been made.[3]

---

[3] We reserve all rights, including the right to supplement this Limited Objection, whether in writing or at the sale hearing, as appropriate once the Debtors provide more detail regarding the Agreement. We also object to the sale in its entirety because, among other things, the Debtors have not submitted sufficient factual support regarding the alleged emergency that exists to effect this sale on such a short schedule or details from which we can evaluate the fairness of the sale.

6

## CONCLUSION

The Court should order that all proceeds should be held in a segregated account pending further disclosure and a hearing to determine how much of the proceeds rightfully belong to Lehman Brothers, Inc. as opposed to the Debtors.

Dated: September 19, 2008  
       New York, New York

Respectfully submitted,

KOBRE & KIM LLP

_____/s/ Michael S. Kim_____

Michael S. Kim (MK-0308)  
Robert W. Henoch (RH-3814)  
Steven W. Perlstein (SP-7841)  
Ian N. Levy (IL-1572)

800 Third Avenue  
New York, New York 10022  
Tel: (212) 488-1200  
Fax: (212) 488-1220

Andrew C. Lourie (AL-0630)

1919 M Street, N.W.  
Washington, D.C. 20036  
Tel: (202) 664-1900  
Fax: (202) 664-1920

*Attorneys for Essex Equity Holdings USA, LLC, M. Brian Maher and Basil Maher*