**Hearing Date: September 19, 2008 at 4 p.m.**

David M. Friedman (DF-4278)
David S. Rosner (DR-4214)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Attorneys for Bay Harbour Management L.C., Bay Harbour Master Ltd.,
Trophy Hunter Investments, Ltd., BHCO Master, Ltd.,
MSS Distressed & Opportunities 2 and Institutional Benchmarks

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC, | |
| | Case No. 08-13555 (JMP) |
| Debtor. | |
| | (Jointly Administered) |

---

**OBJECTION OF BAY HARBOUR MANAGEMENT L.C., BAY HARBOUR MASTER LTD., TROPHY HUNTER INVESTMENTS, LTD., BHCO MASTER, LTD., MSS DISTRESSED & OPPORTUNITIES 2 AND INSTITUTIONAL BENCHMARKS TO THE DEBTORS' MOTION TO (A) SCHEDULE A SALE HEARING, (B) ESTABLISH SALE PROCEDURES, (C) APPROVE A BREAK-UP FEE; AND (D) APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND <u>ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS</u>**

Bay Harbour Management L.C., Bay Harbour Master Ltd., Trophy Hunter Investments, Ltd., BHCO Master, Ltd., MSS Distressed & Opportunities 2 and Institutional Benchmarks (collectively, "Bay Harbour"), creditors of Lehman Brothers Inc. ("LBI") and counterparty to contracts with Lehman Brothers Holdings Inc. ("LBHI" or the "Debtor") and Lehman Brothers International (Europe) ("LBIE"), hereby submit this objection (the "Objection") to the Debtors'

Motion To (A) Schedule A Sale Hearing, (B) Establish Sale Procedures, (C) Approve A Break-Up Fee; And (D) Approve The Sale Of The Purchased Assets And The Assumption And Assignment Of Contracts Relating To The Purchased Assets (the "Sale Motion") [Docket No. 60] and respectfully represents as follows:

## INTRODUCTION

1. Bay Harbour Master, Ltd. Trophy Hunter Investments, Ltd. and BHCO Master, Ltd. are investment funds. MSS Distressed & Opportunities 2 and Institutional Benchmarks are managed accounts. These entities have prime brokerage accounts with LBIE and LBI. LBI is the agent on these accounts.

## OBJECTION

### A. The Barclays Sale May Include Cash That Was Misappropriated From Customers.

2. The Debtor seeks this Court's approval of a sale of substantially all of the assets of LBI, LBHI (together with LBI, the "Sellers"),[1] and LB 745 LLC to Barclays Capital Inc. ("Barclays") for *di minimis* consideration purportedly to stabilize confidence in the marketplace, to save jobs, and to minimize the Sellers' losses. Although these are laudable goals -- Bay Harbour is sympathetic to the plight of Lehman employees -- the proposed sale to Barclays pursuant to the Purchase Agreement (the "Barclays Sale") should not come at the expense of innocent customers potentially defrauded out of billions of dollars on the eve of this bankruptcy.

3. At all relevant times, Bay Harbour dealt with LBI employees in its prime brokerage relationship and believed that its cash and securities safely would be held for its

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

2

account. Nonetheless, despite repeated assurances of the integrity of the cash and securities deposited with LBI and LBIE, Bay Harbour's cash and securities -- indisputably Bay Harbour's and not LBI's or LBIE's property -- appears to have been siphoned from London to the United States as part of an $8 billion asset transfer (the "Defalcated Funds") and then "trapped" by the midnight bankruptcy filing by the Sellers.[2] In this regard, the September 17, 2008 edition of the London Evening Standard stated that:

> [B]illions of dollars disappeared from Lehmans' London bank account over the weekend. . . . [According to a Lehman source], [t]he money was not returned to our bank account from the US and all we were left with was a bunch of useless assets. Nobody can tell us where it has gone. What we do know is that the money disappeared on Friday night and did not come back into our account on Monday morning.[3]

4.  To Bay Harbour's knowledge, the Sellers do not dispute the transfer of the Defalcated Funds from the United Kingdom operations with no consideration in return for Bay Harbour and other customers. But none of the pleadings in these cases discloses the fate of the Defalcated Funds; nor do they disclose whether Barclays knew about or benefited from the transfer of the Defalcated Funds or otherwise were involved. Bay Harbour is not alleging that it was. It is alleging that neither it nor this Court knows.

