Martin Flics, Esquire (#MF 9718)
Mary K. Warren, Esquire (#MW5215)
LINKLATERS LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000 – Telephone
(212) 903-9100 – Facsimile
Attorneys for the Joint Administrators of the
Lehman European Group Administration Companies

Objection Date: September 19, 2008

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

In re:

LEHMAN BROTHERS HOLDINGS
INC., et al.,

                       Debtor.

Chapter 11

Case No. 08-13555 (JMP)

(Jointly Administered)

------------------------------------------------------------x

**RESPONSE OF THE JOINT ADMINISTRATORS OF THE LEHMAN
EUROPEAN GROUP ADMINISTRATION COMPANIES TO
DEBTORS' MOTION TO (A) SCHEDULE A SALE HEARING; (B)
ESTABLISH SALES PROCEDURES; (C) APPROVE A BREAK-UP
FEE; AND (D) APPROVE THE SALE OF THE PURCHASED ASSETS
AND THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS
RELATING TO THE PURCHASED ASSETS [D.I. # 60]**

The Joint Administrators of the Lehman European Group Administration Companies hereby respond to the Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets [D.I. # 60] (hereinafter the "Sale Motion") and in support thereof state as follows:

## SUMMARY

1.      The Joint Administrators do not object to the transaction contemplated in the Sale Motion; indeed, they support it. Due to the close connection between and among the businesses of the Debtors, non-debtor Lehman Brothers Inc. ("LBI"), and the Lehman European Group Administration Companies,[1] however, it is necessary for the Joint Administrators to propose clarifying language for the Asset Purchase Agreement and Sale Order. Inclusion of the Joint Administrators' suggested clarifications will benefit all parties by assisting in an orderly transition of operations of Lehman Brothers Inc. and continuity of services among the Lehman group of companies, while safeguarding serious interests of the creditors of the Lehman European Group Administration Companies.

2.      In addition, the preliminary investigation of the Joint Administrators has revealed that there took place significant transfers of securities from the Lehman European Group Administration Companies to and/or through LBI or Debtor LBHI, but that the reimbursement in respect of those securities and any margin posted in connection with them was not made. If the Court approves the proposed sale, it should include express reservation of rights for the Joint Administrators so that, in the event that the Lehman European Group Administration Companies do have claims in respect of the transfers, the transferees and wrongdoers (if any) cannot argue that the proposed sale cuts off those companies' or the Joint Administrators' right to pursue them for recovery of the funds due in respect of those securities.

---

[1] As the Lehman European Group Administration Companies, as defined below, directly and indirectly own subsidiaries that are part of the global business of the Lehman Group, references herein to the businesses of the Companies should be understood to include subsidiaries.

## **BACKGROUND**

The Lehman European Group

3. As set forth in the Declaration of Dan Yoram Schwarzmann dated September 19, 2008, attached hereto as Exhibit A, the Lehman Brothers group of companies (the "Lehman Group"), of which the Lehman European Group is part, is a global investment bank. The business activities of the Lehman Group are organized in three segments which operate across the Lehman Group: capital markets, investment banking, and investment management. Those segments include businesses in equity and fixed income sales, trading and research, investment banking, asset management, private investment management and private equity. The Lehman Group is headquartered in New York, with regional headquarters in London and Tokyo, and other offices around the world. Because the Lehman Group's segments operate globally, the businesses of the different offices are closely intertwined.

4. Indeed, as part of an international financial group, the Lehman Group's broker-dealer in the U.K., as well as its broker-dealer in the U.S., benefited from a guarantee given by Debtor Lehman Brothers Holdings Inc. ("LBHI"). Many counterparties of the U.K. broker-dealer relied on this guarantee for comfort in transacting business with it.

5. The Lehman Group's interdependence was financial as well as operational. For instance, pre-petition, as part of its global treasury management, the Lehman Group operated a "cash sweep" system. Pursuant to that system, at the end of each trading day, cash in all of the companies within the Lehman Group was transferred to LBHI. At the start of each trading day, LBHI would transfer cash to each of the Lehman Group companies to enable them to meet their cash requirements during that day. The companies within the group

were therefore reliant upon receipt of that cash from LBHI each day to enable them to make any payments.

6. Lehman Brothers International (Europe) ("LBIE") is the principal trading company, and broker-dealer, within Europe. Its business involves the provision of a wide range of financial services, including trading and broking equity and fixed income instruments and financial derivatives. It carries out its business globally. LBIE's headquarters are in London, though it has offices in several other countries in Europe and Asia.

