UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        September 17, 2008

        4:28 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1    HEARING re Debtor's Motion Pursuant to Section 1015(b) of the

2    Federal Rules of Bankruptcy Procedure Requesting Joint

3    Administration of Chapter 11 Cases

4

5    HEARING re Motion for an Order Pursuant to Section 105(a) of

6    the Bankruptcy Code Directing that Certain Orders in the

7    Chapter 11 Case of Lehman Brothers Holdings Inc. be Made

8    Applicable to LB 745 LLC

9

10   HEARING re Debtor's Motion Pursuant to Section 105(a) of the

11   Bankruptcy Code and Bankruptcy Rule 1015(c) and 9007 Seeking

12   Authority to Implement Certain Notice and Case Management

13   Procedures

14

15   HEARING re Debtor's Motion to (a) Schedule a Sale Hearing; (b)

16   Establish Sales Procedures; (c) Approve a Breakup Fee; and (d)

17   Approve the Sale of the Purchased Assets and the Assumption and

18   Assignment of Contracts Relating to the Purchased Assets

19

20   HEARING re Motion for Order (i) Authorizing Debtor to Obtain

21   Post-Petition Financing Pursuant to Sections 363 and 364 of

22   Bankruptcy Code; (ii) Granting Liens and Superpriority Claims

23   to Post-Petition Lenders Pursuant to Section 364 of Bankruptcy

24   Code; and (iii) Scheduling Final Hearing

25   Transcribed by:  Lisa Bar-Leib

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP

     Attorneys for Debtor

     767 Fifth Avenue

     New York, NY 10153


BY:

     HARVEY R. MILLER, ESQ.

     RICHARD P. KRASNOW, ESQ.

     SHAI WAISMAN, ESQ.

     LORI R. FIFE, ESQ.

     MICHELE J. MEISES, ESQ.

     GARRETT A. FAIL, ESQ.

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Proposed counsel to the Official Committee of Unsecured

4          Creditors

5         One Chase Manhattan Plaza

6         New York, NY 10005

7

8    BY:   LUC A. DESPINS, ESQ.

9          WILBUR F. FOSTER, JR.

10         DENNIS F. DUNNE, ESQ.

11         EVAN R. FLECK, ESQ.

12         DENNIS C. O'DONNELL, ESQ.

13

14

15   WACHTELL, LIPTON, ROSEN & KATZ

16         Attorneys for JPMorgan Chase Bank, N.A.

17         51 West 52nd Street

18         New York, NY 10019

19

20   BY:   HAROLD S. NOVIKOFF, ESQ.

21         AMY R. WOLF, ESQ.

22         RICHARD G. MASON, ESQ.

23

24

25

1

2    DEWEY & LEBOEUF LLP

3         Attorneys for Bank of New York Mellon; CAPCO Holdings

4          Inc. and Customer Asset Protection Company

5         125 West 55th Street

6         New York, NY 10019

7

8    BY:   ELIZABETH P. SMITH, ESQ.

9         SAMUEL S. KOHN, ESQ.

10         TIMOTHY Q. KARCHER, ESQ.

11

12   THOMPSON & KNIGHT LLP

13         Attorneys for Chevron and Direct Energy Business, LLC

14         919 Third Avenue

15         39th Floor

16         New York, NY 10022

17

18   BY:   IRA L. HERMAN, ESQ.

19

20

21

22

23

24

25

```
 1

 2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

 3         Attorneys for Barclays Capital Inc.

 4         One Liberty Plaza

 5         New York, NY 10006

 6

 7    BY:   LISA M. SCHJWEITZER, ESQ.

 8          LINDSEE P. GRANFIELD, ESQ.

 9

10    CADWALADER, WICKERSHAM & TAFT LLP

11         Attorneys for Citigroup, N.A., Citigroup Inc.,

12         FXCM Holdings, LLC and Morgan Stanley

13         One World Financial Center

14         New York, NY 10261

15

16    BY:   DERYCK A. PALMER, ESQ.

17          GEORGE DAVIS, ESQ.

18

19

20

21

22

23

24

25
```

1

2    COVINGTON & BURLING LLP

3         Attorneys for Wilmington Trust Company as Indenture

4          Trustee

5         The New York Times Building

6         620 Eight Avenue

7         New York, NY 10016

8

9    BY:   SUSAN P. JOHNSTON, ESQ.

10

11   MAYER BROWN LLP

12        Attorneys for Societe Generale, Sumitomo Mitsui Banking

13         Corp., SMBC Capital Markets, Inc., Sumitomo Mitsui

14         Banking Corp. Brussels Branch, Canadian Imperial Bank of

15         Commerce, CIBC World Markets Corp., CIBC World Markets

16         Inc.

17        1675 Broadway

18        New York, NY 10019

19

20   BY:   BRIAN TRUST, ESQ.

21

22

23

24

25

1

2 DESHAW & CO.

3      120 West Forty-Fifth Street

4      39th Floor

5      Tower 45

6      New York, NY 10036

7

8 BY:   JO E. CHEN, ESQ.

9

10 FEDERAL RESERVE BANK OF NEW YORK

11      33 Liberty Street

12      New York, NY 10045

13

14 BY:   SHARI LEVENTHAL, ESQ.

15

16 STROOCK & STROOCK & LAVAN LLP

17      Attorneys for Mizuho Corporate Bank, Ltd.

18      180 Maiden Lane

19      New York, NY 10038

20

21 BY:   MARK A. SPEISER, ESQ.

22      SHERRY J. MILLMAN, ESQ.

23

24

25

HOLLAND & KNIGHT LLP

    Attorneys for Monument Realty LLC

    195 Broadway

    New York, NY 10007


BY:  PETER A. ZISSER, ESQ.


SHENWICK & ASSOCIATES

    Attorneys for Collins Building Services

    655 Third Avenue

    20th Floor

    New York, NY 10017


BY:  JAMES H. SHENWICK, ESQ.


TROUTMAN SANDERS LLP

    Attorneys for Bank of China, New York Branch

    The Chrysler Building

    405 Lexington Avenue

    New York, NY 10174


BY:  HOLLACE T. COHEN, ESQ.

    PAUL H. DEUTCH, ESQ.

LANE POWELL PC

    Attorneys for Fred Hutchinson Cancer Research Center

    1420 Fifth Avenue

    Suite 4100

    Seattle, WA 98101

BY:   CHARLES R. EKBERG, ESQ.

LAW OFFICES OF ROBERT E. LUNA, P.C.

    Attorney for Carrollton-Farmers Branch Independent School

     District

    4411 North Central Expressway

    Dallas, TX 75205

BY:   ANDREA SHEEHAN, ESQ.

KELLEY DRYE & WARREN LLP

    Attorneys for BP Corp North America Inc., BP Energy

     Company, BP Canada Energy Company, IGI Resources, Inc.

    101 Park Avenue

    New York, NY 10178

BY:   JAMES S. CARR, ESQ.

1

2 COMMODITY FUTURES TRADING COMMISSION

3       Division of Enforcement

4       140 Broadway

5       New York, NY 10005

6

7 BY:   R. STEPHEN PAINTER JR.

8

9 COMMODITY FUTURE TRADING COMMISSION

10       Office of General Counsel

11       1155 21st Street, N.W.

12       Washington, DC 20581

13

14 BY:   BRADFORD M. BERRY, ESQ.

15       ROBERT B. WASSERMAN, ESQ.

16

17 STEVENS & LEE, P.C.

18       Attorneys for 1301 Property Owner, LP

19       485 Madison Avenue

20       20th Floor

21       New York, NY 10022

22

23 BY:   CHESTER B. SALOMON, ESQ.

24       CONSTANTINE D. POURAKIS, ESQ.

25

1

2    SHEPPARD MULLIN RICHTER & HAMPTON, LLP

3         Attorneys for Bank of New York Mellon

4         30 Rockefeller Plaza

5         24th Floor

6         New York, NY 10112

7

8    BY:   CAREN SHULMAN, ESQ.

9          RUSSELL REID, ESQ.

10

11   PLATZER, SWERGOLD, KARLIN, LEVINE, GOLDBERG & JASLOW LLP

12         Attorneys for Hale Avenue Borrower LLC, East 46th

13          Borrower, LLC, 250 East Borrower, LLC

14         1065 Avenue of the Americas

15         18th Floor

16         New York, NY 10018

17

18   BY:   SYDNEY G. PLATZER, ESQ.

19

20

21

22

23

24

25

1

2  GIBSON, DUNN & CRUTCHER LLP

3      Attorneys for Lehman Brothers Private Equity Funds

4      200 Park Avenue

5      New York, NY 10016

6

7  BY:  MICHAEL A. ROSENTHAL, ESQ.

8       JANET M. WEISS, ESQ.

9

10  LINEBARGER GOGGAN BLAIR & SAMPSON, LLP

11      Attorneys for Dallas County, Tarrant County

12      2323 Bryan Street

13      Suite 1600

14      Dallas, TX 75201

15

16  BY:  ELIZABETH WELLER, ESQ.

17

18  CRAVATH SWAINE & MOORE, LLP

19      Attorneys for Credit Suisse

20      Worldwide Plaza

21      825 Eighth Avenue

22      New York, NY 10019

23

24  BY:  RICHARD LEVIN, ESQ.

25       ROBERT H. TRUST, ESQ.

1

2   REED SMITH LLP

3       Attorneys for Galleon Buccaneer's Offshore, Ltd.

4       599 Lexington Avenue

5       New York, NY 10022

6

7   BY:   PAUL A. RACHMUTH, ESQ.

8

9   PAUL, HASTINGS, JANOFSKY & WALKER LLP

10      Attorneys for General Electric Capital Corporation

11      75 East 55th Street

12      New York, NY 10022

13

14   BY:   HARVEY A. STRICKEN, ESQ.

15

16   UNITED STATES SECURITIES AND EXCHANGE COMMISSION

17      3 World Financial Center

18      New York, NY 10281

19

20   BY:   NEAL JACOBSON, ESQ.

21

22

23

24

25

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        Suite 2100

6        New York, NY 10004

7

8    BY:   DIANA G. ADAMS, TRUSTEE

9        TRACY HOPE DAVIS, ESQ.

10

11   ARAPAHOE COUNTY ATTORNEY'S OFFICE

12       Attorneys for Arapahoe County Treasurer

13       5334 South Prince Street

14       Littleton, CO 80166

15

16   BY:   GEORGE ROSENBERG, ESQ.

17       (TELEPHONICALLY)

18

19   HENNIGAN BENNETT & DORMAN

20       865 South Figueroa Street

21       Suite 2900

22       Los Angeles, CA 90017

23

24   BY:   SIDNEY P. LEVINSON, ESQ.

25       (TELEPHONICALLY)

GOULSTON & STORRS P.C.

    Attorneys for Interactive Data Corporation

    400 Atlantic Avenue

    Boston, MA 02110

BY:   DOUGLAS B. ROSNER, ESQ.

    (TELEPHONICALLY)

DUANE MORRIS LLP

    30 South 17th Street

    Philadelphia, PA 19103

BY:   MATTHEW E. HOFFMAN, ESQ.

    (TELEPHONICALLY)

P R O C E E D I N G S

1

2      THE COURT:  Please be seated those who have seats.

3  I'd like to make an announcement which is totally unrelated to

4  the substance of the hearing.  It's related to our sound

5  system.  We discovered during yesterday's hearing and

6  discovered again during the hearing that I had this afternoon

7  in another case at 2:00 that the sound system is being

8  adversely affected by BlackBerry use or other electronic

9  devices.  If you have one, even if you're not close to the

10  podium, please shut it off.  It's like you're on an airplane.

11  Thank you.

12      MR. MILLER:  Good afternoon, Your Honor.  Harvey

13  Miller from Weil Gotshal & Manges on behalf of the debtors in

14  the two Chapter 11 cases of Lehman Brothers Holdings Inc. and

15  LB 745 LCC.  First, Your Honor, let me express the appreciation

16  of the debtors and its professionals for all of your tolerance

17  in accommodating all of our starts and stops over the last two

18  days.  This has been a very, very unique case in many, many

19  respects, Your Honor.

20      Many years ago, John Greenleaf Whittier said "For of

21  all sad words of tongue or pen, the saddest are those 'it might

22  have been'."  It's hard to find a place to begin to describe

23  the events of the past week.  There are lots of things that

24  might have been but did not occur, Your Honor.  If somebody

25  would have said last Wednesday evening that -- it would have

1    been incomprehensible, Your Honor, to believe that an

2    organization that has been in existence for 158 years and has

3    become a worldwide leader in the financial community with over

4    25,000 employees would basically close its doors four days

5    later.  The consequences of the economic and financial

6    conditions that all thought were contained in 2007 are a direct

7    cause of what has happened to Lehman Brothers, Your Honor.

8          For months, the company has been pursuing strategic

9    alternatives.  The objective has been to protect the public

10    customers, preserve values and assist in avoiding the

11    deterioration of the financial markets.  The parties to a

12    proposal which we think, Your Honor, will accomplish that

13    objective are the two debtors and the broker dealer subsidiary

14    Lehman Brothers Inc., Your Honor.  And I might say, Your Honor,

15    there are 630,000 accounts having a value of 138 billion

16    dollars that are dependent upon the consummation of a

17    transaction which will allow this business to continue albeit

18    under the auspices of another entity.  And since last Thursday

19    night, Your Honor, people have been working around the clock in

20    a Herculean effort to try and accomplish a transaction which

21    would protect the public interest, stabilize the public markets

22    and offer some assurance to employees.  And I think, Your

23    Honor, if Your Honor had passed the Lehman Brothers building

24    last Thursday night -- or last Friday night, I should say, Your

25    Honor, and Saturday and watch the employees filling up their

1    suitcases and taking their personal belongings out of the

2    building, you would have seen the traumatic effect of what has

3    happened here, Your Honor.

4          So the question was how to save the value of the

5    franchise, protect the public customers and interest and

6    employees.  The result, Your Honor, is a complex transaction

7    with many moving parts, some parts that are still moving every

8    single hour, Your Honor.  Essentially, it provides for a sale

9    of the assets of the broker dealer, which I'll refer to, Your

10   Honor, as LBI.  And that is the North American investment

11   banking and capital markets operation and supporting

12   infrastructure.  It involves the two Chapter 11 debtors because

13   there are what I call related assets that provide the

14   infrastructure for the broker dealer.  And the second debtor is

15   critical to the transaction because if the transaction, Your

16   Honor, is consummated, the purchaser will be buying that

17   building or the interest that the debtors have in that building

18   because there'll be a great need for space.  The transaction

19   would allow the clearing of the moving of the accounts.  It

20   would protect the public customers.  And I have to say, Your

21   Honor, if the transaction is not consummated the notional cost

22   in connection with the transaction will be in the trillions.

23         The transaction, Your Honor, has been structured

24   because of the needs of the purchaser given the circumstances

25   in which the debtors find themselves and in which the broker

1   dealer finds itself. It is absolutely essential, Your Honor,

2   that the purchaser have the protections of Section 363 of the

3   Bankruptcy Code. The transaction, Your Honor, would

4   contemplate providing continued employment for almost 10 to

5   12,000 employees as part of this transaction for some period of

6   time. Some employees will be continued for much longer periods

7   of time but it will allow a transition, Your Honor.

8         So, how was the transaction structured? It was

9   structured, Your Honor, so that the two debtors would be

10   selling certain assets pursuant to Section 363 and in

11   connection with the broker dealer, Your Honor, in a very

12   unique -- and I don't think I've ever seen it done before.

