| | |
|---|---|
| **BINGHAM McCUTCHEN LLP**<br>399 Park Avenue<br>New York, NY 10022<br>(212) 705-7000<br>Jeffrey S. Sabin<br>Ronald J. Silverman<br>Sabin Willett, *admitted pro hac vice*<br>Rheba Rutkowski, *admitted pro hac vice*<br><br>Counsel to Harbinger Capital Partners Special<br>Situations Fund, L.P. and Harbinger Capital<br>Partners Master Fund I, Ltd. (f/k/a Harbert<br>Distressed Investment Master Fund Ltd.) | Hearing Date: October 16, 2008 at 10:00 a.m.<br>Objection Deadline: October 10, 2008 at 4:00 p.m. |

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
:
In re                                              :    Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.,*    :    Case No. 08-13555 (JMP)
:
Debtors.          :    (Jointly Administered)
:
---------------------------------------------------------------x

## MOTION OF THE HARBINGER FUNDS FOR LEAVE TO CONDUCT RULE 2004 DISCOVERY OF DEBTOR LEHMAN BROTHERS HOLDINGS INC.

Harbinger Capital Partners Special Situations Fund, L.P. and Harbinger Capital Partners Master Fund I, Ltd., f/k/a Harbert Distressed Investment Master Fund, Ltd., (collectively, the "Harbinger Funds"), by its counsel Bingham McCutchen LLP, move, pursuant to section 105(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for an order authorizing and directing discovery in the form of (i) a deposition of Lehman Brothers Holdings Inc. ("LBHI") and (ii) document production concerning the movement of property between and among LBHI and its affiliates, including Lehman Brothers Special Financing, Inc. ("LBSF") and Lehman Brothers International (Europe) ("LBIE"), during the thirty (30) days preceding the filing of

A/72659940.4

these bankruptcy cases, as further described below and in the attached **Schedule A**. In support of this motion ("the "2004 Motion"), the Harbinger Funds state as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

2. LBHI filed a voluntary chapter 11 petition on September 15, 2008 (the "Petition Date"). LB 745 LLC filed a voluntary chapter 11 petition on September 16, 2008. PAMI Statler Arms LLC (together with LBHI and LB 745 LLC, the "Debtors") filed a voluntary chapter 11 petition on September 23, 2008. (We refer to these cases collectively as the "Chapter 11 Cases."). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. 11 U.S.C. §§ 1107(a), 1108.

3. On September 17, 2008, the United States Trustee appointed an Official Committee of Unsecured Creditors.

4. The Debtors filed their Motion to Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the "Sale Motion") on Wednesday, September 17, 2008, seeking (among other relief) the Court's authorization and approval of the sale of the "Purchased Assets" free and clear of all liens, claims, encumbrances, and interests, and the assumption and assignment of certain pre-petition contracts and unexpired leases relating to the Purchased Assets. After a hearing the same day,

the Court approved the Debtors' requested sale procedures, and scheduled a hearing to consider the proposed sale ("Sale") for Friday, September 19, 2008 (the "Sale Hearing").

5. A few hours before the Sale Hearing, the Securities Investor Protection Corporation ("SIPC") filed a complaint and application (the "SIPA Application") in the United States District Court for the Southern District of New York, seeking an order adjudicating that customers of Lehman Brothers, Inc. ("LBI") were in need of the protections afforded under the Securities Investor Protection Act of 1970 ("SIPA"). The district court granted the SIPA Application, entered an Order Commencing Liquidation of LBI (the "Liquidation Order"), and appointed James W. Giddens, Esq. as SIPA trustee (the "SIPA Trustee") of the LBI SIPA proceeding (the "SIPA Proceeding").

6. The district court then transferred the SIPA Proceeding to this Court. This Court now oversees, separately, (i) the Chapter 11 Cases, and (ii) the SIPA Proceeding.

