Jeffrey W. Levitan (JL 6155)
Michael T. Mervis (MM 0306)
Karen D. Coombs (KC 3538)
PROSKAUER ROSE LLP
1585 Broadway
New York, New York 10036-8299
(212) 969-3000

*Attorneys for Markit Group Limited*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS, INC.<br>et al.,<br><br>　　　　　　　Debtors, | X<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
| SECURITIES INVESTOR PROTECTION<br>CORPORATION<br><br>　　　　　　　Creditor,<br><br>　　v.<br><br>LEHMAN BROTHERS, INC.<br><br>　　　　　　　Defendant, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>X | Adversary No. 08-01420 (JMP) |

**MOTION OF MARKIT GROUP LIMITED TO (1) CLARIFY SO MUCH OF THE
SEPTEMBER 19, 2008 ORDER AUTHORIZING AND APPROVING THE SALE OF
ASSETS AS RELATES TO THE ASSUMPTION AND ASSIGNMENT OF THE DATA
SERVICES AGREEMENT BETWEEN LEHMAN BROTHERS, INC. AND MARKIT
PARTNERS LIMITED OR, (2) TO THE EXTENT NECESSARY, MODIFY SO MUCH
OF THAT ORDER AS APPROVED THE ASSIGNMENT OF THAT AGREEMENT TO
<u>PURCHASER WITHOUT MARKIT'S CONSENT</u>**

Markit Group Limited (formerly known as Mark-it Partners Limited) ("Markit"), by and through its undersigned counsel, respectfully requests, pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure, as made applicable by Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure, that this Court clarify, and to the extent necessary modify, so much of that September 19, 2008 Order Under 11 U.S.C. §§ 105(a), 363 and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases (the "Sale Order") as may have approved the assumption of Markit's December 3, 2002 Founding Customer Data Services Agreement With Lehman Brothers, Inc. (the "Markit License") and all associated addenda to that License (the "Markit Addenda")[1], and assignment of the Markit License and Markit Addenda to Barclays Capital, Inc. (the "Purchaser").  As set forth in detail below, an unfortunate (and presumably unintended) result of the necessarily exigent consideration of the motion by Lehman Brothers Holdings, Inc. and Lehman Brothers, Inc. (the "Debtors") to consummate their proposed sale of assets to Purchaser was that Markit did not receive notice of that proposed sale and, accordingly, was denied the opportunity to advise this Court that the Markit License -- an essential component of which is a nonexclusive copyright and intellectual property license -- may not be assigned without Markit's consent.  This Motion is designed to correct that circumstance and make it clear that the Markit License and Markit Addenda has not been assigned to Purchaser and cannot be so assigned without Markit's consent.

---

[1] The Markit Addenda include: a September 24, 2003 Founding Customer Services Addendum – RED; a May 12, 2005 Founding Customer Services Addendum – PORTAL; an October 11, 2005 Portal Addendum; an October 26, 2005 Customer Services Addendum – ABS; a September 25, 2006 RCD Single Name Addendum; a May 18, 2007 Markit Indicative Addendum; a June 11, 2007 Loans Addendum; a June 29, 2007 RED Renewal Addendum; a September 24, 2007 Data Addendum; a November 1, 2007 Equities Addendum; and an undated RCD Addendum.

## **PRELIMINARY STATEMENT**

1. As this Court recognized at the sale hearing (the "Sale Hearing"), this is unquestionably "not an ordinary Chapter 11 case." (Transcript of September 19, 2008 Hearing ("Hrg. Tr."), 248:6-7.) Markit is well aware of both the potential effect on the capital markets from this Chapter 11 filing and this Court's determination that it "ha[d] to approve this transaction because it's the only available transaction." (Hrg. Tr., 248:11-12).

