# EXHIBIT A

<u>FINAL AGREEMENT</u>

**Mark-it Partners Limited**

**Founding Customer**

**Data Services Agreement**

**With**

**Lehman Brothers, Inc.**

**Dated:  December 3, 2002**

# Table of Contents

| | | |
|---|---|---|
| 1 | Interpretation | 1 |
| | 1.1 Definitions | 1 |
| | 1.2 Rules of Interpretation | 6 |
| 2 | Commencement and Term | 7 |
| | 2.1 Commencement | 7 |
| | 2.2 Duration | 7 |
| | 2.3 Conditions Precedent | 7 |
| | 2.4 Commencement/Testing Period | 8 |
| 3 | Performance of Services | 9 |
| | 3.1 General | 9 |
| | 3.2 Support | 9 |
| 4 | Founding Customer Financial Data | 10 |
| | 4.1 General | 10 |
| 5 | License and Ownership of Property – Founding Customer | 10 |
| | 5.1 License to Founding Customer | 10 |
| | 5.2 Restrictions | 10 |
| | 5.3 Ownership of Mark-it Property | 11 |
| 6 | License and Ownership of Property – Mark-it | 12 |
| | 6.1 License to Mark-it | 12 |
| | 6.2 Restrictions | 13 |
| | 6.3 Ownership of Founding Customer Property | 14 |
| 7 | System Requirements and Security | 15 |
| | 7.1 System Requirements | 15 |

7.2    Security ...................................................................................................... 15

8    Liability for Data/Founding Customer Financial Data ........................................ 16

    8.1    Data ........................................................................................................ 16

    8.2    Indemnity Regarding the Data ............................................................... 16

    8.3    Founding Customer Financial Data ........................................................ 16

    8.4    Indemnity Regarding the Founding Customer Financial Data .............. 17

    8.5    Indemnification Procedures .................................................................... 17

9    Price and Payment ............................................................................................. 17

    9.1    General ................................................................................................... 17

    9.2    Initial Fees .............................................................................................. 18

    9.3    Annual Fees ............................................................................................ 18

    9.4    Invoices / Payment Terms ...................................................................... 18

    9.5    Intentionally Omitted .............................................................................. 18

    9.6    Disputed Items ....................................................................................... 18

    9.7    Additional Charges - Taxes .................................................................... 18

    9.8    Rebate .................................................................................................... 19

10    Contract Management ........................................................................................ 19

    10.1    Contract Representatives ...................................................................... 19

11    Confidentiality / Non-Solicitation ....................................................................... 19

    11.1    General Duty of Confidence .................................................................. 19

    11.2    No Unauthorized Use ............................................................................ 20

    11.3    Exceptions ............................................................................................. 20

    11.4    Continuing Obligation/Other Agreements ............................................. 20

    11.5    Non-Solicitation ..................................................................................... 21

    11.6    Contractor Confidentiality Agreements ................................................. 21

12    Dispute Resolution ................................................................................................ 21

    12.1    Deficiency Rectification ............................................................................ 21

    12.2    Dispute Resolution .................................................................................. 22

13    Liability / Miscellaneous ....................................................................................... 22

    13.1    Exclusions ................................................................................................ 22

    13.2    Exclusion of Specific Forms of Loss ....................................................... 23

    13.3    Limits ....................................................................................................... 23

    13.4    Exceptions ............................................................................................... 23

    13.5    Exclusion of Implied Terms ..................................................................... 23

    13.6    Notification of Claims ............................................................................... 24

    13.7    Insurance ................................................................................................. 24

    13.8    Recovery from Third Parties .................................................................... 24

    13.9    Client Claims ............................................................................................ 24

    13.10   Access to Systems .................................................................................. 25

14    Termination .......................................................................................................... 25

    14.1    Termination by Either Party ..................................................................... 25

    14.2    Termination by Founding Customer ......................................................... 26

    14.3    Termination by Mark-it ............................................................................. 26

    14.4    Survival of Rights on Termination or Expiry ............................................ 27

    14.5    Effect of Termination ............................................................................... 27

    14.6    Refund of Fees on Termination ............................................................... 27

15    Force Majeure/Malfunction .................................................................................. 28

    15.1    Relief for Force Majeure .......................................................................... 28

    15.2    Notification and Consultation ................................................................... 28

    15.3    Mitigation ................................................................................................. 28

15.4    Suspension of Services During Malfunction ........................................................... 29

15.5    Termination of Agreement ................................................................................. 29

16    Equivalent Terms ......................................................................................................... 29

17    General ........................................................................................................................ 29

17.1    Notices ............................................................................................................... 29

17.2    Entire Agreement ............................................................................................... 30

17.3    Assignment ........................................................................................................ 30

17.4    Waiver ................................................................................................................ 31

17.5    Amendment and Variation ................................................................................. 31

17.6    Independent Contractor ..................................................................................... 31

17.7    Counterparts ...................................................................................................... 32

17.8    Invalidity ............................................................................................................ 32

17.9    Costs and Expenses .......................................................................................... 32

17.10    Further Assurances .......................................................................................... 32

17.11    Third Party Rights ............................................................................................ 32

17.12    Remedies Cumulative ...................................................................................... 32

17.13    Governing Law ................................................................................................. 32

17.14    Representations and Warranties ...................................................................... 33

17.15    Regulatory Access and Compliance ................................................................ 33

17.16    No Promotion ................................................................................................... 33

17.17    Additional Use Request .................................................................................... 34

17.18    UCITA .............................................................................................................. 34

17.19    Equitable Relief ............................................................................................... 34

Schedule 1:  Services ............................................................................................................ 35

Schedule 2:  Fees and Charges ............................................................................................ 37

4852/99999-501 NYLIB2/948370 v2

Schedule 3: Part A - Technical Obligations ................................................................... 38

Schedule 3: Part B1 – Founding Customer Financial Data Obligations ...................................... 39

Schedule 3: Part B2 – Technical Obligations............................................................... 42

Schedule 3: Part C - Designated IP Address.................................................................. 51

Schedule 4: Disputes Procedure............................................................................... 52

Schedule 5: Additional License Matters ..................................................................... 54

Schedule 6: Rebate Mechanism .............................................................................. 56

Schedule 7: Quorum Requirements .......................................................................... 59

**THIS AGREEMENT** is made as of the ___ day of October, 2002, **between:**

(1)    **Mark-it Partners Limited,** having its principal office at Barn A, New Barnes Mill, Cottonmill Lane, St Albans, Hertfordshire, AL1 2HE (**"Mark-it"**); and

(2)    [_____], having its principal office at [_____] (**"Founding Customer"**).

**Whereas:**

(A)    Mark-it has developed various products and services based on pooling and adding value to credit pricing data that Mark-it receives from financial institutions, including Founding Customer.

(B)    Founding Customer is one of Mark-it's initial customers and contributing institutions and as such will provide significant value to Mark-it.

(C)    Founding Customer has agreed to provide credit pricing data to Mark-it for the purpose of enabling Mark-it to produce and deliver its products and services to its customers, including Founding Customer, on and subject to the terms of this Agreement.

(D)    Mark-it intends to provide products and associated services to Founding Customer and Founding Customer has agreed to accept and pay for them, on and subject to the terms of this Agreement.

**Now, therefore,** in consideration of the promises and mutual agreements set forth herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties agree as follows:

1    Interpretation

    1.1    Definitions

        In this Agreement, the following terms shall have the following meanings unless the context otherwise requires:

        **"Affiliate"** means, in relation to a party, any company, partnership or other entity which from time to time Controls, is Controlled by or is under the common Control with that party (provided that neither Mark-it or Founding Customer shall be regarded as an **"Affiliate"** of the other for the purposes of this Agreement). For these purposes **"Control"** means the beneficial ownership of more than 50% of the issued share capital or the sole legal power to direct or cause the direction of the general management of the company, partnership or other entity in question.

        **"Aggregated Data"** means individual prices of Financial Instruments shown on an anonymous basis in accordance with the applicable Quorum Requirement and any data or information that has been produced or generated by Mark-it based on the Founding Customer Financial Data and/or other Financial Data, (i) which cannot

be readily identified by a third party as having been provided by Founding Customer and (ii) from which information about Founding Customer or any particular individuals or entities cannot be readily determined.

"**Annual Fee**" means the annual fee payable by the Founding Customer as set forth in Schedule 2.

"**Business Day**" means any day other than a Saturday or Sunday on which banks are generally open for business in New York or London.

"**Claims**" has the meaning set forth in Section 8.2.

"**Commencement Date**" means the start date of the Services set forth in the Commencement Notice delivered pursuant to Section 2.4.

"**Commencement Notice**" has the meaning set forth in Section 2.4.

"**Confidential Information**" means in relation to a party and its Group all confidential and proprietary information (whether such information is in oral or written form or is recorded in any other medium) about or pertaining to the business of that party and its Group or their customers which is disclosed to the other party or its Group or their employees or contractors, or which is acquired by or otherwise comes to the knowledge of the other party or its Group or their employees or contractors in connection with this Agreement (including the performance by a party of its obligations hereunder). The "Confidential Information" of Mark-it includes the Mark-it Services and the information contained therein (including, without limitation, the Data) and the business methods and models related thereto, but does not include Transformed Data. The "Confidential Information" of Founding Customer includes the Founding Customer Financial Data and the information contained therein and business information relating to Founding Customer that can be derived therefrom, but does not include Aggregated Data. This Agreement and its terms shall be considered "Confidential Information".

"**Contract Date**" means the date of this Agreement first set out above.

"**Contract Years**" means the 12-month period commencing on the later of January 1, 2003 or the first day of the first month following the Commencement Date, and each succeeding 12-month period.

"**Credit Product**" means fixed income securities, floating rate securities or market standard credit derivatives and their associated recovery rates, whose issuers or, in the case of credit derivatives, reference issuers, are corporate or government entities.

"**Data**" means part or all of the data, charts, statistics, Financial Data and other information included in and made available as part of the Services.

"**Designated Employees**" means each officer, employee or agent, each being a natural person, of the Founding Customer Group who is from time to time authorized by Founding Customer to access and use the Services from a Designated IP Address and who is specifically identified to Mark-it.

"**Designated IP Address**" means one of the IP addresses specified in Schedule 3, Part C, as amended from time to time by agreement between the parties.

"**Executable Prices**" has the meaning set forth in Schedule 3, Part B1.

"**Fees**" means the Initial Fee and Annual Fee for the Services, as further set forth in Schedule 2.

"**Financial Data**" means the financial data Mark-it receives from various financial institutions including Founding Customer.

"**Financial Instruments**" means securities and exchange-traded or over-the-counter derivative contracts, including Credit Product.

"**Force Majeure Event**" means, in relation to a party, an event that is beyond the reasonable control of that party, including: any "act of God"; act of a governmental authority (except to the extent that they constitute remedies or sanctions lawfully exercised by a competent authority as a result of any violation by the relevant party of any law, regulation or order of any governmental, regulatory or other competent authority in effect on the date of this Agreement); act of the public enemy or due to war, riot, fire, flood, civil commotion, insurrection, sabotage or terrorism; labor difficulty (including any strike or other work stoppage or slowdown); severe or adverse weather condition; failure of supply of electricity, telecommunications, water, drainage, heat or light; and any event or circumstance of a nature analogous to any of the foregoing.

"**Founding Customer Client**" means any person (other than an employee) to whom Founding Customer provides (i) the Data or any part of the Data, or (ii) any opinions, recommendations, forecasts, judgments, formulations or any other conclusions or information based on or derived from the Data or the Services from time to time.

"**Founding Customer Financial Data**" means the financial data that the Founding Customer and its Affiliates provide under this Agreement.

"**Founding Customer Positional Data**" means that part of the Founding Customer Financial Data which consists of the sizes of holdings of Financial Instruments on the trading books of, or otherwise held by, the Founding Customer. Founding Customer Positional Data need not be specific as to size but instead may be reported as a Material Position or as not a Material Position as set forth in Schedule 3, Part B1.

**"Founding Customer Price Data"** means that part of the Founding Customer Financial Data which consists of the prices of Financial Instruments.

**"Founding Customer Systems"** means the information technology systems owned or used by the Founding Customer in connection with its business, including such computer hardware, software, telecommunications lines and facilities that comply with the minimum requirements for accessing the Services as are set forth in this Agreement.

**"Give All/Get All Quorum Requirement"** has the meaning set forth in Schedule 7.

**"Give/Get Quorum Requirement"** has the meaning set forth in Schedule 7.

**"Good Industry Practice"** means, in relation to any particular circumstances, the degree of skill, diligence, prudence, foresight and operating practice which would reasonably and ordinarily be expected from a reasonably skilled and experienced provider of services of a similar type to the Services under the same or similar circumstances and conduct in accordance with all applicable laws, rules and regulations.

**"Group"** means, in relation to a party, that party, the ultimate parent company Wholly-Owning and controlling that party, and all Affiliates of that party that are directly or indirectly Wholly-Owned and controlled by such party or such ultimate parent company. In addition, upon the prior written consent of the other party to this Agreement (not to be unreasonably withheld), a party may elect to include in its "Group" Affiliates that only meet the "control" test (and not the Wholly-Owned test) but that such party demonstrates and represents to the other party are operated and are controlled as if they were Wholly-Owned and controlled.

**"Initial Fee"** means the fee payable for the period from the Commencement Date through January 1, 2003, and calculated in accordance with the fee structure set forth in Schedule 2.

**"Initial Term"** has the meaning given such term in Section 2.2.

**"Intellectual Property"** means (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof, (b) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith, (c) all copyrightable works, all copyrights, and any applications, registrations and renewals in connection therewith, (d) all mask works and all applications, registrations and renewals in connection therewith, (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and

techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information and business and marketing plans and proposals, (f) all computer software (including data and related documentation), (g) all websites, domain names, and e-mail addresses, (h) all database rights and any applications, registrations and renewals in connection therewith, and (i) all other proprietary rights now or hereafter recognized in whatever form or medium and irrespective of the method of their embodiment.

"**Investment Grade**" means, in respect of a Financial Instrument, having one or more credit ratings, from an internationally recognized major credit rating agency of "AAA", "AA", "A" or "BBB" (or equivalent ratings), provided that if any internationally recognized major credit rating agency gives such Financial Instrument a credit rating below "BBB" (or equivalent rating) such Financial Instrument shall not be "Investment Grade" for purposes of this Agreement.

"**Malfunction**" means (i) any material failures, malfunctions, faults or errors within Mark-it's systems, (ii) external events or circumstances affecting the Services or the Data and material to the integrity, quality or security of the Services or the Data, or (iii) a request of or requirement by any government or regulatory organization or body that reasonably requires a shut-down (temporary or permanent) of Mark-it's systems.

"**Mark-it Services**" means the data or services that Mark-it offers from time to time to its customers based on data it receives (including from financial institutions), including the Services.

"**Material Position**" means, with respect to a fixed income or floating rate security, a then-current inventory position of Founding Customer at the Submission Time which is of a size of US$5,000,000 (or equivalent in other currency) or greater, or in respect of a credit default swap, a then-current inventory position of Founding Customer at the Submission Time with a delta (meaning sensitivity to a one basis point change in credit spread), expressed as described in Schedule 3, of US$2,000 (or equivalent in other currency) or greater. Upon reasonable prior notice to, and consultation with, Founding Customer, Mark-it may modify this definition of Material Position to reflect changes in, or particular attributes of, the market for a particular Financial Instrument.

"**New Services**" has the meaning set forth in Section 9.1.

"**Participating Founding Customers**" has the meaning set forth in Schedule 6.

"**Quorum Requirement**" means the Give/Get Quorum Requirement or the Give All/Get All Quorum Requirement, as applicable.

"**Services**" means the specific Mark-it Services that Mark-it provides to Founding Customer under this Agreement and, as of the Commencement Date, set forth in Schedule 1.

"**Sub Investment grade**" means any Financial Instrument that is not Investment Grade.

"**Submission Time**" has the meaning set forth in Section 4.1.2.

"**Term**" means the term of this Agreement.

"**Transformed Data**" means any data or information that has been produced or generated by Founding Customer based in part (but not solely) on the Data, provided that (i) any Data used in the preparation of, or that forms a part of, such Transformed Data has been used only as permitted by this Agreement (including Section 5.1 and Schedule 5), (ii) such Data has been transformed, incorporated or used, in each case in a process by Founding Customer (e.g., by aggregation with other data) such that Transformed Data cannot be identified or reverse-engineered as originating or directly derived from the Data and (iii) such Transformed Data has not been produced or generated through an institutionalized, direct-feed or automated system or process in which the Data is an input (other than Transformed Data consisting of prices adopted by Founding Customer in and for its books of record pursuant to such a system or process that is used for the purposes specifically permitted by Section 1.1 and the first sentence of Section 1.2 of Schedule 5).

"**Wholly-Owned**" means at least ninety percent (90%) of the equity interests of one entity (the "**first entity**") being owned directly or indirectly by the other entity, provided that (i) no person or entity that competes with Mark-it's data or information services business holds any equity (or similar rights) of such first entity and (ii) such first entity is operated and controlled as if it were wholly-owned by the applicable other entity.

1.2    Rules of Interpretation

The following rules apply unless the context requires otherwise:

1.2.1    Headings, and headers and footers, shall be ignored in construing this Agreement.

1.2.2    If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

1.2.3    References to this Agreement include its Schedules and this Agreement as from time to time amended and references to Recitals, Sections, paragraphs, Schedules and Appendices are to recitals and sections and paragraphs of, and schedules and appendices to, this Agreement.

1.2.4    The words "include", "includes" and "including" and any words following them shall be construed without limitation to the generality of any preceding words or concepts and vice versa.

1.2.5    The word "person" shall be construed broadly and shall include any company, trust, corporation, association or other entity, and any natural person.

1.2.6    References to times of day are to London (UK) time unless otherwise stated.

1.2.7    A reference to an agreement or document (including, without limitation, a reference to this Agreement) is to the agreement or document as amended, varied, supplemented, novated or replaced, except to the extent prohibited by this Agreement or that other agreement or document.

2    Commencement and Term

2.1    Commencement

Subject to Section 2.3, this Agreement shall be deemed to have commenced operation on, and shall be in full force and effect as of, the Contract Date.

2.2    Duration

Subject to the rights of termination contained in this Agreement, this Agreement shall continue in force for the period from the Contract Date through the later of (i) December 31, 2005 and (ii) the end of the third Contract Year (the "**Initial Term**").

2.3    Conditions Precedent

Mark-it's obligations to commence providing the Services (or any part thereof) under this Agreement shall be conditioned upon (and shall be of no force or effect unless and until):

2.3.1    Founding Customer has commenced providing Mark-it with the Founding Customer Financial Data in accordance with the terms of this Agreement;

2.3.2    Mark-it is then collecting Financial Data from not fewer than seven (7) Participating Founding Customers, and is able to properly compile such Financial Data in a manner that Mark-it reasonably considers to be satisfactory in terms of legality, quality, volume and significance, and sufficiently secure for redistribution as part of Mark-it Services;

2.3.3    The Initial Fees have been paid by the Founding Customer;

2.3.4    The parties have implemented and tested the security measures to be taken in respect of the delivery and receipt of Founding Customer Financial Data and the Services; and

2.3.5    Mark-it has obtained any regulatory consents, licenses and authorizations required to provide the Services.

Mark-it shall use all commercially reasonable efforts to cause the foregoing conditions (other than Section 2.3.3) to be satisfied as soon as is practicable and by not later than December 31, 2002.

