Edward S. Weisfelner, Esq. (EW 5581)                    Hearing Date: October 16, 2008 at 10:00 a.m.
David J. Molton, Esq. (DM 1106)                         Objection Deadline: October 10, 2008 at 4:00 p.m.
Andrew Dash, Esq. (AD 7913)
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

Counsel to Newport Global Opportunities Fund LP,
Newport Global Credit Fund (Master) L.P.,
PEP Credit Investor L.P. and
Providence TMT Special Situations Fund L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------x
                                                 :
In re                                            :    Chapter 11
                                                 :
LEHMAN BROTHERS HOLDINGS INC., et al.,           :    Case No. 08-13555 (JMP)
                                                 :
                              Debtors.           :    (Jointly Administered)
                                                 :
-------------------------------------------------x
```

### NOTICE OF MOTION OF NEWPORT GLOBAL OPPORTUNITIES FUND LP, NEWPORT GLOBAL CREDIT FUND (MASTER) L.P., PEP CREDIT INVESTOR L.P. AND PROVIDENCE TMT SPECIAL SITUATIONS FUND L.P. FOR LEAVE TO CONDUCT RULE 2004 DISCOVERY OF DEBTOR LEHMAN BROTHERS HOLDINGS INC. AND OTHER ENTITIES

PLEASE TAKE NOTICE that Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P. and Providence TMT Special Situations Fund L.P. (collectively, the "Funds"), by and through their undersigned counsel, have filed a Motion for Leave to Conduct Rule 2004 Discovery of Debtor Lehman Brothers Holdings Inc. and Other Entities (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing (the "Hearing") to consider the relief requested in the Motion has been scheduled for 10:00 a.m. (Eastern Time) on October 16, 2008 before the Honorable James M. Peck, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Courtroom 601, New York, New York, 10004-1408.

PLEASE TAKE FURTHER NOTICE that responses, if any, to the Motion must (a) be made in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the local Rules for the United States Bankruptcy Court for the Southern District of New York and the Order pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures [docket no. 285]; (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) (i) electronically by registered users of the Bankruptcy Court's case filing system, or (ii) on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format) by all other parties in interest; (d) be submitted I hard copy form to the chambers of the Honorable James M. Peck, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004; (e) be served upon the following parties: (i) counsel for the Funds, Brown Rudnick LLP, Seven Times Square, New York, New York 10036, Attention: Edward S. Weisfelner, Esq., David J. Molton, Esq., Emilio A. Galván, Esq., and Andrew Dash, Esq., (ii) counsel for the Debtors', Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attention: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq. and Jacqueline Marcus, Esq., (iii) counsel for the Official Committee of Unsecured Creditors, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attention: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq. and Evan Fleck, Esq., (iv) counsel for the

Debtors' Postpetition Lenders, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New

York, New York  10006, Attention:  Lindsee P. Granfield, Esq. and Lisa Schweiger, Esq., and

Sullivan & Cromwell LLP, 125 Broad Street, New York, New York  10004, Attention:

Robinson B. Lacy, Esq. and Hydee R. Feldstein, Esq., and (v) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New

York  10004, Attention:  Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda

Riffkin and Tracy Hope Davis, in each case so as to be **received no later than 4:00 p.m.**

**(Eastern Time) on October 10, 2008 (the "Response Deadline").**

PLEAE TAKE FURTHER NOTICE that only responses made in writing and

timely filed and received by the Response Deadline will be considered by the Bankruptcy Court

at the Hearing.  If no responses to the Motion are timely filed and served in accordance with the

procedures set forth herein, the Bankruptcy Court may enter an order granting the Motion

without further notice.

Dated: New York, New York
      September 29, 2008

**BROWN RUDNICK LLP**

By: /s/ Edward S. Weisfelner
Edward S. Weisfelner, Esq. (EW 5581)
David J. Molton, Esq. (DM 1106)
Andrew Dash, Esq. (AD 7913)
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

*Counsel to Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P. and Providence TMT Special Situations Fund L.P.*

Edward S. Weisfelner, Esq. (EW 5581)
David J. Molton, Esq. (DM 1106)
Andrew Dash, Esq. (AD 7913)
**BROWN RUDNICK LLP**
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

Counsel to Newport Global Opportunities Fund LP,
Newport Global Credit Fund (Master) L.P.,
PEP Credit Investor L.P. and
Providence TMT Special Situations Fund L.P.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------x
                                        :
In re                                   :    Chapter 11
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al., :    Case No. 08-13555 (JMP)
                                        :
                     Debtors.           :    (Jointly Administered)
                                        :
------------------------------------------------------x
```

