# EXHIBIT A

# MANAGEMENT AGREEMENT



# ChildrenFirst Inc.®
### Excellence in Backup Child Care

## Management Agreement

| | | | |
|---|---|---|---|
| Owner: | Lehman Brothers Inc. | ChildrenFirst Inc. Account Manager: | Deborah Calmeyer |
| Liaison: | Salli Madden | | |
| Title: | Manager, Benefit and Employee Programs | Title: | Director of National Accounts |
| Address: | 399 Park Avenue 11th Floor New York, N.Y. 10022 | Address: | 420 Lexington Avenue Suite 310 New York, N.Y. 10170 |
| Telephone: | 212-526-8169 | Telephone: | 212-661-2515 |
| Facsimile: | 646-758-1418 | Facsimile: | 212-9491227 |
| E-mail: | smadden@lehman.com | E-mail: | dcalmeyer@childrenfirst.com |

Location of Center:    745 7th Avenue, First Floor, New York, New York

| | | |
|---|---|---|
| Term: Four Operating Years | Commencement Date: | March 27, 2003 |
| Est. Operating Expenses (Year 1): $416,519 | Development Fee: | See Exhibit C |
| Management and Administrative Fee (Year 1): | $141,980 | |

Attachments (hereby incorporated into this Agreement):

| | X | Yes | No |
|---|---|---|---|
| Exhibit A: Standard Backup Child Care Center Management Terms | X | Yes | No |
| Exhibit B: Description of Center | X | Yes | No |
| Exhibit C: Design and Development Terms and Conditions | X | Yes | No |
| Exhibit D: Estimated Operating Expenses | X | Yes | No |
| Exhibit E: Special Terms and Conditions | X | Yes | No |

Owner and ChildrenFirst Inc. ("ChildrenFirst") hereby agree to the terms and conditions by which ChildrenFirst will assist the Owner in the design, development and operation of the Center (the "Agreement").

Executed under seal as of the date below.

**Owner**

Lehman Brothers Inc.

By: _Seh B Mm_
Its duly authorized: _VP, Manager Emp. Programs_

**ChildrenFirst Inc.**

By: _[signature]_
Its duly authorized: _CEO & Founder_
Date: _5/20/03_

75 Federal Street, Boston, Massachusetts 02110  Phone: 617.646.7000 Fax: 617.646.7070
www.childrenfirst.com

## EXHIBIT A
## STANDARD BACKUP CHILD CARE CENTER MANAGEMENT TERMS

1.  Introduction.  Owner and ChildrenFirst® desire to arrange for ChildrenFirst to assist with the design and development of the Center, and to operate the Center (collectively, the "Services") and, if applicable, to perform Additional Services, all in accordance with the Agreement.

2.  Term.  The Agreement shall commence on the Commencement Date and continue in force through the design and development of the Center and for the Operating Years identified in the Agreement unless terminated pursuant to paragraph 13 or extended by a Renewal pursuant to paragraph 8.  Each twelve-month calendar year during the Term, commencing on the January 1st following the date of the opening of the Center, shall constitute an "Operating Year"; provided, however, that the first Operating Year shall include any preceding period less than twelve months commencing at the date of the opening of the Center.

3.  Design and Development of Center.  ChildrenFirst shall assist the Owner in the design and development of the Center in accordance with the terms and conditions of Exhibit C.  Owner shall be responsible for paying all the costs and expenses relating to the design and development of the Center, including those reasonable costs and expenses incurred by ChildrenFirst relating to the design, development and pre-opening activities for the Center, provided that such costs and expenses are pre-approved by Owner in writing accordance with this Section.  Estimated ChildrenFirst design, development and pre-opening expenses for the Center are attached as part of Exhibit C and approved by Owner; material changes in these expenses shall be subject to Owner's written approval in advance.  In addition, Owner shall pay ChildrenFirst the Development Fee for the performance of such tasks in accordance with the terms of Exhibit C.  ChildrenFirst shall timely advise Owner and its agents on obtaining necessary permits and other approvals from applicable licensing authorities and otherwise cooperate with Owner and its agents in the obtaining any required permits or approvals from federal, state and local authorities with respect to the development of the Center.

4.  Operation of the Center.

(a) ChildrenFirst shall be responsible for the day to day operation of the Center including, without limitation, staffing, supplies and equipment, curriculum, and the enrollment and care of children of Eligible Employees, all in accordance with the terms and conditions of the Agreement and the policies and procedures of the Center. ChildrenFirst shall operate the Center as a quality backup child care facility in accordance with the highest professional standards and in full compliance with the applicable laws, regulations and requirements, and in accordance with the policies and standards described in the Parent Handbook, which shall be mutually agreed upon by the parties pursuant to paragraph 12 of this Exhibit A and the license agreement, by and between the parties, dated as of May 1, 2003 (the "License Agreement").  The Parent Handbook will be subject to change from time to time as mutually agreed upon in writing and in advance by the parties for the purposes of this Agreement.  ChildrenFirst shall not at any time operate the Center in excess of its licensed capacity.   At all times during the Term, ChildrenFirst shall assign managerial and teaching staff to the Center as necessary to operate the center in accordance with the requirements of this Agreement.  ChildrenFirst seeks to employ the highest quality teachers to serve the children at the Center through an evaluation of educational backgrounds and relevant childcare experience.  To this end, ChildrenFirst requires that Center directors at a minimum have one or more degrees in early childhood education or related fields and have at least three to five years of childcare experience.  ChildrenFirst covenants that all of its teaching staff at a minimum shall have or will be currently working toward degrees in early childhood education or related fields.  Greater education levels or experience are sought wherever possible based on market conditions and available candidates.  All ChildrenFirst staff assigned to the Center shall have been trained by ChildrenFirst in first aid and CPR, safety and security procedures for the Center, including building evacuation and other procedures.   ChildrenFirst shall use all reasonable efforts to achieve a minimum annual average teacher to child ratio at all times at the Center as follows: Infants (3-12 mos) 1:1-1:2; Toddlers (12-36 mos) 1:3-1:4; Preschool (3-5 yrs) 1:6-1:8; and School Age (6-12 yrs) 1:8-1:10.  ChildrenFirst agrees to notify Owner within two business days after being notified that the Center's license or accreditation has been or is threatened to be revoked or suspended.  ChildrenFirst agrees that it will perform all screening of personnel required by law, Owner policy or deemed advisable in the professional judgment of ChildrenFirst to provide for the safe operation of the Center and the quality of Backup Child Care Services provided under this Agreement, including verifying residential, employment, and educational histories and screening for drug and alcohol abuse, child abuse and other criminal activity.  ChildrenFirst agrees to review such screening procedures and results with Owner at its request. ChildrenFirst shall determine in its sole discretion the methods, details and means of performing the Services under the Agreement, and assumes full responsibility for

such discretionary choices. Unless otherwise explicitly assumed by Owner hereunder or another signed writing, ChildrenFirst shall be responsible for obtaining and maintaining in effect all necessary child care center licenses, and other similar permits and approvals, from federal, state and local authorities with respect to the operation of the Center. The parties agree to use best efforts to cooperate with each other in obtaining, maintaining and complying with all such approvals and requirements.

(b)    All ChildrenFirst personnel employed by ChildrenFirst at the Center shall at all times be considered employees of ChildrenFirst, and ChildrenFirst shall be solely responsible for their wages and salaries and the administration of all matters relating to the withholding and payment of all federal, state and local taxes, Social Security and other payroll taxes, Workers' Compensation, disability benefits, and all such additional legal requirements of like nature applicable to such personnel.

(c)    Owner agrees to pay for reasonable travel costs and expenses required and actually incurred in the performance of Services in or relating to the Center in accordance with Owner's expense policy, provided that ChildrenFirst has: (a) obtained Owner's prior written approval for any travel expenses in excess of $500 aggregated in any month during the Term; (b) detailed such costs and expenses in a form acceptable to Owner and approved them in accordance with ChildrenFirst's own internal expense policies; and (c) submitted supporting documentation satisfactory to Owner. Owner will not reimburse ChildrenFirst for normal commutation expenses or for travel expenses incurred by any Assigned Contractor performing Services at an Owner facility located in the same metropolitan area as that of such Assigned Contractor's home base (other than reasonable travel expenses related to Center emergencies or pre-authorized non-routine licensing, training or management requirements). Air transportation expenses reimbursable hereunder will be coach-economy. Entertainment by or on behalf of ChildrenFirst will be at no cost to Owner. Accommodations expenses will be subject to Owner's prior written approval.

5.    Management and Administrative Fees. In addition to Owner's other obligations under the Agreement, Owner shall pay an annual Management and Administrative Fee to ChildrenFirst in consideration of the operation of the Center, in monthly installments in advance on or before the first business day of each month during the Term; provided, however, that the payment of the monthly installment for the first month of any Operating Year shall also include the payment of the monthly installment for the last month of that Operating Year. Notwithstanding the foregoing, the monthly installments of Management and Administrative Fee for the first and last full months of the

first Operating Year (plus the pro-rated monthly installment for any initial partial month commencing on the first Operating Year) shall be paid thirty days prior to the commencement of the first Operating Year. The Management and Administrative Fee for each Operating Year shall be equal to the greater of (a) 26.99 per cent of the aggregate of the approved budget for the Operating Expenses and the Management and Administrative Fee for that Operating Year, or (b) 26.99 per cent of the aggregate of the approved budget for the Operating Expenses and the Management and Administrative Fee for the first Operating Year of the Term. No Management and Administrative Fee shall be refunded, rebated or reduced in whole or part except as otherwise provided under this Agreement.

6.    Operating Expenses. Owner shall be responsible for paying all the costs and expenses relating to the operation of the Center and in order to comply with all applicable Federal, state and local laws, rules, regulations, ordinances, licensing requirements and best management practices for similar backup child care facilities, whether incurred directly by Owner or by ChildrenFirst (such as the costs to ChildrenFirst of recruiting and training Center staff, monitoring compliance with regulatory requirements, overseeing Center operations for quality control purposes, and providing human resource functions for Center staff) (collectively, the "Operating Expenses"). Estimated Operating Expenses for the Center for the first Operating Year are attached as Exhibit D to the Agreement. Owner and ChildrenFirst shall agree to a budget for Operating Expenses for each Operating Year at least sixty days prior to the commencement of each Operating Year. The Operating Expenses shall be subject to adjustment from time to time in order to comply with all Federal, state and local laws, rules, regulations, ordinances, licensing requirements and best management practices for similar backup child care facilities, and as daily utilization of the Center by children changes. The Operating Expenses shall be payable in advance in monthly installments on the first business day of each month during the Term; provided, however, that the payment of the monthly installment for the first month of any Operating Year shall also include the payment of the monthly installment for the last month of that Operating Year. Notwithstanding the foregoing, the monthly installments of Operating Expenses for the first and last full months of the first Operating Year (plus the pro-rated monthly installment for any initial partial month commencing on the first Operating Year) shall be paid thirty days prior to the commencement of the first Operating Year. If ChildrenFirst requires amounts in addition to the amount required to be paid in connection with the Operating Expenses for such Operating Year, it shall notify the Owner and, upon pre-approval of such amount by Owner, ChildrenFirst shall adjust the amount of the next monthly installment of the Operating Expenses accordingly by such amount or, in the event of the termination or expiration of this Agreement, Owner shall

pay such amount to ChildrenFirst. ChildrenFirst shall submit to Owner monthly income and expense reports on or before thirty days after the end of each such month of the Term. Within ninety (90) days after the end of each Operating Year, ChildrenFirst shall submit to Owner an annual income and expense report that shall be reconciled against the Operating Expenses for that Operating Year. No material increase in Operating Expenses above the amount budgeted for Operating Expenses and approved by the Owner shall be paid by Owner unless approved by the Owner in advance as provided in the Agreement. Any pre-approved amounts owed pursuant to such statement shall be added to or credited against the next monthly payment of Operating Expenses due ChildrenFirst or, in the event of the termination or expiration of this Agreement, paid to Owner.

