**Hearing Date:  October 16, 2008 at 10:00 a.m. (Prevailing Eastern Time)**
**Objections Due:  October 13, 2008 at 4:00 p.m. (Prevailing Eastern Time)**

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Kathleen M. Sullivan (KS5492)
Faith E. Gay (FG9357)
Susheel Kirpalani (SK8926)

*Proposed Special Counsel for the Official*
*Committee Of Unsecured Creditors of*
*Lehman Brothers Holdings Inc.*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| -------------------------------------------------------- | x | |
| In re: | : | Chapter 11 Case |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., | : | No. 08-13555 (JMP) |
| <u>et al.</u> | : | |
| | : | Jointly Administered |
| Debtors. | : | |
| -------------------------------------------------------- | x | |

## NOTICE OF MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN BROTHERS HOLDINGS INC. FOR LEAVE TO CONDUCT DISCOVERY OF JPMORGAN CHASE BANK, N.A. PURSUANT TO 11 U.S.C. §§ 105(a) AND 1103(c) <u>AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004</u>

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Official

Committee Of Unsecured Creditors Of Lehman Brothers Holdings Inc. (the "<u>Creditors'</u>

<u>Committee</u>") for leave to conduct discovery of JPMorgan Chase Bank, N.A. pursuant to 11

U.S.C. §§ 105(a) and 1103(c) and Federal Rule of Bankruptcy Procedure 2004, as more fully

described in the Motion, will be held before the Honorable James M.

Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander

Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004

(the "Bankruptcy Court"), on **October 16, 2008 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck ("Chambers"), One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq. and Quinn Emanuel Urquhart Oliver & Hedges, LLP, 51 Madison Avenue, 22nd Floor, New York, New York 10010, Attn: Susheel Kirpalani, Esq., James C. Tecce, Esq., and Scott C. Shelley Esq., proposed counsel and special counsel, respectively, to the official committee of unsecured creditors appointed in these cases;

(v) the attorneys for any other official committee(s) appointed in these chapter cases; (vi) Cleary

Gottlieb LLP, One Liberty Plaza, New York, New York 10006, Attn: Lindsee P. Granfield, Esq.

and Lisa Schweitzer, Esq. and Sullivan & Cromwell LLP, 125 Broad Street, New York, New

York 10004, Attn: Robinson B. Lacy, Esq. and Hydee R. Feldstein, Esq., attorneys for the

Debtors' postpetition lenders; and (vii) any person or entity with a particularized interest in the

Motion, so as to be received no later than **October 13, 2008, at 4:00 p.m. (prevailing Eastern

Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not

received by the Objection Deadline, the relief requested shall be deemed unopposed, and the

Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  October 2, 2008
         New York, New York

**QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP**

/s/ Susheel Kirpalani
Kathleen M. Sullivan (KS5492)
Faith E. Gay (FG9357)
Susheel Kirpalani (SK8926)
51 Madison Avenue
New York, New York 10010
Telephone No.:  (212) 849-7000
Facsimile No.:  (212) 849-7100

*Proposed Special Counsel for Official Committee
Of Unsecured Creditors Of Lehman Brothers
Holdings Inc.*

QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000
Kathleen M. Sullivan (KS5492)
Faith E. Gay (FG9357)
Susheel Kirpalani (SK8926)

