UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

In re                                              :
                                                   :
LEHMAN BROTHERS HOLDINGS, Inc.,                    :       Chapter 11
                                                   :       Case No.: 08-13555(JMP)
         *Debtor*                                  :
                                                   :
TeleCommunication Systems, Inc.,                   :
                                                   :
         *Creditor*                                :

## **OBJECTION TO CURE AMOUNT**

         COMES NOW the undersigned officer for the creditor, TeleCommunication

Systems, Inc. ("**TCS**") and objects to the Cure Amount and states that:

         1.       TCS was served with a Notice of Assumption and Assignment of, and Amounts

Necessary to Cure Defaults Under Contracts and Leases to be Assumed and Assigned to

Successful Purchaser on or about September 19, 2008 (the "**Notice of Assumption and**

**Assignment**").

         2.       TCS executed an agreement (and two orders thereunder) with the Debtor,

specifically a Master Agreement: Non-IT Services dated January 30, 2007, and the first order

entitled Exhibit 1: Form of Professional Services Transaction Schedule with an order date of

February 1, 2007, and the second order entitled Professional Services Transaction Schedule #02

with an order date of February 1, 2008 (all of which are attached hereto as Attachment A)

(collectively the "**TCS Agreements**").  Under the terms of the TCS Agreements, TCS agreed to

provide staffing services and other expertise to assist Debtor in the deployment, support and

operation of its wireless devices and mobile phones to Debtor's staff in exchange for the

compensation set forth in the TCS Agreements.  The TCS Agreements remain executory and

TCS continues to provide the staffing and expertise to the Debtor under the terms of the TCS

Agreements.

3.    The Notice of Assumption and Assignment referencing the website located at http://chapter11.epiqsystems.com/lehman sets forth Debtor's allegation that TCS' cure amount is $57,184.00 (the "Cure Amount"). TCS objects to the Cure Amount as more specifically set forth herein.

4.    Since the inception of the TCS Agreements, TCS has invoiced Debtor on a monthly basis for services performed under the terms of the TCS Agreements and, except as set forth herein, the Debtor has paid the invoices (*see* Examples of Paid Invoices attached hereto as Attachment B).  As of the bankruptcy filing date in this matter, September 15, 2008 (the "Bankruptcy Filing Date"), the Debtor has incurred obligations to TCS for services rendered during June, August and the first half of September 2008 in the amount of $139,700.74 (the "Corrected Cure Amount") (*see* supporting detail in the Summary of Outstanding Invoices from TCS to Lehman as of Bankruptcy Filing Date attached hereto as Attachment C), and as of the date of filing of this Objection to Cure Amount, no payments toward the Corrected Cure Amount have been received by TCS.

5.    Since TCS has not received payments for services provided under the TCS Agreements in June, August and the first half of September 2008, the Debtor is in breach of the TCS Agreements and TCS requests that this Honorable Court set the Cure Amount for the TCS Agreements to $139,700.74.

Respectfully submitted,

Bruce A. White
Secretary, General Counsel and Vice President
TeleCommunication Systems, Inc.
275 West Street, Suite 400
Annapolis, Maryland  21401
(410) 263-7616

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing OBJECTION TO CURE AMOUNT including attachments were sent via overnight courier service on this 2nd day of October, 2008, to:

Lori R. Fife, Esquire
Shai Y. Waisman, Esquire
Weil, Gotshal & Manges, LLP
767 Fifth Avenue, New York, NY  10153-0119
(Counsel for Lehman Brothers Holdings, Inc. and LB745 LLC)

Jeffery S. Margolin, Esquire
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(Counsel for SIPC Trustee)

Lindsee P. Granfield, Esquire
Lisa M. Schweitzer, Esquire
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York NY 10006
(Counsel for Purchaser, Barclays Capital Inc.)

Mark D. Johnson
Associate Counsel
TeleCommunication Systems, Inc.
275 West Street, Suite 400
Annapolis, Maryland  21401
(410) 295-1410 desk
(410) 263-7617 fax
mJohnson@telecomsys.com

Note to Counsel: Please direct all future inquires or correspondence in this matter to Mark D. Johnson, Associate Counsel for TeleCommunication Systems, Inc.

# Attachment A

## The TCS Agreements

The following Agreement and Orders thereunder follow on the next page
(collectively the "**TCS Agreements**"):

- Master Agreement: Non-IT Services dated January 30, 2007,
- Exhibit 1: Form of Professional Services Transaction Schedule with an order date of February 1, 2007 (first order)
- Professional Services Transaction Schedule #02 with an order date of February 1, 2008 (second order)

## MASTER AGREEMENT:
## NON-IT SERVICES

**Supplier Name:** TeleCommunication Systems, Inc.

**Supplier Address:** 275 West Street, Annapolis, MD 21401

**Supplier Jurisdiction of Incorporation:** Maryland

**Tax ID:** 52-1526369

**Telephone #:** (443) 394-5167

**Fax #:** (410) 902-8741

**Master Agreement No.:** 000000016364

**Master Agreement Effective Date: January 30, 2007**

THIS MASTER AGREEMENT – NON-IT SERVICES (the **"Master Agreement"**) is made as of the Master Agreement Effective Date specified above (the "**Effective Date**") between Lehman Brothers Holdings Inc., a Delaware corporation, having an office and place of business at 745 Seventh Avenue, New York, New York 10019, (the **"Customer"**) and the Supplier specified above (the "**Supplier**"). As used in this Master Agreement (as defined below), **"Party"** means either Customer or Supplier and **"Parties"** means both Customer and Supplier.

## ARTICLE 1: INTRODUCTION

1.1     <u>Purpose</u>. This Master Agreement will provide the terms and conditions that will govern transactions that may be entered into between Customer and Supplier for the provision of Services (each such individual transaction, a "**Transaction**" and together, the "**Transactions**").

1.2     <u>Definitions</u>. Capitalized terms used in the Master Agreement are defined in-place where the term is used or in the Glossary of Terms located at the end of this Master Agreement and have the meanings there given unless the context requires otherwise. Terms other than those defined within the Master Agreement will be given their plain English meaning.

## ARTICLE 2: AGREEMENT STRUCTURE AND PROCESS FOR PLACING ORDERS

2.1     <u>Placement of Orders and Transaction Schedules</u>.

2.1.1   To enter into a Transaction for Services, the Parties will execute a schedule substantially in the form of <u>Exhibit 1</u> hereto and that contains all other terms specific to the Transaction (e.g., price, service descriptions, statements of work, quantity, delivery dates) (each, a **"Transaction Schedule"** and together, the "**Transaction Schedules**").

U02

1

2.1.2.   Upon execution of this Master Agreement, and, as applicable, a Transaction Schedule for a specific Transaction, Supplier will perform the Services specified on the applicable Transaction Schedule in accordance with the terms of such Transaction Schedule.  Each Transaction Schedule will incorporate by reference this Master Agreement.

2.1.3. Each Transaction Schedule, together with any other documents attached to or incorporated therein by reference (including this Master Agreement, will form a separate and independent contract for the applicable Transaction between Supplier and Customer (i.e. the Customer entity that is the party to the Transaction Schedule).

2.2    Execution of Transaction Schedules by Other Customer Entities.  Customer's parent company, its subsidiaries and other affiliated companies may enter into Transactions with Supplier pursuant to this Master Agreement through the execution of Transaction Schedules.  For the purposes of any such Transaction Schedule, the Customer entity executing the Transaction Schedule, as applicable, will be considered the "**Customer**" as that term is used herein and therein.

2.3    Order of Precedence.  If there is a conflict between the provisions of any of this Master Agreement or a Transaction Schedule, the following order of priority will control: (a) a Transaction Schedule (but any conflicting terms in such Transaction Schedule will apply only with respect to such Transaction Schedule), and (b) this Master Agreement; *provided, however,* that, unless the applicable Transaction Schedule has been approved in writing by legal counsel for Customer, a Transaction Schedule may not modify or amend the rights or obligations set forth in the following Sections and Articles of this Master Agreement: "Relationship of the Parties"; "Compliance with Laws"; "Record Retention and Inspection"; "Confidential Information and Data Protection"; "Intellectual Property Rights"; "Insurance"; "Indemnification"; "Limitation of Liability" and "Subcontractors".

## ARTICLE 3:  NATURE OF THE RELATIONSHIP

3.1    Relationship of the Parties.  Supplier agrees and represents and warrants that: (a) it is an independent contractor, (b) Supplier Personnel are the responsibility of Supplier and solely employees or independent contractors of Supplier (or its subcontractor), (c) no Supplier Personnel are Customer's agents or employees for federal, state, or local tax purposes or any other purposes whatsoever, (d) no Supplier Personnel are entitled to any compensation from Customer or to any Customer employee benefits, (e) Supplier will (or, in the case of its subcontractors, will be responsible for causing the applicable subcontractor to) withhold and pay all applicable taxes, benefits and insurance with respect to such personnel, and (f) Supplier will verify and secure the work eligibility of each Supplier Personnel.  Supplier and its employees, agents and subcontractors have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Customer in any manner whatsoever.

U02

3.2    No Exclusivity.  Each Party acknowledges that the Master Agreement, and any Transaction Schedules, are non-exclusive and either Party may contract with other parties for the procurement or sale of comparable equipment, software, systems and services.

## ARTICLE 4:  SUPPLIER PERSONNEL

4.1    Legal Right to Work.  Supplier is responsible for ensuring that Supplier Personnel assigned to perform Services have the legal right to work in each country in which they are assigned to work for the duration of their assignments.

4.2    Background Screening.  Prior to assigning any Supplier Personnel to perform any Services, Supplier will conform with Customer's screening process with respect to background checks of Supplier Personnel in accordance with Customer's then applicable policies regarding the same. Customer's background screening requirements as of the Supplement Effective Date are set forth in Exhibit 2 to this Supplement.

4.3    Responsibility for Supplier Personnel.  Supplier will manage, supervise and provide direction to Supplier Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Master Agreement and the Transaction Schedules.  Supplier will make Supplier Personnel aware of, and cause them to comply with, Customer's safety and security policies while they are performing Services at Customer sites or accessing Customer data or systems, to the extent Customer has notified Supplier in writing of such safety and security policies.  Supplier is responsible for the acts and omissions of Supplier Personnel.

