CONTRACT NO. *005432-LEHNY- 2004*

## MASTER LICENSE AND SERVICES AGREEMENT

This Master License and Services Agreement, dated as of November 24, 2004 (the "Effective Date"), is made by and among I-DEAL LLC, ("i-Deal"), a Delaware limited liability company, and LEHMAN BROTHERS INC. ("Lehman" and, together with its subsidiaries and affiliates, "Licensee"), a Delaware corporation.

## WITNESSETH

WHEREAS, i-Deal has developed and owns software applications and communications networks and systems that support the distribution of information concerning offerings of various types of securities, including but not limited to the running of the internal books of Licensee in its capacity as lead manager, manager, remarketer, marketer, or member in connection with the issuance of such various types of securities, and certain other functionalities, each of which is described in a schedule attached hereto and made part hereof (collectively, the "Systems"); and

WHEREAS, Licensee is in the business of syndicating, underwriting, marketing and selling equity securities, municipal bonds, notes, and other taxable and tax-exempt instruments and desires to use the Systems for its benefit;

NOW, THEREFORE, in consideration of the foregoing premises and of the covenants and undertakings of the parties hereto, i-Deal and Licensee hereby agree as follows:

1.      **License for the Services**. i-Deal hereby agrees to provide Licensee with access to and use of the Systems during the Term (as hereinafter defined) in accordance with the terms and conditions of this Agreement. i-Deal hereby grants to Licensee and its authorized personnel and clients that are permissioned by Licensee to access and use the System(s) (collectively, the "Users") during the Term and subject to the terms and conditions of this Agreement a non-exclusive, worldwide, non-transferable (except as set forth in Section 14(c)) license to Licensee and its Users to access and use the Systems in connection with Licensee's business as described in the second recital hereof. Licensee may duplicate all manuals and other documentation provided by i-Deal for use solely in accordance with the terms of this Agreement. Licensee shall also have the right to create derivative works of the Documentation for use in connection with the System, Software, Data and Services. In doing so, Licensee agrees that any copyright and other proprietary notices on such manuals and other documentation will be reproduced.

2.      **The Services**. The services shall consist of the services to be provided by or on behalf of i-Deal in connection with providing the Systems to Licensee under this Agreement, including but not limited to providing access to the Systems (the "Services"). The Services shall be provided to Licensee beginning no later than the Effective Date. The Effective Date will commence the Initial Term (as defined in Section 6 herein) of this Agreement. Licensee (including all of its personnel, worldwide) may use the Services for its own internal business purposes.

(b) Licensee acknowledges that except as expressly set forth herein, i-Deal shall own all right, title and interest in and to the Services, the Systems and all enhancements thereto, and all intellectual property rights therein. Notwithstanding the preceding sentence, as between the parties, Licensee shall own all right, title and interest in and to (i) the contents of the

messages transmitted through the System by Users, (ii) all proprietary information and materials provided by Licensee or its Users to i-Deal hereunder, and derivatives thereof, and (iii) all intellectual property rights therein and thereto.

(c) Licensee will comply with all applicable laws and regulations relating to use of the Systems and the Services during the Term, and i-Deal shall comply with all applicable laws and regulations relating to it as a software provider during the Term.

3. **The Systems' Operation.** In addition to the other terms and conditions contained in this Agreement and on the Schedules attached hereto, the following terms and conditions shall apply to the Systems and Services:

(a) Each Schedule hereto shall describe the System to be licensed, the purpose for which it is licensed, and such additional terms as the parties may mutually agree. Licensee agrees, during the Initial Term and any Renewal Term (as defined in Section 6 herein) of this Agreement, and in connection with its business as described in each of the Schedules hereto, , provided that i-Deal has not materially defaulted in its obligations to Licensee hereunder, and provided that doing so would not materially adversely affect Licensee.

(b) i-Deal agrees to make the Systems and Services continuously available for use by Licensee, and its Users, twenty-four hours per day, seven days per week, except during the following periods when the Systems and Services will not be available for use:

    (i).    one daily back-up period to extend not more than three consecutive hours between 10:00 p.m. and 6:00 a.m.;

    (ii).    one mid-month and one end-of-month back-up· to implement the integrity assurance procedure. This will be done on the first Friday following the mid-month or end-of month date between the hours of Friday, 8:00 p.m. and Sunday, 6:00 a.m.;

    (iii).    one preventive maintenance period each quarter to extend not more than six consecutive hours between 7:00 p.m. and 7:00 a.m.;

    (iv).    periods that i-Deal determines are reasonably necessary to maintain or modify computer hardware (an upgrade) and other equipment used by i-Deal operating the Systems, to be scheduled between 7:00 p.m. and 7:00 a.m. However, in the event an upgrade is expected to last more than 12 hours, upon 7 days prior written notice to Licensee, i-Deal will schedule said upgrade on the weekend; and

    (v).    periods which i-Deal determines are reasonably necessary to effect a site relocation computer hardware and other equipment used by i-Deal in operating the Systems as i-Deal shall determine, provided i-Deal schedules said relocation for the weekend.

(c) In the event hardware used by i-Deal to operate the Systems fails to operate, the procedure specified in the relevant Schedule(s) annexed hereto under the heading "Description of Backup" shall be followed.

