SCHEDULE 4

I-DEAL LLC

AND

LEHMAN BROTHERS INC.

FOR THE

I-PLANNER EVENT MANAGEMENT SYSTEM

**Product Description**
I-Planner manages all marketing and communications efforts globally across Cross Divisional Groups. The application is a role based system that has separate permissions for Coordinators, Research and Sales, and integrates with Lehman Brothers' internal account coverage and Client Relationship Management (CRM) applications to provide the most up-to-date client data.

The application allows Coordinators to set-up and manage various events including Deal Road shows, Company Marketing, Analyst Marketing, Conference 1:1s and Conference Calls. Users can view a calendar of events, submit requests for 1-on-1 and group meetings, and communicate in real-time with the Coordinator while the meeting is being scheduled. All meetings and travel can be managed by the Coordinator, and are centralized in one place on the schedule. Users can print detailed schedules, itineraries, and can generate user-defined reports to produce analysis by company, investor or salesperson.

**Services, Term and Charges**
I-Deal grants Customer a non-exclusive, non-transferable license during the Term (as defined below) to allow Customer to manage events globally (for purposes of this Schedule 4, events shall mean Deal Road shows, Company Marketing, Conferences, Analyst Marketing, Conference Calls, and other Non-Deal related events). This License covers users globally in Equity Sales and Trading, Equity Capital Markets, All Business Development Services (BDS) personnel engaged in Equity/Fixed Income Deal and Non-Deal Road shows, Equity Research, Analyst-related Company Marketing, Equity Deal and Non-Deal Road shows, and Fixed Income Division (FID) Road shows. Customer agrees to pay i-Deal the following fees (the "Fees") payable monthly on a prorated basis as provided in the Agreement:

   Year 1 - $250,000
   Year 2 - $300,000
   Year 3 - $350,000

Customer must renew in writing within 6 months of the License expiration. Customer may renew License based on the following terms:

   Renewal for 3 Year Term - $350,000 per year
   Renewal for 2 Year Term - $400,000 per year
   Renewal for 1 Year Term - $450,000 per year

The Fees shall include training time, customer service, and disk storage. In addition, Fees will include integration into Customer's CRM database, company portal, book-building application, and conference management application. All other charges including, without limitation, third party telecommunication charges, labor charges, late payment charges, and any sales taxes or other taxes that may apply, other than taxes on the income of i-Deal, are not included in the Fees.

2

This Schedule 4 will commence on the Effective Date, May 1, 2005, and shall terminate on the third anniversary of the Effective Date, unless otherwise mutually agreed by i-Deal and Customer (together with any renewal terms, the "Term"). Notwithstanding anything to the contrary contained in this Agreement, either party may terminate this Agreement upon notice to the other party if the other party has breached any of its material obligations under this Agreement and the breach is incurable or remains uncured for a period of thirty (30) days after notice of breach.

LEHMAN BROTHERS INC.

BY: _____

NAME: Daniel Wong

TITLE: Vice President

I-DEAL LLC

BY: _____

NAME: JENNIFER SUN

TITLE: MANAGING DIRECTOR

3

*ORIGINAL*

## SCHEDULE 5

## i-DEAL LLC

## AND

## LEHMAN BROTHERS INC.
(together with its subsidiaries and affiliates, "Licensee")

## FOR THE

## i-Deal Institutional and Retail Bookrunning System for Equities Offerings

This Schedule 5 to the Master License and Services Agreement, dated as of November 24, 2004 (the "Master Agreement") shall be effective as January 24, 2006 (the "Effective Date"). All capitalized terms used and not defined in this Schedule are used as defined in the Master Agreement. To the extent there is a conflict between the provisions of this Schedule and the provisions of the Master Agreement, the provisions of this Schedule shall control.

**Product Description:**
The i-Deal Institutional and Retail Bookrunning System (the "System") for equity securities offerings is a hosted software service that supports the marketing, order entry, bookbuilding, and allocation of new issue equity offerings to institutional and retail clients and contains the functional specifications set forth in Appendix A attached hereto and made part hereof. System service levels will be maintained with the addition of new customers.

**Integration Services, Implementation and Training; Development Services:**
i-Deal will provide the one-time integration services necessary to integrate the System with the following Licensee applications listed in the Integration section of Appendix A as they are in existence at the date hereof: The integration services will be provided for a period not to exceed eighteen (18) months, and shall be supervised by David Seidenfrau to the extent he remains employed by i-Deal during such period. Thereafter, any integration services will be mutually agreed upon by the parties and subject to a statement of work.

Upon completion of a full review of the integration and implementation requirements, the parties shall mutually agree upon a schedule pursuant to which such implementation shall occur, which schedule shall also set forth the responsibilities of the parties in achieving such implementation.

In the event i-Deal and Dealogic agree in writing to create interoperability between the System, or a portion thereof, and the Dealogic application, and such interoperability is completed and made available, then i-Deal shall provide such functionality that it has developed (the "Interoperability Functionality") to Licensee at no additional charge for implementation.

i-Deal will provide Licensee with up to 75 days of consulting services related to implementation of the System to be performed within the first twelve (12) months of this Schedule by one i-Deal developer, provided that Licensee provides i-Deal not less than thirty (30) days written notice of its request for such consulting services. Thereafter, any consulting services related to the implementation of the System will be charged at a rate of $1000 per professional day per developer. As part of the implementation services, and at no additional charge to Licensee, i-Deal will provide user training to the First Level Support Recipients (as defined below).

Licensee may request that i-Deal perform additional development work not contemplated hereunder. Such work will be performed pursuant to a mutually agreed statement of work. No development work performed shall be subject to the consent of any other i-Deal customer. If, the parties mutually agree in a statement of work, such statement of work shall specify that Licensee shall own all right, title and interest in and to the deliverable developed by i-Deal for Licensee pursuant to such statement of work. Further, if the parties mutually agree in a statement of work, such statement of work shall specify that the deliverable developed by i-Deal is a custom enhancement for Licensee and is subject to the terms and conditions set forth in such statement of work.

