Jun 22 07 11:48a    Erin Murphy                                516 409-1488           p.1

# SCHEDULE 6

## i-DEAL LLC

## AND

## LEHMAN BROTHERS INC.
(together with its subsidiaries, "Licensee")

## FOR THE

## Equity Deals Database

I

This Schedule 6 to the Master License and Services Agreement, dated as of November 24, 2004 (the "Master Agreement") shall be effective as June 21, 2007 (the "Effective Date"). All capitalized terms used and not defined in this Schedule are used as defined in the Master Agreement. To the extent there is a conflict between the provisions of this Schedule and the provisions of the Master Agreement, the provisions of this Schedule shall control. The Feed and the Data (each as defined below) shall be considered as Services under the Master Agreement.

**Product Description**

The i-Deal Equity Deals Database is a compilation of US and global Equity and Equity-linked deals. For the fees set forth below, i-Deal shall provide Licensee a feed from the database as follows (the "Feed"):

Frequency:   3 times/day (by 9 AM Eastern Time, by 1 PM Eastern Time, by 5 PM Eastern Time).
Format:      Delimited file
Location:    Feed sent to Lehman ftp server (ftp.lehman.com)

Data:        Subject to the pricing set forth in the Fee Chart below, the data sent via the Feed shall consist of between 25 and 75 fields of the year-to-date US and global Equity and Equity-linked deals as compiled and stored in the i-Deal Equity Deals Database, and deltas to such data thereafter during the Term (as defined below) (the "Data").

i-Deal shall not be responsible for the procurement, installation or maintenance of any equipment on which the Feed is accessed or the Data is used by Licensee.

**Fees**

- A one-time implementation fee of $5,000 will be invoiced upon execution of the Agreement.

- Licensee will have the right to use the Data in accordance with this Schedule on a trial basis at no charge for a period of 30 days following the Effective Date (the "Trial Period"). Licensee shall provide written notice at least two (2) business days prior to the end of the Trial Period if it wishes to terminate this Schedule. Licensee shall purge all Data within three (3) business days following delivery of such notice. In the event no such notice is delivered, the day after the Trial Period ends shall be deemed the "Schedule State Date" and, for the period beginning after the Schedule Start Date, i-Deal may invoice and Licensee shall pay the amounts set forth bellow in the Fee Chart. The parties may extend the thirty-day trial period described above upon

2

mutual written agreement.

- The Fee will be $40,000 per contract year for the Initial Term. Thereafter for any Renewal Term, the Fee will be subject to an increase by Supplier on each one-year anniversary of the Schedule Start Date by providing written notice to Licensee at least ninety (90) days prior to the end of Initial Term or the then-current Renewal Term, as applicable; provided, such increase will not exceed an amount equal to 5% of the then current Fee.

Licensee address for invoices:
   Name: Michael Wang
   Address: 70 Hudson St., 10th Floor
   Jersey City, NJ 07302

   Tel: 201-499-4987
   Fax:
   E-mail: miwang@lehman.com

Fee Chart

| Data Set | # of Fields | Annual Fee |
|---|---|---|
| US Equity | 0-25 | $30,000.00 |
| US Equity | 25-75 | $35,000.00 |
| US Equity | 76 and over | $40,000.00 |
| Global Equity | 0-25 | $35,000.00 |
| Global Equity | 25-75 | $40,000.00 |
| Global Equity | 76 and over | $45,000.00 |
| One-time Implementation Fee | | $5,000.00 |

**License Grant**

The following replaces the language in Section 1 of the Master Agreement in its entirety: Subject to the provisions hereof, i-Deal hereby grants to users of the Syndicate Allocations Application (as defined below) located in all Licensee (or its Affiliates) worldwide locations, a non-sub-licensable, non-transferable, non-exclusive, limited license, during the term of this Schedule to: (1) access the feed, (2) store, archive, and display the Data in the Syndicate Allocations Application, (3) within the Syndicate Allocations Application override the Data or correct the Data as Licensee (or its Affiliates) deems necessary, (4) provide and distribute (orally, in writing, by hard copy or

