# EXHIBIT A

<u>**GENERAL TERMS AND CONDITIONS:**</u>
<u>**IT PRODUCTS AND SERVICES**</u>

**Supplier Name: HCL AMERICA. INC.**
**Supplier Address: 330 Potrero Avenue, Sunnyvale, California -94085**
**Supplier Jurisdiction of Incorporation: CALIFORNIA, USA**
**Tax ID: 770-205-035**
**Telephone #: 408 733 0480**
**Fax #: 408 73 0482**
**General Terms and Conditions No.:1**
**General Terms and Conditions Effective Date: 13th October, 2006**

THESE GENERAL TERMS AND CONDITIONS – IT PRODUCTS AND SERVICES are
made as of the General Terms and Conditions Effective Date specified above (the
"**Effective Date**") between **Lehman Brothers Holding Inc.**, a Delaware corporation,
having an office and place of business at 745 Seventh Avenue, New York, New York
10019, (the "**Customer**") and the Supplier specified above (the "**Supplier**"). As used in
these General Terms and Conditions (as defined below), "**Party**" means either
Customer or Supplier and "**Parties**" means both Customer and Supplier.

**ARTICLE 1: INTRODUCTION**

1.1    <u>General Terms and Conditions</u>. The "**General Terms and Conditions**" consist
of the terms and conditions set forth in the Articles and preamble of this document. As
used herein, "**Master Agreement**" means, collectively, these General Terms and
Conditions, together with any of the Supplemental Terms and Conditions (as defined
below) executed by the Parties (or their respective authorized designees).

1.2    <u>Purpose</u>. These General Terms and Conditions, together with the applicable
Supplemental Terms and Conditions, will provide the terms and conditions that will
govern transactions that may be entered into between Customer and Supplier for the
purchase, license or lease, as the case may be, of equipment and/or software from
Supplier (each, a "**Product**" and together, the "**Products**") and/or for the provision of
Services (each such individual transaction, a "**Transaction**" and together, the
"**Transactions**"). Transactions will be entered into by the Parties through the execution
of Transaction Schedules.

1.3    <u>Definitions</u>. Capitalized terms used in the Master Agreement are defined in-place
where the term is used or in the Glossary of Terms located at the end of these General
Terms and Conditions (and any Supplement) and have the meanings there given unless
the context requires otherwise. Terms other than those defined within the Master
Agreement will be given their plain English meaning, and those terms, acronyms and
phrases known in the information technology industry will be interpreted in accordance
with their generally known meanings in such industry.

U02

## ARTICLE 2:  AGREEMENT STRUCTURE AND PROCESS FOR PLACING ORDERS

2.1    <u>Placement of Orders and Transaction Schedules</u>.

    2.1.1  To enter into a Transaction for Products and/or Services, the Parties (a) will execute a supplement to these General Terms and Conditions that contains terms and conditions, including Exhibits, Annexes, Attachments, applicable to the particular type of Product and/or Services to be delivered and/or performed (each such executed supplement, "**Supplemental Terms and Conditions**" or a "**Supplement**" and together, the "**Supplements**") and (b) will execute a schedule that contains all other terms specific to the Transaction (e.g., price, Product descriptions, statements of work, quantity, delivery dates) (each, a "**Transaction Schedule**" and together, the "**Transaction Schedules**").  Multiple Transaction Schedules may be executed under a single Supplement.

    2.1.2.  The Parties' execution of these General Terms and Conditions and a Supplement will not, by itself, commit Customer to purchase, nor Supplier to provide, any specific Products or Services.  Upon execution of these General Terms and Conditions, the applicable Supplements, and, as applicable, a Transaction Schedule for a specific Transaction, Supplier will provide the Products and/or perform the Services specified on the applicable Transaction Schedule in accordance with the terms of such Transaction Schedule.  Each Transaction Schedule will incorporate by reference these General Terms and Conditions and the applicable Supplemental Terms and Conditions.

    2.1.3.  Each Transaction Schedule, together with any other documents attached to or incorporated therein by reference (including these General Terms and Conditions and the applicable Supplemental Terms and Conditions), will form a separate and independent contract for the applicable Transaction between Supplier and Customer (i.e., the Customer entity that is the party to the Transaction Schedule). As applied to a specific Transaction, references herein to the "Master Agreement" (or any part thereof) will be considered references to the applicable Transaction Schedule, as appropriate in the context in which such reference is made.

2.2    <u>Execution of Supplements and Transaction Schedules by Other Customer and Supplier Entities</u>.  Customer's parent company, its subsidiaries and other affiliated companies may enter into Transactions with Supplier pursuant to these General Terms and Conditions through the execution of Supplements and Transaction Schedules. Supplier's parent company, its subsidiaries and other affiliated companies may enter into Transactions with Customer (or Customer's parent company, its subsidiaries and other affiliated companies) pursuant to these General Terms and Conditions through the execution of Supplements and Transaction Schedules.  For the purposes of any such Supplement or Transaction Schedule, the Customer entity executing the Supplement or Transaction Schedule, as applicable, will be considered the "**Customer**" as that term is used herein and therein. For the purposes of any such Supplement or Transaction

2

Schedule, the Supplier entity executing the Supplement or Transaction Schedule, as applicable, will be considered the "**Supplier**" as that term is used herein and therein.

2.3    Order of Precedence.  If there is a conflict between the provisions of any of the General Terms and Conditions, a Supplement or a Transaction Schedule, the following order of priority will control:  (a) a Transaction Schedule (but any conflicting terms in such Transaction Schedule will apply only with respect to such Transaction Schedule) (b) a Supplement (but any conflicting terms will apply only with respect to that Supplement and the Transaction Schedules that incorporate such Supplement by reference), and (c) these General Terms and Conditions; *provided, however, that*, unless the applicable Supplement or Transaction Schedule has been approved in writing by the legal counsel for both parties, a Supplement or Transaction Schedule may not modify or amend the rights or obligations set forth in the following Sections and Articles of these General Terms and Conditions: "Relationship of the Parties"; "Compliance with Laws"; "Record Retention and Inspection"; "Confidential Information and Data Protection"; "Insurance"; "Indemnification"; "Infringement"; "Limitation of Liability" and "Subcontractors".

## ARTICLE 3:  NATURE OF THE RELATIONSHIP

3.1    Relationship of the Parties.  Supplier agrees and represents and warrants that: (a) it is an independent contractor, (b) Supplier Personnel are the responsibility of Supplier and solely employees or independent contractors of Supplier (or its subcontractor), (c) no Supplier Personnel are Customer's agents or employees for federal, state, or local tax purposes or any other purposes whatsoever, (d) no Supplier Personnel are entitled to any compensation from Customer or to any Customer employee benefits, (e)  Supplier will (or, in the case of its subcontractors, will be responsible for causing the applicable subcontractor to) withhold and pay all applicable taxes, benefits and insurance with respect to such personnel, and (f) Supplier will verify and secure the work eligibility of each Supplier Personnel.  Supplier and its employees, agents and subcontractors have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Customer in any manner whatsoever.

3.2    No Exclusivity.  Each Party acknowledges that the Master Agreement, and any Transaction Schedules, are non-exclusive and either Party may contract with other parties for the procurement or sale of comparable equipment, software, systems and services.

## ARTICLE 4:  PERFORMANCE

4.1    In General.  Except as otherwise expressly provided otherwise in the Master Agreement or any Transaction Schedule, Supplier will be responsible for providing all facilities, personnel and other resources as necessary to deliver the Products and perform the Services purchased by Customer pursuant to each Transaction Schedule.

4.2    Service Locations.  Each Transaction Schedule will identify the Customer sites at which Products purchased from Supplier are to be delivered and, if applicable, at which Customer site Supplier is required to perform any on-site Services.  In addition, a Transaction Schedule may specify the Supplier facilities (or facilities of a Supplier subcontractor) at which (or from which) certain Supplier Services are to be provided.

4.3    Time of Performance.  Supplier will deliver the Products purchased by Customer in accordance with the mutually   agreed delivery time frame and perform and complete the Services diligently and in accordance with any time frames set forth in the applicable Transaction Schedule.  Supplier will promptly notify Customer upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely and successful delivery of any Product or performance and completion of any Deliverable or Service.

4.4    Manner of Performance.  Supplier's performance under a Transaction Schedule, and the performance of Supplier's Products and Deliverables, will be in accordance with all applicable requirements of the Transaction Schedule, including any service levels or other specific standards of performance set forth therein.

4.5    Supplier Quality Assurance.  In providing the Products and performing the Services purchased by Customer, Supplier will follow quality assurance procedures to ensure that, as applicable, the Products have been manufactured and/or developed and the Services have been performed with a high degree of professional quality and reliability.

4.6    Cooperation and Coordination.  If Customer performs itself, or retains a third party to perform, any services that interface or interact with Supplier's Products and/or Services, Supplier will cooperate and coordinate with Customer or such third party as reasonably requested or required by such third parties to perform their duties.

4.7    Compliance with Laws.

    4.7.1    Compliance Generally.   Supplier agrees to obtain all necessary regulatory approvals, licenses and/or permits applicable to its business, and Supplier will comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority.

    4.7.2    Export.  Supplier represents and warrants that as of the date a Product or Deliverable, as applicable, is delivered to Customer, except where Supplier has expressly stated otherwise in a Transaction Schedule, all Products and Deliverables, as applicable, provided to Customer hereunder are exportable without restriction except to countries or nationals of those countries to which exports are prohibited by the Export

4

Administration Regulations, the Office of Foreign Assets Control ("OFAC") regulations, or any applicable successor regulation thereto. Each Party that exports, re-exports or imports any Product or Deliverable, as applicable, assumes responsibility for complying with applicable laws and regulations, including OFAC, and for obtaining required export and import authorizations. To facilitate Customer's compliance with this Section, if any equipment, software or other technology (including technical data, technical assistance or training) provided to Customer hereunder (or any component thereof) contains or concerns encryption, Supplier will promptly provide in writing Customer with information relating to the type of encryption, level of encryption (measured by key lengths in bits), Export Control Classification Number (ECCN), export license or export license exception information, Commodity Classification Automated Tracking System number (CCATS#) and any other similar information requested by Customer.

4.8    Savings Clause. Except as provided in Section 9.3, Customer's failure to perform any of its responsibilities set forth in the Master Agreement or a particular Transaction Schedule will not constitute a material breach of the Master Agreement or the Transaction Schedule or be deemed grounds for termination by Supplier; provided, however, that Supplier's nonperformance of its obligations under the Master Agreement or a Transaction Schedule will be excused if and to the extent (a) such Supplier nonperformance results from Customer's failure to perform Customer responsibilities under the Master Agreement or the Transaction Schedule, and (b) Supplier provides Customer prompt written notice of such Customer nonperformance and uses Commercially Reasonable Efforts to perform notwithstanding Customer's failure to perform Customer's responsibilities under the Master Agreement or the Transaction Schedule.

**ARTICLE 5:  SUPPLIER COMPENSATION**

5.1    Fees and Expenses. The applicable prices and/or rates and allowable reimbursable expenses for Products and Services purchased from Supplier will be specified in the applicable Transaction Schedule. In no event will any charges to Customer by Supplier exceed the prices or rates set forth in the applicable Transaction Schedule. Such Supplier prices and rates will be subject to any agreed discounts, most favored customer or similar arrangement between the Parties set forth in the Master Agreement or the applicable Transaction Schedule.

5.2    Taxes. Customer will pay all sales, use, property, ad valorem, value added, service tax or similar taxes imposed on Products purchased from Supplier hereunder or as a result of the Services and/or Deliverables provided by Supplier hereunder, exclusive of corporate business and franchise taxes, taxes based on Supplier's income or gross receipts, withholding taxes and personnel-related taxes. If the transaction contemplated by this Master Agreement is exempt from tax, Customer will provide Supplier with a valid exemption certificate or other evidence of such exemption in a form reasonably acceptable to Supplier. Supplier will, at its own expense, use Commercially Reasonable Efforts to recover refundable or recoverable taxes. Each Party will

cooperate with the other in minimizing applicable tax. Supplier will provide to Customer, upon request, in a form reasonably acceptable to Customer, original or certified copies of all tax payment receipts or other evidence of payment of taxes by Supplier with respect to transactions or payments under this Master Agreement.

5.3    **Payment Terms.**

5.3.1    Unless another payment schedule is specified in the applicable Transaction Schedule, Supplier will invoice Customer (a) after Customer's acceptance or thirty (30) **days after receipt whichever is earlier**, of the Products or Deliverables (or other agreed payment milestones) in the case of Products sold or Services performed on a fixed price basis; or (b) monthly in arrears for all other charges, including charges for Services priced on a variable unit rate or time and materials basis, recurring license fees, lease payments, and for out-of pocket costs and expenses; *provided, however,* that Supplier will submit to Customer's project manager the amounts to be invoiced under this clause (b) for review prior to actual invoicing, the project manager shall revert with acceptance/rejection within seven days from the date of receipt of such claim.   For Services performed on a time and materials basis, Supplier will also submit time reports to Customer showing the hours worked during the billing period by each Supplier Personnel, with copies of individual time tracking sheets. To the extent applicable, in addition to the charge(s), each invoice will contain a listing of the following: (a) the type, quantity and serial number (if any), (b) any discounts, (c) applicable taxes and transportation and other costs, and (d) shipping date(s).

5.3.2    Except for amounts disputed by Customer, validly rendered Supplier invoices will be payable within thirty (30) days after Customer's receipt of the invoice. Any such dispute will not affect Supplier's right to payment of undisputed amounts and expenses or the Parties' obligations to perform hereunder. Late payments shall accrue interest from the date due at the lesser of the highest rate permitted by law and one and one-half percent per month. However the Customer shall revert with acceptance/rejection of the invoice within seven (7) days from the date of receipt of the invoice.

5.4    <u>Most Favored Customer</u>.  Supplier represents and warrants that the rates, prices and the terms and conditions with respect to all Deliverables, Products and Services provided under the Transaction Schedules are at least as favorable to or better than the rates, prices and terms and conditions offered prior to and as of the effective date of the applicable Transaction Schedule by Supplier to any of its other commercial customers who are similarly situated to Customer with respect to types and volumes of Deliverables, Products and Services purchased, complexity of supported environment, technologies employed,  customer location and the service location ("**Comparison Factors**"). If at any time during the term of these General Terms and Conditions, Supplier contracts with any customer for deliverables, products or services identical or

6

substantially similar to the Deliverables, Products or Services at a price or rate lower than the price or rate set forth in the applicable Transaction Schedule after taking into account the Comparison Factors, then the prices or rates set forth in the applicable Transaction Schedule will be amended as mutually agreed upon. The provisions of this Section 5.4 shall not (i) apply in respect of any agreements with any customer in effect as of the Effective Date or (ii) any proof of concept or pilot programs offered by Supplier to any of its customers.

5.5    Audit.

5.5.1.  Record Retention and Inspection.  During the term of each Transaction Schedule and for a period of at least one (1) year after the date of the final payment under such Transaction Schedule, Supplier will maintain complete and accurate accounting records in connection with Products and Deliverables provided and Services performed under such Transaction Schedule, in accordance with generally accepted accounting principles applied on a consistent basis, to substantiate its charges thereunder. Such records will include, attendance cards, time tracking sheets and job summaries. Customer will have no access to any records including payroll records or other financial information which are not directly linked to the invoices raised by Supplier. Supplier will provide Customer or its designees access to such records, not more than once every year, for audit purposes during the term of each Transaction Schedule and for one (1) year after the date of the final payment under such Transaction Schedule.

