CON 000 0000 29584
~In other attachments.

# CANADIAN EXCHANGE GROUP
## MARKET DATA DISTRIBUTION AGREEMENT

This agreement dated as of the _23_ day of _June_ 20 _08_

between the CANADIAN  EXCHANGE GROUP
(hereinafter called "CEG")
and

_Lehman Brothers Holdings Inc_ (hereinafter called "Distributor")

Distributor Name: _Lehman Brothers Holdings Inc._

Distributor Address: _Wincheste Building_
_Hiranandani Business Park_              _10th Floor_
Street                                              Suite

_MUNBAI_                                    _Maharashtra_
City                                                State\Province

_India_                                       _400076_
Country                                           Zip/Postal Code

_011-91-223052-2/61_
Telephone Number                                  Facsimile Number

1

# PART I - DEFINITIONS

1. **DEFINITIONS**

(a) "Canadian Exchange Group" or "CEG" shall mean TSX Inc. ("TSX") and TSX Venture Exchange Inc. ("TSX Venture"). TSX Venture has appointed TSX as agent for the purposes of entering into this and other agreements necessary for provision of Market Data to Distributor on its and their behalf, and to establish the terms and conditions under which Market Data is to be made available to Distributor. For the purposes of this Agreement, "Canadian Exchange Group" or "CEG" shall refer to the exchanges comprising the Canadian Exchange Group jointly and severally.

(b) "Delayed Market Data" shall mean Market Data that has been delayed by a Distributor at least fifteen (15) minutes from the time of dissemination by CEG.

(c) "Distributor" shall include those Persons who furnish Receipt of Market Data by any means to any Person and who have executed a Distribution Agreement which has been approved by CEG and which has not been terminated by any of the parties hereto.

(d) "Distributor Affiliate" shall include those Persons identified in "Exhibit A" by Distributor, who are in a control relationship with Distributor, as determined by CEG in its sole discretion, or agents or licensees of Distributor's services, as described in Distributor's Exhibit A and Exhibit B to this Agreement.

(e) "Exhibit A" shall mean an attachment to this Agreement, which shall form an integral part hereof, and which may be amended from time to time as provided herein, which describes Distributor's system for furnishing Receipt of Market Data including the methods of receipt, retrieval, processing and supply of Market Data by Distributor to any Person.

(f) "Exhibit B" shall mean an attachment to this Agreement, which shall form an integral part hereof, and which may be amended from time to time as provided herein, describing the records and other information required by CEG to be maintained by Distributor for audit and administration purposes of this Agreement.

(g) "Interrogation Device" shall mean any device that displays (or is capable of displaying) Real-Time Market Data in any visible, audible, or other comprehensible form, to any person at any time during the month.

(h) "Market Data" shall mean a bundled transmission of electronic signals emanating from the exchanges comprising CEG and containing trading information with respect to securities traded on the exchanges comprising CEG.

(i) "Person" includes any natural person or proprietorship or any corporation, partnership or other organization.

(j) "Real-Time Market Data" shall mean Market Data from the time of dissemination by CEG to the time fifteen (15) minutes after such dissemination.

(k) "Receipt of Market Data" shall mean the physical capability, whether used or not, of successfully receiving or retrieving Market Data.

(l) "Subscriber" shall include those Persons who are not Distributors and who have executed either an Application Agreement for Receipt of Canadian Exchange Group Market Data or, a Non-Professional Application Agreement for Receipt of Canadian Exchange Group Market Data which have been approved by CEG and which has not been terminated by any of the parties hereto.

## PART II - MARKET DATA ACCESS AND USE

2. **PROPRIETARY INTEREST OF CEG**

Distributor understands and acknowledges, and shall ensure that any other Distributor and Subscriber in Receipt of Market Data from Distributor understands and acknowledges, that CEG has a proprietary interest in the Market Data that originates on CEG markets and that same is not within the public domain. Any Market Data provided to Distributor by CEG pursuant to this Agreement, which has been derived from databases owned by CEG, is copyrighted and as such Distributor's use of such Market Data is subject to the limitations set out in this Agreement.

3. SYSTEM INTERFACE

(a) If Distributor is in Receipt of Market Data directly from CEG, Distributor shall be responsible for (i) obtaining the requisite quantity of common carrier communication lines, (ii) the reliability and continued availability of such communication lines, and (iii) interfacing with the CEG's facilities at such places as may be designated from time to time by CEG. Distributor will meet any reasonable requirement of CEG concerning the location of the interface or interfaces to permit Receipt of Market Data.

(b) If Distributor is in Receipt of Market Data from a third party, then Distributor and such third party are responsible for all communication, interfacing and related matters regarding the reliability and availability of Market Data to Distributor. Further, Distributor acknowledges and agrees that CEG is in no way liable for, and makes no representations or warranties regarding any services Distributor obtains from a third party.

(c) If the interface with CEG's facilities described in subsection 3(a) enables Distributor to receive information other than Market Data, CEG shall so notify Distributor, and Distributor shall not furnish or permit to be furnished such other information to any other Distributor or Subscriber without the prior approval of CEG.

4. **CONFIGURATION**

Distributor acknowledges and agrees that nothing in this Agreement shall be deemed to constitute an undertaking by CEG to continue to disseminate the Market Data in the present form or configuration or to continue to use existing communications facilities. CEG, in its sole discretion, may from time to time make modifications to the Market Data and CEG facilities, including the interface and operational requirements, irrespective of whether such modifications would require changes to be made by Distributor. CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the speed, code, format, operating hours, or any other material changes in the operational requirements, unless a malfunction in the system necessitates modifications on an accelerated basis or an emergency situation precludes such advance notice. Distributor shall bear the responsibility of making concurrent modifications to its service.

5. **NON-EXCLUSIVE BASIS**

CEG agrees to provide Receipt of Market Data to Distributor on a non-exclusive basis. CEG reserves the right, without any notice or liability to Distributor or to any other Person, to provide Receipt of Market Data or any other information, or to contract with any other Person to provide Receipt of Market Data or any other information to any Person by any means whatsoever, including devices or equipment designed or manufactured by CEG or any other Person.

6. **DATA NOT GUARANTEED**

(A) NO WARRANTIES - THE DISTRIBUTOR AGREES THAT CEG MAKES NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE MARKET DATA, ITS TRANSMISSION, TIMELINESS, ACCURACY OR COMPLETENESS, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, QUALITY AND FITNESS FOR A PARTICULAR PURPOSE AND, THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM THE COURSE OF DEALING OR USAGE OF TRADE.

(B)    NO GUARANTY - CEG does not guarantee the timeliness, sequence, accuracy or completeness of Market Data, or other information or messages, disseminated by CEG.  CEG will not be liable in any way to Distributor or to any other Person for:

    (a)    any inaccuracy, error or delay in, or omission of (i) any such Market Data, or other information or messages, or (ii) the transmission or delivery of any such Market Data, or other information or messages, or

    (b)    any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, or (ii) non-performance, or (iii) interruption in any such Market Data, or other information or messages, due either to any negligent act or omission by CEG, "force majeure" or any other cause.

## 7.    CEG WARRANTY

(a)  CEG represents, warrants and covenants that in performing its services or duties hereunder it will understand and report any errors in Market Data as it has full power and authority to enter this undertaking pursuant to this Agreement without the consent of any other party.  CEG shall indemnify and hold Subscriber or Distributor, their officers, directors, employees and agents, harmless from and against any loss, costs, liability and expense including reasonable legal fees, arising out of any breach or claimed breach of this representation, warranty and covenant.

