#45

### PC-BOND INDEX LICENCE AGREEMENT

**THIS INDEX LICENCE AGREEMENT**, dated as of January 1, 2008 ("**the Commencement Date**") by and among PC-Bond, a business unit of TSX Inc. ("**PC-BOND**"), a corporation governed by the laws of the Province of Ontario and Lehman Brothers Special Financing Inc., a corporation established under the laws of the State of Delaware ("Licensee").

**WHEREAS** PC-BOND compiles, calculates, maintains and owns rights in and to the indices listed in the attached Exhibit A, which may be amended from time to time, and to the proprietary methodology therein contained (such index and rights being hereinafter individually and collectively referred to as the "**Indices**");

**AND WHEREAS** PC-BOND is the owner of certain trademarks in Canada as identified on the attached Exhibit D (referred to as the "**PC-BOND Trade Marks**");

**AND WHEREAS** certain third parties (collectively, the "**Third Parties**"), are the owners of certain trademarks in Canada as identified on the attached Exhibit D (referred to as the "**Third Party Trade Marks**");

**AND WHEREAS** the Third Parties have authorized PC-BOND to use and sublicense the Third Party Trade Marks in connection with the Indices;

**AND WHEREAS** PC-BOND licenses the PC-BOND Trade Marks and the Third Party Trade Marks (collectively, the "**Trade Marks**"), as attached in Exhibit D (which Exhibit may be updated from time to time by PC-BOND);

**AND WHEREAS** Licensee wishes to obtain PC-BOND's authorization to use the Trade Marks in connection with the issuance, marketing and/or promotion of the Product(s) (as defined below) in Canada, the United States and the Cayman Islands (the "**Territory**") and in connection with making disclosure about the Product(s) under applicable law, rules and regulations in order to indicate that PC-BOND is the source of the Indices;

**AND WHEREAS** Licensee has obtained from PC-BOND a license to receive and use certain data comprising the Indices in a separate data license agreement (the "**Data License Agreement**");

**AND WHEREAS** Licensee and any permitted affiliates or subsidiaries of Licensee (as provided in Section 1 hereof) wish to use the Indices as a component of the product or products described in Exhibit B attached hereto and made a part hereof (individually and collectively referred to as the "**Product(s)**").

**NOW, THEREFORE THIS AGREEMENT WITNESSES THAT** in consideration of the premises and the mutual covenants herein set forth and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **Grant of License**

Subject to the terms and conditions of this Agreement: (i) PC-BOND hereby grants to Licensee and any of its permitted affiliates and/or subsidiaries a non-transferable, non-exclusive, revocable license to use the Indices, as provided under and subject to the Data License Agreement, as a component of the Product(s) to be issued, entered into, written, sold and/or purchased by Licensee; and (ii) PC-BOND hereby grants to Licensee and any of its permitted affiliates and/or subsidiaries a non-transferable, non-exclusive, revocable license to use and display the Trade Marks in the Territory for the purpose of: (a) the management of the Product(s), namely benchmarking of the Products; (b) marketing and promotion of the Product(s); and (c) making such disclosure about the Products(s) as Licensee and any of its permitted affiliates and/or subsidiaries deems necessary or desirable under any applicable law, rules, regulations, or provisions of this Agreement (collectively, the **"Services"**). Any use of the Indices or Trade Marks as set out above by an affiliate or subsidiary of Licensee is subject to the prior written consent of PC-BOND. Moreover, Licensee acknowledges and agrees that it shall take all necessary measures to ensure any such affiliates or subsidiaries comply with the terms of this Agreement and the Data License Agreement and that it shall be liable for any failure by any such affiliates or subsidiaries to perform or observe any of the terms of this Agreement. For greater certainty, nothing herein authorizes Licensee to use the Trade Marks in or as part of a Product, business, trade, partnership or other name. It is expressly agreed and understood by Licensee that no rights to use the Indices, or the Trade Marks are granted hereunder other than those specifically described and expressly granted herein. Licensee agrees that the Product will not be listed on any exchange or marketplace.

2. **Control by PC-BOND of Representations of Trade Marks**

(a)   Upon request, Licensee shall provide PC-BOND with any materials bearing the Trade Marks, including but not limited to any advertising, promotional or disclosure materials, and/or samples of the Products;

(b)   PC-BOND may from time to time change the names of the Indices and the owners of the Trade Marks by providing an updated version of Exhibit D in writing to Licensee. Six months following the receipt by Licensee of written notice of the updated version of Exhibit D, the Licensee's license under Section 1 of this Agreement shall be restricted to only those Trade Marks listed in the then-current Exhibit D. For greater certainty, Licensee agrees to cease using any Trade Mark that is removed from Exhibit D and Licensee agrees to appropriately reference any use of the Trade Marks in Sections 2(c), 13(c) and 15(b) in accordance with the updated Exhibit D and PC-Bond's written instructions (if any have been provided prior to the end of the six month period) on or before the end of the six month period.

(c)   Licensee shall ensure that any and all print or electronic media use of Trade Marks other than Informational Materials (as defined in Section 12), is accompanied by an asterisk printed closely adjacent to each representation, to which will be related on the same page the legend "*[Registered] trade mark of [insert Owner of Trademark from Exhibit D]. Used under licence."

2

3.    **Control of Quality of Services in Association with the Trade Marks**

In order that PC-BOND may ensure that the nature and quality of the Products and Services offered or performed by Licensee using the Trade Marks conform with PC-BOND's standards of quality for the Products and Services, PC-BOND will from time to time issue reasonable instructions to Licensee setting out applicable standards of quality for the use of the Trade Marks in connection with the Products and Services which at the date of this Agreement include the instructions in Exhibit E and Licensee shall comply with such instructions. PC-BOND, and/or its duly authorized representatives, shall have the right, upon not less than five (5) business days prior written notice and during ordinary business hours to inspect the Products and performance of the Services on the business premises of the Licensee to ensure that Licensee is maintaining the character and quality of the Products and Services as required herein and Licensee's employees shall make readily available to PC-BOND's representative(s) such information as is reasonably required by PC-BOND's representative(s) to make such inspection and evaluation.

4.    **Variation of Trade Marks**

Licensee shall not change or vary the Trade Marks nor use any other trademark or service mark which is similar to or substantially similar to or so nearly resembles any of the Trade Marks as to be likely to cause deception or confusion, except with the prior written consent of PC-BOND.

5.    **Goodwill from use of Trade Marks**

(a)    Licensee recognizes that the Third Parties are the respective owners of the Third Party Trade Marks as set out in Exhibit D and all the goodwill therein and agrees that the same shall remain vested in the Third Parties and that use of the Third Party Trade Marks by Licensee shall inure to the benefit of such Third Parties. Licensee agrees not to challenge the validity or ownership of the Third Party Trade Marks and/or the goodwill therein or their registration in any country or that the use of the Third Party Trade Marks by Licensee is use for the benefit of such Third Parties; and

(b)    Licensee recognizes that PC-BOND is the owner of the PC-BOND Trade Marks and all the goodwill therein and agrees that the same shall remain vested in PC-BOND and that use of the PC-BOND Trade Marks by Licensee shall inure to the benefit of PC-BOND. Licensee agrees not to challenge the validity or ownership of the PC-BOND Trade Marks and/or the goodwill therein or their registration in any country or that the use of the PC-BOND Trade Marks by Licensee is use for the benefit of PC-BOND.

6.    **Protection of Trade Marks**

In the event Licensee learns of any infringement or threatened infringement of the Trade Marks, or of any use of a confusingly similar mark, or any passing off by reason of imitation of get-up or that any third party alleges or claims that the Trade Marks are liable to cause deception or confusion to the public, Licensee shall promptly notify PC-BOND

3

in writing, giving particulars thereof and Licensee shall provide all information and assistance to PC-BOND in the event PC-BOND and/or the Third Parties decide that proceedings should be commenced or defended, and any such proceedings shall be under the sole control of PC-BOND and/or the Third Parties. The provisions of this Section shall survive any termination of this Agreement.

7. **Interest of Licensee under Agreement**

Licensee acknowledges and agrees that no right, title or interest in the Trade Marks, any application or registration in respect thereof or any goodwill appurtenant thereto is transferred to Licensee by this Agreement, but only the permission to use the Trade Marks on the terms and conditions set forth herein. The provisions of this Section shall survive any termination of this Agreement.

8. **Term**

The term of this Agreement shall commence on the Commencement Date and shall, unless terminated pursuant to Section 10, continue in effect for an initial period of one (1) year from the Commencement Date. Thereafter, this Agreement shall be automatically renewed on an annual basis for additional one year terms, on the same date as the Commencement Date (the **"Renewal Date"**), unless terminated in accordance with the terms of this Agreement.

9. **Licence Fees**

(a) Licensee shall pay to PC-BOND the licence fees (**"Licence Fees"**) specified in and in accordance with Exhibit C, attached hereto and made a part hereof. During the term of this Agreement and for a period of one (1) year after its termination, PC-BOND shall have the right, during normal business hours and upon reasonable notice to Licensee, to audit on a confidential basis the relevant books and records of Licensee to determine that Licence Fees have been accurately determined. The costs of such audit shall be borne by PC-BOND unless such audit reveals that PC-BOND has been underpaid by five percent (5%) or more; in such case, costs of the audit shall be paid by Licensee.

(b) If any fees paid to PC-BOND hereunder are subjected to withholding taxes by another country, the Licensee shall provide PC-BOND an original receipt from the tax authorities of such foreign country evidencing the amount of tax withheld. Such receipt shall be furnished at the time such fee is paid to PC-BOND or as soon thereafter as is practicable. In the event that PC-BOND is denied a foreign tax credit, Licensee shall pay PC-BOND an amount sufficient to compensate, on an after tax basis, for the credit denied.

(c) In addition to the License Fees, Licensee shall pay any sales, use, goods and services, consumption or other tax and any duties or tariffs that may be assessed in connection with this Agreement, except for tax based on the net income of PC-Bond.

(d) The provisions of this Section shall survive any termination of this Agreement.

4

10. **Termination**

    (a)    In the event that PC-BOND discovers, whether as a result of inspections performed pursuant to Section 3 or otherwise, that the Products or Services do not maintain the standards of character and quality set out in Section 3, or that Licensee is using Trade Marks in any manner that may bring PC-BOND or the Third Parties and/or their respective businesses into disrepute, or that harm is occurring to the reputation or goodwill of PC-BOND and/or Third Parties by reason of its or their continued performance hereunder, then upon written notice of such failure or objectionable use being given to the Licensee and upon failure of Licensee to remedy such failure or objectionable use to PC-BOND's satisfaction, acting reasonably, within thirty (30) days or such longer period set out in said notice, termination shall be effective on the last day of such period or, at the discretion of PC-BOND, on such later date as PC-BOND may advise.

    (b)    In the case of breach of any of the material terms or conditions of this Agreement by either PC-BOND or Licensee, the non-breaching party may terminate this Agreement by giving thirty (30) days prior written notice to the other party of its intent to terminate, and such notice shall be effective on the date specified therein for such termination unless the breaching party or parties shall correct such breach within the notice period.

    (c)    PC-BOND shall have the right, in its sole discretion, to cease compilation and publication of the Indices and, in such event, to either: (i) terminate this Agreement; or (ii) offer a replacement or substitute index for the Indices, subject to a revised License Fee in Exhibit C. In the event that PC-BOND intends to discontinue the Indices, PC-BOND shall give Licensee at least one hundred eighty (180) days written notice prior to such discontinuance, which notice shall specify whether a replacement or substitute index will be made available, and the revised License Fee for such replacement and substitute index, if applicable. Licensee shall have the option hereunder within ninety (90) days after receiving such written notice from PC-BOND to notify PC-BOND in writing of its intent to use the replacement or substitute index, if any, under the terms of this Agreement and the revised License Fees. In the event that Licensee does not exercise such option or no substitute or replacement index is made available, this Agreement shall terminate as of the date specified in the PC-BOND notice.

    (d)    Licensee may terminate this Agreement as it relates to the Product(s) upon ninety (90) days prior written notice to PC-BOND if: (i) Licensee is informed of the final adoption of any legislation or regulation within the Territory and applicable to Licensee or the issuance of any interpretation that in Licensee's reasonable judgment materially impairs Licensee's ability to issue, market and/or promote the Product(s); (ii) any material litigation or regulatory proceeding regarding the Product(s) is threatened or commenced; (iii) Licensee elects to terminate the public offering or other distribution of the Product(s) or to terminate the Product(s), as may be applicable.

    (e)    PC-BOND may terminate this Agreement as it relates to the Product(s) immediately upon providing written notice if: (i) PC-BOND is informed of the

5

final adoption of any legislation or regulation or the issuance of any interpretation that in PC-BOND's reasonable judgment materially impairs PC-BOND's ability to license and provide the Indices in connection with the Product(s) or PC-BOND's ability to license use of the Trade Marks under this Agreement in connection with the licensed Services or Products; or (ii) any litigation or proceeding is threatened or commenced and PC-BOND believes that such litigation or proceeding would have a material and adverse effect upon the Trade Marks or upon the ability of PC-BOND to perform under this Agreement.

(f)     PC-BOND may terminate this Agreement immediately on the commission of an act of insolvency by Licensee or Licensee's bankruptcy or a general assignment for the benefit of its creditors or the filing of an involuntary petition of bankruptcy against Licensee, or its liquidation or by statutory arrangement with its creditors or the appointment of a receiver or receiver and manager to one of its or of any substantial part of its properties and assets with its consent or acquiescence, or Licensee taking the benefit of any law relating to bankruptcy, insolvency, dissolution or winding-up.

