ST. JAMES LAW, P.C.
155 Montgomery St., Suite 1004
San Francisco, CA 94104-4117
(415) 391-7566 Telephone
(415) 391-7568 Fax
Michael St. James (MS 8592)

Counsel for BigFix, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                          :
In re:                                    :
                                          :     Chapter 11
LEHMAN BROTHERS HOLDINGS, INC.            :
                                          :     Case No. 08-13555 (JMP)
                                          :
            Debtor.                       :
                                          :
-------------------------------------------------------------x

## OBJECTION OF BIGFIX, INC. TO CURE AMOUNT
### (Barclays Capital Inc. Sale)

BigFix, Inc. hereby submits this objection (the "Objection"), in accordance with the

Order Under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure

2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and

Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts

and Unexpired Leases [Docket No. 258] (the "Sale Order"), to the Cure Amounts  and other

information included on that certain "List of IT Closing Date Contracts" (the "Contract

Schedule").  By this Objection, BigFix seeks to correct the Contract Schedule relating to those

Closing Date Contracts to which BigFix, Inc and Lehman Brothers, Inc. ("LBI" and, together

with LB 745 LLC, the "Debtors") are parties.  In support of this Objection, BigFix, Inc.

respectfully states as follows:

## BACKGROUND

1.      Through a Software License and Support Agreement dated August 9, 2004,

designated Contract No. 004809-LEHNY-2004, LBI obtained a 3-year license to use BigFix's

enterprise solutions security software on 47,000 machines (the "License").   A true and correct

copy of the License is attached hereto as Exhibit 1.

2.      The License was subsequently extended for an additional 3-year term.  A true and

correct copy of the "Amendment No. 1" to the License is attached hereto as Exhibit 2.   The

current License term runs from August 13, 2007 through August 13, 2010.

3.      In addition, the Amendment No. 1 added an additional 2,000 licensed machines to

the License, resulting in an increase to the annual license fee (the "Additional Machine Charge").

4.      The License requires LBI to pay annual license fees.  The base annual fee for the

current License term is $264,375, and is due on August 13th of 2007, 2008 and 2009.  The annual

License fee for 2007 was paid.

5.      The annual License fee that was due on August 13, 2008 was not paid, and is

presently due and owing (the "2008 License Fee").

6.      The annual Additional Machine Charge of $11,250 was due on August 13th of

2007, 2008 and 2009.

7.      No Additional Machine Charges have been paid, and there is presently due and

owing $22,500 on account of the 2007 and 2008 annual Additional Machine Charges(the

"Machine Charge").

8.      The 2008 License Fee and the Machine Charge, aggregating $286,875, are

collectively referred to herein as the "Correct BigFix Cure Amount".

9.      In connection with that certain Asset Purchase Agreement, dated September 16,

2008, among the Debtors, Lehman Brothers Inc. and Barclays Capital, Inc. ("Barclays"), the

Debtors purport to assume and assign certain contracts to Barclays. Pursuant to the Contract Schedule, among such assumed and assigned contracts are three contracts to which BigFix, Inc. is asserted to be a counterparty. Exhibit A to the Contract Schedule lists the cure amount for BigFix, Inc. as "$0.00." The relevant pages are attached hereto as Exhibit 3.

10.    Upon information and belief, the Contract Schedule lists the cure amount as "$0.00" because the Debtors assumed that the 2008 License Fee had been timely paid and nothing else was owed. In fact, however, the Correct BigFix Cure Amount is due and owing.

11.    By this Objection, BigFix seeks to correct two errors in the Contract Schedule relating to the contracts between BigFix, Inc. and the Debtors:

> • *First*, Exhibit A to the Contract Schedule erroneously lists the cure amount as "$0.00." In fact, the Correct BigFix Cure Amount in the aggregate amount of $286,875 is due and owing, and this cure obligation must be satisfied prior to the Debtors' assumption and assignment of the contracts with BigFix, Inc. See 11 U.S.C. § 365(b)(1)(A). Therefore, the Exhibit A to the Contract Schedule should be modified to reflect a cure amount of $286,875.

> • *Second*, the Contract Schedule indicates that there are three contracts between the Debtors and BigFix to be assumed and assigned. In fact, the only ongoing contract between the Debtors and BigFix is the License.

## CONCLUSION

WHEREFORE, BigFix, Inc. respectfully requests that the Court enter an order correcting the Contract Schedule in the manner described herein and grant BigFix, Inc. such other and further relief as is just and proper.

Dated: October 3, 2008

    /s/ Michael St. James
Michael St James
ST. JAMES LAW, P.C.
155 Montgomery St., Suite 1004
San Francisco, CA 94104-4117
415-391-7566 (voice)
415-391-7568 (fax)
ecf@stjames-law.com

Counsel for BigFix, Inc.

# Exhibit

# 1

SOFTWARE LICENSE AND SUPPORT AGREEMENT **CONTRACT NO. DO4809-LEHN1-2004**

This SOFTWARE LICENSE AND SUPPORT AGREEMENT ("Agreement") is made as of this 9th day of August, 2004 (the "Effective Date") by and between BigFix, Inc. located at 6121 Hollis Street, Emeryville, California 94608 ("Vendor") and Lehman Brothers Inc., with an office at 745 Seventh Avenue, New York, New York 10019 ("Lehman Brothers").

In consideration of the mutual covenants contained herein, the parties hereto agree as follows:

"BigFix Solution" shall mean a subscription to a "Content Site" (defined as any site maintained by Vendor that provides Fixlet Messages (defined below) for use in connection with the Licensed Software.

"Fixlet Messages" shall mean digital files (properly obtained from Vendor or developed by Lehman Brothers using BDE pursuant to this Agreement) containing some or all of the following elements: (A) a relevance clause written in Vendor's proprietary relevance language which describes attributes of a computer system, its content or environment, or such other factors as may be supported by Vendor from time to time; (B) text that is displayed to the BES Console operator which describes a particular condition or failure; and (C) computer system intelligible components which contain some form of action to remediate the discovered issue, all of which shall be in a format consistent with the standards set from time to time by Vendor.

## 1.    LICENSE.

1.1    **License Grant**. Subject to the terms of this Agreement, Vendor grants to Lehman Brothers a global, royalty free, non-exclusive license to internally use, display and perform in the course of its business operations and for its own business purposes, including but not limited to processing its own information and that of its affiliates and clients as part of its business ("Use") the Licensed Software (as defined). Use shall include only the following rights: (i) to use the Licensed Software in object code form only and only on the numbers of machines licensed as specified in Schedule C for each component of the Licensed Software ("Licensed Machines") and with respect to BDE this includes the right to develop Fixlet Messages for internal use only, whether new or derivatives of existing Fixlet Messages, (ii) to distribute copies of the Licensed Software and Fixlet Messages only to, and only for internal use on, Licensed Machines, and (iii) to access and download Fixlet Messages (using Licensed Software components in accordance with Vendor's then current access procedures) from any Content Site that is part of a BigFix Solution for which Lehman Brothers has paid the applicable Fees, as specified in Schedule C. Any activity contemplated by this license shall be strictly in accordance with and subject to Vendor's applicable user documentation and, in the case of Fixlet Messages obtained from Vendor or third parties (or derivatives thereof), any limitations and conditions under which those Fixlet Messages were obtained, as well as any applicable third party rights. The term of the license or subscription with respect to any Licensed Software, Fixlet Message, BigFix Solution or Content Site shall be limited to the period specified in Schedule C or any Renewal Term for which Vendor has received full payment. Lehman Brothers will maintain the copyright notice and any other notices that appear on any Licensed Software or Fixlet Message on any copies and any media and will not, except as expressly set forth in the Agreement, provide, lease, lend, use for timesharing or service bureau purposes or otherwise use or allow others to use the Licensed Software or any Fixlet Message for the benefit of any third party. As between the parties, Vendor and/or its suppliers have and will retain all right, title and interest in and to the Licensed Software, Fixlet Messages, and all copies, modifications and derivative works thereof except that, notwithstanding the foregoing, Lehman Brothers may own only that portion of any Fixlet Message content that is created entirely by (or by a third party contractor on behalf of) Lehman Brothers in accordance with the terms of this Agreement ("Custom Content"), provided that neither Lehman Brothers nor any third party may challenge the right of Vendor or the right of any of Vendor's resellers, affiliates or customers to develop, use, or distribute any Fixlet Message Content, notwithstanding any similarity to any Custom Content. Without limitation of the foregoing, to the extent that exclusive title and ownership rights in any Custom Content may not originally vest in Lehman Brothers as contemplated hereunder, and such rights in that Custom Content are somehow acquired by Vendor, Vendor hereby irrevocably assigns, transfers and conveys to Lehman Brothers all right, title and interest therein, and Vendor and its employees, and personnel will give Lehman Brothers, and any Lehman Brothers designee, all reasonable assistance and execute all documents necessary to assist or enable Lehman Brothers to perfect, preserve, register and record its rights in any such Custom Content. Lehman Brothers may make a reasonable number of copies solely for backup, training, archiving, testing and disaster recovery. Notwithstanding anything to the contrary contained in this Agreement, the scope

of Use authorized hereunder shall include use by or on behalf of any Lehman Brothers affiliate, and use by third parties under contract to provide services to Lehman Brothers or its affiliates, provided that such third parties' use is limited solely to providing such services and shall otherwise be subject to the restrictions on Use set forth herein and provided further that Lehman Brothers shall remain fully responsible for compliance by any such affiliate or third party. As used in this Agreement, the term "Licensed Software" means the software programs listed in Schedule A and any upgrades, updates, enhancements, modifications, alterations, improvements, revisions, releases, new versions thereof, including any of the foregoing made generally available after the Effective Date and while the Agreement remains in effect (collectively, "Upgrades"), but expressly excluding any software programs which BigFix may make generally available as new products marketed separately from the Licensed Software ("Additional Products"). The license granted hereunder also includes the right to transfer Licensed Software from one hardware platform or operating system to another hardware platform or operating system (or both) for which the Licensed Software is or becomes generally available, at no additional charge. The concurrent subscription to BigFix Solutions (as defined) for use in connection with the Licensed Software is described herein.

