## SECOND ASSET MANAGEMENT AGREEMENT

This Second Asset Management Agreement (the "Agreement"), dated as of February 1, 2007, and effective as of July 1, 2007, by and between Cargill Investment Group Ltd., a Massachusetts corporation (the "Manager") and Lehman Brothers Inc. ("Lehman").

### W I T N E S S E T H:

WHEREAS, Lehman Housing Capital Inc. ("LHCI"), a wholly owned subsidiary of Lehman, and its affiliates are the general partners (the "General Partners") of seven limited partnerships (each, a "Fund") each of which owns limited partnership interests in Property Partnerships (as defined herein);

WHEREAS, Lehman and LHCI desire to engage the Manager to perform asset management services on behalf of the General Partners for each Property Partnership in which a Fund invests;

WHEREAS, LHCI and its affiliates sold its interests in several partnerships to affiliates of PNC Bank, N.A. (the "PNC Partnerships") and pursuant to such sales, LHCI and PNC have agreed that certain amounts of the purchase price for interests in the partnerships listed on Exhibit AM-1 will be held by PNC (the "Holdbacks") pending the satisfaction of certain conditions;

WHEREAS, Lehman entered into an asset management agreement with the Manager, dated as of June 8, 2004 (the "Original Asset Management Agreement") under which the Manager agreed to provide certain asset management services with respect to the Funds and to monitor the PNC Partnerships to determine LHCI's rights with respect to the Holdbacks;

WHEREAS, the Manager and Lehman wish to enter into this Second Asset Management Agreement, to become effective upon the expiration without default of the Original Asset Management Agreement and to memorialize the scope of the services to be performed by the Manager for the term and in consideration of the payment by Lehman of the amounts set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained and wishing to be legally bound hereby, Lehman and the Manager hereby agree as follows:

80298510.8

1. **Definitions.**

"CPI" means the U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index for Urban Wage Earners and Clerical Workers, All Items, for U.S. City Average or, if such index is no longer published, the most nearly corresponding index designated by Lehman.

"CPI Factor" means, for any year, the ratio expressed as a percentage that the CPI at the beginning of such year bears to the CPI at the end of 2007.

"Effective Date" means July 1, 2007.

"Person" means any individual or entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits.

"Property" means an affordable housing property constructed, rehabilitated or acquired or to be constructed, rehabilitated or acquired by a Property Partnership, which property is or is planned to be eligible for low income housing tax credits.

"Property General Partner" means the general partner of a Property Partnership that is organized as a limited partnership or the manager (or Person discharging the corresponding function) of a Property Partnership that is organized as a limited liability company.

"Property Partnership" means each of the limited partnerships and limited liability companies owned by a Fund and listed on Exhibit AM-2, each of which owns a Property.

"Property Partnership Agreement" means the agreement of limited partnership (or, in the case of a limited liability company, the operating agreement) of a Property Partnership pursuant to which the Fund acquires an interest therein, in each case as such agreement may be amended from time to time.

2. **Effectiveness; Asset Management.**

Upon the expiration of the Original Asset Management Agreement on June 30, 2007, provided that at such time the Manager remains in compliance with its obligations under the Original Asset Management Agreement, this Agreement will automatically become effective. During the term of this Agreement, the Manager shall perform or cause to be performed the asset management services and the monitoring services set forth in Exhibit AM-3 (the "Services").

3. **Compensation.**

REDACTED

(b)     The Fees shall be paid quarterly no later than the last day of each calendar quarter. The Fees shall be increased annually by the CPI Factor as of the first day of each calendar year beginning in 2008.

(c)     The Manager shall be responsible for all expenses incurred in connection with, or related to, the performance of the Services; provided that Manager shall not be responsible for the legal, accounting and other professional fees of Lehman or its affiliates or the Funds. Other than engagements of professionals on behalf of Lehman, or the Funds in the ordinary course of business, the Manager shall not engage any professional advisor on behalf of a Fund, Lehman or their affiliates in connection with the Services without the prior written approval of Lehman unless such engagement is of professionals typically engaged by Lehman or LHCI and for services costing less than $5,000 and the Manager promptly notifies Lehman of such engagement.

4.     **Term and Termination.**

(a)     Term. The term of this Agreement shall commence as of the Effective Date and shall continue in effect for a period of 36 months unless earlier terminated in accordance with the provisions of this Section 4. Upon the expiration of the then-current term, this Agreement shall terminate unless no more than 270 days but no less than 180 days before such expiration one party sends to the other party a notice of such party's intention to extend the term of this Agreement. If upon timely receipt of such notice, the other party does not object to such extension within 60 days, the term hereof shall be extended for a period of 36 months.

