WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  |  |
| --- | --- |
| In re | Chapter 11 Case No. |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.* | **08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

------------------------------------------------------------------x

**DEBTORS' MOTION TO (A) ESTABLISH SALES PROCEDURES; (B) APPROVE A SELLER TERMINATION FEE AND A REIMBURSEMENT AMOUNT; AND (C) APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Background**

1.      Commencing on September 15, 2008 and thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are

being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.

2.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.    On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under the SIPA is administering LBI's estate.

### Jurisdiction

4.    This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Lehman's Businesses

5.    Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.  Its headquarters in New

York and regional headquarters in London and Tokyo are complemented by a network of offices

in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

6.    Lehman operated in three business segments:  its Capital Markets,

Investment Banking and Investment Management Division ("IMD").  During the Company's

2007 fiscal year, the Capital Markets segment represented 64% of consolidated net revenues.

Investment Banking and IMD accounted for 20% and 16% of net revenues, respectively.

Additional information regarding the Debtors' businesses, capital structures, and the

circumstances leading to these chapter 11 filings is contained in the Affidavit of Ian T. Lowitt

Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in

Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

       7.      On September 20, 2008, this Court approved a sale of Lehman's U.S. and

Canadian Capital Markets and Investment Banking businesses, including the fixed income and

equities cash trading, brokerage, dealing, trading and advisory businesses, investment banking

operations and LBI's business as a futures commission merchant, to Barclays Capital Inc.

("Barclays").  A portion of IMD, including the Private Investment Management Group and the

Institutional Client Group, was also included in the sale to Barclays.  The sale to Barclays was

consummated on September 22, 2008.

       8.      On September 29, 2008, LBHI and certain of its non-debtor subsidiaries

(collectively, the "Sellers") entered into an agreement for the sale of IMD to IMD Parent LLC

(the "Purchaser").  The Purchaser is jointly controlled by private investment funds sponsored by

Bain Capital Partners, LLC ("Bain") and Hellman & Friedman ("H&F"), which have each

agreed to provide 50% of the funding required to close the transaction.  On October 3, 2008, the

Sellers and the Purchaser entered into an amended and restated sale agreement (the "Purchase

Agreement").  A copy of the Purchase Agreement is annexed hereto as Exhibit 1.[1]

       9.      IMD provides customized investment management services for high-net-

worth clients, mutual funds and other institutional investors, serves as the general partner for

---

[1] Capitalized terms not defined in this Motion shall have the meaning ascribed to them in the
Purchase Agreement.

private equity and other alternative investment partnerships, and has minority stake investments in certain alternative investment managers.  IMD encompasses Neuberger Berman, Lehman Brothers Asset Management, and the Alternative Investment group, as well as a portion of the private equity business.

### **Relief Requested**

10.     Pursuant to sections 105, 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6003, 6004, 6006, and 9006, it is requested that the Court grant the following relief that will facilitate the sale of equity interests and assets relating to IMD.

11.     First, a "Bid Procedures Order" substantially in the form attached hereto as Exhibit 2, that will approve, among other things, the procedures for the conduct of the auction of the Purchased Assets, and the conditions under which the Seller Termination Fee and the Reimbursement Amount (each as defined in the Purchase Agreement and as described more fully below) are payable.  Second, a "Sale Order," substantially in the form attached hereto as Exhibit 3, that will approve (a) a sale pursuant to section 363 of the Bankruptcy Code of the Purchased Assets in accordance with the Purchase Agreement, free and clear of all liens, claims, encumbrances and other interests, and (b) the assumption and sublease or the assumption and assignment of certain executory contracts and unexpired leases related to the Purchased Assets, pursuant to sections 363 and 365 of the Bankruptcy Code, free of all liens, claims, encumbrances and other interests.

12.     Entry of the Bid Procedures Order and the proposed sale of the Purchased Assets are critical to the maximization of the value of the IMD assets and, in turn, to a recovery for the Sellers and the Debtors' estates.  As was the case with the assets that were sold to Barclays, the Purchased Assets are subject to the vagaries and vicissitudes of the marketplace,

the impact of the Debtors' chapter 11 cases, and the public speculation that additional Lehman entities might seek bankruptcy protection that would diminish the value of the Purchased Assets. These uncertainties have led to a decline in the value of the Purchased Assets. Importantly, the Sellers' employees are a significant part of the value of the Purchased Assets. Unless and until these employees (a) know, with certainty, who their employer will be, and (b) agree to continue to work for such employer going forward, their departure remains a significant risk to the value of the Purchased Assets and the recoveries for the Sellers and the Debtors' estates. The Debtors and Sellers have met with many of the Sellers' critical employees and are confident that such employees support and urge the consummation of the purchase of the Purchased Assets.

13.     The Sellers and the Debtors believe that Purchase Agreement represents a reasonable exercise of business judgment by each of the Sellers and the Debtors and that the sale is in their best interests, and the best interests of their employees and the economic stakeholders of the Debtors. In light of the reasonable due diligence period and auction procedures proposed, the Debtors will achieve the maximum recovery from the Purchased Assets to facilitate the wind down of the Debtors' businesses. Accordingly, the relief requested should be granted.

## Sale of Lehman's Investment Management Division

### A.     Lehman's Decision to Sell IMD and Related Prepetition Marketing Efforts

14.     Prior to the Commencement Date and for most of 2008, Lehman operated in an extremely unfavorable global business environment. The combination of inadequate liquidity and the requirement that financial companies de-leverage their balance sheets resulted in downward pressure on financial asset prices. These global and national economic conditions, in the aggregate, depressed both the valuations of Lehman's inventory positions as well as transactional volumes and market activity levels in which Lehman's capital markets and investment banking business segments operated. Ultimately, the instability in the financial and

credit markets caused significant liquidity problems and credit downgrades for Lehman. These

factors resulted in a chain reaction of adverse economic consequences that impeded its ability to

maintain normal business operations.

15.     In response, management explored various options to restructure

operations, reduce overall cost structure, and improve performance, including the sale of equity

interests in various divisions of Lehman, including IMD. In June 2008, Lehman began a

concentrated effort to market a stake in IMD with a goal towards having a definitive binding

agreement for the disposition prior to September 15, 2008. To that end:

- Lehman developed a marketing book and a list of approximately fifty potential partners;

- Lehman contacted no fewer than eleven potential financial buyers and six potential strategic buyers in July 2008 and sent fourteen of these seventeen potential buyers "teaser" memoranda and a summary overview;

- Lehman proceeded to negotiate and execute thirteen non-disclosure agreements and provided each of the counterparties with a package of diligence information;

- IMD's most senior management met with eleven potential purchasers and invited them to submit a response indicating preliminary interest by mid-August 2008; and

- Lehman opened an electronic diligence room to the potential purchasers during the week of August 4, 2008.

