**Expedited Hearing Requested**

**WEIL, GOTSHAL & MANGES LLP**
**767 Fifth Avenue**
**New York, New York 10153**
**Telephone: (212) 310-8000**
**Facsimile: (212) 310-8007**
**Harvey R. Miller**
**Richard P. Krasnow**
**Lori R. Fife**
**Shai Y. Waisman**
**Jacqueline Marcus**

**Attorneys for Debtors**
**and Debtors in Possession**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
**In re**                                                         :    **Chapter 11 Case No.**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,                      :    **08-13555 (JMP)**
                                                                  :
                                            **Debtors.**          :    **(Jointly Administered)**
                                                                  :
                                                                  :
------------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, 6006, AND 9019 (I) APPROVING EQUITY INTERESTS PURCHASE AGREEMENT; (II) AUTHORIZING DEBTORS TO COMPROMISE, SETTLE, AND RELEASE RELATED CLAIMS; AND (III) GRANTING CERTAIN RELATED RELIEF**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

    Lehman Brothers Holdings, Inc. ("LBHI") and its affiliated Debtors in the

above-referenced chapter 11 cases, as debtors and debtors in possession (together, the

"Debtors" and, collectively with their non-Debtor affiliates, "Lehman") file this Motion

and respectfully represent:

**Background**

1.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

**Jurisdiction**

4.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Lehman's Business**

5.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.  Its headquarters in New York and regional headquarters in London and Tokyo are complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region.

6.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to these chapter 11 filings is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**The R3 Settlement and Redemption Transaction**

7.      LB R3 Holdings L.P (the "Investor"), a Delaware limited partnership, is an indirect, wholly-owned subsidiary of LBHI (the "Seller").  LB R3 Holdings GP L.L.C., a Delaware limited liability company (the "Investor GP," and together with the Investor, the "Investor Parties"), is the general partner, and LBHI is the limited partner, of the Investor.  LBHI is the sole member of LB R3 Holdings GP L.L.C.

8.      The Investor is the record and beneficial owner of (i) membership interests in R3 Capital Management, LLC, a Delaware limited liability company (the "Manager") (the "Manager Interests"); (ii) Class B Shares of R3 Capital GenPar MGP, Ltd., a Cayman Islands exempted company (the "GP") (the "GP Shares"); (iii) Class B

Shares of R3 Capital SLP MGP, Ltd., a Cayman Islands exempted company (the "SLP")

(the "SLP Shares"); and (iv) limited partnership interests in R3 Capital Partners (B), L.P.,

a Cayman Islands exempted limited partnership (the "Fund," and together with the

Manager, the GP, and the SLP, the "Buyers") (the "Fund Interests," and together with the

Manager Interests, the GP Shares, and the SLP Shares, the "Equity Interests").

　　　　9.　　The Investor acquired the Equity Interests pursuant to a Master

Transaction Agreement, dated as of May 28, 2008 (the "Master Transaction

Agreement"), with LBHI and certain of its affiliates listed on Annex 1 to the Master

Transaction Agreement, on the one hand, and R3 Capital Partners Master, L.P., a

Cayman Islands exempted limited partnership (the "Master Fund"), the Manager, and

other affiliated entities listed on Annex 1 to the Master Transaction Agreement, on the

other hand (the "Investment Transaction").  In connection with the Investment

Transaction, the Investor made a seed capital investment of approximately $1 billion (the

"Seed Capital Investment"), representing an indirect 45% nonvoting equity interest in the

Master Fund.  Pursuant to a side letter among the Investor, the Manager, the GP, and the

Fund, dated May 28, 2008 (the "Fund Side Letter"), the Investor committed to make a

capital contribution to the Fund.

　　　　10.　　The Buyers have asserted that the Investor has the following

ongoing obligations to the Buyers and their affiliates in connection with the Investment

Transaction (the "Investor Obligations") pursuant to the Global Side Letter Agreement,

dated May 28, 2008, by and among Richard M. Reider, the Manager, the GP, the SLP,

and the Investor (the "Global Side Letter"):  (i) an affiliate of LB (as defined therein)

would serve as a prime broker for any Fund (as defined therein); (ii) LB would arrange

financing (including cash and securities loans) for any Fund; and (iii) LB would provide marketing services to the Fund.

11.      Pursuant to a Sub-Sublease between the Manager and the Seller, dated as of May 23, 2008 (the "Sub-Sublease"), the Manager leases office space from the Seller (the "Premises").

12.      As set forth in the First Day Affidavit, the events that drove down Lehman's credit standing impeded its ability to maintain normal business operations. As a result, the Investor, through certain of its affiliates, were unable to provide loans and financing.

13.      These chapter 11 cases have created significant uncertainty in the marketplace regarding the impact of these chapter 11 cases on the Seller's operations and the fate of the Seed Capital Investment. If allowed to continue, this uncertain state of affairs could lead to an erosion of the value of the Debtors' Equity Interests, which value would otherwise inure to the benefit of the Debtors' estates and their creditors.

14.      To maximize the value of the Seed Capital Investment and in accordance with the Master Transaction Agreement, Global Side Letter, and Fund Side Letter, LBHI entered into a dialogue with the Buyers regarding the nature and scope of Lehman's future participation in connection with the Investment Transaction and a global settlement and release of all claims and causes of action associated with the Investment Transaction, the Investor Obligations, and all related matters between the parties.

15.      After extensive arm's-length negotiations, LBHI and the Investor Parties entered into a Purchase Agreement with the Buyers, dated October 8, 2008 (the

"Purchase Agreement"),[1] pursuant to which (i) the Seller will transfer, and the Buyers

will purchase, the Manager Interests, the GP Shares, the SLP Shares, and the Fund

Interests set forth on Schedule 2.1 to the Purchase Agreement (the "Purchased Fund

Interests") (collectively, the "Purchased R3 Interests"); (ii) (A) the Seller, through a

redemption, will exchange $250 million of its interests in the Master Fund and contribute

such interest to a new fund, R3 Capital Partners (A), L.P., a Cayman Islands exempted

limited partnership (the "New Fund") in exchange for the New L.P. Investment (defined

below) (collectively, the "Exchanges"); (B) the Buyers will pay cash of $125 million at

Closing and deliver at Closing a promissory note from the Master Fund with a principal

amount of $125 million; (C) the Master Fund and Buyers will effect an assignment of

certain claims to LBHI, as set forth in the Purchase Agreement; and (iii) there will be

among the parties a mutual release of claims, as set forth in the Purchase Agreement.

The Exchanges will be effected in accordance with a redemption and contribution

agreement (the "Redemption and Contribution Agreement"), by which the Seller shall

contribute its existing Master Fund Interests other than the Purchased Fund Interests for

interests in the New Fund with a net asset value of $250 million based on the overall net

asset value of the Master Fund as of September 30, 2008 (the "New LP Investment").

The $250 million in Cash Consideration and the $250 million New LP Investment shall

be in full and final satisfaction of the Seller's prior existing Fund Interests, which were

issued on or about May 28, 2008 with a net asset value of approximately $1.1 billion.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto
in the Purchase Agreement. Insofar as there are any inconsistencies between this
summary description of the Purchase Agreement and the Purchase Agreement, the terms
of the Purchase Agreement shall control.

16.     The Purchase Agreement, a true and correct copy (without

exhibits) of which is annexed hereto as Exhibit "A," includes the following salient terms:

- <u>The Exchanges</u>.  Upon consummation of the Exchanges on the Closing Date, upon the terms and conditions of the Purchase Agreement, the Seller's Fund Interests shall be redeemed in full and the New LP Investment shall be issued to the Seller with an initial capital amount of $250 million as of September 30, 2008.

- <u>Purchase and Sale of Assets</u>.  The Seller shall sell and transfer, and the Buyers shall purchase and redeem, the Manager Interests, the GP Shares, the SLP Shares, and the Purchased Fund Interests.

- <u>No Assumption of Liabilities</u>.  None of the Buyers nor their Affiliates shall assume any liabilities or obligations of the Investor, the Investor GP, the Seller, or any of their Affiliates or respective predecessors.  Neither the Seller nor any of its Affiliates shall assume any liabilities or obligations of the Buyers or any of their Affiliates or respective predecessors, whether known or unknown, matured or unmatured, contingent or absolute, direct or indirect, whenever incurred.

- <u>Cash Consideration</u>.  In consideration for the Purchased R3 Interests and other consideration provided by the Seller or any of its Affiliates (the "<u>LB Parties</u>"), the Buyers shall pay to the Seller $250 million (the "<u>Cash Consideration</u>") as follows:

  - $125 million in immediately payable funds shall be paid at the Closing (the "<u>Closing Payment</u>").

  - At the Closing, the Master Fund shall issue a Promissory Note, substantially in the form annexed to the Purchase Agreement as Exhibit "C," for the $125 million unpaid balance of the Cash Consideration (the "<u>Deferred Amount</u>").  The Promissory Note shall have a maturity date of May 31, 2009, shall provide for prepayments without penalty, shall be an obligation of the Master Fund senior to all limited partnership interests in the Master Fund and shall bear interest at a rate equal to the yield on the six-month Treasury bill rate as of the Closing Date.

  - The delivery of the Closing Payment and the issuance to the Seller of the Promissory Note and the New Fund Investment shall be, and is deemed to be, in full and final satisfaction of all Fund Interests, originally issued on or about May 28, 2008 with a net asset value of approximately $1.1 billion.

- <u>Withholding</u>.  The Buyers may deduct and withhold from the Cash Consideration withholding Taxes, if any, provided that the Buyers give notice to the Seller one Business Day prior to Closing or other payment

date if they Buyers reasonably believe they are required to withhold Taxes or other amounts under the Purchase Agreement, and the Buyers will not make any such deduction or withholding if the Seller provides such forms or takes such other actions necessary to remove such requirement.

- <u>New LP Investment</u>. On the Closing Date, immediately following the consummation of the purchase, sale, and transfer of the Purchased Fund Interests, the Seller, the Fund, the New Fund, and the Master Fund shall enter and perform the Redemption and Contribution Agreement.

- <u>Merger</u>: Prior to the closing of the transactions contemplated by the Purchase Agreement, the Investor Parties shall merge with and into LBHI, with LBHI as the surviving entity (the "<u>Merger</u>").

- <u>Assignment of Claims</u>. At the Closing, the Buyer will deliver to the Seller an assignment of the Assigned Claims assigned under the Assignment Agreement, annexed to the Purchase Agreement as Exhibit "A," which Assignment Agreement shall be delivered subject to the terms and conditions of the Cross Margining and Netting Agreement, dated as of May 28, 2008, by and among the Master Fund and certain LB Parties or in any Base Contract (as defined therein).

- <u>Release of Claims</u>. The releases (the "<u>Releases</u>") are set forth in Section 3.4.2 of the Purchase Agreement. Section 3.4.2(a) of the Purchase Agreement provides that, upon the Closing, (i) the Participating R3 Release Parties forever release and irrevocably discharge the Participating LB Release Parties from and against all R3 Released Claims effective as of the Closing; and (ii) the Participating LB Release Parties forever release and irrevocably discharge the Participating R3 Release Parties from and against all LB Released Claims effective as of the Closing. Any release pursuant to Section 3.4.2(a) shall not be in addition to or duplicate any release in Section 3.4.2(b). Section 3.4.2(b) provides that, upon the Closing, the Participating LB General Release Parties and the Eligible R3 General Release Parties irrevocably release and forever discharge each other from any and all Claims, except in the case of a Participating LB General Release Party, claims that the Seller may have (a) as a holder of a New LP Investment; (b) a holder of the Promissory Note; and (c) claims arising from any action or failure to take action after any Eligible R3 General Release Party ceases to be actively involved in the business and operation of the New Fund, but subject in any event to the exculpation and limits on liability in the Organizational Documents of the New Fund. To the extent that the Assignment Agreement is determined to be ineffective in whole or in part, any claim with respect thereto shall not be an R3 Released Claim or an LB Released Claim and shall be preserved for the benefit of the Seller. The R3 Released Claims means Claims relating to (a) the Investment Transaction; (b) the Master Transaction Agreement and any of the transactions contemplated therein; (c) the Investor Obligations;

(d) the Global Side Letter; (e) the Side Letter for Funds; (f) the Equity Interests; (g) the Exchanges; (h) the Organizational Documents of the R3 Parties; and (i) any conduct, agreements, or instruments relating to the business operations of the R3 Parties, but excluding the Seller's rights under the Assigned Claims, the Individual Claims, and any Claims arising under or relating to the Purchase Agreement, the New LP Investment, the Promissory Note, the Sub-Sublease, and the Elevation Claims.  The LB Released Claims include, without limitation, Avoidance Actions relating to (a) the Investment Transaction; (b) the Master Transaction Agreement and any of the transactions contemplated therein; (c) the Investor Obligations; (d) the Global Side Letter; (e) the Side Letter for Funds; (f) the Equity Interests; (g) the Exchanges; (h) the Organizational Documents of the R3 Parties; and (i) any conduct, agreements, or instruments relating to the business operations of the R3 Parties, but excluding any Claims arising under or relating to the Purchase Agreement, the Sub-Sublease, the New LP Investment, the Promissory Note, the Elevation Claims, and any claims directly relating to the Individual Claims.

- <u>Termination of Agreements</u>.  Upon the Closing, the Transition Services, Transfer and License Agreement; the Global Side Letter; the Side Letter for Funds; the Customer Account Agreement Prime Brokerage; the Management Indemnification Agreement among the Master Fund, Lehman Commercial Paper Inc., and certain other parties; the Private Equity Transaction Agreement No. 1 by and among the GP, the Master Fund, certain Fund entities and LB Group I, Inc., and the Investment Management Agreement by and among the Seller, LBIE, certain of their Affiliates, and the Manager, shall be automatically terminated.

- <u>Ownership</u>.  As of the date of the Purchase Agreement and prior to the Merger, the Investor is the record and beneficial owner of the Purchased R3 Interests free and clear of all Encumbrances except as are imposed by applicable securities laws and the Fund Documents.  The Investor has full right, power, and authority to transfer and deliver valid title to the Purchased R3 Interests, free and clear of all Encumbrances, except those provided in the Fund Documents.  Except pursuant to the Purchase Agreement and the Fund Documents, there is no Contractual Obligation pursuant to which such Investor Party has, directly or indirectly, granted any option, warrant, or right to any Person to acquire any Purchased R3 Interests.  Upon consummation of the Merger and at all times thereafter prior to the Closing, the Seller will be the record and beneficial owner of the Purchased R3 Interests free and clear of all Encumbrances created by the Seller except as are imposed by applicable securities laws, the Fund Documents, and as a consequence of these chapter 11 cases.  Subject to the Court's authorization, the Seller has full right, power, and authority to transfer and deliver to the Buyers valid title to the Purchased R3 Interests, free and clear of all Encumbrances, except for any created by the Buyers

or those provided in the Fund Documents. Immediately following the Closing, upon recordation of the Sale in the registers of the GP, the SLP, the Manager, and the Fund, the Buyers will be the record and beneficial owner of the Purchased R3 Interests, free and clear of all Encumbrances except for any created by the Buyers or as are imposed by applicable securities laws or the Fund Documents.

- <u>Indemnification</u>. The Seller agrees to indemnify, defend, and hold harmless the Buyer Indemnified Parties from and against Damages asserted against, imposed on, or incurred by any Buyer Indemnified Parties as set forth in Section 10.2 of the Purchase Agreement, which amount of indemnification shall not exceed the sum of the Cash Consideration and the contribution value of the New LP Investment. The R3 Indemnifying Parties jointly and severally agree to indemnify, defend, and hold harmless the Seller Indemnified Parties from and against Damages asserted against, imposed on, or incurred by any Seller Indemnified Parties as set forth in Section 10.3 of the Purchase Agreement, which amount of indemnification shall not exceed $15 million. The Indemnified Party shall not settle or compromise any Claim or consent to the entry of any judgment without the prior written consent of each affected Indemnifying Party, which consent shall not be unreasonably withheld.

- <u>Subrogation</u>. The Buyers agree to subrogate the Seller to the rights of the Buyers against any non-Participating LB Release Parties, provided that such subrogation shall not release the Indemnifying Parties under Section 10 of the Purchase Agreement.

- <u>The Sub-Sublease</u>. After the Closing, notwithstanding any provisions of the Sub-Sublease to the contrary, the Manager may immediately terminate the Sub-Sublease upon notice to the Seller without any liability to the Seller or any of the Seller's successors or assigns.

## **Extraordinary Provisions in the Purchase Agreement**

17.     Certain aspects of the Purchase Agreement may contain

Extraordinary Provisions, as defined in General Order M-331, dated September 5, 2006:

- <u>No Competitive Bidding</u>. The Purchase Agreement does not provide for competitive bidding. Without prejudice to the Debtors' rights to argue otherwise in the context of other investments, the Buyers assert, and the Debtors dispute, that certain restrictions on the assignment of the Purchased R3 Interests may be enforceable in bankruptcy. The delay caused by any litigation over these provisions in a competitive sale

process would threaten an erosion in the value of the Seed Capital Investment and a loss of value to the Debtors and their estates.

## Relief Requested

18.     The Debtors respectfully request entry of an order pursuant to sections 105, 363, and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9019 approving the Purchase Agreement and authorizing the consummation of the transactions contemplated therein, including the Merger, the Assignment Agreement, and the Releases.

19.     As more fully set forth below, the Debtors' decision to enter into the Purchase Agreement, execute the Assignment Agreement, and provide for the mutual Releases in connection therewith represents a reasonable exercise of the Debtors' business judgment.  The Purchase Agreement, the Assignment Agreement, and the Releases are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.  As such, the relief requested in this Motion should be granted.

### The Purchase Agreement
### Is an Appropriate Exercise of the Debtors' Business Judgment

20.     Ample authority exists for approval of the proposed Purchase Agreement.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts in the Second Circuit and others, in applying this section, have required that it be based

upon the sound business judgment of the debtor.  *See In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) (same).

21.    Moreover, Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction." Courts often allow a chapter 11 debtor to sell assets outside the ordinary course of business by private sale when the debtor demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code.  *See, e.g., In re Loral Space & Commc'ns Ltd.*, Ch. 11 Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Sep. 30, 2005); *In re Int'l Wire Group, Inc.,* Ch. 11 Case No. 04-11991 (BRL) (Bankr. S.D.N.Y. June 10, 2004); *Palermo v. Pritam Realty, Inc. (In re Pritam Reality, Inc.),* 233 B.R. 619 (D.P.R. 1999) (upholding bankruptcy court's approval of private sale conducted by chapter 11 debtor); *In re Wieboldt Stores, Inc.*, 92 B.R. 309 (N.D. Ill. 1988) (affirming right of chapter 11 debtor to transfer assets by private sale); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998) (approving private sale of chapter 11 debtor's assets where standards of section 363(b) were met).  Here, the market for the Purchased R3 Interests is limited, and the Buyers assert that the restrictions on the assignment of the Purchased R3 Interests may be enforceable in bankruptcy, although the Debtors dispute this assertion. The Debtors believe that any delay caused by a competitive bidding process and any litigation over the restrictions on assignment could erode the value of the New LP Investment.

22.     Moreover, the exigent circumstances surrounding these chapter 11 cases support the Debtors' decision to pursue a private sale.  The time and effort associated with marketing the Purchased R3 Interests for sale at a public auction would needlessly duplicate the previous efforts made by LBHI in negotiating this Sale and would far exceed any benefit to be derived therefrom.  The Debtors therefore submit that holding a public auction for the Purchased R3 Interests is unnecessary and would only entail unwarranted delay and additional expense.

23.     Furthermore, the Debtors have determined that the consideration to be paid by the Buyers in respect of the transactions contemplated by the Purchase Agreement is reasonable.  Given the uncertainties associated with a possible special allocation of losses to the Seed Capital Investment asserted by the Buyers, which the Debtors dispute, the Debtors do not believe that a materially higher or better offer would be obtained through a public sale of the Purchased R3 Interests.

24.     The Creditors' Committee was an active participant in the negotiations regarding the terms and conditions of the Purchase Agreement, and supports the sale of the Purchased R3 Interests, the Merger, the New LP Investment, the Assignment Agreement, the Releases, and the other transactions contemplated in the Purchase Agreement.

25.     For all these reasons, the Debtors believe that the proposed payment of $250 million in exchange for the Purchased R3 Interests, the Merger, the Assignment Agreement, the Releases, and the other transactions contemplated in the Purchase Agreement are both reasonable and in the best interests of the Debtors, their

estates, and their creditors.  The Purchase Agreement, therefore, should be approved

pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 6004.

**Sale of the Purchased Assets Free and Clear
of Liens, Claims, Encumbrances, and Interests
<u>Pursuant to Section 363(f) of the Bankruptcy Code</u>**

26.      It is appropriate for the Purchased R3 Interests to be sold to R3

free and clear of liens, claims, encumbrances, and interests pursuant to section 363(f) of

the Bankruptcy Code.  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 94 (2d

Cir. 1988) ("It has long been recognized that when a debtor's assets are disposed of free

and clear of third-party interests, the third party is adequately protected if his interest is

assertable against the proceeds of the disposition.); *Circus Time, Inc. v. Oxford Bank &

Trust (In re Circus Time, Inc.)*, 5 B.R. 1, 8 (Bankr. D. Me. 1979) (finding the court's

power to sell property free and clear of liens has long been recognized); *see also In re

Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982) ("Generally, in a 'free and clear'

sale, the liens are impressed on the proceeds of the sale and discharged at the time of

sale.").

27.      As of the date hereof, the Debtors are not aware of any parties that

have any liens, claims, encumbrances, or interests in the Purchased R3 Interests.  Thus,

the sale of the Purchased R3 Interests free and clear of liens, claims, encumbrances, and

interests will satisfy the statutory prerequisites of section 363(f) of the Bankruptcy Code.

In the event a party does have a lien, claim, encumbrance, or interest in the Purchased R3

Interests, such lien, claim, encumbrance, or interest will be adequately protected by

attachment to the net proceeds of the sale, subject to any claims and defenses the Debtors

may possess with respect thereto.  *See Circus Time*, 5 B.R. at 7.  Moreover, any party that

may hold a lien on the Purchased R3 Interests (of which the Debtors are unaware), could

be compelled to accept a money satisfaction of such interests, satisfying section 363(f)(5)

of the Bankruptcy Code.

### Good Faith Purchasers

28.     Section 363(m) of the Bankruptcy Code protects the sale of a

debtor's property to a good faith purchaser.  Specifically, it provides:

> The reversal or modification on appeal of an authorization
> under subsection (b) or (c) of this section of a sale or lease of
> property does not affect the validity of a sale or lease under
> such authorization to an entity that purchased or leased such
> property in good faith, whether or not such entity knew of the
> pendency of the appeal, unless such authorization and such sale
> or lease were stayed pending appeal.

11 U.S.C. § 363(m).

29.     Although the Bankruptcy Code does not define the meaning of

"good-faith purchaser," most courts have adopted a traditional equitable definition:  "one

who purchases the assets for value, in good faith and without notice of adverse claims."

*See, e.g.. Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir.

1997).  The Second Circuit has stated:

> Good faith of a purchaser is shown by the integrity of his
> conduct during the course of the sale proceedings; where there
> is a lack of such integrity, a good faith finding may not be
> made.  A purchaser's good faith is lost by 'fraud, collusion
> between the purchaser and other bidders or the trustee, or an
> attempt to take grossly unfair advantage of other bidders.'

*Id.* (internal citations omitted).

30.     The terms and conditions of the Purchase Agreement were

negotiated by LBHI and the Buyers at arm's length and in good faith.  Each party was

represented by sophisticated counsel.  Accordingly, the Debtors respectfully request that

the Court determine that the Buyers have acted in good faith and are entitled to the

protections of a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

### The Releases Meet the Legal Standard Established
### Under Rule 9019 and Is in the Bests Interests of the Estates

31.     The Debtors submit that the proposed Releases are in the Debtors'

best interests.  The willingness of the Debtors and the Buyers to compromise their

respective claims, including any claims relating to the Investment Transaction and the

Investor Obligations, is an integral aspect of the Purchase Agreement.  Furthermore, the

Releases are critical to clearing away any uncertainty in the marketplace about the future

of the Buyers, which will inure to the benefit of the New LP Interests.

32.     Bankruptcy Rule 9019 provides, in part, that "[o]n motion by the

[debtor-in-possession] and after notice and a hearing, the court may approve a

compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy

courts to approve settlements "if they are in the best interests of the estate." *Vaughn v.*

*Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134

B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or

settlement is within the sound discretion of the Court.  *Id.; see also* 9 *Collier on*

*Bankruptcy* ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in the best

possible outcome for the debtor, but must not "fall beneath the lowest point in the range

of reasonableness." *Drexel Burnham Lambert Group*, 134 B.R. at 505.

33.     Bankruptcy courts have applied the following factors in

determining whether a settlement should be approved:  (i) the probability of success in

litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity

and likely duration of the litigation and any attendant expense, inconvenience, and delay; (iii) the proportion of creditors who do not object to, or who affirmatively support, the proposed settlement; and (iv) the extent to which the settlement is truly the product of arm's-length bargaining and not the product of fraud or collusion.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968) ("There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated.")*; In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804 (Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).

34.     If the issues regarding the Buyers are not resolved pursuant to the Purchase Agreement, the value of the Seed Capital Investment may suffer and would be subject to significant contest by the Buyers as a result of the breaches of contract asserted by the Buyers against the Debtors and their affiliates.  By consummating the Purchase Agreement, the Debtors avoid this potential value deterioration.  The recovery to be realized from the Purchase Agreement and associated transactions is well within the range of reasonableness and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest.

### Relief Under Bankruptcy Rule 6004(g)

35.     Bankruptcy Rule 6004(g) provides that an "order authorizing the use, sale or lease of property . . . is stayed until expiration of 10 days after entry of the order, unless the Court orders otherwise." Fed. R. Bankr. P. 6004(g).  The Debtors request that any order authorizing the Debtors to enter into the Purchase Agreement be

effective immediately.  By dispelling any uncertainty around the estates' interests in the Buyers as soon as possible, the Debtors will maximize the value of their remaining investment in [the Fund] for the benefit of their estates and their creditors.  Accordingly, the parties wish to begin preparing for the closing of the transactions contemplated by the Purchase Agreement without delay.

## Notice

36.     No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the attorneys for the Debtors' postpetition lenders; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York; (vii) the Buyers; (viii) any party with an interest in the Sub-Sublease, and (ix) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.

37.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully requests that the Court enter an order (i) approving the Purchase Agreement and authorizing the Debtors to consummate the transactions contemplated therein, including the Assignment Agreement and the Releases and (ii) granting such other and further relief as is just.

Dated:  October 8, 2008
        New York, New York

/s/ Alfredo R. Perez
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
:
In re                               :        **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :        **08-13555 (JMP)**
:
                   **Debtors.**       :        **(Jointly Administered)**
:
:
-------------------------------------------------------------------x

**ORDER GRANTING DEBTORS' MOTION FOR ENTRY OF ORDER
PURSUANT TO SECTIONS 105, 363, AND 365 OF THE BANKRUPTCY CODE
AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, 6006,
AND 9019 (I) APPROVING EQUITY INTERESTS PURCHASE AGREEMENT;
(II) AUTHORIZING THE DEBTORS TO COMPROMISE, SETTLE, AND
RELEASE RELATED CLAIMS; AND (III) GRANTING RELATED RELIEF**

        Upon the motion, dated October 8, 2008 (the "Motion"), of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors-in-possession (collectively, the "Debtors" and,

together with their non-debtor affiliates, "Lehman"), pursuant to sections 105, 363, and

365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004,

6006, and 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

for authorization and approval of, among other things, (i) a Purchase Agreement, dated

October 8, 2008[2] for the sale of the Purchased R3 Interests; (ii) an Assignment

Agreement, dated October 8, 2008; (iii) the Debtors' settlement and exchange of mutual

Releases of related claims; and (iv) certain related relief, all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested

---

[2]      Capitalized terms that are used but not defined in this Order have the meanings
ascribed to them in the Motion.

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61

Referring to Bankruptcy Judges for the Southern District of New York Any and All

Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration

of the Motion and the relief requested therein being a core proceeding pursuant to 28

U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408

and 1409; and due and proper notice of the Motion having been provided in accordance

with the procedures set forth in the order entered September 22, 2008 governing case

management and administrative procedures [Docket No. 285] to (i) the United States

Trustee for the Southern District of New York; (ii) the attorneys for the Official

Committee of Unsecured Creditors; (iii) the attorneys for the Debtors' postpetition

lenders; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service;

(vi) the United States Attorney for the Southern District of New York; (vii) the Buyers;

(viii) any party with an interest in the Sub-Sublease; and (ix) all parties who have

requested notice in these chapter 11 cases, and it appearing that no other or further notice

need be provided; and the Court having found and determined that the relief sought in the

Motion is in the best interests of the Debtors, their estates and creditors, and all parties in

interest and that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is hereby

> FOUND that:

> A.    **Arm's-Length Transaction**.  The Purchase Agreement and the

Releases were negotiated, and entered into by the Debtors, the Investor Parties, and the

Buyers without collusion, in good faith and from arm's-length bargaining positions.  The

Buyers are not "insiders" of the Debtors or the Investor Parties, as that term is defined in section 101(31) of the Bankruptcy Code.

B. **Business Justification**. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications and compelling circumstances for the relief requested in the Motion and the approval of the transactions contemplated thereby.

C. **Fair and Reasonable**. The Releases are an integral aspect of the Purchase Agreement. The Debtors have demonstrated that the probability of success in litigation regarding the claims resolved by the Releases would be complex and extremely costly. In light of the substantial recovery afforded to the Debtors' estates by the Purchase Agreement, the compromise and settlement of claims pursuant to the Releases rises well above the lowest range of reasonableness.

D. **Good Faith**. The Buyers are good faith purchasers of the Purchased R3 Interests within the meaning of section 363(m) of the Bankruptcy Code and are, therefore, entitled to all of the protections afforded thereby. The Buyers have proceeded in good faith in all respects in connection with this proceeding and will be acting in good faith in closing the transactions contemplated by the Purchase Agreement.

E. **Consideration**. The consideration to be provided by the Buyers constitutes reasonably equivalent value or fair consideration, as the case may be (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code), and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia. The Purchase Agreement represents a fair and

reasonable offer to purchase the Purchased R3 Interests under the circumstances of these chapter 11 cases.

F.    **Net Asset Value**.  The Net Asset Value of the New LP Investment reflects a reasonable reduction of the Net Asset Value of the Seller's Fund Interests in light of the circumstances.

G.    **Free and Clear**.  After the Merger, LBHI will be the sole and lawful owner of the Purchased R3 Interests.  The transfer of the Purchased R3 Interests to the Buyers pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased R3 Interests, and vests or will vest the Buyers with all rights and title to the Purchased R3 Interests free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), and encumbrances.

H.    **Satisfaction of 363(f) Standards**.  LBHI may sell the Purchased R3 Interests free and clear of any interests because one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.

I.    **Private Sale**.  The exigent circumstances surrounding these chapter 11 cases support the Debtors' decision to pursue a private sale.  A public auction for the Purchased R3 Interests would entail unwarranted delay, risk, and expense.

J.    **Prompt Consummation**.  The prompt consummation of the sale of the Purchased R3 Interests is in the best interests of the Debtors, their estates, and their creditors.

NOW, THEREFORE, IT IS ORDERED THAT:

1.      The Motion is GRANTED.

2.      Pursuant to section 363(b) of the Bankruptcy Code and Bankruptcy Rules 6004, 6006, and 9019, the Purchase Agreement and the Assignment Agreement are approved, and the Debtors are authorized to consummate all the transactions contemplated thereby, including but not limited to (i) the merger of the Investor Parties with and into LBHI; (ii) the Buyers' purchase from LBHI of the Purchased R3 Interests; (iii) the exchange of mutual Releases contemplated in section 3.4.2(a) by and between the Participating R3 Release Parties and the Participating LB Release Parties as well as the Releases contemplated is section 3.4.2(b) of the Purchase Agreement by and between Participating LB General Release Parties and Eligible R3 General Release Parties; and (iv) the contribution of the Seller's Master Fund Interests to the New LP Investment in the New Fund.

3.      Any objections to the entry of this Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

4.      LBHI is authorized to accept the instruction of the Buyers, if any, to terminate the Sub-Sublease without any liability of the Buyer to the Seller or any of the Seller's successors and assigns.  The Sub-Sublease shall be expressly excluded from any assumption and rejection procedures established in the chapter 11 cases.  Without further Court order, LBHI is authorized and directed to perform all ordinary course duties and

fulfill all obligations with respect to the Sub-Sublease, including, but not limited to, the delivery and installation of office furniture and the payment of all related charges.

5. Pursuant to section 363(f) of the Bankruptcy Code, the sale of the Purchased R3 Interests to the Buyers shall be free and clear of any and all liens, claims, and encumbrances, with such liens, claims, and encumbrances (if any) to attach to the proceeds of the Sale with the same force, effect, and priority as such liens, claims, and encumbrances have on the Purchased R3 Interests as appropriate, subject to the rights and defenses of the Debtors and any party in interest with respect thereto.

6. Except as expressly permitted by the Purchase Agreement or by this Order, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding interests or claims of any kind or nature whatsoever against or in the Debtors, the Investor Parties, or the Purchased R3 Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Investor Parties, the Purchased R3 Interests, the Purchase Agreement, the Merger, the Investment Transaction, the Master Transaction Agreement, and all related agreements, shall be and hereby are forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing against the Participating R3 Release Parties, their property, their successors and assigns, their affiliates, or the Purchased R3 Interests, such persons' or entities' interests or claims.

7.      The terms and provisions of the Purchase Agreement, including, but not limited to, the Releases, and this Order shall be binding in all respects upon (i) the Debtors and their estates, (ii) the Investor Parties, (iii) all creditors of (whether known or unknown) and holders of equity interests in, the Debtors, (iv) the Buyers and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee of the Debtors under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.  This Order and the Purchase Agreement shall inure to the benefit of the Debtors and their estates and their creditors, the Investor Parties, the Buyers, the Participating R3 Releasing Parties, and the respective successors and assigns of each of the foregoing.

8.      Each of the Buyers are granted the protections provided to a good faith purchaser under section 363(m) of the Bankruptcy Code.

9.      The Debtors are authorized to execute and deliver such assignments, conveyances, and other documents, and instruments of transfer and to take such other actions as may be reasonably necessary to consummate the Sale.

10.      This Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing and shall not be stayed pursuant to Bankruptcy Rule 6004(g).

11.      The jurisdictional provisions of the Purchase Agreement shall be binding on the parties thereto.  This Court shall retain jurisdiction to interpret and enforce this Order,.

Dated:  October ___, 2008
         New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE