PURCHASE AGREEMENT


by and among


R3 Capital Management, LLC

R3 Capital GenPar MGP, Ltd.

R3 Capital SLP MGP, Ltd., and

R3 Capital Partners (B), L.P., as Buyers


LB R3 Holdings L.P., as Investor

LB R3 Holdings GP L.L.C., as Investor GP


and


Lehman Brothers Holdings Inc., as Seller


Dated as of October 8, 2008

# TABLE OF CONTENTS

1.  DEFINITIONS; CERTAIN RULES OF CONSTRUCTION. ................................................2
2.  PURCHASE AND SALE OF ASSETS. .................................................................................10
   2.1.  The Exchanges .........................................................................................................10
   2.2.  Purchase and Sale of Assets .....................................................................................10
   2.3.  No Assumption of Liabilities ...................................................................................10
   2.4.  Cash Consideration ..................................................................................................10
   2.5.  Withholding ..............................................................................................................11
   2.6.  New LP Investment ..................................................................................................11
3.  CLOSING ..............................................................................................................................11
   3.1.  The Closing ..............................................................................................................11
   3.2.  Deliveries by the Seller at Closing ..........................................................................12
   3.3.  Deliveries by the Buyers at Closing ........................................................................12
   3.4.  Effect of Closing. .....................................................................................................13
4.  REPRESENTATIONS AND WARRANTIES OF THE INVESTOR PARTIES. ..............14
   4.1.  Organization .............................................................................................................14
   4.2.  Power and Authorization ..........................................................................................14
   4.3.  Authorization of Governmental Authorities ............................................................14
   4.4.  Noncontravention .....................................................................................................14
   4.5.  Ownership .................................................................................................................15
   4.6.  Litigation; Governmental Orders. ............................................................................15
   4.7.  No Brokers ...............................................................................................................15
5.  REPRESENTATIONS AND WARRANTIES OF THE SELLER ....................................15
   5.1.  Organization .............................................................................................................15
   5.2.  Power and Authorization ..........................................................................................15
   5.3.  Authorization of Governmental Authorities ............................................................16
   5.4.  Noncontravention .....................................................................................................16
   5.5.  Ownership .................................................................................................................16
   5.6.  Litigation; Governmental Orders. ............................................................................16
   5.7.  No Brokers ...............................................................................................................17
   5.8.  No Reliance ..............................................................................................................17
   5.9.  Information ...............................................................................................................17
6.  REPRESENTATIONS AND WARRANTIES OF THE BUYERS ...................................17
   6.1.  Organization .............................................................................................................17
   6.2.  Power and Authorization ..........................................................................................17
   6.3.  Authorization of Governmental Authorities ............................................................17
   6.4.  Noncontravention .....................................................................................................17
   6.5.  Side Letters ..............................................................................................................18
   6.6.  Litigation; Governmental Orders. ............................................................................18
   6.7.  No Brokers ...............................................................................................................18
   6.8.  No Reliance ..............................................................................................................18
   6.9.  Information ...............................................................................................................18
   6.10.  Accredited Investor ................................................................................................19
7.  COVENANTS. ......................................................................................................................19
   7.1.  Conduct of Investor Parties .....................................................................................19

7.2.    Further Assurances; Cooperation ...................................................................19
7.3.    Bankruptcy Court Filings. ............................................................................19
7.4.    Fees and Expenses .......................................................................................20
7.5.    Transfer of Interests. ...................................................................................20
7.6.    Post-Closing Covenants ..............................................................................20
7.7.    Allocation of Taxable Income .....................................................................22
8.    CONDITIONS TO CLOSING .................................................................................22
8.1.    Conditions to Each Party's Obligations ......................................................22
8.2.    Conditions to Buyers' Obligations ..............................................................22
8.3.    Conditions to Seller's Obligations ..............................................................23
9.    TERMINATION. .....................................................................................................23
9.1.    Termination of Agreement ..........................................................................23
9.2.    Effect of Termination ..................................................................................24
10.    SURVIVAL; INDEMNIFICATION. .......................................................................24
10.1.    Survival .......................................................................................................24
10.2.    Seller Indemnification .................................................................................24
10.3.    Buyer Indemnification .................................................................................25
10.4.    Limitation of Liability .................................................................................25
10.5.    Conditions of Indemnification .....................................................................25
10.6.    Remedies Cumulative ..................................................................................26
10.7.    Subrogation ..................................................................................................26
11.    MISCELLANEOUS .................................................................................................26
11.1.    Notices .........................................................................................................26
11.2.    Succession and Assignment; No Third-Party Beneficiary ..........................28
11.3.    Amendments and Waivers ...........................................................................28
11.4.    Entire Agreement .........................................................................................28
11.5.    Counterparts .................................................................................................28
11.6.    Severability ..................................................................................................28
11.7.    Headings .......................................................................................................29
11.8.    Construction .................................................................................................29
11.9.    Governing Law .............................................................................................29
11.10.    Jurisdiction; Venue; Service of Process. .....................................................29
11.11.    Specific Performance ...................................................................................30
11.12.    Waiver of Jury Trial .....................................................................................30

## EXHIBITS

Exhibit A        -        Assignment Agreement

Exhibit B-1      -        LB Joinder

Exhibit B-2      -        R3 Joinder

Exhibit C        -        Promissory Note

Exhibit D        -        Redemption and Contribution Agreement

## SCHEDULES

Schedule 1-A    -        LB Release Parties

Schedule 1-B    -        R3 Release Parties

Scheduel 1-C    -        R3 Principals

Schedule 2.1    -        Purchased R3 Interests

Schedule 6.4    -        Buyer Consents

PURCHASE AGREEMENT

This Purchase Agreement dated as of October [8], 2008 (as amended or otherwise modified, the "Agreement") is by and among R3 Capital Management, LLC, a Delaware limited liability company (the "Manager"), R3 Capital GenPar MGP, Ltd., a Cayman Islands exempted company (the "GP"), R3 Capital SLP MGP, Ltd., a Cayman Islands exempted company (the "SLP"), R3 Capital Partners (B), L.P., a Cayman Islands exempted limited partnership (the "Fund")(each of the Manager, the GP, the SLP and the Fund, a "Buyer" and, collectively, the "Buyers"), and LB R3 Holdings L.P., a Delaware limited partnership (the "Investor"), LB R3 Holdings GP L.L.C., a Delaware limited liability company (the "Investor GP" and, together with the Investor, the "Investor Parties") and Lehman Brothers Holdings, Inc., a Delaware corporation (the "Seller").

RECITALS

WHEREAS, the Investor is the record and beneficial owner of (i) membership interests in the Manager (the "Manager Interests"), (ii) Class B Shares of the GP (the "GP Shares"), (iii) Class B Shares of the SLP (the "SLP Shares"), and (iv) limited partnership interests in the Fund (the "Fund Interests" and, together with the Manager Interests, the GP Shares and the SLP Shares, the "Equity Interests");

WHEREAS, in May, 2008 the Investor acquired the Equity Interests in connection with a transaction by and among the Investor, the Seller and certain of their affiliates, on the one hand, and the Buyers and certain of their affiliates, on the other hand (the "Investment Transaction");

WHEREAS, the Investor has ongoing obligations to the Buyers and their affiliates in connection with the Investment Transaction (the "Investor Obligations") under the terms of the Global Side Letter Agreement dated May 28, 2008 by and among Richard M. Rieder, the Manager, the GP, the SLP and the Investor (the "Global Side Letter");

WHEREAS, the Investor, the Manager, the GP and the Fund are parties to a side letter dated May 28, 2008 in which the Investor committed to make a capital contribution to the Fund (the "Fund Side Letter");

WHEREAS, the Manager and the Seller are parties to that certain Sub-Sublease dated as of May 23, 2008 (the "Sub-Sublease");

WHEREAS, the Investor is an indirect wholly owned subsidiary of the Seller; and Seller is currently a debtor and debtor-in-possession together with certain of its Affiliates in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in jointly administered cases (the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Buyers, the Investor Parties, the Seller and their respective affiliates desire to exchange releases of claims and causes of action associated with the Investment Transaction and the Investor Obligations and any and all related matters between the parties on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Buyers desire to assign, and the Sellers desire to acquire, the Assigned Claims (as defined below) to the Seller; and

WHEREAS, in connection with the foregoing, (i) the Seller desires to transfer, and each of the Buyers desires to purchase from the Seller, the Purchased R3 Interests (as defined below), (ii) the Seller desires to redeem all of its Fund Interests in exchange for a $250,000,000.00 interest in the Master Fund and to contribute such interest to the New Fund (as defined below) in exchange for the New L.P. Investment (as defined below) (collectively, the "Exchanges"), in each case on the terms and subject to the conditions set forth in this Agreement.

AGREEMENT

NOW THEREFORE, in consideration of the premises and mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Manager, the GP, the SLP, the Fund, the Investor Parties, and the Seller hereby agree as follows:

1.    DEFINITIONS; CERTAIN RULES OF CONSTRUCTION.

As used herein, the following terms will have the following meanings:

"Action" means any claim, action, cause of action or suit (whether in contract or tort or otherwise), litigation (whether at law or in equity, whether civil or criminal), controversy, assessment, arbitration, investigation, hearing, charge, complaint, demand, notice or proceeding to, from, by or before any Governmental Authority.

"Affiliate" means, with respect to any specified Person at any time means, (a) each Person directly or indirectly controlling, controlled by or under direct or indirect common control with such specified Person at such time, (b) each Person who is at such time an officer or director of, or direct or indirect beneficial holder of at least 20% of any class of the equity interests of, such specified Person, (c) each Person that is managed by a common group of executive officers and/or directors as such specified Person, (d) the members of the immediate family (i) of each officer, director or holder described in clause (b) and (ii) if such specified Person is an individual, of such specified Person and (e) each Person of which such specified Person or an Affiliate (as defined in clauses (a) through (d)) thereof will, directly or indirectly, beneficially own at least 20% of any class of equity interests at such time. For the avoidance of doubt, the Affiliates of each of the Seller and the Investor Parties shall not include the Buyers or any of their Affiliates controlled by or under common control with the Buyers.

"Agreement" is defined in the Preamble.

"Approval Order" means an order, in form and substance satisfactory to the Buyers, entered by the Bankruptcy Court approving the Agreement and the consummation of the transactions contemplated herein.

"Assigned Claims" means the claims set forth on Exhibit A of the Assignment Agreement.

"Assignment Agreement" means the agreement for the assignment of claims in the form attached hereto as Exhibit A.

"Aviation Asset Parties" means those parties designated as "Aviation Asset Parties" on Schedule 1-A.

"Avoidance Actions" means all causes of action to avoid or recover transfers or obligations recognized under Bankruptcy Code Sections 502(d), 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and 553(b) or similar state laws.

"Bankruptcy Cases" is defined in the Recitals.

"Bankruptcy Code" is defined in the Recitals.

"Bankruptcy Court' is defined in the Recitals.

"Business Day" means any weekday other than a weekday on which banks in New York, New York are authorized or required to be closed.

"Buyer" and "Buyers" are defined in the Preamble.

"Buyer Excluded Information" is defined in Section 6.9.

"Buyer Indemnified Parties" is defined in Section 10.2.

"Claim(s)" means, individually or collectively, as applicable, any and all actions, causes of action, counterclaims, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, rights, claims, demands, liabilities, losses, rights to reimbursement, subrogation, indemnification or other payment, costs or expenses, and reasonable attorneys' fees, whether in law or in equity, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, and whether representing a past, present or future obligation.

"Closing" is defined in Section 3.1.

"Closing Date" means the date on which the Closing actually occurs.

"CMNA" means that certain Cross Margining and Netting Agreement dated as of May 28, 2008 by and among the Master Fund and certain LB Parties or in any Base Contract (as defined therein).

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Contractual Obligation" means, with respect to any Person, any contract, agreement, deed, mortgage, lease, license, commitment, promise, undertaking, arrangement or understanding, whether written or oral and whether express or implied, or other document or instrument (including any document or instrument evidencing or otherwise relating to any Debt,) to which or by which such Person is a party or otherwise subject or bound or to which or by which any property, business, operation or right of such Person is subject or bound, but excluding any restrictions on assignment in CMNA.

"Damages" is defined in Section 10.2.

"Debt" means, with respect to any Person, all obligations (including all obligations in respect of principal, accrued interest, penalties, fees and premiums) of such Person (a) for borrowed money (including overdraft facilities), (b) evidenced by notes, bonds, debentures or similar Contractual Obligations, (c) for the deferred purchase price of property, goods or services (other than trade payables or accruals incurred in the Ordinary Course of Business), (d) under capital leases (in accordance with GAAP), (e) in respect of letters of credit and bankers' acceptances, (f) for Contractual Obligations relating to interest rate protection, swap agreements and collar agreements and (g) in the nature of Guarantees of the obligations described in clauses (a) through (f) above of any other Person.

"Deferred Amount" is defined in Section 2.4.2.

"Elevation Claims" means claims for the elevation of loan participations into assignments pursuant to the Order Pursuant to Sections 105(a), 363(b), and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing Debtor to (A) Continue to Utilize Its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations entered by the Bankruptcy Court in the chapter 11 case of Lehman Commercial Paper Inc.

"Eligible R3 General Release Party" means any R3 Party designated on Schedule 1-B as an Eligible R3 General Release Party who executes and delivers to the Buyers and the Seller a joinder for a general release pursuant to Section 3.4.2(b) to any and all Participating LB General Release Parties.

"Encumbrance" means any charge, claim, community or other marital property interest, condition, equitable interest, lien, license, option, pledge, security interest, mortgage, right of way, easement, encroachment, servitude, right of first offer or first refusal, buy/sell agreement and any other restriction or covenant with respect to, or condition governing the use, construction, voting (in the case of any security or equity interest), transfer, receipt of income or exercise of any other attribute of ownership.

"Enforceable" means, with respect to any Contractual Obligation stated to be Enforceable by or against any Person, that such Contractual Obligation is a legal, valid and binding obligation of such Person enforceable by or against such Person in accordance with its terms, except to the extent that enforcement of the rights and remedies created thereby is subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws of general application affecting the rights and remedies of creditors and to general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"Equity Interests" is defined in the Recitals.

"Expenses" means reasonable attorneys' fees and all other costs, travel expenses, fees of experts, transcript costs, filing fees, witness fees, telephone charges, postage, copying costs, delivery services fees and other expenses and obligations of any nature whatsoever reasonably paid or incurred in connection with investigating, prosecuting or defending, being a witness in or participating in (including on appeal), or preparing to prosecute or defend, be a witness in or participate in any Indemnity Claim.

"Fund" is defined in the Preamble.

"Fund Agreements" means the Organizational Documents of the Fund.

"Fund Documents" means the Manager Agreements, the GP Agreements, the SLP
Agreements, and the Fund Agreements.

"Fund Interests" is defined in the Recitals.

"Global Side Letter" is defined in the Recitals.

"Government Order" means any order, writ, judgment, injunction, decree, stipulation, ruling,
determination or award entered by or with any Governmental Authority.

"Governmental Authority" means any United States federal, state or local or any foreign
government, or political subdivision thereof, or any multinational organization or authority or
any authority, agency or commission entitled to exercise any administrative, executive, judicial,
legislative, police, regulatory or taxing authority or power, any court or tribunal (or any
department, bureau or division thereof), or any arbitrator or arbitral body.

"GP" is defined in the Preamble.

"GP Agreements" means the Organizational Documents of the GP.

"GP Shares" is defined in the Recitals.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or
performance of, or any contingent obligation in respect of, any Debt or other Liability of any
other Person, (b) any other arrangement whereby credit is extended to any obligor (other than
such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or
other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to
purchase or lease assets under circumstances that are designed to enable such obligor to
discharge one or more of its obligations or (iv) to maintain the capital, working capital, solvency
or general financial condition of such obligor and (c) any liability as a general partner of a
partnership or as a venturer in a joint venture in respect of Debt or other obligations of such
partnership or venture.

"Indemnity Claim" means a claim for indemnity under Section 10.2 or 10.3.

"Indemnified Party" means, with respect to any Indemnity Claim, the Buyer Indemnified
Party or the Seller Indemnified Party asserting such Indemnity Claim.

"Indemnifying Party" means, with respect to any Indemnity Claim, the Buyer Indemnified
Party or the Seller Indemnified Party against whom such Indemnity Claim is asserted.

"Individual Claims" means the claims of the R3 Principals and any other Person employed
by R3 from May 28, 2008 through the Closing Date, individually, to the extent such claims arise
from or relate to (i) the employment of such Person by, or such Person's service as an officer

director of, the Seller or one or more of its Affiliates or (ii) a personal investment or customer account of such Person with the Seller or one or more of its Affiliates.

"Investment Transaction" is defined in the Recitals.

"Investor" is defined in the Preamble.

"Investor GP" is defined in the Preamble.

"Investor Obligations" is defined in the Recitals.

"Investor Parties" is defined in the Preamble.

"Joinder" means an LB Joinder or an R3 Joinder, as the case may be.

"LB Joinder" means a joinder to the LB Releases in the form of Exhibit B-1.

"LB Party" means the Seller or any of its Affiliates.

"LB Released Claims" means any and all Claims, including, without limitation, any Avoidance Actions, that are connected with, arise out of, relate to or are otherwise based (as a whole or in part) on any acts, omissions, facts, matters, transactions or occurrences prior to the Closing, directly or indirectly, relating to any or all of the (i) the Investment Transaction, (ii) the Master Transaction Agreement and any of the transactions contemplated therein; (iii) the Investor Obligations; (iv) the Global Side Letter; (v) the Side Letter for Funds, (vi) the Equity Interests, (vii) the Exchanges, (viii) the Organizational Documents of the R3 Parties and (ix) any conduct, agreements or instruments, relating to the business operations of the R3 Parties, but excluding any Claims arising under or relating to this Agreement, the Sub-Sublease, the New LP Investment, the Promissory Note, the Elevation Claims and any claims directly relating to the Individual Claims.

"LB Releases" means the releases of the LB Released Claims against the Participating R3 Release Parties pursuant to Section 3.4.2.

"LBIE" means Lehman Brothers International (Europe).

"Legal Requirement" means any United States federal, state or local or foreign law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Governmental Order, or any license, franchise, permit or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"Liability" means, with respect to any Person, any liability or obligation of such Person whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential, whether due or to become due and whether or not required under GAAP to be accrued on the financial statements of such Person.

"Manager" is defined in the Preamble.

"Manager  Agreements" means the Organizational Documents of the Manager.

"Manager Interests" is defined in the Recitals.

"Master Fund" means R3 Capital Partners Master, L.P. and R3 Capital Partners Master (DE),
L.P.

"Master Transaction Agreement" means the Master Transaction Agreement dated as of May
28, 2008 by and among the Manager, the GP, the SLP, the Fund, the Master Fund, the Fund
Entities (as defined therein), the Investor and the LB Entities (as defined therein).

"Merger" means the merger, immediately prior to the Closing, of the Investor Parties with
and into the Seller, with the Seller as the surviving party.

"New Fund" means R3 Capital Partners (A), L.P., a Cayman Islands exempted limited
partnership.

"New Fund Documents" means the New LP Investment Side Letter, the Organizational
Documents of New Fund and any other documents or instruments that the Seller may enter into
in connection with the New LP Investment.

"New LP Investment" is defined in Section 2.6.

"New LP Investment Side Letter" means the side letter executed and delivered by the Seller
and the Buyers contemporaneously with this Agreement containing the terms and conditions of
the New LP Investment.

"Organizational Documents" means, with respect to any Person (other than an individual),
(a) the certificate, memorandum or articles of incorporation, organization or association and any
joint venture, limited liability company, operating or partnership agreement and other similar
documents adopted or filed in connection with the creation, formation or organization of such
Person and (b) all by-laws, voting agreements, shareholders' agreements and similar documents,
instruments or agreements relating to the organization or governance of such Person, in each
case, as amended or supplemented.

"Overlease" means the prime lease relating to the Premises leased by the Manager under the
Sub-Sublease.

"Participating LB General Release Party" means any LB Party that executes and delivers to
the Buyers and the Seller a joinder for a general release pursuant to Section 3.4.2(b) to any and
all Eligible R3 General Release Parties.

"Participating LB Release Parties" means the Seller, the Investor Parties and any Affiliate
thereof that has executed and delivered to the Buyers and the Seller a joinder to the LB Releases,
on behalf of themselves and their respective predecessors, successors, past and present assigns,
subsidiaries, officers, directors, agents, attorneys, insurers, and employees.

"Participating R3 Release Parties" means any R3 Parties that execute and deliver to the Buyers and the Seller a R3 Joinder to the R3 Releases, on behalf of themselves and their respective predecessors, successors, past and present assigns, subsidiaries, officers, directors, agents, attorneys, insurers, and employees.

"Person" means any individual or corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, Governmental Authority or other entity of any kind.

"Premises" means the office space leased by the Manager from the Seller under the Sub-Sublease.

"Promissory Note" means a Promissory Note substantially in the form attached hereto as Exhibit C.

"Purchased Fund Interests" is defined in Section 2.2.4.

"Purchased R3 Interests" means the Manager Interests, the GP Shares, the SLP Shares and the Purchased Fund Interests.

"R3 Indemnifying Parties" means the GP, the SLP and the Manager.

"R3 Joinder" means a joinder to the R3 Releases in the form of Exhibit B-2.

"R3 Party" means any of the Manager, the GP, the SLP, the Fund, the R3 Principals and their respective Affiliates.

"R3 Principals" means the Persons listed on Schedule 1-C.

"R3 Released Claims" means any and all Claims that are connected with, arise out of, relate to or are otherwise based (as a whole or in part) on any acts, omissions, facts, matters, transactions or occurrences at or prior to the Closing, directly or indirectly, relating to any or all of the (i) the Investment Transaction, (ii) Master Transaction Agreement and any of the transactions contemplated therein; (iii) the Investor Obligations; (iv) the Global Side Letter; (v) the Side Letter for Funds, (vi) the Equity Interests, (vii) the Exchanges, (viii) the Organizational Documents of the R3 Parties and (ix) any conduct, agreements or instruments, relating to the business operations of the R3 Parties, but excluding the Seller's rights under the Assigned Claims, the Individual Claims and any Claims arising under or relating to this Agreement, the New LP Investment, the Promissory Note, the Sub-Sublease and the Elevation Claims.

"R3 Releases" means the releases of the R3 Released Claims against the Participating LB Release Parties pursuant to Section 3.4.2.

"R3 Release Parties" means the R3 Parties set forth on Schedule 1-B.

"Redemption and Contribution Agreement" means the Redemption and Contribution Agreement by and among, the Fund, the New Fund, the Master Fund, the GP and the Seller substantially in the form attached hereto as Exhibit D.

"Releases" means the LB Releases and the R3 Releases.

"Required LB Release Parties" means the Seller, the Investor Parties, and the LB Parties designated on Schedule 1-A as "Required LB Release Parties."

"Required R3 Release Parties" means the Manager, the GP, the SLP and the Fund, and the other R3 Parties designated on Schedule 1-B as "Required R3 Release Parties."

"Sale" means the assignment, transfer and sale by the Seller and the purchase by the Buyers of the Purchased R3 Interests.

"Seller" is defined in the Preamble.

"Seller Excluded Information" is defined in Section 5.9.

"Seller Indemnified Parties" is defined in Section 10.3.

"Side Letter for Funds" means the Side Letter for Funds dated May 28, 2008 by and among the Manager, the GP, the Fund and the Investor.

"SLP" is defined in the Preamble.

"SLP Agreements" means the Organizational Documents of the SLP.

"SLP Shares" is defined in the Recitals.

"Sub-Sublease" is defined in the Recitals.

"Tax" or "Taxes" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and (b) any liability for the payment of any amounts of the type described in clause (a) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Termination Date" is defined in Section 9.1.

"Treasury Regulations" means the regulations promulgated under the Code.

Except as otherwise explicitly specified to the contrary, (a) references to a Section, Article, Exhibit or Schedule means a Section or Article of, or Schedule or Exhibit to this Agreement, unless another agreement is specified, (b) the word "including" will be construed as "including without limitation," (c) references to a particular statute or regulation include all rules and regulations thereunder and any predecessor or successor statute, rules or regulation, in each case as amended or otherwise modified from time to time, (d) words in the singular or plural form include the plural and singular form, respectively and (e) references to a particular Person include such Person's successors and assigns to the extent not prohibited by this Agreement.

2.    PURCHASE AND SALE OF ASSETS.

2.1.    The Exchanges.  Upon consummation of the Exchanges on the Closing Date, upon the terms and conditions of this Agreement, the Seller's Fund Interests shall be redeemed in full and the New LP Investment shall be issued to the Seller with an initial capital amount of $250,000,000.00 as of September 30, 2008.

2.2.    Purchase and Sale of Assets.  On the terms and subject to the conditions of this Agreement, the Seller shall sell and transfer, and the Buyers shall purchase and redeem the Purchased R3 Interests as set forth below:

2.2.1    At the Closing and on the terms and subject to conditions of this Agreement, the Seller shall irrevocably transfer and sell to the Manager or its designee the Manager Interests set forth on Schedule 2.1.

2.2.2    At the Closing and on the terms and subject to conditions of this Agreement, the Seller shall irrevocably transfer and sell to the GP the GP Shares set forth on Schedule 2.1.

2.2.3    At the Closing and on the terms and subject to conditions of this Agreement, the Seller shall irrevocably transfer and sell to the SLP the SLP Shares set forth on Schedule 2.1.

2.2.4    At the Closing and on the terms and subject to the conditions of this Agreement, the Seller shall irrevocably transfer in the Exchanges, and the Fund shall redeem the Fund Interests set forth on Schedule 2.1 (the "Purchased Fund Interests").

2.3.    No Assumption of Liabilities.  None of the Buyers nor any of their Affiliates shall assume any liabilities or obligations of the Investor, the Investor GP, the Seller or any of their Affiliates or respective predecessors, whether known or unknown, matured or unmatured, contingent or absolute, direct or indirect, whenever incurred.  Neither the Seller nor any of its Affiliates shall assume any liabilities or obligations of the Buyers or any of their Affiliates or respective predecessors, whether known or unknown, matured or unmatured, contingent or absolute, direct or indirect, whenever incurred.

2.4.    Cash Consideration.  In consideration for the Purchased R3 Interests and the other consideration provided by the LB Parties hereunder, the Buyers shall pay to the Seller USD $250,000,000.00 as provided below (the "Cash Consideration").

2.4.1    Closing Payment.  At the Closing and on the terms and subject to the conditions of this Agreement, the Buyers shall pay to the Seller USD $125,000,000.00 in immediately available funds (the "Closing Payment").

2.4.2    Deferred Amount.  At the Closing, the Master Fund shall issue the Promissory Note for the USD $125,000,000.00 unpaid balance of the Cash Consideration as of the Closing Date (the "Deferred Amount").  The Promissory Note shall have a maturity date of May 31, 2009, shall provide for prepayments without penalty, shall be an obligation of the Master Fund senior to all limited partnership interests in the Master Fund and shall bear interest at a rate equal to the yield on the six-month Treasury bill as of the Closing Date.

2.4.3    Full and Final Satisfaction.  The delivery of the Closing Payment and the issuance to the Seller of the Promissory Note and the New Fund Investment shall be and are hereby deemed to be in full and final satisfaction of all Fund Interests, originally issued on or about May 28, 2008 with a net asset value of approximately $1.1 billion.

2.5.    Withholding.  The Buyers will be entitled to deduct and withhold from the Cash Consideration any withholding Taxes or other amounts required under the Code or any applicable Legal Requirement to be deducted and withheld; provided, however, that the Buyers will give notice to the Seller one Business Day prior to Closing or other payment date if the Buyers reasonably believe that they shall be required to withhold Taxes or other amounts hereunder, and the Buyers will not make any such deduction or withholding if the Seller provides such forms or takes such other actions necessary to remove such requirement. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

2.6.    New LP Investment.  On the Closing Date, immediately following the consummation of the purchase, sale and transfer of the Purchased R3 Fund Interests, the Seller, the Fund, the New Fund and the Master Fund shall enter into and perform the Redemption and Contribution Agreement, pursuant to which the Seller shall contribute its Master Fund Interests other than the Purchase Fund Interests for interests in the New Fund with a net asset value of $250,000,000.00 based on the overall net asset value of the Master Fund as of September 30, 2008 (the "New LP Investment").

3.    CLOSING

3.1.    The Closing.  The transfer, purchase and sale of the Purchased R3 Interests and the consummation of the other transactions contemplated by this Agreement to occur at such time (the "Closing") shall take place at the offices of Ropes & Gray LLP at 1211 Avenue of the Americas, New York, New York 10036 on the date that is one Business Day following the satisfaction or waiver of the conditions set forth in Section 8.  Except as otherwise provided in Section 9, the failure to consummate the Sale on the date and time and at the place specified herein will not relieve any party to this Agreement of any obligation under this Agreement.

3.2.    Deliveries by the Seller at Closing.  On the terms and subject to the conditions of this Agreement, at the Closing the Seller shall deliver, or cause to be delivered, the following to the Buyers:

3.2.1    Executed instruments of transfer from the Seller for each of the Manager Interests, the GP Shares, the LP Shares and the Purchased Fund Interests;

3.2.2    An executed copy of the Redemption and Contribution Agreement;

3.2.3    An executed copy of the Assignment Agreement;

3.2.4    Executed copies of LB Joinders from the Required LB Release Parties;

3.2.5    A certificate duly executed by a duly authorized officer of the Seller, dated as of the Closing Date, certifying that the Seller has satisfied, or caused to be satisfied, conditions to Closing set forth in Section 8;

3.2.6    A certificate duly executed by the Investor Parties, dated as of the Closing Date, certifying the accuracy of the representations and warranties contained in Section 4;

3.2.7    A certificate duly executed by the Seller, dated as of the Closing Date, certifying the accuracy of the representations and warranties contained in Section 5;

3.2.8    A certificate of merger of the Investor Parties into the Seller, with the Seller as the surviving entity;

3.2.9    A certificate of non-foreign status, executed by the Seller, that complies with the requirements of Section 1445 of the Code and the Treasury Regulations promulgated thereunder;

3.2.10    All other documents, instruments and writings necessary to consummate the transactions contemplated in this Agreement or otherwise reasonably required by the Buyers to be delivered at or prior to the Closing pursuant to this Agreement.

3.3.    Deliveries by the Buyers at Closing.  On the terms and subject to the conditions of this Agreement, at the Closing the Buyers shall deliver, or cause to be delivered, the following to the Seller:

3.3.1    The Closing Payment by wire transfer of immediately available funds to an account designated by the Seller in a written notice to the Buyers such notice to be delivered no later than October 15, 2008; provided that such account information may be updated after such time upon reasonable notice (which shall be no less than one Business Day) by Seller prior to the Closing;

3.3.2    The Promissory Note;

3.3.3    An executed copy of the Redemption and Contribution Agreement;

3.3.4    An executed copy of the Assignment Agreement, which, when delivered, shall be subject to the terms and conditions of the CMNA;

3.3.5    Executed copies of R3 Joinders from the Participating R3 Release Parties;

3.3.6    A notarized copy of the Register of partnership interests of the New Fund showing Seller's ownership of record of the New LP Investment;

3.3.7    A certificate duly executed by a duly authorized officer of the Manager, dated as of the Closing Date, certifying that the Buyers have satisfied, or caused to be satisfied, conditions to Closing set forth in Section 8;

3.3.8    A certificate duly executed by the Manager, dated as of the Closing Date, certifying the accuracy of the representations and warranties contained in Section 6; and

3.3.9    All other documents, instruments and writings necessary to consummate the transactions contemplated in this Agreement or otherwise reasonably required by the Seller to be delivered at or prior to the Closing pursuant to this Agreement.

3.4.    <u>Effect of Closing</u>.

3.4.1    <u>Termination of Agreements</u>.  Upon the Closing of the Sale, each of the Transition Services, Transfer and License Agreement; the Global Side Letter Agreement; the Side Letter for Funds; the Customer Account Agreement Prime Brokerage; the Management Indemnification Agreement among the Master Fund, Lehman Commercial Paper Inc. and certain other parties; Private Equity Transaction Agreement No. 1 by and among the GP, the Master Fund, certain Fund entities and LB Group I, Inc., and the Investment Management Agreement by and among the Seller, LBIE, certain of their Affiliates and the Manager, shall be automatically terminated.

3.4.2    <u>Effectiveness of Releases</u>.

(a)    Upon the Closing of the Sale, (i) the Participating R3 Release Parties hereby forever release and irrevocably discharge the Participating LB Release Parties from and against all R3 Released Claims effective as of the Closing and (ii) the Participating LB Release Parties hereby forever release and irrevocably discharge the Participating R3 Release Parties from and against all LB Released Claims effective as of the Closing.  For the avoidance of doubt, any release pursuant to this Section 3.4.2(a) shall not be in addition to or duplicate any release in Section 3.4.2(b).

(b)    Upon the Closing of the Sale, the Participating LB General Release Parties and the Eligible R3 General Release Parties hereby irrevocably release and forever discharge each other from any and all Claims, except in the case of a Participating LB General Release Party, claims that the Seller may have (i) as a holder of a New LP Investment, (ii) a holder of the Promissory Note and (iii) claims arising from any action or failure to take action after any Eligible R3 General Release Party ceases to be actively involved in the business and operations of the New Fund, but subject in

any event to the exculpation and limits on liability in the Organizational Documents of the New Fund.

(c)     For the avoidance of doubt, to the extent that the Assignment Agreement is determined to be ineffective in whole or in part, any claim with respect thereto shall not be an R3 Released Claim or an LB Released Claim and shall be preserved for the benefit of the Seller.

3.4.3     <u>Waiver of Bankruptcy Court Jurisdiction</u>.  The Seller and its permitted successors and assigns shall have waived the jurisdiction of the Bankruptcy Court with respect to any dispute arising from or relating to the New LP Investment, except for (i) any motion for reconsideration of the Sale Motion, (ii) any remand from appeal of the Sale Order, or (iii) any dispute arising from or relating to this Agreement.

4.     REPRESENTATIONS AND WARRANTIES OF THE INVESTOR PARTIES.

In order to induce the Buyers to enter into and perform this Agreement and to consummate the Sale, each of the Investor Parties severally represents and warrants to the Buyers, as of the date hereof, as follows:

4.1.     <u>Organization</u>.  Such Investor Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

4.2.     <u>Power and Authorization</u>.  The execution, delivery and performance by such Investor Party of this Agreement are within the power and authority of such Investor Party and have been duly authorized by all necessary action on the part of such Investor Party. This Agreement (a) has been duly executed and delivered by such Investor Party and (b) is a legal, valid and binding obligation of such Investor Party, enforceable against such Investor Party in accordance with its terms.

4.3.     <u>Authorization of Governmental Authorities</u>.  No action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful authorization, execution, delivery and performance by such Investor Party of this Agreement.

4.4.     <u>Noncontravention</u>.  The execution, delivery and performance by such Investor Party of this Agreement will not:

(a)     violate any material Legal Requirement applicable to such Investor Party;

(b)     result in a material breach or violation of, or default under, any Contractual Obligation of such Investor Party;

(c)     require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation of such Investor Party, except as is required under the Fund Documents;

(d)   result in the creation or imposition of an Encumbrance by such Investor Party upon, or the forfeiture of, any Purchased R3 Interests; or

(e)   result in a breach or violation of, or default under, the Organizational Documents of such Investor Party.

4.5.   <u>Ownership</u>.  As of the date of this Agreement and at all times from the date hereof prior to the Merger, the Investor is and shall be the record and beneficial owner of the Purchased R3 Interests, free and clear of all Encumbrances except as are imposed by applicable securities laws and the Fund Documents.  The Investor has full right, power and authority to transfer and deliver valid title to the Purchased R3 Interests, free and clear of all Encumbrances, except those provided in the Fund Documents.  Except pursuant to this Agreement and the Fund Documents, there is no Contractual Obligation pursuant to which such Investor Party has, directly or indirectly, granted any option, warrant or other right to any Person to acquire any Purchased R3 Interests.

4.6.   <u>Litigation; Governmental Orders</u>.

4.6.1   <u>Litigation</u>.  There is no Action pending or, to the knowledge of such Investor Party, threatened to which such Investor Party is a party (either as plaintiff or defendant) or to which the Purchased R3 Interests are subject, which may materially adversely affect such Investor Party's ability to consummate the transactions contemplated hereby.

4.6.2   <u>Governmental Orders</u>.  No Governmental Order has been issued, which may materially adversely affect such Investor Party's ability to consummate the transactions contemplated hereby.

4.7.   <u>No Brokers</u>.  Neither of the Investor Parties has any Liability of any kind to, or is subject to any claim of, any broker, finder or agent in connection with the Sale.

5.   REPRESENTATIONS AND WARRANTIES OF THE SELLER.

The Seller hereby represents and warrants to the Buyers, as of the date hereof and as of the Closing Date, that:

5.1.   <u>Organization</u>.  The Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

5.2.   <u>Power and Authorization</u>.  Except for the authorization of the Bankruptcy Court, the execution, delivery and performance by the Seller of this Agreement and the consummation of the Sale are within the power and authority of the Seller and have been duly authorized by all necessary action on the part of the Seller.  This Agreement (a) has been duly executed and delivered by such Seller and (b) subject to the authorization of the Bankruptcy Court is a legal, valid and binding obligation of such Seller, enforceable against such Seller in accordance with its terms.

5.3.     Authorization of Governmental Authorities.  Except for the authorization of the Bankruptcy Court, no action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by the Seller of this Agreement or (b) the consummation of the Sale by the Seller.

5.4.     Noncontravention. Subject to approval by the Bankruptcy Court, neither the execution, delivery and performance by the Seller of this Agreement will:

(a)     violate any material provision of any Legal Requirement applicable to the Seller;

(b)     result in a material breach or violation of, or default under, any Contractual Obligation of the Seller;

(c)     require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation, except as is required under the Fund Documents; or

(d)     result in a breach or violation of, or default under, the Seller's Organizational Documents.

5.5.     Ownership.  Upon the consummation of the Merger and at all times thereafter prior to the Closing, the Seller will be the record and beneficial owner of the Purchased R3 Interests, free and clear of all Encumbrances created by the Seller except as are imposed by applicable securities laws, the Fund Documents and as a consequence of the Bankruptcy Cases.  Subject to the authorization of the Bankruptcy Court, the Seller has full right, power and authority to transfer and deliver to the Buyers valid title to the Purchased R3 Interests, free and clear of all Encumbrances, except for any created by the Buyers or those provided in the Fund Documents.  Immediately following the Closing, upon recordation of the Sale in the registers of the GP, the SLP, the Manager and the Fund, the Buyers will be the record and beneficial owner of the Purchased R3 Interests, free and clear of all Encumbrances except for any created by the Buyers or as are imposed by applicable securities laws or the Fund Documents.  Except pursuant to this Agreement and the Fund Documents, there is no Contractual Obligation pursuant to which such Seller has, directly or indirectly, granted any option, warrant or other right to any Person to acquire any Purchased R3 Interests.

5.6.     Litigation; Governmental Orders.

5.6.1     Litigation.  Except for the Approval Motion, there is no Action pending or, to the knowledge of the Seller, threatened to which the Seller is a party (either as plaintiff or defendant) or to which the Purchased R3 Interests are subject, which may materially adversely affect the Seller's ability to consummate the transactions contemplated hereby.

5.6.2     Governmental Orders.  Except for the Approval Motion, no Governmental Order has been issued which may materially adversely affect the Seller's ability to consummate the transactions contemplated hereby.

5.7.   <u>No Brokers</u>.  The Seller has no Liability of any kind to any broker, finder or agent with respect to the Sale.

5.8.   <u>No Reliance</u>.  The Seller (i) is a sophisticated entity with respect to the sale of Purchased R3 Interests, (ii) has adequate information concerning the business and financial condition of the Buyers and the Master Fund to make an informed decision regarding the sale of the Equity Interests and (iii) has independently and without reliance upon the Buyers, and based on such information as the Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that the Seller has relied upon the Buyers' express representations, warranties, covenants, agreements and indemnities in this Agreement.  The Seller acknowledges that the Buyers have not given the Seller any investment advice, credit information or opinion on whether the sale of the Equity Interests is prudent.

5.9.   <u>Information</u>.  The Seller acknowledges that (i) the Buyers currently may have, and later may come into possession of, information with respect to the Purchased R3 Interests, the Buyers or any of their respective Affiliates that is not known to Seller and that may be material to a decision to sell the Purchased R3 Interests ("<u>Seller Excluded Information</u>"), (ii) the Seller has determined to sell the Purchased R3 Interests notwithstanding its lack of knowledge of Seller Excluded Information and (iii) the Buyers shall have no liability to the Seller, and the Seller waives and releases any claims that it might have against the Buyers or any Buyer Indemnified Person whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Sale; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyers' representations or warranties in this Agreement.

6.   REPRESENTATIONS AND WARRANTIES OF THE BUYERS.

   Each of the Buyers, severally and not jointly or jointly and severally, represents and warrants to the Seller, as of the date hereof and on the Closing Date, that:

6.1.   <u>Organization</u>.  Such Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.

6.2.   <u>Power and Authorization</u>.  The execution, delivery and performance by such Buyer of this Agreement are within the power and authority of such Buyer and have been duly authorized by all necessary action on the part of such Buyer.  This Agreement (a) has been duly executed and delivered by such Buyer and (b) is a legal, valid and binding obligation of such Buyer, enforceable against such Buyer in accordance with its terms.

6.3.   <u>Authorization of Governmental Authorities</u>.  No action by (including any authorization, consent or approval), or in respect of, or filing with, any Governmental Authority is required for, or in connection with, the valid and lawful (a) authorization, execution, delivery and performance by such Buyer of this Agreement or (b) the consummation of the Sale by the Buyers.

6.4.   <u>Noncontravention</u>.  Neither the execution, delivery and performance by any Buyers of this Agreement will:

(a)    violate any provision of any Legal Requirement applicable to such Buyer;

(b)    result in a breach or violation of, or default under, any Contractual Obligation of such Buyer;

(c)    require any action by (including any authorization, consent or approval) or in respect of (including notice to), any Person under any Contractual Obligation, other than the consents set forth on Schedule 6.4, which consents have been or shall be obtained at or prior to the Closing; or

(d)    result in a breach or violation of, or default under, such Buyer's Organizational Documents.

6.5.    Side Letters.  There are no other side letters between the New Fund and any of its limited partners other than the New LP Investment Side Letter.

6.6.    Litigation; Governmental Orders.

6.6.1    Litigation.  There is no Action pending or, to the knowledge of such Buyer, threatened to which such Buyer is a party (either as plaintiff or defendant) or to which the Purchased R3 Interests are subject, which may materially adversely affect such Buyer's ability to consummate the transactions contemplated hereby.

6.6.2    Governmental Orders.  No Governmental Order has been issued which may materially adversely affect such Buyer's ability to consummate the transactions contemplated hereby.

6.7.    No Brokers.  No Buyer has any Liability of any kind to any broker, finder or agent with respect to the Sale for which the Seller could be Liable.

6.8.    No Reliance.  Such Buyer (i) is a sophisticated entity with respect to the sale of Purchased R3 Interests, (ii) has adequate information concerning the business and financial condition of such Buyer and the Master Fund to make an informed decision regarding the purchase of the Equity Interests and (iii) has independently and without reliance upon the Seller, and based on such information as the Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that such Buyer has relied upon the express representations, warranties, covenants, agreements and indemnities of the Investor Parties and the Seller in this Agreement.  Such Buyer acknowledges that the Seller has not given such Buyer any investment advice, credit information or opinion on whether the sale of the Equity Interests is prudent.

6.9.    Information.  Such Buyer acknowledges that (i) the Seller currently may have, and later may come into possession of, information with respect to the Purchased R3 Interests, the Buyers or any of their respective Affiliates that is not known to the Buyers and that may be material to a decision to sell the Purchased R3 Interests ("Buyer Excluded Information"), (ii) such Buyer has determined to purchase the Purchased R3 Interests notwithstanding its lack of knowledge of Buyer Excluded Information and (iii) the Seller shall have no liability to such Buyer, and such Buyer waives and releases any claims that it

might have against the Seller or any Seller Indemnified Person whether under applicable
securities laws or otherwise, with respect to the nondisclosure of Buyer Excluded
Information in connection with the Sale; provided, however, that Buyer Excluded
Information shall not and does not affect the truth or accuracy of Seller's representations or
warranties in this Agreement.

6.10.    Accredited Investor.  Such Buyer is an "accredited investor" as defined in Rule
501 under the Securities Act.  Such Buyer has not made any offers to sell, or solicitations of
any offers to buy, all or any portion of the Purchased R3 Interests in violation of any
applicable securities laws.

7.    COVENANTS.

7.1.    Conduct of Investor Parties.  Except as required under applicable law or by
Governmental Authority, or to the extent the Buyers have consented in writing, between the
date hereof and the Closing, neither of the Investor Parties shall, nor shall the Seller cause
either of the Investor Parties to:

(a)    transfer, or attempt to transfer, any Equity Interests, except pursuant to the
Merger; or

(b)    merge, dissolve or otherwise terminate its existence, except pursuant to the
Merger.

7.2.    Further Assurances; Cooperation.  Subject to the terms and conditions of this
Agreement, each of the parties hereto will use its commercially reasonable efforts to take, or
cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or
advisable under applicable Legal Requirements to consummate and make effective the
transfer, purchase and sale of the Purchased R3 Interests, the issuance of the Promissory
Note, the redemption and contribution of the Fund Interests, the issuance of the New LP
Interests, and the assignment of the Assigned Claims pursuant to this Agreement, including
using commercially reasonable efforts to ensure satisfaction of the conditions precedent to
each party's obligations hereunder.  None of the parties hereto will, without the prior written
consent of the other parties, take or fail to take any action, which would reasonably be
expected to prevent or materially impede, interfere with or delay the transactions
contemplated by this Agreement.  From time to time after the Closing, without further
consideration, each party will, at its own expense, execute and deliver such documents to the
other parties, and take such other actions, as the other parties may reasonably request in order
to more effectively consummate the transfer, purchase and sale of the Purchased R3 Interests,
the issuance of the Promissory Note, the redemption and contribution of the Fund Interests,
the issuance of the New LP Interests, and the assignment of the Assigned Claims hereunder
and the other transactions contemplated by this Agreement.  Nothing herein shall obligate the
Buyers or any of their Affiliates to take or omit to take any action relating to the Assigned
Claims, including, without limitation, to prepare or file a proof of claim in the Bankruptcy
Cases or any other proceeding.

7.3.    Bankruptcy Court Filings.

7.3.1    As promptly as practicable, but in no event later than October 8, 2008, the Seller shall file the Approval Motion with the Bankruptcy Court under an Order to Show Cause for the Approval Motion to be heard on October 16, 2008.  The Seller shall not adjourn the hearing on the Approval Motion without the Buyers' prior written consent.

7.3.2    The Buyers agree that they will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Approval Order, including furnishing documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that the Buyers are "good faith" purchasers under section 363(m) of the Bankruptcy Code.  Notwithstanding the foregoing, the Buyers shall have no obligation to provide documents or information that the Buyers deem commercially sensitive unless the Buyers have prior assurances, by protective order of the Bankruptcy Court or otherwise, that such information will not be publicly disclosed without the Buyers' prior written consent and will not be disclosed to competitors in any event.

7.4.    <u>Fees and Expenses</u>.  Except as otherwise expressly provided in this Agreement, all fees and expenses, including all fees and expenses incurred in connection with his Agreement and the transactions contemplated herein, shall be borne by the party incurring such fees and expenses.

7.5.    <u>Transfer of Interests</u>.

7.5.1    Following the entry of the Approval Order and immediately prior to the Closing, the Seller shall, and shall cause the Investor Parties to, consummate the Merger.

7.5.2    At the Closing, the Seller shall irrevocably transfer the Purchased R3 Interests to the Buyers as set forth in Section 2.1.

7.6.    <u>Post-Closing Covenants</u>.  After the Closing:

7.6.1    The Seller shall use best efforts to obtain LB Joinders from any LB Party that is not a Participating LB Release Party on the Closing Date.

7.6.2    The Buyers shall use best efforts to obtain R3 Joinders from any R3 Party that is not a Participating R3 Release Party on the Closing Date.

7.6.3    The Seller and the Buyers shall cooperate in good faith to evaluate the liabilities associated with the Aviation Asset Parties and shall endeavor to reach a mutual agreement concerning which Aviation Asset Parties shall be required to execute LB Joinders post-Closing.

7.6.4    The Seller shall provide the Manager with 60 days' notice in writing of the effective date of any proposed assumption or rejection of the Overlease.

7.6.5    Notwithstanding any provisions of the Sub-Sublease to the contrary, the Manager may immediately terminate the Sub-Sublease upon notice to the Seller without any liability to the Seller or any of the Seller's successors or assigns.

7.6.6     The Seller shall pay any outstanding charges due and owing on the furniture in transit to the Premises and such furniture shall be delivered and installed in accordance with terms of the Sub-Sublease.

7.6.7     The Buyers agree to prosecute, at the expense of the Seller, any Assigned Claims preserved for the benefit of the Seller pursuant to Section 3.4.2(c).

7.6.8     The Manager, the GP and the SLP shall provide, or cause to be provided, to the Seller, Tax information that would otherwise have been provided to the Investor Parties under Section 22(c) of the Global Side Letter; provided, however, that such information shall not be required to be provided to the Seller until Schedule K-1s for a taxable year are provided to investors in the New Fund.

7.6.9     The Seller and the Manager will jointly endeavor to recover from LBIE for the benefit of the Buyers any securities in the Master Fund portfolio that have not been rehypothecated, including any securities held in street name.

7.6.10     The Seller and the Manager will cooperate in transitioning to third parties any administrative or counterparty roles relating to the Master Fund investments.

7.6.11     The Seller will assist the Manager and the Master Fund in completing securities transfers involving non-Debtor Affiliates of the Seller.

7.6.12     The Participating LB Release Parties shall not bring any action or initiate any proceeding in respect of the LB Released Claims; provided, however, that nothing herein shall prevent any Participating LB Release Party from commencing a separate action or proceeding for any breach of this provision.

7.6.13     The Participating R3 Release Parties shall not bring any action or initiate any proceeding in respect of the R3 Released Claims; provided, however, that nothing herein shall prevent any Participating R3 Release Party from commencing a separate action or proceeding for any breach of this provision.

7.6.14     The Buyers shall report for federal income tax purposes the transactions contemplated by this Agreement and the Redemption and Contribution Agreement as (i) a purchase of Seller's interest in the Manager, (ii) a distribution by the Fund in respect of Seller's interest in the Fund of the assets of the Fund and its affiliates held at the date hereof by Seller and its Affiliates, (iii) a distribution by the Fund in respect of Seller's interest in the Fund, the GP and the SLP of the Cash Consideration and (iv) a distribution by the Fund of interests in the Master Fund and a contribution of such interests to the New Fund; provided, however, that the Buyers shall change such reporting position to another position permitted by applicable law if the Seller's income tax positions would be adversely affected by the initial position so long as no direct or indirect member of the Master Fund would be adversely affected by the new position. Except as required by applicable law, the Buyers and the Sellers shall take no position on any income tax return that is inconsistent with the initial position or any other position ultimately agreed to.

7.7.   Allocation of Taxable Income.  With respect to each entity of which the Seller and/or the Investor Parties are selling or transferring, directly or indirectly, an interest pursuant to this Agreement, except for portfolio entities in which the Buyers own a minority interest, if such entity is taxable as a partnership for U.S. federal tax purposes, for purposes of allocating taxable income, gain, loss, deduction, and credit for the year in which the Closing occurs, the Buyers shall cause to occur a closing of the books of such entity as of the Closing, consistent with the requirements of Code Section 706 and the Treasury Regulations promulgated thereunder.

8.   CONDITIONS TO CLOSING

The obligations of the Buyer to consummate the Closing is subject to the fulfillment of each of the following conditions:

8.1.   Conditions to Each Party's Obligations.  The obligations of the Investor Parties, the Seller and the Buyers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions:

8.1.1   The Approval Order shall have been entered by the Bankruptcy Court and shall not have been stayed.

8.1.2   The New LP Investment Side Letter and the Redemption and Contribution Agreement shall have been executed and delivered.

8.1.3   There shall not be in effect any other Legal Requirement or Governmental Order that would render the parties unable to consummate or perform the transactions contemplated hereby or make such transactions illegal or prohibit, restrict or delay such consummation or performance; and there shall not be in effect any injunction or other order issued by a court of competent jurisdiction restraining or prohibiting the consummation or performance of the transactions contemplated hereby.

8.2.   Conditions to Buyers' Obligations.  The obligations of the Buyers to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions, any or all of which may be waived in whole or in part by the Buyers in their sole discretion:

8.2.1   The representations and warranties of the Investor Parties and the Seller contained in this Agreement and in any document, instrument or certificate delivered hereunder will be true and correct in all material respects at and as of the Closing with the same force and effect as if made as of the Closing, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time.

8.2.2   The Seller and the Investor Parties will have performed and complied in all respects, with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by them at or prior to the Closing.

8.2.3   The Merger shall have been consummated.

8.2.4     All Required LB Release Parties shall have executed and delivered the LB Joinders.

8.2.5     All deliveries required to be delivered by the Seller pursuant to Section 3.2 hereunder shall have been delivered at or prior to the Closing.

8.2.6     All corporate and other proceedings of non-debtor LB Parties in connection with the Sale and all documents incident thereto will be reasonably satisfactory in form and substance to the Buyers and their counsel, and they will have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

8.3.     <u>Conditions to Seller's Obligations</u>.  The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, at or prior to the Closing, of the following conditions, any or all of which may be waived in whole or in part by the Seller in its sole discretion:

8.3.1     The representations and warranties of the Buyers contained in this Agreement and in any document, instrument or certificate delivered hereunder will be true and correct in all material respects at and as of the Closing with the same force and effect as if made as of the Closing, other than representations and warranties that expressly speak only as of a specific date or time, which will be true and correct as of such specified date or time.

8.3.2     The Buyers will have performed and complied in all respects, with all agreements, obligations and covenants contained in this Agreement that are required to be performed or complied with by them at or prior to the Closing.

8.3.3     The New LP Interests shall have been issued.

8.3.4     The Master Fund shall have executed and delivered the Promissory Note.

8.3.5     The Required R3 Release Parties shall have executed and delivered the R3 Joinders.

8.3.6     All deliveries required to be delivered by the Buyers pursuant to Section 3.3 hereunder shall have been delivered at or prior to Closing.

8.3.7     All corporate and other proceedings in connection with the Sale and all documents incident thereto will be reasonably satisfactory in form and substance to the Seller and its counsel, and they will have received all such counterpart original and certified or other copies of such documents as they may reasonably request.

9.     TERMINATION.

9.1.     <u>Termination of Agreement</u>.  This Agreement may be terminated (the date on which the Agreement is terminated, the "<u>Termination Date</u>") at any time prior to the Closing:

(a)    by mutual written consent of the Buyers and the Seller;

(b)    by either the Buyers or the Seller if a final nonappealable Governmental Order permanently enjoining or otherwise prohibiting the Closing will have been issued by a Governmental Authority of competent jurisdiction;

(c)    by the Buyers if a Governmental Authority has issued a temporary restraining order, stay or other order enjoining the consummation of the Sale and the other transactions contemplated in this Agreement;

(d)    by the Buyers if either one or both of the Investor Parties files for protection under the Bankruptcy Code and does not simultaneously join the motion for entry of the Approval Order; or

(e)    by the Buyers if the Approval Order has not been entered by October 16, 2008.

9.2.    <u>Effect of Termination</u>.  In the event of the termination of this Agreement pursuant to Section 9.1, this Agreement – other than the provisions of Sections 4.7, 5.7 and 6.5 (No Brokers), 10 (Survival; Indemnification), 11.9 (Governing Law), 11.10 (Jurisdiction, etc.) and 11.12 (Waiver of Jury Trial) – will then be null and void and have no further force and effect and all other rights and Liabilities of the parties hereunder will terminate without any Liability of any party to any other party, except for Liabilities arising in respect of breaches under this Agreement by any party on or prior to the Termination Date.

10.    SURVIVAL; INDEMNIFICATION.

10.1.    <u>Survival</u>.  The representations and warranties made by the Seller in this Agreement shall not survive the Closing, except that the representations and warranties made by the Seller in Section 5.2 (Authorization), 5.5 (Title), shall survive the Closing.  The covenants and agreements made by the parties hereto in Section 2 (Purchase and Sale of Assets), Section 3.4.2 (Effectiveness of Releases), Sections 7.2 (Further Assurances), and 7.6 (Post-Closing Covenants) shall survive the Closing until performed in accordance with their terms.

10.2.    <u>Seller Indemnification</u>.  The Seller agrees to indemnify, defend and hold harmless the Buyers and their successors and assigns, representatives and affiliates, and each of their respective directors, officers, partners, members, stockholders, managers, employees and agents (collectively, the "<u>Buyer Indemnified Parties</u>") from and against all claims, actions or causes of action, assessments, demands, losses, damages, judgments, settlements, liabilities, costs and expenses, including interest, penalties and reasonable attorneys' and accounting fees and expense of any nature whatsoever ("<u>Damages</u>") asserted against, imposed upon or incurred directly by any Buyer Indemnified Parties to the extent resulting from (i) a breach by the Seller of any representation or warranty of the Seller contained in Section 5.2 (Authorization), Section 5.5 (Title), or the Seller's failure to perform in any material respect the covenants in Sections 7.2 (Further Assurances), and 7.6 (Post-Closing Covenants), (ii) the assertion by any party of any LB Released Claims against any Participating R3 Release Party or against any Eligible R3 General Release Party or (iii) the assertion of any Claim against

any R3 Party arising under, relating to or in connection with the assignment of the Assigned Claims under the Assignment Agreement.

10.3.   <u>Buyer Indemnification</u>.  The R3 Indemnifying Parties jointly and severally agree to indemnify, defend and hold harmless the Participating LB Release Parties and their successors and assigns, representatives and affiliates, and each of their respective directors, officers, partners, members, stockholders, managers, employees and agents (collectively, the "<u>Seller Indemnified Parties</u>") from and against all Damages asserted against, imposed upon or incurred directly by any Seller Indemnified Parties to the extent resulting from (i) a breach by a Buyer of any representation or warranty of such Buyer contained in Section 6.2 (Authorization), (ii) such Buyer's failure to perform in any material respect the covenants in Sections 7.2 (Further Assurances), and 7.6 (Post-Closing Covenants) or (iii) the assertion by any party of any R3 Released Claims against any Participating LB Release Party excluding a contest of the assignment asserted by any R3 Parties or any limited partners of R3 Parties in their capacity as such.

10.4.   <u>Limitation of Liability</u>.  The obligations and liabilities of the Seller to indemnify the Buyer Indemnified Parties with respect to Indemnity Claims under Section 10.2 hereof made by the Buyers shall not exceed, in the aggregate, the sum of (i) the Cash Consideration and (ii) the contribution value of the New LP Investment.  The obligations of the R3 Indemnifying Parties to indemnify the Seller Indemnified Parties with respect to Indemnity Claims under Section 10.3 hereof made by the Buyers shall not exceed $15,000,000.00.

10.5.   <u>Conditions of Indemnification</u>.  The obligations and liabilities of the Seller to indemnify the Buyer Indemnified Parties with respect to the Indemnity Claims, respectively, resulting from the assertion of liability by third parties shall be subject to the following terms and conditions:

10.5.1   If any Indemnity Claim shall be brought against an Indemnified Party based upon any of the matters for which such Indemnified Party is indemnified hereunder, such Indemnified Party shall notify the Indemnifying Party in writing within ten (10) Business Days thereof; <u>provided</u>, <u>however</u>, that any failure of an Indemnified Party to notify the Indemnifying Party of such matter shall not impair or reduce the obligations of the Indemnifying Party hereunder.  With respect to any Indemnity Claim the Indemnified Parties shall have the right, at the expense of the Indemnifying Party, to employ one counsel in any such action (<u>provided</u>, <u>however</u>, that any Indemnified Party may employ separate counsel in the event of a legal or ethical conflict with chosen counsel, and the Indemnified Parties may employ local counsel to the extent reasonably required with respect to such Indemnity Claim and action) and to undertake the defense thereof.  If the Indemnified Parties exercise the right to employ counsel to conduct the defense of an Indemnity Claim, as set forth in the preceding sentence of this subsection 10.5.1, the Indemnifying Party shall have the right, at its expense, to associate in the defense through a single counsel of its selection, which counsel shall not have any actual or potential conflict of interest or issue conflict.  In the event that the Indemnifying Party elects to associate in the defense, the Indemnified Party may seek written recommendations and instructions from such counsel.

10.5.2    The Indemnified Party shall not settle or compromise any Claim or consent to the entry of any judgment without the prior written consent of each affected Indemnifying Party, which consent shall not be unreasonably withheld.

10.5.3    All Expenses shall be reimbursable to the applicable Indemnified Party, and the Indemnifying Party shall pay to such Indemnified Party any and all Expenses within thirty (30) days after written notice from such Indemnified Party itemizing the amounts thereof incurred to the date of such notice.  The payment for any Damages shall be advanced by the Indemnifying Party to the Indemnified Party within ten (10) Business Days after written notice from such Indemnified Party of a judgment or arbitral decision imposing such Damages (including copies of any documents substantiating such Damages) or such earlier time as may be required under any judgment or settlement giving rise to such Damages.  If such judgment or arbitral decision is subsequently reversed on appeal or otherwise, the Indemnified Party shall reimburse the Indemnifying Party for the amount of such judgment or arbitral award.

10.5.4    In the event that the Seller fails to reimburse any Expenses or to advance payment for any Losses within the applicable periods set forth in Section 10.5.3, the Buyer Indemnified Party shall request reimbursement of Expenses or payment of Damages from the Manager, which will cause the amount of such Expenses or Damages to be (i) offset against the Promissory Note, or to be deducted from the contribution value of the New LP Investment.

10.6.    <u>Remedies Cumulative</u>.  The rights of each Buyer Indemnified Person and Seller Indemnified Person under this Section 10 are cumulative, and each Buyer Indemnified Person and Seller Indemnified Person, as the case may be, will have the right in any particular circumstance, in its sole discretion, to enforce any provision of this Section 10 without regard to the availability of a remedy under any other provision of this Section 10.

10.7.    <u>Subrogation</u>.  The Buyers agree to subrogate the Seller to the rights of the Buyers against any non-Participating LB Release Parties, provided that such subrogation shall not release the Indemnifying Parties under this Section 10.

11.    MISCELLANEOUS

11.1.    <u>Notices</u>.  All notices, requests, demands, claims and other communications required or permitted to be delivered, given or otherwise provided under this Agreement must be in writing and must be delivered, given or otherwise provided:

(a)    by hand (in which case, it will be effective upon delivery);

(b)    by facsimile (in which case, it will be effective upon receipt of confirmation of good transmission); or

(c)    by overnight delivery by a nationally recognized courier service (in which case, it will be effective on the Business Day after being deposited with such courier service);

in each case, to the address (or facsimile number) listed below:

If to the Investor Parties or the Seller, to them at:

> Lehman Brothers Holdings, Inc.
> 745 Seventh Avenue
> New York, NY 10019
> Telephone number:
> Facsimile number:
> Attention: Daniel Ehrmann

with a copy to:

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> Telephone number: (212) 310-8000
> Facsimile number: (212) 310-8007
> Attention: Paul Cohn, Esq., Rod Miller, Esq., Alfredo Perez, Esq.
>
> -and-
>
> Milbank, Tweed, Hadley & McCloy LLP
> One Chase Manhattan Plaza
> New York, NY 10005-1413
> Telephone number: (212 ) 530-5000
> Facsimile number: (212) 530-5219

If to the Buyers to them

> R3 Capital Management, LLC
> 1271 Avenue of the Americas, 39th Floor
> New York, NY 10020
> Telephone number:
> Facsimile number:
> Attention: Irshad Karim, General Counsel

with a copy to:

> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY 10036
> Telephone number: (212) 596-9000
> Facsimile number: (212) 596-9090
> Attention: Keith H. Wofford

Each of the parties to this Agreement may specify different address or facsimile number by giving notice in accordance with this Section 11.1 to each of the other parties hereto.

11.2.   <u>Succession and Assignment; No Third-Party Beneficiary</u>.  Subject to the immediately following sentence, this Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, each of which such successors and permitted assigns will be deemed to be a party hereto for all purposes hereof.  No party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests, or obligations hereunder without the prior written approval of the other parties; <u>provided</u>, <u>however</u>, that the Buyers may designate one or more of their Affiliates to perform their obligations hereunder, in each case, so long as the Buyers are not relieved of any Liability hereunder and such designation does not adversely affect the tax, accounting or regulatory position of Seller or have an adverse effect on the economics of the Note or the New LP Investment.  Except as expressly provided herein, this Agreement is for the sole benefit of the parties and their permitted successors and assignees and nothing herein expressed or implied will give or be construed to give any Person, other than the parties and such successors and assignees, any legal or equitable rights hereunder.

11.3.   <u>Amendments and Waivers</u>.  No amendment or waiver of any provision of this Agreement will be valid and binding unless it is in writing and signed, in the case of an amendment, by the Buyers, the Investor Parties and the Seller, or in the case of a waiver, by the party against whom the waiver is to be effective.  No waiver by any party of any breach or violation or, default under or inaccuracy in any representation, warranty or covenant hereunder, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation, default of, or inaccuracy in, any such representation, warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence.  No delay or omission on the part of any party in exercising any right, power or remedy under this Agreement will operate as a waiver thereof.

11.4.   <u>Entire Agreement</u>.  This Agreement, together with any documents, instruments and certificates explicitly referred to herein, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto.

11.5.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute but one and the same instrument.  This Agreement will become effective when duly executed by each party hereto.

11.6.   <u>Severability</u>.  Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  In the event that any provision hereof would, under applicable law, be invalid or unenforceable in any respect, each party hereto intends that such provision will be construed by modifying or limiting it so as to be valid and enforceable to the maximum extent compatible with, and possible under, applicable law.

11.7.   <u>Headings</u>.  The headings contained in this Agreement are for convenience purposes only and will not in any way affect the meaning or interpretation hereof.

11.8.   <u>Construction</u>.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The parties intend that each representation, warranty and covenant contained herein will have independent significance.  If any party has breached or violated, or if there is an inaccuracy in, any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, or in respect of which there is not an inaccuracy, will not detract from or mitigate the fact that the party has breached or violated, or there is an inaccuracy in, the first representation, warranty or covenant.

11.9.   <u>Governing Law</u>.  This Agreement, the rights of the parties and all Actions arising in whole or in part under or in connection herewith, will be governed by and construed in accordance with the domestic substantive laws of State of New York, without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

11.10.   <u>Jurisdiction; Venue; Service of Process.</u>

11.10.1   <u>Matters Arising Under this Agreement</u>.  Each party to this Agreement, by its execution hereof, (a) hereby irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court for the purpose of any Action between the parties arising in whole or in part under this Agreement, (b) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court and (c) hereby agrees not to commence any such Action other than before one of the above-named courts.  Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

11.10.2   <u>Other Matters</u>.  Each party to this Agreement, by its execution hereof, (a) hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of New York or the United States District Court located in the Southern District of New York for the purpose of any Action between the parties arising in whole or in part under or in connection with the New LP Investment or the New Fund Documents, (b) hereby waives to the extent not prohibited by applicable law, and agrees not to assert, by way of

motion, as a defense or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such Action brought in one of the above-named courts should be dismissed on grounds of *forum non conveniens*, should be transferred or removed to any court other than one of the above-named courts, or should be stayed by reason of the pendency of some other proceeding in any other court other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by such court and (c) hereby agrees not to commence any such Action other than before one of the above-named courts. Notwithstanding the previous sentence a party may commence any Action in a court other than the above-named courts solely for the purpose of enforcing an order or judgment issued by one of the above-named courts.

11.10.3   <u>No Submission to Jurisdiction</u>. The parties agree that the Master Fund has not submitted to the jurisdiction of the Bankruptcy Court.

11.10.4   <u>Venue</u>. Each party agrees that for any Action between the parties arising in whole or in part under or in connection with this Agreement, such party bring Actions only in the Borough of Manhattan. Each party further waives any claim and will not assert that venue should properly lie in any other location within the selected jurisdiction.

11.10.5   <u>Service of Process</u>. Each party hereby (a) consents to service of process in any Action between the parties arising in whole or in part under or in connection with this Agreement in any manner permitted by New York law, (b) agrees that service of process made in accordance with clause (a) or made by registered or certified mail, return receipt requested, at its address specified pursuant to Section 11.1, will constitute good and valid service of process in any such Action and (c) waives and agrees not to assert (by way of motion, as a defense, or otherwise) in any such Action any claim that service of process made in accordance with clause (a) or (b) does not constitute good and valid service of process.

11.11.   <u>Specific Performance</u>. Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached or violated. Accordingly, each of the parties agrees that, without posting bond or other undertaking, the other parties will be entitled to an injunction or injunctions to prevent breaches or violations of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any Action instituted in any court of the United States or any state thereof having jurisdiction over the parties and the matter in addition to any other remedy to which it may be entitled, at law or in equity. Each party further agrees that, in the event of any action for specific performance in respect of such breach or violation, it will not assert that the defense that a remedy at law would be adequate.

11.12.   <u>Waiver of Jury Trial</u>. **TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW THAT CANNOT BE WAIVED, THE PARTIES HEREBY WAIVE, AND COVENANT THAT THEY WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE), ANY RIGHT TO TRIAL BY JURY**

**IN ANY ACTION ARISING IN WHOLE OR IN PART UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF THE KNOWING, VOLUNTARY AND BARGAINED-FOR AGREEMENT AMONG THE PARTIES IRREVOCABLY TO WAIVE ITS RIGHT TO TRIAL BY JURY IN ANY PROCEEDING WHATSOEVER BETWEEN THEM RELATING TO THIS AGREEMENT OR ANY OF THE CONTEMPLATED TRANSACTIONS WILL INSTEAD BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.**

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as an agreement under seal as of the date first above written.

THE BUYERS:                              **R3 CAPITAL MANAGEMENT, LLC**


By:_____
    Name:
    Title:


**R3 CAPITAL GENPAR MGP, LTD.**


By:_____
    Name:
    Title:


**R3 CAPITAL SLP MGP, LTD.**


By:_____
    Name:
    Title:


**R3 CAPITAL PARTNERS (B), L.P.**

By: R3 Capital GenPar MGP, Ltd.
    Its General Partner

By:_____
    Name:
    Title:


THE SELLER:                              **LEHMAN BROTHERS HOLDINGS INC.**


By:_____
    Name:
    Title:

THE INVESTOR:                    **LB R3 HOLDINGS L.P.**


By:_____
   Name:
   Title:

THE INVESTOR GP:                **LB R3 HOLDINGS GP L.L.C.**


By:_____
   Name:
   Title:

Schedule 1-A

LB Release Parties

Required LB Release Parties | Non-Required LB Release Parties

Bromley LLC

Lehman Brothers International (Europe)

LB 745 LLC

Lehman Brothers Inc.

LB I Group Inc.

LB R3 Holdings GP L.L.C.

LB R3 Holdings, L.P.

Aviation Asset Parties

Fundo de Investimento Multimercado Credito Privado

Lehman Brothers Bankhaus AG                    Clarks Summit I LLC

Lehman Brothers Commercial Bank                Clarks Summit II LLC

Lehman Brothers Commercial Corporation         737 Portfolio Trust

Lehman Brothers Commercial Corporation Asia Ltd.   737 Portfolio Services

Lehman Brothers Commodity Services Inc.        Flight Sim I LLC

Lehman Brothers Derivative Products Inc.        Flight Sim II LLC

Lehman Brothers Finance SA                     Flight Sim III LLC

Lehman Brothers Financial Products Inc.        Flight Sim IV LLC

Lehman Brothers Holdings Inc.                  Flight Sim V Inc.

East Dover Limited                             Flight Sim LLC

Lehman Brothers Offshore Partners Ltd.         Jet Partners LLC

Lehman Brothers OTC Derivatives Inc.           Laminar Holdings LLC Bombardier Aircraft #1 Statutory Trust

Lehman Brothers Special Financing Inc.         Laminar Holdings LLC Bombardier Aircraft #2 Statutory Trust

Lehman Commercial Paper Inc.                   Laminar Holdings LLC Bombardier Aircraft #3 Statutory Trust

Lehman Commercial Paper Inc. – U.K. Branch     Laminar Holdings LLC Bombardier Aircraft #4 Statutory Trust

Lehman Scottish Finance L.P.                   Laminar Holdings LLC Bombardier Aircraft #5 Statutory Trust

PAMI Statler Arms LLC                          Laminar Holdings LLC Cessna 750-0270 Statutory Trust

Laminar Holdings LLC Cessna 750-0276 Statutory Trust

Laminar Holdings LLC Cessna 750-0278 Statutory Trust

Laminar Holdings LLC Cessna 750-0284 Statutory Trust

Laminar Holdings LLC Cessna 750-0286 Statutory Trust

Laminar Holdings LLC Cessna 750-0287 Statutory Trust

Madison Jet LLC

Acadia RJV LLC

Peterborough 850 LLC

West Dover LLC

Whitmore LLC

CES Aviation LLC

CES Aviation V LLC

CES Aviation IX LLC

<u>Schedule 1-B</u>

R3 Release Parties

<u>Required R3 Release Parties</u>

R3 Capital GenPar MGP, Ltd.
R3 Capital Principal Investors GenPar, LLC
R3 Capital Management MPG, LLC
R3 Capital Management, LLC
R3 Capital Partners (A), L.P.
R3 Capital Partners (B), L.P.
R3 Capital Partners (C) (Master), L.P.
R3 Capital Partners (C), Ltd.
R3 Capital Partners (D) (Master), L.P.
R3 Capital Partners (D), L.P.
R3 Capital Partners (Delaware I), LLC
R3 Capital Partners Delaware Holdings (C), L.P.
R3 Capital Partners LLP
R3 Capital Partners Ltd.
R3 Capital Partners Master (DE), L.P.
R3 Capital Partners Master, L.P.
R3 Capital Principal Investors, L.P.
R3 Capital SLP MGP, Ltd.
R3 Capital SLP, LLC
RRR Loan Funding Trust
Shannon Bass
Russell J. Brownback, III
Assan Din
Irshad Karim
Chris Kelly
Michael Lipsky
Deborah Millstein
David Munoz
Michael Phelps
Richard M. Rieder
Josh Tarnow
Paul H. Tice
C. Michael Weaver

<u>Non-Required R3 Release Parties</u>

R3 Capital Advisors (Singapore) Pte. Ltd.
R3 Capital Partners (Ireland I), Ltd.
R3 Capital Partners (Luxembourg I), S.a.r.l.
R3 Capital Partners (Luxembourg II), S.a.r.l.
R3 Capital Partners (Luxembourg III), S.a.r.l.
R3 Capital Partners (Mauritius I), Ltd.
R3 Capital Partners (Singapore I), Ltd.
R3 Capital Partners (XO Holdings), LLC
R3 Capital Partners Luxembourg Holdings, I
R3 Capital Partners Luxembourg Holdings, II

<u>Eligible R3 General Release Parties</u>

Richard M. Rieder

## Schedule 1-C

R3 Principals

Shannon Bass
Russell J. Brownback, III
Assan Din
Irshad Karim
Chris Kelly
Michael Lipsky
Deborah Millstein
David Munoz
Michael Phelps
Richard M. Rieder
Josh Tarnow
Paul H. Tice
C. Michael Weaver

## Schedule 2.1

Purchased R3 Interests

### Manager Interests

All of Seller's Non-Managing Member Interests, representing 45% of the Company Percentage.

### GP Shares

All of Seller's Class B Shares, representing 45% of the Company Percentage.

### SLP Shares

All of Seller's Class B Shares, representing 45% of the Company Percentage.

### Purchased Fund Interests

All Seller's limited partnership interests in the Fund, except such limited partnership interests exchanged for interests in the Master Fund with a net asset value of $250,000,000.00 based on the aggregate net asset value of the Master Fund as of September 30, 2008.

## Schedule 6.4

Buyer Consents


Approval of the Advisory Committee of R3 Capital GenPar MGP, Ltd.