## **EXHIBIT D**

(PFI Agreement)

## PARTICIPATING FINANCIAL INSTITUTION AGREEMENT

| | |
|---|---|
| *Participating Financial Institution:* | Lehman Brothers Commercial Corporation |
| *Headquarters Address:* | 745 Seventh Avenue<br>New York, New York 10019 |
| *Effective Date of Agreement:* | July 21, 2005 |

This PARTICIPATING FINANCIAL INSTITUTION AGREEMENT is entered into as of the date set forth above (the "Effective Date"), by and between HOTSPOT FXi, L.L.C., a New Jersey limited liability company having its principal place of business at 1375 Plainfield Avenue, Watchung, New Jersey 07069 (the "Provider"), and the financial institution set forth above (the "Participating Financial Institution").

## RECITALS:

WHEREAS, the Provider has developed an electronic platform, accessible via the Internet using the Interface (as defined herein), that allows certain financial institutions and certain of their clients who are ECPs (as defined herein) to enter into foreign currency transactions (the "Platform");

WHEREAS, the Participating Financial Institution desires to (i) enable and allow it and certain of its clients who are ECPs to access and use the Platform, or (ii) provide pricing to the Platform, or (iii) do both, in each case all on the terms and conditions hereinafter set forth and as set forth in the applicable addendum or addenda hereto;

WHEREAS, the Provider and the Participating Financial Institution each believe it to be in its best interests to set forth herein the agreements reached between them as more particularly set forth hereinbelow;

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter set forth, the parties hereto, intending to be legally bound hereby, do hereby agree as follows:

## ARTICLE I -- DEFINITIONS AND CONSTRUCTION

Section 1.1.    **Certain Definitions.**    As used in this Agreement, the following terms have the respective meanings set forth below.

"Access Codes" means the user identification codes and passwords provided by the Provider to the Participating Financial Institution for use by the Participating

Financial Institution and, if the Participating Financial Institution has executed the Client Trading Addendum, its Clients.

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Aggregate Data" means the trading data provided by the Participating Financial Institution (and, if applicable, its Clients) and the Other Institutions (and their respective clients) to the Platform, in the aggregate, so long as such data, as disclosed by the Provider or the Platform, does not identify to a third-party viewer that the source of any such trading data is either the Participating Financial Institution or its Clients.

"Agreement" means this Participating Financial Institution Agreement, as it may be amended or modified by written agreement of the parties hereto from time to time, and all exhibits, schedules and addenda (if such addenda are executed by both the Participating Financial Institution and the Provider) hereto.

"Business Day" means any day on which commercial banks in the City of New York are generally open for business (other than a Saturday or Sunday).

"Client" means, if the Participating Financial Institution has executed the Client Trading Addendum, a client of the Participating Financial Institution which the Participating Financial Institution has authorized in writing to trade on the Platform in the Participating Financial Institution's name.

"Client Trading Addendum" means the Client Trading Addendum annexed hereto as Addendum 2, and, if executed by both the Participating Financial Institution and the Provider, made a part hereof.

"Currency" means the legal tender issued by and acceptable for the payment of obligations under the laws of a particular country.

"Currency Pair" means the two Currencies that comprise a foreign currency transaction subject to this Agreement.

"Data" means all material, information and data provided by Participating Financial Institution or otherwise relating to its transactions or applicable transactions (and if applicable, its Clients'), including without limitation, trading data, terms of transactions, and all account information accessed or provided by the Participating Financial Institution (and if applicable, its Clients), except for Aggregate Data.

"ECP" means an "eligible contract participant" as defined in Section 1a(12) of the U.S. Commodity Exchange Act, as amended, and the regulations promulgated by the Commodity Futures Trading Commission (CFTC) thereunder from time to time.

"Foreign Business Day" means, for a given Currency Pair, any day on which commercial banks are open for business (other than a Saturday or Sunday) in the capital of the country in which the lawful Currency is a Currency that is contained within that Currency Pairs.

"Governmental Authority" means any national, federal, state, provincial, county, municipal or local government, foreign or domestic, or the government of any political subdivision of any of the foregoing, or any entity, authority, agency, ministry or other similar body exercising executive, legislative, judicial, regulatory or administrative authority or functions of or pertaining to government, including any authority or other quasi-governmental entity established to perform any of such functions.

"Interface" means the software provided by the Provider to the Participating Financial Institution and its Clients, and installed on the Participating Financial Institution's and its Clients' equipment, which allows the Participating Financial Institution and its Clients to access and use the Platform.

"Law" means all applicable laws, rules, regulations, judgments, decrees, treaties, ordinances, orders and rulings, of any Governmental Authority or self-regulatory organization, authority, agency or body, in each case which has jurisdiction over the Provider, the Participating Financial Institution, or their respective operations.

"Other Institution" means each of the financial institutions that has entered, or will enter, into a participating financial institution agreement (or the equivalent thereof in whatever form, but in all cases containing a provision substantially identical to Section 4.2(b) below) with Provider with respect to the use of the Platform by such institution and/or certain of its clients who are ECPs.

"Non-Disclosure Agreement" means the non-disclosure restrictions set forth in Exhibit B.

"Person" means an individual, partnership, limited partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust or joint venture, or a Governmental Authority or political subdivision thereof.

"PFI Covered Party" means the Participating Financial Institution, its Affiliates, their Clients and their respective Representatives.

"Price Provider Addendum" means the Price Provider Addendum annexed hereto as Addendum 1, and, if executed by both the Participating Financial Institution and the Provider, made a part hereof.

"Provider Covered Party" means the Provider, its Affiliates, and their respective Representatives.

"Representatives" means its stockholders, officers, directors, members, managers, partners, employees and agents.

-3-

"Trading Day" means any day that is both a Business Day and a Foreign Business Day, but shall not mean any holiday in any one or more of the United States of America, Japan, the United Kingdom, or any other country in Europe, on which banks and exchanges are required by law, regulation or government decree to be closed.

**Section 1.2.    Other Defined Terms.**    The following terms have the respective meanings set forth in the Section of this Agreement referenced below:

| Defined Term | Section |
|---|---|
| Aggregate Data | 6.4 |
| Covered Matters | 12.10 |
| Effective Date | Preamble |
| Fees | 5.1 |
| Force Majeure Event | 12.10 |
| Initial Term | 7.1 |
| Non-Disclosure Agreement | 8.1 |
| Operating Procedures | 3.1 |
| Participating Financial Institution | Preamble |
| Participating Financial Institution IP Rights | Client Trading Addendum |
| Platform | Recitals |
| Price Feed | Price Provider Addendum |
| Provider | Preamble |
| Provider IP Rights | 6.1 |
| Renewal Term | 7.1 |
| Term | 7.1 |
| User Agreement | Client Trading Addendum |

**Section 1.3.    References to Dollars.**    References to dollars or "$" in this Agreement or any Schedule or Exhibit hereto shall mean United States dollars, unless otherwise expressly provided.

**Section 1.4.    Interpretation.**    Unless otherwise indicated to the contrary herein by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole and not to any particular Section or paragraph hereof; (ii) words importing the masculine gender shall also include the feminine and neutral genders, and vice versa and (iii) words importing the singular shall also include the plural, and vice versa.

## ARTICLE II -- THE PLATFORM

**Section 2.1.    Functionality of the Platform.**    The Platform will reasonably facilitate foreign currency trading by the Participating Financial Institution and, if the Participating Financial Institution has executed the Client Trading Addendum, its Clients (each in the name of the Participating Financial Institution), and Other Institutions and certain of their clients who are ECPs (each in the name of the applicable Other Institution).    The Platform shall have such additional functionality as the Provider shall determine is necessary or desirable to the operation of the Platform.

-4-

**Section 2.2.    Permissioning.**    The Platform will enable Participating Financial Institution to limit the foreign exchange transactions that can be initiated by each Client using Participating Financial Institution as principal through the Platform, including without limitation, with respect to pertinent credit limits for each such Client and the types of transactions that may be entered into by the Client through the Platform using Participating Financial Institution as principal.

## ARTICLE III -- OPERATION OF THE PLATFORM

**Section 3.1.    Operating Procedures.**    Use of the Platform by the Participating Financial Institution and, if applicable, its Clients, shall be subject to any written guidelines provided by the Provider to the Participating Financial Institution and Clients by posting on the Provider's website (which posting shall contain the date of the last revision thereto) (as amended from time to time by the Provider and so posted on the Provider's website, the "Operating Procedures"). The version of the Operating Procedures as in effect on the Effective Date is annexed hereto as Exhibit A. In the event of any inconsistency between this Agreement and the Operating Procedures, the Agreement shall prevail. The Provider shall have the right, at any time, to amend the provisions of the Operating Procedures upon thirty (30) days prior posting on the Provider's website (which posting shall contain the date of the last revision thereto); provided, however, that any amendment to the Operating Procedures may be made effective immediately upon posting to the Provider's website, where appropriate in the Provider's determination, (i) to permit the Platform and/or the Provider to comply with any Law; or (ii) to facilitate the continued and proper operation of the Platform without performance interruption or degradation.

**Section 3.2.    Training.**    During the Initial Term, the Provider shall provide a reasonable level of telephonic training, and, upon special request, in-person training, to authorized personnel of the Participating Financial Institution with respect to the use of the Platform and the Interface. The Participating Financial Institution shall pay to or reimburse the Provider for reasonable and pre-approved (in writing) travel, lodging and meal costs and expenses incurred by the Provider and its (or its Affiliates') personnel in conducting in-person training of the Participating Financial Institution's personnel, provided that the Provider has: (i) delivered to the Participating Financial Institution a reasonably detailed report of such costs and expenses; and (ii) submitted supporting documentation, in form reasonably satisfactory to the Participating Financial Institution, for such costs and expenses.

**Section 3.3.    Technical Support.**    The Provider shall provide a reasonable level of help desk support to the Participating Financial Institution during normal trading hours.

**Section 3.4.    Platform Maintenance.**    The Provider shall perform scheduled maintenance on the Platform with advance electronic notice at least 1 day in advance (which notice may consist of a posting of the times of scheduled maintenance on the Provider's website) to the Participating Financial Institution and shall perform unscheduled maintenance at such times as shall be reasonably necessary, in the Provider's sole determination, to maintain the Platform in good working order and to otherwise facilitate the proper performance of the Platform.

-5-

**Section 3.5.    Suspension or Limitation of System or Information.** Notwithstanding any other provision of this Agreement, the Provider shall have the right to restrict access to, or to impose limits or suspend trading or transactions on, the Platform, either generally or in respect of specific Currency Pairs, transactions or users, or to discontinue transmitting any or all information, or to refuse to facilitate or process any or all transactions, if in the Provider's sole good faith determination any of the following circumstances occurs: (i) full or partial Platform failure, including failure of the technology constituting the Platform or any of the communications links within the Platform, or between the Platform and the Participating Financial Institution, any Other Institution or any other user, or any other circumstance where it is not practicable for the Provider to provide the Platform; (ii) a breach of Platform security; (iii) a material breach by the Participating Financial Institution of its obligations under this Agreement, or of the Operating Procedures; (iv) in order to comply with Law; or (v) if market conditions generally, or conditions with respect to a particular Currency Pair or Currency, render it necessary or desirable, in the Provider's sole determination, to do so. Any actions taken by the Provider pursuant to this Section 3.5 shall continue for such time as the Provider shall reasonably determine to be necessary or desirable. The Participating Financial Institution agrees that (x) it shall be a material breach of this Agreement to evade, or attempt to evade, any suspension, restriction or limitation imposed under this Section 3.5; and (y) the Provider shall not be obligated to take any action permitted under this Section 3.5. In event of any such restriction, limitation or suspension, Provider shall promptly notify Participating Financial Institution in writing with respect to the reason(s) underlying such restriction, limitation or suspension.

**Section 3.6.    Control of the Platform.** The Provider shall have sole discretion and control over, and the right to modify at any time, the Platform's functionality, configuration, appearance and content, including without limitation: (i) the parameters and protocols by which orders are placed, routed, matched or otherwise processed by the Platform; and (ii) the availability of the Platform with respect to particular Currency Pairs or transactions at any particular places, times or locations. Provider will make commercially reasonable efforts to give Participating Financial Institution reasonable prior written notice of any such changes.

**Section 3.7.    Limited Licenses.** Subject to the terms and conditions of this Agreement and the Operating Procedures, Provider hereby grants to the Participating Financial Institution a revocable, worldwide, non-exclusive, non-transferable, license to access and use the Platform, and to use the Interface, during the Term, for purposes consistent with the terms of this Agreement.

**Section 3.8**    [Deleted]

**Section 3.9.    Security and Fraud.** Without limitation of Section 4.4, Provider shall continuously monitor the Platform for, and take all reasonable steps to prevent, fraud and breaches of security. Upon learning of or suspecting any such fraud or breach affecting or which is likely to affect the Participating Financial Institution's (or the Clients'), Provider shall promptly notify Participating Financial Institution's (or the applicable Clients) thereof, and take all reasonable steps to remedy the situation and take any other reasonable action requested by Participating Financial Institution.

-6-

## ARTICLE IV -- OBLIGATIONS OF THE PARTICIPATING FINANCIAL INSTITUTION

**Section 4.1.    Equipment.**  The Participating Financial Institution shall be solely responsible for the purchase or lease, installation, maintenance, and performance of all remote terminal equipment, and all software resident thereon, necessary for Participating Financial Institution to access, or desirable for Participating Financial Institution to access, the Platform over the Internet and to use the Platform.  The Participating Financial Institution will consult with the Provider to determine the minimum hardware/software configuration necessary to access and use the Platform.  The Participating Financial Institution shall be solely responsible for establishing and maintaining the telecommunications and/or data network lines and equipment necessary to transmit data between the Participating Financial Institution's terminal equipment and the Platform.

**Section 4.2.    Transmission of Information.**

(a)    In connection with the use of the Platform by the Participating Financial Institution and, if applicable, its Clients, the operation of the Platform (including the matching of bids and offers submitted to the Platform by the Participating Financial Institution and the formation of transactions with respect thereto) shall be based on (i) all bids, offers, orders, commands a nd o ther i nput i nformation r eceived from P articipating Financial Institution o r, i f applicable, its Clients, and accompanied by a valid Access Code, in the form in which such information is received by the Platform; and (ii) transaction confirmations sent to the Participating Financial Institution or, if applicable, its Clients, by the Platform reflecting transactions based on information received from the Participating Financial Institution or, if applicable, its Clients, accompanied by a valid Access Code, in the form in which such confirmations are sent out by the Platform; in each case regardless of whether or not (A) such bids, offers, other orders or commands or other input information were authorized by the Participating F inancial I nstitution or, if applicable, its Clients; (B) such i nformation had been altered or corrupted (electronically or otherwise) prior to reaching the Platform; and (C) such transaction confirmations are altered or corrupted (electronically or otherwise) after being transmitted from the Platform.  The Provider shall not be responsible for any loss, corruption or modification of information submitted to or sent by the Platform, unless resulting from Provider's gross negligence or willful misconduct.

(b)    Neither the Provider nor any Other Institution (solely with respect to information submitted by the Participating Financial Institution or its Clients) shall have any duty to verify whether any information submitted to the Platform accompanied by a valid Access Code issued to the Participating Financial Institution or any Other Institution was authorized by the Participating Financial Institution (or, if applicable, its Clients) or such Other Institution (or its clients).   Any transactions executed on the Platform between the Participating Financial Institution and an Other Institution, whether or not initiated by a Client, shall be on a principal to principal basis, and shall be valid and binding with respect to such Participating Financial Institution a nd s uch O ther Institution i n a ccordance w ith t he t erms e xecuted o n t he P latform, except to the extent that the transaction is affected due to Provider's negligence or breach of this Agreement.. This Section 2(b) shall be subject to Sections 3.9, 4.2(c) and 11.1.

**Section 4.3.    Compliance with Applicable Laws and Operating Procedures.** Access to and use of the Platform by the Participating Financial Institution and, if applicable, its Clients, shall b e s ubject t o c ompliance b y t he P articipating F inancial Institution a nd, i f applicable, i ts Clients, with all Law and the Operating Procedures.  At all times during the Term, the Participating Financial Institution shall be deemed hereby to represent and warrant to the Provider that its access to and use of the Platform, complies in all respects with this Agreement, the O perating P rocedures a nd a ll L aw.  T he P articipating F inancial Institution s hall b e s olely responsible for maintaining any records of transactions required to be maintained by Participating Financial Institution under Law, or any agreement to which the Participating Financial Institution is a party or by which it is bound.

**Section 4.4.    Access Codes and Security.** The Provider shall provide the Participating Financial Institution with Access Codes to be used only by authorized personnel of the Participating Financial Institution and, if applicable, authorized Clients.  The Participating Financial Institution shall promptly notify the Provider as soon as the Participating Financial Institution becomes aware of any unauthorized use or misuse of the Platform or the Access Codes.  Upon receipt of such notice, if the Provider reasonably believes that the Participating Financial Institution or, if applicable, any of its Clients (or any of their respective employees or agents) or any other Person acting through the Participating Financial Institution's or, if applicable, its Clients' facilities, is breaching the Platform's security, using the Platform without due authority, or using the Platform in a manner that is not in the best interests of the participants therein g enerally, or otherwise misusing the Platform, the Provider shall take any action as it may reasonably deem necessary to prevent the Participating Financial Institution, or, as appropriate and if applicable, its Client, or any such employee, agent or other Person, from accessing or using the Platform until such time as (in the Provider's good faith determination) such breach, unauthorized use or misuse is no longer continuing or will no longer continue.  The Participating Financial Institution shall take all measures reasonable under the circumstances to rectify such breach, use, unauthorized use, or misuse, whether requested by the Provider or not, including immediately ceasing to access or use the Platform, or, if applicable, requiring its Client(s) to immediately cease accessing or using the Platform.  The Provider shall not be liable for any breach of Platform security or for any losses of the Participating Financial Institution or, if applicable, its Clients arising therefrom, except to the extent resulting from Provider's gross negligence or breach of this Agreement.

**Section 4.5.    Risk of Transactions.**    The Participating Financial Institution acknowledges and agrees that (i) the Provider shall not, directly or indirectly, be a principal to any transaction or be responsible for, or otherwise guarantee, the performance of any transaction entered into by the Participating Financial Institution or, if applicable, its Clients, via the Platform, and the Participating Financial Institution shall proceed solely against the Other Institution in any transaction executed via the Platform and not against the Provider to collect or recover any amounts owed to it or to enforce any of its rights in connection with, or as a result of, such transaction; (ii) neither the relationship between the Participating Financial Institution and the Provider, nor the services provided by the Provider hereunder, nor any other aspect of this Agreement shall give rise to any fiduciary or equitable duties on the part of the Provider; (iii) the Provider may receive fees from both the Participating Financial Institution and Other Institutions in respect of a transaction executed through the Platform; and (iv) the submitting or posting of any information to or on the Platform by the Provider or any Other Institution (or its

-8-

clients) shall not be deemed to be a recommendation by the Provider or any Other Institution (or its clients) that the Participating Financial Institution or, if applicable, any of its Clients, enter into any particular transaction or that any particular transaction is suitable or appropriate for the Participating Financial Institution or, if applicable, its Clients.

## ARTICLE V -- FEES

**Section 5.1.    Fees.**

(a)    The Participating Financial Institution shall pay to the Provider the fees (the "Fees") set forth on Schedule 5.1 hereto for each transaction executed via the Platform in which the Participating Financial Institution is a counterparty. No fees shall be payable by Participating Financial Institution for transactions initiated by Clients.

**Section 5.2.    Payment of Fees.**

(a)    All Fees, commissions and/or expense reimbursements payable by the Participating Financial Institution shall be payable in United States dollars.

(b)    The Provider shall deliver an electronic invoice to the Participating Financial Institution within ten (10) days of the end of each month during the Term (prorated on a thirty (30) day month for any period less than one month in duration for which Fees accrue) reporting the Fees, commissions and/or reimbursable expenses incurred with respect to all transactions executed by the Participating Financial Institution and, if applicable, its Clients during that month. Each month, Provider will prepare an invoice for each Client setting forth amounts owed by such Client ("Hotspot Fees") for such Client's use of the Platform to initiate transactions using Participating Financial Institution as principal. Participating Financial Institution will forward the invoice to the applicable Client within 14 days of Participating Financial Institution's receipt of such. Within 14 days of receiving Hotspot Fees from a Client, Participating Financial Institution will remit such to Provider. Amounts received by Participating Financial Institution from a particular Client shall be used first to satisfy sums owed by such Client to Participating Financial Institution, unless the sums are clearly designated by the Client to satisfy its obligations to Provider. Under no circumstances shall Participating Financial Institution have any liability for a Client's failure to pay Hotspot Fees on a timely basis or failure to pay Hotspot Fees at all.

(c)    The Participating Financial Institution shall pay all amounts due hereunder via electronic funds transfer to an account designated by the Provider.

**Section 5.3.    Taxes.** The Participating Financial Institution shall pay on a timely basis to the appropriate Governmental Authority all taxes, levies or charges (other than taxes based on the Provider's net income or personnel) imposed by any Governmental Authority of any kind whatsoever with respect to the Fees paid to or owing to the Provider and the transactions executed by the Participating Financial Institution via the Platform, except that neither Participating Financial Institution shall be liable for taxes based on Hotspot Fees payable by Clients or otherwise based on Provider's corporate franchise or revenues.

## ARTICLE VI -- OWNERSHIP OF INTELLECTUAL PROPERTY AND INFORMATION

**Section 6.1.   Ownership.**   The Participating Financial Institution acknowledges and agrees that the Provider is the sole owner (except to the extent owned by third party licensors) of all right, title and interest in and to the Platform and each component thereof (including, without limitation, the Interface) and all intellectual property and proprietary rights with respect thereto, including, without limitation: patent, copyright, trade secret, trademark and other proprietary rights, in and to the Platform and each component thereof (including, without limitation, the Interface), and to all modifications made by Provider or Provider's agents, including custom modifications, t o t he P latform a nd e ach component t hereof ( including, without l imitation, t he Interface), and any know-how, techniques, methodologies, equipment or processes used by the Provider; the look and feel of the Platform and each component thereof (including, without limitation, the Interface) and all of the Provider's websites; all software (front- and back-end), all registered trademarks, trademark applications, trademarks and service marks, tradenames, URL registrations and all pricing information which is not Data (all of which, collectively, the "Provider IP Rights"). The Participating Financial Institution shall not obtain any intellectual property rights in or to the Provider IP Rights nor to pricing information (other than Data) with respect to the Other Institutions. The Participating Financial Institution shall take all reasonable steps consistent with the Non-Disclosure Agreement to maintain the confidentiality of all documents and material provided by the Provider, its Affiliates or third party providers with respect to the Platform and each component thereof (including, without limitation, the Interface). The Participating Financial Institution shall not (i) alter, maintain, enhance or otherwise modify the Interface or the Platform; or (ii) disassemble, decompile or reverse-engineer the Interface or the Platform; nor (iii) otherwise take express action using the Interface or Platform to discover the equivalent of the Interface or the Platform.

**Section 6.2.   Other Participant's Information.**   Neither the Participating Financial Institution nor, if applicable, its Clients, shall have access to any list or other personally identifiable information with respect to the identity or trading history of the clients of any Other Institution. Neither a ny Other I nstitution nor its clients shall have a ccess to any list or other personally identifiable information with respect to the identity or trading history of the Participating Financial Institution's clients.

**Section 6.3.   The Participating Financial Institution's Client Information.**   If the Participating Financial Institution has executed the Client Trading Addendum, then the Provider shall use information regarding the specific identity of the Participating Financial Institution's Clients only for purposes of processing transactions on the Platform. Notwithstanding anything to the contrary in this Agreement, the Provider may (i) monitor the Participating Financial Institution's and, if applicable, its Clients' use of the Platform and use the information acquired thereby for purposes of processing transactions on the Platform; (ii) use the Aggregate Data (as defined below) to promote the Platform; and (iii) provide to any Governmental Authority or self-regulatory agency or authority any information or documents regarding the Participating Financial Institution's or, if applicable, its Client's transactions, as required by Law, provided unless prohibited by Law, the Provider shall give prior notice to the Participating Financial Institution of any such disclosure to any Governmental Authority or self-regulatory agency or authority and the reasons thereof.

**Section 6.4.    Data and Aggregate Data.**  Notwithstanding Section 6.1, as between the parties, the Participating Financial Institution owns all right, title and interest in and to all Data. Provider shall be permitted to use the Data only for purposes of processing transactions on the Platform and it may also provide Data to any Governmental Authority or self-regulatory agency or authority any Data, as required by Law, provided that where reasonably practicable and appropriate, the Provider shall give prior notice to the Participating Financial Institution of any such disclosure to any Governmental Authority or self-regulatory agency or authority and the reasons thereof. Notwithstanding the foregoing, Provider is the owner of the Aggregate Data and reserves the right to manipulate, use, license (to Affiliates of the Provider and to other Persons) and sublicense the Aggregate Data, in its sole discretion.    Upon Participating Financial Institution's request during the Term and five (5) years later, Provider shall provide Participating Financial Institution with copies of all Records (as defined below) in Provider's possession or control. Provider shall retain all trading information ("Records") for a period of at least five (5) years from the date of receipt or creation, as the case may be.

**Section 6.5    Participating Financial Institution IP Rights.**    Notwithstanding anything to the contrary herein, Participating Financial Institution shall own all right, title and interest in and to all proprietary information, materials, methodologies, Participating Financial Institution Confidential Information (as defined below) or other proprietary items provided by Participating Financial Institution to Provider or accessed by Provider pursuant to this Agreement, any and all derivatives thereof, and all intellectual property rights therein and thereto (collectively, "Participating Financial Institution IP Rights"), provided that Participating Financial Institution IP Rights shall not include Aggregate Data. Participating Financial Institution grants Provider a non-exclusive license during the Term to use the Participating Financial Institution IP Rights solely as necessary for Provider to perform hereunder.

## ARTICLE VII -- TERM; TERMINATION

**Section 7.1.    Term; Termination for Convenience.**  This Agreement shall remain in effect from the Effective Date until the first (1st) anniversary of the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew on an annual basis for a one (1) year term (each, a "Renewal Term" and, collectively with the Initial Term, the "Term"). After the Initial Term, either of the Participating Financial Institution or the Provider shall have the right to terminate this Agreement, without cause, upon ninety (90) days' advance written notice to the other party.

**Section 7.2.    Termination for Cause.**

(a)    Either of the Participating Financial Institution or the Provider shall have the right to terminate this Agreement, whether during the Initial Term or during any Renewal Term immediately upon written notice to the other party, in the event of any action, application or proceeding taken in respect of the other party with respect to the bankruptcy or insolvency of the other party.

-11-

(b)      Each party shall have the right to terminate this Agreement, whether during the Initial Term or during any Renewal Term, upon thirty (30) days' prior written notice to the other party in the event of any material breach by the other party of this Agreement or in the Participating Financial Institution's case, the Operating Procedures, in either case that is not cured within such thirty (30) day period.

(c)      The Provider shall have the right to terminate this Agreement, whether during the Initial Term or during any Renewal Term, immediately upon notice to the Participating Financial Institution: (i) upon the occurrence of any event which would reasonably prevent the Provider from providing the Platform to users generally, including, without limitation, any termination of, default under, or failure to enter into an agreement between the Provider and any third party (other than an Affiliate) that is material to the operation of the Platform, any loss or potential loss of regulatory authorization or license, or any limitation on the Provider's right to license the use of the Platform to users (provided that in such event Provider shall refund any prepaid but unused fees); (ii) if the Participating Financial Institution has materially violated any Law in connection with its use of the Platform; (iii) if, as a result of the use or misuse of the Platform by the Participating Financial Institution, the Provider has suspended access to and use of the Platform in accordance with this Agreement and the Participating Financial Institution fails to cure the cause of the suspension to the reasonable satisfaction of Provider within fourteen (14) days of such suspension; (iv) if the Provider determines, in its sole discretion, that the security or normal operation of any part of the Platform has been compromised and cannot be promptly cured; or (v) if the Provider determines, in its sole discretion, that it shall for any reason cease providing the Platform to users generally.  In the event that Provider exercises its right to terminate this Agreement under this subsection (c), it shall do so without any liability to the Participating Financial Institution or any of its Clients, provided Provider satisfies its post-termination obligations as expressly set forth herein.

**Section 7.3.    Effect of Termination.**    Termination of this Agreement shall not terminate or otherwise modify either party's obligations with respect to any liability or matter arising out of the use or provision of the Platform, or any transaction executed via the Platform by the Participating Financial Institution or, if applicable, any of its Clients, prior to such termination.  Upon such termination, (i) the Participating Financial Institution shall pay all Fees due or accrued to the Provider under this Agreement prior to such termination and shall promptly return t o t he P rovider a ll P rovider C onfidential I nformation ( including, without l imitation, a ll copies of the Interface), and (ii) Provider shall promptly return to the Participating Financial Institution all materials and documents reasonably available to Provider relating to the Data, but not the Data, except that in either case (i) or (ii), the party may retain a copy of the materials for regulatory and legal purposes.

## ARTICLE VIII -- CONFIDENTIALITY

**Section 8.1.    Non-Disclosure Agreement.**  Each party shall comply with the non-disclosure restrictions set forth in Exhibit B hereto.

**Section 8.2.    Compliance with Privacy Laws.**  Provider shall comply with any and all applicable Law governing or relating to privacy rights.

**Section 8.3** __Security.__ Provider shall maintain, and shall require all third parties to which it discloses Participating Financial Institution (and if applicable, Clients') Confidential Information of this Agreement to maintain, effective information security measures to protect such Confidential Information from unauthorized disclosure or use, in accordance with acceptable standards of normal market precautions.

## ARTICLE IX -- REPRESENTATIONS AND WARRANTIES

**Section 9.1.** __Representations and Warranties of the Provider.__ The Provider hereby represents and warrants to the Participating Financial Institution that:

(i)     it has the power and authority to execute, deliver and perform this Agreement; and

(ii)    upon due execution and delivery, this Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity;

(iii)   Provider will take reasonable precautions to insure that the Platform and Interface do not and will not contain any computer code, programs or programming devices (a) intentionally designed to disrupt, modify, delete, damage, deactivate, disable, harm or otherwise impede in any manner, including aesthetic disruptions or distortions, the operation of any other software, firmware, hardware, computer system or network (sometimes referred to as "Trojan horses," "viruses" or "worms"), (b) that would permit Provider to access the Participating Financial Institution's (or Client's) systems (sometimes referred to as "traps," "access codes" or "trap door" devices), or any other similar harmful, malicious or hidden procedures, routines or mechanisms that would cause such systems to cease functioning or to damage or corrupt data, storage media, programs, equipment or communications, or otherwise interfere with operations (collectively "Destructive Elements"). In the event of Provider's breach of this Section, Provider further agrees to use reasonable efforts to eliminate any and all Destructive Elements. ;

(iv)    Provider's provision of the Platform to Participating Financial Institution (and if applicable, the Clients), complies in all respects with this Agreement, the Operating Procedures and all Law.

(v)     The Platform and Interface, when used in accordance with user manuals and other documentation published by Provider (collectively, "Documentation"), will perform and provide functionality in accordance with such Documentation.

**Section 9.2.** __Representations and Warranties of the Participating Financial Institution.__ The Participating Financial Institution represents and warrants to the Provider that:

(i) it has the power and authority to execute, deliver and perform this Agreement; (ii) upon due execution and delivery, this Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except that such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity; (iii) its trading on the Platform does not and shall not violate any Law; and (iv) it is authorized to enter in the transactions entered into by it through the Platform and each of such transactions, as confirmed by the Platform, is the legal, valid and binding obligation of the Participating Financial Institution, enforceable against the Participating Financial Institution in accordance with its terms and the terms hereof.

## ARTICLE X -- DISCLAIMERS AND LIMITATION OF LIABILITY

**Section 10.1.  DISCLAIMERS.**  THE PARTICIPATING FINANCIAL INSTITUTION UNDERSTANDS AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED HEREIN, THE PLATFORM, ITS COMPONENTS, INTERFACES, ANY RELATED EQUIPMENT, ANY DOCUMENTATION AND OTHER MATERIALS ARE PROVIDED "AS IS". EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, EACH PARTY, ITS AFFILIATES, AND ANY THIRD PARTY PROVIDERS, SPECIFICALLY DISCLAIM, WITHOUT LIMITATION, ALL WARRANTIES OF ANY KIND TO THE OTHER PARTY, ITS CLIENTS AND OTHER THIRD PARTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT, OR THOSE WARRANTIES ARISING FROM A COURSE OF PERFORMANCE, A COURSE OF DEALING OR TRADE USAGE. NEITHER PARTY NOR ITS AFFILIATES MAKE ANY REPRESENTATION OR WARRANTY AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION ON THE PLATFORM OR AS TO THE RESULTS TO BE ATTAINED BY THE OTHER PARTY, ITS CLIENTS OR ANY THIRD PARTY FROM ACCESS TO OR USE OF THE PLATFORM. EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE PROVIDER, ITS AFFILIATES AND THIRD PARTY PROVIDERS, SHALL HAVE NO LIABILITY WHATSOEVER FOR ANY CLAIMS RELATING TO ANY SOFTWARE, ANY TECHNOLOGY, ANY EQUIPMENT, THE PLATFORM, ANY INFORMATION, MATERIALS, CURRENCY OR THAT THE PLATFORM MEETS THE PARTICIPATING FINANCIAL INSTITUTION'S OR ITS CLIENTS' REQUIREMENTS OR BE UNINTERRUPTED, TIMELY, SECURE, COMPLETE, ACCURATE OR FREE FROM ERRORS OR DEFECTS. THE PROVIDER DOES NOT MAKE ANY WARRANTY AS TO THE LIFE OF ANY URL GENERATED OR PUBLISHED.  THE PARTICIPATING FINANCIAL INSTITUTION ACKNOWLEDGES THAT, EXCEPT AS SET FORTH IN THE SERVICE SPECIFICATIONS OR DOCUMENTATION, CERTAIN SOFTWARE AND EQUIPMENT USED BY THE PARTICIPATING FINANCIAL INSTITUTION OR ITS CLIENTS MAY NOT BE CAPABLE OF SUPPORTING CERTAIN FEATURES OF THE PLATFORM. EACH PARTY HERETO HEREBY ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATIONS OR WARRANTIES MADE BY THE OTHER EXCEPT AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

Section 10.2. **Limitation of Liability.** The parties hereto acknowledge that the limitations set forth in this Section 10.2 are integral to the amount of Fees levied in connection with this Agreement, and that, were the Provider to assume any further liability other than as expressly set forth herein or as provided by law, such Fees would of necessity be set substantially higher. EACH PARTY UNDERSTANDS AND AGREES THAT IT, ITS AFFILIATES AND THIRD PARTY PROVIDERS (AND THE RESPECTIVE REPRESENTATIVES)) SHALL HAVE NO LIABILITY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFIT, LOST DATA, LOSS OF USE OF THE PLATFORM, BUSINESS INTERRUPTION, LOSS OF BUSINESS REPUTATION OR GOODWILL, COSTS OF SUBSTITUTE SERVICES, OR DOWNTIME COSTS) SUFFERED BY THE OTHER PARTY, ITS AFFILIATES, THIRD PARTY PROVIDERS AND REPRESENTATIVES, EVEN IF THE OTHER PARTY, ITS AFFILIATES, THIRD PARTY PROVIDERS AND REPRESENTATIVES HAVE BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE. **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, THE AGGREGATE LIABILITY OF EACH OF THE PROVIDER OR PARTICIPATING FINANCIAL INSTITUTION AND ITS RESPECTIVE AFFILIATES (AND THEIR REPRESENTATIVES) FOR DAMAGES FOR ANY CAUSE WHATSOEVER RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE PLATFORM, AND REGARDLESS OF THE FORM OF ACTION, SHALL BE LIMITED TO THE AMOUNT OF FEES ACTUALLY PAID BY THE PARTICIPATING FINANCIAL INSTITUTION AND CLIENTS TO THE PROVIDER DURING THE NINE (9) MONTHS PRIOR TO THE EVENT GIVING RISE TO SUCH DAMAGES. THE LIMITATIONS OF LIABILITY SET FORTH IN THIS SECTION SHALL NOT APPLY TO INDEMNITY OBLIGATIONS, BREACHES OF NON-DISCLOSURE OBLIGATIONS, AND TO DAMAGES CAUSED BY WILLFUL CONDUCT OR GROSS NEGLIGENCE.**

Section 10.3. **ADDITIONAL LIMITATIONS.** EXCEPT IN THE EVENT OF GROSS NEGLIGENCE, FRAUD OR WILLFUL MISCONDUCT, THE PROVIDER SHALL HAVE NO LIABILITY TO THE PARTICIPATING FINANCIAL INSTITUTION OR ITS CLIENTS IN CONNECTION WITH THE FAILURE BY ANY OTHER INSTITUTION TO A TRANSACTION ENTERED INTO BY THE PARTICIPATING FINANCIAL INSTITUTION OR ITS CLIENTS TO PERFORM SUCH TRANSACTION OR THE FAILURE OF ANY OTHER INSTITUTION OR ITS CLIENTS OR OTHER USERS TO COMPLY WITH THE OPERATING PROCEDURES OR ITS AGREEMENTS WITH THE PROVIDER REGARDING ACCESS TO OR USE OF THE PLATFORM.

**ARTICLE XI -- INDEMNIFICATION**

Section 11.1 **Indemnification by Provider.** The Provider agrees to defend, hold harmless and indemnify each PFI Covered Party from and against any claim, suit or proceeding brought by a third party against such PFI Covered Party to the extent that such claim, suit or proceeding is based on a claim: (i) that the Platform or Interface infringes any copyright, trade secret, trademark, service mark or registered patent of a third party; or (ii) which arises or results, directly or indirectly, from the provision of the Platform and/or Interface by Provider in breach

-15-

of this Agreement, or the provision of the Platform by Provider in a manner that violates Law, this Agreement or the Operating Procedures. With respect to each indemnified claim, the Provider shall pay all costs incurred by (including reasonable attorneys fees and disbursements) and damages awarded against a PFI Covered Party or any settlement with respect to such third-party claim, suit or proceeding, but shall not be responsible in any way for any compromise or settlement made without the Provider's consent. Such indemnity, however, specifically excludes any such claims, suits or proceedings (or portions thereof) to the extent they arise or result, directly or indirectly, from the use of the Platform by the Participating Financial Institution or its Clients in breach of this Agreement, or the use of the Platform by Participating Financial Institution or its Client in a manner that violates Law, this Agreement, the Operating Procedures or in a manner for which the Platform was neither designed or contemplated, provided that no infringement would have occurred absent such use in violation of Law, this Agreement, the Operating Procedures or in a manner for which the platform was neither designed or contemplated. Such indemnity also specifically excludes any such claims, suits or proceedings to the extent they arise or result from (i) unauthorized alteration of the Platform by the Participating Financial Institution, provided that no infringement would have occurred absent such alteration or (ii) use of the Platform by Participating Financial Institution in combination with apparatus, hardware, software or services not provided, authorized or furnished by the Provider, provided that no infringement would have occurred absent such combination. The PFI Covered Party seeking indemnification under this <u>Section 11.1</u> shall promptly notify the Provider in writing of any claim, suit or proceeding that the Provider may have obligations under this <u>Section 11.1</u>, provided, however, that any failure of the PFI Covered Party to provide prompt written notice pursuant to this <u>Section 11.1</u> shall excuse the Provider only to the extent that it is prejudiced thereby. The PFI Covered Party seeking indemnification hereunder shall reasonably cooperate with the Provider at Provider's expense with regard to the defense of any claim, proceeding, suit or threatened suit. The Provider shall have full control of any such claim, proceeding or suit and the authority to settle or otherwise dispose of any suit or threatened suit. In no event, however, may the Provider agree to any settlement of any claim, suit or proceeding for which it has agreed to provide indemnification under this Agreement if such settlement would impose any liability or obligation upon the PFI Covered Party, without the PFI Covered Party's prior written consent. Notwithstanding the foregoing, a PFI Covered Party may participate in the defense of an indemnified claim at its own expense. Upon written notice of a third-party claim that the Platform is infringing a third party's copyright, trade secret or registered patent, the Provider may, but is not obligated to (i) modify or replace the Platform to make it non-infringing; (ii) procure any rights from any Person necessary to offer the Platform; or (iii) terminate providing the Platform (but only if alternatives (i) or (ii) are not commercially reasonable), in full satisfaction of its obligations under this <u>Section 11.1</u>.

       **Section 11.2. <u>Indemnification by Participating Financial Institution</u>.** The Participating Financial Institution agrees to defend, hold harmless and indemnify each Provider Covered Party from and against any claim, suit or proceeding brought by a third party against such Provider Covered Party to the extent that it is based on a claim arising, directly or indirectly, out of the Participating Financial Institution's trading (through a Client or otherwise) on the Platform, or any other trade or transaction involving the Participating Financial Institution, and the Participating Financial Institution shall pay all costs incurred by (including reasonable attorneys fees and disbursements) and damages awarded against the Provider Covered Party or any settlement, but shall not be responsible for any compromise or settlement

made without the Participating Financial Institution consent. Such indemnity, however, specifically excludes any such claims, suits or proceedings (or portions thereof) which arise or result, directly or indirectly, from the provision of the Platform and/or Interface by Provider in breach of this Agreement, or the provision of the Platform by Provider in a manner that violates Law, this Agreement or the Operating Procedures, provided that no claim would have occurred absent such provision in violation of Law, this Agreement or the Operating Procedures. The Provider Covered Party seeking indemnification under this <u>Section 11.2</u> shall promptly notify the Participating Financial Institution in writing of any claim, suit or proceeding that the Participating Financial Institution may have obligations under this <u>Section 11.2</u>, provided, however, that any failure of the Provider Covered Party to provide prompt written notice pursuant to this <u>Section 11.2</u> shall excuse the Participating Financial Institution only to the extent that it is prejudiced thereby. The Provider Covered Party seeking indemnification hereunder shall reasonably cooperate with the Participating Financial Institution at the Participating Financial Institution's expense with regard to the defense of any claim, proceeding, suit or threatened suit. The Participating Financial Institution shall have full control of any such claim, proceeding or suit and the authority to settle or otherwise dispose of any suit or threatened suit. Notwithstanding the foregoing, a Provider Covered Party may participate in the defense of an indemnified claim at the Provider's expense. In no event, however, may the Participating Financial Institution agree to any settlement of any claim, suit or proceeding for which it has agreed to provide indemnification under this Agreement if such settlement would impose any liability or obligation upon the Provider Covered Party, without the Provider Covered Party's prior written consent.

## ARTICLE XII -- MISCELLANEOUS

**Section 12.1. <u>Force Majeure</u>.** In the event that either the Participating Financial Institution or the Provider is unable to perform any of its obligations under this Agreement or to enjoy any of its benefits because of reasons outside its reasonable control (a "<u>Force Majeure Event</u>"), the party who has been so affected shall give notice immediately to the other party and shall use its best efforts to resume performance hereunder. Examples of a Force Majeure Event may include the following, to the extent reasonably outside the non-performing party's control: a natural disaster, act of war, act of terrorism, actions or decrees of Governmental Authorities, communications line failure, computer hackers or other events not the fault of the affected party. Neither party shall be liable for any failure or delay in the performance of any of their respective obligations due to a Force Majeure Event. Failure to meet due dates or time schedules resulting from a Force Majeure Event shall extend the due dates or time schedules for reasonable periods of time as determined by the parties in good faith. Notwithstanding the foregoing, in the event a party is prevented from performing for more than fifteen (15) days due to a Force Majeure Event, the other party shall be permitted to terminate this Agreement on written notice to the non-performing party, and in such event, Provider shall refund to Participating Financial Institution any prepaid fees for unused services.

**Section 12.2. <u>Notices</u>.** Except as expressly provided herein, all notices or other communications required or permitted hereunder shall be in writing and shall be delivered personally, sent by certified, registered or express air mail, postage prepaid, or sent by overnight courier and shall be deemed given (i) when so delivered personally, (ii) if mailed, sent by overnight courier, or sent electronically, upon actual receipt, (x) if to the Provider, at the address

set forth in the preamble hereof, with a courtesy copy to Edward M. Zimmerman, Esq., Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, and (y) if to the Participating Financial Institution, at the address set forth in the preamble hereof, with a courtesy copy to Lehman Brothers, 745 Seventh Avenue, New York, New York 10019 Attention: Jonathan D. Williams, with a copy to Lehman Brothers, 745 Seventh Avenue, New York, New York 10019 Attention: General Counsel.

**Section 12.3.  Survival of Certain Sections.**  Articles I, VI, VIII, X, XI and XII and Sections 3.6, 5.2, 5.3 and 7.3 of the Agreement shall survive the expiration, termination and/or completion of this Agreement.

**Section 12.4.  Assignment.**  Except as set forth in this Section 12.4, neither the Provider nor the Participating Financial Institution shall assign this agreement, by operation of law or otherwise, without the other party's prior, written consent, and any attempted assignment in violation of this Section 12.4 shall be null and void. Notwithstanding the preceding sentence, the Provider may consolidate or amalgamate with another Person, merge with or into another Person, transfer all or substantially all of its assets or business to another Person, or the Provider's owners may s ell a majority o f t he e quity interests of the Provider to a third-party. Nothing in this Agreement shall be deemed to restrict or limit the ability of the Provider's successor by merger, the transfer of all or substantially all of the Provider's assets or the transferee o f a m ajority of t he e quity se curities of t he P rovider f rom h aving a ccess, a fter t he consummation of such transactions(s), to any information or data with respect to the Platform and the trading history thereof of any Person. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors, permitted assigns and legal representatives. This Agreement shall be for the sole benefit of the parties to this Agreement and their respective successors, permitted assigns and legal representatives and, except as set forth in Section 4.2, is not intended, nor shall it be construed, to give any Person, other than the parties hereto and their respective successors, permitted assigns and legal representatives, any legal or equitable right, remedy or claim hereunder.

**Section 12.5.  Independent Contractors.**  The parties to this Agreement are independent contractors. Neither party is an agent, representative or partner of the other party. Neither p arty s hall h ave a ny r ight, p ower o r authority t o enter i nto a ny agreement f or, o r o n behalf of, or incur any obligation or liability of, or to otherwise bind, the other party. This Agreement shall not be interpreted or construed to create an association, agency, joint venture or partnership between the parties or to impose any liability attributable to such a relationship upon either party. Neither party will make any representations or warranties about the other, or the business of the other, in any contract or agreement without the other party's prior written consent.

**Section 12.6.  Amendments and Modification; Waiver.**  This Agreement may only be amended or modified in writing signed by the party against whom enforcement of such amendment or modification is sought. Any of the terms or conditions of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof, but only by a writing signed by the party or parties waiving such terms or conditions; provided, however, that no such written waiver, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provision being waived and no such waiver in any instance

shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. All shrinkwrap and clickwrap licenses that purport to govern the terms of use of any software licensed, or service provided, by Provider to Participating Financial Institution pursuant to this Agreement or otherwise shall be void.

Section 12.7. <u>Severability</u>. The invalidity of any portion hereof shall not affect the validity, force or effect of the remaining portions hereof. If it is ever held that any restriction hereunder is too broad to permit enforcement of such restriction to its fullest extent, such restriction shall be enforced to the maximum extent permitted by Law.

Section 12.8. <u>Injunctive Relief</u>. In the event of a violation or threatened violation of Articles VI or VIII hereof, or the violation or threatened violation of a party's intellectual property rights with respect to the Platform or a party's proprietary information, the non-violating party shall have the right, in addition to such other remedies as may be available pursuant to Law or this Agreement, to seek injunctive (including preliminary and permanent injunctions and temporary restraining orders) or declaratory relief enjoining such act or threatened act. Each party acknowledges that legal remedies for such violation or threatened violation are inadequate.

Section 12.9. <u>Confidentiality of Terms of This Agreement</u>. Subject to Article VIII, each party shall be entitled to disclose the existence of this Agreement, but agrees that the financial terms of this Agreement shall be treated as confidential and shall not be disclosed to any third party; <u>provided</u>, <u>however</u>, that each party may disclose the financial terms of this Agreement to the extent: (i) required by a court or other governmental authority or otherwise as required by Law; and (ii) to its legal counsel, accountants, banks and other financing sources and their advisors; or (iii) in connection with an actual or proposed merger or acquisition involving such party. Further, Participating Financial Institution may disclose the fee arrangement between Participating Financial Institution and Provider by providing a client or potential client the fee description attached hereto.

Section 12.10. <u>Governing Law; Jurisdiction; Venue</u>. This Agreement and all matters arising herefrom or with respect hereto or from or with respect to the use of the Platform by the Participating Financial Institution or its Clients, including, without limitation, tort claims (the "Covered Matters") shall be governed by, and construed in accordance with, the internal laws of the State of New York, without reference to the choice of law principles thereof. Each of the parties hereto irrevocably submits to the co-exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York for the purpose of any suit, action, proceeding or judgment relating to or arising out of the Covered Matters. Service of process in connection with any such suit, action or proceeding may be served on each party hereto anywhere in the world by the same methods as are specified for the giving of notices under this Agreement. Each of the parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court. Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

**Section 12.11. Entire Agreement.** This Agreement and the Schedules and Exhibits and Addenda hereto (to the extent signed by both parties), constitute the entire agreement between the parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings between them with respect to such matters.

**Section 12.12. Titles and Headings.** The headings and table of contents in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

**Section 12.13. Counterparts.** This Agreement may be executed in counterparts, in original or by facsimile, each of which shall be deemed an original agreement, but all of which together shall constitute one and the same instrument.

**Section 12.14. No Strict Construction.** The parties hereto acknowledge that this Agreement has been prepared jointly by the parties hereto and their respective counsel, and shall not be strictly construed against either party.

**Section 12.15.  No publicity.** Provider shall not use the names or marks, refer to, or identify "Lehman Brothers" or any Participating Financial Institution entity in formal publicity releases, interviews, promotional or marketing materials, announcements, testimonials or advertising without Participating Financial Institution's prior written consent in each instance. Notwithstanding, Hotspot may identify Lehman Brothers in a list of available brokers with Lehman's prior written approval in each instance.

**Section 12.16.  Insurance.** I nsurance.   Provider shall obtain and maintain insurance including but not limited to  $2,000,000 umbrella liability.   Each such insurance policy shall be maintained by an insurer having a rating of at least an "A-" in the most currently available A.M. Best's Insurance Reports. At Lehman Brothers's request, Provider shall furnish Lehman Brothers with certificates of insurance evidencing compliance with these provisions.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

LEHMAN BROTHERS
COMMERCIAL CORPORATION


By: _____
Name: Jonathan D. Williams
Title: ~~Senior Vice~~ President
Date:

HOTSPOT FXi, L.L.C.


By: _____
Name: Steven Reich
Title: MD

-20-

**SCHEDULE 5.1**

**FEES**

No fees or other amounts shall be payable by Lehman under this Agreement.  Fees and other sums payable by Clients are discussed in Section 10(d) of Annex II.

**EXHIBIT A**

**OPERATING PROCEDURES IN EFFECT AS OF THE EFFECTIVE DATE**

*(see attached)*

# HOTSPOT FXi, L.L.C.

## PLATFORM OPERATING PROCEDURES

RELEASE DATE: MAY 1, 2004
EFFECTIVE DATE: JUNE 1, 2004, 2004
VERSION 1.00

1.    *Privacy Policy*.  The privacy policy of Hotspot FXi, L.L.C. appears at http://www.hotspotfxi.com/privacy/index.jsp and is incorporated into these operating procedures by reference thereto.

2.    *Obligation of Credit Providers to Maintain the Confidentiality of Trades* The following restrictions (in addition to all of the restrictions set forth in the Participating Financial Institution's written agreements with Hotspot FXi, L.L.C.) shall apply to those Participating Financial Institutions that act as both a price provider and as a prime broker on the Hotspot FXi Platform:

(a)    The Participating Financial Institution shall be obligated to keep the identities of all prime brokerage client's confidential.  To the extent that a client of a Participating Financial Institution's prime brokerage business is trading on Hotspot FXi, the identity of that client and all details relating to its trading activities shall not be provided to or made available to any other party, including but not limited to that Participating Financial Institution's own trading desk.   For the purposes of these procedures, "identity" means the actual name of the client as well as any information that would allow a reasonably knowledgeable market participant to identify the client by its trading activities and/or style.

(b)    Should a client of the Participating Financial Institution trade on the price provided by the Participating Financial Institution, the trade will only be identified to the Participating Financial Institution as a prime brokerage trade without naming the client or using a 'code name'. Information about any trade executed by the client of the Participating Financial Institution with another financial institution on the Platform shall only be made available to the prime brokerage area of the Participating Financial Institution (and not to the trading desk of the Participating Financial Institution).

### 3. *Off Market Transactions Policy*

An " Off Market" transaction is defined as the execution on an order that was entered  at a price substantially away from, or inconsistent with, the prevailing market for that currency pair at the time of execution.

Hotspot FXi will review questionable transactions with the intent of preserving the integrity of the marketplace and facilitating a fair and orderly market and pursuant to this Policy and Guidelines.

A client's use of Hotspot FXi trading systems constitutes its executory acceptance of Hotspot FXi's right to modify or to cancel transactions in accordance with this Policy and Guidelines.

Notification of Clear Error

If a client receives an execution of an order that was entered in error (e.g. in terms of price or quantity), the client may contact Hotspot FXi [give number] and request that the transaction be reviewed pursuant to the Off Market Transactions Policy.

Clients should submit requests to review transactions within 20 minutes of execution of such transaction. Requests received after such time period may be reviewed depending on the facts and circumstances surrounding such request, however, Hotspot FXi reserves the right to decline to review any request submitted more than 20 minutes after execution.

Transaction Reviews Initiated by Hotspot FXi

Hotspot FXi reserves the right to initiate a review of a transaction, regardless of whether or not a client request has been submitted, if it determines in its sole discretion that circumstances warrant such a review. In such instances, Hotspot FXi will notify clients that a transaction will be reviewed pursuant to the Off Market Transactions Policy.

Adjudicating Transactions

Hotspot FXi will use its good faith efforts to contact each of the participating financial institution(s)/client(s) party to an Off-Market Transaction. Hotspot FXi will review data reasonably available to it to determine where the "correct" price for the applicable currency pair was at the time of the Off Market transaction. (The data that Hotspot FXi may consider includes, but is not limited to, pricing data from the Hotspot FXi platform and other electronic platforms and any market, oral interviews with the parties to the Off Market Transaction, and market professionals not involved in the Off Market Transaction.) Hotspot FXi will use its good faith efforts to assist the parties to the Off Market Transaction to arrive at a resolution which is reasonably acceptable to those parties and to Hotspot FXi. Possible resolutions include, but are not limited to, an adjustment of the rate or voiding the Off-Market Transaction entirely.
Hotspot FXi will use commercially reasonable efforts to preserve the anonymity of the parties to the Off-Market Transaction from each other during the period in which it is attempting to assist those parties to come to arrive at a resolution.
In the event that after a reasonable period of time (generally not to exceed 60 minutes), the parties to the Off-Market Transaction cannot agree on resolution, or if Hotspot FXi is unable to reach one or more of the parties to the Off-Market Transaction during such period of time, Hotspot FXi reserves the right to act unilaterally to void the Off-Market Transaction or to modify one or more terms of the Off-Market Transaction.

-2-

24

A final determination generally will be made quickly, typically within an hour of a request being submitted. Hotspot FXi will promptly provide oral notification of a determination to the parties involved in a disputed transaction.

Rules Applicable to All Off Market Requests

Each request will be considered on a case-by-case basis.


These revised Operating Procedures shall become effective automatically on the Effective Date set forth above, without further notice.

25

**EXHIBIT B**

**EXISTING NON-DISCLOSURE AGREEMENT**

*(see attached)*

## NONDISCLOSURE OBLIGATIONS

1. DEFINITION AND EXCLUSIONS. "Confidential Information" shall mean any and all information of or concerning a Party obtained by the receiving Party or to which the receiving Party has direct or indirect access, whether marked as confidential or not, in any form, format or media, including information obtained from oral or other transitory means, unless expressly and specifically indicated at the time of disclosure to be non-confidential. Confidential Information shall include but is not limited to: all trade secrets, know-how, computer programs (whether in source code or object code), mathematical formulae, theories, techniques, procedures, processes, strategies, methods, systems, designs, the identity of, and any information concerning, affiliates or Participating Financial Institutions, the identity of and any information concerning suppliers, development methods and sources, marketing and sales information, information received from others that the disclosing Party is obligated to treat as confidential or proprietary, business plans and any other technical, operating, financial and other business information that has commercial value. Notwithstanding the foregoing, Confidential Information shall exclude information that: (i) was lawfully in the public domain at the time of disclosure; (ii) lawfully becomes part of the public domain after disclosure through no fault of the receiving Party; (iii) was already in the receiving Party's possession free of any confidentiality obligation at the time of disclosure; (iv) was received after disclosure to the receiving Party from a third party who had a lawful right to disclose such information without any obligation to restrict its further use or disclosure; or (v) was developed by the receiving Party independently of and without exposure to the disclosing Party's Confidential Information. All Confidential Information is provided "as is." Neither Party makes any warranties, express, implied or otherwise, regarding the accuracy, completeness or performance or its Confidential Information.

2. NATURE OF OBLIGATION AND LIMITED RIGHT TO USE. Except as otherwise approved in writing, each Party shall: (a) hold and maintain the other Party's Confidential Information in strict confidence, exercising no less than reasonable care; (b) not disclose such Confidential Information to any third party except that Participating Financial Institution shall be permitted to disclose Provider's Confidential Information to its service providers and to Clients; and (c) use the Confidential Information for no purpose other than in the furtherance of fulfilling obligations or exercising rights under the Participating Financial Institution Agreement between the Parties. Each Party shall immediately notify the other Party upon discovery of any loss or unauthorized disclosure of the other Party's Confidential Information. Nothing herein shall be construed as granting any property, license or use rights to any Confidential Information, and neither Party shall make, have made, market, use or sell any product or service using, incorporating, relying on, or derived from the other Party's Confidential Information except as expressly permitted in the Participating Financial Institution Agreement. Each Party agrees that any software of the other Party contains valuable Confidential Information and agrees not to modify, reverse engineer, decompile, create other works from, or disassemble any such software without the prior written consent of the other Party. Neither Party shall communicate any information to the other Party in violation of such Party's confidentiality obligations to a third party, and neither Party shall knowingly communicate any information to the other Party in violation of the proprietary rights of any third party.

3. At any time, upon the written request of the disclosing Party, the receiving Party shall promptly return to the disclosing Party or destroy all documents and other tangible materials representing or embodying the disclosing Party's Confidential Information and all copies thereof, and shall immediately cease any further use thereof. Upon written request, receiving Party shall furnish a written officer's certificate attesting to the complete return or destruction of the disclosing Party's Confidential Information. The foregoing shall not limit either Party's rights to use the other party's Confidential

Information as expressly set forth in the Participating Financial Institution Agreement.

4. ASSIGNMENT. Neither Party may assign, transfer, delegate or sublicense any rights, duties or obligations under this Agreement without the prior written consent of the other Party.

5. NOTICES. All notices required under this Agreement shall be in writing and shall be delivered by personal delivery, electronic mail, facsimile transmission or by certified or registered mail, return receipt requested, and shall be deemed given upon personal delivery, five days after deposit in the mail, or upon acknowledgment of receipt of electronic transmission. Notices shall be sent to the addresses set forth above or to such other address as either Party may specify in writing.

6. IRREPARABLE HARM. Each Party acknowledges that breach of this Agreement will cause irreparable harm to the other Party and hereby agrees that the other Party shall be entitled to seek injunctive relief under this Agreement for such breach or threatened breach, as well as such further relief as may be granted by a court of competent jurisdiction. Neither Party may raise any defense based on adequate remedy at law.

# ANNEX I

## Price Provider Addendum

**[Intentionally deleted]**

28

## ANNEX II

### Client Trading Addendum

In addition to the obligations set forth in the Participating Financial Institution Agreement between the Provider and the Participating Financial Institution to which this <u>Annex II</u> is attached, the Provider and the Participating Financial Institution hereby agree as follows:

II.1.  *Additional Restrictions.*  The Provider shall have the right to restrict a C lient's access to, or to impose limits on or suspend the trading of such Client on the Platform, either generally or in respect of specific Currency Pairs, if, in the Provider's sole good faith determination, it determines that such Client has committed a material breach of the Operating Procedures or the User Agreement.  Any actions taken by the Provider pursuant to this <u>Section II.1</u> shall continue for such time as the Provider shall reasonably determine to be necessary or desirable.  Provider will promptly notify Participating Financial Provider in writing with respect to any action taken by Provider under this Section, with a reasonably detailed description of the bases therefore.

II.2.  *Participating Financial Institution Obligations.*  During the Term, the Participating Financial Institution shall support the Platform by, among other things:

(a)  *Request Processing.*  The Participating Financial Institution shall, on a timely basis, process requests from potential clients referred to the Platform by the Provider or one of its Affiliates, for credit or margin.  The Participating Financial Institution shall apprise the Provider (or such Affiliate), in writing, whether such client has been approved as a Client of the Participating Financial Institution for p urposes o f t he P latform.  N othing i n t his A greement shall be deemed to require Participating Financial Institution to approve a potential client.

II.3.  *Interaction With Other Institutions.*  A Client of the Participating Financial Institution, through a separately negotiated agreement entered into between the Participating Financial Institution and such Client, may be authorized in writing by the Participating Financial Institution to trade Currency Pairs on the Platform and to execute transactions on the Platform, but all transactions executed by such Client shall be for the account of the Participating Financial Institution.  All transactions executed via the Platform by either the Participating Financial Institution or any of its Clients shall be deemed to be transactions between the Participating Financial Institution and the Other Institutions, as principals.  All transactions executed by the Clients of the Participating Financial Institution shall be deemed to have been executed through the Participating Financial Institution.  The Provider shall not be deemed to be a counterparty to any transaction with the Participating Financial Institution or any of its Clients.

II.4.  *Relationship Between the Participating Financial Institution and its Clients.*

(a)  Provider shall ensure that each Person that accesses or uses the Platform (including each Client of the Participating Financial Institution that accesses or uses the Platform) shall be bound by a user agreement with respect to the use of the Platform (as such agreement may be amended, or the form of such agreement may be changed from time to time by the Provider in its sole discretion, the "<u>User Agreement</u>").  Provider shall look exclusively to the applicable Client for breaches of the User Agreement by such Client, and Participating

Financial Institution shall have no liability relating to breaches of User Agreement by a Client. The User Agreement shall contain, among other things, a disclaimer by the Provider of any liability for transactions, Platform usage and availability. The Provider may change the form of and update and/or modify the User Agreement, in each case as the Provider, in its sole discretion, determines to be necessary or desirable, except that Provider shall not change, update and/or modify the User Agreement in a manner that would provide Participating Financial Institution with any less favorable disclaimers and limitations on liability as in the User Agreement attached hereto. In the event of a conflict between the User Agreement and this Agreement, then this Agreement shall govern.

(b)    The Participating Financial Institution shall bear sole responsibility for all of the financial or economic aspects of the relationship between it and its Clients. The Participating Financial Institution shall be responsible for entering into agreements or arrangements with its own Clients regarding all such aspects of the Participating Financial Institution/Client relationship. The Client will, moreover, be required to acknowledge in the User Agreement that the sole remedy of any Client for the performance of transactions executed via the Platform shall be against the Participating Financial Institution, and that the Provider shall not be liable to the Client for any losses or other amounts.

(c)    The Participating Financial Institution shall be bound by each transaction entered into by it or its Clients, as confirmed by the Platform, in accordance with the terms of the matched bid and offer on the Platform and the terms of the master trading agreement (if any) between the Participating Financial Institution and an Other Institution that is permissioned by Participating Financial Institution through the Platform, regardless of whether or not: (i) any other party which has entered into a transaction with the Participating Financial Institution on the Platform has failed to perform its obligations under such transaction; or (ii) the transaction was authorized by the Participating Financial Institution or its Clients unless Provider had reason to know that the transaction was not so authorized.

(d)    Client fees are discussed in Section 5.2(b) of the main agreement.

(e)    The Provider acknowledges and agrees that, as between the Provider and the Participating Financial Institution, the Participating Financial Institution's client list and all intellectual property rights therein and thereto (collectively, the "Participating Financial Institution IP Rights"), are the valuable property of the Participating Financial Institution, and other than the license granted hereunder, the Provider shall obtain no rights therein or thereto. Subject to the terms and conditions of this Agreement, the Participating Financial Institution hereby grants to the Provider a revocable, non-exclusive, non-transferable license to use the Participating Financial Institution IP Rights as necessary to operate the Platform as contemplated herein.

(f)    The Participating Financial Institution represents and warrants to the Provider that: (i) its Clients' trading on the Platform does not and shall not violate any Law; and (ii) that it has reasonable grounds to believe that each Client is an ECP.


LEHMAN BROTHERS
COMMERCIAL CORPORATION

By: _____
Name:  Jonathan D. Williams
Title:  Senior Vice President
Date:


HOTSPOT FXi, L.L.C.

By: _____
Name:  Steven Reich
Title:  MD


31

## USER AGREEMENT

VERSION 1.2 (LAST REVISED: FEBRUARY 17, 2003)

You are accessing and using an electronic platform, accessible via the Internet, that allows select financial institutions, either directly or through an authorized third party, to enter into spot foreign currency transactions (the "Platform"). This Agreement sets forth the terms and conditions to which you (the "User" or "you") and other users are subject with respect to accessing the Platform via the Internet and otherwise using the Platform. **This is an Agreement between you and Hotspot FXi, L.L.C. ("HSFXi").** By using or subscribing to the Platform or the Website (as defined below) you signify your agreement to the terms of this Agreement.

1.    **Definitions.**

"Access Codes" means the access identification codes and passwords provided by HSFXi to Participating Financial Institutions for their use or for use by their clients, including, without limitation, all security identification codes and passwords provided by HSFXi to Your PFI for use by you.

"Affiliate" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"Agreement" means this User Agreement, as it may be amended or modified from time to time in accordance with its terms.

"Covered Matters" has the meaning ascribed thereto in Section 22.

"Covered Proceeding" has the meaning ascribed thereto in Section 13.

"Currency" means the legal tender issued by and acceptable for the payment of obligations under the laws of a country.

"Currency Pair" means the two currencies that comprise a foreign Currency transaction.

"ECP" means an "eligible contract participant" as defined in Section 1a(12) of the Commodity Exchange Act, as amended, and the regulations promulgated thereunder from time to time.

"Existing Technology" means the software and intellectual property rights licensed to HSFXi by an Affiliate of HSFXi, in connection with which the Platform has been developed by HSFXi.

"Fees" has the meaning ascribed thereto in Section 7.

"Governmental Authority" means any national, federal, state, provincial, county, municipal or local government, foreign or domestic, or the government of any political subdivision of any of the foregoing, or any entity, authority, agency, ministry or other similar body exercising executive, legislative, judicial, regulatory or administrative authority or functions of or pertaining to government, including any authority or other quasi-governmental entity established to perform any of such functions.

"HSFXi Party" means HSFXi, its Affiliates, and their respective Representatives.

"IP Rights" has the meaning ascribed thereto in Section 10.

"Operating Procedures" has the meaning ascribed thereto in Section 2.

"Participating Financial Institution" means each of the financial institutions that has entered, or will enter, into a written Participating Financial Institution Agreement (or the equivalent thereof in whatever form) with HSFXi with respect to the use of the Platform by such institution and certain authorized third-party users.

"Person" means an individual, partnership, limited partnership, corporation, limited liability company, joint stock company, unincorporated organization or association, trust or joint venture, or a Governmental Authority or political subdivision thereof.

"Platform" has the meaning ascribed thereto in the preamble hereof.

"Representatives" means a Person's current and past officers, directors, members, managers, employees and agents.

"Term" has the meaning ascribed thereto in Section 2.

"user" means (i) a third party that is not affiliated with a PFI which has been authorized to trade in the name of such PFI on the Platform for the purpose of effecting back-to-back transactions between such third party's customers (each, a "prime brokerage customer") and the PFI, but only where each such prime brokerage customer is an ECP, or (ii) a client of a PFI, which client is an ECP, that is authorized to effect transactions on the Platform by the PFI without using the services of a third party.

33

"Website" means the Internet website through which you access the Platform.

"you" has the meaning ascribed thereto in the preamble hereof.

"Your PFI" means the Participating Financial Institution in whose name you are trading on the Platform.

2.    **Your Use of the Website and the Platform; Term.**

(a)    Your access to, and your use of, the Website and the Platform are expressly subject to your compliance with the terms of (i) this Agreement and (ii) any written guidelines for using the Website or the Platform posted on the Website (as amended from time to time, and including the Website's privacy policy, as it may be amended from time to time, the "Operating Procedures").    In the event of any inconsistency between this Agreement and the Operating Procedures, the Operating Procedures shall prevail.    HSFXi shall have the right, at any time, to amend the provisions of the Operating Procedures upon five (5) days prior notice (by posting on the Website); provided, however, that any amendment to the Operating Procedures may be made effective immediately, where appropriate in HSFXi's determination, (i) to permit the Website, the Platform and/or HSFXi to comply with any applicable laws or regulations; or (ii) to facilitate the continued and proper operation of the Website or the Platform without performance interruption or degradation.

(b)    You agree to not make use of the Platform or the Website (by remote means or otherwise) in a manner that would violate any applicable law, regulation, or rule of any Governmental Authority or self-regulatory authority or agency.    The Website is not directed to any Person in any jurisdiction where (by reason of that Person's domicile, status or otherwise) the publication or availability of the Website is prohibited. Users in respect of whom such prohibitions apply must not access the Website.

(c)    The term of this Agreement (the "Term") shall commence at the moment of your first access to or use of the Website or the Platform and shall continue for so long as you are authorized to use the Website or the Platform by Your PFI.

(d)    Subject to your compliance with the terms and conditions of this Agreement and the Operating Procedures, you are granted a limited, revocable, non-exclusive, non-transferable license to access and use the Website and the Platform during the term of this Agreement, for purposes and in a manner consistent with the terms of this Agreement and the Operating Procedures.

3.    **Suspension or Limitation.**    Notwithstanding any other provision of this Agreement, you acknowledge that HSFXi shall have the right to restrict your access to, or to impose limits or suspend your trading or transactions on, the Platform, either generally or in respect of specific Currency Pairs, transactions or users, or to discontinue transmitting any or all information, or to refuse to facilitate or process any or all transactions, if in HSFXi's sole determination any of the following circumstances

-3-

34

occurs: (i) full or partial Website or Platform failure, including failure of the technology constituting the Website or the Platform or any of the communications links within the Platform or between the Platform or the Website and any Participating Financial Institution or user, or any other circumstance where it is not practicable for HSFXi to provide the Website or the Platform; (ii) a breach in the security of the Website or the Platform; (iii) a material breach by you of your obligations under this Agreement or of the Operating Procedures; (iv) in order to comply with applicable laws or regulations; (v) if market conditions generally, or conditions with respect to a particular Currency Pair or Currency, render it necessary or desirable, in HSFXi's sole determination, to do so; or (vi) if Your PFI requests that your ability to access and use the Platform be suspended or terminated. Any actions taken by HSFXi pursuant to this Section 3 shall continue for such time as HSFXi shall reasonably determine to be necessary or desirable. You agree that (x) it shall be a material breach of this Agreement to evade, or attempt to evade, any suspension, restriction or limitation imposed under this Section 3; and (y) neither HSFXi nor Your PFI shall be obligated to take any action permitted under this Section 3.

4.    **Control of the Platform.**    You acknowledge that HSFXi shall have sole discretion and control over, and the right to modify at any time, the Website's and the Platform's functionality, configuration, appearance and content, including without limitation: (i) the parameters and protocols by which orders are placed, routed, matched or otherwise processed by the Platform; and (ii) the availability of the Website and the availability of the Platform to any user or with respect to particular Currency Pairs or transactions at any particular places, times or locations.

5.    **Transmission of Information.**    In connection with your use of the Platform, the operation of the Platform (including the matching of bids and offers submitted to the Platform by the Participating Financial Institution and the formation of transactions with respect thereto) shall be based on (i) all bids, offers, orders, commands and other input information submitted by a Participating Financial Institution or user and accompanied by a valid Access Code, in the form in which such information is received by the Platform; and (ii) transaction confirmations sent to the Participating Financial Institution or user by the Platform reflecting transactions based on information received from the Participating Financial Institution or user accompanied by a valid Access Code, in the form in which such confirmations are sent out by the Platform; in each case regardless of whether or not (A) such bids, offers, other orders or commands or other input information were authorized by the Participating Financial Institution or user; (B) such information had been altered or corrupted (electronically or otherwise) prior to reaching the Platform; and (C) such transaction confirmations are altered or corrupted (electronically or otherwise) after being transmitted from the Platform. Other than information made generally available to all users of the Platform, you shall have access only to information about the trades that you execute on behalf of Your PFI using the Platform. You acknowledge that neither HSFXi nor any Participating Financial Institution shall have any duty to verify whether any information submitted to the Platform accompanied by a valid Access Code issued to any Participating Financial Institution or user was authorized by the Participating Financial Institution or user. You

-4-

35

acknowledge t hat n either the H SFXi P arties n or a ny P articipating F inancial I nstitution shall be responsible for any loss, corruption or modification of information submitted to or sent by the Platform, except to the extent that HSFXi has committed gross negligence or e ngaged i n w illful m isconduct w ith respect t hereto. E ach P articipating Financial Institution is an express third-party beneficiary of this <u>Section 5</u>.

**6.    Fees.**    You shall pay to Your PFI such fees and commissions (the "<u>Fees</u>") as are set forth in the fee schedule agreed to in advance by you, or by Your PFI on your behalf, for each transaction executed by you via the Platform.   You shall be solely responsible for all taxes, levies or charges imposed by any Governmental Authority of any kind whatsoever with respect to the Fees paid to or owing with respect to the transactions executed by you via the Platform.

**7.    No Obligation to Maintain Records.**    You acknowledge that HSFXi has no obligation to maintain or retain, and shall not be responsible for maintaining or retaining, any records of transactions between you and Your PFI, if applicable, or between your client and Your PFI, if applicable.  HSFXi shall generally maintain and retain records of transactions made over t he Platform as may be required by applicable Governmental Authorities or in accordance with HSFXi's internal procedures.

**8.    Access Codes and Security.**    You acknowledge that HSFXi provides Participating Financial Institutions with Access Codes to be used only by authorized personnel of the Participating Financial Institution and authorized clients thereof.  You shall keep confidential any Access Codes that are allocated to you by Your PFI or HSFXi. You shall promptly notify HSFXi and Your PFI as soon as you become aware of any unauthorized use or misuse of the Platform or the Access Codes by any Person. Upon receipt of such notice from you or Your PFI, or if HSFXi believes that any Person is breaching the Platform's security, using the Platform without due authority, or using the Platform in a manner that is not in the best interests of the participants therein generally, or otherwise misusing the Platform, HSFXi shall have the right (but not the obligation), in its sole discretion, to take any action as it may deem necessary to prevent such Person from accessing or using the Platform until such time as (in HSFXi's sole determina tion) such breach, unauthorized use or misuse is no longer continuing or will no longer continue.  You shall take all measures reasonable under the circumstances to rectify such breach, use, unauthorized use, or misuse, whether requested by HSFXi or Your PFI or not, including immediately ceasing to access or use the Platform.  The HSFXi Parties shall not be liable for any breach of Platform security or for any of your losses arising therefrom, except to the extent that HSFXi has committed gross negligence or engaged in willful misconduct with respect thereto.

**9.    Risk of Transactions.**  Y ou a cknowledge a nd agree t hat (i) H SFXi s hall not, directly or indirectly, be a principal to any transaction or be responsible for, or otherwise guarantee, t he p erformance of any transaction e ntered into b y y ou o n b ehalf o f Y our PFI via the Platform, and no HSFXi Party shall have any liability to you or any other Person for any transaction executed via the Platform and you shall not proceed against any HSFXi Party to collect o r recover any amounts owed to you or to enforce any of

36

your rights in connection with, or as a result of, such transaction; (ii) no service provided by HSFXi in connection with the Platform, the Website, or otherwise, shall give rise to any fiduciary or equitable duties on the part of HSFXi; (iii) HSFXi may receive fees from more than one Participating Financial Institution in respect of any particular transaction executed through the Platform; and (iv) the submitting or posting of any information to or on the Platform by a HSFXi Party, Your PFI, any other Participating Financial Institution or user shall not be deemed to be a recommendation by any such Person that you should enter into any particular transaction or that any particular transaction is suitable or appropriate for you.

**10.    Intellectual Property Rights.** You acknowledge and agree that HSFXi is the sole owner (except to the extent owned by third party licensors and except to the limited extent licensed by HSFXi to Participating Financial Institutions and their clients, including, without limitation, the limited license set forth in Section 2(d) hereof) of all right, title and interest (collectively, the "IP Rights") in and to the Website and the Platform and each component thereof and all intellectual property and proprietary rights with respect thereto, including, without limitation, patent, copyright, trade secret, trademark and other proprietary rights, in and to the Platform and each component thereof, and to all modifications, including custom modifications, to the Platform and each component thereof, whether made by or with the assistance of you or any other Person, and any know-how, techniques, methodologies, equipment or processes used by HSFXi, the look and feel of the Website and the Platform and each component thereof, and all of HSFXi's websites, all software (front- and back-end), all registered trademarks, trademark applications, trademarks and service marks, tradenames, URL registrations and all pricing information. You shall not obtain any intellectual property rights in or to the IP Rights. You shall take all steps necessary to maintain the confidentiality of all documents and material provided by HSFXi, its Affiliates or third party providers with respect to the Platform and each component thereof. You shall not (i) alter, maintain, enhance or otherwise modify the Website or the Platform; (ii) disassemble, decompile or reverse-engineer the Website or the Platform; nor (iii) otherwise take express action to discover the equivalent of the Website or the Platform. You acknowledge and agree that HSFXi shall use information regarding your identity and use of the Platform in accordance with its stated privacy policy, as such policy may be amended from time to time by HSFXi in accordance with the terms thereof.

**11.    Representations and Warranties.** As of the date hereof you represent and warrant, and at all times during the Term you shall be deemed to be continuously representing and warranting, to HSFXi that: (i) if you are a natural person, you are of sound mind, legal age (at least 18 years old in the United States) and competent to enter into this Agreement; (ii) if the User is not a natural person, the User is duly organized and validly existing under the applicable laws of the jurisdiction of its organization or formation, the User's acceptance of this Agreement and all transactions contemplated hereunder and the performance of all obligations contemplated hereunder have been duly authorized by all necessary action of the User, and each Person accepting this Agreement or any transaction contemplated hereby on the User's behalf has been duly authorized by the User to do so; (iii) this Agreement constitutes your

-6-

37

legal, valid and binding obligation, enforceable against you in accordance with its terms; (iv) your acceptance of and performance of this Agreement, and your access and use of the P latform a nd t he W ebsite, d oes n ot and s hall n ot v iolate a ny a pplicable l aws, or regulations or rules of any Governmental Authority or self-regulatory authority or agency, the Operating P rocedures, o r a ny a greement by w hich you are b ound o r b y which any of your assets are affected; (v) you have been duly authorized to enter into transactions over the Platform on behalf of Your PFI; and (vi) (x) if you are a third party authorized to enter into transactions through the Platform, each of your prime brokerage customers is a n ECP, or ( y) if y ou a re a c lient of Y our P FI a uthorized to e nter i nto transactions through the Platform, you are an ECP.

**12.    <u>DISCLAIMERS AND LIMITATION OF LIABILITY.</u>**  YOU UNDERSTAND AND AGREE THAT THE WEBSITE, THE PLATFORM, ITS COMPONENTS, INTERFACES, ANY RELATED EQUIPMENT, ANY DOCUMENTATION AND OTHER MATERIALS AND THE EXISTING TECHNOLOGY ARE PROVIDED "AS IS". THE HSFXI PARTIES AND ANY THIRD PARTY PROVIDERS, SPECIFICALLY DISCLAIM, WITHOUT LIMITATION, ALL WARRANTIES OF ANY KIND TO YOU, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT (EXCEPT TO THE EXTENT EXPRESSLY SET FORTH IN SECTION 13 HEREOF) OR THOSE WARRANTIES ARISING FROM A COURSE OF PERFORMANCE, A COURSE OF DEALING OR TRADE USAGE.  THE HSFXI PARTIES AND ANY THIRD PARTY PROVIDERS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF ANY INFORMATION ON THE WEBSITE OR THE PLATFORM OR AS TO THE RESULTS TO BE ATTAINED BY YOU FROM ACCESS TO OR USE OF THE WEBSITE OR THE PLATFORM.  THE HSFXI P ARTIES A ND ANY THIRD P ARTY P ROVIDERS SHALL HAVE NO LIABILITY WHATSOEVER FOR ANY CLAIMS RELATING TO ANY SOFTWARE, ANY TECHNOLOGY, ANY EQUIPMENT, THE WEBSITE, THE PLATFORM, THE EXISTING TECHNOLOGY, ANY INFORMATION, MATERIALS, CURRENCY OR THAT THE WEBSITE OR THE PLATFORM MEETS YOUR REQUIREMENTS OR BE UNINTERRUPTED, TIMELY, SECURE, COMPLETE, ACCURATE OR FREE FROM ERRORS OR DEFECTS. THE HSFXI PARTIES MAKE NO WARRANTIES AS TO THE LIFE OF ANY URL GENERATED OR P UBLISHED. YOU ACKNOWLEDGE THAT CERTAIN SOFTWARE AND EQUIPMENT USED BY YOU MAY NOT BE CAPABLE OF SUPPORTING CERTAIN F EATURES OF T HE WEBSITE OR THE PLATFORM.  YOU HEREBY ACKNOWLEDGE THAT YOU HAVE NOT RELIED UPON ANY REPRESENTATIONS O R WARRANTIES MADE BY THE HSFXI PARTIES AND ANY THIRD PARTY PROVIDERS EXCEPT AS SPECIF ICALLY SET FORTH IN THIS AGREEMENT.  NONE OF THE HSFXI PARTIES AND ANY THIRD PARTY PROVIDERS RECOMMENDS, ENDORSES, ADVOCATES OR SPONSORS ANY OF THE CURRENCIES, CURRENCY PAIRS OR FOREIGN CURRENCY TRANSACTIONS APPEARING ON OR MADE THROUGH THE WEBSITE OR THE PLATFORM. YOU ACKNOWLEDGE THE RISKS ASSOCIATED WITH FOREIGN EXCHANGE MARKETS AND TRADING TRANSACTIONS. HSFXI IS NOT AN AUTHORIZED FINANCIAL ADVISOR OR REPRESENTATIVE AND DOES

38

NOT GIVE TAX, EMPLOYMENT OR INVESTMENT ADVICE. ANY PRICE INFORMATION, QUOTES, FORECASTS, RETURN ESTIMATES OR INDICATIONS OF PAST PERFORMANCE ARE FOR INFORMATION PURPOSES ONLY AND DO NOT GUARANTEE FUTURE PERFORMANCE AND DO NOT CONSTITUTE AN OFFER TO BUY OR SELL OR ANY SOLICITATION OF AN OFFER TO BUY OR SELL ANY CURRENCIES, CURRENCY PAIRS OR OTHER PROPERTY, NOR TO ENTER INTO ANY FOREIGN CURRENCY EXCHANGE TRANSACTION. THE WEBSITE AND THE PLATFORM SHALL NOT SERVE AS THE PRIMARY BASIS FOR ANY OF YOUR INVESTMENT DECISIONS AND NONE OF THE HSFXI PARTIES SHALL BE OR BE DEEMED TO BE YOUR FINANCIAL ADVISOR OR FIDUCIARY.   THE HSFXI PARTIES STRONGLY ADVISE ANY USER THAT IS NOT ITSELF SUCH AN ADVISOR, THAT YOU OBTAIN ADVICE A ND A SSISTANCE FROM A SECURITIES, COMMODITIES OR FINANCIAL SERVICES PROFESSIONAL AS APPROPRIATE, REGARDING THE EVALUATION OF ANY SPECIFIC INDEX, REPORT, RESEARCH, FORECAST, OPINION, ADVICE, DATA OR OTHER CONTENT.   YOU HEREBY ACKNOWLEDGE T HAT A NY RELIANCE UPON ANY CONTENT O F T HE W EBSITE OR THE PLATFORM SHALL BE AT YOUR SOLE AND EXCLUSIVE RISK.   THE WEBSITE MAY CONTAIN (I) HYPERLINKS TO WEBSITES OPERATED BY PERSONS OTHER THAN HSFXI PARTIES AND (II) MESSAGE BOARDS AND CHAT ROOMS CONTAINING INFORMATION A ND CONTENT S UBMITTED B Y P ERSONS OTHER THAN HSFXI PARTIES. SUCH HYPERLINKS, MESSAGE BOARDS AND CHAT ROOMS ARE PROVIDED FOR YOUR REFERENCE AND CONVENIENCE ONLY. YOU AGREE NOT TO H OLD A NY H SFXI P ARTY RESPONSIBLE FOR THE CONTENT OR OPERATION OF SUCH PORTIONS OF THE WEBSITE. A HYPERLINK DOES NOT AND SHOULD NOT BE DEEMED TO SUGGEST, IMPLY OR MEAN THAT ANY HSFXI PARTY IN ANY WAY ENDORSES OR SUPPORTS THE CONTENT, OPERATOR OR OWNER OF SUCH HYPERLINKED WEBSITES.   THE HSFXI PARTIES HAVE NOT DEVELOPED OR REVIEWED THE CONTENT APPEARING IN OR ON SUCH HYPERLINKED WEBSITES OR ON ANY MESSAGE BOARD OR CHAT ROOM AND NO HSFXI PARTY DOES OR SHOULD BE DEEMED TO IN ANY WAY ENDORSE OR SUPPORT ANY CONTENT THEREIN. YOU UNDERSTAND T HAT ANY HYPERLINKED WEBSITES, AND ANY MESSAGE BOARDS AND CHAT ROOMS MAY CONTAIN ILLEGAL OR OBJECTIONABLE CONTENT OR DANGEROUS COMPUTER VIRUSES. YOU ASSUME, AND THE HSFXI PARTIE S HEREBY DISCLAIM, ALL RESPONSIBILITY FOR ANY LOSS OR INJURY SUSTAINED BY YOU AS A USER OF SUCH HYPERLINKED WEB SITES, MESSAGE BOARDS AND CHAT ROOMS. **The parties hereto acknowledge that the limitations set forth in this** <u>**Section 12**</u> **are integral to the amount of Fees levied by the Platform, and that, were the HSFXI Parties to assume any further liability other than as expressly set forth herein, such Fees would of necessity be set substantially higher.** YOU UNDERSTAND AND AGREE THAT THE HSFXI PARTIES SHALL HAVE NO LIABILITY FOR ANY INDIRECT, INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFIT, LOST DATA, LOSS OF USE OF THE PLATFORM, BUSINESS INTERRUPTION, L OSS OF BUSINESS R EPUTATION OR G OODWILL, C OSTS O F SUBSTITUTE SERVICES, OR DOWNTIME COSTS) SUFFERED BY YOU, YOUR

39

AFFILIATES AND ANY OTHER PERSON, EVEN IF ONE OR MORE HSFXI PARTY HAS OR HAVE BEEN PREVIOUSLY ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, EXCEPT TO THE EXTENT SET FORTH IN SECTION 13(B) HEREOF, THE AGGREGATE LIABILITY OF THE HSFXI PARTIES FOR DAMAGES FOR ANY CAUSE WHATSOEVER RELATING TO OR ARISING OUT OF THIS AGREEMENT OR THE PLATFORM, AND REGARDLESS OF THE FORM OF ACTION, SHALL BE LIMITED TO $3,000. THE HSFXI PARTIES SHALL HAVE NO LIABILITY TO YOU OR TO ANY PARTICIPATING FINANCIAL INSTITUTION OR USER IN CONNECTION WITH THE FAILURE BY ANY OTHER USER OR PARTICIPATING FINANCIAL INSTITUTION TO PERFORM ANY TRANSACTION EXECUTED VIA THE PLATFORM OR THE FAILURE OF ANY OTHER PARTICIPATING FINANCIAL INSTITUTION OR USER TO COMPLY WITH THE OPERATING PROCEDURES OR ITS AGREEMENTS WITH HSFXI REGARDING ACCESS TO OR USE OF THE WEBSITE OR THE PLATFORM.

**13.    Indemnification.**  (a) You agree to defend, hold harmless and indemnify the HSFXi Parties from and against any claim, suit or proceeding brought by a third party against any HSFXi Party to the extent that it is based on a claim arising, directly or indirectly, out of your use of the Platform (a "Covered Proceeding"), and you shall pay all costs incurred by and damages (including reasonable attorneys fees and disbursements) awarded against an HSFXi Party.  HSFXi shall promptly notify you in writing of any claim, suit or proceeding that you may have obligations with respect to under this Section 13(a); provided, however, that any failure of HSFXi to provide prompt written notice pursuant to this Section 13(a) shall excuse you only to the extent that you are prejudiced thereby.  HSFXi shall reasonably cooperate with you with regard to the defense of any Covered Proceeding or threatened Covered Proceeding.

(b)    HSFXi agrees to defend, hold harmless and indemnify the User from and against any claim, suit or proceeding brought by a Person against the User to the extent that it is based on a claim that the Platform infringes any copyright or registered U.S. patent or trademark, and HSFXi shall pay all costs incurred by and damages (including reasonable attorneys fees and disbursements) finally awarded against the User, but shall not be responsible for any compromise or settlement made without its consent. Such indemnity, however, is specifically exclusive of any such claims which arise or result from (i) the misuse of the Platform by Your PFI or the User; (ii) alteration of the Platform by Your PFI or the User, provided that no infringement would have occurred absent such alteration; (iii) use of the Platform by Your PFI or the User in combination with apparatus, hardware, software or services not provided, authorized or furnished by HSFXi, provided that no infringement would have occurred absent such combination; and (iv) use of the Platform by Your PFI or the User in a manner that violates applicable law or regulation of any Governmental Authority or self-regulatory agency or authority, this Agreement, the Operating Procedures or in a manner for which the Platform was neither designed or contemplated.  The User shall promptly notify HSFXi in writing of any claim, suit or proceeding that HSFXi may have obligations with respect to under this subsection (b), provided, however, that any failure of the User to provide prompt written

notice hereunder shall excuse HSFXi only to the extent that it is prejudiced thereby. The User shall cooperate with HSFXi with regard to the defense of any suit or threatened suit. HSFXi shall have full control of any such claim, proceeding or suit and the authority to settle or otherwise dispose of any such suit or threatened suit, and to appeal any adverse judgment, which may be entered. Upon written notice of a claim that the Platform is infringing a third party's intellectual property rights, HSFXi may, but is not obligated to (i) modify or replace the Platform to make it non-infringing; (ii) procure any rights from any Person necessary to offer the Platform; or (iii) terminate providing the Platform, in each case in full satisfaction of its obligations pursuant to this subsection (b).

**14.    Notices.**  Unless otherwise specified herein, all notices or other communications required o r p ermitted h ereunder s hall b e i n writing and shall be delivered personally, sent by certified, registered or express air mail, postage prepaid, or sent by overnight courier and shall be deemed given (i) when so delivered personally, (ii) if mailed, sent by overnight courier, or sent electronically, upon actual receipt, (x) if to HSFXi, at 1375 Plainfield A venue, Watchung, New J ersey 07069, with a courtesy copy to Edward M. Zimmerman, Esq., Lowenstein Sandler PC, 65 Livingston Avenue, Roseland, New Jersey 07068, and (y) if to you, at the address set forth on Your PFI's books and records, with a courtesy copy to Your PFI.

**15.    Survival of Certain Sections.**  Sections 4, 9, 10, 11, 12, 13, 14, 17, 19, 20, 21, 22, and 23 hereof shall survive the expiration, termination and/or completion of this Agreement.

**16.    Assignment.**  You shall not assign t his Agreement i n any manner without t he prior, written consent of HSFXi, and any attempted assignment in violation of this Section 16 shall be null and void. HSFXi may assign this Agreement to another Person in connection with the transfer of all or part of HSFXi's assets or business to an Affiliate of HSFXi o r to a t hird-party. T his A greement s hall b e b inding u pon and i nure t o t he benefit of the parties hereto and their respective successors, permitted assigns and legal representatives. Your PFI is an express third-party beneficiary of this Agreement. Except as set forth in Section 5, t his A greement s hall be f or t he s ole b enefit o f t he parties to this Agreement, Your PFI, and their respective successors, permitted assigns and legal representatives and is not intended, nor shall it be construed, to give a ny other Person (other than the parties hereto), any legal or equitable right, remedy or claim hereunder.

**17.    Independent Contractors.**      The parties to this Agreement are independent contractors. Neither party is an agent, representative or partner of the other party. Neither party shall have any right, power or authority to enter into any agreement for, or on behalf of, or incur any obligation or liability of, to otherwise bind, the other party. This Agreement shall not be interpreted or construed to create an association, agency, joint venture or partnership between the parties or to impose any liability attributable to such a relationship upon either party.

41

18.    <u>Amendments and Modification; Waiver</u>.  **The terms of this Agreement may be amended from time to time by HSFXi posting the revised terms of this Agreement on the Website (which posting will contain the date of such amendment), with the revised terms of the Agreement taking effect from the date of posting, unless otherwise specified in such posting.   You should check frequently for any such revisions.   Your continued u se of t he Website or the Platform shall be deemed to constitute your acceptance of any such revised terms of this Agreement.**  Any of the terms or conditions of this Agreement may be waived at any time by the party or parties entitled to the benefit thereof, but only by a writing signed by the party or parties waiving such terms or conditions; provided, however, that no such written waiver, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provision being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision.

19.    <u>Severability</u>.  The invalidity of any portion hereof shall not affect the validity, force or effect o f the r emaining portions hereof.  If it is ever held t hat any restriction hereunder i s too b road to p ermit enforcement o f such r estriction t o its f ullest e xtent, such restriction shall be enforced to the maximum extent permitted by law.

20.    <u>Injunctive Relief</u>.  In the event of a v iolation or t hreatened violation by y ou of Sections <u>3</u>, <u>5</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u> or <u>11</u> hereof, or the violation or threatened violation by you of the IP Rights, HSFXi shall have the right, in addition to such other remedies as may be available pursuant to law or this Agreement, to injunctive (including preliminary and permanent injunctions and temporary restraining orders) or declaratory relief enjoining such act or threatened act.  You acknowledge that legal remedies for such violation or threatened violation are inadequate.

21.    <u>Governing Law; Jurisdiction; Venue</u>.  This Agreement and all matters arising herefrom or with respect hereto or from or with respect to your access to or use o f the Website or the Platform, including, without limitation, tort claims (the "<u>Covered Matters</u>") shall be governed by, and construed in accordance with, the internal laws of the State of New York, without reference to the choice of law principles thereof.  Each of the parties hereto irrevocably submits to the co-exclusive jurisdiction of the courts of the State of New York and the United States District Court for the Southern District of New York for the purpose of any suit, action, proceeding or judgment relating to or arising out of the Covered Matters.   Service of process in connection with any such suit, action or proceeding may b e served on e ach p arty hereto a nywhere in the world by the same methods as are specified for the giving of notices under this Agreement.  Each of the parties hereto irrevocably consents to the jurisdiction of any such court in any such suit, action or proceeding and to the laying of venue in such court.  Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action or proceeding brought in such courts and irrevocably waives any claim that any such suit,

42

action or proceeding brought in any such court has been brought in an inconvenient forum.

**22.**    **Entire Agreement.**    This Agreement constitutes the entire agreement between the parties with respect to the matters covered hereby and supersedes all previous written, oral or implied understandings between them with respect to such matters.

**23.**    **Titles and Headings.**    The headings and table of contents in this Agreement are for reference purposes only, and shall not in any way affect the meaning or interpretation of this Agreement.

-END-

43