**2.2.4**    <u>**Determination of Option Rent.**</u>    In the event Tenant objects or is deemed to have objected to the Option Rent, First Offer Rent or Second Expansion Space Rent, Landlord and Tenant shall attempt to agree upon the Option Rent, First Offer Rent or Second Expansion Space Rent, using reasonable good-faith efforts.  If Landlord and Tenant fail to reach agreement within thirty (30) days following Tenant's objection or deemed objection to the Option Rent (the **"Outside Agreement Date"**), with respect to the Option Rent, then Landlord's Option Rent Calculation and Tenant's Option Rent Calculation, each as previously delivered to the other party, and, with respect to the Second Expansion Space Rent or the First Offer Rent, as the case may be, the Second Expansion Space Rent or the First Offer Rent submitted by each of the parties within ten (10) days following the expiration of such 30-day period, shall be submitted to the arbitrators pursuant to the TCCs of this <u>Section 2.2.4</u> and such submittal shall be submitted to arbitration in accordance with <u>Sections 2.2.4.1</u> through <u>2.2.4.7</u> of this Lease.

**2.2.4.1**    Landlord and Tenant shall each appoint one arbitrator who shall be by profession a real estate lawyer who shall have been active over the five (5) year period ending on the date of such appointment in the leasing of first-class commercial high-rise office properties in the Los Angeles County, California area.  The determination of the arbitrators shall be limited solely to the issue area of whether Landlord's or Tenant's submitted Fair Rental Value, is the closest to the actual Fair Rental Value as determined by the arbitrators, taking into account the requirements of <u>Section 2.2.5</u> of this Lease.  Each such arbitrator shall be appointed within fifteen (15) days after the applicable Outside Agreement Date.  Landlord and Tenant may consult with their selected arbitrators prior to appointment and may select an arbitrator who is favorable to their respective positions.  The arbitrators so selected by Landlord and Tenant shall be deemed **"Advocate Arbitrators."**

**2.2.4.2**    The Advocate Arbitrators so appointed shall be specifically required pursuant to an engagement letter within ten (10) days of the date of the appointment of the last appointed Advocate Arbitrator to agree upon and appoint a third arbitrator (**"Neutral Arbitrator"**) who shall be qualified under the same criteria set forth hereinabove for qualification of the two Advocate Arbitrators, except that neither the Landlord nor Tenant nor either parties' Advocate Arbitrator may, directly or indirectly, consult with the Neutral Arbitrator prior or subsequent to his or her appearance.  The Neutral Arbitrator shall be retained via an engagement letter jointly prepared by Landlord's counsel and Tenant's counsel.

**2.2.4.3**    The three arbitrators shall within thirty (30) days of the appointment of the Neutral Arbitrator reach a decision as to Fair Rental Value and determine whether the Landlord's or Tenant's determination of Fair Rental Value as submitted pursuant to <u>Section 2.2.3</u> (as to Option Rent) of this Lease, <u>Section 2.2.4</u> (as to Second Expansion Space Rent or First Offer Rent or as to Option Rent if the Option Rent submittals are not made under <u>Section 2.2.3</u> of this Lease) is closest to Fair Rental Value as determined by the arbitrators and simultaneously publish a ruling (**"Award"**) indicating whether Landlord's or Tenant's submitted Fair Rental Value is closest to the Fair Rental Value as determined by the arbitrators. Following notification of the Award, the Landlord's or Tenant's submitted Fair Rental Value determination, whichever is selected by the arbitrators as being closest to Fair Rental Value shall become the then applicable Fair Rental Value.

**2.2.4.4**    The Award issued by the majority of the three arbitrators shall be binding upon Landlord and Tenant.

**2.2.4.5**    If either Landlord or Tenant fail to appoint an Advocate Arbitrator within fifteen (15) days after the applicable Outside Agreement Date, then either party may petition the presiding judge of the Superior Court of Los Angeles County to appoint such Advocate Arbitrator subject to the criteria in <u>Section 2.2.4.1</u> of this Lease, or if he or she refuses to act, either party may petition any judge having jurisdiction over the parties to appoint such Advocate Arbitrator.

**2.2.4.6**    If the Advocate Arbitrators fail to agree upon and appoint the Neutral Arbitrator, then either party may petition the presiding judge of the Superior Court of Los Angeles County to appoint the Neutral Arbitrator, subject to criteria in <u>Section 2.2.4.2</u> of this Lease, or if he or she refuses to act, either party may petition any judge having jurisdiction over the parties to appoint such arbitrator.

**2.2.4.7**    The cost of the arbitration shall be paid by Landlord and Tenant equally.

**2.2.5**    The "**Fair Rental Value**," as used in this Lease, shall be equal to the annual rent (including additional rent and considering any "base year" or "expense stop" applicable thereto), including all escalations, at which, as of the commencement of the applicable term of the subject space (e.g., the Option Term or the term of the Second Expansion Space or First Offer Space, as the case may be), tenants are leasing non-sublease, non-encumbered, non-equity, non-renewal (unless the lease being renewed contained a renewal rental clause which was materially commercially reasonable, and contained a reasonably comparable definition of Fair Rental Value, that reflects concessions then generally available in the marketplace, regardless of whether the renewal was effectuated by a new lease or an amendment or a memorandum), pursuant to a lease of at least two (2) full floors (except when determining the Fair Rental Value for the Second Expansion Space or First Offer Space, in which case the lease shall be of comparable size to the space then being leased by Tenant, and which is comparable in location and quality to the subject space in lease transactions which will have a term commencement which occurs during the period between the date of commencement of such term of the subject space and the date which is twelve (12) months prior thereto as to Option Rent, but only six (6) months prior thereto as to the Second Expansion Space or First Offer Rent, for a comparable lease term, in an arm's length transaction ("**Comparable Transactions**"), which comparable space is located in any of the "Comparable Buildings," as that term is defined below, in either case taking into consideration the following concessions (the "**Concessions**"):  (a) rental abatement concessions, if any, being granted such tenants in connection with such comparable space; (b) tenant improvements or allowances provided or to be provided for such comparable space, and taking into account, and deducting the value of, the existing improvements in the subject space, such value to be based upon the age, condition, design, quality of finishes and layout of the improvements and the extent to which the same can be utilized by a general office user; and (c) other reasonable monetary concessions being granted such tenants in connection with such comparable space. Additionally, in calculating the Fair Rental Value, consideration shall be given to the method by which the rentable square footage of the Premises and the space in the Comparable Transactions is measured, and to the ratio of usable square footage to rentable

square footage. No consideration shall be given, however, to (i) the fact that Landlord is or is not required to pay a real estate brokerage commission in connection with Tenant's exercise of its right to lease the subject space during the term thereof or the fact that landlords are or are not paying real estate brokerage commissions in connection with such comparable space, and (ii) any period of rental abatement, if any, granted to tenants in comparable transactions in connection with the design, permitting and construction of tenant improvements in such comparable spaces (the "**Construction Period**"); provided, however, in calculating the Fair Rental Value for the Second Expansion Space or the First Offer Space, as the case may be, consideration shall be given to such period of rental abatement, if any. Such Concessions (A) shall be reflected in the effective rental rate (which effective rental rate shall take into consideration the total dollar value of such Concessions as amortized on a straight-line basis over the applicable term of the Comparable Transaction (in which case such Concessions evidenced in the effective rental rate shall not be granted to Tenant)) payable by Tenant, or (B) at Landlord's election, all such Concessions shall be granted to Tenant in kind. The Fair Rental Value shall additionally include a determination as to whether, and if so to what extent, Tenant must provide Landlord with financial security, such as a letter of credit or guaranty, for Tenant's Rent obligations during the term of the subject space. Such determination shall be made by reviewing the extent of financial security then generally being imposed in Comparable Transactions from tenants of comparable financial condition and credit history to the then existing financial condition and credit history of Tenant (with appropriate adjustments to account for differences in the then-existing financial condition of Tenant and such other tenants). For purposes of this Lease, "**Comparable Buildings**" shall mean "Class A+" buildings located in Century City, California. As used in this Lease, the term "Class A+" buildings shall mean the Building, those buildings located at 1999 Avenue of the Stars, 2000 Avenue of the Stars and 2121 Avenue of the Stars, and any other first-class high-rise buildings in the Century City area of Los Angeles, California, which are constructed after the date of this Lease, and which contain at least 500,000 rentable square feet of space and are of the same quality of appearance and construction as the Building, with consideration to the marketplace considerations, if any, given to the difference in the age of the Comparable Buildings.

       **2.2.6**     **Tenant's Right to Reduce the Premises**. Concurrently with Tenant's delivery to Landlord of the Interest Notice, and provided that, during the applicable Option Term, Tenant (including Tenant's Occupants) will initially be occupying at least sixty-five percent (65%) of the Premises remaining after the reduction, Tenant shall have the right to deliver to Landlord a written notice (the "**Reduction Notice**") which states that Tenant elects to reduce the size of the Premises pursuant to the terms and conditions of this Section 2.2.6 (the "**Reduction Right**"), and describes the area of the Premises which Tenant elects to no longer lease (the "**Downsized Space**"). The following conditions shall apply to Tenant's exercise of the Reduction Right. The Downsized Space shall (i) either include all of the Premises located on a floor of the Building or no space on any such floor, (ii) be a contiguous consolidated block of space which is adjacent to the Premises, (iii) not include a full or partial floor of the Premises which is located anywhere in-between two (2) full or partial floors of the Premises which Tenant elects to continue to lease during the Option Term, and (iv) the total number of rentable square feet of space contained in all of the Downsized Space, in the aggregate (including the Downsized Space included in all previous exercises of the Reduction Right), shall not exceed one (1) full floor of the Building. In the event that Tenant's election to reduce the size of the Premises pursuant to this Section 2.2.6 necessitates the closing off of any stairwells connecting the

Downsized Space to the Premises, then Tenant shall perform such work in a manner which is approved by Landlord and otherwise in accordance with the terms of this Lease, and at Tenant's sole cost and expense. If Tenant timely exercises the Reduction Right as set forth herein, Landlord shall deliver Tenant an amendment from Landlord setting forth the new rentable square footage of the Premises, and proportionately adjusting the Base Rent and Tenant's Share of Direct Expenses, effective as of the first (1st) day of the Option Term, and Tenant shall execute such amendment within fifteen (15) days after receipt thereof. If Tenant elects to exercise the Reduction Right pursuant to the terms of this Section 2.2.6, then Landlord and Tenant shall be relieved of their respective obligations under this Lease with respect to the applicable Downsized Space as of the first (1st) day of the Option Term, except for those obligations set forth in this Lease which specifically survive the expiration or earlier termination of this Lease, including, without limitation, the payment by Tenant of all amounts owed by Tenant under this Lease, up to the first (1st) day of the Option Term, with respect to the Downsized Space. In the event that Tenant fails to vacate, and surrender and deliver to Landlord exclusive possession of the Downsized Space, free of all subleases, prior to the first (1st) day of the Option Term in the condition required by this Lease, and such failure continues for two (2) business days after receipt of notice from Landlord, then the provisions of Article 16 of this Lease shall apply. If Tenant fails to timely exercise the Reduction Right pursuant to the terms of this Section 2.2.6, then such right shall terminate and be of no further force or effect.

## ARTICLE 3

## BASE RENT

Tenant shall pay, without prior Notice or demand (except as specifically set forth in this Lease), to Landlord or Landlord's agent at the office of the Project, or, at Landlord's option, at such other place as Landlord may from time to time designate in writing, by a check for currency which, at the time of payment, is legal tender for private or public debts in the United States of America, base rent ("**Base Rent**") as set forth in Section 4 of the Summary, payable in equal monthly installments as set forth in Section 4 of the Summary in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever (except as specifically set forth in this Lease). The Base Rent for the first full month of the Lease Term shall be paid on or before the earlier of (i) the Lease Commencement Date, or (ii) the commencement of the Early Occupancy Period. If any "Rent" (as that term is defined in Section 4.1 of this Lease) payment date (including the Lease Commencement Date) falls on a day of the month other than the first day of such month or if any payment of Rent is for a period which is shorter than one month, the Rent for any fractional month shall accrue on a daily basis for the period from the date such payment is due to the end of such calendar month or to the end of the Lease Term at a rate per day which is equal to 1/365 of the applicable annual Rent. All other payments or adjustments required to be made under the TCCs of this Lease that require proration on a time basis shall be prorated on the same basis. Such Base Rent amounts are subject to recalculation in connection with any remeasurement made pursuant to Section 1.2 of this Lease. Notwithstanding anything to the contrary contained in this Article 3, Tenant's obligation to pay Rent with respect to the 25th Floor Premises does not commence until February 24, 2008, in accordance with the terms of this Lease.

# ARTICLE 4

## ADDITIONAL RENT

**4.1**    **General Terms**. In addition to paying the Base Rent specified in Article 3 of this Lease, commencing on the later to occur of (i) January 1, 2006, and (ii) the Lease Commencement Date applicable to each portion of the Premises, Tenant shall pay "Tenant's Share" of the annual "Direct Expenses," as those terms are defined in Sections 4.2.6 and 4.2.2 of this Lease, respectively, which are in excess of the amount of Direct Expenses applicable to the "Base Year," as that term is defined in Section 4.2.1 of this Lease; provided, however, that in no event shall any decrease in Direct Expenses for any Expense Year (whether through any credits given to Tenant by Landlord or otherwise) below Direct Expenses for the Base Year entitle Tenant to any decrease in Base Rent or any credit against sums due under this Lease.  Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord pursuant to the terms of this Lease, are hereinafter collectively referred to as the "**Additional Rent**", and the Base Rent and the Additional Rent are herein collectively referred to as "**Rent**." All amounts due under this Article 4 as Additional Rent shall be payable for the same periods and in the same manner as the Base Rent.  Without limitation on other obligations of Tenant and Landlord which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent attributable to the period of time prior to the Lease Expiration Date, as may be extended pursuant to the TCCs of Section 2.2 of this Lease, or earlier termination of this Lease, and Landlord's obligation to refund to Tenant any overpayments of such Additional Rent shall survive the expiration of the Lease Term.  Tenant shall not have to pay Tenant's Share of Direct Expenses attributed to any period of time prior to the expiration of the Base Year or after the Lease Term has ended except to the extent Tenant continues to occupy the Premises.

**4.2**    **Definitions of Key Terms Relating to Additional Rent**.  As used in this Article 4, the following terms shall have the meanings hereinafter set forth:

**4.2.1**    "**Base Year**" shall have the meaning set forth in Section 5 of the summary.

**4.2.2**    "**Direct Expenses**" shall mean "Operating Expenses" and "Tax Expenses."

**4.2.3**    "**Expense Year**" shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires.

**4.2.4**    "**Operating Expenses**" shall mean all expenses, costs and amounts of every kind and nature which Landlord pays or accrues during any Expense Year because of or in connection with the ownership, management, maintenance, security, repair, replacement, restoration or operation of the Project, or any portion thereof, subject to the allocation thereof as set forth in Section 4.3 of this Lease (provided that Landlord shall accrue amounts in a materially consistent manner throughout the Lease Term, including during the Base Year).  Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following:  (i) the cost of supplying all utilities, the cost of operating, repairing,

maintaining, and renovating the utility, telephone, mechanical, sanitary, storm drainage, and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which are reasonably calculated to reduce Operating Expenses, and the costs incurred in connection with a transportation system management program or similar program; (iii) the cost of all insurance carried by Landlord in connection with the Project; (iv) the cost of landscaping, re-lamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Project, or any portion thereof; (v) costs incurred in connection with the parking areas servicing the Building; (vi) fees and other costs, including management fees, consulting fees, legal fees and accounting fees, for all contractors and consultants in connection with the management, operation, maintenance and repair of the Project; (vii) payments under any equipment rental agreements and the fair rental value of any management office space; (viii) wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons engaged in the operation, maintenance and security of the Project for the Project manager and all employees at levels below the Project manager; (ix) costs under any instrument pertaining to the sharing of costs by the Project, or any portion thereof; (x) operation, repair, maintenance and replacement of all systems and equipment and components thereof of the Building; (xi) the cost of janitorial, alarm, security and other services, repair of wall and floor coverings, ceiling tiles and fixtures in common areas, maintenance and replacement of curbs and walkways, repair to roofs and re-roofing; (xii) amortization over its reasonable useful life (including interest on the unamortized cost at a rate equal to the floating commercial loan rate announced from time to time by Bank of America, a national banking association, or its successor, as its prime rate, plus 2% per annum (the "**Interest Rate**")) of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Project, or any portion thereof to the extent such acquisition costs, prior to amortization, are materially consistent with the costs incurred for such items by landlords of the Comparable Buildings given the scope, size, and nature of the Project; (xiii) the cost of capital repairs, replacements or other improvements or other costs incurred in connection with the Project (A) which are intended to effect economies in the operation or maintenance of the Project, or any portion thereof, to the extent of cost savings reasonably anticipated by Landlord at the time of such expenditure to be incurred in connection therewith, or (B) that are required under any governmental law or regulation, except for capital repairs, replacements or other improvements to remedy a condition existing prior to the Lease Commencement Date which an applicable governmental authority, if it had knowledge of such condition prior to the Lease Commencement Date, would have then required to be remedied pursuant to then-current "Applicable Law," as that term is defined in Article 24 of this Lease, in their form existing as of the Lease Commencement Date; provided, however, that any such permitted capital expenditure shall be amortized (with interest at the Interest Rate) over its reasonable useful life; (xiv) costs, fees, charges or assessments imposed by, or resulting from any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, trash removal, community services, or other services which do not constitute "Tax Expenses" as that term is defined in Section 4.2.5 of this Lease; and (xv) payments under any easement, license, operating agreement, declaration, covenants, conditions and restrictions, or instrument pertaining to the equitable sharing of costs by the Building with other buildings in the Project and by the Project with buildings and property located outside the Project. Only as provided hereinafter in items [i], [ii] and [iii] of the next sentence of this Section 4.2.4, in the event Landlord incurs costs or

expenses associated with or relating to separate items or categories or subcategories of Operating Expenses which were not part of Operating Expenses during the entire Base Year, Operating Expenses for the Base Year shall be deemed increased by the amounts Landlord would have incurred during the Base Year with respect to such costs and expenses had such separate items or categories or subcategories of Operating Expenses been included in Operating Expenses during the entire Base Year. The foregoing sentence shall only apply as follows: [i] in the event and to the extent any portion of the Project is covered by a warranty or service agreement which provides warranty-type protection at any time during the Base Year and is not covered by such warranty or such warranty-type protection under such service agreement in a subsequent Expense Year to the same extent, Operating Expenses for the Base Year shall be deemed increased by the amount Landlord would have incurred during the Base Year with respect to the items or matters covered by the subject warranty or warranty-type protection, had such warranty or such service agreement not been in effect during the entire Base Year; [ii] any insurance premium resulting from any new forms of insurance, including earthquake insurance, shall be deemed to be included in Operating Expenses for the Base Year. In the event that the earthquake insurance premium or terrorism insurance premium (or any other insurance premium) applicable to the Building shall decrease in any Expense Year subsequent to the Base Year, Operating Expenses attributable to the Base Year shall, commencing in the year of such decrease, but only so long as and to the extent such decrease remains in effect, thereafter be reduced by the amount of such decrease in earthquake insurance premiums or terrorism insurance premiums (or any other insurance premium), and [iii] if any other type of expense which was incurred in the Base Year but not included in Operating Expenses in the Base Year is subsequently included in Operating Expenses on an ongoing basis, then in any Expense Year in which such expense is included in Operating Expenses, such expense shall be deemed to be included in Operating Expenses for the Base Year in the amount actually incurred in the Base Year. Notwithstanding anything in this <u>Section 4.2.4</u> to the contrary, for purposes of this Lease, Operating Expenses and Tax Expenses shall not, however, include the following:

(i)    costs incurred in connection with the original construction of the Project or in connection with any major change in the Project, such as adding or deleting floors or buildings;

(ii)    costs of the design and construction of tenant improvements to the Premises or the premises of other tenants or other occupants and the amount of any allowances or credits paid to or granted to tenants or other occupants for any such design or construction;

(iii)    except as set forth in items (xii) and (xiii) of the second sentence of this Section 4.2.4, above, depreciation, interest and principal payments on mortgages and other debt costs, if any;

(iv)    marketing costs, legal fees, space planners' fees, advertising and promotional expenses, and brokerage fees incurred in connection with the original development, subsequent improvement, or original or future leasing of the Project;

(v)    costs for which the Landlord is reimbursed, or would have been reimbursed if Landlord had carried the insurance Landlord is required to carry pursuant to

this Lease or would have been reimbursed if Landlord had used commercially reasonable efforts to collect such amounts, by any tenant or occupant of the Project or by insurance from its carrier or any tenant's carrier;

(vi)    any bad debt loss, rent loss, or reserves for bad debts or rent loss or any reserves of any kind;

(vii)    costs associated with the operation of the business of the partnership or entity which constitutes the Landlord, as the same are distinguished from the costs of operation of the Project, including partnership accounting and legal matters, costs of defending any lawsuits with any mortgagee (except as the actions of the Tenant may be in issue), costs of selling, syndicating, financing, mortgaging or hypothecating any of the Landlord's interest in the Project, and costs incurred in connection with any disputes between Landlord and its employees, between Landlord and Project management, or between Landlord and other tenants or occupants;

(viii)    the wages and benefits of any employee who does not devote substantially all of his or her employed time to the Project unless such wages and benefits are prorated to reflect time spent on operating and managing the Project vis-à-vis time spent on matters unrelated to operating and managing the Project; provided, that in no event shall Operating Expenses for purposes of this Lease include wages and/or benefits attributable to personnel above the level of Project manager or Project engineer;

(ix)    except as set forth in items (xii) and (xiii), in the second sentence of this Section 4.2.4 above, late charges, penalties, liquidated damages, and interest;

(x)    amount paid as ground rental or as rental for the Project by the Landlord;

(xi)    costs, including permit, license and inspection costs, incurred with respect to the installation of tenant improvements made for new tenants or other occupants in the Project or incurred in renovating or otherwise improving, decorating, painting or redecorating vacant space for tenants or other occupants of the Project (excluding, however, such costs relating to any Common Areas of the Project or parking facilities);

(xii)    costs of capital repairs and alterations, capital improvements and equipment except as set forth in items (xii) and (xiii), in the second sentence of the Section 4.2.4, above;

(xiii)    any amount paid by Landlord or to the parent organization or a subsidiary or affiliate of the Landlord for supplies and/or services in the Project to the extent the same exceeds the costs of such supplies and/or services rendered by qualified, first-class unaffiliated third parties on a competitive basis;

(xiv)    any compensation paid to clerks, attendants or other persons in commercial concessions operated by or on behalf of the Landlord;

(xv)       rentals and other related expenses incurred in leasing air conditioning systems, elevators or other equipment which if purchased the cost of which would be excluded from Operating Expenses as a capital cost, except equipment not affixed to the Project which is used in providing janitorial or similar services and, further excepting from this exclusion such equipment rented or leased to remedy or ameliorate an emergency condition in the Project;

(xvi)       all items and services for which Tenant or any other tenant in the Project reimburses Landlord, provided that Landlord shall use commercially reasonable efforts to collect such reimbursable amounts, or which Landlord provides selectively to one or more tenants (other than Tenant) without reimbursement;

(xvii)       electric power costs for which any tenant directly contracts with a public service company;

(xviii)       costs, other than those incurred in ordinary maintenance and repair, for sculpture, paintings, fountains or other objects of art;

(xix)       tax penalties;

(xx)       fees and reimbursements payable to Landlord (including its parent organization, subsidiaries and/or affiliates) or by Landlord for management of the Project (collectively, the "Management Fee") which exceed the greater of (i) three and one-half percent (3.5%) of all gross receipts for the Project (as fully grossed up for a 100% occupancy level) and (ii) the amount which would normally be paid to a company, in connection with the management of the Comparable Buildings, with a general reputation for excellence and integrity used at "arms length" and which is not, directly or indirectly, affiliated with Landlord ("Independent Company Test");

(xxi)       any costs expressly excluded from Operating Expenses elsewhere in this Lease;

(xxii)       rent for any office space occupied by Project management personnel to the extent the size or rental rate of such office space exceeds the size or fair market rental value of office space occupied by management personnel of the Comparable Buildings in the vicinity of the Building, with adjustment where appropriate for the size of the applicable project;

(xxiii)       Landlord's general corporate overhead and general and administrative expenses;

(xxiv)       all assessments and premiums which are not specifically charged to Tenant because of what Tenant has done, which can be paid by Landlord in installments, shall be paid by Landlord in the maximum number of installments permitted by law (except to the extent inconsistent with the general practice of the Comparable Buildings) and shall be included as Operating Expenses in the year in which the assessment or premium installment is actually paid;

(xxv)      costs arising from the gross negligence or willful misconduct of Landlord or "Landlord Parties," as that term is defined in Section 10.1 of this Lease;

(xxvi)      costs incurred to comply with Applicable Law with respect to "Hazardous Material," as that term is defined in Section 29.40 of this Lease, which was in existence in the Building or on the Project prior to the Lease Commencement Date, and was of such a nature that a federal, state or municipal governmental or quasi-governmental authority, if it had then had knowledge of the presence of such Hazardous Material, in the state, and under the conditions that it then existed in the Building or on the Project, would have then required the removal, remediation or other action with respect to such Hazardous Material; and costs incurred with respect to Hazardous Material, which Hazardous Material is brought into the Building or onto the Project after the date hereof by Landlord or any other tenant of the Project or by anyone other than Tenant or Tenant Parties and is of such a nature, at that time, that a federal, state or municipal governmental or quasi-governmental authority, if it had then had knowledge of the presence of such Hazardous Material, in the state, and under the conditions, that it then exists in the Building or on the Project, would have then required the removal, remediation or other action with respect to such Hazardous Material;

(xxvii)      costs arising from Landlord's charitable or political contributions;

(xxviii)      any finders fees, brokerage commissions, job placement costs or job advertising cost, other than with respect to a receptionist or secretary in the Project office, once per year;

(xxix)      in the event any facilities, services or utilities used in connection with the Project are provided from another building owned or operated by Landlord or vice versa, the costs incurred by Landlord in connection therewith shall be allocated to Operating Expenses by Landlord on a reasonably equitable basis;

(xxx)      legal fees and costs, settlements, judgments or awards paid or incurred because of disputes between Landlord and Tenant, Landlord and other tenants or prospective occupants or prospective tenants/occupants or providers of goods and services to the Project;

(xxxi)      costs associated with material portions of the Common Areas dedicated for the exclusive use of tenants of the Project (other than Tenant), except to the extent Tenant is given its pro-rata share (rentable square feet in the Premises in relation to rentable square feet in the Project) of comparable Common Areas;

(xxxii)      legal fees and costs concerning the negotiation and preparation of this Lease or any litigation between Landlord and Tenant;

(xxxiii)      any reserves retained by Landlord;

(xxxiv)      in-house legal fees and in-house bookkeeping fees and costs;

(xxxv)      any entertainment, dining or travel expenses for any purpose;

(xxxvi)    costs of validated parking privileges granted to Tenant or other tenants of the Project, or to the brokers involved in the sale or lease of the Project;

(xxxvii)    costs for items and services for which Tenant or any other tenant in the Building reimburses Landlord and all items and services supplied selectively to any tenant without reimbursement, provided that, any item or service supplied selectively to Tenant at Tenant's request shall be paid for by Tenant; and

(xxxviii)    costs and expenses incurred by Landlord in connection with any obligation of Landlord to indemnify any tenant (including Tenant) pursuant to its lease (including the Lease) or otherwise.

To the extent that the Project is damaged as a result of a terrorist act or by earthquakes and related aftershocks ("**Terrorism or Earthquake Damage**") and the cost of repairing the Earthquake Damage is not covered by insurance or falls within the deductible, then to the extent that the cost of such repairs are permitted to be included in Operating Expenses pursuant to the remaining terms of this Lease (i.e., to the extent such costs are not otherwise expressly excluded by the terms of this <u>Section 4.2.4</u>, including by the terms of item (xii), above, which excludes from Operating Expenses the costs of certain capital improvements), Tenant's Share of Direct Expenses for Earthquake Damage repairs in any Expense Year shall not exceed the lesser of (a) $1.00 per rentable square foot of the Premises, and (b) Tenant's Share of such costs calculated on a nondiscriminatory basis as the appropriate portion of Direct Expenses.

Landlord agrees that any the cost of any tenant relations parties, events or promotions, or of any flowers, gifts, balloons, etc., provided to any parties by Landlord, shall be included in Operating Expenses only to the extent such costs are reasonable and customary in the Comparable Buildings, and are provided to tenants in the Project on a non-discriminatory basis. Landlord shall not deliberately delay payment of expenses or the incurring of costs in order to reduce Operating Expenses in the Base Year.

If Landlord is not furnishing any particular work or service (the cost of which, if performed by Landlord, would be included in Operating Expenses) to a tenant who has undertaken to perform such work or service in lieu of the performance thereof by Landlord, Operating Expenses shall be deemed to be increased by an amount equal to the additional Operating Expenses which would reasonably have been incurred during such period by Landlord if it had at its own expense furnished such work or service to such tenant. If the Building and/or Project is not at least one hundred percent (100%) occupied during all or a portion of the Base Year or any Expense Year with all tenants and occupants paying full rent (as opposed to free rent, half rent, partial rent, and the like), Landlord shall make an appropriate adjustment to the components of Direct Expenses for such year to determine the amount of Direct Expenses that would have been incurred had the Project been one hundred percent (100%) occupied, with all tenants and occupants paying full rent (as opposed to free rent, half rent, partial rent, and the like); and the amount so determined shall be deemed to have been the amount of Direct Expenses for such year. Landlord shall (i) not make a profit by charging items to Direct Expenses that are otherwise also charged separately to others and (ii) Landlord shall not collect Direct Expenses from Tenant and all other tenants/occupants in the Building in an amount in excess of what Landlord incurred for the items included in Operating Expenses. In no event shall the

components of Direct Expenses for any Expense Year related to electrical costs be less than the components of Direct Expenses related to electrical costs in the Base Year.

If at least ten (10) business days prior to the commencement of any month of the Lease Term, Tenant gives Landlord a factually correct Notice that Tenant shall cease to occupy (but will still lease) one or more full floors of the Building for one or more full months (as so quantified, the "**Vacated Space**"), Landlord shall (i) determine, in the exercise of its reasonable judgment, the cost of the electricity, janitorial service and HVAC (collectively, the "**Variable Expenses**") included in Operating Expenses each such month as a result of the gross-up provision that is directly attributable to the Vacated Space, and (ii) to the extent permitted pursuant to applicable law, cease causing to be provided to such Vacated Space such electricity, janitorial service and HVAC. Landlord shall provide to Tenant, to the extent such Notice was factually correct, a credit against Tenant's Share of Direct Expenses otherwise due with respect to the remainder of the Premises during each such month of the Lease Term, in an amount equal to the Variable Expenses attributable to such Vacated Space as part of the gross-up calculation and not in fact paid by Landlord to third party providers of such Variable Expenses, all as reasonably determined by Landlord. Nothing in this paragraph shall limit or alter Landlord's right to gross-up Variable Expenses nor Tenant's obligation to pay Tenant's Share of Direct Expenses as calculated based upon such gross-up.

### 4.2.5    Taxes.

4.2.5.1    "Tax Expenses" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary (including, without limitation, real estate taxes, general and special assessments, transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Project, or any portion thereof), which shall be paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing and operation of the Project, or any portion thereof. For purposes of this Lease, Tax Expenses for the Base Year and each Expense Year shall be calculated as if the Building were fully occupied, tenant improvements in the Building were fully constructed and the Project, the Building, and all tenant improvements in the Building were fully assessed for real estate tax purposes, and accordingly, during any Expense Year and during the portion of any Expense Year occurring during the Base Year, Tax Expenses shall be deemed to be increased appropriately.

4.2.5.2    Tax Expenses shall include, without limitation: (i) any tax on the Rent, right to Rent or any other income from the Project, or any portion thereof, or as against the business of leasing the Project, or any portion thereof; (ii) any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election ("Proposition 13") and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk

and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants, and, in further recognition of the decrease in the level and quality of governmental services and amenities as a result of Proposition 13, Tax Expenses shall also include any governmental or private assessments or the Project's contribution towards a governmental or private cost-sharing agreement for the purpose of augmenting or improving the quality of services and amenities normally provided by governmental agencies; (iii) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, including, without limitation, any business or gross income tax or excise tax with respect to the receipt of such Rent, or upon or with respect to the possession, leasing, operating, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises, or any portion thereof; and (iv) any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises.

        **4.2.5.3**    To the extent Landlord obtains a tax refund (other than a tax refund resulting from a reduction of taxes pursuant to the terms of Proposition 8, which shall be treated in accordance with the TCC's of Section 4.2.5.4 of this Lease), such tax refund shall be credited against Tax Expenses and refunded to Tenant regardless of when received, based upon the Expense Year to which such refund is applicable, provided that in no event shall the amount to be refunded to Tenant for any such Expense Year exceed the total amount paid by Tenant as Additional Rent under this Article 4 for such Expense Year. If Tax Expenses for any period during the Lease Term or any extension thereof are increased after payment thereof for any reason, including, without limitation, error or reassessment by applicable governmental or municipal authorities, Tenant shall pay Landlord upon demand Tenant's Share of any such increased Tax Expenses included by Landlord as Building Tax Expenses pursuant to the TCCs of this Lease. Notwithstanding anything to the contrary contained in this Section 4.2.5 (except as set forth in Section 4.2.5.1, above), there shall be excluded from Tax Expenses (i) all excess profits taxes, franchise taxes, gift taxes, capital stock taxes, inheritance and succession taxes, estate taxes, federal and state income taxes, and other taxes to the extent applicable to Landlord's general or net income (as opposed to rents, receipts or income attributable to operations at the Project), (ii) any items included as Operating Expenses, and (iii) any items paid by Tenant under Section 4.5 of this Lease.

        **4.2.5.4**    Notwithstanding anything to the contrary set forth in this Lease, the amount of Tax Expenses for the Base Year and any Expense Year shall be calculated without taking into account any decreases in real estate taxes obtained in connection with Proposition 8, and, therefore, the Tax Expenses in the Base Year and/or an Expense Year may be greater than those actually incurred by Landlord, but shall, nonetheless, be the Tax Expenses due under this Lease; provided that (i) any reasonable costs and expenses incurred by Landlord in securing any Proposition 8 reduction shall not be deducted from Tax Expenses nor included in Direct Expenses for purposes of this Lease, and (ii) tax refunds under Proposition 8 shall not be deducted from Tax Expenses nor refunded to Tenant, but rather shall be the sole property of Landlord. Landlord and Tenant acknowledge that this Section 4.2.5.4 is not intended to in any way affect (A) the inclusion in Tax Expenses of the statutory two percent (2.0%) annual increase in Tax Expenses (as such statutory increase may be modified by subsequent legislation), or (B) the inclusion or exclusion of Tax Expenses pursuant to the terms of Proposition 13, which shall be governed pursuant to the TCCs of Section 4.6 of this Lease. Notwithstanding the foregoing,

upon a "Reassessment," as that term is defined in <u>Section 4.6</u> of this Lease, occurring after the Base Year, the component of Tax Expenses for the Base Year which is attributable to the assessed value of the Project under Proposition 13 prior to the Reassessment (without taking into account any Proposition 8 reductions) shall be reduced, if at all, for the purposes of comparison to all subsequent Expense Years (commencing with the Expense Year in which the Reassessment takes place) to an amount equal to the real estate taxes based upon such Reassessment.

       4.2.6     "**Tenant's Share**" for the Premises shall mean the percentage set forth in <u>Section 6</u> of the Summary.

       **4.3**    <u>**Cost Pools**</u>.  Landlord shall have the right, from time to time, to equitably allocate some or all of the Direct Expenses for the Project among different portions or occupants of the Project (the "**Cost Pools**"), in Landlord's discretion.  Such Cost Pools may include, but shall not be limited to, the office space tenants of a building of the Project or of the Project, and the retail space tenants of a building of the Project or of the Project.  The Direct Expenses within each such Cost Pool shall be allocated and charged to the tenants within such Cost Pool in an equitable and consistent manner over all Expense Years.

       **4.4**    <u>**Calculation and Payment of Additional Rent**</u>.  If for any Expense Year ending or commencing within the Lease Term, Tenant's Share of Direct Expenses for such Expense Year exceeds Tenant's Share of Direct Expenses applicable to the Base Year, then Tenant shall pay to Landlord, in the manner set forth in <u>Section 4.4.1</u> of this Lease, and as Additional Rent, an amount equal to the excess (the "**Excess**").

       **4.4.1**    <u>**Statement of Actual Direct Expenses and Payment by Tenant**</u>. Landlord shall use commercially reasonable efforts to give to Tenant within one hundred fifty (150) days following the end of the Base Year and each subsequent Expense Year, a statement (the "**Statement**") itemized on a line-item by line-item basis, which shall state the Direct Expenses incurred or accrued for the Base Year or such preceding Expense Year, as applicable, and which shall indicate the amount of the Excess.  Upon receipt of the Statement for each Expense Year commencing or ending during the Lease Term, if an Excess is present, Tenant shall pay, with its next installment of Base Rent due, the full amount of the Excess for such Expense Year, less the amounts, if any, paid during such Expense Year as "Estimated Excess," as that term is defined in <u>Section 4.4.2</u> of this Lease.  The failure of Landlord to timely furnish the Statement for any Expense Year shall not prejudice Landlord (provided that in the event that such failure continues for a period of six (6) months following receipt of Notice from Tenant, Tenant may elect to seek specific performance) or Tenant from enforcing its rights under this Article 4.  Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, if an Excess if present, Tenant shall immediately pay to Landlord such amount.  The provisions of this <u>Section 4.4.1</u> shall survive the expiration or earlier termination of the Lease Term.  Notwithstanding the immediately preceding sentence, Tenant shall not be responsible for Tenant's Share of any Direct Expenses attributable to any Expense Year which are first billed to Tenant more than two (2) calendar years after the earlier of the expiration of the applicable Expense Year or the Lease Expiration Date, provided that in any event Tenant shall be responsible for Tenant's Share of Direct Expenses levied by any

governmental authority or by any public utility companies at any time following the Lease Expiration Date which are attributable to any Expense Year (provided that Landlord delivers Tenant a bill (a **"Supplemental Statement"**) for such amounts within two (2) years following Landlord's receipt of the bill therefor).

           **4.4.2**      **Statement of Estimated Direct Expenses**.  In addition, Landlord shall use commercially reasonable efforts to give Tenant a yearly expense estimate statement (the **"Estimate Statement"**) itemized on a line-item by line-item basis, which shall set forth Landlord's reasonable estimate (the **"Estimate"**) of what the total amount of Direct Expenses for the then-current Expense Year shall be and the estimated excess (the **"Estimated Excess"**) as calculated by comparing the Direct Expenses for such Expense Year, which shall be based upon the Estimate, to the amount of Direct Expenses for the Base Year. The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Estimated Excess under this Article 4 (provided that in the event that such failure continues for a period of six (6) months following receipt of Notice from Tenant, Tenant may elect to seek specific performance), nor shall Landlord be prohibited from revising any Estimate Statement or Estimated Excess theretofore delivered to the extent necessary; provided however, any such subsequent revision shall set forth on a reasonably specific basis any particular expense increase. Upon receipt of an Estimate Statement, Tenant shall thereafter pay, upon the later to occur of its next installment of Base Rent due or thirty (30) days after receipt of the Statement, a fraction of the Estimated Excess for the then-current Expense Year (reduced by any amounts paid pursuant to the next to last sentence of this Section 4.4.2). Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year, including the month of such payment, and twelve (12) as its denominator. Until a new Estimate Statement is furnished (which Landlord shall have the right to deliver to Tenant at any time), Tenant shall pay monthly, with the monthly Base Rent installments, an amount equal to one-twelfth (1/12) of the total Estimated Excess set forth in the previous Estimate Statement delivered by Landlord to Tenant.

           **4.4.3**      **Payment of Taxes and Insurance**.  Notwithstanding any TCCs of this Lease to the contrary, Tenant shall not be required to pay Tenant's Share of real property taxes or insurance premiums includable in Direct Expenses on the basis of estimates or in monthly installments (unless, with respect to insurance premiums, such amounts are actually paid by Landlord more frequently than twice each Expense Year or on a monthly basis, or, with respect to insurance premiums and/or real property taxes, Landlord is required by its then current lender to impound or escrow such amounts on a more frequent or monthly basis); instead, Tenant shall only be required to pay Tenant's Share of such real property taxes or insurance premiums upon the later to occur of (i) five (5) business days after receipt of Landlord's invoice for the same, and (ii) thirty (30) days prior to the date Landlord is required to pay such taxes or insurance premiums.

**4.5**     **Taxes and Other Charges for Which Tenant Is Directly Responsible**.

           **4.5.1**      **When Payment is Due**.  Tenant shall be liable for and shall pay ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, trade fixtures and any other personal property located in the Premises. If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or

Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall upon demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

           **4.5.2**    **Above Building Standard Tenant Improvements**.  If the tenant improvements in the Premises, whether installed and/or paid for by Landlord or Tenant and whether or not affixed to the real property so as to become a part thereof, are assessed for real property tax purposes at a valuation higher than the valuation at which tenant improvements conforming to Landlord's **"building standard"** in other space in the Project are assessed, then the Tax Expenses levied against Landlord or the real property by reason of such excess assessed valuation shall be deemed to be taxes levied against personal property of Tenant and shall be governed by the provisions of Section 4.5.1, above.  For this purpose Landlord and Tenant agree that the value of building standard improvements is Thirty Dollars and No/100 ($30.00) per rentable square foot.  To the extent that Landlord enforces the TCCs of this Section 4.5.2 against Tenant, then Landlord shall not include in Tax Expenses, taxes assessed against any other tenant improvements in the Project to the extent such taxes relate to the value of such tenant improvements in excess of Thirty Dollars and No/100 ($30.00) per rentable square foot.

           **4.5.3**    **Other Taxes**.  Notwithstanding any contrary provision herein, Tenant shall pay prior to delinquency any (i) Rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion of the Project, including the Project parking facility; or (iii) taxes assessed upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

           **4.6**    **Proposition 13 Protection; Tenant's Payment of Certain Tax Expenses**.  Notwithstanding anything to the contrary contained in this Lease, in the event that, at any time during the Lease Term subsequent to the Base Year, any sale, refinancing, or change in ownership of the Building or Project is consummated, and as a result thereof, and to the extent that in connection therewith, the Building or Project is reassessed (the **"Reassessment"**) for real estate tax purposes by the appropriate governmental authority pursuant to the terms of Proposition 13, then the TCCs of this Section 4.6 shall apply to such Reassessment of the Building or Project.

           **4.6.1**    **The Tax Increase**.  For purposes of this Section 4.6, the term **"Tax Increase"** shall mean that portion of the Tax Expenses, as calculated immediately following the Reassessment, which is attributable solely to the Reassessment.  Accordingly, the term Tax Increase shall not include any portion of the Tax Expenses, as calculated immediately following the Reassessment, which is attributable (i) to the initial assessment of the value of the Building, the **"Base, Shell and Core,"** as that term is defined in Section 1 of the Tenant Work Letter, of the Building or the tenant improvements located in the Building; (ii) to assessments which were pending immediately prior to the Reassessment which assessments were conducted during, and

included in, such Reassessment, or which assessments were otherwise rendered unnecessary following the Reassessment; (iii) to the annual inflationary increase of real estate taxes, but not in excess of two percent (2.0%) per annum; or (iv) to Tax Expenses assessed during the Base Year or assessed prior to the Reassessment without including any Proposition 8 reduction.

        **4.6.2**    **Protection**. During the first three (3) Lease Years of the initial Lease Term, Tenant shall not be obligated to pay any portion of any Tax Increase attributable to such three (3) Lease Years. In no event shall any such protection carry beyond the third (3rd) Lease Year.

        **4.6.3**    **Landlord's Right to Purchase the Proposition 13 Protection Amount Attributable to a Particular Reassessment**. The amount of Tax Expenses which Tenant is not obligated to pay or will not be obligated to pay during the Lease Term in connection with a particular Reassessment pursuant to the terms of this Section 4.6, shall be sometimes referred to hereinafter as a **"Proposition 13 Protection Amount."** If the occurrence of a Reassessment is reasonably foreseeable by Landlord and the Proposition 13 Protection Amount attributable to such Reassessment can be reasonably quantified or estimated for each Lease Year commencing with the Lease Year in which the Reassessment will occur, the terms of this Section 4.6.3 shall apply to each such Reassessment. Upon notice to Tenant, Landlord shall have the right to purchase the Proposition 13 Protection Amount relating to the applicable Reassessment (the **"Applicable Reassessment"**), at any time during the Lease Term, by paying to Tenant an amount equal to the **"Proposition 13 Purchase Price,"** as that term is defined below, provided that the right of any successor of Landlord to exercise its right of repurchase hereunder shall not apply to any Reassessment which results from the event pursuant to which such successor of Landlord became the Landlord under this Lease. As used herein, **"Proposition 13 Purchase Price"** shall mean the present value of the Proposition 13 Protection Amount remaining during the Lease Term, as of the date of payment of the Proposition 13 Purchase Price by Landlord. Such present value shall be calculated (i) by using the portion of the Proposition 13 Protection Amount attributable to each remaining Lease Year (as though the portion of such Proposition 13 Protection Amount benefited Tenant at the end of each Lease Year), as the amounts to be discounted, and (ii) by using discount rates for each amount to be discounted equal to (A) the average rates of yield for United States Treasury Obligations with maturity dates as close as reasonably possible to the end of each Lease Year during which the portions of the Proposition 13 Protection Amount would have benefited Tenant, which rates shall be those in effect as of Landlord's exercise of its right to purchase, as set forth in this Section 4.6.3, plus (B) two percent (2%) per annum. Upon such payment of the Proposition 13 Purchase Price, the provisions of Section 4.6.2 of this Lease shall not apply to any Tax Increase attributable to the Applicable Reassessment. Since the Proposition 13 Purchase Price is an estimate because a Reassessment has not yet occurred, then when such Reassessment occurs, if Landlord has underestimated the Proposition 13 Purchase Price, then upon notice by Landlord to Tenant, Tenant's Rent next due shall be credited with the amount of such underestimation, and if Landlord overestimates the Proposition 13 Purchase Price, Tenant's Rent next due shall be increased by the amount of the overestimation.

4.7    <u>Landlord's Book and Records.</u>

4.7.1    <u>In General</u>.    In the event that Tenant disputes the amount of
Additional Rent set forth in any annual Statement or Supplemental Statement delivered by
Landlord, then subject to the TCCs of <u>Section 4.7.2</u> of this Lease, Tenant shall have the right to
provide Notice to Landlord that it intends to inspect Landlord's accounting records for the
Expense Year covered by such Statement or Supplemental Statement during normal business
hours ("**Tenant Review**").  The Tenant Review may only be conducted by employees of Tenant
and/or independent certified public accountants (a "**Third Party Auditor**"), which Third Party
Auditor shall be retained by Tenant pursuant to a commercially reasonable, non-contingency fee
arrangement so that the Third Party Auditor will be retained on any unconditional hourly rate
basis (and Tenant shall deliver evidence of such arrangement to Landlord).  As a condition
precedent to any such inspection, Tenant shall deliver to Landlord a copy of Tenant's written
agreement with such Third Party Auditor, which agreement shall include provisions which stated
that (i) Landlord is an intended third-party beneficiary of such agreement, (ii) such Third Party
Auditor will not in any manner solicit or agree to represent any other tenant of the Project with
respect to an audit or other review of Landlord's accounting records at the Project, and (iii) such
Third Party Auditor shall maintain in strict confidence any and all information obtained in
connection with the Tenant Review and shall not disclose such information to any person or
entity other than to the management personnel of Tenant, or any Tenant Parties or otherwise as
required by law.  Any Tenant Review shall take place in Landlord's office at the Project or at
such other location in Los Angeles County as Landlord may reasonably designate, and Landlord
will provide Tenant with reasonable accommodations for such Tenant Review and reasonable
use of such available office equipment, but may charge Tenant for telephone calls and
photocopies at Landlord's Actual Cost.  Tenant shall provide Landlord with not less than two (2)
weeks' prior written notice of its desire to conduct such Tenant Review.  In connection with the
foregoing review, Landlord shall furnish Tenant with such reasonable supporting documentation
relating to the subject Statement as Tenant or its third party auditor may reasonably request,
including any previous audit conducted by Landlord with respect to the Expense Year in
question.  In connection with such inspection, Tenant and Tenant's agents must agree in advance
to follow Landlord's reasonable rules and procedures regarding inspections of Landlord's records
and must execute a commercially reasonable confidentiality agreement relating to such audit.  In
no event shall Tenant have the right to conduct such Tenant Review if Tenant is then in Default
under <u>Section 19.1.1</u> of this Lease, including, without limitation, in Default of Tenant's
obligations with respect to the payment by Tenant of all Additional Rent amounts described in
the Statement which is the subject of Tenant's Review, which payment, at Tenant's election,
may be made under dispute.  In the event that following Tenant's Review, Tenant and Landlord
continue to dispute the amounts of Additional Rent shown on Landlord's Statement or
Supplemental Statement and Landlord and Tenant are unable to resolve such dispute, then either
Landlord or Tenant may submit the matter to arbitration pursuant to <u>Section 29.17</u> of this Lease
and the proper amount of the disputed items and/or categories of Direct Expenses to be shown on
such Statement shall be determined by such proceeding producing an "**Arbitration Award**" as
that term is defined in <u>Section 29.17.4</u> of this Lease.  The Arbitration Award shall be final and
binding upon both Landlord and Tenant.  If the resolution of the parties' dispute with regard to
the Additional Rent shown on the Statement, pursuant to  the Arbitration Award reveals an error
in the calculation of Tenant's Share of Direct Expenses to be paid for such Expense Year, the
parties' sole remedy shall be for the parties to make appropriate payments or reimbursements, as

the case may be, to each other as are determined to be owing. Any such payments shall be made within thirty (30) days following the resolution of such dispute. Tenant shall be responsible for all costs and expenses associated with Tenant's Review, and Tenant shall be responsible for all reasonable audit fees, attorney's fees and related costs of Tenant relating to an Arbitration Award (collectively, the **"Costs"**), provided that if the parties' final resolution of the dispute involves the overstatement by Landlord of Direct Expenses for such Expense Year in excess of four percent (4%), then Landlord shall be responsible for all Costs. Subject to the terms of Section 4.7.2 of this Lease, this provision shall survive the termination of this Lease to allow the parties to enforce their respective rights hereunder.

    **4.7.2**  **Termination of Rights**. In the event that, within thirty (30) months following receipt of any particular Statement or Supplemental Statement, as applicable, Tenant shall fail to either (i) fully and finally settle (by written agreement) any dispute with respect to such Statement or Supplemental Statement, as applicable, or (ii) submit the dispute to arbitration in accordance with the terms of Section 4.7.1, above, then Tenant shall have no further right to conduct a Tenant Review or to dispute the amount of Additional Rent set forth in the applicable Statement or Supplemental Statement, as applicable.

## ARTICLE 5

## USE OF PREMISES

    **5.1**  **Permitted Use**. Tenant shall use the Premises solely for the Permitted Use set forth in Section 7 of the Summary and Tenant shall not use or permit the Premises or the Project to be used for any other purpose or purposes whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion (subject to the terms of Section 5.4, below). Tenant shall have the right to use, in compliance with all applicable law, one (1) of the Building fire stairwells for the purposes of traveling between contiguous floors of the Premises, provided that Tenant shall, at Tenant's sole cost, install locking devices on the applicable doorways, and make any other modifications as required to allow such use. Any such installations shall comply with the terms of Article 8, below.

    **5.2**  **Prohibited Uses**. The uses prohibited under this Lease shall include, without limitation, use of the Premises or a portion thereof for (i) schools or other training facilities which are not for Tenant's Personnel or ancillary to Tenant's corporate, executive or professional office use; (ii) retail or restaurant uses open to the general public but Tenant may operate a mini-kitchen to prepare and serve food to its employees and visitors; (iii) any portion of the Premises for living quarters, sleeping apartments or lodging rooms; (iv) an auction, liquidation, fire sale, going-out-of-business or bankruptcy sale without the prior written consent of Landlord; (v) manufacturing or for the storage of merchandise except as storage incidental to the use of the Premises provided for in the Summary of this Lease; or (vi) storage or keeping of any foul or noxious gas or substances which are offensive or objectionable to Landlord or other occupants of the Project by reason of excessive noise, odors, or vibrations or interference with other tenants (collectively (i) through (vi) are the **"Prohibited Uses"**); provided, however, that to the extent Landlord permits the Prohibited Uses set forth in item (i), above, to be conducted at the Project on a significant basis, then Tenant shall be permitted to conduct such uses in a comparable manner and to a comparable extent. Tenant further covenants and agrees that Tenant shall not

use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to the provisions of the Rules and Regulations set forth in **Exhibit D**, attached hereto, or in violation of the laws of the United States of America, the State of California, or the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Project, including, without limitation, any such laws, ordinances, regulations or requirements relating to Hazardous Materials. Tenant shall not do or permit anything to be done in or about the Premises which will in any way unreasonably obstruct or interfere with the normal and customary business office operations of other tenants or occupants of the Building. Tenant shall comply with all recorded covenants, conditions, and restrictions recorded against the Project after the date of this Lease, provided that, except as required by applicable law, Tenant's obligation to comply with any covenants, conditions, and restrictions recorded after the date of this Lease shall be subject to Tenant's prior consent, which will not be withheld unless the same would materially adversely affect Tenant's rights under this Lease.

**5.3    Restrictions on Landlord's Use**. During the Lease Term, Landlord shall not permit any direct leases of space, or consent to a sublease or an assignment to which it has the right, as determined by Landlord in its sole discretion, to withhold its consent, in the Building, (i) with any foreign consulate or governmental agency, or to any entity or person which might reasonably be deemed to pose a threat of significant increased security risks, or which is of a character or reputation, or is associated with a political faction or orientation, which is materially inconsistent with the quality of the Project (provided the foregoing provisions of this item (i) shall not apply to restrict Landlord's leasing activities if such tenants or types of tenants (other than foreign consulates or governmental agencies) are currently or have in the past been tenants of the Project or Comparable Buildings), (ii) with any medical group or practitioner providing medical services (which require physical on site medical procedures not including the dispensing of drugs) to visitors of such space, or (iii) with any other entity whose use might reasonably represent a material health risk to the Building or its occupants.

**5.4    Kitchen**. Landlord hereby acknowledges and agrees that as a part of the Tenant Improvements to be constructed by Tenant in accordance with the terms of the Tenant Work Letter attached hereto as **Exhibit B**, Tenant may install a kitchen for uses consistent with general office uses within a first-class office building, subject to (i) the terms of this Section 5.4, (ii) Landlord's consent to all plans and specifications related to such kitchen (including, but not limited to, the location of such kitchen and provision for adequate venting), and (iii) compliance with all Applicable Laws. Tenant shall prevent any and all liquids, materials and odors from migrating into adjacent occupant's spaces or into the Common Areas of the Project. The means Tenant shall use to prevent such migration shall include, but not be limited to, immediately ceasing preparation of the items determined by Landlord, in Landlord's sole discretion, to be the cause of the odors. Tenant's failure to cooperate with Landlord to eliminate any odor created by Tenant's use of its kitchen shall constitute a default under this Lease.

## ARTICLE 6

## SERVICES AND UTILITIES

**6.1    Standard Tenant Services**.    Throughout the Lease Term, Landlord shall maintain and operate the Building in a first class manner materially consistent with "Class A+", as that term is defined in Section 2.2.5 of this Lease, office buildings, and provide ingress and egress control services to the Building in a first class manner materially consistent with Class A+ office buildings, shall keep the Building Structure and Building Systems in first class condition and repair materially consistent with Class A+ office buildings.  Landlord shall provide an on-site, staffed property management office throughout the Lease Term.  Landlord shall provide the following services on all days (unless otherwise stated in this Lease) during the Lease Term.

**6.1.1    Building Hours**.  Subject to limitations imposed by all governmental rules, regulations and guidelines applicable thereto, Landlord shall provide heating and air conditioning ("**HVAC**") when necessary for normal comfort for normal office use in the Premises from 8:00 A.M. to 6:00 P.M. Monday through Friday, and on Saturdays from 9:00 A.M. to 1:00 P.M. (collectively, the **Building Hours**"), except for the date of observation of New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day and, at Landlord's discretion, other locally or nationally recognized holidays (collectively, the "**Holidays**").  Upon not less than ten (10) days notice to Landlord, Tenant shall have the right, with respect to any full floor of the Premises only, to change the starting and ending times of the Building Hours, each by an equal number of hours, so as not to increase the total Building Hours, on Monday through Friday (for example, start at 5:00 a.m. and end at 3:00 p.m.).

**6.1.2    Electrical Wattage/Excess Consumption**.  Landlord shall provide adequate electrical wiring to subpanels facilities for Tenant's connection located on each floor of the Premises to Tenant's lighting fixtures and incidental use equipment to accommodate a maximum connected electrical load capacity of seven (7) watts (exclusive of electricity which is needed for HVAC) per rentable square foot of the Premises with the electricity so furnished for Tenant's lighting fixtures to be at a nominal 277/480 volts, and for equipment at a nominal 120/208 volts, with no electrical circuit for the supply of such equipment which will require a current capacity exceeding twenty (20) amperes, except that, at Tenant's sole cost, Tenant may cause three (3) outlets to have current capacity of thirty (30) amperes.  Within such foregoing capacity, as long as a Design Problem is not created, Tenant, at its sole cost and expense, will be allowed to convert a portion of such capacity to other such currents and voltages as required by Tenant's equipment. Landlord shall supply, as part of Operating Expenses, to the Premises four and one-half (4½) watts of electricity per rentable square foot during Building Hours, on a monthly basis, on a used and consumed basis for Tenant's equipment and for Tenant's lighting fixtures. If Tenant's electrical consumption in the Premises exceeds four and one-half (4½) watts per rentable square foot during Building Hours, on a monthly basis (the "**Excess Consumption**"), then within thirty (30) days after receipt of Notice, which Notice shall include reasonable evidence of the cost of such Excess Consumption, Tenant shall pay Landlord's "Actual Cost," as such term is defined in Section 6.2 of this Lease of such Excess Consumption. Landlord shall, as part of Operating Expenses, replace lamps, starters and ballasts for building standard lighting fixtures, within the Premises, and Landlord shall, at Tenant's sole cost and expense, replace lamps, starters and ballasts for non-building standard lighting fixtures within the

Premises. Tenant shall be allowed, if Tenant elects, to replace lamps, starters and ballasts for non-building standard lighting fixtures within the Premises.

      6.1.3    **Water/Smoking Areas**. Landlord shall provide city water from the regular Building outlets for drinking (in accordance with Landlord's obligations pursuant to the TCCs of Article 24 of this Lease), lavatory and toilet purposes in the Building Common Areas. Landlord shall provide a central area in the exterior Project Common Areas as a designated smoking area, in a reasonable configuration, size and location to reasonably accommodate Tenant's Personnel and other occupants, visitors and tenants of the Project who wish to smoke. Landlord shall use commercially reasonable efforts to locate the smoking area in an area removed from Building entrances or areas subject to heavy pedestrian traffic.

      6.1.4    **Janitorial Service**. Landlord shall provide janitorial services to the Premises, five (5) days per week, except on the date of observation of the Holidays, in and about the Premises and window washing services in a manner consistent with the Comparable Buildings (but in no event shall such janitorial services be less than the janitorial services set forth on **Exhibit F**). Landlord will provide necessary facilities and/or procedures at reasonable locations within the Building to facilitate the recycling of paper, glass, plastic, cardboard, and other materials reasonably designated by Tenant in accordance with Applicable Law. Notwithstanding the foregoing, Tenant shall have the right, on not less than sixty (60) days prior notice to Landlord to elect to provide its own janitorial services to the Premises, or a portion thereof, commencing as of the first day of a month, at Tenant's sole cost and expense. Such services shall be rendered by Tenant on a daily basis (five (5) days per week) to at least the standards set forth in **Exhibit H**, attached hereto. During any period in which Tenant elects to provide its own janitorial services as set forth above, Tenant shall receive a credit against Tenant's Share of Direct Expenses in an amount equal to the cost of janitorial services attributable to the Premises, or such portion thereof, as part of the gross-up calculation applied to Operating Expenses, and not in fact paid by Landlord to third party providers of janitorial services, as reasonably determined by Landlord.

      6.1.5    **Elevator**. Landlord shall provide nonexclusive, non-attended automatic passenger elevator service for all the elevators in the Building during the Building Hours and until 7:30 p.m. on weekdays (not including Holidays). Subject to closures for routine maintenance or repair and except to the extent prevented by Force Majeure Event, Landlord shall make two (2) elevators available at all other times to provide service to the Premises.

      6.1.6    **Access Control**. Landlord shall supply access control services in a manner materially consistent with the Comparable Buildings. Landlord shall in no case be liable for personal injury or property damage for any error with regard to the admission to or exclusion from the Building or Project of any person. Landlord shall provide, twenty-four hour (24) hours per day, seven (7) days per week, every day of the year, on-site Project access control equipment, personnel, procedures and systems. Subject to Landlord's reasonable approval, Tenant shall be entitled, at its sole cost, to install its own security systems for the Premises, which shall be located within the Premises and which shall not interfere with the Building Systems. Subject to availability and upon request from Tenant, Landlord's access control personnel will, during the hours 6:00 p.m. to 7:30 a.m., accompany any employee or visitor of Tenant from the Building to the on-site garage. Landlord shall, subject to Tenant's instructions to the contrary, and subject to

Landlord's reasonable access control procedures, grant access to the Premises to Tenant and Tenant's Personnel on all days and during all hours during the Lease Term.

     **6.2**    <u>**Overstandard Tenant Use**</u>.  Tenant shall not, without Landlord's prior written consent, use heat-generating machines, machines other than normal office machines, or equipment or lighting other than Building standard lights in the Premises, to the extent same may materially adversely affect the temperature otherwise maintained by the air conditioning system or materially increase the water (unless Tenant agrees to pay for such excess water) normally furnished for the Premises by Landlord pursuant to the TCCs of <u>Section 6.1</u> of this Lease, unless Tenant provides, as set forth in <u>Section 6.4</u>, below, a "Tenant HVAC System" as necessary to compensate for such effect.  If such consent is given, Landlord shall have the right to install supplementary air conditioning units or other facilities in the Premises, including supplementary or additional metering devices, and the "Actual Cost," as that term is defined in this <u>Section 6.2</u>, including the cost of installation, operation and maintenance, increased wear and tear on existing equipment and other similar charges, shall be paid by Tenant to Landlord upon billing by Landlord.  If Tenant uses water or electricity in excess of that supplied by Landlord pursuant to <u>Section 6.1</u> of this Lease, Tenant shall pay to Landlord, within thirty (30) days of billing, the Actual Cost of such excess consumption, the Actual Cost of the installation, operation, and maintenance of equipment which is installed in order to supply such excess consumption, and the cost of the increased wear and tear on existing equipment caused by such excess consumption; and Landlord may install devices to separately meter any increased use and in such event Tenant shall pay the increased cost directly to Landlord, on demand, at the Actual Cost charged by the public utility company furnishing the same, including the Actual Cost of such additional metering devices.  Tenant's use of electricity shall never exceed the capacity of the feeders to the Project or the risers or wiring installation, and subject to the TCCs of <u>Section 29.32</u> of this Lease, Tenant may install or use or permit the installation or use of any computer or electronic data processing equipment in the Premises, without the prior written consent of Landlord as long as a Design Problem is not created.  If Tenant desires to use heat, ventilation or air conditioning during hours other than those set forth in the most recently delivered Tenant Designated HVAC Hours, Tenant shall give Landlord reasonable prior Notice of Tenant's desired use in order to supply such utilities and Landlord shall provide such "after hours" HVAC to Tenant (the "**After-Hours HVAC**"), and Tenant will pay the cost of such After-Hours HVAC as Additional Rent, not more than thirty (30) days after receipt of an invoice therefor, provided that the cost for such After-Hours HVAC charged by Landlord will not exceed Landlord's Actual Cost therefor.  Such After-Hours HVAC shall be available to Tenant on a floor-by-floor basis and may be obtained by Tenant at any time by use of the after-hours HVAC activation system servicing the Premises as designated by Landlord and installed by Landlord at Landlord's sole cost and expense.  For purpose of this Lease, "Actual Cost" shall mean the actual cost, including reasonable depreciation (attributable to such after-hours usage) and actual administrative charges (to the extent not duplicative of Operating Expenses), incurred by Landlord, as reasonably determined by Landlord but without charge for profit, provided that, notwithstanding the foregoing, any amount actually charged by any third party to Landlord (i.e., unaffiliated with Landlord) for the supply of HVAC to Tenant shall be deemed part of Landlord's "**Actual Cost**".

     **6.3**    <u>**Interruption of Use**</u>.  Tenant agrees that Landlord shall not be liable for damages, by abatement of Rent (except as provided in <u>Section 19.6.2</u> of this Lease) or otherwise, for failure to furnish or delay in furnishing any service (including telephone and

telecommunication services), or for any diminution in the quality or quantity thereof, when such failure or delay or diminution is occasioned, in whole or in part, by breakage, repairs, replacements, or improvements, by any strike, lockout or other labor trouble, by ability to secure electricity, gas, water, or other fuel at the Building or Project after reasonable effort to do so, by any riot or other dangerous condition, emergency, accident or casualty whatsoever, by act or default of Tenant or other parties; and such failures or delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying Rent (except as provided in <u>Section 19.6.2</u> of this Lease) or performing any of its obligations under this Lease.   Furthermore, following the Lease Commencement Date, except with respect to personal injury or property damage to the extent caused by the negligence or willful misconduct of Landlord, Landlord shall not be liable under any circumstances for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any of the services or utilities as set forth in this <u>Article 6</u>.  Landlord may comply with voluntary controls or guidelines promulgated by any governmental entity relating to the use or conservation of energy, water, gas, light or electricity or the reduction of automobile or other emissions (**"Voluntary Compliance"**) without creating any liability of Landlord to Tenant under this Lease (subject to the terms of <u>Section 10.1</u> of this Lease to the contrary), provided that such compliance does not unreasonably reduce the quality of Tenant's occupancy of the Premises.  In the event that as a direct result of any such Voluntary Compliance, Landlord provides materially less services and/or utilities during the Base Year than during a subsequent Expense Year, the Operating Expenses for the Base Year shall be "grossed-up" to the amount they would have been had such greater amount of utilities and services used during a particular Expense Year be provided during the Base Year.

**6.4    Tenant HVAC System**.  Tenant, at its sole expense, may install a supplemental HVAC system in the Premises, for the purpose of servicing the Premises during hours other than the Tenant Designated HVAC Hours (the **"Tenant HVAC System"**).  If required for such purpose, Tenant may connect into the Building's chilled water system, if and to the extent that (i) Tenant's use of chilled water pursuant to this <u>Section 6.4</u> will not materially adversely affected the chilled water system or the use thereof by other tenants of the Project, and (ii) such connection is otherwise approved by Landlord, which approval shall not be withheld, conditioned or delayed unless a Design Problem exists.  If Tenant connects into the Building's chilled water system pursuant to the TCCs of the foregoing sentence, (x) Tenant shall install, at Tenant's expense, a meter to measure Tenant's use of chilled water, and (y) Tenant shall reimburse Landlord for Tenant's use of chilled water at Landlord's Actual Cost therefor.  Tenant shall be permitted, at Tenant's sole cost and expense, to access 277/480 volts of electricity from the existing bus duct riser in connection with the Tenant HVAC System.  In connection with the foregoing (a) Landlord shall, at Tenant's sole cost and expense, separately meter the electricity utilized by the Tenant HVAC System, and (b) Tenant shall be responsible for the cost of all electricity utilized by the Tenant HVAC System.

**6.5    Tenant's Right to Install an Emergency Generator**.  Subject to the terms hereof, Tenant shall have the right to install a generator and related fuel equipment (the **"Generator"**) the location of which shall be as indicated on **Exhibit K**, attached hereto.  Tenant must exercise its right to install the Generator, if at all, upon notice to Landlord (the **"Generator Notice"**) delivered not later than one (1) year following the Lease Commencement Date

applicable to the 24th Floor Premises, and must install the Generator, if at all, within six (6) months following Landlord's receipt of the Generator Notice. In the event Tenant fails to deliver the Generator Notice on or before the Lease Commencement Date, or fails to install the Generator within six (6) months following Landlord's receipt of the Generator Notice, Tenant's continued right to install the Generator shall be subject to the availability of suitable space at the Project to install and maintain the Generator, as reasonably determined by Landlord. Subject to Landlord's prior approval of all plans and specifications, and at Tenant's sole cost and expense, Landlord shall permit Tenant to install and maintain the Generator, and connections between the Generator and the Premises, all in compliance with all applicable Laws. Such Generator shall be used by Tenant only during (i) testing and regular maintenance, and (ii) the period of any electrical power outage in the Building. Tenant shall be entitled to operate the Generator and such connections to the Premises for testing and regular maintenance only upon notice to Landlord and at times reasonably approved by Landlord. Tenant shall submit the specifications for design, operation, installation, and maintenance of the connections to the Generator and facilities related thereto to Landlord for Landlord's consent, which consent may be conditioned on Tenant complying with such reasonable requirements imposed by Landlord, based on the advice of Landlord's engineers, so that the safety and security of the Building is not endangered, and the Building's Systems are not materially and adversely affected by the installation and operation of the Generator. Tenant shall have no obligation to pay any base rent for the space occupied by the Generator, provided that the cost of design (including engineering costs) and installation of the Generator and the costs of the Generator itself shall be Tenant's sole responsibility. All repairs and maintenance of and compliance with Applicable Laws with respect to the Generator shall be the sole responsibility of Tenant, and Landlord makes no representation or warranty with respect to such Generator. At Landlord's option, Landlord may require that Tenant remove the Generator and all related facilities upon the expiration or earlier termination of this Lease and repair all damage to the Building resulting from such removal, at Tenant's sole cost and expense. The terms of the preceding sentence shall survive the termination or earlier expiration of this Lease. The Generator shall be deemed to be a part of the Premises for purposes of the indemnification and insurance provisions of this Lease, and Tenant shall maintain, at Tenant's cost, industry standard "boiler and machinery" insurance coverage with respect thereto.

**6.6** **Tenant's Right to Install UPS System**. Subject to the terms hereof, Tenant shall have the right to install a UPS system (the "**UPS System**") within the Premises, and not within the Building core, in a location to be designated by Tenant. Subject to Landlord's prior approval of all plans and specifications, and at Tenant's sole cost and expense, Landlord shall permit Tenant to install and maintain the UPS System, all in compliance with all Applicable Laws. Tenant shall submit the specifications for design, operation, installation, and maintenance of the UPS System and facilities related thereto to Landlord for Landlord's consent, which consent may be conditioned on Tenant complying with such reasonable requirements imposed by Landlord, based on the advice of Landlord's engineers, so that the safety and security of the Building is not endangered, and the Building's Systems are not materially and adversely affected by the installation and operation of the UPS System. Tenant shall have no obligation to pay any base rent for the space occupied by the UPS System, provided that the cost of design (including engineering costs) and installation of the UPS System and the costs of the UPS System itself shall be Tenant's sole responsibility. All repairs and maintenance of and compliance with Applicable Laws with respect to the UPS System shall be the sole responsibility of Tenant, and