### C. Monthly

1. Strip, power scrub and wax all tile floors.

2. Clean all fire extinguisher cabinets - inside and outside.

## IV. ELEVATORS

### A. Daily

1. Clean and polish any metal strip work, interior buttons, and elevator doors to remove fingerprints, smudges, water, and other marks.

2. Elevator cab thresholds and elevator thresholds on each floor landing will be thoroughly scrubbed and polished.

3. Elevator hall call buttons will be polished and wall surfaces around hall call plates cleaned.

## V. PERIMETER WINDOWS

1. Clean two (2) times per year on the outside and once per year on the inside.

## VI. SPECIALIZED CLEANING

Tenant may require specialized cleaning of certain finishes and Landlord agrees to follow Tenant's reasonable instruction as to the cleaning of such materials. Tenant shall reimburse Landlord for any extra janitorial costs incurred as a result of such specialized cleaning to the extent the cost exceed the amount of costs that would have otherwise been incurred by Landlord but for such specialized instruction.

# EXHIBIT G

## FORM OF SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (the "Agreement") is dated as of the 10th day of January, 2005, between LaSalle Bank National Association, as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2004-C1, Commercial Mortgage Pass-Through Certificates, Series 2004-C1 ("Lender"), and Lehman Brothers Holdings Inc., a Delaware corporation ("Tenant").

## RECITALS

A.  Tenant is the tenant under a certain lease (the "Lease") dated January 10th, 2005, with Constellation Place, LLC, a Delaware limited liability company ("Landlord") of premises described in the Lease (the "Premises") located in a certain office building known as MGM Tower located in the County of Los Angeles, State of California and more particularly described in Exhibit A attached hereto and made a part hereof (such office building, including the Premises, is hereinafter referred to as the "Property").

B.  Landlord represents to Tenant that Landlord has executed a deed of trust in favor of Lender pursuant to which Landlord encumbered Landlord's interest in the Property to secure, among other things, a loan made by Lender (or its predecessor in interest) to Landlord on terms more particularly set for in that certain Loan Agreement between Lender (or its predecessor in interest) and Landlord. The Deed of Trust and the Loan Agreement, along with other pertinent loan documents are hereinafter collectively referred to as the "Security Documents".

## AGREEMENT

For mutual consideration, including the mutual covenants and agreements set forth below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Subject to Section 2 below, Tenant agrees that the Lease is and shall be subject and subordinate to the Security Documents and to all present or future advances under the obligations secured thereby and all renewals, amendments, modifications, consolidations, replacements and extensions of the secured obligations and the Security Documents, to the full extent of all amounts secured by the Security Documents from time to time. Said subordination is to have the same force and effect as if the Security Documents and such renewals, modifications, consolidations, replacements and extensions thereof had been executed, acknowledged, delivered and recorded prior to the Lease, any amendments or modifications thereof and any notice thereof.

2.  Lender agrees that, if the Lender exercises any of its rights under the Security Documents, including an entry by Lender pursuant to the Mortgage or a foreclosure of the

Mortgage, or if Lender otherwise succeeds to Landlord's interest under the Lease, then, so long as Tenant is not in default under the Lease beyond all applicable notice and cure periods set forth in the Lease, (i) Lender shall not disturb Tenant's right of quiet possession of the Premises under the terms of the Lease (including during all extension periods which are hereinafter exercised in accordance with the Lease), and (ii) subject to the terms and provisions of this Agreement (including, without limitation, the terms and provisions of Section 4 below), Lender will recognize Tenant as the "tenant" under the Lease upon the same terms and provisions set forth in the Lease.

3. Tenant agrees that, in the event of a foreclosure of the Mortgage by Lender or the acceptance of a deed in lieu of foreclosure by Lender or in the event of any other succession of Lender to fee ownership, Tenant will attorn to and recognize Lender as its landlord under the Lease for the remainder of the term of the Lease (including all extension periods which have been or are hereafter exercised) upon the same terms and conditions as are set forth in the Lease, and Tenant hereby agrees to pay and perform all of the obligations of Tenant pursuant to the Lease.

4. Notwithstanding anything to the contrary contained in this Agreement (including, without limitation, Section 2 above), Tenant agrees that, in the event Lender succeeds to the interest of Landlord under the Lease, Lender shall not be:

(a) liable for any act or omission of any prior Landlord (including, without limitation, the then defaulting Landlord), except as specifically set forth in the last paragraph of this Section 4, or

(b) subject to any defense or offsets which Tenant may have against any prior Landlord (including, without limitation, the then defaulting Landlord), except as specifically set forth in the last paragraph of this Section 4, or

(c) bound by any payment of rent or additional rent which Tenant might have paid for more than one month in advance of the due date under the Lease to any prior Landlord (including, without limitation, the then defaulting Landlord), except for payments made to Landlord pursuant to Section 4.4.2 of the Lease, or

(d) bound by any obligation to make any payment to Tenant which was required to be made prior to the time Lender succeeded to any prior Landlord's interest, or

(e) accountable for any monies deposited with any prior Landlord (including security deposits), except to the extent such monies are actually received by Lender, or

(f) bound by any surrender or termination of the Lease made without the consent of Lender (other than a surrender or a termination that is permitted in the Lease without Landlord's consent).

Nothing contained in Section 4(a) above shall relieve Lender from its obligation to cure any repair or maintenance default under the Lease by any prior landlord under the Lease (including Landlord) which is continuing when Lender succeeds to Landlord's interest under the Lease and acquires title to the Premises, provided that (i) Lender had written notice of such

default in accordance with Section 6 below prior to succeeding to Landlord's interest under the Lease and acquiring title to the Premises, (ii) Lender had an opportunity to cure such default in accordance with Section 6 below prior to succeeding to Landlord's interest under the Lease and acquiring title to the Premises, and (iii) Lender's obligation to cure such default shall be limited solely to performing the repair or maintenance obligation as required pursuant to the terms of the Lease (and in no event shall Lender have any other liability or obligation with respect to such default). Additionally, and notwithstanding anything contained in Section 4(b) above, if Lender succeeds to Landlord's interest under the Lease and acquires title to the Premises, then Lender shall be subject to any offset rights then currently existing and specifically set forth in the Lease, provided that (i) Lender had written notice of the default giving rise to the offset right in accordance with Section 6 below prior to succeeding to Landlord's interest under the Lease and acquiring title to the Premises, (ii) Lender had an opportunity to cure such default in accordance with Section 6 below prior to succeeding to Landlord's interest under the Lease and acquiring title to the Premises, and (iii) in no event shall Lender be subject to any such offset rights which total, in the aggregate, more than $50,000.00 (the "Offset Cap") (provided, however, the Offset Cap shall in no way limit Tenant's right to offset the Tenant Improvement Allowance (as defined in the Lease) to the extent Tenant is permitted to offset the Tenant Improvement Allowance pursuant to the Lease).

     5.     Tenant agrees that, notwithstanding any provision hereof to the contrary, the terms of the Mortgage shall continue to govern with respect to the disposition of any insurance proceeds or eminent domain awards, and any obligations of Landlord to restore the real estate of which the Premises are a part shall, insofar as they apply to Lender, be limited to insurance proceeds or eminent domain awards received by Lender after the deduction of all costs and expenses incurred in obtaining such proceeds or awards; provided, however, the foregoing shall not (i) alter Landlord's restoration obligations specifically set forth in the Lease with respect to any casualty or condemnation, or (ii) affect any of Tenant's termination rights specifically set forth in the Lease with respect to any casualty or condemnation.

     6.     Tenant hereby agrees to give to Lender copies of all notices of Landlord default(s) under the Lease in the same manner as, and whenever, Tenant shall give any such notice of default to Landlord, and no such notice of default shall be deemed given to Landlord unless and until a copy of such notice shall have been so delivered to Lender. Lender shall have the right to remedy any Landlord default under the Lease, or to cause any default of Landlord under the Lease to be remedied, and for such purpose Tenant hereby grants Lender such additional period of time as may be reasonable to enable Lender to remedy, or cause to be remedied, any such default in addition to the period given to Landlord for remedying, or causing to be remedied, any such default (provided such additional period shall not (i) exceed ten (10) additional days for any Landlord default which can be cured simply by the payment of money, and (ii) exceed thirty (30) additional days for all other defaults, provided that if Lender cannot reasonably cure any such other default in such thirty (30) additional day period, then Lender shall have such additional time as is reasonably necessary to cure such default so long as Lender commenced to cure such default within such thirty (30) additional day period and diligently prosecutes such cure). Tenant shall accept performance by Lender of any term, covenant, condition or agreement to be performed by Landlord under the Lease with the same force and effect as though performed by Landlord. No Landlord default under the Lease shall exist or shall be deemed to exist (i) as long as Lender, in good faith, shall have commenced to cure such default within the above referenced

time period and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, or (ii) if possession of the Premises is required in order to cure such default, or if such default is not susceptible of being cured by Lender, as long as Lender, in good faith, shall have notified Tenant that Lender intends to institute proceedings under the Security Documents, and, thereafter, as long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence. Lender shall have the right, without Tenant's consent, to foreclose the Mortgage or to accept a deed in lieu of foreclosure of the Mortgage or to exercise any other remedies under the Security Documents.

       7.    Tenant hereby consents to the Assignment of Leases and Rents from Landlord to Lender in connection with the Loan. Tenant acknowledges that the interest of the Landlord under the Lease is to be assigned to Lender solely as security for the purposes specified in said assignments, and Lender shall have no duty, liability or obligation whatsoever under the Lease or any extension or renewal thereof, either by virtue of said assignments or by any subsequent receipt or collection of rents thereunder, unless Lender shall specifically undertake such liability in writing or unless Lender or its designee or nominee becomes, and then only with respect to periods in which Lender or its designee or nominee becomes, the fee owner of the Premises. Tenant agrees that upon receipt of a written notice from Lender of a default by Landlord under the Loan, Tenant will thereafter, if requested by Lender, pay rent to Lender in accordance with the terms of the Lease, and Landlord agrees that Tenant may make such payment in full reliance on Lender's notice to Tenant.

       8.    Intentionally Omitted.

       9.    Any notice, election, communication, request or other document or demand required or permitted under this Agreement shall be in writing and shall be deemed delivered on the earlier to occur of (a) receipt or (b) the date of delivery, refusal or nondelivery indicated on the return receipt, if deposited in a United States Postal Service Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to Tenant or Lender, as the case may be, at the following addresses:

    If to Tenant:

    Lehman Brothers, Inc.
    745 7th Avenue, 29th Floor
    New York, New York  10019
    Attn:  Jaime Fuertes

    and to:

    Lehman Brothers, Inc.
    745 7th Avenue
    New York, New York  10019
    Attn:  Beth E. Anisman, Esq., Senior Real Estate Counsel

    with a copy to:

> DLA Piper Rudnick Gray Cary US LLP
> 550 South Hope Street
> Suite 2300
> Los Angeles, CA 90071
> Attn: Michael Meyer, Esq.
>
> If to Lender:
>
> Wachovia Bank, National Association
> NC 1075
> 8739 Research Drive URP4
> Charlotte, North Carolina 28288-1075
> Attention: Commercial Real Estate Services

10. The term "Lender" as used herein includes any successor or assign of the named Lender herein, including without limitation, any co-lender at the time of making the Loan, any purchaser at a foreclosure sale and any transferee pursuant to a deed in lieu of foreclosure, and their successors and assigns, and the terms "Tenant" and "Landlord" as used herein include any successor and assign of the named Tenant and Landlord herein, respectively; provided, however, that such reference to Tenant's or Landlord's successors and assigns shall not be construed as Lender's consent to any assignment or other transfer by Tenant or Landlord.

11. If any provision of this Agreement is held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed modified to the extent necessary to be enforceable, or if such modification is not practicable, such provision shall be deemed deleted from this Agreement, and the other provisions of this Agreement shall remain in full force and effect, and shall be liberally construed in favor of Lender.

12. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented, waived or modified orally, but only by an instrument in writing executed by the party against which enforcement of the termination, amendment, supplement, waiver or modification is sought.

This Agreement shall be construed in accordance with the laws of the State of California.

The person executing this Agreement on behalf of Tenant is authorized by Tenant to do so and execution hereof is the binding act of Tenant enforceable against Tenant.

Witness the execution hereof [under seal] as of the date first above written.

LENDER:   LaSalle Bank, National Association, as trustee for the registered holders of LB-UBS Commercial Mortgage Trust 2004-C1, Commercial Mortgage Pass-Through Certificates, Series 2004-C1 by Wachovia Bank, National Association, as Master Servicer

By: _____
Name:
Title:

TENANT:   Lehman Brothers Holdings

By: _____
Name:
Title:

The undersigned Landlord hereby consents to the foregoing Agreement and confirms the facts stated in the foregoing Agreement.
LANDLORD: _____

By: _____
Name:
Title:

STATE OF NORTH CAROLINA    )
                           ) SS.
COUNTY OF MECKLENBURG      )

On _____, 200\_\_\_\_, personally appeared the above named _____ _____, a _____ of Wachovia Bank, National Association, and acknowledged the foregoing to be the free act and deed of said association, before me.

                                                   Notary Public
                                                   My commission expires: _____

                                    )
_____    ) SS.
                                    )

On _____, 200\_\_\_\_, personally appeared the above named _____ _____, a _____ of _____, and acknowledged the foregoing to be the free act and deed of said association, before me.

                                                   Notary Public
                                                   My commission expires: _____

                                    )
_____    ) SS.
                                    )

On _____, 200\_\_\_\_, personally appeared the above named _____ _____, a _____ of _____, and acknowledged the foregoing to be the free act and deed of said association, before me.

                                                   Notary Public
                                                   My commission expires: _____

# EXHIBIT H

## SECURITY SYSTEM SPECIFICATIONS

Landlord's access control systems shall materially comply with those certain reference drawings dated as of October 25, 2000, prepared by the Schatz Consulting Group, and containing the specific sheets referenced below.

| SHEET | TITLE |
|---|---|
| ESO-1 | Symbol Legend & General Notes |
| T-ES2-1 | Basement Floor Plan |
| T-ES2-2 | Ground Floor Plan |
| T-ES2-3 | Mechanical Floor |
| T-ES2-17 | Tower Mechanical Penthouse |
| P-ES2-1 | Parking Structure B-3 Level |
| P-ES2-2 | Parking Structure B-2 W Level Plan |
| P-ES2-3 | Parking Structure B-1 W Level Plan |
| P-ES2-4 | Parking Structure B-1 E Level Plan |
| P-ES2-5 | Parking Structure Ground W Level Plan |
| P-ES2-6 | Parking Structure - Ground E Level Plan |
| P-ES2-7 | Parking Structure - 2nd Level W Plan |
| P-ES2-8 | Parking Structure - 2nd E Level Plan |
| P-ES2-9 | Parking Structure - 3rd W Level Plan |
| P-ES2-10 | Parking Structure - 3rd E Level Plan |
| P-ES2-11 | Parking Structure - 4th W Level Plan |
| P-ES2-12 | Parking Structure - 4th E Level Plan |
| P-ES2-13 | Parking Structure - 5th Level Plan |
| P-ES2-14 | Parking Structure - 6th Level Plan |

# EXHIBIT I

## HVAC SPECIFICATIONS

The Building HVAC System is designed to meet the following specifications:

**Summer:**    Outside dry bulb:        88d.F

Outside wet bulb:        69d.F

Inside dry bulb:         75d.F

Inside relative humidity:    30%-60%

**Winter:**    Outside dry bulb:        43d.F

Inside dry bulb:         70d.F

Inside relative humidity:    30%-60%

**Minimum ventilation:**    15.0 CFM/100 square feet.

**Average air supply:**      1.0 CFM/square foot.

## EXHIBIT J

## MULTI-TENANT MONUMENT



# EXHIBIT K

## CONSTELLATION PLACE

## LOCATION OF GENERATOR



# EXHIBIT L

# CONSTELLATION PLACE

# COMPETITOR LIST

Goldman Sachs
Morgan Stanley
Bear Stearns
Citigroup/Smith Barney
Credit Suisse First Boston
Merrill Lynch
JPMorgan Chase
Deutsche Bank
UBS Warburg

# EXHIBIT M

# CONSTELLATION PLACE

# ILFC RIGHTS

Commencing as of the expiration of the third (3rd) year of ILFC's lease term, ILFC has a one-time right of first offer with respect to each full floor space located in the high-rise portion of the Building (i.e., floors 24 through 35 of the Building), subject to and in accordance with the terms of ILFC's lease.