**Hearing Date: October 16, 2008, at 10:00 a.m. (Eastern Time)**

Dennis F. Dunne
Luc A. Despins
Wilbur F. Foster
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

-and-

Paul Aronzon
Gregory A. Bray
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000

Proposed Counsel for Official
Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
:
In re:                                          :         Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., et al.,          :         08-13555 (JMP)
:
       Debtors.                                 :         (Jointly Administered)
:
------------------------------------------------------------------ x

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO AMENDED MOTION FOR APPOINTMENT OF
<u>OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in

the chapter 11 cases of Lehman Brothers Holdings Inc. (the "<u>Debtor</u>") and its affiliated debtors

and debtors in possession (other than Lehman Brothers Inc. ("<u>LBI</u>"), collectively, the "<u>Debtors</u>")

hereby objects to the Amended Motion For Appointment Of Equity Committee (the "<u>Equity

Committee Motion"), dated September 22, 2008, filed by Mr. Greg Georgas (the "Movant"), and respectfully states as follows:

## I. PRELIMINARY STATEMENT

1. As a result of the market turmoil over the past few months, virtually all investors have witnessed and suffered a tremendous and, in many respects, unparalleled loss of value. This rapid and catastrophic diminution of value was particularly acute for the Debtor's securities. The value of the Debtor's stock and debt securities plummeted both prior to and after its bankruptcy filing. At the same time, the sales of the Debtor's assets and businesses have been at fractions of book or previously assumed levels of value. Accordingly, the Debtor's debt securities are trading at extremely low levels, implying that the Debtor is insolvent by well over $100 billion. While the Committee hopes these bleak projections will improve, there currently is no foreseeable and credible path to any distribution to common stockholders.

2. The appointment of an equity committee – a "rare" and "extraordinary" remedy in bankruptcy jurisprudence – is unwarranted in these cases. The Movant's "arguments" to the contrary are entirely speculative and are nothing but wishful thinking about current assets and liabilities, without any credible evidence to satisfy his burden. The sum total of the Movant's "arguments" for the appointment of an equity committee consists of (i) a statement in the Debtor's press release with respect to its financial results for the third quarter of 2008 (the "September Press Release") showing positive "shareholders equity"; (ii) his hope that the proposed governmental bailout of the financial industry will somehow redound to the benefit of the Debtor's equity holders; and (iii) an allegation that the discrepancy in the amount of cash on hand as of the date of the September Press Release and as of the date of the Debtor's bankruptcy filing warrants an investigation that only an official equity committee could properly conduct.

2

These assertions are neither accurate nor probative.

3. The Debtor's equity securities lost approximately 98.7% of their value during the month prior to the Debtor's bankruptcy filing, while its debt securities lost, depending on their ranking, between 95.6% and 63.8% of their value, during the same period. Sophisticated investors in the secondary markets thus evinced (and, since bond and stock prices are still falling, continue to evince) a strong belief that (i) the Debtor's senior unsecured debt securities will be impaired substantially and (ii) the holders of the Debtor's subordinated debt are likely to recover no more than four percent of their face value.

4. Similarly, no showing has been made that the interests of the equity holders are not being adequately represented in these cases, by either the Debtors or the Committee. The Movant alleges no fraud or breach of fiduciary duty against the Debtors. No reason exists for suspecting that either the Debtors or the Committee will fail to diligently and zealously search for ways to maximize the value of these estates and limit claims for the benefit of all parties in interest. The Movant's interests are certainly no different.

5. Moreover, adding another statutory committee without sufficient justification would serve only to add unwarranted complexity to already complex cases, interfere with their efficient administration, and unnecessarily increase the costs of such administration, which will ultimately be borne by, and reduce the recoveries of, the unsecured creditors. Thus, since the Movant has utterly failed to demonstrate that any of the legal grounds for the appointment of an equity committee is present in these cases – where there is no substantial likelihood of a meaningful distribution to equity, where equity's interests are already adequately represented, and where such an appointment would be an unnecessary waste of the Debtor's resources – the Court should deny the Equity Committee Motion.

## II.   BACKGROUND

6.   On September 15, 2008 and periodically thereafter, the Debtors commenced these chapter 11 cases. The Debtors have been authorized to operate their businesses and manage their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code. On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the Committee. No trustee or examiner been appointed in these chapter 11 cases.

7.   In the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First Day Motions and Applications (the "Lowitt Aff.", Docket No. 2), the Debtor explained the circumstances that necessitated its bankruptcy filing, including the rapid continuing diminution in the value of its assets, its increasing mark-to-market obligations and its plummeting stock price. (Lowitt Aff. at ¶ 27) The same concerns about downwardly-spiraling values and prices have continued to pervade every aspect of these chapter 11 cases.

8.   On September 16, 2008, the Debtors, LBI, and Barclays Capital Inc. entered into an Asset Purchase Agreement (as amended and clarified, the "Purchase Agreement") for the purchase and sale of LBI's assets, three real properties including the Debtor's headquarters, and two data centers. On September 20, 2008, the Court entered an order (Docket No. 258, the "Sale Order") approving the Purchase Agreement and various transactions contemplated therein (the "LBI Sale"), as well as a similar order with respect to LBI in the concurrent proceeding under the Securities Investor Protection Act of 1970. As a result of the LBI Sale, the Debtor hopes to realize approximately $1.3 billion proceeds from the assets that, as recently as May 31, 2008, were conservatively valued at over $6 billion.

4

9. In the ensuing weeks, the Debtors have filed motions seeking Bankruptcy Court approval of proposed sales of (i) the Neuberger Berman investment management business, (ii) Eagle Energy, and (iii) certain membership/equity interests in R3 Capital Management LLC – each at values significantly lower than those estimated or anticipated prepetition. (Docket Nos. 503, 694, and 746.)

10. In addition, administrators in insolvency proceedings in the U.K. and Asia have agreed to sell (i) former Debtors' assets in Hong Kong, Japan, Singapore, India and Australia for $221.3 million, see Nomura Grows in Europe As It Buys More of Lehman, *Wall Street Journal* (Sept. 24, 2008); and (ii) a substantial portion of the Debtors' businesses in Europe and the Middle East for what has been reported to be 2 Euros, plus the assumption of significant liabilities. See PwC Finds No Buyer for Lehman Fixed-Income Europe, *Reuters* (Sept. 30, 2008).

11. Finally, this Court should note the state of the global economy, with its expanding circle of customer and market crises of confidence that have led to a virtual implosion of the businesses of various prominent financial market players around the world. The value of the assets of companies such as the Debtors, is highly correlative to the actual or perceived weaknesses in the capital markets. Amidst this storm, it is not probative to recite historical values to attempt to demonstrate current ones.

12. On September 19, 2008, the Movant filed the initial Equity Committee Motion, and re-filed it in amended form on September 22, 2008. By letter dated October 7, 2008, the Movant also requested the U.S. Trustee to appoint an equity committee in the Debtor's case, which request was denied by the U.S. Trustee on October 9, 2008. On or about October 10, 2008, the Movant filed the Memorandum of Law in Support of the Amended Motion for

5

Appointment of Equity Committee.

### III.  OBJECTION

#### A.  Applicable Legal Standards

13. Section 1102(a)(2) of the Bankruptcy Code provides, in pertinent part, that "[o]n request of a party in interest, the court **may** order the appointment of additional committees of creditors or equity security holders **if necessary** to assure adequate representation of creditors or equity security holders." 11 U.S.C. § 1102(a)(2) (emphasis added). The Bankruptcy Code does not define when the appointment of an equity committee may be "necessary" to assure adequate representation. Instead, bankruptcy courts retain the discretion to appoint an equity committee based on the particular facts of each case. In re Williams Commc'ns Group, Inc., 281 B.R. 216, 219 (Bankr. S.D.N.Y. 2002) ("permissive language ('may') of the statute indicates that the UST's authority to appoint [an equity] committee is discretionary") (citing Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.), 68 B.R. 155, 159 (S.D.N.Y. 1986)); In re Dow Corning Corp., 194 B.R. 121, 141 (Bankr. E.D. Mich. 1996), rev'd on other grounds, 212 B.R. 258 (E.D. Mich. 1997) ("The test is, in essence, a balancing of interests and is by its nature quite case-specific.").

14. Well-settled interpretative principles guide the Court's discretion in this area. First, that "[t]he appointment of official equity committees should be the **rare exception**," and second, that "[s]uch committees should not be appointed unless equity holders establish that (i) there is a **substantial likelihood** that they will receive a **meaningful** distribution in the case under a strict application of the absolute priority rule, **and** (ii) they are unable to represent their interests in the bankruptcy case without an official committee." Williams, 281 B.R. at 223 (emphasis added); see also In re Emons Indus., Inc., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985).

6

15.     In assessing the "adequacy" of the stockholders' representation, bankruptcy courts have also looked to a plethora of factors, none of them dispositive, but that inevitably include the weighing of the costs, in terms of delay and administrative burden, of an additional committee against legitimate concerns, if any, for adequacy of representation.  See Johns-Manville, 68 B.R. at 159-60;  In re Nat'l R.V. Holdings, Inc., 390 B.R. 690, 696 (Bankr. C.D. Cal. 2008);  Williams, 281 B.R. at 220.  Ultimately, "the amount of weight that the court should place on each factor may depend on the circumstances of the particular Chapter 11 case." In re Kalvar Microfilm, Inc., 195 B.R. 599, 600-01 (Bankr. D. Del. 1996); R.V. Holdings, 390 B.R. at 696.

16.     Significantly – and notwithstanding the Movant's contentions to the contrary – the existence of a large number of shareholders is not a controlling, or necessarily even a relevant, factor in assessing the need for the appointment of an equity committee.  To the contrary, as the Williams court held, "not every case with . . . a large number [of shareholders] will require an official equity committee" because "if Congress' intent was otherwise, it would have mandated the appointment of equity committee instead of leaving it within the discretion of the UST and the Court."  Williams, 281 B.R. at 223; see also In re Wang Laboratories, Inc., 149 B.R. 1, 2 (Bankr. E.D. Mass 1992) (finding sufficient number of shareholders, but "not conclud[ing] or implying that every case with a large number of equity holders requires the appointment of an equity committee"); Johns-Manville, 68 B.R. at 159 ("Congress' desire to protect shareholders in reorganization proceedings was not strong enough . . . to mandate the creation of an equity committee" in every case).

17.     The Movant bears the burden of proof, based on the above criteria.  In re Dana Corp., 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006) ("The movant has the burden of proving

7

that the appointment of an additional committee is necessary to insure 'adequate representation' of the moving party."); In re Delphi Corp., 05-44481, slip op. at 159-60 (Bankr. S.D.N.Y. Mar. 22, 2006) ("The case law is clear that the burden of showing lack of adequacy of representation is on the movant."). Under the foregoing generally accepted principles, the appointment of an equity committee in these cases is unwarranted.

### B. Shareholders Are Unlikely to Receive a Meaningful Distribution

18. At the heart of the analysis lies the determination of whether there is a "substantial likelihood that [equity holders] will receive a meaningful distribution in the case under the strict application of the absolute priority rule." Williams, 281 B.R. at 223. The Movant's sole "evidence" to support such likelihood is the positive "shareholders equity" listed in the September Press Release that is based on the book value of the Debtor's assets and liabilities prior to the bankruptcy filing. At its best, resort to book value does "not tell the whole story" (R.V. Holdings, 390 B.R. at 696), while at worst it "does not shed any light" on the actual market value of the Debtor's assets. In re Leap Wireless Int'l, Inc., 295 B.R. 135, 138 (Bankr. S.D. Cal. 2003) (when confronted with evidence exclusively of "the net book value" of the debtor's assets, concluded that "the asset side remains an 'unknown' as net book value clearly is not market value."); Official Form No. 6 (requiring debtors to schedule all of their property at current market value).

#### 1. Asset Values and Liabilities

19. In this case, the prepetition book values utterly fail to reflect today's market reality and its impact on the actual value of the Debtor's assets and liabilities. Had it been the Debtor's or the Committee's burden (which it is not) to prove that the book value of the Debtor's assets and liabilities on which the positive shareholders' equity in the September Press

8

Release was based had no relationship to reality, they could readily have done so. For instance, the investment banking operations of LBI, the investment management business of Neuberger Berman, and the Debtor's interest in a spun-off investment fund, R3 Capital Management, LLC, were all sold at values significantly lower than estimated or anticipated prepetition.

### 2. Public Security Prices

20. Furthermore, in a publicly traded company, there is a readily ascertainable metric that sheds vivid light on what the Debtor's value is in reality: it is the price at which the Debtor's public securities trade on the secondary market. See, e.g., Leap Wireless, 295 B.R at 138 (value of the debtors' equity securities is to be calculated with reference to its "market value," and not its "net book value"); see also In re Iridium Operating LLC, 373 B.R. 283, 346 (Bankr. S.D.N.Y. 2007) (in a fraudulent conveyance context, "recognize[ing] the advantage of contemporaneous market evidence as being 'untainted by hindsight or post-hoc litigation interests' and f[inding] it important to consider the company's stock price and the opinions regarding value of other contemporaneous market participants"). In this case, the trading price of the Debtor's equity securities as of thirty days prior to the date of the Debtor's bankruptcy filing was $16.17 per share, while on October 10, 2008, it was $0.098 per share. Such a dramatic drop in price conclusively demonstrates that the market does not perceive a substantial likelihood for a meaningful distribution to the holders of the Debtor's equity securities, and that such holders do not have a significant interest to protect.

21. The trading price for the Debtor's debt securities reflects and evinces the underlying deterioration of the value of its assets. See, e.g., Williams Communications, 281 B.R. at 221 (debtors' "publicly held bonds are trading at a steep discount on the market -- another useful, though not exclusive, indicator of insolvency.") While thirty days prior to the Debtor's

9

bankruptcy filing its senior unsecured debt traded at $93.90 and its subordinated debt at $90.32, as of October 10, 2008, these securities traded at $8.50 and $0.125, respectively. The fact that sophisticated players in the secondary markets believe that there is substantial risk that even senior unsecured debt securities of the Debtor will be impaired, while the holders of the Debtor's subordinated debt are unlikely to recover even one percent of its face value further demonstrates that no distribution to equity holders is likely in these cases. Accordingly, the market evidence in these cases clearly indicates that the Debtor's equity holders are highly unlikely to receive any – let alone a "meaningful"-- distribution in these cases.

### 3. Value of Government Bailout

22.   The Movant's misguided reliance on the alleged benefits to the Debtor of the legislation providing for a governmental bailout of the financial industry (the "Bailout Legislation") entails little more than the type of "rank speculation" that controlling precedent has rejected as a proper basis for the "practical conclusion" about solvency required in the equity committee context. Williams, 281 B.R. at 222 (rejecting as "rank speculation" argument seeking to establish solvency predicated on the subordination of certain claims); Victor v. Edison Bros. Stores (In re Edison Bros. Stores, Inc.), No. 95-1354, 1996 WL 534853, at *5 (D. Del. Sept. 17, 1996) (affirming denial of motion to appoint separate committee based on "pure speculation"); In re Hills Stores Co., 137 B.R. 4, 6-7 (Bankr. S.D.N.Y. 1992) (denying appointment of separate committee based on "rank speculation"); In re Northwestern Corp., No. 03-12872, 2004 WL 1077913 (Bankr. D. Del. May 13, 2004) (declining to appoint equity committee on basis of "dubious" valuation arguments).

### C.   There are Other Avenues for Equity Interests to be Represented

23.   The Movant has likewise failed to sustain its burden in demonstrating to

10

the Court that it has no other avenues to have its interests represented in these cases. As other courts have held in similar contexts, section 1109(b) of the Bankruptcy Code (which allows any party in interest, including equity holders, to be heard on any issue in a bankruptcy case), coupled with section 503(b)(3)(D) (which allows such party in interest to seek reimbursement of costs incurred to the extent it makes a "substantial contribution" to the case), absent other compelling factors, provide adequate avenues for an equity holder to pursue its interests, making the appointment of an official equity committee "unwarranted." See, e.g., Williams, 281 B.R. at 223-224.

D.    **Equity Interests Are Adequately Represented**

24.    Furthermore, appointment of an equity committee in these cases is not warranted because the interests of the Debtor's equity security holders are already "adequately" represented. "[T]he statutory focus of section 1102(a)(2) is not whether shareholders are 'exclusively' represented, but whether they are 'adequately' represented." Edison Bros. Stores, 1996 WL 534853, at *4. With respect to maximizing value, as well as any allegedly improper transfers of funds, the interests of the Debtor's equity holders, the Debtor and the Debtor's unsecured creditors represented by the Committee are "sufficiently aligned or parallel . . . to preclude the need for an additional committee." Williams, 281 B.R. at 222-23; Leap Wireless, 295 B.R. at 139-40 ("The economic interests of the bondholders and shareholders appear to be the same – that is, to find the highest realistic value for the company").

25.    There have been no allegations that the Debtor's management has committed fraud or has been derelict in its fiduciary duties. "A company's board of directors acts for the shareholders and the insolvency of a company does not absolve the board of its fiduciary duty to the shareholders." In re Oneida Ltd., No. 06-10489, 2006 WL 1288576, at *2

11

(Bankr. S.D.N.Y. May 4, 2006) (quoting Commodities Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355 (1985)); see Unofficial Comm. Of Equity Holders of Penick Pharm., Inc. v. McManigle (In re Penick Pharm., Inc.), 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) (finding that managers of debtors-in-possession had same duties as chapter 11 trustee, i.e., to maximize value).

26.     Moreover, in this case, the Committee's efforts to maximize asset values and contain claims will redound to the benefit of all parties in interest. See Williams, 281 B.R. at 222-23 ("[T]he Creditors' Committee has sufficiently aligned or parallel interests with the Shareholders to preclude the need for an additional committee"); Leap Wireless, 295 B.R. at 140 (same). Thus, both the Debtors and the Committee will strive to attain the "highest realistic value" for the estates' assets. The Movant has presented no evidence that either the Committee or the Debtors will not continue to do so. See In re Grant Broad. of Phila., Inc., 71 B.R. 655, 664 (Bankr. E.D. Pa. 1987) ("We have no reason to anticipate that [creditors] who are appointed members of this Committee will not appreciate their fiduciary duties as Committee members, and perform them well.")

**E.     Costs And Delay Mandate Against Appointment Of Equity Committee**

27.     Finally, even if any other factors did weigh in favor of appointment of an official equity committee in these cases (which, as discussed above, they do not), the costs to the Debtor's estate, in terms of delay and administrative burdens, would outweigh any marginal increase in the level of representation of equity security holders. See In re Enron Corp., 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002) ("[T]he court must decide whether it should exercise its discretion and order the appointment . . . even once inadequate representation is found") (citing In re Dow Corning Corp., 194 B.R. at 141 and In re Wang Labs., Inc. 149 B.R. 1, 2 (Bankr. D.

12

Mass. 1992)).

28. The appointment of an equity committee in these cases would impose an unfair burden on the Debtor, adding to the complexity of these cases and saddling the Debtor's estate with the significant costs of additional professional fees without sufficient justification. It would only serve to delay the Debtor's efforts to maximize value and prove an unnecessary distraction for the benefit of stakeholders that are almost certainly out of the money. See In re Emons Indus., 50 B.R. at 694 ("[N]o equity committee should be appointed when it appears that a debtor is hopelessly insolvent because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift.") Accordingly, no equity committee should be appointed in these cases.

## IV.    CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (i) deny the Equity Committee Motion in its entirety, and (ii) grant such other relief as is just.

Dated:    New York, New York
          October 13, 2008

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By: /s/  Dennis F. Dunne
Dennis F. Dunne
Luc A. Despins
Wilbur F. Foster
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

-and-

Paul Aronzon
Gregory A. Bray
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone:  (213) 892-4000

Proposed Counsel for Official
Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., et al.