Hearing Date: October 16, 2008, at 10:00 a.m.
Objection Deadline: October 14, 2008, at 10:00 a.m.

MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard Street
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584
Russell L. Munsch (admitted *pro hac vice*)
Kevin M. Lippman (admitted *pro hac vice*)
Raymond J. Urbanik (admitted)

ATTORNEYS FOR AD HOC COMMITTEE OF BONDHOLDERS

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                      :
In re:                                :    Chapter 11
                                      :
LEHMAN BROTHERS HOLDINGS              :    Case No. 08-13555 (JMP)
Inc., *et al.*,                       :    Jointly Administered
                                      :
       Debtors.                       :
-------------------------------------------------------X

**OBJECTION OF AD HOC COMMITTEE OF BONDHOLDERS TO
DEBTORS' MOTION FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS
363 AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF
BANKRUPTCY PROCEDURE 6004, 6006 AND 9019 AUTHORIZING LEHMAN
BROTHERS HOLDINGS INC. TO (A) ENTER INTO A PARTNERSHIP
INTERESTS PURCHASE AGREEMENT, (B) COMPROMISE AND
RELEASE A PORTION OF AN INTERCOMPANY LOAN, AND (C) ASSIGN
<u>THE REMAINDER OF SUCH INTERCOMPANY LOAN TO PURCHASERS</u>**

The Ad Hoc Committee of Bondholders (the "<u>Ad Hoc Committee</u>") of the Main Street Natural Gas, Inc. Gas Project Revenue Bonds, Series 2008A (56036YED, 56036YEE, 56036YEF, 56036YEG, 56036YEH) (the "<u>Bonds</u>"),[1] hereby files this Objection to Debtors'

---

[1] The Ad Hoc Committee consists of the following bondholders (who collectively hold approximately 18.94% of the outstanding principal amount of the Bonds): Allstate Insurance Company; Bel Air Investment Advisors LLC; Franklin Advisers, Inc.; and Independence Holding Co.

Page 1

("Debtors") Motion for Entry of an Order Pursuant to Sections 363 and 365 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 6004, 6006 and 9019 Authorizing Lehman Brothers Holdings Inc. to (A) Enter Into a Partnership Interests Purchase Agreement, (B) Compromise and Release a Portion of an Intercompany Loan, and (C) Assign the Remainder of Such Intercompany Loan to Purchasers [Docket No. 503] (the "Sale Motion"), respectfully stating as follows:

## I.   BACKGROUND

1.   Commencing on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings, Inc. ("LBHI") and certain of its direct and indirect subsidiaries, including, Lehman Brothers Commodity Services, Inc. ("LBCS"), filed petitions for relief under chapter 11 of title 11 of the United States Code, §§ 101, *et seq.* (as amended, the "Bankruptcy Code").

2.   By Order of this Court entered on September 17, 2008 [Docket No. 86], the Debtors' bankruptcy cases (collectively, the "Bankruptcy Case") are being jointly administered under Case No. 08-13555.[2]

3.   The Debtors are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

## II.   MAIN STREET BONDS

4.   The members of the Ad Hoc Committee are holders of the Bonds, which were issued pursuant to a Trust Indenture dated April 1, 2008, between Main Street Natural Gas, Inc., a Georgia non-profit corporation ("Main Street"), and The Bank of New York Trust Company, N.A., as Trustee. The proceeds of the Bonds were used to finance Main Street's prepayment of the purchase price of approximately $681,643,656.00 for a thirty year supply of natural gas from

---

[2] The Court's Order only expressly covers the bankruptcy cases of LBHI and LB 745 LLC. However, a motion seeking an order directing joint administration of all of the Debtors' bankruptcy cases was filed on October 11, 2008.

LBCS, a subsidiary of LBHI, under an Agreement for Purchase and Sale of Natural Gas (the "Gas Purchase Agreement"), dated April 1, 2008, by and between Main Street and LBCS.[3]

5.      Main Street is sponsored by and created on behalf of the Municipal Gas Authority of Georgia, a public body and instrumentality of the State of Georgia. It was formed to acquire, finance and manage supplies of natural gas for sale to municipal and other governmental entities that are customers of Main Street.

6.      As of the date of the filing of LBCS's bankruptcy petition on October 3, 2008, LBCS was in default of its obligations under the Gas Purchase Agreement. LBCS's obligations under the Gas Purchase Agreement are guaranteed by LBHI pursuant to a Guaranty dated April 1, 2008.

### III.    SALE MOTION

7.      On October 1, 2008, the Debtors filed the Sale Motion seeking this Court's authorization for LBHI, through certain of its subsidiaries (collectively, the "Sellers"), to sell limited and general partnership interests in Eagle Energy Partners, L.P. ("Eagle") to EDF Trading North America Management LLC and EDF Trading North America Inc. (collectively, the "Purchasers") for the proposed purchase price of approximately $230 million.[4]  Sale Motion, at ¶ 11.

8.      As set forth in the Sale Motion, LBCS is one of the LBHI subsidiaries that holds interests in Eagle. Sale Motion, at ¶ 8 n. 1. LBCS is a limited partner in Eagle, and upon information and belief, is also an equity interest holder in Eagle's general partner, Eagle Energy Management LLC. ("Eagle Management"). Upon information and belief, LBHI owns 100% of

---

[3] Pursuant to the Trust Indenture, the Gas Purchase Agreement and LBCS's payment obligations thereunder serve as collateral for the repayment of the Bonds. Because of the recent date of the Gas Purchase Agreement, the vast majority of LBCS' obligations thereunder are unperformed.

[4] Capitalized terms used and not otherwise defined herein have those same meanings as in the Sale Motion.

Page 3

LBCS through two wholly owned, intermediary affiliates. LBHI is the sole, direct parent of Lehman Brothers Inc. ("LBI").[5] In turn, LBI is the sole, direct parent of Lehman Brothers Special Financing Inc., which is, in turn, the sole, direct parent of LBCS. The other LBHI subsidiaries / Sellers holding interests in Eagle are, at least currently, non-debtor entities (the "Non-Debtor Sellers").[6]

9. Eagle is engaged in the acquisition, management and delivery of natural gas and electric power throughout the United States and Canada, including the supply, storage, and transportation of natural gas. Sale Motion, at ¶ 7. Eagle markets approximately 1.5 billion cubic feet of natural gas and 1.5 billion megawatts of electricity per day, with a storage capacity of approximately 30 billion cubic feet of gas per day. *Id.*

10. Pursuant to the Purchase Agreement attached to the Sale Motion as Exhibit "1" ("Purchase Agreement"), the equity interests in Eagle, including the interests held by non-debtor entities and those held by and in Eagle Management, are to be conveyed to the Purchasers in exchange for the payment of approximately $230 million. Sale Motion, at ¶ 11; Purchase Agreement, at p. 1; §§ 1.1, 1.2. In addition, as a condition to the proposed sale, LBHI is forgiving approximately $433 million purportedly owed by Eagle to LBHI under an alleged intercompany obligation (the "Loan"), and is assigning to the Purchasers all of its rights under the Loan, including, but not limited to, the remaining outstanding balance of $230,483,347. Sale Motion, at ¶¶ 8, 11. Moreover, any other amounts owed as between any of the Sellers *or any of*

---

[5] LBI is the subject of a proceeding commenced under the Securities Investor Protection Act of 1970, which is pending before this Court under Adversary Proceeding No. 08-01420.

[6] According to the Motion and Purchase Agreement, these Non-Debtor Sellers are: (i) LBMB Fund Eagle Energy Holdings LLC; (ii) LBMB Partners Eagle Energy Holdings LLC; (iii) LBMB Fund (B) Eagle Energy Holdings LLC; (iv) LBMB Capital Partners V Eagle Energy Holdings LLC; and (v) Eagle Management.

*their affiliates* are deemed to be satisfied.  Sale Motion, at ¶ 12.  Such intercompany obligations are undisclosed.

11.     The Purchase Agreement is structured to require all of the selling entities to transfer their interests in Eagle to the Purchasers primarily for the benefit of LBHI.  Specifically, the Purchase Agreement is structured to allocate the $230 million to be paid by the Purchasers solely on account of the Loan, while the equity interests are being sold to the Purchasers for a total consideration of $100.  Purchase Agreement, at p. 1 (Recitals defining Purchased Interests), §§1.1, 1.3 and 1.4.

## IV.     OBJECTIONS

### A.     The Debtors Have Provided Insufficient Disclosures Regarding the Proposed Sale

12.     In order to sustain their burden to justify the proposed sale transaction (the "Sale") pursuant to 11 U.S.C. § 363(b), the Debtors must show that there is a "sound business purpose" why the Sale should be allowed to take place outside of the ordinary course, which requires that the Debtors establish: (i) adequate and reasonable notice of the Sale; (ii) that the price to be paid is adequate, fair and reasonable; and (iii) that the Sale is proposed in good faith.  *In re Lady H Coal Co., Inc.*, 193 B.R. 233, 243 (Bankr. S.D. W.Va. 1996).

13.     Here, the Debtors' disclosures regarding the Sale are critically deficient, beginning with the fact that the Sale Motion and its exhibits do not disclose the various Debtors' and Sellers' respective interests in Eagle.  Although these disclosures are purportedly set forth on Exhibits "A" and "B" to the Purchase Agreement, these Exhibits were not attached to the Purchase Agreement filed with the Court under the justification that such information is allegedly confidential and proprietary.  *See* Sale Motion, at ¶ 11 n. 3; Purchase Agreement, at p. 1.

14. It is difficult to understand how the respective equity interests in Eagle can constitute sensitive, proprietary information, but easy to understand why the Debtors would not include exhibits to the Purchase Agreement with the Sale Motion. Exhibit "C" to the Sale Motion, which allocates the purchase price for each equity interest in Eagle, would highlight the fact that the debtor Sellers are receiving fractional percentages of $100 in exchange for their interests while LBHI receives in excess of $230 million from the proceeds of the Sale. The Motion includes no effort to justify why the Sale has been structured solely to benefit LBHI's estate at the expense of the other debtor Sellers and their creditors, as well as at the expense of the Non-Debtor Sellers and other entities in the chain of ownership between LBHI and Eagle.

15. LBHI has used its control over debtors LBCS and Lehman Brothers Special Financing Inc. – as well as over the Non-Debtor Sellers – to structure the Sale in an attempt to prefer itself and its claims ahead of creditors of the other Sellers, including LBCS. Each of these Sellers, over which LBHI exercises control as their ultimate parent company, are required not only to convey their interests in Eagle and Eagle Management for minimal consideration, but also to forgive all loans owed to them by other Sellers (including Eagle Management) as well as by Eagle.[7] LBHI only vaguely refers to these intercompany obligations to make it appear that LBHI is entitled to all of the consideration paid on account of the Sale because it is receiving consideration for the alleged Loan claim against Eagle while the other Sellers are selling equity interests. Of course, to the extent that Eagle or Eagle Management owe other intercompany obligations to other Sellers, these obligations are also required to be forgiven, but with no consideration, clearly resulting in the preferment of LBHI over all other Sellers.

---

[7] Although LBCS is proposed under the Sale to receive forgiveness of a receivable allegedly owing to Eagle in the amount of $19,516,563, no details are provided regarding the nature of this alleged claim. In any event, such claim would likely be subject to pro rata distributions from LBCS's estate. The critical consideration is that, absent any information regarding other intercompany obligations that may be owed to LBCS that are to be released under the terms of the Sale, it is impossible to evaluate whether the Sale is fair to LBCS and other Sellers.

16.     In essence, without any authorization by this Court and despite their separate legal existence, LBHI has engineered a "de facto" substantive consolidation of the Debtors' (and Sellers') estates so the assets of these other entities may be devoted to LBHI's estate, and is treating these non-debtors as a single business enterprise or mere instrumentalities of LBHI for its own exclusive benefit.  This apparent attempt raises significant questions regarding the negotiation of the Sale, and who, if anyone, was present at the bargaining table to represent the interests of LBCS, the Non-Debtor Sellers, LBI, Lehman Brothers Special Financing Inc., Eagle, and/or Eagle Management.  All of these entities are distinct legal entities with their own assets and creditors, and (at least in the instances of the debtor Sellers) with fiduciary duties to those creditors.  Accordingly, creditors of, and parties in interest in, these entities are entitled to know the circumstances of the negotiation of the Sale, the nature of the alleged intercompany obligations, whether the interests of the other Debtors / Sellers were fairly and properly represented in such negotiations, and if not, why.  *See In re Temtechco, Inc.*, 1998 WL 887256, *4 (Bankr. D.Del. 1998) (standards for approval of a sale under section 363 include, *inter alia*, "a fair and reasonable price, and good faith negotiations.").

17.     While the Debtors may also be expected to assert that Eagle's debt obligations should be repaid prior to any return to its equity holders, this only underscores the lack of sufficient information provided in connection with the Sale.  The Court and creditors must know the nature of the intercompany obligations to be released, including but not limited to other loans and receivables other Debtors hold against Eagle and/or Eagle Management, which the Purchase Agreement proposes to release for the exclusive benefit of LBHI.  These disclosures are necessary in order to evaluate whether the proposed Sale is made for reasonable consideration with respect to each Debtors' estate.

18. In fact, LBHI's improper use of its control over the other Sellers to prefer its exclusive interests may very well be more egregious. Because little is disclosed about the alleged Loan to Eagle by LBHI, it is possible that this alleged Loan may be susceptible to subordination or recharacterization as equity.[8] The Sale Motion acknowledges that Eagle is extremely thinly capitalized, despite its substantial operations, and relies on loans from LBHI in order to operate. Sale Motion, at ¶¶ 8, 12. In order to explore these issues, the Court and creditors must have more information on, at a minimum, the history of Eagle's formation, its initial and historical capitalization, and of the alleged Loan and other loans and capital contributions made to Eagle by LBHI and the remaining debtor Sellers holding interests in Eagle.

19. LBHI, by failing to disclose these intercompany obligations and provide sufficient details regarding them, frustrates any ability of the Court and creditors of the other Sellers to evaluate the extent of damage resulting from the Sale to creditors' hopes for recovery on their claims against the other Debtors and Sellers. It is clear that LBHI, which is a direct or indirect equity interest owner in each of these Sellers, will be paid approximately $230 million, while the other Sellers and their creditors will receive minimal benefits. LBHI has attempted to obscure the extent of other claims which Sellers may hold against each other (including Eagle Management), or against Eagle which should be of equal or greater priority with the Loan.

---

[8] Recharacterization may apply where the circumstances show that a debt transaction was functionally an equity contribution, such as where an insider makes a loan to an undercapitalized corporation. *See, e.g., Bayer Corp. v. Mascotech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001); *In re Fabricators, Inc.*, 926 F.2d 1458, 1469 (5th Cir. 1991); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr. N.D. Fla. 1990).

Where an insider creditor owes a fiduciary duty to a debtor, courts will equitably subordinate the fiduciary's claim to prevent its use of its insider position for its own preferment at the expense of creditors unless the fiduciary can show that the transaction that gave rise to the contested claim carried the earmarks of an arms-length bargain. *See, e.g., Pepper v. Litton*, 308 U.S. 295, 307 (1939); *In re Mobile Steel Co.*, 563 F.2d 692, 700 (5th Cir. 1977); *In re Vermont Electric Generation & Transmission Cooperative, Inc.*, 240 B.R. 476, 483 (Bankr. D.Vt. 1999); *In re Kids Creek Partners, L.P.*, 200 B.R. 996, 1015 (Bankr. N.D. Ill. 1996); *In re 80 Nassau Associates*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994).

20. These issues are particularly acute where formal allegations have already been made against the Debtors, and LBHI in particular, regarding the possible diversion of funds and other potentially fraudulent transfers on the eve of the Debtors' bankruptcy. *See, e.g.* Motion of the Harbinger Funds for Leave to Conduct Rule 2004 Discovery of Lehman Brothers Holdings Inc., filed September 26, 2008 [Docket No. 373], at ¶¶ 9-13.

21. Of particular interest is the fact that the proposed Purchase Agreement designates LBHI as the Sellers' agent with respect to the Sale and related transactions, and empowers LBHI with the discretion to charge various individual Sellers (including each debtor Sellers' estate) for expenses which LBHI may advance under the Sale, up to each entity's proportionate interest in Eagle. Purchase Agreement, at § 7.14. The debtor Sellers' creditors cannot estimate the likely impact of these administrative charges upon their estates absent disclosures of these proportionate interests in Eagle.

22. As debtors under the Bankruptcy Code, the Debtors are required to disclose their various property interests. *See* Federal Rule of Bankruptcy Procedure 1007(b). Such disclosures are essential to creditors of the Debtors' respective estates to evaluate the Sale and the probable benefits to each estate. Especially here, where the Sale is proposed at an early juncture of the Bankruptcy Case and the Debtors may not be required to file their bankruptcy Schedules and Statement(s) of Financial Affairs for some time, the Debtors should be required to disclose this information to creditors in connection with the Sale Motion in order to allow them to evaluate it and the probable degree of prejudice that creditors may face by virtue of the Sale. *See* Order, dated September 16, 2008 [Docket No. 52], (i) Extending the Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (ii) Waiving of the

Requirements to File the Equity List and Provide Notice to Equity Security Holders, at p. 2 (through and including November 14, 2008).

23. The fact that time may be of the essence with respect to this proposed Sale is no justification for the failure to provide critical information regarding the proposed transaction. Rather, it emphasizes the need for such information. As stated by the Court of Appeals in *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983), "As the Supreme Court has noted, it is easy to sympathize with the desire of a bankruptcy court to expedite bankruptcy reorganization proceedings for they are frequently protracted. 'The need for expedition, however, is not a justification for abandoning proper standards.'" (*citing and quoting Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 450 (1968)).

24. The *Lionel* Court goes on to explain that "a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike." *Id*. This involves consideration of, *inter alia*, the proceeds to be obtained viewed against a valuation of the property, and what alternatives were considered (e.g., marketing), as well as consideration of the effect of the proposed disposition on future plans of reorganization. *Id*.

25. It also appears that, while the Debtors contend that time is of the essence (because Eagle is so thinly capitalized) the Purchase Agreement itself contemplates that employment agreements must be negotiated as conditions precedent, and regulatory approvals requiring a waiting period to close the Sale also apply. Sale Motion, at ¶¶ 8, 12, 13; Purchase Agreement, §§ 3.1, 5.7. In fact, the Sale Motion makes clear that the Purchase Agreement remains viable pending this Court's approval until November 30, 2008. Sale Motion at ¶ 12; Purchase

Agreement, §§ 9.1. Therefore, sufficient time exists for the Debtors to provide adequate disclosures to creditors and parties in interest, and that time should be prudently utilized to ensure that this proposal meets the standards of the Bankruptcy Code.

### B. The Debtors have Failed to Provide Disclosures of their Marketing Efforts Required to Evaluate the Sale

26. Evidence to establish the sufficiency of marketing efforts is critical to the Debtors' ability to carry their burdens to prove that the Sale is a an exercise of sound business judgment by establishing reasonable notice of the Sale, the fairness of the consideration obtained, and that the Sale is proposed in good faith. *In re Exaeris, Inc.*, 380 B.R. 741, 744-46 (Bankr. D.Del. 2008); *In re Summit Global Logistics, Inc.*, 2008 WL 819934, *12 (Bankr. D.N.J. 2008) ("A fair and open sale process is crucial to a bankruptcy court's good faith finding."); *In re Bella Vista Associates, LLC*, 2007 WL 4555891, *14 (Bankr. D.N.J. 2007). *See also In re Duro Industries, Inc.*, 293 B.R. 271, 280 (1st Cir. BAP 2003) (discussing bankruptcy court's dismissal of case in light of failure to adequately market assets in furtherance of reorganization); *In re Brook Valley IV*, 347 B.R. 662, 672-73 (8th Cir. BAP 2006) (debtors in possession and their management have fiduciary duties to creditors to maximize the value of estate assets and property available for distribution to creditors).

27. Here, the Debtors only vaguely allude to an "extensive search" for potential purchasers and state in a conclusory fashion that the market is limited, that the Debtors "believe that substantially all potential purchasers were aware of the Debtors' intent to sell Eagle," and further conclude that, as a result of such awareness, such potential purchasers "were afforded an opportunity to bid on them." Sale Motion, at ¶¶ 10, 16.

28. This degree of conclusory and speculative statements is insufficient to establish that the Debtors expended reasonable efforts, even under the circumstances described in the Sale

Motion, to maximize the value obtained in the Sale. In fact, the sum of the Debtors' statements, other than the Debtors' vague statement that they conducted an extensive search, suggests that the Debtors did not reasonably market the assets. Rather, the Debtors presumed the market for Eagle be small, and they appear to contend that because other parties likely were aware of their intentions to sell Eagle, this constitutes adequate marketing efforts.

29. As set forth herein above, the Debtors' lack of effort to justify this proposed Sale under the applicable standards of fairness is plainly insufficient. The Debtors should be required to provide adequate details regarding their efforts to market Eagle, to assure the Court and parties in interest that the best possible price under the circumstances is being obtained. The failure to do so compounds the concerns raised by the prejudicial structure of the Sale, the expedited posture of the Sale Motion, and their lack of disclosure regarding the ownership structure of Eagle and the negotiation of the Purchase Agreement.

C. **In the Event That the Court Ultimately Approves the Proposed Sale, the Sale Proceeds Should be Placed in Escrow**

30. The foregoing issues raised herein establish the need for a procedure to escrow, protect, preserve and segregate the Sale proceeds pending an opportunity for the Court and parties in interest to explore, address and resolve the issues as to what portion of the Sale proceeds each Debtors' estate may be entitled to receive. Such an allocation of the Sale price may be affected by a recharacterization or subordination of the alleged Loan and the presence and evaluation of other intercompany receivables held against Eagle, Eagle Management, or as between other Sellers, including but not limited to those proposed to be released pursuant to the Sale.

31. The Ad Hoc Committee objects to the Sale absent such a protective procedure, such as an escrow account to which the proceeds shall be devoted pending this Court's

authorization for their disposition, and an opportunity to fully explore these issues potentially impacting its recovery of claims held against LBHI, LBCS and potentially other Debtors.

WHEREFORE, the Ad Hoc Committee respectfully objects to the relief requested in the Sale Motion, requests that the Court deny its approval for the Sale proposed therein except subject to the disclosures and protections raised in this Objection, and requests that the Court grant the Ad Hoc Committee such other and further relief as is just and equitable.

Dated: October 13, 2008

> MUNSCH HARDT KOPF & HARR, P.C.
> 3800 Lincoln Plaza
> 500 North Akard Street
> Dallas, Texas 75201-6659
> Telephone: (214) 855-7500
> Facsimile: (214) 855-7584
>
> By: /s/ Raymond J. Urbanik
> Russell L. Munsch (*pro hac vice*)
> Kevin M. Lippman (*pro hac vice*)
> Raymond J. Urbanik (RU-1842)
>
> ATTORNEYS FOR AD HOC COMMITTEE
> OF BONDHOLDERS

# CERTIFICATE OF SERVICE

      I hereby certify that on the 13th day of October, 2008, I caused a copy of the foregoing Objection to be served via facsimile transmission and First Class U.S. Mail, postage prepaid, upon the following parties:

Weil Gotshal & Manges LLP
Attn:   Richard P. Krasnow, Esq.
         Lori R. Fife, Esq.
         Shai Y. Waisman, Esq.
         Jacqueline Marcus, Esq.
767 Fifth Avenue
New York, NY  10153
Fax:  (212) 310-8007
*Counsel for the Debtors*

Office of the United States Trustee
Attn:   Brian Shoichi Masumoto
         Andrew D. Velez-Rivera
         Paul Schwartzberg
         Linda Riffkin
         Tracy Hope Davis
33 Whitehall Street, 21st Floor
New York, NY  10004
Fax:  (212) 668-2255

Cleary Gotliebb LLP
Attn:   Lindsee P. Granfield, Esq.
         Lisa Schweiger, Esq.
One Liberty Plaza
New York, NY  10006
Fax:  (212) 225-3999
*Counsel for the Debtors' Postpetition Lenders*

Milbank Tweed Hadley & McCloy LLP
Attn:   Dennis F. Dunne, Esq.
         Dennis O'Donnell, Esq.
         Evan Fleck, Esq.
1 Chase Manhattan Plaza
New York, NY  10005
Fax:  (212) 530-5000
*Counsel for the Committee*

Sullivan & Cromwell LLP
Attn:   Robinson B. Lacy, Esq.
         Hydee R. Feldstein, Esq.
125 Broad Street
New York, NY  10004
Fax:  (212) 558-3588
*Counsel for the Debtors' Postpetition Lenders*

Ropes and Gray LLP
Attn:   Keith H. Wofford, Esq.
1211 Avenue of the Americas
New York, NY  10036
Fax:  (646) 728-1664
*Counsel for the Buyers*

                                   /s/ Kevin M. Lippman
                                 Kevin M. Lippman