Hearing Date: October 16, 2008 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date: October 15, 2008 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                        :
**In re**                                               :    Chapter 11 Case No.
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,            :    08-13555 (JMP)
                                                        :
                        Debtors.                        :    (Jointly Administered)
                                                        :
                                                        :
---------------------------------------------------------------x

# DEBTORS' OPPOSITION TO AMENDED MOTION FOR APPOINTMENT OF EQUITY COMMITTEE

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

      Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), oppose the

Amended Motion for Appointment of an Equity Committee filed by Georg Georgas (the "Motion"),[1] and respectfully represent:

### Preliminary Statement

1. The Motion fails to meet the burden of demonstrating that the appointment of an equity interest holders committee is necessary or appropriate at this juncture in the administration of these extraordinary and immensely complex chapter 11 cases.

2. The interests of equity security holders are adequately represented by the directors and management of LBHI. They have a fiduciary responsibility to LBHI that encompasses the interests of equity holders. Further, the Debtors' equity interest holders include numerous large institutional investors who possess the resources and ability to protect their interests without the formation of a committee. The activities of an equity committee would only duplicate the efforts of such parties, and would not result in appreciably more representation for equity holders.

3. The financial condition of the Debtors has not yet been determined. However, based upon the information available it is unlikely that equity interest holders have any economic stake in the Debtors. The financial collapse of the Debtors has resulted in huge losses that will be asserted by claimants having priority over

---

[1] Mr. Georgas filed a Memorandum of Law in support of the Motion on October 13, 2008, the date of the objection deadline for the Motion. This late filing contravenes both the Bankruptcy Rules and the Case Management Order entered in these chapter 11 cases. By withholding the legal arguments supporting the Motion until the eleventh hour, the movant deprives the Debtors and others parties of the opportunity to respond to them. Consequently, the Debtors respectfully request that the Court decline to consider the Memorandum of Law.

equity interest holders. The current market prices for LBHI's shares of common stock and its debt imply that any distribution to equity holders is highly unlikely.

4. The appointment of an equity committee would increase administrative expenses in exchange for little, if any, increased representation for the equity holders, at the cost of the creditors having allowed claims.

### Controlling Legal Standard

5. Section 1102(a)(2) of the Bankruptcy Code provides, in pertinent part, that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or equity security holders." The Bankruptcy Code does not define the term "adequate representation." In re National R.V. Holdings, Inc., 390 B.R. 690, 695 (Bankr. C.D.Cal. 2008). Instead, courts retain the discretion to appoint an equity committee based on the facts of each individual case. In re Williams Communications Group, Inc., 281 B.R. 216, 220 (Bankr. S.D.N.Y. 2002) (citing Albero v. Johns-Manville Corp. (In re Johns-Manville Corp.), 68 B.R. 155, 159 (S.D.N.Y. 1986)).

6. Courts have considered a number of factors in evaluating the need for an equity committee. Most notably, an equity committee "should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee." Williams, 281 B.R. at 223. An equity committee should not be appointed if the debtors appears hopelessly insolvent "because neither the debtor

nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift." Id. at 220 (citing In re Emons Industries, Inc., 50 B.R. 692, 694 (Bankr. S.D.N.Y. 1985)).

7. In addition to those determinants, courts have also considered the following factors: (i) the number of shareholders, and whether the shares are publicly traded; (ii) the size and complexity of the chapter 11 case; (iii) the delay and additional cost that would result from the appointment of an equity committee; (iv) the likelihood that the debtor is solvent; and (v) the timing of the motion relative to the status of the chapter 11 case. National R.V., 390 B.R. at 695-6 (citing In re Leap Wireless Int'l, Inc., 295 B.R. 135, 137 (Bankr. S.D.Cal. 2003); Williams, 281 B.R. at 220; In re Wang Laboratories, Inc., 149 B.R. 1, 2 (Bankr. D.Mass. 1992)).

8. Not every case with a large number of shareholders warrants an official equity committee. Williams, 281 B.R. at 223 (citing Wang, 149 B.R. at 2). If an equity committee were necessary in every large case, Congress "would have mandated the appointment of equity committees instead of leaving it within the discretion of the UST and the Court." Id. (citing Albero v. Johns-Manville, 68 B.R. at 160).

9. The burden rests on the movant to show that an additional committee is necessary for adequate representation. In re Dana Corp., 344 B.R. 35, 38 (Bankr. S.D.N.Y. 2006); In re Enron Corp., 279 B.R. 671, 685 (Bankr. S.D.N.Y. 2002).

10. The appointment of an equity committee is "an extraordinary remedy" and should be "the rare exception." National R.V., 390 B.R. at 695 (citing Dana, 344 B.R. at 38; Enron, 279 B.R. at 685, et al.); Williams, 281 B.R. at 223.

I.  **An Equity Committee Should Not Be Appointed Until It is Clear That Equity Holders Have an Economic Interest in the Chapter 11 Cases**

11. An equity committee should not be appointed unless it appears likely that the equity holders will receive a meaningful distribution. Williams, 281 B.R. at 223. Though there is no clear litmus test for solvency, the court in Williams examined the following evidence: (i) the difference between the debtor's reported assets and liabilities; (ii) the trading price of the debtor's publicly held stock and bonds; and (iii) the partial recovery to creditors and other parties under a proposed plan. Id. at 220-1.

12. These chapter 11 cases were filed less than one month ago, and it remains far too early to determine whether the equity holders will receive any meaningful distribution. The Debtors have not yet proposed a plan of reorganization or even fully set out a schedule of their assets and liabilities. The deadline to file proofs of claim has not yet expired, and it remains unclear what demands will be made on the Debtors' estates. Though much of this information is forthcoming, the degree of uncertainty remains too high to justifiably conclude that the equity holders will receive a distribution in these chapter 11 cases.

13. Lehman's stock is currently trading for approximately 11 cents per share, a nearly 100 percent drop in value from its price only months ago. Even more tellingly, Lehman's unsecured debt largely is trading at less than 10 cents on the dollar, suggesting that market participants believe the prospects for substantial repayment to creditors are slim. See Table of Lehman Bond Prices, attached as Exhibit A. An auction of derivatives tied to Lehman Bonds held on October 10, 2008 set a price of 8.625 cents on the dollar for Lehman bonds, further corroborating that informed markets do not

expect a substantial payout to Lehman's creditors.  See Press Release, Markit Group Limited, Creditex and Markit Announce Final Results of Lehman Credit Event Auction (October 10, 2008), attached as Exhibit B.  If the likelihood of a full recovery to creditors is slight, the prospects for a residual payment to shareholders are even more dire.

**II.     The Added Cost to the Estates of an Equity Committee Far Outweighs Any Minimal Increase in Representation for Equity Holders**

14.    In determining whether to appoint an equity committee, courts apply a balancing test to weigh the cost of an equity committee against the concern for adequate representation.  Wang, 149 B.R. at 3.  The appointment of an equity committee would significantly increase costs to the Debtors, since such appointments are "closely followed by applications to retain attorneys and accountants."  In re Saxon Indus., Inc., 39 B.R. 945, 947 (Bankr. S.D.N.Y. 1984).  In addition to the direct cost of maintaining an additional staff of professionals, the appointment of an equity committee would impose intangible costs on the Debtors's estates, such as delay and disruption in the administration of these chapter 11 cases.  See Albero v. Johns-Manville, 68 B.R. at 160.  The appointment of an additional committee would stymie the chapter 11 process in exchange for little, if any, benefit to equity holders.

**Conclusion**

15.    Mr. Georgas has failed to sustain his burden of demonstrating that an equity committee is necessary to adequately represent the interests of the equity holders or appropriate at this time.

16.    Mr. Georgas and other equity holders may continue to appear and be heard on any issue in these cases, pursuant to 11 U.S.C. section 1109(b).  If the Court

determines that their work results in a substantial contribution to the estates, they may be reimbursed for their expenses under 11 U.S.C. section 503(b)(3)(D).

WHEREFORE the Motion should be denied without prejudice and the Debtors granted such other and further relief as is just.

Dated: October 13, 2008
      New York, New York

    /s/ Shai Y. Waisman
    Harvey R. Miller
    Richard P. Krasnow
    Lori R. Fife
    Shai Y. Waisman
    Jacqueline Marcus

    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, New York 10153
    Telephone: (212) 310-8000
    Facsimile: (212) 310-8007

    Attorneys for Debtors
    and Debtors in Possession

# Exhibit A

### TABLE OF LEHMAN BOND PRICES
### as of October 8, 2008[2]

| Cusip | Short Name | Coupon | Maturity | Ask Price |
|---|---|---|---|---|
| 524908UB | LEHMAN BROS HLDG | 5.75 | 1/3/2017 | 0.05 |
| 524908R3 | LEHMAN BROS HLDG | 6.50 | 7/19/2017 | 0.06 |
| 5249087N | LEHMAN BROS HLDG | 7.50 | 5/11/2038 | 0.06 |
| 524908R4 | LEHMAN BROS HLDG | 6.88 | 7/17/2037 | 0.25 |
| 52517PVU | LEHMAN BROS HLDG | 3.60 | 3/13/2009 | 5.00 |
| 52517PSC | LEHMAN BROS HLDG | 6.63 | 1/18/2012 | 8.00 |
| 524908AA | LEHMAN BROS HLDG | 8.80 | 3/1/2015 | 9.88 |
| 524908BQ | LEHMAN BROS HLDG | 7.20 | 8/15/2009 | 9.90 |
| 524908CM | LEHMAN BROS HLDG | 7.88 | 8/15/2010 | 9.90 |
| 52517PA3 | LEHMAN BROS HLDG | 4.50 | 7/26/2010 | 9.90 |
| 524908CF | LEHMAN BROS HLDG | 7.88 | 11/1/2009 | 10.00 |
| 524908BF | LEHMAN BROS HLDG | 8.50 | 8/1/2015 | 13.25 |
| | | | AVERAGE ASK PRICE: | 6.35 |

---

[2] The bond data in this table was collected from a Bloomberg Terminal on October 8, 2008.  The bonds listed represent a fraction of the total outstanding bonds of Lehman Brothers Holdings, and were selected first by whether an ask price was listed (most prices were listed as not available) and then by whether they bear a non-zero coupon rate (zero coupon bonds would confuse the comparability of the pricing).

# Exhibit B

» news > press releases > 2008 > october > 10

## Creditex and Markit Announce Final Results of Lehman Credit Event Auction

http://www.creditex.com/**New York, NY** – Markit and Creditex, in partnership with 14 major credit derivative dealers, have successfully conducted a Credit Event Auction to facilitate the settlement of credit derivative trades referencing Lehman Brothers Holdings Inc., which filed for Chapter 11 bankruptcy protection on September 15, 2008.

The auction was conducted in accordance with the International Swaps and Derivatives Association (ISDA) 2008 Lehman CDS Protocol. Markit and Creditex are the official administrators of Credit Event Auctions.

At 2:00 pm EST today, the final price for Lehman Brothers bonds was determined as follows:

| Credit Event Auction | Final Price |
|---|---|
| Lehman Brothers Holdings Inc. | 8.625% |

The Credit Event Auction enabled market participants to cash settle triggered contracts which included single name, index, bespoke tranche and other credit derivative transactions. During the Credit Event Auction, dealers submitted orders electronically on the Creditex platform. The auction submissions were delivered to Markit electronically. Markit calculated and verified the results, and published them on www.creditfixings.com.

On October 23, Markit and Creditex will conduct a Credit Event Auction to facilitate the settlement of CDS contracts referencing Washington Mutual Inc.

The Credit Event Auction process was launched in 2005 by Markit and Creditex in collaboration with ISDA and major credit derivative dealers to facilitate the settlement of credit derivative contracts in the event of a corporate default. Credit Event Auctions have been held to facilitate settlement of credit derivative trades referencing Federal National Mortgage Association, Federal Home Loan Mortgage Corporation, Tembec Industries Inc., Quebecor World Inc., Movie Gallery, Collins & Aikman, Delta Air Lines, Northwest Airlines, Delphi Corporation, Calpine Corporation, Dana Corporation and Dura.

**- Ends -**

**For more information please contact:**

*Markit*
John Dooley
Vice President, Corporate Communications
Tel: +1 212 205 1310
Email: john.dooley@markit.com

*Creditex*
Annette Bronkesh
Bronkesh Associates

Tel: +1 973 778 8648
Email: annettec@att.net

**About Markit**
Markit is a financial information services company with more than 1,000 employees in Europe, North America and Asia Pacific. Over 1,000 financial institutions use our independent services to manage risk, improve operational efficiency and meet regulatory requirements.

For more information, see www.markit.com

**About Creditex**
Creditex is a global market leader and innovator in execution and processing of credit derivatives. The company operates a hybrid model of voice and electronic execution, and was the first to successfully launch electronic trading for CDS in 2004. In addition to its core execution business, Creditex has two operating subsidiaries, T-Zero and Q-WIXX, which provide additional electronic processing and execution services in the CDS space. Creditex Group is a wholly-owned subsidiary of IntercontinentalExchange, Inc. (ICE).

For more information, see www.creditex.com