AKIN GUMP STRAUSS HAUER & FELD LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
Michael S. Stamer (MS-4900)
Philip C. Dublin (PD-4919)
Meredith A. Lahaie (ML-1008)

*Counsel for the Informal Noteholder Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
In re:                                                      :    Chapter 11 Case No.
                                                            :
LEHMAN BROTHERS HOLDINGS INC., *et al.* :    08-13555 (JMP)
                                                            :
                        Debtors.                  :    (Jointly Administered)
------------------------------------------------------------x

**OBJECTION OF THE INFORMAL NOTEHOLDER GROUP TO
THE DEBTORS' MOTION TO (A) ESTABLISH SALES PROCEDURES; (B) APPROVE
A SELLER TERMINATION FEE AND A REIMBURSEMENT AMOUNT; AND (C)
APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION AND
ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

   The Informal Noteholder Group (the "Informal Noteholder Group"), consisting of certain

unaffiliated holders of senior and subordinated notes issued by Lehman Brothers Holdings Inc.

("LBHI" and, together with its debtor affiliates, the "Debtors"), by and through its undersigned

counsel, hereby files this objection (the "Objection") to the Debtors' Motion to (A) Establish

Sales Procedures; (B) Approve a Seller Termination Fee and a Reimbursement Amount; and (C)

Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts

Relating to the Purchased Assets (the "Motion"). In support of this Objection, the Informal Noteholder Group respectfully represents as follows:[1]

## PRELIMINARY STATEMENT

1.     By the Motion, the Debtors seek (i) approval of bidding procedures (the "Bidding Procedures") for the auction and sale of the IMD[2] Businesses and authority to pay excessive break-up and expense reimbursement fees in the event that an entity (the "Potential Purchaser") formed by Bain Capital Partners, LLC ("Bain") and Hellman & Friedman ("H&F") is not the successful bidder for the IMD Businesses, and (ii) approval of a Purchase Agreement (as defined below) pursuant to which designated IMD and other assets will be sold to the Potential Purchaser for a gross purchase price of $2.15 billion (the "Gross Purchase Price").

2.     The Bidding Procedures provide for a sixty-day period during which interested parties may conduct diligence and submit competing bids to acquire the IMD Businesses. Those bidders who submit Qualified Bids will have the option to participate in an auction for the IMD assets conducted in accordance with the Bidding Procedures. The Bidding Procedures do not, however, operate to encourage a fair and competitive bidding process and are likely to discourage interested third parties from participating in an auction for the IMD Businesses. In order to maximize the value of these assets for the Debtors' creditors, the Bidding Procedures must be modified as follows:

- The proposed $70 million Seller Termination Fee (which, together with the Reimbursement Amount, is approximately 5% of the Gross Purchase Price) is

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion, Bidding Procedures or Purchase Agreement, as applicable.

[2] The Investment Management Division ("IMD") includes Neuberger Berman, Lehman Brothers Asset Management, the Alternative Investment Group, and portions of the Debtors' private equity business (collectively, the "IMD Businesses").

2

inappropriate given that courts generally limit break-up fees to 1%-3% of the proposed purchase price. Moreover, based on adjustments that may be made to the purchase price pursuant to the terms of the Purchase Agreement, the net purchase price to be paid by the Potential Purchaser to the Sellers is likely to be significantly less than the Gross Purchase Price.[3] Indeed, the purchase price adjustments could result in the Sellers receiving more than $1 billion less than the Gross Purchase Price. The Seller Termination Fee must be reduced so that it bears a direct relationship to the actual net purchase price after giving effect to the purchase price adjustments.

- The Seller Termination Fee should only be paid from the proceeds of a Competing Transaction consummated by the Sellers in accordance with the Bidding Procedures.

- The Potential Purchaser should not be entitled to receive both a Seller Termination Fee and the Reimbursement Amount.

- The Reimbursement Amount cap of $35 million is too high and should be (i) limited to the actual, reasonable out-of-pocket expenses incurred by the Potential Purchaser in connection with the sale, (ii) estimated by the Debtors, in consultation with the Creditors' Committee, in connection with selecting the Starting Bid and (iii) reviewed by the Court before any payment is made on account of such expenses.

- The Bidding Procedures should be amended to ensure a level playing field among all Qualified Bidders including the Potential Purchaser. For example, the Potential Purchaser should not be permitted to increase its stalking horse bid to be consistent with the highest and best Qualified Bid in order to be deemed the Starting Bid. Rather, the highest and best Qualified Bid should be deemed the Starting Bid. To the extent the Potential Purchaser desires to increase its bid, it should be required to do so at an auction in accordance with the Bidding Procedures with which all other Qualified Bidders are required to comply.

- In order for a Qualified Bid (other than the Potential Purchaser's stalking horse bid) to be deemed the Starting Bid, it would need to equal the value of the Gross Purchase Price, plus the Seller Termination Fee, plus the maximum Reimbursement Amount, plus $50 million (the "<u>Initial Overbid</u>"). This amount would be $555 million (or approximately 32%) more than the Seller's estimated maximum net purchase price of $1.75 billion to be paid by the Potential Purchaser. Accordingly, the Initial Overbid must be reduced significantly to encourage competing bids.

---

[3] As discussed in the Motion, the Sellers are obligated to pay certain employee bonuses and retention payments in connection with the IMD Businesses that are estimated by the Sellers to be approximately $400 million, which results in a maximum net purchase price of $1.75 billion to the extent the stalking horse bid is the Successful Bid. *See* Motion at 15.

3

- The Debtors should not be permitted to deem the Potential Purchaser's bid a "better" bid solely on the basis of its receipt of applicable consents at the time of the Auction. As with all asset sales requiring third-party approval, to the extent a competing Qualified Bid requires certain consents or approvals, it should be at most a factor considered in determining the highest and best offer, but not the determining factor.

3. Further, the Bidding Procedures must be modified to permit parties to work collaboratively to submit a Qualified Bid to the extent permitted by applicable law. The Debtors allege in the Motion that they conducted a thorough and comprehensive marketing process for the IMD Businesses beginning in June 2008. The Debtors further allege that, of the four parties who expressed interest in purchasing all or a portion of the IMD assets, the Potential Purchaser was most likely to be in a position to consummate the transaction given the deterioration of the debt financing markets. The Debtors do not, however, disclose in the Motion that despite selecting a stalking horse bid submitted jointly by Bain and H&F, confidentiality agreements executed by other parties prohibited them from working in concert with other potential interested parties. Indeed, counsel for the Informal Noteholder Group has been contacted by a number of parties that previously executed confidentiality agreements and remain interested in acquiring the IMD Businesses to the extent they can work with other parties to submit a Qualified Bid. Accordingly, in order to maximize value for the Debtors' estates, prohibitions on parties working together to submit a Qualified Bid must be stricken from the applicable confidentiality agreements.

4. In addition to the foregoing, the Informal Noteholder Group believes that the current Purchase Agreement should not be approved as the form of contract against which

competing bidders will bid.[4] Specifically, the Purchase Agreement contains numerous provisions that may substantially and unjustifiably reduce the purchase price, saddle the Debtors with continuing liabilities without providing a corresponding benefit, and provide the Potential Purchaser with the right to terminate the Purchase Agreement for events beyond the Debtors' control. These provisions, as discussed in more detail below, should be modified or stricken to ensure that the highest and best price is obtained for the IMD Businesses.

## BACKGROUND

5. On October 6, 2008, the Debtors filed the Motion. Pursuant to the Motion, the Debtors seek the entry of an order (i) establishing bidding procedures to govern the sale of the IMD Businesses and approving certain bid protections therewith, and (ii) approving the Purchase Agreement. On October 3, 2008, the Sellers and the Potential Purchaser executed the Purchase Agreement pursuant to which the Potential Purchaser agreed to be the stalking horse bidder for the IMD Businesses. More specifically, the Sellers propose to sell the IMD Businesses to the Potential Purchaser for the Gross Purchase Price of $2.15 billion, but subject to numerous purchase price adjustments and other mandatory deductions.

6. The Purchase Agreement will be subjected to higher and better offers in connection with an auction process to be conducted in accordance with the Bidding Procedures. As set forth in the Bidding Procedures, potential bidders will be given a period of 60 days to conduct diligence beginning from the date the Bid Procedures Order is entered. Qualified Bids must be submitted by any interested potential purchasers two days prior to the Auction.

---

[4] The Informal Noteholder Group reserves the right to object to the Sale at the Sale Hearing in the event the Purchase Agreement is not modified to address its concerns.

7.    In order to be deemed a "Qualified Bid," such bid must (i) identify the assets to be purchased and the contracts and leases to be assumed, (ii) not be conditioned on obtaining financing or on the outcome of unperformed due diligence or corporate, stockholder or internal approval; and (iii) provide evidence satisfactory to the Sellers (in consultation with the Creditors' Committee) of the bidder's financial wherewithal and operational ability to consummate the transaction.

8.    Bidding at the Auction will begin with the Starting Bid. The first minimum incremental bid must have a purchase price of at least $25 million more than the Starting Bid, and any subsequent bids must be made in minimum increments of $25 million. Subsequent bids made by the Potential Purchaser will be credited in full with the Seller Termination Fee and the Reimbursement Amount. The Sellers will select that Qualified Bid constituting the highest and best offer for the IMD Businesses as the successful bid upon approval of such bid by this Court. A hearing to consider the Successful Bid will be held on the first business day that is two days after the Auction. The deadline to object to the Sale Order will be five business days prior to the sale hearing (*i.e.*, three days *prior* to the Auction).

**OBJECTION**

**I.    The Proposed Bidding Procedures will Discourage Alternative Proposals and "Chill" the Bidding Process.**

9.    The Bidding Procedures as proposed are not conducive to maximizing the value of the IMD Businesses for creditors of these estates. The purpose of bidding procedures is to facilitate the fair sale of a debtor's assets through a process that will maximize the value of such assets for the benefit of the debtor's creditors. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997); *In re E-Z Serve Convenience Stores, Inc.*, 289 B.R. 45, 54 (Bankr.

6

M.D.N.C. 2003) (bankruptcy court denied approval of a sale on grounds that the auction procedures were "patently unfair and inequitable"); *In re Edwards*, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate."); *In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo. 2004) (court permitted debtor to conduct sale of assets, but declined to approve bidding procedures that could have hampered the bidding process).

10. The Bidding Procedures proposed by the Sellers will not facilitate a fair sale of the IMD Businesses and must be modified. As detailed below, these modifications include: (i) reducing the size of the Seller Termination Fee and the circumstances upon which such fee is payable; (ii) eliminating the Potential Purchaser's entitlement to the Reimbursement Amount when the Seller Termination Fee is payable; (iii) reducing the "cap" on the Reimbursement Amount and ensuring that only actual, reasonable out-of-pocket expenses are reimbursed; (iv) limiting the Potential Purchaser's ability to credit bid the full Reimbursement Amount; and (v) revising the qualifications necessary for a Qualified Bid to be deemed the Starting Bid. Absent these modifications and others mentioned herein, numerous aspects of the Bidding Procedures will discourage competing bids, thereby diminishing (a) the likelihood of a competitive auction process and (b) the likelihood of increased unsecured creditor recoveries.

### A. The Seller Termination Fee is Excessive and Should Only Be Paid if a Competing Transaction Closes

11. In general, the proponent of a break-up fee bears a very heavy burden. As stated by the United District Court for the Southern District of New York, after careful scrutiny, a break-up fee will be upheld only when it "constitute[s] a fair and reasonable percentage of the proposed purchase price, and [is] reasonably related to the risk, effort, and expenses of the prospective purchaser." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In*

7

*re Integrated Res., Inc.)*, 147 B.R. 650, 662 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999) ("the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").

12. Although reasonable break-up fees are generally approved by courts, break-up fees "must be carefully scrutinized to ensure that the Debtor's estate is not unduly burdened and that the relative rights of the parties in interest are protected." *In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994). Further, courts have recognized that break-up fees may yield large profits to the recipient at the expense of unpaid unsecured creditors. *America West*, 166 B.R. at 913; *see also*, *In re S.N.A. Nut Co.*, 186 B.R. 98, 105-06 (Bankr. N.D. Ill. 1995) ("[A]ny money that a bidder receives through a bidding incentive comes out of the pockets of the creditors of the estate . . . there should be a direct relationship between the reimbursement an unsuccessful buyer receives and the benefit to the estate from the unsuccessful buyer's bid") (citation omitted).

13. In addition, because the Debtors' intention in these cases is to liquidate rather than to reorganize their core businesses, the Debtors' business judgment with respect to the payment of a break-up fee is not entitled to particular deference. The court in *In re S.N.A. Nut Co.*, 186 B.R. at 105 (Bankr. N.D. Ill. 1995), for example, denied a break-up fee based on the fact that the debtor was no longer being reorganized but, instead, was pursuing a "liquidating Chapter 11." The *S.N.A. Nut* Court stated that "[t]his is of note for two reasons. First, regardless of whether a sale of assets is usually within the ordinary course of business, in this instance the debtor is not in the business of liquidating. Therefore, no particular deference should be given to the debtor's

8

business decision. Second, . . . [i]n a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint than in a reorganization case because the princip[al] underlying rationale for the 'business judgment rule', *i.e.*, that a [debtor in possession] is entitled to some free reign in fulfilling its perceived mission of adding the economy . . . is lacking in such circumstances." *Id*. at 105. The Informal Noteholder Group believes that based on the Seller's estimated net purchase price, the Seller Termination Fee is excessive.

14. Even if the proponent carries its heavy burden and establishes that a break-up fee actually preserves value for the estate, it must also show that the amount of the proposed break-up fee is fair and reasonable, and served as a catalyst to other higher bids. *In re O'Brien Envt'l Energy, Inc.*, 181 F.3d at 537. The range of break-up fees generally approved by courts is between 1 and 3% of the aggregate purchase price. *See e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Res., Inc.)*, 147 B.R. at 662 (approving a break-up fee of 1.6% of purchase price); *Cottle v. Storer Comm.*, 849 F.2d 570, 578-79 (11th Cir. 1988) (approving a break-up fee of approximately 1% of purchase price); *Beebe v. Pacific Realty Trust*, 578 F.Supp. 1128, 1150-51 (D. Or. 1984) (finding a 1% break-up fee to be reasonable); *In re Twenver, Inc.*, 149 B.R. 954, 957 (Bankr. D. Colo. 1992) (noting that break-up fees of 1 to 2% found reasonable in the majority of cases approving such fees).

15. As noted above, the Seller Termination Fee and the Reimbursement Amount together constitute approximately 5% of the $2.15 billion Gross Purchase Price set forth in the Purchase Agreement. In the event that the purchase price adjustments are triggered upon closing, the net purchase price could be reduced by more than $1 billion. After taking into consideration the Debtors' estimate of assumed liabilities and the minimum holdback amount of $140 million

9

(but which may be as large as $390 million)[5] contemplated in the Purchase Agreement, if the actual revenue run rate, EBITDA and S&P 500 as of the closing of the sale (the "Closing Date") are each 10% less than the Debtors' targets, the Informal Noteholder Group's analysis indicates that the Sellers could receive as little as approximately $650 million for the IMD Businesses. The Purchase Agreement, however, does not contain a mechanism by which the Seller Termination Fee would be adjusted in the event the purchase price is substantially lowered. As a result, the Potential Purchaser could be entitled to fees *in excess of* 16% of such estimated net purchase price in the event it does not acquire the IMD Businesses. The Seller Termination Fee should therefore be calculated as a percentage of the net purchase price that actually would be paid at closing, and should not in any event exceed 3% of the total net compensation to be received by the Sellers.

16.    In addition, the only circumstance upon which the Seller Termination Fee should be paid is upon the closing of a Competing Transaction pursuant to acceptable Bidding Procedures eventually approved by this Court. Awarding the Seller Termination Fee in any other circumstance would not be in accord with the generally accepted principle that break-up fees are awarded to encourage competing bids, not to stifle a competitive sale process. *See In re Integrated Res, Inc.*, 147 B.R. at 659 ("[t]he usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding they are not enforceable").

---

[5] Upon information and belief, Neuberger Berman is not an entity that previously has been audited. Thus, the delivery of financial statements likely will be time consuming and costly, making it more likely that the holdback amount would be $390 million pursuant to applicable provisions of the Purchase Agreement, as opposed to the minimum holdback amount of $140 million.

    **B.**    **The Potential Reimbursement Amount Must Be Capped at a Lower Amount and Should Not Be Paid in the Event the Seller Termination Fee is Payable**

17.    The Purchase Agreement contemplates that, under certain circumstances, the Potential Purchaser could be entitled to up to $35 million in expense reimbursements in addition to the $70 million Seller Termination Fee. The Sellers have failed to provide a reasonable cap on any Reimbursement Amounts or subtract any such amounts from the Seller Termination Fee as is contemplated by applicable case law. *See, e.g., In re APP Plus, Inc.*, 223 B.R. 870, 874 (Bankr. E.D.N.Y. 1998) (holding that break-up fees typically cover reimbursement of the disappointed purchaser's out-of-pocket expenses related to the proposed acquisition); *see also In re Integrated Res., Inc.*, 147 B.R. at 662.

18.    The Informal Noteholder Group therefore requests that the Court (i) order that the Reimbursement Amount only be paid with respect to actual and reasonable out-of-pocket expenses incurred by the Potential Purchaser in connection with its stalking horse bid, (ii) cap the Reimbursement Amount at a reasonable amount as determined by this Court, (iii) subtract any Reimbursement Amount from the reduced Seller Termination Fee and (iv) condition the timing of the payment of any Reimbursement Amount on the closing of a Competing Transaction.

    **C.**    **The Potential Purchaser Should Not be Allowed to Credit Bid Both the Seller Termination Fee and the Reimbursement Amount in Full**

19.    Among the bid protections afforded the Purchaser by the Purchase Agreement (in addition to the Seller Termination Fee and the Reimbursement Amount) is the Purchaser's ability to credit bid both the Seller Termination Fee and the Expense Reimbursement Fee against any competing bid at the Auction. To the extent this Court determines that the Potential Purchaser is entitled to both a Seller Termination Fee and a Reimbursement Amount, the Purchaser should not be allowed to credit bid the entire $35 million Reimbursement Amount. Rather, in connection

11

with the Auction, the Potential Purchaser should only be allowed to credit bid the Seller Termination Fee plus the Potential Purchaser's actual, reasonable out-of-pocket expenses incurred to date, as determined by the Debtors, in consultation with the Creditors' Committee.

### D. The Process for Selecting the Starting Bid Should be Modified to Provide a Level Playing Field for All Bidders

20.     The Bidding Procedures provide that, to the extent a Qualified Bid other than the Potential Purchaser's stalking horse bid is deemed to be the Starting Bid, the Potential Purchaser need only modify the terms of its bid to be "more favorable or consistent" with a competing Starting Bid in order for its bid to become the Starting Bid.  *See* Motion at p. 15.  This provision is likely to discourage third party bidders from participating in the auction process because such provision, at the very least, creates the appearance of an uneven playing field.

21.     The Initial Overbid required for a Qualified Bid (other than the stalking horse bid) to be deemed the Starting Bid is inequitable and will chill bidding.  Indeed, in order for a third party Qualified Bid to be deemed the Starting Bid, it would need to exceed the initial $2.15 billion Gross Purchase Price by at least $155 million, which is 7.2% of the Gross Purchase Price and over 8.9% of the Gross Purchase Price, net of the Debtors' estimate of assumed liabilities (as set forth in the Motion).  This Initial Overbid will not encourage a competitive sale process and should be reduced to a percentage deemed reasonable by this Court.

## II.    Objections to Certain Provisions of the Purchase Agreement

22.     In addition to the foregoing, the Informal Noteholder Group will object to the approval of any sale based on certain provisions contained in the proposed form of Purchase

12

Agreement.[6] The problems with the Purchase Agreement are both relevant to the Court's consideration of the Motion and further support the Objection.

23.  The objectionable provisions of the Purchase Agreement relate to (i) purchase price adjustments; (ii) certain closing conditions that would allow the Potential Purchaser to terminate the Purchase Agreement; and (iii) the exclusion of certain liabilities from the list of assumed liabilities.

24.  As currently proposed, the Purchase Agreement includes a number of purchase price adjustments that could result in substantial reductions to the purchase price.  One of these adjustments provides for a significant reduction in the purchase price to the extent the actual closing price of the S&P 500 Index on the applicable measurement date is less than a target of 1202.77.[7] For example, if the closing price of the S&P 500 Index on the Closing Date is 900, the purchase price will be reduced by approximately $847 million; if the closing price is 1000, the purchase price will be reduced by approximately $567.5 million.  On October 10, 2008, the S&P 500 closing price was 899.22.  In addition, if multiple purchase price adjustments are triggered upon closing, additional downward adjustments to the purchase price will be made. With respect to certain of the purchase price adjustments, the Seller has the option to cap the adjustment amount; provided, however, that the Potential Purchaser may elect not to close on the transaction if the Sellers exercise such rights.  These purchase price adjustments and related rights make the stalking horse bid illusory and further evidence the fact that the proposed Bidding Procedures do not facilitate the fair sale of the Debtors' assets.

---

[6] As noted above, the Debtors' proposed deadline to object to the sale is three days prior to the Auction. The Informal Noteholder Group submits that the objection deadline should be no earlier than two days after the Auction in order for parties in interest to know the terms of the Successful Bid and make an informed decision as to whether to oppose approval of such bid.

13

25. The Purchase Agreement also contains a number of unreasonable closing conditions and other termination events that would eliminate the Potential Purchaser's obligation to close on the transaction. These closing conditions and termination events include, but are not limited to, the following: (a) the Revenue Run-Rate, calculated 10 days prior to the Closing Date, must exceed 70% of the Run-Rate Target; (b) the average closing price of the S&P 500 Index must exceed 902.1 for the 10 days immediately preceding the Closing Date (on October 10, 2008, the closing price for the S&P 500 Index was 899.2); (c) the Sellers must not exercise their right under the Purchase Agreement to cap any Additional Aggregate Adjustments at $850 million; and (d) the appointment of an examiner in any of the Debtors' bankruptcy cases. These closing conditions and termination events (i) restrict the administration of the Debtors' estates and (ii) punish the estates for events beyond the Debtors' control.

26. The Purchase Agreement also provides for the sale of the general partner and limited partner interests in certain funds. The Purchase Agreement, however, carves out from the list of assumed liabilities any liabilities with respect to the unfunded amount of limited partner and side-by-side capital commitments to those funds. *See* Purchase Agreement § 2.4(c). The rationale for the Sellers retention of liabilities in respect of capital commitments to funds they will no longer own and the scope of these retained liabilities is not apparent from either the Motion or the Purchase Agreement.

27. The Purchase Agreement also carves out from the list of assumed liabilities any liabilities arising out of auction rate securities issued, underwritten, sold or distributed by any affiliate of LBHI including the Neuberger Berman business. *See* Purchase Agreement § 2.4(a).

---

[7] The Purchase Agreement defines the "closing price" as the greater of (i) the closing price on the date the Bid Procedures Order is entered and (ii) the average of the closing prices for the 3 days preceding the closing date.

14

According to recent news reports, other entities, such as Bank of America and RBC Capital Markets, have agreed with the SEC and various state regulators to repurchase large quantities of their auction rate securities from investors. The IMD Businesses' level of exposure to these products is unknown and could be significant. Accordingly, these liabilities should be assumed by the purchaser of the IMD Businesses or the Debtors should be required to disclose the potential magnitude of these liabilities in order for parties in interest to determine whether such potential liabilities impact the appropriateness of the contemplated sale.

28.     Other items that may give rise to an objection at the Sale Hearing include, but are not limited to, (a) the allocation of the purchase price among the various Lehman entities and (b) the Debtors' retention of Barclays in addition to Lazard to act as their financial advisor in connection with the sale of the IMD Businesses.

## **CONCLUSION**

For all of the foregoing reasons, the Informal Noteholder Group respectfully requests that the Court (i) deny approval of the Bidding Procedures absent the modification thereof as outlined herein, and (ii) grant the Informal Noteholder Group such other relief as is just, proper and equitable.

Dated: New York, New York
October 14, 2008

By: /s/ Michael S. Stamer
Michael S. Stamer (MS-4900)
Philip C. Dublin (PD-4919)
Meredith A. Lahaie (ML-1008)
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York 10022-2524
(212) 872-1000 (Telephone)
(212) 872-1002 (Facsimile)
mstamer@akingump.com
pdublin@akingump.com
mlahaie@akingump.com

*Counsel for the Informal Noteholder Group*