**Objection Deadline: October 14, 2008 @ 5:00 p.m.**
**Hearing Date: October 16, 2008 @ 10:00 a.m.**

Paul Aronzon
Robert Jay Moore
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000

-and-

Abhilash M. Raval
Evan R. Fleck
MILBANK, TWEED, HADLEY & M$^c$CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

Proposed Counsel for Official
Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x
                                                                   :
In re:                                                             :    Chapter 11 Case No.
                                                                   :
LEHMAN BROTHERS HOLDINGS INC., et al.,                             :    08-13555 (JMP)
                                                                   :
               Debtors.                                            :    (Jointly Administered)
                                                                   :
------------------------------------------------------------------ x

**LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO DEBTORS' MOTION TO (A) ESTABLISH
SALES PROCEDURES; (B) APPROVE A SELLER TERMINATION FEE AND
REIMBURSEMENT AMOUNT; AND (C) APPROVE THE SALE OF THE
PURCHASED ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF
CONTRACTS RELATING TO THE PURCHASED ASSETS**

The Official Committee of Unsecured Creditors (the "Committee") of

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated chapter 11 debtors, as debtors

and debtors in possession (collectively, the "Debtors"), hereby files this Limited

Objection to the Debtors' Motion to (A) Establish Sales Procedures; (B) Approve a Seller

Termination Fee and a Reimbursement Amount; and (C) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the "Motion"), and respectfully states as follows:

## BACKGROUND

1. Commencing on September 15, 2008, and periodically thereafter, the Debtors commenced these chapter 11 cases. On September 17, 2008, the Office of the United States Trustee appointed the Committee.

2. The Bain/Hellman & Friedman Sale. On October 6, 2008, the Debtors filed the instant Motion. By the Motion, the Debtors seek entry of an order (the "Bid Procedures Order") with respect to the sale of a second very significant asset of the Debtors' estates, the material assets of the Debtors' Investment Management Division (the "IMD"), which order will establish, inter alia, the procedures for an auction of the IMD and the conditions by which the Seller Termination Fee[1] and the Reimbursement Amount will be payable to IMD Parent LLC (the "Purchaser") in connection therewith.

## LIMITED OBJECTION

3. The Committee is aware that the bidding procedures were the subject of extensive, arm's length negotiations between the Debtors and the Purchaser and that the Debtors made a good faith effort to obtain the Purchaser's consent to appropriate procedures for the sale of this valuable asset of the estates. Nevertheless, under the proposed Purchase Agreement, the net Purchase Price may be as little as $733 million (exclusive of adjustments relating to the amount of cash in the IMD at Closing and the Purchaser's return of the Sellers' assets) for what is an extremely valuable brand

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion and the Purchase Agreement.

2

and business.[2] The proposed bidding procedures and Purchase Agreement should therefore be revised to increase the likelihood that a higher, more appropriate bid will be submitted.

4. Properly crafted bidding procedures should strike a balance, encouraging an initial bid without stifling subsequent bids. The proposed bidding procedures tilt the balance too far in favor of the Purchaser. To protect the integrity of the bankruptcy auction process, it is essential that the Court ensure that the playing field is level and that prospective bidders are not put at such a disadvantage that they are reluctant or unwilling to make competing bids. The Committee does not wish to revisit all potentially objectionable aspects of the proposed procedures or obstruct the Debtors' path to approval of the sale of the IMD to the Purchaser, but rather brings to the Court's attention only those aspects of the procedures that are of significant concern and that may have the effect of chilling, rather than enhancing, opportunities for other parties to submit and obtain approval of a competitive proposal for acquisition of the IMD.[3] The proposed procedures are materially deficient specifically because:

- The Purchaser's obligation is too conditional, particularly given the present volatility and unpredictable status of the financial markets;

- The Purchaser should not be permitted to cause the filing of additional affiliated entities until after the Auction, and this right should be permitted only if the Purchaser is the Successful Bidder;

---

[2] The estimated net Purchase Price of $733 million assumes a $1.25 billion maximum possible Aggregate Additional Adjustment as well as an estimated $167 million in value of management equity. The estimated management equity adjustment is based on the ratio of the adjusted Purchase Price to the unadjusted Purchase Price multiplied by $400 million (as described in the Purchase Agreement).

[3] The Committee's objections to the proposed bidding procedures are grounded on observations from discussions with at least three (3) parties that contacted the Committee's professionals to express interest in the IMD, each of whom identified the same issues with the proposed bidding procedures.

3

- The Seller Termination Fee and Reimbursement Amount are unreasonable, particularly in light of the conditionality of the Purchaser's obligation to consummate the transaction;

- The overbid increments are excessive and should be eliminated;

- The Bid Procedures Order should require the Sellers to fully cooperate with competing bidders, and to allow for more expansive bidding; and

- The Sellers should not be the sole arbiters of all key decisions regarding the auction process, but should be required to consult with the Committee.

**<u>Purchaser Should Be Obligated To Commit To Close As Of The Bid Deadline</u>**

5. Section 8.1 of the Purchase Agreement sets forth the numerous conditions that must be satisfied to trigger the Purchaser's obligation to consummate the transaction. The Purchaser has the right to decline to consummate the transaction if any one of the conditions precedent has not been satisfied on or prior to the Closing Date. Certain of such conditions may be reasonable in the present circumstances, but others clearly are not and could render any value contemplated by the Purchase Agreement wholly ephemeral, notwithstanding the Sellers' obligation to pay the very significant Seller Termination Fee and Reimbursement Amount.

6. The Debtors and the Committee have the right to know prior to the start of the Auction whether the Purchaser believes that it would have a right to terminate the Purchase Agreement based on then-current circumstances. A tremendous amount of time and estate resources will have been wasted if the Purchaser is permitted, by virtue of improvidently crafted procedures, to receive the Seller Termination Fee and/or Reimbursement Amount if the Purchaser was not committed to the transaction. There is absolutely no basis to approve bidding procedures that provide the Purchaser with significant protections if the Purchaser is likely to have an absolute right to walk.

Accordingly, the Purchaser should be required to certify to the Sellers as of the Bid Deadline, and again as of the start of the Auction, that it knows of no circumstances existing as of such time that would give it a right to terminate the Purchase Agreement and/or not consummate the transaction. To the extent that such circumstances exist, the Purchaser will not have provided any value to the estates and therefore it should not be entitled either to receive the Seller Termination Fee or Reimbursement Amount if it is not determined to be the Successful Bidder, or to exercise a walk right based on the existence of such circumstances if it is deemed the Successful Bidder.

7. Indeed, the Committee believes that its requests set forth in the preceding paragraph are appropriate and reasonable in light of the walk right that the Purchaser has with respect to declines in the volatile S&P 500 Index. Specifically, the Purchase Agreement entitles the Purchaser to terminate the agreement if the average closing price of the S&P 500 Index for the ten (10) consecutive full trading days immediately preceding the Closing Date is less than $902.09. See Purchase Agreement, Sec. 8.1(h). The closing price of the S&P 500 Index was $899.22 on October 10, 2008 and $1,003.35 on October 13, 2008. The Court thus is being asked to approve bidding procedures that, at the very moment of their consideration on October 16, 2008, render the Purchaser's obligation to close ephemeral and may trigger an entitlement to the Seller Termination Fee and Reimbursement Amount even where it would be wholly unjustified.

**Purchaser's Designation Notice Should Not Be Effective Until After The Auction**

8. Pursuant to the Purchase Agreement, the Purchaser, in its sole discretion, has the right to designate, between forty-five (45) and sixty (60) days after September 29, 2008, the Lehman entities that will sell, assign, convey and deliver assets

5

free and clear of all liens and claims pursuant to sections 363 and 365 of the Bankruptcy Code in a voluntary proceeding under the Bankruptcy Code. Because the designation period expires prior to the Auction, the Purchase Agreement permits the Purchaser to control which entities will seek bankruptcy protection despite the fact that the Purchaser may not ultimately emerge as the Successful Bidder and other bidders may be willing to submit overbids that do not require such filings and the attendant uncertainties, expense, and delay. Upon information and belief, certain parties interested in the IMD may prefer that no additional entities file chapter 11 petitions due to the potentially destabilizing impact such filings may have on ongoing business operations at a point in the process when it is not determined with certainty that the Purchaser will ultimately be the Successful Bidder.

9.    By vesting in the Purchaser unfettered discretion to determine which Sellers will become debtors, the Purchaser may exert undue control over the bidding process to the detriment of other bidders and the Debtors' estates and their creditors. It is essential that the party ultimately identified as the Successful Bidder at the Auction, whether or not that party is the Purchaser, retains the right to determine which, if any, Lehman entities should seek protection under the Bankruptcy Code in connection with the sale of the IMD. If the Purchaser is the Successful Bidder or no qualifying alternative bid is timely submitted, then the Committee has no objection to the Purchaser's exercise of this right. Consequently, the Designation Notices should have no force or effect until after the Auction has concluded.

**The Proposed Fees Are Inappropriate For This Transaction**

A.      The Seller Termination Fee Is Unreasonable

10.     Under the circumstances of these chapter 11 cases and this transaction, a $70 million break-up fee is inappropriately large.  The purpose of a break-up fee is to induce a stalking horse to enter the process and thereby assure that there is at least one certain purchaser, which in turn generates competing bids, to the benefit of the estate and its creditors.  Here, upon information and belief, there is substantial interest from a number of parties in acquiring the IMD on terms that are favorable to the estates.  In determining the propriety of the Seller Termination Fee, the Court must "determine whether approval of a [break-up] Fee, in conjunction with the other Bidding Procedures in [a] case, will encourage rather than discourage the bidding, and whether it would enhance rather than detract from the ultimate maximum recovery to the estate."  In re APP Plus, Inc., 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998).  See, e.g., In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *6 (Bankr. S.D.N.Y. 1992) (holding that bidder was not entitled to a break-up fee and noting that while "[i]n the corporate takeover area, these types of liquidation damage provisions are not uncommon…[i]n the bankruptcy context . . . the strategy used must enhance the bidding to benefit the creditors of the estate."); Calpine Corp. v. O'Brien Envtl. Energy, Inc., (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999) ("[T]he allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate.").

7

11.    Here, where the net purchase price to the Sellers is currently estimated to be $1.38 billion (exclusive of adjustments relating to the amount of cash in the IMD at Closing and the Purchaser's return of the Sellers' assets), the proposed Seller Termination Fee and Reimbursement Amount represent 5.1% and 2.5%, respectively, of the Purchase Price.[4]  Such a break-up fee is excessive and inconsistent with market practice and applicable bankruptcy law.  Market analysis reflects that typical break-up fees approved by bankruptcy courts range, in the aggregate, between 1.0% and 3.0% for transactions greater than $500 million.  While the Committee recognizes that the present case and market conditions present unique issues in the context of the Bankruptcy Code section 363 sale process, the Committee believes that the Seller Termination Fee should be reduced to a maximum of $35 million, which is equal to 2.0% of the $2.15 billion Purchase Price, net of the $400 million management equity component.[5]

B.    The Reimbursement Amount Should Not Be A Disguised Break-Up Fee

12.    The Committee finds it appropriate that the Purchaser be reimbursed its reasonable, documented and customary out-of-pocket expenses incurred in

---

[4] The estimated current net purchase price to the Sellers is approximately $1.38 billion based on the most recent 10-day weighted average closing price of the S&P Index as of October 13, 2008.  After applying certain adjustments, including S&P Adjustment, the Purchase Price may be reduced by as much $1.4 billion, resulting in a net Purchase Price of $733 million, which would render the Seller Termination Fee and Reimbursement Amount 9.6% and 4.8%, respectively, of the net Purchase Price.  The range of net Purchase Prices, from $733 million to $1.7 billion, reflects an adjustment related to the management equity allocation, which is based on the ratio of the adjusted Purchase Price to the unadjusted Purchase Price multiplied by $400 million (as described in the Purchase Agreement).

[5] Courts have denied approval of break-up fees when they have found that such fees would chill bidding. See, e.g., In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y.) ("If the break-up fee . . . stifles bidding, it will not be approved."), aff'd 147 B.R. 650 (S.D.N.Y. 1992); In re American West Airlines, Inc., 166 B.R. 908, 913 (Bankr. D. Ariz. 1994) (denying break-up fee where, among other things, "the proposed break-up fee will not induce further bidding or bidding generally.); In re APP Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y. 1998) (a court must "determine whether approval of a [break-up] Fee, in conjunction with the other Bidding Procedures in [a] case, will encourage rather than discourage the bidding, and whether it would enhance rather than detract from the ultimate maximum recovery to the estate.").

8

connection with the sale of the IMD. The Purchase Agreement, however, makes no reference to the level of documentation required for Purchaser to qualify for such reimbursement. The Committee fears that it would be possible for the Purchaser, pursuant to the Purchase Agreement, to submit a request for the full $35 million reimbursement allowance with little or no documentation, which would effectively represent a disguised supplement to the Seller Termination Fee. Accordingly, transparency should be introduced into the process, requiring the Purchaser to submit appropriate documentation in connection with its request for payment of the Reimbursement Amount to the Sellers and the Committee, and for its requests for reimbursement to be limited to reasonable and customary out-of-pocket expenses.

**The Overbid Requirements Are Excessive And Should Not Be Approved**

13.     Given the amount of the proposed Purchase Price, the "overbid" requirements may chill bidding and make it less likely that the Debtors will obtain the highest and best offer for the IMD. For example, under the proposed bidding procedures, the initial minimum overbid increment is $155 million - the amount of the Seller Termination Fee ($70 million), plus the amount of the Reimbursement Amount ($35 million), plus $50 million - in excess of the net amount the Sellers would receive under the Purchase Agreement. This requires an overbid amount of greater than 11% of the net Purchase Price for a bidder to participate in the Auction.

14.     While a break-up fee and expense reimbursement allowance could theoretically add value to the transaction by providing the Sellers with a stalking horse, the additional $50 million overbid is excessive, inflexible and provides no benefit to the

Debtors or their estates.[6] As this Court noted in connection with the Debtors' transaction with Barclays Capital, Inc., a high overbid amount such as the one proposed here makes it more difficult for qualified bidders to enter the process.[7] Accordingly, the Committee believes that the amount required to become the Starting Bid should be reduced by $50 million.

15.  Once a Starting Bid has been established, the Purchaser has the option to outbid and become the Starting Bid by adding $1 million to its bid (or by otherwise modifying its offer to be at least consistent with the bid that otherwise would be the Starting Bid). This provision serves as a considerable disincentive to other Qualified Bidders because, after such party has offered $155 million more than Purchaser's bid, the Purchaser can easily displace such bidder by virtually matching the bid. If another Qualified Bidder then wants to outbid the Purchaser, it will have to bid an additional $25 million. This provision, in reality, renders the initial overbid not the $155 million mentioned in the previous paragraph, but in reality $181 million (the $155 million initial increment, plus the $1 million matching Purchaser initial overbid, plus the $25 million incremental overbid). The purpose of bid increments is to avoid bid increases of small amounts, but in this instance it is unnecessary to require such a large increase in purchase price with each and every subsequent bid, especially where the Purchaser can

---

[6] In addition, at the time of the Auction, other Qualified Bidders must assume the Reimbursement Amount is $35 million when determining the required overbid amount; however the Reimbursement Amount, in actuality, may be significantly less than this amount given that $35 million represents the **maximum** reimbursable amount. It is unfair to require Qualified Bidders to increase their initial bids by such a large amount to cover the Reimbursement Amount when such amount can reasonably be estimated by the Purchaser prior to the Bid Deadline.

[7] "COURT: I don't understand the rationale for a fifty million dollar overbid. If there's a real player in the game prepared to do everything that Barclays is doing and is anxious for a competitive auction, why make it any harder for that party to come into the process? I don't understand why we should have a high hurdle." September 17, 2008  Tr. at 40:23-41:17 (Docket No. 352).

outbid the other Qualified Bidders with a fraction of that amount. The bid process will remain far more competitive and benefit the Debtors and their estates if, once the break-up fee and expense reimbursement are fixed, initial and subsequent overbid requirements are left to the discretion of the Debtors, upon consultation with the Committee.

**The Sellers Should Be Ordered To Cooperate Fully With Bidders And Permit More Expansive Bidding**

16.     The proposed Bid Procedures Order does not expressly impose a duty on Sellers to cooperate fully with potential bidders during the period of due diligence prior to the Auction, nor does it expressly permit joint bidding. To maximize value for the IMD, potential bidders must have unrestricted access to real time data, as well as management employees of the relevant Seller entities, including Neuberger Berman, and the management incentive plans proposed by the Purchaser. As the goal of the bidding procedures is to elicit the highest and best value for the IMD assets, the estate and its creditors benefit from encouraging additional participation in the process. It will also maximize value if the Bid Procedures Order expressly allows for joint bids, notwithstanding any other agreements, and allows for parties interested in formulating joint bids to share information among themselves. Finally, the Bid Procedures Order should not in any way restrict bidding by current Neuberger Berman management. Accordingly, the Bid Procedures Order should include language requiring the Sellers to cooperate with all potential bidders throughout the auction process, including with respect to joint bidding and bidding by current management.

**Committee Consultation Rights Should Be Expanded**

17.     While the Committee has been granted certain oversight and consultation rights under the proposed bidding process, the limited extent of the

11

Committee's consultation rights is inappropriate and reflects neither the size and importance of the sale of the IMD, nor the fact that the unsecured creditors are the primary stakeholders in these cases.  The Committee has requested, but not been granted, consultation rights in connection with certain additional aspects of the sale of the IMD, including, but not limited to, the Sellers' (i) determination of which Qualified Bid is the Starting Bid, (ii) determination of which Qualified Bid is the highest or otherwise best offer, (iii) determination to reject any bid that is inadequate or insufficient, (iv) extension of the Bid Deadline, and (v) amendment of procedural rules in connection with the Auction.  Without the benefit of the consultation rights described herein, the Committee will be unable to satisfy its statutory obligations to its constituents.  The Committee therefore requests modification of the proposed bid procedures to require the Sellers to consult with the Committee in connection with the matters described herein.

WHEREFORE, the Committee respectfully requests that, to the extent the Court enters the Bid Procedures Order, the terms of such order be amended in accordance with this Limited Objection, and the Committee be granted such other and further relief as is just and proper.

Dated:    New York, New York
          October 14, 2008

**MILBANK, TWEED, HADLEY & McCLOY LLP**

By: /s/ Abhilash M. Raval
Abhilash M. Raval
Evan R. Fleck
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000

-and-

Paul Aronzon
Robert Jay Moore
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017
Telephone: (213) 892-4000

Proposed Counsel for Official
Committee of Unsecured Creditors
of Lehman Brothers Holdings Inc., et al.