Hearing Date: October 16, 2008 at 10:00 a.m.

Ira L. Herman
Demetra L. Liggins
**THOMPSON & KNIGHT LLP**
919 Third Avenue, 39th Floor
New York, New York 10022-3915
(212) 751-3001 Telephone
(212) 751-3113 Facsimile

David M. Bennett*
William L. Banowsky*
**THOMPSON & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201-2533
(214) 969-1700 Telephone
(214) 969-1751 Facsimile

Attorneys for Crossmark Investment Advisers, L.P.,
Crossmark Corporate Advisers, L.P., Crossmark
Cornerstone Partners, L.P., Financial Analytics,
L.P., Crossmark Investment Company, L.P.,
Crossmark Corporate Investors, L.P., and
Crossmark Corporate Investors II, L.P.

*Pro Hac Application pending

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>**LEHMAN BROTHERS HOLDINGS INC.,**<br><br>Debtor. | Chapter 11<br><br>Case No. 08-13555 (JMP) |

**OBJECTION TO DEBTORS' MOTION TO (A) ESTABLISH SALES PROCEDURES;
(B) APPROVE A SELLER TERMINATION FEE AND A REIMBURSEMENT
AMOUNT; AND (C) APPROVE THE SALE OF THE PURCHASED ASSETS AND THE
ASSUMPTION AND ASSIGNMENT OF
<u>CONTRACTS RELATING TO THE PURCHASED ASSETS</u>**
[Relates to Docket No. 694]

Crossmark Investment Advisers, L.P. f/k/a Crossroads Investment Advisers, L.P., Crossmark Corporate Advisers, L.P. f/k/a Crossroads Corporate Advisers, Crossmark Cornerstone Partners, L.P. f/k/a Crossroads Cornerstone Partners, L.P., Financial Analytics, L.P.

f/k/a Capital Analytics, L.P., Crossmark Investment Company, L.P. f/k/a Crossroads Investment Company, L.P., Crossmark Corporate Investors, L.P. f/k/a Crossroads Corporate Investors, L.P., and Crossmark Corporate Investors II, L.P. f/k/a Crossroads Corporate Investors II, L.P. (collectively, "Crossmark") hereby object to the Debtors' Motion to (a) Establish Sales Procedures; (b) Approve a Seller Termination Fee and a Reimbursement Amount; and (c) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (the "Sale Motion").

## INTRODUCTION

1.  In the Sale Motion, the Debtors, along with non-debtor entities, seek this Court's authority to sell certain equity interests and assets related to Lehman Brothers' investment banking and investment management division ("IMD"), which encompasses Neuberger Berman, and certain non-Neuberger Berman business units, including Lehman's private fund investment group. Crossmark objects to the Sales Motion, both as an interested potential purchaser of Lehman's private funds investment group and as one of the largest and significant creditors of the non-debtor seller, Lehman Brothers Private Fund Investment Company LP, LLC ("PFIC"). For years, Crossmark developed and managed the business that now constitutes Lehman's private funds investment group under the name "Crossroads." After its purchase in 2003 by a Lehman entity, Crossroads business (now operated under PFIC) continued to be operated as a cohesive business unit. Lehman has never merged the PFIC business with any other Lehman businesses, including Neuberger Berman.

2.  Multiple Lehman entities, only one of which is a debtor in these consolidated bankruptcy cases, seek this Court's approval of sales procedures set out in the Sale Motion (the "Sale Procedures") without disclosure of certain basic information such as the actual assets being sold, the terms of the executive contracts for former Lehman employees, or the liabilities

assumed. This lack of transparency is prejudicial to both creditors and other stakeholders of debtor and non-debtor Lehman entities alike. For example, included in this sale are profitable operating subsidiaries and the most profitable fund-management contracts, which are substantially all of the assets of PFIC, the non-debtor seller that owes Crossmark $50,000,000. The Sale Motion gives no indication as to how the proceeds of the sale of those entities are to be allocated or the proposed treatment of the $50,000,000 Crossroads indebtedness.

## RELIEF REQUESTED

3. The Court should deny approval of the Sale Motion, among other things, and require full disclosure of all of the terms of the IMD Sale. As a part of such disclosure, the Court should require the parties to declare allocations for the non-Neuberger Berman assets being purchased, including the private funds investment unit for which Crossmark is willing to pay more than the $50,000,000 it is owed by such unit.

## JURISDICTION AND VENUE

4. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 157 (b) and Rule 6004(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL BACKGROUND

6. On September 15, 2008 (the "Petition Date"), Lehman Brothers Holdings, Inc. ("LBHI") and certain of its subsidiaries (collectively, the "Debtors") commenced these bankruptcy proceedings by filing voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' cases are jointly administered pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate their businesses as debtors-in-possession. 11 U.S.C. §§ 1107(a) and 1108.

7. On September 17, 2008, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code.

8. On September 19, 2008, a proceeding commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers, Inc. ("LBI"). A trustee appointed under the SIPA is administering LBI's estate.

9. On September 20, 2008, this Court approved a sale of Lehman's U.S. and Canadian Capital Markets and Investment Banking businesses to Barclays Capital, inc. (the "Barclays Sale"). On September 22, 2008, the Barclays Sale was consummated.

10. On October 3, 2008, LBHI and certain of its non-debtor subsidiaries entered into a purchase agreement (the "IMD Asset Purchase Agreement")[1] for the sale of certain assets (the "IMD Sale") to IMD Parent LLC, ("Buyer"), which Bain Capital Partners, LLC ("Bain") and Hellman & Friedman ("Hellman") control. Bain & Hellman have each agreed to provide 50% of the funding required to the close the IMD Sale. The aggregate gross purchase price (the "Purchase Price") is $2,150,000,000.

11. In the IMD Asset Purchase Agreement, LBHI agrees to sell stock and assets of non-debtor subsidiaries that are used primarily in connection with IMD.[2] The Sale Motion provides for the sale of five business units: (a) the Neuberger Berman business; (b) the fixed income business; (c) parts of the hedge funds of funds and single manager businesses; (d) the private funds investment group of the private equity business; and (e) a portion of the Asian and European asset management business. Upon information and belief, the vast majority of the

---

[1] Amended and Restated Purchase Agreement by and between IMD Parent LLC, Lehman Brothers Holding, Inc. and Other Sellers Named Herein dated as of October 3, 2008.
[2] Schedule I of the IMD Asset Purchase Agreement.

subsidiaries to be sold constitute the Neuberger Berman business; however, the Sale Motion fails to identify which entities comprise any of the business units. Likewise, the Sale Motion fails to allocate the Purchase Price or account for the value of these business units.

12. At the Buyer's sole discretion, it may elect to purchase the equity interests or assets non-debtor entities as long as it provides a Designation Notice to the sellers between 45 and 60 days of the IMD Asset Purchase Agreement.[3] Upon receipt of the Designation Notice, LBHI and the non-debtor subsidiaries are obligated to commence a bankruptcy case to facilitate the EMD Sale.[4] Neither the Sale Motion nor the IMD Asset Purchase Agreement provides for a deadline for the sellers to commence any new bankruptcy case to effectuate the IMD Sale.

## FACTUAL BACKGROUND

### A. Lehman Brothers Private Funds Investment Company LP, LLC, an entity not in bankruptcy, purchased the profitable Crossroads business in 2003.

13. The Crossroads business was originally founded in 1981 as a "fund of funds," a pool of capital that invested in private equity funds and, through them, in their many companies. In 1995, Crossroads had approximately $500,000,000 in capital under management on behalf of approximately fifty clients.

14. By late 1999, after just four years under new leadership, Crossroads had quadrupled its capital investments to $2,000,000,000 invested from over 150 institutional clients. By that time, Crossroads was one of the highest-performing, most diversified private-equity firms in the nation.

15. In September 2003, Crossroads entered into an agreement to sell substantially all of its assets to Lehman Brothers Private Funds Investment Company LP, LLC ("PFIC"), a

---

[3] Sale Mot. ¶22; IMD Asset Purchase Agreement 8.
[4] Sale Mot. ¶22.

newly-formed Lehman entity formed for the purposes of purchasing and managing the Crossroads assets (the "PFIC Asset Purchase Agreement").[5] The sale (the "PFIC Asset Sale") closed on October 9, 2003.

16. At the time of the PFIC Asset Sale, Crossroads had approximately sixteen established funds, each of which was run using Crossroads's proprietary management system (the "Crossroads Legacy Funds"). The PFIC Asset Purchase Agreement provided that Crossroads would transfer all of its operating and management units along with its general partnership interest in each of the Crossroads Legacy Funds to PFIC or to a PFIC designee. PFIC or its designee, as general partner of the funds, would run the Crossroads Legacy Funds, along with any "Successor Funds," using the very same Crossroads proprietary investment-management system, operating in the very same office space, and using the very same employees. Accordingly, upon closing of the transaction, PFIC acquired the Crossroads business.

### B. Crossmark is currently owed $50,000,000 by PFIC as part of PFIC's purchase price for the Crossroads business.

17. The purchase price in the PFIC Asset Sale consisted of cash, notes, and a "Contingent Purchase Price."[6] PFIC still owes at least $50,000,000 of the Contingent Purchase

---

[5] See PFIC Asset Purchase Agreement, dated as of September 16, 2003 by and among Lehman Brothers private Funds Investment Company LP, LLC, as Purchaser; Lehman Brothers Holdings Inc., as Parent, and Crossroads Investment Advisers, L.P.; Crossroads Corporate Advisers, L.P.; Crossroads Cornerstone Partners, L.P.; Capital Analytics, L.P.; The Main Office Management Company, L.P.; E-Valuate, L.P.; Security Assurance Advisers, L.P.; Crossroads Investment Company, L.P.; Crossroads Corporate Investors, L.P.; and Crossroads Corporate Investors II, L.P., as Purchasers.

[6] Specifically, the 2003 PFIC Asset Purchase Agreement contemplates that, during the Contingent Period, PFIC will make "Contingent Payments" to Crossmark based on the performance of the Crossroads "Business," as that term is defined as: "(a) investment management services to private investment pools and managed accounts and (b) investment management related financial services, including fund accounting, risk administration services, research and publishing services and corporate accounts." PFIC Asset Purchase Agreement at 1. Business includes "as the Business may be expanded or modified from time to time ..." Id. at §3.3.7(1).

To further safeguard the Contingent Purchase Price payment, the parties reinforced those rights through an acceleration clause. Id. at § 3.38(c) The acceleration clause mandates that any agreement to sell or transfer

Price to Crossmark. The Contingent Purchase Price amount is determined by the performance of the private funds investment group business during the seven years following the PFIC Asset Sale (the "Contingent Period"). The calculation of the Contingent Purchase Price is based on all fund revenues and all fund management and operation revenues, including Lehman Crossroads Fund XVII ("Fund XVII") and Lehman Crossroads Fund XVIII ("Fund XVIII"), which are "Included Businesses and Funds" under the IMD Asset Purchase Agreement.[7]

### C. The former Crossroads business, now operated under PFIC, remains separate from the Neuberger Berman business unit.

18. As stated above, PFIC has always operated the former Crossroads business as a separate and *distinct* business. Although it was ostensibly under IMD, the PFIC businesses' main offices have been and continue to be located in Dallas, Texas, in the same building where they were formerly operated as Crossroads. Most PFIC employees are former Crossroads employees. To Crossmark's knowledge, none of the PFIC principals participate in *any* other Lehman business, including the Neuberger Berman business unit that constitutes the vast majority of the assets involved in the IMD Sale. PFIC's bank accounts, computer systems, management information systems, and other business assets are completely separate from the Neuberger Berman business unit. Rather, all PFIC businesses, including the funds and fund management entities that are proposed to be sold in the IMD Sale, are operated as they always have been—as one cohesive unit—sharing employees, computer systems, office space, and investment philosophy.

---

substantially all of the Crossroads assets include an assumption by a purchaser to pay any remaining portion of the Contingent Purchase Price to Crossroads. If the agreement does not provide for such an assumption, all unpaid payments toward the Contingent Purchase Price become due and payable.
[7] Schedule 1.1(d) of IMD Asset Purchase Agreement.

### D. Crossmark's attempts to buy back the Business were ignored while management responsible for PFIC sought to arrange a management buyout PFIC business.

19. For several months, Crossmark has expressed its interest in purchasing back the business sold to PFIC. But Crossmark's inquiries were simply and repeatedly ignored by the current management of PFIC.

20. Even before the Petition Date, Crossmark grew concerned that the $50,000,000 still owed under the PFIC Asset Purchase Agreement would not be paid. Crossmark has continually sought to invoke its right under the PFIC Asset Purchase Agreement to inspect PFIC's books and records. These requests were made by letter, by phone, and in person to multiple Lehman principals to no avail. In fact, Crossmark received no information from any Lehman entity as to Lehman's plans for the private funds investment business unit until the Sale Motion was filed. Crossmark continues to be denied acess to basic information which is relevant to its claim.

21. As the developer and former owner of the PFIC assets, Crossmark is in the best position to properly value the assets of the private fund investment business unit and ensure a fair price is paid for them. But it is impossible to do so without basic disclosures that are missing from the Sales Procedure as proposed.

### E. The IMD Sale proposes to strip the valuable assets of non-debtor subsidiaries and leave nothing for their creditors.

22. Crossroads learned of the IMD Sale only when it was disclosed to the public. While it is difficult to understand what assets are being sold, it appears that the IMD Sale proposes to strip profitable, solvent non-debtor entities and leave nothing for their creditors. Despite the paucity of detail in the IMD Asset Purchase Agrement, it is clear that Buyer would purchase the profitable operating units and the two most profitable funds under PFIC, along with

its office space, employees, computer systems, and related fund service businesses—together accounting for 70% to 90% of the PFIC business unit's revenue.[8] But Buyer would leave behind core aspects of the PFIC business, including the remainder of the funds and any investments in the funds. But, to Crossmark's detriment, Buyer is not assuming any obligation to pay Crossmark, which violates PFIC's obligations under the PFIC Asset Purchase Agreement and sabotages the value of PFIC's business as a whole.

23. On information and belief, Crossmark's purchase inquiries were ignored because current management of PFIC was attempting a management-led buyout that would further its own interests.[9] Crossmark believes that the private fund investment business unit was included in the IMD Sale only after management had negotiated lucrative contracts for themselves. Now, the IMD sale includes some $400,000,000 in retention awards for certain unnamed "key employees."[10] The Sale Motion gives no indication as to how the $400,000,000 will be allocated. Hence, the employment package appears to be a disguised management buyout of the private funds investment business unit.

## ARGUMENTS AND AUTHORITIES

24. At the hearing on the Barclays Sale, the Court acknowledged that the Barclays Sale proceeded on an "extraordinary fast schedule."[11] The Debtors, however, indicated that after the sale, they hoped to "go into the more conventional procedures of a Chapter 11."[12] Likewise, the Committee indicated to the Court that after the Barclays Sale, this case would proceed as a more conventional chapter 11 case:

---

[8] Fund XVII and Fund XVIII, which are Successor Funds under the PFIC Asset Purchase Agreement, constitute the majority of the private fund investment businesses' gross profits.
[9] *See* Sale Mot. ¶ 15.
[10] *See* Sales Mot. ¶28.
[11] Barclays Sale Hr'g Tr., p.247:23, dated September 19, 2008.
[12] Barclays Sale Hr'g Tr., p.244:15-16.

> The committee fully expects that after this, we're going to go back to what I would call—
>
> THE COURT: A more conventional model?
>
> MR. DESPINS: Yes. Business as usual for Chapter 11, if you will, your honor.
>
> . . .
>
> THE COURT: I appreciate that. And it lifts the fog over at least that aspect of the case. And I'm grateful for the comment.[13]

Despite these representations, the Debtors are asking the Court to approve a sale of entities and assets wholly outside of its jurisdiction without sufficient disclosure to creditors of the terms and provisions of the sale or its impact on the rights of affected stakeholders.

### A. This Court Lacks Subject Matter Jurisdiction over Non-Debtor Assets.

25. This Court does not have subject matter jurisdiction to approve the sale of a non-debtor's assets. The Sale Motion proposes that the Court approve a sale process wherein the Debtors would transfer "free and clear" of assets of one bankrupt Lehman entity, LBHI, together with the assets of 23 non-debtor Lehman entities even before there is any bankruptcy case filed by those entities.[14] Section 1334(b) of the Judicial Code governs a bankruptcy court's jurisdiction. The statute does not give a bankruptcy court jurisdiction over property owned (in whole or in part) by the debtor unless the property is part of the debtor's bankruptcy estate.[15]

26. As a matter of law, "a parent company does not hold the assets of a subsidiary."[16] The Bankruptcy Code's exclusive jurisdiction over a debtor and its property does not extend to a

---

[13] Barclays Sale Hr'g Tr., p.68:6-21.
[14] Schedule I of the IMD APA.
[15] *Gould v. Smith (In re Holywell Corp.)*, 118 B.R. 876, 879 (Bankr. S.D. Fla. 1990); *In re Tower Auto, Inc.*, 356 B.R. 598, 603 (Bankr. S.D.N.Y. 2006).
[16] *In re Insilco Technologies, Inc.*, 351 B.R. 313, 321 (Bankr. D. Del. 2006).

"solvent independent subsidiary of the debtor merely because the stock is held by the debtor."[17] Generally, bankruptcy courts are "without jurisdiction over proceeding involving a non-debtor filing subsidiary."[18] This lack of jurisdiction is true even where a debtor owns one hundred percent of the subsidiary's stock.[19]

27. With respect to the IMD Sale, the Sellers include only one debtor — LBHI — which presently is a debtor in these administratively consolidated bankruptcy cases. The remaining 23 sellers are non-debtor entities.[20] A subsidiary's assets are not property of the estate under Section 541 of the Bankruptcy Code.[21] Property of estate comprises all legal or equitable interests of the debtor in property as of the commencement of the case.[22] Because the non-debtor Sellers' assets are not property of the estate, Section 363 (which governs a debtor's right to sell property of its estate) does not authorize the debtors to sell such assets.[23] In fact, "there is no authorization in [Section] 363, or elsewhere, for a debtor in possession or a trustee to sell property in which the estate has no interest."[24] Therefore, this Court does not have jurisdiction over the PFIC assets which, therefore, cannot be part of the proposed IMD Sale.

**B. The IMD Sale attempts to sell non-debtor assets sale free of future claims.**

28. In the Sale Motion, the Debtors are seeking to sell the non-debtor assets free and clear of all liens, claims, encumbrances and other interests, which would include future claims that third parties have against the non-debtor entities. While courts disagree as to whether a

---

[17] *Feldman v. Beck Indus., Inc. (In re Beck Indus., Inc.)*, 479 F.2d 410, 415 (2d Cir. 1973).
[18] *In re Alan's Dep't Stores, Inc,.* 615 F.2d 925, 940 (2d Cir. 1979).
[19] *In re Murchison*, 54 B.R. 721, 728 (Bankr. N.D. Tex. 1985).
[20] Schedule I of the IMD APA.
[21] *Murchison*, 54 B.R. at 725 ("Debtor had not interests in the particular property at issue; rather, he had an equitable interest in the entities which owned other entities, and so on, which ultimately owned an equitable interest in the partnership holding title to the property.").
[22] 11 U.S.C. § 541(a)(1).
[23] *Murchison*, 54 B.R. at 725 ("Because the criterion in §541(a)(1) has not been satisfied, §363(b)(1) cannot apply.").
[24] *Id.*

Section 363 sale can effectively insulate a purchaser of estate assets from a future lawsuit, the statute cannot protect a purchaser where the assets are not estate property.[25] Bankruptcy courts simply do not have jurisdiction to interfere with an action between a future claimant and a purchase or assets.[26]

29. The IMD Sale clearly contemplates insulating the purchasers of non-debtor property from liability. In the Sale Motion, the buyers are assuming only the obligations of the selling entities "incurred after closing."[27] Accordingly, the sellers are clearly trying to insulate the buyers and the buyers are trying to insulate themselves from any of Lehman's pre-petition liabilities. The Sale Motion, however, fails to identify even the aggregate amount of any such liabilities, the holder of such claims or how and to what extent the sales proceeds would be available to satisfy such claims.

30. The fact that some or all of the proposed sellers may later avail themselves of a Chapter 11 filing does not ameliorate these jurisdictional and due process concerns. The filing of a Chapter 11 case by one of the sellers (like PFIC) after approval of the sales process is <u>fate accompli</u>. It does not afford any real protection for the creditors of, and other stakeholders in, the non-debtor entities subsidiaries that are proposed sellers under the IMD Sale. While the IMD Sale appears to richly compensate Lehman and its officers, it threatens to leave Crossmark and other creditors of non-debtor entities in the dark, with insufficient assets to pay their claims.

31. If this Court approves the Sale Motion, it should require LBHI and the non-debtor entities to specifically identity which entities will be sold as a part of each business unit. The Court should further require that the sellers identify the value of each business unit to be sold and

---

[25] *Upholsters Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1326 (7th Cir. 1990).
[26] *Fairchild Aircraft, Inc. v. Cambell ( In re Fairchild Aircraft Corp.)*, 184 B. R. 910 (Bankr. W.D. Tex. 1995), *rev'd on other grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998).
[27] Sale Mot. at ¶23.

its allocated share of the Purchase Price. Finally, the Court should order that the Sale Motion has no impact on successor liability claims against the Buyer so that no creditors of the non-debtor entities are prejudiced by the IMD Sale.

### C. The Debtors have failed to articulate a legitimate business reason for the sale.

32. As a debtor-in-possession, LBHI as the burden to demonstrate a sound business purpose exists for a Section 363 sale.[28] Historically, courts have approved the sale of all or substantially all of the assets of a bankruptcy estate outside of a plan of reorganization in limited circumstances.[29] This rule is based on the danger that a Section 363 sale might deprive parties of substantial rights inherent in the plan confirmation process.[30] As such, Section 363 sales of substantially all of a chapter 11 debtor's assets in Chapter 11 are permissible only where the sale proponent demonstrates a good, sound business justification for conducting the sale before confirmation.[31]

33. Here, not only are the Debtors seeking approval of the sale of assets pursuant to Section 363 in advance of a plan of reorganization, in fact, they seek approval of a sales process even before the filing of a bankruptcy case by most (23 of 24) of the sellers.[32]

### D. The Debtors have failed to define adequately the terms of the IMD Sale.

34. The Sale Motion fails to provide notice of the particular assets to be sold. Section 363 allows sales to take place outside the ordinary course, when a debtor establishes: (a) adequate and reasonable notice of the sale; (b) the purchase price is fair, adequate, and

---

[28] *See In re Lionel Corp.*, 722 F.3d 1063, 1071 (2d Cir. 1983).
[29] *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007).
[30] *In re Abbotts Dairies of Penn, Inc.*, 788 F.2d 143, 150 (3d Cir. 1986); *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) (finding that a 363 sale of substantially all of estate assets allows the debtor to "short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan.").
[31] *Iridium Operating*, 478 F.3d at 466.
[32] Schedule 1 of the APA.

reasonable; and (c) the sale is proposed in good faith.[33] As such, two fundamental principals which apply to all bankruptcy sales (big and small) are that (i) the terms and provisions of the sale must be disclosed to the Court[34], the creditors and other parties-in-interest and (ii) that a bankruptcy sale can only be approved after adequate notice and a hearing.[35] Here, the Sale Motion simply does not contain sufficient information for the Court, the creditors and other parties-in-interest to make a reasoned judgment about the sale process and the terms of the IMD Sale. In fact, the Sale Motion and accompanying schedules and exhibits raise more questions about the sale than they answer.

35.  While the Sale Motion indicates the business units that are proposed to be sold to the Buyer, it is impossible to tell from the pleadings filed to date:

- what assets are to be sold;

- what portion of the assets to be sold are not property of the LHI bankruptcy estate (and hence outside of the jurisdiction of this Court);

- the impact of the sale on the assets and liabilities of non-debtor Lehman entities which are sellers;

- whether creditors and other parties-in-interest of the non-debtor Lehman entities have been given notice;

- which of the sellers are selling "all or substantially all" of their assets;

- which assets are proposed to be sold "free and clear" of liens, claims and encumbrances;

- which Lehman entities intend to file a bankruptcy case; and

---

[33] *In re Lady H Coal Co., Inc.*, 93 B. R. 233, 243 (Bankr. S.D. Va. 1996).
[34] *See id.*
[35] Fed. R. Bank. P. 2002(c)(2) (notice of a sale is sufficient if it describes the property to be sold).

- how the proceeds of the sale would be allocated among the debtor and non-debtor Lehman entities.

36. It is axiomatic that a bankruptcy court may only approve the sale of assets "free and clear" if the assets are property of a bankruptcy estate.[36] For the Court to approve a sale process where most of the sellers are not debtors and, apparently, most of the assets involved are not assets of any bankruptcy estate and are not subject to the Bankruptcy Court's jurisdiction is simply premature. If Lehman affiliates must file bankruptcy in advance of any sale, this Court should mandate that those entities seek bankruptcy protection now and then, only after, among other things, the filing of appropriate creditor lists, schedules and statement of affairs, seek court approval of procedures to sell some or all of their assets. The approval of a process to sell assets of non-debtors, particularly where it is contemplated that some or all of them later will be joined as debtors in these proceedings, is extraordinary and impermissible.

37. Not only does the Sale Motion fail to disclose which of the Lehman sellers intend to file a bankruptcy case, but it goes on to propose that the proposed buyer be given the power to designate which entities file a Chapter 11 case in order to facilitate the purported "free and clear" transfer of title to the assets in question. It is wholly impermissible for a debtor-in-possession to abdicate to the putative buyer the decision to seek relief under the Bankruptcy Code for one or more of its subsidiaries. For that reason alone, the Court should decline to approve the IMD Sales procedures.

38. Here, Crossmark is the largest (and perhaps only) creditor of one of the non-bankrupt selling entities. It is impossible for Crossmark to determine:

---

[36] *Murchison*, 54 B.R. at 725.

- the impact of the sale on the Lehman entity which is the direct obligor of Crossmark's indebtedness;

- how its rights to payment from its obligor will be protected (if at all); or

- how and to what extent the $2.1 billion purchase price will be allocated to its obligor.

39. Crossmark and other creditors of the non-bankrupt sellers should not be left guessing. The Court should mandate that full disclosure of the terms and provisions of the sale and the particulars of the sale process be made as a condition to approval of any relief requested in the Sale Motion.

40. Moreover the IMD Sale appears to be a disguised management buyout with respect to the private fund investment group. In fact, in the run-up to Lehman's Chapter 11 filing (and thereafter) PFIC sought to arrange a management buyout for the company. Lacking financing, it appears that Lehman investment management has made arrangements to advance a disguised management buyout, which is buried in the larger IMD Sale.

41. The terms and provisions of the management buyout have not been disclosed. While the existence of employment agreements for certain senior executives has been publicly disclosed, none of the terms and provisions of such agreements are summarized or disclosed in the Sale Motion. Given all of the concerns that have been raised (in Congress and otherwise) about possible self-dealing by Lehman executives, the Court should condition the approval of the sale procedures set forth in the Sale Motion on the disclosure of all material employment agreements which are proposed to be a part of the transaction.

## **RESERVATION OF RIGHTS**

42.     Crossmark reserves the right to amend, supplement, or otherwise revise this Objection.

## CONCLUSION

WHEREFORE, for the reasons stated above, Crossmark asks this Court to enter an order (i) sustaining its Objection; (ii) denying approval of the Sale Motion; and (iii) granting such other and further relief as this Court deems proper, both at law and in equity.

**DATED:**   New York, New York
October 14, 2008.

Respectfully submitted,

By: ___/s/ David M. Bennett___

**THOMPSON & KNIGHT LLP**
Ira L. Herman
Demetra L. Liggins
919 Third Avenue, 39th Floor
New York, New York 10022-3915
(212) 751-3001 Telephone
(212) 751-3113 Facsimile

**THOMPSON & KNIGHT LLP**
David M. Bennett
William L. Banowsky
1722 Routh Street, Suite 1500
Dallas, Texas 75201-2533
(214) 969-1486 Telephone
(214) 880-3293 Facsimile

**ATTORNEYS FOR CROSSMARK**