DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333
Martin J. Bienenstock, Esq.
Irena Goldstein, Esq.
Donna L. Gordon, Esq.

FLASTER/GREENBERG PC
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
Telephone: (215) 279-9393
Facsimile: (215) 279-9394
Eugene J. Chikowski, Esq.
Greg T. Kupniewski, Esq.

Co-Counsel for American Express Travel Related
    Services Company, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., <u>et al</u>. | Case No. 08-13555 (JMP) (Jointly Administered) |
| Debtors. | |

**OBJECTION OF AMERICAN EXPRESS TRAVEL RELATED
SERVICES COMPANY, INC. TO RELIEF REQUESTED IN NOTICE OF REVISIONS
TO SCHEDULES OF CONTRACTS ASSUMED AND ASSIGNED TO PURCHASER
<u>AND TO PROPOSED CURE AMOUNT</u>**

American Express Travel Related Services Company, Inc. ("<u>AmEx</u>") files this Objection

(the "<u>Objection</u>") to the relief requested by the Notice of Revisions to Schedules of Contracts

Assumed and Assigned to Purchaser filed by Barclays Capital Inc. ("<u>Barclays</u>") on October 1,

2008 (the "Revision Notice")[1] and to the proposed cure amount with respect to an AmEx Contract assumed and assigned to Barclays, and in support thereof respectfully states as follows:

## PRELIMINARY STATEMENT

1. Certain AmEx Contracts (defined in paragraph 7 below) were assumed and assigned to Barclays in connection with the sale (the "Sale") of the "Purchased Assets," as defined in the Asset Purchase Agreement among Lehman Brothers Holdings, Inc. ("LBHI"), Lehman Brothers, Inc. ("LBI"), LB745 LLC and Barclays, dated as of September 16, 2008 (the "APA") pursuant to this Court's Order under 11 U.S.C. §§ 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption And Assignment Of Executory Contracts And Unexpired Leases, dated September 19, 2008 (the "Sale Order"). [Dkt No. 258]

2. The hearing on the Sale commenced on a Friday evening before the actual APA was available to parties in interest. Changes to a prior form of agreement were orally conveyed during a recess. The relief requested in the actual proposed order was not made available until Friday night after the Debtors called their first witness. Thus, the APA was approved on minimal notice to creditors and parties in interest, because, as set forth in the Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts relating to the Purchased Assets [Dkt. No. 60] ("Sale Motion"), time was "of the essence." ¶29.

---

[1] Since the Revision Notice seeks affirmative relief from this Court, AmEx is treating the Revision Notice as if it were a motion pursuant to Fed. R. Bankr. P. 9014. Therefore, this is a contested matter pursuant to Rule 9014 and all of the provisions of that rule apply here.

2

Now Barclays comes before this Court and argues that, despite the fact that creditors should be bound by the terms of the Sale Order, it should be relieved of certain of its provisions.

3. Pursuant to the terms of the APA, the "Purchased Assets" acquired by Barclays under the APA included executory contracts to be assumed by the Debtors and assigned to Barclays. These contracts were divided into two categories under the Sale Order: (i) contracts to be assumed and assigned upon the closing of the APA the ("Closing Date Contracts") and (ii) contracts that Barclays had 60 days to evaluate before deciding whether to take assignment of ("Designated Contracts"). Prior to the hearing on the Sale Motion, the Debtors' two contracts with AmEx were identified as "Closing Date Contracts" on the list ("Closing Date Contracts List") posted by the Debtors' claims agent on http://chapter11.epiqsystems.com/Lehman ("Lehman Website"). (The Closing Date Contracts List is annexed as Exhibit A to the Declaration of Eugene J. Chikowski (the "Declaration"), filed herewith.)

4. Notwithstanding the express terms of the Sale Order and the APA, on October 1, 2008, *after* (a) the AmEx Contracts were designated by the Debtors and Barclays on the Lehman Website as Closing Date Contracts, (b) the Sale Order was entered, which among other things, approved the assumption and assignment of the AmEx Contracts to Barclays, (c) the Sale to Barclays closed, (d) counsel for Barclays and AmEx engaged in discussions concerning the cure amounts due and owing under the AmEx Contracts, (e) certain former Lehman employees (now Barclays employees) continued their use of AmEx services; and (f) *AmEx, in reliance on of all of the forgoing, provided confidential and proprietary information to Barclays*, Barclays filed the Revision Notice purporting to remove the AmEx Contracts from the contracts assumed and assigned to Barclays upon the closing of the Sale.

5. The assumption and assignment of the AmEx Contracts cannot unilaterally be

3

unwound as Barclays now attempts to do. Plainly put, once the closing occurred, by operation of Sections 363 and 365 of Title 11 of the United States Code (the "Bankruptcy Code") and black letter contract law, the AmEx Contracts at issue were conveyed to Barclays. Moreover, because Barclays made binding promises and representations to AmEx, and AmEx relied upon such promises and statements to its detriment, equity requires that Barclays be estopped from reneging on its obligations under the Sale Order. If creditors and parties in interest are bound by the terms of the Sale Order, Barclays is too. Put differently, if the Debtors now determine that they sold the real estate for too low a price, can they get it back? Of course not!

## FACTUAL AND PROCEDURAL BACKGROUND

6. Prior to September 15, 2008, when LBHI and certain of its subsidiaries commenced filing voluntary Chapter 11 cases, LBHI (on behalf of itself and its global related entities) entered into a Global Corporate Services Commercial Account Agreement with American Express Travel Related Services Company, Inc. (and its global related entities) effective as of October 13, 2006 (as amended from time to time, the "AmEx Corporate Services Contract").[2] *See* Affidavit of Daniel J. Massoni ("Massoni Affidavit"), filed herewith, ¶3.

7. Also prior to the commencement of these bankruptcy cases, LBI entered into a Business Travel Services Agreement with American Express Travel Related Services Company, Inc. effective as of September 1, 2000 (as amended from time to time, the "AmEx Travel

---

[2] The AmEx Corporate Services Contract is structured as a master agreement with separate addenda setting forth certain unique terms for each particular market. The AmEx Corporate Services Contract originally incorporated one addendum for the United States. The parties subsequently amended the AmEx Corporate Services Contract to incorporate addenda for several additional markets. The addenda and the master agreement, pursuant to their terms, constitute a single, integrated agreement.

4

Contract" and, together with the AmEx Corporate Services Contract, the "AmEx Contracts").[3] *See* Affidavit of Stephanie Deihl ("Deihl Affidavit"), filed herewith ¶3.

8.   As of the September 22, 2008, the Debtors owed AmEx approximately $17,234,887.00 on account of the AmEx Corporate Services Contract ("Corporate Services Cure") and $577,833.00 on account of the AmEx Travel Contract ("Travel Cure"), for a combined total of $17,812,000.00 (the "Cure Amounts").[4]  Massoni Affidavit, ¶3; Deihl Affidavit 3.

### I.   The AmEx Contracts Were Designated As "Closing Date Contracts".

9.   On September 17, 2008, the Debtor filed the Sale Motion pursuant to which the Debtors, *inter alia*, requested this Court's approval of the APA which provided for the assumption and assignment of certain executory contracts to Barclays. Pursuant to the Sale Motion and the Closing Date Contracts List posted on the Lehman Website, the AmEx Corporate Services Contract and the AmEx Travel Contract were listed as Closing Date Contracts[5] with associated cure amounts of $18,000,000.00 and $0, respectively.

### II.   The Debtors Irrevocably Conveyed The AmEx Contracts To Barclays.

A.   The Court Enters the Sale Order

10.   On September 20, 2008, this Court entered the Sale Order approving the relief requested in the Sale Motion [Dkt. No. 258]. The Sale Order contains the following findings:

---

[3]   The AmEx Contracts are confidential and contain proprietary business information. AmEx is willing to provide copies of the AmEx Contracts to the Court and interested parties who sign a confidentiality agreement, and if necessary, will file a motion to file the AmEx Contracts under seal.

[4]   The Cure Amounts fluctuate based upon, among other things, the value of the US dollar, resolution of disputed charges and continued use of AmEx services.

[5]   "Closing Date Contracts" are defined as those contracts that will be assumed and assigned to Barclays immediately upon the Closing Date (as distinguished from the "Designated Contracts" which were the subject of the 60-day evaluation period described in section 2.5 of the APA). Sale Order at ¶ F; APA at § 2.5. The Sale Order defines "Cure Amounts" as the cure amounts for the respective Closing Date Contracts as identified on the Lehman Website. Sale Order at ¶ T.

5

> The assumption and assignment of the Contracts pursuant to the terms of this Order is integral to the Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and all other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors. The Debtors have: (i) to the extent necessary, cured or provided adequate assurance of cure, of any default existing prior to the date hereof with respect to the Closing Date Contracts, within the meaning of 11 U.S.C. §§ 365(b)(1)(A) and 365(f)(2)(A). … *The Purchaser's promise to pay the Cure Amounts (as defined below) and to perform the obligations under the Closing Date Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of 11 U.S.C. §§ 365(b)(1)(C) and 365(f)(2)(B). Any objections to the assumption and assignment of any of the Closing Date Contracts to the Purchaser are hereby overruled.* … The procedures with respect to assumption, assignment and cure of the Contracts that are the subject of the Purchaser's designation rights (the "<u>Designated Contracts</u>") will be set forth in one or more separate orders of the Court which will be entered at a later date or dates.

Sale Order at ¶ T (emphasis added).

Paragraph 12 of the Sale Order, in pertinent part, reads:

> In accordance with Bankruptcy Code sections 363, 365 and 105(a), and subject to the terms of the Purchase Agreement and this Sale Order, the Sellers are hereby authorized to assume and assign the Closing Date Contracts, including customer account agreements, to which they are a party to the Purchaser. All counterparties to Closing Date Contracts shall have until the Cure Amount Objection Deadline to file an objection to the Cure Amounts (including as to the specific identity of such contracts). To the extent that any counterparty does not object to its Cure Amount by the Cure Amount Objection Deadline, such counterparty is deemed to have consented to such Cure Amounts and the assignments of their respective Closing Date Contracts to the Purchaser. … *The Purchaser shall pay any Cure Amount as soon as reasonably practicable after (i) the date on which the contracting counterparty consents in writing to the Cure Amount*, (ii) the date on which the counterparty is deemed to have consented, or (iii) the date on which the Court enters an order determining the Cure Amount after the notice and hearing procedure set forth above. The procedures with respect to assumption, assignment and cure of the Designated Contracts will be set forth in one or more separate orders of the Court which will be entered at a later date or dates.

NY3 3012718.5 900000 632732 10/14/2008 04:29pm

Sale Order at ¶ 12 (emphasis added).

11. The Sale Order further provides that the "[Sale] Order shall govern any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and [the] Order. Sale Order ¶ 27.

B. The Closing Date Contracts Have Already Been "Purchased" by Barclays

12. On September 22, 2008, the Debtor filed a notice stating that the transaction contemplated by the Sale Order and the APA had been consummated that same day [Dkt. No. 280]. At that time, all of Barclays obligations under the Sale Order and the APA became fixed and Barclays became the assignee of all of the Closing Date Contracts, including the AmEx Contracts. Barclays, therefore, was free to enjoy the benefits of the AmEx Contracts, but also had the concomitant burden of making the cure payments required thereunder, subject to the cure procedures established under the APA and the Sale Order.

C. AmEx Consents In Writing To The Proposed Cure Amount, Thereby Obligating Barclays Under The Sale Order To Pay $18 Million "As Soon As Practicable"

13. On the Closing day, AmEx sent a letter to Debtor's counsel, with a courtesy copy to Barclays' counsel, consenting in writing to the cure amount, a true and correct copy of which is annexed to the Declaration as Exhibit B.[6] As set forth in the Declaration, because of confusion created by the Debtors' and Barclays' own procedures, AmEx subsequently sent two more consent notices which are attached as Exhibits C and D to the Declaration.

D. Barclays Demands and Obtains, and May Have Misused, Sensitive And Competitive Terms Of The AmEx Corporate Services Contract.

14. In response to the consent forms submitted by AmEx, Barclays contacted Amex's counsel to discuss the assignment and payment of the Cure Amounts. During its

---

[6] AmEx consented to the combined $18 million cure amount set forth on the Closing Date Contracts List, even though the Corporate Services Cure was slightly lower and the Travel Cure was higher than that listed because the combined total approximated the $18 million.

7

communications with AmEx, Barclays expressed the position that the cure amount sent forth on the Closing Contracts List may not be accurate "given the scope of the assets purchased by Barclays." Declaration ¶10. Barclays' position was in contravention of the express terms of the Global Agreement which make clear that the Amex Corporate Services Contract (the master agreement and the addenda) is a single integrated agreement governing the entire commercial card relationship between AmEx (and its related affiliates) and LBHI (and its related affiliates).[7]

15.  In a good faith attempt to address and resolve Barclays' assertions (and at the request of Barclays' outside counsel), AmEx provided Barclays' outside counsel with a copy of the AmEx Corporate Services Contract. Declaration, ¶12.  Because Barclays is itself an AmEx competitor in the UK market and regularly favors AmEx competitors in the North America market, AmEx required that Barclays' outside counsel keep the terms of the AmEx Corporate Services Contract confidential and limit its disclosure to "attorneys' eyes" only. Declaration, ¶12, Exhibit F.  Barclays' outside counsel claimed a need to share the AmEx Corporate Services Contract with Barclays' in-house counsel and relevant business people in order to get the cure issue resolved.  Declaration, ¶13.  Because the AmEx Contracts had already been assumed and assigned to Barclays under the Sale Order and the discussions at that time concerned only the cure amounts due and owing (and not whether or not Barclays would accept assignment of the AmEx Contracts) AmEx's outside counsel obtained the consent of its client to allow Barclays' counsel to share the AmEx Contracts with its client.  (True and correct copies of the e-mail exchange between AmEx's and Barclays' respective outside counsel regarding the confidentiality of the AmEx Corporate Services Contract are attached as <u>Exhibit G</u> to the Declaration.)

---

[7]  Nowhere in the Sale Motion did the Debtors request relief entitling them to bifurcate an executory contract.  Moreover, if such relief had been requested, it would have been denied based on the black letter law that executory contracts can only be assumed *cum onere*, with all benefits and burdens.

8

16. After AmEx provided its confidential information, Barclays abruptly informed AmEx by telephone on the evening of October 1, 2008, that it intended to "amend" the list of Closing Date Contracts and that the AmEx Contracts would no longer be included on the amended list. AmEx subsequently learned that, after the assumption and assignment of the AmEx Corporate Services Contract, Barclays arranged for the issuance of new credit cards to over 1,000 former Lehman employees through an AmEx competitor in the U.S.

17. Later in the evening of October 1, 2008, Barclays filed the Revision Notice and posted a copy of a purported amendment to the Closing Date Contract List ("<u>Amended Closing Date Contract List</u>") on the Lehman Website. The AmEx Contracts do not appear on the Amended Closing Date Contract List. The Revision Notice purports to require parties whose contracts are affected by the revision (either through a modification to the cure amount or, in the case of AmEx, a total elimination of its contracts), to interpose an objection by October 13, 2008.[8]

18. On Friday, October 10, 2008, Barclays filed its Motion for Relief Concerning Certain Contracts Erroneously Posted with the "Closing Date Contracts" ("<u>Barclays Motion</u>") in which it contends that certain contracts were included on the Closing Date Contract List because of "an error that occurred in reformatting the list for electronic posting." Barclays Motion, ¶1 [Dkt No. 809].[9] In particular, as set forth in the Declaration of Eszter Farkas, dated October 9, 2008 (the "<u>Farkas Declaration</u>"), accompanying the Barclays Motion, certain contracts listed on the excel spread sheet prepared by Barclays with the letter "N" in row Z of the spreadsheet,

---

[8] Barclays, through its counsel, agreed to extend the time in which AmEx could file this objection to October 14, 2008.

[9] Because AmEx is a client of Cleary Gottlieb Steen & Hamilton LLP, Barclays counsel in this matter, Barclays has retained separate counsel with respect to its dispute with AmEx. Barclays has informed AmEx that a separate motion will be filed with respect to the AmEx Contracts.

9

should not have been included on the Closing Date Contracts List while contracts with the letter "Y" on the spreadsheet were to be included on the List. The AmEx Contracts (numbered 17 and 459 on the Excel Spread sheet attached as Exhibit "D" to the Farkas Declaration) are both marked "Y". Accordingly, Barclays admitted in the Barclays Motion that it intended to take assignment of the AmEx Contracts and cannot now be heard to the contrary.

19. Moreover, the AmEx Contracts by far had the largest cure amounts of all the Closing Date Contracts. It is inconceivable, in light of that, that the AmEx Contracts could have been assumed and assigned accidentally. Rather, it is apparent, that the AmEx Contracts were listed properly and Barclays simply changed its mind. The Sale Order should not be modified because Barclays had a change of heart.

## ARGUMENT

### I. THE AMEX CONTRACTS WERE ASSUMED AND ASSIGNED TO BARCLAYS UPON THE CLOSING OF THE APA.

20. As set forth above, the AmEx Contracts were listed as Closing Date Contracts and were therefore assigned to Barclays upon the closing of the APA pursuant to the Sale Order. A purported Revision Notice -- delivered nine days after the fact – cannot retroactively undo the assignment. Moreover, in accordance with the Sale Order, upon AmEx's delivery of written consents to the Proposed Cure Amount, Barclays becomes obligated to pay the Proposed Cure Amount "as soon as reasonably practicable." Sale Order ¶T.

21. Accordingly, for the reasons set forth below, the Court should deny the relief sought in the Revision Notice and direct Barclays to immediately pay the Proposed Cure Amount in full.

10

    A.    **Barclays Lacks the Authority to Undo the Court-Approved Assumption and Assignment of the AmEx Contracts.**

22.    Section 365 of the Bankruptcy Code permits a debtor to assume or reject executory contracts or unexpired leases. 11 U.S.C. § 365(a). If the debtor elects to assume an executory contract or unexpired lease, however, the Bankruptcy Code requires the debtor to: (i) cure (or provide adequate assurance that it will promptly cure) any defaults under such contract; (ii) compensate (or provide adequate assurance that it will promptly compensate) the non-debtor party for any actual pecuniary loss resulting from such defaults; and (iii) provide adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1).

23.    Since the debtor must elect to either assume or reject its executory contracts, the debtor's decision to assume a contract forecloses the debtor's right to reject the contract and have the damages from such rejection treated as a pre-petition unsecured claim *See*, *In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 1000 (2d Cir. 1996) (recognizing that after debtor assumes contract, equitable estoppel principles may be applied to prevent debtor from escaping its obligations under the contract); *In re Teligent, Inc.*, 326 B.R. 219, 226 (S.D.N.Y. 2005) (declining representative's request to vacate assumption order where order was entered at request of representative's predecessor-in-interest). The decision to assume a contract, therefore, is binding. *In re City Stores Co.*, 21 B.R. 809, 812 (Bankr. S.D.N.Y. 1982).

24.    Thus, even if the AmEx Contracts had only been assumed and not assigned, the Debtors could not reject the AmEx Contracts without incurring damages that would be an administrative priority claim. *In re Klein Sleep Products, Inc.,* 78 F.3d 18 (2d Cir. 1996) (damages resulting from rejection of assumed lease entitled to administrative priority because the Second Circuit declined "to find that [the debtor] did not benefit by assuming its lease simply because the lease was no longer profitable . . . . Such a holding would mean that any post-

11

bankruptcy contract, entered into for the benefit of a bankrupt's estate, would cease to be entitled to priority the moment the deal turned sour."); *see also* (*In re Frontier Properties*, 979 F.2d 1358, 1367 (9th Cir. 1992 ("When a trustee assumes and then rejects an executory contract, however, all of the liabilities flowing from that rejection are entitled to priority as administrative expenses of the estate."); *see also In re Multech Corp.*, 47 B.R. 747, 751 (Bankr. N.D. Iowa 1985) ("the rejection of an assumed contract arises directly from a transaction with the Debtor-in-Possession.  Thus, it is the Debtor-in-Possession which has caused legally cognizable injuries and the claims arising from those actions are entitled to priority as an administrative expense.").

25.     Finally, the Sale Order is a final order and public policy dictates that a final order not be changed simply because a party changed its mind. *Gazes v. Delprete (In re Clinton St. Food Corp.)*, 254 B.R. 523, 530 (Bankr. S.D.N.Y. 2000) (in which the court noted "the important public policy favoring the finality of orders transferring ownership of bankruptcy estate assets."); *see also Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 742 (5th Cir. 1993) (citation omitted) (bankruptcy court orders "authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes).

26.     In this case, the Debtors have not only assumed the AmEx Contracts, but assigned them to Barclays.  Sale Order, at ¶¶ T, 12.  Simply put, Barclays lacks any authority under the Bankruptcy Code, the Sale Order or any other applicable law to unwind the assumption and assignment of the AmEx Contracts.

12

B.   <u>Section 2.5 of The APA Does Not Justify The Relief Barclay Seeks.</u>

27.   To justify the relief it seeks through the Revision Notice, Barclays relies on section 2.5 of the APA.[10] Its reliance is misplaced. Section 2.5 of the APA reads:

> For a period of 60 days after the Closing, the Purchaser shall have the right upon notice to Seller to designate any contract related to the assets purchased from Seller by Purchaser or its Affiliates (the "<u>Related Contracts</u>" as either (1) a Purchased Contract or (2) a Contract not designated as a Purchase [sic] Contract (a "<u>Rejected Contract</u>"). Until a Related Contract is so designated, Buyer [sic] shall be obligated to pay or cause to be paid ordinary course amounts due under such contracts in accordance with the terms thereof. If a Related Contract is designated as a Purchased Contract, such Purchased Contract shall be assigned to the Purchaser and upon such assignment Purchaser shall be obligated to pay or cause to be paid the cure amount in respect of such Purchased Contract. If a Related Contract is designated as a Rejected Contract, Purchaser shall have no further obligations in respect thereof. In the event of any dispute relating to such cure amount, Purchaser shall escrow such funds in a manner satisfactory to the court. This Section will not apply to real property leases.

APA at § 2.5. "Purchased Contracts" are included in the definition of Purchased Assets under the APA. <u>Id</u>. at § 1.1. The APA defines "Purchased Contracts" as all contracts designated as Purchased Contracts pursuant to section 2.5 of the APA. <u>Id</u>. While the concept of "Closing Date Contracts" (as used in the Sale Motion and the Sale Order) is absent from the APA, the Sale Order makes clear that the 60-day waiting period does not apply to the contracts (*i.e.* the AmEx Contracts) that were already designated as Closing Date Contracts. Furthermore, the Sale Order specifically provides by its own terms that, in the event of any inconsistency between the Order and the APA, the Order governs.[11] Sale Order ¶ 27.

---

[10]   Barclays did not reply upon section 2.5 of the APA in the Barclays Motion seeking relief from the Sale Order, presumably because, as set forth below, the terms of the Sale Order govern the assumption and assignment of Closing Date Contracts, not APA section 2.5.

[11]   The difference between Closing Date Contracts and Designated Contracts is underscored by the Debtor's Motion, filed on September 26, 2008 (<u>after</u> the entry of the Sale Order and the Closing of the

13

C.   Under The Plain Language Of Section 365, The Debtor Remains Responsible For The Cure Payment If Barclays Refuses To Pay.

28.   Section 365 requires the <u>debtor</u> to cure monetary defaults on an executory contract if the debtor elects to assume such contract. 11 U.S.C. § 365(b)(1). Through the Sale Motion the Debtor sought, and by operation of the Sale Order the Debtor was permitted, to assume the AmEx Contracts. The Debtor has not appealed the Sale Order and no basis exists to grant the Debtor relief from the Sale Order at this time. Having assumed the AmEx Contracts, the Debtor is obligated under the Bankruptcy Code to fully cure any defaults thereunder (and to provide adequate assurance of future performance). The Debtor attempted, through the APA, to satisfy its independent cure obligations by causing Barclays to contractually agree to make the applicable cure payments. However, if Barclays refuses to pay AmEx the Cure Amounts, the Debtor remains fully obligated under the Bankruptcy Code to make the associated cure payments (and the Debtor remains free to pursue any and all remedies it may have against Barclays under the APA or otherwise resulting from its payment of such amount).

---

APA), in which the Debtors sought approval of procedures for the assumption or rejection of the Designated Contracts [Dkt. No. 376] (the "<u>Designated Contracts Procedures Motion</u>"). In that motion, the Debtor stated:

> The [APA] and Sale Order provide for the assumption and assignment of certain contracts and leases to the Purchaser. Given the expedited nature of the sale transaction, the contracts and leases were divided into two categories. The first category consisted of contracts and leases that the *Purchaser required to be assumed and assigned to Purchaser on the Closing Date* (the "<u>Closing Date Contracts</u>"). The second category consisted of the remaining contracts and leases that relate to the sale to the Purchaser (the "<u>Related Contracts</u>"). Section 2.5 of the Purchase Agreement provides that the Purchaser will have a sixty-day period following the Closing Date to designate any Related Contract for assumption and assignment as a "Purchased Contract," or for rejection as a "Rejected Contract." Related Contracts may be rejected by the Debtors if not so designated.

Designated Contracts Procedures Motion at ¶ 8 (emphasis added).

14

## II.  BARCLAYS SHOULD BE ESTOPPED FROM REFUSING TO PAY CURE AMOUNTS AND TAKING ASSIGNMENT OF AMEX CONTRACTS

29.  Pursuant to the doctrines of promissory and equitable estoppel, Barclay's should be enjoined from retroactively removing the AmEx Contracts from the Closing Date Contracts List.  "Equitable Estoppel is grounded on notions of fair dealing and good conscience and is designed to aid the law in the administration of justice where injustice would otherwise result." *In re Ionosphere Clubs,* 85 F.3d at 999; *see also In re Vebeliunas*, 332 F.3d 85, 93 (2d Cir. 2003).  "The doctrine is 'imposed by law in the interest of fairness to prevent the enforcement of rights which work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.'"  *In re Ionosphere Clubs*, 85 F.3d at 999; *quoting*, *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir. 1996).

30.  Because "there has been a clear and unambiguous promise, reasonable and foreseeable reliance on the promise and unconscionable injury as a result of the reliance" (*In re Ionosphere*, 85 F.3d at 999 (citations omitted)), this matter calls out for the application of the promissory estoppel. The Debtors and Barclays promised to AmEx that the AmEx Contracts would be assumed and assigned to Barclays, which promise was made binding through entry of the Sale Order and acknowledged in conferences between counsel where the parties discussed what cure amounts were owing and the extent of the AmEx Contracts assumed and assigned (not whether they were assumed and assigned).  "It is not necessary to find that the party estopped intended to mislead, or it is not material whether the conduct relied upon be 'affirmative or negative, active or quiescent.'"  *McConnell v. Hellwig*, 190 App. Div. 244, (N.Y App. Div. 1920) (*citing Continental Nat'l Bank v. Nat'l Bank of the Commonwealth*, 50 N.Y.575, 586 (1872); *Leather Manufacturers' Bank v. Morgan*, 117 U.S. 96, 108 (1886); *Blair v. Wait*, 69

15

N.Y. 116 (1877)). What is important is that these promises were relied upon to the detriment of AmEx. *Shondel J. v. Mark D.,* 7 N.Y. 3d 320 (2006) (A party who does not realize that he made a false representation may still be estopped when that representation was justifiably relied upon to another's detriment.). As set forth below, AmEx allowed certain Lehman executives (now at Barclays) to continue using AmEx services under the AmEx Contract, and most importantly, AmEx provided confidential information to Barclays that it would never have provided in the absence of an agreement by Barclays to take assignment of the AmEx Contracts.

    A.    Former Lehman (Now Barclays) Employees Have Continued to Use AmEx Cards Post-Closing.

31. As set forth in the Massoni Affidavit, since the closing under the APA on September 22, 2008, Lehman employees, including several former Lehman executives, who upon information and belief are now employed by Barclays, have continued to use their AmEx cards. The employees' continued use of their AmEx cards puts AmEx in an untenable position. On one hand, AmEx values their continued business and desires to maintain good will between the parties if they are to continue doing business together. On the other hand, AmEx has been met with stiff resistance to its efforts to collect amounts due and owing to it by Barclays pursuant to the Sale Order. AmEx has continued doing business with these individuals in a good faith effort to preserve its existing relationship. AmEx, however, has not been shown much in the way of good faith from Barclays in this case in light of Barclays' reversal in violation of the Sale Order.

    B.    Barclays Received An Invaluable Benefit From The Assignment Of The AmEx Card Contract That Cannot Be Undone.

32. Barclays and/or one or more of its affiliates compete with AmEx in certain European markets. The financial structure, pricing and other terms of the AmEx Corporate Services Contract are valuable to Barclays from a competitive standpoint. Despite Barclays'

16

current protestations that assumption and assignment of the AmEx Corporate Services Contract was a mistake, Barclays nevertheless requested a copy of the AmEx Corporate Services Contract after this Court entered the Sale Order, and insisted that such Contract be made available to it, as opposed to it being available solely to its counsel.

33. In reliance on the fact that the Sale Order had been entered and that the Closing had occurred (pursuant to which Barclays became the assignee to the contract), and in further reliance on assurances from Barclays that access was needed to expedite its internal discussions and resolution of the cure amount attributable to the AmEx Contracts, AmEx agreed to permit Barclays business people to review the agreement. Declaration, ¶14. AmEx did not, and could not, have predicted that Barclays would take in all of the valuable information contained in the AmEx Corporate Services Contract and then unilaterally reject the agreement without paying one cent of the Cure Amount in direct contravention of the plain language of the Sale Order.

34. It is also quite possible that Barclays used the information gleaned from the AmEx Corporate Services Contract to negotiate a more favorable deal with an AmEx competitor which apparently issued new credit cards to over 1,000 former Lehman employees. Having reaped the benefits of the assignment of the AmEx Contracts, it must shoulder the duties imposed by the assignment as provided in the Sale Order.

### III. OBJECTION TO THE CURE AMOUNT OF THE TRAVEL CONTRACT.

35. The Non-IT Contract List listed the proposed cure amount for the AmEx Travel Contract as $0.00. As set forth above, as of September 22, 2008, AmEx calculates the amount outstanding under the AmEx Travel Contract to be approximately $577.833.00, and, therefore objects to the Debtor's original proposed cure amount of $0.00, but not to the assignment and assumption of the AmEx Travel Contract by Purchaser.

17

36. To avoid any doubt, this Objection shall serve as AmEx's written objection to the proposed cure as required by the Sale Order and the Internet Procedures. Since the AmEx Travel Contract was assumed and assigned to Barclays at closing, AmEx is entitled to a cure payment equal to the Travel Cure Amount. This Court should direct Barclays to pay AmEx the Travel Cure Amount immediately.

## CONCLUSION

For all of the reasons set forth herein, AmEx respectfully requests that this Court enter an Order: (i) denying the relief requested in the Revision Notice, (ii) enforcing the terms of the Sale Order and directing Barclays to pay AmEx the entire Proposed Cure Amount immediately; and (iii) granting such other relief as is just and equitable.

Dated: October 14, 2008
New York, New York

**DEWEY & LEBOEUF LLP**

By: /s/ Irena Goldstein
    Martin J. Bienenstock
    Irena Goldstein
    Donna L. Gordon
1301 Avenue of the Americas
New York, New York 10019
Tel. 212-259-8000
Fax 212-259-6333

**FLASTER/GREENBERG P.C.**
Eugene J. Chikowski, Esquire
Greg T. Kupniewski, Esquire
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
Telephone: 215-279-9393
Facsimile: 215-279-9394

*Co-Counsel to American Express Travel Related Services Company, Inc.*

18