Martin Flics (#MF 9718)  
Mary K. Warren (#MW 5215)  
LINKLATERS LLP  
1345 Avenue of the Americas  
New York, NY 10105  
(+1) 212 903 9000 (Tel)  
(+1) 212 903 9100 (Fax)  

Hearing Date: October 16, 2008 at 10:00 a.m.  
Objection Deadline: October 14, 2008 at 5:00 p.m.

Attorneys for the Joint Administrators of the  
Lehman European Group Administration Companies

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

In re                                                                  Chapter 11

In re LEHMAN BROTHERS HOLDING INC., et al.,    08-13555 (JMP)

                          Debtors.    (Jointly Administered)

--------------------------------------------------------x

**LIMITED OBJECTION OF THE JOINT ADMINISTRATORS OF THE LEHMAN EUROPEAN GROUP ADMINISTRATION COMPANIES TO THE DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 345(b), 363(b), 363(c) AND 364(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6003 AND 6004 (A) FOR AUTHORIZATION TO (i) CONTINUE USING EXISTING CENTRALIZED CASH MANAGEMENT SYSTEM, AS MODIFIED, (ii) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE OF THE CASH MANAGEMENT SYSTEM AND (iii) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; (B) FOR AN EXTENSION OF TIME TO COMPLY WITH SECTION 345(b) OF THE <u>BANKRUPTCY CODE AND (C) TO SCHEDULE A FINAL HEARING</u>**

The Joint Administrators of the Lehman European Group Administration Companies[1] hereby object to the Debtors' Motion Pursuant to Sections 105(a), 345(b), 363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) for Authorization to (i)

---

[1] The Lehman European Group Administration Companies include Lehman Brothers International (Europe), Lehman Brothers Holding plc, Lehman Brothers Limited, LB UK RE Holdings Limited, Storm Funding Limited, Mable Commercial Funding Limited, Lehman Brothers Europe Limited and the other Lehman group companies in insolvency processes in the UK over which partners in PricewaterhouseCoopers LLP are appointed.

A10030131

Continue Using Existing Centralized Cash Management System, as Modified, (ii) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System and (iii) Maintain Existing Bank Accounts and Business Forms; (B) for an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code and (C) to Schedule a Final Hearing (as supplemented on October 10, 2008, the "Cash Management Motion"), and in support thereof state as follows:[2]

## THE DEBTORS' CASH MANAGEMENT MOTION

1.   The Cash Management Motion seeks interim relief for, among other things, authorization to maintain the Debtors' pre-petition Cash Management System during their chapter 11 cases, including the authority to continue the collection, concentration and disbursement (including intercompany transfers) of cash in the ordinary course of business and to continue funding non-debtor affiliates when doing so would, in the Debtors' estimation, enhance the value of the Debtors' bankruptcy estate. With certain adjustments to account for the sale of a substantial portion of the Debtors' and LBI's businesses to Barclays Capital Inc. ("Barclays") and for the commencement of the SIPA Proceeding against LBI, the Debtors effectively seek relief to resume 'business as usual' with respect to the Cash Management System.

2.   Under the Debtors' pre-petition Cash Management System, most European Subsidiaries of LBHI did not maintain separate bank accounts but instead relied upon accounts maintained by LBHI. Cash Management Motion ¶ 14. The Debtors state that collections from European Subsidiaries, including LBIE and the other Lehman European Group Administration Companies on account of revenues and debt proceeds were made into LBHI's UK Operating Account or other similar accounts with respect to non-US currency transactions.

---

[2]   Capitalized terms used but not defined herein shall have the meaning given to such terms in the Cash Management Motion.

Id.  Additionally, the Debtors state that certain derivative, futures and foreign exchange transactions involving LBIE settled into LBI FX Accounts, rather than accounts maintained by LBIE in its name.  Id. ¶ 15.  The Cash Management Motion characterizes LBHI's role with respect to the European Subsidiaries, including LBIE and the Lehman European Group Administration Companies, as "paymaster" for their operations, meaning that nearly all disbursements for operating expenses were made out of LBHI's accounts.  Id. ¶ 22.

   3. While the Debtors' Cash Management System may have been adequate for a fully integrated entity, as the Lehman Group had historically operated until just before the commencement of these chapter 11 bankruptcy cases, in certain respects the Debtors' Cash Management System must be adjusted to reflect the difficulties of managing the cash flows of a formerly integrated group that has now been fragmented across independent insolvency or bankruptcy estates in the United States, Europe and Asia and whose assets are in the process of being acquired by Barclays or Nomura Holdings Inc.  (We note that, like other creditors and parties-in-interest in these chapter 11 cases, the Joint Administrators have not yet been provided with copies of Schedules A and B to the Sale Motion, which are understood to describe assets sold to Barclays in detail.)  As described in further detail below, the Joint Administrators believe that continuing the Cash Management System in the manner that the Debtors are currently proposing would be prejudicial to the Lehman European Group Administration Companies and the creditors of their estates.

   4. Representatives of the Joint Administrators, with their counsel, have discussed the issues raised herein with the Debtors, their counsel and Alvarez & Marsal ("A&M"), including during a meeting earlier today at the offices of Weil, Gotshal & Manges and during previous discussions in London.  The Joint Administrators are encouraged by these

3

discussions and are hopeful that these issues will be resolved consensually before the final hearing. Therefore, the Joint Administrators are filing this limited objection as a protective measure to assert and preserve their rights in the context of ongoing negotiations with the Debtors for the implementation of a Cash Management System that is mutually agreeable to the Debtors and the Joint Administrators.

## **OBJECTION**

5. The Joint Administrators do not oppose the Debtors' implementation of a cash management system to increase the Debtors' liquidity and enhance the value of the Debtors' bankruptcy estate; however, the Joint Administrators do object to the Cash Management Motion to the extent that the Debtors have failed to institute safeguards to distinguish between funds that are property of the Debtors' bankruptcy estate and funds that are not property of the Debtors' estate. The Joint Administrators hereby reserve their right to assert proprietary and other claims on behalf of the Lehman European Group Administration Companies and the clients for whom one or more Lehman European Group Administration Companies acted as agent with respect to the funds and other property that have become subject to the Debtors' Cash Management System (both before and after the commencement of the administrations in the UK).

6. Since their appointment by the English High Court of Justice (the "High Court") on September 15, 2008, the Joint Administrators have been challenged with the enormous tasks of quickly investigating and understanding the extensive operations of the Lehman European Group Administration Companies and the Debtors while managing and operating the Lehman European Group Administration Companies in a rapidly changing environment. One essential and particularly laborious part of this task has been to establish banking arrangements that will allow the Joint Administrators to pursue the purposes of the

4

administration proceedings, including realizing assets and paying employees and other expenses related to the administrations. To this end, the Joint Administrators have made special arrangements to open dozens of bank accounts with the Bank of England in numerous currencies. Witness Statement of Steven Anthony Pearson- Redacted Version of the Statement Before Mr. Justice Blackburne at a Hearing on 7 October 2008 ("Pearson Statement") available at http://www.pwc.co.uk/pdf/Lehman_Witness_Statement_1010108.pdf, at ¶¶ 52.12- 52.14. As set forth in more detail in the Pearson Statement, with respect to each of the Lehman European Group Administration Companies, the Joint Administrators have opened multiple (i) own monies accounts and (ii) designated/client accounts. Id. More than 60 such accounts have been opened to date and the Joint Administrators anticipate that they will need to open more to permit the Joint Administrators to manage the businesses of the Lehman European Group Administration Companies. Id.

7.  Notwithstanding the Joint Administrators' efforts to implement a stand-alone cash management system with respect to the Lehman European Group Administration Companies, there has been, is, and likely will continue to be, property of the Lehman European Group Administration Companies (or their clients) that is or becomes intermingled within the Debtors' Cash Management System. That is largely due in part to (i) the longstanding interconnectedness between the Debtors' and the Lehman European Group Administration Companies' cash management system and (ii) the nature of receivables owed to the Lehman European Group Administration Companies.

8.  For example, there are a number of different ways in which LBIE money could have flowed into, or may in the future flow into accounts controlled by LBHI or LBI. In relation to LBIE's own money, for instance, (i) the Debtors' Bank Accounts are likely to be

5

holding sums that were deposited directly and/or swept from other accounts on or before the Commencement Date and (ii) there are also very likely to be sums that have been paid into the Debtors' Bank Accounts after the Commencement Date by LBIE's counterparties. Although the Joint Administrators have taken and continue to take steps to attempt to ensure that payments made post-administration are re-routed to one of the new Bank of England accounts established by the Joint Administrators, there have been significant practical difficulties in ensuring that payments are re-routed in this way.

9. On at least two occasions on and after the commencement of the UK administration proceedings, the Joint Administrators broadcast SWIFT messages to LBIE's known counterparties and clients notifying them that LBIE's settlement instructions had changed with immediate effect. Notwithstanding this, payments continue to be made into the LBHI accounts. This problem continues to arise for several reasons. Sometimes counterparties simply fail to take account of the new instructions. Sometimes the new instructions have not reached the correct party (for example, payments are sometimes made by a third party or via an agent bank, not by the end customer). It can often take a long period of time for new instructions to filter through the system, particularly in relation to standing orders and direct debits, and there are a vast number of counterparties and clients. The Joint Administrators continue to attempt to resolve the issue in respect of future payments.

10. The Joint Administrators currently estimate that funds in excess of US$1 billion intended for LBIE have been deposited into Bank Accounts controlled by LBHI during the period immediately before and subsequent to the Commencement Date. Though the Joint Administrators have observed that the flow of LBIE's funds deposited into LBHI accounts have diminished with the passage of time, each day additional amounts are added to this tally.

6

11. Moreover, in addition to holding LBIE's own money, the Debtors' Bank Accounts may also contain money that belongs to LBIE's clients (or in respect of which LBIE's clients have some sort of entitlement or interest). In some cases, the Debtors' Bank Accounts may be holding money that is designated as "client money" for the purposes of Financial Services Authority ("FSA") rules and in respect of which, therefore, there is a statutory trust. In addition, the Debtors' Bank Accounts may contain money that has been received as a result of a corporate action (e.g. a dividend or redemption) and in respect of which there might be some proprietary claim.

12. In view of these concerns, the Debtors' Cash Management System should expressly provide for the segregation of funds received in respect of LBIE or the other Lehman European Group Administration Companies from funds received in respect of the Debtors' bankruptcy estate. Additionally, the Debtors should articulate a methodology by which all funds received after the Petition Date can be recorded, segregated and properly credited to and promptly returned to the true owner. Such funds received post-petition by LBHI or LBI in respect of transactions that were clearly not entered into by the Debtors, but rather by one of the Lehman European Group Administration Companies, should not be permitted to be commingled with the Debtors' funds. Instead, these funds should be treated as earmarked for the benefit of such Lehman European Administration Companies as applicable in the same way that funds directed to Lehman Commercial Paper, Inc. were deemed to pass through its estate without being held therein. See Order Pursuant to Sections 105(a), 363(b), 363(c) and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 Authorizing Debtor to (A) Continue to Utilize its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations at 2-3, In re Lehman Commercial Paper, Inc., No. 08-13900 (JMP) (Oct. 6, 2008).

13. Physical segregation of funds owned by the Lehman European Group Administration Companies and/or the freezing of certain accounts that the Joint Administrators believe in good faith contain property of the Lehman European Group Administration Companies is the most effective way to safeguard the Joint Administrators' direct or indirect *property* rights in such funds. While the Debtors' assurance that they, under the supervision of A&M, will maintain books and records after the Commencement Date in the same manner that they were maintained before the Commencement Date and that all transfers and transactions will be properly documented is helpful, see Cash Management Motion ¶ 34, such assurance does not go far enough to preserve the property rights of the rightful owners of funds improperly intermingled in the Debtors' Bank Accounts. Likewise, the Debtors' assurance that post-petition intercompany receivables from the Debtors will be entitled to administrative expense status under section 503(b)(1), see id. at ¶ 32, is inappropriate when 'receivables' arise from the return of property that the Debtors never owned in the first instance. Moreover, relying on administrative expense status precludes the Lehman European Group Administration Companies from realizing interest on their own funds, which would have the effect of improperly transferring as much as tens of millions of dollars of value from the European estate to the Debtors. We also note that to the extent that the Joint Administrators are delayed from receiving funds which the Lehman European Group Administration Companies would otherwise be entitled could have ripple effects with respect to the Joint Administrators ability to settle claims of other creditors of its estate. Similarly, the open-ended time line for payment of administrative expense claims does not provides sufficient comfort to a client of LBIE that has statutory protections under English law governing the return of client monies assets.

14. As noted above, the Joint Administrators have been working with the Debtors and are prepared to continue to work with the Debtors, together with A&M, to establish a Cash Management System that adequately protects the property interests of the Lehman European Administration Companies and their clients and creditors.

15. By filing this Objection, the Joint Administrators reserve all rights with respect to property of the Lehman European Administration Companies and their clients that is or may be located in the Debtors Bank Accounts. Nothing in an interim order approving the Cash Management Motion shall prejudice, impair, waive or otherwise affect rights of the Joint Administrators, the Lehman European Group Administration Companies, or their creditors.

Pg 10 of 10

16. **WHEREFORE**, for the reasons set forth above, the Joint Administrators respectfully ask that should the Court grant interim relief requested pursuant to the Cash Management Motion, that any Cash Management System safeguard the proprietary interests of the Lehman European Group Administration Companies and their clients in the manner set forth herein and grant such other further relief as is just and proper.

/s/ Martin Flics
Martin Flics, Esquire (# MF 9718)
Linklaters, LLP
1345 Avenue of the Americas
New York, New York 10105
(212) 903-9000 – Telephone
(212) 903-9100 – Fascimile
Martin.Flics@linklaters.com

Attorneys for the Joint Administrators of the Lehman European Group Administration Companies