Hearing Date:  October 16, 2008
Hearing Time:    10:00 a.m.

WACHTELL, LIPTON, ROSEN & KATZ
Philip Mindlin (PM 2536)
Douglas K. Mayer (DM 5033)
Joshua A. Feltman (JF 9486)
51 West 52nd Street
New York, NY  10019-6150
(212) 403-1000

Attorney for The Carlyle Group

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x
                                                             :
In re:                                                       :   Chapter 11
                                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,                       :   Case No. 08-13555 (JMP)
                                                             :
                        Debtors.                             :   Jointly Administered
                                                             :
------------------------------------------------------------ x

# LIMITED OBJECTION OF THE CARLYLE GROUP TO DEBTORS' MOTION FOR ORDER APPROVING BIDDING PROCEDURES

Carlyle Investment Management, L.L.C. ("Carlyle"), a Washington DC-based private equity investment firm, by its undersigned counsel, objects in part to the Debtors' "Motion to (A) Establish Sales Procedures; (B) Approve a Seller Termination Fee and a Reimbursement Amount; and (C) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets" (the "Motion"), and respectfully states as follows:

## INTRODUCTION

Carlyle presently intends to bid for all or part of the business and assets constituting the investment management division ("IMD") of the Debtors and their affiliates.

Carlyle is one of the world's leading private equity investment firms and, in connection with this matter, is working with Jeffrey B. Lane, former chairman and chief executive officer of Neuberger Berman. As such, Carlyle is plainly a qualified potential bidder. The purpose of this Objection is to inform the Court that several aspects of the sale procedures contemplated by the Purchase Agreement (as such term and other capitalized undefined terms used herein are defined in the Motion) and of the bidding procedures requested in the Motion significantly impede the ability of Carlyle (and, likely, other bidders) to bid for the IMD and prevent the estate from receiving bidders' highest and best offers. This is patently contrary to hornbook law that a debtor which sells assets in a chapter 11 case has an obligation to seek the highest and best values for the benefit of its estate. *See, e.g., In re Big Rivers Elec. Corp.*, 223 B.R., 726, 734-36 (Bankr. W.D. Ky. 1998); *In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547, 551-53 (Bankr. S.D.N.Y. 1997).

Carlyle respectfully urges that the Court decline to grant the Motion unless the bidding procedures and the Purchase Agreement are modified to address the defects set forth below:

1. <u>The Gun-Jumping Proposed by the Motion Assures That Bain/Hellman & Friedman Will Prevail</u>. The process contemplated by the Motion and the proposed Purchase Agreement makes it impossible for Carlyle or any other bidder besides the proposed Purchaser to prevail at the putative "auction." The Purchase Agreement requires the Debtors to solicit the consent of IMD's clients to the sale of IMD <u>to the Bain/Hellman & Friedman joint venture</u> as soon as possible, long before the "auction." This court-sanctioned marketing process for the Bain/Hellman & Friedman joint venture -- which may already have begun, since the Purchase Agreement requires in Section 7.14(a) that it commence "as soon as practicable after the

-2-

Execution Date" -- can have no result other than to lock in the stalking horse as the prevailing bidder: IMD clients may well be unwilling to consent yet again should a bidder other than Bain/Hellman & Friedman prevail at "auction." Moreover, it can be predicted that the Bain/Hellman & Friedman joint venture will argue that the client drop-off that would result from a subsequent round of solicitations for consent to a different buyer will result in price adjustments (as to which, see below) that make their bid superior to any competitive bid.

2. The Court should eliminate the Bain/Hellman & Friedman thumb on the scale, and require that no IMD client change-of-control solicitation take place prior to auction. Instead, either:

- The Court should require the parties to reform the Purchase Agreement so as to delay closing for the time necessary to permit a post-auction client solicitation; or
- The Court should rule that transfer of IMD client accounts to the control of the winning bidder in a closing promptly following auction is permissible under §§105 and 365 of the Bankruptcy Code, subject to the clients' right to subsequently terminate the transferred account agreements.

3. Apart from this premature client solicitation in favor of Bain/Hellman & Friedman, the Purchase Agreement allows Bain/Hellman & Friedman to direct the Debtors to cause chapter 11 proceedings to be commenced for non-debtor entities within IMD, long before the commencement of the auction. Other bidders may prefer not to see such proceedings commenced. Indeed, at the present time Carlyle would not elect to structure a transaction that included new bankruptcy cases for IMD entities, and sees such filings as value-destructive.

4. <u>The Bidder Protections are Excessive.</u> The $70 million break-up fee for which the Debtors seek approval is cast in the Motion as a high, but not unusually so, 3.0% of

the "Base Purchase Price" of $2.15 billion. The debtors also concede in passing that the break-up fee is 4.0% of "the expected net purchase price" of $1.75 billion ($2.15 billion less $400 million in seller-paid employee retention arrangements). (Motion, pp. 11, 27 ) However, this concession masks the fact that a "net purchase price" of $1.75 billion cannot be expected to result from the Purchase Agreement under any plausible circumstances. As explained below, a number less than half that amount would be a far better estimate, with the result that the true economic cost of the proposed break-up fee would be in excess of 10% of any reasonable expectation of the net purchase price.

       5.       Most obviously, the very same provision of the Purchase Agreement -- the definition of "Closing Cash Target" -- that sets forth the $400 million purchase price reduction to which the Motion refers also provides the Purchaser with an additional $203 million cash benefit, bringing the true purchase price to not more than $1.55 billion.

       6.       Less obvious but far more important, the Purchase Agreement's "Base Purchase Price" is subject to a number of dramatic built-in adjustments not reflected in the supposed "expected net purchase price" of $1.75 billion. These adjustments, based *inter alia* on the level of the S&P 500 index on or about closing, levels of post-signing customer defection from IMD and reduction in IMD cash flows, could bring the true purchase price down by an additional $1.25 billion or more. Based on the closing of the S&P 500 Index on October 13, 2008 (a day that saw the index rise an historic 11.6%) *alone*, the "Base Purchase Price" would be reduced by an additional $557 million. (Calculated as of the close of business on October 10, the adjustment would have been more than $800 million.) Over and above the S&P 500 adjustment, the "NB Revenue Run-Rate" adjustment keys off the number of existing IMD clients that agree to stay with IMD following the consummation of the Purchase Agreement. Assuming a

relatively modest 10.0% defection rate, this adjustment would reduce the purchase price by an additional $337 million. Additional adjustments for a decline in EBITDA ($280 million assuming a 10% decline relative to target EBITDA) and other matters are also highly material.

7. Moreover, the nominal $70 million break-up fee understates the true break-up fee which the Debtors would have the Court approve, in that the $35 million "Reimbursement Amount" proposed in the Motion so obviously exceeds a reasonable level of out-of-pocket costs incurred in connection with a lost transaction that it plainly represents an incremental break-up fee in disguise.

8. Thus, the true break-up fee sought by the motion is $105 million, or 6.0% of the Debtor's averred "expected net purchase price" and far in excess of 10.0% of any plausible net purchase price.

9. Such a break-up fee can only result in an entrenchment of the Purchaser's offer and a significant chilling of bidding. *See In re Biderman Industries U.S.A., Inc.*, 203 B.R. 547 (Bankr. S.D.N.Y. 1997) (breakup fee of between 4.4% and 6% of the equity investment characterized by court as "certainly on the high side"); *see generally id.* at 551-53 (limitations on the ability of competing bidders to obtain information and submit bids were "designed not to encourage but to stifle bidding" and violated fiduciary duty, which arose once the decision was made to offer the debtors for sale, to "ensure that the debtors receive[ ] the highest and best offer available").

10. Carlyle is an interested bidder, and the Motion discloses that many other financial institutions have already expressed interest in IMD. As such, an exceptionally high break up fee is especially unwarranted in this case.

11. <u>The Buyer's Proposed Transaction Is Far from Firm</u>.  Seriously compounding the detriment to the estate of these rich bidder protections is the problematic structure of the Buyer's proposed transaction, which gives the Purchaser various walk-away rights in many plausible scenarios.  As noted above, the Purchase Agreement contains various adjustments to the so-called "Base Purchase Price," which adjustments are likely to sum to in excess of $1 billion.

12. Lehman has the option to elect to cause the aggregate adjustments to equal $850 million even if they exceed such number; <u>however</u>, the Purchase Agreement gives the Purchaser a right to walk away if such election is made.  Moreover, the Purchaser has a right to walk away if the aggregate adjustments exceed $1.25 billion, which they seem likely to do.

13. The logic of a break-up fee is that it induces a stalking horse bidder to establish a price floor for the assets to be bid upon, and thus provides some certainty of recovery to the seller and its stakeholders.  Unfortunately, the more one tries to find the floor in the proposed Purchase Agreement, the further it recedes beneath one's feet.  The Purchasers are entitled to insist on a highly conditional transaction with a low effective purchase price.  But they are not entitled to a $105 million break-up fee if they do.

\* \* \* \*

14. In sum, the Bidding Procedures and Purchase Agreement should be modified to improve the potential for a real auction to take place that will enhance the value received by the Debtors for the IMD by reducing the break-up fee to a level consistent with bankruptcy norms and be eliminating pre-auction solicitation of client approval for the

Bain/Hellman & Friedman joint venture. Without such changes, Carlyle believes that it and other interested parties are likely to refrain from bidding at the supposed auction.

WHEREFORE, Carlyle respectfully requests that the Court enter an order denying the Motion unless the Bidding Procedures and Purchase Agreement are modified to address the defects set forth herein, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 14, 2008

WACHTELL, LIPTON, ROSEN & KATZ

By:   /s/ Douglas K. Mayer
      Douglas K. Mayer (DM 5033)

51 West 52nd Street
New York, NY  10019-6150
(212) 403-1000

Attorneys for The Carlyle Group