# Exhibit A-5

## PROFESSIONAL SERVICES SUPPLEMENT

**Supplier Name: Strategic Systems Solutions, Inc.**
**Supplier Address: 113 Rock Road, Horsham, PA 19044**
**Supplier Jurisdiction of Incorporation: South Carolina**
**Tax ID: 58-2569995**
**Telephone #: 215-706-2400**
**Fax #: 215-706-2499**
**General Terms and Conditions No.: CON000000021913**
**General Terms and Conditions Effective Date: July 2, 2007**
**Professional Services Supplement No.: CON000000021914**
**Professional Services Supplement Effective Date: July 2, 2007**

THIS PROFESSIONAL SERVICES SUPPLEMENT (the "**Services Supplement**") is made as of the Professional Services Supplement Effective Date specified above ("**Supplement Effective Date**") between Lehman Brothers Holdings Inc., a Delaware corporation, having an office and place of business at 745 Seventh Avenue, New York, New York 10019 (as used herein, the "**Customer**") and the Supplier specified above (as used herein, the "**Supplier**"). This Services Supplement sets forth additional terms and conditions applicable to Services performed by Supplier and incorporates by reference the above-referenced General Terms and Conditions. This Services Supplement includes the attached Exhibits, Annexes and Attachments hereto. Capitalized terms defined in this Services Supplement have the meanings given herein, and other capitalized terms not defined in this Services Supplement will have the meanings given elsewhere in the Master Agreement.

## ARTICLE 1:  PROVISION OF SERVICES, IN GENERAL

1.1     General. From time to time the Parties may, under this Services Supplement, execute Transaction Schedules pursuant to which Supplier agrees to perform the Services and/or provide the Deliverables described in such Transaction Schedules. Each such Transaction Schedule will be substantially in the form of the attached Exhibit 1 and, together with any other documents attached thereto or incorporated therein by reference (including the General Terms and Conditions and this Services Supplement) will constitute a separate and independent contract for the applicable Transaction between Supplier and Customer (i.e., the Customer entity that is the party to the Transaction Schedule). Each Transaction Schedule will incorporate by reference the General Terms and Conditions and this Supplement and will be consecutively numbered to facilitate identification.

1.2     Time and Materials Services. For Services performed by Supplier on a time and materials basis, the rates payable by Customer for such Services will be as set forth in the applicable Transaction Schedule, together with such other charges, credits and adjustments as are provided for herein. In no event will any Supplier rates exceed

U02

Supplier's best available published rates then in effect, which published rates will be provided to Customer upon request. Supplier's prices and rates will be subject to any agreed discounts, most favored customer or similar arrangement between the Parties, including as provided in the General Terms and Conditions. Additionally, for Services performed on a time and materials basis, any hours worked in excess of (8) hours in any one day or on Saturdays, Sundays or holidays, will be at the same time and materials rates for hours worked that are not in excess of such eight (8) hour period unless specifically authorized in writing by Customer; *provided, however,* that Supplier may not bill Customer for more than forty (40) hours a week for any Supplier Personnel without Customer's advance written authorization. Unless otherwise set forth in a Transaction Schedule, for Services performed by Supplier on a time and materials basis, Customer also agrees to pay for reasonable out-of-pocket costs and expenses required and actually incurred in the performance of Services hereunder, provided that Supplier has: (a) obtained Customer's prior written approval and such out-of-pocket costs and expenses are in accordance with Customer's then-current travel and expense policy; (b) detailed such costs and expenses in a form acceptable to Customer and approved them in accordance with Supplier's own internal expense policies; and (c) submitted supporting documentation satisfactory to Customer. Notwithstanding anything to the contrary in the preceding sentence, Customer will not reimburse Supplier for normal commuting expenses or for travel and living expenses incurred by any Supplier Personnel performing Services hereunder at a Customer facility located in the same metropolitan area as that of such Supplier Personnel's home base. Air transportation reimbursable hereunder will be reimbursed at coach-economy rates. Entertainment by or on behalf of Supplier will be at no cost to Customer. Hotel/living accommodations will be subject to Customer's prior written approval.

1.3    Inspections. In addition to Customer's audit rights under the General Terms and Conditions, Supplier will provide to Customer, Customer's auditors (including internal audit staff and external auditors) and regulators or other law enforcement agents access at all reasonable times, after providing Supplier with at least ten (10) days advance notice (except in the event of audits or investigations by regulators or other law enforcement agents, or investigations of reasonable suspicion of misappropriation, fraud or business irregularities of a potentially criminal nature, or relating to Customer data protection requirements), to any facility or part of a facility at which either Supplier or any of Supplier's Personnel are providing the Services and to data and records relating to the Services for the purpose of performing audits designed to enable Customer or regulators or other law enforcement agents to confirm that Supplier is meeting all applicable information privacy and security, regulatory and other legal requirements.

## ARTICLE 2: SUPPLIER PERSONNEL

2.1    Legal Right to Work. Supplier is responsible for ensuring that Supplier Personnel assigned to perform Services have the legal right to work in each country in which they are assigned to work for the duration of their assignments.

2

2.2    Background Screening. Prior to assigning any Supplier Personnel to perform any Services, Supplier will conform with Customer's screening process with respect to background checks of Supplier Personnel in accordance with Customer's then applicable policies regarding the same. Customer's background screening requirements as of the Supplement Effective Date are set forth in Exhibit 2 to this Services Supplement.

2.3    Responsibility for Supplier Personnel. Supplier will manage, supervise and provide direction to Supplier Personnel and cause them to comply with the obligations and restrictions applicable to Supplier under the Master Agreement and the Transaction Schedules. Supplier will make Supplier Personnel aware of, and cause them to comply with, Customer's safety and security policies while they are performing Services at Customer sites or accessing Customer data or systems, to the extent Customer has notified Supplier in writing of such safety and security policies. Supplier is responsible for the acts and omissions of Supplier Personnel.

2.4    Project Managers/Key Personnel. For each Transaction Schedule, each Party will designate a project manager ("**Project Manager**") to serve as the primary contact between them. The scope and conduct of the Supplier's performance hereunder will be consistent with the applicable Transaction Schedule and must be coordinated with Customer's Project Manager. The Parties may also designate in a Transaction Schedule any Supplier Personnel that have been identified as having key positions for a particular Transaction Schedule ("**Key Personnel**"). Supplier will ensure the continuity of any individual (whether a Supplier employee or subcontractor) performing Services hereunder (including those Supplier Personnel expected to work on Customer's premises). Supplier will obtain Customer's prior approval before any reassignment of any Supplier Project Manager or Key Personnel to another Supplier client (unless such reassignment is requested by the Supplier Personnel as a result of personal or family reasons).

2.5    Removal and Replacement of Supplier Personnel. If Customer reasonably believes that any Supplier Personnel or their performance to be unsatisfactory and so notifies Supplier, Supplier and Customer will promptly meet in an effort to address Customer's concern on a mutually satisfactory basis. If Customer's concerns have not been addressed to Customer's reasonable satisfaction within fourteen (14) days after Customer's initial notice to Supplier, Customer may require Supplier to replace the individual in question with another individual having suitable qualifications for the assignment. There will be no charge to Customer for any replacement personnel assigned by Supplier until Customer confirms that such replacement has the necessary skills and acquired the necessary orientation and background to make a productive contribution. This provision does not in any way require, endorse or approve (expressly or impliedly) the termination of employment by Supplier of any person replaced under the terms of this paragraph.

2.6    Subcontracting. Supplier may subcontract the performance of Services only in accordance with the following:

3

26.1    Supplier may, in the ordinary course of business and without obtaining Customer's prior written approval, utilize third party services or products that are not dedicated to performance of Services for Customer and that are not a material aspect of Supplier's Services under a particular Transaction Schedule.

2.6.2    Except as set forth in Section 2.6.1 above, Supplier will obtain the prior written approval of Customer for all Supplier subcontractors performing Services under a particular Transaction Schedule.

2.7    Non-Disclosure Agreements.  Supplier will, in advance, require each Supplier Personnel and each of its other personnel who obtain or are in a position to obtain any Confidential Information of Customer and/or Customer Sensitive Data to execute a Non-Disclosure Agreement ("NDA") in the form attached hereto as Exhibit 3.  Supplier will provide Customer with a true copy of each such NDA upon request.  Supplier further agrees to take any other steps reasonably required or appropriate to ensure compliance with the obligations set forth herein.

2.8    Competitive Projects. Supplier acknowledges that the Services performed for Customer may relate to past, present or future strategies, plans business activities, methods, processes and/or information which afford Customer competitive or strategic advantages.  To further ensure the protection of Customer's interests in this regard and unless otherwise provided in the applicable Transaction Schedule, Supplier agrees that during the term of any Transaction Schedule and for a period of six (6) months thereafter, Supplier will not assign or utilize any Supplier Personnel assigned to perform Services for Customer thereunder, to perform services for or in support of any Competitor of Customer or a Competitive Project.  For purposes of this section **"Competitor"** is defined as any person, firm or enterprise conducting a business or providing or supporting a product or service substantially similar to any of Customer's, and **"Competitive Project"** is defined as any task or work effort whose intent or result is or will be substantially similar to any contemplated by such Transaction Schedule.  If there is any doubt whether any person, firm or enterprise is deemed a "Competitor" or whether any task or work effort is deemed a "Competitive Project," Supplier will obtain Customer's advance written approval (not to be unreasonably withheld), which decision will be deemed final and controlling for all purposes hereunder.

## ARTICLE 3: STATUS REPORTS

On a monthly basis (or as otherwise specified in the applicable Transaction Schedule), Supplier will submit written status reports describing its activities including: (a) the current status of activities (with explanatory narrative when appropriate); (b) for time and materials engagements, resources used since the last report, and for fixed price engagements percentage completion of project, and a cumulative total, including in each case where applicable fees, time and materials expended against budget since the effective date of the Transaction Schedule;  and (c) identification of any problems and all actions taken to resolve them, and the current status of any such problems.

Upon request, Supplier will meet with Customer's personnel at no additional charge to review the status of Supplier's activities.

## ARTICLE 4: DELIVERY AND ACCEPTANCE OF DELIVERABLES

4.1     Delivery.     Supplier agrees to deliver to Customer, on or before the applicable delivery date(s) set forth in the applicable Transaction Schedule, each Deliverable having a delivery date assigned to it.  If any Deliverable is not delivered on or before its scheduled delivery date, Customer may, on written notice any time before formal Acceptance thereof in accordance with this Delivery and Acceptance of Deliverables Article, terminate the applicable Transaction Schedule, in whole or in part, without obligation, liability or penalty of any kind.  In the event that Customer so elects, Supplier will, within thirty (30) days, provide Customer with a refund of any amounts paid by Customer with respect to such Deliverable.

4.2     Acceptance. Each Deliverable will be subject to Acceptance by Customer in accordance with the procedures set out in this Article.  Unless otherwise agreed to in writing by the Parties in an applicable Transaction Schedule, the acceptability of any Deliverable will be based on Customer's determination that the Deliverable either (a) meets the applicable Acceptance Criteria in all material respects, or (b) if there are no applicable Acceptance Criteria, meets Customer's reasonable satisfaction.  If any Deliverable does not meet the forgoing requirements for Acceptance, Customer will notify Supplier specifying its reasons in reasonable detail, and Supplier will, at no additional cost to Customer, promptly conform the Deliverable to the applicable Acceptance Criteria or as needed to meet Customer's reasonable satisfaction, as applicable.  If within ten (10) days of notification by Customer (or such other time period as the Parties may agree in writing), any Deliverable still does not meet the Acceptance Criteria in all material respects, or does not meet Customer's reasonable satisfaction, as applicable, Customer may, at its option and without obligation or liability of any kind:  (i) terminate the applicable Transaction Schedule, in whole or in part, and receive a prompt refund of all fees for the portion of the Transaction Schedule so terminated and any other Deliverables that are unusable as a result of such rejection; or (ii) without prejudice to Customer's right to implement (i) above, extend the time for Supplier to correct the affected Deliverable.  When a Deliverable provided to Customer for review is determined by Customer to meet the applicable Acceptance Criteria or Customer's reasonable satisfaction, as applicable, Customer will notify Supplier in writing of its Acceptance.

## ARTICLE 5:  SUPPLEMENTAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Supplier represents, warrants and covenants as follows, which representations, warranties and covenants will be considered to be given anew for each Transaction upon the execution of the applicable Transaction Schedule:

5.1.     (a) Supplier Personnel will observe and comply with Customer's security

procedures, rules, regulations, policies and, except in cases of emergency repairs requested by Customer, working hours and holiday schedules; and (b) in performing Services at Customer locations, Supplier Personnel will use Commercially Reasonable Efforts to minimize any disruption to Customer's normal business operations.

5.2    Without detracting from the generality of any provisions set forth elsewhere in the Master Agreement, Supplier will comply with Customer's legal compliance policy requirements as they are provided to Supplier and to the extent they are applicable to Supplier's performance under or in relation to performance of Services under any Transaction Schedule.

5.3    No Deliverable and/or other materials provided by Supplier or Services performed by Supplier (whether directly or indirectly through its agents and/or subcontractors), nor the use thereof by Customer, will constitute an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Right of any third party.

5.4    Customer will have the right to use for its own purposes, any ideas, methods, processes, techniques, materials and information provided to or otherwise obtained or learned by Customer as a result of this Services Supplement or any Transaction Schedule without restriction, liability or obligation, except as may be specified otherwise in a Transaction Schedule.

5.5    Deliverables will not include any "open source" software or any code derived therefrom (in any format or medium whatsoever) without Customer's prior written consent.

5.6    Any Deliverables provided by Supplier under a Transaction Schedule that are intended to interact or otherwise work together as part of a functioning system will be compatible and will properly inter-operate and work together as components of an integrated system.

5.7    All Deliverables will accurately recognize, calculate, process and store all same century and multi-century formulas, dates and date notations (including leap years), will resolve ambiguities in date input and output and will have capacity to interoperate with other products used by Customer that may deliver to or receive records from the Deliverables, including backup and archived data.

5.8    Any of the Deliverables that work with security prices will accurately recognize, calculate, process, and store all numbers, whether expressed in decimal form, fraction form, or both.

5.9    Any of the Deliverables that process multiple currency denominations, will correctly input, store, process, convert, retrieve, output, and display monetary amounts denominated in the Euro.

5.10   Each Deliverable will perform in accordance with the applicable Acceptance Criteria and other standards set forth in the applicable Transaction Schedule at the time of Customer's Acceptance of such Deliverable and for one-hundred eighty (180) days following such Acceptance, and Supplier will correct and repair, at no cost to Customer, any defect, malfunction or non-conformity that prevents such Deliverable from conforming and performing as so warranted and that occurs during such warranty period.

5.11   Customer will receive free and clear title to all, Deliverables and/or materials being purchased (rather than licensed) from Supplier, free and clear of all mortgages, liens, pledges, custodianships, security interests, objections or other encumbrances, claims or charges of any kind.

5.12   Except as expressly set forth in the applicable Transaction Schedule, (a) no additional software or licenses are required for effective use of the Deliverable, including, without limitation, for effective use of any database components thereof, and (b) to the extent that the Deliverable is used in conjunction with a Web browser, no plug-ins or non-standard browser components are required for effective use of the Deliverable.

5.13 EXCEPT AS SPECIFICALLY PROVIDED IN THIS SERVICES SUPPLEMENT, THE GENERAL TERMS AND CONDITIONS OR IN A TRANSACTION SCHEDULE, THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 6:  TERM; TERMINATION; AND WIND-DOWN ASSISTANCE

6.1   Term.

6.1.1. Services Supplement. This Services Supplement will commence as of the Supplement Effective Date and will continue in full force and effect thereafter unless and until terminated as provided herein.

6.1.2. Transaction Schedules.    Each Transaction Schedule will become effective on the Order Date set forth in the applicable Transaction Schedule and will continue in effect thereafter until the later to occur of (a) the expiration date or expiration event, if any, set forth in the Transaction Schedule; or (b) all performance obligations under the Transaction Schedule have been completed (other than with respect to those obligations that will survive termination), *provided, however,* that such Transaction Schedule will terminate prior to the occurrence of both (a) and (b) above if such Transaction Schedule is terminated by a Party as permitted under the Master Agreement or in accordance with the applicable Transaction Schedule.

6.2   Termination. The Parties' respective rights of termination with respect to this Services Supplement and any Transaction Schedules executed hereunder are as set

forth in the General Terms and Conditions.

6.3    Wind-Down Assistance.

6.3.1. If Supplier's provision of the Services under a Transaction Schedule ceases for any reason prior to completion of the Services or Deliverables to be provided under such Transaction Schedule, Supplier will wind down its performance in an orderly manner, including by using Commercially Reasonable Efforts to assist Customer in the orderly transfer of the affected Services and the transfer of all Deliverables, work-in-progress, and other materials as may facilitate the orderly, non-disrupted business continuation of Customer. In addition, if Customer plans to continue the affected project itself or to use another service provider, Supplier will provide such other cooperation and assistance as Customer may reasonably request to permit Customer and/or its designee(s) to assume and otherwise take over performance of the affected project.

6.3.2. Such wind-down assistance will be deemed to be governed by the terms and conditions of the applicable Transaction Schedule notwithstanding its earlier termination or expiration, other than any terms or conditions that do not reasonably apply to the wind-down assistance. Customer will compensate Supplier for any wind-down assistance requested by Customer on a time and materials basis at the rates applicable under the Transaction Schedule at the time of termination, or if none were so provided, at Supplier's then prevailing rates for such services, or on such other basis as may be mutually agreed by the Parties; *provided, however,* that Customer's payment for such assistance will be without prejudice to any right Customer may have to claim that such amounts paid by it constitute recoverable damages under the Transaction Schedule. If the affected Transaction Schedule is being terminated by Supplier, as permitted by the Transaction Schedule, for non-payment of undisputed amounts, then Supplier may condition its provision of the wind-down assistance on Customer's pre-payment or reasonable assurances of payment for such assistance.

## ARTICLE 7: INTELLECTUAL PROPERTY RIGHTS

7.1    Disclosed Subjects. Supplier will promptly make a complete written disclosure ("**Disclosure Statement**") to Customer of each invention, discovery, device, technique or procedure, whether patentable or not (hereinafter referred to as "**Disclosed Subject**"), conceived or first actually reduced to practice, solely or jointly, by Supplier, Customer, or their respective employees and agents as a result of the Services performed hereunder. Each Disclosure Statement will be deemed a Deliverable hereunder. As to each such Disclosed Subject, Supplier will specifically point out the features or concepts which Supplier believes to be novel, non-obvious, or an improvement upon existing practice.

7.2    Title. Supplier acknowledges that Customer will have exclusive, unlimited ownership rights to the works performed or created under each Transaction Schedule and all materials, information and/or Deliverables prepared or developed as a result of the Services provided thereunder (including any Disclosed Subjects), both as individual

8

items and/or as a combination of components and whether or not the Transaction Schedule is completed. All of the foregoing will be deemed to be works made for hire and made in the course of Services rendered under the applicable Transaction Schedule and will belong exclusively to Customer from the moment of their creation, with Customer having the sole right to obtain, hold and renew, in its own name and/or for its own benefit, patents, copyrights, trademarks, trade secrets, registrations and/or other appropriate Intellectual Property Rights protection. To the extent that exclusive title and ownership rights may not originally vest in Customer as contemplated hereunder, Supplier hereby irrevocably assigns, transfers and conveys to Customer all right, title and interest therein. Supplier and its personnel will give Customer, and any Customer designee, all reasonable assistance and execute all documents necessary to assist or enable Customer to perfect, preserve, register, record, enforce and defend its rights in any such works, materials, information and/or Deliverables. Supplier will, immediately upon request of Customer, or upon the termination, cancellation or expiration of each Transaction Schedule or this Services Supplement, turn over to Customer all materials, information and/or Deliverables prepared or developed as a result of this Services Supplement or any Transaction Schedule, and any Customer documents or other materials held by or on behalf of Supplier, together with all copies thereof. Supplier will enter into written agreements with Supplier Personnel involved in performance under this Master Agreement as may be necessary to ensure Customer's rights under this Article.

7.3    Independent IP. Nothing herein will be construed to restrict, impair or deprive either Party of any of its rights or proprietary interest in intellectual property or technology that existed prior to and independent of the provision of works, materials, information and/or Deliverables prepared under a Transaction Schedule or developed as a result of Services performed under a Transaction Schedule. Notwithstanding any of the foregoing, if any such pre-existing or independent intellectual property or technology are incorporated into, combined with, or required for the operation or provision of any works, materials, information and/or Deliverables prepared under a Transaction Schedule or developed as a result of Services performed under a Transaction Schedule, then Supplier hereby grants to Customer (and its affiliates and its contractors under contract to provide services to Customer or its affiliates (provided that such contractors' use shall be limited solely to providing such services)), at no additional charge, a non-exclusive, fully paid up, perpetual, irrevocable, assignable (in accordance with the terms hereof), worldwide license to use, execute, copy, perform, distribute copies of, maintain, modify, enhance, and create derivative works of such independent intellectual property or technology, unless other terms are expressly agreed to by Customer in writing in the applicable Transaction Schedule.

7.4    Exceptions. Notwithstanding anything to the contrary contained in the Master Agreement, the rights and obligations set forth in this Article will not be modified or amended without approval in writing by legal counsel for Customer and then the effect of such amendment or modification will apply only as set forth in writing in the specific Transaction Schedule and only to that Transaction.

9

## ARTICLE 8:  GLOSSARY OF DEFINED TERMS

Certain definitions of capitalized terms used in this Services Supplement are set out below.

| Defined Term: | Meaning: |
| --- | --- |
| Acceptance | Customer's agreement that a Deliverable meets the applicable Acceptance Criteria. |
| Acceptance Criteria | The acceptance criteria, requirements and/or specifications set out in the applicable Transaction Schedule.  If no such criteria, requirements or specifications are provided for particular Deliverables, then the applicable Specifications. |
| Master Agreement | As provided in the General Terms and Conditions. |
| Specifications | In the case of a Deliverable, the technical specifications, design characteristics, functions and features, and performance and operating characteristics specified in the applicable Transaction Schedule or otherwise mutually agreed by Supplier and Customer. |
| Transaction | As provided in the General Terms and Conditions. |
| Transaction Schedule | As provided in the General Terms and Conditions. |

(The Next Page is the Signature Page)

The undersigned parties have caused this Services Supplement to be executed by their respective duly authorized representatives.

| **Strategic Systems Solutions, Inc.** **(SUPPLIER)** | **Lehman Brothers Holdings Inc.** **(CUSTOMER)** |
|---|---|
| By: _Stephen Daly_ | By: _Erin Murphy_ |
| Name: _STEPHEN DALY_ (Type, Print or Stamp) | Name: _Erin Murphy_ (Type, Print or Stamp) |
| Title: _VICE PRESIDENT_ | Title: _Authorized Signatory_ |

## EXHIBIT 1:  FORM OF PROFESSIONAL SERVICES TRANSACTION SCHEDULE

**[SAMPLE TEMPLATE ONLY – APPROPRIATE VERSION TO BE DEVELOPED FOR EACH TRANSACTION]**

**Supplier Name:**
**Supplier Address:**
**Supplier Jurisdiction of Incorporation:**
**Tax ID:**
**Telephone #:**
**Fax #:**
**General Terms and Conditions No.:**
**General Terms and Conditions Effective Date:**
**Professional Services Supplement Effective Date:**
**Schedule No.:  PSTS-_____**
**Order Date:**

This Professional Services Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and Professional Services Supplement (the "**Services Supplement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the Services and Deliverables being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, Services Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the Services Supplement, that form this Transaction Schedule **[INSTRUCTIONS: LIST ANNEXES BELOW, CREATE ADDITIONAL ANNEXES AS NEEDED, AND ATTACH COPIES OF EACH DOCUMENT TO THIS TRANSACTION SCHEDULE, AS APPROPRIATE]:**

Annex 1: Description of Services [Required]
Annex 2: Project Plans, Delivery Dates and Milestones [Required for all date and/or milestone-based projects]
Annex 3: Prices, Fees and Charges [Required]
Annex 4: Deliverable Specifications [Optional]
Annex 5: Project Managers [Required]
Annex 6: Key Personnel [Optional]
Annex 7: Performance Standards/Service Levels for Services [Optional]
**[Annex 8: Export Control [Required, when applicable]]**

Annex 9: Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the Services Supplement referenced above.

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives

| **[LEGAL NAME OF SUPPLIER ENTITY] (SUPPLIER)** | **[LEGAL NAME OF CUSTOMER ENTITY] (CUSTOMER)** |
|---|---|
| By:_____ | By:_____ |
| Name:_____<br>　　　　(Type, Print or Stamp) | Name:_____<br>　　　　(Type, Print or Stamp) |
| Title:_____ | Title:_____ |

## ANNEX 1:  DESCRIPTION OF SERVICES

**A.  Services Overview.**
[INSTRUCTIONS: INSERT AN EXECUTIVE-LEVEL SUMMARY OF WHAT THE OVERALL INITIATIVE IS ABOUT]

**B. Detailed Description of Services.**
[INSTRUCTIONS: INSERT OR ATTACH A DETAILED DESCRIPTION OF THE SERVICES TO BE PERFORMED – E.G., WHAT IS THE OVERALL SCOPE AND THE NATURE OF THE WORK TO BE PERFORMED.  IF THIS TRANSACTION SCHEDULE IS ONLY FOR A PARTICULAR PHASE OR PHASES OF THE ENTIRE PROJECT, INDICATE THAT AND SUMMARIZE HOW THE WORK TO BE PERFORMED UNDER THIS TRANSACTION SCHEDULE WILL FIT INTO THE PROJECT AS A WHOLE].

## ANNEX 2:  PROJECT PLANS, DELIVERY DATES AND MILESTONES

**[INSTRUCTIONS: INSERT OR ATTACH INFORMATION REGARDING A PROJECT SCHEDULE AND TIME-LINE, WHICH ALSO LISTS ALL OF THE PROJECT MILESTONES AND CORRESPONDING DELIVERABLES, WITH THEIR ASSOCIATED COMPLETION DATES.  REFER AS NECESSARY TO THE DELIVERABLE SPECIFICATIONS OR OTHER DOCUMENT TO DEFINE A MILESTONE REACHED. INCLUDE PROJECT START DATES, PROJECT END DATES, SPECIFIC EVENTS/MILESTONES.]**

## ANNEX 3:  PRICES, FEES AND CHARGES

**[INSTRUCTIONS:  INSERT OR ATTACH THE APPLICABLE FIXED OR UNIT PRICES OR TIME AND MATERIALS CHARGES/RATES FOR SERVICES PURCHASED FROM SUPPLIER.  ALSO SET OUT ANY DISCOUNTS, MOST FAVORED CUSTOMER OR SIMILAR ARRANGEMENT, IF NOT ALREADY COVERED IN THE GENERAL TERMS AND CONDITIONS OR SERVICES SUPPLEMENT.  IF THERE ARE MILESTONE PAYMENTS AND THE LIKE, CROSS-REFERENCE PROJECT PLANS, DELIVERY DATES AND MILESTONES ANNEX. PROVIDE INVOICING INSTRUCTIONS.]**
**[SAMPLE EXAMPLES ONLY – APPROPRIATE VERSION TO BE DEVELOPED FOR EACH TRANSACTION]**

Time and Materials Basis.  Cost Estimate:  _____  (including reimbursable expenses but excluding taxes).  The Parties agree that, before exceeding such cost estimate, Supplier will obtain the prior written consent of Customer. **[INSTRUCTIONS: INSERT OR ATTACH RATES/RATE CARD]**
Fixed-Price Basis.

Fixed Price:  _____  (including reimbursable expenses but excluding taxes).  The fixed price will be due and payable in progress payments made in accordance with the [following] payment milestone schedule [set forth as Annex __]:
**[INSTRUCTIONS: INSERT OR REFER TO PAYMENT MILESTONE SCHEDULE. PAYMENT MILESTONES MAY INCLUDE SPECIFIC DATES, COMPLETED TASKS OR ACCEPTED DELIVERABLES]**
Invoices will be sent to:  [_____], at [_____].

## ANNEX 4:  DELIVERABLE SPECIFICATIONS

**[INSTRUCTIONS: INSERT OR ATTACH DETAILED SPECIFICATIONS OF HOW THE DELIVERABLE SHOULD WORK, INCLUDING FUNCTIONALITY AND PERFORMANCE STANDARDS FOR THE DELIVERABLES.  INCLUDE ACCEPTANCE CRITERIA OR THE PROCESS FOR DEVELOPING ACCEPTANCE CRITERIA, AS APPLICABLE.]**

## ANNEX 5:  PROJECT MANAGERS

| Supplier | Customer |
|---|---|
| Name: _____ | Name: _____ |
| Address: _____ | Address: _____ |
| _____ | _____ |
| Email: _____ | Email: _____ |
| Tel: _____ | Tel: _____ |
| Mob: _____ | Mob: _____ |
| Fax: _____ | Fax: _____ |

## ANNEX 6:  KEY PERSONNEL

**[INSTRUCTIONS: INSERT OR ATTACH A LIST OF ANY SUPPLIER PERSONNEL OR POSITIONS DESIGNATED AS KEY PERSONNEL FOR PURPOSES OF THIS TRANSACTION SCHEDULE, TOGETHER WITH ANY AGREED-UPON TERMS PERTAINING TO THAT DESIGNATION – E.G., WHETHER THE PERSON IS ASSIGNED FULL-TIME OR A PERCENTAGE OF TIME TO THE PROJECT, WHERE SHE OR HE WILL BE LOCATED, THE DURATION AND NATURE OF THE ASSIGNED ROLE, ETC.]**

<u>**ANNEX 7:  PERFORMANCE STANDARDS/SERVICE LEVELS FOR SERVICES**</u>

**[INSTRUCTIONS: INSERT OR ATTACH A DESCRIPTION OF THE MECHANISMS AND PROCESS THAT WILL BE USED TO MONITOR AND EVALUATE SUPPLIER'S PERFORMANCE UNDER THIS TRANSACTION SCHEDULE AND DETAILS SUCH AS SPECIFIC PERFORMANCE STANDARDS/SERVICE LEVELS, E.G., RESPONSE TIMES, ETC.).  INDICATE THE FREQUENCY AND NATURE OF PROJECT STATUS MEETINGS AND PERFORMANCE AND STATUS REPORTS THAT WILL BE DELIVERED TO CUSTOMER (IF DIFFERENT OR IN ADDITION TO THE STATUS MEETINGS/REPORTS DESCRIBED IN THE SERVICES SUPPLEMENT).]**

## ANNEX 8:  EXPORT CONTROL

**[INSTRUCTIONS: SUPPLIER TO DETAIL WHETHER THE DELIVERABLES
CONTAIN ANY ENCRYPTION FUNCTIONALITY THAT MAY REQUIRE A SPECIAL
LICENSE FOR EXPORT]**

## ANNEX 9:  ADDITIONAL AGREED-UPON PROVISIONS

**[SAMPLE EXAMPLES ONLY – APPROPRIATE VERSION TO BE DEVELOPED FOR EACH TRANSACTION]**

1.      Task and Staffing Plan
**[INSTRUCTIONS: REFER TO AN ATTACHMENT CONTAINING A DETAILED TASK PLAN THAT INCLUDES OR IS SUPPLEMENTED BY A FULLY LOADED, INTEGRATED STAFFING PLAN FOR THE WORK, SHOWING THE NUMBERS AND TYPES OF ALL SUPPLIER (AND SUBCONTRACTOR)  AND OTHER RESOURCES THAT WILL BE ASSIGNED TO OR REQUIRED FOR THE PROJECT, ARRAYED ALONG A PROJECT TIMELINE TO DEPICT THE REQUIRED LEVEL OF RESOURCES BY TIME PERIOD.  INCLUDE CUSTOMER ROLES AND RESPONSIBILITIES AND/OR DEPENDENCIES, IF APPLICABLE.]**

2.      Subcontractors
**[INSTRUCTIONS: IF ANY SUBCONTRACTORS WILL BE USED TO PERFORM THE WORK, IDENTIFY THEM AND THEIR ROLE.]**

3      Service Locations
**[INSTRUCTIONS: IDENTIFY THE LOCATIONS AT WHICH THE SERVICES WILL BE PERFORMED AND THE CUSTOMER SITES TO WHICH THE DELIVERABLES ARE TO BE DELIVERED.]**

4.      Use of Customer Facilities and Resources
**[INSTRUCTIONS: INSERT OR ATTACH A LIST AND DESCRIPTION OF ANY CUSTOMER FACILITIES AND OTHER RESOURCES (E.G., EQUIPMENT AND SOFTWARE, PCs FOR SUPPLIER PERSONNEL, CUBICLES/OFFICE FURNITURE) CUSTOMER WILL BE REQUIRED TO FURNISH OR MAKE AVAILABLE TO SUPPLIER TO ENABLE OR FACILITATE SUPPLIER'S PERFORMANCE OF THE SERVICES.]**

5.      Supplier Facilities and Resources
**[INSTRUCTIONS: INSERT OR ATTACH A LIST AND DESCRIPTION OF THE FACILITIES AND OTHER RESOURCES (E.G., EQUIPMENT AND SOFTWARE) SUPPLIER WILL FURNISH ENABLE OR FACILITATE ITS PERFORMANCE OF THE SERVICES.]**

6.      Other Terms.
**[INSTRUCTIONS: INSERT OR ATTACH ANY OTHER TERMS AGREED BY THE PARTIES THAT ARE NOT WITHIN THE SCOPE OF THE ABOVE SECTIONS.]**

## EXHIBIT 2:  BACKGROUND SCREENING INFORMATION

Upon Customer's request, Supplier will promptly require any Supplier Personnel to provide to Customer a completed background and security questionnaire in the form provided by Customer and to undergo drug testing.  Notwithstanding anything to the contrary in the Master Agreement, Customer may terminate the applicable Transaction Schedule or may require Supplier immediately to terminate the assignment of any Supplier Personnel if such Supplier Personnel: (a) does not promptly provide complete information (and fingerprint specimens) as provided such background and security questionnaire; or (b) does not undergo drug testing; or (c) if, in the sole judgment of Customer (i) the results of the background investigation or drug testing are unsatisfactory, (ii) any background information provided by such individual is inaccurate, or (iii) any background information provided by such individual cannot be verified to Customer's satisfaction.  Nothing contained in this Master Agreement will be construed to create any obligation on the part of Customer to disclose to Supplier or its personnel the reasons for its determination in this regard, or share any information obtained through its background investigation or drug testing, except to the extent otherwise required by law.

## EXHIBIT 3: NON-DISCLOSURE AGREEMENT

I, the undersigned individual, am aware that a Lehman Brothers entity ("Lehman") and the company named below (hereinafter referred to as "Supplier") have entered into an agreement ("Agreement"), pursuant to which I may have access to Confidential Information (as defined below) and/or Lehman Sensitive Data (as defined below). I understand that as part of its obligations under the Agreement, Supplier is required to obtain this written agreement ("Non-Disclosure Agreement") from certain of its personnel, including myself, to ensure understanding and compliance with its confidentiality and data protection obligations.

1.    **Confidential Information.**

**a) "Confidential Information"** means any information obtained from or on behalf of Lehman that relates to the past, present or future business activities of Lehman or its subsidiaries or affiliates, or their respective employees, customers or third party suppliers or contractors, including the terms and conditions of this Non-Disclosure Agreement and the Agreement and any information relating to Lehman's plans, pricing, methods, methodologies, processes, financial data, lists, intellectual property rights, customer information, apparatus, statistics, programs, research, development, and/or information technology.

**b)** Confidential Information does not include any particular information that can be demonstrated by the undersigned is (a) currently in the public domain and/or previously known to me, and in either case free from any obligation to keep it confidential, (b) publicly disclosed by Lehman either prior to or subsequent to receipt by the undersigned of such information, (c) independently developed by the undersigned without any access to or use of the Confidential Information, or (d) rightfully obtained by the undersigned from a third party lawfully in possession of the Confidential Information who is not bound by confidentiality obligations to Lehman.

**c)** I agree to hold all Confidential Information in trust and confidence for Lehman and, except as set forth in this Agreement or as otherwise may be authorized by Lehman in writing, I will not disclose to any person, firm or enterprise, or use for my benefit, any Confidential Information. I will treat all Confidential Information with the same degree of care that I treat Supplier's confidential or proprietary information, but in no event less than using standards of reasonable care. I may disclose Confidential Information to other Supplier employees, and to any other Supplier contractors who agree to confidentiality obligations substantially equivalent to those set forth in this Non-Disclosure Agreement, solely as required in order for Supplier to perform its obligations under the Agreement. I may disclose Confidential Information if required to do so under applicable law, rule or order provided that I, where reasonably practicable and to the extent legally permissible, provide Lehman with prior written notice of the required disclosure so that Lehman may seek a protective order or other appropriate remedy, and provided further that I disclose no more Confidential Information than is reasonably necessary in order to respond to the required disclosure.

2.    **Lehman Sensitive Data.** I hereby acknowledge that Lehman is subject to certain privacy and information security laws and regulations, pursuant to which

Lehman is required to ensure that I, and Supplier, appropriately safeguard personal or financial information regarding Lehman's former, current or prospective clients or employees ("**Lehman Sensitive Data**").  To the extent that I receive any Lehman Sensitive Data as a result of Supplier's performance under the Agreement, and notwithstanding anything to the contrary contained in this Non-Disclosure Agreement and the Agreement, I agree that I will (a) not disclose or use any Lehman Sensitive Data except to the extent necessary to carry out Supplier's obligations under the Agreement and for no other purpose, (b) not disclose Lehman Sensitive Data to any third party, including its third party service providers without the prior written consent of Lehman and Supplier and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Lehman Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems, policies and procedures as Lehman may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Lehman Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Lehman notice thereof, and such further information and assistance as may be reasonably requested.

3.      **Return of Confidential Information and Lehman Sensitive Data.**  At any time, at the request and option of Lehman, and in the event of termination or expiration of the Agreement or my termination as an employee or subcontractor of Supplier, I agree to promptly: (a) return to Lehman or Supplier, as directed by Lehman or Supplier, the Confidential Information and/or Lehman Sensitive Data, as applicable, in my possession or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Lehman Sensitive Data, as applicable, in my possession, and if requested by Lehman or Supplier, acknowledge in writing that all such Confidential Information and/or Lehman Sensitive Data, as applicable, has been destroyed or permanently erased.

4.      **Title.**  I acknowledge and agree that as between Lehman and myself, all of the Confidential Information and/or Lehman Sensitive Data, including any derivative works thereof, is, and will remain, proprietary to Lehman.  To the extent that exclusive title and ownership rights may not originally vest in Lehman, as contemplated hereunder, I hereby irrevocably assign, transfer and convey to Lehman all right, title and interest therein.

5.      **Obligations.**

a) In consideration of my future or continued assignment and responsibilities in connection with Supplier's performance under the Agreement, I hereby acknowledge, represent and confirm to Supplier and Lehman as follows:  (a) I have read the provisions of this Non-Disclosure Agreement and know of no agreements, obligations or restrictions which prevent or prohibit me from complying with them; (b) I will receive and maintain all Lehman information, perform services and conduct myself, in all respects, in a manner consistent with these obligations; and (c) I agree not to, directly or