1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


      Debtors.


- - - - - - - - - - - - - - - - - - - -x


         United States Bankruptcy Court

         One Bowling Green

         New York, New York


         October 6, 2008

         3:13 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Motion Filed by Lehman Commercial Paper Inc. Seeking

3    Authority to Continue to Utilize Bank Account, Terminate Agency

4    Relationships and Elevate Loan Participations

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Lehman Brothers Holdings Inc. and Lehman

5          Commercial Paper Inc.

6         767 Fifth Avenue

7         New York, NY 10153

8

9    BY:   SHAI WAISMAN, ESQ.

10         JACQUELINE MARCUS, ESQ.

11

12   MILBANK, TWEED, HADLEY & MCCLOY LLP

13        Proposed counsel to the Official Committee of Unsecured

14         Creditors

15        One Chase Manhattan Plaza

16        New York, NY 10005

17

18   BY:   DENNIS F. DUNNE, ESQ.

19

20

21

22

23

24

25

4

KAYE SCHOLER LLP

    Attorneys for Bank of America, N.A.

    425 Park Avenue

    New York, NY 10022


BY:  MARGOT B. SCHONHOLZ, ESQ.

    ANA M. ALFONSO, ESQ.


HOLLAND & KNIGHT LLP

    Attorneys for Caisse de Depot et Placement du Quebec

    195 Broadway

    24th Floor

    New York, NY 10007


BY:  SANDRA E. MAYERSON, ESQ.


CADWALADER, WICKERSHAM & TAFT LLP

    Attorneys for Citibank

    One World Financial Center

    New York, NY 10261


BY:  DERYCK A. PALMER, ESQ.

    JESSICA L. FINK, ESQ.

5

1

2    BINGHAM MCCUTCHEN LLP

3          Attorneys for Met Life and UBS Financial Services

4          399 Park Avenue

5          New York, NY 10022

6

7    BY:   STEVEN WILAMOWSKY, ESQ.

8          MARK W. DEVENO, ESQ. (TELEPHONICALLY)

9

10   KRAMER LEVIN NAFTALIS & FRANKEL LLP

11         Attorneys for Contrarian Funds LLC and Abram Capital

12          Partners

13         1177 Avenue of the Americas

14         New York, NY 10036

15

16   BY:   AMY D. CATON, ESQ.

17

18   ROPES & GRAY LLP

19         Attorneys for Balpost

20         1211 Avenue of the Americas

21         New York, NY 10036

22

23   BY:   D. ROSS MARTIN, ESQ.

24         (TELEPHONICALLY)

25

6

1

2    ROPES & GRAY LLP

3         Attorneys for Ropes & Gray LLP

4         One International Place

5         Boston, MA 02110

6

7    BY:   PATRICIA I. CHEN, ESQ.

8         (TELEPHONICALLY)

9

10   GOULSTON & STORRS P.C.

11        Attorneys for Interactive Data

12        400 Atlantic Avenue

13        Boston, MA 02110

14

15   BY:   GREGORY O. KADEN, ESQ.

16        (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

7

P R O C E E D I N G S

1

2      THE COURT:  Please be seated.

3      MS. MARCUS:  Good afternoon, Your Honor.

4      THE COURT:  Good afternoon.

5      MS. MARCUS:  Jacqueline Marcus from Weil Gotshal &

6   Manges LLP on behalf of Lehman Commercial Paper Inc.  First,

7   Your Honor, a brief update.  We filed three additional Lehman

8   related debtors on Friday evening.  Their names are Lehman

9   Brothers Specialized Financing Inc., Lehman Brothers Commodity

10  Services Inc. and Lehman Brothers Finance, S.A.  And most

11  recently, last night, late last night, we filed ten additional

12  cases.  The names of those debtors are Lehman Brothers

13  Derivative Products Inc., Lehman Commercial Paper Inc., Lehman

14  Brothers Commercial Corporation, Lehman Brothers Financial

15  Products Inc., Fondo -- and pardon my Spanish accent --

16  d'Investimento Multimercado Credito Cevaro (ph.), Lehman's

17  Scottish Finance LP, CES Aviation LLC, CES Aviation V LLC, CES

18  Aviation IX LLC and East Dover Limited.

19      We're here today, Your Honor, with respect to the

20  emergency relief required by one of last night's debtors,

21  Lehman Commercial Paper Inc. and we thank you for seeing us on

22  such short notice.  The motion at issue today is the motion

23  pursuant to Sections 105(a), 363(b) and 363(c) of the

24  Bankruptcy Code and Bankruptcy Rule 6004 for authority to

25  continue to use agency bank accounts, terminate agency

8

1    relationships and elevate loan participation.

2         Your Honor, notice of the motion and the motion were

3    served by e-mail late this morning and by fax a little after 12

4    noon on all parties on the master service list with the except

5    of thirty-three parties for whom we only had mail addresses.

6    So those will be mailed, obviously, a little bit too late.  In

7    addition, however, and I think the courtroom demonstrates that

8    a lot of people have received notice of this hearing.  Notice

9    of the hearing was posted on the LSTA website early this

10   morning including the motion and a summary of the relief

11   requested in the motion.

12        A bit of background, Your Honor.  Since the filing of

13   the Lehman Brothers Holdings case, LCPI has literally been

14   bombarded with inquiries from borrowers and lenders regarding

15   the status of their agency business.  LCPI is involved in a

16   lending business and it acts as an agent with respect to

17   approximately 150 loans.  In those agency relationships, they

18   represent more than a thousand lenders.  So since the filing of

19   the Lehman Brothers Holdings case, we've had numerous inquiries

20   regarding whether LCPI would continue as agent, whether lenders

21   should advance in the ordinary course to the LCP account that

22   was used for that purpose, whether borrowers should advance

23   payments of principal and interest to that account for

24   subsequent distribution to the other lenders and whether LCPI

25   would have access to the funds in the account.  We have worked

1    cooperatively in the pre-petition period with Citibank where

2    that account is maintained and we have all spent and the

3    employees of LCPI have spent an inordinate amount of time

4    trying to assure people that that agency account would be

5    maintained intact, that it would operate normally and they

6    should continue to fund payments into that account for

7    distribution in the ordinary course.  I think we've done a

8    fairly good job in the pre-petition period of keeping that

9    altogether.  Of course, the circumstances have changed with the

10   advent of the LCPI filing.  And as a result, we prepared a

11   motion to request that the Court authorize the debtor to

12   continue using that account and direct the lender to continue

13   providing access to that account -- not the lender, excuse me,

14   the institution in which the account is maintained.

15          Citibank's attorneys are here and Citibank, I

16   believe, and they'll probably speak later, is generally

17   agreeable to continuing the agency account.

18          THE COURT:  Generally agreeable or agreeable?

19          MS. MARCUS:  They have a few little tweaks that

20   they'd like to make but they should be fine.  The motion is

21   comprised of three different forms of relief.  One is with

22   respect to the agency account, I think as I've already

23   described.  Two is with respect to the agency relationships in

24   general and the debtor's desire to start terminating, resigning

25   from, ending those agency relationships so that it is not

10

1    caught in the middle between borrowers and lenders any further.

2    And the third has to do with what we've called elevating

3    participation where LCPI has participated out in many, many,

4    many, over 700, loan participations and wants to elevate its

5    participants to the direct lender position or its sub-

6    participants to the participants' position and, again, exit

7    from between those relationships.

8              THE COURT:  I have a question about that.

9              MS. MARCUS:  Sure.

10             THE COURT:  This may not be the right time to answer

11   it but you should know that I have the question and you can

12   answer it whenever you think it's appropriate.  I've never seen

13   the term "elevation" used in this way before at least in the

14   pleading that I've had before me.  And ordinarily,

15   participations are governed by well recognized documentation in

16   the loan syndication industry and there's a distinction that

17   parties to such transactions draw between participations and

18   pro-lender relationships.  In the "elevation", as you use that

19   term, is it contemplated that there will be negotiated

20   documentation to the satisfaction of all parties to the

21   transaction that will, in effect, convert participations into

22   direct lending relationships with the various borrowers who are

23   affected?  Or is it something short of that that's involved?

24   That's question 1.

25             MS. MARCUS:  May I answer that one first?

11

1    THE COURT:  You can.  Question 2 is whether there's

2    anything about the order that seeks to impose a burden on any

3    party to so agree?  I am assuming that the only thing that's

4    happening here is authorization to the new debtor to engage in

5    such documentation as may be appropriate to affect these goals.

6    MS. MARCUS:  I'll answer the second one first.  The

7    answer to that one is yes and various parties have asked that

8    question as to whether we were trying to somehow enhance the

9    debtor's rights, change the rights of the counterparties,

10   adversely affect them.  The answer to that was no, we weren't

11   intending to do that.  We've modified the order and I will read

12   into the record a few additional changes to make that very

13   clear.

14   THE COURT:  Okay.

15   MS. MARCUS:  The answer to the first question is

16   that, yes, the intent is to elevate participants to direct

17   lender positions.  Now there were somewhere there are sub-

18   participants so they're only being elevated to the position

19   that LCPI had which might not be a direct lender position.  Bu

20   the attempt is to put them in the position that LCPI had and

21   let LCPI exit .

22   I hadn't heard the term "elevation" until two weeks

23   ago and it has become part of my daily vocabulary.  But

24   apparently, it is a term of art in the banking world.

25   THE COURT:  I'm sure there are many terms of art I

12

1   will come to learn in the course of this case.  But at least

2   when I was in practice, there was no concept of a Court

3   intervening to wave a magic wand and change relationships.  Is

4   it contemplated that that's what's happening here or is it

5   simply authorizing consensual commercial behavior?

6           MS. MARCUS:  The latter.

7           THE COURT:  Fine.

8           MS. MARCUS:  And the other thing I've been asked to

9   include in the order because the creditors' committee has a

10  position on this participation, in particular, and we will be

11  consulting with the representatives of the creditors' committee

12  and establishing a protocol for those participations that we

13  collectively view as true participation and perhaps those that

14  we don't and acing accordingly.  So we have taken that into

15  account.  But again, just to reiterate, there is no attempt on

16  the participation side or the agency side to change the

17  relative rights of the parties.  And the reason for the motion

18  was for the Court, the creditors' committee, the U.S. trustee

19  and other parties to be aware of what we intend to do in

20  accordance with those governing documents.

21          Getting back for a second to the agency account, I

22  can describe the account number on the funds.  A number of

23  parties are here in the courtroom.  I don't think, and I don't

24  know whether there's anybody on the phone, I think with respect

25  to the agency account, almost everybody that I've spoken to, if

13

1    not everybody, has agreed that it's important that the relief

2    be granted and be granted quickly because, for example, there

3    are borrowers today who are requesting advances under their

4    revolvers.  They need that money and we don't want that to be

5    held up.  So I can go into additional detail if you'd like me

6    to but if there's no objection, I'd just as soon dispense with

7    that.

8            THE COURT:  Well, let me first find out if there are

9    any objections or comments that any party may have in

10   connection with, in effect, providing a comfort order as to the

11   way the agency account will continue to be used.

12           MS. MARCUS:  Okay.

13           THE COURT:  That's really step 1.  Step 2 is going to

14   be what proof is presented in the record to support the entry

15   of the overall order including this aspect of it.  I did not

16   notice that there was an affidavit or other declaration to

17   support the requested relief.  I'm assuming that there is

18   someone who will be offered to provide that necessary

19   evidentiary record.

20           MS. MARCUS:  Yes, Your Honor.  He actually arrived

21   while I was up here speaking so I can now breathe a sigh of

22   relief that my witness, James Seery, currently of Barclays

23   Capital, formerly of Lehman, is here to

24           THE COURT:  Fine.

25           MS. MARCUS:  -- either testify or I will proffer

14

1    testimony.

2         THE COURT:  Fine.  Let's just start with comments or

3    objections or any reactions to what you're proposing.

4         MS. MARCUS:  Sure.

5         MR. DUNNE:  Good afternoon, Your Honor.  Dennis Dunne

6    from Milbank, Tweed, Hadley & McCloy on behalf of the official

7    creditors' committee.  I rise to put into context some of the

8    comments we've asked the debtors to include in the order.  But

9    at the outset, the committee's generally supportive of this

10   relief.  To the extent that Lehman acts as agent for syndicate

11   of lenders, the benefits to the estate are diminimus but the

12   burden's substantial so we favor trying to transfer or resign

13   out of those positions.

14        Similarly, if Lehman owes bank debt itself for which

15   it has sold the economic interest through a participation, we

16   understand that they are trying to collapse that.  They use the

17   term "elevated" but they're trying to collapse that to remove

18   Lehman as the intermediary or middle man between that, and, in

19   essence, make the participant an assignee and a lender of

20   record.

21        Our comments and potential concerns are in two areas.

22   One is, we are assuming that all of these are true

23   participations.  If they are not true participations and, for

24   instance, are disguised financings, we don't want to be

25   prejudiced today by anything that's in the order.  If it's a

15

1    disguised financing, for instance, and the counterparty is

2    properly perfected, it may not make a difference because their

3    collateral would be the underlying bank debt.  If it's a

4    disguised financing and they're not properly perfected, they

5    may just be an unsecured creditor of the LCPI estate which

6    would allow LCPI to retain the ownership of the bank debt and

7    receive the proceeds.

8         So the change that we have agreed on is two-fold.

9    One, we'll work hand in glove with the debtors through each of

10   these to determine at the outset whether they're true

11   participations or not.  There's also language in the order that

12   we've asked to be added which is consistent with Your Honor's

13   comments that we're not trying to alter the commercial

14   relationship that exists on the petition date between any of

15   the counterparties.  So there's basically a reservation of

16   rights that says that, that this order is not impairing the

17   rights as they exist with respect to any of the parties.

18        Lastly, there is a concern with respect to the

19   transfer of the agency roles.  Typically, out of court, there'd

20   be a transfer agreement.  And that agreement could contain, and

21   frequently does contain, indemnities and affirmative covenants

22   on the part of the incumbent transferring agent, i.e., LCPI in

23   this case, which we don't think is appropriate here because

24   that could give rise to administrative expense liabilities for

25   the breach.  And they could walk away, in essence, from the

16

1    obligations under those contracts today and the counterparty

2    would have unsecured pre-petition claims for that breach.

3    We're not against accommodating a smooth transition but we

4    don't think, in so doing, we should unintentionally create

5    administrative expense liabilities.  And the debtors, again,

6    have agreed to work through that to take appropriate steps to

7    ensure that that does not happen.

8            And with that, Your Honor, the committee's in support

9    of the relief requested.

10           THE COURT:  Fine.  Thank you.

11           MS. FINK:  Good afternoon, Your Honor.  Jessica Fink

12   of Cadwalader here on behalf of Citibank, the institution of

13   which the agency account is maintained.  Your Honor, Citibank

14   has no substantive objection to the relief requested in the

15   motion.  However, Citibank would like some comfort about from

16   whom it should take direction with respect to transfer of the

17   funds maintained in the account in light of the fact that the

18   debtor will be resigning or transferring its role as agent.

19           We're willing to work with the debtor going forward

20   on this; however, we would suggest that some sort of notice be

21   filed with the court or posted on the docket every time the

22   agency is transferred or assigned so that Citibank has comfort

23   about exactly from whom it should be taking direction.

24           THE COURT:  Okay.

25           MS. FINK:  Thank you.

17

1          MS. CATON:  Good afternoon, Your Honor.  Amy Caton

2     from Kramer Levin.  We're here representing Contrarian Funds

3     LLC and Abram Capital Partners.  And unfortunately, we were

4     able to file a response this afternoon but it was only

5     approximately thirty minutes prior to the hearing.

6          Our two clients hold approximately seventy-five

7     million dollars in claims against the Enron estate through

8     Lehman Commercial Paper Inc as the record holder with our

9     clients as the beneficial holders.  And we support the debtor's

10    motion but would like to request that the relief be extended to

11    other types of participations where the debtors have no

12    beneficial interests.

13         Our claims may be even easier than those in the

14    administrative loan category because we don't have ongoing

15    requirements by Lehman Brothers Commercial Papers Inc. other

16    than turning over of funds to our clients.  And if the funds

17    aren't turned over within x days, I believe it's three days of

18    distribution, then interest starts to accrue on those funds.

19         In this instance, Enron is expected to make an 800

20    million dollar distribution within a few days and we want to

21    make sure that these distributions go out to our clients as

22    they're due.  And we're happy to comply with any documentation

23    requirements that the debtors or the committee may ask of us.

24         And furthermore, on a going forward basis, we'd like

25    to find a solution so that Lehman Brothers can exit its

18

1    obligations and have the beneficial holders step in and receive

2    their funds directly or appoint a new participation agent in

3    their place.

4            THE COURT:  Okay.

5            MS. SCHONHOLZ:  Good afternoon, Your Honor. Margot

6    Schonholz, Kaye Scholer, for Bank of America as a lender and LC

7    issuing bank under the five billion Archstone credit

8    facilities.  We filed an objection about an hour before the

9    hearing.  We share the goal of removal of LCPI as an

10   administrative agent in an orderly fashion and we've been, in

11   fact, asking LCPI to resign for a few weeks.  BofA is prepared

12   to step in as a replacement agent if customary success or

13   agency documentation is executed.  We understand the

14   committee's concern about indemnities and we'll be willing,

15   obviously, to work with them on that.

16           We have no objection to the transfer of agency if the

17   debtor is given authority to enter into customary successor

18   agency agreements to facilitate an orderly transition to BofA.

19   And we have no objection to the use of existing accounts.  Our

20   biggest concern, Your Honor, you articulated and that is

21   permitted elevation of participation of assignments.  We are

22   comforted in part that consensual commercial behavior is what's

23   being contemplated.  That was not clear from the motion and

24   that no magic wand is being waved today to convert essentially

25   a one debt instrument into another one.  The debtors have

1   agreed to add language to the order and statements to make

2   statements on the record that there would be no prejudice to

3   any existing rights of any parties to any of these debt

4   agreements including with respect to existing rights of setoff.

5   And that partially satisfies our concern.  However, we've also,

6   in our objection, asked for information concerning the identity

7   of participants being elevated and related information

8   particularly, because BofA is currently the issuing bank for

9   LCs under the facility and there is unfunded revolver

10  availability.

11       So we reserve the right, Your Honor, assuming all

12  else is equal and the order looks like what has been agreed to

13  come back to the court if the debtor does not provide the

14  information we've requested in the objection.  Thank you.

15       THE COURT:  Okay.  I should be clear that I have not

16  read the objection that you've just referred to.  I'm assuming

17  that in making the comments you've just made, you told me what

18  I would have learned if I read your objection.  I hope that's

19  true.

20       MS. SCHONHOLZ:  Exactly, Your Honor.

21       THE COURT:  Fine.

22       MS. SCHONHOLZ:  Thank you.

23       THE COURT:  Thank you.

24       MS. MAYERSON:  Your Honor, Sandra Mayerson, Holland &

25  Knight for Caisse de Depot et Placement du Quebec.  First of

20

1    all, I'd like to make it clear that we applaud what Lehman

2    Brothers Commercial Paper is trying to do here.  Like Bank of

3    America, we had been trying to get them out of our relationship

4    and take control of the situation.  However, we feel that this

5    rush to do it without proper notice and without all the terms

6    spelled out is really not in anyone's interest.  And we have

7    several concerns that we think we could address with the debtor

8    but we think that there should be some adjournment of this

9    motion, an opportunity to work through some of the concerns we

10   have.  Now, I should state at the outset that our particular

11   loan is set up in an unusual structure and may not even be

12   included here.  But that's one of the problems is that there's

13   really no notice provided.  After this order is entered, you

14   have no way of knowing if you've been elevated, if your agency

15   has been resigned.  You have no opportunity to object to that.

16   So we would like to see some notice provision so that we know

17   if we're being affected or not affected.

18          Secondly, we are concerned whether the resignation,

19   once this order is entered, they can just resign or they have

20   to resign in accordance with the terms of the agreement.  Our

21   agreement, for example, specifies that when they resign, that

22   resignation does not become effective until a replacement agent

23   is found and that's a very important provision to us because

24   the partnership cannot function without that provision.

25          Second of all, we don't think that elevation should

21

1    be unilateral on the debtor's part.  We think that the parties

2    who are proposed to be elevated should be given notice and have

3    an opportunity to come into court.  In our particular

4    situation, we have an unusual structure because it's a cross-

5    border transaction.  And if we were elevated to be a direct

6    participant there would be huge tax consequences for us in

7    Quebec.  So if we were elevated, it would really be a disaster

8    for us.  And I think that we have several creative ideas how to

9    avoid that kind of disaster.  We just have not been able to

10   find anybody at Lehman to talk to about it.  We're as anxious

11   to get them out of the situation as they are anxious to get

12   out.  But elevation wouldn't work in our case and may not work

13   in other people's cases as well.

14        Finally, we're concerned about implementation.

15   There's nothing in the order that says prior to their

16   resignation they have to implement things that they should have

17   implemented.  For example, in our case, there were some notes

18   that were supposed to be issued by a third party trustee.  They

19   said that they can't issue those notes until Lehman presents

20   them the old notes for cancellation which Lehman hasn't done.

21   If they just resign and disappear and those notes are never

22   presented, we would have a real problem.  So I think that's

23   stuff that the language of the order could address if people

24   are given a few more days to work through some of these

25   situations.  But I think having this order entered today

22

1    without any discussion among the affected the parties and

2    without notice to all the affected parties is a bit premature.

3    Thank you, Your Honor.

4            THE COURT:  Okay.

5            MR. WILAMOWSKY:  Good afternoon, Your Honor.  Steven

6    Wilamowsky, Bingham McCutchen LLP on behalf of Met Life and

7    also here today on behalf of UBS Financial Services.  Your

8    Honor, Met Life is a sub-participant and UBS has a number of

9    relationships including, I believe, a participant.  I had a

10   very comforting discussion with Ms. Marcus just in the few

11   minutes before the hearing so I think that with respect to Met

12   Life's concerns about elevation, we really think that those are

13   being resolved.  I rise in that respect only to reserve rights

14   because we haven't actually seen the order and the language

15   that's going to be going in and that Ms. Marcus is planning on

16   reading into the record.  But we assume that, based on what

17   we've been told, we're not going to have a problem.

18           With respect to UBS, UBS was very concerned about --

19   is very concerned about money going up and getting in any way

20   trapped at Lehman.  And therefore, we had asked for a finding

21   which presumably -- hopefully Your Honor will be able to make

22   based on the proffer that any money that goes up pursuant to

23   these agency relationships would not be -- or that comes down

24   from a borrower would not constitute property of the estate.  I

25   think that Ms. Marcus also advised me that that would be taken

23

1   care of in the order as well.  Again, because we haven't seen

2   the language that's being proposed, I'm just reserving our

3   rights.

4            THE COURT:  Okay.  Everybody has commented, it seems,

5   who's in the courtroom who cares to comment.  I'm simply going

6   to ask if there's anyone on the telephone who wishes to

7   comment.  And I'm going to make a comment before anybody says

8   anything about people who are participating by telephone.

9   Because this is a hearing that was conducted on the shortest

10  notice possible given the emergency nature of the relief being

11  sought, I'm going to be much flexible and lenient in respect of

12  telephonic appearances.  But generally speaking, for those who

13  wish to appear by telephone for listening only purposes or for

14  participation purposes, unless you are outside the immediate

15  area of the court, namely Manhattan, and unless you have a good

16  reason to participate by phone, it is the Court's strong

17  preference that anybody who intends to have a speaking role in

18  this or any other hearing in the case be physically present in

19  court.  For someone who is appearing from California or Florida

20  or a foreign country, obviously, telephonic appearance may be

21  the only practical solution.  I'm somewhat concerned that

22  certain people who may be participating by phone today may have

23  taken advantage of the fact that this was happening as an

24  emergency hearing and may not actually qualify to be by

25  telephone as opposed to being present.  But you're getting a

24

1    mulligan today.  It's not going to be available any other day.

2          Now, having said that, is there anyone who wishes to

3    comment by phone?  Apparently not.

4          MS. MARCUS:  Your Honor, would you like me to address

5    the responses first?

6          THE COURT:  Please.

7          MS. MARCUS:  Okay.  With respect to the Contrarian

8    Funds request that other types of participations be included, I

9    think we have confirmed that we are amenable to doing that and

10    will speak to anybody who wants to speak to us about this

11    issue.  I'm not sure that that requires any changes in the

12    order itself or not.  But that's something that we can

13    consider.

14          With respect to Ms. Mayerson's client, I think she

15    indicated that it's kind of a sui generis situation and that

16    the facts are different on this issue and what we would be

17    amenable to doing is excluding her client, Caisse de Depot -- I

18    don't know how to spell it -- from the ambit of this order if

19    that would make her more comfortable.

20          THE COURT:  I'm not sure if that would make her more

21    comfortable.  You'll have to speak with her about that.

22          MS. MARCUS:  Okay.  Alternatively, I can address

23    those objections with the fact clarifying, again, in the

24    language of the proposed order that I'll read will also

25    clarify, that we're not intending to affect anybody's rights,

25

1    that we're not intending to surprise anybody or provide anybody

2    with a participation or an elevation -- hey, you've been

3    elevated.  We intend to discuss with each participant and each

4    borrower and each agent those transactions and deal with them

5    accordingly.  Again, the purpose of the motion was for the

6    Court and everybody to know what we're doing, not to impose

7    anything on any of the counterparties.

8         THE COURT:  In connection with your most recent

9    comments, let me ask you this because Ms. Mayerson's comment

10   included the suggestion that with an adjournment, some more

11   time for parties to react to what's going on here and to

12   evaluate the proposal and perhaps with notice provisions which

13   would include an opportunity to appear here that she might be

14   satisfied.  Now, it's really that latter point that I'm raising

15   a question about.  And I just need some comfort on this from

16   you.  As I read your motion and proposed order, and I recognize

17   that the order is evolving, I did not view it as contemplating

18   judicial intervention in respect of future disagreements that

19   might arise as to an elevation of participation or as to the

20   terms of a particular transaction.  My question to you is, is

21   it contemplated by the debtor that there will be a need for

22   follow-up oversight by the Court or an opportunity for parties

23   to transactions that are being negotiated to show up here to

24   the extent there are disagreements or issues that need to be

25   clarified?

26

1          MS. MARCUS:  I think the debtor's position is that to

2     the extent that things can't be resolved consensually then we

3     would reserve the right to come back to court to say x

4     participant won't agree and we think something in the

5     Bankruptcy Code somewhere authorizes us to do this.  Or,

6     similarly, with respect to the transfer of an agency.  We're

7     not taking that position now but if we saw the need to at a

8     later date take the position that something in the Bankruptcy

9     Code in 365(f) gives us more rights than we might have by the

10    terms of the documents themselves then we would come back to

11    the court and seek that relief on notice with an opportunity to

12    be heard by the other party.

13          THE COURT:  As it relates to a particular

14    transaction.

15          MS. MARCUS:  Yeah.  Or a group.

16          THE COURT:  Okay.  Thank you.

17          MS. MARCUS:  Your Honor, I just wanted to note also

18    in connection with notice, I mentioned the LSTA website.  I've

19    also been reminded that the LSTA sent an e-mail to all of its

20    members this morning again setting forth notice of the hearing

21    and a description of the motion.

22          I think that was all the objections that needed

23    responding to.  And I think what we should do is save the

24    order -- the changes to the order till the end.

25          I mentioned, Your Honor, that James Seery of Barclays

27

1    Capital is present in the courtroom and is available to testify

2    if anybody thinks that's necessary.  But what I would like to

3    do is proffer his testimony.

4         THE COURT:  Is there any objection to an offer of the

5    witness' testimony by means of a proffer?  There's no

6    objection.  So why don't you proceed on that basis?

7         MS. MARCUS:  Okay.  Mr. Seery would testify that he's

8    currently employed by Barclays Capital and that until

9    approximately two weeks ago, he was employed by Lehman

10   Brothers.  He was a managing director of Lehman Brothers Inc.

11   and the head of the global loan business.  His responsibilities

12   included working on originating loans and managing LCPI and

13   Lehman's relationship as an agent bank on numerous loans.

14        He would describe Lehman's agency business as

15   follows:  in its role as agent, Lehman collects interest and

16   principal payments from borrowers.  It notifies lenders of

17   borrowing requests, collects amounts funded by the respective

18   lenders and makes advances of those amounts to borrowers.  It

19   also reviews and executes waivers and amendments requested by

20   borrowers in connection with their loans and it services the

21   loans on a regular basis.

22        LCPI acts as agent for approximately 150 loans

23   involving more than a thousand lenders.  He would also testify

24   that the account at Citibank, account number 30434141 is LCPI's

25   agency disbursement account, that it uses that account to take

28

1   payments in from lenders and to make payments to borrowers as

2   well as to receive payments of principal and interest from

3   borrowers for further repayment to the other members of the

4   lender group.

5           He would also testify that some small portion of the

6   funds in that agency account do constitute property of the LCPI

7   estate and that would represent LCPI's proportional share of

8   payments made with respect to loans in which it is not only the

9   administrative agent but also owns a piece of the loan itself.

10          Mr. Seery would testify that there would be

11  significant adverse consequences for both borrowers and lenders

12  if LCPI did not have immediate access to the agency account.

13  For borrowers, it is critical that they have access to their

14  working capital and if they didn't have that access, they might

15  have to default on their own obligations.  For lenders, lenders

16  have counted on payments of interest and principal and,

17  likewise, if they did not get those payments, they might not be

18  able to meet their obligations.

19          LCPI's intent with respect to its 150 agency

20  positions going forward is to seek to transfer those positions

21  in cooperation with both borrowers and lenders in those

22  credits.  He would also testify that Barclays itself might be

23  interested in taking an assignment or transfer of some of those

24  positions, again, if the other parties are on board with that

25  idea.

29

1    He would testify that in doing this, LCPI intends to

2    conform to the relevant credit agreement and does not intend to

3    improve its rights vis-a-vis the counterparties to those

4    agreements.  He would also testify that subsequent to the LBHI

5    bankruptcy, LCPI gave some thought and tried to sell those

6    agency positions but that there really isn't anybody interested

7    in buying those positions because the fees associated with

8    those agency positions are not substantial enough in many cases

9    even to cover the cost of doing the work.

10    With respect to the participations, Mr. Seery would

11    testify that it's essential for LCPI to, again, get itself out

12    of the middle of those relationships because of the cost of

13    being in that position and the administrative burden of being

14    in that position as well as to minimize any potential claims

15    against LCPI arising from its failure to comply with its

16    obligations under those agreements.

17    I think that covers it, Your Honor.

18    THE COURT:  The witness seems to agree that you've

19    done a nice job.  Is there anyone who wishes to cross-examine

20    the witness in connection with the offer of proof that has just

21    been made?  Is there any objection to my receipt of the

22    proffer?  I hear no response.  I accept the proffer as the

23    evidentiary record in support of the requested relief.

24    MS. MARCUS:  Your Honor, I have a blackline copy of

25    the order.  It's slightly different from the version that was

30

1   filed but doesn't include all the changes that people have

2   requested.  But I suppose it would be easier for you to follow

3   along with this one, if I may approach.

4          THE COURT:  You may approach.  Thank you.  Now,

5   before we go through the blackline, I have a question relating

6   to one comment made during the proffer and the statement that

7   was made during the presentation by counsel for Bank of

8   America.  To what extent does the order authorize without

9   further Court approval a party such as Barclays or Bank of

10  America or any other institution, for that matter, to step in

11  as to any or all of these transactions to take over the agency

12  role?  As I read this, the answer is not at all.  But maybe I

13  need to read it more carefully.  And it seems to me that if the

14  contemplation is that there is some major transaction that

15  either Bank of America or Barclays intends to enter into that

16  there should be a need to come back here.  What's contemplated

17  and why?

18         MS. MARCUS:  What was contemplated actually was that

19  we not come back to court.  I think it's -- I have so many

20  marks on this.  On the top of page 3, the second decretal

21  paragraph was intended to give the debtor the authority in its

22  business --

23         THE COURT:  Just let me make sure I'm in the right

24  spot.  Where are you?

25         MS. MARCUS:  On page 3, the second decretal

31

1    paragraph, "Order that pursuant to Sections 105(a) and 363(b)

2    of the Bankruptcy Code, the debtor is authorized and empowered

3    to transfer, assign or resign from any and all in its business

4    judgment."  That was intended to give the debtor the authority

5    without coming back to the court to do that.

6         Before you respond, based on what was in the proffer,

7    we don't believe -- there isn't anybody and we don't believe

8    that the agencies themselves have value.  So there isn't

9    anybody, to our knowledge, that is going to come in and pay a

10   lot, or a little, frankly, for these agency positions.  And

11   that's what I mentioned about the fact that the cost of

12   administering these agencies is actually more than the fee

13   that's received for those agencies.

14        THE COURT:  It seems to me, though, and I may be

15   misunderstanding the nature of this business, that there may be

16   significant value in the relationships --

17        MS. MARCUS:  That's exactly right.

18        THE COURT:  -- and that being agent is not about

19   collecting agency fees on a particular transaction as much as

20   it is having access to a rolodex of a thousand lenders to sign

21   up to some or all on some other deal.  At least that's my take.

22        MS. MARCUS:  That's exactly right and that's what

23   I've been told by Lehman.

24        THE COURT:  So there is value you may not be able to

25   ascribe in a classic fill in the blank sense to this but

32

1    there's clear commercial value to it.  And at least as I read

2    this order when I -- and I hadn't read it with the blackline,

3    obviously, 'cause I'm seeing that for the first time.  I did

4    not understand this to be -- not quite done.  I know you want

5    to meet and confer over there.  I did not understand this to be

6    a blanket authorization of what might be a wholesale transfer

7    of positions to one or more major institutions because that

8    hasn't been disclosed.  And I'm not saying that I'm opposed to

9    it.  I'm just questioning whether or not this very general

10   language provides that kind of authority.  Now, we can talk

11   about whether or not it should or does.  But I'm telling you

12   that, as I read it, my immediate reaction was that it didn't.

13          MS. MARCUS:  It was intended to, Your Honor.  And I

14   think that it's clear Barclays was originally looking at a

15   rather large -- Barclays -- at a rather large group of these.

16   I want to say twenty-four?  Twenty-four of them.  Okay.  I

17   think we'll address this by putting Mr. Seery on the stand if

18   that's okay with you, Your Honor.

19          THE COURT:  Okay.

20          MS. MARCUS:  Since he has the facts, I can -- and be

21   helpful.

22          THE COURT:  Do you want to take a break and talk to

23   your witness or do you want to just go cold?

24          MS. MARCUS:  We'll wing it.

25          THE COURT:  It's another exciting afternoon in the

33

1   Lehman case.

2        (Witness duly sworn)

3             THE COURT:  Please be seated.

4             THE WITNESS:  Thank you.

5   DIRECT EXAMINATION

6   BY MS. MARCUS:

7   Q.   Please state your name for the record.

8   A.   Jim Seery from Barclays Capital.

9   Q.   And, Mr. Seery, you heard in the proffer that I presented

10   earlier may refer to the fact that you were previously employed

11   by Lehman Brothers.  Could you describe your prior employment

12   by Lehman Brothers, please?

13   A.   Yes.  Quickly, I was at Lehman Brothers for approximately

14   nine and a half years.  I ran the global loan business in my

15   last position.  In that position, I was responsible for the

16   agency business which we're discussing today and that reported

17   up to me.  That business I think you described well in the

18   proffer as to what generally the agency business does.

19   Essentially, it's an administrative function.  So Your Honor

20   mentioned that you do have a rolodex.  But virtually everybody

21   in the business has the same rolodex.  So there's no new

22   lenders or discovery other than you do know in each credit who

23   the lenders are in those credits and that could potentially

24   help you trade those credits slightly better.

25        The real issue is that there's an administrative burden to

34

1   being the agent. And I think those were amply described by

2   counsel. And the cost of maintaining that service, only a few

3   institutions can do. We had looked, meaning LCPI had looked at

4   transferring all of the agency to Barclay for an administrative

5   convenience and then have Barclays resign those if the

6   relationship wasn't enough to merit supporting that agreement.

7   Barclays was unwilling to do that because of the cost and

8   burdens of taking on all those agencies. That's particularly

9   acute where the estate has not met certain liabilities with

10   respect to ongoing relationships for borrowing. That is, has

11   not fulfilled certain commitments with respect to revolving

12   credit facilities. Those obligations were not purchased by

13   Barclays. So to the extent that Barclays can have a

14   relationship with that borrower, it's going to be in respect of

15   Barclays' ability to service that borrower through banking and

16   providing capital, not through a preexisting LCPI relationship.

17   So there's really not a significant advantage other than for

18   lenders who are in that credit and want to be in it. So I

19   can't speak to necessarily BofA's motives for doing it for

20   Archstone other than to tell you there's only three or four

21   lenders in that credit. And if LCPI is out, they want to have

22   an agent they feel confident in and presumably they feel

23   confident in themselves. But there's not a significant value

24   to an entity coming and taking all of these agencies and we

25   wouldn't purport to do it on a wholesale basis. For Barclays,

35

1    they'll take some if it's appropriate ad the borrower feels

2    that's appropriate and Barclays is in the credits or has some

3    other relationship with that borrower.  For others, we'll look

4    to different lenders like GECC or Citibank or whomever is in

5    that credit and try to make those transfers in the most

6    efficient way as possible.  It's really about administrative

7    convenience; it's not about value.

8            THE COURT:  I have a question, if you don't mind.

9    Have all of the people who used to work in this business at

10   Lehman for all practical purposes moved over to Barclays or has

11   there been significant loss in personnel?

12           THE WITNESS:  There has not yet been significant loss

13   in personnel primarily because all of them have moved to

14   Barclays and are currently Barclays employees and are being

15   paid by Barclays.  Barclays has a business that does agency

16   work.  It wasn't nearly this size or is not nearly this size of

17   Lehman's existing business.  We're working on a possible

18   transition of certain portions of those businesses.  It's

19   unlikely that all of those personnel and all of that business

20   would follow to Barclays.  So some portion certainly will

21   transfer and we're trying to do that in the most efficient way

22   possible both with respect to the LCPI businesses as well as

23   the Barclays businesses and for the best interest of as many

24   employees as we can.  Certain of the employees in both

25   businesses may not continue in the capacities that they're in.

36

1          So, all of the employees have moved to Barclays.

2     LCPI never had employees that I'm aware of.  They actually were

3     employed by Lehman Brothers Inc.  The services are being

4     provided to LCPI under a transition services agreement that was

5     part of the sale and the accompanying documents and agreements

6     that related to the sale.

7          THE COURT:  Okay.  Thank you.

8     Q.   Mr. Seery, I have one follow-up question.  Has Alvarez and

9     Marsal, the CRO, been involved in LCPI's decisions regarding

10    what to do about the agency positions and what to do with the

11    participation?

12    A.   Very much so.  What -- the way LCPI and the existing

13    businesses have worked is that anything that would relate to a

14    transfer of assets out of LCPI be it in respect of a loan or

15    any other type of security or other arrangement has been worked

16    through Alvarez with counsel from -- for the debtor.  So we

17    want to make sure that as CRO for the holding company, we

18    believe for the subsidiaries, Alvarez has been intimately

19    involved in any of those decisions in trying to do it only in

20    the ordinary course.  If there's anything extraordinary, I

21    expect that we would be back here.

22         MS. MARCUS:  I have no further questions.

23         THE COURT:  Is there any one that wishes to examine

24    the witness?  Apparently, the answer to that is yes.

25         MS. SCHONHOLZ:  Thank you, Your Honor.

37

1    CROSS-EXAMINATION

2    BY MS. SCHONHOLZ:

3    Q.   Good afternoon, Mr. Seery.  Margot Schonholz for BofA.  To

4    your knowledge, there have been no discussions with BofA

5    concerning taking over all the agencies, have there been?

6    A.   Not to my knowledge.

7    Q.   Okay.  And you have no reason to believe that they would

8    be interested in taking over all the agencies, do you?

9    A.   I have no such belief.

10   Q.   Okay.  You testified that BofA might be interested in

11   taking over the Archstone agency, is that correct?

12   A.   Only because I heard you say it earlier.

13   Q.   And there are only three lenders in that facility, is that

14   right?

15   A.   I believe there's a fourth.

16   Q.   But of the four, one of the four is LCPI, is that correct?

17   A.   There's a -- there's a very small lender you may not be

18   aware of yet.

19   Q.   Okay.

20        MS. SCHONHOLZ:  I have no further questions, Your

21   Honor.

22        THE COURT:  Anyone else?  Then the witness is

23   excused.

24        THE WITNESS:  Thank you, Your Honor.

25        THE COURT:  Thank you.

38

1          MS. MARCUS:  Now we can go through the order.  On

2     page 2 of the order, Your Honor, after the second decretal

3     paragraph, a number of parties have asked and we have agreed to

4     insert the following language.  "Ordered that the funds in the

5     agency account are not property of the debtors' estate except

6     to the extent of the debtors' proportional share of such funds

7     as lender."  And then it goes on, "And it is further" --

8          THE COURT:  Can you tell me, if you know, what we're

9     talking about in terms of dollars or percents of the funds that

10     are in the agency account?  What's property of the estate?

11     What's not property of the estate?

12          MS. MARCUS:  Do you know?

13          MR. SEERY:  There's currently seventy-one million

14     dollars in the account.  I do not have a breakdown.  Between

15     the percentage that's Lehman's and the percent that would be

16     parties for whom we would be acting as agent.  It would have to

17     be less than ten percent, I would think, Your Honor, but we can

18     come back to the court with some specifics.

19          THE COURT:  It was just --

20          MS. MARCUS:  A small --

21          THE COURT:  -- a small amount.  Okay.

22          MS. MARCUS:  Okay.

23          THE COURT:  I think the language covers it but

24     there's nothing in the record that relates to it.  So --

25          MS. MARCUS:  Right.

39

1       THE COURT:  -- I'm happy to have that clarification.

2       MS. MARCUS:  Turning over to page 3, for those

3   parties who don't have the blacklined version, in the second

4   decretal paragraph, I think in the version that was filed with

5   the court, it ended "in accordance" -- this is regarding the

6   administrative agent positions.  It ended "as it determines in

7   accordance with its business judgment".  And we added "subject

8   to and in accordance with the provisions of the applicable

9   credit agreements" and have been requested to insert "or

10  customary successor agency agreements to facilitate the orderly

11  transfer of LCPI's agency duties provided that no agreement

12  providing for the transfer of such positions shall impose on

13  the debtor affirmative obligations that could give rise to

14  administrative expense claims."  And I think that addresses

15  some concerns of BofA as well as of the committee.

16      MS. FINK:  Could you read that again slowly?

17      MS. MARCUS:  Sure.

18      MR. PALMER:  Do you have copies of that available?

19      MS. MARCUS:  No.

20      MR. PALMER:  Read it slowly, please.

21      MS. MARCUS:  Sure.  At the end of the paragraph --

22  let me read the whole paragraph.  It's easier.  "Ordered that

23  pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code,

24  the debtor is authorized and empowered to transfer, assign or

25  resign from any and all administrative agent positions as it

40

1    determines in accordance with its business judgment subject to

2    and in accordance with the provisions of the applicable credit

3    agreements or customary successor agency agreements to

4    facilitate the orderly transfer of LCPI's agency duties;

5    provided that no agreement providing for the transfer of such

6    positions shall impose on the debtor affirmative obligations

7    that could give rise to administrative expense claims."

8              MR. PALMER:  Excuse me?

9              MS. MARCUS:  Sorry, Your Honor.

10             THE COURT:  Mr. Palmer?

11             MR. PALMER:  Your Honor, Deryck Palmer of Cadwalader

12   on behalf of Citibank.  What I was asking counsel for

13   clarification as to the extent there are any fees due to

14   Citibank as the bank that has this account, I want to make sure

15   this language that's being read into the record is not so broad

16   to prevent the payment of those fees 'cause those would be

17   administrative expenses that would be due and owing to

18   Citibank.  So counsel was explaining to me that it was not

19   intended to affect that but I just wanted to make sure that's

20   on the record.

21             THE COURT:  We now know publicly that it was not

22   intended to affect that.  And I take it that that would satisfy

23   your concern, Mr. Palmer?

24             MR. PALMER:  If it's not intended to affect that, it

25   does, Your Honor.

41

1          THE COURT:  Fine.

2          MS. MARCUS:  Okay.  Another further clarification on

3     that language, Your Honor, where we inserted "or customary

4     successor agency agreements", I've been asked to clarify that

5     that doesn't override the provision that we comply with the

6     existing agreement.  And that was really additive.  To the

7     extent that a particular lender, meaning BofA in this case, I

8     guess, didn't have that language in their agreement, they might

9     want additional language but that it isn't intended to override

10    the proviso that we have to comply with the existing

11    agreements.  Does that do it?  Okay.

12         The next one, Your Honor, is in the third decretal

13    paragraph, again on page 3 --

14         THE COURT:  The people listening in on the phone are

15    really missing out on the scene which is playing out before me

16    here with all the whispering going on.

17         MS. MARCUS:  I apologize, Your Honor.

18         THE COURT:  It's not your fault.  It's nobody's

19    fault.  It's just the nature of this particular hearing.

20         MS. MARCUS:  The language where we talk about "will

21    not impose on the debtor affirmative obligations" will also say

22    "or indemnities that could give rise to administrative expense

23    claims".

24         Okay.  The next one is the third decretal paragraph.

25    And this is the one that deals with elevating participations.

42

1    And we've agreed to insert -- and I'll just read the paragraph

2    as revised.  I think it's easier.  "Pursuant to Sections

3    105(a), 363(c) and 363(b) of the Bankruptcy Code, the debtor is

4    authorized and empowered in consultation with the committee to

5    elevate participations and sub-participations subject to and in

6    accordance with and to the extent permitted by the provisions

7    of the applicable credit agreements."

8           And there's one more.  One more new paragraph.  And

9    that will go right after the third decretal paragraph.  This is

10   another one requested by the creditors' committee.  "Ordered

11   that notwithstanding such elevation of participations or sub-

12   participations, neither the debtor nor the committee nor any

13   party in interest shall, by virtue of this order, waive the

14   right to subsequently argue that such participations or sub-

15   participations are not true participations."

16          And with that, I think that's all of the changes that

17   have been requested and everything we've agreed to.

18          Somebody asked me to clarify on the record that

19   consent rights and possible setoff rights will be dealt on a

20   consensual basis with the agents and the borrowers and that,

21   again, we're not intending to affect the relative rights.  And

22   that's all I have, Your Honor.

23          MS. CATON:  Your Honor, Amy Caton from Kramer Levin

24   on behalf of Contrarian and Abrams.  Due to the nature of the

25   order and the fact that it generally refers to credit

43

1    agreements instead of all participations, I think we would like

2    to request either enlarging the definition of participations to

3    include all participations in claims or adding a decretal

4    paragraph at the end of the order providing that.  In addition,

5    we'd like to make it clear that monies received in respect of

6    such participations are not property of the estate but to be

7    turned over to the beneficial holders.  And the reason that we

8    need this language in there is that we're not sure that our

9    money that would be coming into the estate would actually come

10   through the agency account.  And so, I think we would want to

11   clarify on that point.  And I'm happy to work out language with

12   counsel.

13            THE COURT:  Is the debtor willing to provide that

14   comfort?

15            MS. MARCUS:  I think the debtor is, Your Honor.  I'm

16   not sure if the committee has a position on that.  So we'll

17   work on language, Your Honor.  We would like to get an order

18   entered today if it's all possible.  We do have a computer and

19   a disk and everything.  We can make these changes.

20            THE COURT:  That is possible.  My suggestion is that

21   the issue with respect to the Enron claims might be the subject

22   of some quick drafting so that it can be included in in order

23   to be entered this afternoon.  And I also think it would be

24   useful for any other party in interest who has been active in

25   this afternoon's hearing and who wishes to have sufficient time

44

1    to review, evaluate and get comfortable with the language that

2    has been read into the record that those parties stay in the

3    courtroom after we adjourn so that the order which is

4    ultimately entered is one that has the input of all interested

5    parties who have been active today.

6           Is there anyone who, on the basis of the record that

7    has been developed and the clarifications to the order, who

8    objects to the entry of that order as it has been reflected on

9    the record?  I hear no objections.  That doesn't mean that

10   parties may not have concerns, particularly because this is

11   happening so quickly.

12          I'm satisfied, based on the record, that the relief

13   that's being sought today, while unusual in my experience, is

14   nonetheless critically important to not only Lehman Commercial

15   Paper Incorporated as a newly filed affiliated debtor entity

16   but to the numerous participants, counterparties, borrowers and

17   others who are interested in the various facilities that are

18   ultimately being affected by this relief.  Additionally, I

19   understand the need of Citibank in connection with account

20   30434141 to be assured that payments can be made in the

21   ordinary course without under risk, perhaps without any risk.

22   And so, this is an order which is necessary in order to

23   facilitate the reorganization of Lehman Commercial Paper but

24   also to facilitate the loan transactions that are at the heart

25   of the agency business that it has been described.

45

1          I'm prepared to approve the order in the form in

2     which it has been modified and appreciate the fact that the

3     record was supplemented by live testimony to answer certain

4     questions that I had.

5          Now that I've taken care of that matter, I have a

6     couple of unrelated comments which I would simply like to

7     address to counsel for the debtor.  And these comments relate

8     to the growing family of Lehman related entities that are now

9     before me.

10         I'm holding up so you can see it a homemade chart

11    which I have made -- actually, it was made for me by one of my

12    clerks at my request.  It's an attempt to understand the

13    corporate family that is presently before me including filed

14    and unfiled affiliated entities.  And as a result of this

15    exercise, I've come to the conclusion that I really need some

16    more information from debtor's counsel at the status conference

17    to be held on the 16th to include if not a flow chart at least

18    a better understanding than I currently have as to why these

19    particular debtors who have been filed, the relationships that

20    they have to each other.  I assume that orders will be sought

21    in each of the newly filed cases, comparable to the ones

22    entered as recently as last Thursday, to have general

23    administration orders applied to each of the companies.

24         But this is an example of an evolving Lehman story

25    which I'd like to know more about.  It came as something of a

46

1    surprise to me that we had so many filings over the weekend.

2    And I can live with surprises but if I can have them softened

3    by some advance notice, that's even better.

4         MR. WAISMAN:  Your Honor, Shai Waisman, Weil Gotshal

5    & Manges on behalf of Lehman Brothers.  Your Honor's comments

6    are very well taken and completely understood.  First, as to

7    the sudden nature of all of the filings from the first day on,

8    they very much have been reactionary by the debtors and by us

9    working unfortunately very much at the last minute with some of

10   these.  The filings, in particular this weekend, and we can get

11   into further detail at the status conference on the 16th, but

12   the filings this weekend were necessitated really to protect

13   entities that had bank accounts which had cash in them where

14   there was sudden concern that certain parties may set off as a

15   result of certain actions at the end of last week.  It was not

16   anticipated.  I can assure Your Honor that sitting in my office

17   as late as Friday at 6 in the evening that this wasn't even on

18   anyone's radar.  And we do regret having to repeatedly subject

19   Your Honor to walking in on a Monday morning or any weekday

20   morning to find additional entities and requests for immediate

21   relief.

22        Your Honor is correct.  There will be an identical

23   all orders motion presented that we would hope to have heard on

24   the 16th such that all the administrative and some of the

25   substantive motions and orders that have been granted will

1    apply to these debtors as well.

2         As to the organizational structure and how these

3    entities fall into that organizational structure, how they

4    relate one to the other, we will endeavor to present something

5    to Your Honor.  It is something that we have worked on from the

6    very moment we were engaged because that's obviously how you

7    prepare for a Chapter 11 case.  This is, by last count, an

8    empire that included over 4,000 legal entities.  And

9    understanding where they lie in the family tree and how they

10   relate one to the other is an endeavor that many people are

11   involved with and not one with which we've been able to present

12   with some certainty an organizational chart.  Otherwise, we

13   would have had it for Your Honor.  We hope to have one before

14   the 16th and to provide it to Your Honor and to chambers to

15   hopefully facilitate an understanding of the interrelationships

16   here.  Thank you.

17        THE COURT:  Okay.  My last general question.  This

18   may not be an accurate count but I think it's pretty close.

19   Based upon our review of the docket in the Lehman Brother's

20   Holdings case, there are 136 cure objections in connection with

21   the Barclays sale.  I'd like to know what the debtors' view is

22   as to how more sufficiently to deal with those cure objections.

23   I don't have to know the answer now because I recognize that

24   I'm going off the pure agenda of today's hearing.  But I am

25   concerned administratively that what we talked about on

48

1    September 19th as a deferral of cure objections to a later date

2    has turned into a significant case management problem at least

3    as I observe it from my end.  It may be that it's not a problem

4    because of the language the debtors and the committee and

5    others are dealing with these issues.  But I'm interested in

6    knowing, not necessarily now but sometime soon, how this will

7    be addressed so as to manage what could otherwise be an

8    unmanageable problem.

9           MR. WAISMAN:  Shai Waisman again, Your Honor.  As

10   Your Honor may recall in connection with the Barclays sale and

11   the assumption and assignment of purchase contracts, Barclays

12   took responsibility for all payment of all cure amounts and set

13   an October 3rd deadline for objections based on cure amounts.

14   And that's the reason for the volume of objections.

15   Instructions were actually posted on the claims agent website

16   on how parties with cure objections should proceed and

17   instructed them to contact Barclays' counsel and/or file

18   objections.  My understanding is that Cleary Gottlieb, on

19   behalf of Barclays, is working with those counterparties trying

20   to reach consensual resolution.  And to the extent they cannot

21   reach consensual resolution as to cure amounts, there would be

22   proper notice, including coordination with chambers, as to a

23   hearing with respect to any specific cure issue and any

24   evidentiary hearing.  But until that point in time, my

25   understanding is, for your purposes, chambers can largely

49

1    ignore those cure objections because the intent --

2         THE COURT:  That's exactly what I wanted to hear.  I

3    was only slightly teasing.  I'm assuming the bulk of these will

4    get resolved one way or the other and that it's conceivable

5    that some may require judicial intervention.

6         One thought that has occurred to me and you might

7    share this with counsel for Barclays is that some alternative

8    dispute resolution mechanism for the resolution of cure

9    disputes might be appropriate in order to minimize expense to

10    parties.  And I'm mindful of the fact that having an

11    evidentiary hearing could turn out to be burdensome both to the

12    estate and to the parties who have a dispute as to the cure

13    amount.  I don't want the fact that it is burdensome to be used

14    as a club to beat into submission parties who've raised

15    objections to the cure amount claim.  I'm just using that as a

16    kind of vivid image.  And so, one of the things I'd like

17    counsel to think about with counsel for Barclays is whether

18    there is a particular efficient alternative approach that could

19    be adopted before there's a need for judicial intervention, in

20    effect, to have a halfway house between consensually working it

21    out to working it out with ADR.  And then the final circle

22    would be then we'd have a hearing after everything else had

23    failed.

24         MR. WAISMAN:  Your Honor, I will take that back to

25    the Cleary firm and report to Your Honor at the status

50

1    conference if not before.

2         THE COURT:  That's fine.  My simple point is that I

3    want to minimize to the extent we can unnecessary

4    administrative expenses for all concerned.

5         MR. WAISMAN:  Understood, Your Honor.  Perhaps then

6    if that addresses all of Your Honor's questions --

7         THE COURT:  That does.

8         MR. WAISMAN:  -- perhaps if we could have half an

9    hour here --

10        THE COURT:  Sure.

11        MR. WAISMAN:  -- in Your Honor's courtroom, we would

12   then submit a consensual order to chambers either on disk or --

13   I think we're having slight technical difficulties with our

14   computer.  Perhaps we would submit a hand-marked order with the

15   original order on a disk.

16        THE COURT:  Whatever works best for counsel.  We'll

17   be flexible.

18        MR. WAISMAN:  Thank you, Your Honor.

19        THE COURT:  Okay.

20        MR. WAISMAN:  Thank you again for seeing us on such

21   short notice.

22        THE COURT:  Sure.  We're adjourned.  Thank you.

23        MS. MARCUS:  Thank you, Your Honor.

24        (Whereupon these proceedings were concluded at 4:25 p.m.)

25

51

1

2                        I N D E X

3

4                      T E S T I M O N Y

5

6    WITNESS              EXAM BY                    PAGE

7    James Seery          Ms. Marcus                 33

8    James Seery          Ms. Schonholz             37

9

10                       R U L I N G S

11   DESCRIPTION                          PAGE    LINE

12   Debtor Lehman Commercial Paper Inc.'s motion   45      1

13   for authority to continue to use agency bank

14   accounts, terminate agency relationships and

15   elevate loan participation approved pursuant to

16   modifications made on the record

17

18

19

20

21

22

23

24

25

52

1

2                    C E R T I F I C A T I O N

3

4      I, Lisa Bar-Leib, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      LISA BAR-LEIB

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, NY 11501

14

15     Date:  October 8, 2008

16

17

18

19

20

21

22

23

24

25