WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
:
**In re** : **Chapter 11 Case No.**
:
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.* : **08-13555 (JMP)**
:
**Debtors.** : **(Jointly Administered)**
:
------------------------------------------------------------------x

**OMNIBUS REPLY TO OBJECTIONS TO DEBTORS' MOTION TO
(A) ESTABLISH SALES PROCEDURES; (B) APPROVE A SELLER
TERMINATION FEE AND A REIMBURSEMENT AMOUNT; AND
(C) APPROVE THE SALE OF THE PURCHASED ASSETS AND THE ASSUMPTION
AND ASSIGNMENT OF CONTRACTS RELATING TO THE PURCHASED ASSETS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), as and for their reply to the various objections (collectively, the "Objections") interposed to the Debtors' motion (the "Sale Motion") to

establish sales procedures, approve a Seller Termination Fee and a Reimbursement Amount,[1] and approve the sale of the Purchased Assets and the assumption and assignments relating to the Purchased Assets, respectfully represent:

## Preliminary Statement

1. After around-the-clock negotiations during the course of two weeks following the commencement of these chapter 11 cases, the Debtors and the Sellers entered into the Purchase Agreement with Bain and H&F for the sale of the IMD business. The Purchase Agreement has already provided to the Debtors and their estates significant benefits in terms of stabilizing the IMD business and stemming the loss of customers, assets under management, and critical employees. The Purchaser and the Purchase Agreement will continue to provide benefits to Debtors and their estates – as a committed stalking horse through a prolonged diligence and full and fair auction process.

2. None of the objectors oppose the sale of the IMD business; yet they want the benefits of the Purchase Agreement with Bain and H&F but none of the burdens. However, the Purchase Agreement is the product of extensive negotiation with a great deal of give and take. Indeed, the quid pro quo for many of the beneficial provisions such as the 60-day due diligence period was the Seller Termination Fee and the Reimbursement Amount. Parties should not be permitted to cherry pick provisions in an agreement that is a package deal.

3. It is urgent to sell the Purchased Assets now or face the material disruption of their value. It is each of the Sellers' and the Debtors' reasonable business judgment that a sale process governed by the proposed Bid Procedures Order, as required by the Purchase Agreement, will achieve the maximum recovery from the Purchased Assets and be in the best

---

[1] Capitalized terms used but not defined shall have the meanings ascribed to them in the Motion or in the Purchase Agreement (as defined in the Motion).

interests of the Sellers, the Debtors, and their economic stakeholders. Contrary to the objectors' assertions, the proposed Bidding Procedures will provide parties with more than ample opportunity to bid on the Purchased Assets in an open auction process.

## Reply to Objections

4. The following charts summarize the Objections and the Debtors' reply thereto.[2] For the following reasons, the Objections should be overruled.[3]

---

[2] The chart is qualified entirely by the terms of the Purchase Agreement. To the extent there are any inconsistencies between the description of the Purchase Agreement contained in the chart and the terms and conditions of the Purchase Agreement, the terms of the Purchase Agreement shall control. The characterizations of the Purchase Agreement in the chart represent the understanding of the Debtors and do not necessarily represent the understanding of the Purchaser or any other persons.

[3] Lehman denies many of the factual and legal assertions and characterizations contained in the Objections. Nothing contained herein shall be deemed an admission or acceptance of any statement contained in the Objections.

| 1. Objection of the Informal Noteholder Group | (Docket No. 928) |
|---|---|
| **Objection** | **Response** |
| <ul><li>The Seller Termination Fee should be reduced. (¶¶ 2, 11-15.)</li></ul> | <ul><li>Break-up fees should be approved as long as (i) the relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction.[4]<ul><li>There is no allegation of self-dealing.</li><li>The Sellers and the Debtors have been advised by Lazard Frères & Co. LLC ("Lazard"), their investment bankers, that the Seller Termination Fee should not hamper bidding. The Objection argues otherwise without basis.</li><li>The Seller Termination Fee is reasonable in relation to the size of the transaction. Bankruptcy courts in this district and others have approved proportionate fees when compared to the value of the assets sold. Break-up fees greater than three – and even four – percent, while infrequent, are not without precedent.[5]</li></ul></li><li>The Objection grossly exaggerates the size of the Seller Termination Fee with calculations that combine the Seller Termination Fee with the separate and distinct Reimbursement Amount, include hypothetical purchase price adjustments and assume no recovery from a holdback.</li><li>A reduction in the Seller Termination Fee would have a negligible effect on the bidding. Each percentage reduction would reduce the incremental value required by an overbid by only 0.03% of the Base Purchase Price and only 0.04% of the anticipated net purchase price.</li></ul> |

---

[4] Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993).

[5] See, e.g., In re Global Crossing Ltd., Case No. 02-40188 (REG) (Bankr. S.D.N.Y. Mar. 25, 2002) [Docket No. 715] (approving break-up fee equal to 4% of the value of cash investment); In re Delphi Corp., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Aug. 2, 2007) [Docket No. 8856] (approving break-up fee greater than 3.24% of value of equity investment); In re GT Brands Holdings LLC, Case No. 05-15167 (PCB) (Bankr. S.D.N.Y. July 28, 2005) [Docket No. 85] (approving break-up fee equal to 3.13% of the value of assets); In re Genuity Inc., Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. Dec. 16, 2002) [Docket No. 142] (approving break-up fee equal to 4.13% of the value of assets); In re ATA Holdings Corp., Case No. 04-19866 (BHL) (Bankr. S.D. Ind. Nov. 19, 2004) [Docket No. 438] (approving break-up fee equal to 3.71% of the value of assets); In re Vartec Telecom, Inc., Case No. 04-81694 (Bankr. N.D. Tex. June 30, 2005) (HDH) [Docket No. 1446] (approving break-up fee equal to 3.25% of the value of assets); In re Jernberg Indus., Inc., Case No. 05-25909 (JHS) (Bankr. N.D. Ill. July 21, 2005) [Docket No. 222] (approving break-up fee equal to 3.33% of purchase price, including assumed liabilities). Paragraph 45 of the Sale Motion erroneously cited the court in In re Fruit of the Loom, Inc., Case No. 99-4497 (PJW) (Bankr. D. Del. 1999) as having approved a break-up fee of 3.59%. The break-up fee approved in that case was between 2.7% and 3.29% of the value of the assets sold.

NY2:\1927474\03\15B8Y03!.DOC\58399.0003                                                                4

| | |
|---|---|
| ▪ The Seller Termination Fee should only be paid from the proceeds of a Competing Transaction. (¶¶ 2, 16.) | ▪ The Seller Termination Fee is only payable if (a) the Purchaser is not selected as the Successful Bidder at the Auction, or (b) Seller enters into a definitive agreement with respect to a Competing Transaction or a Competing Transaction is consummated. (Purchase Agreement § 3.5(b).) In other words, it will only be paid if (a) the Sellers and the Debtors determine that they can receive a higher or better return for their estates, after taking into account the obligation to pay the Seller Termination Fee, or (b) the Seller Termination Fee is paid out of the proceeds of a Competing Transaction. |
| ▪ The Reimbursement Amount should be reduced and limited to actual and reasonable out-of-pocket expenses. (¶¶ 2, 17-18.) | ▪ The conditions upon which the Debtors and the Sellers are obligated to pay the Reimbursement Amount are not unusual. The Objection simply suggests that the Reimbursement Amount itself is too high. The Objection fails to address several important, mitigating factors.<br>   o The Reimbursement Amount is intended to cover the out-of-pocket expenses of two parties – the Purchaser's two sponsors, which the Debtors and the Sellers suggested partner to ensure a transaction could be consummated without any dependence on the debt financing markets, which had continued to deteriorate.<br>   o Despite an arguably-high maximum, the Purchasers will only be entitled to "reasonable out-of-pocket fees, costs and expenses" for the Reimbursement Amount. "Reimbursement Amount" is already defined as, and therefore limited to, "reasonable out-of-pocket fees, costs and expenses." (Purchase Agreement § 1.1.)<br>▪ This Court has previously approved reimbursement of expenses for stalking horse bidders without maximum limits.[6] Courts in this district, as well as others, have also approved reimbursement of expenses for stalking horse bidders with maximum limits comparable to the Reimbursement Amount, as a percentage of purchase price.[7] |
| ▪ The Purchaser should not be entitled to both the Seller Termination Fee and the Reimbursement Amount. (¶¶ 2, 17-18.) | ▪ A break-up fee and an expense reimbursement serve distinct purposes, and it is common for a stalking horse to be awarded both a reimbursement of expenses – to make the stalking horse whole – and a break-up fee – to encourage stalking horse bidders to participate in an uncertain process. |
| ▪ The Purchaser should only be entitled to credit bid the Seller Termination Fee plus actual, reasonable out-of pocket expenses incurred to date. (¶ 19.) | ▪ "Reimbursement Amount" is defined as, and therefore limited to, "reasonable out-of-pocket fees, costs and expenses." (Purchase Agreement § 1.1.) The Purchaser is not permitted to credit bid more than what it has incurred (i.e., the maximum aggregate amount), as suggested in the Objection. |

---

[6] See, e.g., In re Delphi Corp., 05-44481 (RDD) (Bankr. S.D.N.Y. Aug. 2, 2007) [Docket No. 8856] (adopting alternate structure, including creditors' committee review of invoices).

[7] See, e.g., In re Parmalat USA Corp., Case No. 04-11139 (RDD) (Bankr. S.D.N.Y. Aug. 5, 2004) [Docket No. 579] (approving expense reimbursement up to 1.52% of the total sale value); In re GT Brands Holdings LLC, Case No. 05-15167 (PCB) (Bankr. S.D.N.Y. July 28, 2005) [Docket No. 85] (approving expense reimbursement up to 1.25% of the total sale value); see also In re Jernberg Indus., Inc., Case No. 05-25909 (JHS) (Bankr. N.D. Ill. July 21, 2005) [Docket No. 222] (approving expense reimbursement equal to 2% of the total sale value).

| | |
|---|---|
| ▪ The Purchaser should not be permitted to increase its bid in order to be deemed the Starting Bid at the Auction. (¶ 2.) "This provision is likely to discourage third party bidders from participating in the auction process because such provision, at the very least, creates the appearance of an uneven playing field." (¶ 20.) | ▪ Neither the Sellers nor Lazard believe this provision would chill bidding or prevent participation in an auction. No seriously interested party would be discouraged by what, in effect, is the Purchaser's right to be the first bidder at the Auction.<br>▪ This provision refers only to the Starting Bid at the Auction – not the selection of a Successful Bidder at the conclusion of the Auction. The Purchaser has no right to match and top an otherwise Successful Bidder at the conclusion of the Auction. |
| ▪ The Initial Overbid should be reduced. (¶¶ 2, 21.) | ▪ The Objection's description of the Initial Overbid is incorrect and misleading.<br>   o It is <u>not</u> calculated using the "<u>Gross</u> Purchase Price" or a "<u>maximum</u> Reimbursement Amount" of $35 million, as the Objection states. (Objection ¶ 2 (emphasis added).)<br>▪ The proposed Bid Procedures Order makes clear that the overbid shall have a value to the Sellers, "as determined by the Sellers in their sole discretion," based on the "<u>net</u> amount the Sellers would receive under the Purchase Agreement," and actual, out-of-pocket expenses, not a pre-set maximum. (Bid Procedures Order at A-3.) |
| ▪ Consents or approvals should be only one factor in determining the highest and best offer, not the determining factor. (¶ 2.) | ▪ The Bid Procedures Order does not provide otherwise. The Sellers and the Debtors have reserved their right to determine, in their reasonable discretion (after consultation with the Creditors' Committee) which bid is the highest or best. (E.g., Sale Mot. ¶ 33; Bid Procedures Order at A-4.) |
| ▪ Prohibitions on parties working together to submit a Qualified Bid must be stricken from the applicable confidentiality agreement. (¶ 3.) | ▪ The proposed confidentiality agreement does not prohibit parties from working together to submit a Qualified Bid. It simply requires prior written consent of the Sellers and the other party to executing a similar confidentiality agreement. |
| ▪ The Purchase Agreement should not be the approved as the form against which competing bidders will bid. (¶¶ 4, 22-23.)<br>▪ In particular, certain purchase price adjustments and closing conditions are objectionable. (¶¶ 23-25.)<br>▪ The rationale for retaining liabilities in respect of capital commitments to funds the Sellers will no longer own and the scope of these retained liabilities is not apparent. (¶ 26.) | ▪ The purchase price adjustments and closing conditions in the Purchase Agreement are fair and reasonable and rational due to the nature of the Purchase Assets. The provisions in the Purchase Agreement reflect the fact that the value of the Sellers' business is highly variable and largely outside of the Sellers' control. Unlike the fixed assets of a more traditional company, the significant majority of the value of the Purchased Assets resides in IMD's employees and its customers – neither of which is obligated to remain with the business. The Purchasers are willing to purchase an ongoing business, but are justified in requiring adjustments to the purchase price and even walk-away rights if the business does not exist in the same form when the Sellers and the Purchaser are prepared to consummate a transaction. In this case, regulatory approvals and other non-bankruptcy consents necessitates an additional period of delay between Bankruptcy Court approval of the transaction and consummation of the transaction.<br>▪ The Purchaser is unwilling to purchase the Excluded Assets and unwilling to assume the Excluded Liabilities, including certain capital commitments. |

| | |
|---|---|
| ▪ The deadline to interpose objections to the sale of the Purchased Assets should be no earlier than two days after the Auction. (¶ 22 n.6.) | ▪ In return for its consent to a 60-day diligence period and a full and fair auction process (which begins 17 days after the Purchase Agreement was first executed), the Purchaser has required that the Auction occur the first Business Day after entry of the Bid Procedures Order and that the Sale Hearing Occur the first Business Day two days thereafter.<br>▪ The proposal in the Objection would establish an objection deadline on the date of the Sale Hearing and would prevent the Debtors from having an opportunity to consider or consensually resolve any objections.<br>▪ Parties in interest may always reserve their rights and supplement their objections, as necessary. |

| 2. Limited Objection of the Creditors' Committee | |
|---|---|
| | **(Docket No. 938)** |
| **Objection** | **Response** |
| ▪ The Purchaser's obligation is too conditional, given the volatility and unpredictable status of the financial markets. (¶¶ 4.) | ▪ <u>See</u> above Response to Objection of the Informal Noteholder Group. |
| ▪ The Purchaser should not be permitted to cause the filing of additional affiliated entities until after the Auction and only if the Purchaser is the Successful Bidder. (¶¶ 4, 8-9.)<br>  o "<u>Upon information and belief</u>, certain parties interested in the IMD <u>may prefer</u> that no additional entities file chapter 11 petitions…" (¶ 8.) | ▪ This provision was incorporated to protect creditors of the Company Group.  The Court must have jurisdiction over assets before it can authorize their sale free and clear of liens, claims, interests and encumbrances.  Creditors of Company Group member are entitled to have a full and fair opportunity to consider the sale of Purchased Assets after the member becomes a debtor.  The timing of additional chapter 11 filings is designed to occur at least 23 days prior to the Sale Hearing.<br>▪ The timing of the chapter 11 cases was also intended to protect the Successful Bidder, whoever it may be.  It is not unreasonable for a Successful Bidder at an auction to be unwilling to subject the propriety of the auction process to attack by new creditors of new debtors after being declared the Successful Bidder.  The timing of the bankruptcy filings thus inures to the benefit of any Successful Bidder.<br>▪ Creditors' Committee's speculation is unsupported. |
| ▪ The Seller Termination Fee should be reduced. (¶¶ 4, 10-.)<br>  o "[U]pon information and belief, there is substantial interest from a number of parties in acquiring the IMD on terms that are favorable to the estates." (¶ 10.)<br>  o "Market analysis reflects that typical break-up fees approved by bankruptcy courts range, in aggregate, between 1.0% and 3.0% for transactions greater than $500 million." (¶ 11.) | ▪ <u>See</u> above Response to Objection of the Informal Noteholder Group.<br>▪ Creditors' Committee's speculation is unsupported.<br>▪ The Objection contains no citation to market analysis. |

| | |
|---|---|
| ▪ The Purchaser should have to submit appropriate documentation in connection with its request for payment of the Reimbursement Amount to the Sellers and the Creditors' Committee. Its request for reimbursements should be limited to reasonable and customary out-of-pocket expenses. | ▪ <u>See</u> above Response to Objection of the Informal Noteholder Group.<br>▪ The Debtors do not oppose the Creditors Committee's request to have the Purchaser submit appropriate documentation to the Sellers and the Creditors' Committee in connection with its request for payment of the Reimbursement Amount. |
| ▪ "Purchaser should be required to certify to the Sellers as of the Bid Deadline, and again as of the start of the Auction, that it knows of no circumstances existing as of such time that would give it a right to terminate the Purchase Agreement and/or not consummate the transaction." (¶ 6.)<br>▪ To the extent that such circumstances exist, the Purchaser will not have provided any value to the estates and should not be entitled to receive the Seller Termination Fee or Reimbursement Amount. (<u>Id.</u>) | ▪ This is a red herring, as conditions precedent to closing are measured at closing, not at the Bid Deadline. The requested certification would not compel the Purchaser to close if, subsequently, conditions are not met. |
| ▪ The "overbid" requirements may chill bidding. (¶ 13.) | ▪ <u>See</u> above Response to Objection of the Informal Noteholder Group. |
| ▪ The Sellers should be ordered to cooperate fully with bidders and permit more expansive bidding. (¶ 16.)<br>   o The proposed Bid Procedures Order does not contain an express provision imposing a duty on Sellers. (<u>Id.</u>)<br>   o "[P]otential bidders must have <u>unrestricted access to real time data, as well as management employees</u> of the relevant Seller entities … and the management incentive plans proposed by the Purchaser." (<u>Id.</u>)<br>   o The Bid Procedures Order should expressly allow for joint bids, "<u>notwithstanding any other agreements, and allow for parties interested in formulating joint bids to share information among themselves</u>." (<u>Id.</u>) | ▪ The Sellers and the Debtors intend to cooperate fully with bidders and are aware of and are fulfilling their fiduciary duties and the Creditors' Committee is actively involved in an oversight capacity.<br>▪ The value of the Sellers' businesses is in their employees, their customers, and proprietary data. The value must be preserved for the benefit of the economic stakeholders in the Sellers' businesses. The Sellers and the Debtors have retained Lazard because of Lazard's expertise in running sale and auction processes. "Potential" bidders – who are likely competitors of the Sellers – need not and should not be granted immediate or unrestricted access to data or personnel. As is typical in any auction process, Lazard will balance the need for information with the need to protect the Sellers' interests.<br>▪ Joint bids are not prohibited by the Purchase Agreement or the Bid Procedures Order, and the Bidding Procedures contemplate multiple Successful Bidders. (Bid Procedures Order at A-4.) |
| ▪ The Committee has requested, but not been granted, consultation rights in connection with (i) determination of which Qualified Bid is the Starting Bid; (ii) determination of which Qualified Bid is the highest or otherwise best offer; (iii) determination to reject any bid that is inadequate or insufficient; (iv) extension of the Bid Deadline; and (v) amendment of procedural rules in connection with the Auction. | ▪ The Debtors do not have an objection to granting consultation rights to the Creditors' Committee.<br>▪ The Debtors and the Sellers have already provided for consultation with the Creditors' Committee in connection with determination of what qualifies as a Qualified Bid and which Qualified Bid is the highest or otherwise best offer (Bid Procedures Order at A-2, A-4.) |

| 3. Objection of Crossmark Investment Advisors, L.P., Crossmark Corporate Advisors, L.P., Crossmark Cornerstone Partners, L.P., Financial Analytics, L.P., Crossmark Investment Company, L.P., Crossmark Corporate Investors, L.P., and Crossmark Corporate Investors II, L.P. (collectively, "Crossmark") ||
|---|---|
| **(Docket No. 943)** ||
| **Objection** | **Response** |
| • The Sellers failed to disclose information such as the actual assets being sold, the terms of the executive contracts for former Lehman employees, or the liabilities assumed. (¶¶ 2, 34-27.) | • The Sale Motion described the assets being sold (Sale Mot. ¶¶ 20-24). The Purchase Agreement filed with the Sale Motion further defines, among other things, the Purchased Assets and the Excluded Assets. (Purchase Agreement § 1.1.) Schedules annexed to the filed Purchase Agreement provide additional general information, including the names of the Sellers, the Companies, the included businesses and funds, the excluded businesses and funds, the acquired private equity businesses and the included European and Asian business segments. (Purchase Agreement Schedules I, II, 1.1(d), (e), (j), (k).)<br>• More specific information will be provided qualified interested parties subject to nondisclosure agreements. |
| • The Court should require parties to declare allocations for the assets being purchased, including the private funds investment unit for which Crossmark is willing to pay more than the $50 million that it is allegedly owed by such unit. (¶ 3.) | • There is no need for the Sellers to allocate the Purchase Price at this time.<br>• Qualified Bids are required to identify the assets to be purchased and the contracts and leases to be assumed. (Bid Procedures Order at A-2.) The Bidding Procedures contemplate multiple Successful Bidders in the event that multiple bids will generate a higher or better return to the Sellers. (Bid Procedures Order at A-4.) |
| • The Debtors are asking the Court to approve a sale of entities and assets wholly outside of the Court's jurisdiction without sufficient disclosure to creditors of the terms of the provisions of the sale or the impact on the rights of its affected stakeholders. (¶ 24.) | • The Debtors are not requesting approval of a sale at this time, and are requesting only approval of the Bid Procedures Order.<br>• The Debtors are not requesting relief for non-debtor entities. The Purchase Agreement contemplates, and the Sale Motion discloses, that additional entities may commence voluntary chapter 11 cases. In such an event, the new debtors will seek such relief as may be appropriate from the Court. (E.g., Purchase Agreement §7.25(g); Sale Motion ¶ 22.) |
| • If the Court approves the "Sale Motion", it should require LBHI and the non-debtor entities to specifically identify which entities will be sold as part of each business unit and the value of each business unit, and allocate the Purchase Price. (¶ 29.) | • Details of the final sale proposal will be determined after the Auction and after a Successful Bidder is identified and will be disclosed prior to the Sale Hearing. |
| • The Debtors have failed to articulate a legitimate business reason for the sale. (¶32.) | • See Sale Motion; Evidence presented at Bid Procedures Hearing.<br>• The Debtors are not requesting approval of a sale at this time, and are requesting only approval of the Bid Procedures Order. |

| 4. Objection of The Carlyle Group ("Carlyle") | (Docket No. 943) |
|---|---|
| **Objection** | **Response** |
|  | - It is not clear that Carlyle has standing to interpose an objection or be heard at the Bid Procedures Hearing. |
| - The proposed process "makes it impossible for Carlyle or any other bidders besides the proposed Purchaser" to prevail at the Auction because the Purchase Agreement requires the Debtors to solicit the consent of IMD's clients to the sale of IMD to the Purchaser prior to the Auction. (¶ 1.) The Court should require that no IMD change-of-control solicitation take place prior to the Auction. (¶ 2.) | - The proposed process enables the Debtors to provide the possibility of certainty to clients and employees and the potential to stabilize the businesses, to the benefit of all creditors. The proposed process also provides a path toward an expeditious consummation of a sale transaction. |
| - The Purchaser should not be permitted to direct the commencement of additional chapter 11 proceedings prior to the Auction. (¶ 3.) | - See above Response to Objection of the Informal Noteholder Group. |
| - The Seller Termination Fee is excessive. (¶¶ 4-10.) | - See above Response to Objection of the Informal Noteholder Group. |
| - The Purchase Agreement contains certain Purchase Price adjustments and "walk-away" rights that make the transaction too conditional. (¶¶ 11-13.) | - See above Response to Objection of the Informal Noteholder Group.<br>- Carlyle concedes, however, that the conditionality alone is not fatal to the stalking horse bid. (¶ 13 ("The Purchasers are entitled to insist on a highly conditional transaction with a low effective purchase price. But they are not entitled to a $105 million break-up fee if they do.")) |

| 5. Limited Objection and Reservation of Rights of Thomson Reuters Corporation | (Docket No. 937) |
|---|---|
| **Objection** | **Response** |
| - The Sale Motion lacks clarity with respect to applicable procedures and the timeframe for the Debtors' proposed assumption and assignment or rejection of executory contracts. (¶ 6.)<br>- The Debtors should confirm their intention to pay post-petition obligations on executory contracts pending their determination to assume or reject. (¶ 7.) | - Section 2.5 of the Purchase Agreement establishes the timing and mechanisms for the assumption and assignment of executory contracts. This process is referenced and described in paragraph 27 of the Sale Motion.<br>- The Debtors will make determinations with respect to Related Contracts and Purchased Contracts in accordance with the Purchase Agreement. They will make determinations with respect to other executory contracts in due course. Nevertheless, in all cases, the Debtors will pay their post-petition obligations pending the assumption or rejection of the Purchased Contracts. |

| 6. Limited Objection of Options Price Reporting Authority ("OPRA") | (Docket No. 913) |
|---|---|
| **Objection** | **Response** |
| <ul><li>Certain OPRA contracts "might be impacted by the sale of the IMD Business to Purchaser." (¶ 7.) OPRA requests that the Court order that Lehman or the Purchaser "specify which of the agreements … Purchaser intends to acquire through the APA and pay any and all cure amounts relating to such contacts." (¶ 9.)</li></ul> | <ul><li>The Purchase Agreement provides that prior to the Auction, the Purchaser will designate certain contracts as Purchased Contracts. In the event a Debtor is a party to a Purchased Contract, such Debtor shall assume and assign such Purchased Contract. In the event a non-Debtor is a party to a Purchased Contract, such Purchased Contract will be assigned. (§ 2.5(a).)</li><li>The Purchase Agreement provides the Seller will pay or cause to be paid all cure costs under any Purchased Contract. (§ 2.5(c).)</li><li>A proposed notice of assumption, assignment and cure amount with respect to executory contracts was attached to the Sale Motion as an exhibit to the Bid Procedures Order and will be sent to parties to Purchased Contracts. (Sale Mot. at Ex. 2, Ex. C.)</li></ul> |

| 7. Limited Objection of Korea Investment & Securities Co., Ltd. ("KISC") and True Friend 4th Securitization Specialty Co., Ltd. ("True Friend") | (Docket No. 922) |
|---|---|
| **Objection** | **Response** |
| <ul><li>KISC and True Friend object to the proposed sale "to the extent that it includes any of the CLN Assets or Lehman Brothers' equity interests in Merit."</li><li>KISC and True Friend request the Bidding Procedures Order and Sale Order be modified to expressly state that neither Merit nor the CLN Assets shall be included in any sale transaction under the APA.</li></ul> | <ul><li>The proposed sale does not include any of the "CLN assets or Lehman Brothers' equity interests in Merit" as such are not owned, held or used in connection with the Business being sold.</li></ul> |

**8. Limited Objection of SuccessFactors, Inc.**

**(Docket No. 964)**

| Objection | Response |
|---|---|
| - The Purchased Contracts have not yet been identified.  (p. 2.)<br>- The Sale Motion should be denied unless the Court requires the Debtors and Lehman to identify the Purchased Contracts and Cure Amounts.  (p. 3.) | - The objecting party confuses (A) entry of the Bid Procedures Order, which would approve procedures to notify contract counterparties of the Debtors' intentions with respect to individual Purchased Contracts and any related Cure Amounts, with (B) entry of the Sale Order, which would approve the assumption and assignment of certain Purchased Contracts.<br>- The proposed Bid Procedures Order clearly provides that the Debtors will file with the Court and serve on each counterparty to a Purchased Contracts an Assumption, Assignment and Cure Notice with sufficient time for counterparties to review and, if necessary, object prior to the Sale Hearing.  (Bid Procedures Order ¶ 13.) |

**9. Limited Objection of Sun Microsystems, Inc.**

**(Docket No. 966)**

| Objection | Response |
|---|---|
| - The Purchased Contracts have not yet been identified.  (p. 2.)<br>- The Sale Motion should be denied unless the Court requires the Debtors and Lehman to identify the Purchased Contracts and Cure Amounts.  (p. 3.) | - See above Response to Limited Objection of SuccessFactors, Inc. |

**10. Limited Objection of Cisco Systems, Inc. and Cisco Systems Capital Corporation**

**(Docket No. 967)**

| Objection | Response |
|---|---|
| - The Purchased Contracts have not yet been identified.  (p. 2.)<br>- The Sale Motion should be denied unless the Court requires the Debtors and Lehman to identify the Purchased Contracts and Cure Amounts.  (p. 3.) | - See above Response to Limited Objection of SuccessFactors, Inc. |

| 11. Limited Objection of NetApp, Inc. and Network Appliance Limited | (Docket No. 968) |
|---|---|
| **Objection** | **Response** |
| <ul><li>The Purchased Contracts have not yet been identified. (p. 2.)</li><li>The Sale Motion should be denied unless the Court requires the Debtors and Lehman to identify the Purchased Contracts and Cure Amounts. (p. 3.)</li></ul> | <ul><li>See above Response to Limited Objection of SuccessFactors, Inc.</li></ul> |

WHEREFORE the Debtors respectfully request that the Court enter the Bid Procedures Order and such other and further relief as is just.

Dated: October 16, 2008
      New York, New York

      /s/ Lori R. Fife
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession