UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


     Debtors.


- - - - - - - - - - - - - - - - - - - -x


          United States Bankruptcy Court

          One Bowling Green

          New York, New York


          October 16, 2008

          11:19 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1

2      HEARING re Order Scheduling Initial Case Conference

3

4      HEARING re Debtors' Motion Pursuant to Rule 1015(b) of the

5      Federal Rules of Bankruptcy Procedure Requesting Joint

6      Administration of Chapter 11 Cases

7

8      HEARING re Motion for Order Pursuant to Section 105(a) of the

9      Bankruptcy Code Directing that Certain Orders and Other

10     Pleadings Entered or Filed in the Chapter 11 Cases of

11     Affiliated Debtors be Made Applicable to Recently Filed Cases

12

13     HEARING re Debtors' Application Pursuant to Sections 327(a) and

14     328(a) of the Bankruptcy Code for an Interim Order Authorizing

15     the Employment and Retention of Weil, Gotshal & Manges LLP as

16     Attorneys for the Debtors, Nunc Pro Tunc to the Commencement

17     Date

18

19     HEARING re Motion Pursuant to Sections 105(a) and 363(b) of the

20     Bankruptcy Code for an Interim Order Authorizing the Debtors to

21     (A) Retain Alvarez & Marsal North America, LLC to Provide the

22     Debtors a Chief Restructuring Officer and Additional Personnel;

23     (B) to Appoint the Chief Restructuring Officer Nunc Pro Tunc to

24     the Commencement Date; and (C) to Schedule a Final Hearing

25

1

2   HEARING re Debtors' Application Pursuant to Sections § 327(a)

3   and § 328(a) of the Bankruptcy Code for Authorization to Employ

4   and Retain Curtis, Mallet-Prevost, Colt & Mosle LLP as

5   Conflicts Counsel for the Debtors, Nunc Pro Tunc, to the Date

6   of its Engagement

7

8   HEARING re Motion of Shinsei Bank, Limited for the Entry of an

9   Order Approving Specified Information Blocking Procedures and

10  Permitting Trading of Claims Against the Debtor Upon

11  Establishment of a Screening Wall

12

13  HEARING re Motion of Metropolitan Life Insurance Company for

14  Entry of an Order Approving Specified Information Blocking

15  Procedures and Permitting Trading of Claims Against the

16  Debtor Upon Establishment of a Screening Wall

17

18  HEARING re Motion of AEGON USA Investment Management, LLC for

19  Entry of an Order Approving Specified Information Blocking

20  Procedures and Permitting Trading of Claims Against the Debtor

21  Upon Establishment of s Screening Wall

22

23

24

25

1

2    HEARING re Debtors' Motion Pursuant to Sections 105(a) and 366

3    of the Bankruptcy Code to (i) Approve the Debtors' Proposed

4    Form of Adequate Assurance of Payment; (ii) Establish

5    Procedures for Resolving Objections by Utility Companies; and

6    (iii) Prohibit Utilities from Altering, Refusing, or

7    Discontinuing Service

8

9    HEARING re Motion for Relief from Stay for an Order Lifting or

10   Modifying the Automatic Stay filed by William Kuntz

11

12   HEARING re Amended Motion for Appointment of Equity committee

13

14   HEARING re Joint Motion of the Debtors and Barclays Capital Inc

15   for Entry of an Order Authorizing to File Under Seal Certain

16   Schedules to the Asset Purchase Agreement, dated September 29,

17   2008, with Exhibit A (Proposed Order)

18

19   HEARING re Motion of the Harbinger Funds for Leave to Conduct

20   Rule 2004 Discovery of Debtor Lehman Brothers Holdings Inc.

21

22

23

24

25

1

2     HEARING re Motion of Newport Global Opportunities Fund LP,

3     Newport Global Credit Fund (Master) L.P., PEP Credit Investor

4     L.P. and Providence TMT Special Situations Fund L.P. for Leave

5     to Conduct Rule 2004 Discovery of Debtor Lehman Brothers

6     Holdings Inc. and Other Entities

7

8     HEARING re LB R3 HOLDING SETTLEMENT & REDEMPTION TRANSACTION -

9     Debtors' Motion for Entry of Order Pursuant to Sections 105,

10    363, and 365 of the Bankruptcy Code and Federal Rules of

11    Bankruptcy Procedure 2002, 6004, 6006, and 9019 (i)

12    Approving Equity Interests Purchase Agreement; (ii) Authorizing

13    Debtors to Compromise, Settle, and Release Related Claims; and

14    (iii) Granting Certain Related Relief

15

16    HEARING re Eagle Energy Partners I L.P. Transaction - Debtors'

17    Motion for Entry of an Order Pursuant to Sections 363 and 365

18    of the Bankruptcy Code and Federal Rules of Bankruptcy

19    Procedure 6004, 6006 and 9019 Authorizing Lehman Brothers

20    Holdings Inc. to (A) Enter into a Partnership Interests

21    Purchase Agreement; (B) Compromise and Release a Portion of an

22    Intercompany Loan; and (C) Assign the Remainder of Such

23    Intercompany Loan to Purchasers

24

25

1

2  HEARING re Sale of Lehman's Investment Management Division

3  Transaction - Debtors' Motion to (A) Establish Sales

4  Procedures; (B) Approve a Seller Termination Fee and a

5  Reimbursement Amount; and (C) Approve the Sale of the Purchased

6  Assets and the Assumption and Assignment of Contracts Relating

7  to the Purchased Assets

8

9  HEARING re Debtors' Motion Pursuant to Sections 105(a), 345(b),

10  363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy

11  Rules 6003 and 6004 (A) for Authorization to (i) Continue Using

12  Existing Centralized Cash Management System, as Modified; (ii)

13  Honor Certain Pre-petition Obligations Related to the Use of

14  the Cash Management System; and (iii) Maintain Existing Bank

15  Accounts and Business Forms; (B) for an Extension of Time

16  to Comply with Section 345(b) of the Bankruptcy Code, and (c)

17  to Schedule a Final Hearing

18

19  HEARING re Debtor's Motion for Order: (i) Authorizing Debtor to

20  Obtain Post-petition Financing Pursuant to Sections 363 and 364

21  of Bankruptcy Code; (ii) Granting Liens and Superpriority

22  Claims to Post-petition Lenders Pursuant to Section 364 of

23  Bankruptcy Code; and (iii) Scheduling Final Hearing

24

25  Transcribed by:  Lisa Bar-Leib

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors

5        767 Fifth Avenue

6        New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9        SHAI WAISMAN, ESQ.

10        LORI R. FIFE, ESQ.

11        RICHARD P. KRASNOW, ESQ.

12        ALFREDO R. PEREZ, ESQ.

13        JOHN W. LUCAS, ESQ.

14

15    HUGHES HUBBARD & REED LLP

16        Attorneys for James W. Giddens, SIPC Trustee

17        One Battery Park Plaza

18        New York, NY 10004

19

20    BY:   JAMES B. KOBAK, JR.

21        JEFFREY S. MARGOLIN, ESQ.

22        DAVID W. WILTENBURG, ESQ.

23        JAMES W. GIDDENS, ESQ.

24

25

SECURITIES INVESTOR PROTECTION CORPORATION

     Senior Associate General Counsel

     805 15th Street, N.W.

     Suite 800

     Washington, DC 20005

BY:   KENNETH J. CAPUTO, ESQ.

MILBANK, TWEED, HADLEY & MCCLOY LLP

     Attorneys for the Official committee of Unsecured

     Creditors

     One Chase Manhattan Plaza

     New York, NY 10005

BY:   LUC A. DESPINS, ESQ.

     DENNIS F. DUNNE, ESQ.

     DENNIS C. O'DONNELL, JR.

     PAUL ARONZON, ESQ.

     EVAN R. FLECK, ESQ.

1

2    CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for Barclays Capital Inc.; Luke Barefoot

4         One Liberty Plaza

5         New York, NY 10006

6

7    BY:   LINDSEE P. GRANFIELD, ESQ.

8          LISA M. SCHJWEITZER, ESQ.

9          THOMAS J. MOLONEY, ESQ.

10         AVRAM E. LUFT, ESQ.

11

12   CLEARY GOTTLIEB STEEN & HAMILTON LLP

13         Attorneys for Hellman & Friedman

14         One Liberty Plaza

15         New York, NY 10006

16

17   BY:   JAMES L. BROMLEY, ESQ.

18

19   FEDERAL RESERVE BANK OF NEW YORK

20         Assistant General Counsel and Senior Vice President

21         33 Liberty Street

22         New York, NY 10045

23

24   BY:   SHARI LEVENTHAL, ESQ.

25

1

2    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

3        3 World Financial Center

4        New York, NY 10279

5

6    BY:   ALISTAIRE BAMBACH, ESQ.

7          DAN GALLAGHER, ESQ.

8          NEAL JACOBSON, ESQ.

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        Office of the United States Trustee

12        33 Whitehall Street

13        Suite 2100

14        New York, NY 10004

15

16   BY:   TRACY HOPE DAVIS, ESQ.

17          ANDREW D. VELEZ-RIVERA, ESQ.

18          LINDA A. RIFFKIN, ESQ.

19          DIANA G. ADAMS, U.S. TRUSTEE

20

21

22

23

24

25

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3        Attorneys for the Informal Noteholders Group

4        590 Madison Avenue

5        New York, NY 10022

6

7    BY:   DANIEL H. GOLDEN, ESQ.

8          ABID QURESHI, ESQ.

9          MICHAEL S. STAMER, ESQ.

10         PHILIP C. DUBLIN, ESQ.

11

12   STUTMAN, TREISTER & BLATT

13       Attorneys for Baubost Group

14       1901 Avenue of the Stars

15       12th Floor

16       Los Angeles, CA 90067

17

18   BY:   ERIC D. WINSTON, ESQ.

19

20   ALLEN & OVERY LLP

21       Attorneys for HSBC Bank USA Inc.

22       1221 Avenue of the Americas

23       New York, NY 10020

24

25   BY:   DANIEL GUYDER, ESQ.

1

2    ARENT FOX LLP

3          Attorneys for The Vanguard Group

4          1675 Broadway

5          New York, NY 10019

6

7    BY:    ROBERT M. HIRSH, ESQ.

8          DAVID DUBROW, ESQ.

9

10   BINGHAM MCCUTCHEN LLP

11         Attorneys for Harbinger Capital Partners Special

12          Situations Fund, L.P. and Harbinger Capital Master

13          Fund I, Ltd.

14         150 Federal Street

15         Boston, MA 02110

16

17   BY:    SABIN WILLETT, ESQ.

18         RHEBA RUTKOWSKI, ESQ.

19

20

21

22

23

24

25

1

2    BINGHAM MCCUTCHEN LLP

3         Attorneys for Harbinger Capital Partners Special

4          Situations Fund, L.P. and Harbinger Capital Master

5          Fund I, Ltd.

6         399 Park Avenue

7         New York, NY 10022

8

9    BY:   JEFFREY S. SABIN, ESQ.

10

11   BINGHAM MCCUTCHEN LLP

12        Attorneys for MetLife Insurance Company

13        399 Park Avenue

14        New York, NY 10022

15

16   BY:   ERIN H. MAUTNER, ESQ.

17

18   BLANK ROME LLP

19        Attorneys for Thomson Reuters

20        The Chrysler Building

21        405 Lexington Avenue

22        New York, NY 10174

23

24   BY:   EDWARD J. LOBELLO, ESQ.

25

1

2   BROWN RUDNICK LLP

3       Attorneys for Newport Global Opportunity Fund; and PEP

4        Credit Investor Fund LLP; and Provident IMT SP

5       Seven Times Square

6       New York, NY 10036

7

8   BY:   DAVID J. MOLTON, ESQ.

9       ANDREW S. DASH, ESQ.

10

11  CADWALADER, WICKERSHAM & TAFT LLP

12      Attorneys for Citibank

13      One World Financial Center

14      New York, NY 10261

15

16  BY:   JESSICA L. FINK, ESQ.

17

18  CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

19      Attorneys for NYSE Euronext

20      101 Park Avenue

21      New York, NY 10178

22

23  BY:   JERROLD L. BREGMAN, ESQ.

24      STEVEN J. REISMAN, ESQ.

25

1

2    CURTIS, MALLET-PREVOST, COLT & MOSLE LLP

3         Conflict Counsel for the Debtors

4         101 Park Avenue

5         New York, NY 10178

6

7    BY:   LYNN P. HARRISON 3RD, ESQ.

8

9    COLE, SHOTZ, MEISEL, FORMAN & LEONARD, P.A.

10        Attorneys for FHLB Pittsburgh

11        900 Third Avenue

12        16th Floor

13        New York, NY 10022

14

15   BY:   LAURENCE MAY, ESQ.

16

17   DECHERT LLP

18        Attorneys for Russell Investments

19        1095 Avenue of the Americas

20        New York, NY 10036

21

22   BY:   GLENN E. SIEGEL, ESQ.

23

24

25

1

2    DRINKER BIDDLE & REATH LLP

3          Attorneys for Allianz Global Advisors

4          500 Campus Drive

5          Florham Park, NJ 07932

6

7    BY:   ROBERT K. MALONEY, ESQ.

8

9    HAHN & HESSEN LLP

10         Attorneys for Avista Corporation and Powerex Corp.

11         488 Madison Avenue

12         New York, NY 10022

13

14   BY:   ROSANNE THOMAS MATZAT, ESQ.

15

16   JONES DAY

17         Attorneys for EDF Trading

18         222 East 41st Street

19         New York, NY 10017

20

21   BY:   RICHARD H. ENGMAN, ESQ.

22

23

24

25

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

    Attorneys for Bay Harbour Management L.C.; Bay Harbour

     Master Ltd.; Trophy Hunter Investments, Ltd., BHCO

     Master, Ltd.; MSS Distressed & Opportunities 2 and

     Institutional Benchmarks

    1633 Broadway

    New York, NY 10019

BY:   DAVID M. FRIEDMAN, ESQ.

     DAVID S. ROSNER, ESQ.

     ANDREW K. GLENN, ESQ.

KAYE SCHOLER LLP

    Attorneys for Wells Fargo Bank, N.A.; Wells Fargo & Co.;

     and Bank of America, N.A.

    425 Park Avenue

    New York, NY 10022

BY:   SCOTT D. TALMADGE, ESQ.

     ANA M. ALFONSO, ESQ.

     MADLYN G. PRIMOFF, ESQ.

1

2    KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.

3         Attorneys for Elliott Associates, L.P., Elliott

4          International, L.P. and the Liverpool Limited

5          Partnership

6         551 Fifth Avenue

7         18th Floor

8         New York, NY 10176

9

10   BY:   MATTHEW J. GOLD, ESQ.

11

12   KRAMER LEVIN NAFTALIS & FRANKEL LLP

13         Attorneys for Bank of New York Mellon as Indenture

14          Trustee

15         1177 Avenue of teh Americas

16         New York, NY 10036

17

18   BY:   P. BRADLEY O'NEILL, ESQ.

19         AMY COHEN, ESQ.

20

21

22

23

24

25

1

2  LINKLATERS LLP

3      Attorneys for Joint Administrators of Lehman Brothers

4       International Europe

5      1345 Avenue of the Americas

6      New York, NY 10105

7

8  BY:   LAWRENCE BYRNE, ESQ.

9        MARTIN N. FLICS, ESQ.

10

11  LOVELLS LLP

12      Attorneys for Lloyds TSB

13      590 Madison Avenue

14      New York, NY 10022

15

16  BY:   MATTHEW P. MORRIS, ESQ.

17

18  LOWENSTEIN SANDLER P.C.

19      Attorneys for Energy Co.

20      65 Livingston Avenue

21      Roseland, NJ 07068

22

23  BY:   MICHAEL S. ETKIN, ESQ.

24

25

MUNSCH HARDT KOPF & HARR, P.C.

    Attorneys for Ad Hoc committee of Bondholders

    3800 Lincoln Plaza

    500 North Akard Street

    Dallas, TX 75201


BY:   RUSSELL L. MUNSCH, ESQ.

      RAYMOND J. URBANIK, ESQ.


OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.

    230 Park Avenue

    New York, NY 10169


BY:   STEVEN B. SOLL, ESQ.


PENSION BENEFIT GUARANTY CORPORATION

    Office of the Chief Counsel

    1200 K Street, N.W.

    Washington, DC 20005


BY:   ISRAEL GOLDOWITZ, ESQ.

      SARA B. EAGLE, ESQ.

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3         Special Counsel for Creditors' committee

4         51 Madison Avenue

5         22nd Floor

6         New York, NY 10010

7

8    BY:   SUSHEEL KIRPALANI, ESQ.

9

10   REED SMITH LLP

11        Attorneys for AEGON USA Investment Management, LLC.

12        599 Lexington Avenue

13        New York, NY 10022

14

15   BY:   MICHAEL J. VENDITTO, ESQ.

16        J. ANDREW RAHL, JR.

17        PAUL A. RACHMUTH, ESQ.

18

19   ROPES & GRAY LLP

20        Attorneys for R3 Capital Management LLC

21        1211 Avenue of the Americas

22        New York, NY 10036

23

24   BY:   KEITH H. WOFFORD, ESQ.

25

1

2    ROPES & GRAY LLP

3         Attorneys for Bain Capital Partners

4         1211 Avenue of the Americas

5         New York, NY 10036

6

7    BY:   MARK I. BANE, ESQ.

8

9    SALANS

10        Attorneys for Svenska Handelsbanken

11        Rockefeller Center

12        620 Fifth Avenue

13        New York, NY 10020

14

15   BY:   CLAUDE D. MONTGOMERY, ESQ.

16

17   SEWARD & KISSEL LLP

18        One Battery Park Plaza

19        New York, NY 10004

20

21   BY:   JOHN R. ASHMEAD, ESQ.

22

23

24

25

```
 1
 2    SHEARMAN & STERLING LLP
 3         Attorneys for Bank of America Securities
 4         599 Lexington Avenue
 5         New York, NY 10022
 6
 7    BY:   JAMES L. GARRITY, ESQ.
 8          DAVID LAGUARDIA, ESQ.
 9          NED S. SCHODEK, ESQ.
10
11    THOMPSON & KNIGHT LLP
12         Attorneys for Crossmark Investments Advisers, L.P.;
13          Crossmark Corporate Advisers, L.P.; Crossmark
14          Cornerstone Partners, L.P.; Financial Analytics, L.P.;
15          Crossmark Investment Company, L.P.; Crossmark Corporate
16          Investors, L.P.; and Crossmark Corporate
17          Investors II, L.P.
18         1722 Routh Street
19         Suite 1500
20         Dallas, TX 75201
21
22    BY:   DAVID M. BENNETT, ESQ.
23
24
25
```

THOMPSON & KNIGHT LLP

      Attorneys for Crossmark Investments Advisers, L.P.;

       Crossmark Corporate Advisers, L.P.; Crossmark

       Cornerstone Partners, L.P.; Financial Analytics, L.P.;

       Crossmark Investment Company, L.P.; Crossmark Corporate

       Investors, L.P.; and Crossmark Corporate

       Investors II, L.P.

       919 Third Avenue

       39th Floor

       New York, NY 10022

BY:   IRA L. HERMAN

TROUTMAN SANDERS LLP

      Attorneys for New South Federal Savings Bank; and PT Bank

       Negara Indonesia

      The Chrysler Building

      405 Lexington Avenue

      New York, NY 10174

BY:   PAUL H. DEUTCH, ESQ.

TUCKER ARENSBERG

     Attorneys for FHLB Pittsburgh

     1500 One PPG Place

     Pittsburgh, PA 15222


BY:  GARY P. HUNT, ESQ.

     BEVERLY W. MANNE, ESQ.

     MICHAEL STAUBER, ESQ. (TELEPHONICALLY)

     MICHAEL SHINER, ESQ. (TELEPHONICALLY)


DEWEY & LEBOEUF, LLP

     Attorneys for CAPCO Holdings Inc.

     One Embarcadero Center

     Suite 400

     San Francisco, CA


BY:  RAINA KIM, ESQ.

     (TELEPHONICALLY)

1

2     WACHTELL, LIPTON, ROSEN & KATZ

3          Attorneys for JPMorgan Chase Bank, N.A.

4          51 West 52nd Street

5          New York, NY 10019

6

7     BY:   HAROLD S. NOVIKOFF, ESQ.

8          PHILIP MINDLIN, ESQ.

9          AMY R. WOLF, ESQ.

10

11    VINSON & ELKINS LLP

12         Attorneys for Shinsei Bank, Limited

13         666 Fifth Avenue

14         26th Floor

15         New York, NY 10103

16

17    BY:   DOV KLEINER, ESQ.

18

19

20

21

22

23

24

25

1

2    WILLKIE FARR & GALLAGHER LLP

3           Attorneys for Fir Tree; Royal Charter Properties; Avantam

4            Partners; Oppenheimer Funds

5           787 Seventh Avenue

6           New York, NY 10019

7

8    BY:    ROGER NETZER, ESQ.

9           DAN C. KOZUSKO, ESQ.

10          SHELLEY C. CHAPMAN

11

12   HOLLAND & KNIGHT LLP

13          Attorneys for Lehman Executives

14          195 Broadway

15          New York, NY 10007

16

17   BY:    SANDRA E. MAYERSON, ESQ.

18

19   PEITZMAN, WEG & KEMPINSKY LLP

20          Attorneys for Avista Corporation and Powerex Corp.

21          10100 Santa Monica Blvd., Suite 1450

22          Los Angeles, CA 90067

23

24   BY:   DAVID B. SHEMANO, ESQ.

25          (TELEPHONICALLY)

1

2     CHAPMAN AND CUTLER LLP

3          Attorneys for US Bank, N.A.

4          111 West Monroe Street

5          Chicago, IL 60603

6

7     BY:   JAMES E. SPIOTTO, ESQ.

8          (TELEPHONICALLY)

9

10    MCGUIREWOODS LLP

11         Attorneys for Meridian Comp of New York d/b/a CHD

12          Meridian Healthcare; Toronto-Dominion Bank

13         One James Center

14         901 East Cary Street

15         Richmond, VA 23219

16

17    BY:   DION W. HAYES, ESQ.

18         JOSEPH S. SHEERIN, ESQ.

19         (TELEPHONICALLY)

20

21

22

23

24

25

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  Mr. Miller, good

3   morning.

4          MR. MILLER:  Good morning, Your Honor.  Harvey Miller

5   with Weil Gotshal & Manges on behalf of the debtors.  Once

6   again, Your Honor, this is the first omnibus hearing in this

7   case and we are now completing our fifth week of

8   administration.  And once again, Your Honor, on behalf of all

9   parties involved, we appreciate the Court's efforts to

10  accommodate the needs of this epic saga and we recognize the

11  long journey Your Honor's had to get here today.

12         Your Honor, before we get into the agenda, it was my

13  understanding that Your Honor wanted to have a status

14  conference as to the state of the estate at this point.

15         THE COURT:  Yes.

16         MR. MILLER:  So if I may proceed with that, Your

17  Honor.  And I thought, Your Honor, in the context of where we

18  are that some history has to be alluded to in connection with

19  the commencement of these Chapter 11 cases.  And if I may, Your

20  Honor -- if I may approach, Your Honor, we've prepared an

21  organization chart of Lehman Brothers --

22         THE COURT:  You may approach.

23         MR. MILLER:  -- that may be of some help to you.

24         THE COURT:  I'm interested in seeing it.  Thank you.

25         MR. MILLER:  And we have the copies for other

1    parties.

2          The chart, Your Honor, is a simplified version of the

3    Lehman Brothers Holdings, Inc. enterprise.  And the entities

4    that are listed in red, Your Honor, are entities which are

5    currently under some type of judicial administration or

6    supervision, either an administration process in the U.K. or

7    receivership action in another foreign jurisdiction.  And the

8    entities that are in the sort of purplish color, Your Honor,

9    are entities that were sold to Barclays as part of the Barclays

10   transaction.  And that's the first page of the organization

11   chart, Your Honor.  And I might say, Your Honor, this is an

12   attempt to consolidate almost 4,000 different entities.  And

13   there are notes on the second page that related to each of the

14   entities.  And the third page, Your Honor, is an organizational

15   chart which is directed to Lehman Brother's Inc. which is the

16   broker dealer.

17         So with that in reference, Your Honor, let me just

18   begin by saying that Lehman was a massive business with

19   consolidated assets of over six billion dollars and liabilities

20   of at least that amount.  There was a global business that

21   operated on a twenty-four/seven basis with hundreds of

22   thousands of transactions occurring each day at the speed of

23   light moving billions of dollars.  On a worldwide basis, Lehman

24   employed 25,163 employees on September 15, 2008, the date of

25   the commencement of these proceedings.

1          Bankruptcy was not in contemplation, Your Honor, of

2    the Lehman enterprise.  However, the week of September 8th,

3    2008 was horrendous for Lehman exacerbated by contracting

4    liquidity as clearing banks demanding collateral security,

5    spreads widening, decreasing market capitalization, potential

6    downgrades and a crippling loss of confidence on the part of

7    Lehman account holders and counterparties.  Nevertheless, it

8    was believed at that time, Your Honor, that a transaction with

9    the Bank of America or, alternatively, with Barclays would

10   occur.  Unfortunately, the Bank of America went radio silent

11   during Saturday, September 13th.  The proposed Barclays

12   transaction, Your Honor, collapsed during the morning of

13   September 14, 2008.  But even at that point, there was

14   confidence that a transition process would evolve with the

15   assistance of the Federal Reserve or the U.S. Treasury that

16   would enable Lehman to continue and operate in the ordinary

17   course at least to close out the transactions and its business

18   in an orderly manner.

19          There was no substantive consideration of bankruptcy

20   as a Lehman option until the evening of Friday, September 12

21   and even at that time, it was considered a remote possibility.

22   The events of Sunday, September 14, 2008, were dramatic.  They

23   involved negotiations with the Federal Reserve Bank of New

24   York, the Treasury and the SEC.  It culminated in the rejection

25   by the Federal Reserve and the Treasury to provide -- let me

1    call it a bailout to Lehman.  Indeed, it was recommended that

2    Lehman immediately convince its board of directors to authorize

3    the commencement of a Chapter 11 case.  There was a decision, I

4    believe, that failed to realize the consequences of what would

5    occur.  A decision that is comparable in its monumental lack of

6    foresight to the federal government's reaction to the Katrina

7    catastrophe.  That is the way it will be recorded in the

8    history books because, like Churchill said, I may have to write

9    one of the books.

10             As the Court stated, Lehman Brothers became a victim,

11   in effect the only true icon to fall in the tsunami that had

12   befallen the credit markets.  The board of directors met that

13   night and ultimately passed a resolution authorizing the

14   commencement of the voluntary Chapter 11 case by Lehman

15   Brothers Holdings Inc. that was filed on September 15 in the

16   wee hours of that morning.

17             There was no preplanning.  The result was trauma and

18   dislocation as the shocks of bankruptcy caused the fourth

19   largest independent banker to suddenly stop operating in its

20   normal fashion.  The LBHI Chapter 11 case was preceded by the

21   commencement of administration proceedings in the United

22   Kingdom of Lehman Brothers Inc. Europe.  And the appointment of

23   members of PWC as the joint administrators for what I will

24   refer to, Your Honor, as LBIE.  LBIE was the critical hub for

25   the European operations and an integral part of the worldwide

1    financial reporting system.  There were approximately 5600

2    employees at LBI on September 15th.  As a result of the

3    appointment of the administrators, there was a lockdown at LBIE

4    and the system stopped.

5          In the context of what happened on September 15th in

6    the morning, at 7 a.m. in the morning, negotiations resumed

7    with Barclays Capital Inc. in an effort to try and salvage

8    value, protect customers, and also to provide for the transfer

9    of customer accounts and provide employment and continue the

10   broker dealer business.  Those negotiations which began at 7

11   a.m. on the 15th, Your Honor, ultimately evolved into the

12   creation of a structure that would accomplish those ends so

13   that there would be a sale to Barclays of certain assets and

14   there would be a companion proceeding initiated against Lehmans

15   Brothers Inc., the broker dealer under the Securities Investor

16   Protection Act where a Securities Investor Protection Act

17   trustee would be appointed and we would coordinated the two

18   proceedings so as to effect a sale which resulted in the

19   hearings that occurred before Your Honor during the week of the

20   15th.

21         While this was happening, Your Honor, the foreign

22   proceedings in which administrators were appointed or judicial

23   supervision occurred caused a breakdown of the financial

24   reporting system both in the U.K. and in Asia.  The immediate

25   need was for protection of the value of the assets.  The

1    negotiation and execution of an asset purchase agreement

2    occurred on September 16, 2008.  There were many moving parts

3    as circumstances and market conditions changed. The scene on

4    the 30th and 31st floors of 745 Seventh Avenue resembled bedlam

5    as hundreds of professionals converged and negotiated.  The

6    businesses sold to Barclays consisted of the U.S. and Canadian

7    investment banking and capital markets businesses that

8    encompassed fixed income and equities cash trading business,

9    brokerage dealing, trading and advisory businesses, investment

10    banking operations, LBI's business as a future's commission

11    merchant, LBI's commodity's business, government securities

12    trading operations, mortgage banks securities trading

13    operations of LBI but not any securities of such nature held by

14    the seller except as otherwise specified in the asset purchase

15    agreement, the PIM, or private investment management business,

16    and the building at 745 Seventh Avenue and two data centers.

17        Consideration for the purchase price of the LBI

18    business was 250 million dollars representing the goodwill of

19    that business and 1,000,290,000 dollars to Lehman Brothers

20    Holdings Inc. for the other businesses sold and the real estate

21    known as 745 Seventh Avenue and the two data centers.

22        Purchased assets are defined in the asset purchase

23    agreement as (1)all of the assets of seller used primarily in

24    the business or necessary for the operation of the business in

25    each case excluding the excluded assets; (2)none of the assets

1     or subsidiaries of LBHI other than assets at LBI except as

2     otherwise specifically provided.  There was also executed

3     thereafter, Your Honor, pursuant to the asset purchase

4     agreement, a transition services agreement which is dated as of

5     September 22, 2008.  In that agreement, the purchase of

6     Barclays Capital agreed to extend to LBHI entities the use of

7     facilities and other assistance on a transitional basis as set

8     forth in that agreement which also imposed upon Lehman

9     reciprocal obligations and duties.  The implementation of the

10    transition services agreement is a difficult process, Your

11    Honor, because of all of the things which have happened since

12    the commencement of this case.  And there will be more about

13    that after, Your Honor.

14          Immediately prior to the commencement of the SIPA

15    proceeding, Your Honor, an agreement was reached to transfer

16    all of the LBI subsidiaries before the consummation of the

17    sale.  This was consistent with the commencement of the

18    proceedings under the Securities Investor Protection Act of

19    1970 and the appointment of a SIPA trustee.  This was part of

20    the coordination of keeping the business operating and trying

21    to preserve value, Your Honor.  The transfer of the LBI

22    subsidiaries was for the purpose to enable the continued

23    efficient and expeditious administration of their businesses

24    with the cooperation of the SIPA trustee.  And if Your Honor

25    will look at the third page of the organizational chart, all of

1   the entities on the first line starting with "Lehman Brothers

2   Derivative Products" across the line, all of those entities,

3   the stock was transferred to another Lehman Brothers entity,

4   Lehman Alley, and the consideration for the transfers was a

5   note issued to LBI by the LBHI subsidiaries to which the

6   subsidiaries were transferred.  The note, which is a pick note,

7   "equals the fair market value of the LBI subsidiaries at the

8   time of transfer and would be determined by an independent

9   valuation to be completed by Lazard Ltd. pursuant to an agreed

10  upon methodology with the SIPA trustee.  Pursuant to the note,

11  LBI will receive one hundred percent of the net cash proceeds

12  from the sale of assets of LBI subsidiaries as provided in the

13  note.  The note bears interest at the rate of eight percent per

14  annum and is secured by the equity of those subsidiaries."  And

15  that was all, Your Honor, negotiated with the SIPA trustee.

16          THE COURT:  When was that done?  When did that

17  happen?

18          MR. MILLER:  Before the commencement of the SIPA

19  proceeding, Your Honor.

20          THE COURT:  Immediately before.

21          MR. MILLER:  Immediately before.  That morning, as I

22  recall it, Your Honor.  The SIPA proceeding, as I remember, was

23  about midday, 1:00 or thereabouts.

24          THE COURT:  On the 19th.

25          MR. MILLER:  On the 19th, Your Honor.  The closing of

1  the Barclays sale, as Your Honor may vividly recall at about

2  12:30 a.m. in this courtroom, the sale was approved and

3  immediately thereafter, took about an hour to get the order

4  entered, immediately thereafter the closing transactions began.

5  And in that connection, I should note, Your Honor, that the

6  United States trustee appointed a creditors' committee on

7  September 17th.  The committee immediately went into

8  organization and action and representatives of the committee,

9  their counsel and their financial advisors, Houlihan Lokey and

10  FDI, attended a good portion of the closing transactions which

11  began very early in the morning on the 20th of September.  What

12  we contemplated would be a simple neat little closing turned

13  out to take two full days, Your Honor.  And I found out when

14  you pick a time that you must close by, and someone said 7 a.m.

15  Monday morning before the markets opened, somehow the

16  transaction consumes all of the time.  So from early morning on

17  Saturday the 20th without any break at all right through 7 a.m.

18  Monday morning, the closing transaction moved forward.  And it

19  was effected, Your Honor, by the changing market conditions

20  which affected values and other difficulties which occurred in

21  connection with clearing transactions and in connection with

22  Depository Trust Company.

23       On Sunday afternoon, the 21st, Your Honor, there were

24  some serious difficulties.  The Federal Reserve and the SEC and

25  other governmental agencies became involved.  There were a

1    great many conferences to resolve differences with the clearing

2    agencies or clearing entities.  And that was not cleared up,

3    Your Honor, until about 5 a.m. Monday morning.  It was a very

4    difficult closing, Your Honor.  We made it by 7 a.m. and the

5    transaction went forward.  While all of this was going on, Your

6    Honor, more and more foreign proceedings were being instituted.

7    And Lehman's financial systems, Your Honor, worked perfectly

8    when the company was in operation.  When the company stopped

9    operating, the systems became, to some extent, dysfunctional

10   because they were all integrated.  And when the U.K. went down

11   you could not access those records and a lot of records there.

12   When Asia went down, the same thing happened.  So the system,

13   in effect, disintegrated.  And it's been difficult to reset the

14   system so that you can really get information the way Lehman

15   did when it was operating.  And that has been a continuing

16   problem that we're working on.

17        THE COURT:  This sounds like a prelude to your cash

18   management motion.

19        MR. MILLER:  Yes, sir.  It's involved in that.  Now,

20   Your Honor, on the evening of September 14th, late in the

21   evening, I might say, it was clear that given what was

22   happening with people picking up their belongings and leaving

23   and great uncertainty as to what was going to happen with

24   Lehman and the entire enterprise, it was clear that there was a

25   need for a very experienced personnel to deal with the

1  bankruptcy issues, the turnaround issues, etcetera. And it was

2  at that point that the company selected Alvarez & Marsal to

3  function in that capacity and Mr. Brian Marsal, one of the co-

4  founders of Alvarez & Marsal, was selected to act as the chief

5  restructuring officer. And Mr. Marsal, Your Honor, is in court

6  today with us and other members of his team.

7      Starting on Monday morning, the Alvarez & Marsal team

8  came on in force to start to try and organize what I can only

9  describe, Your Honor, as what might have been called a chaotic

10 situation with a great deal of uncertainty as to what was the

11 effect of the filing of the Chapter 11 case. The role of

12 Alvarez & Marsal has been critical in bringing order to this

13 process, Your Honor. The collapse of the integrated financial

14 reporting systems has had enormous impact. Prior to the

15 Chapter 11, I mentioned the total number of employees, Your

16 Honor. Of that 25,160 employees 13,710 were residents in the

17 United States. 1100 employees had been terminated in the two

18 weeks preceding the commencement of the case. The current

19 state, as a result of the Barclays transaction, Your Honor,

20 approximately 9100 plus employees became employees of Barclays

21 Capital Inc. The IMD division, the investment management

22 division of Lehman employs approximately 1,912 employees. And

23 that, really, Your Honor, is almost like a separate unit. It

24 includes the Neuberger Berman entities and that Neuberger

25 entity enterprise was never totally integrated into the Lehman

1    enterprise.  They had their own employees and so on.

2         Mortgage servicing had another 1,596 employees.  And

3    what has happened since September 15th, Your Honor, is Barclays

4    has taken possession of 745 Seventh Avenue and it is now the

5    Barclays Capital building.  About a week or ten days ago, the

6    Lehman -- I'll call it Lehman legacy -- moved out of the

7    building with the A&M team and moved to 1271 Avenue of the

8    Americas which was another Lehman office.  Of the Lehman

9    employees that have not gone to work for Barclays and are now

10   working at Lehmans, the legacy company under the direction of

11   the CRO, now number 164 persons.  And most of those persons,

12   Your Honor, are primarily legal and treasury.

13        One of the big difficulties, Your Honor, is that the

14   traders and others who were involved in the day to day business

15   of moving securities and so on are not employees of Lehman.

16   And this is a monumental task in connection with the resolution

17   of derivative transactions which are a very peculiar animal.

18        THE COURT:  This raises a question in my mind as to

19   how Mr. Marsal and his colleagues are able to access

20   institutional knowledge.  How do you do that?

21        MR. MILLER:  I'm going to get there, Your Honor.  I'm

22   going to get there.

23        THE COURT:  Okay.

24        MR. MILLER:  Okay?  So what has happened, Your Honor,

25   is A&M has about a hundred to 125 people working with the

1   legacy people.  The intention of Mr. Marsal is to recruit and

2   increase the workforce to approximately 450 people with the

3   bulk to be dedicated to derivatives, the bulk of the new

4   employees.  The organization for the administration of the

5   Chapter 11 cases contemplates -- and what has been done is that

6   A&M employees have been divided into teams.  There are, one, an

7   asset divestiture team.  And this team is responsible for the

8   loan book, the derivatives book, private equity, proprietary

9   portfolio, overseas assets, domestic banks, real estate

10  portfolio, tax refunds and receivables, aircraft, hardware and

11  other.  Then there is operational teams.  And these operational

12  teams include the following:  orders and claims, treasury and

13  accounting, wind-down transition, data preservation, forensic

14  review, IT interdependency.  And there are various senior

15  people assigned to each of those teams, Your Honor.  And one of

16  the first -- I'll get to this in just a minute, Your Honor.

17  The complexities of administration and enormous firefights that

18  have resulted, there are approximately 1.5 million derivative

19  transactions.  In the U.S., over a million derivative

20  transactions involving approximately 8,000 counterparties.

21  Many of those counterparties, Your Honor, under their -- is the

22  agreements elected to create and elected to declare an event of

23  default, the event of default being the commencement of the

24  Chapter 11 case by LBHI as the guarantor of the transaction.

25  This, Your Honor, is, I think, is the International Swaps and

Derivatives Association.

THE COURT:  I'm familiar with the term.

MR. MILLER:  So that there was an event of default on the 15th.  Each one of the counterparties declared September 16th as the early termination date.  And approximately 600 to 700,000 of those contracts, Your Honor, have been terminated. And essentially, I might say, Your Honor, with the exception of but a few, every movant for a Rule 2004 examinations is a counterparty who terminated a Swap or other derivative transaction.  And in many of these cases, after the early termination date, the counterparty has elected to value the collateral that was posted with Lehman and come up either with, in all of these cases, with a net claim against Lehman.  In the case, for example, like we used Harbinger for an example, Your Honor.  There were two transactions.  They were liquidated out and they ended up with net claims against Lehman.

Now, there's a question, Your Honor, as tot he valuation of the collateral which is something that will have to be gone into later on in the administration of these cases. The difficulties of administration, Your Honor, have been the demands by individuals for specific information as to their accounts.  It's been complicated by the disintegration of the systems.  The stored data, Your Honor, and I am not an expert on this stuff at all, are equal to two petabytes.  I'm told that's supposed to be very impressive.

1          THE COURT:  I think that you've communicated

2     something that neither you understand nor I understand.  So

3     it's not -- I gather it's a lot of data.

4          MR. MILLER:  I'm told that, Your Honor.

5          THE COURT:  Okay.

6          MR. MILLER:  And over 2700 applications -- and Mr.

7     Marsal's team has told me there's no staple solution where you

8     just push a button and material comes out.  There are literally

9     hundreds of inquiries and e-mails coming in on an hourly basis

10    over the first four weeks.

11         THE COURT:  Well, let me stop you for a second --

12         MR. MILLER:  Sure.

13         THE COURT:  -- because I can't tell if I should be

14    very concerned about this report or comforted by this report.

15    Should I be comforted that Mr. Marsal has this massive hard-to-

16    manage pile of data under control?  Or is it so massive that it

17    requires a tremendous amount of work in accordance with the

18    strategies and allocated personnel that you have described.  I

19    can't tell whether this is a good report or negative report.

20         MR. MILLER:  That's the climax, Your Honor.  No.

21    This is a good report, Your Honor.

22         THE COURT:  Oh, okay.

23         MR. MILLER:  Okay?  I may not be effective in

24    conveying that message but I hope we get there.  What I'm

25    trying to say, Your Honor, is the first three weeks were really

1    difficult, very difficult.  And I think we all owe a debt

2    gratitude to the effort which the Alvarez & Marsal team have

3    put in and the fact that all of these people have been working

4    around the clock to get control of this process.  And we are

5    beginning to see -- we are now moving, Your Honor, from the

6    kingdom of perpetual darkness into the light.

7         THE COURT:  It's a very vivid image.  Let me go to

8    one point of light.

9         MR. MILLER:  Sure.

10         THE COURT:  And this is a comment which I'm going to

11    make in the context of the status report but it may foreshadow

12    some of the things coming up at me, a portion of the agenda

13    that involves contested motion practice.  It's obvious that

14    there are any number of parties in interest who are

15    counterparties to swap transactions or entities that had prime

16    brokerage relationships with Lehman or other businesses that

17    have claims against Lehman that have expressed through the 2004

18    discovery which is before me a strong desire to get the facts

19    and if the facts aren't available through the debtors'

20    fiduciaries, they want the opportunity to pursue a 2004

21    discovery and get the answers themselves.

22         Are you able to tell me or is Mr. Marsal able to tell

23    me anything about his ability to respond within a particular

24    period of time to these reasonable information requests?

25         MR. MILLER:  Yes, sir.  What I'm trying to emphasize,

1  Your Honor, and what Mr. Marsal would emphasize if he were

2  standing in my place, is this is a really, an atypical case, a

3  case without any preplanning, a case which had a high level of

4  chaos the first week.  Order is being obtained out of this

5  process, Your Honor.  What we had tried to say to people

6  seeking information is give us an opportunity to put the

7  organization in place, to get the records, to get the

8  information that we can share with everybody.  And we have been

9  sharing information, Your Honor, as we have been accumulating

10  it.  Some of it is preliminary.  But we've been sharing it with

11  the creditors' committee.  Now, in a case of this size, Your

12  Honor, you can't have fifteen, twenty, thirty-five 2004

13  examinations.

14            THE COURT:  Well, I don't want to --

15            MR. MILLER:  Okay.

16            THE COURT:  --convert this into --

17            MR. MILLER:  All right.  But I want to ask you a

18  question, Your Honor.

19            THE COURT:  -- what amounts to a preview of that

20  argument unless it can be resolved in the context of what we're

21  now talking about.  And I'm guessing it won't be.  What I

22  really am looking for in the context of the status --

23            MR. MILLER:  Yes, Your Honor.  We --

24            THE COURT:  -- conference portion of this

25  presentation is whether Mr. Marsal, and I'd be happy to hear

1    from him, is able to rationally predict when he and his staff

2    will have sufficient control over the data that would, perhaps

3    not with the ease of pushing a button but with some relative

4    ease, can respond to particularized requests for information.

5            MR. MILLER:  Your Honor, as a matter of fact, we had

6    this discussion yesterday.  We had a series of meetings

7    yesterday.  And our best guestimate, and I'm calling it a

8    guestimate, Your Honor, is with all the efforts of the IT team

9    as put into place and we are negotiating protocols with the UK

10   administrators so that we can share information and, as Your

11   Honor knows, the Rule 2004 examination that the creditors'

12   committee special counsel wants to take, that's been continued

13   to November 5th because we're trying to work out a protocol on

14   that one.  The estimate, Your Honor, and Mr. Marsal can speak

15   for himself, is that in forty-five to sixty days, we should be

16   in a position where we can answer specific inquiries.  And

17   that's a goal, Your Honor.  But again, using the type of

18   phrase, two petabytes, that's a lot of information that we have

19   to get.  And the biggest issue here, Your Honor, is the

20   derivatives contracts.  We have to know what's in the inventory

21   in derivative contracts.  We have to know what is the value of

22   the collateral in connection with those.  And there are a lot

23   of problems about valuation because the market was changing

24   every day.  And the mark to market is not the easiest thing in

25   the world.  And then to find out whether it's a net claim or we

have money owed to us. Now, we are having difficulty, Your

Honor, that everybody that owes us money is not too anxious to

pay. Everybody we owe money to is sending us wire

instructions. It's a little bit different depending what side

you're on.

But let me just tell you, there are four guiding

principles that have been adopted by the chief restructuring

officer and permeates the entire system. And one, Your Honor,

is preserve, capture and store key data such that we can

reconstruct transactions and events. Two, address immediate

buyers impacting asset values and claims. Three, identify and

retain teams to work the problems. Four, determine pre-

bankruptcy events giving rise to causes of action or mitigation

of claims.

Now, in the context of this emergency situation that

we've been working, Your Honor, the first three are the highest

priorities. And number one is the preservation of data. And

just yesterday, we had a meeting with Barclays Capital. We

have to implement a transition services agreement in a broader

scale, Your Honor, so that we can have access to systems that

are now under the control of Barclays. And that's a project.

But we made progress yesterday. All of these things are being

dealt with, Y our Honor, on a daily basis. And as I said, the

conclusion was that in forty-five to sixty days, we will be

able to answer specific inquiries.

1          Now, in fact, one of the joinders to one of the

2     motions, we found out some information last night and told him

3     where his account was.  Most of these accounts are one off swap

4     agreements, Your Honor.  And the question is what happened in

5     the liquidation of the collateral relating to that swap

6     agreement.  Now, that's a specific area -- I don't know how

7     that translates -- I don't want to argue the motion now -- how

8     that translates into this broad, broad discovery.  But we're

9     cognizant of the issue.  And we are -- Mr. Marsal is and his

10    team are working diligently to get to that position.  There's a

11    whole team that is working on reconstructing -- I shouldn't say

12    reconstructing, resuscitating the systems.  And there's going

13    to be a bankrupt data center for all of this.  And that's not a

14    long time, forty-five to sixty days in a case of this size,

15    Your Honor.  And as Your Honor knows, there has been --

16    additional Chapter 11 cases have been filed.  There are now

17    seventeen debtors.  Most of the derivative transactions, Your

18    Honor, not entirely all of them but most of them were with

19    Lehman Brothers Special Finance Inc. which was a debtor which

20    was filed on October 3.  That particular entity, Your Honor,

21    was filed because one of the guiding principles was to preserve

22    value and protect the assets.  So if there was an entity that

23    might be subject to attachment or it might be subject to

24    seizure of assets then the decision was made -- you have to

25    file that before something happens.

1          In other cases, where you could take action to

2     protect the assets before it dissipated such as, I will tell

3     you, the Indian back office processing center.  Mr. Marsal and

4     his team got involved right away.  It was a very difficult

5     situation.  The employees there were forming their own group.

6     There were offers -- they were going to offer themselves to

7     another entity.  They got involved right away and we did a

8     transaction where the purchase price is going to be seventy

9     million dollars, a good portion of which will go to LBHI.

10          So continuing through this effort, Your Honor, was

11     having to make a determination should a particular entity be

12     put into Chapter 11.  And that resulted in the seventeen

13     entities that are now there.

14          THE COURT:  Can you tell me whether or not with the

15     exception of those entities whose filings might be mandated by

16     a party to a transaction such as the proposed transaction for

17     IMD, are there any entities that are currently in the departure

18     lounge and ready to file that I should know about or that

19     you're prepared to publicly declare?

20          MR. MILLER:  Not as of today, Your Honor.  Most of

21     the protective actions have been done, unfortunately, Your

22     Honor, in the case of LBSF, the special financing entity, there

23     were monies on deposit in that bank, JPMorgan Chase was the

24     banker for that entity and there was a state court proceeding

25     in which the Bank of America was attempting to, in effect, get

1    an attachment on that account.  And there was an order entered

2    in that proceeding, not quite a restraining order but leaving

3    the account undiminished.  And under New York State law, the

4    bank decided it had a right to set off those accounts.  And it

5    set off those accounts and we've reached an agreement with the

6    bank that it will hold those monies separate, not apply them

7    until there's a final accounting.  That company, Your Honor,

8    had a relationship with Chase on a derivative transaction and

9    Chase is in the process of liquidating the collateral in the

10   account.  It'll be settled someday.  And either the 500 million

11   dollars in round figures that were in that account will be

12   applied to that deficit or it will be returned.  So we have

13   that agreement in writing with the bank and the bank has been

14   very cooperative in that respect, Your Honor.

15          But, unfortunately, LBSF, Your Honor, has zero

16   dollars.  And that was the counterparty to all these other

17   counterparties in these swap transactions.  Then, of course,

18   LBHI is alleged to be the guarantor in relation to all those

19   swaps.

20          So the team that has been working is to preserve the

21   values, preserve the data, deal with the firefights and get an

22   organization stabilized.  And the difference between September

23   16th, Your Honor, and Monday of this week is really dramatic.

24   We now have an organization which I would say is humming.  They

25   know what they're objectives are.  They're moving forward.

1    Information is being developed.  We had a six and a half hour

2    meeting last week, Your Honor, with the creditors' meeting in

3    which there was good give and take, there's been a good

4    relationship with the creditors' committee.

5              This is not the typical Chapter 11 case, Your Honor,

6    where you have old management and a creditors' committee and

7    you're fighting for control.  The management today is Mr.

8    Marsal who reports to the board of directors, Your Honor.  And

9    the board of directors, I have to point out to Your Honor, has

10   ten members.  Nine of them are independent, not employees of

11   Lehman.  Nine independent directors.  And Mr. Marsal I think

12   is -- he can speak for himself, Your Honor, has met with them,

13   I think, at least once every week.  They're on top of the

14   situation.  He reports to them.  That's the only body he

15   reports to.  He is technically -- I would say not even

16   technically, Your Honor.  He is an independent impartial

17   objective administrator of this estate.  And, I have to say

18   this again, he has brought order out of this chaos.

19             The difficulty, Your Honor, is that we now have a

20   small workforce, just 160 people, the A&M people and now we

21   have this attempt to go out and recruit people, 200 of whom,

22   Your Honor, we want to put into -- he wants to put into the

23   derivative section.  That is the most complex.  The rest of the

24   information is going to start coming in on a regular basis.

25   Maybe we will get to the point where you can press a button and

1   the information will come up.  But we're not there yet.

2          So, since September 15th, Your Honor, we've done the

3   Barclays sale.  We have on the calendar today the proposed sale

4   of the IMD division.

5          THE COURT:  The procedures for that sale.

6          MR. MILLER:  I'm sorry, Your Honor.  To approve the

7   procedures for that sale.  We have on the calendar for today

8   two proposed sales, one of Eagle Energy and the other one of

9   R3.  And as I said, Your Honor, we have sold the back office

10  processing center in India to Nomura for a gross sales price of

11  seventy million dollars.  And we are in the process of

12  establishing protocols with the PWC joint administrators, the

13  Japanese supervisors of that company.  We have a protocol in

14  effect, an informal -- maybe we will reduce it to writing with

15  the SIPA trustee.  We've worked very closely with the SIPA

16  trustee.  And I would purport, Your Honor, that there is this

17  forensic unit which is going to turn its attention to a review

18  of all pre-Chapter 11 transactions.  We have three grand jury

19  investigations, Eastern District of New York, Southern District

20  of New York and the District of New Jersey.  A number of

21  people, I think the number is around twelve, Your Honor, have

22  already been subpoenaed to appear before those grand juries.

23  There's a state attorney general investigation.  So there are

24  huge demands that are being made but they're being coped with,

25  Your Honor.  They're being dealt with in seriatim.  Information

1    is going out.  A great deal of information, Your Honor, has

2    been furnished to the creditors' committee.  It's been a very

3    active participant in that.

4          Currently now, Your Honor, the estates hold in excess

5    of three billion dollars.  And I have to say, Your Honor, in

6    connection with some of the statements that were made at the

7    time of the filing of the Chapter 11 cases and in connection

8    with the Barclays sale, maybe people didn't realize this, Your

9    Honor, but Lehman operated basically under a very basic

10   corporate structure in U.S. businesses.  You have Lehman

11   Brothers Holdings Inc. at the top as the holding company.  And

12   basically, Your Honor, as the bank.  So you had all these

13   entities.  And every day cash was swept up to the holding

14   company.  And in the morning, the holding company disbursed

15   cash as needed.  Even though these were corporate entities, it

16   was basically operating -- I would have to say, Your Honor, it

17   was out trying on a preliminary basis almost as one ball of

18   wax.  LBI was the major paymaster --

19         THE COURT:  You don't really want to say that in this

20   hearing, do you?

21         MR. MILLER:  I withdraw that, Your Honor.  I said

22   it's a very preliminary matter, Your Honor.  I don't know where

23   that's going to go.  I really don't know.  That's the

24   investigation --

25         THE COURT:  Well, just for what it's worth, given

1    what you described as the chaotic circumstances surrounding the

2    filing and the fact that the chief restructuring officer is

3    only now in the process -- I'm not saying he's taking more time

4    than he should.  It's a huge job -- but only now in the process

5    of developing the strategies for getting full control over the

6    business.  I don't think on this record we should say anything

7    one way or the other that might be later quoted as a cause for

8    or against possible substantive consolidation.  And I don't --

9            MR. MILLER:  I don't mean to prejudge --

10           THE COURT:  I don't know that you were making any

11   such suggestion.  But it certainly caught my attention.

12           MR. MILLER:  I would limit it, Your Honor, just to

13   the way cash was managed in the system.  Most of the employees

14   were LBI employees.  And most of them used to get their W-2s --

15           THE COURT:  But you also have said pretty clearly in

16   the cash management motion that there were accounting entries

17   made reflecting the --

18           MR. MILLER:  Yes.

19           THE COURT:  -- debits and credits, those parties that

20   owed money, those parties that were entitled to money.  And

21   that at the end of whatever period of sweeping and paying out

22   money, there was some appropriate reconciliation based upon

23   properly maintained books and records.

24           MR. MILLER:  Absolutely, Your Honor.

25           THE COURT:  That I don't view as apropos of a single

1    ball of wax.  But it's your comment.

2         MR. MILLER:  No.  I --

3         THE COURT:  And you're either stuck with it or you

4    can retract it.  Up to you.

5         MR. MILLER:  I take Your Honor's advice.  I retract

6    it.  And I would confirm, Your Honor, there were debits and

7    credits made and accounting systems were maintained to show

8    intercompany transactions.  There's no doubt about that, Your

9    Honor. And --

10        THE COURT:  What I understood you to be saying is

11   that for cash management purposes, and we're not talking about

12   that motion now, but there was a reference to -- it was either

13   LBHI or LBI -- I, frankly, don't recall which -- served as the

14   "paymaster" --

15        MR. MILLER:  Yes.

16        THE COURT:  -- with respect to the various payments

17   to be made on behalf of the enterprise.  And if that's what

18   you're referencing, I accept that as not one ball of wax but

19   simply a cash management protocol.

20        MR. MILLER:  That's what I was referencing, Your

21   Honor.  But I would like to make just a comment, Your Honor,

22   because ever since the hearing on approving the sales

23   procedures in connection with Barclays, there's been a great to

24   do about the alleged 8.48 billion dollar alleged transfer on

25   the eve of bankruptcy from LBIE to LBHI which was referrred to,

1    I think, in the declaration as one of the administrators of

2    LBIE.  On a preliminary basis, Your Honor, there is no evidence

3    of any kind whatsoever that there was anything unusual or

4    outside the ordinary course of business --

5         THE COURT:  But is there evidence that the eight

6    billion dollars was, in fact, transferred from London to New

7    York on September 12th?

8         MR. MILLER:  No, Your Honor.  No.  The facts, as we

9    have them today, and, again, Your Honor, subject to

10   confirmation, is that LBIE is actually indebted to LBHI for

11   approximately eight billion dollars.  And LBI, Lehman Brothers

12   Inc., is indebted to LBIE for approximately 3.4 billion

13   dollars.  And if you netted those figures, there's still a net

14   payable from LBIE to LBHI.  Now, you've got to put that in the

15   context, Your Honor, that in the regular course of conduct, the

16   sweeps did occur.  And then the accounting entries were made.

17   Now, as I said before, Your Honor, on September 12th,

18   bankruptcy was not considered an option to Lehman.  People were

19   still working and preparing for completion and settlement of

20   trades on Monday the 15th and also arranging for the transfer

21   of funds.  That was stopped dead, Your Honor, on the 15 --

22   actually, on the 14th.  LBI closed down, there was a lockdown

23   on all systems in London.  Transactions that were supposed to

24   go forward on the 15th did not occur because of the bankruptcy,

25   Your Honor.  Those trades were not concluded.  Now, that's not

to say, Your Honor, that there was a bundle of money or a
bundle of securities that were going to move.  Remember, this
is all electronic.

So there are a lot of transactions, Your Honor, I'm
sure that got caught in the filing and got caught in the
administration proceedings and got caught in the appointment of
judicial supervision in the other offices.  And that's just
unfortunately, Your Honor, the consequences of a bankruptcy.
If there had been a bailout, that would not have occurred or
probably would not have occurred.  But that's what happened,
Your Honor.

And there's been a lot of talk, Your Honor, about the
alleged 1.3 billion dollars that initially was supposed to
be -- I shouldn't say be but it was on a balance sheet for LBI
on September 16 -- or 15.  And when we got to the actual Friday
when Your Honor approved the sale, the terms of the sale
changed and there was no cash going to Barclays.  What had
happened there, and we alluded to it and maybe superficially at
the hearing, is on Wednesday night, the CME, the Chicago
Mercantile Exchange, closed out all of LBI's transactions.  And
that cost about a billion two hundred thousand dollars of
posted margin.  So that ate up almost all of that billion
three.  The balance of the monies, I am told, Your Honor, and
again, this is all preliminary, was taken by Citibank in
connection with margin payments as the clearing bank for

1    commodities transactions.  And all during that week, Your

2    Honor -- and that was a terrible week, the market was going

3    down, values were disappearing.  And when we go to the closing,

4    there was no billion three hundred million dollars.  The only

5    money at LBI, and the SIPA trustee can tell us that also, was

6    in the 15C3-3 account which was the reserve account for

7    protection of customers.  And in that account, there was a

8    billion dollars in cash and there was 700 odd million dollars

9    in securities for customers.  And then there was another

10   account for broker customers which had about 460 odd million

11   dollars in it.  And as part of the Barclays closing, because

12   Barclays was taking the customer accounts, they got the 700 odd

13   million dollars in securities.  The one billion dollars in cash

14   and the 400 odd billion dollars in securities is still in the

15   15C3-3 account and can't be released until the SEC authorizes a

16   release.  And if it is released, it will go to the SIPA

17   trustee.  So that's what happened to that money, Your Honor.

18           There are ongoing issues, Your Honor, with JPMorgan

19   Chase on reconciling the ultimate closeouts.  That's a problem

20   for another day, Your Honor.

21           So, in conclusion on my status report, Your Honor,

22   let me say this.  Maybe the word "chaos" was an extremely

23   emotional word.  It was a difficult situation.  None of the

24   employees anticipated that there would be a bankruptcy.  There

25   was a lot of uncertainty.  And in the period of, I would say,

1   Your Honor, less than four weeks, with the tremendous

2   contribution of Mr. Marsal and the A&M team, we now have a

3   functioning organization, an organization that is retrieving

4   information, putting it in proper form for distribution.  We've

5   had a very active creditors' committee which has been extremely

6   helpful in getting this organization in shape so that we are

7   now moving into what I hope, Your Honor, is a return to

8   normality.  Is it the end of abnormality?  I can't say that,

9   Your Honor.  But it is certainly the beginning of the end of

10  abnormality.  We are moving in the right direction.

11          THE COURT:  Well, you're talking about the beginning

12  of normality in a bankruptcy case.

13          MR. MILLER:  Yes, sir.

14          THE COURT:  Not the beginning of normality in the

15  sense of what this business was.

16          MR. MILLER:  No, sir.

17          THE COURT:  We're really talking about being able to

18  progress without the kinds of emergencies that characterize the

19  first thirty days of the bankruptcy.

20          MR. MILLER:  Exactly, Your Honor.  That's what

21  we're --

22          THE COURT:  Okay.  Fine.

23          MR. MILLER:  We took your admonition on the 20th to

24  get this case into the normal Chapter 11 framework and that's

25  what we're working on.

1          THE COURT:  Okay.  I appreciate your report.  I have

2     a question or two for you and I may have a very general

3     question for Mr. Marsal.

4          MR. MILLER:  Sure.

5          THE COURT:  The question for you, principally,

6     involves can you provide at this juncture any predictions of

7     coming attractions as to what you anticipate requiring of the

8     Court over the next sixty to ninety days or is this still a

9     case that is in a reactive mode?

10          MR. MILLER:  Your Honor, we are moving, I believe,

11     and Mr. Marsal can confirm this, I hope, we are moving out of

12     the reactive process and that phase.  And I believe we're

13     moving into a phase in which we are beginning to think

14     affirmatively in what will be the ultimate objective in these

15     Chapter 11 cases.  Is it just going to be a wind down or is

16     there something -- some entity or groups of entities that may

17     be reorganized so that this process can be brought to an

18     earlier termination.

19          It is going to be a long process, Your Honor.  What

20     is coming up in the immediate future, and I think is probably

21     the most critical thing we are facing right now, is the ability

22     to recruit qualified people who can assist in unwinding the

23     most difficult transactions that we have.  And again, Your

24     Honor, I refer to the derivatives.  I believe that the team and

25     the Lehman legacy people, they have the real estate situation

1     under control.  They are beginning to get control of all of the

2     data.  Yes, there are some assets that you might say are in the

3     danger situation.  But every one of those assets has a team

4     that's focusing on it.

5            So coming up before Your Honor, I think very shortly,

6     will be a request for authority to put into place a recruitment

7     program to get qualified people.  And the difficulty with that,

8     Your Honor, and we've discussed this at length with the

9     creditors' committee is to get the kind of people that are

10    needed with the expertise that is required in the Wall Street

11    community which I don't want to characterize it -- I'll

12    characterize it the way other people do as very high

13    compensation levels.  A compensation that may have to be

14    offered is not the compensation you would normally find in a

15    Chapter 11 case.  And that is the problem that we are trying to

16    deal with.

17           THE COURT:  It sounds like a problem that may be as

18    much optical as it is anything else.

19           MR. MILLER:  That's right.  I can visualize, Your

20    Honor, the stories if we were to hire somebody at x amount of

21    dollars.  But it may be expensive in the first instance but the

22    fruits of that employment will be many, many fold more than the

23    cost of employment.  And what we're trying to do is work it out

24    with the creditors' committee.  I think that's the first thing

25    that's going to come up before Your Honor.

1          THE COURT:  All right.

2          MR. MILLER:  Okay?

3          THE COURT:  Anything else?

4          MR. MILLER:  Not at this moment, Your Honor.

5          THE COURT:  Okay.

6          MR. MILLER:  Thank you.

7          THE COURT:  The other question, which is really a

8     question for you and I'm going to ask this of Mr. Marsal, too,

9     there is an overriding theme in at least certain of the

10    objections that have been filed by the informal noteholders

11    group, certain of the 2004 requests and the term that seems to

12    appear repeatedly is "transparency".  It's a term that I myself

13    used at the last omnibus hearing.  I think I have heard you

14    say, although in not precisely a declarative sentence, that the

15    efforts currently underway by Mr. Marsal and his team from

16    Alvarez and Marsal are ultimately dedicated to the proposition

17    that this will be a transparent case in the sense that

18    individual creditors who have information requests will be able

19    to have those requests satisfied within a reasonable period of

20    time after making those requests.  Am I right in drawing that

21    conclusion?

22          MR. MILLER:  I will make it a simple declarative

23    sentence, Your Honor.  Yes.

24          THE COURT:  Okay.  My question for Mr. Marsal will

25    then be how is he going to do that.  When does he believe it's

1   going to happen?  And what are the contingencies that we need

2   to be concerned about between now and whenever it does happen

3   that might impact the success of that venture?

4           MR. MARSAL:  I'm sorry, Your Honor.  Can you repeat

5   what you just asked me?

6           THE COURT:  I absolutely can't.  You're going to have

7   to remember it.  Basically, how are you going to get this done,

8   when is it going to get done and what are the problems that you

9   foresee in getting it done?

10          MR. MARSAL:  Well, Your Honor, let me just take a

11  second to explain to you when we came into the case, the first

12  order of business was to try and protect the data.  In other

13  words, save the data so we can fight another day.

14          THE COURT:  And when you use "data" in the context of

15  a business of this sort, you're really talking about the assets

16  because so much --

17          MR. MARSAL:  Yes.

18          THE COURT:  -- of what goes on in a business like

19  this is electronic transfer, correct?

20          MR. MARSAL:  Correct.  Transactions.  Transactions.

21  Trades.  Also capturing the e-mail of people, what did people

22  intend.  So the first order of business was trying to capture

23  that data and protect the estate so that we can again

24  reconstruct what happened, who shot who.

25          Second order of business, because the nature of this

case -- there are two kinds of assets.  There are financial

assets and there are human assets.  The financial assets fall

into two categories:  melting ice cubes, which have a very

short lifespan and have driven you crazy the last thirty days,

but if we don't deal with that then we lose whatever value

those melting ice cubes have.  And then the second book of

assets are a liquid assets.  And those assets will be dealt

with and are being dealt with in a more -- in a more

regularized fashion which we will be dealing with over the

coming months.

As far as the human side, this is -- the assets of

this business are two-footed.  If we, knowing that this is a

wind down, if we do not move on those assets and dispose of

those assets or find a new location for those assets then we'll

not only find ourselves without a lot of the -- we'll find

ourselves with issues such as severance, such as the

dissipation of further value for the estate, but we'll also

lose the knowledge that we could have from those people.

In trying to solve the derivatives problem, we're

going to have to rely heavily upon the knowledge that's in the

Barclays -- that are with the people that are now at Barclays.

And that's where we met yesterday.  We not only need the

technology but we need the cooperation of the people from

Barclays.

THE COURT:  Does the transition services agreement,

1    as it's currently structured, give you comfort that you can

2    gain access to the people who know what you need to know?

3            MR. MARSAL:  It's a difference of opinion on that,

4    Your Honor.  We have struggled a bit at the outset.  But I

5    believe that -- I believe that it is the intentions of Barclays

6    to help us on the technology side and on the people access

7    side.  But I could very well be back to you in a couple of

8    weeks with a very different -- in terms of -- with a very

9    different position on that.  It is essential that we get the

10   cooperation of Barclays on the DSA.

11           But to continue on, Your Honor, the third -- after we

12   address the melting ice cubes, if you would, the third order of

13   business is recruiting the team because we do have liquid

14   assets and we have massive claims.  So we have to recruit the

15   team who are qualified to estimate the claims, strike the

16   deals, settle up the derivative contracts.  That's what we're

17   doing now.

18           The fourth priority, and, believe me, I understand.

19   Anyone who's lost x millions of dollars comes in and says

20   where's my collateral, where's my cash.  They've got a right to

21   that.  They've got a right to ask that question and I empathize

22   with them.  The difficulty with that is that the first day --

23   within the first week, Mr. Miller came to me and he asked me

24   about this eight billion dollars which was a boohaha.  As he

25   said to me, the prime minister of the United Kingdom thinks

1    that we stole some money.  President Sarkozy of France thinks

2    that we're bad people.  Can you address this issue.  Diverted

3    the activity from the other three priorities and focused the

4    team on trying to construct it.  What we found, Your Honor,

5    there isn't anybody making off with the money.  It's a cash

6    management system which, as Mr. Miller said, it provides cash

7    in the morning and it sweeps cash in the evening.  At the end

8    of the day, LBI owed approximately 2.3 billion dollars to LBIE

9    on Friday, as a preliminary basis, I understand.  But the U.S.

10   trading operation owed the European operation 2.3 billion

11   dollars.  Had that payable been made, I mean, had that cash

12   been transferred -- keep in mind, Your Honor, it would have

13   been swept.  It would have been swept.  There would never be

14   cash in the European operation under the cash management

15   system.  So the inference that there was no cash and there was

16   something nefarious is just wrong.  In fact, it's silly.  But

17   we invested a lot of time to determine that and that kind of

18   got diverted.  So I went back to Mr. Miller and I said, really,

19   we can't be spending our time on this right now.  We have too

20   many other fires.

21          The biggest problem I have right now, Your Honor, is

22   having the information.  We're trying to reconstruct the

23   information.  I can put a lot of people on this assignment and

24   have them sit there twiddling their thumbs.  Until I get the

25   receiver at Pricewaterhouse, until I get SIPC, until I get

1  Barclays all cooperating so I have the data and I can start to

2  get through these transactions, I'm just wasting the estate's

3  money.  Today, we are much closer to being in a position to do

4  that.  We have six work streams, forensic work streams, each

5  led by a partner of Alvarez & Marsal trying to -- in one work

6  stream would involve, for example, intercompany accounts.

7  Another work stream is dealing with the actual transactions

8  which occurred from September 1st through the filing date.

9  Another work stream is dealing with preferences.  Another work

10  stream is dealing, again, with the preservation of the data

11  issues.  All that's moving forward.  And I'd like to satisfy

12  all 8,000 requests that I may have, or how many requests that I

13  have, but I sort of figure everybody has a right to the same

14  thing at the same time.  And so what we're trying to do is to

15  position this thing so we can begin to respond to those

16  requests, all of which are fair.  And, Your Honor, I think in

17  forty-five to sixty days, we'll be well along.  But I'm sure

18  there'll be people who will say why aren't you addressing my

19  requests because we have so many.

20  THE COURT:  Well, from what you've said, it sounds to

21  me that the greatest imponderable here may be the alignment of

22  the different parties who need to cooperate in order to get you

23  the access to data that you need and presumably the access to

24  individuals who can interpret the data.  Is that correct?

25  MR. MARSAL:  That's correct, Your Honor.

1          THE COURT:  What's the process for solving that

2     problem?

3          MR. MARSAL:  Well, the parties who are -- I mean, the

4     key parties to this is the TSA agreement with Barclays.  We met

5     with the highest level of Barclays yesterday to have a very

6     frank conversation with some of the issues that we had.  And I

7     believe we made a lot of progress yesterday.  I think what --

8     the intentions at a senior level have not filtered down to the

9     more junior people within the organization and I was assured

10    yesterday that's going to happen.  But without their

11    cooperation, we're in a lot of trouble.  And even more

12    important than the retention agreement -- the recruiting motion

13    that will be coming down the pipe is that we need to get the

14    cooperation of Barclays.  And then I need to get the

15    cooperation, which we met the day before, with the

16    Pricewaterhouse receiver.  So if we have Pricewaterhouse

17    receiver and we have Barclays, we'll be well on our way to

18    being able to do this.  Without their cooperation, we're in

19    trouble.

20         THE COURT:  So your forty-five to sixty day time

21    estimate is an estimate which assumes that at some point early

22    within that time horizon, you're able to gain the cooperation

23    presumably by consent because you're not going to be doing it

24    any other way with the other parties in interest here that need

25    to work together for this to be a successful enterprise,

1  correct?

2         MR. MARSAL:  Exactly.  For us to answer your question

3  of what happened to a transaction, we need those other two

4  parties -- in most instances, those two parties -- to

5  cooperate.  In all instances, we need Barclays' cooperation.

6         MR. MILLER:  And as Mr. Marsal pointed out, Your

7  Honor, we met with one of the U.K. administrators the day

8  before yesterday.  We met with Barclays yesterday.  There's a

9  team working in London.  Initially, we were denied access to

10  the London headquarters.  We now have access to the quarters.

11  So progress is being made.  And I would ask Mr. Marsal, is it

12  your intention that this be a transparent proceeding?

13         MR. MARSAL:  Absolutely.  This is an entity which is

14  in a wind down.

15         THE COURT:  Okay, fine.  That's very helpful.  Thank

16  you.  I have one more question for Mr. Miller.

17         MR. MILLER:  Yes, sir.

18         THE COURT:  It's obvious that this is a global

19  business, and by my count, and I may be missing an important

20  item, there are four principal insolvency proceedings that are

21  occurring concurrently.  There's the LBHI bankruptcy case

22  together with its affiliated entities.  There's the LBI SIPA

23  proceeding.  The U.K. insolvency of LBIE and the Asian

24  insolvency proceeding involving the acquisition of various

25  assets by Nomura --

1        MR. MILLER:  Correct, Your Honor.

2        THE COURT:  Is there --

3        MR. MILLER:  There's one other, Your Honor.

4        THE COURT:  What's the one I'm missing?

5        MR. MILLER:  The Swiss company, Your Honor.  The

6   Swiss Federal Loan Bank Commission is basically taking control

7   of that entity, LBSSA.

8        THE COURT:  Okay.  I have a -- call it a cross-border

9   or global insolvency question.  Is there a coordination of

10  these various proceedings so as to minimize the risk of cases

11  that are running at cross purposes and is there some group of

12  people who is in charge to the extent that's possible of

13  coordinating this global insolvency?

14        MR. MILLER:  I would answer that question, Your

15  Honor, with a broad yes.  The main concern is really LBIE which

16  is a critical part of the Lehman operation.  And as Mr. Marsal

17  alluded to, we met with Mr. George Jacobs at PWC on Tuesday.

18  It is our intention to negotiate a protocol to share

19  information.  It will be reciprocal.  They need information

20  from us and we want information from them.  And it was an

21  encouraging meeting.  There are attorneys in London.  There's

22  an A&M team in London that are working with the PWC

23  administrators.  The Asian, Your Honor, is not as critical and

24  there are people working -- I know out of my Hong Kong office

25  that are working with the judicial supervisors in the Asian

1   cases.  So it's all being administered and it all comes back,

2   Your Honor.  And there are weekly meetings, almost daily

3   meetings with Mr. Marsal where each of these are reviewed.  And

4   the attempts to get protocols really started about six days ago

5   when we finally got our arms around everything, got settled

6   into 1271.

7         So, yes, everybody recognizes it's a global business.

8   And everybody's trying to point out that there is a need for

9   reciprocity.  As Mr. Marsal points out, the biggest one is the

10   implementation of the transition services agreement.  And I

11   think he's absolutely right.  At the highest levels of

12   Barclays, there is every statement of cooperation.  It's when

13   you get down to the lower levels.  And it's a simple process,

14   Your Honor.  A former Lehman employee who was probably involved

15   in the trading operation, when you want to have access to that

16   person, you talk to that person without castigating in any way

17   the attitude on Wall Street, that person is likely to say look,

18   that's my past life.  I'm finished with that book.  I'm worried

19   about my future.  I've got a job here and I want to do well at

20   this job.  So it's getting those people getting instructions

21   from high on saying you have to do that.  And every

22   encouragement was given to Mr. Marsal in the meeting we had

23   yesterday.

24         THE COURT:  Okay.  Fine.

25         MR. MILLER:  Thank you, Your Honor.

1          THE COURT:  Thank you for that report.

2          MR. MILLER:  As I understand, Your Honor wants a

3    status report from the SIPA trustee and then we'll go to the

4    agenda?

5          THE COURT:  Yes.

6          MR. KOBAK:  And, Your Honor, if we may, the trustee

7    himself is prepared to give that report.

8          THE COURT:  That's fine.  Good afternoon.

9          MR. GIDDENS:  Thank you, Your Honor.  James Giddens.

10   What I said earlier at the time of our appointment in the

11   lengthy hearing was that there had been extraordinary

12   cooperation among various regulatory agencies.  That has

13   continued.  It's also continued with most of the parties in the

14   case.  And many of the same issues Mr. Miller alluded to affect

15   us.

16          I should say that the restructuring, I think, in the

17   end will be beneficial to all the creditors.  That is, the

18   transfer of most of virtually all of the subsidiaries of the

19   broker dealer to the holding company in return for which the

20   holding company received a note as to what the value will be is

21   structurally beneficial.  The SIPA proceeding requires that the

22   broker dealer be liquidated.  And therefore, what we're left

23   with is really a rather clean entity dealing with the

24   securities transactions and the issues that are peculiar to a

25   SIPC proceeding.

1          In a global sense, what we have accomplished, which

2     is really one of the mandates of the SIPA statute, is the

3     transfer of customer accounts to other broker dealers.  We've

4     transferred 135,000 customer accounts and approximately 140

5     billion dollars of collateral and property in those accounts

6     which belongs to them to either Barclays or to Broadridge

7     Clearing, which is a Neuberger Berman entity.  That's taken an

8     extraordinary effort that's been our primary focus.  And that's

9     consistent with the SIPA statute which states that with the

10    approval of SIPC supervision of the SEC, you can hire

11    professionals to begin immediately that process.  We retained

12    the firm of Deloitte & Touche who are highly skilled in broker

13    dealer operations.  And they are really our only employees.  We

14    are also in the process of trying to hire competent individuals

15    to complete the other parts of this proceeding.  As I say, the

16    most significant achievement, and nothing like it's ever

17    happened in the securities industry, is literally in a matter

18    of weeks to transfer out 140 billion dollars of property and

19    135,000 customer accounts.  Those individuals have access to

20    their accounts and they have not been harmed except by the

21    market.  But the purpose of the statute and that part of it has

22    worked very well.

23          We have faced extraordinary difficulties in the same

24    sense.  The day that the Lehman SIPA proceeding was filed

25    Lehman was -- the former Lehman operational personnel were

1   denied access to any of the information they would ordinarily

2   have relating to something like 300,000 transactions a day.

3   We've had to work painfully to restore that access.  With the

4   clearing banks and the Depository Trust Corporation.  This is

5   not meant to be a criticism of anyone.  I think the dice were

6   thrown on this proceeding and people simply did not foresee how

7   complicated, protracted and sort of painful the process would

8   be.  We have --

9       THE COURT:  The dice were thrown?

10      MR. GIDDENS:  Well --

11      THE COURT:  I'm just trying to understand what you

12  mean by that.

13      MR. GIDDENS:  I meant the decision -- I think the

14  decision Mr. Miller --

15      THE COURT:  The decision to allow Lehman to fail?

16      MR. GIDDENS:  Yes.  Yes.  I think -- that may be an

17  improper metaphor but all I'm saying is that I think regulators

18  and others involved could not foresee some of the consequences

19  and complications of allowing the fourth largest global firm to

20  fail.

21      So we have made progress in gaining access to

22  information which is absolutely essential to telling people

23  what is in their accounts and to dealing with other issues.

24  There are approximately 630,000 accounts at the broker dealer.

25  As I say, the restructuring operations that they've gone

1    through has isolated the broker dealer which have substantially

2    less assets than it had on its balance sheets, say, in May

3    2008.  However, that allows us to focus on resolving these

4    customer claims.  As I say, there are about 630,000 claims or

5    customers who will have claims.  Many of those will be

6    satisfied in full and they will have no claim against the

7    estate.  But there are 300,000 failed transactions, very

8    complex financial transactions which will result probably in

9    billions of dollars of claims against the estate.  In terms of

10   available assets, the asset purchase agreement contemplated

11   that the broker dealer would receive 250 million dollars.  That

12   was changed in the wee hours of Sunday morning to which we

13   agreed that money had to be pledged to DTC to collateralize

14   clearing obligations.  Billions of dollars of Lehman

15   obligations are cleared through DTC or were on a daily basis.

16   So, on a pro forma basis where we were supposed to have 300

17   million in cash, we, in fact, were reduced to perhaps fifty

18   million in cash.  You're also faced with the fact that there

19   are hundreds of banking relationships throughout the world

20   where most of these banks assert that they are secured

21   creditors that are also involved in transactions with Lehmans

22   and they imposed administrative holds on access to cash

23   including what we view as customer cash.

24          So, as I say, many of these problems are difficult

25   and they are being worked through.  I think fortunately with

1    the cooperation of everyone involved, including clearing banks

2    and DTC, we've been able to achieve something significant in

3    transferring the customer accounts.  We still have prime

4    brokerage accounts who were not acquired by Barclays and the

5    prime brokerage accounts are, principally, hedge funds with

6    very complex and differing strategies.

7            We have issued a protocol in accordance with SIPC's

8    approval and in consultation with the SEC, which tries to

9    devise a process by which those accounts could be transferred

10   out which is novel in a SIPC proceeding.  Anyone always has a

11   right to assert their right to assert a claim under SIPA and to

12   go through that process.  That is likely to be a protracted

13   process.  We have already moved, I believe, some 900 million

14   dollars worth of prime brokerage property and we've moved --

15   accounts.  We have contacted all of the -- or are in the

16   process of contacting and talking directly to the, I think, 365

17   separate hedge funds.  These are very, very complex.  It's

18   complex in part because many of them also have positions with

19   the U.K. administrator as to which we do not have at this time

20   information and jurisdiction.  And I should say in that regard

21   we, too, will be meeting with the U.K. administrator and we

22   have proposed, along with Mr. Miller, that we all work out a

23   protocol of some of the models which have been adopted in other

24   cross-border cases in the Southern District.

25           As I say, we are beginning to -- the next big phase

1    after we finish transferring what we can will be the claims

2    process and the analysis of 600,000 claims and the number which

3    may be contested, all of which will have a right to come to

4    court, will present very, very significant issues as to how you

5    handle and how we can handle that in some kind of efficient

6    process.

7         We are -- as I say, part of our process has been to

8    try to coordinate fully not only with the regulators and we've

9    had an enormous cooperation from the SEC in Washington and New

10   York and the Federal Reserve, the CFTC and others but we also

11   have a weekly meeting with the holding company to talk about

12   mutual issues and the like.  And we have Deloitte also

13   beginning the process of preserving information.  Just to

14   highlight this, we were told that Lehman has something like

15   2,170 different computer programs for different kind of

16   information, all of which has to be understood and, again, it's

17   going to take time to do all this.  We, too, as I say, are

18   willing to share information with anyone.  I think mostly what

19   we need and the staff needs is time to -- probably a month or

20   two months to complete the transfers of accounts which is a

21   primary purpose of the SIPA proceeding.

22        So I think we made significant progress.  But I do

23   think there will be a long complicated process in sorting out,

24   for example, what are the claims from the 300,000 failed

25   transactions which involve repos, stock loans, etcetera.  Thank

1     you.

2          THE COURT:  One question for you.  When you talked

3     about a cross-border protocol of the type that is frequently

4     entered into, I'm not sure that there is a protocol that's

5     precedent for this kind of situation.  If you're aware of one,

6     you can tell me, but I don't think there is one.  Is it

7     contemplated that there'll be some effort to come up with a

8     cross-border netting arrangement in which parties who dealt

9     with Lehman as a single enterprise are able to or claim the

10    right to net across borders?

11         MR. GIDDENS:  Yes.  That certainly would be

12    objective.  I should comment that one of the difficulties here

13    is there is a 180 degree approach under the U.K. and our

14    system.  Our system emphasizes returning cash and securities to

15    customers as quickly as possible.  The U.K. procedures, which

16    they've announced, is not that.  It's a process of allowing

17    people to see how things shake out what the assets are in

18    allowing them to file claims.  So that's creates -- whether

19    that can be properly meshed in or not, I don't know.  But we're

20    also meeting with the U.K. administrator and his counsel today.

21    And clearly, out of fairness to any claimant, they should

22    have -- there should be some kind of process that metes out

23    what the claims should be.  As to how that will work out, I

24    don't know.

25         THE COURT:  Thank you, Mr. Giddens.

1          MR. GIDDENS:  Mr. Caputo from SIPC is available to

2     make a few comments if you'd like to hear from him.

3          THE COURT:  Only if he'd like to make them.

4          MR. CAPUTO:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. CAPUTO:  Just a few brief comments that I think

7     will help the Court get a fuller picture of where we are and

8     what we've done so far and what we anticipate coming down the

9     pike.  Throughout the process, we have continued to coordinate

10    our activities with a host of agencies and regulatory bodies

11    including the Securities and Exchange Commission, the Fed, the

12    New York Fed, CFTS, FINRA and DTC and we thank them for their

13    cooperation.  But we meet with them and I think it's important

14    the Court know that we meet with them almost daily, sometimes

15    multiple time a day we have conversations with these entities

16    in order to coordinate some of these protocols that are being

17    issued and some of these -- getting over some of the more

18    difficult issues.  We've acted as a facilitator of transfer of

19    information, both receiving it in and providing it out, to all

20    of those agencies and the White House.  The transfer of

21    accounts was a significant achievement in the case because it

22    allowed these 140,000 customers access to their property which

23    they have.  So they are, in effect, for the most part out of

24    the process and hopefully in full possession of the property

25    that they seek.  Now, they may have claims and they may have

1    damage claims that they can assert against the estates and we

2    will -- that will remain to be seen.  But for the most part,

3    the achievement of getting 140,000 customers out with the 140

4    some odd billion dollars was tremendous and took a tremendous

5    amount of attention.

6              There were a number of things, as Mr. Miller alluded

7    to, their transactions caught in the filing, Mr. Giddens

8    mentioned 300,000 failed.  Certainly, that presents a huge

9    problem to sort out.  There were transfers of accounts through

10   a process called the ACATS transfer system which is run by the

11   NSCC which is a division of DTC.  And there are about 16,000

12   ACATS transactions in the system.  And the normal process of an

13   ACATS transfer, as I am told by DTC, takes about two to three

14   weeks.  If a customer goes into a broker dealer and wants to

15   transfer their account, it takes about two to three weeks to

16   move that in the ordinary course of business.  Here, you had

17   about 16,000 of them and the system simply cratered and could

18   not be dealt with at that point.  But that is currently being

19   worked out through the efforts of Mr. Miller's estate, the SIPA

20   estate, DTC and the others who come into play.  The protocols

21   that have been developed, again, have been done wiht the

22   assistance of everybody.  It does not preclude anyone from

23   filing a claim.  And the process that we envision going forward

24   will make that very clear to customers that they can afford

25   themselves the opportunity to file a claim for damages if they

1    believe they have any.  The protocols really afford them an

2    opportunity to get access to their property in a much more

3    expeditious manner which we think is the focus of the case.

4          We have -- in the past, SIPC has drafted and we have

5    effected a memorandum of understanding with our British

6    counterparts.  We have contacted them and caused that to take

7    effect.  Hopefully, that will help in the development of an

8    international protocol here.  We've been in communication with

9    them.  And we will of course be assisting with the

10   communication with the LBIE representatives at Pricewaterhouse

11   and their counsel.

12         So the coordination proceeding is ongoing.  The only

13   other thing that I would mention is coming down the road, what

14   we envision is the -- what we would call the housekeeping

15   papers will be brought before the court very soon.  That will

16   be asking the Court by motion to approve the process to notice

17   the proceeding in newspapers all across the country and

18   internationally and to mail claim forms to customers, all

19   630,000 customers as well as general creditors.  This is all

20   envisioned and provided for specifically under SIPA.  We intend

21   to carry that out in the near term.  And I believe we're

22   seeking to have a notification date -- notice date, excuse me,

23   and a mailing date so that there's some change, but roughly

24   around December 1st.  So we think we'll be getting off the mark

25   very quickly in terms of getting people an opportunity to file

1    a claim with the SIPA trustee for anything that they have.

2          One final point.  I think it's important that people

3    understand that SIPC doesn't hold, possess or have at this

4    point anything in this case.  We are simply a facilitator of

5    information.  We provide access to data where we can use our

6    offices to do so.  But we are not in custody or control of any

7    of the data or any of the property.  And we get numerous

8    inquiries about that issue about why isn't SIPC doing -- giving

9    up the access to the property or something along those lines.

10   Mr. Marsal even stated that contact with SIPC was potentially a

11   problem.

12         And I just want to stress to the Court that we have

13   been there -- there has been a SIPC person in New York,

14   multiple people in New York, every single day since even before

15   this case began.  And they are there today working on this

16   case.  I myself have been in New York, as this Court well

17   knows, every week since the process began.  And we intend to

18   act as a facilitator.  We've worked hard hours to do that.  And

19   we do not stand in the way.  But there are many, many rough

20   patches to get over and we're -- I think it's fair to say that

21   I agree with Mr. Miller and Mr. Giddens that we are moving from

22   the reactionary phase of this case into one where we can be

23   more proactive.  And a good example of that is the motion for

24   the housekeeping which will allow for the claims process to

25   ensue.

1          THE COURT:  Fine.  Thank you, Mr. Caputo.

2          MR. CAPUTO:  Thank you, Your Honor.

3          THE COURT:  Mr. Miller, it's now almost a quarter to

4    one.  My suggestion is that we proceed with everything on the

5    agenda that's uncontested and hopefully that won't take a

6    tremendous amount of time.  We'll then see where we are in

7    terms of a best estimate as to how much time is likely to be

8    required for the contested matters.  If, as I'm surmising that

9    that's a substantial amount of time, we may want to take a

10   break for lunch after you deal with the uncontested items.

11         MR. MILLER:  Thank you, Your Honor.  Your Honor, I

12   should have mentioned one other thing in the status report.  On

13   September 17th, Your Honor did approve on an interim basis,

14   debtor-in-possession financing under Section 364 and it was

15   originally scheduled for today a hearing for final order.  The

16   debtor-in-possession financing, we drew down 200 million

17   dollars of the revolving credit facility.  That has been repaid

18   and the motion has been withdrawn, Your Honor.

19         THE COURT:  And has the debtor, and I presume this is

20   Mr. Marsal's business judgment, concluded that there's no need

21   for DIP financing in the case and there's no foreseeable need

22   for future financing.

23         MR. MILLER:  That is correct, Your Honor.  And I

24   alluded to, Your Honor, the committee's 2004 motion has been

25   adjourned to November 5th.

1          THE COURT:  Let me, just because this housekeeping

2     item came up, ask the committee to comment on something.  There

3     is pending a matter which has been adjourned to November 5,

4     where the committee was seeking reconsideration of certain

5     aspects of the interim DIP facility if I remember correctly.

6     Is that mooted out by virtue of what's happened or is there an

7     issue with respect to the interim DIP order that I'm going to

8     need to revisit on November 5?

9          MR. DUNNE:  Your Honor, Dennis Dunne of Milbank,

10     Tweed on behalf of the official creditors committee.  The short

11     answer is it is not mooted out yet.  There are discussions with

12     Barclays with respect to some of the fees that are arguably

13     were approved by Your Honor on an interim basis and whether

14     those fees were triggered or not as a result of the termination

15     that --

16          THE COURT:  Have those fees been paid?

17          MR. MILLER:  Excuse me, Your Honor.  The fees in

18     connection with the interim were paid, Your Honor.  What Mr.

19     Dune is precluding to is what I call loosely a prepayment

20     premium.  And there is a dispute over that.

21          THE COURT:  No reason to deal with that until

22     November 5.  I just wanted to know if it was still a live

23     grenade the way it is.

24          MR. MILLER:  It is under discussion, Your Honor.

25          THE COURT:  Fine.

1          MR. MILLER:  It has been the subject of discussion.

2          Your Honor, on housekeeping motions.  There is a

3    motion that agenda Item I, Item 2, Docket Number 3, 831, Joint

4    Administration Motion for the Chapter 11 cases that were filed

5    on October 3 and on October 5, Your Honor.  There is no

6    opposition for that.

7          THE COURT:  That motion is granted.

8          MR. MILLER:  The second item, Your Honor, is agenda

9    Number I, Item 3, All orders motion.  This is a request by the

10   debtors, Your Honor, to apply certain orders entered in these

11   cases and the first day affidavit to the cases discussed --

12   that were filed on October 3 and October 5th and the

13   application itemizes the particular orders, Your Honor.

14         THE COURT:  That's fine.  That's consistent with

15   similar orders entered earlier during the administration of

16   these cases and I will grant that as well.

17         MR. MILLER:  Thank you, Your Honor.

18         Next, Your Honor, and I probably if I might group

19   these three together.  These are motions, Your Honor, by the

20   debtors to approve retention engagement of my firm as general

21   counsel, Curtis, Mallet as conflict's counsel and to engage

22   Alvarez and Marsal.  These are for interim orders, Your Honor.

23   They will be heard again on November 5th.  They have been

24   reviewed with the U.S. trustee.  There are amplifications and

25   other materials that have to be furnished between now and the

1    5th and we would ask Your Honor to approve the interim order.

2    THE COURT:  I'm prepared to do that but let me just

3    ask the U.S. trustee's comments with respect to these.  Mr.

4    Valez-Rivera?

5    MR. VELEZ-RIVERA:  Good morning, Your Honor.  My

6    office did meet with both the proposed professionals for the

7    debtors and the committee separately earlier this week.  We had

8    a productive meeting in terms of exchanging what our concerns

9    were with respect to the draft applications, with respect to

10   the committee and the filed versions for the debtors.  The

11   professionals have our concerns in terms of future disclosures.

12   We expect that amendments will be filed.  My office will review

13   them.  In the meantime we will reserve our rights.  That's

14   where we are.

15   THE COURT:  You have no objection to the entry of the

16   interims, I take it.

17   MR. VELEZ-RIVERA:  No, Your Honor.

18   THE COURT:  Fine.

19   MR. VELEZ-RIVERA:  Thank you.

20   THE COURT:  I approve each of these three retentions

21   for the debtor.

22   MR. MILLER:  Thank you, Your Honor.  There is agenda

23   I, Item 10, the Debtors' utility motion, Your Honor.  I don't

24   believe that there is any opposition to that.  There are

25   arrangements that have been made and are in process with ConEd

1  and AT&T.  I don't believe there's an objection.  Am I right on

2  that?

3          THE COURT:  I think there was one objection by AT&T?

4          MR. LUCAS:  Your Honor, there was -- this is John

5  Lucas, Your Honor.  There was objection by AT&T however it's

6  been since resolved.  AT&T requested that if we were going to

7  supplement the utility schedule in the future, that such newly

8  added utility services would be provided notice.  The order's

9  been changed to reflect that so that it would serve the revised

10  schedule on such party and they would have ten days to respond

11  and that we'd try to work out something --

12          THE COURT:  Okay.  So that's resolved.

13          MR. MILLER:  That bring us, Your Honor, to contested

14  motions but there are some contested --

15          THE COURT:  Why don't we just make clear that I'm

16  also approving the utilities motion --

17          MR. MILLER:  I'm sorry.

18          THE COURT:  -- so that for record purposes, that item

19  is taken care of.  I approve that.

20          MR. MILLER:  Your Honor, there are three motions to

21  approve trade screening procedures for committee members:

22  Shinsei Bank, Metropolitan Life and AEGON USA.  There are no

23  opposition to those motions, Your Honor.  That's agenda I,

24  numbers 7, 8, and 9.

25          THE COURT:  Those motions were brought by committee

1    members.  I view Mr. Miller in a role now of Master of

2    Ceremonies with respect to at least three --

3              MR. MILLER:  I belong to equity, Your Honor.

4              THE COURT:  Is there an attorney representing the

5    movant or the movants so that I can say that I have reviewed

6    the motion, because I have, and I find no problem with it and

7    I'm prepared to approve it.  But I think I should at least do

8    this with the movant party being represented.

9              MR. KLEINER:  Good afternoon, Your Honor, Dov Kleiner

10   from Vinson & Elkins for Shinsei Bank.  I can only speak for

11   one of the movants but we filed the motion that's on -- the

12   agenda item is number 7 -- requesting approval of trading

13   procedures orders and screening procedures.

14             THE COURT:  The motion's granted.

15             MS. MAUTNER:  Good morning, Your Honor, Erin Mautner,

16   Bingham McCutchen on behalf of Metropolitan Life Insurance

17   Company.  Our motion is motion number 8 on the agenda.  We

18   would ask that Your Honor enter the relief requested unless you

19   have any questions.

20             THE COURT:  I have no questions.  I grant that as

21   well.

22             MS. MAUTNER:  Thank you, Your Honor.

23             MR. VENDITTO:  Good afternoon, Your Honor, Michael

24   Venditto from Reed Smith on behalf of AEGON, the movant, with

25   respect to agenda item number 9.  We've negotiated the terms of

1  the order with the Office of the U.S. Trustee and the debtor,

2  and I believe it's substantially similar to the language you

3  approved for the other two.

4           THE COURT:  That's approved as well.

5           MR. VENDITTO:  Thank you, Your Honor.

6           MR. MILLER:  I'm going to resume my role, Your Honor.

7           THE COURT:  What role were you in Hamasmore (ph.)?

8           MR. MILLER:  I was going to wear a tuxedo, but I

9  try -- no.  There are some other matters, Your Honor, which I

10 think are now in the process of being uncontested.  If Your

11 Honor would like to hear those: R3 and Eagle Energy.

12          UNIDENTIFIED MALE SPEAKER:  No, just R3.

13          MR. MILLER:  R3?

14          UNIDENTIFIED MALE SPEAKER:  Just R3.

15          THE COURT:  Anything that's uncontested I'm prepared

16 to hear right now.

17          MR. MILLER:  And that is -- I'll just get the item

18 number, Your Honor.  Okay, Your Honor.  There's some language

19 that has to be added and the committee would like to have the

20 opportunity to reconsider then.  So I withdraw those remarks.

21          It's ten to 1, Your Honor.  I don't think some of

22 these motions would take a lot of time.

23          THE COURT:  Let's continue.

24          MR. MILLER:  Could we take, Your Honor, the motion to

25 lift the automatic stay by Mr. Kuntz.  That's agenda II, number

1.

        MR. KUNTZ:  Your Honor, in light of the large crowd here, I'd submit my motion on papers.  I'm sure Mr. Miller has some copies --

        THE COURT:  Are you Mr. Kuntz?

        MR. MILLER:  Are you Mr. Kuntz?

        MR. KUNTZ:  Yes, I am, Mr. Miller, as you recall.

        MR. MILLER:  You've changed a lot since 1975.  I'm sorry, Your Honor.

        THE COURT:  Was that picked up on the record, I hope?

        MR. MILLER:  Mr. Kuntz and I met a long time ago in the --

        THE COURT:  I noticed that in the affidavit that he filed.

        MR. MILLER:  -- WC grand case.  If Mr. Kuntz wants to submit other papers, Your Honor, I have no comments to lay on it.  They're all in the papers.

        THE COURT:  Fine.  So they're sitting on the papers.  Now, as far as the papers in opposition, are you prepared to rely on the papers as well?

        MR. WILSON:  Yes, Your Honor.

        THE COURT:  Well, based upon my review of Mr. Kuntz's affidavit and the papers filed both by the debtor and by the creditors' committee, which I have reviewed, in opposition to the motion freely from automatic stay I've concluded that Mr.

1 Kuntz has failed to make out a case that sets forth cause for

2 relief from the stay and indeed, based upon my review of the

3 Sonax factors which is the leading case in the Second Circuit

4 dealing with the grant of stay relief, I find that Mr. Kuntz

5 has not made out a case under any of those factors.

6        Additionally, and I mean no disrespect to Mr. Kuntz

7 in saying this, based upon my review of his motion and

8 supporting affidavit and of the papers in opposition, it

9 appears that Mr. Kuntz is principally complaining about certain

10 matters arising out of a series of bankruptcies affecting the

11 Grand Union Company, the most recent of which I think was in

12 New Jersey before Judge Winfield.  The circumstances of those

13 cases are known to me only from the papers since I was not, at

14 the time when I was in practice, involved in those cases.

15 However, based upon my review of Mr. Kuntz's motion and

16 affidavit, it appears that at best he is one of the perhaps

17 hundreds of thousands of creditors of this estate who has a

18 claim, potentially, against the Lehman estate.  And it's not

19 clear to me from his papers that he actually has such a claim.

20 If he has such a claim, presumably it will be asserted when

21 proofs of claim are solicited and filed and will be dealt with

22 in the ordinary course as a claim to either be allowed or

23 objected to or dealt with in whatever way claims of that type

24 of dealt with.

25        But I'd like it to be clearly noted for record

1  purposes that at this stage of this massively complicated

2  bankruptcy case, it would be administratively burdensome for

3  parties who are unable to make an absolutely compelling case

4  that they're entitled to stay relief to be able to proceed

5  against the debtor.  I'm particularly persuaded by comments

6  made by Mr. Marsal during his informal presentation which I

7  treat as the equivalent of testimony under oath, although he

8  wasn't sworn, that he is in the midst of a truly heroic effort

9  to marshal the data, work across boarders with other parties

10  who are working in parallel proceedings and working with

11  Barclays in an effort to develop the transparency that in

12  direct response to Mr. Miller's question, is his goal.

13       It seems to me that Mr. Kuntz, at some point in the

14  future, in a manner no different from other parties in

15  interest, may be in a position to make further inquiry of the

16  debtor concerning his particular issue involving these Grand

17  Union notes and at least get an answer to his question.  But

18  his question doesn't go to the front of the line simply because

19  he filed a motion for stay relief.  This is a matter that

20  presumably will be handled along with the many other claims of

21  equal merit or greater merit.

22       For the reasons that I have expressed, the motion for

23  relief from automatic stay, filed by William Kuntz, is denied.

24       MR. MILLER:  The rest of the calendar, Your Honor,

25  with the exception of R3 -- we may come back after the lunch

1  break and say that's noncontested -- are all contested issues.

2  So unless Your Honor wants to take maybe the equity committee

3  motion and deal with that before lunch.

4         THE COURT:  Well, if counsel for the proponent of the

5  equity committee motion is prepared to proceed, why don't we do

6  that?  I think that makes sense because the more we can do

7  before -- there are so many people in this room and in other

8  rooms, that one of my concerns is just crowd control.  Because

9  as we take a break there's going to be a big crowd waiting at

10  the elevators and it's going to take some time for us to both

11  empty out the rooms and to fill them up later.  So why don't we

12  take this in turn?

13         MR. WILSON:  Good morning, Your Honor.  My name is

14  Mat Wilson.  I'm an attorney in Atlanta, Georgia, and I'm here

15  on behalf of Gregory Georgas who is a shareholder of Lehman

16  Brothers Holding.  Your Honor, we have made a motion for the

17  appointment of an official equity committee.  I believe that

18  the law in this matter is relatively straightforward.  This is

19  a matter we're submitting to the discretion of the Court.  It's

20  a matter on de novo review from the trustee's denial or refusal

21  to permit.  I agree, Your Honor, with the arguments of the

22  opponents of this motion that the --

23         THE COURT:  It sounds like it's over.

24         MR. WILSON:  Just, Your Honor, as perhaps in the

25  debates last night, I agree that it's a rare exception and

1   reserved for extraordinary cases.  Your Honor, I respectively

2   submit that this is precisely the type of an extraordinary

3   case.  Everything we have heard about this case, the market

4   conditions, the proceedings to date, Your Honor has himself,

5   today, I believe, used the word extraordinary, as have some of

6   the other attorneys who have addressed you.

7           The question is one of adequate representation.  The

8   factors, which are nonexcluisve, first are the number of

9   shareholders, huge number of shareholders in this case.  I

10  believe the number of shareholders is a factor that all of the

11  opponents would concede to the movant.

12          The second, Your Honor, is the complexity of the

13  case.  Your Honor, I believe, moments ago commented that this

14  is a massively complex case.  I believe that is a point which

15  all parties will concede.

16          The next question is the question of solvency versus

17  insolvency.  Solvency, Your Honor, starts with a balance sheet

18  test.  The May 31st balance sheet of the debtor demonstrated

19  twenty-six plus billion dollars of equity.  The balance sheet

20  as of the end of August, six weeks ago, according to the

21  debtor's news report press release filed days before the

22  bankruptcy at a time when the debtor, according to debtor's

23  counsel, was striving to avoid bankruptcy and wasn't even

24  considering bankruptcy, reported twenty-eight plus billion

25  dollars of shareholder's equity.

1        An examination of that equity, when one examines the

2   assets and liabilities, those numbers are confirmed in both the

3   filing docket number 1 and in the affidavit of the chief

4   financial officer, docket number 2 in this case.  The nature of

5   the business of Lehman Brothers is that of a bank.  Lehman

6   Brothers has never reported operating losses.  The net loss it

7   reported in its press release was as a result of a write-down

8   of portfolio.  And even with that paper write-down, still left

9   twenty-eight plus billion dollars of equity.  There's been

10  positive cash flow throughout the history or the most recent

11  history, with the exception of the credit crisis where

12  counterparties changed the terms, refused to trade, refused to

13  participate.  All of those are market events, events in the

14  marketplace which are unprecedented, which address this issue

15  of extraordinary circumstances.

16       THE COURT:  But you can't ignore those market events.

17       MR. WILSON:  Absolutely not, Your Honor.  And I'm

18  simply addressing the factors which address, one way or the

19  other, which Your Honor should consider in the exercise of his

20  discretion.

21       Similarly, the contra factor, Your Honor.  The only

22  counter factor that has been raised, really, is that the stock

23  has traded low, the debt of Lehman has traded very low.  But I

24  point out, Your Honor, that the stock has traded, is trading

25  above zeros.  That bonds and debt trade at a discount for every

1  company that enters bankruptcy because of factors such as time

2  delay, the uncertainty associated with bankruptcy, the

3  fiduciaries that cannot hold bankrupt securities and therefore

4  are forced to sell, and the risk and uncertainty that is

5  associated with bankruptcy proceedings.

6        And, Your Honor, respectfully, I think that, frankly,

7  is compounded by the typical bleak and opaque nature of

8  bankruptcies.  It's wonderful to hear Your Honor talk about a

9  notion of transparency in these cases.  I believe that's a

10 laudable goal in all of these cases.  And I respectfully

11 submit, Your Honor, that an equity committee can contribute to

12 that effort.

13       The final issue, Your Honor, is whether the cost of a

14 committee significantly outweighs the concerns for adequate

15 representation.  In this case the costs would be relatively low

16 compared to twenty-eight billion dollars worth of equity and

17 that is a matter, the cost of the committee is a matter as to

18 which the Court retains jurisdiction with the employment of

19 counsel and the employment of financial advisors,

20       Your Honor, for all of these reasons, we respectfully

21 ask the Court to exercise its discretion and appoint an equity

22 committee in this case.  Thank you.

23       THE COURT:  Thank you.  This motion is opposed.  I

24 should hear from your adversaries on this.

25       MR. MILLER:  Your Honor, please, on behalf of the

1    debtors.  Your Honor, as counsel has pointed out, a motion for

2    the appointment of the equity committee, particularly after

3    rejection by the Office of the U.S. Trustee, is addressed to

4    the discretion of the Court.

5         Counsel has made a doggone good argument about

6    solvency.  I wish the twenty-nine million dollars popped up --

7    billion dollars popped up someplace.  There was a CVS auction,

8    Your Honor, involving Lehman last week, in which Lehman debt

9    was valued at less than nine dollars.  I think it was $8.32.

10   Certainly, the market is taking into account what has happened

11   to Lehman.  And to come to the conclusion that today, October

12   16, Lehman is solvent, Your Honor, is a far stretch.

13        I would submit to Your Honor that the number of

14   stockholders in this particular case is not a significant

15   factor.  The question is one of adequate representation.  And

16   as I pointed out before, Your Honor, we have a board of

17   directors with nine independent directors.  At least for this

18   time being, Your Honor, the adequate representation of

19   stockholders is vested in the board of directors.  The board of

20   directors is aware of their fiduciary responsibilities.  They

21   are acting, they are active, they are meeting with Mr. Marsal.

22   And until something in that respect changes, I would submit to

23   Your Honor that there is adequate representation.  I believe

24   the motion is premature.  I believe it should be denied without

25   prejudice, Your Honor.

1          THE COURT:  Mr. Dunne?

2          MR. DUNNE:  Thank you, Your Honor.  For the most

3     part, we're going to rest on our papers.  And I echo Mr.

4     Miller's comments.  I'd like to just focus on two points

5     briefly.  I want to underscore what this motion is not about,

6     first of all.  It's not about the ability of any stockholder to

7     come in as a party in interest in this case and be heard.  It's

8     also not about their ability to create an ad hoc committee, ala

9     the noteholder ad hoc committee that we have here and come in

10    and weigh in on any issue of the case.

11         What it's about is who pays their fees if they're

12    wrong on all their allegations of solvency.  Because,

13    presumably, if they were correct in their assertions and

14    through their efforts they proved solvency, creditors were paid

15    in full in cash or otherwise, they would probably have a pretty

16    good claim for a substantial contribution award.  What is

17    effectuated by their relief is imposing the administrative

18    burdens on the estate in the event --

19         THE COURT:  That's not necessarily true, but I

20    understand the import of your argument.  It is possible for an

21    equity committee to be appointed with the proviso that it will

22    earn no fees except on the basis of substantial contribution.

23    So it's not, per se, required that a committee be a committee

24    entitled to professional compensation under the standards of

25    the Code other than substantial contribution.

1          MR. DUNNE:  All right.  And I'm just addressing that

2     part just to get across that they have other recourse and

3     avenues for payment.

4          THE COURT:  I understand that fully.

5          MR. DUNNE:  And then to get to the issue with respect

6     to why it's just not appropriate, we address that in the

7     pleadings.  I also want to focus on the fact that our interests

8     are long.  The creditors' committee here is charged with, and

9     is in fact doing a job of ensuring that we maximize the value

10    of the assets as well as contain the claims.  And this isn't a

11    case where we're likely at the end of this Chapter 11 going to

12    be in evaluation over what the standalone reorganization

13    securities of reorganized Lehman are going to be worth.  We've

14    sold the North American broker dealer operations for cash.

15    We're in the process of selling Neuberger Berman for cash.

16         At the end of the day, we're going to have a pile of

17    cash and we're going to have a universe of claims.  Either

18    those assets exceed that or not.  We don't think it's credible

19    to imply that we're not motivated to get as much dollars as we

20    can out of those assets.  Frankly, we don't know what the

21    universe of unsecured claims will be in this case.  Probably

22    we'll not know for months if not years.  And in the interim we

23    are monetizing very important assets of the estate.  And the

24    creditors' committee has a fiduciary duty to do that.

25         So there's no benefit to what we see to have an

1    additional layer of an official committee and the attendant

2    expenses that go with that.  And with that, Your Honor, unless

3    you have questions, I'll rest.

4              THE COURT:  No questions.  Mr. Velez-Rivera?

5              MR. VELEZ-RIVERA:  Your Honor, Mr. Dunne relied

6    partly on his papers.  We are relying entirely on our papers.

7    And unless you have any further questions of us, we submit to

8    your discretion.

9              THE COURT:  Fine.  I've reviewed all the papers.  And

10   I'm not persuaded by the movant that this is a case that, at

11   least at this point, calls for the appointment of a committee

12   of equity security holders.  Notwithstanding the fact that it

13   is a case, and I'll use counsel's term, that is massively

14   complex and a case the involves a great number of shareholders.

15   That alone does not provide much support for a committee in a

16   case that manifestly, at this juncture, does not appear to

17   reflect any value in the equity securities.

18             The papers filed by the creditors' committee, as I

19   recall, included some powerful references to what has been

20   going on in the market for a distressed Lehman bonds.  That was

21   all -- appears to be congruent with the result mentioned by Mr.

22   Miller of the recent CVS auction.

23             I'm not concluding that the trading value of these

24   securities in an unregulated market constitutes proof of

25   anything other than what the market is currently judging these

1  assets to be worth.  But because the trading market has

2  declared, whether correctly or incorrectly, that the senior

3  indebtedness of Lehman can only trade now at a very deep

4  discount from par, tells me that whatever positive value may be

5  in the stock that remains is more in the nature of a hope and a

6  prayer and certainly not a reflection of fair value.

7  Additionally, I am persuaded that under the

8  circumstances of this case, as articulated by Mr. Miller,

9  equity holders are adequately represented now without a

10  committee.  They are represented by the activities of the

11  debtor-in-possession seeking to maximize value and by the

12  activities of the creditors' committee working in cooperation

13  with the debtor and working for their constituency, also

14  seeking to maximize value.

15  No particular purpose would be served at this

16  juncture in appointing another official committee.  The U.S.

17  trustee has considered this and this is truly a sweet spot for

18  the U.S. trustee's office, the determination of whether a

19  committee should be formed and the composition of such a

20  committee.  And the U.S. trustee has concluded that no

21  committee is appropriate here for equity security holders.

22  That conclusion is set forth both in the correspondence from

23  the U.S. trustee to counsel, denying a request that a committee

24  be appointed, and in the papers in opposition to the motion.

25  Under the circumstances, I am exercising my

1    discretion to deny the motion for appointment of an equity

2    committee.  But I'm doing so without prejudice to such a motion

3    being presented at some time in the future should the facts

4    warrant the appointment of such a committee.  Such a motion, in

5    order to be successful, in my view, would need to demonstrate

6    some credible reason to believe that there is an opportunity

7    for equity security holders to recover something of value in

8    this case and a showing that the debtor and other parties who

9    are involved in the case are not providing adequate

10   representation for that constituency.  Motion denied.

11          MR. DUNNE:  Thank you, Your Honor.

12          MR. MILLER:  If Your Honor's body clock could take

13   it, we could take, Your Honor, the motion by Barclays and the

14   debtors to seal schedules to the asset purchase agreement.

15   Your discretion, Your Honor.

16          THE COURT:  Now I'm exercising the discretion to

17   declare when lunch should take place.  In my discretion, it's

18   now.  Now the only question becomes, at this point, just for

19   everybody's comfort getting out and getting back, because we're

20   dealing with quite a few people and experience tells me that

21   our elevator service is suboptimal, particularly at times like

22   this.  So my suggestion is that we turn at 2:30.  Hopefully

23   that will be enough time for everybody to get out, get

24   something to eat, talk, and perhaps, to the extent it's

25   possible, reach some accommodations as to those matters that

1    are still contested.

2              MR. MILLER:  Thank you, Your Honor.

3              THE COURT:  We're adjourned until then.

4         (Recess from 1:16 p.m. until 2:40 p.m.)

5              THE COURT:  Please be seated.

6              MR. MILLER:  Good afternoon, Your Honor.  Harvey

7    Miller for the debtors again.

8              THE COURT:  Good afternoon.  Did anything get

9    resolved over lunch?

10             MR. MILLER:  Your Honor, that's good news and bad

11   news.  Some of us gave up lunch in the interest of justice.

12   One more uncontested matter, Your Honor, will be the R3

13   transaction which Mr. Perez will describe in just a few

14   moments.  There are, by my latest counts, Your Honor, thirteen

15   motions in connection with Rule 2004.  The lead motion was the

16   Harbinger Funds motion.  Harbinger has agreed to adjourn the

17   motion to November 5th and the debtors have agreed to meet in

18   that interim period with Harbinger in an effort to perhaps

19   resolve the motions.  All the other movants with the exception

20   of Newport Global Opportunities have agreed to the same

21   adjournment.  And we are -- will attempt to set up meetings,

22   maybe joint meetings with the movants to see if we can resolve

23   that.

24             THE COURT:  Fine.  So that means that the Newport

25   matter is still on and still contested?

1          MR. MILLER:  Yes, Your Honor.

2          THE COURT:  Okay.

3          MR. MILLER:  Yes.  Okay.  With that, Your Honor, the

4    next matter on the agenda is the Barclays and debtors' motion

5    to seal the schedules to the asset purchase agreement, which is

6    docket number 430 and it is agenda II item 3.  This motion will

7    be presented, Your Honor, by Cleary Gottlieb as the attorneys

8    for Barclays.

9          MR. WILLET:  Excuse me.  I'm sorry, Your Honor.

10   Sabin Willet for the Harbinger Funds.  I just wanted to be

11   clear that the meeting that was described to you a second ago

12   is to be a meeting as we understand it with Alvarez.

13         MR. MILLER:  Yes.

14         MR. WILLET:  And on that basis, we'll adjourn to the

15   5th.  Thank you.

16         MR. MILLER:  They don't want to meet with me alone,

17   Your Honor.  I understand.

18         MR. BAREFOOT:  Good morning, Your Honor.

19         THE COURT:  Good afternoon.

20         MR. BAREFOOT:  Luc Barefoot from Cleary -- afternoon,

21   excuse me.  Luc Barefoot from Cleary Gottlieb Steen & Hamilton

22   LLP for Barclays Capital here on the joint motions of the

23   debtors and Barclays to file under seal certain limited

24   schedules to the asset purchase agreement.  The motion applies

25   only to Schedules A and B to the clarification letter that was

1    entered into between the debtors and Barclays.  Those schedules

2    set forth a list of the proprietary securities positions that

3    were sold to Barclays.  All of the other aspects of the APA,

4    including the clarification itself and all the amendments

5    thereto, have been publicly disclosed both on the docket and on

6    the Court's website.

7            We filed this motion only in response to certain

8    requests that the debtors were getting from creditors in order

9    to access these schedules and securities.  We're certainly

10   mindful, Your Honor, of the need for transparency in these

11   proceedings and, as we set forth in our motion, we're willing

12   to share these schedules with creditors who will sign a

13   confidentiality agreement that limits their use to their role

14   as a creditor in these proceedings.  We also, for those

15   creditors who are just seeking more general information and in

16   response to concerns that the committee raised, filed last

17   evening a summary that discloses the general composition of the

18   securities that are listed on the schedules and breaks it down

19   into the general categories and also discloses the par value or

20   the number of shares in each category.  But in order to allow

21   unfettered access on the debtors' website and everywhere else

22   would cause significant commercial harm to Barclays as --

23           THE COURT:  Could you explain why?

24           MR. BAREFOOT:  Well, Your Honor, this certainly isn't

25   an evidentiary hearing as it's the first time this is up but I

1  don't think it's a controversial position that where all of

2  Barclays' competitors, including the members in Mr. Stamer's

3  group, are not required to disclose their own proprietary

4  portfolios and the compositions of those portfolios that

5  putting Barclays in the unique position of giving all of its

6  competitors access to that information limits its ability to

7  trade these securities in the market.  And the balance that

8  we've struck in terms of offering creditors unfettered access

9  for their role as a creditor and a more general summary has

10  satisfied the concerns of the committee.  I believe it's also

11  satisfied the concerns of the U.S. trustee and of all the other

12  creditors in the proceeding.

13       THE COURT:  Do I understand that the only objection

14  that remains unresolved is the objection of Mr. Stamer and his

15  group?

16       MR. BAREFOOT:  The only clarification I'd like to

17  make in that respect --

18       THE COURT:  Is that a yes or a no?

19       MR. BAREFOOT:  Yes, with the understanding that we're

20  still in the process of negotiating a confidentiality agreement

21  with the trustee for -- the U.K. administrator for LBIE.  We're

22  hopeful that we'll be able to reach something out but their

23  counsel did ask that I reserve rights in the unlikely event

24  that we're not able to.

25       THE COURT:  Wasn't that consistent with your position

1    from the outset which is that parties could see this if they

2    signed a confidentiality?  That's no different, is it?

3         MR. BAREFOOT:  No, Your Honor.  It's the same.  It's

4    just I wanted to make clear, per their request, that we haven't

5    documented that up yet.

6         And turning specifically to Mr. Stamer's objection in

7    which he claims that we haven't made the threshold showing that

8    this constitutes commercial information, you know, again, we

9    really think it's uncontroversial that where Barclays, by

10   disclosing this information, would be put in a situation that

11   is different than any of its competitors that that clearly

12   establishes commercial harm.  And Mr. Stamer's --

13        THE COURT:  I think you may be right.  I just don't

14   think you've said it.  By saying that it's so doesn't mean it's

15   so.

16        MR. BAREFOOT:  Your Honor, if your concern is the

17   evidentiary showing, we're certainly happy to put this over to

18   an evidentiary hearing and we have been served with notices of

19   depositions from Mr. Stamer.  We just didn't think that this

20   really rose to the level of something beyond judicial notice,

21   something that was --

22        THE COURT:  Well, I think maybe it does.  107(b) is

23   pretty clear.  And sealing of commercial and proprietary

24   information happens routinely in bankruptcy cases.  But there's

25   a logical problem.  You seal it if it's confidential but how do

1  you demonstrate that it's confidential?  You demonstrate that

2  it's confidential through your assertions by simply saying

3  well, because it's a list of positions it has to be

4  confidential.  I don't know if that's true.

5        MR. BAREFOOT:  And if the list of positions

6  specifically that Barclays' competitors are not required to

7  disclose and I don't think that's open to factual dispute.

8        THE COURT:  Well, that's not terribly different from

9  other bankruptcy acquisitions where the acquired assets are

10  identified and scheduled.  Their competitors that are not

11  buying assets out of bankruptcy are in a different position.

12  Parties that buy assets out of bankruptcy understand that the

13  rules of the game include some level of, your word,

14  "transparency".

15        MR. BAREFOOT:  And I think we've satisfied that level

16  of transparency both by our offer to provide them to people in

17  connection with their use as creditors and also to provide a

18  general overview.  But for people who want this sort of CUSIP

19  by CUSIP identification that would be particularly useful to

20  people who are trading in these securities and particularly

21  harmful to Barclays, that information isn't available where

22  they want to use that for purposes other than their role as

23  creditors.

24        THE COURT:  I think some parties want a CUSIP by

25  CUSIP identification to be sure whether or not a particular

1  underlying asset, say, in a repo transaction, ended up at

2  Barclays or someplace else.

3       MR. BAREFOOT:  Certainly.

4       THE COURT:  That was true of a matter that we had

5  some litigation on a few weeks ago.  FD&R brought a declaratory

6  judgment action seeking a temporary restraining order in the

7  SIPA proceeding.  Their issue was where's our security.  I

8  expect they're not the only party in interest who wants to know

9  where's their security.  Is that part of this?

10      MR. BAREFOOT:  Your Honor, for those parties who are

11 interested in simply locating their security, that interest is

12 accommodated by a confidentiality agreement that says I'm

13 interested in using these schedules in connection with my role

14 as a creditor.  The only interest that that confidentiality

15 agreement doesn't accommodate is people who want to use those

16 schedules to trade on the information.

17      THE COURT:  Okay.  I hear what you're saying and I'm

18 not trying to make your argument more difficult by pushing back

19 on it.  But I am pushing back on it because there's a QED

20 aspect to this.  You're saying it's confidential so it must be

21 confidential but you haven't demonstrated that it's

22 confidential.  You've only said that I should conclude that

23 it's confidential because these are trading positions.  And I'm

24 left with the shrug of my shoulders, well, what makes that

25 confidential other than you've said so.

1          MR. BAREFOOT:  If Your Honor wants to put this over

2     to an evidentiary hearing --

3          THE COURT:  Oh, no.  It's not my motion.  I have no

4     desire that it be decided today or on November 5 or on any

5     other day.  It's your motion to prevail on one way or the other

6     or lose on one way or the other.

7          MR. BAREFOOT:  Of course.  And I believe that we have

8     made the requisite showing --

9          THE COURT:  How?

10         MR. BAREFOOT:  -- based on the simple uncontested

11    matter that I don't think Mr. Stamer would dispute that his

12    clients don't have to disclose what their trading information

13    is, what positions they hold and in what quantity.  He's asking

14    us to make that --

15         THE COURT:  That's certainly true of most hedge funds

16    that aren't ad hoc committees.  I suppose because he's a group,

17    he relies upon an unpublished decision from Texas to take the

18    position that 2019 doesn't apply to him.  That has not yet been

19    tested in this court; maybe it will be.

20         MR. BAREFOOT:  Your Honor, we're happy to put this

21    over to an evidentiary hearing for November 5th.  And in the

22    meantime, we'll work to make the requisite factual showing --

23         THE COURT:  That's probably a good way to approach

24    this.  And maybe you and Mr. Stamer can work something out such

25    that we don't have to convert what I think is a relatively

1  theoretical question into something that's unnecessarily time

2  consuming.  To the extent that the materials that you seek to

3  protect in fact are properly characterized as confidential,

4  they should be sealed.  The only issue I have is whether or not

5  you've made the requisite showing that these materials are, in

6  fact, confidential.  Once you've done that, you'll win.  But

7  you have it done it yet.  Saying it doesn't make it so.

8          MR. BAREFOOT:  Understood.  Very well, Your Honor.

9          THE COURT:  Mr. Stamer, this is great.  You don't

10  have to say anything.

11          MR. STAMER:  That's the whole idea.  If you want,

12  I'll stand up and say I'm not going to say anything.  Thank

13  you, Your Honor.  We'll see you at the scheduled evidentiary

14  hearing.

15          THE COURT:  Whenever that is.

16          MR. STAMER:  Whenever that is.

17          THE COURT:  If it has to happen.

18          MR. STAMER:  Agreed.

19          MR. MILLER:  The next matter, Your Honor, is the

20  motion of the debtors in connection with the R3 sale.  Mr.

21  Perez will handle that matter.

22          MR. PEREZ:  Good morning, Your Honor, Alfredo Perez.

23  Your Honor, this motion can be characterized as one of the

24  melting ice cubes.  Lehman made an investment in R3, which is a

25  hedge fund, in May of last year.  Obviously, the Court is well

1    aware what's happened in the market.  There has been

2    significant deterioration.  And, in essence, this is an effort

3    to extricate themselves from the hedge fund and allow it to go

4    forward.  We're continuing to keep a small investment in

5    comparison.  Large in most cases but small in comparison to the

6    original investment.

7           Your Honor, we received two objections.  We received

8    an objection to the PTBC which was resolved by the language

9    that was included in the form of order that was sent last

10   night.  There was a little tweaking because we had the wrong

11   defined term.  So the order, the existing order, in paragraph 9

12   rather than saying "LBI's remaining interest", it talks about

13   the "purchased interest".  Nonmaterial change.

14          The other objection we had, Your Honor, was from Mr.

15   Stamer's group.  We had extensive discussions with them and we

16   were able to resolve the objections.  And one of the premises

17   of resolving the objection was that because most of the

18   information that we provided to him was confidential that we

19   would read a proffer which would support the evidentiary

20   finding for the objection.  So, with the Court's permission,

21   I'd like to proffer the testimony of Daniel Ehrmann

22          THE COURT:  I take it that's consented to by Mr.

23   Stamer?

24          MR. STAMER:  It is, Your Honor.

25          THE COURT:  Fine.

1    MR. PEREZ:  Your Honor, Mr. Ehrmann is sitting right

2    here.  Right here.  All right.

3    THE COURT:  Could you identify who that individual

4    is?

5    MR. PEREZ:  Yes, Your Honor.  Mr. Ehrmann is a

6    managing director of Alvarez & Marsal.  And he was the person

7    primary responsible for both the R3 sale and the Eagle sale

8    which is the other sale that's coming up today.  Your Honor, if

9    asked to proffer, he would indicate that he's a managing

10   director with Alvarez & Marsal, that he has eight years of

11   interim management experience, that his industry experience

12   includes a wide variety of industries including apparel,

13   retail, consumer products, professional services.  Most

14   recently, he was the CFO and senior vice president for business

15   planning and development with Spiegel Brands.  He holds a law

16   degree from Assas University, a master's degree in corporate

17   law and economic science from the Sorbonne and a master's

18   degree in law from NYU.  He is a member of both the Paris and

19   the New York bars.  Earlier in his career, he spent five years

20   as an MNA associate at Cleary Gottlieb.

21   Mr. Ehrmann would testify that in May of 2008, LBHI,

22   through wholly owned subsidiaries, made an initial investment

23   of 1.1 billion into R3 for which they got a forty-five percent

24   nonvoting equity interest and a forty-eight LP interest.  He

25   would also testify that pursuant to these agreements and

1    agreements of certain -- agreements of other LBHI affiliates,

2    they agreed to support the ongoing services of the fund either

3    directly or indirectly by providing prime brokerage services,

4    financing and marketing services.  He would further testify

5    that the investment documents, which LBHI signed, had a two-

6    year lockup before it could withdraw any of the 1.1 billion

7    dollar investment.  And he would also testify that at the time

8    that there were also multiple unrelated co-investors to Lehman

9    that also made substantial investments in the funds.

10           He would testify that the Chapter 11 cases created

11   significant uncertainty regarding the fund, its operation and

12   LBHI's initial investment in the fund, that if allowed to

13   continue, this uncertain state of affairs could lead to the

14   erosion of the value of LBHI's interest in the fund which would

15   otherwise inure to the benefit of the debtors' estate and its

16   creditors.

17           He would also testify that LBHI's co-investors have

18   alleged significant claims against the estate arising from

19   LBHI's inability to provide the ongoing support services to the

20   fund.  Accordingly, in an effort to maximize the value of the

21   investment and to settle all the claims with the co-investors

22   in the funds, the parties have agreed to this purchase

23   agreement which accomplishes the objectives and provides an

24   opportunity for the estate to participate in the fund on a go

25   forward basis.

1          Mr. Ehrmann would testify that he first became

2     involved with this transaction on September 25th, 2008 and

3     since that time has been in constant contact with senior

4     management at R3, which is the fund, as well as LBHI's co-

5     investors and the various professionals that have been involved

6     in the transaction.  He would testify that the negotiations

7     leading up to the R3 sale have been fair and at arms' length

8     and have been developed continuously on an hourly basis.  He

9     would testify that he participated in multiple conference calls

10    and reviewed numerous drafts of the purchase agreement and the

11    related documents and that he believes that the efforts

12    resulted in the best possible transaction for the debtors.

13         He would further testify that the debtors'

14    professionals have been involved in negotiating this

15    transaction and that the creditors' committee, both through its

16    counsel, Milbank Tweed, and its financial advisor, Houlihan

17    Lokey, have been actively involved in the negotiations and

18    jointly pursued the interest of the estates throughout the

19    history of the transaction.  He would testify that as a result

20    of the involvement of the professionals for the creditors'

21    committee in these negotiations, the consideration that was

22    received by the debtors was increased.

23         Mr. Ehrmann would testify that the buyers are not

24    insiders of the debtors and have conducted themselves in good

25    faith and fair dealing throughout the negotiations of the

1    transactions.

2         In connection with the transaction, Mr. Ehrmann would

3    testify that the purchase agreements provide that two

4    subsidiaries of LBHI which made the initial investment in the

5    fund, LBR3 Holdings L.P. and LBR3 Holdings GP, LLC will be

6    merged into LBHI prior to the closing of the transaction with

7    LBHI continuing as a surviving entity.  LBHI will then sell its

8    equity interest in the fund to its co-investors for 125 million

9    dollars of cash at closing, a promissory note in the amount of

10   125 million that is due and payable on May 31, 2009, which will

11   bear interest at the six month T-bill rate, and will exchange

12   LBHI's remaining interest in the fund for a limited partnership

13   interest in the new fund having a value of 250 million dollars.

14        In addition, LBHI will receive an assignment of

15   substantially all of the claims of R3 Capital Partners have

16   against the various Lehman entities.  Most significantly, LBHI

17   will receive a claim against Lehman Brothers International

18   Europe, LBIE, and certain of its affiliates believed to be in

19   the approximate amount of 590 million dollars.  This claim is

20   without recourse, representation or any warranty by the

21   sellers.  The debtors and the buyers have agreed to exchange --

22   I'm sorry, without warranty by the buyers.  The debtors and the

23   buyers have agreed to exchange mutual releases of all claims

24   related to the transaction including any alleged claims that

25   the buyers may have against LBHI for failing to provide the

ongoing support services.

Mr. Ehrmann would further testify that in connection with the foregoing releases, the debtors discussed potential significant claims between the debtors and the buyers related to the transaction.

Mr. Ehrmann would further testify that he believes the transaction to be fair, reasonable and a sound exercise of the debtors' business judgment.  Significantly, it allows LBHI to recover 250 million dollars, approximately twenty-five percent of the initial investment notwithstanding the two-year lockup period that would otherwise expire in May of 2010. Moreover, he would testify that given the uncertainty in the marketplace, the transaction allows for the maximum recovery of LBHI's initial investment.  The interests of the estate are further capitalized by their redemption and contribution which allows LBHI to participate as a limited partner in the new fund without the burden to provide ongoing support services.

In light of these circumstances, Mr. Ehrmann would testify that the net asset value of the new investments represents a reasonable reduction of the original fund.

Mr. Ehrmann would further testify that the settlement agreement and mutual release of the claims is well-informed, reasonable and in the best interest of the estate.  This transaction allows the parties to extinguish their prior relationship and to continue business going forward.  The

1    settlement agreement also eliminates significant claims against

2    the estate including purported claims for breach of contract

3    and restrictions on the assignability of LBHI's interests as

4    well as the cost of litigations associated therewith.

5         In addition, Mr. Ehrmann would testify that if the

6    issues between the buyers and LBHI are not quickly resolved,

7    LBHI's initial investment may be held hostage and continue to

8    erode unnecessarily.

9         Finally, Mr. Ehrmann would testify that a private

10   sale is necessary and appropriate under the circumstances.  He

11   would testify that the market for these assets is limited and

12   the buyers have asserted intention to enforce the contractual

13   restrictions on the assignment of LBHI's interest to a third

14   party.  Although the debtors dispute the enforceability of

15   those restrictions, this private sale resolves the live

16   disputes and avoids time consuming litigation that is likely to

17   ensue.

18        Also, since the redemption is occurring at an agreed

19   net asset value, it is extremely unlikely that the buyer would

20   pay more for the purchased interest than if it were a

21   competitive bid.

22        Mr. Ehrmann would also testify that identifying a

23   third party purchaser would be significantly hindered by the

24   cloud of litigation over the assignability of LBHI's interest

25   in the fund.  But the time associated with resolving such a

1    dispute with the buyers and subsequent marketing these assets

2    may unnecessarily duplicate efforts and will likely cause

3    further erosion of LBHI's initial investments in this volatile

4    market.

5         He would testify that no other purchaser could offer

6    the unique benefits of a global transaction including, most

7    significantly, the release of any claims asserted by the buyer

8    against LBHI and the assignment of significant claims to the

9    estate against various Lehman entities.

10        Finally, Mr. Ehrmann would testify that the prompt

11   consummation of the transaction is in the best interest of the

12   estate and will maximize value of the remaining investment

13   fund.

14        THE COURT:  Is there any objection to my receipt of

15   this proffer as evidence in support of the R3 transaction?

16   Hearing no objection, I accept the proffer.  Is there any

17   desire on the part of any party to examine Mr. Ehrmann in

18   connection with the proffer?  There's no need to cross-examine.

19        MR. PEREZ:  Thank you.

20        THE COURT:  Mr. Stamer, are you satisfied?

21        MR. STAMER:  I am, Your Honor.  May I just make a two

22   minute statement for the record?

23        THE COURT:  Sure.

24        MR. STAMER:  Again, for the record, Michael Stamer

25   from Akin Gump on behalf of the informal noteholder group.

1  Your Honor, we filed an objection to the R3 transaction on two

2  grounds.  The first was insufficient information and the asset

3  wasn't shopped.  Literally fifteen minutes our objection hit

4  the docket, we got a call from Mr. Perez saying what can we do

5  to make you comfortable.  What information do you need?  From

6  that moment until shortly before midnight last night, we've

7  been in conversations with the debtors, with R3, with the

8  committee, with the committee's financial advisor.  We were

9  made aware of the improvements in the transaction that took

10  place between the first time a deal was struck and where we are

11  today.  We were made aware of certain assignability issues,

12  whether they were valid or not.  There are issues that would be

13  subject to litigation.  And we were made aware of certain

14  potential claims assertable by R3 against Lehman entities.

15       Based on the information that we received from the

16  parties involved, based upon the proffer that was just made in

17  court, Your Honor, we're withdrawing our objection.

18            THE COURT:  Fine.  Thank you.

19            MR. STAMER:  Thank you, Your Honor.

20            THE COURT:  Does anyone else have any comments with

21  respect to this proposed transaction?

22            MS. EAGLE:  Your Honor, Sara Eagle on behalf of the

23  Pension Benefit Guaranty Corporation.  I just want to say that

24  we'll withdraw our objection to the extent that the language

25  critiques that were made reference to are incorporated in the

1    order.

2              THE COURT:  Okay.

3              MR. FLICS:  Your Honor, Martin Flics from Linklaters

4    LLP for the joint administrators.  I'd just like to be heard

5    very briefly.  I apologize, we didn't file a piece of paper in

6    connection with this motion.  And I really only have one point

7    which is a result of a discussion that I had with Mr. Perez

8    shortly before the lunch break.  The agreement, which we

9    received the other day, has a number of complex provisions.

10   But one of the matters that you can imagine is very important

11   to us and that's why I wanted to state it on the record is that

12   it provide for releases by various Lehman Brothers parties.

13   And there is a schedule, Schedule 1A to this agreement, which

14   includes those required LB released parties, in the language of

15   the agreement, and those who are nonrequired LB released

16   parties.  And just so there is no doubt in light of the short

17   notice, I note that Lehman Brothers International Europe is a

18   nonrequired release party, meaning, that its release will not

19   be sought or may be sought, may not be obtained.  It's

20   certainly not required or any attempt for it to be compelled in

21   connection with this motion and that Lehman Brothers

22   International Europe does indeed retain all of its rights,

23   claims and defenses in connection with the subject matter of

24   this motion.  Thank you, Your Honor.

25             THE COURT:  You've said it so I suppose it's true.

1          MR. FLICS:  Well, Your Honor, I've said it.

2          THE COURT:  Okay.

3          MR. FLICS:  Thank you.

4          THE COURT:  Is it true, Mr. Perez?

5          MR. PEREZ:  Well, we're going to try to get a release

6     from them but --

7          THE COURT:  Okay.

8          MR. PEREZ:  -- I don't know whether we'll succeed.

9     Your Honor, on the basis of the proffer and the fact that both

10    of the objections have been withdrawn, we would request that

11    the Court enter an order approving this transaction.  There is

12    one change to the purchase agreement.  It had to do with the

13    tax allocation.  The committee has approved it.  It was

14    actually a change done at the debtors' request.  I have

15    highlighted language for the Court if the Court wants to see

16    it.  May I approach?  If the Court doesn't want to see it,

17    that's fine.

18         THE COURT:  I haven't said that I want to see it.

19         MR. PEREZ:  That's fine.

20         THE COURT:  I'm sure it will be useful for me to see

21    it.

22         MR. PEREZ:  Your Honor, and I'm going to try to make

23    my proffers --

24         THE COURT:  Why don't you approach and I'll take it.

25    And I don't think I need to see it before we move on, do I?

1          MR. PEREZ:  No, no.

2          THE COURT:  Fine.  I have it.

3          MR. PEREZ:  Thank you, Your Honor.

4          THE COURT:  Looks good.

5          MR. PEREZ:  In the future, I'll make my proffers

6    shorter.  With that, Your Honor, we would request entry of the

7    order.  This is a little time sensitive because they are trying

8    to close today.

9          THE COURT:  Well, I take it based upon the comments

10   that have been made and the fact a still packed courtroom does

11   not include anybody else standing up to object that there are

12   no objections to the prompt entry of this order, I'm prepared

13   to both approve it and arrange for prompt entry.  But --

14         MR. PEREZ:  Thank you, Your Honor.

15         THE COURT:  -- in order for the order to be entered

16   promptly so that you can close today, it will have to occur

17   during a short break --

18         MR. PEREZ:  Thank you.

19         THE COURT:  -- because I will need to both review the

20   order, pay close attention to the language that you've shown me

21   and make sure that the order is entered on the electronic

22   docket.

23         MR. PEREZ:  Okay.

24         THE COURT:  If in fact, it's time sensitive enough to

25   call for a break of, say, ten minutes at some point, we'll do

1     that.

2          MR. PEREZ:  No.  I just -- Mr. Wofford represents the

3     purchaser, Your Honor.

4          MR. WOFFORD:  Your Honor, Keith Wofford from Ropes &

5     Gray on behalf of R3 Capital Management LLC.  Your Honor, we

6     are trying to close tomorrow but there are wires and things

7     that have to be set up.  And given the lack of knowledge as to

8     how late into the night the proceedings would go, we would be

9     satisfied merely if the Court has ruled in favor and --

10          THE COURT:  I've done that.

11          MR. WOFFORD:  Okay.  And as long as it's entered as

12     soon as is reasonably possible so that we know it will be a

13     closing condition to satisfy for tomorrow morning.

14          THE COURT:  It will be entered as soon as it's

15     reasonably possible.

16          MR. PEREZ:  Thank you, Your Honor.  We very much

17     appreciate it.

18          MR. WOFFORD:  Thank you, Your Honor.  May the R3

19     parties be excused, Your Honor, from the courtroom?

20          THE COURT:  You may be.

21          MR. MILLER:  Your Honor, just a housekeeping detail.

22     The motion to seal, I take it, that is adjourned to November

23     5th --

24          THE COURT:  Well --

25          MR. MILLER:  -- for an evidentiary hearing if

1   necessary?

2          THE COURT:  Well, it's an important detail.  There

3   was a request for an evidentiary hearing.  The next omnibus day

4   is November 5.  I suppose it makes sense to adjourn it to that

5   date unless counsel for Barclays would like to have this listed

6   specially to the extent it may be a time consuming hearing.  My

7   belief is that it's probably going to be a brief hearing and

8   that we can include it on the November 5 omnibus date.  Is that

9   right?

10         MR. BAREFOOT:  Thank you, Your Honor.  November 5 is

11  fine.

12         THE COURT:  Fine.  That's when it is.

13         MR. MILLER:  Okay.  And, Your Honor, just for the

14  record, so we don't lose track of it, the informal noteholders

15  group -- I think I got that right -- was originally appeared in

16  this proceeding as the ad hoc bondholders committee in

17  connection with the Barclays sale.  I think that's the same

18  group.  So I would just like to have that on the record.

19         THE COURT:  Well --

20         MR. STAMER:  Your Honor, I think the record speaks

21  for itself.

22         THE COURT:  It usually does.

23         MR. MILLER:  The next matter, Your Honor, which Mr.

24  Perez will be handling, is the debtors' motion in connection

25  with the sale of the Eagle Energy Partners I L.P.  That's

1  agenda item II, number 7, Your Honor.

2      MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

3  on behalf of the debtors.  Your Honor -- excuse me, Your Honor.

4  Your Honor, pursuant to this motion, the debtors are doing two

5  things.  They are selling their partnership interests in Eagle

6  Energy, which is an oil and gas -- energy trading company

7  headquartered in Houston, Texas.  In addition, Your Honor, LBHI

8  is compromising a claim, approximately 630 million dollar

9  claim, in which it is compromising and receiving a payment of

10  230 million dollars.  And, Your Honor, that's the primary

11  consideration for the motion.

12      We received, Your Honor, several objections to the

13  motion and I'll address the objections.  We received an

14  objection from the Pension Guaranty -- Pension Benefit Guaranty

15  Corporation.  And it really wasn't an objection.  It was a

16  response.  And Ms. Eagle is here.  But we are going -- that is

17  going forward.  We're going to make one adjustment in the

18  purchase agreement which is there is a representation that an

19  indemnity relating to any potential benefit claims and the PGBC

20  has filed a statement saying that we believe that there are

21  potential underfunding liabilities and to the extent that Eagle

22  is part of the control group, they may be liable for those

23  underfunding liabilities.  We, one, both dispute that and don't

24  think that it would be applicable to any entity after it's

25  sold.  But we'll leave that for a different day.  But there is

1  a provision in the contract that says there aren't any

2  pension -- potential pension liabilities.

3          So we're amending that representation and the

4  indemnity to go post-closing through the conclusion of these

5  cases.  And then to the extent that there's any claim made

6  against EDFT, which is the purchaser, Electricite de France,

7  which is a large company, that they would have a secured claim

8  in the proceeds.  We're not going to perfect in the sense of

9  doing any documents.  It's just going to be an ordered

10 paragraph in the order.  So I think we have dealt with the

11 issues raised by the PGBC.  Although it was in the nature of a

12 response, it really wasn't in the nature of an objection.

13         Also, Your Honor, we received a limited objection

14 from Lloyds Bank relating to two letters of credit.  I believe,

15 Your Honor, that, in fact, those letters of credit have already

16 been substituted.  So I think that the issues raised by Lloyd

17 Bank are resolved or in the process of being resolved.  The two

18 letters of credit will be returned and they will be

19 substituted.

20         THE COURT:  Is counsel for Lloyds present?

21         MS. NED:  Yes, Your Honor.  Omeka (ph.) Ned from

22 Lovells --

23         THE COURT:  Can you come forward, please?  State your

24 name for the record.

25         MS. NED:  Sure.  Good afternoon, Your Honor.  Omeka

1    Ned on behalf of Lloyds TSB Bank.  Your Honor, as Mr. Perez

2    said, we filed a limited objection to preserve our rights with

3    respect to certain letters of credit.  We have been told by

4    Eagle that Lloyds will take off the liability by cash

5    collateralizing these LCs and that that process is continuing

6    today.  However, I have not heard that it's been completed.

7            Our only issue is that we're not prejudiced unfairly

8    in connection with this transaction.  So if the process that

9    LBHI and Eagle have agreed works out then our objection is

10   resolved.  But to the extent it's not then we reserve our

11   rights to come back and just to object to how the LCs are being

12   treated.

13           THE COURT:  Okay.

14           MR. PEREZ:  Thank you, Your Honor.  All right.  Then,

15   Your Honor, we received three objections in the last few days

16   and then we received one objection last night.  Basically, the

17   three objections that we received go to the allocation, if you

18   will, of the purchase price -- or of the consideration.

19   There's 230 million dollars that is being paid on account of

20   the loan that had been made by LBHI to Eagle.  LBHI is

21   forgiving -- I think it's 330 million dollars of that loan.

22   I'm sorry, 430 million dollars of that loan and 230 is being

23   paid on account of that loan.  And that's being purchased by

24   the purchaser to contribute to Eagle.  The equity interests, if

25   you will, Your Honor, are receiving a nominal consideration for

that.

Your Honor, I have a copy of the org chart which I'd like to hand up for the Court if that's acceptable.

THE COURT: This is a different organizational chart?

MR. PEREZ: Well, this is -- it's down from one of those. It is on there but you only really go to here.

THE COURT: Well, you're welcome to come forward with it and I'll figure out where it fits. Thank you. Oh, this is definitely different. It has all kinds of lines and percentages.

MR. PEREZ: All right. Thank you, Your Honor. The issue here is -- or the nature of the objections is that Lehman Brothers Commodity Services Inc., which is in the middle line on the far left-hand side, who is -- owns ninety-four percent interest in Eagle is receiving a nominal consideration and that LBHI, who has made a loan to Eagle, is receiving 230 million dollars.

Your Honor, we have been working trying to resolve those objections. And we have been able to resolve the objection as it relates to one of the parties, EnergyCo Marketing and Trading, Mr. Etkin's client. We have not been able to resolve the objection as it relates to the ad hoc committee of bondholders or Bank of New York Mellon. And, Your Honor, the way that we have resolved the objection, if I may approach and give you a marked copy of the order --

1          THE COURT:  You have all kinds of things for me this

2     afternoon, don't you?  Thank you.  Now, do I understand that

3     the marked order resolves only the objection of Mr. Etkin's

4     client?

5          MR. PEREZ:  Yes.  In essence, the three objectors are

6     making the same objections but I've been able to resolve one

7     and not the other two.

8          THE COURT:  In other words, the language that was

9     acceptable to Mr. Etkin is not acceptable to the others?

10         MR. PEREZ:  Correct, correct.  All right.  And if you

11    will, Your Honor, if I could just take you through the order,

12    because I think this addresses -- and then at that point, if

13    you'd like to hear from the objectors, Mr. Ehrmann is here.

14    I'm prepared to go forward and make a showing if that's

15    necessary.  But, Your Honor, if I could just --

16         THE COURT:  Well, if you want to prevail, I think it

17    will be necessary.

18         MR. PEREZ:  We'd like to prevail, Your Honor.  Your

19    Honor, if you look at the next to last page of the order, if I

20    could just take you through the changes, the -- well, if you

21    could just go back one page, unfortunately, when the Barclays

22    transaction got done, the lease to Eagle was transferred to

23    Barclays inadvertently.  So at the very bottom of the second --

24    I'm sorry, of the third page of this order, we're basically

25    saying that that was done in error.  And at the top of the next

page, it says that Barclays has no liability for that lease.
It was done in error; it was transferred to them in error and
we're just saying it didn't happen and it's being assumed and
assigned to Eagle.

Then, Your Honor, the next --

THE COURT:  Barclays acknowledges this?

MR. BAREFOOT:  Yes, Your Honor, we've negotiated that
language with the debtors.

THE COURT:  Fine.

MR. PEREZ:  Next, Your Honor, the next paragraph in
there relates to a request that we had from the U.S. attorney
to put in language to make sure that the releases don't affect
any governmental unit or go beyond what would be normal
releases.

And then, Your Honor, it's really the last two
paragraphs that were put in to address the objections.

THE COURT:  This language was in Mr. Etkin's
objection, I think.  Didn't you have language in your
objection?

MR. ETKINS:  Not exactly, Your Honor.

THE COURT:  But close?

MR. ETKINS:  But close enough, I guess.

MR. PEREZ:  And, in essence --

MR. ETKINS:  It's certainly okay with me, Your Honor.
If there are no objections, I hope -- I don't think --

1       MR. PEREZ:  Okay.  Your Honor, basically, it says

2  that nothing in the order or the purchase agreement will be

3  deemed to determine as between LBHI and Commodity which is the

4  ninety-four percent owner.  The allocation of the proceeds of

5  the sale or the appropriate characterization of the

6  intercompany claims with respect to -- and that those issues

7  are fully reserved.  That's number one.  And then number two,

8  if it's ever determined that the money belonged to Commodity or

9  that Commodity had the right to the sales proceeds, either as a

10  result of a recharacterization or a reallocation, Commodity

11  will be entitled to an administrative expense as if it had made

12  an intercompany advance pursuant to the -- I hope to be entered

13  cash management order which would, in essence, give them a

14  superpriority claim for any money that otherwise should have

15  gone to them that didn't go to them.  And that's how we had

16  proposed to resolve these objections.

17       THE COURT:  So we took care of Mr. Etkin's client.

18  Mr. Etkin, you concur?  This is satisfactory?

19       MR. ETKINS:  It is satisfactory.  I think the only

20  issue is, as Mr. Perez alluded to, is one of timing.  It hinges

21  upon the treatment in a cash management order that is yet to be

22  entered by the Court.

23       THE COURT:  Well, we'll see where we end up with that

24  this afternoon.

25       MR. PEREZ:  Yes, Your Honor.

1     THE COURT:  Why if you're willing to do this for Mr.

2   Etkin and -- is the drafting of language to accommodate the

3   other objections not a feasible solution?

4     MR. PEREZ:  Your Honor, I've offered that to the

5   other objectors.  Was that the question?

6     THE COURT:  Well, I guess the question is why are we

7   proceeding with a contested hearing with respect to this if the

8   debtor is willing to come up with language to accommodate

9   issues of entitlement to these proceeds?

10     MR. O'NEILL:  Your Honor, Brad O'Neill, Kramer Levin,

11   on behalf of Bank of New York Mellon.  I think the issue really

12   is one of what the appropriate protection for the creditors of

13   Commodities should be.  By putting the money in Holdings and

14   granting an administrative claim, you are, in effect, assuming

15   that the characterization of this intercompany transfer as debt

16   is accurate.  And, you know, as you've already said several

17   times today, saying it so doesn't make it so.  And by

18   transferring the money up, you're essentially putting the

19   creditors of Commodities at some risk that the proceeds of the

20   sale if they're right about the character -- or if the debtors

21   are not able to sustain the characterization of this transfer

22   as debt that their risk that some portion of that proceeds

23   would be dissipated in the Holdings estate.  And so while we

24   appreciate the reservation of our rights, what we're really

25   looking for is some form of segregation, either in escrow or

1 segregated account subject to further order of this Court so

2 that the proceeds couldn't be used for other purposes pending

3 our ability to review to achieve as the debtors hope to achieve

4 transparency concerning the nature of these transactions. And

5 if they can demonstrate to us, to our satisfaction, that this

6 is, in fact, a legitimate intercompany debt then the

7 segregation could end. If there turned out to be a dispute

8 about it, then we would be back in front of Your Honor to

9 arrange some type of process to resolve that dispute. But

10 basically, to distill it down to its essence, we want an

11 escrow, we want segregation as opposed to having the money

12 actually transferred up based on the presumption that this is a

13 debt which hasn't been established and subjecting us to the

14 additional risk that potentially the Holdings estate might --

15 or that those proceeds might be dissipated in the Holdings

16 estate.

17 THE COURT: Okay. I understand your position.

18 MR. MUNSCH: Your Honor, Russ Munsch on behalf of the

19 ad hoc committee of administrative bondholders. We would

20 reiterate the position of the Bank of New York as well in terms

21 of requiring some type of segregation. As we've heard this

22 morning, the debtor is simply trying to get its hands around a

23 mountain of information. All we've been able to find out is

24 that there is some intercompany loan between LBHI and LB

25 Commodities. And obviously, we'd like to get information on

1    that and we do think it's inappropriate that the funds are, in

2    essence, swept up to LBHI before there's been any really review

3    or analysis from the debtor or any other party as to what the

4    true character of those funds are.  We're willing to do some

5    short time fuse on an opportunity to review that as long as the

6    proceeds are escrowed, an opportunity to review information so

7    we have an opportunity to determine whether those funds are

8    appropriate to go to LBHI or to Lehman Brothers Commodities.

9         THE COURT:  All right.  It sounds to me from what

10   I've heard that nobody's really complaining that the

11   transaction is an inappropriate transaction or shouldn't happen

12   but rather that the transaction should happen protecting

13   everybody's rights in different ways.  And the continuing

14   objectors say the only way to really protect their rights is

15   for the money to be held in an escrow account of some form and

16   not be upstreamed to Lehman Brothers Holdings Inc.  Is that

17   what's going on?

18        MR. PEREZ:  Absolutely, Your Honor.  But I think the

19   characterization of it being upstreamed is, in this case, not

20   quite correct.  But, Your Honor, I do think that --

21        THE COURT:  Okay.  I'm sorry for saying that.

22        MR. PEREZ:  No, no.  I --

23        THE COURT:  I don't know what the right

24   characterization is but this is really not terribly different

25   from some of the arguments we had during the Barclay sale

1    hearing as to which one of the separate Lehman entities is

2    actually entitled to benefit from the proceeds.  And because

3    there are different creditors who assert claims at different

4    levels of the structure, these are important issues and they're

5    likely to recur.

6            MR. PEREZ:  Absolutely, Your Honor.

7            THE COURT:  So it may make some sense to have a

8    consistent approach.

9            MR. PEREZ:  Right.  And, Your Honor, I think the

10   approach that we have taken so far and certainly the approach

11   that my client, that Alvarez and Marsal would like to take is

12   to reserve all of the rights -- and I'm happy to put any

13   language in there and then to provide for, in essence, a

14   superpriority administrative expense to that extent.

15           THE COURT:  I'm going to suggest that we table this

16   until after we have addressed the cash management motion.

17   Because it seems to me that if there is consensus that the cash

18   management motion should be approved with inter-entity

19   protections in a form that is acceptable for purposes of cash

20   management that those same protections should be appropriate

21   with respect to this transaction.  It certainly seems that way

22   to me.  I see no reason why this should be separate treatment

23   as to disputed claims in connection with Eagle Energy Partners

24   but an acceptance that massive amounts of cash can flow back

25   and forth within what is left of the Lehman system.  And if

1    it's, in fact, true, a superpriority claim is enough to provide

2    adequate protection.  So, let's just see where we stand on cash

3    management.

4          MR. PEREZ:  Yes.  Your Honor, can I just get my cash

5    management --

6          THE COURT:  Are you the cash management guru, too?

7          MR. PEREZ:  Your Honor, I've hidden the trifecta

8    today.

9      (Pause)

10         MR. PEREZ:  Your Honor, very late last night or

11   perhaps early this morning -- again, Alfredo Perez, Your Honor,

12   on behalf of the debtors.  Very late last night or perhaps

13   early this morning, we filed a revised form of cash management

14   order.  And I would like to take the Court through the changes

15   that we have made in that order.

16         THE COURT:  Why don't you hand that one up?  Thank

17   you.

18         MR. PEREZ:  Your Honor, there have been various

19   changes that have been made, but the most significant changes,

20   Your Honor, have to do with the objections and the discussions

21   that we had with the creditors' committee with respect to the

22   very issues that the Court raised.  And we've had a lot of

23   discussion with them over the last several weeks and I think

24   last night probably around ten or eleven I think we finished up

25   the negotiations and this order reflects that.

1           First of all, Your Honor, the --

2           THE COURT:  Let me just ask a question that I suppose

3    is obvious.  Does it reflect consensus between the creditors'

4    committee and the debtors?

5           MR. PEREZ:  Yes.

6           THE COURT:  Okay.

7           MR. PEREZ:  So, Your Honor, the key part of the order

8    is at the last order paragraph on page 5.  And in essence what

9    it says is "That the debtor shall account for the movement of

10   cash and any collection of disbursement activity between the

11   debtors and affiliates through the intercompany accounting and

12   from and after the date of the order, (1) the transfer of cash

13   to or for the benefit of any debtor directly or indirectly from

14   any debtor or non debtor shall be entitled the transferring

15   affiliate to an allowed claim in that debtors' Chapter 11 case

16   under Sections 364(c)(1) 507(b) of the Bankruptcy Code, having

17   a priority over any and all administrative expenses of the kind

18   specified in 503(b) and 507 of the bankruptcy code.  And (2)

19   with respect to any transfer of cash by the debtor to or for

20   the benefit of any non debtor affiliate pursuant to this order,

21   the debtor shall use commercially reasonable efforts to obtain

22   from the affiliate a note accruing interest at a market rate,

23   which note may be a master note covering all such transfers and

24   (b) a valid perfected junior lien, junior to any existing liens

25   on such affiliate".  And then, Your Honor, that's the claims

1    that they would get.  In addition to that --

2         THE COURT:  I know you've negotiated that language

3    but I don't know what that means.  What does it mean for the

4    debtors' commercially reasonable efforts to obtain this?  Does

5    that mean use your commercially reasonable efforts to do that

6    and if you can't do it there's no consequence?

7         MR. PEREZ:  No, Your Honor.  I believe that with

8    respect to the notes, we will get the notes.  It's just a

9    matter of how long it's going to take us to get the notes.  And

10    remember, Your Honor, this is an interim order.  We expect to

11    be back here November 5th and that's one of the things that the

12    committee would like for that to go away.  With respect to the

13    security interest, it may not be possible for us to obtain

14    security interests from perhaps some foreign affiliate or

15    something like that.  At that point, we'd have to determine

16    whether we want to advance any funds.  I think that decision

17    has to be made.  But this is only to the extent that there's

18    money going to a non debtor entity.  With respect to a debtor

19    entity, it's a super priority done.  With respect to a non

20    debtor entity, it's really a timing issue more than anything

21    else.  I think the goal is to have notes and security interest

22    for all of the non debtor affiliates.  And then --

23         THE COURT:  Well, Lehmann Brother's Commodity

24    Services is a non debtor.  Right?

25         MR. PEREZ:  It's a debtor, Your Honor.

1    THE COURT:  It's a debtor?

2    MR. PEREZ:  It's a debtor.

3    THE COURT:  It's hard to tell.

4    MR. PEREZ:  If we would go to the third page, Your

5    Honor.

6    THE COURT:  I'm looking at the first page.

7    MR. PEREZ:  Third page.

8    THE COURT:  Oh, there it is.

9    MR. PEREZ:  Third page, Your Honor.

10    THE COURT:  I see it.

11    MR. PEREZ:  If you see Commodity Service which owns

12    Eagle Energy --

13    THE COURT:  Never mind, I see it.

14    MR. PEREZ:  -- it's a debtor.  And then, Your Honor,

15    there are what I would call the reporting aspects of this order

16    and kind of the protocols that we have established.  So if we

17    read further, to the extent that we seek to transfer anything

18    in excess of twenty-five million dollars in a single

19    transaction or in excess of forty million dollars in the

20    aggregate of any calendar month, will give them five business

21    days notice of that; they'll have an opportunity to object to

22    the extent that they don't agree with our business judgment on

23    that.

24         In addition, Your Honor, just right before the

25    ordered paragraphs, there is a stipulation, and that's on page

1  3, in the middle of page 3, that we've entered into a protocol

2  pursuant to which the debtors will provide the committee the

3  following reports in a format acceptable to the committee.

4          One, a report on cash activities on a weekly basis.

5          Two, a rolling thirteen week forecast updated

6  monthly.

7          And three, a monthly postpetition intercompany

8  activity and intercompany balances.

9          So that's basically -- there's both the protection

10  aspect of it and then there is the reporting aspects of it.

11  And I think with that, the committee was satisfied with the

12  cash management motion, Your Honor.

13          Your Honor, we received numerous objections and let

14  me make a couple of points clear. Number one, we in the motion

15  to strive what happened historically, that's really not

16  happening anymore. There is no cash sweep anymore. So to some

17  extent it is our cash management system; it's not -- a couple

18  of the parties said you really should centralize cash

19  management system because it's our cash management system but

20  it's really not the centralized cash management system that

21  existed before the bankruptcy. That's not here.

22          Number two, the goal of Alvarez and Marsal and

23  Mr. Cohn who is the person who is particularly responsible for

24  this, is to absolutely minimize the movement of monies from one

25  entity to the other entity. Obviously, if an entity has no

1    money -- has no liquidity but has assets it may need to fund

2    insurance and things of that nature.

3          So we received numerous objections, Your Honor, and I

4    believe that the objections kind of fall into two categories.

5          One, are what I would call the objections -- the

6    protection/reporting objections which I think are addressed

7    with respect to the creditors' committee.  The other set of

8    objections really have to do with the impact or potential

9    impact of the cash management system on anybody's particular

10   claim or their rights or how things -- what will happen to them

11   in this case.  And unfortunately, in the -- with no good deed

12   going unpunished, Your Honor, at the bottom of page 6 we

13   inserted a paragraph having to do with the Solace and MKP

14   Opportunity Master Fund (ph.).  In essence, they mistakenly

15   wired money in.  We recognize that they mistakenly wired money

16   in.  We instructed the bank to wire it out and the bank struck

17   the account.  So we put this paragraph in there because we, in

18   essence, tried to address their concern.  Unfortunately, that

19   has resulted in many, many, many requests -- similar requests.

20   And so I would propose, and it's not in here, what I would

21   propose to do is to insert a sentence in this paragraph which

22   says that nothing in this paragraph affects any of the rights

23   that you might otherwise have.  So in other words, that there

24   shouldn't be any negative inference drawn from this paragraph.

25   So to the extent that somebody believes they have a claim, this

1    paragraph doesn't impact it one way or the other. And so I

2    would propose to make that change. I'm not sure that -- I

3    think people want to be mentioned by name and I regret that I

4    agreed to put this in. At this point, I don't think I could

5    back out, although if the Court tells me I can; I'm happy to do

6    it but --

7            THE COURT: I'm not going to say that. You've made

8    an agreement and I guess you're stuck with it.

9            MR. PEREZ: Okay.

10           THE COURT: It does seem that this is becoming almost

11   like an earmark order which is not such a good thing.

12           MR. PEREZ: Exactly.

13           THE COURT: I suggest that to the extent that we're

14   dealing with an order which is really not designed to deal with

15   the rights and claims of individual creditors, I'd rather to

16   propose a global generally applicable system for doing the cash

17   and for protecting the rights of those creditors who have

18   claims at particular entity levels of the Lehmann family, that

19   it's probably best not to burden the order with too much of

20   what I'm half jokingly calling earmarks but it actually applies

21   in this instance. Just for purposes of being able to get to an

22   agreed order, you may have to do it up to a point.

23           MR. PEREZ: Right.

24           THE COURT: Perhaps it's possible for some clever

25   lawyers working together to come up with some language of

1   general application that could fit everybody without having to

2   name them.

3           MR. PEREZ:  Right.  Your Honor, I think that -- and

4   we did receive this from one of the other persons who once we

5   told them we couldn't put his name in he said okay, well, fine.

6   At least say that this paragraph doesn't create a negative

7   inference.  And we're willing to do that.

8           And with that, Your Honor, I'm not sure exactly who

9   remains as an objector.

10          THE COURT:  Let's find out.

11          MR. DUNNE:  Your Honor, may I be heard first?

12          THE COURT:  Absolutely.

13          MR. DUNNE:  For the record, Dennis Dunne from

14  Milbank, Tweed on behalf of the official creditors' committee.

15  Mr. Perez is right that we worked extensively with the debtors

16  to craft some of the protocols that you see in this version.  I

17  actually wanted to stand up to talk about and Your Honor picked

18  up on this, the negative pregnant that's created by some of the

19  language in the order.  For instance, if they used their

20  commercially reasonable efforts to try to obtain the investment

21  on a secured basis and fail can they still go forward because

22  they used their commercially reasonable efforts?  We're viewing

23  the consent proviso as the umbrella override on that and if

24  it's above the threshold, the twenty-five million dollars

25  individually or forty million dollars in aggregate for any one

1 month, they need the committee consent. It may be that if they

2 use their commercially reasonable efforts and they can't thread

3 the needle through the negative pledges with respect to the non

4 debtor or other restrictive covenants, that we then don't

5 consent because it doesn't make sense to take cash from LBHI

6 where there may be relatively small amounts of secured debt and

7 downstream it or move it somewhere else in the system below

8 secured debt in order to, in essence, grow the secured

9 creditors' claim. And so if that happens, we'll be back in

10 front of Your Honor if there's a disagreement. Presumably, we

11 reach the same business judgment. The same is true between

12 debtors.

13 If we're above the thresholds, super priority may in

14 many situations make sense unless we're talking about an entity

15 that has a substantial amount of secured debts and a super

16 priority claim from some other entity in the Lehmann family

17 maybe below all the secured debt. And if we run into that

18 hypothetical, don't know if we will, we'll either agree. If we

19 do, great, if not we'll be back in front of you. And with

20 that, Your Honor, unless you have questions, we support enter

21 to the cash management.

22 THE COURT: No, I'm satisfied that the committee has

23 worked diligently to achieve a consensus on this order but also

24 recognize that there are others who are not in retent yet.

25 MR. DUNNE: Thank you, Your Honor.

1    THE COURT:  Looks like we have a -- it's either a

2    long line of people interested in getting a better view or

3    people who actually want to speak to this question.  I'm

4    guessing it's the latter.

5    MR. DUBLIN:  I'll try to be brief, Your Honor.  Phil

6    Dublin, Akin Gump on behalf of the Informal Noteholder Group.

7    Your Honor, the committee has made great strides in addressing

8    a number of our concerns but there are some that remain

9    primarily with respect to transfers to non debtors.  The fact

10   that the debtors are going to use commercially reasonable

11   efforts, I think you picked this up right off the bat,

12   commercially reasonable efforts to get a lien on a transfer to

13   a non debtor we do not believe provides the necessary

14   protections.  The debtors are seeking -- for example, the

15   debtors' seeking approval today of the bidding procedures to

16   the IMD business sale.  That transaction contemplates

17   potentially multiple non debtors filing for bankruptcy in the

18   future.  If that's the case and if liens are not granted in

19   respect to inter company transfers respective of any entity

20   that may file in the future, then there's no protection for

21   LBHI or any of the current debtors with respect to any

22   transfers they make to those entities if they're insolvent.

23   We'll end up with prepetition unsecured claims that may not be

24   able to get satisfied.  So we think with respect to any

25   intercompany transfer to a non debtor, there has to be liens.

1    And if they cannot get the lien, then automatically they cannot

2    make the transfer.

3          Also, with respect to the system that's set up with

4    the creditors' committee, we believe that a twenty-five million

5    dollar single transaction or forty-million dollar in the

6    aggregate per month is too high of a threshold.  Mr. Miller

7    referenced earlier, he has no idea how long these cases are

8    going to last and how many -- you saw the chart of three pages

9    of how many debtors we have.  That can be an astronomical

10   amount of money that they're not proper protection for.

11         In addition, Your Honor, it's our understanding that

12   the protocol that's referenced in the proposed order, has not

13   actually been fully agreed to yet and no other party other than

14   the creditors' committee has seen it and it can be amended

15   without any notice.  So we believe that in order for that

16   protocol to be approved, it should be put out on notice and

17   parties should have the opportunity to object to it and any

18   modifications to it.

19         THE COURT:  Thank you.

20         MR. FLICS:  Martin Flics from Linklaters LLP for the

21   joint administrators.  Your Honor, our issue is a little bit

22   different and perhaps unique to us.  As you heard at some

23   length from me at the sale hearing, and as you've heard today

24   from Mr. Miller and Mr. Marsal, one of the big issues here is

25   the separation, the separation among the various Lehman

1    entities around the world.  I think it's fair to say that all

2    of the key parties, including the administrators, are eager to

3    work in a consensual fashion along the lines that have been

4    discussed in the course of the status reports today.  We've

5    initiated a number of meetings that have been referred to.

6         But, nevertheless, these problems are serious, and

7    they do impact rights.  And I mention that because the cash

8    management process impacts those directly.  As you might

9    imagine, a system in which entity, which was LBHI, acted as the

10   paymaster and in which payments in the ordinary course of an

11   integrated level entity were directed to that entity, once that

12   terminates there are likely to be some difficulties.  And right

13   now, we are in the midst of totally foreseeable difficulties.

14   And all we want to do is to make sure that property rights of

15   LBIE and its customers and its estates are not waived or

16   impaired as a result of the use of a cash management procedure

17   that is gradually being phased out.  It would be great if the

18   cash management procedure simply terminated and everyone in the

19   world knew to make payments to the right place the very next

20   day.  Unfortunately, that is not realistic nor is it what

21   happens.

22        The administrators have taken diligent steps to

23   notify parties to transactions to send cash to them but, not

24   surprisingly, that hasn't happened in every case.  And so all

25   we would like for this order to reflect is that property of LBI

1    (sic) that enters into this cash management system --

2          THE COURT:  You mean LBIE?

3          MR. FLICS:  LBIE.  Thank you very much, Your Honor.

4    That property of LBIE that is sent to the LBHI accounts,

5    pursuant to prior instructions from parties that either didn't

6    receive or ignored the directions from the administrator, is

7    returned to LBIE as their rightful property.

8          Now, that requires a process of identification.

9    We're not asking the debtors to guess at it, but we are meeting

10   with them, we are providing information.  And it just seems to

11   me that rather than run the risk of significant amounts of

12   money, we're talking about billion and more, being waived or

13   commingled or sent along to third parties that we can work with

14   the debtor and get some recognition and statement in this order

15   that those funds will be segregated, they will not be

16   commingled and that they will be returned.

17         THE COURT:  Well, look, everybody in this case, Mr.

18   Flics is obviously supersensitive about reserving their rights

19   and not waiving anything, and I fully appreciate the reason

20   that you're speaking to this issue now.  But I'm reminded of

21   the statements that were made in the course of the status

22   conference this morning in which at least I heard both Mr.

23   Miller and Mr. Marsal indicate that efforts were underway to

24   develop some kind of working protocol that would protect the

25   interests of LBIE to the extent that there's property that ends

1    up in the LBHI estate and vice versa.  To the extent that

2    there's LBHI money that's subject to the jurisdiction of your

3    clients, they have a claim to it too.  So I supposed it's a

4    two-way street.  I don't know that it belongs in the cash

5    management order.  Maybe it belongs in some other order.

6           MR. FLICS:  Well, Your Honor, that might be right.

7    The placement in a particular order of course is not important,

8    and we --

9           THE COURT:  All I'm saying is every -- I'm not being

10    critical at all.  Every contest matter becomes an opportunity

11    for every sensitive player to get up and say we want to be

12    protected here to.  And I just think probably once to be fully

13    protected is enough.

14           MR. FLICS:  Well, with all respect, Your Honor,

15    this --

16           THE COURT:  This is an important order; I recognize

17    that.

18           MR. FLICS:  -- this motion goes directly to the issue

19    that I mentioned.  It's not another order in which we'd like to

20    argue for the usual reservation.  This is very important

21    because it is this cash management procedure that hasn't been

22    in place for a long time that is contributing to this issue

23    that is happening today.  We are willing and eager to work with

24    Mr. Miller, with Mr. Marsal.  We suggested the meeting that was

25    referred today.  We suggested the meeting that will hopefully

1    occur later today with the LBI trustee.

2              THE COURT:  Has there been any effort to work out

3    some simple language to incorporate in this order that

4    satisfies you?

5              MR. FLICS:  We have requested that there be a

6    segregation of assets in which LBI has an interest, and we've

7    been told no.

8              THE COURT:  LBIE?

9              MR. FLICS:  LBIE.  Thank you again, Your Honor.  And

10   we've been told no, not in this order.  Frankly, I don't

11   understand that.  We do want to work for it but we have an

12   existing order today and cash coming in today and every day.

13             So I will commit us, as I have in the past, in the

14   last few weeks, to continue to work with all of those parties

15   towards working out a consensual resolution across borders,

16   whether it's in protocols or otherwise, but we don't want with

17   each passing day real property interests to be waived.  Thank

18   you, Your Honor.

19             THE COURT:  Okay.

20             MR. MILLER:  Your Honor, if I could just respond to

21   that because I have a meeting, and, Your Honor --

22             THE COURT:  Please do respond.

23             MR. MILLER:  Your Honor, the exact topic that Mr.

24   Flics just raised, that if LBHI received a payment that was

25   mistakenly sent to it and actually belonged to LBIE, would Mr.

1  Marsal return it.  And there was discussion about it.  Mr.

2  Marsal, and I think I'm quoting him, Your Honor, said, "It's

3  not our property; we're going to give it back to you.  However

4  we would like the reciprocal right."  At that point, Mr. Jacob

5  said, "Well, I can't do that right now.  I've got to go talk to

6  Linklaters in London."  Now, reciprocity is very important.

7  That has to be part of the protocol that we hope to enter into.

8  It doesn't have to be in this order, Your Honor.

9       Now, as Mr. Perez pointed out, this is an interim

10  order.  It's only going to be for three weeks.  We'll be back

11  here on November 5.  Otherwise, we're going to have this order

12  with eighteen paragraphs.  Every speaker that gets up here,

13  just as Your Honor, wants his particular interest protected.

14  So that is the subject for the protocol, Your Honor.

15       THE COURT:  Okay.  Mr. Sabin?

16       MR. SABIN:  Good afternoon, Your Honor.  Jeffrey

17  Sabin on behalf of the Harbinger Funds from Bingham McCutchen.

18  With reference to the proposed draft, amended order, page 3,

19  Your Honor, and I'm now looking at the carryover language at

20  the first decretal paragraph, where there is a mechanism for

21  reporting on cash activities on a weekly basis to the

22  committee.  I would suggest under the rule of breakup

23  transparency that many have talked about in this case that

24  since there are at least two websites that I know of, the

25  debtors' and the creditors' committee, that perhaps that weekly

1  reporting that's referred to in clause (i) in that paragraph

2  could be made available on the debtors' website for all to see

3  on cash transfers.

4         And as I deal with cash transfers, I note that on

5  page 5 of this proposed order, the last decretal paragraph, the

6  reporting apparently wouldn't start until the day of this order

7  itself.  And one of the things that concerns our client is that

8  the reporting should start from the applicable petition dates

9  of each of the debtors in this case, not from the date that

10  this order is entered.  I know that there are ongoing efforts,

11  and I know that those efforts have to date and will in the

12  future take much effort to report, but I would imagine that

13  under the rules and under the law all cash transactions must be

14  accounted for, not only between debtors but between debtors and

15  nondebtors.

16         My next point, Your Honor, is back on page 3, the

17  last decretal paragraph, where apparently it is contemplated

18  that one or more of these debtors will use and/or fund a bank

19  account that they do not own or control.  In this case, a bank

20  account that is controlled by the SIPA trustee, i.e., of Lehman

21  Brothers Inc., and secondarily and/or of Barclays Capital.  If

22  that indeed is the case and monies of these debtors will flow

23  through those accounts, either by funding and directly, I would

24  hope that those monies would not be subject to setoff rights or

25  other rights of the SIPA trustee and/or Barclays Capital so

1   that they would otherwise not be trapped.

2          As to paragraph 5 itself, that deals with reasonable

3   efforts.  Harbinger adopts the comments made by comments for

4   the ad hoc committee but notes two other things, and that is

5   instead of necessarily imposing the will of any individual

6   creditors, perhaps once again under the concept of

7   transparency, transactions above twenty-five million could be

8   posted as proposed transactions on a website so that not only

9   would the creditors' committee, in essence, under its protocol

10  have rights, but if any individual creditor wanted to object it

11  had advanced prior notice and could do so and bring it to this

12  Court's attention.  Thank you, Your Honor.

13         THE COURT:  Okay.  Thank you.

14         MS. CHAPMAN:  Good afternoon, Your Honor.  Shelley

15  Chapman, Willkie Farr & Gallagher for Fir Tree and Quantum.

16  Your Honor, I'll be brief.  We are one of the parties, I think,

17  that you've now referred to as the "earmarked parties".  We did

18  submit an objection in which we raised the constructive trust

19  argument.  I did have an opportunity --

20         THE COURT:  I mean no offense by that.  It's --

21         MS. CHAPMAN:  I understand, Your Honor, and --

22         THE COURT:  -- a well-established practice in

23  Washington.

24         MS. CHAPMAN:  Yes, and I take none, Your Honor.  I'm

25  simply using it as a shorthand to describe my position.  I did

1    speak to Mr. Perez and suggested one of two fixes:  either that

2    my clients be named specifically in the order or, as Your Honor

3    suggested, there might be some generic language that could be

4    included in the order to generally make the point that from the

5    entry of this order forward no party who at that moment has

6    constructive trust remedies, rights will be diminished or

7    otherwise affected by the entry of the order.  It's a simple

8    concept.  I don't think we're trying to enlarge anyone's

9    rights.  We've taken great comfort in listening to Mr. Miller's

10   representations this morning and Mr. Marsal's as well.  Thank

11   you.

12          THE COURT:  Fine.  Thank you, Ms. Chapman.

13          MS. WEISSMANN:  Good afternoon, Your Honor.  Beverly

14   Weissmann on behalf Federal Home Loan Bank of Pittsburgh.  We

15   actually echo the comments of Fir Tree in terms of the issues

16   as to the order.  I briefly glanced at the order.  I don't

17   think it needs to be specific as to each party but I don't

18   think it goes far enough to reserve the rights of parties and

19   property in a constructive trust.  And we would echo the

20   comments that this order needs to specifically provide that to

21   the extent LBHI had monies that didn't belong to them, that as

22   those get disbursed out down the road, now or in the future,

23   that that doesn't create an issue with respect to parties'

24   rights in the constructive issue.  It really does need to be

25   addressed because as they mentioned this morning, there are a

1    lot of counterparties, there was a lot of collateral that

2    didn't belong to this debtor, didn't belong to LBSF, didn't

3    belong to Lehman Brothers Holdings Inc.  And in that instance,

4    if it gets swept into a cash management order and we're down

5    the road six months or one year, no party wants to be in a

6    position where they say well, gosh, you know, we didn't

7    preserve your right with respect to the property that you owned

8    and those funds are dissipated.

9         So we would respectfully request that this Court puts

10   some language in the order to protect all of the parties'

11   rights vis-a-vis constructive trust, as suggested by Fir Tree.

12        THE COURT:  Okay.  I mean, I think there's a common

13   theme here, and when we're done with everybody's comments I

14   think it would be useful to hear from Mr. Perez again as to

15   whether or not there is a way for the debtor to act as the

16   principal drafter of some language that might satisfy the needs

17   of -- the legitimate needs of those parties who have expressed

18   their concerns about the impact of the order this afternoon.

19        Mr. Montgomery?

20        MR. MONTGOMERY:  Good afternoon, Your Honor.  Claude

21   Montgomery, Salans.  We represent two of the named banks in the

22   cash collateral order:  Swedbank AB and Svenska Hundelsbanken

23   AB.  We have not filed an objection because we have an

24   agreement with debtors' counsel that was reflected in the order

25   in all but one respect.  And I believe Mr. Perez is prepared to

1 read on the record that we have the last issue also resolved,

2 which is that this order does not -- the failure of the two

3 banks to object does not constitute a waiver of any cash

4 collateral rights that the banks may have.

5      MR. PEREZ:  Your Honor, I'm prepared to do that.  I

6 have the language.

7      THE COURT:  Sounds like he just did it.

8      MR. MONTGOMERY:  Thank you.

9      THE COURT:  And if he has language as is acceptable

10 to you, I don't need to hear it.

11      MR. LAGUARDIA:  Your Honor, Daniel Laguardia,

12 Shearman & Sterling, for Bank of America.  I don't have to

13 repeat everything that's been said.  We are a party that has

14 claims against the collateral.  We have a constructive trust

15 claim, among others.  I don't think this order is intended to

16 affect anybody's legal rights or claims, and I think it's

17 important that there be language in the order providing that.

18      MS. MATZAT:  Good afternoon, Your Honor.  Rosanne

19 Matzat of Hahn and Hessen, on behalf of Powerex Corporation and

20 Avista Corporation.  I guess I could sum it up by saying ditto,

21 Your Honor, on the last several objections that were made.  We,

22 too, are a party who have been seeking to track down and get a

23 handle on where our collateral is.  We are concerned that it

24 gets transferred somewhere else in a superpriority

25 administration claim is not enough to compensate us or to

1  preserve those rights.

2         So our papers are of record, and we would like to be

3  considered in connection with any constructive trust type of

4  language that is put together.  Thank you.

5         THE COURT:  Fine.  Mr. Perez, I think it's your turn.

6         MR. PEREZ:  Yes, Your Honor.  Your Honor, I think

7  there's a quick fix, and if you'd look at paragraph 5 of the

8  order --

9         THE COURT:  Just so we're looking at the right

10  paragraph --

11        MR. PEREZ:  The first "Ordered" paragraph.

12        THE COURT:  The paragraphs are not numbered.

13        MR. PEREZ:  I apologize, Your Honor.  It's the

14  highlighted paragraph in the middle of the page.

15        THE COURT:  In the middle of page 5 --

16        MR. PEREZ:  5.

17        THE COURT:  -- or the middle of page 3?

18        MR. PEREZ:  Middle of page 5, Your Honor.

19        THE COURT:  Okay.

20        MR. PEREZ:  I apologize.  All right.  Your Honor,

21  this was actually put in at the request of the gentleman that

22  represents Bank of America and several other ones, which says

23  "Nothing in the order shall be deemed to affect any parties'

24  otherwise valid setoff."  And then we also -- they requested to

25  insert recoupment, which we will, or the rights to seek to

1   impose a constructive trust under applicable law.  I think we

2   could insert that in there, and I think that would preserve the

3   parties' rights.

4         Then it goes on, "valid netting agreements under

5   applicable law or under applicable laws to impose an

6   administrative freeze on any bank account or nothing herein

7   shall affect any bank's actions exercise any valid rights of

8   the debtors to assert" -- "or any of the rights of the debtors

9   to assert that the purported right is improper".  I think if we

10  just add the constructive trust language in there, I think that

11  should fix it.

12        THE COURT:  It probably does work but others may have

13  a different view, and we'll see if it satisfies them.  And by

14  the way, there are also --

15        MR. FLICS:  Your Honor, not quite all the way.

16        THE COURT:  But I actually wasn't quite finished

17  myself.

18        MR. FLICS:  Oh, I'm sorry, Your Honor.

19        THE COURT:  That's fine.  I was also going to comment

20  that that's only one of the things that a lot of people talked

21  about.  And while I think that may be sufficient to satisfy the

22  arguments made with respect to preservation of rights to assert

23  a constructive trust, there were parties who raised a whole

24  litany of other miscellaneous comments regarding the order.

25  And it occurs to me that this hearing should not be converted

into a drafting session, at least not with me on the bench.  So

I'm going to hear what else anybody has to say and make the

suggestion that I think an interim order authorizing the

debtors to have some kind of comprehensive system for cash

management is necessary and appropriate and should be entered

as promptly as possible.

I would note, however, that this is an enterprise

that has functioned without such an order for the last month.

And if it takes another day to get an order that satisfies all

the objectors and that also meets the debtors' needs, some time

spent drafting may be time well spent.  I'll hear from Mr.

Flics.

MR. FLICS:  Your Honor, with that, I have no further

comment.  We're happy to participate in any further drafting

exercise to satisfy us.  Thank you, Your Honor.

THE COURT:  I just think that's a reasonable way for

us to approach this, particularly since there are a lot of

lawyers in the room and I'm confident somebody in the room has

thought of something I haven't thought of, and that it makes

some sense for people who are not in a crowded courtroom to get

together and pause and reflect about what the language says and

what negative pregnance, I think was the term used, what

possible traps for the unwary may innocently be placed in our

midst as a result of late-night drafting sessions.  So it's

probably a good idea for the parties to spend a little bit of

1    time to get it right.

2           That said, I'm also confident that there are some

3    positions that have been expressed that the debtor may not

4    agree with or that the committee may not agree with,

5    particularly to the extent, and I mean no offense, Mr. Sabin,

6    that you've asked to sort of have a public showing of certain

7    of this information.  That may be fine; it may not be fine.  I

8    have no idea.  I leave it to the parties to decide what works

9    in the context of this case.

10           But I would like it to be very clear I believe that a

11    cash management system order is appropriate and should be

12    entered without delay.  And I also believe that the parties

13    should exercise their reasonable best efforts later today or

14    early tomorrow so that we could enter the order before the end

15    of the week.

16           MR. PEREZ:  Thank you, Your Honor.  Your Honor, if I

17    could just go back to Eagle for one minute --

18           THE COURT:  Yes, it's a good --

19           MR. PEREZ:  -- because we were waiting on Eagle.

20           THE COURT:  And let me tie together my own thinking

21    with respect to this form of order and Eagle.  I'd like the

22    parties who have objected to the Eagle transaction and have

23    insisted, for these purposes, that there be a segregation or

24    escrow arrangement for those proceeds to comment as to why the

25    same kind of protection that's available in the cash management

1   procedure shouldn't be adequate for purposes of the Eagle

2   transaction because it seems to me that these are related

3   issues.

4           MR. O'NEILL:  Sorry, Your Honor.  I'll take a stab at

5   it.  The --

6           THE COURT:  State your name for the record.

7           MR. O'NEILL:  I'm sorry.  Brad O'Neill, Kramer,

8   Levin, on behalf of BONY Mellon as indenture trustee.  We would

9   argue essentially that the determination of whether or not

10  there's a proper administrative claim -- there's been no sort

11  of independent fiduciary acting on behalf of the commodities'

12  creditors who's vetted the transaction, or at least there's no

13  evidence that anyone has vetted the transaction.  Essentially,

14  you have Holdings on both sides of the transaction determining

15  whether or not there's really a claim here, and we're being

16  asked to take an administrative claim on that basis.  It

17  exposes us in a way that potentially others are not exposed.

18  Having said that, however, I hear what you're saying on cash

19  management.  So --

20          THE COURT:  Okay.

21          MR. MUNSCH:  Your Honor, Russ Munsch on behalf of the

22  ad hoc committee of bondholders.  I guess, in response to your

23  inquiry, this is a rather unique motion that's been filed by

24  the debtor, and that is seeking to sell partnership interests

25  which are actually -- in Eagle, which are owned by fourth and

1    fifth-tier subsidiaries.  In addition, the motion seeks to do a

2    compromise of claims among LBCS, LBHI, claims they had against

3    Eagle, where we don't have, as counsel for Bank of New York

4    points out, we don't have an independent fiduciary.  They

5    obviously sat down and did a compromise, but who are they

6    compromising with?  Themselves?

7         And that's the concern we have at this point.  We

8    don't have enough information.  We're not asking the Court to

9    make a determination of that today or recharacterize it.

10        THE COURT:  How much time do you think is necessary

11   to make this determination?

12        MR. MUNSCH:  Your Honor --

13        THE COURT:  It seems to me that one of the risks

14   associated with the position that you've taken and that the

15   Bank of New York, as trustee, has taken in this is that, and

16   I've lived through this in the past, money is escrowed and it

17   just doesn't come out; it just stays there indefinitely as

18   parties continue to argue.  And the fact of the escrow becomes

19   one of the points of the negotiation.  So it does affect

20   outcomes, and I think that that's why you want it.  I'm

21   guessing.

22        MR. MUNSCH:  Not essentially, Your Honor, but we're

23   willing to work with the debtors' schedule.  If they will

24   provide us the information, give us a reasonable period of time

25   to review that, and if we have some claims to that, we would

1    make them to the Court within a finite period of time.  That

2    could be done 90 to 120 days as long -- as once we get the

3    information from the debtor.  We're not asking for some

4    inappropriate length of time to hold the funds in escrow.

5           So I think there's -- all we're simply saying is give

6    us the information that backs up these claims, what's the basis

7    of them, whether they were equity, whether they're actual debt.

8    Give us an opportunity to look at that, and if we have claims

9    we'll come back to this Court and assert those claims.  The

10   Court can make a determination of it.  And if the Court

11   determines that it was a proper and valid debt claim, the

12   escrow will be released.

13          THE COURT:  Well, it sounds as good as you say it,

14   but I have a feeling, in practice, it's not going to be quite

15   that simple.

16          MR. MUNSCH:  Your Honor, we're willing to put it at

17   the debtor's timetable.  If the debtor will get the information

18   to us, we'll proceed quickly.

19          THE COURT:  All right.  I hear your argument.  I'd

20   like to hear what Mr. Perez has to say about that.  And Mr.

21   Etkin is standing by having made his deal a while ago and sort

22   of watching all this from the sidelines.

23          MR. PEREZ:  Your Honor, we reviewed the three

24   objections.  We tried to address them in what we thought was a

25   fair and equitable fashion.  I don't believe that providing for

1    a total reservation of rights and a -- basically what will

2    amount to a superpriority administrative claim to the extent

3    that those monies were either mischaracterized or improperly

4    allocated, that that doesn't support them.  And I think the

5    Court's absolutely correct:  It's going to be a matter of where

6    is the leverage.  And the fact that creating an escrow changes

7    the leverage.

8            But, Your Honor, this is not a situation where we're

9    going out there, and it's not an insider deal.  The committee

10   has looked at this.  We've spent a lot of time trying to make

11   sure that this gets done.  It's being sold to a third party, a

12   totally unrelated third party, Your Honor.  And so it's a

13   transaction that -- nobody's saying that we shouldn't do the

14   transaction.  It's really just what happens --

15           THE COURT:  This is about protecting the rights of

16   those parties who have claims against one entity, Lehman

17   Brothers Commodities Services Inc. --

18           MR. PEREZ:  Correct.

19           THE COURT:  -- which, pursuant to a note transaction

20   that some parties say they don't fully understand, will be, in

21   effect, transferring the funds, or the funds will go directly

22   to LBHI.  Is that correct?

23           MR. PEREZ:  Yes, Your Honor.  LBHI has a note --

24           THE COURT:  That's the note I was referring to.

25           MR. PEREZ:  -- that's going to be sold to the

1    purchaser for 230 million dollars, and part of that note will

2    be forgiven.  The note is not between LB --

3            THE COURT:  Okay.

4            MR. PEREZ:  It's between LBHI and the debtor -- and,

5    I'm sorry, and Eagle.  And, Your Honor, I don't think that a

6    superpriority administrative expense claim in this case is --

7    in LBHI is going to be something hollow.  I mean, there is -- I

8    mean, you've heard the testimony -- I mean, you've heard how

9    much cash there is in the estate.  So it's not a situation

10   where tomorrow the money is going to fly away.  I mean, there

11   is going to be money there, and to the extent that they can

12   either prove it was mischaracterized or there should be a

13   different allocation, they will enjoy that claim.

14           THE COURT:  Okay.  Well, is there anyone else who

15   wishes to be heard on this?  Now, Mr. Etkin is reconsidering

16   his willingness to make a deal.

17           MR. ETKIN:  No, I'm not, Your Honor.  No, I'm not,

18   but what concerns me, Your Honor, about what I've heard in

19   terms of suggestions from the other objectors is placing some

20   artificial timetable on when this needs to get done in case

21   that's extraordinarily complex, in a case where the debtor and

22   their professionals are still trying to get their arms around

23   documents, data, etcetera.  So while obviously there was always

24   a concern about protection in the event that there should be a

25   different allocation or the claim needs to be recharacterized,

1    I made my case with Mr. Perez with respect to the superpriority

2    administrative claim.  And one of the reasons was, I can share

3    with the Court, that I was concerned about some artificial

4    timetable in a case like this of having to get this done within

5    60, 90, 120 days where the data and information may not be

6    available and where events may happen down the road that could

7    impact on the determinations that have been reserved pursuant

8    to the current language.  So that's an observation I wanted to

9    share with the Court.

10           THE COURT:  Okay.  Thanks for that.  Is there anyone

11   else who wants to talk about this?  Because I think I'm

12   prepared to tell you my thinking in the form a ruling.

13           I believe that the cash management procedures, as

14   they have evolved by virtue of the productive conservations

15   between the creditors' committee and counsel for the debtor,

16   represent a broad-based approach to providing all parties in

17   interest with what I'll term for the purposes adequate

18   protection and that an escrow may be a desirable feature but

19   it's not required.  It's not required based upon representation

20   that have been made to the Court in the context of a status

21   conference of billions of dollars being on hand at LBHI.

22   There's no assurance, of course, that the money will stay in

23   that amount because this is an expensive proposition to manage

24   and, no doubt, the money there will be spent for any number of

25   legitimate purposes.

1    But I'm concerned that an escrow arrangement, not

2  just for the reasons articulated by Mr. Etkin, which would be

3  that the parties might be up against a hard-and-fast deadline

4  that could be difficult to deal with in the context of a case

5  that has many competing priorities, but rather by virtue of

6  tying the funds up in what amounts to a special escrow account,

7  this, in effect, transforms the Eagle transaction from

8  virtually any other intercompany transaction in the Lehman

9  family and elevates it to a level that, at least I don't think,

10  it deserves.

11    There's been no showing here whatsoever by the

12  objectors that they are at any risk whatsoever by being bound

13  by the very same superpriority commercial best efforts to get a

14  lien provisions, or however that language may change, in the

15  cash management protocol.  And that, to me, seems an

16  appropriate general rule to apply.  And the Eagle Energy

17  Partners situation is not to be distinguished from that of

18  other affiliate transactions within the Lehman family.  You

19  don't always get what you want, but in this case I think you're

20  getting what you need if you get the cash management order

21  treatment.

22    MR. PEREZ:  Thank you, Your Honor.  We'll prepare an

23  order and make the changes that I've alluded at the outset.

24    THE COURT:  Fine.

25    MR. MILLER:  Your Honor, in connection -- Your Honor,

1  in connection with the cash management order, could we have a

2  date for a hearing, if necessary, tomorrow so -- it's always

3  good to have a time pressure for the drafting session.

4          THE COURT:  Are you looking for a standby hearing --

5          MR. MILLER:  Yes.

6          THE COURT:  -- to come back here?  Well, you can have

7  5:00 tomorrow.

8          MR. MILLER:  Thank you, Your Honor.  That leaves two

9  more matters on the calendar, Your Honor:  The remainder of the

10  Rule 2004 motions.  By my count, Your Honor, motions enjoined

11  is there were fourteen.  We have reached accommodation with

12  thirteen of the movants to put those matters over to November

13  5.  As I stated before, the open motion, Your Honor, is the

14  motion of net profit -- Newport Global Opportunities Fund LP

15  and its affiliates.

16          MR. MOLTON:  Good afternoon, Your Honor.  David

17  Molton of Brown Rudnick for Newport/PEP and Provident.  Your

18  Honor, we represent clients that have about 330 million dollars

19  in --

20          THE COURT:  Can I ask you this --

21          MR. MOLTON:  Yes.

22          THE COURT:  -- threshold question?

23          MR. MOLTON:  Go ahead, Judge.

24          THE COURT:  You're obviously perfectly free to be

25  obdurate by why are you not going along with what everybody

1    else has agreed to do, which is putting this off to the 5th?

2         MR. MOLTON:  I knew you were going to ask that

3    question, Judge.

4         THE COURT:  What's that?

5         MR. MOLTON:  I knew you were going to ask that

6    question.

7         THE COURT:  Just that way?

8         MR. MOLTON:  Just that way.  So I'm ready for it.  In

9    any event, we're different, and I'll tell you why we're

10   different, Judge.  We've limited our discovery, our request,

11   away from the global issues, which are completely legitimate

12   and which we'd love to share and which we encourage the

13   parties, including the OCC, the official committee, and

14   Harbinger and others, to pursue.  Those are important

15   questions, and those relate to events that have happened and to

16   history of this case.

17        What we're interested, Judge, is very simple, and

18   we've limited, as you know, our request to where are our

19   securities.  That makes us different, and I think it makes it

20   in an important fashion because those securities and where they

21   are will inform us, necessarily inform us, of the rights of

22   where we have to go to seek to protect.  You talk about

23   adequate assurance and protecting rights.  We need to know

24   where to go to protect those rights.  We're not dealing with

25   matters past; we're dealing with possibilities future and now.

1    And that's why we caucused with all the parties during lunch

2    and Mr. Miller.  I talked to him, and he graciously invited me

3    to participate in the meeting.  But I don't think that that

4    meeting concerning what happened a month ago is going to

5    address the very simple issue of where are securities ago.

6         And that's why we're different, Your Honor.  Our

7    papers show that we had secured -- our positions and our

8    accounts were under prime brokerage agreement with all the

9    Lehman entities.  I mean, it was with LBIE, but pursuant to the

10   agreement it's with, I guess, the entire universe.

11        We had asked, on 9/12, an issue to direction that we

12   transfer our entire portfolio out of our prime brokerage

13   account and establish a new one at Credit Suisse First Boston.

14   Lehman agreed.  They agreed.  And they were in the process of

15   pulling whatever securities we had and getting them ready to

16   transfer them over to Credit Suisse First Boston.  We received,

17   and I don't need to go through the record Your Honor has read

18   it, but we received confirmation that that was ready to occur.

19   And then what Mr. Miller has appropriate described as the era

20   of perpetual darkness fell, and that fell on --

21        THE COURT:  Now he's sorry he used that term.

22        MR. MOLTON:  Yes, he is.  In any event, but ever

23   since that date, Judge, we don't know where our securities are,

24   and we've outlined in our pleadings our diligent --

25        THE COURT:  But --

1          MR. MOLTON:  Go ahead, Judge.

2          THE COURT:  -- Mr. Molton, you're not unique in this

3     case in having that question.  There was an adversary

4     proceeding brought by FBR in the --

5          MR. MOLTON:  Correct.

6          THE COURT:  -- in the matter involving the SIPC**

7     proceeding.  There's been another adversary proceeding brought

8     by the Home Loan Bank of Pittsburg in connection with a similar

9     "protect our underlying asset, wherever it may be" kind of

10    lawsuit.  And I don't meant to suggest that you don't have an

11    anxious and deserving client who has charged you with the

12    responsibility of doing everything within your power to get the

13    answers, but you were also here when we all heard Mr. Marsal

14    and Mr. Miller make a lengthy and completely credible

15    presentation as to what the situation is at the debtor.  And I

16    don't see how you can get any relief earlier than the period of

17    time when the debtor is in a position to respond to a rational

18    question.

19         MR. MOLTON:  Can I answer that?  I think I have a few

20    responses to that, Judge.  Number one, I believe that the

21    adversary proceeding by Friedman, Billings resulted in a very

22    quick answer:  The securities are at Barclays.  So I think

23    that's what the response was.

24         THE COURT:  Well, I have no idea what the outcome of

25    that --

1          MR. MOLTON:  Okay.

2          THE COURT:  -- litigation is.  I only know that in

3     the context of arguing the TRO, it was asserted that the

4     securities were at Barclays.  But because there's a schedule

5     that I believe is the subject of a sealing order, I don't know

6     the answer to that question.

7          MR. MOLTON:  Okay.  Well, in any event, we heard some

8     interesting things today, Your Honor, that, I think, puts us in

9     a different position in terms of what people know and who may

10    know it as opposed to the forty-five to sixty-day issue, as

11    well as the derivative problem, the problem of getting a handle

12    on derivates.  First of all, we heard from the SIPA

13    representative that they've already identified prime broker

14    accounts at SBI and that they've moved, I guess, I wrote down,

15    I tried to write down, 900 million dollars' worth of primer

16    broker accounts out of the Lehman universe to other brokers in

17    accordance with the SIPA statute.  So the bottom line is people

18    know, somebody knows, about prime brokerage accounts and has

19    been moving on it.

20          Number two, the forty-five to sixty days -- and we

21    well understand what's going on at LBHI.  We understand the,

22    sort of, challenge they face.  But what I heard, Your Honor, is

23    much of that has to do with derivative issues, not with the

24    status or location of cash asset accounts, which we didn't hear

25    about in terms of presenting any problem.  Indeed, it would be

1  my recommendation, and that's one thing we're going to be

2  talking to the debtor about as part of their team, is to get

3  some people to deal with this issue.

4       But I also heard Mr. Miller talk about how they've

5  actually undergone some analysis and diligence with respect to

6  the transfers over from England into the United States.  So it

7  may be very well that they have this information because that's

8  exactly where our securities would have come from after the era

9  of perpetual darkness fell, or immediately before that.

10      So I think, with all due respect to the struggle that

11 they face, we believe that, and in especially in light of what

12 we've learned today, Your Honor, that these questions can be

13 answered.  And with respect to the debtor, and it may --

14      THE COURT:  But why do I have to be answered with a

15 204 exam?

16      MR. MOLTON:  Well, Your Honor, because, for the

17 reasons we set forth, we are facing imminent harm.  We're

18 facing some challenges.  In order to -- the identity and

19 location of where securities are is especially important in

20 light of the fact that we read that certain assets are being

21 transferred over in accordance with the SIPA trustee, and I

22 think I read this in the Chase JPMorgan -- JPMorgan Chase

23 response to the creditor committee's 2004 application; two,

24 that certain assets and securities are being transferred to

25 JPMorgan Chase for various purposes.  Maybe it's collateral;

1  maybe it's liquidation.  As I said earlier, Your Honor, we

2  think we're in a very different situation based on the facts

3  that occurred immediately before the bankruptcy.  And needless

4  to say, who has those securities is going to inform us as to

5  what acts we may need to take in order to protect our position.

6  And number two, Your Honor, as we set forth in our

7  pleadings, we have certain voting rights issues.  And this,

8  again, impacts innocent people outside of this bankruptcy.

9  We're involved -- we own securities that are involved in

10  restructuring, for which we will need to be able to give voting

11  instructions in order for those restructurings to occur.  And

12  if we're -- because we own substantial and majority shares in

13  those companies, and if we're not able to get that done, there

14  may be resultant bankruptcies and problems that go beyond the

15  Lehman universe and affect innocent parties.  We have, under

16  our various agreements, the right to request that voting

17  instructions be given to the extent those agreements are still

18  in effect.  But we can't do that unless we know where the

19  securities are.

20  So for those two reasons, Your Honor, as well as the

21  reasons I heard today, it would seem that the debtor, at the

22  very least, could certify to us in some fashion whether the

23  securities came over from Europe and if they know that for a

24  fact or they don't, and number two, where they are now or

25  whether they don't know where they are now.

1    We have -- because we had, during our informal

2 attempt over the past month, to find out this information, what

3 we got, Your Honor, is a letter from Mr. Miller saying you're

4 asking the wrong person; you should be asking the SIPA trustee

5 or you should be asking the person in England.  But Mr.

6 Miller's letter was very helpful but it didn't say we know

7 they're not with us.  And that's what we need, Your Honor.

8    And we also have asked the SIPA trustee, on -- I

9 think it was October 9th, and followed up:  Please advise us.

10 We've received no response from that, and what we're doing in

11 light of where we've come and in light of what Mr. Miller told

12 us in his letter is we filed yesterday, I believe, a 2004

13 application in the SIPA proceeding, that's going to be on

14 November 5th, on this very issue.

15    So what we're looking for, Your Honor -- we're

16 different.  We're the only one here --

17    THE COURT:  I'm sorry.  What is coming up on November

18 5th in the SIPA proceeding?

19    MR. MOLTON:  We filed a 2004 in that proceeding last

20 night.

21    THE COURT:  Why should I be hearing a 2004 for you in

22 the LBHI case today when you're going to be presenting one on

23 the 5th and you didn't defer to the 5th?  It would have been

24 perfectly logical to defer both so that they could be heard on

25 the same day.

1          MR. MOLTON:  Your Honor --

2          THE COURT:  I'm missing something here.

3          MR. MOLTON:  -- because to the extent that the debtor

4     has the ability to tell us today --

5          THE COURT:  But you don't need a 2004 to get an

6     answer to the question.  Obviously, you've been trying, without

7     success, to get that answer, but you've also been present in

8     court when, I think, very credible statements have been made as

9     to the administrative burdens of this estate, the efforts of

10    Mr. Marsal and his staff to deal with the multiplicity of

11    problems that confront the estate.  And, of course, you're

12    shooting one of the rifle bullets at a debtor that is being

13    shot at 360 degrees, 24/7, all day long, all week long, all

14    night long.  I understand your desire to get the answer to your

15    question, and by being persistent you may ultimately get it,

16    but you're not going to get it today because I'm not giving the

17    relief today.

18         MR. MOLTON:  Judge --

19         THE COURT:  I think it's, frankly, unreasonable on

20    your part to be the one holdout, particularly when you've just

21    told me that you're going to be in court on the 5th on the same

22    issue.

23         MR. MOLTON:  Well --

24         THE COURT:  I'm astounded, frankly, that you didn't

25    agree to put it off to the 5th.  Talk about judicial economy;

1    this is judicial inecomony for you to be pressing this now.  I

2    don't get it.

3             MR. MOLTON:  Judge --

4             THE COURT:  I heard the argument; I don't buy it.

5    And I'm not granting the relief.  Have you heard enough?

6             MR. MOLTON:  Yes, Your Honor.

7             THE COURT:  Fine.

8             MR. MOLTON:  Thank you.

9             MR. MILLER:  I elect not to say anything, Your Honor.

10   I think we can move on, Your Honor, to the next matter on the

11   calendar, which is the proposed sale of the investor management

12   division.  Ms. Fife will be hearing that, Your Honor.

13            THE COURT:  Let me just ask a question before we get

14   into this because I have a sense based upon the brief that I

15   saw over the lunch hour, which was an omnibus response of the

16   debtors to the various objections, that this is a very live and

17   actively contested matter, unless you've been able to achieve

18   the whole bunch of positive changes in the landscape between

19   lunch and now.  Have you?

20            MS. FIFE:  Yes, Your Honor.  We have reached an

21   agreement with the creditors' committee.  So that is one

22   objection that has been resolved.  The other objections are

23   still unresolved.

24            THE COURT:  I'm going to make this suggestion.  We've

25   been going at it now for about two hours.  I personally could

1    use a break, and I think that I'm not alone in that.  The room

2    is warm, and I think we can all benefit from a stretch.  And

3    I'm going to suggest that if this is going to be, as I'm

4    expecting, an actively litigated and important matter, that we

5    take a twenty-minute break and resume at ten minutes to 5.

6            MS. FIFE:  Okay.  Thank you, Your Honor.

7            THE COURT:  We're adjourned.

8        (Recess from 4:34 p.m. until 5:59 p.m.)

9            THE COURT:  Be seated, please.

10            MS. FIFE:  Good evening, Your Honor.  Lori Fife from

11   Weil Gotshal & Manges on behalf of the debtors.  First of all,

12   I'd like to thank Your Honor for giving us the opportunity to

13   have some discussions among the parties.  We recognize the

14   lateness of the hour but I am happy to report that we were able

15   to make significant progress --

16            THE COURT:  Wonderful.

17            MS. FIFE:  -- with respect to the last thing on

18   today's agenda which is the debtors' motion to establish

19   bidding procedures in connection with the sale of the IMD

20   business which is investment management division.  And just by

21   way of background, Your Honor, IMD provides customized

22   investment management services for high net worth clients,

23   mutual funds and other institutional investors.  And it also

24   serves as a general partner for private equity and investment

25   partnerships and has minority stakes and also investment

1  managers.  IMD encompasses Neuberger Berman for which it's very

2  well known and also Lehman Brothers Asset Management and the

3  Alternative Investment Group.  Not to be outdone by my

4  partners, we made a chart for Your Honor and this one's in

5  color.

6  THE COURT:  That's a very colorful chart.

7  MS. FIFE:  Yes, it is.

8  THE COURT:  I can see it from here.

9  MS. FIFE:  So if I may, I'd like to approach, Your

10  Honor.

11  THE COURT:  Oh, please.  Looks great.  Do you have

12  competing technical departments within the firm?

13  MS. FIFE:  Yes.

14  MR. MILLER:  We are the low end, Your Honor.  She's

15  the high end.

16  MS. FIFE:  And I was going to say, I hope you'll find

17  that I won.

18  MR. MILLER:  It could have been the associates.

19  MS. FIFE:  Oh, yes.  And I have great associate help,

20  too.  But, in any event, this chart is really just a summary

21  and does not take into account the size of the business and the

22  number of partnerships and LLCs that exist under these boxes.

23  But as you can see, it's essentially a fixed income business

24  and then a mortgage opportunity business, hedge funds, private

25  equity funds and then there's also some business in Asia and

1    Europe.

2         Given the lateness in the hour, I can proceed in a

3    number of different ways.  I obviously could go through the

4    motion and --

5         THE COURT:  But let me first ask whether or not the

6    product of your off the record discussions is a consensual

7    resolution --

8         MS. FIFE:  Right.

9         THE COURT:  -- or whether there are still some

10   outstanding objections --

11        MS. FIFE:  Right.

12        THE COURT:  -- that need to be resolved.

13        MS. FIFE:  That's what I was going to suggest that

14   perhaps I go through the objections generally first.  There

15   were eleven objections that were filed.  The creditors'

16   committee objection has been resolved and the informal

17   noteholder group, otherwise known as the ad hoc committee, was

18   also --

19        THE COURT:  Nice shot.

20        MS. FIFE:  Yeah.  I never give up an opportunity.

21   Was also resolved during the break, Your Honor.  So those two

22   are resolved.  Thomson Reuter is withdrawing their objection in

23   light of the reply that we filed.  So that leaves Carlyle which

24   is a bidder.  And then six parties who have expressed concern

25   regarding their particular contracts.  And as we stated in our

1    reply, the issues that those parties raised really relate to

2    getting notice as to whether the purchaser is going to assume

3    or reject their contract.  And pursuant to Section 2.5 of the

4    purchase agreement, we do provide that the purchaser will

5    provide notice of the assumption and assignment.  We will send

6    out notices to all parties to contracts.  They will have an

7    opportunity to object.  And we will also send out cure amounts

8    and they can object to that as well.  There is one other

9    objection; I think it's the Korea Investment objector and they

10   wanted to know whether their assets were part of this sale and

11   they are not.  So if you put aside the objectors dealing with

12   their contracts and the one on the asset, that basically leaves

13   Carlyle and Crossroads or Crossmark that are unresolved.

14        So, Your Honor, it may be helpful if I tell you the

15   resolution between the company and the committee and the

16   informal noteholders.  I can do that.  I also was prepared to

17   proffer Mr. Ridings from Lazard.  He has been involved with the

18   sale process and could provide testimony regarding that and

19   also the breakup fee and reimbursement amounts.

20        THE COURT:  Okay.  I think I'd like to first hear the

21   resolution of the objections filed by the committee and what

22   I'm going to call charitably the noteholders group.

23        MR. QURESHI:  Thank you, Your Honor.

24        THE COURT:  You're welcome.  That's what you call

25   yourselves and that's what I'm going to call you.  Just because

1   you're called a group doesn't mean you're not a committee.  Nor

2   do I consider it to be a significant distinction between the

3   two although that's not presently before me.

4          The objections of both the committee and the

5   noteholder group I viewed as significant and, as I read them,

6   troublesome.  So I'm very pleased to hear that there has been a

7   resolution because had there not been a resolution, I don't

8   know how we would have been able to move forward this evening.

9          MS. FIFE:  Yes, Your Honor.  I understand your

10  concern.  In light of those issues, the parties have agreed to

11  the following terms.  The seller termination fee, which is the

12  breakup fee, will be reduced from seventy million to 52.5

13  million.  Reimbursable expenses which in the agreement were an

14  amount up to thirty-five million dollars has now been revised

15  to be the reasonable customary documented out of pocket

16  expenses.  So they will only be actual expenses.

17         THE COURT:  And uncapped.

18         MS. FIFE:  And uncapped.  Only reimbursement expenses

19  that have actually been incurred through the date of the

20  auction will count towards the initial overbid amount.  So

21  there was a concern that the full thirty-five million dollars

22  would count against the initial overbid and that's been

23  clarified.

24         THE COURT:  And both will be available for credit

25  bidding purposes?

1          MS. FIFE:  Yes.

2          THE COURT:  The initial overbid amount has been

3    reduced from fifty million to twenty-five million.  And the

4    bidding increments have been reduced from twenty-five million

5    to five million.

6          In addition, there was a provision in the purchase

7    agreement that permitted the purchaser to become the starting

8    bidder if it bid an additional one million amount over the

9    highest bid.  And that provision has been removed completely

10   from the agreement.

11         The bidding procedures will be modified to allow the

12   committee for extensive consultation rights.  That was always

13   our intention anyway, Your Honor, so that's certainly not a

14   problem.  The bidding procedures will be modified to allow

15   expressly for joint bids and bids by management, management

16   buyouts and to require debtors to provide full access to

17   information including access to management, the portfolio

18   managers and also access to management compensation and

19   incentive plans proposed by the purchaser in each case to other

20   interested bidders.  So what's intended, which, frankly, was

21   always intended, was a full open and transparent auction.

22         In addition, there was a provision in the original

23   agreement which enabled the purchaser to direct the debtors to

24   cause the filing of certain subsidiaries into bankruptcy prior

25   to the closing of the auction.  And that would include that we

1    would have to put certain entities into bankruptcy without

2    really knowing that this purchaser was the highest bidder.  The

3    purchaser has agreed to change that provision such that only

4    the highest bidder, the successful bidder at the auction, will

5    have the right subsequent to the auction to direct or consult

6    with us in putting entities into bankruptcy.  And, Your Honor,

7    we recognize that we have fiduciary duties in terms of making

8    the decision whether to put companies into Chapter 11 and will

9    exercise those.  But this is -- at the time, we will look at

10   those duties in the context of trying to, I guess, exercise the

11   rights and obligations under the purchase agreement.

12           THE COURT:  Are each of the subsidiaries that are

13   within the class that might be subject to this bankruptcy call

14   right, if I can call it that --

15           MS. FIFE:  Right.

16           THE COURT:  -- governed by a board of directors that

17   is the same as or different from the board that was described

18   in this morning's status conference?  Are the directors the

19   same or do they have special purpose directors?

20           MS. FIFE:  Certain of the companies have their own

21   directors.  And then others are Mr. Alvarez and his colleagues.

22           THE COURT:  I don't want to get into the

23   micromanagement of this issue but it seems to me that it's an

24   issue of governance.  And that I assume the parties have

25   thought about this and we're not going to resolve it on this

1    colloquy.  So --

2         MS. FIFE:  Well --

3         THE COURT:  -- I'll simply note that I think it's a

4    troublesome issue.

5         MS. FIFE:  Right.  Well, Your Honor, we are hopeful

6    that it will not be necessary to put these companies into

7    Chapter 11 and instead that this sale will constitute sales of

8    stock instead of access.  That would certainly alleviate the

9    governance issue.  But if we do then we will seriously consider

10   those issues.

11        THE COURT:  How many affiliates or subsidiaries are

12   in the zone of possibly being brought into a proceeding in

13   order to affect the transaction?

14        MS. FIFE:  A lot.  I mean, could be up to a hundred.

15        THE COURT:  I'm surprised that it's that many.

16        MS. FIFE:  I think it's likely to be a hundred.  Oh,

17   okay.  Sorry.  It's likely to be a handful.

18        THE COURT:  A handful?  That's better than a hundred.

19        MS. FIFE:  That's a big change from what we had heard

20   in the past.  But I'm glad to hear it.  Okay.  Great.  Moving

21   right along.  You learn something new every day, Your Honor.

22        THE COURT:  Me, too.

23        MS. FIFE:  So, the auction will take place -- one of

24   the other changes that were made in connection with this filing

25   was that we shortened the auction period.  Everybody agreed

1    that sixty days was a very long period of time and wasn't

2    really necessary given the fact that these assets had been

3    already diligenced prior to the petition and there are many

4    entities who have expressed an interest already.  So, we have

5    shortened the diligence period to forty-five days such that the

6    auction will take place forty-five days from today.  And then

7    the sale hearing would be held sixty to sixty-five days

8    thereafter.  With those changes, the informal noteholders, as I

9    said, agrees to withdraw its objection and the creditors'

10   committee withdraws its objection.  One thing that the

11   purchaser would like to make clear on the record is that

12   regardless of when the order actually gets entered, they would

13   like to fix the amount of the S&P as of today so that there's,

14   I guess, no risk of the market dropping a lot tomorrow or, I

15   believe, they're actually buying a hedge on the market.  So

16   they're going to -- we're going to agree that the S&P amount is

17   today's amount.

18        THE COURT:  I saw referenced to this issue in a

19   number of objections and noted the risk that the actual

20   realization to the estate might be materially reduced as a

21   result of a degradation of that index between now and closing.

22   What does today's number mean in terms of a price adjustment,

23   if any?

24        MS. FIFE:  Well, the way the S&P adjustment works is

25   that it's the difference between the S&P today, if we fix it

1    today, versus the S&P as of closing.  That amount is adjusted,

2    I believe.  No?  Oh, from execution to --

3            THE COURT:  I don't think that's the right way to do

4    it.

5            MS. FIFE:  Yes.  No, it's not.

6            THE COURT:  If you want to confer, that's fine.

7            MS. FIFE:  One second.  Excuse me.

8            THE COURT:  But for record purposes, Mr. Ridings, I

9    think you should either say it on the record or whisper.

10           MR. RIDINGS:  Your Honor, Barry Ridings at Lazard.

11   It's the difference from when we sign the contract when the S&P

12   was 1202 to whatever it is at closing.  Today it's about 940.

13   So there's been degradation since we signed the contract.

14   That's not right?

15           THE COURT:  Well, you haven't --

16           MR. RIDINGS:  I thought that was right.  Excuse me,

17   Your Honor.

18           THE COURT:  Mr. Ridings, why don't the two of you

19   talk?

20       (Pause)

21           MR. ROSE:  Your Honor, Alfred Rose.  I'm at Ropes &

22   Gray and represent Ben Capital, one of the investors in the

23   stalking horse bid.  There are two S&P features in the

24   agreement.  One is a closing condition.  And that condition

25   required that the S&P index be at the closing date, or during

1    the short window of time before the closing date, at least

2    seventy-five percent of where it was when this agreement was

3    signed.  In addition, there's a purchaser price adjustment that

4    relates to the S&P index --

5        THE COURT:  Which one is being hedged?

6        MR. ROSE:  The purchase price adjustment.  And that

7    takes two snapshots.  It takes a snapshot from the date the

8    agreement was signed through today.  And then it takes a second

9    snapshot from the date the agreement was signed through an

10   average shortly before the closing date.  It compares those two

11   snapshots and whichever is smaller is taken as a purchase price

12   adjustment by multiplying that degradation by a multiple that

13   reflects the revenue run rate that one would expect to value

14   the decline in the revenues that will be thrown off by the

15   assets under management.

16       THE COURT:  So the risk of -- let me just make

17   something clear in my own mind.  To what extent does the

18   protection that's being purchased with respect to this variable

19   benefit the estate, if at all?  Explain that to me.

20       MR. ROSE:  The estate bargained for a certainty of

21   closing.  The transaction could have been structured with a

22   fixed price but with a hair trigger that would have allowed the

23   purchaser to walk away from the transaction if the market

24   declined a small increment.

25       THE COURT:  So does this eliminate the walk-away risk

1  associated with this?

2          MR. ROSE:  No.  There is a right for the purchaser

3  not to close if at the time all conditions are satisfied this

4  one -- the S&P 500 has declined more than twenty-five percent.

5  The purchaser is obligated to remain bound by the agreement

6  through June 30, 2009 so that if all conditions but this one

7  are satisfied, and this one is not satisfied, the purchaser

8  does not have the right to walk from the contract.  Instead,

9  it's required to wait and see if this condition becomes

10  satisfied at any point prior to June 30, 2009.  And if it

11  satisfied then the purchaser would be required to close.

12          THE COURT:  I've heard what you've said.  I'm not

13  sure I've understood it all but, yes, I've heard it.

14          MR. ROSE:  Thank you, Your Honor.

15          THE COURT:  Let me ask you this question --

16          MS. FIFE:  Yes.

17          THE COURT:  -- Ms. Fife.  I don't need to wrap my

18  mind around this -- at least fully wrap my mind around this

19  important issue of how the price might be adjusted or how the

20  purchaser's closing obligation might be affected by this

21  somewhat subtle change.  For purposes of today, however, do I

22  understand that this adjustment is an agreed change in the

23  underlying transaction or does it have an impact on the bid

24  procedures themselves.

25          MS. FIFE:  No.

1          THE COURT:  It's the underlying transaction?

2          MS. FIFE:  Correct.  But it's not even a change.  I

3    don't view it as a change.  The date would either be today if

4    the hearing had ended earlier in the day or it would be

5    tomorrow when the order is actually entered.  And we have

6    agreed that the day will be today.

7          THE COURT:  Okay.

8          MS. FIFE:  Other than that, there's no change to the

9    document.  We just --

10          THE COURT:  Right.  You picked a day when the

11    market's relatively up.

12          MS. FIFE:  Yeah, that's all.  Yes, Your Honor.  The

13    fact that there is a purchase price adjustment based on the S&P

14    is still in the contract.  And the fact that the purchaser can

15    walk away as a result of a twenty-five percent drop in the S&P

16    is also in the contract.  And that we were unable to change.

17          THE COURT:  Okay.

18          MS. FIFE:  So how would you like to proceed?

19          THE COURT:  So that's a summary of the changes that

20    were made to the bid procedures that were sufficient to satisfy

21    two of the most vigorous objectors --

22          MS. FIFE:  Correct.

23          THE COURT:  -- that you confronted for this hearing.

24    You still have Carlyle.  Mr. Mindlin, I see, is politely

25    raising his hand.  And Mr. Herman is pointing to somebody else

1    who might be his designated fighter who's presumably here to

2    present Crossroads position.  So --

3                MS. FIFE:  Right.

4                THE COURT:  -- we have an ongoing contested matter.

5                MS. FIFE:  Correct.

6                THE COURT:  Now, one question, I suppose, is given

7    these material improvements in the bid procedures, I'd be

8    interested in knowing and I think it's not a bad time for me to

9    hear from Mr. Mindlin and from Mr. Herman's partner, why we

10   still have a problem.

11               MS. FIFE:  Okay, Your Honor.

12               THE COURT:  And I also recognize that the debtor has

13   at least asserted obliquely that there are questions as to the

14   standing of a prospective purchaser.  But for purposes of

15   today's -- or this evening's hearing, I'm simply interested in

16   hearing what Carlyle's counsel has to say.  And I'm not, by

17   virtue of asking him to speak affecting any argument regarding

18   his actual standing to speak.

19               MS. FIFE:  Yes, Your Honor.

20               MR. MINDLIN:  Thank you, Your Honor.  Good evening.

21   My name in Philip Mindlin.  I'm a partner in the firm of

22   Wachtell, Lipton, Rosen & Katz.  My firm represents Carlyle

23   Investment Management LLC which filed a limited objection to

24   the sale procedures --

25               THE COURT:  I read that objection.

1      MR. MINDLIN:  -- before Your Honor this evening.

2  Your Honor, Carlyle would be eager to participate in a real

3  auction for this company.  We think it's a great company,

4  strong franchise, great portfolio managers, great client base.

5  And a number of the objections that we've put forward have been

6  resolved.  Not a perfect resolution but it's been resolved.

7  And it's been resolved in a way that satisfied the two

8  committees and therefore I won't address the bankruptcy concern

9  and I won't address the break fee.

10      The concern that -- we have three principal

11  objections, Your Honor.  And the one that hasn't been addressed

12  is the headstart in the consent process.  And if I may, Your

13  Honor, I'd like to explain why it matters to us.  The reason it

14  matters to us is that under the sale procedures as they now

15  stand, the Bain is out there already seeking client consent and

16  the consent of the public, the institutional clients, which

17  involves going to their boards and getting approval of the

18  board and then going out to the shareholder base of those

19  public clients.  That process is already underway.  I'm advised

20  by the debtors that it's going to cost something like five

21  million dollars to begin today to seek consent for Bain Group

22  to be the purchaser of these assets when they may in the end

23  not be the purchaser at all.

24      Now, that's not my five million dollars.  So you

25  might properly ask why I should object to somebody else's five

1    million dollars being spent.  And here's the reason, Your

2    Honor.  It's that if you roll forward, what happens?  When the

3    auction occurs and you're now forty-five days, there will be

4    two bids.  I hope that we're going to be bidding.  I hope that

5    ours will be the higher bid.  But when you compare the two

6    bids, when the rational members -- and they are rational.

7    They're economically rational preachers.  When the rational

8    folks on the side of the debtors and the committee and the

9    informal group look at the two bids, there will be one that may

10   be ahead in dollars but there will be another bid that has

11   already virtually completely its consent process because it got

12   a headstart with the estate's money and without asking you or

13   anyone else for permission.  Right now, money that belongs to

14   these estates, albeit three or four tiers down, is being used

15   to give a headstart to somebody who may not be the winning

16   bidder.  And so when we flash forward to the auction, and this

17   is why my client cares, there'll be two bids.  One bid may be

18   higher in dollars.  But the other one's got ninety-five percent

19   of its consent already in place.  Now why does that matter?

20   Because people are rational.  Because that means greater speed

21   and it means greater certainty.  And because it means lesser

22   adjustments.  There will be a greater ability to assess the

23   Bain Group bid because they've gone out and got the client

24   consents that are one of the many, many adjustments to the

25   purchase price.  So anybody who isn't Bain Group is going to

1   have a bid that has these elements of speed, certainty and

2   unknowable purchase price adjustments baked into it.  That's

3   unfair.  It's not a fair auction.  It amounts to a bidding

4   increment that we have to top that is unknowable to us.  We

5   can't predict how much our bid has to be better by to overcome

6   these advantages of speed, certainty and lesser price

7   adjustments.

8           We suggested a solution to this.  Actually, I don't

9   claim credit for it.  It emerged out of the welter of

10  discussions.  But we were amenable to it.  And the solution

11  that was put forward that we were amenable to was that there

12  would be a consensus, an agreement, that this headstart at the

13  estate's expense wouldn't count when the bids were evaluated.

14  For reasons that I think were entirely sensible, the estate

15  said they couldn't agree to it because it might be that there

16  is a bid from someone who is truly unacceptable and who likely

17  wouldn't get consents and that it wouldn't be appropriate, in

18  the estate's view, to call out our sells and some of the other

19  bidders who are present in the room and say, you guys are okay

20  and we won't take that headstart into account for you while not

21  doing the same for this hypothetical other purchaser.  I

22  understand that.  But it leaves us with a process that's

23  unfair.  It leaves us with a process that we're not sure we

24  want to play in because we're going to invest a lot of time, a

25  lot of effort, a lot of legal expense in a process that we

don't know we can win because somebody has, with the estate's

money, got this headstart that translates into a real but

unknowable economic advantage.

And so our view is that this solicitation process

should be stopped now.  It shouldn't go forward.  It's not fair

to have it go forward before a winner is picked.  And only

after the auction occurs and we know who the high bidder is

should the process of seeking consent for that bidder to own

these assets begin with the estate's money.  Thank you, Your

Honor.

THE COURT:  Thank you.

MR. MINDLIN:  Unless you have some questions, I'm

prepared to sit down.

THE COURT:  No.  I understand your argument and I

read your papers.  And I think I know exactly where you're

coming from.

MR. MINDLIN:  Thank you, Your Honor.

MR. BENNETT:  Thank you, Your Honor.  David Bennett,

a partner with Thompson & Knight here for Crossmark Equity

Advisers and its affiliates.  Your Honor, we did file a fulsome

objection to the sale process and we'll certainly assume that

the Court has read it given the lateness of the hour.  Our

objection at this point really falls into two categories:

jurisdiction and transparency.  Both issues that the Court has

raised at least in the course of today.  Twenty-three of the

1  twenty-four selling entities are not debtors before the

2  bankruptcy court.  The debtor hasn't made any representation

3  about what notice has been given to those, to the creditors and

4  counterparties of nondebtor entities.  My client is a purchase

5  money obligee of PFIG, Private Fund Investment Group, and built

6  and sold one of the businesses that are being auctioned as part

7  of the sales process.  Your Honor, we simply don't see -- we

8  see it as premature.  We see it as premature for the Court to

9  approve a sales process given the fact that the debtor hasn't

10 disclosed even as basic an item as what assets that are subject

11 to the sales process are inside and what assets that are

12 subject to the sales process are outside of the bankruptcy

13 estate.  As a result, Your Honor -- there's a huge

14 jurisdictional question, Your Honor, that runs through this

15 entire process.  If there are going to be entities, they're

16 going to be filed, they're going to avail themselves of the

17 bankruptcy sales process --

18        THE COURT:  Let me stop you for a second so I

19 understand your argument, 'cause I'm not sure I do yet.  We

20 were talking earlier about what I termed a call right on

21 certain entities to file for bankruptcy as designated by the

22 successful purchaser.  Presumably they would then be subject to

23 the bankruptcy court's jurisdiction authority and I would be

24 empowered to enter appropriate orders at the time of a sale

25 hearing authorizing a sale of assets free and clear of all

1   liens, claims and encumbrances coupled with such other terms

2   and conditions as might be engrafted in such an order.  Is that

3   the jurisdictional issue you're talking about or is it

4   something else?

5           MR. BENNETT:  Well, that is the jurisdictional issue

6   I'm talking about, Your Honor, and it's an issue for the Court

7   today in this sense.

8           THE COURT:  Why is that a today issue for purposes of

9   bid procedures?

10          MR. BENNETT:  Because, Your Honor, what's being

11  requested is to establish bidding procedures for entities that

12  are outside the jurisdiction of this bankruptcy court.  The

13  fact that they may later file a few days ahead of the sale

14  hearing is insufficient comfort to those creditors like my

15  client who may be impacted.  And there's no indication that

16  those creditors and counterparties are even given notice of

17  this process.  So the Court is being asked to approve a

18  process, approve a breakup fee, presumably payable out of the

19  assets of those entities with no notice to those creditors, no

20  pending bankruptcy of the case.  And the fact that they have

21  reserved the right now shifted back to the debtor to file

22  bankruptcy cases, again, as late as a few days before the sale

23  hearing is cold comfort.  This process, we all know -- I mean,

24  you can certainly feel the train leaving the station this

25  evening.  It will certainly have left the station by then.  And

1       whatever nominal notice those creditors and counterparties are

2       given a few days before the sale would be insufficient in our

3       view to protect their rights.

4               THE COURT:  Doesn't everybody who's a sophisticated

5       party in interest in the Lehman Brothers family of companies

6       know that the IMD businesses to be sold includes these

7       enterprises?  Or if they don't aren't they inquiring notice

8       now?

9               MR. BENNETT:  Your Honor, I understand that

10      sentiment.  On the other hand --

11              THE COURT:  It wasn't a sentiment; it was just a

12      question.

13              MR. BENNETT:  Well, Your Honor, they may be on

14      constructive notice.  I don't know who those creditors are.  I

15      presume that there are thousands of them, maybe tens of

16      thousands of them worldwide.  And whether the parties that

17      could be impacted by this process, for example, the holders of

18      auction rate security claims, understand what impact this

19      process may have on their rights.  I don't know.  I can't

20      represent that.  Certainly, sophisticated parties in the market

21      know about the Lehman bankruptcy case.  That I will concede.

22              THE COURT:  Okay.  Well, that's the jurisdictional

23      issue.

24              MR. BENNETT:  Yes, sir.

25              THE COURT:  What's the other one?

1          MR. BENNETT:  The other is transparency, Your Honor.

2          THE COURT:  What about transparency at this point?

3          MR. BENNETT:  My client, like so many others, resides

4    outside the bankruptcy process at this point at least in the

5    main.  We have a guaranty from Lehman Brothers Holdings.  But

6    we have no idea from the papers that have been filed what

7    impact the sales process will have on our claim, the assets

8    that would be available to pay our claim.  We believe that our

9    counterparty is solvent.  In fact, my client, who founded the

10   business or built the business that Lehman purchased in 2003,

11   would buy the business back for more than the debt against that

12   business today.  But he finds himself trapped --

13         THE COURT:  That's the fifty million dollar debt?

14         MR. BENNETT:  Yes, sir.

15         THE COURT:  Well, so, you're a little bit like

16   Carlyle in the sense that you're an objector but you're also a

17   potential participant in the auction process, right?

18         MR. BENNETT:  No question about it.  And we actually

19   tried to access that process and began the discussions on that

20   weeks ago.  So far we haven't gotten anywhere in terms of

21   accessing the data room and participating in the process.

22         THE COURT:  Is the only part of the asset base that

23   your client is interested in acquiring the very same platform,

24   the Crossroads platform that was sold in 2003?

25         MR. BENNETT:  It's either the same or similar

1   platform, yes, sir.

2           THE COURT:  It's the one that's based in Dallas?

3           MR. BENNETT:  Yes, sir.  That's correct.  There have

4   been some, as you would imagine, modifications and changes to

5   that but that is where our interest lies.

6           THE COURT:  Okay.  So you're basically seeking to

7   unwind that sale and to acquire the same asset base or

8   something substantially similar?

9           MR. BENNETT:  We're seeking to, if there's going to

10  be an auction process, we know this business as well as

11  anybody.  We're seeking to participate in that.  And failing

12  that participation, we'd like to see the value in our

13  counterparty protected.  We'd like to know how the sales

14  process is going to be allocated and we'd like to ensure that

15  there is a fiduciary who's watching our value on behalf of us

16  and the other fee creditors.  And so --

17          THE COURT:  A fiduciary watching it?  I don't

18  understand what you mean.

19          MR. BENNETT:  Well, overseeing it.

20          THE COURT:  But who's -- like Brian Marsal?

21          MR. BENNETT:  He's in a position to protect it.

22          THE COURT:  Isn't he the fiduciary for the estate?

23          MR. BENNETT:  Your Honor, the fact that this sales

24  process generates the highest and best value for Lehman

25  Brothers Holdings Inc. at two billion dollars, hypothetically,

1    although it won't reach that level, doesn't mean that in the

2    process it will generate the highest and best price for my

3    client's counterparties.  That's the point.  And so there could

4    be a circumstance, certainly, where what's in the best interest

5    of other Lehman entities isn't in the best interest of my

6    client and its counterparty.

7            THE COURT:  I don't understand how this affects

8    transparency.  I know we've been using transparency --

9            MR. BENNETT:  Well, the issue --

10           THE COURT:  I'm not finished.  Excuse me.

11           MR. BENNETT:  The issue of transparency goes to --

12           THE COURT:  When I'm talking, it's just great if you

13   just let me finish.

14           MR. BENNETT:  Okay.

15           THE COURT:  I know that we've been talking about

16   transparency throughout the day.  But I don't understand how

17   the issue that you're addressing, which, I think, mostly is

18   parochial as to your clients, has anything to do with

19   transparency.

20           MR. BENNETT:  The issue --

21           THE COURT:  Explain it to me, please.

22           MR. BENNETT:  Okay.  I will.  The issue of

23   transparency is our ability to assess the impact of the

24   proposed sale on the assets that would otherwise be available

25   to pay my client's claim.  We can't assess what those assets

1  are that are being sold.  We can't assess the purchase price

2  that would be attributable to those assets.  And we can't

3  assess how our counterparties' ability to be paid will be

4  impacted by the sales process.  So it's transparency in that

5  sense.

6          THE COURT:  Is it transparency or is it simply the

7  fact that you're interested in a subpart of the businesses

8  being sold and you're not interested in being a player for the

9  whole.  So it's difficult for you to compete for what you want

10 which is a piece.  That's not really transparency.  That's just

11 that you have a different set of economic objectives.

12         MR. BENNETT:  We are interested in a piece.  But

13 failing that, Your Honor, we're interested in seeing our rights

14 protected in this process.

15         THE COURT:  Okay.

16         MR. BENNETT:  Thank you.

17         THE COURT:  Well, now I know -- oh, there are more.

18 Mr. Bromley?

19         MR. BROMLEY:  Your Honor, James Bromley, Cleary

20 Gottlieb Steen & Hamilton on behalf of Hellman and Friedman.

21 If I can be heard on response to the objection?

22         THE COURT:  Sure.  I'm just not sure who you're

23 representing.

24         MR. BROMLEY:  Hellman & Friedman, one of the bidders.

25         THE COURT:  Oh, fine.

1          MR. BROMLEY:  Your Honor, I think that the two

2     objections are eminently distinguishable.  First, what we're

3     talking about here is not a simple business.  And the

4     objections try to simplify, we think, much to the detriment of

5     our bid as I would think would be the case that Carlyle is

6     seeking to bid against us.  But also to the detriment of the

7     business itself.

8          Our clients have been sitting up at Weil Gotshal for

9     several weeks working extremely hard to stabilize this business

10    to provide a proposal, a proposal that the management of the

11    business can take to its employees, that provide the value for

12    this business all during the time of the greatest market

13    upheaval any of us have seen in our lifetime.  So does that

14    mean that's a bad thing?  I think actually, it's a very good

15    thing.  Provides very strong benefit to this estate and to all

16    of the other entities that are not yet before Your Honor.

17         So the question is, are the benefits that the

18    stalking horse bidders are looking for right now unreasonable

19    under the circumstances?  And certainly, Your Honor, we feel

20    that they are.  We also feel that we've made a substantial

21    amount of movement over the past couple of days and

22    particularly in the conference right outside your courtroom.

23    And so, as we're sitting here today, we have to take into

24    account, though, in terms of some of these particular

25    complaints, some of the particularities that this business

1   presents.  So Mr. Mindlin talks quite a bit about the consent

2   process and the leg up and the gun jumping that a benefit that

3   he says is unfair.

4           Your Honor, we're not talking about a simple

5   business, as I said.  We're talking about a business that is an

6   investment advisory business, a business where the material

7   assets are subject to the Investment Advisers Act and certain

8   very significant and specific requirements in terms of seeking

9   consent to transfer those assets.

10          Mr. Mindlin knows that.  He also recognizes, I think,

11  or if he doesn't recognize it he should, that that process

12  isn't something that takes place over the course of a day or a

13  week or even a month.  It takes place over the course of three

14  or four months.  So the idea that with an auction process that

15  is scheduled under the current schedule that we have agreed to,

16  and, hopefully, Your Honor will enter, we would have an auction

17  in forty-five days.  We have not yet, as we stand here today,

18  started any consent process.  So I want to correct that

19  statement that had been made on the record.  And once that

20  consent process begins, Your Honor, it's going to take several

21  months.

22          So the idea that we're getting some substantial and

23  significant gun jumping and benefit that puts this bidder, who,

24  frankly, doesn't have standing in our view, Your Honor, but

25  does have motivation to accept that proposal as the proposition

1    that should govern how the consent process should go forward

2    frankly doesn't make any sense.

3            And with respect to Bain Capital and Hellman &

4    Friedman, the efforts that have been expended over the past

5    three weeks, we believe, have conveyed a substantial benefit on

6    these estates stabilizing this business and the individuals who

7    are the core of this business.  We believe that once Mr.

8    Ridings gets on the stand he'll testify to that.  We're

9    absolutely sure of that.

10           So as we stand here today and hear two objections

11   which are left after substantial movement and good faith effort

12   on the part of Bain and Hellman & Friedman, we have to take

13   into account who they are.  Carlyle is here represented by

14   Wachtell Lipton.  I submit, Your Honor, that they knew exactly

15   where we were for the last three weeks.  They knew exactly

16   where Mr. Ridings was located, where Mr. Miller was located.

17   And if they wanted to come in and put another bid on the table

18   and be here as the stalking horse bidder instead of us, they

19   had every opportunity to do so.  They're certainly represented

20   by sophisticated counsel and they're certainly well known in

21   the business.  So the idea that they've been somehow

22   disadvantaged by having to sit here and complain about our

23   bidding procedures, we think is ridiculous.

24           They also have a lot of motivation, Your Honor.  They

25   have a lot of motivation to preserve their optionality.  I

1    think Mr. Mindlin said he would hope to put in a bid.  And he

2    would hope if he put in that bid that that bid would be the

3    highest bid.  We have a signed and binding contract, Your

4    Honor.  Yes, it is a contract with purchase price adjustments

5    and termination rights, the sort of termination rights and

6    purchaser price adjustments that Mr. Mindlin would have

7    demanded if he was the stalking horse bidder.

8         So the idea that we're sitting here today dealing

9    with a phantom is, in our mind, inappropriate.  It undercuts

10   substantially the perception of the value that we've given to

11   this process.  We're talking about an investment advisory

12   business, people who are dealing with people's investments,

13   their stocks and their bonds.  And I don't think there's a

14   person in this courtroom, Your Honor, over the past three weeks

15   that hasn't sat down and had some very difficult conversations

16   about their own portfolios.  So the idea that these portfolio

17   managers are being held together by our bid, I think, is a

18   very, very true statement.

19        THE COURT:  I have a question for you, Mr. Bromley,

20   just to interrupt you for one moment.  I don't understand

21   enough about the consent process to use the word as a

22   sufficiently defining concept.  Tell me, if you can, what's

23   involved and whether or not once the consent process has been

24   undertaken and completed, it is rational for any other bidder

25   to step in because one of the problems here, and I'm not

disagreeing with anything you've said so far, is that we have

the proverbial uneven playing field problem which wasn't said

by Mr. Mindlin in his oral remarks but certainly implied in his

written submission that there's something fundamentally unfair

about giving the stalking horse what amounts to the keys to the

kingdom before the kingdom has been acquired. And what I want

to understand is whether the process of obtaining consents is

something that -- at a five million dollar price tag, I

understand, potentially, which you haven't disputed so I'm

gathering that's a good rounding number for it, how easy is it

for someone else to do it. If you already have the consents,

does that mean that parties are readily willing to give

consents? If you get the consents, are the consents Bain and

Hellman & Friedman specific or are they consents that go to the

notion of ownership change provided that we're dealing with a

reputable firm of the sorts that you represent? I don't

understand enough about the concept of consent to know whether

it's personal, whether or not after someone has gone through it

it's unlikely they're going to want to be burdened by it again?

Are they going to say enough's enough? I consented to the

Bain/H&F deal and I'm not going to consent to anybody else. So

if it's that, isn't it a lockup? So I want to know what it is.

        MR. BROMLEY: Okay.

        THE COURT: I don't want to characterize it. What is

it?

1          MR. BROMLEY:  The Investment Advisers Act, Your

2     Honor, requires that when you're going to transfer these

3     investment advisory agreements that you need to obtain --

4          THE COURT:  Understood.  Why isn't that just a

5     condition for closing?

6          MR. BROMLEY:  Because it takes a number of months to

7     go through that, Your Honor.

8          THE COURT:  Okay.

9          MR. BROMLEY:  And our process that we put in place is

10    important to getting to closing sooner rather than later.  Not

11    just --

12         THE COURT:  I think that's desirable.  But the

13    problem, and this is one that I just want to hear more about,

14    is that --

15         MR. BROMLEY:  Sorry, Your Honor.

16         THE COURT:  If you want to confer, that's fine.

17         MR. BROMLEY:  Would you like -- you were in the

18    middle of a question.

19         THE COURT:  Do you want to confer for a minute or do

20    you want me to finish my sentence?

21         MR. BROMLEY:  Yes, please, Your Honor.

22         THE COURT:  The problem that I have is that it seems

23    to me that if it's initiated when you're the stalking horse

24    bidder and if it takes some amount of time and money to get it

25    done that you have a noncash lockup on the process that may

1    have a material chilling impact upon alternative bidders.  And

2    that's a serious issue unless you can explain to me that this

3    is something that anybody can just step up and do.  If it's

4    something that anybody can step up and do then this is just a

5    timing issue.  If it's an exclusivity issue, you have a

6    problem.

7          MR. BROMLEY:  I understand, Your Honor.  Can I confer

8    for a moment?

9          THE COURT:  Sure.

10    (Pause)

11          MR. BROMLEY:  Thank you, Your Honor, for the -

12          THE COURT:  There's another little cluster over

13    there.  So let's come back to order.

14          MR. BROMLEY:  The idea that there are clusters of

15    people discussing Investment Adviser Act consent process is --

16    I don't think it happens much.  Your Honor, I think a couple of

17    things to respond to your questions.  First, does this

18    foreclose anyone else from doing it?  The answer is no.  Is the

19    contemplation that the consent process will mention Hellman &

20    Friedman and Bain and them alone in connection with the initial

21    solicitation?  Yes.  It will say Hellman & Friedman and Bain as

22    purchasers in accordance with the terms of the asset purchase

23    agreement.

24          THE COURT:  And will it say that this is all part of

25    a bankruptcy process in which there's no assurance whatsoever

1    that we'll be the successful bidder and as a result, we're

2    asking you to consent to something?

3              MR. BROMLEY:  It will --

4              THE COURT:  It's entirely contingent and possibly

5    illusory?

6              MR. BROMLEY:  I don't think we had the word

7    "illusory" in the draft.

8              THE COURT:  Well, but I want to consider that word.

9              MR. BROMLEY:  Well, Your Honor --

10             THE COURT:  No, I'm teasing.

11             MR. BROMLEY:  -- yes, it -- yeah -- no.

12             THE COURT:  What I'm really pointing out is this is a

13   problem for me and I think you're hearing it's a problem for

14   me.

15             MR. BROMLEY:  I understand what you're saying, Your

16   Honor, but I think there's a couple of statements in response.

17   One, we absolutely plan to make it clear that this is subject

18   to a bankruptcy court approval process and that other bids are

19   possible.  We have not --

20             THE COURT:  What about encouraged?

21             MR. BROMLEY:  Can we say who's encouraging that, Your

22   Honor.

23             THE COURT:  Actually I am.

24             MR. BROMLEY:  You're encouraging it.  The fact is,

25   Your Honor, what we are planning on doing is starting a three

1   or four month process.  Why are we starting that process?

2   Because we believe as the purchasers who want to buy this

3   business that it's very important to stabilize this business as

4   soon as possible.  There is already word out there on the

5   street that this process is going forward.  The fact that

6   Neuberger Berman, the investment management division, was up

7   for sale prior to the bankruptcy filing is already out there.

8   The first thing that Neuberger Berman had to do after the

9   bankruptcy filing was put notices up on their website to give

10  comfort to their customers.  These are people who had the

11  ability to walk away on a hair trigger notice.  As well as the

12  people who are working at the company, the ones who are

13  providing the value, the value that we would be looking to

14  purchase and the value that Carlyle would be looking to

15  purchase.  So the idea that there is something that's going to

16  be done here that cannot be undone, it's just not true.  If

17  we're going to sit here and try to determine from a

18  psychological perspective if somebody who is already standing

19  out there in this market wondering whether they should remain

20  with Neuberger Berman or one of the other investment management

21  companies is going to be put off by having the possibility of a

22  second consent, if there's a higher or better bid, particularly

23  one from an institution as sterling as Carlyle, I think that is

24  something that is not a real concern that shouldn't be driving

25  this process.

1    THE COURT: Can you explain -- 'cause I still have

2    this lingering concern that I don't have a very good

3    understanding of what's involved in obtaining these requisite

4    consents, how hard it is to get them, what the process is on

5    the side of the party whose consent is being given, whether or

6    not in undertaking the process, the party giving consents has

7    to go through their own internal process of diligence and

8    oversight and review. And to what extent as a result of doing

9    it once it's a one shot deal that parties don't want to have to

10   do again? So one of the concerns I have, and it may be that I

11   just don't understand this -- in fact, I know I don't

12   understand this which is why I'm asking the question. I'm

13   trying to understand whether or not this is an unfair advantage

14   or simply something that the deals requires because unless this

15   is done, the somewhat intangible nature of a business of this

16   sort begins to unravel. Now, no one's actually said that in so

17   many words to me and I don't know if it can be said because the

18   fact that there is an approval process that is a condition to a

19   closing is hardly a new concept. What is a new concept is that

20   the approval process is happening before a party has been

21   anointed. That's what's troublesome. And I've never seen it.

22   And I bet you haven't either.

23    MR. BROMLEY: Well, Your Honor, we certainly strongly

24   believe that the nature of the business requires this process

25   to start sooner rather than later. And we believe that it

1    should start as soon as we're ready to do it.  I --

2          THE COURT:  Well, shouldn't it start as soon as

3    somebody is awarded the bid?

4          MR. BROMLEY:  I understand, Your Honor.  It would be

5    helpful, I think, if Mr. Rose -- two things.  Mr. Rose could

6    explain a little more detail about the consent process.  But I

7    also think what we've done here and this is unfortunate the way

8    we've structured it -- and fortunate for us, right? -- that

9    normally what we would have here is we would have already had

10   Mr. Ridings on the stand.  He already would have talked about

11   the fragility of the business and the importance of the

12   process.  We have not had that yet.  All we have had is an

13   objector who is a competing bidder with a motivation to make

14   our bid as little as possible and to have as much optionality

15   for them as possible without having put any effort into this.

16   And that's what we're doing here.  So we haven't had the

17   evidence yet.  And we're talking about Mr. Mindlin's objection.

18   Without there having been anything that -- and I know that it

19   was without prejudice to the argument that he shouldn't have

20   been able to stand up.  But, in effect, once he stood up, we're

21   here.  So what we have, I think, to help Your Honor deal with

22   this is Mr. Rose is the corporate lawyer who can explain in

23   much more detail the Investment Adviser Act process and why we

24   believe strongly that it does not prejudice anything here as

25   well as the evidence that we believe should be put on with

1    respect to the damage to the business if this process doesn't

2    go forward.

3         MS. FIFE:  Your Honor, if I could interrupt for one

4    second.  I'm happy to put on Mr. Ridings or do it by proffer,

5    if you would like.  In addition, we do have the general counsel

6    of Neuberger Berman here in court and it may make sense for him

7    to explain to you the process which the company anticipates

8    going through in connection with the consent rather than Mr.

9    Rose, if you'd like.

10        THE COURT:  That's fine.  I'll hear from anybody

11   who's competent to tell me.  And it might also be useful to

12   hear from Neuberger Berman's general counsel to know a little

13   bit more about the fragility of the business.  And if he knows

14   what the process is like, his view of the process, and in

15   particular, whether or not this is a process which once done

16   can be done again in practical terms.  Because one of my

17   concerns here and no one has yet really answered this is

18   whether or not this is a completed transaction before it's a

19   completed auction.  That's my concern.

20        MS. FIFE:  Right.  It's not a completed transaction

21   because the consent process will not be complete before the

22   auction process will be complete.

23        THE COURT:  But it may be substantially complete.

24        MS. FIFE:  Based on my understanding of the process,

25   it will take at least three months before we will be able to

1  get the consent.  So if we're talking about a sale hearing in

2  sixty to sixty-three days, Your Honor, the consent process will

3  naturally be subsequent to the auction process.  So I don't

4  think that we run the risk of having the consent process prior

5  to the auction.  The risk as we see it is that customers,

6  clients, ordinary people and institutions who get a consent

7  form in the mail that says will you go with me to Bain and

8  Hellman & Friedman and they consent, yes, we'll then

9  subsequently perhaps get another form.  And will it lead to

10  confusion?  Will it lead to a lot of phone calls to their

11  portfolio managers?  Will it lead to -- if the market's not

12  doing particularly well or their portfolio manager doesn't do

13  well, then perhaps they will withdraw their account.  So we run

14  the risk that there will be a diminution in the value of the

15  assets by virtue of a second auction.  Having said that --

16       THE COURT:  A second auction or a second --

17       MS. FIFE:  I mean a second --

18       THE COURT:  -- solicitation of consent?

19       MS. FIFE:  Second solicitation, I'm sorry.  Having

20  said that, we negotiated a transaction with Bain and Hellman &

21  Friedman which was extremely difficult at arms' length.  Mr.

22  Ridings can testify to that.  It was over the course of two

23  weeks.  And it was a package.  We won several points and didn't

24  get others and this was the process that we ultimately reached.

25       As to -- wow.

1          THE COURT:  They're ganging up on you from behind.

2          MS. FIFE:  Yeah.  I mean, as to Mr. Mindlin's

3    objection, it's really a price issue.  I mean, he's basically

4    saying at the end of the day when we look at Carlyle's bid, if,

5    in fact, it does bid, will we take that into consideration.

6    And that's perhaps -- and it's just a question of price.  And I

7    think that can be taken into consideration.

8          THE COURT:  I'm actually not seeing this as a pricing

9    issue and I may be seeing it wrong which is why I think we

10   should go to some evidence.  My concern --

11         MR. MILLER:  If I can just supplement Ms. Fife's --

12         THE COURT:  Let me just finish my concern and then

13   I'll hear from you, Mr. Miller.  My concern is that the process

14   of getting the consents may be a fait accompli, that by virtue

15   of getting the consents or having substantially taken the steps

16   necessary to achieve that goal, for all practical purposes

17   means no one else is a permissible bidder, even at a higher

18   price, because there's too much risk in resoliciting.

19         MS. FIFE:  Right.

20         THE COURT:  That's the concern.

21         MS. FIFE:  Right.  And I don't think that's the case.

22         THE COURT:  Well, let's find out.

23         MR. MILLER:  But, Your Honor, Mr. Mindlin's objection

24   wasn't to that point.  What Mr. Mindlin was objecting to, Your

25   Honor, is that if Carlyle came in and bid and let's say the bid

1  some dollars over Bain and Hellman & Friedman, in determining

2  which is the best bid, would the committee and would the debtor

3  and would all the other interested parties say well, Bain and

4  Hellman & Friedman have got the consents already.

5  　　　　THE COURT:  I understand that was Mr. Mindlin's

6  point.  That doesn't matter.  This is my point now.

7  　　　　MR. MILLER:  I understand, Your Honor.

8  　　　　MR. ROSE:  May I be heard, Your Honor?  May I be

9  heard?

10  　　　　THE COURT:  Yes, of course.

11  　　　　MR. ROSE:  Alfred Rose again from Ropes & Gray.  Your

12  Honor asked if this is a conventional or unconventional

13  process.  And the answer is it's completely conventional.  When

14  a public company investment adviser agrees to sell itself, it

15  begins the process of seeking client consents immediately even

16  though the transaction remains subject to shareholder approval

17  and subject to the risk that a competing bidder will emerge who

18  is willing to pay a higher price.  If the competing bidder

19  does, in fact, emerge and does agree to pay a higher price then

20  that public company investment adviser would set aside the

21  transaction it had entered into and would begin seeking

22  consents for the other transaction.  So the process here is

23  exactly like --

24  　　　　THE COURT:  Has it ever happened?

25  　　　　MR. ROSE:  I can't say.

1          THE COURT:  I'll bet you don't know because I'll bet

2     it's never happened.

3          MR. ROSE:  Your Honor, I can't think of a case in

4     which it has happened --

5          THE COURT:  Okay.  So why make the argument?  It's

6     not conventional.  It's just plain wrong.  You've stood up and

7     said it's purely conventional and you acknowledge that you know

8     of no precedent.

9          MR. ROSE:  Your Honor, what I believe is conventional

10    is the fact that the consent process has begun immediately

11    after the deal is announced.

12         THE COURT:  Yes.  But this is in bankruptcy.  This is

13    in bankruptcy and you have no rights yet except the rights that

14    we're going to give you if I approve the bid protections which

15    are just that, bid protections.  It's not a right to do

16    anything except maybe be the stalking horse bidder if no one

17    else bids.  That's the problem here.  This is not a board that

18    has decided to do something.  This is a process that's entirely

19    contingent.  Understood?

20         MR. ROSE:  I do understand, Your Honor.  Would it be

21    helpful for me to describe the consent process?

22         THE COURT:  Yes, please.  But I also want to hear it

23    from Neuberger Berman's counsel.

24         MR. ROSE:  Very well.  There will be three separate

25    streams to seek client consent.  One stream will relate to

1    those clients whose contracts require their written consent.

2    And there, Neuberger Berman will reach out to them with a

3    letter and with a form consent that it will ask them to sign

4    and return. In order for the consent to be effective, it needs

5    to describe who the buyer will be.

6          The second stream will relate to a group of clients

7    whose contracts require consent but do not require written

8    consent. And for that group of clients, Neuberger Berman will

9    reach out to them with a letter that says we are proposing to

10    enter into a transaction subject to bankruptcy court approval

11    and if we do not hear from you within the next forty-five days,

12    we will presume you to have consented. And that's an accepted

13    process under the Investment Advisers Act. It's been

14    sanctioned by the SEC.

15          The third stream will relate to mutual fund clients.

16    With respect to mutual fund clients, Neuberger Berman will

17    first go to the boards of directors or boards of trustees of

18    the funds and seek their consent. And when that consent is in

19    hand, it will then mail proxy statements to the shareholders of

20    the fund and seek their consent. In general, a majority of the

21    shareholders must vote in favor in order to give consent.

22          THE COURT: That sounds like the hardest part.

23          MR. ROSE: Your Honor is right. Can I be of further

24    help to Your Honor or would you prefer me to step back?

25          THE COURT: No. That's very helpful. I think we

1    should get to a record pretty soon.  It's getting late.

2          MR. MINDLIN:  Your Honor, I'll be brief then.  It's

3    Phil Mindlin, Wachtell Lipton for Carlyle.  Three quick points,

4    Your Honor.  First, if you were to refer to the contract,

5    Section 714 and 715 are the sections of the contract that deal

6    with this consent process and even actually lay it out in some

7    detail.  And it is actually consistent with what was just

8    described to you.  The flavoring around it, though, the color

9    around it is that it's a lot more interactive on the private

10    client side than I think you would have concluded if you had

11    only heard the description.  What happens is that the portfolio

12    managers deal with people who do what people normally do.  They

13    put the letter aside to deal with later.  And so there's a

14    process of reaching out, calling, urging and encouraging.  And

15    one thing that hasn't been mentioned to Your Honor is that it's

16    already begun.  Letters have gone out that were dated October

17    8th that made no mention of an auction.  Those letters said

18    that the companies entered into an agreement with Bain, Hellman

19    & Friedman, that it's highly constructive, that the new

20    partners have extensive experience, they understand the

21    business, they respect the distinctive culture, etcetera,

22    etcetera.  Nothing about an auction.  Nothing about possibly

23    somebody else being the winning bidder.

24          So that's the color, Your Honor.  It's interactive.

25    It's begun already.  If it's really a process that takes four

1   months, and I don't dispute that, then waiting forty-five days

2   until you know who the real purchaser is, is worth waiting

3   because it is an unfair advantage that's baked into the

4   process.  And it is also -- and I'm not sure that this entirely

5   came through in what was said to Your Honor.  It's completely

6   Bain specific.  Apparently, and I'm no expert on this, but I'm

7   told that you can't go out and seek some sort of generalized

8   consent.  You have to describe exactly on whose behalf consent

9   is being sought.  So the consent that people are talking about

10  is a five million dollar proxy solicitation on behalf of Bain.

11  Thank you, Your Honor.

12          THE COURT:  Okay.  Thanks.  Should we put on some

13  evidence or how do you want to handle this?

14          MS. FIFE:  Excuse me, Your Honor.

15          THE COURT:  Or do you want to talk?

16          MS. FIFE:  Evidence is fine, Your Honor.  Would you

17  like Mr. Ridings or someone from Neuberger?

18          THE COURT:  As I've said in the past, it's your case.

19          MS. FIFE:  Yeah.  Why don't we deal with the issues

20  that you've requested from Neuberger?  So I'd like to call Mr.

21  John Bluagr to the stand.

22          THE COURT:  Sure.  Can you stand up in that little

23  box?  Raise your right hand.

24      (Witness duly sworn)

25          THE COURT:  Please be seated.

1    DIRECT EXAMINATION

2    BY MS. FIFE:

3    Q.   Mr. Bluagr, please state your full name for the record.

4    A.   It's John Bluagr, B-L-U-A-G-R.

5    Q.   And where do you reside?

6    A.   I reside in Denver, Colorado but I live in New York City

7    also.

8    Q.   And where do you currently work?

9    A.   I am the general counsel of the IMD division of Lehman

10   Brothers.  And I live here -- work here in New York at 399 Park

11   Avenue.

12   Q.   And can you give us a brief history of your past work

13   experience?

14   A.   I've been in the securities industry for approximately

15   twenty years, private practice beforehand.  I've worked in the

16   insurance industry and for the last ten years in the asset

17   management business.

18   Q.   And prior to that, what schools did you attend?

19   A.   University of Wyoming for both undergraduate and law

20   school.

21   Q.   Are you familiar with the IMD transaction?

22   A.   Yes, I am.

23   Q.   Have you read the purchase agreement?

24   A.   Yes, I have.

25   Q.   Are you familiar with the requirement to get consents to

1    the transactions that are proposed in the purchase agreement?

2    A.    Yes.

3    Q.    Could you explain to the Court the consent process?

4    A.    The purchase agreement provides for within a reasonably

5    commercially -- reasonably commercial period after the sign-in

6    for us to commence a consent process with regard to all of the

7    clients and the IMD business.

8    Q.    And what are those consents specifically?

9    A.    Well, we've got a schedule which I brought up with me -- I

10    think is part of the asset purchase agreement which goes into a

11    number of the different consent process.  But, in general, Your

12    Honor, you have a '40 Act consent process which is for all of

13    the mutual fund shareholders.  That process requires us to

14    develop a proxy.  We have to have -- the proxy has to have

15    specifically has to address the transaction and how the

16    transaction is structured and who the buyers are.  That has to

17    be approved by the fund share -- the fund board.  They have to

18    go through a diligence process to make sure they understand

19    that.  They approve that.  It goes to the SEC.  SEC reviews it

20    and approves it which takes, you know, a period of time

21    depending on how much expediency they're willing to provide.

22    And then it gets mailed with the proxy cards.  And then you go

23    through a forty-five day waiting period and then you begin to

24    solicit those proxies, have a proxy solicitation service and

25    try and obtain a quorum so that you can have a vote and you can

get -- you can get the proxy approved. That's essentially the

'40 Act part of that with regard to the mutual funds.

We have a variety of different other types of consents.

Mr. Rose was accurate in his portrayal. There's a negative

consent capacity with some contractual asset management

clients. With some historic clients, there is a positive

consent required where they must be mailed a specific letter.

Has to have the detail with regard to who's in the transaction,

who the buyers are and they have to specifically sign off.

There are a series of accounts which are held on what are

called wrap platforms which would be an intermediate sale

client who we have our product positioned on a, say, a Merrill

Lynch retail platform for sale. We have to go through a

process with those intermediaries to get those consents done.

There's an institutional -- they're institutional clients

which do work through consultants primarily. We have contracts

with them. We would have to go -- and those -- that's -- that

is, in particular, is a renegotiation of the contract. And you

have to go through on a client by client basis, seek their

approval to have that contract affirmed. And -- as part of the

consent process. And those are for fairly large institutions

which do business with us.

MS. FIFE: Your Honor, may I interrupt for one

second, please? We actually have a schedule to the purchase

agreement that lists all of the consents that are required. It

1 might be helpful if I could provide that to you.

2         THE COURT:  That's fine.  You may approach.  Okay.

3 A.  So the core piece of the Neuberger business aside from the

4 '40 Act product are what we call PAM.  It's the private asset

5 management business which are -- they are clients who are --

6 have signed advisory contracts and our portfolio managers

7 provide advisory services to those clients under our Investment

8 Adviser.  And we have approximately -- I think it's 50,000

9 clients that would be in that category.  And those -- those --

10 that group are divided.  And some we'll be able to -- we'll be

11 able to obtain positive consents.  Some we'll have -- we'll be

12 able to do negative consents as part of the process we've -- we

13 looked at.

14     With the fixed income business, there are a variety of

15 different products.  There are CDOs which require a very

16 specific type of consent process that we would have to go

17 through to get to -- to get down into -- to where the clients

18 are for purposes of those.

19     But that's a general outline of the types of consents we

20 would ultimately have to get for the business.  And I can go

21 through this in more detail if you're interested but that's --

22 I think that's a general outline.

23 Q.  Would you take a moment and just review the schedule and

24 see if there are any consents that you have neglected to

25 mention?

1   A.   We have the private equity business which would be --

2   would be a consent from the independent directors.  We have a

3   hedge fund business that has a variety of different products.

4   Those would be written client consents also pursuant to the --

5   to the investments and the limited partnerships that the

6   clients made.  Let me just look through.

7   Q.   How long would you anticipate this consent process to

8   take, Mr. Bluagr?

9   A.   I think when Lehman acquired Neuberger, if we use that as

10  a roadmap, that's approx -- it was approximately ninety days.

11  I think with -- thereabout to obtain all of the consents.

12  Q.   Thank you.  Would the solicitation of the consents for

13  Bain and Hellman & Friedman preclude the solicitation of

14  consents on behalf of another entity if Bain is not the winning

15  bidder?

16  A.   If Bain were not the winning bidder at the close of the

17  363 process, we would have to go through and do a

18  resolicitation of all the clients --

19  Q.   And --

20  A.   -- if that's your question.

21  Q.   Yes --

22  A.   Okay.

23  Q.   -- it is my question.  And do you think that that process

24  would be harmful to the business in any way?

25  A.   I have a view on it.  It's -- I think we feel that there

is likely to be a substantial amount of confusion on the client

base.  We -- as the attorney for Hellman said, they did help us

through a period -- very rough period with the Lehman

bankruptcy landing right in the middle of a -- what was

essentially an auction process that was being done.  They --

they spent weeks with us working day and night working to get

an agreement done.  It did help stabilize the business.  We

feel comfortable that the clients -- the client attrition has

slowed down substantially in the last week to ten days.  And

the clients know that a consent process will be undertaken at

some point in time.  And, you know, we -- we do have -- we do

have some anxiety about the fact that we would have to go

through two consent processes.

MS. FIFE:  Your Honor, I'd like to mark the schedule,

I forgot to do that, as Exhibit 1.

THE COURT:  Do you want to offer it?

MS. FIFE:  Yes.  And I'd like to offer it into

evidence?

THE COURT:  Any objections?  It's admitted.

MS. FIFE:  Thank you.

(Debtors' Exhibit 1, schedule to asset purchase agreement of

client consent process, was hereby marked for identification

and received into evidence as of this date.)

MS. FIFE:  Could I just have a moment, please?

Q.  Are you familiar with the letter that was sent to various

1    customers of Neuberger on October 8th?

2    A.    I -- I -- I'm sure that I am.   But at this point, I -- if

3    you could show it to me, I could tell you if I've read it and

4    if I've -- if I edited it.   But --

5    Q.    Let me ask you a different question.   Has Neuberger begun

6    the solicitation process?

7    A.    No, not officially.   We are prepared -- if we need to move

8    forward quickly, we're prepare.   And we think the client base

9    is prepared if we need to wait until an auction process is

10    completed.

11    Q.    Just finally, in your opinion does the consent process

12    which we have agreed to with Bain and Hellman & Friedman

13    constitute a lockout -- lockup, lockout of other bidders?

14    A.    You know, I go back to what I said before.   I think it

15    creates a significant amount of potential confusion on the

16    clients.   I think it becomes much more difficult to obtain

17    consents if, in an auction process, they were unable -- if they

18    were not the winning bidder.   And I think the clients --

19    there's a high chance for an extension and a larger amount of

20    time to get through the '40 Act process in particular.   And it

21    gives the institutional clients basically a second chance to

22    reassess whether there's too much instability in the business

23    and whether or not they want to continue having their

24    contractual -- contractually have their mandates by our

25    advisors and by our fixed income people.

1    Q.  But with time, you can solicit consents, correct?

2    A.  We would be able to do that in time but I -- I -- there is

3    a high degree of fear that that could be a damaging process to

4    our client base.

5           MS. FIFE:  Thank you.  No further questions.

6           THE COURT:  Anyone else wish to question the witness?

7    You're not quite excused but close.  You're excused.  Thank

8    you.  Did you want ask any questions?

9           MR. BROMLEY:  Yes, I did, Your Honor.  Sorry.  Excuse

10    me.  I was asking Mr. Mindlin if he wanted to ask any

11    questions.

12           THE COURT:  You actually almost lost that opportunity

13    and it's out of my being very tired that I'm not snapping at

14    you for getting up too late.  Go ahead.

15           MR. BROMLEY:  I apologize, Your Honor.  Next time

16    I'll try not to be polite to Mr. Mindlin.

17           THE COURT:  No.  Please be polite to him.  He needs

18    it.

19           MR. BROMLEY:  I'm just kidding, Your Honor.

20    CROSS-EXAMINATION

21    BY MR. BROMLEY:

22    Q.  Mr. Bluagr, you testified that the process that Bain and

23    Hellman & Friedman have gone through to date has helped

24    stabilize the business, correct?

25    A.  The pro -- yeah.  The process of us -- of working with us

1    to the point where we were able to arrive at an agreement. I

2    think the fact that there is an agreement in place, has

3    stabilized the business, have made clients feel more

4    comfortable.

5    Q.   The fact that there is an agreement has stabilized the

6    business?  If there was --

7    A.   Yes.

8    Q.   Yes.  Thank you.  If there was an announcement that there

9    was no longer an agreement in place, what effect would that

10   have on the business?

11   A.   I think there would be -- it would both be a destabilizing

12   event for the clients and for the internal employees.

13   Q.   Could you try to split that up?  How do you see it

14   destabilizing with respect to the internal employees?

15   A.   The employees are searching for clarity right now in their

16   world.  There's, you know, a large group of employees have

17   moved off to Barclays.  A large group of employees

18   internationally have moved off to Nomura.  The employees that

19   are essentially part of the IMD division are waiting for some

20   clarity around what their role is going to be and how quickly

21   we can get to a closing and be on with our -- with our business

22   with a new partner.

23   Q.   And with respect to the clients, could you describe that a

24   little more?

25   A.   With the clients, I think it's more just confusion over

1    whether this means there's a change in their relationship with

2    their manager, whether this means that there's been some change

3    in terms of who's going to be actually managing their money.

4    And so I think it's -- it's more of just a -- a market

5    confusion, I guess, maybe not knowing what the process means.

6    And I'm -- am answering this based on the limited question you

7    asked which was if there -- if there was no more agreement.  If

8    there was a substitute agreement, there is an agreement that is

9    put in place momentarily after an auction takes place.  I think

10   that confusion and that issue is diluted.

11   Q.   So is it fair to say that the existence of an agreement

12   with Bain and Hellman & Friedman has stabilized both the

13   business and the employees but with respect to the clients you

14   say that it's more of an issue of confusion with respect to a

15   second consent process?

16   A.   I think -- you know, it may be best if we could ask the --

17   you know, the business folks their view because they actually

18   have a much tighter and closer relationship to what the clients

19   actually think on a day to day basis.  But my view is that

20   receiving, you know -- these clients having just come through a

21   horrific event with a lot of confusion, particularly, those

22   clients that had crossover assets into LBI and all of the

23   confusion on where their accounts were, where their money was,

24   whether they had protection.

25        The clients, I think, have come through that period that

1    we've stabilized.  The clients now understand that we're still

2    here. We have an operating business that we're trying to run.

3    The managers are still doing what they're doing.  They're

4    working with the clients because of the terrible market

5    conditions.

6            Getting a consent letter or proxy saying that a

7    transaction has been completed or is being commenced and is

8    going to be completed at the close of an auction and these are

9    the people that are buying it, it's my belief that if that

10   doesn't occur and another buyer comes forth, it creates a

11   significant amount of confusion on the client's part around

12   what's happened.  It gives them another opportunity to think

13   that the business is unstable and to question what exactly took

14   place 'cause for their part they don't understand the 363

15   hearing, they don't understand what the auction means.

16           You know, I think the clients view this as being a

17   stabilizing event.  They think there's a new owner coming in.

18   And I don't think they're looking ahead to an auction process

19   which could generate another owner.

20   Q.   But in the information process and consent process, you do

21   intend to tell the customers and clients that there is a

22   process, correct?

23   A.   That's correct.  Yes.

24   Q.   Okay.

25           MR. BROMLEY:  Thank you, Your Honor.  No further

1  questions.

2         THE COURT:  Thank you.  You're excused.  You're

3  really excused this time.  Do you have any more witnesses?  Do

4  you want to call Mr. Ridings?

5         MS. FIFE:  I'm sorry, Your Honor.  I think it might

6  be easier if I just proffer his testimony.

7         THE COURT:  Is there any objection to proceeding by

8  means of proffer?  Mr. Mindlin has -

9         MR. MINDLIN:  I have no objection, Your Honor.

10        THE COURT:  -- indicated by body language no, he has

11  no problem.  The objectors don't object at least to this.

12        MS. FIFE:  All right.  Great.  Thank you, Your Honor.

13  I offer the proffer of testimony that would be given by Mr.

14  Barry W. Ridings, the co-chairman of the restructuring group at

15  Lazard Freres & Co., LLC, investment banker to Lehman Brothers

16  Holdings Inc. and its affiliated debtors which I will refer to

17  as Lehman.

18        Mr. Ridings is present in the courtroom today and

19  pursuant to Federal Rule of Evidence 103(a)(2), this Court may

20  accept a proffer in lieu of his testimony.  Mr. Ridings is

21  thoroughly familiar with the matters before the Court and, in

22  particular, the motion to establish bidding procedures and to

23  approve Lehman's proposed sale of its investment management

24  division, IMD.

25        If Mr. Ridings were called to testify in support of

1    the sale motion, his direct testimony would be as follows:  Mr.

2    Ridings joined Lazard in July 1999 to co-head its restructuring

3    advisory practice.  Mr. Ridings now serves as managing director

4    and vice chairman of the U.S. Investment Banking at Lazard.  He

5    has a B.A. in religion from Colgate University and an M.B.A. in

6    finance from Cornell University.  Mr. Ridings is licensed by

7    the NSD and the stock exchange with series 7, 63 and 24

8    licenses.  Mr. Ridings has been involved in the restructuring

9    of troubled companies for over thirty years.  From 1990 to

10   1999, Mr. Ridings was managing director of BT Alex. Brown in

11   its restructuring group.  And before that, he was at Dreckville

12   (ph.).  Since 1990, Lazard's professionals have been involved

13   in over 250 restructurings representing over 350 billion in-

14   debtor assets.  Mr. Ridings has testified and has been

15   qualified as an expert in scores of large cases including Trump

16   Casinos, Macy's, Western Union, Owens Corning, Marble

17   Entertainment, Calpine, Sun Healthcare and Vlasic Foods.  Mr.

18   Ridings has been involved in over a hundred debtor and creditor

19   assignments including both pre-petition and Chapter 11

20   restructurings domestically and internationally.

21        Mr. Ridings lectures extensively and is recognized as

22   an expert in connection with asset sales in and out of

23   bankruptcy.  He is a fellow at the American College of

24   Bankruptcy and a member of the Institutional Insolvency

25   Institute.  He teaches classes on valuation, MNA and

1    restructuring at Cornell's graduate school of business and New

2    York University Stern School of Business for the past fifteen

3    years.

4         Lazard was retained by Lehman in September 2008 to

5    act as its investment banker and provide advice regarding any

6    restructuring or sale transaction.  In particular, Lazard and

7    Mr. Ridings were engaged with respect to the sale of the IMD

8    business.  He would testify that he became familiar with

9    Lehman's businesses, with IMD business, in particular, and he

10   was involved in the negotiations of and has reviewed the terms

11   of the purchase agreement and bidding procedures negotiated

12   with Bain Capital Partners and Hellman & Friedman.

13        Mr. Ridings would testify that the extreme volatility

14   in the financial markets over the course of the past year has

15   resulted in negative consequences to Lehman and other similar

16   firms.  He is aware that at the time of Lazard's engagement,

17   Lehman's management was exploring several different options to

18   deal with the deterioration of its business.  In connection

19   with Lazard's engagement, he became aware that since June 2008,

20   Lehman's management had expensively explored the possibility of

21   a sale of a part or all of the IMD business.  Mr. Ridings

22   reviewed the comprehensive marketing effort undertaken by

23   Lehman to obtain a binding agreement and he is familiar with

24   the four bids received by Lehman prior to the commencement of

25   the Chapter 11 case.  Three of those bids were for fifty-five

percent of IMD and one was for a hundred percent of IMD.

Mr. Ridings would testify that uncertainty regarding Lehman's stability since early September 2008 has affected and continues to affect IMD's ability to maintain its clients, employees and assets under management. Before Lehman could consummate a sale, however, Lehman was forced to file Chapter 11 cases because its assets were rapidly deteriorating. Mr. Ridings would testify that Bain and H&F were two parties very advanced in their effort to conduct diligence and therefore the debtors believed that Bain and F&M (sic) were most likely to offer the highest or best value for IMD in the shortest period of time.

On September 14th, therefore, Lehman encouraged Bain and H&F to partner in making an offer for the IMD business. Each would provide fifty percent of the funding required to close the transaction. Excuse me. In the fourteen days between Lehman's Chapter 11 filing and the signing of the purchase agreement, the IMD business was extremely stressed. The private investment management business, Lehman's high net worth brokerage franchise, was under assault by competitors who attacked aggressively offering substantial compensation and, in one case, hosting open houses for Lehman's IMD employees. The core of IMD, Neuberger Berman, was under stress especially as clients and employees sought clarity with regard to the future ownership structure. In the month of September alone, assets

1   under management were down approximately six percent due to

2   withdrawal.  Clients and employees were concerned about being

3   part of a bankrupt Lehman Brothers and were looking for clarity

4   and stability as to the ownership.  Mr. Ridings would testify

5   that following the commencement of the cases, Bain & H&F

6   actively continued their diligence of IMD businesses and

7   assets.  The parties engaged in around-the-clock meetings and

8   negotiations over the course of the initial two weeks of these

9   cases until a purchase agreement was executed.

10          Mr. Ridings would testify that the debtors were

11  extremely motivated by the threatened and actual loss of

12  important clients and the corresponding erosion of value of the

13  IMD businesses.  Lazard participated in the negotiation process

14  and many meetings with the various constituencies.  Alvarez &

15  Marsal, like Lazard, approved the proposed auction process and

16  the purchase agreement ultimately agreed upon by Lehman, Bain

17  and H&F.  Mr. Ridings would testify that these negotiations

18  were at arms' length, difficult, aggressively negotiated by the

19  parties and the bidding procedures and the purchase agreement

20  are the result of good faith negotiations.

21          Mr. Ridings would also testify that Lehman did not

22  rush into the purchase agreement.  He would testify that the

23  sellers resisted urges to accept many proposals from Bain and

24  H&F that were materially worse for their estate even though the

25  value of IMD's assets were depreciating day by day.

1          Mr. Ridings would testify that pursuant to the

2     proposed bidding procedures, the diligence window and open

3     auction process will allow potential bidders to do their

4     diligence and to make an offer higher or better than the one

5     established by the purchase agreement.  In fact, Mr. Ridings

6     would testify that the only way that those would agree to many

7     of the provisions was in the context that there would be a long

8     diligence and auction period during which all parties would

9     have the opportunity to consider bidding on the purchased

10    assets.

11          The sellers insisted on an open and fair process at

12    the same time having an executed purchase agreement satisfy the

13    immediate and pressing need to establish certainty with regard

14    to the future of IMD in order to preserve its values of going

15    concern.  Mr. Ridings would testify that the sellers' entry

16    into the proposed purchase agreement had the effect of enabling

17    IMD to convince many clients and employees to remain with the

18    business until the conclusion of today's hearing.  Mr. Ridings

19    believes that the bidding procedures are appropriate because

20    they provide a process where Lazard can run an auction with the

21    goal of maximizing recovery for the debtors and their

22    stakeholders.

23          It is clear that if the Court rejects the proposed

24    bidding procedures, Bain and H&F would be entitled to terminate

25    the purchase agreement.  It is not clear that IMD would be able

1  to convince clients and key employees to stay with the sellers

2  and to enter into employment agreements.

3       Mr. Ridings would testify that the termination fee,

4  reimbursement amount, and other stalking horse protections,

5  particularly as they've been revised by the compromise with the

6  creditors' committee, are reasonable and they were heavily

7  negotiated and the amount set forth as revised were significant

8  concessions on the part of the purchaser that were required by

9  the sellers.

10      In these circumstances and given the condition of the

11 business and the time pressure that the sellers were facing,

12 the agreement represents the best the sellers could do.

13      In sum, Mr. Ridings would represent that the pending

14 transaction should be approved and the sale process allowed to

15 go forward.

16      THE COURT:  Is there anyone who objects to receiving

17 the proffer as evidence or who wishes to examine Mr. Ridings in

18 cross-examination?  I hear no objections.  I accept the

19 proffer.

20      MS. FIFE:  Oh, I'm sorry.  I'm sorry.  The debtors

21 rest, Your Honor.

22      THE COURT:  All right.  The evidence is in and

23 counsel for the committee is rising.

24      MR. ARONZON:  Good evening, Your Honor.  I'm Paul

25 Aronzon with Milbank Tweed.

1          THE COURT:  Good evening.

2          MR. ARONZON:  I don't want to elongate this hearing

3     but I wanted you to understand the thinking of the committee on

4     this '40 Act issue and I'll refer to it as the '40 Act issue.

5     That's how we see it.  Look, we wanted a full and complete

6     auction.  We hope that Carlyle bids.  We want as many bidders

7     as we can get.  We worked very hard over the last three and a

8     half weeks to try and ensure that we had a process and

9     procedures that would accommodate a bidding process that

10    invited people in.  It was not simple.  But I think we've

11    achieved that result here tonight especially with the

12    negotiations that occurred out in the hallway.

13         We had a number of issues.  They got knocked down one

14    by one.  This '40 Act issue was one of the things that was

15    left.  We view the '40 Act issue as timing.  We are concerned

16    about confusion as to customer and we thought long and hard

17    about it but on balance, we wanted a stalking horse.  And we

18    wanted a bid announced with a stalking horse to stabilize this

19    business.  We were sitting there watching the deterioration as

20    the contract negotiations were being dragged out and watching

21    customers leave and watching portfolio managers become upset

22    and threaten or actually leave.  And so for us, it was real

23    time in balancing these problems.

24         We're prepared right now and I just said it to say

25    that these bidding procedures we think work.  We'd like to get

1    on with the auction.  We are mindful of the customer confusion

2    issue.  We know there's a risk that people might leave.  But we

3    know that this is not a lockup.  We know it's not exclusive.

4    We know that whoever wins the auction can send out notices

5    again.  And yes, people would be confused.  I know when I get

6    things like this in the mail, I throw them out.  I should

7    probably pay more attention to them.  But I don't.

8              THE COURT:  Probably should.

9              MR. ARONZON:  Thank you, Your Honor.

10             THE COURT:  Any other --

11             MR. ARONZON:  Well --

12             THE COURT:  Well --

13             MR. ARONZON:  -- one more comment.

14             THE COURT:  -- I was actually asking somebody else,

15   but you're certainly free to come back.

16             MR. ARONZON:  I'm so sorry.  Mr. Mindlin was asking

17   me before the hearing how we viewed -- how we would view

18   bidders, because we'll be sitting at the table, under our

19   arrangement, who have not started the consent process.  And

20   because we view it as timing, I don't view it as a significant

21   leg up and neither does the committee.  The whole committee's

22   been briefed on these issues, and they're well aware of them.

23             THE COURT:  Okay.  That's very helpful.

24             MR. MINDLIN:  Thank you, Your Honor.  Phil Mindlin,

25   Wachtel Lipton, for Carlyle.  A couple of quick points.  We've

heard it would cause a substantial amount of confusion if we

had to go out with a second round of consents.  We've heard

that the consent process hasn't begun.  We've heard it could

wait.  We've heard, therefore, that it adds only a limited

amount of time to what is already a 90 to 120-day process,

depending whose account of it you go with.  We've heard that

with institutional clients they're open to a re-renegotiation

of a contract.  I've lived with this before.  What happens is

that when you go to them and you say you want approval to sell

to Hellman & Friedman, Bain, they change some of the terms.

And then when you come back and ask for approval again, the

terms change again because it's somebody else's opportunity to

get a second bite at the apple.

So that leaves open in my mind why do it?  One answer

is people are acting honorably.  They raised their issues, they

got agreement on their issues and they don't want to, certainly

in any transparent way, abandon what they feel may be a

handshake.  But this is a vitally important issue.

The reason that we have said Carlyle hopes to bid

better and hopes to be a high bidder is because we're not sure

we'd play in an auction that's stacked against us, and that's

how this auction looks to us.  It really is an unfair process.

The bidder has said, Bain Group has said, and I can see it,

that they've added value by being the stalking horse.  That's

why in this kind of process we have stalking horses.  But

1    they're not altruists. The contract we started out with was,

2    frankly, egregious, and the contract that we ended up with was

3    better but way beyond the norm. The reality of this S&P

4    adjustment is it knocks 850 million off the purchase price, and

5    the purchase price was already a number that they expected

6    would be around a billion-six.

7              So if you really look at it, fifty million plus

8    expense reimbursement is against a purchase price that's

9    probably in the neighborhood of 850, 900, on their call. So

10   they're getting what's double the normal break fee for being

11   the stalking horse. So they're not altruists, and I wouldn't

12   expect them to be and I expect them to act in their own best

13   interests. But we shouldn't allow them to say, to threaten,

14   that they're going to pick up their toys and go away unless

15   they get something that in a fundamental way is inimical to the

16   notion of a bankruptcy auction: a fair process. That's why

17   people play in these auctions: because they know they're fair;

18   they know that when the gavel comes down it's theirs; they know

19   what the bidding increment is. To have a process like this

20   that starts out unfair is a disincentive for bidders to play.

21   It is certainly a disincentive for Carlyle to bid, and that's

22   why, Your Honor, all I can say is that I would hope for us to

23   be there. I can tell you that the process is a fair one, one

24   that starts out level, we're there. Thank you, Your Honor.

25              THE COURT: Thank you.

1       MR. BENNETT:  Very briefly, Your Honor.  Again, David

2  Bennett, Thompson & Knight, for Crossmark.  Your Honor, we

3  raise two issues:  jurisdiction and transparency.  And I would

4  like to suggest a solution.  As to jurisdiction, Your Honor, if

5  the debtor or an interested buyer is to exercise the bankruptcy

6  call, then the Court should require that that be done in

7  advance of the sale hearing with sufficient time to give

8  parties in interest notice, say thirty days, not three days.

9  Your Honor, this process should accommodate that at this point.

10  There's been no contention that that kind of notice would be

11  deleterious.

12       Your Honor, as to transparency, the bid that is on

13  the table should be disclosed to parties in interest, and the

14  allocation of the purchase price should be disclosed.  There is

15  an allocation schedule somewhere for the bid, for the Bain bid,

16  and we'd like to have it disclosed to parties in interest.

17  They should be reasonably required to disclose what they're

18  paying, for which assets and how the twenty-three sellers are

19  to be impacted in the sales process.  Likewise, a competing

20  bidder should be required in some similar fashion to disclose

21  what they're paying, for which assets, so that we can assess,

22  and others like us, the thousands and tens of thousands of

23  others like us, can assess the impact of this process on their

24  rights.  Thank you, Your Honor.

25       THE COURT:  Thank you.

1      MS. FIFE:  I'd like to just briefly adjust the

2  objection of Crossmark, Your Honor, in response to that

3  argument.  First of all, it's clear that Crossmark got notice,

4  so I'm somewhat surprised by the remarks of that, not getting

5  notice.  What we intend to do is provide notice of the bidding

6  procedures and the sale to all creditors of LBHI, which I'm

7  told is about 300,000 parties.  That also includes all of the

8  creditors of the subsidiaries, for the most part.  So we're

9  pretty comfortable that they will have actual notice.  In

10  addition, we're going to post it on the website.  So I think

11  that actually all parties will have notice.

12      Also, there is no allocation schedule; it just hasn't

13  been done.  I don't know what gives the attorney the impression

14  that one exists, but I haven't seen it and I'm fairly certain

15  that it just doesn't exist.

16      THE COURT:  If it existed, would you have any

17  interest in sharing it?

18      MS. FIFE:  No.  No.

19      THE COURT:  I didn't think so.

20      MS. FIFE:  But it doesn't exist.  We will allocate

21  the purchase price.  I believe that we have to do it, and we

22  will do that, and that's the fair thing.  And in light of all

23  of the discussions that we've had earlier today, that's

24  appropriate, and we intend to do that and Lazard will help us

25  with that.  They will value the assets, and we will allocate

1     the purchase price accordingly, but haven't done that yet, and

2     that's certainly not a high priority.

3           What Crossmark has is a claim; they have a fifty

4     million dollar claim.  And they'll be able to assert that claim

5     against the proceeds that will be left in that particular

6     entity after the allocation, and that's what they will get.

7     They'll get satisfied from that claim.  And if they're a

8     bidder, they can bid as well.  I mean, the auction -- the

9     bidding procedures permit parties to bid for individual assets,

10    and if they're interested in a particular asset they can bid

11    for that.  So I think we really have satisfied all of the

12    issues that have been raised by Crossmark.  Thank you, Your

13    Honor.

14          THE COURT:  Okay.  Is there anyone else?

15          MS. PIPER:  Your Honor?

16          THE COURT:  Well, I guess there is.

17          THE COURT:  Hello.  Who are you?

18          MS. PIPER:  Katherine Piper from Steptoe & Johnson,

19    Your Honor, with respect to the limited objection of Korea

20    Investment & Securities Company and True Friend Forth

21    Securitization Specialty.  I appreciate the late hour there and

22    will be very brief.  I believe I heard counsel for the debtor

23    represent earlier that the assets that were the subject of our

24    limited objection are intended to be part of the sale, and we

25    appreciated that.  We just wanted clarification on the record

1     that they're not subject to be added at a later date, and with

2     that clarification our objection will be resolved.

3           THE COURT:  We'll see if we can get you that

4     clarification now.

5           MS. FIFE:  I can clarify that those assets are not

6     part of the IMD business, so they will not be added to the

7     sale.

8           THE COURT:  Okay.

9           MS. PIPER:  Thank you, Your Honor.

10          THE COURT:  Objection's withdrawn.

11          MS. PIPER:  That does resolve our objection.

12          THE COURT:  Fine.

13          MS. PIPER:  May I be excused, Your Honor?

14          THE COURT:  Yes.

15          MS. PIPER:  Thank you.

16          MR. LOBELLO:  Good evening, Your Honor.  Edward

17    LoBello of Blank Rome, for Thomson Reuters.  I just want to

18    touch on something Ms. Fife said earlier.  We filed a limited

19    objection as well.  I indicated to Ms. Fife that we were

20    withdrawing our objection based upon the omnibus reply that she

21    filed, and she reported that to the Court.  She is correct.  I

22    want it to be clear for the record, however, that our limited

23    objection also had a reservation of rights.  I know Your Honor

24    is not fond of people taking the mike and indicating

25    reservations of rights, especially at the late hour, but I

1    wanted to make it very clear that we were withdrawing our

2    limited objection but the reservation of rights still stands.

3            THE COURT:  It's fine, and I'm perfectly willing to

4    hear as many reservations of rights as people want to make.

5    It's part of the process.  That's just not necessary but it's

6    expected, and that's fine.

7            MR. LOBELLO:  Then, if I can, for thirty seconds,

8    given the hour, Your Honor --

9            THE COURT:  Really?  You're going to add something

10   now?

11           MR. LOBELLO:  Just thirty seconds, Your Honor,

12   because I've not stood up to do this before and I know other

13   parties have.  Your Honor, we have a series of executory

14   contracts with the debtors.  We have worked in cooperation with

15   Barclays with respect to its acquisition in terms of providing

16   critical services to provide the continuity that the business

17   requires.  It is our intent, if our contracts are implicated by

18   this transaction, to try to work cooperatively with the buyer

19   of these assets.  That is our intent; that is our approach.

20           Having said that, Judge, we do reserve our rights

21   under 365 to assert that our contracts are integrated

22   agreements that must be assumed in their entirety and also to

23   assert that our contracts have already been assumed and

24   assigned to Barclays, because that's what appears to have

25   happened.  Having said that, Your Honor, we will work

1    cooperatively through the process.  Thank you.

2              THE COURT:  Your rights are reserved.

3              MR. LOBELLO:  Thank you.

4              THE COURT:  Everybody's rights are reserved.

5              MR. KENT:  Good evening, Your Honor.  Thomas Kent

6    from Paul Hastings.  We have not filed an objection.  I

7    represent landlord Fischer Brothers, whose lease may be assumed

8    as part of this transaction.  I have not filed an objection but

9    I wanted just a point of clarification with respect to

10   something that was said respecting shortening the auction

11   period to forty-five days and perhaps having the hearing to

12   approve the sale sixty days from now.  There is a timeline in

13   the existing contract for parties to get notice of contracts or

14   leases being assumed, and I'm wondering whether if the time

15   period from what was sent out previously from the expected

16   hearing and the time period that people would have notice,

17   whether that'll also get backed up.  I want to be sure that

18   that gets enough notice so people like my client have

19   sufficient time to review the fact that their contracts are

20   being assumed and they have an ample opportunity to review

21   adequate assurance of future performance with respect to

22   whoever it is that's going to assume the contract.

23             So I don't know whether now is the time you're going

24   to actually set the dates for this but I just want to be sure

25   that there's plenty of time for that in the order that you're

1  going to sign, as I assume you may be signing, with respect to

2  the bidding procedures.

3  THE COURT:  Do you wish to comment on that?

4  MS. FIFE:  Just to say that we intend to change all

5  of the dates.

6  THE COURT:  Okay.  The dates will be adjusted to

7  reflect the new timeline.

8  MR. BROMLEY:  Your Honor --

9  THE COURT:  I think I better rule quickly and that'll

10  stop this.  What do you have to say, Mr. Bromley?

11  MR. BROMLEY:  I don't have any leases to deal with,

12  Your Honor.  Very quickly, Your Honor, the bidders, Bain,

13  Capital and Hellman & Friedman, have, as the testimony has

14  shown, been a substantial stabilizing influence on these

15  businesses.  I think it's also clear that the absence of a deal

16  would be destabilizing.  The issues that have been raised more

17  focus on information, the confusion that may result from a lack

18  of information, and certainly seem to be able to be cured quite

19  easily by having adequate information provided.

20  What we're talking about here, Your Honor, is looking

21  to have this business healthy.  We don't want to exercise

22  rights with respect to purchase price adjustments.  We want

23  this business as healthy as possible and to buy it as quickly

24  as possible.  And when taking into account Mr. Mindlin's views,

25  Your Honor, again, I just reiterate what we're talking about

1    here is a free option for someone who hasn't done anything and

2    has made no promises.  Thank you, Your Honor.

3              THE COURT:  Is there anyone in the courtroom or on

4    the telephone who wishes to say anything more at this point?

5    Okay.  I've given careful consideration to the objections that

6    remain outstanding, but before addressing those objections, I'd

7    like to comment generally on the improved terms and conditions

8    of the bid procedures that resulted from the discussions that

9    took place during the break.  I believe that the adjustments

10   that were described on the record reflect a significant

11   enhancement in those bid procedures in any number of respects,

12   and I don't need to repeat them now.  It's manifest to me that

13   the lowering of the breakup fee, the clarification that the

14   expense reimbursement is for actual expenses, the lowering of

15   the bid increments and other similar adjustments, in

16   combination, make these bid procedures acceptable from my

17   perspective.  I would note that they might not have been

18   acceptable absent these adjustments.

19              As for the issues raised by the remaining objections,

20   I have a lingering concern with respect to the consent process

21   that we have spent so much time discussing this evening.  I

22   believe that the testimony of Neuberger Berman's general

23   counsel makes it clear that the business of the IMD group, not

24   just of Neuberger Berman, is a fragile enterprise predicated,

25   to a large extent, on the skills of the people who work within

1    the group and their relationships with their clients.

2        I take it as a given that the Lehman bankruptcy on

3    September 15 was a huge shock to the system and that keeping

4    this transaction, as it has been proposed, in place and

5    allowing this transaction to proceed in the manner that has

6    been proposed tonight represent the principal stabilizing force

7    for that business.  That, however, is not the issue before me.

8    The issue before me is whether the bid procedures are fair and

9    should be approved as a matter of established bankruptcy law.

10   Ordinarily, it wouldn't be appropriate to approve bid

11   procedures that, taken as a whole, would offer disincentives,

12   material disincentives, to prospective bidders.  Ordinarily,

13   this comes up in the context of breakup fees or overbid

14   requirements, matters that go to the economics of entering the

15   auction process, and the case law is fairly clear, not that we

16   deal with percentages; we deal with the structures of

17   transactions that either are suitable to encourage bidding or

18   are designed to frustrate bidding and as a form of exclusivity.

19   That's the reason that Courts, in this circuit and elsewhere,

20   tend to focus on whether or not the breakup fee is within

21   market or is excessive relative to market.

22        Here, I think the adjustments that have been made to

23   the proposed bid procedures go a long way toward taking the

24   sting out of what had been fairly onerous overbid and breakup

25   and expense reimbursement requirements.  As has been apparent

1    from the colloquy and the presentation of evidence, I have

2    taken Mr. Mindlin's observations regarding the consent process

3    and I have run with that in my own direction.  Notwithstanding

4    that, I believe that there's now alternative at this point for

5    these debtors other than to accept the condition to the

6    transaction which has been imposed by the stalking horse

7    bidder, Bain and H&F, that they be afforded the opportunity to

8    initiate the consent process.  In accepting this condition, I

9    am comforted to some extent by the comments of committee

10   counsel indicating that this issue has been vetted within the

11   committee, considered by the committee's professionals.  And

12   while not optimal from the perspective of encouraging

13   sophisticated parties to come to the table, the issue does not

14   represent an impermissible lock-up.

15        The practical reality, however, may be different.  I

16   believe the testimony of counsel for Neuberger Berman makes it

17   evident that the consent process is something that, in

18   practical terms, can really only be done once.  There would

19   have to be a remarkably better bid to encourage the debtors and

20   the committee in consultation with the debtors to assume the

21   risk that a resolicitation of these various consents would be a

22   risk worth taking, although it's possible that some third

23   party, Carlyle included, could come in with a bid that doesn't

24   include the kinds of purchase price adjustments and other

25   unattractive features of the current bid that would make for a

1    tough business decision, and I hope that happens.  Ultimately,

2    this is about dollars.

3           A contingent "I might bid" argument balanced against

4    a fully committed transaction with a party that's prepared to

5    move forward and which does provide material stabilizing

6    benefits to the enterprise makes for an easy call, for me,

7    although it would be a much easier call indeed if the consent

8    process were delayed.  What has not effectively been presented

9    to me this evening is why it is essential, from the perspective

10   of Bain and H&F as purchasers, to insist that the consent

11   solicitation be initiated immediately.  Candidly, I view it as

12   their way of making it that much more likely that they are the

13   only game in town.  For that reason, this transaction, from my

14   perspective, appears to be a private sale masquerading as a

15   public one and looks more like ego energy than anything else

16   I've seen tonight.

17          But that was also true of the Barclays transaction.

18   We've talked throughout the day about how extraordinary and

19   exception the Lehman case is.  It's exceptional in some ways

20   that I don't particularly like; this is one of them.  But I'm

21   also a realist.  The transaction as is, as adjusted through the

22   efforts of lawyers for the debtors and the objectors,

23   represents the only transaction currently available for the IMD

24   platform and, as structured, does not foreclose the possibility

25   of other bids.

1          Now, as for the objections raised by Crossroads, both

2     with respect to transparency and jurisdiction, I find neither

3     of those objections compelling.  As to transparency, that's the

4     theme of the day.  Over time, there will be increasing

5     transparency in this case.  And as to the sale of the IMD

6     businesses, this particular objection really isn't interested

7     in anything other than its parochial interests in one

8     particular part of the whole.  I believe that, as a result,

9     Crossroads probably knows everything it needs to know about the

10    assets it might be interested in buying.

11         As to jurisdiction, I think that's a pure red

12    herring.  I will not be approving a sale of any nondebtor

13    assets; everyone knows that.  That's the reason for the

14    somewhat unconventional provision of what I've termed "a call"

15    on certain possible bankruptcy filings that will be at the

16    behest of the purchaser.  If those filings take place, I will

17    have jurisdiction.  If those filings take places, parties in

18    interest in those particular cases will have notice.  Even if

19    those filings don't take place, everyone within a reasonable

20    level of commercial curiosity has notice.  Accordingly, I

21    overrule those objections.

22         And as for the Carlyle objection, we never did get to

23    the question of standing, but it doesn't matter.  I believe

24    that the objections were thoughtful, helpful and provocative.

25         That's my ruling.  I'll take an order once one is

1 modified according to the adjustments described on the record.

2         MR. MILLER:  Thank you, Your Honor.

3         THE COURT:  I think if there's nothing more --

4         MR. MILLER:  Your Honor, there's just one more.

5         THE COURT:  Is there more?

6         MR. MILLER:  One more item.  Your Honor asked for a

7 report in connection with the Barclays sale on the assumption

8 of executory contracts and unexpired leases as to the cure

9 amounts.  I believe we have a report on that, Your Honor, from

10 Cleary Gottlieb.

11         MS. GRANFIELD:  What I would suggest, Your Honor, in

12 view of the lateness of the hour is just simply that we are in

13 the process.  We apologize that because thousands of contracts

14 are being assumed and assigned that there are a number of curer

15 objections that had been filed.  We're working through that

16 process and that what I would suggest is that we give you kind

17 of chapter and verse maybe at the November 5th hearing, if that

18 is acceptable.  We were prepared to do that but I just think --

19 we're working through, trying to do it at a business level, to

20 begin with, and we will give you chapter and verse on November

21 5th.

22         THE COURT:  That's fine.  If there's nothing more,

23 we're adjourned.  Thank you.

24     (Whereupon these proceedings were concluded at 8:09 p.m.)

25

I N D E X

T E S T I M O N Y

| John Bluagr | Ms. Fife | 146 |
| John Bluagr | Mr. Bromley | 154 |

E X H I B I T S

| PARTY | NO. | DESCRIPTION | ID. | EVID. |
|-------|-----|-------------|-----|-------|
| Debtors' | 1 | Schedule to asset purchase agreement of client consent process | 96 | 15 |

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|-------------|------|------|
| Joint administration motion for Chapter 11 cases that were filed on 10/3 and 10/5 granted | 85 | 7 |
| Motion for order directing that certain orders and other pleadings entered or filed in the Chapter 11cases of affiliated debtors be made applicable to recently file cases granted | 85 | 16 |

I N D E X, cont'd


R U L I N G S

DESCRIPTION                                      PAGE    LINE

Motions by debtors to approve retention,          86      20

engagement of Weil, Gotshal as general counsel;

Curtis, Mallet as conflicts counsel and to

engage Alvarez & Marsal as interim retention

orders approved


Utilities motion approved                         87      19


Motion of Shinsei Bank, Ltd. for entry of order   88      14

approving specified information blocking procedures

and permitting trading of claims against debtor

upon establishment of a screening wall granted


Motion of Metropolitan Life Insurance Company     88      20

for entry of order approving specified

information blocking procedures and

permitting trading of claims against debtor

upon establishment of a screening wall granted

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion of AEGON USA Investment Management, LLC for entry of order approving specified information blocking procedures and permitting trading of claims against debtor upon establishment of a screening wall granted | 89 | 4 |
| Motion of William Kuntz for relief from stay for an order lifting or modifying the automatic stay denied | 92 | 23 |
| Motion for appointment of equity committee denied without prejudice | 102 | 10 |
| Crossroads' objections as to transparency and jurisdiction overruled | 106 | 15 |
| Eagle transaction granted | 123 | 13 |

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Newport Global Opportunities Fund LP Rule 2004 | 178 | 5 |
| motion denied | | |

1

2                    C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  October 21, 2008

16

17

18

19

20

21

22

23

24

25