Hearing Date: November 18, 2008 at 10:00 a.m. (EST)
Objections Due: November 13, 2008 at 4:00 p.m. (EST)

Richard L. Wynne (RW-5630)
R. Alexander Pilmer (*to be admitted pro hac vice*)
Shirley S. Cho (SC-5002)
David I. Horowitz (DH-0921)
**KIRKLAND & ELLIS LLP**
777 South Figueroa Street, 37th Floor
Los Angeles, CA 90017
Telephone: (213) 680-8400
Facsimile:  (213) 680-8500

Counsel for Kapalua Bay, LLC

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | Case No. 08-13555 (JMP) |
| Lehman Brothers Holdings, Inc., et al., ) | Jointly Administered |
| ) | |
| Debtors. ) | |
| ) | |

**MOTION OF KAPALUA BAY, LLC TO (I) COMPEL IMMEDIATE ASSUMPTION OR REJECTION OF CONSTRUCTION LOAN AGREEMENT; AND (II) UPON REJECTION, TO GRANT RELIEF FROM THE AUTOMATIC STAY**

Kapalua Bay, LLC ("Kapalua") is the developer of the Ritz-Carlton Club and Residences at Kapalua Bay, Maui (the "Project"). The Project, which is 83% complete, is the largest active construction project in the state of Hawaii. Pursuant to a Construction Loan Agreement (defined herein), Lehman Brothers Holdings, Inc. ("Lehman") committed to loan Kapalua $370 million to fund the Project. Lehman has already funded $209 million into the Project and is obligated to fund $160 million more. Since the filing of this chapter 11 case, Lehman has failed to honor its funding obligation and thus the Project, which has over $200 million of equity, is in extreme jeopardy. Kapalua has tried for weeks to determine the status of Lehman's commitment by requesting that Lehman fund the Project, or in the alternative, allow an alternate lender to take its place; however, Kapalua's entreaties have been met with inaction from Lehman. Lehman's

K&E 13472460.

inaction, including its failure to fund, have caused significant harm to Kapalua, the Project, and Lehman's own estate and creditors. Instead of preserving its own valuable asset, Lehman's complete failure to act and its inability to timely respond to the situation at all during the past five weeks now threatens to destroy the very project that serves as collateral for Lehman's $209 million lien. If Kapalua is unable to finish the Project on time in the first quarter of 2009, it may be faced with claims from buyers seeking a refund of their deposit and cancellation of over $312 million of committed sale contracts. These sales contracts are the very source of funds that would be used to pay back Lehman's loan in less than six short months.

Kapalua requests that this Court require Lehman to immediately assume or reject the loan agreement. If Lehman decides to reject the contract, Kapalua requests that this Court grant relief from the automatic stay so that it can liquidate its claim and pursue all of its rights and remedies against Lehman (except for enforcement of a money judgment), including obtaining equitable relief in Hawaii state court in order to allow a third party lender to fund completion of the Project in a position senior to all interests pledged to Lehman as security for the loan.

## BACKGROUND

1.  Kapalua is a joint venture between Maui Land & Pineapple Company, Inc., the Ritz-Carlton Development Company (which is owned by Marriott International), and Exclusive Resorts.[1] The joint venture partners have already invested over $150 million of equity into the Project, not including the emergency bridge loan for Lehman's missed September 2008 funding.

2.  Pursuant to the *Construction Loan Agreement for a loan in the aggregate amount of up to $370,000,000 made by and between Kapalua Bay, LLC and Lehman Brothers Holdings,*

---

[1] The facts in support of this Motion are set forth in the Declaration of Ryan Churchill ("Churchill Decl.") and Declaration of Richard Wynne ("Wynne Decl."), which are concurrently filed herewith.

2

*Inc. Dated as of July 14, 2006* (the "Construction Loan Agreement"), Lehman agreed to loan $370 million to Kapalua for the development of the Ritz-Carlton Club and Residences at Kapalua Bay, Maui. A copy of the Construction Loan Agreement is attached to the Churchill Declaration as Exhibit A. Kapalua is informed and believes that Lehman has syndicated 22% of the loan out to three other bank participants (the "Non-Lehman Participant Banks").

3. A majority of the loan, $209 million, has already been funded, and the construction on the development is 83% complete. The first two of six buildings are scheduled to be completed by the end of 2008, and the entire project by April 2009. The Project is built on the water front. As a result, the Project is in great jeopardy for severe damage from natural elements because the structures will not be completely water tight or fully resistant to wind and weather damage until they are fully built.

4. The Project has already pre-sold a substantial number of the luxury units, which translates into $312 million in binding contracts. The prospective buyers have funded deposits of approximately 10% to 20% per unit, totaling $51 million in funded deposits. Sales for the residences are scheduled to begin closing as early as January 2009.

5. In the days before it filed for chapter 11, Kapalua contacted Lehman and sought assurances from Lehman as to its financial stability and ability to fund the loan despite marketplace rumors. As a result of assurances from Lehman representatives, Kapalua did not immediately seek alternative financing for the Project. On September 15, 2008, Lehman filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

6. On September 22, 2008, Lehman was obligated to fund a construction draw request of $35.6 million. The Construction Loan Agreement requires that Lehman "<u>shall</u> make

successive disbursements of the Loan to Borrower . . . ." *See* Ex. A to Church Decl., Sec. 4.1(d) (emphasis added). Lehman's failure to fund the September draw request constitutes a breach of the Construction Loan Agreement.

7. All of the Non-Lehman Participant Banks have funded their collective 22% portion of the September draw.

8. Both before and after Lehman failed to fund the September draw, Kapalua representatives attempted to contact the Lehman personnel on the account and Lehman's loan servicer, TriMont Real Estate Advisors, Inc., numerous times by email and phone. To date, Kapalua has not received an answer as to whether or not Lehman will fund the remainder of the loan.

9. On September 24, 2008, Kapalua sent a letter to counsel for Lehman asking for a definitive answer as to whether or not Lehman would perform under the Construction Loan Agreement by funding the missed draw and future amounts. In the alternative, Kapalua proposed that a new lender be allowed to step in to fund the Project and that any new money in would be ahead of Lehman's security interest and lien on the Project. *See* Ex. A to Wynne Decl. The only response that Kapalua received was that a response would be forthcoming. *See* Ex. C to Wynne Decl.

10. As a result of Lehman's unresponsiveness, Kapalua has been hindered in its ability to find alternative financing. For example, Kapalua was in active discussion with a lender to step in for Lehman and finish funding the Project. Because of Lehman's failure to respond, that lender has moved on to another opportunity. Furthermore, Kapalua has been forced to expend resources to find alternative financing in an increasingly depressed financial market. Although Kapalua is in discussion with several financing sources, none have committed yet and

4

all have indicated that any new money into the Project must be secured by a mortgage with priority over all interests pledged to Lehman as security for the loan.

11. Lehman's missed September funding has also caused the general contractor Nordic/PCL to send Kapalua a notice of default, and to threaten the cessation of construction. *See* Exhibit B to Churchill Decl. Needless to say, if Kapalua's general contractor were to stop work on the project, Kapalua would be unable to continue the Project for a significant period of time until a replacement contractor could be found, if at all, which would materially diminish the value of the Project. Kapalua has been actively negotiating with Nordic/PCL to prevent the general contractor from foreclosing and shutting down the Project and has agreed to certain concessions to Nordic/PCL on an interim basis, including payment of interest on certain portions of the outstanding amounts owing.

12. As a result of Lehman's failure to fund, Kapalua's joint venture partners have pooled together the funding necessary for construction to continue during the month of September at a premium to the joint venture. These parties (including Kapalua's general contractor) have made it clear to Kapalua that these "advances" are intended as an emergency bridge loan to be repaid from the first available financing and that such advances are not to be treated as further capital contributions. These parties have no obligation to fund Lehman's share into the future and Kapalua has no assurances that they will step in for Lehman again for any future payments.

13. On October 7, 2008, Kapalua again sent another letter to counsel for Lehman explaining that if Lehman would not commit to funding, Kapalua would need to file a protective motion with the Bankruptcy Court. *See* Exhibit B to Wynne Decl. To date, Lehman has not

5

committed to fund the remainder of this Project as it is obligated to do under the Construction Loan Agreement, necessitating the filing of this Motion.

14.     On October 24, 2008, Lehman will be obligated to provide an additional $20 million (approximate) under the Construction Loan Agreement.

15.     While the Construction Loan Agreement provides that New York is the governing law for "matters of construction, validity, and performance", it provides that Hawaii law is the governing law for disputes regarding the priority of Lehman's lien:

> Notwithstanding the foregoing provisions in this Loan Agreement and other Loan Documents, with respect to the creation, perfection, priority, enforcement, and foreclosure of the liens and security interests created hereunder shall be governed by and construed according to the law of the state in which the project is located."

Ex. A to Churchill Decl., Sec. 22.3. The Construction Loan Agreement further provides that jurisdiction is proper in Hawaii. *Id.*, Sec. 22.11.

16.     Kapalua is current on all its obligations under the Construction Loan Agreement and remains able to perform under the loan. With respect to the October 1, 2008 interest payments that Kapalua was required to pay to Lehman, Kapalua has directed that Lehman disburse loan proceeds to itself in the amount of approximately $900,000 as permitted by the terms of the Construction Loan Agreement to cover the interest payment. Ex. A to Churchill Decl., Sec. 11.4; Ex. B to Wynne Decl.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## RELIEF REQUESTED

18.     Kapalua requests that the Court enter an order pursuant to sections 365(d)(2) and 105(d)(2)(A) of the Bankruptcy Code, compelling Lehman to assume or reject the Construction Loan Agreement by no later than the date scheduled for a hearing on this Motion, or by November 18, 2008.

19.     If Lehman chooses to assume the Construction Loan Agreement, Lehman should be required to cure all defaults arising from its breach of the Construction Loan Agreement as outlined in more detail herein and provide adequate assurance of future performance satisfactory to Kapalua pursuant to section 365(b)(1) of the Bankruptcy Code.

20.     If Lehman chooses to reject the Construction Loan Agreement, Kapalua seeks relief from stay to file a complaint in the state court of Hawaii to pursue all of its rights and remedies (other than the enforcement of a money judgment) against Lehman, including liquidating its claim and pursuing its state-law equitable remedies to allow alternative financing and to amend the loan documents as necessary to reflect the circumstances created as a result of Lehman's failure to fund and to allow a new lender to fund, among other things. Specifically, Kapalua would seek an order allowing an alternative lender's lien to be senior to all interests pledged to Lehman as security for the loan with respect to any new money funded into the Project. The new money would be used to first repay all of the temporary advances made by Kapalua's joint venture partners and its general contractor.

## ARGUMENT

21.     This loan is a substantial asset for Lehman and its estate. Kapalua is less than six short months away from completing this development. There are already $312 million in binding contracts for these Ritz-Carlton residences, some of which are scheduled to close as

7

early as January 2009. The buyers have funded deposits of $51 million. These early sales are projected to repay a substantial portion of the construction financing by April 2009. By not immediately curing its default and funding under the Construction Loan Agreement, construction on the development will come to a halt. The surest way to maximize the value of this asset for Lehman's estate is to complete construction of the Project on time. Lehman's inaction is risking the value of its own asset.

### This Court Should Require Lehman To Immediately Assume Or Reject The Construction Loan Agreement

22.     Kapalua requests that the Court enter an order compelling Lehman to immediately assume or reject the Construction Loan Agreement by no later than the date scheduled for a hearing on this Motion. Section 365(d)(2) of the Bankruptcy Code provides in pertinent part that "the court, on request of any party to [an executory contract], may order the [debtor in possession] to determine within a specified period of time whether to assume or reject such contract." Setting a date by which the Debtor must assume or reject executory contracts is one of the specifically enumerated powers granted to the Bankruptcy Court. 11 U.S.C. § 105(d)(2)(A). Although under section 365(d)(2), a debtor "is allowed a reasonable time to decide whether to assume or reject," what is a "reasonable" time depends upon the facts and circumstances of the particular case and is within the discretion of the Court. *See In re Teligent, Inc., 268* B.R. *723, 738* (Bankr. S.D.N.Y. 2001)*;* 3 Colliers on Bankruptcy Sec. 365.04[2][b]. In setting a time to assume or reject an executory contract, courts will consider the nature of the interest at stake, the balance of the harm to the parties, the good to be achieved and the safeguards afforded all of the parties. *See In re Lionel Corp., 23* B.R. *224, 225-26* (Bankr. S.D.N.Y. 1982*).*

8

23. Kapalua cannot wait any longer for a decision from Lehman as to whether it will cure its default and honor its obligation to fund the Project. The development is due to be completed in six months and sales for the residences are scheduled to begin closing in less than three short months. If the development is not completed on time, Lehman will compromise the underlying contracts for sale of the Ritz-Carlton Residences and Kapalua may possibly be confronted with buyers seeking back their deposits and attempting to unwind their sale contracts, which are the very assets that will be used to repay Lehman's loan

24. As Lehman continues its breach under the Construction Loan Agreement, Kapalua's damages against Lehman mount. As construction lags on the Project, there could be extensive and possibly irreparable damages from the elements to the existing structures in their incomplete state. Kapalua is obligated to certain of its joint venture partners who have providing emergency financing for the missed September draw at a premium to the Project. Kapalua also owes amounts to its general contractor, Nordic/PCL, for agreeing to temporarily forbear on foreclosing. Kapalua may also be faced with claims for loss of the buyers' deposits and committed sales of the residences, potential loss of sales, the reputational damage to Kapalua, erosion of the value of the Project, and the risk of foreclosure to the Project by mechanics' lien holders including that of the general contractor.

25. Not only does Kapalua continue to incur damages, but also so do other parties in interest in the Project. Each of Kapalua's joint venture partners as well as its general contractor have been required to engage counsel, including bankruptcy counsel, to address Lehman's default. There are five hundred employees working full time on this development, which is the largest construction project in the state of Hawaii, nearly all of whose jobs are at risk without immediate relief from this Court. The other lenders who are continuing to fund their portion of

K&E 13472460.

the Construction Loan will no doubt have claims against Lehman.  As well, Kapalua is informed and believes that its joint venture partners have suffered damages as a result of Lehman's actions and that they are considering their remedies under the law against Lehman and third parties.

26. When the risk of economic harm to the counterparty is severe, courts will expedite the timeframe on which the debtor must decide whether to assume or reject an executory contract. *See In re Dana Corp.*, 350 B.R. 144, 147-48 (Bankr. S.D.N.Y. 2006) (citing *In re Enron Corp.*, 279 B.R. 695 (Bankr. S.D.N.Y. 2002) and *In re Adelphia Communications Corp.*, 291 B.R. 283 (Bankr. S.D.N.Y. 2003)) (noting that the court may consider "the damage the non-debtor will suffer beyond the compensation available under the Bankruptcy Code" in deciding "whether to shorten the time in which a debtor must assume or reject an executory contract").  Time is clearly of the essence here and the severe economic harm to Kapalua outweighs any argument that Lehman may have that it needs further time to decide whether to assume or reject.  "Congress intended [section 365(d)(2)] to 'prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-à-vis the estate.'"  *In re University Medical Center*, 973 F.2d 1065, 1079 (3rd Cir. 1992) (citing S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).  The Court should exercise its discretion and require Lehman to decide immediately whether to assume or reject the Construction Loan Agreement.

27. Should Lehman chose to assume the Construction Loan Agreement, it should be required to cure all defaults and breaches under the Construction Loan Agreement and provide Kapalua adequate assurance of future performance acceptable to Kapalua.  Kapalua's quantifiable damages to date arising out of Lehman's breach include the past due draw amount of $35.6 million, the October estimated draw amount of $20 million plus interest (assuming

10

Lehman does not pay the October draw amount by the time of the hearing), interest payable to Kapalua's joint venture partners for funding the September draw, damages (including interest) arising out of any forbearance agreement with Kapalua's general contractor, Nordic/PCL, attorney's fees (including litigation and bankruptcy counsel) and costs for Kapalua and any attorney's fees and costs that Kapalua may be obligated to pay to each of its three joint venture partners and Nordic/PCL arising out of Lehman's breach.

**If Lehman Chooses To Reject The Construction Loan Agreement, This Court Should Lift The Automatic Stay To Allow Kapalua To A Pursue State Court Action**

28.     Assuming Lehman decides to reject the Construction Loan Agreement, Kapalua seeks to lift the stay to liquidate its claim against Lehman and pursue all of its rights and remedies (except for enforcement of a money damages claim), including obtaining equitable relief under applicable state law to allow an alternative lender to lend money into the Project and be provided with a security interest senior to all interests pledged to Lehman as security for the loan.  Kapalua would also seek to make certain other necessary modifications to the Construction Loan Agreement to reflect the circumstances created as a result of Lehman's failure to fund and to allow a new lender to fund, among other things.  Relief from stay is required to allow Kapalua to save this Project and thereby preserve the value of this asset for Lehman's estate and possibly mitigate Lehman's damages exposure.

29.     Bankruptcy Code section 362(d)(1) states in relevant part that, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay… such as by terminating, annulling, modifying, or conditioning such stay for cause…" 11 U.S.C. § 362(d)(1).  The party seeking relief from the stay is required to make an initial showing of cause, and if cause is shown, the burden is shifted to the debtor to disprove the existence of cause

under Bankruptcy Code section 362(g)(2). *In re Deep*, 279 B.R. 653, 657 (Bankr. N.D.N.Y. 2002).

30.     The Bankruptcy Court has broad discretion to grant relief from the automatic stay. *In re Pittsford Polo Club, Inc.*, 188 B.R. 339, 344 (Bankr. W.D.N.Y. 1995); *see also In re Newman*, 196 B.R. 700, 703 (Bankr. S.D.N.Y. 1996) ("As to those areas protected by the automatic stay, relief from the stay is liberally granted."); *In re Anton*, 145 B.R. 767, 770 (Bankr. E.D.N.Y. 1992) ("The Bankruptcy Court has wide discretion to grant the relief and lift the automatic stay."). Courts have found that "cause" exists for purposes of section 362(d)(1) in allowing litigation to proceed in other, non-bankruptcy forums and will generally consider these twelve factors: "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceedings; and (12) impact of the stay on the parties and the balance of harms." *In re Deep*, 279 B.R. at 657 (citing *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990)). Not all twelve factors will apply to every case, and the factors need not be weighed equally. *In re Anton*, 145 B.R. at 770.

31.     Here, the applicable factors weigh in favor of granting of the relief from stay. The Construction Loan Agreement requires that any issue with respect to the priority of Lehman's liens are to be governed by Hawaii law and jurisdiction is also proper in Hawaii. *See* Ex. A to Church Decl., Sections 22.3 and 22.11. Courts generally hold that state courts are in a better position to interpret their own state laws, and in this case, the Hawaii state court is in a better position to interpret its own state laws regarding the priority of Lehman's lien. *See Allied Mechanical and Plumbing Co. v. Dynamic Hostels Housing Development Fund, Co.*, 62 B.R. 873, 878 (Bankr. S.D.N.Y. 1986) ("In the interests of comity and mindful of the legislative concern to allow state courts to continue to interpret state law, this court is satisfied that the state law breach of contract dispute between the parties can be efficiently and timely adjudicated in the state forum."); *In re OptInRealBig.com*, LLC, 345 B.R. 277, 286 (Bankr. D. Colo. 2006) ("Because of the federal judiciary's strong interest in comity with state courts, bankruptcy courts frequently abstain from hearing controversies that would require them to make determinations of unsettled state law issues."); *Corcoran v. Ardra Insurance Co., Ltd.*, 657 F. Supp. 1223, 1235 (S.D.N.Y. 1987) ("The Supreme Court of New York is in the best position to interpret New York law.").

32.     The relief sought in state court includes equitable relief to allow any funding by a new lender to be ahead of all interests pledged to Lehman as security for the loan to the extent of new financing in order to allow for completion of the Project. The Hawaii state court is also in a position to act as expeditiously, if not more expeditiously, than this Court given the volume and size of this case. Relief in the state court action would not interfere with the bankruptcy case.

33.     A swift resolution of this issue is necessary if any new funding is to come into the Project. Granting relief from stay is a necessary first step toward obtaining the funding that may

in turn mitigate the damages against Lehman for its breach of contract under the Construction Loan Agreement. On the other hand, failure to obtain additional financing in a timely manner will severely delay, if not completely destroy, Kapalua's ability to complete the Project.

## NOTICE

34. Notice of this motion has been served in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for this case [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the attorneys for the Debtor's postpetition lenders; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York; (vii) the attorneys for the Debtor; and (viii) all parties who have requested notice in these chapter 11 cases. No other or further notice need be provided.

## CONCLUSION

Lehman should be ordered to immediately decide whether to assume or reject the Construction Loan Agreement. If Lehman cannot perform under the Construction Loan Agreement, it should reject the contract and allow a new lender to fund the Project. Short of Lehman agreeing to subordinate its secured position to a new money lender, this Court should grant Kapalua's motion and lift the automatic stay to allow Kapalua to obtain a state court judgment liquidating its claim and pursuing all of its rights and remedies (except for enforcement of a money judgment), including the equitable relief described above.

| | |
|---|---|
| Dated:  October 23, 2008<br>         New York, New York | Respectfully submitted,<br><br>  */s/  Richard L. Wynne*<br>Richard L. Wynne (RW-5630)<br>R. Alexander Pilmer (*to be admitted pro hac vice*)<br>Shirley S. Cho (SC-5002)<br>David Horowitz (DH-0921)<br>KIRKLAND & ELLIS LLP<br>777 South Figueroa Street, 37th Floor<br>Los Angeles, CA  90017<br>Telephone:  (213) 680-8400<br>Facsimile:  (213) 680-8500<br><br>Counsel for Kapalua Bay, LLC |

15

K&E 13472460.