**<u>EXHIBIT A</u>**

GREEN TREE SERVICING LLC,

as Servicer

and

LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC.,

as Owner

FLOW SUBSERVICING AGREEMENT

Dated as of October 19, 2007

Group No. 2007-FLOW

10386/1
10/19/2007 1458667.03

# TABLE OF CONTENTS

Page

## ARTICLE I.

DEFINITIONS

## ARTICLE II.

| | | |
|---|---|---|
| Section 2.01. | Contract for Servicing; Possession of Servicing Files. | 11 |
| Section 2.02. | Books and Records. | 11 |
| Section 2.03. | Custodial Agreement; Delivery of Documents. | 12 |
| Section 2.04. | Transfer of Servicing. | 12 |

## ARTICLE III.

SERVICING OF THE MORTGAGE LOANS

| | | |
|---|---|---|
| Section 3.01. | Servicer to Service. | 14 |
| Section 3.02. | Collection and Liquidation of Mortgage Loans. | 15 |
| Section 3.03. | Establishment of and Deposits to Custodial Account. | 16 |
| Section 3.04. | Permitted Withdrawals From Custodial Account. | 18 |
| Section 3.05. | Establishment of and Deposits to Escrow Account. | 18 |
| Section 3.06. | Permitted Withdrawals From Escrow Account. | 19 |
| Section 3.07. | Notification of Adjustments. | 20 |
| Section 3.08. | Reserved. | 20 |
| Section 3.09. | Payment of Taxes, Insurance and Other Charges. | 20 |
| Section 3.10. | Protection of Accounts. | 21 |
| Section 3.11. | Maintenance of Hazard Insurance. | 21 |
| Section 3.12. | Maintenance of Mortgage Impairment Insurance. | 23 |
| Section 3.13. | Maintenance of Fidelity Bond and Errors and Omissions Insurance. | 24 |
| Section 3.14. | Inspections. | 24 |
| Section 3.15. | Restoration of Mortgaged Property. | 24 |
| Section 3.16. | Maintenance of PMI and/or LPMI Policy; Claims. | 25 |
| Section 3.17. | Title, Management and Disposition of REO Property. | 26 |
| Section 3.18. | Real Estate Owned Reports. | 28 |
| Section 3.19. | Liquidation Reports. | 28 |
| Section 3.20. | Reports of Foreclosure and Abandonment of Mortgaged Property. | 28 |
| Section 3.21. | Prepayment Charges. | 28 |
| Section 3.22. | Credit Reporting. | 29 |
| Section 3.23. | Safeguarding Customer Information. | 29 |
| Section 3.24. | Superior Liens. | 30 |

Section 3.25.    Advance Facility. ...............................................**Error! Bookmark not defined.**

## ARTICLE IV.

### PAYMENTS TO OWNER

Section 4.01.    Remittances...............................................................................31
Section 4.02.    Statements to Owner. ..............................................................31
Section 4.03.    Monthly Advances by Servicer....................................................32
Section 4.04.    Due Dates Other Than the First of the Month. .............................32

## ARTICLE V.

### GENERAL SERVICING PROCEDURES

Section 5.01.    Transfers of Mortgaged Property..................................................32
Section 5.02.    Satisfaction of Mortgages and Release of Mortgage Files. ..............33
Section 5.03.    Servicing Compensation. ...........................................................33
Section 5.04.    Annual Independent Public Accountants' Servicing Report. ............34
Section 5.05.    Annual Officer's Certificate. .......................................................34
Section 5.06.    Right to Examine Servicer Records. .............................................34

## ARTICLE VI.

### REPRESENTATIONS, WARRANTIES AND AGREEMENTS

Section 6.01.    Representations, Warranties and Agreements of the Servicer............34
Section 6.02.    Remedies for Breach of Representations and Warranties of the Servicer. .........36
Section 6.03.    Representations and Warranties of the Owner................................37
Section 6.04.    Remedies for Breach of Representations and Warranties of the Owner. ...........38

## ARTICLE VII.

### AGENCY TRANSFER; WHOLE LOAN TRANSFER; SECURITIZATION TRANSACTION

Section 7.01.    Removal of Mortgage Loans from Inclusion Under this Agreement
                 Upon an Agency Transfer, a Securitization Transaction or a Whole
                 Loan Transfer on One or More Reconstitution Dates....................39
Section 7.02.    Transfer of Servicing Following Reconstitution.............................41
Section 7.03.    Owner's Repurchase and Indemnification Obligations. ...................41
Section 7.04.    Additional Indemnification by the Servicer....................................42
Section 7.05.    Transfer Of Servicing. ..............................................................43

# ARTICLE VIII.

## THE SERVICER

Section 8.01.    Merger or Consolidation of the Servicer. ...........................................................43
Section 8.02.    Limitation on Liability of the Servicer and Others.............................................43
Section 8.03.    Limitation on Resignation and Assignment by the Servicer. ............................44

# ARTICLE IX.

## TERMINATION

Section 9.01.    Termination for Cause. ......................................................................................45
Section 9.02.    Termination Without Cause...............................................................................47

# ARTICLE X.

## MISCELLANEOUS PROVISIONS

Section 10.01.    Successor to the Servicer. ................................................................................47
Section 10.02.    Costs.................................................................................................................48
Section 10.03.    Protection of Confidential Information.............................................................48
Section 10.04.    Notices. ............................................................................................................49
Section 10.05.    Severability Clause. .........................................................................................50
Section 10.06.    No Personal Solicitation. .................................................................................50
Section 10.07.    Counterparts. ....................................................................................................51
Section 10.08.    Place of Delivery and Governing Law.............................................................51
Section 10.09.    Further Agreements. ........................................................................................51
Section 10.10.    Intention of the Parties.....................................................................................51
Section 10.11.    Successors and Assigns; Assignment of Servicing Agreement........................51
Section 10.12.    Waivers. ...........................................................................................................51
Section 10.13.    Exhibits. ...........................................................................................................52
Section 10.14.    General Interpretive Principles. .......................................................................52
Section 10.15.    Reproduction of Documents. ...........................................................................52

## EXHIBITS

EXHIBIT A           FORM OF SECURITIZATION SERVICING AGREEMENT
EXHIBIT B-1         CUSTODIAL ACCOUNT CERTIFICATION
EXHIBIT B-2         CUSTODIAL ACCOUNT LETTER AGREEMENT
EXHIBIT C-1         ESCROW ACCOUNT CERTIFICATION
EXHIBIT C-2         ESCROW ACCOUNT LETTER AGREEMENT
EXHIBIT D           FORM OF OFFICER'S CERTIFICATE
EXHIBIT E           FORM OF OPINION OF COUNSEL

EXHIBIT F        FORM OF MONTHLY REMITTANCE ADVICE
EXHIBIT G        STANDARD MONTHLY DEFAULTED LOAN REPORT
EXHIBIT H        FORM OF LOAN LOSS REPORT
EXHIBIT I        OTHER SERVICING REQUIREMENTS

This is a Flow Subservicing Agreement (the "Agreement"), dated as of October 19, 2007, by and between LEHMAN CAPITAL, A DIVISION OF LEHMAN BROTHERS HOLDINGS INC. (the "Owner") and GREEN TREE SERVICING LLC  , a Delaware limited liability company ("Servicer").

## WITNESSETH:

WHEREAS, the Owner owns certain mortgage loans secured by mortgages or deeds of trust on residential real property (the "Mortgage Loans") and the servicing rights relating to such Mortgage Loans, and may from time to time originate or buy additional Mortgage Loans;

WHEREAS, the Owner and the Servicer desire to set forth the terms and conditions on which the Servicer will subservice and provide management and disposition services for the Mortgage Loans for the benefit of the Owner.

NOW, THEREFORE, in consideration of the mutual agreements hereinafter set forth, and for other good and reasonable consideration, the receipt and adequacy of which is hereby acknowledged, the Owner and Servicer hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

The following terms are defined as follows:

Accepted Servicing Practices:    With respect to any Mortgage Loan, those mortgage servicing practices of (i) prudent mortgage lending institutions that service mortgage loans of the same type as such Mortgage Loans in the jurisdiction where the related Mortgaged Property is located and (ii) in accordance with applicable state, local and federal laws, rules and regulations.    Accepted Servicing Practices shall also include the requirements set forth on Exhibit J herein.

Acknowledgment Agreement: A subservicing acknowledgment agreement in a form agreed to by the parties hereto that makes specific reference to this Agreement to be executed on or prior to each Transfer Date with respect to the subservicing of a pool of Mortgage Loans.

Affiliate: With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person. For the purposes of this definition, "control" when used with respect to any specified Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Agency Transfer:  The sale or transfer by Owner of some or all of the Mortgage Loans to Fannie Mae under its Cash Purchase Program or its MBS Swap Program (Special Servicing Option) or to Freddie Mac under its Freddie Mac Cash Program or Gold PC Program, retaining the Servicer as "servicer" thereunder.

Agreement:  This Flow Subservicing Agreement and all amendments hereof and supplements hereto.

Ancillary Income:  All income derived from the Mortgage Loans, excluding Servicing Fees and Prepayment Charges attributable to the Mortgage Loans, including but not limited to interest received on funds deposited in the Custodial Account or any Escrow Account, late charges, fees received with respect to checks or bank drafts returned by the related bank for non-sufficient funds, assumption fees, optional insurance administrative fees and all other incidental fees and charges. The Servicer shall retain all Ancillary Income to the extent not required to be deposited into the Custodial Account.

ARM Mortgage Loan: An adjustable rate Mortgage Loan.

Assignment of Mortgage: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the transfer of the Mortgage to the party indicated therein or if the related Mortgage has been recorded in the name of MERS or its designee, such actions as are necessary to cause the Owner or its designee to be shown as the owner of the related Mortgage on the records of MERS for purposes of the system of recording transfers of beneficial ownership of mortgages maintained by MERS.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the State of New York are authorized or obligated by law or executive order to be closed.

Combined Loan-to-Value Ratio:  As to any Mortgage Loan at any date of determination, the ratio (expressed as a percentage) of the principal balance of such Mortgage Loan at the date of determination, plus the principal balance of any Superior Lien based upon the most recent information available to the Servicer, to (a) in the case of a purchase, the lesser of the sales price of the Mortgaged Property and its appraised value at the time of sale, or (b) in the case of a refinancing or modification, the appraised value of the Mortgaged Property at the time of such refinancing or modification.

Commission:  The United States Securities and Exchange Commission.

Condemnation Proceeds:  All awards or settlements in respect of a Mortgaged Property, whether permanent or temporary, partial or entire, by exercise of the power of eminent domain or condemnation, to the extent not required to be released to a Mortgagor in accordance with the terms of the related Mortgage Loan documents.

Custodial Account:  The separate account or accounts created and maintained pursuant to Section 3.03.

<u>Custodial Agreement</u>: Any custodial agreement designated by the Owner and between the Owner and a Custodian.

<u>Custodian</u>: The custodian(s) appointed by the Owner from time to time to hold certain Mortgage Loan documents.

<u>Customer Information</u>: The nonpublic personal information (as defined in 15 U.S.C. § 6809(4)) of the Owner's former, current or prospective customers or employees, including the Mortgagors (and/or clients or prospective customers of the Owner's parent, affiliated or subsidiary companies) held or received by the Servicer in connection with the performance of its obligations under this Agreement, including, but not limited to (i) an individual's name, address, e-mail address, IP address, telephone number and/or social security number, (ii) the fact that an individual has a relationship with the Servicer or the Owner and/or its parent, affiliated or subsidiary companies or (iii) an individual's account information.

<u>Determination Date</u>: The 15th day (or if such 15th day is not a Business Day, the Business Day immediately preceding such 15th day) of the month of the related Remittance Date.

<u>Due Date</u>: The day of the calendar month on which the Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace. Pursuant to Section 4.04, with respect to the Mortgage Loans for which payment from the Mortgagor is due on a day other than the first day of the month, such Mortgage Loans will be treated as if the Monthly Payment is due on the first day of the immediately succeeding month.

<u>Due Period</u>: With respect to each Remittance Date, the calendar month immediately preceding the month of the Remittance Date.

<u>Eligible Investments</u>: Any one or more of the obligations and securities listed below which investment provides for a date of maturity not later than three days prior to the Remittance Date in each month:

(i)    direct obligations of, and obligations fully guaranteed by, the United States of America, or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America; and

(ii)    federal funds, demand and time deposits in, certificates of deposits of, or bankers' acceptances issued by, any depository institution or trust company incorporated or organized under the laws of the United States of America or any state thereof and subject to supervision and examination by federal and/or state banking authorities, so long as at the time of such investment or contractual commitment providing for such investment the commercial paper or other short-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the commercial paper or other short-term debt obligations of such holding company) are rated "P-1" by Moody's and the long-term debt obligations of such holding company) are rated "P-1" by Moody's and

the long-term debt obligations of such depository institution or trust company (or, in the case of a depository institution or trust company which is the principal subsidiary of a holding company, the long-term debt obligations of such holding company) are rated at least "Aa" by Moody's;

provided, however, that no such instrument shall be an Eligible Investment if such instrument evidences either (i) a right to receive only interest payments with respect to the obligations underlying such instrument, or (ii) both principal and interest payments derived from obligations underlying such instrument and the principal and interest payments with respect to such instrument provide a yield to maturity of greater than 120% of the yield to maturity at par of such underlying obligations; provided, further, that upon a Securitization Transaction or Agency Transfer, the Eligible Investments permitted thereunder shall be set forth in the related Reconstitution Agreement.

Errors and Omissions Insurance:    Errors and Omissions Insurance to be maintained by the Servicer in accordance with Section 3.13.

Escrow Account:    The separate account or accounts created and maintained pursuant to Section 3.05.

Escrow Payments:    With respect to any Mortgage Loan, the amounts constituting ground rents, taxes, assessments, water rates, sewer rents, municipal charges, mortgage insurance premiums, fire and hazard insurance premiums, condominium charges, and any other payments required to be escrowed by the Mortgagor with the mortgagee pursuant to the Mortgage or any other document.

Event of Default:    Any event set forth in Section 9.01.

Exchange Act.    The Securities Exchange Act of 1934, as amended.

Fannie Mae:    Fannie Mae, or any successor thereto.

Fannie Mae Guides:    The Fannie Mae Selling Guide and the Fannie Mae Servicing Guide and all amendments or additions thereto.

FDIC:    The Federal Deposit Insurance Corporation or any successor thereto.

Fidelity Bond:    A fidelity bond to be maintained by the Servicer in accordance with Section 3.13.

Fitch:    Fitch Ratings Inc. or any successor in interest.

Freddie Mac:    Freddie Mac, or any successor thereto.

Insurance Proceeds:    With respect to each Mortgage Loan, proceeds of insurance policies insuring the Mortgage Loan or the related Mortgaged Property, including the proceeds of any hazard or flood insurance policy, LPMI Policy or PMI Policy.

Liquidation Proceeds: Cash received in connection with the liquidation of a defaulted Mortgage Loan, whether through the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise, or the sale of the related REO Property, if the Mortgaged Property is acquired in satisfaction of the Mortgage Loan.

Loan De-Boarding Fee: The fee payable by the Owner to the Servicer as set forth in Section 9.02 upon the Owner's termination of the Servicer without cause.

LPMI Loan:  A Mortgage Loan with a LPMI Policy.

LPMI Policy:  A policy of primary mortgage guaranty insurance issued by a Qualified Insurer pursuant to which the related premium is to be paid by the servicer of the related Mortgage Loan from payments of interest made by the Mortgagor in an amount as is set forth in the related Mortgage Loan Schedule.

LPMI Fee: With respect to each LPMI Loan, the portion of the Mortgage Interest Rate as set forth on the related Mortgage Loan Schedule (which shall be payable solely from the interest portion of Monthly Payments, Insurance Proceeds, Condemnation Proceeds or Liquidation Proceeds), which, during such period prior to the required cancellation of the LPMI Policy, shall be used to pay the premium due on the related LPMI Policy.

Maximum Rate:  With respect to any ARM Mortgage Loan and any Due Period, the Maximum Interest Rate that may be charged the borrower under the related Mortgage Note.

MERS:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

MERS Mortgage Loan:  Any Mortgage Loan registered with MERS on the MERS System.

MERS System:  The system of recording transfers of mortgages electronically maintained by MERS.

Monthly Advance:  The portion of a Monthly Payment delinquent with respect to each Mortgage Loan at the close of business on the related Determination Date.

Monthly Payment:  The scheduled monthly payment of principal and interest on a Mortgage Loan.

Moody's:  Moody's Investors Service, Inc. or any successor in interest.

Mortgage:  The mortgage, deed of trust or other instrument securing a Mortgage Note, which creates a first or second lien on an unsubordinated estate in fee simple in real property securing the Mortgage Note.

Mortgage Impairment Insurance Policy:  A mortgage impairment or blanket hazard insurance policy to be maintained by the Servicer in accordance with Section 3.12.

<u>Mortgage Interest Rate</u>:  The annual rate of interest borne on a Mortgage Note.

<u>Mortgage Loan</u>:  An individual mortgage loan that is the subject of this Agreement and identified on the related Mortgage Loan Schedule, which Mortgage Loan includes without limitation the Mortgage Loan documents, the Monthly Payments, Principal Prepayments, Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds, and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.

<u>Mortgage Loan Remittance Rate</u>:  With respect to each Mortgage Loan, the annual rate of interest remitted to the Owner, which shall be equal to the Mortgage Interest Rate minus the applicable Servicing Fee, if any.

<u>Mortgage Loan Schedule</u>:  A schedule of certain Mortgage Loans attached to each Acknowledgment Agreement setting forth information with respect to the related Mortgage Loans.

<u>Mortgage Note</u>:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

<u>Mortgaged Property</u>:  The real property securing repayment of the debt evidenced by a Mortgage Note.

<u>Mortgagor</u>:  The obligor on a Mortgage Note.

<u>Officer's Certificate</u>:  A certificate signed by the Chairman of the Board or the Vice Chairman of the Board, the President, a Vice President or an assistant Vice President and by the Treasurer, the Secretary or one of the Assistant Treasurers or Assistant Secretaries of the Servicer, and delivered to the Owner as required by this Agreement.

<u>Opinion of Counsel</u>:  A written opinion of counsel, who may be an employee of the Servicer, reasonably acceptable to the Owner, but which must be an independent outside counsel with respect to any such opinion of counsel concerning all federal income tax matters.

<u>Owner</u>:  Lehman Capital, A Division of Lehman Brothers Holdings Inc., or its successors in interest and assigns.

<u>Person</u>:  Any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization, government or any agency or political subdivision thereof.

<u>PMI Policy</u>:  A policy of primary mortgage guaranty insurance issued by a Qualified Insurer, as required by this Agreement with respect to certain Mortgage Loans.

<u>Prepayment Charge</u>:  With respect to any Mortgage Loan and Remittance Date, the charges or premiums, if any, due in connection with a full or partial prepayment of such

Mortgage Loan during the immediately preceding Principal Prepayment Period in accordance with the terms thereof.

Prime Rate:  The prime rate announced to be in effect from time to time, as published as the average rate in The Wall Street Journal Northeast Edition.

Prepayment Interest Shortfall Amount:  With respect to any Mortgage Loan that was subject to a Principal Prepayment in full or in part during any Principal Prepayment Period, which Principal Prepayment was applied to such Mortgage Loan prior to such Mortgage Loan's Due Date in such Principal Prepayment Period, the amount of interest (net of the related Servicing Fee for Principal Prepayments in full only) that would have accrued on the amount of such Principal Prepayment during the period commencing on the date as of which such Principal Prepayment was applied to such Mortgage Loan and ending on the day immediately preceding such Due Date, inclusive.

Principal Prepayment:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any Prepayment Charge or premium thereon and which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

Principal Prepayment Period:  With respect to any Remittance Date and any full or partial Principal Prepayment, the calendar month immediately preceding the month of such Remittance Date.

Prior Servicer:  Any prior servicer (other than the Servicer) of any or all of the Mortgage Loans.

Qualified Depository:  A depository the accounts of which are insured by the FDIC and the debt obligations of which are rated A or better by Standard & Poor's Corporation and meets such requirements as are necessary for any Reconstitution Agreement.

Qualified Insurer:  A mortgage guaranty insurance company duly authorized and licensed where required by law to transact mortgage guaranty insurance business and approved as an insurer by Fannie Mae and Freddie Mac.

Rating Agency:  Each of Fitch, Moody's and S&P or their successors.  If such agencies or their successors are no longer in existence, "Rating Agencies" shall be such nationally recognized statistical rating agencies, or other comparable person, agreed upon and designated by the Owner.

Reconstitution:  The actions required by Article VII in connection with an Agency Transfer, Securitization Transaction or Whole Loan Transfer.

Reconstitution Agreements:  The agreement or agreements entered into by the Owner, the Servicer, Fannie Mae or Freddie Mac or certain third parties on the Reconstitution Date(s) with respect to any or all of the Mortgage Loans serviced hereunder, in connection with a

Whole Loan Transfer, a Securitization Transaction or an Agency Transfer as set forth in Section 7.01, including, but not limited to, (i) a Fannie Mae Mortgage Selling and Servicing Contract, a Pool Purchase Contract, and any and all servicing agreements and tri-party agreements reasonably required by Fannie Mae with respect to a Fannie Mae Transfer, (ii) a Purchase Contract and all purchase documents associated therewith as set forth in the Freddie Mac Sellers' & Servicers' Guide, and any and all servicing agreements and tri-party agreements reasonably required by Freddie Mac with respect to a Freddie Mac Transfer, (iii) a Pooling and Servicing Agreement and/or a servicing, subservicing/master servicing agreement and related custodial/trust agreement, insurance agreements, loss mitigation advisory or credit risk management agreements, and other related documents with respect to a Securitization Transaction, and (iv) a Seller's Warranties and Servicing Agreement or a Sale and Servicing Agreement and related custodial agreement and closing documents with respect to a Whole Loan Transfer.  Such agreement or agreements shall prescribe the rights and obligations of the Servicer in servicing the related Mortgage Loans and shall provide for servicing compensation to the Servicer (calculated on a weighted average basis for all the related Mortgage Loans as of the Reconstitution Date), net of any guarantee fees due Fannie Mae or Freddie Mac, if applicable, at least equal to the Servicing Fee and Ancillary Income due the Servicer in accordance with this Agreement. The form of relevant Reconstitution Agreement to be entered into by the Owner and/or master servicer or trustee and the Servicer with respect to Securitization Transactions and/or Whole Loan Transfers shall be reasonably satisfactory in form and substance to the Owner and the Servicer (giving due regard to any Rating Agency, insurer, guarantor, loss mitigation or credit risk management advisor or master servicing requirements) and the representations and warranties and servicing provisions contained therein shall be substantially similar to those contained in this Agreement, unless otherwise mutually agreed by the parties. Notwithstanding the previous sentence, the Reconstitution Agreement with respect to Securitization Transactions shall be substantially in the form of the Securitization Servicing Agreement attached hereto as Exhibit A and shall contain a requirement that the Servicer (i) service the related Mortgage Loan on a "scheduled/scheduled" basis, (ii) advance from its own funds all amounts with respect to Monthly Advances unless the Servicer determines that such advances would be nonrecoverable (as evidenced by an Officer's Certificate), (iii) with respect to each Principal Prepayment in full or in part, remit the Prepayment Interest Shortfall Amount, if any, as set forth in such Reconstitution Agreement, (iv) modify the definition of Remittance Date to be the 18th day (or if such 18th day is not a Business Day, the first Business Day immediately preceding) of any month, (v) modify the definition of Due Period to be, with respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date and (vi) if the servicing fee rate (the "Reconstituted Servicing Fee Rate") contained in such Reconstitution Agreement is greater than the Servicing Fee Rate, remit to the Owner or its designee on each Remittance Date thereunder, with respect to the related Due Period and each Mortgage Loan, an amount equal to one-twelfth the product of (A) the difference between (1) the Reconstituted Servicing Fee Rate and (2) the Servicing Fee Rate and (B) the outstanding principal balance of such Mortgage Loan as of the related Determination Date. In addition, any such Reconstitution Agreement may, at the option of the Owner, contain a provision that will permit the Owner or its assignees to terminate the rights of Servicer as servicer of the Mortgage Loans, without payment of any termination or release fee, upon the occurrence of certain trigger events ("Trigger Events").  Trigger Events for each Securitization Transaction shall be established by Owner in

coordination with applicable rating agencies, guarantors and investors in a manner that shall cause the execution Owner is able to achieve on securities backed by the Mortgage Loans serviced by Servicer to be acceptable to Owner. Each Trigger Event shall only relate to the Mortgage Loans serviced by Servicer in a particular securitization and shall be determined without regard to (x) Mortgage Loans serviced by Servicer in other transactions and (y) mortgage loans serviced by other servicers in the same securitization.

Reconstitution Date: The date or dates on which any or all of the Mortgage Loans serviced under this Agreement shall be removed from this Agreement and reconstituted as part of an Agency Transfer, a Securitization Transaction or a Whole Loan Transfer pursuant to Section 7.01 hereof. On such date or dates, the Mortgage Loans transferred shall cease to be covered by this Agreement and the Servicer's servicing responsibilities shall cease under this Agreement with respect to the related transferred Mortgage Loans, other than the right of the Owner to cause a transfer of the servicing responsibilities to the Mortgage Loans in accordance with Section 7.02 hereof.

Remittance Date: The 18th day (or if such 18th day is not a Business Day, the first Business Day immediately following) of any month.

REO Disposition: The final sale by the Servicer of any REO Property.

REO Disposition Proceeds: All amounts received with respect to an REO Disposition pursuant to Section 3.17.

REO Property: A Mortgaged Property acquired by the Servicer on behalf of the Owner through foreclosure or by deed in lieu of foreclosure, as described in Section 3.17.

Securities Act: The Securities Act of 1933, as amended.

Securitization Transaction: Any transaction involving either (1) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (2) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

Servicer: Green Tree Servicing LLC, a Delaware limited liability company, or its successor in interest or assigns or any successor to the Servicer under this Agreement as herein provided.

Servicing Advances: All customary, reasonable and necessary "out of pocket" costs and expenses (including reasonable attorneys' fees and disbursements) incurred in the performance by the Servicer of its servicing obligations, including, but not limited to, the cost of (a) the preservation, restoration and protection of the Mortgaged Property, (b) any enforcement or administrative or judicial proceedings, including foreclosures, (c) the management and liquidation of the Mortgaged Property if the Mortgaged Property is acquired in satisfaction of the

Mortgage, (d) taxes, assessments, water rates, sewer rents and other charges which are or may become a lien upon the Mortgaged Property, LPMI Policy premiums, PMI Policy premiums and fire and hazard insurance coverage, (e) in connection with the liquidation of a Mortgage Loan which has a Superior Lien, any expenditures relating to the purchase or maintenance of any Superior Lien pursuant to Section 3.24 hereof, (f) any losses sustained by the Servicer with respect to the liquidation of the Mortgaged Property and (g) compliance with the obligations pursuant to the provisions of the Fannie Mae Guides.

Servicing Fee: With respect to each Mortgage Loan that has not been removed from this Agreement as part of a Reconstitution, and with respect to each Mortgage Loan that has been removed from this Agreement as part of a Reconstitution and subsequently repurchased by the Owner pursuant to Section 7.03 hereof and again becoming subject to this Agreement, the monthly fee the Owner shall pay to the Servicer shall be equal to either (i) the fixed dollar amount per Mortgage Loan per month as set forth in the related Acknowledgment Agreement or (ii) one-twelfth the product of (a) the Servicing Fee Rate and (b) the outstanding principal balance of the Mortgage Loan.

Servicing Fee Rate: The amount set forth in the related Acknowledgment Agreement.

Servicing File: The items pertaining to a particular Mortgage Loan including, but not limited to, the computer files, data disks, books, records, data tapes, notes, and all additional documents generated as a result of or utilized in originating and/or servicing each Mortgage Loan, which are held in trust for the Owner by the Servicer.

Servicing Officer: Any officer of the Servicer involved in or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Servicer to the Owner upon request, as such list may from time to time be amended.

S&P: Standard & Poor's Rating Services, A Division of The McGraw-Hill Companies, Inc. or any successor in interest.

Superior Lien: With respect to any Mortgage Loan, any other mortgage loan relating to the corresponding Mortgaged Property which creates a lien on the Mortgaged Property which is senior to the Mortgage Loan.

Transfer Date: The date or dates on which the servicing of a pool of Mortgage Loans is transferred from a Prior Servicer to the Servicer, as evidenced by an Acknowledgment Agreement, executed in accordance with Section 2.01.

Trigger Event: As defined in the definition of "Reconstitution Agreement".

Whole Loan Transfer: The sale or transfer of some or all of the Mortgage Loans to a third party purchaser in a whole loan transaction pursuant to a seller's warranties and servicing agreement or a participation and servicing agreement, retaining the Servicer as "servicer" thereunder.

## ARTICLE II.

## OWNER'S ENGAGEMENT OF SERVICER TO PERFORM SERVICING RESPONSIBILITIES

Section 2.01.  Contract for Servicing; Possession of Servicing Files.

Simultaneously with the execution and delivery of this Agreement, the Servicer shall execute and deliver to the Owner an Officer's Certificate in the form of Exhibit D hereto and an opinion of counsel in the form of Exhibit E hereto.  From and after each Transfer Date, the Owner shall, by execution and delivery of the related Acknowledgment Agreement, contract with the Servicer as an independent contractor, subject to the terms of this Agreement, for the servicing of the Mortgage Loans listed on the Mortgage Loan Schedule annexed to such Acknowledgment Agreement.

The Servicer shall maintain a Servicing File with respect to each Mortgage Loan in order to service such Mortgage Loan pursuant to this Agreement and such Servicing File is and shall be held in trust by the Servicer for the benefit of the Owner as the owner thereof. The possession of each Servicing File by the Servicer is at the will of the Owner for the sole purpose of servicing the related Mortgage Loan, and such retention and possession by the Servicer is in a custodial capacity only. The ownership of each Mortgage Note, Mortgage, and the contents of the Servicing File shall be vested in the Owner and the ownership of all records and documents with respect to the related Mortgage Loan prepared by or which come into the possession of the Servicer shall immediately vest in the Owner and shall be retained and maintained, in trust, by the Servicer at the will of the Owner in such custodial capacity only.  The portion of each Servicing File retained by the Servicer pursuant to this Agreement shall be segregated from the other books and records of the Servicer and shall be appropriately marked to clearly reflect the ownership of the related Mortgage Loan by the Owner.  The Servicer shall release from its custody the contents of any Servicing File retained by it only in accordance with this Agreement.

Section 2.02.  Books and Records.

Record title to each Mortgage and the related Mortgage Note shall remain in the name of (i) the Owner, (ii) the Servicer or (iii) in the name as the Owner shall designate. With respect to each Assignment of Mortgage, if so requested by the Owner in its sole discretion, the Servicer, at the Owner's expense, shall cause MERS to designate on the MERS System the Owner or its designee as the beneficial holder with respect to such Mortgage Loan or shall prepare and record each Assignment of Mortgage, and track such Assignments of Mortgage to ensure they have been recorded. The Owner shall pay all pre-approved, reasonable and necessary fees associated with the preparation, recording and tracking of the initial assignment of the Mortgage Loans from the Owner to a third party.  All rights arising out of the Mortgage Loans shall be vested in the Owner.  All funds received on or in connection with a Mortgage Loan shall be received and held by the Servicer in trust for the benefit of the Owner as the owner of the Mortgage Loans pursuant to the terms of this Agreement.

Section 2.03.  Custodial Agreement; Delivery of Documents.

Pursuant to the Custodial Agreement, the Owner has or shall deliver and release to the Custodian the Mortgage Loan documents as required pursuant to the Custodial Agreement. The Custodian has certified its receipt of all such Mortgage Loan documents required to be delivered pursuant to the Custodial Agreement, as evidenced by the certification of the Custodian. The Owner shall be responsible for maintaining the Custodial Agreement and shall pay all fees and expenses of the Custodian, including reasonable fees and expenses due to the Servicer's requests of the Custodian in the normal course of Servicer's collection and foreclosure activities (including but not limited to follow up document deliveries of the Servicer, photocopies of documents made at the request of the Servicer and follow up document insertion fees). With respect to each Mortgage Loan that has not been removed from this Agreement as part of a Reconstitution, on the related Transfer Date, the Owner and the Servicer shall enter into an assignment and assumption agreement whereby the Owner shall assign to the Servicer, and the Servicer shall assume from the Owner, all of the Owner's rights and responsibilities as servicer of the Mortgage Loans arising under the applicable Custodial Agreement.

The Servicer shall forward to the Custodian original documents evidencing an assumption, modification, consolidation or extension of any Mortgage Loan entered into in accordance with Section 3.01 within one week of their execution, provided, however, that the Servicer shall provide the Custodian with a certified true copy of any such document submitted for recordation within one week of its execution, and shall provide the original of any document submitted for recordation or a copy of such document certified by the appropriate public recording office to be a true and complete copy of the original within 120 days of its submission for recordation.

Section 2.04.  Transfer of Servicing.

On or prior to each Transfer Date with respect to a pool of Mortgage Loans, the Owner shall cause the Prior Servicer to take such steps as may be necessary or appropriate to effectuate and evidence the transfer of the servicing of the Mortgage Loans to the Servicer, including the following:

(a)  Notice to Mortgagors. The Prior Servicer shall mail to the Mortgagor of each Mortgage a letter advising the Mortgagor of the transfer of the servicing of the related Mortgage Loan to the Servicer, or its designee in accordance with the the federal Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. §3500.1 et seq.)  The Prior Servicer shall provide the Servicer with copies of all such notices no later than the Transfer Date.

(b)  Notice to Taxing Authorities and Insurance Companies. The Prior Servicer shall transmit to the applicable tax services, taxing authorities and insurance companies (including primary mortgage insurance policy insurers and flood insurance insurer, if applicable) and/or agents, notification of the transfer of the servicing to the Servicer, or its designee, and instructions to deliver all notices, tax bills and insurance statements, as the case may be, to the

Servicer from and after the Transfer Date. The Prior Servicer shall provide the Servicer with copies of all such notices no later than the Transfer Date.

(c)    Delivery of Servicing Records. The Prior Servicer shall forward to the Servicer, or its designee, all servicing records and the Servicing File in the Prior Servicer's possession relating to each Mortgage Loan.

(d)    Escrow Payments. The Prior Servicer shall provide the Servicer with immediately available funds by wire transfer in the amount of the net Escrow Payments and suspense balances and all loss draft balances associated with the Mortgage Loans. The Prior Servicer shall provide the Servicer with an accounting statement of Escrow Payments and suspense balances and loss draft balances sufficient to enable the Servicer to reconcile the amount of such payment with the accounts of the Mortgage Loans. Additionally, the Prior Servicer shall wire transfer to the Servicer the amount of any agency, trustee or prepaid Mortgage Loan payments and all other similar amounts held by the Prior Servicer.

(e)    Payoffs and Assumptions. The Prior Servicer shall provide to the Servicer, or its designee, copies of all assumption and payoff statements generated by the Prior Servicer on the Mortgage Loans up to the Transfer Date.

(f)    Mortgage Payments Received Prior to Transfer Date. Prior to the Transfer Date all payments received by the Prior Servicer on each Mortgage Loan shall be properly applied by the Prior Servicer to the account of the particular Mortgagor.

(g)    Mortgage Payments Received After Transfer Date. The amount of any Monthly Payments received by the Prior Servicer after the Transfer Date shall be forwarded to the Servicer by overnight mail on the date of receipt. The Prior Servicer shall notify the Servicer of the particulars of the payment, which notification requirement shall be satisfied if the Prior Servicer forwards with its payment sufficient information to permit appropriate processing of the payment by the Servicer such as the account number, dollar amount, date received and any special Mortgagor application instructions.

(h)    Misapplied Payments. Misapplied payments shall be processed as follows:

(i)    All parties shall cooperate in correcting misapplication errors;

(ii)    The party receiving notice of a misapplied payment occurring prior to the Transfer Date and discovered after the Transfer Date shall immediately notify the other party;

(iii)    If a misapplied payment which occurred prior to the Transfer Date cannot be identified and said misapplied payment has resulted in a shortage in a Custodial Account or Escrow Account, the Prior Servicer shall be liable for the amount of such shortage. The Owner shall cause the Prior Servicer to reimburse the Servicer for the amount of such shortage within thirty (30) days after receipt of written demand therefor from the Servicer;

(iv)    Any check issued under the provisions of this Section 2.04(h) shall be accompanied by a statement indicating the corresponding Prior Servicer and/or the Servicer Mortgage Loan identification number and an explanation of the allocation of any such payments.

(i)    _Reconciliation._ The Prior Servicer shall, on or before the Transfer Date, reconcile principal balances and make any monetary adjustments reasonably required by the Servicer. Any such monetary adjustments will be transferred between the Prior Servicer and the Servicer as appropriate.

(j)    _IRS Forms._ The Prior Servicer shall prepare and file all IRS forms 1098, 1099 and other applicable forms and reports which are required to be filed with respect to the period prior to the Transfer Date in relation to the servicing of the Mortgage Loans. The Prior Servicer shall provide copies of such forms to the Servicer upon request and the Owner shall cause the Prior Servicer to reimburse the Servicer for any costs or penalties incurred by the Servicer due to the Prior Servicer's failure to comply with this paragraph. The Servicer or the Servicer's designee shall prepare and file all such reports with respect to any period commencing on or after the Transfer Date.

(k)    _Flood Certification Contracts._  With respect to each Mortgage Loan for which there is a flood certification contract in effect on the Transfer Date, the Prior Servicer shall assign such flood certification contract to the Servicer or the Servicer's designee.

(l)    _Tax Service Contracts._ With respect to each first lien Mortgage Loan, within twenty (20) days of the related Transfer Date, Servicer shall provide Owner with an electronic file of the related Mortgage Loans which shall set forth whether each Mortgage Loan is or is not covered by a transferable life-of-loan real estate tax service contract.  If Owner does not object to such electronic file within ten (10) days of receipt thereof, Servicer shall:  (i) if a Mortgage Loan is not covered by a transferable life-of-loan real estate tax service contract, purchase such a tax service contract from a tax service provider reasonably acceptable to Owner and invoice Owner for the cost thereof up to a maximum amount of $71.00 for each such Mortgage Loan; (ii) if a Mortgage Loan is covered by a transferable life-of-loan real estate tax service contract, transfer such contract to Servicer without further cost to Owner therefor.

**ARTICLE III.**

<u>SERVICING OF THE MORTGAGE LOANS</u>

Section 3.01.  <u>Servicer to Service.</u>

The Servicer, as an independent contractor, shall service and administer the related Mortgage Loans from and after the related Transfer Date and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration which the Servicer may deem necessary or desirable, consistent with the terms of this Agreement and with Accepted Servicing Practices.

Consistent with the terms of this Agreement, prior to a Mortgage Loan becoming subject to a Reconstitution Agreement, the Servicer may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Servicer's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Owner, provided, however, that unless the Servicer has obtained the prior written consent of the Owner or its designee, the Servicer shall not permit any modification with respect to any Mortgage Loan that would change the Mortgage Interest Rate, defer or forgive the payment of principal or interest, reduce or increase the outstanding principal balance (except for actual payments of principal) or change the final maturity date on such Mortgage Loan. Without limiting the generality of the foregoing, the Servicer shall continue, and is hereby authorized and empowered, to execute and deliver on behalf of itself and the Owner, all instruments of satisfaction or cancellation, or of partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Properties. If reasonably required by the Servicer, the Owner shall furnish the Servicer with any powers of attorney and other documents necessary or appropriate to enable the Servicer to carry out its servicing and administrative duties under this Agreement.

The Servicer is authorized, without the prior approval of the Owner, to consent to the refinancing of any Superior Lien on Mortgaged Property, provided that (i) the resulting Combined Loan-to-Value Ratio of such Mortgage Loan is no higher than the Combined Loan-to-Value Ratio prior to such refinancing; (ii) the interest rate, or in the case of any Superior Lien which is an ARM Mortgage Loan, the applicable Maximum Rate which can be charged under the related Mortgage Note is no more than 2.00% higher than the interest rate or the Maximum Rate, as the case may be, on the mortgage loan evidencing the existing Superior Lien immediately prior to the date of such refinancing; and (iii) the mortgage loan evidencing the Superior Lien is not subject to negative amortization.

In servicing and administering the Mortgage Loans, the Servicer shall employ procedures (including collection procedures) and exercise the same care that it would employ and exercise in servicing and administering similar mortgage loans for its own account, giving due consideration to Accepted Servicing Practices where such practices do not conflict with the requirements of this Agreement and the Owner's reliance on the Servicer.

Section 3.02.    <u>Collection and Liquidation of Mortgage Loans.</u>

Continuously from the related Transfer Date until the date each Mortgage Loan ceases to be subject to this Agreement, the Servicer shall proceed diligently to collect all payments due under each of the Mortgage Loans when the same shall become due and payable and shall take special care in ascertaining and estimating Escrow Payments and all other charges that will become due and payable with respect to the Mortgage Loans and each related Mortgaged Property, to the end that the installments payable by the Mortgagors will be sufficient to pay such charges as and when they become due and payable.

The Servicer shall use its best efforts, consistent with the procedures that the Servicer would use in servicing similar mortgage loans for its own account, to foreclose upon or

otherwise comparably convert the ownership of such Mortgaged Properties as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.01. The Servicer shall use its best efforts to realize upon defaulted Mortgage Loans in such a manner as will maximize the receipt of principal and interest by the Owner, taking into account, among other things, the timing of foreclosure proceedings. The foregoing is subject to the provisions that, in any case in which Mortgaged Property shall have suffered damage, the Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its discretion (i) that such restoration will increase the proceeds of liquidation of the related Mortgage Loan to the Owner after reimbursement to itself for such expenses, and (ii) that such expenses will be recoverable by the Servicer through Insurance Proceeds or Liquidation Proceeds from the related Mortgaged Property. In the event that any payment due under any Mortgage Loan and not postponed pursuant to Section 3.01 is not paid when the same becomes due and payable, or in the event the Mortgagor fails to perform any other covenant or obligation under the Mortgage Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as (1) the Servicer would take for other institutional investors under similar circumstances with respect to a similar mortgage loan, (2) shall be consistent with Accepted Servicing Practices, (3) the Servicer shall determine prudently to be in the best interest of the Owner, and (4) is consistent with any related LPMI Policy. In the event that any payment due under any Mortgage Loan is not postponed pursuant to Section 3.01 and remains delinquent for a period of ninety (90) days or any other default continues for a period of ninety (90) days beyond the expiration of any grace or cure period, the Servicer shall commence foreclosure proceedings, provided that prior to commencing foreclosure proceedings, the Servicer shall notify the Owner or its designee in writing of the Servicer's intention to do so. The Servicer shall notify the Owner or its designee in writing of the commencement of foreclosure proceedings on a monthly basis no later than the fifth Business Day of each month. In such connection, the Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that it shall be entitled to reimbursement thereof from the related Mortgaged Property, as contemplated in Section 3.04.

Section 3.03.  <u>Establishment of and Deposits to Custodial Account.</u>

The Servicer shall segregate and hold all funds collected and received pursuant to the Mortgage Loans separate and apart from any of its own funds and general assets and shall establish and maintain one or more Custodial Accounts, in the form of time deposit or demand accounts, titled "Green Tree Servicing LLC in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Mortgage Loans, Group No. 2007-FLOW". The Custodial Account shall be established with a Qualified Depository. Any funds deposited in the Custodial Account shall at all times be fully insured by the FDIC and any amounts therein may be invested in Eligible Investments subject to the provisions of Section 3.10 hereof. Funds deposited in the Custodial Account may be drawn on by the Servicer in accordance with Section 3.04. The creation of any Custodial Account shall be evidenced by a certification in the form of Exhibit B-1 hereto, in the case of an account established with the Servicer, or by a letter agreement in the form of Exhibit B-2 hereto, in the case of an account held by a depository other than the Servicer. A copy of such certification or letter agreement shall be furnished to the Owner and, upon request, to any subsequent owner of the Mortgage Loans.

The Servicer shall deposit in the Custodial Account on a daily basis within two Business Days of receipt, and retain therein, the following collections received by the Servicer and payments made by the Servicer after each Transfer Date:

      (i)     all payments on account of principal on the Mortgage Loans, including all Principal Prepayments and all Prepayment Charges;

      (ii)     all payments on account of interest on the Mortgage Loans adjusted to the Mortgage Loan Remittance Rate;

      (iii)     all Liquidation Proceeds;

      (iv)     all Insurance Proceeds including amounts required to be deposited pursuant to Section 3.11 (other than proceeds to be held in the Escrow Account and applied to the restoration and repair of the Mortgaged Property or released to the Mortgagor in accordance with the related Mortgage Loan documents and Accepted Servicing Practices);

      (v)     all Condemnation Proceeds that are not applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the related Mortgage Loan documents and Accepted Servicing Practices;

      (vi)     any other amount required to be deposited in the Custodial Account pursuant to this Agreement;

      (vii)     any amounts received from the seller of a Mortgage Loan or any other person giving representations and warranties with respect to the Mortgage Loan, in connection with the repurchase of any Mortgage Loan;

      (viii)     any amounts required to be deposited by the Servicer pursuant to Section 3.11 in connection with the deductible clause in any blanket hazard insurance policy;

      (ix)     any amounts received with respect to or related to any REO Property or REO Disposition Proceeds;

      (x)     any amounts required to be deposited by the Servicer pursuant to Section 3.16 in connection with any unpaid claims that are a result of a breach by the Servicer or any subservicer of the obligations hereunder or under the terms of a PMI Policy; and

      (xi)     any amounts received by the Servicer under a PMI or LPMI Policy.

The foregoing requirements for deposit into the Custodial Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of Servicing Fees or Ancillary Income need not be deposited by the Servicer into the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Servicer and the Servicer shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to

Section 3.04.    Additionally, any other benefit derived from the Custodial Account associated with the receipt, disbursement and accumulation of principal, interest, taxes, hazard insurance, mortgage insurance, etc. shall accrue to the Servicer.

Section 3.04.    Permitted Withdrawals From Custodial Account.

The Servicer shall, from time to time, withdraw funds from the Custodial Account for the following purposes:

(i)    to make payments to the Owner in the amounts and in the manner provided for in Section 4.01;

(ii)    in the event the Servicer has elected not to retain the Servicing Fee out of any Mortgagor payments or Insurance Proceeds, Liquidation Proceeds or Condemnation Proceeds) prior to the deposit of such Mortgagor payment or recovery in the Custodial Account, to pay to itself the related Servicing Fee from all such Mortgagor payments or other such recovery with respect to that Mortgage Loan;

(iii)    to reimburse itself for unreimbursed Servicing Advances, the Servicer's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, REO Disposition Proceeds and other amounts received in respect of the related REO Property, and such other amounts as may be collected by the Servicer from the Mortgagor or otherwise relating to the Mortgage Loan, it being understood that, in the case of any such reimbursement, the Servicer's right thereto shall be prior to the rights of the Owner;

(iv)    to pay itself interest on funds deposited in the Custodial Account;

(v)    to transfer funds to another Qualified Depository in accordance with Section 3.10 hereof;

(vi)    to invest funds in certain Eligible Investments in accordance with Section 3.10 hereof;

(vii)    with respect to each LPMI Loan, an amount equal to the related LPMI Fee to make payment of premiums due under the LPMI Policy;

(viii)    to withdraw funds deposited in error; and

(ix)    to clear and terminate the Custodial Account upon the termination of this Agreement.

Section 3.05.    Establishment of and Deposits to Escrow Account.

The Servicer shall segregate and hold all funds collected and received pursuant to a Mortgage Loan constituting Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one or more Escrow Accounts, in the form of

time deposit or demand accounts, titled, "Green Tree Servicing LLC in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Mortgage Loans, Group No. [200_- FLOW], and various Mortgagors". The Escrow Accounts shall be established with a Qualified Depository in a manner that shall provide maximum available insurance thereunder. Funds deposited in the Escrow Account may be drawn on by the Servicer in accordance with Section 3.06. The creation of any Escrow Account shall be evidenced by a certification in the form of Exhibit E-1 hereto, in the case of an account established with the Servicer, or by a letter agreement in the form of Exhibit E-2 hereto, in the case of an account held by a depository other than the Servicer. A copy of such certification or letter agreement shall be furnished to the Owner and, upon request, to any subsequent owner of the Mortgage Loans.

The Servicer shall deposit in the Escrow Account or Accounts on a daily basis within two Business Days of receipt, and retain therein:

(i)    all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement; and

(ii)    all amounts representing Insurance Proceeds or Condemnation Proceeds which are to be applied to the restoration or repair of any Mortgaged Property.

The Servicer shall make withdrawals from the Escrow Account only to effect such payments as are required under this Agreement, as set forth in Section 3.06. The Servicer shall be entitled to retain any interest paid on funds deposited in the Escrow Account by the depository institution, other than interest on escrowed funds required by law to be paid to the Mortgagor. To the extent required by law, the Servicer shall pay interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account may be non-interest bearing or that interest paid thereon is insufficient for such purposes.

Section 3.06.    Permitted Withdrawals From Escrow Account.

Withdrawals from the Escrow Account or Accounts may be made by the Servicer only:

(i)    to effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, condominium charges, fire and hazard insurance premiums or other items constituting Escrow Payments for the related Mortgage;

(ii)    to reimburse the Servicer for any Servicing Advance made by the Servicer with respect to a related Mortgage Loan, but only from amounts received on the related Mortgage Loan which represent late collections of Escrow Payments thereunder;

(iii)    to refund to any Mortgagor any funds found to be in excess of the amounts required under the terms of the related Mortgage Loan;

(iv)    to the extent permitted by applicable law, for transfer to the Custodial Account and application to reduce the principal balance of the Mortgage Loan in accordance with the terms of the related Mortgage and Mortgage Note;

(v)    for application to restoration or repair of the Mortgaged Property in accordance with Section 3.15;

(vi)    to pay to the Servicer, or any Mortgagor to the extent required by law, any interest paid on the funds deposited in the Escrow Account;

(vii)    to withdraw funds deposited in error; and

(viii)    to clear and terminate the Escrow Account on the termination of this Agreement.

The Servicer will be responsible for the administration of the Escrow Accounts and will be obligated to make Servicing Advances to the Escrow Account in respect of its obligations under this Section 3.06, reimbursable from the Escrow Accounts or Custodial Account to the extent not collected from the related Mortgagor.

Section 3.07.    Notification of Adjustments.

With respect to each ARM Mortgage Loan, the Servicer shall adjust the Mortgage Interest Rate on the related interest rate adjustment date and shall adjust the Monthly Payment on the related mortgage payment adjustment date, if applicable, in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. The Servicer shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and Monthly Payment adjustments. The Servicer shall promptly, upon written request therefor, deliver to the Owner such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Servicer or the receipt of notice from the Owner that the Servicer has failed to adjust a Mortgage Interest Rate or Monthly Payment in accordance with the terms of the related Mortgage Note, the Servicer shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss or deferral caused the Owner thereby.

Section 3.08.    Reserved.

Section 3.09.    Payment of Taxes, Insurance and Other Charges.

(a)    With respect to each Mortgage Loan which provides for Escrow Payments, the Servicer shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates, sewer rents, and other charges which are or may become a lien upon the Mortgaged Property and the status of fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges (including renewal premiums) ("Property Charges") and shall effect payment thereof prior to the applicable penalty or termination date, employing for such purpose deposits of the Mortgagor in the Escrow Account

-20-

which shall have been estimated and accumulated by the Servicer in amounts sufficient for such purposes, as allowed under the terms of the Mortgage. The Servicer assumes full responsibility for the timely payment of all such bills and shall effect timely payment of all such charges irrespective of each Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments.

(b)     To the extent that a Mortgage Loan does not provide for Escrow Payments, the Servicer shall make advances from its own funds to effect payment of all Property Charges upon receipt of notice of any failure to pay on the part of the Mortgagor, or at such other time as the Servicer determines to be in the best interest of the Owner, provided, that in any event the Servicer shall pay such charges on or before the earlier of (a) any date by which payment is necessary to preserve the lien status of the Mortgage or (b) the date which is ninety days after the date on which such charges first became due. The Servicer shall pay any late fee or penalty which is payable due to any delay in payment of any Property Charge after the earlier to occur of (a) the date on which the Servicer receives notice of the failure of the Mortgagor to pay such Property Charge or (b) the date which is ninety days after the date on which such charges first became due.

Section 3.10.   Protection of Accounts.

The Servicer may transfer the Custodial Account or the Escrow Account to a different Qualified Depository from time to time. Such transfer shall be made only upon obtaining the consent of the Owner, which consent shall not be withheld unreasonably.

The Servicer shall bear any expenses, losses or damages sustained by the Owner if the Custodial Account and/or the Escrow Account are not demand deposit accounts.

Amounts on deposit in the Custodial Account may at the option of the Servicer be invested in Eligible Investments. Any such Eligible Investment shall mature no later than three days prior to the Remittance Date next following the date of such Eligible Investment, provided, however, that if such Eligible Investment is an obligation of a Qualified Depository (other than the Servicer) that maintains the Custodial Account, then such Eligible Investment may mature on such Remittance Date. Any such Eligible Investment shall be made in the name of the Servicer in trust for the benefit of the Owner. All income on or gain realized from any such Eligible Investment shall be for the benefit of the Servicer and may be withdrawn at any time by the Servicer. Any losses incurred in respect of any such investment shall be deposited in the Custodial Account, by the Servicer out of its own funds immediately as realized. If, at any time, the amount on deposit in the Custodial Account exceeds the amount of the applicable FDIC insurance, such excess above the amount of the applicable FDIC insurance shall be invested in Eligible Investments.

Section 3.11.   Maintenance of Hazard Insurance.

The Servicer shall cause to be maintained for each Mortgage Loan hazard insurance such that all buildings upon the Mortgaged Property are insured by a generally acceptable insurer acceptable under Fannie Mae and Freddie Mac guidelines against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the

Mortgaged Property is located, in an amount which is at least equal to the lesser of (i) the replacement value of the improvements securing such Mortgage Loan and (ii) the greater of (a) the outstanding principal balance of the Mortgage Loan and (b) an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor or the loss payee from becoming a co-insurer.

If upon origination of the Mortgage Loan, the related Mortgaged Property was located in an area identified in the Federal Register by the Flood Emergency Management Agency as having special flood hazards (and such flood insurance has been made available) a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration is in effect with a generally acceptable insurance carrier rated A:VI or better in the current edition of Best's Key Rating Guide in an amount representing coverage equal to the lesser of (i) the minimum amount required, under the terms of coverage, to compensate for any damage or loss on a replacement cost basis (or the unpaid balance of the mortgage if replacement cost coverage is not available for the type of building insured) and (ii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. If at any time during the term of the Mortgage Loan, the Servicer determines in accordance with applicable law and pursuant to the Fannie Mae Guides that a Mortgaged Property is located in a special flood hazard area and is not covered by flood insurance or is covered in an amount less than the amount required by the Flood Disaster Protection Act of 1973, as amended, the Servicer shall notify the related Mortgagor that the Mortgagor must obtain such flood insurance coverage, and if said Mortgagor fails to obtain the required flood insurance coverage within thirty (30) days after such notification, the Servicer shall immediately force place the required flood insurance on the Mortgagor's behalf.

If a Mortgage Loan is secured by a unit in a condominium project, the Servicer shall verify that the coverage required of the owner's association, including hazard, flood, liability, and fidelity coverage, is being maintained in accordance with then current Fannie Mae requirements, and secure from the owner's association its agreement to notify the Servicer promptly of any change in the insurance coverage or of any condemnation or casualty loss that may have a material effect on the value of the Mortgaged Property as security.

The Servicer shall cause to be maintained on each Mortgaged Property earthquake or such other or additional insurance as may be required pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance, or pursuant to the requirements of any private mortgage guaranty insurer, or as may be required to conform with Accepted Servicing Practices.

In the event that the Owner or the Servicer shall determine that the Mortgaged Property should be insured against loss or damage by hazards and risks not covered by the insurance required to be maintained by the Mortgagor pursuant to the terms of the Mortgage, the Servicer shall communicate and consult with the Mortgagor with respect to the need for such insurance and bring to the Mortgagor's attention the desirability of protection of the Mortgaged Property.

All policies required hereunder shall name the Servicer as loss payee and shall be endorsed with standard or union mortgagee clauses, without contribution, which shall provide for at least 30 days prior written notice of any cancellation, reduction in amount or material change in coverage.

The Servicer shall not interfere with the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Servicer shall not accept, to the extent permitted by applicable law, any such insurance policies from insurance companies unless such companies are acceptable to FNMA or FMHLC and are licensed to do business in the jurisdiction in which the Mortgaged Property is located. The Servicer shall determine that such policies provide sufficient risk coverage and amounts, that they insure the property owner, and that they properly describe the property address. The Servicer shall furnish to the Mortgagor a formal notice of expiration of any such insurance in sufficient time for the Mortgagor to arrange for renewal coverage by the expiration date.

Pursuant to Section 3.03, any amounts collected by the Servicer under any such policies (other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the related Mortgaged Property, or property acquired in liquidation of the Mortgage Loan, or to be released to the Mortgagor, in accordance with the Servicer's normal servicing procedures as specified in Section 3.15) shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 3.04.

Notwithstanding anything set forth in the preceding paragraph, the Servicer agrees to indemnify the Owner for any claims, losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments, and any other costs, fees and expenses that the Owner may sustain in any way related to the failure of the Mortgagor (or the Servicer) to maintain hazard insurance or flood insurance with respect to the related Mortgaged Property which complies with the requirements of this section.

Section 3.12.    <u>Maintenance of Mortgage Impairment Insurance.</u>

In the event that the Servicer shall obtain and maintain a blanket policy insuring against losses arising from fire and hazards covered under extended coverage on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 3.11 and otherwise complies with all other requirements of Section 3.11, it shall conclusively be deemed to have satisfied its obligations as set forth in Section 3.11. Any amounts collected by the Servicer under any such policy relating to a Mortgage Loan shall be deposited in the Custodial Account subject to withdrawal pursuant to Section 3.04. Such policy may contain a deductible clause, in which case, in the event that there shall not have been maintained on the related Mortgaged Property a policy complying with Section 3.11, and there shall have been a loss which would have been covered by such policy, the Servicer shall deposit in the Custodial Account at the time of such loss the amount not otherwise payable under the blanket policy because of such deductible clause, such amount to deposited from the Servicer's funds, without reimbursement therefor. Upon request of the Owner, the Servicer shall cause to be delivered to the Owner a certified true copy of such policy

and a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Owner.

Section 3.13.    <u>Maintenance of Fidelity Bond and Errors and Omissions Insurance.</u>

The Servicer shall maintain with responsible companies, at its own expense, a blanket Fidelity Bond and an Errors and Omissions Insurance Policy, with broad coverage on all officers, employees or other persons acting in any capacity requiring such persons to handle funds, money, documents or papers relating to the Mortgage Loans ("<u>Servicer Employees</u>"). Any such Fidelity Bond and Errors and Omissions Insurance Policy shall be in the form of the Mortgage Banker's Blanket Bond and shall protect and insure the Servicer against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such Servicer Employees. Such Fidelity Bond and Errors and Omissions Insurance Policy also shall protect and insure the Servicer against losses in connection with the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby. No provision of this Section 3.13 requiring such Fidelity Bond and Errors and Omissions Insurance Policy shall diminish or relieve the Servicer from its duties and obligations as set forth in this Agreement. The minimum coverage under any such bond and insurance policy shall be at least equal to the corresponding amounts required by Fannie Mae in the Fannie Mae Guides or by Freddie Mac in the Freddie Mac Sellers' & Servicers' Guide. Upon the request of the Owner, the Servicer shall cause to be delivered to the Owner a certified true copy of such fidelity bond and insurance policy and a statement from the surety and the insurer that such fidelity bond and insurance policy shall in no event be terminated or materially modified without 30 days' prior written notice to the Owner.

Section 3.14.    <u>Inspections.</u>

The Servicer shall inspect the Mortgaged Property as often as deemed necessary by the Servicer to assure itself that the value of the Mortgaged Property is being preserved. In addition, if any Mortgage Loan is more than 45 days delinquent and the Servicer has not been in contact with the Mortgagor for more than 60 days the Servicer immediately shall inspect the Mortgaged Property and may conduct subsequent inspections and take other actions as may be necessary or appropriate in accordance with Accepted Servicing Practices or as may be required by the primary mortgage guaranty insurer. The Servicer shall keep a written report of each such inspection.

Section 3.15.    <u>Restoration of Mortgaged Property.</u>

The Servicer need not obtain the approval of the Owner prior to releasing any Insurance Proceeds or Condemnation Proceeds to the Mortgagor to be applied to the restoration or repair of the Mortgaged Property if such release is in accordance with Accepted Servicing Practices. At a minimum, the Servicer shall comply with the following conditions in connection with any such release of Insurance Proceeds or Condemnation Proceeds:

(i)    the Servicer shall receive satisfactory independent verification of completion of repairs and issuance of any required approvals with respect thereto;

(ii)    the Servicer shall take all steps necessary to preserve the priority of the lien of the Mortgage, including, but not limited to requiring waivers with respect to mechanics' and materialmen's liens;

(iii)    the Servicer shall verify that the Mortgage Loan is not in default; and

(iv)    pending repairs or restoration, the Servicer shall place the Insurance Proceeds or Condemnation Proceeds in the Escrow Account.

If the Owner is named as an additional loss payee, the Servicer is hereby empowered to endorse any loss draft issued in respect of such a claim in the name of the Owner.

Section 3.16.    <u>Maintenance of PMI and/or LPMI Policy; Claims.</u>

(a)    The Servicer shall comply with all provisions of applicable state and federal law relating to the cancellation of, or collection of premiums with respect to, PMI Policies, including, but not limited to, the provisions of the Homeowners Protection Act of 1998, and all regulations promulgated thereunder, as amended from time to time. The Servicer shall be obligated to make premium payments with respect to (i) LPMI Policies, to the extent of the LPMI Fee set forth on the Mortgage Loan Schedule with respect to any LPMI Loans, which shall be paid out of the interest portion of the related Monthly Payment or, if a Monthly Payment is not made, from the Servicer's own funds and (ii) PMI Policies required to be maintained by the Mortgagor rather than the Owner, if the Mortgagor is required but fails to pay any PMI Policy premium, which shall be paid from the Servicer's own funds. Any premium payments made by the Servicer from its own funds pursuant to this Section 3.16(a) shall be recoverable by the Servicer as a Servicing Advance, subject to the reimbursement provisions of Section 3.04(iii).

With respect to each Mortgage Loan (other than LPMI Loans) with a loan-to-value ratio at origination in excess of 80%, the Servicer shall, without any cost to the Owner, maintain or cause the Mortgagor to maintain (to the extent that the Mortgage Loan requires the Mortgagor to maintain such insurance) in full force and effect a PMI Policy, and shall pay or shall cause the Mortgagor to pay the premium thereon on a timely basis, until the LTV of such Mortgage Loan is reduced to 80%. In the event that such PMI Policy shall be terminated, the Servicer shall obtain from another Qualified Insurer a comparable replacement policy, with a total coverage equal to the remaining coverage of such terminated PMI Policy, at substantially the same fee level. The Servicer shall not take any action which would result in noncoverage under any applicable PMI Policy of any loss which, but for the actions of the Servicer would have been covered thereunder. In connection with any assumption or substitution agreements entered into or to be entered into with respect to a Mortgage Loan, the Servicer shall promptly notify the insurer under the related PMI Policy, if any, of such assumption or substitution of liability in accordance with the terms of such PMI Policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under such PMI Policy. If such PMI Policy is terminated as a result of such assumption or substitution of liability, the Servicer shall obtain a replacement PMI Policy as provided above.

(b)    With respect to each Mortgage Loan covered by a PMI Policy or LPMI Policy, the Servicer shall take all such actions on behalf of the Owner as are necessary to service, maintain and administer the related Mortgage Loan in accordance with such Policy and to enforce the rights under such Policy. Except as expressly set forth herein, the Servicer shall have full authority on behalf of the Owner to do anything it deems appropriate or desirable in connection with the servicing, maintenance and administration of such Policy; *provided that* the Servicer shall not take any action to permit any modification or assumption of a Mortgage Loan covered by a LPMI or PMI Policy, or take any other action with respect to such Mortgage Loan, which would result in non-coverage under such Policy of any loss which, but for actions of any Servicer or subservicer, would have been covered thereunder. If the Qualified Insurer fails to pay a claim under a LPMI or PMI Policy solely as a result of a breach by the Servicer or subservicer of its obligations hereunder or under such Policy, the Servicer shall be required to deposit in the Custodial Account on or prior to the next succeeding Remittance Date an amount equal to such unpaid claim from its own funds without any rights to reimbursement from the Owner. The Servicer shall cooperate with the Qualified Insurers and shall furnish all reasonable evidence and information in the possession of the Servicer to which the Servicer has access with respect to the related Mortgage Loan.

(c)    In connection with its activities as servicer, the Servicer agrees to prepare and present, on behalf of itself and the Owner, claims to the Qualified Insurer under any PMI Policy or LPMI Policy in a timely fashion in accordance with the terms of such PMI Policy or LPMI Policy and, in this regard, to take such action as shall be necessary to permit recovery under any PMI Policy or LPMI Policy respecting a defaulted Mortgage Loan. Any amounts collected by the Servicer under any PMI Policy or LPMI Policy shall be deposited in the Custodial Account pursuant to Section 3.03(xii), subject to withdrawal pursuant to Section 3.04.

Section 3.17.    Title, Management and Disposition of REO Property.

In the event that title to any Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Owner's designee, or in the event the Owner's designee is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an Opinion of Counsel obtained by the Servicer from any attorney duly licensed to practice law in the state where the REO Property is located. The Person or Persons holding such title other than the Owner shall acknowledge in writing that such title is being held as nominee for the Owner's designee.

The Servicer shall manage, conserve, protect and operate each REO Property for the Owner solely for the purpose of its prompt disposition and sale. The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall attempt to sell the same (and may temporarily

-26-

rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Servicer deems to be in the best interest of the Owner.

The Servicer shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one year after title has been taken to such REO Property, unless (i) a REMIC election has not been made with respect to the arrangement under which the Mortgage Loans and the REO Property are held, and (ii) the Servicer determines, and gives an appropriate notice to the Owner to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one year is permitted under the foregoing sentence and is necessary to sell any REO Property, the Servicer shall report monthly to the Owner as to the progress being made in selling such REO Property.

Notwithstanding anything to the contrary contained in this Section 3.17, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, in the event the Servicer has reasonable cause to believe that a Mortgaged Property is contaminated by hazardous or toxic substances or wastes, or if the Owner or its designee otherwise requests, an environmental inspection or review of such Mortgaged Property to be conducted by a qualified inspector shall be arranged by the Servicer. Upon completion of the inspection, the Servicer shall provide the Owner or its designee with a written report of such environmental inspection. In the event that the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall not proceed with foreclosure or acceptance of a deed in lieu of foreclosure.  In the event that the environmental inspection report is inconclusive as to the whether or not the Mortgaged Property is contaminated by hazardous or toxic substances or wastes, the Servicer shall not, without the prior approval of the Owner or its designee, proceed with foreclosure or acceptance of a deed in lieu of foreclosure.

Subject to the approval of the Owner or its designee as described in this paragraph, the disposition of REO Property shall be carried out by the Servicer at such price, and upon such terms and conditions, as the Servicer deems to be in the best interests of the Owner. Prior to acceptance by the Servicer of an offer to sell any REO Property, the Servicer shall notify the Owner or its designee of such offer in writing which notification shall set forth all material terms of said offer (each a "Notice of Sale").  The Owner or its designee shall be deemed to have approved the sale of any REO Property unless the Owner or its designee notifies the Servicer in writing, within five (5) Business Days after its receipt of the related Notice of Sale, that it disapproves of the related sale, in which case the Servicer shall not proceed with such sale.  The Servicer shall also maintain on each REO Property fire and hazard insurance with extended coverage in amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in the amount required above.

The proceeds of sale of the REO Property shall be promptly deposited in the Custodial Account. As soon as practical thereafter the expenses of such sale shall be paid and the Servicer shall reimburse itself for any related unreimbursed Servicing Advances, unpaid

Servicing Fees and unreimbursed advances made pursuant to this Section or Section 4.03, and on the Remittance Date immediately following the Principal Prepayment Period in which such sale proceeds are received the net cash proceeds of such sale remaining in the Custodial Account shall be distributed to the Owner.

The Servicer shall make advances of all funds necessary for the proper operation, management and maintenance of the REO Property, including the cost of maintaining any hazard insurance pursuant to Section 3.10, such advances to be reimbursed from the disposition or liquidation proceeds of the REO Property. The Servicer shall make monthly distributions on each Remittance Date to the Owner of the net cash flow from the REO Property (which shall equal the revenues from such REO Property net of the expenses described in this Section 3.17 and of any reserves reasonably required from time to time to be maintained to satisfy anticipated liabilities for such expenses).

Section 3.18.    <u>Real Estate Owned Reports.</u>

Together with the statement furnished pursuant to Section 4.02, the Servicer shall furnish to the Owner or its designee on or before the fifth (5th) calendar day of each month a statement with respect to any REO Property covering the operation of such REO Property for the previous month and the Servicer's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month. That statement shall be accompanied by such other information as the Owner or its designee shall reasonably request.

Section 3.19.    <u>Liquidation Reports.</u>

Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Owner or its designee pursuant to a deed in lieu of foreclosure, the Servicer shall submit to the Owner or its designee a liquidation report with respect to such Mortgaged Property. In addition, the Servicer shall provide the Owner or its designee a report setting forth Servicing Advances and other expenses incurred in connection with the liquidation of any Mortgage Loan.

Section 3.20.    <u>Reports of Foreclosure and Abandonment of Mortgaged Property.</u>

Following the foreclosure sale or abandonment of any Mortgaged Property, the Servicer shall report such foreclosure or abandonment as required pursuant to Section 6050J of the Code.

Section 3.21.    <u>Prepayment Charges.</u>

Except as set forth below, the Servicer or any designee of the Servicer shall not waive any prepayment charge with respect to any Mortgage Loan. If the Servicer or its designee fails to collect a prepayment charge at the time of the related prepayment of any Mortgage Loan subject to such prepayment charge, the Servicer shall pay to the Custodial Account an amount equal to the amount of the prepayment charge not collected. Notwithstanding the above, the Servicer or its designee may waive a prepayment charge without paying to the Custodial Account the amount of such prepayment charge only if the related prepayment is not the result of

a refinancing by the Servicer or its designee and such waiver (a) relates to a defaulted Mortgage Loan or a reasonably foreseeable default, such waiver is standard and customary in servicing similar mortgage loans to the Mortgage Loans, and such waiver, in the reasonable judgment of the Servicer, would maximize recovery of total proceeds from the Mortgage Loan, taking into account the amount of such prepayment charge and the related Mortgage Loan, or (b) relates to a prepayment charge the collection of which, in the reasonable judgment of the Servicer, would be a violation of applicable laws.

Section 3.22.   Credit Reporting.

For each Mortgage Loan, the Servicer shall accurately and fully furnish, in accordance with the federal Fair Credit Reporting Act and its implementing regulations, accurate and complete information (e.g., favorable and unfavorable) on its borrower credit files to each of the following consumer reporting agencies:  Equifax Credit Information Services, Inc., Trans Union, LLC and Experian Information Solution, Inc., on a monthly basis.

Section 3.23.   Safeguarding Customer Information.

The Servicer shall implement and maintain security measures designed to meet the objectives of the Interagency Guidelines Establishing Information Security Standards (the "Guidelines"), Section 216 of the federal Fair and Accurate Credit Transactions Act (including its implementing regulations, "FACTA"), as well as any amendments thereto or other applicable regulations regarding safeguarding information enacted or released by a regulatory agency having jurisdiction over the Owner or the Servicer.  In addition, the Servicer represents to the Owner that it has in place a response program to respond to any incident of unauthorized access to Customer Information (as defined in the Guidelines). At all times during the term of this Agreement, the Servicer shall maintain administrative, technical and physical safeguards, including proper information disposal procedures, to ensure the security, confidentiality and integrity of Customer Information, and to protect such information against any threats or hazards, including, without limitation, unauthorized access or use.  The Servicer will periodically (but not less than annually) review and update its information security procedures.

The Servicer shall, at the Servicer's sole expense, take appropriate actions, including such actions as the Owner may request, to address any actual or apparent incident of theft or unauthorized access, use or disclosure of any Customer Information maintained by the Servicer, including providing prompt notification to the Owner of any such incident and will, at the Owner's request, at the Servicer's sole expense, notify the Owner's customers on the Owner's behalf of any such unauthorized access, use or disclosure.  Nothing in this Section shall limit the Servicer's obligations under Section 9.01 of this Agreement.

The Servicer shall promptly provide the Owner with information regarding such information security measures upon the reasonable request of the Owner or its designee (including any Master Servicer of the Mortgage Loans) which information shall include, but not be limited to, any Statement on Auditing Standards (SAS) No. 70 report covering the Servicer's operations, and any other audit reports, summaries of test results or equivalent measures or evaluations taken by the Servicer with respect to its security measures.

With respect to any third party provided access to Customer Information in accordance with this Agreement, the Servicer will enter into a written agreement with such third party requiring safeguarding of Customer Information in a manner no less restrictive than the Servicer's obligations under this Agreement, and including those affirmative obligations set forth in this Section and in any other Section of this Agreement relating to the use or protection of Customer Information.

The obligations set forth in this Section shall survive termination of the Agreement.

Section 3.24.    <u>Superior Liens</u>.

The Servicer shall file (or cause to be filed) a request for notice of any action by a superior lienholder under a Superior Lien for the protection of the Owner's interest, where permitted by local law and whenever applicable state law does not require that a junior lienholder be named as a party defendant in foreclosure proceedings in order to foreclose such junior lienholder's equity of redemption.

If the Servicer is notified that any superior lienholder has accelerated or intends to accelerate the obligations secured by the Superior Lien, or has declared or intends to declare a default under the mortgage or the promissory note secured thereby, or has filed or intends to file an election to have the Mortgaged Property sold or foreclosed, the Servicer shall take, on behalf of the Owner, whatever actions are necessary to protect the interests of the Owner in accordance with Accepted Servicing Practices. The Servicer shall not make such a Servicing Advance except to the extent that it determines in its reasonable good faith judgment that such advance would be recoverable from Liquidation Proceeds on the related Mortgage Loan. The Servicer shall thereafter take such action as is necessary to recover the amount so advanced.

Section 3.25.    <u>Advance Facility</u>.

Servicer is hereby authorized to enter into a financing or other facility (any such arrangement, an "<u>Advance Credit Facility</u>") with any Person (an "<u>Advancing Person</u>") (1) under which the Servicer sells, assigns or pledges to the Advancing Person the Servicer's rights under this Agreement or any Reconstitution Agreement to be reimbursed for any Servicing Advances and/or any advances of the due and unpaid portion of any Monthly Payment ("<u>Monthly Advances</u>"), (2) which provides that the Advancing Person may fund Monthly Advances and/or Servicing Advances under this Agreement or any Reconstitution Agreement, although no such facility shall reduce or otherwise affect the Servicer's obligation to fund such Monthly Advances and/or Servicing Advances or (3) provides financing to the Servicer secured by any servicing rights retained hereunder. No consent of the Owner shall be required before the Servicer may enter into an Advance Facility nor shall the Owner be a third party beneficiary of any obligation of an Advancing Person to the Servicer. The Advancing Person shall be given certain rights under the related Reconstitution Agreement including the right to reimbursement for Monthly Advances and Servicing Advances from the related accounts to the same extent the Servicer would have been permitted to reimburse itself for such Monthly Advances and/or Servicing Advances had the Servicer itself funded such Monthly Advance or Servicing Advance. Each

party shall use its best efforts to ensure that any language required by such Advance Credit Facility to appear in any Securitization agreements or Pooling and Servicing Agreements involving either or both of the parties shall be incorporated into all such agreements.

## ARTICLE IV.

### PAYMENTS TO OWNER

Section 4.01.  Remittances.

On each Remittance Date the Servicer shall remit by wire transfer of immediately available funds to the Owner all amounts deposited in the Custodial Account as of the close of business on the last day of the related Due Period (net of charges against or withdrawals from the Custodial Account pursuant to Section 3.04).

With respect to any remittance received by the Owner after the first Business Day following the Business Day on which such remittance payment was due, the Servicer shall pay to the Owner interest on any such late payment at an annual rate equal to the Prime Rate, adjusted as of the date of each change, plus three percentage points, but in no event greater than the maximum amount permitted by applicable law. Such interest shall be deposited in the Custodial Account by the Servicer on the date such late payment is made and shall cover the period commencing with the day following such first Business Day and ending with the Business Day on which such payment is made, both inclusive. Such interest shall be remitted along with the distribution payable on the next succeeding Remittance Date. The payment by the Servicer of any such interest shall not be deemed an extension of time for payment or a waiver of any Event of Default by the Servicer.

Section 4.02.  Statements to Owner.

Not later than the third (3rd) Business Day of each month, the Servicer shall furnish to the Owner or its designee (i) a monthly remittance advice in the format set forth in Exhibit F hereto and a monthly defaulted loan report and loan loss report in the format set forth in Exhibit G hereto (or in such other format mutually agreed to between the Servicer and the Owner or its designee) relating to the period ending on the last day of the preceding calendar month and (ii) all such information required pursuant to clause (i) above on a magnetic tape or other similar media reasonably acceptable to the Owner.

In addition, not more than 60 days after the end of each calendar year, commencing December 31, 2007, the Servicer shall furnish to each Person who was an Owner of the Mortgage Loans at any time during such calendar year an annual statement in accordance with the requirements of applicable federal income tax law as to the aggregate of remittances for the applicable portion of such year.

Such obligation of the Servicer shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Servicer pursuant to any requirements of the Internal Revenue Code as from time to time are in force.

Beginning with calendar year 2007, the Servicer shall prepare and file any and all tax returns, information statements or other filings for the tax year 2007 and subsequent tax years required to be delivered to any governmental taxing authority or to the Owner pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Servicer shall provide the Owner with such information concerning the Mortgage Loans as is necessary for the Owner to prepare its federal income tax return as the Owner may reasonably request from time to time.

Section 4.03.   Monthly Advances by Servicer.

The Servicer shall not be required to make Monthly Advances prior to any Reconstitution Date.

Section 4.04.   Due Dates Other Than the First of the Month.

Mortgage Loans having Due Dates other than the first day of a month shall be accounted for as described in this Section 4.04. Any payment due on a day other than the first day of each month shall be considered due on the first day of the month following the month in which that payment is due as if such payment were due on the first day of said month. For example, a payment due on August 15 shall be considered to be due on September 1 of said month. Any payment collected on a Mortgage Loan after the related Transfer Date shall be deposited in the Custodial Account. For Mortgage Loans with Due Dates on the first day of a month, deposits to the Custodial Account begin with the payment due on the first of the month following the related Transfer Date.

## ARTICLE V.

## GENERAL SERVICING PROCEDURES

Section 5.01.   Transfers of Mortgaged Property.

The Servicer shall use its best efforts to enforce, as permitted by applicable law, any "due-on-sale" provision contained in any Mortgage or Mortgage Note and to deny assumption by the person to whom the Mortgaged Property has been or is about to be sold whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains liable on the Mortgage and the Mortgage Note. When the Mortgaged Property has been conveyed by the Mortgagor, the Servicer shall, to the extent it has knowledge of such conveyance, exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause applicable thereto, provided, however, that the Servicer shall not exercise such rights if prohibited by law from doing so or if the exercise of such rights would impair or threaten to impair any recovery under the related LPMI Policy, if any.

If the Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Servicer shall enter into (i) an assumption and modification agreement with the person to whom such property has been conveyed, pursuant to which such person becomes liable under the Mortgage Note and the original Mortgagor remains liable thereon or (ii) in the event the Servicer is unable under applicable law to require that the original

Mortgagor remain liable under the Mortgage Note and the Servicer has the prior consent of the primary mortgage guaranty insurer, a substitution of liability agreement with the owner of the Mortgaged Property pursuant to which the original Mortgagor is released from liability and the owner of the Mortgaged Property is substituted as Mortgagor and becomes liable under the Mortgage Note. In connection with any assumption agreement that may be entered into by the Servicer, neither the Mortgage Interest Rate borne by the related Mortgage Note, the term of the Mortgage Loan nor the outstanding principal amount of the Mortgage Loan shall be changed.

To the extent that any Mortgage Loan is assumable, the Servicer shall inquire diligently into the creditworthiness of the proposed transferee, and shall use the underwriting criteria for approving the credit of the proposed transferee which are used by the Servicer, its affiliates or Fannie Mae with respect to underwriting mortgage loans of the same type as the Mortgage Loans. If the credit of the proposed transferee does not meet such underwriting criteria, the Servicer diligently shall, to the extent permitted by the Mortgage or the Mortgage Note and by applicable law, accelerate the maturity of the Mortgage Loan.

Section 5.02.   <u>Satisfaction of Mortgages and Release of Mortgage Files.</u>

Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full will be escrowed in a manner customary for such purposes, the Servicer shall notify the Owner in the Monthly Remittance Advice as provided in Section 4.02, and may request the release of any Mortgage Loan Documents from the Owner in accordance with this Section 5.02 hereof.

If the Servicer satisfies or releases a Mortgage without first having obtained payment in full of the indebtedness secured by the Mortgage or should the Servicer otherwise prejudice any rights the Owner may have under the mortgage instruments, the Servicer shall deposit into the Custodial Account the entire outstanding principal balance, plus all accrued interest on such Mortgage Loan, on the day preceding the Remittance Date in the month following the date of such release. The Servicer shall maintain the Fidelity Bond and Errors and Omissions Insurance Policy as provided for in Section 3.13 insuring the Servicer against any loss it may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

Section 5.03.   <u>Servicing Compensation.</u>

As consideration for servicing the Mortgage Loans subject to this Agreement, the Servicer shall retain the relevant Servicing Fee for each Mortgage Loan remaining subject to this Agreement during any month or part thereof. Such Servicing Fee shall be payable monthly. Additional servicing compensation in the form of Ancillary Income shall be retained by the Servicer and is not required to be deposited in the Custodial Account.

The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement thereof except as specifically provided for herein.

Section 5.04.  <u>Annual Independent Public Accountants' Servicing Report</u>.

On or before March 31 of each year beginning March 31, 2008, the Servicer, at its expense, shall (i) deliver to the Owner a report regarding the Servicer's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year and shall address each of the applicable Servicing Criteria and (ii) deliver to the Owner a report of a registered public accounting firm that attests to, and reports on, the assessment of compliance made by the Servicer and delivered pursuant to the preceding paragraph.  .

Section 5.05.  <u>Annual Officer's Certificate</u>.

On or before February 28th of each calendar year, beginning with February 28, 2008, the Servicer shall, at its own expense, will deliver to the Owner a Servicing Officer's certificate stating, as to each signer thereof, that (i) a review of the activities of the Servicer during such preceding fiscal year and of performance under this Agreement has been made under such officers' supervision, and (ii) to the best of such officers' knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement for such year, or, if there has been a default in the fulfillment of all such obligations, specifying each such default known to such officers and the nature and status thereof including the steps being taken by the Servicer to remedy such default.

Section 5.06.  <u>Right to Examine Servicer Records.</u>

The Owner shall have the right to examine and audit any and all of the books, records, or other information of the Servicer, whether held by the Servicer or by another on its behalf, with respect to or concerning this Agreement or the Mortgage Loans, during business hours or at such other times as may be reasonable under applicable circumstances, upon reasonable advance notice.

The Servicer shall provide to the Owner and any supervisory agents or examiners representing a state or federal government agency having jurisdiction over the Owner, including without limitation the OTS, the FDIC and other similar entities, access to any documentation regarding the Mortgage Loans in the possession of the Servicer that is required by any applicable regulations.  Such access shall be afforded without charge, upon reasonable request, during normal business hours, at the offices of the Servicer and in accordance with any applicable regulations.

<b>ARTICLE VI.</b>

<u>REPRESENTATIONS, WARRANTIES AND AGREEMENTS</u>

Section 6.01.  <u>Representations, Warranties and Agreements of the Servicer.</u>

The Servicer, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to the Owner as of each Transfer Date:

(a)    <u>Due Organization and Authority</u>.    The Servicer is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation and has all licenses necessary to carry on its business as now being conducted and is licensed, qualified and in good standing in each state where a Mortgaged Property is located if the laws of such state require licensing or qualification in order to conduct business of the type conducted by the Servicer, and in any event the Servicer is in compliance with the laws of any such state to the extent necessary to ensure the enforceability of the terms of this Agreement; the Servicer has the full organizational power and authority to execute and deliver this Agreement and to perform in accordance herewith; the execution, delivery and performance of this Agreement (including all instruments of transfer to be delivered pursuant to this Agreement) by the Servicer and the consummation of the transactions contemplated hereby have been duly and validly authorized; this Agreement evidences the valid, binding and enforceable obligation of the Servicer and all requisite organizational action has been taken by the Servicer to make this Agreement valid and binding upon the Servicer in accordance with its terms;

(b)    <u>Ordinary Course of Business</u>.    The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Servicer;

(c)    <u>No Conflicts</u>.    Neither the execution and delivery of this Agreement, the acquisition of the servicing responsibilities by the Servicer or the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's organizational documents or any legal restriction or any agreement or instrument to which the Servicer is now a party or by which it is bound, or constitute a default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject that would impair the ability of the Servicer to service the Mortgage Loans, or impair the value of the Mortgage Loans;

(d)    <u>Ability to Perform</u>.    The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(e)    <u>No Litigation Pending</u>.    There is no action, suit, proceeding or investigation pending or threatened against the Servicer which, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Servicer, or in any material impairment of the right or ability of the Servicer to carry on its business substantially as now conducted, or in any material liability on the part of the Servicer, or which would draw into question the validity of this Agreement or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein, or which would be likely to impair materially the ability of the Servicer to perform under the terms of this Agreement;

(f)    <u>No Consent Required</u>.    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by

the Servicer of or compliance by the Servicer with this Agreement, or if required, such approval has been obtained prior to the related Transfer Date;

(g)    No Default.  The Servicer is not in default, and no event or condition exists that after the giving of notice or lapse of time or both, would constitute an event of default under any material mortgage, indenture, contract, agreement, judgment, or other undertaking, to which the Servicer is a party or which purports to be binding upon it or upon any of its assets, which default could impair materially the ability of the Servicer to perform under the terms of this Agreement;

(h)    Ability to Service.  The Servicer is an approved servicer of conventional residential mortgage loans for Fannie Mae and Freddie Mac, with the facilities, procedures, and experienced personnel necessary for the sound servicing of mortgage loans of the same type as the Mortgage Loans.  The Servicer is in good standing to service mortgage loans for either Fannie Mae or Freddie Mac, and no event has occurred, including but not limited to a change in insurance coverage, which would make the Servicer unable to comply with either Fannie Mae or Freddie Mac eligibility requirements or which would require notification to either of Fannie Mae or Freddie Mac;

(i)    No Untrue Information.  Neither this Agreement nor any statement, report or other document furnished or to be furnished pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of fact or omits to state a fact necessary to make the statements contained therein not misleading; and

(j)    No Commissions to Third Parties.  The Servicer has not dealt with any broker or agent or anyone else who might be entitled to a fee or commission in connection with this transaction other than the Owner.

Section 6.02.    Remedies for Breach of Representations and Warranties of the Servicer.

It is understood and agreed that the representations and warranties set forth in Section 6.01 shall survive the engagement of the Servicer to perform the servicing responsibilities as of the related Transfer Date hereunder and the delivery of the Servicing Files to the Servicer and shall inure to the benefit of the Owner.  Upon discovery by either the Servicer or the Owner of a breach of any of the foregoing representations and warranties which materially and adversely affects the ability of the Servicer to perform its duties and obligations under this Agreement or otherwise materially and adversely affects the value of the Mortgage Loans, the Mortgaged Property or the priority of the security interest on such Mortgaged Property or the interest of the Owner, the party discovering such breach shall give prompt written notice to the other.

Within 60 days of the earlier of either discovery by or notice to the Servicer of any breach of a representation or warranty set forth in Section 6.01 which materially and adversely affects the ability of the Servicer to perform its duties and obligations under this Agreement or otherwise materially and adversely affects the value of the Mortgage Loans, the Mortgaged Property or the priority of the security interest on such Mortgaged Property, the

Servicer shall use its best efforts promptly to cure such breach in all material respects and, if such breach cannot be cured, the Owner shall have the right to terminate the Servicer in the Owner's sole discretion in accordance with Section 10.01 hereof.

In addition, the Servicer shall indemnify the Owner and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the Servicer representations and warranties contained in this Agreement.

Any cause of action against the Servicer relating to or arising out of the breach of any representations and warranties made in Section 6.01 shall accrue upon (i) discovery of such breach by the Servicer or notice thereof by the Owner to the Servicer, (ii) failure by the Servicer to cure such breach within the applicable cure period, and (iii) demand upon the Servicer by the Owner for compliance with this Agreement.

Section 6.03.   Representations and Warranties of the Owner.

The Owner, as a condition to the consummation of the transactions contemplated hereby, hereby makes the following representations and warranties to the Servicer as of each Transfer Date:

(a)   Organization and Good Standing.   The Owner is a limited liability company, duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation, and the Owner has the corporate power to own its assets and to transact the business in which it is currently engaged.   The Owner is duly qualified to do business as a foreign corporation and is in good standing in each jurisdiction in which its type of organization and the character of the business transacted by it or properties owned or leased by it requires such qualification and in which the failure so to qualify would have a material adverse effect on its business, properties, assets, or condition (financial or other).

(b)   Authorization; Binding Obligations.   The Owner has the power and authority to make, execute, deliver and perform this Agreement and all of the transactions contemplated under this Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement.   When executed and delivered, this Agreement will constitute the legal, valid and binding obligation of the Owner enforceable in accordance with its terms, except as enforcement of such terms may be limited by bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and by the availability of equitable remedies.

(c)   No Consent Required. The Owner is not required to obtain the consent of any other party or any consent, license, approval or authorization from, or registration or declaration with, any governmental authority, bureau or agency in connection with the execution, delivery, performance, validity or enforceability of this Agreement, except such as have been obtained or where the failure to obtain any such consent, license, approval or authorization, or to make any registration or declaration does not materially adversely affect the interests of the Servicer or the transactions contemplated by this Agreement.

(d)    No Violations.    The execution, delivery and performance of this Agreement by the Owner will not violate any provision of any existing law or regulation or any order or decree of any court applicable to the Owner or the charter or bylaws of the Owner, or constitute a breach of any mortgage, indenture, contract or other agreement to which the Owner is a party or by which the Owner may be bound, except where such violation or breach does not have a material adverse effect on the Owner.

(e)    Litigation.    No litigation or administrative proceeding of or before any court, tribunal or governmental body is currently pending, or, to the knowledge of such the Owner, threatened, against the Owner or any of its properties or with respect to this Agreement which, if adversely determined, would have a material adverse effect on the transactions contemplated by this Agreement.

Section 6.04.    <u>Remedies for Breach of Representations and Warranties of the Owner.</u>

It is understood and agreed that the representations and warranties set forth in Section 6.03 shall survive the engagement of the Servicer to perform the servicing responsibilities as of the related Transfer Date hereunder.  Upon discovery by either the Owner or the Servicer of a breach of any of the foregoing representations and warranties which materially and adversely affects the ability of the Servicer to perform its duties and obligations under this Agreement, the party discovering such breach shall give prompt written notice to the other.

Within 90 days of the earlier of either discovery by or notice to the Owner of any breach of a representation or warranty set forth in Section 6.03 which materially and adversely affects the ability of the Servicer to perform its duties and obligations under this Agreement, the Owner shall use its best efforts promptly to cure such breach in all material respects.

In addition, the Owner shall indemnify the Servicer and hold it harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and other costs and expenses resulting from any claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach of the Owner's representations and warranties contained in this Agreement.

Any cause of action against the Owner relating to or arising out of the breach of any representations and warranties made in Section 6.03 shall accrue upon (i) discovery of such breach by the Owner or notice thereof by the Servicer to the Owner, (ii) failure by the Owner to cure such breach within the applicable cure period, and (iii) demand upon the Owner by the Servicer for compliance with this Agreement.

## ARTICLE VII.

AGENCY TRANSFER; WHOLE LOAN TRANSFER; SECURITIZATION TRANSACTION

Section 7.01.  Removal of Mortgage Loans from Inclusion Under this Agreement Upon an Agency Transfer, a Securitization Transaction or a Whole Loan Transfer on One or More Reconstitution Dates.

(a)    The Owner and the Servicer agree that with respect to some or all of the Mortgage Loans, from time to time the Owner shall:

(1)    Effect an Agency Transfer, and/or

(2)    Effect a Whole Loan Transfer, and/or

(3)    Effect a Securitization Transaction,

in each case retaining the Servicer as the servicer thereof to service the Mortgage Loans on a "scheduled/scheduled" basis.   On the related Reconstitution Date, the Mortgage Loans transferred shall cease to be covered by this Agreement, except with respect to the right of the Owner to cause a transfer of the servicing responsibilities with respect to the Mortgage Loans in accordance with Section 7.02 hereof.

(b)    The Servicer shall cooperate with the Owner in connection with any Agency Transfer, Securitization Transaction or Whole Loan Transfer contemplated by the Owner pursuant to this Section 7.01.  In that connection, the Servicer shall:

(i)    execute any Reconstitution Agreement within a reasonable period of time after receipt of any Reconstitution Agreement which time shall be sufficient for the Servicer and Servicer's counsel to review such Reconstitution Agreement, but such time shall not exceed ten (10) days after such receipt; in the case of any Agency Transfer, the Reconstitution Agreements shall be those customarily employed by Fannie Mae or Freddie Mac for transactions of such nature. Such Reconstitution Agreement may require the Servicer to remit premium payments with respect to any LPMI Policy to the related insurer;

(ii)    to cooperate fully with the Owner, Fannie Mae, Freddie Mac, the trustee or a third party purchaser and any prospective purchaser, at the Owner's expense, with respect to all reasonable requests and due diligence procedures including participating in meetings with rating agencies, Fannie Mae, Freddie Mac, bond insurers, mortgage insurance providers, guarantors, loss mitigation or credit risk management advisors and such other parties as the Owner shall designate and participating in meetings with prospective purchasers of the Mortgage Loans or interests therein and providing information contained in the Mortgage Loan Schedule including any diskette or other related data tapes provided as reasonably requested by such purchasers;

(iii)    to negotiate and execute one or more loss mitigation advisory or credit risk management agreements between the Servicer and any loss mitigation or credit risk management advisor designated by the Owner in its sole discretion;

(iv)    to deliver to the Owner and to any Person designated by the Owner (a) for inclusion in any prospectus or other offering material such publicly available information regarding the Servicer, its financial condition and its mortgage loan delinquency, foreclosure and loss experience and any additional information requested by the Owner, (b) any similar non-public, unaudited financial information (which the Owner may, at its option and at its cost, have audited by certified public accountants) and such other information as is reasonably requested by the Owner and which the Servicer is capable of providing without unreasonable effort or expense, and to indemnify the Owner and its affiliates for material misstatements contained in such information, and (c) such statements and audit letters of reputable, certified public accountants pertaining to information provided by the Servicer pursuant to clause (a) above as shall be reasonably requested by the Owner; and

(v)    to provide, on an ongoing basis from information obtained through its servicing of the Mortgage Loans, any information necessary to enable the "tax matters person" for any REMIC in a Securitization Transaction, including any master servicer or trustee acting in such capacity, to perform its obligations in accordance with applicable law and customary secondary mortgage market standards for securitized transactions.

(c)    The Servicer shall provide to the Owner or issuer, as the case may be, and any other participants in such Agency Transfer, Whole Loan Transfer or Securitization Transaction, (i) any and all information with respect to itself, its servicing portfolio or the Mortgage Loans and appropriate verification of information which may be reasonably available to the Servicer, whether through letters of its auditors and counsel or otherwise, as the Owner or any such other participant shall request upon reasonable demand and (ii) such additional representations, warranties, covenants, opinions of counsel, letters from auditors, and certificates of public officials or officers of the Servicer as are reasonably believed necessary by Fannie Mae, Freddie Mac, the trustee, such third party purchaser, any master servicer, any Rating Agency or the Owner, as the case may be, in connection with such transactions.

(d)    To the extent required by the applicable Reconstitution Agreements or otherwise requested by the Owner in connection with a Reconstitution, the Servicer shall prepare Assignments of Mortgage in form and substance acceptable to Fannie Mae, Freddie Mac, the trustee or such third party, as the case may be, for each Mortgage Loan that is part of a Reconstitution.    The Servicer shall execute each Assignment of Mortgage, track such Assignments of Mortgage to ensure they have been recorded and deliver them as required by Fannie Mae, Freddie Mac, the trustee or such third party, as the case may be, upon the Servicer's receipt thereof.  The Owner shall pay all pre-approved, reasonable and necessary fees associated with the preparation, recording and tracking of such Assignments of Mortgage.

(e)    All Mortgage Loans not sold or transferred pursuant to an Agency Transfer, Securitization Transaction or Whole Loan Transfer and any and all Mortgage Loans repurchased by the Owner pursuant to Section 7.03 below with respect to an Agency Transfer,

Securitization Transaction or Whole Loan Transfer or otherwise directly or indirectly reacquired by the Owner or its designee upon termination of an Agency Transfer or Securitization Transaction, shall be subject to this Agreement and shall continue to be serviced in accordance with the terms of this Agreement and with respect thereto this Agreement shall remain in full force and effect.

Section 7.02.    <u>Transfer of Servicing Following Reconstitution.</u>

Following a Reconstitution of Mortgage Loans, the Owner or its designee (which may include the master servicer, trustee, insurer, guarantor or certificateholders) shall have the right, in its sole discretion, to cause the Servicer at any time under any Reconstitution Agreement to transfer the servicing responsibilities and duties with respect to some or all of the Mortgage Loans serviced thereunder to the Owner or any designee of the Owner; provided, however, that the Owner shall provide the Servicer with 30 days prior written notice and provided further that such transfer shall be subject to the approval of Fannie Mae or Freddie Mac, as the case may be, with respect to Agency Transfers, the trustee, master servicer or Rating Agency with respect to Securitization Transactions or any relevant third party purchaser with respect to Whole Loan Transfers.    The Servicer agrees to cooperate with the Owner in such transfer of servicing responsibilities and shall comply with the termination procedures set forth in Sections 9.01 and 10.01 hereof.

Section 7.03.    <u>Owner's Repurchase and Indemnification Obligations.</u>

Upon receipt by the Servicer of notice from Fannie Mae, Freddie Mac or other such third party purchaser of a breach of the Owner representation or warranty contained in any Reconstitution Agreement or a request by Fannie Mae, Freddie Mac, the trustee or such third party purchaser, as the case may be, for the repurchase of any Mortgage Loan transferred to Fannie Mae or Freddie Mac pursuant to an Agency Transfer or to a trustee pursuant to a Securitization Transaction or to a third party purchaser pursuant to a Whole Loan Transfer, the Servicer shall promptly notify the Owner of same and shall, at the direction of the Owner, use reasonable best efforts to cure and correct any such breach and to satisfy the requests or concerns of Fannie Mae, Freddie Mac, the trustee or the third party purchaser related to such deficiencies of the related Mortgage Loans transferred to Fannie Mae, Freddie Mac, the trustee or other such third party purchaser.

The Owner shall reimburse the Servicer for any Mortgage Loan transferred to Fannie Mae or Freddie Mac pursuant to an Agency Transfer or to a trustee pursuant to a Securitization Transaction or to a third party purchaser pursuant to a Whole Loan Transfer with respect to which the Servicer has been required by Fannie Mae, Freddie Mac, the trustee or such third party purchaser to repurchase due to a breach of a representation or warranty made by the Owner with respect to the Mortgage Loans, or the servicing thereof prior to the transfer date to Fannie Mae, Freddie Mac, the trustee or any third party purchaser in any Reconstitution Agreement and not due to a breach of the Servicer's obligations thereunder or pursuant to this Agreement.    The amount to be paid by the Owner to the Servicer shall equal that repurchase price paid by the Servicer to Fannie Mae, Freddie Mac, or the third party purchaser plus all reasonable costs and expenses borne by the Servicer in connection with the repurchase of such

Mortgage Loan from Fannie Mae, Freddie Mac, the trustee or the third party purchaser, including, but not limited to, reasonable and necessary attorneys' fees.

At the time of repurchase, the Custodian and the Servicer shall arrange for the reassignment of the repurchased Mortgage Loan to the Owner according to the Owner's instructions and the delivery to the Custodian of any documents held by Fannie Mae, Freddie Mac, the trustee or other relevant third party purchaser with respect to the repurchased Mortgage Loan pursuant to the related Reconstitution Agreement. If the repurchased Mortgage Loan is a MERS Mortgage Loan, the Servicer shall cause MERS to designate on the MERS System the Owner as the beneficial holder with respect to such Mortgage Loan. In the event of a repurchase, the Servicer shall, simultaneously with such reassignment, give written notice to the Owner that such repurchase has taken place, and amend the Mortgage Loan Schedule to reflect the addition of the repurchased Mortgage Loan to this Agreement. In connection with any such addition, the Servicer and the Owner shall be deemed to have made as to such repurchased Mortgage Loan the representations and warranties set forth in this Agreement except that all such representations and warranties set forth in this Agreement shall be deemed made as of the date of such repurchase.

If a Mortgage Loan has been paid in full or repurchased pursuant to Section 7.04, the Servicer is authorized and empowered by the Owner, in its own name to cause the removal from the registration of any Mortgage Loan on the MERS System or to execute and deliver, on behalf of the Owner, any and all instruments of satisfaction or release and other comparable instruments with respect to such release or satisfaction of a Mortgage, in the name of MERS, solely as nominee for the Owner and its successors and assigns.

Section 7.04.    Additional Indemnification by the Servicer.

The Servicer shall indemnify the Owner and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Owner may sustain in any way related to the failure of the Servicer to perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement or any Reconstitution Agreement entered into pursuant to Section 7.01. The Servicer shall immediately notify the Owner if a claim is made by a third party with respect to this Agreement or any Reconstitution Agreement or the Mortgage Loans, shall promptly notify Fannie Mae, Freddie Mac, the trustee or other relevant third party with respect to any claim made by a third party with respect to any Reconstitution Agreement, assume (with the prior written consent of the Owner) the defense of any such claim and pay all expenses in connection therewith, including counsel fees, promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Owner in respect of such claim and follow any written instructions received from the Owner in connection with such claim. The Owner promptly shall reimburse the Servicer for all amounts advanced by it pursuant to the preceding sentence except when the claim is in any way related to a Reconstitution Agreement or to the Servicer's indemnification pursuant to Section 6.02, or the failure of the Servicer to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement or any Reconstitution Agreement. In the event a dispute arises between the Servicer and the Owner with respect to any of the rights and obligations of the parties

pursuant to this Agreement, and such dispute is adjudicated in a court of law, by an arbitration panel or any other judicial process, then the losing party shall indemnify and reimburse the winning party for all attorney's fees and other costs and expenses related to the adjudication of said dispute.

Section 7.05.    Transfer Of Servicing.

In the event that the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the provisions of this Agreement, the Servicer shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor. The Servicer shall deliver promptly to the successor servicer the funds in the Custodial Account and Escrow Account and all Servicing Files and related documents and statements held by it hereunder and the Servicer shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required.

## ARTICLE VIII.

### THE SERVICER

Section 8.01.    Merger or Consolidation of the Servicer.

The Servicer shall keep in full effect its existence, rights and franchises as a limited liability company, and shall obtain and preserve its qualification to do business as a foreign company in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which the Servicer may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any Person succeeding to the business of the Servicer, shall be the successor of the Servicer hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding, provided, however, that the successor or surviving Person shall be an institution (i) having a net worth of not less than $25,000,000, and (ii) which is a Fannie Mae- and Freddie Mac-approved servicer in good standing.

Section 8.02.    Limitation on Liability of the Servicer and Others.

Neither the Servicer nor any of the directors, officers, employees or agents of the Servicer shall be under any liability to the Owner for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment, provided, however, that this provision shall not protect the Servicer or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which

would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement. The Servicer and any director, officer, employee or agent of the Servicer may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.  The Servicer shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance with this Agreement and which in its opinion may involve it in any expense or liability, provided, however, that the Servicer may, with the consent of the Owner, undertake any such action which it may deem necessary or desirable in respect of this Agreement and the rights and duties of the parties hereto.  In such event, the Servicer shall be entitled to reimbursement from the Owner for the reasonable legal expenses and costs of such action.

Section 8.03.    <u>Limitation on Resignation and Assignment by the Servicer.</u>

The Owner has entered into this Agreement with the Servicer and subsequent transferees of the Owner will purchase the Mortgage Loans in reliance upon the independent status of the Servicer, and the representations as to the adequacy of its servicing facilities, plant, personnel, records and procedures, its integrity, reputation and financial standing, and the continuance thereof.  Therefore, the Servicer shall neither assign this Agreement or the servicing responsibilities hereunder nor delegate its rights or duties hereunder or any portion hereof (to other than a third party in the case of outsourcing routine tasks such as taxes, insurance, mortgage release and property inspection, in which case the Servicer shall be fully liable for such tasks as if the Servicer performed them itself) or otherwise dispose of all or substantially all of its property or assets without the prior written consent of the Owner, which consent shall be granted or withheld in the sole discretion of the Owner, [provided that the Servicer may, without the consent of the Owner, (i) subject to Section 3.26, assign to any Person all or any portion of the Servicer's right to reimbursement for Servicing Advances made by the Servicer on any Mortgage Loan, and (ii) assign or transfer any of its rights or obligations hereunder, or delegate any of its duties hereunder, to any of the following licensed, state-specific affiliates of the Servicer that conduct servicing in New York, Pennsylvania, Alabama and Minnesota: Green Tree Credit LLC (in New York), Green Tree Consumer Discount Company (in Pennsylvania), Green Tree-AL LLC (in Alabama), and Green Tree Loan Company (in Minnesota)

.The Servicer shall not resign from the obligations and duties hereby imposed on it except by mutual consent of the Servicer and the Owner or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Servicer.  Any such determination permitting the resignation of the Servicer shall be evidenced by an Opinion of Counsel to such effect delivered to the Owner which Opinion of Counsel shall be in form and substance acceptable to the Owner.

Without in any way limiting the generality of this Section 8.03, in the event that the Servicer either shall assign this Agreement or the servicing responsibilities hereunder or delegate its duties hereunder or any portion thereof other than as permitted by this Section 8.03 (to other than a third party in the case of outsourcing routine tasks such as taxes, insurance, mortgage release and property inspection, in which case the Servicer shall be fully liable for such tasks as if the Servicer performed them itself) or sell or otherwise dispose of all or substantially

-44-

all of its property or assets, without the prior written consent of the Owner, then the Owner shall have the right to terminate this Agreement upon notice given as set forth in Section 9.01, without any payment of any penalty or damages and without any liability whatsoever to the Servicer or any third party.

## ARTICLE IX.

### TERMINATION

Section 9.01.  Termination for Cause.

(a)    This Agreement shall be terminable at the sole option of the Owner, if any of the following events of default (each, an "Event of Default") exist on the part of the Servicer:

(i)    any failure by the Servicer to remit to the Owner any payment required to be made under the terms of this Agreement which continues unremedied for a period of one Business Day after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(ii)    failure by the Servicer duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Servicer set forth in this Agreement which continues unremedied for a period of 5 business days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Owner; or

(iii)    failure by the Servicer to maintain its license to do business or service residential mortgage loans in any jurisdiction where the Mortgaged Properties are located; or

(iv)    a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, including bankruptcy, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Servicer and such decree or order shall have remained in force undischarged or unstayed for a period of 45 days; or

(v)    the Servicer shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Servicer or of or relating to all or substantially all of its property; or

(vi)    the Servicer shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency, bankruptcy or reorganization statute, make an assignment for the benefit of its creditors, voluntarily suspend payment of its obligations or cease its normal business operations for three Business Days; or

-45-

(vii)    the Servicer ceases to meet the qualifications of a Fannie Mae or Freddie Mac servicer; or

(viii)    except as permitted by Section 8.03, the Servicer attempts, without the consent of the Owner, to assign the servicing of the Mortgage Loans or its right to servicing compensation hereunder or the Servicer attempts, without the consent of the Owner, to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof; or

(ix)    if (x) after a Reconstitution in a Securitization Transaction, any of the Rating Agencies reduces or withdraws the rating of any of the certificates issued by a securitization trust that owns the Mortgage Loans due to a reason attributable to the Servicer or (y) the Servicer's residential primary servicer rating for servicing of subprime loans issued by any of the Rating Agencies is reduced by two levels below its rating in effect on the Transfer Date or withdrawn; or

(x)    the termination of any Reconstitution Agreement or any securitization servicing agreement as a result of the occurrence of any Trigger Event or "special termination event" by the Servicer thereunder; or

(xi)    the net worth of the Servicer shall be less than $25,000,000.

In each and every such case, so long as an Event of Default shall not have been remedied, in addition to whatsoever rights the Owner may have at law or equity to damages, including injunctive relief and specific performance, the Owner, by notice in writing to the Servicer, may terminate all the rights and obligations of the Servicer under this Agreement and in and to the servicing contract established hereby and the proceeds thereof.

Upon receipt by the Servicer of such written notice, all authority and power of the Servicer under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the Owner or a successor servicer appointed by the Owner. Upon written request from the Owner, the Servicer shall prepare, execute and deliver to the successor entity designated by the Owner any and all documents and other instruments, place in such successor's possession all Servicing Files, and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer of the Mortgage Loans and related documents, at the Servicer's sole expense. The Servicer shall cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

By a written notice, the Owner may waive any default by the Servicer in the performance of its obligations hereunder and its consequences. Upon any waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall

extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

Section 9.02.    Termination Without Cause.

This Agreement and the Servicer's rights hereunder with respect to some or all of the Mortgage Loans shall terminate upon: (i) the later of (a) the distribution of the final payment or liquidation proceeds on the last Mortgage Loan to the Owner (or advances by the Servicer for the same), and (b) the disposition of all REO Property acquired upon foreclosure of the last Mortgage Loan and the remittance of all funds due hereunder, or (ii) mutual consent of the Servicer and the Owner in writing or (iii) at the sole option of the Owner, without cause, upon 30 days written notice.  Any such notice of termination shall be in writing and delivered to the Servicer by registered mail to the address set forth at the beginning of this Agreement.  If the Owner terminates the Servicer or this Agreement without cause, then within three Business Days following the transfer of servicing of the Mortgage Loans by the Servicer to the Owner or a successor servicer, the Owner shall pay to the Servicer a Loan De-Boarding fee equal to twenty-five dollars ($25.00) for each Mortgage Loan transferred to the Owner or a successor servicer The Owner and the Servicer shall comply with the termination procedures set forth in Sections 9.01 and 10.01 hereof.

## ARTICLE X.

## MISCELLANEOUS PROVISIONS

Section 10.01. Successor to the Servicer.

Simultaneously with the termination of the Servicer's responsibilities and duties under this Agreement pursuant to Sections 6.02, 7.02, 8.03, 9.01 or 9.02, the Owner or its designee shall succeed to and assume the servicing of the Mortgage Loans.  In the event that the Servicer's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned sections, the Servicer shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor.  The resignation or removal of the Servicer pursuant to the aforementioned sections shall in no event relieve the Servicer of the representations and warranties made pursuant to Sections 6.01 and the remedies available to the Owner under Section 6.02 and 7.04, it being understood and agreed that the provisions of such Sections 6.01, 6.02 and 7.04 shall be applicable to the Servicer notwithstanding any such resignation or termination of the Servicer, or the termination of this Agreement.

Within 30 days of the appointment of a successor entity by the Owner, the Servicer shall prepare, execute and deliver to the successor entity any and all documents and other instruments, place in such successor's possession all Servicing Files, and do or cause to be done all other acts or things necessary or appropriate to effect the purposes of such notice of termination, including but not limited to the transfer of the Mortgage Notes and related

documents. The Servicer shall cooperate with the Owner and such successor in effecting the termination of the Servicer's responsibilities and rights hereunder and the transfer of servicing responsibilities to the successor servicer, including without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Servicer to the Custodial Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

Any termination or resignation of the Servicer or termination of this Agreement pursuant to Sections 6.02, 7.02, 8.03, 9.01 or 9.02 shall not affect any claims that the Owner may have against the Servicer arising out of the Servicer's actions or failure to act prior to any such termination or resignation.

Any termination or resignation of the Servicer or termination of this Agreement shall in no event relieve the Owner of the representations and warranties made pursuant to Sections 6.03 and the remedies available to the Servicer under Section 6.04, it being understood and agreed that the provisions of such Sections 6.03 and 6.04 shall be applicable to the Owner notwithstanding any such resignation or termination of the Servicer, or the termination of this Agreement.

The Servicer shall deliver promptly to the successor servicer the funds in the Custodial Account and Escrow Account and all Mortgage Loan documents and related documents and statements held by it hereunder and the Servicer shall account for all funds and shall execute and deliver such instruments and do such other things as may reasonably be required to more fully and definitively vest in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Servicer.

Notwithstanding anything to the contrary contained herein, upon the termination or resignation of the Servicer without cause or the termination of this Agreement without cause, the Owner shall reimburse the Servicer immediately for all Servicing Advances that have made by the Servicer on the Mortgage Loans and that have not been reimbursed to the Servicer as of the date of the termination or resignation of the Servicer or the termination of this Agreement.

Section 10.02. Costs.

The Owner shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys. Costs and expenses incurred in connection with the transfer of the servicing responsibilities, including fees for delivering Servicing Files, shall be paid by the Owner.

Section 10.03. Protection of Confidential Information.

The Servicer hereby acknowledges that the Owner is subject to certain privacy and information security laws and regulations pursuant to which the Owner is required to obtain certain undertakings from the Servicer with regard to the privacy, use and protection of nonpublic personal financial information of the Mortgagors and certain other parties. Therefore, notwithstanding anything to the contrary contained in this Agreement, the Servicer agrees that (a) it shall keep all Customer Information strictly confidential and shall not disclose or use any

Customer Information except to the extent necessary to carry out its obligations under this Agreement and for no other purpose and (b) it shall not disclose Customer Information to any third party, including, without limitation, its third party service providers, without the prior consent of the Owner and an agreement in writing from the third party to use or disclose such Customer Information only to the extent necessary to carry out the Servicer's obligations under this Agreement and for no other purposes. At any time at the request and option of the Owner and in the event of termination or expiration of this Agreement (or any part thereof), the Servicer agrees to promptly: (x) return to the Owner all Customer Information; or (y) properly destroy or permanently erase (on all forms of recordation), in a manner consistent with the Owner's obligations under applicable laws and regulations, the Customer Information and, if requested by the Owner, acknowledge in writing that all such Customer Information has been destroyed or permanently erased. The obligations set forth in this Section shall survive termination of this Agreement.

Section 10.04. <u>Notices.</u>

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if mailed by overnight courier, addressed as follows (or such other address as may hereafter be furnished to the other party by like notice):

(i)    if to the Owner to:

Lehman Capital, A Division of Lehman Brothers Holdings Inc.
745 Seventh Avenue
13th Floor
New York, New York 10019
Attention: Manager, Contract Finance

with a copy to:

Aurora Loan Services LLC
10350 Park Meadows Drive
Littleton, CO 80124
Attention: Jerald W. Dreyer

(ii)    if to the Servicer to:

Green Tree Servicing LLC
345 St. Peter Street, Suite 1100
Saint Paul, Minnesota 55102
Attention: Chief Operating Officer

with a copy to:

Green Tree Servicing LLC

345 St. Peter Street, Suite 1100
Saint Paul, Minnesota 55102
Attention: General Counsel


Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee.

Section 10.05. <u>Severability Clause.</u>

Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate, in good-faith, to develop a structure the economic effect of which is as close as possible to the economic effect of this Agreement without regard to such invalidity.

Section 10.06. <u>No Personal Solicitation.</u>

From and after each Transfer Date, the Servicer hereby agrees that it will not take any action or permit or cause any action to be taken by any of its agents or affiliates, or by any independent contractors on the Servicer's behalf, to personally, by telephone or mail, solicit the borrower or obligor under any related Mortgage Loan for any purpose whatsoever, including to refinance a Mortgage Loan, in whole or in part, without the prior written consent of the Owner. It is understood and agreed that all rights and benefits relating to the solicitation of any Mortgagors and the attendant rights, title and interest in and to the list of such Mortgagors and data relating to their Mortgages (including insurance renewal dates) shall be transferred to the Owner pursuant hereto on the related Transfer Date and the Servicer shall take no action to undermine these rights and benefits. Notwithstanding the foregoing, it is understood and agreed that promotions undertaken by the Servicer or any affiliate of the Servicer which are directed to the general public at large, including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements shall not constitute solicitation under this Section 10.06. The provisions of this Section 10.06 shall survive the termination of this Agreement.

Section 10.07. <u>Counterparts.</u>

This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

Section 10.08. <u>Place of Delivery and Governing Law.</u>

This Agreement shall be deemed in effect when a fully executed counterpart thereof is received by the Owner in the State of New York and shall be deemed to have been made in the State of New York. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS (OTHER THAN SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW), AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

Section 10.09. <u>Further Agreements.</u>

The Owner and the Servicer each agree to execute and deliver to the other such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

Section 10.10. <u>Intention of the Parties.</u>

It is the intention of the parties that the Owner is conveying, and the Servicer is receiving only a contract for servicing the Mortgage Loans. Accordingly, the parties hereby acknowledge that the Owner remains the sole and absolute owner of the Mortgage Loans and all rights related thereto.

Section 10.11. <u>Successors and Assigns; Assignment of Servicing Agreement.</u>

This Agreement shall bind and inure to the benefit of and be enforceable by the Servicer and the Owner and the respective successors and assigns of the Servicer and the Owner. This Agreement shall not be assigned, pledged or hypothecated by the Servicer to a third party without the prior written consent of the Owner, which consent shall be given at the sole discretion of the Owner.

Section 10.12. <u>Waivers.</u>

No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is sought to be enforced.

Section 10.13. Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 10.14. General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)    the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)    accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)    references herein to "Articles", "Sections", "Subsections", "Paragraphs", and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)    the term "include" or "including" shall mean by reason of enumeration.

Section 10.15. Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

IN WITNESS WHEREOF, the Servicer and the Owner have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

LEHMAN CAPITAL, A DIVISION OF
LEHMAN BROTHERS HOLDINGS INC.
(Owner)

By: _____

Name:  Jack E. Desens

Title:    Authorized Signatory

GREEN TREE SERVICING LLC
(Servicer)

By: _____

Name: Keith A. Anderson

Title:  Chief Operating Officer

<u>EXHIBIT A</u>

FORM OF SECURITIZATION SERVICING AGREEMENT

EXHIBIT B-1

CUSTODIAL ACCOUNT CERTIFICATION

_____ __, ____

[SERVICER] hereby certifies that it has established the account described below as a Custodial Account pursuant to Section 3.03 of the Flow Subservicing Agreement, dated as of [DATE], Group No. [200_-FLOW].

Title of Account:    "[SERVICER] in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Mortgage Loans, Group No. [200_-FLOW]".

Account Number:    _____.

Address of office or branch of
the Servicer at which account
is maintained:    _____

_____

[SERVICER]
Servicer

By: _____

Name: _____

Title: _____

Date: _____

EXHIBIT B-2

CUSTODIAL ACCOUNT LETTER AGREEMENT

_____ ___, _____

To:    _____

_____

_____
(the "Depository")

As Servicer under the Flow Subservicing Agreement, dated as of [DATE] (the "Agreement"), we hereby authorize and request you to establish an account, as a Custodial Account pursuant to Section 3.03 of the Agreement, to be designated as "[SERVICER] in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Mortgage Loans, Group No. [200_-FLOW]".  All deposits in the account shall be subject to withdrawal therefrom by order signed by the Servicer.  You may refuse any deposit which would result in violation of the requirement that the account be fully insured as described below.  This letter is submitted to you in duplicate.  Please execute and return one original to us.

[SERVICER]
Servicer

By:_____
Name: _____
Title: _____
Date: _____

The undersigned, as Depository, hereby certifies that the above described account has been established under Account Number _____, at the office of the Depository indicated above, and agrees to honor withdrawals on such account as provided above. The full amount deposited at any time in the account will be one insured by the Federal Deposit Insurance Corporation through the Bank Insurance Fund ("BIF") or the Savings Association Insurance Fund ("SAIF").

_____
Depository

By:
Name:
Title:
Date:

EXHIBIT C-1

ESCROW ACCOUNT CERTIFICATION

_____ ___, _____

    [SERVICER] hereby certifies that it has established the account described below as an Escrow Account pursuant to Section 3.05 of the Flow Subservicing Agreement, dated as of [DATE], Group No. [200_-FLOW].

| | |
|---|---|
| Title of Account: | "[SERVICER] in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Mortgage Loans, Group No. [200_-FLOW], and various Mortgagors". |
| Account Number: | _____. |

Address of office or branch of
the Servicer at which account
is maintained:

_____

_____

[SERVICER]
Servicer

By:

Name:

Title:

Date:

<u>EXHIBIT C-2</u>

ESCROW ACCOUNT LETTER AGREEMENT

_____ ___, ____                .

To:        _____

           _____

           _____
           (the "Depository")


      As servicer under the Flow Subservicing Agreement, dated as of [DATE] (the "Agreement"), we hereby authorize and request you to establish an account, as an Escrow Account pursuant to Section 3.05 of the Agreement, to be designated as "[SERVICER] in trust for Lehman Capital, A Division of Lehman Brothers Holdings Inc., Residential Mortgage Loans, Group No. [200_-FLOW], and various Mortgagors".  All deposits in the account shall be subject to withdrawal therefrom by order signed by the Servicer.  You may refuse any deposit which would result in violation of the requirement that the account be fully insured as described below. This letter is submitted to you in duplicate.  Please execute and return one original to us.


                       [SERVICER]
                       Servicer


                       By:_____

                       Name: _____

                       Title: _____

                       Date: _____

The undersigned, as Depository, hereby certifies that the above described account has been established under Account Number _____, at the office of the Depository indicated above, and agrees to honor withdrawals on such account as provided above. The full amount deposited at any time in the account will be one insured by the Federal Deposit Insurance Corporation through the Bank Insurance Fund ("BIF") or the Savings Association Insurance Fund ("SAIF").

_____
Depository

By: _____

Name: _____

Title: _____

Date: _____

EXHIBIT D

FORM OF OFFICER'S CERTIFICATE

I, _____, hereby certify that I am the duly elected [Vice] President of [SERVICER] a banking corporation organized under the laws of the State of [STATE], (the "Servicer") and further as follows:

1.   Attached hereto as Exhibit 1 is a true, correct and complete copy of the charter of the Servicer which is in full force and effect on the date hereof and which has been in effect without amendment, waiver, rescission or modification.

2.   Attached hereto as Exhibit 2 is a true, correct and complete copy of the bylaws of the Servicer which are in effect on the date hereof and which have been in effect without amendment, waiver, rescission or modification.

3.   Attached hereto as Exhibit 3 is an original certificate of good standing of the Servicer, issued within ten days of the date hereof, and no event has occurred since the date thereof which would impair such standing.

4.   Attached hereto as Exhibit 4 is a true, correct and complete copy of the corporate resolutions of the Board of Directors of the Servicer authorizing the Servicer to execute and deliver the Flow Subservicing Agreement, dated as of [DATE] (the "Agreement"), by and between the Servicer and Lehman Capital, A Division of Lehman Brothers Holdings Inc., (the "Owner"), and such resolutions are in effect on the date hereof and have been in effect without amendment, waiver rescission or modification.

5.   To the best of my knowledge, either (i) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of or compliance by the Servicer with the Agreement or the consummation of the transactions contemplated by the Agreement; or (ii) any required consent, approval, authorization or order has been obtained by the Servicer.

6.   To the best of my knowledge, neither the consummation of the transactions contemplated by, nor the fulfillment of the terms of the Agreement, conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under the charter or by-laws of the Servicer, the terms of any indenture or other agreement or instrument to which the Servicer is a party or by which it is bound or to which it is subject, or any statute or order, rule, regulations, writ, injunction or decree of any court, governmental authority or regulatory body to which the Servicer is subject or by which it is bound.

7. To the best of my knowledge, there is no action, suit, proceeding or investigation pending or threatened against the Servicer which, in my judgment, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Servicer or in any material impairment

of the right or ability of the Servicer to carry on its business substantially as now conducted or in any material liability on the part of the Servicer or which would draw into question the validity of the Agreement or of any action taken or to be taken in connection with the transactions contemplated hereby, or which would be likely to impair materially the ability of the Servicer to perform under the terms of the Agreement.

8. Each person listed on Exhibit 5 attached hereto who, as an officer or representative of the Servicer, signed the Agreement and any other document delivered prior hereto or on the date hereof in connection with the Agreement, was, at the respective times of such signing and delivery, and is now, a duly elected or appointed, qualified and acting officer or representative of the Servicer, who holds the office set forth opposite his or her name on Exhibit 5, and the signatures of such persons appearing on such documents are their genuine signatures.

9. The Servicer is duly authorized to engage in the transactions described and contemplated in the Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Servicer.


Dated: _____    By: _____
                                    Name:_____
[Seal]                              Title:  [Vice] President


      I, _____, an [Assistant] Secretary of [SERVICER] hereby certify that _____ is the duly elected, qualified and acting [Vice] President of the Servicer and that the signature appearing above is [her] [his] genuine signature.

IN WITNESS WHEREOF, I have hereunto signed my name.


Dated: _____    By: _____
                                    Name:_____
                                    Title:  [Assistant] Secretary

EXHIBIT 5 to
<u>Servicer's Officer's Certificate</u>

<u>Name</u>                    <u>Title</u>                              <u>Signature</u>

_____

_____

_____

_____

_____

_____

EXHIBIT E

FORM OF OPINION OF COUNSEL TO THE SERVICER

(date)

Lehman Capital, A Division of Lehman Brothers Holdings Inc.
745 Seventh Avenue
6th Floor
New York, New York 10019

Dear Sirs:

You have requested [our] [my] opinion, as [Assistant] General Counsel to [SERVICER] (the "Servicer"), with respect to certain matters in connection with the servicing by the Servicer of the Mortgage Loans pursuant to that certain Flow Subservicing Agreement, Group No. [200_-FLOW] by and between the Servicer and Lehman Capital, A Division of Lehman Brothers Holdings Inc. (the "Owner"), dated as of [DATE], (the "Servicing Agreement"). Capitalized terms not otherwise defined herein have the meanings set forth in the Servicing Agreement.

[We] [I] have examined the following documents:

1.      the Servicing Agreement; and

2.      such other documents, records and papers as [we] [I] have deemed necessary and relevant as a basis for this opinion.

To the extent [we] [I] have deemed necessary and proper, [we] [I] have relied upon the representations and warranties of the Servicer contained in the Servicing Agreement. [We] [I] have assumed the authenticity of all documents submitted to me as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents.

Based upon the foregoing, it is [our] [my] opinion that:

1.      The Servicer is a duly organized, validly existing corporation in good standing under the laws of the state of [STATE] and is qualified to service and administer the Mortgage Loans in the states where the Mortgaged Properties are located.

2.      The Servicer has the power to engage in the transactions contemplated by the Servicing Agreement and all requisite power, authority and legal right to execute and deliver the Servicing Agreement, and to perform and observe the terms and conditions of such instruments.

3.      The Servicing Agreement has been duly authorized, executed and delivered by the Servicer and is a legal, valid and binding agreement enforceable in accordance

with its respective terms against the Servicer, subject to bankruptcy laws and other similar laws of general application affecting rights of creditors and subject to the application of the rules of equity, including those respecting the availability of specific performance, none of which will materially interfere with the realization of the benefits provided thereunder.

4.    Either (i) no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Servicer of or compliance by the Servicer with the Servicing Agreement, or the servicing of the Mortgage Loans or the consummation of the transactions contemplated by the Servicing Agreement; or (ii) any required consent, approval, authorization or order has been obtained by the Servicer.

5.    Neither the consummation of the transactions contemplated by, nor the fulfillment of the terms of, the Servicing Agreement conflicts or will conflict with or results or will result in a breach of, or constitutes or will constitute a default under, the charter or by-laws of the Servicer, the terms of any indenture or other agreement or instrument to which the Servicer is a party or by which it is bound or to which it is subject, or violates any statute or order, rule, regulations, writ, injunction or decree of any court, governmental authority or regulatory body to which the Servicer is subject or by which it is bound.

6.    There is no action, suit, proceeding or investigation pending or, to the best of [our] [my] knowledge, threatened against the Servicer which, in [our] [my] judgment, either in any one instance or in the aggregate, may result in any material adverse change in the business, operations, financial condition, properties or assets of the Servicer or in any material impairment of the right or ability of the Servicer to carry on its business substantially as now conducted or in any material liability on the part of the Servicer or which would draw into question the validity of the Servicing Agreement or of any action taken or to be taken in connection with the transactions contemplated thereby, or which would be likely to impair materially the ability of the Servicer to perform under the terms of the Servicing Agreement.

This opinion is given to you for your sole benefit, and no other person or entity is entitled to rely hereon except that the purchaser or purchasers to which you resell the Mortgage Loans may rely on this opinion as if it were addressed to them as of its date, provided that the Servicer remains the Servicer of the Mortgage Loans under the Servicing Agreement.

Very truly yours,


[Name]
[Assistant] General Counsel

EXHIBIT F

FORM OF MONTHLY REMITTANCE ADVICE

| FIELD NAME | Description | Actual Format |
|---|---|---|
| INVID | The Servicer's internal Investor designation. | Alphanumeric - 10 positions |
| INVLOANNUM | Our (Aurora) Loan Number    If you have the ability to maintain this number in your system, please report it here. If you were not given the Aurora Loan Number, please contact us and we will provide it. | Numeric, no decimal - 10 positions |
| SERVLOANNUM | Your Loan number [This field CANNOT be left blank.] | Alphanumeric - 10 positions |
| BEGSCHEDBAL | The balance at the beginning of the reporting period. If A/A or S/A, the beginning actual unpaid principal balance. If S/S, the beginning scheduled principal balance. If reporting was done last month, this should agree to the ENDSCHEDBAL from the previous reporting cycle.) [If this field is left blank, zero will be reported.] | 0.00 |
| SCHEDPRIN | The principal portion of payment(s) remitted  –  This field is NOT to be used for Payoff reporting.  If A/A or S/A, the actual principal collected from the borrower or zero.  If S/S, the scheduled principal amount. [If this field is left blank, zero will be reported.] | 0.00 |
| CURT1 | 1st curtailment or zero [If this field is left blank, zero will be reported.] | 0.00 |
| CURT1DATE | Effective date of the curtailment.  Please DO NOT report the actual date the curtailment was applied.  This field should be the due date in effect at the time of the curtailment. [If no curtailment reported, this field should be left blank.] | DD-MMM-YY |
| CURT1ADJ | 1st curtailment adjustment or zero [If this field is left blank, zero will be reported.] | 0.00 |
| CURT2 | 2nd curtailment or zero [If this field is left blank, zero will be reported.] | 0.00 |
| CURT2DATE | Effective date of the 2nd curtailment.  Please DO NOT report the actual date the curtailment was applied.  This field should be the due date in effect at the time of the curtailment. [If no curtailment reported, this field should be left blank.] | DD-MMM-YY |
| CURT2ADJ | 2nd curtailment adjustment or zero [If this field is left blank, zero will be reported.] | 0.00 |
| LIQPRIN | The Principal portion of the loan payoff or zero. [If this field is left blank, zero will be reported.] | 0.00 |

F-1

| Field | Description | Value |
|---|---|---|
| OTHPRIN | Any other payments or adjustments to principal not already reported or zero. [If field is left null, zero will be reported.] | 0.00 |
| PRINREMIT | Total Principal remitted for this loan. This is the sum of the fields above [SCHEDPRIN+CURT1+CURT1ADJ+ CURT2+CURT2ADJ+LIQPRIN+OTHERPRIN] | 0.00 |
| INTREMIT | Total Interest remitted for this loan. [If field is left null, zero will be reported.] | 0.00 |
| ANCILLARY FEE_1 | Any additional fees to be remitted under the terms of the Servicing Agreement are to be reported here (Example: Prepayment Penalties) [If field is left null, zero will be reported.] | 0.00 |
| ANCILLARY_CODE_1 | Code/De-code to be provided by Aurora TBD | Alphanumeric - 4 positions |
| ANCILLARY FEE_2 | Any additional fees to be remitted under the terms of the Servicing Agreement are to be reported here (Example: Prepayment Penalties) [If field is left null, zero will be reported.] | 0.00 |
| ANCILLARY_CODE_2 | Code/De-code to be provided by Aurora TBD | Alphanumeric - 4 positions |
| ANCILLARY FEE_3 | Any additional fees to be remitted under the terms of the Servicing Agreement are to be reported here (Example: Prepayment Penalties) [If field is left null, zero will be reported.] | 0.00 |
| ANCILLARY_CODE_3 | Code/De-code to be provided by Aurora TBD | Alphanumeric - 4 positions |
| TOTREMIT | Total Amount remitted for this loan. This is the sum of the fields above [PRINREMIT + INTREMIT] | 0.00 |
| ENDSCHEDBAL | The balance at the end of the reporting period. If A/A or S/A, the ending actual unpaid principal balance. If S/S, the ending scheduled principal balance. [If this field is left blank, zero will be reported.] | 0.00 |
| ENDACTBAL | Ending Actual (Contractual) balance on this loan at the end of the reporting period. For A/A, this should be the same as ENDSCHEDBAL. | 0.00 |
| ENDACTDUEDATE | Actual (Contractual) Due Date for this loan at the end of the reporting period. | DD-MMM-YY |
| REG_AB_MOD_TYPE | L= Lost Maturity Date M = Extention Date For loans with a borrower executed Modification, provide Mod. Type otherwide leave blank | Alphanumeric - 1 positions |
| REG_AB_PPP_WAIVED | Amount of Pre Payment Penalty Waived | 0.00 |
| ACTION_CODE | Action Code - Populate from codes listed otherwise leave blank. PAYOFF = 60, SUBSTITUTION = 63, REPURCHASE = 65 | Numeric, no decimal - 2 positions |
| ACTION_DATE | If Action Code = 60 (Payoff) enter Payoff Date, if Action Code = 63 (Substitution) enter Substitution Date, if Action Code = 65 (Repurchase) enter Repurchase Date If no Action Code leave blank | DD-MMM-YY |

| | | |
|---|---|---|
| ACTINTRATE | Actual (Contractual) Interest Rate on the loan. For S/S or S/A reporting on prepaid or delinquent loans, this may not be the Scheduled Interest Rate. | 0.0000000 |
| ACTSFRATE | Actual (Contractual) Service Fee on the loan. For S/S or S/A reporting on prepaid or delinquent loans, this may not be the Scheduled Service Fee. | 0.0000000 |
| PTRATE | Interest Pass Thru Rate – The gross interest rate less the service fee rate. | 0.0000000 |
| ACTPIPMT | Actual (Contractual) payment amount on the loan. For S/S reporting on prepaid or delinquent loans, this may not be the Scheduled Payment Amount. | 0.00 |
| SCHEDINTRATE | Scheduled Interest Rate on the loan for the reporting period. For A/A reporting, this will be the same rate as ACTINTRATE. For S/S or S/A reporting, this is the Interest Rate for the scheduled due date. | 0.0000000 |
| SCHSERVFEE | Scheduled Service Fee on the loan for the reporting period. For A/A reporting, this will be the same rate as ACTSFRATE. For S/S or S/A reporting, this is the Service Fee for the scheduled due date. | DD-MMM-YY |
| SCHEDPIPMT | Scheduled payment amount on the loan. For S/S reporting, this is the payment amount for the scheduled due date. For A/A or S/A reporting, this will be the same as the ACTPIPMT | 0.00 |

F-3

## EXHIBIT G

## STANDARD MONTHLY DEFAULTED LOAN REPORT

| | Data Field | Format | Data Description |
|---|---|---|---|
| A | Servicer loan number | VARCHAR2(15) | Individual number that uniquely identifies loan as defined by servicer. |
| B | Loan type | VARCHAR2(2)<br>1=FHA Residential<br>2=VA Residential<br>3=Conventional w/o PMI<br>4=Commercial<br>5=FHA<br>6=Conventional w/PMI<br>7=HUD<br>235/265<br>9=Farm Loan | Type of loan being serviced generally defined by the existence of certain types of insurance. (ie: FHA, VA, conventional insured, conventional uninsured, SBA, etc.) |
| C | Actual due date | DATE(MM/DD/YYYY) | Actual due date of the next outstanding payment amount due from the mortgagor. |
| D | Delinquency flag | VARCHAR2(2)<br>90+ delinq. Not in FC, Bky or Loss mit<br>N=Less than 90 days delinquent | Y=Servicer defined indicator that identifies that the loan is delinquent but is not involved in loss mitigation, foreclosure, bankruptcy or REO. |
| E | Foreclosure flag | VARCHAR2(2)<br>foreclosure<br>foreclosure | Y=Active Servicer defined indicator that identifies that the loan is involved in N=No active foreclosure proceedings. |
| F | Bankruptcy flag | VARCHAR2(2)<br>Bankruptcy<br>Bankruptcy | Y=Active Servicer defined indicator that identifies that the property is an asset in an N=No Active active bankruptcy case. |
| G | Loss mit flag | VARCHAR2(2)<br>Active loss mitigation<br>active loss mitigation | Y=Servicer defined indicator that identifies that the loan is involved in N=No completing a loss mitigation alternative. |
| H | Post Foreclosure Flag | R=REO<br>T=Third Party sale held | C=Claims Servicer defined indicator that identifies that the property is in REO/Claims N= No FC or went to a Third Party at FC sale |
| I | Foreclosure referral date | attorney DATE(MM/DD/YYYY) | Actual date that the loan was referred to local counsel to begin foreclosure proceedings. |
| J | Actual first legal date | DATE(MM/DD/YYYY) | Actual date that foreclosure counsel filed the first legal action as defined by state statute. |
| K | Date FC sale scheduled | DATE(MM/DD/YYYY) | Date that the foreclosure sale is either project or scheduled to be held. |
| L | Foreclosure actual sale held date | DATE(MM/DD/YYYY) | Actual date that the foreclosure sale was held. |

G-1

| | | | |
|---|---|---|---|
| M | 3rd Party Sale | VARCHAR2(7) 3rd Party at FC sale N= Sold back to noteholder at FC sale | Y= Sold to a servicer defined indicator that identifies that the loan was sold to a 3rd Party saleat Foreclosure Sale |
| N | Bankruptcy filed date | DATE(MM/DD/YYYY) | Actual date that the bankruptcy petition is filed with the court. |
| O | Bankruptcy chapter | VARCHAR2(2) Chapter 7 filed 11 filed 13= Chapter 13 filed | 7=Chapter of bankruptcy filed. 11= Chapter 12= Chapter 12 filed |
| P | Post petition due date | DATE(MM/DD/YYYY) | The post petition due date of a loan involved in a chapter 13 bankruptcy. |
| Q | Pre and Post Payments paid by trustee | VARCHAR2(2) Pays both pays Pre Payments | Y=Trustee To identify if the trustee makes the pre and post petition payments N=No Trustee only throughout the Bankruptcy. |
| R | Bankruptcy discharge date | DATE(MM/DD/YYYY) | Actual date that the Discharge Order is entered in the bankruptcy docket. |
| S | BK Relief/Dismissal Granted date | DATE(MM/DD/YYYY) | Actual date that the dismissal or relief from stay order is entered by the bankruptcy court. |
| T | Loss mit approval date | DATE(MM/DD/YYYY) | The date determined that the servicer and mortgagor agree to pursue a defined loss mitigation alternative. |
| U | Loss mit type | VARCHAR2(2) CH= Charge off Deed in lieu Forbearance plan/repay PC=Partial claim VA=VA refunding Solication of Loss Mit DI= FB= MO=Modification SH=Short sale SL= | The defined loss mitigation alternative identified on the loss mit approval date. |
| V | Repay first due date | DATE(MM/DD/YYYY) | The due date of the first scheduled payment due under a forbearance or repayment plan agreed to by both the mortgagor and servicer. |
| W | Repay next due date | DATE(MM/DD/YYYY) | The due date of the next outstanding payment due under a forbearance or repayment plan agreed to by both the mortgagor and servicer. |
| X | REO original list date | DATE(MM/DD/YYYY) | The initial/first date that the property was listed with an agent as an REO. |
| Y | REO original list price | NUMBER(15,2) | The initial/first price that was used to list the property with an agent as an REO. |
| Z | REO current list price | NUMBER(15,2) | The current list price of the REO |
| AA | REO sales price | NUMBER(10,2) | The actual REO sales price |
| AB | REO offer accepted | DATE(MM/DD/YYYY) | The actual date that the REO offer was accepted. |
| AC | REO actual closing date | DATE(MM/DD/YYYY) | The actual date that the sale of the REO property closed escrow. |
| AD | REO net proceeds received | NUMBER(10,2) | The actual REO sales price less closing costs paid. The net sales proceeds are identified within the HUD1 settlement statement. |

| Code | Field | Data Type | Description |
|---|---|---|---|
| AE | Eviction start date | DATE(MM/DD/YYYY) | Actual date that the eviction proceedings are commenced by local counsel. |
| AF | Eviction complete date | DATE(MM/DD/YYYY) | Actual date that the eviction proceedings are completed by local counsel. |
| AG | MI claim filed date | DATE(MM/DD/YYYY) | Actual date that the claim was submitted to the PMI company. |
| AH | MI claim amount filed | NUMBER(15,2) | The amount of the claim that was filed by the servicer with the PMI company. |
| AI | MI claim funds received date | DATE(MM/DD/YYYY) | Actual date that funds were received from the PMI company as a result of transmitting an MI claim. |
| AJ | MI claim amount paid | NUMBER(15,2) | The amount of the claim that the MI company paid. |
| AK | MI Interest Paid to Date | DATE (MM/DD/YYYY) | The date through which MI paid interest |
| AL | Clear Title Date | DATE (MM/DD/YYYY) | Actual date that the property became marketable. |
| AM | FHA 27011A transmitted date | DATE(MM/DD/YYYY) | Actual date that the FHA 27011A claim was submitted to HUD. |
| AN | FHA Part A funds received date | DATE(MM/DD/YYYY) | Actual date that funds were received from HUD as a result of transmitting the 27011A claim. |
| AO | FHA 27011 transmitted date | BDATE(MM/DD/YYYY) | Actual date that the FHA 27011B claim was submitted to HUD. |
| AP | FHA Part B Funds Received Date | DATE(MM/DD/YYYY) | |
| AQ | VA NOE submitted date | DATE(MM/DD/YYYY) | Actual date that the Notice of Election to Convey was submitted to the VA. |
| AR | VA first funds received date | DATE(MM/DD/YYYY) | The date the the funds from the specified bid were received by the servicer from the VA. |
| AS | VA first funds received amount | NUMBER(15,2) | The amount of funds received by the servicer from VA as a result of the specified bid. |
| AT | Title approval letter received date | DATE(MM/DD/YYYY) | The actual date that the title approval was received as set forth in the HUD title approval letter. |
| AU | VA claim submitted date | DATE(MM/DD/YYYY) | The actual date that the expense claim was submitted by the servicer to the VA. |
| AV | VA claim funds received date | DATE(MM/DD/YYYY) | The actual date that funds were received by the servicer from the VA for the expense claim submitted by the servicer. |
| AW | VA Claim received amount | NUMBER(15,2) | The amount of funds received by the servicer from VA as a result of the specified bid. |
| AX | Current Value | NUMBER(10,2) | The most recent value of the property. |
| AY | Current Value Source | VARCHAR2(15) Broker's Price Appraisal=Appraisal Assumed BPO if Value and Date reported | BPO=Opinion Blank = Name of vendor or management company that provided the value. |
| AZ | Current Value date | DATE(MM/DD/YYYY) | The most recent value date of the property. |
| BA | Current Occupancy | VARCHAR2(1) | O=Owner The most recent status of the property regarding who if anyone is occupying |

G-3

| Code | Field | Type / Values | Description |
|---|---|---|---|
|  | status | occupied U=Unknown | T=Tenant occupied V=Vacant | die property. Typically a result of a routine property inspection. |
| BB | Date of last property inspection | DATE(MM/DD/YYYY) | The date of the most recent property inspection |
| BC | Property condition | VARCHAR2(2) Excellent 3=Average 5=Poor | 1=Physical condition of the property as most recently reported to the servicer 2=Good by vendor or property management company. 4=Fair 6=Very poor |
| BD | Reason for default | VARCHAR2(3) 001=Death of principal mtgr 002=Illness of principal 003=Illness of mtgr's family member 004=Death of mtgr's family member 005=Marital difficulties 006=Curtailment of income 007=Excessive obligations 008=Abandonment of property 009=Distant employee transfer 011=Property problem/Natural Disaster 012=Inability to sell property 013=Inability to rent property 014=Military service 015=Other 016=Unemployment 017=Business failure 019=Casualty loss 022=Energy-Environment costs 023= Servicing problems 026= Payment adjustment 027=Payment dispute 029=Transfer ownership pending 030=Fraud 031=Unable to contact borrower INC=Incarceration | 001=Death of principal(for Default) Cause of delinquency as identified by mortgagor. (Standard FNMA Reasons |
| BE | Corporate expense balance | NUMBER(10,2) | Total of all cumulative expenses advanced by the servicer for non-escrow expenses such as but not limited to: FC fees and costs, bankruptcy fees and costs, property preservation and property inspections. |
| BF | Escrow balance | NUMBER(10,2) | The positive or negative account balance that is dedicated to payment of hazard insurance, property taxes, MI, etc. (escrow items only) |
| BG | Escrow advance balance | NUMBER(10,2) | The positive or negative account balance that is dedicated to payment of hazard insurance, property taxes, MI, etc. (escrow items only) |
| BH | Suspense balance | NUMBER(10,2) | Money submitted to the servicer, credited to the mortgagor's account but not allocated to principal, interest, escrow, etc. |
| BI | Restricted escrow | NUMBER(10,2) | Money held in escrow by the mortgage company through completion of |

G-4

| | | | repairs to property. |
|---|---|---|---|
| BJ | VA LGC/ FHA Case number | VARCHAR2(15) | | Number that is assigned individually to the loan by either HUD or VA at the time of origination. The number is located on the Loan Guarantee Certificate (LGC) or the Mortgage Insurance Certificate (MIC). |
| BK | Senior Lien Balance | NUMBER(10,2) | | Current Principal Balance on First lien or Original Principal Balance |
| BL | Litigation in process | VARCHAR2(7) Y=Active | N=No active | Any delinquent loan that is not able to be Foreclosed on or the REO is not marketable |
| BM | Loan Liquidated | VARCHAR2 SS-Short sale VA-VA Refunding | CH-Charge off REO-REO | Type of liquidation within the last 30 days. |
| BN | Date of Liquidation | DATE(MM/DD/YYYY) | | Date the CH, SS, REO or VA was liquidation off of servicer system. |
| BO | Bankruptcy Loss | NUMBER(10,2) | | Cramdown amount associated with the |
| BP | % of MI coverage | NUMBER(6,5) | | % of Coverage of MI |
| BQ | MI Carrier | | | Name of the MI Company |
| BR | MI Certification Number | VARCHAR2(15) | | MI Certification Number |
| BS | % of Pool MI Coverage | NUMBER(6,5) | | |
| BT | Pool MI Carrier | | | |
| BU | Pool MI Certification Number | VARCHAR2(15) | | |
| BV | VA Interest Cutoff Date | DATE(MM/DD/YYYY) | | The date in which VA has determine the Cut off date |
| BW | Investor number | NUMBER (10,2) | | Unique number assigned to a group of loans in the servicing system. |
| BX | Estimated (Loss)/Gain | NUMBER (10,2) | | The projected loss at REO |

G-5

EXHIBIT H

FORM OF LOAN LOSS REPORT

| | Applicability | Field Name | Field Definition | Format |
|---|---|---|---|---|
| A | All | Servicer Loan Number | Individual number that uniquely identifies loan as defined by Servicer | VARCHAR2(15) |
| B | All | Aurora Loan Number | Individual number that uniquely identifies loan as defined by Aurora Master Servicing | NUMBER(9) |
| C | All | Liquidation Date | Date the loan was liquidated on the Servicers servicing system. | DATE(MM/DD/YYYY) |
| D | All | Servicer Cut-off Date | Reporting cycle cutoff date of loan liquidation | DATE(MM/DD/YYYY) |
| E | All | Loan Type | Type of loan being serviced generally defined by the existence of certain types of insurance. (ie: FHA, VA, conventional insured, conventional uninsured, SBA, etc.) | VARCHAR2(2) 1=FHA Residential 2=VA Residential 3=Conventional w/o PMI 4=Commercial 5=FHA Project 6=Conventional w/PMI 7=HUD 235/265 9=Farm Loan |
| F | All | Stop Advance Date | Date the servicer stopped advancing P&I on a Scheduled/Scheduled loan. | DATE(MM/DD/YYYY) |
| G | All | Stop Interest Amount | Amount of Interest Accrued and not advanced by the servicer. | NUMBER(10,2) |
| H | All | Date of Last Delinquency | The Last Paid Installment (LPI) date. | DATE(MM/DD/YYYY) |
| I | All | Resolution Type | Description of the process to resolve the delinquency. CH = Charge Off DI = Deed in Lieu MO = Modification PC = Partial Claim SH = Short Sale FC = Foreclosure TP = Third Party Sale FB = Forbearance Agreement RD= Redemption NS = Note Sale SP = Short Pay | VARCHAR2(15) |
| J | All | Resolution Start Date | Date the process described in Resolution Type started. | DATE(MM/DD/YYYY) |
| K | All | Resolution Completion Date | Date the process described in Resolution Type was completed. | DATE(MM/DD/YYYY) |
| L | All | Forbearance Start Date | The due date of the first scheduled payment due under a forbearance or repayment plan agreed to by both the mortgagor and the Servicer | DATE(MM/DD/YYYY) |
| M | All | Forbearance End Date | The Servicer defined date upon which the Servicer considers that the plan was no longer in effect as a result of plan completion or mortgagor's failure to remit payments as scheduled | DATE(MM/DD/YYYY) |

| | | | | |
|---|---|---|---|---|
| N | All | BK Filing Date | The actual date bankruptcy petition is filed with the court | DATE(MM/DD/YYYY) |
| O | All | BK Relief/ Dismissal Date | Actual date of dismissal or relief from stay order is entered | DATE(MM/DD/YYYY) |
| P | All | Bk Discharged Date | Actual date discharge order is entered in the bankruptcy docket | DATE(MM/DD/YYYY) |
| Q | All | 1st Legal Date | Actual date the foreclosure first legal action is recorded, as defined by state statute | DATE(MM/DD/YYYY) |
| R | All | Foreclosure Held Date | Actual date the foreclosure date was held | DATE(MM/DD/YYYY) |
| S | All | Clear Title Date | Actual date that the property became marketable | DATE(MM/DD/YYYY) |
| T | FHA/VA | Conveyance Date | Date the insuring agency accepted title of the property held as collateral for the mortgage loan. | DATE(MM/DD/YYYY) |
| U | FHA | Part A Settlement Date | Date the Part A Claim to HUD was paid (The Settlement date noted on the EOB provided by HUD). | DATE(MM/DD/YYYY) |
| V | VA | VA Max Guaranty % | Maximum percentage VA will insure in the event of a no bid | NUMBER(6,5) |
| W | VA | VA Interest Cut Off Date | Date designated by the VA that Interest will be paid through. | DATE(MM/DD/YYYY) |
| X | VA | VA Buydown | The amount of money held by the servicer to be used towards payments. Not buydown funds for the VA to issue a bid | NUMBER(10,2) |
| Y | All Loans except FHA/VA | REO Sale/Closing Date | Actual date that the sale of the REO property closed escrow. | DATE(MM/DD/YYYY) |
| Z | All | Principle Advance Amount | Amount of monthly advances made to the master servicer by the servicer attributable to Principal. | NUMBER(16,2) |
| AA | All | Interest Advance Amount | Monthly advances made to the master servicer by the servicer attributable to net interest. | NUMBER(9,2) |
| AB | All | Interest Accrued | Delinquent interest that accrued from date of delinquency to liquidation at note rate. | NUMBER(10,2) |
| AC | All | Bankruptcy Fees | Sum of bankruptcy attorney fees paid to a third party | NUMBER(10,2) |
| AD | All | Bankruptcy Costs | Sum of bankruptcy costs paid to a third party related to a bankruptcy filing involving the borrower or subject property. | NUMBER(10,2) |
| AE | All | Foreclosure Fees | Sum of foreclosure attorney fees paid to a third party | NUMBER(10,2) |
| AF | All | Foreclosure Costs | Sum of foreclosure costs paid to a third party | NUMBER(10,2) |
| AG | All | Eviction Fees | Sum of eviction attorney fees paid to a third party | NUMBER(10,2) |
| AH | All | Eviction Costs | Sum eviction costs paid to a third party | NUMBER(10,2) |
| AI | All | Appraisal Costs | Sum of fees paid in connection with obtaining property valuation | NUMBER(10,2) |
| AJ | All | Preservation Costs | Sum of preservation and protection expenses | NUMBER(10,2) |
| AK | All | Utility Costs | Funds advanced by Servicer for required utility services at the property. | NUMBER(10,2) |
| AL | All | HOA Costs | Funds advanced by Servicer for homeowner's association dues | NUMBER(10,2) |
| AM | All | Hazard Refunds | Amount of refunds of Hazard Premiums paid. | NUMBER(10,2) |
| AN | All | Hazard Premiums | Funds advanced by Servicer for Hazard Insurance on the property held as collateral for the mortgage. | NUMBER(10,2) |
| AO | All | Real Estate Taxes | Funds advanced by Servicer for real estate taxes | NUMBER(10,2) |

H-2

| | | | | |
|---|---|---|---|---|
| AP | All | Escrow Balance | Positive balance remaining in the escrow account at time of liquidation | NUMBER(10,2) |
| AQ | All | Restricted Escrow | Amount of funds held in the Restricted Escrow account. | NUMBER(10,2) |
| AR | All | Escrow Advance Amount | Negative escrow balance in the escrow account at time of liquidation | NUMBER(10,2) |
| AS | All | Suspense Balance | Amount of funds held in the Suspense account (Positive Number). | NUMBER(10,2) |
| AT | All Loans except FHA/VA | REO/Sale Net Proceeds | The actual REO sales price less the closing costs paid. The net proceeds must match HUD1 settlement statement | NUMBER(10,2) |
| AU | Third Party Sale Only | Third Party Sale Proceeds | Funds received in connection with the sale of the property held as collateral for the mortgage loan (Positive Number). | NUMBER(10,2) |
| AV | MI | MI Claimed Amount Filed | The amount of the claim that was filed by the Servicer with the MI company | NUMBER(15,2) |
| AW | MI | MI Claimed File Date | Actual date that the claim was submitted to the MI company | DATE(MM/DD/YYYY) |
| AX | MI | Amount of MI Proceeds Received | The amount of proceeds received from the MI company | NUMBER(15,2) |
| AY | MI | MI Proceeds Received Date | Actual date that the funds were received from the MI company as a result of transmitting an MI claim | DATE(MM/DD/YYYY) |
| AZ | FHA/VA | Interest on Advances | Interest paid by HUD/VA or MI on the amounts advanced related to the liquidation of the property. | NUMBER(16,2) |
| BA | FHA/VA | Initial Claim Proceeds | Funds received in connection with the conveyance of the property to the insuring agency (Positive Number). | NUMBER(10,2) |
| BB | FHA/VA | Final Claim Proceeds | Final Claim funds received from the insuring agency (HUD/VA). | NUMBER(10,2) |
| BC | FHA/VA | Servicer Retained Loss | The total amount of the **Final Loss** the Servicer will take, due to Interest/Expense Curtailments by HUD/VA (This would include Advances not claimed to HUD/VA or MI due to servicer error) (Positive Number). | NUMBER(10,2) |
| BD | RF Securities Only | Estimated Recovery | The amount of Proceeds estimated to be received from your HUD Part B or VA claim if not already received. (For RF Deals only) | NUMBER(10,2) |
| BE | All | Initial Realized Loss | Realized loss passed in the initial month of liquidation | NUMBER(10,2) |
| BF | All | Cumulative Realized Loss | The sum of the initial loss plus any subsequent expense or gain accrued on the asset | NUMBER(10,2) |
| BG | All | Total Proceeds | Any proceeds used to liquidate the asset. The Sum of: Sales Proceeds, Initial Claim Proceeds, Final Claim Proceeds, Other Claim Proceeds, Replacement Reserve, Restricted Escrow, Suspense Balance (Positive Number). | NUMBER(10,2) |
| BH | All | Fraud Loss | Please refer to exhibit C for definition | NUMBER(10,2) |
| BI | All | Special Hazard Loss | Please refer to exhibit C for definition | NUMBER(10,2) |
| BJ | All | Investor Code | Servicer's Investor Code | VARCHAR2(15) |

H-3

## EXHIBIT I

OTHER SERVICING REQUIREMENTS

## AMENDMENT
## TO
## FLOW SUBSERVICING AGREEMENT

This Amendment to the Flow Subservicing Agreement ("Amendment") is entered into as of the 'ᵍᵗʰ 'day of October, 2007, by and between Lehman Capital, A Division of Lehman Brothers Holdings Inc. (the "Owner") and Green Tree Servicing LLC (the "Servicer").

WHEREAS, the Owner and the Servicer are parties to that certain Flow Subservicing Agreement dated as of October 19, 2007 (the "Flow Agreement"); and

WHEREAS, Section 10.12 of the Flow Agreement requires waivers and modifications to the Flow Agreement to be in writing and signed by all parties; and

WHEREAS, the Owner and the Servicer desire to amend the Flow Agreement pursuant to the terms of this Amendment.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the parties, the parties agree as follows:

1.    Except as otherwise specifically defined in this Amendment, capitalized terms used in this Amendment without definition shall have the meaning ascribed thereto in the Flow Agreement.

2.    The definition of "Remittance Date" set forth in Article I of the Flow Agreement is hereby deleted and replaced with the following definition:

"Remittance Date: The 10th day (or if such 10th day is not a Business Day, the first Business Day immediately following) of any month."

3.    Except as expressly amended herein, all other terms of the Flow Agreement remain unchanged.

[The Next Page is the Signature Page]

1

IN WITNESS WHEREOF, the parties have duly executed this Amendment as of the date set forth in the preamble of this Amendment.

LEHMAN CAPITAL, A DIVISION OF LEHMAN
BROTHERS HOLDINGS INC.,

Owner

By: _____

Name: Jack E. Desens
Title:  Vice President


GREEN TREE SERVICING LLC,

Servicer

By: _____

Name:  Keith A. Anderson
Title:   Chief Operating Officer

2