DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, NY  10019
Telephone:  (212) 259-8000
Facsimile:  (212) 259-6333
Martin J. Bienenstock, Esq.
Irena M. Goldstein, Esq.
Donna L. Gordon, Esq.

FLASTER/GREENBERG PC
1628 John F. Kennedy Blvd.
Philadelphia, PA  19103
Telephone: (215) 279-9393
Facsimile: (215) 279-9394
Eugene J. Chikowski, Esq.
Greg T. Kupniewski, Esq.

Co-Attorneys for American Express Travel Related
 Services Company, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al. | Case No. 08-13555 (JMP) (Jointly Administered) |
| Debtors. | |
| BARCLAYS CAPITAL INC. | |
| Movant, v. | |
| AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, | |
| Respondent. | |

**OBJECTION OF AMERICAN EXPRESS TRAVEL RELATED**
**SERVICES COMPANY, INC. TO MOTION OF BARCLAYS CAPITAL INC.**
**FOR RELIEF CONCERNING AMERICAN EXPRESS CONTRACTS**
**LISTED AS CLOSING DATE CONTRACTS**
**AND REQUEST FOR INTEREST, FEES AND EXPENSES**

American Express Travel Related Services Company, Inc. ("AmEx") files this Objection

(the "Objection") to the relief requested by Barclays Capital Inc. ("Barclays") in its motion for

relief concerning an American Express contract,[1] dated October 14, 2008 (the "Rule 60(b)

Motion") and this request for interest, fees and expenses, and in support thereof respectfully

states as follows:

## SUMMARY OF ARGUMENT

1.    Background.  On September 17, 2008, Lehman Brothers Holdings Inc. ("LBHI"),

along with its affiliate LB745 LLC (together with LBHI and affiliated debtors, the "Debtors"),

filed their Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a

Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and

Assignment of Contracts relating to the Purchased Assets [Dkt. No. 60] ("Sale Motion").

Barclays was not a party, and did not object or otherwise respond, to the Sale Motion.

2.    Sale Order Approved Assumption and Assignment of Closing Date Contracts.  On

September 20, 2008, this Court entered its Order Under 11 U.S.C. §§ 105(a), 363, and 365 and

Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A)

The Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption

and Assignment of Executory Contracts and Unexpired Leases, dated September 19, 2008 (the

"Sale Order") [Dkt No. 258] under the terms set forth in the Sale Order and the Asset Purchase

Agreement among LBHI, Lehman Brothers, Inc., LB745 LLC and Barclays, dated as of

September 16, 2008 (the "APA").  Barclays was purchasing an ongoing business and, therefore,

needed to have in place all contracts it needed to continue business operations without any

---

[1] There are actually two AmEx Contracts (as defined herein), not one, as implied by the title of Barclays'
Rule 60(b) Motion.

disruption.  To accomplish this, it ensured that the Sale Order[2] approving the APA provided that contracts listed on the Closing Date Contracts List (defined below) would be assumed and assigned at closing. The AmEx Contracts (defined below) were on the Closing Date Contracts List to be assumed and assigned to Barclays.

3.      <u>Barclays was not a Party to the Sale Motion</u>.  Despite the fact that the Sale Order granted *the Debtors'* Sale Motion, it is Barclays, and not the Debtors, who comes before this Court, and asks for relief from the order.  Indeed, in their Response to the Motions of Barclays Capital Inc. for Relief, Pursuant to Federal Rule of Civil Procedure 60(b) and Federal Rule of Bankruptcy Procedure 9024, Concerning Various Closing Date Contracts ("Debtors' Response") [Dkt 1212], the Debtors "request that the Court either deny the relief requested or condition any relief granted to protect the estates from heightened liability."

4.      <u>Rule 60(b) Only Applies to Parties</u>.  Fed. Rule Civ. P. 60(b) ("Rule 60(b)") allows "a party" to request relief from an order.  Barclays was not a party to the Sale Motion.  The Debtors, who were "parties," have not joined in Barclays' Rule 60(b) Motion and have requested the Court to either deny or condition the relief requested by Barclays.  *See* Debtors' Response at 5.  Thus, simply stated, Barclays lacks standing to seek relief from an order it did not request and under which the Court approved the Debtors', not Barclays', assumption and assignment of contracts.

5.      <u>Rule 60(b) Only Applies to Orders, Not Contracts</u>.  By its express terms, Rule 60(b) only provides relief from orders.  There is nothing in the Sale Order that Barclays wants to change.  To the contrary, Barclays wants to change retroactively its own Closing Date Contracts

---

[2] The definition of "Sale Order" under the APA means an "order or orders of the Bankruptcy Court in form and substance reasonably acceptable to Purchaser and Seller."  APA, p. 8 [Dkt 280]

List to delete some contracts and to retain others. That relief is simply not available from Rule 60(b).

6. <u>Barclays Changed its Mind After Closing:  No Mistake Exists</u>. Even assuming, for argument sake, that Barclays has standing and Rule 60(b) applies to Contracts as well as Orders, it is clear that there was no mistake, only a change of mind. Indeed, as set forth below, the motion filed by Barclays with respect to other Closing Date Contracts (defined below) for which it is seeking to avoid responsibility (Motion for Relief Concerning Certain Contracts Erroneously Posted with the "Closing Date Contracts" ("<u>First Barclays Motion</u>") [Dkt No. 809]), proves that Barclays always intended to take assignment of the AmEx Contracts. It changed its mind after closing. Rule 60(b) provides no relief for changes of mind.[3]

7. <u>Barclays' Own Evidence Proves Barclays, At Most, is Claiming it Exercised Bad Business Judgment in making the AmEx Contracts Closing Date Contracts</u>. As shown below, the communications and statements of Barclays' own representatives and attorneys prove that after Barclays placed the AmEx Contracts on the Closing Date Contracts List, which pursuant to the Sale Order, were assumed and assigned at closing, Barclays rethought whether they comprised a good deal for Barclays and ultimately determined they did not. Without exaggeration, Barclays is making a staggering contention that it had the right to change the business deal after the closing of its purchase in a manner not reserved in the APA or the Sale Order.

---

[3] Indeed, is Barclays proposing that if LBHI changes its mind about the sale and determines it can make a better economic deal selling its investment banking business or real estate to others, the Court can modify the Sale Order and rewrite the APA to accomplish that result?  If not, it appears Barclays is contending that the Sale Order can be modified and the APA rewritten to improve its deal, but those who were actually parties to the Sale Motion have no such rights.

8.      <u>Rule 60(b) Relief is Also Unavailable due to AmEx's Reliance</u>.  AmEx relied to

its detriment upon Barclays' contract to take assignment of the AmEx Contracts and the Sale

Order by, among other things, providing Barclays with proprietary confidential information,

providing services to Lehman/Barclays personnel and retaining numerous employees whose sole

purpose was to provide services under the AmEx Contracts.  Even assuming *arguendo* that

Barclays took assignment of the AmEx Contracts by mistake, *In re UAL Corp.*, 411 F. 3d 818,

824 (7th Cir. 2005), the very precedent which Barclays' entire request hinges upon (presumably

because it upheld the undoing of a contract assumption under Bankruptcy Code section 1110),

actually states reliance as an independent reason why Barclays' Rule 60(b) Motion must be

denied.  As *UAL Corp.* ruled, "People rely on contracts and judgments alike, and when they do

so reasonably their reliance should not be upset because it was induced by a mistake committed

by the other party to the contract or litigation."  *In re UAL Corp.*, 411 F. 3d 818, 824 (7th Cir.

2005).

## FACTUAL AND PROCEDURAL BACKGROUND

9.      Prior to September 15, 2008, when LBHI and certain of its subsidiaries

commenced filing voluntary Chapter 11 cases, LBHI (on behalf of itself and its global related

entities) entered into a Global Corporate Services Commercial Account Agreement with

American Express Travel Related Services Company, Inc. (and its global related entities)

effective as of October 13, 2006 (as amended from time to time, the "<u>AmEx Corporate Services

Contract</u>").

10.     Also prior to the commencement of these bankruptcy cases, LBI entered into a

Business Travel Services Agreement with American Express Travel Related Services Company,

Inc. effective as of September 1, 2000 (as amended from time to time, the "<u>AmEx Travel</u>

Contract" and, together with the AmEx Corporate Services Contract, the "AmEx Contracts").[4]
*See* Affidavit of Stephanie Deihl ("Deihl Affidavit"), filed herewith, ¶2.

11.    As of September 22, 2008, the Debtors owed AmEx approximately
$17,234,887.00 on account of the AmEx Corporate Services Contract ("Corporate Services
Cure") and approximately $577,833.00 on account of the AmEx Travel Contract ("Travel
Cure"), for a combined total of $17,812,000.00 (the "Cure Amounts").[5]  Massoni Affidavit, ¶5.

A.    The AmEx Contracts Were Designated as "Closing Date Contracts"

12.    On September 20, 2008, this Court entered the Sale Order [Dkt. No. 258]
pursuant to which, *inter alia*, executory contracts to be assumed and assigned to Barclays were
broken down into two categories:  (i) contracts to be assumed and assigned upon the closing of
the sale to Barclays the ("Closing Date Contracts") and (ii) contracts that Barclays had 60 days to
evaluate before deciding whether to take by assignment ("Designated Contracts").  Prior to the
hearing on the Sale Motion, the AmEx Contracts were identified as "Closing Date Contracts" on
the list ("Closing Dates Contracts List") posted by the Debtors' claims agent on
http://chapter11.epiqsystems.com/Lehman ("Lehman Website") with associated cure amounts of
$18,000,000.00 and $0, respectively.

13.    According to the Debtors' Response, "the assumption and assignment of Closing
Date Contracts was approved in the Sale Order," and the Closing Date Contracts have therefore
already been assumed and assigned to Barclays pursuant to the closing which occurred on
September 22, 2008.  Debtors' Response, ¶¶5, 8.

---

[4]    The AmEx Contracts are confidential and contain proprietary business information.  AmEx will
provide copies of the AmEx Contracts to the Court, and if necessary, will file a motion to file the AmEx
Contracts under seal.

[5]    The Cure Amounts fluctuate based upon, among other things, the value of the US dollar,
resolution of disputed charges and continued use of AmEx services.

B.      AmEx Consented to Assignment and Cure Amount

14.     On September 22, 2008, AmEx sent a letter to Debtor's counsel, with a courtesy copy to Barclays' counsel, consenting in writing to the cure amount associated with the assumption and assignment of the AmEx Corporate Services Contract, a true and correct copy of which is annexed to the Declaration of Eugene J. Chikowski ("Chikowski Declaration") as Exhibit __.[6]

15.     Pursuant to the Sale Order, absent agreement on the cure amount, the Court would determine the cure amount.  Undoing the assumption and assignment was not a right granted by the APA or Sale Order to Barclays.

C.      Barclays Never Stated that it Made a Mistake By Including the
        AmEx Contracts on the Closing Date Contract List

16.     Counsel for AmEx had a number of conferences with Barclays prior to October 1, 2008 and those discussions concerned only payment of the cure amounts (and not whether Barclays would accept assignment of the AmEx Contracts).

17.     Barclays, after it had reviewed confidential information contained in the AmEx Corporate Services Contract, abruptly informed AmEx by telephone on the evening of October 1, 2008 (nine days after closing), that it intended to unilaterally "amend" the Closing Date Contracts List and that the AmEx Contracts would no longer be included on the amended list. Chikowski Declaration, ¶21.

---

[6]      AmEx consented to the combined $18 million cure amount set forth on the Closing Date Contracts List, even though the Corporate Services Cure was slightly lower and the Travel Cure was higher than that listed because the combined total approximated the $18 million. As set forth in the Chikowski Declaration, because of confusion created by the Debtors' and Barclays' own procedures, AmEx subsequently sent two more consent notices which are attached as Exhibits B and E to the Declaration.

18.    Later in the evening of October 1, 2008, approximately nine days after the sale to Barclays closed, Barclays filed the Revision Notice and posted a copy of a purported amendment to the Closing Date Contract List ("Amended Closing Date Contract List") on the Lehman Website.[7]

19.    Notably, Barclays required the Debtors, the Court and thousands of parties in interest to litigate and complete the entire sale process in less than three days under the most abbreviated of procedures.  Indeed, certain material facts remained undisclosed until the sale hearing, which ended at approximately 2:00 a.m. on Saturday, September 20, 2008.  Now it appears that Barclays, which made all parties rush and proceed under minimal notice, believed it could, at its leisure, take AmEx's confidential Closing Date Contracts, assumed and assigned at closing as per the Sale Order (which by the terms of the APA, was reasonably satisfactory to Barclays), and change its mind during the nine-day  period following closing.

D.    AmEx Relied Upon the Closing Date Contracts List and the Sale Order

20.    During the period of time between LBHI's bankruptcy filing and the filing of the Revision Notice, AmEx continued providing services to Lehman (and to Lehman employees who, upon information and belief, moved to Barclays) under the AmEx Contracts, including, allowing high level Lehman/Barclays executives to continue using their AmEx cards (Deihl Affidavit ¶4), providing services to Lehman employees seeking to travel home (Deihl Affidavit ¶4), and continuing to employ (and pay for) 48 AmEx employees who provided travel services solely to Lehman.  Deihl Affidavit ¶3.  AmEx would not have continued to provide services to Lehman/Barclays under the AmEx Contracts if not for the fact that the AmEx Contracts were

---

[7] Barclays asserted in the Revision Notice that it had the authority to amend the Closing Date Contracts List under the APA.  Such authority is lacking, however, as Barclays admits by filing the First Barclays Motion and the Rule 60(b) Motion.  Barclays' story keeps changing.

assumed and assigned, and, moreover, would have taken other actions to ensure that amounts owing to it were paid or explore whether the AmEx Contracts could have been assumed and assigned as part of the Debtors' other transactions. Massoni Affidavit ¶6.

21.     During that same time period, AmEx employees were in communication with both Lehman and Barclays personnel and were *never* advised that Barclays was purporting to have the right to repudiate its obligation to take assignment of, and pay cure costs associated with, the AmEx Contracts. Deihl Affidavit ¶8. Similarly, AmEx's and Barclays' counsel were in communication, and Barclays' counsel *never* advised AmEx's counsel that Barclays had taken assignment of the AmEx Contracts by mistake – only that it was unsure about the cure amount it listed and needed to investigate the matter. Chikowski Affidavit ¶20.

   E.    There was no "Mistake":
         Barclays Intended to Take Assignment of The AmEx Contracts

22.     On Friday, October 10, 2008, Barclays filed the First Barclays Motion in which it contends that certain contracts were included on the Closing Date Contract List because of "an error that occurred in reformatting the list for electronic posting."    First Barclays Motion, ¶1 [Dkt No. 809]. In particular, as set forth in the Declaration of Eszter Farkas, dated October 9, 2008 (the "Farkas Declaration"), accompanying the First Barclays Motion, certain contracts listed on the excel spread sheet prepared by Barclays with the letter "N" in row Z of the spreadsheet, should not have been included on the Closing Date Contracts List while contracts with the letter "Y" on the spreadsheet were to be included on the List. The AmEx Contracts (numbered 17 and 459 on the Excel Spread sheet attached as Exhibit "D" to the Farkas Declaration) are both marked "Y". Accordingly, Barclays *admitted* in the First Barclays Motion that it intended to take assignment of the AmEx Contracts.

23.     Notwithstanding, on October 14, 2008, Barclays filed the Rule 60(b) Motion, contending the AmEx Contracts were included on the Closing Contracts List as a result of "an error that occurred in reducing a broader-formulated list of contracts to the list of Closing Date Contracts that Barclays would assume."  Rule 60(b) Motion, ¶2.

24.     Barclays pretends that this "error" was the same mistake identified in the First Barclays Motion.  Barclays own documents, however, prove the contrary - - Barclays always identified the AmEx Contracts as Closing Date Contracts, as evidenced by the "Y" in column 2. *See* ¶ 22 above.

25.      Barclays further contends that it advised AmEx of the so-called mistake as soon as it was discovered and relies upon an email wherein Barclays' counsel advised AmEx's counsel as follows:

> Gene:
>
> I am sorry to bother you, but I am concerned that you and Amex did not understand what I told you the business day after you sent your original letter to Harvey Miller re Amex's contract.  As I told you then, listing the Amex contract with the cure amount of $18 million was a mistake.  Therefore, Barclays cannot accept a cure form notice from Amex that trys [sic] to accept the amount that I told you prior to such attempted acceptance was a mistake.  The business folks have got to talk and try to reach an agreed upon resolution.  My understanding is that there has already been some contact.  This is not meant to raise hackles at Amex, but the clients need to seek to resolve the issue.
>
> Lindsee Granfield

26.     Barclays' current implausible reading of Ms. Granfield's email makes absolutely no sense.  Nowhere does Ms. Granfield's email state or suggest that the assumption and assignment of the AmEx Contracts was in error.  To eliminate any doubt, the email expressly explains the mistake was the cure amount:  "Therefore, Barclays cannot accept a cure form notice from Amex that trys [sic] to accept the amount that I told you prior to such attempted

acceptance was a mistake." Why would Ms. Granfield have discussed the cure amount if Barclays didn't want to assume the contract in the first place? Plainly, Barclays originally determined to take the assignment of the AmEx Contracts believing the cure amount was $18 million, but then determined it wanted to pay less.

27.    Moreover, if Ms. Granfield had informed Mr. Chikowski on September 23 ("the business day after [he] sent [his] original letter to Harvey Miller") that Barclays had not intended to take assignment of the AmEx Contracts, why had Barclays/Lehman personnel engaged in any conversations with AmEx personnel regarding the assumption and assignment of the AmEx Contracts? Why had Lehman/Barclays requested and accepted services from AmEx under the AmEx Contracts? Why were there any conversations after September 23 among Barclays, AmEx and their counsel concerning the AmEx Contracts if Barclays had never intended to take assumption of such Contracts? And finally, if assuming the AmEx Contracts was a mistake as a result of actions taken by Barclays' counsel, why would Ms. Granfield's email say that "the clients need to seek to resolve this issue"?

28.    The only coherent explanation of the foregoing is that Barclays originally determined the continuance of the Lehman Brothers investment banking business required the travel and charge card services AmEx had been providing. Therefore, Barclays placed the AmEx Contracts on the Closing Date Contract List and then, only after: (a) the closing, (b) AmEx providing transition services, and (c) Barclays receiving proprietary AmEx information, did Barclays decide that it could do better elsewhere. Simply put, neither Rule 60(b) nor any jurisprudential doctrine allows a party to renege unilaterally on a contract or an order in those circumstances.

**ARGUMENT**

**I.**

**BARCLAYS LACKS STANDING TO SEEK RELIEF
FROM AN ORDER IT DID NOT REQUEST**

29.     Rule 60(b)(1), made applicable by Rule 9024 of the Federal Rules of Bankruptcy Procedure provides: "On motion and just terms, the *court may relieve a party or its legal representative* from a final judgment, order, or proceeding for the following reasons:   (1) mistake, inadvertence, surprise, or excusable neglect."  (emphasis supplied)  This Court entered the Sale Order at the request of the Debtors pursuant to their Sale Motion.  Barclays was not a party to the Sale Motion (nor an intervenor, respondent or objector) and, therefore, lacks standing under the express language of Rule 60(b)(1) to seek relief from the Sale Order.

30.     The AmEx Contracts were assumed and assigned by the Debtors pursuant to the Sale Order.  Barclays "assumed and assigned" nothing.  Indeed, Barclays did not require Court permission to buy the Purchased Assets because it is not a debtor before this Court – rather it was the Debtors, who under Bankruptcy Code sections 363 and 365, were required to obtain, and requested, therefore this Court's approval of the sale of the Purchased Assets and the assumption and assignment of the AmEx Contracts to Barclays.[8]

31.     The Debtors are not moving under Rule 60(b)(1) for relief from the Sale Order, only Barclays is.  In fact, Debtors request this Court to *deny* both the First Barclays Motion and the Rule 60(b) Motion unless the Court conditions any relief requested by Barclays "to protect the estates from heightened liability," an impossible request considering that the estates currently

---

[8] Notably, pursuant to section 363(m) of the Bankruptcy Code, the reversal or modification on appeal of the Sale Order would not affect the validity of the sale of the AmEx Contracts, as long as Barclays was a good faith purchaser.  Is Barclays contending that it was not a good faith purchaser?

have no responsibility to satisfy cure payments, and even if the cure payments are deemed pre-petition unsecured claims, those are pre-petition unsecured claims for which the Debtors' estates would not otherwise be liable. *See* Debtors Response, p. 5.

32.    Yet Barclays cites no decisions in its Rule 60(b) Motion pursuant to which an entity, not party to the original motion or action, obtained relief under Rule 60(b) from an order it had not requested (or opposed), *particularly where the only "parties" with standing, the Debtors, have objected to the relief requested by Barclays. Id.*

33.    While it is obvious that Barclays was pulling the strings behind the scenes and dictating the contracts to be assumed and assigned by the Debtors due to the fact that it had the bargaining leverage, that leverage does not give it authority to undo actions taken by the Debtors pursuant to an order of this Court. Barclays may only step into the shoes of the Debtors if it is an alter ego of one or more of the Debtors, in which case it will have to satisfy such Debtors' debts.

34.    If Barclay contends, however, that it is not the Debtors' alter ego and, thus, lacks authority to step into the Debtors' shoes or act on behalf of and bind the Debtors, it lacks standing to come before this Court and seek relief that benefits it and harms the Debtors' estates for two basic reasons: First, the Debtors assumed and assigned the AmEx Contracts, Barclays did not; second, the APA required the assignment of the contracts assumed by the Debtors under the Sale Order. The Debtors would never have agreed to a transaction under which Barclays could dictate which agreements the Debtors had to assume, and allowed Barclays the ability, after assumption, to pick and choose among the assumed contracts the ones that it wanted to take by assignment.

35.    Finally, while Barclays did not name the Debtors as adverse parties to its motion, the Debtors' estates and their creditors would be prejudiced if Barclays' Rule 60(b) Motion were

granted.  Currently, the AmEx Contracts are assigned to Barclays, Barclays is responsible for the cure costs and Bankruptcy Code section 365(k) relieves the Debtors' estates of liability for subsequent defaults.  If, however, the assumption and assignment were undone, then the Debtor parties to the AmEx Contracts would have liability for the administrative expenses accrued prior to the rejection of the contracts and would have liability for rejection damages.

36.     Indeed, the Debtors agree:  "Typically, contracts rejected after assumption give rise to administrative expense priority claims."  Debtors' Response, ¶8.  The Debtors, therefore, request that the Court, *if* it grants Barclays' Rule 60(b) Motion, condition the relief such that the Debtors' estate "should not be subject to any greater liability than they would have had if the contracts had never been assumed as a result of any relief granted on the Rule 60 Motions."  *Id.* Even if the contracts are deemed rejected, that liability would dilute distributions to all holders of general allowed unsecured claims against such Debtors.  The Debtors' estates will be worse off if the relief requested by Barclays is granted under any scenario and there is no valid reason to force creditors to suffer that dilution because the estates are entitled to the benefit of their bargain.

37.     This Court, therefore, should deny the relief requested by Barclays, because not only does it lack standing to seek it, granting it would harm the Debtors' estates.

## II.

### BARCLAYS IS NOT ENTITLED TO RELIEF UNDER FEDERAL RULE OF CIVIL PROCEDURE 60(b)

38.     Rule 60(b)(1) "permits courts to reopen judgments for reasons of mistake, inadvertence, surprise, or excusable neglect."  *Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship*, 507 U.S. 380, 393 (U.S. 1993).  "Rule 60(b) is an *extraordinary procedure* permitting the court that entered judgment to grant relief therefrom upon a showing of good cause within the

rule." *Cessna Finance Corp. v. Bielenberg Masonry Contracting, Inc.*, 715 F.2d 1442, 1444 (10th Cir. 1983) (emphasis added). "To make the excusable neglect determination, the Court [in *Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship*] listed four factors for courts to consider: "the danger of prejudice to the [non-moving party], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 188 F.3d 116, 125 (3d Cir. 1999) (*citing Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship*, 507 U.S. at 395). "[T]he determination is at bottom an equitable one, taking account of all relevant circumstances . . . " *Pioneer Inv. Serv. Co. v. Brunswick Assocs. P'ship*, 507 U.S. at 395.

39.     As set forth above, the "danger of prejudice" to AmEx as well as the Debtors' estates is substantial. AmEx relied to its detriment upon the Sale Order and the Closing Date Contracts List while the Debtors' estates are being deprived of the benefit of their bargain. During the nine days after Barclays had closed under the APA, and took assignment of the AmEx Contracts, Barclays and its representatives had numerous communications with AmEx and its representatives during which it never advised AmEx of the purported mistake. Moreover, sale orders are sacrosanct and it is in the interests of public policy for orders to be final and not subject to buyer's remorse. This entire matter was in the total control of Barclays: It helped craft the Sale Order and it dictated which contracts were scheduled on the Closing Contracts List. While it can be assumed that Barclays acted in good faith when it listed the AmEx Contracts as Closing Date Contracts, its actions since then, as discussed above, have been questionable.

40.     The facts here show Barclays intentionally placed the AmEx Contracts on the Closing Date Contracts List with an $18 million cure amount that AmEx agreed to, but had a

change of mind after closing.  Thus, the Barclays' mistake was at most, a mistake in its business analysis.

41.     Contrary to Barclays argument that the "'excusable neglect' standard has been *liberally construed* by courts to include, where appropriate, the mistake of the party," Rule 60(b) Motion ¶ 18 (emphasis added), the Court of Appeals for the Second Circuit "has instructed that relief under Rule 60(b) is 'extraordinary' and can be granted 'only upon a showing of exceptional circumstances.'"  *In re Carlton Concrete Corp.*, 2008 U.S. Dist. LEXIS 74430, at *16 (E.D.N.Y. Sept. 26, 2008) (*citing Nemaizer v. Baker*, 793 F.2d 58, 60 (2d Cir. 1986)). The equitable considerations here bar modification of the Sale Order, especially when there's no mistake in the first place.

42.     Barclays principally relies on *In re UAL Corp.*, 411 F.3d 818 (revocation of section 1110 approval) for the proposition that courts have the discretion to relieve a party from an order approving the assumption of contracts under Section 365 of the Bankruptcy Code.  Rule 60(b) Motion ¶ 19.  In *UAL Corp.*, the Court of Appeals for the Seventh Circuit (Circuit Judge Posner) addressed the issue of whether the debtor's mistake in failing to abandon certain leases was a case of excusable neglect within the meaning of Federal Rule of Civil Procedure Rule 60(b)(1).  The Court of Appeals found the facts demonstrated the debtor made an honest mistake assuming economically disadvantageous leases because the debtor believed the cure amount was zero when it was actually very substantial.  *In re UAL Corp.*, 411 F.3d 821.   Based upon erroneously believing the cure amount was zero, the debtor notified the bank (lessor) that it was not abandoning the aircraft but did not accompany its notice of assumption with the requisite cure amount because it thought that the cure amount was zero instead of the millions of dollars

actually owed.  The Court of Appeals for the Seventh Circuit reasoned the bank had constructive

notice of the debtor's honest mistake:

> But the bank, upon receiving United's notice but no check, knew that something
> was amiss - - for February 7 was the deadline for curing any defaults, and unlike
> United the bank realized the payment was past due on those leases.  The bank
> could thus have repossessed the planes, but . . . it didn't want to.  It wanted to
> enforce United's mistaken election to honor the leases and the concomitant duty
> to cure the defaults.  It wanted money, not planes.

> . . .

> **Had the beneficiaries of the mistake, the airplanes' owners, relied to their
> detriment on it, United would not be entitled to relief.**

*In re UAL Corp.*, 411 F.3d 821 (emphasis supplied).  The Seventh Circuit, therefore, held that

the bank was not prejudiced as a result of the mistake.  *In re UAL Corp.*, 411 F.3d 824.

43.    Notably, in *UAL Corp.*, unlike here, (a) the party requesting relief from the order

was the party assuming the lease, namely the debtor, and (b) it was the order approving

assumption of the lease that was the mistake based on the debtor's erroneous belief that the cure

amount was zero, rather than the mistake being a document prepared by an assignee (the Closing

Date Contracts List).

44.    Here, Barclays, which is a competitor of AmEx, received confidential information

and always knew that the cure amounts were substantial (Barclays had listed the cure amounts at

$18 million), and is not seeking relief from the Sale Order, only the Closing Date Contracts List.

AmEx on other hand, provided transition services, maintained a staff of 48 persons to carry out

the AmEx Contracts, and provided credit to certain employees of the Debtors.  The reliance is

undisputable and precludes Rule 60(b) relief from any order.

45.    *UAL Corp.* makes clear that the principle of allowing a party to be relieved of a

court order as a result of a unilateral mistake "must not be pressed too far." *Id.* at 824.  Courts

should "distinguish between an obvious error, such as an error in computation, and an 'error of

judgment,' which if a ground of restitution would make every contract party a kind of fiduciary of the opposing party, end arms length bargaining, and make contractual obligations radically uncertain." *Id.*

46.     In this case, the facts demonstrate that Barclays had not made a forgivable computation error, but instead made an error in judgment.  As the First Barclays Motion makes clear, Barclays intentionally listed the AmEx Contracts as Closing Date Contracts and therefore, intentionally and knowingly took assignment of the AmEx Contracts with a cure amount of $18 million.  Later, upon reflection, Barclays changed its mind (after AmEx had already relied upon the Sale Order in numerous ways and Barclays had reviewed the confidential data and otherwise benefited from the contracts), and now seeks relief from the Sale Order.   That is precisely the relief that *UAL Corp* says is unavailable.

47.     In making its ruling in *UAL Corp.*, the Seventh Circuit looked to decisions where courts allowed a party to rescind its obligations under a contract because of a unilateral mistake. 411 F.3d at 824 ("There is little difference between the criteria for rescinding a contract and the criteria for rescinding a judgment.").   "Under New York law, in order for a court to allow rescission of a contract on the basis of a unilateral mistake, 'a party must establish that (i) he entered into a contract under a mistake of material fact, and that (ii) the other contracting party either knew or should have known that such mistake was being made.'" *Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp 2d 326, 330 (S.D.N.Y. 2002); *quoting Ludwig v. Nynex Serv. Co.*, 838 F. Supp. 769, 795 (S.D.N.Y. 1993).

48.     In this case, Barclays cannot even meet its burden of demonstrating that it agreed to take assignment of the AmEx Contracts "under a mistake of material fact."  As the First Barclays Motion makes clear, any "mistake" made by Barclays in connection with the

preparation of the Closing Date Contracts List was a mistake of business analysis because the First Barclays Motion reveals that the AmEx Contracts were intentionally placed on the Closing Date Contracts List.  Barclays listed the cure amount as $18 million.  Later, it decided it no longer wanted to pay $18 million for the AmEx Contracts.  That is not a mistake for purposes of Rule 60(b)(1).  That's a change of mind.

49.    Additionally, it is clear that AmEx did not know and had no reason to know that a mistake had been made:  Until October 1, 2008, Barclays never advised AmEx that it intended to repudiate its obligation to take assignment of the AmEx Contracts.  In fact, Barclays acted to the contrary by engaging in discussions with AmEx and its counsel, requesting and reviewing the AmEx Contracts' confidential information and referring only to the listed cure amount as a mistake.  There would be no cure amount if the AmEx Contracts were not to be assumed and assigned.  Indeed, Barclays could have disputed the cure amount, taken assignment of the AmEx Contracts and requested the Court to determine the cure amount.

50.    Furthermore, in *UAL Corp.,* the Court granted the relief because to do otherwise would harm the debtor's creditors.  *Id.* at 824.  In this case, the Debtors' creditors *will* be harmed if Barclays is granted the relief it requests.  *See* Debtors' Response at ¶8.

51.    Barclays' efforts to obtain relief from the Sale Order are further undermined by the other cases it relies upon in the Rule 60(b) Motion.  In those cases, the party not seeking relief did not experience any prejudice as a result of the vacatur of the respective court order. *See, Compania Transatlantica Espanola, S.A. v. Hartford Accident & Indemnity Co.,* 950 F.2d 105, 107 (2d Cir. 1991) (holding that granting relief under F.R.C.P. Rule 60(b) to vacate the parties' prior stipulation mistakenly terminating an appeal did not prejudice any of the parties*); American Alliance Insurance Co. Ltd. V. Eagle Insurance Co.*, 92 F.3d 57, 62 (2d Cir. 1997)

(holding that that granting relief under F.R.C.P. Rule 60(b) to vacate a default judgment did not prejudice the other party affected by the vacatur of the default judgment).

52.    In this case, the requested relief prejudices AmEx because (i) former Lehman employees (now Barclays employees) continued their use of AmEx services; (ii) AmEx provided confidential and proprietary information to its competitor Barclays; (iii) AmEx did not pursue other avenues for payment; and (iv) AmEx continued providing services to Lehman/Barclays, including maintaining 48 dedicated staff people to provide services only to Lehman.

53.    Finally, the Sale Order is a final order and public policy dictates that a final order not be changed simply because a party changed its mind. *Gazes v. Delprete (In re Clinton St. Food Corp.)*, 254 B.R. 523, 530 (Bankr. S.D.N.Y. 2000) (in which the court noted "the important public policy favoring the finality of orders transferring ownership of bankruptcy estate assets."); *see also Bank of Lafayette v. Baudoin (In re Baudoin)*, 981 F.2d 736, 742 (5th Cir. 1993) (citation omitted) (bankruptcy court orders "authorizing the sale of part of the estate or confirming such sale are final judgments on the merits for *res judicata* purposes).

54.    If the Court allows Barclays to change its mind and undo the assignment of the AmEx Contracts because Barclays, after closing, determined it could get better contracts elsewhere, then can the Debtors undo the sale of the real estate to Barclays under the APA if it finds it can get a higher price elsewhere?  Perhaps the Debtors can also find a better price for LBHI's investment banking business!  Manifestly, Barclays is requesting relief that renders court orders trendy, unreliable documents, subject to whim.  Barclays' attempt to rescind the Debtors' assumption of the AmEx Contracts is equally preposterous to its attempt to rescind an assignment because it rethought the situation.  Both its requests impugn the judicial process.

55.     More than one month has passed since the date Barclays was required to make cure payments.  AmEx is entitled to interest on its outstanding cure amounts and reimbursement of the attorneys' fees and costs it was forced to incur to oppose Barclays' Rule 60(b) Motion and to enforce this Court's Sale Order.

NY3 3013258.7 398200 000010 10/27/2008 06:08pm

## CONCLUSION

For all of the reasons set forth herein, AmEx respectfully requests that this Court enter an Order: (i) denying the relief requested in the Rule 60(b) Motion; (ii) enforcing the terms of the Sale Order; (iii) awarding AmEx interest, attorneys' fees and expenses; and (iv) granting AmEx such other relief as is just and equitable.

Dated: October 27, 2008
      New York, New York

**DEWEY & LEBOEUF LLP**

By:  /s/Irena Goldstein
      Martin J. Bienenstock
      Irena Goldstein
      Donna L. Gordon
1301 Avenue of the Americas
New York, New York 10019
Tel.  212-259-8000
Fax  212-259-6333

**FLASTER/GREENBERG P.C.**
Eugene J. Chikowski, Esquire
Greg T. Kupniewski, Esquire
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
Telephone: 215-279-9393
Facsimile: 215-279-9394

*Co-Attorneys to American Express Travel Related Services Company, Inc.*

NY3 3013258.7 398200 000010 10/27/2008 06:08pm