# EXHIBIT 1

AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT

Dated as of May 9, 2008

among

SIXTH GEAR FUNDING TRUST,
as seller

SIXTH GEAR SOLUTIONS CORP.,

THE PURCHASERS PARTIES HERETO,

and

LEHMAN BROTHERS COMMERCIAL PAPER INC.,
as Administrative Agent and as Agent,

and

THE OTHER AGENTS PARTIES HERETO

# TABLE OF CONTENTS

**Page**

ARTICLE 1        DEFINITIONS ................................................................................. 1

   1.1    Definitions .................................................................................................. 1

   1.2    Other Definitional Provisions ................................................................... 1

ARTICLE 2        PURCHASE AND SALE OF RECEIVABLES ............................. 1

   2.1    Transactions ............................................................................................... 1

   2.2    Initiation; Confirmation ........................................................................... 2

   2.3    Reductions and Extensions of Committed Purchase Limits; Optional
       Prepayment; Limited Amortization ......................................................... 4

   2.4    Repurchase ................................................................................................. 5

   2.5    Requirements of Law ................................................................................. 5

   2.6    Taxes .......................................................................................................... 6

   2.7    Indemnification .......................................................................................... 8

   2.8    Expenses, Etc ........................................................................................... 10

   2.9    Effect of Event of Default; Amortization Event or Termination Event .............. 10

   2.10   Price Differential, Fees, Expenses, Payments, Etc ............................... 11

   2.11   Substitution ............................................................................................. 12

   2.12   Delivery of Notice of Exclusive Control ............................................... 12

ARTICLE 3        CONDITIONS PRECEDENT ....................................................... 12

   3.1    Conditions to Closing .............................................................................. 12

   3.2    Conditions to Transactions ..................................................................... 13

   3.3    Conditions to Initial Transaction ........................................................... 14

ARTICLE 4        REPRESENTATIONS AND WARRANTIES ............................. 15

   4.1    Representations and Warranties of the Company ................................. 15

ARTICLE 5        COVENANTS ................................................................................. 18

   5.1    Affirmative Covenants ............................................................................ 18

   5.2    Negative Covenants ................................................................................. 21

   5.3    Quarterly Statement as to Compliance ................................................. 21

   5.4    Company May Consolidate, Etc. Only on Certain Terms ................... 22

   5.5    No Other Business ................................................................................... 22

   5.6    No Borrowing ........................................................................................... 22

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 5.7 | Servicer's Obligations | 22 |
| 5.8 | Guarantees, Loans, Advances and Other Liabilities | 22 |
| 5.9 | Capital Expenditures | 22 |
| 5.10 | Compliance with Laws | 22 |
| 5.11 | Restricted Payments | 22 |
| 5.12 | Further Instruments and Acts | 23 |
| 5.13 | Interest Rate Protection | 23 |
| 5.14 | Change in Name | 23 |
| 5.15 | Limitation on Transactions with Affiliates | 23 |
| 5.16 | Limitation on Investments | 23 |
| 5.17 | Margin Confirmation | 24 |
| 5.18 | Financial Covenants | 24 |
| ARTICLE 6 | PAYMENT, TRANSFER AND CUSTODY | 25 |
| 6.1 | Generally | 25 |
| 6.2 | Transfer of Ownership | 25 |
| 6.3 | Conveyance | 25 |
| 6.4 | Custody | 26 |
| ARTICLE 7 | ASSET VALUE MAINTENANCE | 26 |
| 7.1 | Generally | 26 |
| 7.2 | Margin Call | 26 |
| 7.3 | Future Transactions | 26 |
| ARTICLE 8 | COLLECTIONS | 26 |
| 8.1 | Generally | 26 |
| 8.2 | Offset | 28 |
| ARTICLE 9 | SECURITY INTEREST | 28 |
| 9.1 | Grant of Security Interest | 28 |
| ARTICLE 10 | CONFIDENTIALITY | 29 |
| 10.1 | Covenants | 29 |
| 10.2 | Covenants of Purchasers | 29 |
| 10.3 | Non-Confidentiality of Tax Treatment and Tax Structure | 30 |

# TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| ARTICLE 11 | THE AGENTS | 30 |
| 11.1 | Appointment | 30 |
| 11.2 | Delegation of Duties | 31 |
| 11.3 | Exculpatory Provisions | 31 |
| 11.4 | Reliance by Agents | 31 |
| 11.5 | Notices | 32 |
| 11.6 | Non-Reliance on Agents and Other Purchasers | 32 |
| 11.7 | Indemnification | 33 |
| 11.8 | Agents in their Individual Capacity | 33 |
| 11.9 | Successor Agents | 33 |
| ARTICLE 12 | EVENTS OF DEFAULT | 34 |
| 12.1 | Events of Default | 34 |
| 12.2 | Rights Upon Event of Default or Amortization Event | 36 |
| 12.3 | Remedies | 36 |
| 12.4 | Notice of Sale of Repurchase Assets | 37 |
| 12.5 | Restoration of Rights and Remedies | 37 |
| 12.6 | Rights and Remedies Cumulative | 37 |
| 12.7 | Delay or Omission Not a Waiver | 38 |
| 12.8 | Control by Purchasers | 38 |
| 12.9 | Waiver of Past Defaults | 38 |
| 12.10 | Waiver of Stay or Extension Laws | 38 |
| 12.11 | Performance and Enforcement of Certain Obligations | 39 |
| ARTICLE 13 | TRANSFERS | 39 |
| 13.1 | Disclosure to Permitted Parties | 39 |
| 13.2 | Participations and Transfers | 39 |
| 13.3 | Characterization | 40 |
| 13.4 | Disclosure Relation to Certain Federal Protections | 41 |
| ARTICLE 14 | MISCELLANEOUS | 41 |
| 14.1 | Amendments and Waivers | 41 |
| 14.2 | Notices | 42 |

# TABLE OF CONTENTS
(continued)

**Page**

14.3    No Waiver; Cumulative Remedies ................................................................ 43

14.4    Successors and Assigns................................................................................. 43

14.5    Counterparts ................................................................................................. 43

14.6    Severability .................................................................................................. 43

14.7    Integration .................................................................................................... 43

14.8    Governing Law ............................................................................................ 43

14.9    Jurisdiction; Consent to Service of Process ................................................ 44

14.10   Termination.................................................................................................. 44

14.11   No Proceedings ............................................................................................ 44

14.12   No Recourse ................................................................................................. 45

14.13   Survival of Representations and Warranties................................................ 45

14.14   Waiver of Jury Trial..................................................................................... 45

14.15   CP Conduit as Committed Purchaser........................................................... 45

14.16   Committed Purchasers Without CP Conduits............................................... 46

14.17   Terminability................................................................................................ 46

14.18   No Recourse ................................................................................................. 46

Exhibit A    Form of Transfer Supplement
Exhibit B    Form of Joinder Supplement

Annex I    Purchase Limits

AMENDED AND RESTATED MASTER REPURCHASE AGREEMENT (the "Agreement"), dated as of May 9, 2008, by and among SIXTH GEAR FUNDING TRUST a Delaware statutory trust (the "Company"), as seller hereunder, Sixth Gear Solutions Corp., a Delaware corporation ("Sixth Gear"), the PURCHASERS from time to time parties hereto (the "Purchasers"), the AGENTS for the Purchaser Groups from time to time parties hereto (each such party, together with their respective successors in such capacity, an "Agent"), and LEHMAN BROTHERS COMMERCIAL PAPER INC., a Delaware corporation ("Lehman"), as administrative agent (together with its successors in such capacity, the "Administrative Agent").

<u>W I T N E S S E T H</u> :

WHEREAS, Sixth Gear Solutions Corp., a Delaware corporation ("Sixth Gear"), as Seller and as Servicer, and the Company are parties to a Sale and Servicing Agreement, dated as of December 21, 2007 and amended and restated as of May 9, 2008 (as the same may from time to time be amended, modified or otherwise supplemented, the "Sale and Servicing Agreement");

WHEREAS, the parties hereto are parties to the Master Repurchase Agreement, dated as of December 21, 2007 (the "Original Master Repurchase Agreement");

WHEREAS, the parties to the Original Master Repurchase Agreement desire to amend and restate the Original Master Repurchase Agreement;

NOW THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and adequacy of which are hereby expressly acknowledged, the parties hereto agree as follows:

ARTICLE 1    DEFINITIONS

1.1    <u>Definitions</u>.  All capitalized terms used herein as defined terms and not defined herein shall have the meanings given to them in Annex A hereto.

1.2    <u>Other Definitional Provisions</u>.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto.

(b)    The words "hereof", "herein", and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; and Section, subsection and Exhibit references are to this Agreement, unless otherwise specified.  The words "including" and "include" shall be deemed to be followed by the words "without limitation".

ARTICLE 2    PURCHASE AND SALE OF RECEIVABLES

2.1    <u>Transactions</u>.  On and subject to the terms and conditions of this Agreement and prior to the related Purchase Termination Date, the parties hereto may enter into

transactions in which the Company agrees to transfer to the Administrative Agent, on behalf of the Purchasers, all of the Company's right, title and interest in and to certain Receivables against the transfer of funds by the Purchasers to the Company with a simultaneous agreement by each Purchaser to transfer to the Company all of its right, title and interest in and to such Receivables at a date certain not later than the Stated Termination Date. Each such transaction shall be referred to herein as a "Transaction" and shall be governed by this Agreement and the related Confirmation, unless otherwise agreed in writing. Each Transaction shall commence on the Purchase Date and terminate on the Repurchase Date therefor. On the Repurchase Date for each Transaction, the Purchased Receivables included in such Transaction will be deemed to have been rolled into a new Transaction with a Repurchase Date that is the earlier of (a) 30 days beyond such Repurchase Date or such other date that the Company and the Administrative Agent may agree in writing and (b) the Stated Termination Date. Subject to their respective Committed Purchase Limits, this Agreement is a commitment by the Committed Purchasers to enter into Transactions with the Company. However, with respect to the CP Conduits, this Agreement is not a commitment by such CP Conduits to enter into Transactions with the Company, but rather sets forth the procedures to be used in connection with Transactions with the Company that the CP Conduits consent to enter into. The Company hereby acknowledges that the CP Conduits are not under any obligation to agree to enter into, or to enter into, any Transaction pursuant to this Agreement. Any Receivables transferred to the Purchasers pursuant to this Section 2.1 shall be held by the Administrative Agent, as agent on behalf of the Purchasers. Each Purchaser's interest in the Receivables so held by the Administrative Agent shall constitute a pro rata undivided interest in the Receivables in accordance with such Purchaser's respective share of the Purchase Price.

2.2     Initiation; Confirmation.

(a)     On and subject to the terms and conditions of this Agreement and prior to the related Purchase Termination Date, each CP Conduit may, in its sole discretion, purchase its Purchaser Percentage of any Receivables offered for purchase pursuant to Section 2.2(b) hereof.

(b)     Each agreement to enter into a Transaction hereunder on the applicable Purchase Date shall be made upon delivery of a Purchase Request by the Company to the Administrative Agent received no later than 1:00 p.m. (New York City time) on the Business Day prior to the applicable Purchase Date, and the Administrative Agent shall give notice of any such Transaction (in the form of a copy of the related Purchase Request) to the related Agents by facsimile or electronic mail before 3:00 p.m. (New York City time) on the day it receives such request from the Company. Each Purchase Request shall (i) identify the relevant Purchase Date, (ii) set forth the Purchase Price of the related Receivables which will be purchased on such Purchase Date, (iii) specify an account in the United States to which payment of the related Purchase Price is to be made, and (iv) certify that the applicable conditions to the entry into a Transaction contained in Section 3.2 have been satisfied. Each Purchase Request shall be irrevocable and shall specify a Purchase Price which shall not be less than $500,000. No more than one Transaction may be consummated on any day. The Administrative Agent shall promptly forward a copy of each Purchase Request received by it to each Agent and each Purchaser.

(c)     The Administrative Agent shall confirm the terms of each Transaction by issuing a written confirmation to the Company promptly after the parties enter into such Transaction (a "Confirmation").  Such Confirmation shall set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date and (iv) additional terms or conditions not inconsistent with this Agreement.   After receipt of the Confirmation, the Company shall sign the Confirmation and promptly return it to the Purchasers.  The Confirmation may specify any Repurchase Date for the related Transaction agreed upon by the Purchasers and Company; provided that in no event shall such date be after the Stated Termination Date.

(d)     Each CP Conduit shall notify the Agent for its Purchaser Group by 10:00 a.m. (New York City time) on the applicable Purchase Date whether it has elected to make the purchase offered to it pursuant to Section 2.2(b) of this Agreement.   In the event that a CP Conduit shall not have timely provided such notice, such CP Conduit shall be deemed to have elected not to make such purchase.  Such Agent shall notify each Committed Purchaser for such CP Conduit on or prior to 11:00 a.m. (New York City time) on the applicable Purchase Date if such CP Conduit has not elected to purchase its entire Purchaser Percentage of the related Receivables, which notice shall specify (i) the identity of such CP Conduit, (ii) the portion of the Purchase Price with respect to the related Transaction which such CP Conduit has not elected to purchase as provided above, and (iii) the respective Liquidity Percentages of such Committed Purchasers on such Purchase Date (as determined by such Agent in good faith; for purposes of such determination, such Agent shall be entitled to rely conclusively on the most recent information provided by such CP Conduit or its agent or by the agent for its Support Parties). Subject to receiving such notice and to the satisfaction of the applicable conditions set forth in Article 3, each of such CP Conduit's Committed Purchasers shall make a purchase of an interest in the related Receivables on the applicable Purchase Date in an amount equal to its Liquidity Percentage of the portion of the Purchase Price for the Receivables which such CP Conduit has not elected to purchase, for a purchase price equal to its Liquidity Percentage of such portion of the Purchase Price.

(e)     Each Purchaser's purchase price payable pursuant to this Article II shall be made available to the Agent for its Purchaser Group, at or prior to 2:00 p.m. (New York City time) on the applicable Purchase Date, by deposit of immediately available funds to an account of such Agent specified in writing by such Agent.   Such Agent shall promptly notify the Company in the event that any Purchaser either fails to make such funds available to such Agent before such time or notifies such Agent that it will not make such funds available to such Agent before such time.  Subject to (i) such Agent's receipt of such funds and (ii) the fulfillment of the applicable conditions set forth in Article 3, such Agent will, not later than 4:00 p.m. (New York City time) on such Purchase Date, make such funds available, in the same type of funds received, by wire transfer thereof to the account in the United States specified by the Company in the applicable Purchase Request.

(f)     In the event that, notwithstanding the fulfillment of the applicable conditions set forth in Article 3 with respect to a purchase, a CP Conduit elected to make a purchase on a Purchase Date but failed to make its purchase price available to the Agent for its Purchaser Group when required by Section 2.2(e), such CP Conduit shall be deemed to have rescinded its election to make such purchase, and neither the Company nor any other party shall have any claim against such CP Conduit by reason of its failure to timely make such purchase.

In any such case, such Agent shall give notice of such failure not later than 2:30 p.m. (New York City time) on the Purchase Date to each Committed Purchaser for such CP Conduit and to the Company and the Servicer, which notice shall specify (i) the identity of such CP Conduit, (ii) the amount of the purchase which such CP Conduit had elected but failed to make and (iii) the respective Liquidity Percentages of such Committed Purchasers on such Purchase Date (as determined by such Agent in good faith; for purposes of such determination, such Agent shall be entitled to rely conclusively on the most recent information provided by such CP Conduit or its agent or by the agent for its Support Parties).   Subject to receiving such notice, each of such CP Conduit's Committed Purchasers shall purchase a portion of the additional Receivables in an amount equal to its Liquidity Percentage of the amount described in clause (ii) above at or before 4:00 p.m. (New York City time) on such Purchase Date.  Subject to such Agent's receipt of such funds, such Agent will, not later than 5:00 p.m. (New York City time) on such Purchase Date, make such funds available, in the same type of funds received, by wire transfer thereof to the account of the Company described in <u>Section 2.2(e)</u>, which payment shall be deemed to be timely.

(g)     In no event shall a Committed Purchaser be required on any date to purchase any additional Receivables in accordance with this <u>Section 2.2</u> which would result in its Percentage Interest of the Aggregate Purchase Price at any one time subject to then outstanding Transactions exceeding its Committed Purchase Limit (such additional Receivables being referred to herein as "<u>Excess Receivables</u>").  A Purchaser may, in its sole discretion, elect to purchase Excess Receivables in accordance with this <u>Section 2.2</u>; <u>provided</u>, <u>however</u>, that such Purchaser may not elect to purchase Excess Receivables if such purchase would result in the related Purchaser Group's Percentage Interest of the Aggregate Purchase Price of then outstanding Transactions which relate to Excess Receivables exceeding such Purchaser Group's Voluntary Purchase Limit.  In no event may any additional Receivables be offered for purchase hereunder, nor shall any Purchaser purchase any additional Receivables, to the extent that, after giving effect to such Transaction, the aggregate Purchase Price of all Purchased Receivables at any one time subject to then outstanding Transactions would exceed the Facility Limit.

2.3     <u>Reductions and Extensions of Committed Purchase Limits; Optional Prepayment; Limited Amortization</u>.

(a)     On the Purchase Termination Date for a Committed Purchaser, the Committed Purchase Limit of such Committed Purchaser, and the Voluntary Purchase Limit of the related Purchaser Group, shall be automatically reduced to zero.

(b)     So long as no Termination Event has occurred and is continuing, the Company may request, through the applicable Agent, that the applicable Committed Purchaser consent to an extension of its Commitment Termination Date for a specified period, which decision will be made by each Committed Purchaser in its sole discretion.  If a Committed Purchaser has agreed to extend its Commitment Termination Date, the Commitment Termination Date for such Committed Purchaser then in effect shall be extended to the date agreed to by the Company and such Committed Purchaser.

(c)     At any time the Company may, upon at least two Business Days' prior written notice to the Administrative Agent and each applicable Agent, prepay all or any portion

of the Aggregate Repurchase Price.  Each such prepayment shall be in an aggregate amount not less than $100,000 or integral multiples of $5,000 in excess thereof (or such other amount requested by the Company to which the Administrative Agent consents).  The proceeds of any such prepayment shall be allocated in accordance with the priorities set forth in Article 8.

(d)     The Company may from time to time, in its sole discretion, unless an Event of Default shall have occurred prior thereto, cause a Limited Amortization Period to commence for one or more Collection Periods by delivering to the Servicer, the Agent for each Purchaser Group and the Administrative Agent an irrevocable written notice by 3:00 p.m. (New York City time) on the Business Day preceding the first day of the Collection Period in which such Limited Amortization Period is scheduled to commence, which notice shall specify the Limited Amortization Amount.  The Limited Amortization Amount shall be paid in accordance with Section 8.1(b).

2.4     Repurchase.  On each Repurchase Date,  unless the related Transaction is rolled into a new Transaction as described in Section 2.1, termination of the Transactions will be effected by transfer to Company or its designee of the Purchased Receivables (and any Collected Funds in respect thereof received by the Purchasers not previously credited or transferred to, or applied to the obligations of, Company pursuant to Article 8) against the simultaneous transfer of the Aggregate Repurchase Price with respect to such Transaction to the Purchasers.

2.5     Requirements of Law.

(a)     In the event that any Purchaser shall have reasonably determined that any Regulatory Change shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, such Purchaser and the result of any of the foregoing is to increase the cost to such Purchaser, by an amount which such Purchaser deems to be material, of maintaining its Purchase Limit or its interest in the Receivables or to reduce any amount receivable in respect thereof, then, in any such case, after submission by such Purchaser to the Agent for its Purchaser Group of a written request therefor and the submission by such Agent to the Company and the Servicer of such written request therefor, such Purchaser (through the Agent for its Purchaser Group) shall be entitled to be paid, but only to the extent funds are then or thereafter become available therefor pursuant to Article 8, any additional amounts necessary to compensate such Purchaser for such increased cost or reduced amount receivable, to the extent not already reflected in the applicable interest rate, no later than the Distribution Date following receipt by the Company and the Servicer of such request for compensation under this Section 2.5(a), if such request is received by the Company and the Servicer no later than five (5) Business Days prior to the Determination Date related to such Distribution Date, and otherwise on the following Distribution Date (or, if earlier, on the Termination Date).

(b)     In the event that any Purchaser shall have reasonably determined that any Regulatory Change regarding capital adequacy has the effect of reducing the rate of return on such Purchaser's capital or on the capital of any Person controlling such Purchaser as a consequence of its obligations hereunder or its maintenance of its Purchase Limit or its interest in the Receivables to a level below that which such Purchaser or such Person could have

achieved but for such Regulatory Change (taking into consideration such Purchaser's or such Person's policies with respect to capital adequacy) by an amount deemed by such Purchaser or such Person to be material, then, from time to time, after submission by such Purchaser to the Agent for its Purchaser Group of a written request therefor and submission by such Agent to the Company and the Servicer of such written request therefor, such Purchaser (through the Agent for its Purchaser Group) shall be entitled to be paid, but only to the extent funds are then or thereafter become available therefor pursuant to Article 8, such additional amount or amounts as will compensate such Purchaser or such Person, as applicable, for such reduction, no later than the Distribution Date following receipt by the Company and the Servicer of such request for compensation under this Section 2.5(b), if such request is received by the Company and the Servicer no later than five (5) Business Days prior to the Determination Date related to such Distribution Date, and otherwise on the following Distribution Date (or, if earlier, on the Termination Date).  Nothing in this Section 2.5(b) shall be deemed to require the Company to pay any amount to a Purchaser to the extent such Purchaser has been compensated therefor under another provision of this Agreement or to the extent such amount is already reflected in the applicable interest rate.

(c)    Each Purchaser claiming increased amounts described in Section 2.5(a) or 2.5(b) will furnish to the Agent for its Purchaser Group (together with its request for compensation) a certificate prepared in good faith setting forth the basis and the calculation of the amount (in reasonable detail) of each request by such Purchaser for any such increased amounts referred to in Section 2.5(a) or 2.5(b).  Any such certificate shall be conclusive absent manifest error, and such Agent shall deliver a copy thereof to the Company and the Servicer. Failure on the part of any Purchaser to demand compensation for any amount pursuant to Section 2.5(a) or 2.5(b) with respect to any period shall not constitute a waiver of such Purchaser's right to demand compensation with respect to such period.

2.6    Taxes.    (a) Any and all payments made by the Company under this Agreement shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes, except to the extent such Taxes are imposed by law.  In the event that any Taxes are imposed and required by law to be deducted or withheld from any payment required to be made by the Company on behalf of the Purchasers, the Agents, or the Administrative Agent hereunder, then:

(i)    subject to clause (e) below, if such Taxes are not Excluded Taxes, the amount of such payment shall be increased as may be necessary such that such payment is made, after withholding or deduction for or on account of such Taxes, in an amount that is not less than the amount provided for herein; and

(ii)    the Company shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)    As promptly as practicable after the payment of any Taxes, and in any event within forty-five (45) days of any such payment being due, the Company shall furnish to the Administrative Agent a copy of an official receipt (or a certified copy thereof) evidencing the

payment of such Taxes.  The Administrative Agent shall make copies thereof available to any Purchaser or Agent upon request therefor.

(c)    Subject to <u>clause (e)</u>, the Company shall indemnify the Administrative Agent and each Purchaser and Agent for any Non-Excluded Taxes levied, imposed or assessed on (and whether or not paid directly by) the Administrative Agent, Purchasers, or Agents (and whether or not such Non-Excluded Taxes are correctly or legally asserted by the relevant Governmental Authority).  Promptly upon having knowledge that any such Non-Excluded Taxes have been levied, imposed or assessed, and promptly upon notice thereof by the Administrative Agent or any Purchaser or Agent, the Company shall pay such Non-Excluded Taxes directly to the relevant Governmental Authority (provided, however, that neither the Administrative Agent, Purchasers nor Agents shall be under any obligation to provide any such notice to the Company). In addition, the Company shall indemnify the Administrative Agent and each Purchaser and Agent for any incremental Taxes that may become payable by the Administrative Agent or any Purchaser or Agent as a result of any failure of the Company to pay any Taxes when due to the appropriate Governmental Authority or to deliver to the Administrative Agent, pursuant to <u>clause (b)</u>, documentation evidencing the payment of Taxes.  With respect to indemnification for Non-Excluded Taxes actually paid by the Administrative Agent or any Purchasers or Agents or the indemnification provided in the immediately preceding sentence, such indemnification shall be made within thirty (30) days after the date the Administrative Agent or such Purchaser or Agent, as the case may be, makes written demand therefor.  The Company acknowledges that any payment made to the Administrative Agent or any Purchaser or Agent or to any Governmental Authority in respect of the indemnification obligations of the Company provided in this clause shall constitute a payment in respect of which the provisions of <u>clause (a)</u> and this clause shall apply.

(d)    Each Non-U.S. Purchaser, on or prior to the date on which such Non-U.S. Purchaser becomes a Purchaser hereunder (and from time to time thereafter upon the request of the Company or the Administrative Agent, but only for so long as such non-U.S. Purchaser is legally entitled to do so), shall deliver to the Company and the Administrative Agent either

(i)    two duly completed copies of either (x) Internal Revenue Service Form W-8BEN claiming eligibility of the Non-U.S. Purchaser for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; or

(ii)    in the case of a Non-U.S. Purchaser that is not legally entitled to deliver either form listed in <u>clause (d)(i)</u>, (x) a certificate of a duly authorized officer of such Non-U.S. Purchaser to the effect that such Non-U.S. Purchaser is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Company within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (such certificate, an "Exemption Certificate") and (y) two duly completed copies of  Internal Revenue Service Form W-8BEN or applicable successor form.

(e)    The Company shall not be obligated to pay any additional amounts to any Purchaser pursuant to <u>clause (a)(i)</u>, or to indemnify any Purchaser pursuant to <u>clause (c)</u>, in

respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure of such Purchaser to deliver to the Company the form or forms and/or an Exemption Certificate, as applicable to such Purchaser, pursuant to clause (d); (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Purchaser being untrue or inaccurate on the date delivered in any material respect; or (iii) the Purchaser designating a successor investing office which has the effect of causing such Purchaser to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided, however, that the Company shall be obligated to pay additional amounts to any such Purchaser pursuant to clause (a)(i), and to indemnify any such Purchaser pursuant to clause (c), in respect of United States federal withholding taxes if  (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax or inaccuracy or untruth contained therein resulted from a change in any applicable statute, treaty, regulation or other applicable law or any interpretation of any of the foregoing occurring after the date hereof, which change rendered such Purchaser no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, or rendered the information or certifications made in such form or forms or Exemption Certificate untrue or inaccurate in a material respect; (ii) the redesignation of the Purchaser's investing office was made at the request of the Company; or (iii) the obligation to pay any additional amounts to any such Purchaser pursuant to clause (a)(i) or to indemnify any such Purchaser pursuant to clause (c) is with respect to an Assignee Purchaser that becomes an Assignee Purchaser as a result of an assignment made at the request of the Company.

(f)      Each party to this Agreement acknowledges that it is its intent for purposes of U.S. federal, state and local income and franchise taxes to treat each transaction as indebtedness of the Company that is secured by the Purchased Receivables and that the Purchased Receivables are owned by the Company in the absence of an Event of Default by the Company.  All parties to this Agreement agree to such treatment and agree to take no action inconsistent with this treatment, unless required by law.

2.7      Indemnification.

(a)      Without limiting any other rights which any such Person may have hereunder or under applicable law, the Company hereby agrees to indemnify each Indemnitee, forthwith on demand, from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively called "Indemnified Amounts") awarded against or incurred by any of them arising out of or relating to any Transaction Document or the transactions contemplated thereby or the use of proceeds therefrom by the Company, including (without limitation) in respect of the purchase of Receivables by any Purchaser or in respect of any Receivable, excluding, however, (a) Indemnified Amounts to the extent determined by a court of competent jurisdiction to have resulted from gross negligence or willful misconduct on the part of such Indemnitee or its agent or subcontractor, (b) non-payment by any Obligor of an amount due and payable with respect to a Receivable, (c) any loss in value of any Financed Vehicle or Eligible Investment due to changes in market conditions or for other reasons beyond the control of Sixth Gear or the Company or (d) any Excluded Tax.  Without limiting the foregoing, but subject to the exclusions

(a) through (d) above, the Company agrees to indemnify each Indemnitee for Indemnified Amounts arising out of or relating to:

(i)     the breach of any representation or warranty made by the Company or the Servicer under or in connection with this Agreement or the other Transaction Documents and any Servicer's Certificate, Margin Confirmation or any other information, report or certificate delivered by the Company or the Servicer pursuant hereto or thereto which shall have been false or incorrect in any material respect when made or deemed made;

(ii)    the failure by the Company or the Servicer to comply with any applicable law, rule or regulation with respect to any Receivable or any Financed Vehicle, or the nonconformity of any Receivable with any such applicable law, rule or regulation;

(iii)   the failure to vest and maintain vested in the Administrative Agent, for the benefit of the Purchasers, a first-priority security interest in all the Repurchase Assets, free and clear of any Lien, other than a Lien arising solely as a result of an act or omission of the Administrative Agent, or any assignee of the Administrative Agent;

(iv)    any dispute, claim, offset or defense (other than discharge in bankruptcy) of an Obligor to the payment of any Receivable (including, without limitation, a defense based on such Receivable not being a legal, valid and binding obligation of such Obligor enforceable against it in accordance with its terms);

(v)     any failure of the Servicer to perform its duties or obligations in accordance with the provisions of the Sale and Servicing Agreement or any provision contained in any other Transaction Document;

(vi)    any tax or governmental fee or charge (but not including any Excluded Taxes), all interest and penalties thereon or with respect thereto, and all out-of-pocket costs and expenses, including the reasonable fees and expenses of counsel in defending against the same, which may arise by reason of the making, maintenance or funding, directly or indirectly, of any Transaction or any other interest in the Repurchase Assets; or

(vii)   the commingling of the proceeds of the Repurchase Assets at any time with other funds of the Company or the Servicer.

If for any reason (other than (A) non-payment by the Company or (B) the exclusions (a) through (d) set forth in the first paragraph of this Section 2.7(a)) the indemnification provided above in this Section 2.7(a) is unavailable to an Indemnitee or is insufficient to hold an Indemnitee harmless, then Sixth Gear shall contribute to the amount paid or payable by such Indemnitee as a result of such loss, claim, damage or liability in such proportion as is appropriate to reflect not only the relative benefits received by such Indemnitee, on the one hand, and the Company, on the other hand, but also the relative fault of such Indemnitee, on the one hand, and the Company, on the other hand, as well as any other relevant equitable considerations.

(b)     In the event that for any reason, (i) the Company fails to consummate any purchase with respect to which it has delivered a Purchase Request under Section 2.2(b), or (ii) any CP Conduit receives any repayment of its share of the Aggregate Repurchase Price other

than on a Distribution Date or pursuant to <u>Section 2.3</u> hereof, then, in any such case, each affected Purchaser shall be entitled to be indemnified by the Company against, and to be paid the amount equal to, any loss or reasonable out-of-pocket expense suffered by such Purchaser as a result of such failure, change or repayment, including, in the case of a CP Conduit, any loss, cost or expense suffered by such CP Conduit by reason of its issuance of Commercial Paper Notes or its incurrence of other obligations reasonably allocated by such CP Conduit to its funding or the maintenance of its funding of its Purchaser Percentage of the Receivables, or, in the case of any Purchaser, redeploying funds prepaid or repaid, in amounts which correspond to its Purchaser Percentage of the Receivables, but in each case only to the extent funds are then or thereafter available therefor pursuant to <u>Article 8</u>.  A statement setting forth in reasonable detail the calculations of any amounts payable pursuant to this Section submitted by a Purchaser or Agent or by the Administrative Agent, as the case may be, to the Company and the Servicer and shall be conclusive absent manifest error.  Amounts payable pursuant to this <u>Section 2.7(b)</u> shall be due no later than the Distribution Date following receipt by the Company and the Servicer of such request for payment under this <u>Section 2.7(b)</u>, if such request is received by the Company and the Servicer no later than five (5) Business Days prior to the Determination Date related to such Distribution Date, and otherwise on the following Distribution Date (or, if earlier, on the Termination Date).

2.8    <u>Expenses, Etc.</u>

(a)    The Company agrees to pay on demand (i) to the Administrative Agent and the initial Purchasers and Agents all reasonable costs and expenses in connection with the preparation, execution, and delivery of this Agreement and the other documents to be delivered hereunder or in connection herewith, including, subject to the limitations specified in the Supplemental Fee Letters, the reasonable fees and out-of-pocket expenses of counsel with respect thereto and the amounts due to Moody's and S&P in connection with their review of the initial CP Conduits' acquisition of the interest in the Receivables, (ii) to the Administrative Agent and each Agent and Purchaser all reasonable costs and expenses in connection with any amendments of or waivers or consents under this Agreement, any Support Facility or the Transaction Documents, including in each case the reasonable fees and out-of-pocket expenses of counsel with respect thereto, and (iii) to the Administrative Agent and each Agent and Purchaser, on demand, all reasonable costs and expenses (including reasonable fees and expenses of counsel), if any, in connection with the enforcement of this Agreement or any of the Transaction Documents (excluding any action between or among Purchasers and Agents), and the other documents delivered thereunder or in connection therewith.

(b)    The Company agrees to pay on demand any and all stamp, transfer and other similar taxes and governmental fees payable in connection with the execution, delivery, filing and recording of any of the Transaction Documents and agrees to save each Purchaser and Agent and the Administrative Agent harmless from and against any liabilities with respect to or resulting from any delay in paying or any omission to pay such taxes and fees.

2.9    <u>Effect of Event of Default; Amortization Event or Termination Event</u>.

(a)    <u>Optional Termination</u>.  Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 12.1(iii)</u> or <u>(iv)</u>), Amortization Event or

Termination Event (other than an Event of Default described in <u>Section 12.1(iii)</u> or <u>(iv)</u>), the Administrative Agent may, with the consent of the Majority Purchasers and, at the direction of the Majority Purchasers, the Administrative Agent shall declare the Purchase Termination Date to have occurred, whereupon the Purchase Limits of the Committed Purchasers, if any, hereunder shall terminate.

(b)    <u>Automatic Termination</u>.    Upon the occurrence of an Event of Default described in <u>Section 12.1(iii)</u> or <u>(iv)</u>, the Purchase Termination Date shall be deemed to have occurred automatically, and the Commitments of the Committed Purchasers, if any, hereunder shall be deemed to have terminated.

2.10    <u>Price Differential, Fees, Expenses, Payments, Etc.</u>

(a)    Notwithstanding that the Purchasers and the Company intend that the Transactions hereunder be sales to the Purchasers of the Purchased Receivables, any Repurchase Price, Price Differential, fees or other amounts due and payable hereunder (without regard to any limitations set forth herein on the sources from which such amount may be paid) which are not paid to the Administrative Agent or the Agents, as the case may be, prior to the times set forth in <u>Section 2.10(c)</u> on the due date thereof (whether due pursuant to acceleration or otherwise) shall accrue interest (after as well as before judgment) at the Pricing Rate plus 2.0% per annum from and including the due date thereof to but excluding the date such amount is actually paid. Accrued and unpaid interest in respect of any overdue Price Differential shall be payable as a part of the Price Differential on each Distribution Date.  Any overdue Repurchase Price and any accrued and unpaid interest payable pursuant to this <u>Section 2.10(a)</u> in respect of other amounts not described in the preceding sentence shall be payable on each Distribution Date in accordance with the priority of payments set forth in Article 8.

(b)    Unless otherwise specified in an applicable Supplemental Fee Letter, any amount calculated by reference to the LIBOR Rate shall be calculated on the basis of a 360-day year for the actual days elapsed.  Non-Use Fees, Commitment Fees and other periodic fees or amounts payable hereunder shall be calculated, unless otherwise specified in the Supplemental Fee Letter, on the basis of a 360-day year and for the actual days elapsed.

(c)    All payments to be made hereunder by the Company, whether on account of the Repurchase Price, the Price Differential, fees or otherwise, shall be made without setoff or counterclaim in United States dollars and in immediately available funds prior to 12:00 noon (New York City time) on the due date thereof, to each Agent at its account specified pursuant to <u>Section 14.2(b)</u>.  Payments received by an Agent or the Administrative Agent after 12:00 noon (New York City time), shall be deemed to have been made on the next Business Day.  The Administrative Agent will distribute any such payments received by it to the Agents promptly upon receipt but no later than 2:00 p.m. (New York City time) on the day received if such payment is received prior to 12:00 noon (New York City time) and no later than noon, New York City time, on the Business Day after such payment is received if received after 12:00 noon (New York City time).  Notwithstanding anything herein to the contrary, if any payment due hereunder becomes due and payable on a day other than a Business Day, the payment date thereof shall be extended to the next succeeding Business Day and interest shall accrue thereon at the applicable rate during such extension.  To the extent that (i) the Company or the Servicer makes a payment

to the Administrative Agent, any Agent or any Purchaser or (ii) the Administrative Agent, any Agent or any Purchaser receives or is deemed to have received any payment or proceeds for application to an obligation, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy or insolvency law, state or Federal law, common law, or for equitable cause, then, to the extent such payment or proceeds are set aside and returned to, or at the discretion of, the Company or the Servicer, the obligation or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received or deemed received by the Administrative Agent or such Agent or such Purchaser, as the case may be.

2.11    Substitution.  (a) Generally.  Subject to Section 2.11(b), the Company may, subject to agreement with and acceptance by the Administrative Agent in its sole discretion, substitute other Receivables for any Purchased Receivables.  Such substitution shall be made by transfer to the Company or its designee (such transfer to be reflected on the Schedule of Receivables) of such other Receivables and transfer to the Company or its designee of the Purchased Receivables requested for release.  After substitution, the substituted Receivables shall be deemed to be Purchased Receivables subject to the same Transaction as the released Receivables.

(b)    Restrictions.  Notwithstanding anything to the contrary in this Agreement, the Company may not substitute other Receivables for any Purchased Receivables (i) if after taking into account such substitution, a Margin Deficit would occur or (ii) such substitution would cause a breach of any provision of this Agreement.

2.12    Delivery of Notice of Exclusive Control.  Upon the occurrence and continuation of an Amortization Event, Potential Amortization Event, Event of Default or Default, the Administrative Agent may deliver a Notice of Exclusive Control to Wachovia Bank, National Association and Fifth Third Bank under the applicable Account Control Agreement.

## ARTICLE 3    CONDITIONS PRECEDENT

3.1    Conditions to Closing.  The following shall be conditions precedent to the effectiveness of the closing of this Agreement:

(a)    the representations and warranties of the Company set forth or referred to in Article 4 hereof shall be true and correct in all material respects on the Amendment Closing Date as though made on and as of the Amendment Closing Date (except for representations and warranties which relate to a specific date, which shall be true and correct in all material respects as of such date), and no Termination Event or event which of itself or with the giving of notice or lapse of time, or both, would constitute a Termination Event shall have occurred and be continuing on the Amendment Closing Date;

(b)    the Administrative Agent and the Agents shall have received on the Amendment Closing Date the following items, each of which shall be in form and substance satisfactory to the Agents:

(i)    an Officer's Certificate of the Company confirming the satisfaction of the conditions set forth in clause (a) above;

(ii)    (I) a copy of (A) the organizational documents of, and an incumbency certificate with respect to its officers executing any of the Transaction Documents on the Amendment Closing Date on behalf of, each of the Company and Sixth Gear, certified by its authorized officer, and (B) resolutions of the Board of Directors (or an authorized committee thereof) of each of the Company and Sixth Gear with respect to the Transaction Documents to which it is party, certified by its authorized officer or (II) an Officer's Certificate of the Company confirming that the documents delivered in clause (I) above on the Original Closing Date have not been modified or repealed and are now in full force and effect;

(iii)    a certificate issued no earlier than 5 days prior to the Amendment Closing Date by an appropriate Governmental Authority evidencing the legal existence and good standing of each of the Company and Sixth Gear;

(iv)    an executed copy of the Custodial Agreement and the Account Control Agreements together with all Exhibits and Schedules thereto;

(v)    the favorable written opinion of counsel to the Company, addressed to the Administrative Agent and each Agent and Purchaser, or accompanied by a letter providing that the Administrative Agent and each Agent and each Purchaser may rely on such opinion as if it were addressed to them, and dated as of the Amendment Closing Date, covering general corporate matters, the due execution and delivery of, and enforceability, of this Agreement, the Custodial Agreement and the Account Control Agreements and such other matters as the Administrative Agent may request;

(c)    the Administrative Agent shall have received the Underwriting Guidelines and the Collection Policy; and

(d)    the Seller shall have paid all fees payable on or before the Amendment Closing Date to the Administrative Agent (for its own account or for the account of the initial Purchasers and Agents) described in the Supplemental Fee Letters and all reasonable and appropriately invoiced costs and expenses of the Administrative Agent and the Agents and Purchasers payable by the Seller, to the extent provided herein, in connection with the transactions contemplated hereby.

3.2    <u>Conditions to Transactions</u>.  The following shall be conditions precedent to the obligation of each Purchaser to enter into each Transaction pursuant to this Agreement:

(a)    the Administrative Agent shall have timely received a properly completed Purchase Request, which shall include a Margin Confirmation and Schedule of Receivables;

(b)    (i) all interest, fees, expenses and all other amounts then due and payable to the Administrative Agent or any Purchaser or Agent hereunder shall have been paid in accordance with the Transaction Documents, and (ii) no Termination Event, and no event that, after the giving of notice or the lapse of time, would constitute a Termination Event, shall have occurred and be continuing;

(c)      all conditions to the purchase of Receivables by the Purchasers on the applicable Purchase Date set forth in any other Transaction Document, if any, shall have been satisfied;

(d)      after giving effect to the purchase of Receivables by the Purchasers on the applicable Purchase Date, all representations and warranties of the Seller, the Company and the Servicer contained herein or in the Transaction Documents or otherwise made in writing pursuant to any of the provisions hereof or thereof shall be true and correct in all material respects with the same force and effect as though such representations and warranties had been made on and as of such date (other than representations and warranties which specifically relate to an earlier date, which shall be true and correct in all material respects as of such earlier date);

(e)      solely with respect to the initial Transaction which includes Receivables with a Pennsylvania Obligor, the Administrative Agent shall have received evidence satisfactory to it that the Company is duly licensed as a "sales finance company" under the Pennsylvania Motor Vehicle Sales Finance Act;

(f)      solely with respect to the initial Transaction which includes Receivables with a Maryland Obligor, the Administrative Agent shall have received evidence satisfactory to it that the Company is duly licensed as a "sales finance company" under the Maryland Sales Finance Companies Act; and

(g)      after giving effect to the purchase of Receivables by the Purchasers on such date, (i) the Aggregate Repurchase Price of all Purchased Receivables at any one time subject to then outstanding Transactions shall be equal to or less than the Facility Limit, and (ii) no Margin Deficit shall exist.

3.3      <u>Conditions to Initial Transaction</u>.  In addition to the conditions set forth in <u>Section 3.2</u>, the following shall be conditions precedent to the obligation of the Purchasers to enter into the initial Transaction pursuant to this Agreement:

(a)      the Administrative Agent shall have received an executed copy of the Lockbox Agreement, the Custodial Fee Letter, and documentation relating to any Interest Rate Hedge, if any, together with all Exhibits and Schedules thereto;

(b)      the Administrative Agent shall have (i) received an executed copy of an Officer's Certificate of the Seller and the Servicer stating that the conditions precedent set forth in this <u>Article III</u> have been satisfied and (ii) provided its written acknowledgement and agreement that such conditions precedent have been satisfied;

(c)      evidence satisfactory to each CP Conduit that its purchase of Receivables hereunder will not result in a reduction or withdrawal of the rating of its Commercial Paper Notes by Moody's, S&P or any other nationally recognized rating agency;

(d)      the favorable written opinion of counsel to the Custodian, addressed to the Administrative Agent and each Agent and Purchaser, or accompanied by a letter providing that the Administrative Agent and each Agent and each Purchaser may rely on such opinion as if it were addressed to them, and dated as of the Amendment Closing Date, covering general

corporate matters, the due execution and delivery of, and enforceability, of the Custodial Agreement and such other matters as the Administrative Agent may request;

(e)    the finalized version of the "Monitoring Party Confidentiality Agreement" as set forth in Exhibit 1 to the Custodial Agreement; and

(f)    such additional documents, instruments, certificates, letters or legal opinions as the Administrative Agent or any Agent or Purchaser may reasonably request.

ARTICLE 4    REPRESENTATIONS AND WARRANTIES

4.1    <u>Representations and Warranties of the Company</u>.    The Company represents and warrants to the Purchasers, the Agents and the Administrative Agent that its representations and warranties set forth in the Sale and Servicing Agreement and the other Transaction Documents are true and correct as of the date hereof (except for representations or warranties which relate to a specific date, which shall be true and correct as of such date).  The Company further represents and warrants to, and agrees with, each Purchaser and Agent and the Administrative Agent that, as of the date hereof and as of each Purchase Date:

(a)    It is a Delaware statutory trust, with full power and authority under such laws to own its properties and conduct its business as such properties are presently owned and such business is presently conducted and to execute, deliver and perform its obligations under this Agreement and the Transaction Documents to which it is a party.

(b)    It has the power and authority to execute, deliver and perform this Agreement and the Transaction Documents to which it is a party and all the transactions contemplated hereby and thereby and has taken all necessary action to authorize the execution, delivery and performance by it of this Agreement and such Transaction Documents.  When executed and delivered, each of this Agreement and each such Transaction Document will constitute its legal, valid and binding agreement, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, reorganization, insolvency, moratorium and other laws of general applicability relating to or affecting creditors' rights generally.  The enforceability of its obligations under such agreements is also subject to general principles of equity, regardless of whether such enforceability is considered in a proceeding in equity or at law, and indemnification sought in respect of securities laws violations may be limited by public policy.

(c)    No consent, license, approval or authorization of, or registration with, any governmental authority, bureau or agency is required to be obtained in connection with its execution, delivery or performance of each of this Agreement or any Transaction Documents that has not been duly obtained and which is not and will not be in full force and effect on the Closing Date, except such that may be required by the blue sky laws of any state and except those which the failure to obtain, individually or in the aggregate, would not have a material adverse effect on it or the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the Transaction Documents to which it is a party.

(d)    The execution, delivery and performance by it of each of this Agreement and the Transaction Documents to which it is a party do not violate any provision of any existing

law or regulation applicable to it, any order or decree of any court to which it is subject, its organizational documents or any mortgage, indenture, contract or other agreement to which it is a party or by which it or any significant portion of its properties is bound (other than violations of such laws, regulations, orders, decrees, mortgages, indentures, contracts and other agreements which do not affect the legality, validity or enforceability of any of such agreements or the Receivables and which, individually or in the aggregate, would not have a material adverse effect on it or the transactions contemplated by, or its ability to perform its obligations under, this Agreement or the Transaction Documents to which it is a party).

(e)     To its knowledge, except to the extent already disclosed in writing to the Administrative Agent and the Purchasers, there is no litigation or administrative proceeding before any court, tribunal or governmental body presently pending or threatened in writing against it with respect to this Agreement and the Transaction Documents to which it is a party, the transactions contemplated hereby or thereby, and there is no such litigation or proceeding against it or any significant portion of its properties, in each case which would have a material adverse effect on it or the transactions contemplated by, or its ability to perform its respective obligations under, this Agreement or the Transaction Documents to which it is a party.

(f)     The sale of the Receivables is exempt from the registration requirements of the Securities Act, and the Company is not required to be registered under the Investment Company Act.

(g)     No proceeds of any Transaction will be used by the Company to acquire any security in any transaction which is subject to Section 13 or 14 of the Exchange Act.

(h)     The Company is solvent and will not become insolvent after giving effect to the transactions contemplated by this Agreement and the Transaction Documents.   The Company has no Indebtedness to any Person other than pursuant to this Agreement and the other Transaction Documents.   The Company, after giving effect to the transactions contemplated by this Agreement and the other Transaction Documents, will have adequate funds to conduct its business in the foreseeable future.

(i)     The Company has filed on a timely basis all tax returns (including, without limitation, foreign, federal, state, local and otherwise) required to be filed, is not liable for taxes payable by any other Person and has paid or made adequate provisions for the payment of all taxes, assessments and other governmental charges due from the Company.  No tax lien or similar adverse claim has been filed against the Company, and no claim is being asserted, with respect to any such tax, assessment or other governmental charge.  Any taxes, fees and other governmental charges payable by the Company in connection with the execution and delivery of this Agreement and the other Transaction Documents and the transactions contemplated hereby or thereby, including the transfer of each Receivable to the Company, have been paid or shall have been paid if and when due at or prior to the Closing Date and the relevant Purchase Date, as the case may be.

(j)     Each Servicer's Certificate and Margin Confirmation is accurate in all material respects as of the date thereof.

(k)     Each Receivable and related Repurchase Assets were purchased by, or contributed to, the Company on the relevant Purchase Date pursuant to the Sale and Servicing Agreement.

(l)     All information heretofore or hereafter furnished by or on behalf of the Company to any Purchaser, the Administrative Agent or any Agent in connection with this Agreement or any transaction contemplated hereby is and will be true and complete in all material respects and does not and will not omit to state a material fact necessary to make the statements contained therein not misleading.

(m)     The Company is in compliance with ERISA and has not incurred and does not expect to incur any liabilities (except for premium payments arising in the ordinary course of business) to the Pension Benefit Guaranty Corporation (or any successor thereto) under ERISA.

(n)     There has been no material adverse change in the condition (financial or otherwise), business, operations, results of operations, or properties of the Company since the date of its formation.

(o)     The Company has no trade names, fictitious names, assumed names or "doing business as" names other than "Sixth Gear" or other "doing business as" names as the Company may, from time to time, provide written notice of to the Administrative Agent.

(p)     The Company is operated as an entity with assets and liabilities distinct from those of Sixth Gear and any other Affiliates of the Company, and the Company hereby acknowledges that the Administrative Agent, each of the Agents and each of the Purchasers are entering into the transactions contemplated by this Agreement in reliance upon the Company's identity as a separate legal entity from Sixth Gear and each such Affiliate.  There is not now, nor will there be at any time in the future, any agreement or understanding between Sixth Gear or any Affiliate thereof and the Company (other than as expressly set forth in the Transaction Documents) providing for the allocation or sharing of obligations of the Company to make payments or otherwise in respect of any taxes, fees, assessments or other governmental charges.

(q)     The Company does not own or hold, directly or indirectly, any capital stock or equity security of, or any equity interest in, any Person.

(r)     The Sale and Servicing Agreement is the only agreement pursuant to which the Company purchases Receivables, and the Transaction Documents delivered to the Administrative Agent represent all agreements between the Seller, on the one hand, and the Company, on the other.  The Company has furnished to the Agent true, correct and complete copies of each Transaction Document to which the Company is a party, each of which is in full force and effect.  Upon the purchase of each Receivable pursuant to the Sale and Servicing Agreement, the Company shall be the lawful owner of, and have good title to, such Receivable and all assets relating thereto, free and clear of any Liens.  All such assets are transferred to the Company without recourse to the Seller except as described in the Sale and Servicing Agreement.  The purchases of such assets by the Company constitute valid and true contributions or sales for consideration (and not merely a pledge of such assets for security purposes)

enforceable against creditors of the Seller, and no such assets shall constitute property of the Seller.

(s)    All Receivables included in the Asset Amount as Eligible Receivables as of the most recently delivered Servicer's Certificate or Margin Confirmation are Eligible Receivables.

## ARTICLE 5    COVENANTS

5.1    <u>Affirmative Covenants</u>.  The Company covenants and agrees that through the Termination Date and thereafter so long as any monetary obligation arising hereunder shall remain unpaid, unless the Required Purchasers shall otherwise consent in writing, that:

(a)    <u>Performance by Company</u>.  The Company shall perform in all material respects each of the respective agreements, warranties and indemnities applicable to it under the Transaction Documents to which it is a party and comply in all material respects with each of the respective terms and provisions applicable to it under the Transaction Documents to which it is party, which agreements, warranties and indemnities are hereby incorporated by reference into this Agreement as if set forth herein in full;

(b)    <u>Copies of Notices, etc</u>.  The Company shall promptly furnish, or cause to be furnished, to the Administrative Agent and each Agent (i) promptly after receipt thereof a copy of each notice, demand or other communication received by or on behalf of the Company pursuant to this Agreement or the Sale and Servicing Agreement, and (ii) such other information, documents, records or reports respecting the Receivables or the Company, which is in the possession or under the control of the Company, as the Administrative Agent or any such Agent may from time to time reasonably request;

(c)    <u>Copies of Reports, etc</u>.    Without limitation of the provisions of <u>Section 5.1(b)</u>, the Company shall furnish or cause the Servicer to furnish (in writing or electronically) to the Administrative Agent and each Agent (i) with respect to each Distribution Date, a copy of the Servicer's Certificate furnished pursuant to <u>Section 4.8</u> of the Sale and Servicing Agreement, (ii) a copy of each Officer's Certificate furnished pursuant to <u>Section 4.9</u> of the Sale and Servicing Agreement, and (iii) a copy of each annual certified public accountants' report received pursuant to <u>Section 4.10</u> of the Sale and Servicing Agreement;

(d)    <u>Delivery of Financial Statements</u>.  The Company shall deliver to the Administrative Agent and each Agent (i) within 90 days following the end of each of its fiscal years, beginning with the fiscal year ending March 31, 2008, the audited consolidated balance sheet of Sixth Gear Inc. as of the end of such fiscal year, and the related audited consolidated statements of income and cash flows for such fiscal year, prepared in accordance with generally accepted accounting principles and accompanied by the opinion of the independent certified public accountants of Sixth Gear Inc. and (ii) within 45 days following the end of each of its fiscal quarters, beginning with the fiscal quarter ending June 30, 2008, the unaudited consolidated balance sheet of Sixth Gear Inc. as of the end of such fiscal quarter, and the related unaudited consolidated statements of income and cash flows for such fiscal quarter, prepared in accordance with generally accepted accounting principles;

(e)     <u>Actions, Suits and Proceedings</u>.    The Company shall furnish to the Administrative Agent and each Purchaser promptly after known to the Company, information with respect to any action, suit or proceeding involving the Company, the Seller, the Servicer or Sixth Gear Inc. by or before any court or any Governmental Authority;

(f)     <u>Inspection Rights</u>.    From the Closing Date until the Termination Date, the Company will, at any time and from time to time during regular business hours, on at least five Business Days' (or if a Termination Event or event or condition which, with the passage of time or the giving of notice, or both, would become a Termination Event has occurred, one Business Day's) notice to the Company, permit the Administrative Agent and each Agent, or its agents or representatives, at the commercially reasonable cost and expense of the Company, (i) to examine all books, records and documents (including computer tapes and disks) in the possession or under the control of the Company relating to the Receivables, and (ii) to visit the offices and properties of the Company, as applicable, for the purpose of examining such materials described in clause (i) above.    Any information obtained by the Administrative Agent or an Agent pursuant to this <u>Section 5.1(f)</u> shall be held in confidence by the Administrative Agent or such Agent, as applicable, in accordance with the provisions of <u>Section 10.2</u>; and

(g)     <u>Notice of Defaults, etc</u>.    Upon the earlier of discovery or receipt of notice thereof, the Company agrees to give the Administrative Agent and the Agents prompt written notice of each Amortization Event, Potential Amortization Event, Event of Default or Default.

(h)     <u>Existence</u>.    Except as otherwise permitted by the Transaction Documents, the Company will keep in full effect its existence, rights and franchises as a statutory trust under the laws of the State of Delaware (unless it becomes, or any successor Company hereunder is or becomes, organized under the laws of any other state or of the United States of America, in which case the Company will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, the Repurchase Assets and each other instrument or agreement included in the Repurchase Assets.

(i)     <u>Protection of Repurchase Assets</u>.    The Company intends the security interest Granted pursuant to <u>Section 9.1</u> to be prior to all other liens in respect of the Repurchase Assets, and the Company shall take all actions necessary to obtain and maintain, in favor of the Administrative Agent, for the benefit of the Purchasers, a first lien on and a first priority perfected security interest in the Repurchase Assets, <u>provided</u> that the title documents relating to the Financed Vehicles need not be amended and the Company shall not be required to notify any insurer with respect to any insurance policy obtained by any Obligor or to notify any Dealer about any aspect of the transactions evidenced by the Transaction Documents.    The Company will from time to time prepare (or shall cause to be prepared), execute (if necessary) and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)     Grant more effectively all or any portion of the Repurchase Assets;

(ii)        maintain or preserve the lien and security interest (and the priority thereof) in favor of the Administrative Agent for the benefit of the Purchasers created by this Agreement or carry out more effectively the purposes hereof;

(iii)        perfect, publish notice of or protect the validity of any Grant made or to be made by this Agreement;

(iv)        enforce any of the Repurchase Assets;

(v)        preserve and defend title to the Repurchase Assets and the rights of the Administrative Agent in such Repurchase Assets against the claims of all persons and parties; and

(vi)        pay all taxes or assessments levied or assessed upon the Repurchase Assets when due.

The Company hereby designates the Administrative Agent its agent and attorney-in-fact to execute, and authorizes the Administrative Agent to file, any financing statement, continuation statement or other instrument required by the Administrative Agent pursuant to this Section.

(j)        <u>Performance of Obligations; Servicing of Receivables.</u>

(i)        The Company will not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Repurchase Assets or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as ordered by any bankruptcy or other court or as expressly provided in this Agreement, the Transaction Documents or such other instrument or agreement.

(ii)        The Company will punctually perform and observe all of its obligations and agreements contained in this Agreement, the Transaction Documents and in the instruments and agreements included in the Repurchase Assets, including, but not limited to, preparing (or causing to prepared) and filing (or causing to be filed) all UCC financing statements and continuation statements required to be filed by the terms of this Agreement and the Sale and Servicing Agreement in accordance with and within the time periods provided for herein and therein. The Company shall not waive, amend, modify, supplement or terminate any Transaction Document or any provision thereof except in accordance with such Transaction Document. The Company shall at all times comply with the separateness requirements contained in the organizational documents of the Company and of Sixth Gear Solutions Corp., the initial Certificateholder of the Company.

(iii)        If an officer or director of the Company shall have actual knowledge of the occurrence of a Servicer Termination Event under the Sale and Servicing Agreement, the Company shall promptly notify the Administrative Agent and the Agents thereof, and shall specify in such notice the action, if any, the Company is taking in respect of such default. If a Servicer Termination Event shall arise from the failure of the Servicer to perform any of its

duties or obligations under the Sale and Servicing Agreement with respect to the Receivables, the Company shall take all steps available to it to remedy such failure.

           (iv)      The Company agrees that it will not waive timely performance or observance by the Servicer or the Seller of any of their material obligations under the Transaction Documents without the prior consent of the Majority Purchasers and the Administrative Agent.  Nothing in this Section 5.1(j) shall be construed to give the Company the right to waive a Servicer Termination Event.

           5.2     Negative Covenants.  So long as any Transactions are outstanding, neither the Company nor Sixth Gear shall:

           (i)        except as expressly permitted by this Agreement or the Transaction Documents, sell, transfer, exchange or otherwise dispose of any of the properties or assets of the Company included in the Repurchase Assets, except as contemplated by this Agreement;

           (ii)       (A) permit the validity or effectiveness of this Agreement to be impaired, or permit the lien in favor of the Administrative Agent created by Section 9.1 to be amended, hypothecated, subordinated, terminated or discharged, (B) permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other than the lien granted pursuant to Section 9.1 of this Agreement) to be created on or extend to or otherwise arise upon or burden the Repurchase Assets or any part thereof or any interest therein or the proceeds thereof (other than tax liens, mechanics' liens and other liens that arise by operation of law, in each case on a Financed Vehicle and arising solely as a result of an action or omission of the related Obligor) or (C) permit the lien of this Agreement not to constitute a valid first priority (other than with respect to any such tax, mechanics' or other lien) security interest in the Repurchase Assets; or

           (iii)      enter into or permit any amendment of the Interim Custodial Agreement that has an affect on the interests of the Administrative Agent, the Purchasers or the Agents under the Interim Custodial Agreement without the prior written consent of the Administrative Agent.

           5.3     Quarterly Statement as to Compliance.  The Company will deliver to the Agents and the Administrative Agent, within 30 days after the end of each fiscal quarter of the Company (commencing with the fiscal quarter ended March 31, 2008), an Officer's Certificate stating that:

           (i)        a review of the activities of the Company during such quarter and the performance of the Company under this Agreement has been made under such Authorized Officer's supervision; and

           (ii)       to the best of such Authorized Officer's knowledge, based on such review, the Company has complied with all conditions and covenants under this Agreement and the other Transaction Documents throughout such quarter, or, if there has been a default in the compliance of any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

5.4     <u>Company May Consolidate, Etc. Only on Certain Terms</u>.

(a)     The Company shall not consolidate or merge with or into any other Person, without the prior written consent of the Administrative Agent and subject to the fulfillment of any conditions precedent required by the Administrative Agent and the Administrative Agent to the consummation of such consolidation or merger.

(b)     The Company shall not convey or transfer all or substantially all of its properties or assets, including those included in the Repurchase Assets, to any Person except in accordance with this Agreement without the prior written consent of the Administrative Agent and subject to the fulfillment of any conditions precedent required by the Administrative Agent and the Administrative Agent to the consummation of such conveyance or transfer.

5.5     <u>No Other Business</u>.  The Company shall not engage in any business other than financing, purchasing, owning, selling and managing the Receivables in the manner contemplated by this Agreement and the Transaction Documents and activities incidental thereto.

5.6     <u>No Borrowing</u>.  The Company shall not issue, incur, assume, guarantee or otherwise become liable, directly or indirectly, for any Indebtedness except Indebtedness permitted by or arising under the Transaction Documents.  The proceeds of the Transactions shall be used exclusively to fund the Company's purchase of the Receivables and the other assets specified in the Sale and Servicing Agreement and to pay the Company's organizational, transactional and start-up expenses.

5.7     <u>Servicer's Obligations</u>.  The Company shall cause each Servicer to comply with the Servicer's obligations under the Sale and Servicing Agreement.

5.8     <u>Guarantees, Loans, Advances and Other Liabilities</u>.  The Company shall not make any loan or advance or credit to, or guarantee (directly or indirectly or by an instrument having the effect of assuring another's payment or performance on any obligation or capability of so doing or otherwise), endorse or otherwise become contingently liable, directly or indirectly, in connection with the obligations, stocks or dividends of, or own, purchase, repurchase or acquire (or agree contingently to do so) any stock, obligations, assets or securities of, or any other interest in, or make any capital contribution to, any other Person.

5.9     <u>Capital Expenditures</u>.  The Company shall not make any expenditure (by long-term or operating lease or otherwise) for capital assets (either realty or personalty).

5.10     <u>Compliance with Laws</u>.     The Company shall comply with the requirements of all applicable laws, the non-compliance with which would, individually or in the aggregate, materially and adversely affect the ability of the Company to perform its obligations hereunder or under any other Transaction Document.

5.11     <u>Restricted Payments</u>.  The Company shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to any owner of a beneficial interest in the Company or otherwise with respect to any ownership or equity interest or security in or of the Company or to the Servicer, (ii) redeem, purchase, retire or otherwise acquire for value any such

ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Company may make, or cause to be made, distributions to its Certificateholders, the Seller or the Servicer as permitted by, and to the extent funds are available for such purpose under Article 8, so long as, at the time of such declaration or payment (and after giving effect thereto), no Amortization Event, Potential Amortization Event, Event of Default or Default shall occur or be continuing and no amount payable by the Company under any Transaction Document is then due and owing but unpaid. The Company will not, directly or indirectly, make payments to or distributions from the Collection Account except in accordance with this Agreement and the Transaction Documents.

5.12    Further Instruments and Acts.    Upon request of any Agent or the Administrative Agent, the Company will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Agreement.

5.13    Interest Rate Protection.    The Company shall be required to maintain Interest Rate Hedges in a form acceptable to the Administrative Agent which may include the Company's purchase of "out of the money" LIBOR Rate interest rate caps with an aggregate notional principal amount not less than the Aggregate Repurchase Price at the time any such Interest Rate Hedge is put in place, and subject to a declining notional principal amount schedule acceptable to the Administrative Agent. If as of the last day of any calendar month, the Unhedged Amount is $10,000,000 or more, then within five Business Days following such last day of such calendar month, the Company shall enter into Interest Rate Hedges acceptable to the Administrative Agent in a minimum amount necessary to reduced the Unhedged Amount to $0.

5.14    Change in Name.    The Company shall not make any change to its name or use any trade names, fictitious names, assumed names or "doing business as" names or change the jurisdiction under the laws of which it is organized without the prior written consent of the Administrative Agent and subject to the fulfillment of any conditions precedent required by the Administrative Agent to the consummation of such change.

5.15    Limitation on Transactions with Affiliates.    The Company shall not enter into, or be a party to, any transaction with any Affiliate of the Company, except for (a) the transactions contemplated by the Transaction Documents and (b) to the extent not otherwise prohibited under the Transaction Documents, other transactions in the nature of employment contracts and directors' fees, upon fair and reasonable terms materially no less favorable to the Company than would be obtained in a comparable arm's-length transaction with a Person not an Affiliate.

5.16    Limitation on Investments.    The Company shall not form, or cause to be formed, any subsidiaries; or make or suffer to exist any loans or advances to, or extend any credit to, or make any investments (by way of transfer of property, contributions to capital, purchase of stock or securities or evidences of indebtedness, acquisition of the business or assets, or otherwise) in any Affiliate or any other Person except as otherwise permitted herein and pursuant to the Sale and Servicing Agreement.

5.17    Margin Confirmation.  The Company shall deliver, or cause the Servicer to deliver, a Margin Confirmation to the Agents and the Administrative Agent, (a) in connection with each Purchase pursuant to Section 2.2, (b) on each monthly date a Servicer's Certificate is to be delivered, (c) on each date Receivables are repurchased by the Company pursuant to Section 2.4 and (d) on any date it wishes to demonstrate that a Margin Deficit has been cured.

5.18    Financial Covenants.

(a)    Maximum Leverage.  Sixth Gear shall maintain a Leverage Ratio, at and as of the end of each calendar month, of not more than 7.0 to 1.0.

(b)    Minimum Tangible Net Worth.  Sixth Gear shall maintain a Consolidated Tangible Net Worth, at and as of the end of each calendar month, in an amount equal to or greater than the amount set forth for such date in the table below:

| Date | Consolidated Tangible Net Worth |
|---|---|
| All dates through September 30, 2008 | $10,000,000 |
| October 1, 2008 through December 31, 2008 | $12,000,000 |
| January 1, 2009 through March 31, 2009 | $19,000,000 |
| April 1, 2009 through June 30, 2009 | $31,000,000 |
| July 1, 2009 through September 30, 2009 | $43,000,000 |
| October 1, 2009 through December 31, 2009 | $56,000,000 |
| January 1, 2010 through March 31, 2010 | $68,000,000 |
| April 1, 2010 through June 30, 2010 | $78,000,000 |
| July 1, 2010 through September 30, 2010 | $87,000,000 |
| October 1, 2010 through December 31, 2010 | $97,000,000 |
| January 1, 2011 through March 31, 2011 | $107,000,000 |
| April 1, 2011 and thereafter | $114,000,000 |

(c)    Restricted Payments.  On and at all times after the initial Purchase Date, Sixth Gear agrees that:

(i)    it will not declare, pay or make any dividend or distribution (in cash, property or obligations) on any shares of any class of capital stock (now or hereafter outstanding) of it or on any warrants, options or other rights with respect to any shares of any class of capital stock (now or hereafter outstanding) of it (other than dividends or distributions payable in its common stock or warrants to purchase its common stock or splitups or reclassifications of its stock into additional or other shares of its common stock) or apply, or permit any of its Subsidiaries to apply, any of its funds, property or assets to the purchase, redemption, sinking fund or other retirement of, or agree (or permit any of its Subsidiaries to

agree) to purchase or redeem, any shares of any class of capital stock (now or hereafter outstanding) of it, or warrants, options or other rights with respect to any shares of any class of capital stock (now or hereafter outstanding) of it; and

        (ii)      it will not, and will not permit any Subsidiary to, make any deposit for any of the foregoing purposes;

        each of the foregoing being a "restricted payment," unless immediately after giving effect to such restricted payment (A) no Amortization Event, Potential Amortization Event, Event of Default or Default shall occur or be continuing and no amount payable by the Company or Sixth Gear under any Transaction Document is then due and owing but unpaid and (B) the amount of such restricted payment shall not exceed 50% of Available Consolidated Net Income, provided that no restricted payment may be made at any time prior to the first anniversary of the initial Purchase Date.

        (d)    Consolidated Net Income. For each calendar month commencing with the calendar month ending on June 30, 2010, Sixth Gear shall maintain Consolidated Net Income of at least $1.

        (e)    Minimum Liquidity. At any time, the assets of Sixth Gear comprised of unrestricted cash and unrestricted Cash Equivalents shall not be less than the greater of (i) $5,000,000 or (ii) an amount equal to 3% of the sum of (A) the Aggregate Repurchase Price at such time, (B) all debt or other obligations outstanding at such time under all warehouse financing facilities or similar facilities with respect to which Sixth Gear or any of its Subsidiaries is a borrower or seller and (C) all other indebtedness of Sixth Gear with respect to which a margin call may be made upon Sixth Gear or any of its Subsidiaries.

        (f)    Monthly Statement as to Compliance. The Company will deliver to the Agents and the Administrative Agent, within 15 days after the end of each calendar month (commencing with the calendar month ending on May 31, 2008), an Officer's Certificate stating that the Financial Covenants with respect to such calendar month have been complied with (or, if there has been a breach in the compliance of any Financial Covenant, specifying each such breach and the nature and status thereof).

## ARTICLE 6    PAYMENT, TRANSFER AND CUSTODY

        6.1    Generally. Unless otherwise mutually agreed in writing, all transfers of funds hereunder shall be in immediately available funds.

        6.2    Transfer of Ownership. On the Purchase Date for each Transaction, ownership of the Purchased Receivables and all monies received thereon after the related Cutoff Date shall be transferred to each Purchaser or its designee against the simultaneous transfer of the Purchase Price to an account of the Company specified in the Confirmation.

        6.3    Conveyance. Company, simultaneously with the delivery to each Purchaser or its designee of the Purchased Receivables relating to each Transaction hereby sells, transfers, conveys and assigns to each Purchaser or its designee without recourse, but subject to

the terms of this Agreement, all the right, title and interest of Company in and to the Purchased Receivables.

6.4     Custody.  Any Receivable Files are and shall be held in trust by the Custodian as bailee or custodian for the benefit of Purchasers as the beneficial owner thereof. The books and records (including, without limitation, any computer records or tapes) of Company pertaining to the Purchased Receivables shall be marked appropriately to reflect clearly the sale of the related Purchased Receivable to Purchasers.

## ARTICLE 7    ASSET VALUE MAINTENANCE

7.1     Generally.  If at any time a Margin Deficit exists, then Purchasers may by notice to Company (a "Margin Call") require Company to transfer to each Purchaser or its designee Receivables ("Additional Receivables") or cash, so that the cash and aggregate Adjusted Asset Amount of the Purchased Receivables, including any such Additional Receivables, will thereupon equal or exceed the Aggregate  Repurchase Price within the time period set forth in Section 7.2 herein.

7.2     Margin Call.  Notice required pursuant to Section 7.1 above may be given in the manner set forth in Section 14.2.  A notice for the payment or delivery in respect of a Margin Deficit must be met within the Applicable Cure Period.  The failure of a Purchaser, on any one or more occasions, to exercise its rights under Section 7.1 shall not change or alter the terms and conditions to which this Agreement is subject or limit the right of such Purchaser to do so at a later date.  Purchasers and Company agree that a failure or delay to exercise its rights under Section 7.1 shall not limit Purchasers' rights under this Agreement or otherwise existing by law or in any way create additional rights for Company.

7.3     Future Transactions.  In the event that Company fails to comply with the provisions of this Article 7, a Purchaser may choose not to enter into any additional Transactions hereunder after the date of such failure.

## ARTICLE 8    COLLECTIONS

8.1     Generally.

(a)     Except to the extent released to the Company pursuant to Section 8.1(b)(vii) and Section 8.1(c)(vi), Collected Funds shall be the property of Purchasers. Company has established an Eligible Deposit Account (the "Collection Account") which is subject to the Wachovia Deposit Account Control Agreement.  Should any depositary of the Collection Account cease to be a Qualified Institution, then the Company shall, with the Agent's assistance as necessary, cause the related account to be moved to a Qualified Institution.  The Company shall cause the Servicer to remit Collections and Purchase Amounts in accordance with Article V of the Sale and Servicing Agreement.  Funds on deposit in the Collection Account may be invested in Eligible Investments selected in writing by the Company (or the Servicer on behalf of the Company) pursuant to standing instructions or otherwise.  All such Eligible Investments will be held for the benefit of the Purchasers.  Funds on deposit in the Collection Account shall be invested in Eligible Investments that will mature so that funds will be available no later than 10:00 a.m. (New York City time) on the following Distribution Date.  All Eligible Investments

will be held to maturity.  All investment earnings of moneys deposited in the Collection Account shall be retained in the Collection Account, and any loss resulting from such investments shall be charged to such account.

(b)    On each Distribution Date prior to the occurrence of an Event of Default or Amortization Event, the Administrative Agent shall or shall direct the Servicer to (based on the information contained in the Servicer's Certificate delivered with respect to the related Determination Date or, if such Servicer's Certificate shall not have been delivered, such information and direction as the Administrative Agent may reasonably determine in good faith) distribute the following amounts from the Collection Account unless otherwise specified, to the extent of Available Funds, and in the following order of priority:

(i)    pro rata to the Custodian, the Custodial Fee for the related Collection Period, and to the Backup Servicer, the Backup Servicing Fee for the related Collection Period (only to the extent such Custodial Fee or Backup Servicing Fee, as applicable, was not previously paid by the Servicer pursuant to the Custodial Agreement or the Backup Servicing Agreement, as applicable);

(ii)    to the Servicer, the Servicing Fee for the related Collection Period;

(iii)    pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, its applicable share of the Price Differential with respect to such Distribution Date and any Price Differential with respect to any prior Interest Period to the extent not paid on a prior Distribution Date;

(iv)    pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, to the payment of the Aggregate Repurchase Price in an amount equal to the amount required to prevent the existence of, or remedy, a Margin Deficit;

(v)    pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, its applicable share of the Monthly Costs and Expenses with respect to such Distribution Date and any Monthly Costs and Expenses with respect to any prior Interest Period to the extent not paid on a prior Distribution Date;

(vi)    during any Limited Amortization Period and until the termination of such Limited Amortization Period, pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, its applicable share of the Limited Amortization Amount;

(vii)    to the Trustee to the extent of any fees, expenses or indemnities;

(viii)    at the option of the Company, pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, to the payment of the Aggregate Repurchase Price in an amount (the "Optional Payment Amount") set forth in a notice (an "Optional Payment Notice") provided to the Administrative Agent, which Optional Payment Notice shall be delivered by the Servicer to the Administrative Agent 1 Business Day prior to the Distribution Date on which the Company elects to distribute such Optional Payment Amount; and

(ix)    then any remaining Available Funds to the Company.

(c)    On each Distribution Date after the occurrence and during the continuance of an Event of Default or Amortization Event, the Administrative Agent shall or shall direct the Servicer to (based on the information contained in the Servicer's Certificate delivered with respect to the related Determination Date or, if such Servicer's Certificate shall not have been delivered, such information and direction as the Administrative Agent may reasonably determine in good faith) distribute the following amounts from the Collection Account unless otherwise specified, to the extent of Available Funds, and in the following order of priority:

(i)    pro rata to each Custodian, the Custodial Fee for the related Collection Period, and to the Backup Servicer, the Backup Servicing Fee for the related Collection Period;

(ii)    to the Servicer, the Servicing Fee for the related Collection Period;

(iii)    pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, its applicable share of the Price Differential with respect to such Distribution Date and any Price Differential with respect to any prior Interest Period to the extent not paid on a prior Distribution Date;

(iv)    pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, for the payment of the outstanding Aggregate Repurchase Price;

(v)    pro rata to each applicable Agent for the benefit of the Purchasers in the related Purchaser Group, its applicable share of the Monthly Costs and Expenses with respect to such Distribution Date and any Monthly Costs and Expenses with respect to any prior Interest Period to the extent not paid on a prior Distribution Date; and

(vi)    to the Trustee to the extent of any fees, expenses or indemnities, then any remaining Available Funds to the Company.

(d)    Amounts payable to each Purchaser pursuant to Section 8.1(b) and Section 8.1(c) shall be paid pro rata based on amounts then payable to such Purchaser.

8.2    Offset.  Each Purchaser shall offset against the Repurchase Price for each Purchased Receivable all amounts actually received by such Purchaser pursuant to Section 8.1.

## ARTICLE 9    SECURITY INTEREST

9.1    Grant of Security Interest.  The Purchasers and the Company intend that the Transactions hereunder be sales to Purchasers of Company's beneficial right, title and interest in and to the Purchased Receivables and not loans from the Purchasers to Company secured by the Purchased Receivables.  However, in order to preserve the Purchasers' rights under this Agreement, in the event that a court or other forum recharacterizes the Transactions hereunder as loans and as security for the performance by Company of all of Company's obligations to the Purchasers under this Agreement and the Transactions entered into pursuant to this Agreement, Company grants to the Administrative Agent, on behalf of itself and the

Purchasers a first priority security interest in the Company's beneficial interest in all of the Company's right, title and interest in and to (a) the Receivables; (b) the Servicing Rights; (c) the security interests in the Financed Vehicles granted by Obligors pursuant to the Receivables and any other interest of the Company in the Financed Vehicles; (d) all rights under any Service Contracts on the related Financed Vehicles; (e) any proceeds with respect to the Receivables from claims on any physical damage, credit life or disability insurance policies covering Financed Vehicles or Obligors; (f) the Wachovia Accounts and the Wachovia Accounts Property; (g) the Fifth Third Account and the Fifth Third Account Property; (h) the Company's rights and benefits, but none of its obligations or burdens, under Dealer Agreements related to the Receivables, including the delivery requirements, representations and warranties and the cure and repurchase obligations of the Dealers thereunder; (i) all items contained in the Receivable Files and any and all other documents that the Servicer keeps on file in accordance with its customary procedures relating to the Receivables, the Obligors or the Financed Vehicles; (j) the Company's rights and benefits, but none of its obligations or burdens, under the Sale and Servicing Agreement and each Transfer Agreement entered in connection therewith; (k) the Company's rights and benefits, but none of its obligations or burdens, under any Interest Rate Hedge; and (l) all present and future claims, demands, causes and choses of action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing (collectively, the "Repurchase Assets").

## ARTICLE 10  CONFIDENTIALITY

10.1    Covenants.  The Company covenants and agrees to hold in confidence, and not disclose to any Person, the terms of this Agreement (including any fees payable in connection with this Agreement or the identity of any CP Conduit which is a Purchaser or a beneficial owner of Receivables under this Agreement), except as the Administrative Agent may have consented to in writing prior to any proposed disclosure and except it may disclose such terms (i) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, provided the Company shall provide prompt notice of such order to the Administrative Agent, (ii) upon the request or demand of any regulatory authority having jurisdiction over the Company or any of its affiliates, provided the Company shall, unless otherwise prevented by law, provide prompt notice of such request or demand to the Administrative Agent, (iii) to its affiliates, employees, legal counsel, independent auditors and other experts or agents who need to know such information and are informed of the confidential nature of such information; provided, that, in the case of clause (i) the Company will use all reasonable efforts to maintain confidentiality and will (unless otherwise prohibited by law or regulation) notify the Administrative Agent of its intention to make any such disclosure prior to making such disclosure.

10.2    Covenants of Purchasers.  The Administrative Agent and each Agent and Purchaser, severally and with respect to itself only, covenants and agrees that any Confidential

Information obtained by it pursuant to this Agreement shall be held in confidence (it being understood that such information provided to the Administrative Agent or any Agent or Purchaser hereunder may in all cases be distributed to the Administrative Agent or to any Agent or Purchaser) except that the Administrative Agent or such Agent or Purchaser may disclose such information (i) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, provided the Administrative Agent or such Agent or Purchaser shall provide prompt notice of such order to the affected party and the Administrative Agent, (ii) upon the request or demand of any regulatory authority having jurisdiction over the Administrative Agent or any Agent or Purchaser or any of its affiliates, provided the Administrative Agent or such Agent or Purchaser shall, unless otherwise prevented by law, provide prompt notice of such request or demand to the affected party and the Administrative Agent, (iii) to its affiliates, employees, legal counsel, independent auditors and other experts or agents who need to know such information and to any Support Provider who in any event are informed of the confidential nature of such information and, with respect to any Support Provider, upon the prior consent of the Administrative Agent, (iv) which has been independently acquired or developed (other than solely or principally based on Confidential Information) by the Administrative Agent or such Agent or Purchaser without violating any of the Administrative Agent or such Agent or Purchaser's obligations under this Agreement; provided, that, in the case of clause (i) the Administrative Agent or such Agent or Purchaser will use all reasonable efforts to maintain confidentiality and will (unless otherwise prohibited by law or regulation) notify the Company and the Administrative Agent of its intention to make any such disclosure prior to making such disclosure.

10.3   Non-Confidentiality of Tax Treatment and Tax Structure. Notwithstanding anything in any of the Transaction Documents to the contrary, the term "Confidential Information", when used in any Transaction Document, shall not include, and the Company, the Administrative Agent, each Agent and each Purchaser may disclose without limitation of any kind, any information with respect to the "tax treatment" and "tax structure" (in each case, within the meaning of Treasury Regulation Section 1.6011-4) of the transactions contemplated by the Transaction Documents and all materials of any kind (including opinions or other tax analyses) that are provided to the Company, the Administrative Agent, each Agent and each Purchaser relating to such tax treatment and tax structure; provided that with respect to any document or similar item that in either case contains information concerning the tax treatment or tax structure of the transaction as well as other information, this sentence shall only apply to such portions of the document or similar item that relate to the tax treatment or tax structure of the transactions contemplated by the Transaction Documents.

## ARTICLE 11   THE AGENTS

11.1   Appointment. Each Purchaser and each Agent hereby consents and agrees to the appointment of the Administrative Agent, and each such Purchaser and Agent irrevocably authorizes the Administrative Agent, as the agent for such Purchaser or Agent, to take such action on its behalf under the provisions of this Agreement and the other Transaction Documents and to exercise such powers and perform such duties hereunder and thereunder as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Transaction Documents, together with such other powers as are reasonably incidental thereto.   Each Purchaser in each Purchaser Group hereby irrevocably designates and appoints the Agent for

such Purchaser Group as the agent of such Purchaser under this Agreement, and each such Purchaser irrevocably authorizes such Agent, as the agent for such Purchaser, to take such action on its behalf under the provisions of the Transaction Documents and to exercise such powers and perform such duties thereunder as are expressly delegated to such Agent by the terms of the Transaction Documents, together with such other powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary elsewhere in this Agreement, neither the Administrative Agent nor any Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Purchaser, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or otherwise exist against the Administrative Agent or any Agent. To the extent that any provision of this <u>Article 11</u> with respect to the relationship between an Agent and the Purchasers in its Purchaser Group conflicts with any agreement between such Purchasers and such Agent set forth in any agreement with respect to a Support Facility, the terms of such other agreement will control.

11.2    <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under any of the Transaction Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

11.3    <u>Exculpatory Provisions</u>.  Neither any Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable to any of the Purchasers for any action lawfully taken or omitted to be taken by it or such Person under or in connection with any of the Transaction Documents (except for its or such Person's own gross negligence or willful misconduct) or (b) responsible in any manner to any of the Purchasers for any recitals, statements, representations or warranties made by the Seller, the Company, Sixth Gear, the Servicer, Sixth Gear Inc. or the Administrative Agent or any officer thereof contained in any of the Transaction Documents or in any certificate, report, statement or other document referred to or provided for in, or received by an Agent under or in connection with, any of the Transaction Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any of the Transaction Documents or for any failure of the Seller, the Company, Sixth Gear, the Servicer, Sixth Gear Inc. or the Administrative Agent to perform its obligations thereunder.  No Agent shall be under any obligation to any Purchaser to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, any of the other Transaction Documents, or to inspect the properties, books or records of the Seller, the Company, Sixth Gear, the Servicer, Sixth Gear Inc. or the Administrative Agent.

11.4    <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, written statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Agent), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under any of the Transaction Documents unless it shall first receive such advice or concurrence of such

percentage of aggregate Percentage Interests or Purchase Limits of Purchasers in its Purchaser Group as it deems appropriate or it shall first be indemnified to its satisfaction by the Purchasers or by the Committed Purchasers in its Purchaser Group, against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under any of the Transaction Documents in accordance with a request of (i) Purchasers in its Purchaser Group having Percentage Interests aggregating greater than 50% of the aggregate Percentage Interests of all Purchasers in such Purchaser Group, and (ii) Purchasers in its Purchaser Group having Purchase Limits aggregating greater than 50% of the aggregate Purchase Limits of all Purchasers in such Purchaser Group, and such request and any action taken or failure to act pursuant thereto shall be binding upon all present and future Purchasers in such Purchaser Group.

11.5    Notices.  No Agent shall be deemed to have knowledge or notice of the occurrence of any breach of this Agreement or the occurrence of any Termination Event unless such Agent has received notice from the Servicer, the Administrative Agent or any Purchaser, referring to this Agreement and describing such event.  In the event any Agent receives such a notice, it shall promptly give notice thereof to the Purchasers in its Purchaser Group.  Each Agent shall take such action with respect to such event as shall be reasonably directed by (i) Purchasers in its Purchaser Group having Percentage Interests aggregating greater than 50% of the aggregate Percentage Interests of all Purchasers in such Purchaser Group, and (ii) Purchasers in its Purchaser Group having Purchase Limits aggregating greater than 50% of the aggregate Purchase Limits of all Purchasers in such Purchaser Group; provided that unless and until such Agent shall have received such directions, such Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such event as it shall deem advisable in the best interests of the Purchasers in its Purchaser Group.

11.6    Non-Reliance on Agents and Other Purchasers.  Each Purchaser expressly acknowledges that no Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of the Seller, the Company, Sixth Gear, the Servicer, Sixth Gear Inc. or the Administrative Agent shall be deemed to constitute any representation or warranty by any Agent to any Purchaser.  Each Purchaser represents to each Agent that it has, independently and without reliance upon any Agent or any other Purchaser, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Seller, the Company, Sixth Gear, the Servicer, the Administrative Agent and the Receivables and made its own decision to purchase its interest in the Receivables hereunder and enter into this Agreement.  Each Purchaser also represents that it will, independently and without reliance upon any Agent or any other Purchaser, and based on such documents and information as it shall deem appropriate at the time, continue to make its own analysis, appraisals and decisions in taking or not taking action under any of the Transaction Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Seller, the Company, Sixth Gear, the Servicer, the Administrative Agent and the Receivables.  Except for notices, reports and other documents received under Article 5, no Agent shall have any duty or responsibility to provide any Purchaser with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness

of the Seller, the Company, Sixth Gear, the Servicer, Sixth Gear Inc., the Administrative Agent and the Receivables which may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates.

11.7    Indemnification.   The Committed Purchasers in each Purchaser Group agree to indemnify the Agent for such Purchaser Group in its capacity as such (without limiting the obligation (if any) of the Seller, the Company, Sixth Gear and the Servicer to reimburse such Agent for any such amounts), ratably according to the Purchase Limits of their respective Purchaser Groups (or, if the Purchase Limits have terminated, Percentage Interests), in each case from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including at any time following the payment of the obligations under this Agreement) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of this Agreement, or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by the Agent under or in connection with any of the foregoing; provided that no Purchaser shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of an Agent resulting from its own gross negligence or willful misconduct.  The agreements in this subsection shall survive the payment of the obligations under this Agreement.

11.8    Agents in their Individual Capacity.   Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Seller, the Company, Sixth Gear, the Servicer, Sixth Gear Inc. or the Administrative Agent as though such Agent were not an agent hereunder.  In addition, the Purchasers acknowledge that one or more Persons which are Agents may act (i) as administrator, sponsor or agent for one or more CP Conduits and in such capacity acts and may continue to act on behalf of each such CP Conduit in connection with its business, and (ii) as the agent for certain financial institutions under the liquidity and credit enhancement agreements relating to this Agreement to which any one or more CP Conduits is party and in various other capacities relating to the business of any such CP Conduit under various agreements.  Any such Person, in its capacity as Agent, shall not, by virtue of its acting in any such other capacities, be deemed to have duties or responsibilities hereunder or be held to a standard of care in connection with the performance of its duties as an Agent other than as expressly provided in this Agreement.  Any Person which is an Agent may act as an Agent without regard to and without additional duties or liabilities arising from its role as such administrator or agent or arising from its acting in any such other capacity.

11.9    Successor Agents.   Any Agent may resign as Agent upon ten days' notice to the Purchasers in its Purchaser Group, the Administrative Agent and each other Agent, the Seller and the Servicer with such resignation becoming effective upon a successor agent succeeding to the rights, powers and duties of the Agent pursuant to this Section 11.9.  If an Agent shall resign as Agent under this Agreement, then (i) Purchasers in its Purchaser Group having Percentage Interests aggregating greater than 50% of the aggregate Percentage Interests of all Purchasers in such Purchaser Group, and (ii) Committed Purchasers in its Purchaser Group having Committed Purchase Limits aggregating greater than 50% of the aggregate Committed Purchase Limits of all Committed Purchasers in such Purchaser Group shall appoint from among the Committed Purchasers in such Purchaser Group a successor agent for such Purchaser Group.  Any successor agent shall succeed to the rights, powers and duties of resigning Agent, and the

term "Agent" shall mean such successor agent effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement.  After the retiring Agent's resignation as Agent, the provisions of this <u>Article 11</u> shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement.

ARTICLE 12  EVENTS OF DEFAULT

12.1    <u>Events of Default</u>.  "<u>Event of Default</u>" means the occurrence of any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)        default in the payment of any Price Differential pursuant to <u>Section 8.1(b)(iii)</u> or any other amount (except Repurchase Price) due when the same becomes due and payable, and such default shall continue for a period of two (2) days; or

(ii)        default in the payment of any Repurchase Price when the same becomes due and payable, and such default shall continue for a period of one day; or

(iii)        the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Company, the Seller or the Servicer or any part of the Repurchase Assets in an involuntary case under any applicable federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, Administrative Agent, sequestrator or similar official of the Company, the Seller or, the Servicer or for any part of the Repurchase Assets, or ordering the winding-up or liquidation of the affairs the Company, the Seller or the Servicer, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

(iv)        the commencement by the Company, the Seller or the Servicer of a voluntary case under any applicable federal or State bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Company, the Seller or the Servicer to the entry of an order for relief in an involuntary case under any such law, or the consent by the Company, the Seller or the Servicer to the appointment or taking possession by a receiver, liquidator, assignee, custodian, Administrative Agent, sequestrator or similar official of the Company, the Seller or the Servicer, or for any part of the Repurchase Assets, or the making by the Company, the Seller or the Servicer of any general assignment for the benefit of creditors, or the failure by the Company, the Seller or the Servicer generally to pay its debts as such debts become due, or the taking of action by the Company, the Seller or the Servicer in furtherance of any of the foregoing; or

(v)        default in the observance or performance of any covenant or agreement of the Company, the Seller or the Servicer made in any Transaction Document (other than a covenant or agreement, a default in the observance or performance of which is specifically dealt with elsewhere in this Section), or any representation or warranty of the Company, the Seller or the Servicer made in this Agreement, in any Transaction Document or in any

certificate or any other writing delivered pursuant hereto or thereto or in connection herewith or therewith (including any Servicer's Certificate or any Margin Confirmation) proving to have been incorrect in any material respect as of the time when the same shall have been made or deemed to have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such representation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of thirty (30) days after an officer or director of the Company has notice of such default or breach; or

   (vi)  the Internal Revenue Service shall file notice of a lien pursuant to Section 6323 of the Code with regard to any assets of the Company or any material portion of the assets of the Seller or the Servicer and such lien shall not have been released within 15 days, or the Pension Benefit Guaranty Corporation shall file notice of a lien pursuant to Section 4068 of ERISA with regard to any of the assets of the Company, the Seller or the Servicer and such lien shall not have been released within 15 days; or

   (vii)  (a) any Transaction Document or any lien granted thereunder by the Company or the Seller shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of the Company, the Servicer or the Seller; or (b) the Company, the Seller or the Servicer shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability; or (c) any lien securing any Company Secured Obligation shall, in whole or in part, not be or cease to be a perfected first priority security interest against the Company, or (d) the Company shall grant a security interest to any Person other than the Administrative Agent with regard to any assets of the Company, or (e) the assets of the Company shall be subject to any Liens (other than Permitted Liens) and such Liens are not removed or satisfied within thirty (30) days of the imposition of such Lien; or

   (viii)  a Margin Deficit has occurred and not been cured within the Applicable Cure Period; or

   (ix)  the Company or the Seller shall fail to pay any principal of or premium or interest on any Indebtedness having a principal amount of $100,000 (or, in the case of the Company, $1,000) or greater, when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness; or any other default under any agreement or instrument relating to any such Indebtedness of the Company, the Seller or the Servicer, as applicable, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased, or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof; or

(x)        Warburg Pincus & Co. fails to (i) directly or indirectly own a majority of the voting interests and equity interests in Sixth Gear Inc. or (ii) directly or indirectly own a majority of the voting interests and equity interests in the Seller; or

(xi)        a Level II Trigger event has occurred; or

(xii)        the Servicer shall fail to transfer servicing to the Backup Servicer or another successor servicer acceptable to the Administrative Agent within thirty (30) days following the termination of the Servicer;

(xiii)        the Company shall breach the agreements set forth in that certain letter agreement regarding capital markets activities, dated as of December 21, 2007, by the Administrative Agent and Lehman Brothers Inc. and accepted and agreed to by Sixth Gear and the Company; or

(xiv)        the breach of any covenant set forth in <u>Section 5.18</u>.

12.2    <u>Rights Upon Event of Default or Amortization Event</u>.

(a)        If an Event of Default specified in <u>Section 12.1(iii)</u> or <u>(iv)</u> shall have occurred and be continuing, the Company's obligations hereunder to repurchase all Purchased Receivables in Transactions shall become immediately due and payable, together with accrued interest thereon.  If any other Event of Default shall have occurred and be continuing, the Administrative Agent, if so requested in writing by the Required Purchasers, shall exercise any of the remedies specified in <u>Section 12.3</u>, subject to any limitations set forth therein and subject to the rights of the Required Purchasers set forth in <u>Section 12.8</u>.

(b)        If an Event of Default (other than an Event of Default specified in <u>Section 12.1(iii)</u> or <u>(iv)</u> hereof) shall have occurred and be continuing, the Administrative Agent, if so requested in writing by the Required Purchasers shall declare by written notice to the Company that the Company's obligations hereunder to repurchase all Purchased Receivables in Transactions shall thereupon become immediately due and payable.

(c)        At any time after such declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Administrative Agent as hereinafter in this <u>Article 12</u> provided, the Required Purchasers which declared such acceleration may, by written notice to the Company and the Administrative Agent, rescind and annul such declaration and its consequences.

12.3    <u>Remedies</u>.

(a)        If an Event of Default shall have occurred and be continuing, the Administrative Agent may and shall, at the direction of the Required Purchasers (except as provided herein), do one or more of the following:

(i)        institute Proceedings in its own name and as Administrative Agent of an express trust for the collection of all amounts then payable on the Repurchase Assets or under

this Agreement with respect thereto, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Company moneys adjudged due;

(ii)         institute Proceedings from time to time for the complete or partial foreclosure of this Agreement with respect to the Repurchase Assets;

(iii)        exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Administrative Agent and the Purchasers; and

(iv)        sell the Repurchase Assets or any portion thereof or rights or interest therein, at one or more public or private sales called and conducted in any manner permitted by law; provided, however, that the Administrative Agent may not sell or otherwise liquidate the Repurchase Assets following an Event of Default unless (a) the Required Purchasers consent thereto and (b) all amounts due and owing with respect to the Aggregate Repurchase Price and under the Transaction Documents to the holders of Purchasers shall be paid in full with the proceeds of such sale or liquidation.

(b)        In connection with the exercise of any of the remedies described in Section 12.3(a), the Administrative Agent shall be entitled to appoint, at the expense of the Company, an agent to hold title to any part of the Repurchase Assets on behalf of the Administrative Agent and the Purchasers.

12.4    Notice of Sale of Repurchase Assets.  If, pursuant to the terms hereof, all or a portion of the Repurchase Assets is to be sold or otherwise liquidated by the Administrative Agent following the occurrence of an Event of Default, the Administrative Agent shall give the Purchasers prior notice of such sale and the Purchasers may, but shall not be required to, make a bid for the purchase of all or a portion of the Repurchase Assets being sold by the Administrative Agent.

12.5    Restoration of Rights and Remedies.  If the Administrative Agent or any Purchaser has instituted any Proceeding to enforce any right or remedy under this Agreement and such proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Administrative Agent or to such Purchaser, then and in every such case the Company, the Administrative Agent and the Purchasers shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Administrative Agent and the Purchasers shall continue as though no such Proceeding had been instituted.

12.6    Rights and Remedies Cumulative.  No right or remedy herein conferred upon or reserved to the Administrative Agent or to the Purchasers is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

12.7   <u>Delay or Omission Not a Waiver</u>.   No delay or omission of the Administrative Agent or any Purchaser to exercise any right or remedy accruing upon any Default or Event of Default shall impair any such right or remedy or constitute a waiver of any such Default or Event of Default or an acquiescence therein.  Every right and remedy given by this <u>Article 12</u> or by law to the Administrative Agent or to the Purchasers may be exercised from time to time, and as often as may be deemed expedient, by the Administrative Agent or by the Purchasers, as the case may be.

12.8   <u>Control by Purchasers</u>.   The Required Purchasers shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Administrative Agent with respect to the Repurchase Assets or exercising any trust or power conferred on the Administrative Agent; <u>provided</u> that

(i)   such direction shall not be in conflict with any rule of law or with this Agreement;

(ii)   any direction to the Administrative Agent to sell or liquidate the Repurchase Assets shall be subject to the requirements set forth in <u>Section 12.3(a)(iv)</u>; and

(iii)   the Administrative Agent may take any other action deemed proper by the Administrative Agent that is not inconsistent with such direction.

12.9   <u>Waiver of Past Defaults</u>.

Prior to the declaration of the acceleration of the maturity as provided in <u>Section 12.2</u>, the Required Purchasers may waive any past Default or Event of Default and its consequences except (a) a Default in payment of Repurchase Amount or Price Differential, (b) a Default in respect of a covenant or provision hereof which cannot be modified or amended without the consent of each Purchaser and (c) a Margin Deficit.  (Waivers of any Default or Event of Default of a type set forth in (a) through (c) of the preceding sentence shall require the consent of all Purchasers).  In the case of any such waiver, the Company, the Administrative Agent and the Purchasers shall be restored to their former positions and rights hereunder, respectively.

Upon any such waiver, such Default or Event of Default shall cease to exist and be deemed to have been cured and not to have occurred for every purpose of this Master Repurchase Agreement; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereto.

12.10   <u>Waiver of Stay or Extension Laws</u>.   The Company covenants (to the extent that it may lawfully do so) that it will not at any time insist upon or plead or, in any manner whatsoever, claim or take the benefit or advantage of any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Agreement; and the Company (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Administrative Agent, but will suffer and permit the execution of every such power as though no such law had been enacted.

12.11   Performance and Enforcement of Certain Obligations.

(a)      Promptly following a request from the Administrative Agent to do so, the Company agrees to take all such lawful action as the Administrative Agent may request to compel or secure the performance and observance by the Seller and the Servicer, as applicable, of each of their obligations to the Company under or in connection with the Sale and Servicing Agreement in accordance with the terms thereof, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Company under or in connection with the Sale and Servicing Agreement to the extent and in the manner directed by the Administrative Agent, including the transmission of notices of default on the part of the Seller or the Servicer thereunder and the institution of legal or administrative actions or Proceedings to compel or secure performance by the Seller or the Servicer of each of their obligations under the Sale and Servicing Agreement.

(b)      If an Event of Default has occurred and is continuing, the Administrative Agent, at the written direction of the Required Purchasers, shall exercise all rights, remedies, powers, privileges and claims of the Company against the Seller or the Servicer under or in connection with the Sale and Servicing Agreement including the right or power to take any action to compel or secure performance or observance by the Seller or the Servicer of each of their obligations to the Company thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Sale and Servicing Agreement, and any right of the Company to take such action shall be suspended.

## ARTICLE 13  TRANSFERS

13.1   Disclosure to Permitted Parties.  The Company authorizes each Purchaser to disclose to any Transferee and Support Party and any prospective Transferee or Support Party any and all confidential information in the Purchaser's possession concerning this Agreement or the Transaction Documents or concerning the Receivables or such party which has been delivered to any Agent or such Purchaser pursuant to this Agreement or the Transaction Documents (including information obtained pursuant to rights of inspection granted hereunder) or which has been delivered to such Purchaser by or on behalf of the Company in connection with such Purchaser's evaluation of the Receivables, the Seller, the Company, Sixth Gear or the Servicer prior to becoming a party to, or purchasing an interest in, this Agreement or the Purchased Receivables; provided that prior to any such disclosure, (i) the Administrative Agent shall have consented to such disclosure and (ii) such Transferee or Support Party or prospective Transferee or Support Party shall have agreed in writing to comply with the confidentiality provisions of Article 10, and a copy of such written agreement as to compliance has been furnished to the Servicer and the Administrative Agent.

13.2   Participations and Transfers.

(a)      Each Purchaser may, in accordance with applicable law and with prior written notice to the Company, at any time grant Participations in all or part of its Purchase Limit or its interest in the Purchased Receivables, including the payments due to it under this Agreement and the Transaction Documents to any Permitted Transferee; provided, however, that no Participation shall be granted to any Person unless and until (i) the Agent for such Purchaser's

Purchaser Group and the Administrative Agent shall have consented thereto, (ii) the conditions to Transfer specified in this Agreement shall have been satisfied, and (iii) such Participation consists of a pro rata percentage interest in all payments made with respect to such Purchaser's beneficial interest (if any) in the Purchased Receivables.   In connection with any such Participation, each Agent for a Purchaser Group shall maintain a register of each Participant of members of its Purchaser Group and the amount of each related Participation.  Each Purchaser hereby acknowledges and agrees that (A) any such Participation will not alter or affect such Purchaser's direct obligations hereunder, and (B) neither the Company, the Administrative Agent, the Seller nor the Servicer shall have any obligation to have any communication or relationship with any Participant.  No Participant shall be entitled to Transfer all or any portion of its Participation without the prior written consent of the Agent for its Purchaser Group and the Administrative Agent.   Each Participant shall be entitled to receive additional amounts and indemnification pursuant to Sections 2.5, 2.6 and 2.7 as if such Participant were a Purchaser and such Sections applied to its Participation.

(b)      Each Purchaser may, with the consent of the Agent for its Purchaser Group and the Administrative Agent (but without the consent of the Company) and in accordance with applicable law, sell, transfer or assign, to any Permitted Transferee all or any part of its Committed Purchase Limit (if any), its Voluntary Purchase Limit (if any) or its interest in the Purchased Receivables and its rights and obligations under this Agreement and the Transaction Documents pursuant to a Transfer Supplement substantially in the form of Exhibit A hereto, executed by such Assignee and such Purchaser and delivered to the Agent for its Purchaser Group and the Administrative Agent for its acceptance and consent; provided, however, that any partial transfer of such Purchaser's Committed Purchase Limit must be accompanied by a proportionate transfer of such Purchaser's Voluntary Purchase Limit and vice-versa.

(c)      Each Purchaser may pledge its interest in the Purchased Receivables to any Federal Reserve Bank or other Person as collateral to secure a loan to or to otherwise fund such Purchaser.

(d)      Each Affected Party shall be entitled to receive additional payments and indemnification pursuant to Sections 2.5, 2.6 and 2.7 as though it were a Purchaser and such Section applied to its interest in or commitment to acquire an interest in the Purchased Receivables.

(e)      Each Affected Party claiming increased amounts described in Sections 2.5 or 2.6 hereof shall furnish, through its related CP Conduit or Agent, to the Company, the Servicer and the Agent for the applicable Purchaser Group a certificate setting forth the basis and amount of each request by such Affected Party for any such amounts referred to in Sections 2.5 or 2.6, such certificate to be conclusive with respect to the factual information set forth therein absent manifest error.

13.3      Characterization.

The parties acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions

hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of the Company and each Purchaser agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

13.4    Disclosure Relation to Certain Federal Protections.    The parties acknowledge that they have been advised that:

(a)    In the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission (the "SEC") under Section 15 of the Securities Exchange Act of 1934 (the "1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b)    In the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c)    In the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

## ARTICLE 14  MISCELLANEOUS

14.1    Amendments and Waivers.    This Agreement may not be amended, supplemented or modified nor may any provision hereof be waived except in accordance with the provisions of this Section 14.1. With the prior written consent of the Majority Purchasers, the Administrative Agent, each Agent and the Company may, from time to time, enter into written amendments, supplements, waivers or modifications hereto for the purpose of adding any provisions to this Agreement or changing in any manner the rights of any party hereto or waiving, on such terms and conditions as may be specified in such instrument, any of the requirements of this Agreement; provided, however, that no such amendment, supplement, waiver or modification shall (i) reduce the amount of the Repurchase Price or revise the Repurchase Date or reduce the rate or extend the time of payment of Price Differential with respect thereto, or reduce or alter the timing of any other amount payable to any Purchaser hereunder, in each case without the consent of the Purchasers affected thereby, (ii) increase any obligations of a Purchaser hereunder, amend, modify or waive any provision of this Section 14.1, or the definition of "Asset Value", "Asset Amount" or "Margin Deficit", or reduce the

percentage specified in the definition of Required Purchasers, in each case without the written consent of all Purchasers or (iii) amend, modify or waive any provision of Article 11 of this Agreement without the written consent of each Agent affected by such amendment, modification or waiver.   Notwithstanding the foregoing, Annex I to this Agreement may be amended, modified or updated from time to time in accordance with Section 2.3 or pursuant to a Transfer Supplement.

An Agent may cast any vote or give any consent or direction under the Sale and Servicing Agreement or other Transaction Documents on behalf of the Purchasers in its Purchaser Group if it has been directed to do so by Purchasers in such Purchaser Group having Percentage Interests aggregating greater than 50% of the aggregate Percentage Interests of all Purchasers in such Purchaser Group.

14.2    Notices.

(a)    All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy or facsimile), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered by hand, or, in the case of mail or telecopy notice, when received, addressed as follows or, with respect to an Agent or Purchaser, as set forth on the signature pages hereto or in its respective Joinder Supplement or Transfer Supplement or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| Administrative Agent: | Lehman Brothers Commercial Paper Inc.<br>745 Seventh Avenue, 13th Floor<br>New York, New York 10019<br>Attention:  Daniel Sullivan<br>Telephone:  (212) 526-3040<br>Telefax:  (646) 758-2211 |
| Company: | c/o Sixth Gear Solutions Corp.<br>1212 Avenue of the Americas, 17th Floor<br>New York, New York 10036<br>Attention:  Legal Department<br>Telephone:  (646) 454-2608<br>Telefax:  (646) 454-2697<br>with a copy to: |
| | Sixth Gear Inc.<br>1212 Avenue of the Americas, 17th Floor<br>New York, New York 10036<br>Attention:  Legal Department<br>Telephone:  (646) 454-2608<br>Telefax:  (646) 454-2697 |

(b)    All payments to be made to the Administrative Agent or any Agent or Purchaser hereunder shall be made in United States dollars and in immediately available funds

not later than 2:30 p.m. (New York City time) on the date payment is due, and, unless otherwise specifically provided herein, shall be made to the Administrative Agent, for the account of one or more of the Purchasers or for its own account, as the case may be.  Unless otherwise directed by the Administrative Agent, all payments to it shall be made by federal wire to the Administrative Agent, at its account (account number 4061-5659; and account name Lehman Brothers Commercial Paper Inc.) maintained at Citibank, N.A. (ABA #02100089), with telephone notice (including federal wire number) to the Agent, or such other account as the Agent may designate in writing to the Company.  Unless otherwise directed by an Agent or Purchaser, all payments to it shall be made by federal wire to the account specified on the signature pages hereto or in the Joinder Supplement or Transfer Supplement by which it became a party hereto (provided, in the case of an account specified in a Joinder Supplement or Transfer Supplement, that the Agent or the Company, as the case may be, shall have received notice thereof).

14.3    <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of any party hereto, any right, remedy, power or privilege under any of the Transaction Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under any of the Transaction Documents preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided in the Transaction Documents are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

14.4    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Company, the Administrative Agent, the Agents, the Purchasers, any Transferee and their respective successors and permitted assigns, and, to the extent provided herein, to each Indemnitee, Participant and Support Party and their respective successors and assigns; <u>provided</u> that the Company may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Administrative Agent and the Required Purchasers.

14.5    <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

14.6    <u>Severability</u>.  Any provisions of this Agreement which are prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.

14.7    <u>Integration</u>.  This Agreement and the Supplemental Fee Letters, as applicable, represent the agreement of the Company, the Administrative Agent, the Agents and the Purchasers with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by any party hereto relative to subject matter hereof not expressly set forth or referred to herein or therein or in the Transaction Documents.

14.8    <u>Governing Law</u>.  **THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW**

**YORK, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

14.9    <u>Jurisdiction; Consent to Service of Process</u>.  Each of the parties hereto hereby irrevocably and unconditionally (i) submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court in New York County or federal court of the United States of America for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment arising out of or relating to this Agreement; (ii) agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, federal court; (iii) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law; (iv) consents that any such action or proceeding may be brought in such courts and waives any objection it may now or hereafter have to the laying of venue of any such action or proceeding in any such court and any objection it may now or hereafter have that such action or proceeding was brought in an inconvenient court, and agrees not to plead or claim the same; (v) consents to service of process in the manner provided for notices in <u>Section 14.2</u> (<u>provided</u> <u>that</u>, nothing in this Agreement shall affect the right of any such party to serve process in any other manner permitted by law); and (vi) waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any such action or proceeding any special, exemplary, punitive or consequential damages.

14.10    <u>Termination</u>.  This Agreement shall remain in full force and effect until the later to occur of (a) payment in full of the Aggregate Repurchase Price and all other amounts payable to the Purchasers, the Agents and the Administrative Agent hereunder and the termination of all Purchase Limits and (b) the Termination Date; <u>provided</u>, that the provisions of Sections <u>2.5</u>, <u>2.6</u>, <u>2.7</u>, <u>10.1</u>, <u>10.2</u>, <u>11.7</u>, <u>14.9</u>, <u>14.11</u>, <u>14.12</u> and <u>14.13</u> shall survive termination of this Agreement and any amounts payable to the Administrative Agent, the Agents, Purchasers or any Affected Party thereunder shall remain payable thereto.

14.11    <u>No Proceedings</u>.

(a)    The Administrative Agent and each Agent and each Purchaser covenants and agrees that it shall not institute against, or join any other Person in instituting against, or knowingly or intentionally encourage or cooperate with any other Person in instituting against, the Company any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings or other similar proceeding under the laws of the United States or any state of the United States for one year and a day after the Stated Termination Date (as such date may be extended pursuant to <u>Section 2.3(b)</u>.

(b)    Each of the Company, the Administrative Agent, each Agent and each Purchaser hereby agrees that it shall not institute or join any other Person in instituting against, or knowingly or intentionally encourage or cooperate with any other Person in instituting against, any CP Conduit any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding, or other proceeding under any federal or state bankruptcy or similar law, for one

year and a day after the latest maturing commercial paper note, medium term note or other debt security issued by such CP Conduit is paid.

14.12    <u>No Recourse</u>.

(a)    The obligations of each CP Conduit under this Agreement, or any other agreement, instrument, document or certificate executed or delivered or issued by such CP Conduit or any officer thereof are solely the corporate, limited liability company or partnership obligations of such CP Conduit.  No recourse shall be had for the payment of any fee or other obligations, instrument, document or certificate executed and delivered or issued by any CP Conduit or any officer thereof in connection therewith, against any stockholder, limited partner, employee, officer, director or incorporator of any CP Conduit.

(b)    Each of the Company, the Administrative Agent, each Agent and each Purchaser hereby irrevocably waives all right of setoff that it may have under contract (including this Agreement), applicable law or otherwise with respect to any funds or monies of any CP Conduit at any time held by or in the possession of such Person.

(c)    Notwithstanding anything in this Agreement to the contrary, a CP Conduit shall not have any obligation to pay any amount required to be paid by it hereunder in excess of any amount available to such CP Conduit after paying or making provision for the payment of its Commercial Paper Notes; and each of the other parties hereto agrees that it will not have a claim under Section 101(5) of the Bankruptcy Code if and to the extent that any such payment obligation owed to it by such CP Conduit exceeds the amount available to such CP Conduit to pay such amount after paying or making provision for the payment of its Commercial Paper Notes.

14.13    <u>Survival of Representations and Warranties</u>.    All representations and warranties made hereunder and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution, delivery and termination of this Agreement.

14.14    <u>Waiver of Jury Trial</u>.    EACH PARTY HERETO HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER DOCUMENTS AND INSTRUMENTS EXECUTED IN CONNECTION HEREWITH, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF ANY PARTY HERETO.    THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THIS AGREEMENT AND THE ADMINISTRATIVE AGENT AND EACH AGENT AGREEING TO ACT AS SUCH HEREUNDER.

14.15    <u>CP Conduit as Committed Purchaser</u>.    Notwithstanding anything herein to the contrary, a CP Conduit may execute this Agreement as both a CP Conduit and a Committed Purchaser and, in such event, such CP Conduit shall have the rights and obligations of both a CP Conduit and a Committed Purchaser set forth herein.    In no event shall the foregoing prevent a

CP Conduit from exercising its rights to Assign or Transfer some or all of its interest in the Purchased Receivables to one or more Support Parties.

14.16    <u>Committed Purchasers Without CP Conduits</u>.    Notwithstanding anything herein to the contrary, a Committed Purchaser may execute this Agreement without having a CP Conduit in its Purchaser Group and, in such event, such Committed Purchaser will act as its own Agent hereunder and be the sole member of its Purchaser Group.

14.17    <u>Terminability</u>.    This Agreement shall terminate on the Termination Date unless the Purchasers and the Company agree to extend this Agreement but will remain applicable to any Transactions then outstanding until payment of the Aggregate Repurchase Price with respect thereto or any other amounts due hereunder.

14.18    <u>No Recourse</u>.    It is expressly understood and agreed by the parties hereto that (a) this Agreement is executed and delivered by Wilmington Trust Company, not individually or personally but solely as trustee of the Company in the exercise of the powers and authority conferred and vested in it, (b) each of the representations, undertakings and agreements herein made on the part of the Company is made and intended not as personal representations, undertakings and agreements by Wilmington Trust Company but is made and intended for the purpose of binding only the Company, (c) nothing herein contained shall be construed as creating any liability on Wilmington Trust Company, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall Wilmington Trust Company be personally liable for the payment of any indebtedness or expenses of the Company or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Company under this Agreement or any other related documents.

[Remainder of page intentionally left blank.]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective officers as of the day and year first above written.

**SIXTH GEAR FUNDING TRUST,**
as seller hereunder

By:  Wilmington Trust Company, not in its
       individual capacity but solely as Trustee

By:_____

     Name:
     Title:
             Erik E. Overcash
          Assistant Vice President

**SIXTH GEAR SOLUTIONS CORP.**

By: _____

    Name:   William A. Houlihan
    Title:    Treasurer

*Amended and Restated Master Repurchase Agreement*

**LEHMAN BROTHERS COMMERCIAL
PAPER INC.,**
as Administrative Agent

By: _____

     Name:   Stephen A. Valentino
     Title:    Authorized Signatory


**LEHMAN BROTHERS COMMERCIAL
PAPER INC.,**
as Committed Purchaser and as Agent for the
Lehman Purchaser Group

By: _____

     Name:   Stephen A. Valentino
     Title:    Authorized Signatory

## FORM OF TRANSFER SUPPLEMENT

TRANSFER SUPPLEMENT, dated as of the date set forth in Item 1 of Schedule I hereto, among the Selling Purchaser set forth in Item 2 of Schedule I hereto (the "Selling Purchaser"), the Purchasing Purchaser set forth in Item 3 of Schedule I hereto (the "Purchasing Purchaser"), and the Agent set forth in Item 4 of Schedule I hereto (in such capacity, the "Agent") for the Purchaser Group set forth in Item 5 of Schedule I hereto.

W I T N E S S E T H :

WHEREAS, this Supplement is being executed and delivered in accordance with Section 13.2(b) the Amended and Restated Master Repurchase Agreement, dated as of May 9, 2008, among Sixth Gear Funding Trust, as seller thereunder, the purchasers and agents from time to time party thereto and Lehman Brothers Commercial Paper Inc., as Administrative Agent and as an Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "Master Repurchase Agreement"; unless otherwise defined herein, terms defined in the Master Repurchase Agreement are used herein as therein defined);

WHEREAS, the Purchasing Purchaser (if it is not already a Purchaser party to the Master Repurchase Agreement) wishes to become a Purchaser party to the Master Repurchase Agreement and the Purchasing Purchaser wishes to acquire and assume from the Selling Purchaser, certain of the rights, obligations and commitments under the Master Repurchase Agreement; and

WHEREAS, the Selling Purchaser wishes to sell and assign to the Purchasing Purchaser, certain of its rights, obligations and commitments under the Master Repurchase Agreement.

NOW, THEREFORE, the parties hereto hereby agree as follows:

(a)      Upon receipt by the Agent of an executed counterpart of this Supplement, to which is attached a fully completed Schedule I and Schedule II, each of which has been executed by the Selling Purchaser, the Purchasing Purchaser and the Agent, the Agent will promptly transmit to the Company, the Selling Purchaser and the Purchasing Purchaser a Transfer Effective Notice, substantially in the form of Schedule III to this Supplement (a "Transfer Effective Notice").  Such Transfer Effective Notice shall be executed by the Agent and shall set forth, inter alia, the date on which the transfer effected by this Supplement shall become effective (the "Transfer Effective Date").  From and after the Transfer Effective Date the Purchasing Purchaser shall be a Purchaser party to the Master Repurchase Agreement with respect to all Transactions and for all purposes thereof as a CP Conduit and, if applicable, a Committed Purchaser, as specified on Schedule II to this Supplement.

(b)     At or before 12:00 Noon, New York City time of the Selling Purchaser, on the Transfer Effective Date, the Purchasing Purchaser shall pay to the Selling Purchaser, in immediately available funds, an amount equal to the purchase price, as agreed between the Selling Purchaser and such Purchasing Purchaser (the "Purchase Price"), of the portion set forth on Schedule II hereto being purchased by such Purchasing Purchaser of the interest in the Purchased Receivables owned by the Selling Purchaser (such Purchasing Purchaser's "Purchaser Percentage") and amounts owing to the Selling Purchaser under the Master Repurchase Agreement or otherwise in respect of the Purchased Receivables.

Effective upon receipt by the Selling Purchaser of the Purchase Price from the Purchasing Purchaser, the Selling Purchaser hereby irrevocably sells, assigns and transfers to the Purchasing Purchaser, without recourse, representation or warranty, and the Purchasing Purchaser hereby irrevocably purchases, takes and assumes from the Selling Purchaser, the Purchasing Purchaser's Purchaser Percentage of (i) the interest in the Purchased Receivables owned by the Selling Purchaser and amounts owing to the Selling Purchaser in respect of the Purchased Receivables, together with all instruments, documents and collateral security pertaining thereto, and (ii) the Purchasing Purchaser's Purchaser Percentage of (A) if the Selling Purchaser is a CP Conduit, the Purchaser Percentage of the Selling Purchaser and the other rights and duties of the Selling Purchaser under the Master Repurchase Agreement, or (B) if the Selling Purchaser is a Committed Purchaser, the Liquidity Percentage and the Committed Purchase Limit of the Selling Purchaser and other rights, duties and obligations of the Selling Purchaser under the Master Repurchase Agreement.

This Supplement is intended by the parties hereto to effect a purchase by the Purchasing Purchaser and sale by the Selling Purchaser of interests in the Purchased Receivables, and it is not to be construed as a loan or a commitment to make a loan by the Purchasing Purchaser to the Selling Purchaser.  The Selling Purchaser hereby confirms that the amount of the interest in the Purchased Receivables being conveyed hereunder is $_____ and its Percentage Interest thereof is ___%, which equals $_____ as of _____, 20__.  Upon and after the Transfer Effective Date (until further modified in accordance with the Master Repurchase Agreement), the Purchaser Percentage or Liquidity Percentage, as applicable, of the Selling Purchaser and the Purchasing Purchaser and the Committed Purchase Limit, the Voluntary Purchase Limit and the Liquidity Percentage, if applicable, of the Selling Purchaser and the Purchasing Purchaser shall be as set forth in Schedule II to this Supplement.

(c)     The Selling Purchaser has made arrangements with the Purchasing Purchaser with respect to (i) the portion, if any, to be paid, and the date or dates for payment, by the Selling Purchaser to the Purchasing Purchaser of any fees heretofore received by the Selling Purchaser pursuant to the Master Repurchase Agreement prior to the Transfer Effective Date and (ii) the portion, if any, to be paid, and the date or dates for payment, by the Purchasing Purchaser to the Selling Purchaser of fees or interest received by the Purchasing Purchaser pursuant to the Master Repurchase Agreement or otherwise in respect of the Purchased Receivables from and after the Transfer Effective Date.

(d)        (i) All collections on the Purchased Receivables that would otherwise be payable from and after the Transfer Effective Date to or for the account of the Selling Purchaser in respect of the Purchased Receivables shall, instead, be payable to or for the account of the Selling Purchaser and the Purchasing Purchaser, as the case may be, in accordance with their respective interests as reflected in this Supplement.

(ii) All interest, fees and other amounts that would otherwise accrue for the account of the Selling Purchaser from and after the Transfer Effective Date pursuant to the Master Repurchase Agreement or in respect of the Purchased Receivables shall, instead, accrue for the account of, and be payable to or for the account of, the Selling Purchaser and the Purchasing Purchaser, as the case may be, in accordance with their respective interests as reflected in this Supplement.  In the event that any amount of interest, fees or other amounts accruing prior to the Transfer Effective Date was included in the Purchase Price paid by the Purchasing Purchaser, the Selling Purchaser and the Purchasing Purchaser will make appropriate arrangements for payment by the Selling Purchaser to the Purchasing Purchaser of such amount upon receipt thereof from the Agent.

(e)        Each of the parties to this Supplement agrees and acknowledges that (i) at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement, and (ii) the Agent shall apply each payment made to it under the Master Repurchase Agreement, whether in its individual capacity or as Agent, in accordance with the provisions of the Master Repurchase Agreement, as appropriate.

(f)        By executing and delivering this Supplement, the Selling Purchaser and the Purchasing Purchaser confirm to and agree with each other, the Agent and the Purchasers as follows:  (i) other than the representation and warranty that it is the legal and beneficial owner of the interest being assigned hereby free and clear of any adverse claim, the Selling Purchaser makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Master Repurchase Agreement or the Transaction Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Master Repurchase Agreement or any other instrument or document furnished pursuant thereto; (ii) the Selling Purchaser makes no representation or warranty and assumes no responsibility with respect to the Company, the financial condition of the Receivables, the Seller, the Servicer, Sixth Gear Inc. or the performance or observance by the Seller, the Servicer, the Company, Sixth Gear Inc. of any of their respective obligations under the Master Repurchase Agreement or any Transaction Document or any other instrument or document furnished pursuant hereto; (iii) each Purchasing Purchaser confirms that it has received a copy of such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement; (iv) each Purchasing Purchaser will, independently and without reliance upon the Administrative Agent, any Agent (as defined in the Master Repurchase Agreement) the Selling Purchaser or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking

action under the Master Repurchase Agreement or the Transaction Documents; (v) the Purchasing Purchaser appoints and authorizes the Agent and the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Master Repurchase Agreement and the Transaction Documents as are delegated to the Agent or the Administrative Agent, as the case may be, by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with Article 11 of the Master Repurchase Agreement; and (vi) each Purchasing Purchaser agrees (for the benefit of the Selling Purchaser, the Administrative Agent, the Agents (as defined in the Master Repurchase Agreement), the Purchasers, the Servicer and the Seller) that it will perform in accordance with their terms all of the obligations which by the terms of the Master Repurchase Agreement are required to be performed by it as a Purchaser.

(g)    Schedule II hereto sets forth the revised Purchaser Percentage or the revised Liquidity Percentage, as applicable, and Committed Purchase Limit and Voluntary Purchase Limit of the Selling Purchaser, as applicable, the Purchaser Percentage or the Liquidity Percentage, as applicable, and the Committed Purchase Limit and Voluntary Purchase Limit of the Purchasing Purchaser, as applicable, as well as administrative information with respect to the Purchasing Purchaser.

(h)    **THIS SUPPLEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers on Schedule I hereto as of the date set forth in Item 1 of Schedule I hereto.

SCHEDULE I TO
TRANSFER SUPPLEMENT

COMPLETION OF INFORMATION AND
SIGNATURES FOR TRANSFER SUPPLEMENT

Re:    Amended and Restated Master Repurchase Agreement, dated as of May 9, 2008, among Sixth Gear Funding Trust, the purchasers and agents from time to time party thereto and Lehman Brothers Commercial Paper Inc., as Administrative Agent

Item 1:    Date of Transfer Supplement:

Item 2:    Selling Purchaser:

Item 3:    Purchasing Purchaser:

Item 4:    Name of Agent:

Item 5:    Name of Purchaser Group:

Item 6:    Signatures of Parties to Agreement:

_____
as Selling Purchaser

By:_____
    Name:
    Title:

_____
as Purchasing Purchaser

By:_____
    Name:
    Title:

CONSENTED TO AND ACCEPTED BY:

[NAME OF AGENT], as Agent

By:_____
    Name:
    Title:

[If applicable:]

LEHMAN BROTHERS COMMERCIAL PAPER INC.,
  as Administrative Agent

By:_____
      Name:
      Title:

SCHEDULE II TO
TRANSFER SUPPLEMENT

LIST OF ADDRESSES
FOR NOTICES, ASSIGNED INTERESTS AND
PURCHASE AND LIQUIDITY PERCENTAGES

[Selling Purchaser]

A.    Type of Purchaser:    CP Conduit:    Yes/No
                           Committed Purchaser:    Yes/No

B.    Purchaser Percentage:

Selling Purchaser Purchaser Percentage Prior to Sale:    _____%

Purchaser Percentage Sold:    _____%

Purchaser Percentage Retained:    _____%

C.    Committed Purchase Limit (if applicable)[1]

Selling Purchaser Committed Purchase Limit Prior to Sale:    $_____

Committed Purchase Limit Sold:    $_____

Committed Purchase Limit Retained:    $_____

Related CP Conduit (applicable to Committed Purchaser):    _____

D.    Related Committed Purchasers (applicable to CP Conduit)

Committed Purchasers, Committed Purchase Limits and Liquidity Percentages
prior to Sale:

_____    $_____    _____%

_____    $_____    _____%

_____    $_____    _____%

E.    Purchased Receivables Balance:

Selling Purchaser Purchased Receivables Balance Prior to Sale:    $_____

Purchased Receivables Balance Sold:    $_____

---

[1] Any sale or assignment of a Purchaser's Committed Purchase Limit must be accompanied by a proportionate sale or assignment, as applicable, of such Purchaser's Voluntary Purchase Limit.

Purchased Receivables Balance Retained:                    $_____

F.    Voluntary Purchase Limit (if applicable)[2]

Selling Purchaser Voluntary Purchase Limit Prior to Sale:    $_____

Voluntary Purchase Limit Sold:                             $_____

Voluntary Purchase Limit Retained:                         $_____

[Purchasing Purchaser]

G.    Type of Purchaser:    CP Conduit:              Yes/No
                          Committed Purchaser:     Yes/No

H.    Purchaser Percentage:

Transferee Purchaser's Purchaser Percentage After Sale:    _____%

I.    Commitment (if applicable)

Transferee Purchaser Commitment After Sale:               $_____

Related CP Conduit (applicable to Committed Purchaser):   _____

J.    Related Committed Purchasers (applicable to CP Conduit)

Committed Purchasers, Commitments and Liquidity Percentages after Sale:

_____          $_____          _____%

_____          $_____          _____%

_____          $_____          _____%

K.    Purchased Receivables Balance:

Transferee Purchaser Purchased Receivables Balance After Sale:    $_____

L.    Voluntary Purchase Limit:

Transferee Purchaser Voluntary Purchase Limit After Sale:    $_____

---

[2] Any sale or assignment of Purchaser's Voluntary Purchase Limit must be accompanied by a proportionate sale or assignment, as applicable, of such Purchaser's Committed Purchase Limit.

Address for Notices:

Investing Office:

SCHEDULE III TO
<u>TRANSFER SUPPLEMENT</u>

Form of
<u>Transfer Effective Notice</u>

To:     [Name and address of
Administrative Agent, Seller
Purchaser and Purchasing
Purchaser]

        The undersigned, as Agent under the Amended and Restated Master Repurchase Agreement, dated as of May 9, 2008, among Sixth Gear Funding Trust, the purchasers and agents from time to time party thereto and Lehman Brothers Commercial Paper Inc., as Administrative Agent, acknowledges receipt of an executed counterpart of a completed Transfer Supplement.  [Note: attach copies of Schedules I and II from such Agreement.]  Terms defined in such Supplement are used herein as therein defined.

        Pursuant to such Supplement, you are advised that the Transfer Effective Date will be _____, _____.

        Very truly yours,

        [NAME OF AGENT], as Agent


By:_____
     Name:
     Title:

<u>EXHIBIT B</u>

### FORM OF JOINDER SUPPLEMENT

JOINDER SUPPLEMENT, dated as of the date set forth in Item 1 of Schedule I hereto, among the financial institution identified in Item 2 of Schedule I hereto, Sixth Gear Funding Trust (the "<u>Company</u>"), the Agent named in Item 5 of Schedule I hereto (the "<u>Agent</u>"), and Lehman Brothers Commercial Paper Inc., as Administrative Agent (the "<u>Administrative Agent</u>").

W I T N E S S E T H :

WHEREAS, this Supplement is being executed and delivered under the Amended and Restated Master Repurchase Agreement, dated as of May 9, 2008, among the Company, the Purchasers from time to time parties thereto, the Agents for the Purchaser Groups from time to time parties thereto, and the Administrative Agent (as from time to time amended, supplemented or otherwise modified in accordance with the terms thereof, the "<u>Agreement</u>"; unless otherwise defined herein, terms defined in the Agreement are used herein as therein defined); and

WHEREAS, the party set forth in Item 2 of Schedule I hereto (the "<u>Proposed Purchaser</u>") wishes to become a Purchaser designated as a [CP Conduit][Committed Purchaser] party to the Agreement;

NOW, THEREFORE, the parties hereto hereby agree as follows:

(a)     Upon receipt by the Administrative Agent of an executed counterpart of this Supplement, to which is attached a fully completed Schedule I and Schedule II, each of which has been executed by the Proposed Purchaser, the Company, the Agent and the Administrative Agent, the Administrative Agent will transmit to the Proposed Purchaser, the Company and the Agent, a Joinder Effective Notice, substantially in the form of Schedule III to this Supplement (a "<u>Joinder Effective Notice</u>").  Such Joinder Effective Notice shall be executed by the Administrative Agent and shall set forth, <u>inter alia</u>, the date on which the joinder effected by this Supplement shall become effective (the "<u>Joinder Effective Date</u>").  From and after the Joinder Effective Date, the Proposed Purchaser shall be a Purchaser designated as a [CP Conduit][Committed Purchaser] party to the Agreement for all purposes thereof with respect to all Transactions thereunder.

(b)     Each of the parties to this Supplement agrees and acknowledges that at any time and from time to time upon the written request of any other party, it will execute and deliver such further documents and do such further acts and things as such other party may reasonably request in order to effect the purposes of this Supplement.

(c)     By executing and delivering this Supplement, the Proposed Purchaser confirms to and agrees with the Administrative Agent, the Agents and the Purchasers as follows:  (i) none of the Administrative Agent, the Agents or the Purchasers makes any representation or warranty or assumes any responsibility with respect to any statements,

warranties or representations made in or in connection with the Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Agreement or any other instrument or document furnished pursuant thereto, or with respect to any Receivables sold to the Purchasers under the Agreement or the Company Property or the financial condition of Sixth Gear, the Seller, the Servicer, Sixth Gear Inc. or the Company, or the performance or observance by Sixth Gear, the Seller, the Servicer, Sixth Gear Inc. or the Company of any of their respective obligations under the Agreement, any other Transaction Document or any other instrument or document furnished pursuant thereto; (ii) the Proposed Purchaser confirms that it has received a copy of such documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Supplement; (iii) the Proposed Purchaser will, independently and without reliance upon the Administrative Agent, any Agent or any other Purchaser and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Agreement; (iv) the Proposed Purchaser appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under the Agreement as are delegated to the Agent by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with Article 11 of the Agreement; (v) the Proposed Purchaser appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under the Agreement as are delegated to the Administrative Agent by the terms thereof, together with such powers as are reasonably incidental thereto, all in accordance with the Agreement and Article 11 of the Agreement; and (vi) the Proposed Purchaser agrees (for the benefit of the parties hereto and the other Purchasers) that it will perform in accordance with their terms all of the obligations which by the terms of the Agreement are required to be performed by it as a Purchaser designated as a [CP Conduit][Committed Purchaser].

(d)      Schedule II hereto sets forth administrative information with respect to the Proposed Purchaser.

(e)      This Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

Capitalized terms used and not otherwise defined herein shall have the meanings given to them in <u>Annex A</u> to the Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be executed by their respective duly authorized officers on Schedule I hereto as of the date set forth in Item 1 of Schedule I hereto.

SCHEDULE I TO
JOINDER SUPPLEMENT

COMPLETION OF INFORMATION AND
SIGNATURES FOR JOINDER SUPPLEMENT

Re:     Amended and Restated Master Repurchase Agreement, dated as of May 9,
2008, among Sixth Gear Funding Trust, the other parties thereto and
Lehman Brothers Commercial Paper Inc., as Administrative Agent.

Item 1:  Date of Joinder Supplement:          _____

Item 2:  Proposed Purchaser:          _____

Item 3:  Type of Class A Purchaser:          _____ CP Conduit
                                             _____ Committed Purchaser

Item 4:  Complete if Committed Purchaser:  Aggregate
                                           Committed Purchase Limit - $_____
                                           Committed Purchaser with respect to:

                                           _____
                                           [Name of CP Conduit]
                                           Commitment Termination Date:_____

_____

Item 5:  Voluntary Purchase Limit:  $_____

Item 6:  Name of Agent: _____

Item 7:  Name of Purchaser Group: _____

Item 8:  Signatures of Parties to Agreement:


                                           _____, as
                                           Proposed Purchaser


                                           By:_____
                                                Name:
                                                Title:

SIXTH GEAR FUNDING TRUST,


By:_____
    Name:
    Title:


LEHMAN BROTHERS COMMERCIAL
PAPER INC., as Administrative Agent


By:_____
    Name:
    Title:


[NAME OF AGENT], as Agent


By:_____
    Name:
    Title:

SCHEDULE II TO
JOINDER SUPPLEMENT

LIST OF INVESTING OFFICES, ADDRESS
FOR NOTICES AND WIRE INSTRUCTIONS

Address for Notices: _____
_____
_____

Investing Office: _____

Wire Instructions: _____

SCHEDULE III TO
JOINDER SUPPLEMENT

FORM OF
JOINDER EFFECTIVE NOTICE

To:      [Name and address of the Company, Agent and Proposed Purchaser]

The undersigned, as Administrative Agent under the Amended and Restated Master Repurchase Agreement, dated as of May 9, 2008, among Sixth Gear Funding Trust, the other parties thereto and Lehman Brothers Commercial Paper Inc., as Administrative Agent, acknowledges receipt of an executed counterpart of a completed Joinder Supplement.  [Note: attach copies of Schedules I and II from such Agreement.] Terms defined in such Supplement are used herein as therein defined.

Pursuant to such Supplement, you are advised that the Joinder Effective Date for [Name of Proposed Purchaser] will be _____ and such Proposed Purchaser will be a Purchaser (i) designated as a [CP Conduit][Committed Purchaser with a Committed Purchase Limit of $_____] and (ii) with a Voluntary Purchase Limit of $_____.

Very truly yours,

LEHMAN BROTHERS COMMERCIAL
PAPER INC., as
 Administrative Agent


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

# ANNEX I

Purchase Limits

| Purchaser | Committed Purchase Limit | Voluntary Purchase Limit |
|---|---|---|
| Lehman Brothers Commercial Paper Inc. | $750,000,000 | $750,000,000 |

**LEHMAN COMMERCIAL PAPER INC.**

September 18, 2008

Sixth Gear Funding Trust
1212 Avenue of the Americas, 17th Floor
New York, New York 10036
Attn: Legal Department

Re:      Amended and Restated Master Repurchase Agreement dated as of May 9, 2008.  A copy
of the cover page is attached as Exhibit A.

Ladies and Gentlemen:

At your request I can confirm that (1) the full and complete legal name of the "Administrative
Agent", "Agent" and "Purchaser" in the Amended and Restated Master Repurchase Agreement
is Lehman Commercial Paper Inc. ("LCPI"), (2) LCPI is a New York corporation and (3) that
any references to the Administrative Agent, Agent and Buyer that include the word "Brothers"
are inadvertent.

For avoidance of doubt, by execution of this Letter Agreement both parties agree that the
Amended and Restated Master Repurchase Agreement and related documents shall be deemed to
be amended to provide that any references to "Lehman Brothers Commercial Paper Inc." shall be
amended to refer to "Lehman Commercial Paper Inc.".

Page 2

Sincerely,

LEHMAN COMMERCIAL PAPER INC.

By:_____
Name: _____
Its: _____


Agreed and accepted,

SIXTH GEAR FUNDING TRUST

By:  Sixth Gear Solutions Corp., its attorney-in-fact

By:_____
Name: _____
Its: _____

SIXTH GEAR SOLUTIONS CORP.


By:_____
Name: _____
Its: _____