# EXHIBIT 1

# The Property Agreement

# AGREEMENT OF SALE

THIS AGREEMENT OF SALE (this "**Agreement**") is entered into as of May 12, 2008 ("**Effective Date**") by and between LEHMAN BROTHERS HOLDINGS INC. ("**Seller**"), a Delaware corporation having an office at 745 7th Avenue, 4th Floor, New York, New York 10019, and ENGEL GROUP LLC ("**Purchaser**"), a New Jersey limited liability company having an address at 3201 Pacific Avenue, Wildwood, New Jersey 08260.

## WITNESSETH:

WHEREAS, Seller is the owner of approximately fifty (50) acres of undeveloped land in Hamilton Township, Atlantic County, New Jersey (the "**Land**") that has been subdivided into one hundred twenty five (125) lots intended for the single family homes, a stormwater basin, and an additional open space lot as more particularly described on Exhibit A attached hereto.

WHEREAS, the lots will be developed in two phases pursuant to a residential development project commonly known as Glen Eyre @ Hamilton Palette II (the "**Project**").

WHEREAS, the portion of the Land that will be developed in the initial construction phase is depicted on a final plan dated 2/19/04 prepared by Adams, Rehmann & Heggan ("**AHR**") attached hereto as Exhibit B and titled "Glen Eyre @ Hamilton Palette II - Phase I" and includes 63 lots and a stormwater basin (the "**Phase I Property**").

WHEREAS, the portion of the Land to be subsequently developed is depicted on a final plan dated 2/19/04 prepared by AHR attached hereto as Exhibit C titled "Glen Eyre @ Hamilton Palette II - Phase II" and includes 62 Lots and an open space lot (the "**Phase II Property**").

WHEREAS, the Land and all improvements and fixtures, if any, located on the Land (the "**Improvements**") are sometimes collectively referred to herein as the "**Property**".

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereto agree as follows:

1.      **Sale and Purchase.**

(a)      Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Property.

(b)      The sale and purchase shall include all right, title and interest of Seller in and to:

(i)      The Land and Improvements;

(ii)      All easements, tenements, hereditaments, rights-of-way, privileges, appurtenances and other rights, if any, pertaining to the Property;

(iii)     All strips and gores and any land lying in the bed of any street, road or alley, open or proposed, contiguous to the Property; and

(iv)     All plans, development approvals and land use approvals related to the Property.

**2.     Purchase Price.**

(a)     The purchase price ("**Purchase Price**") payable by Purchaser to Seller for the sale of the Property shall be the sum of Six Million Two Hundred Fifty Thousand Dollars ($6,250,000) and shall be paid as follows:

(i)     On the Effective Date, Purchaser shall deliver to Option One Title Agency, LLC (the "**Title Company**"), whose address is 35 Court Street, 3rd Floor, Freehold, New Jersey 07728, telephone number (732) 409-1300,f acsimile number (732) 409-0313, a check or wire transfer in the amount of Two Hundred Fifty Thousand Dollars ($250,000), which Title Company shall immediately deposit for collection in an interest-bearing account at a federally insured banking institution (such deposit plus accrued interest hereinafter called the "**First Down Payment**").  On or before the expiration of the Due Diligence Period (as defined herein), Purchaser shall be obligated to furnish a subsequent payment of Two Hundred Fifty Thousand Dollars ($250,000) (the "**Second Down Payment**" and together with the First Down Payment, the "**Down Payment**").  Following the expiration of the Due Diligence Period, the Down Payment shall be non-refundable excepting only a default by the Seller.  Seller may request in writing that Title Company release the Down Payment to Seller at any time following the expiration of the Due Diligence Period, and Title Company shall comply with such request and Purchaser shall not object thereto.  If the Title Company requires a written escrow agreement with respect to the Down Payment, Purchaser and Seller shall negotiate the terms and conditions thereof diligently and in good faith.

(ii)     On the Phase I Closing Date (as defined in Section 5 hereof), the sum of Two Million Eight Hundred Fifty Thousand Dollars ($2,850,000) shall be paid by Purchaser to the Title Company by cashier's check or wire transfer (in either case, hereinafter referred to as "**Cash**") along with any other fees necessary to complete the transaction which are the responsibility of Purchaser.  Three Hundred Thousand Dollars ($300,000) of the Down Payment shall be applied towards the Purchase Price at the Phase I Closing (which together with the $2,850,000 required payment referenced above shall total $3,150,000, representing the Purchase Price for the Phase I Property).  The $200,000 remaining balance of the Down Payment shall be held by either the Title Company or the Seller as applicable, and shall be subject to partial release on the terms and conditions provided in Section 10(c) of this Agreement.

(iii)     On the Phase II Closing Date (as defined herein), Purchaser shall remit the balance of the Purchase Price to Seller over and above the then remaining portion of the Down Payment which shall be applied towards the Purchase Price if Purchaser completes its obligations hereunder and completes the Closing of the Phase II Property.

3.      **Title and Survey.**

(a)      Within five (5) days following the Effective Date, Purchaser shall order and promptly deliver, when received, to Seller a copy of a commitment for title insurance (the "**Title Commitment**") issued by the Title Company setting forth the status of the title of the Land and Improvements. Purchaser shall be solely responsible for the costs of obtaining and, if necessary, canceling, such Title Commitment. Purchaser shall be responsible for the cost of obtaining any owner's title policy and any lender's title policy and any endorsements to either.

(b)      If Purchaser elects, Purchaser may cause to be prepared, and if prepared, shall deliver to Seller, at Purchaser's sole cost and expense, a survey of the Property (the "**Survey**") prepared and certified as to all matters shown thereon by a surveyor licensed in the State of New Jersey and otherwise reasonably acceptable to Purchaser.

(c)      Purchaser shall have until the expiration of the Due Diligence Period to notify Seller in writing of any objections which Purchaser may have to any exception reported in the Title Commitment or reflected by the Survey (the "**Exceptions**"); provided, however, that notwithstanding anything to the contrary contained herein, Purchaser may not object, and agrees to take title to the Property subject to, the following Exceptions (the "**Permitted Exceptions**"):

(i)      standard printed exceptions on a basic ALTA title commitment;

(ii)      real estate taxes and assessments not yet due and payable,

(iii)      zoning and land development statutes, ordinances and regulations of general applicability,

(iv)      all conditions set forth in the Approvals (as defined herein); and

(v)      any exception listed on Schedule 1 attached hereto and incorporated herein.

If Purchaser fails to make any permissible objection prior to the expiration of the Due Diligence Period, Purchaser shall be deemed to have agreed to take title to the Property subject to the items shown on the Title Commitment.

(d)      Seller may, at its sole option, undertake to eliminate from Purchaser's final title policy any Exception properly objected to by Purchaser pursuant to Section 3(c) above (the "**Non-Permitted Exceptions**") or to have the same removed, cured or insured over by the Title Company at no additional cost to Purchaser. If Seller does not, or elects not to, cause all of the Non-Permitted Exceptions to be removed, cured or insured over, at or prior to the Phase I Closing Date or the Phase II Closing Date (as applicable), Seller may extend such Closing Date for an additional period of time deemed reasonably necessary by Seller in order to effect such removal, satisfaction or cure, which period shall not exceed sixty (60) days from the then existing and applicable Closing Date. If Seller is unable or does not desire to

eliminate any one or more of such Non-Permitted Exceptions, Seller shall so notify Purchaser. Upon receipt of such notice, Purchaser shall have the option to either waive such matters in writing and consummate the transaction contemplated herein or terminate this Agreement at any time within ten (10) days after receipt of Seller's notice. If no election to terminate is made in writing by Purchaser within such ten (10) day period, Purchaser shall be deemed to have waived all objections to such matters, and shall take title to the Property subject thereto.

(e)     In the event of a valid termination under this Section 3, this Agreement shall be deemed null and void, the Down Payment shall be returned to Purchaser within three (3) business days of Seller's and Title Company's receipt of Purchaser's notice of termination, and the parties hereto shall have no further obligations to or recourse against each other with regard to the matters provided for in this Agreement, except for rights and obligations which expressly survive the termination hereof.

4.     **Contingencies.**

(a)     During the forty-five (45) day period following the Effective Date (the "**Due Diligence Period**"), Seller shall allow Purchaser or its agent or designee reasonable access to the Property for the purpose of conducting, at Purchaser's sole cost and expense, such environmental inspections, market surveys, wetlands delineations, and other non-invasive studies of the Property as Purchaser deems reasonable including a Phase I Environmental Investigation of the Property; provided, however, Purchaser shall not be permitted to conduct any intrusive investigations including, without limitation, any Phase II environmental investigation, pesticide testing, or to cause any borings to be made on, at or about the Property. Purchaser agrees to obtain and maintain general liability and completed operations insurance with a minimum amount of $2,000,000 per occurrence. Such insurance shall name Seller, its subsidiaries and affiliates as additional insureds, and shall be written by an insurer with an AM Best rating of A(X). Purchaser and its insurer(s) agree to waive their rights to subrogate against the Seller, its subsidiaries, and affiliates. Purchaser agrees to provide Seller thirty (30) days written notice prior to cancellation of such insurance, and to provide Seller a certificate of insurance evidencing the insurance required prior to inspection. Purchaser will ensure that all parties involved with the environmental inspection will carry the same insurance as stated in this Section 4(a) including the terms and conditions required herein. Notwithstanding anything to the contrary in this Agreement, all Purchaser's insurance provisions set forth in this Agreement shall apply to all subcontractors, agents, designees, consultants, and other parties entering the Property on Purchaser's behalf.

(b)     Purchaser may terminate this Agreement for any reason or no reason by notifying Seller in writing prior to the expiration of the Due Diligence Period, time being strictly of the essence. If Purchaser terminates this Agreement, Purchaser shall provide Seller with a copy of any reports Purchaser obtains or prepares that pertain to the Property, including but not limited to, environmental reports, engineering reports, surveys and site plans.

(c)     If Purchaser fails to notify Seller that it is exercising its termination rights under this Section 4 prior to the expiration of the Due Diligence Period, then Purchaser shall be deemed to have waived its rights to terminate under this Section 4.

(d)      If Purchaser terminates this Agreement by providing written notice prior to the expiration of the Due Diligence Period, the Down Payment shall be returned to Purchaser within three (3) business days of Seller's and Title Company's receipt of Purchaser's notice of termination, this Agreement shall be null and void and Seller and Purchaser shall have no further rights or duties under this Agreement, except for any obligations that expressly survive the termination of this Agreement.

(e)      If Purchaser is unable to obtain financing upon the terms and conditions set forth on the commitment letter from _____ ("Lender") dated _____ attached hereto as <u>Exhibit D</u> ("Commitment Letter") solely because the Lender's appraisal values the unimproved lots at less than $45,000/lot, Purchaser shall provide Seller the right to finance the acquisition on substantially similar terms as are stated in the Commitment Letter. Nothing in this Section 4(e) shall be construed as a financing contingency, as excusing Purchaser's performance of its obligations hereunder, or as obligating Seller to provide any financing.

5.      **Closing Date.**

(a)      The conveyance of title to the Phase I Property (the "**Phase I Closing Date**") shall take place on or before September 4, 2008, time being strictly of the essence. Conveyance of title to the Phase II Property (the "**Phase II Closing Date**") shall occur on September 1, 2010 (or an earlier date selected by Purchaser upon at least 15 days prior notice to Seller) time being strictly of the essence.

(b)      Purchaser hereby indemnifies, defends and holds Seller harmless from and against any and all loss, costs and liability and expense that Seller may incur by reason of Purchaser's (and Purchaser's agents, consultants, advisors and independent contractors) entry onto the Property, and Purchaser's failure to complete any of Purchaser's obligations hereunder. The indemnification set forth herein shall survive the expiration or termination of this Agreement.

(c)      The closings for each conveyance of title (each a "**Closing**", collectively, the "**Closings**", and sometimes referred to herein as either the "**Phase I Closing**" or the "**Phase II Closing**") shall be held at 10:00 a.m. on the applicable Closing Date at the offices of Stagliano & DeWeese, P.A., 3200 Pacific Avenue, Wildwood, New Jersey 08260, or at another location that is mutually acceptable to Purchaser and Seller.

6.      **Representations, Warranties and Covenants of Seller.**

(a)      <u>Authorization of Seller</u>. Seller has full power and authority as of the Effective Date to (i) execute and deliver this Agreement and all other documents executed and delivered by Seller in connection with the transactions contemplated by this Agreement (the "**Transactions**") and (ii) perform all obligations arising under or in connection with this Agreement. Seller represents that as of the Effective Date (i) all other documents executed and delivered by Seller in connection with the Transactions have been duly executed and delivered and constitute the legal, valid and binding obligations of Seller, enforceable in accordance with

their respective terms and provisions, subject, however, to the effect of any bankruptcy, reorganization, moratorium, insolvency, or other laws affecting the rights of creditors generally.

(b)    No Sale. From and after the Effective Date and until the Closings or the earlier termination of this Agreement, Seller will not sell or lease any right, title or interest in or to the Property or create any lien, encumbrance or charge thereon, to the extent the same would continue after the Closings, except with the express written consent of Purchaser.

(c)    Condemnation. As of the Effective Date, Seller has not received written notice of any condemnation or taking by eminent domain of any of the Property.

(d)    Possession. Seller represents that as of the Effective Date (i) the Property is not subject to any oral or written leases entered into by Seller; (ii) no other person, firm, corporation or entity has any right or option granted by Seller to acquire all or any portion of the Property; and (iii) the Property is not occupied by any person, firm, corporation or entity under a grant from Seller.

(e)    Termination of Representations, Warranties and Covenants. The Seller's representations, warranties and covenants in this Agreement and the obligations resulting therefrom are made as of the Effective Date and shall not survive the Closings. All Seller's representations, warranties and covenants regarding the Phase I Property shall merge with the deed delivered in connection with the Phase I Closing. All Seller's representations, warranties and covenants regarding the Phase II Property shall merge with the deed delivered in connection with the Phase II Closing.

(f)    Approvals. To the Seller's actual knowledge, Exhibit E accurately reflects the status of land use and development approvals affecting the Property and the expirations date thereof as of the Effective Date.

7.    **Affirmative and Negative Covenants of Seller.**

(a)    Seller shall, at its sole cost and expense:

(i)    Promptly deliver to Purchaser copies of any written notice received by Seller after the date of this Agreement regarding any law suits filed affecting the Property, or the use, possession or occupancy thereof, that may materially adversely affect the Property;

(ii)    Promptly deliver to Purchaser copies of written notices received by Seller after the date of this Agreement of any actual condemnation of the Property or any portion thereof given by or on behalf of any Federal, state or local agency; and

(iii)    Not create any rights of possession regarding the Property with any third party which would survive or continue after the Closings.

8.    **Apportionments.**

(a)    Subject to Section 8(b) below, real estate taxes shall be prorated in the manner normally prorated in Atlantic County, New Jersey. If a Closing occurs before the tax rate is fixed for the year in which such Closing occurs, real estate taxes shall be based upon the tax rate for the preceding year applied to the latest assessed valuation and shall be re-prorated following such Closing at the time such tax rate is fixed.

(b)    Seller shall pay all roll-back taxes affecting the Property (if any) and Purchaser shall have no liability whatsoever for any portion of such roll-back taxes.

(c)    If on a Closing Date the Property shall be affected by any special or other assessment for public improvements or otherwise which is or may become payable by Seller in annual installments, of which the first installment is then a charge or lien, then, for purposes of this Agreement, all the unpaid installments of such assessment, which are to become due and payable after the Closings, shall be paid and discharged by Purchaser.

(d)    Seller shall be responsible for the costs of any transfer, recording, or conveyance tax in connection with the delivery or recording of the Deeds; provided, however, Purchaser shall be responsible for any applicable "mansion" taxes.

(e)    Notwithstanding anything to the contrary in this Agreement, if the real estate taxes assessed against any portion of the Property are increased by Hamilton Township as a result of any action or inaction of Purchaser (including, without limitation, completion of any Infrastructure Improvement, as defined herein), then such increase shall be payable solely by Purchaser effective as of the assessment date thereof, and such incremental real estate tax obligation shall not be subject to proration between the parties. Purchaser shall pay such amounts to Seller upon Seller's demand thereof.

(f)    The provisions of this Section 8 shall survive the Closings.

9.    **Documents.**

(a)    At each Closing, Seller, at its sole cost and expense, shall deliver or cause to be delivered to Purchaser the following, each of which shall be in form and substance in reasonable conformity with this Agreement:

(i)    A bargain and sale deed which covenants against grantor's acts (the "**Deed**"), which Deed shall contain a metes and bounds description of the applicable portion of the Property (i.e. the Phase I Property or the Phase II Property) and shall be in recordable form, duly executed by Seller or the record title holder and acknowledged;

(ii)    An affidavit and such other certificates or affidavits as Purchaser may reasonably request in order to establish that Seller is not a foreign person, as defined in Internal Revenue Code Section 1445(b)(2), as amended;

(iii)    An affidavit of title, appropriate authority resolution and such other documents as are reasonably required by Title Company and approved by Seller;

(iv)    A duly executed copy of a settlement statement prepared in accordance with the terms of this Agreement (the "**Settlement Statement**");

(b)    At each Closing, Purchaser, at its sole cost and expense, shall deliver or cause to be delivered to Seller the following, each of which shall be in form and substance satisfactory to Seller's attorneys:

(i)    The consideration required pursuant to Section 2, in the amount and form required thereby;

(ii)    A duly executed copy of the Settlement Statement; and

(iii)    Such other documents as are reasonably requested by Seller, in connection with Seller's tax free exchange described in Section 25 hereof.

Further, as provided below in Section 10(a), Purchaser shall execute and deliver a Collateral Assignment of Contracts, Licenses and Permits in the Phase I Closing Date.

**10.    Purchaser's Obligations After the Phase I Closing and Before the Phase II Closing.** Purchaser covenants to comply with the following obligations after the Phase I Closing and before the Phase II Closing:

(a)    As long as this Agreement is in full force and effect, Purchaser shall be responsible for maintaining the current status of all requisite governmental and quasi-governmental approvals, permits, licenses and agreements necessary for the development of the Project at its sole cost and expense, including, without limitation, all local, municipal, county, state and federal approvals, including, without limitation, from the New Jersey Department of Environmental Protection, New Jersey Pinelands Commission and Atlantic County water and/or sewage authority (collectively, the "**Approvals**"). Pursuant to a separate assignment document which shall contain no warranties, Seller shall assign its rights in any such Approvals to Purchaser on the Phase I Closing Date, and Purchaser shall assume all obligations with respect to same. Purchaser shall at all times keep Seller informed regarding the status of the Approvals, and shall promptly furnish to Seller copies of any amendments thereto or renewals or extensions thereof, and any notices (including, without limitation, violation notices) that are received from any governmental or quasi-governmental authority with respect to the Property or the Project. Purchaser's managing member(s) shall further submit written certifications to Seller on December 1st and May 1st of each calendar year regarding the then current status of each Approval, and any other pertinent information that the Seller may reasonably request.

(b)    If Purchaser fails to maintain the Approvals or any Approval is scheduled to expire or lapse within one hundred twenty (120) days at any time, Seller is hereby authorized to (i) make the necessary applications to maintain the current status of the Approvals and Purchaser shall promptly reimburse Seller for the costs thereof; or (ii) terminate this Agreement following notice and a ten (10) day period to cure and retain the Down Payment.

Notwithstanding anything to the contrary in this Section 10(c), the parties recognize that sewer permit No. 08-0002, which allows the construction and operation of treatment works facility, expires on December 12, 2008. Purchaser shall submit a request to the issuing authority seeking permission to extend the expiration of such permit within ten (10) days of the Effective Date. In connection with the Phase I Closing, Purchaser shall execute a Collateral Assignment of Contracts, Licenses and Permits in the form attached hereto as Exhibit F. Purchaser shall further execute a power of attorney in favor of Seller at the Phase I Closing granting Seller powers sufficient to protect the Approvals and the current status thereof.

(c)    Purchaser shall complete all of the infrastructure improvements contemplated by the entire Project, including on, over or under the entire Property, including, without limitation, all roadways, drives and all utilities (including, without limitation, all water and sewer facilities) (collectively, the "**Infrastructure Improvements**"). Purchaser shall achieve substantial completion of the Infrastructure Improvements no later than May 1, 2009 with respect to the Phase I Property and March 1, 2010 with respect to the Phase II Property. Upon commencement of the Infrastructure Improvements upon Phase I (which Purchaser must commence no later than March 1, 2009), Seller or Title Company (as applicable) shall release $50,000 of the Down Payment to Purchaser. Upon commencement of the Infrastructure Improvements upon Phase II (which Purchaser must commence no later than November 1, 2009), Seller or Title Company (as applicable) shall release an additional $50,000 of the Down Payment to Purchaser. Purchaser shall be permitted to enter onto the Phase II Property pursuant to a temporary construction easement to be granted by Seller. Purchaser shall be responsible for insuring the replacement cost of the Infrastructure Improvements. Purchaser agrees to obtain and maintain (and cause all subcontractors and other third parties to maintain) general liability and completed-operations insurance with a minimum amount of $2,000,000 per occurrence. Completed-operations coverage shall remain in effect for six (6) years post completion of the Project construction. Such insurance shall name Seller, its subsidiaries and affiliates as additional insureds. Purchaser and its insurer(s) agree to waive their rights to subrogate against the Seller, its subsidiaries, and affiliates. Such insurance shall be written by an insurer with AM Best rating of A(X). Purchaser agrees to provide Seller thirty (30) days written notice prior to cancellation of such insurance, and to provide Seller a certificate of insurance evidencing the insurance required prior to inspection. Purchaser will ensure that all parties (including contractors and subcontractors) involved with the construction will carry the same insurance including terms and conditions as required herein.

(d)    Construction of the houses upon the Phase I Property must begin no later than August 1, 2009, and shall proceed continuously with a full construction force and otherwise with due diligence and in compliance with all applicable laws, regulations and the Approvals.

(e)    If Purchaser fails to proceed with the acquisition of the Phase II Property and/or complete all of the Infrastructure Improvements, Seller shall be permitted to connect to any Infrastructure Improvement completed upon any portion of the Property. In connection with the Phase I Closing, Purchaser shall execute and deliver a blanket easement allowing Seller access across the entire Phase I Property for such purposes. Purchaser shall further execute and deliver any easements reasonably requested by Seller to ensure that Seller

may complete the development of the Phase II Property in a manner consistent with the intended development of the Project.

(f)    Purchaser shall be responsible for replacing any bonds, including without limitation, performance bonds, that have been issued as a condition of obtaining Approvals for the Project. Purchaser shall further be responsible for posting or issuing and maintaining all bonds in connection with the Infrastructure Improvements or the Project.

(g)    Notwithstanding anything to the contrary in this Agreement, if Purchaser fails to complete any of its obligations pursuant to this Section 10, Seller shall have the right in its sole discretion to cure such breach and to offset against the Down Payment for all costs and expenses related thereto. In such event, Seller shall send a written notice to Purchaser demanding the replenishment of the Down Payment to then applicable required amount based on the Down Payment release terms and conditions provided herein (including, without limitation, Section 10(C) above), and Purchaser shall comply with such request within five (5) days of receipt of such notice.

(h)    Notwithstanding anything to the contrary in this Agreement, if Purchaser fails to proceed with the acquisition of the Phase II Property and/or satisfy any of its obligations under this Agreement (including, without limitation, commencing and/or substantially completing the Infrastructure Improvements and commencing construction of the houses within the applicable deadlines), then Seller shall be permitted to declare a default under Section 15 and may exercise any or all of its remedies, including, without limitation, exercising any remedies under the Collateral Assignment of Contracts, Licenses and Permits.

(i)    The Purchaser's obligations set forth above in this Section 10 shall survive the Phase I Closing.

**11.    Brokerage.**

(a)    Purchaser covenants, represents and warrants that it has had no dealings or communications with any broker or agent in connection with the consummation of this Agreement and covenants and agrees to hold harmless and indemnify Seller from and against any and all cost, expense (including reasonable attorneys' fees) or liability for any compensation, commissions or charges claimed by any broker or agent with whom Purchaser dealt with respect to this Agreement or the negotiation thereof.

(b)    Seller covenants, represents and warrants that it has had no dealings or communications with any broker or agent in connection with the consummation of this Agreement. Seller shall hold harmless and indemnify Purchaser from and against any and all cost, expense (including reasonable attorneys' fees) or liability for any compensation, commissions or charges claimed by any broker or agent with whom Seller dealt with respect to this Agreement or the negotiation thereof.

(c)    The representations set forth above in this Section 11 shall survive the Closings.

12.     **Damage, Destruction or Condemnation.** If prior to any Closing all or any material portion of the Property which has not yet been conveyed to Purchaser is damaged or destroyed or becomes the subject of a condemnation proceeding by a public or quasi-public authority having the power of eminent domain, Seller shall immediately notify Purchaser thereof in writing and Purchaser may elect to terminate this Agreement. If Purchaser elects to terminate this Agreement, it shall so notify the Seller within ten (10) days after Purchaser has received written notice of such destruction, damage or condemnation proceedings from Seller, and the Down Payment shall be returned to Purchaser, and this Agreement shall be deemed null and void and the parties hereto shall have no further obligations to or recourse against each other with regard to the matters provided for herein. If Purchaser does not terminate this Agreement as provided in this paragraph, the transaction shall proceed as contemplated herein, in which event Purchaser shall be entitled to receive all insurance proceeds or of any condemnation award or payment as a result of such damage, destruction or condemnation. Seller agrees to assign its right to any such proceeds or award to the Purchaser at the applicable Closing. For the purposes of this Section 12, damage or a condemnation shall be considered to be "material" if the value of the portion of the Property damaged or taken exceeds $2,000,000, or, in the case of a condemnation, if the portion of the Property taken is such that it materially and adversely affects the ability to use the remainder for the Project.

13.     **Indemnification by Purchaser.** Purchaser agrees to indemnify, defend and hold Seller, its subsidiaries, affiliates, and their respective officers, members, partners, shareholders, directors and employees, harmless of, and from any claim, proceeding, suit, damage, liability, loss, cost, charge or expense or any other liability of every nature, kind and description whatsoever arising before or after the Closings (a "**Loss**") (including, without limitation, reasonable attorney's fees and expenses) incurred or suffered by any of the foregoing entities or persons by reason of, or resulting from or arising out of any activity of the Purchaser and/or its agents, consultants, contractors, subcontractors, invitees, and/or representatives contemplated by Section 4 and/or 10, including, without limitation, tests, inspections, studies and/or investigations performed or caused to be performed by Purchaser on the Property, and arising from or related to the Infrastructure Improvements. This indemnification shall survive the expiration or termination of this Agreement and the Closings.

14.     **Seller's Default.** If Seller shall default in the performance of its obligations under this Agreement, then, Purchaser's sole and exclusive remedies shall be either to (i) terminate this Agreement, by delivering notice of such termination to Seller and the Title Company, in which case Title Company shall return the Down Payment to Purchaser (if Title Company is still holding the Down Payment), or (ii) enforce specific performance of Seller's obligations hereunder. Purchaser shall not seek or obtain any money or other judgment against Seller or any disclosed or undisclosed partner, principal, member, shareholder, officer or employee of Seller or any of the foregoing persons or entities, and Purchaser's sole recourse for payment of such amounts shall be as expressly provided in this Section 14.

15.     **Purchaser's Default.**

(a)     If Purchaser shall default in the performance of its obligations under this Agreement, the sole rights of Seller shall be to (i) terminate this Agreement, by delivering notice of such termination to Purchaser, and (ii) receive and/or retain the sum of Five

Hundred Thousand Dollars ($500,000) as liquidated damages, such amount being fixed as such by reason of the fact that the actual damages to be suffered by Seller in such event are in their nature uncertain and unascertainable with exactness and because Purchaser would not have entered into this Agreement unless Purchaser were exculpated from personal liability except as provided in Section 15(b). Seller shall not seek or obtain any money or other judgment against Purchaser or any disclosed or undisclosed partner, principal, officer or employee of Purchaser or any of the foregoing persons or entities, and Seller's sole recourse for payment of such amounts shall be to receive and/or retain Five Hundred Thousand Dollars ($500,000) as liquidated damages, except as provided in Section 15(b). By signing this Agreement in their individual capacities, Larry Engel and Marina Engel (collectively, the "Guarantors") jointly and severally guarantee the Purchaser's payment of the liquidated damages cited herein and the payment and performance of Purchaser's indemnification obligations pursuant to this Agreement.

(b)    Notwithstanding the foregoing, Purchaser agrees that Purchaser shall not be exculpated from any liability with respect to the indemnifications set forth in Section 13 hereof.

(c)    Notwithstanding anything to the contrary in this Agreement, Seller's remedies shall be cumulative, and Seller shall be entitled to recover from Purchaser all costs and expenses incurred in order to maintain the current status of the Approvals in addition to and notwithstanding the liquidated damages provision set forth in Section 15(a), and may also setoff against the Down Payment to recover such costs and expenses. Further, notwithstanding anything to the contrary in this Agreement, Seller shall have the right to (i) compel specific performance of Purchaser's obligations pursuant to Sections 4 and 10 hereof and pursuant to the Collateral Assignment of Contracts, Licenses and Permits, and (ii) seek other equitable relief as may be necessary to protect Seller's rights.

16.    **Notices.** All notices, requests, or other communications desired or required to be given under this Agreement shall be in writing and shall be sent by (a) certified or registered mail, return receipt requested, postage prepaid, (b) national prepaid overnight delivery service, (c) telecopy or other facsimile transmission (following with hard copies to be sent by national prepaid overnight delivery service) or (d) personal delivery with receipt acknowledged in writing, as follows:

If to Seller:    LEHMAN BROTHERS HOLDINGS INC.
745 7th Avenue
4th Floor
New York, New York 10019,
Attention:    Daniel B. Kamensky
Telephone:    (212) 526-7101
Telecopier:    (917) 522-0160

With a copy to:      Ballard Spahr Andrews & Ingersoll, LLP
                     Plaza 1000 - Suite 500
                     Main Street
                     Voorhees, NJ  08043
                     Attention:      Kenneth M. Morgan, Esquire
                     Telephone:      (856) 761-3491
                     Telecopier:     (856) 761-9038

If to Purchaser:     ENGEL GROUP LLC
                     3201 Pacific Avenue
                     Wildwood, NJ  08260
                     Attention:  Larry Engel
                     Telephone:      (908) 675-6435
                     Telecopier:     (609) 522-5588

With a copy to:      Stagliano & DeWeese, P.A.
                     3200 Pacific Avenue
                     Wildwood, New Jersey 08260
                     Attention:      Ronald J. Stagliano, Esquire
                     Telephone: (609) 522-5599
                     Telecopier: (609) 522-3003

All notices shall be deemed given when actually received or refused by the party to whom the same is directed (except to the extent sent by certified or registered mail, return receipt requested, postage prepaid, in which event such notice shall be deemed given three (3) business days after the date of mailing). Each party may designate a change of address or supplemental addresses by notice to the other parties, given at least fifteen (15) business days before such change of address is to become effective.

**17.      Entire Agreement, Basis of Purchase - As-is, Where-is.**

(a)      This Agreement contains all of the terms agreed upon between the parties with respect to the subject matter hereof and supersedes any and all prior written or oral understandings.

(b)      If any provision of this Agreement is declared invalid or is unenforceable for any reason, such provision shall be deleted and shall not invalidate any other provision of this Agreement.

(c)      Seller hereby expressly disclaims any and all warranties, express or implied, relating in any way to the Property, including, without limitation, any warranty provided for under statutory or common law or the uniform commercial code, including but not limited to warranties of merchantability and fitness for a particular purpose.

(d)      Purchaser acknowledges that it has been afforded and/or shall be afforded the opportunity to inspect the Property and agrees to accept conveyance of the Property at the Closings in its "AS-IS, WHERE-IS" condition as of the Closing Dates (including, without

limitation, the environmental condition of the Property), solely based upon its reliance on its own investigations, inspections and judgment, and not on any representation, warranty or assurance given by Seller or anyone acting on Seller's behalf. Purchaser affirms that Seller has not made, nor has Purchaser relied upon, any representation, express or implied, or promise made by Seller, or any of its employees or agents or any broker, with respect to the Property, the Project or the Approvals. Purchaser agrees that any documentation or other information received from Seller was furnished on the express condition that Purchaser make an independent verification of the accuracy of all such information, all such documentation and information being furnished without any warranty whatsoever. Purchaser releases Seller from all responsibility and liability regarding the condition, utility and development potential of the Property, the Project and with respect to the Approvals.

(e)     Seller has agreed to sell the Property to Purchaser because Purchaser is an experienced residential developer with the ability to complete the Project. Purchaser may not "flip" the Phase I Property or otherwise rely on any other developer to complete the Project including the Infrastructure Improvements. Notwithstanding the foregoing, if Purchaser has acquired the Phase I Property and is not in default of this Agreement (including, without limitation, the obligations to complete the Infrastructure Improvements), then Purchaser's rights to purchase the Phase II Property may be assigned to another party simultaneously with a closing to be held with such third party; provided, however, Purchaser shall not be released from its obligations hereunder and such third party shall assume all of Purchaser's obligations pursuant to this Agreement.

**18.     Amendments.** This Agreement may not be changed, modified or terminated except by an instrument executed by the parties hereto.

**19.     Successors and Assigns.**

(a)     This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

(b)     Seller may assign its rights hereunder and/or transfer the Property or any portion thereof at any time to any existing or newly formed affiliated entity (including, without limitation, a single purpose or single asset entity); provided, however, such assignee shall execute an amendment and joinder to this Agreement and assume all of Seller's remaining obligations hereunder.

(c)     Purchaser may not assign this Agreement or any part of its rights and obligations hereunder without Seller's prior written consent. Any attempted assignment shall be null and void and shall be a default hereunder, and shall allow Seller to terminate this Agreement without further notice. Despite any permitted assignment of this Agreement, Purchaser shall not be released and shall remain liable hereunder. Purchaser shall be solely responsible for any additional transfer, surtax, documentary tax or other fees due by reason of such assignment.

20.    **Governing Law.** This Agreement shall be governed by the laws of the State of New Jersey.

21.    **Waiver of Jury Trial.** IT IS MUTUALLY AGREED BY AND BETWEEN SELLER AND PURCHASER THAT THE RESPECTIVE PARTIES HERETO SHALL AND DO HEREBY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT. EACH PARTY ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THIS WAIVER AND HAS BEEN ADVISED BY COUNSEL AS NECESSARY OR APPROPRIATE. THIS WAIVER IS MADE KNOWINGLY AND VOLUNTARILY BY THE PARTIES HERETO.

22.    **Waiver of Formal Tender.** The requirement for formal tender of payment and deed is hereby waived.

23.    **No Recording.** Neither party shall record this Agreement or any memorandum thereof without the prior written consent of the other party, which consent may be withheld in such party's sole discretion.

24.    **Representations and Warranties of Purchaser.** Purchaser warrants and represents (all of which representations and warranties shall be true and correct on the date hereof and at Closings) to Seller that:

(a)    Purchaser has the full right, power and authority to execute, deliver and perform its obligations under this Agreement and all of the other documents and agreements that it may execute in connection with this Agreement.

(b)    Purchaser's execution, delivery and performance of this Agreement and all of the other documents and agreements executed in connection with this Agreement (i) have been authorized in the case of this Agreement and otherwise will be duly authorized by all necessary action on or before the Closing Dates; (ii) do not require the consent or approval of any judicial or governmental body or regulatory authority or any other person or entity (except as otherwise provided in this Agreement), or that such consent or approval, if required, has been obtained; and (iii) to the Purchaser's actual knowledge, do not conflict with any law or regulation, or any agreement to which it is bound or any governing documents or to which any of its property is bound or affected.

(c)    This Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable in accordance with its terms.

25.    **Exchange.** Purchaser agrees to cooperate with Seller to consummate the sale of the Property by means of a tax-free exchange pursuant to Section 1031 of the Internal Revenue Code of 1986, as amended, provided Seller bears all cost and expense of such exchange. In connection with such exchange, Purchaser agrees that Seller may assign the Agreement of Sale to, and/or direct that the Deeds be conveyed by, a qualified intermediary or another third party in connection with such exchange.

     **26.**    **Time of the Essence.**  All times provided for herein are and shall be of the essence of this Agreement, and each extension of any such time or times shall continue to be of the essence of this Agreement.

     **27.**    **Counterparts.**  This Agreement may be executed in one or more separate counterparts each of which shall constitute an original and all, when taken together, shall constitute one and the same document.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the day and year first above written.

SELLER:

LEHMAN BROTHERS HOLDINGS INC.

By: _____  *James P. Seery Jr.*
      Authorized Signatory


PURCHASER:

ENGEL GROUP LLC


By: _____
      Larry Engel
      Member


By: _____
      Marina Engel
      Member

Tax Identification Number: _____


GUARANTORS:


_____
      Larry Engel, Individually


_____
      Marina Engel, Individually


17

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement as of the day and year first above written.

SELLER:

LEHMAN BROTHERS HOLDINGS INC.

By: _____
Daniel B. Kamensky, Esquire
Authorized Signatory

PURCHASER:

ENGEL GROUP LLC

By: _____
Larry Engel
Member

By: _____
Marina Engel
Member

Tax Identification Number:  02-0631598

GUARANTORS:

_____
Larry Engel, Individually

_____
Marina Engel, Individually

## TITLE COMPANY JOINDER

Title Company joins herein in order to evidence its agreement to perform the duties and obligations of Title Company set forth herein and to acknowledge receipt of a fully executed copy of this Agreement and receipt of the Down Payment described in this Agreement

Dated: _____

       Option One Title Agency, LLC

    By:   _____
          Name:
          Title:

**EXHIBIT A**

**LEGAL DESCRIPTION**

EXHIBIT "A"

LEGAL DESCRIPTION

File No: 1171ST-01

ALL THAT CERTAIN tract or parcel of land and premises lying, being and situate in Hamilton Township, County of Atlantic, and State of New Jersey being more particularly described as follows:

BEGINNING at a point in the Northeasterly line of West Jersey Avenue, (50 feet wide) as the same is laid out North of the Northerly right of way of the West Jersey and Seashore Railroad, (100 feet wide), Where the Northwesterly line of "Victoria Crossing", Filed Map intersects the same, as shown on said Plat and runs; thence

(1)    Along a line of Perpendicular to West Jersey Avenue, North 21 degrees 26 minutes 58 seconds East a distance of 2178.00 feet to rear line of Lots fronting on West Jersey Avenue; thence

(2)    Along said line and parallel with West Jersey Avenue, North 68 degrees 33 minutes 02 seconds West a distance of 1000.00 feet; thence

(3)    Along a line parallel with the first course South 21 degrees 26 minutes 58 seconds West a distance of 2178.00 feet to the Northeasterly line of West Jersey Avenue; thence

(4)    Along said line of West Jersey Avenue, South 68 degrees 33 minutes 02 seconds East a distance of 1000.00 feet to the Northwesterly line of "Victoria Crossing" and the Point and Place of Beginning.

BEING premises No. 4085 West Jersey Avenue.

BEING Block 1132.01, Lot 37.

BEING further known and designated as Block 1132.29, Lot 1 (open space) and Lots 2 through 9 inclusive, Block 1132.30, Lots 14 through 31 inclusive and Lot 32 (open space) Block 1132.31, Lots 1 thorough 26 inclusive and Block 1132.32, Lots 1 through 11 inclusive, together with the beds of Galleria Drive and DaVinci Way as set forth on Final Plan of Lots for Glen Eyre @ Hamilton, Palette I, Phase I filed in the Atlantic County Recorder's Office on 1/20/06 as Map No. M2006007155-A; and

BEING further known and designated as BLock 1132.29, Lots 10 through 28 inclusive; Block 1132.30, Lots 1 through 13 inclusive, and Block 1132.32, Lots 12 through 41 inclusive, together with the beds of Galleria Drive, St. Andrews Drive and Rue Cezanne as set forth on Final Plan of Lots for Glen Eyre @ Hamilton, Palette II, Phase II filed in the Atlantic County Recorder's Office on 1/20/2006 as Map No. M2006007155-B.

BEING the same land and premises which became vested in Kara At Glen Eyre, LLC, by deed from LE Pergole Land Group, LLC, dated 1/10/2006, recorded 2/15/2006, in the Atlantic County Clerk/Register's Office in Instrument No. 2006015548 .

**EXHIBIT B**

**PHASE I PLAN**



**EXHIBIT C**

**PHASE II PLAN**



**EXHIBIT D**

**COMMITMENT LETTER**

## SCHEDULE 1

## PERMITTED EXCEPTIONS

1.     Easement as contained in Deed Book 2170, Page 185.

2.     Easement as contained in Deed Book 6333, Page 46.

3.     Subject to all easements, setback lines and other conditions as set forth on Final Plan of Lots for Glen Eyre at Hamilton, Palette II, Phase I filed 1/20/06 as Map Number M2006007155-A and Palette II, Phase II filed 1/20/06 as Map Number M2006007155-B.

## EXHIBIT E

## COLLATERAL ASSIGNMENT OF CONTRACTS, LICENSES AND PERMITS

**THIS COLLATERAL ASSIGNMENT OF CONTRACTS, LICENSES AND PERMITS** (this "**Assignment**") is made as of the 12th day of May 2008, by ENGEL GROUP LLC, a New Jersey limited liability company ("**Purchaser**") to LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("**Seller**").

## RECITALS :

A.    Purchaser is the owner in fee simple absolute of the land constituting the first phase of a residential development project commonly known as Glen Eyre @ Hamilton Palette II ("**Project**"). The Project contemplates the development of land that has been designated as Block 1132.29, Lot 1 (open space), 2-28, Block 1132.30, Lots 1-31, 62 (open space), Block 1132.31, Lots 1-26, and Block 1132.32, Lots 1-41 in Hamilton Township, Atlantic County, New Jersey, as more particularly described on Exhibit A attached hereto (the "**Premises**").

B.    In connection with the conveyance of the Phase I Property to Purchaser by Seller and pursuant to the terms of that certain Agreement of Sale between Purchaser and Seller dated May 12, 2008 (the "**Agreement**"), Seller has assigned all of its rights regarding the development of the Project and related Approvals to Purchaser.

C.    Purchaser has the right to purchase the Phase II Property and has certain obligations with respect to the development of the entire Premises (including, without limitation, the obligation to maintain the current status of the Approvals and to complete Infrastructure Improvements).

D.    Seller requires as a condition of assigning the Approvals to Purchaser that Purchaser shall have executed and delivered this Assignment as security for Purchaser's obligations under the Agreement.

**NOW THEREFORE**, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Defined Terms. Capitalized terms used in this Assignment and not otherwise defined shall have the respective meanings assigned to them in the Agreement.

2.    Collateral Assignment. As security for the performance and observance of all obligations, covenants, conditions and warranties on the part of Purchaser to be performed or observed under the Agreement, Purchaser hereby assigns, transfers and pledges to Seller all of Purchaser's right, title and interest in, to and under all permits, licenses, franchises, compliances, certificates, consents and approvals, including, without limitation, all governmental approvals, general intangibles, agreements and contracts including, without limitation, contractor agreements, subcontractor agreements, service contracts, insurance policies, warranties, guaranties, indemnities, appraisals, engineering, environmental, soils, insurance and other reports

and studies, tenant lists, books, records, correspondence, files and advertising materials, and other documents, now or hereafter obtained, produced or entered into, as the case may be, pertaining to the construction, use, occupancy, possession, management, maintenance, ownership, or otherwise in respect of the Premises, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (collectively, the "**Contracts, Licenses and Permits**"), together with all cash and non-cash proceeds of any of the foregoing and all claims of Purchaser with respect thereto and together with all right, title and interest of Purchaser in and to any and all extensions and renewals of any of the foregoing (the "**Assigned Property**").

      3.     <u>Representations and Warranties</u>.  Purchaser represents and warrants that:

      (a)     Purchaser has the right to assign the Contracts, Licenses and Permits in accordance with the terms of this Assignment, without the obligation to obtain the consent thereto of any person, other than persons whose consents have been obtained in writing and delivered to Seller;

      (b)     no other person has any right, title or interest in Purchaser's interests in the Assigned Property;

      (c)     the Contracts, Licenses and Permits listed on <u>Rider A</u> annexed hereto (as the same may be updated from time to time pursuant to Section 4(f) below) are in full force and effect and have not been modified, amended or assigned other than pursuant to this Assignment;

      (d)     neither Purchaser nor to the best knowledge of Purchaser, any other party to any Contracts, Licenses and Permits (each, an "**Other Contract Party**") is in default under any of the terms, covenants or provisions of the Contracts, Licenses and Permits and Purchaser knows of no event which, but for the passage of time or the giving of notice or both, would constitute an event of default under the Contracts, Licenses and Permits by Purchaser or any such Other Contract Party;

      (e)     neither Purchaser nor any Other Contract Party has commenced any action or given or received any notice for the purpose of terminating any Contracts, Licenses and Permits; and

      (f)     all sums due and payable as of the date hereof to any Other Contract Party under the related Contracts, Licenses and Permits have been paid in full.

      4.     <u>Covenants of Purchaser</u>.  Purchaser covenants and agrees as follows:

      (a)     Purchaser will at all times comply and cause substantial compliance with all of its covenants, obligations and agreements, if any, under the Contracts, Licenses and Permits (including, the obligation to pay all sums due thereunder) to which it is a party and, subject to the terms and conditions of the Agreement, will use all reasonable efforts to secure or enforce all of its rights under the Contracts, Licenses and Permits to which it is a party.

                        

(b)     Purchaser shall not, other than in the ordinary course of business, surrender, terminate (other than a termination in connection with a default beyond applicable time periods by a third party under the applicable Contract, License and Permit), cancel, modify, amend, enter into any agreement in substitution for, or consent to the assignment of any Contract, License and Permit without Seller's prior written consent; provided, however, Seller shall not unreasonably withhold its consent for immaterial modifications or amendments to any such Contract, Licenses and Permits.

(c)     Purchaser shall abide by, perform and discharge in all material respects all obligations, covenants, agreements, and conditions to be performed by Purchaser, or any of them, under all material Contracts, Licenses and Permits as if this Assignment had not been made.

(d)     Purchaser shall give prompt notice to Seller of any default notice issued by any Governmental Authority or any other party with respect to any of the Contracts, Licenses and Permits together with an accurate and complete copy of any such notice.

(e)     Purchaser shall exercise all reasonable efforts to enforce or secure the performance of each and every material obligation, covenant, condition, and agreement to be performed by the licensor, grantor or other contracting party under all such Contracts, Licenses and Permits.

(f)     Purchaser shall deliver to Seller from time to time an updated Rider A so that the same is a current and complete list as of the time in question of all material Contracts, Licenses and Permits then in existence and deliver the same to Seller.

5.      Limitations on Assignment.  So long as no Event of Default (as defined in Section 6) shall have occurred and be continuing, subject to the provisions of Section 2 hereof and any other restrictions set forth in the Agreement, Purchaser shall have the exclusive right to exercise all rights in, to and under the Contracts, Licenses and Permits, and Seller shall not have any right to exercise such rights hereunder.  Upon the occurrence and during the continuation of an Event of Default, Seller shall be entitled, at Seller's option, to exercise all rights in, to and under any or all of the Contracts, Licenses and Permits, whether or not Seller shall take possession of the Premises.  The foregoing assignment shall be fully operative without any further action on the part of either party.

6.      Remedies.  An "**Event of Default**" shall exist hereunder if (i) Purchaser fails to pay any amount when due hereunder; (ii) Purchaser fails to perform any of the terms, covenants, conditions or undertakings contained herein; (iii) Purchaser is insolvent or is subject to a voluntary or involuntary bankruptcy proceeding; or (iv) any representation, warranty, certification, financial information or other information made or furnished by or on behalf of Purchaser or any guarantor of the Agreement was false or misleading in any material respect when made.  Upon the occurrence and during the continuation of an Event of Default, Seller may, at its option, in addition to all other remedies provided for hereunder and under the Agreement, or at law, exercise from time to time any rights and remedies available to Seller under applicable law in respect of the Contracts, Licenses and Permits (including, all of the rights of a secured creditor under any applicable Uniform Commercial Code) and without regard

for the adequacy of security for the Agreement, either in person or by Seller with or without bringing any action or proceeding, or by a receiver to be appointed by a court, enter upon, take possession of the Premises and exercise all rights of "Purchaser" under the Contracts, Licenses and Permits and do any acts which Seller deems proper to protect the security hereof, and upon the occurrence and during the continuance of such event, Purchaser shall neither have nor exercise any further rights under the Contracts, Licenses and Permits. The exercise of any rights under this Assignment by Seller shall not cure or waive any Default or Event of Default, or invalidate any act done pursuant hereto or pursuant to the Agreement, but shall be cumulative of all other rights and remedies under this Assignment and the Agreement.

       7.     Performance Upon Notice. Purchaser hereby irrevocably directs the Governmental Authority having jurisdiction over the Premises as a party to or the issuer of any Contracts, Licenses or Permits or any Contract Party, upon receipt from Seller of written notice to the effect that a default exists under the Agreement and is continuing or that an Event of Default has occurred hereunder, to recognize Seller as the "**contracting party**," "**licensee**," "**indemnitee**" or "**permittee**", as the case may be, under the Contracts, Licenses and Permits for any and all purposes as fully as it would recognize or accept the performance of Purchaser thereunder, except that Seller shall not be liable for any acts or omissions or defaults occurring or arising prior to such notice from Seller of an Event of Default, and to act in accordance with any and all instructions given by Seller with respect to such Contracts, Licenses and Permits. Purchaser hereby authorizes and directs any Other Contract Party, to continue performance of such parties' respective covenants and obligations under their respective Contracts, Licenses and Permits upon Seller's request therefor, and to continue so to do until otherwise notified by Seller. Nothing contained in this Assignment shall obligate Seller to perform any of Purchaser's covenants or obligations under the Contracts, Licenses and Permits or otherwise impose any obligations on Seller with respect thereto, until such time as Seller gives notice of an Event of Default and makes a request for continued performance in accordance with this Section 7.

       8.     Cross Default. Any default under the Agreement shall constitute an Event of Default hereunder and shall entitle Seller to all of its cumulative remedies under the Agreement and this Assignment.

       9.     Termination. At such time as the Phase II Closing is completed, this Assignment and all of Seller's right, title and interest hereunder with respect to the Contracts, Licenses and Permits shall terminate.

       10.    Notices. All notices or other communications hereunder shall be in writing and shall be given in accordance with the Agreement.

       11.    No Oral Change. This Assignment, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Purchaser or Seller or any Other Contract Party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

       12.    Liability. This Assignment shall be binding upon and inure to the benefit of Purchaser and Seller and their respective successors and assigns forever.

13.     Inapplicable Provisions. If any term, covenant or condition of this Assignment is held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.

14.     Governing Law. This Assignment shall be governed, construed, applied and enforced in accordance with the laws of the State of New Jersey (without giving effect to New Jersey's principles of conflicts of law) and the applicable laws of the United States of America.

15.     Headings, etc. The headings and captions of various paragraphs of this Assignment are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

16.     Duplicate Originals, Counterparts. This Assignment may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Assignment may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute a single Assignment. The failure of any party hereto to execute this Assignment, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

17.     Number and Gender. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

18.     Miscellaneous. (a) Wherever pursuant to this Assignment (i) Seller exercises any right given to it to approve or disapprove, (ii) any arrangement or term is to be satisfactory to Seller, or (iii) any other decision or determination is to be made by Seller, the decision of Seller to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory and all other decisions and determinations made by Seller, shall be in the sole and absolute discretion of Seller and shall be final and conclusive, except as may be otherwise expressly and specifically provided herein.

(b)     Wherever pursuant to this Assignment it is provided that Purchaser shall pay any costs and expenses, such costs and expenses shall include, but not be limited to, reasonable legal fees and disbursements of Seller.

19.     Successors and Assigns. This Assignment shall inure to the benefit of Seller and its successors and assigns, and shall bind Purchaser and its successors and permitted assigns. The term "**Contracts, Licenses and Permits**" as used herein means not only the Contracts, Licenses and Permits hereby assigned or any extension or renewal thereof, but also any future Contracts, Licenses and Permits issued in connection with the Premises.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF** the undersigned have executed this Assignment as of the date and year first written above.

PURCHASER:

ENGEL GROUP LLC
a New Jersey limited liability company


By: _____
　　　　Larry Engel
　　　　Member


By: _____
　　　　Marina Engel
　　　　Member

## EXHIBIT A

**Legal Description of the Premises**

EXHIBIT "A"

LEGAL DESCRIPTION

File No: 1171ST-01

**ALL THAT CERTAIN** tract or parcel of land and premises lying, being and situate in Hamilton Township, County of Atlantic, and State of New Jersey being more particularly described as follows:

**BEGINNING** at a point in the Northeasterly line of West Jersey Avenue, (50 feet wide) as the same is laid out North of the Northerly right of way of the West Jersey and Seashore Railroad, (100 feet wide), Where the Northwesterly line of "Victoria Crossing", Filed Map intersects the same, as shown on said Plat and runs; thence

(1)     Along a line of Perpendicular to West Jersey Avenue, North 21 degrees 26 minutes 58 seconds East a distance of 2178.00 feet to rear line of Lots fronting on West Jersey Avenue; thence

(2)     Along said line and parallel with West Jersey Avenue, North 68 degrees 33 minutes 02 seconds West a distance of 1000.00 feet; thence

(3)     Along a line parallel with the first course South 21 degrees 26 minutes 58 seconds West a distance of 2178.00 feet to the Northeasterly line of West Jersey Avenue; thence

(4)     Along said line of West Jersey Avenue, South 68 degrees 33 minutes 02 seconds East a distance of 1000.00 feet to the Northwesterly line of "Victoria Crossing" and the Point and Place of Beginning.

**BEING** premises No. 4085 West Jersey Avenue.

**BEING** Block 1132.01, Lot 37.

**BEING** further known and designated as Block 1132.29, Lot 1 (open space) and Lots 2 through 9 inclusive, Block 1132.30, Lots 14 through 31 inclusive and Lot 32 (open space) Block 1132.31, Lots 1 thorough 26 inclusive and Block 1132.32, Lots 1 through 11 inclusive, together with the beds of Galleria Drive and DaVinci Way as set forth on Final Plan of Lots for Glen Eyre @ Hamilton, Palette II, Phase I filed in the Atlantic County Recorder's Office on 1/20/06 as Map No. M2006007155-A; and

**BEING** further known and designated as BLock 1132.29, Lots 10 through 28 inclusive; Block 1132.30, Lots 1 through 13 inclusive, and Block 1132.32, Lots 12 through 41 inclusive, together with the beds of Galleria Drive, St. Andrews Drive and Rue Cezanne as set forth on Final Plan of Lots for Glen Eyre @ Hamilton, Palette II, Phase II filed in the Atlantic County Recorder's Office on 1/20/2006 as Map No. M2006007155-B.

**BEING** the same land and premises which became vested in Kara At Glen Eyre, LLC, by deed from LE Pergole Land Group, LLC, dated 1/10/2006, recorded 2/15/2006, in the Atlantic County Clerk/Register's Office in Instrument No. 2006015548 .

## RIDER A

## LIST OF EXISTING CONTRACTS

1.    Plans and Specifications

2.    Construction Agreement

3.    Sub/Prime Contracts

4.    Building Permits

## LIST OF EXISTING APPROVALS

| Approval/Permit | Approval/Permit Number | Current Expiration Date |
|---|---|---|
| Final Major Subdivision | Application No. SD5-03<br><br>Consent Order dated March 24, 2008 | March 3, 2011 |
| Construct, Modify and Operate a Public Water System | No. WCP040005 | August 14, 2009 |
| Construct and Operate Treatment Works - Sewer | No. 08-0002 | December 12, 2008 |
| Authorization to Discharge Stormwater and Certification of Soil Erosion and Sediment Plan | No. 105-04 | Effective Date of Authorization April 26, 2004<br>Certification expires on March 11, 2011 |
| Pinelands Development Approval | Application # 1981-1321.014 | Approved August 10, 2007, follows local approvals. |

**EXHIBIT F**

**APPROVALS**

| Approval/Permit | Approval/Permit Number | Current Expiration Date |
| --- | --- | --- |
| Final Major Subdivision | Application No. SD5-03<br><br>Consent Order dated March 24, 2008 | March 3, 2011 |
| Construct, Modify and Operate a Public Water System | No. WCP040005 | August 14, 2009 |
| Construct and Operate Treatment Works - Sewer | No. 08-0002 | December 12, 2008 |
| Authorization to Discharge Stormwater and Certification of Soil Erosion and Sediment Plan | No. 105-04 | Effective Date of Authorization April 26, 2004<br>Certification expires on March 11, 2011 |
| Pinelands Development Approval | Application # 1981-1321.014 | Approved August 10, 2007, follows local approvals. |

## FIRST AMENDMENT TO AGREEMENT OF SALE

**THIS FIRST AMENDMENT TO AGREEMENT OF SALE** (this "Amendment") is entered into on June **26**, 2008 by and between **LEHMAN BROTHERS HOLDINGS INC.** ("Seller"), a Delaware corporation having an office at 745 7th Avenue, 4th Floor, New York, New York 10019, and **ENGEL GROUP LLC** ("Purchaser"), a New Jersey limited liability company having an office at 3201 Pacific Avenue, Wildwood, New Jersey 08260.

### BACKGROUND

A.     Pursuant to an Agreement of Sale dated May 12, 2008 (the "Agreement"), the Seller agreed to sell and the Purchaser agreed to purchase from the Seller certain land and improvements located in Hamilton Township, Atlantic County, New Jersey (as defined in the Agreement, the "Property").

B.     The Due Diligence Period will expire on June 26, 2008, and Purchaser has not raised any objections with respect to any matters relating to the Property.

C.     Section 5(a) of the Agreement requires the Closing on the Phase I Property to occur on or before September 4, 2008, time being of the essence.

D.     Section 5(a) of the Agreement also requires the Closing on the Phase II Property to occur on or before September 1, 2010, time being of the essence.

E.     Purchaser has requested additional time to prepare for the Phase I Closing, and an option to extend the Phase II Closing until March 1, 2011.

F.     Seller has agreed to grant Purchaser's requests subject to all of the terms and conditions set forth herein. All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and agreements contained herein, Seller and Purchaser, intending to be legally bound hereby, agree to amend the Agreement as follows:

1.     Incorporation of Background Section. The recitals set forth in the Background Section above are incorporated herein as if fully set forth in the body of this Amendment.

2.     Title and Survey; Due Diligence. Purchaser has completed its title, survey and due diligence investigations to its satisfaction, and hereby waives all of its rights to conduct additional due diligence inspections and to terminate the Agreement on account of all of the foregoing. Purchaser hereby agrees to accept the Property in its "AS IS" "WHERE IS" "WITH ALL FAULTS CONDITION" on the applicable Closing Dates.

3.     Down Payment. Purchaser has furnished the First Down Payment to Title Company pursuant to Section 2 of the Agreement, and hereby authorizes Title Company to immediately release the First Down Payment to Seller. Purchaser also hereby agrees to increase the amount of the Second Down Payment from $250,000 to $300,000 and to pay the Second

Down Payment directly to Seller simultaneously with the execution of this Amendment. The effectiveness of this Amendment shall be contingent upon Seller's receipt of the First Down Payment from Title Company and the Second Down Payment from Purchaser. The entire $550,000 Down Payment shall be credited towards the Purchase Price on the Phase I Closing Date if the Phase I Closing shall occur on such date. Purchaser acknowledges that effective immediately the entire $550,000 Down Payment is, absent default by the Seller, non-refundable notwithstanding anything to the contrary in the Agreement (as amended hereby).

4. _Release of Title Company_. Effective upon Seller's receipt of the First Down Payment, Purchaser and Seller hereby release and forever discharge Title Company from all claims arising from or with respect to the release of the First Down Payment to Seller.

5. _Phase I Closing Date_. Section 5 of the Agreement is hereby modified to provide that the Phase I Closing shall occur on or before November 20, 2008, time being of the essence. If Purchaser fails to close on the Phase I Closing Date and pay the balance of the Purchase Price by wire transfer or certified check, the Agreement (as modified by this Amendment) shall automatically terminate, and Seller shall be entitled to retain the entire $550,000 Down Payment as liquidated damages. If Purchaser completes the Phase I Closing but subsequently defaults with respect to its remaining obligations prior to September 1, 2010, Seller shall be entitled to receive liquidated damages of $500,000 from Purchaser pursuant to Section 15(a) of the Agreement.

6. _Extension of Phase II Closing_. Purchaser may, at its option, extend the Phase II Closing from September 1, 2010 to March 1, 2011 ("Optional Extension Period") if Purchaser satisfies all of the following conditions on or prior to September 1, 2010:

(i) Purchaser shall have paid directly to Seller the non-refundable sum of $150,000 ("Extension Fee") (which shall be credited towards the Purchase Price if the Phase II Closing shall occur on or before March 1, 2011);

(ii) Purchaser shall have satisfied all other conditions, requirements and obligations pursuant to the Agreement, including, without limitation, all obligations pursuant to Section 10 of the Agreement (Purchaser's Obligations After the Phase I Closing and Before the Phase II Closing); and

(iii) Purchaser shall not otherwise be in default of the Agreement, as confirmed by Purchaser in a compliance document certified to be true and correct by Purchaser, acceptable to Seller in all respects, and delivered simultaneously with payment of the Extension Fee.

7. _Default During Optional Extension Period_. If Purchaser defaults during the Optional Extension Period, Seller shall be entitled to seek all remedies pursuant to Section 15 of the Agreement, including, without limitation, the right to receive liquidated damages of $500,000 (which sum shall not be subject to reduction or setoff on account of Purchaser's payment of the Extension Fee).

8. _Sewer Permit_. Attached hereto as _Exhibit A_ is a true and correct copy of Purchaser's filed application to extend treatment works - sewer permit no. 08-0002 pursuant to Section 10(b) of the Agreement.

9.    <u>No Seller Default</u>.  Purchaser hereby acknowledges that no breach of the Agreement has occurred or exists on the part of the Seller.

10.    <u>No Further Change</u>.  Except as otherwise provided for herein, the terms and conditions of the Agreement shall remain in full force and effect.

11.    <u>Counterparts</u>.  This Amendment may be executed in counterparts, and facsimile signatures shall be valid for all purposes.

12.    <u>Governing Law</u>.  This Amendment shall be governed in all respects by the laws of the State of New Jersey.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties have caused this First Amendment to Agreement of Sale to be duly executed the day and year first above written.

SELLER:

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: _____

Title: _____

PURCHASER:

ENGEL GROUP LLC

By: _____

Larry Engel
Member

By: _____

Marina Engel
Member

THE UNDERSIGNED GUARANTORS HEREBY AGREE THAT THEIR OBLIGATIONS TO JOINTLY AND SEVERALLY GUARANTEE THE PURCHASER'S PAYMENT OF THE LIQUIDATED DAMAGES AND THE PAYMENT AND PERFORMANCE OF PURCHASER'S INDEMNIFICATION OBLIGATIONS PURSUANT TO THE AGREEMENT CONTINUE IN FULL FORCE AND EFFECT AND APPLY TO THE AGREEMENT AS AMENDED BY THIS AMENDMENT.

_____
Larry Engel, Individually

_____
Marina Engel, Individually

**EXHIBIT A**

**Sewer Permit Extension Application**