**Hearing Date: November 18, 2008 at 10:00 a.m. (prevailing Eastern Time)**
**Objection Deadline: November 14, 2008 at 4:00 p.m. (prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|  |  |  |
|---|---|---|
| In re | : | **Chapter 11 Case No.** |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |

---------------------------------------------------------------x

## NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b)(1) THE BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO IMPLEMENT THE RETENTION AND RECRUITMENT PROGRAM

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated October

29, 2008 (the "Motion"), of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors

in the above-referenced chapter 11 cases (together, the "Debtors"), for authorization to

implement a recruitment program to the extent such program is not in the ordinary course of

business, all as more fully described in the Motion, will be held before the Honorable James M.

Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander

Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004

(the "Bankruptcy Court"), on **November 18, 2008 at 10:00 a.m. (Prevailing Eastern Time)**

(the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and

Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee

for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York

10004 Attn:  Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy

Hope Davis; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New

York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck,

Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v)

any person or entity with a particularized interest in the Motion, so as to be received no later than

**November 14, 2008 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: October 29, 2008
New York, New York

/s/ Richard P. Krasnow
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Richard P. Krasnow
Lori R. Fife
Shai Y. Waisman
Jacqueline Marcus

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                            :
In re                                       :        Chapter 11 Case No.
                                            :
LEHMAN BROTHERS HOLDINGS INC., et al.,      :        08-13555 (JMP)
                                            :
                        Debtors.            :        (Jointly Administered)
                                            :
                                            :
----------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO**
**SECTIONS 105(a) AND 363(b)(1) THE BANKRUPTCY CODE**
**AND BANKRUPTCY RULE 6004 FOR AUTHORIZATION TO**
**IMPLEMENT THE RETENTION AND RECRUITMENT PROGRAM**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

       Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

1.        As described more fully below, it is imperative that the Debtors' adopt a retention and recruitment program if they are to be able to preserve and maximize asset recoveries in the most cost effective and efficient manner for the benefit of their estates and stakeholders.  The Debtors' current workforce is too small to manage this process without incurring unnecessary expenses and delays.  The retention and recruitment program is designed to retain and recruit Lehman employees having the knowledge and skill to effectively manage and monetize Lehman's assets for the benefit of all stakeholders.  The Debtors have reviewed the Retention and Recruitment Program with the Official Creditors' Committee (the "Creditors' Committee") and, as reflected in a statement filed contemporaneously herewith, the Creditors' Committee supports the program and the relief requested herein.

**Background**

2.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

### Jurisdiction

5.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Lehman's Business

6.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.  Its headquarters in New

York and regional headquarters in London and Tokyo are complemented by a network of offices

in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

7.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to these chapter 11 filings is contained in the Affidavit

of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District

of New York in Support of First-Day Motions and Applications, filed on September 15, 2008

[Docket No. 2].

### Relief Requested

8.      By this Motion, the Debtors seek, pursuant to sections 105(a), 363(b)(1),

503(b)(1)(a) of the Bankruptcy Code and Bankruptcy Rule 6004, (i) authorization to implement

an employee retention and recruitment program (the "Retention and Recruitment Program"), as

described herein, to the extent that such Retention and Recruitment Program is not in the

ordinary course of the Debtors' business and (ii) approve administrative expense priority of

payment rights under the Retention and Recruitment Program.  Furthermore, to successfully

implement the Retention and Recruitment Program, the Debtors request that, pursuant to

Bankruptcy Rule 6004(h),[1] the Court direct that the order granting the requested relief be

effective immediately upon entry.

**Lehman's Businesses Post Commencement**

9.      Prior to the Commencement Date, Lehman employed approximately

25,160 individuals worldwide of which 13,710 resided in the United States.  These employees

operated Lehman's global business with consolidated assets in excess of $600 billion and

executed thousands of transactions across all facets of Lehman's businesses.  These employees

possess intimate knowledge regarding these assets and transactions and prior to the

commencement of these chapter 11 cases and foreign proceedings freely exchanged information

on a daily basis regarding these transactions.

10.      Prior to the Commencement Date, Lehman Brothers Inc.'s ("LBI") North

American broker-dealer business was operated by more than 9,100 employees.  On September

20, 2008, the Court authorized the sale of substantially all of the assets relating to LBI's North

American broker-dealer business (the "Barclays Transaction") to Barclays Capital Inc.

("Barclays").  Barclays agreed to continue the employment of more than 9,100 Lehman

employees pursuant to a transition agreement.

11.      In connection with the Barclays Transaction, Barclays agreed to provide

transition services pursuant to a transition services agreement (the "TSA").  Under the TSA,

---

[1]      Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308
of the United States Bankruptcy Code for the Southern District of New York, signed on October 11, 2005 by Chief
Judge Stuart M. Bernstein.

Barclays employees would aid the Debtors and their advisors with the administration of assets and transactions that will either be sold or disposed in some other fashion.  The knowledge that the Barclays' employees possess is crucial to the efficient administration of these estates and the wind-down of Lehman's businesses.

12.    Barclays' employees, however, are not able to devote the time and resources necessary to aid in the administration and wind-down of Lehman's businesses because they are engaged in running Barclays' newly acquired business.  In addition, Barclays is assessing the appropriate size of its workforce and is beginning to terminate these employees.  Accordingly, the Debtors and their advisors will no longer have access to these employees once the TSA expires and/or Barclays terminates their employment.

13.    More importantly, if the Debtors and their advisors are going to preserve and maximize the value of the assets and transactions, they need employees who are dedicated and have an interest in preserving and maximizing values.  These goals cannot be achieved with employees engaged in other endeavors.  Instead, the Debtors need employees that can devote all of their time to the Debtors' interest in preserving and maximizing values and the administration and wind-down of Lehman's businesses.

14.    Similarly, Lehman Brothers Inc. (Europe) ("LBIE") was the critical hub for the Lehman's European operations and an integral part of worldwide financial reporting system among Lehman's affiliates.  Upon the commencement of LBIE's administrations proceedings in the United Kingdom, PriceWaterhouse Cooper assumed control of LBIE as joint administrators and the financial reporting systems and the flow of information between LBIE and the Debtors was terminated.

15.    During the first four weeks of these chapter 11 cases, the Debtors have received and continue to receive hundreds of inquiries and emails primarily from traders, prime brokers, hedge funds, and others for specific information regarding their transactions. The Debtors' response to these inquiries is complicated by the fact that the information is stored in the various computer systems of the Debtors and their affiliates that the Debtors no longer have direct access. The Debtors are in the process of establishing information sharing protocols with Barclays, the SIPC Trustee, LBIE, and other Asian and foreign countries administering insolvency proceedings of the Debtors' affiliates.

16.    As of October 24, 2008, the Debtors' workforce is comprised of approximately 140 employees. The Debtors have also engaged Alvarez and Marsal ("A&M") as restructuring managers and have appointed Bryan Marsal as chief restructuring officer. Mr. Marsal has a team of approximately 125 A&M professionals working with him. In order to be successful in their tasks, A&M needs support of these employees contemplated in the Retention and Recruitment Program to administer and wind-down the Debtors' principal investments, real estate, derivatives book, loan books, as well as many other assets.

17.    As an example of the complexity of the tasks, those employees working on the Debtors' derivatives book are faced with unwinding and/or reconciling almost 1.5 million derivatives transactions that involve approximately 8,000 counterparties. Counterparties are serving thousands of notices of default and designation of early termination of contracts on a daily basis. To date, approximately 600,000 contracts have been terminated and counterparties are either liquidating property in their possession or demanding that the Debtors turnover property they claim is not property of the estate.

18.     In short, the size of the Debtors' current workforce is too small to efficiently and effectively respond to these daily inquiries, demands, and termination notices and wind-down these estates without risking the loss of value that would otherwise be available to the stakeholders in these cases.

19.     The Debtors and their advisors are formulating and implementing plans that are dependent upon the employment of Lehman's current employees and former workforce. These employees will capture and store key data that will be used to manage the assets and maximize values by reconstructing transactions and events and determine the appropriate course of action or disposition. This information will enable the Debtors to respond to information requests, notices of default, or early termination letters that impact asset values and claims. In each case, these employees will be able to assess the value of the claim, whether certain events prior to the commencement of these chapter 11 cases give rise to causes of action or mitigation of claims against the Debtors, or otherwise determine the appropriate course of action.

20.     It is difficult to retain or recruit employees because the Debtors are operating their businesses in chapter 11 and are winding down their affairs. Without these individuals, the Debtors' management, restructuring managers, employees, and other professionals will be required to devote substantial time and resources to familiarize themselves with the Debtors' businesses to replicate the knowledge and skill possessed by the individuals to be recruited. The longer the Debtors delay the Retention and Recruitment Program the more they risk losing the information necessary to administer these estates and wind-down Lehman's businesses, which in the end will affect the value of these assets.

**The Retention and Recruitment Program**

21.     By hiring employees that possess unique knowledge, skills, experience, and professional relationships that are vital to Lehman's business enterprise, the Debtors will be

in the position to assess millions of pending transactions, minimize exposures, and monetize

assets for a greater value for the benefit of all stakeholders.  It would be impracticable and time

consuming for the Debtors to hire new employees with no familiarity with the Debtors'

infrastructure, transactions, and businesses.  Recruiting those individuals with the dedication,

skill, and familiarity with the Debtors' businesses is not only efficient but essential to the

preservation and maximization of value of the Debtors' estates.

22.      In furtherance of these objectives, the Debtors' Retention and Recruitment

Program has the basic goal of (a) retaining approximately 140 of the Debtors' current

employees[2] that remained at the Debtors after the closing of the Barclays Transaction and (b)

recruiting approximately 480 individuals, all or substantially all of whom may be former Lehman

employees, to aid in the administration of these chapter 11 cases and the wind-down of

Lehman's businesses.[3]

23.      These employees would be divided into asset divestiture and operational

teams.  The asset divestiture team would be broken up into smaller teams that oversee the

administration and wind-down of the Debtors' (i) loan book; (ii) derivatives book; (iii) private

equity/proprietary portfolios; (iv) international operations; (v) domestic banks; (vi) real estate

portfolios; and (vii) other assets.  The operational team would be divided into smaller teams that

oversee (i) audits and claims; (ii) treasury, accounting, and finance; (iii) wind-down and

---

[2]      The Debtors' current and prospective employees subject to the Retention and Recruitment Programs are not insiders or members of senior management.  The Debtors, however, intend to continue on a short-term basis the employment of certain key members of senior management pursuant to their current base compensation arrangements but they will not be entitled to a bonus or severance upon their departure.

[3]      An analogous and complementary program has been implemented at certain of the Debtors' non-debtor affiliates, pursuant to which approximately 250 employees are being paid 85% of their total 2007 compensation to remain employed through January 2009, at an aggregate cost of approximately $89 million.  This program, which is intended to facilitate the sale of such affiliates' businesses, was implemented in the ordinary course of such non-debtor entities' businesses using non-debtor funds, which consist of fees paid by limited partners, including fees paid by the Debtors' non-debtor affiliates as a limited partner investors.

transition; (iv) data preservation; (v) forensic analysis and review; and (vi) information technology.

24.     The complex nature of the debtors business and the scale and volume of transactions involved, necessitate the employment of individuals with a very specific skill sets, and preferably, former Lehman employees who possess the expertise and experience necessary to efficiently administer and wind-down the Debtors' businesses and the subject transactions.

25.     In light of the foregoing, A&M designed the Retention and Recruitment Program to retain current employees and attract former employees of the Debtors to aid in the administration and wind-down the Debtors' businesses in exchange for a compensation package that rewards employees for achieving defined project objectives and their continued employment during the chapter 11 cases.

26.     Currently, LBHI employs approximately 140 individuals who earn an aggregate base salary of approximately $15.5 million.  The Retention and Recruitment Program would recruit approximately 480 additional employees, which, inclusive of the current employees, would increase the aggregate base salary of the Debtors' employees payable during the wind-down period to approximately $96 million.  Subject to certain restrictions discussed below, the employees would be eligible to earn a bonus.  The bonuses in the aggregate are estimated not to exceed $110 million.  Employees that are involuntarily terminated would be entitled to receive their pro rata share of the earned bonus and severance benefits, which in the case of severance benefits are estimated not to exceed approximately $22.5 million.  If employees voluntarily terminate their services prior to the end of any initial or extended commitment period they will not be eligible to earn a bonus or receive severance.  The funds that would have been used to pay such employees' bonus or severance will continue to be earmarked

for compensation payments under the Retention and Recruitment Program.  The chart below summarizes the estimated headcount of employees and projected salaries.

| Compensation Estimates Under Retention and Recruitment Plan (Dollars in Millions) | | | | | |
|---|---|---|---|---|---|
| | Headcount | Base | Bonus | Total | Severance |
| **Current Employees** | 140 | $15.5 | $7 | $23 | $3.5 |
| **Recruiting Program** | 480 | $80.5 | $103 | $183 | $19 |
| | 620 | $96 | $110 | $206 | $22.5 |

27.     Employment contracts will have initial commitment periods ranging from three (3) to twenty-four (24) months.  Employees will be paid a base salary that is payable on a bi-weekly basis.  Bonuses are based on the completion of defined project objectives, which will also be subject to an enhancement or reduction if the employee accepts or rejects an offer to extend his or her initial commitment periods.

28.     An employee's projected bonus will be set forth under the terms of  the employment contract.  A&M will consult with and obtain the consent of the Creditors' Committee, which consent will not be unreasonably withheld, as to the scope of the employee's objectives and the applicable performance metrics for the employee.[4]  Within the first 45 days of the initial commitment period, the A&M team leaders of the various projects will meet with the employee to outline the project objectives and the performance metrics for such.  A&M will consult with the Creditors' Committee on the establishment of objectives and performance metrics.  Upon the completion of the initial commitment period, the employee's team leaders will evaluate the employee's performance against the objectives.  If they have been achieved, then the employee will have earned the full bonus subject to the limitations described below.  If, however, the employee has not achieved these goals, then the team leaders will determine the

---

[4]      The Debtors reserve the right to seek court approval of any aspect of the Retention and Recruitment Program that is subject to the Creditors' Committee's consent if such consent is not forthcoming.

appropriate amount of the bonus payable to the employee, which will also be subject to the

limitations described below.  The review of each employee's performance under the applicable

performance metric and the amount of the bonus ultimately payable to employees will be

determined by the A&M team leaders, subject to the consent of the Creditors' Committee, which

consent will not be unreasonably withheld.

29.     Bonuses earned will generally be paid in January of each year.  If an

employee's commitment period ends prior to or after December 31 in any year, the bonus will be

paid within 30 days of employee's last date of service.  The Debtors may, in their sole discretion,

offer to extend the initial commitment period.  Such offers will be made no less than 30 days

prior to the expiration of an employee's commitment period.  Employees having an annualized

base salary less than $150,000 will be paid the full amount of their earned bonus regardless of

whether such employees accept an offer to extend the initial commitment period.  If, however, an

employee's annualized base salary is $150,000 or more and the employee accepts the offer to

extend, then 20% of the employee's earned bonus for the initial commitment period will be

deferred until the conclusion of the renewed commitment period.  The employee's bonus for the

new commitment period will be subject to an increase of no less than 110% of the earned bonus

from the prior commitment period, which bonus will be subject to newly defined project

objectives and performance metrics, both of which will be subject to the Creditors' Committee's

consent, which consent will not be unreasonably withheld.

30.     If an employee with an annualize base salary of $150,000 or more declines

the offer to extend the initial commitment period, then the employee will (i) receive only 80% of

his or her projected bonus, (ii) forfeit the remaining 20% of such bonus; and (iii) receive no

severance.  Finally, employees who leave voluntarily before the expiration of their commitment

period are not entitled to any accumulated bonus or severance.  Thus, the Retention and

Recruitment Program incentivizes employees to continue their employment with the Debtors' as

the Debtors wind-down the businesses and assess the workforce needs going forward.

31.     The employment agreement will also entitle employees to severance in the

event they are involuntarily terminated.  As with the Debtors' employment agreements prior to

the commencement of these chapter 11 cases and those in this industry, severance is a necessary

component of the Retention and Recruitment Program without which the Debtors will not be

able to retain current and recruit former employees.  The Retention and Recruitment Program

provides for severance to those involuntarily terminated in amount equal to one week per month

of post-petition employment capped at six months (*i.e.*, two years of service).  Employees who

are terminated without cause prior to the expiration of their commitment period in their

employment contract are entitled to the balance of their base salary, a pro rata share of their

bonus, and accrued post-petition severance.

32.     The specific amount of funds allocated to any specific job slot under the

Retention and Recruitment Program cannot be materially reduced, increased, or reallocated to

one or more other job slots, without the consent of the Creditors' Committee, which consent will

not be unreasonably withheld.

33.     The foregoing funding requirements for the Retention and Recruitment

Program reflect solely the cost of the initial commitment periods under the Retention and

Recruitment Program.  To the extent that commitment periods are extended, the aggregate cost

of the program will increase and the Debtors will consult with and obtain the consent of the

Creditors' Committee on such extensions that require funding therefor, which consent will not be

unreasonably withheld.  If, however, the Debtors and the Creditors' Committee cannot agree on

the appropriate number and length of extensions and the funding, the Debtors reserve the right to seek court approval of the same.

34.    The Retention and Recruitment Program was developed by A&M and without which it will be extremely difficult to retain and attract employees given that the Debtors are in chapter 11 winding down their affairs and have sold or are in the process of selling the majority of their operations.  A&M has used its expertise in the areas of interim management, crisis management, and turnaround consulting to tailor the Retention and Recruitment Program to fit the current needs of the Debtors' operations.

**The Debtors' Retention and Recruitment Program is Supported
By Sound Business Judgment And Should Be Approved By The Court**

35.    The Debtors believe, based on the governing jurisprudence, that they can implement the Retention and Recruitment Program in the ordinary course of business.[5] Nevertheless, out of an abundance of caution, the Debtors seek authorization to implement the Retention and Recruitment Program, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code, to the extent such program is not in the ordinary course of business.

36.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  When considering a transaction outside the ordinary course of business, courts in the Second Circuit, and others, require that such

---

[5]    The United States Court of Appeals for the Second Circuit has adopted a two part test for determining whether a transaction is in the ordinary course of a debtor's business. *In re Lavigne*, 114 F.3d 379, 385 (2d Cir. 1997).  The "vertical test" views the transaction from a hypothetical creditor's point of view and inquires whether the transaction subjects a creditor to economic risks that differ from the risks such creditor anticipated when it commenced business with the debtor. *Id.* The "horizontal test" compares the transaction to those made in the debtor's industry to determine whether the debtor's transaction is similar to those entered into by others in the debtor's industry. *Id.* Regularity is not a prerequisite for a transaction to be ordinary. *In re John-Manville Corp.*, 60 B.R. 612, 618 (Bankr. S.D.N.Y. 1986).  The Debtors believe that the Retention and Recruitment Program satisfies this two-part test.

transaction be based upon the sound business judgment of the debtor. *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

37.    It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

38.    Since A&M's initial engagement, it has been familiarizing itself with the Debtors' businesses, financial affairs, and capital structure by working closely with the Debtors' management and other professionals by assisting with the myriad requirements of these chapter 11 cases. A&M's significant experience and expertise regarding the Debtors' businesses has enabled it to develop the Retention and Recruitment Program that preserves and maximizes value for these estates while minimizing cost for the benefit of all stakeholders in these cases.

39.     The Retention and Recruitment Program is an exercise of the Debtors'
sound business judgment because the benefits of retaining current and recruiting former
employees out weigh the costs associated with hiring new employees with no familiarity with the
Debtors' businesses or the millions of complex transactions.  Given the importance of the
Retention and Recruitment Program to the Debtors' efforts to maximize the value of their
estates, this Court should approve the relief requested herein.

40.     The importance of the Retention and Recruitment Program is heightened
by the extensive downsizing resulting from the Barclays Transaction.  The Debtor's have
determined in the exercise of their business judgment that the value of the Debtors' businesses
and assets cannot be preserved and maximized for the benefit of the estates and all stakeholders
in these chapter 11 cases without utilizing people that have intimate knowledge of the Debtors'
businesses and the expertise and skill to effect an efficient wind-down of the Debtors' affairs.

### Payments Pursuant to the
### Retention and Recruitment Program Are Administrative Expenses

41.     Because the wind-down of the Debtors' businesses would be less efficient
and more costly without the Retention and Recruitment Program, the payment rights of the
employees engaged pursuant under the Retention and Recruitment Program will be actual,
necessary costs and expenses of preserving the Debtors' estates, and, therefore, should be
accorded administrative expense priority under section 503(b)(1)(a) of the Bankruptcy Code.

### Notice

42.     No trustee or examiner has been appointed in these chapter 11 cases.  The
Debtors have served notice of this Motion in accordance with the procedures set forth in the
order entered on September 22, 2008 governing case management and administrative procedures
for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the attorneys for the Debtors' postpetition lenders; (iv) the Securities and

Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the

Southern District of New York; and (vii) all parties who have requested notice in these chapter

11 cases.  The Debtors submit that no other or further notice need be provided.

   43. No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

   WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  October 29, 2008
  New York, New York

       /s/ Richard P. Krasnow
       Harvey R. Miller
       Richard P. Krasnow
       Lori R. Fife
       Shai Y. Waisman
       Jacqueline Marcus

       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, New York 10153
       Telephone: (212) 310-8000
       Facsimile: (212) 310-8007

       Attorneys for Debtors
       and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
                                                    :
In re                                               :      **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*        :      **08-13555 (JMP)**
                                                    :
                              **Debtors.**          :      **(Jointly Administered)**
                                                    :
                                                    :
---------------------------------------------------------------------x

<u>**ORDER PURSUANT TO SECTIONS 105(a) AND 363 OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULE 6004 AUTHORIZING
IMPLEMENTATION OF THE RETENTION AND RECRUITMENT PROGRAM**</u>

Upon the motion, dated October 29, 2008 (the "<u>Motion</u>"), of Lehman Brothers

Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "<u>Debtors</u>" and, together with their non-

debtor affiliates, "<u>Lehman</u>"), pursuant to sections 105 and 363 of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>") and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), for approval of the Debtors' recruitment program (the "<u>Retention and</u>

<u>Recruitment Program</u>"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward,

Acting C.J.); and consideration of the Motion and the relief requested therein being a core

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in

accordance with the procedures set forth in the order entered September 22, 2008 governing case

management and administrative procedures [Docket No. 285] to (i) the United States Trustee for

the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured

Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v)

the United States Attorney for the Southern District of New York; and (vi) all parties who have

requested notice in these chapter 11 cases, and it appearing that no other or further notice need be

provided, and it appearing that no other or further notice need be provided; and the Official

Creditors' Committee (the "Creditors' Committee") having indicated its support for the relief

sought in the Motion as reflected by its statement in support filed contemporaneously with the

Motion; and a hearing (the "Hearing") having been held to consider the relief requested in the

Motion; and the Court having found and determined that the relief sought in the Motion is in the

best interests of the Debtors, their estates and creditors, and all parties in interest and that the

legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized, pursuant to sections 105(a) and

363(b)(1) of the Bankruptcy Code, to take all necessary action to implement the Retention and

Recruitment Program on the terms and conditions set forth in the Motion to the extent such

actions are not in the ordinary course of business; and it is further

ORDERED that, notwithstanding anything to contrary in this Order or the

Motion, (i) the establishment of the applicable performance metrics, (ii) the review of each

employee's performance under the applicable performance metric and the amount of the bonus

ultimately payable to such employee, (iii) any material increase, decrease, or reallocation of

funds dedicated to any specific job slot under the Retention and Recruitment Program, and (iv)

the propriety of any amounts required to fund base salary and bonuses for extended commitment

periods shall be subject to the consent of the Creditors' Committee, which consent shall not be unreasonably withheld; and it is further

ORDERED, that if the Debtors and the Creditors' Committee do not agree on those aspects of the Retention and Recruitment Program that require the Creditors' Committee's consent, that the Debtors reserve the right to obtain the Court's authorization to implement such aspect of the Retention and Recruitment Program without the consent of the Creditors' Committee; and it is further

ORDERED that payments to employees through under the Retention and Recruitment Program are entitled to administrative expense status and priority under 11 U.S.C. §§503(b)(1)(A) and 507(a)(2); and it is further

ORDERED that notwithstanding any provision in the Motion or related documents to the contrary, the Debtors shall retain the right, in their sole discretion, to decline to pay any bonus or severance under the Retention and Recruitment Program that fails to comply with the terms of the applicable employment agreement; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h),[1] this Order shall be effective immediately upon entry; and it is further

---

[1]    Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation the Retention and Recruitment Program or disputes arising under individual employment agreements.

Dated: November __, 2008
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE