Hearing Date and Time: November 5, 2008 at 10:00 am

WEIL, GOTSHAL & MANGES LLP
Attorneys for Debtors
and Debtors in Possession
767 Fifth Avenue
New York, NY  10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Diane Harvey, Esq. (DH 2486)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
: 
In re: : Chapter 11 Case No.
: 
**LEHMAN BROTHERS HOLDINGS, INC.,** *et al.,* : 08-13555 (JMP)
: 
Debtor, : (Jointly Administered)
: 
------------------------------------------------------------------x

**OBJECTION OF LEHMAN COMMERCIAL PAPER INC.**
**TO SUMITOMO MITSUI BANKING CORPORATION'S**
**MOTION FOR RELIEF FROM THE AUTOMATIC STAY**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Commercial Paper Inc. ("LCPI" or "Debtor"), as and for its objection to the motion (the "Motion") of Sumitomo Matsui Banking Corporation ("Sumitomo") for relief from the automatic stay in the above-captioned case, respectfully represents:

**Preliminary Statement**

1.    A mere ten days after LCPI filed its chapter 11 bankruptcy petition, Sumitomo, which lent $350 million to Lehman Brothers Holdings, Inc. ("LBHI"), seeks to lift the automatic stay so as to foreclose upon certain term loans that LCPI had pledged to Sumitomo in connection with the LBHI loan or, in the alternative, to require LCPI to provide adequate protection. According to information submitted by Sumitomo in its Motion, the nominal value of these term loans (the "Term Loan Collateral") was $402,137,751 as of October 14, 2008 – approximately $50 million higher than Sumitomo's purported outstanding indebtedness of $351,878,827.68. Sumitomo's Motion should be denied for several reasons.

2. First, Sumitomo is not entitled to lift the automatic stay under § 362(d)(2) of the Bankruptcy Code in order to foreclose upon the Term Loan Collateral. Sumitomo has failed to carry its burden of demonstrating that the Debtor lacks equity in the Term Loan Collateral.

3. Sumitomo has put forth in its Motion speculation, not valuation. Namely, in an effort to support its contention that the Debtor lacks equity in the Term Loan Collateral, Sumitomo submits a declaration from one of its executives who concludes that the Term Loan Collateral fell below Sumitomo's outstanding loan amount on October 9, 2008. This Sumitomo executive relies on unverifiable data purportedly showing "bids" (not actual sales) on certain of the term loans that LCPI pledged to calculate the "value" of the Term Loan Collateral. But neither Sumitomo nor its executive provides any qualitative or quantitative analysis of the value of any of the underlying term loans at issue. Sumitomo's purported "bid" method in valuing the Term Loan Collateral is not a valuation technique. The data Sumitomo seeks to rely upon is nothing more than a handful of nameless unverifiable "bids" in an illiquid market. It does not represent a willing buyer and willing seller sales price.

4. Second, Sumitomo has failed to demonstrate sufficient "cause" to be entitled to adequate protection. It has not carried its burden of establishing that the value of the Term Loan Collateral is depreciating in value. Sumitomo uses the same flawed "bid" method and the same flawed data to support its contention that the Term Loan Collateral is declining in value. But the only conclusion that should be drawn from this data is that the term loan market is presently illiquid and therefore not a reflection of true market value.

**Factual Background**

5. On or about May 27, 2008, Sumitomo, LBHI, and the Debtor entered into the Loan Agreement pursuant to which (i) Sumitomo agreed to loan LBHI $350,000,000 (the

"LBHI Loan") and (ii) the Debtor agreed to pledge as collateral for the LBHI Loan certain of its assets which LBHI might from time to time identify as collateral in accordance with the terms of the Loan Agreement.  See Declaration of David A. Buck dated October 15, 2008 ("Buck Decl.") Ex. A.  Section 4.1 of the Loan Agreement granted Sumitomo a security interest in any assets pledged as collateral under the Loan Agreement.  That same day, LBHI delivered a "Notice of Borrowing" to Sumitomo and attached a schedule identifying certain term loan and revolving loans of LCPI to serve as the Term Loan Collateral, in accordance with the terms of the Loan Agreement.  Specifically, the Term Loan Collateral consists of non-investment grade corporate loans, and investment grade corporate loans.

6. On or about May 30, 2008, Sumitomo filed a UCC financing statement with the New York Secretary of State.

7. On or about September 15, 2008, LBHI commenced a voluntary case under Chapter 11 of the Bankruptcy Code.

8. On or about September 19, 2008, Sumitomo delivered a notice to LCPI demanding that it segregate the Term Loan Collateral from its other assets and hold the Term Loan Collateral for Sumitomo's benefit in a separate securities account.  The September 19th letter made no reference to Sumitomo's intentions with respect to the exercise of its rights to sell or otherwise dispose of the Collateral.  See Buck Decl. Ex. E.

9. On or about October 5, 2008, LCPI commenced a voluntary case under Chapter 11 of the Bankruptcy Code.  Sumitomo filed the Motion seeking relief from the automatic stay on October 15, 2008.

I.  **RELIEF FROM THE AUTOMATIC STAY SHOULD BE DENIED**

10. The automatic stay is a fundamental protection afforded to the Debtor under the Bankruptcy Code.  In pertinent part, Section 362(a) provides that:

> [A] petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities of –
>
>     (1)    the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
>     [. . .]; or
>
>     (3)    any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]

11 U.S.C. § 362(a)(1), (3).

11. The automatic stay not only "provide[s] debtors with temporary respite from their creditors so that they may have an opportunity to develop and implement plans of reorganization to satisfy their creditors and resuscitate their businesses[]," In re 160 Bleeker St. Assocs., 156 B.R. 405, 411 (S.D.N.Y. 1993), but also it preserves the property of the estate for use in the debtor's reorganization. In re Prudential Lines, Inc., 114 B.R. 27, 29 (Bankr. S.D.N.Y. 1989).

12. Under certain circumstances, however, the Bankruptcy Code recognizes that relief from the automatic stay may be appropriate. 11 U.S.C. § 362(d); see also, e.g., In re Sonnax Indus., Inc., 907 F.2d 1280, 1285 (2d Cir. 1990). Sumitomo seeks relief from the automatic stay pursuant to the grounds set forth in subsections (1) and (2) of Section 362(d). In pertinent part, the statute provides:

> On request of a party in interest . . . the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
>     (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest; [or]
>
>     (2)    with respect to a stay of an act against property under subsection (a) of this section, if –
>
>         (A)    the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(1), (2).

13. As demonstrated below, Sumitomo has not established "cause" nor carried its burden of establishing that the debtor lacks equity in the Term Loan Collateral and so is not entitled to lift the automatic stay.

**A.** **Sumitomo Has Not Met its Burden under Section 362(d)(2)**

14. The test for whether a creditor is entitled to relief from the automatic stay under Section 362(d)(2) is well-settled: Sumitomo bears the initial burden of establishing that the Debtor lacks equity in the Term Loan Collateral. 11 U.S.C. § 362(g). "Equity" for purposes of Section 362(d)(2) is defined as "the difference between the value of the property and the total of the claims which it secures." In re Diplomat Elecs. Corp., 82 B.R. 688, 692 (Bankr. S.D.N.Y. 1988). If Sumitomo is able to establish that the Debtor lacks equity in the Term Loan Collateral, the burden then shifts to the Debtor to establish that the collateral is necessary to an effective reorganization. 11 U.S.C. § 362(g).

15. In an effort to establish that the Debtor lacks equity in the Term Loan Collateral, Sumitomo relies solely on the views -- not a valuation -- of one of its executives. Rather than performing a valuation analysis of the underlying term loans by assessing the dependability of the payment stream, credit rating of the issuers, loan-to-value ratios, interest rate trends, or performing a discounted cash flow of the payment stream of each of the term loans at issue to ascertain the value of the Term Loan Collateral -- all legitimate valuation methodologies -- Sumitomo's executive, Mr. Buck, engages in a far different exercise. Mr. Buck's "analysis" consists of printing out from a database created by a company called Loan-X, purported "bids" -- not executed trade prices -- of certain of the term loans at issue. Mr. Buck then multiplies the daily "bid" price by the outstanding balance on these term loans to derive the purported "value"

of these term loans.

16.  Although Mr. Buck states in his declaration that Loan-X is used by the loan market, he fails to state in what manner such data is used by the loan market. He does not contend that he uses Loan-X to value term loans at Sumitomo or that anyone else relies on a few "bids" to set the value of hundreds of millions of dollars of term loans.

17.  Sumitomo fails to provide the Court with any way to assess the reliability of the data Mr. Buck purports to rely upon. There is no transparency in the data as to who bid, why they bid, and how Loan-X validates the bidding process, if it does any such validation at all. Theoretically, one bidder (perhaps even Sumitomo itself) could be bidding on the assets and skewing the bid price.

18.  Sumitomo has also failed to establish how this bid data demonstrates a willing buyer and willing seller since no actual sales occurred as a result of the bids. At best, Sumitomo's data shows merely that some buyer was willing to make a bid for the asset which no seller was willing to accept. That cannot be a sufficient technique by which the Court can determine market value because clearly no market existed. Indeed, with respect to certain of the term loans there existed only one bidder each day -- a stark indication of an illiquid market. See First Nat'l Bank of Chicago v. Comptroller of the Currency, 956 F.2d 1360, 1368 (7th Cir. 1992) (Posner, J.) ("[t]here are some illiquid markets . . . and in them transaction prices will not always reflect market values, at least if 'market' is defined to require some minimum number of potential transactors.").

19.  Sumitomo cites to no case, no textbook on valuation and no treatise that supports the proposition that a "bid" is sufficient to determine the value of a term loan.

20.  The process of generating a price valuation for these sophisticated assets requires a multifaceted and detailed analysis:

> The price analysis takes into account a wide range of quantitative and qualitative factors, such as the dependability of the financial stream, quality of collateral, loan-to-value ratio, and debt service coverage among others. The relevant financial factors considered include interest rate trends, yield and whether it is a fixed or floating instrument, and prepayment protection. Complementing this empirical data is the qualitative analysis gathered from a loan officer's narrative accompanying a loan and/or the written summaries provided periodically to management.

The Handbook of Credit Portfolio Management 214 (G. N. Gregoriou, C. Hoppe eds., 2009) (attached hereto as Exhibit A). Sumitomo simply did not perform such a valuation.

21. In light of the foregoing, Sumitomo has not (and cannot) establish that the Debtor lacks equity in the Term Loan Collateral. Therefore, it fails to meet its burden under 11 U.S.C. 362(d)(2)(A), and it is not entitled to relief from the automatic stay.

**B. Sumitomo has failed to Demonstrate "Cause" for Relief under Section 362(d)(1)**

22. Sumitomo contends that it is entitled to relief from the automatic stay "for cause" pursuant to Section 362(d)(1) because the value of the Term Loan Collateral is declining and its interest is not adequately protected. In support of its argument, Sumitomo again relies upon its faulty valuation analysis of the Term Loan Collateral. Even Sumitomo's flawed analysis shows a fluctuating bid price correlated to what the financial markets were doing on any particular day. For example, on October 9, the Dow Jones Industrial Average plummeted to 8,579.19 and declined further on October 10 to 8,451.19. The bids on most of the Term Loan Collateral also went down. On October 14, the Dow Jones Industrial Average went up to 9,310.99 and the bids on most of the Term Loan Collateral also went up, with Sumitomo's purported "value" of the Term Loan Collateral increasing by approximately $9.6 million to $331,331,476. This data does not depict a depreciating asset, rather it depicts bidders (or a single bidder) reacting to dramatic market conditions and attempting to take advantage of the market volatility to obtain a bargain basement purchase. This Court should not rely solely upon a snapshot of a fluctuating asset like the Term Loan Collateral in order to determine value and

whether a creditor is entitled to relief from the automatic stay or to adequate protection payments.

23. In re Johnson, 90 B.R. 973 (Bankr. D. Minn. 1988), is particularly instructive. There the United States Bankruptcy Court for the District of Minnesota confronted a similar situation in which the value of pledged collateral -- shares of over-the-counter stock -- was "declining" as a result of irregular market movements resulting from various external inefficiencies. The secured creditor claimed that the value of the collateral was declining precipitously and it sought to lift the automatic stay for cause under Section 362(d)(1) or, alternatively, for adequate protection in accordance with Section 361 of the Bankruptcy Code. At the lift stay hearing, however, even the secured creditor conceded that the market fluctuations in the price of the collateral were "somewhat unusual." Id. at 976. The court found persuasive the debtor's evidence that the collateral, "if viewed on something other than a daily, short term basis, [was] very strong." Id. Further, the court observed that allowing the secured creditor relief from the stay would negatively impact the debtor's other creditors. Id. at 977. The court then determined that the secured creditor was not entitled to relief from the automatic stay based on a short term view of a volatile collateral asset such as stock. Id. at 978. The court cogently explained its reasoning:

> While downward fluctuations cannot be prudently ignored, they do not compel a conclusion that the value of the [collateral] stock being held by the Bank has depreciated, especially since there is credible evidence that the decline in daily market price is attributable to a temporary factor wholly unrelated to the underlying soundness of the company . . . . There is ample evidence to support the conclusion that the depression in trading price in the first few weeks of August was solely attributable to the "overhang" factor and that, as one of debtor's experts testified, once the court proceedings dispel the uncertainty in the market over what will happen to debtor's block of shares, the market should respond positively.

In re Johnson, 90 B.R. at 978.

24. Given the volatile state of the current financial markets, the reasoning of

the bankruptcy court in In re Johnson is didactic. The Term Loan Collateral is not declining; it is fluctuating in a turbulent marketplace. There is no evidence before the Court that the issuers of the term loans in question will fail to meet their obligations. The Debtor is confident that, as many commentators suggest, in due time (and perhaps in the not-too-distant future) the value of these assets will return to an efficient market price and will trade at an appropriate discount for default risk. In the meantime, however, it would be inequitable to allow unprecedented market events to unnecessarily deprive the Debtor's creditors of the value in the Term Loan Collateral.

25. Finally, the granting of Sumitomo's motion to lift the automatic stay at such an early stage in LCPI's bankruptcy will send a message to other creditors encouraging them to make early lift stay motions at a time when the Debtor should be focusing all of its efforts and attention to maximizing estate value.

26. For these reasons, the Motion should be denied.

WHEREFORE, the Debtor respectfully requests that the Court deny the Motion and grant the Debtor such other relief as is just.

Dated: October 31, 2008
     New York, New York

                              /s/ Diane Harvey
                              Diane Harvey, Esq. (DH 2486)

                              WEIL, GOTSHAL & MANGES, LLP
                              767 Fifth Avenue
                              New York, NY 10153-0019
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

**EXHIBIT A**

# THE HANDBOOK OF CREDIT PORTFOLIO MANAGEMENT

**GREG N. GREGORIOU
CHRISTIAN HOPPE**

EDITORS



New York   Chicago   San Francisco
Lisbon   London   Madrid   Mexico City
Milan   New Delhi   San Juan   Seoul
Singapore   Sydney   Toronto

increasingly common strategy because it is less onerous than managing the loan back to profitability. Because of greater liquidity due to the secondary market, institutions would rather sell than invest in time-consuming loan workouts. Workouts prolong problems and create a drag on performance. Loan sales can expedite a turnaround and create strategic opportunities unavailable to institutions burdened with a weak portfolio.

## HOW BUYERS AND SELLERS ENGAGE ONLINE

Buyers and sellers have traditionally come together offline through investment banks or offline brokers. That process has largely remained the same over time: The agent for the seller finds prospective buyers through his referral network. Since the emergence of online marketplaces, that process has fundamentally changed for the better. The following section offers a step-by-step description outlining the role of the seller, the buyer, and the underwriter acting as the seller's agent at an online marketplace.

### Initial Pricing

The loan sale process begins with a preliminary pricing analysis led by a senior loan sale professional that sets the seller's expectations by providing a snapshot of current market conditions. The price analysis takes into account a wide range of quantitative and qualitative factors, such as the dependability of the financial stream, quality of collateral, loan-to-value ratio, and debt service coverage, among others. The relevant financial factors considered include interest rate trends, yield and whether it is a fixed or floating instrument, and prepayment protection. Complementing this empirical data is the qualitative analysis gathered from a loan officer's narrative accompanying a loan and/or the written summaries provided periodically to management. As a general rule, the pricing process can take as little as a day for simpler loans, such as a pool of residential real estate loans, or it can take several days or even a week for more complicated loans, such as a CRE transaction. The reason is that residential transactions involve analysis of fewer variables than a CRE loan sale.

In setting the loan pricing, advisors have traditionally relied on their market savvy and experience, but online marketplaces have improved the

[right column partially cut off]

...art of loan pricing by aggreg[ating] ...accurate valuation models. [...] thousands of transactions be[...] Previously, it was difficult t[o...] data were scattered across th[e...] usable or accessible format.

### Portfo[lio...]

Once a seller agrees to procee[d...] ing the underwriting docume[nt...] to seven-page underwriting d[ocu]mation. The synopsis is inte[nded to] quickly ascertain the asset's [...] Typically, the document does[...] later by bidders in the open m[arket...] standardized into readily iden[tifiable...] same information in the same [...] tion of offering documents is [...] the secondary market. Standa[rd...] associated costs.

### Mark[eting]

After the underwriting circul[ar...] and transfer documents are c[...] keting program. To attract the [...] tacted by phone, are met in f[...] regular mail. The transaction[...] journals, such as *American* [Banker...] people contact investors wh[o...] buyers for a specific loan typ[e...] can reach prospective buye[rs...] online to participate in a sal[e...] they want to buy in the futu[re...] pool of qualified investors; [...] also allows many individuals[...]

art of loan pricing by aggregating data that can be used to develop more accurate valuation models. Loan sale advisers now analyze data from thousands of transactions before arriving at a starting price for a loan. Previously, it was difficult to obtain market comparables because sales data were scattered across the industry and were not stored in an easily usable or accessible format.

## Portfolio Underwriting

Once a seller agrees to proceed after a pricing review, the next step is drafting the underwriting documents used to market the loan. The two-page to seven-page underwriting document summarizes all of the critical information. The synopsis is intended to give buyers enough information to quickly ascertain the asset's general value and decide if they should bid. Typically, the document doesn't include the price, which is to be decided later by bidders in the open market. Underwriting documents have become standardized into readily identifiable sections that allow buyers to find the same information in the same places for each transaction. The standardization of offering documents is one of the key reasons for greater liquidity in the secondary market. Standardization also reduces dead deal time and the associated costs.

## Marketing Campaign

After the underwriting circular is prepared and due diligence information and transfer documents are completed, the underwriter kicks off the marketing program. To attract the greatest number of buyers, investors are contacted by phone, are met in face-to-face meetings, and receive e-mail and regular mail. The transactions are frequently advertised in leading trade journals, such as *American Banker* in the United States. Dedicated sales people contact investors who have expressed interest or would be ideal buyers for a specific loan type. At online marketplaces, loan sale advisors can reach prospective buyers very efficiently. When investors register online to participate in a sale, they will indicate the exact kinds of loans they want to buy in the future. Targeted, efficient marketing expands the pool of qualified investors; thus, the flexibility at an online marketplace also allows many individuals from the same institution to register.