**Hearing Date and Time: November 5, 2008 at 10:00 a.m.**

Brian Trust, Esq. (BT-0347)
Frederick D. Hyman, Esq. (FH-7832)
Antonia Golianopoulos, Esq. (AG-3676)
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Tel. 212.506.2500
Fax  212.262.1910

*Counsel to Sumitomo Mitsui Banking Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ------------------------------------------------------------ x | : | |
| In re: | : | Chapter 11 |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., *et. al.,* | : | Case No. 08-13555 (JMP) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| ------------------------------------------------------------ x | | |

**REPLY OF SUMITOMO MITSUI BANKING CORPORATION
IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER GRANTING
RELIEF FROM THE AUTOMATIC STAY TO FORECLOSE ON ITS
<u>COLLATERAL PURSUANT TO 11 U.S.C. §362(D) AND FED. R. BANKR. P. 4001</u>**

Sumitomo Mitsui Banking Corporation ("*SMBC"*), by and through its undersigned counsel, hereby replies to (i) "Objection of Lehman Commercial Paper Inc. to Sumitomo Mitsui Banking Corporation's Motion for Relief from the Automatic Stay" (the "*Debtor's Objection"*) filed by Lehman Commercial Paper Inc. ("*LCPI*" or the "*Debtor*"), (ii) "Objection of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et. al. to Motion of Sumitomo Mitsui Banking Corporation for Entry of an Order Pursuant to 11 U.S.C. §362(d) and Fed. R. Bankr. P. 4001 Granting Relief from the Automatic Stay" (the "*Committee's Objection"*) filed by the Official Committee of Unsecured Creditors (the "*Creditors' Committee*") and (iii) "Statement of the Informal Noteholder Group with Respect to

17539364

Motion of Sumitomo Mitsui Banking Corporation for Entry of An Order Pursuant to 11 U.S.C. §362(d) and Fed. R. Bankr. P. 4001 Granting Relief from the Automatic Stay to Foreclose on its Collateral" (the *"Noteholder's Objection"*, together with the Committee's Objection and the Debtor's Objection, the "*Objections*") filed by an informal group of noteholders (the "*Noteholders*"), as follows:

## PRELIMINARY STATEMENT[1]

In any hearing under section 362(d) of the Bankruptcy Code for relief from the automatic stay, the debtor, as the party opposing relief from the stay, has the burden of proof pursuant to section 362(g)(2) on all issues other than the issue of the debtor's equity in the property. *See* 11 U.S.C. §362. Where the plaintiff seeks to lift the automatic stay pursuant to section 362(d)(1) for cause, including for the lack of adequate protection of the plaintiff's interest in the collateral, the debtor must prove facts sufficient to deny the plaintiff's request for relief. *See In re Domestic Fuel Corp.*, 70 B.R. 455, 463 (Bankr. S.D.N.Y. 2004). Contrary to the objections of the Debtor and the other objectors, the relief sought by SMBC is both appropriate and timely.

SMBC has met its burden of showing that the Debtor has no equity in the Collateral, and neither the Debtor, the Creditors' Committee, nor the Noteholders have shown facts sufficient to deny the request for relief. Accordingly, SMBC's request for relief from the automatic stay should be granted.

First, "cause" exists to lift the stay under section 362(d)(1) of the Bankruptcy Code because the value of the Collateral is rapidly declining. SMBC has relied upon valuations for the Collateral that are derived from the well-developed secondary market for the loans that comprise the Collateral. The value of the Collateral was ascertained through "bid" listings as posted on

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the "Motion of Sumitomo Mitsui Banking Corporation For Entry of An Order Pursuant to Section 362(d) of the Bankruptcy Code and Fed. R. Bankr. Pro. 4001Granting Relief From the Automatic Stay to Foreclose On its Collateral" (Docket No. 17) (the "*Motion*").

17539364                                    2

Loan-X (often referred to as Mark-it Partners Loan Valuations Service), a service of Market Group Limited ("*Markit*"), a well-respected daily pricing service for global credit derivatives, cash and loan instruments. Second, relief from the stay is warranted under section 362(d)(2) of the Bankruptcy Code because (i) the estate has no equity in the Collateral and (ii) the Collateral is not essential for the Debtor's reorganization, a fact which neither the Debtor, the Creditors' Committee nor the Noteholders has denied.

In the event the Court determines not to modify the automatic stay, SMBC is entitled to adequate protection of its interest in the Collateral.

## I.     RELIEF FROM THE AUTOMATIC STAY SHOULD BE GRANTED

### A.     Relief From the Stay Is Proper Under Section 362(d)(2)

Under section 362(d)(2), relief from the stay is warranted when the debtor has no equity in the collateral, and the collateral is not essential for an effective reorganization.  SMBC has established that the Debtor does not have equity in the Collateral.  As set forth in the Buck Declaration, the Collateral has exhibited a sharp decline in value since the LCPI Petition Date, resulting in an aggregate value that is significantly less than the outstanding Obligations. Accordingly, the burden shifts to the Debtor to establish that the Collateral is essential for an effective reorganization.  The Debtor cannot satisfy this burden.

#### 1.     Loan-X Provides Real, Valid Pricing

In order to value equity in connection with motions for relief from stay, courts have looked at trading prices, or offers for purchase. *See In re Opelika Mfg. Corp.*, 66 B.R. 444, 450 (Bankr. N.D. Ill. 1986) (court found the value of certain stock to be the average of the bid price and the ask price minus a discount); *In re Fund Raiser Prods. Co., Inc.,* 163 B.R. 744, 750-51 (Bankr. E.D.Pa. 1994) (court found that best benchmark to value stock is the debtor's offer to purchase the stock).  The secondary loan market -- in which the Debtor was a major

17539364                                             3

broker/dealer and where the Collateral is traded -- is a well-developed market. In the first quarter of 2008 alone, the volume of trading in the secondary loan market was approximately $159 billion. *See* LSTA Historical Secondary Trading Volume and Liquidity Statistics: End of 1Q 2008. On a daily basis, Markit receives daily pricing on loans, credit default swaps, and issues of various debt and cash securities. *See* http://www.mark-it.com/markit.jsp?jsppage=pressRelease.jsp&date=01Nov2004 (last visited Nov. 3, 2008). As a large, sophisticated and efficient market, the secondary loan market effectively incorporates into its pricing the assessments of experienced market participants of both public and private information regarding the performance of a borrower. The Collateral consists of term loans and revolving credits to companies such as Ford Motor Co. and TXU Energy that are well-known and actively traded in the secondary market.

The prominent references to the nominal or face value of the Collateral in the Objections of the Debtor and the Creditors' Committee are staged distractions. In fact, SMBC is valuing the Collateral in the precise manner contemplated by the terms of the Loan and Security Agreement. The agreement defines "Collateral Value" with respect to any Pledged Asset as of any date as "the product of (i) the Advance Rate and (ii) the Market Value . . . of such Eligible Asset on such date." *See* Loan and Security Agreement at 3. "Market Value" of any Pledged Asset as of any date is defined as "the value of such Pledged Asset, as determined by the Borrower in the same manner as the Borrower values assets of the same type as the collateral in its own account." *See* Loan and Security Agreement at 9. The Loan and Security Agreement also provides that "[u]pon request, Borrower will deliver to the Lender a report detailing [the value of the Collateral.]" *See id.* The Debtor provided its own detailed reports on the value of the Collateral to SMBC on several occasions (collectively, the "*Reports*"). The Reports show that the Debtor never valued the Collateral at face value. Instead, the Debtor provided values that were in line with values

provided by Loan-X on the dates of the Reports.  Supplemental Declaration of David A. Buck dated November 3, 2008 (the "*Supplemental Buck Declaration*") at ¶3.  The Debtor initially pledged the collateral to SMBC, and continued to assess its value, at a discount.

A comparative look at the pricing provided by Loan-X, the pricing provided in executable dealer quotes, and the pricing set forth in the Reports shows that the difference between them for each of the domestic loans in the portfolio of Collateral was relatively small (less than 100 basis points) (the "*Reports Chart*"; a true and correct copy of which is attached as *Exhibit E* to the Supplemental Buck Declaration).  With the exception of October 14, 2008, a day on which trading was particularly volatile, the difference between the Loan-X bids and executable dealer quotes, including the Debtor's, was negligible.

The Debtor itself recognized Markit's role in secondary market pricing by acting as a Strategic Data Contributor[2] for Markit and thereby supplying to Markit some of the very data it now claims is "flawed."  The Debtor's current protestations of Markit's unreliability are wholly self-serving and utterly unbelievable given its prior contribution to the service.  Markit's webpage[3] still has a link to the Debtor's webpage.

The available data demonstrates that the Debtor lacks equity in the Collateral.  The Debtor initially pledged the Collateral, valued at a discount to its face amount, to SMBC without any equity cushion.  Today, the market for the Collateral and fundamentals of the underlying borrowers have exponentially increased that discount.  In the face of this stark market reality, the Debtor offers speculation rather than credible evidence that lost value will return to the Collateral.  While SMBC is appreciative of the Debtor's admission of the drop of the Collateral's value as reflected in its offer to the Court of that it "is confident that . . . the value of these assets

---

[2]    Strategic Market Contributors are firms that have a data contribution relationship with Markit.

[3]    http://www.markit.com/information/about/clients_and_contributors.html (last visited Nov. 2, 2008).

17539364                                    5

will return" neither the Debtor nor the other objectors cite any authority for the proposition that SMBC should be required to wait based on the speculative hope that value will be restored to the Collateral with the return of "an efficient market." *Debtor's Objection* ¶24. Further qualitative and quantitative analysis on the market value of these loans will not increase the value of the Collateral or the Debtor's equity in it. Instead, allowing further deterioration of the Collateral as the Debtor and the Objectors request will increase SMBC's deficiency claim and further diminish the recovery for all creditors.

      2.    <u>The Debtor's Objection and the Committee's Objection Fail to Consider Existing Guidance Approving the Use of Market Price to Value Impaired Loans</u>

The Debtor and the Creditors' Committee incorrectly assert that SMBC's use of observable market bids to value the Collateral is not a legitimate, recognized approach to valuation. *Debtor's Objection* ¶¶2-4; 15-19; *Committee's Objection* ¶¶2, 6. Contrary to the Debtor's and the Creditors' Committee's assertions, the legitimacy of relying on observable market prices to value impaired loans is recognized in guidance issued by both the Financial Accounting Standards Board ("*FASB*") and all of the principal U.S. federal banking agencies, including the Board of Governors of the Federal Reserve System ("*FRB*"), SMBC's primary U.S. regulator. FASB is a private sector organization committed to establishing standards of financial accounting and reporting used to govern the preparation of financial reports. FASB standards are officially recognized as authoritative by the U.S. Securities and Exchange Commission.

FASB's Statement of Financial Accounting Standards No. 114 ("*FAS 114*") addresses "Accounting by Creditors for Impairment of a Loan." FAS 114 is intended to provide consistency in the accounting by creditors for impairment of a loan by specifying how allowances for credit losses related to certain loans should be determined. FAS 114 generally

requires that loans within its scope be measured using one of three valuation techniques: (i) the present value of expected future cash flows discounted at the loan's effective interest rate; (ii) *the loan's observable market price*, or (iii) the fair value of the collateral if the loan is collateral dependent.

FAS 114 reflects FASB's recognition that the costs, burdens, and judgment associated with performing a discounted present value analysis are not necessary where observable market prices exist. Thus, FASB expressly chose to permit institutions to use a loan's observable market price to evaluate impairment. For example, paragraph 50 of FAS 114 states:

> . . . the Board does believe that the judgment inherent in the estimates [of expected future cash flows] is sufficient to permit the use of observable market price or fair value of the collateral of a collateral-dependent loan as practical alternatives to the present value of expected future cash flows discounted at the loan's effective rate.

FAS 114, at para. 50. Likewise, in paragraph 35, FASB states:

> Practical decisions, such as permitting a creditor to recognize an observable market price of the loan or the fair value of the collateral of a collateral-dependent loan as alternatives to discounting and eliminating the proposed requirement in the Exposure Draft to recognize separately the two components of the change in present value, were made to reduce the cost and complexity of applying this Statement.

FAS 114, at para. 35. FASB also notes the utility of relying on observable market prices in paragraph 73:

> The Board believes that changes made to the provisions of the Exposure Draft—in particular, permitting creditors to recognize the observable market price of the loan or the fair value of the collateral of a collateral-dependent loan and permitting use of aggregation techniques—will minimize the implementation burden.

(FAS 114, at para. 73). Thus, FAS 114 should be read as an express recognition of the legitimacy of relying on observable market prices as a technique to ascribe value to loans.

Additionally, the principal U.S. federal banking agencies have joined FASB in recognizing the legitimacy of using observable market price as a valuation technique. Specifically, FRB, the Office of the Comptroller of the Currency, the Federal Deposit Insurance

Corporation, the National Credit Union Administration, and the Office of Thrift Supervision have jointly issued two interagency policy statements describing appropriate practices for valuing loans for purposes of establishing prudent, appropriate loan loss allowances. Because an appropriate allowance for loan and lease losses ("*ALLL*") covers estimated credit losses on individually evaluated loans that are determined to be impaired, as well as estimated credit losses inherent in the remainder of the loan and lease portfolio, establishing an appropriate ALLL requires an institution to assign values to individual loans in its portfolio. Both interagency policy statements emphasize the legitimacy of relying on observable market prices to determine the value of loans, and both policy statements give *equal weight* to FAS 114's three valuation techniques (present value of expected future cash flows discounted at the loan's effective interest rate; the loan's observable market price; and the fair value of the collateral if the loan is collateral dependent). *See* 2006 Interagency Policy Statement on the Allowance for Loan and Lease Losses at 4; Interagency Policy Statement on Allowance for Loan and Lease Losses Methodologies and Documentation for Banks and Savings Institutions dated July 2, 2001 at 13, 22.

      In light of explicit recognition by the principal U.S. federal banking agencies of observable market prices having equal weight to discounted present value as a valuation technique under FAS 114, Debtor's assertion that the use of observable market bids to value the Collateral is not a legitimate, recognized approach to valuation should be rejected.

      Moreover, the Debtor's argument that pricing and valuation techniques in the "Handbook of Credit Portfolio Management" are inconsistent with the use of observable market prices misses the mark. The Debtor references discussions of specific valuation techniques that should be used in "initial pricing" and "portfolio underwriting." *See Debtor's Objection*, Ex. A. None of the techniques mentioned is inconsistent with observing the market price for an asset in

an existing market. The valuation techniques described in "initial pricing" are consistent with establishing an initial market price for a given asset. However, once an initial market price is established, each subsequent bid/ask price for that asset reflects a consideration of the ongoing validity of each of those initial valuation factors. In this way, the observable market price for a loan provides a valid, independent third-party assessment of the loan's value.

In the face of both private sector and regulatory recognition that the observation of market prices is a legitimate loan valuation technique, the Debtor's argument that the use of observable market prices is somehow illegitimate (presumably because the market has moved against Debtor) should be rejected.

    B.    <u>"Cause" Exists for Relief From the Stay Under Section 362(d)(1) Because of the Decrease In the Value of the Collateral</u>

The precipitous decline in the value of the Collateral supports the conclusion that cause exists under section 362(d)(1) of the Bankruptcy Code to grant SMBC relief from the automatic stay. From the last business day prior to the LCPI Petition Date to November 3, 2008, the value of the Collateral has declined by at least $63,395,408. *Supplemental Buck Declaration* at ¶6 and Exhibit D. Under these circumstances, SMBC should be afforded the right to prevent any further deterioration of its Collateral.

Several courts have found depreciating collateral value to be sufficient "cause" to grant relief from the automatic stay and courts take into consideration local market conditions in reaching the conclusion that cause exists to grant relief. *See In the Matter of Canal Place L.P.*, 921 F.2d 569, 579 (5th Cir. 1991); *see also In re Worldcom, Inc.*, 2003 WL 22025051, at*6 (Bankr. S.D.N.Y. 2003). For example, in *In the Matter of Canal Place L.P.*, the Fifth Circuit took into account the weak local financial market for office space when it found "cause" to lift the stay permitting an undersecured creditor to foreclose upon an office tower. *In the Matter of*

*Canal Place* at 579. A weak financial market is also one of the factors that weighs in favor of a finding that relief from the automatic stay is warranted. Contrary to extensive precedent, the Debtor argues that weak financial markets should instead be considered a factor *against* granting relief from the automatic stay, because of the possibility that one day, no matter how far in the future, the markets may strengthen and the value of the Collateral may increase.

The Debtor's reliance on <u>In re Johnson</u>, 90 B.R. 973 (Bankr. D. Minn. 1988) to support its argument that the Court should ignore the recent downward trend in the value of SMBC's Pledged Collateral is misplaced. *See Debtor Objection* ¶23. In *In re Johnson*, the debtor was an individual engaged in various real estate ventures. *Id*. at 974. The failure of one of these ventures triggered the debtor's personal guaranty made in favor of the venture's lender. *Id*. The guaranty was secured by the pledge of 143,652 shares of stock in Apogee Enterprises, Inc. ("*Apogee*"), a company on whose board of directors the debtor served. *Id*. at 974-75. In total, the debtor owned approximately 435,000 shares of Apogee stock, which represented approximately 3% of the amount outstanding. *Id*. at 975. Following the commencement of the debtor's case, the bank sought relief from the stay in order to foreclose on the pledged stock. *Id*. at 974. On the petition date, June 17, 1988, the Apogee stock was trading on the over-the-counter market at $13 1/8 per share. *Id*. at 975. On August 25, 1988, the stock opened at $10 per share, a decline of approximately 20%. *Id*. In its decision, the bankruptcy court discussed whether negative market fluctuations in the Apogee stock warrant relief from the automatic stay under Section 362(d)(1). *Id.* at 978. The court in *In re Johnson* denied the lender's motion, finding that the fluctuation in the Apogee stock price was a reaction to the bankruptcy of a significant shareholder and member of its board and therefore did not represent a decline in value. *See id*. at 978. The court stated that:

> [w]hile downward fluctuations cannot be prudently ignored, they do not compel a conclusion that the value of the Apogee stock… has depreciated, especially since there is credible evidence that the decline in daily market price is attributable to a temporary factor wholly unrelated to the underlying soundness of the company. . . solely attributable to the 'overhang' factor and that... once the court proceedings dispel the uncertainty in the market over what will happen to debtor's block of shares, the market should respond positively.

*Id*. at 978. Unlike the facts of *In re Johnson*, the declining value of SMBC's Collateral is a result of global market conditions and not simply an over-reaction to the Debtor's financial trouble. There are no pending events that will assuredly return the Collateral to prior valuations. Accordingly, the reasoning of the court in *In re Johnson* is inapposite.

In sum, the losses that the Collateral has experienced to date reflect not only the precipitous and sustained drop in the market but also the market's perspective of the current and future performance of the subject borrowers. The value of the Collateral is declining and, the market's turbulence has accelerated that decline. SMBC has met its burdens under both sections 362(d)(1) and (2).

### C. The Motion Is Timely

Rather than focus on the standards under section 362(d), the Objections focus on the perceived premature timing of SMBC's Motion. The Debtor and the Creditors' Committee argue that it is too soon after the petition date for SMBC to seek relief from the automatic stay with respect to its Collateral. *See Debtor's Objection* ¶1; *Committee's Objection* ¶4. There is no required waiting period for creditors within section 362(d), only a requirement that the creditor meets the test under either §362(d)(1) or §362(d)(2) for stay relief to be granted. *See* 11 U.S.C. §362(d). Several courts have permitted relief from the automatic stay within two months of the bankruptcy filing. *See e.g., In re Anderson Oaks (Phase I) L.P.*, 77 B.R. 108, 109 (Bankr. W.D. Tex. 1987) (motion for relief from stay filed immediately after bankruptcy filing was

granted); *In re Terra Mar Assocs.*, 3 B.R. 462 (Bankr. Conn. 1980) (motion for relief from stay filed two months after bankruptcy filing was granted).

The Objectors also argue that permitting SMBC to foreclose on its collateral will lead many other secured creditors to request similar relief, but none of them present any evidence in support of this proposition. *See Debtor's Objection* ¶25; *Committee's Objection* ¶4; *Noteholder's Objection* ¶4. The Collateral at issue is an investment asset that is irrelevant to the future operations of the Debtor. It is unlikely that granting SMBC the relief it requests will have any effect on the actions of other secured creditors. Nonetheless, in the event that the Debtor has pledged other investment assets, and such creditors move for relief from stay, such actions would similarly have no effect on the Debtor's ability to operate and reorganize.

## II.  IN THE ALTERNATIVE, IF STAY RELIEF IS NOT GRANTED, ADEQUATE PROTECTION IS REQUIRED IN THIS CASE

SMBC must receive adequate protection from the Debtor if this Court should choose not to grant SMBC relief from the automatic stay. Section 361 of the Bankruptcy Code provides that when adequate protection is required under section 362 because of the imposition of the automatic stay, it may be provided by:

> (1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title…results in a decrease in the value of such entity's interest in such property; (2) providing to such entity an additional or replacement lien to the extent that such stay . . . results in a decrease in the value of such entity's interest in such property; or (3) granting such other relief . . . as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

11 U.S.C. §361. The statute clearly provides for adequate protection of secured creditors when there is a decrease in the value of the collateral securing its claim. *See In re Saypol,* 31 B.R. 796, 800 (Bankr. S.D.N.Y. 1983). ("This emphasis by Congress on a decline in the value of

collateral, as shown by its repetition of the term when expressly referring to the automatic stay, is fairly conclusive.  In the context of the automatic stay, Congress believed the existence *vel non* of such a decline to be almost decisive in determining the need for adequate protection.")  The Debtor has the burden under Section 362(g) of the Bankruptcy Code to demonstrate that SMBC will be adequately protected and they have not met their burden.[4]

The Supreme Court has recognized that if collateral is declining in value, an undersecured creditor is entitled to cash payments or additional security in the amount of the decline, as described by section 361 of the Bankruptcy Code.  *See United States Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370-71 (1988); *see also In re Grant Assocs.*, 1991 WL 21228, at *6 (S.D.N.Y. Feb. 5, 1991) ("[w]here a secured party's collateral is found to be declining in value during the period of the stay, it is entitled to adequate protection").  The Debtor has shown no basis to deny SMBC's request for adequate protection.

Given the nature of the Collateral, any order granting adequate protection must require the Debtor to segregate the Collateral as required by the Loan and Security Agreement, including segregation of any cash proceeds (e.g., repayments on the loans by the underlying borrowers) from the Debtor's other cash.

---

[4] Section 362(g) provides that in connection with a hearing concerning relief from the automatic stay, the party opposing relief has the burden of proof on all issues, except on the issue of the debtor's equity in the property. 11 U.S.C. §362(g).

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, SMBC respectfully requests that the Objections be denied in their entirety, the relief sought in the Motion be approved and that the Court grant such other further and appropriate relief as it deems just.

Dated:  New York, New York
              November 4, 2008

Respectfully Submitted,

SUMITOMO MITSUI BANKING CORPORATION

By: /s/ Frederick D. Hyman_____

Brian Trust, Esq. (BT-0347)
Frederick D. Hyman, Esq. (FH-7832)
Antonia Golianopoulos, Esq. (AG-3676)
MAYER BROWN LLP
1675 Broadway
New York, New York 10019
Tel. 212.506.2500
Fax  212.262.1910

17539364