**Hearing Date:  November 18, 2008, 10:00 a.m.**
**Objection Deadline: November 14, 2008, 4:00 p.m.**

ENTWISTLE & CAPPUCCI LLP
Andrew J. Entwistle (AE-6513)
Johnston de F. Whitman, Jr. (JW-5781)
Jonathan H. Beemer (JB-0458)
Joshua K. Porter (KP-2660)
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200

*Counsel for New York State Comptroller*
*Thomas P. DiNapoli, as Administrative*
*Head of the New York State and Local*
*Retirement Systems and Sole Trustee of*
*the New York State Common Retirement Fund*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., | Case No. 08-13555 (JMP) |
| Debtor. | (Jointly Administered) |

**MOTION OF NEW YORK STATE COMPTROLLER FOR APPOINTMENT OF
A TRUSTEE OR, IN THE ALTERNATIVE, AN EXAMINER
WITH EXPANDED POWERS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

New York State Comptroller Thomas P. DiNapoli (the "Comptroller"), as

Administrative Head of the New York State and Local Retirement Systems and sole

Trustee of the New York State Common Retirement Fund ("NYSCRF"), a party-in-

interest in the above-captioned case, by undersigned counsel, Entwistle & Cappucci LLP,

hereby moves pursuant to Section 1104(a) of Title 11 of the United States Code (the

"Bankruptcy Code") for appointment of a Chapter 11 trustee to oversee the estates of

Lehman Brothers Holdings, Inc. ("LBHI") and its affiliated debtors-in-possession

(collectively, with LBHI, the "Company," "Debtors" or "Lehman") other than Lehman

Brothers Inc. ("LBI"), or, in the alternative, for appointment of an examiner under

Section 1104(c) with expanded powers to investigate the Debtors and their former and

current management.  In support of his motion, the Comptroller respectfully represents as

follows:

## INTRODUCTION

1.    Lehman's board of directors (the "Board" or the "Directors") and

Chairman and Chief Executive Officer, Richard Fuld, Jr., are wholly inappropriate parties

to supervise the Company through this large and complex liquidation.  Neither Mr. Fuld

nor the Board is equipped to review potential plans for reorganization or asset recovery

developed by the Debtors' retained representatives, and should not be involved in

directing any investigation into what led Lehman to its historic collapse or what claims

the estate might have against third parties -- including Mr. Fuld and the Directors

themselves.  Mr. Fuld and his hand-selected Board, many members of which lack

experience relevant to the exotic financial instruments and complex structured assets

central to the Debtors' cases, should be replaced by a trustee with expertise in bankruptcy

and restructuring matters to supervise administration of Lehman's estate for the

protection of creditors, equity holders, and other interested parties.  The circumstances

present here clearly demonstrate "cause" to appoint a trustee under Section 1104(a)(1) of

the Bankruptcy Code.

2.    Mr. Fuld's decisions drove the Company toward ruin, as his Board stood

idly by, generally ill-equipped to advise or guide Mr. Fuld or senior management to a

new course.  As Mr. Fuld's pattern of poor decisions and disastrous strategies continued,

many of the Directors lacked the expertise and proficiency in dealing with the current

financial markets that would enable them to meaningfully supervise him or circumscribe

his activities.  By 2006 and 2007, many hand-selected Directors had served for more than

a decade, and their entrenchment and complacency rendered them unable to offer

independent judgment in the face of strong-willed senior management.

   3.  Without question:  (i) Mr. Fuld's stewardship of the Company was a large

factor in its demise, and the Board's failure in its oversight duties allowed Mr. Fuld and

other executives to mismanage the Company; (ii) the Board's failure to circumscribe Mr.

Fuld's almost limitless power over the Company ensured Lehman's failure; and (iii)

when the Company was facing ruin, the Board failed to ensure that Mr. Fuld and senior

management were preparing in advance for the real possibility of bankruptcy in order to

avoid the chaos and lack of transparency that Brian Marsal, Chief Restructuring Officer

(the "CRO") for the Debtors, has now spent the last six weeks trying to correct.

   4.  Given the past failures of Mr. Fuld and inaction by the Board, creditors

and equity holders cannot accept the notion that Mr. Fuld and the Board are the best

parties to supervise the administration of the estate and to investigate the causes of

Lehman's collapse.  Indeed, Lehman's bankruptcy is barely six weeks old, and already

federal prosecutors in the Eastern and Southern Districts of New York and the District of

New Jersey have convened grand jury investigations to investigate Lehman's collapse,

including serving subpoenas upon Mr. Fuld and eleven other current or former Lehman

officers or directors.

5.      Except for Mr. Fuld, who continues to exert power at Lehman, senior
management is now largely gone.  It has been replaced by a reorganization team from
Alvarez & Marsal North America, LLC ("A&M"), which was hand picked by Mr. Fuld
and the Board to guide the Company through administration of its estate.

6.      Debtors and their representatives seek to reassure creditors, equity holders
and other parties-in-interest that, in spite of the lack of transparency in these cases to
date, their interests are being protected.  Debtors' counsel represents that the CRO and
A&M are reporting weekly to Mr. Fuld and the Board concerning efforts to address the
Company's record keeping crisis in order to create more transparency and move toward
more normal administration of the estate.  But, there is no basis to believe that Mr. Fuld
and the Board add any value to this process.  In fact, the opposite is true.

7.      Given the novelty and complexity of the issues to be addressed in these
proceedings and the current lack of transparency, the existing "chain-of-command" does
not make sense.  There must be some independent review of Mr. Marsal's activities
beyond Mr. Fuld and the Board -- the very parties that caused Lehman's problems in the
first place.  Moreover, Mr. Marsal is responsible for other tasks vital to administration of
the estate, such as developing with Mr. Fuld plans of reorganization and asset recovery
for the Board's review.  Mr. Fuld and the Board should not have any authority to direct or
supervise any aspect of the Debtors' proceedings or to develop or review strategies on
behalf of the estate.

8.      The extraordinary size and complexity of Lehman's bankruptcy does not
excuse the troubling lack of transparency thus far -- especially when there are means
available to better protect the interests of creditors, equity holders and the estate.  Due to

the self-described "chaos" in Lehman's record keeping, parties-in-interest have received almost no information regarding the condition of the estate in the six weeks since the Company filed its petition. Moreover, current management estimates that it will be at least 45-60 days before the Debtors can even begin to answer any of the thousands of inquiries they are receiving from former customers and counterparties. Debtors' counsel has urged patience in the face of these extraordinary circumstances, but the Comptroller believes it must be patience born from the assurance that the interests of creditors, equity holders and other interested parties are being protected until normalcy returns. The track record of Mr. Fuld and the composition of the current Board are antithetical to such assurance. Unlike a trustee, the Directors have no relevant expertise in complex bankruptcy matters such as these and, frankly, Mr. Fuld is no longer an appropriate party to act in the interests of creditors and equity holders of the Debtors.

9.      Based on these facts alone, the Court has sufficient cause to appoint a trustee to replace Mr. Fuld and the Board (and any remaining non-essential former management) as supervisors of Debtors' liquidation and to perform the other duties that Sections 704 and 1106(a) of the Bankruptcy Code provide. Appointment of a trustee will preserve value for creditors and equity holders while transparency is achieved and normal bankruptcy administration commences. This includes an investigation into the causes of the Debtors' collapse and the location of the estates' assets. Indeed, the trustee appointed under the Securities Investor Protection Act ("SIPA") is already conducting a similar investigation of and on behalf of LBI.

10.     Here, the typical presumption in favor of current management does not apply. The Debtors have admitted that most institutional knowledge is already gone, and

the Comptroller does not seek to have the trustee replace the CRO. A trustee would not interrupt, side track, or hinder administration of the estate. To the contrary, it would add efficiency and ensure greater transparency by providing the CRO with additional resources, guidance and oversight. In any case, Mr. Fuld should be removed entirely or relegated to a non-compensated "as-needed" consultant to Mr. Marsal and the trustee.

11.    Even if the Court does not find "cause" to appoint a trustee, it can nevertheless appoint one because, pursuant to Section 1104(a)(2), it is in the best interests of the creditors and equity holders and none of the normal facts that may counsel against a trustee is present. The cost of a trustee would not outweigh the benefits to Lehman's estate -- it would be proportional to the added value and protection. Plus, the cost should be contrasted with the sunken costs of maintaining the Board, who collectively received $3.2 million in total compensation from Lehman in 2007.

12.    If the Court does not appoint a trustee, the Comptroller respectfully submits that, alternatively, ample grounds exist for the Court to appoint an examiner with expanded powers pursuant to Section 1104(c) of the Bankruptcy Code to broadly investigate the Debtor and its former management on behalf of all creditors, equity holders and parties-in-interest. On October 20, 2008, The Walt Disney Company ("Disney"), a purported creditor, filed a motion to appoint an examiner to investigate, among other things, intercompany transfers and administrative claims between LBHI and its affiliates and pre-petition conduct by certain of the Debtors' officers and directors since March 16, 2008. Two other creditors have joined the motion, which the Court is now scheduled to hear on November 18, 2008, the hearing date for the instant motion.

13.    Disney is specifically interested in intercompany transfers between LBHI

and one of its subsidiaries that gave rise to Disney's putative claim, just as many other

creditors may be interested primarily in information concerning certain specific

transactions or certain Lehman subsidiaries or affiliates. The limitations on the scope of

Disney's proposed examiner investigation do not serve the interests of numerous other

creditors, equity holders and parties in interest whose claims or interests are grounded in

areas outside those Disney seeks to have an examiner investigate. If the Court appoints

an examiner, it should not limit the investigatory mandate to those areas identified by

Disney and the movants who joined Disney's motion. At a minimum, any examiner's

investigation should include any allegations of fraud, dishonesty, incompetence,

misconduct, mismanagement, or irregularity in the arrangement of the affairs of any of

the Debtors by current or former management, including, but not limited to, issues of

accounting irregularities and representations of liquidity.

## BACKGROUND

**A.    Procedural Background**

14.    On or about September 15, 2008, LBHI filed its voluntary petition for

relief under Chapter 11, Title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the

"Bankruptcy Code") with this Court. The petition listed LBHI's assets of $639 billion

and liabilities of $613 billion. On and after that date, various LBHI subsidiaries and

affiliates filed similar petitions for relief under Chapter 11 of the Bankruptcy Code.

15.    Also on September 15, 2008, LBHI filed a motion to extend its time to

file, among other things, its schedules of assets, schedules of current income and

expenditures, and statements of financial affairs until November 14, 2008. The Court

granted the motion on September 16, 2008.  On October 28, 2008, Debtors filed another

motion to extend the time to file this information until January 13, 2009.

16.    On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed the statutory committee of

unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors'

Committee").  The Court later denied a motion to appoint a similar committee of equity

holders.

17.    On September 19, 2008, the Honorable Gerald Lynch of the United States

District Court for the Southern District of New York, entered an order pursuant to the

SIPA commencing liquidation of Lehman Brothers Inc., LBHI's broker-dealer

subsidiary.  Judge Lynch's order appointed James W. Giddens as trustee of LBI pursuant

to the SIPA to oversee and facilitate the transfer of customer investment accounts to other

broker dealers.  To date, 135,000 customer accounts and approximately $140 billion of

collateral and property have been transferred to other broker-dealers, including Barclays

Capital.  Mr. Giddens has also commenced an investigation as mandated by the SIPA into

the "acts, conduct, property, liabilities, and financial condition of [LBI], the operation of

its business, and any other matter, to the extent relevant to the liquidation proceeding."[1]

Mr. Giddens' trusteeship is limited to LBI.

18.    On September 26, 2008, Harbinger Capital Partners ("Harbinger") filed a

motion for leave to conduct Rule 2004 Discovery of LBHI.  Approximately fourteen

other creditors or parties-in-interest subsequently joined Harbinger's motion or filed their

own Rule 2004 requests.  The Debtors and the Creditors' Committee objected to

---

[1]  *See* the LBI Trustee's Objection to (I) Motion of Walt Disney Company for the Appointment of an
Examiner Pursuant to Section 1104(c)(2) of the Bankruptcy Code and (II) Joinder of Bank of America,
N.A. in Motion, dated October 31, 2008 (Docket No. 1320), at 2.

Harbinger's motion. A hearing on Harbinger's motion and the joinders set for October 16, 2008 was later consensually adjourned so the movants and the Debtors could attempt to reach an accommodation.

19.    On or about October 8, 2008, the Debtors filed a motion to authorize the Debtors to engage A&M and Mr. Marsal as CRO to assist the Debtors with all phases of their Chapter 11 cases, and to designate two other A&M personnel to serve with the CRO as executive officers of the Debtors. On October 16, 2008, the Court held a motions hearing (the "Hearing") during which counsel for the Debtors and Mr. Marsal (as CRO) gave a lengthy presentation regarding the status of the case and the progress of gathering information to provide to creditors. Subsequently, the motion to engage Mr. Marsal and A&M was granted on an interim basis.

20.    During the October 16, 2008 presentation by Debtors' counsel and Mr. Marsal, the extraordinary nature of these cases became even clearer. After one month in bankruptcy, A&M and the CRO were still focused on resuscitating Lehman's information systems, data and transaction records. Debtors' counsel and the CRO estimated that it would take from 45-60 days until the process was advanced enough that the Debtors would be in a position to begin to respond to basic creditor inquiries. The Court noted that many claimants against the estate "have expressed through the 2004 discovery … a strong desire to get the facts and if the facts aren't available through the debtors' fiduciaries, they want the opportunity to pursue a 2004 discovery and get the answers themselves."[2]

---

[2] *See* Transcript of October 16, 2008 Hearing (Docket No. 1187) ("Hearing Tr.") at 44.

21.    On October 29, 2008, the Debtors filed a motion to authorize the CRO to

implement a recruitment and retention plan to replace vital employees that had been

terminated by Lehman or hired away by Barclays Capital when it acquired Lehman's

investment banking and capital markets businesses in the days after the petition.  The

motion asserts that approximately $183 million is required to recruit and retain new

employees in order to, among other things, achieve the much sought after transparency

by unwinding the multitude of derivative contracts that remain on Lehman's books.

22.    To date, Mr. Fuld remains Chairman and CEO of the Debtors and,

according to the September 15, 2008 retention agreement between A&M and Lehman,

Mr. Marsal, A&M, and any additional employees they retain will report to Mr. Fuld and

the Board.[3]

**B.     Debtors' Former and Current Management**

*(i)     Chairman and CEO Richard Fuld, Jr.*

23.    Mr. Fuld started at Lehman as a trader in 1969 at the age of 23.  By the

time the firm was sold to American Express Co. in 1984, he was head of trading.  Mr.

Fuld remained at the firm until 1994, when American Express split with Lehman and

Lehman engaged in an initial public offering.  Mr. Fuld became Lehman's first CEO

when it became a public company in 1994.

24.    Due to his long tenure and ubiquity at Lehman, Mr. Fuld has been able to

consolidate his power to a remarkable degree.  By the date of the Company's collapse,

Mr. Fuld was both the Chairman of the Board and the CEO (a combination that is

---

[3]  *See* Exhibit A (the "Retention Letter") to Debtors' Motion Pursuant to Sections 105(a) and 363(b) of the
Bankruptcy Code for Interim and Final Orders Authorizing the Debtors to (A) Retain Alvarez & Marsal
North America, LLC to Provide the Debtors a Chief Restructuring Officer and Additional Personnel, and
(B) to Appoint the Chief Restructuring Officer *Nunc Pro Tunc* to the Commencement Date, dated October
8, 2008 (Docket No. 760), at 1-3.

becoming more and more unusual as trends in corporate governance have counseled for

separating the positions) and the leader of Lehman's two-person executive committee.

The executive committee was responsible for making important decisions between

meetings of the Directors.  While the executive committee met a reported 16 times in

2007, the full Board met only 8 times.  The other executive committee member

responsible for the vital decisions made by the committee is John Macomber, the second-

longest serving Director, who largely defers to Mr. Fuld.

*(ii)    The Board of Directors*

25.    In addition to their lack of structural oversight of Mr. Fuld, the Directors'

do not possess relevant financial industry or structured finance experience to

meaningfully oversee Lehman's management.  Moreover, most (if not all) of the

Directors were hand-selected by Mr. Fuld, and they are entrenched and complacent due

to their long tenures on the Board.

26.    For example, by the date of Lehman's collapse, more than half of the

independent Directors had served for 12 or more years.  Service as a Director was

lucrative.  In 2007 alone, Directors received collective compensation of more than $3.2

million in cash and common shares from Lehman.

27.    None of the Directors had or have direct experience relevant to the

rapidly changing financial sector or with emerging products such as derivatives, credit

default swaps, and subprime loans that drove profits (and losses) at Lehman, as the

following chart depicting the composition of the Board of Directors on the day the

Company collapsed demonstrates:

| **Director** | **Tenure** | **Position Prior to Joining Lehman's Board** |
|---|---|---|
| Michael Ainslie | 12 yrs. | CEO of Sotheby's Holdings (Retired, 1994) |
| John Akers | 12 yrs. | Chairman of IBM Corp. (Retired, 1993) |
| Roger Berlind | 23 yrs. | Broadway Producer (Current) |
| Thomas Cruikshank | 12 yrs. | Chairman of Halliburton Co. (Retired, 1995) |
| Marsha Johnson Evans | 4 yrs. | CEO of American Red Cross (Retired, 2005) |
| Sir. Christopher Gent | 5 yrs | Non-Executive Chairman of GlaxoSmithKline plc. (Current) |
| Jerry Grundhofer | 6 mos. | CEO of U.S. Bancorp  (Retired, 2007) |
| Roland Hernandez | 3 yrs. | Chairman of Telemundo Group. (Retired, 2000) |
| Henry Kaufman | 13 yrs. | President of Henry Kaufman & Co. (Current) |
| John Macomber | 14 yrs. | Principal of JDM Investment Group (Current) |

28.     In the years leading up to Lehman's collapse, Mr. Fuld and other members of senior management had the benefit of a predominantly entrenched Board that lacked the direct financial experience to discharge their oversight duties competently.  The Board's composition enabled Mr. Fuld to marginalize the Directors, who tolerated an absence of appropriate checks and balances at Lehman, and served mostly as a rubber stamp for senior management – most prominently Mr. Fuld.

29.     As a result of Mr. Fuld's domineering role in all facets of managing the Company, and the Directors' lack of directly relevant financial experience and expertise, the Directors were remarkably inactive.  For example, in early-2007, as the six-month old housing downturn continued and prices for subprime mortgage assets were falling, many banks closed their subprime mortgage origination businesses and drastically tried to reduce subprime exposure.  Yet Lehman continued to originate subprime mortgages,

including billions of dollars worth in the second quarter of 2007 alone, without any
objection from the Directors.

30.      Similarly, when Bear Stearns Asset Management's now infamous
subprime mortgage loaded hedge funds collapsed in July 2007 and rumors surfaced about
Lehman's troublesome subprime exposure, a Company spokesperson publically
answered the rumors by downplaying the risk to Lehman (even though it had just
originated billions in loans in the previous quarter).  Nevertheless, even after the Bear
Stearns hedge funds collapsed, the Directors sat idly by, neither inquiring about nor
acting on concerns and investor questions regarding Lehman's subprime exposure.

31.      The Directors also failed to satisfy their risk-monitoring responsibilities.
The Board's Finance and Risk Committee was responsible for reviewing and advising the
Directors on the financial policies and practices of the Company, including its risk-
management policies and monitoring.  However, during 2006 and 2007, as the turbulence
continued and housing and subprime mortgage markets trended downward, the
committee met only twice each year.

32.      When Lehman suffered its first-ever quarterly losses in the second-quarter
of 2008, Mr. Fuld announced a $6 billion cash infusion from outside investors in June
2008.  Faced with these alarming first-time losses and the sudden need for a cash
infusion, the Directors still did nothing to examine the Company's position or alter its
course -- following its pattern of inaction.

33.      According to Debtors' counsel, during the week of September 8, 2008, the
Company was experiencing "a crippling loss of confidence on the part of Lehman

account holders and counterparties."[4]  Amidst the turmoil, Mr. Fuld participated in a

September 10, 2008 conference call with investors to address the Company's problems.

Remarkably, Mr. Fuld announced financial and operating changes that he assured

investors would mitigate the potential for additional write-downs and allow the firm to

return to profitability.

34.     However, Mr. Fuld and the Board knew before September 10, 2008 that

the Company would fail if a merger or government bailout did not occur.  Indeed, as of

September 10, 2008, the Company's only alternatives to avoid bankruptcy were either:

(i) a possible business combination with Barclays Capital or Bank of America; or (ii) a

government bailout.  (*See* Hearing Tr. at 31.)

35.     At least three United States Attorney's Offices are now investigating

whether Mr. Fuld and other members of Lehman's senior management made material

misstatements to investors during the announcements in June and September, 2008.

*(ii)    Lehman's Chaotic Bankruptcy*

36.     Remarkably, neither the second quarter 2008 losses nor the crisis of

confidence that caused Lehman to look for emergency merger partners prompted the

Directors to prepare for bankruptcy.  In fact, despite the crisis the Company was

experiencing for at least several months, there was no substantive consideration or

preparation for bankruptcy as an option for Lehman until the evening of September 14,

2008, when all other possibilities had failed and the Board finally met to pass a resolution

authorizing Lehman's petition.  (*See* Hearing Tr. at 32.).

37.     The lack of planning for Lehman's bankruptcy had a devastating effect

---

[4] *See* Hearing Tr. at 31.

on the Company, causing it to stop normal operations (*See id.*) and causing its financial

systems to "disintegrate." (*see* Hearing Tr. at 38.)  The Directors and management failed

to realistically assess the situation or to take appropriate steps to plan for the bankruptcy

filing they knew would be required barring a last minute acquisition or bailout.  Clearly

they were gambling -- just as they had throughout the majority of 2007 and 2008.

38.    According to Mr. Marsal, the first order of business when A&M arrived at

Lehman on September 15 and continuing up to and through the Hearing date was to

attempt to resuscitate Lehman's information systems, data and transaction records.  (*See*

Hearing Tr. at 47-48.)  Mr. Marsal stated that the opening month of Lehman's bankruptcy

was dedicated almost entirely to protecting Lehman's transaction data and records and

dealing with certain melting assets.  (*See* Hearing Tr. at 62-63.)  In short, the

unpreparedness of Lehman to declare bankruptcy caused enormous problems and led to

the continued lack of transparency.

*(iii)    Lehman's Current Management*

39.    During the past six weeks, Lehman has contracted from more than 13,000

employees to about 140, whom Debtors' counsel characterizes as primarily legal and

treasury employees.  (*See* Hearing Tr. at 40.)  Approximately 9,000 of the employees,

including those with the most institutional knowledge of Lehman's investment banking

and capital markets businesses, have become employees of Barclays Capital.  (*See*

Hearing Tr. at 39.)

40.    Current Lehman management consists of the CRO, who according to

Debtors' counsel is acting as "independent administrator of the estate," (*See* Hearing Tr.

at 40.), two other executive officers provided by A&M, and Mr. Fuld.  According to

A&M's retention agreement with Lehman, the CRO is responsible for, among other things: (i) performing with Mr. Fuld a financial review of the Company, including a review and assessment of the financial information that will be provided by the Company to creditors; (ii) assisting the CEO in developing for the Board's review potential restructuring plans and strategic alternatives for maximizing the value of the estate; and (iii) performing other such services as requested or directed by the Board or the Company.[5]

41.      According to Debtors' counsel, Mr. Marsal is currently working under four guiding principles, the first three of which are the CRO's highest priorities: (i) preserving and storing key data to reconstruct Lehman's transactions and events; (ii) "addressing immediate buyers impacting asset values and claims"; (iii) identifying and retaining teams to address Lehman's problems; and (iv) determining pre-bankruptcy events giving rise to causes of action or mitigation of claims. (*See* Hearing Tr. at 47.) To these ends, the Debtors recently filed their motion to authorize Mr. Marsal to recruit and retain as many as 450 qualified individuals to help unwind Lehman's business, including the multitude of complex derivative transactions currently on Lehman's books. (*See id.*) In other words, most of Lehman's old management and employees are essentially gone, and only the Directors and Mr. Fuld are left.

42.      Debtors' counsel has acknowledged that the CRO and A&M's lowest priority is determining "pre-bankruptcy events giving rise to causes of action or mitigation of claims." (*See* Hearing Tr. at 51.)

43.      Based on these priorities, the Debtors hope to be able to answer creditor inquiries in 45-60 days. (*See id.*) The CRO has been sharing preliminary information

---

[5]  *See* Retention Letter at 2.

with the Creditors' Committee as it has been accumulated (*see* Hearing Tr. at 51),

although, on information and belief, the Creditors' Committee has not provided any of

that information to general creditors, equity holders or the public.  Moreover, based on its

October 28 motion to extend deadlines, the Company does not plan to file schedules

concerning its financial situation until at least January 13, 2009.

44.     Mr. Marsal is currently reporting directly to the Directors, nine of whom

Debtors' counsel characterizes as independent (Mr. Fuld is the other).  (*See* Hearing Tr.

at 51.)  Debtors' counsel asserts that the CRO meets with the board at least weekly, and

that "they're on top of the situation."  (*See id*.)

**C.      The New York State Comptroller**

45.     Thomas P. DiNapoli, Comptroller of the State of New York (the

"Comptroller"), is the Administrative Head of the New York State and Local Retirement

Systems and the sole Trustee of the New York State Common Retirement Fund

("NYSCRF").  NYSCRF is the third largest public pension fund in the United States.  It

provides pension, death and disability benefits for state and local government employees

and employees of certain other participating employers.  Its assets and income are

invested by the Comptroller as sole trustee.  As of March 31, 2008, NYSCRF had

approximately $155.9 billion in assets held and invested for the benefit of more than one

million active and retired members and their beneficiaries.

46.     The Comptroller, through undersigned counsel, filed his Notice of

Appearance and Demand for Service of Papers in these jointly administered Chapter 11

cases on October 27, 2008 (Docket No. 1204).

47.     The Comptroller is a party-in-interest in these Chapter 11 cases by virtue

of, among other things, NYSCRF's ownership of 4,551,502 shares of LBHI common

stock as of LBHI's September 15, 2008 petition date and its hundreds of millions in

losses sustained when the Company collapsed.

### RELIEF REQUESTED

48.    The Comptroller requests the appointment of a trustee to:  (i) replace

Lehman's Board and Mr. Fuld (and any other non-essential management as determined

by the trustee) as supervisors of the CRO and the A&M team and as the entity that will

review the plans and strategies developed by the CRO; (ii) perform the tasks required

under Sections 704 and 1106 of the Bankruptcy Code, specifically including investigating

the financial affairs of the Debtors, the Debtors' pre-petition conduct, and claims the

Debtor may possess that would result in additional sums of money coming into the estate;

and (iii) where appropriate, perform the other functions that Sections 704 and 1106 of the

Bankruptcy Code provide.

49.    In the alternative, the Comptroller requests the appointment of an

examiner to investigate potential fraud, dishonesty, incompetence, misconduct,

mismanagement, or irregularity in the arrangement of the affairs of any of the Debtors

(other than LBI) by current or former management, including but not limited to issues of

accounting irregularities and representations concerning the Company's liquidity.

### GROUNDS FOR RELIEF REQUESTED

**A.    The Court Should Replace Mr. Fuld and the Board of Directors with a
Trustee to Oversee the CRO**

*(i)    There is Cause to Replace the Board of Directors*

50.    Section 1104(a)(1) of the Bankruptcy Code provides that at the request of

a party in interest or the U.S. Trustee, the Court shall order the appointment of a trustee

"for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case …" 11 U.S.C. § 1104(a)(1).

51.    The Comptroller acknowledges that appointment of a Chapter 11 trustee is an "extraordinary remedy" requiring a demonstration of "cause" under Section 1104(a)(1) by "clear and convincing" evidence. *See In re The 1031 Tax Group, LLC*, 374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007).  Courts have wide discretion to evaluate "cause" on a case-by-case basis. *See In re Marvel Entertainment Group, Inc*., 140 F. 3d 463, 473 (3d. Cir. 1998); *In re Clinton Centrifuge, Inc.*, 85 B.R. 980, 984 (Bankr. E.D. Pa. 1988). The Court can find this case meets the standard even as the factual record continues to develop.

52.    As discussed above, the circumstances of this case are extraordinary:  the CRO, retained by the Debtors to resuscitate its disintegrated information systems and develop plans to see it through its complicated insolvency (as well as the hundreds of new employees he will recruit and retain to replace the institutional knowledge the Company lost when it collapsed), will be reporting to Mr. Fuld and the same Directors who are the last remaining remnants of the corporate leadership that steered the Company to its demise.  Meanwhile, creditors, equity holders and other interested parties to which the current management owes fiduciary duties sit in the dark.  Cause exists for the Comptroller or any other party-in-interest to seek a trustee with expertise in these matters rather than being forced to rely on Mr. Fuld and the Directors, who have already failed and who, even collectively, possess almost no knowledge or expertise that is relevant to guiding the Debtors through these proceedings.

53.    "[T]he concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct." *See In re General Oil Distributors, Inc.*, 42 B.R. 402, 409 (Bankr. E.D.N.Y. 1984); *Schuster v. Dragone*, 266 B.R. 268, 272 (D. Conn. 2001).  Moreover, "[a] court may consider both the pre and post-petition misconduct of the current management when making the determination that 'cause' exists for the appointment of a trustee." *In re The 1031 Tax Group, LLC***,** 374 B.R. at 86.

54.    The pre-petition conduct of Mr. Fuld and the Directors (and absence of conduct) here rise to the level of incompetence and gross mismanagement sufficient to support a finding of "cause" to replace them.  Mr. Fuld took the Company down the road to ruin and the Directors systematically abandoned their duties to oversee Mr. Fuld's management and stood idly by while the Company disintegrated.  The Directors were largely hand-selected by Mr. Fuld, they had long served the Company under his supervision, and ceded virtually all authority to Mr. Fuld through the two-person executive committee under the authority of which Mr. Fuld made critical decisions between meetings of the Directors.

55.    Moreover, the Board of Directors inexplicably did nothing as Mr. Fuld and his senior management permitted Lehman to continue to make risky subprime mortgage investments and originations when most of its peer banks were running the other way.  As many banks closed their dedicated subprime origination divisions, Lehman was still originating subprime mortgage loans, including billions in new loans in the second quarter of 2007 alone.  It is abundantly clear that the Directors were neither competent nor willing to go against Mr. Fuld and management to make difficult financial decisions in a turbulent market.

56.    The CRO has been selected to guide the Company through what Debtors'
counsel has characterized as a complicated liquidation requiring very experienced
personnel.  (*See*, *e.g.*, Hearing Tr. at 38-39.)  Mr. Marsal is tasked with reviewing and
selecting with Mr. Fuld the financial information that will be disclosed to creditors,
developing reorganization and asset maximizing strategies to present to the Board, and
undertaking additional tasks identified by the Board as necessary or beneficial to the
estate.

57.    Mr. Marsal owes considerable responsibility to the estate, to say the least.
But, while Mr. Marsal is working with Mr. Fuld and reporting to the Board at least
weekly, there is little reason to believe that the Directors are able to provide him with any
meaningful oversight, governance or guidance.  They are not qualified to assess or review
the strategies Mr. Marsal develops or to identify additional tasks Mr. Marsal should
perform to maximize the estate.  Thus, there is no further role for them to perform,
especially where a mechanism exists to provide independent expert guidance.  Nor is
there any reason to suggest they will stand up to Mr. Fuld.  Past performance, which the
Court is permitted to consider in examining whether there is "cause," is a good predictor
of future results.  Given their past performance, it is misguided to entrust to Mr. Fuld and
the Directors the supervision of the CRO and evaluation of his plans and efforts.

58.    The usual "strong presumption that a debtor should remain in possession,"
*see In re The 1031 Tax Group, LLC*, 374 B.R. at 86, does not apply here.  The
presumption "finds its basis in the debtor-in-possession's usual familiarity with the
business it had already been managing at the time of the bankruptcy filing, often making
it the best party to conduct operations during the reorganization."  *In re Marvel*

*Entertainment Group, Inc*., 140 F. 3d at 471.  The Comptroller requests that the Court

appoint a trustee to replace the Directors who, as discussed above, lack expertise in the

financial instruments that largely caused the Debtors to fail and will be at issue in these

bankruptcy cases.

59.      Moreover, the CRO is not a member of pre-petition management and is

hiring new employees to assist in dealing with the complex financial matters at issue

here.  It is "inappropriate to suggest that the usual presumption should be applied to a

Johnny-come-lately debtor-in-possession".  *Id*.  Far from upsetting the institutional

knowledge of the typical debtor-in-possession, here the new management is relatively

unfamiliar with the Debtors and a trustee will provide knowledge, expert supervision and

independent guidance to the CRO, the A&M team, and all persons brought back to the

Company under any version of the recruitment and retention program that the Court may

approve.

     *(ii)*     *Appointment of a Trustee is in the Interests of*
               *Creditors, Equity Holders and Parties-in-Interest*

60.      Even if the Court does not find that "cause" exists to appoint a Chapter 11

trustee under Section 1104(a)(1), the Court may still appoint a trustee "if such

appointment is in the interests of creditors, any equity security holders, and other interests

of the estate … ."  11 U.S.C. § 1104(a)(2).  "Section § 1104(a)(2) envisions a flexible

standard and gives the [] court discretion to appoint a trustee when doing so would serve

the parties' and estate's interests."  *In re The 1031 Tax Group, LLC*, 374 B.R. at 90.

61.      Among the factors courts consider in appointing a trustee under Section

1104(a)(2) are "(i) the trustworthiness of the debtor; (ii) the debtor in possession's past

and present performance and prospects for the debtor's rehabilitation; (iii) the confidence

- or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment." *In re Ionosphere Clubs, Inc*., 113 B.R. 164, 167 (Bankr. S.D.N.Y. 1990).

62.    In the instant case, each factor supports appointment of a trustee. First, there can be little question that the trustworthiness of the Debtor is in doubt. Mr. Marsal and the A&M team appear to possess the required expertise, but the fact remains that they were hand-selected by Mr. Fuld and the Directors, the parties to whom they currently report and the very parties under whose guidance the Company collapsed. Prospects for the Debtor's rehabilitation appear bleak. LBI is being liquidated and the investment banking and capital markets businesses now belong to Barclays Capital. With respect to the confidence of creditors in current management, the Court has also recognized that at least 14 creditors who have filed or joined Rule 2004 discovery motions desire to get the facts and believe the facts "aren't available through the debtors' fiduciaries." (*See* Hearing Tr. at 44).

63.    The most important factor to consider in the circumstances presented here is the benefit to the estate balanced against the cost of the trustee, an analysis that tilts decidedly in favor of appointing a trustee.

64.    Here, the net cost of the trustee will be relatively small compared to the value a trustee would add. First, logically, the Court should deduct from the projected expenses of a trustee the services that the CRO and A&M are currently providing and will continue to provide. Many typical trustee responsibilities will be performed by Mr. Marsal under trustee supervision, and expenses for any investigation by the trustee must

be offset against the expenses that the estate would incur by the investigation of an

examiner, the appointment of which, as discussed below, will be mandatory if a trustee is

not appointed.  Second, the expenses of any trustee work must also be offset against the

duplicative investigations or other work that would be performed otherwise by, for

example, the Creditors' Committee or Mr. Marsal.  Third, the Debtor has demonstrated

the necessity of expending resources to maximize the estate.  The cost of a trustee will be

relatively small compared to (i) the size of the estate, and (ii) the volume of expenses the

Debtors have proposed, including approximately $183 million though the recruitment and

retention program discussed in the Debtors' October 29, 2008 motion.  The Debtors have

also identified more than fifty other professionals deemed necessary to maximize the

estate.[6]  Finally, the expenses of a trustee must be offset against the cost of retaining the

Directors who, according to Lehman's 2008 Proxy Statement, collectively received more

than $3.2 million in total compensation in 2007.

65.    A trustee will add independent expertise and transparency to these

proceedings in a number of ways.  First, and most importantly, appointment of a trustee

will assist mightily with administration of the estate.  Debtors' counsel pointed out during

the Hearing that Mr. Marsal and his team are working under four guiding principles, but

have stated that identifying "pre-bankruptcy events giving rise to causes of action or

mitigation of claims" is their lowest priority.  Here, a trustee could quickly undertake

investigating causes of action on behalf of the debtor and circumstances that might

mitigate claims against it while the CRO and his team continue to focus on other

---

[6] *See* Exhibit A to Debtors' Notice of Second Amendment to the List of Ordinary Course Professionals,
dated October 31, 2008 (Docket No. 1326).

necessary activities.  In short, a trustee would permit efficient and transparent administration of the entire estate.

66.     Second, a trustee with experience in bankruptcy and reorganization would benefit the estate in a way the Directors cannot.  As discussed throughout, the Directors largely have no particular expertise to offer the CRO or A&M in their administration of the estate or any unique ability to protect the estate.  They are a sunken cost.  By contrast, an experienced trustee will meaningfully and critically review proposed reorganization plans and asset recovery strategies and oversee their implementation.  A trustee will also be able to identify additional areas where Mr. Marsal should be providing services to the estate.

67.     Third, the trustee and his or her investigation would consolidate some of the duplicative work charged to the estate and would coordinate and mitigate against duplicative activities and motions facing the estate such as 2004 discovery examinations sought by dozens of creditors.  The trustee would also perform a similar investigation of the Debtors as the SIPA trustee is performing in connection with LBI.

68.     Replacing Mr. Fuld and the Directors with a trustee will protect the estate, creditors, equity holders and parties-in-interest.  While the Comptroller is not questioning the expertise or integrity of Mr. Marsal, a trustee would add another welcome level of protection not present if solely Mr. Fuld and the Directors are supervising the CRO. Additional protection is more important given the current lack of transparency.

**B.     Alternatively, the Court Should Appoint an Examiner with Expanded Powers to Investigate the Debtors and Current and Former Management**

69.     Section 1104(c) of the Bankruptcy Code provides that if the Court does not order the appointment of a trustee, then at the request of any party in interest, the

Court shall order the appointment of an examiner to conduct an investigation of the debtor if "the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000." 11 U.S.C. § 1104(c)(2). Here the Comptroller is a party in interest and the Debtors easily meet the $5 million threshold. Because the statutory requirements are met, appointment of an examiner is mandatory. *See In re Revco D.S., Inc.*, 898 F. 2d 498, 501 (6th Cir. 1990) ("we find that the appointment of an examiner is mandatory under § 1104(c)(2)"); *see also In Loral Space & Comm., Ltd.*, No. 04 Civ. 8645, 2004 WL 299985, at *5 (S.D.N.Y. Dec. 23, 2003).

70.     Section 1104(c) further provides that the examiner shall be appointed "to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor". 11 U.S.C. § 1104(c). While the Court is required to appoint an examiner, because the statute calls for an "appropriate" investigation, the Court "retains broad discretion to direct the examiner's investigation, including its nature, extent and duration." *In re Revco*, 898 F. 2d at 501.

71.     On October 20, 2008, Disney filed a motion for appointment of an examiner to investigate discrete matters. Disney asserted that it is a party-in-interest due to a $107 million currency swap transaction it executed with Lehman Brothers Commercial Corporation ("LBCC"), a subsidiary of LBHI whose payment obligations were apparently guaranteed by LBHI.

72.     Disney's motion asked a number of questions about the conduct of LBHI
and LBCC during the period of time after LBHI filed its petition, including whether
LBCC's funds were properly swept by LBHI's company-wide cash management system
into accounts owned by LBHI and whether officers and directors of LBCC or LBHI
breached fiduciary duties owed to LBCC in favor of other Lehman entities.

73.     Disney moved this Court for appointment of an examiner to investigate:
(i) intercompany accounts among LBHI and its subsidiaries, including LBCC, as of
LBHI's petition date; (ii) administrative claims LBHI incurred to LBCC and its other
subsidiaries since its petition date; (iii) pre-petition acts and omissions after March 16,
2008 (when The Bear Stearns Companies failed) by officers and directors of LBHI or
LBCC or other subsidiaries impacting their fiduciary duties; (iv) post-petition acts and
omissions by officers and directors of LBHI or LBCC or other subsidiaries impacting
their fiduciary duties; (v) whether LBCC and LBHI's other subsidiaries took steps to
protect their respective businesses and shareholders in connection with the sale to
Barclays Capital; and (vi) what LBCC and other non-debtor subsidiaries of LBHI did
with their cash after LBHI's petition.

74.     Examiner investigations are designed to be broad.  "The investigation of
an examiner in bankruptcy, unlike in civil discovery under Rule 26, is supposed to be a
'fishing expedition,' as exploratory and groping as appears proper to the Examiner." *In
re Ionosphere Clubs, Inc.*, 156 B.R. 414, 432 (Bankr. S.D.N.Y. 1993).

75.     Here Disney moved for an investigation that is too narrow and, if ordered,
will not protect the interests of all creditors, equity holders and real parties in interest.

76.    For example, Disney seeks an investigation into pre-petition acts after
March 16, 2008 impacting the fiduciary duties of officers and directors of LBHI and its
subsidiaries.  There are certainly parties in interest to which an investigation of pre-
March 16, 2008 conduct is critical.  Similarly, Disney is focused on cash management
and intercompany transfers among the Debtors and their affiliates, but other parties in
interest certainly desire information on pre-petition transfers.

77.    The October 31, 2008 joinders in Disney's motion filed by Bank of
America, N.A. (Docket No. 1302) and Harbinger Capital Partners (Docket No. 1310)
demonstrate why the statutory requirements are met and appointment of an examiner is
mandatory if the Court declines to appoint a trustee.  Yet, like Disney, these movants
seek an investigation that is also too narrow to provide the required information to
creditors.

78.    A hearing on Disney's motion and the joinders is scheduled for November
18, 2008, the return date of the instant motion.

79.    For the reasons discussed above, the Comptroller believes that adequate
cause exists for the Court to appoint a trustee to replace the Board as overseer of the CRO
and his efforts to move the Company through bankruptcy and to commence
investigations of and on behalf of the estate.  However, if the Court declines to order the
appointment of a trustee, the Comptroller respectfully requests that the Court order the
appointment of an examiner with a wider investigatory mandate than that sought by
Disney and to allow parties in interest to be heard regarding the scope of the examiner's
investigation.  The Comptroller respectfully submits that, at very least, the examiner's
mandate should include the ability to investigate allegations of fraud, dishonesty,

incompetence, misconduct, mismanagement, or irregularity in the arrangement of the

affairs of any of the Debtors by current or former management, including, but not limited

to, issues of accounting irregularities and representations concerning the Company's

liquidity.

## <u>WAIVER OF MEMORANDUM OF LAW</u>

80.     This motion sets forth the applicable authority upon which relief is

requested and does not raise any novel issues of law.  Accordingly, the Comptroller

respectfully requests that the Court waive the requirement of Local Rule 9013-1(a) of the

Local Bankruptcy Rules for the Southern District of New York that a separate

memorandum of law be filed in support.

## CONCLUSION

For all of the foregoing reasons, New York State Comptroller Thomas P.

DiNapoli respectfully requests that this Court enter an Order: (i) appointing a Chapter 11

trustee for the estates of Lehman Brothers Holdings, Inc. and its affiliated debtors (other

than LBI); or (ii) appointing an examiner with expanded powers to investigate the

Debtors and their former and current management; and (iii) granting such other and

further relief as is just and proper.

Dated:      New York, New York
            November 4, 2008

ENTWISTLE & CAPPUCCI LLP

By: _____/s/ Andrew J. Entwistle_____
      Andrew J. Entwistle (AE-6513)
      Johnston de F. Whitman, Jr. (JW-5781)
      Jonathan H. Beemer (JB-0458)
      Joshua K. Porter (KP-2660)
        280 Park Avenue, 26th Floor West
        New York, New York 10017
        Telephone: (212) 894-7200

*Counsel for New York State Comptroller
Thomas P. DiNapoli, as Administrative
Head of the New York State and Local
Retirement Systems and Sole Trustee of
the New York State Common Retirement
Fund*