**Hearing Date: December 3, 2008 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Deadline: November 28, 2008 at 4:00 p.m. (Prevailing Eastern Time)**

**LOWENSTEIN SANDLER PC**
Bruce S. Nathan (BN 4844)
David M. Banker (DB 3278)
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

**BARNES & THORNBURG LLP**
Samuel Hodson
11 South Meridian Street
Indianapolis, IN 46204
(317) 261-7972 (Telephone)
(317) 231-7433 (Facsimile)

Co-Counsel to Midwest
Independent System Operator

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., *et al.,* | Case No. 08-13555 (JMP) |
| Debtors. | (Jointly Administered) |

**THE MIDWEST INDEPENDENT SYSTEM OPERATOR'S MOTION
FOR (I) RELIEF FROM THE AUTOMATIC STAY TO EXERCISE
SETOFF RIGHTS PURSUANT TO SECTION 553 OF THE
<u>BANKRUPTCY CODE AND (II) OTHER RELATED RELIEF</u>**

      The Midwest Independent System Operator ("<u>MISO</u>"), by and through its undersigned counsel, hereby submits this Motion for (I) Relief From The Automatic Stay to Exercise Setoff Rights Pursuant to Section 553 of the Bankruptcy Code, and (II) Other Related Relief (the "<u>Motion</u>"). In support of the Motion, MISO respectfully states as follows:

## INTRODUCTION

1.      On October 3, 2008 (the "Petition Date"), Lehman Brothers Commodity Services, Inc. ("LBCS") filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code and an Order for relief was entered.

2.      On October 7, 2008, the Court entered an Order Directing Joint Administration of bankruptcy petitions filed by multiple Lehman Brothers entities, including LBCS, under the above captioned case number (collectively, the "Debtors").

3.      The Debtors continue to operate their businesses and manage their properties as a debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

## BACKGROUND

5.      The MISO is a non-stock, non-profit organization formed to act as an Independent Transmission System Operator ("ISO"). The functions of an ISO are defined in the Federal Energy Regulatory Commission's Orders 888 and 889. MISO has functional control over the transmission assets of its transmission-owning members but does not own the transmission assets. The transmission assets are used to transmit electricity produced at power plants over hundreds of miles of high-voltage transmission lines, through substations and along distribution lines before it reaches the familiar low-voltage neighborhood lines that service end users.

6.      The Federal Energy Regulatory Commission ("FERC") developed the ISO and subsequent Regional Transmission Organization ("RTO") concepts to help support deregulation in the electricity industry. ISOs are designed to ensure non-discriminatory, open access to the

2

electric transmission system, thereby facilitating a robust wholesale energy market and enhancing the stability and reliability of the nation's power grid.

7. RTOs are larger versions of ISOs. To qualify as an RTO, an ISO must meet certain criteria specified in FERC Order 2000. In December 2001, the MISO became the first FERC-approved RTO.

8. MISO has two general types of members. One category of members includes entities that own transmission assets and agree to transfer functional control over those assets to MISO. The second category of members, which includes LBCS, includes entities that do not own transmission assets. MISO's diverse membership includes investor-owned utilities, cooperatives, municipalities, public power districts, independent transmission companies, power marketers, independent power producers, and industrial end users. Members of MISO possess certain rights and privileges, including the right to vote in elections of MISO's board of directors.

9. Members of MISO are not necessarily customers of MISO. Customers of MISO must complete a separate registration process, including a credit review, and sign service agreements in order to be eligible to conduct business with MISO. The service agreement requires prospective customers to abide by all of the terms and conditions of MISO's FERC-approved Open Access Transmission and Energy Markets Tariff (the "Tariff").

10. MISO has over 200 registered customers. These customers include those who acquire transmission services from MISO ("Transmission Customers"), owners of bulk transmission assets who have transferred functional control over their transmission assets to MISO ("Transmission Owners"), and those who participate in the energy market ("Market

3

Participants" collectively, with the Transmission Customers and the Transmission Owners the, "Participants").

11. The Participants consist of investor-owned utilities, cooperatives, municipalities, public power districts, power marketers, independent power producers and industrial end users.

12. MISO began operating day-ahead and real-time energy markets on April 1, 2005. MISO does not buy or sell wholesale energy. Instead, it facilitates the purchasing and selling of wholesale power among its Market Participants. In its role of market facilitator, MISO determines the transaction charges owed by purchasers and the transaction charges due to sellers (this process is referred to as "Market Settlement"). Any given Market Participant can be a net buyer one hour and a net seller the next hour, depending upon its market activity.

13. MISO invoices Participants in arrears on a weekly basis for energy market transactions and on a monthly basis for transmission and ancillary service transactions. Because MISO: (a) is not a participant in the market, (b) is a non-stock, not-for-profit corporation and (c) has zero equity, it operates its FERC-approved market on a revenue-neutral basis. MISO is able to distribute funds to Market Participants and Transmission Customers who are due funds only to the extent it receives funds from Participants that owe funds. If a Participant does not pay an amount owed, then MISO must either: (a) short pay one or more Transmission Owners that are owed funds for services provided, or (b) allocate the unpaid amount for energy market transactions to all other Market Participants as an additional charge shared by all based upon a formula in the Tariff. The Credit Policy of MISO, which is incorporated into its FERC-accepted Tariff, operates primarily to protect Market Participants and Transmission Customers (including LBCS) from non-payment by Participants, and only secondarily to ensure that MISO is paid in full for its services.

14. The transactions between MISO and LBCS are complex and involve a variety of charges and credits. In any given period, LBCS will owe money to MISO for transmission charges and LBCS may owe money to, or be owed money from, MISO for charges related to wholesale energy transactions. MISO has thirty-two (32) types of market charges that are regularly netted before arriving at a final sum due from or to LBCS each week for wholesale energy transactions. Transmission service charges always involve charges owed for service and are billed in arrears monthly.

15. The transactions and relationships between MISO and LBCS are governed by executory contracts, which include service agreements, the MISO Credit Policy, and a Cash Collateral Agreement (collectively, the "Executory Contracts"). These Executory Contracts incorporate each other by reference and are governed by the Tariff.

16. Attachment L to the Tariff, the FERC approved Credit Policy, requires all Participants to maintain, at all times, a Total Credit Limit in excess of the Participant's Total Potential Exposure. A Participant's Total Credit Limit is the sum of the unsecured credit for which the Participant qualifies plus the amount of financial assurances, such as cash collateral or letters of credit, provided to MISO by the Participant. LBCS did not qualify for unsecured credit under the Credit Policy. These payments/assurances are required of *every* Participant in consideration for its use of the MISO system.

**RELIEF REQUESTED**

17. By this Motion, MISO respectfully requests an Order of the Court granting it relief from the automatic stay in order to allow it to immediately exercise its rights of set off. MISO will exercise all rights of set off for which the Tariff provides and pay any balances to LBCS as required by the Tariff.

5

**BASIS FOR RELIEF**

**I.    MISO is Entitled to Relief From the Automatic Stay to Exercise Its Rights of Setoff.**

18.    Section 362(a)(7) of the Bankruptcy Code provides that the filing of the Debtors' voluntary petitions operates as an automatic stay, applicable to all parties, against "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." 11 U.S.C. § 362(a)(7).  However, Section 362(a)(7) "does not affect the right of" a creditor to setoff.  H.R. Rep. No. 595, 95th Cong., 1st Sess., at 342 (1977); S. Rep. No. 989, 95th Cong., 2d Sess., at 51 (1978).  Section 362(a)(7) "simply stays its enforcement pending an orderly examination of the debtors' and creditors' rights." *Id.*  Thus, a party may still exercise its right to setoff in a bankruptcy proceeding but must first obtain relief from the automatic stay or obtain an order allowing setoff prior to exercising any right to setoff. *In re NTG Industries, Inc.*, 103 B.R. 195, 197 (Bankr. N.D. Ill. 1989).

19.    By necessitating a motion for relief to effect a setoff, Section 362 creates a mechanism by which setoff, which is usually marked by no event at all other than perhaps an accounting adjustment, can be subject to an orderly examination by the Court and the creditors of the estate. *See Matter of Corland Corp.*, 967 F.2d 1069, 1076 (5th Cir. 1992); *In re Women's Technical Institute, Inc.,* 200 B.R. 77, 82 (Bankr. D. Mass. 1996).

20.    Section 553 of the Bankruptcy Code governs setoffs in bankruptcy.  In relevant part, Section 553 provides:

> [T]his title does not affect any right of a creditor to a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case. 11 U.S.C. § 553(a).

Essentially, the right to setoff allows entities that have mutual obligations to apply their mutual

6

debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." I*n re Gordon Sel-Way, Inc.,* 270 F.3d 280, 290 (5th Cir. 2001) (*citing Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995)).

21. Thus a creditor who demonstrates one of the following is entitled to a right of setoff:

(a) a debt exists from the creditor to the debtor and that debt arose prior to the commencement of the case;

(b) the creditor has a claim against the debtor that arose to the commencement of the bankruptcy case; or

(c) the debt and claim are mutual obligations.

*See, e.g. In re Nerland Oil, Inc.*, 303 911 (8th Cir. 2002); *United States v. Gerth*, 991 F.2d 1428, 1431 (8th Cir. 1993); *Braniff Airways, Inc. v. Exxon Co., U.S.A.,* 814 F.2d 1030, 1035 (5th Cir. 1987). Debts are mutual when the debts and credits are in the same right and are between the same parties, standing in the same capacity. *See In re Bennett Funding Group, Inc.*, 146 F.3d at 139; *In re Drexel Burnham Lambert Group, Inc*., 113 R.B. 830, 847 (Bankr. S.D.N.Y. 1990)

## II. The Automatic Stay is Not Applicable to MISO Due to the Netting Provisions in the Tariff.

22. The automatic stay provision of the Bankruptcy Code provides a mechanism by which a creditor is prohibited from collecting a debt owed to it by a debtor for a specific period of time. 11 U.S.C. § 363. It does not prevent a creditor from continuing to conduct business with a debtor in the ordinary course of business.

23. Under the provisions of the Tariff, a Market Participant, such as LBCS, is not entitled to receive any funding from MISO until all of the appropriate debits and credits have been applied to a particular Market Participant's account with MISO for that particular billing cycle.

24. Section 7.6 of the Tariff provides that:

> The Market Participant shall have no right to any amount of payment with respect to the services and goods furnished under…this Tariff until all of the credit and debit amounts with respect to the Market Participant for the respective billing cycle for all services and goods furnished under…this Tariff (including prior period adjustments) have been added together, netted against one another and invoiced. The Market Participant shall only be entitled to the net credit.

25. Therefore, LBCS, under the provisions of the Tariff, in the ordinary course of business, would not be entitled to payment from MISO until all of its respective debits and credits had been applied to its account and effectively "netted" out.

26. Furthermore, section 7.17 of the Tariff states that:

> This Tariff (including, without limitation, the Transmission Provider's Credit Policy) and all agreements entered into under, pursuant to, or in connection with this Tariff and any other agreements to which the Transmission Provider and the Tariff Customer are parties shall be viewed as a single agreement and the Transmission Provider shall have the right of setoff and recoupment with respect to all amounts that arise under this Tariff and/or any such agreements.

27. Thus, MISO is expressly granted the right of setoff in the ordinary course of business against the accounts under the FERC approved Tariff.

28. Because MISO is not attempting to collect a debt from LBCS or engage in collection activities, but rather comply with its ordinary business practices and the terms and conditions of the FERC approved Tariff, the automatic stay provisions of the Bankruptcy Code are not applicable.

29. Amendments to the Bankruptcy Code effective in 2005 exclude contracts like the Tariff from the automatic stay. Section 362(d)(6) excludes setoffs by financial participants for commodity contacts. 11 U.S.C. § 362(d)(6). Section 362(b)(17) excludes setoffs by financial

8

participants in swap agreements and section 362(b)(27) excludes setoffs pursuant to a master netting agreement. 11 U.S.C. §§ 362(b)(17), (27).

30. The Tariff falls under one or more of the above enumerated exceptions to the operation of the automatic stay.

31. MISO is not aware of controlling authority applying sections 362(b)(6), 362(b)(7) and 362(b)(27) to FERC approved Tariffs and has therefore chosen to seek Court approval before exercising its setoff rights.

## NOTICE

32. Notice of this Motion has been given to (i) the chambers of the Honorable James M. Peck ("Chambers"), One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, (Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq.), attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 (Attn: Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, Linda Riffkin, and Tracy Hope Davis); (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, (Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq.), attorneys for the official committee of unsecured creditors appointed in these cases (the "Committee"); (v) the attorneys for any other official committee(s) appointed in these chapter cases; (vi) Cleary Gotliebb LLP, One Liberty Plaza, New York, NY 10006, (Attn: Lindsee P. Granfield, Esq. and Lisa Schweiger, Esq.) and (vii) Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004, (Attn: Robinson B. Lacy, Esq. and Hydee R. Feldstein, Esq.), attorneys for the Debtors' postpetition lenders; via electronic means through the ECF notification system;

and upon those parties requesting notice pursuant to Fed. R. Bankr. P. 2002. MISO submits that no further notice of this Motion need be given. No previous motion for the relief sought herein has been made to this or any other Court.

### WAIVER OF FILING OF MEMORANDUM OF LAW

33. As this motion presents no novel issues of law and the authorities relied upon herein are set forth above, MISO requests that the Court waive the requirement of S.D.N.Y. L.B.R. 9013-1(b) requiring the filing of a separate memorandum of law.

**WHEREFORE**, MISO respectfully requests the Court enter an order, substantially in the form attached granting such further and other relief as the Court deems just and proper.

Dated: November 7, 2008

By: /s/ David M. Banker
Bruce S. Nathan (BN 4844)
David M. Banker (DB 3278)
**LOWENSTEIN SANDLER PC**
1251 Avenue of the Americas, 18th Floor
New York, New York 10020
(212) 262-6700 (Telephone)
(212) 262-7402 (Facsimile)

Samuel Hodson
**BARNES & THORNBURG LLP**
11 South Meridian Street
Indianapolis, IN 46204
(317) 261-7972 (Telephone)
(317) 231-7433 (Facsimile)

Co-Counsel to Midwest
Independent System Operator