# EXHIBIT C

# SERVICING AND AGENCY AGREEMENT

dated as of November 9, 2006

between

## TRIMONT REAL ESTATE ADVISORS, INC.
as Servicer

and

## DEKABANK DEUTSCHE GIROZENTRALE
as Lender

and

## LEHMAN BROTHERS HOLDINGS INC.
as Agent

**254 Park Avenue South
New York, New York**

13132139.4

THIS SERVICING AND AGENCY AGREEMENT (this "**Agreement**") is made as of November 9, 2006, between TRIMONT REAL ESTATE ADVISORS, INC., a Georgia corporation ("**TriMont**" or the "**Servicer**"), DEKABANK DEUTSCHE GIROZENTRALE, a German banking corporation (the "**Lender**") and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("**Lehman**" or the "**Agent**").

## RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Senior Loan Agreement, dated as December 12, 2005 (the "**Mortgage Loan Agreement**") among Lehman and 254 PAS Property LLC, a Delaware limited liability company ("**Borrower**"), Lehman made a loan to Borrower in the original principal amount of $37,379,167.00 (the "**Mortgage Loan**") which Mortgage Loan is evidenced by that certain Amended and Restated Promissory Note, dated as of December 12, 2005, made by Borrower in favor of Lehman (the "**Mortgage Note**") and is secured by, among other things, that certain Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, between Borrower and Lehman (the "**Mortgage**"), which Mortgage encumbers the real property, and all improvements thereon and appurtenances thereto, described in the Mortgage and more particularly described on Exhibit A to the Intercreditor Agreement (the "**Premises**"), and is further evidenced and secured by the instruments and documents set forth on Exhibit B to the Intercreditor Agreement (as any of the foregoing, including the instruments and documents set forth on such Exhibit B may be modified, amended, extended, supplemented, restated or replaced from time to time, the "**Mortgage Loan Documents**");

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Building Loan Agreement, dated December 12, 2005 (the "**Building Loan Agreement**") among Borrower and Lehman, Lehman made a loan to Borrower in the original principal amount of $19,168,860.00 (the "**Building Loan**"), which Building Loan is evidenced by that certain Promissory Note (Building Loan) (the "**Building Loan Note**"), dated as of December 12, 2005, made by Borrower and secured by, among other things, that certain Mortgage, Assignment of Leases and Rents and Security Agreement (Building Loan), dated December 12, 2005, between Borrower and Lehman (the "**Building Loan Mortgage**"), which Building Loan Mortgage encumbers the Premises and is further evidenced and secured by the instruments and documents set forth on Exhibit B to the Intercreditor Agreement (as any of the foregoing, including the instruments and documents set forth on such Exhibit B may be modified, amended, extended, supplemented, restated or replaced from time to time, the "**Building Loan Documents**");

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Project Loan Agreement, dated December 12, 2005 (the "**Project Loan Agreement**") among Borrower and Lehman, Lehman made a loan to Borrower in the original principal amount of $18,051,973.00 (the "**Project Loan**"), which Project Loan is evidenced by that certain Promissory Note (Project Loan) (the "**Project Loan Note**"), dated as of December 12, 2005, made by Borrower and secured by, among other things,

13132139.4

that certain Mortgage, Assignment of Leases and Rents and Security Agreement (Project Loan), dated December 12, 2005, between Borrower and Lehman (the **"Project Loan Mortgage"**), which Project Loan Mortgage encumbers the Premises and is further evidenced and secured by the instruments and documents set forth on Exhibit B to the Intercreditor Agreement (as any of the foregoing, including the instruments and documents set forth on such Exhibit B may be modified, amended, extended, supplemented, restated or replaced from time to time, the **"Project Loan Documents"**);

WHEREAS, for purposes of this Agreement (a) the Building Loan Agreement, the Project Loan Agreement and the Senior Loan Agreement are sometimes hereinafter individually and collectively referred to as the **"Senior Loan Agreement"**; (b) the Building Loan, the Project Loan and the Senior Loan are sometimes hereinafter individually and collectively referred to as the **"Senior Loan"**; (c) the Building Loan Note, the Project Loan Note and the Mortgage Note are sometimes hereinafter collectively referred to as the **"Senior Notes"**; and (d) the Building Loan Documents, the Project Loan Documents and the Senior Loan Documents are sometimes herein collectively referred to as the **"Loan Documents"**.

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Loan Agreement, dated as of December 12, 2005, among 254 PAS MEZZ LLC, a Delaware limited liability company (**"Mezzanine Borrower"**) and Lehman (**"Mezzanine Lender"**), Mezzanine Lender made a loan to Mezzanine Borrower in the original principal amount of $20,700,000.00 (the **"Mezzanine Loan"**).

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Intercreditor Agreement, dated as of December 12, 2005, Lehman, as Senior Lender and Lehman, as Mezzanine Lender, established the relative priority of the Senior Loan and the Mezzanine Loan and evidenced certain agreements with respect to the Senior Loan and the Mezzanine Loan.

WHEREAS, pursuant to the terms of three Allonges and an Assignment and Assumption Agreement, each dated the date hereof (collectively, the **"Assignment Documents"**), Lehman assigned and conveyed the Senior Note to the Lender, together with Lehman's right, title and interest as Senior Lender in and to the Intercreditor Agreement and the Loan Documents (except for the Loan Exit Fee (as defined in the Assignment Documents)).

WHEREAS, the Servicer, the Agent and the Lender desire that the Servicer and the Agent manage and service collection and administration of the Senior Loan subject to the terms hereof and the Loan Documents.

NOW THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the Servicer, the Agent and the Lender agree as follows:

## ARTICLE I

### SERVICER AND AGENT

Section 1.1    Appointment of Servicer.    The Servicer is hereby appointed to service, administer and collect all payments, prepayments, remittances, proceeds and other amounts with respect to the Senior Loan ("**Payments**") in accordance with the terms hereof and the terms of the Loan Documents. As used herein, the term "**Accepted Servicing Practices**" shall mean the servicing and administration of the Senior Loan or the management of the Premises, as applicable, by the Servicer or Agent, as applicable, for the benefit of the Lender using the higher of (a) the same care, skill, prudence and diligence with which it services and administers similar mortgage loans for other third party portfolios, giving due consideration to customary and usual standards of practice of prudent institutional commercial lenders servicing their own loans and (b) the same care, skill, prudence and diligence which it utilizes for loans which it owns for its own account, in each case, exercising reasonable business judgment and acting (x) in accordance with applicable law, the terms of this Agreement, the Loan Documents and the Senior Loan's insurance policies, (y) in the best interests of the Lender, and (z) with a view to the maximization of timely recovery of principal and interest on a net present value basis on the Senior Loan, but without regard to (i) any relationship that the Servicer or Agent, as applicable, or any affiliate of either of them, as applicable, may have with the Borrower or any affiliate of the Borrower or any other parties to this Agreement or the Loan Documents including, without limitation, any other current or future lenders; (ii) the existence of any subordinate or mezzanine loan that the Servicer or Agent, as applicable, or any affiliate of the Servicer or Agent, as applicable, may service, hold or have an interest in; (iii) the sufficiency of any compensation for its services hereunder and/or the Servicer's obligation to make any Protective Advances or incur any expenses; and (iv) the ownership, or servicing or management for others, by the Servicer or Agent, as applicable, or any servicer, of any other loans or properties. Subject to the rights of the Lender and the Agent pursuant to this Agreement and the Loan Documents, Servicer shall have full power and authority, as required by and pursuant to the terms of the Loan Documents, to do or cause to be done any and all things in connection with such servicing, administration and collection of the Senior Loan as may be necessary or desirable to conform to Accepted Servicing Practices and the terms of the Loan Documents and this Agreement. If there is any conflict between the terms of this Agreement and the Loan Documents, the terms of the Loan Documents shall govern.

Section 1.2    Documents Evidencing Senior Loan.    The Agent shall deposit with the Servicer copies of each document evidencing the Senior Loan and the collateral and security therefore, including, but not limited to, the Senior Loan Agreement, to be serviced by the Servicer. The Servicer or Agent may also request from Lender such other documents as the Servicer or Agent may reasonably require in order to perform their respective duties under this Agreement. The Servicer and Agent shall maintain physical or imaged possession of copies of all instruments or documents generated by or coming into the possession of each of them that are required to document or service the Senior Loan.

Section 1.3    <u>Duties of Servicer</u>.    The Servicer's duties under this Agreement shall include the following:

(a)    The Servicer shall undertake all reasonable efforts in accordance with Accepted Servicing Practices, to collect or otherwise realize upon the Senior Loan, in accordance with, and as expressly permitted by the terms of the Loan Documents, with the prior written consent of the Lender prior to any action thereunder, to the extent such consent is required in the Loan Documents.

(b)    The Servicer shall receive, review and process all documents, certificates, opinions, insurance policies, reports, requisitions and other materials of every nature and description submitted by, or on behalf of, Borrower and pursuant to this Agreement, the Senior Loan Agreement or the other Loan Documents, to determine whether or not Borrower is in compliance with the requirements of the Senior Note, the Senior Loan Agreement and the other Loan Documents;

(c)    The Servicer shall receive all payments of principal, interest, fees and other charges paid by, or on behalf of Borrower and distribute all such funds to the Lender as provided for in this Agreement;

(d)    The Servicer shall maintain reasonable records with respect to the Senior Loan setting forth the status of the Senior Loan, the amount and application of any funds received on account of the Senior Loan, the amount of any Protective Advances made in collection of, or other realization upon a Mortgage Loan, in accordance with the terms of the Loan Documents.

(e)    All Payments shall be held by the Servicer (or under the Servicer's direction and control) in trust for the benefit of the Lender.    The Lender (or such other party(ies) as Lender directs Servicer in writing) shall be entitled to receive remittances (by wire transfer of immediately available funds) within one (1) Business Day of the Payment Date (the "**Remittance Date**").    If the Servicer fails to make such remittance by 5:00 PM EST time on such Remittance Date, the Servicer shall make such remittance to Lender at or before 12:00 PM EST on the immediately following Business Day.    All interest in excess of bank service fees and charges shall be paid or credited to Servicer.    Each payment to the Lender under this Section shall constitute a payment by the Borrower to the Lender in the amount of such payment, and any portion of the Senior Loan paid by such payment to the Servicer by or on behalf of the Borrower shall not be considered outstanding for any purpose after the date of its receipt by Servicer.

(f)    The Servicer shall furnish to the Lender and Agent reports summarizing the status of its collection efforts with respect to the Senior Loan as more particularly set forth in <u>Section 3.2</u>, and shall furnish the reporting required pursuant to the terms of the Loan Documents to the extent provided to Servicer by the Borrower.

(g)    The Servicer shall maintain and monitor the Reserve Accounts and all other accounts required to be maintained pursuant to the Loan Documents, including without limitation the Cash Management Agreement, and the documents or agreements executed in connection therewith for the benefit of Lender in accordance with Accepted Servicing Practices.

(h)    The Servicer shall monitor the asset cash flow along with the payment of real estate taxes, insurance, and any other escrows or reserves, as required by, and in accordance with the Loan Documents, including without limitation the Cash Management Agreement, and the documents or agreements executed in connection therewith and delivered in final executed form by Agent to Servicer in accordance with the notice provisions herein. To the extent permitted under the terms of the Senior Loan, Servicer shall manage escrow and reserve accounts including disbursement of payments to third parties on behalf of Lender and shall perform periodic analyses of tax and insurance escrow accounts.

(i)    The Servicer shall provide insurance due diligence (including general contractor's, builder's risk and liability insurance), covenant compliance, and at Lender's direction, enforcement of coverage to ensure such compliance as required by documentation. The Servicer shall also advise and make insurance placement recommendations to mitigate Lender's overall risk.

(j)    If the Borrower fails to obtain or maintain the required insurance under the Loan Documents, the Servicer, upon receipt of prior written approval from Lender, shall obtain such insurance with respect to the Senior Loan's collateral. In the event Servicer advances funds to obtain insurance on behalf of a Borrower, such advance shall only be made after Servicer has obtained the funds required to make such advance from the Lender and Servicer has obtained written consent of the Lender in accordance with the terms of the Loan Documents. Any costs incurred by the Servicer in obtaining or maintaining such insurance shall be recoverable as a cost of collection.

(k)    In addition to the servicing functions described in (a) through (j), the Servicer shall provide the normal scope of asset management services with a focus on the tracking of the conversion process and condominium sales. These services provide that Servicer manage all aspects of Lender's interest to the extent permitted under the terms of the Loan Documents, including: (1) business plan and budget approval and monitoring, document enforcement and compliance, (2) understanding neighborhood competition, investor/buyer market and target buyers, (3) Contract, Offering Plan and Condominium Document compliance review, partial releases of individual condominium units and distribution of sales proceeds in accordance with the Loan Documents and the documents or agreements executed in connection therewith and delivered in final, executed form by Agent to Servicer pursuant to the notice provisions herein (4) cash flow monitoring including the tracking and monitoring of earnest money deposits and rental income, and (5) property inspection and valuation.

(l)     The Servicer shall also coordinate ongoing monitoring of the conversion process including funding of monthly draws from reserves held by Servicer on behalf of Lender, to the extent permitted under, and in accordance with the terms of the Loan Documents, including without limitation the Cash Management Agreement.

(m)     The Servicer shall cooperate with the Lender and Agent in the performance of its obligations set forth in this Section 1.3, including, without limitation, responding to the Lender's and Agent's inquiries in a timely manner with respect to the Servicer's performance of its obligations set forth in this Section 1.3.

Section 1.4     Servicing Standard.

(a)     The Servicer shall administer services under this Agreement in accordance with the definition of "Accepted Servicing Practices" (as defined in Section 1.1) and the terms and conditions of the Loan Documents.

(b)     Subject to Section 1.5 below, the Servicer is hereby granted the full power and authority to conduct its obligations pursuant to and in adherence with the terms of the Loan Documents and this Agreement, for and on behalf of the Lender, as Lender. All actions taken hereunder by Servicer shall be performed in accordance with the terms of the Loan Documents. If Servicer takes any action hereunder (or if Lender's consent is required (or Agent's, as applicable), upon receipt of Lender's (or Agent's, as applicable) consent to any action), such action shall be taken with respect to the Senior Loan by the Servicer, in its own name, as servicer for Lender and its participants, successors and/or assigns. In the event Lender receives a request for Lender's consent (or Agent's, as applicable) and does not consent or object within fifteen (15) Business Days of receipt of a request for such consent, the Lender (or Agent, as applicable) shall be deemed to have consented to such matter. If, pursuant to the terms of the Loan Documents, the Servicer participates in any legal proceedings involving the Senior Loan, the Servicer is authorized and empowered upon prior written notice to Agent and Lender to execute and deliver in its name as servicer for Lender any notices, demands, claims, complaints, responses, affidavits or other documents or instruments in connection with any such proceeding. Upon request, Lender shall furnish the Servicer with any powers of attorney or other documents which the Servicer may reasonably request in order to take such steps as the Servicer deems necessary, appropriate or expedient to carry out its servicing, administration and collection activities under this Agreement and the Loan Documents. Subject to Section 2.2, Servicer shall have the right during the term of this Agreement to retain one or more law firms without the approval of the Lender or the Agent to give legal advice or render legal services of any type regarding proper servicing and administration with respect to the Senior Loan in accordance with the terms of this Agreement.

Section 1.5    Powers of Agent.  Except as otherwise expressly provided for in the Loan Documents or this Agreement including, without limitation, Section 1.6 below, the Agent shall have the right, in its commercially reasonable discretion, to be exercised in each instance in the best interests of the Lender and the other holders of the Senior Loan, if any, in each instance subject to the Servicing Standard, (i) to grant or withhold approvals under the Loan Documents or this Agreement; (ii) to exercise any discretion or take any action on behalf of the Lender with regard to the Loan Documents pursuant to this Agreement; (iii) to agree to the modification or waiver of any of the terms or provisions of the Loan Documents; (iv) to consent to any action or failure to act by the Borrower; and (v) to exercise or refrain from exercising any rights which the Lender may have with respect to the Senior Loan, the Loan Documents, or with respect to the Premises including, without limitation, the right (but not the obligation) to:

(a)    enforce or refrain from enforcing all of the rights, remedies and privileges afforded or available to the Lender under the terms of the Senior Loan Agreement, the Senior Note and the other Loan Documents, any opinion, certificates, warranties, representations or insurance policies furnished by or on behalf of Borrower;

(b)    in connection with any enforcement action, subject to Section 1.6, (1) bring such enforcement action in the Lender's name, as agent for the Lender, (2) retain and direct counsel to prosecute such enforcement action on behalf of the Lender, (3) make all decisions concerning the appointment of a receiver, the conduct of such enforcement action, the collection of any judgment, the settlement of such enforcement action, the acceptance of a deed-in-lieu of foreclosure, the bid on behalf of the Lender at any foreclosure sale, the commencement and conduct of any deficiency judgment proceeding, (4) subject to Section 1.9 hereof, determine the manner of taking and holding title to the Premises, and the sale of the Premises after foreclosure, and (5) otherwise act on behalf of (and act at the direction of in accordance with Section 2.03 hereof) the Lender in connection with such enforcement action;

(c)    in connection with any bankruptcy action, (1) submit or file a proof of claim on behalf of any Lender, as agent for same, if and to the extent that Lender has failed to file its own proof of claim on or prior to the tenth (10th) day immediately preceding the expiration of the time period for filing claims, (2) vote on behalf of the Lender pursuant to its direction in accordance with Section 1.6 below, and (3) otherwise act on behalf of (and act at the direction of, in accordance with Section 1.6 hereof) the Lender in connection with such Bankruptcy Action; and

(d)    do or refrain from doing all such other acts as may be reasonably necessary or incident to the implementation, administration and servicing of the Senior Loan and the enforcement of the rights and remedies of the Lender.

Section 1.6    Limitations on Agent.  The provisions of this Section 1.6 shall govern and control any other inconsistent provision of this Agreement, including, without

limitation, Section 1.5. The Agent shall not (i) agree to the modification or waiver of any of the terms of the Loan Documents; (ii) consent to any act or omission by Borrower or, (iii) exercise or waive any rights which the Lender may have with respect to the Loan Documents or this Agreement, if any such agreement, consent or exercise would, unless in each case consented to, approved by or directed by the Lender:

     (a)    change or modify the interest rate provisions set forth in the Loan Documents;

     (b)    increase or decrease the principal amount of the Senior Loan, except for Protective Advances;

     (c)    extend the Maturity Date of the Senior Loan;

     (d)    forgive the payment of principal of, or interest on, the Senior Loan or the payment of any other sum or fee due under the Loan Documents to which the Lender is entitled;

     (e)    amend or modify in any material respect the terms and provisions of this Agreement;

     (f)    release all or any portion of the Premises or Loan Documents (including guaranties, pledges, required equity contributions, and recourse obligations) for the Senior Loan except as expressly permitted without Lender's consent pursuant to this Agreement or as expressly permitted by the Senior Loan Agreement or other Loan Documents or modify any terms with respect to the conditions of release of the Premises (including, without limitation, modifying any terms of the Senior Loan Agreement related to the release of individual condominium units from the lien of the Loan Documents, including, without limitation, the modification of the Minimum Release Prices) or the other Loan Documents (including guaranties, pledges, required equity contributions and recourse obligations) in any respect or release Borrower, Guarantors or any other credit support party or any other Persons liable under any of the Loan Documents from any obligation under the Loan Documents;

     (g)    postpone any date for payment of principal of, or interest on (other than interest at the Default Rate), the Senior Loan or the payment of any other sum or fee under the Loan Documents to which the Lender is entitled;

     (h)    permit or consent to any Transfer or voluntary or involuntary sale or transfer of all or any portion of the Premises or permit any subordinate financing or additional financing of all or any portion of the Premises except as expressly permitted without Lender's consent by this Agreement or except to the extent any of the same is expressly permitted by the Senior Loan Agreement;

     (i)    waive the requirement for Borrower to maintain the Reserve Accounts;

(j)     consent to any material change in the use of the Premises (other than the contemplated change of the Premises to a for-sale condominium project);

(k)     deliver a written waiver of any material obligation under the Loan Documents or a claim against Borrower;

(l)     make arrangements for or agree to the distribution of any insurance or condemnation proceeds in a manner not contemplated by the Loan Documents;

(m)     consent to an appraisal to determine the full insurable value of the Improvements;

(n)     modify in any material respect the terms and conditions of the Senior Loan Agreement, the Condominium Documents or the other Loan Documents (other than modifying any terms of the Senior Loan Agreement relating to the release of individual condominium units from the lien of the Loan Documents as set forth in paragraph (f) above for which the consent of the Lender shall be required);

(o)     exercise the Lender's termination right pursuant to <u>Section 5.6</u> or the Lender's consent right pursuant to <u>Section 8.11</u>; or

(p)     accelerate the Senior Loan or institute or pursue an enforcement action or bankruptcy action.

As to any matters referred to in paragraphs (a) to (p) above which are subject to the consent or direction of the Lender, the Agent shall not be permitted or required to exercise any discretion or take any action except upon the instructions of the Lender. The Agent and its directors, officers, agents and employees shall be fully protected in acting or in refraining from action upon such instructions or direction. In no event shall the Agent be required to take any action which exposes the directors, officers, agents or employees of the Agent to personal liability or which is contrary to the Loan Documents or applicable law. As to any matters not expressly provided for by the Loan Documents or this Agreement, the Agent shall not be required to exercise any discretion or take any action, unless such inaction on the part of the Agent exposes the Agent or its directors, officers, agents or employees to personal liability or is contrary to applicable law.

Section 1.7   <u>Legal Approval of Lender</u>. All communications from the Agent to the Lender requesting the Lender's determination, consent, approval or disapproval (i) shall be given in the form of a written notice to the Lender, (ii) shall be accompanied by a description of the matter or thing as to which such determination, approval, consent or disapproval is requested, and shall advise the Lender where such matter or thing may be inspected, or shall otherwise adequately describe the matter or issue to be resolved, (iii) shall include, to the extent not previously provided to the Lender, all written materials (to the extent necessary to make an informed decision) and a description of all oral information (to the extent necessary to make an informed decision) provided to the Agent in respect of the matter or issue to be resolved, and (iv) shall include the Agent's recommended course of action or determination in respect thereof. The Lender shall

reply within ten (10) Business Days after receipt of such notice or such shorter period as may be required under the Loan Documents and as specifically identified to the Lender by the Agent so as to not prejudice the Lender's position under the Loan Documents. Failure of the Lender to respond to such notice within such time frame shall be deemed to be an approval of such recommendation or determination.

Section 1.8    Legal Compliance.    The parties to this Agreement shall perform all of their respective obligations under this Agreement in compliance with all applicable laws, rules and regulations, including, but not limited to, laws, rules and regulations governing debt collection practices and procedures.

Section 1.9    Non-Performance of Senior Loan and REO Property.    The Senior Loan shall be considered to be "**Specially Serviced**" for purposes of this Agreement when one or more of the events set forth in the definition of "**Special Servicing Event**" (as defined below) has occurred and is continuing with respect to the Senior Loan.    In addition, Lender, pursuant to the terms of the Loan Documents, may acquire the collateral securing the Senior Loan as a result of foreclosure, or by deed in lieu of foreclosure (at which time the Premises shall be known as the "**REO Property**").    At the time the Senior Loan becomes either Specially Serviced or converts to the REO Property, the Servicer shall submit a resolution plan ("**Resolution Plan**") for Lender's approval within ninety (90) days of the Senior Loan becoming Specially Serviced.    Subject to Section 1.5, upon written notification by Agent to Servicer of the approval of the Resolution Plan, Servicer shall commence the implementation of such Resolution Plan including the application or execution of the method or methods of recovery specified in the Resolution Plan for the Specially Serviced Loan.    Servicer shall not initiate any exercise of remedies or other action to recover collateral related to the Specially Serviced Senior Loan, including the commencement of any action against the Borrower or Guarantor of the Senior Loan to collect any deficient portion of such Senior Loan not recovered in connection with any foreclosure or deed in lieu of foreclosure transaction with respect to such Senior Loan, unless such action is set forth in the approved Resolution Plan for the Specially Serviced Senior Loan or otherwise approved by Agent, subject to Section 1.5.    If the Senior Loan becomes Specially Serviced, the Servicer shall be entitled to a Special Servicing Fee (the "**Special Servicing Fee**") as set forth on Exhibit A hereto.    As used herein, the term "**Special Servicing Event**" shall mean, with respect to the Senior Loan, when any one of the following has occurred: (a) a payment default occurred on the maturity date of the Senior Loan (as extended pursuant to the applicable Loan Documents) which has not been cured within sixty (60) days; (b) the Borrower has failed to make any two consecutive scheduled interest payments and such interest payments remain delinquent (after exhaustion of any Interest Reserve); (c) the Borrower has entered into or consented to any bankruptcy proceeding, or the Borrower has become the subject of a decree or order for such a proceeding that shall have remained in full force, undischarged or unstayed for a period of sixty (60) days; (d) the Servicer shall have received notice of the foreclosure or proposed foreclosure of any other lien on the Premises; (e) a material default under the Loan Documents, as determined by Lender or Agent, as applicable, has occurred or is imminent, and is not likely to be cured by the Borrower within sixty (60) days after any applicable cure period; (f) the Borrower admits in writing its inability to pay its debts generally as they become

due, makes an assignment for the benefit of its creditors or voluntarily suspends payment of its obligations; (g) the Servicer receives notice that the Borrower intends to violate or has violated any "due-on-sale" or "due-on-encumbrance" clause in the Loan Documents; (h) a non-monetary default has been declared by the Lender or Agent, as applicable, and not cured by the Borrower within ninety (90) days of receipt of written notice by the Lender or Agent, as applicable, and the Lender or Agent, as applicable, has declared the Senior Loan to be due and payable; or (i) any other default occurs that, in the reasonable judgment of the Servicer exercised in accordance with Accepted Servicing Practices, materially impairs, or is reasonably likely to materially impair, the use or marketability of the Premises or the value thereof as security for the Senior Loan; provided, however, that the Senior Loan shall cease to be Specially Serviced (j) with respect to clauses (a) and (b) above, when all past due principal and interest and all late charges, default interest and other amounts due under the Loan Documents have been paid and the Senior Loan otherwise becomes a performing Senior Loan for at least ninety (90) consecutive days, in accordance with its terms; and (ii) with respect to clauses (c), (d), (e), (f), (g), (h) or (i) above, when such specified event has been remedied, cured or otherwise resolved.

Section 1.10    Advances.    Neither the Agent nor the Servicer shall, in any event, be required to make any advance (a "**Protective Advance**") to protect the Senior Loan or the underlying collateral, including, without limitation, taxes, insurance and assessments; attorneys' fees, trustee's fees, recording, filing and publication fees; title report and title search costs, court costs, witness fees, other costs incurred with respect to any foreclosure sale, trustee's sale or acquisition in lieu of foreclosure, or with respect to the marketing, sale or disposition of the Senior Loan collateral, inspections, engineering surveys or environmental assessments, repair, restoration, maintenance or protection of the Senior Loan collateral. In the event Servicer decides to make any Protective Advance, such Protective Advance shall only be made after Servicer has obtained the funds required to make such Protective Advance from the Lender and Servicer has obtained written consent of the Lender in accordance with the terms of the Loan Documents.

## ARTICLE II

## SERVICING FEES; REIMBURSEMENT OF EXPENSES

Section 2.1    Servicing Fees. The Servicer shall be entitled to a servicing fee ("**Servicing Fee**") with respect to the Senior Loan equal to 0.08% of the unpaid legal principal balance of the Senior Loan payable monthly in advance on each Payment Date. The Servicing Fee shall be paid to Servicer by the Borrower under the Senior Loan to the extent provided for in the Loan Documents and any balance due (including any amount Borrower fails to pay as required by the Loan Documents) shall be paid by Agent.

Section 2.2    Costs of Collection.    The Servicer shall be entitled to reimbursement for all out-of-pocket costs of collection actually incurred in connection with its proper servicing, administration and collection activities with respect to the Senior Loan (including, without limitation, reasonable attorneys' fees properly incurred in connection with Section 1.4(b)) and such reimbursement shall be the responsibility of

Borrower pursuant to the terms of the Loan Documents ("**Reimbursable Expenses**"). Cost of collection shall include Protective Advances described in Section 1.10.

Section 2.3    Expenses of Servicer.    The Servicer shall be responsible for payment of all overhead expenses of the Servicer, salaries, wages and other compensation of employees of the Servicer.

Section 2.4    Payment.    Agent shall pay Servicer for any Servicing Fees, costs of collection and Reimbursable Expenses in accordance with the terms of this Agreement and the Loan Documents within sixty (60) days of receipt of any invoice therefore.

# ARTICLE III

## ACCOUNTING, STATEMENTS AND REPORTS

Section 3.1    Books and Records.    The Servicer shall keep satisfactory books and records pertaining to the Senior Loan and shall make periodic reports in accordance with this section. All such records and all Senior Loan documents, whether or not developed or originated by the Servicer, reasonably required to document or properly administer the Senior Loan shall remain at all times the property of Lender, although Servicer and Agent shall be entitled to copies thereof. Upon termination of this Agreement, the Servicer shall deliver all such records and the Senior Loan documents to the Lender and the Agent or any of their respective designees.

Section 3.2    Periodic Reporting.    The Servicer shall provide to the Agent and the Lender periodic reporting set forth in the Loan Documents and such other reports reasonably required to document properly administer the Senior Loan, including, without limitation, (a) reports setting forth amounts on deposit in the Reserve Accounts and (b) Unit sales and sales status reports to be updated at least twice during each calendar month. Additionally, the Servicer shall provide the Agent and the Lender annually, within 120 days of the close of Servicer's fiscal year, an independent accountant's report, certified as true, correct and complete by an officer of Servicer from a firm of independent public accountants which is a member of the American Institute of Certified Public Accountants to the effect that on the basis of an examination conducted substantially in compliance with the Uniform Single Attestation Program for Mortgage Bankers, nothing has come to their attention which would indicate that such servicing has not been conducted in compliance therewith, expect for (a) such exceptions or such firm shall believe to be immaterial and (b) such other exceptions as shall be set forth in such statement.

Section 3.3    Property Inspections.    The Servicer shall perform annual inspections of the Properties, and provide the Agent and the Lender with completed property inspection reports on the Agent's form, together with the Borrower's annual operating statements, as provided in the Loan Documents.

Section 3.4    Inspection Rights.    At any time and from time to time during regular business hours and upon ten (10) business days prior notice, the Servicer shall

permit the Lender and Agent, or their respective agents, at the sole cost and expense of Lender, (a) to examine or make copies of abstracts from all books, records and documents (including, without limitation) computer tapes and disks constituting Senior Loan documents or otherwise in any way relating to the Senior Loan or the Servicer's collection activities with respect thereto, (b) to visit the offices and properties of the Servicer for purposes of examining such materials or the Servicer's procedures, processes and activities relating to the exercise of its duties hereunder and (c) to discuss matters relating to assets or the servicing, collection or liquidation thereof or the performance by the Servicer hereunder with respect thereto with any officers or employees having knowledge of any such matters.

Section 3.5    Fidelity Bond and E&O Insurance.    To the extent requested by Agent, Servicer shall provide evidence of its maintenance of a fidelity bond (the "**Fidelity Bond**") with broad coverage in a responsible surety company acceptable to the Agent, on all employees or others authorized by the Servicer handling the Senior Loan funds, money, documents and papers, which Fidelity Bond shall protect the Servicer against losses arising out of theft, embezzlement, fraud, misplacement, and other similar causes. In addition, the Servicer shall maintain for the term of this Agreement Employees and Officer's Insurance in an amount not less than $2,000,000.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties of the Servicer.    Servicer hereby represents and warrants to Lender and Agent the following:

(a)    Servicer is a corporation duly organized, validly existing and in good standing under the laws of the State of Georgia. Servicer has all requisite corporate power and authority to own and operate its properties, carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement.

(b)    The execution and delivery by Servicer of this Agreement and the other documents to which it is a party, and performance and compliance by Servicer with the terms of this Agreement and the other documents to which it is a party have been duly authorized by all necessary corporate action on the part of Servicer and shall not violate Servicer's articles of incorporation or by-laws, or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Servicer is a party or by which it or its properties may be bound or affected.

(c)    This Agreement constitutes the valid, legal and binding obligation of Servicer, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by

general principles of equity (whether considered in a proceeding or action in equity or at law).

(d)    Servicer agrees to comply with the terms and conditions of the Loan Documents, to the extent Servicer's compliance is required thereunder, and pursuant to the terms thereof.

Section 4.2    Representations and Warranties of the Agent.    Agent hereby represents and warrants to Servicer and Lender the following:

(a)    Agent is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.    Agent has all requisite corporate power and authority to own and operate its properties, carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement.

(b)    The execution and delivery by Agent of this Agreement and the other documents to which it is a party, and performance and compliance by Agent with the terms of this Agreement and the other documents to which it is a party have been duly authorized by all necessary corporate action on the part of Agent and shall not violate Agent's articles of incorporation or by-laws, or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Servicer is a party or by which it or its properties may be bound or affected.

(c)    This Agreement constitutes the valid, legal and binding obligation of Agent, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

Agent agrees to comply with the terms and conditions of the Loan Documents, to the extent Agent's compliance is required thereunder, and pursuant to the terms thereof.

Section 4.3    Representations and Warranties of the Lender.    Lender hereby represents and warrants to Servicer the following:

(a)    Lender is a banking corporation duly organized and validly existing in Germany, and is duly qualified to transact business and is in good standing in each jurisdiction in which the nature of its business make such qualification necessary, except where the failure to be so qualified does not materially affect Lender's business operations. Lender has all requisite corporate power and authority to own and operate its properties, carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement.

(b)    The execution and delivery by Lender of this Agreement and the other documents to which it is a party and performance and compliance by Lender with the terms of this Agreement and the other documents to which it is a party have been duly authorized by all necessary corporate action on the part of Lender and shall not violate Lender's articles of incorporation or by-laws, if applicable, or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Lender is a party or by which it or its properties may be bound or affected.

(c)    This Agreement constitutes the valid, legal and binding obligation of the Lender, enforceable against it in accordance with the terms hereof, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

## ARTICLE V

## TERMINATION; TRANSFER OF SERVICING

Section 5.1    Termination Events.  Any of the following acts or occurrences shall constitute a **"Termination Event"** under this Agreement:

(a)    a default by the Servicer, Agent or Lender under the terms of this Agreement; or

(b)    gross negligence or willful misconduct by the Servicer, Agent or Lender in the performance of its obligations under this Agreement.

Section 5.2    Termination by Lender or Agent; Removal of the Servicer. Immediately upon the occurrence of a Termination Event caused by the Servicer, the Lender, in accordance with the Loan Documents, upon ten days (10) written notice to the Servicer, may terminate this Agreement whereupon the Servicer shall be removed from its duties and obligations as Servicer under this Agreement with respect to the Senior Loan and the Agent, subject to the Lender's approval, not to be unreasonably withheld or delayed, shall appoint a replacement servicer to service, manage, and collect the Senior Loan.

Section 5.3    Effect of Termination for Cause by Lender.  Upon termination of this Agreement pursuant to Section 5.2, the Servicer shall not be entitled to any Servicing Fee with respect to the Senior Loan after the date of transfer to the replacement servicer other than fees due to Servicer under this Agreement prior to the date of transfer to a replacement servicer and any reasonable and proper administrative fees and costs incurred by Servicer in transferring to a replacement servicer or reasonably incurred by Servicer hereunder prior to the transfer of servicing. Upon termination of this Agreement with respect to the Senior Loan, the Servicer shall promptly deliver or cause to be delivered to the replacement servicer all books and records that the Servicer has

maintained with respect to the Senior Loan, including, without limitation, the Senior Loan documents then in the Servicer's possession. Any Senior Loan proceeds received by the Servicer with respect to the Senior Loan no longer serviced by the Servicer hereunder after removal shall be remitted directly and immediately to the replacement servicer or the Lender. The Servicer agrees to cooperate with any such replacement servicer in effecting the termination of any of the Servicer's servicing responsibilities and rights under this Agreement and shall promptly provide such replacement servicer with all documents and records reasonably requested by it to enable it to assume the Servicer's functions hereunder. Agent shall pay Servicer a Workout Fee if the Senior Loan is subject to previously approved Resolution Plans which have been implemented prior to the transfer of the Senior Loan to a replacement servicer.

Section 5.4    Termination by Servicer.  Upon the occurrence of a Termination Event caused by the Lender or Agent, if any, Servicer, upon thirty (30) days written notice to Lender or Agent, as applicable, may terminate this Agreement with respect to its duties to service, manage and collect upon the Senior Loan.

Section 5.5    Effect of Termination by Servicer.  Upon termination of this Agreement by Servicer pursuant to Section 5.4, the Lender shall promptly pay Servicer all unpaid fees incurred under this Agreement prior to the date of transfer to a replacement servicer and any administrative fees and costs incurred by Servicer in transferring to a replacement servicer or incurred by Servicer hereunder prior to the transfer of servicing.

Section 5.6    Termination Without Cause.  Either Lender or Servicer may terminate this Agreement without cause upon a thirty (30) day written notice to the other party.  Should the Lender terminate this Agreement pursuant to this Section 5.6, the Agent agrees to promptly pay Servicer all unpaid fees incurred under this Agreement prior to the date of transfer to a replacement servicer and any reasonable and proper administrative fees and costs incurred by Servicer in transferring to a replacement servicer or incurred by Servicer hereunder prior to the transfer of servicing.  Should the Servicer terminate this Agreement pursuant to this Section 5.6, the Servicer agrees to reimburse the Agent and Lender for any reasonable costs incurred by the Agent or Lender in transferring the Servicer's obligations under this Agreement to a replacement servicer.  No termination without cause by Servicer shall become effective until a replacement servicer shall have assumed the Servicer's responsibilities and obligations hereunder, provided however that if the Lender or Agent has not selected a replacement servicer within sixty (60) days of written notice from Servicer of its desire to terminate this Agreement without cause, then Servicer may resign effective on the 61st day and shall immediately provide the Agent with all books and records that the Servicer has maintained with respect to the Senior Loan, including without limitation all loan documents then in the Servicer's possession.

Section 5.7    Term.  Unless terminated pursuant to this Section 5, or unless otherwise agreed upon in writing by the parties, this Agreement shall continue until the Senior Loan is fully paid, liquidated, or otherwise resolved.

Section 5.8    Conflict.  If there is any conflict between the terms of this Section 5 and the terms of the Loan Documents, the terms of the Loan Documents shall govern.

## ARTICLE VI

## INTENTIONALLY DELETED

## ARTICLE VII

## INDEMNIFICATION AND LIABILITY

Section 7.1    Indemnification by Servicer.  Except to the extent provided in the next sentence, Servicer shall indemnify, defend and hold harmless, at Servicer's sole expense, Lender and Agent and their respective affiliates from and against any losses caused by, resulting from or arising out of (i) Servicer's breach of any covenant, representation, warranty or other provision of this Agreement or other failure to perform its duties in accordance with this Agreement, or (ii) Servicer's gross negligence, willful misconduct or willful violation of law.  Notwithstanding anything to the contrary, Servicer shall not be responsible to indemnify Lender from or against any act or omission which Servicer takes or fails to take pursuant to the express written instructions of Lender or Agent or any other act or omission which complies strictly with the Loan Documents.

Section 7.2    Indemnification by Agent.  Agent shall indemnify, defend and hold harmless, at Agent's sole expense, Lender and Servicer and their respective affiliates as from and against any losses caused by, resulting from or arising out of (a) Agent's breach of any covenant, representation, warranty or other provision of this Agreement or other failure to perform its duties in accordance with this Agreement, (b) Agent's gross negligence, willful misconduct or willful violation of law, (c) Lender's and Servicer's execution, delivery or good faith performance of this Agreement, or (d) Lender's and Servicer's acting under the directions of Agent or in accordance with the Loan Documents.

Section 7.3    Indemnification by Lender.  Lender shall indemnify, defend and hold harmless, at Lender's sole expense, Servicer and Agent and their respective affiliates from and against any losses caused by, resulting from or arising out of (a) Lender's breach of any covenant, representation, warranty or other provision of this Agreement or other failure to perform its duties in accordance with this Agreement, (b) Lender's gross negligence, willful misconduct or willful violation of law, (c) Servicer's and Agent's execution, delivery or good faith performance of this Agreement, or (d) Servicer's and Agent's acting under the directions of Lender or in accordance with the Loan Documents.

Section 7.4    Survival of Indemnification Obligations.  The indemnification obligations under this Article VII shall survive the expiration or termination of this Agreement for any reason.

## ARTICLE VIII

### MISCELLANEOUS

Section 8.1  <u>Severability Clause.</u>  Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision, representation or warranty of this Agreement shall deprive any party of the economic benefit intended to be conferred by this Agreement, the parties shall negotiate in good faith to develop a structure the economic effect of which is as nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

Section 8.2  <u>Notices.</u> Any notices, consents, directions, demands or other communications given under this Agreement shall be in writing and shall be deemed to have been duly given when delivered in person or by overnight delivery at, or telecopied to: (i) the respective addresses or telecopy numbers, as the case may be, set forth below (or to such other address or telecopy numbers as such party shall give notice to the other parties pursuant to this <u>Section 8.2</u>):

| | |
|---|---|
| If to the Lender: | DekaBank Deutsche Girozentrale<br>Mainzer Landstrasse 16<br>60325 Frankfurt, Germany<br>Attn: Carsten Götsch<br>Telecopy: (+49) 69-7147-2875 |
| With a copy to: | Shearman & Sterling LLP<br>599 Lexington Avenue<br>New York, New York 10022<br>Attn: Robert W. Fagiola<br>Telecopy: (646) 848-7606 |
| If to the Agent: | Lehman Brothers Holdings, Inc.<br>399 Park Avenue, 8th Floor<br>New York, NY 10022<br>Attn: Charlene Thomas<br>Telecopy: (646)758-4544 |
| With a copy to: | Dechert LLP |

30 Rockefeller Plaza
New York, NY 10112
Attn: Lawrence A. Ceriello
Telecopy: (212) 698-3599

If to the Servicer:      TriMont Real Estate Advisors
Monarch Tower
3424 Peachtree Road NE , Suite 2200
Atlanta, GA 30326
Attn: J. Gregory Winchester
Telecopy: (404) 582-8760

With a copy to:      Kilpatrick Stockton LLP
Suite 2800
1100 Peachtree Street
Atlanta, GA 30309-4530
Attn: Richard W. White
Telecopy: (404) 541-3490

A copy of all such demands, notices or communications given to Lender hereunder shall be sent to the Agent simultaneously with service thereof.

Section 8.3    Counterparts.  For the purpose of facilitating the execution of this Agreement and for other purposes, this Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed to be an original, and together shall constitute and be one and the same instrument.

Section 8.4    Governing Law; Waiver of Jury Trial.

(a)    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. Any dispute arising hereunder or related to this Agreement shall be resolved in the federal court sitting in New York, New York, and the parties hereto hereby irrevocably agree that all claims in respect of such action or proceeding may be heard and determined in such federal court.

(b)    **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED THEREUNDER.**

Section 8.5    Amendments.  This Agreement may be amended from time to time by a written instrument signed by all of the parties hereto and no waiver of any of the terms hereof by any party shall be effective unless it is in writing and signed by the other parties.

13132139.4                                    19

Section 8.6   Headings Descriptive.   The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 8.7   General Definitional Provisions.

(a)   The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, subsection, appendix and exhibit references are to this Agreement, unless otherwise specified.

(b)   The meanings given to terms defined herein shall be equally applicable to the singular and plural forms of such terms.

(c)   Capitalized terms and phrases not otherwise defined in this Agreement shall have the meanings ascribed to them in the Loan Documents.

Section 8.8   Judicial Interpretation.   Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any person by reason of the rule of construction that a document is to be construed more strictly against the person who itself or through its agent prepared the same, it being agreed that all parties hereto have participated in the preparation of this Agreement.

Section 8.9   Integration.   The Agreement comprises the final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof as of the date hereof and shall constitute the entire agreement among the parties hereto with respect to such subject matter, superseding all prior oral or written understandings.

Section 8.10   Successors and Assigns.   This Agreement shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.

Section 8.11   Assignment.

(a)   This Agreement may be assigned by Agent to any person with Lender's prior written consent (such consent not to be unreasonably withheld or delayed) upon five (5) days prior written notice to Servicer.

(b)   This Agreement shall not be assigned by (i) Servicer without the prior written consent of Lender and Agent (such consent to be exercised at Lender's and Agent's sole discretion) and (ii) Lender unless it is to the Co-Lender(s) in a Syndication of the Senior Loan made in accordance with the terms of the Loan Documents. Any assignee of Lender under this Agreement must assume in writing the obligations of Lender hereunder and agree to be bound by the terms and provisions hereof and such proposed assignee shall also remake

each of the representations and warranties contained herein for the benefit of the parties hereto.

Section 8.12    Waiver of Conflict. The Lender acknowledges that Lehman is, as of the date hereof, both the initial Mezzanine Lender under the Mezzanine Loan Agreement and the initial Agent under this Agreement ("**Joint Responsibility**") and further acknowledges that Lender's interests as Senior Lender under the Mortgage Loan Agreement and Lehman's interests as Mezzanine Lender are potentially adverse. Notwithstanding the foregoing, Lender expressly consents and agrees to Lehman assuming such Joint Responsibility and, in furtherance of its acknowledgement in the preceding sentence, Lender expressly waives any claim that it may have at any time against Lehman whatsoever (in its capacity as Mezzanine Lender under the Mezzanine Loan Agreement, as Agent under this Agreement or otherwise) based solely on the fact that Lehman is assuming such Joint Responsibility.

[    REMAINDER OF PAGE INTENTIONALLY BLANK    ]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their authorized officer as of the day and year first above written.

**LENDER:**

DekaBank Deutsche Girozentrale

By: _____
    Name: Thomas Kling
    Title: Senior Vice President

By: _____
    Name: Carsten Gatzke
    Title: Vice President

**SERVICER:**

TriMont Real Estate Advisors, Inc.

By: _____
    Name:
    Title:

**AGENT:**

Lehman Brothers Holdings, Inc.

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed by their authorized officer as of the day and year first above written.

LENDER:

DekaBank Deutsche Girozentrale

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

SERVICER:

TriMont Real Estate Advisors, Inc.

By: _____
    Name: Doug Sullivan
    Title: Vice President

AGENT:

Lehman Brothers Holdings, Inc.

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the undersigned have caused this Agreement to be executed by their authorized officer as of the day and year first above written.

LENDER:                                              SERVICER:

DekaBank Deutsche Girozentrale                        TriMont Real Estate Advisors, Inc.

By: _____                        By: _____
    Name:                                                Name:
    Title:                                               Title:

By: _____
    Name:
    Title:

AGENT:

Lehman Brothers Holdings, Inc.

By: _____
    Name:  CHARLENE THOMAS
    Title:  AUTHORIZED SIGNATORY

<u>EXHIBIT A</u>

FEES FOR SPECIAL SERVICING

As compensation for special services hereunder, the Servicer shall be entitled to the following fees:

I.      A Special Servicing Fee equal to one twelfth of 0.25% per annum of the principal balance of the Specially Serviced Senior Loan, as of the preceding Payment Date, allocated to the Specially Serviced Senior Loan or the Senior Loan if the Premises have become an REO Property, in accordance with the principal balance of the Senior Loan outstanding as of the end of the preceding Payment Date.

II.     If any of the events referred to in paragraphs (a) to (i) of <u>Section 1.9</u> (each a "**Servicing Transfer Event**") in connection with a monetary default is terminated following resolution of such Servicing Transfer Event by a written agreement with the Borrower with respect to such monetary default that was negotiated by the Servicer, a workout fee ("**Workout Fee**") equal to 0.50% of each payment of principal and interest made in respect of the Specially Serviced Senior Loan following such written agreement for so long as another Servicing Transfer Event with respect to such Serviced Loan does not occur.

III.    A liquidation fee ("**Liquidation Fee**") with respect to the Specially Serviced Senior Loan if the Servicer received liquidation proceeds (including by way of discounted payoff), equal to the product of (a) 0.50% and (b) a fraction, the numerator of which is equal to the net liquidation proceeds received (after payment of all other fees and expenses with respect thereto, but without taking into account the Liquidation Fee) and the denominator of which is equal to the unpaid principal balance of such Specially Serviced Senior Loan plus accrued and unpaid interest thereon, and (c) the net liquidation proceeds.

**LEHMAN BROTHERS HOLDINGS INC.**
399 Park Avenue
New York, New York 10022

November 9, 2006

DekaBank Deutsche Girozentrale
Mainzer Landstrasse 16
60325 Frankfurt, Germany
Attn: Martin Bess

Re: Loan (the "**Loan**") made in the original principal amount of $74,600,000
pursuant to the terms and provisions of (i) that certain Mortgage Loan Agreement
("**Mortgage Loan Agreement**") dated as of December 15, 2005, between
Lehman Brothers Holdings Inc., ("**Lehman**") and 254 PAS Property LLC,
("**Borrower**"), (ii) that certain Building Loan Agreement dated as of December
15, 2005 between Borrower and Lehman (the "**Building Loan Agreement**"), and
(iii) that certain Project Loan Agreement dated as of December 15, 2005 between
Borrower and Lehman (the "**Project Loan Agreement**"; the Mortgage Loan
Agreement, the Building Loan Agreement and the Project Loan Agreement, as
each are amended, restated, replaced, supplemented or otherwise modified from
time to time, are collectively referred to herein as the "**Loan Agreement**").

Ladies and Gentlemen:

As a condition to your purchase of Lehman's interest in the Loan pursuant to that
certain Assignment and Assumption Agreement dated as of the date hereof between
Lehman and DekaBank Deutsche Girozentrale, the undersigned hereby confirms that, to
Lehman's actual knowledge, Borrower has materially satisfied or caused to be materially
satisfied either prior to the closing of the Loan or by the date hereof, all conditions
precedent that are required by Lehman when originating mortgage loans of a similar
amount, type and quality to that of the Loan made by Lehman.

All terms not defined herein shall have the meanings set forth in the Loan
Agreement.

[    *Signature(s) on following page*    ]

Very truly yours,

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware Corporation

By: _____

Name:    CHARLENE THOMAS
Title:    AUTHORIZED SIGNATORY

# INTERCREDITOR AGREEMENT

by and between

## LEHMAN BROTHERS HOLDINGS INC.
as Senior Lender

and

## LEHMAN BROTHERS HOLDINGS INC.
as Mezzanine Lender

dated as of December 15, 2005

254 Park Avenue South
New York, New York

## INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (this "**Agreement**"), dated as of December 15, 2005, by and between LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, having an office at 399 Park Avenue, New York, New York 10022 ("**Senior Lender**"), and LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation, individually and as agent for one or more Co-Lenders, having an office at 399 Park Avenue, New York, New York 10022 ("**Mezzanine Lender**").

## RECITALS

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Senior Loan Agreement, dated as of the date hereof (the "**Mortgage Loan Agreement**") among Senior Lender and 254 PAS Property LLC, a Delaware limited liability company ("**Borrower**"), Senior Lender has made a loan to Borrower in the original principal amount of $37,379,167.00 (the "**Mortgage Loan**"), which Mortgage Loan is evidenced by that certain Amended and Restated Promissory Note, dated as of the date hereof, made by Borrower in favor of Senior Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time the "**Mortgage Note**"), and secured by, among other things, that certain Amended and Restated Mortgage, Assignment of Leases and Rents and Security Agreement, dated as of the date hereof, between Borrower and Senior Lender (the "**Mortgage**"), which Mortgage encumbers the real property, and all improvements thereon and appurtenances thereto, described in the Mortgage and more particularly described on Exhibit A hereto (the "**Premises**"), and is further evidenced and secured by the instruments and documents set forth on Exhibit B hereto (as any of the foregoing, including the instruments and documents set forth on Exhibit B, may be modified, amended, extended, supplemented, restated or replaced from time to time, the "**Mortgage Loan Documents**");

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Building Loan Agreement, dated as of the date hereof (the "**Building Loan Agreement**") among Borrower and Senior Lender, Senior Lender has made a loan to Borrower in the original principal amount of $19,168,360.00 (the "**Building Loan**"), which Building Loan is evidenced by that certain Promissory Note (Building Loan) (the "**Building Loan Note**"), dated as of the date hereof, made by Borrower and secured by, among other things, that certain Mortgage, Assignment of Leases and Rents and Security Agreement (Building Loan), dated as of the date hereof, between Borrower and Senior Lender (the "**Building Loan Mortgage**"), which Building Loan Mortgage encumbers the Premises and is further evidenced and secured by the instruments and documents set forth on Exhibit B hereto (as any of the foregoing, including the instruments and documents set forth on Exhibit B, may be modified, amended, extended, supplemented, restated or replaced from time to time, the "**Building Loan Documents**");

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Project Loan Agreement, dated as of the date hereof (the "**Project Loan Agreement**") among Borrower and Senior Lender, Senior Lender has made a loan to Borrower in the original principal amount of $18,051,973.00 (the "**Project Loan**"), which Project Loan is evidenced by that certain Promissory Note (Project Loan) (the "**Project Loan Note**"), dated as of the date hereof, made by Borrower and secured by, among other things, that certain Mortgage,

Assignment of Leases and Rents and Security Agreement (Project Loan), dated as of the date hereof, between Borrower and Senior Lender (the "**Project Loan Mortgage**"), which Project Loan Mortgage encumbers the Premises and is further evidenced and secured by the instruments and documents set forth on Exhibit B hereto (as any of the foregoing, including the instruments and documents set forth on Exhibit B, may be modified, amended, extended, supplemented, restated or replaced from time to time, the "**Project Loan Documents**");

WHEREAS, for purposes of this Agreement (a) the Building Loan Agreement, the Project Loan Agreement and the Mortgage Loan Agreement are sometimes hereinafter collectively referred to as the "**Senior Loan Agreement**"; (b) the Building Loan, the Project Loan and the Mortgage Loan are sometimes hereinafter collectively referred to as the "**Senior Loan**"; (c) the Building Loan Note, the Project Loan Note and the Mortgage Note are sometimes hereinafter collectively referred to as the "**Senior Note**"; (d) the Building Loan Mortgage, the Project Loan Mortgage and the Mortgage are sometimes hereinafter collectively referred to as the "**Senior Mortgage**"; and (e) the Building Loan Documents, the Project Loan Documents and the Mortgage Loan Documents are sometimes herein collectively referred to as the "**Senior Loan Documents**";

WHEREAS, pursuant to the terms, provisions and conditions set forth in that certain Mezzanine Loan Agreement, dated as of the date hereof, among 254 PAS MEZZ LLC, a Delaware limited liability company ("**Mezzanine Borrower**"), and Mezzanine Lender (the "**Mezzanine Loan Agreement**"), Mezzanine Lender has made a loan to Mezzanine Borrower in the original principal amount of $20,700,000.00 (the "**Mezzanine Loan**"), which Mezzanine Loan is evidenced by that certain Mezzanine Promissory Note, dated as of the date hereof, made by Mezzanine Borrower to Mezzanine Lender in the amount of the Mezzanine Loan (the "**Mezzanine Note**"), and secured by, among other things, that certain Pledge and Security Agreement, dated as of the date hereof, from Mezzanine Borrower, pursuant to which Mezzanine Lender is granted a first priority perfected security interest in one hundred percent (100%) of the ownership interests of Borrower (collectively, the "**Pledge Agreement**"); and

NOW, THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Senior Lender and Mezzanine Lender hereby agree as follows:

Section 1.    Certain Definitions; Rules of Construction.

(a)    As used in this Agreement, the following capitalized terms shall have the following meanings:

"**Affiliate**" means, as to any particular Person, any Person directly or indirectly, through one or more intermediaries, controlling, Controlled by or under common control with the Person or Persons in question.

"**Agreement**" means this Agreement, as the same may be amended, modified and in effect from time to time, pursuant to the terms hereof.

"**Award**" has the meaning provided in Section 9(d) hereof.

-2-

12855326.4

"**Borrower**" has the meaning provided in the Recitals hereto.

"**Borrower Group**" has the meaning provided in Section 10(c) hereof.

"**Business Day**" means any day other than a Saturday, Sunday or any other day on which national banks in New York, New York are not open for business.

"**CDO**" has the meaning provided in the definition of the term "**Qualified Transferee.**"

"**Completion Guarantee**" means the Guaranty of Completion, dated as of the date hereof, among Guarantor and Senior Lender.

"**Continuing Senior Loan Event of Default**" means an Event of Default under the Senior Loan for which (i) Senior Lender has provided notice of such Event of Default to Mezzanine Lender in accordance with Section 11(a) of this Agreement and (ii) the cure period provided to Mezzanine Lender in Section 11(a) of this Agreement has expired.

"**Control**" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "**Controlled by,**" "**controlling**" and "**under common control with**" shall have the respective correlative meaning thereto.

"**Directing Mezzanine Lender**" has the meaning provided in Section 4(c) hereof.

"**Eligibility Requirements**" means, with respect to any Person, that such Person (i) has total assets (in name or under management) in excess of $600,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans (or interests in commercial real estate loans) or operating commercial mortgage properties.

"**Enforcement Action**" means any (A) judicial or non-judicial foreclosure proceeding, the exercise of any power of sale, the taking of a deed or assignment in lieu of foreclosure, the obtaining of a receiver or the taking of any other enforcement action against the Premises, Borrower or Mezzanine Borrower, as applicable, including, without limitation, the taking of possession or control of the Premises, (B) acceleration of, or demand or action taken in order to collect, all or any indebtedness secured by the Premises (other than giving notices of default and statements of overdue amounts) or (C) exercise of any right or remedy available to (1) Senior Lender under the Senior Loan Documents, at law, in equity or otherwise with respect to Borrower and/or the Premises or (2) Mezzanine Lender under the Mezzanine Loan Documents, at law, in equity or otherwise with respect to Mezzanine Borrower and/or the Separate Collateral.

"**Equity Collateral**" means the equity interests pledged pursuant to the Pledge Agreement.

"**Equity Collateral Enforcement Action**" means any action or proceeding or other exercise of Mezzanine Lender's rights and remedies commenced by Mezzanine Lender, in law or in equity, or otherwise, in order to realize upon the Equity Collateral.

"**Event of Default**" as used herein means (i) with respect to the Senior Loan and the Senior Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Borrower or by the Mezzanine Lender in accordance with the terms of this Agreement) and (ii) with respect to the Mezzanine Loan and the Mezzanine Loan Documents, any Event of Default thereunder which has occurred and is continuing (i.e., has not been cured by Mezzanine Borrower).

"**Loan Pledgee**" has the meaning provided in Section 15 hereof.

"**Loan Purchase Price**" has the meaning provided in Section 13(a) hereof.

"**Mezzanine Borrower**" has the meaning provided in the Recitals hereto.

"**Mezzanine Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Mezzanine Loan**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Mezzanine Loan Documents**" means the Mezzanine Loan Agreement, the Mezzanine Note and the Pledge Agreement, together with all documents and instruments set forth on Exhibit C hereto, as any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Mezzanine Loan Modification**" has the meaning provided in Section 7(b) hereof.

"**Mezzanine Note**" has the meaning provided in the Recitals hereto.

"**Monetary Cure Period**" has the meaning provided in Section 11(a) hereof.

"**Patriot Act**" means the United States of America Patriot Act, Pub.L. No. 107-56.

"**Permitted Fund Manager**" means any Person that on the date of determination is (i) one of the entities listed on Exhibit D or any other nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding.

"**Person**" means any individual, sole proprietorship, corporation, general partnership, limited partnership, limited liability company or partnership, joint venture, association, joint stock company, bank, trust, estate unincorporated organization, any federal, state, county or municipal government (or any agency or political subdivision thereof) endowment fund or any other form of entity.

-4-

"**Pledge**" has the meaning provided in Section 15 hereof.

"**Pledge Agreement**" has the meaning provided in the Recitals hereto.

"**Premises**" has the meaning provided in the Recitals hereto.

"**Proceeding**" has the meaning provided in Section 10(c) hereof.

"**Prohibited Person**" shall mean any Person:

        (i)    listed in the annex to, or who is otherwise subject to the provisions of, Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "**Executive Order**");

        (ii)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed in the annex to, or is otherwise subject to the provisions, of the Executive Order;

        (iii)    with whom a Person is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering Law, including the Executive Order;

        (iv)    who commits, threatens or conspires to commit or supports "**terrorism**" as defined in the Executive Order;

        (v)    that is named as a "**specially designated national and blocked person**" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website or at any replacement website or other replacement official publication of such list; or

        (vi)    who is an Affiliate of a Person listed in clauses (i) – (v) above.

"**Property Manager**" means (i) with respect to the Premises, Penmark Realty Corp., a New York corporation, or any successor thereto as property manager of the Premises or any portion thereof.

"**Protective Advances**" means all sums advanced for the purpose of payment of real estate taxes (including special payments in lieu of real estate taxes), maintenance costs, insurance premiums or other items (including capital items) reasonably necessary to protect the Premises or the Separate Collateral, respectively, from forfeiture, casualty, loss or waste, to protect the lien of the Senior Loan Documents, and with respect to the Mezzanine Loan, amounts advanced by Mezzanine Lender pursuant to Section 11 hereof.

"**Purchase Option Notice**" has the meaning provided in Section 13(a) hereof.

"**Qualified Manager**" shall mean (i) a Person which, together with its Affiliates, (x) has constructed, or has caused the renovation and conversion of existing apartment units to

condominium ownership, of at least 500 residential condominium units, and (y) manages at least three (3) multifamily rental buildings, or (ii) a Person which is otherwise reasonably acceptable to Senior Lender.

"**Qualified Transferee**" means a Person that is not a "Prohibited Person" for purposes of the Patriot Act and that is (i) Mezzanine Lender or any Affiliate Controlled by the Mezzanine Lender, or (ii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (ii)(A) or (ii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i) or clauses (ii)(A) or (ii)(C);

(E)    a Qualified Trustee in connection with a securitization of, the creation of collateralized debt obligations (including, without limitation, collateralized loan obligations) ("CDO") secured by or financing through an "owner trust" of, the Mezzanine Loan (collectively, "**Securitization Vehicles**"), so long as (A) the special servicer or manager of such Securitization Vehicle has the Required Special Servicer Rating and (B) the entire "controlling class" of such Securitization Vehicle, other than with respect to a CDO Securitization Vehicle, is held by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition; provided that the operative documents of the related Securitization Vehicle require that (1) in the case of a CDO Securitization Vehicle, the "equity interest" in such Securitization Vehicle is owned by one or more entities that are Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition and (2) if any of the relevant trustee, special servicer, manager fails to meet the requirements of this clause (E), such Person must be replaced by a Person meeting the requirements of this clause (E) within thirty (30) days;

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager or an entity that is otherwise a Qualified Transferee under clauses (ii)(A), (B), (C) or (D) of this definition acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (ii)(A), (B), (C) or (D) of this definition;

(G)    any entity listed on Exhibit D attached hereto;

(H)    any entity listed on Exhibit E attached hereto; or

(I)    any Affiliate of a Person described in subparagraphs (A) – (H).

"**Qualified Trustee**" means (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

"**Rating Agencies**" shall mean each of S&P, Moody's Investors Service, Inc., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been designated by Senior Lender.

"**Redirection Notice**" has the meaning provided in Section 15 hereof.

"**Required Special Servicer Rating**" means (i) a rating of "CSS1" in the case of Fitch, (ii) on the S&P Select Servicer List as a U.S. Commercial Special Servicer in the case of S&P and (iii) in the case of Moody's, such special servicer is acting as special servicer in a commercial mortgage loan securitization that was rated by Moody's within the twelve (12) month period prior to the date of determination, and Moody's has not downgraded or withdrawn the then-current rating on any class of commercial mortgage securities or placed any class of commercial mortgage securities on watch citing the continuation of such special servicer as special servicer of such commercial mortgage securities.

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**Senior Lender**" has the meaning provided in the first paragraph of this Agreement.

"**Senior Loan**" has the meaning provided in the Recitals hereto.

"**Senior Loan Agreement**" has the meaning provided in the Recitals hereto.

"**Senior Loan Cash Management Agreement**" means any cash management agreement or agreements executed in connection with, or cash management provisions of, the Senior Loan Documents.

"**Senior Loan Collateral**" means (i) the Premises and (ii) all other collateral given as security for the Senior Loan pursuant to the Senior Loan Documents.

"**Senior Loan Default Notice**" has the meaning provided in Section 11(a) hereof.

"**Senior Loan Documents**" means the Senior Loan Agreement, the Senior Note and the Senior Mortgage, together with the instruments and documents set forth on Exhibit B hereto, as

any of the foregoing may be modified, amended, extended, supplemented, restated or replaced from time to time, subject to the limitations and agreements contained in this Agreement.

"**Senior Loan Liabilities**" shall mean, collectively, all of the indebtedness, liabilities and obligations of Borrower evidenced by the Senior Loan Documents and all amounts due or to become due pursuant to the Senior Loan Documents, including interest thereon and any other amounts payable in respect thereof or in connection therewith, including, without limitation, any late charges, default interest, prepayment fees or premiums, exit fees, advances and post-petition interest.

"**Senior Loan Modification**" has the meaning provided in Section 7(a) hereof.

"**Senior Mortgage**" has the meaning provided in the Recitals hereto.

"**Senior Note**" has the meaning provided in the Recitals hereto.

"**Separate Collateral**" means (i) the Equity Collateral and (ii) any other collateral given as security for the Mezzanine Loan pursuant to the Mezzanine Loan Documents and in accordance with the terms of this Agreement, in each case not directly constituting security for the Senior Loan.

"**SPE Constituent Entity**" means Borrower, Mezzanine Borrower and each of the respective pledgors (other than any individual pledgors) under the Pledge Agreement.

"**Successor Borrower**" has the meaning provided in Section 5(c) hereof.

"**Third Party Agreement**" has the meaning set forth in Section 5(a) hereof.

"**Third Party Obligor**" has the meaning set forth in Section 5(a) hereof.

"**Transfer**" means any assignment, pledge, conveyance, sale, transfer, mortgage, encumbrance, grant of a security interest, issuance of a participation interest, or other disposition, either directly or indirectly, by operation of law or otherwise.

(b)    For all purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(i)    all capitalized terms defined in the recitals to this Agreement shall have the meanings ascribed thereto whenever used in this Agreement and the terms defined in this Agreement have the meanings assigned to them in this Agreement, and the use of any gender herein shall be deemed to include the other genders;

(ii)    all capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Senior Loan Agreement;

(iii)    all references in this Agreement to designated Sections, Subsections, Paragraphs, Articles, Exhibits, Schedules and other subdivisions or addenda without reference to a document are to the designated sections, subsections, paragraphs

-8 -

and articles and all other subdivisions of and exhibits, schedules and all other addenda to this Agreement, unless otherwise specified;

(iv)    a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall apply to Paragraphs and other subdivisions;

(v)    the terms "**includes**" or "**including**" shall mean without limitation by reason of enumeration;

(vi)    the words "**herein**", "**hereof**", "**hereunder**" and other words of similar import refer to this Agreement as a whole and not to any particular provision;

(vii)    the words "**to Mezzanine Lender's knowledge**" or "**to the knowledge of Mezzanine Lender**" (or words of similar meaning) shall mean to the actual knowledge of officers of Mezzanine Lender with direct oversight responsibility for the Mezzanine Loan without independent investigation or inquiry and without any imputation whatsoever; and

(viii)    the words "**to Senior Lender's knowledge**" or "**to the knowledge of Senior Lender**" (or words of similar meaning) shall mean to the actual knowledge of officers of Senior Lender with direct oversight responsibility for the Senior Loan without independent investigation or inquiry and without any imputation whatsoever.

Section 2.    Approval of Loans and Loan Documents.

(a)    Mezzanine Lender hereby acknowledges that (i) it has received and reviewed and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Senior Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Senior Loan Documents, (ii) the execution, delivery and performance of the Senior Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Mezzanine Loan Documents, (iii) Senior Lender is under no obligation or duty to, nor has Senior Lender represented that it will, see to the application of the proceeds of the Senior Loan by Borrower or any other Person to whom Senior Lender disburses such proceeds and (iv) any application or use of the proceeds of the Senior Loan for purposes other than those provided in the Senior Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Senior Loan Documents.

(b)    Senior Lender hereby acknowledges that (i) it has received and reviewed, and, subject to the terms and conditions of this Agreement, hereby consents to and approves of the making of the Mezzanine Loan and, subject to the terms and provisions of this Agreement, all of the terms and provisions of the Mezzanine Loan Documents, (ii) the execution, delivery and performance of the Mezzanine Loan Documents will not constitute a default or an event which, with the giving of notice or the lapse of time, or both, would constitute a default under the Senior Loan Documents, (iii) Mezzanine Lender is under no obligation or duty to, nor has Mezzanine Lender represented that it will, see to the application of the proceeds of the Mezzanine Loan by Mezzanine Borrower or any other Person to whom Mezzanine Lender

-9-

disburses such proceeds and (iv) any application or use of the proceeds of the Mezzanine Loan for purposes other than those provided in the Mezzanine Loan Documents shall not affect, impair or defeat the terms and provisions of this Agreement or the Mezzanine Loan Documents. Senior Lender hereby acknowledges and agrees that any conditions precedent to Senior Lender's consent to mezzanine financing as set forth in the Senior Loan Documents or any other agreements with the Borrower, as they apply to the Mezzanine Loan Documents or the making of the Mezzanine Loan, have been either satisfied or waived.

Section 3.    Representations and Warranties.

(a)    Mezzanine Lender hereby represents and warrants as follows:

(i)    To Mezzanine Lender's knowledge, Exhibit C attached hereto and made a part hereof is a true, correct and complete listing of all of the Mezzanine Loan Documents as of the date hereof. To Mezzanine Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Mezzanine Loan Documents.

(ii)    Mezzanine Lender is the legal and beneficial owner of the entire Mezzanine Loan free and clear of any lien, security interest, option or other charge or encumbrance, other than any lien or security interest granted to any Loan Pledgee as contemplated by the provisions of Section 15 hereof.

(iii)    There are no conditions precedent to the effectiveness of this Agreement or the enforceability of this Agreement against Mezzanine Lender that have not been satisfied or waived.

(iv)    Mezzanine Lender has, independently and without reliance upon Senior Lender and based on such documents and information as Mezzanine Lender deems appropriate, made its own credit analysis and decision to enter into the Mezzanine Loan and this Agreement.

(v)    Mezzanine Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)    All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Mezzanine Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)    Mezzanine Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Mezzanine Lender enforceable against Mezzanine Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws, and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

-10-

(viii) To Mezzanine Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Mezzanine Lender of this Agreement or consummation by Mezzanine Lender of the transactions contemplated by this Agreement.

(ix) None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement by Mezzanine Lender will (v) violate or conflict with any provision of the organizational or governing documents of Mezzanine Lender, (w) to Mezzanine Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Mezzanine Lender is a party or to which any of its properties are subject, (x) to Mezzanine Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Mezzanine Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise, or other instrument (provided, however, that Mezzanine Lender shall have the right to grant a lien, charge, encumbrance, claim or security interest in the Mezzanine Loan or any portion thereof to a Loan Pledgee as contemplated by the provisions of Section 15 hereof), (y) violate any judgment, order, injunction, decree, or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Mezzanine Lender has knowledge against, or binding upon Mezzanine Lender or upon any of the securities, properties, assets, or business of Mezzanine Lender or (z) to Mezzanine Lender's knowledge, constitute a violation by Mezzanine Lender of any statute, law or regulation that is applicable to Mezzanine Lender.

(x) The Mezzanine Loan is not cross-defaulted with any loan other than the Senior Loan. None of the Senior Loan Collateral secures any loan from Mezzanine Lender to Mezzanine Borrower or any other Affiliate of the Borrower.

(b) Senior Lender hereby represents and warrants as follows:

(i) To Senior Lender's knowledge, Exhibit B attached hereto and made a part hereof is a true, correct and complete listing of the Senior Loan Documents as of the date hereof. To Senior Lender's knowledge, there currently exists no default or event which, with the giving of notice or the lapse of time, or both, would constitute a default under any of the Senior Loan Documents.

(ii) Senior Lender is the legal and beneficial owner of the Senior Loan free and clear of any lien, security interest, option or other charge or encumbrance.

(iii) There are no conditions precedent to the effectiveness of this Agreement or the enforceability of this Agreement against Senior Lender that have not been satisfied or waived.

-11-

(iv)     Senior Lender has, independently and without reliance upon Mezzanine Lender and based on such documents and information as Senior Lender deems appropriate, made its own credit analysis and decision to enter into the Senior Loan and this Agreement.

(v)     Senior Lender is duly organized and is validly existing under the laws of the jurisdiction under which it was organized with full power to execute, deliver, and perform this Agreement and consummate the transactions contemplated hereby.

(vi)     All actions necessary to authorize the execution, delivery, and performance of this Agreement on behalf of Senior Lender have been duly taken, and all such actions continue in full force and effect as of the date hereof.

(vii)     Senior Lender has duly executed and delivered this Agreement and this Agreement constitutes the legal, valid, and binding agreement of Senior Lender enforceable against Senior Lender in accordance with its terms subject to (x) applicable bankruptcy, reorganization, insolvency and moratorium laws and (y) general principles of equity which may apply regardless of whether a proceeding is brought in law or in equity.

(viii)     To Senior Lender's knowledge, no consent of any other Person and no consent, license, approval, or authorization of, or exemption by, or registration or declaration or filing with, any governmental authority, bureau or agency is required in connection with the execution, delivery or performance by Senior Lender of this Agreement or consummation by Senior Lender of the transactions contemplated by this Agreement.

(ix)     None of the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated by this Agreement by Senior Lender will (v) violate or conflict with any provision of the organizational or governing documents of Senior Lender, (w) to Senior Lender's knowledge, violate, conflict with, or result in the breach or termination of, or otherwise give any other Person the right to terminate, or constitute (or with the giving of notice or lapse of time, or both, would constitute) a default under the terms of any contract, mortgage, lease, bond, indenture, agreement, or other instrument to which Senior Lender is a party or to which any of its properties are subject, (x) to Senior Lender's knowledge, result in the creation of any lien, charge, encumbrance, mortgage, lease, claim, security interest, or other right or interest upon the properties or assets of Senior Lender pursuant to the terms of any such contract, mortgage, lease, bond, indenture, agreement, franchise or other instrument, (y) violate any judgment, order, injunction, decree or award of any court, arbitrator, administrative agency or governmental or regulatory body of which Senior Lender has knowledge against, or binding upon, Senior Lender or upon any of the securities, properties, assets, or business of Senior Lender or (z) to Senior Lender's knowledge, constitute a violation by Senior Lender of any statute, law or regulation that is applicable to Senior Lender.

12855326.4

(x)    The Senior Loan is not cross-defaulted with the Mezzanine Loan. The Premises do not secure any other loan from Senior Lender to Borrower, Mezzanine Borrower or any other Affiliate of Borrower.

Section 4.    Transfer of Mezzanine Loan or Senior Loan.

(a)    Mezzanine Lender shall not Transfer more than 49% of its beneficial interest in the Mezzanine Loan unless either (i) Senior Lender has consented to such Transfer (such consent not to be unreasonably withheld or delayed) or (ii) such Transfer is to a Qualified Transferee. Any such transferee must assume in writing the obligations of Mezzanine Lender hereunder and agree to be bound by the terms and provisions hereof. Such proposed transferee shall also remake each of the representations and warranties contained herein for the benefit of the Senior Lender.

(b)    At least five (5) days prior to a transfer to a Qualified Transferee, the Mezzanine Lender shall provide to Senior Lender a certification that such transfer will be made in accordance with this Section 4, such certification to include the name and contact information of the Qualified Transferee.

(c)    If more than one Person shall hold a direct interest in the Mezzanine Loan, the holder(s) of more than 50% of the principal amount of the Mezzanine Loan shall designate by written notice to Senior Lender one of such Persons (the "**Directing Mezzanine Lender**") to act on behalf of all such Persons holding an interest in the Mezzanine Loan. The Directing Mezzanine Lender shall have the sole right to receive any notices which are required to be given or which may be given to Mezzanine Lender pursuant to this Agreement and to exercise the rights and power given to Mezzanine Lender hereunder, including any approval rights of Mezzanine Lender; provided, that until the Directing Mezzanine Lender has been so designated, the last Person known to the Senior Lender to hold more than a 50% direct interest in the Mezzanine Loan shall be deemed to be the Directing Mezzanine Lender. Once the Directing Mezzanine Lender has been designated hereunder, Senior Lender shall be entitled to rely on such designation until it has received written notice from the holder(s) of more than 50% of the principal amount of the Mezzanine Loan of the designation of a different Person to act as the Directing Mezzanine Lender.

(d)    Senior Lender may, from time to time, in its sole discretion Transfer all or any of the Senior Loan or any interest therein, provided that any such transferee assumes in writing the obligations of Senior Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof and notwithstanding any such Transfer or subsequent Transfer, the Senior Loan and the Senior Loan Documents shall be and remain a senior obligation in the respects set forth in this Agreement to the Mezzanine Loan and the Mezzanine Loan Documents in accordance with the terms and provisions of this Agreement. Notwithstanding the foregoing, no Transfer of all or any portion of the Senior Loan shall be knowingly made to Borrower or any Affiliate of Borrower.

12855326.4

Section 5.    <u>Foreclosure of Separate Collateral.</u>

(a)    Mezzanine Lender shall not exercise any rights it may have under the Pledge Agreement and the other Mezzanine Loan Documents or applicable law with respect to a foreclosure or other realization upon the Equity Collateral (including, without limitation, obtaining title to the Equity Collateral or selling or otherwise transferring the Equity Collateral) without obtaining the consent of Senior Lender (not to be unreasonably withheld or delayed) unless (i) the transferee of title to the Equity Collateral is a Qualified Transferee, and (ii) the Premises will be managed by a Qualified Manager immediately after the transfer of title to the Equity Collateral. Additionally, if a non-consolidation opinion was delivered in connection with the closing of the Senior Loan, the transferee of the Equity Collateral shall deliver a new non-consolidation opinion relating to the transferee reasonably acceptable to Senior Lender at least three (3) Business Days prior to the proposed date of the transfer of title to the Equity Collateral. Mezzanine Lender shall provide notice of the transfer to Senior Lender together with an officer's certificate from an officer of Mezzanine Lender certifying that all conditions set forth in this <u>Section 5(a)</u> have been satisfied. Senior Lender may request reasonable evidence that the foregoing requirements have been satisfied. In the event that such Transfer results in the removal of any guarantor, indemnitor, pledgor, or other obligor under the Senior Loan Documents (each, a "**Third Party Obligor**"), such transferee or an Affiliate thereof must be satisfactory to the Senior Lender (in the exercise of its reasonable judgment) and shall execute and deliver to Senior Lender a guaranty, indemnity, pledge agreement or other agreement which provides for the obligations of such obligor (each, a "**Third Party Agreement**"), in each case, in a form substantially similar to the Third Party Agreement that it is replacing, pursuant to which the Third Party Obligor shall undertake the obligations set forth therein.

(b)    Nothing contained herein shall limit or restrict the right of Mezzanine Lender to (i) exercise its rights and remedies, in law or in equity, or otherwise, in order to realize on any Separate Collateral that is not Equity Collateral, or (ii) exercise any other rights or remedies other than foreclosure of the Equity Collateral.

(c)    If the Mezzanine Lender (or such Mezzanine Lender's designee that is a Qualified Transferee) or any purchaser at a UCC sale obtains title to all or any portion of the Separate Collateral in accordance with this Agreement, Senior Lender acknowledges and agrees that (i) any transfer or assumption fee in the Senior Loan Agreement shall be waived as a condition to such transfer and any such transfer shall not constitute a breach or default under the Senior Loan Documents or cause the acceleration of the Senior Loan, provided all applicable conditions set forth in <u>Section 5(a)</u> and <u>Section 11(b)</u> are satisfied, and provided, <u>further</u>, that to the extent set forth in <u>Section 11(b)</u>, Senior Lender agrees to waive Events of Default under the Senior Loan Documents that are not susceptible to cure, and (ii) provided that no other Event of Default under the Senior Loan has occurred and is continuing from and after Mezzanine Lender (or such Mezzanine Lender's designee that is a Qualified Transferee) or any purchaser at a UCC sale that is a Qualified Transferee (each, a "**Successor Borrower**") obtains title to all or any portion of the Separate Collateral in accordance with this Agreement or otherwise exercises its rights to cure pursuant to <u>Section 11</u> hereof, and becomes the Successor Borrower or the curing Mezzanine Lender, as applicable, and complies in all material respects with the applicable terms, provisions, covenants and conditions set forth in the Senior Loan Agreement, Senior Lender shall remain obligated to continue to make Advances (as such term is defined in the Senior Loan

-14-

Agreement) to Mezzanine Lender or Successor Borrower, as applicable, in accordance with the procedures of Senior Loan Agreement; it being acknowledged and agreed by Senior Lender that, notwithstanding any other provision of the Senior Loan Agreement to the contrary, Mezzanine Lender or Successor Borrower, as applicable, shall have such additional reasonable time as is necessary for Completion of the Project Improvements. In the event that Successor Borrower obtains title to all or any portion of the Separate Collateral in accordance with this Agreement and Mezzanine Lender provides Senior Lender with one or more replacement guarantors acceptable to Senior Lender in Senior Lender's sole discretion (it being acknowledged and agreed that an acceptable replacement guarantor shall be either Mezzanine Lender or an Affiliate of Mezzanine Lender that meets the net worth and liquidity requirements set forth in the Completion Guaranty), and such replacement guarantor(s) execute and deliver to Senior Lender a new Completion Guaranty in substantially the form executed by the Guarantor, then, in such event, Senior Lender shall, contemporaneously with the execution of the new Completion Guaranty, assign to Mezzanine Lender all of Senior Lender's rights and title under and to the Completion Guaranty and take all reasonable actions requested by Mezzanine Lender without cost or expense to Senior Lender in order to assist Mezzanine Lender in the enforcement of the Completion Guaranty.

Section 6.    Intentionally Omitted.

Section 7.    Modifications, Amendments, Etc.

(a)    Senior Lender shall have the right without the consent of Mezzanine Lender in each instance to enter into any amendment, deferral, extension, modification, increase, renewal, replacement, consolidation, supplement or waiver (collectively, a "**Senior Loan Modification**") of the Senior Loan or the Senior Loan Documents provided that no such Senior Loan Modification shall (i) increase the interest rate or principal amount of the Senior Loan, (ii) increase in any other material respect any monetary obligations of Borrower under the Senior Loan Documents, (iii) extend or shorten the scheduled maturity date of the Senior Loan (except that Senior Lender may permit Borrower to exercise any extension options in accordance with the terms and provisions of the Senior Loan Documents), (iv) convert or exchange the Senior Loan into or for any other indebtedness or subordinate any of the Senior Loan to any indebtedness of Borrower, (v) amend or modify the provisions limiting transfers of interests in Borrower or the Premises, (vi) modify or amend the terms and provisions of the Senior Loan Cash Management Agreement with respect to the manner, timing and method of the application of payments under the Senior Loan Documents, (vii) cross default the Senior Loan with the Mezzanine Loan or any other indebtedness of the Borrower, the Mezzanine Borrower or any other indebtedness, (viii) consent to a higher strike price with respect to any new or extended interest rate cap agreement entered into in connection with the extended term of the Senior Loan, (ix) obtain any contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, (or other similar equity participation), (x) extend the period during which voluntary prepayments are prohibited or during which prepayments require the payment of an additional fee, exit fee, a prepayment fee or premium or yield maintenance charge or impose any new prepayment fee or premium or yield maintenance charge in connection with the prepayment of the Senior Loan when none is now required or increase the amount of any such additional fee, exit fee, prepayment fee, premium or yield maintenance charge, (xi) materially modify or amend the terms and provisions of Article 9 of the

- 15 -

Senior Loan Agreement or any definition used in such Article, (xii) modify the definition of "Event of Default" under the Senior Loan Documents, (xiii) shorten any notice or cure periods provided in the Senior Loan Documents, (xiv) spread the lien of the Senior Mortgage to encumber additional real property, (xv) reduce any minimum release price for a Unit (xvi) release in writing any guarantor of the Senior Loan, (xvii) amend, modify or waive any material insurance requirements set forth in Section 6.1 of the Senior Loan Agreement, (xviii) waive any prohibition on prepayment of the Senior Loan without contemporaneous prepayment of the Mezzanine Loan as required under the Senior Loan Documents on the date hereof, or (xix) impose any additional financial covenants on Borrower, provided, however, in no event shall Senior Lender be obligated to obtain Mezzanine Lender's consent to a Senior Loan Modification in the case of a work-out or other surrender, compromise, release, renewal, or indulgence relating to the Senior Loan during the existence of a Continuing Senior Loan Event of Default, except that (A) under no conditions shall clause (i) (with respect to increase in principal amount only), or clause (x) be modified without the written consent of Mezzanine Lender and (B) if Mezzanine Lender has cured or is in the process of curing (within the time permitted herein for cure) any such Continuing Senior Loan Event of Default that Mezzanine Lender is capable of curing and with respect to non-monetary Events of Default that Mezzanine Lender is not capable of curing, if such Continuing Senior Loan Events of Default will not materially adversely affect the operation of the Premises, the cash flow from the Premises (as determined by Senior Lender in its reasonable discretion) or the priority of Senior Lender's lien thereon (as determined by Senior Lender in its reasonable discretion) and if Mezzanine Lender is diligently pursuing its remedies to acquire the equity in Mezzanine Borrower pursuant to the Pledge Agreement, Senior Lender will not violate the other provisions of items (i) through (xix) above without the written consent of Mezzanine Lender. In addition and notwithstanding the foregoing provisions of this Section 7, (A) any amounts funded by the Senior Lender under the Senior Loan Documents as a result of (i) the making of any Protective Advances or other advances by the Senior Lender expressly permitted by the terms of the Senior Loan Documents, or (ii) interest accruals, capitalizations of accrued interest as principal or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7, (B) to the extent that the Senior Lender has a consent or approval right to permit, consent or approve any modification that would reduce the number of Units below 210, allow material additions or removals of walls separating the demise of individual Units, allow material changes to the current use of space within the Premises, modify the footprint of the Improvements or any other material modification of the Loan Budget or any construction schedule, or the plans and specifications for the Project Improvements, Senior Lender agrees to consult with the Mezzanine Lender before granting such approval or consent and shall not grant any such approval or consent without having obtained the prior approval of Mezzanine Lender to any such matters, and (C) to the extent that the Senior Lender has a consent or approval right to permit, consent or approve any modification to (i) the Management Agreement, (ii) the identity of, or a change in the identity of, the Manager, (iii) any Extraordinary Expenses, (iv) any Capital Expenditures, (v) any Leases for a term of five (5) years or more, or (vi) a change to Borrower's principal place of business, Senior Lender agrees to consult with the Mezzanine Lender before granting such approval or consent and shall not grant any such approval or consent without having obtained the prior written approval of Mezzanine Lender to any such matters.

(b)     Mezzanine Lender shall have the right, without the consent of Senior Lender in each instance, to enter into any amendment, deferral, extension, modification, increase,

-16-

renewal, replacement, consolidation, supplement or waiver (collectively, a **"Mezzanine Loan Modification"**) of the Mezzanine Loan or the Mezzanine Loan Documents provided that no such Mezzanine Loan Modification shall (i) increase the interest rate or principal amount of the Mezzanine Loan, (ii) increase in any other material respect any monetary obligations of Mezzanine Borrower under the Mezzanine Loan Documents, (iii) extend or shorten the scheduled maturity date of the Mezzanine Loan (except that Mezzanine Lender may permit Mezzanine Borrower to exercise any extension options in accordance with the terms and provisions of the Mezzanine Loan Documents), (iv) convert or exchange the Mezzanine Loan into or for any other indebtedness or subordinate any of the Mezzanine Loan to any indebtedness of Mezzanine Borrower, (v) provide for any additional contingent interest, additional interest or so-called "kicker" measured on the basis of the cash flow or appreciation of the Premises, or (vi) cross default the Mezzanine Loan with any other indebtedness. Notwithstanding anything to the contrary contained herein, if an Event of Default exists under the Mezzanine Loan Documents, Mezzanine Lender shall be permitted to modify or amend the Mezzanine Loan Documents in connection with a work-out or other surrender, compromise, release, renewal or modification of the Mezzanine Loan except that under no conditions shall a Mezzanine Loan Modification of the type described in clause (i) (with respect to increases in principal amounts only), clause (ii), clause (iii) (with respect to shortening the maturity only), clause (iv), or clause (v) be entered into without the written consent of the Senior Lender. In addition and notwithstanding the foregoing provisions of this Section 7(b), any amounts funded by the Mezzanine Lender under the Mezzanine Loan Documents as a result of (A) funding of cost overruns, the making of any Protective Advances or other advances by the Mezzanine Lender expressly permitted by the terms of the Mezzanine Loan Documents, or (B) interest accruals or accretions and any compounding thereof (including default interest), shall not be deemed to contravene this Section 7(b).

(c)     Senior Lender shall deliver to Mezzanine Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Senior Loan Documents (including, without limitation, any material side letters, waivers or consents entered into, executed or delivered by Senior Lender) within a reasonable time after any of such applicable instruments have been executed by Senior Lender.

(d)     Mezzanine Lender shall deliver to Senior Lender copies of any and all modifications, amendments, extensions, consolidations, spreaders, restatements, alterations, changes or revisions to any one or more of the Mezzanine Loan Documents (including, without limitation, any material side letters, waivers or consents entered into, executed or delivered by Mezzanine Lender) within a reasonable time after any of such applicable instruments have been executed by Mezzanine Lender.

Section 8.     Subordination of Mezzanine Loan and Mezzanine Loan Documents.

(a)     Mezzanine Lender hereby subordinates and makes junior the Mezzanine Loan, the Mezzanine Loan Documents and the liens and security interests created thereby, and all rights, remedies, terms and covenants contained therein to (i) the Senior Loan, (ii) the liens and security interests created by the Senior Loan Documents and (iii) all of the terms, covenants, conditions, rights and remedies contained in the Senior Loan Documents, and no amendments or

-17-

modifications to the Senior Loan Documents or waivers of any provisions thereof shall affect the subordination thereof as set forth in this Section 8, provided that Mezzanine Lender shall not be subordinated with respect to a modification to the Senior Loan Documents prohibited by the terms hereof.

(b)    Every document and instrument included within the Mezzanine Loan Documents shall be subject and subordinate to each and every document and instrument included within the Senior Loan Documents and all extensions, modifications, consolidations, supplements, amendments, replacements and restatements of and/or to the Senior Loan Documents.

(c)    This Agreement shall not be construed as subordinating and shall not subordinate or impair Mezzanine Lender's first lien priority right, estate and interest in and to the Separate Collateral and Senior Lender hereby acknowledges and agrees that Senior Lender does not have and shall not hereafter acquire, any lien on, or any other interest whatsoever in, the Separate Collateral, or any part thereof, and that the exercise of remedies and realization upon the Separate Collateral by Mezzanine Lender or a Loan Pledgee in accordance with the terms and provisions of this Agreement shall not in and of itself constitute a Default or an Event of Default under the Senior Loan Documents.

Section 9.    Payment Subordination.

(a)    Except (i) as otherwise expressly provided in this Agreement and (ii) in connection with the exercise by Mezzanine Lender of its rights and remedies with respect to the Separate Collateral in accordance with the terms of this Agreement, all of Mezzanine Lender's rights to payment of the Mezzanine Loan and the obligations evidenced by the Mezzanine Loan Documents are hereby subordinated to all of Senior Lender's rights to payment by Borrower of the Senior Loan Liabilities and the obligations secured by the Senior Loan Documents, and Mezzanine Lender shall not accept or receive payments (including, without limitation, whether in cash, net proceeds from sales of the Units or other property and whether received directly, indirectly or by set-off, counterclaim or otherwise) from Borrower, any guarantor and/or from the Premises prior to the date that all Senior Loan Liabilities are paid in full. If a Proceeding shall have occurred or a Continuing Senior Loan Event of Default shall have occurred and be continuing, after giving effect to Mezzanine Lender's cure rights with respect to any non-monetary default pursuant to Section 11 hereof, Senior Lender shall be entitled to receive payment and performance in full of all amounts due or to become due to Senior Lender before Mezzanine Lender is entitled to receive any payment on account of the Mezzanine Loan. All payments or distributions upon or with respect to the Mezzanine Loan which are received by Mezzanine Lender contrary to the provisions of this Agreement shall be received in trust for the benefit of Senior Lender and shall be paid over to Senior Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of non-cash property or securities) for, the payment or performance of the Senior Loan in accordance with the terms of the Senior Loan Documents. Nothing contained herein shall prohibit the Mezzanine Lender from making Protective Advances (and adding the amount thereof to the principal balance of the Mezzanine Loan) notwithstanding the existence of a default under the Senior Loan at such time.

-18-

(b)     Notwithstanding anything to the contrary contained in this Agreement, including, without limitation, Section 9(a), provided that Mezzanine Lender has not received a Senior Loan Default Notice (or if such notification has occurred, Mezzanine Lender is curing or has cured such Continuing Senior Loan Event of Default) as of the date payment is tendered to Mezzanine Lender, if and only if any such payments are permitted to be made to the Mezzanine Lender pursuant to the terms of the Senior Loan Documents, Mezzanine Lender may accept payments of any amounts due and payable from time to time which Mezzanine Borrower is obligated to pay Mezzanine Lender in accordance with the terms and conditions of the Mezzanine Loan Documents and Mezzanine Lender shall have no obligation to pay over to Senior Lender any such amounts. If such payments are not permitted pursuant to the terms of the Senior Loan Documents, such payment shall be received in trust for the benefit of, and shall be paid over or delivered and transferred to, the Senior Lender for application to the payment of the Senior Loan in accordance with the provisions of the Senior Loan Documents. Further provided nothing contained herein shall prohibit Mezzanine Borrower from making payments from its own funds to cure a default under the Mezzanine Loan notwithstanding the existence of an Event of Default under the Senior Loan.

(c)     Mezzanine Lender may in its sole and absolute discretion without Senior Lender's consent take any Equity Collateral Enforcement Action which is permitted under Section 5 hereof; provided, however, that Mezzanine Lender shall (i) prior to commencing any Equity Collateral Enforcement Action, give Senior Lender written notice of the default which would permit Mezzanine Lender to commence such Equity Collateral Enforcement Action and (ii) provide Senior Lender with copies of any and all material notices, pleadings, agreements, motions and briefs served upon, delivered to or with any party to any Equity Collateral Enforcement Action and otherwise keep Senior Lender reasonably apprised as to the status of any Equity Collateral Enforcement Action.

(d)     In the event of a casualty to the buildings or improvements constructed on any portion of the Premises or a condemnation or taking under a power of eminent domain of all or any portion of the Premises, the buildings or improvements thereon, Senior Lender shall have a first and prior interest in and to any payments, awards, proceeds, distributions, or consideration arising from any such event (the "**Award**"). If the amount of the Award is in excess of all amounts owed to Senior Lender under the Senior Loan Documents, and either the Senior Loan has been paid in full or Borrower is entitled to a remittance of same under the Senior Loan Documents other than to restore the Premises, such excess Award or portion to be so remitted to Borrower shall, to the extent permitted in the Senior Loan Documents, be paid to or at the direction of Mezzanine Lender, unless other Persons have claimed the right to such awards or proceeds, in which case Senior Lender shall only be required to provide notice to Mezzanine Lender of such excess Award and of any other claims thereto. In the event of any competing claims for any such excess Award, Senior Lender shall continue to hold such excess Award until Senior Lender receives an agreement signed by all Persons making a claim to the excess Award or a final order of a court of competent jurisdiction directing Senior Lender as to how and to which Person(s) the excess Award is to be distributed. Notwithstanding the foregoing, in the event of a casualty or condemnation, Senior Lender shall release the Award from any such event to the Borrower if and to the extent required by the terms and conditions of the Senior Loan Documents in order to repair and restore the Premises in accordance with the terms and provisions of the Senior Loan Documents. Any portion of the Award made available to the

-19 -

Borrower for the repair or restoration of the Premises shall not be subject to attachment by Mezzanine Lender, but this sentence is not intended to affect any lien that Mezzanine Lender may have upon such proceeds.

(e)    Notwithstanding anything to the contrary contained in this Agreement or the Senior Loan Documents, Mezzanine Lender shall be entitled to any Exit Fee payable in accordance with Section 2.2.9 of each of the Mortgage Loan Agreement, the Project Loan Agreement and the Building Loan Agreement (collectively, the "**Loan Exit Fee**"). If Senior Lender receives payment of any Loan Exit Fee, such Loan Exit Fee shall be received by Senior Lender in trust for the benefit of, and shall be promptly paid over or delivered and transferred to, the Mezzanine Lender.

Section 10.    Rights of Subrogation; Bankruptcy.

(a)    Each of Mezzanine Lender and Senior Lender hereby waives any requirement for marshaling of assets thereby in connection with any foreclosure of any security interest or any other realization upon collateral in respect of the Senior Loan Documents or the Mezzanine Loan Documents, as applicable, or any exercise of any rights of set-off or otherwise. Each of Mezzanine Lender or Senior Lender assumes all responsibility for keeping itself informed as to the condition (financial or otherwise) of Borrower, Mezzanine Borrower, the condition of the Premises and all other collateral and other circumstances and, except for notices expressly required by this Agreement, neither Senior Lender nor Mezzanine Lender shall have any duty whatsoever to obtain, advise or deliver information or documents to the other relative to such condition, business, assets and/or operations. Mezzanine Lender agrees that Senior Lender owes no fiduciary duty to Mezzanine Lender in connection with the administration of the Senior Loan and the Senior Loan Documents and Mezzanine Lender agrees not to assert any such claim. Senior Lender agrees that Mezzanine Lender owes no fiduciary duty to Senior Lender in connection with the administration of the Mezzanine Loan and the Mezzanine Loan Documents and Senior Lender agrees not to assert any such claim.

(b)    No payment or distribution to Senior Lender pursuant to the provisions of this Agreement and no Protective Advance by Mezzanine Lender shall entitle Mezzanine Lender to exercise any right of subrogation in respect thereof prior to the payment in full of the Senior Loan Liabilities, and Mezzanine Lender agrees that, except with respect to the enforcement of its remedies under the Mezzanine Loan Documents permitted hereunder, prior to the satisfaction of all Senior Loan Liabilities it shall not acquire, by subrogation or otherwise, any lien, estate, right or other interest in any portion of the Senior Loan Collateral or the proceeds therefrom that is, or may be prior to, or of equal priority to, any of the Senior Loan Documents or the liens, rights, estates and interests created thereby.

(c)    Subject to Section 30 of this Agreement, the provisions of this Agreement shall be applicable both before and after the commencement, whether voluntary or involuntary, of any case, proceeding or other action against Borrower, any guarantor or any SPE Constituent Entity under any existing or future law of any jurisdiction relating to bankruptcy, insolvency, reorganization or relief of debtors (a "**Proceeding**"). For as long as the Senior Loan shall remain outstanding, Mezzanine Lender shall not, and shall not solicit any person or entity to, and shall not direct or cause Mezzanine Borrower to direct or cause Borrower, any guarantor or any entity

-20-

which controls Borrower (the "**Borrower Group**") to: (i) commence any Proceeding; (ii) institute proceedings to have Borrower, any guarantor or any SPE Constituent Entity adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce in, the institution of bankruptcy or insolvency proceedings against Borrower, any guarantor or any SPE Constituent Entity; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Borrower, any guarantor or any SPE Constituent Entity; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Borrower, any guarantor or any SPE Constituent Entity, the Premises (or any portion thereof) or any other collateral securing the Senior Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Borrower, any guarantor or any SPE Constituent Entity; (vii) seek to consolidate the Premises or any other assets of Borrower, any guarantor or any SPE Constituent Entity with the assets of the Mezzanine Borrower or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing.

(d)    If Mezzanine Lender is deemed to be a creditor of Borrower in any Proceeding (i) Mezzanine Lender hereby agrees that it shall not make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Proceeding by or against the Borrower without the prior written consent of Senior Lender, except to the extent necessary to preserve or realize upon Mezzanine Lender's interest in the Equity Collateral; provided, however, that any such action or filing shall not be as a creditor of the Borrower, (ii) Senior Lender may vote in any such Proceeding any and all claims of Mezzanine Lender, and Mezzanine Lender hereby appoints the Senior Lender as its agent, and grants to the Senior Lender an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to the Mezzanine Lender in connection with any case by or against the Borrower in any Proceeding, including without limitation, the right to file and/or prosecute any claims, to vote to accept or reject a plan, to make any election under Section 1111(b) of the Bankruptcy Code; provided, however, that with respect to any proposed plan of reorganization in respect of which creditors are voting, Senior Lender may vote on behalf of Mezzanine Lender only if the proposed plan would result in Senior Lender being "**impaired**" (as such term is defined in the United States Bankruptcy Code) and (iii) Mezzanine Lender shall not challenge the validity or amount of any claim submitted in such Proceeding by Senior Lender in good faith or any valuations of the Premises or other Senior Loan collateral submitted by Senior Lender in good faith, in such Proceeding or take any other action in such Proceeding, which is adverse to Senior Lender's enforcement of its claim or receipt of adequate protection (as that term is defined in the Bankruptcy Code).

Section 11.    Rights of Cure.

(a)    Prior to Senior Lender commencing any Enforcement Action by reason of an Event of Default under the Senior Loan Documents, Senior Lender (i) shall provide written notice of such Event of Default to Mezzanine Lender and any Loan Pledgee entitled to notice thereof pursuant to Section 15 of this Agreement, whether or not Senior Lender is obligated to give notice thereof to Borrower (each, a "**Senior Loan Default Notice**") and (ii) shall permit Mezzanine Lender an opportunity to cure such default in accordance with the provisions of this

-21 -

Section 11. If the default is a monetary default relating to a liquidated sum of money (including any Shortfall (as defined in the Building Loan Agreement) necessary to put the Senior Loan "in balance" as required under the Senior Loan Documents), Mezzanine Lender shall have until five (5) Business Days after the later of (i) the giving by Senior Lender of the Senior Loan Default Notice and (ii) the expiration of Borrower's cure period, if any, (a "**Monetary Cure Period**") to cure such monetary default; provided, however, in the event it elects to cure any such monetary default, Mezzanine Lender shall (x) defend and hold harmless Senior Lender for all cost, expenses, losses, liabilities, obligations, damages, penalties, costs, and disbursements imposed on, incurred by or asserted against Senior Lender due to or arising from such Monetary Cure Period and (y) without duplication of the foregoing, reimburse the Senior Lender for any interest charged by Senior Lender on any required (pursuant to any applicable pooling and servicing agreement) advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances. Mezzanine Lender shall not be required, in order to effect a cure hereunder for a default that is of a non-monetary nature (e.g. a default that cannot be cured solely by the payment of a liquidated sum of money), to pay any interest calculated at the default rate under the Senior Loan Documents to the extent the same is in excess of the rate of interest which would have been payable by Borrower in the absence of such default (and irrespective of any cure of such default by Mezzanine Lender pursuant to the provisions of this Agreement), and, solely with respect to defaults of a non-monetary nature, no interest shall accrue at the default rate as against Mezzanine Lender for such period. Mezzanine Lender shall not have the right to cure as hereinabove set forth with respect to monthly scheduled debt service payments on the Senior Loan for a period of more than six (6) consecutive months unless Mezzanine Lender has commenced and is continuing to diligently pursue its rights against the Separate Collateral. During a Monetary Cure Period, Mezzanine Lender shall not be required, in order to effect a cure hereunder (other than the cure by Mezzanine Lender of a default in the payment of the Senior Loan in full on the maturity date thereof), to pay any late charges under the Senior Loan Documents (irrespective of any cure of such default by Mezzanine Lender pursuant to the provisions of this Agreement), and no late charges shall accrue against Mezzanine Lender for such period. If the default is of a non-monetary nature (i.e. a default that cannot be cured solely by the payment of a liquidated sum of money), Mezzanine Lender shall have the same period of time as the Borrower under the Senior Loan Documents to cure such non-monetary default plus an additional ten (10) Business Days; provided, however, if such non-monetary default is susceptible of cure but cannot reasonably be cured within such period and if curative action was promptly commenced and is being diligently pursued by Mezzanine Lender, Mezzanine Lender shall be given an additional period of time as is reasonably necessary for Mezzanine Lender in the exercise of due diligence to cure such non-monetary default (a "**Non-monetary Cure Period**") so long as (i) Mezzanine Lender makes or causes to be made timely payment of Borrower's regularly scheduled monthly principal and/or interest payments under the Senior Loan and any other amounts due under the Senior Loan Documents, (ii) such additional period of time does not exceed sixty (60) days following the expiration of the period of time available to the Borrower under the Senior Loan Documents to cure such non-monetary default, unless such non-monetary default is of a nature that cannot be cured within such sixty (60) days, in which case, Mezzanine Lender shall have such additional time as is reasonably necessary to cure such non-monetary default, and (iii) during such Non-monetary Cure Period, there is no material impairment to the value, use or operation of the Premises.

-22-

(b)     To the extent that Mezzanine Lender or any Qualified Transferee acquires the Equity Collateral in accordance with the provisions and conditions of this Agreement, such Qualified Transferee shall acquire the same subject to the Senior Loan and the terms, conditions and provisions of the Senior Loan Documents and this Agreement for the balance of the term of the Senior Loan, which shall not be accelerated by Senior Lender solely due to such acquisition and shall remain in full force and effect; provided, however, that (i) Mezzanine Lender or such Qualified Transferee shall have agreed in writing, subject to such exculpatory provisions as shall be set forth in the Senior Loan Documents, all of the terms, conditions and provisions of the Senior Loan Documents on Borrower's part to be performed and (ii) all defaults under the Senior Loan Documents which remain uncured as of the date of such acquisition have been cured or waived by Senior Lender. Senior Lender shall waive all defaults that are not susceptible of being cured unless such defaults that are not susceptible of being cured materially impair the value, use or operation of the Premises. Notwithstanding any contrary or inconsistent provision of this Agreement, the Senior Loan Documents or the Mezzanine Loan Documents, no acquisition or other fee or similar charge shall be due in connection with Mezzanine Lender's or such other Qualified Transferee's acquisition of any interest in Borrower or the Separate Collateral as the result of a Equity Collateral Enforcement Action or assignment in lieu of foreclosure or other negotiated settlement in lieu of any of the foregoing.

(c)     So long as no Event of Default shall have occurred and be continuing under the Senior Loan Documents, all funds held and applied pursuant to the Senior Loan Documents, shall continue to be applied pursuant thereto and shall not be applied by Senior Lender to prepay the outstanding principal balance of the Senior Loan.

Section 12.     No Actions; Restrictive Provisions. Senior Lender consents to Mezzanine Lender's right, pursuant to the Mezzanine Loan Documents, under certain circumstances, to cause the termination of the Property Manager. In the event both Mezzanine Lender and Senior Lender shall have such rights at any time, and Senior Lender shall fail to exercise such rights, Mezzanine Lender may exercise such rights, provided such exercise may be superseded by any subsequent exercise of such rights by Senior Lender pursuant to the Senior Loan Documents. Upon the occurrence of any event which would entitle Mezzanine Lender to cause the termination of the Property Manager pursuant to the Mezzanine Loan Documents, Mezzanine Lender shall have the right to select, or cause the selection, of one or more replacement property managers (including any asset manager) or leasing agent for the Premises, which replacement managers, asset manager and/or leasing agent shall either (a) be subject to Senior Lender's reasonable prior approval or (b) be a Qualified Manager. Notwithstanding anything in this Section 12 to the contrary, if an Event of Default under the Senior Loan then exists or any other event shall have occurred pursuant to which Senior Lender has the right to select any replacement manager, asset manager and/or leasing agent pursuant to the Senior Loan Documents, Senior Lender shall have the sole right to select any replacement manager, asset manager and/or leasing agent, whether or not a new manager or agent was retained by Mezzanine Lender.

Section 13.     Right to Purchase Senior Loan.

(a)     If the Senior Loan has been accelerated, or an Event of Default has occurred and is continuing or any Enforcement Action has been commenced and is continuing

-23 -

under the Senior Loan Documents (each of the foregoing, a "**Purchase Option Event**"), Senior Lender shall give Mezzanine Lender written notice thereof and upon ten (10) Business Days prior written notice to Senior Lender (the "**Purchase Option Notice**"), Mezzanine Lender shall have the right to purchase, in whole but not in part, the Senior Loan for a price equal to the sum of (x) the outstanding principal balance thereof, (y) all accrued interest and other amounts due thereon (but excluding any prepayment fees or premiums, exit fees, additional fees, yield maintenance fees or similar fees and/or charges), any Protective Advances made by Senior Lender and any interest charged by Senior Lender on any advances for monthly payments of principal and/or interest on the Senior Loan and/or on any Protective Advances and (z) any and all reasonable fees and costs (including legal fees and expenses) incurred by the Senior Lender in enforcing the terms of the Loan Documents (the "**Loan Purchase Price**"). Concurrently with payment to the Senior Lender of the Loan Purchase Price, Senior Lender shall deliver or cause to be delivered to Mezzanine Lender all Senior Loan Documents held by or on behalf of Senior Lender and will execute in favor of Mezzanine Lender or its designee assignment documentation, in form and substance reasonably acceptable to Mezzanine Lender at the sole cost and expense of Mezzanine Lender, to assign the Senior Loan and its rights under the Senior Loan Documents (without recourse, representations or warranties, except for representations as to the outstanding balance of the Senior Loan, the Loan Purchase Price and as to Senior Lender's not having assigned or encumbered its rights in the Senior Loan). The right of Mezzanine Lender to purchase the Senior Loan shall automatically terminate (i) if a transfer by foreclosure sale, delivery of a deed in lieu of foreclosure or trustee's sale of the Premises occurs or (ii) if a Purchase Option Event ceases to exist. Senior Lender hereby agrees to give Mezzanine Lender a notice of its intention to accept a deed-in-lieu of foreclosure of the Premises at least ten (10) days prior to such acceptance.

(b)    Mezzanine Lender covenants not to enter any agreement with the Borrower or any Affiliate thereof to purchase the Senior Loan pursuant to subsection (a) above or in connection with any refinancing of the Senior Loan in any manner designed to avoid or circumvent the provisions of the Senior Loan Documents which require the payment of a prepayment fee or yield maintenance charge in connection with a prepayment of the Senior Loan by the Borrower.

Section 14.    Additional Understandings.  For as long as the Mezzanine Loan remains outstanding:

(a)    Notices of Transfer; Consent.  Senior Lender promptly shall notify Mezzanine Lender if Borrower seeks or requests a release of the lien of the Senior Loan Documents or seeks or requests Senior Lender's consent to, or takes any action in connection with or in furtherance of, a Transfer of all or any material portion of the Premises or any direct or indirect interest in Borrower, the granting of a further mortgage, deed of trust or similar encumbrance against the Premises or a prepayment or refinancing of the Senior Loan.  In the event of a request by the Borrower for Senior Lender's consent to either (i) the sale or transfer of all or any material portion of the Premises or any direct or indirect interest in Borrower or (ii) the granting of a further mortgage, deed of trust or similar encumbrance against the Premises, Senior Lender shall, if Senior Lender has the right to consent, obtain the prior written consent of Mezzanine Lender prior to Senior Lender's granting of its consent or agreement thereto (for the purposes of this subsection (ii), Mezzanine Lender shall be reasonable to the extent Senior

-24-

Lender must be reasonable with respect to such consent, but nothing contained above is intended to reduce or limit the rights of Mezzanine Lender under the Mezzanine Loan Documents).

        (b)     Books and Records. Upon any inspection of the books or records of Borrower or the Premises by Senior Lender pursuant to the terms of the Senior Loan Documents, Senior Lender shall, upon written request of Mezzanine Lender, request Borrower to reasonably cooperate to provide Mezzanine Lender access for its own inspection of such books, records or Premises. At the request of Mezzanine Lender, Senior Lender shall deliver or cause Servicer to deliver to Mezzanine Lender, a schedule of disbursements made to Borrower from any reserves held under the Senior Loan Documents.

        (c)     Financial Statements, etc. Upon written request of either Senior Lender or Mezzanine Lender by the other, the requested lender shall provide the requesting lender with copies of each financial statement (including, without limitation, any loan servicing statements) delivered to the requested lender pursuant to the terms of Senior Loan Documents or the Mezzanine Loan Documents, as applicable.

        (d)     Approval of Plans and Specifications. Mezzanine Lender shall have the right to approve Plans and Specifications. Mezzanine Lender hereby agrees that it shall first advise Senior Lender of whether it objects to the requested consent or approval within ten (10) Business Days after its receipt of (i) a written request for a consent or approval from Mezzanine Borrower or Senior Lender, as applicable, and (ii) delivery of all materials reasonably requested by Mezzanine Lender reasonably required to make a decision on such request. Mezzanine Lender shall not unreasonably withhold its consent or approval to such Plans and Specifications if Senior Lender approves any such Plans and Specifications.

        (e)     Approval of Budgets. Mezzanine Lender shall have the right to approve the Loan Budgets. Mezzanine Lender hereby agrees that it shall first advise Senior Lender of whether it objects to the requested consent or approval within ten (10) Business Days after its receipt of (i) a written request for a consent or approval from Mezzanine Borrower or Senior Lender, as applicable, and (ii) delivery of all materials reasonably requested by Mezzanine Lender reasonably required to make a decision on such request. Mezzanine Lender shall not unreasonably withhold its consent or approval to the Loan Budgets if Senior Lender approves such Loan Budgets.

        (f)     Construction Contracts. Mezzanine Lender shall have the right to approve the Architect's Contract(s) and any material modifications or amendments thereto, the General Contractor's Agreement(s) and any material modifications or amendments thereto, Major Contracts, if any, any materials received from the Construction Consultant, the Condominium Documents and the Contracts relating to the sale of the Units.

        (g)     Property Inspection Rights and Reports. Senior Lender will endeavor, at no cost to Senior Lender, to cause Borrower to permit agents, representatives and employees of any Mezzanine Lender to inspect the Premises or any part thereof during normal business hours on Business Days upon reasonable advance notice. In addition, to the extent that Senior Lender prepares or receives property reports from Borrower or with respect to the Premises, Senior Lender will make such reports available to Mezzanine Lender.

12855326.4

(h)    Leasing and Alterations. Following Completion of the Project Improvements, if the Mezzanine Loan Documents contain any provision or requirement that Mezzanine Lender's consent or approval be obtained for any act or determination by Borrower or Mezzanine Borrower in connection with the leasing of the Premises or alterations to the Premises, to the extent that such consent or approval is also required by Senior Lender under the Senior Loan Documents, Mezzanine Lender hereby agrees that it shall first advise Senior Lender of whether Mezzanine Lender objects to the requested consent or approval within ten (10) Business Days after its receipt of (i) a written request for a consent or approval from Mezzanine Borrower or Senior Lender and (ii) delivery of all materials reasonably requested by Mezzanine Lender reasonably required to make a decision on such request. Senior Lender shall consult with Mezzanine Lender with respect to any such consent or approval right of Mezzanine Lender but such consultation shall not be binding on Senior Lender. Mezzanine Lender shall not unreasonably withhold its consent to such lease or alteration if Senior Lender reasonably approves such lease or alteration provided, with respect to a lease, the lease is on market terms and, with respect to an alteration, the alteration is necessary to maintain the Premises in good order and repair as required by the Senior Loan Documents.

(i)    Construction and Renovation. Subject to the provisions of paragraphs (d), (e) and (f) above, if the Mezzanine Loan Documents contain any provision or requirement that Mezzanine Lender's consent or approval be obtained for any act or determination by Borrower or Mezzanine Borrower in connection with the renovation and construction of the Project Improvements, to the extent that such consent or approval is also required by Senior Lender under the Senior Loan Documents, Mezzanine Lender hereby agrees that it shall first advise Senior Lender of whether Mezzanine Lender objects to the requested consent or approval within ten (10) Business Days after its receipt of (i) a written request for a consent or approval from Mezzanine Borrower of Senior Lender and (ii) delivery of all materials reasonably requested by Mezzanine Lender reasonably required to make a decision on such request. Senior Lender shall consult with Mezzanine Lender with respect to any such consent or approval right of Mezzanine Lender but, subject to those matters referred to in paragraphs (d), (e) and (f) above, such consultation shall not be binding on Senior Lender. Mezzanine Lender shall not unreasonably withhold its consent to such renovation or construction item if Senior Lender reasonably approves such renovation or construction item.

(j)    Completion Guaranty. Senior Lender agrees diligently to enforce (but not including calling an Event of Default under the Senior Loan) any failure by Guarantor to comply with the net worth and liquidity obligations under Section 3.4 of the Completion Guaranty of which it has actual knowledge and to provide the Mezzanine Lender with prompt written notice of any breach of the Completion Guaranty of which Senior Lender or its servicer has actual knowledge.

Section 15.    Financing of Mezzanine Loan. Notwithstanding any other provision hereof, Senior Lender consents to Mezzanine Lender's pledge (a "**Pledge**") of the Mezzanine Loan and of the Separate Collateral to any entity which has extended a credit facility to Mezzanine Lender and would otherwise be deemed to be either a Qualified Transferee or a financial institution whose long-term unsecured debt is rated at least "A" (or the equivalent) or better by S&P (a "**Loan Pledgee**"), on the terms and conditions set forth in this Section 15; provided, that, a Loan Pledgee which is not a Qualified Transferee may not take title to the

-26-

Equity Collateral without the written consent of Senior Lender (not to be unreasonably withheld or delayed). A Loan Pledgee shall include any entity that has provided financing to Mezzanine Lender, or to any entity which owns, directly or indirectly, substantially all of the interests in Mezzanine Lender, that is secured by Mezzanine Lender's interest in the Mezzanine Loan and is structured as a repurchase agreement provided that the terms and conditions of this Section 15 are complied with. Upon written notice by Mezzanine Lender to Senior Lender that the Pledge has been effected, Senior Lender agrees to acknowledge receipt of such notice and thereafter agrees: (a) to give Loan Pledgee a copy of every written notice of any default given to Mezzanine Lender under this Agreement; (b) to allow Loan Pledgee a period of at least ten (10) days, but not more than twenty (20) days (in respect of a monetary default) and a period of not less than thirty (30) days, but not more than sixty (60) days (in respect of a non-monetary default) to cure a default by Mezzanine Lender in respect of its obligations to Senior Lender hereunder, but Loan Pledgee shall not be obligated to cure any such default; (c) that no amendment, modification, waiver or termination of any of Mezzanine Lender's rights under this Agreement shall be effective without the written consent of Loan Pledgee, which consent shall not be unreasonably withheld; provided, however, that the consent of Loan Pledgee shall not be required unless Mezzanine Lender's consent was required pursuant to the terms of this Agreement to effect such amendment, modification, waiver or termination; (d) that Senior Lender shall give to Loan Pledgee copies of any Senior Loan Default Notice simultaneously with the giving of same to the Mezzanine Lender and accept any cure thereof by Loan Pledgee made in accordance with the provisions of Section 11 of this Agreement as if such cure were made by the Mezzanine Lender; and (e) that, upon written notice (a "**Redirection Notice**") to Senior Lender by Loan Pledgee that Mezzanine Lender is in default, beyond applicable cure periods, under Mezzanine Lender's obligations to Loan Pledgee pursuant to the applicable credit agreement between Mezzanine Lender and Loan Pledgee (which notice need not be joined in or confirmed by Mezzanine Lender), and until such Redirection Notice is withdrawn or rescinded by Loan Pledgee, Senior Lender shall remit to Loan Pledgee and not to Mezzanine Lender, any payments that Senior Lender would otherwise be obligated to pay to Mezzanine Lender from time to time pursuant to this Agreement, any Mezzanine Loan Document or any other agreement between Senior Lender and Mezzanine Lender that relates to the Senior Loan. Mezzanine Lender hereby unconditionally and absolutely releases Senior Lender from any liability to Mezzanine Lender on account of Senior Lender's compliance with any Redirection Notice believed by Senior Lender to have been delivered by Loan Pledgee. After Senior Lender's receipt of a Redirection Notice (so long as the same has not been withdrawn or rescinded by Loan Pledgee), Loan Pledgee shall be permitted to fully exercise its rights and remedies against Mezzanine Lender, and realize on any and all collateral granted by Mezzanine Lender to Loan Pledgee (and accept an assignment in lieu of foreclosure as to such collateral), in accordance with applicable law. In such event, the Senior Lender shall recognize Loan Pledgee (and any transferee which is also a Qualified Transferee at any foreclosure or similar sale held by Loan Pledgee or any transfer in lieu of such foreclosure), and its successors and assigns, as the successor to Mezzanine Lender's rights, remedies and obligations under this Agreement and the Mezzanine Loan Documents and any such Loan Pledgee or Qualified Transferee shall assume in writing the obligations of the Mezzanine Lender hereunder accruing from and after such Transfer and agrees to be bound by the terms and provisions hereof. The rights of Loan Pledgee under this Section 15 shall remain effective unless and until Loan Pledgee shall have notified the Senior Lender in writing that its interest in the Mezzanine Loan has terminated.

-27-

Section 16.     Intentionally Omitted.

Section 17.     Obligations Hereunder Not Affected.

(a)     All rights, interests, agreements and obligations of Senior Lender and Mezzanine Lender under this Agreement shall remain in full force and effect irrespective of:

(i)     any lack of validity or enforceability of the Senior Loan Documents or the Mezzanine Loan Documents or any other agreement or instrument relating thereto;

(ii)     any taking, exchange, release or non-perfection of any other collateral, or any taking, release or amendment or waiver of or consent to or departure from any guaranty, for all or any portion of the Senior Loan or the Mezzanine Loan;

(iii)     any manner of application of collateral, or proceeds thereof, to all or any portion of the Senior Loan or the Mezzanine Loan, or any manner of sale or other disposition of any collateral for all or any portion of the Senior Loan or the Mezzanine Loan or any other assets of Borrower or Mezzanine Borrower or any other Affiliates of Borrower;

(iv)     any change, restructuring or termination of the corporate structure or existence of Borrower or Mezzanine Borrower or any other Affiliates of Borrower; or

(v)     any other circumstance which might otherwise constitute a defense available to, or a discharge of, Borrower, Mezzanine Borrower or a subordinated creditor or Senior Lender subject to the terms hereof.

(b)     This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the Senior Loan is rescinded or must otherwise be returned by Senior Lender or Mezzanine Lender upon the insolvency, bankruptcy or reorganization of Borrower or otherwise, all as though such payment had not been made.

Section 18.     Notices.     All notices, demands, requests, consents, approvals or other communications required, permitted, or desired to be given hereunder shall be in writing sent by facsimile (with answer back acknowledged) or by registered or certified mail, postage prepaid, return receipt requested, or delivered by hand or reputable overnight courier addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 18.  Any such notice, demand, request, consent, approval or other communication shall be deemed to have been received: (a) three (3) Business Days after the date mailed, (b) on the date of sending by facsimile if sent during business hours on a Business Day (otherwise on the next Business Day), (c) on the date of delivery by hand if delivered during business hours on a Business Day (otherwise on the next Business Day) and (d) on the next Business Day if sent by an overnight commercial courier, in each case addressed to the parties as follows:

To Senior Lender:

-28-

Lehman Brothers Holdings Inc.
399 Park Avenue
New York, New York 10022
Attention: Tracy Dembicer
Telecopy: (646) 758-5326

*with a copy to:*

Dechert LLP
30 Rockefeller Plaza
New York, New York 10112
Attention: Lawrence A. Ceriello
Telecopy: (212) 698-3599

To Mezzanine Lender:

Lehman Brothers Holdings Inc.
399 Park Avenue
New York, New York 10022
Attention: Tracy Dembicer
Telecopy: (646) 758-5326

*with a copy to:*

Dechert LLP
30 Rockefeller Plaza
New York, New York 10112
Attention: Lawrence A. Ceriello
Telecopy: (212) 698-3599

Section 19.    Estoppel.

(a)    Mezzanine Lender shall, within ten (10) days following a request from Senior Lender, provide Senior Lender with a written statement setting forth the then current outstanding principal balance of the Mezzanine Loan, the aggregate accrued and unpaid interest under the Mezzanine Loan, and stating whether to Mezzanine Lender's knowledge any default or Event of Default exists under the Mezzanine Loan.

(b)    Senior Lender shall, within ten (10) days following a request from Mezzanine Lender, provide Mezzanine Lender with a written statement setting forth the then current outstanding principal balance of the Senior Loan, the aggregate accrued and unpaid interest under the Senior Loan, and stating whether to Senior Lender's knowledge any default or Event of Default exists under the Senior Loan.

Section 20.    Further Assurances. So long as all or any portion of the Senior Loan and the Mezzanine Loan remains unpaid and the Senior Mortgage encumbers the Premises, Mezzanine Lender and Senior Lender will each execute, acknowledge and deliver in recordable

-29 -

form and upon demand of the other, any other instruments or agreements reasonably required in order to carry out the provisions of this Agreement or to effectuate the intent and purposes hereof.

Section 21.    No Third Party Beneficiaries; No Modification.    The parties hereto do not intend the benefits of this Agreement to inure to Borrower, Mezzanine Borrower or any other Person. This Agreement may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any change is sought.

Section 22.    Successors and Assigns.    This Agreement shall bind all successors and permitted assigns of Mezzanine Lender and Senior Lender and shall inure to the benefit of all successors and permitted assigns of Senior Lender and Mezzanine Lender. Senior Lender understands that Mezzanine Lender may sell interests in the Mezzanine Loan (subject in all cases to the requirements of this Agreement) and that the arrangements among such interest holders may permit them to divide the Mezzanine Loan into two or more mezzanine loans (but in the aggregate on the same terms and conditions of the Mezzanine Loan); if such division occurs, Senior Lender and Mezzanine Lender agree that such mezzanine lenders shall retain the benefits and burdens of this Agreement provided, however, that such mezzanine lenders' rights and benefits hereunder shall be collective (that is, as a group and not individually) and that Senior Lender will only be required to give notice to and to deal with only one of such holders designated by all holders and all actions of and notices given by such holders are to be by such designated holder only. None of such holders shall have individual rights hereunder.

Section 23.    Counterpart Originals.    This Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

Section 24.    Legal Construction.    In all respects, including, without limitation, matters of construction and performance of this Agreement and the obligations arising hereunder, this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York applicable to agreements intended to be wholly performed within the State of New York.

Section 25.    No Waiver; Remedies.    No failure on the part of Senior Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

Section 26.    No Joint Venture.    Nothing provided herein is intended to create a joint venture, partnership, tenancy-in-common or joint tenancy relationship between or among any of the parties hereto.

Section 27.    Captions.    The captions in this Agreement are inserted only as a matter of convenience and for reference, and are not and shall not be deemed to be a part hereof.

Section 28.    Conflicts.    In the event of any conflict, ambiguity or inconsistency between the terms and conditions of this Agreement and the terms and conditions of any of the

-30 -

Senior Loan Documents or the Mezzanine Loan Documents, the terms and conditions of this Agreement shall control.

Section 29.    No Release.    Nothing herein contained shall operate (i) to release Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Senior Loan Documents or (b) any liability of Borrower under the Senior Loan Documents, or (ii) to release Mezzanine Borrower from (a) its obligation to keep and perform all of the terms, conditions, obligations, covenants and agreements contained in the Mezzanine Loan Documents or (b) any liability of Mezzanine Borrower under the Mezzanine Loan Documents.

Section 30.    Continuing Agreement.    This Agreement is a continuing agreement and shall remain in full force and effect until the earliest of (a) payment in full of the Senior Loan Liabilities, (b) transfer of the Premises by foreclosure of the Senior Mortgage or the exercise of the power of sale contained therein or Senior Lender's acceptance of a deed-in-lieu of foreclosure, (c) transfer of title to Mezzanine Lender of the Separate Collateral or (d) payment in full of the Mezzanine Loan; provided, however, (i) that any rights, remedies, duties or obligations of either party hereto arising out of any breach of any provision hereof occurring prior to such date of termination and (ii) the representations contained in Section 3 hereof shall survive any termination of this Agreement. If this Agreement is terminated pursuant to clause (c) above, Senior Lender agrees not to release any letter of credit held as security for the Senior Loan without the consent of Mezzanine Lender. If connection with the exercise of rights under the Mezzanine Loan, a portion of the Mezzanine Loan is preserved, or reinstated, Senior Lender shall recognize same as the Mezzanine Loan under this Agreement, provided there is no material change in the Mezzanine Loan Documents.

Section 31.    Severability.    In the event that any provision of this Agreement or the application hereof to any party hereto shall, to any extent, be invalid or unenforceable under any applicable statute, regulation, or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform to such statute, regulation or rule of law, and the remainder of this Agreement and the application of any such invalid or unenforceable provisions to parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall same affect the validity or enforceability of any other provision of this Agreement.

Section 32.    Expenses.

(a)    Mezzanine Lender agrees to pay to Senior Lender within fifteen (15) days of demand the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Senior Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Senior Lender against Mezzanine Lender hereunder to the extent that Senior Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Mezzanine Lender to perform or observe any of the provisions hereof; provided, however, that Mezzanine Lender shall not be required to pay any such fees or expenses to the extent any such fees or expenses have previously been paid by Borrower or have been recovered by Senior Lender out of or from any Senior Loan Collateral realized by Senior Lender (provided further that Senior Lender shall not

-31 -

be required to seek payment or recovery of such fees and expenses from Borrower or the Senior Loan Collateral before demanding payment from the Mezzanine Lender).

(b)    Senior Lender agrees to pay to Mezzanine Lender within fifteen (15) days of demand the amount of any and all reasonable expenses, including, without limitation, the reasonable fees and expenses of its counsel and of any experts or agents, which Mezzanine Lender may incur in connection with the (i) exercise or enforcement of any of the rights of Mezzanine Lender against Senior Lender hereunder to the extent that Mezzanine Lender is the prevailing party in any dispute with respect thereto or (ii) failure by Senior Lender to perform or observe any of the provisions hereof; provided, however, that Senior Lender shall not be required to pay any such fees or expenses to the extent any such fees or expenses have previously been paid by Mezzanine Borrower or have been recovered by Mezzanine Lender out of or from any Separate Collateral realized by Mezzanine Lender (provided further that Mezzanine Lender shall not be required to seek payment or recovery of such fees and expenses from Mezzanine Borrower or the Separate Collateral before demanding payment from the Senior Lender).

Section 33.    Injunction.  Senior Lender and Mezzanine Lender each acknowledge (and waive any defense based on a claim) that monetary damages are not an adequate remedy to redress a breach by the other hereunder and that a breach by either Senior Lender or Mezzanine Lender hereunder would cause irreparable harm to the other.  Accordingly, Senior Lender and Mezzanine Lender agree that upon a breach of this Agreement by the other, the remedies of injunction, declaratory judgment and specific performance shall be available to such non-breaching party.

Section 34.    Mutual Disclaimer.

(a)    Each of Senior Lender and Mezzanine Lender are sophisticated lenders and/or investors in real estate and their respective decision to enter into the Senior Loan and the Mezzanine Loan is based upon their own independent expert evaluation of the terms, covenants, conditions and provisions of, respectively, the Senior Loan Documents and the Mezzanine Loan Documents and such other matters, materials and market conditions and criteria which each of Senior Lender and Mezzanine Lender deem relevant.  Each of Senior Lender and Mezzanine Lender has not relied in entering into this Agreement, and respectively, the Senior Loan, the Senior Loan Documents, the Mezzanine Loan or the Mezzanine Loan Documents, upon any oral or written information, representation, warranty or covenant from the other, or any of the other's representatives, employees, Affiliates or agents other than the representations and warranties, if any, of the other contained herein.  Each of Senior Lender and Mezzanine Lender further acknowledges that no employee, agent or representative of the other has been authorized to make, and that each of Senior Lender and Mezzanine Lender have not relied upon, any statements, representations, warranties or covenants other than those specifically contained in this Agreement.  Without limiting the foregoing, each of Senior Lender and Mezzanine Lender acknowledges that the other has made no representations or warranties as to the Senior Loan or the Mezzanine Loan or the Premises (including, without limitation, the cash flow of the Premises, the value, marketability, condition or future performance thereof, the existence, status, adequacy or sufficiency of the leases, the tenancies or occupancies of the Premises, or the sufficiency of the cash flow of the Premises, to pay all amounts which may become due from time to time pursuant to the Senior Loan or the Mezzanine Loan).

-32-

(b)    Each of Senior Lender and Mezzanine Lender acknowledges that the Senior Loan, the Senior Loan Documents, the Mezzanine Loan and the Mezzanine Loan Documents are distinct, separate transactions and loans, separate and apart from each other. Each of Senior Lender and Mezzanine Lender agrees that the other shall be treated as a separate lender with a distinct and separate loan.

**[ NO FURTHER TEXT ON THIS PAGE ]**

12855526.4

IN WITNESS WHEREOF, Senior Lender and Mezzanine Lender have executed this Agreement as of the date and year first set forth above.

SENIOR LENDER:

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By: _____

Name:   CHARLENE THOMAS
Title:    AUTHORIZED SIGNATORY

MEZZANINE LENDER:

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By: _____

Name:   CHARLENE THOMAS
Title:    AUTHORIZED SIGNATORY