# EXHIBIT A

## AGREEMENT

THIS AGREEMENT (this "Agreement"), dated as of May 23, 2008 (the "Effective Date, is made by and among (i) LEHMAN BROTHERS HOLDINGS INC., a Delaware corporation ("LBHI"), (ii) LEHMAN ALI, INC., a Delaware corporation ("Lehman ALI"), (iii) the Borrowers (as defined on Annex 1 hereto), (iv) the Grantors (as defined on Annex 1 hereto), (v) SCC ACQUISITIONS, INC., a California corporation ("SCC"), (vi) SCC ACQUISITIONS, LLC, a Delaware limited liability company, (vii) the Guarantors (as defined on Annex 1 hereto), (viii) the Pledgors (as defined on Annex 1 hereto), (ix) the SunCal Equity Partners (as defined on Annex 1 hereto), (x) the Lehman Equity Partners (as defined on Annex 1 hereto), (xi) SUNCAL COMMUNITIES II, LLC, a Delaware limited liability company, (xii) BRUCE ELIEFF, and (xiii) SUNCAL MANAGEMENT, LLC, a Delaware limited liability company. Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Settlement Agreement (as hereinafter defined).

## WITNESSETH

WHEREAS, SCC and LBHI executed and delivered that certain Omnibus Restructuring Summary of Terms (the "Term Sheet"), a copy of which is attached hereto as Exhibit A, which Term Sheet is expressly stated to be non-binding on all parties, reflecting the terms and conditions under which the parties hereto (the "Parties") and certain of their respective affiliates would enter into certain restructuring transactions relating to various loans and joint ventures to which the Parties and certain of their respective affiliates are parties; and

WHEREAS, since the execution and delivery of the Term Sheet, the Parties have negotiated and agreed upon (a) the form of the Settlement Agreement to be executed and delivered at the closing of the restructuring transactions contemplated in the Term Sheet, which form is attached hereto as Exhibit B (the "Settlement Agreement"), and (b) the forms of various other Settlement Documents to be executed and delivered contemporaneously with the execution and delivery of the Settlement Agreement, each of which is attached as an exhibit to the Settlement Agreement (collectively, the "Documented Additional Settlement Documents");

WHEREAS, this Agreement is being entered into for the purpose of setting forth certain agreements of the Parties.

NOW, THEREFORE, in consideration of the premises, the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which hereby is acknowledged, the Parties agree as set forth below.

Section 1.    **Obligation to Execute the Settlement Documents**.

(a)    Each of Parties acknowledges and agrees that, provided that a Termination Event (as hereinafter defined) has not occurred and subject to the terms of Sections 2, 3 and 4 hereof, not later than three (3) Business Days following the satisfaction of all of the

Closing Conditions (as hereinafter defined) (such date being referred to herein as the "Closing Date"), each of the Parties will execute, deliver and enter into and will cause the other SunCal Parties and Lehman Parties, respectively, and any other Affiliates thereof, as applicable, to execute, deliver and enter into, the Settlement Agreement, the Documented Additional Settlement Documents and all other documents contemplated by the Settlement Agreement or any of the Documented Additional Settlement Documents to be entered into and/or delivered in connection with the Settlement Transactions (including, without limitation, the New Interim Loan Documents) or as the Parties may mutually agree are necessary to implement the terms of the Settlement Agreement or any of the Documented Additional Settlement Documents (collectively, the "Undocumented Additional Settlement Documents" and, together with the Settlement Agreement and the Documented Additional Settlement Documents, the "Settlement Documents"). Upon consummation of the Settlement Transactions on the Closing Date, this Agreement shall be deemed to be terminated and of no further force or effect except for those provisions which are expressly stated to survive the consummation of the Settlement Transactions or the termination of this Agreement.

(b)    Unless this Agreement shall have been terminated pursuant to the terms hereof, the obligations of the Parties to execute and deliver (or to have their Affiliates execute and deliver) the Settlement Agreement and the other Settlement Documents shall be unconditional and irrevocable provided that the following conditions are satisfied (collectively, the "Closing Conditions"):

(i)    Each of the representations and warranties of the Parties and any other parties set forth in the Settlement Agreement and each of the other Settlement Documents shall be true and correct as of the Closing Date in all material respects;

(ii)    All consents and approvals of governmental authorities and parties to any agreements to which the SunCal Parties and Lehman Parties, as applicable, are parties or to which they may be bound that are required to be obtained with respect to or as a result of any of the Settlement Transactions including, without limitation, consents under any Development Agreement, or otherwise with respect to any Development Right, with respect to the Conveyance Transactions, shall have been obtained on terms reasonably satisfactory to the Parties;

(iii)    The Parties shall have negotiated and agreed upon the form of each of the Undocumented Additional Settlement Documents, each of which shall be in form and substance reasonably satisfactory to the Parties, and shall have further agreed upon any other schedules, exhibits and annexes to the Settlement Agreement and/or any of the other Settlement Documents which have not been agreed upon as of the Effective Date (the "Outstanding Attachments"); provided that (i) each of the Parties agrees to negotiate the terms and conditions of the Undocumented Additional Settlement Documents and the final form

of any Outstanding Attachments in good faith, and (ii) to the extent that a term or condition is not specifically set forth in or contemplated by the Settlement Agreement or any of the Documented Additional Settlement Documents, the Parties agree that they will act in a commercially reasonable manner in approving customary terms and conditions for transactions of this type (in the context of the totality of the Settlement Documents, with such modifications as may be necessary to take into account the specific circumstances of the Settlement Transactions); notwithstanding the foregoing or anything herein to the contrary, the parties acknowledge that Schedule 14 and Schedule 17 of the Settlement Agreement have been appended to the Settlement Agreement in draft form only and that each of such schedules shall be subject to further modification as follows: (1) Schedule 14 shall be modified and updated as may be reasonably agreed upon by the parties, and (2) Schedule 17 shall be modified to include such level of detail and specificity regarding the costs, budgets and scope of work as may be required and approved by the Lehman Parties in their sole and absolute discretion.

(iv)     as to those Parties which are Lehman Parties only, (a) there shall have been no material adverse change in title to the Conveyance Properties from the condition of title reflected in various title reports received by the Lehman Parties as of the Effective Date other than changes reflecting the filing of additional mechanics' liens, stop notices or other matters resulting from the non-payment of the Vendor Obligations, and (b) the Title Insurer shall be prepared to issue the Title Policies as contemplated under the terms of the Settlement Agreement;

(v)      as to those Parties which are Lehman Parties only, there shall have occurred no material adverse change in (1) the organizational status of any of the Borrower Parties or other SunCal Parties, or (2) the physical or environmental condition of any of the Properties; and

(vi)     no governmental authority or court of competent jurisdiction shall have issued an order, decree or ruling or taken any other action materially restraining, enjoining or otherwise prohibiting any of the Settlement Transactions or any of the other transactions contemplated by the other Settlement Documents, it being agreed that the Parties shall reasonably cooperate with one another to contest and/or appeal any such order, decree, ruling or other action in good faith.

(c)     Upon satisfaction of the Closing Conditions, the Parties shall proceed to Closing but the obligation of the Parties to consummate the Settlement Transactions on the Closing Date shall be conditioned upon the satisfaction of all conditions precedent and the satisfaction and performance of and/or compliance with all requirements, covenants, conditions, obligations and undertakings set forth in the Settlement Agreement and each of

the other Settlement Documents and the delivery of such opinions, closing certificates, and other deliverables as contemplated in the Settlement Documents and/or as reflected in the preliminary closing checklist attached hereto as <u>Exhibit C</u>.

    (d)    This Agreement may be terminated as follows (each a "Termination Event"):

        (i)    by SCC or LBHI, if the Closing Conditions shall not have been satisfied on or prior to August 31, 2008; provided that neither SCC nor LBHI, as the case may be, shall be permitted to terminate this Agreement if the failure of any of the Closing Conditions shall have been due to such Party's (or such Party's Affiliate's) willful misconduct, gross negligence or failure to pursue the satisfaction the Closing Conditions in good faith;

        (ii)    by LBHI, if an Interference Event shall have occurred (other than those events described in clauses (v), (vi) or (vii) of the definition thereof which events shall not be relevant prior to the consummation of the Settlement Transactions);

        (iii)    by LBHI, if an Involuntary Bankruptcy Filing shall have occurred; or

        (iv)    by the mutual agreement of SCC and LBHI.

    (e)    Upon the termination of this Agreement, any obligations of the Parties hereunder shall terminate and each of the Parties shall have no further obligation to one another pursuant to this Agreement, notwithstanding anything to the contrary set forth herein, provided that, Sections 1(j), 1(k), 7, 8, 11 and 15 hereof shall survive the termination hereof and each Party shall remain liable for any breach by it of this Agreement.

    (f)    From the date of this Agreement through the consummation of the Settlement Transactions, the SunCal Parties shall cause (i) the Properties to be operated in the ordinary course of business, consistent with past practice during the period from November 1, 2007 through the Effective Date, and (ii) the Borrowers, Grantors and Pledgors to not make any distributions to their members or partners, to the Guarantors or to any Affiliates of any Borrower Party or to Elieff.

    (g)    Upon consummation of the Settlement Transactions with respect to a Property, any amounts actually paid by the Bond Obligors to any of the Bond Issuers in respect of any Approved Bond Claims with respect to such Property from the Effective Date through the Closing Date shall be reimbursed to such Bond Obligors at Closing by the applicable Venture Grantee(s) and/or Pac Point Lender, as applicable, if and to the extent that the same would otherwise have been payable to such Bond Obligors pursuant to Section 16 of the Settlement Agreement if the Settlement Agreement had been executed and delivered on the Effective Date (the aggregate amount so reimbursed at Closing being referred to as the "Bond Claim Reimbursement Amount"); provided, however, that the Bond Claim Reimbursement Amount shall be included for purposes of calculating the maximum aggregate amount of the Assumed Bond Obligations set forth in Section 16.c. of the Settlement Agreement.

(h)     During the term of this Agreement, Lehman ALI, as the Lender with respect to each Loan, and the respective Borrowers shall continue to have periodic meetings (by teleconference) to discuss and determine, with respect to each Property, the nature of the work and other services (including, without limitation, litigation defense costs) that need to be performed or provided with respect to each Property and any accounts payable arising from work previously authorized by Lehman ALI which need to be paid with respect to each Property (collectively, the "Urgent Payables") and Lehman ALI hereby agrees to make protective advances under the applicable Loan(s) to reimburse or otherwise provide funds to the applicable Borrowers for the payment of any such Urgent Payables which are approved by Lehman ALI (pursuant to such invoices and other documentation substantiating the same to Lehman ALI's reasonable satisfaction) and each of the relevant Borrower Parties hereby requests and agrees to the making of such protective advances and acknowledges and agrees that such protective advances shall be secured by the applicable Deed(s) of Trust and other Loan Documents notwithstanding anything to the contrary contained therein. Further, the Borrower Parties agree to cooperate with Lehman ALI and/or its designee (which may be a third party retained by Lehman ALI on its behalf and at its sole expense) and provide Lehman ALI and/or its designee an opportunity to discuss with the Borrower Parties the Urgent Payables and/or any other accounts payable or other obligations relating to any of the Properties and to participate with the Borrower Parties in the negotiation and settlement of any such payables or obligations and, to the extent agreed by the parties, to allow Lehman ALI (or its designee) to conduct or manage the negotiation of such payables or obligations.

(i)     On the Effective Date and on the first day of each calendar month thereafter until the termination of this Agreement, Lehman ALI, as the Lender with respect to each Loan, shall pay to the Manager, in advance, a management fee for the management of each Conveyance Property equal to, for each Conveyance Property, the applicable monthly management fee set forth on Exhibit D attached hereto (or prorated portion thereof with respect to the first period, which shall be from May 15, 2008 through May 31, 2008, and for the last period, which shall be from the first day of the month in which this Agreement is terminated through the day immediately preceding the date of such termination) (collectively, the "Monthly Management Fees"). Lehman ALI shall have the right to cease payment of any further Monthly Management Fees as to any or all of the Conveyance Properties at any time prior to the termination of this Agreement upon thirty (30) days' written notice to the Manager, and upon the giving of any such written notice by Lehman ALI to the Manager, this Section 1(i) shall terminate and be of no further force or effect with respect to such Conveyance Property and Manager shall immediately refund to Lehman ALI any Management Fees paid by Lehman ALI to the Manager with respect to such Conveyance Property for the period following the termination of this Section 1(i), failing which Lehman ALI shall have the right to offset any such refund obligation against any other Management Fees payable to Manager under this Section 1(i).

(j)     Nothing contained in this Agreement shall limit, restrict, alter, modify, waive, prejudice or otherwise affect any of the obligations, liabilities, rights or remedies of any of the Borrower Parties, Elieff, or any of the Lenders under the Loan Documents and upon termination of this Agreement for any reason, such parties rights and remedies shall remain unaffected. Further, nothing contained herein shall restrict, limit or prevent any of the Lenders from: (A) taking any action that any such Lender may take under the applicable

Loan Documents or at law or in equity necessary or appropriate in such Lender's sole discretion to preserve, protect or defend any of the collateral described in the applicable Loan Documents including, without limitation (i) defending, intervening in or filing of any legal proceedings relating to any such collateral, (ii) the sending of any notices to any Person concerning the existence of security interests or liens in favor of such Lender relating to such collateral, or (iii) otherwise preserving any of such Lender's rights, remedies or positions; or (B) filing a statutory notice of default in accordance with California Civil Code Section 2924.3 at any time in such Lender's sole and absolute discretion and setting a sale date with respect to the sale of such collateral and continuing such foreclosure proceedings to conclusion, as described in Section 1(k) hereof. The Borrower Parties acknowledge and agree that the Lenders, or any of them, may, during the term of this Agreement accept any partial payments of the Loans tendered by the Borrowers or any of the other Borrower Parties or any other party or as a result of the application of any funds or deposits under the control of the Lenders. Furthermore, the Borrower Parties acknowledge that the acceptance of any such partial payments by any of the Lenders shall not (i) constitute any agreement or commitment by such Lender to amend, modify or extend the term of the applicable Loan(s) or any of the applicable Loan Documents, (ii) constitute any agreement by such Lender to continue to accept such partial payments, (iii) constitute any course of conduct by such Lender, (iv) extend the maturity date of or otherwise reinstate the applicable Loan(s) or cure any default or Event of Default (as such term is defined in the applicable Loan Agreement) under any of the applicable Loan Documents, (v) constitute any agreement or commitment by such Lender to forbear from the exercise of any of its rights or remedies, or (vi) otherwise waive or alter in any way any of such Lender's rights or remedies pursuant to the applicable Loan Documents, applicable law or otherwise. Additionally, the Borrower Parties further acknowledge and agree that this Agreement is not intended to be and shall not be deemed or construed to be a reinstatement, novation, release, modification, amendment or waiver of any of the Loans or the Loan Documents or any provision thereof, and shall not be deemed to extend the maturity date of any of the Loans or cure any other defaults or Events of Default (as defined under the respective Loan Agreements) under the Loan Documents or to cure or reinstate any of the Loans or the Loan Documents, it being the intention of the Parties that the Loans are and shall remain in default and immediately due and payable in full notwithstanding the agreement of the Parties to enter into the Settlement Transactions or anything to the contrary in this Agreement. Lenders reserve all of their respective rights and remedies in connection with any maturity of the Loans, defaults or Events of Default under the Loan Documents, at law or in equity.

(k)    Notwithstanding anything to the contrary contained herein, each Lender shall have the right, pursuant to the applicable Loan Documents, at law or in equity, at any time and in its sole and absolute discretion, to initiate foreclosure proceedings (judicial or non-judicial) with respect to the applicable Property(ies) and/or other collateral securing the applicable Loan(s) (including, without limitation, the right to a file statutory notice of default and to set a sale date with respect to the sale of such Property(ies) and/or other collateral) and continue such foreclosure proceedings to conclusion. If any such foreclosure proceedings result in the acquisition of title to any of the Properties (or equity interests in the entities which, as of the Effective Date, own, directly or indirectly, any of the Properties) by a Lender or any of its Affiliates, prior to the consummation of the Settlement Transactions, then the Parties shall, in connection with the consummation of the Settlement Transactions,

cooperate and take all steps necessary to effectuate the provisions of the penultimate sentence of Section 12.a. of the Settlement Agreement with respect to any such foreclosure. If any such foreclosure proceedings result in the acquisition of title to any of the Properties (or equity interests in the entities which, as of the Effective Date, own, directly or indirectly, any of the Properties) by a third party unrelated to the foreclosing Lender, prior to the consummation of the Settlement Transactions, then the Parties shall, in connection with the consummation of the Settlement Transactions, cooperate and take all steps necessary to effectuate the provisions of the last sentence of Section 12.a. of the Settlement Agreement with respect to any such foreclosure.

(l)     Prior to the Closing Date, unless otherwise elected in writing by Lehman ALI, Lehman ALI shall have the right to cause the Borrower Parties to terminate any or all of the infrastructure license agreements relating to or otherwise affecting various of the Properties (all of which agreements constitute Affiliate Agreements) as of the Closing Date and the termination of any such agreements shall be a condition precedent to the Closing.

(m)     The Settlement Agreement contemplates that each of the Mortgage Loans will be modified at Closing, pursuant to the Loan Modification Documents, to provide that all outstanding principal under the Mortgage Loans will accrue interest, from and after the Closing Date, at a rate of 15% per annum, compounded monthly. At Lehman ALI's sole election prior to the Closing, the Parties will cooperate in all commercially reasonable respects to revise the structure contemplated by the Settlement Agreement and eliminate the modifications contemplated to be made to the Mortgage Loans and instead provide for the same economic benefits to the Lehman Master Venture Member that were to be provided to the Lenders under the Mortgage Loans; provided, however, that such changes shall impose no economic detriment on any party. Specifically, the documents would be modified to provide that an amount equal to the aggregate amount of all indebtedness outstanding under the Mortgage Loan as of the Closing Date would accrue a return equal to 15% per annum, compounded monthly, and such indebtedness together with the return thereon would be paid to the Lehman Master Venture Member prior to any distributions to the SunCal Master Venture Member.

Section 2.     **Required Consents**.

(a)     Notwithstanding anything to the contrary contained herein or in the Settlement Agreement or any of the other Settlement Documents but subject to Section 3 and Section 4 hereof, if (i) all Closing Conditions have been satisfied except that the consents required to be obtained pursuant to Section 1(b)(ii) hereof (including, without limitation, consents under any Development Agreement or otherwise with respect to any Development Rights) (collectively, the "Required Consents") have not been obtained with respect to all of the Conveyance Properties, (ii) all Required Consents have been obtained as to at least eight (8) of such Conveyance Properties and as to the Pacific Point Property, and (iii) the Required Consents shall have been obtained for all Conveyance Properties which are within the same group of Related Conveyance Properties (as defined on Annex 2 attached hereto) (such that the consummation of the Closing as to all Related Conveyance Properties shall occur simultaneously), then the Parties shall proceed to consummate the Closing (the "Initial Closing") as to those Conveyance Properties for which the Required

Consents have been obtained and as to the Pacific Point Property (the Conveyance Properties for which the Required Consents have been obtained being collectively referred to as the "Initial Conveyance Properties" and the Conveyance Properties for which the Required Consents have not been obtained being collectively referred to as the "Subsequent Conveyance Properties") and each Subsequent Conveyance Property shall continue to be subject to the terms of this Agreement. After the Initial Closing, the Parties shall use commercially reasonable efforts to obtain all Required Consents with respect to each of the Subsequent Conveyance Properties and, upon obtaining all Required Consents with respect to any Subsequent Conveyance Property, the Parties shall proceed to consummate the Closing with respect to the conveyance of such Subsequent Conveyance Property pursuant to the terms of the Settlement Agreement within three (3) Business Days following the date upon which all Required Consents with respect to such Subsequent Conveyance Property have been obtained (the date on which the Closing of a Subsequent Conveyance Property occurs being referred to as a "Subsequent Closing Date"). In connection with the Initial Closing, the Parties shall modify the form of Settlement Agreement and any other Settlement Documents, as may be necessary, to provide for the subsequent Closing of each Subsequent Conveyance Property on the applicable Subsequent Closing Date. Upon termination of this Agreement for any reason (including pursuant to an election by SCC or LBHI under Section 1(d)(i) hereof), the applicable Lender as to any Subsequent Conveyance Property the Closing of which has not then occurred, shall have the right, in its sole and absolute discretion, to either (x) terminate this Agreement as to such Subsequent Conveyance Property, whereupon all references to such Subsequent Conveyance Property shall automatically be deemed to be deleted from the Settlement Agreement and all other Settlement Documents without further action by any party and this Agreement shall no longer be applicable to or otherwise affect or govern the Parties rights with respect to such Subsequent Conveyance Property except as provided in Section 1(j), or (y) proceed with a foreclosure (judicial or non-judicial or both) of the applicable Loan or Loans held by such Lender, in which event the provisions of Section 5 hereof shall apply.

(b)    Unless all Conveyance Properties shall have been conveyed to the applicable Venture Grantees on the Initial Closing Date or as of any Subsequent Closing Date, the provisions of this Section 2 shall survive the consummation of the Settlement Transactions on the Initial Closing Date and on any Subsequent Closing Date and shall further survive the termination of this Agreement at any time after the Initial Closing Date.

Section 3.    **Northlake Mezz Consents.**

(a)    Notwithstanding anything to the contrary contained herein or in the Settlement Agreement or any of the other Settlement Documents, if for any reason consents from the Northlake Mezz Lenders (collectively, the "Northlake Consents"), or either of them, have not been obtained as of the Initial Closing Date, then the Closing shall proceed as to all Initial Closing Properties and the Lender under the Loan Documents relating to the Northlake Property (the "Northlake Loan") shall have the right to proceed with a foreclosure (judicial or non-judicial or both) of the Northlake Loan, in which event the provisions of Section 5 hereof shall apply; provided, however, that if the Northlake Consents have been obtained but are effective as to a conveyance of the Northlake Property on a date that is after the Initial Closing Date (such date being referred to as the "Northlake Closing Date"), then,

subject to the terms of Section 2 hereof, the Closing of the Northlake Property shall be consummated on the Northlake Closing Date and the Settlement Agreement and other Settlement Documents shall be amended, as may be necessary, to reflect the Closing of the Northlake Property on such Northlake Closing Date. Nothing contained herein shall obligate or require the Borrower Parties under the Northlake Loan to take any action (including, without limitation, pursuant to or as may be required under Section 5 hereof) that would violate the terms of any agreements between such Borrower Parties and the Northlake Mezz Lenders. The Parties acknowledge that to the extent that schedules relating to the Northlake Property have not been appended to the Settlement Agreement as of the Effective Date, such schedules shall constitute Outstanding Attachments hereunder, to be agreed upon by the Parties prior to the Closing Date. Further, the Parties acknowledge that the Management Fee with respect to the Northlake Property has not been agreed upon as of the Effective Date and the Parties agree to cooperate in determining the amount of such Management Fee.

(b)    Unless the Northlake Property shall have been conveyed to the applicable Venture Grantee on the Initial Closing Date or on the Northlake Closing Date, the provisions of this Section 3 shall survive the consummation of the Settlement Transactions on the Initial Closing Date and any Subsequent Closing Date and shall further survive any termination of this Agreement at any time after the Initial Closing Date.

Section 4.    **Ritter Ranch Property.**

(a)    Notwithstanding anything to the contrary contained herein or in the Settlement Agreement or any of the other Settlement Documents, at any time prior to the Initial Closing Date, the applicable Lender (the "Ritter Ranch Lender") under the Loan Documents relating to the Ritter Ranch Property (the "Ritter Ranch Loan") shall have the right to elect to acquire title to the Ritter Ranch Property by proceeding with a foreclosure (judicial or non-judicial or both) of the Ritter Ranch Loan (the "Ritter Ranch Foreclosure Proceeding"), in which event the provisions of Section 5 hereof shall apply, in lieu of accepting a deed to the Ritter Ranch Property, as currently provided in the Settlement Agreement, and the Settlement Agreement and other Settlement Documents shall be amended, as may be necessary, to reflect the acquisition of the Ritter Ranch Property pursuant to the Ritter Ranch Foreclosure Proceeding.

(b)    Unless the Ritter Ranch Property shall have been conveyed to the applicable Venture Grantee on the Initial Closing Date, the provisions of this Section 4 shall survive the consummation of the Settlement Transactions on the Initial Closing Date and shall further survive any termination of this Agreement at any time after the Initial Closing Date if the Ritter Ranch Lender has elected to proceed with the Ritter Ranch Foreclosure Proceeding.

Section 5.    **Foreclosure Proceedings.**

(a)    In connection with the foreclosure of any Subsequent Conveyance Property, the Northlake Property or the Ritter Ranch Property (each, a "Foreclosure Property") as provided under Sections 2, 3 or 4 hereof, respectively (each, a "Foreclosure Proceeding"),

the applicable Borrower Parties (the "Applicable Borrower Parties") and other SunCal Parties shall execute and deliver such consents, acknowledgments, waivers, stipulations and approvals as the applicable Lender (the "Applicable Lender") may reasonably request in connection with the commencement and expeditious prosecution of the Foreclosure Proceeding and shall otherwise cooperate with the Applicable Lender and the purchaser at the foreclosure sale (any such purchaser which is an Affiliate of the Applicable Lender being referred to as the "Foreclosure Property Transferee"), to the maximum extent permitted by law, in connection with the Foreclosure Proceeding and the sale of the Foreclosure Property pursuant thereto and the pursuit of any other remedies by the Applicable Lender under the applicable Loan Documents (including the appointment of a receiver) (provided that the Applicable Borrower Parties and other SunCal Parties shall not be required to incur any liability or unreimbursed cost unless the Applicable Lender agrees to reimburse or indemnify the Applicable Borrower Parties and other SunCal Parties therefor) and neither the Applicable Borrower Parties nor any other SunCal Party shall take any action to enjoin, restrain, contest, defend, hinder or otherwise interfere with or delay the Foreclosure Proceeding or the exercise of any rights and remedies of the Applicable Lender ancillary thereto (including the appointment of a receiver) in any way or manner. Further, neither the Applicable Borrower Parties nor any other SunCal Party shall take any action, either directly or indirectly, to oppose, impede, obstruct, hinder, enjoin, defend or otherwise interfere with the Applicable Lender's exercise of its rights and remedies pursuant to the applicable Loan Documents or applicable law or otherwise with respect to the Foreclosure Property or the applicable Loan. All of the foregoing obligations, covenants and agreements of the Applicable Borrower Parties and the other SunCal Parties are collectively referred to herein as the "Foreclosure Covenants."

(b)    Each of the Additional Indemnitors, jointly and severally with respect to each other Additional Indemnitor, as a primary obligor and not as a surety, hereby agrees to cause the Applicable Borrower Parties and the other SunCal Parties to comply with the Foreclosure Covenants and agrees, jointly and severally with each other Additional Indemnitor, as a primary obligor and not as a surety, to indemnify and hold the Applicable Lender, LBHI, any Foreclosure Property Transferee and each of their respective parents, predecessors, subsidiaries and affiliates and the respective employees, officers, directors, shareholders, partners, members, principals, agents, representatives, servants and counsel of any of the foregoing, and their successors and assigns (collectively, the "Foreclosure Property Indemnitees"), free and harmless from and against all losses, damages, liabilities , costs and expenses (including reasonable attorneys' fees ands costs) sustained by any of the Foreclosure Property Indemnitees as a result of (i) a breach by any of the Applicable Borrower Parties or any of the other SunCal Parties of, or a failure of any of the Applicable Borrower Parties or any of the other SunCal Parties to comply with, any of the Foreclosure Covenants, or (ii) the occurrence of any Interference Event. Notwithstanding the foregoing, except as provided in Section 33 of the Settlement Agreement, the Applicable Lender shall not pursue a money judgment against any Guarantor under any Guaranty executed and delivered in connection with the applicable Loan provided that (i) the Applicable Borrower Parties and the other SunCal Parties are in compliance with and have not breached any of the Foreclosure Covenants and (ii) no Interference Event shall have occurred.

(c)      At the time that the Applicable Lender makes an election to proceed with a Foreclosure Proceeding as to any Foreclosure Property, the Applicable Borrower Parties and Elieff shall execute and deliver a Release Agreement substantially in the form attached to the Settlement Agreement as Exhibit H-1, duly executed by the Applicable Borrower Parties and Elieff in favor of the Applicable Lender and LBHI and, upon completion of the Foreclosure Proceeding and acquisition of title to the Foreclosure Property by the Foreclosure Property Transferee, (i) the Applicable Borrower Parties and Elieff shall execute and deliver a second Release Agreement substantially in the form of Exhibit H-2 to the Settlement Agreement to the Applicable Lender and the Foreclosure Property Transferee, and (ii) subject to the terms of Section 33 of the Settlement Agreement and provided that the SunCal Parties have complied with the Foreclosure Covenants and have not asserted any claim against the Applicable Lender or against the Foreclosure Property, the Applicable Lender shall execute and deliver a Covenant Not to Sue substantially in the form of Exhibit I to the Settlement Agreement to and for the benefit of the Applicable Borrower Parties and Elieff with respect to the applicable Loan or Loans. If the Foreclosure Property is acquired by the Foreclosure Property Transferee, then the Applicable Lender (or its Affiliate) shall assign its interest in the Foreclosure Property Transferee to the Master Venture (free and clear of any liens or encumbrances affecting such interest) and the LB Master Venture Member shall be deemed to have made a capital contribution to the Master Venture in an amount equal to the sum of (i) the aggregate outstanding indebtedness and other amounts secured by the Applicable Lender's Deed of Trust on the Foreclosure Property as of the date of acquisition of title to the Foreclosure Property by the Foreclosure Property Transferee and (ii) the aggregate outstanding amount of any Related Mezzanine Loan. If the Applicable Lender (or its Affiliate) is not the successful bidder at the foreclosure sale but such successful bidder is a third party unrelated to the Applicable Lender, then any proceeds of such foreclosure sale which are received by any of the Applicable Borrower Parties shall be delivered by the Applicable Borrower Parties to the Master Venture for further distribution to the members thereof as provided in the Master Venture Operating Agreement. From and after the acquisition of title by the Foreclosure Property Transferee, the Foreclosure Property shall be treated as a Conveyance Property for all purposes under the Settlement Agreement.

(d)      The Parties shall cause the Settlement Agreement to be modified and amended, prior to the execution and delivery thereof on the Initial Closing Date and from time to time thereafter, as may be necessary, to provide for any Foreclosure Proceedings and to reflect the terms of this Section 5 as to any Foreclosure Property.

(e)      Unless all Conveyance Properties shall have been conveyed to the applicable Venture Grantees on the Initial Closing Date or as of the Northlake Closing Date or any Subsequent Closing Date, the provisions of this Section 5 shall survive the consummation of the Settlement Transactions on the Initial Closing Date, the Northlake Closing Date and on any Subsequent Closing Date and shall further survive any termination of this Agreement at any time after the Initial Closing Date.

Section 6.      **Miscellaneous.** This Agreement, together with the attachments hereto and the documents referred to herein, contain the entire agreement among the Parties with respect to the subject matter hereof, and any other agreements shall be deemed to have

merged herewith. This Agreement is for the benefit only of the Parties and their respective Affiliates and no third party shall have any interest herein or rights pursuant hereto. This Agreement is not assignable by any Party to any other Person without the prior written consent of all other Parties, which may be given or withheld in such other Party's sole discretion. Time is of the essence with respect to each of the Parties' obligations under this Agreement. The terms and provisions of this Agreement cannot be waived or modified except in writing and signed by all Parties. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the SunCal Parties any right, benefit or remedy against any other Person other than the Lehman Parties under or by reason of this Agreement. Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the Lehman Parties any right, benefit or remedy against any other Person other than the SunCal Parties under or by reason of this Agreement.

Section 7.    **Confidentiality**. The terms of Section 53 of the Settlement Agreement shall apply mutandis mutatis.

Section 8.    **Governing Law**. This Agreement shall be governed by the laws of the State of New York without regard to the principles of conflicts of law.

Section 9.    **Further Assurances**. Each of the Parties shall, as promptly as practicable, execute and deliver, upon reasonable request by any other Party, all such other and further documents, agreements, certificates and other instruments in compliance with, or accomplishment of its covenants and agreements hereunder or to make any recording, filing or notice or obtain any consent in compliance with, or accomplishment of its covenants and agreements hereunder, all as may be reasonably necessary or appropriate in connection therewith.

Section 10.    **Successors and Assigns**. This Agreement shall inure to the benefit of each of the Parties' respective successors and permitted assigns.

Section 11.    **No Fiduciary Duty**. Nothing contained in this Agreement shall establish any fiduciary, partnership, joint venture or similar relationship between or among the Parties or any other duty or relationship except as specifically set forth herein. The Parties have an arms-length business relationship that does not directly or indirectly give rise to, nor does any Party rely on, any fiduciary duty on the part of any other Party. Each Party is capable of evaluating and understanding, and each Party understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement. Each Party has been advised that the other Parties are engaged in a broad range of transactions that may involve interests that differ from such Party's interests, including the foregoing, and that none of the Parties has any obligation to disclose such interests and transactions to any other Party by virtue of any fiduciary, advisory or agency relationship. The foregoing is not intended to negate or alter any fiduciary, advisory or agency relationship which may exist between or among various of the Parties pursuant to agreements other than this Agreement.

Section 12.    **Additional Indemnitors**. To the extent that any Additional Indemnitor is not a Party to this Agreement as of the Effective Date, SCC and the other Borrower Parties which are Parties hereto shall cause any such Additional Indemnitor to acknowledge and

agree to be bound by the terms of Section 5 of this Agreement and to be made a Party hereunder on and as of the Initial Closing Date.

Section 13.    **Announcements**.  Each Party agrees not to make any public announcements in relation to this Agreement without the prior approval of the other Parties.

Section 14.    **Counterpart Signatures**.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same document.

Section 15.    **Waiver of Jury Trial**.  TO THE MAXIMUM EXTENT PERMITTED BY LAW, EACH OF THE PARTIES HERETO HEREBY KNOWINGLY, VOLUNTARILY, UNCONDITIONALLY, IRREVOCABLY AND INTENTIONALLY FOREVER WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED THEREBY OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (VERBAL OR WRITTEN) OR ACTION OF ANY PERSON OR ANY EXERCISE BY ANY PARTY OF THEIR RESPECTIVE RIGHTS UNDER THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT (INCLUDING WITHOUT LIMITATION ANY ACTION TO RESCIND OR CANCEL THIS AGREEMENT OR ANY CLAIMS OR DEFENSES ASSERTING THAT THIS AGREEMENT WAS FRAUDULENTLY INDUCED OR ARE OTHERWISE VOID OR VOIDABLE). THIS PROVISION IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT.

Signature Pages Follow.

**[SIGNATURE PAGES TO BE PREPARED AND APPENDED TO THIS AGREEMENT]**

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first written above.

LEHMAN BROTHERS HOLDINGS INC.,
a Delaware corporation

By: _____
Name: ~~FRANCIS X. GILHOOL~~
Title: ~~AUTHORIZED SIGNATORY~~

LEHMAN ALI INC., a Delaware corporation

By: _____
Name: FRANCIS X. GILHOOL
Title: AUTHORIZED SIGNATORY

LB INDIO LAND VENTURES LLC, a Delaware limited
liability company

By:    PAMI LLC, a Delaware limited liability company
Its:    Managing Member

    By: _____
    Name: Francis X. Gilhool
    Its:    Authorized Signatory

LB/LAKESIDE CAPITAL PARTNERS, LLC, a Delaware
limited liability company

By: _____
Name: _____
Its:    Authorized Signatory

LB-DELTA MASTER IV MEMBER LLC, a Delaware limited
liability company

By: _____
Name: Francis X. Gilhool
Its:    Authorized Signatory

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SUNCAL MARBLEHEAD HEARTLAND MASTER LLC,
a Delaware limited liability company

By:    SunCal Master JV LLC,  a Delaware limited liability
        company
ITS:    Sole Member

      By:    SCC JV Ventures LLC, a Delaware
             limited liability company
      Its:    Operating Member

          By:    _____
                 Bruce V. Cook
          Its:    Secretary

SUNCAL MARBLEHEAD LLC, a Delaware limited liability
company

By:    SunCal Marblehead Heartland Master LLC, a Delaware
        limited liability company
Its:    Sole Member

      By:    SunCal Master JV LLC,  a Delaware limited
             liability company
      Its:    Sole Member

          By:    SCC JV Ventures LLC, a Delaware
                limited liability company
          Its:    Operating Member

             By:    _____
                    Bruce V. Cook
             Its:    Secretary

SUNCAL HEARTLAND LLC, a Delaware limited liability
company

By:    SunCal Marblehead Heartland Master LLC, a Delaware
        limited liability company
Its:    Sole Member

      By:    SunCal Master JV LLC,  a Delaware limited
              liability company
      Its:    Sole Member

          By:    SCC JV Ventures LLC, a Delaware
                limited liability company
          Its:    Operating Member

             By:    _____
                    Bruce V. Cook
             Its:    Secretary

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

LB/L-SUNCAL OAK VALLEY LLC, a Delaware limited
liability company

By:     SCC/Oak Valley LLC, a Delaware limited
        liability company
Its:    Operating Member

        By:     _____
                Bruce V. Cook
        Its:    Secretary


SJD PARTNERS, LTD., a California limited partnership

By: SJD Development Corp., a California corporation
Its: General Partner

    By:     _____
            Bruce V. Cook
            Its:   Secretary


PALMDALE HILLS PROPERTY, LLC, a Delaware limited
liability company

By:     _____
        Bruce V. Cook
Its:    Secretary


SCC/PALMDALE, LLC, a Delaware limited liability
company

By:     _____
        Bruce V. Cook
Its:    Manager


SUNCAL COMMUNITIES I, LLC, a Delaware limited
liability company

By:     _____
        Bruce V. Cook
Its:    Secretary


**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SUNCAL COMMUNITIES III, LLC, a Delaware limited
liability company

By: _____
      Bruce V. Cook

Its:    Secretary


SUNCAL BICKFORD RANCH LLC, a Delaware limited
liability company

By: _____
      Bruce V. Cook

Its:    Secretary


ACTON ESTATES, LLC, a Delaware limited liability
company

By: _____
      Bruce V. Cook

Its:    Secretary


SUNCAL SUMMIT VALLEY LLC, a Delaware limited
liability company

By: _____
      Bruce V. Cook

Its:    Secretary


KIRBY ESTATES, LLC, a Delaware limited liability
company

By: _____
      Bruce V. Cook

Its:    Secretary


SUNCAL BEAUMONT HEIGHTS, LLC, a Delaware
limited liability company

By: _____
      Bruce V. Cook

Its:    Secretary


**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SUNCAL EMERALD MEADOWS LLC, a Delaware
limited liability company

By: _____
    Bruce V. Cook
Its:    Secretary


SUNCAL JOHANNSON RANCH LLC, a Delaware limited
liability company

By: _____
    Bruce V. Cook
Its:    Secretary


SCC ACQUISITIONS, INC., a California corporation

By: _____
    Bruce V. Cook
Its:    Secretary


SCC ACQUISITIONS, LLC, a Delaware limited liability
company

By: _____
    Bruce V. Cook
Its:    Secretary


SUNCAL MASTER JV LLC, a Delaware limited liability
company

By:    SCC JV Ventures LLC, a Delaware limited liability
       company
Its:   Operating Member

       By: _____
           Bruce V. Cook
       Its:    Secretary


SJD DEVELOPMENT CORP., a California corporation

By: _____
    Bruce V. Cook
Its:    Secretary


**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SCC/INDIO LAND, LLC, a Delaware limited liability
company

By: _____

Bruce V. Cook

Its:    Secretary


SCC MASTER IV COMMUNITIES LLC, a Delaware
limited liability company

By: _____

Bruce V. Cook

Its:    Secretary


SCC/WEST CREEK, LLC, a Delaware limited liability
company

By: _____

Bruce Elieff

Its:    Manager


SUNCAL COMMUNITIES II, LLC, a Delaware limited
liability company

By: _____

Bruce Elieff

Its:    Manager


SEVEN BROTHERS LLC, a Delaware limited liability
company

By: _____

Bruce Elieff

Its:    Manager


SUNCAL MANAGEMENT, LLC, a Delaware limited
liability company

By: _____

Bruce Elieff

Its:    Manager


_____

BRUCE ELIEFF

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

SCC/INDIO LAND, LLC, a Delaware limited liability
company

By:      _____
         Bruce V. Cook
Its:     Secretary

SCC MASTER IV COMMUNITIES LLC, a Delaware
limited liability company

By:      _____
         Bruce V. Cook
Its:     Secretary

SCC/WEST CREEK, LLC, a Delaware limited liability
company

By:      _____
         Bruce Elieff
Its:     Manager

SUNCAL COMMUNITIES II, LLC, a Delaware limited
liability company

By:      _____
         Bruce Elieff
Its:     Manager

SEVEN BROTHERS LLC, a Delaware limited liability
company

By:      _____
         Bruce Elieff
Its:     Manager

SUNCAL MANAGEMENT, LLC, a Delaware limited
liability company

By:      _____
         Bruce Elieff
Its:     Manager

         _____
BRUCE ELIEFF

## [SIGNATURES CONTINUE ON FOLLOWING PAGE]

LB/L - SUNCAL NORTHLAKE LLC, a Delaware limited
liability company

By:    SCLV Northlake LLC, a Delaware limited liability
        company
Its:    Managing Member

        By: _____
        Name:    Francis X. Gilhool
        Title:  Authorized Signatory

By:    SCC/Northlake LLC, a Delaware limited
        liability company
Its:    Operating Member

        By: _____
        Bruce V. Cook
        Its:    Secretary

LB/L - SUNCAL NORTHLAKE LLC, a Delaware limited
liability company

By:   [_____], a Delaware
limited liability company

Its:   Managing Member

    By:  _____
    Name: _____
    Title: _____

By:   SCC/Northlake LLC, a Delaware limited
liability company

Its:   Operating Member

    By:  _____
        Bruce V. Cook
    Its:  Secretary

ANNEX 1

"Borrowers" shall mean the following:

SCC
SunCal Marblehead Heartland Master LLC, a Delaware limited liability company
SunCal Marblehead LLC, a Delaware limited liability company ("Marblehead Project Owner")
SunCal Heartland LLC, a Delaware limited liability company ("Heartland Project Owner")
LB/L SunCal Northlake LLC, a Delaware limited liability company ("Northlake Borrower")
LB/L SunCal Oak Valley LLC, a Delaware limited liability company ("Oak Valley Borrower")
SJD Partners, Ltd., a California limited partnership ("Pacific Point Borrower")
Palmdale Hills Property, LLC, a Delaware limited liability company (the "Ritter Ranch Mortgage Borrower")
SCC/Palmdale, LLC, a Delaware limited liability company ("Ritter Ranch Mezz Borrower")
SunCal Communities I, LLC, a Delaware limited liability company ("SunCal I Borrower")
SunCal Communities III, LLC, a Delaware limited liability company
SunCal Bickford Ranch LLC, a Delaware limited liability company ("Bickford Ranch Second Lien Borrower")

"Grantors" shall mean the following:

SCC
Marblehead Project Owner
Heartland Project Owner
Northlake Borrower
Oak Valley Borrower
Pacific Point Borrower
Ritter Ranch Mortgage Borrower
Acton Estates, LLC, a Delaware limited liability company ("Acton Estates Project Owner")
SunCal Summit Valley LLC, a Delaware limited liability company ("Summit Valley Project Owner")
Seven Brothers LLC, a Delaware limited liability company
Kirby Estates, LLC, a Delaware limited liability company
SunCal Beaumont Heights, LLC, a Delaware limited liability company
Bickford Ranch Second Lien Borrower
SunCal Emerald Meadows LLC, a Delaware limited liability company ("Emerald Meadows Project Owner")
SunCal Johannson Ranch LLC, a Delaware limited liability company

"Guarantors" shall mean the following:

    SCC
    Bruce Elieff
    Acton Estates Project Owner
    Summit Valley Project Owner
    Bickford Ranch Second Lien Borrower
    Emerald Meadows Project Owner

"Pledgors" shall mean the following:

    SCC
    SunCal Master JV, LLC, a Delaware limited liability company
    SJD Development Corp., a California corporation
    Ritter Ranch Mezz Borrower
    SunCal I Borrower
    Summit Valley Project Owner

"SunCal Equity Partners" shall mean the following:

    SCC/Indio Land, LLC, a Delaware limited liability company
    SCC/West Creek, LLC, a Delaware limited liability company
    SCC Master IV Communities LLC, a Delaware limited liability company

"Lehman Equity Partners" shall mean the following:

    LB Indio Land Ventures LLC, a Delaware limited liability company
    LB/Lakeside Capital Partners, LLC, a Delaware limited liability company
    LB-Delta Master IV Member LLC, a Delaware limited liability company

ANNEX 2

Each of the Conveyance Properties within a particular group below are Related Conveyance
Properties to each other.

Group A        Marblehead
               Heartland

Group B        Bickford Ranch
               Emerald Meadows
               Acton
               Beaumont Heights
               Summit Valley
               Johansen Ranch