1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x

                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                November 5, 2008

                10:02 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    HEARING re Debtors' Motion Pursuant to Sections 105(a) and 331

3    of the Bankruptcy Code and Bankruptcy Rule 2016(a) for

4    Authorization to Establish Procedures for Interim Monthly

5    Compensation and Reimbursement of Expenses of Professionals

6

7    HEARING re Debtors' Motion Pursuant to Sections 105(a), 327,

8    328, and 330 of the Bankruptcy Code for Authorization to Employ

9    Professionals Utilized in the Ordinary Course of Business Nunc

10   Pro Tunc to the Commencement Date

11

12   HEARING re Application of the Debtor and Debtor in Possession

13   Lehman Brothers Holdings, Inc. Pursuant to Sections 327(e) and

14   328(a) of the Bankruptcy Code for Authorization to Employ, Nunc

15   Pro Tunc, Mckee Nelson LLP as Special Tax Counsel

16

17   HEARING re Application to Employ Milbank, Tweed, Hadley &

18   McCloy LLP as Counsel to Official Committee of Unsecured

19   Creditors / Application Of Official Committee Of Unsecured

20   Creditors Of Lehman Brothers Holdings Inc., et al., Under 11

21   U.S.C. Section 1103 And Fed. R. Bankr. P. 2014 And 5002, For

22   Order Authorizing Retention And Employment Of Milbank, Tweed,

23   Hadley & McCloy LLP As Counsel, Effective As Of September 17,

24   2008

25

3

1

2 HEARING re Application to Employ Quinn Emanuel Urquhart Oliver

3 & Hedges, LLP as Special Counsel to Official Committee of

4 Unsecured Creditors Application of Official Committee Of

5 Unsecured Creditors of Lehman Brothers Holdings Inc., et al.,

6 Under 11 U.S.C. Sections 328 and 1103 and Fed. R. Bankr. P.

7 2014 and 5002, for Order Authorizing Retention and Employment

8 of Quinn Emanuel Urquhart Oliver & Hedges, LLP, as Special

9 Counsel, Nunc Pro Tunc to September 17, 2008

10

11 HEARING re Application to Employ FTI Consulting Inc. as

12 Financial Advisor to Official Committee Of Unsecured

13 Creditors/Application Of Official Committee Of Unsecured

14 Creditors Of Lehman Brothers Holdings Inc., et al., For Order

15 Under 11 U.S.C. Sections 328(a) And 1103, Fed. R. Bankr. P.

16 2014, And S.D.N.Y. LBR 2014-1, Authorizing Employment And

17 Retention Of FTI Consulting Inc., As Its Financial Advisor As

18 Of September 17, 2008

19

20

21

22

23

24

25

4

1

2    HEARING re Application to Employ Houlihan Lokey Howard & Zukin

3    Capital, Inc. as Investment Banker to Official Committee Of

4    Unsecured Creditors / Application Of Official Committee Of

5    Unsecured Creditors For Order Under 11 U.S.C. Sections 328(a)

6    And 1103, Fed. R. Bankr. P. 2014, And S.D.N.Y. LBR 2014-1,

7    Authorizing Employment And Retention Of Houlihan Lokey Howard &

8    Zukin Capital, Inc. As Investment Banker As Of September 17,

9    2008

10

11   HEARING re Motion of The Vanguard Group, Inc. for Entry of An

12   Order Approving Specified Information Blocking Procedures and

13   Permitting Trading of Claims Against the Debtor Upon

14   Establishment of A Screening Wall

15

16   HEARING re Debtors Motion Pursuant to Sections 105(a), 362(d),

17   363(b) and 503(b) of the Bankruptcy Code and Bankruptcy Rules

18   4001, 6003 and 6004 Seeking Authority to (A) (i) Continue the

19   Debtors Workers Compensation Programs and its Liability,

20   Property, and Other Insurance Programs and (ii) Pay All Pre-

21   petition Obligations in Respect Thereof and (B) Schedule a

22   Final Hearing

23

24

25

5

1

2    HEARING re Motion of Cargill Investment Group, Ltd. for Relief

3    from Stay to Terminate Management Agreement and for Allowance

4    and Payment of Administrative Expense Claim

5

6    HEARING re Debtors Motion Pursuant to Section 365 of the

7    Bankruptcy Code and Bankruptcy Rules 6006 and 9014 for

8    Authorization to Reject Contingent Management Agreement with

9    WestLB AG

10

11    HEARING re Debtors Motion Pursuant to Sections 105(a) and 362

12    of the Bankruptcy Code for an Order Approving Restrictions on

13    Certain Transfers of Interests in the Debtors and Establishing

14    Notification Procedures Relating Thereto

15

16    HEARING re Debtors Motion for Entry of an Order Pursuant to

17    Section 363 of the Bankruptcy Code and Federal Rule of

18    Bankruptcy Procedure 6004 Authorizing Lehman Brothers Holdings

19    Inc. to Enter into a Sale and Purchase Agreement of G-IV

20    Aircraft

21

22

23

24

25

6

1

2   HEARING re Motion of DNB NOR BANK ASA for Entry of (I) an Order

3   Pursuant to 11 U.S.C. Section 362(d) and Fed.R.BankR.P.4001

4   Granting Relief From the Automatic Stay to Effect Setoff or, in

5   the Alternative, (II) an Order Pursuant to 11 U.S.C. Section

6   361 and 506(a) Requiring the Debtors to Provide Adequate

7   Protection

8

9   HEARING re Debtors Motion Pursuant to Sections 105(a), 345(b),

10  363(b), 363(c) and 364(a) of the Bankruptcy Code and Bankruptcy

11  Rules 6003 and 6004 (A) for Authorization to (i) Continue Using

12  Existing Centralized Cash Management System, as Modified, (ii)

13  Honor Certain Pre-petition Obligations Related to the Use of

14  the Cash Management System, and (iii) Maintain Existing Bank

15  Accounts and Business Forms; (B) for an Extension of Time to

16  Comply with Section 345(b) of the Bankruptcy Code, and (c) to

17  Schedule a Final Hearing

18

19  HEARING re Motion of Sumitomo Mitsui Banking Corporation for

20  Relief from the Automatic Stay to Foreclosure on its Collateral

21

22

23

24

25

7

1

2    HEARING re Motion to Reconsider FRCP 60 or FRBP 3008 / Motion

3    for Clarification, and Relief from Judgment pursuant to Fed R.

4    Civ. P. 60(b), Section 105(a) of the Bankruptcy Code, regarding

5    the Courts Order Approving the Sale of Assets to Barclays

6    Capital Inc. with respect to Non-Debtor Assets (related

7    document(s)[258])

8

9    HEARING re Motion of Evergreen Solar, Inc. for Preliminary

10   Injunction

11

12   HEARING re Trustee's Application for Entry of an Order

13   Regarding Disinterestedness of the Trustee and Counsel to the

14   Trustee

15

16   HEARING re Cargill Investment Group, Ltd.'s Motion for Relief

17   from Automatic Stay

18

19

20

21

22

23

24

25

8

1

2    HEARING re Motion to Authorize Trustees Motion to (A) Adopt and

3    Incorporate by Reference for Purposes of this Proceeding, an

4    Order Authorizing (I) Continuing Use of Existing Centralized

5    Cash Management System, as Modified; (II) Honoring Certain Pre-

6    petition Obligations Related to the Use of the Cash Management

7    System; (III) Maintaining Existing Bank Accounts and Business

8    Forms; and (IV) Extending Time to Comply with Section 345(b) of

9    the Bankruptcy Code, and (B) Authorize, but not Direct, Payment

10   of Certain Pre-petition Compensation and Employee Benefit

11   Obligations

12

13   HEARING re Motion to Authorize Motion for Order Pursuant to

14   Section 78eee(b)(5) of SIPA, Sections 105, 330 and 331 of the

15   Bankruptcy Code, Bankruptcy Rule 2016(a) and Local Bankruptcy

16   Rule 2016-1 Establishing Procedures Governing Interim Monthly

17   Compensation of Trustee and Hughes Hubbard & Reed LLP

18

19   HEARING re Motion to Set Last Day to File Proofs of Claim

20   Trustees Application for Entry of an Order Approving Form and

21   Manner of Publication and Mailing of Notice of Commencement;

22   Specifying Procedures and Forms for Filing, Determination, and

23   Adjudication of Claims; Fixing a Meeting of Customers and Other

24   Creditors; and Fixing Interim Reporting Pursuant to SIPA

25

9

1

2     HEARING re Motion to Authorize Trustees Application Pursuant to

3     Section 105(a) of the Bankruptcy Code and Bankruptcy Rules

4     1015(c) and 9007 Seeking Authority to Implement Certain Notice

5     and Case Management Procedures and Related Relief

6

7     HEARING re Motion to Reject Lease or Executory Contract

8     Trustees Motion for Entry of an Order Approving the Rejection

9     of Certain Nonresidential Real Property Leases and Subleases

10    and Abandonment of Related Personal Property

11

12    HEARING Motion to Extend Time Trustees Application for an Order

13    Pursuant to Section 365(d)(1) of the Bankruptcy Code Extending

14    Time Within Which the Trustee May Assume or Reject Executory

15    Contracts and Certain Unexpired Leases

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

10

1

2   A P P E A R A N C E S :

3   WEIL, GOTSHAL & MANGES LLP

4        Attorneys for Debtors

5        767 Fifth Avenue

6        New York, NY 10153

7

8   BY:   HARVEY R. MILLER, ESQ.

9         SHAI WAISMAN, ESQ.

10        LORI R. FIFE, ESQ.

11        RICHARD P. KRASNOW, ESQ.

12        ALFREDO R. PEREZ, ESQ.

13        JOHN W. LUCAS, ESQ.

14        JACQUELINE MARCUS, ESQ.

15        RONIT J. BERKOVICH, ESQ.

16        DIANE HARVEY, ESQ.

17

18

19

20

21

22

23

24

25

11

1

2    HUGHES HUBBARD & REED LLP

3          Attorneys for James W. Giddens, SIPC Trustee

4          One Battery Park Plaza

5          New York, NY 10004

6

7    BY:   JAMES B. KOBAK, JR.

8          JEFFREY S. MARGOLIN, ESQ.

9          DAVID W. WILTENBURG, ESQ.

10         JAMES W. GIDDENS, ESQ.

11

12   SECURITIES INVESTOR PROTECTION CORPORATION

13         Senior Associate General Counsel

14         805 15th Street, N.W.

15         Suite 800

16         Washington, DC 20005

17

18   BY:   KENNETH J. CAPUTO, ESQ.

19

20

21

22

23

24

25

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         One Chase Manhattan Plaza

6         New York, NY 10005

7

8    BY:   LUC A. DESPINS, ESQ.

9          DENNIS F. DUNNE, ESQ.

10         DENNIS C. O'DONNELL, JR.

11         PAUL ARONZON, ESQ.

12         EVAN R. FLECK, ESQ.

13         THOMAS A. ARENA, ESQ.

14

15   CLEARY GOTTLIEB STEEN & HAMILTON LLP

16         Attorneys for Barclays Capital Inc.; Luke Barefoot

17         One Liberty Plaza

18         New York, NY 10006

19

20   BY:   LINDSEE P. GRANFIELD, ESQ.

21         LISA M. SCHJWEITZER, ESQ.

22         THOMAS J. MOLONEY, ESQ.

23         AVRAM E. LUFT, ESQ.

24         BOAZ S. MORAG, ESQ.

25         MELISSA MARLER, ESQ.

13

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:   TRACY HOPE DAVIS, ESQ.

9          ANDREW D. VELEZ-RIVERA, ESQ.

10         LINDA A. RIFFKIN, ESQ.

11         DIANA G. ADAMS, U.S. TRUSTEE

12

13   AKIN GUMP STRAUSS HAUER & FELD LLP

14         Attorneys for the Informal Noteholders Group

15         590 Madison Avenue

16         New York, NY 10022

17

18   BY:   MEREDITH A. LAHAIE, ESQ.

19

20

21

22

23

24

25

14

1

2    ARENT FOX LLP

3         Attorneys for The Vanguard Group

4         1675 Broadway

5         New York, NY 10019

6

7    BY:   GEORGE P. ANGELICH, ESQ.

8          DAVID DUBROW, ESQ.

9

10   BINGHAM MCCUTCHEN LLP

11        Attorneys for Harbinger Capital Partners Special

12         Situations Fund, L.P. and Harbinger Capital Master

13         Fund I, Ltd.

14        399 Park Avenue

15        New York, NY 10022

16

17   BY:   JEFFREY S. SABIN, ESQ.

18

19   CADWALADER, WICKERSHAM & TAFT LLP

20        Attorneys for Citibank

21        One World Financial Center

22        New York, NY 10261

23

24   BY:   HOWARD R. HAWKINS, JR.

25        MARK C. ELLENBERG, ESQ.

15

1

2    DRINKER BIDDLE & REATH LLP

3        Attorneys for Allianz Global Advisors

4        500 Campus Drive

5        Florham Park, NJ 07932

6

7    BY:   ROBERT K. MALONE, ESQ.

8

9    FARRELL FRITZ, P.C.

10        Attorneys for Cargill Investment Group, Ltd.

11        1320 RexCorp Plaza

12        Uniondale, NY 11556

13

14    BY:   TED A. BERKOWITZ, ESQ.

15        PATRICK COLLINS, ESQ.

16

17    GOODWIN PROCTER LLP

18        Attorneys for Evergreen Solar, Inc.

19        The New York Times Building

20        620 Eighth Avenue

21        New York, NY 10018

22

23    BY:   BRIAN HAIL, ESQ.

24        EMANUEL C. GRILLO, ESQ.

25

16

1

2    HAHN & HESSEN LLP

3          Attorneys for Avista Corporation and Powerex Corp.

4          488 Madison Avenue

5          New York, NY 10022

6

7    BY:   ROSANNE THOMAS MATZAT, ESQ.

8

9    JONES DAY

10         Attorneys for EDF Trading

11         222 East 41st Street

12         New York, NY 10017

13

14   BY:   RICHARD H. ENGMAN, ESQ.

15

16   LINKLATERS LLP

17         Attorneys for Joint Administrators of Lehman Brothers

18          International Europe

19         1345 Avenue of the Americas

20         New York, NY 10105

21

22   BY:   MARY WARREN, ESQ.

23         MARTIN N. FLICS, ESQ.

24

25

17

```
1
2    MAYOR BROWN LLP
3          1675 Broadway
4          New York, NY 10019
5
6    BY:   JOHN M. CONLON, ESQ.
7          FREDERICK D. HYMAN, ESQ.
8
9    MORRISON & FOERSTER LLP
10         Attorneys for Brookfield Properties
11         1290 Avenue of the Americas
12         New York, NY 10104
13
14   BY:   TODD M. GOREN, ESQ.
15
16   PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
17         Attorneys for Houlihan Lokey Howard & Zukin Capital, Inc.
18         1285 Avenue of the Americas
19         New York, NY 10019
20
21   BY:   ALAN W. KORNBERG, ESQ.
22         N. TANI ZAHARI, ESQ.
23
24
25
```

18

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3         Special Counsel for Creditors' Committee

4         51 Madison Avenue

5         22nd Floor

6         New York, NY 10010

7

8    BY:   JAMES C. TECCE, ESQ.

9          ROBERT K. DAKIS, ESQ.

10         SUSHEEL KIRPALANI, ESQ.

11

12   RICHARDS KIBBE & ORBE LLP

13         Attorneys for Lehman Commercial Paper Inc.

14         One World Financial Center

15         New York, NY 10281

16

17   BY:   MICHAEL FRIEDMAN, ESQ.

18

19   SEWARD & KISSEL LLP

20         One Battery Park Plaza

21         New York, NY 10004

22

23   BY:   JOHN R. ASHMEAD, ESQ.

24         JUSTIN L. SHEARER, ESQ.

25         MARK J. HYLAND, ESQ.

19

1

2    SHEARMAN & STERLING LLP

3         Attorneys for Bank of America Securities

4         599 Lexington Avenue

5         New York, NY 10022

6

7    BY:   JAMES L. GARRITY, ESQ.

8          DAVID LAGUARDIA, ESQ.

9          NED S. SCHODEK, ESQ.

10

11   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

12        Attorneys for BlackRock Financial Management, Inc.

13        Four Times Square

14        New York, NY 10036

15

16   BY:   DENISE KALOUDIS, ESQ.

17

18

19

20

21

22

23

24

25

20

1

2    TUCKER ARENSBERG

3         Attorneys for FHLB Pittsburgh

4         1500 One PPG Place

5         Pittsburgh, PA 15222

6

7    BY:   GARY P. HUNT, ESQ.

8         BEVERLY W. MANNE, ESQ.

9         MICHAEL STAUBER, ESQ. (TELEPHONICALLY)

10        MICHAEL SHINER, ESQ. (TELEPHONICALLY)

11

12   WACHTELL, LIPTON, ROSEN & KATZ

13        Attorneys for JPMorgan Chase Bank, N.A.

14        51 West 52nd Street

15        New York, NY 10019

16

17   BY:   DAVID C. BRYAN, ESQ.

18        RICHARD G. MASON, ESQ.

19        HAROLD S. NOVIKOFF, ESQ.

20        PHILIP MINDLIN, ESQ.

21        AMY R. WOLF, ESQ.

22

23

24

25

21

```
 1

 2    WESTLB AG, NEW YORK BRANCH

 3         Attorneys for WestLB AG, New York Branch

 4         1211 Avenue of the Americas

 5         New York, NY 10002

 6

 7    BY:   PETER MARCHETTI, ESQ.

 8

 9    WHITE & CASE LLP

10         Attorneys for DNB NOR Bank ASA

11         1155 Avenue of the Americas

12         New York, NY 10036

13

14    BY:   GERARD UZZI, ESQ.

15

16

17

18

19

20

21

22

23

24

25
```

22

1              P R O C E E D I N G S

2          THE COURT:  Please be seated.  Mr. Miller, good

3    morning.

4          MR. MILLER:  Good morning, Your Honor.  Harvey

5    Miller, Weil Gotshal & Manges, on behalf of the debtors.  I

6    believe, Your Honor, that this is the third omnibus hearing in

7    these Chapter 11 cases, the last hearing having been on October

8    16th.  And before turning to the calendar, Your Honor, I just

9    thought I'd give you a slight update on what we have been doing

10   since October 16th.

11         THE COURT:  I'd be interested in hearing that.

12         MR. MILLER:  Yeah.  It's been a very busy period,

13   Your Honor.  And as each day has gone by, it has resulted in

14   greater organization and greater control of the assets and

15   liabilities of these estates.  The chief restructuring officer

16   has been filling in the teams that are working on this matter.

17   And every team has been filled in, Your Honor, except for

18   filling in the team that is working on the derivatives.  And

19   that's a more selective expertise and a little bit harder to

20   find the employees for that.  But that's in process.

21         Mr. Marsal and the debtors, Your Honor, have taken

22   very seriously Your Honor's admonition about transparency.

23   There have been sequential meetings with various groups of

24   creditors over the last three weeks.  And, as Your Honor will

25   notice from looking at the agenda, the Rule 2004 motions, to a

23

1    large extent, have been deferred.  Harbinger, which was the

2    lead moving party, has agreed to adjourn that sine die to be

3    restored on -- I think, it's twelve days' notice or fourteen

4    days' notice, Your Honor.  And maybe of the other Rule 2004

5    applicants or movants have likewise agreed to that.  The few

6    that haven't and there are about seven who have and have agreed

7    to adjourn it to November 18th as we try to get more

8    information out.

9         And the problem with getting all this information

10   out, Your Honor, is some of the information, we are finding

11   out, people are seeking information to -- taking advantage in a

12   way in trading in claims for and against the Lehman Brothers'

13   estate.  So we're very careful about information going out.

14   And there are confidentiality agreements and these are 408

15   meetings.  But in the context of more transparency, Your Honor,

16   we are trying very hard to post to a website -- we're having a

17   little difficulty; we thought it was going to be done on

18   Monday -- a presentation that has been made to Harbinger and

19   other creditors which will be available to all creditors.  In

20   addition, we are posting a contact list for Lehman Brothers so

21   that if a creditor or a claimant has a particular kind of claim

22   and wants to speak to somebody at Alvarez & Marsal, there will

23   be a contact list with e-mail addresses and phone numbers.  So,

24   each day, we're improving the contacts and the transparency.

25        In addition to that, Your Honor, we are engaged --

24

1    the CRO is engaged with his team in negotiating protocols with

2    the various foreign fiduciaries which include the joint

3    administrators for Lehman Brothers Inc. Europe and for the

4    Asian domain.  And those are in the process right now.  And we

5    hope that we'll reach maturity before the next date.

6          So there's been a lot of activity going on and effort

7    made, Your Honor, to avoid protracted Court hearings wherever

8    possible.

9          With that and with Your Honor's permission, I would

10   turn to the agenda.  And I would go through the uncontested

11   matters with Your Honor and the adjournments and then we can go

12   to the contested matters, if that's all right with Your Honor.

13         THE COURT:  That's fine.  I just have one question

14   about the 2004 discovery.  You indicated that, to a large

15   extent, those matters have been adjourned.  I didn't see any

16   active matters relating to 2004 discovery on the agenda.  Have

17   they all been put off?

18         MR. MILLER:  All put off, Your Honor.  Either --

19         THE COURT:  Okay.

20         MR. MILLER:  Without date, Your Honor, subject to

21   restoration, or to November 18th.

22         THE COURT:  Fine.  And the website that --

23         MR. MILLER:  And there will be stipulations, Your

24   Honor, that we will be handing up.

25         THE COURT:  And the website that you mentioned?

25

1          MR. MILLER:  Yes.

2          THE COURT:  Is that a separate website or is that

3     linked to an existing website?

4          MR. MILLER:  That's where the problem has occurred,

5     Your Honor.  The old Lehman website is really owned by Barclays

6     now.  So we are setting up a website, as I understand it,

7     through EPIQ, the claims administrator.  So people will be able

8     to go through the claims website and get to this website.

9          THE COURT:  All right.

10         MR. MILLER:  Okay?  So, if Your Honor please, I would

11    go to the uncontested matters.  The first matter on the

12    calendar, Your Honor, is the motion to establish procedures for

13    interim compensation and reimbursement of expenses.  This is a

14    pretty standard order, Your Honor.  It has been reviewed with

15    the U.S. trustee and there were changes made to the order to

16    accommodate the comments of the U.S. trustee.  And there are no

17    objections to the order, Your Honor.

18         THE COURT:  Matters of this sort are routine, at

19    least in the Southern District of New York, and I'm prepared to

20    approve it.

21         MR. MILLER:  Thank you, Your Honor.  The second

22    matter, Your Honor, is authorization to retain, nunc pro tunc

23    to the commencement date, ordinary course professionals.  Once

24    again, Your Honor, this motion and the order have been reviewed

25    with the Office of the United States Trustee.  It has been

26

1    conformed to the comments of the United States trustee.  And

2    there are no objections to this order, Your Honor.

3           THE COURT:  That is approved.

4           MR. MILLER:  The third matter on the calendar, Your

5    Honor, is the application of the debtors to employ, nunc pro

6    tunc, McKee Nelson LLP as special tax counsel.  The McKee

7    Nelson firm, Your Honor, has historically been the tax counsel

8    for Lehman Brothers.  And there are many, many complicated tax

9    issues that relate to these Chapter 11 cases, Your Honor.

10          THE COURT:  Does the Office of the United States

11    Trustee have any comment with respect to this?

12          MR. VELEZ-RIVERA:  Andrew Velez-Rivera for the United

13    States trustee.  We've seen a revised form of order, Your

14    Honor, that reflects our comments and we have no objection on

15    that basis.

16          THE COURT:  Fine.  It's approved.

17          MR. MILLER:  Your Honor, items 4 through 8 relate --

18    I'm sorry.  4 through 7 relate to the creditors' committee and

19    engagement of its professionals.  I'll turn that over to Mr.

20    Dunne, Your Honor.

21          MR. DUNNE:  Good morning, Your Honor.  For the

22    record --

23          THE COURT:  Good morning, Mr. Dunne.

24          MR. DUNNE:  -- Dennis Dunne from Milbank Tweed Hadley

25    & McCloy on behalf of the official creditors' committee.  And

27

1    my comments do apply to the next four agenda items.  We are

2    seeking only interim approval of these retention applications,

3    not final approval.  At the U.S. trustee's request, we have

4    adjourned consideration of the final order until November 18th

5    and have extended the deadline to object solely with respect to

6    the Office of the United States Trustee and the debtors until

7    November 13th.

8              THE COURT:  I've looked at these.  I don't have any

9    issues.  And particularly, since this is all happening on an

10   interim rather than a final basis, I'm prepared to approve

11   them.  But I'll hear what the U.S. trustee has to say.

12             MR. VELEZ-RIVERA:  Your Honor, the Office of the

13   United States Trustee has been engaged in a series of ongoing

14   discussions with all of the professionals including the

15   professionals for the creditors' committee.  Several of our

16   concerns, and there have been literally dozens of them, have

17   been resolved.  But we still have a way to go, particularly,

18   with respect to substantive issues involving both disclosure

19   and what would be broadly characterized as concurrent

20   representations.  Both the professionals in my office are still

21   working through those.  We will address them on November the

22   18th.  We have no objection in the meantime to the entry of an

23   interim order.

24             THE COURT:  It sounds like a reservation of rights

25   with lumps in it.  I think I understand what you're talking

28

1    about although I'm not sure what you meant by the areas of

2    concurrent representation.

3              MR. VELEZ-RIVERA:  Your Honor, to say the least, in

4    light of the magnitude of the case and the number of

5    professionals involved, every single professional whose

6    employment application we have seen has what could be called

7    "connections".  And some of those connections are not -- they

8    range from the not problematic to the very problematic.

9    Accommodating ourselves along that continuum is what we're

10   wrestling with at the moment.

11             THE COURT:  I understand.  We'll deal with it at the

12   next omnibus hearing on the 18th.  Meanwhile, on an interim

13   basis, each one of these applications is approved.

14             MR. MILLER:  Thank you, Your Honor.

15             MR. DUNNE:  Thanks, Judge.

16             MR. MILLER:  Your Honor, number 8 on the agenda is

17   the motion of Vanguard Group for, basically, a screening wall

18   to allow trading within the organization.  Vanguard is a new

19   member of the creditors' committee, Your Honor.  Your Honor has

20   previously approved the same type of order.  There are no

21   objections to this order so --

22             THE COURT:  And Vanguard's counsel is here to stand

23   in your spot and say that he wants this relief and for me to

24   grant it.

25             MR. ANGELICH:  Thank you, Your Honor, yes.  George

29

1    Angelich of Arent Fox, counsel to Vanguard Group.  We'd request

2    that the relief be granted.

3           THE COURT:  It's consistent with relief I've granted

4    to other committee members who've sought similar protection to

5    allow trading.  And I'm prepared to approve this.

6           MR. ANGELICH:  Thank you, Your Honor.

7           MR. MILLER:  Number 9 on the agenda, Your Honor, is

8    the debtors' motion to continue workman's compensation programs

9    and its liability, property and other insurance programs and to

10   authorization the payment of all pre-petition obligations in

11   relation to workman's compensation, Your Honor.  There are no

12   objections and I would ask Your Honor to approve the

13   application and enter the order.

14          THE COURT:  It's approved.

15          MR. MILLER:  The next matter, Your Honor, is the

16   motion by Cargill Group Ltd.  We have reached a stipulation,

17   Your Honor, but I'll allow counsel to take the podium if he

18   wants to.  Okay.  I'm told, Your Honor, that counsel is relying

19   upon us to present the stip.

20          THE COURT:  Okay.  So why don't you present the

21   stipulation.

22          MR. MILLER:  So we will present the stip, Your Honor.

23          THE COURT:  Is that going to happen now or later in

24   the hearing?

25          MR. MILLER:  Do we have the stip?

30

1          MR. LUCAS:  Your Honor, this is John Lucas on behalf

2     of Lehman.  But Cargill, Lehman and the LBI trustee have all

3     agreed to lift the automatic stay for the limited purpose of

4     permitting Cargill to terminate its management agreement with

5     LBI.  In exchange, Cargill has agreed that it does not have a

6     claim arising from the termination of the management agreement

7     either pre or post-petition against the debtors and that all

8     rights to claims between LBI and Cargill have been reserved.

9          THE COURT:  That sounds like the stipulation.  Is it

10    something which involves the writing to be so ordered or is

11    that simply a statement being read into the record for me to so

12    order?  Or is that simply a statement of the intention of the

13    parties?

14         MR. LUCAS:  It's a stipulation agreement and proposed

15    order that we will submit to Your Honor after the hearing.

16         THE COURT:  Fine.  So I'll treat that as simply a

17    statement of what will later be coming to be so ordered.  And I

18    take it that there are no objections to that arrangement.

19    Hearing none, I will simply approve that in the ordinary course

20    once it's received.

21         MR. MILLER:  Thank you, Your Honor.  Item number 11,

22    Your Honor, is the debtors' motion to reject a contingent

23    management agreement with WestLB AG.  This is an agreement

24    which provides for WestLB to assume certain management

25    functions that were previously performed by a subsidiary of the

31

1    debtors, Your Honor.  We have reached an agreement and a

2    stipulation will be presented to the Court, Your Honor,

3    essentially allowing for the rejection.  There is a reservation

4    of rights on the part of WestLB to present a claim for

5    rejection damages.  And we have no objection to that, Your

6    Honor.  I don't know if WestLB is here.

7            THE COURT:  Are you counsel for WestLB?

8            MR. HAWKINS:  Yes, Your Honor.  Howard Hawkins from

9    Cadwalader for WestLB and what Mr. Miller said is correct.

10           THE COURT:  Fine.

11           MR. MILLER:  Thank you, Your Honor.  Item number 12,

12   Your Honor, is the debtors' motion which I will refer to Your

13   Honor as an NOL order.  It's to preserve the net operating

14   losses carried forward.  It is spelled out in the application,

15   Your Honor.  There have been no objections to it.  It's an

16   attempt, really, to preserve the NOL going forward to the

17   extent it has value.

18           THE COURT:  Let me simply confirm that there are no

19   objections to the entry of this order.  In other cases, I know

20   that these motions have led to at least some objections or

21   requests for clarification.  And I am prepared to approve this

22   with the understanding that there are no objections to the

23   requested relief.

24           MR. MILLER:  There were some changes made to the

25   order, Your Honor, which everybody agreed to.

32

1          THE COURT:  And those changes are the result of --

2     from parties potentially to be affected by the order?

3          MR. MILLER:  Ms. Berkovich, Your Honor, will explain

4     it.

5          MS. BERKOVICH:  Your Honor, Ronit Berkovich, Weil

6     Gotshal.  The transfer agent for the common stock, which is

7     Bank of New York Mellon, asked us to make some changes to the

8     order to add language that says that we will pay their fees for

9     effecting service of the notice onto the record holders and

10    also that they will not incur liability as a result of another

11    party violating this order.  We made those changes to the order

12    and we have a blackline that we can give to Your Honor, if

13    you'd like.

14         THE COURT:  All right.  I'll take a look at the

15    changes but I see no problem with what you've said.

16         MR. MILLER:  Thank you, Your Honor.  The next item on

17    the agenda, Your Honor, is the debtors' application for

18    approval of the sale of a G-IV airplane.  The revised

19    application, Your Honor, provides for a sale in the amount of

20    24.9 million dollars which, unfortunately, in the economic

21    circumstances, that's a slight reduction from the original

22    price.  The order has been revised to meet the comments of both

23    the United States attorney and the U.S. trustee's office.  And

24    there are no objections other than that, Your Honor.

25         THE COURT:  That sale is approved.

33

1          MR. MILLER:  Thank you, Your Honor.  Item 14, Your

2    Honor, is the motion to compel Lehman Commercial Paper Inc. to

3    assume or reject executory contracts.  I don't know if

4    counsel's present.  We have reached an agreement, Your Honor,

5    which is being encompassed in a stipulation.  Basically, the

6    motion is being granted.  There's a reservation to, I

7    understand, fifty executory contracts which we needed some more

8    factual information on, Your Honor.  But other than that, the

9    debtors have no objection to the motion and we'll submit an

10   order.

11          THE COURT:  All right.  I saw on the ECF system

12   yesterday a form of stipulation to resolve this motion although

13   as I read it, it included the provision that various things

14   have to happen between now and I think the 18th.

15          MR. MILLER:  Ms. Marcus, Your Honor, from Weil

16   Gotshal, will respond.

17          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

18   Marcus, Weil Gotshal & Manges, on behalf of Lehman Brothers.

19   Your Honor, on Friday, October 31st, we did file a notice of

20   presentment of a stipulation resolving this matter.  And

21   yesterday, the debtors determined that of the 11 to 1200 open

22   trades that were out there, there were forty-nine exactly as to

23   which they believed that they need more time because there are

24   some difficult inter-Lehman issues as well as issues that

25   involve some structured vehicles.  So the debtors decided in

34

1    their business judgment that it made more sense to take a

2    little more time on those.  So what we have prepared is a

3    revised stipulation which says that the notification deadline

4    remains November 7th except for certain trades that are listed

5    on an exhibit.  Those are the forty-nine trades.  And that we

6    will file a motion to assume or reject all the other ones by

7    November 16th.  As to the forty-nine trades, we've asked for

8    an -- we provided for an additional, essentially, four weeks to

9    provide the notification on those.  And those will be handled

10   with a subsequent motion to assume or reject.  And the moving

11   parties represented by Mr. Friedman have agreed to that.  In

12   addition, there were two joinder parties who had joined in the

13   original motion and they're okay with the revised language.

14   The creditors' committee, in addition, is also in approval of

15   the revised language.

16        THE COURT:  Now, as to the forty-nine trades that are

17   in the zone of requiring additional time to study them so that

18   you can make the decision whether to assume or reject, is there

19   a lawyer present in the room who represents those

20   counterparties?  Are they represented by either of the lawyers

21   now standing before me?

22        MS. MARCUS:  I don't believe that they're represented

23   by either of the lawyers standing before you or anyone else who

24   has either objected or joined in the original motion to compel.

25        THE COURT:  Okay.  So you're taking the position that

VERITEXT REPORTING COMPANY

35

1   as to these forty-nine, they're not covered by the original

2   motion anyway so you can effectively take what time you need

3   and you've laid out the four week window for yourselves.

4         MS. MARCUS:  That's correct, Your Honor.  There was

5   an -- the original motion and the debtors determined because,

6   frankly, of a lot of market pressure as well as the debtors'

7   own business justifications that it made sense to do this on an

8   across the board basis except for these fifty.  And I'm happy

9   to hand up the blacklined version of the stipulation if you'd

10  like to see it now.  Or we can submit it later.

11        THE COURT:  Why don't you hand that up?  And I'll

12  also hear from counsel who appear to want to say a few words.

13  Well, maybe not.  Maybe he's just --

14        MR. FRIEDMAN:  No.  Your Honor.

15        THE COURT:  Just wanted a better view.

16        MR. FRIEDMAN:  If you have any questions, Your Honor,

17  I'm here.  Otherwise, Michael Friedman, Richards, Kibbe & Orbe

18  on behalf of the movants.  We are fine with the revised order.

19        THE COURT:  And that's true for you, too?

20        MS. KALOUDIS:  Yes.  Denise Kaloudis of Skadden,

21  Arps, Slate, Meagher & Flom on behalf of BlackRock Financial

22  Management.  We also filed a joinder and as debtors' counsel

23  accurately presented, we reviewed the stipulation and agree

24  with the proposed mechanism set forth therein.

25        MR. BRYAN:  Good morning, Your Honor.  David Bryan,

36

1    Wachtell, Lipton, Rosen & Katz, on behalf of JPMorgan.  We also

2    filed a joinder and we're also pleased to be covered by the

3    stay.

4            THE COURT:  Fine.

5            MS. MARCUS:  May I approach?

6            THE COURT:  You may approach.  Thank you.  Seems to

7    be an appropriate way to resolve the problem.  And I'm

8    approving the stipulation.

9            MS. MARCUS:  Thank you, Your Honor.

10            MR. MILLER:  With Your Honor's permission, I would

11    move to the adjourned matters and just run through those

12    quickly with Your Honor.  And then we can come back to the

13    contested matters.

14            THE COURT:  Okay.  So we would move, Your Honor, to

15    item 28.  28, 29, 30 are applications for employment of the

16    debtors' professionals, Your Honor.  All of those matters are

17    going over to November 18th with the continuing discussions

18    with the Office of the United States Trustee.

19            Item 31, which is the order -- the committee's

20    order -- motion, I should say, Your Honor, in relation to the

21    debtor-in-possession financing.  We've been holding that

22    because we haven't finally included all the issues with the

23    debtor-in-possession financing, which, as Your Honor knows, is

24    not outstanding.  It has been paid in full, we think, anyway.

25    So that's going over, Your Honor, to November 18th.

37

1           32, Your Honor, WFP Tower A Co. L.P.'s motion for

2    payment of post-petition administrative expense, the parties

3    have agreed to put that over to November 18th.  33, Meridian

4    Company of New York's motion for an order compelling payment of

5    post-petition administrative expenses likewise is going over to

6    the 18th, Your Honor.  What we're doing on these is trying to

7    get the facts and see if they can be resolved.

8           As I said before, Your Honor, number 34 is the

9    Harbinger motion for Rule 2004 authority to conduct

10   investigations.  That has been adjourned sine die subject to

11   restoration.  Of the 2004 joinders, Your Honor, there were

12   twelve joinders to the Harbinger motion.  Nine of them have

13   agreed to adjourn sine die.  Six or seven, Your Honor, have

14   been adjourned to November 18th because we're in sequential

15   meetings.  I'm sure when they get to the website and they see

16   this presentation and the -- Rule 2004 examinations that are

17   sought, Your Honor, in connection with the particular count and

18   getting information on the particular count has been difficult

19   because the system hasn't been working the way it worked

20   before.  We are now getting some access to more information and

21   we are replying to specific customer account inquiries.  And

22   the contact list will alleviate some of the administrative

23   processes.  Now they'll be able to go directly to a person at

24   Alvarez & Marsal who will take the information and seek to get

25   the information as to a particular account.  So all of the

38

1   2004s, Your Honor, are either over to November 18th or

2   adjourned sine die.  And we'll be filing stipulations with the

3   Court.

4           THE COURT:  Fine.

5           MR. MILLER:  The motion of the creditors' committee's

6   conflicts counsel, Your Honor, to conduct discovery of JPMorgan

7   Chase -- and if I can expedite it, Your Honor, a stipulation

8   will be presented to Your Honor pursuant to which there is an

9   agreement between Quinn Emanuel and JPMorgan Chase which will

10  provide for the commencement of discovery, let me put it that

11  way, and an adjournment of this matter for ninety days, Your

12  Honor.  So that stipulation will be presented at the end of

13  this hearing.

14          THE COURT:  So the discovery to be conducted will be

15  consensual and rights are being reserved?

16          MR. MILLER:  Reserved, Your Honor.

17          THE COURT:  Okay.

18          MR. MILLER:  And whatever is produced in connection

19  with that discovery by Quinn Emanuel -- the same product, let

20  me call it, will be furnished to the debtors also as part of

21  the stipulation.

22          THE COURT:  Okay.  Is there someone from Quinn

23  Emanuel who wants to speak to this?

24          MR. TECCE:  Good morning, Your Honor.  James Tecce of

25  Quinn Emanuel on behalf of the official committee of unsecured

39

1    creditors.  Mr. Miller described the stipulation.  There are, I

2    believe, just two other features of the stipulation which I can

3    speak to.  The first is that we'll enter into a form of

4    confidentiality agreement that's acceptable to Chase and the

5    debtors.  Secondly, Chase's rights are reserved in the event

6    that an examiner is appointed in the case to examine Chase and

7    Lehman Brothers transactions.  They reserve their right to seek

8    relief from their obligations under the stipulation.  They'll

9    agree to produce a privilege log.  And I believe that that --

10   the final feature is that attached to the stipulation is a very

11   short chart that shows which documents Chase has agreed to

12   produce now.  But the balance of the motion will be pushed

13   forward for ninety days, meaning the balance of the document

14   request.  And with that, we would respectfully request the

15   ability to submit the stipulation at the end of the hearing for

16   signature.

17         MR. BRYAN:  Good morning, Your Honor.  David Bryan

18   from Wachtell, Lipton for JPMorgan Chase.  That accurately

19   reflects the stipulation.  We signed it yesterday; it's ready

20   to go.

21         THE COURT:  Fine.  Okay.

22         MR. MILLER:  The next matter, Your Honor, is item

23   number 36, which is the motion of Barclays Capital for relief

24   concerning certain contracts erroneously posted with the

25   closing date contracts.  That likewise, Your Honor, is going

40

1    over to November 18th.  I don't know if Barclays wants to say

2    anything.  No?

3            The next item, Your Honor, is another motion by

4    Barclays for relief concerning an American Express contract

5    that was erroneously posted with the closing date contracts.

6    That, likewise, is going to November 18, Your Honor.

7            Then there's -- number 38, Your Honor, is the motion

8    of the Walt Disney Company for the appointment of an examiner

9    pursuant to Section 1104(c)(2) of the Bankruptcy Code.  We have

10   been in discussions, Your Honor, with the Walt Disney Company's

11   attorneys and they've agreed to put it over to November 18th.

12   We hope to reach some amicable conclusion of that matter.

13           The next item, Your Honor, relates to the motion of

14   Barclays and the debtors to file under seal certain schedules.

15   There have been discussions about that motion, Your Honor, and

16   the parties have all agreed to put it over without date.  I

17   think progress is being made, Your Honor.

18           THE COURT:  That's good.

19           MR. MILLER:  Number 40, Your Honor, is the motion --

20   this is the one motion -- I'm sorry.  This is the Federal Home

21   Loan Mortgage Corporation which I think is the successor to

22   Freddie Mac off the other entity.  And they have agreed to put

23   it over to November 18th.

24           The last adjournment item, Your Honor, is item 41, a

25   motion for relief from the automatic stay to proceed with class

41

1    action settlements of a certified class action entitled

2    "Austin, et al, v. Chisick".  The parties have agreed to put

3    that over for November 18th, Your Honor.

4           THE COURT:  There's also a number on there carried --

5           MR. MILLER:  I'm sorry?

6           THE COURT:  Number 42 on the next page.

7           MR. MILLER:  I'm sorry, Your Honor.  That is the

8    debtors' motion, Your Honor, to pay pre-petition excise and

9    withholding taxes.  We have agreed -- there's an objection

10   filed, Your Honor, by the Walt Disney Company.  We've agreed to

11   discuss that with the Walt Disney Company and bring it back on

12   November 18th.

13          THE COURT:  Fine.

14          MR. MILLER:  We can go to the contested matters, Your

15   Honor, which relate to Lehman Brothers Inc., et al. and then go

16   to LBI, Lehman Brothers Inc., if that's --

17          THE COURT:  Fine.

18          MR. MILLER:  -- agreeable to Your Honor.

19          THE COURT:  That's agreeable.

20          MR. MILLER:  Okay.  The first contested matter, Your

21   Honor, is the motion of DNB Bank ASA for stay relief or, in the

22   alternative, an order requiring the debtors to provide adequate

23   protection.  This relates, Your Honor, to a deposit of

24   approximately 18.5 million dollars.  It's actually in Swedish

25   krona, Your Honor.  And the moving party would like to have the

42

1    stay lifted.  We are in negotiations, Your Honor, to try and

2    resolve this matter.  The debtors are agreeable to the

3    conversion of the krona into U.S. dollars to protect it against

4    deterioration in value.  The parties have agreed that there

5    should be final hearing on December 3.  In the interim, there

6    would be expedited discovery to see if this matter can be

7    resolved and then bring it forward to December 3 which I think

8    is an omnibus hearing date, if I recall correctly, Your Honor,

9    if it can't be resolved prior to that date.  I don't know if

10   counsel is here --

11         MR. UZZI:  Your Honor, pardon me, Gerard Uzzi of

12   White & Case on behalf of DNB NOR Bank.  That, for the most

13   part, accurately reflects our agreement, Your Honor, with one,

14   I think, nuance.  The next omnibus hearing date is November

15   14th --

16         THE COURT:  November 18th.

17         MR. UZZI:  18th, I'm sorry, 18th.  I think both

18   parties want to work toward getting to a final hearing if we

19   need a contested hearing, an evidentiary hearing by the 18th.

20   We're using the 3rd as a fallback in the event that we can't

21   get it done by the 18th.  But our hope would be that we resolve

22   this consensually by the 18th, that the parties are ready to go

23   forward on the 18th.  If we haven't otherwise resolved it

24   consensually, then we will want to go forward on the 18th as a

25   final hearing.

43

1        THE COURT:  I don't think you mean the 18th.  Maybe I

2   misunderstood you.  I thought that this was being put off to a

3   possible hearing on the 3rd.  What happens on the 18th?

4        MR. UZZI:  It's really being put off, Your Honor, to

5   the 18th but there's a recognition that my client's in Norway,

6   the debtors may want to take some discovery.  And if we're

7   unable to resolve the matter consensually, either on the merits

8   or with respect to providing discovery so that the parties are

9   ready to go forward on the 18th, we've agreed that we would

10  then adjourn it to the 3rd.  But it no event would we adjourn

11  it later than the 3rd so that we would have the final hearing

12  on the 3rd.

13       THE COURT:  All right.  Well, here's my take-away

14  from this.

15       MR. UZZI:  Yes.

16       THE COURT:  If you have a consensual resolution, it

17  can be approved on the 18th.  Otherwise, there will be a

18  hearing on the 3rd.  But since you don't control the calendar,

19  you can't tell me that that's the last permissible date.  It

20  will be ultimately up to me when this happens.

21       MR. UZZI:  Understood, Your Honor.

22       THE COURT:  Okay.

23       MR. UZZI:  And I didn't mean to imply otherwise.  I

24  just meant the agreement between the parties.

25       THE COURT:  Okay.  I understand the agreement.  Okay.

44

1          MR. UZZI:  And then just, Your Honor, the -- we are -

2    - we've reached an agreement also on adequate protection, as

3    Mr. Miller said, that my client can convert the krona account

4    to U.S. dollars at its discretion in order to protect it

5    against currency fluctuations.  And we're fine with that being

6    just a memorialization on the record, Your Honor.  But if Your

7    Honor would prefer a written order on that, we would be happy

8    to submit a written order also.

9          THE COURT:  Well, it's up to you as to how much

10   protection you want as you convert kronas into dollars.  I

11   assume with the consent of Mr. Miller on behalf of the estate

12   and with your stating the intention to do it as a form of

13   adequate protection, I'm confident that you're free to proceed

14   without further documentation.  But if, for your own

15   protection, you want that documentation, go right ahead and

16   produce it.

17         MR. UZZI:  No, that's fine, Your Honor.  We just want

18   to make sure the Court was aware.

19         THE COURT:  I understand.  Thank you.

20         MR. UZZI:  Thank you.  May I be excused, Your Honor?

21         THE COURT:  You may.

22         MR. UZZI:  Thank you.

23         MR. MILLER:  I just want to make clear, Your Honor,

24   to get to a resolution on November 18th depends upon expedited

25   discovery.  And as counsel pointed out, because the moving

45

1    party is in Sweden, there may be some delay.  That's why we did

2    that backup.

3              MR. UZZI:  We're fine with expedited discovery.

4              THE COURT:  Is it Norway or is it Sweden?

5              MR. UZZI:  It's Norway, Your Honor.

6              MR. MILLER:  I'm sorry.  Scandinavia, Your Honor.

7              THE COURT:  Okay.  Fine.

8              MR. MILLER:  And in one election and the dollar

9    suddenly became a solid currency.  Your Honor, the next matter

10   is the cash management order.  Mr. Perez will handle that.

11             MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez.

12   Your Honor, there's a footnote on the G-IV sale motion that I

13   neglected to tell Mr. Miller.  And that is there's a footnote 8

14   in the supplemental motion that talks about rights and

15   obligations being assigned.  And that is a little incorrect.

16   The purchaser -- Pegasus is obligated to pay the money.  They

17   will then assign the right to take the liberty of the contract

18   but they're not assigning the obligation to pay.  And I just --

19   I told the creditors' committee I would put it on the record

20   and I just wanted to make sure that that was on the record.

21             THE COURT:  Okay.  Fine.

22             MR. PEREZ:  Thank you, Your Honor.

23             THE COURT:  Now we'll proceed with what you stood up

24   to talk about.

25             MR. PEREZ:  I apologize.

46

1          THE COURT:  No, it's fine.

2          MR. PEREZ:  Your Honor, we have two remaining

3     objections left to the cash management order.  The agenda

4     reflects that the informal committee was still objecting.  As a

5     result of discussions with them through the course of the day

6     yesterday, I think they have withdrawn any objection to it.  So

7     the only two objections that remain and one, I didn't find out

8     in time, is Mr. Sabin's objection with respect to the desire to

9     have the actual amounts advanced back and forth posted on a

10    website which based on lots of good reasons we don't think is

11    appropriate to tell people where we're moving money and what

12    entities are supporting.  And then the second objection, which,

13    frankly, I read more as a reservation of rights or a statement,

14    is the limited objection filed by the LBIE trustee.  We think

15    both of those objections were considered at the time of the

16    interim hearing.  They were either withdrawn or overruled by

17    the Court.  We think that the Court should likewise do the same

18    thing right now.  We have made several changes to the form of

19    the order primarily to accommodate individual requests by the

20    creditors' committee and by other parties.  The last change,

21    Your Honor, reflected a request -- we're obtaining second liens

22    on some assets in which we advance.  And in one situation, the

23    first lienholder properly said well now, you're going to make

24    me come into court if -- if I have a negative pledge and I let

25    you get a second lien and now you're going to make me come in

47

1    to court if I want to enforce my first lien, we thought that

2    was an appropriate request.  And so that's been carved out from

3    the order and in consultation with the committee, I think

4    they're fine.  They recognize that that would be the result

5    that would ensue were we not in bankruptcy.

6            So, Your Honor, with that, we would request entry of

7    the order.

8            THE COURT:  Okay.  Well, Mr. Sabin is here to talk

9    about his desire to have issues relating to cash movement

10   posted on a website.  And I think I also want to hear from

11   counsel for LBIE concerning their position which is in a

12   pleading but I don't think we should have Mr. Perez assume that

13   I've already ruled on that.

14           MR. SABIN:  Good morning, Your Honor.  Jeff Sabin

15   from Bingham McCutchen on behalf of the Harbinger Funds.  Mr.

16   Perez was partially right.  We do not seek notice being posted

17   as to every transfer.  We seek just limited notice.  And if you

18   have the form of order, it is the decretal paragraph 10 that

19   I'm referring to.  And in addition, what we are seeking is as

20   follows.  Under that proposed paragraph as we now read it, and

21   it has been further negotiated with many benefits, we would

22   admit, as a result of the negotiations with the committee

23   involved, with the debtors and with various other parties in

24   interest including Harbinger.  Effectively, what we are seeking

25   is that if under that paragraph, the debtors are required to

48

1    give a notice to the committee and the notice is -- or,

2    basically, if there is a particular single transaction of cash

3    from an estate to a nondebtor affiliate of twenty-five million

4    or more or a series of transactions during a month of forty

5    million or more or if there is a transaction where

6    notwithstanding commercial efforts that could not be attained a

7    note evidencing the transaction between the debtor and a

8    nondebtor that exceeds five million dollars, then, as I read

9    the paragraph, a notice is supposed to go to the committee with

10   supporting documents and a rationale.  And the committee then

11   has a limited period of time to talk with the debtors about the

12   rationale or, in essence, object and seek to have a hearing

13   before this Court where you would decide the propriety of the

14   proposed transaction.

15          The only thing that Harbinger is seeking is that a

16   copy of that notice with the supporting detail be put on the

17   website that Mr. Miller referred to is now in process of being

18   formed in a fashion such that such notices could be posted

19   there.  We think that is appropriate in this case given the

20   need for transparency.  We also think it appropriate because we

21   are not asking for the ranks that the committee has under the

22   order.  So that, in effect, if any creditor, whether it was the

23   Harbinger Funds or any other creditor in this estate or party

24   in interest, saw that notice and wanted to object or wanted

25   information, they could seek it from the debtors, they could

49

1    seek it from the committee or at their own cost and peril, they

2    could come to this Court and try to get an emergency hearing

3    before it to stop it.

4            Our concern is that, effectively, the debtors are on

5    both sides of this transaction.  Mr. Marsal and others are the

6    CRO controlling the debtors and controlling the nondebtors.  So

7    it's not as if the transactions are necessarily arm's length.

8    And in addition, we have concern that notwithstanding and

9    appreciating what the committee does, has done and will do in

10   this case is it sometimes may find itself in a conflicted

11   situation as it stands for creditors in different silos, if you

12   will.  And not all creditors are similarly situated with

13   respect to all debtors or with respect to the nondebtor

14   affiliates.

15           And so, for all of those reasons, Your Honor, and

16   given our understanding that the website is in process of being

17   up and, probably the limited cost of just taking a copy of the

18   notice and posting it, we would ask this Court to, in essence,

19   modify the order in that paragraph to require such notice to be

20   sent to the website.  Thank you.

21           THE COURT:  Okay.  Why don't we deal separately with

22   this issue before going to the LBIE.  And I understand your

23   position.  I think Mr. Miller is prepared to respond or at

24   least he's standing and now approaching the microphone.  So I'm

25   expecting to hear a few words.

50

1          MR. MILLER:  If Your Honor please -- are you going to

2    stand behind me?  If Your Honor please, these fundings relate

3    to obligations to protect assets.  They are very sensitive.

4    People are trying to get information to see what Lehman's going

5    to do about protecting positions it has in certain commercial

6    enterprises, whether it's going to fund an investment which it

7    has in real estate and if Lehman doesn't fund or funds the

8    changes of value of that transaction.  These are very

9    confidential, Your Honor.  And to put it on a website is giving

10   distressed debt traders an opportunity to get inside

11   information which they're not entitled to.  These are very

12   sensitive things.  That's why it's very confidential within the

13   committee.  If Mr. Sabin's client, which I must say, Your

14   Honor, owns a claim on a terminated -- two terminated

15   derivatives contracts and that's the only claim, where these

16   transfers are going, Your Honor, and what these funds are being

17   used for really doesn't affect that claim, Your Honor.  All I

18   would point out to Your Honor, these are very confidential

19   fundings to protect assets.  They're not made unless there is

20   an asset to be protected.  And if they don't make the funding,

21   it changes the value of that investment.  And that's inside

22   information or confidential information, Your Honor.

23          THE COURT:  Thank you, Mr. Miller.  Let me ask

24   counsel for the committee something.  Mr. Dunne, I'm reminded

25   of an argument that took place -- I think it was at the first

51

1    omnibus hearing that we had in the auditorium.  And you'll note

2    that I have chosen not to have the hearings in the auditorium

3    at least for the time being because I found that to be a

4    somewhat uncomfortable venue.  But counsel for the ad hoc

5    noteholders group or committee was seeking information

6    directly.  And I took the position at that time that the ad hoc

7    committee could enter into some kind of conduit arrangement

8    with the creditors' committee to obtain information from the

9    committee subject to confidentiality restrictions.  I'm

10   wondering out loud whether or not an arrangement such as that

11   would work to satisfy Mr. Sabin's concerns for transparency.

12   And I'm wondering whether or not anything has happened in

13   connection with the ad hoc committee's request for information

14   or that of any other creditors or creditor groups to obtain

15   information through the creditors' committee.  It's certainly

16   one of the committee's functions to provide reasonably accessed

17   information subject to confidentiality restrictions.

18           MR. DUNNE:  Your Honor, let me address that in two

19   parts.  With respect to what's transpired, particularly vis-a-

20   vis the ad hoc committee of noteholders since the colloquy that

21   we had several weeks ago, I think that there's been progress in

22   both putting that infrastructure in place with appropriate

23   confidentiality agreements and we've developed a working

24   relationship.  We spent a lot of time talking about pending

25   matters with the ad hoc committee making the advisories to the

52

1    committee available to them.  And I'd like to take some credit

2    for why many of those objections have been resolved because

3    they've been getting access to some of the views that Houlihan

4    may have on a particular transaction or FTI.  And I think

5    that's precisely why Your Honor requested that we serve in that

6    type of role plus, you know, the statutory obligations that we

7    have.

8              THE COURT:  Right.

9              MR. DUNNE:  With respect to the cash management

10   issues and precisely what Mr. Sabin is requesting, we started

11   this process by talking with the debtors and looking at

12   transparency as being a goal that in and of itself is worth

13   achieving here but then spent time with Mr. Miller and Mr.

14   Marsal about -- hearing their concerns about the unintended

15   consequences of posting to a website if particular parties are

16   looking out for a particular investment that may benefit them

17   and only them at the expense of creditors and the estate at

18   large.

19             So that's a long way of saying I'm fine working with

20   Mr. Sabin and his client with appropriate confidentiality

21   agreement subject to Mr. Miller and Mr. Marsal saying that a

22   particular transaction is appropriate to be shared through us

23   with them and doesn't raise the concerns that they have been

24   articulating.

25             MR. MILLER:  As of Monday, Your Honor, we finalized

53

1    confidentiality agreements with the ad hoc noteholder committee

2    members only.  Each member had to sign.  And we did sign a

3    confidentiality agreement with Akin Gump so that they could

4    participate.  Now, in the past, Your Honor, we have asked

5    Harbinger to sign a confidentiality agreement and they've said

6    they don't want to sign a confidentiality agreement.  So

7    there's some -- something to be inferred from that.

8            THE COURT:  Well, I think we're not going to go there

9    for now.  So, Mr. Sabin, you don't need to comment with regard

10   to that aspect of Mr. Miller's last remark.  But I am sensitive

11   to both the needs and the desires of parties in interest to get

12   as much information as they can without restricting themselves

13   and the appropriate needs of the debtor to preserve

14   confidential transactions and proprietary information from

15   unnecessary scrutiny which could either harm the debtor or

16   provide unfair advantages to the parties seeking the

17   information.  And so my inclination, based upon what I've

18   heard, is to deny the request that you've made for the cash

19   management procedures to be modified by means of a posting of

20   the notice that's going to the creditors' committee, but to

21   encourage instead that alternative means be adopted to provide

22   your client and others who may have similar desires to obtain

23   information.  To obtain it through alternative means,

24   principally through the creditors' committee as an organization

25   whose mandate includes the dissemination of information to

54

1    creditors and others parties in interest represented by the

2    committee.  Why does that not work for you?  Or does that work

3    for you?

4            MR. SABIN:  I will make it work for our client.  I

5    understand it.  I just want to make sure that I understand the

6    debtors' position in response to Mr. Dunne's position, which is

7    if, indeed, our client, or any other creditor, goes and

8    negotiates the appropriate confidentiality agreement to protect

9    the information that it would hope to receive through the

10   committee, that, indeed, it won't be thwarted when the

11   committee turns around and says dear debtor, can I give it to

12   X, Y and Z who signed confidentiality?

13           THE COURT:  I guess that question is will you bargain

14   in good faith, Mr. Miller?

15           MR. MILLER:  Absolutely, Your Honor.

16           THE COURT:  There we go.  No problem.

17           MR. SABIN:  Then I think we're resolved, Your Honor.

18   Thank you.

19           THE COURT:  All Right.

20           MS. LAHAIE:  Good morning, Your Honor.  Meredith

21   Lahaie, Akin Gump Strauss Hauer & Feld on behalf of the

22   Informal Noteholder Group.  Just a couple of things.  First,

23   with respect to the cash management motion, now, Your Honor,

24   the representations are correct that the Informal Noteholder

25   Group has decided to withdraw its objection based on our

55

1    conversations with the debtors and the oversight provided to

2    the committee with respect to the nondebtor transfers.

3    Secondly, Your Honor, with respect to the transparency issues

4    that you raised a minute ago, the representations made here are

5    correct, that Akin Gump and one committee member from the

6    Informal Noteholder Group have signed confidentiality

7    agreements and we are working together with the creditors'

8    committee to get that download.  And thus far they've been very

9    accommodating so we are very appreciative of the reference.

10           THE COURT:  Good.  That takes care of the

11   transparency question, but we still have the LBIE issue to deal

12   with.  I just want to make sure that the position paper that

13   was filed by the administrators of the LBIE estate gets

14   appropriate attention this morning.

15           MR. FLICS:  Thank you very much, Your Honor.  Martin

16   Flics of Linklaters LLP on behalf of the joint administrators

17   of LBIE.  Your Honor, although we have a small disagreement

18   with the debtors about what is appropriate for inclusion in

19   this cash management order on a particular issue, I should

20   state at the outset that we have been working very

21   cooperatively, all parties have, on a very regular basis.

22   Alvarez and Marsal and PWC are involved in daily discussions on

23   a whole range of issues.  Very complex, very hardworking.

24   Everyone, as far as we can tell, is working in good faith to

25   resolve some incredibly difficult issues.  And I do want to

56

1    acknowledge that.

2          And, second, with respect to the concept of a

3    protocol I also want to confirm Mr. Miller's statements earlier

4    that there have been meetings on that.  There was, I believe, a

5    productive meeting just yesterday for a number of hours in

6    which Mr. Perez and Mr. Kobak and myself and clients

7    participated in which we worked through a number of these very

8    difficult issues.

9          Having said that, and despite that good faith of all

10   parties, there is much still to be done.  We are faced with the

11   issue of having to address a particular motion brought to the

12   Court by the debtors, and it's only in that context that we

13   come forward and have made a request.  And that request is a

14   limited one.  The request is simply that to the extent that

15   LBHI determines that it has no interest in funds that are

16   misdirected to it post-petition because of the pre-petition

17   cash management arrangements, then it will segregate, account

18   for, and return those funds.  So it is if LBHI agrees.  And we

19   only advanced this because this is a cash management motion.

20   These issues derive specifically from the cash management

21   arrangements.  That is our only request.  We have indicated to

22   LBHI our willingness to cooperate on many issues, and I might

23   add, Your Honor, that just in the last day or two the

24   administrators have scheduled a creditors meeting for November

25   14th in connection with that.  They have submitted a document

57

1   to creditors, and that document is very express in addressing

2   LBHI, that it's the intention of the administrators to

3   cooperate, to agree on operating protocols, and otherwise a

4   relationship that mitigates the need to go before courts.

5           THE COURT:  Let me ask you this, Mr. Flics.  You

6   indicate that you are taking this position because there's a

7   cash management motion which is about to be approved.  But

8   isn't it also true that the segregation, accounting, and return

9   that you describe is something that could be provided for in

10  the kind of protocol that you are in the process of negotiating

11  that I gather is not yet in final form.  As a result, assuming

12  that an agreement is reached with respect to such a protocol,

13  wouldn't more specific understanding take priority and then

14  govern the relationship between LBIE and LBHI?

15          MR. FLICS:  Your Honor, that is absolutely possible.

16  And I expect that at such time as a protocol is agreed to, and

17  there are a lot of complicated issues, but assuming, and we all

18  hope that there will be one, I would expect that that would be

19  included.  But I think that that cannot, and should not,

20  preclude that where there are very specific issues that are

21  brought to the Court and I believe, in this case, make a very

22  narrow request, it's not inconsistent with continuing to

23  negotiate, and we absolutely have every intention.  It is just

24  that we are put in the position, through no bad intention of

25  anyone, of addressing a motion that does address cash

58

1    management.  We do believe these issues relate to that.  Is it

2    possible to do it another way?  We could sign a stipulation

3    tomorrow with the debtors that says the same thing.  I cannot

4    say that it must be in a cash management motion, but I do

5    believe it is appropriate.

6            THE COURT:  Well, since you've taken the position

7    that it isn't required that it be in the cash management order

8    it won't be.  The reservation of rights that you've made is

9    clear.  It's both in the written form that you submitted which

10   is part of the docket and now in the reservation of rights that

11   you've made on the record of today's hearing.  I understand

12   your position, and as far as I'm concerned the fact that there

13   is no language in the cash management order dealing with the

14   segregation, accounting, and return of misdirected property

15   does not preclude an appropriate motion at some time in the

16   future by any party in interest, not just LBIE, to seek the

17   return of property that belongs in another estate.

18           So, for that reason I am going to overrule this to

19   the extent it's deemed an objection, but note that I believe

20   you have other fully suitable means to achieve the same result.

21           MR. FLICS:  Thank you, Your Honor.

22           THE COURT:  Mr. Perez, sir, you're now satisfied?

23           MR. PEREZ:  Yes, Your Honor.  Thank you very much.

24           THE COURT:  Okay.  So the cash management order will

25   go final at this point, and I have seen a form of order that

59

1    was -- a notice of order was put on the docket a number of days

2    ago.  Has that been updated?

3             MR. PEREZ:  It has changed, Your Honor.  In

4    particular the reference that I had made to when we put on a

5    second lien making sure the stay doesn't apply to any first

6    lien, but we will provide you a black line of the revised

7    order.

8             THE COURT:  Fine.  Okay.

9             MR. MILLER:  Item number 17, Your Honor, is the

10   motion of Sumitomo Mitsui Banking Corporation.  It's their

11   motion, Your Honor.

12        (Pause)

13            THE COURT:  Mr. Perez, you may be excused.

14            MR. CONLON:  Good morning, Your Honor.  John Conlon

15   of Mayer Brown for Sumitomo Mitsui Banking Corporation.

16            By way of background, Sumitomo or SMBC is a party to

17   a credit agreement with Lehman Brothers Holding Inc. as

18   borrower and Lehman Commercial Paper Inc. as pledgor, dated May

19   27, 2008.  Pursuant to that loan agreement SMBC extended a 350

20   million dollar term loan and received in return security a pool

21   of term and revolving loans that LCPI owned and were identified

22   from time to time.

23            We're here today seeking a relief from the automatic

24   stay with respect to recovering that collateral because the

25   value of that collateral has dropped precipitously over the

60

1   last month.

2          Under 362(d)(2) we're entitled to relief from the

3   automatic stay if the debtor does not have equity in the

4   property and the property is not necessary for an effective

5   reorganization.  There's no argument that's been made that this

6   property is necessary for effective reorganization so I'll

7   focus on the first point.

8          There's a three step showing that must be made by a

9   secured creditor.  First, as to the amount of the claim.  Here'

10  it's approximately 350 million dollars and there's no dispute

11  about that.   The second is that the claim is secured by a

12  valid perfected lien on the property.  There's no dispute that

13  we have appropriately filed UCC financing statements.  Third,

14  that the debtor does not have equity in the property.

15         As set forth in the submissions that are before Your

16  Honor, as of the petition date my client was owed approximately

17  350 million dollars.  And as further set forth, the value of

18  the security that's supporting that 350 million dollar

19  obligation is now worth approximately 313 million dollars.

20         THE COURT:  Let me stop you there.

21         MR. CONLON:  Sure.

22         THE COURT:  Mr. Buck has provided two declarations,

23  an original at the time that you filed the motion and a

24  supplemental declaration filed within the last day or two.

25  Both of those declarations reference the loan X intermediary

61

1    for distressed loan trades as a source of valuation data.

2            MR. CONLON:  Yes.

3            THE COURT:  On the basis of which he, and now you in

4    argument, assert the value has dropped.

5            MR. CONLON:  Yes.

6            THE COURT:  I don't think you can get where you want

7    to go by saying that because you haven't proven anything but

8    making the assertion.  It doesn't mean that you can't prove it

9    at some point.

10           Are you standing here and saying that that is the

11   functional equivalent of a market value for marketable

12   securities quoted on a particular day, because I don't think

13   you can be saying that.

14           MR. CONLON:  Well, it --

15           THE COURT:  I could rely on that but I'm not sure I

16   can rely on a loan X bid as being the functional equivalent of

17   value.  And if that's your position, you're going to lose

18   today.

19           MR. CONLAN:  Your Honor, loan X shows the range of

20   values that bids and offers are made for a particular loan on

21   any given day.  They polled all dealers who participate in the

22   system and come up with the arithmetical mean of those bids and

23   offers.

24           We have supplemented the loan X data by reporting in

25   the supplemental Buck declaration actual quotes from a number

62

1   of dealers including the debtor, while the debtor was still

2   providing such information.  And the debtor's -- in terms of

3   the debtor's quotes, they tied in almost precisely with the

4   loan X reported arithmatic mean.

5          In addition, they also tied in to the valuations that

6   debtors provided while they were in operation, as they were

7   required to under the loan agreement, where they valued the

8   underlying loan portfolio themselves.  All those valuations tie

9   in, for the most part, within a hundred basis points.

10         The loan agreement contemplates valuing these loans

11  at market value.  We have shown what the market is for these

12  loans.

13         THE COURT:  Let me ask you this, because this is a

14  question that interests me.  If a loan agreement talks in terms

15  of valuing the collateral, and these are all -- there are seven

16  commercial loans, as I understand it.

17         MR. CONLON:  Eight.

18         THE COURT:  Eight?

19         MR. CONLON:  Yes.

20         THE COURT:  I read in the paper it's seven,

21  somewhere.

22         MR. CONLON:  Well, there is one that's both a term

23  and revolving loan.  So for purposes of valuation we combined

24  the two.

25         THE COURT:  Okay.  The revolver is also one that is,

63

1    if I recall what I've read, is more difficult to value?

2          MR. CONLON:  Yes.  So to the debtor's benefit we

3    valued that at par, along with the other term loan.

4          THE COURT:  Okay.  But here's the question.  Assuming

5    that parties have agreed, by contract, to value collateral at

6    market value and that there is an industry practice that

7    parties to the transaction engage in routinely to determine

8    value, is that binding on a Bankruptcy Court and should it be?

9          MR. CONLON:  Well, to the extent that the Bankruptcy

10   Court is enforcing the terms of a written agreement, which I

11   believe should be here, and our rights under the UCC, I believe

12   it should be.  Yes, Your Honor.

13         THE COURT:  So are you saying that parties to a

14   contract can dictate how a Court should determine valuation

15   questions?  You can't be saying that.

16         MR. CONLON:  I'm not saying that.

17         THE COURT:  So what are you saying?

18         MR. CONLON:  I'm saying that the contract sets out a

19   mechanism for valuation and in absence of some other reason to

20   use that methodology, that methodology should be employed.

21         THE COURT:  Okay.  What's a Court that applies the

22   Federal Rules of Evidence supposed to do?  Shouldn't there be

23   an evidentiary hearing and shouldn't the validity of the market

24   data that you rely on be tested, subjected to cross-examination

25   and also exposed to differing valuation methodologies in order

64

1    for the Court, as a finder of fact, to confirm one way or

2    another what the value is as of the relevant valuation date.

3             MR. CONLON:  Well, Mr. Buck is here today and

4    available.

5             THE COURT:  We're not having a valuation hearing

6    today.  Under Local Rule 9014-2 the first hearing, unless I

7    order otherwise, of any matter which is called is not an

8    evidentiary hearing.  No one contacted my chambers to request

9    that this be an evidentiary hearing and it's not.

10            You may, on some other occasion, have an evidentiary

11   hearing and it will probably not be on an omnibus hearing date.

12   Because my experience with valuation hearings tells me that

13   it's likely to be more than half a day, it might be multiple

14   days.

15            MR. CONLON:  My response to the need for, for

16   example, discounted cash flow or the like of the underlying

17   collateral is that it should not be necessary here because the

18   parties contracted for valuation.  Whether a discount of cash

19   flow or some other valuation shows an underlying value or the

20   fundamentals of the loans are different, that the loans are

21   worth more or worth less than the market value shouldn't impact

22   our ability to recover and protect ourselves, given the

23   apparent drop in the value.

24            THE COURT:  Did I just hear you say the market value

25   shouldn't affect your rights?

65

1          MR. CONLON:  No, the market value should.  If there

2     is an analysis of discounted cash flow or some other valuation

3     technique which indicates a value different from the market

4     value, that should not affect our ability to protect our rights

5     which are based upon the market value of the loan portfolio.

6          THE COURT:  So are you standing at the lectern and

7     arguing that even if a Court is persuaded that there is a more

8     reliable valuation metric which determines value, that that's

9     trumped by your agreement.  Is that your position?

10          THE COURT:  I'm not saying that, Your Honor.  I'm

11     saying that the -- that it would not be more -- in this

12     situation it would not be more reliable, the underlying

13     fundamentals would not be a more reliable indicator of the

14     value of this portfolio then the market indicates.

15          THE COURT:  Your papers also talk in terms of

16     adequate protection.  Adequate protection as of what date,

17     protected how?

18          MR. CONLON:  Well, there's a variety of issues.  One,

19     there is cash coming in, there's interest payments being made.

20     So there's cash presumably being received by the debtor.  We

21     would like to have that cash segregated and subject to adequate

22     protection so that that cash can be -- which is ours under the

23     cash collateral agreement, that we have some assurance that

24     that's not being applied to other purposes of the debtor.

25          We would also like to have, to the extent that there

66

1    are shortfalls, as we think we've demonstrated but to the

2    extent that there are shortfalls that the loans be substituted

3    out as appropriate for that cash, these be deposited into a

4    segregated account to make up the difference.

5        THE COURT:  I don't understand the reference to

6    substituting out the loans.

7        MR. CONLON:  Well, the loan agreement provides that

8    different loans can be taken in or out of the collateral pool

9    to support the value of the collateral.  And if there are

10   other, more valuable loans that can be put in, that's what we

11   would request.

12       THE COURT:  So you're moving from stay relief at the

13   same time you're seeking to substitute out loans that may have

14   a higher value in some loan X type arrangement of valuation so

15   as to increase the value of the pool that secures the 350

16   million dollars in the Sumitomo loan, right?

17       MR. CONLON:  We're asking for adequate protection

18   which could be provided in a variety of ways.  One is by cash,

19   additional cash.  And an additional manner would be additional

20   or replacement liens to protect the value of our interest in

21   the property.

22       THE COURT:  Well, the only thing you're entitled to,

23   as a matter of law, is protection against the diminution in

24   value of your secured claim, correct?

25       MR. CONLON:  Yes.

67

1          THE COURT:  And the value of your secured claim is

2     what?

3          MR. CONLON:  355 million.

4          THE COURT:  No, that's the notional amount of your

5     claim.  The value of the claim is the value of the security.

6          MR. CONLON:  Yes.

7          THE COURT:  What do you assert to be the value of the

8     security, because you're about to say something against your

9     adequate protection interest, you recognize that I think?

10         MR. CONLON:  Yes, I do.  Yes.  The value of the

11    security is approximately 313 million.

12         THE COURT:  Based upon the loan X --

13         MR. CONLON:  That's the loan X bid price.

14         THE COURT:  The loan X bids.  Okay.  I understand

15    your position and I'm going to hear other counsel, including

16    the debtor and the creditors' committee who filed papers in

17    response to this.  But just so you're all generally aware of

18    how I'm thinking about this, you're not getting any relief

19    today and I think I've made that clear because I believe that

20    there is an evidentiary issue that's significant.  An issue

21    which as been raised both by the debtor and by the committee in

22    their responsive papers.  So it comes as no surprise to you.

23         I believe it makes sense for the parties to do the

24    following, and I'm not, by saying this now, precluding any

25    arguments to be made by either the debtor or the committee.

68

1    One, I think that the parties should determine what, if any,

2    discovery is appropriate on the question of valuation,

3    including valuation expert, individuals associated with the

4    transaction or otherwise, who may have different views as to

5    the fair value of the underlying collateral.

6          I think that there should be an understanding as to

7    the date when valuation is being performed.  One of the

8    confusing aspects of this situation, as it has been presented,

9    is that we're dealing with an asset pool, the value of which

10   notionally varies daily.  And without looking at any loan X or

11   other intermediary data I'm guessing certain of the loans may

12   be worth more today then they were worth a week ago.  I'm just

13   guessing that because yesterday was one of the most traumatic

14   market increases on an election day in history.  And while this

15   is not directly driven by the stock market this is a trading

16   market and that's your position.  Your argument is this is

17   driven by a trading market value.  Which means that the numbers

18   go up and down depending on what day of the week we're talking

19   about and what's going on in the world economy or in the

20   industrial economy, depending on the underlying borrower.

21         So I want to know what the effective date is for

22   measurement and whether or not, from an adequate protection

23   perspective, forecasting future value is a relevant

24   consideration and whether that can be done.

25         The third thing I want to know about is adequate

69

1   protection of your interests.  Because in your motion and in

2   your supplemental brief there is a fallback to adequate

3   protection but it's not at all clear to me, based on your

4   papers and based upon what you've said, what adequate

5   protection would consist of for these purposes.  I believe that

6   the parties might profitably spend some time talking to each

7   other about what it would take to provide adequate protection,

8   thereby avoiding what could be a very time consuming and

9   potentially expensive hearing on valuation.

10          Finally, I'll make just a general comment.  It

11  concerns me that your client has been on a mission to obtain

12  stay relief on what I'll consider to be an incredibly

13  accelerated timetable.  I'm not saying that it isn't your

14  client's right to do that but I noted, with concern, that this

15  foreclosure effort on the part of Sumitomo predates the

16  commencement of the Lehman Commercial Paper bankruptcy itself.

17  And that a notice appeared in the New York Times on October the

18  6th relating to foreclosure, one day after the commencement of

19  the case.  No one has commented one way or the other as to

20  whether that publication is a stay violation.  I'd like some

21  consideration of that, both by you, the committee and the

22  debtor.

23          It also seems to me that since you and your client

24  have been on a mission to achieve this result, you're going to

25  be slowed down somewhat here.  Your client's need for speed

70

1   will not override this Court's need to understand, fully, the

2   facts that support your position.  And I find, based upon

3   having reviewed both of the Buck declarations that they are

4   inadequate and fail to provide prime facie proof of an

5   entitlement.  That doesn't mean that you're not going to have

6   the ability to prove it up in an appropriate hearing in the

7   future.

8          I'll now hear from other counsel.

9          MS. HARVEY:  Good morning, Your Honor.  Diane Harvey

10  from Weil Gotshal representing debtor, Lehman Commercial Paper,

11  Inc.

12         I was going to start my argument that said that

13  Sumitomo bared the burden to establish prime facie evidence and

14  that they've failed to do so, but I guess Your Honor has, kind

15  of, stolen my thunder on that.  So I'd like to address one of

16  the questions that Your Honor posed to Sumitomo's counsel,

17  which is what is the ability of the Bankruptcy Court to assess

18  the valuation of the collateral in the context of a contract

19  that has been formed.

20         The bankruptcy cases which deal with lifting the stay

21  and under the sections that Sumitomo is seeking, talk about a

22  bankruptcy judge assessing the totality of the circumstances in

23  making an assessment of what the value is.  Your Honor, you

24  don't have any restraint, contractual or otherwise, with

25  respect to determining, from the facts and the evidence that

71

1    you will hear what the value of the collateral is.  And the

2    case law is very clear on this.

3           I took Mr. Buck's deposition yesterday, Your Honor,

4    just in case there was an evidentiary hearing.  I don't want to

5    waste this Court's time going through it but I do want to make

6    a couple of points.

7           Mr. Buck admitted, in his deposition, that he doesn't

8    have any experience performing valuations of term loans, no

9    experience whatsoever.  He also testified that he wasn't even

10   the one who made the determination of what type of technique to

11   value the collateral.  There's a whole bunch of other things I

12   could tell you Mr. Buck testified to, I won't waste the Court's

13   time.  But those two indications alone, I think, justifies the

14   fact that there is no prime facie evidence that has been proven

15   here or that could be proven through Mr. Buck.

16          THE COURT:  Let me ask you what may be a tough

17   question, though, Ms. Harvey.  Does the debtor have an ability

18   through competent evidence to take the position that Sumitomo

19   is oversecured here?

20          MS. HARVEY:  You're right, Your Honor, that's a tough

21   question.  We have not gotten an expert to actually perform a

22   valuation in connection with the recoverability of the term

23   loans.  The methodology that we believe would be the

24   appropriate methodology in valuing term loans.  I imagine

25   though, Your Honor, that if this does go to an evidentiary

72

1     hearing that we would put in evidence with respect to that.

2          THE COURT:  Okay.

3          MS. HARVEY:  Thank you, Your Honor.

4          MR. TECCE:  Good morning, Your Honor.  For the

5     record, again, James Tecce from Quinn Emanuel.  Your Honor, I

6     will be very brief, only to note that we have filed an

7     objection which Your Honor is aware of.  We support the

8     debtor's position in opposing the stay relief for reasons

9     which, I think, Your Honor has already noted in his remarks.

10         The one point that I would simply stress is the

11    timing point which Your Honor touched on, I think tangentially,

12    at the end of your remarks.  One of the reasons why we did

13    object was given the close proximity of the motion being filed

14    to the LCPI case and that this, we think, involves some LCPI

15    collateral.  We're just concerned that allowing a motion to go

16    forward so quickly after the petition date might invite a

17    series of motions that would result in piecemeal dismemberment

18    of the collateral while the debtors are still trying to find

19    out and evaluate how the existing collateral may relate to the

20    remainder of the estate and the best way to maximize the value

21    of that collateral.

22         THE COURT:  I understand that argument but it's

23    actually one that I completely discount.  I believe that the

24    parties to transactions, not just in this case but in any case,

25    are not held to an arbitrary time schedule.  If there is a

1    right to obtain relief from the automatic stay there's no

2    waiting period that the law requires or that I will impose.

3           Additionally, the notion that this is going to open

4    up a floodgate of other potentially distracting requests for

5    stay relief to the extent true, is also irrelevant.  To the

6    extent untrue is even more irrelevant.  And my comments were

7    not addressed to whether or not it was premature and might lead

8    to other further stay litigation in the context of the Lehman

9    bankruptcy case.  But rather was focused on something that

10   seemed to be in process even before the debtor commenced its

11   case.

12          So we're talking about a request to foreclose, which

13   as I understand it was undertaken because of the Lehman parent,

14   LBHI's bankruptcy as a triggering event and that the motion

15   itself was filed on October 15th, a mere ten days after the

16   commencement of the Lehman Commercial Paper case.  Now the fact

17   that it was filed ten days after the commencement of the

18   relevant debtor's bankruptcy petition is an indication of a

19   very anxious creditor.  Just because a creditor is anxious

20   doesn't mean that the creditor isn't entitled to court time.

21          And so the issues is ultimately not about timing as

22   much as it is about entitlement.

23          MR. TECCE:  Very well, Your Honor.  Thank you.

24          THE COURT:  Okay.

25          MS. LAHAIE:  Good morning, Your Honor.  Again for the

74

1    record, Meredith Lahaie, Aiken Gump on behalf of the informal

2    noteholder group.

3              Your Honor, we agree with the arguments made here by

4    the debtors and we rest on papers.

5              THE COURT:  Fine.

6              MR. CONLON:  Your Honor, just one point I wanted to

7    clarify.  With respect to any repayments, in whole or in part,

8    of any of the underlying loans, we'd request that, whether it's

9    principle or interest but particularly principle, if there are

10   any prepayments or payments of principle, that those be

11   segregated as providing adequate protection for my client.

12             THE COURT:  Okay.  Those requests are all going to be

13   made in the context of discussions to take place after today's

14   hearing.  I'm not ruling on adequate protection today.  What I

15   am doing is encouraging the parties to have some conversations

16   about how to deal with your issues.  And there will either be

17   an evidentiary hearing on value or there'll be a stipulation on

18   adequate protection.  But I don't see anything other than that

19   in the future.

20             If there's no agreement on adequate protection I'll

21   certainly rule on what adequate protection consists of.  But I

22   may establish a briefing schedule on this as well because there

23   are a number of issues that I raised that I think are if not

24   unique at least unusual and I don't consider the Johnson case

25   that was cited to be particularly helpful to either side.

75

1          So let's put this over as a status conference matter

2     for the hearing on the 18th.  And at the status conference I

3     would like there to be a report on some progress, if any, in

4     either completing a discovery schedule, I heard Mr. Buck's

5     deposition was taken but I imagine that if the debtor hasn't

6     yet engaged valuation experts that that may be the next step,

7     if that's required.  And that we talk about when an evidentiary

8     hearing will take place.

9          My suggestion is that if we're going to have to go

10    down that road that it not be on an omnibus hearing date but

11    that we rather establish trial dates that take into account the

12    reasonable estimates of litigation counsel as to how long it's

13    going to take to present this case.

14          MR. CONLON:  Very good, Your Honor.  Thank you.

15          THE COURT:  Okay.

16          MR. HARVEY:  The next matter is number 18, the motion

17    of the Federal Home Loan Bank of Pittsburg for clarification of

18    the order approving the Barclays sale, Your Honor.

19          MS. HARVEY:  Your Honor, may I be excused to go to

20    the back?

21          THE COURT:  You may be excused.

22          MS. HARVEY:  Thank you, Your Honor.

23          MS. MANNE:  Good morning, Your Honor.  Beverly Weiss

24    Manne on behalf of the Federal Home Loan Bank of Pittsburgh.

25          THE COURT:  Good morning.

76

1           MS. MANNE:   Thank you.   Your Honor, we have filed a

2      very limited motion seeking some clarification with respect to

3      the sale order entered by this Court.   A couple of points to

4      bring to the Court's attention.   Pretty much the issue with

5      respect to Rule 60 was addressed by Barclays.   In this

6      particular instance LBHI, who filed bankruptcy on September

7      15th, is a credit support provider under an ISDA agreement with

8      the Federal Home Loan Bank.   Lehman Brothers Special Finance,

9      who we like to refer to as LBSF, was the counterparty to that

10     agreement and was to be holding 316 million dollars of

11     collateral, and as of the date of the bankruptcy filing, as of

12     the sale, those contracts had not, as of the date of the sale

13     motion, of the hearing, there had not been a determination.

14     That subsequently occurred and there was a subsequent net out

15     and closeout of contracts.

16           On October 2nd Federal Home Loan Bank said here's the

17     closeout, here's the net out, return collateral.   On October

18     3rd LBSF filed its bankruptcy proceeding.   We filed a request

19     immediately on October 3rd, once we were told hey, you're not

20     getting your money back.   We don't even know if we have your

21     money.   That was their response at that particular point in

22     time.   And at that point the question was where is the money?

23     What gave us great concern also at that point in time was the

24     debtors' filing of the motion for cash management, which seemed

25     to indicate that as we talk about all roads leading to Rome,

77

1    that LBHI was Rome.  The debtor had -- in the sale order we

2    read that they transferred 1.3 billion in cash, cash

3    equivalents, bank deposits or similar items.  This was all

4    approved by the Court.  Now, arguably it was LBI, but because

5    of the averments within the cash management motion as to cash

6    going up and cash going out we had no way of discerning were

7    there buckets, did money come in, did money come out.  So we

8    were concerned about the language.  There was an averment that

9    in -- subsequently there was a clarification letter.

10             Your Honor, what we seek today simply is further

11   clarification in an order.  We don't think the letter in and of

12   itself is sufficient to constitute this Court's order.  We

13   think an order would be appropriate.  This Court knows that if

14   you're in a bankruptcy case the letter and the agreement among

15   those parties aren't necessarily going to be viewed in the same

16   manner two or three or four years down the road.  We think a

17   simple court order which specifies a few things, and we had

18   some discussions with Barclays and had proposed some language

19   for a stipulation.  We want it to be very simple.  And we did

20   file, also, yesterday, Your Honor, a proposed order at document

21   1369 with three very simple statements.  One --

22             THE COURT:  I saw that.  I saw that order and I've

23   read the papers that have been filed in opposition to the

24   relief you seek.  Everybody seems to be saying you don't need

25   this.  The order is clear.  There's been a failure to comply

78

1       with the requirements of 60.  That's Federal Rule 60.

2               MS. MANNE:  Right.

3               THE COURT:  That the clarifications made on

4       September -- I forget the date of the letter.  21st, I think --

5       is the clarification letter.  And statements made in filings in

6       connection with this contested matter tell you in multiple ways

7       that no cash was conveyed to Barclays as part of the sale,

8       which leads me to question why you need, why anyone needs, a

9       clarification of the sale order which appears clear on its

10      face.

11              MS. MANNE:  Your Honor, the sale order, obviously,

12      was not clear on its face to the extent subsequent to the sale

13      order with respect to issues.  There was a clarification

14      letter.  Clarification letter came afterwards.

15              THE COURT:  The clarification letter did not modify

16      the sale order.  The clarification letter could not modify an

17      order.  The clarification letter was intended to clarify

18      transactional documents.

19              MS. MANNE:  Right.

20              THE COURT:  That's certainly how I read it.  So the

21      order is what it is and unless the district court in connection

22      with pending appeals were to upset it on issues of good faith

23      it says what it says and it's final.

24              MS. MANNE:  Your Honor, we're not disputing that it

25      says what it says and it's final.  We are saying that we did

79

1    not view the language, because the sale order specifically says

2    that you're selling these assets, and it references back to the

3    asset purchase agreement and the clarification letter.  It says

4    to state what those assets are and what the excluded assets

5    are.  You can't read it in a vacuum from the APA and the

6    clarification letter.  In that regard, Your Honor, it just

7    simply was not clear.  We don't know if it still is clear, and

8    that's why we're here.  If we thought it was crystal clear we

9    wouldn't be here, Your Honor.

10         THE COURT:  Well, let me understand something about

11   the procedural setting in which this arises.  I know that there

12   is pending an adversary proceeding that your client has

13   commenced with reference to the same funds.

14         MS. MANNE:  That's correct, Your Honor.

15         THE COURT:  I know that I've been advised in

16   pleadings that the money that we're trying to track down, at

17   least that you're trying to track down, allegedly is the

18   subject of a JPMorgan Chase offset that as I understand it, but

19   I don't know this to be true, may have taken place on October

20   3rd as part of some kind of reconciliation of accounts.  Now, I

21   don't know where the money is.  But let's just say, for the

22   sake of discussion, that what I have been told and I'm now

23   recounting to you is, in fact, true.  And that the money that

24   you're looking for was commingled with other funds, was in a

25   JPMorgan account and was taken by JPMorgan.  Let's just say

80

1    that's all true.  How does anything that we're now talking

2    about in reference to this sale order benefit you?

3              MS. MANNE:  Your Honor, I think you've sort of put

4    the bunny in the hat when you said let's assume.  Where is the

5    money?

6              THE COURT:  Well, it's a question you're actually

7    supposed to answer.

8              MS. MANNE:  Oh, I'm sorry, Your Honor.  Because if

9    that were true, and if the evidence and facts showed that to be

10   the case, then this is probably not an issue.  You're right.

11   That's not the case.  But, Your Honor, we don't have the

12   evidence in support of that.  We have averments and pleadings.

13   We don't have any evidence to say what's up.  We do know that

14   we had collateral.  We do know that other counterparties had

15   collateral.  We do know that the debtor has mentioned they had

16   8,500 counterparties.  We don't know how much collateral they

17   were supposed to have in those accounts.  And the like.  So,

18   yes, Your Honor, at this juncture the averments to the Court

19   and the representations to the Court as of the filings on

20   Friday, but not prior to that time, were oh, the posted

21   collateral was in the account at JPMorgan and JPMorgan swept

22   those funds.  But other than this averment by the debtor there

23   is no evidence to that effect, and there wasn't any presented.

24   The clarification we're seeking with respect to that is the

25   issue as to how much money was at Lehman Brothers Special

81

1    Finance in those accounts, if it was our funds because it was

2    supposed to be segregated, it was supposed to be held apart at

3    Lehman Brothers Special Finance, transferred funds up, and even

4    though they're saying they didn't, if they're supposed to have

5    two billion dollars worth of collateral for these various

6    counterparty accounts and they're saying they had 400 million

7    dollars as of that date, you have to say well, where's the

8    other 1.6 billion dollars, Your Honor.

9         So that is our big issue.  Where is the collateral,

10   because even today, with their comments, we -- fine, if they

11   want to admit today, and we think, perhaps, this is an

12   admission that out of the 415 million there that constituted

13   our collateral, that's what they seem to be saying.  If that's

14   the comment today, and if the Court wants to find that today,

15   that the 415, as of October 2nd, that was in there, constituted

16   Federal Home Loan Bank collateral, we'll withdraw this, Your

17   Honor.  But no one's willing to say that.  No one's willing to

18   represent that.  No one --

19        THE COURT:  There's also nothing before me on the

20   basis of which I could make such a finding.  So that's not

21   going to happen today.

22        MS. MANNE:  That's right, Your Honor.  And that's why

23   we're here.  Because we're -- maybe we're paranoid.  But we are

24   owed forty-one million dollars, and no one has told us where it

25   is.  And we just want to be in the position where if a sale

82

1    order is talking about transferring cash, and it went up into

2    LBHI, and LBHI is this great octopus which sends funds out

3    across the world in cash, they've represented to the Court that

4    we did not sell this collateral.  Barclays said we did not buy

5    that collateral.  We think it would be appropriate.  I'd be

6    happy to have a stipulation to that effect, Your Honor.  I had

7    asked that if, and subsequently it was determined, that, in

8    fact, oops, it was your collateral.  We did transfer it up.  I

9    wanted initially in the stipulation to say we'd have a lien or

10   a trust imposed upon the proceeds.  That was apparently

11   unacceptable, Your Honor.

12          THE COURT:  Well, you were in court when I was

13   engaged in colloquy with Mr. Flicks as he was seeking to obtain

14   certain benefits in the context of the cash management order

15   that would protect rights of LBIE in the event that funds were

16   misdirected.  I mean, in a sense, what you're asking for is

17   another variation on that theme of "I know they said that they

18   didn't transfer the cash to Barclays, and I know they said that

19   the funds that I'm merely interested in are the subject of some

20   offset transaction with JPMorgan Chase, but we don't know those

21   facts to be true."  All I'm looking for is clarification in a

22   sale order that says that's not true and that I don't have to

23   worry in connection with the sale order.

24          But what I said to Mr. Flicks I think I can repeat to

25   you.  Nothing in the cash management order is intended to take

83

1    away the rights that LBIE or any other party may have as to

2    misdirected cash.  Those rights are what they are.  Isn't the

3    same true in connection with the Barclays sale order?  They've

4    said they don't have your cash.  I'm sure they wouldn't have

5    said it unless they knew it was true.  And they've represented

6    as publicly as the hearings that took place on the 19th and

7    20th here that no cash was being acquired as part of the

8    acquisition.  From a clarification perspective, I don't think

9    there's a need for clarification.  I think it's clear on the

10   record of the sale hearing and what the order says.  But in

11   terms of your own rights, don't you have the same ability in

12   your pending adversary proceeding, and to the extent that isn't

13   a workable procedural setting, any other motion you might file

14   if facts ever come to your attention suggesting that everything

15   that's been represented is, in fact, different?

16           MS. MANNE:  Your Honor, the biggest difference here

17   is that the sale order basically washed this cash.  You have --

18   if, in fact, the funds were transferred to Barclays, they were

19   transferred free and clear, and the debtors, in exchange, got

20   cash, which they're going to view as post-sale proceeds from a

21   washed transaction.  Now -- so to the extent you now have

22   proceeds of a sale to Barclays, which was free and clear of

23   liens and free and clear of interest in claims, that's the

24   biggest difference here.  That sale order cuts off rights, and

25   that is our concern.

84

1          THE COURT:  It's supposed to cut off rights.  It's

2     intended to cut off rights.

3          MS. MANNE:  That's right, Your Honor.

4          THE COURT:  I intended it to cut off rights.

5          MS. MANNE:  And we know that to be the case, and that

6     is the biggest difference here.  That is fine.  It can cut off

7     rights.  We expected that to be the case.  But it can't -- one,

8     they couldn't sell cash they didn't own, and even though

9     they're saying we didn't sell cash, they transferred cash

10    equivalents, bank deposits, similar cash items as part of the

11    transfer.  So where the funds in those accounts came from was

12    there.

13         So I agree with you, Your Honor.  I agree that it was

14    supposed to be a permanent sale order.  We're not looking to do

15    that.  We want clarification.  They're saying they didn't buy

16    the cash, our assets weren't included.  Fine.  The assets

17    weren't included.  It's very simple.  They've made the

18    representation, and that's all we're seeking, Your Honor,

19    because at the end -- if I would propose the opposite scenario

20    to the Court, it's nine months from now, they walk in and say

21    oops, you know what, we're sorry, in fact, we found out that

22    these funds were transferred, and they did go up to Barclays.

23    Barclays' off the hook, and the debtor's going to say, you

24    know, these were proceeds, and under a cash management order

25    and under all these other orders we've been using them in the

85

1    ordinary course and those funds are gone as well.

2            Where are we at that point in time, Your Honor, if we

3    took the opposite proposal of facts?  We just don't have them.

4    This order is very simplistic.  It just says -- it's almost a

5    placeholder to say you didn't sell cash, they didn't buy cash,

6    our collateral's not included.  And we didn't even put in

7    anything else that grant liens the issues with respect to the

8    adversary proceeding.  We'll proceed independently of this.  We

9    just don't want an order which is intended to be final, and

10   will be final, with respect to the sale to potentially divest

11   us of rights if worst fears are realized.  That's all, Your

12   Honor.

13           THE COURT:  Okay.  I'll hear what the debtor and

14   Barclays has to say.

15           MR. MILLER:  I guess I'll go first, Your Honor,

16   because I just found out I represent an octopus.  Your Honor,

17   there is no need to clarify the sale order.  It was made

18   perfectly clear.  The clarification letter makes it clear there

19   was no cash sold to Barclays.  The problem with the proposed

20   order, Your Honor, is it keeps talking about FHLB-posted

21   collateral.  There is no evidence that that collateral existed

22   at any point in time.  Counsel has an adversary proceeding

23   pending.  That adversary proceeding will deal with whether

24   there was any posted collateral.

25           The LBSF account, Your Honor, was an account.  The

86

1    money that was set off by JPMorgan Chase -- we had no idea that

2    that was posted collateral.  Unfortunately, LBHI, or LBSF, did

3    not maintain a segregated account.  There is no such thing as

4    FHLB-posted collateral that can be identified and shown went

5    someplace.  Dollars are fungible, and these monies were all

6    commingled.  There were no separate, segregated accounts for

7    this customer, Your Honor.

8         So the order that is proposed can't be signed because

9    it needs an evidentiary background, Your Honor.  There is no

10   evidentiary background.  We have stated unequivocally there was

11   no cash sold to Barclays.  If this posted collateral can be

12   found someplace, that's a completely separate issue that will

13   be determined in the adversary proceeding.  Barclays has said

14   it did not receive any cash.  So why is there a clarification

15   of a sale order necessary at this point in time, Your Honor?

16   It just isn't.  And the order can't be signed because there's

17   no evidence to support the so-called posted collateral ever

18   existing.  Thank you, Your Honor.

19        THE COURT:  Does Barclays wish to say anything?

20        MS. SCHWEITZER:  Good morning, Your Honor.  Lisa

21   Schweitzer from Cleary Gottlieb Steen & Hamilton for Barclays

22   Capital.  I agree that we're here faced with a counterparty to

23   a Lehman entity who wants information, and we all agree that

24   they want information.  They all agree they want to find out

25   where their money is.  It's helpful to me to have Mr. Miller

87

1    stand up and, in fact, confirm that there was no collateral

2    account or where the money went because, facing Barclays, we

3    don't know any of this.  What we know is that we bought assets,

4    that there were representations at the sale hearing that the

5    debtor owned those assets.  There were findings in the order

6    that those were debtor assets being sold and that we're a good

7    faith purchaser under 363(m) entitled to finality on that

8    finding.

9              That said, we don't have to get into any hard issues

10   today because what you're hearing from this side, and

11   particularly with the debtor who is closer in information, is

12   that their cash particularly did not pass up and did not pass

13   over.  And more generally, all the documents contemporaneous to

14   the sale say that no general cash accounts passed over to

15   Barclays.

16             So it's procedurally improper right now to be dealing

17   with this, as you pointed out, in a Rule 60 motion.  And I know

18   FHLB says, well, look, comfort orders are great, we love

19   comfort orders, but this is a case where floodgates are a

20   potential risk here, is that we can't open the door to every

21   potential counterparty who had any transaction with Lehman who

22   says, well, even though the sale agreements and the sale order

23   say one thing, I need comfort to make sure that's what they

24   actually say.  Well, this process will never end if we have to

25   keep fighting off these motions.  They have their adversary

88

1    proceeding.  They have whatever discovery they're entitled to,

2    and that's their remedy.  So we would request, respectfully,

3    that the motion be denied.

4         THE COURT:  Is there anything more?

5         MS. MANNE:  Your Honor, we appreciate Mr. Miller's

6    comments, but that's all they are with respect to that because

7    even though he's representing to the Court that there was no

8    account or there wasn't an account, we --

9         THE COURT:  But what evidence is there that the so-

10   called FHLBP-posted collateral existed?

11        MS. MANNE:  Before you today, Your Honor?

12        THE COURT:  Yes.

13        MS. MANNE:  We can -- we don't have that evidence

14   before you today.  This isn't the evidentiary hearing.  If the

15   Court needed that evidence, we could provide that evidence.

16        THE COURT:  Well, I think that --

17        MS. MANNE:  And that's part of the adversary

18   proceeding.  Your Honor, I am simply saying that all --

19        THE COURT:  All I'm saying is this.  Mr. Miller's

20   comments went to the procedural setting in which you were

21   seeking specific language of a clarification order.  And what

22   he said was, I'm paraphrasing, you can't get that because

23   there's no evidence in the record that this posted collateral

24   even existed as a segregated account.  And I agree with him on

25   that.

1          I think there's a more general question, though,

2     which is, have you, through this motion, demonstrated that

3     there is confusion in the original sale order, ambiguity as to

4     the language of that order and a need for clarification with

5     respect to that order?  And I find that you have failed to

6     demonstrate that, at least to my satisfaction.

7          I believe that the sale order speaks for itself, as I

8     have said, was the product of a very intense process that many

9     of us sat through on the 19th, into the 20th, and was entered

10    early in the morning on September 20th, and I remember when

11    that happened, very vividly.  I think that the order,

12    notwithstanding the intensity of the circumstances that

13    produced it, represents a fully integrated, absolutely clear,

14    and until somebody points out the ambiguities, unambiguous

15    statement of the Court's approval of the sale transaction.

16         As a result, in the context of your client's need for

17    further assurances with respect to the disposition of the cash

18    that you're most concerned with, I see no need for

19    clarification of the sale order and believe that the statements

20    that have been made, both in the clarification letter, in the

21    statements of counsel and the pleadings filed, provide all that

22    you could possibly expect.

23         Additionally, to the extent that there is a way for

24    you, by means of the adversary proceeding, to obtain discovery

25    and/or a determination as to your rights, you have that

90

1    ability.  And denial of this motion does nothing to strip you

2    of those rights.

3            So your motion's denied, and it's without prejudice

4    to your ability to seek whatever relief you can elsewhere.

5            MS. MANNE:  Okay.  Thank you, Your Honor.

6            MR. MILLER:  Thank you, Your Honor.  The adversary

7    proceeding, Your Honor, has been put over to 4 p.m. this

8    afternoon.

9            THE COURT:  Let me explain something about the

10   scheduling of that --

11           MR. MILLER:  Yes.

12           THE COURT:  -- just so it's on the record.  We

13   received a telephone call on Friday in chambers from counsel

14   for the plaintiff in the adversary proceeding concerning the

15   appearance of a witness in connection with the preliminary

16   injunction.  We scheduled a telephone conference.  That

17   telephone conference took place at 2:00 yesterday afternoon and

18   involved counsel for the SIPA trustee, LBHI, the plaintiff,

19   Evergreen Solar, and Barclays.  And as a result of that purely

20   procedural discussion that took place off the record, I

21   determined, and it may not have been a correct determination in

22   terms of the way the calendar's going, that given that that

23   might take as long as three hours to hear, that it made sense

24   to move it to the end of the calendar.

25           I also pointed out, and I'm going to mention this now

91

1    on today's record, that I have a somewhat longer than typical

2    lunch commitment for today and need to adjourn just before

3    12:30, and I'll probably be back by 2:30.  So with that

4    understanding, is there sufficient time for us to go through

5    the SIPA proceeding agenda before lunch?

6            MR. MILLER:  I was going to defer to Mr. Kobak, Your

7    Honor.

8            THE COURT:  Because if we can, I think we should do

9    it.

10           MR. KOBAK:  I hope so, Your Honor.

11           THE COURT:  Let's see what we can accomplish.

12           MR. KOBAK:  Good morning, Your Honor.  James Kobak,

13   Hughes Hubbard & Reed, on behalf of Mr. Giddens, the SIPA

14   trustee.  Your Honor, I was going to give you a brief report on

15   the status but, in light of the schedule, perhaps I'll postpone

16   that until the next omnibus hearing on the 18th.

17           THE COURT:  I think that'd be a shame.  I'd like to

18   hear the status.

19           MR. KOBAK:  All right.  Okay.  All right, Your Honor.

20   As Mr. Giddens, I believe, reported last time, the primary

21   emphasis of our proceeding has been to transfer, where

22   possible, property to customers.  We've transferred now

23   something like 130,000 accounts to Neuberger Berman and to

24   Barclays.  We're in the -- transferring the accounts is the

25   easy part.  Sometimes the property that goes with it takes a

92

1    little longer.  We're in the process of cleaning that up now,

2    and I think we've transferred something like 140 billion

3    dollars of customer property.

4         We're in the process of transferring accounts of

5    prime brokerage customers.  That's proved to be a more

6    complicated procedure, I think, than we envisioned, but we are

7    in the process of doing it.  We've devoted a lot of staff to

8    that.  We've beefed up that staff.  We have a whole team of

9    people from Deloitte as well as attorneys from my shop that are

10   working on that.  SIPC's made several people available.  So

11   that's proceeding.

12        Your Honor's going to hear from Mr. Wiltenburg in a

13   few minutes about the order that we'd like you to enter to

14   allow us to begin the claims process, and we expect that

15   something in the area of as many as perhaps 800,000 claim forms

16   may have to be mailed to customers and others.  I don't think

17   anyone has a good handle on exactly how many claims are likely

18   to be submitted, but I think, under any estimate, it's going to

19   be a very, very substantial number.

20        Mr. Miller referred to beefing up the staff and the

21   Alvarez staff and so forth.  You're going to be receiving some

22   orders on some of these things, but the trustee has hired

23   Marshall Levinson, who's an experienced financial person from

24   Bear Stearns.  We haven't been able to determine his exact

25   title.  We've been using the title "chief liquidating officer".

93

1    He's not so happy with that title, but he'll be the head of the

2    operation.  Deloitte has committed a large number of people,

3    between forty and fifty people, and that number will probably

4    grow some.

5         We're in the process of formalizing arrangements with

6    former LBI personnel who, in some cases, we may hire directly.

7    In other cases, they may now be working for Barclays or LBHI.

8    And we may -- we'll enter some kind of arrangement with them to

9    have them available to us and pay for it, etcetera.

10        And I guess the other thing I'll report is that we do

11   have a website, but hearing Mr. Miller's comments, I think I'll

12   go back, it's been a while since I've looked at it, and make

13   sure that that's up to date because I think that's a good

14   source of information for people.

15        So I think that concludes my report, unless Your

16   Honor has questions that you'd like me to address.

17        THE COURT:  No.  I have no questions now.

18        MR. KOBAK:  Good.  Thank you, Your Honor.  Your

19   Honor, I thought, if I may, I was going to handle items numbers

20   20 and 23.  20 is the disinterestedness application, and 23 are

21   the procedures for interim compensation, which seem to me to be

22   related.  And, also, Mr. Wiltenburg was going to handle the

23   remaining five or six things we have --

24        THE COURT:  Fine.  Go right ahead.

25        MR. KOBAK:  -- if that's appropriate.  So, Your

94

1    Honor, on number 20, disinterestedness, there's no objection to

2    this motion.  We filed an affidavit from the trustee and an

3    affidavit from me on behalf of my firm basically saying that we

4    believe we are disinterested in this under the standard in the

5    SIPA statute.  In paragraph 8 of my affidavit, I pointed to the

6    only relationships, all of which were quite minor and really

7    involved entities other than LBI that a few of my partners

8    have.  So in our view, there's no serious issue that we're not

9    disinterested in this, and we'd ask Your Honor to approve that

10   application.

11         THE COURT:  I'm prepared to approve it.  I just have

12   a question about it, and this is just a procedural question.

13   In the world of Chapter 11 cases, the U.S. Trustee would step

14   in and examine assertions of disinterestedness.  How does that

15   actually work with SIPC?  Who's the person who blesses your

16   assertions, other than me?

17         MR. KOBAK:  SIPC reviews that application, and

18   Mr. Caputo is here in court today.  I don't believe that SIPC

19   has any problem with it, Your Honor.

20         THE COURT:  Fine.  I'll approve it.

21         MR. KOBAK:  Thank you, Your Honor.  The other motion

22   that I handle is number 23, which are the procedures we suggest

23   for interim compensation.  And, again, there's no objection to

24   this motion.  Basically, what we propose, and this has been

25   done in other SIPA cases, is that we would submit on a monthly

95

1    basis to SIPC, I think on the twentieth day of each month, an

2    accounting of our time for the previous month, which they would

3    review.  And I can assure Your Honor from past experience that

4    Mr. Caputo and his cohorts review these time entries very

5    carefully and very painstakingly.

6         We would then be eligible to receive eighty percent

7    of the amount on an interim basis, and there would be a formal

8    fee application filed with the Court, which SIPC would also

9    review and make a recommendation on, which would be filed

10   between every 120 and every 150 days.

11        THE COURT:  That's fine.  It's entirely consistent

12   with case management procedures governing monthly compensation

13   that I'm familiar with in the Chapter 11 setting, and I approve

14   it.

15        MR. KOBAK:  Right.  Thank you, Your Honor.  And with

16   that, I think I'll turn the floor over to Mr. Wiltenburg.

17        MR. WILTENBURG:  Your Honor, I think I'm still able

18   to say good morning.

19        THE COURT:  Just barely.

20        MR. WILTENBURG:  David Wiltenburg, Hughes Hubbard &

21   Reed LLP, on behalf of James Giddens, Trustee for the

22   liquidation of Lehman Brothers, Inc.  As Mr. Kobak said, there

23   are several other matters on the SIPA calendar today.  They are

24   all uncontested.  Beginning with item 21, that was addressed in

25   connection with the LBHI discussion, and it's subject to the

1    same stipulation that was discussed earlier this morning.

2          Number 22 is cash management, and that motion and the

3    relief that's requested have undergone some changes since

4    originally submitted.  As it turned out, the idea of

5    incorporating by reference the cash management order to be

6    entered in the Holdings case was not practicable in that so

7    many complications arose, mostly having to do with the fact

8    that Holdings is an operating company and the fact that there

9    are many affiliated entities, both debtors and nondebtors, that

10   require treatment and a lot of provisions that are simply not

11   relevant in the LBI liquidation.

12         So the order that we're submitting is a simple one,

13   relatively speaking, that deals with bank accounts.  And I'll

14   defer to the affidavit of Mr. Lubell, who was not able to stay

15   for the entire hearing this morning, to explain the other

16   features.  They include the fact that on a temporary basis LBI

17   will continue to serve as, in effect, a paymaster for employees

18   of other entities, and that's kind of an artifact of the cash

19   management system that existed pre-petition, and it is

20   remaining in place just for the sake of convenience for a short

21   period of time while there's a transition.  All of the payments

22   that are going out under that scheme are being funded by LBHI

23   or the relevant interested -- or Barclays or the relevant

24   interested party.

25         Second, the motion seeks authority and nunc pro tunc

97

1    approval of payments to employees based on pre-petition wage

2    obligations.  And the way that came up, Your Honor, as it

3    turned out, the 19th of September was a payday, and wages were

4    due on that day.  For the most part, the great bulk of them

5    were actually made by electronic transfer to the filing that

6    occurred on the afternoon of the 19th.  What we're talking

7    about here is sort of checks and kind of straggler check

8    payments where the checks had not been deposited and honored by

9    the time the automatic stay came down.  And what we've done on

10   that, and this is in the interest both of fairness to the

11   employees and in the interest of the estate in maintaining the

12   morale and goodwill of those employees who are of material

13   assistance to us as we get familiar with a lot of issues, what

14   happened is the trustee approved the funding of checks up to

15   the amount of 10,000 dollars, and that was in deference, as I

16   say, both to these fairness and morale issues and also to the

17   statutory employee priority amount, which is somewhat in excess

18   of 10,000 dollars.

19          THE COURT:  10,950.

20          MR. WILTENBURG:  Correct.  Your Honor, there are

21   some, probably, stragglers still out there that have not

22   presented the checks.  As time goes on, that phenomenon will be

23   less and less.  But in response to a question of the creditors'

24   committee in the Chapter 11 cases, I'm able to say that the

25   maximum that will be paid out under the program that I'm

98

1   talking about now is less than 1.5 million dollars.

2          Your Honor, another feature of this cash management

3   order is with respect to approximately 4.1 million dollars in

4   employee deductions, and that was amounts for 401(k), for

5   medical insurance, for other employee entitlements that were

6   deducted from the employees' pay but not rendered over to --

7   whether it's the 401(k) administrator or health insurance

8   providers and so on, and this application seeks authority to

9   turn over that amount to send that amount to where it should

10  have gone.  And I'm able to say, Your Honor, that we've taken

11  account of comments, and the form of the order that was

12  submitted on Monday is unopposed.

13         THE COURT:  Does anyone else wish to comment on this?

14  I approve it.

15         MR. WILTENBURG:  Your Honor, item 24 is the trustee's

16  application for entry of an order approving the form and manner

17  of publication, mailing and notice of the commencement of the

18  case.  It also includes a claim form that is adapted for use in

19  a SIPA proceeding.  It has features that have been used in

20  other SIPA liquidations and also features that are peculiar to

21  the circumstances here.  Pursuant to the SIPA statutory

22  mandate, this notice will be mailed to all persons who can be

23  identified from the debtors' books and records as potential

24  customers or creditors.  That number, as of today, is 906,760

25  persons and entities.  The notice will also be published in all

99

1    editions of The New York Times, The Wall Street Journal and The

2    Financial Times.  Again, there have been some changes since the

3    order was initially submitted.  There are changes to allow for

4    electronic filing.  There are changes to make clear that the

5    forms should be completed only if the claimant has claimed

6    against LBI and not against any of the other Lehman entities.

7    Again, with changes based on comments, the request is

8    unopposed.

9            THE COURT:  I grant that relief as well.

10           MR. WILTENBURG:  Item 25 is, in effect, a case

11   management order that mirrors the provisions that have been put

12   in place in the Chapter 11 cases.  It deals with things like

13   notices, timing, placement of matters on omnibus hearing days

14   and the like.  Again, the intent is to make procedures in the

15   SIPA proceeding parallel to those in the Chapter 11 cases.

16   And, again, there has been no objection.

17           THE COURT:  Application granted.

18           MR. WILTENBURG:  Item 26 is the trustee's motion for

19   entry of an order approving the rejection of certain

20   nonresidential real property leases.  That motion is unopposed

21   with a footnote that I need to cover.  There was a motion by

22   the landlord of certain premises at The World Financial Center

23   seeking to compel assumption or rejection and also seeking

24   allowance of an administrative priority claim.  We've dealt

25   with that one situation separately in a stipulation that I'm

100

1   able to hand up, if I may, this morning.

2         THE COURT:  Are you interested counsel with respect

3   to that stipulation?

4         MR. GOREN:  Yes, Your Honor.  Todd Goren, Morrison &

5   Foerster, on behalf of Brookfield Properties, also known as WFP

6   A Tower Co.  We did work out an interim stipulation.

7   Basically, we've agreed to modify the rejection date from the

8   20th to the 31st, and then we will just be carrying our motion

9   to the 18th.  And we'll try and work out a more expansive

10  stipulation with respect to the relief we request in that

11  motion by that hearing.

12        THE COURT:  All right.

13        MR. WILTENBURG:  With that, Your Honor, may I hand up

14  the stipulation?

15        THE COURT:  Yes.

16        MR. WILTENBURG:  Your Honor, also certain

17  modifications have been made to the order to accommodate the

18  items that are in that stipulation, and I can provide, after

19  the hearing this morning, to chambers the amended form of order

20  together with a copy that shows the changes to be made.

21        And with that, Your Honor, we would request approval

22  of the trustee's motion for entry of the order approving

23  rejection of nonresidential real property leases.

24        THE COURT:  That motion is approved.

25        MR. WILTENBURG:  Item 27 is the trustee's application

1    for an order extending the time within which the trustee may

2    assume or reject executory contracts.  That relief is

3    appropriate for two reasons, Your Honor.  One is that, pursuant

4    to the sale order, Barclays had a period of 60 days from the

5    closing to assume -- to designate contracts for assumption and

6    assignment, and there will be a gap period between the 60 days

7    that runs from the filing and the 60 days that runs from the

8    closing of the transaction.  So it's necessary, first of all,

9    for that reason.  And, secondly, it's necessary to provide

10   further time to assess such contracts that are not assumed and

11   assigned to make determinations as to the best interest of the

12   LBI estate in such contracts as remain at that time.  Again,

13   Your Honor, we've received no objection.

14           THE COURT:  That's granted as well.

15           MR. WILTENBURG:  Thank you, Your Honor.  Finally,

16   there are a couple of matters that are being adjourned from

17   today's calendar to the omnibus hearing on November 18th.  One

18   of them is the application of Meridian Corp.  That's an

19   adversary proceeding having to do with a claim for post-

20   petition administrative expense that has been adjourned by

21   agreement until November 18.

22           Second, the trustee's motion to approve expedited

23   procedures for the sale or abandonment of de minimis assets --

24           THE COURT:  Let me stop you on that one.  I remember

25   that we had an emergency hearing designed to facilitate a

102

1   closing of a Nomura transaction involving some assets in Asia.

2   And during the course of that hearing, I raised some questions

3   as to supplementing the record to make sure that the procedures

4   for dealing with de minimis assets was one that was consistent

5   and supported by appropriate diligence on the part of the

6   trustee.  Is there some reason why this is taking as much time

7   as it is to come to the top of the list?

8           MR. WILTENBURG:  Your Honor, it's a combination of

9   things.  It's a press of other business, for one, together with

10  the fact that there hasn't, in the interim, been the need to

11  make any disposition of assets.

12          THE COURT:  I'm just interested in moving it forward

13  because, curiously, this is something that would have been

14  approved as an emergency item a while ago, and it's now in the

15  category of being moved from hearing to hearing.  And I'm just

16  going to suggest to you that -- it's your motion, so you can do

17  what you want with it, but it raises a couple of questions in

18  my mind as to why I scheduled a hearing by order to show cause

19  only to have the follow-up delayed as much as this one has been

20  delayed.  No criticism --

21          MR. WILTENBURG:  Yes, Your Honor.

22          THE COURT:  -- no criticism in my comment.  It's just

23  that it raised my curiosity.

24          MR. WILTENBURG:  Indeed.  Well, that exigent

25  situation in Beijing was dealt with under the interim order

103

1    that Your Honor entered, and --

2            THE COURT:  I understand --

3            MR. WILTENBURG:  Yes.

4            THE COURT:  -- but it was also true that, at the

5    time, you were using the emergency as cause to approve these

6    procedures.  And when I raised some questions, it never came to

7    my attention again.

8            MR. WILTENBURG:  Your Honor --

9            THE COURT:  I think it should come back to my

10   attention promptly.

11           MR. WILTENBURG:  Indeed, Your Honor, and it's our

12   hope that we will tee it up properly for the --

13           THE COURT:  Good.

14           MR. WILTENBURG:  -- hearing on the 18th.  The next

15   item, Your Honor, is the Barclays Capital motion for relief

16   concerning certain contracts erroneously posted with the

17   closing date contracts.  That's in parallel with the comments

18   that Mr. Miller made being adjourned to the November 18th

19   omnibus hearing date.

20           Item 46 is the motion of Newport Global Opportunities

21   Fund.  That's one of the 2004 applicants in LBHI.  That, too,

22   is being adjourned on consent to November 18.

23           And finally, Your Honor, item 47 is actually the

24   matter on which we have just submitted the stipulation.

25           THE COURT:  Fine.

104

1         MR. WILTENBURG:  Thank you, Your Honor.

2         THE COURT:  Thank you.  Mr. Miller?

3         MR. MILLER:  If Your Honor has one more minute.

4         THE COURT:  I have more than --

5         MR. MILLER:  Okay.

6         THE COURT:  -- one more minute.  I have multiple

7  minutes for you.

8         MR. MILLER:  Sir, you asked, I think, two hearings

9  ago what was happening in connection with the cure amount --

10        THE COURT:  Yes.

11        MR. MILLER:  -- pursuant to the asset purchase

12 agreement, what activities and what progress was being made by

13 Barclays in connection with that.  Did you want to take that?

14        MS. SCHWEITZER:  Yeah.  Sure.  Good afternoon, Your

15 Honor.  Lisa Schweitzer from Cleary Gottlieb for Barclays

16 Capital.  I wanted you to know and be able to report that I

17 think at the last hearing we had said we were making progress.

18 Barclays is, in fact, making substantial progress in resolving

19 cure objections.  Just so you know that today we haven't

20 been -- we've been prioritizing resolving objections rather

21 than cleaning up the docket, and we are working on the best way

22 of doing some sort of omnibus notice of which objections are

23 being withdrawn, solely because it's a manpower exercise at

24 this point, and counterparties want their money more than they

25 want to file withdrawals of their objections.  So the docket

105

1    will chase the substance.

2         But on the substance, as people have indicated that

3    the right to assign contracts over has a 60-day window that

4    closes November 21st so that there will probably be more

5    contracts noticed.  But, to date, about 3,500 contracts have

6    been noticed.  An additional several hundred financial service

7    agreements have been noticed for assignment.  And then there

8    have been some, for lack of a better word, bulk notices of

9    license agreements and the like where it's relatively

10   noncontroversial, but they're voluminous.

11        Of the objections that have been filed, we've been

12   tracking them by contract rather than counterparties, and we've

13   resolved about a third of the objections measured on a contract

14   basis.  And of the remaining objections that each -- there's

15   about one objector to each three contracts that are

16   outstanding.  So we have knocked out a third of the objections

17   formally or informally asserted to date, and that's about a

18   three, four-week period, and we expect to make substantial

19   progress throughout November.

20        We haven't really hit an impasse with any significant

21   number of creditors such that we want to, at this point,

22   propose an ADR procedure.  We recognize that we don't want to

23   inundate this Court with objections, as a first instance, and

24   we've heard your guidance on that.  But at this point, things

25   are still moving relatively well --

106

1          THE COURT:  Good.

2          MS. SCHWEITZER:  -- that we don't want to propose

3    anything until we see how it shakes out.  But we thought you'd

4    appreciate the update.

5          THE COURT:  Thanks for that update.

6          MS. SCHWEITZER:  Sure.

7          MR. MILLER:  The debtors have nothing further, Your

8    Honor.

9          THE COURT:  Mr. Miller, just one pure housekeeping

10   item.  We need to establish omnibus hearing dates for the

11   period after December, and, incredibly, we've moved to that

12   point in the year when December is next month.  So I would

13   suggest that, in consultation with the creditors' committee and

14   counsel for the trustee in the SIPA proceeding and other

15   interested parties, that you come up with hearing dates for

16   January, February, March and so on --

17         MR. MILLER:  Yes, sir.  We'll do that.

18         THE COURT:  -- and work out some arrangement to

19   confer with chambers so that we can identify those dates as

20   dates that are good for me and then at least be able to give

21   everybody some order to their schedule going into 2009.

22         MR. MILLER:  We will undertake to do that, Your

23   Honor.

24         THE COURT:  Okay.

25         MR. MILLER:  Thank you.

107

1          THE COURT:  Thank you very much.  And we will resume

2     at 4:00.

3          (Recess from 12:18 p.m. until 4:00 p.m.)

4          THE COURT:  Be seated, please.  Mr. Grillo, I think

5     this is your motion so --

6          MR. BRILLO:  Yes.

7          THE COURT:  -- why don't you proceed?

8          MR. BRILLO:  Sure.  Thank you.  Good afternoon, Your

9     Honor.  For the record, Emanuel Grillo of the law firm Goodwin

10    Proctor here on behalf of Evergreen Solar Inc. which is the

11    movants with respect to the preliminary injunction before the

12    Court.  Just by way of introductions, with me in the courtroom

13    today is my partner, Brian Hale.  With us in the courtroom from

14    our client, Evergreen Solar, is Michael El-Hillow, who is the

15    CFO of the company along with Christian Abar.  It's anticipated

16    that Mr. El-Hillow will testify in support of the application.

17         In the first instance, Your Honor, we'd like to thank

18    the Court for its time this afternoon and for putting us on at

19    the end of the day.  We realize it's been a long day.  We'll do

20    our best to get through these matters expeditiously for

21    everyone's benefit understanding that it's been a long day for

22    everyone else already.  We're acutely aware of that.

23         We're also acutely aware of the complex and

24    unprecedented nature of the transactions involving the Lehman

25    bankruptcy.  From Evergreen's perspective, what we have tried

108

1    to do is try and limit and circumscribe what it was that we

2    were dealing and focusing on the relief that was really

3    required and came at this separate time to the Court as opposed

4    to in connection with the sale hearing because we felt that a

5    lot of these things would play out over a period of time.  When

6    we became aware of where the shares were, at that point, we

7    first reached out to counsel on both sides and then came to

8    this court when there was no immediate agreement to try and ask

9    for relief.  So within that context, we present this

10   application.

11        THE COURT:  Let me ask you a preliminary question

12   that may be out of sequence but --

13        MR. BRILLO:  Certainly.

14        THE COURT:  -- it's just something I want to know

15   about.  Assuming purely for the sake of argument that at the

16   end of this process you persuade me that some kind of

17   injunctive relief is appropriate here.

18        MR. BRILLO:  Yes.

19        THE COURT:  Is your client in a position to post a

20   bond?  And, if so, has there been any consideration of the

21   amount of the bond that would be appropriate under the

22   circumstances?

23        MR. BRILLO:  I can address that question, Your Honor.

24   And we've given that question a great deal of consideration

25   especially in the current financing market.  We've reached out

109

1   to try and look into what it would take to post a bond.  Like

2   everything else, and perhaps indicative of why we're all here,

3   it's not so easy in the first instance.  But we thought about

4   approaching that with a measure of both equity and creativity

5   and we developed a proposal that we would like to share with

6   Your Honor and the other parties in that regard.

7           THE COURT:  Is this the first time that the other

8   side will be hearing this proposal?

9           MR. BRILLO:  It is, Your Honor.  It is because we did

10  it last night and this morning.  In terms -- we knew we would

11  get the question from the Court and we wanted to be able to

12  come with a proposal as far as that goes.

13          THE COURT:  What's your proposal?  Because if your

14  unable to bond is consistent with the requirements of the rule,

15  I'm just not sure where we're going with this.  So I wanted to

16  deal with it as a threshold question.

17          MR. BRILLO:  Understood, Your Honor.  And depending

18  on how it comes out, we're still looking at the possibility of

19  bonding it.  But here's what we thought.  In connection with

20  the agreement that's the subject of this proceeding, the share

21  lending agreement, what I think you'll find when you hear the

22  testimony is that Lehman was given the first round of shares.

23  It was a total patch of thirty million shares, eighteen million

24  of which were sold by Lehman into the marketplace, okay, for

25  which the company received no consideration because Lehman only

110

1    had the obligation at the end to deliver the shares back.

2          Lehman sold those into the marketplace for

3    approximately 9.50 a share so which comes to in excess of 166

4    million dollars.  What we thought made sense is instead of

5    having essentially Evergreen pay twice that, effectively, what

6    we'd do, and this is why I said a measure of equity and

7    creativity, is, effectively, take it as a recoupment, okay,

8    against that claim.  So, essentially, if you look at what we

9    are proposing to do and what we need back from the shares along

10   with our original claim in this matter, what we would suggest

11   then is offsetting the bonds -- two things.  One is that we

12   just don't know what, in fact -- and what's absent from what

13   Barclays submitted -- is what they paid for the shares, in the

14   first instance.  So we don't really know what, if anything,

15   Barclays is out.  We know what the market value of the shares

16   is but it's our contention that Barclays didn't even know what

17   they were getting or what they were paying for it, number one.

18   So we don't know how much they're out of pocket.  But, two,

19   that Lehman, in fact, benefited under this contract and under

20   the theory of recoupment because it's all part of the same

21   transaction.  There is no doubt, I think, and the testimony

22   will establish, that Lehman did, in fact, sell the shares into

23   the marketplace, the first eighteen million at an approximate

24   price of 9.50 a share which is 166 million dollars.  So what

25   we'd like to do, for purposes of the bond, is, essentially, put

111

1    up the claim on a recoupment basis for that -- up to 166

2    million which, if you take the twelve million shares at the

3    approximate trading price presently of six dollars a share,

4    comes up to seventy-two million dollars.  And therefore, we're

5    still well within the amounts that were sold into the case as

6    part of the problem.

7            The flip side of it is is that it is extremely

8    difficult, one, to post a bond, to post a bond for seventy-five

9    million, and to do it after, in fact, we had put these thirty

10   million shares into the marketplace with no consideration.

11   Part of our position, obviously, is understanding what kind of

12   a company Evergreen is, where it fits into the marketplace,

13   what its cash needs are and what it's doing.  Coming up with a

14   bond or the equivalent for seventy-two million dollars, if that

15   was what the Court was to require, would be extremely difficult

16   especially in view of the fact that we don't know how much was

17   paid as part of the price.  So that would be our proposal in

18   respect of a bond.

19           THE COURT:  Okay.  Well, I don't want to get the cart

20   before the horse because, based on the papers that have been

21   filed in opposition to your motion, there are a host of

22   arguments that you're not entitled to injunctive relief under

23   any circumstances because of a failure to show irreparable

24   harm.  But that's what this hearing is about.

25           MR. BRILLO:

112

1          THE COURT:  I'll just comment, and I don't mean to

2    preempt anybody's arguments in reference to what you've said,

3    that my notion of what's required in order to bond this is

4    something to compensate Barclays for the consequences of the

5    liquidity because the ultimate penalty that Barclays as

6    purchaser of the shares -- and let's not get into the question

7    of what they paid for them.  They currently hold, pursuant to

8    the sale order, the shares and they are in a position to sell

9    them absent the injunction.  If an injunction is issued, they

10   will suffer the liquidity in respect of those shares for the

11   duration of the injunction.  I view that as the principal issue

12   that needs to be addressed.  And I don't know how your

13   recoupment claim concept deals with that.

14          MR. BRILLO:  Well --

15          THE COURT:  But we don't need to spend a lot of time

16   at the preliminary levels addressing this.  I simply wanted you

17   to know -- and, frankly, the litigants may not see it the way I

18   just articulated it.  But from my perspective, as I was

19   analyzing this, I view the consequence of an injunction that

20   prevents a third party from selling marketable securities to be

21   compensation for the liquidity discount and risk associated

22   with market movement.  And I believe that there needs to be

23   fair compensation for that.  I'm just telling you that's how I

24   see it.  And I'm not preempting any arguments that anybody

25   might make as to the bond.

113

1           MR. BRILLO:  I understand that.  And can I just make

2    one point in response and then maybe we can move on.  My point

3    in response would be is that to the extent that there is an

4    issue, we think the issue is between Barclays and Lehman,

5    frankly, in the sense that Barclays bought something from

6    Lehman.  Lehman made certain representations with respect to

7    it.  The easier thing to do, I think, is to take from the

8    transaction that was approved by the Court an appropriate

9    reserve against the purchase price and we could say, well,

10   look, here are the shares.  Here's what was paid for them.  We

11   put it all in a pile to protect against that risk because it

12   doesn't seem to me that -- you know, if we were to win, it

13   meant that Lehman didn't have title to the shares.  If we were

14   to lose, we still ultimately have a claim against Lehman in

15   connection with the breach of the agreement, all of which ties

16   into my recoupment theory in the sense that it's -- whether

17   it's pre or post-petition, it all works out as part of the same

18   transaction.  There should be a way to net those numbers

19   between Lehman, Barclays and Evergreen so that we can

20   accomplish that, give people protection, effectively, pull it

21   out of the transaction so Barclays doesn't bear any risk.  It's

22   really Lehman, frankly, who should bear the risk of the three

23   parties in our view because they're the ones who don't --

24           THE COURT:  Well, we're not going to rewrite

25   Bankruptcy Rule 7065 today.  There are bonding requirements

114

1    that are incorporated into that rule.  If parties agree to the

2    bond, that's one thing.  If parties are asking me what my

3    ruling's going to be, I'm telling you now I'm going to, if

4    there isn't another agreement, insist on a bond that's a real

5    bond --

6         MR. BRILLO:  Okay.

7         THE COURT:  -- not one that's crafted out of a

8    recoupment claim because I view the party who's most directly

9    affected by the relief that you seek to be Barclays as holder

10   of those shares.  Now, they can speak for themselves.  I'm just

11   letting you know how I see it having studied the papers.

12        MR. BRILLO:  We understand that, Your Honor.  Perhaps

13   what we should do at this point is perhaps move into the merits

14   of the application.

15        THE COURT:  What I think we should do is have an

16   opening from your side on the legal issues --

17        MR. BRILLO:  That's --

18        THE COURT:  -- an opening from the defendants on the

19   legal issues and then get into the merits.

20        MR. BRILLO:  That's what -- I'm sorry.  That's what I

21   was proposing to do as well.

22        THE COURT:  Go right ahead.

23        MR. BRILLO:  Okay.  Your Honor, very simply, just by

24   way of background, Evergreen Solar Inc. is a power technology

25   manufacturing company.  It's a growth company.  It's not an old

115

1    mine manufacturer.  And for these reasons, the needs of the

2    shares and the shareholders are of greater concern than, for

3    example, the IBMs of the world.

4           Evergreen, in order to accomplish any transaction to

5    accomplish its mission of building out the solar plant, for

6    example, that's presently under construction, in Devins,

7    Massachusetts, and further expansion, as we said in our reply

8    papers, the shares are a critical element of that process.

9    It's this company's currency.  It's its lifeblood.  The company

10   does not, at present, have a steady stream of operating income

11   as would be traditional for older manufacturers or a typical

12   sort of operating company.  And that's why when we talk about

13   what the irreparable harm would be if we don't have control

14   over those shares.  The impact on Evergreen can't be overstated

15   by the distribution of those shares into the marketplace.  Why?

16   Because it's a controlled shareholder position.  It's seven

17   percent -- twelve million shares represent seven percent of our

18   outstanding shares.  It makes it extremely difficult for

19   getting shareholder approval for strategic transactions, for

20   financing transaction.  It gives them a significant say over

21   the affairs of the company.  And any next trip to the

22   marketplace, some of which are being contemplated now, will

23   depend on getting that shareholder approval.

24          Now, the argument may be well, Lehman held those

25   shares, too, and if Lehman were holding those shares, what

116

1    would be the difference between Lehman and Barclays.  And

2    there's a material difference, Your Honor, quite simply because

3    under Section 7 of the share lending agreement, the two issues

4    of beneficial ownership or the two traditional indicia of

5    beneficial ownership as opposed to mere record ownership, which

6    is all that was granted under the SLA are the right to

7    dividends, which, under the agreement, has to be paid back

8    under Section 6(a).  So they didn't have -- Lehman, when they

9    had possession of the shares, didn't have the right to

10   dividends.  But more importantly, for the matters that I just

11   addressed, it's the right to vote the shares.  Expressly carved

12   out from the rights granted to Lehman -- and this is why it's

13   our position that, in fact, title wasn't transferred was that

14   the shares, while they were in Lehman's possession were not

15   entitled to exercise their rights to vote.  And because of the

16   position that the company is in and because it needs to go back

17   to the marketplace, having someone holding that significant a

18   block is a material risk factor for the company.  In fact,

19   there's one other significant holder who is a strategic holder

20   which we've disclosed in our -- all of our public filings.  And

21   there are risk factors associated with that.  It gives that

22   party, to the extent that they have an interest in the company,

23   a material say over what occurs and what doesn't occur.  The

24   one thing is that at least those parties have paid for those

25   shares.  No one has paid the company for these shares that are

1    issued at present.  And as a result, there is a material and

2    real and imminent impact having those shares out in the

3    marketplace as they have not been paid for on the company.

4         What we said originally in the opening remarks in

5    respect of the bonds that I just wanted to go over is that the

6    original transaction, the original share lending agreement was

7    for thirty million shares.  And eighteen million of those

8    shares were sold into the marketplace.  And Lehman retained the

9    proceeds of that sale which is in excess of 166 million

10   dollars.

11        The critical question for the Court in our view is

12   the interpretation of Section 7 of the share lending agreement

13   which granted to Lehman for the shares that were in its

14   possession certain incidents of ownership, not beneficial

15   ownership, not the right to vote and not the benefit of the

16   dividends, if any, that are paid on the shares.

17        When Lehman got into trouble and ultimately found

18   itself before Your Honor and before this Court, Evergreen acted

19   quickly to try and figure out what was out there.  When Mr. El-

20   Hillow testifies, I think he's going to say -- he'll tell you a

21   couple of things.  And these documents have been attached to

22   the pleadings and we have a binder for Your Honor to follow the

23   testimony.  But letters were sent by Mr. El-Hillow to Lehman on

24   both the 15th and the 17th of September exercising the remedies

25   to terminate the share lending agreement immediately.  The

118

1   share lending agreement is written so that it's drafted as a

2   swap agreement and therefore entitled to the benefits of the

3   safe harbor provisions of the Bankruptcy Code.  Things moved

4   quickly, we understand, and the sales process was approved.

5   When he's called to testify, Mr. El-Hillow will say no one from

6   Lehman reached out to him.  No one responded to the letters

7   that were sent with respect to the shares.  In fact, when

8   asked, Lehman didn't even say that they had the shares in their

9   possession.  We were dealing both with Lehman here in the U.S.

10  and also trying to deal with the administrators that were

11  appointed in the U.K.  In fact, from the initial inquiries that

12  were made on the 15th, there was a response just received last

13  week, some six weeks after the case was filed and also some --

14  I guess, five weeks after the sale was approved.

15          Again, Evergreen is understanding of what that means

16  and where it fits into the scheme of things and what these

17  twelve million shares are within the universe of this

18  transaction.  However, what it doesn't want to be the subject

19  of or the victim of is collateral damage caused by this process

20  when it needs those shares in order to be able to go to the

21  marketplace, carry out its business, keep its people employed.

22  On that basis, we think there is a real and irreparable harm

23  caused by this.

24          With respect to the last elements, the balance of the

25  hardships, we think the balance of the hardships is actually a

1    somewhat easy argument for the points that I made.  To the

2    extent that Lehman represented that it had good title to those

3    shares then, effectively, all we need to do is to pull them out

4    of the transaction and pull what the cash consideration paid

5    for them, whatever it is because it's not been disclosed at

6    this point, and put that all to the side.  And this way,

7    Barclays doesn't bear a risk that it completed a transaction

8    that if the price moves against them or they wanted to sell or

9    that Evergreen doesn't bear a risk should they come out at the

10   end of the day and have the shares issued.  The problem is is

11   that there's a difference in the shares being issued pursuant

12   to a share lending agreement versus them being sold in the

13   marketplace.  And that is this.  While they're issued for

14   corporate purposes, the shares are ultimately not deemed issued

15   for accounting purposes under U.S. GAP rules.  And by putting

16   those shares back into the marketplace, as Barclays is

17   proposing to do, or at least claims that it has the right to do

18   under the 13(g) that was filed on October 8th with respect to

19   the shares which was the first time that they learned about --

20   actually that Evergreen learned about it, that with the rights

21   that it asserted there, it undermines the company's accounting.

22   It undermines the value of its existing shares.  And it

23   undermines its ability to go back into the marketplace.

24        For Barclays and Lehman and their respective

25   constituencies, I think the balance of harms is no where near

120

1    that because, simply put, they can just pull that element out

2    of the transaction and close around it.

3            It wasn't until the pleadings were filed, in fact, or

4    until the 13(g) was filed that Evergreen had any notice that

5    its shares were even sold.  As I indicated, on 9/15 and 9/17

6    when we inquired as to Lehman as to where it was, we didn't

7    receive any response.  There was no response or not indication

8    post-sale that they were included as part of the assets.  And

9    in the original that was presented to this Court, there was no

10   indication that shares that were subject to these types of

11   agreements would be sold, which we think violates our due

12   process rights.  We understand that there were a whole lot of

13   things going on.  We hope that the Court then takes an open

14   mind with respect to the position that we're in and the issues

15   that it presents.

16           And so, for these reasons, Your Honor, I think we

17   have come to this Court for a preliminary injunction asking the

18   shares to be withheld from dissemination into the marketplace

19   so that this way we can sort out these title issues and move

20   forward and figure out the adversary proceeding, where that

21   takes us and ultimately to satisfy that last element.

22           We talked about the injunction.  The only other thing

23   I would note is that with respect to the claims that Article 8-

24   105(a) applies, we note, and we noted in our papers, that

25   clause 2 of 105 of Article 8, Section 105(a), does say that you

121

1    can't exercise deliberate abandon with respect to a purchase of

2    shares.  We suggest to Your Honor that this transaction is

3    unprecedented, is done on such short order that there had to be

4    some sort of a duty on behalf of the buyer knowing that it was

5    buying these securities from an insolvent entity.  The cases

6    under that provision of the UCC do not really address any

7    situation like this.  Perhaps, knock wood, they don't happen

8    every day, but we think that the case law where there is no

9    duty to investigate is in apposite to the circumstances of this

10   case.  That's not to say that Barclays shouldn't be protected.

11   It's only to say we can pull this out of that transaction, move

12   forward, determine whether the shares are rightfully ours, as

13   we believe, or if they belong to Barclays and there isn't a

14   market risk associated if they pull it out of the transaction.

15           THE COURT:  Okay.  In order to grant you the relief

16   that you seek, do I need to make any preliminary determination

17   as to the rights that you assert under the SLA or the argument

18   made by Barclays that the SLA an irrelevant aside, because

19   these shares were, in fact, transferred pursuant a REPO

20   transaction that was entered into on September 18.  And as part

21   of the sale transaction it was the validation of the REPO

22   purchase that, at least as I understand it, affected the sale.

23   I can't tell -- and I'm letting you know that I'm having a

24   problem with it, the degree to which the SLA is simply a red

25   herring.  And the degree to which all of this is really not

122

1   about the merits of your case, but rather your ability to

2   demonstrate immediate and irreparable harm and bond the

3   illiquidity that would result from tying up those shares.

4   Because in the end, I'm just letting you know this, I think it,

5   both inefficient and unwise, for me to be forced today to make

6   any judgments that go to the merits of your underlying

7   adversary proceeding, other than to determine that you've made

8   some claims that are subject to good faith litigation.

9          I think in the end your burden is going to be to

10  prove up irreparable harm.  And if you succeed in that, to

11  demonstrate that you have the capacity to bond the risk.

12         MR. GRILLO:  Okay.  I'm not exactly clear what the

13  question was.  But as --

14         THE COURT:  It was just a comment from me.

15         MR. GRILLO:  Okay.

16         THE COURT:  It's just letting you know how I'm

17  viewing this.

18         MR. GRILLO:  Understood.

19         THE COURT:  So when you make all kinds of comments

20  about this being unprecedented, sure, there are aspects of the

21  Lehman case that are unprecedented, but what you're seeking

22  today is entirely conventional.  You're seeking a preliminary

23  injunction and the case law that I have to apply is well known

24  by everybody in the courtroom.  And you either succeed or fail

25  in demonstrating principally the irreparable harm standard.

123

1    And if you succeed as to that standard, you're still going to

2    be subjected to a bonding requirement.  I'm just letting you

3    know that loud and clear.

4         MR. GRILLO:  Understood.  Understood.  Well, at this

5    point I'll turn -- I understand your comments, I don't think

6    you were asking me --

7         THE COURT:  My comment was to say this is not so

8    unprecedented.  And I'll hear what the defendants have to say.

9         MR. GRILLO:  Right.  If I could just make one last

10   point before I yield the podium, Your Honor.

11        With respect to tying these issues together, I think

12   they're inextricably tied to the asset sale because, again,

13   what we've said is that our client did not have notice that

14   this was part of the sale.  We reached out to Lehman before the

15   sale, after the case was filed.  And we think that from the

16   sale perspective, and this is kind of what ties the whole thing

17   together from our perspective, is that there was no way in that

18   context to respond.  And what I also note is that even in the

19   clarification letter to the sale order or to the agreement,

20   there is a window of time within which we are in for purposes

21   of clearing what is and what isn't a purchase asset at this

22   point.  There's no evidence in the record, other than the fact

23   that there is an affidavit saying everything that was on

24   Lehman's books was dumped into the REPO.  And the problem that

25   my client has from that perspective is there's no way to kind

124

1    of -- we can't separate those issues.  We understand what Your

2    Honor is saying in terms of what's conventional.  What's not

3    convention from my client's perspective, respectfully, is

4    having the property sold without a chance to do it.  And then

5    sort of say well, this was all one event as far as my client

6    was concerned.  And I know that's not what the Court may view

7    it but that's certainly, you know, the due process issue that

8    we have with the way the sale from our perspective, based on

9    the disclosures that were made by the debtors, you know, in

10   connection with the sale.

11            And with that, I'll yield the podium.

12            THE COURT:  Okay.

13            MR. MORAG:  Good afternoon, Your Honor.  Boaz Morag

14   of Cleary, Gottlieb, Steen & Hamilton for Barclays Capital Inc.

15            I should just say at the outset that this morning we

16   were advised that Barclays PLC, another defendant in this

17   action, and a party against whom the injunction has been

18   requested, was served with process in London.  And I've been

19   authorized to simply state that Barclays PLC adopts the

20   arguments made by Barclays Capital Inc. for purposes of this

21   hearing.

22            THE COURT:  When you say Barclays PLC was served with

23   process, do you mean that they were served with process with

24   respect to the preliminary injunction motion that we're hearing

25   now?  Or is it something else?

125

1          MR. MORAG:  I believe -- I believe it was the

2     complaint and the motion papers.  But they certainly are aware

3     of the application and just wish that --

4          THE COURT:  Are you speaking on their behalf?

5          MR. MORAG:  Yes.

6          THE COURT:  Okay.

7          MR. MORAG:  Your Honor, we certainly concur that

8     there has to be a showing of irreparable harm before you ever

9     get into the question of the propriety of the injunction and

10    then the separate issue of the bonding.  With respect to

11    irreparable harm, I think it would be perhaps useful to focus

12    on the precise legal standard that the Second Circuit has

13    articulated for that harm.  And we are talking about an injury

14    that is not remote or speculative, but actual and imminent.

15    And we're also talking about an injury for monetary reward

16    cannot be adequate compensation either -- only where -- and

17    that occurs really only where you're either dealing with truly

18    unique property which we are not here, or with matters that are

19    incalculable.  And, again, that is not the issue here.

20          As Your Honor indicated, just calculating the

21    appropriate bond would essentially tell you where the damages

22    could possibly be in this case.  I don't think that whatever

23    Mr. Grillo has articulated as harm, which is actually only a

24    small subset of what's in the papers that we've seen so far,

25    qualifies under that demanding Second Circuit standard.

126

1           I want to address a couple of points with respect to

2    the difference between loan shares and other shares in the

3    market.  And a point was made that Lehman didn't have a right

4    to vote the shares.  And when you say Lehman in this case it

5    means LBIE, Lehman Brothers International Europe, the borrower,

6    and any affiliates of Lehman.  That is made clear in the share

7    lending agreement.  But once the shares are transferred outside

8    of affiliates of Lehman, they certainly do have the voting

9    rights.  So the eighteen million shares that are in the market

10   are subject to voting rights.  They are also subject to

11   receiving dividends at this point.  Evergreen Solar has a

12   contractual commitment from Lehman Brothers International Inc.

13   to refund those dividends to Evergreen Solar.  But there is no

14   question that the owners of those shares can't be excluded by

15   Evergreen from the issuance of dividends or distributions.  So

16   those differences between the borrowed shares and shares in the

17   market don't exist.

18           And the other thing, Your Honor, I think we should

19   focus on is that it was always -- had to have been the

20   contemplation of these parties that Lehman Brothers

21   International Europe as the borrower would go out and buy

22   shares in the market when this transaction was done.  Whether

23   it was done by expiration in 2013, whether it was done by

24   Lehman having the unilateral right to terminate the transaction

25   whenever it wanted, or whether it was done by an even of

127

1    default.  And there could have been events of default that

2    don't affect bankruptcy or don't result in bankruptcy.  So we

3    know that eighteen million shares were distributed at the very

4    outset.  And, indeed, Evergreen's own papers disclose that they

5    knew that that would happen because those eighteen million

6    shares of the thirty million were intended to be in some ways

7    supportive of the hedging effort that this whole somewhat

8    complex arrangement is there to support.  The idea being that

9    Evergreen would raise more money, have a better offering of --

10   if they offered convertible debt with this share lending

11   agreement in place as well.  It was a package.  And there was

12   also this -- something called a call spread, which Lehman in

13   its investment banking opinion thought also would enhance the

14   value of this offering to the market and raise more money for

15   Evergreen.

16        So the point being, Your Honor, that there was always

17   an expectation that holders in the market, anonymous holders in

18   the market would hold, if not eighteen million, perhaps all

19   thirty million shares.  So when the music stopped and when the

20   dance ended it was always to be the case that Lehman Brothers

21   International Europe would have to go out in the market to

22   fulfill its contractual obligations and find thirty million

23   shares of Evergreen common stock, all of which bears the same

24   KESP and is otherwise indistinguishable, these are registered

25   shares.  And tender them back to Evergreen.

128

1          So this notion that we couldn't do that -- we

2      Barclays Capital somehow can't do that as a matter of -- the

3      Court should just take Evergreen at its word that these shares

4      are not obtainable and there can be no replacement of them, is

5      simply false.  I mean, if Lehman can do it at thirty million we

6      can do it at twelve million.

7          THE COURT:  Let me ask you a question about the share

8      lending agreement.  Is it Barclays' position that it holds

9      these shares pursuant to the terms of the share lending

10     agreement?  Or that it just holds these shares free and clear

11     pursuant to the sale order and is now free to do whatever it

12     wants with the shares.  Because I think those are very

13     different consequences.  If it's the former then everything

14     that you said applies, in terms of the expectations of the

15     parties.  Because there the shares are being held to cover

16     presumably the shorting requirements of those who are buying

17     convertible bonds and maybe looking for a shorting strategy to

18     cover some of the exposure to the market on conversion.  I'm

19     assuming that's why this arrangement was set up.  If it's not

20     somebody can explain that to me later.

21         But now what you're talking about is, in effect,

22     stripping these shares from the cover of the original

23     underwriting arrangements and having the ability to simply sell

24     them into the market.  Is it Barclays' position that you can

25     just do that whenever you want to and, in effect, pocket the

129

1    money?

2         MR. MORAG:  Your Honor, essentially, yes.  Barclays

3    did not assume the share lending agreement.  It purchased the

4    shares through the REPO.  That was ratified and confirmed

5    through the sale order.  And it filed a Schedule 13-G statement

6    indicating its ownership.  Its indicated that it's holding

7    these for investment with no intention to affect the management

8    or control of Evergreen.

9         THE COURT:  If you're prepared to hold it for

10   investment without any interest in effecting control, is there

11   any reason that you can't agree now that for the duration of

12   the litigation until such time as you give notice, you'll hold

13   the shares and this matter can be disposed of without having to

14   go through all of the time and trouble that we're going through

15   this afternoon?

16        MR. MORAG:  Your Honor, as logical and appealing as

17   that suggestion is, the problem is --

18        THE COURT:  Thank you, you didn't have to say that.

19        MR. MORAG:  Well, I'm a former law clerk and one of

20   the things we were supposed to do was come up with solutions

21   like that.  The problem however is, then that would mean that

22   Barclays would bear all the market risk.  These shares have

23   gone up, they've gone down.

24        THE COURT:  Yes, but didn't you just tell me that the

25   13G that was filed effectively assumed the market risk by

130

1    saying that it was the intention of Barclays, as holder, to

2    simply hold on to the shares?

3           MR. MORAG:  No, that is the present intention and

4    it's most important on what we are not planning to do with it.

5    But the 13G would not require, if Barclays saw an opportunity

6    to sell some shares into the market, it would not prohibit that

7    or restrict that in any way.

8           I am, just to be clear, not an expert on 13G law.

9    There is some point at which, if Barclays were to reduce below

10   the threshold, it's now below five percent there may be a

11   reporting event there and the whole world would know it.  But

12   the point is, simply, that Barclays purchased these shares.

13   There simply is no obligation on a purchaser of securities to

14   do any kind of the diligence or to check the pedigree and

15   provenance of shares that are subject to a standard repo

16   transaction, which is what you would essentially have to find

17   in order to determine that they have a likelihood of success on

18   the merits of their claim.

19          Because without that the UCC defenses are fairly

20   clear.  And I can get into that because I think while

21   Mr. Grillo addressed the willful blindness standard he didn't

22   articulate what it actually says in the UCC commentary.

23          But the point is that we have still not heard why

24   these shares are any different from twelve million shares

25   Evergreen could issue tomorrow and if it is correct vis-a-vis

131

1    Barclays that he could recover subsequently covered damages or

2    replacement shares.  When these shares go back -- if shares go

3    back to Evergreen as an issuer, they do not remain registered

4    shares.

5         The 33, I think, is clear that the registration

6    applies to the transaction, not to specific shares.  So they

7    would get shares that they couldn't issue unless they

8    registered them or did a private placement.  The shares they

9    could issue tomorrow are shares that they could register or do

10   a private placement.  There is nothing unique about these

11   particular ones.

12        Now, with respect to -- if I could just address some

13   other things that were said with respect to affect on earnings

14   per share calculations and so on.

15        The fact of the matter is that according to the

16   complaint the company has already had to reflect the fact that

17   there is no certainty that these shares are coming back.  As I

18   understand it, the accounting treatment of loan shares under

19   GAP is premised on the understanding and expectation that the

20   loan shares will come back at the end of the term.  That

21   expectation has been upset, not by anything Barclays has done,

22   but by the events regarding Lehman.

23        So the earnings per share affect has happened.  There

24   is no suggestion that a preliminary injunction for the few

25   weeks until we can litigate the merits of this whole thing

132

1    would change the earnings per share and if they lose they're

2    going to have to change it back again.  The point is the

3    injunction will not address harm they claim to have already

4    suffered.  So that's a fact that Your Honor has to, I think,

5    take into consideration in deciding whether this relief is

6    going to stop either an ongoing harm or a future imminent clear

7    harm.

8            THE COURT:  I was hearing something else, though.  I

9    was hearing Mr. Grillo say, among other things, that because

10   the shares represent something in excess of seven percent of

11   the shares of a relatively young company in terms of the

12   capital markets, that there is a risk to corporate governance

13   and the company's ability in a volatile financing market to

14   obtain additional financing and capitalization for their

15   anticipated growth and development of their business,

16   particularly in their new plan in Massachusetts.  So his

17   argument, I think and I'm not putting words in his mouth, is

18   that it's less about what you just described and more about

19   future harm to the enterprise.

20           MR. MORAG:  Your Honor, I hear the words.  I heard

21   them when Mr. Grillo said them and we have not yet seen any

22   evidence.

23           THE COURT:  We're about to get into that.  We're just

24   having a little preliminary conversation.

25           MR. MORAG:  Your Honor, I would be very surprised if

133

1    an expert investment banker looking at the situation was able

2    to attribute any particular downside to having Barclays be this

3    shareholder with no intention -- no stated intention to affect

4    the management or control of this company.  That that is a

5    hindrance to a capital markets transaction as opposed to every

6    other reason why, in this market, it is difficult for a company

7    like Evergreen Solar to raise money.

8            That would have to be the showing made.  That there's

9    something particularly unique about it's -- all the income is

10   there, all the plans are there, the forecast for the future are

11   there but just -- but somehow because Barclays has a 7.4

12   percent position, which actually may even be less depending on

13   when the earnings per share calculation is done, inhibits a

14   transaction or makes it more expensive and that this is how

15   much more expensive it is.  That's the kind of specificity we

16   believe you would need to find irreparable harm.  And that is

17   not even irreparable it's compensable by money because that's

18   called a basis spread, that's called a premium that some other

19   investment banker or underwriter wants to charge.

20           If we're going to anticipate some arguments

21   afterwards, I'm happy to stop now.

22           THE COURT:  Keep your powder dry for later?

23           MR. MORAG:  Yes.

24           THE COURT:  Okay.  Is there anyone else who wishes to

25   be heard at this point?

134

1          MR. WILTENBURG:  Your Honor, David Wiltenburg,

2    Hughes, Hubbard and Reed on behalf of James Giddens (Ph.) as

3    trustee for the liquidation of Lehman Brothers, Inc.

4          We put in a very short response for purposes of

5    today's hearing pointing out what we feel are problems with the

6    case from the plaintiff's point of view, including a factual

7    problem and a couple of legal issues as well.

8          First of all, I think there's no dispute that before

9    the events of the week of September 15th began the title to the

10   shares was in LBIE and that LBIE had, I think the contract

11   says, all incidents of ownership including the right to sell

12   the shares.

13         Now, on September 15th a lot of things happened but

14   from the point of view of the plaintiff what happened is that

15   they noticed that there had been a credit downgrade of Lehman

16   Brothers Holdings, the guarantor, and that triggered a right

17   that they exercised and it wasn't a right to terminate.  It was

18   a right to insist that collateral be posted.  Collateral equal

19   in value to the loan shares so that if the ensuing events lead

20   to a breach of the agreement would have rights against that

21   collateral.  So that's basically all that happened on the

22   plaintiff's side on the 15th.

23         Now, over in London on the 15th LBIE did its

24   bankruptcy filing.  And when that filing occurred there had

25   been no breach and termination.  When that filing occurred LBIE

135

1    still had all of the incidents of ownership including the right

2    to sell the shares.

3           So, it's the plaintiff's proposition that upon the

4    filing in London there was automatic revesting, there was an

5    automatic divestment of title of this property that we would,

6    in our system, deem to be property of the estate protected by

7    the automatic stay and protected by many strong principles of

8    law that apply to property of the bankrupt estate.  Now I don't

9    know exactly what English law is but I do recall understanding

10   that they have a similar, I think they call it ring fencing

11   principle.  That is a protective barrier comes down around

12   property of a bankrupt debtor.

13          And so --

14          THE COURT:  Mr. Wiltenburg, you're making a number of

15   comments about LBIE, however you're doing that, I take it, more

16   by way of background because you're not here speaking on behalf

17   of the LBIE administrators, correct?

18          MR. WILTENBURG:  That's quite so, Your Honor.

19          THE COURT:  Is there anyone in the courtroom who

20   speaks on behalf of the LBIE administrators and who takes a

21   position with respect to the preliminary injunction hearing

22   today?  Apparently not.  Wait a minute, there is somebody.

23          MS. WARREN:  Your Honor, Mary Warren as link leaders

24   for the joint administrators.  We're not a party to this

25   proceeding.

136

1           THE COURT:  Are you just here as an observer?

2           MS. WARREN:  Yes.

3           THE COURT:  Okay.  Thank you for responding to that

4    inquiry.

5           MS. WARREN:  Yes.  We're not taking any position

6    because we're not a party to this case.

7           THE COURT:  Okay.  It does seem, however, that in

8    hallway discussion you can confirm some of your theories about

9    ring fencing and the like.

10          MR. WILTENBURG:  Your Honor --

11          THE COURT:  I guess what my question is, is why we're

12   going into issues that relate to the LBIE case and English law

13   to the extent applicable since you're speaking on behalf of

14   your client the trustee of LBI.

15          MR. MORAG:  Indeed, Your Honor.  The reason is that

16   the foundation premise of the case, as I read the papers, is

17   that there was this automatic divestment of title that

18   happened, upon the filing of the bankruptcy petition.  And that

19   is the foundation on which plaintiffs build the propositions

20   that it was their property going forward from that time and the

21   proposition that therefore when LBI conveyed or the property

22   became part of the Barclays repo, that LBI was interfering with

23   their title.  This is by way of a comment that, that's a

24   phenomenon that's unknown in our law and I don't think I've

25   read support for the proposition that any such automatic

137

1  divestment of title can happen under the legal scheme that was

2  in place.

3          And, Your Honor, as we've noted in other matters that

4  have come before the Court, the Safe Harbor provisions that are

5  features of United States -- both the United States Bankruptcy

6  Code and the Securities Investor Protection Act, are not about

7  divestment of title, are not about taking property of the

8  estate and making it property of an individual creditor.

9  They're about fixing gain or loss.  They're about monetizing

10 the financial impact of the bankruptcy filing of a particular

11 party.

12         And so, this is also about, by way of saying that the

13 whole foundation, that is that something, some change to title,

14 took place during the week of the 15th.  It seems to us that

15 that can't be the case.

16         THE COURT:  Ms. Harvey, are you just here as an

17 observer or do you have anything to say?  You don't have to say

18 anything, I was just wondering.

19         MS. HARVEY:  Diane Harvey, Weil Gotshal, representing

20 Lehman Brothers Holding, Inc., debtor.  Your Honor, we don't

21 have any opening but we would like to reserve our right to

22 cross examine the witness.

23         THE COURT:  Fine.

24         MS. HARVEY:  Thank you.

25         THE COURT:  I think we've now heard what everybody

138

1    has to say at the outset and I won't muddy the water by making

2    any further comments.  Mr. Grillo, why don't you just proceed

3    with your evidence?

4              MR. GRILLO:  Thank you, Your Honor.

5              THE COURT:  First of all, let me ask if there are

6    stipulations with respect to --

7              MR. GRILLO:  I was just about to address that, Your

8    Honor.

9              THE COURT:  Okay.  Fine.

10             MR. GRILLO:  If I could, before I was going to call

11   my witness.  Your Honor, the stipulations I think that we have

12   with respect to the documents is that all of the documents that

13   were submitted as exhibits, either to the verified complaint or

14   in the responsive papers submitted by Barclays, I don't think

15   any party has an objection to the authenticity or admissibility

16   of those documents.

17             What we've prepared for the Court and Barclays'

18   benefit was a binder which I can hand up, and we'd also hand up

19   to the witness, that has the document in it.  So if I may do

20   that first, and I'll leave one on the chair.

21             THE COURT:  That's fine.

22             MR. GRILLO:  I have them both for you, spiral bound

23   or in a binder, whichever Your Honor prefers.

24             THE COURT:  I'm completely indifferent as to how it's

25   bound.

139

1          MR. GRILLO:  Okay.  And then I'd like to leave one on

2     the witness stand if I could.

3          THE COURT:  Thank you.

4          MR. GRILLO:  And just quickly, Your Honor, those

5     documents, I think, are indexed on the cover and they include

6     the verified complaint, the share lending agreement as filed

7     and as executed, the letters that I referenced, the 13G and

8     some of the papers from this court's proceeding.  We can

9     discuss them and move them into evidence at the end, if Your

10    Honor likes or we can do it now by stipulation if there's no

11    objection.  But I don't think there's any issue with respect to

12    any of the documents.

13         THE COURT:  It's up to you.  I mean, if they're going

14    to be offered into evidence by stipulation we can do that now.

15    If you're going to need the witness to do anything, in terms of

16    identification or authentication, we can do it through the

17    witness.  But if there's an agreement why don't we do it now.

18         MR. MORAG:  Your Honor, there's no objection from

19    Barclays Capital.

20         THE COURT:  Fine, it's admitted and part of the

21    record.

22    (Debtor's Exhibit Binder was hereby admitted into evidence, as

23    of this date.)

24         MR. GRILLO:  Thank you, Your Honor.  With that I'd

25    like to call Michael El-Hillow to the stand, please.

140

1        THE COURT:  It's probably going to be -- well, you've

2   already taken the hard way up to the front.  I was going to

3   suggest you walk around the other way.  No big deal.

4        (Witness duly sworn)

5        THE COURT:  Please be seated.

6        THE WITNESS:  Thank you.

7   Q.   Okay.  Just as a procedural matter before we introduce

8   anything, as a matter of convenience there's a binder of

9   documents in front of you and those are the documents that

10  we'll be referring to.

11  A.   Okay.  Thank you.

12  Q.   During the course of your testimony.  With that, can you

13  please state your name for the record?

14  A.   Michael El-Hillow.

15  Q.   And what is your position -- are you employed Mr. El-

16  Hillow?

17  A.   I am.

18  Q.   And by whom?

19  A.   Evergreen Solar.

20  Q.   And what is your position with Evergreen Solar?

21  A.   Chief financial officer.

22  Q.   Okay.  And can you generally describe for the Court's

23  benefit what your responsibilities are as the chief financial

24  officer of Evergreen Solar?

25  A.   The major responsibility is to make certain that the

141

1    company has proper financial controls and also access to the

2    capital markets as we pursue a very aggressive growth strategy.

3    Q.    Right.  And for purposes of background, can you describe

4    for the Court and for the parties here, your last five years of

5    professional experience?

6    A.    I've been the chief financial officer of Evergreen Solar

7    since January 2, 2007.  Prior to that I was on the board of

8    directors for two years.  But also at that time I was the chief

9    financial officer of a company, MTM Technologies in Stamford,

10   Connecticut.  And also Advanced Energy Industries of Fort

11   Collins, Colorado.

12   Q.    Thank you.  You indicated that you were responsible for

13   the access to the financial markets on behalf of Evergreen

14   Solar.  Do you have any familiarities of the matters that we've

15   discussed today, particularly the share lending agreement that

16   Evergreen Solar entered into with Lehman?

17   A.    I do.

18   Q.    Okay.  And are you familiar with all of the transactions

19   that took place pursuant to that agreement?

20   A.    I am.

21   Q.    And would it be fair to say that you were the point person

22   for that transaction for Evergreen Solar?

23   A.    Yes.

24   Q.    Can you explain briefly the background that led to the

25   entry into the shared lending agreement for the benefit of the

142

1    Court, please?

2    A.   Absolutely.  We are in the process of completing a factory

3    in Devens, Massachusetts.  Total cost of approximately 425

4    million dollars.  In order to complete that factory we had to

5    raise approximately 375 million dollars earlier this year.  The

6    capital market were very challenging at the time, as they still

7    are, even more so.

8         In order for us to raise the amount of capital we had to

9    raise we had to enter into a convertible no transaction.  Our

10   market capitalization was not large enough to support a raise

11   of that amount.  And the convertible note was the most

12   efficient and most effective way to access the capital that we

13   needed.

14   Q.   Okay.  And with the completion of that transaction are

15   your capital needs presently satisfied for the next three to

16   four year period, or do you --

17   A.   No.  We have informed our shareholder base for well over a

18   year it will need to raise an additional 400 million dollars in

19   2009 as we continue to build out our expansion.  We have on

20   record to open a new factory in the early part of 2010.  And so

21   those funds would be required to open up that next factory.

22   Q.   Okay.  And in this regard, how important is it for you to

23   keep control over the shares that are in the marketplace --

24        MR. GRILLO:  Strike that.

25   Q.   Are shares necessary for you to raise additional -- do you

143

1    raise additional capital in the equity markets, or just purely

2    in the debt markets?

3    A.    We've bid on records saying we'd try to access the debt

4    markets; of course, the debt markets are very challenging.  We

5    would access the equity markets if need be.

6    Q.    All right.

7    A.    But our preference would be to access the debt markets.

8    Q.    But have you made any inquiry to try and access the debt

9    markets at present?

10   A.    We have.

11   Q.    And how have those efforts gone?

12   A.    Very difficult.

13   Q.    When you access the equity markets, do you go back to your

14   existing shareholders?

15   A.    We do.

16   Q.    And have you spoken with your existing shareholders since

17   the time that this event has occurred with Lehman?

18   A.    Numerous times.  Most recently, yesterday.

19   Q.    And what has been the reaction of the investors at this

20   point in time?

21   A.    Quite concerned.  The significant dilution that has

22   occurred.  Because the transaction, as you pointed out, it was

23   never the intent that these shares would be included in our

24   outstanding share count for gap purposes.  They are outstanding

25   for corporate purposes.  That was probably the main reason why

144

1     we went down this road, the ability to maximize our earnings

2     per share which is monitored very closely by the equity

3     markets.  And is really the basis for the ability to raise

4     either equity or debt.  Because debt must be paid off and

5     typically is paid off by internal cash generation, which would

6     require another factory, or through the subsequent issuance of

7     equity.

8     Q.   Do you have -- will you have enough cash to pay off that

9     debt from your operations over the course of the next twelve to

10    twenty-four months?

11    A.   We will not.

12    Q.   So you need to go back to the equity markets again to

13    raise that capital?

14    A.   We would need to go back to the equity markets to raise

15    the capital to open up another facility.  The facility -- the

16    Devens facility would most likely not be able to generate the

17    amount of cash that we'd need to pay off that debt when it

18    comes due in 2013.

19    Q.   Okay.  And how many people do you employ at the -- or how

20    many people do you intend to employ at the Devens facility?

21    A.   Approximately 800.

22    Q.   And how many people do you employ overall, or would you

23    expect to employ overall upon the completion of the facility?

24    A.   Approximately 1,100.

25    Q.   You indicated that you are familiar with the terms of the

145

1   share lending agreement, is that correct?

2   A.   That is correct.

3   Q.   I'd ask you to take a look in your binder at document 2?

4   A.   Yes.

5   Q.   And do you recognize for the record document 2?

6   A.   I do.

7   Q.   And can you identify it for purposes of the written record

8   here to the Court?

9   A.   It is the share lending agreement between us and Lehman or

10  Lehman and their affiliates.

11  Q.   And did you participate in the negotiations of that

12  document?

13  A.   I did.

14  Q.   And were you a signatory of that document on behalf of

15  Evergreen?

16  A.   I was.

17  Q.   I'd ask you to take a quick look to refresh your

18  recollection at Section 7 of that document, that would be page

19  10, part benefits of the parties.

20  A.   Okay, I'm there.

21  Q.   Okay.   The document stated that so long as the borrower,

22  which was Lehman under the document, was the record owner of

23  the loan shares it wouldn't exercise the right to vote or take

24  any action with respect to those shares.   At any time during

25  the course -- from the entry of this agreement, did Lehman ever

146

1   vote those shares that it held in its possession?

2   A.   Not to my knowledge.

3          MR. MORAG:  Your Honor, I'm sorry to object.  But

4   there is no entity in this agreement defined as Lehman.  The

5   borrower is defined as Lehman Brothers International Europe and

6   I would just like to --

7          THE COURT:  It's a fair objection.  The question is

8   ambiguous in its use of the term Lehman, given the

9   identification of the borrower as Lehman Brothers International

10  Europe and the identification as Lehman Brothers Inc. as agent

11  for borrower.

12         MR. GRILLO:  I'll ask a couple clarifying questions,

13  Your Honor.

14  BY MR. GRILLO:

15  Q.   In your relationship -- in Evergreen's relationship with

16  any Lehman entity, can you tell us generally who you dealt with

17  and who they represented, to your knowledge?

18  A.   We dealt with key investment bankers.  One, in particular,

19  we were told was in charge of United States investment banking

20  for Lehman Brothers.  We had no dealings to the best of my

21  knowledge with any of the so-called affiliates.  We were

22  dealing with what we thought was Lehman Brothers, Lehman

23  Brothers Holding.  Lehman Brothers.

24  Q.   Did anyone every represent to you that they were from

25  Lehman Brothers International Europe as oppose to Lehman

147

1     Brothers Inc. or Lehman Brothers Holding?

2     A.    No.

3     Q.    Did they ever make any distinction with respect to any

4     negotiation that you had with respect to any of the various

5     Lehman entities?

6     A.    They spoke about the entities themselves, as making it

7     efficient for them to complete the transaction.  But it was

8     always my understanding that we were dealing with Lehman

9     Brothers Holding as the parent company of Lehman, and they

10    would guarantee the entire transaction.  All these other

11    entities were for their convenience not ours.

12    Q.    Okay.  Did anyone ever represent to you that they were

13    participating specifically on behalf of Lehman Brothers

14    International Europe then?

15    A.    No.

16    Q.    Okay.  And anyone separately representing that they

17    were --

18          MR. GRILLO:  Excuse me, strike that.

19    Q.    Did anyone ever represent to you that they were there on

20    the behalf of Lehman Brothers Inc.?

21    A.    No.

22    Q.    Did you have any reason to believe that there was any

23    distinction between any of the Lehman entities?

24    A.    Not as it would have affected us, no.

25    Q.    Thank you.  With that, I'd ask you to go back to Section 7

148

1   of the agreement?

2   A.   Okay.

3   Q.   I think the last question that I'd asked you prior to the

4   objection was whether or not any Lehman entity had every

5   expressed to you any interest in voting the shares in the

6   possession of any Lehman entity?

7   A.   No.

8   Q.   And at any time did they ever make a public filing with

9   respect to the ownership -- did any Lehman entity make a public

10  filing like a 13(g) or a 13(d) in connection with any of the

11  shares?

12  A.   Not that I'm aware of.

13  Q.   And do you generally follow that as in your capacity as

14  CFO?

15  A.   They are typically all addressed to my attention, so, yes.

16  And we also file it through the public filings.

17  Q.   So it's safe to say you would be aware if such a filing

18  was, in fact, made?

19  A.   Absolutely.

20  Q.   Okay.  And your statement was that there was no such

21  filing made on behalf of Lehman.  Okay.  Did anyone at Lehman

22  ever approach you about the possibility of voting the shares

23  for as long as they held them?

24  A.   No.

25      (Pause)

149

1    Q.    In connection with the Lehman transaction did -- excuse

2    me.  In connection with the share lending agreement did

3    Evergreen make a public filing in connection with that

4    transaction?

5    A.    Yes.

6    Q.    Okay.  And could you sum up to your knowledge what the

7    substance of that filing was?

8    A.    Well, I believe there were two filings.  And one was

9    obviously the filing ultimately for the convertible debt.  And

10   the other one I believe was to register the 30.9 million shares

11   as part of the share lending agreement.

12   Q.    Right.  And I would ask you to refer to what's been marked

13   as Tab or Exhibit 7 in your binder?

14   A.    Uh-huh.

15   Q.    Okay.  I would ask you if you're familiar with what's been

16   marked as Tab 7 in the binder?

17   A.    I am.

18   Q.    And could you just describe for the written record what

19   that document is?

20   A.    Is a form A-K and it describes entry into this

21   transaction, the description of the convertible notes and the

22   cap call transaction.

23   Q.    Okay.  And by looking at that agreement, the form of which

24   I guess was taken from the SEC documents.  Were you the

25   signatory to that public filing?

150

1    A.   Yes.

2    Q.   And so as such you were familiar with its contents?

3    A.   I was.  And I should also point out it also addresses the

4    common stock lending agreement, the entire transaction.  Yes,

5    sir.

6    Q.   Okay.  I would ask you to refer to -- the pages are not

7    number but it's the third page of text.

8    A.   Beginning with what?

9    Q.   The top line says "common stock borrower's election at any

10   time."

11   A.   Yes.

12   Q.   Okay.  I'd ask you to take a look at the last sentence of

13   that first full paragraph that starts with the borrowed shares.

14   And I'll just read it into the record; it says "well, the

15   borrowed shares would be considered issued to outstanding for

16   corporate law purposes.  The company believes that under U.S.

17   gap as currently in affect, the borrowed shares will not be

18   considered outstanding for purposes of computing and reported

19   earnings per share because the borrowed shares must be returned

20   to the company no later than July 15, 2013, the maturity date

21   of the notes."

22        Can you explain to us what your understanding of that

23   provision was at the time it was entered into?

24   A.   Well, certainly a critical decision because when we were

25   approached about the share lending arrangement it was critical

151

1    to us that we minimize the number of shares outstanding.  And

2    we talked to our advisors, our lawyers, and our accountants and

3    our understanding was that for legal purposes, yes, they would

4    be in the marketplace.  But for accounting purposes, which is

5    sort of my capacity, that's what the financial community

6    tracks, that they would not be considered as outstanding.

7    We're a very conservative company so we also check other

8    transactions that have occurred in the marketplace prior to our

9    entering into this transaction.  And there were other companies

10   that had done it earlier in the year, had filed their documents

11   with the Security and Exchange Commission.  And had been able

12   to use this transaction type.

13   Q.        Okay.  And what's the effect of having those shares

14   deemed issued and outstanding for accounting purposes?

15   A.   Well, on the time of the transaction we had 120 million

16   shares outstanding in the marketplace, so adding these thirty-

17   one million shares, in effect, have diluted our shareholders by

18   twenty-five percent.  You would think that the direct cause

19   would be that you would see an approximate twenty-five percent

20   reduction in your stock price since you got no consideration

21   for those shares.  And so that would be the direct impact.

22   Q.   And how has that affected your ability to raise or --

23             MR. GRILLO:   Strike that.

24   Q.   Has it affected your ability to go to the marketplace to

25   raise more money?

152

1   A.   It will certainly affect our ability when we try to access

2   the markets.  Our shareholders and other people that might be

3   interesting in buying our shares are very concerned about the

4   significant number of shares we have outstanding, given the

5   size, and I'll say the lifecycle, of our company.  160 million

6   shares is a significant number of shares.

7   Q.   And when you say it will have a significant effect do you

8   mean a positive or a negative?

9   A.   A negative effect.

10  Q.   In what respect?

11  A.   Because many people do not want to buy into a company that

12  has such a large amount of shares outstanding, because it

13  obviously affects the earnings per share, which is the

14  multiplier with a P/E ratio, that ultimately we allow that

15  investor to seek increase in his or her investment going

16  forward.

17  Q.   I'd like to sort of turn to the voting impact of the

18  shares.  And I'd ask you to turn to document 6 in the binder in

19  front of you.  And just for the written record I'd ask you if

20  you could identify what that document is?

21  A.   I believe it's a Schedule 13-G filed by Barclay's PLC.

22  Q.   And prior to this hearing had you seen that document

23  before?

24  A.   I had.

25  Q.   Can you explain for the Court's benefit when you first

153

1    became aware of that document?

2    A.   I received notification, interestingly enough, from a

3    shareholder.  I believe it was on -- I want to say on October

4    9th.  I don't remember the exact date, but it was sent to me

5    from the shareholder and then subsequently I was provided the

6    document itself by Christian Ehrbar, our general counsel.

7    Q.   Did you have any notice prior to receiving the document

8    that Barclays had purchased the shares?

9    A.   No.

10   Q.   Had you made inquiry at the time that the bankruptcy case

11   was filed, to Lehman or to anyone else, as to where these

12   shares were?

13   A.   Immediately upon the trans -- I'll say the situation on

14   September 15th, yes, we called all of our contacts at Lehman

15   and asked were there any shares still held by Lehman.  And we

16   were told there were none.

17   Q.   And at any time prior to the receipt of this 13-G on

18   approximately October 9th, as you testified, did anyone from

19   Barclays contact you regarding their acquisition of the shares?

20   A.   No.

21   Q.   Did anyone contact you in connection with the share

22   lending agreement anytime between the 15th of September and

23   from when this was received?

24   A.   No.

25   Q.   And for purposes of the record, the statement indicates

154

1   that there are approximately twelve million one, almost 200,000

2   shares at issue.  What percentage of your overall

3   capitalization would that be in terms of issued and outstanding

4   shares?

5   A.   Approximately seven percent today.

6   Q.   And can you explain to me, sort of from a company's

7   perspective, how holders like that are typically treated and

8   what effect that has on the governance and the operation of

9   your company, if any?

10  A.   Well, as a company we treat all of our shareholders, but

11  the fact is our larger shareholders, they call, we respond.  We

12  call them back.  They are shareholders.  We're attuned to their

13  needs, their concerns, and so we would respond immediately to

14  our shareholders.

15  Q.   Right.

16  A.   Especially a shareholder of this magnitude.

17  Q.   What challenges, if any, are presented by virtue of having

18  shareholders with holdings the size that Barclays now has?

19  A.   You know, for a company our size and the global plans we

20  have we will more than likely need to go get shareholder

21  approvals for certain future transactions.  Any large

22  shareholder would obviously have a big say in that transaction,

23  either individually or through talking to other shareholders.

24  They would have a big impact on deciding how we take this

25  company forward.

155

Q.   So then with respect to -- when you say with transactions,

can you be a little bit more explicit into what kind of

transactions that they would have an effect on?

A.   Well, as an example, earlier this year we went to our

shareholders to get approval to increase the number of shares

outstanding for our corporation so we could move forward with

our growth plans.  We needed those shares authorized in order

to do this transaction that we did in the summer and also a

transaction we did earlier this year.  That would be one

situation.  Any type of transaction that would require, you

know, use of more than twenty percent of our shares.

Q.   Would that include, for example, strategic transactions?

A.   Yes.

Q.   Okay.  Like mergers?

A.   Yes.

Q.   And given where Evergreen is in connection with its

overall development, does it survive presently on its own

earnings?

A.   We do not.

Q.   So is there a significant possibility of having either a

major financing transaction or a strategic transaction in the

course of the next, call it, twelve to eighteen months?

A.   Yes.

Q.   Okay.  Can you explain your answer, please?

A.   Well, I think the most important thing is as of today we

156

1    are going through about seven to ten million dollars a month in

2    cash.  Much of that -- that's from operations, not even talking

3    about the build out of the facility in Danvers, Massachusetts.

4    It's the Danvers, Massachusetts facility that will allow us to

5    become profitable and cash flow positive.  Until that time we

6    need access to capital markets, either through equity or debt

7    in the public marketplace or working capital lines of credit.

8    We survive on our ability to access capital markets.  We do not

9    generate cash internally.

10    Q.    And how critical is the participation of your shareholders

11    in that process?

12    A.    Incredibly critical.

13    Q.    In what respect?

14    A.    Well, first of all, anything that's publicly related we

15    would go to them, first and foremost.  We would talk to our

16    shareholders.  Also, in order to access, I'll say, the private

17    capital markets, any lending institution is very much attuned

18    to a company's ability to raise equity down the road if they

19    need to do that in order to pay that debt off.  So they go hand

20    in hand.  They're not severable, especially in this

21    environment.

22    Q.    In that, regarding your public filings, do you make any

23    disclosure with respect to risk factors with significant

24    holders of shares?

25    A.    Yes, we do.  We can talk about the impact that our larger

157

1    shareholders could have on our ability to execute operations

2    going forward or make strategic decisions.

3    Q.   And what do you say about that process, typically?  Just

4    generally in your risk factors.

5    A.   That we would have to approach our shareholders and get

6    counsel and ultimately approval for the things we'd want to do.

7    Q.   Right.  And what happens if a large block of shares does

8    not vote in favor of something at the outset?

9    A.   Well, obviously you want to have as high an approval from

10   your shareholders as possible.  But I guess it would depend

11   upon the transaction.  Some require, you know, more than fifty

12   percent of total shares outstanding.  Some transactions require

13   fifty percent of shares that are voted.  But any large

14   shareholder individually, but certainly talking to other

15   shareholders, could prevent us from moving forward with our

16   plans.

17   Q.   Then is it fair to say that that gives them some leverage

18   in those transactions?

19   A.   It gives them, I would say, influence for sure.  Influence

20   certainly translates to leverage.  Yes.

21   Q.   We've talked about transactions.  What about with respect

22   to corporate governance?  What impact does having a major

23   shareholder like this have on your corporate governance?

24   A.   Well, as I said, all shareholders are important, but if

25   you own a bigger percentage of the company you have more

158

1    access, more influence, just from your vote.  And we will

2    listen to those shareholders.  Our shareholders are important

3    to us.  So, yes, they could have a very, very important impact

4    on our organization.

5    Q.    So, for example, would they have an ability to exercise an

6    influential vote with respect to the composition of the board

7    of directors?

8    A.    They certainly would.  Yes.

9    Q.    Could they bring certain shareholder referenda to the

10   board or a slate of positions to the board as a five percent

11   holder and demand that the board consider those matters?

12   A.    I certainly believe they could, but I would point out that

13   we also have a staggered board.  So I'm not a corporate

14   governance expert.  I know it somewhat, but they certainly

15   could affect the election of the directors that we elect in

16   their year of election.

17   Q.    Turning back quickly to document 7 for just a moment and

18   the section that we just read on the third page of text.  I'm

19   looking at the paragraph that starts June 26, 2008. Are you

20   with me, Mr. El-Hillow?

21   A.    I'm there.  Yes.

22   Q.    Okay.  Thank you.  It says in the second sentence of that

23   paragraph 18,184,511 shares of the borrowed shares were sold to

24   the public concurrently with the offering of the notes at 9.50

25   per share and that the remaining borrowed shares will be sold

159

1    at prevailing market prices at the time of sale or at

2    negotiated prices.  It says the sale of the borrowed shares

3    will be made for the account of the common stock borrower and

4    the company will not receive any proceeds from the sale of the

5    borrowed shares.  First of all, are those statements all true

6    and correct to your knowledge?

7    A.   Yes, they are.

8    Q.   If that's the case were, in fact, to your knowledge, the

9    eighteen million shares sold into the marketplace?

10   A.   Yes.

11   Q.   And at an approximate price of 9 --

12   A.   9.50.

13   Q.    -- per share.

14   A.   Yes.

15   Q.   And by my calculation, ballpark, that would have raised

16   approximately 160 to 175 million dollars.  Is that correct?

17   A.   Yes.

18   Q.   So of that 160 or 175 million dollars did the company get

19   any of the proceeds of that transaction?

20   A.   No.

21   Q.   What is your understanding as to where the proceeds of

22   that transaction went?

23   A.   They went to Lehman Brothers or Lehman.  Lehman.

24   Q.   What?  One of the Lehman --

25   A.   One of the many Lehman --

160

1    Q.    But you don't know which one.

2    A.    No.

3    Q.    Is that your statement?

4    A.    We do not know which one.

5    Q.    And it is fair to say that the anticipation was that at

6    the end of the period they would, in fact, then come in and

7    satisfy their end of the share lending agreement?

8    A.    Yes.

9    Q.    Has anyone from Barclays indicated to you that they would,

10   in fact, participate in that transaction and assume Lehman's

11   obligations in respect to the share lending agreement?

12   A.    No.

13   Q.    Has there been anyone else who stepped up and said we

14   would participate in that transaction on behalf and assume

15   Lehman's obligations under that agreement?

16   A.    No.

17   Q.    So, effectively, then, Lehman has gotten the benefit prior

18   to the bankruptcy case of whatever the proceeds, call it 160 to

19   175 million dollars, and what did Evergreen get for the benefit

20   of that?

21   A.    Nothing.

22   Q.    Final question.  Did any of the Lehman representatives

23   from and after the time of the bankruptcy indicate that there

24   would be any party who'd be willing to step into the shoes of

25   Lehman as far as that transaction goes?

161

1    A.   I approached my contacts from Lehman that went to Barclays

2    to inquire, and they came and met with me, but they said there

3    was no way they would be able to do anything for me.  It was a

4    very short meeting.  Just once.

5    Q.   So, effectively, now, Evergreen is out the value of those

6    shares, which in the summertime could have been anywhere from

7    160 to 175 million dollars?

8    A.   That is correct.

9    Q.   And what impact will that have on your fundraising on a go

10   forward basis?

11   A.   It will have a significant impact, because we only have so

12   many shares that are available to put into the marketplace.

13   And it will more than likely impact our ability to raise funds

14   at reasonable rates.

15              MR. GRILLO:  Thank you.  I have no further questions

16   on direct, Your Honor.

17              THE COURT:  Cross-examine.

18   CROSS-EXAMINATION

19   BY MR. MORAG:

20   Q.   Good afternoon, Mr. El-Hillow.

21   A.   Good afternoon.

22   Q.   You testified that lawyers were involved in these

23   transactions, is that correct?

24   A.   Correct.

25   Q.   Did they review the documentation and the public filings

162

1    of Evergreen Solar?

2    A.   I believe they did, yes.

3    Q.   Did you personally draft the description of the

4    transaction or was that done by lawyers?

5    A.   It was done by lawyers, accountants, our internal, and I

6    had impact on the disclosures, yes.

7    Q.   If you could to turn tab 7 which was the AK fund we were

8    looking at

9    A.   Um-hmm.

10   Q.   At the end, if you sort of flip to the very end of the

11   document there are in fact numbered pages.  About halfway down

12   the page, you'll see some numbering?

13   A.   Um-hmm, yes.

14   Q.   I'd like you to turn to page 14, the page that's numbered

15   14 at the bottom, please.

16   A.   I'm there.

17   Q.   And I believe you testified, and if there's any concern in

18   your mind or doubt in mind you can flip back to the first page

19   of this part of tab 7 which would obviously be page 1.

20   A.   Um-hmm.

21   Q.   But I would focus you on page 14 to the paragraph that is

22   number two, "Borrowing and delivery of the securities," do you

23   see that?

24   A.   I don't think I'm on the same page 14 as you are, I'm

25   sorry.

163

1          THE COURT:  Neither am I.

2          MR. MORAG:  Okay.

3    Q.   If you turn to the very end of exhibit 7, it should say

4    A3.  See that?  At the center of the page, Schedule 2, A3?

5    A.   No but I guess there are several page fourteens in here.

6    Q.   If you turn to tab 8 and then just put tab 8 down so that

7    you're on the last page of tab 7.

8    A.   Okay.

9    Q.   Is there a page that says A3?

10   A.   Yes.

11   Q.   Okay. If you would turn back a few more pages, do you see

12   a page that says thirty six at the top?

13   A.   I do.

14   Q.   Okay and if you flip back from there to, I guess, would be

15   twenty-two pages to page fourteen.  I don't know how else to

16   explain.

17   A.   I believe I'm there.

18   Q.   Okay. Now --

19          THE COURT:  What does this page fourteen have on it?

20   I want to make sure I am looking at the right page 14.

21          MR. MORAG:  Does it have that 2 that's in the center

22   of the page called "borrowing and delivery of securities?"

23          THE COURT:  "Borrowing and delivery of securities".

24          MR. MORAG:  Yes,

25          THE WITNESS:  Yes.

164

1    Q.    I think for identification purposes it should be noted

2    that this is page fourteen of exhibit 1.2.

3    Yes - to the AK and which is entitled, "Underwriting

4    Agreement."

5    A.    Right.

6    Q.    Okay.  To make this simpler, if you would go to the first

7    page of Exhibit 1.2, please, just so that we don't have any

8    confusion as to the nomenclature, which is the first page of

9    this Underwriting Agreement.  So it would require flipping back

10   fourteen pages.

11   A.    The one that's headed 30.8 -- the 3856 shares?

12   Q.    Yes.

13   A.    Okay.

14   Q.    I mean, this is a -- do you recognize this document, maybe

15   perhaps not in this form, but is this not a letter that you

16   received or an agreement that you received and signed is the

17   underwriting?

18   A.    Yes.

19   Q.    Okay. It probably didn't look like this when you got it,

20   but this is how, but you recognize it as the underwriting

21   agreement?

22   A.    Um-hmm.

23   Q.    So just so that we have our terms clear, do you see that

24   in the third line of - on page - the first page of exhibit 1.2

25   Lehman Brothers International (Europe) is identified as the

165

1   borrower?

2   A.   Yes.

3   Q.   Okay. And then do you see towards the very bottom of the

4   page, above the paragraph that's numbered one that the company

5   being Evergreen Solar, Inc. hereby agrees with Lehman Brothers

6   Inc. and Lehman Brothers Inc. is defined as the underwriter?

7   A.   Yes.

8   Q.   Okay.  Now if we can go back to page fourteen.

9   A.   Okay.

10   Q.   Can you read the paragraph to yourself first?

11   A.   Are you talking about paragraph two?

12   Q.   Yes, the subject two of the terms and conditions.

13   A.   Okay.

14   Q.   Does this not state that, "subject to the terms and

15   conditions set forth herein and in the common stock lending

16   agreement the company," that's Evergreen, correct?

17   A.   Yes.

18   Q.   "Agrees to issue and lend to the borrower," and that's

19   Lehman Brothers International Europe, correct?

20   A.   Yes.

21   Q.   Okay.  "And the borrower agrees to borrow from the company

22   up to 30,856,538 shares of common stock and the underwriter".

23   And that's Lehman Brothers Inc., correct?

24   A.   Yes.

25   Q.   "Upon such issuance and loan to the borrower agrees to

166

1    purchase such shares from the borrower."  Did I read that

2    correctly?

3    A.    Yes.

4    Q.    To your knowledge does that accurately state the

5    transaction or that piece of the transaction?

6    A.    Yes.

7    Q.    And you were aware that in July of 2008, right after this

8    transaction closed, Lehman Brothers Inc. did place eighteen

9    million shares with the public, correct?

10   A.    Yes.

11   Q.    So, you understood, is it not the case, that if for any

12   reason the share lending agreement were to terminate, Lehman

13   Brothers Inc. would have to go out and find eighteen million

14   shares of Evergreen common stock to return to you, correct?

15   A.    I'll tell you my outstanding, yes, plus or put collateral,

16   cash collateral in place for our benefit, either or.

17   Q.    Is it your understanding that cash collateral was - what

18   was the trigger for your entitlement to demand cash collateral?

19   A.    A downgrade of the debt of Lehman Brothers.

20   Q.    Okay.  Otherwise Evergreen entered into this transaction

21   without the protection of any collateral, correct?

22   A.    Yes.

23   Q.    So, again, in this situation, let's say it's July, and for

24   whatever reason Lehman Brothers International Inc., the

25   borrower, decided to terminate the share lending agreement.

167

1    Given that it happened up to that point, they would have to go

2    out in the market and find eighteen million shares to return,

3    correct?

4    A.   Yes.  Well, actually, but they'd have to find eighteen but

5    return 30.9 because they had 12.2.

6    Q.   The present trading volume, daily trading volume of

7    Evergreen Stock is around four to seven million shares per day,

8    isn't that right?

9    A.   Yes.  It's reached a seven, yes.

10   Q.   You say seven?

11   A.   Yes, recently.

12   Q.   So some days it's higher than that?

13   A.   The average that we see is about seven million shares a

14   day.

15   Q.   Now you say that - you mentioned something about having a

16   hundred and sixty million shares outstanding?

17   A.   Correct.

18   Q.   And that was as of July 2008?

19   A.   No.  Before the transaction we had a hundred and twenty

20   million shares outstanding. So this transaction occurred on

21   July 2nd, I believe.

22   Q.   Well, let me ask it differently.  You made a distinction

23   between corporate law purposes and accounting purposes,

24   correct?

25   A.   Right.  Yes.

168

1    Q.    So let's just -- so that I'm clear, the hundred and sixty

2    million is the corporate law purposes?

3    A.    Correct.

4    Q.    So that's shares outstanding, not all of which you're

5    saying are counted for earnings per share calculations?

6    A.    Correct.

7    Q.    And the number that were counted for earnings per share

8    calculations as of July?

9    A.    You need to do a weighted average calculation, I believe

10   for EPS purposes is around one hundred and eighteen million

11   shares.

12   Q.    Have you actually calculated the effect on earnings per

13   share from the - as a result of the current situation, as

14   you've described?

15   A.    I just increased the shares outstanding by the 30.9

16   million shares.  It's just a straight division, correct.

17   Q.    And there's nothing short of recovering eighteen million

18   shares from some Lehman entity that would remove the eighteen

19   million shares from the earnings per share calculation going

20   forward, is that in fact right?

21   A.    That is my understanding, yes.

22   Q.    Now I believe you testified that potential investors and

23   current shareholders thought that your one hundred and sixty

24   million outstanding was already too high, is that correct?

25   A.    They're concerned about the level of shares we have in the

169

1   marketplace, correct.

2   Q.   And that was before September of 2008, correct?

3   A.   Yes.

4   Q.   With respect to the issue of the 13G, you testified that

5   to your knowledge Lehman - no Lehman entity filed the 13G form,

6   correct?

7   A.   Correct.

8   Q.   But you don't know precisely why no Lehman entity filed a

9   13G form, do you?

10  A.   They didn't own the shares.

11  Q.   Did they ever tell you that?

12  A.   Yes, we lent them the shares.  That was the negotiations.

13  We lent them the shares. They didn't own the shares.

14  Q.   But if Lehman had placed in the market the eighteen

15  million and there was one holder of over five percent, that

16  person would have had to file a 13(g), correct?

17  A.   Correct.

18  Q.   Now on the issue of voting, there have been no shareholder

19  votes since September 15th, 2008, have there?

20  A.   That's correct.

21  Q.   You said that a seven percent shareholder could have a big

22  impact, correct?

23  A.   Could have influence, yes.

24  Q.   But there has been no vote, no proposal that you've -- you

25  made to shareholders for which Barclays would ask to either

170

1    vote yes, no, or abstain, isn't that right?

2    A.   Correct.

3    Q.   And in fact if there were a proposal that Barclays voted

4    for, that would be a good thing for the company if you're a

5    sponsor of the proposal, correct?

6    A.   Correct.

7    Q.   And you have no basis as you're sitting there today to

8    know what Barclays capital vote might be on any particular

9    proposal that might be coming up for the shareholders in the

10   next year, is that correct?

11   A.   That is correct.

12           MR. MORAG:  Your Honor, if I may consult for one

13   second, we may be at the end.

14           THE COURT:  Sure.  If the witness would like some

15   water?

16           MR. MORAG:  We have a bottle, Your Honor, a bottle

17   coming up as well.

18           THE WITNESS:  Oh, thank you.

19   BY MR. MORAG:

20   Q.   One last question.  You do have up to two hundred fifty

21   million shares authorized, correct?

22   A.   That's correct.

23           MR. MORAG:  No further questions at this time.

24           THE COURT:  Are there further questions of the

25   witness?  Any redirect?

VERITEXT REPORTING COMPANY

212-267-6868                                              516-608-2400

1          MR. GRILLO:  Yes, Your Honor.  Just a couple quick

2      questions on redirect.

3      REDIRECT EXAMINATION

4      BY MR. GRILLO:

5      Q.    I just want to clarify a couple of answers because I

6      wasn't sure that I had understood them. One of the questions

7      was, "were your shareholders - did you discuss the 160 with

8      your shareholders before September 13th or were those

9      discussions had after the effect of this transaction?

10     A.    Our shareholders were a bit concerned about the number of

11     shares we've had outstanding well over a year.  They were

12     concerned with the hundred and twenty million share level.  The

13     reason we did the transaction we did in the summer, that three

14     hundred and seventy five billion dollar convertible note

15     transaction -- it settles for cash not for shares, so we were

16     very attuned to the dilution of our shareholders. So those -

17     that discussion, those discussions have occurred for well over

18     a year.  It was made even worse by the fact that these 30.9

19     million shares that our shareholders thought were lent, that

20     would not be included in our outstanding shares for EPS were

21     now included in outstanding shares for EPS.

22     Q.    Mr. Morag asked you a question with respect to the effect

23     that Barclays has, that Barclays could vote in favor of

24     something that you can oppose, correct?  He asked you that, do

25     you remember he asked that question?

172

1   A.    Yes. Right.

2   Q.    I think I asked you on direct, but I just want to confirm,

3   have you ever heard from Barclays since they closed this

4   transaction?

5   A.    Other than the three representatives that I told you went

6   from Lehman to Barclay, no.

7   Q.    And when you asked them if they were interested in

8   continuing to work with the company, did you get a response to

9   that question?

10  A.    They were interested in working on a new transaction,

11  which we said was unacceptable. They were not interested in

12  helping us solve the problem that was created.

13  Q.    Okay. But did anyone tell you - did you ever learn from

14  Barclays at any point in time what they paid for the shares?

15  A.    Did not.

16  Q.    Did they - did anyone from Barclays ever contact you

17  saying that they were interested in voting those shares?

18  A.    No.

19  Q.    Has anyone from Barclays ever expressed any interest in

20  the company whatsoever?

21  A.    No.

22  Q.    So, if you needed to go for a vote on the shares, would

23  you know who at Barclays to contact?

24  A.    Didn't know who to contact in September, don't know today.

25  Q.    We have no further questions, Your Honor.

173

1          THE COURT:  Anything more?  Or do you want to leave

2     it alone.  You're free to do either.

3          MR. GRILLO:  We'll leave it alone.

4          THE COURT:  Fine.  Witness is excused.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Anything more?  Is that your case?

7          MR. GRILLO:  Those are the witnesses, Your Honor.  I

8     would take a couple of minutes to close, if I could.

9          THE COURT:  Let me make the following suggestion, in

10    light of the fact that the witness was parched and needed to

11    drink, that maybe there are others how need a five or ten

12    minute break.  Let's take a ten minute break and resume for

13    further argument at five to 6.

14         (Recess from 5:44 p.m. until 6:00 p.m.)

15         THE COURT:  Be seated, please.  Closing argument?

16         MR. GRILLO:  Yes please, Your Honor.

17         We came to this Court today, Your Honor, to explain,

18    sort of, what makes Evergreen's situation in this transaction

19    unique, why the harm it suffers is unique and also why the

20    balance of the harms, in that case or in this instance, is

21    unduly burdensome to Evergreen as opposed to Barclays.

22         What Mr. El-Hillow testified to today was to say they

23    have to go back to the capital markets.  They're going back to

24    the capital markets quickly.  This transaction has a very

25    negative impact, both from a governance perspective and from a

174

1    fundraising perspective.  This is not IBM that operates off its

2    cash flow.  I think what Mr. El-Hillow said was specifically

3    that they operate at a seven to ten million dollar a month

4    loss.  And that as a result they can't fund themselves from

5    operations.

6        The anticipation in connection with this transaction,

7    what they bargained for at the end of the day, was an ability

8    to keep their shares off the marketplace or put into the

9    marketplace with an understanding that they can come back.

10   Lehman is not longer there to perform.  So they know they're

11   not getting the benefit of that transaction.  They know that

12   those eighteen million shares are out there in the marketplace

13   and they can't get paid for them and at best they have a breach

14   of contract claim.

15       What they don't or what separates the rest of this

16   transaction from that is that the remainder of the shares,

17   after they made due inquiry, after they tried to find out where

18   they were and what was going on and after they were stonewalled

19   by Lehman were sold in a process for which they didn't have

20   notice, for which they couldn't otherwise -- or which they

21   weren't otherwise participating because they didn't even know

22   where the shares were.

23       And as a result, that those shares being out there in

24   the marketplace and now concentrated in the hands of one party

25   changes the way that they have to run their company.  It

175

1    changes how they exercise their votes.  It changes how they go

2    to the marketplace, how they get approval for corporate

3    governance issues and whether or not somebody will even answer

4    the phone in respect to those shares.

5         Mr. El-Hillow testified that nobody from Barclays has

6    reached out to them or there hasn't been a vote yet.  There

7    will be votes with respect to transactions on a go forward

8    basis.

9         THE COURT:  With respect to the argument you're

10   making, I think you're mischaracterizing the evidence that I

11   heard.  There are no current needs to go to shareholders for

12   approval, there are no current transactions that are in

13   prospect, there are no transactions that have even been, based

14   on the testimony, discussed with any third party.  This is all,

15   my term, somewhat speculative.

16        While it may happen some time in the future, there's

17   no indication that it's about to happen.

18        MR. GRILLO:  I would disagree with one portion of

19   that, Your Honor.  What I would say is that he is -- what Mr.

20   El-Hillow did testify to is that he was meeting with investors,

21   that he knows he needs additional capital, that it's not an

22   overnight process.  There is -- it is correct to say that there

23   is no vote pending today but that the fundraising for a company

24   like Evergreen is a process.  And you go and you talk to your

25   shareholders, and I think he indicated that he has, in fact,

176

1    spoken to his shareholders who are not pleased with where

2    things are, making it doubly difficult to raise money under the

3    current circumstances.

4            So I agree with the proposition that there is not

5    presently a vote pending, okay.  But I think what he testified

6    to when I asked the question was, do you anticipate going to

7    the market within the next twelve months?  The answer was yes.

8    Do you anticipate -- are you losing money and can you fund

9    yourself from your operations, the answer was yes we are losing

10   money and no we cannot fund ourselves from our operations.  And

11   that we need to go back to the market, in the short term, for

12   capital.

13           But yes, there is no vote presently pending but the

14   anticipation is that they need to go to the market in this

15   short period of time.  So what happens from that perspective is

16   that, I think as everybody in this courtroom and as Your Honor

17   is well aware from many years of being in private practices,

18   that doesn't happen overnight and you may never be able to put

19   a transaction together because of the fact that this is what's

20   occurred with respect to these shares.

21           If you can lock up those shares and know that those

22   shares can't vote and may be subject to -- and possibly not

23   going out there, then that will make it somewhat easier, I

24   think, was the conclusion to be drawn from Mr. El-Hillow's

25   testimony.  So I understand Your Honor's point but I think it's

177

1    a process, especially for a company like this.  I think what he

2    said was that the capital markets are extremely challenging,

3    the debt markets are certainly extremely challenging.  And as a

4    result that will have a negative impact on how they raise

5    money.  And if this matter were to run its normal course and

6    take six, nine months or a year to resolve, then by that point

7    in time there might not even be a company left if there's an

8    issue with respect to how they vote.

9          THE COURT:  But when you say if this matter were to

10   run its normal course, you're talking about the adversary

11   proceeding brought by Evergreen against Barclays, correct?

12         MR. GRILLO:  Barclays and Lehman, yes.

13         THE COURT:  And your assumption is that that's a

14   process that takes six months, nine months or a year to

15   resolve?

16         MR. GRILLO:  That's my working assumption Your Honor.

17   Yes.  Just going through the fact that there's time to answer,

18   there could be pre-trial motion practice, discovery --

19         THE COURT:  Does that mean that what you're looking

20   for is an injunction that might have a duration of as long as a

21   year?

22         MR. GRILLO:  Well, I think what we are looking for

23   today is an injunction for some period of time in the hope that

24   one, we can negotiate a resolution.  We'd certainly be willing

25   to live with a short term injunction so that this way we know

178

1    that all of these parties have been occupied with very weighty

2    and big matters.

3            We'd like an injunction for the opportunity to

4    discuss a resolution with them. What we don't want to do is

5    have the shares go out in the short period of time before we

6    could actually negotiate a resolution because we think that --

7            THE COURT:  See, I think you actually have a

8    different case but I'm not suggesting that the case you've put

9    on is inadequate; I'm just making an observation.

10           If you had a financing transaction that was within

11   your grasp and you had a witness who said I went to try to

12   close this transaction and I needed shareholder consents and I

13   called up the people at Barclays and they hung up on me.  Let's

14   just say that happened.

15           MR. GRILLO:  Sure.

16           THE COURT:  That's a different kind of fact pattern

17   as opposed to I have a litigation that might go on for a year,

18   don't know how long it's going to take, actually.  And sometime

19   in that year we may have the need to go to the markets, in fact

20   we expect we will and we don't know whether or not somebody at

21   the other end of the phone is going to say yes when we ask for

22   an affirmative vote.  That's a pretty speculative suggestion as

23   compared with one that I made up which involves imminent harm.

24   So I'm just letting you know that one of the things I'm

25   weighing as I'm hearing all this is the difference between that

179

1   which is imminent and real and that which is foreseeable but

2   long term and not yet in anybody's grasp.

3          MR. GRILLO:  Okay.  Could I respond to that point, if

4   I may?

5          THE COURT:  Absolutely.

6          MR. GRILLO:  Okay.  Very simply, Your Honor, based on

7   where we are and based on the events that occurred and based on

8   the uncertainty with these shares, we may have difficulty just

9   getting to that point, on account of the current circumstances

10  and what has happened with the shares.

11         And so it would almost be, frankly, a rich man's

12  problem, so to speak, if we were coming to the Court and saying

13  well we had this transaction all lined up and ready to go.

14  People will have very little interest, perhaps, in

15  participating in any kind of a financing knowing what's

16  happened and knowing that there is a party out there.  No one

17  will invest the time or the energy without understanding where

18  the second largest shareholder of the company is.

19         THE COURT:  Who's the largest?

20         MR. GRILLO:  I think it's DC Chemical.  Yes, Your

21  Honor, it's DC Chemical.  DC Chemical has, I think, twelve

22  percent, approximately, seventeen million shares.  They also

23  have, Your Honor, a strategic relationship.  They're a main

24  supplier of the company and what was put together, and this is

25  obviously all disclosed in our public filings, but they put

180

1    together a transaction where we sold them shares and they

2    continued to supply us with silicon, I believe.  So they're a

3    major player in our company but they're also a strategic

4    partner.

5           We had, as our partner if you will, Lehman as our

6    banker and the duties that they had to exercise good faith

7    under these variety of agreements that we discussed today.  Now

8    we don't have that.  Now we've got a purchaser who obviously

9    has taken, since the sale, little or no interest in our

10   company.  Now we have to go back to the markets and raise more

11   money because we're at a cash flow negative business, because

12   that takes some time to put together.  And what we don't have

13   in the record and not withstanding the fact that we've raised

14   it in the pleadings is what they think they even paid for it.

15   And that's where the disconnect, I think, is quite frankly.  Is

16   that if this were something where they said look we took a

17   strategic interest in this for the following reasons, and I'm

18   sure if they had somebody who could say that, they would have

19   done that but there isn't.  And that's why getting to the

20   balance of the harms argument, that's why this is so much more

21   critical for us, respectfully, then it is for Barclays or for

22   Lehman.

23          And whereas it can be resolved as far as their

24   concerned by taking the whole transaction and whatever the

25   value was under the repo or otherwise that was paid for it and

181

1    putting it aside, the difference is it's extremely difficult

2    for us to do that.  It's extremely difficult to go into the

3    marketplace with this issue open.  It's extremely difficult to

4    post a bond.  I mean, we're not -- Your Honor made that point

5    in the very beginning.  We know what the law is on that point.

6    What we had tried to propose something to Your Honor, was to be

7    more creative so that this way we wouldn't suffer the harm

8    that's been caused by this transaction when we did everything

9    that we could to reach out and figure out what was going on.

10   And that's really where this -- where this is so important to a

11   company like Evergreen.  And presumably, it was a forty-five

12   billion dollar transaction.  This is, at best, fifty or sixty

13   million dollars of it.  We're sensitive to that.  But if you

14   measure it on a percentage basis, it's miniscule.

15        THE COURT:  Well, the forty-five billion, as I

16   understand it, was the amount advanced by Barclays in

17   consideration of the repurchase agreement.  And my

18   understanding is that the securities that were swept up in that

19   repo included the stock which was subject to the share lending

20   agreement that we've been talking about.

21        MR. GRILLO:  We believe that's correct.

22        THE COURT:  Now, one of the problems that I'm having

23   as I'm listening to all this, and I'm going to give everybody

24   who wants to argue an opportunity to speak, is that assuming I

25   get over the hurdle of irreparable harm, which I consider to

182

1    be, as I said at the outset, a significant hurdle.  And I've

2    also said that I view some of what you talked about as

3    sympathetic but speculative.

4         I think the bonding problem is a very real problem,

5    in part because you're talking about tying up the shares for an

6    indefinite period of time.  You mentioned, well perhaps this is

7    just a short term arrangement, I don't know that and I'm not

8    sure what the proper bond would be for a short term injunction

9    anyway.  One of the problems we all confront in the current

10   climate is that with volatility being what it is and with the

11   share price having materially eroded over time this year, as I

12   understand it, it's very hard to know whether holding these

13   shares in the current environment exposes Barclays, as

14   purchaser, to risk and how to quantify that risk.

15        If you had an agreement with Barclays concerning the

16   terms of an appropriate bond, it would be much easier for me to

17   get over the hurdle as to speculation.  And if you had an

18   agreement as to the duration of some kind of consensual

19   standstill in connection with disposition of the shares, that

20   would also be helpful.  But my working premise is that we

21   wouldn't have had this hearing if it were possible for counsel,

22   by agreement, to work out some kind of standstill arrangement.

23   And that in effect everybody's sort of testing the water here.

24        I'll hear what Barclays' counsel has to say on this

25   whole subject but I'd be interested in knowing, assuming I were

183

1   to set a bond, what the right amount would be because I'm not

2   inclined to go along with the creative approach that you

3   outlined at the outset of the hearing.  This is something

4   which, if it is to be approved as a preliminary injunction,

5   will require an appropriate bond.  And I'm going to need some

6   guidance from the parties as to what the amount of the bond

7   should be.

8           MR. GRILLO:  Understood.  And I'd like to, if I just

9   can take a moment.  And I know the other parties will respond

10  to this point as well.

11          With respect to the amount of the bond, our guys have

12  tried to engage, I think, as Mr. El-Hillow testified, with

13  Barclays and find a responsible party to discuss business

14  terms.  That did not occur.  Why?  Because in all likelihood

15  this is just not on anybody's radar on the business side.

16  That's my sense.  So we're all prepared to have a variety of

17  discussions, starting with a standstill and what the terms of

18  the standstill would be.

19          We are prepared to reach out and do that and have

20  that discussion.  In terms of what an appropriate injunction

21  would or wouldn't be, I think what we can do is we can bite

22  this off, frankly, in small chunks.  And based on where I think

23  I understand Your Honor to be is to say to the Court look, tell

24  us you're not selling the shares in the next, call it, fifteen

25  days.  That being the case, we can come back to Your Honor with

184

1    a recommendation for a bond amount, if there is one, or some

2    other form.  But it doesn't sound like, from a business

3    perspective, and there's been no evidence offered and from what

4    Mr. Morag said there's no intention -- just as we're concerned,

5    they have not expressed an intention to sell.  And if, in the

6    interim, they make a decision to come back and sell sooner,

7    then we can do that.

8            Our concern and our speculation, which we would have

9    to ultimately undertake discovery on is we don't even know

10   whether or not they knew that they were getting these, other

11   than to say that they were thrown into a pile of shares along

12   with everything else.  Discovery will sort that out at the end

13   of the day.  But what we're talking about is addressing an

14   immediate concern.  We can do it over a short period of time,

15   we can come back to Your Honor either with an agreement or not

16   or I think a firm position on what the appropriate amount of a

17   bond will be.  But I don't see how people are harmed in the

18   interim if we just ask everyone to stand still for a very

19   limited period of time.

20           THE COURT:  You didn't need me to make that request

21   and get that answer.  Presumably this all could have happened

22   in a conference room last week instead of in a courtroom today.

23           MR. GRILLO:  It could have but it didn't and that's -

24   - and that's unfortunate.  If this wasn't a matter of extreme

25   importance to us we would not want to miss the opportunity to

185

1   be before Your Honor if it appeared that we couldn't work

2   things out.  And I don't want to characterize either what did

3   or didn't happen leading up to the hearing because it's

4   irrelevant.

5        THE COURT:  It's not part of a closing argument.  I

6   understand your position and I understand your argument, which

7   is maybe we can just push this over for a couple of weeks and

8   parties can talk about the bond amount.  But of course that

9   assumes that there is a willingness on Barclays part to

10  acknowledge that you've shown irreparable harm and that if push

11  came to shove that they'd actually lose.

12       So I think I'd better hear their argument and make a

13  judgment as to how strong it is before we go into the fifteen

14  day rule.

15       MR. GRILLO:  Okay.  I did have a couple of quick

16  points that I did just want to make but I can do that

17  afterwards or not at all.

18       THE COURT:  Why don't you finish your argument, that

19  way Barclays can know exactly what it's responding to.

20       MR. GRILLO:  All right.

21       THE COURT:  Okay.

22       MR. GRILLO:  Your Honor posed two questions at the

23  beginning.  One, are they taking under the SLA or are they

24  taking pursuant to the 363 sale?  I don't know that we heard or

25  maybe the answer to that was presumed.  In our view the 363

186

1    sale, at least as it relates to this stock, because of a lack

2    of notice after the inquiry that was made to Lehman before the

3    sale took place meant that at least as far as our rights were

4    concerned that the 363 sale should be put to the back burner

5    and we should look at what the rights were under the share

6    lending agreement.  It's our position that the share lending

7    agreement controls in that regard.

8         With respect to --

9         THE COURT:  How does it control, as a matter of law,

10   if you accept for the sake of today's discussion, that there is

11   a valid sale order that sold to Barclays, as good faith

12   purchaser, a portfolio of assets including these shares?

13        MR. GRILLO:  Because, Your Honor, the question is

14   what did the debtors tell the parties were being sold and what

15   was in fact sold.  And it's our position that those are two

16   different things.  And to the extent that the debtors made

17   certain representations or warrantees, it's a premise of our

18   action that they were inaccurate as it was for the shares on

19   account of the existence in the share lending agreement.  And

20   as a result that since we did not have -- as we, sort of, went

21   to assert our rights and they didn't provide us with direct

22   notice of the sale, I think the case law says that in order to

23   be bound by this type of order you had to have notice.  They

24   admitted, or excuse me, there's nothing in the record rather

25   that says that they gave us notice notwithstanding the fact

187

1    that there is, in the record, letters to them with regard to

2    the rights of our shares.  So from our perspective we have due

3    process problem based on the way Lehman conducted the sale.

4         So that's the issue as far as our client is

5    concerned.  We understand that there was a big transaction but

6    it wasn't disclosed to us that these shares were being put as

7    part of that group of assets that were subject to the repo.  In

8    fact, in the motion papers the repo is not disclosed.  So

9    that's the concern that we have vis-a-vis the sale order as it

10   affects the Evergreen shares.

11        And again, just a final point Your Honor.  With

12   respect to the 13G that was filed and the fact that we haven't

13   been able to follow up with Barclays, we just don't know what

14   their intentions are.  The fact that there's a 13G pending does

15   not preclude them from filing a 13D that indicates they do have

16   a greater interest in the company when they figure out what

17   they have and what we don't have.  Is that speculative?  Yes it

18   is to some degree.  But there's nothing protecting the company

19   if they were to change their view based on what they've

20   purchased.

21        And as a result it seems to us that it's important

22   to, sort of, establish that and use the injunction as a means

23   to protect ourselves while we go through that process of

24   figuring out who these shares belong to, do they really want

25   them, is anyone willing to live up to this agreement or not and

188

1    what the position will be going forward.  And if we have those

2    conversations with Barclays, I think we would be in a position

3    to move this matter forward and perhaps even take it off the

4    Court's calendar.  But we think, if you look at the harm, the

5    harm is what it does to our process, what it does to our

6    corporate governance, what it does to our fundraising.  That's

7    very different then anything they can say with respect to

8    shares that they can't even come to court and explain what they

9    paid for them at the end of the day as a good faith purchaser

10   or otherwise.  That tips, decidedly, in favor of Evergreen.

11        It's irreparable because there's a process.  There's

12   a process to raise money.  It's very difficult, if testimony is

13   uncontroverted, that it's much harder under the current

14   circumstances as a result of this sale then it would be

15   otherwise.  Thank you.

16        THE COURT:  Thank you, Mr. Grillo.

17        (Pause)

18        MR. MORAG:  Your Honor, we do believe that Evergreen

19   Solar has failed to establish, as is their burden, an imminent

20   irreparable harm that is not, in fact, speculative or

21   potentially far off in the distance.  The record before you

22   would be -- could just as equally support a finding that the

23   Barclays ownership at this time is neutral to the company,

24   beneficial to the company.  There is absolutely no specificity

25   or information on which you could rely to make a determination

1   that Evergreen is being adversely affected.

2         The other point is we're here on a motion that was

3   noticed on the 21st that had a specific order that they wanted

4   Your Honor to enter.  And we have, entirely now, a moving

5   target.  The concerns that were raised today about votes and

6   about the things that differ between Lehman, when Lehman had

7   the shares they didn't vote, they didn't get dividends.  Now

8   Barclays has the shares.  But those aren't even covered by this

9   injunction that they're asking you to sign.  This injunction is

10  not to sell the shares or encumber them.  It doesn't even

11  address the issue of voting and governance.

12        Now, with respect to -- there is also no basis for a

13  short injunction until something.

14        THE COURT:  The parties can agree to that, that's the

15  only basis for it.

16        MR. MORAG:  That's right.  So what we're here on

17  today, what they've noticed and fully briefed and put on their

18  case, and we have our case with respect to the documents we

19  submitted and the declaration of Mr. Petri, is that there is

20  simply no irreparable harm and no harm, certainly that is

21  claimed to be irreparable, that would be remedied or alleviated

22  by the injunction that they're actually seeking.

23        The other thing that even doesn't make sense is they

24  don't want us to sell the shares because of the large

25  controlled position.  But if we actually did sell the shares in

190

1    small increments that doesn't depress or adversely affect the

2    stock price, then there would be no corporate governance issue.

3    So I don't really understand that their entitled to anything

4    right now, certainly on the basis of what they've showed but I

5    should say, I know you're focusing on irreparable harm.  As the

6    case law indicates it is the paramount concern.  But there are

7    some substantial issues with respect to the likelihood of

8    success on the merits here.

9         Mr. Grillo anticipated that with discovery and

10   answers and pre-trial motions this case could take a year.  Our

11   position is that this case will be the subject of a motion to

12   dismiss, irrespective of -- not irrespective, Your Honor, you

13   could obviously make findings that would influence our

14   decision.  But our coming into this case assumption, into this

15   hearing assumption, is that the fundamental premise of this

16   concept that they had title is erroneous and I will walk you

17   through that if you'd care to hear it.

18        This concept that LBI, Lehman Brothers Inc. the party

19   that sold these shares to Barclays in the repo, did not have

20   title at the time of this transaction because LBIE was in

21   default -- the borrower is in default, is not accurate on this

22   agreement that they're so heavily relying on.  And to summarize

23   it for you, their own 8K, the document that was reviewed by the

24   lawyers, indicates that when LBIE borrowed the shares it

25   immediately transferred all thirty million to LBI.  The

191

1    obligation is on the borrower, not LBI, to return these shares.

2         The act that they claim cut off the title or interest

3    of LBIE, the borrower, occurred on September 15th if you accept

4    their papers.  The transfer of those shares, when LBIE had

5    every right to do so to LBI, took place in July or the end of

6    June.  So that is the reading, the proper reading, of this

7    agreement and I have a demonstrative, it's just a series of

8    bullet points that articulates the syllogism of this argument,

9    if Your Honor is interested in receiving it.

10        THE COURT:  I'm interested but it's certainly

11   unconventional.

12        MR. MORAG:  Okay.

13        THE COURT:  If you've gone to the trouble of

14   preparing it I'll take a look at it.

15        MR. MORAG:  It's no different from if I read it to

16   you, you'd hear it in argument form.

17        THE COURT:  I'll take the demonstrative.

18        MR. GRILLO:  I assume this is being offered as

19   argument and not as evidence.

20        THE COURT:  It's clearly not evidence.

21        MR. MORAG:  It's not evidence, it does cite evidence.

22        THE COURT:  You may approach with it and I'll follow

23   along as you make the argument.

24        I'll only point this out before you go into this.

25   This was not a mini hearing on whether or not a good claim was

1    made by the plaintiff, Evergreen Solar, with respect to the

2    questions of title that you're now addressing.  No witness was

3    presented in connection with that.  I'm not sure what witness

4    could be presented but if we get to a trial, should I deny your

5    motion to dismiss, I suppose we'll find out what witness will

6    get to that question, unless it's something that can be

7    disposed of on the basis of a clean reading of unambiguous

8    documents.

9          But I'm questioning where you're going with this

10   because, and I'm not trying to cut you off, I'm interested in

11   hearing your argument.  Obviously you're getting the question

12   of whether or not there's a likelihood of success on the

13   merits.  But I'm surprised we didn't get to that before

14   closing.  Because wasn't that part of the case you'd be putting

15   on in defending against this or is this that case?  Do you view

16   this as legal argument or do you view this as my needing to

17   review record facts to make judgments in which I assess the

18   relative strengths of your defenses.

19          MR. MORAG:  Your Honor, forgive me but I had

20   understood that the fourteen exhibits were admitted into

21   evidence.

22          THE COURT:  They were but nobody told me what they

23   were.  So the only thing that I know is what Mr. Grillo

24   presented during his examination of the witnesses.  And because

25   you did not, during the course of the case up to this moment,

193

1  reference any of the documents, I can't really tell where

2  you're going with it.

3          I'm going to give you the full opportunity to make

4  the presentation.  And if you want to take me through what's in

5  the agreed record, that's fine.

6          MR. MORAG:  Your Honor, the agreed record are the

7  documents that were annexed to the complaint, that were annexed

8  to our opposition papers.  And that's the sum total of it.

9  Maybe I misunderstood but when we had our conference call

10  yesterday, I had understood that Your Honor had read the

11  papers.

12          THE COURT:  Yes.

13          MR. MORAG:  And what I am suggesting to develop here

14  is an argument, a legal argument, based on the evidence that's

15  on the record with which I thought Your Honor was familiar.

16  And forgive me if I made that erroneous assumption.

17          THE COURT:  No, it's fine.  I don't view anything

18  that I read in pleadings as being in the record.  I simply view

19  that as being an attachment to a pleading.  If you're telling

20  me it's now all in evidence, that's fine.  We'll talk about it

21  now.

22          MR. MORAG:  I believe it is and I thought it might be

23  inappropriate to argue with the witness about the meaning of

24  agreements.

25          THE COURT:  We've talked about this enough, why don't

194

1        you go through your argument.

2               MR. MORAG:  And let me say, that obviously although

3        irreparable harm is a threshold and key issue, for what they

4        are seeking or what they say they're seeking the Court under

5        the Second Circuit precedent must find the likelihood of

6        success as well or the alternative aspect of the standards, the

7        fair grounds for dispute run the balance of hardships.  It's

8        not just irreparable harm.

9               The point, and I think we do lay it out in our

10       opposition brief so I don't know that I need to belabor it, is

11       simply that their whole case, and I think Mr. Wiltenburg

12       mentioned this as well, turns on the assertion that whereas

13       Lehman, what they refer to as Lehman, they refer to the Lehman

14       defendants throughout their reply, they don't distinguish them.

15              THE COURT:  They argue this in ipso facto effect

16       caused by the downgrade in credit quality.  The result being

17       that they are revested with title to the shares.  That's their

18       argument.

19              You argue that that's not so.

20              MR. MORAG:  Well actually, if I may.  The downgrade

21       did not constitute an event of default that they claim revested

22       them with the shares.  The downgrade created a collateral

23       trigger.  As Mr. El-Hillow testified, this deal, the deal they

24       negotiated did not include any collateral whatsoever from

25       Lehman Brothers holding these shares worth hundreds of millions

195

1    of dollars, until there was a two notch credit downgrade in the

2    parent holding company.  That was the deal.  The credit risk

3    existed until the two notch downgrade.

4          It happened to coincide, I guess calendar-wise, with

5    the filing.  The LBHI downgrade coincided, maybe coincidentally

6    maybe not, I don't really know that, with the filing in London

7    of LBIE in its insolvency proceeding.  So that was what is

8    claimed to be the event of default.  And that is what triggers

9    the obligation three days thereafter to return the shares and

10   what they say triggers the divestment of title at that point.

11   When there is a duty to deliver them back there's no longer

12   title.

13         In LBIE the borrower, we say that these distinctions

14   between the Lehman entities are legally significant.  I

15   understand if Mr. El-Hillow as a business person did not

16   appreciate them.  But these are sophisticated documents,

17   reviewed by lawyers.  There may have been good and proper

18   reasons for Lehman Brothers, as a business organization, to

19   have structured these things this way with a European borrower

20   and U.S. broker/dealer.  But I think it's pretty clear from

21   these entire proceedings we can't just ignore all that and just

22   mush it all together.

23         Lehman Brothers International, Inc., Europe, is the

24   borrower.  Its title is supposedly divested only on the 15th.

25   Before that time Lehman Brothers International Europe had

196

1    transferred the shares.  The word is sold according to their

2    8K, which is their publication to the shareholder community.

3    They sold the shares to LBI.  There was legal significance to

4    that act.  The significance is that when Barclays purchased

5    them through the repo from LBI, LBI had obtained them before

6    any termination of anybody's rights.  That's the point that

7    this --

8              MR. GRILLO:  Your Honor, respectfully that's not in

9    the record.

10             THE COURT:  Well, you don't have to make that

11   argument.  He's making a closing argument and I've already said

12   that I don't view it as being in the record.  It's not in the

13   record.  You're making an argument that's much the same as the

14   argument being made by Evergreen Solar.  They're saying the

15   documents should be interpreted our way and you're saying, as a

16   matter of fact, that the securities moved on certain dates and

17   were, in fact, located at LBI on certain dates.  I don't know

18   that.  Tell me where, in your papers, you make that clear so

19   that it's in the evidentiary record.

20             MR. MORAG:  Yes, Your Honor.  In the evidentiary

21   record of Tab 7, the 8K at page 14.  This was the sentence that

22   Mr. El-Hillow read that establishes that as of July 2nd, when

23   this document is dated and put out into the public, the

24   transaction was to be a borrowing by LBIE of the 30,856,538

25   shares.  Delivery to the borrower and the borrower -- and the

1    underwriter, which is LBI, that was the reason for going

2    through the different entities.   Upon such issuance and loan

3    to the borrower agrees to purchase such shares from the

4    borrower.

5           THE COURT:  How do I know that happened?

6           MR. MORAG:  Your Honor, we know that LBI was the

7    one -- the entity that sold them to Barclays in the repo.

8           THE COURT:  How do I know that the 8K -- all the 8K

9    is doing is attaching the underwriting agreement which is dated

10   June 26, 2008, Exhibit 1.2.  We spent some time trying to find

11   page 14 because there were multiple page 14s in the exhibit.

12   And you went through that sentence with this witness who was

13   certainly not a witness who speaks for Lehman Brothers, the

14   borrower, the lending agent or any affiliate of Lehman

15   Brothers.  He speaks for the company.  And you asked him

16   questions about a document that he acknowledged, based upon

17   your questioning, was prepared by lawyers, accountants and

18   others, although he was involved in it.  That doesn't tell me

19   when the securities moved, if the securities moved or whether

20   or not they were held by the borrower, contrary to the terms of

21   the agreement and moved to another time.  You haven't proven

22   it, at least not to my satisfaction.

23          You certainly established what the underwriting

24   agreement provided.  That doesn't mean it was performed in

25   accordance with its terms.

1        MR. MORAG:  Your Honor, I believe we will be able to

2    find further citations in this record.  But let me just say

3    that we --

4        THE COURT:  All I'm saying is you're making an

5    argument, and I understand the reason you're making it, but you

6    haven't proven what you assert has been proven by virtue of

7    that paragraph.

8        MR. MORAG:  Well, there is -- I will try my best to

9    fill in those gaps as you see them.

10       THE COURT:  You may not be able to do it this

11   evening.

12       MR. MORAG:  I may not.

13       THE COURT:  Because the record is closed.  I mean, if

14   it's in this document and it says if there's some kind of

15   receipt executed by LBI showing receipt of shares and it's

16   stamped and it has a seal on it, I guess that's pretty

17   persuasive or some other transactional document from within

18   Lehman Brothers showing movement of shares.

19       But I think we all know, based upon everything that's

20   going on in this case, that the records are still in the

21   process of being restored and made transparent.

22       MR. MORAG:  Your Honor, we will endeavor to find it

23   and if we don't we will move on.  But the last element of the

24   chain that whether or not the repo or the shares were sold by

25   LBI, I believe, is alleged by the plaintiffs to have been the

199

1   case in their reply papers.  The Petri declaration does

2   establish that the repo was between LBI and Barclays.  There

3   was no involvement of LBIE in the repo.

4        I have to fill in the gap but the first part and the

5   third part are there.  I'm working on the second.

6        THE COURT:  We have absolutely no debate here.  We

7   understand that somehow these shares ended up at Barclays.  And

8   based upon the transactional provenance, the shares must have

9   been in the hands of LBI at some point.  I just don't know at

10  what point they ended up in LBI's control.

11       MR. MORAG:  Your Honor, that's --

12       THE COURT:  Nor is there any statement by anyone as

13  to when that took place, to my knowledge.

14       MR. MORAG:  Your Honor, I hear you but at the same

15  time I would simply point out that although we have every

16  reason to believe and we will endeavor to confirm, that it

17  happened in the course -- that it was outlined -- it was

18  expected to happen.  We are here on a motion as to which

19  Evergreen bears the burden.  For them to succeed in their

20  argument that they timely vested title and the consequence of

21  that is that nothing done after the 15th of September, with

22  respect to these shares, by any Lehman entity was appropriate

23  or gives the ground for a conversion claim.  Since it is

24  admitted and known that LBI held the shares, I think the

25  failure of proof there goes to the question of Evergreen's

200

1    establishing its likelihood of success on what is a key element

2    of their claim, this title divested.

3         Now, if I can move on.  We do agree that the Court

4    can't simply put the sale order to one side.  And all we would

5    say is that they didn't, as far as I can tell, brief the case

6    law on due process notice.  But I don't believe they

7    established a likelihood of success that the sale order should

8    be ignored, revised or any other verb for purposes of their

9    claim.  And I think it's a binding, governing document that

10   Your Honor should take into consideration, including the

11   findings made therein.

12        Finally, there's the UCC argument.  And that is that

13   comes into play only if you find that they did have some sort

14   of property interest in these shares, that there was some sort

15   of title reversion that gives them a claim, potentially, to

16   look to third parties who purchased these shares.

17        Now, in terms of -- that's not an issue that's been

18   discussed at any length here in their papers.  They seem to

19   suggest that they should be considered like -- akin to a

20   customer of Lehman Brothers Inc, I guess.  We would point out,

21   and we made reference in our opposition to the law that says

22   that if you're claiming to be a customer and that your

23   securities intermediary has been rendered insolvent, that falls

24   under the rubric of Section 8503 of the UCC, which imposes a

25   standard that's different from the notice of an adverse claim.

201

1    It actually is, I think, intentionally and for various policy

2    reasons an even higher standard for the plaintiff to meet which

3    is that there was collusion between the purchaser and the

4    securities intermediary to violate the security intermediary,

5    that would be Lehman's, obligations to Evergreen.

6          Now, they've not made any showing of that in the

7    record portion.  And so that's the law if they want to claim

8    that they're customers in this circumstance.  If they are

9    counterparties, the Sections 8502 and 8510 of the UCC say that

10   no claim, whether it's conversion or any other legal theory,

11   can be asserted against a third party purchaser unless there is

12   notice of an adverse claim.

13         The adverse claim concept is not simply that there

14   may be people out there who aren't going to be happy with this

15   transaction.  But rather it's a -- there has to be notice that

16   there is someone out there with a property interest in these

17   shares, not a mere contractual right to the shares, a property

18   interest in the shares.  And that's found in the definition of

19   adverse claim in 8102(1).  And there are three circumstances

20   that the UCC, in Section 8105(a) enumerates as giving notice of

21   an adverse claim.  And these are narrowly construed and

22   exclusive.  The first is that the person knows of the adverse

23   claim.  That's a clear, actual knowledge standard that they

24   don't purport to satisfy, they're not relying on that one.

25         The third ground, which they're also not purporting

202

1    to rely on, is that there is some extraneous, statutory,

2    regulatory duty to investigate the provenance pedigree of a

3    security that you're purchasing.  There isn't and they don't

4    rely on that one.

5            So that leaves subsection (2).  The person is aware

6    of facts sufficient to indicate that there is a significant

7    probability that the adverse claim exists and deliberately

8    avoids information that would establish the existence of the

9    adverse claim.  That's what they call the willful blindness

10   standard but it starts from the proposition that there is some

11   facts that indicate a significant probability of an adverse

12   claim.

13           What they say in their papers is that we should have

14   known that Lehman had lots of share lending agreements.  That

15   is not, and there's been no evidence, that the circumstances of

16   the repo transaction and the interactions between Lehman and

17   Barclays Capital provided any information of notice.  It has to

18   be the specific claim not share lending agreements in general.

19   It has to be information about Evergreen Solar.  And other

20   commentary to this section also provides that it is -- when

21   we're talking about an organization it's not what the entire

22   organization knows it's what the people involved in the

23   transaction knew.  And you have Mr. Petri's declaration that

24   Barclays was not aware of any claim by Evergreen to these

25   shares until well after the repo transaction occurred.

203

1          That is the record.  That's what's in numbers 1

2     through 14.  So with those three arguments, the lack of the

3     title argument, that we have our little hole on, the sale order

4     and the UCC, we say there's no likelihood of success on the

5     merits.

6          As to the bond, and again we agree with Your Honor's

7     comment that you don't get an injunction because you're willing

8     to post a bond, you have to establish your entitlement to an

9     injunction and then there is a separate requirement of a bond.

10    The bond has to protect us for the duration of the injunction.

11    The injunction they're asking for, what they put before you, is

12    indefinite.  And the consequences to Barclays are the loss of

13    the market value of these shares between now -- I guess between

14    now and when this case is resolved if an injunction were to go

15    out till the case is resolved.  And based on the testament of a

16    year, that would be the -- the bond would essentially have to

17    cover that risk of the valuation of the shares in the next

18    year.

19         I see that I may not have been able to fill the

20    little hole by the time I'm done so if it matters, for future

21    proceedings, we will endeavor to fill that hole.  If it doesn't

22    affect your decision tonight, then it may not be necessary in

23    the future.

24         THE COURT:  Okay.  Mr. Wiltenburg, do you wish to be

25    heard?

204

1          MR. WILTENBURG:  If I may.

2          THE COURT:  Sure.

3      (Pause)

4          MR. WILTENBURG:  Your Honor, I feel that this matter

5    is really much simpler then it might appear to be.  And I would

6    start with Exhibit 2 in evidence, which is the SOA and with the

7    section that this -- from which plaintiff tries to derive this

8    automatic divestiture concept.

9          There was reference in the testimony to the second

10   sentence of Section 7 which appears on page 10 of the exhibit.

11   But the real guts of it is the first sentence.  And at the time

12   that the bankruptcy filing occurred there was no -- even if you

13   suppose that something as abstract as divestiture of title or

14   something as unusual as divestiture of title happens upon the

15   mere obligation to make redelivery, okay, that obligation had

16   not come into existence when the bankruptcy wall came down.

17         The idea that a pre-petition private contract can

18   have the effect of divesting a bankrupt estate of property is

19   an idea that, seems to me, fundamentally at odds with what we

20   know.

21         THE COURT:  But we had this discussion when you made

22   similar comments at the outset.  The borrower here is Lehman

23   Brothers International, Europe, LBIE.

24         MR. WILTENBURG:  Yes.

25         THE COURT:  The sentence that you refer me to in

205

1   Section 7 deals with the borrower.

2           MR. WILTENBURG:  Correct.

3           THE COURT:  Which is the entity which is not before

4   me but rather in administration in the UK.

5           MR. WILTENBURG: Yes.

6           THE COURT:  And the entity that you don't represent.

7           MR. WILTENBURG:  Quite so.

8           THE COURT:  And in your earlier remarks you talked

9   about their being some concept, you used the term ring fence,

10  like a ring fence that --

11          MR. WILTENBURG:  Yes.  Yes.

12          THE COURT:  -- that comes down around the UK estate

13  to prevent the loss of property rights.  That's not exactly

14  something that I can --

15          MR. WILTENBURG:  Your Honor --

16          THE COURT:  -- pin my decision on, is it?

17          MR. WILTENBURG:  Well --

18          THE COURT:  It's pretty oblique.

19          MR. WILTENBURG:  If I can push that comment --

20          THE COURT:  If you're saying to me that something

21  akin to the concept of property of the estate and the ipso

22  facto clause applies as to contractual rights as to all

23  contracts that affect LBIE and that the UK administrator who

24  chose to watch but not participate, took the position in the

25  case that there was no loss of rights by virtue of the

206

1    commencement of the UK administration proceeding on September

2    15, that would certainly be something I could hang my hat on.

3    Your argument is not, however, unless you're able to connect

4    the dots for me.

5          MR. WILTENBURG:  Your Honor, if I may.  I think I

6    don't need to know what the law is that prevails in London to

7    make this argument.  What I'm saying is that the plaintiff

8    needs to assume, as the first premise -- if you don't go this

9    step you don't go to any of the subsequent steps, has to assume

10   as a first premise a highly improbable thing for which they've

11   offered no support of any kind.

12         It would cost the estate money for me to find out and

13   get expert testimony on what the law is that prevails in

14   London.  I just don't think it's very likely.

15         THE COURT:  It doesn't cost very much to pick up the

16   phone and call Linklaters and ask them hey, you know I've got

17   this hearing this afternoon, can you tell me whether or not the

18   UK insolvency law has something like an ipso facto law.  We

19   have one, do you have one too?  I think the answer would be

20   either a yes or a no.  It wouldn't be expensive.

21         MR. WILTENBURG:  But I think the burden of proving

22   likelihood of that proposition, likelihood of the proposition

23   that there could be automatic divestiture, based on a private

24   pre-petition contract, the likelihood of that proposition is

25   for the plaintiff to show.

1          THE COURT:  Well, they've made that allegation but

2     nobody has convincingly said that they're wrong.  You're just

3     saying you think they're wrong.

4          MR. WILTENBURG:  Okay.  Well, I can start from the

5     text of this provision which doesn't say that.  And it only

6     says, and they try to derive it from the proposition that the

7     right to sell goes away when there's an obligation to redeliver

8     the shares.  I think we all have to agree that that obligation

9     to redeliver the shares did not come into being until the

10    bankruptcies had already happened.

11         THE COURT:  Okay.

12         MR. WILTENBURG:  Thank you, Your Honor.

13         THE COURT:  I know you tried to make it simple and I

14    appreciate your trying to do that.  Ms. Harvey, do you have

15    anything to say?

16         MS. HARVEY:  Nothing, Your Honor.  Thank you.

17         THE COURT:  Okay.  Well, it's just about 7:00, just

18    as we predicted.  I'm going to take about five minutes just to

19    collect my thoughts and then I'll come back and provide my

20    comments on the record.  Don't go very far.  Take a five minute

21    adjournment.

22      (Recess from 6:58 till 7:08)

23         THE COURT:  Please be seated.  This is my ruling with

24    respect to the motion brought by plaintiff, Evergreen Solar,

25    Inc., for a preliminary injunction.  We had a hearing that

208

1    included both the examination and cross examination of the

2    chief financial officer of the plaintiff as well as the

3    offering into evidence of a number of documents.  Those

4    documents are in the record as a result of a stipulation

5    between counsel.

6         The standard for granting a preliminary injunction

7    under applicable Second Circuit law has been briefed both by

8    the plaintiff and principally by Barclays in opposition.  There

9    is no disagreement as to the applicable law here.  It's

10    standard.  And to a very large extent the decision whether to

11    grant a preliminary injunction is discretionary with the Court

12    provided that the standards are satisfied.  As noted during

13    argument, the single most important prerequisite for the

14    issuance of a preliminary injunction is demonstrating provable,

15    irreparable harm.

16         The case law also indicates that irreparable harm is

17    an injury that is not remote or speculative but is actual and

18    imminent and a harm for which a monetary award cannot provide

19    adequate compensation.  I noted at the outset of the proceeding

20    that that was the standard I was most interested in.  And I

21    hope that in making that comment I didn't distract the

22    attention of the parties from other aspects of the standards

23    that the Court needs to address, including likelihood of

24    success on the merits.  Counsel for Barclays spent considerable

25    time, during the closing argument, pointing out a variety of

209

1    reasons why in, at least the judgment of counsel, the

2    litigation brought by Evergreen Solar against Barclays PLC,

3    Barclays Capital, Inc., Lehman Brothers Holding, Inc. and

4    Lehman Brothers, Inc. is one that is subject to a motion to

5    dismiss and is one as to which relief cannot be properly

6    granted.

7        I'm going to start with the standard of likelihood of

8    success on the merits for whether or not there are fair grounds

9    for litigation with a balance of the harm favoring a party

10   seeking injunctive relief.

11       It's a real burden to the Court to have to decide

12   whether or not a case has been filed in good faith, is likely

13   to produce a result favorable to the plaintiff on the basis of

14   a hearing as accelerated as the one that took place today.

15   This is not unconventional however, this is what happens in

16   motion practice when a preliminary injunction, or in more

17   extreme cases a TRO, is being sought.  The purpose of the

18   preliminary injunction is to preserve the status quo and to

19   prevent irreparable harm.

20       I happen to believe that it is generally a good idea

21   for the Court to be quite liberal in its interpretation of the

22   likelihood of success or whether or not there are fair grounds

23   for litigations standard.  Because to find otherwise is to

24   potentially deprive a deserving litigant of a remedy on a very

25   spare showing.

210

1    Nonetheless, I do think that counsel for Barclays,

2    during closing argument, demonstrated a number of areas of

3    potential concern for the plaintiff here.  And that this is a

4    complaint which probably can be characterized as a long shot.

5    One, that's a long shot because of the fact pattern involving

6    the shares moving from the borrower to LBI and from LBI to

7    Barclays pursuant to a sale order.  And also one that's a long

8    shot in light of the Article 8 UCC arguments that were made.

9    But notwithstanding the fact that these are possibly

10   strong defenses for Barclays, I'm not going to rely on this

11   prong of the standard for purposes of making a determination

12   regarding the preliminary injunction.  I think that there may

13   well be solid ground for a Barclays' motion to dismiss,

14   properly supported but that's not before me yet.

15   As I said at the outset, my focus is whether or not

16   there is a showing here of probably irreparable harm.  And as

17   to that prong of the standard for granting a preliminary

18   injunction, I remain unconvinced.  I'm unconvinced in part

19   because the problems with obtaining financing in today's credit

20   markets are manifest and do not need to be repeated here.

21   Companies like Evergreen Solar and much larger companies are

22   having well publicized challenges in confronting their

23   financing needs.

24   It is difficult for me to identify the parking of

25   these particular shares at Barclays as a principle impediment

211

1   to the successful identification and closing of alternatives

2   means to finance the company's operations and plans to expand.

3   It's also true that if Evergreen Solar had deep pockets there

4   would be a relatively simple economic solution to this problem.

5   The shares would be repurchased with all rights being reserved.

6   There would be an ability to go to the credit markets with

7   perhaps a better balance sheet.

8           In effect, Evergreen Solar is one of what I assume to

9   be a whole host of individual and corporate casualties of the

10   failure of Lehman Brothers and of the general shutdown of the

11   credit markets that has resulted in the heroic efforts by

12   central banks worldwide to come up with appropriate bailouts.

13           In part, it is this context of trouble in the credit

14   markets which makes it even more difficult for Evergreen Solar,

15   as plaintiff, to demonstrate the shares in question now held by

16   Barclays as disclosed in Barclays' 13G filing, represent a

17   material impediment to future financing.

18           It's also true that this is a situation in which

19   money damages probably do represent the proper measure of

20   damages.  Because to the very same extent that Barclays would

21   assert that it is entitled to a bond, assuming that I were to

22   grant the relief being sought in an amount which is measured by

23   the market value of the securities, it is in fact the market

24   value of the securities that represents the ultimate damage to

25   Evergreen Solar.

1           If there were an angel who could step in to a

2    boardroom with a blank check, the number that would be filled

3    in would be today's closing price for the shares held by

4    Barclays and Barclays, I assume, would sell those shares, at

5    market, to Evergreen Solar.  That's what we're talking about.

6    The way to solve the problem, if you had the money, would be to

7    buy back the shares.

8           In effect, this is an irreparable harm problem that

9    is capable of solution with dollars.  And it's also an

10   irreparable harm problem that is, to the extent it's not solved

11   with dollars, not yet manifest.  Questions were raised during

12   the hearing today as to adverse impacts on corporate governance

13   and voting.  Both of those issues I view as potentially serious

14   issues if in fact it could be demonstrated that there were

15   current problems in both areas.

16          The testimony is consistent with the observation that

17   such problems might arise in the future but that no such

18   problems have arisen today.  Additionally, in questioning the

19   chief financial officer at Evergreen Solar has stated that he

20   did not know whether or not if he asked Barclays to consent to

21   something, whether they'd say yes or no.   His problem is that

22   he doesn't know who to contact at Barclays.

23          I suspect, however, that Barclays has an internal

24   phone directory, has e-mail and that with some diligence it's

25   possible to get to someone with both apparent and actual

213

1    authority to deal with these shares.  If as in when the issue

2    ever arises and becomes a problem that requires attention.

3              Counsel for Barclays also noted and I think this is a

4    fairly telling point, that the form of relief sought by

5    Evergreen Solar in its proposed order granting a preliminary

6    injunction did not really extend to these voting and governance

7    issues but rather dealt with some lockup on the further

8    disposition of the shares.  It's a remedy that doesn't solve

9    the problem.

10             I think that Mr. Grillo effectively presented his

11   case but also, reading between the lines, made clear that this

12   litigation is a cry for help.  I think that Evergreen Solar is

13   in need of an ongoing conversation with business people at

14   Barclays, assuming they're willing to have that conversation,

15   to try to come up with ways to improve Evergreen Solar's

16   current condition.  No one's under any obligation to do that

17   but I suspect that if conversations along those lines took

18   place, that that might go a long way toward resolving this

19   litigation.

20             Under the circumstances and for the reasons stated, I

21   deny the motion of Evergreen Solar Incorporated for a

22   preliminary injunction.  And I close the record.  I suggest

23   that counsel for those parties who have opposed the relief

24   sought by the plaintiff submit a form of order providing for

25   the denial of the requested relief consistent with the

214

1   statements made on this record.  And if there's nothing more,

2   we're adjourned.

3          MR. GRILLO:  Your Honor, is that order just on

4   submission or is it on notice?

5          THE COURT:  It's going to be on submission.  It's

6   going to be very simple.  It's going to be the motion is denied

7   for the reasons stated on the record.

8          MR. GRILLO:  As long as that what's it is.

9          THE COURT:  That's all it's going to be.  And we're

10  adjourned.  Good evening.

11      (Whereupon these proceedings were concluded at 7:26 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

215

1

2                          I N D E X

3

4                       T E S T I M O N Y

5

6    Michael El-Hillow    Mr. Grillo              146

7    Michael El-Hillow    Mr. Morag               154

8    Michael El-Hillow    Mr. Grillo

9

10                       R U L I N G S

11   DESCRIPTION                             PAGE    LINE

12   Debtors' motion to establish procedures for    32      21

13   interim compensation and reimbursement of

14   expenses approved

15

16   Debtors' motion seeking authorization to retain,  33       4

17   nunc pro tunc to the commencement date,

18   ordinary course professionals approved

19

20   Application of the debtors to employ, nunc    33      17

21   pro tunc, McKee Nelson LLP as special tax

22   counsel approved

23

24

25

216

I N D E X, cont'd


R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|

Applications of official committee of unsecured     35       9

creditors seeking interim approval of various

retention applications relating to items 4

through 7 on the agenda approved on an interim

basis until next omnibus hearing on 11/18/08


Motion of Vanguard Group for a screening          35      23

wall to allow trading within the organization

approved


Debtors' motion to continue workman's             36       7

compensation programs and its liability,

property and other insurance programs and to

authorization the payment of all pre-petition

obligations in relation to workman's compensation

approved

217

1

2                         I N D E X,  cont'd

3

4                         R U L I N G S

5    DESCRIPTION                                 PAGE      LINE

6

7    Motion of Cargill Investment Group Ltd. to lift    37       8

8    the automatic stay for the limited purpose of

9    permitting Cargill to terminate its management

10   agreement with LBI approved

11

12   Debtors' motion to reject a contingent           37      18

13   management agreement with WestLB AG approved

14

15   Debtors' motion to preserve the net operating    38      23

16   losses carried forward approved

17

18   Debtors' application for approval of the         39      10

19   sale of a G-IV airplane

20

21   FHLBP motion for clarification denied            90       3

22

23   Disinterestedness application approved           95      13

24

25

218

                    I N D E X, cont'd


                        R U L I N G S

DESCRIPTION                                    PAGE    LINE


Motion for procedures for interim compensation   96      3
approved


Cash management order re: bank accounts        100      27
granted, as modified


Trustee's application for entry of order       101      24
approving form and manner of notice of
commencement of case granted


Case management order to parallel Chapter 11   101      7
procedures granted


Trustee's motion for entry of order approving   19      14
rejection of nonresidential real property leases
approved, as modified


Trustee's application for order extending time   20      4
to assume/reject executory contracts granted

VERITEXT REPORTING COMPANY
212-267-6868                                          516-608-2400

219

1

2                       C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6

7       _____

8       LISA BAR-LEIB

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  November 8, 2008

16

17

18

19

20

21

22

23

24

25