Theodore B. Stolman (to be admitted *pro hac vice*)
Scott H. Yun (to be admitted *pro hac vice*)
Carol Chow (to be admitted *pro hac vice*)
Margreta M. Morgulas (NY State Bar No. 4528907)
**STUTMAN, TREISTER & GLATT**
**PROFESSIONAL CORPORATION**
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: (310) 228-5600
Facsimile:  (310) 228-5788

Attorneys for TPG-Austin Portfolio Holdings LLC

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS,** | : | **Case No.  08-13555 (JMP)** |
| **INC.,** *et al.,* | : | |
| | : | **(Jointly Administered)** |
| **Debtors.** | : | |

-----------------------------------------------------x

## DECLARATION OF JOHN R. SISCHO IN SUPPORT OF MOTION OF TPG-AUSTIN PORTFOLIO HOLDINGS LLC TO COMPEL IMMEDIATE ASSUMPTION OR REJECTION OF CREDIT AGREEMENT; OR IN THE ALTERNATIVE, GRANT RELIEF FROM THE AUTOMATIC STAY TO PERMIT ALTERNATIVE FINANCING ON A SENIOR SECURED BASIS

I, John R. Sischo, hereby declare pursuant to section 1746 of title 28 of the United

States Code as follows:

1.    I am over 18 years of age and, if called as a witness, I could and would

testify to the matters set forth herein based on my personal knowledge.

2.    I am submitting this declaration in support of the "Motion of TPG-Austin

Portfolio Holdings LLC to Compel Immediate Assumption or Rejection of Credit Agreement; or

in the Alternative, Grant Relief from the Stay to Permit Alternative Financing on a Senior

Secured Basis" (the "Motion").

        3.       I am the Vice President of TPG-Austin Portfolio Holdings LLC ("TPG-

Austin").

### A.      June 1, 2007 Acquisition of the Properties.

        4.       On or before June 1, 2007, a partnership comprised of Thomas Properties

Group LP, the California State Teachers Retirement System and Lehman Brothers Holdings, Inc.

("LBHI") formed a partnership called TPG-Austin Portfolio Syndication Partners JV, LP (the

"Partnership") to acquire ten (10) "Class A" office properties (the "Properties") totaling

approximately 3.5 million rentable square feet in Austin, Texas, from affiliates of The

Blackstone Real Estate Advisors (the "June 1, 2007 Acquisition").

        5.       TPG-Austin is a Delaware limited liability company with its principal

place of business in Los Angeles, California.

        6.       TPG-Austin either directly or indirectly owns each of the ten Properties.

TPG-Austin also supplies the working capital needs for the Properties.

        7.       TPG-Austin is an indirect wholly-owned subsidiary of the Partnership.

LBHI initially invested $221,250,000.00 for its 75% interest in the Partnership. The Partnership

owns a series of wholly-owned limited liability companies (the "REIT LLC's"), which in turn

own 100% of TPG-Austin (which in turn own 100% of the Properties, either directly or

indirectly through mezzanine level limited liability companies).

        8.       LBHI subsequently sold a 25% interest in the Partnership and now holds a

50% interest.

**B.      June 1, 2007 Credit Agreement between TPG-Austin and LCPI.**

9.      In order to help fund the initial acquisition costs and the continued operational needs of the Properties, TPG-Austin entered into a Credit Agreement with Lehman Commercial Paper, Inc. ("LCPI"), dated June 1, 2007 (the "Credit Agreement"). Attached hereto as <u>Exhibit A</u> is a true and correct copy of the Credit Agreement.

10.      Pursuant to the Credit Agreement, LCPI is the Administrative Agent and Lehman Brothers, Inc. is the Arranger on behalf of the lenders that are parties to the Credit Agreement. I am informed and believe that LCPI is the sole lender under the Credit Agreement, and no other lenders are parties to the Credit Agreement. The Partnership and the REIT LLC's are guarantors of the loans under the Credit Agreement.

11.      Under the Credit Agreement, LCPI agreed to extend to TPG-Austin a $192,500,000 term loan (the "Term Loan") and a $100,000,000 revolving loan (the "Revolving Loan").

12.      LCPI had previously disbursed the $192,500,000 Term Loan to TPG-Austin to help fund the initial acquisition of the Properties.

13.      The Revolving Loan is an integral part of the capital structure used to acquire and maintain the Properties including, *inter alia*, providing TPG-Austin with the required liquidity to service the Term Loan, to pay capital costs of leasing space, making necessary capital repairs and replacements and servicing the mortgage and mezzanine level debt on the Properties to the extent of cash flow shortfalls.

14.      Aside from the Credit Agreement, the Property Level Entities (*i.e.*, the subsidiaries of TPG-Austin that directly or indirectly own the individual Properties) entered into separate mortgages and mezzanine loans with various entities, including LBHI, in order to obtain additional financing necessary to fund the initial acquisition of the Properties.

**C.    The Breach of the June 1, 2007 Credit Agreement by LCPI.**

15.    On September 17, 2008, I, on behalf of TPG-Austin, made a demand upon LCPI for disbursement of the entire $100,000,000 Revolving Loan to be payable on September 19, 2008, in accordance with the terms of the Credit Agreement. The demand was made prior to the date when LCPI filed for bankruptcy.

16.    In material breach of the Credit Agreement, LCPI failed to advance the funds to TPG-Austin pursuant to the Revolving Loan. On September 19, 2008, I sent, on behalf of TPG-Austin, a written notice to LCPI of its failure to fund.

17.    On October 5, 2008 (the "Petition Date"), LCPI filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, in the United States Bankruptcy Court for the Southern District of New York, commencing this case.

18.    TPG-Austin is current on all its obligations under the Credit Agreement and remains able to perform under the Credit Agreement, assuming that LCPI performs its obligations under the Credit Agreement to advance the Revolving Loan.

**D.    Irreparable Harm Caused by the Breach of the Credit Agreement.**

19.    The Revolving Loan was a critical part of the capital structure used to acquire the Properties and to assure TPG-Austin and the Property Level Entities that there would be sufficient liquidity to service the debt under the Term Loan pursuant to the Credit Agreement, to service the mortgage loans and the mezzanine loans secured by the Properties, and to fund the leasing operations and capital costs for the Properties to bring the Properties to stabilization.

20.    As the date of this declaration, LCPI has refused to advance the Revolving Loan pursuant to the Credit Agreement, placing TPG-Austin and its affiliated entities in serious financial jeopardy. Attached hereto as <u>Exhibit B</u> is the 2009 operating and capital budget (the "Budget") for the Properties for 2009, showing the amounts of capital to be invested in capital

repairs and replacements, as well as new leases. As set forth in the Budget, the Partnership will

require significant amounts of capital in 2009, which was to be funded by the Revolving Loan.

The Partnership lacks sufficient funds to pay for these costs unless it gets the funds from the

Revolving Loan or a new loan from another lender. In order for TPG-Austin to make

commitments to vendors and contractors to perform the necessary repairs and replacements or

enter into new leases, TPG-Austin must have the funds in hand or reasonable assurance that such

funds will be made available as required.

21.    Without the timely advance of the funds required to be disbursed by LCPI

under the Revolving Loan, I believe TPG-Austin and its affiliated entities will sustain irreparable

harm because:

(i)    its inability to timely satisfy local real property tax bills that must

be paid in January 2009, the failure of which will result in the imposition of penalties and

events of default under the mortgage loans and mezzanine loans that directly or indirectly

encumber the ten Properties;

(ii)    its inability to maintain, repair and operate the Properties as required

under the leases with numerous tenants currently occupying the ten Properties;

(iii)    its inability to market, lease and renew leases for existing and future

tenants of the ten Properties, which is essential to maintaining the cash flow to service

both the mortgage and mezzanine debt as well as the LCPI Term Loan;

(iv)    its inability to maintain the Class A image of the ten Properties

whose stabilized rents are conditioned upon being able to provide the required level and

quality of services implicit in operating a Class A office structure; and

(v)    the need to incur extraordinary expenses including legal,

management and finance costs, including possible insolvency proceedings.

22.    In January 2009, an approximately $19,000,000 property tax liability will

become due on the Properties.  Based on current cash flow projections, if LCPI fails to

immediately fund the Revolving Loan, TPG-Austin will not have sufficient funds to meet the

January 2009 property tax liability.  A failure to timely meet property tax obligations would give

rise to penalties and tax liens being imposed on the underlying Properties.  It would also

constitute an event of default under the Credit Agreement (as well as constituting an event of

default under other loan agreements secured by the relevant underlying Properties).   Equally

important, I believe the failure to pay the property taxes in full will immediately impair the

ongoing leasing of the Properties, since existing and prospective tenants will be unwilling to

spend the time and effort of negotiating leases with TGP-Austin in light of the uncertainty of

whether TPG-Austin will have the capital necessary to pay leasing commissions and fund tenant

improvements.  It is imperative that TPG-Austin be able to demonstrate to tenants that it has the

funds necessary to continue with its leasing of the vacant space to new tenants and to renew the

leases of tenants whose leases are expiring over the next several months.  In this economic

climate, it is critical to the financial viability of the Partnership and TPG-Austin that the leasing

of the Properties continue without abatement or delay.

23.    The Properties have been performing well, but the ongoing leasing and

capital program will require substantial additional funds shortly.  If LCPI fails to immediately

fund the Revolving Loan, TPG-Austin and its affiliates will lack the working capital necessary

to, *inter alia*, fulfill their leasing targets, complete necessary capital improvements, and pay for

leasing commissions, thereby severely jeopardizing their cash flow and increasing their liabilities.

24.    Once TPG-Austin and its affiliated entities run out of working capital and are no longer able to service their debts, which is projected to occur in January 2009, the non-payment of such debts will trigger a cascade of defaults under the Credit Agreement, as well as the other mortgages and mezzanine loans that are secured by the Properties. Such a catastrophic event would lead to the threat of foreclosures and bankruptcy, thereby impairing the repayment of the LCPI Term Loan and the value of the 50% indirect interest held by LBHI in the Properties, which LBHI initially paid $221,250,000.00 to acquire.

25.    If LCPI fails to fund the Revolving Loan, I believe it will result in irreparable harm to TPG-Austin, its affiliates, and the Properties.

26.    Further, the harm described above will also jeopardize the interests of the debtors' estates in this case because LBHI owns 50% of TPG-Austin and the Properties. In addition, the Properties serve as collateral securing loans made by LBHI and LCPI, including the following:

| LENDER | BORROWER | COLLATERAL | LOAN AMOUNT |
|--------|----------|------------|-------------|
| LCPI | TPG-Austin Portfolio Holdings LLC | First priority lien on 3 assets (Great Hills Plaza-9600 Great Hills Trail, Park 22-8601 Ranch Road 2222 and Westech 360-8911 Capital of Texas Hwy.) and all of the capital stock of the REIT LLC entities and the Borrower and each of its direct and indirect subsidiaries | $192,500,000.00 |
| LCPI | TPG-Austin Portfolio Holdings LLC | First priority lien on 3 assets (Great Hills Plaza-9600 Great Hills Trail, Park 22-8601 Ranch Road 2222 and Westech 360-8911 Capital of Texas Hwy.) and all of the capital stock of the REIT LLC entities and the Borrower and each of its direct and indirect subsidiaries | $100,000,000.00 |
| LBHI | TPG-300 West 6th Street LLC | 300 West 6th Street, Austin, TX | $127,000,000.00 |

| LENDER | BORROWER | COLLATERAL | LOAN AMOUNT |
|--------|----------|------------|-------------|
| LBHI | TPG-401 Congress LLC | 401 Congress Avenue, Austin, TX | $150,000,000.00 |
| LBHI | TPG-One American Center LLC | 600 Congress Avenue, Austin, TX | $120,000,000.00 |
| LBHI | TPG-One Congress Plaza LLC | 111 Congress Avenue, Austin, TX | $128,000,000.00 |
| LBHI | TPG-San Jacinto Center LLC | 98 San Jacinto Blvd., Austin, TX | $101,000,000.00 |
| LBHI | TPG-Research Park Plaza I & II LLC | 12401 Research Blvd., Austin, TX | $23,560,000.00 |
| LBHI | TPG-Research Park Plaza I & II Mezzanine LLC | Borrower's interest in 12401 Research Blvd., Austin, TX | $27,940,000.00 |
| LBHI | TPG-Stonebridge Plaza II LLC | 9600 North Mopac Expy., Austin, TX | $19,800,000.00 |
| LBHI | TPG-Stonebridge Plaza II Mezzanine LLC | Borrower's interest in 9600 North Mopac Expy., Austin, TX | $17,700,000.00 |
|  |  |  | $1,007,500,000.00 |

E.    **Alternative Financing on a Senior Secured Basis.**

27.    If LCPI decides to reject the Credit Agreement or extend the time to assume or reject the Credit Agreement, TPG-Austin needs an alternate source of financing to replace the unfunded Revolving Loan.

28.    I and my staff acting at my direction, on behalf of TPG-Austin, have looked for an alternate source of financing to replace the Revolving Loan. Our search for alternative financing included contacting various lending sources, including investment bankers, loan brokers and lenders. However, in the current credit market, no one was interested enough in providing alternative financing to even ask for financial information about the Properties or TPG-Austin, if TPG-Austin could only grant liens junior to the existing liens of LCPI.

29.     Given current credit market conditions, the only possible way TPG-Austin can secure replacement financing for the Revolving Loan is on a senior secured basis with priority over the existing liens of LCPI. In today's market conditions, no one will lend on a subordinated basis behind LCPI's $192,000,000 Term Loan and senior lien. My staff and I are currently working to obtain the best terms available in the market for the replacement financing for the Revolving Loan and will supplement the Motion with a term sheet for such replacement financing as soon as one becomes available.

30.     Because TPG-Austin has been unable to get any commitment for alternative financing from a third party lender, the only source of financing available to TPG-Austin may be from the non-Lehman partners of the Partnership. If the Motion is granted, I would seek to have the new lender or lenders commit to a replacement loan to the Partnership up to $100,000,000.00, if TPG-Austin is allowed to grant them a security interest senior to all interests pledged to LCPI as security under the Credit Agreement for both the Term Loan and the Revolving Loan, including senior mortgages on three of the Properties (referred to as Park 22, Westech 360 and Great Hills Plaza Properties), which are currently encumbered by senior mortgages held by LCPI. One of the conditions that any new lender or lenders will likely require in order to make such a replacement loan is that if LCPI decides at a later date to assume the Credit Agreement, including the Revolving Loan, it must advance to TPG-Austin the balance of the $100,000,000.00 Revolving Loan when it pays off the replacement loan.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed this _13th_ day of November 2008, at Los Angeles, California.



JOHN R. SISCHO

# Exhibit A

EXECUTION COPY

---

**$292,500,000**

**CREDIT AGREEMENT**

among

**TPG-AUSTIN PORTFOLIO SYNDICATION PARTNERS JV LP,**
**TPG-401 CONGRESS REIT LLC,**
**TPG-300 WEST 6TH STREET REIT LLC,**
**TPG-ONE CONGRESS PLAZA REIT LLC,**
**TPG-ONE AMERICAN CENTER REIT LLC,**
**TPG-SAN JACINTO CENTER REIT LLC,**
**TPG-STONEBRIDGE PLAZA II REIT LLC,**
**TPG-RESEARCH PARK PLAZA I & II REIT LLC,**
**TPG-WESTECH 360 REIT LLC,**
**TPG-PARK 22 REIT LLC,**
**TPG-GREAT HILLS PLAZA REIT LLC,**
as Parent Guarantors,

**TPG-AUSTIN PORTFOLIO HOLDINGS LLC,**
as Borrower,

The Several Lenders
from Time to Time Parties Hereto,

**LEHMAN BROTHERS INC.,**
as Arranger,

and

**LEHMAN COMMERCIAL PAPER INC.,**
as Administrative Agent

Dated as of June 1, 2007

---

USActive 8584236.17

## TABLE OF CONTENTS

Page

SECTION 1     DEFINITIONS

1.1     Defined Terms ........................................................................................................2
1.2     Other Definitional Provisions ..............................................................................30

SECTION 2     AMOUNT AND TERMS OF COMMITMENTS

2.1     Term Loan Commitments ....................................................................................30
2.2     Procedure for Term Loan Borrowing ..................................................................30
2.3     Repayment of Term Loans ..................................................................................31
2.4     Revolving Credit Commitments ..........................................................................31
2.5     Procedure for Revolving Credit Borrowing ........................................................31
2.6     Swing Line Commitment .....................................................................................32
2.7     Procedure for Swing Line Borrowing; Refunding of Swing Line Loans ...........32
2.8     Repayment of Loans; Evidence of Debt ..............................................................33
2.9     Commitment Fees, etc .........................................................................................34
2.10    Termination or Reduction of Revolving Credit Commitments ...........................35
2.11    Optional Prepayments .........................................................................................35
2.12    Mandatory Prepayments ......................................................................................35
2.13    Conversion and Continuation Options .................................................................36
2.14    Minimum Amounts and Maximum Number of Eurodollar Tranches ..................37
2.15    Interest Rates and Payment Dates .......................................................................37
2.16    Computation of Interest and Fees .......................................................................38
2.17    Inability to Determine Interest Rate ....................................................................38
2.18    Pro Rata Treatment and Payments ......................................................................39
2.19    Requirements of Law ...........................................................................................40
2.20    Taxes ....................................................................................................................42
2.21    Indemnity .............................................................................................................44
2.22    Illegality ...............................................................................................................44
2.23    Change of Lending Office ....................................................................................44
2.24    Replacement of Lenders under Certain Circumstances .......................................45
2.25    Interest Reserve ...................................................................................................45

SECTION 3     LETTERS OF CREDIT

3.1     L/C Commitment ..................................................................................................46
3.2     Procedure for Issuance of Letter of Credit ..........................................................47
3.3     Fees and Other Charges .......................................................................................47
3.4     L/C Participations .................................................................................................47
3.5     Reimbursement Obligation of the Borrower ........................................................49
3.6     Obligations Absolute ...........................................................................................49
3.7     Letter of Credit Payments ....................................................................................50
3.8     Applications .........................................................................................................50

EXHIBIT A

SECTION 4     REPRESENTATIONS AND WARRANTIES

| | | |
|---|---|---|
| 4.1 | Financial Condition | 50 |
| 4.2 | No Change | 50 |
| 4.3 | Corporate Existence; Compliance with Law | 50 |
| 4.4 | Corporate Power; Authorization; Enforceable Obligations | 51 |
| 4.5 | No Legal Bar | 51 |
| 4.6 | No Material Litigation | 51 |
| 4.7 | No Default | 52 |
| 4.8 | Ownership of Property; Liens | 52 |
| 4.9 | Intellectual Property | 52 |
| 4.10 | Taxes | 52 |
| 4.11 | Federal Regulations | 52 |
| 4.12 | Labor Matters | 52 |
| 4.13 | ERISA | 52 |
| 4.14 | Investment Company Act; Other Regulations | 52 |
| 4.15 | Subsidiaries | 53 |
| 4.16 | Use of Proceeds | 53 |
| 4.17 | Environmental Matters | 53 |
| 4.18 | Accuracy of Information, etc | 54 |
| 4.19 | Security Documents | 54 |
| 4.20 | Solvency | 55 |
| 4.21 | Certain Documents | 55 |
| 4.22 | Regulation H | 55 |
| 4.23 | REIT Status; Borrower Tax Status | 55 |

SECTION 5     CONDITIONS PRECEDENT

| | | |
|---|---|---|
| 5.1 | Conditions to Initial Extension of Credit | 55 |
| 5.2 | Conditions to Each Extension of Credit | 60 |

SECTION 6     AFFIRMATIVE COVENANTS

| | | |
|---|---|---|
| 6.1 | Financial Statements | 61 |
| 6.2 | Certificates; Other Information | 61 |
| 6.3 | Payment of Obligations | 63 |
| 6.4 | Conduct of Business and Maintenance of Existence; Compliance | 63 |
| 6.5 | Maintenance of Property; Insurance | 63 |
| 6.6 | Inspection of Property; Books and Records; Discussions | 68 |
| 6.7 | Notices | 68 |
| 6.8 | Environmental Laws | 69 |
| 6.9 | Interest Rate Protection | 70 |
| 6.10 | Additional Collateral, etc | 70 |
| 6.11 | Further Assurances | 72 |
| 6.12 | Appraisals | 72 |

SECTION 7     NEGATIVE COVENANTS

| | | |
|---|---|---|
| 7.1 | Financial Condition Covenants | 72 |

EXHIBIT A

7.2    Limitation on Indebtedness.................................................................73
7.3    Limitation on Liens.........................................................................75
7.4    Limitation on Fundamental Changes.....................................................77
7.5    Limitation on Disposition of Property...................................................77
7.6    Limitation on Restricted Payments.......................................................78
7.7    Limitation on Investments..................................................................79
7.8    Limitation on Transactions with Affiliates..............................................80
7.9    Limitation on Sales and Leasebacks.....................................................80
7.10   Limitation on Changes in Fiscal Periods................................................80
7.11   Limitation on Negative Pledge Clauses..................................................80
7.12   Limitation on Restrictions on Subsidiary Distributions...............................81
7.13   Limitation on Lines of Business..........................................................81
7.14   Limitation on Amendments to Acquisition Documentation...........................81
7.15   Limitation on Amendments to Other Documents.......................................82
7.16   Limitation on Activities of Parent Guarantors.........................................82
7.17   Limitation on Hedge Agreements.........................................................82

SECTION 8    EVENTS OF DEFAULT

SECTION 9    THE AGENTS

9.1    Appointment..................................................................................86
9.2    Delegation of Duties........................................................................86
9.3    Exculpatory Provisions.....................................................................86
9.4    Reliance by Agents..........................................................................86
9.5    Notice of Default............................................................................87
9.6    Non-Reliance on Agents and Other Lenders............................................87
9.7    Indemnification..............................................................................88
9.8    Agent in Its Individual Capacity..........................................................88
9.9    Successor Administrative Agent...........................................................88
9.10   Authorization to Release Liens and Guarantees........................................89
9.11   The Arranger and the Syndication Agent.................................................89
9.12   Execution of Intercreditor Agreements...................................................89

SECTION 10    MISCELLANEOUS

10.1   Amendments and Waivers..................................................................89
10.2   Notices........................................................................................91
10.3   No Waiver; Cumulative Remedies.........................................................92
10.4   Survival of Representations and Warranties.............................................93
10.5   Payment of Expenses.......................................................................93
10.6   Successors and Assigns; Participations and Assignments.............................94
10.7   Adjustments; Set-off.........................................................................97
10.8   Counterparts..................................................................................98
10.9   Severability...................................................................................98
10.10  Integration....................................................................................98
10.11  GOVERNING LAW..........................................................................98
10.12  Submission to Jurisdiction; Waivers.....................................................99

EXHIBIT A

10.13   Acknowledgments.................................................................................99
10.14   Confidentiality ..................................................................................99
10.15   Release of Collateral and Guarantee Obligations ...............................100
10.16   Accounting Changes..........................................................................101
10.17   Delivery of Lender Addenda ...............................................................101
10.18   WAIVERS OF JURY TRIAL .............................................................101

USActive 8584236.17

-iv-

SCHEDULES:

1.1A      Mortgaged Property
1.1B      Real Property
1.1C      CMBS Documents
1.1D      Property Owners/Ground Tenants
4.15      Subsidiaries
4.19(a)   UCC Filing Jurisdictions
4.19(b)   Mortgage Filing Jurisdictions

EXHIBITS:

A      Form of Guarantee and Collateral Agreement
B      Form of Compliance Certificate
C      Form of Closing Certificate
D      Form of Mortgage
E      Form of Assignment and Acceptance
F-1    Form of Legal Opinion of Richards, Layton & Finger
F-2    Form of Legal Opinion of Bracewell & Giuliani LLP,
       Special Texas and New York counsel
G-1    Form of Term Note
G-2    Form of Revolving Credit Note
G-3    Form of Swing Line Note
H      Form of Exemption Certificate
I      Form of Lender Addendum
J      Form of Borrowing Notice

**EXHIBIT A**                                          15

CREDIT AGREEMENT, dated as of June 1, 2007, among TPG-AUSTIN PORTFOLIO SYNDICATION PARTNERS JV LP, a Delaware limited partnership ("TPG-Austin JV"), TPG-401 CONGRESS REIT LLC, a Delaware limited liability company ("REIT 1"), TPG-300 WEST 6TH STREET REIT LLC, a Delaware limited liability company ("REIT 2"), TPG-ONE CONGRESS PLAZA REIT LLC, a Delaware limited liability company ("REIT 3"), TPG-ONE AMERICAN CENTER REIT LLC, a Delaware limited liability company ("REIT 4"), TPG-SAN JACINTO CENTER REIT LLC, a Delaware limited liability company ("REIT 5"), TPG-STONEBRIDGE PLAZA II REIT LLC, a Delaware limited liability company ("REIT 6"), TPG-RESEARCH PARK PLAZA I & II REIT LLC, a Delaware limited liability company ("REIT 7"), TPG-WESTECH 360 REIT LLC, a Delaware limited liability company ("REIT 8"), TPG-PARK 22 REIT LLC, a Delaware limited liability company ("REIT 9"), TPG-GREAT HILLS PLAZA REIT LLC ("REIT 10" and, together with TPG-Austin JV, REIT 1, REIT 2, REIT 3, REIT 4, REIT 5, REIT 6, REIT 7, REIT 8 and REIT 9, the "Parent Guarantors"), TPG-AUSTIN PORTFOLIO HOLDINGS LLC, a Delaware limited liability company (the "Borrower"), the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), LEHMAN BROTHERS INC., as sole advisor, sole lead arranger and sole bookrunner (in such capacity, the "Arranger"), and LEHMAN COMMERCIAL PAPER INC., as administrative agent (in such capacity, the "Administrative Agent").

## W I T N E S S E T H:

WHEREAS, Lehman Brothers Holdings Inc. ("LBHI"), Thomas Properties Group, Inc. ("TPGI") and California State Teachers Retirement System ("CalSTRS") formed a joint venture, TPG-Austin JV, to acquire (the "Acquisition"), directly or indirectly, (i) all of the partnership interests in TX-Austin One American Center Limited Partnership ("TX-Austin Partnership"), that is the owner of fee simple title to a portion and a leasehold interest in the remaining portion of the land and the buildings and other improvements located thereon, constituting the property located at 600 Congress Avenue, Austin, Texas, and (ii) the fee or leasehold interests in nine properties located in and around Austin, Texas, pursuant to the Agreement of Purchase and Sale, dated as of March 25, 2007, among TX-Sixth Street Limited Partnership, TX-Great Hills Plaza Limited Partnership, TX-One Congress Plaza Limited Partnership, TX-Park 22 Limited Partnership, TX-Austin Research Park Limited Partnership, TX-San Jacinto Limited Partnership, TX-Stonebridge Plaza II Limited Partnership, TX-Austin Westech 360 Limited Partnership, TX-Frost Tower Limited Partnership, EOP Owner GP L.L.C. and EOP Owner Holdings L.L.C. (collectively, the "Sellers") and LB/TPG Austin Portfolio LLC (the "Buyer"), (as amended by the First Amendment, dated as of May 8, 2007, the "Purchase Agreement");

WHEREAS, in connection with the Acquisition, TX-Austin Partnership will be converted into a Delaware limited liability company named TPG-One American Center Mezzanine LLC, and the fee and leasehold interests in the property owned by such entity will be transferred to a new limited liability company in which such entity is the sole member, TPG-One American Center LLC, a Delaware limited liability company;

USActive 8584236.17

WHEREAS, the Borrower has requested that the Lenders make available to the Borrower a term loan facility for the purpose of (i) financing a portion of the purchase price of the Acquisition, (ii) to fund an interest reserve account and (iii) paying related fees and expenses;

WHEREAS, the Borrower has requested that the Lenders make available to the Borrower a revolving credit facility for the purpose of financing (i) the working capital needs of the Borrower and its subsidiaries in the ordinary course of business, including without limitation, to finance acquisitions and to pay interest, and (ii) other general corporate purposes; and

WHEREAS, the Lenders are willing to make such credit facilities available upon and subject to the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

SECTION 1.   DEFINITIONS

1.1    Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"Account Bank": Citizens Bank of Pennsylvania, a Pennsylvania state-chartered bank.

"Account Control Agreement": the Account Control Agreement dated as of the date hereof among the Administrative Agent, the Borrower and the Account Bank, as amended, supplemented or otherwise modified from time to time.

"Acquisition": as defined in the recitals hereto.

"Acquisition Documentation":  collectively, the Purchase Agreement and all schedules, exhibits, annexes and amendments thereto and all side letters and agreements affecting the terms thereof or entered into in connection therewith, in each case, as amended, supplemented or otherwise modified from time to time.

"Adjustment Date":  as defined in the Pricing Grid.

"Administrative Agent":  as defined in the preamble hereto.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

USActive 8584236.17

"Agents":  the collective reference to the Syndication Agent and the Administrative Agent.

"Aggregate Exposure":  with respect to any Lender at any time, an amount equal to (a) until the Closing Date, the aggregate amount of such Lender's Commitments at such time and (b) thereafter, the sum of (i) the aggregate then unpaid principal amount of such Lender's Term Loans and (ii) the amount of such Lender's Revolving Credit Commitment then in effect or, if the Revolving Credit Commitments have been terminated, the amount of such Lender's Revolving Extensions of Credit then outstanding.

"Aggregate Exposure Percentage":  with respect to any Lender at any time, the ratio (expressed as a percentage) of such Lender's Aggregate Exposure at such time to the sum of the Aggregate Exposures of all Lenders at such time.

"Agreement":  this Credit Agreement, as amended, supplemented or otherwise modified from time to time.

"Agreement Regarding Debtor/Creditor Relationship":  the Agreement Regarding Debtor/Creditor Relationship, dated as of the date hereof, by the Parent Guarantors, the Borrower and each Subsidiary Guarantor to and for the benefit of Lehman Commercial Paper Inc., as a Lender and as Administrative Agent, as the same may be amended, supplemented or otherwise modified from time to time.

"Applicable Margin":  for each Type of Loan under each Facility, the rate per annum set forth opposite such Facility under the relevant column heading below:

| | Base Rate Loans | Eurodollar Loans |
| --- | --- | --- |
| Revolving Credit Facility (including Swing Line Loans)............................................. | 1.25% | 2.25% |
| Term Loan Facility........................................... | 1.25% | 2.25% |

provided, that on and after the first Adjustment Date occurring after the completion of two full fiscal quarters of the Borrower after the Closing Date, the Applicable Margins with respect to Revolving Credit Loans and Swing Line Loans will be the rate per annum determined pursuant to the Pricing Grid.

"Applicable Leverage Ratio": 0.695 to 1.00.

"Application":  an application, in such form as the relevant Issuing Lender may specify from time to time, requesting such Issuing Lender to issue a Letter of Credit.

"Appraisal":  the most recent of either a Full Appraisal or, to the extent a Full Appraisal has been previously delivered, a Summary Appraisal, in each case, delivered pursuant to Sections 5.1(n) and 6.12.

4

"Appraisal Trigger Event": with respect to any Austin Property, (i) for any fiscal quarter of such Austin Property, Operating EBITDA for such Austin Property decreases by 7.5% or more from Operating EBITDA for such Austin Property from the immediately preceding fiscal quarter, provided that, for the purposes of determining the amount of any decrease in Operating EBITDA for a fiscal quarter from the immediately preceding fiscal quarter, if the event which caused such decrease is included as an assumption in the currently effective Appraisal, the amount of Operating EBITDA assumed by such Appraisal to be lost as a result of such event shall not be subtracted from Operating EBITDA, or (ii) such Austin Property loses a tenant with a lease of 10% or more of the aggregate rentable square footage of such Austin Property (unless a new tenant has executed and delivered a lease for all or substantially all of the vacated space), provided that, if the loss of such tenant is included as an assumption in the currently effective Appraisal, no Appraisal Trigger Event shall be deemed to have occurred under this clause (ii) as a result of the loss of such tenant.

"Appraised Value": with respect to any Austin Property on any date (the "Value Determination Date"), the value of such Austin Property on the Value Determination Date as set forth in the most recent Appraisal for such Austin Property delivered pursuant to Sections 5.1(n) and 6.12.

"Appraiser": CB Richard Ellis, Inc. or such other independent appraisal firm selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Arranger": as defined in the preamble hereto.

"Asset Sale": any Disposition of Property or series of related Dispositions of Property (excluding any such Disposition permitted by clause (a), (b), (c), (d), (g), (h), or (i) of Section 7.5) which yields gross proceeds to any Group Member (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $2,000,000 in any fiscal year.

"Assignee": as defined in Section 10.6(c).

"Assignment and Acceptance": as defined in Section 10.6(c).

"Assignor": as defined in Section 10.6(c).

"ASTM": as defined in Section 5.1(j).

"Austin Properties": each of the parcels of real property described on Schedule 1.1B and any Real Property acquired by the Borrower or any of its Subsidiaries after the Closing Date.

"Available Revolving Credit Commitment": with respect to any Revolving Credit Lender at any time, an amount equal to the excess, if any, of (a) such Lender's Revolving Credit Commitment then in effect over (b) such Lender's Revolving Extensions of Credit then outstanding; provided, that in calculating any Lender's Revolving Extensions of Credit for the purpose of determining such Lender's Available Revolving Credit Commitment pursuant to

USActive 8584236.17

EXHIBIT A

19

5

Section 2.9(a), the aggregate principal amount of Swing Line Loans then outstanding shall be deemed to be zero.

"<u>Base Rate</u>":  for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day <u>plus</u> ½ of 1%.  For purposes hereof:  "<u>Prime Rate</u>" shall mean the prime lending rate as set forth on the British Banking Association Telerate Page 5 (or such other comparable publicly available page as may, in the reasonable opinion of the Administrative Agent after notice to the Borrower, replace such page for the purpose of displaying such rate if such rate no longer appears on the British Bankers Association Telerate Page 5), as in effect from time to time.  The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available.  Any change in the Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"<u>Base Rate Loans</u>":  Loans for which the applicable rate of interest is based upon the Base Rate.

"<u>Benefited Lender</u>":  as defined in Section 10.7.

"<u>Board</u>":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>":  as defined in the preamble hereto.

"<u>Borrowing Date</u>":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"<u>Borrowing Notice</u>":  with respect to any request for borrowing of Loans hereunder, a notice from the Borrower, substantially in the form of, and containing the information prescribed by, Exhibit J, delivered to the Administrative Agent.

"<u>Business Day</u>":  (a) for all purposes other than as covered by clause (b) below, a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close and (b) with respect to all notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, any day which is a Business Day described in clause (a) and which is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"<u>Buyer</u>":  as defined in the recitals hereto.

"<u>CalSTRS</u>":  as defined in the recitals hereto.

"<u>Capital Expenditures</u>":  for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) which are required to be capitalized under GAAP on a balance sheet of such Person.

USActive 8584236.17

6

"Capital Lease Obligations": with respect to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Reserve": on any date of determination, an amount equal to (i) $0.25 per square foot multiplied by (ii) the aggregate total square footage of rentable space for the Austin Properties.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cash Equivalents": (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, eurodollar time deposits or overnight bank deposits having maturities of six months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than $500,000,000; (c) commercial paper of an issuer rated at least A-2 by S&P or P-2 by Moody's, or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within six months from the date of acquisition; (d) repurchase obligations of any Lender or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Change of Control": the occurrence of any of the following events: (a) the Permitted Investors shall cease to have the power, directly or indirectly, to vote or direct the voting of securities having a majority of the ordinary voting power for the election of the managing members of TPG-Austin JV GP (determined on a fully diluted basis); (b) the Permitted Investors shall cease to own of record and beneficially, directly or indirectly, 100% of the membership interests of TPG-Austin JV GP; (c) TPG-Austin JV GP shall (i) fail to be the sole general partner of TPG-Austin JV or (ii) fail to control the management and policies of

USActive 8584236.17

EXHIBIT A                                                               21

7

TPG-Austin JV; (d) TPG-Austin JV shall cease to own and control, of record and beneficially, directly, 100% of each class of outstanding Capital Stock of the REIT Guarantors free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement); and (e) the REIT Guarantors shall cease to own and control, of record and beneficially, directly, 100% of each class of outstanding Capital Stock of the Borrower free and clear of all Liens (except Liens created by the Guarantee and Collateral Agreement).

"Closing Date": the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied, which date shall be not later than June 1, 2007.

"CMBS Borrower": any Wholly Owned Subsidiary of the Borrower that is a borrower under the CMBS Facilities.

"CMBS Documents": each of the documents set forth on Schedule 1.1C hereto, and each of the documents executed in connection with any future CMBS Facilities.

"CMBS Facilities": collectively, (i) the mortgage and mezzanine loan facilities entered into pursuant to the CMBS Documents set forth on Schedule 1.1C hereto and (ii) any refinancing of the mortgage or mezzanine loan facilities permitted by Section 7.2(e).

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all Property of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document.

"Commitment": with respect to any Lender, each of the Term Loan Commitment and the Revolving Credit Commitment of such Lender.

"Commitment Fee Rate": ½ of 1% per annum.

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate": a certificate duly executed by a Responsible Officer, substantially in the form of Exhibit B.

"Confidential Information Memorandum": the Confidential Information Memorandum dated June, 2007 and to be furnished to the initial Lenders in connection with the syndication of the Facilities after the Closing Date.

"Consolidated Current Assets": of any Person at any date, all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of such Person and its Subsidiaries at such date.

"Consolidated Current Liabilities":  of any Person at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of such Person and its Subsidiaries at such date, but excluding, with respect to the Borrower, (a) the current portion of any Funded Debt of the Borrower and its Subsidiaries and (b) without duplication, all Indebtedness consisting of Revolving Credit Loans or Swing Line Loans, to the extent otherwise included therein.

"Consolidated Debt Service":  for any period, the sum (without duplication) of (a) Consolidated Interest Expense for such period and (b) scheduled payments made during such period on account of principal of Indebtedness of the Group Members, other than balloon payments of principal due upon the stated maturity of any such Indebtedness or similar principal payment which repays or discharges such Indebtedness in full.

"Consolidated Debt Service Coverage Ratio":  for any period, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Debt Service for such period.

"Consolidated EBITDA":  of TPG-Austin JV for any period, Consolidated Net Income of such Person and its Subsidiaries for such period plus, without duplication and to the extent reflected as a charge in the statement of such Consolidated Net Income for such period, the sum of (a) income tax expense, (b) interest expense of such Person and its Subsidiaries, amortization or writeoff of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) any extraordinary, unusual or non-recurring expenses or losses (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, losses on sales of assets outside of the ordinary course of business), and (f) any other non-cash charges, and minus, to the extent included in the statement of such Consolidated Net Income for such period, the sum of (a) interest income (except to the extent deducted in determining such Consolidated Net Income), (b) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Consolidated Net Income for such period, gains on the sales of assets outside of the ordinary course of business), and (c) any other non-cash income. For the purposes of determining compliance with the financial covenants set forth in Section 7.1 at the end of any fiscal quarter of the Borrower, Consolidated EBITDA for such quarter shall be deemed to be increased by an amount equal to the Specified Equity Contribution minus that portion of such Specified Equity Contribution, if any, applied pursuant to the definitions of "Gross Asset Value" and "Consolidated Liquidity Amount" in this Section 1.1, provided that, the amount of the Specified Equity Contribution applied pursuant to this definition shall be no greater than an amount required to cause the Borrower to be in compliance with the applicable financial covenants set forth in Section 7.1.

"Consolidated Interest Expense":  of TPG-Austin JV for any period, total interest expense (including that attributable to Capital Lease Obligations) of such Person and its Subsidiaries for such period with respect to all outstanding Indebtedness of such Person and its Subsidiaries (including, without limitation, all commissions, discounts and other fees and charges owed by such Person with respect to letters of credit and bankers' acceptance financing

USActive 8584238.17

9

and net costs of such Person under Hedge Agreements in respect of interest rates to the extent such net costs are allocable to such period in accordance with GAAP).

"Consolidated Leverage Ratio": on any date of determination, the ratio of (a) Consolidated Total Debt on such date to (b) Gross Asset Value for the most recent fiscal quarter of the Borrower ending prior to such date for which financial statements are available.

"Consolidated Liquidity Amount":  on any date of determination, an amount equal to (a) the aggregate Available Revolving Credit Commitment of all the Lenders on such date plus the amount on deposit in the Interest Reserve Account on such date plus (b) an amount equal to (x) Consolidated EBITDA for the most recent fiscal quarter of the Borrower ending prior to such date for which financial statements are available, minus Consolidated Debt Service for such period multiplied by (y) four, minus (c) an amount equal to the greater of (i) Capital Expenditures for the most recent fiscal quarter of the Borrower ending prior to such date for which financial statements are available multiplied by four and (ii) the Capital Reserve for such date.  For the purposes of determining compliance with the financial covenants set forth in Section 7.1 at the end of any fiscal quarter of the Borrower, the Consolidated Liquidity Amount for such quarter shall be deemed to be increased by an amount equal to the Specified Equity Contribution minus that portion of such Specified Equity Contribution, if any, applied pursuant to the definitions of "Gross Asset Value" and "Consolidated EBITDA" in this Section 1.1, provided that, the amount of the Specified Equity Contribution applied pursuant to this definition shall be no greater than an amount required to cause the Borrower to be in compliance with the applicable financial covenants set forth in Section 7.1.

"Consolidated Net Income":  of any Person for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP; provided, that in calculating Consolidated Net Income of the Borrower and its consolidated Subsidiaries for any period, there shall be excluded (a) the income (or deficit) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any of its Subsidiaries, (b) the income (or deficit) of any Person (other than a Subsidiary of the Borrower) in which the Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such income is actually received by the Borrower or such Subsidiary in the form of dividends or similar distributions and (c) the undistributed earnings of any Subsidiary of the Borrower to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary is not at the time permitted by the terms of any Contractual Obligation (other than under any Loan Document) or Requirement of Law applicable to such Subsidiary.

"Consolidated Total Debt":  at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries at such date, determined on a consolidated basis in accordance with GAAP.

"Consolidated Working Capital":  at any date, the difference of (a) Consolidated Current Assets of the Borrower on such date less (b) Consolidated Current Liabilities of the Borrower on such date.

10

"Construction Related Indebtedness": Indebtedness incurred to finance construction of specific Real Estate Under Construction and which is secured by such Real Estate Under Construction.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its Property is bound.

"Control Investment Affiliate": as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies. For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Default": any of the events specified in Section 8, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Derivatives Counterparty": as defined in Section 7.6.

"Disposition": with respect to any Property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof; and the terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$": dollars in lawful currency of the United States of America.

"Domestic Subsidiary": any Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States of America.

"Eligible Land": land that is zoned for use as an office building, including without limitation any Improvements on such land.

"Environmental Laws": any and all laws, rules, orders, regulations, statutes, ordinances, guidelines, codes, decrees, agreements or other legally enforceable requirements (including, without limitation, common law) of any international authority, foreign government, the United States, or any state, local, municipal or other governmental authority, regulating, relating to or imposing liability or standards of conduct concerning protection of the environment or of human health, or employee health and safety, as has been, is now, or may at any time hereafter be, in effect.

"Environmental Permits": any and all permits, licenses, approvals, registrations, notifications, exemptions and other authorizations required under any Environmental Law.

"ERISA": the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ESA": as defined in Section 5.1(j).

USActive 8584236.17

"Eurocurrency Reserve Requirements": for any day, the aggregate (without duplication) of the maximum rates (expressed as a decimal fraction) of reserve requirements in effect on such day (including, without limitation, basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate": with respect to each day during each Interest Period, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR01 Page as of 11:00 A.M. (London time) two Business Days prior to the beginning of such Interest Period. In the event that such rate does not appear on Reuters Screen LIBOR01 Page (or otherwise on such screen), the "Eurodollar Base Rate" for purposes of this definition shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be reasonably selected by the Administrative Agent.

"Eurodollar Loans": Loans for which the applicable rate of interest is based upon the Eurodollar Rate.

"Eurodollar Rate": with respect to each day during each Interest Period, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

"Eurodollar Tranche": the collective reference to Eurodollar Loans under a particular Facility the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default": any of the events specified in Section 8, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow": for any fiscal year of TPG-Austin JV, the difference, if any, of (a) the sum, without duplication, of (i) Consolidated Net Income for such fiscal year, (ii) the amount of all non-cash charges (including depreciation and amortization) deducted in arriving at such Consolidated Net Income, (iii) the amount of the decrease, if any, in Consolidated Working Capital for such fiscal year, (iv) the aggregate net amount of non-cash loss on the Disposition of Property by the Group Members during such fiscal year (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income and (v) the net increase during such fiscal year (if any) in deferred tax accounts of the Parent Guarantors minus (b) the sum, without duplication, of (i) the amount of all non-cash credits included in arriving at such Consolidated Net Income, (ii) the aggregate amount actually paid by the Borrower and its Subsidiaries in cash during such fiscal year on account of Capital Expenditures (minus the principal amount of Indebtedness incurred in connection with such

USActive 8584236.17

12

expenditures and <u>minus</u> the amount of any such expenditures financed with the proceeds of any Reinvestment Deferred Amount), (iii) the aggregate amount of all prepayments of Revolving Credit Loans and Swing Line Loans during such fiscal year to the extent accompanying permanent optional reductions of the Revolving Credit Commitments and all optional prepayments of the Term Loans during such fiscal year, (iv) the aggregate amount of all regularly scheduled principal payments of Funded Debt (including, without limitation, the Term Loans) of the Borrower and its Subsidiaries made during such fiscal year (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), (v) the amount of the increase, if any, in Consolidated Working Capital for such fiscal year, (vi) the aggregate net amount of non-cash gain on the Disposition of Property by the Borrower and its Subsidiaries during such fiscal year (other than sales of inventory in the ordinary course of business), to the extent included in arriving at such Consolidated Net Income, (vii) the net decrease during such fiscal year (if any) in deferred tax accounts of the Borrower, and (viii) the amount of any Restricted Payments made during such fiscal year pursuant to Section 7.6(c).

"<u>Excess Cash Flow Application Date</u>": as defined in Section 2.12(c).

"<u>Excluded Foreign Subsidiary</u>": any Foreign Subsidiary in respect of which either (a) the pledge of all of the Capital Stock of such Subsidiary as Collateral or (b) the guaranteeing by such Subsidiary of the Obligations, would, in the good faith judgment of the Borrower, result in adverse tax consequences to the Borrower.

"<u>Facility</u>": each of (a) the Term Loan Commitments and the Term Loans made thereunder (the "<u>Term Loan Facility</u>") and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "<u>Revolving Credit Facility</u>").

"<u>Federal Funds Effective Rate</u>": for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"<u>Fee Letter</u>": the Fee Letter, dated as of the date hereof, among the Borrower, the Arranger and the Administrative Agent.

"<u>FIRREA</u>": Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), as amended.

"<u>Foreign Subsidiary</u>": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"<u>FQ1</u>", "<u>FQ2</u>", "<u>FQ3</u>", and "<u>FQ4</u>": when used with a numerical year designation, means the first, second, third or fourth fiscal quarters, respectively, of such fiscal year of TPG-Austin JV (e.g., FQ4 2007 means the fourth fiscal quarter of TPG-Austin JV's 2007 fiscal year, which ends December 31, 2007).

USActive 8584236.17

"Full Appraisal": with respect to any Austin Property, a "Full Appraisal Report" prepared in accordance with FIRREA and USPAP, undertaken by an Appraiser, and providing an assessment of the value of such Austin Property.

"Funded Debt": with respect to any Person, all Indebtedness of such Person of the types described in clauses (a) through (e) of the definition of "Indebtedness" in this Section 1.1.

"Funding Office": the office specified from time to time by the Administrative Agent as its funding office by notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States of America as in effect from time to time.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Gross Asset Value": on any date of determination, the sum of (i) the Appraised Values for each of the Austin Properties in effect on such date and (ii) the sum of, for each Austin Property, the aggregate amount of expenditures for tenant improvements and leasing commissions actually paid since the date of the most recent Appraisal for such Austin Property. For the purposes of determining compliance with the financial covenants set forth in Section 7.1 at the end of any fiscal quarter of the Borrower and the calculation of the Consolidated Leverage Ratio for the purposes of determining the Applicable Margin, Gross Asset Value shall be deemed to be increased by an amount equal to any applicable Specified Equity Contribution minus that portion of such Specified Equity Contribution, if any, applied pursuant to the definitions of "Consolidated EBITDA" and "Consolidated Liquidity Amount" in this Section 1.1, provided that, the amount of the Specified Equity Contribution applied pursuant to this definition shall be no greater than an amount required to cause the Borrowers to be in compliance with the applicable financial covenants set forth in Section 7.1.

"Group Members": a collective reference to the Parent Guarantors, the Borrower and each Subsidiary of the Borrower.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement to be executed and delivered by the Parent Guarantors, the Borrower and each Subsidiary Guarantor, substantially in the form of Exhibit A, as the same may be amended, supplemented or otherwise modified from time to time.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any

manner, whether directly or indirectly, including, without limitation, any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any Property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; <u>provided, however,</u> that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"<u>Guarantors</u>": the collective reference to the Parent Guarantors and the Subsidiary Guarantors.

"<u>Hedge Agreements</u>": all interest rate or currency swaps, caps or collar agreements, foreign exchange agreements, commodity contracts or similar arrangements entered into by the Borrower or its Subsidiaries providing for protection against fluctuations in interest rates, currency exchange rates, commodity prices or the exchange of nominal interest obligations, either generally or under specific contingencies.

"<u>Historical Operating Statements</u>": as defined in Section 4.1(b).

"<u>Improvements</u>": all buildings, fixtures, structures, parking areas, landscaping and other improvements whether existing now or hereafter constructed, together with all machinery and mechanical, electrical, HVAC and plumbing systems presently located thereon and used to the operation thereof, excluding (a) any such items owned by utility service providers, (b) any such items owned by tenants or other third parties unaffiliated with the Loan Parties or their Subsidiaries and (c) any items of personal property.

"<u>Indebtedness</u>": of any Person at any date, without duplication, (a) all outstanding indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of Property or services (other than trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an

USActive 8584236.17

15

account party or applicant under acceptance, letter of credit, surety bond or similar facilities, (g) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on Property (including, without limitation, accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation and (j) for the purposes of Section 8(e) only, all obligations of such Person in respect of Hedge Agreements.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Indemnified Liabilities": as defined in Section 10.5.

"Indemnitee": as defined in Section 10.5.

"Insolvency": with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent": pertaining to a condition of Insolvency.

"Insurance Premiums": as defined in Section 6.5(c).

"Intellectual Property": the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including, without limitation, copyrights, copyright licenses, patents, patent licenses, trademarks, trademark licenses, technology, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercreditor Agreements": (i) the Intercreditor Agreements, each dated as of June 1, 2007, between Lehman Brothers Holding Inc. and the Administrative Agent with respect to each of the CMBS Facilities in effect as of the Closing Date and (ii) each Intercreditor Agreement entered into after the Closing Date between the holders of future CMBS Facilities and the Administrative Agent in form and substance substantially the same as the Intercreditor Agreement listed in (i) above, in each case, as amended, supplemented or otherwise modified from time to time.

"Interest Payment Date": (a) as to any Base Rate Loan, the last day of each March, June, September and December to occur while such Loan is outstanding and the final maturity date of such Loan, (b) as to any Eurodollar Loan having an Interest Period of three months or shorter, the last day of such Interest Period, (c) as to any Eurodollar Loan having an Interest Period longer than three months, each day that is three months, or a whole multiple thereof, after the first day of such Interest Period and the last day of such Interest Period and

USActive 8584236.17

(d) as to any Loan (other than any Revolving Credit Loan that is a Base Rate Loan and any Swing Line Loan), the date of any repayment or prepayment made in respect thereof.

"Interest Period": as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M. (New York City time) on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(1) if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(2) any Interest Period that would otherwise extend beyond the Revolving Credit Termination Date or beyond the date final payment is due on any Term Loan shall end on the Revolving Credit Termination Date or such due date, as applicable; and

(3) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period.

"Interest Reserve Account": that certain account established and maintained by the Borrower with the Account Bank for the benefit of the Administrative Agent, for the benefit of the Lenders, and subject to the Account Control Agreement.

"Investments": as defined in Section 7.7.

"Issuing Lender": any Revolving Credit Lender from time to time designated by the Borrower as an Issuing Lender with the consent of such Revolving Credit Lender and the Administrative Agent.

"L/C Commitment": $10,000,000.

"L/C Fee Payment Date": the last day of each March, June, September and December and the last day of the Revolving Credit Commitment Period.

"L/C Obligations": at any time, an amount equal to the sum of (a) the aggregate then undrawn and unexpired amount of the then outstanding Letters of Credit and (b) the aggregate amount of drawings under Letters of Credit that have not then been reimbursed pursuant to Section 3.5.

"L/C Participants": with respect to any Letter of Credit, the collective reference to all the Revolving Credit Lenders other than the Issuing Lender that issued such Letter of Credit.

"LBHI": as defined in the recitals hereto.

"Leases": all leases and other agreements or arrangements heretofore or hereafter entered into affecting the use, enjoyment or occupancy of the Austin Properties or the Improvements, including any extensions, renewals, modifications or amendments thereof and all additional remainders, reversions and other rights and estates appurtenant thereunder.

"Lehman Entity": any of Lehman Commercial Paper Inc. or any of its affiliates.

"Lender Addendum": with respect to any initial Lender, a Lender Addendum, substantially in the form of Exhibit I, to be executed and delivered by such Lender on the Closing Date as provided in Section 10.17.

"Lenders": as defined in the preamble hereto.

"Letters of Credit": as defined in Section 3.1(a).

"Lien": any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan": any loan made by any Lender pursuant to this Agreement.

"Loan Documents": this Agreement, the Security Documents, the Applications, the Notes, the Fee Letter and the Agreement Regarding Debtor/Creditor Relationship.

"Loan Parties": the Parent Guarantors, the Borrower and each Subsidiary of the Borrower that is a party to a Loan Document.

"Majority Facility Lenders": with respect to any Facility, the holders of more than 50% of the aggregate unpaid principal amount of the Term Loans or the Total Revolving Extensions of Credit, as the case may be, outstanding under such Facility (or, in the case of the Revolving Credit Facility, prior to any termination of the Revolving Credit Commitments, the holders of more than 50% of the Total Revolving Credit Commitments).

"Majority Revolving Credit Facility Lenders": the Majority Facility Lenders in respect of the Revolving Credit Facility.

"Material Adverse Effect": a material adverse effect on (a) the business, assets, property, operations, condition (financial or otherwise) or prospects of the Group Members, taken as a whole, or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Agents or the Lenders hereunder or thereunder;

USActive 8584236.17

18

provided that, solely on the Closing Date and with respect to the representations and warranties to be made by the Loan Parties on the Closing Date and the Closing Certificates to be delivered pursuant to Section 5.1(k) on the Closing Date, "Material Adverse Effect" shall mean an effect, event, development or change that, individually or in the aggregate with all other effects, events, developments or changes, is materially adverse to the business, results of operations or financial condition of the Austin Properties, taken as a whole, regardless of whether the use of such term is only in respect of a single matter, such as in Section 5.2(a) of the Purchase Agreement, provided, that none of the following shall be included in determining whether a Material Adverse Effect has occurred: (a) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates, (b) changes in general legal, tax, regulatory, political or business conditions that, in each case, generally affect the geographic region the Austin Properties are located in or the commercial real estate industry (unless, and only to the extent, such effect, event, development or change affects the Austin Properties located in a particular geographic region in a disproportionate manner as compared to other properties in such geographic region affected by such effect, event, development or change), (c) changes in GAAP, (d) the negotiation, execution, announcement or performance of the Purchase Agreement or the transactions contemplated hereby or the consummation of the transactions contemplated by the Purchase Agreement, including the impact thereof on relationships, contractual or otherwise, with tenants, suppliers, lenders, investors, venture partners or employees, (e) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of the Purchase Agreement (unless, and only to the extent, such effect, event, development or change affects the Austin Properties in a disproportionate manner as compared to other properties in the geographic regions affected by such effect, event, development or change), (f) earthquakes, hurricanes or other natural disasters (unless, and only to the extent, such effect, event, development or change affects the Austin Properties located in a particular geographic region in a disproportionate manner as compared to other properties in such geographic region affected by such effect, event, development or change), or (g) any action taken by the Sellers at the request or with the consent of the Buyer.

   "Material Environmental Amount": an amount or amounts payable by the Borrower and/or any of its Subsidiaries, in the aggregate in excess of $5,000,000, for: costs to comply with any Environmental Law; costs of any investigation, and any remediation, of any Material of Environmental Concern; and compensatory damages (including, without limitation damages to natural resources), punitive damages, fines, and penalties pursuant to any Environmental Law.

   "Materials of Environmental Concern": any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products (virgin or unused), polychlorinated biphenyls, urea-formaldehyde insulation, asbestos, pollutants, contaminants, radioactivity, and any other materials, substances or forces of any kind, whether or not any such material, substance or force is defined as hazardous or toxic under any Environmental Law, that is regulated pursuant to or could reasonably be expected to give rise to liability under any Environmental Law.

   "Maximum Required Prepayment Amount": on any date of determination, (x) in the event that the Consolidated Leverage Ratio as at the last day of the most recent fiscal quarter

of the Borrower for which financial statements are available exceeds the Applicable Leverage Ratio in effect on such date, the amount by which Consolidated Total Debt must be reduced as of such day to cause the Consolidated Leverage Ratio as of such day to equal the Applicable Leverage Ratio in effect on such date and (y) in the event that the Consolidated Leverage Ratio as at the last day of the most recent fiscal quarter of the Borrower for which financial statements are available is equal to or is less than the Applicable Leverage Ratio in effect on such date, $0.

"Moody's":  Moody's Investors Service, Inc.

"Mortgaged Properties":  the real properties listed on Schedule 1.1A, as to which the Administrative Agent for the benefit of the Secured Parties shall be granted a Lien pursuant to one or more Mortgages.

"Mortgages":  each of the mortgages and deeds of trust made by any Loan Party in favor of, or for the benefit of, the Administrative Agent for the benefit of the Secured Parties, substantially in the form of Exhibit D (with such changes thereto as shall be advisable under the law of the jurisdiction in which such mortgage or deed of trust is to be recorded), as the same may be amended, supplemented or otherwise modified from time to time.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received) of such Asset Sale or Recovery Event, net of attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to a Security Document) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements), (b) in connection with any issuance or sale of equity securities or debt securities or instruments or the incurrence of loans, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses and amounts required to be applied to the repayment of Indebtedness in connection with any refinancing actually incurred in connection therewith and (c) in connection with any Purchase Price Refund, the cash amount thereof, net of any expenses incurred in the collection thereof.

"Non-Excluded Taxes":  as defined in Section 2.20(a).

"Non-Recourse Subsidiary Borrower":  a Subsidiary of the Borrower that is a special purpose entity whose only assets are the assets securing Indebtedness incurred in accordance with Section 7.2(i).

"Non-U.S. Lender":  as defined in Section 2.20(d).

USActive 8584236.17

EXHIBIT A

"Note": any promissory note evidencing any Loan.

"Obligations": the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Loans and Reimbursement Obligations and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans, the Reimbursement Obligations and all other obligations and liabilities of the Borrower to the Administrative Agent or to any Lender or any Qualified Counterparty, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, the Letters of Credit, any Specified Hedge Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including, without limitation, all fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise; provided, that (i) obligations of the Borrower or any Subsidiary under any Specified Hedge Agreement shall be secured and guaranteed pursuant to the Security Documents only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (ii) any release of Collateral or Guarantors effected in the manner permitted by this Agreement shall not require the consent of holders of obligations under Specified Hedge Agreements.

"Operating EBITDA": of any Austin Property for any period, Operating Net Income of the relevant Property Owner for such period plus, without duplication and to the extent reflected as a charge in the statement of such Operating Net Income for such period, the sum of (a) income tax expense, (b) interest expense of such Property Owner, amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness, (c) depreciation and amortization expense, (d) amortization of intangibles (including, but not limited to, goodwill) and organization costs, (e) any extraordinary, unusual or non-recurring expenses or losses (including, whether or not otherwise includable as a separate item in the statement of such Operating Net Income for such period, losses on sales of assets outside of the ordinary course of business), and (f) any other non-cash charges, and minus, to the extent included in the statement of such Operating Net Income for such period, the sum of (a) interest income (except to the extent deducted in determining such Operating Net Income), (b) any extraordinary, unusual or non-recurring income or gains (including, whether or not otherwise includable as a separate item in the statement of such Operating Net Income for such period, gains on the sales of assets outside of the ordinary course of business), and (c) any other non-cash income, provided that, the Operating EBITDA of any Austin Property shall exclude Operating EBITDA attributable to any other Austin Property owned by such Property Owner.

"Operating Net Income": of any Property Owner for any period, the combined net income (or loss) of such Property Owner for such period, determined on a combined basis.

"Other Taxes": any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made

USActive 8584236.17

hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Parent Guarantors": as defined in the preamble hereto.

"Participant": as defined in Section 10.6(b).

"Payment Office": the office specified from time to time by the Administrative Agent as its payment office by notice to the Borrower and the Lenders.

"PBGC": the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Investors": the collective reference to LBHI and/or TPGI and their respective Control Investment Affiliates.

"Permitted Leases": leases or subleases (including ground leases and licenses and other occupancy agreements) entered into the ordinary course of business by any Group Member, in each case, at an arm's-length basis (i.e., on market terms) which do not materially impair the interests of such Group Member in the Property subject thereto or the value of such Property.

"Person": an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Personal Property": "personal property", as defined in the Uniform Commercial Code as from time to time in effect in the State of New York, which is owned by any Group Member.

"Plan": at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledged Stock": as defined in the Guarantee and Collateral Agreement.

"Policies": as defined in Section 6.5(c).

"Pricing Grid": the table set forth below:

| Consolidated Leverage Ratio | Applicable Margin for Eurodollar Loans | Applicable Margin for Base Rate Loans |
|---|---|---|
| ≥ 0.55 to 1.00 | 2.25% | 1.25% |
| < 0.55 to 1.00 | 2.00% | 1.00% |

USActive 8594236.17

**EXHIBIT A**

For the purposes of the Pricing Grid, changes in the Applicable Margin resulting from changes in the Consolidated Leverage Ratio shall become effective on the date (the "Adjustment Date") on which financial statements are delivered to the Lenders pursuant to Section 6.1 (but in any event not later than the 45th day after the end of each of the first three quarterly periods of each fiscal year or the 90th day after the end of each fiscal year, as the case may be) and shall remain in effect until the next change to be effected pursuant to this paragraph. If any financial statements referred to above are not delivered within the time periods specified above, then, until such financial statements are delivered, the Consolidated Leverage Ratio as at the end of the fiscal period that would have been covered thereby shall for the purposes of this definition be deemed to be greater than 0.55 to 1.00. In addition, at all times while an Event of Default shall have occurred and be continuing, the Consolidated Leverage Ratio shall for the purposes of this Pricing Grid be deemed to be greater than 0.55 to 1.00. Each determination of the Consolidated Leverage Ratio pursuant to this Pricing Grid shall be made for the periods and in the manner contemplated by Section 7.1(a).

"Pro Forma Balance Sheet": as defined in Section 4.1(a).

"Projections": as defined in Section 6.2(c).

"Property": any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, including, without limitation, Capital Stock.

"Property Management Agreement": such agreements pursuant to which TPG-FP Services, L.P., a Texas limited partnership, is obligated, either as a party or by assumption pursuant to one or more assignment agreements or otherwise, to provide real estate management services to one or more Property Owners.

"Property Owners": collectively, Persons identified in Schedule 1.1D attached hereto, each of which owns the Austin Property identified on such Schedule as being owned by such Person.

"Purchase Agreement": as defined in the recitals hereto.

"Purchase Price Refund": any amount received by any Group Member as a result of a purchase price adjustment or similar event in connection with any acquisition of Property by any Group Member.

"Qualified Counterparty": with respect to any Specified Hedge Agreement, any counterparty thereto that, at the time such Specified Hedge Agreement was entered into, was a Lender or an affiliate of a Lender.

"Real Estate Under Construction": Real Property on which construction of material improvements has commenced and is continuing to be performed, but has not yet been completed (as such completion shall be evidenced by the delivery of a final or temporary certificate of occupancy for such Real Property that shall permit the occupancy of all space in such Real Property, together with the final completion of all amenities).

USActive 8584236.17

EXHIBIT A                                                                    37

"Real Property": any present and future right, title and interest (including, without limitation, any leasehold estate) in (i) any plots, pieces or parcels of Eligible Land, (ii) any Improvements of every nature whatsoever (the rights and interests described in clauses (i) and (ii) above being the "Premises"), (iii) all easements, rights of way, gores of land or any lands occupied by streets, ways, alleys, passages, sewer rights, water courses, water rights and powers, and public places adjoining such land, and any other interests in property constituting appurtenances to the Premises, or which hereafter shall in any way belong, relate or be appurtenant thereto, (iv) all hereditaments, gas, oil, minerals (with the right to extract, sever and remove such gas, oil and minerals), and easements, of every nature whatsoever, located in, on or benefiting the Premises and (v) all other rights and privileges thereunto belonging or appertaining and all extensions, additions, improvements, betterments, renewals, substitutions and replacements to or of any of the rights and interests described in clauses (iii) and (iv) above.

"Recourse Indebtedness": any Indebtedness, to the extent that recourse of the applicable lender for non payment is not limited to such lender's Liens on a particular asset or group of assets that secure such Indebtedness (except to the extent the Property on which such lender has a Lien and to which its recourse for non payment is limited constitutes cash or Cash Equivalents, to which extent such Indebtedness shall be deemed to be Recourse Indebtedness); provided that, personal recourse of any Person for any such Indebtedness for fraud, misrepresentation, misapplication of cash, waste, environmental claims and liabilities, prohibited transfers, violations of single purposes entity covenants, and other circumstances customarily excluded by institutional lenders from exculpation provisions and/or included in separate guaranty or indemnification agreements in non recourse financing of real estate shall not, by itself, cause such Indebtedness to be characterized as Recourse Indebtedness.

"Recovery Event": any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member.

"Refunded Swing Line Loans": as defined in Section 2.7(b).

"Refunding Date": as defined in Section 2.7(c).

"Register": as defined in Section 10.6(d).

"Regulation D": Regulation D of the Board as in effect from time to time.

"Regulation U": Regulation U of the Board as in effect from time to time.

"Regulation X": Regulation X of the Board as in effect from time to time.

"Reimbursement Obligation": the obligation of the Borrower to reimburse each Issuing Lender pursuant to Section 3.5 for amounts drawn under Letters of Credit issued by such Issuing Lender.

"Reinvestment Deferred Amount": with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member in connection therewith that are

not applied to prepay the Term Loans or reduce the Revolving Credit Commitments pursuant to Section 2.12(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event": any Asset Sale, Purchase Price Refund or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice": a written notice executed by a Responsible Officer stating that no Default or Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale, Purchase Price Refund or Recovery Event to acquire or repair assets useful in its business.

"Reinvestment Prepayment Amount": with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the Borrower's business.

"Reinvestment Prepayment Date": with respect to any Reinvestment Event, the earlier of (a) the date occurring twelve months after such Reinvestment Event and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the Borrower's business with all or any portion of the relevant Reinvestment Deferred Amount.

"REIT 1": as defined in the preamble hereto.

"REIT 2": as defined in the preamble hereto.

"REIT 3": as defined in the preamble hereto.

"REIT 4": as defined in the preamble hereto.

"REIT 5": as defined in the preamble hereto.

"REIT 6": as defined in the preamble hereto.

"REIT 7": as defined in the preamble hereto.

"REIT 8": as defined in the preamble hereto.

"REIT 9": as defined in the preamble hereto.

"REIT 10": as defined in the preamble hereto.

"REIT Conversion Date": the date upon which the REIT Guarantors elect to qualify as a real estate investment trust under Sections 856 through 860 of the Code.

"REIT Guarantors": a collective reference to REIT 1, REIT 2, REIT 3, REIT 4, REIT 5, REIT 6, REIT 7, REIT 8, REIT 9 and REIT 10.

"<u>REIT Status</u>":  with respect to any Person, (a) the qualification of such Person as a real estate investment trust under Sections 856 through 860 of the Code, and (b) the applicability to such Person and its shareholders of the method of taxation provided for in Sections 857 et seq. of the Code.

"<u>Related Fund</u>":  with respect to any Lender, any fund that (x) invests in commercial loans and (y) is managed or advised by the same investment advisor as such Lender, by such Lender or an affiliate of such Lender.

"<u>Rents</u>":  all rents, rent equivalents, moneys payable as damages (including payments by reason of the rejection of a Lease in a bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law)) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues (including parking revenue), deposits (including security, utility and other deposits), accounts, cash, issues, profits, tenant charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of the Borrower, the Property Owners or any of their agents or employees from any and all sources arising from or attributable to the Austin Properties and the Improvements, including all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Austin Properties or rendering of services by the Borrower, Property Owner or any of their agents or employees and proceeds, if any, from business interruption or other loss of income insurance.

"<u>Reorganization</u>":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"<u>Reportable Event</u>":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the 30-day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"<u>Required Lenders</u>":  at any time, the holders of more than 50% of (a) until the Closing Date, the Commitments and (b) thereafter, the sum of (i) the aggregate unpaid principal amount of the Term Loans then outstanding and (ii) the Total Revolving Credit Commitments then in effect or, if the Revolving Credit Commitments have been terminated, the Total Revolving Extensions of Credit then outstanding.

"<u>Required Prepayment Lenders</u>":  the Majority Facility Lenders in respect of each Facility.

"<u>Requirements of Law</u>":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

USActive 6584236.17

26

"Responsible Officer": the chief executive officer, president, vice president or controller of TPG-Austin JV, in its capacity as the manager of the Borrower, but in any event, with respect to financial matters, the controller of TPG-Austin JV GP, in its capacity as the general partner of TPG-Austin JV, in its capacity as the manager of the Borrower.

"Restricted Payments": as defined in Section 7.6.

"Revolving Credit Commitment": as to any Lender, the obligation of such Lender, if any, to make Revolving Credit Loans and participate in Swing Line Loans and Letters of Credit, in an aggregate principal and/or face amount not to exceed the amount set forth under the heading "Revolving Credit Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Total Revolving Credit Commitments is $100,000,000.

"Revolving Credit Commitment Period": the period from and including the Closing Date to the Revolving Credit Termination Date.

"Revolving Credit Facility": as defined in the definition of "Facility" in this Section 1.1.

"Revolving Credit Lender": each Lender that has a Revolving Credit Commitment or that is the holder of Revolving Credit Loans.

"Revolving Credit Loans": as defined in Section 2.4.

"Revolving Credit Note": as defined in Section 2.8(e).

"Revolving Credit Percentage": as to any Revolving Credit Lender at any time, the percentage which such Lender's Revolving Credit Commitment then constitutes of the Total Revolving Credit Commitments (or, at any time after the Revolving Credit Commitments shall have expired or terminated, the percentage which the aggregate amount of such Lender's Revolving Extensions of Credit then outstanding constitutes of the Total Revolving Extensions of Credit then outstanding).

"Revolving Credit Termination Date": the fifth anniversary of the Closing Date.

"Revolving Extensions of Credit": as to any Revolving Credit Lender at any time, an amount equal to the sum of (a) the aggregate principal amount of all Revolving Credit Loans made by such Lender then outstanding, (b) such Lender's Revolving Credit Percentage of the L/C Obligations then outstanding and (c) such Lender's Revolving Credit Percentage of the aggregate principal amount of Swing Line Loans then outstanding.

"S&P": Standard & Poor's Ratings Services.

"SEC": the Securities and Exchange Commission (or successors thereto or an analogous Governmental Authority).

USActive 8584236.17

"Secured Parties": as defined in the Guarantee and Collateral Agreement.

"Security Documents": the collective reference to the Guarantee and Collateral Agreement, the Mortgages, the Account Control Agreement and all other security documents hereafter delivered to the Administrative Agent granting a Lien on any Property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"Sellers": as defined in the recitals hereto.

"Significant Casualty": as defined in Section 6.5(c).

"Single Employer Plan": any Plan that is covered by Title IV of ERISA, but which is not a Multiemployer Plan.

"Solvent": with respect to any Person, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature. For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Specified Equity Contribution": any direct or indirect equity contribution made by the Permitted Investors or CalSTRS to TPG-Austin JV (and then contributed in cash to the REIT Guarantors and then to the Borrower) after the Closing Date and prior to the date that is ten days after the date on which financial statements are required to be delivered for a fiscal quarter of the Borrower that will, at the request of the Borrower, be deemed to increase, dollar for dollar, the Consolidated Liquidity Amount, Consolidated EBITDA for such fiscal quarter and/or Gross Asset Value as at the last day of such fiscal quarter for the purpose of determining compliance with such financial covenants at the end of such fiscal quarter and calculating the Consolidated Leverage Ratio for the purpose of determining the Applicable Margin, provided that, (a) the amount of the Specified Equity Contribution deemed applied to the Consolidated Liquidity Amount, Consolidated EBITDA and/or Gross Asset Value, as applicable, shall be no greater than an amount required to cause the Borrower to be in compliance with the applicable financial covenants set forth in Section 7.1, (b) there may only be one Specified Equity Contribution during the term of this Agreement, all or a portion of which may be applied to each of the Consolidated Liquidity Amount, Consolidated EBITDA and Gross Asset Value, and (c) the Specified Equity Contribution may be either common equity or preferred equity, provided that,

USActive 8584236.17

any such preferred equity shall be on terms and conditions reasonably satisfactory to the Administrative Agent.

"Specified Hedge Agreement": any Hedge Agreement entered into by the Borrower or any Subsidiary Guarantor and any Qualified Counterparty.

"Subsidiary": as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor": each Subsidiary of the Borrower that is a party to the Guarantee and Collateral Agreement.

"Summary Appraisal": with respect to any Austin Property, a "Summary Appraisal Report", undertaken by an Appraiser, complying with all applicable laws, rules, regulations and standards, including FIRREA and USPAP, as applicable.

"Swing Line Commitment": the obligation of the Swing Line Lender to make Swing Line Loans pursuant to Section 2.6 in an aggregate principal amount at any one time outstanding not to exceed $10,000,000.

"Swing Line Lender": Lehman Commercial Paper Inc., in its capacity as the lender of Swing Line Loans.

"Swing Line Loans": as defined in Section 2.6.

"Swing Line Note": as defined in Section 2.8(e).

"Swing Line Participation Amount": as defined in Section 2.7(c).

"Syndication Agent": any Person satisfactory to the Borrower and the Arranger, that agrees to act in the capacity of syndication agent under the Loan Documents, together with such Persons successors and assigns.

"Syndication Date": the date on which the Arranger completes the syndication of the Facilities and the entities selected in such syndication process become parties to this Agreement.

"Tangible Net Worth": on any date of determination, (a) Gross Asset Value for the fiscal quarter of the Borrower most recently ending prior to such date for which financial statements are available minus (b) Consolidated Total Debt on such date.

"Term Loan Commitment": as to any Lender, the obligation of such Lender, if any, to make a Term Loan to the Borrower hereunder in a principal amount not to exceed the amount set forth under the heading "Term Loan Commitment" opposite such Lender's name on Schedule 1 to the Lender Addendum delivered by such Lender, or, as the case may be, in the Assignment and Acceptance pursuant to which such Lender became a party hereto, as the same may be changed from time to time pursuant to the terms hereof. The original aggregate amount of the Term Loan Commitments is $192,500,000.

"Term Loan Facility": as defined in the definition of "Facility" in this Section 1.1.

"Term Loan Lender": each Lender that has a Term Loan Commitment or is the holder of a Term Loan.

"Term Loan Maturity Date": the sixth anniversary of the Closing Date.

"Term Loan Percentage": as to any Term Loan Lender at any time, the percentage that such Lender's Term Loan Commitment then constitutes of the aggregate Term Loan Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Term Loan then outstanding constitutes of the aggregate principal amount of the Term Loans then outstanding).

"Term Loans": as defined in Section 2.1.

"Term Note": as defined in Section 2.8(e).

"Total Revolving Credit Commitments": at any time, the aggregate amount of the Revolving Credit Commitments then in effect.

"Total Revolving Extensions of Credit": at any time, the aggregate amount of the Revolving Extensions of Credit of the Revolving Credit Lenders outstanding at such time.

"TPG-Austin JV": as defined in the recitals hereto.

"TPG-Austin JV GP": TPG-Austin Portfolio Partners GP LLC, a Delaware limited liability company.

"TPGI": as defined in the recitals hereto.

"Transferee": as defined in Section 10.14.

"Type": as to any Loan, its nature as a Base Rate Loan or a Eurodollar Loan.

"USPAP": the Uniform Standards for Professional Appraisal Practice (USPAP).

"Wholly Owned Subsidiary": as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

USActive 8584236.17

EXHIBIT A                                                                44

"Wholly Owned Subsidiary Guarantor": any Subsidiary Guarantor that is a Wholly Owned Subsidiary of the Borrower.

1.2     Other Definitional Provisions. (a) Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)     As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, accounting terms relating to the Parent Guarantors, the Borrower and its Subsidiaries not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)     All calculations of financial ratios set forth in Section 7.1 and the calculation of the Consolidated Leverage Ratio for purposes of determining the Applicable Margin shall be calculated to the same number of decimal places as the relevant ratios are required to be expressed in this Agreement and shall be rounded upward if the number in the decimal place immediately following the last calculated decimal place is five or greater. For example, if the relevant ratio is to be calculated to the hundredth decimal place and the calculation of the ratio is 5.126, the ratio will be rounded up to 5.13.

SECTION 2.   AMOUNT AND TERMS OF COMMITMENTS

2.1     Term Loan Commitments. Subject to the terms and conditions hereof, the Term Loan Lenders severally agree to make term loans (each, a "Term Loan") to the Borrower on the Closing Date in an amount for each Term Loan Lender not to exceed the amount of the Term Loan Commitment of such Lender. The Term Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.13.

2.2     Procedure for Term Loan Borrowing. The Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 10:00 A.M. (New York City time) one Business Day prior to the anticipated Closing Date) requesting that the Term Loan Lenders make the Term Loans on the Closing Date. The Term Loans made on the Closing Date shall initially be Base Rate Loans, and no Term Loan may be converted into or continued as a Eurodollar Loan having an Interest Period in excess of one month prior to the date that is the earlier of (x) the date which is 60 days after the Closing Date and (y) the Syndication Date. Upon receipt of such Borrowing Notice the Administrative Agent shall promptly notify each Term Loan Lender thereof. Not later than 9:00 A.M. (New York City time) on the Closing Date each Term Loan Lender shall make

USActive 8584236.17

31

available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Term Loan or Term Loans to be made by such Lender. Not later than 9:00 A.M. (New York time) on the Closing Date, the Administrative Agent shall make available to the Borrower the aggregate of the amounts made available to the Administrative Agent by the Term Loan Lenders, in like funds as received by the Administrative Agent.

2.3    Repayment of Term Loans.  The Borrower shall repay all outstanding Term Loans on the Term Loan Maturity Date.

2.4    Revolving Credit Commitments.  (a)  Subject to the terms and conditions hereof, the Revolving Credit Lenders severally agree to make revolving credit loans ("Revolving Credit Loans") to the Borrower from time to time during the Revolving Credit Commitment Period in an aggregate principal amount at any one time outstanding for each Revolving Credit Lender which, when added to such Lender's Revolving Credit Percentage of the sum of (i) the L/C Obligations then outstanding and (ii) the aggregate principal amount of the Swing Line Loans then outstanding, does not exceed the amount of such Lender's Revolving Credit Commitment.  During the Revolving Credit Commitment Period the Borrower may use the Revolving Credit Commitments by borrowing, prepaying the Revolving Credit Loans in whole or in part, and reborrowing, all in accordance with the terms and conditions hereof.  The Revolving Credit Loans may from time to time be Eurodollar Loans or Base Rate Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.5 and 2.13, provided that no Revolving Credit Loan shall be made as a Eurodollar Loan after the day that is one month prior to the Revolving Credit Termination Date.

(b)    The Borrower shall repay all outstanding Revolving Credit Loans on the Revolving Credit Termination Date.

2.5    Procedure for Revolving Credit Borrowing.  The Borrower may borrow under the Revolving Credit Commitments on any Business Day during the Revolving Credit Commitment Period, provided that the Borrower shall deliver to the Administrative Agent a Borrowing Notice (which Borrowing Notice must be received by the Administrative Agent prior to 12:00 Noon (New York City time) (a) three Business Days prior to the requested Borrowing Date, in the case of Eurodollar Loans, or (b) one Business Day prior to the requested Borrowing Date, in the case of Base Rate Loans).  Any Revolving Credit Loans made on the Closing Date shall initially be Base Rate Loans, and no Revolving Credit Loan may be made as, converted into or continued as a Eurodollar Loan having an Interest Period in excess of one month prior to the date that is the earlier of (x) the date which is 60 days after the Closing Date and (y) the Syndication Date.  Each borrowing of Revolving Credit Loans under the Revolving Credit Commitments shall be in an amount equal to (x) in the case of Base Rate Loans, $1,000,000 or a whole multiple in excess thereof (or, if the then aggregate Available Revolving Credit Commitments are less than $1,000,000, such lesser amount) and (y) in the case of Eurodollar Loans, $1,000,000 or a whole multiple of $1,000,000 in excess thereof; provided, that the Swing Line Lender may request, on behalf of the Borrower, borrowings of Base Rate Loans under the Revolving Credit Commitments in other amounts pursuant to Section 2.7.  Upon receipt of any such Borrowing Notice from the Borrower, the Administrative Agent shall promptly notify each Revolving Credit Lender thereof.  Each Revolving Credit Lender will make its Revolving Credit Percentage of the amount of each borrowing of Revolving Credit Loans available to the

USActive 8584236.17

Administrative Agent for the account of the Borrower at the Funding Office prior to 12:00 Noon (New York City time) on the Borrowing Date requested by the Borrower in funds immediately available to the Administrative Agent. Such borrowing will then be made available to the Borrower by the Administrative Agent in like funds as received by the Administrative Agent.

2.6    Swing Line Commitment. (a) Subject to the terms and conditions hereof, the Swing Line Lender agrees that, during the Revolving Credit Commitment Period, it will make available to the Borrower in the form of swing line loans ("Swing Line Loans") a portion of the credit otherwise available to the Borrower under the Revolving Credit Commitments; provided that (i) the aggregate principal amount of Swing Line Loans outstanding at any time shall not exceed the Swing Line Commitment then in effect (notwithstanding that the Swing Line Loans outstanding at any time, when aggregated with the Swing Line Lender's other outstanding Revolving Credit Loans hereunder, may exceed the Swing Line Commitment then in effect or such Swing Line Lender's Revolving Credit Commitment then in effect) and (ii) the Borrower shall not request, and the Swing Line Lender shall not make, any Swing Line Loan if, after giving effect to the making of such Swing Line Loan, the aggregate amount of the Available Revolving Credit Commitments would be less than zero. During the Revolving Credit Commitment Period, the Borrower may use the Swing Line Commitment by borrowing, repaying and reborrowing, all in accordance with the terms and conditions hereof. Swing Line Loans shall be Base Rate Loans only.

(b)    The Borrower shall repay all outstanding Swing Line Loans on the Revolving Credit Termination Date.

2.7    Procedure for Swing Line Borrowing; Refunding of Swing Line Loans. (a) The Borrower may borrow under the Swing Line Commitment on any Business Day during the Revolving Credit Commitment Period, provided, the Borrower shall give the Swing Line Lender irrevocable telephonic notice confirmed promptly in writing (which telephonic notice must be confirmed in writing by the Swing Line Lender not later than 1:00 P.M. (New York City time) on the proposed Borrowing Date), specifying (i) the amount to be borrowed and (ii) the requested Borrowing Date. Each borrowing under the Swing Line Commitment shall be in an amount equal to $500,000 or a whole multiple of $100,000 in excess thereof. Not later than 3:00 P.M. (New York City time) on the Borrowing Date specified in the borrowing notice in respect of any Swing Line Loan, the Swing Line Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the amount of such Swing Line Loan. The Administrative Agent shall make the proceeds of such Swing Line Loan available to the Borrower on such Borrowing Date in like funds as received by the Administrative Agent.

(b)    The Swing Line Lender, at any time and from time to time in its sole and absolute discretion may, on behalf of the Borrower (which hereby irrevocably directs the Swing Line Lender to act on its behalf), on one Business Day's notice given by the Swing Line Lender no later than 12:00 Noon (New York City time) request each Revolving Credit Lender to make, and each Revolving Credit Lender hereby agrees to make, a Revolving Credit Loan (which shall initially be a Base Rate Loan), in an amount equal to such Revolving Credit Lender's Revolving Credit Percentage of the aggregate amount of the Swing Line Loans (the "Refunded Swing Line Loans") outstanding on the date of such notice, to repay the Swing Line Lender. Each Revolving

Credit Lender shall make the amount of such Revolving Credit Loan available to the Administrative Agent at the Funding Office in immediately available funds, not later than 10:00 A.M. (New York City time) one Business Day after the date of such notice. The proceeds of such Revolving Credit Loans shall be made immediately available by the Administrative Agent to the Swing Line Lender for application by the Swing Line Lender to the repayment of the Refunded Swing Line Loans.

(c)    If prior to the time a Revolving Credit Loan would have otherwise been made pursuant to Section 2.7(b), one of the events described in Section 8(f) shall have occurred and be continuing with respect to the Borrower, or if for any other reason, as determined by the Swing Line Lender in its sole discretion, Revolving Credit Loans may not be made as contemplated by Section 2.7(b), each Revolving Credit Lender shall, on the date such Revolving Credit Loan was to have been made pursuant to the notice referred to in Section 2.7(b) (the "Refunding Date"), purchase for cash an undivided participating interest in the then outstanding Swing Line Loans by paying to the Swing Line Lender an amount (the "Swing Line Participation Amount") equal to (i) such Revolving Credit Lender's Revolving Credit Percentage times (ii) the sum of the aggregate principal amount of Swing Line Loans then outstanding which were to have been repaid with such Revolving Credit Loans.

(d)    Whenever, at any time after the Swing Line Lender has received from any Revolving Credit Lender such Lender's Swing Line Participation Amount, the Swing Line Lender receives any payment on account of the Swing Line Loans, the Swing Line Lender will distribute to such Lender its Swing Line Participation Amount (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's participating interest was outstanding and funded and, in the case of principal and interest payments, to reflect such Lender's pro rata portion of such payment if such payment is not sufficient to pay the principal of and interest on all Swing Line Loans then due); provided, however, that in the event that such payment received by the Swing Line Lender is required to be returned, such Revolving Credit Lender will return to the Swing Line Lender any portion thereof previously distributed to it by the Swing Line Lender.

(e)    Each Revolving Credit Lender's obligation to make the Revolving Credit Loans referred to in Section 2.7(b) and to purchase participating interests pursuant to Section 2.7(c) shall be absolute and unconditional and shall not be affected by any circumstance, including, without limitation, (i) any setoff, counterclaim, recoupment, defense or other right which such Revolving Credit Lender or the Borrower may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever; (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5; (iii) any adverse change in the condition (financial or otherwise) of the Borrower; (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other Revolving Credit Lender; or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

2.8    Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the appropriate Revolving Credit Lender or Term Loan Lender, as the case may be, (i) the then unpaid principal amount of each Revolving Credit Loan of such Revolving Credit Lender on the Revolving Credit

34

Termination Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8), (ii) the then unpaid principal amount of each Swing Line Loan of such Swing Line Lender on the Revolving Credit Termination Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8) and (iii) the principal amount of each Term Loan of such Term Loan Lender on the Term Loan Maturity Date (or on such earlier date on which the Loans become due and payable pursuant to Section 8). The Borrower hereby further agrees to pay interest on the unpaid principal amount of the Loans from time to time outstanding from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.15.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing indebtedness of the Borrower to such Lender resulting from each Loan of such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)    The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 10.6(d), and a subaccount therein for each Lender, in which shall be recorded (i) the amount of each Loan made hereunder and any Note evidencing such Loan, the Type of such Loan and each Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) both the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

(d)    The entries made in the Register and the accounts of each Lender maintained pursuant to Section 2.8(b) shall, to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain the Register or any such account, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e)    The Borrower agrees that, upon the request to the Administrative Agent by any Lender, the Borrower will promptly execute and deliver to such Lender a promissory note of the Borrower evidencing any Term Loans, Revolving Credit Loans or Swing Line Loans, as the case may be, of such Lender, substantially in the form of Exhibit G-1, G-2 or G-3, respectively (a "Term Note", "Revolving Credit Note" or "Swing Line Note", respectively), with appropriate insertions as to date and principal amount; provided, that delivery of Notes shall not be a condition precedent to the occurrence of the Closing Date or the making of the Loans or issuance of Letters of Credit on the Closing Date.

2.9    Commitment Fees, etc.  (a)  The Borrower agrees to pay to the Administrative Agent for the account of each Revolving Credit Lender a commitment fee for the period from and including the Closing Date to the last day of the Revolving Credit Commitment Period, computed at the Commitment Fee Rate on the average daily amount of the Available Revolving Credit Commitment of such Lender during the period for which payment is made, payable quarterly in arrears on the last day of each March, June, September and December and

USActive 8584236.17

35

on the Revolving Credit Termination Date, commencing on the first of such dates to occur after the date hereof.

(b)    The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates from time to time agreed to in writing by the Borrower and the Administrative Agent.

2.10    Termination or Reduction of Revolving Credit Commitments. The Borrower shall have the right, upon not less than three Business Days' notice to the Administrative Agent, to terminate the Revolving Credit Commitments or, from time to time, to reduce the aggregate amount of the Revolving Credit Commitments; provided that no such termination or reduction of Revolving Credit Commitments shall be permitted if, after giving effect thereto and to any prepayments of the Revolving Credit Loans and Swing Line Loans made on the effective date thereof, the Total Revolving Extensions of Credit would exceed the Total Revolving Credit Commitments. Any such reduction shall be in an amount equal to $1,000,000, or a whole multiple thereof, and shall reduce permanently the Revolving Credit Commitments then in effect. Upon the effective date of any such reduction, the commitment fee payable under Section 2.9(a) shall be based upon the reduced Available Revolving Credit Commitment resulting therefrom.

2.11    Optional Prepayments. The Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty (except as otherwise provided herein), upon irrevocable notice delivered to the Administrative Agent no later than 11:00 A.M. (New York City time) three Business Days prior thereto in the case of Eurodollar Loans and no later than 11:00 A.M. (New York City time) one Business Day prior thereto in the case of Base Rate Loans, which notice shall specify the date and amount of such prepayment, whether such prepayment is of Term Loans or Revolving Credit Loans, and whether such prepayment is of Eurodollar Loans or Base Rate Loans; provided, that (i) if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.21 and (ii) no prior notice is required for the prepayment of Swing Line Loans. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof. If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with (except in the case of Revolving Credit Loans that are Base Rate Loans and Swing Line Loans) accrued interest to such date on the amount prepaid. Partial prepayments of Term Loans and Revolving Credit Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple thereof. Partial prepayments of Swing Line Loans shall be in an aggregate principal amount of $100,000 or a whole multiple thereof.

2.12    Mandatory Prepayments. (a) Unless the Required Prepayment Lenders shall otherwise agree, if any Capital Stock shall be issued (excluding Capital Stock issued to any Permitted Investor or Group Member), or Indebtedness incurred, by any Group Member (excluding any Indebtedness incurred in accordance with Section 7.2 as in effect on the date of this Agreement, other than Sections 7.2(e) and (i)), then on the date of such issuance or incurrence, the Term Loans and the Revolving Credit Loans shall be prepaid, and/or the outstanding Letters of Credit shall be cash collateralized, by an amount equal to the lesser of (x) the amount of the Net Cash Proceeds of such issuance or incurrence and (y) the Maximum

36

Required Prepayment Amount in effect on such date, in each case, as set forth in Section 2.12(d). The provisions of this Section do not constitute a consent to the issuance of any equity securities by any entity whose equity securities are pledged pursuant to the Guarantee and Collateral Agreement, or a consent to the incurrence of any Indebtedness by any Group Member.

(b)     Unless the Required Prepayment Lenders shall otherwise agree, if on any date any Group Member shall receive Net Cash Proceeds from any Asset Sale, Purchase Price Refund or Recovery Event then, unless a Reinvestment Notice shall be delivered in respect thereof, on the date of receipt by such Group Member of such Net Cash Proceeds, the Term Loans and the Revolving Credit Loans shall be prepaid, and/or the outstanding Letters of Credit shall be cash collateralized, by an amount equal to the lesser of (x) the amount of the Net Cash Proceeds of such issuance or incurrence and (y) the Maximum Required Prepayment Amount in effect on such date, in each case, as set forth in Section 2.12(d); provided, that, notwithstanding the foregoing, (i) the aggregate Net Cash Proceeds of Asset Sales that may be excluded from the foregoing requirement pursuant to a Reinvestment Notice shall not exceed $5,000,000 in any fiscal year of the Borrower, (ii) the aggregate Net Cash Proceeds of Recovery Events that may be excluded from the foregoing requirement pursuant to a Reinvestment Notice shall not exceed $25,000,000 in any fiscal year of the Borrower and (iii) on each Reinvestment Prepayment Date the Term Loans and the Revolving Credit Loans shall be prepaid, and/or the outstanding Letters of Credit shall be cash collateralized, by an amount equal to the lesser of (x) the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event and (y) the Maximum Required Prepayment Amount in effect on such date, in each case, as set forth in Section 2.12(d). The provisions of this Section do not constitute a consent to the consummation of any Disposition not permitted by Section 7.5.

(c)     Unless the Required Prepayment Lenders shall otherwise agree, if, for any fiscal year of the Borrower commencing with the fiscal year ending December 31, 2007, there shall be Excess Cash Flow, then, on the relevant Excess Cash Flow Application Date, the Term Loans and the Revolving Credit Loans shall be prepaid and/or the outstanding Letters of Credit shall be cash collateralized, by an amount equal to the lesser of (x) 100% of such Excess Cash Flow and (y) the Maximum Required Prepayment Amount in effect on such date, in each case, as set forth in Section 2.12(d). Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than five days after the earlier of (i) the date on which the financial statements of the Borrower referred to in Section 6.1(a), for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Lenders and (ii) the date such financial statements are actually delivered.

(d)     Amounts to be applied in connection with prepayments made pursuant to this Section shall be applied, first, to the prepayment of the Term Loans, second, to the prepayment of the Revolving Credit Loans and/or Swing Line Loans (without a corresponding reduction of the Revolving Credit Commitments) and, third, to replace outstanding Letters of Credit and/or deposit an amount in cash in a cash collateral account established with the Administrative Agent for the benefit of the Secured Parties on terms and conditions reasonably satisfactory to the Administrative Agent.

2.13     Conversion and Continuation Options. (a) The Borrower may elect from time to time to convert Eurodollar Loans to Base Rate Loans by giving the Administrative Agent

USActive 8584236.17

EXHIBIT A                                                              51

37

at least two Business Days' prior irrevocable notice of such election, <u>provided</u> that any such conversion of Eurodollar Loans may be made only on the last day of an Interest Period with respect thereto. The Borrower may elect from time to time to convert Base Rate Loans to Eurodollar Loans by giving the Administrative Agent at least three Business Days' prior irrevocable notice of such election (which notice shall specify the length of the initial Interest Period therefor), <u>provided</u> that no Base Rate Loan under a particular Facility may be converted into a Eurodollar Loan (i) when any Event of Default has occurred and is continuing and the Administrative Agent has, or the Majority Facility Lenders in respect of such Facility have, determined in its or their sole discretion not to permit such conversions or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Facility. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)      The Borrower may elect to continue any Eurodollar Loan as such upon the expiration of the then current Interest Period with respect thereto by giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loan, <u>provided</u> that no Eurodollar Loan under a particular Facility may be continued as such (i) when any Event of Default has occurred and is continuing and the Administrative Agent has, or the Majority Facility Lenders in respect of such Facility have, determined in its or their sole discretion not to permit such continuations or (ii) after the date that is one month prior to the final scheduled termination or maturity date of such Facility, and <u>provided</u>, <u>further</u>, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso, such Loans shall be converted automatically to Base Rate Loans on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.14   Minimum Amounts and Maximum Number of Eurodollar Tranches. Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions, continuations and optional prepayments of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $1,000,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time.

2.15   Interest Rates and Payment Dates. (a) Each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin in effect for such day.

(b)      Each Base Rate Loan shall bear interest for each day on which it is outstanding at a rate per annum equal to the Base Rate in effect for such day plus the Applicable Margin in effect for such day.

(c)      (i) If all or a portion of the principal amount of any Loan or Reimbursement Obligation shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), all outstanding Loans and Reimbursement Obligations (whether or

EXHIBIT A                                                52

not overdue) (to the extent legally permitted) shall bear interest at a rate per annum that is equal to (x) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% per annum or (y) in the case of Reimbursement Obligations, the rate applicable to Base Rate Loans under the Revolving Credit Facility plus 2% per annum, and (ii) if all or a portion of any interest payable on any Loan or Reimbursement Obligation or any commitment fee or other amount payable hereunder shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to Base Rate Loans under the relevant Facility plus 2% per annum (or, in the case of any such other amounts that do not relate to a particular Facility, the rate then applicable to Base Rate Loans under the Revolving Credit Facility plus 2% per annum), in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d)    Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.16    Computation of Interest and Fees. (a) Interest, fees and commissions payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to Base Rate Loans on which interest is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the Base Rate or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)    Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error. The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.15(a).

2.17    Inability to Determine Interest Rate. If prior to the first day of any Interest Period:

(a)    the Administrative Agent shall have determined (which determination shall be conclusive and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)    the Administrative Agent shall have received notice from the Majority Facility Lenders in respect of the relevant Facility that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to

such Lenders (as conclusively certified by such Lenders) of making or maintaining their
affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the
relevant Lenders as soon as practicable thereafter. If such notice is given (x) any Eurodollar
Loans under the relevant Facility requested to be made on the first day of such Interest Period
shall be made as Base Rate Loans, (y) any Loans under the relevant Facility that were to have
been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as
Base Rate Loans and (z) any outstanding Eurodollar Loans under the relevant Facility shall be
converted, on the last day of the then current Interest Period with respect thereto, to Base Rate
Loans. Until such notice has been withdrawn by the Administrative Agent, no further Eurodollar
Loans under the relevant Facility shall be made or continued as such, nor shall the Borrower
have the right to convert Loans under the relevant Facility to Eurodollar Loans.

2.18    Pro Rata Treatment and Payments.  (a)  Each borrowing by the Borrower
from the Lenders hereunder, each payment by the Borrower on account of any commitment fee
or Letter of Credit fee, and any reduction of the Commitments of the Lenders, shall be made pro
rata according to the respective Term Loan Percentages or Revolving Credit Percentages, as the
case may be, of the relevant Lenders. Each payment of interest in respect of the Loans and each
payment in respect of fees payable hereunder shall be applied to the amounts of such obligations
owing to the Lenders pro rata according to the respective amounts then due and owing to the
Lenders.

(b)    Each payment (including each prepayment) on account of principal of the
Term Loans outstanding shall be allocated among the Term Loan Lenders holding such Term
Loans pro rata based on the principal amount of such Term Loans held by such Term Loan
Lenders. Amounts prepaid on account of the Term Loans may not be reborrowed.

(c)    Each payment (including each prepayment) by the Borrower on account of
principal of the Revolving Credit Loans shall be made pro rata according to the respective
outstanding principal amounts of the Revolving Credit Loans then held by the Revolving Credit
Lenders. Each payment in respect of Reimbursement Obligations in respect of any Letter of
Credit shall be made to the Issuing Lender that issued such Letter of Credit.

(d)    The application of any payment of Loans under any Facility (including
optional and mandatory prepayments) shall be made, first, to Base Rate Loans under such
Facility and, second, to Eurodollar Loans under such Facility. Each payment of the Loans
(except in the case of Swing Line Loans and Revolving Credit Loans that are Base Rate Loans)
shall be accompanied by accrued interest to the date of such payment on the amount paid.

(e)    All payments (including prepayments) to be made by the Borrower
hereunder, whether on account of principal, interest, fees or otherwise, shall be made without
setoff or counterclaim and shall be made prior to 12:00 Noon (New York City time) on the due
date thereof to the Administrative Agent, for the account of the relevant Lenders, at the Payment
Office, in Dollars and in immediately available funds. Any payment made by the Borrower after
12:00 Noon (New York City time) on any Business Day shall be deemed to have been on the
next following Business Day. If any payment hereunder (other than payments on the Eurodollar

40

Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(f)    Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable to Base Rate Loans under the relevant Facility, on demand, from the Borrower.  Nothing herein shall be deemed to limit the rights of the Borrower against any Lender.

(g)    Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(h)    Upon receipt by the Administrative Agent of payments on behalf of Lenders, the Administrative Agent shall promptly distribute such payments to the Lender or Lenders entitled thereto, in like funds as received by the Administrative Agent.

2.19    Requirements of Law.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender

USActive 8584236.17

EXHIBIT A                                55

41

with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority made subsequent to the date hereof:

    (i)    shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any Application or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.20 and changes in the rate of tax on the overall net income of such Lender);

    (ii)    shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate hereunder; or

    (iii)    shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount which such Lender reasonably determines to be material, of making, converting into, continuing or maintaining Eurodollar Loans or issuing or participating in Letters of Credit, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, upon its demand, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable. If any Lender becomes entitled to claim any additional amounts pursuant to this Section, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

    (b)    If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder or under or in respect of any Letter of Credit to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount reasonably determined by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction; provided that the Borrower shall not be required to compensate a Lender pursuant to this paragraph for any amounts incurred more than six months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; and provided further that, if the circumstances giving rise to such claim have a retroactive effect, then such six-month period shall be extended to include the period of such retroactive effect.

USActive 8584236.17

(c)      A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be conclusive in the absence of manifest error. The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.20    Taxes. (a) All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on any Agent or any Lender (i) as a result of a present or former connection between such Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from such Agent's or such Lender's having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document), (ii) by the jurisdiction (or any political subdivision thereof) under which the Administrative Agent or such Lender is organized or in which its principal office is located or, in the case of any Lender, in which its lending office is located, and (iii) as a branch profits tax imposed by the jurisdiction in which the Borrower is located. If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or any Other Taxes are required to be withheld from any amounts payable to any Agent or any Lender hereunder, the amounts so payable to such Agent or such Lender shall be increased to the extent necessary to yield to such Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that the Borrower shall not be required to increase any such amounts payable to any Lender with respect to any Non-Excluded Taxes (i) that are attributable to such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section, (ii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender becomes a party to this Agreement, except to the extent that such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph (a), or (iii) that are United States withholding taxes imposed on amounts payable to such Lender at the time such Lender changes its lending office other than at the request of the Borrower, except to the extent that such Lender was entitled, at the time of the change in its lending office, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph (a).

(b)      In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)      Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Administrative Agent for the account of the relevant Agent or Lender, as the case may be, a certified copy of an original official receipt received by the Borrower (or, if an official receipt is not available, such other evidence of payment as shall be satisfactory to the relevant Agent or Lender) showing payment thereof. If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes required

USActive 8584236.17

EXHIBIT A                                                            57

43

to be paid by the Borrower pursuant to this Agreement when due to the appropriate taxing authority or fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Agents and the Lenders for any incremental taxes, interest or penalties that may become payable by any Agent or any Lender as a result of any such failure. The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

(d)    Each Lender (or Transferee) that is not a "United States person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) two duly completed original signed copies of either U.S. Internal Revenue Service Form W-8BEN, Form W-8ECI or W-8IMY, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest" a statement substantially in the form of Exhibit H and a Form W-8BEN, or any subsequent versions thereof or successors thereto properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents. Each Lender (or Transferee) that is a "United States person" as defined in Section 7701(a)(30) of the Code shall, with respect to any payments that the Lender (or Transferee) directs to be paid to a non-U.S. address or non-U.S. bank account, deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Lender from which the related participation shall have been purchased) a duly completed original signed copy of U.S. Internal Revenue Service Form W-9, or any subsequent versions thereof or successors thereto that such Lender is entitled to provide at such time in order to comply with United States backup withholding requirements. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation) and on or before the date, if any, such Lender designates a new lending office. In addition, each Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Lender. Each Lender shall promptly notify the Borrower at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Lender shall not be required to deliver any form pursuant to this paragraph that such Lender is not legally able to deliver.

(e)    A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the legal position of such Lender.

USActive 8584236.17

44

2.21    Indemnity.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement, (b) default by the Borrower in making any prepayment after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment or conversion of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank Eurodollar market.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be conclusive in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.22    Illegality.  Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for any Lender to make or maintain Eurodollar Loans as contemplated by this Agreement, (a) the commitment of such Lender hereunder to make Eurodollar Loans, continue Eurodollar Loans as such and convert Base Rate Loans to Eurodollar Loans shall forthwith be canceled and (b) such Lender's Loans then outstanding as Eurodollar Loans, if any, shall be converted automatically to Base Rate Loans on the respective last days of the then current Interest Periods with respect to such Loans or within such earlier period as required by law.  If any such conversion of a Eurodollar Loan occurs on a day which is not the last day of the then current Interest Period with respect thereto, the Borrower shall pay to such Lender such amounts, if any, as may be required pursuant to Section 2.21.

2.23    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.19, 2.20(a) or 2.22 with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event or take such other measures as such Lender may deem reasonable, if as a result thereof the circumstances which would cause such occurrences described in Section 2.19, 2.20(a) or 2.22 to cease to exist or the additional amounts which would otherwise be required to be paid to such Lender pursuant to Section 2.19, 2.20(a) or 2.22 would be materially reduced; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of any Borrower or the rights of any Lender pursuant to Section 2.19, 2.20(a) or 2.22.

USActive 8584238.17

EXHIBIT A

59