5.  What is clear, however, is that Barclays will be receiving a substantial portion of cash and securities held by the Debtor and LBI. It is possible that some or all of this cash and securities may derive from the Defalcated Assets or that the transfer of the Defalcated Funds may have been manipulated to prop up LBI for sale, or otherwise used for the Debtors' and its affiliates' (other than LBIE) operations. Press reports disclose that Barclays initially backed out

---

[2] The Sellers have only $1.3 billion in cash, $700 million of which goes to Barclays. The remaining Defalcated Funds apparently have been dissipated from the Debtors' estates.

[3] A true and correct copy of this article is annexed hereto as Exhibit A.

3

of a Lehman transaction when the Treasury Department refused to guarantee Lehman's trading operations.[4] It is possible that the Defalcated Funds were used, in whole or in part, as a partial substitute for the Treasury's guarantee. Nobody, including the Court, knows.

6. Nonetheless, under the proposed sale order (the "Sale Order"), Barclays takes free and clear of all claims, other than claims it expressly assumes, claims arising after the Petition Date, and claims arising after the Closing of the Barclays Sale. Barclays apparently will not assume the claims of Bay Harbour and other potentially defrauded customers who at this point apparently cannot recover the cash in their prime brokerage accounts, and who, by Court order are being restrained from seeing to recover it from the Purchaser and possible beneficiary.

7. Customer-creditors such as Bay Harbour have seen over $8 billion of cash and securities accounts evaporate literally overnight -- with no government assistance and no government pressure to protect these innocent customers -- but instead a concerted effort to rush through a sale to the very entity, after access to the Sellers' books and records, that had earlier "walked" from the deal. Now that Barclays has reentered the deal, the Barclays Sale threatens to further dissipate the ability of LBIE's Administrator and customers to recover their rightful property and to protect Barclays from claims to this cash, without an opportunity for discovery on only four days' notice.

8. The Court should not participate in this result. Approving the Barclays Sale would set a very dangerous precedent that the exigency of a sale allows a debtor to eviscerate creditors rights in ways expressly prohibited by the Bankruptcy Code and applicable law.

---

[4] Forbes, "Barclays In The Driving Seat," Sept. 16, 2008. A true and correct copy of this article is annexed hereto as Exhibit B.

4

**B.    As A Matter Of Law, The Debtor Cannot Sell -- And
Barclays Cannot Buy -- Assets That The Debtors Do Not Own.**

9.   Although there may be exigencies justifying the sale of property *validly owned by the Debtor*, those exigencies do not justify selling assets that are not property of the estate and without a factual investigation into title and transfer. The unprecedented pace of the Barclays Sale, the lack of disclosure of the facts leading up to the Barclays Sale, and the broad scope of the transaction precludes parties in interest from conducting appropriate and meaningful factual investigation through discovery.

10.   Barclays cannot acquire cash rightly belonging to potentially defrauded customers such as Bay Harbour. The Debtor can only sell assets to which it has good title and that are property of the estate. 11 U.S.C. § 541. The Debtor cannot sell assets owned by third parties, nor can it sell assets subject to a constructive trust because they are not property of the estate as a matter of law. As the Second Circuit held in *Flanagan v. Mangan*, 503 F.3d 171 (2d Cir. 2007):

> *The effect of a constructive trust in bankruptcy is profound.* While the bankrupt estate is defined very broadly under § 541(a)(1) of the Bankruptcy Code to include all legal or equitable interests of the debtor, *any property that the debtor holds in constructive trust for another is excluded from the estate* pursuant to § 541(d), which states:
>
>> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate . . . only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

*Id.* at 180-81.

11.   "New York law generally requires four elements for a constructive trust: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer of the subject res made in reliance on that promise; and (4) unjust enrichment." *In re First Central Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004). The fourth element is the most important since "the

5

purpose of the constructive trust is prevention of unjust enrichment." *Simonds v. Simonds*, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); *see also In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 354 (2d Cir. 1992) (holding that unjust enrichment constitutes the "key factor" in determining whether a constructive trust should be imposed). Customer property acquired through fraud or misappropriation is subject to a constructive trust. Specifically, New York law provides that a constructive trust arises against an entity that, by fraud or by abuse of confidence, or by commission of a wrong or other form of unconscionable conduct, artifice, concealment, or questionable means, either has obtained or holds the legal right to property which in equity and in good conscience it ought not to hold. *Silverman v. K.E.R.U. Realty Corp., (In re Allou Distributors, Inc.)*, 379 B.R. 5, 39 (Bankr. E.D.N.Y. 2007); *TeseMilner v. TPAC, LLC (In re TicketPlanet.com)*, 313 B.R. 46. 48 (Bankr. S.D.N.Y. 2004).

12. Here, the Defalcated Funds apparently include funds from customer accounts at LBIE. LBI indisputably acted as agent for customers, promised to maintain the customer's accounts pursuant to the prime brokerage agreement. Now, after Bay Harbour deposited funds with LBI and LBIE in reliance on that promise, LBI, LBHI and ultimately, Barclays, will be unjustly enriched to the extent that the Defalcated Funds are transferred to Barclays free and clear of all associated claims. This is a prima facie case for the imposition of a constructive trust against the Defalcated Funds.

C. **The Court Cannot Cleanse Title Without A Full Adjudication On The Merits.**

13. The proposed form of Sale Order includes a finding that "[t]he Debtors and LBI are the sole and lawful owners of the Purchased Assets." Sale Order, Finding N; *see also* Sale Order, Finding G (finding of corporate authority to sell). The Court simply cannot make these findings under the circumstances.

6

14. The Court has no record at this time to determine that the Sellers own the Purchased Assets. Consequently, the Court has no substantive ability to adjudicate, without a record, that the Sellers' own the Purchased Assets and that Barclays obtain good title thereto under this sale.[5]

15. In short, the Court can not make a finding that the Debtors can sell the Defalcated Funds and other customer property that they do not own, Sale Order, Finding Q, nor can it grant *actual title to the Purchased Assets* with the issue of title open for investigation, accounting, and potential recovery. Sale Order ¶ 4. Any transfer must, to protect those with legitimate customer claims to property taken from LBIE must have their liabilities attach to the Purchased Assets insofar as the Purchased Assets are or are derived from the LBIE transfer.

16. Accordingly, should the Court approve the Sale, the Sale Order must make clear that: (i) Barclays will not be acquiring title to assets or their proceeds that the Sellers do not own and these assets (or their value) may be recovered, (ii) parties with claims to ownership or constructive trust to assets subject to the Sale will have the right to assert their ownership claims (which are not interests of the nature addressed in section 363(f) of the Bankruptcy Code) against Barclays, and (iii) cash and securities in an amount of at least $8 billion of securities to be transferred to or from Barclays should be frozen pending a final determination with respect to the rights to such cash and securities in plenary litigation. Moreover, to ensure that the rights of the LBIE Administrator and Bay Harbor are not further prejudiced by the Barclays Sale, all cash to be transferred pursuant to the Purchase Agreement should be placed into segregated accounts pending the outcome of litigation. Otherwise, the Defalcated Funds could be dissipated further,

---

[5] Similarly, the Court does not have jurisdiction to order a sale free and clear of non-Debtor assets. Thus, the Sale Order should be revised to make this clear.

7

which will disadvantage the LBIE Administrator, Bay Harbor, and other parties in interest from obtaining legal and equitable redress of the conversion of the Defalcated Funds.[6]

### D. The Court Cannot Find That Barclays Is A Good Faith Purchaser.

17. The Court may not find Barclays to be a good faith purchaser (Sale Order, Finding K; Order, para. 19) absent investigation into the facts surrounding the transfer of the Defalcated Assets, including its knowledge of the Sellers' books and records and whether it knew of the transfer of the Defalcated Assets. Barclays was involved with the Lehman entities before it "walked away" and it may have known of the asset stripping. Thus, the Court should not adopt any finding that insulates Barclays from successor liability from customer ownership and constructive trust claims to any customer property. Sale Order, Finding P.

18. A court cannot make a binding finding of fact without providing litigants notice and a meaningful opportunity to be heard. *See* U.S. CONST., 5th Amend. The fundamental rules of due process apply with equal force to bankruptcy proceedings. "The normal operation of the Bankruptcy Code . . . is predicated on the satisfaction of constitutional standards of due process." *In re Arch Wireless*, 332 B.R. 241, 251 (Bankr. D. Mass. 2005). The notice required by due process is "notice reasonably calculated under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "The statutory command for notice embodies a *basic principle of justice - that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights.*" *City of New York v. N.Y., N.H. & Hartford R.R.*, 344 U.S. 293, 297 (1953) (emphasis added); *W. Auto Supply Co. v. Savage Arms, Inc. (In re Savage Indus.)*, 43 F.3d 714, 721 (1st Cir. 1994) ("Bankruptcy Code § 102(1)

---

[6] The Motion does not explain why the Debtors are "selling" hundreds of millions of cash to Barclays while Barclays is providing $250 million of cash in exchange, and whether this is being done "to cleanse" the $700 million in cash from claims of LBIE and its creditors.

8

[requiring appropriate notice and appropriate hearing] is founded in fundamental notions of procedural due process"). "Specifically, the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests." *Reliable Elec. Co. v. Olson Constr. Co.*, 726 F.2d 620, 623 (10th Cir. 1984); *In re Stilwell*, 120 F.2d 194 (2d Cir. 1941) (same). Because parties in interest have not -- and, indeed, cannot -- be afforded due process to conduct discovery into the background of the Barclays Sale, there is no basis to give Barclays this protection. *Cf. Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.") (*quoted with approval in Goldberg v. Kelly*, 397 U.S. 254, 270 (1970)). Accordingly, the Court should adjourn consideration of the Barclays Sale for a reasonable time to enable parties in interest to conduct meaningful discovery into the underlying facts.

19. There is no adequate record -- nor any meaningful opportunity for discovery -- of the conduct of the parties during the time leading up to the LBIE transfer and then the Barclays Sale. This precludes a good faith finding.[7]

### E. Specific Issues With The Purchase Agreement.

20. The Purchase Agreement is very vague on a number of points. The Court should not approve the Barclays Sale unless the Debtors clarify, among other things:

- What assets are being sold.
- What value the Debtors are providing.
- What are the Intercompany Claims and what, if any, are being released.

---

[7] Even if the Court makes findings concerning good faith, under no circumstances should the Sale Order exculpate any officers, directors, shareholders, affiliates, subsidiaries, partners and any other parties from any liability for any misconduct relating to the Defalcated Funds or otherwise.

9

- The uses of the Defalcated Funds.

**F.    Protection of Creditors.**

21.    Notwithstanding the above, should the Court approve the sale, there are several ways in which it can protect Bay Harbour's rights. First the Court can eliminate the Debtors' release of "Interests" in Order, para. 24, because Bay Harbour has and likely will prosecute substantial claims against the Debtors and its affiliates. Second, the Court may provide in the Sale Order that Barclays is only purchasing assets that the Sellers own and not those fraudulently transferred in from LBIE or elsewhere. Third, the Court can permit liabilities associated with assets transferred from LBIE to attach to the Purchased Assets and become Barclays' responsibility. Fourth, the Court can require Barclays to segregate at least $8 billion of cash and securities it is buying until there is a full and complete determination by the Administrator and its creditors as to whether that cash rightfully belongs back in LBIE. Fifth, the Court can require the Sellers to segregate the proceeds of sale pending a full and complete determination by the Administrator and its creditors as to whether that cash rightfully belongs back in LBIE. Sixth, the Court can refuse the good faith finding and associated protections pending a full and complete investigation into the circumstances surrounding the LBIE transfer of the Defalcated Assets, the conduct of the negotiations, and the knowledge and access of Barclays regarding the transfer.

## CONCLUSION

WHEREFORE, Bay Harbor respectfully requests that the Court deny approval of the Barclays Sale unless the Sale Order is amended to protect creditors as described herein and grant such other and further relief in favor of Bay Harbour as is deemed just and proper.

Dated: September 19, 2008
      New York, New York

                                        By: /s/ David S. Rosner
David M. Friedman (DF-4278)
David S. Rosner (DR-4214)
Andrew K. Glenn (AG-9934)
KASOWITZ, BENSON, TORRES
 & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
Facsimile: (212) 506-1800

Attorneys for Bay Harbour Management
L.C.., Bay Harbour Master Ltd., Trophy Hunter
Investments, Ltd., BHCO Master, Ltd., MSS
Distressed & Opportunities 2 and Institutional
Benchmarks

11

# Exhibit A

# Evening Standard
standard.co.uk



London, Thursday 18.09.08

## News

David Cohen, Evening Standard
17.09.08

**The day after the fall of Lehman Brothers, Robert Daniels, a director and a senior departmental head at the Canary Wharf headquarters, is sitting contemplating his future over a stiff espresso when an incongruous email drops onto his BlackBerry.**

It is from Ravi Mattu, global head of research at Lehmans on Wall Street, and it says: "I am extremely pleased to announce that for the ninth year in a row, Lehman Brothers' fixed income research team is ranked number one in the annual institutional investor survey of 1,330 professionals at 490 institutions. This achievement is the direct result of a team effort and I want to congratulate the entire fixed income division for this tremendous honour."



Banking wilderness: Lehmans' high-tech offices in the City stand empty

At first Robert, 36, a father of three who lives in Chelsea and who would have earned $700,000 this year, shows me the email as an example of the "bizarre culture of denial" that has characterised the past few months at Lehmans.

"I've heard of rearranging the deck chairs on the Titanic while it's sinking but not after the ship has already sunk," he says. "If it wasn't so sad, it would be pretty hilarious."

Woken on Monday by a 4am text from a colleague in New York to say that Lehmans had filed for bankruptcy, Robert has watched his $200,000-worth of Lehman shares (half of last year's bonus) dwindle to less than a prawn sandwich. He is shocked at how badly things have turned out, he says when we meet outside the company's gleaming offices, but as the day progresses, his resentment at being left "rudderless" for so long "and now jobless" will turn to anger.

He and his colleagues now know that the New York subsidiary of Lehmans is doing a deal with - Barclays Bank to save its broker/dealer operation. "This is the disgusting bit," he says, "it has been done at the expense of Lehmans in London."

What does he mean? According to Robert, billions of dollars disappeared from Lehmans' London bank account over the weekend. On Fridays, he explains, London typically transfers billions to New York and is issued with a portfolio of assets in return. "It's a standard inter-company transfer that happens every Friday to fund the US assets over the weekend and every Monday the trade is reversed," says Robert.

This Monday, he says, was different. "The money was not returned to our bank account from the US and all we were left with was a bunch of useless assets. Nobody can tell us where it has gone. What we do know is that the money disappeared on Friday night and did not come back into our account on Monday morning. That is why the administrators came in on Monday and found no cash and said they probably can't pay our September salaries.

"People were surprised, because a few days before we had over $5 billion in our bank account, now we suddenly couldn't even afford the $150 million September salary bill."

From a legal perspective, the reason the money was not returned is straightforward: late on Sunday night, Lehman declared bankruptcy and as such all assets were frozen pending the liquidators.

But according to Robert and his colleagues, questions are being asked about the "fortuitous Sunday night timing" of the bankruptcy announcement — "at least as far as the US subsidiary of Lehmans is concerned".

"A few hours later and those billions would have been back in London, making the London subsidiary cash-rich and a more attractive takeover target to potential suitors like Barclays than the hitherto cash-poor dealer parts of the US subsidiary," says Robert.

"Most of the 4,500 London employees of Lehmans have no idea that we might have been sold down the river by our New York colleagues but those who do know are extremely upset. It's like we've been stabbed in the back.

"The consequences could be grave. It could be a huge legal issue, setting London Lehman employees against their New York colleagues. But it goes beyond who gets paid their September salaries. This is billions we're talking about, billions that have been moved overnight out of the

UK to the US to the detriment of the British economy, and which might have to be repatriated to London."

Robert, whose name has been changed at his request to protect his identity and who was headhunted to join Lehmans from another City bank two years ago, says that since thunder clouds began gathering over his company some five months ago, the top brass have attempted to keep middle management like him in the dark.

"Lehman is run by a very tight group of people who never consulted with us and hardly bothered to come to London. We called Richard Fuld [the chief executive officer nicknamed The Gorilla because of his obsession with weight lifting] the invisible man because he never put in an appearance. And when the big guns did come, like Kaushik Amin, global head of liquid markets, he told us nothing and showed no leadership."

Robert recalls the morning meeting hosted by Amin a few weeks ago. "He addressed about 40 traders on the fourth floor and when he finished, the traders started telling him about other banks being reticent to trade with us and asking for reassurance as to our future. He said: 'Everything is fine, we're the market leaders.' Then he rebuked the traders for not wearing ties on the trading floor at all times.

"In retrospect you wonder: was he blinded by arrogance? Was he in denial? How could he tell us off for not wearing a tie at a time when the bank was going under?"

The first rumours of rain, Robert says, came in May this year when Lehmans posted its second quarter results showing losses of $2.8 billion, "the first time the bank had experienced negative earnings".

"It showed that our micro-hedge strategy — of hedging our bets against a collapsing property market by betting on interest rates falling — had failed.

"Contrary to popular belief, the problem was not our exposure to the sub-prime market, which was acceptable, but rather our massive $85 billion investment in the commercial property market which had suffered the knock-on effect of the precipitous collapse in the residential housing market.

"The losses caused a great deal of anxiety inside the firm, and speculation from other bankers, that we were about to go the way of Northern Rock and it meant that some other banks didn't want to trade with us any more.

"The response by the top brass was to get us managers to go out and see clients to tell them it was just a blip' and that Lehmans was very much in business'.

"But one by one, clients that had been trading with us for years started to make excuses and shy away from any exposure to us."

As confidence drained away, Jeremy Isaacs, chief executive of Lehmans in Europe, the Middle East and Asia, arranged for a Q&A session last June to calm his employees' nerves. There was only room for director level and above as 200 bankers crammed into Lehmans' ground floor auditorium.

"Isaacs told us that some bad decisions had been made but he pinned it on two individuals — operating officer Joe Gregory and the chief financial officer Erin Callan — who had both since been fired and he said that everything was going to be fine.

"His mood was a mixture of confidence and arrogance and he succeeded in reassuring many of us that it was inconceivable the bank would fail. At that stage, we knew there was a hole in the hull but none of us — except perhaps Jeremy — had any idea just how large it was."

For months the bank limped on, trying to implement a new strategy of raising fresh capital and turning away from real estate towards a commission-based income model. The former led to failed talks with the Korean Development Bank, the latter foundered because of speculation as to mounting third quarter losses that caused clients to shy away.

For Robert, it was a confusing time. His own division, he says, had an incredible year and posted record profits for the second year running. "In our section, we were making hundreds of millions for the bank. It was hard to keep reminding ourselves about the bleak bigger picture."

Three weeks ago, staff were informed of the new "good bank, bad bank" strategy, whereby the toxic commercial real estate assets were to be hived off into a separate company and the good - profitable bits kept in Lehman Brothers. Last week the market responded to this strategy, along with the announcement of third quarter losses of $3.9 billion, by knocking 45 per cent off the value of the shares. From a high of $60, the shares were worth just $7.79.

"At that point, the atmosphere inside our Bank Street office was frantic. We knew there was no longer a strategy and that what we desperately needed was a buyer to bail us out."

Nevertheless, says Robert, even as late as Friday night, he felt 100 per cent convinced that Lehmans would survive and that Barclays or Bank of America would buy it out. "I would have bet anything on it. I went to bed on Sunday night fully expecting to go in for business as usual on Monday."

Is he worried about his future? "Yes," he says. "Although I live frugally compared to your typical banker, I have three young children at private schools. My wife and I sat up last night working out that we have enough money to survive for six months. It won't be easy getting a job in the current conditions. Some of my colleagues have already been out interviewing today but nobody I know has had any luck.

"There was a lot of stress in the building on Monday with some people angrily packing their belongings in boxes and leaving. Today it's quieter. I came in late after taking my seven-year-old

son to school. He wanted to know why I was taking him, because I never do. I said: Because I've lost my job.' He said: Good, maybe now I'll see more of you.' His perspective helped take the edge off, I suppose.

"But then I saw a colleague who has been at the bank a long time and who has lost $10 million — all his bonuses, vested in shares, are now worth nothing. I think we're all beginning to understand that banking is a risky business. Sometimes you hit the bar, and sometimes the bar hits you.

"Right now, although there are a lot of bankers with very sore heads, we are determined to get to the bottom of what's happened to the billions of dollars that were transferred late on Friday to New York and that were never returned to London."

Link to: 🌐 📧 📰 📺

| Show all

Reader Views (21)

Here's a sample of the latest views published. You can click view all to read all views that readers have sent in.

Its true - every single bank worker is greedy and everyone at Lehmans deserved to lose their jobs! I should know - I work for a bank in Docklands myself, all we do all day is sit in the boardrooms, smoking cigars, counting our millions and looking down on everyone else!
WAKE UP! All these horrible comments sum England as a nation up - just bloody ignorant. Approx. 97% of bank employees are on normal wages with mortgages and bills to play like everyone else - its disgusting that a majority of the country are finding some joy in seeing other normal peoples misfortune, and make me sad to be British.

**- City Worker, London**

Yes it's sad for the people who have been affected who are not in the top 5% of high earners. Can I just ask though, what is the the 'average wage' in the City these days?

**- S-M Hearmon, London, UK**

Boy, you people have some pretty disgusting comments. Do you have any idea how hard these people work? I used to work at Lehman. I wasn't a big shot by any means, but I worked bloody hard. At my desk at 7am - out usually by 10pm - on call all weekends. The point of the article is that the big shots at Lehman were always treating the "little people" like crap. Of 7,000 employees, I would say there were about 200 jackasses, the rest very hard-working decent people. The economy is the UK is rubbish - the only thing holding it up in part are the City banks - People - get educated and get a grip - this is a tragedy - oh! and for you people out there mocking a huge salary, somebody in Kenya making $12 a month could look at you and not understand how, if you lost your job at Tesco, could only get by for 6 months. It is all relative. I lived in the UK for 2 years and it really is a souless nation - good grief!

**- Tess, Phoenix, AZ**

Add your comment                                              **Show all**

**Name:**

**Email:**                    Your email address will not be published

**Town and country:**

**Your comment:**                              Terms and conditions

You have     characters left.                    make text area bigger

☐ Remember me - this will save your name, location and email address for when you leave your next comment.
☐ Email me a link to these comments

[Clear] [submit comment]

# Exhibit B





Market Scan
# Barclays In The Driving Seat
Javier Espinoza, 09.16.08, 10:50 AM ET

LONDON - **Lehman Brothers Holdings** might have filed for Chapter 11 bankruptcy but it still has some attractive assets.

Barclays emerged from the rubble after the bloody fall of Wall Street's giant. It held private talks Tuesday afternoon trying to seal a better deal on some of the still-profitable divisions at Lehman. "We are having talks but they might not come to something," a Barclays' representative told Forbes.com.

Barclays, reportedly the only bidder, has finally come out and admitted its interest in buying some leftover assets. (See "Barclays Picking At Lehman Scraps.") The British bank's shares were trading 8.9%, or 28 pence (50 cents) lower at 288 pence (5.13 cents), on Tuesday afternoon in London.

Although Barclays would not reveal which assets it wants to buy, analysts told Forbes.com it makes sense to ignore the toxic ones, linked to bad investments in the mortgage markets, and go for those that would complement its business.

"There a lot of stuff that it's still very good, " Leigh Goodwin, an analyst with Fox-Pitt Cochran Caronia, told Forbes.com. "Barclays has been consistent at saying it wants to expand its operations in the U.S. and it might be able to extract good assets from Lehman's business. It is being opportunistic," he said.

Goodwin said some of the potential assets Barclays would like to put in the bag are the lender's brokerage division and its asset management business.

Barclays had been in talks with Lehman last weekend about a full takeover, but the British bank balked when it could not get the U.S. Treasury to guarantee Lehman's trading obligations. Shares across the planet plunged as a reaction.

Bob Diamond, head of the Barclays Capital investment bank arm, refused to bid for Lehman after the U.S. government said it wouldn't act as a guarantor to Lehman's debt. (See "Barclays Wins By Losing Lehman.")

"I am not aware of anybody else in the bidding process. It's not a fair situation and Barclays is clearly in the driving seat," said Neil Smith, an analyst with WestLB Research.