7. LB UK RE Holdings Limited ("LBUKRE") is a holding company for the real estate division of the Lehman European Group. Its business consists primarily, both directly and through subsidiaries, of investing in real estate, funds, non-performing loans and sub-performing loans.

8. Lehman Brothers Limited (LBL) provides administrative services to fellow Lehman Group companies in the U.K. and European operations of Lehman, including the provision of property, employees and support services such as IT, clearance and settlement.

9. Lehman Brothers Holdings plc ("LBH") holds fixed asset investments in a range of assets, the majority of which are held through investments in subsidiaries.

10. Following the real estate crisis in the United States, the necessity for the Lehman Group to make a number of provisions and write-downs in its accounts, loss of investor and market confidence, the Chapter 11 filing of the Lehman Group's ultimate holding company, Debtor LBHI, and other factors, the Lehman European Group companies listed above were forced to enter English administration proceedings on September 15, 2008.

11. On September 15, 2008, (the "Petition Date"), LBHI filed for bankruptcy protection with the United States Bankruptcy Court for the Southern District of New York pursuant to Chapter 11 of Title 11 of the United States Code. On September 16, 2008, LB 745 LLC (together with LBHI, the "Debtors") filed for similar protection in this Court.

The Joint Administrators and English Administration Proceedings

12. Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann, and Michael John Andrew Jervis are the Joint Administrators of Lehman Brothers Holdings plc, Lehman Brothers Limited, LB UK RE Holdings Limited, and Lehman Brothers International (Europe) (together, the "Lehman European Group Administration Companies"), pursuant to appointment orders of the English High Court of Justice dated September 15, 2008.

13. The Joint Administrators derive their powers and duties from the English Insolvency Act 1986, as modified by the English Enterprise Act 2002. Administration is a proceeding for companies that are, or are likely to become, insolvent. It is similar in concept to Chapter 11 proceedings in the United States, but very different in detail.

14. Administrations under English law have three consecutive objectives:

- to "rescue" the company as a going concern; or,
- to achieve a better result for the company's creditors than would be achieved on a liquidation; or,
- if neither of the first two objectives are reasonably practicable and it does not unnecessarily harm the interests of the creditors of the company as a whole, to realize property to make a distribution to secured or preferential creditors.

15.     After appointment, administrators take over management and control of the debtor company and have the power, on behalf of the company, to do all things necessary and expedient for the management of its affairs, business and property. The administrators may make distributions to creditors, subject in certain cases to court approval, and may make other payments that are likely to assist in achieving the purposes of the administration. They may pursue actions to set aside preferences and transactions at an undervalue as well as to recover assets of the company that were wrongly disposed of. Administrators are agents of the company and officers of the English High Court.

16.     Administrators must act in the interests of the creditors of the company as a whole, and are obligated to make formal proposals and to report regularly to creditors. Creditors have the right to approve the administrators' proposals at creditors' meetings and to appoint a creditors' committee. Creditors may propose and agree upon modifications to the administrators' proposals.

The Joint Administrators' Activities To Date

17.     In the few days since the Appointment Orders were entered on Monday, the Joint Administrators have faced significant challenges. Over the course of approximately 72 hours, the Joint Administrators have endeavored to investigate and to understand the far-flung operations of the Lehman European Group Administration Companies' businesses, which are by no means confined to Europe. As described above, the Lehman European Group Administration Companies operated hand in hand with their U.S. counterparts, as well as providing financial services from a variety of offices in Europe, the Middle East, and Asia to clients across the world.

18. The Joint Administrators have installed a team of approximately 200 PricewaterhouseCoopers LLP employees and 100 lawyers at the offices of the Lehman European Group Administration Companies to manage those companies' business and affairs, including gaining an understanding of the companies' businesses and financial status. The Joint Administrators, their staff, and Lehman Group employees have also had correspondence and notices from a vast number of creditors and counterparties in respect of their claims and other concerns. The Joint Administrators and their staff must also address continuation of the businesses and employee retention. Counsel for the Joint Administrators have met and spoken with counsel for the Debtors as well. Although significant progress had been made, it is obvious that the investigation of the Companies' business and financial affairs will take a significant time to be completed.

19. The investigation to date has, however, highlighted certain important considerations relating to the Asset Purchase Agreement dated as of September 16, 2008 ("APA") that the Joint Administrators now bring to the Court's attention. These issues arise from the intimate interconnection of the Lehman Group's global business segments. The Debtors' Chapter 11 petitions did not magically sever those connections among the offices of a global investment bank that merely 10 days ago was a viable entity. As the APA does not give sufficient recognition to the ongoing nature of those connections, the Joint Administrators have proposed reasonable amendments to the APA, as specifically described below.

20. The investigation to date has revealed that there took place significant transfers of securities from the Lehman European Group Administration Companies to and/or through LBI or Debtor LBHI but that reimbursement in respect of those securities and any

margin posted in connection with them was not made. If the Court approves the proposed sale without an express reservation of rights for the Joint Administrators, it is possible that the transferees and wrongdoers (if any) could argue that the proposed sale cuts off the Joint Administrators' right to pursue them for recovery of the missing funds. Given the magnitude of the transfers that are known to date, and their detrimental impact on the Lehman European Group Administration Companies' creditors around the world, the Court should incorporate in any Sale Order certain language proposed by the Joint Administrators to address this possibility.

## ARGUMENT AND SPECIFIC RELIEF REQUESTED

21. It is axiomatic that a seller cannot sell what it does not own. The Debtors and LBI can lawfully convey to the Purchaser only those assets and rights that the Debtors possessed at the commencement of these Chapter 11 cases. "To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate (except to the extent that defenses which are personal against the debtor are not effective against the estate); section 541(a)(1) is not intended to expand the debtor's rights against others beyond what rights existed at the commencement of the case." In re Village Rathskeller, Inc., 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992). "[C]ontractual right[s are] not affected by the filing of a Chapter 11 petition. The rights of a debtor to the property of the estate do not expand when the debtor files a petition in bankruptcy." In re Nemko, Inc., 143 B.R. 980, 987 (Bankr. E.D.N.Y. 1992) "Only such interest as the debtor has 'as of the commencement of the case' passes into the estate." Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992) (quoting 11 U.S.C. § 541(a)(1)). Yet the APA is disconcertingly vague about which assets are being

conveyed in the proposed transaction. Indeed, it could be read to intend to transfer assets that do belong or may belong to the Lehman European Group Administration Companies. Moreover, the APA gives insufficient recognition to the needs of the ongoing businesses of the Lehman European Group Administration Companies, threatening their disruption. The APA should recognize the right and duty of the Joint Administrators to have access to books and records of LBI and LBHI for purposes of their investigation and discharge of their duties as administrators. Finally, it is only sensible commercial practice that the APA afford confidentiality protections as to both the Lehman European Group Administration Companies and the Purchaser, which as of now it does not do.

Assets Owned By the Lehman European Group Administration Companies

22. First, there appear to be a number of assets utilized by or in the name of LBI and/or the Debtors that are actually owned by one of the Lehman European Group Administration Companies. The APA does not identify or specifically exclude such assets.

23. For example, certain Lehman European Group Administration Companies, predominantly LBL, employed approximately 900 IT staff, and engaged a further 100 or so independent individual IT contractors. That large base of internal IT staff provided support and development for IT applications used not only in Europe, but around the world, including by Debtor LBHI and LBI. Under English law, intellectual property rights ordinarily vest in the employer, and certain inter-company correspondence reviewed by the Joint Administrators' counsel appears to acknowledge ownership, in whole or part, by LBL of a number of software packages used by U.S. Lehman entities. Several of those software packages, such as SUB M and LMX/LOB, are vital to the trading and investment banking

activities of the Lehman Group and its constituent businesses. They represent extremely valuable property rights.

24. In addition, there appear to be some client contracts which were or are jointly performed by LBI and/or the Debtors, on the one hand, and one or more of the Lehman European Group Administration Companies, on the other. The Joint Administrators' investigation is still preliminary, and it is too early to know with certainty which U.S. or U.K. entity owns which items of jointly utilized intellectual property. Indeed, it is too early to know with certainty about the ownership of many jointly utilized assets. But the simple way to protect against this uncertainty, which is likely shared by the Debtors and LBI, is to include language in the Asset Purchase Agreement dated as of September 16, 2008 that provides clarity and flexibility.

Proposals as to Administration Company Assets and Shared Assets

25. The Joint Administrators, through their counsel, have proposed to Debtors' counsel the following amendments to the Asset Purchase Agreement dated as of September 16, 2008.[2] (A copy of Joint Administrators' counsel's markup of the APA, submitted to Debtors' counsel on September 18, 2008, is attached hereto as Exhibit B.)

26. First, there must be clarification that Purchased Assets do not include any assets or rights of the Lehman European Group Administration Companies. The Joint Administrators have proposed that such assets and rights should be included within the definition of Excluded Assets, for the avoidance of doubt, and that the reference to assets of Subsidiaries of Seller in the definition of Purchased Assets should be deleted. If any non-

---

[2] Certain capitalized terms below are used as defined in the Asset Purchase Agreement.

Seller assets are to be included, they must be listed with specificity. The Joint Administrators have proposed corrective language to the Debtors. (Ex. B at Rider 34B and passim.)

27. Second, there must be confirmation that the Lehman European Group Administration Companies will continue to have the right to use any shared assets and services following the Closing to the same manner and degree as used in the preceding 12 months. The Joint Administrators have proposed to reflect this both with respect to the IP licenses provided in APA Section 8.9 and the TSA described in APA Section 8.13. (Ex. B at Rider 34A and page 34.)

28. Third, the Joint Administrators have proposed the inclusion of a general "wrong pockets" / cure provision to the effect that, if any assets or rights of the Lehman European Group Administration Companies are inadvertently conveyed to the Purchaser, or any funds owing to such entities are paid to Seller or Purchaser, such assets, rights or funds would be promptly transferred or remitted to the Lehman European Group Administration Companies. (Ex. B at Rider 34B and page 34.)

29. Fourth, the Joint Administrators have proposed limited and reasonable third party beneficiary rights solely with respect to the provisions relating to paragraphs 27-28 above. (Ex. B at page 42.)

Disruption of Administration Companies' Businesses

30. Just as employees of the Lehman European Group Administration Companies created software applications used in the U.S., employees of LBI contributed to applications now used by the Lehman European Group Administration Companies. In the ordinary course of a separation between the U.K. and U.S. entities of the Lehman Group, the

Lehman European Group Administration Companies would seek assurances that they could continue to use this software after closing of a sale of a U.S. entity. Without such assurances, the Lehman European Group Administration Companies' businesses cannot operate without infringing intellectual property rights. It appears from the Joint Administrators' preliminary investigation that no express written intra-group IP license was put in place although it is the Joint Administrators' counsel's view that an implied license would likely exist. To ensure the orderly continuation of the Administration Companies' businesses and to prevent potentially serious disruption to the Joint Administrators discharging their functions, an appropriate perpetual and royalty-free license must be negotiated and agreed by the relevant parties. Consequently, the Joint Administrators have made such a proposal in connection with Section 8.9 of the APA. (Ex. B at Rider 31 and page 31.)

31. Second, in order to preserve the continuity and value of the Lehman European Group Administration Companies' businesses, there needs to be an agreement among the parties as to transitional services. LBI currently makes software applications and data storage facilities available to the Lehman European Group Administration Companies on its servers; for example the core Ebanker system used by the global investment banking group. Should the parties agree on a licensing arrangement, the Lehman European Group Administration Companies will require a period of time in which to transfer applications and data to their own servers, as well as the cooperation of the U.S. entities with that effort. Without such a transitional arrangement, the Lehman European Group Administration Companies' businesses and, consequently, the Joint Administrators' ability to deal with those businesses will be significantly impaired. The Joint Administrators have proposed suitable language for the APA. (Ex. B at Rider 34A and page 34.)

Books and Records

32.  The Joint Administrators have proposed that they have access rights to the books and records to be retained by Seller and Purchaser pursuant to Section 8.7 of the APA to the extent reasonably required in the administration of the Lehman European Group Administration Companies. (Ex. B at page 29.) As set forth in detail above, the Joint Administrators must investigate and understand a complex business with a global reach, much of it directed and financed out of the United States headquarters. The daily global cash sweep controlled by Debtor LBHI is only one example of funds flows into and out of the United States that the Joint Administrators must understand and reconcile for the benefit of the creditors of the Lehman European Group Administration Companies. Without reasonable access to the books and records to be retained by Seller and Purchaser – which the APA in its current form does not grant to the Joint Administrators – their duties will be impeded.

Confidentiality

33.  The IT systems and databases contain extensive proprietary and confidential information. Given that the IT systems are so integrated and closely linked, as described above, in the absence of appropriate agreement or protection, that information is available to the Sellers, of which they would be able to make unrestricted use. To protect that information and the Lehman European Group Administration Companies' interests in it, appropriate restrictions must be negotiated and agreed among the relevant parties. Consequently, the APA should include protections for the confidential information of the Lehman European Group Administration Companies and/or their subsidiaries as well as for the benefit of the Buyer. The Joint Administrators' counsel has proposed such mutual protections to Debtors' counsel.

Transfer of Lehman European Group Administration Companies' Funds

34.     The Joint Administrators' preliminary investigation over the first few days of the Administration has already revealed evidence of substantial transfers of securities out of LBIE which merit close investigation. LBIE is the Administration Company entity that was the broker-dealer for the Lehman European Group Administration Companies. In its ordinary course of business before entering administration, LBIE held billions of dollars worth of securities. As the market lost confidence in the Lehman Group in recent weeks, many of its clients in the prime brokerage business began to transfer their securities from the Lehman Group to other prime brokers.

35.     In such cases, it appears, the securities were typically transferred from LBIE to LBI, the U.S. broker-dealer, then to another Lehman Group entity located in Luxembourg, and from there to the new prime broker. What was supposed to happen next was that the funds to reimburse LBIE in respect of the securities and any margin posted in connection with the client accounts were to flow from the new prime broker back through the chain of Lehman entities to LBIE. But in many cases, it appears, that did not happen. The Joint Administrators' understanding so far is that those funds were transferred from the new prime broker through the Luxembourg entity to LBI. It seems the funds never reached LBIE. In just the past few days, the Joint Administrators have identified more than $8 billion in such funds that are due to LBIE but that LBIE does not hold. As the investigation progresses, it is quite possible that the Joint Administrators will discover further transfers that may require investigation. In that event, the Joint Administrators will consider potential causes of action, as well as recovery on the simple ground that the funds are property of the Lehman European Group Administration Companies.

36.  Depending on the results of the Joint Administrators' investigations, transfers of this magnitude could have a significant effect on the creditors of LBIE, potentially depriving them of billions of dollars in recoveries. It will be the duty of the Joint Administrators to attempt to find and recover those funds. As counsel for the Joint Administrators have been informed by Debtors' counsel that LBI had negligible cash left at the Petition Date, it is likely that the funds referred to above have been disbursed to third parties in the days before these proceedings were commenced. Should the Joint Administrators need to proceed against those third parties to recover assets, there should be no impediment to doing so by virtue of the proposed sale, if it is approved.

37.  Consequently, the Joint Administrators respectfully request that the Court include the following language in any Sale Order:

> Nothing in this Order shall (i) authorize the Debtors or any of their Subsidiaries to transfer or retain any assets, rights, or claims in which the Lehman European Group Administration Companies, any of those Companies' subsidiaries, or any of their creditors have a property interest or (ii) affect or impair the rights of the Joint Administrators (a) in any such assets, rights, or claims, (b) to investigate, commence proceedings or otherwise take action in their discretion to determine whether the Lehman European Group Administration Companies, any of those Companies' subsidiaries, or any of their creditors have a property interest in any funds, assets, or rights in the possession, custody or control of the Debtors or any other party and (c) to recover such property, or the proceeds or value thereof, from any person or entity, by such lawful proceedings as the Joint Administrators deem appropriate for the benefit of the creditors of the Lehman European Group Administration Companies.

38.  This language would not impede the proposed sale. It would merely clarify that the proposed sale would not extinguish the Joint Administrators' right to pursue the

recovery of funds transferred from the Lehman European Group Administration Companies to and/or through LBI or LBHI.

39. The Joint Administrators further request that the proceeds of the proposed sale be placed in a segregated account, which may not be used without further order of the Court upon no less than 5 days notice to the Joint Administrators and other parties in interest. The Joint Administrators believe that this relief is warranted because the extraordinary speed with which this complex transaction is proceeding has not allowed any party, including the Joint Administrators, adequately to investigate aspects of the relationships among the Debtors, LBI, and their various affiliates. The extent of transfers of assets involving LBI and/or LBHI makes this a reasonable protection to allow further investigation of those transfers to proceed without further prejudicing rights to obtain relief.

## CONCLUSION

WHEREFORE, the Joint Administrators for the Lehman European Group Administration Companies respond to the Sale Motion to the extent cited above and respectfully petition the Court to grant them the requested relief, and such other and further relief as the Court deems just and proper.

/s/ Martin Flics
Martin Flics, Esquire (# MF 9718)
LINKLATERS, LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000 – Telephone
(212) 903-9100 – Facsimile
martin.flics@linklaters.com

Attorneys for the Joint Administrators of the Lehman European Group Administration Companies

Dated: September 19, 2008