13   There would be at a point in time, as the transaction moves

14   forward to conclusion, the commencement of a proceeding under

15   the Securities Investor Protection Act. And a designated

16   trustee would be appointed immediately and there would be, in

17   effect, Your Honor, concurrent hearings before Your Honor, I

18   believe, both in the SIPC proceeding and in the Chapter 11

19   cases for approval of the sale. In effect, we have used the

20   expression, Your Honor, of forward the pre-pack SIPC

21   proceedings. And I have to inform Your Honor that what has

22   gone on in the last four or five days -- it seems like one long

23   day -- is complete cooperation with the regulators, the

24   Securities and Exchange Commission, the Federal Reserve Bank

25   and the Securities Investor Protection Corporation, to agree on

1    a format which would accomplish the purpose of preserving all

2    these interests.  And why is that so important, Your Honor?  I

3    hate to use the analogy of a melting ice cube.  It's been used

4    too often.  So I'm just going to say this is a wasting asset.

5    It is extremely fragile and sensitive.  And it's because of

6    that that people have been working around the clock.  And it is

7    because of that, Your Honor, that the time, and we recognize

8    the time element is so tight that we are basically asking Your

9    Honor to set a -- sign a -- enter a sales procedure order which

10   will set up a hearing on late Friday afternoon.  And the

11   coordination to get the time for the hearing on Friday

12   afternoon is very complex because it has to resonate with the

13   regulators.  It has to be sufficient to allow the transfer of

14   all these accounts at the close of the market.  And this

15   includes not only securities accounts, Your Honor, but

16   commodities futures accounts which is a very complex area.

17          It is a very complex transaction.  As Your Honor

18   knows, the papers weren't filed till 6 a.m. this morning.  The

19   negotiations -- and I want to tell you negotiations, Your

20   Honor, never stopped.  People never went to sleep to get this

21   transaction.  And why did they do that?  Because of the

22   sensitivity of this transaction.  And, Your Honor, just the

23   delay from yesterday, when Your Honor was kind enough to give

24   us a hearing date yesterday, to today has had negative

25   inferences by a great many people.  Is there ever going to be a

1　hearing on this?  That's why, Your Honor, we have come forward

2　today.  We want to go forward.  And I would point out, Your

3　Honor, we are not asking for any real substantive relief today

4　with respect to the sale motion.  We are asking Your Honor to

5　set a hearing for Friday afternoon.  And the only sensitive --

6　I'll call it somewhat sensitive issue is the approval of the

7　breakup fee.

8　　　　　Now, Your Honor, we are talking about a transaction

9　that has, as I said, many, many parts.  But looking at it from

10　the net of this transaction, there will be approximately

11　1,700,000,000 dollars yielded out of this transaction.

12　　　　　UNIDENTIFIED SPEAKER:  A billion.

13　　　　　MR. MILLER:  I'm sorry?

14　　　　　UNIDENTIFIED SPEAKER:  A billion.

15　　　　　MR. MILLER:  You know, I always think of Senator

16　Dirksen, Your Honor.  He said a billion here and a billion

17　there.  Pretty soon you're talking about real money.

18　　　　　THE COURT:  Well, you're talking about real money

19　here.

20　　　　　MR. MILLER:  Absolutely, Your Honor.  And so we have

21　1,700,000,000 dollars.  There has been an enormous effort put

22　into this by the prospective purchaser, Barclays Capital, Your

23　Honor.  And in the negotiations, quite properly, with all of

24　the efforts that they have put into it, there was a request --

25　I should say a request, almost a demand, for a breakup fee.

1 And there were negotiations in respect of that amount. And

2 what it came out to be, Your Honor, was a proposed breakup fee

3 of a hundred million dollars plus reimbursement of expenses of

4 up to twenty-five million dollars.

5         THE COURT: May I ask you a question --

6         MR. MILLER: Yes, sir.

7         THE COURT: -- about how to equate that breakup fee

8 and expense reimbursement with the purchase price? And I've

9 attempted to assess the notional value of the transaction

10 because in addition to the 1.7 billion dollars, there's a

11 reference to 1.5 billion dollars in cure amounts and possibly

12 as much as 2.5 billion dollars in certain employee related --

13         MR. MILLER: Yes, sir.

14         THE COURT: -- severance expenses which may or may

15 not be triggered. For purposes of my evaluating the fairness

16 of the overall proposed breakup fee and expense reimbursement

17 as a percentage of the transaction, not that I need to do that

18 but frequently Courts are viewed as approving breakup fees

19 within a certain market range. How should I view the fair

20 value of the overall transaction?

21         MR. MILLER: I think, Your Honor, if you start with

22 the billion seven hundred million dollars, which is the cash

23 component, as Your Honor obviously read in the papers, there

24 will be an exposure for 2.5 billion dollars in connection with

25 the retention of these 10 to 12,000 employees.

1       In addition to that, Your Honor, in connection with

2    the assumption and assignment of contracts, the cure amounts

3    and other payments in connection with the contracts, are

4    estimated to be a billion five hundred million dollars.  So we

5    have four billion dollars right there, Your Honor.

6       In addition, Your Honor, the purchaser is paying 250

7    million dollars for the goodwill of LBI.  So there you have

8    4,250,000,000 dollars in that respect, Your Honor.

9       And then, Your Honor, in the interim, LBI has entered

10    into an arrangement with the prospective purchaser where

11    there's a repo agreement in which they are backing up and

12    allowing these repos to be settled and to be financed.  In

13    addition, if this goes forward, there will be a support

14    agreement for this interim period of two or three days where

15    Barclays Capital will be on premises, will be offering

16    oversight and in the sole discretion, may be willing to advance

17    some monies in the interim period.

18       So the problem we had, Your Honor, there are so many

19    different elements in this transaction that to do the usual

20    calculation of whether it should be two percent, three percent,

21    etcetera, became enormously complex during the course of the

22    proceedings.  As Your Honor knows, as these transactions go up

23    in value, very often the breakup fee goes up in value.  And

24    this -- if Your Honor just took the 1.7, I would say to Your

25    Honor, it's above three percent, clearly above three percent.

1          THE COURT:  I know.  I did the calculation.

2          MR. MILLER:  Yes, Your Honor.  But this is -- again,

3   I have to use the expression, this is such a unique

4   transaction.  And there's been so much effort and there is so

5   much exposure.  Senior executives at Barclays likewise, like

6   the rest of us slaves, never went to sleep from Sunday right

7   through last night.

8          So, I think, Your Honor, there's an extra quota of

9   consideration that has to be given in connection with this

10  transaction.  And I would also bear in mind, Your Honor, that

11  what are the prospects of a competitive bid.  This is such a

12  fragile asset.  And it is not an asset that people did not know

13  was for sale.  For months now, Lehman Brothers has been

14  pursuing strategic alternatives.  The market has known that

15  aspects of Lehman, or even all of Lehman, were available for

16  purchase or investment.  So that -- I'm not going to call it

17  shopworn  Your Honor, but that the public, the financial

18  markets knew that these assets were for sale.  And we had a

19  benefit, Your Honor.  We were lucky because Barclays had been

20  negotiating to acquire Lehman.  Unfortunately, that was one of

21  the things that might have been but never turned into fruition.

22  But as the part of that process, at least they had some

23  familiarity.  And that was not a long negotiation either, Your

24  Honor.  It was two days, basically.  Unfortunately, because of

25  various regulations in the UK, that transaction could not have

1    gone forward.  So we start at least with somebody who had some

2    knowledge.  Otherwise, Your Honor, this wasting asset might

3    have been wasted.  And unfortunately, Your Honor, and I'm not

4    trying to do the sale hearing now -- in court with us is Mr.

5    McDade, Herbert McDade, who is the president and chief

6    operating officer who, if he had to testify, Your Honor, would

7    testify that if this transaction is not approved, Friday night

8    there will be nobody in the building.  And it will just

9    disappear.

10           So, I want to repeat, Your Honor.  We're not asking

11   for a ruling on the sale today, Your Honor.

12           THE COURT:  Well, let me just deal procedurally with

13   what's before me.  And I know that you're in effect starting

14   with the sale procedures motion.

15           MR. MILLER:  Yes, sir.

16           THE COURT:  I was in early this morning and those

17   papers didn't make it to the ECF system until sometime after

18   7:30 --

19           MR. MILLER:  Yes.

20           THE COURT:  -- I didn't see them until about then.

21   And knowing the way those lawyers who don't work all night

22   behave, they often don't get to their offices until sometime

23   later than that.  I have some concerns which I would like you

24   to address on the record.  Recognizing that this is an

25   absolutely extraordinary transaction with extraordinary

1    importance to the capital markets globally, I still need to

2    deal with fundamental due process issues.

3            MR. MILLER:  Yes, sir.

4            THE COURT:  And I would like you to comment -- and

5    I'm not inviting objections on this basis.  I'm just saying I

6    have a concern as to the adequacy of notice as to the substance

7    of the transaction for purposes of basic constitutional due

8    process.

9            MR. MILLER:  Yes, sir.

10           MR. DESPINS:  Your Honor, I'm sorry to interrupt.  I

11   never do that but I thought that Mr. Miller was making

12   introductory remarks and therefore I wanted him to finish.  But

13   on this issue, Your Honor -- first of all, let me introduce

14   myself.  Luc Despins with my partner, Dennis Dunne, from

15   Milbank Tweed, proposed counsel for the official creditors'

16   committee.

17           THE COURT:  That's okay.  Debtors' counsel is

18   proposed counsel, too.

19           MR. DESPINS:  Your Honor, we -- the committee has

20   concerns regarding -- I want to make sure the Court hears us on

21   that request.  Clearly, we're not going to have a prolonged

22   argument over this but we request, and the committee wanted us

23   to request, a short adjournment until tomorrow morning so that

24   we can actually get up to speed and have an informed discussion

25   or -- or maybe not because maybe this is all -- maybe

1  everything that's going to be approved by the Court is

2  perfectly appropriate.  But we want a short adjournment until

3  tomorrow morning.  We were retained no more than forty minutes

4  ago, Your Honor.  And this -- through no fault of the debtor.

5  This has nothing to do and we're not faulting the debtor in any

6  way.  It's just that -- happened that way.  But it's also

7  outside of our control.

8          So perhaps, in that context, Mr. Miller could, while

9  addressing your remarks, also address our request for a short

10 adjournment until your earliest convenience tomorrow, Your

11 Honor.

12         THE COURT:  Okay.  I'm sure he'll do that.  But my

13 introduction to Mr. Miller was less about whether this hearing

14 should be held at another time and more about dealing with the

15 timing imperatives that confront the Court.  I think everybody

16 needs to understand that I am personally disposed to doing

17 everything within my power to accommodating this transaction

18 within the limits of the law, the procedural rules and

19 fundamental due process.  And all I am asking Mr. Miller to

20 address right now is my ability within my discretion, which is

21 remarkably broad, particularly at a time like this, to do

22 something extraordinary.

23         MR. MILLER:  Your Honor, we could not agree with you

24 more about it being extraordinary.  And I want to assure Your

25 Honor that we were very cognizant of the due process arguments.

1    And if we had the luxury of an asset that would stay in place

2    or a group of assets that would stay in place and would still

3    be there two weeks from now, we clearly would have done the

4    normal process of getting a sale procedures order entered,

5    having a period of time for people to get -- do whatever due

6    diligence they wanted to do.  Our problem, and what we have

7    discussed at length, Your Honor, could we possibly do that and

8    still have a transaction?  Would the purchaser stand by during

9    that period?  And what would happen during that period?  The

10   consensus among all of the business people, Your Honor, and the

11   professionals was there would be nothing to sell in two weeks.

12   This is really and truly a wasting asset.

13        So what we have tried to do, Your Honor, and as I

14   have said to Mr. Despins, we will stay up all night with him

15   and explain this transaction.  Again, the only issue that Your

16   Honor has to decide today which has any significance at all is

17   the breakup fee.  I'm not talking about the DIP.  And set the

18   hearing.  I know Your Honor came in early because Your Honor

19   expected to find the motion papers here.

20        THE COURT:  Actually, I expected to find those papers

21   last evening.  But it's all right.

22        MR. MILLER:  I have to tell Your Honor, modern

23   technology is not all that it's cracked up to be.

24        THE COURT:  I know.

25        MR. MILLER:  And trying to get some stuff through a

1  computer is not so easy and to a printer.  And there was a lot

2  of frustration and a number of statements "Well, I'm about to

3  commit suicide" but we didn't let that happen.

4       So we took that into recognition, Your Honor.  And we

5  have sent them their websites.  We have given as much publicity

6  as we can possibly give to this, Your Honor.  And as I say

7  again, Your Honor, if it wasn't the unique nature of these

8  assets, the sensitivity of these assets and what has happened

9  in the marketplaces -- one of the purposes of doing this

10 transaction, Your Honor, is to try and soothe the markets and

11 to -- it'd be a counter force the volatility that's going

12 on.  I don't know if Your Honor has a screen in your office,

13 but if you watched what's happening to the market today, it's

14 dangerous.

15       THE COURT:  Unfortunately, I was too busy to look at

16 any screens and I don't want to find out later.  But don't tell

17 me now, please.

18       MR. MILLER:  I'm not going to tell Your -- it would

19 depress Your Honor to know what's going on out there in the

20 marketplace.  So we have taken that into account and we have

21 also taken into account, Your Honor, the extremely unique

22 circumstances that we find ourselves in.  This is -- I don't

23 want to compare it to some -- in a small case, Your Honor, that

24 you and I may have been involved in twenty years ago where you

25 had a boat of salmon sitting out on the harbor and the company

1    in Chapter 11 had no money to unload it.  That's the kind --

2    this is such a perishable asset that if we don't take this

3    action, due process -- nothing will matter.  And I think, Your

4    Honor, everybody who has been involved -- and with due

5    deference to Mr. Despins and Mr. Dunne.  They haven't been

6    fully briefed on it.  But every other party who's been involved

7    has recognized that problem, including Your Honor, the

8    Securities and Exchange Commission, the Securities Investor

9    Protection Corporation and the Federal Reserve Bank.

10            Your Honor -- I have to tell Your Honor, there wasn't

11   an intention to file so quickly except what happened over the

12   past weekend.  We would have had more time to deal with these

13   problems.  And we understand what Your Honor is under in

14   connection with due process.  But this has been so notorious.

15   I mean, we have filled up newspapers, we have filled up CNBC

16   and CNN with stories.  We only got pushed off last night by

17   AIG.  We would have liked to have had a portion of the eighty-

18   five billion dollars but we couldn't get it.  So I think, Your

19   Honor, the proceeding is notorious.

20            THE COURT:  I'm going to take judicial notice of the

21   fact that we have a packed courtroom where we have people

22   standing and we have an overflow courtroom, the fact that there

23   are parties represented by experienced and sophisticated

24   counsel, as evidence that there's no question that parties-in-

25   interest and parties who are just plain interested know about

1    today's hearing.  And I've also had an opportunity to

2    understand through the press and television and the internet at

3    least some of the proposed terms and conditions of the

4    transaction.  I think for that reason, I am inclined to

5    conclude that while this is unusual, and should not be viewed

6    as a precedent, I believe that here due process is satisfied

7    simply by virtue of the fact that we're all here together and

8    that we know what we're talking about.

9         MR. MILLER:  I would only add to what Your Honor said

10   that yesterday was the organizational meeting called by the

11   Office of the United States Trustee which was in a ballroom at

12   the Park Lane Hotel in New York City.  And if Your Honor had

13   been in that room, Your Honor would have seen an overflow

14   audience of people standing all through the hallway.  So this

15   is a known situation, as Your Honor has pointed out.  So we

16   really support Your Honor's ruling that there is adequate due

17   process.

18        THE COURT:  Okay.  So we've gotten over that hurdle.

19   Now, we have Mr. Despins request on behalf of the newly formed

20   committee that has newly retained counsel to put this over for

21   a hearing tomorrow.  I want to just comment that I have some

22   issues with respect to that because of my own calendar.  But I

23   will attempt to address that if, in fact, after hearing

24   argument, if that's necessary, we need to adjust the timing.

25   But is this the time to debate that question?  Or would counsel

1    benefit from a chance to confer?  I'm prepared to do it either

2    way.

3             MR. MILLER:  Your Honor, I think --

4             THE COURT:  My only sense of this, based upon your

5    presentation, is that while I am sensitive to the needs of the

6    creditors' committee to have as much time as possible to

7    prepare whatever papers it may choose to file, including papers

8    in support of the transaction for that matter, I am also

9    conscious of the time line that you have outlined.  And what I

10   consider to be the imperative that this transaction, if it is

11   to be approved, be approved before the end of the week.  As a

12   result, the request not yet argued by Mr. Despins that this be

13   put over, that is, this aspect of today's hearing be put over

14   till tomorrow morning, raises in my mind an additional due

15   process question which is that the sale procedures and the sale

16   hearing are even closer together than they would be if I were

17   to approve the sale procedures today.  So that while we take

18   away from the committee's time to respond to this procedural

19   motion by approving it, if I do, today, we also take away from

20   everybody's time to address the merits of the transaction if I

21   approve it tomorrow instead of today.  So, that's the conundrum

22   that I face.

23            I am inclined not to grant the proposed request for

24   an adjournment for multiple reasons but I also don't wish to

25   cut off argument unnecessarily.  The multiple reasons include

1    the following:  one, I have a calendar tomorrow morning which

2    includes a number of other cases.  And, at least in this court,

3    every case, regardless of size, is entitled to access to the

4    Court.  And some of the cases that I'm hearing tomorrow are

5    quite large.  Secondly, I believe that this very fast track

6    case needs to be addressed in an extraordinary way.  And for

7    that reason, while I would, under ordinary circumstances, be

8    very sensitive to the request of committee counsel to have

9    additional time, and I've been in that spot myself when I was

10   in practice, I think that to delay the approval of the sale

11   procedures would send an intolerably awkward message to the

12   world.  And I'm not prepared to preside over the delivery of

13   such a message.  I believe that we should maintain the schedule

14   that we're on recognizing that it imposes some burdens on the

15   parties who need to appear and be heard.  But I will also state

16   that for purposes of the sale hearing, I will be

17   extraordinarily liberal in allowing parties the ability to

18   object if they wish to at the very last minute as soon as we

19   call the hearing because I think that's also consistent with

20   due process.

21           MR. MILLER:  Your Honor, we have no objection to

22   that.  As far as we're concerned, Your Honor, you can extend

23   the objection date to the hour before whatever the time of the

24   hearing will be on Friday.

25           THE COURT:  Since you offered that, that's what we'll

1    do.

2            MR. MILLER:  Very good, Your Honor.

3            MR. DESPINS:  Your Honor, normally and with short

4    deadlines like this, we -- I should say, sometimes the Court

5    dispenses with the filing of an objection, frankly.  We can

6    make the arguments at the hearing.

7            THE COURT:  As far as I'm concerned, every party-in-

8    interest who has a legitimate need to express a position on the

9    record will be free to do so at the sale hearing regardless of

10   whether papers have been filed of record consistent, however,

11   with providing some fair notice to the debtor of the kinds of

12   arguments that are going to be asserted.  I don't think that

13   this is appropriately to be designed as a hearing by surprise.

14   So, as long as there is adequate notice, I think that would

15   work.

16           MR. MILLER:  Absolutely, Your Honor.  And anybody who

17   has an interest, Your Honor, can contact my office.  We will

18   spend the time to explain things.  We will set up meetings.  We

19   are very sensitive to the due process argument, Your Honor.

20   And I agree with Your Honor.  Anybody who has a statement to

21   make, if it's a substantive statement, we'd appreciate a little

22   notice of what it's going to be but it can be oral without any

23   problems.

24           THE COURT:  I think you're entitled to that notice.

25   And I guess I'll be the only one surprised by what happens.

1    But as long as you know, I mean, if you're prepared, that's

2    fine.

3         MR. MILLER:  Yes, Your Honor.  And, Your Honor, if

4    Mr. Despins wants to debate the adjournment, if I may, I would

5    adopt all the reasons in the argument Your Honor is making.

6         THE COURT:  You've always been a wise advocate.

7         MR. DESPINS:  I think I'll pass on that, Your Honor.

8         MR. MILLER:  Your Honor, if I could go back at this

9    point to the breakup fee, I would just note that if you took

10   the cash that's coming out of this transaction and you took the

11   cure amounts, the retention program, it comes up to 5.7 billion

12   dollars.  A hundred million dollars, Your Honor, is

13   approximately two percent of that.  Now, I grant you there's

14   some flex in those other two items.  But given the enormity of

15   this transaction, Your Honor, from the debtors' perspective,

16   and we actively negotiated this, Your Honor, it's not an

17   unreasonable breakup fee.  And if that's what gets the

18   transaction moving forward and as Your Honor pointed out, the

19   markets out there are very, very sensitive to what happens here

20   today.  The employees are waiting.  I mean, one of the things

21   filed -- I will withdraw.  I was going to say something I

22   shouldn't say, Your Honor.  The employees were going to come

23   down here en masse.  It made me think of every time you have an

24   airline case, when the pilots are here.  But we didn't think

25   that was necessary, Your Honor.  There's just a lot of human

1    capital involved in this as well as the economic circumstances.

2        So we would ask Your Honor to approve the breakup

3    fee.

4        THE COURT:  Before I do that, I can tell that there

5    are people who wish to be heard.  I don't know if they wish to

6    be heard with respect to the limited question of the breakup

7    fee or whether they wish to be heard more broadly with respect

8    to the proposed bid procedures that you have on the table.

9        MR. MILLER:  I was just going to go into the bid

10   procedures, Your Honor.

11       THE COURT:  Excuse me?

12       MR. MILLER:  I was just going to go into the bid

13   procedures.

14       THE COURT:  All right.  Well, there's someone behind

15   you who's obviously very pushy because she has made it to -- I

16   don't know who she is or why she's here in the middle of your

17   presentation.  Who are you?

18       MS. SMITH:  Your Honor, my name is Liz Smith.  I'm

19   with Dewey & LeBoeuf and I represent the excess SIPC insured,

20   CAPCO Holdings and Customer Asset Protection Company which was

21   not involved in the process, has not been called, has not been

22   spoken to at all about what's going on here.

23       We don't object to the breakup fee but I do have a

24   limited objection to the actual terms of the proposed order

25   which I believe has been revised.  And I was just shown it a

1    moment ago. And so I would like the opportunity before Your

2    Honor signs anything to discuss that with the debtor --

3           THE COURT: Well, let me make a statement which I

4    think applies broadly to other people who may be similarly

5    situated. Just in the interest of good order because we have

6    such a packed courtroom here today and many of the faces in the

7    room are familiar to me, many are not. I don't know yet who

8    everybody represents except for the principal players. And

9    it's entirely conceivable given the shortness of notice that

10    there may be comments that can be reasonably made to debtors'

11    counsel about the form of the proposed order. I don't think

12    this is the time to get into that unless it is a truly

13    substantive matter that requires the attention of everyone.

14    I'm not trying to cut off anybody's discussion time.

15           MR. MILLER: I would propose, Your Honor, if Your

16    Honor is to grant the motion that we would sit down -- Ms.

17    Smith?

18           MS. SMITH: Yes, thank you.

19           MR. MILLER: -- and anybody else --

20           THE COURT: Exactly my point.

21           MR. MILLER: -- and see if we can come up with a

22    consent order.

23           THE COURT: That's fine.

24           MS. SMITH: That would be ideal, Your Honor. Thank

25    you again.

1          THE COURT:  Sure.  And I think that what I'd really

2     like to find out because we have a fairly large and diverse

3     group of people is whether there are parties who represent

4     those who have complaints about the bid procedures, have

5     concerns about the bid procedures beyond the breakup fee and

6     beyond the timing because I have addressed the timing question.

7     The only questions that I think are really before me at the

8     moment are anything else that relates to the fairness,

9     reasonableness and appropriateness of my entering bid

10    procedures in the form proposed by the debtor obviously working

11    in concert with Barclays as the acquirer.  So I'm prepared to

12    hear comments on that now if --

13          MR. MILLER:  I would just describe very briefly the

14    bidding procedures, Your Honor.

15          THE COURT:  Oh, that's fine.

16          MR. MILLER:  Your Honor, this sales transaction was

17    originated and was negotiated in the context that this was not

18    the usual stalking horse kind of a transaction.  That we were

19    fortunate in finding an entity which was prepared and had the

20    finances to acquire this as a going concern.  However, we

21    wanted to -- we and the purchaser, Your Honor, wanted to

22    provide that in the event that at the sale hearing or before

23    that another bidder came along, experienced counsel

24    representing Barclays, Cleary Gottlieb, said we should be

25    entitled to some protection in connection with the bidding.  So

1    the bidding procedures, Your Honor, are basically that the

2    first bid that would be made by a competitor has to take into

3    account the breakup fee and the reimbursement of expenses and

4    spend something.  So the first overbid, Your Honor, has to be

5    175 million dollars over the 1.7 we're using as the base line,

6    the 1.7 billion.

7            THE COURT:  You said 175?

8            MR. MILLER:  175 million, Your Honor.

9            THE COURT:  My understanding was that the breakup fee

10   was a hundred million, that the expense reimbursement was

11   twenty-five million --

12           MR. MILLER:  Right.

13           THE COURT:  And is there then a fifty million dollar

14   minimum overbid?

15           MR. MILLER:  That's correct, Your Honor.  And then

16   the proposal, Your Honor, is the next bid, the increments of

17   bidding thereafter would be at a hundred million dollars with

18   the right to match -- right to match?

19           UNIDENTIFIED SPEAKER:  Yes.

20           MR. MILLER:  Yes.

21           THE COURT:  I have a question based upon that.

22           MR. MILLER:  Yes, sir.

23           THE COURT:  I don't understand the rationale for a

24   fifty million dollar overbid.  If there's a real player in the

25   game prepared to do everything that Barclays is doing and is

1   anxious for a competitive auction, why make it any harder for

2   that party to come into the process?  I don't understand why we

3   should have a high hurdle.

4           MR. MILLER:  Your Honor --

5           THE COURT:  I'm just asking the question.

6           MR. MILLER:  No.  All I can say, Your Honor --

7           THE COURT:  I'm assuming if I have the question,

8   others in the room might have it, too.

9           MR. MILLER:  I will leave it open for comments, Your

10  Honor, but every time I have seen an overbid process, it's not

11  only to cover the breakup fee and expenses but there has always

12  been another increment on top of it.  To be perfectly candor,

13  Your Honor, it is somewhat protective of the original bidder.

14  And if somebody's really interested in this, Your Honor, and

15  really wants to make a bid, I don't think that fifty million

16  dollars is going to make much of a difference.

17          THE COURT:  All right.  I understand your position.

18          MR. MILLER:  So that's basically the bidding

19  procedures, Your Honor.

20          THE COURT:  And when are bids due and how do bidders

21  who may be interested qualify to bid?

22          MR. MILLER:  Your Honor, I'm going to take the same

23  tack that you previously stated.  Anybody who wants to come in

24  at any time, we will entertain that.  And again, I want to

25  repeat, I am offering my partners on a twenty-four hour basis.

1          THE COURT:  Very generous of you.

2          MR. MILLER:  So I don't know if there are any

3     comments on that, Your Honor.

4          THE COURT:  Okay.  Now that at least the broad

5     outline has been presented, is there anyone else who wished to

6     be heard on any of the substance?

7          MR. MILLER:  I would just add, Your Honor --

8          THE COURT:  Okay.

9          MR. MILLER:  This is not --

10         THE COURT:  You really are a hound for that, aren't

11    you?  You're not giving up.

12         MR. MILLER:  I just wanted to let the Court know that

13    the debtors have hired Lazard as its financial advisor and Mr.

14    Barry Ridings has been intimately involved in the construction

15    of the bidding procedures and involved in the negotiations of

16    the sales.  And Mr. Ridings is in court here today, Your Honor.

17    Thank you, Your Honor.

18         THE COURT:  Okay.  Before you -- actually, now that

19    I've said what I said about not wanting to give up the podium,

20    I have a question for you and I want to ask it now even though

21    it's out of order.  In reviewing the DIP agreement, I noted in

22    Section 5.16 that there is an obligation on the part of the

23    debtor to engage, Brian Marsal as CRO.  I found that by

24    accident.  It wasn't revealed in the motion itself.  And I am

25    concerned, I'm letting you know this --

1          MR. MILLER:  Yes, sir.

2          THE COURT:  -- that it's probably an extraordinary

3     provision.  I'm bringing it up now because there's also a

4     reference in the same long document to the hiring of a

5     financial advisor not identified by name, and now I know who it

6     is.  I'm just alerting you, you don't have to comment now

7     because I think we should limit ourselves to the bid

8     procedures.  But I'm concerned about that.  I want to know more

9     about it.  It seems to me to be a material provision that

10    wasn't disclosed.  And there are event of default consequences

11    that appear to flow from his not being retained and kept on

12    board.  I view that as an unusual provision and one that

13    because it limits my discretion is serious.  So I wanted to let

14    you know about it, not sandbag you with the issue when you've

15    come up with the DIP, and be in a position to give me some

16    thoughtful remarks.  And I'd rather not do it now.  But I'm

17    just letting you know about it.

18          MR. MILLER:  Very good, Your Honor.

19          THE COURT:  Okay.

20          MR. DESPINS:  May I, Your Honor?

21          THE COURT:  Absolutely.

22          MR. DESPINS:  Again, for the record, Luc Despins with

23    Milbank Tweed, proposed counsel for the committee.  And this is

24    going to be -- I apologize.  This is going to be a little bit

25    disorganized because we're getting up to speed at the hearing

1    literally.  So there will be a series of comments and perhaps

2    questions that can be clarified.  The first, and I apologize

3    for doing this, I want to clarify that the no-shop is gone.  Is

4    that correct?  That there's no no-shop provision anymore?

5    Okay.  So therefore, the debtor is free to speak to any bidders

6    whatsoever.  Okay.  The other issue Your Honor identified is

7    the issue of the overbid.  We don't think that a fifty million

8    dollar overbid is required under the circumstances and

9    certainly, not going forward always keeping a high overbid for

10   future bids.

11          Clarification, Your Honor, which is on the issue of

12   timing of Friday's hearing, if you're approving these bid

13   procedures today, will we be able to argue on Friday that the

14   sale should not proceed or that's -- besides the merits of

15   whether the sale is a good sale.  Can we argue on Friday that

16   more time should pass between today and the actual sale hearing

17   or this is only going to be decided today and we are going to

18   be precluded from making that argument on Friday of this week.

19          THE COURT:  Let me tell you what my reaction to that

20   is and others may have a different view.  I decide one motion

21   at a time.  I'm deciding the bid procedures motion and I'm not

22   inclined to grant your request for more time with respect to

23   approval of this particular request.  On behalf of the

24   creditors' committee, you are free as to this matter and any

25   other matter that may come before me throughout the case to

1    appear and raise any issue that you consider appropriate under

2    the circumstances.  I may not always agree with you but you're

3    free to raise it.

4         MR. DESPINS:  Thank you, Your Honor.  Then there are

5    issues related to the breakup fee, Your Honor.  Putting aside

6    the size of it, and we'll come back to that in a minute, and

7    again, this may be plumbing and I apologize for bothering the

8    Court with this.  But there's an issue over the trigger for the

9    breakup fee.  I think in the motion it says that it's triggered

10   by another competing offer being consummated.  And again, we

11   don't agree with the size of the breakup fee but that concept

12   is fine.  But I want to confirm that if, for example, the

13   transaction is terminated because, for example, the Court does

14   not approve the transaction on Friday of this week, that it

15   will not cause the payment of any fees to the purchaser.

16        MR. DUNNE:  We'll get right back to that.

17        MR. DESPINS:  Okay.  The next issue, Your Honor, is

18   the size of the breakup fee.  Mr. Miller mentioned the fact

19   that there are cure costs.  That doesn't go to the estate; it

20   goes to third parties.  That's not, with all due respect, we

21   don't think it's appropriate, Your Honor, to consider that in

22   looking at the size of the breakup fee.  What is relevant is

23   what is coming to the estate.  What's coming to the estate, if

24   I understand correctly, is 250 million dollars plus the

25   appraised value of several properties.  They believe that it's

1    going to be 1.75.  However, and again, maybe we misread the

2    agreement, it appears that the debtor is leaving behind in the

3    broker 1.3 billion of cash or cash equivalents.  I could be

4    wrong on that but maybe that'll be clarified.  If that's the

5    case, and again, I hope I'm wrong, then the -- what's happening

6    is that -- it's not 1.7.  It's 1.7 minus 1.3.  So again, we

7    apologize for raising this in this context.  We would never do

8    that normally but we didn't have time to really --

9         THE COURT:  Well, this is an extraordinary case and I

10   guess the benefit is Mr. Miller gets the opportunity to raise

11   things that he might not ordinarily raise given the timing and

12   so do you.  So that's fine.  Everything's open as far as I'm

13   concerned at this point.  And I hear your arguments and some of

14   them -- I'm sure you'll be able to -- maybe we can take a break

15   at some point although it's going to be awkward to orchestrate

16   with this many people and you might have an opportunity to talk

17   a little bit with Mr. Miller or one of his volunteered

18   partners.

19        MR. DESPINS:  Okay.  So, Your Honor, putting aside

20   the 1.3 billion dollar argument, if you look at what the estate

21   is getting, it is really a breakup fee of a hundred million on

22   1.750 because it is a good thing for third parties that they're

23   getting paid by the purchaser.  But that doesn't bring money to

24   the estate.  So I want to make sure that that is not lost on

25   the Court.  I think --

1          THE COURT:  Well, I hear what you're saying but let

2     me tell you that at least in my experience, and I'm guessing in

3     yours, too, when considering the notional value of the

4     transaction, assumed liabilities are very often included and

5     avoided obligations are very often included for purposes of

6     determining the overall value.  Certainly, when investment

7     bankers seek to be retained, they include everything they can

8     for purposes of their fee.  And I'm assuming that what works

9     for one category in terms of sizing a transaction probably can

10     work for another.  But I hear your argument.

11          MR. DESPINS:  That would be correct, Your Honor, if

12     those assumed liabilities had to be paid by the debtor.  But if

13     they're pre-petition claims that are going to be with all the

14     other pre-petition claims, I'm not sure that you can, without

15     knowing what the dividend will be on unsecured claims, we can't

16     determine whether this breakup fee is reasonable.

17          Before I conclude on this, I'd just like to confer

18     with my colleague, Mr. Dunne, for one second.

19          THE COURT:  Sure.

20     (Pause)

21          MR. DESPINS:  Your Honor, for now, I think that these

22     are our comments.

23          THE COURT:  Okay.  I don't know who else is here.  I

24     can tell Mr. Goldman is coming forward with a look of maybe

25     wanted to speak to me.  Do you want to speak to me, Mr.

1  Goldman?

2       MR. GOLDEN:  Good afternoon, Your Honor.  I'm sorry

3  we were late and I wasn't able to give the court reporter a

4  card.  My name is Daniel Golden.  I'm with the law firm of Akin

5  Gump Strauss Hauer and Feld.  We represent an ad hoc

6  noteholders committee consisting currently of, but I anticipate

7  it to grow, the following institutions:  Pacific Investment

8  Management Company, Western Asset Management Company, Black

9  Rock and Agon.  And in the aggregate, these four institutions

10  hold over nine billion dollars of the debtors' bonds, some

11  senior, some subordinated, some junior subordinated bonds.

12       Your Honor, the problem my clients are having is they

13  just don't know whether this proposal, this sale proposal, is a

14  good one or not.  It may well turn out it's a great one.  It

15  may turn out it's the only one.  But we're never going to know

16  under the debtors' proposed bidding procedures.  These aren't

17  bidding procedures; these are Barclays' protection procedures.

18  They're not designed out to ferret out higher and better

19  offers.  They're designed to ensure that nobody has -- no other

20  party has a legitimate shot to make a competitive offer.

21       Your Honor, this is an extraordinary case.  Nobody's

22  going to doubt that.  And I assume for as long as this case

23  goes on, people are going to talk about how extraordinary it

24  is.  But Your Honor has recognized that due process doesn't go

25  out the window simply because it's an extraordinary or an

1    extraordinarily large case.  And there are concerns that Mr.

2    Miller addressed and the debtors have addressed dealing with

3    the regulators and the employees.  But what I haven't heard

4    whose interests have been protected by these proposed bidding

5    procedures are the creditors who, after all, should be the

6    beneficiaries of these proposed bidding procedures.  Mr. Miller

7    said that these bidding procedures were negotiated aggressively

8    with Barclays.  I'd like to see what happened if they weren't

9    negotiated aggressively.

10            I understand, and I'm sorry I was late again, that

11   they've taken out the absolute no-shop provision.  Well, we're

12   thankful for that.  But how real is that when a competitive --

13   a potential competitive bidder has less than two days to put in

14   a competing bid.  We have heard no testimony whatsoever, no

15   evidence whatsoever as to who else the debtors have talked to

16   in the weeks and months leading up to this crisis, what other

17   bidders were out there, what opportunities other bidders were

18   given to obtain confidential information.  So the fact that

19   there's not -- they've taken out the no-shop clause isn't

20   sufficient.  And I understand, I'm not arguing, Your Honor, at

21   this point because I understand Your Honor has ruled that we

22   are going to go forward today at today's hearing on the

23   approval of the bidding procedures.  But we think the bidding

24   procedures themselves are inherently unreasonable.  One of the

25   provisions in the bidding procedures is that the debtor cannot

1  recognize a competing bid unless it's a "superior proposal".

2  And that's a defined term. And one of the things that makes a

3  competing bid a superior proposal is that it's for at least

4  1,875,000,000 dollars. And you heard Mr. Miller explain how

5  they got to that number. They took the Barclays base bid of a

6  billion seven. They added on the hundred million dollar

7  breakup fee, the up to twenty-five million dollar expense

8  reimbursement and then a little big of fifty million dollars on

9  top of that. The problem we have with that is the starting

10 point.

11       The purchase agreement does not provide that Barclays

12 is going to pay a billion seven hundred million dollars for

13 these assets. It provides that it's going to pay 250 million

14 dollars plus an appraised value for the company's headquarters

15 and two data center located, I think, in the state of New

16 Jersey. There is nothing in the papers that suggests how much

17 the building is worth or how much the data services are worth.

18 There's nothing in the papers that suggests what the appraisal

19 process will be, when it will be, how long it will be and

20 what's the mechanism. So, how in the world or why in the world

21 should the Court establish 1,700,000,000 dollars as the

22 Barclays bid. We have no idea as we sit here today other than

23 the debtors' representations that they think the Barclays'

24 proposal will turn out to be 1,700,000,000 dollars. So to

25 force a competing bidder to take that on faith and have to

1   compete by putting up not only the 1,700,000,000 dollars but an

2   additional 175 million dollars on top of that, we think is

3   unreasonable and was calculated to ensure there would be no

4   competing bids.

5   The bidding procedures provide that should a

6   competitive bidder make a "superior proposal", the debtors are

7   required to give Barclays forty-eight hours of notice so

8   Barclays can figure out what it wants to do with respect to

9   that competing superior proposal.  Well, forty-eight hours

10  doesn't work with the debtors' time frame.  So I don't know if

11  Barclays is willing to accept less notice or the debtors'

12  intent to extend the sale hearing.  But their own provisions,

13  their own bidding procedures, don't work.

14  I understand, Your Honor, that the proposed September

15  18 deadline, tomorrow, to file objections has been removed.

16  And we think that's a good thing.  The bidding procedures also

17  provide for matching rights.  It's not clear the way they get

18  to that but they provide that Barclays has the absolute ability

19  to match any bid.  It doesn't have to beat any competing bid;

20  it only has to match it.  And that's always been a sore point

21  in bidding procedures.  And we suggest that the matching

22  ability granted to Barclays is inappropriate and was designed,

23  once again, to chill competing bids.

24  For the very same reason that I talked about before

25  about what the Barclays bid really is, we don't understand the

1    calculation or the appropriateness of the breakup fee.  We

2    don't know how much cash is actually going to be transferred

3    from Barclays to the debtors when this transaction closes or if

4    this transaction closes.  And I do agree with Mr. Despins that

5    calculating the breakup fee as a percentage of the

6    consideration should definitely not include cure costs or saved

7    severance costs because that's not going to the debtors'

8    estate.

9          So I think, one, it's impossible to determine whether

10   the proposed breakup fee of a hundred million dollars

11   represents two percent, four percent, twenty percent.

12         THE COURT:  It doesn't represent twenty percent, I

13   don't think.

14         MR. GOLDEN:  Well, Your Honor --

15         THE COURT:  But I hear you.

16         MR. GOLDEN:  A couple more points, Your Honor.  And I

17   know there's probably a lot of other people -- we understand

18   how fragile the situation is.  And we don't stand here today

19   trying to scuttle the Barclays proposal.  But Barclays, as the

20   proposed bidder, has dictated the time frames here.  They have

21   dictated that the hearing must be Friday and that the absolute

22   closing date must be, I think, September 23.  Everybody talks

23   about a melting ice cube.  But there's just been no evidence,

24   no testimony, no anything other than attorney representations

25   as to the parade of horribles that would happen if there was

1  not the typical notice that you would have for a transaction of

2  this size.  And maybe there is no typical notice for a

3  transaction of this size because there aren't many transactions

4  of this size that are generally approved by the bankruptcy

5  court.

6          THE COURT:  I think this is the first precedent

7  actually.

8          MR. GOLDEN:  Right.  But give some reasonable notice

9  under the circumstances.  We understand we're up against the

10  wall here.  But that's not a problem of the creditors' making.

11  We weren't the ones who dictated the time frame for the Chapter

12  11 filing or for when they filed the motion for the sale or

13  when they filed the motion for the bidding procedures.  And I

14  understand it may have been outside of everybody's control.  Or

15  certainly not within the total control of the debtors.  But,

16  Judge, give the creditors a break here.  I mean, we need --

17  this is a big part of the debtors' asset base.  We want to

18  ensure that if it's going to be sold to Barclays under this

19  proposed transaction that the debtors' estates are getting a

20  fair price for it.

21          There are some that suggest the building alone, the

22  headquarters on Seventh Avenue, may be worth as much as

23  Barclays is prepared to bid.  We need to allow some shortened

24  but reasonable time frame to let this process play out so as to

25  determine with finality, so that nobody looks foolish, nobody's

1    embarrassed and that at the end of the day, everybody can say

2    we did the best we could under the circumstances, we got a

3    reasonable price for these assets and that nobody was taken

4    advantage of.  Because if you read the bidding procedures as

5    drafted, if you understand the time frames as demanded by

6    Barclays and you understand the companion DIP motion which we

7    haven't even gotten to and presumably won't get to Friday, we

8    are very concerned that we will never know with certainty that

9    the estates were being fairly treated by this transaction.

10          We don't think we're asking for extraordinary relief.

11          THE COURT:  What are you asking for?

12          MR. GOLDEN:  Well, we are asking for an amendment of

13   the bidding procedures to deal with the issues I've raised

14   already.  And we are asking for some modicum of time passed

15   Friday so that we can determine so that the committee, which

16   was just formed, presumably they've hired a financial advisor,

17   let the financial advisor speak to Lazard.  Let the financial

18   advisor determine is there a third party out there that's

19   actually willing to compete for this transaction.  Because

20   this -- with the glare of all the publicity that has shone down

21   upon this company over the last weeks and months, the last

22   thing we should be doing is going to a rush to judgment just to

23   get this asset off the blocks.  Thank you, Your Honor.

24          THE COURT:  Thank you.  Mr. Mason?

25          MR. MASON:  Thank you, Your Honor.  Richard Mason,

1  Wachtell, Lipton, Rosen & Katz for JPMorgan Chase Bank.  Your

2  Honor, I'll be very brief.  I've heard counsel to the committee

3  and counsel to the ad hoc note holders.  I believe, although I

4  haven't had the opportunity in this world to confirm this, that

5  my client might actually be the largest creditor of these

6  estates.  I think, as Your Honor had heard yesterday, we

7  provided clearing advances starting on Monday for the

8  operations of the broker-dealer in the amount of eighty-seven

9  billion dollars.  As of Tuesday, I think it was fifty-one

10 billion.  I don't know what it is today but it's tens of

11 billions of dollars.

12      So I think our client is fundamental, in terms of

13 financing, to the operations of the broker-dealer.  As Your

14 Honor knows, we have a guaranty claim against the holding

15 company secured by certain holding company assets or a secured

16 creditor in both places.

17      And what I could say about the timing, Your Honor, is

18 that I think, and I'm pretty sure my client thinks, that it is

19 urgent.  I do believe that this is, as Mr. Miller has said, an

20 extraordinary situation.  There is extreme sensitivity about

21 the timing of the sale hearing on Friday for some reasons that

22 we'll discuss with SIPC and the Fed, but it has to be carefully

23 coordinated such that if a sale hearing happens on Friday and

24 there's a bankruptcy of the broker-dealer prior to that time,

25 we need to make sure that the broker-dealer is financed and

1 that we're protected.

2     I know that in a normal circumstance a couple of

3 days' additional notice here and there for a sale hearing is

4 quite ordinary. I would be highly concerned, Your Honor,

5 although I'm not an expert in these matters, that if we're

6 trying to close a transaction on any day other than a weekend

7 day, it may be extremely difficult to do that. So that, I

8 think, might be one consideration that Your Honor would have

9 with respect to postponing a sale hearing, if Your Honor were

10 inclined to do so.

11     With respect to the process, given a recognition of

12 the urgency, we think it is quite incumbent upon the debtor,

13 and we understand that everybody has been working extremely

14 hard and it's been literally one long day for all of us since

15 Thursday, Friday or Saturday, but I think it's incumbent upon

16 the debtor, SIPC, the Fed and Barclays to get together in a

17 room with us in some fashion so that we can make sure, at least

18 as a process and financing matter, that if a closing is going

19 to happen on Friday or Saturday or Sunday, that it happen very,

20 very smoothly so that the operations are not interrupted. And

21 we're fully prepared, and I'm sure everybody else is prepared,

22 to do that.

23     With respect to the contract itself, Your Honor, we

24 very much appreciate your statement that objections can be,

25 frankly, lodged at the sale hearing. We'll give the debtor a,

1    as I tried to do before, before today's hearing, a condensed

2    notice of what our issues are.  I'm sure we can work them out.

3           Just very quickly, among other things, we have a lien

4    on assets of the broker-dealer securing their tens of billions

5    of dollars in advances.  And there's no clear statement in the

6    asset purchase agreement that once the assets are sold free and

7    clear really and we actually get paid there's a provision for

8    the sale and assignment of purchase contract.  It would seem to

9    violate the provisions of the Bankruptcy Code that allow

10   parties to financial contracts, repos and the like to terminate

11   those contracts.  I don't think that that was what was

12   intended.  But there's an issue there.  And the purchase

13   contracts really aren't even identified so people -- we're

14   going to be concerned about what's being assumed and what's

15   being left behind.

16          So hopefully we can work out all of these issues.

17   I'm sure we can.  I think we all really need to work as quickly

18   as we have, unfortunately, in the past couple of days to try to

19   come to closure on these issues and, if Your Honor is to

20   approve a sale, to make sure that it actually happens very,

21   very smoothly.

22          THE COURT:  I appreciate your remarks, but let me ask

23   a clarifying question.

24          MR. MASON:  Yes, Your Honor.

25          THE COURT:  On behalf of your client, recognizing

1    that you have reserved rights and talked about a process of

2    smooth coordination, do you have any objection to the bid

3    procedures?

4             MR. MASON:  No, sir, Your Honor.  I want to make that

5    clear.  I have no objection to the bid procedures --

6             THE COURT:  Fine.

7             MR. MASON:  -- or to the break-up fee.

8             THE COURT:  Fine.  Just wanted to be clear on that.

9    Mr. Bienenstock?

10            MR. BIENENSTOCK:  Good afternoon, Your Honor.  Martin

11   Bienenstock, Dewey & LeBoeuf.  I'm here representing several

12   clients not part of the group, just several clients:  One is

13   Royal Bank of Scotland, which is a committee member; for

14   various reasons we discussed with the U.S. Trustee we're about

15   to start participating but have not so far; Bank of New York,

16   other than in its indentured trustee capacity; and The Walt

17   Disney Company.

18            The concerns that overlap all three go to Your

19   Honor's issue of due process and the break-up -- or the sale

20   procedure order in general.  The nature of our claims, Your

21   Honor, and when I say "our" I mean all three clients I've

22   mentioned, is that we've done business, we've done trades with

23   subsidiaries of Lehman Brothers Holdings, direct or indirect.

24   There are losses in those trades, mostly now closed out, and we

25   have the guaranty of Lehman Brothers Holdings, unsecured

1   guaranty, backing up most of those losses.

2        So we have claims against subsidiaries that are

3   nondebtors, and we have a claim against the debtor.  Royal Bank

4   of Scotland -- its claim, for instance, its gross claim on the

5   guaranties is between 1.5 and 1.8 billion.

6        The fundamental reason why I rose is to address the

7   due process issue of notice and hearing.  It's implicit in both

8   that we're supposed to know what has been noticed and what is

9   being heard.  And, again, through no fault of anyone, given all

10  of the exigencies that the debtor has explained, we found it,

11  at least during the hours we've had today, impossible to know,

12  from this asset purchase agreement, what the deal is in a way

13  that particularly affects us, specifically, is the debtor

14  selling assets of subsidiary nondebtors and saying to my

15  clients, who are creditors of the nondebtor subsidiaries, you

16  shall have no claim against Barclays, the purchaser, under

17  theories of successor liability, fraudulent transfer or

18  otherwise?  Is it saying that?

19       And while I, in particular, very much appreciate the

20  offer to spend long hours with Mr. Miller's partners, it's

21  something I've done, and they're wonderful, what they say can't

22  change what this document says.  This document talks about

23  purchased assets, excluded assets, excluded liabilities.  And

24  then when you get into -- we'll call it the fine print, there

25  are parts of this document that says they can leave behind

1    contracts of subsidiaries.

2         Well, presumably, the ones that we have claims on

3    that resulted in lawsuits for my clients they would leave

4    behind.  Or maybe not.  Maybe they want to pay them.  I don't

5    know.  And I don't think there's anything the debtor's lawyers'

6    partners can say that -- I mean, it depends what the document

7    says.  And this document doesn't -- read at its face it would

8    seem to say they can leave behind what is owed to my client,

9    those contracts, and we'll have no claim over it.

10         Now, if they're affecting a claim of my client

11   against a nondebtor subsidiary that it has against the

12   nondebtor subsidiary and would like to assert against the

13   nondebtor purchaser, two third parties who are nondebtors, it

14   creates Article 3 issues, Constitutional issues, whether Your

15   Honor can even hear that relief, grant that relief.  We need to

16   know the answer, and the only way we'll know it is whether they

17   basically change the language to make it clear.

18         Now, one way they can do it is very simply to say

19   notwithstanding anything in this agreement or the proposed

20   order, nothing herein shall impair, release, extinguish claims

21   of creditors against the nondebtor subsidiaries and against the

22   nondebtor purchaser.  We would like that.  That would clear it

23   up quickly, and maybe if I thought a bit longer I'd slightly

24   change the language, but that's the notion.

25         But we have to know what Your Honor is being asked to

1    approve on Friday, or whenever this hearing is.  And this

2    agreement, as it's written now, really creates things that we

3    would submit Your Honor doesn't even have jurisdiction to

4    grant.

5         Now, I want to point out emphatically that none of

6    the clients I'm here for today have decided to oppose or to

7    support this deal.  We want to understand it first of all.  We

8    think the Court needs to understand it to know if it's going to

9    have jurisdiction to approve it.

10        And bottom line:  I think it's hard for me to imagine

11   that there should be one-offs of different creditors, parties-

12   in-interest of having different and probably overlapping

13   questions with the debtor's attorneys.  Perhaps there could be

14   a session, as was done, for instance, in the Enron case.

15   Everyone was invited to speak to the real business parties to

16   ask their questions, to get them answered in a huge conference

17   room, so that we could at least understand what's going on

18   here.

19        That's fundamentally why I had to rise.  Separately,

20   I do want to say that Royal Bank of Scotland completely

21   supports the creditors' committee position.  There are

22   questions we have about the price that go beyond -- that even

23   go beyond, but I don't want to take the Court's time to get

24   into that.  The Court probably knows what it wants to do on the

25   break-up fee and all.

1          And on the question of sympathies, if I heard the

2     debtor correctly, the debtor said if this isn't approved Friday

3     the employees are out the door.  Well, if the employees are

4     saying to the rest of us they're leaving unless they get this,

5     we think that certainly changes the sympathies.  We don't

6     really think -- we'll be pleasantly surprised, hopefully.  We

7     don't really think the circumstances that exist allow for

8     competing bids.  I mean, in this magnitude, serious companies

9     have to study the company, labor over the contract, talk to the

10    key employees.  We don't think it's realistic in this short

11    time that's going to happen.  The fact that Lehman was in the

12    press for a long time doesn't change that.  Maybe we'll be

13    pleasantly surprised, and we hope we are.

14         We think the real question for the Court, whenever

15    this is heard, is go or no-go.  It's based on the price, as was

16    already explained.  And then when you look at getting in a

17    billion-seven hopefully -- but how much cash are you turning

18    over?  Some press reports are talking in the billions.  And why

19    is the company now wanting to borrow after turning over

20    billions?  Why doesn't it just turn over less?  That would

21    bring down the purchase price.

22         I mean, none of these questions are answered in the

23    papers.  And, again, not to point fingers but they're just not

24    answered.  And you can't have due process unless you know

25    what's being heard.

1          So, fundamentally, we would like all of the

2    businesspeople who have the answers to be available, not only

3    tomorrow but whenever this hearing is held, as witnesses so

4    that we can at least find out what the Court's actually being

5    asked to grant.  Thank you.

6          THE COURT:  Thank you, Mr. Bienenstock.  Are there

7    others who wish to be heard?

8          MS. THOMAS:  Your Honor?  This is Stephanie Thomas on

9    behalf of the Pension Benefit Guaranty Corporation, on the

10   phone.  I'd like to speak if everyone else there is done.

11         THE COURT:  I can't tell if there's anybody else live

12   in the courtroom who wishes to be heard, but you have the

13   floor, so go right ahead.

14         MS. THOMAS:  Okay.  Thank you.  PBGC is here today

15   because the lead donor in this case sponsored the pension plan.

16   The other pension plan owners, LBI, employs about nine or ten

17   thousand of the currently -- there's currently thirteen

18   thousand active participants.  And LBI employs nine to ten

19   thousand of them.

20         It appears to us, from reading the asset purchase

21   agreement, that Barclays -- while they're hiring these

22   employees, they don't appear to be assuming the pension plan or

23   the pension liabilities related to these employees.

24         And Your Honor noted a little bit earlier that one of

25   the considerations in valuing an offer is to include the values

1   of liabilities assumed in the transaction.

2           We would like to just request that, in the event that

3   another bid comes in that is willing to either assume the

4   pension plan or the part of the pension plan attributable to

5   these employees, that the value of that, the value of the claim

6   that's being saved from PBGC having to terminate the plan would

7   be counted as part of that offer.

8           THE COURT:  Request noted, and I'm sure that that's

9   something that will either be acceptable or not acceptable from

10  the perspective of the parties to the transaction.

11          MS. THOMAS:  Thank you, Your Honor.

12          MS. LEVENTHAL:  Good afternoon, Your Honor.  Shari

13  Leventhal for the Federal Reserve Bank of New York.  Your

14  Honor, the issue, as we see it here, is a timing question:  How

15  quickly can this be done?  And, with due respect, many of the

16  arguments that have been raised, we believe, are more

17  appropriate for Friday's sale hearing.

18          THE COURT:  It's a useful preview for me, though.

19          MS. LEVENTHAL:  Yes.  At the New York Fed, we, like

20  many in this courtroom, have been working around the clock

21  since before last weekend.  And as was widely reported in the

22  press, we started working around the clock in an attempt to

23  find a purchaser for Lehman.

24          And the sale process was widely reported, and what

25  was also widely reported is that there weren't that many

1    possible bidders.  The number is very small.  The number that

2    met the requirements in terms of financial capability and

3    regulatory qualifications -- we're not talking twenties, tens

4    even.  We're talking one or two.

5         We believe that the timeliness here is -- the time

6    line that's been in place here is what is necessary, what is

7    required under these very, very unique circumstances.  We're

8    looking, in terms of our mandate, at financial stability here,

9    and it is vitally important that this transaction go forward as

10    quickly as possible in order to preserve the financial

11    stability that, at this point, is already very fragile.  Thank

12    you, Your Honor.

13         THE COURT:  Thank you.

14         MS. BAMBACH:  Your Honor, I'm Alistaire Bambach.  I

15    am the chief bankruptcy counsel for the Securities and Exchange

16    Commission in New York.  I'd like to make a few comments about

17    timing and the importance of the transaction.  With me today is

18    my colleague, Dan Gallagher, who is the deputy director of our

19    Trading and Markets Division, who can address -- who can answer

20    questions specifically about the timing issue here.

21         As you are aware, the commission has a statutory

22    obligation to protect both the customers of the broker-dealer

23    and the public investors at the holding company level.

24         We strongly support this very, very important

25    transaction.  It is in the strong interests of the investing

1  public.  We have worked hand in hand in glove with the debtor,

2  with Barclays, and with the Fed to try to facilitate this

3  transaction over the last week or so.

4      We are hopeful that the transaction will move as

5  smoothly as possible in light of the many questions that have

6  been raised here today, but I think it's important that Your

7  Honor understand some of the timing issues that confront us,

8  confront the Fed and confront the debtor as we move forward.

9  And I'd like Mr. Gallagher, perhaps, to assist me in that, if I

10 may.

11     MR. GALLAGHER:  I've been part of the team that's

12 been here with the Fed working hand in hand since late last

13 week and indeed with our chairman, sleeves rolled up, trying to

14 facilitate the deal that was on the table and then later

15 turning to this proceeding and trying to work with the

16 Securities Investor Protection Corporation, the firm, the Fed,

17 the CFTC to get this to a point where the firm would be in a

18 position to still be available Friday afternoon for a sale,

19 that has required extraordinary efforts by everybody involved

20 by the firm, Lehman Brothers, by their employees and the

21 regulators.

22     And I'm here not with a commission mandated statement

23 because, indeed, given the circumstances, we haven't gotten

24 formal commission approval even to be here, although they know

25 we're here.  But we're here to just deliver the message that we

1  think it's critical for this to happen by the end of this week

2  also.

3         So I would support all of the comments already made

4  by my colleague at the Fed and my colleague from the

5  commission.

6         THE COURT:  Thank you very much.  Does the U.S.

7  Trustee wish to speak?

8         MS. ADAMS:  Yes, Your Honor.  Thank you, Your Honor.

9  Diana Adams, United States Trustee.  Obviously, we're cognizant

10 of the unprecedented events that have been going on of the many

11 aspects of this case and the people involved and the

12 constituencies involved.

13        The constituencies are well represented in this

14 courtroom.  The regulatory agencies that have just spoken to

15 the Court have seemed to have had the closest observation and

16 information as to the timing and what has been going on in the

17 past weeks.  And I believe I have heard nothing that would

18 persuade me that they are not correct in their assessment of

19 the situation.  And taking into account all of the

20 sensitivities that I know everybody in this room is well aware

21 of, we do support the position of the debtor in this case and

22 the regulatory agencies, Your Honor.

23        THE COURT:  Thank you.

24        MR. DESPINS:  Your Honor, please.  I just had one

25 additional matter before Mr. Miller responds to all these

1    things.

2         THE COURT:  Okay.  I think, just in the interest of

3    good order, for future reference, without cutting anybody off,

4    I think we should have one opportunity for parties to express

5    whatever they have to express.  And I'm going to give you a

6    mulligan.  You can do it one more time.

7         MR. DESPINS:  Of course, Your Honor.  But as we

8    explained when we were retained, now an hour ago --

9         THE COURT:  I understand, and you told me at the

10   outset that it was a little disorganized because of the

11   lateness of your retention, and that's fine.  I'm just mindful

12   of the fact that this courtroom is packed and also --

13        MR. DESPINS:  I understand.

14        THE COURT:  -- extraordinarily warm.

15        MR. DESPINS:  Okay.  So I'll be brief.  The DIP is

16   not before you right now but there is a link --

17        THE COURT:  I think it is.

18        MR. DESPINS:  No, no, but I'm saying it's not -- you

19   are not considering that right now.  You'll consider it later

20   but --

21        THE COURT:  Well, I guess it depends on how you

22   define "now".  It's here before me today.

23        MR. DESPINS:  Correct, but there is a provision in

24   the DIP document that says that if this agreement, meaning the

25   Barclays purchase agreement, is terminated by Barclays, the DIP

1    becomes due and payable.

2         So you could have a situation where -- let's assume

3    Your Honor, on Friday, decides "I'm not going to approve this

4    transaction at this time," what would happen is that if you

5    approve the DIP today the fees would be due, payable, etcetera,

6    and you would have to repay all of that plus the fee because

7    you didn't approve this transaction.

8         So I think it's important.  It's one of these chorus

9    of provisions that you should be aware of.  It's not -- again,

10   we're not discussing the DIP right now but it's linked to this

11   agreement, and I want to make sure you were aware of it.

12        THE COURT:  I appreciate your pointing that out but

13   as you also pointed out, we're not discussing the DIP right

14   now.

15        MR. WASSERMAN:  Your Honor, I'm Robert Wasserman, and

16   I am associate director in the division of Clearing and

17   Intermediary Oversight of the Commodity Futures Trading

18   Commission and also bankruptcy counsel for the commission.  And

19   I just wanted to add that, in the interest of the futures

20   markets as well, this is a situation that really should be

21   dealt with as quickly as possible and that I support the

22   representations of my colleagues at the Fed and the SEC.

23        THE COURT:  Fine.  Mr. Miller, you're on again.

24        MR. MILLER:  And, Your Honor, please, first, just to

25   alleviate the concerns of the PBGC, I am told, Your Honor, that

1 the pension fund is fully funded and there is no minimum

2 contribution that is due.

3 Your Honor, in listening to the presentations by the

4 various representatives of the creditors, they seem to have

5 lost cognizance of one thing: This debtor doesn't have any

6 money to operate without the total cooperation of JPMorgan

7 Chase, which settles those trades every night, which gives rise

8 to a liability of enormous proportions but which we don't have.

9 They have not taken into account, Your Honor, that just as of

10 yesterday there was a question as to whether we had enough

11 payroll to get through the day. And every single day as the

12 trades settle, there is a question as to whether we're going to

13 be short or we're going to be long.

14 This is not a Garment Center firm where you can sit

15 by and just wait while everybody goes out and looks for

16 bidders. This is an organization that, because of the

17 circumstances surrounding the filing, Your Honor, has no money.

18 It doesn't have the funds to operate without borrowing, and

19 who's giving the borrowing, Your Honor? Barclays. It's not an

20 eleemosynary institution. They're here to buy an asset, like

21 everybody else, and they're willing to support the debtor with

22 the DIP so they can get to a closing. That's a significant

23 thing, Your Honor.

24 So what -- Mr. Golden says we have plenty of time.

25 We don't have plenty of time. If this transaction goes away

1    Friday night, there is no more funding of anything, Your Honor.

2           We have a company, Barclays, which is supporting the

3    operations of LBI right now with a repo credit agreement so

4    they can settle the transaction.  We don't have any sources of

5    funds, Your Honor.  Nobody is sending cash to Lehman in the

6    settlement of the trades.  They're demanding cash, yes.  And

7    people have completely ignored out of this purchase price --

8    the biggest portion of this purchase price, Your Honor, goes to

9    the holdings corporation.  That will give the holdings

10   corporation funds to administer the remainder of the assets.

11          Now, I'm a little bit shocked, having practiced with

12   Mr. Bienenstock for years, that he doesn't understand an

13   agreement.

14          THE COURT:  Oh, he understands an agreement.

15          MR. MILLER:  I think so.  I think so.  As far as --

16   we have a very large conference room, Your Honor.  We could sit

17   down with a hundred lawyers or more.  We'll bring the

18   businesspeople.  That's not the problem, Your Honor.  We said

19   we would do that, and we will do that.  But what I want to

20   emphasize, Your Honor, is we have a problem with operations.

21   We don't have the funds.  It's as simple as that.

22          THE COURT:  Well, I'm going to cut through this at

23   this point.  I think that I've heard substantially all the

24   arguments that could be made at a time like this about this

25   extraordinary transaction.  And I think I've heard enough.

1          MR. MILLER:  Thank you, Your Honor.

2          THE COURT:  I believe that the work of lawyers, even

3     the best lawyers, under the pressure of time, necessarily is

4     imperfect but that the work product that has been created under

5     great pressure relating to the proposed sale of Lehman

6     Brothers' LBI asset to Barclays represents a transaction that

7     should be heard on the merits.  We are not hearing whether or

8     not this transaction should be approved today.  We are dealing

9     with a procedural bridge to a hearing to take place on Friday

10    afternoon.

11         I am satisfied, based upon what I have heard from

12    debtor's counsel, counsel for the various regulatory agencies,

13    JPMorgan Chase and others who recognize the critical timing

14    imperative that drives today's agenda, that this bid procedure

15    package, to the extent it can be improved, perhaps it can be,

16    but this bid procedure package, in one form or another, must be

17    approved today.

18         And I am bench ordering that it is approved subject

19    to such adjustments as may be required to accommodate some of

20    the changes that I've heard about only orally based upon

21    comments made that there are various changes.  So the documents

22    in their form to be approved need to catch up with the

23    representations that have been made on the record.

24         The break-up fee has become a subject for discussion,

25    in part because it goes to the question of whether or not the

1    amount of the bid procedure relative to the fair notional value

2    of the transaction is so disproportionately large relative to

3    market that it shouldn't be approved as is.  Mr. Golden made

4    the point in his remarks that it could be as much as twenty

5    percent.  I, on the spot, disagreed with him.  But what it does

6    point out is something that I think is apparent to everybody

7    who's observed this:  It depends on how you count.

8          I'm not worrying about this as a percentage

9    transaction.  Given the circumstances that brought us to this

10   point, I recognize that this was a negotiated number, not

11   necessarily designed to encourage bidding but a number which

12   nonetheless represents, depending on how you count, a

13   percentage that may be within market.

14         More importantly, while I would welcome the

15   opportunity to preside over a hearing in which some third party

16   within the class of one or two that may be in the zone of

17   potential purchasers for these assets, this is, for all

18   practical purposes, a private sale.

19         And while I don't mean to suggest that the notion of

20   bid protections and higher and better bids represents an

21   unreasonable, unrealistic or fanciful notion, I'm also

22   satisfied, based upon what I have heard, that there is

23   effectively one logical purchaser for these assets.  That

24   purchaser has already identified itself, has been identified

25   publicly to the markets, has been identified publicly to the

1    employees and represents the continuity for this operation.

2        Those lawyers recently engaged by clients who would

3    seek to convert today's hearing into an opportunity for a more

4    traditional bid procedure, I think, missed the point.  This

5    deal is the deal to be approved up or down on the merits when

6    we have a hearing on Friday.

7        If there is a surprise, and the events of the last

8    several weeks suggest to me that surprises are possible, and we

9    actually have another transaction to consider that is more

10    favorable and it's possible for that transaction to be approved

11    and to take place on what amounts to turning on a dime, the

12    smallest currency we'll ever hear in this case, I'm prepared to

13    allow for that possibility.

14        But I think we need to confront the realities of

15    today's hearing with a dose of reality.  This is the

16    transaction that will allow for continuity of operation, absent

17    some extraordinary event.

18        The debtor will have a burden at the time of the

19    approval hearing to demonstrate the benefits to the estate

20    associated with the transaction.  The committee will have a

21    full opportunity, as will other parties in interest, to address

22    the merits of the transactions, whether or not it represents

23    optimal value for all parties in interest.  I recognize that

24    there are constituencies represented here that may not have

25    purely aligned interests, but it's also true that the employees

1   of this enterprise are parties-in-interest, that the value they

2   represent, in combination, well managed, provide services of

3   enormous value to the world economy.  And I'm paying attention

4   to that.

5           As to the specifics of the bid procedures, to some

6   extent we are dealing with an adhesion contract.  This is a

7   transaction that was negotiated by others and is being

8   presented in public.  It's a nonnegotiable deal.  I accept

9   that.  If the circumstances were different, I might push back.

10  I'm not pushing back today.

11          Accordingly, I'm prepared to approve the bid

12  procedures, and I'm also prepared to suggest, since it's now a

13  minute past 6 and we have a large courtroom of people, some of

14  whom have been here since my 2:00 calendar today, that we take

15  a break in the action, assuming that we can all appropriately

16  reconvene in a timely way.

17          And just given the number of people involved, and

18  maybe the number of people who need to also confer, I'm going

19  to suggest a twenty-minute break.  And I'll adjourn until 6:21,

20  22, more or less.  We're adjourned till then.

21      (Recess from 6:04 till 6:59 p.m.)

22      THE COURT:  Please be seated.

23      MS. SCHWEITZER:  Good evening, Your Honor.  I'm Lisa

24  Schweitzer from Cleary Gottlieb Steen & Hamilton, representing

25  Barclays.  I understand we're now turning to the DIP motion.

1    In connection with the DIP agreement, Barclays and the debtors

2    have also entered into a separate letter that contains the fees

3    related to the DIP, and it also contains certain terms related

4    to a potential syndication of the DIP.

5            And as is customary or frequently done in these

6    situations, the parties agreed that we would share the terms of

7    those letters with the U.S. Trustee, the creditor committee.

8    And I hope that Your Honor has been given a copy of those.

9            THE COURT:  I don't have it yet.

10           MS. SCHWEITZER:  Okay.  I understand it was being e-

11   mailed to you or to chambers.  I'm sorry, a copy just went in.

12   I apologize.  We're very short of copies right now, so -- Your

13   Honor, may I approach?

14           THE COURT:  Well, I guess that keeps it confidential,

15   doesn't it?

16           MS. SCHWEITZER:  Yes.  May I approach, Your Honor.

17           THE COURT:  You may.  What about it?

18           MS. SCHWEITZER:  So, in terms of this, what we had

19   discussed with the debtors is the contemplation that we have

20   presented to these entrusted parties, namely, the creditor

21   committee and the United States Trustee and Your Honor.  And

22   the creditors' committee has raised certain concerns and

23   objections to the fees that are being proposed in connection

24   with the -- in the DIP, and --

25           THE COURT:  Well, the fees aren't confidential, are

1    they?

2         MS. SCHWEITZER:  Well, these -- the terms of the fees

3    are --

4         THE COURT:  Why should they be?

5         MS. SCHWEITZER:  Well, we would say that these are

6    competitively sensitive and also secondarily to fees --

7         THE COURT:  I'm sorry.

8         MS. SCHWEITZER:  But --

9         THE COURT:  I'm sorry.  It's a material term of the

10   DIP facility.  This is a public hearing.  I can understand

11   certain terms and conditions of the letter itself being

12   confidential but the amount of the fees?  I'm sorry.  That's

13   part of this record.

14        MS. SCHWEITZER:  I understand, Your Honor.  We would

15   intend to make it part of your record, and what we had proposed

16   is that the terms will be filed under seal.  The second thing

17   that's in the --

18        THE COURT:  Well, then you should have sought to file

19   those terms under seal before this hearing started.

20        MS. SCHWEITZER:  Your Honor, we had contemplated

21   that, and we -- I apologize that we hadn't done that.

22        THE COURT:  This isn't about apologies.  It's about a

23   public hearing on incredibly short notice with giving everybody

24   who's interested in this very important transaction a fair

25   understanding of the essential economic terms.  That's

1    different from a confidential fee letter.  And I feel very

2    strongly that you're in the fishbowl of bankruptcy and it needs

3    to be disclosed.

4         MS. SCHWEITZER:  Okay, Your Honor.  Just to point out

5    to you, the second set of terms that are in the fee letter are

6    certain terms related to the syndication.  And we had felt that

7    it was in the interest of the debtor as well as the lender to

8    keep those terms confidential because, in fact, if this

9    syndicated that could affect the ability to syndicate the loan.

10        THE COURT:  I'm perfectly sensitive to the need to

11   keep certain terms and conditions of this document, which I

12   have not yet read, confidential to the extent that it

13   constitutes proprietary commercial information properly to be

14   sealed under Section 107, but there's been no showing yet that

15   any of that is true.

16        And as to the amount of fees payable in connection

17   with the transaction, it seems to me that's fair for reasonable

18   debate.  And I'm trying to find out what you're trying to keep

19   confidential.

20        MS. SCHWEITZER:  Um-hum.  Well, I think that one of

21   the reasons that this loan is different than other loans is

22   that this loan is secured by one asset, which is the stock of

23   Neuberger, as opposed to a blanket on all of the debtor's

24   property.

25        THE COURT:  Um-hum.

1      MS. SCHWEITZER:  And so that this is a slightly

2   different loan than a typical loan.  It's more as if you were

3   making a margin loan.  And the pricing here is certainly --

4   many people would say margin loan pricing is competitively

5   sensitive and it would reveal, beyond just a DIP loan with

6   lender fees, that it's priced a different way.  And, certainly,

7   we feel this is a market term pricing, and we negotiate quite

8   heavily and painfully with the debtors to come to these fees.

9   But Barclays would view that as different than setting a

10  precedent for every instance, being that every DIP lender is

11  entitled to hide its fees.

12      What we had proposed, Your Honor, and I think that

13  the debtors and the creditor committee would be in agreement

14  with this, is that if we could have an initial conference with

15  Your Honor where the committee would be able to raise their

16  arguments, then that we could raise our arguments and explain

17  how this was priced.

18      THE COURT:  Doesn't work that way.  This is a public

19  hearing.  This is a public hearing, and absent a sealing order,

20  and there's no time for that, the world is entitled to know

21  what's going on here.  If I know it and it's not truly

22  confidential information, and there's been no showing that it

23  is yet, it needs to be disclosed.

24      Now, if we're going to have a mini-hearing as to

25  whether or not the items in this letter, in fact, constitute

1    confidential information within the definition of 107, I'm

2    prepared to do that, if necessary, but I also question why this

3    issue, as opposed to all other aspects of this DIP facility,

4    now becomes the gating issue for purposes of one of the most

5    important transactions any of us have ever dealt with.  Can't

6    we get into this?  And then if, in fact, it becomes relevant to

7    deal with the question of confidentiality and you wish to press

8    the issue, we can, either because the committee is in agreement

9    that it doesn't have to come in, and we can finesse the issue

10   that way, but if it's part of this record and it needs to be

11   confidential, you're going to have to make a showing, with

12   evidence, publicly as to why this is confidential, and I will

13   then make a ruling.  But otherwise, for purposes of this

14   hearing and for this entire case, we are not wiping out the

15   Bankruptcy Code.  We are simply dealing with an emergency DIP

16   hearing which happens in virtually every Chapter 11 case.

17          So we're now not talking about an emergency sale.  I

18   know it's connected.  We're talking about DIP lending.  And DIP

19   lending practice is governed by Rule 4001, Local Rule 4001-2

20   and by a set of procedures that involve public disclosure of

21   extraordinary provisions.  The fact that you are spending the

22   time that you have spent on this issue suggests to me this may

23   be an extraordinary provision.  Whether or not an extraordinary

24   provision should be kept confidential is something I deem very

25   serious, and I am not going to discuss it in a chambers

1    conference.

2         If it comes out, it'll be discussed on the record.

3    And if I conclude that it's confidential, we will then have a

4    confidential hearing in which I will, if necessary, clear the

5    courtroom.  But you're going to have a heavy burden to convince

6    me.

7         MS. SCHWEITZER:  Okay.  Well, that's understood, Your

8    Honor.  What I would propose, in light of the hour and the

9    circumstances and other things that are on the docket,

10   including the rest of the terms of the DIP, is if we could put

11   this to the end of the discussion of the DIP.

12        THE COURT:  Let's do that.

13        MS. SCHWEITZER:  Okay.

14        THE COURT:  I think that's a fine idea.

15        MS. SCHWEITZER:  Okay.  So I'll defer to the debtors

16   on the rest of the DIP motion, if you'd like.

17        MS. FIFE:  Yup.  Good evening, Your Honor.  Lori

18   Fife --

19        THE COURT:  Good evening.

20        MS. FIFE:  -- from Weil, Gotshal & Manges on behalf

21   of the debtors.  You've already heard that this is the largest

22   and undoubtedly the most complicated Chapter 11 case.

23   Nevertheless, and perhaps surprisingly, the DIP financing,

24   which the debtors seek approval of today on an interim basis,

25   is thankfully straightforward and uncomplicated.

1          THE COURT:  I thought that until now.

2          MS. FIFE:  I still think that, Your Honor.  The

3    debtor's management and its professionals have worked arduously

4    over the past weeks to develop a plan to consummate the

5    Barclays sale.  It maximizes the value of their estates in

6    extremely trying times.

7          Right now, their ability to consummate that sale

8    transaction, however, is contingent upon this Court's approval

9    of interim financing in the amount of 200 million dollars.

10   Without approval of the immediate ability to utilize the 200

11   million dollars under the proposed DIP credit agreement,

12   Lehman's operations may cease as early as tonight.  The

13   results, including on employees and the value of the estates,

14   would be catastrophic.  The debtors would lose substantial

15   benefits of the Barclays sale and likely would not be able to

16   realize on substantial other sales that perhaps will occur in

17   the future.  Ability to maintain the debtor's business

18   relationships with its customers, pay its employees and satisfy

19   its other critical operating expenses is essential to its

20   ability to survive.  But, as indicated, this is a simple loan,

21   so let me just turn to the provisions of the loan.

22         It is the -- Barclays is granted a superpriority

23   administrative claim and a perfected first-priority lien on

24   unencumbered collateral, which is basically the debtor's

25   ninety-nine percent membership interest in the stock of

1    Neuberger Berman, which is a subsidiary of the debtor, Your

2    Honor.

3         The proposed financing does not affect the rights of,

4    or the collateral position of, the debtor's existing pre-

5    petition lenders, and therefore we don't have to deal with

6    adequate protection, use of cash collateral, finding or

7    anything of that nature, Your Honor.

8         The debtor was unable to obtain funds on an unsecured

9    basis, and they were also unable to find funds on any other

10   type of basis and essentially was led to the Barclays financing

11   by virtue of the sale transaction.  They believe that the terms

12   offered by Barclays are significantly more favorable than any

13   terms that would have been offered by other lenders and that

14   such terms arise largely from the fact that Barclays is the

15   proposed purchaser.

16        The amount of the DIP is 450 million dollars, and it

17   consists of a 250 million dollar term loan and 200 million

18   dollar revolving credit facility.  Up to 200 million dollars is

19   the interim financing we are seeking.  The maturity date of the

20   loan is the earlier of six months after the closing date, the

21   termination of the asset purchase agreement and the

22   consummation of a sale of Neuberger Berman.  Of course, the

23   stock is the collateral and, therefore, if we sell the stock,

24   then we have to use the proceeds to pay off the DIP facility.

25        The interest rate on the loan is LIBOR plus six

1    percent for the first sixty days and LIBOR plus seven and a

2    half percent for the period thereafter, or base plus five

3    percent for sixty days and base plus six and a half.

4         THE COURT:  Does that increase in the interest rate

5    represent an intention on the part of the lender to encourage

6    refinancing or repayment within that period of time?

7         MS. FIFE:  Yes, Your Honor.  I think there's a belief

8    that the DIP financing will not be outstanding for more than

9    two months, actually.

10         THE COURT:  So it sounds like it's being priced like

11   a bridge loan.

12         MS. FIFE:  Yes, it is, actually.  A bridge to a sale.

13   The proceeds of the DIP credit facility can be used to fund

14   post-petition operating expenses, costs and expenses of the

15   administration of the Chapter 11 case, working capital, capex

16   and other general corporate purposes but in accordance with a

17   cash flow forecast.  There are variances, though, from the

18   forecast that the lender has allowed.

19         The DIP agreement has your typical covenants:  reps

20   and warranties, events of default, nothing that I would believe

21   are out of the ordinary.  I think that perhaps that one --

22         THE COURT:  The one that I think is out of the

23   ordinary --

24         MS. FIFE:  -- provision, Your Honor, that --

25         THE COURT:  -- is the one that I found involving Mr.

1    Marsal.

2             MS. FIFE:  Right.

3             THE COURT:  And maybe there are others but that's the

4    one I found.

5             MS. FIFE:  Yes, Your Honor.  I have seen that in

6    other DIP financings but during the break we consulted with the

7    lender and they've agreed to take that provision out.

8             THE COURT:  That takes care of it then.

9             MS. FIFE:  But I will tell you, we do intend to

10   retain Alvarez & Marsal.

11            THE COURT:  That's fine, and just so it's clear, I'm

12   not, for a minute, opposed to the notion of the retention of a

13   CRO, nor am I opposed to the retention of Mr. Marsal, with whom

14   I've had some dealings long in the past.  My concern, and I

15   just want it to be disclosed, was that, first, the fact that

16   this provision was in the loan agreement wasn't disclosed in

17   the motion.  I assume it was an oversight.  Second, it would --

18   approving the facility with that provision in it would have the

19   effect of removing the Court's discretion, which is not only

20   impermissible under the guidelines, or at least extraordinary

21   under the guidelines, but completely unacceptable to me.

22            MS. FIFE:  Um-hum.

23            THE COURT:  And so I want it to be very clear that,

24   and that's why I highlighted it, that I'm raising it not

25   because I have any concerns as to either the decision to engage

1  a CRO or to engage Mr. Marsal as the CRO but rather that it be

2  a limiting provision on my discretion and that also is was

3  included in the document in a way that I think material but not

4  publicly disclosed.

5      MS. FIFE:  I understand, Your Honor, and I do have to

6  apologize for not disclosing it in the motion.  As you gather,

7  I'm sure, we have all been working --

8      THE COURT:  You've all been dancing as fast as you

9  can.

10     MS. FIFE:  Yes.  And some people working with limited

11 facts, and it just was an oversight.  So --

12     THE COURT:  I understand completely.

13     MS. FIFE:  -- sorry for that.  I did want to address

14 Mr. Despins' question regarding the sort of cross-default and

15 an early termination.  It's not a cross-default but the

16 termination, the tie-in between the DIP financing and the asset

17 purchase agreement.  If, in fact, the asset purchase agreement

18 is not approved, we have thirty days after that date to

19 refinance the DIP facility.  And that is something, Your Honor,

20 that we negotiated very hard for.  The purchaser and the

21 lender, in this case the same party, really wanted that to be

22 an automatic termination and automatic repayment but we

23 insisted on getting at least thirty days to refinance.

24     However, in the event that we accept a superior bid,

25 then in that situation we do have to repay the loan right away.

1    But we believe that that was something that was fair because we

2    would take that into consideration in making a determination as

3    to whether it was a better --

4         THE COURT:  It'll be part of the exercise of the

5    business judgment to accept an allegedly superior deal.

6         MS. FIFE:  Exactly, Your Honor.  So hopefully that

7    addresses Mr. Despins' issues with respect to that provision.

8         There is a carve-out, Your Honor, of six million

9    dollars, which probably is small in this case but the

10   collateral is only the stock, so hopefully there'll be other

11   unencumbered assets from which to get paid.

12        And I don't believe that there are any other

13   provisions in the agreement that are particularly unusual.  So

14   what I would ask Your Honor is that you accept the statements

15   of Mr. Miller and myself as a proffer as to the circumstances

16   of the DIP financing.  And given the tragic events that have

17   enveloped this enterprise in this highly unfavorable business

18   environment, Lehman really requires the approval of this

19   interim financing to maintain the operations, pay its

20   employees, service its customers and preserve value for the

21   benefit of these estates or creditors and all parties-in-

22   interest.

23        We are trying to make the best of a bad situation,

24   and without this DIP financing the debtor's employees and the

25   business is at real peril.

1          I'm happy to answer any questions, Your Honor.

2          THE COURT:  A couple.  First, I'm prepared to accept

3     the proffer but it's a proffer of the testimony of which

4     responsible officer of your client?

5          MR. MILLER:  Presidents and chief operating officer,

6     Your Honor.

7          THE COURT:  Fine.  Is there any objection to my

8     accepting the proffer in lieu of taking testimony from that

9     witness?

10         MR. DESPINS:  Well, Your Honor, the proffer is that

11    we believe these are the best terms we could have that we could

12    have gleaned.  I mean, I really don't want to do this but they

13    haven't chopped this facility.  So if they want to admit that,

14    that's fine.  Otherwise, we'll put the witness on and --

15         THE COURT:  I believe they did admit that in the

16    motion papers.

17         MS. FIFE:  That's correct, Your Honor.  We --

18         THE COURT:  I think I saw -- I saw a clear indication

19    that --

20         MR. DESPINS:  But then I don't understand --

21         THE COURT:  -- while it wasn't chopped, it was

22    believed by the debtor that this was the best available

23    financing.

24         MS. FIFE:  That's --

25         MR. DESPINS:  Well, then, we'd understand the -- I

1    really don't want to do this but what is that belief based on

2    if they haven't talked to any other lenders other than the

3    entity making a bid for the assets?  And you'll see when we get

4    to the fees, Your Honor, but -- I know that these are extreme

5    circumstances, Judge.  We understand that.  But if we're going

6    to say that and everything goes, that's okay but the fees that

7    are being charged here are off the charts.  And so I don't know

8    how to proceed.  I really don't want to go down that path but I

9    think, Your Honor, if -- I don't know what the basis --

10          THE COURT:  By the way, there's no obligation to go

11   down that path.  I mean, this is your professional judgment,

12   that you feel the need to go down that path.  Whether that's a

13   smart thing do I leave to you.

14          But I'm just here to deal with this hearing as it

15   unfolds.  If you feel the need to deal with this in the

16   representative of your constituency, and if you think it's the

17   responsible thing to do, obviously, in your professional

18   judgment, you will do what you think is necessary and I'll

19   preside over the hearing that develops.  If you, after

20   reflecting, think that maybe it's not necessary, that's up to

21   you.  I'm not telling you what to do here.

22          MR. DESPINS:  Okay, Your Honor.

23          THE COURT:  I take it that's an objection to the

24   fees.

25          MS. FIFE:  I understand that, Your Honor.

1          THE COURT:  And I think it -- but I'm not sure if

2    it's an objection to the proffer.  I just want to --

3          MR. DESPINS:  Well --

4          THE COURT:  -- I just want to be clear --

5          MS. FIFE:  Right.

6          THE COURT:  -- procedurally whether or not we are now

7    going to have to call as a witness an officer of Lehman for

8    purposes of putting on the record background information

9    concerning the development of the DIP, alternatives to the DIP

10   and other fairly standard 364-type findings.

11         MR. DESPINS:  Your Honor, if they're willing to

12   stipulate that there was no attempt made to retain any other

13   DIP, that's the first point; the second point, that this

14   witness is not testifying as to the reasonableness of the fees

15   that are being charged by --

16         THE COURT:  I don't think there's been any assertion

17   made in the proffer as to the reasonableness of the fees.

18         MR. DESPINS:  Well, okay, if there are none --

19         THE COURT:  Well, it just --

20         MR. DESPINS:  -- but there's no evidence.

21         THE COURT:  -- it just wasn't part of the proffer.

22         MS. FIFE:  Right.

23         MR. DESPINS:  Okay.  In other words, it was unclear

24   what the proffer was.  I mean, I know there was a presentation

25   made to the Court.  I didn't understand there was a formal

1    proffer.  So if there is no testimony on the record as to the

2    reasonableness of the fees, we don't need to cross-examine.

3                THE COURT:  Fine.  Then we'll accept the proffer, and

4    there's no need for the witness to testify.

5                MS. FIFE:  Okay.  Then, with respect to the fees, how

6    would you like to proceed?

7                THE COURT:  Well, I mean, here's really the question:

8    I need to know whether or not the amount of the fees or the

9    terms for paying the fees, and I haven't had a chance to read

10   the letter yet, are deemed confidential by Barclays, and if so,

11   why.  And I need to have what amounts to a mini-hearing on the

12   subject of possible sealing because these are allegedly

13   proprietary and confidential business terms that should not be

14   part of the public record, recognizing, as I think I made

15   abundantly clear, my belief that sealing is the exception and

16   not the rule and that cause has to be shown.

17               If Barclays is prepared to put on such a record, we

18   can then have a chambers conference or some other procedure,

19   which may include clearing of the courtroom, for purposes of

20   presenting that information.

21               I would hope, and I don't know if this hope is going

22   to lead to a reality, that it may be possible to deal with this

23   issue without having to go through each of those steps.  There

24   are a lot of very smart, creative and experienced lawyers in

25   the room, and one of the things I need to know is if, for

1    purposes of the interim DIP facility, I know going in that the

2    creditors' committee, upon reflection of a document that isn't

3    in evidence and that isn't a part of the public record, asserts

4    that these fees are, I'll use the term, excessive or

5    unreasonable, why do we need to go into the specifics of what

6    they are if I know what they are?  Do they have to be part of

7    the record?  Can't the creditors' committee make a perfectly

8    rational argument without having to have a whole hearing about

9    it since I've been given the letter?  And you've been given the

10   letter, and others have been given the letter.

11          If that's not an acceptable approach, and I'm not

12   here to design the approach that's acceptable, I am simply

13   making a suggestion, then I think we do need to go into the

14   specifics of whether or not this constitutes confidential

15   information.

16          But given the incredible significance of this

17   financing to this incredibly significant case and the fact that

18   interim DIP facilities, in my experience, routinely are

19   granted, often with more onerous terms, forget the fees for a

20   minute, than we're talking about here, and given the fact the

21   DIP facility is being offered by the most likely acquirer of

22   the assets that we're talking about, is it really desirable to

23   convert this into a public display?  I question the wisdom of

24   that.  Everybody's free to do their job, but I think everybody

25   should pay close attention to what their job really is.

1        Mr. Despins, it's really up to you.  And I'm not

2    trying to impose on you at all.  You admitted at the outset

3    you're new to the case.  You have a job to do, and I know

4    you're going to do it well.  But do we really need to go down

5    this road?

6        MR. DESPINS:  Your Honor, if Barclays agreed that the

7    only thing you're approving today is a very limited fee and the

8    rest is left for the final hearing, I'll just stand down and go

9    home.  But my understanding, limited understanding, based on an

10   hour of having this document is that Your Honor would be doing

11   more today than that, and if it's not that, and I want to be

12   precise about -- it's not the issue what's payable today; it's

13   payable or earned.

14       So if Your Honor is only approving a limited fee,

15   whether it's payable or earned today, that's fine.  We can

16   leave the rest for the final hearing.  But if Your Honor is

17   doing more than that pursuant to this order, then, Your Honor,

18   I feel I have a duty to bring to the attention of the Court

19   that these are -- these fees are --

20       THE COURT:  Well, you've done that.  I know that the

21   creditors' committee, upon review of the fee letter, believes

22   that the fees, not yet disclosed publicly, are not market and

23   are, I'll use the term, excessive.

24       MR. DESPINS:  Well, it's --

25       THE COURT:  Is that what you think?

1          MR. DESPINS:  Yes, but, Your Honor, for example,

2     there's a pre-payment -- I'm not going to talk about what the

3     fee is but there's a pre-payment penalty in here.  If the

4     estate finds another source of financing, wants to pre-pay, X

5     percent is due to the lender.  That's -- I'm sorry that you

6     said it but that's not a standard provision for a DIP financing

7     and --

8          THE COURT:  Well, let me say that, and I'm not going

9     into the specifics of my own professional background before I

10    took the bench, but I have more than a passing familiarity with

11    DIP lending practice --

12         MR. DESPINS:  Um-hum.

13         THE COURT:  -- as a practitioner.  And it's always

14    been about the fees, and it always will be about the fees.

15         And so without taking away anything from your

16    argument, I don't know, because I haven't read this yet, and if

17    you want me to I'm going to take a break and read it, there's

18    always a fee letter.

19         MR. DESPINS:  Sure.

20         THE COURT:  The fees are always something which

21    lenders deem to be confidential.  However, they are typically

22    disclosed:  unused line fees, facility fees, a whole host of

23    fees.  I don't consider a pre-payment to be at all off-market.

24    Now, that just may be that I represented extreme lenders in the

25    past but -- and I may have, but I can tell you that I'm not

1    shocked to hear that that's part of this transaction,

2    particularly since there is an opportunity, if the deal fails,

3    to refinance it.  And to the extent that somebody else comes

4    forward with a better transaction, there will be a need to

5    refinance this facility in a heartbeat.  That's the pre-payment

6    risk that I consider reasonable for a lender to guard against

7    and to provide for in fees.

8        So we're talking about one little aspect of this, and

9    I don't mean to focus on it too much, but I'm telling you I'm

10   not yet shocked.

11       MR. DESPINS:  Well, that's one aspect, Your Honor,

12   and also I'm sure you'll agree that when you look at the pre-

13   payment fee you have to look at the length of the loan.  So if

14   you have a pre-payment fee that's due in twenty days, and

15   that's the same size of pre-payment fee and the facility that

16   has a two-year term, it's quite different.

17       And so, Your Honor, what I would ask the Court,

18   because I think the Court needs to know what the fees are, is,

19   I'm not going to describe the amount of the fees for now, we're

20   not going to go in to that, but to look at the letter and

21   basically -- in paragraph 1 of the letter there's one type of

22   fee, a facility fee.  There's also a closing fee in that second

23   paragraph of paragraph 1.  In addition to that, there's a pre-

24   payment fee and there's a syndication -- I'm sorry, there is a

25   market flex in paragraph 4, and I won't describe the amount but

1  it's in there.  And I would ask the Court to look at the

2  totality of these fees.

3         THE COURT:  Well, let's just say, for the sake of

4  discussion, Mr. Despins, that I would agree with you that these

5  fees are off-market.  Let's just say that as a hypothetical.

6  Where are we going with that argument?  Are we saying that I

7  should not approve the interim facility and I should set a

8  match to this asset because it won't be financed?

9         This is the only financing I'm here to approve.  What

10  are you proposing?

11         MR. DESPINS:  Your Honor, I don't have the

12  replacement facility today, given that I was retained a few

13  years ago.  But if that's -- I mean, that's -- I understand

14  your point but in a lot of cases I'm involved in and when I

15  represent the secured lender and the Court finds the fees

16  excessive, they'll say I'm not going to approve those fees on

17  those terms, you need to do better than that.  If you're not --

18  I'm not asking you to do that but my point is that is -- I have

19  experienced that myself, and the point here is if anything goes

20  because we're in a critical situation, then I --

21         THE COURT:  Now, I totally disagree with that

22  assertion.  We are not in an anything goes environment.  We are

23  in an environment in which we're seeking to fit the exceptional

24  case within the standard framework that we're all familiar with

25  of due process, Bankruptcy Code, bankruptcy rules, the local

1    rules and accepted practice in this court.

2           And the only thing that's really different here is

3    that to not approve this facility doesn't just mean that the

4    hypothetical Friday payroll for the big Chapter 11 debtor is

5    not paid; it means that market participants everywhere,

6    globally, are materially adversely affected.  I consider that

7    to be an exceptional circumstance and one in which it may not

8    be good practice to be worrying too much about whether the

9    facility itself is richly priced.  It is the only facility.

10   And I am not going to convert this hearing into a public

11   renegotiation of the fee letter.

12           MR. DESPINS:  Okay.  Got it.  You've heard me.

13   That's all I can say.

14           THE COURT:  And you've heard me.

15           MR. DESPINS:  Thank you.

16           MS. FIFE:  With that, Your Honor, I'd ask you to

17   approve the interim financing.

18           THE COURT:  Now, let me ask, because we have still a

19   reasonably packed courtroom, whether there are any objections

20   other than the ones that I've just heard and dealt with, I

21   think, to the approval of this facility, including issues with

22   respect to the proposed interim financing order or any other

23   aspect of this transaction, because I am not, just because it's

24   late and just because this transaction is critically important,

25   attempting to cut off anybody's ability to be heard.

1          MR. RIVERA:  If I may, Your Honor, just very briefly,

2     Andrew Velez-Rivera for the United States Trustee.  We have

3     less than a half a dozen relatively minor changes, and those

4     have been accepted by both the debtors and Barclays.  So we're

5     taking care --

6          THE COURT:  Very good.  Glad to hear that.  Mr.

7     Mason?

8          MR. MASON:  Yes, Your Honor.  Again, Richard Mason,

9     Wachtell, Lipton, Rosen & Katz for JPMorgan Chase Bank.  Not

10    objecting to the interim financing.  I'd just like to get a

11    clarification on the record.  As Your Honor remembers and we

12    talked about previously, JPMorgan, pursuant to an order Your

13    Honor entered yesterday, has been making advances to the

14    broker-dealer secured by liens, securing a guaranty,

15    effectively, of the holding company.  And I just want it to be

16    clear that those continuing advances, under that order, do not

17    constitute a violation of the DIP credit agreement.  And, as I

18    think Ms. Fife had referred to before, the DIP lender is not

19    seeking a lien, priority, pari passu or subordinate, on our

20    collateral.

21         There are a couple of provisions that I think

22    technically could be read for that proposition.  I just want

23    the record to be clear that's not the case.

24         THE COURT:  Okay.  Let's see if we can confirm that

25    right now.

1          MS. SCHWEITZER:  Your Honor, Lisa Schweitzer from

2     Clearly Gottlieb.  It was our understanding that we are not

3     priming anyone and that the collateral we were accepting was

4     the membership interest of Neuberger.  So, just to be clear, I

5     don't understand JPMorgan to have a lien on that that we would

6     be priming.  And so we were being represented that we were

7     doing a first-priority lien on that asset, but nothing else.

8          MR. MASON:  That's correct.  We don't have a lien on

9     that.  And I just want to make sure that you don't have a

10    primings, pari passu or subordinate lien on our collateral.

11    You only have --

12         MS. SCHWEITZER:  That's correct, Your Honor.  So

13    we're all in agreement.

14         THE COURT:  That's all been confirmed.  Is everybody

15    happy now?

16         MR. MASON:  Very, Your Honor.

17         THE COURT:  Is there anyone else who wishes to be

18    heard with reference to the proposed interim DIP facility?  I

19    have a question.  There's a reference to a budget.  I didn't

20    see it.

21         MS. FIFE:  Sorry, Your Honor.  It was being worked on

22    late last night, but I can provide you with it.  One moment.

23         THE COURT:  And my understanding is that advances

24    under the interim facility will be limited to 200 million

25    dollars but will be made in accordance with the budget.

1          MS. FIFE:  That's correct, Your Honor.

2          MR. DESPINS:  Your Honor, may we inquire because we

3    haven't seen the --

4          THE COURT:  You absolutely should.

5          MR. DESPINS:  The question is whether the maximum 200

6    will be available under the budget.

7          MS. FIFE:  Will it be available under the budget?

8          MR. DESPINS:  Yeah, the full 200 million available

9    under the budget.

10         MS. FIFE:  Yes.

11         MR. DESPINS:  Okay.

12         MS. FIFE:  May I approach --

13         THE COURT:  You may.

14         MS. FIFE:  -- Your Honor?

15         THE COURT:  Thank you.

16         MS. SCHWEITZER:  This is, Your Honor, a proposed

17   budget, I believe, that has been discussed and with the

18   borrower -- I mean, with the lender.  But I am now being that

19   the attorneys for the lender have not seen it, so if they want

20   to reserve that right to --

21         MS. FIFE:  Right.  I apologize.  Right, I think we're

22   all on the same page, that we intend to have the debtor lend

23   against a budget.  Just because of the standard negotiations,

24   we were given rough budgets but we hadn't finally signed off on

25   this particular budget.  Maybe we've seen this, maybe we

1    haven't.  This is the first time we have been handed this

2    document.

3         THE COURT:  I'm really glad I asked this question.

4    It seems awfully important.

5         MS. SCHWEITZER:  No, I think that's right.  So just

6    to be clear is that the 200 million is available on day one.

7    There's a requirement that the debtor provide a budget and

8    provide cash forecasts and all the routine conditions.  The

9    debtor -- we had not -- we have been given a budget, a

10   preliminary budget, to look at.  So I think we all have an

11   understanding generally of where the money would be going to.

12   But because of the urgency and the debtor was just still

13   working on the budget that we hadn't finally signed off on the

14   form of the budget.  I don't think that there's -- I don't

15   understand of any material disagreements about the terms.  I

16   just wanted to note that I can't necessarily say this would be

17   attached to the agreement at this point.

18        MS. FIFE:  But, Your Honor, I just confirmed that our

19   businesspeople and Barclays' businesspeople have reviewed that

20   budget several times.  It's just that particular piece of

21   paper.  So we will finalize it and submit it to Your Honor with

22   the additional changes that need to be made to the order.

23        THE COURT:  Okay.  I may have some edits to the order

24   before it gets entered.  Has everyone who reasonably needs to

25   comment on the form of order had a chance to do that?  I'm

1    going to take silence as "I don't know" instead of "yes".

2          MS. GRANFIELD:  In terms of trying to conform an

3    order to some of the things that were said on the record

4    earlier, Your Honor, that's your question?

5          THE COURT:  Well, actually, I asked a different

6    question, which is whether everybody who reasonably needs to

7    have input as to the form of order has had a chance to do so,

8    because this all happening very fast.  And to the extent there

9    is anything who wishes to have input as to the form of order,

10   we're not going to do that while I'm sitting here.

11         MS. FIFE:  No, I understand that.

12         THE COURT:  But I think that there should be some

13   opportunity for people to meet, confer and wordsmith.

14         MS. FIFE:  That's fine, Your Honor.  There is one

15   issue though:  that I believe we need to borrow tomorrow

16   morning.

17         THE COURT:  So let's get it done now --

18         MS. FIFE:  That's fine, Your Honor.

19         THE COURT:  -- and recognizing that it's twenty to 8,

20   and in order to enter the order on the docket my chamber staff

21   needs to stay here.  So it would be helpful, just from a

22   personal perspective, if we could be done within, say, the next

23   forty-five minutes.

24         MS. FIFE:  We'll work as fast as we can, Your Honor.

25         THE COURT:  I understand that.  Now, there are some

1  miscellan -- Mr. Despins?

2          MR. DESPINS:  Just briefly, Your Honor.  I don't want

3  to beat a dead horse but there are findings in there that

4  there's no other financing available.

5          THE COURT:  That's why you're going to have a chance

6  to meet and confer.

7          MR. DESPINS:  Okay.

8          THE COURT:  If there are aspects of this order that

9  the committee finds objectionable, rather than argue about the

10  language of the order now --

11          MR. DESPINS:  Um-hum.

12          THE COURT:  -- my suggestion is that you meet and

13  confer here in the courtroom and resolve those differences now

14  so that I can enter an order which at least includes -- you're

15  reserving all your rights, I recognize that, and I'm not

16  holding you to the language that you agreed to, but I'm giving

17  you an opportunity, which you can choose to accept or reject,

18  it's entirely up to you, to be part of the process of

19  developing a form of order.

20          MR. DESPINS:  Thank you, Your Honor.

21          THE COURT:  And when it comes to findings and

22  conclusions, I will be very careful to limit my findings and

23  conclusions to the record that's been made here.

24          Now, we had a number of miscellaneous matters that

25  were on the agenda as well, entirely, I think, routine and

1    noncontroversial matters, such as joint administration.  And

2    Mr. Waisman's here so I guess I gave you the right cue.

3         MR. WAISMAN:  Thank you for the cue, Your Honor.

4    Your Honor's correct.  There were three other matters on the

5    calendar.  We would consider them routine administrative

6    matters.  As Your Honor is probably aware, another case was

7    filed last night, the case that Mr. Miller mentioned earlier,

8    LB 745 LLC.  The first matter on the calendar would be a motion

9    to jointly administer the two cases for procedural purposes

10   only, not a substantive consolidation in any way.  And we would

11   ask that that be approved at this time.

12        THE COURT:  I grant that motion.

13        MR. WAISMAN:  The next motion on the calendar, Your

14   Honor, because we had a hearing yesterday in the initially

15   filed case and certain orders were entered, we would like those

16   orders to apply to the debtor that subsequently filed last

17   night and an additional motion that was filed in the interim

18   gap period.  So it's essentially a motion seeking that the new

19   debtor receive all of the relief that Your Honor granted

20   yesterday and today.

21        THE COURT:  It seems to me purely procedural.  Is

22   there any disagreement in regard to this?  I hear none.  I'll

23   grant that.

24        MR. WAISMAN:  Thank you, Your Honor.  The final

25   matter is a case management procedures motion, becoming fairly

1    in this district and being requested by the bench a great deal.

2    It deals with a number of issues, notices of appearance, master

3    service lists, service, omnibus hearing dates and the like, and

4    has been --

5          THE COURT:  Before we get to that --

6          MR. WAISMAN:  Yes.

7          THE COURT:  -- the committee was just formed.  I'd

8    like, before entering that order, to give Mr. Despins and his

9    colleagues an opportunity to check that out, unless he's

10   already done so.

11         MR. DESPINS:  No, Your Honor.

12         MR. MILLER:  I'm certain, not given Mr. Despins'

13   earlier statements, perhaps if there are no other objections we

14   can confer with the committee and submit it on consent --

15         THE COURT:  You can.

16         MR. MILLER:  -- later this week.  The only other

17   thing, the Office of the United States Trustee has asked that

18   we incorporate the provisions of Rule 9070-1, that they shall

19   receive hard copies of all pleadings, and we will incorporate

20   that into the version that's submitted to Your Honor.  And,

21   with that, we conclude the agenda.  Thank you, Your Honor.

22         THE COURT:  Okay.  I want to make clear something

23   that was, I think, left unstated when we were dealing with the

24   sale procedures.  In thinking about how to deal in an orderly

25   way with the hearing set for Friday afternoon, we concluded in

1    chambers that that hearing should be at 3:00, unless that

2    messes things up for the debtor or other parties, my concern

3    being that if we start later, given how we did today, it's

4    going to be very difficult for us to reach closure.  Does that

5    work for you, Mr. Miller?

6              MR. MILLER:  Your Honor, because of the process of

7    closing the transaction and consistent with a manner in which

8    accounts can be transferred and so on, it has been very

9    strongly suggested that the hearing not start till 4:00, Your

10   Honor.

11             THE COURT:  Not start till 4:00?

12             MR. MILLER:  Yeah.

13             THE COURT:  In that case, it will not start till

14   4:00.

15             MR. MILLER:  Thank you, Your Honor.

16             THE COURT:  And, frankly, I believe that even if I

17   have listed it at 3:00, we would not start until 4:00.  Is

18   there anything more for this evening?

19             MR. MILLER:  We need to set a date for the hearing.

20             THE COURT:  For the final?

21             MR. MILLER:  Final.

22             THE COURT:  You mean for the final DIP.  When's that

23   going to be?

24             MR. WAISMAN:  October 10th?

25             MS. SCHWEITZER:  No.  I think we moved it to the 2nd.

1   October 2nd is -- that's seventeen days out, which is the date

2   we had put in there and penciled.  Well, Rosh Hashanah is

3   earlier that week, so it's after the holiday.  We just want to

4   make sure that worked for your calendar because we haven't had

5   an opportunity to consult with your calendar.

6           THE COURT:  I'm here.

7           MS. SCHWEITZER:  Okay.  Do you prefer the morning or

8   the afternoon?

9           THE COURT:  I have a regular calendar that day, so we

10  better do it in the afternoon.  I'd say -- let's do that one at

11  3:00.

12          MS. SCHWEITZER:  3:00.

13          THE COURT:  All right?

14          MR. WAISMAN:  Your Honor, I believe that concludes

15  the calendar.  Thank you very much.

16          THE COURT:  Thank you all, and we'll wait around

17  until we hear from you about the DIP.

18          ALL:  Thank you, Your Honor.

19          THE COURT:  And I am bench-ordering that approved.

20          ALL:  Thank you.

21      (Whereupon these proceedings were concluded at 7:48 p.m.)

22

23

24

25

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtor's bidding procedures package approved | 72 | 18 |
| subject to adjustments according to | | |
| representations made orally on the record | | |

C E R T I F I C A T I O N

I, Lisa Bar-Leib, certify that the foregoing transcript is a true and accurate record of the proceedings.

_____

LISA BAR-LEIB

Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501

Date: September 18, 2008