7. At the close of the September 19 Sale Hearing (which extended into the early morning hours of September 20), the Court approved the Sale, subject to modifications made on the record at the hearing, by an opinion read into the record and approval orders entered in the Chapter 11 Cases and in the SIPA Proceeding.

**FACTUAL BACKGROUND**

8. The Harbinger Funds are substantial creditors of LBHI. They are obligees under counterparty arrangements with LBSF, which until yesterday the Harbinger Funds understood to be a subsidiary of LBI. LBSF has substantial indebtedness to the Harbinger Funds, in an amount today not less than $250 million,[1] pursuant to certain International Swap Dealers Association, Inc. ("ISDA") swap agreements, including that certain Master Agreement dated as of July 28,

---

[1] The Harbinger Funds are in the process of calculating the precise amounts of their potential claims.

A/72659940.4                                3

2006 by and between LBSF and Harbinger Capital Partners Special Situations Fund, L.P., and that certain Master Agreement dated as of May 20, 2005 by and between LBSF and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund, Ltd.). That indebtedness is, in turn, guaranteed by LBHI.[2]

9.  Press accounts of LBHI's financial distress have long circulated in the financial press, but the Debtors entered chapter 11 chaotically. Among other things, press accounts suggested that, on Friday, September 12, 2008, billions of dollars in cash and cash equivalents were swept into LBHI from its London affiliate. *See*, *e.g.*, **Exhibit 1** (David Cohen, *My Anger over Lehmans' $5 Billion "Betrayal" of London*, Evening Standard (London), Sept. 17, 2008, at 18); **Exhibit 2** (Carrick Mollenkamp and Jeffrey McCracken, *Lehman Moved Cash Fast: Some $8 Billion Went from London Before Bankruptcy*, Wall St. J., Sept. 20, 2008, at B1); **Exhibit 3** (Carrick Mollenkamp, Jeffrey McCracken, and Joellen Perry, *Outcry Grows Over Transfer of U.K. Funds by Lehman*, Wall St. J., Sept. 22, 2008, at C1); Declaration of Dan Yoram Schwarzmann, ¶¶ 25-27, Dkt. #223 (filed in support of Dkt. #219, Response of the Joint Administrators of the Lehman European Group Administration Companies to Debtors' [Sale Motion]). Press reports also suggested that, on Monday, September 15, 2008, Japan's Financial Services Agency ordered Lehman Brothers Japan to retain certain assets within Japan in order to prevent assets in Japan from being transferred to other affiliates outside of Japan. *See* **Exhibit 4** (*Lehman Brothers Japan Files for Bankruptcy Protection*, Japan Economic Newswire, Sept. 16, 2008).

10.  With the cash transferred to LBHI, and (perhaps) then down-streamed to LBI,

---

[2] LBHI executed guarantees that unconditionally guaranteed "the due and punctual payment of all amounts payable" by LBSF to the Harbinger Funds under the swap agreements. *See* Guarantee at ¶ A (Exhibit A to ISDA Agreement).

LBHI filed its chapter 11 petition on Monday, September 15. There has been no disclosure of any kind as to the pre-petition cash movement. Although cases of this kind typically begin with a cash-management motion supported by a description of the debtor's cash-management system in the first-day declaration, no cash-management motion was filed. Information concerning the cash-management system is absent from Mr. Lowitt's first-day declaration, and is not provided elsewhere. The Debtors' other court filings provide no disclosure as to where the reported massive cash sweeps went, or whether LBI had recently received cash infusions from Lehman affiliates, in derogation of the rights of creditors of those affiliates, such as the Harbinger Funds.

11.     There was no time to find out before the Sale Motion, for it came on with a haste unprecedented for a sale of this magnitude. From the Sale Motion and the Asset Purchase Agreement attached as Exhibit 2 to the Sale Motion ("Sale Agreement") filed on September 17, 2008, it appeared that only $250 million of the proceeds from the Sale of the assets of LBI could conceivably benefit the parent (although even that was not clear), while $1.3 billion in cash of the "Seller" LBI (the preamble to the Sale Agreement defined the "Seller" as both Debtor LBHI and non-debtor LBI), would go to Barclays. *See* Sale Agreement, §§ 1.1, 3.1.

12.     On September 19, minutes before the commencement of the Sale Hearing, the Debtors announced that the $1.3 billion in cash of LBI that was to be sold to Barclays as part of the Sale was no longer available to the transaction. No further explanation was given. The Debtors have not revealed what happened to the $1.3 billion or to the other pre-petition flows of funds or other property, other than a significant loss on a trade with Chicago Mercantile.

13.     On September 25, the Harbinger Funds learned from the SIPA Trustee that, after these cases had commenced, and allegedly minutes before the SIPA Trustee was appointed, LBI's equity interests in all of its subsidiaries were transferred to Lehman ALI, Inc., a non-

debtor subsidiary of LBHI. Allegedly, and as contemplated by the transfer agreement, the only consideration LBI is to receive is an intercompany note in an undisclosed amount, with undisclosed terms.[3] These transactions were in no way disclosed prior to or during the Sale Hearing. To the contrary, at the Sale hearing the Harbinger Funds understood that LBI's equity interests in those entities remained with LBI and subject to the Sale. (During the hearing, a question was raised by an objector regarding these interests. We understood the Debtors to advise that the subsidiaries in question "are subsidiaries of LBI." *See* September 19, 2008 Hrg. Tr. at 195 (Dkt No. 318)).

14. The Harbinger Funds have made informal requests for disclosure regarding the flow of funds and other property. The information sought has not been provided.

**RELIEF REQUESTED**

15. The Harbinger Funds request, pursuant to 11 U.S.C. § 105(a) and Bankruptcy Rule 2004, an order authorizing and directing (i) the deposition of LBHI's Chief Financial Officer and/or any other person(s) most knowledgeable at LBHI, and (ii) production of documents by LBHI, concerning the movement of property between and among LBHI and its affiliates, including LBSF and LBIE, during the thirty (30) days preceding the filing of these Chapter 11 Cases, as further described in the attached **Schedule A**. The Harbinger Funds reserve the right to serve supplemental and additional requests concerning these matters.

---

[3] A copy of the transfer agreement, provided to us by the SIPA Trustee on September 25, 2008, is attached as **Exhibit 5**. The Harbinger Funds have not expanded their discovery request at this time to embrace the subject of the September 19 equity transfers. They hope to obtain relevant information informally. Nevertheless, this belated disclosure, which we believe was not made at the time of the hearing on the Sale Motion, illustrates the profound confusion that continues to surround basic economic facts in these cases.

# ARGUMENT

16. Bankruptcy Rule 2004 is a familiar tool of reorganization cases that provides parties in interest a vehicle for obtaining information relating to "acts, conduct, or property or to the liabilities or financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate." Fed. R. Bankr. P. 2004(b). This can be done through document production and testimony. Fed. R. Bankr. P. 2004(c).

17. The purpose of a Rule 2004 examination is to 'show the condition of the estate and enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved.'" *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (quoting *Cameron v. United States*, 231 U.S. 710, 717 (1914)); *see also In re Fearn*, 96 B.R. 135, 138 (Bankr. S.D. Ohio 1989) (rule's purpose is to ascertain "the extent and location of the estate's assets"); *In re Dinubilo*, 177 B.R. 932, 940 (E.D. Cal. 1993) (same). The scope of an inquiry permitted under Bankruptcy Rule 2004 is broad,[4] in order to reveal "the nature and extent of the estate; ascertaining assets; and discovering whether any wrongdoing has occurred." *In re Corso*, 328 B.R. 375, 383 (E.D.N.Y. 2005); *see also In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 708 (Bankr. S.D.N.Y. 1991).

18. Rule 2004 requires the Court to "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *Drexel Burnham*, 123 B.R. at 712. In making this determination, courts consider the purpose of the request as well as the degree of intrusiveness. *Id.* at 711-12 (discussing evolution and purpose of

---

[4] *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) ("Starting with the 1978 Code there has been an expansive reading of the rule. . . . It can be legitimately compared to a fishing expedition. It can net the dolphins as well as the tuna; however, the net, in the discretion of the Court, can be carefully stitched to limit its catch.") (citing *In re Vantage Petroleum Corp.*, 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983)); *In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002); *In re Ecam Publ'ns, Inc.*, 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991).

Rule 2004 and granting Rule 2004 motion, highlighting that the "requested purpose" was for "claims amendment and claims litigation" and that "[t]he more knowledge FDIC/RTC has about its claims, the better it, DBL, and the committees will be able to resolve the claims process in this case"); *In Re Hawley Coal Mining Corp.*, 47 B.R. 392, 394 (S.D. W.Va. 1984) (noting that appellant failed to show that requested discovery was "oppressive in any manner" and holding that bankruptcy court did not abuse its discretion in granting Rule 2004 examination).

19.   As can be seen from the attached **Schedule A**, the requested discovery aims to investigate (by documents and deposition testimony), the reported multi-billion dollar transfers of cash and other assets by or into LBHI and/or LBI just prior to the Petition Date, and the transfers or other events that resulted in the apparent disappearance of such assets from the current Debtors and other affiliates prior to the sale of LBI's assets.

20.   No issue has been raised as to whether the information sought is within the scope of Rule 2004 discovery. Plainly it relates to the administration of LBHI's estate and falls within the scope of discovery permitted by Rule 2004. The Debtors' position appears to be that burden or other practical concerns should insulate them from disclosure. Certainly it is appropriate for the Court to consider such issues. But we believe the balance here cuts sharply in favor of disclosure.

21.   First, the issue is *not* trivial. While there is an insufficient factual record from which to draw any firm conclusion, there is a good-faith basis to proceed to discovery, as (i) a wealth of information states that vast sums of cash (and possibly other assets) were transferred on the eve of these Chapter 11 Cases; (ii) there has been no explanation as to what happened to it, other than the disclosure just before the September 19 Sale Hearing that $1.3 billion that existed two days earlier was no longer available, *see* **Exhibits 1-4;** and (iii) the usual cash-

A/72659940.4                                              8

management system disclosures are absent.  Given the recent revelation that intercompany[5] subsidiary transfers took place during these cases, on September 19, additional concern and confusion has now arisen as to whether additional transfers are continuing to occur without disclosure or Court oversight.  As the bankruptcy court explained in the *Drexel Burnham* case:

> When a trustee takes over a Chapter 7 case, the trustee must learn quickly about the debtor entity.  One of the original purposes of the 2004 examination (formerly 205) was to assist the trustee in this endeavor.  *See Zydney v. New York Credit Men's Association*, 113 F.2d 986 (2d Cir. 1940).  Thus, a long line of cases, starting with *Cameron v. U.S.*, 231 U.S. 710 (1914), have defined the purpose of a 2004 examination.  The object of the examination of the bankrupt and other witnesses is to show the condition of the estate and to enable the Court to discover its extent and whereabouts, and to come into possession of it, that the rights of the creditor may be preserved.  *Id.*, at 717.

123 B.R. at 708 (collecting cases; footnotes omitted).  It is imperative that this information, sought herein by the Harbinger Funds, be disclosed to the creditors and the Court.[6]

22.     Second, there is a substantial risk of imminent harm.  Few of the Lehman entities are in a chapter 11 or other proceeding; most remain non-debtors.  Transfers of highly liquid assets, such as cash and securities, outside of the Court's control risks immediate dissipation of those assets through use, pledge, or further transfer.  That is why information concerning the Debtors' cash management and alleged transfers is so vital now.  Creditors, including the Harbinger Funds, must make critical decisions *now* concerning LBHI's non-debtor affiliates, and/or other LBHI affiliates subject to proceedings in other jurisdictions, or unaffiliated transferees, in order to respond to their investors and shareholders at risk of suffering enormous potential losses in these cases.

---

[5] It appears that the LBI subsidiaries were transferred, an instant before the effectiveness of the SIPA Trustee appointment, to a non-debtor – but wholly owned – subsidiary of LBHI.  *See* **Exhibit 5**.  Accordingly, the transferred assets appear to be outside the protection of the automatic stay.

[6] The information sought does not relate in any way to trade secrets or competitive matters.  There is no plausible reason that it should be kept secret.

23. In short, the "melting ice cube" problem for assets that may have been transferred out of the small chapter 11 umbrella is a huge one. With the LBI asset sale now closed, this practical problem has shifted away from the Debtors and falls heavily on the creditors. There may be a swift erosion of creditors' valuable rights, as each day increases the risk that commingling of proceeds, intervention of good-faith transferees, and other factors will make unwinding of transactions difficult or unfeasible. There is an urgent need to get to the facts.

24. On the Debtors' side of the balance stand concerns of burden. Those concerns must be viewed in the context of the significance of the issue presented, and would fall away even if a far more burdensome request had been made. But the request is not burdensome. The Harbinger Funds do not seek to conduct an unfettered "fishing expedition"; they neither seek nor want "millions of documents." It is simply not credible that the basic facts concerning asset transfer are not available in summary form, and we have been careful to craft our request, in the appropriate places, to request only "documents sufficient" to show the relevant facts. LBHI personnel surely have a present understanding of the material funds and property flows, and immediate access to sufficient documents to demonstrate those facts. The Harbinger Funds want no long depositions – the single deposition sought would be one to provide the explanation that will be necessary to explain the crucial documents. Further, the Harbinger Funds stand ready, both before and after any hearing on this 2004 Motion, to tailor the request in such a way that the facts can be provided swiftly and efficiently.

25. Long and burdensome discovery would serve no-one's interest. What is critical is that creditors quickly gain a working understanding concerning material funds and property transfers that have occurred or that the Debtors contemplate going forward so that they can protect their interests.

A/72659940.4
10

26. If the Debtors had disclosed this information in their filings to date, as ordinarily happens on the first day of any chapter 11 case, there might today be no need for this motion. The information is basic and must necessarily be close at hand. The Debtors should not be permitted to continue to withhold it.

## WAIVER OF MEMORANDUM OF LAW

27. As there are no novel issues of law presented herein, the Harbinger Funds respectfully request that the Court waive the requirement that the Harbinger Funds file a memorandum of law in support of this Motion pursuant to Local Bankruptcy Rule 9013-1(b).

## NO PREVIOUS MOTION OR APPLICATION

28. No previous motion or application for the relief sought herein has been made to this or any other Court.[7]

---

[7] Pursuant to the Case Management Order, the movant did seek telephonically to have the hearing on this 2004 Motion expedited. That relief was not granted.

## CONCLUSION

For the foregoing reasons, the Harbinger Funds respectfully request that the Court (i) grant the 2004 Motion in its entirety; and (ii) grant such other, further relief as the Court deems just and proper.

Dated: New York, New York
September 26, 2008

**BINGHAM McCUTCHEN LLP**

By: /s/ Jeffrey S. Sabin
Jeffrey S. Sabin
Ronald J. Silverman
Sabin Willett, *admitted pro hac vice*
Rheba Rutkowski, *admitted pro hac vice*
399 Park Avenue
New York, New York 10022
Telephone No.: (212) 705-7000
Facsimile No.: (212) 752-5378

*Counsel to Harbinger Capital Partners Special Situations Fund L.P. and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund Ltd.)*