2. However, a necessary consequence of the compressed time frame in which the transaction was presented to this Court for approval was, at least in one case, a lack of clarity. Specifically, it is not clear whether the Sales Order is intended to assign the Markit License and Markit Addenda to the Purchaser. Markit respectfully submits that the Debtors should not have intended that the Markit License and Markit Addenda be assigned to Purchaser (because they are not assignable absent Markit's consent, which has not been given) and respectfully requests that the Court issue an order clarifying that the Sales Order does not provide for such an assignment.

3. To the extent that the Sales Order does purport to assign the Markit License and Markit Addenda to Purchaser, that determination would present a manifest error of law. The Debtors, in their (from what has been publicly reported, understandable) haste to present the proposed sale transaction to the Court, failed to provide Markit with notice of the transaction before it was approved. Although a Notice of Assumption and Assignment (which Notice failed to provide Markit with the information required by Federal Rule of Bankruptcy Procedure 6006) was delivered to Markit at its offices in London, England, that (facially inadequate) Notice was not received until after the hearing was already concluded.[2]

---

[2] Nor, as explained below, did Markit receive notice by virtue of the Debtors' faxing of this vague Notice to Markit North America (an affiliate of Markit located in White Plains, New York, which had its own contract with the Debtors that is unrelated to the Markit License) at 5:30 p.m. the evening before the sale hearing. This fax was

4.      As a result of this failure to provide notice, Markit was deprived of the opportunity to advise the Court that the Markit License and Markit Addenda -- as a non-exclusive and non-assignable (except in certain limited, inapplicable circumstances) license of, among other things, copyright rights -- could not be included in the extensive list of contracts the Debtors proposed be assumed and assigned to the Purchaser on the Closing Date, and that the Purchaser could not, on information and belief, provide adequate assurance of the performance due to Markit under those contracts in any event. To this limited extent, Markit submits that, if the Sales Order purports to assign the Markit License and the Markit Addenda to Purchaser, that determination constitutes a manifest error of law, which Markit respectfully requests be corrected by this Court.[3]

## FACTS

### The Markit License and Markit Addenda

5.      On or about December 3, 2002, Markit entered into the Markit License with Lehman Brothers Inc. ("LBI"). A copy of the Markit License is annexed hereto as Exhibit A. The Markit License provided LBI with a non-exclusive, non-transferable license to use Markit's "Data and Services," including "Intellectual Property," which the Markit License defined as, *inter alia*, "all copyrightable works, all copyrights, and any applications, registrations and renewals in connection therewith." Ex. A, §§ 1.1, 5.1, 5.3. As described in the Markit License's Schedule of Services, LBI was entitled to access databases, charts and valuations analyses developed by Markit. *Id.* at p. 35

---

inadequate as a matter of law or fact to place Markit on notice with respect to any action to be taken regarding the Markit License or the Markit Addenda.

[3] Following this motion, Markit intends, to the extent necessary, to subsequently move to lift the automatic stay and terminate the Markit License and Markit Addenda on the grounds that, because the Markit License is a nonexclusive copyright and intellectual property license, the *ipso facto* clause in that license remains enforceable notwithstanding the Debtors' Chapter 11 filing.

6. The Markit License contains several explicit prohibitions on the ability of LBI to transfer or assign the contract. Section 5.2.1, which comes under the heading of "Restrictions," provides: "Except as specifically set forth in this Agreement, this license does not include the right to sub-license, rent, lend, transmit, sell, assign, lease, resell, publish or otherwise distribute, transfer or make available all or any portion of the [license] by whatever means to any third party or any employee or Affiliate of the Founding Customer or its Group Members." Ex. A, § 5.2.1. *See also, id.* at §§ 5.3.4 ("[LBI] shall not assign, sub-license, rent, resell, publish or otherwise distribute, transfer or (except as specifically set forth in this Agreement) make available such Intellectual Property or any part thereof to any third party or Affiliate by whatever means"), 17.3.1 ("[LBI] shall not be entitled to and shall not assign, novate or otherwise transfer this Agreement or any rights or obligations hereunder, in whole or in part, without Markit's prior written consent (which may not be unreasonably withheld or delayed), other than to a member of the Founding Customer's Group . . .").[4]

7. Further, the Markit License and Markit Addenda imposed ongoing duties on LBI to "provide on a timely basis" various financial data and information, which is an essential element of the consideration Markit receives under the Markit License. *Id.* § 4.1.[5] Markit is granted a non-assignable license for the use of such data in connection with Markit's provision of services. *Id.* § 6.3.

8. Pursuant to the terms of the Markit License, any notice was to be provided to Markit via hand delivery, fax, or overnight delivery service to the following address:

---

[4] Although LBI was permitted to assign the Markit License to a member of its "Group," (*i.e.*, a qualified affiliated entity), the contract expressly provided that if, at any time, that entity ceased to be a Group member, LBI was required to revoke such assignment, thus ensuring that the license would never be assigned to any non-affiliate of LBI. Ex. A, § 17.3.1. In any case, there can be no contention that the Purchaser is a member of LBI's Group.

[5] The Purchaser or LBI is required to establish adequate assurance that the Purchaser will be able to perform LBI's obligations. On information and belief, the Purchaser may not be able to do so, depriving Markit of the benefit of its bargain should the Markit License be assumed and assigned.

>Barn A, New Barnes Mill, Cottonmill Lane, St. Albans,
>Hertfordshire
>AL1 2HE
>Fax: +44 1727 834068
>Attn: Lance Uggla

Ex. A, § 17.1.1.

**The Debtors' Chapter 11 Filing and Expedited Sale Motion**

9.   On or about September 15, 2008, Lehman Brothers Holdings, Inc. and LB 745 LLC (the "Debtors") filed voluntary petitions under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

10.  On or about September 19, 2008, the Securities Investor Protection Corporation ("SIPC") commenced a liquidation proceeding against LBI under the Securities Investor Protection Act of 1970, as amended ("SIPA"), 15 U.S.C. Sections 78aaa et seq.

11.  Two days after the Debtors' initial filing, on or about September 17, 2008, the Debtors filed the "*Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets*" (the "Sale Motion") [Docket No. 60]. One of the numerous items in that substantial and complex Sale Motion provided for the assumption and assignment to Purchaser of certain executory contracts (the "Closing Date Contracts") between the Debtors, LBI and various third parties, pursuant to an Asset Purchase Agreement among the Debtors, LBI and Purchaser. Advising this Court that the extreme exigent circumstances presented by their application necessitated expedition, the Debtors sought and were granted a hearing on the Sale Motion two days later, on September 19, 2008.

**The Failure of the Debtors to Give Notice to Markit**

12. The Debtors apparently undertook to provide notice to the numerous creditors, lenders and other third parties affected by the Sale Motion. With respect to those third parties with whom LBI had so-called Closing Date Contracts (contracts that were proposed to be assigned to Purchaser at closing), it appears that the Debtors set up a website page through Epiq Bankruptcy Solutions, LLC (the "Claims and Noticing Agent") on which lists of Closing Date Contracts were posted. The Debtors then apparently sent a two-page document, titled "Notice of Assumption and Assignment of, and Amounts Necessary to Cure Defaults Under Contracts and Leases to Be Assumed and Assigned to Successful Purchaser" (the "Assumption Notice") to the counter-parties to the Closing Date Contracts. The Assumption Notice did not include the name, terms or any other identifying information with respect to any Closing Date Contract. Rather, it directed interested parties to visit the website of the Claims and Noticing Agent to "determine whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement at the closing of transactions . . . ." The Assumption Notice then set forth the date and time of the Sale Hearing and advised that any non-Debtor party to a Closing Date Contract had to object to, *inter alia*, the proposed assignment and assumption of its contract by either (a) providing the Debtors with written objections prior to the Sale Hearing, or (b) appearing at the Hearing.

13. The Debtors, however, failed to provide this Assumption Notice to Markit in a timely manner. The Debtors sent Markit an Assumption Notice by overseas courier to 2 More London Riverside, London United Kingdom. A copy of that Assumption Notice is annexed as Exhibit B. However, Markit did not receive that Assumption Notice until September 22, three

-7-

days *after* the Sale Hearing.  Declaration of Boaz Zilberman, executed September 29, 2008 ("Zilberman Decl."), ¶ 5.

14.   Nor did the Debtors send a facsimile notice to the UK fax number expressly set forth in the "Notice" provision of the Markit License.  The Claims and Noticing Agent did send an Assumption Notice by fax to a White Plains, New York office of "Communicator, Inc.," a company that had been acquired by an affiliate called Markit North America, Inc..  Markit North America, Inc. is engaged in an entirely different line of business, has no involvement with the Markit License and, indeed, Communicator, Inc. had its own contract with Debtors.  Thus, nothing in the faxed Assumption Notice, sent to White Plains at 5:34 p.m. on September 18, 2008, could have placed the recipient on notice that the Assumption Notice was intended for Markit or could be applicable to the Markit License or the Markit Addenda.  Accordingly, the faxed Assumption Notice was not brought to the attention of Markit in sufficient time for Markit to object to any attempt to assume and assign the Markit License in advance of the Sale Hearing.

15.   Even had Debtors provided Markit with the Assumption Notice prior to the Sale Hearing, a visit to the website of the Claims and Noticing Agent would not have provided Markit with adequate information.  The website contains a link to a list, titled "List of IT Closing Date Contracts" and spanning 109 pages, which appears to (a) list all "IT Closing Date Contracts" to which the Debtors are parties and (b) highlight those contracts which were proposed to be assigned to the Purchaser.  An excerpt of this list is annexed hereto as Exhibit C.  The List includes a reference to "Markit Group Limited" as a "Vendor" of a Closing Date Contract to be assigned.  However, where many, if not most of the other Closing Date Contracts are described in a column on the Closing Date Contracts List titled "Type II," the entry for "Markit Group

-8-

Limited" in the "Type II" column reads only "TBD." There is no reference anywhere on the Closing Date Contracts List to the Markit License or the Markit Addenda.

**This Court's Approval of Debtors' Sale Motion**

16. On September 19, 2008, this Court held the Sale Hearing. Markit, having not received notice of the Hearing, much less any indication that assignment of the Markit License would be at issue, did not appear. However, numerous other affected parties, including lenders, creditors, contractholders, and owners of real property leased to Debtors were in attendance, and the hearing proceeded until late in the evening.

17. As this Court recognized, the proposed Asset Purchase Agreement among the Debtors, LBI and the Purchaser had changed even in the two day period between Debtors' filing of the Sale Motion and the hearing date on that Motion. Indeed, several affected parties commented that they were unaware what deal was being proposed and, even as of the time of the hearing, did not understand the relief being sought. The Court recognized these concerns:

> [M]any of the objections, but not all of them, raise questions as to vagueness in the asset purchase agreement, ambiguous provisions in the asset purchase agreement, concerns with respect to the sale of non-debtor assets, and confusion associated with the speed with which the transaction is proceeding that makes it more difficult for parties-in-interest to comprehend precisely how they're being affected by the transaction.

Hrg. Tr. 83:14-21.

18. The Court was cognizant of the urgent need for quick action under the extreme circumstances. Accordingly, it noted that the parties who had appeared had received "cobbled together notice" and that at least the "broad outline" of the transaction was understood. Accordingly, with the proviso that "everybody's rights were reserved," the Court proceeded to take testimony by proffer and live witness and to hear objections. *See* Hrg. Tr. 84:13-85:18. At the conclusion of that process, the Court noted the importance of this case, and the importance of

-9-

the proposed transaction to the financial markets, to the creditors, to the employees, and to the customers. Referencing the potential adverse consequences, not only to the Debtors and their estates, but potentially to the national and global economies, the Court held: "I have to approve this transaction because it's the only available transaction." Hrg. Tr., 248:11-12; *see generally,* Hrg. Tr. 247:14-254:7.

19. Accordingly, this Court entered the Sale Order dated September 19, 2008 and annexed hereto as Exhibit D. The Sale Order does not contain any explicit reference to the Markit License or the Markit Addenda; however, it provides: "In accordance with Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the Closing Date Contracts, including customer account agreements, to which they are a party to the Purchaser." Ex. D, ¶ 12.

20. For the reasons described above, it is unclear to Markit whether the reference to Closing Date Contracts in the Sale Order is intended to include the Markit License. Because the Debtors should not have intended to include the Markit License or the Markit Addenda for assignment, Markit respectfully requests that this Court issue an order clarifying that the Markit License and Markit Addenda are not among the contracts to be assigned to the Purchaser.

21. To the extent the Sale Order is intended to and does purport to order the assumption and assignment of the Markit License and Markit Addenda, Markit respectfully requests that this Court modify the Sale Order on the alternative grounds that (a) Markit lacked notice of the proposed assumption and assignment of the Markit License and Markit Addenda to the Purchaser, and (b) assignment of the Markit License and Markit Addenda to the Purchaser without Markit's consent constitutes a manifest error of law.

## ARGUMENT

22. Rule 59(e) of the Federal Rules of Civil Procedure (applicable to bankruptcy proceedings pursuant to Rule 9023 of the Bankruptcy Rules)[6] permits a party affected by a judgment or order to move to alter or amend that judgment or order within ten days of entry. It is well-settled that the grounds for altering or amending an order or judgment include: "(1) an intervening change in the law, (2) newly discovered evidence that in all fairness could not have been presented or could not have been anticipated as being relevant at the time of trial; (3) any manifest error of fact or law; and (4) lack of notice." *In re Brooks*, 324 B.R. 56, 58-59 (Bankr. N.D. Ill. 2005) (collecting cases).

23. Similarly, Federal Rule of Civil Procedure 60(b) (applicable to bankruptcy proceeding through Bankr. R. Proc. 9024), allows a party to seek relief from a judgment or order on numerous grounds, including mistake, inadvertence or surprise, as well as "any other reason that justifies relief." Fed. R. Civ. Pro. 60(b)(1) and (6). Courts have recognized that these rules, to some degree, provide overlapping relief, and that, while manifest errors of law should be corrected by the trial court pursuant to Rule 59, Rule 60 was designed to address mistakes attributable to "special circumstances." *Russell v. Delco Remy*, 51 F.3d 746, 749 (7th Cir. 1995).

### I. The Order Should Be Clarified or Modified With Respect to the Markit License and Markit Addenda Because Markit Did Not Receive Notice of the Proposed Assumption and Assignment

24. It is, of course, a fundamental component of due process that a party affected by a court order must be afforded notice and an opportunity to be heard. Whether or not the "cobbled

---

[6] Although Markit seeks here, in the first instance, a clarification as to whether the Sale Order affects the Markit License and Markit Addenda at all, and seeks modification of the Sale Order only to the extent that that it purports to, this Motion is still properly considered pursuant to Bankruptcy Rule 9023. As Collier's has recognized, any motion that draws into question the correctness of an order or judgment, whether labeled as a motion to clarify, to vacate, to reargue or otherwise, is functionally a motion under Rule 9023. 10 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 9023.04, at 9023-6 (15th ed. 2004).

together" notice of the Sale Hearing afforded adequate notice to affected parties, the fact remains that Markit did not receive even such "cobbled together" notice -- it received no notice at all.

25. Rather, the Debtors provided Markit with an Assumption Notice sent to Markit's London office that did not arrive until *after* the Sale Hearing was concluded and the Sale Order entered. Whether considered under Rule 59 or Rule 60, Markit's lack of notice constitutes cause for reconsideration and modification of so much of the Sale Order as may relate to the Markit License and Markit Addenda.[7]

26. The case of *In re Golden Books Family Entm't, Inc.*, 269 B.R. 300 (Bankr. D. Del. 2001), is instructive. In that bankruptcy proceeding, the debtor Golden Books sought to sell its assets to Random House and proposed, as part of that sale, to assume and assign various executory contracts, including certain licensing agreements between Golden Books and Warner Brothers Consumer Products ("WBCP"). Golden Books purported to provide a Notice of Hearing on its Motion to Sell to all interested parties, including licensors, which advised those parties of a deadline by which to file objections, and further provided that failure to provide objections by the specified time would be deemed consent to assumption. *Id.* at 302-03.

27. WBCP did not file an objection by the deadline. Rather, several days later, WBCP filed an objection arguing that the several Notices it had received were defective, because those notices had been sent to, variously, a general studio lot at Warner Brothers, Inc., or to an "Asst. Controller" at Warner Brothers, or to the address specified in the subject license agreements for payment of royalties (a check processing center in Chicago, Illinois). As with the Markit License at issue here, each of the WBCP licenses at issue contained a Notice provision that specifically identified the correct address for providing notice. *Id.* at 303.

---

[7] Mark-is not suggesting that either the Debtors or their Claims and Noticing Agent deliberately deprived Markit of notice, nor does resolution of the present Motion require the Court to make any findings in this regard. It is sufficient that no notice was given; the reason is not important.

28. The *In re Golden Books* court agreed that the Notices were defective and, accordingly, considered WBCP's objections as timely filed. In phrasing equally applicable to the present matter, the court noted:

> It does not seem too onerous to require the notice to comply with the literal requirement that it be addressed to an officer or to the known person responsible for such licensing matters, in order for the notice to be considered 'reasonably calculated' to afford WBCP an opportunity to object in this particular circumstance, *especially given the extremely short period in which those receiving notice were given to file objections.*

*Id.* at 305 (emphasis added). Accordingly, the *In re Golden Books* court determined to consider even such portions of WBCP's objections as were raised after the proposed sale of assets was completed. (The court noted that, to the extent WBCP's objections were granted, it would not undo the entire sale transaction. *Id.* at 307. The same analysis applies here; the Markit License is hardly a fundamental or central piece of the enormous and complex transaction addressed by the Sale Order, and the modification of so much of the Sale Order as relates to the assumption and assignment of the Markit License creates no risk that the transaction would be undone or materially affected. In fact, Markit believes the Purchaser will suffer no prejudice if the Markit license is not assigned.)

29. Like the licensor in *In re Golden Books*, Markit did not timely receive the Assumption Notice. This lack of notice provides ample basis for reconsideration and modification of so much of the Sale Order as relates to the Markit License. *See also, e.g., In re Massa*, 187 F.3d 292, 297 (2d Cir. 1999) (where under the totality of the circumstances, creditors did not receive sufficient notice of the conversion of debtor's bankruptcy from Chapter 13 to Chapter 7, debt to those creditors was not discharged); *In re Savage Indus., Inc.*, 43 F.3d 714, 716 (1st Cir. 1994) (vacating injunction against "successor product-line liability" action against purchaser of debtor's assets, where plaintiff had not received adequate notice of proposed

injunction); *In re Timely Secretarial Servs., Inc.*, 987 F.2d 1167, 1171 (5th Cir. 1993) (where court reimposed previously-lifted automatic stay against lessor of debtor on two hours telephone notice to lessor, order would be vacated as a violation of lessor's procedural due process rights).

30.     Even if Markit had timely received the Assumption Notice (and it did not), it would have been insufficient in any event. Federal Rule of Bankruptcy Procedure 6006(e) permits a debtor to seek to assume or assign multiple executory contracts by a single omnibus motion only under limited circumstances.[8] Further, even where such motion is permitted, subsection (f) of the Rule requires that the debtor, *inter alia*, (a) state in a conspicuous place that parties receiving that omnibus motion should locate their names and their contracts or leases, which must be listed in the motion, and (b) identify with specificity the contracts or leases at issue, including a specification of the terms of assumption. The Assumption Notice at issue here fails to do so with respect to Markit, the Markit License and the Markit Addenda.[9]

31.     Nor, with respect to Markit, can the Debtors argue that the List of IT Closing Date Contracts located on the website of its Claims and Noticing Agent satisfies the requirements of Rule 6006. That List does not identify or describe the Markit License and the Markit Addenda, instead "describing" the contract(s) to be assumed solely by the term "TBD."

32.     In short, because Markit was deprived of any notice of the Sale Motion, much less the notice required by the Bankruptcy Rules, the resulting Sale Order, to the limited extent it purports to assume and assign the Markit License or the Markit Addenda to Purchaser without

---

[8]     The enumerated circumstances include where "the court otherwise authorizes the motion to be filed." Fed. R. Bankr. P. 6006(e)(3). Markit is not aware of whether such authorization was given here.

[9]     Indeed, that Assumption Notice stands in stark contrast to the Proposed Form of Notice attached as Exhibit A to Debtors' Motion for Assumption and Assignment or Rejection of certain Non-Closing Date Contracts, filed on September 26, 2008 (Docket No. 376), which Proposed Form will attach a list of the subject contracts and leases, including the names and addresses of each contract's counterparty, a description of the contract, and a specification of cure amounts.

Markit's consent, should be modified to make clear that the Markit License and Markit Addenda are not among the contracts that were assumed and assigned to the Purchaser at closing.

II. **In Any Event, The Sale Order Should Be Modified With Respect to Assignment and Assumption of the Markit License and Markit Addenda Because Such Assignment Would Be In Manifest Disregard of the Law.**

33. The Sale Order should also be modified for the independent reason that, to the extent it purports to assume and assign the Markit License or Markit Addenda, that determination would constitute a manifest error of law. The "manifest error" standard is well-recognized as a basis for amendment or modification of orders pursuant to either Rule 59 or Rule 60. *See, e.g., In re Enron Creditors Recovery Corp.*, 378 B.R. 54, 56-7 (Bankr. S.D.N.Y. 2007) ("a motion to amend a judgment pursuant to Fed. R. Civ. P. 59(e) is properly granted when the movant shows that it was based on manifest errors of law or fact"); *Russell v. Delco Remy*, 51 F.3d at 749 (a court should correct manifest errors of law under Rule 59(e), although Rule 60 provides overlapping relief).[10]

A. **The Assignment of the Markit License and Markit Addenda without Adequate Assurance of Performance Would Constitute A Manifest Error of Law**

34. As noted above, the Markit License contains certain ongoing obligations on the part of LBI to provide certain data and information to Markit. Ex. A § 4.1. Thus, pursuant to 11 U.S.C. § 365(b)(1)(C), the Markit License and Markit Addenda may not be assumed (or assigned) unless there is adequate assurance of future performance. The requirements of adequate assurance" extend equally to non-monetary obligations, such as the obligations at issue here. *In re Rachels Indus., Inc.*, 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *In re Southern Biotech, Inc.*, 37 B.R. 311, 317 (Bankr. M.D. Fla. 1983).

---

[10] Although the *Enron* court warned that Rule 59(e) is not a vehicle by which an aggrieved party should present new legal theories it did not raise to the court in the first instance, here, of course, Markit was denied the opportunity to present this dispositive issue of law.

35. The burden of persuasion on this issue rests with the Debtors, who in this case have provided *no* assurance to Markit that Purchaser would be able to adequately perform these obligations. *See In re Rachels Indus., Inc.*, 109 B.R. at 802; *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 175 (Bankr. E.D. Va. 1993) (denying motion to assume and assign lease where proposed assignee's evidence of adequate assurance was "woefully inadequate").

36. Here, the information and data which Markit requires to be provided is personal to LBI. It is unclear to Markit whether the Purchaser has acquired that data and, on information and belief, Markit submits that the Purchaser will be unable to meet LBI's ongoing obligations under the Markit License and Markit Addenda. As a result, it would be a manifest error of law for the Markit License and Markit Addenda to be assumed and assigned to Purchaser.

### B. The Assignment of a Nonexclusive Copyright License Without the Licensor's Consent Would Also Constitute a Manifest Error of Law

37. Assumption and assignment of the Markit License and Markit Addenda would also constitute a manifest error of the law because the Markit License includes, *inter alia*, a nonexclusive copyright license which may not be assigned absent Markit's consent.

38. Section 365 of the Bankruptcy Code, by its plain terms, forbids assignment of an executory contract where applicable non-bankruptcy law forbids such assignment and the affected party has not consented to assignment:

> Trustees may not assume or assign any executory contract . . of the debtor, whether or not such contract . . . prohibits or restricts assignment of rights, if . . .
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract from accepting performance from or rendering performance to an entity other than the debtor or debtor in possession . . . whether or not such contract . . . prohibits or restricts assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c).

39. The Markit License -- which provides, *inter alia*, a license for non-exclusive use of copyrighted matter -- is not assignable under applicable non-bankruptcy law. Indeed, it is well-settled that nonexclusive copyright licenses are personal to the licensee and substantive law prohibits their assignment without consent of the licensor. *In re Golden Books*, 269 B.R. at 309 (upholding licensor's objection to proposed assignment and assumption of licenses in connection with sale of debtor's assets), *citing* 3 Melvin B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT, § 10.02[A] at 10-23 (1996); *see also, e.g., RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 266 (4th Cir. 2004); *Gardner v. Nike, Inc.*, 110 F. Supp. 2d 1282 (C.D. Cal. 2000), *aff'd*, 279 F.3d 774 (9th Cir. 2002); *In re BuildNet, Inc.*, 2002 Bankr. LEXIS 1851, at * 15 (Bankr. M.D.N.C. Sept. 20, 2002).

40. This conclusion is not altered by the fact that the Markit License also licenses rights in addition to copyright rights. In *In re BuildNet, supra*, the bankruptcy court held that a contract which licensed the use of both copyrighted e-commerce software and a non-copyrightable database was non-assignable in bankruptcy pursuant to Section 365(c).

41. Because Section 365(c) of the Bankruptcy Code and applicable non-bankruptcy law forbid assumption and assignment of non-exclusive copyright licenses, such as the Markit License and the Markit Addenda, the Sale Order, to the extent it purports to assign the Markit License or the Markit Addenda to the Purchaser, is in manifest error that should be corrected.

## CONCLUSION

42. For the reasons set forth above, Markit respectfully requests that this Court (a) clarify that the Sale Order does not approve the assumption and assignment of the Markit License or the Markit Addenda to the Purchaser, and (b) to the extent that the Sale Order does

08-13555-mg    Doc 433    Filed 09/29/08    Entered 09/29/08 19:36:12    Main Document
                                    Pg 18 of 18

purport to approve the assumption and assignment of the Markit License and the Markit Addenda, modify the Sale Order to the limited extent of providing that the Markit License and Markit Addenda may not be included among the Closing Date Contracts assumed and assigned to the Purchaser without Markit's consent.

Dated:    September 29, 2008
         New York, New York

/s/ Michael T. Mervis
Jeffrey W. Levitan (JL 6155)
Michael T. Mervis (MM 0306)
Karen D. Coombs (KC 3538)
Proskauer Rose LLP
1585 Broadway
New York, NY 10036-8299
(212) 969-3000

*Attorneys for Markit Group Limited*