2.4    Commencement/Testing Period

2.4.1    Mark-it shall deliver a written notice (the **"Commencement Notice"**) to the Founding Customer at such time as Mark-it reasonably determines that the conditions set forth in Section 2.3 (other than Section 2.3.3) have been, or within thirty (30) days will be, satisfied. The Commencement Notice shall specify the "Commencement Date," which shall be a date not earlier than thirty (30) days from the date of delivery of the Commencement Notice to Founding Customer.

2.4.2    Mark-it shall make the Services available for testing by the Founding Customer commencing on the Commencement Date and during the thirty (30) day period following the Commencement Date (the "Testing Period").

2.4.3    If the Founding Customer reasonably determines during the Testing Period that the Services do not perform and function properly, Founding Customer will document in writing to Mark-it each such failure in reasonably sufficient detail (a **"Failure Notice"**), delivered prior to the end of the Testing Period. Mark-it will have ten (10) Business Days from the delivery of the Failure Notice (the **"Correction Period"**) to correct each such failure and make the corrected Services available for testing, and the Founding Customer shall have ten (10) Business Days from the date such corrected services are made available for testing (a **"Re-test Period"**) to re-test the corrected Services.

2.4.4    If the Founding Customer has not delivered a Failure Notice prior to the end of the Testing Period, or prior to the end of any Re-test Period with respect to any corrected failure (if any), the Founding Customer shall be deemed to have accepted the performance and function of the Services for purposes of this Section 2.4.

2.4.5    If the Founding Customer has timely delivered a Failure Notice and Mark-it has failed to correct each identified failure within the Correction Period (a **"Correction Failure"**) (other than a Correction Failure due to the Founding Customer's unreasonable lack of cooperation with Mark-it to remedy the applicable failure), the Founding Customer shall have the right, at any time after the Correction Failure and prior to the fifteenth (15) Business Day following the receipt by Founding Customer of written notice from Mark-it that Mark-it will take no further action relating to the

applicable failure, to immediately terminate this Agreement and receive a full refund of all Fees paid through the date of such termination.

2.4.6    Mark-it shall notify Founding Customer as to other failure notices received by Mark-it from Participating Founding Customers (on an anonymous basis) to the extent that the applicable failure affects Founding Customer's use of the Services in any significant respect.

3    Performance of Services

3.1    General

3.1.1    Mark-it shall provide Founding Customer the Services during the Term, and Founding Customer shall pay the Fees for such Services, in each case subject to and in accordance with the terms of this Agreement.

3.1.2    Founding Customer shall participate in discussions regarding the provision of the Services to Mark-it to the extent reasonably requested by Mark-it in order to facilitate decision-making in relation to, and the development of, the Services and other Mark-it Services.

3.1.3    A designee of Founding Customer will have the right to serve on an Advisory Committee of Mark-it until the earlier of (i) the termination of this Agreement and (ii) the exercise or expiration of the option to purchase shares of Mark-it held or to be held by each of the Participating Founding Customers. The Advisory Committee will consult with the Board of Directors of Mark-it and make recommendations and provide input relating to the development and implementation of the Mark-it Services.

3.1.4    Mark-it shall use all commercially reasonable efforts to perform its obligations hereunder in accordance with Good Industry Practice and shall perform its obligations under this Agreement at the same level and with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and efficiency as Mark-it's other comparable customers generally receive from Mark-it for services similar to the Services.

3.2    Support

Mark-it shall, in accordance with Good Industry Practice, maintain its systems and the availability of the Services to Founding Customer. Mark-it shall have no responsibility for support or maintenance that is required as a result of a failure in Founding Customer's Systems or its improper accessing of the Data or Services.

4    Founding Customer Financial Data

    4.1    General

        4.1.1    Founding Customer shall provide on a timely basis, in accordance with Schedule 3, Part B2, to Mark-it the Founding Customer Financial Data described in Schedule 3, Part B1 (as may be amended from time to time by agreement of the parties hereto) by electronic means in the format set out in Schedule 3, Part B2 (as may be amended from time to time by agreement of the parties hereto), for use by Mark-it in creating and providing Mark-it Services (subject to the provisions of this Agreement).

        4.1.2    All Founding Customer Financial Data shall be provided to Mark-it by not later than 10:00PM New York time (or such earlier time as is agreed upon between Mark-it and the Founding Customer) (the "Submission Time") on each Business Day and each piece of Financial Data provided shall have an appropriate time stamp as provided in Schedule 3, Part B2.

        4.1.3    Founding Customer will, in all material respects, perform its obligations under this Agreement at substantially the same level and with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and efficiency as its other vendors generally receive from Founding Customer for the delivery of data similar to the Founding Customer Financial Data.

5    License and Ownership of Property – Founding Customer

    5.1    License to Founding Customer

        Mark-it hereby grants to the Founding Customer for use by the Founding Customer and its Group and each relevant Designated Employee a worldwide, personal, non-exclusive, non-transferable, perpetual license to use the Data and Services for its own internal business purposes in the ordinary course of its business, except to the extent prohibited hereunder, including as set forth in (and subject to the limitations of) Schedule 5.

    5.2    Restrictions

        5.2.1    Founding Customer may not use the Data or Services for any purpose other than as set out in Section 5.1. Except as specifically set forth in this Agreement, this license does not include the right to sub-license, rent, lend, transmit, sell, assign, lease, resell, publish or otherwise distribute, transfer or make available all or any portion of the Data or Services by whatever means to any third party or any employee or Affiliate of the Founding Customer or its Group members.

        5.2.2    Except as specifically set forth in this Agreement (including as provided in Schedule 5), (i) Founding Customer may not copy, translate, convert,

decompile, alter, enhance, disassemble, modify, change, or create derivative works from the Services or Data or any part thereof, and (ii) Founding Customer may not enter into any service, reporting or other agreement or arrangement with any party pursuant to which the Services or the Data are used to produce or distribute information or services to or for such party.

5.2.3    Founding Customer may not use the Data or Services to develop, create or directly price any index.  In the event of a breach of the preceding sentence, Founding Customer shall promptly report such activity to Mark-it.

5.2.4    Each of the restrictions contained in Sections 5.2.1, 5.2.2 and 5.2.3 shall apply to each member of the Founding Customer's Group and each Designated Employee that uses or obtains the Data or Services, *mutatis mutandis*.

5.2.5    It is acknowledged and agreed that the restrictions contained in Sections 5.2.1, 5.2.2 and 5.2.3 shall not apply to Transformed Data.

5.3    Ownership of Mark-it Property

Subject to any other specific agreement between the parties, Founding Customer agrees that if Mark-it, in the performance of its obligations under this Agreement, makes available to Founding Customer or any member of its Group any Intellectual Property or materials in which Intellectual Property owned by Mark-it or an Affiliate of Mark-it subsists (including the Services and the Data):

5.3.1    that Intellectual Property will remain the sole property of Mark-it or the relevant Affiliate of Mark-it (as the case may be) and neither Founding Customer nor any member of its Group will acquire any Intellectual Property or title therein;

5.3.2    neither Founding Customer nor any member of its Group may use or reproduce that Intellectual Property, except to the extent specifically provided in this Agreement;

5.3.3    except as specifically set forth in this Agreement (including using the Intellectual Property to create Transformed Data), Founding Customer must not modify, translate, decompile, reverse-engineer, disassemble, make derivative works based on or copy such Intellectual Property or any part thereof, other than to the extent permitted by law and to the extent required to comply with industry-standard and customary backup, disaster recovery and regulatory requirements;

5.3.4    Founding Customer shall not assign, sub-license, rent, resell, publish or otherwise distribute, transfer or (except as specifically set forth in this

Agreement) make available such Intellectual Property or any part thereof to any third party or Affiliate by whatever means;

5.3.5    Founding Customer agrees not to remove, suppress or modify in any way the proprietary markings, including any trade mark or copyright notice, used in relation to the Services or Intellectual Property;

5.3.6    other than as specifically agreed to by Mark-it in writing, Founding Customer must not refer to the Data, the Services, the Mark-it Services, or any trade mark or copyright notice used in relation to these, in a way which does or may imply (i) that any Mark-it Services form part of the services or products offered to Founding Customer's Clients, or (ii) that Mark-it is responsible for the accuracy or quality of the Data or any other information or data that Founding Customer provides to Founding Customer Clients.

5.3.7    Founding Customer shall notify Mark-it promptly if it becomes aware of any unauthorized access to, use or copying of any part of the Services or Intellectual Property; and

5.3.8    Founding Customer will use all commercially reasonable efforts to remove any third party lien on such Intellectual Property or materials that arises from the act or failure to act of the Founding Customer.

It is acknowledged and agreed that Transformed Data shall not be considered Intellectual Property of Mark-it, Founding Customer retains all rights with respect to Transformed Data and, therefore, that the provisions of this Section 5.3 shall not apply to Transformed Data.

6    License and Ownership of Property – Mark-it

6.1    License to Mark-it

Founding Customer hereby grants to Mark-it a worldwide, non-exclusive, perpetual and irrevocable license, for Mark-it and the Mark-it Group, to use, copy, modify, adapt, compile and aggregate the Founding Customer Financial Data provided to Mark-it, solely for the purposes of creating Aggregated Data. Founding Customer acknowledges and agrees that Founding Customer has no rights (of ownership or otherwise) to the Aggregated Data (except to receive and use Aggregated Data as part of the Services as provided under this Agreement) and that, except as specifically restricted in Section 6.2, Mark-it may use the Aggregated Data in any manner permitted by applicable law and without limitation. Except as specifically provided herein, the Founding Customer retains all rights with respect to the Founding Customer Financial Data, and may otherwise use or distribute such data without restriction, even if such use or distribution competes with Mark-it.

6.2    <u>Restrictions</u>

6.2.1    Mark-it may not use the Founding Customer Financial Data for any purpose other than as set out in Section 6.1. Except as specifically set forth in this Agreement, this license does not include the right to sub-license, rent, lend, transmit, sell, assign, lease, resell, publish or otherwise distribute, transfer or make available all or any portion of the Founding Customer Financial Data to any third party.

6.2.2    Neither Mark-it nor any of its Group members, may enter into any financial trades based on the Founding Customer Financial Data, and Mark-it will take all reasonable steps in accordance with Good Industry Practice to ensure that its and its Group's employees do not do so.

6.2.3    Except as specifically permitted in writing by the Founding Customer, Mark-it may not disclose to any third party that the Founding Customer is the provider of the Founding Customer Financial Data.

6.2.4    Mark-it may not use the Founding Customer Financial Data or any Aggregated Data to, and will cause each of its customers to agree not to, develop, create or directly price indices to be marketed by Mark-it or any other Person, and may not directly feed data to any entity for the purpose of pricing any index. In the event Mark-it becomes aware of any breach by a customer of the restriction described above, it will report such breach to Founding Customer.

6.2.5    Mark-it may not, without, in each case, the prior consent of the Founding Customer, display, make available for download or otherwise disclose Founding Customer Financial Data to any third party, except as part of Aggregated Data.

6.2.6    Mark-it will display, make available for download or otherwise disclose Founding Customer Price Data as part of Aggregated Data for any single Financial Instrument only where the aggregate Financial Data received by Mark-it in respect of that Financial Instrument meets or exceeds Mark-it's Quorum Requirement, as set forth in Schedule 7.

6.2.7    Each of the restrictions contained in Sections 6.2.1 through 6.2.6 (inclusive) shall apply to each member the Mark-it Group, mutatis mutandis.

6.2.8    It is acknowledged and agreed that the foregoing restrictions contained in Sections 6.2.1 through 6.2.6 (inclusive) shall not apply to Aggregated Data, except as specifically provided in Sections 6.2.4 and 6.2.6.

08-13555-mg    Doc 433-1    Filed 09/29/08    Entered 09/29/08 19:36:12    Exhibit A-D
Pg 21 of 100

6.3   Ownership of Founding Customer Property

Subject to any other specific agreement between the parties, Mark-it agrees that if Founding Customer, in the performance of its obligations under this Agreement, makes available to Mark-it or any member of the Mark-it Group any Intellectual Property or materials in which Intellectual Property owned by Founding Customer or an Affiliate of Founding Customer subsists (including the Founding Customer Financial Data),

6.3.1   that Intellectual Property will remain the sole property of Founding Customer or the relevant Affiliate of Founding Customer (as the case may be) and neither Mark-it nor any member of the Mark-it Group will acquire any Intellectual Property or title therein;

6.3.2   Mark-it shall notify Founding Customer promptly if it becomes aware of any unauthorized access to, use or copying of any part of the Founding Customer's Intellectual Property; and

6.3.3   Mark-it will use all commercially reasonable efforts to remove any third party lien on such Intellectual Property or materials that arises from the act or failure to act of Mark-it.

6.3.4   neither Mark-it nor any member of its Group may use or reproduce that Intellectual Property, except to the extent specifically provided in this Agreement;

6.3.5   except as specifically set forth in this Agreement (including using the Intellectual Property to create Aggregated Data), Mark-it must not modify, translate, decompile, reverse-engineer, disassemble, make derivative works based on or copy such Intellectual Property or any part thereof, other than to the extent permitted by law and to the extent required to comply with industry-standard and customary backup, disaster recovery and regulatory requirements; and

6.3.6   Mark-it shall not assign, sub-license, rent, resell, publish or otherwise distribute, transfer or (except as specifically set forth in this Agreement) make available such Intellectual Property or any part thereof to any third party or Affiliate by whatever means, other than as part of Aggregated Data.

It is acknowledged and agreed that Aggregated Data shall not be considered Intellectual Property of Founding Customer, Mark-it retains all rights with respect to Aggregated Data and, therefore, that the provisions of this Section 6.3 shall not apply to Aggregated Data.

7    System Requirements and Security

    7.1    System Requirements

Founding Customer shall at its own cost obtain and maintain the Founding Customer System throughout the Term, and shall, at its own cost, implement and integrate the Founding Customer Systems, in each case in order to properly allow for the delivery of Services and the delivery of Founding Customer Financial Data as provided in this Agreement. As of the date hereof, the parties expect that the Founding Customer System will need to meet at least the minimum requirements set forth in Schedule 3, Part A. Founding Customer acknowledges that non-compliance with this obligation may render it incapable of accessing the Services. Founding Customer shall endeavor to inform Mark-it of any proposed changes to the Founding Customer Systems or in Founding Customer's information technology (IT) policy which might reasonably be expected to adversely affect the continued provision of Founding Customer Financial Data or receipt of Services. Without prejudice to Founding Customer's obligations under this Agreement, in the event that the Founding Customer System suffers any interruption, disablement or other problem, Founding Customer will as soon as reasonably practicable notify Mark-it and use commercially reasonable efforts, at its own cost, to remedy the problem or find an alternative way of accessing the Services and providing the Founding Customer Financial Data.

    7.2    Security

Founding Customer and Mark-it shall each ensure that it implements and complies with all security measures as would constitute Good Industry Practice to ensure the security of the Services and the Data contained therein and the Founding Customer Financial Data, and to protect the Founding Customer Systems and Mark-it systems from unauthorized third-party access. Each party agrees to notify the other party as soon as reasonably practicable if it discovers such unauthorized access (it being understood that the parties will endeavor to notify each other within two hours of discovery of such access). In addition, Founding Customer will implement reasonable security measures as would constitute Good Industry Practice to ensure that there are no security breaches in respect of Mark-it's systems, including unauthorized access or damage to the Mark-it Services. At the request of Founding Customer, upon reasonable notice Mark-it will review its security procedures and protocols with Founding Customer and make its security systems available for inspection by Founding Customer (all at the sole expense of Founding Customer and only at reasonably convenient times).

Founding Customer may terminate this Agreement immediately by written notice to Mark-it if Founding Customer reasonably determines that the security measures implemented by Mark-it to protect Founding Customer Financial Data do not comply with the requirements of this Agreement regarding the confidentiality and security of the Founding Customer Financial Data and (where the deficient measures are possible of being remedied) these measures have not been

remedied within ten (10) days after Founding Customer requests Mark-it in writing to do so.

8    Liability for Data/Founding Customer Financial Data

8.1    Data

Except as specifically provided in Section 8.2 below, the Data and Services are made available to Founding Customer on an "as is" basis. Mark-it makes no warranty, express or implied, as to results to be obtained from the use of the Data or Services, merchantability or fitness for a particular purpose. Neither Mark-it nor any of its Affiliates shall in any way be liable to Founding Customer or any of its Group Members or any Founding Customer Client for any inaccuracies, errors or omissions, regardless of cause, in the Data or Services or for any damages (whether direct or indirect) resulting therefrom. Without limiting the foregoing, Mark-it shall have no liability whatsoever to Founding Customer, whether in contract (including under an indemnity), in tort (including negligence), under a warranty, under statute or otherwise, in respect of any loss or damage suffered by Founding Customer as a result of or in connection with any opinions, recommendations, forecasts, judgments, or any other conclusions, or any course of action determined, by Founding Customer or any Founding Customer Client, whether or not based on the Data and/or the Services. The limits on liability set out in this Section 8.1 shall not apply in respect of liability for fraud or willful misconduct.

8.2    Indemnity Regarding the Data

Mark-it will indemnify, defend and hold harmless Founding Customer and its Affiliates, and their directors, officers, agents, employees, successors and assigns ("**Founding Customer Indemnitees**") from and against any and all losses, liabilities, damages, costs (including reasonable attorney's fees) and expenses (collectively, "**Losses**") arising as a result of any claims, suits or proceedings (collectively, "**Claims**") brought by any third party against any Founding Customer Indemnitees arising from any claim that the providing of Data or performance of the Services by Mark-it infringes or misappropriates any patent, trade secret, copyright or other proprietary rights of such third party.

8.3    Founding Customer Financial Data

Except as specifically set forth in Section 8.4 below, the Founding Customer Financial Data is made available to Mark-it on an "as is" basis. Founding Customer makes no warranty, express or implied, as to results to be obtained from the use of the Data or Services, merchantability or fitness for a particular purpose. Neither Founding Customer nor any of its Affiliates shall in any way be liable to Mark-it or any of its Group Members or any Mark-it Client for any inaccuracies, errors or omissions, regardless of cause, in the Data or Services or for any damages (whether direct or indirect) resulting therefrom. The limits on liability set

out in this Section 8.3 shall not apply in respect of liability for fraud or willful misconduct.

8.4    <u>Indemnity Regarding the Founding Customer Financial Data</u>

Founding Customer will indemnify, defend and hold harmless Mark-it and its Affiliates, and their directors, officers, agents, employees, successors and assigns (**"Mark-it Indemnitees"**) from and against any and all Losses arising as a result of any Claims brought by any third party against any Mark-it Indemnitees arising from any claim that the providing of Founding Customer Financial Data by Founding Customer infringes or misappropriates any patent, trade secret, copyright or other proprietary rights of such third party.

8.5    <u>Indemnification Procedures</u>

As a condition of obtaining the benefits of a party's indemnification obligations hereunder, the indemnified party shall (i) promptly notify the indemnifying party in writing of any indemnifiable Claim; (ii) give the indemnifying party sole control over the defense and settlement of such Claims, provided the indemnifying party makes no attribution of fault or wrongdoing to, or admission on behalf of, the indemnified party; and (iii) provide reasonable cooperation and assistance to the indemnifying party in conducting its defense, at the indemnifying party's expense; provided however, that the indemnified party may control its defense or settlement at its expense.    The indemnifying party's advance written approval (not to be unreasonably withheld or delayed) is required for any settlement that imposes any obligation or limitation on the indemnifying party.    Notwithstanding the foregoing, the indemnified party's failure to provide prompt written notification to the indemnifying party, as provided in (i) above will not excuse the indemnifying party from its indemnification obligations and duties to defend, except to the extent the indemnifying party's ability to defend or settle such Claim is actually prejudiced by such failure by the indemnified party.

9    <u>Price and Payment</u>

9.1    <u>General</u>

Founding Customer shall pay Mark-it the Fees in respect of the provision of the Services.    The Annual Fee shall cover the Services and enhancements thereto, but shall not cover any "New Services" made available to the Founding Customer. **"New Services"** shall mean those Mark-it Services that are substantively different from and in addition to the services set forth in Schedule 1.    Mark-it shall be free to alter the Annual Fees as of the commencement of any Contract Year other than during the Initial Term, provided that Founding Customer has been afforded at least one hundred twenty (120) days prior written notice of such alteration in Annual Fees.

9.2    Initial Fees

Founding Customer shall pay Mark-it the Initial Fees promptly (and in any event within thirty (30) days) after receipt by Founding Customer of the Commencement Notice.

9.3    Annual Fees

Mark-it will provide an invoice to Founding Customer, and Founding Customer shall pay Mark-it, the Annual Fees in quarterly installments. Invoices will be rendered such that payment will be due approximately fifteen (15) days prior to the commencement of the applicable quarter.

9.4    Invoices / Payment Terms

Mark-it will invoice Founding Customer in a timely manner for all Fees that are payable under this Agreement and will send Founding Customer a written receipt after it receives any payment of such Fees. All invoices submitted by Mark-it in accordance with this Agreement shall be paid by Founding Customer within thirty (30) days after receipt to the bank account specified on the invoice.

9.5    Intentionally Omitted

9.6    Disputed Items

9.6.1    If Founding Customer fails to pay an invoice within thirty (30) days after receipt of that invoice, Mark-it may, on five Business Days prior notice, suspend providing the Services to Founding Customer for so long as such invoice remains unpaid.

9.6.2    If the amount or part of the amount of an invoice rendered by Mark-it under this Agreement is reasonably and in good faith disputed or subject to question by Founding Customer (the "Disputed Amount"), the parties shall refer that matter to the Disputes Procedure for resolution but Founding Customer shall not be entitled to withhold payment of the Disputed Amount on those grounds. Upon the parties agreeing or it being determined pursuant to the Disputes Procedure that all or part of the Disputed Amount is not payable, Mark-it shall immediately refund to the Founding Customer the part of the Disputed Amount agreed or determined not to have been payable.

9.7    Additional Charges - Taxes

All amounts stated in this Agreement are exclusive of all taxes and duties. If any sales, use, value added, property, goods and services or other taxes, any tax in the nature of withholding tax, or any duty is payable in connection with the Fees or any part thereof and/or the provision of the Services or otherwise arising as a result of any transaction occurring pursuant to this Agreement (other than taxes

levied on Mark-it income), Founding Customer shall promptly pay to Mark-it or the appropriate taxing authority such tax or duty (it being understood that withholding taxes may be paid directly to the relevant taxing authority). If any party is obliged to reimburse or pay an expenditure incurred by, or otherwise to indemnify, the other party pursuant to this Agreement, such obligation shall extend to any irrecoverable taxes or duties in respect thereof.

Any party not responsible for taxes covered by this Section 9.7 will reasonably cooperate with the party being taxed in efforts such as obtaining a refund or exemption. The foregoing sentence shall not require a party to incur any material cost or liability in connection with such cooperation.

9.8    Rebate

Within forty-five (45) days after the end of each quarter of each Contract Year, Mark-it shall pay to Founding Customer a rebate of a portion of the Annual Fee paid for that quarter in accordance with the provisions set forth in Schedule 6. Founding Customer acknowledges that (i) the amount of the rebate shall be determined as provided on Schedule 6, and (ii) Founding Customer's rebate may be *de minimus* to the extent that Founding Customer's performance during the applicable quarter (as measured in accordance with the standards provided in Schedule 6) is inferior to other Participating Founding Customers of Mark-it.

10    Contract Management

10.1    Contract Representatives

The principal point of contact between Founding Customer and Mark-it in relation to issues arising out of this Agreement or the performance of the Services will be the person designated by Founding Customer as Founding Customer's Representative, and the person designated by Mark-it as Mark-it's Representative, being as at the date of this Agreement:

10.1.1    Founding Customer's Representative:    [ ]

10.1.2    Mark-it's Representative:    [ ]

Either party may change the identity of its Representative at any time by reasonable written notice to the other.

11    Confidentiality / Non-Solicitation

11.1    General Duty of Confidence

Subject to Section 11.3 and any other agreement between the parties, each party (a **"Recipient"**) shall keep the Confidential Information of the other party (the **"Discloser"**) secret and confidential and shall not (without the prior written consent of the Discloser) disclose any part of that Confidential Information to any person

other than to those of its, and in the case of Mark-it, Mark-it's Group members', employees, contractors and agents who require access to that Confidential Information in order for the Recipient to perform its obligations under this Agreement or receive the benefit of its rights under this Agreement, provided that Founding Customer may not disclose Confidential Information to any of its Group members, or such Group member's employees, contractors or agents, unless such Group member has executed a confidentiality agreement reasonably acceptable to Mark-it giving Mark-it the direct ability to protect Confidential Information in a manner comparable to that provided under this Agreement.

11.2    No Unauthorized Use

Subject to Section 11.3, Recipient and its Group and their respective employees, contractors and agents shall not (without the prior written consent of the Discloser) use the Confidential Information except for the purpose of performing its obligations under this Agreement or receiving the benefit of its rights under this Agreement. Each party shall be responsible for the acts and omissions of its, and in the case of Mark-it, Mark-it's Group members', respective employees, contractors and agents.

11.3    Exceptions

Sections 11.1 and 11.2 shall not apply to:

11.3.1    any Confidential Information which is or passes into the public domain, other than directly or indirectly as a result of or in connection with any act or default of the Recipient, its Group or any of their employees, contractors or agents in breach of this Agreement;

11.3.2    any Confidential Information held by the Recipient prior to disclosure of such Confidential Information by the Discloser to the Recipient;

11.3.3    the use or disclosure of Confidential Information in accordance with rights lawfully granted by a third party; or

11.3.4    the disclosure of Confidential Information to the extent required by any applicable legislation or subordinate legislation or any court or judicial or administrative authority of competent authority; provided however, that prior to making any such disclosure, the disclosing party promptly notifies the other party of such requirement or request (where allowed by law to do so), and allows the other party the reasonable opportunity to exhaust all reasonable legal and equitable channels for maintaining such information in confidence.

11.4    Continuing Obligation/Other Agreements

Notwithstanding termination of this Agreement, the obligations of a Recipient under this Section 11 shall continue with respect to any part of the Confidential

Information of the Discloser. The terms and provisions of this Agreement shall not in any manner limit or modify the terms or provisions of any other confidentiality agreement between the parties.

11.5    Non-Solicitation

Each party shall use its commercially reasonable efforts to ensure that it and its employees and Affiliates that have had direct contact with the other party in relation to the Mark-it Services do not, without the prior written consent of the other party, at any time during the Term or the one year period immediately following the Term, employ or hire the services of any person who is at that time or at any time in the previous six months was an employee of the other party or a Group member of the other party, as consultants or otherwise, and who has been identified in writing to the other party not less than three months prior to the hiring of such person.

11.6    Contractor Confidentiality Agreements

Mark-it shall not make Founding Customer Financial Data available to any agent or subcontractor (other than Mark-it, its Group members and their respective employees) absent prior written notice to Founding Customer describing the particular agent or subcontractor and the work to be performed. Mark-it shall cause each of its agents and subcontractors (if any) to whom Founding Customer Financial Data is made available to enter into or otherwise be subject to a written confidentiality agreement on terms substantially conforming to those in Section 11 hereof, and consistent with the obligations of Mark-it under Section 6; and Mark-it agrees that in the event of a breach of such agreement to take all commercially reasonable steps to enforce the terms of such agreement. Mark-it agrees to prohibit access to Founding Customer Financial Data for any agent or subcontractor who has neither signed nor is bound by such an agreement. For the purpose of clarity, the restrictions of this Section shall not apply vis-à-vis Aggregated Data.

12    Dispute Resolution

12.1    Deficiency Rectification

If there is a failure by either party to perform its obligations under this Agreement (a **"Deficiency"**), then upon being notified of the Deficiency in writing or by electronic transmission by the other party, the parties shall:

12.1.1    liaise to determine the nature, cause and extent of the Deficiency; and

12.1.2    take such steps as are reasonably necessary to resolve the Deficiency to the reasonable satisfaction of the non-deficient party, or to provide a solution which mitigates the effects of the Deficiency to the reasonable

satisfaction of the non-deficient party, as soon as reasonably practicable.

In the event a Deficiency cannot be resolved by the parties within thirty (30) days of notice of such Deficiency, the parties may avail themselves of any remedy available under this Agreement.

In the event that the Deficiency is a determination by a party that the security measures of the other party or its systems do not comport with Good Industry Practice, the first party shall have the right to immediately suspend the transmission of Founding Customer Financial Data or Data (as applicable), under this Agreement until such Deficiency has been remedied.

12.2    Dispute Resolution.

The parties must resolve any dispute in relation to any aspect of, or failure to agree upon any matter arising in relation to, this Agreement or any document agreed pursuant to and in connection with this Agreement (a **"Dispute"**) in accordance with Schedule 4.

13    Liability / Miscellaneous

13.1    Exclusions

Subject to Section 13.4, to the maximum extent permitted by law, Mark-it shall have no liability to Founding Customer under or in connection with this Agreement or the provision of the Services, whether in contract (including under any indemnity), in tort (including negligence), under a warranty, under statute or otherwise to the extent that such liability is caused by or is a result of:

13.1.1    the failure by Founding Customer to perform any of its obligations under this Agreement or any breach by Founding Customer of the terms of this Agreement;

13.1.2    any defects in the Founding Customer System or any failure in the operation of the Founding Customer System; or

13.1.3    any failure of Founding Customer to operate the Founding Customer System in accordance with Good Industry Practice or written specifications or documentation, or other directions reasonably given by Mark-it in the ordinary course of operations (to the extent to which they are not inconsistent with this Agreement).

Each of Sections 13.1.1 through 13.1.3 (inclusive) shall be construed separately and without limitation to each other.

13.2    Exclusion of Specific Forms of Loss

Subject to Section 13.4, the specific provisions of Sections 8.2 and 8.4 and the specific provisions of Section 13.9, to the maximum extent permitted by law, neither party shall have any liability to the other party under or in connection with this Agreement or the provision of the Data, Services or the Founding Customer Financial Data, whether in contract (including under any indemnity), in tort (including negligence), under any warranty (express or implied, including but not limited to warranties as to merchantability or use for a particular purpose), under statute or otherwise, in each case for any indirect, consequential, punitive, special or exemplary damages, loss of profits, loss of anticipated savings, loss of goodwill, loss of contract or business opportunities, loss of or damage to reputation, loss of data, loss or damage in respect of moneys paid out to third parties in error, moneys not recovered from third parties, loss of use of money, and any and all liabilities to third parties. Without limiting in any manner the foregoing, it is acknowledged and agreed that Mark-it's sole remedy for a failure by Founding Customer to provide Founding Customer Financial Data will be the termination of this Agreement in accordance with Section 14.3.1.

13.3    Limits

Subject to Section 13.4 and to the maximum extent permitted by law, each party's aggregate liability, whether in contract (including under any indemnity), in tort (including negligence), under a warranty, under statute or otherwise, for or in respect of any loss or damage suffered by the other party under, in connection with or arising out of this Agreement shall be limited to not more than the aggregate net Fees actually paid by Founding Customer to Mark-it in the calendar year in which such liability arises, but not less than four hundred thousand dollars (US$400,000), except that the cap on such liability under Section 13.9 shall be five hundred thousand dollars (US$500,000).

13.4    Exceptions

The limits on liability set out in this Section 13 shall not apply in respect of:

13.4.1    any liability for death or personal injury of a natural person resulting from a party's negligence or misconduct;

13.4.2    any liability for fraud or willful misconduct; or

13.4.3    any liability for breach of the confidentiality obligations set out in Section 11.

13.5    Exclusion of Implied Terms

To the maximum extent permitted by law, all terms, conditions and warranties, other than those expressly set out in this Agreement, are excluded including all

implied and statutory terms, warranties and conditions relating to satisfactory quality or fitness for purpose.

13.6    Notification of Claims

If either party becomes aware of any matter that such party has good reason to believe will give rise to a claim against the other party under this Agreement, notice of that fact (together with all details of the matter in question as are available) shall be given as soon as is reasonably possible to the other party to the extent legally permissible. A party's failure to perform in accordance with the immediately preceding sentence shall not be a waiver of any of its rights with respect to the applicable matter. Without prejudice to its obligations at law, each party shall take all reasonable steps to mitigate any loss it may suffer in connection with such claims.

13.7    Insurance

Mark-it shall, during the Term, have and maintain in force reasonable professional/errors and omissions liability insurance that is consistent with practice and usage for companies undertaking activities similar to Mark-it covering errors or omissions arising out of the Services provided under this Agreement with coverage amounts of up to US$1,000,000 per occurrence and US$2,000,000 in the aggregate.

13.8    Recovery from Third Parties

If a party pays an amount in discharge of any claim under this Agreement and the other party or any member of its Group has previously or subsequently recovers (whether by payment, discount, credit, relief, set-off or otherwise) from a third party (including an insurer) a sum for which it has already been reimbursed by the first party, the other party shall forthwith pay, or shall procure that the relevant member of its Group forthwith pays, to the other party an amount equal to the lesser of: (i) the net sum recovered from the third party, and (ii) the amount previously paid by the first party to the other party on account of the relevant claim.

13.9    Client Claims

13.9.1    Founding Customer shall indemnify and keep Mark-it and Mark-it's Group members indemnified from and against any and all actions, claims, proceedings, losses, damages, costs, expenses (including reasonable attorney's fees) and other liabilities of whatever nature (whether foreseeable or not) suffered, incurred or sustained by Mark-it or any of. Mark-it's Group members, excluding consequential and indirect damages, loss of revenue, loss of profits, loss of income or loss of anticipated savings, as a result of any action, claim or proceeding made or brought against Mark-it or any of Mark-it's Group members by any Founding Customer Client in connection with its use of or reliance upon the Data or the Services or the failure by Mark-it to provide the

Data or Services at all or in accordance with this Agreement except to the extent such action, claim or proceeding is based upon fraud or willful misconduct of Mark-it or its Group member.

13.9.2  Mark-it shall indemnify and keep Founding Customer and Founding Customer's Group members indemnified from and against any and all actions, claims, proceedings, losses, damages, costs, expenses and other liabilities of whatever nature (whether foreseeable or not) suffered, incurred or sustained by Founding Customer or any of Founding Customer's Group members, excluding consequential and indirect damages, loss of revenue, loss of profits, loss of income or loss of anticipated savings, as a result of any action, claim or proceeding made or brought against Founding Customer or any of Founding Customer's Group members by any Mark-it client in connection with its use of or reliance upon Mark-it Services except to the extent such action, claim or proceeding is based upon fraud or willful misconduct of Founding Customer or its Group member.

13.9.3  The provisions of Section 8.5 shall apply to this Section 13.9, *mutatis mutandis.*

13.10  Access to Systems

Neither party shall attempt to obtain access to, use or interfere with any information technology systems used by the other except to the extent required to do so to receive (in the case of Founding Customer) or provide (in the case of Mark-it) the Services or as otherwise expressly permitted by this Agreement.

14  Termination

14.1  Termination by Either Party

14.1.1  Either party may terminate this Agreement upon thirty (30) days prior written notice (or immediately in the case of clause (vi) or (vii) below) to the other party if:

(i)  that other party becomes unable to pay its debts as they become due and payable;

(ii)  that other party enters into liquidation (except for the purposes of a solvent amalgamation or reconstruction);

(iii)  that other party makes an arrangement with its creditors;

(iv)  a receiver or administrative receiver is appointed over all or any of that other party's assets;

       (v)      any procedure equivalent to any of the above occurs in any jurisdiction with respect to that other party;

       (vi)     any of the conditions set forth in Section 2.3 (other than Section 2.3.3) are not satisfied by December 31, 2002; or

       (vii)    the provisions of Section 15.5 apply.

14.2    Termination by Founding Customer

14.2.1   Founding Customer may terminate this Agreement immediately by written notice to Mark-it if Mark-it commits a material breach of its obligations under this Agreement and (where the breach is capable of being remedied) that breach has not been remedied within thirty (30) days (or such longer period as may be specified in the notice) after Founding Customer requesting Mark-it in writing to do so.

14.2.2   Founding Customer may terminate this Agreement immediately by written notice to Mark-it provided that such notice is given at least ninety (90) days prior to the effective date of such termination.

14.2.3   Founding Customer may terminate this Agreement upon thirty (30) days written notice at any time after the delivery by Mark-it to the Founding Customer of the definitive terms to be offered to the Founding Customer regarding an investment in Mark-it and prior to execution of definitive documents relating to such an investment by at least seven (7) Participating Founding Customers.

14.2.4   Founding Customer may terminate this Agreement in accordance with Section 2.4 and in accordance with Section 7.2.

14.3    Termination by Mark-it

14.3.1   Mark-it may terminate this Agreement immediately by written notice to Founding Customer if Founding Customer commits a material breach of its obligations under this Agreement and (where the breach is capable of being remedied) that breach has not been remedied within thirty (30) days (or such longer period as may be specified in the notice) after Mark-it requesting Founding Customer in writing to do so.

14.3.2   Mark-it may terminate this Agreement immediately by written notice to Founding Customer if (i) it reasonably considers at any time that the Financial Data used to provide the Service is not satisfactory in terms of legality, quality, volume or significance, or not sufficiently secure for redistribution and (ii) it terminates its Data Services Agreement with all Participating Founding Customers at or about the same time.

14.4    Survival of Rights on Termination or Expiry

Termination or expiry of this Agreement shall not affect any rights or obligations which may have accrued prior to termination or expiry. Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect. For the avoidance of doubt, the obligations of each party set out in this Section 14.4 and in Sections 8, 11 and 13 shall continue in full force and effect notwithstanding termination or expiry of this Agreement.

14.5    Effect of Termination

On termination or expiry of this Agreement for any reason:

14.5.1    Mark-it and Founding Customer shall be discharged from any further obligation to provide Data or to perform the Services, or to provide Founding Customer Financial Data, as applicable; and

14.5.2    Mark-it shall be entitled immediately to disable or modify the Mark-it systems in order to prevent Founding Customer from accessing the Services.

14.5.3    On termination, Mark-it shall destroy any Founding Customer Financial Data which has not been made anonymous or aggregated by Mark-it (if any such non-anonymous and non-aggregated data then exists).

14.6    Refund of Fees on Termination

14.6.1    In the event of any termination of this Agreement after the commencement of the first Contract Year, other than a termination by Founding Customer under Section 14.2.2 [ninety (90) day termination] prior to the end of the first Contract Year (a "First-Year 90-day Termination") or a termination by Mark-it under Section 14.3.1 [breach by FC], Founding Customer will promptly receive a refund from Mark-it in an amount equal to the most recent quarterly installment of the Annual Fee paid by such Founding Customer multiplied by a fraction, the numerator of which is the number of weeks remaining in the relevant quarter and the denominator of which is 13. In addition, in the event of a termination of this Agreement, other than a First-Year 90-Day Termination by Founding Customer or a termination by Mark-it under Section 14.3.1, Founding Customer will be entitled to receive its pro rata share of the rebate provided in Section 9.8 (based upon such Founding Customer's performance compared to the entire quarter of performance by other Participating Founding Customers), as and when such rebate is paid to other Participating Founding Customers.

14.6.2    In the event of any termination of this Agreement prior to the commencement of the first Contract Year, other than a First-Year 90-Day Termination by Founding Customer or a termination by Mark-it under Section 14.3.1, the Initial Fees will be promptly refunded based upon the proportion of the period from the Commencement Date through the beginning of the first Contract Year that the Agreement was in full force and effect; provided, that, if such termination is pursuant to Section 2.4, all Fees shall be refunded as provided in Section 2.4.5.

14.6.3    In the event of a First-Year 90-day Termination of this Agreement by Founding Customer or a termination by Mark-it under Section 14.3.1, any and all Fees paid or payable by the Founding Customer through the effective date of such termination shall not be refunded by Mark-it, and Founding Customer shall not be eligible for any portion of the rebate provided in Section 9.8.

15    Force Majeure/Malfunction

15.1    Relief for Force Majeure

A party (the **"Affected Party"**) shall not be liable for any failure to perform or delay in performing any of its obligations under this Agreement to the extent caused by a Force Majeure Event, and shall be deemed not to be in breach of this Agreement to the extent that such breach is caused by such Force Majeure Event, subject to the Affected Party complying with Sections 15.2 and 15.3.

15.2    Notification and Consultation

An Affected Party shall give written notice to the other party as soon as reasonably practicable after becoming aware of the relevant Force Majeure Event or Malfunction, giving reasonable details of the circumstances constituting the Force Majeure Event or Malfunction and its likely duration. Following receipt of any such notice the parties shall consult to assess the extent of the relevant Force Majeure Event or Malfunction and any ways in which the same might be avoided or its effects mitigated having regard to each party's rights and obligations under any relevant contract to which it is a party.

15.3    Mitigation

An Affected Party shall in accordance with Good Industry Practice take steps to mitigate the effects of the relevant Force Majeure Event or Malfunction and, to the extent practicable, continue to perform its obligations under this Agreement for the duration of such Force Majeure Event or Malfunction, and to resume full performance of its obligations as soon as reasonably possible after the occurrence of that event. The other party shall provide the Affected Party with such co-operation as the Affected Party may reasonably require for those purposes.

15.4    Suspension of Services During Malfunction

Without limiting the other provisions of this Section 15 and subject to the obligations of mitigation under Section 15.3, Mark-it may, in its reasonable discretion, suspend the provision of the Services in the event of a Malfunction. Mark-it shall give advance notice to Founding Customer where reasonably practicable, and in each case shall provide notice promptly after such suspension is imposed. In the event of a suspension exceeding seven (7) Business Days, Mark-it will refund to the Founding Customer a pro-rata portion of any Annual Fee paid by such Founding Customer for the applicable Contract Year, based upon the quotient of the number of Business Days of suspension exceeding seven divided by the total number of Business Days in the applicable Contract Year.

15.5    Termination of Agreement

Where the rights or obligations of a party have been suspended for thirty (30) consecutive days or more by reason of a Force Majeure Event or Malfunction, so as to prevent substantial performance of this Agreement, the party not affected by the Force Majeure Event or Malfunction may terminate this Agreement by written notice to the other party as provided in Section 14.1.1 (vii) above.

16    Equivalent Terms

Subject to the immediately subsequent sentence, Mark-it Services will be provided to Founding Customer on terms (including pricing) not in any material respect less favorable to Founding Customer than the terms (including pricing) on which Mark-it Services are provided to any other Participating Founding Customer. The preceding sentence is expressly conditioned upon Founding Customer's continued provision of the Founding Customer Financial Data as provided in this Agreement and at levels (in terms of breadth of available Financial Data, not actual number of data points) comparable to the Financial Data provided by other Participating Founding Customers. Without limiting the foregoing, Mark-it hereby confirms to Founding Customer that this Agreement is substantially identical to the Founding Customer Data Services Agreement entered into between Mark-it and each of the other Participating Founding Customers on or about the date hereof.

17    General

17.1    Notices

17.1.1    Any communication or notice given pursuant to this Agreement shall be in writing and shall be delivered by hand or sent by facsimile or sent by registered or certified mail, or by "overnight delivery service" to the address of the relevant party as follows, or to any other address as any party may notify for the purposes of this Section:

(i)    in the case of Founding Customer:

[•]

Fax: [•]

(ii)   in the case of Mark-it:

Barn A, New Barnes Mill, Cottonmill Lane, St Albans, Hertfordshire
AL1 2HE
Fax: +44 1727 834068
Attn: Lance Uggla

17.1.2   Any communication or notice pursuant to Section 17.1.1 shall be deemed to have been received and served:

(i)   if hand delivered at the time of delivery;

(ii)   if sent by facsimile at the completion of transmission during business hours at its destination or if not within business hours at the opening of business hours at its destination on the next Business Day and on:

(a)   proof by the sender that it holds a printed record confirming dispatch of the transmitted notice to the addressee; and

(b)   dispatch of the notice by post in accordance with Section 17.1.1 on the same day as its transmission; and

(c)   if sent by post or "overnight delivery service" within 48 hours of posting (exclusive of the hours of Sunday).

17.1.3   For the purpose of Section 17.1.2 **"business hours"** means between 09.00 and 17.30 on a Business Day.

17.2   Entire Agreement

This Agreement constitutes the entire agreement between the parties with respect to its subject matter and (to the extent permissible by law) supersedes all prior representations, writings, negotiations or understandings with respect to that subject matter, provided that neither party is attempting to exclude any liability for fraudulent statements (including fraudulent pre-contractual misrepresentations on which the other party can be shown to have relied). All terms, conditions and warranties not stated expressly in this Agreement, and which would in the absence of this provision be implied into this Agreement by statute, common law, equity, trade, custom or usage or otherwise, are excluded to the maximum extent permitted by law.

17.3   Assignment

17.3.1   Founding Customer shall not be entitled to and shall not assign, novate or otherwise transfer this Agreement or any rights or obligations

hereunder, in whole or in part, without Mark-it's prior written consent (which may not be unreasonably withheld or delayed), other than to a member of the Founding Customer's Group, provided that if at any time following such a transfer, assignment or novation to a Group member, the relevant entity ceases to be such a Group member, Founding Customer shall procure that such entity shall re-transfer, re-assign or re-novate this Agreement, or the relevant part of it to Founding Customer or another appropriate Founding Customer Group member at that time.

17.3.2    Mark-it shall not be entitled to and shall not assign, novate or otherwise transfer this Agreement or any rights or obligations hereunder, in whole or in part, without Founding Customer's prior written consent (which may not be unreasonably withheld or delayed), other than to a member of Mark-it's Group, provided that if at any time following such a transfer, assignment or novation to a Group member, the relevant entity ceases to be such a Mark-it Group member, Mark-it shall procure that such entity shall re-transfer, re-assign or re-novate this Agreement, or the relevant part of it to Mark-it or another appropriate Mark-it Group member at that time.

## 17.4    Waiver

No failure to exercise nor any delay in exercising any right, power or remedy by a party operates as a waiver. A single or partial exercise of any right, power or remedy does not preclude any other or further exercise of that or any other right, power or remedy. A waiver is not valid or binding on the party granting that waiver unless made in writing.

## 17.5    Amendment and Variation

No variation of this Agreement (or of any of the documents referred to in this Agreement) shall be valid unless it is in writing and signed by or on behalf of each of the parties to it. The expression "variation" shall include any amendment, variation, supplement, deletion or replacement however effected.

## 17.6    Independent Contractor

This Agreement does not set up or create an employer/employee relationship, partnership of any kind, an association or trust between the parties, each party being individually responsible only for its obligations as set out in this Agreement and in addition the parties agree that their relationship is one of independent contractors. Save to the extent to which a party is specifically authorized in writing in advance by the other party, neither party is authorized or empowered to act as agent for the other for any purpose and neither party must on behalf of the other enter into any contract, warranty or representation as to any matter. Neither party will be bound by the acts or conduct of the other, save for acts or conduct which the first party specifically authorizes in writing in advance.

17.7    Counterparts

This Agreement may be executed in any number of counterparts and by the parties to it on separate counterparts, each of which is an original but all of which together constitute one and the same instrument.

17.8    Invalidity

If any provision in or any part of this Agreement shall be found to be illegal or unenforceable under any enactment or rule of law then that provision or part shall to that extent be deemed not to form part of this Agreement and the remaining provisions shall continue in full force and effect.

17.9    Costs and Expenses

Each party shall bear its own costs and expenses arising out of the negotiation, preparation and execution of this Agreement.

17.10    Further Assurances

Each party agrees at its own expense to do all things and execute all deeds, instruments, transfers or other documents as may be reasonably necessary or desirable to give full effect to the provisions of this Agreement and the transactions specifically contemplated by it.

17.11    Third Party Rights

17.11.1    Except to the extent expressly stated to the contrary in this Agreement, this contract does not create any rights in any other person.

17.11.2    Founding Customer and Mark-it may by written agreement amend this Agreement without obtaining the consent of their respective Group members or other Affiliates notwithstanding that any such amendment may relate to any benefits conferred on such Group Members or other Affiliates.

17.12    Remedies Cumulative

Except where this Agreement provides otherwise, the rights, powers and remedies provided to the parties in this Agreement are in addition to, and do not exclude or limit, any right, power or remedy provided by law or equity or by any agreement between the parties.

17.13    Governing Law

The construction and validity and performance of this Agreement and the transactions contemplated by it shall be governed by the laws of New York and each party submits to the jurisdiction of the state and federal courts residing in

New York, New York for the purposes of determining any dispute arising out of this Agreement or the transactions contemplated by it.

17.14   Representations and Warranties

Each party hereby represents and warrants to the other party as follows:

17.14.1   It has the full right, power and authority to execute, deliver and perform this Agreement in accordance with its terms;

17.14.2   This Agreement has been duly executed and delivered by or on behalf of such party and constitutes a legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms;

17.14.3   No consent, approval, authorization or order of any person or entity is required for the execution delivery or performance of this Agreement by such party, and neither the execution, delivery nor performance of this Agreement by such party will (a) conflict with, or result in a breach of, or constitute a default under, or result in a violation of, any organization document of such party or any agreement or instrument to which such party is subject or by which it is bound, or (b) result in the violation of any applicable law, rule or regulation to which such party is subject.

Each of the parties hereto agrees that the representations and warranties set forth in this Section 17.14 shall survive the execution and delivery of this Agreement.

17.15   Regulatory Access and Compliance

Mark-it acknowledges and agrees that the data maintained and produced under this Agreement will at all times be available for examination and audit by governmental agencies, regulators or securities exchanges of which Founding Customer or any of its Affiliates is a member and which has jurisdiction over the business of Founding Customer or any of its Affiliates.  Each party will (to the extent permitted by law) notify the other promptly of any formal request by an authorized governmental agency, regulator or exchange to examine records regarding Founding Customer or any of its Affiliates that are maintained by Mark-it. Upon the written request of Founding Customer, Mark-it will provide any relevant assurances to such agencies, regulators or securities exchanges, and will subject itself to any required examination or regulation and make any required regulatory corrections.

17.16   No Promotion

Mark-it agrees that it will not, without the prior written consent of Founding Customer in each instance, (i) use in advertising, publicity, or otherwise the name of Founding Customer, or any affiliate of Founding Customer, or any partner or employee of Founding Customer, nor any trade name, trademark, trade device, service mark, symbol or any abbreviation, contraction or simulation thereof owned

by Founding Customer or its affiliates, or (ii) represent, directly or indirectly, that any product or any service provided by Mark-it has been approved or endorsed by Founding Customer.  This provision shall survive termination of the Agreement.

17.17  Additional Use Request

In the event that after the date hereof Founding Customer requests an expansion of the definition of Transformed Data to allow the use of Data in a manner not presently permitted under this Agreement, Mark-it will reasonably consider such request in light of, among other factors, the degree to which such expansion or use could reasonably be expected to result in the effective redistribution (without material transformation) of the Data and the impact that such expansion or use could reasonably be expected to have on commercial opportunities available to Mark-it.

17.18  UCITA

The provisions of the Uniform Computer Information Transactions Act ("**UCITA**") will not apply to this Agreement, even if UCITA or a variation thereof is adopted in New York after the date hereof.

17.19  Equitable Relief

Neither Founding Customer nor Mark-it will be precluded from seeking injunctive or other equitable relief against the other party (in addition to any other legal or equitable remedies available to it) to prevent a threatened, initial or continuing breach of any material provision or term of this Agreement.

Schedule 1:  Services

Services to be provided as part of this agreement:

**Mark-it Data**
A database of daily closing prices of Financial Instruments. Individual prices obtained from Founding Customer and other parties, a composite security price as well as a theoretical price generated using Mark-it Curves are available for viewing and download by Founding Customer, subject to the Quorum Requirements set out in Schedule 7.  In the event Founding Customer identifies Material Positions as provided is Section 2 of Schedule 3, Part B1 in connection with its delivery of particular Founding Customer Financial Data, Mark-it will make available to Founding Customer information it has as to whether the other prices made available by Mark-it for the applicable Financial Instrument are associated with Material Positions.

**Mark-it Curves**
A spread curve for each issuer or reference entity of a Financial Instrument for which Mark-it has sufficient and reliable data.  Financial Data is used to populate a scatter diagram and a best-fit line is drawn.  In addition, data points on the scatter diagram can be highlighted and the range of prices for that Financial Instrument viewed, subject to the Quorum Requirements as set out in Schedule 7.

**Mark-it Check**
Provides a price discrepancy service for Founding Customer's credit portfolios.  Founding Customer can compare its price to Mark-it's database and create a price discrepancy report.  For each Financial Instrument for which Founding Customer has supplied position and price data, the report calculates the discrepancy between Founding Customer's valuation and Mark-it's valuation (based on both the composite price and Mark-it Curve price).  Availability of the composite price for this calculation is subject to the Quorum Requirements as set out in Schedule 7.

**Mark-it Risk**
Daily sector curves are built from Mark-it's database. Sector definitions are determined by Mark-it. These curves are available for download and, once sufficient data is available, Mark-It will supply a rolling one-year data file of daily changes and current daily levels.

The Services will be subject to modification by Mark-it to reflect technical, administrative, market-based or similar changes that Mark-it determines in good faith are required or desirable to improve the quality of the Services.

**The above Services will be initiated only for the following types of Financial Instrument:**

1.    Market standard credit default swaps.

2.    Bonds with a constant regularly paid coupon, which are not callable, puttable or amortizing.

3.    Floating Rate Notes that are not callable, puttable, collared or amortizing with coupons linked to short term deposit rates and not capped, floored, collared or otherwise structured.

For certain other Financial Instruments, Mark-it may produce a composite price (or spread calculation) which may be used in curve construction.

Mark-it presently intends to make composite data available in a data feed or download feature such that data can be incorporated into existing product control or similar applications at the Founding Customer (subject to the limitations in this Agreement).

Schedule 2: Fees and Charges

Initial Fees

Founding Customer will pay to Mark-it as the Initial Fees an amount equal to US$100,000 multiplied by a fraction, the numerator of which is the number of weeks remaining in the calendar year 2002 after the Commencement Date (the "**Initial Period**") and the denominator of which is 52.

Annual Fees

The Annual Fees for the Services described in Schedule 1 will be US$300,000 per Contract Year, plus any amounts otherwise payable under the Agreement.

The Fees cover up to 30 log-on access codes for use by Designated Employees. If there are additional log-on access codes requested (more than 30), additional fees to be agreed upon (not to exceed US$100 per additional log-on, per month) will be payable, and the number of additional log-ons would be agreed upon in writing by the parties prior to the provision of such log-on codes.

Fees for New Services, fees for tailor made services agreed upon by Mark-it and the Founding Customer and fees for the use of Data in the circumstances described in this Agreement as requiring the payment of additional fees, are not included in the Fees described above and would be agreed upon in writing by the parties prior to commencement of the applicable services with Founding Customer.

Schedule 3:  Part A - Technical Obligations

Minimum Technical Requirements:

Microsoft NT4 Service Pack 5 or later, Windows 2000

Windows XP will be supported once customers start to use this Operating System

Internet Explorer 4.0, 5.0, 5.5 or Netscape 4.7

Cookies must be switched on within the browser

Java script must be switched on within the browser

Microsoft Excel 97 or 2000

128 Megabytes  RAM

500Mhz processor

64 kilobits internet connection

Minimum screen resolution: 1024 x 768

Minimum screen colour depth 16 bits (65,536)

128 bits encryption (High Encryption Pack)

Schedule 3:  Part B1 – Founding Customer Financial Data Obligations

**Founding Customer Financial Data**

1.  Founding Customer shall provide to Mark-it, for use by Mark-it only in accordance with this Agreement, the following types of Founding Customer Price Data and Founding Customer Positional Data on each Business Day at or before the Submission Time, subject to the exclusions set out below:

   1.1. Types:

      1.1.1. All market standard credit default swap prices that are in the Founding Customer's books of record.

      1.1.2. All prices for Credit Product (other than market standard credit default swaps) with respect to which Founding Customer has a then-current inventory position at the Submission Time reflected in Founding Customer's books of record for the applicable day. It is understood that the foregoing prices initially will be provided only for Credit Product traded in North America and Europe, although Founding Customer will endeavor to provide all prices as soon as is reasonably practicable.

      1.1.3. All prices of Credit Product that are fixed income securities or floating rate notes that are otherwise published by Founding Customer through an automated mechanism to one or more electronic communications networks (internal or external dealing platforms) that are "end-of-day" or "closing" Executable Prices (as defined below).  An Executable Price is one at which Founding Customer has committed to purchase a particular Financial Instrument from, or sell a particular Financial Instrument to, a third-party, and which is valid to purchase or sell a face amount of said Financial Instrument equivalent to USD$500,000 or more. It is understood that the foregoing prices initially will be provided only for Credit Product traded in North America and Europe, although Founding Customer will endeavor to provide all prices as soon as is practicable.  For the purpose of clarity it is noted that Founding Customer will only be obligated to provide the prices described in this Section 1.1.3 if a mechanism for delivery such prices is otherwise in place.

   1.2. Sources:

      1.2.1. All of Founding Customer's trading desks which deal in Credit Product, other than a trading desk that is acting solely as a customer of Founding Customer.

   1.3. Exclusions:

   Founding Customer is not obligated to provide Founding Customer Data that:

      1.3.1. Founding Customer is restricted from disclosing by law or regulation or general internal policies based upon legal or regulatory restrictions;

1.3.2. Founding Customer is restricted from disclosing by agreements with third parties in place prior to the Contract Date, of which, as of the Contract Date, to the best knowledge of Founding Customer, there are none;

1.3.3. is created by Founding Customer's (and its Affiliates') third party asset management operations;

1.3.4. consists of prices or positional information of Sub Investment Grade Credit Product which are fixed-income securities or floating-rate securities; or

1.3.5. consists of prices or positional information of U.S. mortgage-backed securities, U.S. municipal securities, CDOs, CLOs, CBOs, asset-backed securities, convertible bonds, asset repackagings, capital securities, corporate repos, equipment trust certificates/enhanced equipment trust certificates, equity-linked notes, credit-linked notes, risk-linked securities, insurance-linked securities, securities having an original maturity of less than 397, loans, domestic issues of U.S. government agencies, G-7 sovereign government securities denominated in their home currency, or securities of a nature substantively different from securities in existence on the Contract Date.

In addition, Founding Customer is not obligated to provide any Founding Customer Positional Data as provided in Section 2 below.

1.4. Optional

1.4.1. Founding Customer may choose to provide the prices described in Section 1.3.4 of this Schedule 3, Part B1 to Mark-it, for use by Mark-it only in accordance with this Agreement. If Founding Customer provides the information described in said Section 1.3.4, Founding Customer will receive Services associated with the applicable Credit Product (subject to the Quorum Requirements set out in Schedule 7).

1.4.2. Founding Customer may choose to provide to Mark-it prices for Credit Product that are fixed income securities or floating rate notes that are published by Founding Customer to one or more electronic communications networks that are the applicable last price on an executable security, where a "closing" or "end-of-day" Executable Price is not available.

1.4.3. Founding Customer may choose to submit to Mark-it Partners the prices described in Section 1.4.1 or 1.4.2 of this Schedule 3, Part B1 or any other prices of Credit Product which are not specifically required under this Agreement only where Founding Customer reasonably believes such prices are reliably updated, and such prices will be included in the determination of rebate as set out in Schedule 6.

2. Founding Customer Positional Data

2.1. Founding customer may choose to provide Founding Customer Positional Data to Mark-it. This may be supplied in the form of either:

      2.1.1.  a flag on each price reflecting whether or not it is associated with a Material Position; or

      2.1.2.  a numerical value which indicates the size of the position, denominated in the same currency as the Financial Instrument to which it pertains.

3.  Where prices pertain to credit default swaps, Founding Customer Financial Data shall be supplied in the form of prices, and deltas or materiality flags where appropriate, for credit default swaps with generic maturities as set out in Schedule 3, Part B2.

4.  Founding Customer shall be deemed to be delivering all prices required to be delivered hereunder notwithstanding a failure to deliver less than one percent (1%) of the number of prices available for delivery to Mark-it.

5.  It is understood and agreed that Founding Customer may initially be unable to provide all of the Founding Customer Financial Data that is described in this Schedule for a particular geographic region other than North America and Europe.  Such failure shall not constitute a breach of the Agreement, but, if such failure is not remedied on a reasonable time frame, such failure may result in Founding Customer not having access to Data and Services on a Give All/Get All basis in the applicable geographic region.

6.  Founding Customer will reasonably consider any request by Mark-it to provide price information to Mark-it that is not currently required by this Schedule 3, Part B1 to the extent that Founding Customer can readily provide such price information.  It is understood that this Section 6 is not intended to create any legally binding obligation of Founding Customer to provide any additional price information.

7.  References to Founding Customer in this Schedule 3, Part B1 shall be deemed to include members of Founding Customer's Group.

Schedule 3: Part B2 – Technical Obligations

<u>Introduction</u>

Data submitted to Mark-it Partners Limited takes the form of an XML upload file containing the information listed below, using the XML tags described in this document and contained in the document type definition file (DTD) located at <u>http://www.mark-it.com/import/dtd</u> which may be modified from time to time. Data must be submitted to Mark-it at the agreed time, on the day to which it pertains.

<u>The XML File</u>

A customer's XML file is checked against a document type definition (DTD) for correctness. The elements must appear in the sequence described in this document (see Appendix A), and also note that XML tags are case-sensitive.
It is important that the second line in your XML file points to our DTD document. The line should look like this (N.B. case sensitive):
```
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">
```

<u>The Header Section</u>

The header section of the file contains the following information:

| XML Tag Name | Mandatory | Description |
|---|---|---|
| system | Y | The name of the customer's computer system from which the data is sourced. This is agreed with Mark-it Partners. Case sensitive. |
| Fileid | Y | The customer's file identification number. This is agreed with Mark-it Partners. |
| Date | Y | The date on which the snapshot was taken. Valid date formats are DD-Mon-YYYY (e.g. 01-Jan-2001) and YYYYMMDD (e.g. 20010101). |

The top section of an XML file, including the header, might look like the example below. It is important that the first two lines appear as in this example.

```
<?xml version="1.0"?>
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">

<import>

<header>
  <system> DerivSys</system>
  <fileid> 1 </fileid>
  <date>   20-Jun-2002 </date>
</header>
.
```

<u>Credit Default Swaps</u>

Credit default swaps are defined with the 'credswap' XML tag, which contains information for identifying the instruments. Within the 'credswap' tag is the mandatory 'credcurve' tag for defining the credit curve rates, and the optional 'creddelta' tag for identifying the credit spread deltas as an indicator of the precise position size held.

| XML Tag Name | Mandatory | Description |
|---|---|---|
| credswap XML tag | | |
| entity | Y | The customer's legal entity code. This is truncated to ten characters. |
| entityname | N | The long name for this legal entity. This is useful during the process of mapping customer legal entities to Mark-it Partner legal entity codes, and will appear on the mapping screen on the web page. This is truncated to 40 characters. |
| tier | Y | The tier or seniority of the debt. See the 'Tier of Debt' Table below. |
| baseccy | Y | The currency in which the credit curve is quoted. |
| docclause | Y | CR for Cum-Restructuring. XR for Ex-Restructuring. MR for Modified Restructuring |
| credcurve XML tag (mandatory within credswap) | | |
| spread1y | At least one of these | The mid default swap spread expressed as a number (i.e. 0.0001 for one basis point.) |
| spread2y | | |
| spread3y | | |
| spread5y | | |
| spread7y | | |
| spread10y | | |
| spread15y | | |
| spread20y | | |
| recovery | Y | The recovery rate as a number (i.e. 0.01 for one percent.) |
| creddelta XML tag (optional within credswap) | | |
| book | Y | This is the name of the customer's desk or trading book providing the price and position. Free format except for special characters: % ? '. This is truncated to 30 characters. |
| delta1y | At least one of these | The delta for the corresponding credit curve point in USD. A negative number for a long position. Alternatively, an 'L' can be used to specify a large delta position ($2,000 or more), or an 'S' can be used to specify a small (under $2,000) delta position. |
| delta2y | | |
| delta3y | | |
| delta5y | | |
| delta7y | | |
| delta10y | | |
| delta15y | | |
| delta20y | | |
| delta30y | | |

**Tier of Debt**

The codes used to identify the seniority of a default swap are as follows:

| SECDOM | Secured Debt (Corporate/Financial) or Domestic Currency Debt (Government) |
|---|---|

| SNRFOR | Senior Debt (Corporate/Financial) Foreign Currency Debt (Government) |
|---|---|
| SUBLT2 | Subordinated or Lower Tier2 Debt (Banks) |
| JRSUBUT2 | Junior Subordinated, or Upper Tier 2 Debt (Banks) |
| PREFT1 | Preference Shares, or Tier 1 Capital (Banks) |

Example credit curve and position file in XML format:

```
<?xml version="1.0"?>
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">

<import>

<header>
   <system> DerivSys</system>
   <fileid> 1 </fileid>
   <date>   20-Jun-2002 </date>
</header>

<data>
<credswap>
   <entity>        F-CRD           </entity>
   <entityname>    FORD MOTOR CREDIT </entityname>
   <tier>          SNRFOR          </tier>
   <baseccy>       USD             </baseccy>
   <docclause>     CR              </docclause>
   <credcurve>
      <spread1y>   0.0011          </spread1y>
      <spread3y>   0.0012          </spread3y>
      <spread5y>   0.0018          </spread5y>
      <spread7y>   0.0021          </spread7y>
      <spread10y>  0.0026          </spread10y>
      <spread20y>  0.0031          </spread20y>
      <recovery>   0.5             </recovery>
   </credcurve>
   <creddelta>
      <book>       CredTrading     </book>
      <delta1y>    S               </delta1y>
      <delta3y>    S               </delta3y>
      <delta5y>    L               </delta5y>
      <delta7y>    S               </delta7y>
   </creddelta>
</credswap>

<credswap>
   <entity>        F-MTR           </entity>
   <entityname>    FORD MOTOR COMPANY </entityname>
   <tier>          SUBLT2          </tier>
   <baseccy>       EUR             </baseccy>
   <docclause>     CR              </docclause>
   <credcurve>
      <spread1y>   0.0021          </spread1y>
      <spread3y>   0.0026          </spread3y>
      <spread5y>   0.0035          </spread5y>
```

```
        <spread7y>   0.0042                        </spread7y>
        <spread10y>  0.0052                        </spread10y>
        <spread20y>  0.0055                        </spread20y>
        <recovery>   0.2                           </recovery>
    </credcurve>
    <creddelta>
        <book>       CredTrading                   </book>
        <delta1y>    -123.48                        </delta1y>
        <delta3y>    1009.11                        </delta3y>
        <delta5y>    37689.10                       </delta5y>
        <delta7y>    -543.21                        </delta7y>
    </creddelta>

</credswap>
</data>
</import>
```

## Bonds

The information required for specifying a bond mark to market price and (optionally) position is described in the following table:

| XML Tag Name | Mandatory | Description | | |
|---|---|---|---|---|
| bond XML tag | | | | |
| Bondname | N | A long name description of the bond. This is useful for improving the readability of error reports. This is truncated to 40 characters. | | |
| Bonded | Y | The bond is identified by one of the following types of bondid: | | |
| | | Isin | The twelve character International Securities Identification Number. | |
| | | Cusip | This can be either the eight character Cusip without the check digit, or the nine character with the check digit. | |
| | | Common | The nine digit identification number used by both Euroclear and Cedel. | |
| | | Fonds | The Amsterdam Stock Exchange five digit identification code. | |
| | | Sedol | The London Stock Exchange seven digit identification number. | |
| | | Sicovam | The six digit identification code for France. | |
| | | Svm | The six digit Belgian code. | |
| | | Valoren | The six digit Swiss code issued by Telekurs. | |
| | | Wpk | The six digit German code (Wertpapier Kenn number). | |
| | | An example in XML format for a Cusip = JJ115950: <br> <bondid type="cusip"> JJ115950 </bondid> | | |
| Book | Y | This is the name of the customer's desk or trading book | | |

| | | |
|---|---|---|
| | | providing the price and position. Free format except for special characters: % ? '. This is truncated to 30 characters. |
| **bondprice XML tag** | | |
| Time | Y | The time at which the price snapshot was taken. Format is 24 hour HH:MM TMZ, where TMZ is the three character timezone string: GMT=Greenwich Mean Time, BST=British Summer Time, EST=Eastern Standard Time, EDT=Eastern Daylight Time. |
| Price | One of these | This is the bond's clean price. The type of price is specified with one of the following attributes: <table><tr><td>cash</td><td>A price from a cash desk.</td></tr><tr><td>aswap</td><td>A price from an asset swap desk. This is always assumed to be on a par USD basis.</td></tr><tr><td>highyield</td><td>A price from a high yield desk.</td></tr></table> This should be a mid price. 1 represents 100%. If the type is not known, then set it to "cash". An example of what this looks like in XML: `<price type="cash">1.003</price>` |
| Spread | | The type of the spread is specified with one of the following attributes: <table><tr><td>usdpar</td><td>A USD par asset swap spread</td></tr><tr><td>localpar</td><td>A local currency par asset swap spread</td></tr></table> This should be a mid spread. 0.0001 represents one basis point. An example of what this looks like in XML: `<spread type="usdpar">0.056</spread>` |
| Position | N | The position in the bond for that trading book. Negative for short. Additionally, a value of 'L' can be used to signify a large ($5,000,000 or more) position or a calue of 'S' to signify a small position. If this is not provided, the price is assumed to be an indicative price. |

Example bond price file in XML format:

```
<?xml version="1.0"?>
<!DOCTYPE import SYSTEM "http://www.mark-it.com/import.dtd">

<import>

<header>
   <system>DerivSys</system>
   <fileid> 1 </fileid>
   <date>20020531</date>
</header>
```

```
<data>
<bond>
    <bondname>              VLVY 6.125 11Jun09 </bondname>
    <bondid type="cusip">   TT334203           </bondid>
    <book>                  ASWAP              </book>
    <bondprice>
        <time>              17:00 GMT          </time>
        <price type="aswap"> 1.003             </price>
    </bondprice>
    <position>              10000000           </position>
</bond>
</data>

</import>
```

**The Document Type Definition (DTD)**

```
<!-- ================================================ -->
<!-- Mark-It Partners Import DTD Version 1.0          -->
<!-- ================================================ -->
<!ELEMENT import (
     header,
     data
)
>


<!ELEMENT header (
     system,
     fileid,
     date
)
>


<!ELEMENT data
     (bond|credswap)*
>


<!ELEMENT system (#PCDATA)>
<!ELEMENT fileid (#PCDATA)>
<!ELEMENT date   (#PCDATA)>


<!ELEMENT bond (
     bondname?,
     bondid,
     book,
     bondprice?,
     position?
)
>


<!ELEMENT bondprice (
     time,
     (price|spread)
)
>


<!ELEMENT credswap (
     entity,
     entityname?,
     tier,
     baseccy,
     docclause?,
     credcurve?,
     creddelta?
```

```
)
>

<!ELEMENT credcurve (
      spread1y?,
      spread2y?,
      spread3y?,
      spread5y?,
      spread7y?,
      spread10y?,
      spread15y?,
      spread20y?,
      spread30y?,
      recovery
)
>

<!ELEMENT creddelta (
      book,
      delta1y?,
      delta2y?,
      delta3y?,
      delta5y?,
      delta7y?,
      delta10y?,
      delta15y?,
      delta20y?,
      delta30y?
)
>

<!ELEMENT recovery    (#PCDATA)>
<!ELEMENT spread1y    (#PCDATA)>
<!ELEMENT spread2y    (#PCDATA)>
<!ELEMENT spread3y    (#PCDATA)>
<!ELEMENT spread5y    (#PCDATA)>
<!ELEMENT spread7y    (#PCDATA)>
<!ELEMENT spread10y   (#PCDATA)>
<!ELEMENT spread15y   (#PCDATA)>
<!ELEMENT spread20y   (#PCDATA)>
<!ELEMENT spread30y   (#PCDATA)>

<!ELEMENT delta1y     (#PCDATA)>
<!ELEMENT delta2y     (#PCDATA)>
<!ELEMENT delta3y     (#PCDATA)>
<!ELEMENT delta5y     (#PCDATA)>
<!ELEMENT delta7y     (#PCDATA)>
<!ELEMENT delta10y    (#PCDATA)>
<!ELEMENT delta15y    (#PCDATA)>
<!ELEMENT delta20y    (#PCDATA)>
<!ELEMENT delta30y    (#PCDATA)>
```

```
<!ELEMENT entity     (#PCDATA)>
<!ELEMENT entityname (#PCDATA)>
<!ELEMENT tier       (#PCDATA)>
<!ELEMENT baseccy    (#PCDATA)>
<!ELEMENT docclause  (#PCDATA)>

<!ELEMENT bondname   (#PCDATA)>
<!ELEMENT bondid     (#PCDATA)>
<!ATTLIST bondid
     type
(isin|cusip|common|fonds|sedol|sicovam|svm|valoren|wpk)
#REQUIRED
>

<!ELEMENT book       (#PCDATA)>
<!ELEMENT time       (#PCDATA)>
<!ELEMENT price      (#PCDATA)>
<!ATTLIST price
     type  (aswap|cash|highyield)     #REQUIRED
>

<!ELEMENT spread     (#PCDATA)>
<!ATTLIST spread
     type  (usdpar|localpar)     #REQUIRED
>

<!ELEMENT position   (#PCDATA)>
```

Schedule 3:  Part C - Designated IP Address

Founding Customer will provide Mark-it with a list of IP addresses from which the Founding
Customer is allowed to access the Mark-it system.   The parties will cooperate to address access
through sites with changing IP addresses.

Schedule 4: Disputes Procedure

To the fullest extent permitted by law, any dispute or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved through arbitration, in accordance with the following provisions:

(a)     In the event any party asserts a dispute or claim arising out of or relating to this Agreement, it shall notify in writing the other party of such alleged dispute or claim (a "**Dispute Notice**") and the parties shall attempt in good faith to resolve such dispute or claim amicably. If the parties fail to agree on settlement or resolution within ten (10) days of the date the non-disputing party receives the Dispute Notice, any party may, after giving the other party a written demand of arbitration (a "**Demand of Arbitration**"), refer the dispute or claim to arbitration in accordance with the provisions set forth herein.

(b)     The arbitration shall, subject to the provisions hereof, be governed by the Commercial Arbitration Rules of the American Arbitration Association (the "**AAA**"). The arbitration shall be administered and conducted by the AAA. The AAA shall be the appointing authority. The place of the arbitration and the place of the making of the arbitral decision shall be New York City. The substantive law to be applied by the arbitrators shall be the law governing this Agreement.

(c)     The arbitration panel (the "**Arbitration Panel**") shall be composed of three arbitrators, designated as follows. The party asserting the dispute or claim (the "**Claimant**") shall, in its Demand of Arbitration, appoint one arbitrator. The party named as parties Respondent in the Demand of Arbitration (the "**Respondent**") shall, no later than ten (10) days after being notified of the Demand of Arbitration, appoint one arbitrator. If the Respondent fails to appoint such arbitrator within said ten (10) days, the AAA shall appoint such arbitrator no later than fifteen (15) days after being notified of the Respondent's failure to timely appoint such arbitrator.

(d)     The two arbitrators shall mutually agree upon and appoint the third arbitrator no later than fifteen (15) days after the date of appointment of the second arbitrator. The arbitrators shall each be lawyers with at least ten years of experience in commercial litigation.

(e)     The Arbitration Panel shall render its award (the "**Award**") not later than ninety (90) days after the date of appointment of the third arbitrator. In the event that the Arbitration Panel fails to render the Award within such time limit, the Arbitration Panel shall, nonetheless, retain jurisdiction over the dispute.

(f)     The Award shall be in writing and shall set forth the reasons for the decision. The Award shall be final and binding upon the parties to the arbitration. Judgment on the Award may be entered in any court of competent jurisdiction. The prevailing party shall be entitled to reasonable attorneys fees and costs to be fixed by the arbitrators.

(g)     This Schedule 4 shall in no way affect the right of any party to seek such interim relief, and only such interim relief, in any appropriate forum (with the state or federal courts residing in New York, New York, Borough of Manhattan being the agreed upon forum of first choice provided such forum has appropriate jurisdiction to effectively provide such relief), as may be required to maintain the status quo in aid of the arbitration in any court of competent jurisdiction.

(h)     Pending the decision of the Arbitration Panel (as the case may be), the parties must continue performing their respective obligations under this Agreement to the maximum extent possible.

Schedule 5:  Additional License Matters

Further clarification and definition of permitted and prohibited uses of Data and Services. The provisions of this Schedule 5 and the other provisions of this Agreement shall, to the greatest extent possible, be read in a manner that gives effect to the plain meaning of both.  However, in the event of any difference or inconsistency between the provisions of this Schedule 5 and the other provisions of this Agreement, the provisions of this Schedule 5 shall control:

1.1    Founding Customer may use the Data and Services internally to verify prices as part of the Founding Customer's internal product control process relating to Financial Instruments held by the Founding Customer for its own account.

1.2    Founding Customer may use the Data and Services internally as part of a process to create books of record (including, on a case-by-case basis, adopting the price provided by Mark-it as the Founding Customer's price with respect to a Financial Instrument).   Except as otherwise provided in this Agreement (including the immediately preceding sentence) Founding Customer may not use the Data and Services for the purpose of confirming or providing prices for or to any third party (including, without limitation, any Affiliate of the Founding Customer (other than a Group Member), or any fund or asset pool managed by the Founding Customer or any of its Affiliates).   For purposes of clarity, the immediately preceding sentence shall not restrict Founding Customer's use of Transformed Data (notwithstanding that the prices reflected in Transformed Data may, in certain cases, be the same prices as were provided by Mark-it as part of the Data).

1.3    Founding Customer may use the Data as a reference on trades where Founding Customer is a counter-party to the trade, provided that Mark-it is given appropriate attribution as reasonably agreed upon by Mark-it and the Founding Customer. Where Founding Customer is a not a counter-party to the trade, in any circumstance not otherwise covered in this Agreement where Data or any Mark-it Service is used as an independent source of pricing, such use will be subject to the prior mutual agreement of Mark-it and the Founding Customer as to pricing and other terms, and provided that Mark-it is given appropriate attribution as reasonably agreed upon by Mark-it and the Founding Customer.

1.4    Founding Customer may show Mark-it Curves on its websites, provided that the Mark-it Curves are, as far as reasonably and technically practicable, not downloadable from the website and Mark-it is given proper attribution as mutually agreed upon by Mark-it and the Founding Customer.

1.5    Founding Customer may not use the Data and Services in an institutionalised, direct-feed, automated or other system that distributes prices to third parties. Founding Customer may not use Data or Services in, or to generate, any advice, recommendations, guidance, publications or alerts made available to Founding Customer Clients or other third parties,

except for occasional one-off transactions or proposed transactions. For purposes of clarity, the immediately preceding sentence shall not restrict Founding Customer's use of Transformed Data (notwithstanding that the prices reflected in Transformed Data may, in certain cases, be the same prices as were provided by Mark-it as part of the Data).

1.6    In any circumstance where Data or any Service is used as an independent source of pricing (other than for the purposes specifically permitted under the Agreement (including as set forth in Sections 1.1, 1.2, 1.3 and 1.4 of this Schedule 5)), such use will be subject to the prior mutual agreement of Mark-it and the Founding Customer as to pricing and other terms, and provided that Mark-it is given appropriate attribution as reasonably agreed upon by Mark-it and the Founding Customer. For the purpose of clarity, this Section 1.6 is not intended to permit the use of Aggregated Data in a manner not otherwise permitted under this Agreement.

1.7    Any time that Data or Services are used by the Founding Customer in a manner that may be viewed by third parties, Mark-it shall be given proper attribution, as mutually agreed upon by Mark-it and the Founding Customer.

1.8    All restrictions contained herein shall also apply to any person to whom the Founding Customer provides Data and/or to whom Founding Customer makes any of the Services available.

1.9    All references to Founding Customer in this Schedule 5 shall be deemed to include Founding Customer's Group.

1.10   If Mark-it agrees to permit any customer (other than a Participating Founding Customer) to use data or services of Mark-it comparable to the Data or Services in any manner materially more favorable to such customer than the uses of Data and Services available to the Founding Customer hereunder, Mark-it shall offer Founding Customer the right to use the applicable Data and/or Services in a manner and on terms that are reasonably comparable to the manner permitted to such customer. For the purpose of clarity, this Section 1.10 is not intended to permit the use of Aggregated Data in a manner not otherwise permitted under this Agreement or to limit the rights of Founding Customer under Section 16 of this Agreement.

Schedule 6: Rebate Mechanism

<u>Rebate</u>

1.1    Subject to paragraph 1.6 of this Schedule 6, each Participating Founding Customer (as defined below) of Mark-it will be eligible to receive a rebate in accordance with this Schedule 6. No Participating Founding Customer will receive a rebate for a particular quarter of a Contract Year in excess of the portion of the Annual Fee paid by such Participating Founding Customer for that quarter (net of any refunds).

1.2    The aggregate amount available for rebates to all Participating Founding Customers for a particular quarter of a Contract Year shall be two-thirds of the aggregate Annual Fees paid by all Participating Founding Customers (net of any refunds) with respect to that quarter (the "Aggregate Rebate Amount").

1.3    [Omitted.]

1.4    The allocation of the Aggregate Rebate Amount among Participating Founding Customers will be proportional to the relative contribution of each Participating Founding Customer. The relative contribution of a Participating Founding Customer will be based upon a weighted measure of the quality and quantity of Financial Data provided to Mark-it by such Participating Founding Customer.

       1.4.1    Contributed data points will be assigned a weight based upon their type (*e.g.*, bond or default swap point), number of contributions per Financial Instrument, origin and quality, in accordance with Schedule 6 – Annex A attached hereto.

       1.4.2    Data points determined by Mark-it to be outliers, or that are otherwise determined by Mark-it not to be valid, will carry a zero weight, and Mark-it will periodically inform Participating Founding Customers of their data points that have been assigned a zero weight. All other data points will be valid data points for purposes of this Agreement.

       1.4.3    Mark-it shall make its determinations under this paragraph 1.4 on a consistent basis for all of the Participating Founding Customers in accordance with a published protocol. Mark-it shall maintain records of Mark-it's acts under this Schedule 6 and shall make them available for inspection and verification by the Participating Founding Customers (not more than once every calendar quarter) and their agents (in each case at their own expense and subject to confidentiality restrictions similar in nature and scope to those set out in Section 11 of this Agreement). Mark-it shall prepare and deliver to each Participating Founding Customer a quarterly report reflecting the percentage of the Aggregate Rebate Amount allocated to such Participating Founding Customer for the applicable quarter.

1.5    Subject to the limitation in the last sentence of paragraph 1.1, the entire Aggregate Rebate Amount for each quarter of a Contract Year will be paid to the Participating Founding Customers eligible to receive a rebate (divided among them as provided in

paragraph 1.4 above and reallocated (based upon paragraph 1.4 above) to the extent necessary as a result of one or more Participating Founding Customers being subject to the cap provided in the last sentence of paragraph 1.1 above), not later than forty (45) days after the end of such quarter.

1.6    The term "Participating Founding Customer" shall mean each of **Morgan Stanley & Co. Incorporated,** and **Dresdner Bank AG London Branch,** and **Goldman Sachs & Co.** ,and **Credit Suisse First Boston Corporation,** and **ABN AMRO Bank N.V.,** and **Banc of America Securities LLC** ,and **The Toronto-Dominion Bank** , and **Deutsche Bank Securities Inc.,** and **Lehman Brothers Inc.,** in each case for so long as their respective Founding Customer Data Service Agreement with Mark-it remains in effect. In addition, Mark-it may from time to time by written notice to, and after consultation with, Founding Customer add as additional Participating Founding Customers other customers of Mark-it that are paying equivalent fees to Mark-it and that Mark-it determines are providing comparable Financial Data to the Company as is being provided by the then Participating Founding Customers.

4852/99999-501 NYLIB2/948370 v2

<u>Annex A</u>

The rebate will be allocated based upon a daily calculation, and the amount allocated for each Business Day will be the Aggregate Rebate Amount divided by the number of Business Days for the applicable quarter.

The relative weight applied to a data point for the purpose of determining the allocation of the Aggregate Rebate Amount among the Participating Founding Customers will be determined by multiplying (i) the 'Number of Contributions' weight for such data point by (ii) the 'Source' weight for such data point.

**Number of Contributions weight**:

This weight is inversely proportional to the number of contributions by Participating Founding Customers for a given Financial Instrument for any specific business day.

For Financial Instruments where the quorum requirement has been met, the total daily Number of Contributions weight for data points relating to such Financial Instrument will be 1. The Number of Contributions weight for each Participating Founding Customer that has contributed a data point for such Business Day will be 1 divided by the number of Participating Founding Customers contributing data points for such Financial Instrument on such Business Day.

For Financial Instruments where a quorum requirement has not been met, data points contributed by a Participating Founding Customer relating to such Financial Instrument will be given a Number of Contributions weight of 0.25.

**Source weight**

This weight is allocated according to the source of the data as follows:

| | |
|---|---|
| From Material Positions sourced from books of record: | 1 |
| From internal and external feeds of Executable Prices to automated trading platforms: | 1 |
| All other prices: | 0.5 |

**Note:** In the event that a Founding Customer contributes more than one price for a given Financial Instrument per Business Day, recognition will only be given for one of these prices. If one of these prices relates to a Material Position, this price will take precedence in the rebate calculation as long as it is not an outlier.

Schedule 7:  Quorum Requirements

Give/Get Concession

1.1    Founding Customer will receive Aggregated Data in respect of a particular Financial Instrument only if (i) both of the following apply: (a) Founding Customer has contributed a price for such Financial Instrument in accordance with this Agreement and (b) the number of parties providing prices for that Financial Instrument meets or exceeds the Give/Get Quorum Requirement (as defined below) for such Financial Instrument, or (ii) the Give All / Get All Concession applies.

1.2    The "Give/Get Quorum Requirement" for Financial Instruments is as follows:

Investment Grade Credit Product: 3

Sub-Investment Grade Credit Product: 3

Give All / Get All Concession

2.1    Founding Customer will receive Aggregated Data in respect of all Investment Grade Credit Product traded in a given geographic region if (i) Founding Customer is contributing all of its prices in respect of Investment Grade Credit Product traded in such geographic region as provided in this Agreement and (ii) in respect of a particular Financial Instrument, the number of parties providing prices for such Financial Instrument meets or exceeds the Give All /Get All Quorum Requirement (as defined below) for such Financial Instrument.

2.2    The "Give All / Get All Quorum Requirement" for Financial Instruments is as follows:

Investment Grade Credit Product: 3

2.3    Founding Customer and Mark-it will reasonably consider implementing a Give All / Get All Concession in respect of Sub Investment Grade Credit Product with a Quorum Requirement and on a time frame reasonably agreed upon between Mark-it and Founding Customer.

In witness whereof, this Agreement has been executed the day and year first written above.

SIGNED for and on behalf of
**Mark-it Partners Limited** by:                              }

_____
Print Name and Title

Roy Carushens

SIGNED for and on behalf of
**Lehman Brothers, Inc.** by:                      } *Mark E. Polhill*

Mark E. Polhill, Managing Director

_____
Print Name and Title

4852/99999-501 NYLIB2/948370 v2

# EXHIBIT B



**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                         :

**In re**                       :       Chapter 11 Case No.

                        :

**LEHMAN BROTHERS HOLDINGS INC.,**   :       08-13555 (JMP)

                        :

         **Debtor.**            :

                        :

                        :

-------------------------------------------------------x

### NOTICE OF ASSUMPTION AND ASSIGNMENT OF, AND AMOUNTS NECESSARY TO CURE DEFAULTS UNDER CONTRACTS AND LEASES TO BE ASSUMED AND ASSIGNED TO SUCCESSFUL PURCHASER

       **PLEASE TAKE NOTICE** that Lehman Brothers Holdings Inc. ("LBHI") and LB 745 LLC (together with LBHI, the "Debtors") filed petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on September 15, 2008, and September 17, 2008, respectively.

       **PLEASE TAKE FURTHER NOTICE** that on September 17, 2008, the Debtors filed a motion (the "Sale Motion") with the Bankruptcy Court seeking, among other things, an order (the "Sale Order") approving a sale of certain designated assets relating to LBHI's wholly-owned subsidiary Lehman Brothers Inc. ("LBI"), including assets which are owned by LBI and related assets which are owned by LBHI. The assets will be sold in accordance with an Asset Purchase Agreement (the "Purchase Agreement") by and among Barclays Capital Inc. (the "Purchaser"), the Debtors, and LBI, free and clear of all liens, claims, encumbrances, and other interests.

       **PLEASE TAKE FURTHER NOTICE** that on September 17, 2008, the Bankruptcy Court entered an Order: (A) Authorizing a Break-Up Fee and Expense Reimbursement, (B) Approving Certain Matters Relating to Competing Bids, if any, as Set Forth in the Purchase Agreement, (C) Approving the Form and Manner of Sale Notices, and (D) Fixing a Date for the Sale Hearing (such order, the "Break-Up Fee and Competing Bid Order").

### Notice to Contract Parties

       Pursuant to the Break-Up Fee and Competing Bid Order, parties to executory contracts and unexpired leases (the "Contracts") may determine whether their contract is proposed for assumption and assignment to Purchaser under the Purchase Agreement at the closing of transactions (a "Closing Date Contract") by visiting http://chapter11.epiqsystems.com/lehman (the "Website"). The Debtors will compute the appropriate cure amount (the "Cure Amount") for each Closing Date Contract and will list such Cure Amounts on the Website (the "List") prior to the hearing (the "Sale Hearing") to authorize the Debtors and LBI to enter into the Purchase Agreement. The Sale Hearing is scheduled for September 19, 2008 at 4:00 pm. If the Contract is one that the Purchaser

designates for assumption and assignment within the 60 days after the Closing (a "Designated Contract"), the Debtors will file a motion for approval of procedures with respect to Designated Contracts at a later date.

Any non-Debtor party to a Closing Date Contract shall either (A) at any time prior to the Sale Hearing, file with the Court and serve on the Debtors in writing or (B) raise at the Sale Hearing, any objections to (i) the proposed assumption and assignment to the Purchaser (and must state in its objection, with specificity, the legal and factual basis of its objection) and (ii) if applicable, the proposed Cure Amount (and must state in its objection, with specificity, what Cure Amount is required with appropriate documentation in support thereof), no later than the Sale Hearing. If no such objection is timely received or raised at the Sale Hearing, (x) the non-Debtor party to the Closing Date Contract shall be deemed to have consented to the assumption and assignment of the Closing Date Contract to the Purchaser and shall be forever barred from asserting any objection with regard to such assumption and assignment, and (y) any Cure Amount identified pursuant to the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Closing Date Contract, or any other document, and the non-Debtor party to a Closing Date Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Closing Date Contract against the Debtors or the Purchaser, or the property of any of them.

The failure of any Contract to appear on the List does not necessarily indicate that such Contract will not be assumed by the Debtors and assigned to the Purchaser, as Section 2.5 of the Purchase Agreement provides that the Purchaser shall have until 60 days after the Closing to designate contracts for assignment.

A copy of the Sale Motion, Break-Up Fee and Competing Bid Order and further information relating to the sale transaction may be found at http://chapter11.epiqsystems.com/lehman. Questions may be directed to counsel to the above-captioned debtor or to EPIQ at lehman@epiqsystems.com.

Dated: September 18, 2008
       New York, New York

*Jacqueline Marcus*

Harvey R. Miller, Esq.
Richard P. Krasnow, Esq.
Lori R. Fife, Esq.
Shai Y. Waisman, Esq.
Jacqueline Marcus, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtor
and Debtor in Possession

# EXHIBIT C

The contracts highlighted in yellow below are being assumed by Purchaser pursuant to the Asset Purchase Agreement. Cure amounts are listed on Exhibit A by vendor.

| Vendor Name* | Type II | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| Access Data Corp. | | Access Data Corp. | Two Chatham Center<br>24th Fl.<br>Pittsburgh, PA 15219 | LBHI |
| Dimension Data | | Dimension Data | 110 Parkway Dr. South<br>Hauppauge, Ny 11788 | LBI |
| Platform Computing, Inc. | | Platform Computing, Inc.<br>Attn: General Counsel | 3760 14th Avenue<br>Markham Ontario<br>L3R 3T7 | LBI |
| Red Hat, Inc. | | Red Hat, Inc.<br>Attn: General Counsel | 1801 Varsity Drive<br>Raleigh, NC 27606 | LBI |
| @STAKE, INC | Master Agreement | Ray Soulari, Royal Hansen, Emily Sebert | 2 Wall Street, New York, NY 10005 | Lehman Brothers, Inc. |
| 1010 DATA, INC | Trial | N/A | 65 Broadway, Suite 1010, New York, NY 10006 | Lehman Brothers Holdings |
| 2 TRACK GLOBAL | Master Agreement | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Amendment / Addendum / Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Amendment / Addendum / Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 2 TRACK GLOBAL | Transaction Schedule | N/A | 1270 Broadway, Suite 208, New York, NY 10001 | Lehman Brothers Holdings Inc. |
| 451.COM | Amendment / Addendum / Schedule | Alan Elworthy | N/A | Lehman Brothers Inc. |
| 4CONNECTIONS, LLC | Master Agreement | President and James Martin, Chief Financial Officer | 4 Gatehall Drive, 2nd Floor Parsippany, NJ 07054 | Lehman Brothers Holdings |
| 4CONNECTIONS, LLC | Amendment / Addendum / Schedule | President and James Martin, Chief Financial Officer | 4 Gatehall Drive, 2nd Floor Parsippany, NJ 07054 | Lehman Brothers Inc. |
| 4CONNECTIONS, LLC | Side Letter | President and James Martin, Chief Financial Officer | 4 Gatehall Drive, 2nd Floor Parsippany, NJ 07054 | Lehman Brothers Inc. |
| ABOVENET COMMUNICATIONS INC | Master Agreement | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Supplement | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - Legal Affairs, Vice President- | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - Legal Affairs, Vice President-<br>Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Transaction Schedule | Senior Vice President - Legal Affairs, Vice President-<br>Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Vice President - Legal Affairs, Vice President-<br>Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Marketing<br>Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Transaction Schedule | Senior Vice President - General Counsel | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | Amendment / Addendum / Schedule | Vice President - Legal Affairs, Vice President-<br>Marketing | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Holdings, Inc |
| ABOVENET COMMUNICATIONS INC | TBD | N/A | 360 Hamilton Avenue, White Plains, NY 10601 | Lehman Brothers Inc. |

| Vendor Name | Type II | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| COGNIZANT TECHNOLOGY SOLUTIONS | Amendment / Addendum / Schedule | Cognizant Technology Solutions U.S. Corporation | 500 Glenpointe Center West, Teaneck, NJ 07666 | Lehman Brothers Inc. |
| COGNIZANT TECHNOLOGY SOLUTIONS | TBD | Cognizant Technology Solutions U.S. Corporation | 500 Glenpointe Center West, Teaneck, NJ 07666 | Lehman Brothers Inc. |
| COGNIZANT TECHNOLOGY SOLUTIONS | Transaction Schedule | Cognizant Technology Solutions U.S. Corporation | 500 Glenpointe Center West, Teaneck, NJ 07666 | Lehman Brothers Inc. |
| Cognizant Technology Solutions U.S. Corporation | | Cognizant Technology Solutions | 500 Glenpointe Centre West, Teaneck, NJ 07666 | LBHI |
| COGNOS CORPORATION | Trial | | 3755 Riverside Drive, Ottawa, Ontario Canada, KIG 4K9 | LBI |
| COGNOS CORPORATION | TBD | | no attachment | Unknown |
| COGNOS CORPORATION | Maintenance Renewal Quote | | quote | Unknown |
| COLDSPARK, LLC | Maintenance Renewal Quote | | quote | Unknown |
| COLEMAN RESEARCH GROUP, LLC | Master Agreement | | 989 Ave of Americas, 18th floor, New York, NY 10018 | LBI |
| COLLABNET, INC. | Maintenance Renewal Quote | CollabNet, Inc. | 8000 Marina Blvd, Suite 600 Brisbane, CA 94005-1865 | LBI |
| Color by Pergament LLC | TBD | | 30-00 47 Avenue Long Island City, NY 11101 | LBHI |
| Color by Pergament LLC | TBD | | 30-00 47 Avenue Long Island City, NY 11101 | LBHI |
| COLUMBINE CABLE COMPANY, INC. | Master Agreement | | 5480 West 60 Ave Unit A, Arvada, CO 80003 | LBHI |
| COLUMBINE CAPITAL SERVICES INC | Amendment / Addendum / Schedule | | Two North Cascade Ave, Suite 450 Colorado Springs, CO 80903 | LBI |
| COLUMN TECHNOLOGIES INC | Master Agreement | | 1400 Opus Place Suite 110, Downers Grove, IL 60515 | LBHI |
| COLUMN TECHNOLOGIES INC | Side Letter | | n/a | Unknown |
| Combined Computer Resources, Inc. | Amendment / Addendum / Schedule | | 120 Wood Ave South, Iselin, NJ 08830 | LBI |
| COMSCAN LLC | Amendment / Addendum / Schedule | | 120 Broadway, 11th floor, New York, NY 10271 | LBI |
| CommScope | TBD | | 1100 CommScope Place SE, Hickory, NC 28602 | LBHI |
| CommScope* | Master Agreement | | 1100 CommScope Place SE, Hickory, NC 28602 | LBHI |
| COMMUNICATOR INC | Master Agreement | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| COMMUNICATOR INC | Amendment / Addendum / Schedule | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| COMMUNICATOR INC | Other | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| Communicator Inc. | Standalone Agreement | | 360 Hamilton Ave, White Plaines, NY 10601 | LBI |
| COMVAULT SYSTEMS INC | Side Letter | not listed | not listed | LBI |
| COMPATIBL TECHNOLOGIES LLC | Master Agreement | | 29 Emmons Drive Suite C-10 Princeton, NJ 08540 | Lehman Brothers Inc |
| COMPATIBL TECHNOLOGIES LLC | Amendment / Addendum / Schedule | | 29 Emmons Drive Suite C-10 Princeton, NJ 08540 | Lehman Brothers Inc |
| Complinet, Inc. | TBD | | 1250 Broadway, Suite C-10, New York, NY 10001 | LBI |
| Complinet, Inc. | Master Agreement | | 1250 Broadway, Suite 1902, New York, NY 10001 | LBI |
| Complinet, Inc. | Supplement | | 1250 Broadway, Suite 1902, New York, NY 10001 | LBI |
| COMPOSITE SOFTWARE, INC. | Trial | | 265 Campus Drive Suite 200 San Mateo, CA 94403 | Lehman Brothers Inc |

| Vendor Name | Type II | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| Longview of America | TBD | Longview of America | 161 Washington Street, Suite 750, Conshohocken, PA, 19428 | Lehman Brothers Holdings Inc. |
| LUMIGENT TECHNOLOGIES INC. | Master Agreement | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | Lehman Brothers Holdings Inc. |
| LUMIGENT TECHNOLOGIES INC. | Supplement | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | Lehman Brothers Holdings Inc. |
| LUMIGENT TECHNOLOGIES INC. | Maintenance Renewal Quote | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | Lehman Brothers Holdings Inc. |
| Lumigent technologies, Inc. | | Lumigent Technologies, Inc. | 289 Great Road, Acton, MA 01720 | LBHI |
| LURHQ CORPORATION | Master Agreement | LURHQ Corporation | 4033 Highway 501 West, Myrtle Beach, SC 29579 | Lehman Brothers Inc. |
| LURHQ CORPORATION | Transaction Schedule | LURHQ Corporation | 4033 Highway 501 West, Myrtle Beach, SC 29579 | Lehman Brothers Inc. |
| M&M Sentinel Glow | not listed | M&M Sentinel Glow | 24 Regency Way, Manalapan, NJ 07726 | LBI |
| M&M SENTINEL GLOW, INC | | M&M Sentinel Glow | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M Technologies | Supplement | M&M Technologies Corp. | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Master Agreement | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Supplement | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Transaction Schedule | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Amendment / Addendum / Schedule | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Transaction Schedule | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M&M TECHNOLOGIES CORP. | Transaction Schedule | not listed | 24 Regency Way, Manalapan, NJ 07726 | LBHI |
| M.A. PARTNERS, LLC | Master Agreement | Operations Department | 330 Madison Avenue, 9th floor, New York, NY 10017 | LBHI |
| M.A. PARTNERS, LLC | Professional and Consulting | not listed | 330 Madison Avenue, 9th floor, New York, NY 10017 | LBHI |
| M.P.A Technologies Inc. | Amendment / Addendum / Schedule | not listed | 330 Primrose Road, Suite 610, Burlingame, California 94010 | LBI |
| MACROMEDIA | Master Agreement | not listed | not listed | LB |
| Mainstar Software Corporation | | Mainstar Software Corporation | PO Box 4132, Bellevue, WA 98009 | Unknown |
| MAINSTAR SOFTWARE CORPORATION | Maintenance Renewal Quote | | | Unknown |
| MAPINFO CORP | Amendment / Addendum / Schedule | not listed | not listed | LBI |
| MARKET NEWS INTERNATIONAL | Amendment / Addendum / Schedule | not listed | 100 William Street, 3rd floor, New York, NY 10038 | LBI |
| MARKET NEWS INTERNATIONAL | TBD | Penny Davenport | 100 William Street, 3rd floor, New York, NY 10038 | LBI |
| MARKIT GROUP LIMITED | Master Agreement | N/A | 2 More London Riverside, London SE1, 2AP | LBI |
| MARKIT VALUATIONS LIMITED | Amendment / Addendum / Schedule | not listed | N/A | N/A |
| MARKMONITOR | TBD | not listed | not listed | LBI |
| MARKMONITOR | Maintenance Renewal Quote | N/A | N/A | N/A |
| MATHWORKS INC | | N/A | N/A | N/A |
| MATHWORKS INC | Maintenance Renewal Quote | N/A | N/A | N/A |
| MATHWORKS INC | TBD | not listed | not listed | N/A |
| MATHWORKS INC | | | | N/A |
| MAZE COMPUTER COMMUNICATIONS | Amendment / Addendum / Schedule | not listed | 269 Amethyst Way, Franklin Park, NJ 08823 | not listed |
| MAZE COMPUTER COMMUNICATIONS | Amendment / Addendum / Schedule | not listed | not listed | Unknown |
| MEG EXPENSE MANAGEMENT, LLC | Master Agreement | not listed | 370 Lexington Avenue, New York, NY 10017 | LBI |
| MEG EXPENSE MANAGEMENT, LLC | Supplement | not listed | 370 Lexington Avenue, New York, NY 10017 | LBHI |
| MFLOX, INC | Trial | N/A | N/A | N/A |
| MCDATA CORPORATION | Trial | N/A | 11802 Ridge Parkway, Broomfield, CO 80021 | LBI |
| MCI | Amendment / Addendum / Schedule | not listed | not listed | LBHI |

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
                                       :

In re                             :      Chapter 11 Case No.
                                         :

LEHMAN BROTHERS HOLDINGS INC., *et al.*   :      08-13555 (JMP)

                                       :

        Debtors.                  :      (Jointly Administered)
                                         :

-----------------------------------------------------------------x

## ORDER UNDER 11 U.S.C. §§ 105(a), 363, AND 365 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004 AND 6006 AUTHORIZING AND APPROVING (A) THE SALE OF PURCHASED ASSETS FREE AND CLEAR OF LIENS AND OTHER INTERESTS AND (B) ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Upon the motion, dated September 17, 2008 (the "Motion"),[1] of Lehman Brothers

Holdings, Inc. ("LBHI") and LB 745 LLC ("LB 745"), as debtors and debtors-in-possession

(collectively, the "Debtors" and, together with their non-debtor affiliates, "Lehman") for orders

pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1) and 365 and Fed. R. Bankr. P. (the "Bankruptcy

Rules") 2002, 6004, 6006 and 9014 (A) scheduling a final sale hearing (the "Sale Hearing") with

respect to that certain Asset Purchase Agreement, dated September 16, 2008, among the Debtors,

Lehman Brothers Inc. ("LBI" and, collectively with the Debtors, the "Seller") and Barclays

Capital, Inc. (the "Purchaser"), collectively with that First Amendment Clarifying Asset

Purchase Agreement dated September 19, 2008 and that letter agreement clarifying and

supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be

subsequently modified or amended or clarified, the "Purchase Agreement"); (B) establishing

sales procedures; (C) approving a break-up fee; and (D) authorizing and approving the sale of

---

[1]    Capitalized terms used herein but not defined herein shall have the meaning ascribed to such terms in the Agreement.

certain of the Seller's assets (the "Purchased Assets") free and clear of all liens, claims,

encumbrances and interests  and the assumption and assignment of certain prepetition executory

contracts and unexpired leases (the "Contracts") relating to the Purchased Assets  to the

Purchaser or the Successful Bidder(s); and upon the Court's consideration of the Motion and the

record of the Sale Hearing held on September 19, 2008 with respect to the Motion, including the

testimony and evidence admitted at the Hearing; and after due deliberation thereon, and

sufficient cause appearing therefor,

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS:

A.    **Jurisdiction and Venue**.   This Court has jurisdiction to consider this

Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**.  The statutory predicates for the relief sought in the

Motion are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006

and 9008 and the applicable Local Rules for the United States Bankruptcy Court for the Southern

District of New York (the "Local Rules").

C.    **Notice**.  As evidenced by the affidavits of service filed with this Court and

based upon the representations of counsel at the Sale Hearing and as approved under the Order

(I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating to

Competing Bids, If Any, (III) Approving the Form and Manner of Sale Notices and (IV) Setting

the Sale Hearing Date in Connection with the Sale of Certain of the Sellers' Assets (the "Break-

Up Fee and Competing Bids Order"): (i) in light of the exigent circumstances of these cases and

the wasting nature of the Sellers' assets, due, proper, timely, adequate and sufficient notice of the

Motion, the Sale Hearing and the transactions set forth in the Purchase Agreement  (the "Sale"),

2

including the assumption and assignment of the Contracts and Cure Amounts with respect

thereto, has been provided in accordance with Bankruptcy Code sections 105(a), 363 and 365,

Bankruptcy Rules 2002, 6004, 6006 and 9008 and the Local Rules; (ii) it appearing that no other

or further notice need be provided; (iii) such notice was and is good, sufficient and appropriate

under the circumstances of the Debtors' chapter 11 cases; (iv) good cause exists to shorten the

applicable notice periods in Bankruptcy Rules 2002, 6004, and 6006 and the applicable notice

periods in the Local Rules, and (iv) no other or further notice of the Motion, the Sale Hearing or

the Sale (including the assumption and assignment of the Contracts), is or shall be required.

        D.    **Irreparable Harm.**    The Debtors' estates will suffer immediate and
irreparable harm if the relief requested in the Motion is not granted on an expedited basis
consistent with the provisions set forth herein and the Purchase Agreement, particularly given the
wasting nature of the Purchased Assets.

        E.    **LBI.**  LBI is the subject of a proceeding under the Securities Investors
Protection Act of 1970 ("SIPA") which was filed on September 19, 2008. The Purchase
Agreement provides for the sale of certain of LBI's assets to the Purchaser. The effectiveness of
this Order is conditioned upon the entry of an order in LBI's SIPA proceeding which, to the
extent applicable, has the same material terms as this Order and is otherwise in form and
substance reasonably satisfactory to the Purchaser. As part of that transfer, the Depository Trust
Clearing Corporation ("DTCC") informed the Purchaser and LBI on Wednesday, September 17,
2008, that the Purchaser would be required to assume the liabilities associated with the accounts
maintained by LBI at the DTCC and its subsidiaries -- The Depository Trust Company ("DTC"),
the National Securities Clearing Corporation ("NSCC"), and the Fixed Income Clearing
Corporation ("FICC") – in their entirety and irrespective of whether the assets or liabilities in a

particular account were the subject of the Purchase Agreement or were owned by LBI or an

affiliate of LBI. The Purchaser agreed to do so upon the terms and conditions specified in the

Purchase Agreement, as amended.

        F.    **Opportunity to Object**. A reasonable opportunity to object and to be

heard with respect to the proposed Sale, the Motion and the relief requested therein has been

given, in light of the exigent circumstances in these cases, to all interested persons and entities,

including the following: (i) the Office of the United States Trustee, (ii) counsel for the

Purchaser, (iii) counsel for the Official Committee of Unsecured Creditors (the "Committee"),

(iv) the Company's thirty largest creditors, (iv) Rock-Forty-Ninth LLC, (v) all entities known to

have asserted any lien, claim, interest or encumbrance in or upon the Purchased Assets, (vi) all

non-Debtor parties to Contracts that will be assumed on the Closing Date (the "Closing Date

Contracts"), (vii) the United States Attorney's office, (viii) the United States Department of

Justice, the Securities and Exchange Commission, (ix) the Securities Investor Protection

Corporation, (x) the Internal Revenue Service, (xi) all persons, if any, who have filed objections

to the Sale Motion; and (xiii) all persons who have filed a notice of appearance in the chapter 11

cases.

        G.    **Corporate Authority**.  The Debtors (i) have full corporate power and

authority to execute the Purchase Agreement and all other documents contemplated thereby and

the Debtors' sale of the   Assets has been duly and validly authorized by all necessary corporate

action, (ii) have all of the corporate power and authority necessary to consummate the

transactions contemplated by the Purchase Agreement, (iii) have taken all corporate action

necessary to authorize and approve the Purchase Agreement and the consummation of the

transactions contemplated thereby, and (iv) no consents or approvals, other than those expressly

provided for in the Purchase Agreement, are required for the Debtors to consummate such transactions.

        H.     **Sale in Best Interests**.  Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

        I.     **Business Justification**.  The Debtors have demonstrated both (i) good, sufficient and sound business purposes and justifications and (ii) compelling circumstances for the Sale other than in the ordinary course of business under Bankruptcy Code section 363(b) before, and outside of, a plan of reorganization in that, among other things, the immediate consummation of the Sale with the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates, particularly given the wasting nature of the Purchased Assets.  Entry of an order approving the Purchase Agreement and all the provisions thereof is a necessary condition precedent to the Purchaser's consummation of the transactions set forth in the Purchase Agreement.

        J.     **Arm's-Length Sale**.  The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arm's-length bargaining positions.  The Purchaser is not an "insider" of the Debtors, as that term is defined in Bankruptcy Code section 101(31).  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.

        K.     **Good Faith Purchaser**.  The Purchaser is a good faith Purchaser of the Purchased Assets within the meaning of Bankruptcy Code section 363(m) and is, therefore,

entitled to all of the protections afforded thereby. The Purchaser has proceeded in good faith in all respects in connection with this proceeding.

L. **Highest and Best Offer**. The Purchase Agreement constitutes the highest and best offer for the Purchased Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. The Debtors' determination that the Purchase Agreement constitutes the highest and best offer for the Purchased Assets constitutes a valid and sound exercise of the Debtors' business judgment.

M. **Consideration**. The consideration constitutes reasonably equivalent value or fair consideration, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchase Agreement represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities, other than the Purchaser, has offered to purchase the Purchased Assets for an amount that would give greater economic value to the Debtors' estates. Approval of the Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby is in the best interests of the Debtors, their creditors and all other parties in interest.

N. **Free and Clear**. Except to the extent that certain intellectual property rights may be owned by entities other than the Seller, the Debtors and LBI are the sole and lawful owners of the Purchased Assets. The transfer of the Purchased Assets to the Purchaser under the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Debtors to the

6

Purchased Assets free and clear of all Liens, claims (as defined in section 101(5) of the

Bankruptcy Code) (including, without limitation, successor liability claims), encumbrances,

obligations, liabilities, contractual commitments, rights of first refusal or interests of any kind or

nature whatsoever (collectively, the "Interests"), including, but not limited to, (i) those that

purport to give to any party a right or option to effect any forfeiture, modification or termination

of the Debtors' interests in the Purchased Assets, or any similar rights or (ii) those relating to

taxes arising under or out of, in connection with, or in any way relating to the operation of the

Debtors' business prior to the Closing Date.  For avoidance of doubt, all Interests shall attach to

the proceeds ultimately attributable to the property against or in which such Interests are

asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the

same order of priority, which such Interests now have against the Purchased Assets or their

proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable,

may possess with respect thereto.  Further, the assumption and assignment of any Closing Date

Contracts is likewise free and clear of all Interests.  Notwithstanding the foregoing, as of the

Closing Date, all obligations to The Options Clearing Corporation ("OCC") with respect to

Purchased Assets that are within the possession or control of OCC shall have been assigned to

the Purchaser, and the Purchaser shall have assumed all of such obligations including, without

limitation, all obligations with respect to short option positions, futures contracts, and stock loan

or borrow positions that are transferred to the accounts of Purchaser at OCC as of the Closing

Date in accordance with the Purchase Agreement.  From and after the Closing Date, all

securities, cash, collateral and other property transferred to accounts of the Purchaser at OCC

shall be subject to all rights of OCC therein in accordance with the By-Laws and Rules of OCC

including, without limitation, the security interests and setoff rights of OCC with respect thereto.

O.      **Free and Clear Findings Needed by Purchaser**. The Purchaser asserts that it would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) to the Purchaser and the assumption and assignment of the Contracts to the Purchaser was not free and clear of all Interests of any kind or nature whatsoever, or if the Purchaser would, or in the future could, be liable for any of the Interests.

P.      **No Liability Findings Needed by Purchaser**. Purchaser asserts that it will not consummate the transactions contemplated by the Purchase Agreement unless the Purchase Agreement specifically provides, and the Bankruptcy Court specifically orders, that none of Purchaser or its affiliates, members or shareholders or the Purchased Assets will have any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability.

Q.      **Satisfaction of 363(f) Standards**. The Sellers may sell the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) free and clear of any Interests of any kind or nature whatsoever because in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. The person or entity with any Interest in the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller): (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money

8

satisfaction of such Interest; or (iii) otherwise falls within the provisions of section 363(f) of the

Bankruptcy Code. Those holders of Interests who did not object to the Motion are deemed,

subject to the terms of this Order, to have consented pursuant to Bankruptcy Code section

363(f)(2). All holders of Interests are adequately protected by having their Interests attach to the

proceeds ultimately attributable to the Purchased Assets (except to the extent that certain

intellectual property rights may be owned by entities other than the Seller) against or in which

such Interests are asserted, subject to the terms of such Interests, with the same validity, force

and effect, and in the same order of priority, which such Interests now have against the

Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or

their estates, as applicable, may possess with respect thereto.

       R.     **No Fraudulent Transfer**. The Purchase Agreement was not entered into

for the purpose of hindering, delaying or defrauding creditors of Seller under the Bankruptcy

Code and under the laws of the United States, any state, territory, possession, or the District of

Columbia. Neither Debtors nor Purchaser is entering into the transactions contemplated by the

Purchase Agreement fraudulently for the purpose of such statutory and common law fraudulent

conveyance and fraudulent transfer claims.

       S.     **No Successor Liability**. Except for the Assumed Liabilities, the transfer

of the Purchased Assets (except to the extent that certain intellectual property rights may be

owned by entities other than the Seller) to the Purchaser under the Purchase Agreement shall not

result in (i) the Purchaser having any liability or responsibility for any claim against the Debtors

or against an insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to

the Debtors except as is expressly set forth in the Purchase Agreement. Without limiting the

effect or scope of the foregoing, to the fullest extent permitted by law, the transfer of the

Purchased Assets(except to the extent that certain intellectual property rights may be owned by entities other than the Seller) from the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or the Debtors' interests in such Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions, including, without limitation, any successor liability.

T.    **Cure/Adequate Assurance**.  The assumption and assignment of the Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  The Debtors have:  (i) to the extent necessary, cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A), and (ii) to the extent necessary, provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(B) and 365(f)(2)(A).  The Purchaser's promise to pay the Cure Amounts (as defined below) and to perform the obligations under the Closing Date Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B).  Any objections to the assumption and assignment of any of the Closing Date Contracts to the Purchaser are hereby overruled.  Any objections to the Cure Amounts (as defined below) are resolved as set forth herein.  All counterparties to Closing Date Contracts shall have until

10

October 3, 2008 (the "Cure Amount Objection Deadline") to file an objection to the cure amounts of their respective Closing Date Contracts (including as to the identity of such contracts) identified on http: //chapter11.epiqsystems.com/Lehman (the "Website") (the "Cure Amounts"). To the extent that any counterparty does not object to its Cure Amount by the Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. To the extent any objections to Cure Amounts are timely filed, the Debtors, Purchaser and the counterparty shall meet and confer in good faith to attempt resolve any such objection without Court intervention. If the objecting party and the Purchaser determine that the objection cannot be resolved without judicial intervention, then such dispute will be determined by the Court upon written application by either party on 20 (twenty) days notice, with any response due to such an application 15 (fifteen) days after such application is filed. The Purchaser shall pay any Cure Amount as soon as reasonably practicable after (i) the date on which the contracting counterparty consents in writing to the Cure Amount, (ii) the date on which the counterparty is deemed to have consented, or (iii) the date on which the Court enters an order determining the Cure Amount after the notice and hearing procedure set forth above. The procedures with respect to assumption, assignment and cure of the Contracts that are the subject of the Purchaser's designation rights (the "Designated Contracts") will be set forth in one or more separate orders of the Court which will be entered at a later date or dates.

U.    **Prompt Consummation**. The Sale must be approved and consummated promptly in order to preserve the viability of the businesses subject to the sale as going concerns, to maximize the value of the estates. Time is of the essence in consummating the Sale.

11

V.    **Personally Identifiable Information**. The Sale may include the transfer of Personally Identifiable Information, as defined in Bankruptcy Code section 101(41A). No Consumer Privacy Ombudsman need be appointed under Code section 363(b)(1) because Purchaser has agreed to adhere to any such privacy policies applicable to the Debtors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.    **Motion is Granted**. The Motion and the relief requested therein is GRANTED and APPROVED, as set forth herein.

2.    **Objections Overruled**. Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3.    **Approval**. The Purchase Agreement and all of the terms and conditions thereto are hereby approved. The Debtors are hereby authorized and directed to (1) execute the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Purchase Agreement, provided that such additional documents do not materially change its terms; (2) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and the other agreements contemplated thereby; and (3) take all other and further actions as may be reasonably necessary to implement the transactions contemplated by the Purchase Agreement.

4.    **Free and Clear**. Except as expressly provided for in the Purchase Agreement or this Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors are authorized and directed to transfer the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) to the Purchaser and,

as of the Closing Date, the Purchaser shall take title to and possession of the Purchased Assets
(except to the extent that certain intellectual property rights may be owned by entities other than
the Seller) free and clear of all Interests of any kind or nature whatsoever, including but not
limited to the Liens and Excluded Liabilities, with all such Interests to attach to the proceeds
ultimately attributable to the property against or in which such Interests are asserted, subject to
the terms of such Interests, with the same validity, force and effect, and in the same order of
priority, which such Interests now have against the Purchased Assets or their proceeds, subject to
any rights, claims and defenses the Debtors or their estates, as applicable, may possess with
respect thereto.

      5.      **Valid Transfer**.  As of the Closing Date, (a) the transactions
contemplated by the Purchase Agreement effect a legal, valid, enforceable and effective sale and
transfer of the Purchased Assets to Purchaser, and shall vest Purchaser with title to such
Purchased Assets (except to the extent that certain intellectual property rights may be owned by
entities other than the Seller) free and clear of all Interests and Excluded Liabilities and (b) the
Purchase Agreement and the transactions and instruments contemplated hereby shall be
specifically performable and enforceable against and binding upon, and not subject to rejection
or avoidance by, the Debtors or any successor chapter 11 or chapter 7 trustee appointed with
respect thereto.

      6.      **General Assignment**.  On the Closing Date, this Order shall be construed
and shall constitute for any and all purposes a full and complete general assignment, conveyance
and transfer of the Sellers' interests in the Purchased Assets.  Each and every federal, state, and
local governmental agency or department is hereby directed to accept any and all documents and

13

instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

       7.    **Injunction**. Except as expressly permitted by the Purchase Agreement or by this Sale Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants and other creditors, holding Interests or Claims of any kind or nature whatsoever against or in the Debtors or the Debtors' interests in the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses before the Closing Date or the transfer of the Debtors' interests in the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the interests of the Debtors in such Purchased Assets, such persons' or entities' Interests or Claims. Following the Closing Date, no holder of an Interest in or Claim against the Debtors shall interfere with Purchaser's title to or use and enjoyment of the Debtors' interests in the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are transferred and attached to the Debtors' interests in the Sale proceeds as provided in this Sale Order in the order of their priority, with the same validity, force and effect which they have against such Purchased Assets as of the Closing Date, subject to any rights, claims and defenses that the Debtors' estates and Debtors, as applicable, may possess with respect thereto.

14

8.    **Release of Interests**. This Order (a) shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Purchased Assets (except to the extent that certain intellectual property rights may be owned by entities other than the Seller) prior to the Closing Date have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

9.    **Direction to Release Interests**.    On the Closing Date, each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

10.    **No Successor Liability**. Neither Purchaser nor its affiliates, successors or assigns shall, as a result of the consummation of the transaction contemplated by the Purchase Agreement,: (a) be a successor to the Debtors or their estates; (b) have, de facto or otherwise, merged or consolidated with or into the Debtors or their estates; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. Except for the Assumed Liabilities, the transfer of the Purchased Assets to Purchaser under the Purchase Agreement shall not result in (i) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets,

having any liability or responsibility for any claim against the Debtors or against an insider of the Debtors, (ii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff or otherwise, directly or indirectly, any Interest or Excluded Liability, or (iii) Purchaser, its affiliates, members, or shareholders, or the Purchased Assets, having any liability or responsibility to the Debtors except as is expressly set forth in the Purchase Agreement.

11.    **Examples of No Successor Liability**.  Without limiting the effect or scope of the foregoing, as a result of the closing of the transactions contemplated by the Purchase Agreement, the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Purchased Assets prior to the Closing Date.

12.    **Assumption and Assignment of Contracts**.  In accordance with Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the Closing Date Contracts, including customer account agreements, to which they are a party to the Purchaser.  All counterparties to Closing Date Contracts shall have until the Cure Amount Objection Deadline to file an objection to the Cure Amounts (including as to the specific identity

16

of such contracts).  To the extent that any counterparty does not object to its Cure Amount by the

Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure

Amounts and the assignments of their respective Closing Date Contracts to the Purchaser.  To

the extent any objections are timely filed, the Debtors, Purchaser and the counterparty shall meet

and confer in good faith to attempt resolve any such objection without Court intervention.  If the

objecting party and the Purchaser determine that the objection cannot be resolved without

judicial intervention, then such dispute will be determined by the Court upon written application

by either party on 20 (twenty) days notice, with any response due to such an application 15

(fifteen) days after such application is filed. The Purchaser shall pay any Cure Amount as soon

as reasonably practicable after (i) the date on which the contracting counterparty consents in

writing to the Cure Amount, (ii) the date on which the counterparty is deemed to have consented,

or (iii) the date on which the Court enters an order determining the Cure Amount after the notice

and hearing procedure set forth above.  The procedures with respect to assumption, assignment

and cure of the Designated Contracts will be set forth in one or more separate orders of the Court

which will be entered at a later date or dates.

       13.      **Bankruptcy Code Sections 365(b)(1) and 365(f)(2).**  The requirements

of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with

respect to the Closing Date Contracts.

       14.      **Binding Effect of Order**.  This Order shall be binding upon and shall

govern the acts of all entities, including without limitation all filing agents, filing officers, title

agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds,

administrative agencies, governmental departments, secretaries of state, federal, state and local

officials, and all other persons and entities who may be required by operation of law, the duties

17

of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.    **Ipso Facto Clauses Ineffective**.  Upon the Debtors' assignment of the Contracts to the Purchaser under the provisions of this Sale Order and any additional order contemplated by the Purchase Agreement, no default shall exist under any Closing Date Contract, and no counterparty to any Closing Date Contract shall be permitted to declare a default by the Purchaser under such Closing Date Contract or otherwise take action against the Purchaser as a result of any Debtors' financial condition, bankruptcy or failure to perform any of its obligations under the relevant Closing Date Contract.

16.    **Binding on Successors**.  The terms and provisions of the Purchase Agreement and this Order shall be binding in all respects upon the Debtors, their estates, all creditors of (whether known or unknown) and holders of equity interests in either Debtor, Purchaser and its respective affiliates, successors and assigns, and any third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding. This Order and the Purchase Agreement shall inure to the benefit of the Debtors, their estates, their creditors, the Purchaser and the respective successors and assigns of each of the foregoing.

17.    **Bankruptcy Code Section 363(n)**.  The consideration provided by Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

18.    **Good Faith**.  The transactions contemplated by the Purchase Agreement are undertaken by Purchaser without collusion and in good faith, as that term is used in

18

Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale shall not affect the validity of the Sale

(including the assumption and assignment of the Closing Date Contracts) with Purchaser, unless

such authorization is duly stayed pending such appeal prior to the Closing Date. Purchaser is a

good faith Purchaser of the Purchased Assets, and is entitled to all of the benefits and protections

afforded by Bankruptcy Code section 363(m).

19.    **Fair Consideration**. The consideration provided by the Purchaser to the

Debtors and LBI pursuant to the Purchase Agreement for its purchase of the Debtors' interest in

the Purchased Assets constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and

under the laws of the United States, any state, territory, possession or the District of Columbia;

provided that nothing in the foregoing shall waive or compromise any claim of a creditor,

including a non -debtor affiliate to seek relief against any estate or any person other than the

Purchaser, arising out of or related to flows of funds to and from the Debtors prior to entry of this

Order.

20.    **Retention of Jurisdiction**. This Court retains jurisdiction, pursuant to its

statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and

enforce the terms and provisions of this Order, all amendments thereto and any waivers and

consents thereunder, including, but not limited to, retaining jurisdiction to (a) compel delivery of

the Purchased Assets to Purchaser; (b) interpret, implement and enforce the provisions of this

Order; (c) protect Purchaser against any Interests in or Claims against the Sellers or the

Purchased Assets of any kind or nature whatsoever, attaching to the proceeds of the Sale, and (d)

enter any orders under section 363 and 365 of the Bankruptcy Code with respect to the
Designated Contracts.

      21.    **Retention of Rights By the Government**. Nothing in this Order or in the
Purchase Agreement (i) releases, nullifies, or enjoins the enforcement of any liability to a
governmental unit under police and regulatory statutes or regulations that any entity would be
subject to as the owner or operator of property after the date of entry of this Order; or (ii) should
be construed to give Purchaser any more protection against any government unit than it is
otherwise entitled to under 11 U.S.C. § 363(f). Nothing in this paragraph should be construed to
create for any governmental unit any substantive right that does not already exist under law.

      22.    **Surrender of Possession**. All entities that are currently, or on the Closing
Date may be, in possession of some or all of the Purchased Assets in which the Sellers hold an
interest hereby are directed to surrender possession of the Purchased Assets either to (i) the
Debtors or LBI before the Closing Date, or (ii) to Purchaser on the Closing Date.

      23.    **Fees and Expenses**. Any amounts payable by the Debtors under the
Purchase Agreement or any of the documents delivered by the Debtors in connection with the
Purchase Agreement, including, but not limited to the Breakup Fee or Expense Reimbursement,
shall be paid in the manner provided in the Purchase Agreement and the Break-Up Fee and
Competing Bid Order, entered on September 17, 2008, without further order of this Court, shall
be an allowed administrative claim in an amount equal to such payments in accordance with
sections 503(b) and 507(a)(2) of the Bankruptcy Code, shall have the other protections provided
in the Break-Up Fee and Competing Bid Order, and shall not be discharged, modified or
otherwise affected by any reorganization plan for the Debtors, except by an express agreement
with Purchaser, its successors, or assigns.

20

24.    **Sale Proceeds**.  Any and all valid and perfected Interests in Purchased Assets of the Debtors shall attach to any proceeds of such Purchased Assets immediately upon receipt of such proceeds by the Debtors (or any party acting on any Debtor's behalf) in the order of priority, and with the same validity, force and effect which they now have against such Purchased Assets, subject to any rights, claims and defenses the Debtors, their estates or any trustee for any Debtor, as applicable, may possess with respect thereto, and, in addition to any limitations on the use of such proceeds pursuant to any provision of this Order, except as required by this Order or the Purchase Agreement, no proceeds subject to an asserted Interest shall be used or disbursed by the Debtors without the express consent of the party or parties asserting an Interest therein or further order of the Court after notice (to all parties who have asserted an Interest in such proceeds) and a hearing, consistent with the requirements of the Bankruptcy Code.

25.    **Non-material Modifications**.  The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates and has been agreed to between the Committee, the Debtors and the Purchaser.

26.    **Subsequent Plan Provisions**.  Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in these chapter 11 cases (including any order entered after any conversion of a chapter 11 case of any of the Debtors to a case under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Order.

21

27.    **Failure to Specify Provisions**.  The failure specifically to include any
particular provisions of the Purchase Agreement in this Order shall not diminish or impair the
effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be
authorized and approved in its entirety; provided, however, that this Order shall govern if there is
any inconsistency between the Purchase Agreement (including all ancillary documents executed
in connection therewith) and this Order.  Likewise, all of the provisions of this Order are
nonseverable and mutually dependent.

28.    **Further Notice to Lienholders**.  The Debtors, at the Debtors' expense,
shall provide additional notice to any additional lienholders identified after the Debtors obtain
additional lien searches (such searches shall be done in a manner to the reasonable satisfaction of
the Purchaser).  If additional lienholders are identified after the Debtors' additional searches,
then such additional lienholders identified will be sent notice of the relief granted in the Sale
Motion and will be given 15 (fifteen) days after such notice to file an objection to the 11 U.S.C.
§ 363(f) relief provided herein.  If after such notice, any objections are filed, the Debtors and the
Purchaser will have 15 (fifteen) days to respond to such objections and such objections will be
set for hearing and determined by this Court.

29.    **No Stay of Order**.  Notwithstanding the provisions of Interim Bankruptcy
Rule 6004 and Bankruptcy Rule 6006 or any applicable provisions of the Local Rules, this Order
shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable
immediately upon entry.  Time is of the essence in closing the transactions referenced herein,
and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Any party
objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk
its appeal being foreclosed as moot.

22

30.    **Allocation**.  The consideration received by Seller pursuant to the Purchase

Agreement on account of the Lehman headquarters at 745 Seventh Avenue in New York City,

the Cranford New Jersey Data Center and the Piscataway New Jersey Data Center (collectively,

the "Real Estate Assets") shall become property of the LBHI estate. The rights of all parties in

interest in respect of the proper allocation of proceeds received by the Seller on account of the

Purchased Assets other than the Real Estate Assets are reserved, as among each Seller (and

without impairing or affecting in any way Purchaser's rights under the Purchase Agreement),

subject to the further order of the Court. The Debtors shall seek an order approving such

allocation, on notice to the SIPA Trustee and the Committee, in the event of any dispute

regarding such allocation.

31.    **Preservation of Certain Records**.  Subject to further order of the Court,

the Seller and the Purchaser are hereby ordered to take appropriate measures to maintain and

preserve, until the consummation of any chapter 11 plan for the Debtors, the books and records

and any other documentation, including tapes or other audio or digital recordings and data in or

retrievable from computers or servers, relating to or reflecting the records held by it or its

Affiliates relating to the Business, including the accounts, property and trading records of the

customers of the Seller.  In addition, the Debtors and Committee shall promptly identify

reasonable procedures for preserving information in the Seller or Purchaser's possession related

to potential tax or financial audits of, government investigations of, or claims against Seller, as

well as any claims that the Debtors may have against third parties, and the Seller and Purchaser

shall maintain and reserve such information, subject to further order of the Court until the

consummation of any chapter 11 plan for the Debtors.

32.    Notwithstanding anything to the contrary set forth in this order, this order does not (i) alter the rights of parties to "forward contracts," "securities contracts," "repurchase agreements," "commodity contracts," "swap agreements," "master netting agreements" (each as defined in the Bankruptcy Code) from exercising their rights pursuant to the "financial contract safe harbor" provisions of the Bankruptcy Code, including without limitation those set forth in sections 555, 556, 559, 560, 561 and 562 or (ii) affect any right of JPMorgan under or with respect to any securities contract, commodities contract, forward contract, repurchase agreement, swap agreement or master netting agreement (each as defined in the Bankruptcy Code) to exercise any contractual right (as defined in the relevant section of the Bankruptcy Code) of a kind described in section 362(b)(6), (7), (17), or (27), 362(o), 555, 556, 559, 560 or 561 of the Bankruptcy Code.

33.    Nothing in this order or actions taken pursuant to this Order shall undermine any obligations of the Debtors or the SIPA Trustee to comply with the rules of the Chicago Mercantile Exchange.

Dated:  New York, New York
        September 19, 2008


                        _s/ James M. Peck_____
                        HONORABLE JAMES M. PECK
                        UNITED STATES BANKRUPTCY JUDGE