**MOTION OF NEWPORT GLOBAL OPPORTUNITIES FUND LP, NEWPORT
GLOBAL CREDIT FUND (MASTER) L.P., PEP CREDIT INVESTOR L.P. AND
PROVIDENCE TMT SPECIAL SITUATIONS FUND L.P. FOR LEAVE TO CONDUCT
RULE 2004 DISCOVERY OF DEBTOR LEHMAN BROTHERS HOLDINGS INC.
AND OTHER ENTITIES**

Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP

Credit Investor L.P. and Providence TMT Special Situations Fund L.P. (collectively, the

"Funds"),[1] by and through their undersigned counsel, hereby move this Court, pursuant to

section 105(a) of title 11 of the United States Code (as amended, the "Bankruptcy Code") and

---

[1]  Newport Global Opportunities Fund LP and Newport Global Credit Fund (Master) L.P. shall be defined
herein as "Newport".  PEP Credit Investor L.P. and Providence TMT Special Situations Fund L.P. shall be
defined herein as "PEP".

Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for an order authorizing and directing discovery in the form of: (i) a deposition of Lehman Brothers Holdings Inc. ("LBHI") (together with certain of its affiliates, the "Debtors") regarding the transfer of securities, cash, or other property held by or for Lehman Brothers International (Europe) ("LBIE"); (ii) document production concerning such transfers; and (iii) document and deposition discovery of any third parties that received a transfer from LBIE or the Debtors, or any person or entities on their behalf, of securities, cash, or other property in which either or both of PEP and Newport held an ownership or other interest.

In support of this motion (the "2004 Motion"), the Funds state as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    PROCEDURAL BACKGROUND

2.    On September 15, 2008 (the "Petition Date"), and in the days following, the Debtors commenced these voluntary cases under chapter 11 of Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.       On September 19, 2008, the Securities Investor Protection Corporation ("SIPC") commenced a proceeding in the United States District Court for the Southern District of New York (the "District Court"), seeking an order adjudicating that customers of Lehman Brothers, Inc. ("LBI") required the protection of the Securities Investor Protection Act of 1970 ("SIPA"). A trustee appointed under SIPA (the "SIPA Trustee") is administering LBI's estate. The District Court subsequently transferred the matter to this Court, which is now presiding over the chapter 11 bankruptcy proceedings and the SIPA proceeding.

5.       On September 17, 2008, the Debtors filed a Motion to Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the "Sale Motion") seeking (among other relief) the Court's authorization and approval of the sale of the "Purchased Assets" free and clear of all liens, claims, encumbrances, and interests, and the assumption and assignment of certain pre-petition contracts and unexpired leases relating to the Purchased Assets. After a lengthy hearing the same day, the Court approved the Debtors' requested sale procedures, and scheduled a hearing to consider the proposed sale ("Sale") for Friday, September 19, 2008 (the "Sale Hearing").

6.       The Court approved the Sale at the conclusion of the Sale Hearing, subject to modifications made on the record at the hearing, by an opinion read into the record and approval orders entered in the chapter 11 bankruptcy proceeding and in the SIPA proceeding.

### III.    FACTUAL BACKGROUND

7.       The Funds and LBI entered into respective Customer Account Agreements – Prime Brokerage and Margin Lending Agreements (collectively, the "Agreements")

pursuant to which LBI provided prime brokerage services to the Funds. These services included, among other things, trading and brokering equity and fixed income instruments and financial derivatives. LBIE, Lehman Brothers Special Financing, and other members of the Lehman Brothers group of companies (collectively, the "Lehman Entities") were also parties to the Agreements.

8.      On or around September 10, 2008, the Funds instructed LBI to transfer assets held by LBIE as collateral under the Agreements to Credit Suisse, which would assume duties as the prime broker for the Funds going forward. The assets subject to transfer were held in four (4) separate accounts. Each account was specifically identified by account number.

9.      The transfer request was expressly acknowledged by Mirzan Rahman of LBI in New York on or around September 11, 2008. See E-mail dated September 11, 2008 from Mirzan Rahman to Roger May, Chief Operating Officer of Newport, attached hereto as Exhibit A. The Funds subsequently forwarded Letters of Authorization to LBIE in order to facilitate the transfer of assets. True and accurate copies of the Letters of Authorization dated September 12, 2008 are attached hereto as Exhibit B. Upon receipt of the Letters of Authorization and related approvals from both Credit Suisse and the Funds, LBIE *confirmed* via email on September 12, 2008 that the transfer was being processed and, more importantly, would be "booked out for settlement on September 16, 2008." See E-mail dated September 12, 2008 from Mirzan Rahman, attached hereto as Exhibit C.

10.     Given the straightforward nature of the transfer, the Funds expected that it would be completed within one business day. The Funds' expectation was not met. On September 15, 2008, LBIE and several other European affiliates (Lehman Brothers Ltd.,

LB Holdings PLC, and LB UK RE Holdings Ltd) were placed into Administration proceedings under English law. On the same day, a representative of LBI advised the Funds that all accounts in the possession of LBIE were "under lockdown" and that PricewaterhouseCoopers LLP ("PwC"), appointed as Joint Administrators pursuant to orders issued by the English High Court of Justice, would provide an update on progress relating to the transfer. However, no update has been provided, despite numerous telephone calls made by the Funds to PwC.

11.    On or around September 19, 2008, Mr. May sent a letter to Robert Curtis of LBIE inquiring as to the status of the transfer, which, at that time, had been outstanding for over one week. Mr. May also explained, in candid detail, the harm that would be visited upon the Funds in the event that the transfers were not completed in an expedited manner. Mr. Curtis responded to the letter by summarily advising the Funds that Linklaters LLP, counsel to PwC in its capacity as Joint Administrators, "promised to look at this as a priority." See E-mail dated September 19, 2008 from Robert Curtis to Roger May, attached hereto as Exhibit D.

12.    Counsel for the Funds contacted PwC directly in letters dated September 23, 2008 and September 26, 2008. Counsel underscored the gravity of the matter and, again, explained that if the transfer to Credit Suisse did not take place immediately, it could compromise a number of transactions that the Funds have with third parties. These efforts, however, were to no avail, as, to date, no substantive response was provided by PwC or the Debtors.

13.    In the aftermath of the chapter 11 filing, rumors abound that billons of dollars were swept to LBHI from its London affiliates on September 12, 2008. These rumors were fueled by numerous reports in the domestic and international press. With

the cash allegedly transferred to LBHI, LBHI filed its chapter 11 petition on Monday, September 15, 2008.  Since commencing these cases, the Debtors have failed to disclose any kind of pre-petition cash movement.  It is customary in a case of this magnitude for a debtor to file a cash-management motion supported by a description of its cash-management system in a first-day declaration.  Yet, conspicuously, no such cash-management motion has been filed and the first-day declaration is devoid of any information concerning the Debtors' cash-management system.

14.    On September 19, 2008, the Debtors announced that the $1.3 billion in cash of LBI that was to be sold to Barclays PLC as part of the Sale was no longer available to the transaction.  No further explanation was given.  The Debtors have not revealed what happened to the $1.3 billion or to the other pre-petition flows of funds or other property, other than a significant loss on a trade with the Chicago Mercantile Exchange.  In sum, there are vital, unanswered questions regarding the Debtors' cash management and the pre-petition flow, movement or transfer of cash, securities and/or other assets and, more particularly, the whereabouts and disposition of the Funds' assets.  Simply put, in view of the paucity of relevant information from the Debtors, creditors are left to unscramble the egg.[2]

15.    As of the date of this motion, the Funds have no knowledge and have been given no information regarding the location or disposition of its assets.  Upon information and belief, a substantial portion of the Funds' assets held by LBIE have been transferred

---

[2]     The Funds have learned through the chapter 11 bankruptcy proceedings that other creditors, including Harbinger Capital Partners Special Situations Fund, L.P. and Harbinger Capital Partners Master Fund I, Ltd, have similarly sought Rule 2004 discovery from the Debtors and related entities regarding transfer and/or disposition of assets.

to one or more third parties and no information has been given to the Funds as to the present location and status of those assets.

16.     This is a matter of critical importance to the Funds. A substantial portion of the Funds' assets were held by the Lehman Entities. These assets were held in trust for the benefit of the Funds and the failure by the Lehman Entities to discharge the Funds' express instructions to transfer its assets to Credit Suisse constitutes an egregious breach of duties owed to the Funds. If these assets are not located and recovered immediately, there is the very real specter of serious and irreparable harm to not only the Funds, but also to their respective investors. The Court must not countenance such a result.

## IV.    **RELIEF REQUESTED**

17.     By this Motion, the Funds seek (a) an order compelling the Debtors to produce the documents responsive to the document requests set forth on Schedule A attached hereto, and (b) the opportunity to depose the person(s) within the Debtors most knowledgeable with regard to the topics listed in Schedule B. In addition, the Funds seek, pursuant to Bankruptcy Rules 2004 and 9016, leave to conduct similar document and deposition discovery of any third-party transferee of securities, cash, or other property held by the Debtors -- in particular third-party transferees of securities or the proceeds thereof in which the Funds have an ownership or other interest in the period commencing 60 days prior to the Petition Date to the present.[3]

18.     The Funds reserve their right to request and/or to conduct any other discovery, pursuant to Rule 2004 or other applicable law, from any person or entity, including, without limitation, the Debtors and the SIPA Trustee.

---

[3]     The Funds will provide a list of the securities in question to the parties to which the 2004 discovery requests are addressed.

## V.    ARGUMENT

### A.    Legal Standard

19.    "On motion of any party in interest, the court may order the examination of any entity." See Fed. R. Bankr. P. 2004(a). Generally, the purpose of a Rule 2004 examination is to "discover assets, examine transactions, and determine whether wrongdoing has occurred." See In re Bennett Funding Group, Inc., 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996); see also Fed. R. Bankr. P. 2004(b) (examination may relate to, among other things, "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate").

20.    As creditors, the Funds are clearly a "party-in-interest" with standing to seek authorization for, and to undertake, a Rule 2004 investigation. See 11 U.S.C. § 1109(b) ("A party in interest, including . . . a creditor, an equity security holder . . . may raise and may appear and be heard on any issue in a case under this chapter.").

### B.    Scope of 2004 Exam

21.    The scope of a Rule 2004 examination is "unfettered and broad," as the plain language of the rule indicates. See 9 Collier on Bankruptcy ¶ 2004.02[1] at 2004-6 (15th ed. Rev. 1997) (quoting In re Table Talk, Inc., 51 B.R. 143, 145 (Bankr. D. Mass. 1985)); see also In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991); In re Silverman, 36 B.R. 254, 258 (Bankr. S.D.N.Y. 1984). Indeed, it is well-settled that the scope of examination allowed under Rule 2004 is broader than discovery allowed under the Federal Rules of Civil Procedure. See In re Ionosphere Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993); In re Duratech Indus., 241 B.R. 283, 289

(Bankr. E.D.N.Y. 1999).); In re Drexel Burnham Lambert Group, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991).

22.    Examinations under Rule 2004 may include within their scope, among many other things, any matter which may affect "the administration of the debtor's estate," and, in a Chapter 11 case, any matter relevant to the case or to the formulation of a plan. See Moore v. Eason (In re Bazemore), 216 B.R. 1020, 1023 (Bankr. S.D. Ga. 1998). In fact, the well-settled scope of discovery conducted under Rule 2004 is so fundamental to the process and permissibly broad that courts have gone so far as to use with approval words and phrases such as "fishing expedition," "exploratory and groping," and "inquisition." See, e.g., In re Johns-Manville Corp. (Keene Corp. v. Johns-Manville Corp.), 42 B.R. 362, 364 (S.D.N.Y. 1984); In re Drexel Burnham Lambert Group, 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991); In re Innosphere, 156 B.R. at 432.

23.    Thus, a Rule 2004 examination affords a party in interest an opportunity to conduct a wide-ranging examination with respect to a debtor's financial affairs. See In re Texaco Inc., 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987). Further, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation. See Ionosphere Clubs, 156 B.R. at 432 (third party who has a relationship with the debtor may be subject to a Rule 2004 examination in order to aid in discovery of assets); In re Johns-Manville, 42 B.R. at 364 (discovery under Rule 2004 extends beyond the debtor to persons associated with him as well as to those persons who may have had business dealings with the debtor).

24.    Ultimately, Rule 2004 requires the Court to "balance the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." See Drexel Burnham, 123 B.R. at 712. In making this determination,

-9-

courts consider the purpose of the request as well as the degree of intrusiveness.  See id.

at 711-12 (discussing evolution and purpose of Rule 2004 and granting Rule 2004

motion, highlighting that the "requested purpose" was for "claims amendment and claims

litigation" and that "[t]he more knowledge FDIC/RTC has about its claims, the better it,

DBL, and the committees will be able to resolve the claims process in this case"); In Re

Hawley Coal Mining Corp., 47 B.R. 392, 394 (S.D. W.Va. 1984) (noting that appellant

failed to show that requested discovery was "oppressive in any manner" and holding that

bankruptcy court did not abuse its discretion in granting Rule 2004 examination).

### C.    2004 Discovery in connection with Pre-Petition Transfers and Disposition of Assets

25.    In the instant case, the balance of competing interests militates strongly in

favor of the Funds.  Therefore, the 2004 Motion should be granted.

26.    First, the discovery sought by the Funds herein is narrowly tailored and

falls squarely within the scope of Rule 2004.  As set forth in the attached Schedules, the

requested discovery aims to investigate (by documents and deposition testimony), the

reported multi-billion dollar transfers of cash and other assets by or into LBHI and/or LBI

just prior to the Petition Date, and the transfers or other events that resulted in the

apparent disappearance of such assets from the current Debtors and other affiliates prior

to the sale of LBI's assets.  A review of this information is critical for creditors, including

the Funds, to locate their lost property and, more generally, understand the Debtors' cash

management system so that they can protect their interests going forward.

27.    Second, while several Lehman entities are in a chapter 11 or other

proceeding, many remain non-debtors.  Transfers of highly liquid assets, such as cash and

securities, outside of the Court's control risks immediate dissipation of those assets

through use, pledge, or further transfer.  In short, there may be a swift erosion of

-10-

creditors' valuable rights, as each day increases the risk that commingling of proceeds, intervention of good-faith transferees, and other factors will make unwinding of transactions difficult or unfeasible. This would be an untenable result for creditors.

28.     Third, there is a substantial risk of imminent harm to the Funds. As described in the letters to the Debtors and PwC, the nature of the Funds' business is restructuring the balance sheet of distressed companies. They are currently involved in active restructuring negotiations with several companies. However, securities relating to these companies have been frozen because of the interrupted transfer to Credit Suisse. The ability of these companies to restructure may be compromised if the voting rights attached to the securities cannot be exercised, because each of the positions represents large percentages of the relevant classes of security. If the restructurings are delayed due to the Funds' inability to access securities or exercise voting rights, there is a substantial likelihood that the current stakeholders (debt and equity) will incur significant losses that otherwise would not have occurred.

29.     Finally, upon receiving and reviewing the discovery contemplated herein from the Debtors, the Funds may determine that further discovery from the Debtors, and/or discovery from the SIPA Trustee or other third parties is necessary. As the scope of such additional discovery will not be fully determined until after the Funds have had a meaningful opportunity to review the requested documents responsive to the document requests, the Funds respectfully request that this Court also authorize the Funds to conduct, without further of order of this Court, additional discovery beyond that specifically requested in the document requests, including, without limitation, additional document requests and depositions from the Debtors, the SIPA Trustee or any other

person or entity, to the extent the Funds deem necessary and to the extent such additional discovery relates to the above-described issues.

## VI.    WAIVER OF MEMORANDUM OF LAW

30.    As this Motion presents no novel issues of law and the authorities relied upon by the Funds are set forth herein, the Funds respectfully request that the Court waive the requirement of Local Rule 9013-1(b) that a separate memorandum of law be submitted herewith. However, the Funds reserve the right to file a memorandum in reply to any objection to this Motion.

## VII.    NO PRIOR REQUEST

31.    No prior motion for the relief requested herein has been made to this Court or any other court.

## VIII.    NOTICE

32.    The Funds have provided notice of this Motion to (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel for the Debtors; (c) counsel to the Creditors' Committee and (d) all other parties on the regular service list in these cases. The Funds respectfully submit that no other or further notice need be given.

## IX.    CONCLUSION

33.    WHEREFORE, for the reasons stated herein, the Funds respectfully request that this Court enter an Order, pursuant to Bankruptcy Rule 2004, in the form attached hereto as Exhibit E: (i) requiring the production of documents from the relevant parties responsive to the document requests; (ii) requiring the Deponents to submit to examination under oath by the Funds, from day to day until completed; and (iii) granting the Funds such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
       September 29, 2008

**BROWN RUDNICK LLP**


By:  /s/ Edward S. Weisfelner
Edward S. Weisfelner, Esq. (EW 5581)
David J. Molton, Esq. (DM 1106)
Andrew Dash, Esq. (AD 7913)
Seven Times Square
New York, NY 10036
Telephone:  (212) 209-4800
Facsimile:  (212) 209-4801

*Counsel to Newport Global Opportunities Fund*
*LP, Newport Global Credit Fund (Master) L.P.,*
*PEP Credit Investor L.P. and Providence TMT*
*Special Situations Fund L.P.*

## SCHEDULE A

## DEFINITIONS

1.      As used herein, the term "document" is used in the broadest sense and includes, but is not limited to, the following items, whether printed or recorded or reproduced by any other mechanical process, or written or produced by hand, and whether sent or received or neither, and further includes any and every manner of information recordation, storage, transmission or retrieval, including, but not limited to (a) typing, handwriting, printing, or any other form of writing or marking on paper or other material, (b) tape recordings, microfilms, microfiche, photocopies, and (c) any electronic, magnetic, or electromagnetic means of information storage and/or retrieval, including, but not limited to, electronic mail, optical storage media, computer memory chips, computer tapes, hard disks, compact discs, floppy disks, and any other storage medium used in connection with electronic data processing (together with the programming instructions and all other material necessary to understand or to use such tapes, disks, or other storage materials), namely: contracts; agreements and understandings; communications, including intracompany communications; memos; statements; handwritten or other types of notes; correspondence; telegrams; memoranda; notices; records; books; summaries, notes, or records of telephone conversations; summaries, notes or records of personal conversations or interviews; diaries; forecasts; statistical statements; accountants' work papers; graphs; charts; ledgers; journals; books or records of account; summaries of accounts; balance sheets; income statements; minutes or records of meetings or conferences; desk calendars; appointment books (including pocket appointment books); reports and/or summaries of interviews; reports and/or summaries of investigations; rough or scratch pad notes; records, reports or summaries of negotiations; studies; brochures; pamphlets; circulars; press releases; contracts; projections; drafts of any documents; working papers; marginal notations; doodlings; photographs; drawings; checks (front and back); invoices, bills of lading and other commercial papers; tape or video recordings; computer printouts; data processing input and output; microfilms; check stubs or receipts; and any other document or writing of whatever description.   As used herein, "document" means the original and any non-identical copy.   Handwritten notations of any kind on the original or any copy of a document render same non-identical.

2.      As used herein, the terms "relating to" or "referring to" or "pertaining to" or the like means and includes all documents that in any manner or form are relevant in any way to or bear upon the subject matter in question, including, without limitation, all documents which contain, record, reflect, summarize, evaluate, comment upon, transmit, refer to, or discuss that subject matter or that in any manner state the background of, or where the basis or bases for, or that record, evaluate comment upon, or were referred to, relied upon, utilized, generated, transmitted, or received in arriving at your conclusions, opinions, estimates, calculations, positions, decisions, beliefs, assertions or allegations, undermine, contradict, or conflict with your conclusions, opinions, calculations, estimates, positions, beliefs, assertions, or allegations, concerning the subject matter in question.

3.      As used herein, the term "derivative securities" is defined as it is 17 C.F.R. § 240.16a-1(c)

4.      As used herein, the term "PEP" shall mean PEP Credit Investor L.P. and Providence TMT Special Situations Fund L.P., including their directors, officers, agents,

employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with PEP.

5.    As used herein, the term "Newport" shall mean Newport Global Opportunities Fund LP and Newport Global Credit Fund (Master) L.P., including their directors, officers, agents, employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with Newport.

6.    As used herein, the term "Funds" shall mean PEP and Newport.

7.    As used herein, the term "LBHI," "you" and "yours" shall mean Lehman Brothers Holdings, Inc, including its directors, officers, agents, employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with LBHI.

8.    As used herein, the term "Debtors" shall mean LBHI and its affiliated entities, as debtors and debtors-in-possession in the above-captioned jointly administered chapter 11 cases.

9.    As used herein, the term "LBI" shall mean Lehman Brothers, Inc, including its directors, officers, agents, employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with LBI.

10.    As used herein, the term "LBSF" shall mean Lehman Brothers Special Financing, Inc., including its directors, officers, agents, employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with LBSF.

11.    As used herein, the term "LBIE" shall mean Lehman Brothers International (Europe), including its directors, officers, agents, employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with LBIE.

12.    As used herein, the term "Credit Suisse" shall mean Credit Suisse, including its directors, officers, agents, employees, attorneys, servants, subsidiaries, affiliates, representatives, investment bankers and/or anyone acting on the instruction of or on behalf of or in active concert or participation with Credit Suisse.

13.    As used herein, the term "Transferred Property" shall mean the flow, movement and transfer of any funds, cash, securities, repurchase agreements, swap agreements, derivative securities and/or other property after July 15, 2008 between, on the one hand, debtor LBHI or its wholly owned LBI and, on the other hand, the affiliates and other subsidiaries of LBHI, including but not limited to LBSF and LBIE.

14.    As used herein, the term "Fund Property", shall mean cash, securities, repurchase agreements, swap agreements, derivative securities and/or other property held by LBI pursuant to Customer Account Agreements – Prime Brokerage and Margin Lending Agreements with PEP and Newport, respectively.

15.    As used herein, the term "Discovery" shall mean information of any nature disclosed, formally or informally, between parties to a lawsuit or obtained from a non-party through the issuance of a subpoena or otherwise including, but not limited to document requests, interrogatories, requests for admissions, responses to document requests, answers to

interrogatories, answers to requests for admissions, documents, video tapes and deposition transcripts.

16.    The uniform definitions contained in Rule 26.3 of the Local Civil Rules for the Southern and Eastern Districts of New York (incorporated by reference by Local Bankruptcy Rule 7026-1) are hereby incorporated by reference.

## INSTRUCTIONS

1.    This discovery is to be deemed continuing and any information secured subsequent to the service of the response hereto must be furnished with supplemental responses immediately upon receipt of such information.

2.    If any document requested in any request for production is withheld because of a claim or privilege or otherwise, state the following:

    (a)    the privilege or other grounds upon which you rely to protect the document from disclosure;

    (b)    the date of the document;

    (c)    the name, address, telephone number, title and occupation of each of the individuals who prepared, produced, or reproduced, or who were recipients of, said document;

    (d)    a description of the document sufficient to identify it; and

    (e)    each and every fact or basis upon which you claim any such privilege or other grounds for non-disclosure.

3.    If a document was prepared in several copies or if additional copies were thereafter made, and if any such copies were not identical or are no longer identical by reason of any notation or modification of any kind whatsoever, including without limitation notations on the front or back of any of the pages thereof, then each such non-identical copy is a separate document and must be produced.

4.    Documents are to be produced for inspection as they are kept in the usual course of business, with delineation of the files from which they were produced, or organized and labeled to correspond with the categories in the request.

5.    In producing documents, furnish all documents known or available to you, regardless of whether such documents or things are possessed directly by you or by your attorneys or their agents, employees, representatives or investigators.

6.    If any portion of any document is responsive to any request, then the entire document must be produced. If any requested document cannot be produced in full, produce the document to the extent possible, specifying each reason for your inability to produce the remainder and stating whatever information, knowledge or belief you do have concerning the unproduced portion.

7.    If any document responsive to any request was at one time in existence, but is no longer in existence, then so state, specifying for each document:

(a)    the type of document;

(b)    the type(s) of information contained therein;

(c)    the date upon which it ceased to exist;

(d)    the circumstances under which it ceased to exist;

(e)    the identity of all persons having knowledge of the circumstances under which it ceased to exist; and

(f)    the identity of all persons having knowledge or who had knowledge of the contents thereof.

8.    Documents shall be produced in the order in which they appear in their files, and shall not be shuffled or otherwise rearranged.  Documents that, in their original condition, were stapled, clipped, or otherwise fastened together shall be produced in such form.

9.    Unless otherwise indicated, all requests cover the period from July 15, 2008 through and including the present date.

## DOCUMENTS REQUESTED

1.    All documents that concern, refer, relate to or evidence the flow, movement and/or transfer of Transferred Property.

2.    Internal work papers, emails, memoranda and/or similar documents that concern, refer, relate to or evidence the reasons, rational or justification for the flow, movement and transfer of the Transferred Property.

3.    All documents that concern, refer, relate to or evidence the disposition, use, transfer and/or current custody of the Transferred Property.

4.    All documents that concern, refer, relate to or evidence the flow, movement and/or transfer of the Fund Property, including the proceeds or cash equivalent thereof.

5.    All documents that concern, refer, relate to or evidence the disposition, use, transfer and/or current custody of the Fund Property, including the proceeds or cash equivalent thereof.

6.    All documents that concern, refer, relate to or evidence requests made by the Funds to transfer the Fund Property to Credit Suisse.

## SCHEDULE B

## DEPOSITION TOPICS

1.    Requests made by the Funds to transfer Fund Property to Credit Suisse.

2.    The flow, movement and/or transfer of Fund Property.

3.    The disposition, use, transfer and/or current custody of Fund Property, including the proceeds or cash equivalent thereof.

4.    The flow, movement and/or transfer of the Transferred Property.

5.    The disposition, use, transfer and/or current custody of the Transferred Property, including the proceeds or cash equivalent thereof.

6.    An accounting of all Transferred Property.

7.    An accounting of all Fund Property.

8193265v4