7. <u>Taxes</u>. Owner will pay all sales, use, value added or similar taxes, exclusive of corporate franchise taxes, or taxes based on ChildrenFirst's income or personnel.

8. <u>Additional Services</u>. With the execution of a mutually signed writing, Owner agrees to pay ChildrenFirst for the cost of additional services, if any, requested by the Owner (the "Additional Services") within thirty days after receipt of an invoice for such payment from ChildrenFirst.

9. <u>Renewals</u>. The Agreement may be extended for one or more successive renewal terms (individually, a "Renewal Term") upon written agreement of Owner and ChildrenFirst (the "Renewal") not less sixty (60) days prior to the end of the current Term. Not more than one hundred and eighty (180) days and not less than ninety (90) days prior to the expiration of the then current term, ChildrenFirst shall notify Owner in writing as to the upcoming expiration. Owner shall have the option of renewing this Agreement by providing a written renewal notice to ChildrenFirst; provided, however, that Owner shall be entitled to renew this Agreement regardless of whether or not ChildrenFirst has provided timely notice in accordance with this paragraph. In the event Owner does not provide ChildrenFirst with notice of exercise of its renewal option or its decision not to renew, this Agreement shall nonetheless continue on a month-to-month basis upon the same terms and conditions, subject to termination by either party upon one hundred eighty (180) days' prior written notice.

10. <u>ChildrenFirst Obligations</u>. In addition to its other obligations under the Agreement, ChildrenFirst agrees as follows.

(a) *Insurance*. ChildrenFirst shall purchase and maintain at all times during the Term the following minimum insurance coverages, in the amounts set forth below:

| Form of Insurance | Minimum Limits of Insurance |
|---|---|
| (i) Disability | As required by law |
| (ii) Unemployment | As required by law |
| (iii) (1) Workers Compensation and (2) Employers Liability | Statutory $1,000,000 per occurrence (BI/disease) |
| (iv) Commercial General Liability on an occurrence basis, including sexual abuse, physical abuse and molestation; first aid, CPR and other similar non-professional medical assistance administered to children in the Center; professional liability (including services provided by subcontractors, if any); premises operations; products and completed operations; contractual liability; and personal and advertising injury coverages, naming Owner as an additional insured by endorsement to the policy. | $1,000,000 per occurrence and $2,000,000 aggregate |
| (v) Excess and Umbrella Liability on a follow form basis, following Professional Liability and Commercial General Liability coverages | $10,000,000 per occurrence and aggregate |

All insurance coverage required herein will provide primary coverage for all losses and damages caused by the perils or causes of loss covered thereby. ChildrenFirst agrees to have included in each of the insurance policies required herein a waiver of the insurer's rights of subrogation against Owner. All policies shall be written using A rated carriers by the A.M. Best Company or its replacement. Owner shall be listed as an additional insured on the insurance policies described under subsections (iv) and (v) above. Each policy shall provide for a minimum of thirty days' prior written notice of any cancellation or limitation of any coverage. ChildrenFirst shall forward insurance certificates for these coverages to Owner at the beginning of the Term and thereafter upon the renewal of such coverages during the Term. ChildrenFirst shall promptly, and in any event not later than two business days following its receipt thereof, forward to Owner copies of all notices relating to the cancellation or nonrenewal of any insurance coverage described in this subparagraph.

(b) *Reports; Incident Logs*. ChildrenFirst shall provide Owner with monthly use reports (a "Use Report") concerning the Center, its operation and utilization by the Owner's Eligible Employees, including without limitation: (i) the number and ages of the children using the Center on a daily and weekly basis, and (ii) the identity of the Owner's Eligible Employees using the Center and the dates of use, and (iii) the identity of the Owner's Eligible Employees who requested use of the Center, the date(s) for which use was requested and, for each such requested date(s), whether such request was granted or denied and, if denied, the reason(s) for the denial. ChildrenFirst shall maintain an incident/complaint log for the recording of accidents or other incidents in the Center along with any parent complaints, and make available such information to Owner upon request.

(c) *Confidential Information*. ChildrenFirst shall hold in strict confidence all nonpublic information concerning Owner, its operations, and its Eligible Employees and their children using the Services (collectively, "Owner Confidential Information"), received by ChildrenFirst in the performance of the Agreement other than to the extent required by law or necessary to enforce the terms of the Agreement. ChildrenFirst will hold all Owner Confidential Information in confidence for Owner and, except as set forth in this Agreement or as otherwise may be authorized by Owner in writing, ChildrenFirst will not disclose to any person, firm or enterprise, or use for its own benefit, any Owner Confidential Information. ChildrenFirst may disclose Owner Confidential Information to its employees and agents solely as required in order for ChildrenFirst to perform its obligations under this Agreement. ChildrenFirst may disclose Owner Confidential Information if required to do so under applicable law, rule or order; provided that ChildrenFirst, where reasonably practicable and to the extent legally permissible, provides Owner with prior written notice of the required disclosure so that Owner may seek a protective order or other appropriate remedy; and provided further that ChildrenFirst discloses no more Owner Confidential Information than is reasonably necessary in order to respond to the required disclosure. At any time upon the request of Owner, and in the event of termination of this Agreement, ChildrenFirst shall return, or destroy if so directed by Owner, all Owner Confidential Information, including all copies thereof and notes and other materials incorporating the Confidential Information, whether in physical or electronic form. Notwithstanding any other provision of the Agreement, certain Owner Confidential Information provided to, collected and maintained by ChildrenFirst in the course of providing the Services and regarding Owner's Eligible Employees and the children registered to use the Center (including without limitation all medical and family records) shall not be available to Owner or returned to Owner after the expiration of this Agreement or the termination of Services hereunder and

ChildrenFirst shall be entitled to retain copies of all such Owner Confidential Information in accordance with all licensing requirements and record retention best practices. In the event of a breach or threatened breach of the provisions of this subparagraph, Owner may have no adequate remedy in money or damages and, accordingly, may seek an injunction against such breach. Owner may, in advance, require each Assigned Contractor to execute an NDA in the form attached hereto as Schedule 2. ChildrenFirst represents and warrants to Owner that each employee and agent who has access to such Owner Confidential Information has executed a confidentiality agreement with ChildrenFirst requiring that all such information and materials be held in strict confidence. ChildrenFirst shall actively enforce any such confidentiality agreements. ChildrenFirst will provide Owner with a true copy of each such confidentiality agreement upon request. ChildrenFirst further agrees to take any other steps reasonably required or appropriate to ensure compliance with the obligations set forth herein.

(d) *Proprietary Documents*. Owner shall have exclusive ownership rights, including without limitation any rights to copyrights and trademarks, with respect to any of Owner's Proprietary Documents. ChildrenFirst agrees not to copy, reproduce, sell, assign, license or otherwise dispose of, give or disclose any of Owner's Proprietary Documents without the prior written approval of Owner. At the termination of the Agreement, ChildrenFirst agrees to promptly return to Owner all of Owner's Proprietary Documents in its possession and to cease use thereof without the prior written approval of Owner. "Owner's Proprietary Documents" shall mean any written documents clearly marked as proprietary or which would reasonably be deemed proprietary in normal business operations and provided to ChildrenFirst by Owner in the performance of the Services.

(e) *Assignment*. Neither this Agreement nor any part hereof may be assigned (whether by operation of law or otherwise) by either party without the other party's prior written consent and any such assignment will be void. Notwithstanding the foregoing, Owner may assign this Agreement or any of its rights or obligations hereunder upon written notice to ChildrenFirst, to any of its affiliated companies or to an entity with or into which it is merged or consolidated or to which it sells all or substantially all its capital stock or assets. This Agreement will be binding upon the parties' respective successors and assigns. Without limiting the foregoing, ChildrenFirst will not subcontract any Services without Owner's prior written consent. If Owner consents to subcontracting, ChildrenFirst will remain primarily liable for the performance of such obligations, and will be responsible for the acts and omissions of its permitted subcontractors as if such acts and omissions were those of its employees.

(f) *Inspection of Books*. ChildrenFirst shall keep detailed, complete and accurate accounts and records of all activities carried out, and all costs and expenses incurred, in the performance of its obligations under the Agreement, in accordance with generally accepted accounting principles, to substantiate its charges hereunder. Such records shall include, without limitation, payroll records, Assigned Contractors employment screening results, attendance cards, and job summaries. ChildrenFirst will make available such accounts and records to Owner at such reasonable times as Owner may request. ChildrenFirst will provide Owner or its designees access to such records for audit purposes for three (3) years from the date of final payment under this Agreement.

(g) *Continuity of Services*. ChildrenFirst will use all reasonable means to ensure the continuity of the Services at the Center for the benefit of the Owner. There will be no charge to Owner for any replacement personnel assigned by ChildrenFirst until Owner confirms that such replacement has acquired the necessary orientation and background to make a productive contribution to the Services.

(h) <u>Owner's Policies and Procedures</u>. ChildrenFirst personnel will observe and comply with Owner's applicable policies and procedures (including without limitation, as to physical and electronic security), working hours and holiday schedules, as modified from time to time in Owner's discretion, at all times while in the Center. ChildrenFirst will minimize any disruption to Owner's normal business operations. Owner may require any Assigned Contractor expected to assist in providing the Services in the Center in excess of thirty days per year to provide to Owner a completed background and security questionnaire in the form of <u>Schedule 1</u>, as the same may be revised by Owner from time to time (including both background information and fingerprint specimens) and to undergo drug testing. Notwithstanding anything to the contrary in this Agreement, Owner may require ChildrenFirst immediately to terminate the assignment at the Center of any Assigned Contractor if such person does not execute a Non-Disclosure Agreement ("NDA") in the form attached as <u>Schedule 2</u> or does not promptly provide complete information (and fingerprint specimens) as provided in <u>Schedule 1</u> or does not undergo drug testing or if, in the sole judgment of Owner (a) the results of the background investigation are unsatisfactory; (b) any background information provided by such individual is inaccurate; (c) any background information provided by such individual cannot be verified to Owner's satisfaction; or (d) the results of the drug testing are unsatisfactory. Nothing contained in this Agreement shall be construed to create any obligation on the part of Owner to disclose to ChildrenFirst or its personnel the reasons for its determination in this regard, or share any information obtained through its background investigation or drug

testing, except to the extent otherwise required by law. Owner agrees to share with ChildrenFirst any information obtained through such background investigation or testing which is substantially likely to affect the health or safety of children using the Center

(i) *Assigned Contractors*. Each employee or agent assigned by ChildrenFirst to work in the Center, or who otherwise assists in providing Services in the Center shall constitute an "Assigned Contractor" for the purposes of the Agreement. If any Assigned Contractor is unacceptable to Owner, as determined by Owner in its discretion, Owner will notify ChildrenFirst and ChildrenFirst will immediately, at Owner's option, (a) terminate the assignment of such Assigned Contractor or (b) take appropriate corrective action as the employer of the Assigned Contractor. If such corrective action under (b) does not result in immediate and sustained improvement, as determined by Owner in its sole discretion, Owner will so notify ChildrenFirst and ChildrenFirst will immediately terminate the assignment of such Assigned Contractor at the Center. Unless otherwise consented to by Owner in writing, ChildrenFirst will not engage or hire, or solicit for employment or engagement as a contractor, any Owner personnel while ChildrenFirst is performing Services for Owner and for a period of six (6) months thereafter.

11. <u>Owner Obligations</u>. In addition to its other obligations under the Agreement, Owner agrees as follows.

(a) *Center*. Owner shall complete and make available to ChildrenFirst the premises comprising the Center. Heat, lighting, air-conditioning, electrical service, telecommunications, security and cleaning services will be provided by the Owner at its sole cost consistent at a minimum with the quality of services and materials generally required to operate the Center as a first class backup child care center and so as to permit the Center to comply with all applicable Federal, state and local laws, rules, regulations, ordinances, licensing requirements and best management practices for similar backup child care centers (the "Premises Operating Standards"), provided, however, ChildrenFirst agrees to notify Owner of any special provisions of ChildrenFirst's legal and regulatory requirements and changes thereof relative to Owner's obligations herein to meet the Premises Operating Standards. Owner shall provide ChildrenFirst, subject to Owner's normal security procedures, with reasonable access to the Center. Each party shall cooperate fully with the other to enable such other party to participate in its respective role supporting the operation of the Center and provision of the Services in compliance with all applicable Federal, state and local laws, rules, regulations, ordinances and licensing requirements. Owner shall be responsible for securing and maintaining all necessary permits and approvals to enable ChildrenFirst to occupy the premises in which the Center is located for the Term other than those

permits and approvals ChildrenFirst is required to obtain pursuant to paragraph 4 above.

(b) *Eligible Employees*. Only Eligible Employees may use the Center. Each officer, director, employee or agent of Owner designated by Owner as eligible to use the Center, who meets all registration and other requirements of ChildrenFirst in accordance with the form of Parent Handbook, and registration materials, attached hereto as Attachment A to Exhibit E, shall constitute an "Eligible Employee" unless Owner notifies ChildrenFirst otherwise. ChildrenFirst shall make all reasonable efforts to ensure that only Eligible Employees use the Center. All use will be documented in the Use Reports as set forth in subparagraph 11(b) of this Exhibit A. Owner shall be responsible for reviewing the Use Reports and informing ChildrenFirst in the event that it discovers any unauthorized use of the Center. Owner agrees to reasonably assist ChildrenFirst in communicating the benefits of the Services to Owner's employees and other representatives for the purposes of maximizing levels of registration by Eligible Employees.

(c) *No Employment*. Owner shall not employ, solicit or contract with any employee of ChildrenFirst located at the Center to perform child care or related services for the benefit of Owner or its employees full or part-time regardless of location during or within one year after the Term. Owner understands and acknowledges that ChildrenFirst may prohibit each Eligible Employee from employing, soliciting or contracting with any employee of ChildrenFirst located at the Center to perform child care or related services full or part-time outside of the Center.

(d) *Confidential Information*. Owner shall hold in strict confidence all non-Owner Confidential Information that is also nonpublic information concerning ChildrenFirst, the Center, Operating Expenses, Management and Administrative Fees and other financial information concerning the operation of the Center or the Agreement, including, all ChildrenFirst utilization models and statistics, and other statistical information regarding the Services or the Center, along with any written documents clearly marked as confidential and provided to Owner by ChildrenFirst in the performance of the Agreement (collectively, "ChildrenFirst Confidential Information").

(e) *Proprietary Documents*. ChildrenFirst shall have exclusive ownership rights, including without limitation any rights to copyrights and trademarks, with respect to any of ChildrenFirst's Proprietary Documents. Owner agrees not to copy, reproduce, sell, assign, license or otherwise dispose of, give or disclose any of ChildrenFirst's Proprietary Documents without the prior written approval of ChildrenFirst. At the termination of the Agreement, Owner agrees to promptly cease use of all ChildrenFirst's Proprietary Documents in its possession.

"ChildrenFirst's Proprietary Documents" shall mean ChildrenFirst's personnel manuals, best practices manuals, curriculum plans, form of parent handbook (including registration materials), form of parent brochure, marketing materials and form of Use Reports, along with any written documents clearly marked as proprietary or which would reasonably be deemed proprietary in normal business operations and provided to Owner by ChildrenFirst in the performance of the Agreement.

(f) *Trademarks*. ChildrenFirst, its logo and "Excellence in Child Care" tagline are trademarks of ChildrenFirst. As between the parties, ChildrenFirst reserves all rights to all ChildrenFirst trademarks.

(g) *Insurance*. Owner shall be solely responsible for purchasing and maintaining at its sole cost all property and casualty insurance coverage relating to the Center, its furnishings, fixtures and equipment, and all insurance desired or required in connection with the construction and completion of the Center. Owner's insurance shall be for the sole benefit and protection of Owner and no coverage shall inure to the benefit of ChildrenFirst.

12. Parent Handbook; Use of the Center. ChildrenFirst hereby agrees that Owner at its sole expense may develop and use a form of the parent handbook, parent brochure and registration materials solely use in connection with the Center (collectively, the "Parent Handbook") based on the form parent handbook, parent brochure and registration materials created and used by ChildrenFirst; provided, however, that the Parent Handbook, and any amendment or replacement thereof, shall be subject to the reasonable review and approval by ChildrenFirst. ChildrenFirst agrees to grant Owner a limited, nonexclusive license ("License"), pursuant to the License Agreement, to use the Parent Handbook, and the name "ChildrenFirst" and the ChildrenFirst logo solely in the Parent Handbook and in other written communications and designs concerning the Center distributed internally to the personnel and representatives of Owner. Subject to the terms of the License Agreement, the Owner shall acknowledge in the Parent Handbook and in all such other written communications that the Center is operated by ChildrenFirst. From and after the execution and delivery of a License, Owner's use of the Parent Handbook, the name "ChildrenFirst" and the ChildrenFirst logo shall be subject to the terms of the License Agreement at all times and shall terminate upon the expiration or termination of the License Agreement. Subject to the terms of the License Agreement, the parties recognize that ChildrenFirst shall continue to hold all other rights to the Parent Handbook, and to the name "ChildrenFirst" and the ChildrenFirst logo, notwithstanding the development and limited use of the Parent Handbook and other written communications by Owner. Eligible Employees shall be permitted to use the Center only in accordance with, and

subject to, the provisions set forth in the Parent Handbook and the enrollment package provided by ChildrenFirst to Owner, as the same Parent Handbook and enrollment package may be may be amended, updated or replaced from time to time.

13.    Indemnities.    To the maximum extent permitted by law, ChildrenFirst and the Owner (each an "Indemnitor") agree to indemnify, defend, and save harmless the other party, its directors, officers, employees and agents (each an "Indemnitee") from all suits, actions, claims, demands, damages, losses, expenses and costs, including without limitation attorneys' fees, arising out of or in connection with:

   (i) the breach of any contractual duty by the Indemnitor under the Agreement, or

   (ii) personal or bodily injury (including death) to any person, including without limitation any children enrolled at the Center or the employees of ChildrenFirst employed at the Center, or

   (iii) damage to the property of any person or entity, or

   (iv) in the case of ChildrenFirst as Indemnitor, the acts or omission any Assigned Contractor including but not limited to any loss resulting from breach of any duty or theft of material or services by any such Assigned Contractor,

in each event to the extent such injury or damage was caused by the willful or negligent acts, errors or omissions of the Indemnitor, its directors, officers, employees, or agents; provided, however, that Owner's obligations under subsections (ii) and (iii) of this paragraph shall be limited to the extent such directors, officers, employees or agents are acting within the scope of their office, employment or agency and not solely as parents or guardians using the Services.

(b)    ChildrenFirst warrants and represents that it is an independent contractor and that no Assigned Contractor shall constitute Owner's agent or employee for federal, state, and local tax purposes or any other purposes whatsoever, and is not entitled to any compensation from Owner or any Owner employee benefits.  ChildrenFirst acknowledges and agrees that its Assigned Contractors are solely employees of ChildrenFirst and that, as their employer, ChildrenFirst shall be solely responsible for the recruitment, hiring, training, utilization, assignment, re-assignment, promotion, discipline, termination, or other employment-related activities concerning such Assigned Contractors.  ChildrenFirst will defend, indemnify and hold harmless each Indemnitee from any loss arising out of:

   (i)  ChildrenFirst's actions as an employer of its personnel (including any Assigned Contractor), or

   (ii) any claim or action alleging that Indemnitees should be deemed the "employer" or "joint employer" of any of ChildrenFirst's personnel (including any Assigned Contractor), or

   (iii) any claim arising from ChildrenFirst's failure to comply with applicable laws;

other than to the extent such loss was caused by the willful or negligent acts, errors or omissions of such Indemnitee.

ChildrenFirst warrants and represents that each Assigned Contractor is an employee of ChildrenFirst and that ChildrenFirst will withhold and pay all applicable income and payroll taxes with respect to such personnel. ChildrenFirst is solely responsible for the compensation of any Assigned Contractor, and payment of workers' compensation, disability and other similar benefits, unemployment and other similar insurance, for withholding income and payroll taxes and for verifying the work eligibility of each Assigned Contractor, including the completion and maintenance of Form I-9 (for purposes of determining authorization to work in the United States). ChildrenFirst has sole responsibility for activities of ChildrenFirst and any Assigned Contractor, and may not bind or otherwise obligate Owner in any manner. ChildrenFirst will comply with all applicable employment laws and will further comply with the requirements of Executive Order 11246, the Vietnam Veterans' Readjustment Assistance Act of 1974, as amended, the Rehabilitation Act of 1973, as amended, and the applicable implementing regulations and reporting requirements under each of the foregoing, each of which is incorporated herein by reference.

(c)    With regard to any claims described herein, the Indemnitor shall control the defense and settlement of such claims; provided, however, that the Indemnitor shall not settle any claim without the Indemnitee's prior written consent, which consent shall not be unreasonably withheld or delayed.  The Indemnitor shall permit the Indemnitee to participate in any such defense at the Indemnitee's expense. Promptly upon the Indemnitor's request, the Indemnitee shall provide all reasonable assistance in the defense of such claims.

14.    Termination.

(a)    *For Cause.*  Except as provided in Section 13(b) below, either party may terminate the Agreement upon any material breach by the other party of any obligations under the Agreement by sending such defaulting party written notice of the termination stating the nature of the breach of obligation.  Such notice shall be effective thirty days

following the date of delivery thereof unless the breach shall have been remedied to the satisfaction of the terminating party during such thirty day period; provided, however, that if the nature of the breach of obligation is such that it is not capable of being remedied within such thirty day period, so long as the breaching party diligently commences remedying the breach within such thirty day period and diligently pursues such remedy through completion, the notice of such termination shall have no force or effect. In the event the Owner is the terminating party under this paragraph, and Owner is not in material default of its obligations under the Agreement, ChildrenFirst shall promptly refund to Owner upon such termination any remaining pro rata portion of the Operating Expenses and Management and Administrative Fee then paid for the remainder of the Term.

(b) *For Convenience.* Either party may terminate the Agreement for convenience upon one hundred eighty days' prior written notice to the other party. In the event ChildrenFirst is the terminating party under this subparagraph (b), and Owner is not in default of its obligations under the Agreement, ChildrenFirst shall promptly refund to Owner upon such termination any remaining pro rata portion of the Management and Administration Fee then paid for the remainder of the Term. In the event Owner is the terminating party under this subparagraph (b) as a result of an event beyond the control of Owner (a "force Majeure Event"), and Owner is not in default of its obligations under the Agreement, ChildrenFirst shall promptly refund to Owner any remaining pro rata portion of the Management and Administration Fee then paid for the remainder of the Term as of the date of the Force Majeure Event, provided (i) a majority of the Eligible Employees of Owner are no longer reasonably able to use the Membership(s) at the Center due to the relocation of such Eligible Employees or similar circumstances as a result of the Force Majeure Event, and (ii) ChildrenFirst is unable to reasonably provide the Services to such Eligible Employees at another suitably located backup child care center owned or managed by ChildrenFirst. Any destruction or substantial damage to the Center which materially interferes with the provision of the Services shall constitute a Force Majeure Event for the purposes of this subparagraph 13(b). Otherwise, in the event Owner is the terminating party under this subparagraph (b), and Owner is not in default of its obligations under the Agreement, ChildrenFirst shall promptly refund to Owner any remaining pro rata portion of the Management and Administrative Fee then paid for the remainder of the Term following such one hundred eighty days' notice.

(c)    *Bankruptcy.* Either party may terminate Services in whole or in part immediately upon notice if the other party (i) is liquidated, dissolved, or adjudged to be in a state of bankruptcy or receivership, (ii) is insolvent, unable to pay its debts as they become due, or makes an assignment to or for the benefit of its creditors, or (iii) ceases to conduct business for any reason on an on-going basis leaving no qualified successor to perform its obligations hereunder. In the event the Owner is the terminating party under this subparagraph (c), and Owner is not in material default of its obligations under the Agreement, ChildrenFirst shall promptly refund to Owner upon such termination any remaining pro rata portion of the Management and Administrative Fee then paid for the remainder of the Term.

15. Miscellaneous.

(a) The Agreement supersedes any and all discussions, correspondence or agreements between the parties relating to the Services or the terms of the Agreement.

(b) The Agreement shall be governed by the laws of the State of New York without regard to conflict of law provisions, may be amended only by a writing executed by both parties, and shall apply to all successors and permitted assigns. The parties irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the borough of Manhattan, New York, New York, and the appellate courts thereof.

(c) The parties agree that nothing in the Agreement shall be deemed to create a partnership, employer-employee relationship, or joint venture between the parties, it being agreed that ChildrenFirst shall be acting solely as an independent contractor under the Agreement at all times.

(d) The provisions of paragraphs 10(c), 10(d), 10(e), 10(f), 11(c), 11(d), 11(e), 11(f), 13, 14 and 15 and any other clauses that contain payment obligations for any incurred, authorized, unpaid fees or taxes, at the time of termination, shall survive the expiration or termination of the Agreement.

(e) In no event shall either Owner or ChildrenFirst be liable for any indirect, incidental or punitive damages, including without limitation for lost business or profits.

(f) Any notices required under the Agreement shall be in writing and shall be deemed given if delivered by hand, by certified mail (postage prepaid and return receipt requested), or by a nationally recognized overnight courier, to the Owner and the local and corporate offices of ChildrenFirst, at the addresses set forth above.

(g) ChildrenFirst shall have the right to impose reasonable interest charges not in excess of the prime rate as published in the Wall Street Journal on all past due payments more than thirty (30) days under the Agreement and Owner shall promptly pay such charges if imposed.

(h) Paragraph headings in the Agreement are for convenience of reference only and shall not define or limit the provisions of the Agreement.

(i) ChildrenFirst will not use the name or marks, refer to, or identify "Lehman" or any Owner affiliate in publicity releases, promotional or marketing materials, announcements, customer listings, testimonials, or advertising without Lehman's prior written approval.

(j) Neither party to this Agreement will be liable for any delay or failure to perform its obligations hereunder caused by an event of natural disaster, casualty, acts of God, riots, terrorism, governmental acts or such other event of similar nature that is beyond the reasonable control of the party seeking to rely on this Section to excuse its delay or failure; provided, however, that such party will not have contributed in any way to such event. ChildrenFirst will maintain commercially reasonable disaster recovery measures to respond to such events. If a delay or failure continues beyond thirty (30) calendar days, Owner may terminate this Agreement in whole or in part with no further liability, and shall receive a pro-rata refund of any prepaid fees unearned as of the time of termination.

(k) No failure or delay on the part of any party in exercising any right or remedy provided in this Agreement will operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or at law or in equity. Except as expressly provided herein, no remedy specified in this Agreement is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other right or remedy provided herein or available at law or in equity.

(m) If any provision of this Agreement is held to be unenforceable, the remaining provisions of this Agreement will be unimpaired and will remain in full force and effect.

(n) This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

(o) A facsimile of a signed copy of this Agreement or other copy made by reliable mechanical means may be relied upon as an original. If there is any inconsistency between the facsimile and a subsequently received hard copy, the facsimile will control.

**SCHEDULE  1**

**LEHMAN BROTHERS**

**STATEMENT OF BACKGROUND INFORMATION
FOR VERIFICATION AND SECURITY CHECK**

Instructions:  Please fill in all parts of this statement of background information.  Use additional pages if necessary.

| Name (Last)        (First)  (Middle) | Social Security No. | Date of Birth |
|---|---|---|
| Consulting/Vendor Firm Name: | | |
| Address                           Telephone No. (include area code) | | |

*Date of Birth is required to conduct a complete background and security investigation and will not be used for any other purpose.

Is any additional information relative to change of name, use of an assumed name or nickname necessary to enable a security check?

_____    Yes    _____    No    If yes, explain:

*HOME ADDRESS WITHIN THE PAST TEN YEARS:*

| DATES (from-to) | ADDRESSES (No and Street) | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EDUCATION:**

| HIGH SCHOOL NAME AND ADDRESS | COURSE OF STUDY | OTHER EDUCATION/NAME & ADDRESS | COURSE OF STUDY |
|---|---|---|---|
|  |  |  |  |
|  | HIGHEST GRADE COMPLETED |  |  |
| COLLEGE NAME AND ADDRESS | MAJOR |  |  |
|  | MINOR |  |  |
|  | DEGREE RECEIVED |  |  |

**EMPLOYMENT RECORD:**

List below all present employers for the past 10 years, beginning with your most recent position.  Attach additional sheets if necessary.

| From/to dates | | Company Name, Type of business, and address | Position and Description of Duties | Reason For Leaving | Supervisor |
|---|---|---|---|---|---|
| From (Mo./Yr.) | To (Mo./Yr.) | Company | Position |  | Supervisor's Name |
|  |  | Type of Business | Description of Duties |  | Telephone No. |
| ✍Full Time ✍Pt. Time |  | Address |  |  |  |
| From (Mo./Yr.) | To (Mo./Yr.) | Company | Position |  | Supervisor's Name |
|  |  | Type of Business | Description of Duties |  | Telephone No. |
| ✍Full Time ✍Pt. Time |  | Address |  |  |  |
| From (Mo./Yr.) | To (Mo./Yr.) | Company | Position |  | Supervisor's Name |
|  |  | Type of Business | Description of Duties |  | Telephone No. |
| ✍Full Time ✍Pt. Time |  | Address |  |  |  |
| From (Mo./Yr.) | To (Mo./Yr.) | Company | Position |  | Supervisor's Name |
|  |  | Type of Business | Description of Duties |  | Telephone No. |
| ✍Full Time ✍Pt. Time |  | Address |  |  |  |

## GENERAL:

Have you ever been convicted of, pleaded guilty of or pleaded "no contestant" (nolo contendre) to a crime of any kind other than minor traffic violations? *Minor traffic violations include parking tickets and other non-moving violations in addition to speeding and similar moving violations. "Driving while intoxicated" is* **not** *a minor traffic violation. (This information is being sought based on federal regulations. A conviction record will not necessarily prevent your obtaining a security clearance. Individuals with a conviction record who have been denied a security clearance may request a written explanation concerning the denial.)*  ☞Yes    ☞No

Have you ever had a gap in your employment history of 6 months or greater?  ☞Yes    ☞No

Have you ever been employed by Lehman Brothers Inc. or any of its subsidiaries, parents, affiliates or predecessor firms?  ☞Yes    ☞No

Have you ever been suspended, expelled or otherwise disciplined by any securities industry regulatory body or by any such exchange or association, or been denied membership therein, or ever withdrawn your application to such membership?  ☞Yes    ☞No

Have you ever been associated with any organization, as a director, investment advisor, controlling stockholder, partner, officer, employee or some other representative of a broker-dealer which has been, or principal of which has been suspended or expelled from any securities exchange or registered association, or was refused membership therein or withdrew an application for membership, or whose registration as a broker-dealer with the S.E.C. or any state or agency has been denied, suspended, or revoked?  ☞Yes    ☞No

Are you now subject to an order of the N.A.S.D or any national securities exchange?  ☞Yes    ☞No

Have you ever been named as a "cause" in any action mentioned in the preceding questions taken with respect to a broker-dealer?  ☞Yes    ☞No

Has any permanent or temporary injunction ever been entered against you?  ☞Yes    ☞No

In your previous business connections or employment in any capacity, have transactions under your attention ever been the subject of formal complaint or regulatory proceeding?  ☞Yes    ☞No

Are you now or have you ever been subject to an order of the S.E.C. or any other regulatory agency or association which bars or suspends you from becoming associated with a broker-dealer?  ☞Yes    ☞No

---

*If you have answered "Yes" to any of the above, please supply additional information as to the reason(s) for the positive response(s) on a separate page.*

Please read the following statements carefully.  As the term "Lehman Brothers" is used in these statements, that term refers to and includes either jointly or individually, Lehman Brothers Inc., Lehman Brothers Holdings Inc., and/or any of their subsidiaries or affiliates, and/or their respective officers, agents or employees.

1.    **VERIFICATION:**        The information I have provided in this statement of background information is accurate to the best of my knowledge and subject to verification.  **I UNDERSTAND THAT ANY UNTRUE STATEMENT, MATERIAL OMISSION OR MISREPRESENTATION OF FACT IN THESE MATERIALS WILL BE GROUNDS FOR TERMINATING IMMEDIATELY MY ASSIGNMENT TO LEHMAN BROTHERS, REGARDLESS OF WHEN DISCOVERED.**

2.    **FINGERPRINT AUTHORIZATION:**        I hereby acknowledge that I shall voluntarily submit a specimen of my fingerprints to Lehman Brothers.  I hereby authorize Lehman Brothers through any of its officers or employees to make such use of my fingerprints as may be deemed advisable by Lehman Brothers, including, but without limitation to, the delivery thereof to any federal, state, or municipal authority or regulatory agency for the retention by any one or all of such authorities as a permanent record.  I hereby release Lehman Brothers from any liability in connection with the submission or use of such fingerprints.

3.    **DRUG TESTING:**        I hereby acknowledge that I shall voluntarily undergo drug testing pursuant to policies and procedures established by Lehman Brothers and hereby release Lehman Brothers and its affiliated companies, and their successors, agents, employees, officers and directors, from any claims I might have in this regard.

4.    **AUTHORIZATION OF BACKGROUND AND SECURITY INVESTIGATION:**
I hereby authorize the performance of a background and security investigation of me and, in connection with such investigation, the preparation or procurement of an investigation and/or consumer report covering my credit worthiness, credit standing or capacity, job performance, character, reputation and/or personal characteristics.  This information may be obtained through interviews or other communications with persons who may have knowledge concerning such information.  I understand that upon my request (written request in the case of an investigative consumer report) I will be informed whether any such report was sought and of the name and address of the agency asked to prepare such report(s) and that subsequent consumer reports may be sought or utilized in connection with an update of this statement of additional background information.  I also understand I have the right to request in writing, within a reasonable period of time after the date below, additional information concerning the nature and scope of any investigative consumer report.  I hereby authorize the procurement and preparation of such an investigative consumer report.  I understand and agree that Lehman Brothers shall not be responsible for the accuracy of the information disclosed during any background and security check or in any investigative and/or consumer report or any action taken as a consequence of such disclosure.  I hereby release and agree to hold harmless all persons and entities who may provide information with respect to me in this connection.  I further authorize Lehman Brothers to release to my employer and to the vendor through which I am expected to provide services to Lehman Brothers, any and all information provided or obtained in connection with this background and security investigation and hereby release and agree to hold harmless Lehman Brothers and all other persons and entities who may provide such information to my employer or such vendor.

5.    **CONFIDENTIALITY OF INFORMATION:**        I agree to hold in trust and preserve as confidential all information related to the business activities of Lehman Brothers, its affiliates, their clients, suppliers and other entities with whom Lehman Brothers do business that may be obtained by me from any source or may be developed as a result of my assignment.  I agree to hold such information in trust and confidence for Lehman Brothers and not to disclose such information to any person, firm or enterprise, or use any such information for my own benefit or the benefit of any other party, unless authorized by Lehman Brothers in writing, and even then, to limit access and disclosure of such confidential information on a "need to know" basis only.

Date: _____        Signature:

                                        _____
                                        PrintName

*ChildrenFirst-Lehman Management Agreement*
*5/20/03*
*Page 13 of 21*

## SCHEDULE 2

## NON-DISCLOSURE AGREEMENT

The undersigned is aware that Lehman Brothers Inc. ("Lehman Brothers") and ChildrenFirst ("Vendor") have entered into an agreement providing for the operation of a backup child care center by Vendor for the benefit of Lehman Brothers ("Agreement") and I fully understand that it imposes certain obligations on Vendor and its personnel, some of which are specifically set forth below. I further understand that, under the Agreement, Lehman Brothers may require the execution and delivery of this written agreement from certain personnel of Vendor, including myself, to further ensure understanding and compliance with these obligations.

In consideration of my future or continued assignment and responsibilities in connection with Vendor's performance under the Agreement, I hereby acknowledge, represent and confirm to Vendor and Lehman Brothers as follows: (a) I have read the provisions of this Non-Disclosure Agreement, understand each of them, agree to them, and know of no agreements, obligations or restrictions which prevent or prohibit me from complying with them; (b) I will receive and maintain all Lehman Brothers information, perform services and conduct myself, in all respects, in a manner consistent with these obligations; and (c) I agree not to, directly or indirectly, engage in or assist others to engage in, any activity or conduct which violates the provisions of this Non-Disclosure Agreement. In furtherance of these obligations, I agree to hold in trust and preserve as confidential all information related to the business activities of Lehman Brothers, its affiliates, their clients, suppliers and other entities with whom Lehman Brothers do business that may be obtained by me from any source or may be developed as a result of my assignment. I agree to hold such information in trust and confidence for Lehman Brothers and not to disclose such information to any person, firm or enterprise, or use any such information for my own benefit or the benefit of any other party, unless authorized by Lehman Brothers in writing, and even then, to limit access and disclosure of such confidential information on a "need to know" basis only.

I understand that if I threaten to or actually breach or fail to observe any of the obligations set forth in this Non-Disclosure Agreement, Lehman Brothers will be subject to irreparable harm which will not be adequately satisfied by damages. I therefore agree that Lehman Brothers may be entitled to seek an injunction and any other remedies permitted to ensure and enforce my compliance with these obligations in the unlikely event I do not comply with them; provided, however, that no specification herein of any particular legal or equitable remedy will be construed as a waiver, prohibition or limitation of any legal or equitable remedies.

By: _____

Print Name: _____

Address: _____

Social Security #: _____

**EXHIBIT B**

**DESCRIPTION OF CENTER**

| | |
|---|---|
| **Hours of Operation** | 7:00 a.m. – 6:00 p.m. |
| **Days of Normal Operation** | Monday – Friday |
| **Center Closing Days (in addition to Owner designated holidays)** | New Years Day<br>Presidents' Day<br>Memorial Day<br>Independence Day<br>Labor Day<br>Thanksgiving Day<br>Christmas Day<br>ChildrenFirst Professional Day (to be determined- with a minimum of thirty (30) days written prior notice) |
| **Operating Capacity** | Up to 32 children for backup child care. |
| **Children Served** | Twelve weeks through twelve years old. |
| **Teacher-to-Child Ratios:** | ChildrenFirst strives to maintain average annual teacher-child ratios that exceed state-mandated standards: 1:1 to 1:2 for infants, 1:3 to 1:4 for toddlers, 1:6 to 1:8 for pre-schoolers, and 1:8 to 1:10 for school age children. At a minimum, ChildrenFirst will comply with all teacher-child ratios mandated by state law in which the Center is located. |
| **Staffing Qualifications** | ChildrenFirst will employ qualified educators in the Center. Employees are trained in first aid, CPR, hygiene and universal precaution skills. A full-time, year-round team of professionals operate regardless of daily fluctuation in demand. |
| **Programming** | Thematic developmentally appropriate curriculum. |
| **Safety & Security** | The Center design maximizes lines of sight throughout the facility. Security measures generally include double-locked entrances, staffed by a customer service associate, photo identification for check-in and check-out, and closed–circuit television systems for video monitoring. |
| **Accreditation/Licensing** | ChildrenFirst will make reasonable efforts to ensure that the Center is accredited by the National Association for the Education of Young Children (NAEYC) when eligible for accreditation. NAEYC exceeds operating standards and procedures outlined by state and local licensing boards. |

## EXHIBIT C

## CENTER DESIGN AND DEVELOPMENT TERMS AND CONDITIONS

Phase I – Planning and Design

Planning and Design includes working with the Owner and the Owner's representatives on preliminary design of the Center and focuses on issues of suitability and compliance. The following details the scope of work for Phase I:

- Development of Management Agreement
  - ✓Review and execution of contract between Owner and Children**First**
  - ✓Develop capital budget for Center development
  - ✓Develop Annual Fee and Adjusted Annual Fee for the first Operating Year
  - ✓Review Children**First** policies and procedures for Parent Handbook
- Identify Project Team
  - ✓Owner and Children**First** Teams
  - ✓Architect, Engineer, Expediter, General Contractor, Security
- Site Review
  - ✓Evaluate location for Center
  - ✓Identify any obstacles to using identified space
  - ✓Assist in addressing zoning issues and building codes, including fire and egress requirements
- Develop Program and Components
  - ✓Ages and numbers of children in each licensed age group
  - ✓Maternity Transition/Extended Care
  - ✓School age programming, including vacation week programs
- Schematic Design
  - ✓Consult on schematic design based on initial meetings with Owner and   Children**First**
- Introductory Meeting with Regulatory Agencies
  - ✓Visit space
  - ✓Discuss program components
  - ✓Prepare license application
- Facility Design and Development
  - ✓Participate in Design Development Review meetings
  - ✓ Review of Construction Drawings for consistency with program and applicable licensing requirements
  - ✓Provide guidance on the Equipment Selection Process
  - ✓Determine process for order placement, receiving equipment/furnishings
  - ✓Order and receive furniture, fixtures and equipment

Phase II – Development and Implementation

Development and Implementation includes all aspects of center construction, including licensing, procurement of appropriate equipment for the environment, and the physical set-up of the Center for operation. Implementation includes preparing Owner employees for the opening of the center, screening, hiring and training the Center staff for Center operations and the planning of internal and external official opening or "ribbon cutting" events. The following details the scope of work for Phase II:

- Bid Process
  - ✓Participate in any necessary review of subcontractor bids
  - ✓Participate in vendor selection for Center operation (security, telephone, laundry, nutrition, etc.)
  - ✓Permit process
- Construction and Environment
  - ✓Attend project meetings as needed
  - ✓Detail Center furniture and equipment layout
  - ✓Obtain copy of Certificate of Occupancy for final license inspection

- Final licensing inspection
  - ✓ Walkthrough with regulatory agents
  - ✓ Walkthrough with fire marshal
  - ✓ Provide Certificate of Occupancy
  - ✓ Receive License to operate center
- Recruit, interview, screen, hire and train Center staff
- Refine curriculum based on final program components
- Assist Owner in preparing Parent Handbook and registration materials
- Plan pre-opening events
  - ✓ Prepare communication plan for pre-opening events
- Assist Owner in developing employee roll-out program
  - ✓ Materials for publication: registration package, informational brochures/pamphlets/videos
  - ✓ Pre-opening events, as desired
- Plan ribbon cutting if desired
  - ✓ Determine need for internal and/or external focus
  - ✓ Develop media plan
- Conduct ribbon cutting if desired

## Development Fee

The Development Fee shall be $60,000, based on an anticipated design and development schedule of up to eight calendar months to complete construction and obtain the required license to operate the Center. Notwithstanding any other provision of the Agreement, the Development Fee shall be adjusted as follows in the event that design and development schedule extends to eight or more calendar months, other than where due to the fault of ChildrenFirst:

| Design and Development Schedule | Adjusted Development Fee |
| --- | --- |
| Up to Nine Months | $70,000 |
| Up to Ten Months | $80,000 |
| Up to Eleven Months | $90,000 |
| Over Eleven Months | $100,000 |

The Owner shall pay ChildrenFirst the Development Fee in two equal installments as follows:

(a)    For the work performed by ChildrenFirst in Phase I, Planning and Design, 50% of the Development Fee upon the earlier of (i) the commencement of Phase I, or (ii) the execution of the Agreement.

(b)    For the work performed by ChildrenFirst in Phase II, Development and Implementation, 50% of the Development Fee upon the commencement of construction of the Center.

Estimated ChildrenFirst Design, Development and Pre-Opening Expenses

| | | | |
|---|---|---|---|
| **PROJECT:** | **Lehman Brothers** | **DATE:** | 03/20/03 |
| **ADDRESS:** | **745 Seventh Avenue, NYC** | **SIZE/SF** | 2,446 |
| **CAPITAL BUDGET:** | **Preliminary Estimate 32 children** | | |

| Project Elements | Description | VALUE |
|---|---|---|
| Preconstruction capital | Due diligence costs | Lehman |
| | Preconstruction architectural services | Lehman |
| General Contractor | Preconstruction bid services | Lehman |
| | Hard construction costs | Lehman |
| Other construction capital | Design fees | Lehman |
| | Engineering fees | Lehman |
| | Expeditor | Lehman |
| | Insurance | Lehman |
| | Reimbursable expenses | Lehman |
| Non-construction capital | Furniture | $30,000 |
| | Educational Supplies | $29,000 |
| | Telecommunications | $8,800 |
| | Technology | $12,000 |
| | Subtotal Project Costs | $600,000-$810,000 |
| Pre-opening expenses | License fees, legal fees | |
| | recruiting and screening expense | |
| | pre-opening payroll | $30,000 |
| Development Fee | CFI Development Fee | $60,000 |
| | Reimbursable expenses | $15,000 |
| | Subtotal Fees and Expenses | $105,000 |
| | PROJECT TOTAL | $700,000-$915,000 |

**Assumptions:**   **Technology & communications based on typical**
**CFI costs.**

**Does not include cost of flat screens.**

**Office furniture purchases included based on typical CFI costs.**

**Furniture includes all wood and soft furnishings, tables, chairs, etc.**
**Educational/Office supplies includes books, curriculum, toys, games and**
**start up supplies.**

**All costs reflect 2002 catalog pricing and do not reflect additional CFI**
**discounts.**

**Pre-Opening expenses are an estimate based on Director commencing 30**
**days prior**
**to center opening and staff commencing 30 days prior to center opening.**
**All applicable**
**expenses shall be passed thru to LB at cost with no mark-up.**

## Exhibit D

### ESTIMATED OPERATING EXPENSES (FIRST OPERATING YEAR; ANNUALIZED)

| Item | Estimated Expense |
|---|---|
| Salaries | $323,589 |
| Benefits | $ 47,892 |
| Other Operating Expenses | $ 45,038 |
| TOTAL | $416,519 |

## EXHIBIT E

## SPECIAL TERMS AND CONDITIONS

1.  <u>Repayment of Discount</u>.  Owner acknowledges and agrees that the Management and Administrative Fee to be paid by Owner under the terms of the Agreement for the first Operating Year has been discounted by $12,000 by ChildrenFirst in exchange for the Owner's commitment to enter into the Agreement for a term equal to at least four full Operating Years.  In the event of any default by Owner, or termination of the Agreement by Owner other than under subparagraph 13(a) of Exhibit A of the Agreement, prior to the end of the fourth full Operating Year under the terms of the Agreement, after all applicable notice and cure periods and in addition to all other rights of ChildrenFirst and obligations of Owner arising out of such default, Owner shall be obligated to promptly pay ChildrenFirst such $12,000 discount.

2.  <u>Fixed Fee Amendment</u>.  The parties agree to discuss from time to time the feasibility and desirability of amending the Agreement to provide for the operation of the Center on a fixed fee basis in accordance with ChildrenFirst's normal practices.  This Agreement may only be amended by the written agreement of the parties.

3.  <u>Prior Agreement</u>.  Upon execution of the Agreement, the Owner shall have the option of terminating the two memberships at ChildrenFirst Times Square, New York purchased pursuant to the terms of a Participation Agreement, dated as of May 2, 2002, between Lehman Brothers Inc. and ChildrenFirst Inc. ("Times Square Participation Agreement") effective no earlier than the date of the opening of the Center.  Owner shall provide ChildrenFirst thirty (30) days written notice of such termination.  On the date of termination, Owner shall be released from all its obligations under the Times Square Participation Agreement.  Any pre-paid, unused portion of the Annual Membership Fees for such memberships under the Times Square Participation Agreement as of the date of such termination shall be, at Owner's option, either credited to annual membership fee obligations for other memberships purchased by Owner in other ChildrenFirst centers or refunded to Owner.

Attachments:

Attachment A – Form of Parent Handbook
Attachment B – Parent Brochure

# EXHIBIT B

## MANAGEMENT AGREEMENT RENEWAL



**Bright Horizons**
FAMILY SOLUTIONS®

# Management Agreement Renewal

### *Reference Information*

Owner:                                          Bright Horizons Account Manager:

Lehman Brothers Inc.
_____                          Name:    Andrea Martini
                                                Telephone:    212-332-4918
Liaison:  Maxine Gruner                          Facsimile:    212-332-4917
Title:    Vice President Human
          Resources/Benefits
Address:  1301 Avenue of the Americas            E-mail:    amartini@brighthorizons.com
          New York, New York 10019


Telephone:    212-320-7043
Facsimile:    646-758-2681
E-mail:    mgruner@lehman.com


Management Agreement, as amended (original Commencement Date):    March 27, 2003
Location of Center(s):    745 7th Avenue, First Floor, New York, New York
Renewal Term:    Five Years          Commencement Date:    January 1, 2008
Management and Administrative Fee  (Year 1):    $185,224

Special Terms (attach, if any):    Yes    X    No    _____

Bright Horizons Children's Centers, Inc. ("Bright Horizons"), as successor in interest to ChildrenFirst, Inc. under the Management Agreement, and Lehman Brothers Inc. ("Owner") agree to the terms and conditions described in this Renewal by which Bright Horizons will assist the Owner in the management and operation of the Center. All the terms and conditions of the Management Agreement shall remain in full force and effect except as modified by this Renewal and the attached Special Terms, if any (collectively, the "Agreement").

Executed under seal as of the date below.

**Lehman Brothers Inc.**                         **Bright Horizons Children's Centers, Inc.**
By: _____                        By: _____
Its duly authorized:  PATRICK COSTER             Its duly authorized:    CAO
Date:    11·28·2007                              Date:    12·19·07

Bright Horizons Children's Centers, Inc., 200 Talcott Avenue South, Watertown, MA  02472

(Attachment to Management Agreement Renewal)

Special Terms

Operating Expenses. Estimated Operating Expenses for the Operating Year commencing
January 1, 2008 are attached.

Management and Administrative Fee. The third sentence of paragraph 5 of Exhibit A of
the Agreement hereby is deleted and the following inserted in its place: The
Management and Administrative Fee for each Operating Year be equal to the product of
(a) the Management and Administrative Fee for the immediately prior Operating Year,
and (b) one hundred and five per cent (105%), unless otherwise mutually agreed by the
parties.

Owner's Insurance. Subparagraph 11(g) of Exhibit A of the Agreement is hereby deleted
in its entirety and replaced with the following language:

> "Owner shall be responsible for purchasing and maintaining all risk property
> insurance relating to the Center and to the building of which the Center is a part,
> including to its improvements and betterments, furnishings, fixtures, equipment
> and contents. Owner agrees to waive its and its insurer's rights to subrogate .
> against Bright Horizons, however, Bright Horizons shall be responsible for the
> first $1million of a property loss resulting from fire and/or water damage, if such
> loss was caused by Bright Horizons' negligence. Owner's insurance shall be for
> the sole benefit and protection of Owner and no coverage shall insure to the
> benefit of Bright Horizons."

**Estimated Operating Expenses for the Operating Year commencing January 1, 2008**

|  | Budget 2007 | Budget 2008 | 2008 vs 2007 budget | % |
|---|---|---|---|---|
| **Salaries and Benefits** | $ 427,971 | $ 445,255 | $ 17,284 | 4% |
| **Total Controllables** | $ 50,328 | $ 52,313 | $ 1,985 | 4% |
| **Total Center Support Services** | $ 47,670 | $ 50,053 | $ 2,383 | 5% |
| **Management Fee** | $ 128,734 | $ 135,171 | $ 6,437 | 5% |
| **Total Budget** | $ 654,703 | $ 682,792 | $ 28,089 | 4% |

**Key Assumptions**

| | |
|---|---|
| Utilization Growth | 4% |
| Salary Inflation Factor | 4% |
| # of Full Time Staff | 7 |

**Year 2008 Utilization Projections**

|  |  | Utilization | Age Mix |
|---|---|---|---|
| U | Infant | 1,002 | 28% |
| S | Toddler | 1,033 | 29% |
| A | Preschool | 795 | 22% |
| G | School-age | 743 | 21% |
| E | Total | 3,573 | 100% |

**Utilization Statistics**

|  |  | Actual 2006 | Budget Year 2007 | Reforecast Year 2007 |
|---|---|---|---|---|
| **Utilization** | | | | |
| U | Infant | 879 | 1,049 | 963 |
| S | Toddler | 816 | 986 | 993 |
| A | Preschool | 698 | 602 | 765 |
| G | School-age | 695 | 687 | 714 |
| E | Total | 3,088 | 3,324 | 3,435 |

**Lehman pays directly for the folllowing:**

All capital expenses
Annual repairs & cleaning
Computer support
Copying and postage
Rent and operating costs
Telecommunications

**EXHIBIT C**

**BACKUP CARE PARTICIPATION AGREEMENT**



# Backup Care Participation Agreement

## *Reference Information*

Participating Company:                Bright Horizons Account Manager:

Lehman Brothers Inc.

                                       Name:   Susan Cunningham

Liaison:  Maxine Gruner                    Telephone:   860.633.2114
Title:  VP, HR/Benefits                      Facsimile:   860.652.9271
Address:   1301 Avenue of the Americas       E-mail:   scunningham@brighthorizons.com
            New York, NY 10019
Telephone:   212.320.7043
E-mail:   Maxine.gruner@lehman.com
Backup Child Care Membership(s):   Yes   x   No   ____
    Location of Center(s):   See attached Special Terms
    Uses per Week by Center:   See attached Special Terms
Additional Services:  *Extended Access:*   Yes   x   No   ____
Initial Term:  Three years          Commencement Date:   January 1, 2008
Annual Fee(s)  (Year 1):   $300,000
           (Year:2)   $312,000
           (Year 3)   $327,600
Co-Payment collected by Bright Horizons:   Yes   ____   No   x
Special Terms (attach, if any):   Yes   x   No   ____

Bright Horizons Children's Centers, Inc. ("Bright Horizons") agrees to provide and Participating Company agrees to accept the Services on the terms described in this Participation Agreement, consisting of this Reference Information, the attached Backup Care Services Terms, and the attached Special Terms, if any (collectively, the "Agreement"). Executed under seal as of the date below.

**Lehman Brothers Inc.**                    **Bright Horizons Children's Centers, Inc.**

By:  _____                By:  _____
Its duly authorized:  PATRICK COSTER        Its duly authorized:   CAO
Date:  12/05/2007                          Date:   12·19·07

Bright Horizons Children's Centers, Inc., 200 Talcott Avenue South, Watertown, MA  02472

## Backup Care Services Terms

1.  <u>Introduction</u>.  Bright Horizons® and Participating Company desire to arrange for Eligible Employees to use the backup care services provided or arranged by Bright Horizons in accordance with the terms of this Agreement (the "Services").  To the extent specified in the Reference Information, the Services shall consist of the Backup Child Care Memberships, Extended Access (as described in the Special Terms, if applicable) and Priority Access (as described in the Special Terms, if applicable).  Bright Horizons and Participating Company each shall have the right to limit use of the Services by an Eligible Employee to no more than twenty uses per child during any twelve month period.

2.  <u>Term</u>.  This Agreement shall commence on the Commencement Date and continue for the Initial Term indicated in the Reference Information, unless terminated pursuant to paragraph 10 or extended by a Renewal pursuant to paragraph 5 ("Term").

3.  <u>Services</u>.  *Backup Child Care Membership(s)*.  Eligible Employees shall be entitled during the Term to (a) reserve and use each Center up to the number of Uses Per Week specified in the Reference Information to the extent available, and (b) reserve and use the remaining unused capacity in each Center to the extent available, all in accordance with the provisions of the User Guide; provided, however, that the average use of a Center by Eligible Employees shall not exceed the Uses Per Week specified in the Reference Information for any three or more  months within twelve consecutive months (one "Membership"). Each Center eligible for use is specified in the Reference Information.  Each use of a Center by a child shall constitute a use regardless of the number of hours used.  A reservation to use a Center shall constitute a use unless otherwise cancelled in accordance with the terms of the User Guide.  Bright Horizons and Participating Company agree to promptly negotiate an amendment to this Agreement in good faith in the event of any use of a Center exceeds or is expected to exceed the Uses Per Week specified in the Reference Information.  Eligible Employees shall not be entitled to use a Center in excess of the Uses Per Week specified in the Reference Information unless the parties amend this Agreement to incorporate such additional use.

4.  <u>Annual Fee(s)</u>.  Participating Company shall pay an Annual Fee for the Services purchased for each year of the Term.  The Annual Fee for each year (or partial year) during the Term shall be due within thirty days after the receipt of an invoice.  In no event shall such Annual Fee be due more than thirty days prior to such year.  The initial Annual Fee is specified in the Reference Information.  The Annual Fee shall increase by five percent per year unless otherwise agreed by the parties.  No Annual Fee shall be refunded, rebated or reduced in whole or part except as otherwise provided in this Agreement.  Access to the Services may be denied during any period for which an Annual Fee or other payment under this Agreement remains past due and unpaid.  Bright Horizons shall have the right to impose interest charges at the rate of one percent per month on all past due payments and Participating Company shall promptly pay such charges if imposed.

5.  <u>Renewal</u>.  This Agreement shall be renewed for additional terms equal to the Initial Term, as specified in the Reference Information, following the last day of each current Term (a "Renewal") unless either party elects to terminate this Agreement effective as of the end of the current Term by written notice to the other party no later than ninety days prior to the end of the current Term.  Unless otherwise so terminated, this Agreement shall renew as amended consistent with the terms of this Agreement without any further action by the parties.

6.  <u>Bright Horizons Obligations</u>.  In addition to its other obligations under this Agreement, Bright Horizons agrees as follows.

(a) *Operation of Centers*.  Bright Horizons shall operate the Centers as quality child care centers in accordance with the requirements of all applicable laws and regulations and consistent with the policies and standards described in the User Guide.  The Centers are licensed, fully furnished and equipped child care centers which operate with teacher/child ratios which equal or exceed ratios mandated by state licensing requirements.    Operating policies, procedures and practices may vary among Centers, provided that such policies, procedures and practices shall be consistent with the requirements of all applicable laws and regulations as well as the policies and standards described in the User Guide. All heat, lighting, air-conditioning, electrical service, telecommunications, security and cleaning services will be provided by Bright Horizons at its sole cost consistent at a minimum with the quality of services and materials generally required to operate the Centers as first class backup child care centers and so as to permit the Centers to comply with all applicable Federal, state and local laws, rules, regulations, ordinances, licensing requirements and best management practices for similar backup child care centers ("Operating Standards").  Bright Horizons shall be responsible for securing and maintaining all necessary permits and

approvals to enable Bright Horizons to occupy the premises in which the Centers are located for the Term of this Agreement.   (b) *Insurance*. Bright Horizons shall maintain at all times during the Term the following minimum insurance coverages for the Services: (i) Commercial General Liability insurance with combined single limits for bodily injury and property damage, including without limitation sexual abuse and molestation, of not less than $1,000,000 each occurrence   and $2,000,000 in the aggregate per policy year; (ii) Umbrella Liability insurance in the amount of $20,000,000, with umbrella liability coverage following the form and terms of the underlying coverages to the extent such coverages are available; and (iii) workers' compensation insurance as required by law.   All policies shall be written using A-rated carriers falling within a "Secure" rating by the A.M. Best Company or its replacement. Bright Horizons shall provide Participating Company a certificate of insurance evidencing the foregoing coverages and limits at the commencement of the Initial Term and a renewal certificate not more than ten days following the expiration of the certificate it renews. Each certificate shall specify Participating Company as an additional insured for the general and umbrella liability policies described above. Each certificate shall provide for a minimum of thirty days' prior written notice of any cancellation or limitation of any coverage, and ten days' prior written notice of any nonpayment.

(c) *Reports*.   Bright Horizons shall provide Participating Company with standard monthly use reports (each a "Use Report") concerning the use of the Services by Eligible Employees, including without limitation (i) the identity of the Eligible Employees and the dates of use, and (ii) the number and ages of the children using the Services on a daily basis.

(d) *Confidential Information*. Bright Horizons shall hold in strict confidence all nonpublic information concerning Participating Company, its operations, employees, children using the Services and the terms of this Agreement, received by Bright Horizons in the performance of the Services other than to the extent required by law, disclosed under regulatory examination or necessary to enforce the terms of this Agreement.   In addition, without limitation, Bright Horizons shall hold in strict confidence the information provided in each Use Report concerning the use of the Services by Eligible Employees.

(e) *Proprietary Documents*. Participating Company shall have exclusive ownership rights, including without limitation any rights to copyrights and trademarks, with respect to any of Participating Company's Proprietary Documents.     Bright Horizons agrees not to copy, reproduce, sell, assign, license or otherwise dispose of, give or disclose any of Participating Company's Proprietary Documents without the prior written approval of Participating Company.   At the termination of this Agreement, Bright Horizons agrees to promptly return to Participating Company or destroy all of Participating Company's Proprietary Documents in its possession and to cease use thereof without the prior written approval of Participating Company.     "Participating Company's Proprietary Documents" shall mean any written documents clearly marked as proprietary or which would reasonably be deemed proprietary in normal business operations and provided to Bright Horizons by Participating Company in the performance of the Services.

(f) *Employee Communications*.  At the request of Participating Company, Bright Horizons agrees to participate in no less than two information events annually at no additional cost in order to acquaint the Participating Company's employees with the Services provided by Bright Horizons.  The number of information events shall be determined by Bright Horizons based on the amount of the Annual Fee, and may be increased by the payment of an additional charge by Participating Company.     In addition, at the request of Participating Company, Bright Horizons shall provide standard Bright Horizons communication materials equal to twenty-five percent of the approximate number of Eligible Employees at no additional cost to promote the Services.  Participating Company may purchase additional communication materials from time to time at standard Bright Horizons' rates.  The cost of any required or desired customization of these standard communication materials, and their distribution, shall be the responsibility of Participating Company.

(g) *Assignment*. Bright Horizons shall not assign this Agreement without the prior written consent of the Participating Company; provided, however, that no such consent shall be required if such assignment is made to, accepted by and enforceable against an assignee (i) which is a parent, affiliate or subsidiary of Bright Horizons, or (ii) as a result of a merger, sale, consolidation or reorganization of Bright Horizons' corporate structure, provided there is no material change in the Services or the obligations of the assignee under this Agreement (a "Permitted Assignment").  Notwithstanding the foregoing, Bright Horizons shall promptly provide written notice to Participating Company of any Permitted Assignment and Participating Company may, in its sole discretion, terminate this Agreement as a result of any such Permitted Assignment (except to the extent such Permitted Assignment is an internal reorganization of Bright Horizon's corporate structure) upon thirty (30) days prior written notice thereof.

(h)   *Co-Payments; Other Charges*.  If applicable as specified in the Reference Information, a co-payment shall

be collected and retained by or on behalf of Bright Horizons from each Eligible Employee in connection with each use of the Services (each a "Co-Payment").  Co-Payments shall be calculated on a per use basis regardless of the hours of use.  Co-Payment rates and other charges are subject to adjustment annually.  Co-Payments are non-refundable and shall be due and paid regardless of use unless the reservation has been cancelled in accordance with the terms of the User Guide.  Bright Horizons may use all reasonable and lawful means to collect Co-Payments and other charges from Eligible Employees, and may deny access to the Services to any Eligible Employee who fails to pay one or more Co-Payments or other charges.  Participating Company agrees to remit to Bright Horizons upon written notice any Co-Payment not otherwise made by an Eligible Employee in accordance with the requirements of this Agreement.

7.  Participating Company Obligations.  In addition to its other obligations under this Agreement, Participating Company agrees as follows.

(a) *Eligible Employees*.  Only Eligible Employees may use the Services.  Each employee and other person determined by Participating Company to be eligible to use the Services who meets all registration and other requirements of Bright Horizons in accordance with the User Guide shall constitute an "Eligible Employee" unless Participating Company notifies Bright Horizons otherwise.  Participating Company shall inform Bright Horizons in the event it has knowledge of any unauthorized use of the Services.  Participating Company agrees to assist Bright Horizons in communicating the benefits of the Services to its employees and other representatives for the purposes of managing levels of registration by Eligible Employees.

(b) *No Employment*.  Participating Company shall not employ or solicit, or permit any agent acting in the interests of Participating Company to employ or solicit, any employee of Bright Horizons to perform child care or related services for the benefit of Participating Company or its employees regardless of location during or within one year after the Term.

(c) *Confidential Information*.  Participating Company shall hold in strict confidence all nonpublic information concerning Bright Horizons, the Centers, the terms of this Agreement, and the Services provided by Bright Horizons in the performance of this Agreement other than to the extent required by law, disclosed under regulatory examination or necessary to enforce the terms of this Agreement. In addition, without limitation, Participating Company shall hold in strict confidence the information provided in each Use Report concerning the use of the Services by Eligible Employees.

(d) *Proprietary Documents*.  Bright Horizons shall have exclusive ownership rights, including without limitation any rights to copyrights and trademarks, with respect to any of Bright Horizons' Proprietary Documents. Participating Company agrees not to copy or reproduce (other than for internal use in connection with the Services), sell, assign, license or otherwise dispose of, give or disclose any of Bright Horizons' Proprietary Documents without the prior written approval of Bright Horizons.  At the termination of this Agreement, Participating Company agrees to promptly return to Bright Horizons or destroy all of Bright Horizons' Proprietary Documents in its possession and to cease use thereof without the prior written approval of Bright Horizons, except that Participating Company may retain copies of such Proprietary Documents for archival purposes.  "Bright Horizons' Proprietary Documents" shall mean Bright Horizons' personnel manuals, curriculum plans, User Guides, registration forms, marketing materials and form of Use Reports, along with any written documents clearly marked as proprietary or which would reasonably be deemed proprietary in normal business operations and provided to Participating Company by Bright Horizons in the performance of this Agreement.

(e) *Intellectual Property*.  Bright Horizons shall be the sole and exclusive owner of all intellectual property used in connection with the Services, including but not limited to all User Guides, trademarks and service marks, websites, communication materials, and other materials created by or for Bright Horizons, excluding any Participating Company's confidential and/or proprietary information/materials.  The permitted use of any such intellectual property by Participating Company pursuant to the terms of this Agreement shall not create any ownership interest in such property or related rights whatsoever.

8.  Use of the Services.  Eligible Employees shall use the Services solely in accordance with, and subject to, the provisions set forth in a user guide or handbook, registration materials, policies and procedures, and other information provided by Bright Horizons to Eligible Employees for the Services, as the same may be amended, updated or replaced from time to time (collectively, the "User Guide") provided such amendment, update or replacement does not materially reduce the obligations of Bright Horizons or increase the obligations of Eligible Employees.  The form and content of the User Guide may vary among Centers.  Bright Horizons agrees to notify Participating Company in advance of all material changes to the User Guide.

9.  Indemnities.  To the maximum extent permitted by law, Bright Horizons and the Participating Company (each an "Indemnitor") each agree to indemnify, defend, and save harmless the other party, its directors, officers, partners,

employees and agents (each an "Indemnitee") from all third party suits, actions, claims, demands, damages, losses, liabilities, expenses and costs, including without limitation reasonable attorneys' fees, arising out of or in connection with (a) the breach of any contractual duty by the Indemnitor under this Agreement, or (b) personal or bodily injury (including death) to any person, including without limitation any children using the Services or the employees of Bright Horizons, or (c) damage to the property of any person or entity, in each event to the extent such injury or damage was caused by the willful or negligent acts, errors or omissions of the Indemnitor, its directors, officers, partners, employees, or agents. Notwithstanding the foregoing, (i) Participating Company shall have no obligation under this paragraph for the acts, errors or omissions of any Participating Company's directors, officers, partners, employees or agents acting solely as a parent or guardian using the Services, and (ii) Bright Horizons' obligations under this paragraph extend to Participating Company's Indemnitees acting within the scope of their employment or service to Participating Company and not as a parent or guardian using the Services..

10.    Termination.    Either party may terminate this Agreement upon any material breach by the other party of any obligations under this Agreement by sending such defaulting party written notice of the termination stating the nature of the breach of obligation. Such notice shall be effective thirty days following the date of delivery thereof unless the breach shall have been remedied to the satisfaction of the terminating party during such thirty day period; provided, however, that if the nature of the breach of obligation is such that it is not capable of being remedied within such thirty day period, so long as the breaching party commences remedying the breach within such thirty day period and diligently pursues such remedy through completion, the notice of such termination shall have no force or effect.  In the event the Participating Company is the terminating party under this paragraph, and Participating Company is not in default of its obligations under this Agreement, Bright Horizons shall promptly refund to Participating Company upon such termination any pro rata portion of the Annual Fee then paid for the remainder of the Term.

11.    Miscellaneous.    This Agreement supersedes any and all prior discussions, correspondence or agreements between the parties relating to the Services or the terms of this Agreement. This Agreement shall be governed by the laws of the State of Delaware without regard to conflict of law principles, and shall apply to all successors and assigns.  This Agreement may be amended only by a writing executed by both parties.  The parties agree that nothing in this Agreement shall be deemed to create a partnership, employer-employee relationship, or joint

venture between the parties, it being agreed that Bright Horizons shall be acting solely as an independent contractor under this Agreement at all times.    The provisions of paragraphs 6(d), 6(e), 7(b)(for one year after the Term), 7(c), 7(d), 7(e), 9, 10 (last sentence) and 11 shall survive the expiration or termination of this Agreement. In no event shall either Participating Company or Bright Horizons be liable to the other for any indirect, consequential, special, incidental or punitive damages, including without limitation for lost business or profits. Any notices required under this Agreement shall be in writing and shall be deemed given when received if delivered by hand, by certified mail (postage prepaid and return receipt requested), or by a nationally recognized overnight courier, to corporate offices of Participating Company and Bright Horizons at the addresses set forth above.  Paragraph headings in this Agreement are for convenience of reference only and shall not define or limit the provisions of this Agreement.  Neither party shall be liable for failure or delay in performance of its obligations under this Agreement beyond its reasonable control. If any term, covenant or condition of this Agreement or the application thereof to any person or circumstance shall be held invalid or unenforceable, the remainder of this Agreement or the application of such term, covenant or condition to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term, covenant or condition of this Agreement shall be valid and enforced to the fullest extent permitted by law.

Attachment to Backup Care Participation Agreement

Special Terms

1.  Annual Membership Fees shall be paid as follows:

| | |
|---|---|
| Bright Horizons at Harborside (100 Plaza One, Jersey City, NJ) | $85,715 |
| Bright Horizons at Lexington Ave (575 Lexington Avenue, New York, NY) | $42,857 |
| Bright Horizons Park Ave (200 Park Avenue, New York, NY) | $42,857 |
| Bright Horizons Irvine (2010 Main Street, Irvine, CA) | $42,857 |
| Bright Horizons Chicago West Loop (500 W. Monroe Street, Chicago, IL) | $21,428 |
| The Children's Center at Ropes & Gray (1 International Place, Boston, MA) | $21,428 |
| Bright Horizons at 75 Rockefeller Plaza (75 Rockefeller Plaza, New York, NY) | $21,428 |
| Bright Horizons San Francisco (555 California Street, San Francisco, CA) | $21,428 |
| **Total** | $300,000 |

2.  Uses per Week by Center shall be as follows:

| | |
|---|---|
| Bright Horizons at Harborside (100 Plaza One, Jersey City, NJ) | Up to 8 |
| Bright Horizons at Lexington Ave (575 Lexington Avenue, New York, NY) | Up to 4 |
| Bright Horizons Park Ave (200 Park Avenue, New York, NY) | Up to 4 |
| Bright Horizons Irvine (2010 Main Street, Irvine, CA) | Up to 4 |
| Bright Horizons Chicago West Loop (500 W. Monroe Street, Chicago, IL) | Up to 2 |
| The Children's Center at Ropes & Gray (1 International Place, Boston, MA) | Up to 2 |
| Bright Horizons at 75 Rockefeller Plaza (75 Rockefeller Plaza, New York, NY) | Up to 2 |
| Bright Horizons San Francisco California Street (555 California Street, San Francisco, CA) | Up to 2 |

3.     *Extended Access Membership*.  In connection with the purchase of a primary Membership in a Center, Eligible Employees of Participating Company may use the child care centers identified below (each an "Additional Center" and collectively the "Additional Centers") upon the payment of the Extended Access Fee, subject to all the terms and conditions of the Agreement ("Extended Access").  Use of any Additional Center by the Eligible Employees of Participating Company as part of Extended Access shall not equal or exceed two or more Uses per Week for any three or more months within twelve consecutive months.  In the event and effective upon the date by which an Additional Center is used by the Eligible Employees of Participating Company two or more Uses per Week for any three or more months within twelve consecutive months, the Eligible Employees shall not be entitled to use the Additional Center unless the parties agree that the Extended Access shall be upgraded to the appropriate Membership level (e.g., to a Membership equal to two Uses per Week).  Participating Company agrees to promptly amend the Agreement to reflect any such upgrade at the request of Bright Horizons, and pay the pro-rata portion of the Annual Fee applicable to the upgrade in the Membership level.

   *Additional Center(s):*
   Bright Horizons Chicago East Loop (225 N. Michigan Avenue, Chicago, IL)
   Bright Horizons Chicago Central Loop (33 North LaSalle Street, Chicago, IL)
   Bright Horizons Houston (1001 McKinney Street, Houston, TX)
   Bright Horizons Los Angeles (550 South Hope Street, Los Angeles, CA)
   Bright Horizons Palo Alto (3 Palo Alto Square, Palo Alto, CA)
   Bright Horizons Tysons Corner Pinnacle Drive (1751 Pinnacle Drive, McLean, VA)
   Bright Horizons Washington DC I Street (1725 I Street, NW, Washington, DC)
   Bright Horizons, One Financial Center, Boston, MA

Use of Extended Access during any peak period (e.g., school holidays) is subject to availability.  Extended Access shall include only limited employee presentations and other similar outreach activities for the Services at any Additional Center.  Use of any Additional Center by the Eligible Employees of Participating Company as part of Extended Membership shall be counted towards the Uses per Week of the primary Membership(s) purchased by the Participating Company under the Agreement.

**EXHIBIT D**

**INVOICE FOR MANAGEMENT AGREEMENT
DATED AUGUST 1, 2008**

**INVOICE**



| | | | |
|---|---|---|---|
| Page: | 1 | of | 1 |
| Invoice: | | | B-001895 |
| Invoice Date: | | | 08/01/2008 |
| Customer No: | | | 2002202 |
| Due Date: | | | 08/01/2008 |

**PLEASE REMIT TO:**

Bright Horizons
P.O. Box 277878
Atlanta GA 30384-7878
United States

**CUSTOMER:**                                                           **AMOUNT DUE:**        56,896.50   USD

Lehman Brothers
Image Processing Systems   Attn: Maxine
Gruner
C/O Lehman Brothers Accounts Payable
PO BOX 2339
Secaucus NJ 07094

For billing questions, please call:        617-673-8000

| Line | Description | Quantity | UOM | Unit Amt | Net Amount |
|---|---|---|---|---|---|
| | Children's Center at Lehman Brothers 745 7th Avenue, NY | | | | |
| 1 | August 2008 Operating Period | 1.00 | UNT | 56,896.50 | 56,896.50 |
| 08/01/2008 - 08/31/2008 | | | | | |
| | | | | Subtotal: | 56,896.50 |
| | | | | **AMOUNT DUE:** | **56,896.50**   USD |

Amounts billed in accordance with contractual terms and approved budget

200 Talcott Avenue South, Watertown, Massachusetts 02472   p 617.673.8000 f  617.673.8001
www.brighthorizons.com
BOSTON  CHICAGO  DALLAS  DUBLIN  LONDON  LOS ANGELES  NASHVILLE  NEW YORK  SEATTLE

 **Report Summary**

Printed On:            August 20,2008         2:54:36PM

Number of Invoices:    1

Process Instance:      1652948

200 Talcott Avenue South, Watertown, Massachusetts 02472   p 617.673.8000 f 617.673.8001

www. brighthorizons.com

BOSTON  CHICAGO  DALLAS  DUBLIN  LONDON  LOS ANGELES  NASHVILLE  NEW YORK  SEATTLE

**EXHIBIT E**

**NOTICE FROM BANK OF AMERICA
DATED SEPTEMBER 22, 2008**

BANK OF AMERICA, N.A.    Page 01 of 01    H
EAST RETURN ITEMS     Bank  : 00172
P.O. BOX 2518       Center :
HOUSTON, TX  77252-2518    Divider: 8,874
             Code   : 3 B

            Deposit Account:  325-544-9052
            Charge Account :  325-544-9052
            Store/Reference:00000000277878

CORPORATE FAMILY SOLUTIONS
ATTN: ALEX MONTEIRO
LBX # 277878
200 TALCOTT AVENUE SOUTH     DESK #3
WATERTOWN, MA 02472

          Date of Notice: 09-22-2008

Dear Valued Customer:

The item(s) below, which were deposited to your account, have been returned unpaid.
Therefore, we have charged them to your account.  Fees for analyzed accounts are itemized
on the account analysis statement.

If you have any questions or need additional information, please contact one of our
Customer Service Representatives at 1-800-432-1000.  Thank you for choosing Bank of
America.

Number of Returned Items:      1
Amount of Returned Item(s):    56,896.50

| SEQUENCE/ DEP DATE | ABA NUMBER/ DEP AMOUNT | MAKER NAME/ CHECK DATE | RETURN REASON/ I.D. | AMOUNT |
|---|---|---|---|---|
| 6115886909 | 0311-0020 | LEHMAN BROTHERS | Refer to Maker | 56,896.50 |
| 9/16/2008 | 79,996.50 | | | |

\*111012822\*
09/22/2008
00000651743B530

This is a LEGAL COPY of your
check. You can use it the same
way you would use the original
check

RETURN REASON-S
REFER TO MAKER

\*19340001\*
\*8874\*
\*1\*
\*00535\*



#00 2088 123# 4:03 1100 209: 388 26983# /0005689650#

**EXHIBIT F**

**INVOICE FOR MANAGEMENT AGREEMENT
DATED SEPTEMBER 1, 2008**

**INVOICE**



| | | | |
|---|---|---|---|
| Page: | 1 | of | 1 |
| Invoice: | | | B-001965 |
| Invoice Date: | | | 09/01/2008 |
| Customer No: | | | 2002202 |
| Due Date: | | | 09/01/2008 |

**PLEASE REMIT TO:**

Bright Horizons
P.O. Box 277878
Atlanta GA 30384-7878
United States

**CUSTOMER:**                                                          **AMOUNT DUE:**          56,896.50  USD
Lehman Brothers
c/o Lehman Brothers Accounts Payable
Attn: Paul Imbimbo
PO BOX 2339
Secaucus NJ 07094
United States

For billing questions, please call:         617-673-8000

| Line | Description | Quantity | UOM | Unit Amt | Net Amount |
|---|---|---|---|---|---|
| | Children's Center at Lehman Brothers 745 7th Avenue, NY | | | | |
| 1 | Sept 2008, 09/01/08 - 09/30/08 | 1.00 | UNT | 56,896.50 | 56,896.50 |
| 09/01/2008 - 09/30/2008 | | | | | |

Subtotal:                      56,896.50

**AMOUNT DUE:**              56,896.50  USD

Amounts billed in accordance with contractual terms and approved budget



# Report Summary

Printed On:              September 15,2008        9:15:39AM

Number of Invoices:     1

Process Instance:       1685626

200 Talcott Avenue South, Watertown, Massachusetts 02472   p 617.673.8000 f 617.673.8001

www. brighthorizons.com

BOSTON  CHICAGO  DALLAS  DUBLIN  LONDON  LOS ANGELES  NASHVILLE  NEW YORK  SEATTLE