*Proposed Special Counsel for the Official
Committee Of Unsecured Creditors of
Lehman Brothers Holdings Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------- x
In re:                                             :    Chapter 11 Case
                                                   :
LEHMAN BROTHERS HOLDINGS INC.,                     :    No. 08-13555 (JMP)
et al.                                             :
                                                   :    Jointly Administered
                             Debtors.              :
-------------------------------------------------- x
```

**MOTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN
BROTHERS HOLDINGS INC. FOR LEAVE TO CONDUCT DISCOVERY OF
JPMORGAN CHASE BANK, N.A. PURSUANT TO 11 U.S.C. §§ 105(a) AND 1103(c)
AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004**

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of

Lehman Brothers Holdings Inc. ("LBHI"), pursuant to 11 U.S.C. §§ 105(a) and 1103(c) and

Federal Rule of Bankruptcy Procedure 2004, moves this Court for entry of an order[1] authorizing

and directing discovery from JPMorgan Chase Bank, N.A. ("JPMC" or the "Respondent") in the

form of the following:  (i) responses to the document requests attached to this motion as Exhibit

2 or substantially similar document requests; and (ii) the deposition of a representative of the

Respondent who is most knowledgeable about the matters for examination set forth in Exhibit 3

---

[1]  A proposed Order is attached as Exhibit 1.

pursuant to Federal Rule of Civil Procedure 30(b)(6).[2]  In support of its motion, the Creditors'

Committee respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

1.    Rule 2004 discovery of JPMC is necessary in order for the Creditors'

Committee to carry out its statutory authority to investigate the financial affairs of the Debtors to

discover assets and expose any conduct that may give rise to causes of action of the estate.  The

Creditors' Committee understands that as of the Friday before the filing of the bankruptcy

petition, LBHI had at least $17 billion in excess assets in the form of cash and securities, which

were held at JPMC.  JPMC's refusal to make those assets available to LBHI and its subsidiaries

in the days leading up to LBHI's bankruptcy filing may have contributed to LBHI's liquidity

constraints.  As such, discovery of JPMC is necessary in order to determine the basis for JPMC's

refusal.

2.    In addition, the Creditors' Committee has learned that LBHI purportedly

guaranteed certain obligations of its subsidiaries, and also transferred the aforementioned

property to JPMC to secure such obligations, on the eve of bankruptcy.  The Creditors'

Committee is authorized by the Bankruptcy Code to understand the intent, effect, consideration,

and financial condition of LBHI at the time of such transfer.[3]

---

[2]    If this Court grants its motion, the Creditors' Committee anticipates that it will serve
deposition notices after it has received and reviewed any documents produced in response to its
discovery requests.  The Creditors' Committee reserves the right to seek authority to conduct
additional examinations of individuals at JPMC based on a review of the documents provided.

[3]    On the "first day" of these bankruptcy cases, the Court authorized JPMC to look to the
property transferred on the eve of bankruptcy as collateral for its purported guaranty from LBHI.
The Creditors' Committee has subsequently confirmed in writing with JPMC that nothing in the
Court's order precludes the investigation of such transaction and, if warranted, the pursuit of
claims in respect thereof.

## II.    PROCEDURAL HISTORY, JURISDICTION, AND VENUE

3.      On September 15, 2008 (the "Petition Date"), LBHI filed a voluntary petition with this Court for relief under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101-1532).  The following day, on September 16, 2008, LB 745 LLC (collectively, with LBHI, the "Debtors") also filed for Chapter 11 protection.  The Debtors continue to manage and operate their businesses and manage their properties as a debtors in possession pursuant to 11 U.S.C. § 1107(a) and 1108.

4.      The Debtors' Chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and this Court's order dated and entered September 17, 2008.  No trustee or examiner has been appointed.  The Creditors' Committee was appointed on September 17, 2008.

5.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C.§ 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates underlying the relief requested in this motion are sections 105(a) and 1103(c) of the Bankruptcy Code and Bankruptcy Rule 2004.

## III.    RELEVANT FACTUAL BACKGROUND

### A.    The Debtors' Businesses and Capital Needs

6.      LBHI's businesses consist of the Debtors and various non-debtor subsidiaries and affiliates (collectively, "Lehman Brothers").  Prior to the Petition Date, Lehman Brothers was the fourth largest investment bank in the United States.  It offered a full array of financial services in equity and fixed income sales, trading and research, investment banking,

asset management, private investment management and private equity.[4] As of May 31, 2008, Lehman Brothers reported consolidated assets totaling approximately $639 billion, and consolidated liabilities totaling approximately $613 billion.[5]

7.     The vast majority of LBHI's funding for operations was provided by financing. According to the Debtors, as of May 31, 2008, LBHI owed approximately $110.5 billion on senior unsecured notes, approximately $12.6 billion on subordinated unsecured notes, and approximately $5 billion on junior subordinated notes.[6]

8.     In addition, Lehman Brothers generally purchased highly liquid securities using secured financing obtained through tri-party repurchase agreements. In such an agreement, a custodian bank or clearing organization acts as an intermediary between Lehman Brothers and its funding counterparties. According to the Debtors, as of May 31, 2008, the outstanding amount owed under such tri-party repurchase agreements was approximately $188 billion.[7]

**B.     Events Leading To Chapter 11 Filing**

9.     The Debtors have advised this Court that these Chapter 11 cases were precipitated by deteriorating conditions in the global financial markets, including but not limited to, a lack of liquidity in the credit markets, significantly depressed volumes in most equity markets, a widening in certain fixed income credit spreads as compared to the end of the 2007 fiscal year, and declining asset values.[8] In addition, according to the Debtors, these conditions in

---

[4]   Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications ("First Day Aff.") at ¶ 5.

[5]   First Day Aff. at ¶ 6.

[6]   First Day Aff. at ¶ 16.

[7]   First Day Aff. at ¶¶ 18-19.

[8]   First Day Aff. at ¶ 20.

the financial markets were compounded by a general down turn in the global economy, consisting of slowed growth in major economies as a result of declining business and consumer confidence, global inflation, increases in commodity prices, with oil and gold reaching record levels, increasing costs of industrial production, reductions in consumer spending due to lower levels of disposable income, and falling private sector employment growth.[9]

10.    The combination of these conditions in the financial markets and the global economy resulted in downward pressure on financial asset prices.[10]  Because Lehman Brothers purchased many of its assets using secured credit obtained under tri-party repurchase agreements, when the market value of the pledged assets began to deviate from the pledged value of those assets, secured lenders imposed "haircuts" (discounts) on Lehman Brothers.[11]

C.    **The Creditors' Committee's Examination To Date Has Uncovered Additional Factors That May Have Contributed to or Caused LBHI's Demise**

11.    Based on its examination of the Debtors' public statements and filings, the First Day Affidavit filed on September 16, 2008, and other publicly available information, the Creditors' Committee believes that there may have been additional factors that contributed to or caused the demise of Lehman Brothers.

12.    Starting in mid-2007, a downturn in the capital markets had a negative impact on LBHI due to its emphasis on leveraged finance underwriting, residential mortgage origination and securitization, and commercial real estate finance.[12]  Although hedges largely offset the deterioration in the value of certain of LBHI's assets on its balance sheet during the

---

[9]  First Day Aff. ¶ 21.

[10]  First Day Aff. ¶ 22.

[11]  First Day Aff. ¶ 23.

second half of 2007, these hedges were insufficient during the first half of 2008.[13]  As a result,

LBHI had only breakeven pretax earnings in the first quarter of 2008 and incurred a $4.3 billion

pretax loss in the second quarter.[14]  Despite these challenges, LBHI was viewed by most as a

strong franchise across its core investment banking, trading, and investment management

business.  It had adequate liquidity and good earnings-generating ability in the long term.[15]

13.     On September 10, 2008, LBHI announced its preliminary third quarter

results.  Among other things, these results showed that LBHI ended the third quarter with:  (i) an

estimated net loss of $3.9 billion; (ii) a gross mark-to-market adjustment of $7.8 billion; (iii) a

total stockholders' equity of $28.4 billion, up from $26.3 billion; and (iv) a liquidity pool of $42

billion.[16]  LBHI also held a conference call with its investors that same day and stated that it had

a $15 billion cash surplus.[17]

14.     In conjunction with the announcement of its preliminary third quarter

results, LBHI also unveiled a comprehensive plan of initiatives to reduce dramatically its

commercial real estate and residential mortgage exposure, generate additional capital through the

---

[12]   Stephen Taub, <u>Rating Itself: S&P Defends Lehman's "A"</u>, CFO, Sept. 24, 2008, http://www.cfo.com/printable/article.cfm/12295579/c_2984321?f=options.

[13]   <u>Id.</u>

[14]   <u>Id.</u>

[15]   Heidi N. Moore, <u>Black Holes of Value at Lehman Brothers</u>, WALL ST. J., Sept. 12, 2008, http://blogs.wsj.com/deals/2008/09/12/black-holes-of-value-at-lehman-brothers/; Stephen Taub, <u>Rating Itself: S&P Defends Lehman's "A"</u>, CFO, Sept. 24, 2008, http://www.cfo.com/printable/article.cfm/12295579/c_2984321?f=options.

[16]   Press Release, Lehman Brothers, Lehman Brothers Announces Preliminary Third Quarter Results and Strategic Restructuring, (Sept. 10, 2008) (<u>available</u> <u>at</u> http://www.lehman.com/newsroom).

[17]   Heidi N. Moore, <u>Live-Blogging the Lehman Conference Call</u>, WALL ST. J., Sept. 10, 2008, http://blogs.wsj.com/deals/2008/09/10/live-blogging-the-lehman-conference-

sale of a majority stake of its Investment Management Division and reduce the annual dividend, all in an effort to maximize value for clients, creditors, shareholders, and employees.[18]

15.     LBHI's efforts were stymied by a series of events over the next several days.  On or about September 9, 2008, the Korean Development Bank ("KDB"), a state-owned financial institution with whom LBHI was in discussions to sell parts of its business, revealed that it was no longer interested in a strategic transaction with LBHI.[19]

16.     That same day, two leading credit rating agencies, Fitch Ratings, Ltd. ("Fitch") and Standard and Poor's Rating Services ("S&P") placed LBHI's rating on review for potential downgrades, claiming uncertainty about its ability to raise capital based on the decline in its share price.[20]

17.     On September 11, 2008, analysts from Goldman Sachs, Citigroup, and Merrill Lynch downgraded LBHI stock from "buy" recommendations issued just six months earlier to "hold" recommendations.  One of these analysts acknowledged that the stock's decline "has the potential to further negatively impact the confidence and perception around the Lehman franchise, as well as making the ability to raise a large amount of capital less likely and more

---

call/trackback/ ; Lehman Struggles to Shore Up Confidence, WALL ST. J., Sept. 11, 2008, http://online.wsj.com/public/article_print/SB122109572989621863.html.

[18]    Press Release, Lehman Brothers, Lehman Brothers Announces Preliminary Third Quarter Results and Strategic Restructuring, (Sept. 10, 2008) (available at http://www.lehman.com/newsroom).

[19]    Heidi N. Moore, Should the Federal Reserve Bank Bail Out Lehman? Can It?, WALL ST. J., Sept. 9, 2008, http://blogs.wsj.com/deals/2008/09/09/should-the-fed-step-in-to-help-lehman-can-it/.

[20]    Susanne Craig, Randall Smith, Serena Ng and Matthew Karnitschnig Lehman Faces Mounting Pressures, WALL ST.J., Sept. 10, 2008, http://online.wsj.com/article/ SB122103833291118977.html.

dilutive." Another noted "the change in rating agency posture" as "an unexpected negative that may create a distressed sale situation" in his downgraded recommendation.[21]

18.    That same day, Moody's Investors Services, Inc. ("Moody's") also placed LBHI's credit rating on review for potential downgrades and additionally threatened to lower its credit rating from its current A2 level unless LBHI was able to negotiate "a strategic transaction with a strong partner."[22] The effects of Moody's actions were immediately apparent.  LBHI shares dropped 42% to $4.22 on Thursday, and on Friday, the stock closed down another 13.51 percent at $3.65.[23]

19.    In the two weeks leading up to LBHI's bankruptcy filing, anywhere from 10 to 16.8 percent of LBHI's shares were shorted daily.[24] The Creditors' Committee believes that some of this short selling may have occurred in the absence of actual borrowing, or arrangements to borrow, LBHI's stock.  Although the Securities and Exchange Commission ("SEC") had issued an emergency order[25] pertaining to short selling on July 15, 2008, that Order was limited

---

[21]    David Gaffen Mega-Analyst Box Score: Lehman Brothers, Wall St. J., Sept. 11, 2008,http://blogs.wsj.com/marketbeat/2008/09/11/mega-analyst-box-score-lehman-brothers/.

[22]    Randall Smith, Lehman's Revamp Plan Draws Doubters, WALL ST. J., Sept. 11, 2008, http://online.wsj.com/article/SB122103219388318869.html?mod=ITPAWSJ_1.

[23]    Rob Curran, Lehman Slides 42%; Volatile AIG Advances, WALL ST. J., Sept. 12, 2008, http://online.wsj.com/article/SB122114419650923589.html.

[24]    Kara Scannell, Gregory Zuckerman and Liz Rappaport, Uncaged Bears Hit Lehman Stock Hard, WALL ST. J., Sept. 13, 2008, http://online.wsj.com/article/ SB122124956990029341.html.

[25]    Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments, Exchange Act Release No. 34-58166 (Jul. 15, 2008) (available at www.sec.gov/rules/other/2008/34-58166.pdf).  The July 15, 2008 Order recognized the impact of rumor mongering and naked short selling on Bear Stearns, and was intended to prevent such activities from impacting other similar financial institutions.  Id. at 1.

in that among other things, (i) it prohibited only the practice of naked short selling as opposed to all short selling; and (ii) it was effective only from July 21 to August 12, 2008.[26]

20.     After the collapse of Lehman Brothers, the SEC instituted two more expansive measures designed to strengthen investor confidence and protect the integrity of the securities market.  First, on September 17, 2008, the SEC took several coordinated actions against *naked* short selling which applied to the securities of *all* public companies.[27]  On the following day, the SEC issued an order prohibiting *any* short selling of the stocks of a much broader list (799, to be precise) of financial institutions.[28]  These measures were reportedly instituted following calls from Morgan Stanley CEO John Mack and Goldman Sachs CEO Lloyd Blankfein requesting "new, emergency rules to prevent abuses in the market by investors betting on drops in Morgan Stanley and Goldman shares."[29]  Unfortunately, both measures were

---

[26]    On July 29, 2008, the SEC extended the July 15, 2008 Order until August 12, 2008.  See Order Extending Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments, Exchange Act Release No. 34-58248 (Jul. 29, 2008) (available at www.sec.gov/rules/other/2008/34-58248.pdf).

[27]    Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments, Exchange Act Release No. 34-58572 (Sept. 17, 2008) (available at www.sec.gov/rules/other/2008/34-58572.pdf).  Among other things, this order required that short sellers and their broker-dealers deliver securities by the close of business three days after the sale transaction date (the "settlement date").  It also adopted Rule 10b-21, which expressly targets fraudulent short selling transactions by providing that short sellers who lie about their intention or ability to deliver securities in time for settlement are violating the law when they fail to deliver.  Id.

[28]    Emergency Order Pursuant to Section 12(k)(2) of the Securities Exchange Act of 1934 Taking Temporary Action to Respond to Market Developments, Exchange Act Release No. 34-58592 (Sept. 18, 2008) (available at www.sec.gov/rules/other/2008/34-58592.pdf).

[29]    Aaron Lucchetti and Kate Kelly, Goldman, Morgan Rewrite Playbooks, WALL ST. J., Oct. 2, 2008, http://online.wsj.com/article/ SB1222906700215196457.html.

instituted too late to assist LBHI when large percentages of its stock were being shorted in the weeks before its bankruptcy filing.[30]

21.    Despite the decline in share price, LBHI appears to have had adequate assets to meet its current obligations as of Friday, September 12, 2008.[31]  The book value of its equity was $28 billion.  Moreover, the Creditors' Committee understands that LBHI had at least $17 billion in excess assets consisting of cash and securities, which were held at JPMC.

**D.    <u>JPMC's Role in the Events Leading to LBHI's Bankruptcy Filing</u>**

22.    LBHI depended on collateral-backed credit lines or repurchase agreements to fund its business.  LBHI's collateral included securities backed by mortgages and derivatives, as well as private equity investments and other assets.

23.    JPMC, one of the world's largest securities clearing organizations, provided cash advances to LBHI to fund overnight repurchase agreements.  JPMC was a party to various clearance agreements with LBHI and certain of its subsidiaries (the "Clearance Agreements").  The obligations of the Lehman Brothers entities under the Clearance Agreements

---

[30]    Recently, the SEC has come under fire for failures in its enforcement duties.  <u>See</u> SEC's Oversight of Bear Stearns and Related Entities: Broker-Dealer Risk Assessment Program, Report No. 446-B (Sept. 25, 2008) (<u>available</u> <u>at</u> www.sec.gov/about/oig/audit/2008/446-b.pdf ). These failures in enforcement "hinder[] the Commission's ability to foresee or respond to weaknesses in the financial markets" and impacts its "ability to protect customers from financial or other problems experienced by broker-dealers."  <u>Id.</u> at v.  In addition, the SEC has been criticized recently for its failure to supervise and regulate large investment bank holding companies such as Lehman Brothers, Bear Stearns, Merrill Lynch, Goldman Sachs, and Morgan Stanley under its Consolidated Supervised Entities ("CSE") program which created a regime of voluntary regulatory oversight for these companies.  <u>See, e.g.</u>, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program, Report No. 446-A (Sept. 25, 2008) (<u>available</u> <u>at</u> http://www.sec.gov/about/oig/oigauditlist.htm); Julie Satow, <u>Ex-SEC Official Blames Agency for Blow-Up of Broker-Dealers</u>, N.Y. SUN, Sep. 18, 2008, http://www.nysun.com/business/ex-sec-official-blames-agency-for-blow-up/86130/.

[31]    The Creditors' Committee is not, at this time, taking any position with respect to the actual financial condition of LBHI at any point leading up to the bankruptcy filing.

were purportedly guaranteed pursuant to various guarantee agreements between JPMC and LBHI

(the "Guarantee Agreements").  LBHI's obligations under the Guarantee Agreements were

allegedly secured by collateral pledged to JPMC pursuant to various security agreements

between JPMC and LBHI (the "Security Agreements").

24.    JPMC is party to various clearing agreements among LBHI and certain

subsidiaries (including LBI), specifically:

- the Clearance Agreement originally among LBI and The Chase Manhattan Bank, dated on or about June 15, 2000, (the "2000 LBI Agreement"), which on August 28, 2008, in the days before the bankruptcy filings, was expanded to include LBHI, Lehman Brothers International (Europe), Lehman Brothers OTC Derivatives and Lehman Brothers Japan, Inc. as counter-parties;[32]

- the Global Custody and Clearance Agreement among LBI and The Chase Manhattan Bank dated on or about March 14, 2001 (the "2001 LBI Agreement");

- the Clearance Agreement among Lehman Brothers Bank, FSB, and JPMC, executed shortly before the Petition Date (on September 10, 2008) (the "2008 FSB Agreement");

- the Clearance Agreement among Lehman Brothers Bankhaus Aktiengesellschaft and JPMC, also executed shortly before the Petition Date (on September 10, 2008) (the "2008 Bankhaus Agreement"); and

- the Clearance Agreement among LBCB and JPMC, also executed shortly before the Petition Date (on September 10, 2008) (the "2008 LBCB Agreement").

25.    On August 26, 2008 and September 9, 2008, days before the bankruptcy

filings, two Guaranty Agreements relating to the Clearance Agreements were executed:

- the Guaranty dated August 26, 2008 (the "August Guaranty"), under which the "Guarantor" guaranties the obligations of the Lehman Counterparties under the 2000 LBI Agreement, which (i) was executed in favor of JPMC, (ii) defined "Guarantor" as "the undersigned," (iii) contained the signature of "Ian Lowitt, Chief Financial Officer," and (iv) made no mention of LBHI; and

---

[32]    In what appears to be an amendment executed in May 2008, Lehman Brothers Commercial Paper ("LBCP") became a party to the 2000 LBI Agreement (although that documentation is not signed).  A copy of the unsigned guaranty is annexed to Exhibit A-1 hereto (the 2000 LBI Agreement).

- the Guaranty dated September 9, 2008, that appears to have been provided by LBHI[33] six days before the bankruptcy filing, pursuant to which LBHI agreed to punctually pay all obligations and liabilities of each of LBHI's direct and indirect subsidiaries to Chase "of whatever nature, whether now existing or hereafter incurred, whether created directly or acquired by" JPMC by assignment or otherwise.  The September Guaranty purports that it is "in addition to and does not replace the [August Guaranty]."

26.     Prior to the Petition Date, LBHI had on-line access to its various accounts with JPMC that enabled it to, among other things, review the location and value of its collateral. JPMC terminated LBHI's on-line access to that information upon the filing of these bankruptcy cases.  This Motion also requests that LBHI's on-line access be restored in the same manner provided pre-petition.

27.     As set forth above, the Creditors' Committee understands that LBHI had at least $17 billion in excess assets which were held at JPMC on the Friday going into the weekend before its bankruptcy filing.  The Creditors' Committee further understands that, on September 12, 2008, JPMC refused to allow LBHI to access its excess assets and instead "froze" LBHI's account.  In freezing LBHI's assets, JPMC was purportedly holding all of LBHI's assets as a potential offset against any claims JPMC may have had against LBHI, although the Creditors' Committee is unaware of how such alleged claims exceeded the assets on hand.

28.     The Creditors' Committee believes that as a result of JPMC's actions, LBHI suffered an immediate liquidity crisis that could have been averted by any number of events, none of which transpired.

---

[33]     The Creditors' Committee does not have a copy of the executed version of the September Guaranty.

## IV.    <u>RELIEF REQUESTED</u>

29.    The Creditors' Committee requests the entry of an order, pursuant to

sections 105(a) and 1103(c) of the Bankruptcy Code and Bankruptcy Rule 2004, authorizing and

directing (i) the production of documents by the Respondent in response to the document

requests attached as Exhibit 2 or to substantially similar document requests, and (ii) the

deposition of a representative of the Respondent who is most knowledgeable about the matters

for examination set forth in Exhibit 3 pursuant to Federal Rule of Civil Procedure 30(b)(6).

30.    The Creditors' Committee is best positioned to investigate, for the benefit

of all creditors, the conduct and activities that devastated the Debtors' financial health and

precipitated their bankruptcy filings.  The Rule 2004 discovery requested in this Motion will

provide the Creditors' Committee with information it needs from those parties uniquely

positioned to have such information.  The Creditors' Committee must obtain such information to

properly discharge its duties to its constituency under section 1103(c) of the Bankruptcy Code.

On behalf of all unsecured creditors, the Creditors' Committee is entitled to seek and obtain

discovery regarding these and other matters relating to the acts, conduct, property, liabilities and

financial condition of the Debtors and their estates.

31.    The Creditors' Committee requires the requested information to assess

fully and investigate potential claims against third parties.  Moreover, the discovery sought is

tailored to the factual matters raised or implicated by certain issues and events that precipitated

the Chapter 11 cases.  Compliance with the annexed Rule 2004 document requests by the

Respondent will not be burdensome and can be achieved without undue hardship in the time

period requested.

## V.    ARGUMENT

32.    Bankruptcy Rule 2004(a) provides that "[o]n motion of any party in

interest, the court may order the examination of any entity."  Fed. R. Bankr. P. 2004(a).

Discovery under Rule 2004 includes both document discovery and depositions.  Fed. R. Bankr.

P. 2004(c).

33.    Rule 2004 has been termed the "basic discovery device used [in]

bankruptcy cases."  In re French, 145 B.R. 991, 992 (Bankr. D. S.D. 1992).  The purpose of Rule

2004 is to permit a broad investigation into the financial affairs of the debtors to assure the

proper administration of bankruptcy estates.  In re Symington, 209 B.R. 678, 683 (Bankr. D. Md.

1997) (citations omitted.)  The goal of the investigation is to discover assets and expose any

fraudulent conduct.  In re Recoton Corp., 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004); In re

Symington, 209 B.R. at 683; In re Valley Forge Plaza Assocs., 109 B.R. 669, 674 (E.D. Pa.

1990).

34.    Rule 2004(a) provides that "[o]n motion of any party in interest, the court

may order the examination of any entity."  Thus, a Rule 2004 examination is not limited to the

debtor.  It may be made of any entity with knowledge of the debtor's acts, property, liabilities,

and financial affairs relating to the debtor's bankruptcy proceedings.  In re Valley Forge Plaza

Assocs., 109 B.R. at 674; In re Fearn, 96 B.R. 135, 138 (Bankr. S.D. Oh. 1989).  Emphasizing

the broad purpose of Rule 2004, courts have been inclined to allow examination of any third

party who can be shown to have had dealings with the debtor.  In re Ionosphere Clubs, Inc., 156

B.R. 414 (S.D.N.Y. 1993), aff'd 17 F.3d 600 (2d Cir. 1994); In re Recoton Corp., 307 B.R. 751,

755 (Bankr. S.D.N.Y. 2004) ("Any third party who has a relationship with a debtor may be made

subject to a Rule 2004 investigation.").

14

35.     Rule 2004(b) provides that the scope of the examination "may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge." Fed. Bankr. R. 2004(b).  In addition, "the examination may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefor, and any other matter relevant to the case or to the formulation of a plan." Id.

36.     There are two critical differences between discovery under Rule 2004 and discovery under the Federal Rules of Civil Procedure.  First, Rule 2004 discovery is an investigatory tool in that it is undertaken pre-litigation, that is, before the filing of a lawsuit or a motion.  In contrast, discovery under the Federal Rules of Civil Procedure is pretrial, that is, after the filing of a complaint.  As such, a Rule 2004 motion need not be tied to specific factual allegations at issue between parties to a complaint or contested matter.  In re Symington, 209 B.R. at 683.  Rule 2004 discovery is subject to fewer objections on grounds of relevance than discovery issued in connection with a contested matter or adversary proceeding.  Id.

37.     Second, the scope of a Rule 2004 examination is much broader than discovery under the Federal Rules of Civil Procedure.  In re Ecam Publications, Inc., 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991) (noting that the scope of Rule 2004 questioning was extremely broad); In re Drexel Burnham Lambert Group, Inc., 123 B.R. 702, 711 (Bankr. S.D.N.Y. 1991) (same); In re Corso, 328 B.R. 375, 383 (Bankr. E.D.N.Y. 2005) (same).  Indeed, courts have recognized that the scope of Rule 2004 examinations is broad, unfettered, and can legitimately be in the nature of a "fishing expedition."  In re Countrywide Home Loans, Inc., 384 B.R. 373, 400

15

(Bankr. W.D. Pa. 2008); In re Lev, 2008 WL 207523, at *3 (Bankr. D.N.J. 2008) (unpublished);

In re Bakalis, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996); In re Valley Forge Plaza Assocs., 109

B.R. at 674.

38.     "The purpose of Rule 2004 examination is 'to show the condition of the

estate and to enable the court to discover its extent and whereabouts and to come into possession

of it that the rights of creditors may be preserved.'" In re Coffee Cupboard, Inc., 128 B.R. 509,

514 (Bankr. E.D.N.Y. 1991) (citing Cameron v. United States, 231 U.S. 710, 717 (1914)).  A

Rule 2004 examination is "designed to bring the Debtor's affairs to light, not to hide them." In

re PRS Ins. Group., Inc., 274 B.R. 381, 385 (Bankr. D. Del. 2001).  "Because the purpose of the

Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to

have a relationship with the debtor can be made subject to a Rule 2004 investigation." In re

Ionosphere Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993) , aff'd, 17 F.3d 600 (2d Cir. 1994).

The scope of inquiry permitted under a Rule 2004 examination is generally very broad and can

"legitimately be in the nature of a fishing expedition." In re Wilcher, 56 B.R. 428, 433 (Bankr.

N.D. Ill. 1985).  See also In re Bakalis, 199 B.R. 443, 447 (Bankr. E.D.N.Y. 1996) (same); In re

Johns-Manville Corp., 42 B.R. 362, 364 (S.D.N.Y. 1984) (same).  Examinations under

Bankruptcy Rules 2004(a) and (c) may include within their scope, among many other things:

any matter which may relate to the property and assets of the estate; the financial condition of the

debtor; any matter which may affect the administration of a debtors' estate; and, in a Chapter 11

case, any matter relevant to the case or to the formulation of a plan.

39.     Here, JPMC withheld $17 billion in excess assets from LBHI in the days

just prior to the bankruptcy filing, and such substantial assets were transferred to JPMC on the

eve of bankruptcy.  As such, because there can be no question that JPMC had dealings with

Debtor LBHI, it is subject to examination under Rule 2004.  In addition, the information sought by the Creditors' Committee concerns JPMC's actions in withholding assets from LBHI on the business day prior to the Chapter 11 filing.  Accordingly, any information in the possession of the Respondent regarding these topics concerns the "acts, conduct, or property" and/or "liabilities and financial condition" of the Debtor LBHI.  Consequently, the documents and testimony sought by the Creditors' Committee are squarely within the scope of a Rule 2004 examination.

## COMPLIANCE WITH LOCAL RULES

40.    Notice of this Application will be provided to (i) the United States Trustee for the Southern District of New York pursuant to Local Rule 2002-1 of the United States Bankruptcy Court for the Southern District of New York ("S.D.N.Y. Bankr. LR").

## NO PRIOR REQUEST

41.    No prior Application for the relief requested in this motion has been made to this or any other court.

## <u>CONCLUSION</u>

For the reasons set forth above, the Creditors' Committee respectfully requests

that the Court grant its Rule 2004 motion in its entirety; and grant such other further relief as this

Court deems appropriate.

Dated:  October 2, 2008
      New York, New York

                         **QUINN EMANUEL URQUHART
OLIVER & HEDGES, LLP**

                         /s/ Susheel Kirpalani
                         Kathleen M. Sullivan (KS5492)
                         Faith E. Gay (FG9357)
                         Susheel Kirpalani (SK8926)
                         51 Madison Avenue
                         New York, New York 10010
                         Telephone No.:  (212) 849-7000
                         Facsimile No.:  (212) 849-7100

                         *Proposed Special Counsel for Official Committee
Of Unsecured Creditors Of Lehman Brothers
Holdings Inc.*