4.4    Project Managers/Key Personnel. For each Transaction Schedule, each Party will designate a project manager ("**Project Manager**") to serve as the primary contact between them.  The scope and conduct of the Supplier's performance hereunder will be consistent with the applicable Transaction Schedule and must be coordinated with Customer's Project Manager.  The Parties may also designate in a Transaction Schedule any Supplier Personnel that have been identified as having key positions for a particular Transaction Schedule ("**Key Personnel**").  Supplier will ensure the continuity of any individual (whether a Supplier employee or subcontractor) performing Services hereunder (including those Supplier Personnel expected to work on Customer's premises).  Supplier will obtain Customer's prior approval before any reassignment of any Supplier Project Manager or Key Personnel to another Supplier client (unless such reassignment is requested by the Supplier Personnel as a result of personal or family reasons).

4.5    Removal and Replacement of Supplier Personnel.  If Customer reasonably believes that any Supplier Personnel or their performance to be unsatisfactory and so notifies Supplier, Supplier and Customer will promptly meet in an effort to address

U02

3

Customer's concern on a mutually satisfactory basis. If Customer's concerns have not been addressed to Customer's reasonable satisfaction within thirty (30) days after Customer's initial notice to Supplier, Customer may require Supplier to replace the individual in question with another individual having suitable qualifications for the assignment. There will be no charge to Customer for any replacement personnel assigned by Supplier until Customer confirms that such replacement has the necessary skills and acquired the necessary orientation and background to make a productive contribution. This provision does not in any way require, endorse or approve (expressly or impliedly) the termination of employment by Supplier of any person replaced under the terms of this paragraph.

4.6     Subcontracting. Supplier may subcontract the performance of Services only in accordance with the following:

        4.6.1   Supplier may, in the ordinary course of business and without obtaining Customer's prior written approval, utilize third party services or products that are not dedicated to performance of Services for Customer and that are not a material aspect of Supplier's Services under a particular Transaction Schedule.

        4.6.2   Except as set forth in Section 4.6.1 above, Supplier will obtain the prior written approval of Customer for all Supplier subcontractors performing Services under a particular Transaction Schedule.

4.7     Non-Disclosure Agreements. Supplier will, in advance, require each Supplier Personnel and each of its other personnel who obtain or are in a position to obtain any Confidential Information of Customer and/or Customer Sensitive Data to execute a Non-Disclosure Agreement ("**NDA**") in the form attached hereto as Exhibit 3. Supplier will provide Customer with a true copy of each such NDA upon request. Supplier further agrees to take any other steps reasonably required or appropriate to ensure compliance with the obligations set forth herein.

4.8     Competitive Projects. Supplier acknowledges that the Services performed for Customer may relate to past, present or future strategies, plans business activities, methods, processes and/or information which afford Customer competitive or strategic advantages. To further ensure the protection of Customer's interests in this regard and unless otherwise provided in the applicable Transaction Schedule, Supplier agrees that during the term of any Transaction Schedule Supplier will not assign or utilize any Supplier Personnel assigned to perform Services for Customer thereunder, to perform services for or in support of any Competitor of Customer or a Competitive Project. For purposes of this section "**Competitor**" is defined as any person, firm or enterprise conducting a business or providing or supporting a product or service substantially similar to any of Customer's, and "**Competitive Project**" is defined as any task or work effort whose intent or result is or will be substantially similar to any contemplated by such Transaction Schedule.

U02

4

## ARTICLE 5: STATUS REPORTS

On a monthly basis (or as otherwise specified in the applicable Transaction Schedule), Supplier will submit written status reports describing its activities including: (a) the current status of activities (with explanatory narrative when appropriate); (b) for time and materials engagements, resources used since the last report, and for fixed price engagements percentage completion of project, and a cumulative total, including in each case where applicable fees, time and materials expended against budget since the effective date of the Transaction Schedule;  and (c) identification of any problems and all actions taken to resolve them, and the current status of any such problems. Upon request, Supplier will meet with Customer's personnel at no additional charge to review the status of Supplier's activities.

## ARTICLE 6:  PERFORMANCE

6.1     In General.  Except as otherwise expressly provided otherwise in the Master Agreement or any Transaction Schedule, Supplier will be responsible for providing all facilities, personnel and other resources as necessary to perform the Services purchased by Customer pursuant to each Transaction Schedule.

6.2     Service Locations.  If applicable, each Transaction Schedule will identify at which Customer site Supplier is required to perform any on-site Services.  In addition, a Transaction Schedule may specify the Supplier facilities (or facilities of a Supplier subcontractor) at which (or from which) certain Supplier Services are to be provided.

6.3     Time of Performance.  Supplier will complete the Services diligently and in accordance with any time frames set forth in the applicable Transaction Schedule. Supplier will promptly notify Customer upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely and successful performance and completion of any Deliverable or Service.

6.4     Manner of Performance.  Supplier's performance under a Transaction Schedule, and the performance of Supplier's Deliverables, will be in accordance with all applicable requirements of the Transaction Schedule, including any service levels or other specific standards of performance set forth therein.

6.5     Supplier Quality Assurance.  In performing the Services purchased by Customer, Supplier will follow quality assurance procedures to ensure that, as applicable, the Services have been performed with a high degree of professional quality and reliability.

6.6     Cooperation and Coordination.  If Customer performs itself, or retains a third party to perform, any services that interface or interact with Supplier's Services,

Supplier will cooperate and coordinate with Customer or such third party as reasonably requested or required by such third parties to perform their duties.

6.7   Intentionally Omitted.

6.8     Acceptance. Each Deliverable will be subject to Acceptance by Customer in accordance with the procedures set out in this Article.  Unless otherwise agreed to in writing by the Parties in an applicable Transaction Schedule, the acceptability of any Deliverable will be based on Customer's determination that the Deliverable either (a) meets the applicable Acceptance Criteria in all material respects, or (b) if there are no applicable Acceptance Criteria, meets Customer's reasonable satisfaction.  If any Deliverable does not meet the forgoing requirements for Acceptance, Customer will notify Supplier specifying its reasons in reasonable detail, and Supplier will, at no additional cost to Customer, promptly conform the Deliverable to the applicable Acceptance Criteria or as needed to meet Customer's reasonable satisfaction, as applicable.  If within ten (10) days of notification by Customer (or such other time period as the Parties may agree in writing), any Deliverable still does not meet the Acceptance Criteria in all material respects, or does not meet Customer's reasonable satisfaction, as applicable, Customer may, at its option and without obligation or liability of any kind:  (i) terminate the applicable Transaction Schedule, in whole or in part, or (ii) without prejudice to Customer's right to implement (i) above, extend the time for Supplier to correct the affected Deliverable.  When a Deliverable provided to Customer for review is determined by Customer to meet the applicable Acceptance Criteria or Customer's reasonable satisfaction, as applicable, Customer will notify Supplier in writing of its Acceptance.

6.9     Wind-Down Assistance.

6.9.1. If Supplier's provision of the Services under a Transaction Schedule ceases for any reason except for non-payment prior to completion of the Services or Deliverables to be provided under such Transaction Schedule, Supplier will wind down its performance in an orderly manner, including by using Commercially Reasonable Efforts to assist Customer in the orderly transfer of the affected Services and the transfer of all Deliverables, work-in-progress, and other materials as may facilitate the orderly, non-disrupted business continuation of Customer.  In addition, if Customer plans to continue the affected project itself or to use another service provider, Supplier will provide such other cooperation and assistance as Customer may reasonably request to permit Customer and/or its designee(s) to assume and otherwise take over performance of the affected project.

6.9.2. Such wind-down assistance will be deemed to be governed by the terms and conditions of the applicable Transaction Schedule notwithstanding its earlier termination or expiration, other than any terms or conditions that do not reasonably apply to the wind-down assistance.  Customer will compensate Supplier for any wind-down assistance requested by Customer on a time and materials basis at the rates

U02

applicable under the Transaction Schedule at the time of termination, or if none were so provided, at Supplier's then prevailing rates for such services, or on such other basis as may be mutually agreed by the Parties; *provided, however,* that Customer's payment for such assistance will be without prejudice to any right Customer may have to claim that such amounts paid by it constitute recoverable damages under the Transaction Schedule. If the affected Transaction Schedule is being terminated by Supplier, as permitted by the Transaction Schedule, for non-payment of undisputed amounts, then Supplier may condition its provision of the wind-down assistance on Customer's pre-payment or reasonable assurances of payment for such assistance.

6.10   Compliance with Laws.   Supplier agrees to obtain all necessary regulatory approvals, licenses and/or permits applicable to its business, and Supplier will comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority.

## ARTICLE 7: SUPPLIER COMPENSATION

7.1   Fees and Expenses.   The applicable prices and/or rates and allowable reimbursable expenses for Services purchased from Supplier will be specified in the applicable Transaction Schedule. In no event will any charges to Customer by Supplier exceed the prices or rates set forth in the applicable Transaction Schedule, or if prices or rates are not set forth in the applicable Transaction Schedule, Supplier's best available published rates then in effect, which published rates will be provided to Customer upon request. Such Supplier prices and rates will be subject to any agreed discounts, most favored customer or similar arrangement between the Parties set forth in the Master Agreement or the applicable Transaction Schedule.

7.2   Taxes.   Customer will pay all sales, use, property, ad valorem, value added or similar taxes imposed as a result of the Services and/or Deliverables provided by Supplier hereunder, exclusive of corporate business and franchise taxes, taxes based on Supplier's income or gross receipts, withholding taxes and personnel-related taxes. If the transaction contemplated by this Master Agreement is exempt from tax, Customer will provide Supplier with a valid exemption certificate or other evidence of such exemption in a form reasonably acceptable to Supplier. Supplier will, at its own expense, use Commercially Reasonable Efforts to recover refundable or recoverable taxes. Each Party will cooperate with the other in minimizing applicable tax. Supplier will provide to Customer, in a form reasonably acceptable to Customer, original or certified copies of all tax payment receipts or other evidence of payment of taxes by Supplier with respect to transactions or payments under this Master Agreement.

7.3   Payment Terms.

7.3.1  Unless another payment schedule is specified in the applicable

U02

7

Transaction Schedule, Supplier will invoice Customer (a) after Customer's acceptance of the Deliverables (or other agreed payment milestones) in the case of Services performed on a fixed price basis, or (b) monthly in arrears for all other charges, including charges for Services priced on a variable unit rate or time and materials basis, and for out-of pocket costs and expenses; *provided, however,* that Supplier will submit to Customer's project manager the amounts to be invoiced for review prior to actual invoicing. For Services performed on a time and materials basis, Supplier will also submit time reports to Customer showing the hours worked during the billing period by each Supplier Personnel, with copies of individual time tracking sheets. To the extent applicable, in addition to the charge(s), each invoice will contain a listing of the following: (a) the type, quantity and serial number (if any), (b) any discounts, (c) applicable taxes and transportation and other costs, and (d) shipping date(s).

7.3.2   Except for amounts disputed by Customer, validly rendered Supplier invoices will be payable within sixty (60) days after Customer's receipt of the invoice. Any such dispute will not affect Supplier's right to payment of undisputed amounts and expenses or the Parties' obligations to perform hereunder.

7.4     Intentionally Omitted

7.5     Audit.

7.5.1. Record Retention and Inspection. During the term of each Transaction Schedule and for a period of at least three (3) years after the date of the final payment under such Transaction Schedule, Supplier will maintain complete and accurate accounting records in connection with Deliverables provided and Services performed under such Transaction Schedule, in accordance with generally accepted accounting principles applied on a consistent basis, to substantiate its charges thereunder. Such records will include, without limitation, payroll records, attendance cards, time tracking sheets and job summaries. Supplier will provide Customer or its designees access to such records for audit purposes during the term of each Transaction Schedule and for three (3) years after the date of the final payment under such Transaction Schedule.

7.5.2. Overcharges. If any audit reveals that Customer has overpaid any amounts, Supplier will remit to Customer such amounts due within thirty (30) days after receiving from Customer an invoice therefor. If any audit reveals that Customer has overpaid any amounts under a particular Transaction Schedule (exclusive of reimbursable expenses and taxes) during the audited period by ten percent (10%) or more of the total charges payable under such Transaction Schedule during such period, Supplier will, within thirty (30) days after receiving an invoice therefor, reimburse Customer for all reasonable fees and expenses incurred to conduct the audit and otherwise detect and rectify such overpayment.

U02

## ARTICLE 8:  REPRESENTATIONS, WARRANTIES AND COVENANTS

Supplier represents, warrants and covenants as follows, which representations, warranties and covenants will be considered to be given anew for each Transaction upon the execution of each applicable Transaction Schedule:

8.1    Authority.  Supplier has the requisite corporate power and authority and the right (a) to enter into the Master Agreement and each Transaction Schedule, (b) to provide the Deliverables, works and information thereunder, and (c) to perform the Services thereunder.

8.2    No Improper Inducements.  Supplier is familiar with, has complied with, and will comply, in all respects, with the laws and regulations regarding the offering of unlawful or improper inducements (including the U.S. Foreign Corrupt Practices Act, as amended, and other anti-corruption and anti-bribery laws), as applicable to its relationship with Customer, and with any other applicable Customer policies regarding inducements of which Supplier has been given notice.  If at any time during the term of this Master Agreement, Supplier breaches the foregoing representation, warranty and covenant, then, in addition to any other rights Customer may have under the Master Agreement, at law or in equity, Customer may terminate the Master Agreement and/or any affected Transaction Schedules.

8.3    (a) Supplier Personnel will observe and comply with Customer's security procedures, rules, regulations, policies and, except in cases of emergency repairs requested by Customer, working hours and holiday schedules; and (b) in performing Services at Customer locations, Supplier Personnel will use Commercially Reasonable Efforts to minimize any disruption to Customer's normal business operations.

8.4    Without detracting from the generality of any provisions set forth elsewhere in the Master Agreement, Supplier will comply with Customer's legal compliance policy requirements as they are provided to Supplier and to the extent they are applicable to Supplier's performance under or in relation to performance of Services under any Transaction Schedule.

8.5    No Deliverable and/or other materials provided by Supplier or Services performed by Supplier (whether directly or indirectly through its agents and/or subcontractors), nor the use thereof by Customer, will constitute an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Right of any third party.

8.6    Equal Opportunity and Affirmative Action Requirements.  To the extent applicable, the equal employment opportunity and affirmative action requirements set forth in 41 C.F.R. Part 60-1.4(a) (women and minorities), 41 C.F.R. Part 60-250.5(a) (covered veterans) and 41 C.F.R. Part 60-741-5(a) (individuals with disabilities) are

U02

9

hereby incorporated by reference into this Master Agreement.

8.7    DISCLAIMER OF IMPLIED WARRANTIES. EXCEPT AS SPECIFICALLY
PROVIDED IN THE MASTER AGREEMENT OR IN A TRANSACTION SCHEDULE,
THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, EXPRESSED OR
IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR
FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 9:  CONFIDENTIAL INFORMATION AND DATA PROTECTION

9.1    Confidential Information.  "**Confidential Information**" means any information
obtained by a Party (the **"Receiving Party"**) from or on behalf of the other Party (the
**"Disclosing Party"**) that relates to the past, present or future business activities of the
Disclosing Party or its subsidiaries or affiliates, or their respective employees,
customers or third party suppliers or contractors, including the terms and conditions of
the Master Agreement, information exchanged in the course of negotiating Transaction
Schedules, any Transaction Schedule, and any information relating to the applicable
entity's (or person's) plans, pricing, methods, methodologies, processes, financial data,
lists, Intellectual Property Rights, customer information, apparatus, statistics, programs,
research, development, and/or information technology.

9.2    Exceptions.  Confidential Information does not include any particular information
that the Receiving Party can demonstrate is (a) currently in the public domain,
(b) previously known to the Receiving Party free from any obligation to keep it
confidential, (c) publicly disclosed by or on behalf of the Disclosing Party either prior to
or subsequent to the receipt of such information by the Receiving Party,
(d) independently developed by the Receiving Party without any access to or use of
Confidential Information of the Disclosing Party, or (e) rightfully obtained by the
Receiving Party from a third party lawfully in possession of the Confidential Information
and who is not bound by confidentiality obligations to the Disclosing Party.

9.3    Treatment of Confidential Information.  The Receiving Party will hold all
Confidential Information of the Disclosing Party in trust and confidence for the
Disclosing Party and, except as set forth in the Master Agreement or as otherwise may
be authorized by the Disclosing Party in writing, the Receiving Party will not disclose to
any person, firm or enterprise, or use for its own benefit, any Confidential Information of
the Disclosing Party.  The Receiving Party will treat all Confidential Information of the
Disclosing Party with the same degree of care that the Receiving Party treats its own
confidential or proprietary information, but in no event less than using standards of
reasonable care.  The Receiving Party may disclose Confidential Information of the
Disclosing Party to the Receiving Party's employees, and to any of the Receiving
Party's contractors who are bound to the Receiving Party by confidentiality obligations
substantially equivalent to those set forth in this Article, solely as required in order for
the Receiving Party to perform its obligations under the Master Agreement or a

U02

Transaction Schedule, or in the case of Customer, to receive the Services and/or to use the Deliverables.  In addition, in the case of Customer, Customer may also disclose Supplier's Confidential Information to employees of its parent, subsidiaries and affiliates. The Receiving Party may disclose Confidential Information of the Disclosing Party if required to do so under applicable law, rule or order provided that the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of the required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy, and provided further that the Receiving Party discloses no more Confidential Information of the Disclosing Party than is reasonably necessary in order to respond to the required disclosure.

9.4    Customer Sensitive Data.  Supplier hereby acknowledges that Customer is subject to certain privacy and information security laws and regulations, pursuant to which Customer is required to ensure that Supplier appropriately safeguards personal or financial information regarding Customer's former, current or prospective clients or employees ("**Customer Sensitive Data**").  To the extent that Supplier receives any Customer Sensitive Data as a result of any exchange of information under the Master Agreement or a Transaction Schedule, and notwithstanding anything to the contrary contained in the Master Agreement, Supplier agrees that it will (a) not disclose or use any Customer Sensitive Data except to the extent necessary to carry out its obligations under the Master Agreement or a Transaction Schedule and for no other purpose, (b) not disclose Customer Sensitive Data to any third party, including its third party service providers without the prior written consent of Customer and subject to the further requirements of this Section except as set forth in any Transaction Schedule, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Customer Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems, policies and procedures as Customer may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Customer Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Customer notice thereof, and such further information and assistance as may be reasonably requested.  With respect to any third party provided access to Customer Sensitive Data pursuant to subsection (b) of this Section, Supplier will enter into a written agreement with such third party requiring safeguarding of Customer Sensitive Data in a manner no less restrictive than Supplier's obligations under the Master Agreement, and including those affirmative obligations described in this Section.

9.5    Return of Information.  At any time at the request and option of the Disclosing Party and in the event of termination or expiration of the Master Agreement (or any part thereof) or any applicable Transaction Schedule, the Receiving Party agrees to promptly:  (a) return to the Disclosing Party the Confidential Information and/or Customer Sensitive Data, as applicable; or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Customer Sensitive Data, as applicable and, if requested by the Disclosing Party, acknowledge in writing that all such

U02

11

Confidential Information and/or Customer Sensitive Data, as applicable, has been destroyed or permanently erased. Notwithstanding the foregoing, each party may retain copies of the Confidential Information and/or Customer Sensitive Data, as applicable, to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information and/or Customer Sensitive Data, as applicable, will remain subject to the terms and conditions herein.

9.6    Title. The Parties acknowledge and agree that any disclosure of Confidential Information, and in the case of Customer, Customer Sensitive Data, will in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such Confidential Information or Customer Sensitive Data. In addition, Customer's obligations under this Article with respect to Supplier's Confidential Information will not be construed to limit Customer's rights to own or use intellectual property under the Master Agreement and any applicable Transaction Schedules.

9.7    Injunctive Relief. In the event of a breach or threatened or attempted breach of the provisions of this Article, the Disclosing Party may have no adequate remedy in money or damages and, accordingly, may immediately seek an injunction against such breach.

## ARTICLE 10: INTELLECTUAL PROPERTY RIGHTS

10.1    Title. Supplier acknowledges that Customer will have exclusive, unlimited ownership rights to the works performed or created under each Transaction Schedule and all materials, information and/or Deliverables prepared or developed as a result of the Services provided thereunder, both as individual items and/or as a combination of components and whether or not the Transaction Schedule is completed. All of the foregoing will be deemed to be works made for hire and made in the course of Services rendered under the applicable Transaction Schedule and will belong exclusively to Customer from the moment of their creation, with Customer having the sole right to obtain, hold and renew, in its own name and/or for its own benefit, patents, copyrights, trademarks, trade secrets, registrations and/or other appropriate Intellectual Property Rights protection. To the extent that exclusive title and ownership rights may not originally vest in Customer as contemplated hereunder, Supplier hereby irrevocably assigns, transfers and conveys to Customer all right, title and interest therein. Supplier and its personnel will give Customer, and any Customer designee, all reasonable assistance and execute all documents necessary to assist or enable Customer to perfect, preserve, register, record, enforce and defend its rights in any such works, materials, information and/or Deliverables. Supplier will, immediately upon request of Customer, or upon the termination, cancellation or expiration of each Transaction Schedule, turn over to Customer all materials, information and/or Deliverables prepared or developed as a result of any Transaction Schedule, and any Customer documents or other materials held by or on behalf of Supplier, together with all copies thereof. Supplier will enter into written agreements with Supplier Personnel involved in performance under this Master Agreement as may be necessary to ensure Customer's rights under this Article.

U02

10.2   Independent IP.  Nothing herein will be construed to restrict, impair or deprive either Party of any of its rights or proprietary interest in intellectual property or technology that existed prior to and independent of the provision of works, materials, information and/or Deliverables prepared under a Transaction Schedule or developed as a result of Services performed under a Transaction Schedule.  Notwithstanding any of the foregoing, if any such pre-existing or independent intellectual property or technology are incorporated into, combined with, or required for the operation or provision of any works, materials, information and/or Deliverables prepared under a Transaction Schedule or developed as a result of Services performed under a Transaction Schedule, then Supplier hereby grants to Customer (and its affiliates and its contractors under contract to provide services to Customer or its affiliates (provided that such contractors' use shall be limited solely to providing such services)), at no additional charge, a non-exclusive, fully paid up, perpetual, irrevocable, assignable (in accordance with the terms hereof), worldwide license to use, execute, copy, perform, distribute copies of, maintain, modify, enhance, and create derivative works of  such independent intellectual property or technology, unless other terms are expressly agreed to by Customer in writing in the applicable Transaction Schedule.

## ARTICLE 11:  INSURANCE

11.1   Forms of Insurance. Supplier agrees to obtain and maintain and keep in full force and effect, at Supplier's expense, the forms of insurance with the minimum limits of insurance stated in Exhibit 4.

11.2   Coverage. All insurance coverage required herein will provide primary coverage, without contribution from other insurance, for all losses and damages caused by the perils or causes of loss covered thereby.  Supplier agrees to have included in each of the insurance policies required herein, a waiver of the insurer's rights of subrogation against Customer, its subsidiaries and affiliates and its insurers.

11.3   Certificates of Insurance. Each insurance policy will be maintained with an insurer having a rating of at least an "A-" in the most currently available Best's Insurance Reports and will provide for at least thirty (30) days prior written notice to Customer in the event of any modification or cancellation.  Supplier will furnish Customer with certificates of insurance in satisfactory form, evidencing its compliance with these provisions.

## ARTICLE 12:  TERM AND TERMINATION

12.1   Generally.  This Master Agreement will commence as of the Effective Date and will continue in full force and effect thereafter unless and until terminated as provided herein.

12.2   Termination by Customer.

U02

13

12.2.1 <u>For Convenience</u>.

(a)    If, at any time, there are no outstanding Transaction Schedules in effect, Customer may terminate this Master Agreement upon written notice to Supplier without liability for any charges of any kind.

(b)    Customer may terminate any Transaction Schedule for convenience by giving Supplier at least thirty (30) days' prior written notice specifying the termination date (or such other period of advance notice as may be specified in the applicable Transaction Schedule). In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all Deliverables delivered and Services performed up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

12.2.2 <u>For Supplier Insolvency</u>. Customer may terminate any Transaction Schedule(s) upon written notice specifying the termination date if Supplier becomes insolvent or unable to pay its debts as they come due or enters into or files (or has filed or commenced against it) a petition, arrangement, application, action or other proceeding seeking relief or protection under the bankruptcy laws of the United States or any similar laws of the United States or any state of the United States or any other country or transfers all or substantially all of its assets to another person or entity. In such event, Customer will be obliged to pay Supplier at the contracted rates for all Services performed and Accepted up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

12.2.3 <u>For Cause</u>. In the event of any material breach of the Master Agreement or a Transaction Schedule by Supplier, Customer may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved or affected by such breach, in whole or in part, by giving Supplier thirty (30) days' prior written notice of termination thereof; *provided, however,* that such termination will not be effective if Supplier has cured the breach of which it has been notified prior to the expiration of such thirty (30) day notice period.

12.2.4 <u>Termination Notices</u>. Notice of termination under this Section of any specific Transaction Schedule will not be effective as notice of termination of the Master Agreement (or any part thereof) or any other Transaction Schedules then in effect unless specifically stated in the notice; provided, further, that any such notice that purports to be notice of termination of this Master Agreement will not be considered or effective as notice of termination of this Master Agreement unless such notice specifically states that all Transaction Schedules have been terminated and/or expired.

12.3    <u>Termination by Supplier</u>.

U02

12.3.1 <u>For Convenience</u>.

(a)    If, at any time, there are no outstanding Transaction Schedules in effect, Supplier may terminate this Master Agreement upon written notice to Customer without liability for any charges of any kind.

(b)    Supplier may terminate any Transaction Schedule for convenience by giving Customer at least sixty (60) days' prior written notice specifying the termination date (or such other period of advance notice as may be specified in the applicable Transaction Schedule). In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all Deliverables delivered and Services performed up to the effective date of termination.

12.3.2 <u>For Cause.</u> In the event Customer (a) breaches in a material respect its obligation to pay any undisputed fees under a particular Transaction Schedule, or (b) fails to meet its confidentiality obligations under the Master Agreement with respect to a particular Transaction Schedule such that Customer materially breaches the Master Agreement or the applicable Transaction Schedule, then Supplier may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved by giving Customer thirty (30) days' prior written notice thereof; *provided, however,* that any such termination will not be effective if Customer has cured such material breach prior to the expiration of such thirty (30) day period. In such event, Customer will be obliged to pay Supplier at the contracted rates for all Deliverables accepted and Services performed up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

## ARTICLE 13: INDEMNIFICATION

13.1    <u>"Claim" and "Losses" Defined</u>.    **"Claim"** means any demand, or any civil, criminal, administrative, or investigative claim, action, or proceeding (including arbitration) asserted, commenced or threatened against an entity or person. **"Losses"** means all judgments, awards, settlements, liabilities, damages, liens and claims, and all related costs, expenses and other charges suffered or incurred as a result of or in connection with a Claim, including reasonable attorneys' fees and disbursements, costs of investigation, litigation, settlement and judgment, and any taxes, interest, penalties and fines with respect to any of the foregoing.

13.2    <u>Indemnification by Supplier</u>.    Supplier will, at its sole cost and expense, indemnify, defend and hold harmless Customer and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assigns (collectively, **"Customer Indemnitees"**) from and against any

U02

15

and all Losses suffered or incurred by any of them arising out of or in connection with a Claim of or for any of the following, whenever made:

13.2.1 that any Deliverable(s), works, information, material(s) and/or Services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Rights of a third party; or

13.2.2 that Supplier has failed to comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority; or

13.2.3 for death or bodily injury, or the damage, loss or destruction of real or tangible personal property of third parties (including employees of Customer and Supplier and their respective subcontractors) brought against a Customer Indemnitee and alleged to have been caused by the fault or negligence of Supplier, its officers, personnel (including Supplier Personnel), agents and/or representatives; or

13.2.4 by or on behalf of any subcontractors or independent contractors of Supplier, or any of Supplier's personnel (including Supplier Personnel); or

13.2.5 (a) in respect of Supplier's obligations as an employer of its personnel (including any Supplier Personnel), or (b) any claim or action alleging that a Customer Indemnitee should be deemed the "employer" or "joint employer" of any of Supplier's personnel (including any Supplier Personnel).

13.3   Indemnification Procedures.   Customer agrees to give Supplier prompt written notice of any Claim for which a Customer Indemnitee seeks indemnification; provided, however, any failure by Customer to provide such notice will not relieve Supplier of its indemnification obligations under the Master Agreement except to the extent Supplier can demonstrate actual prejudice as a result of such failure. Within thirty (30) days after receiving Customer's notice of a Claim, but no later than ten (10) days before the date on which any formal response to the Claim is due, Supplier will notify Customer in writing as to whether Supplier acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the Claim (a **"Notice of Election"**). If Supplier delivers a timely Notice of Election to Customer, Supplier will have the right to conduct the defense of the Claim and, consistent with the rights of Customer Indemnitees hereunder, all negotiations for its settlement; *provided, however,* that the Customer Indemnitee(s) may participate in such defense or negotiations to protect its (or their) interests (at its own expense) and that any settlement will be for the payment of money by Supplier and will not, without the prior written approval of Customer, obligate or impose liability on Customer or any Customer Indemnitee in any way, including without limitation, to any determination or admission regarding Customer's or any Customer Indemnitee's interest. If Supplier does not deliver a timely Notice of Election, the affected Customer Indemnitee(s) may defend and/or settle the Claim in such manner as it (or they) may deem appropriate, at the cost and expense of Supplier,

including payment of any settlement, judgment or award and the reasonable costs of defending or settling the Claim. Supplier will promptly reimburse the Customer Indemnitee(s) upon demand for all Losses suffered or incurred as a result of or in connection the Claim.

## ARTICLE 14:  LIMITATION OF LIABILITY

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; *PROVIDED, HOWEVER,* THAT THE FOREGOING LIMITATION OF LIABILITY WILL NOT APPLY TO ANY OF THE FOLLOWING: (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PROTECTION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; OR(C) ANY  GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.

## ARTICLE 15: RULES OF CONSTRUCTION

15.1   Entire Agreement.  The Master Agreement constitutes the entire agreement between the Parties with respect to its subject matter contained therein, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to such subject matter.  When executed by both Parties, each Transaction Schedule will constitute the entire agreement between the Parties with respect to its subject matter, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to the subject matter thereof.

15.2   Amendment.  No modification or amendment of, or supplement to, the Master Agreement or any Transaction Schedule, or any provisions thereof, will be binding upon the Parties unless made in writing and signed by a duly authorized representative of both Parties.

15.3   Governing Law and Jurisdiction.  In all respects the Master Agreement and each Transaction Schedule will be governed by and construed in accordance with the substantive laws of the State of New York without regard to conflict of law principles. Any claim or action brought by one of the Parties connection with the Master Agreement or a Transaction Schedule will be brought in the appropriate Federal or State court located in the County of New York, and the Parties irrevocably consent to the exclusive jurisdiction of such court.

U02

15.4    Third Party Beneficiaries.  Except as expressly set forth herein, no person not a Party hereto will be a third party beneficiary of any provision of the Master Agreement or any Transaction Schedule.  Notwithstanding the foregoing, it is agreed that Customer Indemnitees are not such excluded third party beneficiaries.

15.5    Waiver.  At no time will any failure or delay on the part of any Party in exercising any right or remedy provided in the Master Agreement or in any Transaction Schedule operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at law or in equity.

15.6    Remedies Not Exclusive.  Except as expressly provided herein, no remedy specified in the Master Agreement or in any Transaction Schedule is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other right or remedy provided herein or available at law or in equity.

15.7    Headings.  Headings in the Master Agreement and in the Transaction Schedule(s) are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

15.8    Section References.  Unless otherwise indicated or required by the context, references to articles and sections of the Master Agreement and any Transaction Schedule(s) also refer to and include all sections and subsections of the referenced article or section.

15.9    Use of Certain Words.  Unless the context requires otherwise, (a) **"including"** (and any of its derivative forms) means including but not limited to, (b)  **"will"** and **"shall"** are expressions of command, not merely expressions of future intent or expectation, and (c) use of the singular imports the plural and vice versa.

15.10  Severability.  If any term, provision or part of the Master Agreement or any Transaction Schedule is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of the Master Agreement or Transaction Schedule, as applicable, will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.

15.11  Survival.  Any provision of the Master Agreement or any Transaction Schedule that contemplates performance or observance subsequent to termination or expiration of the Master Agreement or such Transaction Schedule (including confidentiality and data protection, limitation of liability, indemnification provisions and perpetual licenses)

U02

18

will survive termination or expiration of the Master Agreement or such Transaction Schedule, as applicable, and continue in full force and effect thereafter.

15.12  Counterparts.  The Master Agreement and any Transaction Schedule may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  A facsimile of a signed copy of the Master Agreement or other copy made by reliable mechanical means may be relied upon as an original.

15.13  Other Purported Agreements.   Neither the Master Agreement nor any Transaction Schedule may be supplemented, modified, or governed by any shrink-wrap or click-wrap agreement or any confirmation, acknowledgement, or other sales or shipping form of Supplier, or executed via electronic signature, unless Customer first agrees in a writing that is not an electronic communication to be bound by such purported agreements.

## ARTICLE 16:  GENERAL

16.1    Binding Nature and Assignment.  Neither Party may assign this Master Agreement or any Transaction Schedule (whether by operation of law or otherwise) without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed.  Any purported assignment in breach of this Section will be void. Notwithstanding the foregoing, in the event that Customer files for protection under the United States Bankruptcy Code, the trustee of Customer's bankruptcy estate may assume this Master Agreement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier, and Supplier hereby consents to such assumption. In addition, either Party may assign this Master Agreement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier to (a) any Customer entity; (b) in the case of any merger or sale of its stock or assets, to the successor in a merger of Customer or to any entity that acquires all or substantially all of its stock or assets, or (c) any service provider contracted by Customer to perform data processing, facilities management or other outsourced services on Customer's behalf.

16.2   Notices.

16.2.1 All formal notices and communications relating to the Master Agreement or any Transaction Schedule will be in writing and delivered personally, by overnight delivery service or by first class prepaid mail with return receipt requested to (a) in the case of Supplier, its address as first set forth above and (b) in the case of Customer, to Director of Global Sourcing Services, 745 Seventh Avenue, New York, New York 10019, with a copy marked to the attention of the General Counsel at the same address.  A copy of each notice or communication relating to an affected Transaction

Schedule will also be sent to the applicable Parties' principal points of contact identified in the applicable Transaction Schedule.

16.2.2 Either party may change the address(es) or addressee(s) for notice hereunder upon written notice to the other. Any notice hereunder will be effective upon receipt by the Party to which such notice is addressed.

16.3   Force Majeure. Neither Party will be liable for delay or failure to perform its obligations hereunder caused by an event of natural disaster, casualty, acts of God, riots, terrorism, governmental acts or such other event of similar nature that is beyond the reasonable control of the Party seeking to rely in this Section to excuse its delay or failure provided such Party did not contribute in any way to such event. Supplier will maintain commercially reasonable disaster recovery plans to cure any such delays or failures. Supplier will keep the plans under review and make such changes, from time to time, as are required in accordance with industry best practice, and will make such plans available to Customer for review upon request. Notwithstanding the foregoing, if any Supplier delay or failure to perform that is attributable to a force majeure event continues beyond ten (10) calendar days, Customer will nevertheless have the right to terminate any affected Transaction Schedule, in whole or in part, with no further liability and receive a refund of any unearned, prepaid fees.

16.4   Publicity. Neither Party will use the name or marks of, refer to, or identify the other Party (or any related entity) in publicity releases, interviews, promotional or marketing materials, public announcements, customer listings, testimonials or advertising without the prior written consent of the other Party.

16.5   Subcontractors. . Supplier will be solely responsible for its subcontractors and will remain fully responsible at all times for providing the Services. Supplier will be Customer's sole point of contact regarding the Services (including Deliverables), including with respect to payment.

## ARTICLE 17: GLOSSARY OF DEFINED TERMS

Certain definitions of capitalized terms used in the Master Agreement and the Transaction Schedules are set out below. Other capitalized terms will have the meanings as assigned throughout the Master Agreement and the Transaction Schedules.

| Defined Term: | Meaning: |
| --- | --- |
| Acceptance | Customer's agreement that a Deliverable meets the applicable Acceptance Criteria. |
| Acceptance Criteria | The acceptance criteria, requirements and/or specifications |

| Defined Term: | Meaning: |
|---|---|
| | set out in the applicable Transaction Schedule. If no such criteria, requirements or specifications are provided for particular Deliverables, then the applicable Specifications. |
| **Commercially Reasonable Efforts** | Taking all such steps and performing in such a manner as a well managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit. |
| **Deliverable** | Any work product, in any form, resulting from performance of the Services that is either specifically identified as a Deliverable in a Transaction Schedule or is developed for Customer pursuant to a Transaction Schedule. |
| **Intellectual Property Rights** | All intellectual and industrial property rights, including copyrights, mask work rights, moral rights, trade secrets, patent rights, rights in inventions, trademarks, trade names, and service marks (including applications for, and registrations, extensions, renewals, and re-issuances of, the foregoing). |
| **Services** | Any functions, responsibilities, activities and/or tasks Supplier performs (whether directly or indirectly) or is responsible for performing under the Master Agreement or any Transaction Schedule. |
| **Specifications** | In the case of a Deliverable, as specified in the applicable Transaction Schedule or otherwise mutually agreed by Supplier and Customer. |
| **Supplier Personnel** | Any and all personnel assigned by Supplier to perform any part of the Services, including employees and independent contractors and agents of Supplier and any of its subcontractors. |

(The Next Page Is The Signature Page)

U02

The Parties have caused this Master Agreement to be executed by their respective duly authorized representatives.

**TeleCommunication Systems, Inc.
(SUPPLIER)**

By: _Richard A. Y_____

Name: _Richard A. Young_
     (Type, Print or Stamp)

Title: _COO_____

**Lehman Brothers Holdings Inc.
(CUSTOMER)**

By: _Janet Bradley_____

Name: _Janet Bradley_
     (Type, Print or Stamp)

Title: _Auth. Signatory_____

## EXHIBIT 1: FORM OF PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**Supplier Name: TeleCommunication Systems, Inc.**

**Supplier Address: 275 West Street, Annapolis, MD 21401**

**Supplier Jurisdiction of Incorporation: Maryland**

**Tax ID:** 52-1526369

**Telephone #: (443) 394-5167**

**Fax #: (410) 902-8741**

**Master Agreement No.: 000000016364**

**Master Agreement Effective Date: January 30, 2007**

**Order Date: February 1, 2007**

This Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced Master Agreement between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above. This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced Master Agreement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced Master Agreement, that form this Transaction Schedule

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all date and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
Annex 8: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the Master Agreement referenced above.

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives

| TeleCommunication Systems, Inc. (SUPPLIER) | Lehman Brothers Inc. (CUSTOMER) |
|---|---|
| By: _Richard A. Y___ | By: _Janet Bradley_ |
| Name:_Richard A. Young_ <br> (Type, Print or Stamp) | Name: _Janet Bradley_ <br> (Type, Print or Stamp) |
| Title: _COO_ | Title:_VP_ |

## ANNEX 1:  DESCRIPTION OF SERVICES

### A.  Services Overview.

TCS will be responsible for Wireless Support Services for all Lehman locations in the Americas, including on-site support at four (4) New York area offices.   Responsibilities include both remote and hands-on support of Lehman's wireless service needs.

On-site Metro NY locations include:
- 745 7th Ave.,New York, NY
- 399 Park Ave.,New York, NY
- 1301 6th Ave., New York, NY
- 70 Hudson St., Jersey City, NJ

Remote locations include:
- Americas Branch offices
- Americas Data Centers
- Mortgage Capital Division – Americas
- Additional subsidiary, affiliate or acquired companies not listed above will also require servicing as necessary.

Provide eight (8) wireless support technicians fulfilling these Wireless Support Service responsibilities on-site at Lehman Brothers locations.

### B. Detailed Description of Services.

TCS wireless support technicians will be required to be trained in the support for wireless devices including BlackBerry, cell phones, satellite phones, pagers, and WAN cards as well as handling all hardware/software supplier and carrier inquiries.  Support at the on-site locations will be one-on-one with the end user as requested and support for the remote locations will be provided via phone, e-mail, SMS and/or PIN to PIN with the end user.

Additional responsibilities include:
- Manage all wireless carrier inquiries and escalations for wireless network problems
- Adhere to Lehman's internal technical support policies and procedures
- Familiarity with basic wireless device diagnostic testing
- Ensure support technicians are properly trained on all  BlackBerry technical support procedures
- Provide support for BlackBerry Enterprise Server (BES) and future BES upgrades
- Configure devices to Lehman's standards
- Coordinate delivery of devices to users

- Train new users on device and software functionality and re-educate as needed
- Provide New York area users with one-on-one training of their wireless device and software
- Assist users with replacement devices as needed
- Manage all Change Requests, service terminations and device retrieval
- Provide emergency support for problems initiated during non-business hours as needed
- Maintain Lehman's Remedy system for all wireless technical support cases
- Perform periodic follow-up with users to gage satisfaction
- Monitor Help Desk activity trends and provide cumulative/monthly statistical reports with performance measurements
- Work with Lehman on decisions relative to support Staff hiring / addition / reduction

## ANNEX 2:  PROJECT PLANS, DELIVERY DATES AND MILESTONES

Phase I:
(Week of February 5)
- Transition planning meeting on-site at Lehman headquarters
- Detailed review of all current SLA's
- Familiarize TCS support management with Remedy system protocols and all Lehman business processes as required
- Screening of all planned TCS resources
- Educate TCS resources on Lehman procedures
- Allocate TCS Program Manager to be dedicated to project implementation and on-going oversight
- Familiarize Program Manager with contract, obligations and expectations

Phase II:
(Week of February 12)
- Finalize resource allocation and educate team on all procedures
- Prepare TCS corporate tech support resources for back-filling support as needed and prepare contingency plan
- Identify any processes that may need further review and confirm with Lehman management
- TCS Program Manager on-site to confirm all aspects of preparation and do a another review of system protocols

Phase III:
(Week of February 19)

- Continue preparation of support team resources and TCS corporate resources
- Conduct final review meeting with Lehman management and present all final details to ensure a seamless implementation is on track and meets Lehman expectations

Phase IV:
(Week of February 26)

- TCS Program Manager on-site for implementation start date: February 1st
- TCS Program Manager available to ensure all processes are implemented as required
- Present implementation report to Lehman management with summary of all objectives met and itemized list of areas requiring special attention

Phase V:
(Week of March 5)

- Review results of SLA metrics for initial 2 weeks of implementation
- Review status with Lehman management and plan for any enhancements as needed

- TCS Program Manager to work with Lehman on identifying new goals and initiatives for the short term

## ANNEX 3:  PRICES, FEES AND CHARGES

**Fixed-Price Basis.**

Fixed Price:  $78,000 per annum per individual provided by Supplier (including reimbursable expenses but excluding taxes).  This Transaction Schedule shall be in full force and effect for a period of one (1) year (the "Initial Term").  At the end of the Initial Term this Transaction Schedule shall automatically renew for successive one (1) year terms (the "Renewal Term").  Supplier may increase pricing not to exceed three and one-half percent (3.5%) of the pricing for the previous Term at the start of each Renewal Term.  The fixed price will be due and payable in monthly payments.

Customer shall pay to Supplier the amounts indicated in this Transaction Schedule for the Services performed by Supplier, and the Work Product, if applicable, delivered by Supplier and in accordance with the payment terms specified in this Annex 3.  Supplier will invoice Customer on a monthly basis in the amount of $6,500 per individual provided by Supplier per month.

Customer agrees to pay all invoices within thirty (30) days after receipt of invoice.

Invoices will be sent to:
Image Processing Systems
PO Box 2339
Secaucus, New Jersey 07096
C/O Lehman Brothers Accounts Payable Department

## ANNEX 4:  DELIVERABLE SPECIFICATIONS

**NOT APPLICABLE**

## ANNEX 5:  PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name:     Barry Oursler<br>Address: 275 West Street<br>             Annapolis, MD 21401 | Name:        Chad Fulgham<br>Address:      70 Hudson Street<br>                 Jersey City, NJ  07302 |
| Email:  boursler@telecomsys.com<br>Tel: 443-394-5324<br>Mob: 443-695-4047<br>Fax:   410-902-8741 | Email:  cfulgham@lehman.com<br>Tel:   +1 201 499 9797<br>Mob:<br>Fax:   646-834-4710 |

## ANNEX 6:  KEY PERSONNEL

**Eight (8) on-site wireless support individuals**

## ANNEX 7:  PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

| Priority | Core Hours | | Non Core Hours | | Conformance |
|---|---|---|---|---|---|
| | Response | Resolution | Response | Resolution | |
| Urgent | 15 minutes | 2 hours | 30 minutes | 2 hours | 95% within target |
| High | 15 minutes | 2 hours | 30 minutes | 2 hours | 95% within target |
| Medium | 4 hours | 8 hours | Best Eff | Best Eff | 90% within target |
| Low | 24 hours | 72hours | Best Eff | Best Eff | 90% within target |
| | | | | | |

Core Hours : 0700-1900

Non Core Hours : 1900-0700

## ANNEX 8:  ADDITIONAL AGREED-UPON PROVISIONS

\*\*\*  Covered in Annex 1

## EXHIBIT 2:  BACKGROUND SCREENING INFORMATION

Upon Customer's request and at Customer's expense, Supplier will promptly require any Supplier Personnel to provide to Customer a completed background and security questionnaire in the form provided by Customer and to undergo drug testing. Notwithstanding anything to the contrary in the Master Agreement, Customer may terminate the applicable Transaction Schedule or may require Supplier immediately to terminate the assignment of any Supplier Personnel if such Supplier Personnel: (a) does not promptly provide complete information (and fingerprint specimens) as provided such background and security questionnaire; or (b) does not undergo drug testing; or (c) if, in the sole judgment of Customer (i) the results of the background investigation or drug testing are unsatisfactory, (ii) any background information provided by such individual is inaccurate, or (iii) any background information provided by such individual cannot be verified to Customer's satisfaction.  Nothing contained in this Master Agreement will be construed to create any obligation on the part of Customer to disclose to Supplier or its personnel the reasons for its determination in this regard, or share any information obtained through its background investigation or drug testing, except to the extent otherwise required by law.

## EXHIBIT 3:  NON-DISCLOSURE AGREEMENT

I, the undersigned individual, am aware that a Lehman Brothers entity ("Lehman") and the company named below (hereinafter referred to as "Supplier") have entered into an agreement ("Agreement"), pursuant to which I may have access to Confidential Information (as defined below) and/or Lehman Sensitive Data (as defined below).  I understand that as part of its obligations under the Agreement, Supplier is required to obtain this written agreement ("Non-Disclosure Agreement") from certain of its personnel, including myself, to ensure understanding and compliance with its confidentiality and data protection obligations.

**1.**    **Confidential Information.**

**a) "Confidential Information"** means any information obtained from or on behalf of Lehman that relates to the past, present or future business activities of Lehman or its subsidiaries or affiliates, or their respective employees, customers or third party suppliers or contractors, including the terms and conditions of this Non-Disclosure Agreement and the Agreement and any information relating to Lehman's plans, pricing, methods, methodologies, processes, financial data, lists, intellectual property rights, customer information, apparatus, statistics, programs, research, development, and/or information technology.

**b)** Confidential Information does not include any particular information that can be demonstrated by the undersigned is (a) currently in the public domain and/or previously known to me, and in either case free from any obligation to keep it confidential, (b) publicly disclosed by Lehman either prior to or subsequent to receipt by the undersigned of such information, (c) independently developed by the undersigned without any access to or use of the Confidential Information, or (d) rightfully obtained by the undersigned from a third party lawfully in possession of the Confidential Information who is not bound by confidentiality obligations to Lehman.

**c)** I agree to hold all Confidential Information in trust and confidence for Lehman and, except as set forth in this Agreement or as otherwise may be authorized by Lehman in writing, I will not disclose to any person, firm or enterprise, or use for my benefit, any Confidential Information.  I will treat all Confidential Information with the same degree of care that I treat Supplier's confidential or proprietary information, but in no event less than using standards of reasonable care.  I may disclose Confidential Information to other Supplier employees, and to any other Supplier contractors who agree to confidentiality obligations substantially equivalent to those set forth in this Non-Disclosure Agreement, solely as required in order for Supplier to perform its obligations under the Agreement.  I may disclose Confidential Information if required to do so under applicable law, rule or order provided that I, where reasonably practicable and to the extent legally permissible, provide Lehman with prior written notice of the required disclosure so that Lehman may seek a protective order or other appropriate remedy, and provided further that I disclose no more Confidential Information than is reasonably necessary in order to respond to the required disclosure.

**2.**    **Lehman Sensitive Data.**  I hereby acknowledge that Lehman is subject to certain privacy and information security laws and regulations, pursuant to which

Lehman is required to ensure that I, and Supplier, appropriately safeguard personal or financial information regarding Lehman's former, current or prospective clients or employees ("**Lehman Sensitive Data**").  To the extent that I receive any Lehman Sensitive Data as a result of Supplier's performance under the Agreement, and notwithstanding anything to the contrary contained in this Non-Disclosure Agreement and the Agreement, I agree that I will (a) not disclose or use any Lehman Sensitive Data except to the extent necessary to carry out Supplier's obligations under the Agreement and for no other purpose, (b) not disclose Lehman Sensitive Data to any third party, including its third party service providers without the prior written consent of Lehman and Supplier and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Lehman Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems, policies and procedures as Lehman may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Lehman Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Lehman notice thereof, and such further information and assistance as may be reasonably requested.

**3.      Return of Confidential Information and Lehman Sensitive Data.**  At any time, at the request and option of Lehman, and in the event of termination or expiration of the Agreement or my termination as an employee or subcontractor of Supplier, I agree to promptly: (a) return to Lehman or Supplier, as directed by Lehman or Supplier, the Confidential Information and/or Lehman Sensitive Data, as applicable, in my possession or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Lehman Sensitive Data, as applicable, in my possession, and if requested by Lehman or Supplier, acknowledge in writing that all such Confidential Information and/or Lehman Sensitive Data, as applicable, has been destroyed or permanently erased.

**4.      Title.**  I acknowledge and agree that as between Lehman and myself, all of the Confidential Information and/or Lehman Sensitive Data, including any derivative works thereof, is, and will remain, proprietary to Lehman.  To the extent that exclusive title and ownership rights may not originally vest in Lehman, as contemplated hereunder, I hereby irrevocably assign, transfer and convey to Lehman all right, title and interest therein.

**5.      Obligations.**

**a)** In consideration of my future or continued assignment and responsibilities in connection with Supplier's performance under the Agreement, I hereby acknowledge, represent and confirm to Supplier and Lehman as follows:  (a) I have read the provisions of this Non-Disclosure Agreement and know of no agreements, obligations or restrictions which prevent or prohibit me from complying with them; (b) I will receive and maintain all Lehman information, perform services and conduct myself, in all respects, in a manner consistent with these obligations; and (c) I agree not to, directly or

indirectly, engage in or assist others to engage in, any activity or conduct which violates the provisions of this Non-Disclosure Agreement.

**b)** I understand that if I threaten to or actually breach or fail to observe any of the obligations set forth in this Non-Disclosure Agreement, Lehman may have no adequate remedy in money or damages and, accordingly, may seek an injunction against such breach; *provided, however,* that no specification herein of any particular legal or equitable remedy will be construed as a waiver, prohibition or limitation of any legal or equitable remedies.

**c)** I further understand that this Non-Disclosure Agreement is enforceable against me by Lehman.

**d)** I further agree that this Non-Disclosure Agreement will be governed by the laws of the State of New York, and I irrevocably agree to submit to the jurisdiction of the appropriate Federal or State court located in the County of New York.

COMPANY:

_____          _____
Print or Type Full Legal Name             Print or Type Your Name


_____          _____
Signature                                 Your Signature


_____          _____
Date                                      Date

## EXHIBIT 4: INSURANCE

| Form of Insurance | Minimum Limits of Insurance |
|---|---|
| (a) (1) Workers Compensation and (2) Employers Liability | As required by law $1,000,000 per occurrence (BI/disease) |
| (b) Professional Liability (aka Errors & Omissions Liability). Such insurance should be endorsed to cover services provided by subcontractors if any. | $5,000,000 per occurrence and aggregate |
| (c) Commercial General Liability on an occurrence basis, including premises operations, products and completed operations, contractual liability, and personal and advertising injury coverages. Supplier will name Lehman Brothers Holdings, Inc. and its subsidiaries and affiliates as an additional insured by certificate of insurance. | $1,000,000 per occurrence and aggregate |
| (d) Commercial Automobile Liability covering all leased, owned and non-owned vehicles and naming Lehman Brothers as an additional insured by certificate of insurance. | $1,000,000 per occurrence combined single limit for bodily injury and property damage liability |
| (e) Umbrella Liability on a follow form basis | $4,000,000 per occurrence and aggregate excess of the Commercial General Liability and Commercial Automobile Liability Insurance |
| (f) Fidelity Bond (aka Crime Insurance), including third party liability or client coverage and naming Lehman Brothers Holdings Inc, and its subsidiaries and affiliates as a loss payee by certificate of insurance. | $5,000,000 per occurrence and aggregate |

## PROFESSIONAL SERVICES TRANSACTION SCHEDULE #02

**Supplier Name: TeleCommunication Systems, Inc.**

**Supplier Address: 275 West Street, Annapolis, MD 21401**
**Supplier Jurisdiction of Incorporation: Maryland**
**Tax ID:** 52-1526369

**Telephone #: (443) 394-5167**

**Fax #: (410) 902-8741**

**Master Agreement No.: 000000016364**

**Master Agreement Effective Date: January 30, 2007**

**Order Date: February 1, 2008** *CON000000027972*

This Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced Master Agreement between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above. This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced Master Agreement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced Master Agreement, that form this Transaction Schedule.

Annex 1: Description of Services
Annex 3: Prices, Fees and Charges
Annex 5: Project Managers
Annex 6: Key Personnel
Annex 7: Performance Standards/Service Levels for Services
Annex 8: Additional Agreed-Upon Provisions

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the Master Agreement referenced above.

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives

| TeleCommunication Systems, Inc. (SUPPLIER) | Lehman Brothers Inc. (CUSTOMER) |
|---|---|
| By: _Bruce White_ | By: _Janet Bradley_ |
| Name: _BRUCE A. WHITE_ | Name: _Janet Bradley_ |
| (Type, Print or Stamp) | (Type, Print or Stamp) |
| Title: _VP_ | Title: _VP_ |

## ANNEX 1:  DESCRIPTION OF SERVICES

### A.  Services Overview.

TCS will be responsible for Wireless Support Services for all Lehman locations in the
Americas, including on-site support at four (4) New York area offices.   Responsibilities
include both remote and hands-on support of Lehman's wireless service needs.

On-site Metro NY locations include:
- 745 7th Ave.,New York, NY
- 399 Park Ave.,New York, NY
- 1301 6th Ave., New York, NY
- 70 Hudson St., Jersey City, NJ

Remote locations include:
- Americas Branch offices
- Americas Data Centers
- Mortgage Capital Division – Americas
- Additional subsidiary, affiliate or acquired companies not listed above will also
  require servicing as necessary.

Provide nine and one-half (9 ½) wireless support technicians fulfilling these Wireless
Support Service responsibilities on-site at Lehman Brothers locations.

### B. Detailed Description of Services.

TCS wireless support technicians will be required to be trained in the support for
wireless devices including BlackBerry, cell phones, satellite phones, pagers, and WAN
cards as well as handling all hardware/software supplier and carrier inquiries.  Support
at the on-site locations will be one-on-one with the end user as requested and support
for the remote locations will be provided via phone, e-mail, SMS and/or PIN to PIN with
the end user.

Additional responsibilities include:
- Manage all wireless carrier inquiries and escalations for wireless network
  problems
- Adhere to Lehman's internal technical support policies and procedures
- Familiarity with basic wireless device diagnostic testing
- Ensure support technicians are properly trained on all  BlackBerry technical
  support procedures
- Provide support for BlackBerry Enterprise Server (BES) and future BES
  upgrades
- Configure devices to Lehman's standards
- Coordinate delivery of devices to users

- Train new users on device and software functionality and re-educate as needed
- Provide New York area users with one-on-one training of their wireless device and software
- Assist users with replacement devices as needed
- Manage all Change Requests, service terminations and device retrieval
- Provide emergency support for problems initiated during non-business hours as needed
- Maintain Lehman's Remedy system for all wireless technical support cases
- Perform periodic follow-up with users to gage satisfaction
- Monitor Help Desk activity trends and provide cumulative/monthly statistical reports with performance measurements
- Work with Lehman on decisions relative to support Staff hiring / addition / reduction

## ANNEX 3:  PRICES, FEES AND CHARGES

**Fixed-Price Basis.**

Fixed Price:  $80,730 per annum per individual provided by Supplier (including reimbursable expenses but excluding taxes).  This Transaction Schedule shall be in full force and effect for a period of one (1) year (the "Initial Term").  At the end of the Initial Term this Transaction Schedule shall automatically renew for successive one (1) year terms (the "Renewal Term").  Supplier may increase pricing not to exceed three and one-half percent (3.5%) of the pricing for the previous Term at the start of each Renewal Term.  The fixed price will be due and payable in monthly payments.

Customer shall pay to Supplier the amounts indicated in this Transaction Schedule for the Services performed by Supplier, and the Work Product, if applicable, delivered by Supplier and in accordance with the payment terms specified in this Annex 3.  Supplier will invoice Customer on a monthly basis in the amount of $6,727.50 per individual provided by Supplier per month.

Customer agrees to pay all invoices within thirty (30) days after receipt of invoice.

Invoices will be sent to:
Image Processing Systems
PO Box 2339
Secaucus, New Jersey 07096
C/O Lehman Brothers Accounts Payable Department

## ANNEX 5:  PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name:    Arne Lindquist<br>Address: 275 West Street<br>              Annapolis, MD 21401 | Name:        Chad Fulgham<br>Address:     70 Hudson Street<br>                    Jersey City, NJ  07302 |
| Email: alindquist@telecomsys.com<br>Tel: <u>410-280-1090</u><br>Mob: <u>410-262-2662</u><br>Fax: _____ | Email: cfulgham@lehman.com<br>Tel:  <u>+1 201 499 9797</u><br>Mob: _____<br>Fax:  <u>646-834-4710</u> |

## ANNEX 6:  KEY PERSONNEL

**Nine and ½ (9.5) on-site wireless support individuals**

## ANNEX 7:  PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

| Priority | Core Hours | | Non Core Hours | | Conformance |
|---|---|---|---|---|---|
| | Response | Resolution | Response | Resolution | |
| Urgent | 15 minutes | 2 hours | 30 minutes | 2 hours | 95% within target |
| High | 15 minutes | 2 hours | 30 minutes | 2 hours | 95% within target |
| Medium | 4 hours | 8 hours | Best Eff | Best Eff | 90% within target |
| Low | 24 hours | 72 hours | Best Eff | Best Eff | 90% within target |

Core Hours : 0700-1900

Non Core Hours : 1900-0700

# Attachment B

## Examples of Paid Invoices

The following invoices, starting on the next page, are examples of invoices that have been paid by the Debtor in the past.  TCS does NOT assert that these invoices should be included in the Cure Amount.  They are provided to demonstrate that the Debtor has paid invoices to TCS for these types of services in the past:

| Invoice Date | Invoice Number | Service Period | Invoice Total |
|---|---|---|---|
| 4/30/2008 | 1500-LHMN-01-15 | April 1 to 30, 2008 | $70,638.75 |
| 5/31/2008 | 1500-LHMN-01-16 | May 1 to 31, 2008 | $53,820.00 |
| 7/31/2008 | 1500-LHMN-01-18 | July 1 to 30, 2008 | $59,790.66 |

# TCS TeleCommunication Systems

*Enabling Convergent Technologies®*

**Invoice Number:** 1500-LHMN-01-15
**Invoice Date:** 04/30/08

**PAID**

**Bill To:**
Lehman Brothers Holdings
Maria Milone
Lehman Brothers
1301 Avenue of the Americas, 3rd Floor
New York, NY   10019

**Remit To:**
VIA WIRE or ACH:
Silicon Valley Bank
ABA# 121140399/ACCT# 3300472036
FBO: TeleCommunication Systems, Inc.
Santa Clara, CA   95054

**Terms:** NET 30
**Due Date:** 05/30/08

**Customer PO:** 000000016364
**Bill Number:** 00015

**Prime Contract:**
**Invoice Total:** 70,638.75

**Project Number:** 1500.LHMN.00001.PSV    **Description:** Lehman Bros Wireles SptSr

**Statement of Work:**

V#00007199/ PRE-HIRE 29490

| Description: | SCHEDULED VALUE | PERCENT COMPLETE | PREVIOUS AMT BILLED | AMOUNT BILLABLE | CURRENT AMT DUE |
|---|---|---|---|---|---|
| WIRELESS SUPPORT SERVICES 4/01/08 to 4/30/08 QT(10) @ 6,727.50 = $67,275.00 4/01/08 to 4/30/08 QT(1) PART TIME @ 3,363.75 = $3,363.75 | 1,316,478.00 | 63.05 % | 759,411.00 | 830,049.75 | 70,638.75 |
| **Subtotal:** | 1,316,478.00 | | 759,411.00 | 830,049.75 | 70,638.75 |

|  |  |
|---|---|
| **AMOUNT BILLABLE** | 830,049.75 |
| **Less PREVIOUS AMT BILLED** | 759,411.00 |
| **CURRENT AMT DUE** | 70,638.75 |
| **Invoice Total** | 70,638.75 |

# TCS TeleCommunication Systems

*Enabling Convergent Technologies®*

**PAID**

**Invoice Number:**    1500-LHMN-01-16
**Invoice Date:**      05/31/08

**Bill To:**
Lehman Brothers Holdings
Maria Milone
Lehman Brothers
1301 Avenue of the Americas, 3rd Floor
New York, NY   10019

**Remit To:**
VIA WIRE or ACH:
Silicon Valley Bank
ABA# 121140399/ACCT# 3300472036
FBO: TeleCommunication Systems, Inc.
Santa Clara, CA   95054

**Terms:**    NET 30
**Due Date:**  06/30/08

**Customer PO:** 000000016364
**Bill Number:** 00016

**Prime Contract:**
**Invoice Total:**  53,820.00

**Project Number:** 1500.LHMN.00001.PSV

**Description:**  Lehman Bros Wireles SptSr

**Statement of Work:**

V#00007199/ PRE-HIRE 29490

| Description: | SCHEDULED VALUE | PERCENT COMPLETE | PREVIOUS AMT BILLED | AMOUNT BILLABLE | CURRENT AMT DUE |
|---|---|---|---|---|---|
| WIRELESS SUPPORT SERVICES 5/01/08 to 5/31/08 QT(8) @ 6,727.50 = $53,820.00 | 1,316,478.00 | 67.14 % | 830,049.75 | 883,869.75 | 53,820.00 |
| Subtotal: | 1,316,478.00 | | 830,049.75 | 883,869.75 | 53,820.00 |

| | |
|---|---|
| **AMOUNT BILLABLE** | 883,869.75 |
| **Less PREVIOUS AMT BILLED** | 830,049.75 |
| **CURRENT AMT DUE** | 53,820.00 |
| **Invoice Total** | 53,820.00 |



# TeleCommunication Systems

*Enabling Convergent Technologies®*

**PAID**

**Invoice Number:** 1500-LHMN-01-18
**Invoice Date:** 07/31/08

**Bill To:**
Lehman Brothers Holdings
Maria Milone
Lehman Brothers
1301 Avenue of the Americas, 3rd Floor
New York, NY  10019

**Remit To:**
VIA WIRE or ACH:
Silicon Valley Bank
ABA# 121140399/ACCT# 3300472036
FBO: TeleCommunication Systems, Inc.
Santa Clara, CA  95054

**Terms:**     NET 30
**Due Date:** 08/30/08

**Customer PO:** 000000016364
**Bill Number:** 00018

**Prime Contract:**
**Invoice Total:** 59,790.66

**Project Number:** 1500.LHMN.00001.PSV          **Description:** Lehman Bros Wireles SptSr

**Statement of Work:**

V#00007199/ PRE-HIRE 29490

| Description: | SCHEDULED VALUE | PERCENT COMPLETE | PREVIOUS AMT BILLED | AMOUNT BILLABLE | CURRENT AMT DUE |
|---|---|---|---|---|---|
| WIRELESS SUPPORT SERVICES 7/01/08 to 7/31/08 QTY(8) @ $6,727.50 = $53,820.00 QTY(1 PART TIME) @ $5,970.66 = $5,970.66 | 1,316,478.00 | 75.77 % | 937,689.75 | 997,480.41 | 59,790.66 |
| Subtotal: | 1,316,478.00 | | 937,689.75 | 997,480.41 | 59,790.66 |

| | |
|---|---|
| **AMOUNT BILLABLE** | 997,480.41 |
| **Less PREVIOUS AMT BILLED** | 937,689.75 |
| **CURRENT AMT DUE** | 59,790.66 |
| **Invoice Total** | 59,790.66 |

# Attachment C

## Summary of Outstanding Invoices from TCS to Lehman as of Bankruptcy Filing Date

| Invoice Date | Invoice Number | Service Period | Invoice Total | Adjusted Amount | Notes |
|---|---|---|---|---|---|
| 6/30/2008 | 1500-LHMN-01-17 | June 1 to 30, 2008 | $53,820.00 | $53,820.00 | |
| 8/31/2008 | 1500-LHMN-01-19 | August 1 to 31, 2008 | $57,183.75 | $57,183.75 | |
| 9/30/2008 | 1500-LHMN-01-20 | September 1 to 30, 2008 | $57,393.98 | $28,696.99 | (1) |
| **Total Outstanding Invoices Through Bankruptcy Filing Date (9/15/08)** | | | | **$139,700.74** | |

**Explanation of Notes:**

(1)     Invoice Number 1500-LHMN-01-20, dated September 30, 2008 (the "September Invoice"), reflects payment due of $57,393.98 for the entire month of service. Since the Debtor filed for bankruptcy protection on September 15, 2008, only half of that amount, or $28,696.99, should be included in the Cure Amount. The remaining portion of the September Invoice will be billed to the Purchaser when and if the TCS Agreements are assumed by the Purchaser.

The Invoices referenced above are set forth in full on the following pages.

**TCS TeleCommunication Systems**
*Enabling Convergent Technologies®*

**Invoice Number:** 1500-LEHM-01-17
**Invoice Date:** 06/30/08

**Bill To:**
Lehman Brothers Holdings
Maria Milone
Lehman Brothers
1301 Avenue of the Americas, 3rd Floor
New York, NY 10019

**Remit To:**
VIA WIRE or ACH:
Silicon Valley Bank
ABA# 121140399/ACCT# 3300472036
FBO: TeleCommunication Systems, Inc.
Santa Clara, CA 95054

**Terms:** NET 30
**Due Date:** 07/30/08

**Customer PO:** 000000016364
**Bill Number:** 00017

**Prime Contract:**
**Invoice Total:** 53,820.00

**Project Number:** 1500.LEHM.00001.PSV

**Description:** Lehman Bros Wireles SptSr

**Statement of Work:**

V#00007199/ PRE-HIRE 29490

| Description: | SCHEDULED VALUE | PERCENT COMPLETE | PREVIOUS AMT BILLED | AMOUNT BILLABLE | CURRENT AMT DUE |
|---|---|---|---|---|---|
| WIRELESS SUPPORT SERVICES 6/01/08 to 6/30/08 QT(8) @ 6,727.50 = $53,820.00 | | | | | |
| | 1,316,478.00 | 71.23 % | 883,869.75 | 937,689.75 | 53,820.00 |
| Subtotal: | 1,316,478.00 | | 883,869.75 | 937,689.75 | 53,820.00 |

| | |
|---|---|
| AMOUNT BILLABLE | 937,689.75 |
| Less PREVIOUS AMT BILLED | 883,869.75 |
| CURRENT AMT DUE | 53,820.00 |
| Invoice Total | 53,820.00 |

# TCS TeleCommunication Systems
*Enabling Convergent Technologies®*

**Invoice Number:** 1500-LHMN-01-20
**Invoice Date:** 09/30/08

**Bill To:**
Lehman Brothers Holdings
Maria Milone
Lehman Brothers
1301 Avenue of the Americas, 3rd Floor
New York, NY   10019

**Remit To:**
VIA WIRE or ACH:
Silicon Valley Bank
ABA# 121140399/ACCT# 3300472036
FBO: TeleCommunication Systems, Inc.
Santa Clara, CA   95054

**Terms:**   NET 30
**Due Date:** 10/30/08

**Customer PO:** 000000016364
**Bill Number:** 00020

**Prime Contract:**
**Invoice Total:**   57,393.98

**Project Number:** 1500.LHMN.00001.PSV

**Description:** Lehman Bros Wireles SptSr

**Statement of Work:**

V#00007199/ PRE-HIRE 29490

| Description: | SCHEDULED VALUE | PERCENT COMPLETE | PREVIOUS AMT BILLED | AMOUNT BILLABLE | CURRENT AMT DUE |
|---|---|---|---|---|---|
| WIRELESS SUPPORT SERVICES 9/01/08 to 9/30/08 QTY(8) @ $6,727.50 = $53,820.00 QTY(1 PART TIME) @ $3,573.98 $53,820.00 + $3,573.98 = $57,393.98 | | | | | |
| | 1,329,386.39 | 83.65 % | 1,054,664.16 | 1,112,058.14 | 57,393.98 |
| Subtotal: | 1,329,386.39 | | 1,054,664.16 | 1,112,058.14 | 57,393.98 |

| | |
|---|---|
| **AMOUNT BILLABLE** | 1,112,058.14 |
| **Less PREVIOUS AMT BILLED** | 1,054,664.16 |
| **CURRENT AMT DUE** | 57,393.98 |
| **Invoice Total** | 57,393.98 |



**TCS** **TeleCommunication Systems**
*Enabling Convergent Technologies®*

**Invoice Number:** 1500-LBHN-01-19
**Invoice Date:** 08/31/08

**Bill To:**
Lehman Brothers Holdings
Maria Milone
Lehman Brothers
1301 Avenue of the Americas, 3rd Floor
New York, NY   10019

**Remit To:**
VIA WIRE or ACH:
Silicon Valley Bank
ABA# 121140399/ACCT# 3300472036
FBO: TeleCommunication Systems, Inc.
Santa Clara, CA   95054

**Terms:**   NET 30
**Due Date:** 09/30/08

**Customer PO:** 000000016364
**Bill Number:** 00019

**Prime Contract:**
**Invoice Total:**   57,183.75

**Project Number:** 1500.LBHN.00001.PSV      **Description:** Lehman Bros Wireless SptSr

**Statement of Work:**

V#00007199/ PRE-HIRE 29490

| Description: | SCHEDULED VALUE | PERCENT COMPLETE | PREVIOUS AMT BILLED | AMOUNT BILLABLE | CURRENT AMT DUE |
|---|---|---|---|---|---|
| WIRELESS SUPPORT SERVICES 8/01/08 to 8/31/08 QTY(8) @ $6,727.50 = $53,820.00 QTY(1 PART TIME) @ $3,363.75 $53,820.00 + $3,363.75 = $57,183.75 | | | | | |
| | 1,325,812.41 | 79.55 % | 997,480.41 | 1,054,664.16 | 57,183.75 |
| **Subtotal:** | 1,325,812.41 | | 997,480.41 | 1,054,664.16 | 57,183.75 |

|  | |
|---|---|
| **AMOUNT BILLABLE** | 1,054,664.16 |
| **Less PREVIOUS AMT BILLED** | 997,480.41 |
| **CURRENT AMT DUE** | 57,183.75 |
| **Invoice Total** | 57,183.75 |

*275 West Street, Annapolis, Maryland 21401*
*www.telecomsys.com*