(d) i-Deal shall comply at all times during the Term with the disaster recovery continuity plan previously provided to Licensee ("DRP"). i-Deal shall, (a) at least once every calendar year during the term of the Agreement, test the operability of the DRP, (b) upon Licensee's request,

certify to Licensee that the DRP is fully operational, and (c) upon discovery by i-Deal, immediately implement the DRP upon the occurrence of a disaster or other event affecting the delivery or receipt of the Systems ("Disaster") and promptly provide Licensee with a written notice of the Disaster. i-Deal shall use all best efforts on a 24/7 basis to reinstate the Systems following a Disaster. Reinstating the Systems of Licensee shall receive as high or greater priority as that of i-Deal's affiliates and other customers. In the event of a Disaster, i-Deal shall not increase its charges under this Agreement.

(e) In the event any Licensee's proprietary data is damaged, lost or destroyed, i-Deal shall have no liability for such damage, loss or destruction unless Licensee gives prompt written notice of the same to i-Deal and such loss is caused by i-Deal, in which case i-Deal shall restore such data from machine readable back-up copies within 5 days thereof which i-Deal agrees to maintain throughout the term of this Agreement.

4.    **Intentionally Omitted.**

5.    **Charges.**

(a) Licensee shall pay only those charges which have rates listed on a Schedule and are actually incurred by and authorized by Licensee in writing. Third party charges must be authorized in advance in writing by Licensee. i-Deal shall invoice Licensee separately for the Services attributable to each respective Schedule. Each invoice shall reference this Agreement and all parties thereto. Invoices shall be made monthly in arrears unless otherwise set forth in a relevant Schedule, and payment will be sent by Licensee within thirty (30) days of receipt of each invoice, unless there is a bona fide dispute. Each invoice shall be accompanied by a detailed itemized statement of the charges.

(b) i-Deal may not increase charges for the Initial Term of this Agreement. For any Renewal Term thereafter, and only once per such Renewal Term, i-Deal may increase charges by the lesser of 5% or the Consumer Price Index for the prior year. i-Deal shall give notice to Licensee at least thirty (30) days in advance of any charges increase. Charge increases must be exercised with each renewal; if i-Deal for whatever reason does not elect within sixty (60) days of the start of a given Renewal Term to make an increase, the right to make one is waived for the Renewal Term.

6.    **Term/Termination.**

(a) The initial term of this Agreement shall commence on the Effective Date and shall continue for a period of three (3) years (the "Initial Term"). i-Deal shall be obligated to notify Licensee in writing at least ninety (90) but not more than one hundred and twenty (120) days in advance of this Agreement's expiration date. The parties may enter into consecutive one-year renewal terms (each such term a "Renewal Term") following the expiration of the Initial Term or any Renewal Term upon mutual written consent.

Notwithstanding the foregoing, the Term of this Agreement shall be extended for so long as there is a Schedule still in effect.

(b) Either party may terminate the Agreement by written notice to the other party in the following circumstances: (i) if the other party fails to observe or perform any material term or condition of this Agreement and does not cure such failure within thirty (30) days after written

demand by the first party, or (ii) if the other party makes a general assignment for the benefit of creditors, or files a voluntary petition in bankruptcy or for reorganization or other arrangement under the bankruptcy laws, or if a petition in bankruptcy is filed against such other party and is not dismissed within 45 days after filing, or if a receiver or trustee is appointed for all or any part of the property or assets of such other party.

(c) Upon termination of this Agreement, Licensee agrees to either, at Licensee's sole discretion, (i) grant i-Deal access to its offices, at a time to reasonably determined by Licensee, to repossess any equipment and related documentation to which i-Deal then has ownership rights (whereupon Thomson shall observe all rules, regulations and security procedures of Licensee's offices and proceed in a manner non-disruptive to Licensee's business); or (ii) arrange for the return of i-Deal's property (if any). Notwithstanding the foregoing, Licensee shall be permitted to retain copies of the documentation as necessary to comply with record keeping and regulatory requirements and procedures.

(d) Paragraphs 2(b), 7 (Confidentiality), 8 (Warranties/Disclaimer of Warranties), 9 (Limitations of Liability), 10 (i-Deal Indemnity), and 13 (Publicity), shall survive termination of this Agreement.

7.    **Confidentiality.**

(a) Each party shall maintain as confidential, all confidential or proprietary documents and any other non-public information whatsoever relating to this Agreement or to the other's business or operations, including Licensee's clients, suppliers, and other entities Licensee does business with, to which such party has gained access pursuant to, or as a result of this Agreement, including without limitation, a disclosing party's proprietary technology developments, business plans, methods, processes, strategies and trade secrets, and the terms of this Agreement ("Confidential Information"), unless such information: (a) becomes generally available to the public other than as a result of disclosure by the recipient or anyone to whom the recipient transmits the information; (b) becomes available to the recipient on a non-confidential basis from a source other than the disclosing party who is not bound by a confidentiality agreement with the disclosing party and who came across it rightfully; (c) was known to the recipient prior to the negotiations for this Agreement or any prior agreement between the parties; or (d) is developed by the recipient entirely independent of reference Confidential Information. Further, party shall be permitted to disclose the other party's Confidential Information if required to do so under applicable law, rule or order; provided that such party, where reasonably practicable and to the extent legally permissible, provides the other party with prior written notice of the required disclosure so that the other party may seek a protective order or other appropriate remedy; and provided further that the party discloses no more Confidential Information than is reasonably necessary in order to respond to the required disclosure.

(b) Licensee and i-Deal agree any breach of the provisions contained in this Section 7 will give the non-breaching party the right to obtain equitable and injunctive relief and pursue all remedies said party may have at law or in equity.

(c)    i-Deal hereby acknowledges that Licensee is subject to the privacy regulations under Title V of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq., pursuant to which regulations Licensee is required to ensure that i-Deal appropriately safeguards the privacy, use and protection of nonpublic personal information of Licensee's clients or prospective clients. Therefore, notwithstanding anything to the contrary contained in this Agreement, i-Deal agrees that (a) it shall not disclose or use any Licensee Client Data (as defined below) except to the

extent necessary to carry out its obligations under this Agreement and for no other purpose, (b) it shall not disclose Licensee Client Data to any of its third party service providers without the prior consent of Licensee and agreement in writing from the third party to safeguard Licensee Client Data under this Agreement, (c) it shall maintain, and shall require all third parties approved under subsection (b) to maintain, effective information security measures to protect Licensee Client Data from unauthorized disclosure or use, and (c) it shall provide Licensee with information regarding such security measures upon the reasonable request of Licensee and promptly provide Licensee with information regarding any failure of such security measures or any security breach related to Licensee Client Data. Licensee may, at its own expense, during business hours, and not more frequently than once per calendar year, by providing reasonable notice to i-Deal, conduct an audit and otherwise monitor i-Deal's products and/or services for the purpose of verifying i-Deal's compliance with the terms of this Section. The obligations set forth in this Section shall survive termination of this Agreement. For the purposes of this Agreement, "Licensee Client Data" means the nonpublic personal information (as defined in 15 U.S.C. § 6809(4)) of Licensee's clients or prospective clients (and/or clients or prospective clients of Licensee's parent, affiliated or subsidiary companies), including, but not limited to (i) an individual's name, address, e-mail address, IP address, telephone number and/or social security number, (ii) the fact that an individual has a relationship with Licensee and/or its parent, affiliated or subsidiary companies, or (iii) an individual's account information.

8. **Warranties/Disclaimer or Warranties.**

(a) i-Deal warrants that it shall at all times use industry-standard anti-virus software and other commercially reasonable security measures to prevent the introduction of viruses into any software, hardware and/or electronic data it supplies to Licensee. In the event of i-Deal's breach of this Section, i-Deal agrees to use its best and continuous efforts to immediately eliminate any and all viruses.

(b) i-Deal warrants that it will not intentionally install disabling devices of any kind whatsoever into any software, hardware, or electronic media of Licensee or that Thomson supplies Licensee.

(c) Although i-Deal endeavors to use care in respect to providing the Services and will use good faith efforts and its best reasonable commercial efforts to provide quality Services pursuant to this Agreement, and will use its best efforts to ensure the accuracy of data provided, i-Deal makes no representations or warranties with the exception of Sections 8 (a) and 8(b), in respect to providing the Services, either express or implied, including without limitation any implied warranty of merchantability or fitness for a particular use, with respect to any of the Services. i-Deal cannot warrant that the Services will not be uninterrupted or error free, nor does it make any warranties as to the results to obtained from use of the Services. i-Deal will promptly notify Licensee of any material inaccuracies in the data which become known to i-Deal.

9. **Limitations of Liability.** In no event shall either party be liable for indirect, special or consequential damages in connection with or arising out of this Agreement, even if foreseeable, with the exception of Sections 7, 8(b) and 10 herein. Except for (a) liability arising from a breach of Section 7 hereof, or (b) the indemnification obligations set forth in Section 10(a) hereof, in no event shall i-Deal's damages for all claims arising under this Agreement exceed the aggregate amount of all fees paid by Licensee to i-Deal pursuant to this Agreement in the twelve months prior to such claim.

10. **i-Deal Indemnity.**

(a) i-Deal shall, at its sole expense, indemnity, hold harmless and defend Licensee and its principals, employees, suppliers, customers, and agents, against all claims, actions, proceedings, and for damages, costs and expenses, including without limitation reasonable attorneys' fees which Licensee incurs as a result of any claims against Licensee that the System or the Services or any non-Licensee content transmitted through the System, infringe any copyright, patent, trademark, trade secret or other proprietary right of any third party, provided that: (i) Licensee notifies i-Deal promptly in writing any such claim (provided however that if Licensee fails to give prompt notice, i-Deal shall only be relieved of its obligations to hereunder to the extent materially prejudiced); (ii) i-Deal has sole conduct of the defense of such claim (provided that i-Deal will not settle an indemnified claim in a manner which would create any obligation on the part of Licensee without Licensee's prior written approval); and (iii) the infringement was not the result of Licensee's unauthorized use of the System or the Services. Licensee may appoint counsel of its own choosing at Licensee's sole expense.

(b) In the event of a claim infringement i-Deal reserves the right to terminate solely that portion of this Agreement which contains the allegedly infringing portion of the System and/or the Services, and i-Deal shall wither substitute other substantially similar services(s) or refund to Licensee the pro rata portion of any prepaid fees relating to such terminated portion of the System and/or the Services.

11.    **Notices.**  All notices required by this Agreement shall be sufficiently given if delivered by hand, or sent by certified mail, return receipt requested, or by overnight delivery service, to the address of the parties set forth below, or such other address(es) of which the parties shall have given notice in accordance herewith.

If to Licensee:

Lehman Brothers Inc.
745 Seventh Avenue
New York, NY  10019
Att: VP Global Sourcing Services

With Copies To:

Lehman Brothers Inc.

745 Seventh Avenue
New York, NY  10019
Att: General Counsel

If to i-Deal:

i-Deal LLC

1359 Broadway, 2nd Floor
New York, NY  10018
Attn: Mr. Allen Williams

With Copies To:

i-Deal LLC
1359 Broadway, 2nd Floor
New York, NY 10018
Attention: General Counsel

12.    **Force Majeure.**    Neither party shall be responsible for any delay or failure in performance resulting from acts beyond the control of such party. Such acts shall include but are not limited to the following, to the extent outside a party's reasonable control: power outages; an act of God; an act of war; terrorism; a riot; an epidemic; fire, flood or other disaster; and an act of government; and a strike or lockout.

13.    **Publicity.**    i-Deal agrees that it will not use the name of Licensee or any affiliate or subsidiary of Licensee, or of any partner or employee of Licensee, in advertising, marketing or publicity in any medium, nor use any trade name, trademark, logo, service mark or any abbreviation, contraction or simulation thereof owned by Licensee in any such manner, without the prior written consent of Licensee's Corporate Communications Department.

14.    **Miscellaneous.**

(a)  The parties hereto are independent contractors engaged in the operation of their own respective businesses. Neither party is, or is to be considered as, the agent or employee of the other for any purpose whatsoever. Neither party has authority to enter into contracts or assume any obligations for the other party or make any warranties or representations on behalf of partners or joint venturers between the parties.

(b)  this Agreement, including the attached exhibit and schedules, constitutes the entire understanding between Licensee and i-Deal (including its affiliates, subsidiaries, and divisions) with regard to the subject matter herein supersedes all prior agreements contracts proposals, commitments, writings, negotiations and understandings, oral and written, and all other communications between the parties relating to the subject matter of this Agreement. Any amendments or modifications to this Agreement shall be effective only if made in writing and signed by both parties.

(c)  Neither Licensee, on the one hand, or i-Deal on the other hand, may assign, sub-license, sub-contract, charge or otherwise encumber any of the rights or obligations under this Agreement or any part thereof without the prior written consent (such consent not to be unreasonably withheld) of the other party, except that any party may assign this Agreement to any entity which, as of the date hereof, controls, is controlled by, or is under common control with such party.

(d)  Should any part, term or condition hereof be declared illegal or unenforceable or in conflict with any other law, the validity of the remaining portion or provisions of this Agreement shall not affected thereby, and the parties hereto shall amend the illegal or offending portions of the Agreement to conform with applicable law most accurately reflect the intent of the parties, while leaving the remaining portions of this Agreement intact.

(e)  The waiver by either party of a breach or violation hereof shall not operate as or be construed to be a waiver of any subsequent breach or violation hereof.

(f)  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without giving effect to principles of conflicts of law, and the parties agree to submit to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan, New York, New York.

**Insurance.**  i-Deal agrees that it has and shall maintain during the life of this Agreement commercial general liability insurance with a minimum limit of five million dollars ($5,000,000). i-Deal agrees to obtain fidelity bond coverage for each of its employees or other personnel engaged by it to perform services under this Agreement who may be on Licensee's premises, in the minimum amount of one million dollars ($1,000,000). Each such insurance policy shall: (i) be maintained with an insurer having a rating of at least a A-(VII) in the most currently available Best's Insurance Reports; (ii) wherever permitted, name Licensee as additional insured and additional loss payee; (iii) shall provide for at least (30) thirty days prior written notice to Licensee in the event of any modifications or cancellation. All vendor insurance contained within shall be primary and contain a waiver of their insurers rights of subrogation against either Lehman Brothers or any of its insurers.]

End of Terms and Conditions

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the Effective Date first above written.

AGREED:

I-DEAL LLC                          LEHMAN BROTHERS INC.

By: _Allen Williams_                By: _Nancy N Murray_
Name: _Allen Williams_              Name: _Nancy N. Murray_
Title: _Co Head of Cap M/ETS_       Title: _VP - Global Sourcing Services_

SCHEDULE 1

**i-DEAL LLC**

**AND**

**LEHMAN BROTHERS INC.**

**FOR THE**

**i-Deal BOOKRUNNING AND WIRE SYSTEM**
**i-Deal NON-MANAGED INTERNAL ALLOCATION SYSTEM**
**i-Deal VARIABLE RATE TRADING SYSTEM**
**BIDCOMP**
**i-DEAL PROSPECTUS**



Exhibit A To Schedule 1

**Term:**  This Agreement shall have an initial term beginning on December 1, 2005 and ending on the second anniversary of the Effective date.

(a)  Not less than ninety (90) days prior to the expiration of the Initial Term or any Renewal Term (as defined), Licensee may, at its sole option, renew for additional one (1) year periods (each a "Renewal Term") by providing written notice to i-Deal  In the event Licensee does not notify i-Deal whether or not it chooses to exercise its renewal option, License will automatically renew for a one-year period  upon the same terms and conditions.

(b)  Licensee shall have the right to terminate use of the i-Deal Floating Rate System without cause in whole or in part at any time upon ninety (90) days' notice to i-Deal and receive a pro rata refund of any fees for such service that have been paid but not earned upon the effective date of termination

## 1.    Dalcomp Bookrunning System

(a) **Description:**     The Dalcomp Bookrunning System comprehensively automates processes performed by Licensee in its capacity as book running manager of any new issue of municipal securities.  Capabilities include, but are not limited to, pricing and structuring of the issue, management of the order period and allocation process, calculation and distribution of syndicate P&L including designated and group credit, underwriting and management fees, and performance reporting for use internally and with Licensee clients.  The Dalcomp Bookrunning System is seamlessly interfaced with the Dalnet Wire System.  The link provides the capability to create, broadcast and direct appropriately both general and variable-content messages to the members of Licensee syndicates and selling groups.

(b) **Functional Specifications**:  The Dalcomp Bookrunning System shall include all currently available, non-proprietary functionality, all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "Dalcomp Bookrunning Functional Specifications"). The Dalcomp Bookrunning Functional Specifications may be revised from time to time by Dalcomp, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of the Dalcomp Bookrunning System.  Licensee will be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

## 2.    Municipal Wire System

(a)     **Description:**   The Dalnet Wire System is a computer automated private syndicate communications system and network capable of sending municipal syndicate manager messages.

(i)  Manager Messages:  For each and every Syndicate of which Licensee is book running manager and for which Licensee elects to use the Dalnet Wire System, Licensee will cause to be transmitted over the Dalnet Wire

System all of its Messages related to such Syndication (the "Manager Messages"). Each Manager Message shall only be transmitted over the Dalnet Wire Network to those members of the particular Syndication ("Members") selected by Licensee which are licensed, at the time of transmission to use an Dalcomp computer terminal (the "Dalcomp Terminal").

(ii)    Branch Messages:  For each Syndication of which Licensee is book running manager or a Member, Licensee may cause a copy of one or more Manager Messages it receives to be transmitted over the Dalnet Wire Network to those branch offices of Licensee selected by Licensee which are licensed, at the time of transmission, to use a Dalcomp Terminal. Only the branch managers selected by Licensee shall receive the Branch Message.

(iii)    Message Content:  Messages transmitted over the Dalnet Wire Network may be of any number, type and kind, provided any information entered by Licensee shall relate only to the Deals and shall only be transmitted to third parties selected by Licensee.

(iv)    Message Timing:  All Messages related to a particular Syndication shall be transmitted on or before the sixtieth day following the settlement date thereof.

(b)    **Functional Specifications:**  The Municipal Wire System shall include all currently available, **non-proprietary functionality that is** generally available at no additional cost.  Including all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "Municipal Wire Functional Specifications").  The Municipal Wire Functional Specifications may be revised from time to time by Dalcomp, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of the Municipal Wire System.  Licensee will be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

3.    **Non-Managed Internal Allocation System**

(a).    **Description**  The Dalcomp NMIA System provides the capability to collect and analyze data on Licensee's participation and performance in any new issue when Licensee acts as a co-manager, member of a syndicate or selling group or financial advisor.  Licensee can, if they so elect, manage their internal order and allocation process in conjunction with the syndication of an issue.  Licensee will electronically receive deal-related data on deals managed by other Dalcomp Bookrunning System and Dalnet Wire System users through subscription to the Query/Shared Data System (more fully described herein).

(b)    **Functional Specifications:**  The Dalcomp NMIA System shall include all currently available, non-proprietary functionality, all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "Dalcomp NMIA Functional Specifications").  The Dalcomp NMIA Functional Specifications may be revised from time to time by Dalcomp,

provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of the Dalcomp NMIA System. Licensee will be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

4.   **Municipal Query/Shared Data System**

(a)   **Description:** The Dalcomp Query/Shared Data System provides a comprehensive database of new issue underwriting and sales performance for public finance, management, syndicate and back office personnel. The Query/Shared Data System can be used as a generic database of non-proprietary municipal new issue information and as a proprietary reference tool for evaluation of Licensee's performance in the marketplace. Shared Data is the mechanism by which the database may be electronically loaded at each manager's discretion with information on deals managed by Dalcomp Bookrunning and Wire System customers in which Licensee has a role. In addition, Licensee's use of the Dalcomp Bookrunning and NMIA Systems loads non-proprietary information and proprietary performance information into the database. The query language provides the capability to search the database using various parameters to create output dynamically through use of a report generator or by downloading data into Lotus or Excel spreadsheets.

(b)   **Functional Specifications:** The Dalcomp Query/Shared Data System shall include all currently available, non-proprietary functionality, all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "Dalcomp Query/Shared Data Functional Specifications"). The Dalcomp Query/Shared Data Functional Specifications may be revised from time to time by Dalcomp, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of the Dalcomp Query/Shared Data System. Licensee will be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

5.   **Municipal Primary Trading System**

(a)   **Description:** The Dalcomp Primary Trading System provides a means by which trades can be created from allotments in the Senior-Managed Bookrunning System or the Non-Managed/Internal Allocation System. The System then provides the means by which these trades are completed with account numbers proprietary to Licensee and are fed into Licensee's internal trade processing system. The System has the ability to cancel and rebook trades, create a risk profile of all new issues and perform profit and loss calculations.

(b)   **Functional Specifications:** The Dalcomp Primary Trading System System shall include all currently available, non-proprietary functionality, all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "Dalcomp Primary Trading Functional Specifications"). The Dalcomp Primary Trading Functional Specifications may be revised from time to time by Dalcomp, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of the Dalcomp Primary Trading System. Licensee will

be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

### 6.    Variable Rate Trading System

(a)    **Description:** The Dalcomp Variable Rate Trading System is a computer software system which is capable of performing with regard to tax exempt securities ("Bond") transactions, including but not limited to: daily pricing, trading, index, put, credit, tier and call maintenance and generation of reports

(b)    **Functional Specifications:** The Dalcomp Variable Rate Trading System shall include all currently available, non-proprietary functionality, all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "Dalcomp Variable Rate Trading Functional Specifications"). The Dalcomp Variable Rate Trading Functional Specifications may be revised from time to time by Dalcomp, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of the Dalcomp Variable Rate Trading System. Licensee will be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

### 7.    BiDCOMP™ Competitive Bidding System

(a)    **Description:** The BiDCOMP Competitive Bidding System provides the capability for Licensee to access the parameters set out by an issuer for a competitive bid, enter a scale, calculate appropriate figures, submit the bid electronically and produce reports. In addition, BiDCOMP provides Licensee with the ability to automatically download the information contained therein into the Dalcomp Bookrunning System.

(b)    **Functional Specifications:** BiDCOMP shall include all currently available, non-proprietary functionality, all future enhancements made to the system that Dalcomp provides free of charge, as well as any proprietary enhancements made by Dalcomp for Licensee (the "BiDCOMP Functional Specifications"). The BiDCOMP Functional Specifications may be revised from time to time by Dalcomp, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of BiDCOMP. Licensee will be informed of any proposed changes by thirty (30) days advance written notice, and via the Dalnet Wire System.

### 8.    i-Deal Prospectus

(a)    **Description:** I-Deal Prospectus is an electronic document delivery service that allows Licensee to electronically distribute documents including Preliminary Official Statements, Notices of Sales, Final Official Statements, Escrow Agreements and the like to be distributed only to Licensee's proprietary lists of receivers.

(b)    **Functional Specifications:** i-Deal Prospectus shall include all currently available, non-proprietary functionality, all future enhancements made to the system that i-Deal provides free of charge, as well as any proprietary enhancements made by i-Deal for Licensee (the "i-Deal Prospectus Functional Specifications"). The i-Deal Prospectus

Functional Specifications may be revised from time to time by i-Deal, provided however, that any proposed revision shall not be made if, in Licensee's reasonable judgement, such revision would adversely affect Licensee's use of i-Deal Prospectus.  Licensee will be informed of any proposed changes by thirty (30) days advance written notice.

## Exhibit B to Schedule 1
### Backup

<u>Description of Backup</u>

If the Licensee's site is equipped with a leased line modem, automatic backup capabilities are supplied in the event of a line failure. In the event that the hardware at the Licensee's site is deemed faulty, i-Deal will dispatch a technician from the Harborside location with spare equipment. i-Deal personnel will also make available special telephone numbers and modems at their site for Licensee to dial up for modem access. It is the Licensee's responsibility to install and maintain auxiliary phone lines and purchase modems for dial up capabilities.

In the event of a disk or data loss, an on-site backup drive is available for use. Licensee's transactions are entered on both the production drive and on-site drive. If the production drive fails, the machine uses this other drive. This procedure will take thirty minutes.

An off-site backup drive is also maintained in the event of a site failure. Transactions occurring on the production system are then applied to the off-site drive. This process entails the movement of communications hardware and wiring of the alternative site. This procedure will require two hours.

Hardware backup for each system is based on the principle that they are modular and identical in configuration to every other active system and two hot spare machines. If a piece of hardware is deemed faulty, i-Deal personnel can swap out the defective part within thirty minutes.
In addition to the above precautions, a disk tape backup of all Licensee's programs and data is performed and archived on a regular basis.

<u>Accessing Backup System</u>

In the event of hardware or communications failure, the following procedure can be implemented to allow Licensee to continue using the System.

     (a) Contact i-Deal at (212) 843-5023 to verify that the main facility is indeed inoperative.

     (b)    i-Deal personnel will assign a special telephone number for Licensee to dial up for modem access.

     (c)    All access codes and passwords on the backup system are identical to those on the production system.

     (d)    i-Deal personnel will respond to the best of their ability to ensure that any of the above events are remedied without substantial downtime.

**Exhibit C to Schedule 1**
**Fee Schedule**

(a)     Dalcomp Bookrunning System:   For each Deal that Licensee acts as senior manager of the syndicate or selling group, and such deal was completed using the Dalcomp Bookrunning System, Licensee shall pay Dalcomp, within 30 days of the later of (i) the date of the invoice related to such Deal or (ii) the closing of the particular Deal, a fee at the following rates:

(A)  $0.06 per $1,000 principal amount of negotiated bonds sold;
(B)  $0.02 per $1,000 of principal amount of negotiated notes sold in such Deal (for purposes hereof, a "note" is defined as a debt security having an effective maturity (will include mandatory put bonds) of 13 months or less.)
(C)  $0.04 per $1,000 principal amount of competitive bonds sold.
(D)  $0.01 per $1,000 principal amount of competitive notes sold.

(E) For each Negotiated Deal for which dealer to dealer Electronic Order Entry is used, a fee equal to the following:

| Deal Size | Fee |
| --- | --- |
| $0-$10,000,000 | $100 per deal |
| $10,000,001 - $25,000,000 | $150 per deal |
| $25,000,001 - $50,000,000 | $250 per deal |
| $50,000,001 - $100,000,000 | $350 per deal |
| $100,000,001 + | $500 per deal |

(F) For each Competitive Deal for which dealer to dealer Electronic Order Entry is used, a fee equal to the following

| Deal Size | Fee |
| --- | --- |
| $0-$10,000,000 | $50 per deal |
| $10,000,001 - $25,000,000 | $75 per deal |
| $25,000,001 - $50,000,000 | $125 per deal |
| $50,000,001 - $100,000,000 | $175 per deal |
| $100,000,001 + | $250 per deal |

(G) For each deal in which Institutional Electronic Order Entry, Sales Person Electronic Order Entry or the Issuer Monitor is used, Licensee shall pay a fee equal to $.015 per bond or note and the fee outlined in (E) and (F) above will not be charged.

If Licensee is a user of i-Deal's BiDCOMP Competitive Bidding Software the fees for the use of Electronic Order Entry on Competitive Deals will be further discounted by 25%.

**(b)     Dalnet Wire System**

For each Deal for which Licensee acts as senior manager of the syndicate or selling group, when Licensee uses the Dalnet Wire System to complete the Deal, Licensee shall pay Dalcomp within 30 days of the later of (i) the date of the invoice related to such Deal or (ii) the closing of the particular Deal provided Licensee uses the System for such transactions:

### For Negotiated Deals

- $30 for each participating syndicate or selling group member per negotiated bond or note Deal
- $0 for each syndicate branch receiving wires on a Deal
- $15 for each news service receiving wires on a Deal

### For Competitive Deals

- $10 per syndicate member for one wire;
    - $20 per syndicate member for two or three wires;
    - $30 per syndicate member for four or more wires.
    - $10 for each branch receiving one wire via a Dalnet printer or fax transmission
    - $0 for each syndicate branch receiving wires
    - $15 for each news service receiving wires

(d)    Non-Managed/Internal Allocation System, Municipal Query/Shared Data System and Municipal Primary Trading System

$115,000 per annum, payable monthly, in arrears

(g)    Variable Rate Trading System:  License fees shall be calculated semi-annually (January 1 and July 1) based on the then-outstanding value of transactions stored in the Variable Rate Trading System as follows:

$.02 per $1,000 face value

Additional Fees:  Licensee shall pay $1.00 per issue per role for use of the automated fax service through the Dalcomp Money Market System.

(h)    BiDCOMP Competitive Bidding System

Note  deals bid on through the System and won:              $100 per deal

Bond deals bid on through the System and won:

| | |
|---|---|
| $0 - $10 MM | $200 per deal |
| $10.01-$25 MM | $250 per deal |
| $25.01-$50 MM | $350 per deal |
| $50.01-$100 MM | $450 per deal |
| $100.01+ MM | $600 per deal |

Bond deals bid on through the System and not won:        $25 per deal

(i)      i-Deal Prospectus

  $1,500 per deal plus printing charges equal to the following

  $.055 per page

  $2.20 per book

  $400 minimum printing charge per deal

  $40 per color

  Shipping and Handling at i-Deal's cost

Updates and Enhancements

  No Charge

Training and Customer Support

  No Charge

If you use the Bookrunning System (i.e., do orders and allotments) for all Senior Managed deals, you will not be charged for wires on competitive deals which you do not win.

## EXHIBIT E Schedule 1
## Data Definitions and Usage

The following definitions shall be used herein:

<u>Dalcomp Compilation:</u>  shall mean the compilation of information i-Deal provides to Licensee or any Syndicate Member relating to any Deal or via the Dalcomp Bookrunning System or Dalnet Wire Network.  Dalcomp Compilation shall not include any Licensee Data or derivatives thereof.

<u>Licensee Data</u> shall mean (i) the information Licensee provides to i-Deal hereunder that is not Non-Proprietary Data, (ii) any compilations of such information, Syndicate Data and/or Non-Proprietary Information prepared by Licensee and provided to i-Deal hereunder and (iii) all of the data, including data that would otherwise be non-proprietary, for any transaction that Licensee notifies i-Deal is a private placement transaction.

<u>Syndicate Data</u>  shall mean the information any Syndicate member provides to i-Deal that is not publicly available and any compilations of such information and /or Non-Proprietary Information prepared by the Syndicate Member and provided to i-Deal.

- Type
- State of issuance
- Ratings
- Insurer
- LOC Bank
- Book entry status
- Clearing house and status
- Paying Agent
- Tender Agent
- Remarketing Agent
- Number of Issues
- Number of days of interest
- Registration status
- Put information
- Bank qualified status
- Printer of prospectuses
- Financial advisor
- Bookrunning manager
- Manager
- Trustee
- Bond counsel
- Sale date and time for competitive issues
- Time and location of meetings for competitive issues
- Award Date
- Dated Date
- Dated Date on zero coupon bonds
- First coupon date
- Initial trade date
- Delivery date
- Settlement date
- Interest Accrual date
- Underwriter Counsel
- Forward Status
- Tax status

(b)    Structure and Pricing Information

- Maturity schedule with due dates
- Call features
- Per Maturity
  - Security Type
  - Amount
  - Serial/term
  - Coupon
  - List price
  - Dollar price
  - Yield
  - Concession
  - Takedown
  - Put/tender information
  - Not re-offered (NRO) status

- Original issue discount (OID) status
- Supersinker status
- Cusip
- Insurer
- Ratings
- Minimum Denomination
- Sealed Bid
- Call feature

(c)  Syndicate Information

- Management groups

II.  The following shall be considered Syndicate Proprietary Information

(a)  Syndicate Information

- Role of each member of the account
- Participation of each member of the account

(b)  Spread Information

- Gross Spread
- Management Fee
- Expenses
- Average Takedown
- Net to Underwriters
- Average Life
- NIC,TIC CIC
- Clearing Fee

(c)  Sales Performance

- Retentions
- Allotments
- Total group business on issue
- Total designated business on issue
- Total priority business on issue
- Total non-list business on issue
- Designations

(d)  Structure and Pricing Information

- Amount left to group on designated trades (per maturity)

III.  The following shall be considered Licensee Proprietary Information:

(a)  Orders
(b)  Trades
(c)  Salesmen
(d)  Branches

(e)    Customer Accounts
(f)    Any non-public field added by Licensee

AGREED and ACCEPTED BY:

Name: _Allen Williams_

Title: _Co Head Cap Mkts Fixed Income_

i-Deal LLC


Name: _Robert D Irvin_

Title: _VP_

Lehman Brothers _Inc_

14

CONTRACT NO. 2006 - US - 1118

**SCHEDULE 3**

**i-DEAL LLC**

**AND**

**LEHMAN BROTHERS INC.**

**FOR THE**

**i-Deal Wires System for Fixed Income Offerings**

I

COPY

This Schedule 3 is entered into as of February 14, 2006 (the "Effective Date") between i-Deal LLC ("i-Deal") and Lehman Brothers ("Licensee") pursuant to the Master License and Services Agreement between the parties dated November 24, 2004 ("the Master")

**Product Description**
i-Deal Wires is a broker-to-broker communications platform that allows broker-dealers to send deal-related communications to one another via the Internet. i-Deal Wires has the ability to direct wires by wire type, based on a customer's preference, enabling you to view only the wires that pertain to your job functions. In addition, i-Deal Wires allows users to send out Payment Wires over our wire network and send notifications to non-broker-dealer entities, including regulatory agencies, news services and repositories. The system also sends out email alerts to remind users that certain regulatory wires need to be sent. Notification is sent by email to designated individuals specified by the Licensee. All wires activity is logged and available online in the form of audit trails. This provides a level of transparency and assurance that wires are being sent accurately and on timely basis.

Pursuant to this Schedule and as part of the Services, Licensee may use i-Deal Wires to send the following wire types for debt offerings:

- Directed Order
- Email Alert
- Free Text
- Greenshoe
- Invitation
- Miscellaneous
- Payment
- Pot
- Regulation M
- Retention
- Termination
- Terms

Note: Due to requirements of regulatory agencies, Licensee may request additional wire types which will be added at no additional charge to Licensee

**Services, Term and Charges**

i-Deal grants Licensee a non-exclusive, worldwide, non-transferable (except as set forth in Section 14(c) of the Master) license during the Schedule Term (as defined below) to allow Customer to communicate with syndicate and selling group members during a deal (for purposes of this Schedule 3, deals shall mean fixed income offerings in the primary market, each a "Deal") using the i-Deal Wires System to transmit such messages. Licensee agrees to pay i-Deal a fee that will be calculated as follows:

Licensee and i-Deal will record usage of the System by Licensee for the first six months. During the initial 6 month period, i-Deal will bill at a pro-rated $75,000 per annum rate or $6,250 per month. At the end of the six month period, i-Deal and Licensee will run a usage calculation = (number of deals) / 6 (# of months) x 12 (# of months). If such calculation <= 180 (deals on an annualized basis) then Licensee will continue to pay i-Deal at the $75,000 per annum rate, payable monthly, in arrears. If such calculation > 180 (deals on an annualized basis) then Licensee will pay i-Deal at the $100,000 per annum rate, payable monthly, in arrears commencing at month 7.

2

The Fees shall include training time, customer service, disk storage and programming time for log-in validation.    In addition, Fees will include all table mappings as well as alert and synchronization of wires programming.

This Schedule 3 will commence on the Effective Date on and shall terminate on the second anniversary, unless otherwise mutually agreed in writing by i-Deal and Licensee (the "Schedule Term").Notwithstanding anything to the contrary contained this Schedule, either party may terminate this Agreement as set forth in the Master.

LEHMAN BROTHERS INC.                I-DEAL LLC

BY: _____      BY: _____
NAME: _Robert L Davis_____   NAME: _Allen Williams_____
TITLE: _____V P_____      TITLE: __MD_____

3