2

**Acceptance of the System**
Licensee shall work diligently to perform integration testing as the System is implemented, and shall commence user acceptance testing of the System immediately upon the completion of such integration testing. All such testing shall occur within thirty (30) days of any delivery date (the "Acceptance Period").

Acceptance of the System, or any enhancement or deliverable, will be based on Licensee's written determination that the System, or any enhancement or deliverable, materially conforms to the specifications set forth in Appendix A, and any other criteria mutually agreed upon in writing from time to time by the parties (the "Acceptance Criteria") and is acceptable (an "Acceptance Notice"). If the System, or any enhancement or deliverable, does not pass acceptance testing, Licensee will notify i-Deal, specifying in reasonable detail in what respects the System, or such enhancement or deliverable, has failed to meet the Acceptance Criteria (an "Error Notice"). i-Deal will, at no additional cost to Licensee, promptly correct any deficiencies disclosed by the acceptance testing and Licensee will repeat the acceptance testing within the Acceptance Period following delivery of a corrected version. If Licensee performs all acceptance testing within the applicable Acceptance Periods and timely provides Error Notices to i-Deal, and the System, or any enhancement or deliverable, fails to meet the Acceptance Criteria within 120 days of the date Licensee commenced acceptance testing of the System, or any enhancement or deliverable, Licensee may, at its option terminate this Schedule, if the testing related to the System, or terminate any statement of work. Except as provided below, the System, and each deliverable and enhancement, shall be deemed accepted by Licensee only when Licensee notifies i-Deal of its acceptance thereof by provision of an Acceptance Notice, provided, however, that if (a) Licensee does not provide any Acceptance Notice or Error Notice within ten (10) days after the end of each applicable Acceptance Period, or (b) Licensee prices a Deal (as defined below) in production on the System, such Deliverable shall be deemed accepted. The date of any such Acceptance Notice or deemed acceptance as provided in the foregoing sentence, shall be the "Acceptance Date." The parties specifically agree that Licensee's London office has not accepted the System until such time as Licensee's London office either (a) provides an Acceptance Notice, or (b) prices a Deal in production on the System, in each case in accordance with a mutually agreed upon functional specifications appendix for London. The parties further specifically agree that Licensee's offices in Asia have not accepted the System until such time as each such office either (a) provides an Acceptance Notice, or (b) prices a Deal in production on the System, in each case in accordance with a mutually agreed upon functional specifications appendix for such office.

**Service Levels and Support**

i-Deal System Operation. i-Deal shall host, or have hosted on its behalf, the System from secure data centers administered on a 24-hour x 7-day basis, or as otherwise agreed by the Parties. The System shall have sufficient hardware and software capacity such that it is capable of supporting at least 2,500 simultaneous user sessions for Users (as defined below) and 200 simultaneous User requests (collectively, "Peak User Demand"). In the event i-Deal deploys software for a customer other than Licensee, and such deployment causes Licensee to experience a materially negative impact on its ability to execute a Deal on the System, and such an event occurs three (3) times in any rolling six (6) month period, Licensee may request that i-Deal add redundant web servers to the hosting infrastructure for Licensee's use of the System, and i-Deal shall add such redundant web servers as promptly as possible but in no event later than more than sixty (60) days after such request. This option shall be available to Licensee only in the event the materially negative impact on Licensee's activities was caused directly by upgrades to the software image by i-Deal, where i-Deal had failed to notify Licensee more than 48 hours in advance of the nature of the change and where such change includes software designed for use by customers other than Licensee and a defect introduced in the new code, or where the change caused a regression error. Licensee shall be permitted to use the redundant web servers until the earlier to occur of (i) i-Deal correcting its software deployment process, or (ii) six (6) months; for no additional fee. If, at the end of the six-month period, Licensee elects to

3

keep the redundant web server, then Licensee shall pay an annual fee of $250,000, payable annually in advance, for the use of such server. This fee shall not be included in the calculation of the minimum or maximum fees set forth in the "Fees" section below.

i-Deal shall use commercially reasonable efforts to make the System Available (as hereinafter defined) for use by Licensee and its Users seven (7) days a week, twenty-four (24) hours a day, three hundred sixty-five (365) days a year, except for periods of maintenance as set forth below and Availability Exceptions (as hereinafter defined). As used in this Schedule 5, "Availability Exceptions" shall mean those instances in which the System is inaccessible, and such inaccessibility is determined after troubleshooting to be due to: (i) internet traffic problems not under i-Deal's reasonable control; (ii) the failure of, or problems relating to, Licensee's or its User's hardware, software, equipment or services not provided by i-Deal, including the Licensee's web site; and (iii) use by Users that exceeds Peak User Demand; and "Available" shall mean that the System is operating in conformance with the material terms of this Schedule and is accessible by Licensee's authorized Users except due to Availability Exceptions.

In the event Licensee becomes aware that the System is not Available to a User for any reason, Licensee shall immediately notify i-Deal by telephone in accordance with the following procedures:

(a) i-Deal shall provide Licensee access to its New York based client support staff between the hours of 7:30 a.m. and 8:00 p.m. E.S.T., Monday through Friday, and to its London based client support staff between the hours of 7:30 a.m. and 6:00 p.m. local London time to receive all service calls with respect to Deals from Licensee. Licensee shall provide first level support to receive all reports of incidents from its users designated by Licensee to have access to the System ("Users") including technical support (i.e., infrastructure, operating system/browser configuration, communications, lost/forgotten logins and passwords) and application support (i.e., navigation, guidance and functionality instruction) relating to the System; <u>provided</u> that i-Deal shall provide such first level support directly to Licensee's Equity Syndicate Desks, Institutional Salesforce, Retail Branch Coordinators, Middle Market Sales personnel and Private Investment Management Application Support Team ("First Level Support Recipients"). Licensee shall be responsible for resolving all Service Calls to the extent that they relate to (i) Licensee hardware, software, computer systems and equipment, including the Licensee web site and the configurations of any of the foregoing, but excluding the System, and (ii) information and content provided by Licensee. Support services shall include the availability, during business hours, of at least one developer and two support service personnel in London to assist in troubleshooting and supporting the Bookrunning application in the System, and not less than two support service personnel in Asia at such time as the System is implemented in Asia. At such time as support in Asia is implemented, such support staff, together with the client support staff in New York and in London, will, as a whole, result in client support staff availability on a 24/5 basis to receive calls. The primary relationship manager for Licensee shall be Jennifer Sun for so long as she is employed by i-Deal.

(b) If a First Level Support Recipient detects any material malfunctions, problems or errors (each, an "Error") in the System, such First Level Support Recipient shall contact i-Deal as promptly as practicable by calling i-Deal's designated telephone number as set forth in the escalation list attached hereto as Appendix B (the "Escalation List"). The First Level Support Recipient shall simultaneously contact a designated person from the Licensee escalation list set forth on Appendix B. i-Deal shall make reasonable efforts to respond to the First Level Support Recipient's initial telephone call with off-site telephone consultation, assistance and advice on use and maintenance of the System within one (1) hour of the First Level Support Recipient's first call for answers or assistance. If i-Deal fails

4

        to respond within one (1) hour after contact by the First Level Support Recipient at the designated telephone number, or if the First Level Support Recipient is unable, after three or more calls within a fifteen (15) minute time period, to reach the designated number, then the First Level Support Recipient shall attempt to contact the first person on the Escalation List and shall move on to the next more responsible or qualified person on the Escalation List until contact is made and a designated person responds to the call.

(c)     After the First Level Support Recipient reports a suspected Error, the designated Licensee contact shall consult with i-Deal to determine the severity of the Error, and whether the Error originated in the System or was caused by Licensee hardware, software, equipment or services not provided by i-Deal, including the Licensee's web site, and if the Error originated within the System, i-Deal shall work to correct the Error in accordance with the provisions of paragraph (d) below so that the i-Deal System operates in accordance with the functionality set forth in Appendix A (a "<u>Correction</u>") or i-Deal shall provide a workaround.

(d)     If, in accordance with subparagraphs (b) and (c) above, the First Level Support Recipient calls i-Deal to report that (1) Licensee is unable to use the System, or a significant function is not working, in each case resulting in a critical impact on Licensee's operations (a "<u>Level 1 Severity Error</u>"), after determining that the System is the cause of the Level 1 Severity Error, i-Deal shall immediately assign such development, engineering and other personnel as is necessary to help provide Licensee with a Correction, and such personnel shall work on a 24/7 basis until such Correction is provided; or (2) Licensee is able to access and use the System but its operations are severely impaired (a "Level 2 Severity Error"), after determining that the System is the cause of the Level 2 Severity Error, i-Deal shall, within 3 hours of such determination, assign such development, engineering and other personnel as is necessary to help provide Licensee with a Correction, and such personnel shall work exclusively on such Correction during normal business hours until such Correction is provided; or (3) Licensee is able to access and use the System, but the Error is having a low level impact on the System operation (a "Level 3 Severity Error"), after determining that the System is the cause of the Level 3 Severity Error, i-Deal shall, within one business day of such determination, assign such personnel necessary to help provide Licensee with a Correction, and such personnel shall work non-exclusively during normal business hours on each business day to provide such Correction. i-Deal shall provide a Correction for any other Error within thirty (30) days. i-Deal specifically agrees that in the event of a Level 1 Severity Error, i-Deal will begin working on the Correction concurrently with working with Licensee to determine the cause of the Level 1 Severity Error.

(e)     In the event that the Error reported pursuant to paragraphs (b), (c) or (d) above is not resolved to Licensee's reasonable satisfaction, the First Level Support Recipient may call persons on the Escalation List in the order indicated until the Error reported has been resolved to Licensee's reasonable satisfaction. If i-Deal does not correct a Material Error to Licensee's reasonable satisfaction during the time periods described in paragraph (d) above, i-Deal shall provide around the clock operations at no charge, including technical support and maintenance services, until the Material Error has been corrected.

<u>Service Level Credits</u>. If for any reasons other than a Force Majeure (as described in Section 12 of the Master Agreement) the System is not Available for more than two (2) hours on any calendar day (each an "<u>Outage</u>"), then Licensee shall be entitled to receive credits in the amount of $150 per hour for each hour of such Outage over two (2) hours; provided that if the Outage

5

occurs during the period beginning 24 hours before the pricing of a Deal and ending 24 hours after settlement of a Deal, the amount shall be increased to $1500 per hour. The total amount of credits available shall not exceed the transaction fees payable by Licensee in any calendar month, and in the event there are no transaction fees payable by Licensee in any calendar month, then there shall be no credits during such month; provided that transaction fees that would have been payable for Deals that occurred but could not be executed on the System due to Outage shall be counted as transaction fees paid during that month for purposes of providing Licensee with credits pursuant to this paragraph. i-Deal will credit Licensee the foregoing amounts for the calendar month during which the Outage(s) occurs within thirty (30) days following the end of such calendar month. Each of i-Deal and Licensee shall maintain complete and accurate records in sufficient detail to enable the amounts creditable hereunder to be substantiated.

i-Deal will commit to working continually with Licensee to help ensure optimal performance of the System at all times. To that end, i-Deal agrees to perform initial benchmark performance testing on the System within 30 days following a request by Licensee. Such testing shall occur for period not less than 5 business days. Thereafter, benchmark testing shall be performed in accordance with the procedures above following implementation of the System in each region to establish a benchmark in each region. Thereafter, tests shall be performed against established benchmarks in each region upon Licensee's reasonable prior request, but in no event more than twice per year in each region. Benchmark testing shall test server execution time in Sales Worksheet and Master Book. Benchmark testing shall also test "bytes sent"; provided the parties shall agree a testing plan to ensure that all variables remain constant in order to achieve accurate testing. In each case, i-Deal and Licensee shall mutually agree to the testing criteria, and any subsequent testing shall be based on the same criteria. In the event performance degrades by more than 3 seconds from the response times established during the most recent benchmark testing and such degradation has a duration of longer than one (1) hour (a "Degradation"), and such Degradation is determined in the reasonable judgment of the parties to have been caused by i-Deal or the System, then i-Deal shall remedy the Degradation within twenty (20) business days of such determination. In the event the Degradation is not remedied by the end of such twenty (20) business day period, Licensee shall be entitled to a credit in the amount of $1000 per day for each day after the expiration of such period, ending on the day prior to i-Deal remedying the Degradation. The total amount of credits available shall not exceed the transaction fees payable by Licensee in any calendar month, and in the event there are no transaction fees payable by Licensee in any calendar month, then there shall be no credits during such month. i-Deal will credit Licensee the foregoing amounts for the calendar month during which the Degradation(s) occurs within thirty (30) days following the end of such calendar month. Each of i-Deal and Licensee shall maintain complete and accurate records in sufficient detail to enable the amounts creditable hereunder to be substantiated.

**Maintenance**
i-Deal shall maintain the hardware provided by i-Deal or used by i-Deal to operate the System and provide the services so that the functionality required by Users is operating in material accordance with this Schedule. i-Deal shall perform maintenance that requires interruption of the operation of the System during the hours of 8:00 p.m. Friday through 5:00 p.m. Sunday, E.S.T. If i-Deal is required to perform maintenance that requires interruption of the System outside of the hours mentioned in the previous sentence, i-Deal shall use commercially reasonable efforts to notify Licensee at least forty-eight (48) hours prior to the beginning of such maintenance of the times that the System will not be available as a result of such maintenance. In the event of emergency maintenance, i-Deal shall provide notice to Licensee at least one (1) hour prior to the start of such emergency maintenance, provided that, if such one (1) hour notice is not possible, i-Deal shall notify Licensee promptly upon deciding to commence such emergency maintenance. i-Deal will provide Licensee with all enhancements made to the System, including all enhancements made in response to new regulatory requirements, and all new versions of the System regardless of whether the name of the System changes, to the extent such enhancements are made generally available to all i-Deal clients at no charge.

6

**Ownership**
Licensee shall retain all right and title to, and interest in all data input into the System by Licensee ("Licensee Data"), including all intellectual property rights therein. Licensee hereby grants to i-Deal a perpetual, non-exclusive, worldwide, royalty-free license to post and use the Licensee Data solely in connection with providing the services to Licensee. Upon the expiration or termination of this Schedule for any reason, i-Deal shall upon the reasonable request of Licensee, return to Licensee all copies of Licensee Data in its possession or control, or destroy such Licensee Data, including any copies or reproductions thereof, as may be directed by Licensee and certify in writing that such return or destruction has been completed.

All proprietary materials provided to i-Deal by Licensee are the sole and exclusive property of Licensee, including all intellectual property rights in such materials. Notwithstanding the foregoing, except as otherwise specifically set forth in a statement of work with respect to a deliverable, i-Deal shall own right, title, and interest in and to the System, all general enhancements thereto, all derivative works thereof, and all other proprietary materials of i-Deal (collectively, "i-Deal Products"), and, in each case, all intellectual property rights therein. For the avoidance of doubt, except as otherwise agreed by the parties in writing, i-Deal shall be the sole owner of all title, right and interests to and in all portions of i-Deal Products created hereunder by i-Deal that embody or incorporate any Licensee proprietary materials. The parties will make reasonable efforts to create a statement of work which designates Licensee as the owner of the intellectual property rights in a deliverable where appropriate. Licensee proprietary materials shall not include any materials that that are (i) not unique to Licensee at the time such materials were first disclosed to i-Deal by or on behalf of Licensee, other than as a result of a breach by i-Deal of any provision of this Schedule or the Master Agreement, (ii) available in the public domain or are otherwise generally known in the financial services industry, in each case other than as a result of a breach by i-Deal of any provision of this Schedule or the Master Agreement, or (iii) independently developed by i-Deal without reference to any Licensee proprietary materials.

**Fees**
i-Deal grants Licensee a non-exclusive, non-transferable, worldwide license during the Term (as defined below) to allow one Licensee equity syndicate desk in the US, one Licensee equity syndicate desk in the UK, and two Licensee equity syndicate desks in Asia to conduct equity deals (for purposes of this Agreement, deals shall mean the marketing, order entry, bookbuilding, and allocation of new issue equity offerings of the product and security types listed in Appendix A to institutional and retail clients, each a "Deal") using the System. Licensee acknowledges the time and work involved in performing the integration and other services necessary to implement the System at Licensee. In consideration of such undertakings by i-Deal, Licensee agrees to use the System, with the limited exception for certain Deals, for all Deals that are appropriate to be run on the System in each region covered by this Schedule following the Acceptance Date in each such region; provided that the System is Available.

In exchange for such license and the support and maintenance services described herein, Licensee agrees to pay i-Deal the following fees:

$19,500 per Deal utilizing the System; provided that, prior to the Acceptance Date for the Retail Bookrunning System in the US, the fees shall be $15,750 per Deal. Fees shall be charged on priced Deals where Licensee is a bookrunner.

Licensee shall pay i-Deal all fees due to i-Deal in connection with the services provided hereunder as determined in accordance with this Agreement, any applicable statements of work and the pricing terms below, provided that each 12-month period during the Initial Term beginning on the Acceptance Date for the Institutional Equity System in the US, the fees for Deals shall not exceed $2.5 million.

7

During each 12-month period in the Initial Term beginning on the Acceptance Date for the Institutional Equity System in the US, the total amount of fees invoiced to Licensee for Deals shall not be less than $1.5 million. In the event that the total amount of fees for Deals paid by Licensee during any such 12-month period in the Initial Term is less than $1.5 million, i-Deal shall invoice Licensee by the end of the second full calendar month after the expiration of such 12-month period for, and Licensee shall pay in accordance with the invoicing provisions below, the difference between $1.5 million and the total fees for Deals paid during such period.

The Fees shall include training time for the First Level Support Personnel described above. All other charges including, without limitation, late payment charges, and any sales taxes or other taxes that may apply, other than taxes on the income of i-Deal, are not included in the Fees and shall be invoiced separately. The parties specifically agree that for purposes of Section 9 of the Master Agreement, fees paid by Licensee to i-Deal pursuant to this Schedule shall not count towards the aggregate amount of fees used to determine the limit of liability with respect to any product or service under the Master Agreement except for the System provided pursuant to this Schedule.

Licensee agrees that at i-Deal's request it will reimburse i-Deal for all out-of-pocket costs and expenses, including travel and related expenses, incurred by i-Deal in connection with performing the services under this Schedule; provided i-Deal received Licensee's prior approval with respect to such expenses. Such costs and expenses shall be invoiced separately to Licensee in accordance with the invoicing provisions below. Upon the request of Licensee, i-Deal shall submit supporting documentation (such as third party receipts or invoices) in addition to the invoice for such costs and expenses.

Until such time as the Interoperability Functionality is available but in any event for no longer than the earlier to occur of (a) the termination or expiration of this Schedule or (b) three years from the date hereof, i-Deal will reimburse Licensee for fees paid to Dealogic for use of the Dealogic Bookbuilder API required for interoperation between i-Deal and Dealogic's Bookbuilder application; provided that such fees shall not, individually or in the aggregate, exceed $35,000 in any twelve-month period. Subject to the foregoing limitation, such fees will be reimbursed to Licensee within thirty (30) days of i-Deal's receipt from Licensee of an invoice from Dealogic for such services. i-Deal agrees to use commercially reasonable efforts to persuade Dealogic to cooperate in building the Interoperability Functionality.

All outstanding undisputed fees accrued, owed, or due under this Schedule shall be paid by Licensse regardless of termination.

### Invoicing

i-Deal shall invoice Licensee no later than fifteen (15) days after the end of each calendar month for all fees and expenses incurred in connection with performing its obligations hereunder during the previous calendar month that are payable to i-Deal under this Agreement. Licensee shall not be invoiced for any fees or expenses other than those fees or expenses expressly stated or authorized in this Agreement. Each invoice shall include a description of the services covered by such invoice. Licensee shall pay all invoiced amounts within forty-five (45) days following receipt of the invoice. Any amount not paid by Licensee and not subject to bona fide dispute within ninety (90) days after receipt of the invoice shall bear interest at the rate of one and one-half (1.5%) percent per month or the maximum rate permitted by applicable law, whichever is less, computed and compounded on a daily basis from the end of such ninety (90) day period following receipt of such invoice until the date paid.

### Fixed Income Bookrunning System

In the event Licensee and i-Deal mutually agree a Schedule for Licensee's use of i-Deal's Fixed Income Bookrunning System, i-Deal warrants that the pricing terms with respect to such Fixed Income Bookrunning System considered as a whole, granted by i-Deal to Licensee pursuant to Schedule shall be at least as favorable as the pricing terms that are then being offered by i-Deal

8

to any of its other customers receiving similar services and similar functionality at similar service levels, with similar transactional flow, numbers of users, credits for service failures and minimums and caps on fees as Licensee.

Term

This Schedule will commence on the Effective Date and shall continue in force until the third anniversary of the Acceptance Date, unless otherwise mutually agreed by i-Deal and Licensee (the "Initial Term"). The parties may enter into successive renewal terms following the expiration of the Initial Term or any Renewal Term upon mutual written consent, the length of which shall be determined by Licensee as provided below (each, a "Renewal Term" and, together with the Initial term, the "Term").

Not less than one hundred and twenty (120) days' prior to the end of the Initial Term or any Renewal Term, Licensee shall notify i-Deal in writing whether it elects to terminate this Schedule or whether it elects to renew this Schedule. i-Deal shall be obligated to notify Licensee in writing at least forty-five (45) days in advance of the 120-day notice period specified in the preceding sentence. If Licensee elects to renew the Schedule, it may do so on the following terms:

- If Licensee elects a Renewal Term of one year, all fees enumerated in this Schedule shall be increased by 12% over the then-current rates, and the minimum and the cap shall be increased by 12% over the then-current minimum and cap amounts, in each case for the duration of such one-year Renewal Term;

- If Licensee elects a Renewal Term of two years, all fees enumerated in this Schedule shall be increased by a one-time 10% increase over the then-current rates, and the minimum and the cap shall be increased by 10% over the then-current minimum and cap amounts, in each case for the duration of such two-year Renewal Term; or

- If Licensee elects a Renewal Term of three years, all fees enumerated in this Schedule shall be increased by a one-time 8% increase over the then-current rates, and the minimum and the cap shall be increased by 8% over the then-current minimum and cap amounts, in each case for the duration of such three-year Renewal Term.

For the sake of clarity, below are two examples of how renewal fee increases work:

**Example One – Licensee Renews for a Two Year Term Following the end of the Initial Term**

The fees are increased by 10%, to $21,450 upon renewal and will not increase again during the two-year term. The minimum amount is increased by 10% to $1,650,000 and the cap is increased to $2,750,000.

**Example Two – Licensee Renews for a Three Year Term Following the end of the Initial Term and then for a Two Year Term following the end of the Three-Year Renewal Term**

Following the end of the Initial term, Licensee elected a three year renewal and the fees were increased by 8%, to $21,060, and the minimum and the cap were increased to $1,620,000 and $2,700,000, respectively. Those fees do not increase again during the three year renewal term. At the end of the three year renewal term, Licensee elects to renew for another two years. The fees are then increased by 10% to $23,166, and the min and the cap are increased to $1,782,000 and $2,970,000, respectively.

Notwithstanding anything to the contrary contained in this Agreement, either party may terminate this Agreement upon notice to the other party if the other party has breached any of its material obligations under this Agreement and the breach is incurable or remains uncured for a period of thirty (30) days after notice of breach.

9

Notwithstanding the foregoing, beginning on the date that is eight months following the Acceptance Date of the Institutional Equity System in US, Licensee may terminate this contract at any time upon not less than 180 days prior written notice ("Termination Notice") to i-Deal upon the following terms:

Within thirty (30) days of the date of the Termination Notice, Licensee will pay to i-Deal an amount that is the greater of (a) the aggregate amount of transaction fees owed to i-Deal as of the date of the Termination Notice, which transaction fees shall have accrued as of the Acceptance Date of the Institutional Equity System in New York, or the anniversary of such Acceptance Date, whichever is later and (b) an amount that is equal to $2 million divided by 12 multiplied by the number of months (plus any fractional portion of the current month) that have elapsed since the Acceptance Date of the Equity System in New York or the anniversary of such Acceptance Date. Additionally, during the 180-day period following the Termination Notice, Licensee shall, within fifteen (15) days following the end of each 30-day period following the Termination Notice, pay to i-Deal $250,000. At the end of the 180-day period, if the aggregate amount of the transaction fees that would have been payable during such period is greater than $1.5 million, then, within thirty (30) days following the end of such 180-day period, Licensee shall remit to i-Deal an amount equal to the difference between the aggregate amount of the fees that would have been payable and $1.5 million. For the sake of clarity, to follow are two examples of how the termination payments described in this paragraph will work:

**Example One**
Contract signed on January 15, 2006 (Effective Date). System implemented and in production in US on April 15, 2006 (Acceptance Date). Lehman sends termination notice on December 15, 2006 (Notice Date) – notice period ends 180 days later on June 15, 2007 (Termination Date).

First, after Lehman send the termination notice, the parties true-up as of the Notice Date – if the aggregate amount of transaction fees paid during the period from April 15 (Acceptance Date) through December 15 (Notice Date) is less than $1,333,333.33 million (i.e. $2 million floor prorated to reflect an 8-month period), then Lehman will pay the difference to i-Deal.

Second, during the period from December 15 through June 15 (180 day termination period), Lehman pays i-Deal $250,000 per month. After June 15, if the aggregate amount of the transaction fees that Lehman would have paid to i-Deal during the 180-day termination period is greater than $1.5 million, then Lehman will pay to i-Deal an amount equal to the aggregate amount of transaction fees that would have been minus $1.5 million.

**Example Two**
Contract signed on January 15, 2006 (Effective Date). System implemented and in production in US on April 15, 2006 (Acceptance Date). Lehman sends termination notice on November 15, 2007 (Notice Date) – notice period ends 180 days later on May 15, 2008 (Termination Date).

First, after Lehman send the termination notice, the parties true-up as of the Notice Date. The parties have already trued up for the first year (April 15, 2006 to April 14, 2007 – the first anniversary of the Acceptance Date). The parties now need to true-up for the stub period (April 15, 2007 through the Notice Date, November 16, 2007). If the aggregate amount of transaction fees paid during the period from April 16, 2007 through November 16, 2007 is less than $1,166,666.67 ($2 million floor prorated to reflect a 7-month period), then Lehman will pay the difference to i-Deal.

Second, during the period from November 16, 2007 through May 15, 2008, Lehman pays i-Deal $250,000 per month. After May 15, if the aggregate amount of the transaction fees that Lehman would have paid to i-Deal during the 180-day termination period is greater than $1.5 million, then Lehman will pay to i-Deal an amount equal to the aggregate amount of transaction fees that would have been minus $1.5 million.

10

Expressed as a formula, the payments will be as follows:

**Pay-out Formula**

- $X =$ Acceptance Date (Year 1)/ Anniversary date if in year 2 or greater of contract
- $Y =$ Start of Termination Date (minimum 8 months from X)
- $Z =$ Termination Date (6 months from Y)
- $P =$ Payment to i-Deal
- $F =$ Fees collected during Y - X
- $T =$ # of months between Y- X
- $U =$ Fees collected between Z - Y

$P =$ {Greater fee between ((T /12) *2,000,000) or F} + {Greater fee between (U) or 1.5 million}

Following the Initial Term, Licensee can terminate at any time upon not less than 180 days prior written notice.

**No Solicitation**
During the Term and for a period of one (1) year thereafter, neither party shall, directly or indirectly, on its own account or in conjunction with or on behalf of any other person, solicit for hire any employees of the other party with whom such party has contact in connection with this Agreement. Licensee shall not, without the prior written consent of i-Deal, directly or indirectly, solicit for hire any independent contractor or subcontractor of i-Deal with whom Licensee has contact in connection with this Agreement. This Section shall not apply in the event that any such employee of either party seeks employment with the other party in response to a general advertisement or recruiting effort.

**Assignment**
Neither Licensee, on the one hand, or i-Deal on the other hand, may assign, sub-license, sub-contract, charge or otherwise encumber any of the rights or obligations under this Agreement or any part thereof without the prior written consent (such consent not to be unreasonably withheld) of the other party, except that any party may assign this Agreement to any entity which, as of the date hereof, controls, is controlled by, or is under common control with such party. In the event Licensee acquires or merges with another entity in a manner that does not require i-Deal's consent pursuant to this Section, Licensee agrees that within six (6) months following such merger, the parties shall renegotiate this Schedule in good faith to reflect the new level of Deals transacted by the combined entity.

| LEHMAN BROTHERS INC. | I-DEAL LLC |
|---|---|
| BY: _[signature]_ | BY: _Scott C. Ganeles_ |
| NAME: Daniel Wong | NAME: Scott C. Ganeles |
| TITLE: VP | TITLE: CEO |

11

## Appendix A

The i-Deal Institutional Equity and Retail applications shall include all the functionality in such applications as of the date hereof and shall support the following Deal Types: Initial Public Offering, Follow-on Offering, Secondary Offering, Block Trade/Overnight Offering, Closed End Fund, REIT, PIPEs, Private Placements and Convertible Bond. In conjunction with the Deal Types listed above, i-Deal Institutional Equity supports the following Product Types: Common Stock, Common Class A Stock, Common Shares of Beneficial Interest, Convertible Subordinated Notes, Convertible Bonds, Convertible Preferreds, Common Units, American Depository Shares (ADS), American Depository Receipts (ADR), Global Depository Receipts (GDR), Holder Shares, Ordinary Shares, Zero Coupon and Discount Bonds and Warrants, Equity-linked Notes, Structured Products and Preferreds, in each case as such Product Type is currently run in the System or using the functionality set forth in this Appendix A. Any other deal types and instruments not included above will be added at no charge to Licensee provided such addition takes less that one developer working 5 business days. Any other items discovered during user acceptance testing shall be added to this Appendix A as mutually agreed by the parties.

**Functional specifications in the Equity Institutional Bookbuilding application include the following:**

1. **Syndicate Desk Functions**
    a. Deal Set-Up
    b. Deal download
    c. View Deal Calendars
    d. Deal Access Controls for Permissioning including allowing retail-only and institutional-only viewing
    e. Manage Syndicate Participations and Allocations
    f. Content Management (Offering Documents, Marketing Materials)Investor profiles
    g. Manage Deal Economics
    h. Enter Indications and Allocations including Institutional retention
    i. Send and Receive Wires
    j. MasterBook (sorting, filtering, reporting, functions, data entry and viewing data)
    k. Joint Books with other i-Deal Clients
    l. Joint Books Internationally via Bookbuilder APIReports based on what is currently used in Lehman's existing bookbuilding application
    m. Master Lists for Managing Standing Data
    n. Multi-currency
    o. 2790-blocking
    p. Trader, roadshow meeting and desk feedback
    q. Designations calculations
    t. Access to flips and reports

2. **Syndicate Operations/Accounting Functions**
    a. Send and Receive Wires
    b. Manage Designations – based off of agreed upon specs
    c. Non-Lead Deal Information Entry to the extent mutually agreed by the Parties
    d. Broker Penalty Bid Tracking (does not include separate fees that may be charged by the DTC)
    e. Revenues and Expenses Tracking
    f. Final Settlement

12

g. Monitor booking of trades thru reports

3. **Compliance Functions**
   a. Audit Trails on Indications and Allocations
   b. 2790 Certifications (data collection and processing)
   c. QIB Certifications (data collection and processing)
   d. Prospectus Tracking in the MasterBook
   e. Regulatory Wires
   f. Read-only View to the System (if required)

4. **Institutional and Middle Markets Sales Functions**
   a. View Deal Calendar
   b. Enter Indications
   c. View inst and retail Allocations
   d. Enter Trade Breakdowns
   e. Ack allocations and send info to Icam
   f. View and Enter Designations
   g. View and Send Prospectuses
   h. View and Access Market Material Posted by the Syndicate Desk
   i. View 2790 and QIB Statuses
   j. For ipos needs series 8 approval process
   k. Integration with i-Planner
   l. Ability to access retail app from inst
   m. Reports:Pricing Sheets, Investor History, Deal Performance, Ticket Variance.
   n. Screens based off of acct coverage
   o. Search for investor history off of order screen

5. **Prospectus Functions for Institutional and Retail**
   a. Global consent – contacts click on a link which is tracked by i-Deal as "consented"
   b. Block IOI entry by Sales unless System indicates a prospectus and global consent has been sent
   c. Block e-mail delivery of prospectus unless System indicates a global consent has been received
   d. Ability to change consent status – sales can revoke consent
   e. Request for hardcopy sent to mail queue for a spreadsheet to be created
   f. E-mail notification of hardcopy request mail queue at 3 pm each day of Deal to Deal admin
   g. Ability for sales to enter number of hardcopies to be sent to a contact
   h. Ability for Sales to select delivery via e-mail or hardcopy or both or attesting they sent by themselves – must choose a contact that they sent it to when attesting to it
   i. No overnight mail option available to Sales
   j. Ability to send electronic recirculations, amendments, supplements and free-writing prospectuses to all contacts who received prior documents for a Deal by hardcopy, or electronically or to the contacts who have attested to sending the hardcopy themselves.
   k. Create report for each Deal showing which contacts received email delivery, hardcopy via the system or a Sales person, and which gave global consent
   l. For recirculations, global consent is not needed and emails will be sent to those who received a hardcopy or for those contacts that received a hardcopy directly from a Sales person. The Syndicate Desk needs the ability to send a recirculation out themselves and to send to all contacts who have already received a previous document from Lehman. Sales people will not send recirculations.
   m. Indicator in Master Book showing account has been sent a prospectus
   n. Ability to turn prospectus functionality off for certain deals

13

o. Ability to support different emails for different deal types and between Retail and Institutional
p. If Syndicate Desk is entering an IOI, they need to select at least one contact before the IOI can be accepted
q. Choice to include a contact for each deal and the ability to revoke this choice – the contact / account will then populate on the next deals. If not clicked then will not appear unless the next deal is the same sector. The sales person would then have to manually add the contact
r. Audit tracking by account per contact showing what was sent and to whom it was sent and status – for consent and communication page for sales to view
s. Audit tracking showing status of emails – whether sent, failed, accessed
t. Content Management for Syndicate Desk to upload deal documents
u. In regards to prospectus functionality for the Retail application; detailed specifications still need to be determined; however, functionality will be less than or substantially similar to those outlined in this section (Section 5 under Appendix A) for the Institutional Bookbuild application

Functional specifications in the Equity Retail application include the following:

a. View Deal Calendar
b. View Deal Summary
c. Access Controls to Manage Deal Level Permissioning
d. Accts restricted as syndicate and branch level
e. Access Deal Related Documents – loaded once from inst side
f. Views of Overall Retail Demand, Branch Book, Rep Book and Account Book
g. Enter Indications and Allocations
h. Manage Retail Order Book
i. Compliance Approval Process
j. For all deals needs series 8 approval process
k. Branch Maintenance to Manage/View Account Restrictions
l. Submit Trades to TMS and View Status
m. Search for TMS and Master Accounts
n. Access and Download 2790 and QIB Forms
o. Search for Historical Deals
p. Deal and cross deal reports based on what is currently used in Lehman's existing Retail application
q. Ability to access institutional application from retail application
r. In addition to the functional requirements listed in this section, any functionality already documented in Retail User Guides that have been made available to Lehman Brothers will also be included

**Integrations**

a. LCAM – i-Deal to send trades to LCAM. LCAM to send trade status back to i-Deal
b. GSS – Integration between GSS and i-Deal for sales coverage and sales credit processing
c. Historical Data Migration – Deal data from 2000 will be migrated from SynDesk, SynTicket and Bookbuilder
d. Lehman Live – Single sign on for all users from LehmanLive to i-Deal Institutional and i-Deal Retail
e. Lehman Prospectus – Integration of Lehman's internally built prospectus application and i-Deal MasterBook and Sales Worksheet
f. Communicator Inc. – Integration of 2790 and QIB status into the MasterBook and SalesWorksheet

14

  g. Data replication from i-Deal Institutional and i-Deal Retail back to Lehman
  h. Integration between i-Deal Institutional, i-Deal Retail and i-Planner systems
  i. Integration of i-Deal Retail and i-Deal DSP applications
  j. TheMarkets.com
  k. URL for Dealogic deal calendar – subject to further investigation as to feasibility

## Appendix B

## Escalation List

**i-Deal**

**i-Deal Institutional Bookbuild Product**

| | | |
|---|---|---|
| i-Deal Client Services | 1-866-708-4357 | help@i-Deal.com |
| Brad Johnston | 212-849-5083 | brad.johnston@i-Deal.com |
| Christopher Hayes | 212-849-5087 | christopher.hayes@i-Deal.com |
| Kathy Cassidy | 212-849-5080 | kathleen.cassidy@i-Deal.com |
| Jennifer Sun | 212-849-5008 | jennifer.sun@i-Deal.com |

**i-Deal Retail Product**

| | | |
|---|---|---|
| i-Deal Client Services | 1-866-708-4357 | help@i-Deal.com |
| Barrie Effron | 212-849-5071 | barrie.effron@i-Deal.com |
| Diogenes "DJ" Balsam | 212-849-5109 | diogenes.balsam@i-Deal.com |
| Glenn Judson | 212-849-5111 | glenn.judson@i-Deal.com |
| Jennifer Sun | 212-849-5008 | jennifer.sun@i-Deal.com |

**Integration Services (Single Sign-on, Bridgehead and Inbound Data Feeds)**

| | | |
|---|---|---|
| David Bozett | 212-849-5072 | david.bozett@i-Deal.com |
| David Lancer | 212-849-5107 | david.lancer@i-Deal.com |
| David Seidenfrau | 212-849-5327 | david.seidenfrau@i-Deal.com |

**After Business Hours Emergencies**

i-Deal NOC (Network Operations Control) Group    212-849-5210    NOC@i-Deal.com

**Licensee**

**Lehman Brothers ECM First line of support (ecmtech@lehman.com)**

| | | | |
|---|---|---|---|
| Gary Lilienfeld | 212-320-6093 (work) | 917-207-5396 | glilienf@lehman.com |
| Jason Look | 212-320-6092 (work) | 917-8378334 | jlook@lehman.com |
| Naresh Krishnani | 212-320-7202 (work) | 201-4569851 | nkrishna@lehman.com |
| **Network operations** | netops@lehman.com | | |
| **Windows Server** | Windows_AM_LB_Sup_Server@Lehman.com | | |

16

**Syndicate Desk**

| | | |
|---|---|---|
| Danny King | 212-526-8100 | dking@lehman.com |
| Eric Treiling | 212-526-8100 | etreilin@lehman.com |
| Sean Joyce | 212-526-8100 | sjoyce@lehman.com |

**Syndicate Operations**

| | | |
|---|---|---|
| Michael Bouloubasis | 201-499-8157 | mbouloub@lehman.com |
| Saul Spital | 201-499-8161 | sspital@lehman.com |

**Booking Trades (Back office)**

| | | |
|---|---|---|
| Kirk Butryn | 212-526 9248 | kbutryn@lehman.com |
| John Dolan | 212-526-9294 | jdolan1@lehman.com |

**Booking Trades (technical support)**

| | | |
|---|---|---|
| Ravi Jasti | 212-320-6109 | rjasti@lehman.com |