3

electronically (but not via feed, API or FTP)) internally to users of the Syndicate Allocations Application and to Lehman Brothers clients only and on a no-charge basis only, Insubstantial Amounts of the Data (for the avoidance of doubt, including using commonly used applications such as Excel, PowerPoint or PDF). "Insubstantial Amounts of the Data" shall mean an amount of the Data that (a) has no independent commercial value, (b) could not be used by Licensee as a substitute for the Service or a discrete or substantial part of it, (c) is not separately marketed or re-sold commercially by Licensee or its Affiliates, and (d) is not regularly or systematically retrieved from the Syndicate Allocations Application or otherwise by Licensee or its Affiliates.

For purposes of this Schedule 6, "Syndicate Allocations Application" shall mean Licensee's (or its Affiliates') proprietary syndicate notification calendar that is accessible internally via intranet by all private and institutional money management teams and relevant compliance, legal or corporate support (e.g., CAO, IT support,) employees within the Lehman Brothers Asset management (buy-side) business.

**Change in Services**

i-Deal may change the content, format, medium and/or means of access to or delivery of the Data at any time. i-Deal shall provide Licensee with ninety (90) days notice of any such change, including but not limited to, change in file format, modifications of external fields, or change in data display, that would have a material adverse effect on Licensee's use of the Data. In the event that any such change would cause Licensee to incur a significant and material expense or would impact Licensee such that its use of the Data would constitute a significant departure from the Data as originally provided, then Licensee may terminate this Schedule upon thirty (30) days' written notice and receive a pro rata refund of any fees paid in advance but unearned as of the effective date of such termination.

**Use Restrictions**

Except as expressly permitted herein, Licensee will utilize reasonable commercial efforts to prevent unauthorized individuals from accessing the data and Licensee will not (a) copy the Data unless internal controls are implemented to ensure that the Data is not accessed by unauthorized individuals or used for purposes not expressly authorized hereunder; (b) except as otherwise provided herein, Licensee will not alter, modify or adapt the Data including, but not limited to, translating or creating derivative works of the Data; or (c) distribute or disseminate the Data except as expressly permitted in the "License Grant" section above. Licensee agrees that any user identifications, passwords or other entitlement information related to Licensee's authorized users shall be

4

maintained in confidence and used only by the user to which such information is assigned.

Licensee agrees to use the Data only as expressly permitted by this Agreement and in accordance with all applicable laws, rules and regulations. Licensee will not permit the use of the Data or the Feed, in whole or in part, by any other unauthorized person or for any purpose other than as expressly permitted hereunder. Except as expressly set forth herein, Licensee shall have no rights or licenses to the Data.

### Term

This Schedule will commence on the Schedule State Date and shall continue for a period of two (2) years (the "Initial Term"), unless earlier terminated as provided herein (or the Master Agreement). This Agreement shall renew automatically for subsequent one (1) year terms (each such renewal term shall be referred to herein as a "Renewal Term" and together with the Initial Term, shall be referred to herein as the "Term"), unless either party provides the other party with written notice of non-renewal at least thirty (30) days' prior to the commencement of any Renewal Term. Upon the expiration or termination of this Schedule, Licensee shall not be required to purge the Data except in the event of termination by i-Deal for Licensee's material breach of the terms of the License Grant or Use Restrictions set forth herein. Following the termination or expiration of this Schedule, Licensee's use of the Data shall continue to be governed by and subject to the License Grant and Use Restrictions set forth herein.

Licensee acknowledges that: (a) i-Deal has advised Licensee the Data constitutes copyrighted, trade secret, and/or proprietary information of substantial value to i-Deal and its third party providers; (b) Licensee receives no proprietary rights whatsoever in or to the Data; and (c) as between Licensee and i-Deal, title to the Data and rights and legal protections with respect thereto remain exclusively with i-Deal.

### Limitations of Liability

THE DATA IS PROVIDED TO LICENSEE "AS IS" AND NEITHER I-DEAL, ITS AFFILIATES NOR ANY OF ITS PROVIDERS MAKES ANY REPRESENTATION OR WARRANTY OF ANY KIND TO LICENSEE OR ANY THIRD PARTY, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO THE DATA, THE TIMELINESS, RELIABILITY, ACCURACY OR COMPLETENESS THEREOF, THE RESULTS TO BE OBTAINED BY THE USE THEREOF OR ANY OTHER MATTER. I-DEAL AND ITS PROVIDERS EXPRESSLY DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

THE PROVISION OF THE DATA DOES NOT CONSTITUTE A RECOMMENDATION TO BUY OR SELL SECURITIES OF ANY KIND. LICENSEE ACKNOWLEDGES AND AGREES THAT NEITHER I-DEAL NOR ITS PROVIDERS HAVE UNDERTAKEN ANY LIABILITY OR OBLIGATION RELATING TO THE PURCHASE OR SALE OF ANY SECURITIES. LICENSEE ACCEPTS RESPONSIBILITY FOR, AND ACKNOWLEDGES THAT IT EXERCISES ITS OWN INDEPENDENT JUDGMENT IN, ITS SELECTION OF ANY SERVICES, ITS SELECTION AND USE OR INTENDED USE OF SUCH, AND ANY RESULTS OBTAINED.

IN NO EVENT SHALL LICENSEE (OR ITS AFFILIATES), I-DEAL OR ANY OF ITS PROVIDERS BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING, WITHOUT LIMITATION, LOSS OF USE, LOSS OF PROFITS OR REVENUES OR OTHER ECONOMIC LOSS OF LICENSEE OR ANY THIRD PARTY), WHETHER IN TORT, CONTRACT OR OTHERWISE, AND WHETHER OR NOT I-DEAL HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE TOTAL LIABILITY FOR DIRECT DAMAGES OF I-DEAL AND ITS PROVIDERS, ON THE ONE HAND, AND LICENSEE AND ITS AFFILIATES, ON THE OTHER, IS LIMITED TO THE GREATER AMOUNT OF EITHER (1) TOTAL FEES PAID OR PAYABLE BY LICENSEE PURSUANT TO THIS SCHEDULE DURING THE TWELVE (12) MONTHS PRECEDING THE EVENT GIVING RISE TO A CLAIM HEREUNDER OR (2) TWO HUNDRED AND FIFTY THOUSAND DOLLARS ($250,000); PROVIDED, IF THE MOST RECENT EVENT GIVING RISE TO LIABILITY OCCURS DURING THE FIRST TWELVE (12) MONTHS AFTER THE EFFECTIVE DATE, THE DIRECT DAMAGES CAP SHALL BE TWELVE (12) TIMES THE RESULT OBTAINED BY DIVIDING (THE TOTAL CHARGES PAID OR PAYABLE UNDER THIS SCHEDULE FROM THE EFFECTIVE DATE THROUGH THE DATE ON WHICH SUCH EVENT OCCURRED) BY (THE NUMBER OF MONTHS FROM THE EFFECTIVE DATE THROUGH SUCH DATE). THE LIMITATIONS SET FORTH IN THIS PARAGRAPH SHALL NOT APPLY TO I-DEAL'S INDEMNIFICATION OBLIGATIONS SET FORTH BELOW.

**Indemnification**

i-Deal shall, at its sole expense, indemnity, hold harmless and defend Licensee and its principals and employees against all claims, actions, proceedings, and for damages, costs and expenses, including without limitation reasonable attorneys' fees which Licensee and its Affiliates incur as a result of any claims that the Data infringes any copyright, patent, trademark, trade secret or other proprietary right of any third party, provided that: (i) Licensee notifies i-Deal promptly in writing any such claim (provided, however, that if Licensee fails to give prompt notice, i-Deal shall only be relieved of its obligations to hereunder to the extent materially prejudiced); (ii) i-Deal has sole conduct of the defense of such claim (provided that i-Deal will not settle an indemnified claim in a manner which would create any obligation on the part of Licensee without Licensee's prior written approval);

6

and (iii) the infringement was not the result of Licensee's unauthorized use of the Data or Licensee's use of the Data.

In the event of a claim infringement for which Licensee is entitled to indemnity hereunder i-Deal reserves the right to terminate solely that portion of this Schedule which contains the allegedly infringing portion of the Data, and i-Deal shall wither substitute other substantially similar or same data, with same or similar functional fields, displays, content, etc., or refund to Licensee the pro rata portion of any prepaid fees relating to such terminated portion of the Schedule. For purposes of the this Schedule, "Affiliate" means, with respect to any entity, any other entity Controlling, Controlled by or under common Control with such entity. "Control" and its derivatives mean with regard to any entity the legal, beneficial or equitable ownership, directly or indirectly, of fifty percent (50%) or more of the capital stock (or other ownership interest, if not a corporation) of such entity ordinarily having voting rights.

Jun 22 07 11:50a          Erin Murphy                                      510 409-1400                p.6

LEHMAN BROTHERS INC.

By: *Erin Murphy*
Name: ERIN MURPHY
Title: VICE PRESIDENT

I-DEAL LLC

By: *Scott C. Ganeles*
Name: SCOTT GANELES
Title: CEO

8

AMENDMENT #1 TO MASTER LICENSE AND SERVICES AGREEMENT, SCHEDULE 5

AMENDMENT #1 TO THE MASTER LICENSE AND SERVICES AGREEMENT, SCHEDULE 5 ("Amendment"), dated as of March 3, 2008, between LEHMAN BROTHERS, INC., a New York corporation ("Lehmann") and i-Deal LLC, a Delaware limited liability company ("i-Deal").

WITNESSETH:

WHEREAS, Lehman and i-Deal entered into that certain Master License and Services Agreement, dated as of November 24, 2004 (the "Master Agreement"); and

WHEREAS, Lehman and i-Deal desire to make certain amendments to Schedule 5 to the Master Agreement ("Schedule 5").

NOW, THEREFORE, in consideration of the mutual covenants and undertakings contained herein, the parties hereto agree as follows:

1. **Definitions.** Capitalized terms used herein without definition shall have the meanings ascribed to them in the Master Agreement.

2. **Data Feeds.** Schedule 5 is hereby amended by adding, after the section titled "Integration Services, Implementation and Training; Development Services," the following section titled "Data Feeds,"

"Data Feeds

i-Deal shall provide to Licensee certain third-party QIB data via a data feed (the "QIB Data Feed"), as requested by Licensee in accordance with a mutually agreed protocol, for use by Licensee with Licensee's ECM Publications application. All ownership of the QIB data shall remain with the third-party provider of such QIB data and Licensee shall not obtain any ownership rights in such data."

3. **Fees.** Schedule 5 is hereby amended by adding, in the section titled "Fees" is the following paragraph:

"Licensee shall pay i-Deal, not later than the latter of (i) one month after i-Deal commences providing the QIB Data Feed and (ii) 30 days after receipt by Lehman of an invoice therefor, a one-time, non-refundable implementation fee of $20,000.00."

3. **Miscellaneous.** (a) Except as expressly amended by this Amendment, all of the terms, covenants and conditions of the Master Agreement, including Schedule 5, shall remain unamended and in full force and effect to the same extent as if fully set forth herein.

DCi:#8144512

(b)     This Amendment shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflict of laws thereof except that New York General Obligations Law Section 5-1401 shall apply.

(c)     This Amendment may be executed in any number of counterparts, each of which shall be deemed to be an original but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Amendment has been signed on behalf of each of the parties hereto as of the date first written above.

LEHMAN BROTHERS INC.

By _____
Name:
Title: Vice President

I-DEAL LLC

By _____
Name: Jennifer Sun
Title: Managing Director

DCI:#8144512