5.5.2.  Overcharges.  If any audit reveals that Customer has overpaid any amounts, Supplier will remit to Customer such amounts due within thirty (30) days after receiving from Customer an invoice therefor. If any audit reveals that Customer has overpaid any amounts under a particular Transaction Schedule (exclusive of reimbursable expenses and taxes) during the audited period by ten percent (10%) or more of the total charges payable under such Transaction Schedule during such period, Supplier will, within thirty (30) days after receiving an invoice therefor, reimburse Customer for all reasonable fees and expenses incurred to conduct the audit and otherwise detect and rectify such overpayment, not exceeding US$25,000 per year.

5.6  Payment Dispute Resolution.

If the parties are unable to resolve any payment dispute within ten (10) days of Customer's notice of dispute to Supplier, the parties will commence the procedures for dispute resolution as provided in this paragraph. Any payment dispute will be considered in person or by telephone by the project managers of both the parties within ten (10) days after receipt of a notice from Customer specifying the nature of the dispute. If the project managers cannot agree on a resolution of the dispute, the dispute will be escalated to the project managers level at both the organizations. In the event

7

the dispute has been referred to the levels pursuant to the preceding sentence and cannot be resolved, within ten (10) days after escalation to such level, then the dispute will be further escalated to the applicable delivery unit head of HCL and procurement manager of Company for resolution. If the applicable delivery unit head and procurement manager are unable to resolve any dispute escalated to them within ten (10) days, either Party may pursue any of its rights and remedies under this Agreement thereafter, including termination pursuant to Section 9.3.

## ARTICLE 6: REPRESENTATIONS, WARRANTIES AND COVENANTS

Supplier represents, warrants and covenants as follows, which representations, warranties and covenants will be considered to be given anew for each Transaction upon the execution of each applicable Transaction Schedule:

6.1    <u>Authority</u>.  Supplier has the requisite corporate power and authority and the right (a) to enter into the Master Agreement and each Transaction Schedule, (b) to provide the Products, Deliverables, works and information thereunder, and (c) to perform the Services thereunder.

6.2    <u>No Destructive Elements</u>.  The Products, Deliverables, and/or material(s) provided by Supplier do not and will not contain or involve any computer code, programs, procedures, mechanisms or programming devices that are designed to, or would enable Supplier to, disrupt, modify, delete, damage, deactivate, disable, harm or otherwise impede in any manner the operation of the Products, Deliverables, any Customer system or any other associated software, firmware, hardware, computer system or network (e.g., a virus, Trojan horse, worm, backdoor, etc.) (collectively, **"Destructive Elements"**). If Supplier breaches this Section, Supplier further agrees to use Commercially Reasonable Efforts to immediately eliminate any and all Destructive Elements and reverse their adverse effects. Prior to delivery to Customer, Supplier will test each element of the Deliverables or Products utilizing the most recent version and the most recent data file of a reputable, commercially available anti-virus-checking software program to ensure that it is free of Destructive Elements. Supplier acknowledges that it does not have any right to electronically repossess any Products or Deliverables.

6.3    <u>No Improper Inducements</u>.  Supplier is familiar with, has complied with, and will comply, in all respects, with the laws and regulations regarding the offering of unlawful or improper inducements (including the U.S. Foreign Corrupt Practices Act, as amended, and other anti-corruption and anti-bribery laws), as applicable to its relationship with Customer, and with any other applicable Customer policies regarding inducements of which Supplier has been given notice. If at any time during the term of these General Terms and Conditions, Supplier breaches the foregoing representation, warranty and covenant, then, in addition to any other rights Customer may have under the Master Agreement, at law or in equity, Customer may terminate the Master

8

Agreement and/or any affected Transaction Schedules.

6.4    Equal Opportunity and Affirmative Action Requirements. To the extent applicable, the equal employment opportunity and affirmative action requirements set forth in 41 C.F.R. Part 60-1.4(a) (women and minorities), 41 C.F.R. Part 60-250.5(a) (covered veterans) and 41 C.F.R. Part 60-741-5(a) (individuals with disabilities) are hereby incorporated by reference into this Master Agreement.

6.5    DISCLAIMER OF IMPLIED WARRANTIES. EXCEPT AS SPECIFICALLY PROVIDED IN THE MASTER AGREEMENT OR IN A TRANSACTION SCHEDULE, THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 7: CONFIDENTIAL INFORMATION AND DATA PROTECTION

7.1    Confidential Information. "**Confidential Information**" means any information obtained by a Party (the "**Receiving Party**") from or on behalf of the other Party (the "**Disclosing Party**") that relates to the past, present or future business activities of the Disclosing Party or its subsidiaries or affiliates, or their respective employees, customers or third party suppliers or contractors, including the terms and conditions of the Master Agreement, information exchanged in the course of negotiating Supplements and Transaction Schedules, any Transaction Schedule, and any information relating to the applicable entity's (or person's) plans, pricing, methods, methodologies, processes, financial data, lists, Intellectual Property Rights, customer information, apparatus, statistics, programs, research, development, and/or information technology.

7.2    Exceptions.  Confidential Information does not include any particular information that the Receiving Party can demonstrate is (a) currently in the public domain, (b) previously known to the Receiving Party free from any obligation to keep it confidential, (c) publicly disclosed by or on behalf of the Disclosing Party either prior to or subsequent to the receipt of such information by the Receiving Party, (d) independently developed by the Receiving Party without any access to or use of Confidential Information of the Disclosing Party, or (e) rightfully obtained by the Receiving Party from a third party lawfully in possession of the Confidential Information and who is not bound by confidentiality obligations to the Disclosing Party.

7.3    Treatment of Confidential Information. The Receiving Party will hold all Confidential Information of the Disclosing Party in trust and confidence for the Disclosing Party and, except as set forth in the Master Agreement or as otherwise may be authorized by the Disclosing Party in writing, the Receiving Party will not disclose to any person, firm or enterprise, or use for its own benefit, any Confidential Information of the Disclosing Party. The Receiving Party will treat all Confidential Information of the Disclosing Party with the same degree of care that the Receiving Party treats its own

9

confidential or proprietary information, but in no event less than using standards of reasonable care. The Receiving Party may disclose Confidential Information of the Disclosing Party to the Receiving Party's employees, and to any of the Receiving Party's contractors who are bound to the Receiving Party by confidentiality obligations substantially equivalent to those set forth in this Article, solely as required in order for the Receiving Party to perform its obligations under the Master Agreement or a Transaction Schedule, or in the case of Customer, to receive the Services and/or to use the Products and Deliverables. In addition, (a) in the case of Customer, Customer may also disclose Supplier's Confidential Information to employees of its parent, subsidiaries and affiliates; and (b) in the case of Supplier, Supplier may also disclose Customer's Confidential Information to employees of its parent, subsidiaries and affiliates on a need to know basis. The Receiving Party may disclose Confidential Information of the Disclosing Party if required to do so under applicable law, rule or order provided that the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of the required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy, and provided further that the Receiving Party discloses no more Confidential Information of the Disclosing Party than is reasonably necessary in order to respond to the required disclosure.

7.4    Customer Sensitive Data. Supplier hereby acknowledges that Customer is subject to certain privacy and information security laws and regulations, pursuant to which Customer is required to ensure that Supplier appropriately safeguards personal or financial information regarding Customer's former, current or prospective clients or employees ("**Customer Sensitive Data**"). To the extent that Supplier receives any Customer Sensitive Data as a result of any exchange of information under the Master Agreement or a Transaction Schedule, and notwithstanding anything to the contrary contained in the Master Agreement, Supplier agrees that it will (a) not disclose or use any Customer Sensitive Data except to the extent necessary to carry out its obligations under the Master Agreement or a Transaction Schedule and for no other purpose, (b) not disclose Customer Sensitive Data to any third party, including its third party service providers without the prior written consent of Customer and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Customer Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems, policies and procedures as Customer may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Customer Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Customer notice thereof, and such further information and assistance as may be reasonably requested. With respect to any third party provided access to Customer Sensitive Data pursuant to subsection (b) of this Section, Supplier will enter into a written agreement with such third party requiring safeguarding of Customer Sensitive Data in a manner no less restrictive

10

than Supplier's obligations under the Master Agreement, and including those affirmative obligations described in this Section.

**7.5**   Return of Information.  At any time at the request and option of the Disclosing Party and in the event of termination or expiration of the Master Agreement (or any part thereof) or any applicable Transaction Schedule, the Receiving Party agrees to promptly:  (a) return to the Disclosing Party the Confidential Information and/or Customer Sensitive Data, as applicable; or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Customer Sensitive Data, as applicable and, if requested by the Disclosing Party, acknowledge in writing that all such Confidential Information and/or Customer Sensitive Data, as applicable, has been destroyed or permanently erased.  Notwithstanding the foregoing, each party may retain copies of the Confidential Information and/or Customer Sensitive Data, as applicable, to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information and/or Customer Sensitive Data, as applicable, will remain subject to the terms and conditions herein.

**7.6**   Title.  The Parties acknowledge and agree that any disclosure of Confidential Information, and in the case of Customer, Customer Sensitive Data, will in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such Confidential Information or Customer Sensitive Data.  In addition, Customer's obligations under this Article with respect to Supplier's Confidential Information will not be construed to limit Customer's rights to own or use intellectual property under the Master Agreement and any applicable Transaction Schedules.

**7.7**   Injunctive Relief.  In the event of a breach or threatened or attempted breach of the provisions of this Article, the Disclosing Party may have no adequate remedy in money or damages and, accordingly, may immediately seek an injunction against such breach.

## ARTICLE 8:  INSURANCE

**8.1**   Forms of Insurance.  Supplier agrees to obtain and maintain and keep in full force and effect, at Supplier's expense, the forms of insurance with the minimum limits of insurance stated in Exhibit 1.

**8.2**   Coverage.  All insurance coverage required herein will provide primary coverage, without contribution from other insurance, for all losses and damages caused by the perils or causes of loss covered thereby.  Supplier agrees to have included in its General Liability and Workers Compensation policies   required herein, a waiver of the insurer's rights of subrogation against Customer, its subsidiaries and affiliates and its insurers.

**8.3**   Certificates of Insurance.  Each insurance policy will be maintained with an

11

insurer having a rating of at least an "A-" in the most currently available Best's Insurance Reports and Supplier will provide at least thirty (30) days prior written notice to Customer in the event of any modification or cancellation. Supplier will furnish Customer with certificates of insurance in satisfactory form, evidencing its compliance with these provisions.

## ARTICLE 9:  TERM AND TERMINATION

9.1    <u>Generally</u>.  These General Terms and Conditions will commence as of the Effective Date and will continue in full force and effect thereafter unless and until terminated as provided herein.

9.2    <u>Termination by Customer</u>.

9.2.1  <u>For Convenience</u>.

(a)    If, at any time, there are no outstanding Transaction Schedules in effect, Customer may terminate these General Terms and Conditions and/or any then existing Supplements upon written notice to Supplier without liability for any charges of any kind.

(b)    Customer may terminate any Transaction Schedule for convenience by giving Supplier at least one hundred and eighty (180) days' prior written notice specifying the termination date (or such other period of advance notice as may be specified in the applicable Transaction Schedule).  In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all Products, Deliverables delivered and Services performed up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

9.2.2  <u>For Supplier Insolvency</u>.  Customer may terminate any Transaction Schedule(s) upon written notice specifying the termination date if Supplier becomes insolvent or unable to pay its debts as they come due or enters into or files (or has filed or commenced against it) a petition, arrangement, application, action or other proceeding seeking relief or protection under the bankruptcy laws of the United States or any similar laws of the United States or any state of the United States or any other country or transfers all or substantially all of its assets to another person or entity.  In such event, Customer will be obliged to pay Supplier at the contracted rates for all Products, Deliverables and Services performed and Accepted up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

9.2.3  <u>For Cause</u>.  In the event of any material breach of the Master Agreement

12

or a Transaction Schedule by Supplier, Customer may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved or affected by such breach, in whole or in part, by giving Supplier thirty (30) days' prior written notice (or such longer period as mutually agreed upon) of termination thereof; *provided, however,* that such termination will not be effective if Supplier has cured the breach of which it has been notified prior to the expiration of such thirty (30) day notice period (or such longer period as mutually agreed upon).

9.2.4    <u>Additional Rights Upon Termination For Cause</u>.  If Customer terminates a Transaction Schedule, in whole or in part, for cause: (a) Customer may, at its option either (i) return any Products and/or Deliverables received from Supplier thereunder, in whole or in part, (and, in the case of software, destroy all copies thereof), after which Supplier will promptly refund the aggregate payments made by Customer for or in respect of the returned Products and/or Deliverables (including amounts paid in respect of any Services performed in relation to the returned Products and/or Deliverables), less a reasonable deduction for amortization if Customer has been using the Products and/or Deliverables, except in the case of a termination for willful or knowing infringement by Supplier in which case there will be no such amortization, or (ii) keep the Products and/or Deliverables, in whole or in part, upon payment of the applicable undisputed portion of the fees incurred for such Products and/or Deliverables as of the date of such termination; and (b) Supplier will promptly issue a refund of any prepaid fees unearned as of the date of such termination.

9.2.5    <u>Termination Notices</u>.  Notice of termination under this Section of any specific Transaction Schedule will not be effective as notice of termination of the Master Agreement (or any part thereof) or any other Transaction Schedules then in effect unless specifically stated in the notice; provided, further, that any such notice that purports to be notice of termination of these General Terms and Conditions or any Supplement will not be considered or effective as notice of termination of these General Terms and Conditions or such Supplement unless such notice specifically states that (a) in the case of termination of these General Terms and Conditions, all Transaction Schedules have been terminated and/or expired, or (b) in the case of termination of such Supplement, all Transaction Schedules executed pursuant to such Supplement have been terminated and/or expired, as applicable.

9.3    <u>Termination by Supplier</u>.  In the event Customer (a) breaches in a material respect its obligation to pay any undisputed fees under a particular Transaction Schedule, or (b) fails to meet its confidentiality obligations under the Master Agreement with respect to a particular Transaction Schedule such that Customer materially breaches the Master Agreement or the applicable Transaction Schedule or (c) is unable to resolve a  dispute about the payment or the work or the expense with respect to which an invoice has been issued, after having gone through the payment dispute resolution procedure as mentioned in Section 5.6, then Supplier may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in

equity) terminate the Transaction Schedule(s) involved by giving Customer thirty (30) days' prior written notice thereof; *provided, however,* that any such termination will not be effective if Customer has cured such material breach prior to the expiration of such thirty (30) day period. In such event, Customer will be obliged to pay Supplier at the contracted rates for all Products accepted, Deliverables accepted and Services performed up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

## ARTICLE 10:  INDEMNIFICATION

10.1   "Claim" and "Losses" Defined.  **"Claim"** means any demand, or any civil, criminal, administrative, or investigative claim, action, or proceeding (including arbitration) asserted, commenced or threatened against an entity or person.  **"Losses"** means all judgments, awards, settlements, liabilities, damages, liens and claims, and all related costs, expenses and other charges suffered or incurred as a result of or in connection with a Claim, including reasonable attorneys' fees and disbursements, costs of investigation, litigation, settlement and judgment, and any taxes, interest, penalties and fines with respect to any of the foregoing.

10.2   Indemnification by Supplier.  Supplier will, at its sole cost and expense, indemnify, defend and hold harmless Customer and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assigns (collectively, "**Customer Indemnitees**") from and against any and all Losses suffered or incurred by any of them arising out of or in connection with a Claim or for any of the following, whenever made:

10.2.1 that any Product(s), Deliverable(s), works, information, material(s) and/or Services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Rights of a third party; or

10.2.2 that Supplier has failed to comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority; or

10.2.3 for death or bodily injury, or the damage, loss or destruction of real or tangible personal property of third parties (including employees of Customer and Supplier and their respective subcontractors) brought against a Customer Indemnitee and alleged to have been caused by the fault or negligence of Supplier, its officers, personnel (including Supplier Personnel), agents and/or representatives; or

10.2.4 by or on behalf of any subcontractors or independent contractors of Supplier, or any of Supplier's personnel (including Supplier Personnel); or

14

10.2.5 (a) in respect of Supplier's obligations as an employer of its personnel (including any Supplier Personnel), or (b) any claim or action alleging that a Customer Indemnitee should be deemed the "employer" or "joint employer" of any of Supplier's personnel (including any Supplier Personnel).

**10.3**  Indemnification Procedures.  Customer agrees to give Supplier prompt written notice of any Claim and in no case later than fifteen (15) days before the date on which any formal response to the Claim is due, for which a Customer Indemnitee seeks indemnification; provided, however, any failure by Customer to provide such notice will not relieve Supplier of its indemnification obligations under the Master Agreement except to the extent Supplier can demonstrate actual prejudice as a result of such failure.  Within thirty (30) days after receiving Customer's notice of a Claim, but no later than ten (10) days before the date on which any formal response to the Claim is due, Supplier will notify Customer in writing as to whether Supplier acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the Claim (a **"Notice of Election"**).  If Supplier delivers a timely Notice of Election to Customer, Supplier will have the right to conduct the defense of the Claim and, consistent with the rights of Customer Indemnitees hereunder, all negotiations for its settlement; provided, however, that the Customer Indemnitee(s) may participate in such defense or negotiations to protect its (or their) interests and that any settlement will be for the payment of money by Supplier and will not, without the prior written approval of Customer, obligate or impose liability on Customer or any Customer Indemnitee in any way, including without limitation, to any determination or admission regarding Customer's or any Customer Indemnitee's interest.  If Supplier does not deliver a timely Notice of Election, the affected Customer Indemnitee(s) may defend and/or settle the Claim in such manner as it (or they) may deem appropriate, at the cost and expense of Supplier, including payment of any settlement, judgment or award and the costs of defending or settling the Claim.  Supplier will promptly reimburse the Customer Indemnitee(s) upon demand for all Losses suffered or incurred as a result of or in connection the Claim.

**ARTICLE 11:  INFRINGEMENT**

**11.1**  Corrective Actions.  Supplier will give Customer prompt written notice of any threat, warning or notice of any Claim asserted against Supplier that any Products, Deliverables, Information, materials and/or Services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Rights of a third party.  In addition to Customer's other rights and Supplier's other obligations hereunder, if all or any part of a Product or Deliverable is, or in the opinion of Supplier's intellectual property counsel may become, the subject of any claim or suit for infringement of any Intellectual Property Right, Supplier may, and in the event of any adjudication that the Product or Deliverable, or any part thereof, does infringe or if the use of the Product or

Deliverable, or any part thereof, is enjoined, Supplier will promptly: (a) procure for Customer, at no additional cost or expense to Customer, the right to use the Product or Deliverable, or the affected part thereof; or, (b) to the extent such option is not available to Supplier on commercially reasonable terms following Commercially Reasonable Efforts to procure such right, replace, at no additional cost or expense to Customer, the Product or Deliverable, or affected part thereof, with a modified or substituted Product, Deliverable or part, that does not violate any third party's Intellectual Property Rights and that is qualitatively and functionally at least the equivalent of the affected Product or Deliverable, or part thereof.

11.2   Return.   If neither (a) nor (b) above is available to Supplier on commercially reasonable terms following Commercially Reasonable Efforts to procure the same, and Supplier has so advised Customer, or if Supplier has not promptly performed in accordance with (a) or (b) above, Customer may, at its option, surrender the Products and/or Deliverables purchased under the applicable Transaction Schedule, in whole or in part, and receive a refund of the aggregate payments made by Customer for or in respect of the returned Products and/or Deliverables (including amounts paid in respect of any Services performed in relation to the returned Products and/or Deliverables) less a reasonable deduction for amortization if Customer has been using the Products and/or Deliverables for at least twelve (12) months, except in the case of a willful or knowing infringement by Supplier in which case there will be no such amortization.

## ARTICLE 12:  LIMITATION OF LIABILITY

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE.  IN NO EVENT SHALL THE AGGREGATE LIABILITY OF SUPPLIER, ARISING AT ANY TIME UNDER THIS AGREEMENT AND/ OR ANY TRANSACTION SCHEDULE  SHALL EXCEED THE AMOUNT INVOICED BY THE SUPPLIER AND PAID FOR BY CUSTOMER  DURING THE PRECEDING TWELVE MONTHS UNDER THE APPLICABLE TRANSACTION SCHEDULE GIVING RISE TO CLAIM;  *PROVIDED, HOWEVER,* THAT THE FOREGOING LIMITATIONS OF LIABILITY WILL NOT APPLY TO ANY OF THE FOLLOWING:  (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PROTECTION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; OR(C) ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.

## ARTICLE 13:  RULES OF CONSTRUCTION

13.1   Entire Agreement.  The Master Agreement constitutes the entire agreement between the Parties with respect to its subject matter contained therein, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to such subject matter.  When executed by both Parties, each Transaction Schedule will constitute the entire agreement between the Parties with respect to its subject matter, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to the subject matter thereof.

13.2   Amendment.  No modification or amendment of, or supplement to, the Master Agreement or any Transaction Schedule, or any provisions thereof, will be binding upon the Parties unless made in writing and signed by a duly authorized representative of both Parties.

13.3   Governing Law and Jurisdiction.  In all respects the Master Agreement and each Transaction Schedule will be governed by and construed in accordance with the substantive laws of the State of New York without regard to conflict of law principles. Any claim or action brought by one of the Parties connection with the Master Agreement or a Transaction Schedule will be brought in the appropriate Federal or State court located in the County of New York, and the Parties irrevocably consent to the exclusive jurisdiction of such court.

13.4   Third Party Beneficiaries.  Except as expressly set forth herein, no person not a Party hereto will be a third party beneficiary of any provision of the Master Agreement or any Transaction Schedule.  Notwithstanding the foregoing, it is agreed that Customer Indemnitees are not such excluded third party beneficiaries.

13.5   Waiver.  At no time will any failure or delay on the part of any Party in exercising any right or remedy provided in the Master Agreement or in any Transaction Schedule operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at law or in equity.

13.6   Remedies Not Exclusive.  Except as expressly provided herein, no remedy specified in the Master Agreement or in any Transaction Schedule is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other right or remedy provided herein or available at law or in equity.

13.7   Headings.  Headings in the Master Agreement and in the Transaction Schedule(s) are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

**13.8    Section References.** Unless otherwise indicated or required by the context, references to articles and sections of the Master Agreement and any Transaction Schedule(s) also refer to and include all sections and subsections of the referenced article or section.

**13.9    Use of Certain Words.** Unless the context requires otherwise, (a) **"including"** (and any of its derivative forms) means including but not limited to, (b) **"will"** and **"shall"** are expressions of command, not merely expressions of future intent or expectation, and (c) use of the singular imports the plural and vice versa.

**13.10    Severability.** If any term, provision or part of the Master Agreement or any Transaction Schedule is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of the Master Agreement or Transaction Schedule, as applicable, will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.

**13.11    Survival.** Any provision of the Master Agreement or any Transaction Schedule that contemplates performance or observance subsequent to termination or expiration of the Master Agreement or such Transaction Schedule (including confidentiality and data protection, limitation of liability, indemnification provisions and perpetual licenses) will survive termination or expiration of the Master Agreement or such Transaction Schedule, as applicable, and continue in full force and effect thereafter.

**13.12    Counterparts.** The Master Agreement and any Transaction Schedule may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument. A facsimile of a signed copy of the Master Agreement or other copy made by reliable mechanical means may be relied upon as an original.

**13.13    Other Purported Agreements.** Neither the Master Agreement nor any Transaction Schedule may be supplemented, modified, or governed by any shrink-wrap or click-wrap agreement, any purchase order or any confirmation, acknowledgement, or other sales, purchase or shipping form of Supplier or Customer, or executed via electronic signature, unless the party affected first agrees in a writing that is not an electronic communication to be bound by such purported agreements.

**13.14    Licenses Survive Bankruptcy.** All rights and licenses (if any) granted by Supplier to Customer under or pursuant to the Master Agreement or any Transaction Schedule are, and will otherwise be deemed to be, for purposes of Article 365(n) of the United States Bankruptcy Code (the **"Code"**), licenses to rights to "intellectual property" as defined under Article 101(35A) of the Code. The Parties agree that Customer, as licensee of such rights under the Master Agreement or such Transaction Schedule, will

18

retain and may fully exercise all of its rights and elections under the Code. The Parties further agree that, in the event of the commencement of bankruptcy proceedings by or against Supplier under the Code, Customer will be entitled to retain all of its rights under this license.

## ARTICLE 14: GENERAL

14.1   <u>Binding Nature and Assignment</u>.  Neither Party may assign these General Terms and Conditions, any Supplement or any Transaction Schedule (whether by operation of law or otherwise) without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed.  Any purported assignment in breach of this Section will be void.  Notwithstanding the foregoing, in the event that Customer files for protection under the United States Bankruptcy Code, the trustee of Customer's bankruptcy estate may assume these General Terms and Conditions, any Supplement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier, and Supplier hereby consents to such assumption. In addition, Customer may assign these General Terms and Conditions, any Supplement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier to (a) any Customer entity; (b) in the case of any merger or sale of its stock or assets, to the successor in a merger of Customer or to any entity that acquires all or substantially all of its stock or assets, or (c) any service provider contracted by Customer to perform data processing, facilities management or other outsourced services on Customer's behalf.

14.2   <u>Notices</u>.

14.2.1 All formal notices and communications relating to the Master Agreement or any Transaction Schedule will be in writing and delivered personally, by overnight delivery service or by first class prepaid mail with return receipt requested to (a) in the case of Supplier, its address as first set forth above and (b) in the case of Customer, to Director of Global Sourcing Services, 745 Seventh Avenue, New York, New York 10019, with a copy marked to the attention of the General Counsel at the same address.  A copy of each notice or communication relating to an affected Supplement or Transaction Schedule will also be sent to the applicable Parties' principal points of contact identified in the applicable Supplement or Transaction Schedule.

14.2.2 Either party may change the address(es) or addressee(s) for notice hereunder upon written notice to the other.  Any notice hereunder will be effective upon receipt by the Party to which such notice is addressed.

14.3   <u>Force Majeure</u>.  Neither Party will be liable for delay or failure to perform its obligations hereunder caused by an event of natural disaster, casualty, acts of God, riots, terrorism, governmental acts or such other event of similar nature that is beyond the reasonable control of the Party seeking to rely in this Section to excuse its delay or

19

failure provided such Party did not contribute in any way to such event. Supplier will
maintain commercially reasonable disaster recovery plans to cure any such delays or
failures. Supplier will keep the plans under review and make such changes, from time
to time, as are required in accordance with industry best practice, and will make such
plans available to Customer for review upon request. Notwithstanding the foregoing, if
any Supplier delay or failure to perform that is attributable to a force majeure event
continues beyond thirty (30) calendar days, Customer will nevertheless have the right to
terminate any affected Transaction Schedule, in whole or in part, with no further liability
and receive a refund of any unearned, prepaid fees.

14.4    Publicity. Neither Party will use the name or marks of, refer to, or identify the
other Party (or any related entity) in publicity releases, interviews, promotional or
marketing materials, public announcements, customer listings, testimonials or
advertising without the prior written consent of the other Party.

14.5    Subcontractors.    Supplier will be solely responsible for its subcontractors and
will remain fully responsible at all times for providing the Services. Supplier will be
Customer's sole point of contact regarding the Products and Services (including
Deliverables), including with respect to payment.

14.6    Non-Solicitation of Employees

Without the prior written consent of the other Party, (a) Customer employees with
whom Supplier Personnel interact in the course of Supplier providing the Services
hereunder will not solicit or seek to procure the employment of, directly or indirectly
(other than by general advertising), Supplier Personnel engaged in the provision of the
Services, during the period such Supplier Personnel are so engaged and for six (6)
months thereafter; and (b) Supplier will not solicit or seek to procure the employment
of, directly or indirectly (other than by general advertising), Customer's employees with
whom Supplier Personnel interact in the course of providing the Services, during the
term of the applicable Transaction Schedule and for six (6) months thereafter; provided
however, the Parties will not be precluded from hiring any employee of the other who
has been terminated by the Party prior to the commencement of employment
discussions. For the avoidance of doubt, neither party may make general solicitations
solely for the purpose of avoiding the obligations imposed by this Section.

14.7    Customer shall have the necessary licenses for any software which will be
provided to Supplier

## ARTICLE 15: GLOSSARY OF DEFINED TERMS

Certain definitions of capitalized terms used in the Master Agreement and the Transaction Schedules are set out below.  Other capitalized terms will have the meanings as assigned throughout the Master Agreement (including the Supplements) and the Transaction Schedules.

| Defined Term: | Meaning: |
| --- | --- |
| **Commercially Reasonable Efforts** | Taking all such steps and performing in such a manner as a well managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit. |
| **Deliverable** | Any work product, in any form, resulting from performance of the Services that is either specifically identified as a Deliverable in a Transaction Schedule or is developed for Customer pursuant to a Transaction Schedule. |
| **Intellectual Property Rights** | All intellectual and industrial property rights, including copyrights, mask work rights, moral rights, trade secrets, patent rights, rights in inventions, trademarks, trade names, and service marks (including applications for, and registrations, extensions, renewals, and re-issuances of, the foregoing). |
| **Services** | Any functions, responsibilities, activities and/or tasks Supplier performs (whether directly or indirectly) or is responsible for performing under the Master Agreement or any Transaction Schedule. |
| **Supplier Personnel** | Any and all personnel assigned by Supplier to perform any part of the Services, including employees and independent contractors and agents of Supplier and any of its subcontractors. |

(The Next Page Is The Signature Page)

21

The Parties have caused these General Terms and Conditions to be executed by their respective duly authorized representatives.

| HCL America, Inc. | Lehman Brothers Holding Inc. (CUSTOMER) |
|---|---|
| By: _L. R, Ra_ | By: _Dan C3_ |
| Name: _Raghu Rama Lakshman_ | Name: _Daniel Wong_ |
| (Type, Print or Stamp) | (Type, Print or Stamp) |
| Title: _Secretary & GC_ | Title: _____ |
| Date: _10 | 17 | 2006_ | Date: _10/16/2006_ |

22

**EXHIBIT 1**

**INSURANCE**

| Form of Insurance | Minimum Limits of Insurance |
|---|---|
| (a) (1) Workers Compensation and (2) Employers Liability | As required by law $1,000,000 per occurrence (BI/disease) |
| (b) Professional Liability (aka Errors & Omissions Liability). Such insurance should be endorsed to cover services provided by subcontractors if any. | $5,000,000 per claim |
| (c) Commercial General Liability on an occurrence basis, including premises operations, products and completed operations, contractual liability, and personal and advertising injury coverages. Supplier will name Lehman Brothers Holdings, Inc. and its subsidiaries and affiliates as an additional insured by certificate of insurance. | $1,000,000 per occurrence and aggregate |
| (d) Commercial Automobile Liability covering all leased, owned and non-owned vehicles and naming Lehman Brothers as an additional insured by certificate of insurance. | $1,000,000 per occurrence combined single limit for bodily injury and property damage liability |
| (e) Umbrella Liability on a follow form basis | $4,000,000 per occurrence and aggregate excess of the Commercial General Liability and Commercial Automobile Liability Insurance |
| (f) Fidelity Bond (aka Crime Insurance), including third party liability or client coverage and naming Lehman Brothers Holdings Inc, and its subsidiaries and affiliates as a loss payee by certificate of insurance. | $2,000,000 aggregate |

23

# EXHIBIT B

## PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**Supplier Name: HCL AMERICA, INC.**

**Supplier Address: 330 Potrero Avenue, Sunnyvale, California -94085**

**Supplier Jurisdiction of Incorporation: CALIFORNIA, USA**

**Tax ID: 770-205-035**

**Telephone #: 408 733 0480**

**Fax #: 408 73 0482**

**General Terms and Conditions No.: CON00000019350**

**General Terms and Conditions Effective Date: October 16, 2006**

**Professional Services Supplement Effective Date: December 11, 2007**

**Schedule No.: PSTS-7**

**Order Date: December 11, 2007**

This Professional Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and Professional Services Supplement (the "**Services Supplement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above. This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, Services Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the Services Supplement that forms this Transaction Schedule:

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all data and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
Annex 8: Export Control [Required, when applicable]
Annex 9: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the Services Supplement referenced above.



The undersigned parties have caused this Transaction Schedule to be executed by their
respective duly authorized representatives.

HCL AMERICA, INC. (SUPPLIER)

By: _____

Name: Raghu Raman Lakshmanan
(Type, Print or Stamp)

Title: Secretary & General Counsel

Lehman Brothers Inc. (CUSTOMER)

By: _____

Name: Subramaniam Venkateswaran
(Type, Print or Stamp)

Title: _____ SVP

Lehman Brothers Inc. (CUSTOMER)

By: _____

Name: Anitha Bhaskaran for Ben Wu
(Type, Print or Stamp)

Title: _____ SVP

# ANNEX 1: DESCRIPTION OF SERVICES

## A. Services Overview:

**Lehman requested HCL to execute a Production Management Pilot for APE Applications as listed in this section below.** The activity will be include but not be limited to First Level User Support for six applications for APE and creation of Run Books for these applications.

| Phoenix | BreakGlass | Mercury |
|---------|------------|---------|
| QMT | ASAPMailer | Caliber |
| ERAP | Jira | LAS |
| XMS | PS Test | MyInfrastructure |
| TIBCO Process | Buildforge | Mainframe Transparency |
| Flow Dashboard | SVN | Phoenix Syntrans |
| BPM Universal Client | UDO | BPM Developer Tools |
| CCM | MEGA | Checklist |
| Staffware | | |

## Run book

- Need for run book and contents of the run book
- Based on the above, create run book for these applications

## First Level User Support for 6 Applications

1. **Jira**
2. **Mercury**
3. **CheckList**
4. **QMT**
5. **LAS**
6. **Staffware**

HCL shall provide the services of a delivery team that will be with the Lehman team on the following high level work processes.

This will involve understanding the Application & existing Support Process for the above listed six applications and transitioning this knowledge to an offshore team.

**Knowledge Transfer of the remaining 19 applications**

This will involve:

- **Understanding of the Application and Support requirements of the remaining 19 applications and performing some level of support under supervision of Lehman Managers to demonstrate successful knowledge transfer.**

- Creation of the Runbooks of the remaining 19 applications

Upon successful completion of the current Pilot Lehman will award HCL the contract for the QA and Production Management of all the 25 APE Applications, subject to the acceptance of commercial terms between HCL and Lehman.

The criteria for measuring the success of the Lehman Pilot engagement will be as follows:

**Successful Knowledge Transfer - of all 25 APE applications**
(to be measured by clear User Support work and scope definition for all 25 applications)
(to be measured by successful Runbook Documentation for all 25 applications)
(to be measured by successful Metrics Dashboard Template Creation for all 25 applications)

**Successful Support –**
of 6 APE applications as above for User Support from January to February 2008
(to be measured by measurable increase in productivity month on month)
(to be measured by measurable increase in the number of tickets / reduction in effort per ticket handled on a month on month)
(to be measured by clear definition of SLAs and meeting the same)

## B. Detailed Description of Services.

The execution plan to provide the requisite services to Lehman comprises of the following Phases:

### Run books Creation:

- Need for run book and contents of the run book.

A run book seeks to answer the following questions, based on the answers/clarifications obtained, content of the run book will be defined which will assist Lehman in identifying areas that are suitable for run book creation

1. Are there any existing processes that the organization possesses for creating run books? How is the process used currently?
2. Who will use the run book?
3. What level of detail will be stored in the run book?
4. How often is the run book to be updated and by whom?
5. Is the run book to be considered as a subset of configuration management records?
6. Does the run book have to take account the organization of the application owners and procedures?
7. Who will be willing to answer questions in the event of a scenario those have not been faced before in the application?
8. Who is to be contacted in emergencies? Is there only level of contact or are there multiple contacts for the application? Are so many contacts required?
9. With respect to an application

   a. Are emails/alerts information required to be transferred for analysis, how is this done and by whom? What is the expected ETA for performing an analysis and why is this required and who will be responsible for performing such an analysis?

   b. Is the required to store information on alerts and errors and how are they are to be handled

   c. Is information about remote and local servers essential?

   d. How the data backed up and what is the restore procedure? Are backups required for backup and restore procedures, how often is this to be carried out and by whom?

   e. Is a copy of the software as required for the application to be stored, who will re-install/restore when a need arises and why?

   f. Are any custom made objects/interfaces in use? Is support required for this? If so, why and who will provide support, what are the times of the day when support will be provided

   g. Are user ids and passwords protected? If yes, why and who will be responsible for ensuring that this practice is followed? Are there regular audits required to be conducted?

   h. Is it necessary to have contact information? Will it be required to store this information by roles performed by each of the persons? What happens when a person changes roles/jobs?

i.  Is there a need to document the applications security architecture, type of logins and roles permissions?

j.  Is information on operating system version, with service packs and hot fixes required to be stored?

k.  Is the hardware configurable, if so how and why will the hardware be configurable and by whom?

l.  Is it required to record dates and / or version numbers of software used?

m.  Is it required to store the physical and logical disk configuration, disk type, disk size and any special options that may be used while configuring the disk?

n.  Is the network topology to be included? Is it likely to change, what are the scenarios in which this would change and why?

10. Is standardization required? How is this to be accomplished?

11. Will creating standards for parts of the system be required to be created? Will it be sufficient then to only record the differences that a application exhibits from the standard set? Will this be a simpler way to achieve a consistent process?

### Level 1 Support

There are six applications for APE which will be supported and in scope of this exercise which are –

    1.  Jira
    2.  Mercury
    3.  CheckList
    4.  QMT
    5.  LAS
    6.  Starfware

o  User Support

    ▪  Provide resolution using hotline/emails for any issues that may be faced by the users

    ▪  Record issues faced by user using an incident management system which could be looked at the relevant support/development teams

o  Batch Monitoring and Execution (if applicable for the application)

    ▪  Daily/Weekly/Monthly/Yearly checks to be carried out on applications

    ▪  Executing batch process on demand and on a periodic basis as defined by the application

    ▪  Manual Monitoring health of the application

    ▪  Automation of monitoring checks

o  Administrative tasks

    ▪  Creation of user groups, Ids and permissions as required for the application

    ▪  Liaise with relevant groups for the creations of required user Ids

    ▪  Liaise with the relevant groups for executing scripts on the database

- Liaise with relevant groups for monitoring disk space , network issues and possibly excessive CPU usage activity

o Application Maintenance (if applicable for the application)
  - Setting up alert monitoring systems that would warn of potential outages
  - Outage management
  - Release management
  - ID and Access management
  - QA and UAT set up management
  - Ensure application health maintenance by carrying out preventive maintenance activities over the weekends
  - Provide resolutions to issues as may have been raised/forwarded by relevant teams
  - Maintain relevant documentation/FAQs application wise
  - Execute adhoc queries based on requests obtained for each application

## ANNEX 2: PROJECT PLANS, DELIVERY DATES AND MILESTONES

It is proposed to execute the assignment on an onsite – offshore model with a team size of 5 resources. It is proposed to have 2 resources onsite and 3 resources shall be offshore.

The project deliverables will be submitted to the identified point of contact at Lehman Brothers in New York based on the mutually agreed scope of the agreement.

**Proposed Project Start date of January 7th 2008 and it concludes on March 8th 2008.**

The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

## ANNEX 3: PRICES, FEES AND CHARGES

Fixed Price: **95,600.00 USD** (excluding taxes). The fixed price will be due and payable in progress payments made in accordance with the payment milestone schedule set forth as Annex 8.5:

Invoices will be sent to:

Subramaniam Venkateswaran / Anitha Bhaskaran

The Accounts Payable Department

at

**Lehman, New York.**

## ANNEX 4: DELIVERABLE SPECIFICATIONS

The tentative Project Deliverables for this project are:

**Project Deliverables**

**Run Books:**

| Phase | Activity | Proposed Deliverables | Delivery/Dates |
|---|---|---|---|
| Runbooks | Create a sample run book based on the Template | Sample run book created | |

**Level 1 Support:**

| Phase | Level 1 Support | Proposed Deliverables Level 1 Support | Delivery/Dates |
|---|---|---|---|
| Study | Inventory of Applications | Schedule adherence report | |
| | Process Documentation(Downstream/Upstream) | Queries & Assumptions | |
| | Interface Mapping | Milestone Review | |
| You Run We Watch | Understand Past Incident History | Escalation Matrix | |
| | Draft the "To Be" workflow for all support activities | | |
| | Prepare Escalation Matrix | | |
| | Jointly simulate & resolve issues | | |
| | Watch existing team for the approach of resolution | Run book Preparation | |
| We Run You Oversee | HCL Level 1 Support team will take over support | Preparation of Service Level Agreement (SLA) | |
| | Lehman team to provide shadow support | Review Draft SLA | |
| | Compile key metrics & SLA parameters | | |
| | Identify Gaps in the current project documentation | | |
| | Preparation of SLA Document | | |
| Dry Run of SLA | Support applications as per SLA terms & conditions | SLA Sign-off, Periodic Update SLA & key metrics | |
| Enduring Phase | Start Enduring Application Management (Onsite) | Start Enduring Application Management (Onsite)\Weekly Project Status | |

- Proposed Project Start date of January 7th, 2007. The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

# ANNEX 5: PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name: Anshu Agarwal | Name: Subramaniam |
| Address: HCL Technologies Ltd. | Venkateswaran |
| Vertex Tech Park, | Address: |
| 564, Pattandur Agrahara Road | Lehman Brothers |
| Off Whitefield Road, Behind ITPL | 70 Hudson St, 8th Floor |
| Bangalore, 560 066, India | Jersey City, NJ 07302 |
| Email: anshu.agarwal@hcl.in | Email:  |
|  | mani@lehman.com |
| Tel: | Tel: |
| Mob: | Mob: |
| Fax: | Fax: |

| Customer |
|---|
| Name: Anitha Bhaskaran for Ben Wu |
| Address: |
| Lehman Brothers |
| 70 Hudson St, 8th Floor |
| Jersey City, NJ 07302 |
| Email:  |
| bwu@lehman.com / anitha.bhaskaran@lehman.com |
| Tel: +1 201 499 4734 |
| Mob: |
| Fax: |

## ANNEX 6: KEY PERSONNEL

**Key Personnel**

| # | Position | Location | No. of Resources |
|---|----------|----------|------------------|
| 1 | Sr. Production Support Consultant | Onsite New Jersey / New York | 1 |
| 2 | Jr. Production Support Analyst | Onsite New Jersey / New York | 1 |
| 3. | Sr. Production Support Consultant | Offshore Bangalore / India | 3 |

## ANNEX 7: PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

This complete transaction will be monitored and managed by the senior management team comprising of representatives from Lehman Brothers and the HCLT.

It is proposed that the following monitoring and control structure is adopted

| Monitoring & Controlling Activity | Responsible | Escalations |
|---|---|---|
| Schedule adherence | Sr. Production Support Consultant | Offshore Program Manager / Delivery Head |
| Deliverables | Sr. Production Support Consultant | Offshore Program Manager / Delivery Head |
| Status Reporting | Sr. Production Support Consultant | Offshore Program Manager / Delivery Head |
| Weekly Status Reports (Onsite tasks) | Sr. Production Support Consultant | Offshore Program Manager / Delivery Head |

Not Applicable

**ANNEX B: EXPORT CONTROL**

**ANNEX 9: ADDITIONAL AGREED-UPON PROVISIONS**

1. Subcontractors

It is envisaged that no subcontractor's services shall be availed to perform the work described in this SOW

2. Service Locations

The services for executing the scope of work identified in this SOW will be executed out of the following locations

**Project Execution**

| Onsite | Lehman Brothers facilities in the New York/NJ area. |
|--------|------------------------------------------------------|
| Offshore | HCL Technologies – Capital Market Services offices located at Bangalore. HCL Technologies - CMS Vertex Tech Park, 554, Pattandur Agrahara Road Off Whitefield Road, Behind ITPL Bangalore, 560 066, India. Registered Office :HCL Technologies 806, Siddharth, 96, Nehru Place, New Delhi 110 019 |

3. Use of Customer Facilities and Resources

**Workspace Logistics**

Lehman Brothers shall provide workspace facility for the 2 member onsite team to execute the project.

Lehman Brothers shall provide the onsite team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

Lehman Brothers will provide the team with the requisite hardware.

Lehman Brothers will provide the HCL resources with the requisite software installations and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL Team located on-site and offshore.

Lehman Brothers will provide mailing facilities to the HCL team on the Lehman mailing infrastructure.

**Functional / Business resources**

Lehman Brothers will provide for at least 1 full time single point of contact during the execution, to help internal co-ordination and support.

Lehman Brothers will provide access to relevant application owners / contacts for the HCL team to seek clarifications on the existing systems / artifacts

It is envisaged that the approximate interface times required from the following teams within Lehman are as outlined

| Contact Person / Lehman Resource | Envisaged discussion time |
| --- | --- |
| Support Engineer | 8 – 10 hours per week |
| Support Manager | 3 – 5 hours per week |

If during the course of the project, if more time is needed for validation/clarification from any of the Lehman personnel, this will be intimated at least two days before.

4.    Supplier Facilities and Resources

**Workspace Logistics**

HCL shall provide workspace facility for the 3 member offshore team to execute the project.

HCL shall provide the offshore team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

HCL will provide the team with the requisite hardware including Laptops and pager/mobile for the staff traveling onsite.

**Lehman Brothers will provide the SecureIDs to all 5 HCL Staff working onsite and offshore on this Pilot.**

Onsite resources will travel offshore upon completion of the Knowledge Transfer and transition the knowledge to the resources offshore.

Lehman Brothers will provide the HCL resources with the requisite software installations and licenses for the applications that are used in the day-to-day operations.



**HCL Technologies Limited**

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO,:11233618 DATED 16.12.2003
Exim Code   5194000111

## INVOICE

**TO**
Lehman Brothers Limited
**Attention**  : Subramanium Venkat /Anitha Bhaskaran
70 Hudson St., 8th Floor, Jersey City,
NJ, USA
07302 USA

**Invoice Number** 3507102602
**Invoice Date**  Apr 14, 2008
**PO Number** *

**Amount In**   USD

| Description | Amount |
|---|---|
| Month 2 Fixed Price | 47,900.00 |

| | |
|---|---|
| **Total** | 47,900.00 |
| **Tax** | |
| **Total Payable** | 47,900.00 |

**Payment terms :**   **Within 30 days Due net**

> Please Remit To
> **HCL Technologies Limited**
> **Bank Name** Deutsche Bank AG  Bangalore  IN

> **Payment Instructions**
>          Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
> to Deutsche Bank, Bangalore branch with instructions to credit our
> current Account No. 2000107-00-0 with them.
> Delayed payments will attract interest if applicable as per the
> provisions of the applicable service agreement
> Any clarifications on this invoice should be brought to the attention of
> finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
> invoice

**For  HCL Technologies Limited**

**Authorized Signatory**



Annexure to Invoice No : 3507102602          Dated : Apr 14, 2008
PO Number : *
Project ID : C/071744
Project Name : Production Management Pilot for APE Appl    Account Manager : WATAL ADITYA

|  | Amount in   USD |
| --- | --- |
| **MileStone Description** | **Amount** |
| Month 2 Fixed Price | 47,900.00 |
| **Sub Total(Offshore)** | 47,900.00 |
| **Project Total(Production Management Pilot for APE Appl)** | 47,900.00 |
| Items Total | 47,900.00 |
| Net value | 47,900.00 |
| Gross Value | 47,900.00 |
| Final amount | 47,900.00 |

# EXHIBIT C

## PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**Supplier Name: HCL AMERICA, INC.**

**Supplier Address: 330 Potrero Avenue, Sunnyvale, California -94085**
**Supplier Jurisdiction of Incorporation: CALIFORNIA, USA**

**Tax ID: 770-205-035**

**Telephone #: 408 733 0480**

**Fax #: 408 73 0482**

**General Terms and Conditions No.: CON000000019350**

**General Terms and Conditions Effective Date: October 16, 2006**
**Professional Services Supplement Effective Date: Mar 26, 2008**

**Schedule No.: PSTS- 6**

**Order Date: Mar 26, 2008**


This Professional Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and Professional Services Supplement (the "**Services Supplement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, Services Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the Services Supplement that forms this Transaction Schedule:

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all date and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
Annex 8: Export Control [Required, when applicable]
Annex 9: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the Services Supplement referenced above.

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives.

| HCL AMERICA, INC. (SUPPLIER) | Lehman Brothers Inc. (CUSTOMER) |
|---|---|
| By: _L. R̪ l Ra_ | By: _[signature]_ |
| Name: _Raghu Ramalakrishna_ | Name: _SUBRAMANIAM VENKATESWARAN_ |
| (Type, Print or Stamp) | (Type, Print or Stamp) |
| Title: _Secretary & General Counsel_ | Title: _SVP_ |

## ANNEX 1:  DESCRIPTION OF SERVICES

**A. Services Overview.**

Live Documentation is a new Project which involves the documentation used in production services. This will include the overview of the operations manual, incident management workflow, run book and the SLA framework.

## B. <u>Detailed Description of Services</u>.

As part of the Live Documentation Project the following tasks will be achieved.

| # | Title / Description | Contents – Details / Reference to TOC | Source of Information | Comments |
|---|---------------------|---------------------------------------|-----------------------|----------|
| 1 | "Service Delivery Document" (SDD) or "Operations Manual" for Production Services (for application / set of applications) | a. Business and Functional Overview<br>b. Architecture Reference (including Hosts/Servers, networks, Interfaces)<br>c. Overview of Production Services provided – Roles and responsibilities | • Already defined scope of Production services<br>• ADB Information(for Production Instances)<br>• Project / Application Documentation | For smaller applications, this can include all other sections identified in this Table also. For larger applications – it is suggested that the other sections (as indicated below) are considered as separate artefacts<br><br>This is meant to be the overarching definition of Production Services – the Services offered in the Business and Functional Context, and references to other individual artefacts and Process Guides.<br><br>The Business, Functional and Architectural context consolidated here can be expanded to map to complete Business Areas.<br><br>This document is not expected to undergo frequent updates – If correct references are made to ADB. The contents of this document are also likely to be the "home" content of a Production Services URL in the Intranet. |

| 2 | Incident Management Process: Workflow, Escalations, Tools, Contacts, Knowledge Base building and maintenance process, Reporting (Incidents are handed over to the Production Support Team by the User Support team) | a. Incident Definitions – Severity, Classification, Routing (Application Component Information), Knowledge-base components<br>b. Workflow for Incident Capture / Handoffs from various teams<br>c. Workflow for Incident escalations to other teams (e.g. Downstream applications for Data, to other shared services teams)<br>d. Reporting schedules, formats<br>e. Contact lists, Call trees for escalation<br>f. Handoffs to Development Process | Already existing definitions (e.g. Severity) Existing Workflows, Tools People finders | Workflow for Development teams on Production/Staging<br><br>Proposed workflow tool (TMC, Siebel etc) needs to be amenable to capture Knowledge from previous incidents and provide it is in an accessible format to the Incident Management team.<br><br>Jira is seen to be the preferred, standard platform for handoffs to Development teams.<br><br>Classification of incidents as defects or new feature requests is a key aspect. A separate Governance mechanism to accurately implement this differentiation is suggested.<br><br>Knowledge base components – will be required address<br>- Ability to seamlessly capture information for better analyses of repeat incidents, root cause either at the time of incident capture or retrofit later<br>- Ability to search incidents based on key words (business or technical), application – screens<br>- Ability to provide a known solution / workaround /FAQ support for the support personnel in an unambiguous manner |

| # | Title / Description | Contents – Details / Reference to TOC | Source of Information | Comments |
|---|---|---|---|---|
| 3 | "Run-book" – For day to day Production Operations | a. Catalog of Scheduled and Automated jobs across the Applications – Daily / Monthly / Other schedules<br>b. Manual Clean-up tasks and Procedures<br>c. Backup, Recovery, Archival Tasks<br>d. Proactive monitoring of Dashboards (Autosys, DBA, Informatica etc)<br>e. Handling alerts / upgrade notices from Shared Services teams and Change Management teams | ADB / Autosys or SysAdmiral – and other Shared Services Repositories<br><br>To be sought from various teams | Alerts (Bings, Beetels) from Automated Jobs are expected to be treated as "incidents" when indicating an exception. Such "incidents" need to be captured by the Incident Management team and then assigned / acted upon by the Monitoring teams.<br><br>While most shared services teams are providing dashboards to monitor various jobs (e.g. Autosys, Informatica etc.) using the HP Openview facility – for an end to end view of the status of jobs and alerts at any time, Applications may also build a custom view in HP Openview. It is suggested that all monitoring happen through a read only access, and HP Openview based. (Breakglass) |

| 4 | SLA Framework for selected Application | a. KPI for Production Services, back to back arrangements with other teams<br>b. SLA Groups (Time, Quality, Backlog etc.)<br>c. Monitoring, Reporting, Compliance process<br>d. SLA Categories<br>    a. Availability<br>    b. Response Time<br>    c. Resolution Time<br>    d. Feeds (Timeliness, Tolerance) | To be gathered from various teams where possible. | The framework and KPI will be defined for key components. |

| # | Title / Description | Contents – Details / Reference to TOC | Source of Information | Comments |
|---|---|---|---|---|
| 5 | Release Management | a. Release Plan – Production <br>    a. On going Maintenance and Enhancement releases <br>    b. Event Calendar <br>b. Release Planning Procedure <br>c. Maintenance Release Process <br>    a. Release notification <br>    b. Release Configuration Planning, Review <br>    c. Release Notes <br>d. Emergency Release Process | Application Release Planning | Considered as part of QA and Release Management in the Lehman Model. To be considered – whether it is part of the Production Services. |
| 6 | Change Management | a. Change Control Policy for Application <br>b. Production / Staging – Deployment of workflows (based on Lehman ACM Process) <br>c. Production Quality Assurance <br>    a. Automated Regression testing <br>    b. Smoke tests <br>    c. End user / Business Sign off process <br>d. Post implementation Reporting | Existing ACM Process | To be determined – if it is part of Production Services. |
| 7 | Configuration Management Plan | a. Detailed TOC available | | To be considered part of the Development SDLC. (Part of CTB) |

The following Support is required from Lehman.

(a) Access and availability to Leadership / Management teams and Team leads of all Stakeholder teams within the Project
(b) Single point of Contact from Lehman to facilitate this Project and help coordinate the sessions and information availability for this effort
(c) Access to existing Production Support Process and Practices within Lehman.
(d) Desk Space at the Lehman Office
(e) Access to Lehman Email and systems as needed for successful execution of this project for Consultants working onsite or offshore

## Annex 2: Project Plan, Deliverables and Milestones

The following table lists the Deliverables and schedule of deliverables.

| Phase | Duration | Tasks |
|---|---|---|
| Phase I | 3 Weeks | • Identification of 3 candidate Projects<br>• Agreement on the templates of documentation to be produced (as listed above)<br>• Gap analysis of existing documentation for selected Projects against templates |
| Phase II | 12 Weeks | Following documentation for selected Projects (as listed above)<br>• Section 1    -    Operations Manual (Overview)<br><br>• Section 2    -    Incident Management Workflow (including Incident analyses for previous 2 months Incident data)<br><br>• Section 3    -    Run book for day to day operations<br><br>• Section 4    -    SLA Framework |

Proposed Project Start date of 1st Apr, 2008. The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

## ANNEX 3:  PRICES, FEES AND CHARGES

Fixed Price: **148,000 USD** (excluding taxes).  The fixed price will be due and payable in progress payments made in accordance with the payment milestone schedule set forth as Annex **9.5**:

Invoices will be sent to:

The Accounts Payable Department

at

**Lehman, New York.**

## <u>ANNEX 4:  DELIVERABLE SPECIFICATIONS</u>

The tentative Project Deliverables for this project are:

**Project Deliverables**

| Phase | Duration | Tasks |
|-------|----------|-------|
| Phase I | 3 Weeks | <ul><li>Identification of 3 candidate Projects</li><li>Agreement on the templates of documentation to be produced (as listed above)</li><li>Gap analysis of existing documentation for selected Projects against templates</li></ul> |
| Phase II | 12 Weeks | Following documentation for selected Projects (as listed above)<ul><li>Section 1    -    Operations Manual (Overview)</li><li>Section 2    -    Incident Management Workflow (including Incident analyses for previous 2 months Incident data)</li><li>Section 3    -    Run book for day to day operations</li><li>Section 4    -    SLA Framework</li></ul> |

The duration of this assignment is 15 weeks commencing 1st Apr 2008 up to 15th July 2008.

Proposed Project Start date of 1st Apr, 2008. The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

**<u>ANNEX 5:  PROJECT MANAGERS</u>**

| Supplier | Customer |
|---|---|
| Name:  Anshu Agarwal<br><br>#33/1 Ulsoor Road, Bangalore, 560042<br><br><br>Email: <u>anshu.agarwal@hcl.in</u><br><br>Tel:<br>Mob: +91 9972001512<br>Fax: | Name:  Subramaniam Venkateswaran<br>1301 6th Avenue, New York, NY<br><br>Email: mani@lehman.com<br><br>Tel:  +1 212 320 3546<br>Mob:<br>Fax: |

## ANNEX 6:  KEY PERSONNEL

**Key Personnel**

| # | Position | Location | No. of Resources |
|---|----------|----------|------------------|
| 1 | Project Manager | Onsite New Jersey / New York / Offshore Bangalore as needed | 1 (Full time for the entire duration of the project) |
| 2 | Documentation person | Onsite New Jersey / Offshore Bangalore as needed | 2 (Full time for the Phase 2 duration) |
| 3 | Twiki Development | Offshore Bangalore | 1 (Part time as needed on the project) |

## ANNEX 7:  PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

It is proposed that the following monitoring and control structure is adopted

| Monitoring & Controlling Activity | Responsible | Escalations |
| --- | --- | --- |
| Schedule adherence | Project Manager | Global Engagement Manager |
| Deliverables | Project Manager | Global Engagement Manager |
| Status Reporting | Project Manager | Global Engagement Manager |
| Weekly Status Reports | Project Manager | Global Engagement Manager |

## ANNEX 8:  EXPORT CONTROL

Not Applicable

## ANNEX 9:  ADDITIONAL AGREED-UPON PROVISIONS

1. Subcontractors

It is envisaged that no subcontractor's services shall be availed to perform the work described in this SOW

2. Service Locations

The services for executing the scope of work identified in this SOW will be executed out of the following locations

**Project Execution**

| Onsite | Lehman Brothers facilities in the New York/NJ area. |
|---|---|
| Offshore | HCL Technologies – Capital Market Services offices located at Bangalore.<br>HCL Technologies - CMS<br>The Senate, #33/1 Ulsoor Road<br>Bangalore – 560 042<br><br>Registered Office :HCL Technologies<br>                  806, Siddharth,<br>                  96, Nehru Place,<br>                  New Delhi 110 019 |

3. Use of Customer Facilities and Resources

**Workspace Logistics**

Lehman Brothers shall provide desks for the HCL resources to enable the project execution.

Lehman Brothers shall provide the onsite team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

Lehman Brothers will provide the team with the requisite hardware.

Lehman Brothers will provide the HCL resources with the requisite software installations and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL Team located on-site and offshore.

Lehman Brothers will provide mailing facilities to the HCL team on the Lehman mailing infrastructure.

**Functional / Business resources**

Lehman Brothers will provide for at least 1 dedicated single point of contact during the execution, to help internal co-ordination and support.

Lehman Brothers will provide access to relevant application owners / contacts for the HCL team to seek clarifications on the existing systems / artifacts

It is envisaged that the approximate interface times required from the following teams within Lehman are as outlined

| Contact Person / Lehman Resource | Envisaged discussion time |
| --- | --- |
| Support Engineer | 8 – 10 hours per week |
| Support Manager | 3 – 5 hours per week |

If during the course of the project, if more time is needed for validation/clarification from any of the Lehman personnel, this will be intimated at least two days before.

4. Supplier Facilities and Resources

**Workspace Logistics**

HCL shall provide workspace facility for the offshore team to execute the project.

HCL shall provide the offshore team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

HCL will provide the resources with the requisite software installations and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL Team located offshore.

Lehman Brothers will provide mailing facilities to the HCL team on the Lehman mailing infrastructure.

5. Other Terms.
None


Payment Terms

| Payment Milestone | Amount in USD | Date |
|---|---|---|
| Monthly Fixed Billing | 37,000 | 30 April 2008 |
| Monthly Fixed Billing | 56,000 | 31 May 2008 |
| Monthly Fixed Billing | 37,000 | 30 June 2008 |
| Monthly Fixed Billing | 18,000 | 29 July 2008 |

**HCL Technologies Limited**

HCL Technologies Limited
The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka  India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

TO
Lehman Brothers Limited
1301 6th Avenue
New York,
 NY
**Attention** : Subramaniam Venkateswaran

**Invoice Number** 3507102777
**Invoice Date**  Apr 30, 2008
**Project** Live Documentation
**Del. Plant** HCL TECHNOLOGIES LIMITED
**Location** Bangalore,560042
**PO Number** : SOW

**Amount in    USD**

| Description | No. of days | Amount |
|---|---|---|
| Service Charges for the Period   Apr. 2008 | | 37,000.00 |

| | | |
|---|---|---|
| **Total** | | 37,000.00 |
| **Tax** | | |
| **Total Payable** | | 37,000.00 |

**Payment terms :**    **Within 30 days Due net**

**Please Remit To**

**Bank Name**  Deutsche Bank AG   Bangalore  IN

```
Payment Instructions
            Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice
```

**For  HCL Technologies Limited**

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

Annexure to Invoice No : 3507102777          Dated : Apr 30, 2008


PO Number : SOW
Project ID : C/072624
Project Name : Live Documentation          Account Manager : WATAL ADITYA

Amount in   USD

| ITEM DESCRIPTION | ITEM | FROM | TO | UNITS | RATE | AMOUNT |
|---|---|---|---|---|---|---|

Service Charges for Period April 08                                    37,000.00


| | | |
|---|---|---|
| Sub Total() | | 37,000.00 |
| Project Total(Live Documentation) | | 37,000.00 |

| | |
|---|---|
| Items Total | 37,000.00 |
| Net Value | 37,000.00 |
| Final amount | 37,000.00 |

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

HCL Technologies Limited
The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## HCL Technologies Limited

## INVOICE

TO
Lehman Brothers Limited
1301, 6th Avenue,
New York,
   USA
Attention  : Subramaniam Venkateswaran

Invoice Number 3507103059
Invoice Date  May 31, 2008
Project Live Documentation
Del. Plant HCL TECHNOLOGIES LIMITED
Location Bangalore,560042
PO Number : SOW

Amount in    USD

| Description | No. of days | Amount |
|---|---|---|
| Service Charges for the Period May'2008 (TSR Number - 1019181) | | 56,000.00 |

| | | |
|---|---|---|
| Total | | 56,000.00 |
| Tax | | |
| Total Payable | | 56,000.00 |

Payment terms :    Within 30 days Due net

Please Remit To

Bank Name  Deutsche Bank AG  Bangalore  IN

Payment Instructions
         Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice

For  HCL Technologies Limited

Authorized Signatory

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

**Annexure to Invoice No : 3507103059**          **Dated : May 31, 2008**
**PO Number : SOW**
**Project ID : C/072624**
**Project Name : Live Documentation**          **Account Manager : WATAL ADITYA**

| | | | | | | Amount in   USD |
|---|---|---|---|---|---|---|
| **ITEM DESCRIPTION** | **ITEM** | **FROM** | **TO** | **UNITS** | **RATE** | **AMOUNT** |
| Service Charges for the Period May'2008 | | | | | | 56,000.00 |
| | | | | | | |
| **Sub Total()** | | | | | | 56,000.00 |
| **Project Total(Live Documentation)** | | | | | | 56,000.00 |
| | | | | | | |
| **Items Total** | | | | | | 56,000.00 |
| **Net Value** | | | | | | 56,000.00 |
| **Final amount** | | | | | | 56,000.00 |

**Registered Office**
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



## HCL Technologies Limited

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka  India
☎ 91-80-41906000
✉
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
Lehman Brothers Limited
**Attention  :** Subramaniam Venkateswaran
1301, 6th Avenue,
New York,
  USA

**Invoice Number** 3507103307
**Invoice Date**  Jun 30, 2008
**PO Number** SOW

**Amount in**   USD

| Description | Amount |
|---|---|
| Service Charges for the Period June 08 (TSR Number - 1019181) | 37,000.00 |
| **Total** | 37,000.00 |
| **Tax** | |
| **Total Payable** | 37,000.00 |

**Payment terms :**   **Within 30 days Due net**

**Please Remit To**
**HCL Technologies Limited**
**Bank Name** Deutsche Bank AG  Bangalore  IN

```
Payment Instructions
            Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice
```

**For  HCL Technologies Limited**

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



**Annexure to Invoice No : 3507103307**                                        **Dated : Jun 30, 2008**
**PO Number : SOW**
**Project ID : C/072624**
**Project Name : Live Documentation**                       **Account Manager : WATAL ADITYA**

|                                                           | Amount in   USD |
| :-------------------------------------------------------- | --------------: |
| **Description**                                           |      **Amount** |
| Service Charges for the Period June'2008                  |       37,000.00 |
|                              **Total**                    |       37,000.00 |
|                              **Net Value**                |       37,000.00 |
|                              **Final amount**             |       37,000.00 |



**HCL Technologies Limited**

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000

CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
Lehman Brothers Limited
**Attention**  : Subramaniam Venkateswaran
1301, 6th Avenue,
New York,
 USA

**Invoice Number** 3508100050
**Invoice Date**  Jul 29, 2008
**PO Number** SOW

Amount in    USD

| Description | Amount |
|---|---|
| Monthly fixed billing for service charges for the month of July- 2008 (TSR Number - 1019181) | 18,000.00 |
| **Total** | 18,000.00 |
| **Tax** | |
| **Total Payable** | 18,000.00 |

**Payment terms :**    **Within 30 days Due net**

**Please Remit To**
**HCL Technologies Limited**
**Bank Name** Deutsche Bank AG  Bangalore  IN

**Payment Instructions**
          Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice

**For  HCL Technologies Limited**

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

Page 1/    2



Annexure to Invoice No : 3508100050                                    Dated : Jul 29, 2008
PO Number : SOW
Project ID : C/072624
Project Name : Live Documentation                          Account Manager : WATAL ADITYA

                                                                    Amount in  USD

| Description | Amount |
|---|---|
| Monthly fixed billing for service charges for the month of July-2008 | 18,000.00 |
| **Total** | 18,000.00 |
| **Net Value** | 18,000.00 |
| **Final amount** | 18,000.00 |

# EXHIBIT D

## PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**Supplier Name: HCL AMERICA, INC.**

**Supplier Address: 330 Potrero Avenue, Sunnyvale, California -94085**
**Supplier Jurisdiction of Incorporation: CALIFORNIA, USA**

**Tax ID: 770-205-035**

**Telephone #: 408 733 0480**

**Fax #: 408 73 0482**

**General Terms and Conditions No.: CON000000019350**

**General Terms and Conditions Effective Date: October 16, 2006**
**Professional Services Supplement Effective Date: Feb 25, 2008**

**Schedule No.: PSTS- 8 – CON000000028402**

**Order Date: March 10, 2008**

This Professional Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and Professional Services Supplement (the "**Services Supplement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, Services Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the Services Supplement that forms this Transaction Schedule:

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all date and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
Annex 8: Export Control [Required, when applicable]
Annex 9: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have ꞓ meanings given in the General Terms and Conditions or the Services Supplement rꞓ renced above.

The undersigned parties have caused this Transaction Schedule to be ex ᴉted by their respective duly authorized representatives.

**HCL AMERICA, INC. (SUPPLIER)**

By: _____

Name: _Raghu Raman Laksh_manan_
(Type, Print or Stamp)

Title: _Secretary + General Counsel._

**Lehman Brothers Inc. ( STOMER)**

By: _____

Name: _____
(Type, Print or Sta )

Title: _____

## ANNEX 1:  DESCRIPTION OF SERVICES

### A.  Services Overview.

WMR is a project that is under various stages of development within Customer's IMD division. The WMR Production Services Setup Project is defined as a short duration (13 weeks effort, proposed team of 4 consultants, at any time a maximum of 2 located at Customer's NYC offices) aimed at defining the detailed requirements of the WMR Production Services team (base requirements are already defined in the document titled "Production Services Proposal kick off") and establish the roadmap to the team and the support process evolving to a state of readiness when the software release to production occurs.

The work for this Transaction Schedule will not include the execution of the actual production services functions, but will define and set them up for the support team to commence execution.

### B. Detailed Description of Services.

WMR is a project that is under various stages of development within Cusomer's IMD division.

As part of the WMR Production Services Setup Project, the following tasks will be achieved.

    (a) Understand and elaborate the Production Support Model (team roles and responsibilities, processes, dependencies and constraints, schedule, risks and mitigation).

    (b) Discuss with various stakeholders and teams their drivers and establish a common process of alignment to an overall plan to achieve the setup of the production services

    (c) Define and establish the first versions of the Production Services Delivery framework, including documentation, SLA, run-books, workflows and other artifacts to be subsequently expanded and maintained by the support teams

    (d) Establish processes that have been mandated as Customer's firm wide production support processes and comply with global mandates.

    (e) Model the production support function after the agreed firm wide standard

    (f) Achieve the  above mentioned tasks within a defined period of time so that the support team may take it forward subsequently

The following support is needed from Customer.

    (a) Access and availability to leadership / management teams and team leads of all stakeholder teams within the project (estimated between 20 – 30 hours from each team over the duration of this exercise)

(b) Single point of contact from Customer to facilitate this project and help coordinate the sessions and information availability for this effort (identified as Michael Kuperman from the WMR team)

(c) Access to existing production support process and practices in other areas within IMD.

(d) Objectives, plans and standards and global mandate for Customer firm wide production services that need to be complied with.

(e) Initial sign-off on the templates and deliverables planned when accepted of this effort and final sign-off indicating completion of this assignment

(f) Desk Space at the Customer location at 399 Park Avenue

(g) Access to Customer Email and systems as needed for successful execution of this project for consultants working onsite, offsite or offshore

## Annex 2: Project Plan, Deliverables and Milestones

The following table lists the Deliverables and schedule of deliverables.

Deliverables for Phase I (2 weeks duration)

(a) Agreed structure of deliverables for Phase II (based on initial definition given below), including detailed format/description of content of the documents, and templates.

(b) Plan for Phase II – including timeline for all document deliverables, stakeholders to meet, framework for data collection , schedule when to meet the stakeholders

(c) Initial assessment of the Production Services Operating Model (layers, roles, workflow). Initial assessment of gaps in team structure, workflow for incident management, knowledge management (runbooks and other documents), SLAs, management structure as a service organization.

(d) Cross-reference Customer-wide directives, other Customer policies / guidelines and process compliance frameworks to ensure that all document deliverables specified in (a) and (b) adhere to the said policies and guidelines

Deliverables for Phase II (9 weeks duration)

| # | Deliverable | Description | Priority 1 : To be completed within Month 1 by Supplier | Priority 2: To be completed by end of Phase II (9 weeks) by Supplier | Priority 3 : To be completed later – by Customer team based on Release and Production Services priorities |
|---|---|---|---|---|---|
| 1 | Service Delivery Document (SDD) | "Operations manual" for production services – will also be a "Book of books" based on selected sections to be expanded as separate documents as identified below. | | | |
| A | Business Overview | Summary of support needs / roles performed from a "Business" view – for business / business operations stakeholders point | Yes – initial version | Expanded version | To be maintained by the production services team |

| | | of view | | | |
|---|---|---|---|---|---|
| B | Functional Overview | Support-oriented functional overview | Yes – to be expanded on an ongoing basis by the production services team. | | |
| C | Hosting, Availability, Interfaces – Details. | "Architecture" – relevant to support needs. | | Yes - subject to change control afterwards for each release of software | |
| D | Workflow, Escalation routes, Contacts, Tools | Day to day procedures, tool-based workflow | Yes | Yes (to be refined) | |
| E | Housekeeping checks, DR test checks, Alert Management, Backup and recovery plan ("Run Book") (to be determined if it needs to be a separate document) | Pro-active checks, day to day procedures pre-incident / preventive checks | | Yes – framework to be defined and data captured based on information available from various teams. | |
| 2 | SLA | Suggested to be a separate document to address various aspects including support response, outage / availability, feeds etc. | | Framework document with actual SLAs wherever parameters are available / identified | Complete document filling in all gaps where parameters were not available |
| 3 | Configuration Management Plan | To address release taxonomy (including code version and control methodology for all | Yes | Yes – to be refined | To be maintained on an on going basis by the |

| | | | | |
|---|---|---|---|---|
| | WMR technologies), build management, pre-release checks, regression test approach framework, change impact analysis process, deployment checks (hardware, software, policy compliance) | | | production services team in conjunction with the development teams |
| 4 | Release management and Change Control Process | Release plans, release strategy, roadmap, change control board process, end user / business user forums for release planning | Framework to be discussed with stakeholders | Yes | |
| 5 | Product – Risk Impact Assessment | To be understood from Customer policies and guidelines for various compliance and audit needs. | | | TBD |
| 6 | Gap analysis of current team, processes | One time report (presentation) | Yes, initial analysis (draft) | | To be used as inputs for WMR production services project planning. |
| 7 | Production Services build out schedule | High level sequence of tasks to implement production services, with dependencies, tying to WMR dates | | Yes | |
| 8 | WMR Production Services – Project Plan | Project manager's plan to run production services as a project | | Project plan to be given to Supplier for review and comments by end of week 7. | Inputs to be provided by Supplier team based on need. |

The status reporting of the setup project (this project) will be discussed on a weekly basis.

A project review every week is proposed for a common view of progress made. A Sign-off process at appropriate times and a final sign-off on the SDD and project plan to indicate completion of this project is proposed.

Sign offs will be at following intervals:
- Phase 1 (first two weeks of engagement) – items (a) through (d) listed under phase 1 in Annex 2
- Phase 2 part 1 (following 1 month of engagement) – items 1a, 1b, 1d, 3, 4 and 6 listed under phase 2 in Annex 2
- Phase 2 part 2 (following 5 weeks of engagement) – items 1a, 1c, 1d, 1e, 2, 3, 4, 6, 7 and 8 listed under phase 2 in Annex 2
- Final sign-offs and revisions – 2 weeks following completion of phase 2

Timeframes for sign-offs will be as following:
- 3 business days for Customer's comments
- 2 days for Supplier's remediation

A delivery will not be considered accepted and payment not made until such remediation is made.

The start date for the 13 week exercise is 11th March 2008 (Phase I – 2 weeks) and the second phase (11 weeks) will be 7th April 2008. The end date will be 20th June. This date may be adjusted slightly to coincide with agreement by all parties on the SOW.

There will be a sign-off (for deliverables identified) milestone at the end of Phase I (2 weeks) to indicate approval for commencement of Phase II. Lehman reserves the right to terminate the contract if sign-offs for deliverables outlined for phase 1 are not achieved.

## ANNEX 3:  PRICES, FEES AND CHARGES

Fixed Price: **$88,500.00 USD** (excluding taxes).  The fixed price will be due and payable in progress payments made in accordance with the payment milestone schedule set forth below:

| Payment Milestone | Amount in USD | Date |
|---|---|---|
| Phase I Delivery acceptance | 11,000 | 4 April 2008 |
| Phase II – First Deliverable (4 weeks) acceptance | 27,000 | 16 May 2008 |
| Phase II – Final Deliverables for review and sign off | 40,000 | 20 June 2008 |
| Upon sign off | 10,500 | 3 July 2008 |

Invoices will be sent to:

Kirti Mehta
Lehman Brothers Inc.
605 Third Avenue 20 Floor
New York, NY 10158
+1 646 497 4128

## ANNEX 4:  DELIVERABLE SPECIFICATIONS

The tentative Project Deliverables for this project are:

As identified in Annex 2

## ANNEX 5:  PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name:    Aditya Watal<br>Address: 61 Broadway<br>           New York, NY, 10006<br><br>Email:    Aditya.Watal@hcl.in<br>Tel:       201-499-9561<br>Mob:      917-667-4063<br>Fax:       N/A | Name:    Michael Kuperman<br>Address: 399 Park Avenue<br>           New York, NY 10022<br><br>Email: mkuperman@lehman.com<br>Tel:       212-526-8128<br>Mob:      N/A<br>Fax:       N/A |

## ANNEX 6: KEY PERSONNEL

**Key Personnel**

| # | Position | Location | No. of Resources |
|---|----------|----------|------------------|
| 1 | Lead Consultant | Onsite / Offshore New Jersey / New York Offshore Bangalore | 1 |
| 2 | Consultant | Onsite / Offshore New Jersey / New York | 2 |
| 3 | Additional Principals, Production Support Experts on a need basis. | Onsite / Offshore New Jersey / New York | Multiple |

## ANNEX 7: PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

This complete transaction will be monitored and managed by the senior management team comprising of representatives from Lehman Brothers and the HCLT.

It is proposed that the following monitoring and control structure is adopted

| Monitoring & Controlling Activity | Responsible | Escalations |
|-----------------------------------|-------------|-------------|
| Schedule adherence | Lead Consultant | Global Engagement Manager |
| Deliverables | Lead Consultant | Global Engagement Manager |
| Status Reporting | Lead Consultant | Global Engagement Manager |
| Weekly Status Reports (Onsite tasks) | Lead Consultant | Global Engagement Manager |

## ANNEX 8: EXPORT CONTROL

Not Applicable

## ANNEX 9:  ADDITIONAL AGREED-UPON PROVISIONS

1. Subcontractors

It is envisaged that no subcontractor's services shall be availed to perform the work
described in this SOW

2. Service Locations

The services for executing the scope of work identified in this SOW will be executed out
of the following locations

**Project Execution**

| Onsite | Lehman Brothers facilities in the New York/NJ area. |
|---|---|
| Offshore | HCL Technologies *Ltd* Capital Market Services offices located at Bangalore.<br>HCL Technologies *Ltd* CMS<br>The Senate, #33/1 Ulsoor Road<br>Bangalore – 560 042<br><br>Registered Office :HCL Technologies *Ltd*<br>806, Siddharth,<br>96, Nehru Place,<br>New Delhi 110 019 |

3. Use of Customer Facilities and Resources

**Workspace Logistics**

Lehman Brothers shall provide desks  for the Lead Consultant and for additional
Principals to enable the project execution.

Lehman Brothers shall provide the onsite team with relevant building access during the
execution phase of the project.

**Hardware & Software Logistics**

Lehman Brothers will provide the team with the requisite hardware.

Lehman Brothers will provide the HCL resources with the requisite software installations
and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL Team located on-site
and offshore.

Lehman Brothers will provide mailing facilities to the HCL team on the Lehman mailing infrastructure.

4. Supplier Facilities and Resources

**Workspace Logistics**

HCL shall provide workspace facility for the 1 member offshore team to execute the project.

HCL shall provide the offshore team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

HCL will provide the resources with the requisite software installations and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL Team located offshore.

Lehman Brothers will provide mailing facilities to the HCL team on the Lehman mailing infrastructure.

5. Other Terms.

None



**HCL Technologies Limited**

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka  India
☎ 91-80-41906000
✉
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
Lehman Brothers Inc.
**Attention**  : Kirti Mehta
605, Third Avenue, 20 th Floor,
New York,
NY 10158 USA

**Invoice Number** 3507102845
**Invoice Date**  May 19, 2008
**PO Number** *

**Amount in    USD**

| Description | Amount |
|---|---|
| Phase 1 Delivery Acceptance | 11,000.00 |

| | |
|---|---|
| **Total** | 11,000.00 |
| **Tax** | |
| **Total Payable** | 11,000.00 |

**Payment terms :**    **Within 30 days Due net**

**Please Remit To**
**HCL Technologies Limited**
**Bank Name**  Deutsche Bank AG   Bangalore  IN

```
Payment  Instructions
          Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice
```

**For   HCL Technologies Limited**

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



Annexure to Invoice No : 3507102845          Dated : May 19, 2008
PO Number : *
Project ID : C/072366
Project Name : Lehman WMR              Account Manager : WATAL ADITYA

|  | Amount in USD |
|---|---|
| **MileStone Description** | **Amount** |
| Phase 1 Delivery Acceptance | 11,000.00 |
| Sub Total(Offshore) | 11,000.00 |
| Project Total(Lehman WMR) | 11,000.00 |

| | |
|---|---|
| Items Total | 11,000.00 |
| Net value | 11,000.00 |
| Gross Value | 11,000.00 |
| Final amount | 11,000.00 |



## HCL Technologies Limited

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## **INVOICE**

**TO**
Lehman Brothers Inc.
**Attention** : Kirti Mehta
605, Third Avenue, 20 th Floor,
New York,
NY 10158 USA

**Invoice Number** 3508100379
**Invoice Date** Aug 31, 2008
**PO Number** *

**Amount in    USD**

| Description | Amount |
|---|---|
| Phase II-Final Deliverable for review & Sign off | 40,000.00 |

| | |
|---|---|
| **Total** | 40,000.00 |
| **Tax** | |
| **Total Payable** | 40,000.00 |

**Payment terms :    Within 30 days Due net**

**Please Remit To
HCL Technologies Limited
Bank Name** Deutsche Bank AG  Bangalore  IN

```
Payment Instructions
            Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice
```

**For  HCL Technologies Limited**

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



Annexure to Invoice No : 3508100379        Dated : Aug 31, 2008
PO Number : *
Project ID : C/072366
Project Name : Lehman WMR          Account Manager : WATAL ADITYA

|  | Amount in USD |
|---|---|
| **MileStone Description** | **Amount** |
| Phase II-Final Deliverable for review & Sign off | 40,000.00 |
| Sub Total(Offshore) | 40,000.00 |
| Project Total(Lehman WMR) | 40,000.00 |

| | |
|---|---|
| Items Total | 40,000.00 |
| Net value | 40,000.00 |
| Gross Value | 40,000.00 |
| Final amount | 40,000.00 |



## HCL Technologies Limited

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
Lehman Brothers Inc.
**Attention**  : Kirti Mehta
605, Third Avenue, 20 th Floor,
New York,
NY 10158 USA

**Invoice Number** 3508100380
**Invoice Date** Aug 31, 2008
**PO Number** *

**Amount in**  USD

| Description | Amount |
|---|---|
| Upon Sign off | 10,500.00 |

| | |
|---|---|
| **Total** | 10,500.00 |
| **Tax** | |
| **Total Payable** | 10,500.00 |

**Payment terms :**    **Within 30 days Due net**

**Please Remit To**
**HCL Technologies Limited**
**Bank Name** Deutsche Bank AG  Bangalore  IN

```
Payment Instructions
            Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice
```

**For  HCL Technologies Limited**

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

Page 1/    2



Annexure to Invoice No : 3508100380          Dated : Aug 31, 2008
PO Number : *
Project ID : C/072366
Project Name : Lehman WMR              Account Manager : WATAL ADITYA

|  | Amount in   USD |
|---|---|
| **MileStone Description** | **Amount** |
| Upon Sign off | 10,500.00 |
| **Sub Total(Offshore)** | 10,500.00 |
| **Project Total(Lehman WMR)** | 10,500.00 |
| Items Total | 10,500.00 |
| Net value | 10,500.00 |
| Gross Value | 10,500.00 |
| Final amount | 10,500.00 |

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

# EXHIBIT E

## PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**Supplier Name: HCL AMERICA, INC.**

**Supplier Address: 330 Potrero Avenue, Sunnyvale, California -94085**
**Supplier Jurisdiction of Incorporation: CALIFORNIA, USA**

Tax ID: 770-205-035

**Telephone #: 408 733 0480**

**Fax #: 408 73 0482**

**General Terms and Conditions No.: CON000000019350**

**General Terms and Conditions Effective Date: October 16, 2006**
**Professional Services Supplement Effective Date: June 1st, 2008**
**Schedule No.: PSTS- 10 – CON000000029553**

**Order Date: June 1st, 2008**

This Professional Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and Professional Services Supplement (the "**Services Supplement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above. This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, Services Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the Services Supplement that forms this Transaction Schedule:

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all date and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
Annex 8: Export Control [Required, when applicable]
Annex 9: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the Services Supplement referenced above.

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives.

| HCL AMERICA, INC. (SUPPLIER) | Lehman Brothers Inc. (CUSTOMER) |
|---|---|
| By: _L. Rghu Raman_ | By: _Rhonda Vitn_ |
| Name: _Raghu Raman Lakshmanan_ <br> (Type, Print or Stamp) | Name: _Rhonda Vetere_ <br> (Type, Print or Stamp) |
| Title: _Secretary & General Counsel_ | Title: _SVP / FTA_ |

## ANNEX 1: DESCRIPTION OF SERVICES

**A. Services Overview.**

Lehman Brothers has identified the need of availing services of a Program Manager from HCLT. The resource would be required to manage the FTA applications, key business and technology initiatives in Lehman Brother.

The HCL onsite Manager will help build the Global Production Services Teams and operationalize them.

**B. Detailed Description of Services.**

Lehman Brothers has identified the need of availing services of a Program Manager from HCLT. The resource would be required to manage the FTA applications, key business and technology initiatives in Lehman Brother.

The HCL onsite Manager will help build the Global Production Services Teams and operationalize them.

The key activities performed for this assignment for the onsite Manager is

1. Building the RTB Teams.
2. Establishing the Process for RTB
3. Establishing the Interaction and Governance Model for the New RTB structure.
4. Establishing Performance Benchmarks and Metrics for Performance Measurement for applications
5. Establishing SLAs will the Application User Groups
6. Establishing the Process for Production Management (Capacity, Performance, Stability) and Root Cause Analysis
7. Proposing the Long term Global Sourcing Model for RTB
8. Ensuring all the Application Teams are on the same page during the RTB CTB transition process
9. Guiding and Reviewing the Runbooks Effort across all Applications for FTA
10. Identify and Bridge any gaps in Knowledge Management for an effective RTB execution for FTA.

## Annex 2: Project Plan, Deliverables and Milestones

It is proposed to execute the assignment onsite 1 resource who will be working out of Lehman New Jersey/New York.

The project deliverables will be submitted to the identified point of contact at Lehman Brothers in New Jersey/New York based on the mutually agreed scope.

\* Proposed Project Start date is 1st June, 2008 and end date is 30th November, 2008. The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

The project delivery dates and milestones will be finalized based on discussion with Lehman Project Manager.

## ANNEX 3:  PRICES, FEES AND CHARGES

Fixed Price: **93,840 USD** (excluding taxes).  The fixed price will be due and payable in progress payments made in accordance with the payment milestone schedule set forth as Annex **9.5**:

Any travel outside New Jersey/New York due to project work will be arranged and paid for by Lehman Brothers.

Invoices will be sent to:

The Accounts Payable Department

at

**Lehman, New York.**

## ANNEX 4:  DELIVERABLE SPECIFICATIONS

Acceptance Criteria

During the Project kickoff Phase it is proposed to identify a set of criteria that will be used for acceptance of the deliverables.

* Proposed Project Start date is 1st June, 2008 and end date is 30th November, 2008. The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

## ANNEX 5:  PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name:  Anshu Agarwal | Name:      Rhonda Vetere |
| Address: | Address: |
| HCL Technologies Ltd | Lehman Brothers |
| #31/3, Ulsoor Road | _____ |
| Bangalore | _____ |
| Karnataka 560 042 | _____ |
| | |
| Email: | Email: rvetere@lehman.com |
| anshu.agarwal@hcl.in | |
| | |
| Tel:   +91 80 4190 1042 | Tel:  +1 212-526-3935 |
| Mob:  +91 9972001512 | Mob: |
| Fax:  + 91 80 4124 6888 | Fax: _____ |

## ANNEX 6:  KEY PERSONNEL

**Key Personnel**

| # | Position | Location | No. of Resources |
|---|---|---|---|
| 1 | Onsite Manager | Onsite New Jersey / New York | 1 |

## ANNEX 7:  PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

This complete transaction will be monitored and managed by the senior management team comprising of representatives from Lehman Brothers and the HCLT.

It is proposed that the following monitoring and control structure is adopted

| Monitoring & Controlling Activity | Responsible | Escalations |
|---|---|---|
| Schedule adherence | Onsite Manager | Program Manager / Account Manager |
| Deliverables | Onsite Manager | Program Manager / Account Manager |
| Status Reporting | Onsite Manager | Program Manager / Account Manager |
| Weekly Status Reports (Covering Onsite & Offshore tasks) | Onsite Manager | Program Manager / Account Manager |

## ANNEX 8:  EXPORT CONTROL

Not Applicable

## ANNEX 9:  ADDITIONAL AGREED-UPON PROVISIONS

1.  Subcontractors

It is envisaged that no subcontractor's services shall be availed to perform the work described in this SOW

2.  Service Locations

The services for executing the scope of work identified in this SOW will be executed out of the following locations

**Project Execution**

| Onsite | Lehman Brothers facilities in the New York/NJ area. |
|---|---|
| Offshore | HCL Technologies – Capital Market Services offices located at Bangalore.<br>HCL Technologies - CMS<br>The Senate, #33/1 Ulsoor Road<br>Bangalore – 560 042<br><br>Registered Office :HCL Technologies<br>806, Siddharth,<br>96, Nehru Place,<br>New Delhi 110 019 |

3.  Use of Customer Facilities and Resources

**Workspace Logistics**

Lehman Brothers shall provide workspace facility for the 1 member onsite team to execute the project.

Lehman Brothers shall provide the onsite team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

Lehman Brothers will provide the HCL resource with the requisite hardware

Lehman Brothers will provide the HCL resource with the requisite software installations and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL resource located on-site and offshore.

Lehman Brothers will provide mailing facilities to the HCL resource on the Lehman mailing infrastructure.

**Functional / Business resources**

Lehman Brothers will provide for at least 1 full time single point of contact during the assignment, to help internal co-ordination and support.

Lehman Brothers will provide access to relevant application owners / contacts for the HCL resource to seek clarifications on the existing systems /artifacts.

It is envisaged that the approximate interface times required from various teams as and when required on prior appointment will be arranged for.

| Contact Person / Lehman Resource | Envisaged discussion time |
|---|---|
| Development / Business Heads | 6 - 8 hours per week |
| Senior Management | 2 – 4 hours in all for the Review meetings |

If during the course of the project, if more time is needed for validation/clarification from any of the Lehman personnel, this will be intimated at least two days before.

4.  Supplier Facilities and Resources

Not Applicable

5.  Other Terms.

Payment Terms

| Milestone | Amount in USD | Date |
|---|---|---|
| Monthly Fixed Billing | 15,640 | 15th June 2008 |
| Monthly Fixed Billing | 15,640 | 15th July 2008 |
| Monthly Fixed Billing | 15,640 | 15th August 2008 |
| Monthly Fixed Billing | 15,640 | 15th September 2008 |
| Monthly Fixed Billing | 15,640 | 15th October 2008 |
| Monthly Fixed Billing | 15,640 | 15th November 2008 |

## PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**Supplier Name: HCL AMERICA, INC.**

**Supplier Address: 330 Potrero Avenue, Sunnyvale, California -94085**
**Supplier Jurisdiction of Incorporation: CALIFORNIA, USA**

**Tax ID: 770-205-035**

**Telephone #: 408 733 0480**

**Fax #: 408 73 0482**

**General Terms and Conditions No.: CON000000019350**

**General Terms and Conditions Effective Date: October 16, 2006**
**Professional Services Supplement Effective Date: Jun 09, 2008**

**Schedule No.:  PSTS-**

**Order Date: Jun 09, 2008**


This Professional Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and Professional Services Supplement (the "**Services Supplement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, Services Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the Services Supplement that forms this Transaction Schedule:

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all date and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
Annex 8: Export Control [Required, when applicable]
Annex 9: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the Services Supplement referenced above.

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives.

**HCL AMERICA, INC. (SUPPLIER)**

By: _L. Ryke_

Name: _Raghu Raman Lakshmanan_
      (Type, Print or Stamp)

Title: _Secretary + General Counsel_

**Lehman Brothers Inc. (CUSTOMER)**

By: _Rhonda Vetere_

Name: Rhonda Vetere
      (Type, Print or Stamp)

Title:  SVP,    Global    Production
Services FTA

## ANNEX 1: DESCRIPTION OF SERVICES

A. **Services Overview.**

Lehman Brothers has identified the need of availing services of a Senior Program Manager from HCLT. The resource would be required to manage the FTA applications, key business and technology initiatives in Lehman Brother.

The HCL Senior Program Manager will help build the Global Production Services Teams and operationalize them.

**B. Detailed Description of Services.**

Lehman Brothers has identified the need of availing services of a Senior Program Manager from HCLT. The resource would be required to manage the FTA applications, key business and technology initiatives in Lehman Brother.

The HCL Senior Program Manager will help build the Global Production Services Teams and operationalize them.

The key activities performed for this assignment for the Senior Program Manager is

1. Building the RTB Teams.
2. Establishing the Process for RTB
3. Establishing the Interaction and Governance Model for the New RTB structure.
4. Establishing Performance Benchmarks and Metrics for Performance Measurement For applications
5. Establishing SLAs will the Application User Groups
6. Establishing the Process for Production Management (Capacity, Performance, Stability) and Root Cause Analysis
7. Proposing the Long term Global Sourcing Model for RTB
8. Ensuring all the Application Teams are on the same page during the RTB CTB Transition process
9. Guiding and Reviewing the Runbooks Effort across all Applications for FTA
10. Identify and Bridge any gaps in Knowledge Management for an effective RTB Execution for FTA.
11. Helping defining the Future State Road Map for the FTA RTB Production Services Organization

## Annex 2: Project Plan, Deliverables and Milestones

It is proposed to execute the assignment onsite 1 resource who will be working out of Lehman New Jersey/New York.

The project deliverables will be submitted to the identified point of contact at Lehman Brothers in New Jersey/New York based on the mutually agreed scope.

* Proposed Project Start date is 16th June, 2008 and end date is 30th November, 2008. The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

The project delivery dates and milestones will be finalized based on discussion with Lehman Project Manager.

## ANNEX 3:  PRICES, FEES AND CHARGES

Fixed Price:  **152,000 USD** (excluding taxes).  The fixed price will be due and payable in progress payments made in accordance with the payment milestone schedule set forth as Annex **9.5**:

Any travel outside New Jersey/New York due to project work will be arranged and paid for by Lehman Brothers.

Invoices will be sent to:

The Accounts Payable Department

at

**Lehman, New York.**

## ANNEX 4:  DELIVERABLE SPECIFICATIONS

Acceptance Criteria

During the Project kickoff Phase it is proposed to identify a set of criteria that will be used for acceptance of the deliverables.

* Proposed Project Start date is 16th June, 2008 and end date is 30th November, 2008.

The deliverables/dates may be altered on mutual discussion or at the behest of Lehman Project Manager to suit project needs.

## ANNEX 5:  PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name:  Aditya Watal<br>Address:<br>61 Broadway, Suite 2610<br>New York<br>NY<br>10006<br><br>Email:  Aditya.Watal@hcl.in<br><br><br>Tel: _____<br>Mob:  +1 917 667 4063<br>Fax: _____ | Name: _____ Rhonda Vetere _____<br>Address:<br>Lehman Brothers<br>745, 7th Avenue<br>New York<br>NY<br><br>Email:<br>Rhonda.Vetere@lehman.com<br><br><br>Tel:  +1 212 -526-3935<br>Mob:<br>Fax: _____ |

## ANNEX 6:  KEY PERSONNEL

**Key Personnel**

| # | Position | Location | No. of Resources |
|---|----------|----------|------------------|
| 1 | Senior Program Manager | Onsite<br>New Jersey / New York | 1 |

## ANNEX 7:  PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES

This complete transaction will be monitored and managed by the senior management team comprising of representatives from Lehman Brothers and the HCLT.

It is proposed that the following monitoring and control structure is adopted

| Monitoring & Controlling Activity | Responsible | Escalations |
|---|---|---|
| Schedule adherence | Onsite Manager | Program Manager / Account Manager |
| Deliverables | Onsite Manager | Program Manager / Account Manager |
| Status Reporting | Onsite Manager | Program Manager / Account Manager |
| Weekly Status Reports (Covering Onsite & Offshore tasks) | Onsite Manager | Program Manager / Account Manager |

## ANNEX 8:  EXPORT CONTROL

Not Applicable

## ANNEX 9:  ADDITIONAL AGREED-UPON PROVISIONS

1. Subcontractors

It is envisaged that no subcontractor's services shall be availed to perform the work described in this SOW

2. Service Locations

The services for executing the scope of work identified in this SOW will be executed out of the following locations

**Project Execution**

| Onsite | Lehman Brothers facilities in the New York/NJ area. |
|--------|-----------------------------------------------------|
| Offshore | HCL Technologies – Capital Market Services offices located at Bangalore. <br> HCL Technologies - CMS <br> The Senate, #33/1 Ulsoor Road <br> Bangalore – 560 042 <br><br> Registered Office :HCL Technologies <br> 806, Siddharth, <br> 96, Nehru Place, <br> New Delhi 110 019 |

3. Use of Customer Facilities and Resources

**Workspace Logistics**

Lehman Brothers shall provide workspace facility for the 1 member onsite team to execute the project.

Lehman Brothers shall provide the onsite team with relevant building access during the execution phase of the project.

**Hardware & Software Logistics**

Lehman Brothers will provide the HCL resource with the requisite hardware

Lehman Brothers will provide the HCL resource with the requisite software installations and licenses for the applications that are used in the day-to-day operations.

Lehman Brothers will provide relevant system access to the HCL resource located on-site and offshore.

Lehman Brothers will provide mailing facilities to the HCL resource on the Lehman mailing infrastructure.

**Functional / Business resources**

Lehman Brothers will provide for at least 1 full time single point of contact during the assignment, to help internal co-ordination and support.

Lehman Brothers will provide access to relevant application owners / contacts for the HCL resource to seek clarifications on the existing systems /artifacts.

It is envisaged that the approximate interface times required from various teams as and when required on prior appointment will be arranged for.

| Contact Person / Lehman Resource | Envisaged discussion time |
|---|---|
| Development / Business Heads | 6 - 8 hours per week |
| Senior Management | 2 – 4 hours in all for the Review meetings |

If during the course of the project, if more time is needed for validation/clarification from any of the Lehman personnel, this will be intimated at least two days before.

4. Supplier Facilities and Resources

Not Applicable

5. Other Terms.

Payment Terms

| Milestone | Amount in USD | Date |
|---|---|---|
| Monthly Fixed Billing | 14000 | 30th June 2008 |
| Monthly Fixed Billing | 27600 | 31st July 2008 |
| Monthly Fixed Billing | 27600 | 31st August 2008 |
| Monthly Fixed Billing | 27600 | 30th September 2008 |
| Monthly Fixed Billing | 27600 | 31st October 2008 |
| Monthly Fixed Billing | 27600 | 30th November 2008 |



**HCL Technologies Limited**

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
Lehman Brothers
1301 Avenue of the Americas, Floor 5
**Attention**  : Subramaniam Venkateswaran
1301 Avenue of the Americas, Floor 5
New York
10019 USA

**Invoice Number** 3508100027
**Invoice Date**  Jul 17, 2008
**PO Number** SOW

**Amount in**   USD

| Description | Amount |
|---|---|
| Monthly fixed charges for June 2008 | 15,640.00 |
| **Total** | 15,640.00 |
| **Tax** | |
| **Total Payable** | 15,640.00 |

**Payment terms :**    **Within 30 days Due net**

**Please Remit To**
**HCL Technologies Limited**
**Bank Name** Deutsche Bank AG  Bangalore  IN

**Payment Instructions**
          Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice

For  HCL Technologies Limited

**Authorized Signatory**

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



Annexure to Invoice No : 3508100027                    Dated : Jul 17, 2008
PO Number : SOW
Project ID : C/073144
Project Name : Lehm-FTA Manager                        Account Manager : WATAL ADITYA

                                                        Amount in    USD

| Description | Amount |
|---|---|
| Monthly fixed charges for June 2008 | 15,640.00 |
| **Total** | 15,640.00 |
| **Net Value** | 15,640.00 |
| **Final amount** | 15,640.00 |

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



## HCL Technologies Limited

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka  India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
LehmanBrothers
**Attention** : Accounts Payable
1301AvenueoftheAmericas,Floor5
New York
10019 USA

**Invoice Number** 3508100049
**Invoice Date**  Jul 29, 2008
**PO Number** SOW

**Amount in**   USD

| Description | Amount |
|---|---|
| Monthly fixed billing for service charges for the month of July- 2008 | 15,640.00 |
| Total | 15,640.00 |
| Tax | |
| Total Payable | 15,640.00 |

**Payment terms :**    Within 30 days Due net

**Please Remit To**
**HCL Technologies Limited**
**Bank Name** Deutsche Bank AG   Bangalore  IN

```
Payment Instructions
            Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice
```

**For   HCL Technologies Limited**



**Authorized Signatory**

**Registered Office**
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



Annexure to Invoice No : 3508100049                    Dated : Jul 29, 2008
PO Number : SOW
Project ID : C/073144
Project Name : Lehm-FTA Manager                        Account Manager : WATAL ADITYA

                                                     Amount in    USD

Description                                                        Amount

Monthly fixed billing for service charges for the month of July- 2008        15,640.00

                    Total                                         15,640.00
                    Net Value                                     15,640.00
                    Final amount                                  15,640.00

Registered Office
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



## HCL Technologies Limited

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
LehmanBrothers
**Attention** : Accounts Payable
1301AvenueoftheAmericas,Floor5
New York
  10019 USA

**Invoice Number** 3508100268
**Invoice Date**  Aug 21, 2008
**PO Number** SOW

**Amount in**   USD

| Description | Amount |
|---|---|
| Monthly fixed Charges for August 2008 | 15,640.00 |
| **Total** | 15,640.00 |
| **Tax** | |
| **Total Payable** | 15,640.00 |

**Payment terms :**    **Within 30 days Due net**

> **Please Remit To**
> **HCL Technologies Limited**
> **Bank Name** Deutsche Bank AG  Bangalore  IN

> **Payment Instructions**
>              Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
> to Deutsche Bank, Bangalore branch with instructions to credit our
> current Account No. 2000107-00-0 with them.
> Delayed payments will attract interest if applicable as per the
> provisions of the applicable service agreement
> Any clarifications on this invoice should be brought to the attention of
> finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
> invoice

**For   HCL Technologies Limited**

**Authorized Signatory**

**Registered Office**
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India

**HCL**

**Annexure to Invoice No :** 3508100268                          **Dated :** Aug 21, 2008
**PO Number :** SOW
**Project ID :** C/073144
**Project Name :** Lehm-FTA Manager                        **Account Manager :** WATAL ADITYA

|  | Amount in   USD |
|---|---|
| **Description** | **Amount** |
| Monthly fixed Charges for August 2008 | 15,640.00 |
| **Total** | 15,640.00 |
| **Net Value** | 15,640.00 |
| **Final amount** | 15,640.00 |



HCL Technologies Limited

The Senate, No.33/1,Ulsoor Road
Bangalore,560042
Karnataka India
☎ 91-80-41906000
🖷
CST NO  11283610 DATED 16.12.2003
LST NO.:11233618 DATED 16.12.2003
Exim Code  5194000111

## INVOICE

**TO**
LehmanBrothers
**Attention**  : Rhonda Vetere
1301AvenueoftheAmericas,
Floor5
NY 10019 USA

**Invoice Number** 3508100537
**Invoice Date**  Sep 23, 2008
**PO Number** *

Amount in    USD

| Description | Amount |
|---|---|
| Monthly fixed billing for service charges for the month of Sep-2008 | 15,640.00 |
| **Total** | 15,640.00 |
| **Tax** | |
| **Total Payable** | 15,640.00 |

**Payment terms :**    Within 30 days Due net

**Please Remit To**
**HCL Technologies Limited**
**Bank Name** Deutsche Bank AG   Bangalore  IN

**Payment Instructions**
          Please remit the funds via SWIFT [Code - DEUTINBBBGL]/TT
to Deutsche Bank, Bangalore branch with instructions to credit our
current Account No. 2000107-00-0 with them.
Delayed payments will attract interest if applicable as per the
provisions of the applicable service agreement
Any clarifications on this invoice should be brought to the attention of
finance (HCL-CMS-INVOICECELL@hcl.in) within ten days of receipt of this
invoice

**For  HCL Technologies Limited**

**Authorized Signatory**

**Registered Office**
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India



**Annexure to Invoice No : 3508100537**                                      **Dated : Sep 23, 2008**
**PO Number : ***
**Project ID : C/073144**
**Project Name : Lehm-FTA Manager**                            **Account Manager : WATAL ADITYA**

|                                                                      | **Amount in    USD** |
| --- | --- |
| **Description**                                                      | **Amount** |
| Monthly fixed billing for service charges for the month of Sep-2008  |  |
|                                                                      | 15,640.00 |
| **Total** | 15,640.00 |
| **Net Value** | 15,640.00 |
| **Final amount** | 15,640.00 |

**Registered Office**
HCL Technologies Limited 806 Siddharth, 96 Nehru Place New Delhi 110019 India