(b)  CEG represents, warrants and covenants that Market Data and the use of Market Data as permitted by this Agreement does not and will not infringe or misappropriate the proprietary rights of any third party which proprietary rights include but not limited to patents, copyrights, trademarks and trade secrets.

(c)  CEG shall indemnify, and hold harmless and defend, Distributor and its Subscribers or, Distributors in Receipt of Market Data from Distributor, their officers, directors, employees and agents, against any loss, cost, liability and expense, including reasonable legal fees, for  infringement of any proprietary rights of any third party.  CEG shall, at its own expense,  defend or settle any claim or proceeding brought against Distributor and its Subscribers or  Distributors in Receipt of Market Data from Distributor by any third party alleging that Market Data or the use of Market Data as permitted by this Agreement, constitutes an infringement of any proprietary right, provided that CEG is notified promptly in writing of such claim and is given the opportunity to have sole control for the defence of any action on such claim and all negotiation for its settlement. CEG shall pay all damages and costs finally awarded against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor in such action or proceedings, and shall pay reasonable legal fees of Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor, but shall not be responsible for any costs, expenses, or compromises incurred or made by Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor without CEG's prior written consent.

## 8.    **AUTHORIZED USE**

(a)  Distributor and Distributor Affiliates are authorized by this Agreement to receive, process, transmit and use the Market Data only as approved by CEG and described in Exhibit A.  Any use of the Market Data not described in Exhibit A and, not approved by CEG is prohibited.  Subscribers and Distributors in Receipt of Market Data from Distributor, are authorized to receive and use the Market Data only as set forth in the applicable agreement.

(b)  Any proposed use of the Market Data (including, but not limited to, developing or communicating derivative information based upon the Market Data, re-transmission, re-distribution, reproduction or calculation of indices, etc.) shall require the prior approval of CEG.  Any such proposed use shall be submitted to CEG in the form of a draft amendment to Exhibit A. CEG shall promptly and in good faith approve or disapprove any such proposed use by Distributor.  Distributor acknowledges and agrees that it acts at its own risk in developing any modification to its service prior to receiving approval  from CEG, since CEG is not obligated by this Agreement to grant such approval.

(c)  Distributor agrees not to alter the Market Data in any manner that adversely affects its accuracy or integrity or that renders it misleading.

(d)  Distributor may furnish Delayed Market Data in the manner specified in Exhibit A and shall  comply with any  requirements that CEG and Distributor agree to from time to time as to Persons receiving Delayed Market Data.

4

9.    **DISTRIBUTOR INTERROGATION DEVICES**

Distributor shall be entitled to use certain Interrogation Devices located on its premises, without charge, for advertisement, demonstration, product development, and customer service. Distributor's use of such Interrogation Devices and the number thereof shall be subject to all provisions of the Agreement including, without limitation, CEG approval, monthly reporting and audit by CEG.

10.    **ACCESS TO DISTRIBUTOR INTERROGATION DEVICES**

(a)    In lieu of assessing monthly charges upon Interrogation Devices utilized by Distributor for the purposes described in Section 9, at CEG's request, Distributor agrees to provide to CEG (at CEG's premises) up to two Interrogation Devices, or otherwise furnish access to the Distributor's service to CEG by means acceptable to CEG to be used by CEG to monitor Distributor's compliance with the terms of this Agreement, and any other Agreements that may be entered into between CEG and Distributor.

with their expenses not permissible to third parties for data received through Distributor's service which fee shall be paid by CEG.

11.    **DESCRIPTION OF DISTRIBUTOR'S SERVICE**

Distributor represents and warrants that the description of its service, and any data processing equipment, software and

12.    **OPERATION OF DISTRIBUTOR'S SERVICE**

Distributor shall assume sole responsibility for the design, development, acquisition, installation, testing, implementation, operation and maintenance of any and all software and equipment not directly supplied by CEG. Distributor represents and warrants that the design, development, acquisition, installation, testing, implementation, operation and maintenance of its service, and its system supporting the service, will not interfere with or adversely affect the Receipt of Market Data by any other Distributor or Subscriber.

13.    **TRANSMISSION TO OTHER DISTRIBUTORS**

Distributor shall not, by any means, furnish Receipt of Market Data to any Person, unless that Person is a Distributor, a Distributor Affiliate, or a Subscriber.

14.    **NO USE OF INFORMATION AFTER TERMINATION**

Upon termination of this Agreement for whatever reason, Distributor shall immediately cease any and all use of the Market Data.

# PART III - SYSTEM SECURITY

### 15.    TRANSMISSION AND EQUIPMENT SECURITY

(a)  Distributor shall assure that all service-related data processing, transmission and communications equipment and software are arranged and protected so that, so far as reasonably possible, no Person will obtain Receipt of Market Data who is not a Distributor, a Distributor Affiliate, or a Subscriber.

(b)  Distributor shall assure that the security provisions described in Exhibit A are enforced.  If, in its sole discretion, CEG determines that one or more Persons have unauthorized access to Receipt of Market Data, Distributor shall, in accordance with  subsection 15 (a), take all steps necessary to alter the security safeguards and the manner of furnishing Receipt of Market Data so as to preclude the unauthorized access. Distributor shall provide CEG with such evidence as CEG may request regarding the adequacy of those steps.  If CEG determines, in its reasonable discretion, those steps to be inadequate, Distributor shall promptly comply with any reasonable action to resume Distributor's authorized furnishing Receipt of Market Data, by which is only demanded ...

(c)  Distributor shall assure that any Person authorized in writing by CEG has access, at any reasonable time, to any premises of Distributor and Distributor Affiliate, and access to equipment of any Person to whom Distributor provides directly for delivery market Data securities or other Market Data (whether under this Agreement or otherwise).  In the presence of officials in charge of the premises, the authorized Person may (i) examine any component of the equipment and software used for the purposes of this Agreement and located at the premises and (ii) observe all operations located or conducted at the premises, but solely to monitor compliance with this agreement.  Any information obtained by a CEG or its representative in the course of such exercise shall be kept in strictest confidence and will be used solely for the purposes of verifying Distributor's compliance with the terms of this Agreement.

### 16.    RESPONSIBILITY FOR DISTRIBUTOR AFFILIATES

Whenever CEG notifies Distributor in writing that it has determined that Distributor Affiliate has failed to act in accordance with, or in the manner specified in this Agreement, Distributor shall  promptly cure the breach or rectify the failure.

### 17.    CO-OPERATION AS TO UNAUTHORIZED RECEIPT

(a)  Distributor shall assure that no unauthorized Person obtains Receipt of Market Data by use of equipment and software used for the delivery of the Market Data.  For the purposes of this Agreement an unauthorized Person is one who is not a Distributor, a Distributor Affiliate, or a Subscriber.  If an unauthorized Person is in Receipt of Market Data, Distributor shall use its best efforts to ascertain the source and manner of receipt, shall fully and promptly brief CEG, and shall promptly pay the applicable amounts described in subsection 18(a).  Distributor shall otherwise co-operate and assist in any investigation relating to any unauthorized Receipt of Market Data.

(b)  CEG may sue or otherwise proceed against any unauthorized Person to prevent the unauthorized Person from obtaining, or from using, Market Data.  If CEG institutes any such suit or other proceeding, Distributor, unless made a defendant in the suit or proceeding, shall assure that it and Distributor Affiliates (if any) co-operate with and assist CEG in the suit or proceeding in all reasonable respects, provided that CEG reimburses Distributor for reasonable out-of-pocket expenses.

(c)  If any Person brings a suit or other proceeding to enjoin Distributor, or any Distributor Affiliate from refusing to furnish Market Data to any unauthorized Person, Distributor shall promptly notify CEG. CEG may intervene in the suit or proceeding in the name of Distributor or the Distributor Affiliate, as appropriate, and, through counsel chosen by CEG, assume the defence of the action on behalf of Distributor or the Distributor Affiliate.  CEG shall indemnify, hold harmless and defend Distributor against any loss, liability or expense (including  reasonable attorneys' fees) that arises out of or results from the suit or proceeding.

(d)  If CEG notifies Distributor in writing that CEG has terminated the right of any Distributor in Receipt of Market Data from Distributor or Subscriber to be in Receipt of Market Data, Distributor   (i) shall cease furnishing Market Data to the

Distributor in Receipt of Market Data  from Distributor or Subscriber within five business days of the notice and (ii) shall, within ten business days, confirm the cessation, and inform CEG of the cessation date, by notice to CEG.

(c)   If Distributor refuses to provide, or to continue to provide, Receipt of Market Data to any Person solely because CEG has notified Distributor in writing that CEG does not authorize, or no longer authorizes, the Person to be in Receipt of Market Data, CEG shall indemnify, hold harmless and defend Distributor from and against (i) any suit or other proceeding that arises from the refusal and (ii) any liability, loss, cost, damage or expense (including reasonable attorneys' fees) that Distributor incurs as a result of the suit or proceeding.  CEG shall have sole control of the defence of any such suit or proceeding and of all the negotiations for its settlement  or compromise.  Distributor's prompt notice to CEG of  any such suit or proceeding is a condition to Distributor's rights under subsection 17(e). These rights do not apply when Distributor ceases to furnish Receipt of Market Data to an unauthorized Person.

18.   PENALTIES FOR UNAUTHORIZED RECEIPT

(a)   [illegible] Distributor as Distributor Affiliate is, [illegible] Distributor shall pay to CEG any applicable charges [illegible] that would have been imposed on Distributor or the unauthorized Person in respect of the Receipt of Market Data by the unauthorized Person provided that such non-payment [illegible] the month if [illegible] Person [illegible] the unauthorized Person [illegible] applied to interest [illegible] when the unauthorized Person was first in Receipt of Market Data.

(b)   [illegible] Distributor's liability [illegible] CEG [illegible] Distribution Fee, together with interest, for months ended within the two (2) years preceding the date CEG first became aware that such under-reporting has occurred, if such under-reporting is solely the result of a good faith error by Distributor.

(c)   If Distributor has paid all amounts due in respect of any unauthorized Receipt of Market Data: (i) Distributor becomes subrogated to all rights of CEG and (ii) CEG will return to Distributor any amounts subsequently received from the unauthorized Person.

19.   **INDEMNIFICATION OF CEG**

(a)   Distributor shall indemnify CEG against, and hold CEG harmless from, any and all claims or losses imposed on, incurred by CEG as a result of or relating to:

(i)   any non-compliance by Distributor or Distributor Affiliate with the terms and conditions hereof;

(ii)   any non-compliance by a Subscriber or a Distributor in Receipt of Market Data from Distributor or Distributor Affiliate with the terms and conditions hereof or of their respective agreements with CEG, if Distributor has failed to notify CEG of such non-compliance within thirty (30) days after Distributor knows of such non-compliance;

(iii)   any assertion of claims or losses relating to the subject matter or existence of this Agreement against CEG made by a Person who is in Receipt of Market Data from Distributor (or any Person relying upon the Market Data received by such a Person) and who is not a Distributor, or a Distributor Affiliate, or a Subscriber;

(iv)   any defence of or participation by CEG in any action, suit, arbitration, or judicial or administrative proceeding involving any claims or losses described in subsection 19(a).

The indemnifications provided by this subsection 19(a) shall include, without limitation, CEG's investigative and administrative costs which result in the detection of any material non-compliance by Distributor referred to in clause (i)

above or any material non-compliance by Subscribers or Distributors in Receipt of Market Data from Distributor referred to in clause (ii) above, provided, however, that such costs are not excessive as compared to the injury CEG would suffer as a result of any such non-compliance.

(b)    The party claiming indemnification under this Agreement agrees to promptly notify (and, in the case of any action, suit, arbitration or judicial or administrative proceeding, shall so notify no later than fifteen (15) days after the party claiming indemnification has received notice thereof or has been served with a complaint or other process) the other party when it has knowledge of circumstances or the occurrence of any events which are likely to result in an indemnification obligation under this Agreement or when any action, suit, arbitration, or judicial or administrative proceeding is pending or threatened that is covered by this Agreement; and further agrees that, upon request and to the extent permitted by applicable law, the other party shall have the right to defend, settle, or compromise any such suit or proceeding, at the other party's expense, provided that:  (i) the other party demonstrates to the satisfaction of the party claiming indemnification that it is financially able to defend such action and to pay any settlement or judgment; and (ii) counsel retained by the other party is reasonably satisfactory to the party claiming indemnification.  The failure of the party claiming indemnification to promptly notify the other party as required by subsection 19(b) shall not invalidate the claim for indemnification, unless such failure has have been avoided or mitigated by prompt notice as required by subsection 19(b).

(c)    Notwithstanding any provision in this Agreement to the contrary, the obligations arising under this Section 19 shall continue in force for two (2) years following the completion of performance or any termination of this Agreement.

# PART IV - PAYMENTS, RECORDS AND REPORTS

## 20.   PAYMENTS

(a) Distributor shall pay CEG the applicable charge(s) from time to time in effect, in the currency specified in the invoice.  CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the applicable charge(s).  Distributor shall pay any amounts due in accordance with such procedures, and within such time parameters, as CEG may specify from time to time.

(b) If Distributor has not paid any amounts payable pursuant to subsection 20(a) within the applicable time parameters, Distributor shall pay interest on the unpaid amount.  The interest begins to accrue on the forty-fifth day following the date of the invoice.  The applicable rate of interest pursuant to this part will equal the lesser of (i) 1 1/2% per month and (ii) the maximum rate of interest permitted by applicable law.

(c) Distributor shall assume full and complete responsibility for the payment of any taxes, charges or assessments imposed on Distributor or CEG by any foreign or domestic national, state, provincial or local governmental bodies, or subdivisions thereof, and any penalties or interest, relating to the Receipt of Market Data, excluding any taxes based upon the net income of CEG, TSX and/or TSX Venture Exchange.  In addition, if Distributor is required by applicable law to deduct or withhold any such tax, charge or assessment from the amounts due CEG, then the amounts due shall be increased so that the net amount actually received by CEG after the deduction or withholding of any such tax, charge or assessment will equal one hundred percent (100%) of the applicable charges.

## 21.   REPORTING OBLIGATIONS

(a) As of the effective date of the Agreement, Distributor shall supply the information specified in Exhibit B attached hereto, relating to all Subscribers, Distributor Affiliates, and Distributors in Receipt of Market Data from Distributor.

(b) Following the effective date of this Agreement, Distributor shall notify CEG in a form and manner satisfactory to CEG, no less than once per calendar month, of any changes in the information supplied pursuant to subsection 21(a).

## 22.   RECORDS AND INSPECTION/AUDIT PROCEDURES

(a)    Distributor shall make available for review upon reasonable advanced written notice all records and supporting documentation necessary for CEG audit personnel to monitor compliance with this Agreement and verify the accuracy and completeness of:

    (i)    any reports submitted to CEG pursuant to this Agreement

    (ii)    any payments made by Distributor to CEG pursuant to this Agreement

    (iii)    the information set forth in Exhibit A

(b)    Any information provided to CEG pursuant to subsection 21 and 22(a) shall be kept confidential in accordance with the confidentiality provisions of this Agreement.

    Receipt of Market Data from Distributor which is more ... and that more have resulted to CEG billing those parts ... than would have been the case had such information been accurate then Distributor shall pay to CEG all amounts that would ...

(d)    If the erroneous information referred to in subsection 22(c) is equal to or greater than 5% of the total billings by CEG in respect of Subscribers and Distributors in Receipt of Market Data from Distributor for the 365 day period preceding the ... administrative costs and expenses incurred ... costs being incurred in good faith and are not unreasonable given the amount of work necessary to detect and determine the extent of such errors.

(e)    CEG agrees that Distributor's liability pursuant to subsection 22(c) and subsection 22(d) for under-reporting the number of Subscriber Interrogation Devices in Receipt of Market Data, or Distributors in Receipt of Market Data from Distributor, shall be limited to unpaid Subscriber fees and/or Distribution fees, together with interest, for months ended within the two (2) years preceding the date Distributor, Distributor's auditors or CEG first noted the under-reporting, provided that such under-reporting is solely the result of a good faith error by Distributor.

(f)    The provisions of this Section 22 shall remain in force for a period of two (2) years from the date of any termination of this Agreement.

## PART V - PROVISIONS OF GENERAL APPLICABILITY

### 23.    EFFECTIVE DATE AND TERMINATION

Upon its execution by each party, this Agreement becomes effective as of the date first above written. This Agreement continues in effect until terminated as provided in this Section 23:

    (a)  Either Distributor or CEG may terminate this Agreement upon not less than ninety (90) days written notice to the other, or

    (b)  Either Distributor or CEG may terminate this Agreement upon thirty (30) days written notice to the other in the event that either party is in breach of any material provision of this Agreement and that such breach has not been cured by the party in default within the thirty (30) day notice period.

    (c)  Withdrawal of TSX Venture Exchange from CEG terminates this Agreement, providing notice as set out in subsection 23(a) has been given by CEG, solely as to the Receipt of Market Data from the withdrawing exchange. Withdrawal of TSX from CEG, again providing proper notice has been given, terminates this Agreement.

### 24.    SURVIVAL OF TERMS

The provisions of Sections 2, 6, 7, 8, 14, 15, 18, 20, 22, 23, and 25 shall survive the completion of performance or any termination of this Agreement.

25.    **CONFIDENTIALITY**

Each party acknowledges that during the term of this Agreement it may obtain confidential data, information or techniques from the other party. With respect to any such data, information or techniques which a party has designated in writing as confidential, and which are not otherwise publicly available, the other party agrees to hold such data, information or techniques confidential and to use it solely to monitor compliance with this Agreement and agrees not to disclose it unless directed to do so by any court or administrative agency or any other governmental body. For purposes hereof, CEG agrees that the information supplied to CEG by Distributor under Exhibits A and B is proprietary and confidential information of Distributor.

26.    EXPORT LAWS: PROHIBITED

Nothing in this Agreement shall prohibit the Distributor from doing any act this Agreement does prohibit or the Distributor from doing the act indirectly or as the result of permitting another Person to do the act.

27.    ASSIGNMENT

Distributor may not assign this Agreement, in whole or in part, without the written consent of CEG. The rights and obligations under CEG hereunder may be assigned by CEG to any corporation or other legal entity of which CEG owns at least a majority of the outstanding voting securities.

28.    ENTIRE AGREEMENT

This Agreement, including the attachments hereto which are an integral part hereof, constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes all prior negotiations, communications, writing and understandings. There are no warranties, representations, conditions or other agreements between the parties in connection with this Agreement, except as specifically set forth herein.

29.    **AMENDMENT: WAIVER**

Except as otherwise provided herein, no provision of this Agreement, or the attachments which are a part hereof, may be amended, modified or waived unless by an instrument in writing executed on behalf of each of the parties by their respective duly-authorized officers. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar), nor shall any waiver constitute a continuing waiver, unless expressly provided.

30.    **GOOD FAITH**

CEG and Distributor shall act in good faith in the performance of their respective obligations under this Agreement and shall act as promptly as is reasonably practicable in the circumstances in granting or denying any consent or approval required hereunder.

31.    **NOTICE**

Any notices required or permitted to be given herein shall be given to the parties in writing by overnight courier, registered or certified mail or electronic mail at the addresses set forth in this Agreement or to such addresses as the parties may hereafter substitute by written notice given in the manner prescribed in this Section 31 and shall be deemed to have been received on the business day following the dispatch.

32.    **GOVERNING LAW**

10

This Agreement shall be interpreted in accordance with and be governed in all respects by the laws of the Province of Ontario. The courts of Ontario shall have jurisdiction to entertain any action or proceeding brought by any of the parties hereto in connection with this Agreement or any alleged breach thereof.

33.    **NUMBER, ETC.**

This Agreement shall be read with all changes in gender or number as the context may require. Headings shall in no way limit or modify the contents of the respective paragraphs and are for purposes of convenience only.

34.    SEVERABILITY

If any of the provisions of this Agreement, or the application thereof to any Persons or circumstances, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

35.    FORCE MAJEURE

Neither Distributor nor CEG shall be liable for delay or failure of performance of any of the acts required by this Agreement when such delay or failure arises from events or circumstances beyond the reasonable control of the party and without the fault or negligence of the parties. Such events may include, without limitation, acts of God, acts of government or by agencies in their contractual capacity, acts of a public enemy, acts of civil or military authority, war, riots, civil strife, terrorism, blockades, sabotage, rationing, embargoes, epidemics, earthquakes, fire, flood, quarantine restrictions, power shortages or failures, utility or communication failures or delays, labour disputes, strikes, or shortages, supply shortages, equipment failures, or solitary malfunctions. The time for performance of any act delayed by such events may be postponed for a period equal to the delay.

36.    **COUNTERPARTS**

This Agreement may be executed in one or more counterparts which shall each be considered an original, but all of which together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be duly executed as of the day and year first above written.

Date:    07/24/2008

TSX Inc.
(on behalf of CBG)

_(authorized signing officer)_

Michael McCrea
Senior Manager
TSX Datalinx Services
TSX Group

Title:

6/23/2008

Lehman Brothers Holdings Inc.

Distributor

By: _____
    (authorized signing officer)

Name:  ERIN MURPHY
       (please print)

Title: Authorized Signatory

# CANADIAN EXCHANGE GROUP
## MARKET DATA DISTRIBUTION AGREEMENT

This agreement dated as of the _____8ᵀᴴ_____ day of _____July_____ 20_02_

between the CANADIAN  EXCHANGE GROUP
(hereinafter called the "CEG")
and

_Lehman Brothers Holdings Inc._ (hereinafter called "Distributor").

Distributor Name: ___Lehman Brothers Holdings Inc. Attn: Paula Hardy___

Distributor Address: ___745  7ᵗʰ Avenue___    ___14ᵗʰ Floor___
                     Street                     Suite

___New York___                     ___New York___
City                               State\Province

___USA___                          ___10019___
Country                            Zip/Postal Code

___(212) 526-4045___               ___(646) 758-1190___
Telephone Number                   Facsimile Number

1

# PART I - DEFINITIONS

1.   <u>DEFINITIONS</u>

(a) "Canadian Exchange Group" or "CEG" shall mean the Toronto Stock Exchange (TSE) and the Canadian Venture Exchange (CDNX). CDNX has appointed TSE as agent for the purposes of entering into this and other agreements necessary for provision of Market Data to Distributor on its and their behalf, and to establish the terms and conditions under which Market Data is to be made available to Distributor. For the purposes of this Agreement, "Canadian Exchange Group" or "CEG" shall refer to the exchanges comprising the Canadian Exchange Group jointly and severally.

(b) "Delayed Market Data" shall mean Market Data that has been delayed by a Distributor at least fifteen (15) minutes from the time of dissemination by the CEG.

(c) "Distributor" shall include those Persons who furnish Receipt of Market Data by any means to any Person and who have executed a Distribution Agreement which has been approved by the CEG and which has not been terminated by any of the parties hereto.

(d) "Distributor Affiliate" shall include those Persons identified in "Exhibit A" by Distributor, who are in a control relationship with Distributor, as determined by the CEG in its sole discretion, or agents or licensees of Distributor's services, and to whom Distributor furnishes Receipt of Market Data.

(e) "Exhibit A" shall mean an attachment to this Agreement, which shall form an integral part hereof, and which may be amended from time to time as provided herein, which describes Distributor's system for furnishing Receipt of Market Data including the methods of receipt, retrieval, processing and supply of Market Data by Distributor to any Person.

(f) "Exhibit B" shall mean an attachment to this Agreement, which shall form an integral part hereof, and which may be amended from time to time as provided herein, describing the records and other information required by the CEG to be maintained by Distributor for audit and administration purposes of this Agreement.

(g) "Interrogation Device" shall mean any device that displays (or is capable of displaying) Real-Time Market Data in any visible, audible, or other comprehensible form, to any person at any time during the month.

(h) "Market Data" shall mean a bundled transmission of electronic signals emanating from the exchanges comprising the CEG and containing trading information with respect to securities traded on the exchanges comprising the CEG.

(i) "Person" includes any natural person or proprietorship or any corporation, partnership or other organization.

(j) "Real-Time Market Data" shall mean Market Data from the time of dissemination by the CEG to the time fifteen (15) minutes after such dissemination.

(k) "Receipt of Market Data" shall mean the physical capability, whether used or not, of successfully receiving or retrieving Market Data.

(l) "Subscriber" shall include those Persons who are not Distributors and who have executed either an Application Agreement for Receipt of Canadian Exchange Group Market Data or, a Non-Professional Application Agreement for Receipt of Canadian Exchange Group Market Data which have been approved by the CEG and which has not been terminated by any of the parties hereto.

2

# PART II - MARKET DATA ACCESS AND USE

2.    **PROPRIETARY INTEREST OF CEG**

Distributor understands and acknowledges, and shall ensure that any other Distributor and Subscriber in Receipt of Market Data from Distributor understands and acknowledges, that CEG has a proprietary interest in the Market Data that originates on the CEG markets and that same is not within the public domain. Any Market Data provided to Distributor by CEG pursuant to this Agreement, which has been derived from databases owned by CEG, is copyrighted and as such Distributor's use of such Market Data is subject to the limitations set out in this Agreement.

3.    **SYSTEM INTERFACE**

(a)    If Distributor is in Receipt of Market Data directly from CEG, Distributor shall be responsible for: (i) obtaining the requisite quantity of common carrier communication lines, (ii) the reliability and continued availability of such communication lines, and (iii) interfacing with the CEG's facilities at such places as may be designated from time to time by CEG. Distributor will meet any reasonable requirement of CEG concerning the location of the interface or interfaces to permit Receipt of Market Data.

(b)    If Distributor is in Receipt of Market Data from a third party, then Distributor and such third party are responsible for all communications facilities and other arrangements necessary for Distributor to receive the Market Data from such third party. Further, Distributor acknowledges and agrees that CEG is not responsible for, and makes no representations or warranties regarding any services Distributor obtains from a third party.

(c)    If the interface with the CEG's facilities described in subsection 3(a) enables Distributor to receive information other than Market Data, CEG shall so notify Distributor, and Distributor shall not furnish or permit to be furnished such other information to any other Distributor or Subscriber without the prior approval of CEG.

4.    **CONFIGURATION**

Distributor acknowledges and agrees that nothing in this Agreement shall be deemed to constitute an undertaking by CEG to continue to disseminate the Market Data in the present form or configuration or to continue to use existing communications facilities. CEG, in its sole discretion, may from time to time make modifications to the Market Data and CEG facilities, including the interface and operational requirements, irrespective of whether such modifications would require changes to be made by Distributor. CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the speed, code, format, operating hours, or any other material changes in the operational requirements, unless a malfunction in the system necessitates modifications on an accelerated basis or an emergency situation precludes such advance notice. Distributor shall bear the responsibility of making concurrent modifications to its service.

5.    **NON-EXCLUSIVE BASIS**

CEG agrees to provide Receipt of Market Data to Distributor on a non-exclusive basis. CEG reserves the right, without any notice or liability to Distributor or to any other Person, to provide Receipt of Market Data or any other information, or to contract with any other Person to provide Receipt of Market Data or any other information to any Person by any means whatsoever, including devices or equipment designed or manufactured by CEG or any other Person.

6.    **DATA NOT GUARANTEED**

(A)    NO WARRANTIES - THE DISTRIBUTOR AGREES THAT THE CEG MAKES NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE MARKET DATA, ITS TRANSMISSION, TIMELINESS, ACCURACY OR COMPLETENESS, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, QUALITY AND FITNESS FOR A PARTICULAR PURPOSE AND, THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM THE COURSE OF DEALING OR USAGE OF TRADE.

(B)    NO GUARANTY - The CEG does not guarantee the timeliness, sequence, accuracy or completeness of Market Data, or other information or messages, disseminated by the CEG. The CEG will not be liable in any way to Distributor or to any other Person for:

    (a)    any inaccuracy, error or delay in, or omission of (i) any such Market Data, or other information or messages, or (ii) the transmission or delivery of any such Market Data, or other information or messages, or

    (b)    any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, or (ii) non-performance, or (iii) interruption in any such Market Data, or other information or messages, due either to any negligent act or omission by the CEG, "force majeure" or any other cause.

## 7.  CEG WARRANTY

(a)    The CEG represents, warrants and covenants that it is the exclusive owner of Market Data and of all intellectual and proprietary rights in Market Data and has full power and authority to grant the rights granted in this Agreement without the consent of any other party. The CEG shall indemnify and hold Subscriber or Distributor, their officers, directors, employees and agents, harmless from and against any loss, costs, liability and expense including reasonable legal fees, arising out of any breach or claimed breach of this representation, warranty and covenant.

(b)    The CEG represents, warrants and covenants that Market Data and the use of Market Data as permitted by this Agreement does not and will not infringe upon or violate the proprietary rights of any third party which proprietary rights include, without limitation, patents, copyrights, trademarks and trade secrets.

(c)    The CEG shall indemnify, and hold harmless and defend, Distributor and its Subscribers or, Distributors in Receipt of Market Data from Distributor, their officers, directors, employees and agents, against any loss, cost, liability and expense, including reasonable legal fees, for infringement of any proprietary rights of any third party. The CEG shall, at its own expense, defend or settle any claim or proceeding brought against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor by any third party alleging that Market Data or the use of Market Data as permitted by this Agreement, constitutes an infringement of any proprietary right, provided that the CEG is notified promptly in writing of such claim and is given the opportunity to have sole control for the defence of any action on such claim and all negotiation for its settlement. The CEG shall pay all damages and costs finally awarded against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor in such action or proceedings, and shall pay reasonable legal fees of Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor, but shall not be responsible for any costs, expenses, or compromises incurred or made by Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor without the CEG's prior written consent.

## 8.  AUTHORIZED USE

(a)    Distributor and Distributor Affiliates are authorized by this Agreement to receive, process, transmit and use the Market Data only as approved by CEG and described in Exhibit A. Any use of the Market Data not described in Exhibit A and, not approved by CEG is prohibited. Subscribers and Distributors in Receipt of Market Data from Distributor, are authorized to receive and use the Market Data only as set forth in the applicable agreement.

(b)    Any proposed use of the Market Data (including, but not limited to, developing or communicating derivative information based upon the Market Data, re-transmission, re-distribution, reproduction or calculation of indices, etc.) shall require the prior approval of CEG. Any such proposed use shall be submitted to CEG in the form of a draft amendment to Exhibit A. CEG shall promptly and in good faith approve or disapprove any such proposed use by Distributor. Distributor acknowledges and agrees that it acts at its own risk in developing any modification to its service prior to receiving approval from CEG, since CEG is not obligated by this Agreement to grant such approval.

(c)    Distributor agrees not to alter the Market Data in any manner that adversely affects its accuracy or integrity or that renders it misleading.

4

(d)   Distributor may furnish Delayed Market Data in the manner specified in Exhibit A and shall comply with any requirements that CEG and Distributor agree to from time to time as to Persons receiving Delayed Market Data.

9.   DISTRIBUTOR INTERROGATION DEVICES

Distributor shall be entitled to use certain Interrogation Devices located on its premises, without charge, for advertisement, demonstration, product development, and customer service. Distributor's use of such Interrogation Devices and the number thereof shall be subject to all provisions of the Agreement including, without limitation, CEG approval, monthly reporting and audit by the CEG.

10.   ACCESS TO DISTRIBUTOR INTERROGATION DEVICES

(a)   In lieu of assessing monthly charges upon Interrogation Devices utilized by Distributor for the purposes described in Section 9, at the CEG's request, Distributor agrees to provide to CEG (at the CEG's premises) up to two Interrogation Devices, or otherwise furnish access to the Distributor's service to the CEG by means acceptable to the CEG to be used by CEG to monitor Distributor's compliance with the terms of this Agreement, and any other Agreements that may be entered into between CEG and Distributor.

(b)   Any such Interrogation Device(s) provided to the CEG by Distributor pursuant to subsection 10(a), shall be without charge to CEG with the exception of fees payable to third parties for data provided through Distributor's services, which fees shall be paid by CEG.

11.   DESCRIPTION OF DISTRIBUTOR'S SERVICE

Distributor represents and warrants that the description of its service, and any data processing equipment, software and communications facilities related thereto and set forth in Exhibit A, is true, complete and not misleading.

12.   OPERATION OF DISTRIBUTOR'S SERVICE

Distributor shall assume sole responsibility for the design, development, acquisition, installation, testing, implementation, operation and maintenance of any and all software and equipment not directly supplied by CEG. Distributor represents and warrants that the design, development, acquisition, installation, testing, implementation, operation and maintenance of its service, and its system supporting the service, will not interfere with or adversely affect the Receipt of Market Data by any other Distributor or Subscriber.

13.   TRANSMISSION TO OTHER DISTRIBUTORS

Distributor shall not, by any means, furnish Receipt of Market Data to any Person, unless that Person is a Distributor, a Distributor Affiliate, or a Subscriber.

14.   NO USE OF INFORMATION AFTER TERMINATION

Upon termination of this Agreement for whatever reason, Distributor shall immediately cease any and all use of the Market Data.

# PART III - SYSTEM SECURITY

**15.    TRANSMISSION AND EQUIPMENT SECURITY**

(a)    Distributor shall assure that all service-related data processing, transmission and communications equipment and software are arranged and protected so that, so far as reasonably possible, no Person will obtain Receipt of Market Data who is not a Distributor, a Distributor Affiliate, or a Subscriber.

(b)    Distributor shall assure that the security provisions described in Exhibit A are enforced.  If, in its sole discretion, CEG determines that one or more Persons have unauthorized access to Receipt of Market Data, Distributor shall, in accordance with subsection 15 (a), take all steps necessary to alter the security safeguards and the manner of furnishing Receipt of Market Data so as to  preclude the unauthorized access.  Distributor shall provide CEG with such evidence as CEG  may request regarding the adequacy of those steps.  If CEG determines, in its reasonable discretion, those steps to be inadequate, Distributor shall promptly comply with any reasonable writing instructing Distributor to discontinue furnishing Receipt of Market Data by inadequately safeguarded means.

(c)    Distributor shall assure that any Person authorized in writing by CEG has access, at any reasonable time, to any premises of Distributor, any Distributor Affiliate, any service facilitator or any Person to whom Distributor provides any kind of commodities, securities or other Market Data (whether under this Agreement or otherwise).  In the presence of officials in charge of the premises, the authorized Person may (i) examine any component of the equipment and software used for the purposes of this Agreement and located at the premises and (ii) observe all operations located or conducted at the premises, but solely to monitor compliance with this Agreement.  Any information obtained by the CEG or its representatives in connection with such  examination shall be kept in strictest confidence and will be used solely for the purposes of verifying Distributor's compliance with the terms of this Agreement.

**16.    RESPONSIBILITY FOR DISTRIBUTOR AFFILIATES**

Whenever CEG notifies Distributor in writing that it has determined that Distributor Affiliate has failed to act in accordance with, or in the manner specified in this Agreement, Distributor shall promptly cure the breach or rectify the failure.

**17.    CO-OPERATION AS TO UNAUTHORIZED RECEIPT**

(a)    Distributor shall assure that no unauthorized Person obtains Receipt of Market Data by use of equipment and software used for the delivery of the Market Data.  For the purposes of this Agreement an unauthorized Person is one who is not a Distributor, a Distributor Affiliate, or a  Subscriber.  If an unauthorized Person is in Receipt of Market Data, Distributor shall use its best efforts to ascertain the source and manner of receipt, shall fully and promptly brief CEG, and shall promptly pay the applicable amounts described in subsection 18(a). Distributor shall otherwise co-operate and assist in any investigation relating to any unauthorized Receipt of Market Data.

(b)    CEG may sue or otherwise proceed against any unauthorized Person to prevent the unauthorized Person from obtaining, or from using, Market Data.  If CEG institutes any such suit or other proceeding, Distributor, unless made a defendant in the suit or proceeding, shall assure that it and Distributor Affiliates (if any) co-operate with and assist the CEG in the suit or proceeding in all reasonable respects, provided that the CEG reimburses Distributor for reasonable out-of-pocket expenses.

(c)    If any Person brings a suit or other proceeding to enjoin Distributor, or any Distributor Affiliate from refusing to furnish Market Data to any unauthorized Person, Distributor shall promptly notify CEG. CEG may intervene in  the suit or proceeding in the name of Distributor or the Distributor Affiliate, as appropriate, and, through counsel chosen by the CEG, assume the defence of the action on behalf of Distributor or the Distributor Affiliate.  The CEG shall indemnify, hold harmless and defend Distributor against any loss, liability or expense (including  reasonable attorneys' fees) that arises out of or results from the suit or proceeding.

(d)    If CEG notifies Distributor in writing that CEG has terminated the right of any Distributor in Receipt of Market Data from Distributor or Subscriber to be in Receipt of Market Data,  Distributor  (i) shall cease furnishing Market Data to the

Distributor in Receipt of Market Data from Distributor or Subscriber within five business days of the notice and (ii) shall, within ten business days, confirm the cessation, and inform CEG of the cessation date, by notice to CEG.

(e)    If Distributor refuses to provide, or to continue to provide, Receipt of Market Data to any Person solely because CEG has notified Distributor in writing that the CEG does not authorize, or no longer authorizes, the Person to be in Receipt of Market Data, the CEG shall indemnify, hold harmless and defend Distributor from and against (i) any suit or other proceeding that arises from the refusal and (ii) any liability, loss, cost, damage or expense (including reasonable attorneys' fees) that Distributor incurs as a result of the suit or proceeding. The CEG shall have sole control of the defence of any such suit or proceeding and of all the negotiations for its settlement or compromise. Distributor's prompt notice to CEG of any such suit or proceeding is a condition to Distributor's rights under subsection 17(e). These rights do not apply when Distributor ceases to furnish Receipt of Market Data to an unauthorized Person.

## 18.  PENALTIES FOR UNAUTHORIZED RECEIPT

(a)    In respect of any Receipt of Market Data by an unauthorized Person, which Market Data has been provided through Distributor's, or Distributor Affiliate's, facilities, Distributor shall pay to CEG any applicable charges, together with interest, that would have been imposed on Distributor or the unauthorized Person in respect of the Receipt of Market Data by the unauthorized Person provided that such unauthorized receipt has not occurred as the result of fraud or theft of the Market Data by the unauthorized Person. These charges shall include applicable interest (if any) and shall be retroactive to the date when the unauthorized Person was first in Receipt of Market Data.

(b)    CEG agrees that Distributor's liability pursuant to subsection 18(a) shall be limited to unpaid Subscriber fees and Distribution fees, together with interest, for months ended within the two (2) years preceding the date CEG first becomes aware that such under-reporting has occurred, if such under-reporting is solely the result of a good faith error by Distributor.

(c)    If Distributor has paid all amounts due in respect of any unauthorized Receipt of Market Data: (i) Distributor becomes subrogated to all rights of the CEG and (ii) CEG will return to Distributor any amounts subsequently received from the unauthorized Person.

## 19.  INDEMNIFICATION OF CEG

(a)    Distributor shall indemnify the CEG against, and hold the CEG harmless from, any and all claims or losses imposed on, incurred by CEG as a result of or relating to:

    (i)    any non-compliance by Distributor or Distributor Affiliate with the terms and conditions hereof;

    (ii)    any non-compliance by a Subscriber or a Distributor in Receipt of Market Data from Distributor or Distributor Affiliate with the terms and conditions hereof or of their respective agreements with the CEG, if Distributor has failed to notify CEG of such non-compliance within thirty (30) days after Distributor knows of such non-compliance;

    (iii)    any assertion of claims or losses relating to the subject matter or existence of this Agreement against the CEG made by a Person who is in Receipt of Market Data from Distributor (or any Person relying upon the Market Data received by such a Person) and who is not a Distributor, or a Distributor Affiliate, or a Subscriber;

    (iv)    any defence of or participation by the CEG in any action, suit, arbitration, or judicial or administrative proceeding involving any claims or losses described in subsection 19(a).

7

The indemnifications provided by this subsection 19(a) shall include, without limitation, CEG's investigative and administrative costs which result in the detection of any material non-compliance by Distributor referred to in clause (i) above or any material non-compliance by Subscribers or Distributors in Receipt of Market Data from Distributor referred to in clause (ii) above, provided, however, that such costs are not excessive as compared to the injury CEG would suffer as a result of any such non-compliance.

(b)    The party claiming indemnification under this Agreement agrees to promptly notify (and, in the case of any action, suit, arbitration or judicial or administrative proceeding, shall so notify no later than fifteen (15) days after the party claiming indemnification has received notice thereof or has been served with a complaint or other process) the other party when it has knowledge of circumstances or the occurrence of any events which are likely to result in an indemnification obligation under this Agreement or when any action, suit, arbitration, or judicial or administrative proceeding is pending or   threatened that is covered by this Agreement; and further agrees that, upon request and to the extent permitted by applicable law, the other party shall have the right to defend, settle, or compromise any such suit or proceeding, at the other party's expense, provided that:  (i) the other party demonstrates to the satisfaction of the party claiming indemnification that it is financially able to defend such action and to pay any settlement or  judgement; and (ii) counsel retained by the other party is reasonably satisfactory to the party claiming indemnification.  The party claiming indemnification agrees to cooperate with the other party in the defence of any such suit or proceeding, and the other party agrees to reimburse the  party claiming indemnification for its expenses with respect thereto.  Failure by the party claiming indemnification to promptly notify the other party as required by subsection 19(b) shall not invalidate the claim for indemnification, unless such failure has a material adverse effect on the settlement, defence, or compromise of the matter that is the subject of the claim for indemnification. In addition, the party claiming indemnification shall be responsible for any claims or losses which   could have been avoided or mitigated by prompt notice as required by subsection 19(b).

(c)    Notwithstanding any provisions in this Agreement to the contrary, the obligations set out in this Section 19 shall continue in force for two (2) years following the completion of performance or any termination of this Agreement.

## PART IV - PAYMENTS, RECORDS AND REPORTS

20.    **PAYMENTS**

(a)    Distributor shall pay CEG the applicable charge(s) from time to time in effect, in the currency specified in the invoice.  CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the applicable charge(s). Distributor shall pay any amounts due in accordance with such procedures, and within such time parameters, as CEG may specify from time to time.

(b)    If Distributor has not paid any amounts payable pursuant to subsection 20(a) within the applicable time parameters, Distributor shall pay interest on the unpaid amount.  The interest begins to accrue on the forty-fifth day following the date of the invoice. The applicable rate of interest pursuant to this part will equal the lesser of (i)1 1/2% per month and (ii) the maximum rate of interest permitted by applicable law.

(c)    Distributor shall assume full and complete responsibility for the payment of any taxes, charges or assessments imposed on Distributor or CEG by any foreign or domestic national, state, provincial or local governmental bodies, or subdivisions thereof, and any penalties or interest, relating to the Receipt of Market Data, excluding any taxes based upon the net income of the CEG, TSE and/or CDNX.  In addition, if Distributor is required by applicable law to deduct or withhold any such tax, charge or assessment from the amounts due CEG, then the amounts due shall be increased so that the net amount actually received by CEG after the deduction or withholding of any such tax, charge or assessment will equal one hundred percent (100%) of the applicable charges.

21.    **REPORTING OBLIGATIONS**

(a)    As of the effective date of the Agreement, Distributor shall supply the information specified in Exhibit B attached hereto, relating to all Subscribers, Distributor Affiliates, and Distributors in Receipt of Market Data from Distributor.

8

(b)    Following the effective date of this Agreement, Distributor shall notify CEG in a form and manner satisfactory to CEG, no less than once per calendar month, of any changes in the information supplied pursuant to subsection 21(a).

## 22.  RECORDS AND INSPECTION/AUDIT PROCEDURES

(a)    Distributor shall make available for review upon reasonable advanced written notice all records and supporting documentation necessary for CEG audit personnel to monitor compliance with this Agreement and verify the accuracy and completeness of:

    (i)    any reports submitted to CEG pursuant to this Agreement

    (ii)    any payments made by Distributor to CEG pursuant to this Agreement

    (iii)    the information set forth in Exhibit A

(b)    Any information provided to CEG pursuant to subsection 21 and 22(a) shall be kept confidential in accordance with the confidentiality provisions of this Agreement.

(c)    If Distributor has provided information to CEG concerning the Receipt of Market Data by Subscribers and/or Distributors in Receipt of Market Data from Distributor which is erroneous and such errors have resulted in CEG billing these parties less than would have been the case had such information been accurate, then Distributor shall pay to CEG all amounts that would have been due relative to such erroneous reports.

(d)    If the erroneous information referred to in subsection 22(c) is equal to or greater than 5% of the total billings by CEG in respect of Subscribers and Distributors in Receipt of Market Data from Distributor for the 365 day period preceding the discovery of errors, then Distributor shall reimburse CEG, within sixty (60) days of invoice for reasonable audit, legal or administrative costs and expenses incurred to detect and rectify such errors. Distributor's obligation is contingent on these costs being incurred in good faith and are not unreasonable given the amount of work necessary to detect and determine the extent of such errors.

(e)    CEG agrees that Distributor's liability pursuant to subsection 22(c) and subsection 22(d) for under-reporting the number of Subscriber Interrogation Devices in Receipt of Market Data, or Distributors in Receipt of Market Data from Distributor, shall be limited to unpaid Subscriber fees and/or Distribution fees, together with interest, for months ended within the two (2) years preceding the date Distributor, Distributor's auditors or CEG first noted the under-reporting, provided that such under-reporting is solely the result of a good faith error by Distributor.

(f)    The provisions of this Section 22 shall remain in force for a period of two (2) years from the date of any termination of this Agreement.

## PART V - PROVISIONS OF GENERAL APPLICABILITY

## 23.  EFFECTIVE DATE AND TERMINATION

Upon its execution by each party, this Agreement becomes effective as of the date first above written. This Agreement continues in effect until terminated as provided in this Section 23:

(a)    Either Distributor or CEG may terminate this Agreement upon not less than ninety (90) days written notice to the other, or

(b)    Either Distributor or CEG may terminate this Agreement upon thirty (30) days written notice to the other in the event that either party is in breach of any material provision of this Agreement and that such breach has not been cured by the party in default within the thirty (30) day notice period.

(c)    Withdrawal of the CDNX from the CEG terminates this Agreement, providing notice as set out in subsection 23(a) has been given by CEG, solely as to the Receipt of Market Data from the withdrawing exchange. Withdrawal of the TSE from CEG, again providing proper notice has been given, terminates this Agreement.

24.    SURVIVAL OF TERMS

The provisions of Sections 2, 6, 7, 8, 14, 15, 18, 20, 22, 23, and 25 shall survive the completion of performance or any termination of this Agreement.

25.    CONFIDENTIALITY

Each party acknowledges that during the term of this Agreement it may obtain confidential data, information or techniques from the other party. With respect to any such data, information or techniques which a party has designated in writing as confidential, and which are not otherwise publicly available, the other party agrees to hold such data, information or techniques confidential and to use it solely to monitor compliance with this Agreement and agrees not to disclose it unless directed to do so by any court or administrative agency or any other governmental body. For purposes hereof, CEG agrees that the information supplied to the CEG by Distributor under Exhibits A and B is proprietary and confidential information of Distributor.

26.    INDIRECT ACTS PROHIBITED

In prohibiting the Distributor from doing any act, this Agreement also prohibits the Distributor from doing the act indirectly (e.g. by causing or permitting another Person to do the act).

27.    ASSIGNMENTS

Distributor may not assign this Agreement, in whole or in part, without the written consent of CEG. The rights and obligations of the CEG hereunder may be assigned by it at any time without the prior written consent of the Distributor.

28.    ENTIRE AGREEMENT

This Agreement, including the attachments hereto which are an integral part hereof, constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes all prior negotiations, communications, writing and understandings. There are no warranties, representations, conditions or other agreements between the parties in connection with this Agreement, except as specifically set forth herein.

29.    AMENDMENT: WAIVER

Except as otherwise provided herein, no provision of this Agreement, or the attachments which are a part hereof, may be amended, modified or waived unless by an instrument in writing executed on behalf of each of the parties by their respective duly-authorized officers. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar), nor shall any waiver constitute a continuing waiver, unless expressly provided.

30.    GOOD FAITH

CEG and Distributor shall act in good faith in the performance of their respective obligations under this Agreement and shall act as promptly as is reasonably practicable in the circumstances in granting or denying any consent or approval required hereunder.

31.    NOTICE

Any notices required or permitted to be given herein shall be given to the parties in writing by overnight courier, registered or certified mail or electronic mail at the addresses set forth in this Agreement or to such addresses as the parties may hereafter substitute by written notice given in the manner prescribed in this Section 31 and shall be deemed to have been received on the business day following the dispatch.

10

32. <u>GOVERNING LAW</u>

This Agreement shall be interpreted in accordance with and be governed in all respects by the laws of the Province of Ontario. The courts of Ontario shall have jurisdiction to entertain any action or proceeding brought by any of the parties hereto in connection with this Agreement or any alleged breach thereof.

33. <u>NUMBER, ETC.</u>

This Agreement shall be read with all changes in gender or number as the context may require. Headings shall in no way limit or modify the contents of the respective paragraphs and are for purposes of convenience only.

34. <u>SEVERABILITY</u>

If any of the provisions of this Agreement, or the application thereof to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such terms or provisions to Persons or circumstances other than those which are invalid or unenforceable, shall not be effected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

35. <u>FORCE MAJEURE</u>

Neither Distributor nor the CEG shall be liable for delay or failure of performance of any of the acts required by this Agreement when such delay or failure arises from circumstances beyond the control and without the gross negligence or willful misconduct of the parties. Such causes may include, without limitation, acts of God, acts of government in its sovereign or contractual capacity, acts of a public enemy, acts of civil or military authority, war, riots, civil strife, terrorism, blockades, sabotage, rationing, embargoes, epidemics, earthquakes, fire, flood, quarantine restrictions, power shortages or failures, utility or communication failures or delays, labour disputes, strikes, or shortages, supply shortages, equipment failures, or solitary malfunctions. The time for performance of any act delayed by such events may be postponed for a period equal to the delay.

11

36.     **COUNTERPARTS**

This Agreement may be executed in one or more counterparts which shall each be considered an original, but all of which together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be duly executed as of the day and year first above written.

Date: _____Sept. 6 2007_____          THE TORONTO STOCK EXCHANGE
                                       (on behalf of the CEO)

                                       By: _____
                                            (authorized signing officer)

                                       Title: ___**Richard Nesbitt**___
                                                    ~~President~~
                                                **TSX Markets Inc.**

Date: _____7/16/0~_____                 _____LEHMAN BROTHERS HOLDINGS INC_____
                                       Distributor

                                       By: _____
                                            (authorized signing officer)

                                       Name: ___JAMES J.HERMAN___
                                                (please print)

                                       Title: ___VP Global Purchasing___

12