(g)     Either PC-BOND or Licensee may terminate this Agreement effective as at the Renewal Date, provided the terminating party gives not less than ninety (90) days' prior written notice of termination. In the absence of such notice, the term of this Agreement shall be deemed to be renewed for successive one-year terms in accordance with Section 8 hereof.

(h)     In the event that the Data License Agreement has terminated, for whatever reason, this Agreement will automatically terminate at the end of such thirty (30) day period.

(i)     Upon termination of this Agreement, Licensee shall forthwith cease to use the Indices and Trade Marks, in connection with the Product(s) and the Services, or any other trading style, trade name, domain name, trade mark or get-up confusingly similar to or which so nearly resembles the Trade Marks as to cause deception or confusion and shall remove or cause to be removed all representations of the Trade Marks in the materials and media of the Licensee that are in the Licensee's possession or under the Licensee's control.

11.    **PC-BOND's Obligations**

(a)     It is the policy of PC-BOND to prohibit its employees (or employees of its affiliates) who are directly responsible for changes in the components of the Indices from purchasing or beneficially owning any interest in the Product(s). Licensee shall have no responsibility for ensuring that such employees comply with such policy and shall have no duty to inquire whether any purchasers or sellers of the Product(s) are PC-BOND employees. PC-BOND shall have no liability to the Licensee with respect to its employees' adherence or failure of adherence to such policy.

(b)     PC-BOND shall not be and is in no way obliged to engage in any marketing or promotional activities in connection with the Product(s) or in making any

6

representation or statement to investors or prospective investors in connection with the promotion by Licensee of the Product(s) or the Services.

(c)     PC-BOND agrees to provide reasonable support for efforts with respect to the Product(s) as follows: (i) PC-BOND shall provide Licensee, upon request but subject to any agreements of confidentiality with respect thereto, copies of the results of any marketing research conducted by or on behalf of PC-BOND with respect to the Indices; and (ii) PC-BOND shall respond in a timely fashion to any reasonable requests for information by Licensee regarding the Indices.

(d)     PC-BOND or its agent shall calculate and disseminate the Indices at least once each business day in accordance with its current procedures under the Data License Agreement. PC-BOND Indices and procedures may be modified at PC-BOND's sole discretion, however PC-BOND shall use commercially reasonable efforts to provide Licensee with reasonable prior written notice of any material modifications to such procedures relating to the Indices.

## 12.   Informational Materials Review

Licensee shall use its best efforts to protect the goodwill and reputation of PC-BOND, the Trade Marks and Indices in connection with its use of the Trade Marks and Indices under this Agreement. Licensee shall submit to PC-BOND for its review and prior approval all informational materials pertaining to and to be used in connection with the Product(s) or Services, including, where applicable, all prospectuses, advertisements, brochures and promotional and any other similar informational materials (including documents required to be filed with governmental or regulatory agencies) that in any way use or refer to PC-BOND, the Indices or the Trade Marks in any form or media, including any print or electronic media (the **"Informational Materials"**).

Informational Materials shall be addressed to:

PC-BOND, c/o Lisa McAllister, Compliance & Contract Manager, PC Bond & Indices at the address specified in Subsection 18(e). Informational Materials may be submitted via facsimile to 416.947.4708, if they are less than 20 pages and legible after transmission or email to pcbond@tsx.com. Such information may be updated in writing from time to time by PC-BOND.

PC-BOND's approval shall be required with respect to the use of and description of PC-BOND, the Trade Marks and the Indices and shall not be unreasonably withheld or delayed. Specifically, PC-BOND shall notify Licensee, of its approval or disapproval of any Informational Materials within three business days (excluding weekends and holidays) following receipt thereof from Licensee. Any disapproval shall state PC-BOND's reasons therefor. Any failure by PC-BOND to respond within such three business day period shall be deemed to constitute a waiver by PC-BOND of its right to review such Informational Materials by PC-BOND. Once Informational Materials have been approved by PC-BOND, subsequent Informational Materials which do not materially differ from such approved Informational Materials with respect to the use or description of PC-BOND, the Trade Marks or the Indices need not be submitted for review and approval by PC-BOND.

13. **Protection of Value of License**

(a)     PC-BOND shall at its own expense and in its sole discretion exercise PC-BOND's common law and statutory rights against infringement of the PC-BOND Trade Marks or Indices.

(b)     Licensee shall cooperate with PC-BOND in the exercise or maintenance of such rights and registrations and shall take such actions and execute such instruments as PC-BOND may from time to time reasonably request.

(c)     Licensee shall use the following notice when any of the Indices and/or the Trade Marks is first referenced in any Informational Material:

> * [Insert applicable Index] is a trademark of [insert Trademark Owner from Exhibit D]. This mark has been sublicensed for use for certain purposes to Lehman Brothers by PC-BOND, a business unit of TSX Inc. [The Product] is not sponsored, endorsed, sold or promoted by [Insert Trademark Owner], PC-BOND, its affiliates (including TSX Group Inc.) or third party data suppliers. [Insert Trademark Owner], PC-BOND, its affiliates (including TSX Group Inc) and third party data suppliers make no representation, warranty, or condition regarding the advisability of investing in the [Product].

or such similar language as may be approved in advance or required by PC-BOND, it being understood that such notice need only refer to the specific Trade Marks and/or Indices referred to in the Informational Material. For greater certainty, when referring to the Indices and/or Trade Marks more than one time in any Informational Material, the above notice will only need to appear once in the Informational Material so long as such notice is clearly linked to the applicable Indices and/or Trade Marks, either as a footnote at the bottom of the applicable page or at the end of the document.

(d)     The provisions of this Section shall survive any termination of this Agreement.

14. **Proprietary Rights**

(a)     Licensee acknowledges that the Indices are selected, coordinated, arranged and prepared by PC-BOND through the application of methods and standards of judgment used and developed through the expenditure of considerable work, time and money by PC-BOND. Licensee acknowledges that the Indices and the Trade Marks are the exclusive property of PC-BOND or the Third Parties, as applicable, and that PC-BOND and the Third Parties, as applicable, have and retain all proprietary rights therein (including, but not limited to, trademarks and copyrights) and that the Indices and their compilation and composition and changes therein are in the control and discretion of PC-BOND or its designates.

(b)     PC-BOND reserves all rights with respect to the Indices except those expressly licensed to Licensee hereunder. Licensee acknowledges that the index methodologies for the Indices are the exclusive property of PC-BOND and no

rights to use or reproduce the index methodologies are granted herein except the limited right to refer to the applicable PC-BOND website where the methodologies are posted in disclosures about the Products which are required under applicable law. Licensee agrees that it will take such security measures as are reasonably necessary to prevent any unauthorized use of the information provided to it concerning the selection, co-ordination, arrangement and preparation of the Indices.

(c)     Each party shall treat as confidential and shall not disclose or transmit to any third party any documentation or other written materials provided by the other party that are marked as "Confidential and Proprietary" by the providing party (collectively, **"Confidential Information"**). Confidential Information shall not include (i) any information that is available to the public or to the receiving party hereunder from sources other than the providing party (provided that such source is not subject to a confidentiality agreement with regard to such information) or (ii) any information that is independently developed by the receiving party without use of or reference to information from the providing party. Notwithstanding the foregoing, either party may reveal Confidential Information to any regulatory agency or court of competent jurisdiction if such information to be disclosed is (a) approved in writing by the providing party for disclosure or (b) required by law, regulatory agency or court order to be disclosed by a party, provided, if permitted by law, that prior written notice of such required disclosure is given to the providing party and provided further that the party making such disclosure shall cooperate with the providing party to limit the extent of such disclosure. The parties agree that the terms and conditions of this Agreement are confidential.

(d)     The provisions of this Section shall survive any termination of this Agreement.

15.    **Warranties; Disclaimers**

(a)     PC-BOND represents and warrants that PC-BOND has the right to grant the rights granted to Licensee herein and that to the actual knowledge of PC-BOND, subject to the terms and conditions of this Agreement, the licenses granted herein by PC-BOND with respect to the Trade Marks have not infringed any trademark in the Territory of any person not a party to this Agreement, nor is there a valid basis for such claim, and to the actual knowledge of PC-BOND, the licenses granted herein by PC-BOND with respect to the Indices do not infringe any copyright in the Territory of any person not a party to this Agreement.  For purposes of this provision, "actual knowledge" shall mean the current personal knowledge of those persons responsible for the licensing, protection and/or defence of the Trade Marks and copyrights at PC-BOND, without any implication of a duty to perform due diligence on the subject.

(b)     Licensee acknowledges and expressly agrees to be bound itself by the following disclaimers and limitations and furthermore to include all of the following disclaimers and limitations in each prospectus and registration statement or other similar or analogous document(s) and in any contract(s) relating to the Product(s) and upon request to furnish a copy (copies) thereof to PC-BOND:

9

"The [Product(s)] are not sponsored, endorsed, sold or promoted by [insert applicable Trademark Owner from Exhibit D], PC-Bond, a business unit of TSX Inc.), its affiliates (including TSX Group Inc.) or third party data suppliers (collectively, **"PC-Bond Group"**). The PC-Bond Group makes no representation, condition or warranty, express or implied, to the owners of the [Product(s)] or any member of the public regarding the advisability of investing in securities generally or in the [Product(s)] particularly or the ability of the [Indices] to track general bond market performance or any other economic factors. PC-Bond's relationship to [Licensee] is the licensing (or sublicensing) of certain trademarks and the licensing of the [Indices], which are determined, composed and calculated by PC-Bond without regard to [Licensee] or the [Product(s)]. PC-Bond has no obligation to take the needs of [Licensee] or the owners of the [Product(s)] into consideration in determining, composing or calculating the [Indices]. PC-Bond is not responsible for and has not participated in the determination of the timing of, prices at, or quantities of the [Product(s)] to be issued or in the determination or calculation of the equation by which the [Product(s)] are to be converted into cash. PC-Bond has no obligation or liability in connection with the administration, marketing or trading of the [Product(s)].

PC-Bond Group does not guarantee the accuracy and/or the completeness of the [Indices] or any data included therein or any other data provided by the PC-Bond Group and PC-Bond Group shall have no liability for any interruptions, delays, errors or omissions therein. PC-Bond Group makes no warranty, condition or representation, express or implied, as to results to be obtained by [Licensee], owners of the [Product(s)], or any other person or entity from the use of the [Indices] or any data included therein or any other data provided by the PC-Bond Group. PC-Bond Group makes no express or implied warranties, representations or conditions, and expressly disclaims all warranties or conditions of merchantability, merchantable quality or fitness for a particular purpose or use and any other express or implied warranty or condition with respect to the [Indices] or any data included therein or any other data provided by the PC-Bond Group. Without limiting any of the foregoing, in no event shall PC-Bond Group have any liability for any special, punitive, indirect or consequential damages (including lost profits), even if notified of the possibility of such damages."

Any changes in the foregoing disclaimers and limitations to be included in a prospectus and registration statement or other similar or analogous document(s) and in any contract(s) relating to the Product(s) must be approved by an authorized officer of PC-BOND. PC-Bond may require changes to the foregoing disclaimers and limitations from time to time, upon written notice to the Licensee.

(c)    Each party represents and warrants to the other that it has the authority to enter into this Agreement according to its terms and that its performance does not violate any laws, regulations or agreements applicable to it.

(d)    Licensee represents, warrants and covenants to PC-BOND that the Product(s) do now and will at all times comply with the descriptions in Exhibit B and shall not violate any of the restrictions set forth therein.

(e)     Licensee represents, warrants and covenants to PC-BOND that the Product(s) do not now and will not violate any applicable law, including but not limited to banking, commodities and securities laws.

(f)     PC-BOND shall have no liability for lost profits or indirect, punitive, special, or consequential damages arising out of this Agreement, even if notified of the possibility of such damages. Without diminishing the disclaimers and other limitations set out in the Agreement, PC-BOND's entire cumulative liability to Licensee shall be limited to direct damages suffered by the Licensee in an amount not to exceed the License Fees paid by the Licensee during the twelve month period immediately preceding the event giving rise to the liability.

(g)     Use of any marks by Licensee in connection with the Product(s) (including in the name of such Product(s)) which are not the Trade Marks is at Licensee's sole risk.

(h)     The provisions of this Section shall survive any termination of this Agreement.

16.    **Indemnification**

(a)     Licensee shall defend, indemnify and hold harmless PC-BOND, its affiliates and its and their officers, directors, employees and agents against any and all judgments, damages, costs or losses of any kind (including reasonable legal and experts' fees) as a result of any claim, action, proceeding, that arises out of or relates to: (i) this Agreement, except to the extent caused by a breach by PC-BOND, as applicable, of its representations and warranties hereunder, or (ii) the Product(s); provided however, that PC-BOND notifies Licensee promptly of any such claim, action or proceeding. PC-BOND, if it so requests, and/or Third Parties, if applicable, shall have the right, at its own expense, to participate with the Licensee in the defense of any claim, action, proceeding against which it is indemnified hereunder. Licensee, in the defense of any such claim, action or proceeding, except with the written consent of PC-BOND shall not consent to entry of any judgment or enter into any settlement which either (a) does not include, as an unconditional term, the grant by the claimant to PC-BOND of a release of all liabilities in respect of such claims or (b) otherwise adversely affects the rights of PC-BOND. For the purposes of this Section 16, the term PC-BOND shall refer to all indemnified parties under this paragraph collectively.

(b)     PC-BOND shall defend, indemnify and hold harmless Licensee, its affiliates and its and their officers, directors, employees and agents against any and all judgments, damages, costs or losses of any kind (including reasonable legal and experts' fees) as a result of any claim, action, or proceeding that arises out of or relates to any breach by PC-BOND of its representations or warranties under this Agreement (except to the extent caused by Licensee's breach of this Agreement or use of the Indices in a manner not permitted by this Agreement); provided, however, that: (i) Licensee notifies PC-BOND promptly of any such claim, action or proceeding; (ii) Licensee grants PC-BOND control of its defense and/or settlement; and (iii) Licensee cooperates with PC-BOND in the defense thereof. Licensee shall have the right, at its own expense, to participate in the defense of any claim, action or proceeding against which it is indemnified hereunder;

11

provided, however, it shall have no right to control the defense, consent to judgment, or agree to settle any such claim, action or proceeding without the written consent of PC-BOND without waiving the indemnity hereunder. PC-BOND, in the defense of any such claim, action or proceeding, except with the written consent of Licensee, shall not consent to entry of any judgment or enter into any settlement which either (a) does not include, as an unconditional term, the grant by the claimant to Licensee of a release of all liabilities in respect of such claims or (b) otherwise adversely affects the rights of Licensee. For the purposes of this Section 16, the term Licensee shall refer to all indemnified parties under this paragraph collectively.

(c)     If as a result of a third party claim for infringement, PC-Bond's ability to license or provide the Indices or Trade Marks or Licensee's ability to use the Indices or Trade Marks is, or in either party's reasonable opinion is likely to be enjoined then (x) PC-Bond may, at its sole option and expense, either (i) procure the right to continue to provide the Indices or Trade Marks or (ii) modify or replace the Indices or Trade Marks so that it is not infringing, or (y) either party may terminate this Agreement, whereupon PC-BOND shall promptly refund the Licensee any License Fees paid in advance in respect of periods that follow termination. The remedies set forth in Section 16 (c) shall constitute the Licensee's sole and exclusive remedy with respect to an infringement claim.

(d)     Licensee shall not commence any legal or administrative proceedings in connection with the Trade Marks and/or the Indices (other than as against PC-BOND) without PC-BOND's prior written consent. As between the parties, only PC-BOND may in its absolute discretion, and at its cost, either in its name, or in the name of the Licensee, or in both names, take such action or proceedings as PC-BOND may deem necessary or desirable, at law or in equity or otherwise, in Canada or elsewhere relating to the Trade Marks and/or Indices.

(e)     Licensee may not bring an action, regardless of form, arising out of or related to this Agreement more than twelve (12) months after the cause of action has arisen or the date of discovery of such cause, whichever is later.

(f)     The indemnification provisions are solely for the benefit of PC-Bond and Licensee and are not intended to, and do not create, any rights or causes of actions on behalf of any third party.

(g)     The provisions of this Section shall survive any termination of this Agreement

17.     **Suspension of Performance**

Neither PC-BOND nor Licensee shall bear responsibility or liability for any losses arising out of any delay in or interruptions of their respective performance of their obligations under this Agreement due to any act of God, act of governmental authority, act of the public enemy or due to war, the outbreak or escalation of hostilities, riot, fire, flood, civil commotion, insurrection, labour difficulty (including, without limitation, any strike, or other work stoppage or slow down), severe or adverse weather conditions,

12

communications line failure, or other similar cause beyond the reasonable control of the party so affected.

18. **Other Matters**

(a) This Agreement shall not be assigned or transferred by Licensee, without the prior written consent of PC-BOND, and any attempt to so assign or transfer this Agreement without such written consent shall be null and void. PC-BOND may assign this Agreement without Licensee's consent. In the event that PC-BOND assigns this Agreement, any required notices in Sections 2(c), 13(c) and 15(b) that refer to PC-BOND shall be amended to reference the assignee (as applicable) effective on the date Licensee receives notice of such assignment and in accordance with any written instructions of PC-Bond.

(b) This Agreement will be binding upon and inure to the benefit of the successors and permitted assigns of the parties.

(c) This Agreement, together with the attached Exhibits and the Data License Agreement, constitutes the entire agreement of the parties hereto with respect to its subject matter and may be amended or modified only by a writing signed by duly authorized officers of each party. This Agreement supersedes all previous Agreements among the parties with respect to the subject matter of this Agreement. Any representations, inducements, promises, agreements, understandings, commitments, conditions or warranties of any kind, whether direct, indirect, collateral, express or implied, oral or written, alleged by either party that are not contained in this Agreement will not be enforceable.

(d) No breach, default, or threatened breach of this Agreement by any party shall relieve the other party of its obligations or liabilities under this Agreement with respect to the protection of the property or proprietary nature of any property which is the subject of this Agreement.

(e) Except as set forth in Section 12 hereof with respect to Informational Materials, all notices and other communications under this Agreement shall be (i) in writing, (ii) delivered by hand, by registered or certified mail, return receipt requested, or by facsimile transmission, to the address or facsimile number set forth below or such address or facsimile number as each party shall specify by a written notice to the others and (iii) deemed given upon receipt.

Notice to PC-BOND
TSX Inc.
Lisa McAllister, Compliance & Contract Manager, PC Bonds & Indices
The Exchange Tower
130 King Street West
Toronto, Ontario, M5X 1J2
Fax: 416.947.4708
Email: pcbond@tsx.com

13

Notice to Licensee:        Lehman Brothers Special Financing Inc.
                           745 Seventh Avenue – 3rd Floor
                           New York, NY 10019
                           Attention: Lingfeng Song
                           Fax: [   ]
                           Email: Fundderivativesny@lehman.com

(f)    This Agreement shall be interpreted, construed and enforced in accordance with
       the laws of the Province of Ontario, Canada and the laws of Canada in force in the
       Province of Ontario.

(g)    Each party agrees that in connection with any legal action or proceeding arising
       with respect to this Agreement, they will bring such action or proceeding in the
       Courts of Ontario or in any Federal Court in Canada in each case situated in
       Toronto, Ontario, and each party agrees to submit to the jurisdiction of such court
       and venue in such court and to waive any claim that such court is an inconvenient
       forum.

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the
date first set forth below.

**PC-Bond, a business unit of TSX Inc.**

By: _____

Name: MICHAEL MCCREA

Title: SENIOR MANAGER TSX INC.

Date:

FEB 0 5 2008

**[Lehman Brothers]**

By: _____

Name:  Anatoly Kozlov
       Authorized Signatory
Title:  Lehman Brothers Special Financing Inc.

Date: 2/5/08

14

**EXHIBIT A**
**INDICES**

The following Indices are licensed in this Agreement:

- **DEX Long Term Bond Index**

**EXHIBIT B**
**PRODUCT(S) DESCRIPTION**

Product Description: OTC SWAP Transaction JPMorgan Alpha Strategy, Ltd., on behalf of its class Q (DEXLTB) CAD shares with an Effective Date of January 1, 2008 (the "Primary Swap") and the OTC SWAP Transaction with Scotia Capital Inc. based on the DEX Long Term Bond Index, which is the hedge for the Primary SWAP (the "Hedge Swap").

Term: 1 year, commencing January 1 2008

Notional: $7 Million CAD

1

**EXHIBIT C**
**LICENCE FEES**

Licensee shall pay PC-BOND Licence Fees computed as follows:

- Annual license fee of 4bps per Notional amount on the Product of $7 Million for an annual license fee of $2,800 US Funds

- Licensee will promptly notify PC-Bond of any increase in the Notional amount on the Product and PC-Bond shall adjust any applicable fees accordingly

The parties agree that the terms upon which Licence Fees are calculated pursuant to this Exhibit C shall be considered "Confidential Information" for purposes of Subsection 14(c) of this Agreement.

The above Licence Fees shall be non-refundable and payable in Canadian dollars. License Fees will be payable annually in advance within 30 days of receipt of the invoice. The Licensee agrees that the obligation to pay any unpaid License Fees will survive the termination of this Agreement.

1

### EXHIBIT D
### TRADE MARKS

| Third Party Trade-marks | Services | Owner |
|---|---|---|
| | | |

| PC-BOND Trade Marks | Services | Owner |
|---|---|---|
| DEX Long Term Bond Index | | TSX Inc. |

2

**EXHIBIT E**
**QUALITY CONTROL**

1.    **Control by PC-BOND and/or the Third Parties of Representation of Trade Marks:**

PC-BOND and/or the Third Parties will from time to time issue reasonable instructions to Licensee as to the form, manner and scope of the use of the Trade Marks, including but not limited to the design and colour of the Trade Marks, as permitted by this Agreement and Licensee shall comply with such instructions.

2.    **Control of Quality of Services in Association with the Trade Marks:**

PC-BOND and/or Third Parties will from time to time issue reasonable instructions to Licensee applicable standards of quality for the Products and the performance of the Services;

(a)    subject to any overriding requirements of the laws from time to time, Licensee shall perform the Services only in accordance with PC-BOND and/or Third Parties' applicable instructions and standards; and

(b)    during the ordinary business hours of any place of business of Licensee, a representative or representatives designated by PC-BOND and/or Third Parties shall have the right to inspect and evaluate Licensee's Products and performance of the Services at such place of business with reasonable prior notice and during normal business hours, in order to ensure that PC-BOND and/or Third Parties' applicable standards of quality for the Products and performance of the Services are being maintained by Licensee, and Licensee and its employees shall make readily available to PC-BOND and/or Third Parties' representative(s) any and all information required by PC-BOND and/or Third Parties' representative(s) to make such inspection and evaluation.

Upon notice or other discovery of any misuse of the Trade Marks or non-conformance with the requirements or prohibitions of this section, Licensee shall promptly remedy such non-conformance and notify PC-BOND of the remedial steps taken.

3

Statement of Services

This is the Statement of Services to the Agreement for receipt and use of PC–Bond®
Products and/or Data dated:

FEB 0 5 2008

Between PC–Bond, a business unit of TSX Inc. ("PC–Bond") and

Lehman Brothers ("Lehman")

Name of Subscriber (Company Name)

Installation Address (Location at which Products and Data will be received)

745 7th Avenue 3rd Floor

Street Address (PO Box Numbers Not Accepted)

New York City, NY 10019 USA

City                State                Postal Code                Country

Billing Address (if different from Installation Address)

Street Address (PO Box Numbers Not Accepted)

City                State                Postal Code                Country

Contact Name        Phone Number        Fax Number                 Email Address

1 of 5

1. Subscriber Contact Information

Please provide contact information for one main contact regarding the Agreement *(Applications will not be processed without full information for main contact).*

Main ☒          Technical ☐          Reporting ☐          Other ☐

| Claudio F. | Robertson | Fund Derivatives Trading |
|---|---|---|
| First Name | Last Name | Title |

| 745 7th Avenue 3rd Floor | | | |
|---|---|---|---|
| Street Address | | | |

| New York | NY | 10019 | USA |
|---|---|---|---|
| City | State/Prov | Postal Code | Country |

| 212.526.6602 | | clrobert@lehman.com |
|---|---|---|
| Phone # | Fax # | Email |

2. System Subscription:

All subscriptions of the PC–BondManager™ Data Suite System and ScotiaBond® Analytical System require the Subscriber to execute the Terms and Conditions for PC–Bond® Products, attached as Schedule A together with this Statement of Services.*

PC–BondManager Data Suite System

For each License of the PC–BondManager Data Suite System, the term User means each concurrent use of the PC–BondManager Data Suite System by a person employed by the Subscriber on one local area network installed at the address listed above. The PC–BondManager Data Suite System cannot be installed on more than one local area network.

Underlined heading: **End User Network Version**

☐ License 1 User
☐ License 2 Users
☐ License 3–5 Users
☐ License 6–8 Users
☐ License 9–10 Users
☐ License 11–12 Users
☐ License 13–14 Users
☐ License 15–16 Users

**End User Network Version including Index Component**

☐ License 1 User
☐ License 2 Users
☐ License 3–5 Users
☐ License 6–8 Users
☐ License 9–10 Users
☐ License 11–12 Users
☐ License 13–14 Users
☐ License 15–16 Users

**Dealer Network Version, including Index Component**

☐ License Dealer 5 Users
☐ License Dealer 10 Users

| Applicable Fee in CANADIAN Dollars (annual): |
|---|

| Initial term: |
|---|

| Start/End dates for initial term: |
|---|

* The following trademarks, referenced in this Agreement, are owned by PC–Bond: PC–Bond, PCBondManager, Bondman, Bondcalc, and Bonddata. ScotiaBond and Scotia Capital are registered trademarks of The Bank of Nova Scotia. Used under License.

ScotiaBond Analytical System

For each license of the ScotiaBond Analytical System, the term User means each use of the ScotiaBond Analytical System by a person employed by the Subscriber on one personal computer of the Subscriber, at the address listed above. The ScotiaBond Analytical System cannot be installed on a local area network.

End User Version

☐   License 1 User
☐   License 2 Users
☐   License 3 Users
☐   License 4 Users
☐   License 5 Users
☐   License 6 Users
☐   License 7 Users

| Applicable Fee in CANADIAN Dollars (annual): |
|---|

| Initial term: |
|---|

| Start/End dates for initial term: |
|---|

---

3. Data Subscription

All subscriptions of the FastQuote Data, Curves Data, the Index Data and any other custom data require the Subscriber to execute the Terms and Conditions for PC-Bond Data, attached as Schedule B, together with this Statement of Services.

| FastQuote Database (end of day files via ftp) | Curves Database (month end files via email) |
|---|---|
| ☐   smiquote.prn | ☐   Canada Yield Curve |
| ☐   scmhpdom.prn | ☐   Canada Coupon Curve |
| ☐   fqmbs.prn, fqmbsf.prn | ☐   AA Corporate Yield Curve |
| ☐   fqcoupon.prn | ☐   A Corporate Yield Curve |
| ☐   fqmmkt.prn | ☐   AA Corporate Coupon Curve |
| ☐   fqfrn.prn | |
| ☐   fqfactor.prn | |

| Applicable Fee in CANADIAN Dollars (annual): |
|---|

| Initial term: |
|---|

| Start/End dates for initial term: |
|---|

Index Data Database

Constituent File Name (end of day via ftp)     Summary File Name (end of day via ftp)

☐   _____     ☐   _____
☐   _____     ☐   _____

☐   Additional Terms & Conditions

3 of 5

Type of Data / Use:

☐    External Platform (1 only)

Platform Name / Function:

☐    External Platform Enterprise

Platform Names / Functions:

Applicable Fee in CANADIAN Dollars (annual):

Initial term:

Start/End dates for initial term:

Other/Custom Data

Service Name

☒    Custom Index Data File

☐    _____

Service Description: Custom index file containing the Total Return value for the DEX Long Term Overall Bond Index

☒    Additional Terms & Conditions

Type of Data / Use: License for Data (Schedule B) is directly linked to the Index License Agreement with PC-Bond dated the date hereof (the "Index License Agreement"). Termination of the Index License Agreement will automatically terminate Schedule B and this Statement of Services.

☐    History

Type of Data / Use:

Applicable Fee in CANADIAN Dollars (annual):        0$ (based on fees paid as part of the Index License Agreement)

Applicable Fee in CANADIAN Dollars (history):

Initial term:  1 Years

Start/End dates for initial term: January 1, 2008 to December 31, 2008

3. Service Description

PC-BondManager Data Suite System

4 of 5

Programs:
1. PC-BondManager Analytical Programs which include Bondman™, Bondcalc™ and Bonddata™
2. The Database Access Programs
3. The Index Comparison Module

Data and Associated Documentation:
4. The Subscriber Guide and associated documentation, as well as ongoing support and training by our marketing and technical staff
5. The Fixed Income Database

### ScotiaBond Analytical System

Programs:
1. Scotiabond Manager Analytical Programs
2. The Database Access Programs

Data and Associated Documentation:
3. The Subscriber Guide and associated documentation, as well as ongoing support and training by our marketing and technical staff
4. The Fixed Income Database

### FastQuote Data
End of day pricing files available via ftp between 4:30-5:30 PM EST

### Curves Data
Files available within three (3) business days following month end via email in Excel

### Index Data
End of day pricing files available via ftp between 4:45-6:30 PM EST

The delivery times for FastQuote, Curves and Index Data are on a commercially reasonable efforts basis and failure to deliver these files during the above quoted time periods does not constitute a breach of this Agreement. If any such files are not delivered during the above quoted time periods, PC-BOND will notify the Subscriber and will endeavor to deliver the files as soon as reasonably possible. Delivery of the files when available shall constitute Subscriber's sole and exclusive remedy for any failure to deliver files on time. Both FastQuote and Index Data files remain available for ftp retrieval until 12 noon the following business day.

For general questions regarding procedures, policies, pricing, etc., please contact PC-Bond Distributor Services at pcbond@tsx.com or phone 416-947-4772.

| Subscriber Signature: | | |
|---|---|---|
| Date Completed: 2/5/08 | Name: Anatoly Kozlov | Title: Authorized Signatory |
| PC-Bond Signature: | | |
| Date Completed: FEB 0 5 2008 | Name: Michael McCrea | Title: Manager, TSX Group Inc. |

## Schedule B
## Terms and Conditions for PC-Bond Data

These Terms and Conditions, the attached Statement of Services and the attached End-Use Restrictions Addendum (Schedule C) constitute the agreement (**"Agreement"**) between PC-BOND, a business unit of TSX Inc. (**"PC-BOND"**) and the Subscriber, as described in the Statement of Services, to permit Subscriber to receive certain PC-BOND data products. This Agreement also sets forth the process under which the Subscriber may purchase additional data products from time to time by executing additional Statements of Services.

1.    **Description of the Data**

The following are the terms and conditions upon which the data specified in the Statement of Services (the data, any portion thereof and any copy, modification or merged portion thereof is hereinafter referred to as the **"Data"**) is provided to the Subscriber at the location specified in the Statement of Services.

2.    **Delivery**

PC-BOND shall make the Data available to the Subscriber, via ftp or any other electric delivery method selected by PC-BOND in its sole discretion, on a Toronto business day basis.

3.    **Rights and Permitted Use of Data**

The Subscriber agrees that the Data which it is receiving under this Agreement and which is contained in the database specified in the Statement of Services (the **"Database"**) shall be used solely by the Subscriber's employees for Subscriber's internal use, as set out in this Section. Any use of the Data not approved by PC-BOND and not described in this Section is prohibited.

The Subscriber may and is specifically authorized to, and is restricted to the following:

1.    use the Data to update the Subscriber's local, internally maintained and built data warehouse facility;

2.    use price and yield information from the Data only, for securities held in the Subscriber's portfolios, in the Subscriber's locally maintained accounting platform for products held by and/or managed by the Subscriber;

3.    report summary level information only (non-constituent based Data) contained in reports generated using the Data via the Subscriber's local reporting facility, in marketing, sales and research materials that are distributed to the Subscriber's clients only, in non-machine readable format, provided that: (i) Subscriber agrees and acknowledges that Subscriber shall assume full liability for any such distribution of the Data; (ii) the Data represents a minor amount of the data contained in the applicable Database; (iii) the distribution of the Data does not serve as a substitute for any such client obtaining a license from PC-BOND; (iv) external presentation of the Data by the Subscriber is not made to a Competitor or any other restricted party, as defined in and subject to the attached End Use Restrictions Addendum; and (v) the Subscriber's clients will not have direct access to any PC-BOND raw data, including without limitation constituent based data; and

4.    electronically transfer the Data for Subscriber's use, for internal purposes in accordance with this Section, in an external third party system, but only if such right is explicitly provided to Subscriber under the applicable Statement of Services. If any external third

1

*CON 000 0000 29584*
*~In other attachments.*

## CANADIAN EXCHANGE GROUP
## MARKET DATA DISTRIBUTION AGREEMENT

This agreement dated as of the __23__ day of __June__ 20 __08__

between the **CANADIAN EXCHANGE GROUP**
(hereinafter called "CEG")
and

*Lehman Brothers Holdings Inc.* (hereinafter called "Distributor").

Distributor Name: __Lehman Brothers Holdings Inc.__

Distributor Address: __Hiranandani Business Park__   __10th Floor__
Winchester Building
                    Street                                    Suite

__MUMBAI__                              __Maharashtra__
City                                   State\Province

__India__                               __400076__
Country                                Zip/Postal Code

__011-91-223053-2/61__
Telephone Number                       Facsimile Number

1

# PART I - DEFINITIONS

1. **DEFINITIONS**

(a) "Canadian Exchange Group" or "CEG" shall mean TSX Inc. ("TSX") and TSX Venture Exchange Inc. ("TSX Venture"). TSX Venture has appointed TSX as agent for the purposes of entering into this and other agreements necessary for provision of Market Data to Distributor on its and their behalf, and to establish the terms and conditions under which Market Data is to be  made available to Distributor.  For the purposes of this Agreement, "Canadian Exchange Group" or "CEG" shall refer to the exchanges comprising the Canadian Exchange Group  jointly and severally.

(b) "Delayed Market Data" shall mean Market Data that has been delayed by a Distributor at least fifteen (15) minutes from the time of dissemination by CEG.

(c) "Distributor" shall include those Persons who furnish Receipt of Market Data by any means to any Person and who have executed a Distribution Agreement which has been approved by CEG and which has not been terminated by any of the parties hereto.

(d) "Distributor Affiliate" shall include those Persons identified in "Exhibit A" by Distributor, who are in a control relationship with Distributor, as determined by CEG in its sole discretion, or agents or licensees of Distributor's services, and to whom Distributor furnishes Receipt of Market Data.

(e) "Exhibit A" shall mean an attachment to this Agreement, which shall form an integral part  hereof, and which  may be amended from time to time as provided herein, which describes Distributor's system for furnishing Receipt of Market Data including  the methods of receipt, retrieval, processing and supply of Market Data by Distributor to any Person.

(f) "Exhibit B" shall mean an attachment to this Agreement, which shall form an integral part  hereof, and which  may be amended from time to time as provided herein, describing the records and other information required by CEG to be maintained by Distributor for audit and administration purposes of this Agreement.

(g) "Interrogation Device" shall mean any device that displays (or is capable of displaying) Real-Time Market Data in any visible, audible, or other comprehensible form, to any person at any  time during the month.

(h) "Market Data" shall mean a bundled transmission of electronic signals emanating from the exchanges comprising CEG and containing trading information with respect to securities traded on the exchanges comprising CEG.

(i) "Person" includes any natural person or proprietorship or any corporation, partnership or other organization.

(j) "Real-Time Market Data" shall mean Market Data from the time of dissemination by CEG to the time fifteen (15) minutes after such dissemination.

(k) "Receipt of Market Data" shall mean the physical capability, whether used or not, of successfully receiving or retrieving Market Data.

(l) "Subscriber" shall include those Persons who are not Distributors and who have executed either an Application Agreement for Receipt of Canadian Exchange Group Market Data or, a Non-Professional Application Agreement for Receipt of Canadian Exchange Group Market Data which have been approved by CEG and which has not been terminated by any of the parties hereto.

## PART II - MARKET DATA ACCESS AND USE

**2.    PROPRIETARY INTEREST OF CEG**

    Distributor understands and acknowledges, and shall ensure that any other Distributor and Subscriber in Receipt of Market Data from Distributor understands and acknowledges, that CEG has a proprietary interest in the Market Data that originates on CEG markets and that same is not within the public domain. Any Market Data provided to Distributor by CEG pursuant to this Agreement, which has been derived from databases owned by CEG, is copyrighted and as such Distributor's use of such Market Data is subject to the limitations set out in this Agreement.

**3.    SYSTEM INTERFACE**

(a)    If Distributor is in Receipt of Market Data directly from CEG, Distributor shall be responsible for (i) obtaining the requisite quantity of common carrier communication lines, (ii) the reliability and continued availability of such communication lines, and (iii) interfacing with the CEG's facilities at such places as may be designated from time to time by CEG. Distributor will meet any reasonable requirement of CEG concerning the location of the interface or interfaces to permit Receipt of Market Data.

(b)    If Distributor is in Receipt of Market Data from a third party, then Distributor and such third party are responsible for all communication facilities and obligations or contracts. [...] to receive the Market Data [...]. Further, Distributor acknowledges and agrees that CEG is not responsible for, and makes no representation or warranties regarding, any services Distributor obtains from a third party.

(c)    If the interface with CEG's facilities described in subsection 3(a) enables Distributor to receive information other than Market Data, CEG shall so notify Distributor, and Distributor shall not furnish or permit to be furnished such other information to any other Distributor or Subscriber without the prior approval of CEG.

**4.    CONFIGURATION**

    Distributor acknowledges and agrees that nothing in this Agreement shall be deemed to constitute an undertaking by CEG to continue to disseminate the Market Data in the present form or configuration or to continue to use existing communications facilities. CEG, in its sole discretion, may from time to time make modifications to the Market Data and CEG facilities, including the interface and operational requirements, irrespective of whether such modifications would require changes to be made by Distributor. CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the speed, code, format, operating hours, or any other material changes in the operational requirements, unless a malfunction in the system necessitates modifications on an accelerated basis or an emergency situation precludes such advance notice. Distributor shall bear the responsibility of making concurrent modifications to its service.

**5.    NON-EXCLUSIVE BASIS**

    CEG agrees to provide Receipt of Market Data to Distributor on a non-exclusive basis. CEG reserves the right, without any notice or liability to Distributor or to any other Person, to provide Receipt of Market Data or any other information, or to contract with any other Person to provide Receipt of Market Data or any other information to any Person by any means whatsoever, including devices or equipment designed or manufactured by CEG or any other Person.

**6.    DATA NOT GUARANTEED**

(A)    NO WARRANTIES - THE DISTRIBUTOR AGREES THAT CEG MAKES NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE MARKET DATA, ITS TRANSMISSION, TIMELINESS, ACCURACY OR COMPLETENESS, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, QUALITY AND FITNESS FOR A PARTICULAR PURPOSE AND, THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM THE COURSE OF DEALING OR USAGE OF TRADE.

(B)      NO GUARANTY - CEG does not guarantee the timeliness, sequence, accuracy or completeness of Market Data, or other information or messages, disseminated by CEG.  CEG will not be liable in any way to Distributor or to any other Person for:

(a)      any inaccuracy, error or delay in, or omission of (i) any such Market Data, or other information or messages, or (ii) the transmission or delivery of any such Market Data, or other information or messages, or

(b)      any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, or (ii) non-performance, or (iii) interruption in any such Market Data, or other information or messages, due either to any negligent act or omission by CEG, "force majeure" or any other cause.

7.      CEG WARRANTY

(a)  CEG represents, warrants and covenants that it is the exclusive owner of Market Data and of all intellectual and proprietary rights in Market Data and has full power and authority to grant the rights granted in this Agreement without the consent of any other party.  CEG shall indemnify and hold Subscriber or Distributor, their officers, directors, employees and agents, harmless from and against any loss, costs, liability and expense including reasonable legal fees, arising out of any breach or claimed breach of this representation, warranty and covenant.

(b)  CEG represents, warrants and covenants that Market Data and the use of Market Data as permitted by this Agreement does not and will not infringe upon or violate the proprietary rights of any third party which proprietary rights include, without limitation, patents, copyrights, trademarks and trade secrets.

(c)  CEG shall indemnify, and hold harmless and defend, Distributor and its Subscribers or, Distributors in Receipt of Market Data from Distributor, their officers, directors, employees and agents, against any loss, cost, liability and expense, including reasonable legal fees, for infringement of any proprietary rights of any third party.  CEG shall, at its own expense, defend or settle any claim or proceeding brought against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor by any third party alleging that Market Data or the use of Market Data as permitted by this Agreement, constitutes an infringement of any proprietary right, provided that CEG is notified promptly in writing of such claim and is given the opportunity to have sole control for the defence of any action on such claim and all negotiation for its settlement.  CEG shall pay all damages and costs finally awarded against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor in such action or proceedings, and shall pay reasonable legal fees of Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor, but shall not be responsible for any costs, expenses, or compromises incurred or made by Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor without CEG's prior written consent.

8.      AUTHORIZED USE

(a)  Distributor and Distributor Affiliates are authorized by this Agreement to receive, process, transmit and use the Market Data only as approved by CEG and described in Exhibit A.  Any use of the Market Data not described in Exhibit A and, not approved by CEG is prohibited.  Subscribers and Distributors in Receipt of Market Data from Distributor, are authorized to receive and use the Market Data only as set forth in the applicable agreement.

(b)  Any proposed use of the Market Data (including, but not limited to, developing or communicating derivative information based upon the Market Data, re-transmission, re-distribution, reproduction or calculation of indices, etc.) shall require the prior approval of CEG.  Any such proposed use shall be submitted to CEG in the form of a draft amendment to Exhibit A.  CEG shall promptly and in good faith approve or disapprove any such proposed use by Distributor.  Distributor acknowledges and agrees that it acts at its own risk in developing any modification to its service prior to receiving approval from CEG, since CEG is not obligated by this Agreement to grant such approval.

(c)  Distributor agrees not to alter the Market Data in any manner that adversely affects its accuracy or integrity or that renders it misleading.

(d)  Distributor may furnish Delayed Market Data in the manner specified in Exhibit A and shall comply with any requirements that CEG and Distributor agree to from time to time as to Persons receiving Delayed Market Data.

4

**9.   DISTRIBUTOR INTERROGATION DEVICES**

Distributor shall be entitled to use certain Interrogation Devices located on its premises, without charge, for advertisement, demonstration, product development, and customer service. Distributor's use of such Interrogation Devices and the number thereof shall be subject to all provisions of the Agreement including, without limitation, CEG approval, monthly reporting and audit by CEG.

**10.   ACCESS TO DISTRIBUTOR INTERROGATION DEVICES**

(a)  In lieu of assessing monthly charges upon Interrogation Devices utilized by Distributor for the purposes described in Section 9, at CEG's request, Distributor agrees to provide to CEG (at CEG's premises) up to two Interrogation Devices, or otherwise furnish access to the Distributor's service to CEG by means acceptable to CEG to be used by CEG to monitor Distributor's compliance with the terms of this Agreement, and any other Agreements that may be entered into between CEG and Distributor.

(b)  Any such interrogation device(s) provided on a basis of third use pursuant to subsection (a) above shall be at no charge to use with the exception of fees payable to third parties for data provided through Distributor's service, which fees shall be paid by CEG.

**11.   DESCRIPTION OF DISTRIBUTOR'S SERVICE**

Distributor represents and warrants that the description of its service, and any data processing equipment, software and computer(s) used of its related thereto, and set forth in Exhibit A is true and complete and accurate.

**12.   OPERATION OF DISTRIBUTOR'S SERVICE**

Distributor shall assume sole responsibility for the design, development, acquisition, installation, testing, implementation, operation and maintenance of any and all software and equipment not directly supplied by CEG. Distributor represents and warrants that the design, development, acquisition, installation, testing, implementation, operation and maintenance of its service, and its system supporting the service, will not interfere with or adversely affect the Receipt of Market Data by any other Distributor or Subscriber.

**13.   TRANSMISSION TO OTHER DISTRIBUTORS**

Distributor shall not, by any means, furnish Receipt of Market Data to any Person, unless that Person is a Distributor, a Distributor Affiliate, or a Subscriber.

**14.   NO USE OF INFORMATION AFTER TERMINATION**

Upon termination of this Agreement for whatever reason, Distributor shall immediately cease any and all use of the Market Data.

## PART III - SYSTEM SECURITY

**15.    TRANSMISSION AND EQUIPMENT SECURITY**

(a)  Distributor shall assure that all service-related data processing, transmission and communications equipment and software are arranged and protected so that, so far as reasonably possible, no Person will obtain Receipt of Market Data who is not a Distributor, a Distributor Affiliate, or a Subscriber.

(b)  Distributor shall assure that the security provisions described in Exhibit A are enforced. If, in its sole discretion, CEG determines that one or more Persons have unauthorized access to Receipt of Market Data, Distributor shall, in accordance with subsection 15 (a), take all steps necessary to alter the security safeguards and the manner of furnishing Receipt of Market Data so as to preclude the unauthorized access. Distributor shall provide CEG with such evidence as CEG may request regarding the adequacy of those steps. If CEG determines, in its reasonable discretion, those steps to be inadequate, Distributor shall promptly comply with any reasonable writing instructing Distributor to discontinue furnishing Receipt of Market Data by improperly safeguarded account.

(c)  Distributor shall assure that any Person authorized in writing by CEG has access, at any reasonable time, to any premises of Distributor any Distributor Affiliate, any service facilitator or any Person to whom Distributor provides any kind of commodities, securities or other Market Data (whether under this Agreement or otherwise). In the presence of officials in charge of the premises, the authorized Person may (i) examine any component of the equipment and software used for the purposes of this Agreement and located at the premises and (ii) observe all operations located or conducted at the premises, but solely to monitor compliance with this Agreement. Any information obtained by CEG or its representatives in connection with such examination shall be kept in strictest confidence and will be used solely for the purposes of verifying Distributor's compliance with the terms of this Agreement.

**16.    RESPONSIBILITY FOR DISTRIBUTOR AFFILIATES**

Whenever CEG notifies Distributor in writing that it has determined that Distributor Affiliate has failed to act in accordance with, or in the manner specified in this Agreement, Distributor shall promptly cure the breach or rectify the failure.

**17.    CO-OPERATION AS TO UNAUTHORIZED RECEIPT**

(a)    Distributor shall assure that no unauthorized Person obtains Receipt of Market Data by use of equipment and software used for the delivery of the Market Data. For the purposes of this Agreement an unauthorized Person is one who is not a Distributor, a Distributor Affiliate, or a Subscriber. If an unauthorized Person is in Receipt of Market Data, Distributor shall use its best efforts to ascertain the source and manner of receipt, shall fully and promptly brief CEG, and shall promptly pay the applicable amounts described in subsection 18(a). Distributor shall otherwise co-operate and assist in any investigation relating to any unauthorized Receipt of Market Data.

(b)    CEG may sue or otherwise proceed against any unauthorized Person to prevent the unauthorized Person from obtaining, or from using, Market Data. If CEG institutes any such suit or other proceeding, Distributor, unless made a defendant in the suit or proceeding, shall assure that it and Distributor Affiliates (if any) co-operate with and assist CEG in the suit or proceeding in all reasonable respects, provided that CEG reimburses Distributor for reasonable out-of-pocket expenses.

(c)    If any Person brings a suit or other proceeding to enjoin Distributor, or any Distributor Affiliate from refusing to furnish Market Data to any unauthorized Person, Distributor shall promptly notify CEG. CEG may intervene in the suit or proceeding in the name of Distributor or the Distributor Affiliate, as appropriate, and, through counsel chosen by CEG, assume the defence of the action on behalf of Distributor or the Distributor Affiliate. CEG shall indemnify, hold harmless and defend Distributor against any loss, liability or expense (including reasonable attorneys' fees) that arises out of or results from the suit or proceeding.

(d)    If CEG notifies Distributor in writing that CEG has terminated the right of any Distributor in Receipt of Market Data from Distributor or Subscriber to be in Receipt of Market Data, Distributor  (i) shall cease furnishing Market Data to the

6

Distributor in Receipt of Market Data from Distributor or Subscriber within five business days of the notice and (ii) shall, within ten business days, confirm the cessation, and inform CEG of the cessation date, by notice to CEG.

(e)    If Distributor refuses to provide, or to continue to provide, Receipt of Market Data to any Person solely because CEG has notified Distributor in writing that CEG does not authorize, or no longer authorizes, the Person to be in Receipt of Market Data, CEG shall indemnify, hold harmless and defend Distributor from and against (i) any suit or other proceeding that arises from the refusal and (ii) any liability, loss, cost, damage or expense (including reasonable attorneys' fees) that Distributor incurs as a result of the suit or proceeding. CEG shall have sole control of the defence of any such suit or proceeding and of all the negotiations for its settlement or compromise. Distributor's prompt notice to CEG of any such suit or proceeding is a condition to Distributor's rights under subsection 17(e). These rights do not apply when Distributor ceases to furnish Receipt of Market Data to an unauthorized Person.

18.    PENALTIES FOR UNAUTHORIZED RECEIPT

(a)    In respect of any Receipt of Market Data by an unauthorized Person whose Data has been provided using Distributor's or Distributor Affiliate's facilities, Distributor shall pay to CEG any applicable charges, together with interest, that would have been imposed on Distributor or the unauthorized Person in respect of the Receipt of Market Data by the unauthorized Person provided that such unauthorized receipt has not occurred as the result of fraud or theft of the Market Data by the unauthorized Person. These charges shall include applicable interest at any and shall be retroactive to the date when the unauthorized Person was first in Receipt of Market Data.

(b)    CEG agrees that Distributor's liability pursuant to subsection 18(a) shall be limited to unpaid Subscriber fees and Distribution fees, together with interest, for months ended within the two (2) years preceding the date CEG first becomes aware that such under-reporting has occurred, if such under-reporting is solely the result of a good faith error by Distributor.

(c)    If Distributor has paid all amounts due in respect of any unauthorized Receipt of Market Data: (i) Distributor becomes subrogated to all rights of CEG and (ii) CEG will return to Distributor any amounts subsequently received from the unauthorized Person.

19.    **INDEMNIFICATION OF CEG**

(a)    Distributor shall indemnify CEG against, and hold CEG harmless from, any and all claims or losses imposed on, incurred by CEG as a result of or relating to:

(i)    any non-compliance by Distributor or Distributor Affiliate with the terms and conditions hereof;

(ii)    any non-compliance by a Subscriber or a Distributor in Receipt of Market Data from Distributor or Distributor Affiliate with the terms and conditions hereof or of their respective agreements with CEG, if Distributor has failed to notify CEG of such non-compliance within thirty (30) days after Distributor knows of such non-compliance;

(iii)    any assertion of claims or losses relating to the subject matter or existence of this Agreement against CEG made by a Person who is in Receipt of Market Data from Distributor (or any Person relying upon the Market Data received by such a Person) and who is not a Distributor, or a Distributor Affiliate, or a Subscriber;

(iv)    any defence of or participation by CEG in any action, suit, arbitration, or judicial or administrative proceeding involving any claims or losses described in subsection 19(a).

The indemnifications provided by this subsection 19(a) shall include, without limitation, CEG's investigative and administrative costs which result in the detection of any material non-compliance by Distributor referred to in clause (i)

above or any material non-compliance by Subscribers or Distributors in Receipt of Market Data from Distributor referred to in clause (ii) above, provided, however, that such costs are not excessive as compared to the injury CEG would suffer as a result of any such non-compliance.

(b)     The party claiming indemnification under this Agreement agrees to promptly notify (and, in the case of any action, suit, arbitration or judicial or administrative proceeding, shall so notify no later than fifteen (15) days after the party claiming indemnification has received notice thereof or has been served with a complaint or other process) the other party when it has knowledge of circumstances or the occurrence of any events which are likely to result in an indemnification obligation under this Agreement or when any action, suit, arbitration, or judicial or administrative proceeding is pending or threatened that is covered by this Agreement; and further agrees that, upon request and to the extent permitted by applicable law, the other party shall have the right to defend, settle, or compromise any such suit or proceeding, at the other party's expense, provided that: (i) the other party demonstrates to the satisfaction of the party claiming indemnification that it is financially able to defend such action and to pay any settlement or judgement; and (ii) counsel retained by the other party is reasonably satisfactory to the party claiming indemnification. The party claiming indemnification agrees to cooperate with the other party in the defense of any such suit or proceeding and not the other party agrees to reimburse the party claiming indemnification for its expenses with respect thereto. Failure by the party claiming indemnification to promptly notify the other party as required by subsection 19(b) shall not invalidate the claim for indemnification, unless such failure has a material adverse effect on the actions or defense or compromise of the matter that is the subject of the claim for indemnification. In addition, the party claiming indemnification shall be responsible for any claims or losses which could have been avoided or mitigated by prompt notice as required by subsection 19(b).

(c)     Notwithstanding any provisions in this Agreement to the contrary, the obligations set out in this Section 19, shall continue in force for two (2) years following the completion of performance or any termination of this Agreement.

## PART IV - PAYMENTS, RECORDS AND REPORTS

**20.    PAYMENTS**

(a) Distributor shall pay CEG the applicable charge(s) from time to time in effect, in the currency specified in the invoice. CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the applicable charge(s). Distributor shall pay any amounts due in accordance with such procedures, and within such time parameters, as CEG may specify from time to time.

(b) If Distributor has not paid any amounts payable pursuant to subsection 20(a) within the applicable time parameters, Distributor shall pay interest on the unpaid amount. The interest begins to accrue on the forty-fifth day following the date of the invoice. The applicable rate of interest pursuant to this part will equal the lesser of (i)1 1/2% per month and (ii) the maximum rate of interest permitted by applicable law.

(c) Distributor shall assume full and complete responsibility for the payment of any taxes, charges or assessments imposed on Distributor or CEG by any foreign or domestic national, state, provincial or local governmental bodies, or subdivisions thereof, and any penalties or interest, relating to the Receipt of Market Data, excluding any taxes based upon the net income of CEG, TSX and/or TSX Venture Exchange. In addition, if Distributor is required by applicable law to deduct or withhold any such tax, charge or assessment from the amounts due CEG, then the amounts due shall be increased so that the net amount actually received by CEG after the deduction or withholding of any such tax, charge or assessment will equal one hundred percent (100%) of the applicable charges.

**21.    REPORTING OBLIGATIONS**

(a) As of the effective date of the Agreement, Distributor shall supply the information specified in Exhibit B attached hereto, relating to all Subscribers, Distributor Affiliates, and Distributors in Receipt of Market Data from Distributor.

(b) Following the effective date of this Agreement, Distributor shall notify CEG in a form and manner satisfactory to CEG, no less than once per calendar month, of any changes in the information supplied pursuant to subsection 21(a).

**22.    RECORDS AND INSPECTION/AUDIT PROCEDURES**

(a)  Distributor shall make available for review upon reasonable advanced written notice all records and supporting documentation necessary for CEG audit personnel to monitor compliance with this Agreement and verify the accuracy and completeness of:

  (i)  any reports submitted to CEG pursuant to this Agreement

  (ii)  any payments made by Distributor to CEG pursuant to this Agreement

  (iii)  the information set forth in Exhibit A

(b)  Any information provided to CEG pursuant to subsection 21 and 22(a) shall be kept confidential in accordance with the confidentiality provisions of this Agreement.

(c)  ... provision of information ... Receipt of Market Data from Distributor which is erroneous and such errors have resulted in CEG billing these parties less than would have been the case had such information been accurate, then Distributor shall pay to CEG all amounts that would ... default ...

(d)  If the erroneous information referred to in subsection 22(c) is equal to or greater than 5% of the total billings by CEG in respect of Subscribers and Distributors in Receipt of Market Data from Distributor for the 365 day period preceding the discovery of errors, then Distributor shall reimburse CEG within five (60) days of receipt for reasonable costs and administrative costs and expenses incurred to detect and identify such errors. Distributor's obligation is contingent on there costs being incurred in good faith and are not unreasonable given the amount of work necessary to detect and determine the extent of such errors.

(e)  CEG agrees that Distributor's liability pursuant to subsection 22(c) and subsection 22(d) for under-reporting the number of Subscriber Interrogation Devices in Receipt of Market Data, or Distributors in Receipt of Market Data from Distributor, shall be limited to unpaid Subscriber fees and/or Distribution fees, together with interest, for months ended within the two (2) years preceding the date Distributor, Distributor's auditors or CEG first noted the under-reporting, provided that such under-reporting is solely the result of a good faith error by Distributor.

(f)  The provisions of this Section 22 shall remain in force for a period of two (2) years from the date of any termination of this Agreement.

## PART V - PROVISIONS OF GENERAL APPLICABILITY

23.  **EFFECTIVE DATE AND TERMINATION**

Upon its execution by each party, this Agreement becomes effective as of the date first above written. This Agreement continues in effect until terminated as provided in this Section 23:

(a)  Either Distributor or CEG may terminate this Agreement upon not less than ninety (90) days written notice to the other, or

(b)  Either Distributor or CEG may terminate this Agreement upon thirty (30) days written notice to the other in the event that either party is in breach of any material provision of this Agreement and that such breach has not been cured by the party in default within the thirty (30) day notice period.

(c)  Withdrawal of TSX Venture Exchange from CEG terminates this Agreement, providing notice as set out in subsection 23(a) has been given by CEG, solely as to the Receipt of Market Data from the withdrawing exchange. Withdrawal of TSX from CEG, again providing proper notice has been given, terminates this Agreement.

24.  **SURVIVAL OF TERMS**

The provisions of Sections 2, 6, 7, 8, 14, 15, 18, 20, 22, 23, and 25 shall survive the completion of performance or any termination of this Agreement.

## 25.  CONFIDENTIALITY

Each party acknowledges that during the term of this Agreement it may obtain confidential data, information or techniques from the other party. With respect to any such data, information or techniques which a party has designated in writing as confidential, and which are not otherwise publicly available, the other party agrees to hold such data, information or techniques confidential and to use it solely to monitor compliance with this Agreement and agrees not to disclose it unless directed to do so by any court or administrative agency or any other governmental body. For purposes hereof, CEG agrees that the information supplied to CEG by Distributor under Exhibits A and B is proprietary and confidential information of Distributor.

## 26.  INDIRECT ACTS PROHIBITED

In prohibiting the Distributor from doing any act, this Agreement also prohibits the Distributor from doing the act indirectly (e.g. by causing or permitting another Person to do the act).

## 27.  ASSIGNMENTS

Distributor may not assign this Agreement, in whole or in part, without the written consent of CEG. The rights and obligations of CEG hereunder may be assigned if to it or any of its affiliates the prior written consent any of which is not to...

## 28.  ENTIRE AGREEMENT

This Agreement, including the attachments hereto which are an integral part hereof, constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes all prior negotiations, communications, writing and understandings. There are no warranties, representations, conditions or other agreements between the parties in connection with this Agreement, except as specifically set forth herein.

## 29.  AMENDMENT; WAIVER

Except as otherwise provided herein, no provision of this Agreement, or the attachments which are a part hereof, may be amended, modified or waived unless by an instrument in writing executed on behalf of each of the parties by their respective duly-authorized officers. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar), nor shall any waiver constitute a continuing waiver, unless expressly provided.

## 30.  GOOD FAITH

CEG and Distributor shall act in good faith in the performance of their respective obligations under this Agreement and shall act as promptly as is reasonably practicable in the circumstances in granting or denying any consent or approval required hereunder.

## 31.  NOTICE

Any notices required or permitted to be given herein shall be given to the parties in writing by overnight courier, registered or certified mail or electronic mail at the addresses set forth in this Agreement or to such addresses as the parties may hereafter substitute by written notice given in the manner prescribed in this Section 31 and shall be deemed to have been received on the business day following the dispatch.

## 32.  GOVERNING LAW

This Agreement shall be interpreted in accordance with and be governed in all respects by the laws of the Province of Ontario. The courts of Ontario shall have jurisdiction to entertain any action or proceeding brought by any of the parties hereto in connection with this Agreement or any alleged breach thereof.

33. **NUMBER, ETC.**

This Agreement shall be read with all changes in gender or number as the context may require. Headings shall in no way limit or modify the contents of the respective paragraphs and are for purposes of convenience only.

34. **SEVERABILITY**

If any of the provisions of this Agreement, or the application thereof to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

35. **FORCE MAJEURE**

Neither Distributor nor CEG shall be liable for delay or failure of performance of any of the acts required by this Agreement where such delay or failure arises from any cause or causes beyond the control and without the gross negligence or wilful misconduct of the parties. Such causes may include, without limitation, acts of God, acts of government in its sovereign or contractual capacity, acts of a public enemy, acts of civil or military authority, war, riots, civil strife, terrorism, blockades, sabotage, rationing, embargoes, epidemics, earthquakes, fire, flood, quarantine restrictions, power shortages or failures, utility or communication failures or delays, labour disputes, strikes, or shortages, supply shortages, equipment failures, or solitary malfunctions. The time for performance of any act delayed by such events may be postponed for a period equal to the delay.

11

36.  <u>COUNTERPARTS</u>

This Agreement may be executed in one or more counterparts which shall each be considered an original, but all of which together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be duly executed as of the day and year first above written.

Date: _____ *07/24/2008* _____

TSX Inc.
(on behalf of CEG)

_____
(authorized signing officer)

**Michael McCrea**
**Senior Manager**
**TSX Datalinx Services**
**TSX Group**

Title: _____

Date: *6/23/2008*

*Lehman Brothers Holdings Inc.*
Distributor

By: _____
(authorized signing officer)

Name: *ERIN MURPHY*
(please print)

Title: *Authorized Signatory*

12

# CANADIAN EXCHANGE GROUP
# MARKET DATA DISTRIBUTION AGREEMENT

This agreement dated as of the _____ 8TH _____ day of _____ July _____ 20 02

between the **CANADIAN EXCHANGE GROUP**
(hereinafter called the "CEG")
and

_Lehman Brothers Holdings Inc._ (hereinafter called "Distributor").

Distributor Name: _____ Lehman Brothers Holdings Inc. Attn: Paula Hardy _____

Distributor Address: _____ 745 7th Avenue _____     _____ 14th Floor _____
Street                                                                                    Suite

_____ New York _____     _____ New York _____
City                                                                                     State\Province

_____ USA _____     _____ 10019 _____
Country                                                                              Zip/Postal Code

_____ (212) 526-4045 _____     _____ (646) 758-1190 _____
Telephone Number                                                        Facsimile Number

1

# PART I - DEFINITIONS

1. **DEFINITIONS**

(a) "Canadian Exchange Group" or "CEG" shall mean the Toronto Stock Exchange (TSE) and the Canadian Venture Exchange (CDNX). CDNX has appointed TSE as agent for the purposes of entering into this and other agreements necessary for provision of Market Data to Distributor on its and their behalf, and to establish the terms and conditions under which Market Data is to be made available to Distributor. For the purposes of this Agreement, "Canadian Exchange Group" or "CEG" shall refer to the exchanges comprising the Canadian Exchange Group jointly and severally.

(b) "Delayed Market Data" shall mean Market Data that has been delayed by a Distributor at least fifteen (15) minutes from the time of dissemination by the CEG.

(c) "Distributor" shall include those Persons who furnish Receipt of Market Data by any means to any Person and who have executed a Distribution Agreement which has been approved by the CEG and which has not been terminated by any of the parties hereto.

(d) "Distributor Affiliate" shall include those Persons identified in "Exhibit A" by Distributor, who are in a control relationship with Distributor, as determined by the CEG in its sole discretion, or agents or licensees of Distributor's services, and to whom Distributor furnishes Receipt of Market Data.

(e) "Exhibit A" shall mean an attachment to this Agreement, which shall form an integral part hereof, and which may be amended from time to time as provided herein, which describes Distributor's system for furnishing Receipt of Market Data including the methods of receipt, retrieval, processing and supply of Market Data by Distributor to any Person.

(f) "Exhibit B" shall mean an attachment to this Agreement, which shall form an integral part hereof, and which may be amended from time to time as provided herein, describing the records and other information required by the CEG to be maintained by Distributor for audit and administration purposes of this Agreement.

(g) "Interrogation Device" shall mean any device that displays (or is capable of displaying) Real-Time Market Data in any visible, audible, or other comprehensible form, to any person at any time during the month.

(h) "Market Data" shall mean a bundled transmission of electronic signals emanating from the exchanges comprising the CEG and containing trading information with respect to securities traded on the exchanges comprising the CEG.

(i) "Person" includes any natural person or proprietorship or any corporation, partnership or other organization.

(j) "Real-Time Market Data" shall mean Market Data from the time of dissemination by the CEG to the time fifteen (15) minutes after such dissemination.

(k) "Receipt of Market Data" shall mean the physical capability, whether used or not, of successfully receiving or retrieving Market Data.

(l) "Subscriber" shall include those Persons who are not Distributors and who have executed either an Application Agreement for Receipt of Canadian Exchange Group Market Data or, a Non-Professional Application Agreement for Receipt of Canadian Exchange Group Market Data which have been approved by the CEG and which has not been terminated by any of the parties hereto.

2

## PART II - MARKET DATA ACCESS AND USE

**2.**   **PROPRIETARY INTEREST OF CEG**

Distributor understands and acknowledges, and shall ensure that any other Distributor and Subscriber in Receipt of Market Data from Distributor understands and acknowledges, that CEG has a proprietary interest in the Market Data that originates on the CEG markets and that same is not within the public domain. Any Market Data provided to Distributor by CEG pursuant to this Agreement, which has been derived from databases owned by CEG, is copyrighted and as such Distributor's use of such Market Data is subject to the limitations set out in this Agreement.

**3.**   **SYSTEM INTERFACE**

(a)   If Distributor is in Receipt of Market Data directly from CEG, Distributor shall be responsible for: (i) obtaining the requisite quantity of common carrier communication lines, (ii) the reliability and continued availability of such communication lines, and (iii) interfacing with the CEG's facilities at such places as may be designated from time to time by CEG. Distributor will meet any reasonable requirement of CEG concerning the location of the interface or interfaces to permit Receipt of Market Data.

(b)   If Distributor is in Receipt of Market Data from a third party, then Distributor and such third party are responsible for all communications facilities and other arrangements necessary for Distributor to receive the Market Data from such third party. Further, Distributor acknowledges and agrees that CEG is not responsible for, and makes no representations or warranties regarding any services Distributor obtains from a third party.

(c)   If the interface with the CEG's facilities described in subsection 3(a) enables Distributor to receive information other than Market Data, CEG shall so notify Distributor, and Distributor shall not furnish or permit to be furnished such other information to any other Distributor or Subscriber without the prior approval of CEG.

**4.**   **CONFIGURATION**

Distributor acknowledges and agrees that nothing in this Agreement shall be deemed to constitute an undertaking by CEG to continue to disseminate the Market Data in the present form or configuration or to continue to use existing communications facilities. CEG, in its sole discretion, may from time to time make modifications to the Market Data and CEG facilities, including the interface and operational requirements, irrespective of whether such modifications would require changes to be made by Distributor. CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the speed, code, format, operating hours, or any other material changes in the operational requirements, unless a malfunction in the system necessitates modifications on an accelerated basis or an emergency situation precludes such advance notice. Distributor shall bear the responsibility of making concurrent modifications to its service.

**5.**   **NON-EXCLUSIVE BASIS**

CEG agrees to provide Receipt of Market Data to Distributor on a non-exclusive basis. CEG reserves the right, without any notice or liability to Distributor or to any other Person, to provide Receipt of Market Data or any other information, or to contract with any other Person to provide Receipt of Market Data or any other information to any Person by any means whatsoever, including devices or equipment designed or manufactured by CEG or any other Person.

**6.**   **DATA NOT GUARANTEED**

(A)   NO WARRANTIES - THE DISTRIBUTOR AGREES THAT THE CEG MAKES NO REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, WITH RESPECT TO THE MARKET DATA, ITS TRANSMISSION, TIMELINESS, ACCURACY OR COMPLETENESS, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY, QUALITY AND FITNESS FOR A PARTICULAR PURPOSE AND, THOSE ARISING BY STATUTE OR OTHERWISE IN LAW OR FROM THE COURSE OF DEALING OR USAGE OF TRADE.

3

(B)  NO GUARANTY - The CEG does not guarantee the timeliness, sequence, accuracy or completeness of Market Data, or other information or messages, disseminated by the CEG. The CEG will not be liable in any way to Distributor or to any other Person for:

   (a)  any inaccuracy, error or delay in, or omission of (i) any such Market Data, or other information or messages, or (ii) the transmission or delivery of any such Market Data, or other information or messages, or

   (b)  any loss or damage arising from or occasioned by (i) any such inaccuracy, error, delay or omission, or (ii) non-performance, or (iii) interruption in any such Market Data, or other information or messages, due either to any negligent act or omission by the CEG, "force majeure" or any other cause.

7.  **CEG WARRANTY**

   (a)  The CEG represents, warrants and covenants that it is the exclusive owner of Market Data and of all intellectual and proprietary rights in Market Data and has full power and authority to grant the rights granted in this Agreement without the consent of any other party. The CEG shall indemnify and hold Subscriber or Distributor, their officers, directors, employees and agents, harmless from and against any loss, costs, liability and expense including reasonable legal fees, arising out of any breach or claimed breach of this representation, warranty and covenant.

   (b)  The CEG represents, warrants and covenants that Market Data and the use of Market Data as permitted by this Agreement does not and will not infringe upon or violate the proprietary rights of any third party which proprietary rights include, without limitation, patents, copyrights, trademarks and trade secrets.

   (c)  The CEG shall indemnify, and hold harmless and defend, Distributor and its Subscribers or, Distributors in Receipt of Market Data from Distributor, their officers, directors, employees and agents, against any loss, cost, liability and expense, including reasonable legal fees, for infringement of any proprietary rights of any third party. The CEG shall, at its own expense, defend or settle any claim or proceeding brought against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor by any third party alleging that Market Data or the use of Market Data as permitted by this Agreement, constitutes an infringement of any proprietary right, provided that the CEG is notified promptly in writing of such claim and is given the opportunity to have sole control for the defence of any action on such claim and all negotiation for its settlement. The CEG shall pay all damages and costs finally awarded against Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor in such action or proceedings, and shall pay reasonable legal fees of Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor, but shall not be responsible for any costs, expenses, or compromises incurred or made by Distributor and its Subscribers or Distributors in Receipt of Market Data from Distributor without the CEG's prior written consent.

8.  **AUTHORIZED USE**

   (a)  Distributor and Distributor Affiliates are authorized by this Agreement to receive, process, transmit and use the Market Data only as approved by CEG and described in Exhibit A. Any use of the Market Data not described in Exhibit A and, not approved by CEG is prohibited. Subscribers and Distributors in Receipt of Market Data from Distributor, are authorized to receive and use the Market Data only as set forth in the applicable agreement.

   (b)  Any proposed use of the Market Data (including, but not limited to, developing or communicating derivative information based upon the Market Data, re-transmission, re-distribution, reproduction or calculation of indices, etc.) shall require the prior approval of CEG. Any such proposed use shall be submitted to CEG in the form of a draft amendment to Exhibit A. CEG shall promptly and in good faith approve or disapprove any such proposed use by Distributor. Distributor acknowledges and agrees that it acts at its own risk in developing any modification to its service prior to receiving approval from CEG, since CEG is not obligated by this Agreement to grant such approval.

   (c)  Distributor agrees not to alter the Market Data in any manner that adversely affects its accuracy or integrity or that renders it misleading.

4

(d)   Distributor may furnish Delayed Market Data in the manner specified in Exhibit A and shall comply with any requirements that CEG and Distributor agree to from time to time as to Persons receiving Delayed Market Data.

### 9.   DISTRIBUTOR INTERROGATION DEVICES

Distributor shall be entitled to use certain Interrogation Devices located on its premises, without charge, for advertisement, demonstration, product development, and customer service. Distributor's use of such Interrogation Devices and the number thereof shall be subject to all provisions of the Agreement including, without limitation, CEG approval, monthly reporting and audit by the CEG.

### 10.   ACCESS TO DISTRIBUTOR INTERROGATION DEVICES

(a)   In lieu of assessing monthly charges upon Interrogation Devices utilized by Distributor for the purposes described in Section 9, at the CEG's request, Distributor agrees to provide to CEG (at the CEG's premises) up to two Interrogation Devices, or otherwise furnish access to the Distributor's service to the CEG by means acceptable to the CEG to be used by CEG to monitor Distributor's compliance with the terms of this Agreement, and any other Agreements that may be entered into between CEG and Distributor.

(b)   Any such Interrogation Device(s) provided to the CEG by Distributor pursuant to subsection 10(a), shall be without charge to CEG with the exception of fees payable to third parties for data provided through Distributor's services, which fees shall be paid by CEG.

### 11.   DESCRIPTION OF DISTRIBUTOR'S SERVICE

Distributor represents and warrants that the description of its service, and any data processing equipment, software and communications facilities related thereto and set forth in Exhibit A, is true, complete and not misleading.

### 12.   OPERATION OF DISTRIBUTOR'S SERVICE

Distributor shall assume sole responsibility for the design, development, acquisition, installation, testing, implementation, operation and maintenance of any and all software and equipment not directly supplied by CEG. Distributor represents and warrants that the design, development, acquisition, installation, testing, implementation, operation and maintenance of its service, and its system supporting the service, will not interfere with or adversely affect the Receipt of Market Data by any other Distributor or Subscriber.

### 13.   TRANSMISSION TO OTHER DISTRIBUTORS

Distributor shall not, by any means, furnish Receipt of Market Data to any Person, unless that Person is a Distributor, a Distributor Affiliate, or a Subscriber.

### 14.   NO USE OF INFORMATION AFTER TERMINATION

Upon termination of this Agreement for whatever reason, Distributor shall immediately cease any and all use of the Market Data.

# PART III - SYSTEM SECURITY

### 15.    TRANSMISSION AND EQUIPMENT SECURITY

(a)    Distributor shall assure that all service-related data processing, transmission and communications equipment and software are arranged and protected so that, so far as reasonably possible, no Person will obtain Receipt of Market Data who is not a Distributor, a Distributor Affiliate, or a Subscriber.

(b)    Distributor shall assure that the security provisions described in Exhibit A are enforced. If, in its sole discretion, CEG determines that one or more Persons have unauthorized access to Receipt of Market Data, Distributor shall, in accordance with subsection 15 (a), take all steps necessary to alter the security safeguards and the manner of furnishing Receipt of Market Data so as to preclude the unauthorized access. Distributor shall provide CEG with such evidence as CEG may request regarding the adequacy of those steps. If CEG determines, in its reasonable discretion, those steps to be inadequate, Distributor shall promptly comply with any reasonable writing instructing Distributor to discontinue furnishing Receipt of Market Data by inadequately safeguarded means.

(c)    Distributor shall assure that any Person authorized in writing by CEG has access, at any reasonable time, to any premises of Distributor, any Distributor Affiliate, any service facilitator or any Person to whom Distributor provides any kind of commodities, securities or other Market Data (whether under this Agreement or otherwise). In the presence of officials in charge of the premises, the authorized Person may (i) examine any component of the equipment and software used for the purposes of this Agreement and located at the premises and (ii) observe all operations located or conducted at the premises, but solely to monitor compliance with this Agreement. Any information obtained by the CEG or its representatives in connection with such examination shall be kept in strictest confidence and will be used solely for the purposes of verifying Distributor's compliance with the terms of this Agreement.

### 16.    RESPONSIBILITY FOR DISTRIBUTOR AFFILIATES

Whenever CEG notifies Distributor in writing that it has determined that Distributor Affiliate has failed to act in accordance with, or in the manner specified in this Agreement, Distributor shall promptly cure the breach or rectify the failure.

### 17.    CO-OPERATION AS TO UNAUTHORIZED RECEIPT

(a)    Distributor shall assure that no unauthorized Person obtains Receipt of Market Data by use of equipment and software used for the delivery of the Market Data. For the purposes of this Agreement an unauthorized Person is one who is not a Distributor, a Distributor Affiliate, or a Subscriber. If an unauthorized Person is in Receipt of Market Data, Distributor shall use its best efforts to ascertain the source and manner of receipt, shall fully and promptly brief CEG, and shall promptly pay the applicable amounts described in subsection 18(a). Distributor shall otherwise co-operate and assist in any investigation relating to any unauthorized Receipt of Market Data.

(b)    CEG may sue or otherwise proceed against any unauthorized Person to prevent the unauthorized Person from obtaining, or from using, Market Data. If CEG institutes any such suit or other proceeding, Distributor, unless made a defendant in the suit or proceeding, shall assure that it and Distributor Affiliates (if any) co-operate with and assist the CEG in the suit or proceeding in all reasonable respects, provided that the CEG reimburses Distributor for reasonable out-of-pocket expenses.

(c)    If any Person brings a suit or other proceeding to enjoin Distributor, or any Distributor Affiliate from refusing to furnish Market Data to any unauthorized Person, Distributor shall promptly notify CEG. CEG may intervene in the suit or proceeding in the name of Distributor or the Distributor Affiliate, as appropriate, and, through counsel chosen by the CEG, assume the defence of the action on behalf of Distributor or the Distributor Affiliate. The CEG shall indemnify, hold harmless and defend Distributor against any loss, liability or expense (including reasonable attorneys' fees) that arises out of or results from the suit or proceeding.

(d)    If CEG notifies Distributor in writing that CEG has terminated the right of any Distributor in Receipt of Market Data from Distributor or Subscriber to be in Receipt of Market Data, Distributor  (i) shall cease furnishing Market Data to the

6

Distributor in Receipt of Market Data from Distributor or Subscriber within five business days of the notice and (ii) shall, within ten business days, confirm the cessation, and inform CEG of the cessation date, by notice to CEG.

(e)    If Distributor refuses to provide, or to continue to provide, Receipt of Market Data to any Person solely because CEG has notified Distributor in writing that the CEG does not authorize, or no longer authorizes, the Person to be in Receipt of Market Data, the CEG shall indemnify, hold harmless and defend Distributor from and against (i) any suit or other proceeding that arises from the refusal and (ii) any liability, loss, cost, damage or expense (including reasonable attorneys' fees) that Distributor incurs as a result of the suit or proceeding. The CEG shall have sole control of the defence of any such suit or proceeding and of all the negotiations for its settlement or compromise. Distributor's prompt notice to CEG of any such suit or proceeding is a condition to Distributor's rights under subsection 17(e). These rights do not apply when Distributor ceases to furnish Receipt of Market Data to an unauthorized Person.

**18.    PENALTIES FOR UNAUTHORIZED RECEIPT**

(a)    In respect of any Receipt of Market Data by an unauthorized Person, which Market Data has been provided through Distributor's, or Distributor Affiliate's, facilities, Distributor shall pay to CEG any applicable charges, together with interest, that would have been imposed on Distributor or the unauthorized Person in respect of the Receipt of Market Data by the unauthorized Person provided that such unauthorized receipt has not occurred as the result of fraud or theft of the Market Data by the unauthorized Person. These charges shall include applicable interest (if any) and shall be retroactive to the date when the unauthorized Person was first in Receipt of Market Data.

(b)    CEG agrees that Distributor's liability pursuant to subsection 18(a) shall be limited to unpaid Subscriber fees and Distribution fees, together with interest, for months ended within the two (2) years preceding the date CEG first becomes aware that such under-reporting has occurred, if such under-reporting is solely the result of a good faith error by Distributor.

(c)    If Distributor has paid all amounts due in respect of any unauthorized Receipt of Market Data: (i) Distributor becomes subrogated to all rights of the CEG and (ii) CEG will return to Distributor any amounts subsequently received from the unauthorized Person.

**19.    INDEMNIFICATION OF CEG**

(a)    Distributor shall indemnify the CEG against, and hold the CEG harmless from, any and all claims or losses imposed on, incurred by CEG as a result of or relating to:

(i)    any non-compliance by Distributor or Distributor Affiliate with the terms and conditions hereof;

(ii)    any non-compliance by a Subscriber or a Distributor in Receipt of Market Data from Distributor or Distributor Affiliate with the terms and conditions hereof or of their respective agreements with the CEG, if Distributor has failed to notify CEG of such non-compliance within thirty (30) days after Distributor knows of such non-compliance;

(iii)    any assertion of claims or losses relating to the subject matter or existence of this Agreement against the CEG made by a Person who is in Receipt of Market Data from Distributor (or any Person relying upon the Market Data received by such a Person) and who is not a Distributor, or a Distributor Affiliate, or a Subscriber;

(iv)    any defence of or participation by the CEG in any action, suit, arbitration, or judicial or administrative proceeding involving any claims or losses described in subsection 19(a).

The indemnifications provided by this subsection 19(a) shall include, without limitation, CEG's investigative and administrative costs which result in the detection of any material non-compliance by Distributor referred to in clause (i) above or any material non-compliance by Subscribers or Distributors in Receipt of Market Data from Distributor referred to in clause (ii) above, provided, however, that such costs are not excessive as compared to the injury CEG would suffer as a result of any such non-compliance.

(b)    The party claiming indemnification under this Agreement agrees to promptly notify (and, in the case of any action, suit, arbitration or judicial or administrative proceeding, shall so notify no later than fifteen (15) days after the party claiming indemnification has received notice thereof or has been served with a complaint or other process) the other party when it has knowledge of circumstances or the occurrence of any events which are likely to result in an indemnification obligation under this Agreement or when any action, suit, arbitration, or judicial or administrative proceeding is pending or threatened and is covered by this Agreement; and further agrees that, upon request and to the extent permitted by applicable law, the other party shall have the right to defend, settle, or compromise any such suit or proceeding, at the other party's expense, provided that: (i) the other party demonstrates to the satisfaction of the party claiming indemnification that it is financially able to defend such action and to pay any settlement or judgement; and (ii) counsel retained by the other party is reasonably satisfactory to the party claiming indemnification. The party claiming indemnification agrees to cooperate with the other party in the defence of any such suit or proceeding, and the other party agrees to reimburse the party claiming indemnification for its expenses with respect thereto. Failure by the party claiming indemnification to promptly notify the other party as required by subsection 19(b) shall not invalidate the claim for indemnification, unless such failure has a material adverse effect on the settlement, defence, or compromise of the matter that is the subject of the claim for indemnification. In addition, the party claiming indemnification shall be responsible for any claims or losses which could have been avoided or mitigated by prompt notice as required by subsection 19(b).

(c)    Notwithstanding any provisions in this Agreement to the contrary, the obligations set out in this Section 19 shall continue in force for two (2) years following the completion of performance or any termination of this Agreement.

## PART IV - PAYMENTS, RECORDS AND REPORTS

**20.**    **PAYMENTS**

(a)    Distributor shall pay CEG the applicable charge(s) from time to time in effect, in the currency specified in the invoice. CEG agrees to give Distributor at least sixty (60) days prior notice of any change in the applicable charge(s). Distributor shall pay any amounts due in accordance with such procedures, and within such time parameters, as CEG may specify from time to time.

(b)    If Distributor has not paid any amounts payable pursuant to subsection 20(a) within the applicable time parameters, Distributor shall pay interest on the unpaid amount. The interest begins to accrue on the forty-fifth day following the date of the invoice. The applicable rate of interest pursuant to this part will equal the lesser of (i)1 1/2% per month and (ii) the maximum rate of interest permitted by applicable law.

(c)    Distributor shall assume full and complete responsibility for the payment of any taxes, charges or assessments imposed on Distributor or CEG by any foreign or domestic national, state, provincial or local governmental bodies, or subdivisions thereof, and any penalties or interest, relating to the Receipt of Market Data, excluding any taxes based upon the net income of the CEG, TSE and/or CDNX. In addition, if Distributor is required by applicable law to deduct or withhold any such tax, charge or assessment from the amounts due CEG, then the amounts due shall be increased so that the net amount actually received by CEG after the deduction or withholding of any such tax, charge or assessment will equal one hundred percent (100%) of the applicable charges.

**21.**    **REPORTING OBLIGATIONS**

(a)    As of the effective date of the Agreement, Distributor shall supply the information specified in Exhibit B attached hereto, relating to all Subscribers, Distributor Affiliates, and Distributors in Receipt of Market Data from Distributor.

(b)   Following the effective date of this Agreement, Distributor shall notify CEG in a form and manner satisfactory to CEG, no less than once per calendar month, of any changes in the information supplied pursuant to subsection 21(a).

**22.   RECORDS AND INSPECTION/AUDIT PROCEDURES**

(a)   Distributor shall make available for review upon reasonable advanced written notice all records and supporting documentation necessary for CEG audit personnel to monitor compliance with this Agreement and verify the accuracy and completeness of:

 (i)   any reports submitted to CEG pursuant to this Agreement

 (ii)   any payments made by Distributor to CEG pursuant to this Agreement

 (iii)   the information set forth in Exhibit A

(b)   Any information provided to CEG pursuant to subsection 21 and 22(a) shall be kept confidential in accordance with the confidentiality provisions of this Agreement.

(c)   If Distributor has provided information to CEG concerning the Receipt of Market Data by Subscribers and/or Distributors in Receipt of Market Data from Distributor which is erroneous and such errors have resulted in CEG billing these parties less than would have been the case had such information been accurate, then Distributor shall pay to CEG all amounts that would have been due relative to such erroneous reports.

(d)   If the erroneous information referred to in subsection 22(c) is equal to or greater than 5% of the total billings by CEG in respect of Subscribers and Distributors in Receipt of Market Data from Distributor for the 365 day period preceding the discovery of errors, then Distributor shall reimburse CEG, within sixty (60) days of invoice for reasonable audit, legal or administrative costs and expenses incurred to detect and rectify such errors. Distributor's obligation is contingent on these costs being incurred in good faith and are not unreasonable given the amount of work necessary to detect and determine the extent of such errors.

(e)   CEG agrees that Distributor's liability pursuant to subsection 22(c) and subsection 22(d) for under-reporting the number of Subscriber Interrogation Devices in Receipt of Market Data, or Distributors in Receipt of Market Data from Distributor, shall be limited to unpaid Subscriber fees and/or Distribution fees, together with interest, for months ended within the two (2) years preceding the date Distributor, Distributor's auditors or CEG first noted the under-reporting, provided that such under-reporting is solely the result of a good faith error by Distributor.

(f)   The provisions of this Section 22 shall remain in force for a period of two (2) years from the date of any termination of this Agreement.

# PART V - PROVISIONS OF GENERAL APPLICABILITY

**23.   EFFECTIVE DATE AND TERMINATION**

Upon its execution by each party, this Agreement becomes effective as of the date first above written. This Agreement continues in effect until terminated as provided in this Section 23:

 (a)   Either Distributor or CEG may terminate this Agreement upon not less than ninety (90) days written notice to the other, or

 (b)   Either Distributor or CEG may terminate this Agreement upon thirty (30) days written notice to the other in the event that either party is in breach of any material provision of this Agreement and that such breach has not been cured by the party in default within the thirty (30) day notice period.

 (c)   Withdrawal of the CDNX from the CEG terminates this Agreement, providing notice as set out in subsection 23(a) has been given by CEG, solely as to the Receipt of Market Data from the withdrawing exchange. Withdrawal of the TSE from CEG, again providing proper notice has been given, terminates this Agreement.

**24.**    **SURVIVAL OF TERMS**

The provisions of Sections 2, 6, 7, 8, 14, 15, 18, 20, 22, 23, and 25 shall survive the completion of performance or any termination of this Agreement.

**25.**    **CONFIDENTIALITY**

Each party acknowledges that during the term of this Agreement it may obtain confidential data, information or techniques from the other party. With respect to any such data, information or techniques which a party has designated in writing as confidential, and which are not otherwise publicly available, the other party agrees to hold such data, information or techniques confidential and to use it solely to monitor compliance with this Agreement and agrees not to disclose it unless directed to do so by any court or administrative agency or any other governmental body. For purposes hereof, CEG agrees that the information supplied to the CEG by Distributor under Exhibits A and B is proprietary and confidential information of Distributor.

**26.**    **INDIRECT ACTS PROHIBITED**

In prohibiting the Distributor from doing any act, this Agreement also prohibits the Distributor from doing the act indirectly (e.g. by causing or permitting another Person to do the act).

**27.**    **ASSIGNMENTS**

Distributor may not assign this Agreement, in whole or in part, without the written consent of CEG. The rights and obligations of the CEG hereunder may be assigned by it at any time without the prior written consent of the Distributor.

**28.**    **ENTIRE AGREEMENT**

This Agreement, including the attachments hereto which are an integral part hereof, constitutes the entire Agreement between the parties with respect to the subject matter hereof, and supersedes all prior negotiations, communications, writing and understandings. There are no warranties, representations, conditions or other agreements between the parties in connection with this Agreement, except as specifically set forth herein.

**29.**    **AMENDMENT: WAIVER**

Except as otherwise provided herein, no provision of this Agreement, or the attachments which are a part hereof, may be amended, modified or waived unless by an instrument in writing executed on behalf of each of the parties by their respective duly-authorized officers. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision (whether or not similar), nor shall any waiver constitute a continuing waiver, unless expressly provided.

**30.**    **GOOD FAITH**

CEG and Distributor shall act in good faith in the performance of their respective obligations under this Agreement and shall act as promptly as is reasonably practicable in the circumstances in granting or denying any consent or approval required hereunder.

**31.**    **NOTICE**

Any notices required or permitted to be given herein shall be given to the parties in writing by overnight courier, registered or certified mail or electronic mail at the addresses set forth in this Agreement or to such addresses as the parties may hereafter substitute by written notice given in the manner prescribed in this Section 31 and shall be deemed to have been received on the business day following the dispatch.

10

**32.**    <u>GOVERNING LAW</u>

This Agreement shall be interpreted in accordance with and be governed in all respects by the laws of the Province of Ontario.  The courts of Ontario shall have jurisdiction to entertain any action or proceeding brought by any of the parties hereto in connection with this Agreement or any alleged breach thereof.

**33.**    <u>NUMBER, ETC.</u>

This Agreement shall be read with all changes in gender or number as the context may require.  Headings shall in no way limit or modify the contents of the respective paragraphs and are for purposes of convenience only.

**34.**    <u>SEVERABILITY</u>

If any of the provisions of this Agreement, or the application thereof to any Person or circumstance, shall to any extent be invalid or unenforceable, the remainder of this Agreement, or the application of such terms or provisions to Persons or circumstances other than those which are invalid or unenforceable, shall not be effected thereby, and each term and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**35.**    <u>FORCE MAJEURE</u>

Neither Distributor nor the CEG shall be liable for delay or failure of performance of any of the acts required by this Agreement when such delay or failure arises from circumstances beyond the control and without the gross negligence or willful misconduct of the parties.  Such causes may  include, without limitation, acts of God, acts of government in its sovereign or contractual capacity, acts of a public enemy, acts of civil or military authority, war, riots, civil strife, terrorism, blockades, sabotage, rationing, embargoes, epidemics, earthquakes, fire, flood, quarantine restrictions, power shortages or failures, utility or communication failures or delays, labour disputes, strikes, or shortages, supply shortages, equipment failures, or solitary  malfunctions. The time for performance of any act delayed by such events may be postponed for a period equal to the delay.

36.    **COUNTERPARTS**

This Agreement may be executed in one or more counterparts which shall each be considered an original, but all of which together shall constitute one and the same Agreement.

IN WITNESS WHEREOF, the parties hereto have caused the Agreement to be duly executed as of the day and year first above written.

Date: _Sept. 6 2007_    THE TORONTO STOCK EXCHANGE
(on behalf of the CEG)

By: _____
(authorized signing officer)

Title: **Richard Nesbitt**
~~President~~
**TSX Markets Inc.**

Date: _7/16/0~_    LEHMAN BROTHERS HOLDINGS INC
**Distributor**

By: _____
(authorized signing officer)

Name: _JAMES J HERMAN_
(please print)

Title: _VP Global Marketing_

12