1.2    **Restrictions on Use**. Lehman Brothers will not, and will not authorize any third party to, modify, reverse engineer, reverse assemble or reverse compile the Licensed Software or any part thereof, except to the extent otherwise provided pursuant to applicable law. Notwithstanding the foregoing and without prejudice to any of Lehman Brothers' rights under applicable law, the foregoing prohibition shall not apply to the extent that such prohibition conflicts with Lehman Brothers' exercise of its rights under Section 11.

1.3    **Documentation**. Vendor will provide Lehman Brothers with functional and technical specifications for the Licensed Software, as well as user manuals and related materials sufficient to allow Lehman Brothers to utilize fully the intended capacity and functionality of the Licensed Software (the "Documentation"). Vendor will deliver a minimum of two (2) copies of the Documentation to Lehman Brothers upon execution of this Agreement and will revise such Documentation and provide copies thereof to Lehman Brothers from time to time as necessary to reflect any Upgrades to the Licensed Software. Lehman Brothers may make copies of and incorporate the Documentation in works prepared for Lehman Brothers' internal business endeavors so long as Lehman Brothers includes all copyright, trademark, and other notices of Vendor in the same form as they appear on or in the Documentation.

## 2.    TERM AND TERMINATION.

2.1    **Term.**

(a)    The initial term of this Agreement shall commence as of the Effective Date and continue for the period specified in Schedule C ("Initial Term"), unless earlier terminated in accordance with this Section 2.

(b)    The initial term for Support (as defined) runs concurrently with the Initial Term of the Agreement (and will be extended to run concurrently with any Renewal Term).

(c)    This subsection intentionally omitted.

2.2    **Renewal Option**. Not more than one hundred twenty (120) days and not less than ninety (90) days prior to the expiration of the Initial Term or any Renewal Term (as defined), Vendor will notify Lehman Brothers in writing of the upcoming expiration. Subject to the renewal pricing terms set out in Section 7.5 (the "Renewal Pricing Terms"), Lehman Brothers may, at its sole option, renew this Agreement (including the Licensed Software, BigFix Solutions and Support) for additional one (1) year periods (each a "Renewal Term") by providing written notice to Vendor; provided, however, that Lehman Brothers will be entitled to renew this Agreement (including the Licensed Software, BigFix Solutions and Support) for one or more Renewal Terms whether or not Vendor has provided timely notice in accordance with this Section and provided further that Vendor's failure to provide such notice shall not be considered a breach of this Agreement.

2.3    **Termination.**

2.3.1    Except as provided in Section 2.3.2, in the event of any material breach of this Agreement by either party, the non-defaulting party may terminate this Agreement, in whole or in part, by giving thirty (30) days' prior written notice; provided, however, that this Agreement will not terminate at the end of the thirty (30) day notice period if the party in breach has cured the breach of which it has

been notified prior to the expiration of the thirty (30) day period.

2.3.2  In the event that Lehman Brothers fails to make payment of any undisputed, invoiced amounts due hereunder, and such failure continues for a period of thirty (30) days after Lehman Brothers' receipt of written notice thereof, Vendor will have the right to terminate the Licensed Software, Support or Statement of Work to which the payment default relates upon an additional sixty (60) days' prior written notice unless the payment default has been cured before the end of such sixty (60) day period.

2.3.3  This subsection intentionally omitted.

2.3.4  Either party may terminate Support in whole or in part immediately upon notice if the other party (a) is liquidated, dissolved, or adjudged to be in a state of bankruptcy or receivership, (b) is insolvent, unable to pay its debts as they become due, or makes an assignment to or for the benefit of its creditors, or (c) ceases to conduct business for any reason on an on-going basis (i.e., for a period in excess of thirty (30) days) leaving no qualified successor to perform its obligations hereunder.

2.3.5  In the event that Lehman Brothers terminates this Agreement in whole or in part pursuant to Section 2.3.1 or Section 2.3.4: (a) Lehman Brothers may, at its sole option, in the case of Licensed Software (i) return the Licensed Software and related Documentation, in whole or in part, at Vendor's expense, and destroy all copies thereof, and Vendor will promptly refund the applicable license fees for the then-current License Term that remain unamortized as of the effective date of such termination, or (ii) continue the license to use the Licensed Software and related Documentation, in whole or in part, for the remainder of the then-current License Term upon payment of the applicable license fees; and (b) Vendor will, in the case of Support, promptly issue a refund of any prepaid fees unearned as of the date of such termination.

2.3.6  This subsection intentionally omitted.

2.3.7  This Agreement, along with the license and any subscriptions and related rights to Licensed Software, BigFix Solutions and Support will terminate upon expiration of the Initial Term specified on Schedule C (or the then current Renewal Term, if applicable) unless renewed in accordance with Section 2.2. Upon any full or partial termination Lehman Brothers shall immediately cease all use of all affected Licensed Software and related content and destroy all copies thereof and so certify to Company.

3.    ACCEPTANCE.

(a)    Each item of Licensed Software will be subject to a verification of acceptability by Lehman Brothers ("Acceptance") in accordance with the procedures set out in this Section 3(a), provided that no Upgrades other than major releases, as indicated by a change in the number to the left of the decimal point in the version number of the Licensed Software, such as from 1.0 to 2.0, shall be subject to Acceptance. Unless otherwise agreed to in writing by the parties, the acceptability of any item of Licensed Software will be based on Lehman Brothers' determination that the Licensed Software performs and provides functionality in accordance with the applicable Documentation or, if Vendor fails to provide such Documentation (or the Documentation fails to address a particular functionality), Lehman Brothers' reasonable satisfaction with the Licensed Software (or functionality, as applicable). If any item of Licensed Software is not acceptable, Lehman Brothers will notify Vendor within thirty (30) days of installation of the Licensed Software, specifying its reasons in reasonable detail, and Vendor will, at no additional cost, use best efforts to promptly conform the Licensed Software to the Documentation or Lehman Brothers' reasonable satisfaction, as applicable. If Lehman Brothers does not provide such notification to Vendor, Acceptance shall be deemed to occur thirty (30) days after delivery to Lehman Brothers of the Licensed Software (or any corrected version of the Licensed Software, as applicable). If within ten (10) days of notification by Lehman Brothers, any item of Licensed Software is still not acceptable, Lehman Brothers may, at its option: (i) terminate this Agreement in whole or in part without cause and as its sole remedy and Vendor's sole obligation and receive a prompt refund of fees for the portion of the Agreement so terminated; or (ii) without prejudice to Lehman Brothers' right to implement (i) above, extend the time for Vendor to correct the affected Licensed Software. If Lehman Brothers has notified Vendor three times in accordance with this Section 3(a) with respect to a particular item of Licensed Software (a "Rejected Item"), and Vendor is unable to correct that Rejected Item by exercising its best efforts within thirty (30) days of the third (or any subsequent) such notice, but Lehman Brothers does not exercise its termination right set forth in subsection 3(a)(i) above, then Vendor may, upon notice to Lehman Brothers, cease all efforts to correct that Rejected Item with no liability therefor, provided that, if the previous sequential release of the Rejected Item has been previously accepted by Lehman Brothers,

then Lehman Brothers shall have the right, as its sole remedy with respect to the failure of the Rejected Item to pass Acceptance, to continue use of the previous sequential release of that Rejected Item in accordance with the terms of this Agreement. When any item of Licensed Software is acceptable to Lehman Brothers, Lehman Brothers will notify Vendor in writing of its Acceptance. The Licensed Software set forth on Schedule A, other than BDE (as defined), has been installed and tested by Lehman Brothers prior to the Effective Date; therefore, with respect to such Licensed Software, Acceptance shall be deemed to have occurred as of the Effective Date of this Agreement. Upon installation, BDE shall be subject to Acceptance in accordance with this Section 3(a).

(b)    This subsection intentionally omitted.

4.    WARRANTIES, REPRESENTATIONS AND COVENANTS.

Vendor warrants, represents and covenants as follows:

4.1    Licensed Software Performance.

(a)    (i) During the Warranty Period (as defined), the Licensed Software when Used in accordance with its Documentation will perform and provide functionality in accordance with such Documentation. (ii) The Documentation provided by Vendor will faithfully and accurately reflect the Licensed Software. (iii) Upgrades to the Licensed Software provided under this Agreement will not materially degrade, impair or otherwise adversely affect the performance or operation of the Licensed Software, so long as all Licensed Software and Upgrades are installed and used in accordance with this Agreement and applicable Documentation. (iv) The Licensed Software media will be free of defects.

(b)    This subsection intentionally omitted.

4.2    No Destructive Elements. Except as set forth in this Section 4.2, the Licensed Software do not and will not contain any computer code, programs or programming devices (a) intentionally designed to disrupt, modify, delete, damage, deactivate, disable, harm or otherwise impede in any manner, including aesthetic disruptions or distortions, the operation of the Licensed Software, or any other associated software, firmware, hardware, computer system or network (sometimes referred to as "Trojan horses," "viruses" or "worms"), (b) that would disable the Licensed Software or impair in any way their operation based on the elapsing of a period of time, exceeding an authorized number of copies or advancement to a particular date or other numeral (sometimes referred to as "time bombs," "time locks" or "drop dead" devices), or (c) that would permit Vendor to access the Licensed Software to cause such disablement or impairment (sometimes referred to as "traps," "access codes" or "trap door" devices), or any other similar harmful, malicious or hidden procedures, routines or mechanisms that would cause such Licensed Software to cease functioning or to damage or corrupt data, storage media, programs, equipment or communications, or otherwise interfere with operations (collectively "Destructive Elements"). Lehman Brothers acknowledges that the Licensed Software may contain a counting device which will issue a notice when Lehman Brothers has installed a number of copies of the Licensed Software which approaches two (2) times the maximum number licensed hereunder, and which may prevent Lehman Brothers from making or installing additional copies which exceed two (2) times the number licensed hereunder. If Lehman Brothers installs any number of copies of the Licensed Software in excess of the maximum number licensed hereunder, then Lehman Brothers will, within thirty (30) days of the first anniversary of the Effective Date (and any subsequent anniversary thereof on which this Agreement remains in effect), (a) report the installation and use of such additional copies to Vendor and (b) pay to Vendor the fees applicable to such additional copies (calculated in accordance with Schedule C on a pro-rata basis from the first date of use to the end of the then-current Agreement year), provided that, if any such excess use is more than fifteen percent (15%) over the maximum licensed amount and persists for a period of thirty (30) consecutive days at any time during the initial or any renewal term of the Agreement (a "Grace Period"), Lehman Brothers will, within thirty (30) days of the end of such Grace Period, report such excess use to Vendor, and pay to Vendor the fees applicable to such additional copies (calculated in accordance with Schedule C on a pro-rata basis from the first date of use to the end of the then-current Agreement year). The annual payment to be made by Lehman Brothers for the second and each subsequent Agreement year (as set forth in Schedule C) will be adjusted to include any additional copies reported in accordance with this Section 4.2 during the previous Agreement year. Lehman Brothers also acknowledges that the Licensed Software may contain a license expiration device which will issue a notice when the then-current license term is near expiration, and which may prevent Lehman Brothers from using the Licensed Software after such term has expired. Vendor further agrees that it will not, under any circumstances including enforcement of a valid contract right, install or trigger a Destructive Element other than as set forth in

this Section 4.2 which in any manner is intended to interfere with Lehman Brothers' Use of the Licensed Software and/or to restrict Lehman Brothers from accessing its data files or in any way to interfere with the transaction of Lehman Brothers' business. In the event of Vendor's breach of this Section 4.2, Vendor further agrees to use its best and continuous efforts to immediately eliminate any and all Destructive Elements. Vendor will test each element of the Licensed Software utilizing the most recent version and the most recent data file of a reputable, commercially available anti-virus-checking software program prior to delivery to Lehman Brothers to ensure that it is free of Destructive Elements. Vendor acknowledges that it does not have any right to electronically repossess the Licensed Software.

**4.3    Date Data Processing.** The Licensed Software will accurately recognize, calculate, process and store all same century and multi-century formulas, dates and date notations (including leap years), will resolve ambiguities in date input and output and will have capacity to interoperate with other products used by Lehman Brothers that may deliver to or receive records from the Licensed Software, including backup and archived data; provided that the other products satisfy the requirements of this Section

**4.4    Security Price Processing.** Any of the Licensed Software provided hereunder that are designed to work with security prices will accurately recognize, calculate, process, and store all numbers, whether expressed in decimal form, fraction form, or both.

**4.5    Multiple Currency Processing.** The Licensed Software, if designed to process multiple currency denominations, will correctly input, store, process, convert, retrieve, output, and display monetary amounts denominated in the Euro.

**4.6    Right to Furnish.**

(a)    As of the Effective Date (or, if earlier, the date on which an item of Licensed Software is delivered to Lehman Brothers), (i) Vendor has the right to furnish, and Lehman Brothers has the right to Use, the Licensed Software in accordance with the terms of this Agreement, free of all liens, claims, encumbrances and other restrictions, and free of any third party rights, interests, license or support fees; and (ii) the license furnished by Vendor, and Lehman Brothers' Use of the Licensed Software in accordance with the terms of this Agreement, do not and will not violate, infringe or misappropriate any patent, published patent application, copyright, trademark, service mark, trade secret or other intellectual property or industrial property rights of any third party (collectively, "Intellectual Property Rights") or, to Vendor's knowledge, the laws or regulations of any governmental or judicial authority.

(b)    This subsection intentionally omitted.

**4.7    Professional Services.** The Support will be performed in a high quality, professional manner by qualified personnel, and are and at all times will be, with respect to quality, timeliness and qualification of personnel performing the Support comparable to or better than support and services offered by Vendor to any of its commercial customers who are similarly situated to Lehman Brothers with respect to types and volumes of support and services purchased.

**4.8    Export Control Regulations.** As of the Effective Date, all Licensed Software is, and as of the date on which any Update is provided to Lehman Brothers hereunder, such Update will be, to the best of Vendor's knowledge, exportable without restriction except to those countries expressly excluded from License Exception ENC pursuant to 15 C.F.R. 740.17 (2002), or any applicable successor regulation thereto. Each party who exports, re-exports or imports the Licensed Software assumes responsibility for complying with applicable laws and regulations, and for obtaining required export and import authorizations. In order to facilitate Lehman Brothers' compliance with this Section, Vendor will use best efforts to notify Lehman Brothers within thirty (30) days of any modifications made by vendor to the encryption levels present in any Licensed Software that cause such Licensed Software to be subject to more stringent export restrictions.

**4.9    Additional Software.** Except as expressly stated in Schedule A (a) no additional software or licenses are required for effective use (in accordance with the relevant Documentation) of the Licensed Software including, without limitation, for effective use of any database components thereof, and (b) to the extent that the Licensed Software is used in conjunction with a Web browser, no plug-ins or non-standard browser components are required for effective use (in accordance with the relevant Documentation) of the Licensed Software. Further, to the extent necessary in connection with installation or use of any Licensed Software, Lehman Brothers may create (and retain ownership of) software that interfaces with the APIs of the Licensed Software ("Interface Software"), and Vendor agrees, at Lehman Brothers' request, to provide sufficient information and

assistance to Lehman Brothers to allow Lehman Brothers to establish the effective operation of such Interface Software.

**4.10    Warranty Period.**

(a)    In the event that, during the Warranty Period (as defined), any part of the Licensed Software fails to conform to any of the warranties, representations and covenants set forth in Section 4.1(a), Section 4.2, Section 4.3, Section 4.4, Section 4.5, Section 4.8 or Section 4.9, Vendor will at its sole expense and as Vendor's sole obligation under this Agreement and Lehman Brothers' exclusive remedy (i) repair or replace the defective Licensed Software within five (5) business days, or, if Vendor reasonably determines that (i) is not possible, then (ii) refund all license fees for the affected Licensed Software, together with all prepaid and unearned Support fees applicable thereto, or (iii) in the case of an Upgrade received as part of Support, refund the unearned Support fees paid for such Licensed Software for the then current Support term. The "Warranty Period" means the period beginning on the Effective Date and ending sixty (60) days following the later of installation or, if applicable, Acceptance by Lehman Brothers.

(b)    This subsection intentionally omitted.

**4.11    Disclaimer.** EXCEPT AS EXPRESSLY PROVIDED IN THIS SECTION 4, VENDOR MAKES NO WARRANTIES OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH RESPECT TO ANYTHING PROVIDED HEREUNDER (WHETHER PRODUCT, SERVICE OR OTHERWISE), INCLUDING WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE. FURTHER, VENDOR DOES NOT WARRANT RESULTS OF USE OR FREEDOM FROM BUGS.

**5.    LIMITATION ON LIABILITY.** UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE FOR LOST PROFITS OR ANY OTHER INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND, HOWSOEVER CAUSED; PROVIDED THAT THE FOREGOING LIMITATION ON LIABILITY WILL NOT APPLY TO (A) VENDOR'S INDEMNIFICATION OBLIGATIONS, OR (B) EITHER PARTY'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS, OR (C) LOSS OF OR DAMAGE TO DATA ACCESSIBLE BY THE LICENSED SOFTWARE CAUSED BY VENDOR OR A FAILURE OF THE LICENSED SOFTWARE; HOWEVER, VENDOR SHALL NOT BE LIABLE UNDER SUBSECTION (C) FOR ANY AMOUNTS IN EXCESS OF THE FEES PAID OR PAYABLE TO VENDOR HEREUNDER FOR THE THEN-CURRENT AGREEMENT YEAR.

**6.    SUPPORT AND DEVELOPMENT SERVICES.**

(a)    Vendor will provide the technical support services described in Schedule B ("Support").

(b)    Vendor may, in consultation with Lehman Brothers, agree to provide mutually agreed upon programming, customization and other development services set forth on a mutually executed statement of work (collectively the "Development Services") in accordance with such terms as may be mutually negotiated and agreed upon in writing between the parties. Vendor's installation, optimization and training services are offered as part of premium Support and shall in no event be considered "Development Services."

**7.    PRICING AND PAYMENT.**

**7.1    Fees.** The fees for the Licensed Software and Support are set forth in Schedule C.

**7.2    Payment Terms.** Except as otherwise set forth in Schedule C, Invoices are due within thirty (30) days of Lehman Brothers' receipt of Vendor's invoice, except for any disputed amounts. Lehman Brothers will receive an early payment discount (the "Early Payment Discount") on charges incurred under this Agreement as described in this Section 7.2 only if such discount is specifically indicated on Schedule C and on Vendor's invoice as applicable to a particular charge. If Lehman Brothers transmits payment to Vendor on or before the tenth business day after Lehman Brothers' receipt of invoice, the Early Payment Discount will be 3% of the invoiced amount. If Lehman Brothers transmits payment to Vendor within eleven (11) to fifteen (15) business days of Lehman Brothers' receipt of invoice, the Early Payment Discount will be 2% of the invoiced amount. If Lehman Brothers transmits payment to Vendor within sixteen (16) to twenty (20) business days of Lehman Brothers' receipt of invoice, the Early Payment Discount will be 1% of the invoiced amount. If Lehman Brothers transmits payment to Vendor later than twenty (20) business days after Lehman Brothers' receipt of invoice, the Early Payment Discount will not apply

to such invoice.

7.3    Taxes. Lehman Brothers will pay all sales, use, value added or similar taxes, exclusive of corporate franchise taxes, or taxes based upon Vendor's income or investment.

7.4    Most Favored Customer. Vendor warrants and represents that the prices and the terms and conditions with respect to all Licensed Software, Documentation, and Support (the "Products") provided pursuant to this Agreement are, when taken as a whole, comparable to or better than the prices and terms and conditions taken as a whole offered prior to and as of the Effective Date by Vendor to any of its commercial customers who are similarly situated to Lehman Brothers with respect to types and volumes of Products purchased (i.e. have purchased the identical types and volume). If at any time during the term of this Agreement, Vendor contracts with any customer for Products identical in types and volume to the Products at a price lower than the price set forth herein and on terms and conditions more favorable, when taken as a whole, than those offered to Lehman Brothers, then this Agreement will be amended, effective as of the effective date of the more favorable agreement, to provide the lower price to Lehman Brothers. For the avoidance of doubt, the parties agree that any violation of this Section 7.4 will constitute a material breach of this Agreement.

7.5    Renewal Pricing Terms. Except as otherwise agreed in writing by the parties, license fees and Support fees for any Renewal Term will not exceed the lesser of (a) 105% of the applicable fee during the immediately preceding twelve (12) month period or (b) the fee for the immediately preceding twelve (12) month period adjusted for any increase in the Consumer Price Index during such period. For purposes of this Section, "Consumer Price Index" means Consumer Price Index for All Items, U.S. City Average, All Urban Consumers (base year 1982-1984=100), published by the Bureau of Labor Statistics of the U.S. Department of Labor.

7.6    Additional Products. During the Initial Term or any Renewal Term, Lehman Brothers may purchase Vendor Additional Products at a discount of 25% or more off the then current published list price. Corresponding first year Support fees for software purchases made pursuant to this Section will also be at a discount of 25% or more off the then current published list price; provided that such first year Support fees will in no event exceed 25% of the net price of the applicable software.

8.    CONFIDENTIALITY.

8.1    Confidential Information. "Confidential Information" means any information obtained by either party ("Receiving Party") that relates to the past, present or future business activities of the other party ("Disclosing Party"), its subsidiaries and affiliates or their respective employees, customers or third party contractors, including any information relating to the plans, pricing, methods, methodologies, processes, financial data, lists, Intellectual Property Rights, customer information, apparatus, statistics, programs, research, development, information technology, the terms and existence of this Agreement or related information , and any and all past, present and future agreements and/or business arrangements that have been, are, or are anticipated to be entered into by the parties.

8.2    Exceptions. Confidential Information does not include information that is (a) previously known to the Receiving Party, free from any obligation to keep it confidential, (b) publicly disclosed by the Disclosing Party either prior to or subsequent to the receipt by the Receiving Party of such information, (c) independently developed by the Receiving Party without any access to the Confidential Information, or (d) rightfully obtained by the Receiving Party from a third party lawfully in possession of the Confidential Information who is not bound by confidentiality obligations to the Disclosing Party.

8.3    Treatment of Confidential Information. Each Receiving Party will hold all Confidential Information in confidence for the Disclosing Party and, except as set forth in this Agreement or as otherwise may be authorized by the Disclosing Party in writing, the Receiving Party will not disclose to any person, firm or enterprise, or use for its own benefit, any such Confidential Information. The Receiving Party may disclose Confidential Information to its employees solely as required in order for such party to perform its obligations under this Agreement. A Receiving Party may disclose Confidential Information if required to do so under applicable law, rule or order; provided that such Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of the required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy; and provided further that the Receiving Party discloses no more Confidential Information than is reasonably necessary in order to respond to the required disclosure. Notwithstanding the foregoing, Vendor may disclose this Agreement

to its investors, potential investors or acquirers (and their respective professional advisors), provided that (a) any such investor or acquirer is bound by confidentiality obligations similar to those set forth in this Agreement and (b) Vendor provides prior written notice to Lehman Brothers of any such disclosure.

8.4    Return of Confidential Information. At any time upon the request of the Disclosing Party, and in the event of termination of this Agreement, the Receiving Party shall return, or destroy if so directed by the Disclosing Party, all Confidential Information, including all copies thereof and notes and other materials incorporating the Confidential Information, whether in physical or electronic form.

8.5    Injunctive Relief. In the event of a breach or threatened breach of the provisions of this Section, either party may have no adequate remedy in money or damages and, accordingly, either Disclosing Party may seek an injunction against such breach.

9.    INSURANCE.

9.1    Forms of Insurance. Vendor agrees to obtain and maintain and keep in full force and effect, at Vendor's expense, the following forms of insurance with the minimum limits of insurance stated below:

| Form of Insurance | Minimum Limits of Insurance |
| --- | --- |
| (a) Disability | As required by law |
| (b) Unemployment | As required by law |
| (c) (1) Workers Compensation and (2) Employers Liability | Statutory $1,000,000 per occurrence (BI/disease) |
| (d) Professional Liability. Such insurance should be endorsed to cover services provided by subcontractors if any. | $1,000,000 per occurrence and aggregate |
| (e) Commercial General Liability on an occurrence basis, including premises operations, products and completed operations, contractual liability, and personal and advertising injury coverages, naming Lehman Brothers as an additional insured by endorsement to the policy. | $1,000,000 per occurrence and aggregate |
| (f) Commercial Automobile Liability covering all leased, owned and non-owned vehicles and naming Lehman Brothers as an additional insured by endorsement to the policy. | $1,000,000 per occurrence combined single limit for bodily injury and property damage liability |
| (g) Umbrella Liability on a follow form basis. | $1,000,000 per occurrence and aggregate excess of the Commercial General Liability and Commercial Automobile Liability Insurance |
| (h) Fidelity Bond, including third party liability or client coverage and naming Lehman Brothers as a loss payee by endorsement to the policy. | $500,000 per occurrence and aggregate |

9.2    Coverage. All insurance coverage required herein will provide primary coverage for all losses and damages caused by the perils or causes of loss covered thereby. Vendor agrees to have included in each of the insurance policies required herein a waiver of the insurer's rights of subrogation against Lehman Brothers.

9.3    Certificates of Insurance. Each insurance policy will be maintained with an insurer having a rating of at least an "A-" in the most currently available Best's Insurance Reports and will provide for at least thirty (30) days' prior written notice to Lehman Brothers in the event of any modification or cancellation. Vendor will furnish Lehman Brothers with certificates of insurance in satisfactory form, evidencing its compliance with these provisions.

10.    RISK OF LOSS.

Vendor will bear all risk of loss or damage to any Products and Additional Products shipped to Lehman Brothers by Vendor until the time of receipt by Lehman Brothers at Lehman Brothers' specified location. In the event of any such loss or damage, Vendor will, at Lehman Brothers' request, promptly replace the lost or damaged Products at Vendor's sole expense.

## 11.  SOURCE CODE.

No later than ten (10) days after the Effective Date and at no cost to Lehman Brothers, Vendor will deposit with a commercial escrow agent reasonably satisfactory to Lehman Brothers (provided that Vendor's existing agent, Escrow Associates, shall be deemed satisfactory) copies of all source code, Documentation, system documentation, statements of principles of operation, and schematics for the Licensed Software as well as any pertinent commentary or explanation that may be necessary to render the Licensed Software understandable by a programmer of reasonable skill and to enable such programmer to modify the Licensed Software without adverse consequence to its normal operation (the "Deposits"). Vendor will also provide Lehman Brothers with written verification from the escrow agent that all such Deposits have been placed in escrow in accordance with the terms of this Section 11. In the event that (a) Vendor is in material and fundamental breach of its Support obligations under this Agreement on a continuous basis for more than thirty (30) days after written notice from Lehman Brothers, (b) Vendor is liquidated, dissolved, or adjudged to be in a state of bankruptcy or receivership, (c) Vendor is insolvent, unable to pay its debts as they become due, or makes an assignment to or for the benefit of its creditors, (d) Vendor ceases to conduct business for any reason on an on-going basis leaving no qualified successor to provide Support for the Licensed Software, or (e) Vendor decides, for whatever reason, not to provide Support for the Licensed Software on an ongoing basis and notifies Lehman Brothers of such decision, Lehman Brothers will be entitled to obtain a copy of the Deposits. In such event, the terms "Licensed Software" and "Documentation" shall be deemed to include the Deposits, and the scope of Use authorized hereunder shall be deemed to include making and utilizing such modifications to the Licensed Software and Documentation as Lehman Brothers may desire for the sole purpose of maintaining Lehman Brothers authorized Use of the Licensed Software while this Agreement remains in effect (including through the use of third party contractors or otherwise, subject to Section 1), subject to the terms of this Agreement and the limitations on Use otherwise applicable hereunder. Lehman Brothers agrees that any Deposits received under the provisions of this Section shall be considered confidential and proprietary to Vendor. Vendor agrees to update the Deposits for all Upgrades no later than twenty (20) business days after the general release of any Upgrade.

## 12.  INDEMNIFICATION.

12.1  **Infringement.** At no expense to Lehman Brothers, Vendor will defend, indemnify and hold harmless Lehman Brothers, its affiliates and their respective successors, assigns, officers, directors and employees (collectively, "Indemnitees") from damage, loss, liability, costs and expenses of any kind (including reasonable attorneys' fees) (collectively, "Loss") relating to or arising out of any third party claim that any Product, any portion thereof, or the use thereof in accordance with the terms of this Agreement, infringes any Intellectual Property Right of a third party.   In addition to Lehman's Brothers other rights and Vendor's obligations, if all or any part of a Product is, or in the opinion of Vendor may become, the subject of any claim or suit for infringement of any Intellectual Property Right, Vendor may, and in the event of any adjudication that the Product or any part thereof does infringe or if the use of the Product or any part thereof is enjoined, Vendor at its expense will promptly: (a) procure for Lehman Brothers, at no additional cost to Lehman Brothers, the right to use the Product or the affected part thereof; or, to the extent such option is not available to Vendor on commercially reasonable terms following best efforts to procure such right (b) replace the Product or affected part with a modified or substituted Product or part that does not violate any third party's Intellectual Property Rights and that is qualitatively and functionally at least the equivalent of the affected Product or part. If neither (a) nor (b) is available to Vendor on commercially reasonable terms following best efforts to procure the same, and Vendor has so advised Lehman Brothers, or if Vendor has not promptly performed in accordance with (a) or (b) above, Lehman Brothers may, as its sole option, surrender the Products purchased under this Agreement in whole or in part and receive a refund of the unamortized portion of the aggregate payments made by Lehman Brothers for the applicable Products for the then current Agreement term (and Vendor may require that Lehman Brothers do so). Vendor's obligations under this Section 12.1 do not apply with respect to Licensed Software, content, or portions thereof that are (i) modified by Lehman Brothers after delivery where the alleged infringement would not exist but for such modification, (ii) combined with other software (other than is listed in Schedule A as "Additional Software") where the alleged infringement would not exist but for such combination. Each party will give the other party prompt written notice of any threat, warning or notice of any claim or action to which any of Sections 12.1 through 12.4 applies and reasonable assistance with the defense thereof. Vendor shall have the right to conduct the defense of any such claim or action and, subject to section 12.5, all negotiations for its settlement; provided, however, Lehman Brothers may participate in such defense or negotiations to protect its interests, at its expense using counsel of its choice, and Vendor will provide reasonable assistance to

Lehman Brothers and its counsel.

12.2  **Injury to Persons or Property.** Vendor will defend, indemnify and hold harmless the Indemnitees from Loss arising from injury to persons or property caused by the fault or negligence of Vendor's officers, personnel, agents or representatives.

12.3  **Vendor Personnel.** Vendor assumes sole and full responsibility for the acts of its personnel and will indemnify and save harmless Indemnitees from Loss with respect to any and all claims on account of any act or omission on the part of Vendor or its personnel, including but not limited to any Loss resulting from breach of any duty or theft of material or services by any such person; provided, however, that Vendor's obligation to indemnify will not apply to any Loss caused solely by the misconduct or negligence of Indemnitee's employees or of other individuals not employed or engaged by Vendor. Vendor warrants and represents that it is an independent contractor and its personnel are not Lehman Brothers' agents or employees for federal, state, and local tax purposes or any other purposes whatsoever, and are not entitled to any compensation from Lehman Brothers or any Lehman Brothers employee benefits. Vendor acknowledges and agrees that, as between the parties, its personnel are solely employees or contractors of Vendor and that, as their employer (to the extent applicable), Vendor shall be solely responsible for the recruitment, hiring, training, utilization, assignment, re-assignment, promotion, discipline, termination, or other employment-related activities concerning such personnel. Vendor will defend, indemnify and hold harmless Indemnitees from Loss arising out of (a) Vendor's actions as an employer of its personnel or with respect to engagement of any contractor, (b) any third party claim or action alleging that Indemnitees should be deemed the "employer" or "joint employer" of any of Vendor's personnel, or (c) any third party claim arising from Vendor's failure to comply with applicable laws. Vendor warrants and represents that each of its personnel is an employee or contractor of Vendor and that Vendor will withhold and pay all applicable income and payroll taxes with respect to such personnel to the extent required by law. As between the parties, Vendor is solely responsible for the compensation of its personnel, and payment of workers' compensation, disability and other similar benefits, unemployment and other similar insurance, for withholding income and payroll taxes and for verifying the work eligibility of each such individual, including the completion and maintenance of Form I-9 (for purposes of determining authorization to work in the United States). Vendor has sole responsibility for activities of Vendor and its personnel, and may not bind or otherwise obligate Lehman Brothers in any manner.

12.4  **Confidentiality Obligations.** Vendor will defend, indemnify and hold harmless Indemnitees from Loss arising from a breach of the confidentiality obligations by Vendor, its officers, personnel, agents and representatives.

12.5  **Settlement of Claims.** Vendor will not settle or otherwise dispose of any indemnified claim or action in a manner adversely affecting the rights of Lehman Brothers or an Indemnitee (other than the right to use the Products hereunder), or otherwise binding Lehman Brothers or an Indemnitee, without Lehman Brothers' prior written consent, which consent shall not be unreasonably withheld.

## 13.  COMPLIANCE WITH LAWS.

13.1  **Employment Laws.** Vendor will comply with all applicable employment laws and will further comply, to the extent applicable, with the requirements of Executive Order 11246, the Vietnam Veterans' Readjustment Assistance Act of 1974, as amended, the Rehabilitation Act of 1973, as amended, and the applicable implementing regulations and reporting requirements under each of the foregoing, each of which is incorporated herein by reference.

13.2  **Foreign Corrupt Practices.** Vendor is fully aware of and has complied with, and in the performance of its obligations under this Agreement shall not take any action or omit to take any action that would cause it to be in violation of, the U.S. Foreign Corrupt Practices Act of 1977 and all regulations promulgated there under.

13.3  **Export Restrictions.** Each party who exports, re-exports or imports the Software assumes responsibility for complying with applicable laws and regulations, and for obtaining required export and import authorizations. Vendor represents and warrants that as of the Effective Date, all Software is exportable without restriction except to those countries expressly excluded from License Exception ENC pursuant to 15 C.F.R. 740.17 (2002). In order to facilitate Lehman Brothers' compliance with this Section, Vendor will use its best efforts to notify Lehman Brothers within thirty (30) days of any request by Lehman Brothers of the level of encryption present in any Software and any applicable information in relation to licenses Vendor has obtained for its export of the Software out of the United States.

14. **DISASTER RECOVERY / BUSINESS CONTINUITY**

14.1 **Disaster Recovery.** Vendor shall use best efforts to provide disaster recovery and backup capabilities and facilities through which it will be able to render the Services to Lehman Brothers with minimal disruptions or delays. Vendor shall use best efforts to: (i) develop a disaster recovery plan ("DRP") and implement such DRP as soon as practicable following the Effective Date, (ii) at least once every calendar year during the term of the Agreement, test the operability of the DRP, and (iii) upon discovery by Vendor, immediately implement the DRP upon the occurrence of a disaster or other event other than a planned outage affecting the delivery or receipt of the Services over a period of at least one hour ("Disaster") and promptly provide Lehman Brothers with a written notice of the Disaster. Vendor shall use best efforts to reinstate the Services within one (1) business day of a Disaster. Reinstating the Services of Lehman Brothers shall receive as high or greater priority as that of Vendor's affiliates and other customers. In the event of a Disaster, Vendor shall not increase its charges under this Agreement.

14.2 **Business Continuity.** Vendor shall for the duration of the applicable Agreement and in accordance with industry best practice, maintain detailed and comprehensive contingency plans against events which could reasonably be expected to affect the ability of Vendor to perform in accordance with the Agreement including, without limit, loss of production, loss of systems, loss of equipment, industrial relations problems with Vendor's or Vendor's subcontractors' employees, failures in the supply chain, failure of carriers and the failure of Vendor's or its supplier's equipment, computer systems or business systems. Vendor shall keep the plans under review and make such changes, from time to time, as shall be required in accordance with industry best practice. Lehman Brothers shall be entitled to review the plans at any time and make suggested changes or amendments to the plans which Vendor, acting reasonably, shall consider (in consultation with Lehman Brothers) and may, at its discretion, put in place.

15. **GENERAL.**

15.1 **Governing Law; Jurisdiction.** This Agreement will be governed by and construed under the laws of the State of New York excluding its conflict of laws rules. The parties irrevocably submit to the exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the borough of Manhattan, New York, New York, and the appellate courts thereof.

15.2 **Shrinkwrap and Clickwrap Void.** All shrinkwrap and clickwrap licenses that purport to govern the terms of use of any Product licensed by Vendor to Lehman Brothers pursuant to this Agreement or otherwise will be void.

15.3 **No Publicity.** Vendor will not use the name or marks, refer to, or identify Lehman Brothers or any Lehman Brothers affiliate on the Internet or its Internet site www.bigfix.com, in publicity releases, public announcements, promotional or marketing materials, customer listings, advertising, case studies, testimonials or quote, in any media, any staff or employee of Lehman Brothers with regards to this Agreement or Lehman Brother's relationship with BigFix hereunder.

15.4 **Force Majeure.** Neither party to this Agreement will be liable for any delay or failure to perform its obligations hereunder caused by an event of natural disaster, casualty, acts of God, riots, terrorism, governmental acts or such other event of similar nature that is beyond the reasonable control of the party seeking to rely on this Section 15.4 to excuse its delay or failure; provided, however, that such party will not have contributed in any way to such event. Vendor will maintain commercially reasonable disaster recovery measures to prevent or cure the delay or failure. If the delay or failure continues beyond ten (10) calendar days, Lehman Brothers may terminate this Agreement in whole or in part with no further liability and will receive a refund of any prepaid fees unearned as of the time of termination.

15.5 **Assignment.** Except as set forth in this Section, neither this Agreement nor any part hereof may be assigned (whether by operation of law or otherwise) by either party without the other party's prior written consent and any such assignment will be void. Notwithstanding the foregoing, Lehman Brothers may assign this Agreement or any of its rights or obligations hereunder upon written notice to Vendor, to any of its affiliated companies or to an entity with or into which it is merged or consolidated or to which it sells all or substantially all its capital stock or assets associated with the operations for which the Products are

Used, without the consent of Vendor, and Vendor may assign this Agreement to an entity with or into which it is merged or consolidated or to which it sells all or substantially all its capital stock or assets associated with the Products, without the consent of Lehman Brothers; provided, however, that Vendor provides Lehman Brothers with prior written notice of any such assignment, and Lehman Brothers shall have the right, at any time during the thirty (30) days following Lehman Brothers' receipt of such notice from Vendor, to terminate this Agreement without cause. Unless terminated by Lehman Brothers in accordance with the immediately preceding sentence, this Agreement will be binding upon the parties' respective successors and assigns. Without limiting the foregoing, Vendor will not subcontract Support or any Development Services without Lehman Brothers' prior written consent. If Lehman Brothers consents to subcontracting, Vendor will remain primarily liable for the performance of any subcontracted obligations and will be responsible for the acts and omissions of its permitted subcontractors as if such acts and omissions were those of its employees.

15.6 **Notice.** All notices relating to this Agreement will be in writing and delivered personally, by overnight delivery service or first class prepaid mail with return receipt requested to (a) in the case of Vendor, its address as first set forth above and (b) in the case of Lehman Brothers, Director of Global Procurement Services, 745 Seventh Avenue, New York, New York 10019, with a copy marked to the attention of the General Counsel at the same address. Invoices will be sent to: Lehman Brothers Inc., Technology Expense, 70 Hudson Street, 10th Floor, Jersey City, New Jersey 07302-4585. Any notice hereunder will be effective upon receipt by the party to which such notice is addressed.

15.7 **Entire Agreement.** This Agreement (including Schedule A, Schedule B, and Schedule C, each of which is hereby expressly incorporated by reference herein) is the entire agreement of the parties and supersedes all previous and contemporaneous communications, presentations, proposals, or agreements regarding the subject matter hereof. This Agreement cannot be amended or waived except by a physical writing manually signed by both parties. Terms contained in any documentation that purports to address the legal rights or obligations of the parties or otherwise conflict with this Agreement shall be of no force or effect.

15.8 **Waiver; Remedies Non-Exclusive.** No failure or delay on the part of any party in exercising any right or remedy provided in this Agreement will operate as a waiver thereof; nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or at law or in equity. Except as expressly provided herein, no remedy specified in this Agreement is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other right or remedy provided herein or available at law or in equity.

15.9 **Enforceability.** If any provision of this Agreement is held to be unenforceable, the remaining provisions of this Agreement will be unimpaired and will remain in full force and effect.

15.10 **Counterparts.** This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

15.11 **Facsimile Copy.** A facsimile of a signed copy of this Agreement or other copy made by reliable mechanical means may be relied upon as an original. If there is any inconsistency between the facsimile and a subsequently received hard copy, the facsimile will control.

15.12 **Headings.** The headings in this Agreement are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

15.13 **Survival.** Sections 2.3, 4, 5, 8, 12 and 15, along with any accrued rights to payment will survive any termination of this Agreement.

15.14 **Relationship of the Parties.** Vendor is an independent contractor of Lehman Brothers and is and will not be an agent of Lehman Brothers for any purpose. Vendor has sole responsibility for activities of Vendor and its personnel and may not bind or otherwise obligate Lehman Brothers in any manner.

SIGNATURE PAGE FOLLOWS

GDSVF&H\573111.1

## SCHEDULE A

### LICENSED SOFTWARE

**Licensed Software**

Licensed Software (as further defined in Section 1 of the Agreement) consists of the BigFix Enterprise Suite, including each of the following components:
- BES Server
- BES Console,
- BES Client
- BigFix Development Environment

**Additional Software**

For the Licensed Software to operate effectively, Lehman Brothers must have adequate licenses to: Windows 2000 or 2003 Server and SQL Server.

## SCHEDULE B

## SUPPORT

The following will apply so long as they remain Vendor's standard terms and Lehman Brothers is in full compliance with the Agreement. "Licensee" shall mean Lehman Brothers and "Company" shall mean Vendor. Other capitalized terms not defined in Section 5 below have the same meaning as in the Agreement.

1. **SUPPORT AND MAINTENANCE SERVICES.** Support and Maintenance Services consist of (a) Issue Correction and Telephone Support provided to a single consistent technical support contact concerning the installation and use of the then current release of Licensed Software and the Previous Sequential Release, (b) E-mail Support, (c) Web Support, and (d) Licensed Software updates that Company in its discretion makes generally available to its support and maintenance customers without additional charge as well as Upgrades as defined in the Agreement.

2. **ISSUE SEVERITY LEVELS.** Subject to Section 4 "PREMIUM SUPPORT," if applicable, Company shall exercise commercially reasonable efforts (up to 8 hours per month) to correct any Issue reported by Licensee with the current unmodified release of Licensed Software in accordance with the severity level reasonably assigned to such Issue by Company. Company will use commercially reasonable efforts to initially respond to Issues reported by Licensee during Telephone Support hours within the target response times indicated below; however, these are targets only and are not a guarantee by Company that resolution will be possible during such time.

- Severity 1 Issues - Company shall promptly commence the following procedures: (i) assign Company engineers to correct the Issue, including a primary contact with full-time availability; (ii) notify Company management that such Issues have been reported and of steps being taken to correct such Issue(s); (iii) provide Licensee with periodic reports on the status of the corrections at least once per day; and (iv) initiate work to provide Licensee with a Workaround or Fix; and (v) will continue such commercially reasonable efforts until a Workaround or Fix has been made available to Licensee. Initial response time: one (1) hour.

- Severity 2 Issues - Company shall exercise commercially reasonable efforts to provide Licensee with a Workaround or Fix. Company will include the Fix for the Issue in the next major release of the Product Component. Initial response time: four (4) hours.

- Severity 3 Issues - Company may include a permanent Fix for the Issue in the next major release of the Licensed Software. Initial response time: two business days.

- Severity 4 Issues - Company will provide relevant information to Licensee. Initial response time: three business days.

If Company believes that a problem reported by Licensee may not be due to an Issue with the Licensed Software, Company will so notify Licensee. At that time, Licensee may (1) instruct Company to proceed with problem determination at its possible expense as set forth below, or (2) instruct Company that Licensee does not wish the problem pursued at its possible expense. If Licensee requests that Company proceed with problem determination at its possible expense and Company determines that the error was not due to an Issue with the Licensed Software, Licensee shall pay Company, at Company's then-current and standard consulting rates, for all work performed in connection with such determination, plus reasonable related expenses incurred therewith. Licensee shall not be liable for (i) problem determination or repair to the extent problems are due to Issues with the Licensed Software; or (ii) work performed under this paragraph in excess of its instructions; or (iii) work performed after Licensee has notified Company that it no longer wishes work on the problem determination to be continued at its possible expense (such notice shall be deemed given when actually received by Company). If Licensee instructs Company that it does not wish the problem pursued at its possible expense or if such determination requires effort in excess of Licensee's instructions, Company may, at its sole discretion, elect not to investigate the Issue with no liability therefor.

3. **EXCLUSIONS.** Company shall have no obligation to support: (i) altered or damaged Licensed Software or any portion of the Licensed Software incorporated with or into other software; (ii) any Licensed Software that is not the then current release or immediately Previous Sequential Release (for avoidance of doubt, Company shall be obligated to support a Previous Sequential Release); (iii) Licensed Software problems caused by Licensee's negligence, abuse or misapplication, use of the Licensed Software other than as specified in the Company's user manual or other causes beyond the control of Company; or (iv) Licensed Software installed on any hardware that is not supported by Company. Company shall have no liability for any changes in Licensee's

hardware which may be necessary to use Licensed Software due to a Workaround or maintenance release.

4. **PREMIUM SUPPORT.** To the extent Licensee is entitled to Premium support as specified in the Agreement: Telephone support will be expanded to 24 hours; Licensee will be given access to expanded Company contact information, including technical support managers and engineers; Licensee will be assigned a Company technical support engineer as primary contact during Company business hours (PST); the amount of time spent by Company to address Licensee's Issue reports shall not be limited to 8 hours; and Licensee's Issue reports will be given priority over Issue reports of the same priority level from basic support customers.

5. **DEFINITIONS.**

- "E-mail support" means ability to make requests for technical support assistance by e-mail at any time (with reasonable efforts by Company to respond within one business day) concerning the installation and use of the then current release of the Licensed Software and the Previous Sequential Release.

- "Issue" means an error in the Licensed Software which significantly degrades such Licensed Software as compared to the Company's published performance specifications.

- "Issue Correction" means the use of reasonable commercial efforts to correct Issues.

- "Fix" means the repair or replacement of object or executable code versions of the Licensed Software or documentation to remedy an Issue.

- "Previous Sequential Release" means the release of Licensed Software which has been replaced by a subsequent release of the same Licensed Software.

- "Severity 1 Issue" means an Issue which renders the core functionality of the Licensed Software inoperative.

- "Severity 2 Issue" means an Issue which substantially degrades the performance of the Licensed Software or materially restricts Licensee's use of such Licensed Software.

- "Severity 3 Issue" means an Issue which causes only a minor impact on the Licensee's use of the Licensed Software.

- "Severity 4 Issue" means an inquiry regarding capabilities of the Licensed Software; Licensee's use of the Licensed Software is not impeded.

- "Telephone Support" means technical support telephone assistance between 7:00AM and 7:00PM Pacific Time (or as set forth in Section 4 "PREMIUM SUPPORT" if applicable) on Company's regular business days concerning the installation and use of the then current release of the Licensed Software and the Previous Sequential Release.

- "Web Support" means information available on the World Wide Web, including frequently asked questions, product documentation and bug reporting.

- "Workaround" means a change in the procedures followed or data supplied by Licensee to avoid an Issue without substantially impairing Licensee's use of the Licensed Software.

THESE TERMS AND CONDITIONS CONSTITUTE A SERVICE CONTRACT AND NOT A PRODUCT WARRANTY. ALL PRODUCTS AND MATERIALS RELATED THERETO ARE SUBJECT EXCLUSIVELY TO THE WARRANTIES SET FORTH IN THE AGREEMENT. THIS ATTACHMENT IS AN ADDITIONAL PART OF THE AGREEMENT AND DOES NOT CHANGE OR SUPERSEDE ANY TERM OF THE AGREEMENT EXCEPT TO THE EXTENT UNAMBIGUOUSLY CONTRARY THERETO.

GDSVF&H\573111.1

## SCHEDULE C

### FEE SCHEDULE

The Fees for the Initial Term are set forth in the table below.    Annual Fees for the first year shall be due and payable by Lehman Brothers on the Effective Date of the Agreement.  Annual Fees for each subsequent year of the Initial Term shall be invoiced by Vendor thirty (30) days prior to the relevant anniversary of the Effective Date.  Fees for any Renewal Term shall be invoiced thirty (30) days prior to the expiration of the then-current term.  Invoices are due and payable in accordance with Section 7.2, not subject to Early Discount.

| LICENSE TERM: Three (3) years from the Effective Date of this Agreement, subject to renewal in accordance with Section 2.2. | | | |
|---|---|---|---|
| **LICENSED SOFTWARE:**<br><br>BigFix Platform, BigFix Agent, BDE | **Licensed Machines**<br><br>40,000 | **Annual License Fee per Licensed Machine**<br><br>$4.50 | **Total Annual License Fee**<br><br>$180,000 |
| **BIGFIX SOLUTIONS:**<br><br>The Annual License Fee set forth above for each Licensed Machine includes a concurrent subscription for to all BigFix Solutions currently offered and maintained by Vendor and to any BigFix Solution made generally available by Vendor during the term of this Agreement. | **Licensed Machines**<br><br>40,000 | **Annual BigFix Solutions Fee per Licensed Machine**<br><br>Included | **Total Annual BigFix Solutions Fee**<br><br>Included |
| **SUPPORT:**<br><br>Premium Support (in accordance with Schedule B) and including up to five (5) days of installation, optimization and training services. | **Licensed Machines**<br><br>40,000 | **Annual Support Fee Per Licensed Machine**<br><br>$1.125 | **Total Annual Support Fees**<br><br>$45,000 |
| **Total Annual Fees for Licensed Software, BigFix Solutions and Support for each year of the Initial Term set forth above:** | | | $225,000 |

The parties have caused this Agreement to be executed by their respective
authorized representatives.

VENDOR                              LEHMAN BROTHERS INC.

By: _____        By: _____

Name: DAVID S. HINDAO              Name: PATRICK COSTER
        (Type or Print)                    (Type or Print)

Title: CHAIRMAN                    Title: VICE PRESIDENT

# Exhibit

# 2

Confidential Document

**AMENDMENT No. 1**
**to the**
**Software License and Support Agreement**
**Dated August 9, 2004**
**Between**
**BigFix, Inc. and Lehman Brothers, Inc.**

This Amendment No. 1 ("Amendment") is entered into as of May 30, 2007 ("Amendment Effective Date") between BigFix, Inc. ("BigFix") and Lehman Brothers, Inc. ("Lehman") and it amends the Software License and Support Agreement ("Agreement") dated August 9, 2004 ("Agreement Effective Date").

WHEREAS, BigFix and Lehman have entered into the aforementioned Agreement; and

WHEREAS, BigFix and Lehman have agreed to amend the Agreement as set forth below so that Lehman can purchase licenses for additional Licensed Machines as well as extend the Original License Term for an additional three (3) year period;

NOW THEREFORE, BigFix and Lehman hereby agree as follows:

**1.     Amended Schedule C.**  The parties agree to amend Schedule C of the Agreement by deleting the words "Three (3) years" as listed in the License Term section and adding the words "Six (6) years" in its place, and updating the Total Annual License Fees column as necessary.  The entire amended Schedule C is attached to this Amendment as Exhibit A.

**2.     Additional Schedule D.**  A Schedule D, attached to this Amendment as Exhibit B, will be appended to the Agreement in order to memorialize Townsend Analytics' (a Lehman affiliate) purchase of licenses for an additional number of Licensed Machines. These additional licenses are in addition to the amount of Licensed Machines licensed by Lehman in Schedule C, and are subject to all the terms and conditions of the Agreement.  Furthermore, all references in the Agreement to a "Schedule C" shall now read and refer to a "Schedule C and Schedule D", as applicable, in order to give the additional Schedule D all the necessary force and effect of being part of the Agreement.

**3.     Definitions and Conflict.**  The Agreement shall remain in full force and effect except to the extent necessary to give effect to the terms of this Amendment.  All terms and references used in the Agreement and which are defined or construed in the Agreement but are not defined or construed in this Amendment shall have the same meaning and construction as in the Agreement.  In the event of a conflict between the terms of the Agreement and the terms of this Amendment, the terms of this Amendment shall prevail.

Confidential Document

IN WITNESS WHEREOF, the parties hereto have accepted and signed this Amendment as of the Effective Date:

BigFix, Inc.

Signature: _____

Name: ___DAVID I. ROBBINS___

Title: ___CEO___

Date: ___12 JUNE 2007___

Lehman Brothers, Inc.

Signature: _____

Name: ___CHRIS D'ALESSANDRO___

Title: ___VP- WINDOWS SERVERS.___

Date: ___6/12/07.___



BIGFIX
KR
INITIALS
12JUN07
DATE
LEGAL

Confidential Document

## **Exhibit A**

Amended Schedule C

Fee Schedule

The Fees for the Initial Term are set forth in the table below. Annual Fees for the first year shall be due and payable by Lehman Brothers on the Effective Date of the Agreement. Annual Fees for each subsequent year of the Initial Term shall be invoiced by Vendor thirty (30) days prior to the relevant anniversary of the Effective Date. Fees for any Renewal Term shall be invoiced thirty (30) days prior to the expiration of the then-current term. Invoices are due and payable in accordance with Section 7.2, not subject to Early Discount.

| LICENSE TERM: Six (6) years from the Agreement Effective Date, subject to renewal in accordance with Section 2.2. | | | |
|---|---|---|---|
| **LICENSED SOFTWARE:**<br><br>BigFix Platform, BigFix Agent, BDE | **Licensed Machines**<br><br>**47,000** | **Annual License Fee per Licensed Machine**<br><br>**$4.50** | **Total Annual License Fee**<br><br>**$211,500** |
| **BIGFIX SOLUTIONS:**<br><br>The Annual License Fee set forth above for each Licensed Machine includes a concurrent subscription for all BigFix Solutions currently offered and maintained by Vendor and to any BigFix Solution made generally available by Vendor during the term of this Agreement. | **Licensed Machines**<br><br>**47,000** | **Annual BigFix Solutions Fee per Licensed Machine**<br><br>**Included** | **Total Annual BigFix Solutions Fee**<br><br>**Included** |
| **SUPPORT:**<br><br>Premium Support (in accordance with Schedule B) and including up to five (5) days of installation, optimization and training services. | **Licensed Machines**<br><br>**47,000** | **Annual Support Fee per Licensed Machine**<br><br>**$1.125** | **Total Annual Support Fees**<br><br>**$52,875** |
| **Total Annual Fees for Licensed Software, BigFix Solutions and Support for each year of the Initial Term set forth above:** | | | **$264,375** |

Confidential Document

## Exhibit B

Schedule D

Fee Schedule for Additional Licensed Machines for a Lehman Affiliate

The Fees for the Initial Term are set forth in the table below. Annual Fees for the first year shall be due and payable by Lehman Brothers on the Effective Date of the Agreement. Annual Fees for each subsequent year of the Initial Term shall be invoiced by Vendor thirty (30) days prior to the relevant anniversary of the Effective Date. Fees for any Renewal Term shall be invoiced thirty (30) days prior to the expiration of the then-current term. Invoices are due and payable in accordance with Section 7.2, not subject to Early Discount.

---

**LICENSEE AND DELIVERY INFORMATION:**
Licensee: Townsend Analytics, an affiliate of Lehman Brothers, Inc.
Address: 100 South Wacker Drive, 20th Floor, Chicago, IL 60606
Contact: Mario Carrasco
Phone: 312-442-8662
Fax: 312-960-4714
E-mail: mcarrasco2@taltrade.com

---

**BILLING INFORMATION:**
Billing Contact:
Address:
Phone:
E-mail:

---

**ORIGINAL EFFECTIVE DATE OF AGREEMENT:** August 9, 2004

**EFFECTIVE DATE OF THIS SCHEDULE D:** May 30, 2007

**LICENSE TERM:** Three (3) years from the Effective Date of this Schedule D, subject to renewal in accordance with Section 2.2.

---

| LICENSED SOFTWARE: | Licensed Machines | Annual License Fee per Licensed Machine | Total Annual License Fee |
|---|---|---|---|
| BigFix Core Services — PC (BF-CORE-ENT-Z) | 2,000 | $4.50 | $9000 |

Confidential Document

| BIGFIX SOLUTIONS:<br><br>The Annual License Fee set forth above for each Licensed Machine includes a concurrent subscription for all BigFix Solutions currently offered and maintained by Vendor and to any BigFix Solution made generally available by Vendor during the term of this Agreement.<br><br>PC (BF-ITPE-DSME-Z) | Licensed Machines<br><br><br><br><br><br><br><br>2,000 | Annual BigFix Solutions Fee per Licensed Machine<br><br><br><br><br><br><br><br>Included | Total Annual BigFix Solutions Fee<br><br><br><br><br><br><br><br>Included |
|---|---|---|---|
| SUPPORT:<br><br>Premium Support (in accordance with Schedule B). | Licensed Machines<br><br>2,000 | Annual Support Fee per Licensed Machine<br><br>$1.125 | Total Annual Support Fees<br><br>$2,250 |
| Total Annual Fees for Licensed Software, BigFix Solutions and Support for each year of the Initial Term set forth above: | | | $11,250 |

# Exhibit

# 3

| Vendor Name | Type | Vendor Contact Name | Vendor Contact Address | Lehman Entity |
|---|---|---|---|---|
| | | | 433 Park Point Drive | |
| BENTEK ENERGY | | N/a | Golden CO 80401 | LBI |
| | | | 1505 Pavilion Place | |
| Best Software  Inc. | | | Norcross , Georgia 30093 | LBI |
| | | | 6121 Hollis Street | |
| BIG FIX INC | | N/a | Emeryville, CA 94608 | LBI |
| | | | 6121 Hollis Street | |
| BIG FIX INC | | N/a | Emeryville, CA 94608 | LBI |
| | | | 4833 Rugby, Suite 600 | |
| BIGDOUGH.COM INC. | | N/a | Bethesda, MD 20814 | LBI |
| | | | 4833 Rugby, Suite 600 | |
| BIGDOUGH.COM INC. | | N/a | Bethesda, MD 20814 | LBI |
| | | | 6121 Hollis St | |
| BigFix, Inc. | | BigFix, Inc. | Emeryville CA 94608 | LBI |
| | | | 707 Orchard Way | |
| BIO DIRECT INC. | | N/a | Silver Spring, MD 20904 | LBI |
| | | | BioPharm Insight | |
| | | | A division of Infinata, Inc. | |
| | | | 100 River Ridge Drive | |
| | | | Suite 204 | |
| BioPharm Insight | | N/A | Norwood, MA 02062 | LBI |
| | | | BioPharm Insight | |
| | | | A division of Infinata, Inc. | |
| | | | 100 River Ridge Drive | |
| | | | Suite 204 | |
| BioPharm Insight | | N/A | Norwood, MA 02062 | LBI |
| BLACK HAWK MORTGAGE SERVICES, LLC | | N/a | N/a | N/a |
| BLOOMBERG | | N/a | N/a | LBI |
| Bloomberg L.P. | | n/a | N/a | LBI |
| Bloomberg L.P. | | n/a | N/a | LBI |
| Bloomberg L.P. | | n/a | N/a | LBI |
| BLOOMBERG LP | | n/a | N/a | LB |
| BLOOMBERG LP | | n/a | N/a | LB |
| BLOOMBERG LP | | n/a | N/a | LBHI |
| BLOOMBERG LP | | n/a | N/a | LBI |
| Bloomberg Tradebook Options | | n/a | N/a | LBHI |
| | | | 650 Almanor Ae | |
| Blue Coat Systems, Inc. | | N/a | Sunnyvale, CA 94085 | LBI |
| | | | 800 Regency Parkway | |
| BLUE PHOENIX SOLUTIONS, USA | | N/a | Cary NC 27511 | LBI |
| | | | 800 Regency Parkway | |
| BLUE PHOENIX SOLUTIONS, USA | | N/a | Cary NC 27511 | LBI |
| | | | 800 Regency Parkway | |
| BLUE PHOENIX SOLUTIONS, USA | | N/a | Cary NC 27511 | LBI |
| BMC SOFTWARE DISTRIBUTION, INC | | n/a | N/a | n/a |
| | | | BMC Software Distribution, Inc. | |
| | | | Customer Financial Operations | |
| | | | 2101 CityWest Blvd | |
| BMC Software Distribution, Inc. | | | Houston, TX 77042 | |
| | | | Copy to General Counsel | LBI |
| BMC SOFTWARE INC | | n/a | N/a | LBI |
| BMC SOFTWARE INC | | n/a | N/a | LBI |
| BMC SOFTWARE INC | | n/a | N/a | LBI |

| Vendor Name | Cure amounts |
|---|---|
| ARUBA NETWORKS | $0.00 |
| ASPECT COMMUNICATIONS CORP | $0.00 |
| ASSENTIS TECHNOLOGIES, AG | $0.00 |
| Assured Environments | $0.00 |
| AT&T | $37,128.14 |
| AT&T WIRELESS | $631,684.87 |
| ATLASSIAN SOFTWARE SYSTEMS, | $0.00 |
| AUDIO VISUAL INNOVATIONS | $6,214.10 |
| AUTOMATED SECURITIES CLEARANCE LTD | $418,565.11 |
| AVAYA INC. | $0.00 |
| AVOCENT* | $0.00 |
| BARCLAYS | $0.00 |
| BARRA INC | $23,240.63 |
| BEA SYSTEMS INC. | $0.00 |
| BEARING POINT | $90,000.00 |
| BEELINE.COM | $3,541,565.11 |
| BELL CANADA | $0.00 |
| BELL SOUTH | $0.00 |
| BIG FIX INC | $0.00 |
| BLOOMBERG | $0.00 |
| Bloomberg L.P. | -$1,995.00 |
| Bloomberg Tradebook Options | $0.00 |
| Blue Coat Systems, Inc. | $0.00 |
| BMC SOFTWARE DISTRIBUTION, INC | $248,080.98 |
| BMC SOFTWARE INC | $0.00 |
| BORLAND SOFTWARE CORPORATION | $0.00 |
| BOURSE DE MONTREAL INC | $4,719.27 |
| BRITISH TELECOM* | $0.00 |
| BROADRIDGE SECURITIES PROCESSING SOLUT | $0.00 |
| BROCADE COMMUNICATION SYSTEM, INC. | $0.00 |
| BT AMERICAS, INC | $134,159.04 |
| BUILDFORGE, INC | $0.00 |
| BUSINESS EDGE SOLUTIONS, INC | $0.00 |
| Business Engine Corporation | $0.00 |
| Business Objects | $648,032.72 |
| BUSINESS OBJECTS AMERICAS | $0.00 |
| BUSINESS OBJECTS(UK) LIMITED | $0.00 |
| CAMBRIDGE ENERGY RESEARCH | $0.00 |
| CANADIAN EXCHANGE GROUP | $0.00 |
| CANDLE CORPORATION | $0.00 |
| CAP GEMINI AMERICA INC. | $0.00 |
| CAPGEMINI FINANCIAL SERVICES USA, INC | $147,957.00 |
| Capital Moving & Storage | $0.00 |
| CAPTIAL IQ, INC. | $0.00 |