(b)     Termination by Lehman. Lehman may terminate this Agreement upon the occurrence of any of the following events:

(i)     any material breach by Manager of any of Manager's material obligations under this Agreement if such breach continues for thirty (30) days after receipt by Manager of notice specifying such breach in reasonable detail;

(ii)     the dissolution or liquidation of Manager, the appointment of a receiver for the assets of Manager, the assignment by Manager of assets for the benefit of creditors or any action taken or suffered by Manager (with respect to Manager) under any bankruptcy or insolvency act;

(iii)     the failure of Manager to qualify for or maintain the insurance coverage required under the terms of this Agreement;

(iv)    the inability of Linda Cargill to perform the essential duties required hereunder by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less that twelve (12) weeks;

(v)    the death, retirement from employment with the Manager or legal incapacity of Linda Cargill or the actual or attempted issuance, transfer, sale, assignment, or encumbrance, in any one or series of transactions, of a controlling interest in the Manager, by Manager or by any shareholder of Manager without the prior written consent of LHCI;

(vi)    Linda Cargill's conviction of or pleading guilty to any felony or any crime involving fraud, dishonesty, theft, embezzlement or other misappropriation of money or other property of LHCI, its affiliates or any other individual or entity or engaging in conduct or activities materially damaging to the property, business or reputation of LHCI or its affiliates.

(c)    Termination by Manager. Manager may terminate this Agreement upon the occurrence of any material breach by Lehman of any of its obligations hereunder if such breach continues for thirty (30) days after the parties have met to resolve such material breach following receipt by LHCI of notice specifying such breach in reasonable detail.

(d)    Payments Upon Termination. Upon the termination of this Agreement, the Manager shall only be entitled to payment of the Fees accrued through the last day on which services are actually performed prior to the effective date of the termination and reimbursement of all expenses accrued through the effective date of termination of this Agreement.

(e)    Survival; Cooperation Upon Termination. The provisions of Sections 12, 13 and 15, shall survive any termination of this Agreement, as shall any claims in respect of rights or obligations accrued prior to termination of this Agreement. The parties hereto will cooperate in effecting any termination of this Agreement.

5.    **Cooperation.**

Lehman shall provide the Manager with access to such of Lehman's or LHCI's information and property as may be reasonably required in order to permit the Manager to perform its obligations hereunder. In addition to the provisions of Section 4(b)(v), Manager agrees that it shall not and shall not permit Linda Cargill to issue, transfer, sell, assign or encumber, in any one or series of transactions, a controlling interest in the Manager without giving six month's prior written notice to Lehman.

6.    **Relationship of the Parties.**

(a)    The Manager is acting solely as an independent contractor under this Agreement. This Agreement is not intended to create an agency relationship or a partnership or joint venture between the Manager and Lehman or LHCI. Subject to the requirements of the applicable regulatory agencies, the Manager retains the sole and exclusive right to control or direct the manner or means by which the Services are to be performed. Lehman retains the right to control the results of the Manager's work to ensure compliance with the terms of this Agreement.

(b)    Neither Linda Cargill nor any other employee of the Manager is or shall be deemed to be an employee of Lehman. Lehman shall not be required to furnish the Manager or any employee thereof with an office or support staff, and Lehman shall have no obligation for any fringe benefits, including health insurance, disability benefits, paid vacation or any other employee benefit, to or for the benefit of Manager or any employee thereof. The Manager further acknowledges that it has no power or authority to bind Lehman in any respect, and in the event it has reason to believe it is perceived by a third party as an agent of Lehman or its affiliates, it shall take all reasonable steps to dispel such perception.

### 7.    Reporting and Coordination.

The Manager will report directly to Gary Killian, Managing Director or to any other employee or officer of Lehman or its affiliates to whom the Manager is directed to report by written notice from Lehman. All activities and plans of Manager shall be coordinated with Gary Killian or such other employee or officer.

### 8.    Human Resource Allocation.

(a)    The Manager shall provide the services using at least the following personnel: (i) Linda Cargill, (ii) two asset managers, each with no less than two years experience in the development, property management or asset management of multifamily housing properties, and (iii) one administrative assistant. Such personnel other than Linda Cargill shall devote substantially all of their time performing services required hereby. Before hiring or replacing any of such asset managers, the Manager shall offer to introduce the asset manager to be hired to appropriate representatives of Lehman and, if required, shall provide Lehman with a resume and any other information about such asset manager reasonably requested by Lehman. If, after being notified thereof, Lehman in good faith objects to the proposed hiring within five days then the Manager shall not assign such asset manager to perform services for Lehman.

(b)    Linda Cargill shall direct all of the activities of the Manager relating to the services provided hereunder and shall be directly supervise for the performance of the services required hereby. Linda Cargill shall spend no less than 50% of her time performing the services required hereby.

(c)    The Manager shall not provide asset management services to any other party unless the Manager has first hired additional staff to provide such services and determines that the provision of such services will not materially adversely effect the Manager's performance of the services required hereby.

### 9.    Creation of Spreadsheets and Reports.

Manager shall create spreadsheets using Microsoft Excel containing all of the data, and in a similar form to, the spreadsheets developed by Trimont for Lehman. Lehman and Manager agree that such spreadsheets shall contain no less than all of the data contained by the spreadsheets prepared by Trimont in the performance of its services to Lehman and its affiliates.

80298510.8                    5

10. **Conflicts of Interest.**

The Manager shall not provide services to or accept any payment from any Property General Partner or property manager (or any of their affiliates) performing management services at any Property or any of their affiliates without the prior written consent of Lehman. The Manager shall not provide services to or accept any payment from any limited partner of a Fund, lender to a Property Partnership or any person or entity with an economic interest in a Property Partnership, without the prior written consent of Lehman.

11. **Standard of Care.**

In performing the Services, the Manager agrees that it shall (i) apply that standard of care that a prudent person would apply in the management of his or her own affairs; (ii) avoid or, to the extent unavoidable, disclose and minimize any actual or potential conflicts between the interests of Lehman or its affiliates, on the one hand, and the interests of the Manager or its affiliates, on the other; and (iii) act in compliance with all federal, state and local laws.

12. **Confidential Information and Trade Secrets of Others.**

(a)     "Confidential Information" means any information relating to the business affairs of Lehman, the Funds or their affiliates (the "Lehman Parties") that is treated by such parties as confidential or proprietary, and any similar information obtained by or given to the Lehman Parties about or belonging to the limited partners of the Funds, the Property Partnerships, the Property General Partners, the Properties or any of the Lehman Parties' suppliers, licensors, licensees, partners, affiliates, customers, potential customers or others. Confidential Information is contained in various media, whether or not labeled or identified as "Confidential" or prepared in full or in part by the Manager.

Confidential Information does not include information which (a) is at the time of disclosure or later becomes publicly known under circumstances involving no breach of this Agreement; or (b) is required to be disclosed by a governmental authority or by order of a court of competent jurisdiction, provided that such disclosure is subject to all available protection and reasonable advance notice is given to Lehman.

(b)     During the course of performing the Services, Manager or its employees may become aware of or have access to Confidential Information. Manager acknowledges Lehman is and shall at all times remain the sole owner of the Confidential Information and Materials (as defined in Section 13 below).

(c)     Manager shall not directly or indirectly publish, disseminate or otherwise disclose, deliver or make available to any third party any Confidential Information, other than in furtherance of the purposes of this Agreement, and only then with the prior written consent of Lehman; nor will Manager use such Confidential Information or the Manager's or its affiliates' own benefit or for the benefit of any third party.

80298510.8                                                                 6

(d)    Manager shall exercise all commercially reasonable precautions to protect the integrity and confidentiality of the Confidential Information. Upon termination of this Agreement, and in any case upon the Lehman's request, Manager shall return immediately to Lehman all copies and other tangible manifestations of Confidential Information then in Manager's or its affiliates' possession or control.

(e)    Manager acknowledges and agrees that Lehman's remedies at law for a breach or threatened breach of the foregoing provisions of this section would be inadequate. Accordingly, Manager agrees that Lehman will be entitled to seek, in addition to any remedies available to it at law, equitable relief in the form of an injunction, specific performance or such other form as may then be available.

### 13.    Copyrights.

**Manager hereby assigns to Lehman all of its rights, title, and interests in and to all copyrights on all writings, documents, reports, papers, drawings, tabulations, books, computer programs, and other works written or made by Manager or its agents under or arising out of this Agreement ("Material").** All Materials developed by Manager or its agents under this Agreement are to be considered works made for hire as that term is defined in Section 101 of the Copyright Act (17 U.S.C. § 101) and are the sole and exclusive property of Lehman. To the extent that any such works may not be considered works made for hire for Lehman or its affiliates under applicable law, Manager hereby assigns to Lehman and, upon their creation, will automatically assign to Lehman the ownership of such works, including copyright interests and any other intellectual property therein, without the necessity of any further consideration. Any assignment of copyright hereunder includes all rights of paternity, integrity, disclosure and withdrawal and any other rights that may be known as or referred to as "moral rights".

### 14.    Insurance.

Manager shall obtain $1 million of general liability insurance, $1 million of errors and omissions insurance covering the Manager and its provision of the Services and such other insurance policies as are required by law, including, workers compensation insurance. Such insurance shall be in full force and effect during the term of this Agreement with insurers satisfactory to LHCI. Notwithstanding the foregoing, if Manager believes that the insurance required by this Section 14 is not commercially available to Manager or is only commercially available at premium rates that are disproportionate in relation to Manager's duties and compensation hereunder, then (without prejudice to Lehman's rights under Section 4(b)(iii)) Manager and Lehman shall consult together to determine whether insurance at the levels required hereby or at other mutually agreeable levels can reasonably be obtained by or for Manager.

### 15.    Indemnification.

(a)    Lehman hereby covenants and agrees to indemnify and hold Manager harmless fully, completely and absolutely against and in respect of any and all actions, suits, proceedings,

80298510.8                                    7

claims, demands, judgements, costs, expenses (including reasonable attorney's fees), losses and damages (collectively, "Losses and Claims") resulting from Manager's good faith performance of its duties and obligations hereunder; provided that Manager shall not be indemnified for its own gross negligence.

(b)   The Manager hereby covenants and agrees to indemnify and hold Lehman and its affiliates and the Funds harmless fully, completely and absolutely against and in respect of any and all Losses and Claims resulting from any act or omission by or on behalf of Manager in the performance of its duties and obligations hereunder which was grossly negligent or was not undertaken in good faith.

(c)   The amount of any Loss or Claim for which indemnification is provided under this Section shall be net of any amounts recovered or recoverable by the indemnified party under any insurance policy(ies) with respect to Loss or Claim.

## 16.   Third Party Beneficiaries.

Each of the General Partners and Lehman Tax Credit Advisor Inc. shall be a third party beneficiary hereof, entitled to enforce the provisions of this agreement.

## 17.   Miscellaneous.

(a)   This Agreement shall be governed by the laws of the State of New York, without reference to the principles thereof respecting conflicts of laws.

(b)   All prior or contemporaneous oral or written statements between the parties with respect to the subject matter hereof are hereby merged herein.

(c)   This Agreement may be amended only by a written instrument signed by both of the parties.

(d)   This Agreement may be executed in any number of each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

**Signature Page Follows**

IN WITNESS WHEREOF, the Manager and Lehman have caused their assent to the terms hereof to be manifested by their respective officers or representatives thereunto duly authorized as of the day and year first hereinabove.

CARGILL INVESTMENT GROUP LTD.

By: _____
Name: Linda Cargill
Title: President


LEHMAN BROTHERS INC.

By: _____
Name: Gary Killian
Title: Managing Director

**Exhibit AM-1 Intentionally Omitted**

**Exhibit AM-2 Intentionally Omitted**

Exhibit AM-3 to Asset Management Contract
Between
Lehman Brothers Inc. (LBI) and Cargill Investment Group Ltd. (CIGL)
July 1, 2007

I. PROPERTY PARTNERSHIP AND REAL ESTATE OPERATIONS

   A. Establish a working relationship among the property general partner, the property management company and the CIG team members.

   B. Maintain electronically and update annually the Lehman Housing Capital Inc. ("LHCI") Excel based lower tier model projecting the results of each property's operations, including tax benefits, for a 15-year period commencing in year of equity closing (the "LHCI Model").

   C. With respect to any property partnership which has not received its final capital contribution from a Fund, receive, review for compliance with all applicable partnership, loan and regulatory documents, and approve all property partnership requests for the disbursement of funds in connection with:

   1. any LHCI or affiliate loan to the property partnership;
   2. any fund capital contribution to the property partnership.

   D. On or before December 1st each year, solicit, review, negotiate when necessary, and approve the property general partner or management company's proposed annual operating budgets, as permitted pursuant to the applicable partnership agreement.

   E. On a monthly basis, receive and compare the property's results of operations with the approved annual operating budget, conduct a financial feasibility analysis and generate a variance report.

   F. Conduct an annual property site inspection and prepare an inspection report on property condition and on-site management's capability, including knowledge of and practices and policies in connection with Section 42.

   G. Prior to the end of each year of the credit period, conduct an audit or cause an audit to be conducted of the files of tenants representing not less than 20% of the units in the property for compliance with the requirements of Section 42.

   H. Monitor the property general partner's compliance with all applicable partnership, loan and regulatory documents.

   I. Create and update the Excel spreadsheets referred to in Section 9 of the Agreement and make such revisions or modifications thereto as are reasonably requested by LHCI.

   J. Cooperate with LHCI on file and data sharing relating to the Services.

80301031.1

Exhibit AM-3
July 1, 2007
Page 2

II. TROUBLED PROPERTIES AND PROPERTY PARTNERSHIPS

　　A.　Consistent with established practices, maintain on a monthly basis a property partnership watchlist of under-performing properties.

　　B.　Develop and execute LHCI-approved workout strategies.

III. PROPERTY PARTNERSHIP ANNUAL FINANCIAL STATEMENTS, INCOME TAX RETURNS AND UPDATING LHCI MODEL

　　A.　Pursuant to the property partnership agreement, receive each property partnership's federal income tax return (IRS Form 1065) for the prior year; reconcile with the actual results of operations, and approve with the property general partner and accountants.

　　B.　Concurrent with distribution of the annual k-1 to the investors, analyze and generate a report on the variances between IRS Form 1065 and the Property Partnership Year End Estimate.

　　C.　Pursuant to the property partnership agreement, receive each property partnership's audited financial statement for the prior year; reconcile with the actual results of operations, and approve with the property general partner and accountants.

　　D.　On or before November 30th, provide LHCI with a revised LHCI Model for each property partnership covering the remainder of the initial 15-year tax credit compliance period.

　　E.　On or before October 1st, pursuant to the property partnership agreements, ensure that all property partnership IRS Form 1065's have been finalized and will be filed with the IRS no later than October 15th; analyze and generate a report on the variances between the final property partnership IRS Form 1065 and the draft property partnership IRS Form 1065 included in the fund IRS Form 1065 as filed, if any.

　　F.　On or before November 1st, analyze and summarize financial transactions by and among LHCI or its affiliates and each fund and the property partnerships in which it has invested and notify the property partnerships and their accountants of such transactions.

　　G.　On or before November 15th, prepare an estimate for each property partnership for the current year of the annual tax benefits based on the actual results of operations for the first 3 calendar quarters and by annualizing such results for the fourth calendar quarter, including passive losses and tax credits (the "Property Partnership Year End Estimate") and generate a report on the variances between the Property Partnership Year End Estimate and the LHCI Model.

Exhibit AM-3
July 1, 2007
Page 3

IV. INVESTOR REPORTS

A. On a quarterly basis, distribute to the investors a quarterly operating statement summarizing the results of operations of the properties by Fund along with an unaudited financial statement for such Fund.

B. On or before March 1st, provide the Fund accountants with copies of approved Fund k-1's from its property partnerships and the Fund's tax books and records for the prior year in order for the Fund accountants to prepare the Fund's federal and state income tax returns; coordinate the preparation of the Fund's returns by the accountants; review and recommend to LHCI that such returns be signed and filed with the appropriate authority on or before April 15th or such later date as may be extended by permission of the appropriate authority.

C. Distribute the investor k-1 by Fund on or before the due date provided in the Fund Agreement provided the property partnerships have materially complied with the requirements of the property partnership agreements.

D. On or before June 1st, provide the Fund accountants with copies of approved property partnership audited financial statements and the Fund's fiscal year books and records for the prior year in order for the Fund accountants to prepare the Fund's audited financial statement; coordinate the preparation of the Fund's audits by the accountants; review and recommend to LHCI approval of such audits.

E. Distribute the Fund audited financial statement to the investors by Fund on or before the due date provided in the Fund Agreement provided the property partnerships have materially complied with the requirements of the property partnership agreements.

F. On or before November 30th, provide the investors by Fund with an estimate for the current year of the annual tax benefits based on the Property Partnership Year End Estimate, including passive losses and tax credits (the "Investor Year End Estimate").

V. INVESTOR RELATIONS

A. Communicate with investors as to the status of properties in their respective portfolios.

B. Respond to requests from investors for information or documentation relating to properties in their respective portfolios, including the transfer of limited partnership interests to new investors.

C. At the request of LHCI, arrange investor site visits and accompany investor during such visit.

Exhibit AM-3
July 1, 2007
Page 4

VI.  HOLDBACKS AND TITLE ESCROWS

   A.  Monitor the PNC Partnerships and the terms of the agreements governing the Holdbacks and the attainment of benchmarks provided in such agreements.

   B.  Enforce LHCI's rights under such agreements and update LHCI with respect thereto.