The initial indications revealed a range of proposals, each of which required additional diligence.

Based on these responses, Lehman determined that the structure of the sale would have to be

altered in order to maximize value and reinitiated discussions with the potential buyers. Certain

parties informed Lehman that they would not be able to consummate a transaction in the

timeframe Lehman required; certain parties were interested in only specific assets; and certain

parties were not interested in pursuing a transaction at all. The five financial sponsors whose

offers provided Lehman with the greatest value were invited to pursue additional diligence and

met with senior-level IMD members in mid-late August.  Lehman also met again with the one

strategic buyer who continued to be interested in pursuing the transaction.

16.    In the following days and weeks, the parties conducted follow-up

meetings, discussions and calls with Lehman's various business groups and Lehman provided

interested parties with additional diligence information.  On September 8, 2008, Lehman

distributed a process letter and a term sheet and, on September 12, 2008, received, in return,

three proposals to acquire 55% percent of all or a portion of IMD.  Additionally, one financial

sponsor expressed interest in acquiring 100% of certain assets of IMD.

17.    Unfortunately, concerns about the viability of Lehman and the uncertainty,

particularly among the banks through which Lehman cleared securities trades, ultimately made it

impossible for Lehman to continue to operate its business.  The disruption to its business

virtually guaranteed that Lehman would not be able to sustain itself long enough to implement its

restructuring and de-leveraging initiatives.  As a result, the Debtors were compelled to

commence their chapter 11 cases to preserve and maximize the value, protect their public

customers, limit turmoil in the financial markets and benefit Lehman's creditors and employees.

Recognizing the likely value erosion from departing employees and clients, the Debtors and the

Sellers decided to explore a sale of IMD at the earliest possible time.  Accordingly, on

September 14, 2008, they selected the two financial sponsors, Bain and H&F, that were most

advanced in their efforts to purchase IMD and were, in the Debtors' and Sellers' opinion, most

likely to pay the highest value in the shortest period of time.  The Debtors and the Sellers

suggested Bain and H&F partner to ensure a transaction could be consummated without any

dependence on the debt financing markets, which had continued to deteriorate.

B.    **Lehman's Post-Commencement Date Efforts**

18.    Following the Commencement Date, Bain and H&F actively continued their diligence of the IMD businesses and the Purchased Assets.  The Purchaser, the Sellers, and their various advisors engaged in around-the-clock meetings and negotiations during the initial two-week postpetition period.  In addition to guidance and ultimate approval from Alvarez and Marsal North America LLC, the Debtors' investment bankers, Lazard Frères & Co. LLC, were actively involved in the negotiation process.  The parties' arduous efforts resulted in the parties' entering into the Purchase Agreement.

19.    IMD is a valuable, but highly sensitive, collection of assets.  Its value is greatly dependent upon its ability to assure its clients and customers of its financial and operational integrity.  Lehman's current instability has affected, and continues to affect, IMD's ability to maintain its clients and customers.  In the weeks prior to the signing of the Purchase Agreement, IMD experienced a loss of certain clients and resulting decline in assets under management.  Consequently, the Debtors and the Sellers believe it is urgent to sell the Purchased Assets now or face material disruption of their value.  The Debtors and the Sellers believe that the proposed sale, coupled with the open and fair due diligence and auction process described herein, will maximize the value of the Purchased Assets and avoid rapid erosion of their value.

**The Purchase Agreement**[2]

20.    The Purchase Agreement provides for the sale of the Purchased Assets, which includes stock and assets, of the Sellers and their Subsidiaries owned, held, or used primarily in connection with IMD.[3]

---

[2] The following summary is qualified entirely by the terms of the Purchase Agreement.  To the extent there are any inconsistencies between the description of the Purchase Agreement contained herein and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement shall control.

21.     **More specifically, the Purchased Assets include equity interests and**

**assets relating to:**

- the Neuberger Berman business, including the portion of the Business that is the private asset management business (including relevant fixed income securities managed within, or on behalf of, the private asset management business), equities mutual funds (both open end and closed end), equities sub-advised funds, equities WRAP (Managed Account Group and model portfolio assets), equities global balanced portfolio and the equities institutional separate accounts businesses;

- the fixed income business, including the portion of the Business that offers U.S. fixed income, liquidity and municipal mutual funds and WRAP (Managed Account Group and model portfolio assets), U.S. institutional cash, short duration and municipal products, structured products, investment grade core and index, high yield, loans, and other fixed-income asset management products and services other than fixed income securities managed within, or on behalf of, the private asset management business;

- parts of the hedge fund of funds and single manager businesses, including long/short, diversified arbitrage, commodities and quantitative funds;

- the private funds investment group of the private equity business, which includes the fund-of-funds businesses (both hedge fund and private equity), secondary private equity and co-investment, as well as several startup private equity businesses including infrastructure and mezzanine debt;[4] and

---

[3] A list of the Sellers is set forth on Schedule I of the Purchase Agreement. A list of the businesses and Funds included in the Business is set forth on Schedule 1.1(d) of the Purchase Agreement. A list of the businesses and Funds excluded from the Business is set forth on Schedule 1.1(e) of the Purchase Agreement. The Purchased Assets include certain partnerships, limited liability companies, and investment vehicles to which one the Companies listed on Schedule II of the Purchase Agreement and their direct and indirect Subsidiaries (collectively, the "Company Group") provides investment advisory services or serves as the general partner, managing member, or any similar capacity.

[4] Purchasers are only acquiring the assets associated with the Funds and related entities set forth on Schedule 1.1(j) of the Purchase Agreement. The assets primarily associated with the private equity business of LBHI and its Affiliates other than the foregoing assets are Excluded Assets.

▪ certain assets related to the Asian and European asset management businesses, the Asian and European fund businesses, the Asian and European segregated account mandates and the Asian and European distribution platforms.[5]

22. The Purchaser may elect to acquire either the equity interests or assets of the members of the Company Group, or a combination thereof. Purchaser may deliver a Designation Notice to the Sellers between forty-five (45) and sixty (60) days from the date of execution of the Purchase Agreement. Upon receipt of a Designation Notice, the Sellers shall, or shall cause the designated Affiliate to, commence a voluntary reorganization case to consummate the proposed sale transaction, and any new debtor will file a joinder to this Motion and request approval of the assignment, conveyance and delivery of its assets that will be Purchased Assets free and clear of all liens, claims, encumbrances and other interests, pursuant to sections 363 and 365 of the Bankruptcy Code. All parties in interest will be provided notice of the Purchaser's designation.

23. **Key liabilities being assumed by the Purchaser include:**

▪ all liabilities incurred after the Closing in connection with the ownership or operation of the Business;

▪ liabilities under contracts assigned to Purchaser or its subsidiaries, to the extent based on facts and circumstances first arising after the Closing;

▪ the unfunded amount of Lehman's and its affiliates' general partner or special limited partner capital commitments that relate to post-Closing periods and are associated with the parts of the private equity business being acquired under the Purchase Agreement; and

▪ certain liabilities relating to benefits to be provided to employees transferred to the Purchaser or its subsidiaries following the Closing.

24. **Key assets and liabilities being retained by the Sellers include:**

---

[5] A list of the included European and Asian Business segments is set forth on Schedule 1.1(k) of the Purchase Agreement.

- all assets of Lehman that are not owned, held or used primarily in connection with the Business;

- the assets primarily associated with the Satori and LibertyView businesses;

- the equity interests in Lehman Brothers Trust Company of Delaware and Lehman Brothers Trust Company, N.A.;

- the assets primarily associated with Lehman's merchant banking, real estate and venture capital private equity funds;

- Lehman's minority stake investments in the following asset management firms: D.E. Shaw & Co., Ospraie Management, Spinnaker Capital, R3 Capital Partners, One William Street Capital, Field Street Capital Management, GLG Partners, BlueBay Asset Management, Synergy and Integrated Asset Management;

- the funded amount of Lehman's limited partner and side-by-side capital commitments associated with the Business and the seed capital invested in the Business's asset management products; and

- all liabilities of the Business other than the Assumed Liabilities; and

- assets that would otherwise be acquired by Purchaser but Purchaser designates as an "Excluded Asset" prior to the Closing, after determining such asset could subject it or any of its subsidiaries to a liability that is material to such asset.

25.    The aggregate gross purchase price for the Purchased Assets is $2.15 billion.  The estimated net purchase price, after providing for employee retention arrangements is $1.75 billion and is subject to certain further adjustments, including adjustments to reflect (i) decreases in the S&P 500 Index, (ii) other liabilities not reflected in working capital, (iii) changes in revenue run rates, assets under management and the departure of certain portfolio managers and (iv) historical EBITDA as reflected in audited financial statements.  Further, the Sellers are expected to deliver the Purchased Assets with a certain minimum cash balance that is anticipated to consist primarily of working capital.  The Sellers anticipate that, in addition to the net purchase price, prior to the completion of the proposed transaction, they will be able to

extract some amount of cash from the Purchased Assets.  Such amount will depend on the net

cash generated by the Purchased Assets in normal course of business.

      26.     In addition to Bankruptcy Court approval, applicable non-bankruptcy law,

including the Investment Advisors Act of 1940, the Investment Company Act of 1940, and

certain of the Business' brokerage and investment advisory agreements require client and/or

counterparty consents upon the occurrence of certain events, including a change of control such

as the ones contemplated in the Purchase Agreement.  Accordingly, the Purchase Agreement

provides that within 30 days of execution of the Purchase Agreement, Sellers shall and shall

cause the members of the Company Group to inform each of its applicable brokerage clients of

the transactions contemplated by the Purchase Agreement and to seek such clients' consent to the

continuation of its brokerage or investment advisory agreement.  Sellers also shall promptly use

reasonable best efforts in connection with approvals required by Public Funds' boards of

directors, trustees and shareholders.

      27.    **The Purchase Agreement also provides:**

▪    <u>Assumption of Contracts and Leases</u>:  Purchaser shall have the right upon
notice to Sellers to designate any Related Contract as a Purchased Contract,
Transferred Real Property Lease or Subleased Real Property Lease to be assumed
and/or assigned and/or subleased (as applicable, for debtor and non-debtor
Sellers).  Sellers shall be obligated to pay or cause to be paid all amounts accrued
or otherwise owed prior to the Closing Date (i.e., the "cure costs").  Purchaser
shall be obligated for all amounts for services rendered, goods provided, or
benefits obtained from and after the Closing Date.  Until a date that is five (5)
days before the Closing Date, the Purchaser shall have the right to remove any
Related Contract previously designated a Purchased Contract, Transferred Real
Property Lease or Subleased Real Property Lease from the list of Purchased
Contracts.

▪    <u>Purchaser's Election</u>:  At any time prior to the fifth (5th) Business Day
prior to Closing, Purchaser may elect, without any effect on the Purchase Price, (i)
to designate as an Excluded Asset any asset, interest or right that would otherwise
constitute a Purchased Asset if Purchaser reasonably and in good faith believes
that Purchaser could be liable for a material Liability as a result of acquiring such
asset, and (ii) to purchase the assets of any member of the Company Group and

assume the Liabilities of a type that constitute Assumed Liabilities of such member of the Company Group in lieu of purchasing the equity interests in such member of the Company Group.

▪        <u>Transition Services</u>:  The Sellers and the Purchaser shall meet and confer to draft and reach mutual agreement upon a detailed transition services agreement consistent with the obligations of the Sellers and the Purchaser set forth in the Purchase Agreement.

▪        <u>Closing and Closing Date</u>:  The Purchaser or the Seller may terminate the Purchase Agreement if the Closing does not occur on or prior to June 30, 2009. Additional conditions to closing are set forth in Article VIII of the Purchase Agreement.

▪        <u>Termination of the Purchase Agreement</u>:  The Purchase Agreement may also be terminated prior to the Closing by the Purchaser and/or the Seller in certain circumstances set forth in Section 3.3 of the Purchase Agreement, including: (i) by mutual consent; (ii) by either the Purchaser or the Seller if certain governmental approvals are denied; (iii) by the Purchaser or the Seller if certain representations and warranties or covenants are not satisfied or breached; (iv) by the Purchaser or the Seller if the Purchaser is not selected as the Successful Bidder at the Auction; (v) by the Purchaser, if the Bid Procedures Order, in form and substance reasonably satisfactory to the Purchaser, is not entered on the first available date on the Bankruptcy Court's calendar that is at least ten (10) days after the filing of the Sale Motion, or if after such entry, such Bid Procedures Order is stayed, reversed, amended or vacated or modified without Purchaser's prior written consent and such Bid Procedures Order ceases to be reinstated after a period of five (5) Business Days; (vi) by the Purchaser, if the Sale Order, in form and substance reasonably satisfactory to Purchaser, has not been entered on the first available date on the Bankruptcy Court's calendar that is at least sixty-three (63) days after entry of the Bid Procedures Order, or if after such entry, such Sale Order is stayed, reversed, amended, vacated or modified without Purchaser's prior written consent and such Sale Order ceases to be reinstated after a period of ten (10) Business Days; and (vii) by the Purchaser, if any Bankruptcy Case that relates to any Purchased Asset is involuntarily converted to a case under Chapter 7 of the Bankruptcy Code, a trustee or examiner is appointed in any such Bankruptcy Case, or any such Bankruptcy Case is dismissed.

### **Additional Provisions in the Purchase Agreement**

28.      The Purchase Agreement contains the following provisions, which the

Guidelines for the Conduct of Asset Sales, adopted by this Court's General Order M-331, require

be separately disclosed:

▪   <u>Stalking Horse Bid Protections</u>:  The Purchase Agreement incorporates the following provisions:

      i.     a limited "no-shop" and "no-solicitation" period through the date on which the Bid Procedures Order is entered and following the Auction;

      ii.     Sellers shall pay Purchaser a Seller Termination Fee of $70 million and a Reimbursement Amount of up to $35 million upon certain events of termination:[6]

      a.     If either (1) the Purchaser or the Seller terminate because the Closing has not been consummated on or prior to June 30, 2009, and the failure to close is not primarily due to the failure of such party to perform any of its obligations under the Purchase Agreement, or (2) LBHI has made certain elections that would cause certain conditions precedent to closing not to be satisfied, then Seller shall pay the Reimbursement Amount.  In addition, if prior to such termination, a proposal for a Competing Transaction is made and not withdrawn and within twelve (12) months following such termination, Seller enters into a definitive agreement with respect to a Competing Transaction, or a Competing Transaction is Consummated, Seller shall pay the Seller Termination Fee.

      b.     If (1) Sellers breach certain representations and warranties or covenants that cause a failure to satisfy certain conditions precedent, (2) the Sale Order is not entered prior to the first available date on the Court's calendar that is at least sixty-three (63) days after entry of the Bid Procedures Order, or the Sale Order is stayed, reversed, amended, vacated or modified without Purchaser's prior written consent, or (3) the Sellers breach certain covenants in the Purchase Agreement, then Seller shall pay the Reimbursement Amount.  In addition, if within twelve (12) months following such termination, Seller enters into a definitive agreement with respect to a Competing Transaction, or a Competing Transaction is consummated, Seller pay the Seller Termination Fee.

      c.     If either the Purchaser or the Seller terminates because the Purchaser is not selected as the Successful Bidder at the Auction, Seller shall pay the Seller Termination Fee and the Reimbursement Amount.

      d.     If Purchaser terminates because any Bankruptcy Case that relates to any Purchased Asset is involuntarily converted to a case under Chapter 7 of the Bankruptcy Code, a trustee or examiner is appointed

---

[6] The provisions governing termination of the Purchase Agreement and the effects if terminated are set forth in Sections 3.3 and 3.5 of the Purchase Agreement.

in any such Bankruptcy Case, or any such Bankruptcy Case is dismissed, the Seller shall pay the Reimbursement Amount

   iii. the Debtors' obligations to pay the Seller Termination Fee and the Reimbursement Amount shall be joint and several with the other Sellers, shall constitute a superpriority administrative claim against the Debtors pursuant to sections 105(a), 503( b) and 364(c)(1) of the Bankruptcy Code and shall be senior to, and have priority over, all other claims against the Debtors, other than any claims arising under the Debtors' postpetition credit agreement with Barclays.

   iv. in order for a Qualified Bid (as defined in the Bidding Procedures) (other than Purchaser's bid) to be the Starting Bid (as defined in the Bidding Procedures), such Qualified Bid shall have a value to the Sellers, either individually or, in conjunction with any other Qualified Bid, greater than or equal to net amount the Sellers would receive under the Purchase Agreement, plus the amount of the Seller Termination Fee,  plus the amount of the Reimbursement Amount, plus $50 million, as determined by the Sellers in their sole discretion;

   v. Purchaser may credit bid the amount of the Seller Termination Fee and the Reimbursement Amount and have the opportunity to increase its offer to (x) a level at least $1 million in excess of the Starting Bid, or (y) to otherwise modify the terms of its offer to be more favorable or consistent with such offer to become the Starting Bid; and

   vi. the first minimum incremental bid at the Auction shall have a purchase price of at least $25 million over the Starting Bid, with any subsequent bid increases of bids to be made in minimum increments of at least $25 million.

▪ <u>Agreement with Management and Employee Benefits</u>: Key employees and portfolio managers are expected to receive approximately 18.6% of the equity in the Purchased Assets over time to ensure their continued employment in the business.   Based upon the gross purchase price of $2.15 billion these retention awards are valued at $400 million.  The Sellers will be responsible for these retention bonuses and awards which will reduce the net price and proceeds realized from the proposed transaction.  Schedule 6.8 of the Purchase Agreement lists the portfolio managers that have entered into letter agreements with the Purchasers, prior to the date of the Purchase Agreement regarding continued employment in the Business following the Closing Date. Additionally, the Sellers will pay or provide cash at Closing Date for the Purchasers to pay (i) cash incentive compensation and/or bonuses to Transferred Employees with respect to any performance periods that have started as of the Closing Date but have not ended prior to the Closing Date, (ii) accrued and unpaid salaries or wages as of the Closing Date; (iii) unused vacation or other paid time off to the extent earned as of the Closing Date, (iv) any and all educational or training assistance for Transferred Employees for periods that have not been completed as of the Closing Date, and (v), incentive compensation and bonuses payable to Transferred Employees, which shall be equal to $647,562 per day, with respect to the period

from December 1, 2007 until the Closing Date.  Further, for the period between December 1, 2007 and July 31, 2008, the Sellers accrued, and shall maintain an accrual through the Closing Date, of $61,200,000 for deferred commissions, production payments and other formulaic compensation.  For the period between August 1, 2008 and the Closing Date, Sellers shall accrue in full an amount equal to the economic value of the commissions and formulaic compensation that will be earned or awarded at levels consistent with past practice.  The Sellers will pay or provide cash at Closing Date for the Purchasers to pay all such formulaic compensation relating to any period prior to closing.  The Sellers shall also cause each member of the Company Group to accelerate vesting of all employee benefits of Transferred Employees under the Lehman Brothers Holdings Inc. Retirement Plan and the Lehman Brothers Savings Plan.

- **Certain Deadlines**:  The Purchaser may terminate the Purchase Agreement if:  (i) the Bid Procedures Order, in form and substance reasonably satisfactory to the Purchaser, is not entered before the tenth (10th) day after the date of the filing of this Motion or the first available date on the Court's calendar thereafter; (ii) the Sale Order, in form and substance reasonably satisfactory to the Purchaser, is not entered prior to the sixty-third (63rd) day after entry of the Bid Procedures Order or the first available date on the Court's calendar thereafter.  The proposed Bidding Procedures require the Auction be held on the sixty-first (61st) day after the Bid Procedures Order is entered.

- **No Good Faith Deposit**:  Neither the Purchaser nor any Qualified Bidder is required to provide a good faith deposit.

- **Record Retention**:  The Seller and the Purchaser agree that each of them shall preserve and keep the business records held by them relating to the Business for a period of seven years (or such longer period as may be required under applicable Law) from the Closing Date and shall make such business records available to the other as may be reasonably required by such party; provided, however, that the Seller may deliver such business records to the Purchaser if the Seller winds down its affairs prior to the end of such seven year period.

- **Sale of Avoidance Actions**:  The Purchased Assets include all avoidance actions and similar rights and causes of action, including causes of action of the Seller and its Subsidiaries under Sections 544 through 553 of the Bankruptcy Code, against any of the Acquired Subsidiaries or the Purchaser, any of its Affiliates or any portfolio company of any direct or indirect equity holder of the Purchaser or any of its Affiliates.

- **Requested Findings as to Successor Liability**:  The proposed Sale Order contains findings of fact and conclusions of law limiting the Purchaser's successor liability.

▪   <u>Requested Findings as to Fraudulent Transfer</u>:   The proposed Sale Order contains findings of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

▪   <u>Sale Free and Clear</u>:  As described above and below, the sale of the Purchased Assets from any of the Debtors will be free and clear of all liens, claims, encumbrances and other interests.

▪   <u>Relief from Bankruptcy Rule 6004(h)</u>:  As described below, the Debtors seek relief from the ten-day stay imposed by Bankruptcy Rule 6004(h).

## **Proposed Notice, Bidding and Auction Procedures**

29.     In order to ensure that the Sellers receive the maximum value for the Purchased Assets, the Sellers and the Purchaser have agreed that the Purchase Agreement is subject to higher or better offers.  The Purchase Agreement will serve as the "stalking horse" bid for the Purchased Assets.  As set forth in the Purchase Agreement and the Bid Procedures Order, the Sellers and the Purchasers have agreed to allow for a full sixty (60) day period for potential bidders to conduct diligence with respect to the Purchased Assets, beginning from the date the Bid Procedures Order is entered, and for an Auction to occur after receipt of qualified bids.  The Purchased Assets may be sold in a single sale to a single offeror or in parts to different offerors.

A.     **<u>Notice and Other Procedures</u>**

30.     The Debtors propose the following notice and other procedures:

a.     <u>Notice of Sale Hearing</u>:  Within five (5) days after entry of the Bid Procedures Order, the Sellers (or their agents) shall:

i.     provide notice, in substantially the form attached to the proposed Bid Procedures Order (the "<u>Sale Notice</u>"), of the proposed sale, the Bid Procedures Order, the Sale Motion, the Purchase Agreement and the proposed Sale Order by email, mail, facsimile or overnight delivery service, upon (i) the U.S. Trustee, (ii) counsel for the Purchaser, (iii) counsel for the Creditors' Committee, (iv) all entities known to have asserted any lien, claim, interest or encumbrance in or upon LBHI, (v) the Office of the United States Attorney for the Southern District of New York, (vi) the United States Department of Justice, (vii) the Securities and Exchange Commission, (viii) the Federal Reserve Bank of New York, (ix) the Securities Investor Protection Corporation, (x) the Internal Revenue Service and applicable federal and state taxing authorities, (xi) the U.S.

Commodities Futures Trading Commission, (xii) the Pension Benefit Guaranty Corporation and all regulatory authorities of the Debtors' foreign pension plans, including the U.K. Pension Regulator, (xiii) all persons, if any, who have filed objections to the Motion, (xiv) all persons who have filed a notice of appearance in the Debtors' bankruptcy cases, and (xv) all persons who Purchaser may reasonably request; provided, however, that, in the event that any Seller or any member of the Company Group becomes subject to a Bankruptcy Case, such entity shall provide a Sale Notice, to the extent not already provided, to all entities known to have asserted any lien, claim, interest or encumbrance against the new debtor or its property; and

        ii.      cause the Sale Notice to be published on http://chapter11.epiqsystems.com/lehman (the "Website").

        b.      Assumption, Assignment and Cure Notice:  Within five (5) business days after receiving a Designation Notice, the Debtors shall file with the Court and serve on each counterparty to a Purchased Contract or Transferred Real Property Lease that has been designated, as of the date of such notice, as a Purchased Contract or Transferred Real Property Lease to be assumed and subleased or assumed and assigned to the Purchaser at Closing (collectively, the "Designated Contracts") a notice of assumption, assignment and cure substantially in the form attached to the proposed Bid Procedures Order.  The notice shall include the Debtors' calculation of the cure amount (the "Cure Amount") for each such Designated Contract.  A list of the Designated Contracts and Cure Amounts will also be posted on the Website and updated as modified.  Any counterparty to a Designated Contract shall file and serve any objections to (i) the proposed assumption and sublease or assumption and assignment to the Purchaser and (ii) if applicable, the proposed Cure Amount, no later than five (5) days before the Sale Hearing.  If no objection is timely received, (x) the counterparty to a Designated Contract shall be deemed to have consented to the assumption and sublease or assumption and assignment of the Designated Contract to the Purchaser and shall be forever barred from asserting any objection with regard to such assumption and sublease or assumption and assignment, and (y) the Cure Amount set forth in the Assumption, Assignment and Cure Notice shall be controlling, notwithstanding anything to the contrary in any Designated Contract, or any other document, and the counterparty to a Designated Contract shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the Purchaser, or the property of any of them.

        c.      Date, Time, and Place of Auction:  The Debtors propose that the Auction be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 commencing on **the first Business Day sixty-one (61) days after entry of the Bid Procedures Order, at 10:00 a.m. (New York time)**.

d.    Date, Time, and Place of Sale Hearing:  The Debtors propose that the Sale Hearing be held on **the first Business Day that is two days following the Auction, or as soon thereafter as the Court may permit**.  The Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open Court or on the Court's docket.

e.    Objection Deadline to Sale Order:  In accordance with this Court's order, dated September 22, 2008, establishing case management procedures, objections to the relief sought in the Sale Order shall be in writing, filed, and served so as to be actually received by (i) the Court; (ii) attorneys for the Debtors; (iii) the U.S. Trustee; (iv) attorneys for the Creditors' Committee; (v) attorneys for any other official committee(s) appointed in these chapter cases; (vi) attorneys for the Debtors' postpetition lenders; and (vii) the attorneys for the Purchaser, by **five (5) Business Days prior to the Sale Hearing, at 4:00 p.m. (New York time)**.

f.    Information Provided to Interested Parties:  Any person who wishes to conduct diligence in connection with the Bidding Process must enter into a confidentiality agreement, which shall inure to the benefit of any purchaser of the Purchased Assets, and shall be on terms that are not less favorable to the Sellers or more favorable to such potential bidder than the terms of the confidentiality agreement entered into with the Purchaser.  From the date of the entry of the Bid Procedures Order until the Auction, the Seller is permitted to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person in connection with any Competing Transaction.  During that period, the Seller shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Business and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including, without limitation, supplying information relating to the Business and assets of the Companies to prospective buyers.

B.    **The Bidding Procedures**

31.    The Debtors believe that the Bidding Procedures, a copy of which is annexed to the Bidding Procedures Order, are appropriate and will maximize the recovery for the Debtors and their estates in connection with the sale of the Purchased Assets.  The Bidding Procedures allow all parties in interest an opportunity to conduct in-depth diligence and to meet with the Sellers' management and investment bankers over an extensive two-month period.  The Bidding Procedures also provide an appropriate framework for selling the Purchased Assets in a uniform fashion and will enable the Debtors to review, analyze, and compare all bids received to

determine which bid(s) are in the best interests of the Debtors and their economic stakeholders.

The Bidding Procedures include participation requirements for Qualified Bidders and bid

requirements for Qualified Bids.

**C.** **The Auction**

32.     Only the Purchaser and other Qualified Bidders will be entitled to make

any subsequent Qualified Bids at the Auction.  Bidding at the Auction will begin with the

Starting Bid and continue, in one or more rounds of bidding, so long as during each round at

least one subsequent bid is submitted by a Qualified Bidder that (i) improves upon such

Qualified Bidder's immediately prior Qualified Bid and (ii) the Sellers determine that such

Subsequent Bid is (a) for the first round, a higher or otherwise better offer than the Starting Bid,

and (b) for subsequent rounds, a higher or otherwise better offer than the Leading Bid (as defined

in the Bidding Procedures).  The Sellers may employ and announce at the Auction additional

procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to

make Subsequent Bids) for conducting the Auction, provided that such rules are (i) not

inconsistent with the Bid Procedures Order, the Bankruptcy Code, or any order of the

Bankruptcy Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder.

33.     The Sellers reserve the right to (i) determine in their reasonable discretion

(after consultation with the Creditors' Committee) which bid is the highest or best and (ii) reject

at any time prior to entry of a Court order approving an offer, without liability, any offer, other

than the Stalking Horse Bid, that the Sellers in their reasonable discretion (after consultation with

the Creditors' Committee) deem to be (x) inadequate or insufficient, (y) not in conformity with

the requirements of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or procedures

set forth therein or in the Bid Procedures Order, or (z) contrary to the best interests of the Sellers,

the Debtors, and their estates.  The Sellers will sell the Purchased Assets for the highest or

otherwise best Qualified Bid upon the approval of such Qualified Bid by the Court after the Sale

Hearing.

## The Relief Requested is Warranted and in
## the Best Interests of the Debtors and Their Economic Stakeholders

### A.    Sale of the Purchased Assets

34.    Ample authority exists for approval of the proposed sale.  Section 363 of

the Bankruptcy Code provides, in relevant part, "The trustee, after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C.

§ 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that

the sale of a debtor's assets be based upon the sound business judgment of the debtor.  See In re

Chateaugay Corp., 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b)

application must find from the evidence presented a good business reason to grant such

application); Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722

F.2d 1063, 1071 (2d Cir. 1983) (same).  Once a court is satisfied that there is a sound business

justification for the proposed sale, the court must then determine whether (i) the debtor has

provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and

reasonable, and (iii) the purchaser is proceeding in good faith.  In re Betty Owens Sch., 1997

U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); accord In re Delaware and Hudson Ry. Co., 124 B.R. at

166; In re Decora Indus., Inc., Case No.  00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del.

May 20, 2002).

35.    As described above, an orderly but expeditious sale of the Purchased

Assets is critical to preserving the value of IMD and, in turn, to a recovery for the Sellers and

their economic stakeholders.  Prior to the announcement of the execution of the Purchase

Agreement, IMD had begun to experience a loss of clients and assets under management.  The

announcement of the sale to Purchaser was beneficial in stemming those losses and the potential

loss of critical IMD employees, which would have more seriously reduced IMD's sale value.

Thus, the Purchase Agreement represents a reasonable exercise of business judgment by each of

the Sellers and the Debtors that the sale is in the best interests of all parties in interest.

36.     The notice that the Sellers propose to provide, as set forth in the Purchase

Agreement and the proposed Bid Procedures Order, is more than adequate and reasonable.

Within five (5) days of entry of the Bid Procedures Order, and more than fifty-five (55) days

prior to the Sale Hearing, the Sellers will serve and publish the Sale Notice, as described above.

Additional notice will be provided to potential parties in interest through various

communications and consent notices sent to IMD's customers and contract counterparties,

through SEC filings, including Forms 8-K filed on October 3, 2008, [and on the date hereof], and

through the news media.  Such notice of the sale, together with the authority pursuant to section

363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing

and in the Sale Order that Purchaser shall not be liable under theories of successor liability in

connection with the Purchased Assets.

37.     The Sellers believe that the Purchase Price under the Purchase Agreement

is fair and reasonable, but the Court will be assured at the Sale Hearing, after an extended

diligence period and marketing by the Sellers' investment bankers, and after the Auction is

concluded, that the Sellers will have selected the party or parties with the highest or best offer for

the Purchased Assets.  The Sellers' compliance with the Bid Procedures Order, the Bidding

Procedures, and the Auction will provide the basis to find that the sale of the Purchased Assets

does not constitute a fraudulent transfer because the purchase price represents reasonably

equivalent value and is fair and reasonable.  It will also establish that the Sellers and the

Purchaser, or any other Successful Bidder, has proceeded in good faith. The sale of the Sellers'
avoidance actions against any of the Acquired Subsidiaries or the Purchaser, any of its Affiliates
or any portfolio company of any direct or indirect equity holder of the Purchaser or any of its
Affiliates, is a necessary substantive provision to avoid a disruption to the business that
Purchaser is acquiring.

### B.    Sale Free and Clear of Liens, Claims, Encumbrances, and Interests

38.    In the interest of attracting the best offers, the sale of the Purchased
Assets, to the extent that such assets are assets of a debtor, should be free and clear of any and all
liens, claims, encumbrances and other interests in accordance with section 363(f) of the
Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the
proceeds of the sale. Pursuant to section 363(f) of the Bankruptcy Code, a debtor in possession
may sell property of the estate "free and clear of any interest in such property of an entity other
than the estate" if applicable nonbankruptcy law permits sale of such property free and clear of
such interest, if such entity consents, if such interest is a lien and the price at which such property
is to be sold is greater than the aggregate value of all liens on such property, if such interest is in
bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to
accept a money satisfaction of such interest. 11 U.S.C. § 363(f)(1) – (5). With respect to any
party asserting a lien, claim, encumbrance or other interest against the assets, the Debtors
anticipate that they will be able to satisfy one or more of the conditions set forth in section
363(f).

### C.    Protections As a Good Faith Purchaser

39.    Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's
interest in property purchased from the debtor notwithstanding that the sale conducted under
section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m). Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'" In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 at 147). *See also* Allstate Ins. Co. v. Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

40.    The selection of the Successful Bidder will be the product of arm's-length, good-faith negotiations in an anticipated competitive purchasing process. Based upon the record to be made at the Sale Hearing, the Debtors intend to request a finding that the Successful Bidder is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

### D.    **Bidding Procedures**

41.    The Bidding Procedures were fiercely negotiated between the Sellersand the Purchaser. The result – including a 60 day diligence period and an open auction process with minimum barriers to entry – will ensure that the bidding process with respect to the Auction is fair and reasonable and will yield the maximum value for their estates and creditors. In particular, the Bidding Procedures treat the Purchaser and other potential bidders fairly vis a vis one another. In particular, because the Purchaser was not required to provide a good faith

deposit, the Bidding Procedures do not require other Qualified Bidders to make good faith deposits. The deadlines, noted above, that are incorporated into the Purchase Agreement and the proposed Bid Procedures Order do not limit notice of the Sale Hearing to parties in interest. Accordingly, approval of the Bidding Procedures, including the dates established thereby for the Auction and the Sale Approval Hearing, is warranted.

### E.    Stalking Horse Protections

42.    Approval of termination fees and expense reimbursements as a form of bidder protection in connection with a sale of assets pursuant to section 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[7]

43.    As described above, authorization is requested to pay the Seller Termination Fee and the Reimbursement Amount. Courts in this District have approved the use of break-up fees, where warranted, in bankruptcy cases. See Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Specifically, courts have held break-up fees should be approved as long as (i) the relationship between the parties is not tainted

---

[7] See, e.g., In re Fortunoff Fine Jewelry and Silverware, LLC, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. February 22, 2008) (approving break-up fee); In re Bally Total Fitness of Greater New York, Inc., Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); In re G+G Retail, Inc., Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); In re Footstar, Inc. Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); In re Twinlab Corp., et al., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); In re Adelphia Business Solutions, Inc., et al., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction.  Id. at 657.  Bankruptcy courts have approved bidding incentives similar to the ones contemplated in the Purchase Agreement under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.

44.    The stalking horse protections in the proposed transaction meet the "business judgment rule" standard.  The protections, including the Seller Termination Fee, the Reimbursement Amount, the initial overbid, and subsequent bidding increments, individually and collectively, were a material inducement for, and condition of, the Purchaser's entry into the Purchase Agreement.  The Purchaser is unwilling to commit to hold open the offer to purchase the Purchased Assets under the terms of the Purchase Agreement unless the Purchaser is assured of payment of the Seller Termination Fee and the Reimbursement Amount.  The Seller Termination Fee and the Reimbursement Amount promote more competitive bidding by inducing the Purchaser to hold its offer open as a minimum or floor bid on which other bidders – and the Sellers – can rely.  The stalking horse bid increases the likelihood that the price at which the Purchased Assets are sold will reflect their true worth.  Value has been received as a result of the stalking horse bid in the form of stabilizing the Seller workforce and client base. The Purchaser is entitled to be compensated as a result.

45.    The Sellers recognize that the Seller Termination Fee and the Reimbursement Amount are on the high end of the range of similar fees approved by the Court.  Nonetheless, the Sellers believe the Seller Termination Fee and the Reimbursement Amount are fair and reasonable in amount under the circumstances.  In most instances, the Sellers will be reimbursed for the Seller Termination Fee and the Reimbursement Amount out of the proceeds

of any Competing Transaction, and in all instances, the Purchaser will only be reimbursed for

reasonable out-of-pocket fees, costs and expenses.  Further, there is ample precedent for

approving the Seller Termination Fee, which equals 3% of the Base Purchase Price and

approximately 4% of the expected net purchase price.  See, e.g., In re Global Crossing Ltd., Case

# 02-40187 (REG) (Bankr. S.D.N.Y. 2002) (break-up fee equal to 4%); In re LTV Steel

Company, Inc., Case # 00-43866 (WTB) (Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%);

In re Fruit of the Loom, Inc., Case # 99-4497 (PJW) (Bankr. D. Del. 1999) (break-up fee equal to

3.59%); In re Graham-Field Health Products, Inc., Case # 99-4457 (MFW) (Bankr. D. Del. 1999)

(break-up fee equal to 4.65%).

46.     The foregoing will not deter or chill bidding, are reasonable, and their

availability to the Debtors will enable the Debtors to maximize the value of their estates.

**F.      Assumption and Assignment of Related Contracts**

47.     To facilitate and effect the sale of the Purchased Assets, the Debtors seek

authorization to assume and assign the Purchased Contracts and the Transferred Real Property

Leases and assume and sublease the Subleased Real Property Leases to the Purchaser.  Section

365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's

approval may assume or reject any executory contracts or unexpired leases of the debtor."  11

U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment in

determining to assume an executory contract or unexpired lease, courts will approve the

assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v. Costich (In re

Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime

Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).  In connection

with the proposed sale, the Debtors will only assume Purchased Contracts, the Transferred Real

Property Leases, and Subleased Real Property Leases, i.e., those Related Contracts that the

Purchaser has designated it wants to assume liability for post-Closing obligations on a going

forward basis. The Debtors' assumption of the Purchased Contracts, Transferred Real Property

Leases and Subleased Real Property Leases will be contingent and effective only upon the

Closing. In addition, the assumption will allow the Debtors to avoid rejection damages if the

Purchased Contracts, Transferred Real Property Leases and Subleased Real Property Leases

were otherwise rejected. Further, section 365(k) of the Bankruptcy Code provides that

assignment by the debtor to an entity of a contract or lease "relieves the trustee and the estate

from any liability for any breach of such contract or lease occurring after such assignment." 11

U.S.C. § 365(k). Pursuant to section 365(k), the Debtors and the estates will therefore be

relieved from any liability for any breach of any Purchased Contract, Transferred Real Property

Lease or Subleased Real Property Lease after such assignment or sublease to the Purchaser. As

such, the assumption of the Purchased Contracts will be an exercise of the Debtors' sound

business judgment.

48.    Section 365(b)(1) of the Bankruptcy Code requires that the Debtors cure,

or provide adequate assurance that they will promptly cure, any outstanding defaults under the

Purchased Contracts, Transferred Real Property Leases and Subleased Real Property Leases that

they will assume. As set forth above, the Debtors propose to file with the Court, publish on the

Website, and serve on each counterparty to a Purchased Contract, Transferred Real Property

Lease and Subleased Real Property Lease a notice which shall include the Debtors' calculation

of the Cure Amount for each such Purchased Contract, Transferred Real Property Lease or

Subleased Real Property Lease. Contract counterparties shall have the opportunity to lodge any

objections to the proposed assumption and assignment to the Purchaser and, if applicable, the

proposed Cure Amount.  Sellers shall be obligated to pay or cause to be paid any and all Cure

Amounts.  In the event of any dispute relating to any Cure Amount, Sellers shall escrow such

funds in a manner approved by the Court for payment pending resolution of such dispute.

49.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign

an executory contract or unexpired lease of nonresidential real property if "adequate assurance of

future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).

The meaning of "adequate assurance of future performance" depends on the facts and

circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle

Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989)

(citation omitted); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985)

(adequate assurance of future performance does not mean absolute assurance that debtor will

thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill.

1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall

considerably short of an absolute guarantee of performance.").  Among other things, adequate

assurance may be given by demonstrating the assignee's financial health and experience in

managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-

06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when

prospective assignee of lease has financial resources and expressed willingness to devote

sufficient funding to business to give it strong likelihood of succeeding; chief determinant of

adequate assurance is whether rent will be paid).  At the Sale Hearing, the Debtors will be

prepared to proffer testimony or present evidence to demonstrate the financial credibility,

willingness, and ability of Purchaser to perform under the Purchased Contracts and Transferred

Real Property Leases.  The Sale Hearing, therefore, will provide the Court and other interested

parties with the opportunity to evaluate the ability of the Purchaser to provide adequate assurance

of future performance under the Purchased Contracts and Transferred Real Property Leases, as

required by section 365(b)(1)(C) of the Bankruptcy Code.  Accordingly, it is requested that at the

conclusion of the Sale Hearing, the proposed assumption and assignment the Purchased

Contracts and Transferred Real Property Leases be approved.

50.    To facilitate the assumption and assignment of the Purchased Contracts

and Transferred Real Property Leases, the Debtors further request the Court find all anti-

assignment provisions of the Closing Date Contracts to be unenforceable under section 365(f) of

the Bankruptcy Code.[8]

### G.    Request for Relief Pursuant to Bankruptcy Rules 6004(g), and 6006(d)

51.    Bankruptcy Rule 6004(g) provides an "order authorizing the use, sale, or

lease of property is stayed until the expiration of 10 days after entry of the order, unless the court

orders otherwise."  FED. R. BANKR. P. 6004(g).  Bankruptcy Rule 6006(d) further provides that

an "order authorizing the trustee to assign an executory contract or unexpired lease under

§ 365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court

orders otherwise."  FED. R. BANKR. P. 6006(d).

52.    In light of the fragility of the Purchased Assets and the need to stabilize

the IMD businesses, the Debtors, the Sellers, and the Purchaser agree that the sale of the

---

[8] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that "Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

Purchased Assets should be consummated as soon as practicable.  Assuming all non-bankruptcy

consents are obtained, the parties believe that the Sale Order approving the sale of the Purchased

Assets and the assumption and assignment of the Purchased Contracts should be effective

immediately upon entry of such order.  Therefore, waiver of the ten-day stay under Bankruptcy

Rules 6004(h) and 6006(d) is requested.

### H.    Appointment of a Consumer Privacy Ombudsman

53.    Pursuant to section 363(b)(1) of the Bankruptcy Code, a debtor may sell or

lease personally identifiable information, such as its consumer customer list, so long as it

complies with the debtor's privacy policy.  11 U.S.C. § 363(b)(1)(A).  If a sale is inconsistent

with the debtor's privacy policy, Bankruptcy Code section 332 governs the appointment of a

consumer privacy ombudsman.  11 U.S.C. § 332(b)(1).

54.    Should the Debtors sell personally identifiable information, the Debtors

will ensure that the sale is consistent with the Debtors' current privacy policy.  Therefore, the

appointment of a consumer privacy ombudsman is unnecessary at this time.  Should the Debtors

propose to sell such information other than in compliance with their privacy policy, they will

promptly notify the Court and seek the appointment of a consumer privacy ombudsman in

accordance with section 332 of the Bankruptcy Code.

### Notice

55.    No trustee or examiner has been appointed in these chapter 11 cases.  The

Debtors have served notice of this Motion in accordance with the procedures set forth in the

order entered on September 22, 2008 governing case management and administrative procedures

for these cases [Docket No. 285] and the order to show cause entered on the date hereof in

connection with this Motion.  No other or further notice need be provided, other than as may be

subsequently set forth in the Bid Procedures Order.

56.    No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested and such other and further relief as is just.

Dated:  October 6, 2008
        New York, New York

/s/ Lori R. Fife
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession