45

2.24    Replacement of Lenders under Certain Circumstances. The Borrower shall be permitted to replace any Lender that (a) requests reimbursement for amounts owing pursuant to Section 2.19 or 2.20 or gives a notice of illegality pursuant to Section 2.22 or (b) defaults in its obligation to make Loans hereunder, with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) no Event of Default shall have occurred and be continuing at the time of such replacement, (iii) prior to any such replacement, such Lender shall have taken no action under Section 2.23 so as to eliminate the continued need for payment of amounts owing pursuant to Section 2.19 or 2.20 or to eliminate the illegality referred to in such notice of illegality given pursuant to Section 2.22, (iv) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (v) the Borrower shall be liable to such replaced Lender under Section 2.21 (as though Section 2.21 were applicable) if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (vi) the replacement financial institution, if not already a Lender, shall be reasonably satisfactory to the Administrative Agent, (vii) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the registration and processing fee referred to therein), (viii) the Borrower shall pay all additional amounts (if any) required pursuant to Section 2.19 or 2.20, as the case may be, in respect of any period prior to the date on which such replacement shall be consummated, and (ix) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

2.25    Interest Reserve. (a)    On the Closing Date, the Borrower shall deposit a portion of the Term Loans into the Interest Reserve Account in an amount equal to $27,500,000, which shall be withdrawn by the Borrower or the Administrative Agent in accordance with the applicable provisions of this Section 2.25.

(b)    At any time and from time to time, the Borrower may withdraw, or direct the Administrative Agent to withdraw, an amount of funds on deposit in the Interest Reserve Account necessary to pay interest with respect to any outstanding Indebtedness of the Borrower and its Subsidiaries, including, without limitation, the CMBS Facilities and any Loans, provided that, (i) the aggregate amount of withdrawals (the "Interest Reserve Withdrawals") from the Interest Reserve for any fiscal quarter of the Borrower shall not exceed $6,000,000, except as otherwise consented to in writing by the Administrative Agent in its sole discretion after delivery of information reasonably requested by the Administrative Agent, and (ii) upon the occurrence and during the continuation of a Default or an Event of Default, the Administrative Agent shall have the option to give notice to the Account Bank that disbursements from the Interest Reserve Account shall be made solely at the direction of the Administrative Agent to pay interest on the Loans and the Borrower hereby authorizes the Administrative Agent to make any and all such withdrawals and payments.

(c)    If the Borrower has made an Interest Reserve Withdrawal during any period of four consecutive fiscal quarters of the Borrower (or, if less, the number of full fiscal quarters ending subsequent to the Closing Date), then concurrently with the delivery of a Compliance Certificate pursuant to Section 6.2(b) for the last day of such period, the Borrower shall deliver to the Administrative Agent all information and supporting detail necessary to

USActive 8584236.17

46

determine, (i) the ratio ("Interest Reserve Withdrawal Ratio") of (x) Consolidated EBITDA for such period, assuming that the aggregate amount of Interest Reserve Withdrawals during such period increased Consolidated EBITDA for such period on a dollar-for-dollar basis (after giving effect to such adjustment, the "Adjusted EBITDA Base Amount"), to (y) Consolidated Interest Expense for such period and (ii) the amount (the "Interest Reserve True-Up Amount"), to be added to or subtracted from, as applicable, the Adjusted EBITDA Base Amount for such period to cause the Interest Reserve Withdrawal Ratio for such period to equal 1.00 to 1.00. In the event that, for any such period (a) the Interest Reserve True-Up Amount for such period is to be subtracted from the Adjusted EBITDA Base Amount for such period, on or prior to the date that is five Business Days after the delivery of the related Compliance Certificate the Borrower shall deposit in the Interest Reserve Account an amount equal to the lesser of (i) such Interest Reserve True-Up Amount and (ii) the aggregate amount of Interest Reserve Withdrawals made during such period, or (b) the Interest Reserve True-Up Amount for such period is to be added to the Adjusted EBITDA Base Amount for such period, subject to Section 2.25(b), the Borrower may make additional withdrawals from the Interest Reserve Account in an amount not exceeding the Interest Reserve True-Up Amount for such period. For the avoidance of doubt, the Interest Reserve True-Up Amount for any period of four consecutive fiscal quarters of the Borrower (or, if less, the number of full fiscal quarters ending subsequent to the Closing Date) deposited in, or withdrawn from, as applicable, the Interest Reserve Account subsequent to such period shall not be included in the determination of the Interest Reserve Withdrawal Ratio for such subsequent period.

(d)    Notwithstanding anything to the contrary in this Section 2.25, the Borrower may withdraw the remaining amount on deposit in the Interest Reserve Account and use such proceeds for general corporate purposes on the date that is the later of (x) the date that is the second anniversary of the Closing Date and (y) the date after the Borrower has delivered Compliance Certificates demonstrating for two consecutive periods that the Consolidated Debt Service Coverage Ratio for four consecutive fiscal quarters of the Borrower (or, if less, the number of full fiscal quarters of the Borrower ending with any fiscal quarter ending subsequent to the Closing Date) exceeds 1.10 to 1.00.

SECTION 3.  LETTERS OF CREDIT

3.1    L/C Commitment.  (a)  Subject to the terms and conditions hereof, each Issuing Lender, in reliance on the agreements of the other Revolving Credit Lenders set forth in Section 3.4(a), agrees to issue letters of credit ("Letters of Credit") for the account of the Borrower on any Business Day during the Revolving Credit Commitment Period in such form as may be approved from time to time by such Issuing Lender; provided, that no Issuing Lender shall have any obligation to issue any Letter of Credit if, after giving effect to such issuance, (i) the L/C Obligations would exceed the L/C Commitment or (ii) the aggregate amount of the Available Revolving Credit Commitments would be less than zero. Each Letter of Credit shall (i) be denominated in Dollars and (ii) expire no later than the earlier of (x) the first anniversary of its date of issuance and (y) the date which is five Business Days prior to the Revolving Credit Termination Date; provided that any Letter of Credit with a one-year term may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (y) above).

(b)    No Issuing Lender shall at any time be obligated to issue any Letter of Credit hereunder if such issuance would conflict with, or cause such Issuing Lender or any L/C Participant to exceed any limits imposed by, any applicable Requirement of Law.

3.2    Procedure for Issuance of Letter of Credit.  The Borrower may from time to time request that an Issuing Lender issue a Letter of Credit by delivering to such Issuing Lender at its address for notices specified herein an Application therefor, completed to the satisfaction of such Issuing Lender, and such other certificates, documents and other papers and information as such Issuing Lender may request.  Concurrently with the delivery of an Application to an Issuing Lender, the Borrower shall deliver a copy thereof to the Administrative Agent.  Upon receipt of any Application, an Issuing Lender will process such Application and the certificates, documents and other papers and information delivered to it in connection therewith in accordance with its customary procedures and shall promptly issue the Letter of Credit requested thereby by issuing the original of such Letter of Credit to the beneficiary thereof or as otherwise may be agreed to by such Issuing Lender and the Borrower (but in no event shall any Issuing Lender be required to issue any Letter of Credit earlier than three Business Days after its receipt of the Application therefor and all such other certificates, documents and other papers and information relating thereto).  Promptly after issuance by an Issuing Lender of a Letter of Credit, such Issuing Lender shall furnish a copy of such Letter of Credit to the Borrower.  Each Issuing Lender shall promptly give notice to the Administrative Agent of the issuance of each Letter of Credit issued by such Issuing Lender (including the face amount thereof), and shall provide a copy of such Letter of Credit to the Administrative Agent as soon as possible after the date of issuance.

3.3    Fees and Other Charges.  (a)  The Borrower will pay a fee on the aggregate drawable amount of all outstanding Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Eurodollar Loans under the Revolving Credit Facility, shared ratably among the Revolving Credit Lenders in accordance with their respective Revolving Credit Percentages and payable quarterly in arrears on each L/C Fee Payment Date after the issuance date.  In addition, the Borrower shall pay to the relevant Issuing Lender for its own account a fronting fee on the aggregate drawable amount of all outstanding Letters of Credit issued by it at a rate per annum agreed upon between the Borrower and such Issuing Lender, payable quarterly in arrears on each L/C Fee Payment Date after the issuance date.

(b)    In addition to the foregoing fees, the Borrower shall pay or reimburse each Issuing Lender for such normal and customary costs and expenses as are incurred or charged by such Issuing Lender in issuing, negotiating, effecting payment under, amending or otherwise administering any Letter of Credit.

3.4    L/C Participations.  (a)  Each Issuing Lender irrevocably agrees to grant and hereby grants to each L/C Participant, and, to induce each Issuing Lender to issue Letters of Credit hereunder, each L/C Participant irrevocably agrees to accept and purchase and hereby accepts and purchases from each Issuing Lender, on the terms and conditions hereinafter stated, for such L/C Participant's own account and risk, an undivided interest equal to such L/C Participant's Revolving Credit Percentage in each Issuing Lender's obligations and rights under each Letter of Credit issued by such Issuing Lender hereunder and the amount of each draft paid by such Issuing Lender thereunder.  Each L/C Participant unconditionally and irrevocably agrees

with each Issuing Lender that, if a draft is paid under any Letter of Credit issued by such Issuing Lender for which such Issuing Lender is not reimbursed in full by the Borrower in accordance with the terms of this Agreement, such L/C Participant shall pay to the Administrative Agent for the account of such Issuing Lender upon demand at such Issuing Lender's address for notices specified herein (and thereafter the Administrative Agent shall promptly pay to such Issuing Lender) an amount equal to such L/C Participant's Revolving Credit Percentage of the amount of such draft, or any part thereof, that is not so reimbursed. Each L/C Participant's obligation to pay such amount shall be absolute and unconditional and shall not be affected by any circumstance, including (i) any setoff, counterclaim, recoupment, defense or other right that such L/C Participant may have against any Issuing Lender, the Borrower or any other Person for any reason whatsoever, (ii) the occurrence or continuance of a Default or an Event of Default or the failure to satisfy any of the other conditions specified in Section 5, (iii) any adverse change in the condition (financial or otherwise) of the Borrower, (iv) any breach of this Agreement or any other Loan Document by the Borrower, any other Loan Party or any other L/C Participant or (v) any other circumstance, happening or event whatsoever, whether or not similar to any of the foregoing.

(b)    If any amount (a "Participation Amount") required to be paid by any L/C Participant to an Issuing Lender pursuant to Section 3.4(a) in respect of any unreimbursed portion of any payment made by such Issuing Lender under any Letter of Credit is paid to such Issuing Lender within three Business Days after the date such payment is due, such Issuing Lender shall so notify the Administrative Agent, which shall promptly notify the L/C Participants, and each L/C Participant shall pay to the Administrative Agent, for the account of such Issuing Lender, on demand (and thereafter the Administrative Agent shall promptly pay to such Issuing Lender) an amount equal to the product of (i) such Participation Amount, times (ii) the daily average Federal Funds Effective Rate during the period from and including the date such payment is required to the date on which such payment is immediately available to such Issuing Lender, times (iii) a fraction the numerator of which is the number of days that elapse during such period and the denominator of which is 360. If any Participation Amount required to be paid by any L/C Participant pursuant to Section 3.4(a) is not made available to the Administrative Agent for the account of the relevant Issuing Lender by such L/C Participant within three Business Days after the date such payment is due, the Administrative Agent on behalf of such Issuing Lender shall be entitled to recover from such L/C Participant, on demand, such Participation Amount with interest thereon calculated from such due date at the rate per annum applicable to Base Rate Loans under the Revolving Credit Facility. A certificate of the Administrative Agent submitted on behalf of an Issuing Lender to any L/C Participant with respect to any amounts owing under this Section shall be conclusive in the absence of manifest error.

(c)    Whenever, at any time after an Issuing Lender has made payment under any Letter of Credit and has received from the Administrative Agent any L/C Participant's pro rata share of such payment in accordance with Section 3.4(a), such Issuing Lender receives any payment related to such Letter of Credit (whether directly from the Borrower or otherwise, including proceeds of collateral applied thereto by such Issuing Lender), or any payment of interest on account thereof, such Issuing Lender will distribute to the Administrative Agent for the account of such L/C Participant (and thereafter the Administrative Agent will promptly distribute to such L/C Participant) its pro rata share thereof; provided, however, that in the event

USActive 8584236.17

EXHIBIT A

that any such payment received by such Issuing Lender shall be required to be returned by such Issuing Lender, such L/C Participant shall return to the Administrative Agent for the account of such Issuing Lender (and thereafter the Administrative Agent shall promptly return to such Issuing Lender) the portion thereof previously distributed by such Issuing Lender.

      3.5    Reimbursement Obligation of the Borrower.  The Borrower agrees to reimburse each Issuing Lender, on each date on which such Issuing Lender notifies the Borrower of the date and amount of a draft presented under any Letter of Credit and paid by such Issuing Lender, for the amount of (a) such draft so paid and (b) any taxes, fees, charges or other costs or expenses incurred by such Issuing Lender in connection with such payment (the amounts described in the foregoing clauses (a) and (b) in respect of any drawing, collectively, the "Payment Amount").  Each such payment shall be made to such Issuing Lender at its address for notices specified herein in lawful money of the United States of America and in immediately available funds.  Interest shall be payable on each Payment Amount from the date of the applicable drawing until payment in full at the rate set forth in (i) until the second Business Day following the date of the applicable drawing, Section 2.15(b) and (ii) thereafter, Section 2.15(c).  Each drawing under any Letter of Credit shall (unless an event of the type described in clause (i) or (ii) of Section 8(f) shall have occurred and be continuing with respect to the Borrower, in which case the procedures specified in Section 3.4 for funding by L/C Participants shall apply) constitute a request by the Borrower to the Administrative Agent for a borrowing pursuant to Section 2.5 of Base Rate Loans (or, at the option of the Administrative Agent and the Swing Line Lender in their sole discretion, a borrowing pursuant to Section 2.7 of Swing Line Loans) in the amount of such drawing.  The Borrowing Date with respect to such borrowing shall be the first date on which a borrowing of Revolving Credit Loans (or, if applicable, Swing Line Loans) could be made, pursuant to Section 2.5 (or, if applicable, Section 2.7), if the Administrative Agent had received a notice of such borrowing at the time the Administrative Agent receives notice from the relevant Issuing Lender of such drawing under such Letter of Credit.

      3.6    Obligations Absolute.  The Borrower's obligations under this Section 3 shall be absolute and unconditional under any and all circumstances and irrespective of any setoff, counterclaim or defense to payment that the Borrower may have or have had against any Issuing Lender, any beneficiary of a Letter of Credit or any other Person.  The Borrower also agrees with each Issuing Lender that such Issuing Lender shall not be responsible for, and the Borrower's Reimbursement Obligations under Section 3.5 shall not be affected by, among other things, the validity or genuineness of documents or of any endorsements thereon, even though such documents shall in fact prove to be invalid, fraudulent or forged, or any dispute between or among the Borrower and any beneficiary of any Letter of Credit or any other party to which such Letter of Credit may be transferred or any claims whatsoever of the Borrower against any beneficiary of such Letter of Credit or any such transferee.  No Issuing Lender shall be liable for any error, omission, interruption or delay in transmission, dispatch or delivery of any message or advice, however transmitted, in connection with any Letter of Credit, except for errors or omissions found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Issuing Lender.  The Borrower agrees that any action taken or omitted by an Issuing Lender under or in connection with any Letter of Credit issued by it or the related drafts or documents, if done in the absence of gross negligence or willful misconduct and in accordance with the standards of care specified in

50

the Uniform Commercial Code of the State of New York, shall be binding on the Borrower and shall not result in any liability of such Issuing Lender to the Borrower.

3.7    Letter of Credit Payments.  If any draft shall be presented for payment under any Letter of Credit, the relevant Issuing Lender shall promptly notify the Borrower and the Administrative Agent of the date and amount thereof.  The responsibility of the relevant Issuing Lender to the Borrower in connection with any draft presented for payment under any Letter of Credit, in addition to any payment obligation expressly provided for in such Letter of Credit issued by such Issuing Lender, shall be limited to determining that the documents (including each draft) delivered under such Letter of Credit in connection with such presentment appear on their face to be in conformity with such Letter of Credit.

3.8    Applications.  To the extent that any provision of any Application related to any Letter of Credit is inconsistent with the provisions of this Section 3, the provisions of this Section 3 shall apply.

SECTION 4.   REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and to make the Loans and issue or participate in the Letters of Credit, the Parent Guarantors and the Borrower hereby jointly and severally represent and warrant to each Agent and each Lender that:

4.1    Financial Condition.  (a)  The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of the Closing Date (including the notes thereto) (the "Pro Forma Balance Sheet"), copies of which have heretofore been furnished to each Lender, has been prepared giving effect (as if such events had occurred on such date) to (i) the consummation of the Acquisition, (ii) the Loans to be made on the Closing Date and the use of proceeds thereof and (iii) the payment of fees and expenses in connection with the foregoing.  The Pro Forma Balance Sheet has been prepared based on the best information available to the Borrower as of the date of delivery thereof, and presents fairly on a pro forma basis the estimated financial position of the Borrower and its consolidated Subsidiaries as of the Closing Date, assuming that the events specified in the preceding sentence had actually occurred at such date.

(b)    The historical income and expense summaries of each Austin Property for the four-year period ended December 31, 2006, if available (collectively, the "Historical Operating Statements"), reflecting income and expense results for the portion of such period each such Austin Property was owned or leased by the Seller, copies of which have heretofore been furnished to the Administrative Agent for distribution to the Lenders, present fairly the historical operating results of each Austin Property for the respective periods then ended.  All such Historical Operating Statements have been prepared in accordance with GAAP applied consistently throughout the periods involved.

4.2    No Change.  Since December 31, 2006 there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect.

4.3    Corporate Existence; Compliance with Law.  Each Group Member (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its

USActive 8584236.17

EXHIBIT A

65

51

organization, (b) has the corporate power and authority, and the legal right, to own and operate its Property, to lease the Property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of Property or the conduct of its business requires such qualification and (d) is in compliance with all Requirements of Law except, in the case of clauses (c) and (d), to the extent that the failure to be so qualified comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.4   Corporate Power; Authorization; Enforceable Obligations. Each Loan Party has the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party, to consummate the Acquisition and, in the case of the Borrower, to borrow hereunder. Each Loan Party has taken all necessary corporate or other action to authorize the execution, delivery and performance of the Loan Documents to which it is a party, to consummate the Acquisition and, in the case of the Borrower, to authorize the borrowings on the terms and conditions of this Agreement. No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the consummation of the Acquisition, the borrowings hereunder or the execution, delivery, performance, validity or enforceability of this Agreement or any of the other Loan Documents, except the filings referred to in Section 4.19. Each Loan Document has been duly executed and delivered on behalf of each Loan Party that is a party thereto. This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party that is a party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

4.5   No Legal Bar. The execution, delivery and performance of this Agreement and the other Loan Documents, the consummation of the Acquisition, the issuance of Letters of Credit, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Group Member and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents). No Requirement of Law or Contractual Obligation applicable to any Group Member could reasonably be expected to have a Material Adverse Effect.

4.6   No Material Litigation. No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of any Parent Guarantor or the Borrower, threatened by or against any Group Member or against any of their respective properties or revenues (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) that could reasonably be expected to have a Material Adverse Effect.

USActive 8584236.17

52

4.7    No Default. No Group Member is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect. No Default or Event of Default has occurred and is continuing.

4.8    Ownership of Property; Liens. Each Group Member has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other Property, and none of such Property is subject to any Lien except as permitted by Section 7.3.

4.9    Intellectual Property. Each Group Member owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted. No material claim has been asserted and is pending by any Person challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property, nor does any Parent Guarantor or the Borrower know of any valid basis for any such claim. The use of Intellectual Property by each Group Member does not infringe on the rights of any Person in any material respect.

4.10    Taxes. Each Group Member has filed or caused to be filed all Federal, state and other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its Property and all other taxes, fees or other charges imposed on it or any of its Property by any Governmental Authority that are due and payable and no tax Lien has been filed, and, to the knowledge of each Parent Guarantor and the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge (other than any, in each case, the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the applicable Group Member, as the case may be).

4.11    Federal Regulations. No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulations of the Board. If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

4.12    Labor Matters. None of the Borrower or any Group Member has ever, or during the term of this Agreement will have, employees.

4.13    ERISA. None of the Borrower, any Group Member or Commonly Controlled Entity has ever, or during the term of this Agreement will have, maintained or contributed to a Plan subject to ERISA.

4.14    Investment Company Act; Other Regulations. No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. No Loan Party is subject to

USActive 8584236.17

EXHIBIT A

67

53

regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness.

4.15    Subsidiaries. (a) The Subsidiaries listed on Schedule 4.15 constitute all the Subsidiaries of the Parent Guarantors at the date hereof. Schedule 4.15 sets forth as of the Closing Date the name and jurisdiction of formation of each Subsidiary and, as to each Subsidiary, the percentage of each class of Capital Stock owned by each Loan Party.

(b)    There are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options granted to employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of any Group Member.

4.16    Use of Proceeds. The proceeds of the Term Loans shall be used to finance a portion of the Acquisition, to fund the Interest Reserve Account and to pay related fees and expenses. The proceeds of the Revolving Credit Loans and the Swing Line Loans, and the Letters of Credit, shall be used (i) to finance the working capital needs of the Borrower and its subsidiaries in the ordinary course of business, including without limitation, to finance acquisitions and to pay interest, and (ii) for general corporate purposes.

4.17    Environmental Matters. Other than exceptions to any of the following that could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    Each Group Member: (i) is, and within the period of all applicable statutes of limitation has been, in compliance with all applicable Environmental Laws; (ii) holds all Environmental Permits (each of which is in full force and effect) required for any of its current or intended operations or for any property owned, leased, or otherwise operated by it; (iii) is, and within the period of all applicable statutes of limitation has been, in compliance with all of its Environmental Permits; and (iv) to the extent within the control of such Group Member: each of its Environmental Permits will be timely renewed and complied with and any additional Environmental Permits that may be required of it will be timely obtained and complied with, without material expense; and compliance with any Environmental Law that is or is expected to become applicable to it will be timely attained and maintained, without material expense.

(b)    Materials of Environmental Concern are not present at, on, under, in, or about any real property now or formerly owned, leased or operated by any Group Member, or at any other location (including, without limitation, any location to which Materials of Environmental Concern have been sent for re-use or recycling or for treatment, storage, or disposal) which could reasonably be expected to (i) give rise to liability of any Group Member under any applicable Environmental Law or otherwise result in costs to any Group Member, or (ii) interfere with any Group Members' continued operations, or (iii) impair the fair saleable value of any real property owned or leased by the any Group Member.

(c)    There is no judicial, administrative, or arbitral proceeding (including any notice of violation or alleged violation) under or relating to any Environmental Law to which any Group Member is, or to the knowledge of any Parent Guarantor, the Borrower or any of its

EXHIBIT A

54

Subsidiaries will be, named as a party that is pending or, to the knowledge of any Parent Guarantor, the Borrower or any of its Subsidiaries, threatened.

(d)    No Group Member has received any written request for information, or been notified that it is a potentially responsible party under or relating to the federal Comprehensive Environmental Response, Compensation, and Liability Act or any similar Environmental Law, or with respect to any Materials of Environmental Concern.

(e)    No Group Member has entered into or agreed to any consent decree, order, or settlement or other agreement, or is subject to any judgment, decree, or order or other agreement, in any judicial, administrative, arbitral, or other forum for dispute resolution, relating to compliance with or liability under any Environmental Law.

(f)    No Group Member has assumed or retained, by contract, conduct or operation of law, any liabilities of any kind, fixed or contingent, known or unknown, under any Environmental Law or with respect to any Materials of Environmental Concern.

4.18    Accuracy of Information, etc.  No statement or information contained in this Agreement, any other Loan Document, the Confidential Information Memorandum or any other document, certificate or statement furnished to the Administrative Agent or the Lenders or any of them, by or on behalf of any Loan Party for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading. The projections and pro forma financial information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount.  As of the date hereof, the representations and warranties of the Buyer contained in the Acquisition Documentation are true and correct in all material respects.  There is no fact known to any Loan Party that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents, in the Confidential Information Memorandum or in any other documents, certificates and statements furnished to the Agents and the Lenders for use in connection with the transactions contemplated hereby and by the other Loan Documents.

4.19    Security Documents.  (a) The Guarantee and Collateral Agreement is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  In the case of the Pledged Stock described in the Guarantee and Collateral Agreement, when any stock certificates representing such Pledged Stock are delivered to the Administrative Agent, and in the case of the other Collateral described in the Guarantee and Collateral Agreement, when financing statements in appropriate form are filed in the offices specified on Schedule 4.19 and such other filings or other documentation duly executed and delivered as are specified on Schedule 3 to the Guarantee and Collateral Agreement have been completed, the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security

EXHIBIT A

69

55

interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof, as security for the Obligations (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock, Liens permitted by Section 7.3).

(b)     Each of the Mortgages is effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable Lien on the Mortgaged Properties described therein and proceeds thereof; and when the Mortgages are filed in the offices specified on Schedule 4.19(b) (in the case of the Mortgages to be executed and delivered on the Closing Date) or in the recording office designated by the Borrower (in the case of any Mortgage to be executed and delivered pursuant to Section 6.10(b)), each Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in the Mortgaged Properties described therein and the proceeds thereof, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (other than Persons holding Liens or other encumbrances or rights permitted by the relevant Mortgage). Schedule 1.1B lists, as of the Closing Date, each parcel of owned real property and each leasehold interest in real property located in the United States and held by the Group Members.

4.20    Solvency. Each Loan Party is, and after giving effect to the Acquisition and the incurrence of all Indebtedness and obligations being incurred in connection herewith and therewith will be, Solvent.

4.21    Certain Documents. The Borrower has delivered to the Administrative Agent a complete and correct copy of the Acquisition Documentation, and CMBS Documents, including any amendments, supplements or modifications with respect to any of the foregoing.

4.22    Regulation H. No Mortgage encumbers improved real property which is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (except any Mortgaged Properties as to which such flood insurance as required by Regulation H has been obtained and is in full force and effect as required by this Agreement).

4.23    REIT Status; Borrower Tax Status. After the REIT Conversion Date, each of the REIT Guarantors will be organized and will be operated in a manner that will allow it to qualify for REIT Status commencing with the year in which the REIT Conversion Date occurs and will maintain REIT Status on a continuous basis since such date. Neither the Borrower nor any of its Subsidiaries is an association (or publicly traded partnership or taxable mortgage pool) taxable as a corporation for federal tax purposes.

SECTION 5.   CONDITIONS PRECEDENT

5.1     Conditions to Initial Extension of Credit. The agreement of each Lender to make the initial extension of credit requested to be made by it hereunder is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

USActive 8584236.17

EXHIBIT A

70

56

(a)   Loan Documents. The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of each Parent Guarantor and the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of each Parent Guarantor, the Borrower and each Subsidiary Guarantor (other than any Excluded Foreign Subsidiary or any Subsidiary of an Excluded Foreign Subsidiary), (iii) the Agreement Regarding Debtor/Creditor Relationship, duly executed and delivered by each Loan Party and each of their Affiliates party thereto, (iv) a Mortgage covering each of the Mortgaged Properties, executed and delivered by a duly authorized officer of each party thereto and (v) a Lender Addendum executed and delivered by each Lender and accepted by the Borrower.

(b)   Acquisition, etc. The following transactions shall have been consummated, in each case on terms and conditions reasonably satisfactory to the Lenders:

(i)   TPG-Austin JV shall have received an equity contribution of an amount equal to at least $295,000,000 consisting of a cash equity contribution from (i) LBHI or its affiliates, (ii) TPGI or its affiliates, (iii) CalSTRS or its affiliates and (iv) equity syndication investors, and shall have contributed such cash equity to the Borrower;

(ii)   the Borrower shall have received proceeds in an amount equal to at least $715,000,000 in cash from the CMBS Facilities obtained by the CMBS Borrowers; and

(iii)   the Acquisition shall have been consummated as set forth in the Purchase Agreement, and no provision thereof shall have been waived, amended, supplemented or modified in a manner that would reasonably be expected to be materially adverse to the Lenders without the prior written consent of the Administrative Agent.

(c)   Financial Statements. The Lenders shall have received (i) the Pro Forma Balance Sheet and (ii) Historical Operating Statements.

(d)   Approvals. (i) To the extent required by the Purchase Agreement, all governmental and third party approvals (including landlords' and other consents) necessary or, in the reasonable discretion of the Administrative Agent advisable, in connection with the Acquisition, the continuing operations of the Group Members and the transactions contemplated hereby shall have been obtained and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose adverse conditions on the Acquisition or the financing contemplated hereby.

(ii)   All governmental and third party approvals (including landlords' and other consents) necessary or, in the reasonable discretion of the Administrative Agent, advisable in connection with the Facilities shall have been obtained and be in full force and effect.

USActive 8584236.17

57

(e)    <u>Related Agreements</u>. The Administrative Agent shall have received (in a form reasonably satisfactory to the Administrative Agent), true and correct copies, certified as to authenticity by the Borrower, of (i) the CMBS Documents, (ii) the Purchase Agreement, and (iii) such other documents or instruments as may be reasonably requested by the Administrative Agent, including, without limitation, a copy of any debt instrument, security agreement or other material contract to which the Loan Parties may be a party.

(f)    <u>Fees</u>. The Lenders, the Administrative Agent and the Arranger shall have received all fees required to be paid, and all out-of-pocket expenses for which invoices have been presented (including reasonable fees, disbursements and other charges of counsel to the Agents), on or before the Closing Date. All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrower to the Administrative Agent on or before the Closing Date.

(g)    <u>Business Plan</u>. The Lenders shall have received a satisfactory business plan for TPG-Austin JV for fiscal years 2007 through 2013.

(h)    <u>Solvency Analysis</u>. The Administrative Agent shall have received, with a copy for each Lender, a customary solvency analysis certified by the Vice President of Borrower which shall document the solvency of the Borrower and its Subsidiaries considered as a whole after giving effect to the transactions contemplated hereby.

(i)    <u>Lien Searches</u>. The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions in which Uniform Commercial Code financing statement or other filings or recordations should be made to evidence or perfect security interests in all assets of the Loan Parties, and such search shall reveal no liens on any of the assets of any Loan Party, except for Liens permitted by Section 7.3 or liens to be discharged on or prior to the Closing Date.

(j)    <u>Environmental Matters</u>. The Administrative Agent shall have received, with a copy for each Lender, an American Society for Testing & Materials ("<u>ASTM</u>") compliant Environmental Site Assessment ("<u>ESA</u>") dated no earlier than the date that is twelve months prior to the Closing Date for each parcel of real property owned or leased by the Borrower and its Subsidiaries, prepared by an environmental consultant acceptable to the Administrative Agent, in form, scope, and substance satisfactory to the Administrative Agent, together with a letter from the environmental consultant permitting the Agents and the Lenders to rely on the environmental assessment as if addressed to and prepared for each of them.

(k)    <u>Closing Certificate</u>. The Administrative Agent shall have received a certificate of each Loan Party, dated the Closing Date, substantially in the form of Exhibit C, with appropriate insertions and attachments.

USActive 8584236.17

EXHIBIT A                                                                 72

58

(l)    Legal Opinions. The Administrative Agent shall have received the following executed legal opinions:

(i)    the legal opinion of Richards, Layton & Finger, special Delaware counsel to the Group Members, substantially in the form of Exhibit F-1;

(ii)    the legal opinion of Bracewell & Guiliani LLP, special New York and Texas counsel of the Group Members, substantially in the form of Exhibit F-2; and

(iii)    to the extent consented to by the relevant counsel, each legal opinion, if any, delivered in connection with the Purchase Agreement, accompanied by a reliance letter in favor of the Lenders.

Each such legal opinion shall cover such other matters incidental to the transactions contemplated by this Agreement as the Administrative Agent may reasonably require and shall be addressed to the Administrative Agent and the Lenders.

(m)    Pledged Stock; Stock Powers; Acknowledgment and Consent; Pledged Notes. The Administrative Agent shall have received (i) the certificates (if any) representing the shares of Capital Stock pledged pursuant to the Guarantee and Collateral Agreement, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof, (ii) an Acknowledgment and Consent, substantially in the form of Annex II to the Guarantee and Collateral Agreement, duly executed by any issuer of Capital Stock pledged pursuant to the Guarantee and Collateral Agreement that is not itself a party to the Guarantee and Collateral Agreement and (iii) each promissory note pledged pursuant to the Guarantee and Collateral Agreement endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank satisfactory to the Administrative Agent) by the pledgor thereof.

(n)    Filings, Registrations and Recordings. Each document (including, without limitation, any Uniform Commercial Code financing statement) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 7.3), shall have been filed, registered or recorded or shall have been delivered to the Administrative Agent in proper form for filing, registration or recordation.

(o)    Appraisals. The Administrative Agent shall have received a Full Appraisal for each of the Austin Properties prepared by Appraisers.

(p)    Property Condition Reports. The Administrative Agent shall have received a property condition report for each of the Austin Properties prepared by a vendor satisfactory to the Administrative Agent.

(q)    Title Insurance; Flood Insurance. (i)  If requested by the Administrative
Agent, the Administrative Agent shall have received, and the title insurance company
issuing the policy referred to in clause (ii) below (the "Title Insurance Company") shall
have received, maps or plats of an as-built survey of the sites of the Mortgaged Properties
certified to the Administrative Agent and the Title Insurance Company in a manner
satisfactory to them, dated a date satisfactory to the Administrative Agent and the Title
Insurance Company by an independent professional licensed land surveyor satisfactory to
the Administrative Agent and the Title Insurance Company, which maps or plats and the
surveys on which they are based shall be made in accordance with the Minimum
Standard Detail Requirements for Land Title Surveys jointly established and adopted by
the American Land Title Association and the American Congress on Surveying and
Mapping in 2005, and, without limiting the generality of the foregoing, there shall be
surveyed and shown on such maps, plats or surveys the following:  (A) the locations on
such sites of all the buildings, structures and other improvements and the established
building setback lines; (B) the lines of streets abutting the sites and width thereof; (C) all
access and other easements appurtenant to the sites; (D) all roadways, paths, driveways,
easements, encroachments and overhanging projections and similar encumbrances
affecting the site, whether recorded, apparent from a physical inspection of the sites or
otherwise known to the surveyor; (E) any encroachments on any adjoining property by
the building structures and improvements on the sites; (F) if the site is described as being
on a filed map, a legend relating the survey to said map; and (G) the flood zone
designations, if any, in which the Mortgaged Properties are located.

(ii)    The Administrative Agent shall have received in respect of each
Mortgaged Property a mortgagee's title insurance policy (or policies) or marked
up unconditional binder for such insurance.  Each such policy shall (A) be in an
amount satisfactory to the Administrative Agent (the amount of such policy not to
exceed the sum of the Term Loan Commitments of all the Lenders and the Total
Revolving Credit Commitments on the Closing Date); (B) be issued at ordinary
rates; (C) insure that the Mortgage insured thereby creates a valid first Lien on
such Mortgaged Property free and clear of all defects and encumbrances, except
as disclosed therein; (D) name the Administrative Agent for the benefit of the
Secured Parties as the insured thereunder; (E) be in the form of ALTA Loan
Policy - 1970 (Amended 10/17/70 and 10/17/84) (or equivalent policies);
(F) contain such endorsements and affirmative coverage as the Administrative
Agent may reasonably request and (G) be issued by title companies satisfactory to
the Administrative Agent (including any such title companies acting as co-
insurers or reinsurers, at the option of the Administrative Agent).  The
Administrative Agent shall have received evidence satisfactory to it that all
premiums in respect of each such policy, all charges for mortgage recording tax,
and all related expenses, if any, have been paid.

(iii)    If requested by the Administrative Agent, the Administrative
Agent shall have received (A) a policy of flood insurance that (1) covers any
parcel of improved real property located in a flood zone that is encumbered by
any Mortgage, (2) is written in an amount not less than the outstanding principal
amount of the indebtedness secured by such Mortgage that is reasonably allocable

USActive 8584236.17

60

to such real property or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less, and (3) has a term ending not later than the maturity of the indebtedness secured by such Mortgage or that may be extended to such maturity date and (B) confirmation that the Borrower has received the notice required pursuant to Section 208(e)(3) of Regulation H of the Board.

(iv)    The Administrative Agent shall have received a copy of all recorded documents referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (ii) above and a copy of all other material documents affecting the Mortgaged Properties.

(r)    Insurance. The Administrative Agent shall have received insurance certificates satisfying the requirements of Section 6.5 of this Agreement.

(s)    PATRIOT Act. The Lenders shall have received, sufficiently in advance of the Closing Date, all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA PATRIOT Act.

(t)    UCC Insurance Policy. The Administrative Agent shall have received a "UCC-9 Loan Insurance Policy" in form and substance satisfactory to the Administrative Agent (the "UCC Insurance Policy") and from an insurance company satisfactory to the Administrative Agent (the amount of such policy not to exceed the sum of the Term Loan Commitment and the Revolving Credit Commitment on the Closing Date).

(u)    Intercreditor Agreement. The Administrative Agent shall have received the Intercreditor Agreement, duly executed and delivered by the parties thereto.

(v)    Interest Reserve. The Administrative Agent shall have received (i) irrevocable instruction from the Borrower to deposit $27,500,000 of the proceeds of the Term Loans into the Interest Reserve Account and (ii) the Account Control Agreement, duly executed and delivered by the parties thereto.

5.2    Conditions to Each Extension of Credit. The agreement of each Lender to make any extension of credit requested to be made by it hereunder on any date (including, without limitation, its initial extension of credit) is subject to the satisfaction of the following conditions precedent:

(a)    Representations and Warranties. Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects on and as of such date as if made on and as of such date.

(b)    No Default. No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

EXHIBIT A

75

Each borrowing by and issuance of a Letter of Credit on behalf of the Borrower hereunder shall constitute a representation and warranty by the Borrower as of the date of such extension of credit that the conditions contained in this Section 5.2 have been satisfied.

SECTION 6.  AFFIRMATIVE COVENANTS

Each Parent Guarantor and the Borrower hereby jointly and severally agree that, so long as the Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender or any Agent hereunder, each Parent Guarantor and the Borrower shall, and shall cause, each of its Subsidiaries to:

6.1    Financial Statements.  Furnish to the Administrative Agent for distribution to the Lenders:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of TPG-Austin JV, a copy of the audited consolidated balance sheet of TPG-Austin JV and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case in comparative form the figures as of the end of and for the previous year, reported on without a "going concern" or like qualification or exception, or qualification arising out of the scope of the audit, by Deloitte & Touche LLP or other independent certified public accountants of nationally recognized standing;

(b)    as soon as available, but in any event not later than 45 days after the end of each of the first three quarterly periods of each fiscal year of TPG-Austin JV, the unaudited consolidated balance sheet of TPG-Austin JV and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case in comparative form the figures as of the end of and for the corresponding period in the previous year, certified by a Responsible Officer as being fairly stated in all material respects (subject to normal year-end audit adjustments); and

(c)    no later than three Business Days after the same are required to be delivered to the lenders under the CMBS Facilities, all of the financial statements and other materials each CMBS Borrower is required to deliver pursuant to its respective CMBS Documents;

all such financial statements to be complete and correct in all material respects and to be prepared in reasonable detail and in accordance with GAAP applied consistently throughout the periods reflected therein and with prior periods (except as approved by such accountants or officer, as the case may be, and disclosed therein).

6.2    Certificates; Other Information.  Furnish to the Administrative Agent and each Lender, or, in the case of clause (g), to the relevant Lender:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.1(a), a certificate of the independent certified public accountants reporting on

USActive 8584236.17

such financial statements stating that in making the examination necessary therefor no knowledge was obtained of any Default or Event of Default, except as specified in such certificate (it being understood that such certificate shall be limited to the items that independent certified public accountants are permitted to cover in such certificates pursuant to their professional standards and customs of the profession);

(b)        concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of a Responsible Officer stating that, to the best of such Responsible Officer's knowledge, each Loan Party during such period has observed or performed all of its covenants and other agreements, and satisfied every condition, contained in this Agreement and the other Loan Documents to which it is a party to be observed, performed or satisfied by it, and that such Responsible Officer has obtained no knowledge of any Default or Event of Default except as specified in such certificate and (ii) in the case of quarterly or annual financial statements, (A) a Compliance Certificate containing all information and calculations necessary for determining compliance by the Group Members with the provisions of this Agreement referred to therein as of the last day of the fiscal quarter or fiscal year of the Borrower, as the case may be, including, without limitation, Section 2.25(c), (B) information with respect to each Reinvestment Event occurring during such fiscal quarter or fiscal year, as applicable, (x) the aggregate amount of Net Cash Proceeds received by any Group Member in connection with such Reinvestment Event, (y) the date on which such Net Cash Proceeds were received and (z) the aggregate amount of such Net Cash Proceeds used by the Group Members for each such Reinvestment Event prior to the end of such fiscal quarter or fiscal year, as applicable, and (C) any UCC financing statements or other filings specified in such Compliance Certificate as being required to be delivered therewith;

(c)        as soon as available, and in any event no later than 45 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year of the Borrower and its Subsidiaries, and, as soon as available, significant revisions, if any, of such budget and projections with respect to such fiscal year (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect;

(d)        within 45 days after the end of each fiscal quarter of the Borrower, a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter;

(e)        no later than ten Business Days prior to the effectiveness thereof, copies of substantially final drafts of any proposed amendment, supplement, waiver or other modification with respect to the CMBS Documents or the Purchase Agreement;

(f)        within five days after the same are sent, copies of all financial statements and reports that any Group Member sends to the holders of any class of its debt securities or public equity securities and, within five days after the same are filed, copies of all

financial statements and reports that any Group Member may make to, or file with, the SEC;

     (g)    after the REIT Conversion Date, promptly after the occurrence thereof, notice of (i) the failure of a REIT Guarantor to maintain REIT Status or (ii) the taxation of the Borrower or any of its Subsidiaries as a corporation for federal tax purposes; and

     (h)    promptly, such additional financial and other information as any Lender may from time to time reasonably request.

     6.3    <u>Payment of Obligations</u>.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of any Group Member, as the case may be.

     6.4    <u>Conduct of Business and Maintenance of Existence; Compliance</u>. (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) comply with all Contractual Obligations and Requirements of Law, except to the extent that failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

     6.5    <u>Maintenance of Property; Insurance</u>.  (a) Keep all Property and systems useful and necessary in its business in good working order and condition, ordinary wear and tear excepted.

     (b)    Maintain with financially sound and reputable insurance companies the following types of insurance coverage on all of the Austin Properties:

     (i)    Property insurance insuring against loss or damage customarily included under so called "all risk" or "special form" policies including fire, lightning, vandalism, windstorm and malicious mischief, boiler and machinery and, if required by the Administrative Agent, flood and/or earthquake coverage and subject to Section 6.5(b)(x) below, coverage for damage or destruction caused by the acts of "Terrorists" (or such policies shall have no exclusion from coverage with respect thereto) and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction.  Such insurance policy shall also insure for ordinance of law coverage, loss of replacement cost value due to non-conforming use, costs of demolition and increased cost of construction in amounts satisfactory to the Administrative Agent.  Each such insurance policy shall for all perils other than Tier 1 Wind and flood (i) be in an amount equal to 100% of the then replacement cost of the Improvements without deduction for physical depreciation, (ii) have deductibles no greater than $50,000 for non-catastrophic perils, (iii) be paid annually in advance and (iv)

USActive 8584236.17

64

be on a replacement cost basis and contain either no coinsurance or, an Agreed Amount endorsement, and shall cover, without limitation, all tenant improvements and betterments that applicable Property Owner is required to insure on a replacement cost basis. The Administrative Agent, for the benefit of the Lenders, shall be named Mortgagee and Loss Payee on a Standard Mortgagee Endorsement. Notwithstanding the foregoing, in the event that windstorm coverage is not included as part of the "all risk" property policy required above, the applicable Property Owner shall, nevertheless be required to obtain coverage for windstorm (as stand alone coverage) provided that such coverage is commercially available at a reasonable rate (as determined by the Administrative Agent).

(ii)     Flood insurance if any part of any Austin Property is located in an area now or hereafter designated by the Federal Emergency Management Agency as a Zone "A" & "V" Special Hazard Area, or such other Special Hazard Area if the Administrative Agent so requires in its sole discretion. Provided such coverage is commercially available for comparable properties in the same geographic area as the Austin Properties, such policy shall be in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended.

(iii)    Public liability insurance, including (i) "Commercial General Liability Insurance", (ii) "Owned", "Hired" and "Non Owned Auto Liability", and (iii) umbrella liability coverage for personal injury, bodily injury, death, accident and property damage, such insurance providing in combination no less than containing minimum limits per occurrence of $1,000,000 and $2,000,000 in the aggregate for any policy year with no deductible or self insured retention; together with at least $50,000,000 excess and/or umbrella liability insurance for any and all claims. The policies described in this subsection shall also include coverage for elevators, escalators, independent contractors, "Contractual Liability" (covering, to the maximum extent available, the Borrower's obligation to indemnify the Administrative Agent as required under this Agreement and the other Loan Documents), "Products" and "Completed Operations Liability" coverage, on an "if any" basis.

(iv)     Rental loss and/or business interruption insurance (i) with the Administrative Agent, for the benefit of the Lenders, being named as "Administrative Agent Loss Payee", (ii) in an amount equal to 100% of the projected Rents from the Austin Properties during an eighteen (18) month period, and (iii) providing payment for the initial period of restoration followed by an extended period of indemnity endorsement which provides that after the physical loss to any Austin Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of six months from the date that such Austin Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such insurance shall be increased from time to time during the term of this Agreement as and when the estimated or actual Rents increase.

USActive 8584236.17

EXHIBIT A                                          79

(v)    If a Property Owner installs high pressure boilers at an Austin Property, comprehensive boiler and machinery insurance covering all mechanical and electrical equipment against physical damage, rent loss and improvements loss and covering, without limitation, all tenant improvements and betterments that the Property Owner is required to insure pursuant to the leases on a replacement cost basis and in an amount equal to 100% of the full replacement cost of the equipment on such Austin Property (without any deduction for depreciation). All losses for resulting damage to building Improvements are to be paid under the Borrower's or Property Owner's manuscripted property policy form. Under the terms and conditions of the current insurance program only damage to Equipment (as defined in the CMBS Documents) will be paid under the boiler & machinery policy.

(vi)    Worker's compensation and Employer's Liability insurance with respect to any employees of the Borrower or Property Owners, as required by any Requirement of Law.

(vii)    To the extent not covered by the coverage required under Section 6.5(b)(i) above, during any period of repair or restoration, builder's "all-risk" insurance on the so called completed value basis in an amount equal to not less than the full insurable value of the Austin Properties, against such risks (including fire and extended coverage and collapse of the Improvements to agreed limits) as the Administrative Agent may reasonably request, in form and substance acceptable to the Administrative Agent.

(viii)    Ordinance and Law coverage, as commercially available at a reasonable rate (as determined by the Administrative Agent) to compensate for loss of value to the undamaged portion of the Austin Properties due to a legal non-conforming use, the cost of demolition and debris removal, and the increased cost of construction, in an amount satisfactory to the Administrative Agent.

(ix)    Such other insurance (including earthquake insurance, mine subsidence insurance and windstorm insurance) as may from time to time be reasonably required by the Administrative Agent in order to protect its interests; provided that, such coverage is customarily required by institutional lenders originating first mortgage loans for the securitization market for comparable properties in the same geographic location as the Austin Properties.

(x)    Notwithstanding anything in Section 6.5(b)(i) above to the contrary, each Property Owner shall be required to obtain and maintain coverage in its property insurance Policy (or by a separate Policy) against loss or damage by terrorist acts in an amount equal to 100% of the "Full Replacement Cost" of the Improvements without deduction for physical depreciation of the Austin Properties; provided that, such coverage is commercially available. In the event that such coverage with respect to terrorist acts is not included as part of the "all risk" property policy required by Section 6.5(b)(i) above, the Borrower and/or applicable Property Owner shall, nevertheless be required to obtain coverage for terrorism (as stand alone coverage) in an amount equal to 100% of the "Full Replacement Cost" of the Improvements without deduction for physical depreciation of the Austin Properties; provided that, such coverage is available. Notwithstanding the

USActive 8584236.17

foregoing, with respect to any such stand-alone policy covering terrorist acts, neither the Borrower nor the Property Owners shall be required to pay any insurance premiums solely with respect to such terrorism coverage in excess of the Terrorism Premium Cap (hereinafter defined); provided that, if the insurance premiums payable with respect to such terrorism coverage exceeds the Terrorism Premium Cap, the Administrative Agent may, at its option (1) purchase such stand-alone terrorism Policy, with the Borrower paying such portion of the insurance premiums with respect thereto equal to the Terrorism Premium Cap and the Administrative Agent paying such portion of the insurance premiums in excess of the Terrorism Premium Cap or (2) modify the deductible amounts, policy limits and other required policy terms to reduce the insurance premiums payable with respect to such stand-alone terrorism Policy to the Terrorism Premium Cap. As used herein, (i) "Terrorism Premium Cap" means an amount equal to 150% of the aggregate insurance premiums payable with respect to all the insurance coverage under Section 6.5(b)(i) above for the last policy year in which coverage for terrorism was included as part of the "all risk" (excluding earthquake, Tier 1 Wind and Flood insurance) property policy required by subsection (a) above, adjusted annually by a percentage equal to the increase in the Consumer Price Index (hereinafter defined) and (ii) "Consumer Price Index" means the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York Metropolitan Statistical Area, All Items (1982-84 = 100), or any successor index thereto, approximately adjusted, and in the event that the Consumer Price Index is converted to a different standard reference base or otherwise revised, the determination of adjustments provided for herein shall be made with the use of such conversion factor, formula or table for converting the Consumer Price Index as may be published by the Bureau of Labor Statistics or, if said Bureau shall not publish the same, then with the use of such conversion factor, formula or table as may be published by Prentice-Hall, Inc., or any other nationally recognized publisher of similar statistical information; and if the Consumer Price Index ceases to be published, and there is no successor thereto (i) such other index as the Administrative Agent and the Borrower shall agree upon in writing or (ii) if the Administrative Agent and the Borrower cannot agree on a substitute index, such other index, as reasonably selected by the Administrative Agent. The Borrower shall obtain the coverage required under this subsection (x) from a carrier which otherwise satisfies the rating criteria specified in Section 6.5(c) (a "Qualified Carrier") or in the event that such coverage is not available from a Qualified Carrier, the Borrower shall obtain such coverage from the highest rated insurance company providing such coverage.

(c)    All policies of insurance (the "Policies") required pursuant to Section 6.5(b) above shall (i) be issued by companies approved by the Administrative Agent and authorized to do business in the states in which the Austin Properties are located, with a claims paying ability rating of "A" or better by S&P (or carrying an equivalent rating by any other nationally recognized rating agency), and a rating of A-:VII or better in the current Best's Insurance Reports (provided, however for multi-layered policies, (A) if four (4) or less insurance companies issue the Policies, then at least 75% of the insurance coverage represented by the Policies must be provided by insurance companies with a claims paying ability rating of "A-" or better by S&P (or carrying an equivalent rating by any other nationally recognized rating agency), with no carrier below "BBB" (and the equivalent by any other nationally recognized rating agency) or (B) if five (5) or more insurance companies issue the Policies, then at least 60%

USActive 8584236.17

of the insurance coverage represented by the Policies must be provided by insurance companies with a claims paying ability rating of "A-" or better by S&P (or carrying an equivalent rating by any other nationally recognized rating agency), with no carrier below "BBB" (or carrying an equivalent rating by any other nationally recognized rating agency), or (C) if ten (10) or more insurance companies issue the Policies, then at least 60% of the insurance coverage represented by the Policies must be provided by insurance companies with a claims paying ability rating of "A-" or better by S&P (or carrying an equivalent rating by any other nationally recognized rating agency), and no other carrier rating below "BBB" by S&P, except that up to 10% of the total insurance coverage may be provided by carrier(s) with a rating of A-:IX or better in the current Best's Insurance Reports, with no S&P rating; (ii) name the Administrative Agent and its successors and/or assigns as their interest may appear as the mortgagee (in the case of property insurance), loss payee (in the case of business interruption/loss of rents coverage) and an additional insured (in the case of liability insurance, other than worker's compensation and employer liability); (iii) contain (in the case of property insurance) a Non-Contributory Standard Mortgagee Clause and a Lender's Loss Payable Endorsement, or their equivalents, naming the Administrative Agent as the person to which all payments made by such insurance company shall be paid; (iv) contain a waiver of all subrogation rights against the Administrative Agent; (v) the Borrower shall deliver Acord evidence of coverages (on Acord certificates acceptable to the Administrative Agent) as proof of coverage; provided, however, if any Austin Property is damaged or destroyed, in whole or in part, by fire or other casualty covered by any of the Policies where the loss equals or exceeds $2,000,000 (a "Significant Casualty"), the Borrower shall deliver original or carrier certified copies of the Policies to the Administrative Agent; (vi) contain such provisions as the Administrative Agent deems reasonably necessary or desirable to protect its interest, such as (A) neither the Borrower, the Administrative Agent nor any other party shall be a co-insurer under the Policies, (B) that the Administrative Agent shall receive at least (x) thirty (30) days' prior written notice of any cancellation of any of the Policies and (y) ten (10) days' prior written notice for nonpayment of Insurance Premiums (and the Borrower agrees to advise and obtain the Administrative Agent's approval for any material changes in the terms and conditions of any Policy, which approval shall not be unreasonably withheld), (C) the Administrative Agent is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums and (vii) in the event any insurance policy (except for general public and other liability and workers compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of the Administrative Agent, such insurance policy shall not be invalidated by and shall insure the Administrative Agent regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured, (B) the occupancy or use of the premises for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by the Administrative Agent pursuant to any provision of the Loan Documents. The Borrower shall pay the premiums for such Policies (the "Insurance Premiums") as the same become due and payable and furnish to the Administrative Agent evidence of the renewal of each of the Policies together with receipts for or other evidence of the payment of the Insurance Premiums reasonably satisfactory to the Administrative Agent. If the Borrower does not furnish such evidence and receipts upon the expiration of any expiring Policy, then the Administrative Agent may, but shall not be obligated to, procure such insurance and pay the Insurance Premiums therefor, and the Borrower shall reimburse the Administrative Agent for the cost of such

EXHIBIT A

68

Insurance Premiums promptly on demand, with interest accruing at the rate per annum determined in accordance with Section 2.15(c)(ii). The Borrower shall deliver to the Administrative Agent at closing and upon each renewal of the Policies, proof of the insurance coverages required hereunder on Acord certificates acceptable to the Administrative Agent; provided, however, if a Significant Casualty shall have occurred, the Borrower shall deliver original or carrier certified copies of the Policies to Lender. Within thirty (30) days after request by the Administrative Agent, the Borrower shall obtain such increases in the amounts of coverage required hereunder as may be reasonably requested by the Administrative Agent, taking into consideration changes in the value of money over time, changes in liability laws, changes in prudent customs and practices, and the like.

(d)     Notwithstanding anything to the contrary contained herein, the insurance coverages required under Section 6.5(b) above may be effected under a blanket policy or policies covering the Austin Properties and other property and assets not constituting a part of the security for the Obligations; provided that, the Borrower shall provide evidence reasonably satisfactory to the Administrative Agent that the insurance premiums for the Austin Properties are separately allocated under such Policy to each Austin Property and that overall insurance limits will under no circumstance limit the amount that will be paid in respect of each Austin Property, and provided further that any such blanket policy shall contain an amendment setting forth that (A) the aggregate limit under such policy shall apply separately to each property covered thereunder, and (B) unless otherwise agreed to by the Administrative Agent (which consent shall not be unreasonably withheld), the limit of such policy shall be a "true blanket limit" and not limited by a schedule of values for the properties covered thereby (any such blanket policies which complies with such conditions, an "Acceptable Blanket Policy").

6.6     Inspection of Property; Books and Records; Discussions. (a) Keep proper books of records and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities and (b) permit representatives of any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of any Group Member with officers and employees of any Group Member and with its independent certified public accountants.

6.7     Notices. Promptly give notice to the Administrative Agent and each Lender of:

(a)     the occurrence of any Default or Event of Default upon the earlier of a Loan Party becoming aware, or when the Loan Parties should have been aware;

(b)     any (i) default or event of default under any Contractual Obligation of any Group Member or (ii) litigation, investigation or proceeding that may exist at any time between any Group Member and any Governmental Authority, that in any case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a Material Adverse Effect;

USActive 8584236.17

(c)    any litigation or proceeding affecting any Group Member (i) in which the amount involved is $5,000,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(d)    the following events, as soon as possible and in any event within 30 days after the Borrower knows or has reason to know thereof: (i) the occurrence of any Reportable Event with respect to any Plan, a failure to make any required contribution to a Plan, the creation of any Lien in favor of the PBGC or a Plan or any withdrawal from, or the termination, Reorganization or Insolvency of, any Multiemployer Plan or (ii) the institution of proceedings or the taking of any other action by the PBGC or the Borrower or any Commonly Controlled Entity or any Multiemployer Plan with respect to the withdrawal from, or the termination, Reorganization or Insolvency of, any Plan;

(e)    as soon as possible and in any event within 30 days of obtaining knowledge thereof: (i) any development, event, or condition that, individually or in the aggregate with other developments, events or conditions, could reasonably be expected to result in the payment by any Group Member, in the aggregate, of a Material Environmental Amount; and (ii) any notice that any governmental authority may deny any application for an Environmental Permit sought by, or revoke or refuse to renew any Environmental Permit held by, any Group Member; and

(f)    any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Group Member proposes to take with respect thereto.

6.8    Environmental Laws.  (a)  Comply in all material respects with, and use commercially reasonable efforts to ensure compliance in all material respects by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply in all material respects with and maintain, and use commercially reasonable efforts to ensure that all tenants and subtenants obtain and comply in all material respects with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)    Conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply in all material respects with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

(c)    If any ESA or update delivered pursuant to Section 5.1(j) identifies a Recognized Environmental Condition ("REC"), as defined under ASTM guidelines, the Borrower shall, within six months of the delivery of such ESA or update to the Administrative Agent, conduct such follow up testing, provide such reports, and take such other actions as required or approved by the applicable Governmental Authority to the Administrative Agent to mitigate such REC.

70

6.9    Interest Rate Protection. In the case of the Borrower, (i) within 60 days after the Closing Date, enter into, and thereafter maintain for a period of not less than three years, Hedge Agreements to the extent necessary to provide that at least 50% of the aggregate principal amount of the Term Loans outstanding on the Closing Date is subject to either a fixed interest rate or interest rate protection for a period of not less than three years, (ii) if the Hedge Agreements entered into pursuant to the preceding clause (i) are for a term of less than four years, not later than one month prior to the expiration of the Hedge Agreements referred to in the preceding clause (i), enter into, and thereafter maintain, Hedge Agreements to the extent necessary to provide that at least 50% of the aggregate principal amount of the Term Loans outstanding on the Initial Expiration Date (as defined below) is subject to either a fixed rate or interest rate protection for a period beginning on the expiration date (the "Initial Expiration Date") of the preceding clause (i) and ending on or after the second anniversary of the Initial Expiration Date, and (iii) if the Hedge Agreements entered into pursuant to the preceding clauses (i) or (ii) are for a term that expires prior to the Term Loan Maturity Date, not later than one month prior to the date (the "Subsequent Expiration Date") that is later of (x) the expiration of the Hedge Agreements referred to in the preceding clause (i) and (y) the expiration of the Hedge Agreements referred to in the preceding clause (ii), enter into, and thereafter maintain, Hedge Agreements to the extent necessary to provide that at least 50% of the aggregate principal amount of the Term Loans outstanding on the Subsequent Expiration Date is subject to either a fixed rate or interest rate protection for a period beginning on the Subsequent Expiration Date and ending on or after the Term Loan Maturity Date in each case, which Hedge Agreements shall have terms and conditions reasonably satisfactory to the Administrative Agent.

6.10    Additional Collateral, etc. (a) With respect to any Property acquired after the Closing Date by any Loan Party (other than (x) any real property or any Property described in paragraph (c) of this Section, (y) any Property subject to a Lien expressly permitted by Section 7.3(f) and (z) Property acquired by an Excluded Foreign Subsidiary) as to which the Administrative Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent reasonably deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a security interest in such Property and (ii) take all actions necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Property, including without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent.

(b)    With respect (i) to any fee interest in any real property having an appraised value (together with improvements thereof) of at least $1,000,000 acquired after the Closing Date by any Group Member, or (ii) subject to the related Loan Party obtaining the required landlord consent (provided that each Loan Party shall use commercially reasonable efforts to obtain such consent), any leasehold interest in real property having an aggregate appraised value of $1,000,000 acquired or leased (including any leasehold property interest owned by any new Subsidiary acquired after the Closing Date) in one or a series of transactions after the Closing Date by a Group Member promptly (and in any event no later than 60 days after the acquisition thereof), in any case other than any such real property owned by an Excluded Foreign Subsidiary or subject to a Lien expressly permitted by Section 7.3(q), (A) execute and

USActive 8584236.17

EXHIBIT A

85

deliver a first priority Mortgage in favor of the Administrative Agent, for the benefit of the Secured Parties, covering such real property, (B) if requested by the Administrative Agent, provide the Lenders with (x) title and extended coverage insurance covering such real property in an amount at least equal to the purchase price of such real property (or such other amount as shall be reasonably specified by the Administrative Agent) as well as a current ALTA survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary or advisable by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (C) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

(c)    With respect to any new Subsidiary (other than an Excluded Foreign Subsidiary) created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any existing Subsidiary that ceases to be an Excluded Foreign Subsidiary), by any Group Member, promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent deems necessary or advisable to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member, (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of such Group Member, as the case may be, (iii) cause such new Subsidiary (A) to become a party to the Guarantee and Collateral Agreement and (B) to take such actions necessary or advisable to grant to the Administrative Agent for the benefit of the Secured Parties a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement with respect to such new Subsidiary, including, without limitation, the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent, and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent; provided that the covenants set forth in this paragraph 6.10(c) shall be inapplicable with respect to any new Subsidiary created after the Closing Date, to the extent the Capital Stock of such Subsidiary is required to be subject to a Lien securing the Indebtedness under the CMBS Facilities or a Lien permitted under Section 7.3(r).

(d)    With respect to any new Excluded Foreign Subsidiary created or acquired after the Closing Date by any Group Member (other than any Excluded Foreign Subsidiaries), promptly (i) execute and deliver to the Administrative Agent such amendments to the Guarantee and Collateral Agreement or such other documents as the Administrative Agent deems necessary or advisable in order to grant to the Administrative Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Capital Stock of such new Subsidiary that is owned by any Group Member (other than any Excluded Foreign Subsidiaries), (provided that in no event shall more than 65% of the total outstanding Capital Stock of any such new Excluded Foreign Subsidiary be required to be so pledged), (ii) deliver to the Administrative Agent the certificates representing such Capital Stock, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of any Group Member, as the case may be,

USActive 8584236.17

and take such other action as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the Lien of the Administrative Agent thereon, and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

      6.11   Further Assurances. From time to time execute and deliver, or cause to be executed and delivered, such additional instruments, certificates or documents, and take such actions, as the Administrative Agent may reasonably request for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent and the Lenders with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds thereof or with respect to any other property or assets hereafter acquired by any Group Member which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Administrative Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent or such Lender may be required to obtain from any Group Member for such governmental consent, approval, recording, qualification or authorization.

      6.12   Appraisals. (a) On or within 30 days prior to each anniversary of the Closing Date, the Borrower shall deliver to the Administrative Agent an updated Summary Appraisal for each of the Austin Properties.

      (b)   In addition to the Appraisals delivered pursuant to Section 6.12(a), in the event an Appraisal Trigger Event has occurred with respect to any Austin Property, the Borrower shall deliver to the Administrative Agent on or prior to the date that is 60 days after such Appraisal Trigger Event an updated Appraisal for such Austin Property, which Appraisal may be either a Full Appraisal or a Summary Appraisal, provided that, such Appraisal may not be a Summary Appraisal if the Administrative Agent has not received a Full Appraisal for such Austin Property within the three year period immediately prior to such Appraisal Trigger Event.

SECTION 7.  NEGATIVE COVENANTS

      Each Parent Guarantor and the Borrower hereby jointly and severally agree that, so long as the Commitments remain in effect, any Letter of Credit remains outstanding or any Loan or other amount is owing to any Lender or any Agent hereunder, each Parent Guarantor and the Borrower shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

      7.1   Financial Condition Covenants.

      (a)   Consolidated Leverage Ratio. Permit the Consolidated Leverage Ratio as at the last day of any fiscal quarter of the Borrower to exceed the ratio set forth below opposite such fiscal quarter:

| Fiscal Quarter | Consolidated Leverage Ratio |
|---|---|
| FQ3 2007 through FQ2 2008 ............... | 0.795 to 1.00 |
| FQ3 2008 through FQ2 2009 ............. | 0.775 to 1.00 |
| FQ3 2009 and thereafter..................... | 0.750 to 1.00 |

(b)    Consolidated Debt Service Coverage Ratio. Beginning with FQ3 2010, permit the Consolidated Debt Service Coverage Ratio for any period of four consecutive fiscal quarters of the Borrower ending with any fiscal quarter to be less than 1.00 to 1.00.

(c)    Maintenance of Tangible Net Worth. Permit Tangible Net Worth as of the last day of any fiscal quarter of the Borrower and its Subsidiaries to be less than $250,000,000.

(d)    Minimum Consolidated Liquidity Amount. Permit the Consolidated Liquidity Amount as of the last day of any fiscal quarter of the Borrower and its Subsidiaries to be less than $35,000,000.

7.2    Limitation on Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness of any Loan Party pursuant to any Loan Document;

(b)    Indebtedness of the Borrower to any Subsidiary and of any Wholly Owned Subsidiary Guarantor to the Borrower or any other Subsidiary;

(c)    Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(f) in an aggregate principal amount not to exceed $2,000,000 at any one time outstanding;

(d)    Guarantee Obligations made in the ordinary course of business by the Borrower or any of its Subsidiaries of obligations of the Borrower or any Wholly Owned Subsidiary;

(e)    Indebtedness of the CMBS Borrowers in respect of the CMBS Facilities and any refinancings, refundings, renewals or extensions thereof (without any shortening of the maturity of any principal amount thereof to a date prior to December 1, 2013);

(f)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business, or in respect of netting services, overdraft protections or otherwise in connection with deposit accounts;

(g)    Indebtedness (other than Recourse Indebtedness) assumed by the Borrower or any of its Subsidiaries in connection with any acquisition permitted by Section 7.7(g); provided that, such Indebtedness existed at the time of such acquisition and was not created in connection therewith or in contemplation thereof, and provided,

USActive 8584236.17

further that, the Borrower shall deliver to the Administrative Agent a pro forma Compliance Certificate (i) certifying that, after giving effect to such additional Indebtedness, no Event of Default shall exist and (ii) containing all information and calculations necessary, and taking into consideration such additional Indebtedness, for determining pro forma compliance with the provisions of Section 7.1 hereof;

(h)    guarantees (including bonds), performance bonds and indemnification obligations incurred in the ordinary course of business of obligations of the Borrower and their respective Subsidiaries in favor of suppliers, customers, contractors, lessees, tenants, and mechanics of any Borrower or any Subsidiary and any other such obligations, in each case entered into in the ordinary course of business, which are in an outstanding amount not exceeding $10,000,000 individually or $20,000,000 in the aggregate outstanding at any time;

(i)    Indebtedness in respect of the Non-Recourse Subsidiary Borrowers at any one time outstanding that is secured by either (i) Real Property and any related Property permitted by Section 7.3(q) or (ii) the Capital Stock in a Non-Recourse Subsidiary Borrower, including without limitation all future CMBS Facilities; provided that, with respect to any of the foregoing Indebtedness:

(A)    such indebtedness shall not mature prior to December 1, 2013;

(B)    none of the Borrower nor any of its Subsidiaries provides credit support of any kind (including any undertaking, agreement or instrument that would constitute Indebtedness) or is directly or indirectly liable (as guarantor or otherwise), other than as guarantor (x) to the extent permitted by Section 7.2(d) for fraud, misrepresentation, misapplication of cash, waste, environmental claims and liabilities, prohibited transfers, violations of special purpose entity covenants and other circumstances customarily excluded by institutional lenders from exculpation provisions and/or included in separate guarantee or indemnification agreements in non recourse financing of real estate or (y) to the extent otherwise permitted by Section 7.2(k); and

(C)    as to which the lenders thereunder will not have any recourse to the Capital Stock or assets of the Borrower nor any of its Subsidiaries other than the assets securing such Indebtedness, additions, accessions and improvements thereto and proceeds thereof and the Capital Stock of a Non-Recourse Subsidiary Borrower and, in the case of the Borrower or any Subsidiary, recourse against the Borrower or such Subsidiary for fraud, misrepresentation, misapplication of cash, waste, environmental claims and liabilities, prohibited transfers, violations of special purpose entity covenants and other circumstances customarily excluded by institutional lenders from exculpation provisions and/or included in separate guarantee or indemnification agreements in non recourse financing of real estate;

provided, further, that the Borrower shall deliver to the Administrative Agent a pro forma Compliance Certificate (x) certifying that, after giving effect to such additional Indebtedness, no Default or Event of Default shall exist and (y) containing all

USActive 8584236.17

information and calculations necessary, and taking into consideration such additional Indebtedness, for determining pro forma compliance with the provisions of Section 7.1 hereof;

(j)    guarantees by any Parent Guarantor for fraud, misrepresentation, misapplication of cash, waste, environmental claims and liabilities, prohibited transfers, violations of special purpose entity covenants and other circumstances customarily excluded by institutional lenders from exculpation provisions and/or included in separate guarantee or indemnification agreements in non-recourse financing of real estate and customary completion guarantees by any Parent Guarantor, in each case with respect to Indebtedness permitted by Sections 7.2(e) and (i) hereof; and

(k)    additional unsecured Indebtedness of the Borrower or any of its respective Subsidiaries in an aggregate principal amount (for the Borrower and all Subsidiaries) not to exceed $20,000,000 at any one time outstanding.

7.3    Limitation on Liens.  Create, incur, assume or suffer to exist any Lien upon any of its Property, whether now owned or hereafter acquired, except for:

(a)    Liens for taxes not yet due or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP;

(b)    carriers', warehousemen's, mechanics', materialmen's, repairmen's, workmen's or other like Liens arising in the ordinary course of business that are not overdue for a period of more than 30 days or that are being contested in good faith by appropriate proceedings;

(c)    pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation;

(d)    deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(e)    easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the Property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)    Liens securing Indebtedness of the Borrower or any other Subsidiary incurred pursuant to Section 7.2(c) to finance the acquisition of fixed or capital assets, provided that (i) such Liens shall be created substantially simultaneously with the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness, (iii) the amount of Indebtedness secured thereby is not increased and (iv) the amount of Indebtedness

USActive 8584236.17

76

initially secured thereby is not more than 100% of the purchase price of such fixed or capital asset;

(g)     Liens created pursuant to the Security Documents;

(h)     any interest or title of a lessor under any lease entered into by the Borrower or any of its Subsidiaries in the ordinary course of its business and covering only the assets so leased;

(i)     Permitted Leases (including memoranda thereof), and any recordation thereof;

(j)     Liens resulting from any judgment, writ or warrant of attachment or similar process and not constituting an Event of Default;

(k)     licenses of Intellectual Property in the ordinary course of business;

(l)     Liens on property of a Person existing at the time such Person is acquired or merged with or into or consolidated with the Borrower or any of its Subsidiaries to the extent permitted hereunder (and not created in anticipation or contemplation thereof) securing Indebtedness permitted by Section 7.2(g); provided that, such Liens do not extend to property not subject to such Liens at the time of acquisition (other than improvements and accessions thereon and proceeds thereof), and are no more favorable to the lienholders than such existing Liens (taken as a whole);

(m)     Liens created by sale contracts documenting unconsummated asset dispositions permitted by this Agreement; provided that, such Liens attach only to assets and proceeds thereof subject to such sales contracts;

(n)     Liens attaching to cash earnest money deposits made by the Borrower and its Subsidiaries in connection with any letter of intent or purchase agreement entered into by the Borrower or the applicable Subsidiary, provided that, such acquisition is permitted by Section 7.7;

(o)     Liens arising by operation of law or contract on insurance policies and the proceeds thereof to secure premiums thereunder;

(p)     purported Liens evidenced by the filing of precautionary UCC financing statements by a lessor relating solely to operating leases of personal property entered into in the ordinary course of business;

(q)     Liens securing Indebtedness permitted by Section 7.2(i) on (i) fee-owned property or real property leases of the Borrower and its Subsidiaries and any related Property, and the Capital Stock in a Subsidiary (other than the Capital Stock of the Borrower or any of its Subsidiaries which are not Non-Recourse Subsidiary Borrowers) customarily granted by a borrower to its lender in connection with non-recourse financing including, without limitation, any personal property located on or related to such Property, any contracts, receivables and general intangibles related to such real property

USActive 8584236.17

EXHIBIT A

91

77

and any Hedge Agreements relating to the Indebtedness or (ii) the Capital Stock of any Non-Recourse Subsidiary Borrower; provided that (x) such Liens shall be created substantially simultaneously with the incurrence of such Indebtedness and (y) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness, other than, in each case, in connection with any consolidations of such Indebtedness; and

      (r)     Liens securing Indebtedness permitted by Section 7.2(e), provided that, (x) such Liens are created substantially simultaneously with the incurrence of such Indebtedness and (y) such Liens do not at any time encumber any Property other than the Property financed by such Indebtedness, other than, in each case, in connection with any consolidations of such Indebtedness.

    7.4    Limitation on Fundamental Changes. Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its Property or business, except that:

      (a)     any Subsidiary of the Borrower may be merged or consolidated with or into the Borrower (provided that the Borrower shall be the continuing or surviving corporation) or with or into any Wholly Owned Subsidiary Guarantor (provided that (i) the Wholly Owned Subsidiary Guarantor shall be the continuing or surviving corporation or (ii) simultaneously with such transaction, the continuing or surviving corporation shall become a Wholly Owned Subsidiary Guarantor and the Borrower shall comply with Section 6.10 in connection therewith);

      (b)     any Subsidiary of the Borrower may Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any Subsidiary Guarantor; and

      (c)     TPG-Austin JV may enter into a transaction permitted by Section 7.5(e) involving the Disposition of 100% of the Capital Stock of any REIT Guarantor.

    7.5    Limitation on Disposition of Property. Dispose of any of its Property (including, without limitation, receivables and leasehold interests), whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person, except:

      (a)     the Disposition of obsolete or worn out property in the ordinary course of business;

      (b)     the sale of inventory in the ordinary course of business;

      (c)     Dispositions permitted by Section 7.4(b);

      (d)     the sale or issuance of any Subsidiary's Capital Stock to the Borrower or any Subsidiary Guarantor;

USActive 8584236.17

EXHIBIT A

92

(e)    the Disposition of other assets, including, without limitation, (x) the Disposition by TPG-Austin JV of 100% of the Capital Stock of any REIT Guarantor to any Person, provided that, (i) such Disposition is at fair market value, as reasonably determined by the Group Member making such Disposition, (ii) such Disposition shall not result in a Material Adverse Effect, (iii) at the time of such Disposition, a certificate of a Responsible Officer shall have been delivered to the Administrative Agent, which shall include (A) a computation demonstrating pro forma compliance with the covenants contained in Section 7.1 after giving effect to such Disposition and (B) a certification that no Default or Event of Default shall have occurred and be continuing at such time or after giving effect to such Disposition and (iv) the requirements of Section 2.12(b) are complied with in connection therewith, to the extent necessary, and (y) in connection with any Disposition permitted by the immediately preceding clause (x), the Borrower may contribute or distribute the equity property of any Subsidiary to such Subsidiary's related REIT Guarantor;

(f)    any Recovery Event, provided, that the requirements of Section 2.12(b) are complied with in connection therewith;

(g)    Permitted Leases;

(h)    Investments permitted by Section 7.7; and

(i)    Dispositions, by means of trade-in, of equipment used in the ordinary course of business, so long as such equipment is replaced or substituted, substantially concurrently, by like-equipment.

7.6    Limitation on Restricted Payments.  Declare or pay any dividend on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of any Group Member, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of any Group Member, or enter into any derivatives or other transaction with any financial institution, commodities or stock exchange or clearinghouse (a "Derivatives Counterparty") obligating any Group Member to make payments to such Derivatives Counterparty as a result of any change in market value of any such Capital Stock (collectively, "Restricted Payments"), except that:

(a)    any Subsidiary may make Restricted Payments to the Borrower or any Subsidiary Guarantor;

(b)    TPG-Austin JV may make Restricted Payments to its equity holders (i) in the form of its common membership interests and (ii) with the proceeds of any dividends received by it pursuant to Section 7.6(c) or 7.6(d);

(c)    (i) the Borrower and its Subsidiaries may make Restricted Payments directly or indirectly to any Parent Guarantor, and each Parent Guarantor may make Restricted Payments to its direct or indirect owners if on the date of such Restricted Payment, either (x) the Consolidated Leverage Ratio as of the last day of the fiscal quarter most recently ended for which financial statements are available is less than or

79

equal to the Applicable Leverage Ratio or (y) after giving effect to any mandatory prepayment of the Loans required by Section 2.12, the Consolidated Leverage Ratio as of the date of such Restricted Payment is less than or equal to the Applicable Leverage Ratio, and (ii) after the REIT Conversion Date, the Borrower and its Subsidiaries may make Restricted Payments directly or indirectly to any Parent Guarantor, and each Parent Guarantor may make Restricted Payments to its direct or indirect owners, in an amount not exceeding for any fiscal quarter the amount necessary to enable the REIT Guarantors to pay such cash dividends to their respective members as may be necessary for such REIT Guarantors to maintain REIT Status, determined without regard to Section 565 of the Code; provided that, on the date of any Restricted Payment, the Borrower shall deliver to the Administrative Agent a pro forma Compliance Certificate (x) certifying that, immediately prior to and after giving effect to such Restricted Payment, no Default or Event of Default shall have occurred and be continuing and (y) containing all information and calculations necessary, and taking into consideration such Restricted Payment, for determining pro forma compliance with the provisions of Section 7.1 hereof;

(d)   the Borrower and its Subsidiaries may make Restricted Payments to the Parent Guarantors, or their direct or indirect owners, (i) in an amount equal to the aggregate amount of taxes payable by the Parent Guarantors or their direct or indirect owners in connection with any Disposition of Property permitted by Section 7.5, and (ii) to pay (x) corporate overhead expenses incurred in the ordinary course of business not to exceed $1,000,000 in any fiscal year and (y) any taxes which are due and payable by the Parent Guarantors or the Borrower as part of a consolidated, combined or unitary group (or any direct or indirect owner of the REIT Guarantors); provided that, on the date of any such Restricted Payment, the Borrower shall deliver to the Administrative Agent a pro forma Compliance Certificate (i) certifying that, solely in the case of a Restricted Payment described in clause (i) above, immediately prior to and after giving effect to such Restricted Payment, no Default or Event of Default shall have occurred and be continuing and (ii) containing all information and calculations necessary, and taking into consideration such Restricted Payment, for determining pro forma compliance with the provisions of Section 7.1 hereof; and

(e)   the Borrower may make a Restricted Payment of the Capital Stock or Real Property of any Subsidiary to the REIT Guarantor related to such Subsidiary to the extent necessary to permit the consummation of a Disposition permitted by Section 7.5(e).

7.7   Limitation on Investments. Make any advance, loan, extension of credit (by way of guaranty or otherwise) or capital contribution to, or purchase any Capital Stock, bonds, notes, debentures or other debt securities of, or any assets constituting an ongoing business from, or make any other investment in, any other Person (all of the foregoing, "Investments"), except:

(a)   extensions of trade credit in the ordinary course of business;

(b)   Investments in Cash Equivalents;

USActive 8584236.17

EXHIBIT A

94

(c)    Investments arising in connection with the incurrence of Indebtedness permitted by Section 7.2(b) and (d);

(d)    the Acquisition;

(e)    Investments in assets useful in the Borrower's business made by the Borrower or any of its Subsidiaries with the proceeds of any Reinvestment Deferred Amount;

(f)    Investments (other than those relating to the incurrence of Indebtedness permitted by Section 7.7(c)) by any Group Member in the Borrower or any Person that is a Wholly Owned Subsidiary; and

(g)    Investments (whether made directly or indirectly through the acquisition of a Person owning such assets) to acquire Real Property and other incidental Property related to such Real Property, provided that, (x) such Investment shall not result in a Material Adverse Effect, (y) at the time of such Investment, a certificate of a Responsible Officer shall have been delivered to the Administrative Agent, which shall include (A) a computation demonstrating pro forma compliance with the covenant contained in Section 7.1 after giving effect to such Investment and (B) a certification that no Default or Event of Default shall have occurred and be continuing at such time or after giving effect to such Investment and (z) the terms and conditions set forth in Section 6.10 are satisfied.

7.8    Limitation on Transactions with Affiliates.  Enter into any transaction, including, without limitation, any purchase, sale, lease or exchange of Property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than the Guarantors and the Borrower) unless such transaction is (i)(a) otherwise permitted under this Agreement, (b) in the ordinary course of business of any such Group Member, as the case may be, and (c) upon fair and reasonable terms no less favorable to such Group Member than it would obtain in a comparable arm's-length transaction with a Person that is not an Affiliate, (ii) the Property Management Agreements or (iii) the limited partnership agreement of TPG-Austin JV.

7.9    Limitation on Sales and Leasebacks.  Enter into any arrangement with any Person providing for the leasing by any Group Member of real or personal property which has been or is to be sold or transferred by such Group Member to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Group Member.

7.10    Limitation on Changes in Fiscal Periods.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

7.11    Limitation on Negative Pledge Clauses.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations or, in the case of any guarantor, its

USActive 6584236.17

81

obligations under the Guarantee and Collateral Agreement, other than (a) this Agreement and the other Loan Documents, (b) the CMBS Documents and documents in connection with Indebtedness permitted by Section 7.2(i) (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), and (c) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), and (d) any prohibition or limitation that (i) consists of customary restrictions and conditions contained in any agreement relating to the sale of any Property permitted under Section 7.5 pending the consummation of such sale, provided that, such restriction or condition shall only be effective against such Property, (ii) exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of a Borrower, provided that (A) such agreement was not entered into in contemplation of such Person becoming a Subsidiary and (B) such prohibition or limitation shall only be effective against such Subsidiary or (iii) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (d)(ii), provided that (A) such amendments and refinancings are no more materially restrictive (taken as a whole) with respect to such prohibitions and limitations than those in effect prior to such amendment or refinancing and (B) the negative pledge clause(s) in such amendments or refinancings do not extend to Property other than such Property covered in the agreements permitted in clause (d)(ii).

7.12   Limitation on Restrictions on Subsidiary Distributions. Enter into or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary, (b) make Investments in the Borrower or any other Subsidiary or (c) transfer any of its assets to the Borrower or any other Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents or the CMBS Documents and documents in connection with Indebtedness permitted by Section 7.2(i) (in which case, any prohibition or limitation shall only be effective against the assets financed thereby), (ii) any restrictions with respect to a Subsidiary imposed pursuant to an agreement that has been entered into in connection with the Disposition of all or substantially all of the Capital Stock or assets of such Subsidiary, and (iii) any restrictions existing on the Closing Date under the documents set forth on Schedule 7.2(d) hereto.

7.13   Limitation on Lines of Business. Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement (after giving effect to the Acquisition) or that are reasonably related thereto.

7.14   Limitation on Amendments to Acquisition Documentation. (a) Amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of the indemnities and licenses furnished to the Borrower or any of its Subsidiaries pursuant to the Acquisition Documentation such that after giving effect thereto such indemnities or licenses shall be materially less favorable to the interests of the Loan Parties or the Lenders with respect thereto or (b) otherwise amend, supplement or otherwise modify the terms and conditions of the Acquisition Documentation except to the extent that any such amendment, supplement or modification could not reasonably be expected to have a Material Adverse Effect.

USActive 8584236.17

EXHIBIT A                                                                                      96

82

7.15    Limitation on Amendments to Other Documents.  (a) Amend, supplement or otherwise modify (pursuant to a waiver or otherwise) the terms and conditions of the Property Management Agreement in any manner that would increase the amounts payable by the Group Members thereunder, or (b) amend, supplement or otherwise modify the organizational document of any Group Member in any manner that would adversely affect the interests of the Secured Parties.

7.16    Limitation on Activities of Parent Guarantors.  In the case of Parent Guarantors, notwithstanding anything to the contrary in this Agreement or any other Loan Document, (a) conduct, transact or otherwise engage in, or commit to conduct, transact or otherwise engage in, any business or operations other than those incidental to (x) in the case of the REIT Guarantors, its ownership of the Capital Stock of the Borrower, and (y) in the case of TPG-Austin JV, its ownership of the Capital Stock of the REIT Guarantors, (b) incur, create, assume or suffer to exist any Indebtedness or other liabilities or financial obligations, except (i) nonconsensual obligations imposed by operation of law, (ii) pursuant to the Loan Documents to which it is a party, (iii) obligations with respect to its Capital Stock, and (iv) the guarantees permitted by Section 7.2(j), or (c) own, lease, manage or otherwise operate any properties or assets (including cash (other than cash received in connection with dividends made by the Borrower in accordance with Section 7.6 pending application in the manner contemplated by said Section) and cash equivalents) other than the ownership of shares of Capital Stock of the Borrower.

7.17    Limitation on Hedge Agreements.  Enter into any Hedge Agreement other than Hedge Agreements entered into in the ordinary course of business, and not for speculative purposes, to protect against changes in interest rates or foreign exchange rates.

7.18    Special Covenants Relating to the REIT Guarantors, the Borrower and the Subsidiaries.  With respect to each REIT Guarantor:

(a)    permit any REIT Guarantor to make any disposition of or encumber, pledge or hypothecate, whether directly or indirectly, all or any portion of its interest in the Borrower or any Subsidiary at any time or any rights to distributions or dividends therefrom other than to the Borrower or a Wholly Owned Subsidiary, other than any pledges of equity interests pursuant to the Security Documents in connection with this Agreement or as otherwise permitted by Section 7.5; or

(b)    after the REIT Conversion Date, permit any REIT Guarantor to cease to operate in a manner that will allow it to qualify for REIT Status or to fail to maintain REIT Status at all times;

(c)    after the REIT Conversion Date, permit the Borrower to become an association (or publicly traded partnership or taxable mortgage pool) taxable as a corporation for federal tax purposes at any time; or

(d)    after the REIT Conversion Date, permit any Subsidiary of the Borrower to cease to be a disregarded entity of the Borrower for federal tax purposes or to become an

association (or publicly traded partnership or taxable mortgage pool) taxable as a corporation for federal tax purposes at any time.

## SECTION 8.  EVENTS OF DEFAULT

If any of the following events shall occur and be continuing:

(a)    the Borrower shall fail to pay any principal of any Loan or Reimbursement Obligation when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or Reimbursement Obligation, or any other amount payable hereunder or under any other Loan Document, within five days after any such interest or other amount becomes due in accordance with the terms hereof or thereof; or

(b)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made or furnished; or

(c)    (i) any Loan Party shall default in the observance or performance of any agreement contained in clause (i) or (ii) of Section 6.4(a) (with respect to the Guarantors and the Borrower only), Section 6.7(a) or Section 7, or in Section 5 of the Guarantee and Collateral Agreement or (ii) an "Event of Default" under and as defined in any Mortgage shall have occurred and be continuing; or

(d)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days; or

(e)    any Group Member shall (i) default in making any payment of any principal of any Indebtedness (including, without limitation, any Indebtedness under any Guarantee Obligation, but excluding the Loans and Reimbursement Obligations) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or to become subject to a mandatory offer to purchase by the obligor thereunder or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii)

84

of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount of which exceeds in the aggregate $5,000,000; or

(f)    (i) any Group Member shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or any Group Member shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against any Group Member any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of 60 days; or (iii) there shall be commenced against any Group Member any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) any Group Member shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) any Group Member shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or

(g)    (i) any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan, or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Required Lenders, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Required Lenders shall be likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Required Lenders, reasonably be expected to have a Material Adverse Effect; or

(h)    one or more judgments or decrees shall be entered against any Group Member involving for any Group Member taken as a whole a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged

USActive 8584236.17

85

coverage) of $5,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(i)    any of the Security Documents shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 10.15), to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby, other than as a result of any termination or release in accordance with the terms of this Agreement; or

(j)    the guarantee contained in Section 2 of the Guarantee and Collateral Agreement shall cease, for any reason (other than by reason of the express release thereof pursuant to Section 10.15), to be in full force and effect or any Loan Party or any Affiliate of any Loan Party shall so assert; or

(k)    any Change of Control shall occur;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including, without limitation, all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken:  (i) with the consent of the Majority Revolving Credit Facility Lenders, the Administrative Agent may, or upon the request of the Majority Revolving Credit Facility Lenders, the Administrative Agent shall, by notice to the Borrower declare the Revolving Credit Commitments to be terminated forthwith, whereupon the Revolving Credit Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including, without limitation, all amounts of L/C Obligations, whether or not the beneficiaries of the then outstanding Letters of Credit shall have presented the documents required thereunder) to be due and payable forthwith, whereupon the same shall immediately become due and payable.  In the case of all Letters of Credit with respect to which presentment for honor shall not have occurred at the time of an acceleration pursuant to this paragraph, the Borrower shall at such time deposit in a cash collateral account opened by the Administrative Agent an amount equal to the aggregate then undrawn and unexpired face amount of such Letters of Credit.  Amounts held in such cash collateral account shall be applied by the Administrative Agent to the payment of drafts drawn under such Letters of Credit, and the unused portion thereof after all such Letters of Credit shall have expired or been fully drawn upon, if any, shall be applied to repay other obligations of the Borrower hereunder and under the other Loan Documents.  After all such Letters of Credit shall have expired or been fully drawn upon, all Reimbursement Obligations shall have been satisfied and all other obligations of the Borrower hereunder and under the other Loan Documents shall have been paid in full, the balance, if any,

USActive 8584236.17

in such cash collateral account shall be returned to the Borrower (or such other Person as may be lawfully entitled thereto).

## SECTION 9.   THE AGENTS

9.1   <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Agents as the agents of such Lender under this Agreement and the other Loan Documents, and each Lender irrevocably authorizes each Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to such Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, no Agent shall have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.

9.2   <u>Delegation of Duties</u>.  Each Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  No Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

9.3   <u>Exculpatory Provisions</u>.  Neither any Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party to perform its obligations hereunder or thereunder.  The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4   <u>Reliance by Agents</u>.  Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Loan Parties), independent accountants and other experts selected by such Agent.  The Agents may deem and treat the payee of any Note as the owner thereof for all

USActive 8584236.17

87

purposes unless such Note shall have been transferred in accordance with Section 10.6 and all actions required by such Section in connection with such transfer shall have been taken. Each Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5    Notice of Default. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless such Agent shall have received notice from a Lender, a Guarantor or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that the Administrative Agent shall receive such a notice, the Administrative Agent shall give notice thereof to the Lenders. The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

9.6    Non-Reliance on Agents and Other Lenders. Each Lender expressly acknowledges that neither any of the Agents nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, no Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or

USActive 8584236.17

88

creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of such Agent or any of its officers, directors, employees, agents, attorneys-in-fact or affiliates.

9.7    Indemnification. The Lenders agree to indemnify each Agent in its capacity as such (to the extent not reimbursed by a Guarantor or the Borrower and without limiting the obligation of a Guarantor or the Borrower to do so), ratably according to their respective Aggregate Exposure Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Aggregate Exposure Percentages immediately prior to such date), for, and to save each Agent harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including, without limitation, at any time following the payment of the Loans) be imposed on, incurred by or asserted against such Agent in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

9.8    Agent in Its Individual Capacity. Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it and with respect to any Letter of Credit issued or participated in by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9    Successor Administrative Agent. The Administrative Agent may resign as Administrative Agent upon ten days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall (i) be a Qualified Transferee (as defined in the Intercreditor Agreements) and (ii) (unless an Event of Default under Section 8(a) or Section 8(f) with respect to the Borrower shall have occurred and be continuing) be subject to approval by the Borrower (which approval shall not be unreasonably withheld or delayed), whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that

USActive 8584236.17

89

is ten days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. The Syndication Agent may, at any time, by notice to the Lenders and the Administrative Agent, resign as Syndication Agent hereunder, whereupon the duties, rights, obligations and responsibilities of the Syndication Agent hereunder shall automatically be assumed by, and inure to the benefit of, the Administrative Agent, without any further act by the Syndication Agent, the Administrative Agent or any Lender. After any retiring Agent's resignation as Agent, the provisions of this Section 9 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement and the other Loan Documents.

9.10    Authorization to Release Liens and Guarantees. The Administrative Agent is hereby irrevocably authorized by each of the Lenders to effect any release of Liens or guarantee obligations contemplated by Section 10.15, and only the Administrative Agent's signature shall be required for any such action to be effective under any Loan Document, including releases, as may be evidenced by a payoff, termination or release letter or agreement.

9.11    The Arranger and the Syndication Agent. Neither the Arranger nor the Syndication Agent, in their respective capacities as such, shall have any duties or responsibilities, nor shall either such Person incur any liability, under this Agreement and the other Loan Documents.

9.12    Execution of Intercreditor Agreements. Each Lender hereby irrevocably approves and consents to the execution and delivery of the Intercreditor Agreements by the Administrative Agent on its behalf.

SECTION 10. MISCELLANEOUS

10.1    Amendments and Waivers. Neither this Agreement or any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and each Loan Party party to the relevant Loan Document may, or (with the written consent of the Required Lenders) the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents (including amendments and restatements hereof or thereof) for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as may be specified in the instrument of waiver, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall:

(i)    reduce or forgive the principal amount or extend the final scheduled date of maturity of any Loan or Reimbursement Obligation, extend the scheduled date of any amortization payment in respect of any Term Loan, reduce the stated rate of any interest or fee payable under this Agreement (except (x) in connection with the waiver of

applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Majority Facility Lenders of each adversely affected Facility) and (y) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Commitment of any Lender, in each case without the consent of each Lender directly affected thereby;

      (ii)    amend, modify or waive any provision of this Section or reduce any percentage specified in the definition of Required Lenders or Required Prepayment Lenders, consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, release all or substantially all of the Collateral or release all or substantially all of the Subsidiary Guarantors from their guarantee obligations under the Guarantee and Collateral Agreement, in each case without the consent of all the Lenders;

      (iii)    amend, modify or waive any condition precedent to any extension of credit under the Revolving Credit Facility set forth in Section 5.2 (including, without limitation, the waiver of an existing Default or Event of Default required to be waived in order for such extension of credit to be made) without the consent of the Majority Revolving Credit Facility Lenders;

      (iv)    reduce the percentage specified in the definition of Majority Facility Lenders with respect to any Facility without the consent of all of the Lenders under such Facility;

      (v)    amend, modify or waive any provision of Section 9, or any other provision affecting the rights, duties or obligations of any Agent, without the consent of any Agent directly affected thereby;

      (vi)    amend, modify or waive any provision of Section 2.6 or 2.7 without the consent of the Swing Line Lender;

      (vii)    amend, modify or waive any provision of Section 2.18 without the consent of each Lender directly affected thereby;

      (viii)    amend, modify or waive any provision of Section 3 without the consent of each Issuing Lender affected thereby; or

      (ix)    impose restrictions on assignments and participations that are more restrictive than, or additional to, those set forth in Section 10.6 without the consent of each Lender directly affected thereby.

Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Agents and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Agents shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not

USActive 8584236.17

91

continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon. Any such waiver, amendment, supplement or modification shall be effected by a written instrument signed by the parties required to sign pursuant to the foregoing provisions of this Section; provided, that delivery of an executed signature page of any such instrument by facsimile transmission shall be effective as delivery of a manually executed counterpart thereof.

For the avoidance of doubt, this Agreement and any other Loan Document may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and each Loan Party to each relevant Loan Document (x) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof (collectively, the "Additional Extensions of Credit") to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and Revolving Extensions of Credit and the accrued interest and fees in respect thereof and (y) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders, Required Prepayment Lenders and Majority Revolving Credit Facility Lenders; provided, however, that no such amendment shall permit the Additional Extensions of Credit to share ratably with or with preference to the Loans in the application of mandatory prepayments without the consent of the Required Prepayment Lenders.

10.2    Notices. All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed (a) in the case of any Guarantor, the Borrower and the Agents, as follows and (b) in the case of the Lenders, as set forth in an administrative questionnaire delivered to the Administrative Agent or on Schedule 1 to the Lender Addendum to which such Lender is a party or, in the case of a Lender which becomes a party to this Agreement pursuant to an Assignment and Acceptance, in such Assignment and Acceptance or (c) in the case of any party, to such other address as such party may hereafter notify to the other parties hereto:

Parent Guarantors:          515 South Flower Street
                            6th Floor
                            Los Angeles, California 90071
                            Telecopy: (213) 633-4760
                            Telephone: (213) 233-2558
                            Attention: Todd Merkle

with a copy to:             2005 Market Street
                            Suite 2300
                            Philadelphia, Pennsylvania 19103
                            Telecopy: (215) 851-6021
                            Telephone: (215) 851-6018
                            Attention: Frank Zazzera

EXHIBIT A                                                          106

92

| The Borrower: | c/o Thomas Properties Group, Inc. |
|---|---|
| | 515 South Flower Street |
| | 6th Floor |
| | Los Angeles, California 90071 |
| | Telecopy: (213) 633-4760 |
| | Telephone: (213) 233-2558 |
| | Attention: Todd Merkle |
| with a copy to: | 2005 Market Street |
| | Suite 2300 |
| | Philadelphia, Pennsylvania 19103 |
| | Telecopy: (215) 851-6021 |
| | Telephone: (215) 851-6018 |
| | Attention: Frank Zazzera |
| The Administrative Agent: | Lehman Commercial Paper Inc. |
| | 745 Seventh Avenue |
| | New York, New York 10019 |
| | Attention: Maritza Ospina |
| | Telecopy: (646) 758-4648 |
| | Telephone: (212) 526-6590 |
| with a copy to: | TriMont Real Estate Advisors |
| | Monarch Towers |
| | 3424 Peachtree Road, N.E. |
| | Suite 2200 |
| | Atlanta, Georgia 30326 |
| | Attention: John Schwartz |
| | Telecopy: 404-582-8918 |
| | Telephone: 404-420-5509 |
| Issuing Lender: | As notified by such Issuing Lender to the |
| | Administrative Agent and the Borrower |

provided that any notice, request or demand to or upon the Administrative Agent, any Issuing Lender or any Lender shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3   No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of any Agent or any Lender, any right, remedy, power or privilege

USActive 8584236.17

93

hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4    Survival of Representations and Warranties. All representations and warranties made herein, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5    Payment of Expenses. The Borrower agrees (a) to pay or reimburse the Agents for all their reasonable out-of-pocket costs and expenses incurred in connection with the syndication of the Facilities (other than fees payable to syndicate members) and the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation, the reasonable fees and disbursements and other charges of counsel to the Administrative Agent and the charges of Intralinks, (b) to pay or reimburse each Lender and the Agents for all their costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, including, without limitation, the fees and disbursements of counsel (including the allocated fees and disbursements and other charges of in-house counsel) to each Lender and of counsel to the Agents, (c) to pay, indemnify, or reimburse each Lender and the Agents for, and hold each Lender and the Agents harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify or reimburse each Lender, each Agent, their respective affiliates, and their respective officers, directors, trustees, employees, advisors, agents and controlling persons (each, an "Indemnitee") for, and hold each Indemnitee harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by an Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto or thereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, including, but not limited to, the cost of third party consultants, (ii) any Loan or Letter of Credit or the use or proposed use of the proceeds thereof (including any refusal by any Issuing Lender to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Materials of Environmental Concern on or from any property owned, occupied or operated by the Borrower or any of its Subsidiaries, or any environmental liability related in any

USActive 8584236.17

EXHIBIT A

108

94

way to the Borrower or any of its Subsidiaries or any or their respective properties, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by any third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. No Indemnitee shall be liable for any damages arising from the use by unauthorized persons of information or other materials sent through electronic, telecommunications or other information transmission systems that are intercepted by such persons or for any special, indirect, consequential or punitive damages in connection with the Facilities. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries so to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section shall be payable not later than 30 days after written demand therefor. Statements payable by the Borrower pursuant to this Section shall be submitted to Frank Zazzera (Telephone No. (215) 851-6018) (Fax No. (215) 851-6021), at the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a notice to the Administrative Agent. The agreements in this Section shall survive repayment of the Loans and all other amounts payable hereunder.

10.6    Successors and Assigns; Participations and Assignments. (a) This Agreement shall be binding upon and inure to the benefit of the Parent Guarantors, the Borrower, the Lenders, the Agents, all future holders of the Loans and their respective successors and assigns, except that the Borrower may not assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the Agents and each Lender.

(b)    Any Lender may, without the consent of the Borrower, in accordance with applicable law, at any time sell to one or more banks, financial institutions or other entities (each, a "Participant") participating interests in any Loan owing to such Lender, any Commitment of such Lender or any other interest of such Lender hereunder and under the other Loan Documents. In the event of any such sale by a Lender of a participating interest to a Participant, such Lender's obligations under this Agreement to the other parties to this Agreement shall remain unchanged, such Lender shall remain solely responsible for the performance thereof, such Lender shall remain the holder of any such Loan for all purposes under this Agreement and the other Loan Documents, and the Borrower and the Agents shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. In no event shall any Participant under any such participation have any right to approve any amendment or waiver of any provision of any Loan Document, or any consent to any departure by any Loan Party therefrom, except to the extent that such amendment, waiver or consent would require the consent of all Lenders pursuant to Section 10.1. The Borrower agrees that if amounts outstanding under this Agreement and the Loans are due or unpaid, or shall have been declared or shall have become due and payable upon

95

the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by applicable law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest were owing directly to it as a Lender under this Agreement, provided that, in purchasing such participating interest, such Participant shall be deemed to have agreed to share with the Lenders the proceeds thereof as provided in Section 10.7(a) as fully as if such Participant were a Lender hereunder. The Borrower also agrees that each Participant shall be entitled to the benefits of Section 2.19, 2.20 or 2.21 with respect to its participation in the Commitments and the Loans outstanding from time to time as if such Participant were a Lender; provided that, in the case of Section 2.20, such Participant shall have complied with the requirements of said Section, and provided, further, that no Participant shall be entitled to receive any greater amount pursuant to any such Section than the transferor Lender would have been entitled to receive in respect of the amount of the participation transferred by such transferor Lender to such Participant had no such transfer occurred.

(c)    Any Lender (an "Assignor") may, in accordance with applicable law and upon written notice to the Administrative Agent, at any time and from time to time assign to any Lender or any affiliate, Related Fund or Control Investment Affiliate thereof or, with the consent of the Borrower and the Agents and, in the case of any assignment of Revolving Credit Commitments, the written consent of the Issuing Lender and the Swing Line Lender (which, in each case, shall not be unreasonably withheld or delayed) (provided (x) that no such consent need be obtained by any Lehman Entity and (y) the consent of the Borrower need not be obtained with respect to any assignment of Term Loans), to an additional bank, financial institution or other entity (an "Assignee") all or any part of its rights and obligations under this Agreement pursuant to an Assignment and Acceptance, substantially in the form of Exhibit E (an "Assignment and Acceptance"), executed by such Assignee and such Assignor (and, where the consent of the Borrower, the Administrative Agent or the Issuing Lender or the Swing Line Lender is required pursuant to the foregoing provisions, by the Borrower and such other Persons) and delivered to the Administrative Agent for its acceptance and recording in the Register; provided that no such assignment to an Assignee (other than any Lender or any affiliate thereof) shall be in an aggregate principal amount of less than $1,000,000 (other than in the case of an assignment of all of a Lender's interests under this Agreement) and, after giving effect to any such assignment, the Assignor (if it shall retain any Commitments or Loans) shall have Revolving Credit Commitments of at least $1,000,000 or Term Loans of at least $1,000,000, as applicable, in each case, unless otherwise agreed by the Borrower and the Administrative Agent. Any such assignment need not be ratable as among the Facilities. Upon such execution, delivery, acceptance and recording, from and after the effective date determined pursuant to such Assignment and Acceptance, (x) the Assignee thereunder shall be a party hereto and, to the extent provided in such Assignment and Acceptance, have the rights and obligations of a Lender hereunder with Commitments and/or Loans as set forth therein, and (y) the Assignor thereunder shall, to the extent provided in such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of an Assignor's rights and obligations under this Agreement, such Assignor shall cease to be a party hereto, except as to Sections 2.19, 2.20 and 10.5 in respect of the period prior to such effective date). Notwithstanding any provision of this Section, the consent of the Borrower shall not be required for any assignment that occurs at any time when any Event of Default shall have

USActive 8584236.17

EXHIBIT A                                                                 110

occurred and be continuing. For purposes of the minimum assignment amounts set forth in this paragraph, multiple assignments by two or more Related Funds shall be aggregated.

(d)    The Administrative Agent shall, on behalf of the Borrower, maintain at its address referred to in Section 10.2 a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders any changes thereto, whether by assignment or otherwise and the Commitment of, and principal amount (and interest thereon) of the Loans owing to and paid by, each Lender from time to time, and amounts received by the Administrative Agent from the Borrower, whether such amounts constitute principal, interest, fees or other, and each Lender's share thereof. The entries in the Register shall be conclusive, in the absence of manifest error, and the Borrower, each Agent and the Lenders shall treat each Person whose name is recorded in the Register as the owner of the Loans and any Notes evidencing such Loans recorded therein for all purposes of this Agreement. Any assignment of any Loan, whether or not evidenced by a Note, shall be effective only upon appropriate entries with respect thereto being made in the Register (and each Note shall expressly so provide). Any assignment or transfer of all or part of a Loan evidenced by a Note shall be registered on the Register only upon surrender for registration of assignment or transfer of the Note evidencing such Loan, accompanied by a duly executed Assignment and Acceptance; thereupon one or more new Notes in the same aggregate principal amount shall be issued to the designated Assignee, and the old Notes shall be returned by the Administrative Agent to the Borrower marked "canceled". The Register shall be available for inspection by the Borrower or any Lender (with respect to any entry relating to such Lender's Loans) at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of an Assignment and Acceptance executed by an Assignor and an Assignee (and, in any case where the consent of any other Person is required by Section 10.6(c), by each such other Person) together with payment to the Administrative Agent of a registration and processing fee of $3,500 (treating multiple, simultaneous assignments by or to two or more Related Funds as a single assignment) (except that no such registration and processing fee shall be payable in connection with an assignment by or to a Lehman Entity), the Administrative Agent shall (i) promptly accept such Assignment and Acceptance and (ii) on the effective date determined pursuant thereto record the information contained therein in the Register and give notice of such acceptance and recordation to the Borrower. On or prior to such effective date, the Borrower, at its own expense, upon request, shall execute and deliver to the Administrative Agent (in exchange for the Revolving Credit Note and/or applicable Term Notes, as the case may be, of the assigning Lender) a new Revolving Credit Note and/or applicable Term Notes, as the case may be, to the order of such Assignee in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, assumed or acquired by it pursuant to such Assignment and Acceptance and, if the Assignor has retained a Revolving Credit Commitment and/or Term Loans, as the case may be, upon request, a new Revolving Credit Note and/or Term Notes, as the case may be, to the order of the Assignor in an amount equal to the Revolving Credit Commitment and/or applicable Term Loans, as the case may be, retained by it hereunder. Such new Note or Notes shall be dated the Closing Date and shall otherwise be in the form of the Note or Notes replaced thereby.

(f)    For avoidance of doubt, the parties to this Agreement acknowledge that the provisions of this Section concerning assignments of Loans and Notes relate only to absolute

assignments and that such provisions do not prohibit assignments creating security interests in Loans and Notes, including, without limitation, any pledge or assignment by a Lender of any Loan or Note to any Federal Reserve Bank in accordance with applicable law.

(g)    Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof. In addition, notwithstanding anything to the contrary in this Section 10.6(g), any SPC may (A) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender, or with the prior written consent of the Borrower and the Administrative Agent (which consent shall not be unreasonably withheld) to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans, and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC; provided that non-public information with respect to the Borrower may be disclosed only with the Borrower's consent which will not be unreasonably withheld. This paragraph (g) may not be amended without the written consent of any SPC with Loans outstanding at the time of such proposed amendment.

10.7    Adjustments; Set-off. (a) Except to the extent that this Agreement provides for payments to be allocated to a particular Lender or to the Lenders under a particular Facility, if any Lender (a "Benefited Lender") shall at any time receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, pursuant to events or proceedings of the nature referred to in Section 8(f), or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of such other Lender's Obligations, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of each such other Lender's Obligations, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered

USActive 8584236.17

from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)    In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to any Parent Guarantor or the Borrower, any such notice being expressly waived by each of the Parent Guarantors and the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by any Parent Guarantor or the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of any Parent Guarantor the Borrower, as the case may be. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.8    Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement or of a Lender Addendum by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

10.9    Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.10    Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Parent Guarantors, the Borrower, the Agents, the Arranger and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Arranger, any Agent or any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

10.11    GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

EXHIBIT A

99

10.12  <u>Submission to Jurisdiction; Waivers</u>.  Each Parent Guarantor and the Borrower hereby irrevocably and unconditionally:

(a)    submits for itself and its Property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the courts of the State of New York, the courts of the United States of America for the Southern District of New York, and appellate courts from any thereof;

(b)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to any Parent Guarantor or the Borrower, as the case may be at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

10.13  <u>Acknowledgments</u>.  Each Parent Guarantor and the Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)    neither the Arranger, any Agent, nor any Lender has any fiduciary relationship with or duty to any Parent Guarantor or the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Arranger, the Agents and the Lenders, on one hand, and the Parent Guarantors and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)    no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Arranger, the Agents and the Lenders or among any Parent Guarantor, the Borrower and the Lenders.

10.14  <u>Confidentiality</u>.  Each of the Agents and the Lenders agrees to keep confidential all non-public information provided to it by any Loan Party pursuant to this

USActive 8584236.17

EXHIBIT A

114

Agreement that is designated by such Loan Party as confidential; provided that nothing herein shall prevent any Agent or any Lender from disclosing any such information (a) to the Arranger, any Agent, any other Lender or any affiliate of any thereof, (b) to any Participant or Assignee (each, a "Transferee") or prospective Transferee that agrees to comply with the provisions of this Section or substantially equivalent provisions, (c) to any of its employees, directors, agents, attorneys, accountants and other professional advisors, (d) to any financial institution that is a direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section), (e) upon the request or demand of any Governmental Authority having jurisdiction over it, (f) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (g) in connection with any litigation or similar proceeding, (h) that has been publicly disclosed other than in breach of this Section, (i) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender or (j) in connection with the exercise of any remedy hereunder or under any other Loan Document.

10.15    Release of Collateral and Guarantee Obligations. (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, upon request of the Borrower in connection with any Disposition of Property or of the Capital Stock of a Parent Guarantor permitted by the Loan Documents or the incurrence of Indebtedness permitted by Section 7.2(i), the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its security interest in any Collateral being Disposed of in such Disposition or to be subject to a Lien permitted by Section 7.3 securing such Indebtedness, and to release any guarantee obligations under any Loan Document of any Person being Disposed of in such Disposition, to the extent necessary to permit consummation of such Disposition in accordance with the Loan Documents or the incurrence of Indebtedness permitted by Section 7.2(i).

(b)    Notwithstanding anything to the contrary contained herein or any other Loan Document, when all Obligations (other than obligations in respect of any Specified Hedge Agreement and any indemnification and other contingent obligations as to which no claim has been asserted) have been paid in full, all Commitments have terminated or expired and no Letter of Credit shall be outstanding, upon request of the Borrower, the Administrative Agent shall (without notice to, or vote or consent of, any Lender, or any affiliate of any Lender that is a party to any Specified Hedge Agreement) take such actions as shall be required to release its security interest in all Collateral, and to release all guarantee obligations under any Loan Document, whether or not on the date of such release there may be outstanding Obligations in respect of Specified Hedge Agreements. Any such release of guarantee obligations shall be deemed subject to the provision that such guarantee obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any

USActive 8584236.17

Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

(c)    If one or more assets pledged or mortgaged as collateral for the CMBS Facilities (each such asset, a "Released Asset") are released from the Lien of the CMBS Documents as part of a release or defeasance permitted under the CMBS Documents in connection with a sale or other Disposition of such Released Assets, the Borrower will be entitled to obtain the release of any of the Collateral consisting of an equity interest in an entity that owns a direct or indirect interest in any such Released Asset, provided the Loan Parties are in compliance with (i) all applicable financial condition covenants contained in Section 7.1 after giving effect to such release and (ii) any applicable provisions of Section 2.12.

10.16    Accounting Changes.  In the event that any "Accounting Change" (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and the Administrative Agent agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Change with the desired result that the criteria for evaluating the Borrower's financial condition shall be the same after such Accounting Change as if such Accounting Change had not been made.  Until such time as such an amendment shall have been executed and delivered by the Borrower, the Administrative Agent and the Required Lenders, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Change had not occurred. "Accounting Change" refers to any change in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the SEC.

10.17    Delivery of Lender Addenda.  Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrower and the Administrative Agent.

10.18    WAIVERS OF JURY TRIAL.  THE PARENT GUARANTORS, THE BORROWER, THE AGENTS AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

USActive 8584238.17

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

TPG-AUSTIN PORTFOLIO SYNDICATION
PARTNERS JV LP

By: TPG-AUSTIN PORTFOLIO PARTNERS GP
LLC, its General Partner

By: _____
Name: Todd L. Merkle
Title:   Vice President


TPG-401 CONGRESS REIT LLC

TPG-300 WEST 6TH STREET REIT LLC

TPG-SAN JACINTO CENTER REIT LLC

TPG-ONE CONGRESS PLAZA REIT LLC

TPG-ONE AMERICAN CENTER REIT LLC

TPG-STONEBRIDGE PLAZA II REIT LLC

TPG-PARK 22 REIT LLC

TPG-RESEARCH PARK PLAZA I & II REIT LLC

TPG-WESTECH 360 REIT LLC

TPG-GREAT HILLS PLAZA REIT LLC

By: _____
Name:  Todd L. Merkle
Title:   Vice President


[Signature Page to Credit Agreement]

EXHIBIT A

117

TPG-AUSTIN PORTFOLIO HOLDINGS LLC,
   as the Borrower

By: _____
   Name:
   Title:

[Signature Page to Credit Agreement]

EXHIBIT A

118

LEHMAN BROTHERS INC.,
  as Arranger

By: _____

Name:
Title:        Francis X. Gilhool
              Authorized Signatory


_____
  as Syndication Agent

By: _____

Name:
Title:        Francis X. Gilhool
              Authorized Signatory

LEHMAN COMMERCIAL PAPER INC.,
  as Administrative Agent

By: _____

Name:
Title:        Francis X. Gilhool
              Authorized Signatory

{Signature Page to Credit Agreement}

**EXHIBIT A**

119

# Exhibit B

NOVEMBER 1, 2008

# THOMAS PROPERTIES GROUP, INC.

## 2009 TPG-AUSTIN PORTFOLIO SYNDICATION PARTNERS JV LP ANNUAL MANAGEMENT PLAN

### CONSOLIDATED BUDGETED INCOME STATEMENT

Thomas Properties Group, Inc.
TPG-Austin Portfolio Syndication Partners JV LP
Consolidated Budgeted Income Statement
Year 2009

| | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Total 2009 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Base Rent | $4,301,679 | $4,217,763 | $4,213,718 | $4,235,500 | $4,293,465 | $4,305,738 | $4,078,327 | $4,047,311 | $4,079,201 | $4,369,901 | $4,226,463 | $4,345,806 | $50,774,854 |
| Escalations | 3,256,307 | 3,318,212 | 3,313,869 | 3,285,033 | 3,317,044 | 3,335,688 | 3,195,909 | 3,193,509 | 3,211,907 | 3,384,632 | 3,389,494 | 3,393,111 | 39,673,225 |
| Parking Income | 676,217 | 678,837 | 679,733 | 677,821 | 688,426 | 682,819 | 692,432 | 692,482 | 693,663 | 692,665 | 692,222 | 692,480 | 8,250,629 |
| Other Income | 42,046 | 39,025 | 38,583 | 38,388 | 39,171 | 39,781 | 40,167 | 39,736 | 39,765 | 41,443 | 41,137 | 41,131 | 480,377 |
| Total Revenue | 8,275,250 | 8,253,837 | 8,245,886 | 8,236,742 | 8,338,069 | 8,374,026 | 8,006,861 | 7,973,448 | 8,024,537 | 8,488,660 | 8,398,306 | 8,472,528 | 99,179,285 |
| Cleaning | (366,167) | (339,329) | (325,583) | (388,047) | (370,477) | (361,493) | (405,677) | (355,175) | (354,128) | (406,743) | (360,928) | (357,879) | (4,353,626) |
| Repairs and Maintenance | (331,745) | (379,238) | (379,543) | (362,968) | (369,802) | (348,879) | (320,154) | (345,746) | (389,021) | (376,524) | (337,150) | (345,781) | (4,268,494) |
| Utilities | (539,260) | (512,673) | (505,471) | (503,242) | (541,873) | (598,760) | (598,914) | (597,398) | (578,885) | (532,604) | (505,422) | (531,514) | (6,494,394) |
| Roads/Grounds | (146,531) | (145,621) | (187,804) | (192,911) | (120,430) | (142,500) | (113,312) | (106,961) | (145,675) | (126,837) | (107,484) | (113,578) | (1,653,332) |
| Security | (167,592) | (204,219) | (242,516) | (203,280) | (189,750) | (183,310) | (187,697) | (183,313) | (242,283) | (242,283) | (186,208) | (225,070) | (2,544,297) |
| Property Management Fees | (282,387) | (277,488) | (277,338) | (277,047) | (280,434) | (280,082) | (280,819) | (282,616) | (282,808) | (288,466) | (288,466) | (289,021) | (3,385,464) |
| Administration | (336,298) | (349,496) | (336,774) | (320,754) | (314,874) | (441,799) | (388,452) | (322,894) | (322,806) | (383,516) | (305,464) | (320,712) | (4,073,630) |
| Real Estate Taxes | (1,828,518) | (1,826,844) | (1,826,521) | (1,826,521) | (1,827,417) | (1,830,681) | (1,848,944) | (1,832,881) | (1,831,032) | (1,829,217) | (1,828,970) | (1,828,970) | (21,974,169) |
| Insurance | (71,637) | (71,637) | (71,637) | (71,637) | (71,637) | (71,637) | (71,637) | (71,637) | (71,637) | (71,639) | (71,839) | (71,839) | (859,168) |
| Total Operating | (4,069,676) | (4,105,516) | (4,165,726) | (4,145,861) | (4,486,679) | (4,303,873) | (4,187,769) | (4,089,202) | (4,165,408) | (4,211,660) | (3,993,418) | (4,084,867) | (49,647,902) |
| Parking | (147,346) | (166,019) | (162,088) | (162,861) | (179,092) | (193,898) | (166,519) | (177,021) | (159,388) | (192,220) | (159,519) | (174,988) | (2,001,032) |
| Other | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (10,570) | (126,845) |
| Total Other | (238,430) | (227,278) | (582,082) | (300,945) | (196,824) | (429,423) | (247,543) | (203,974) | (203,891) | (211,189) | (203,762) | (283,458) | (3,328,800) |
| Total Expenses | (4,496,625) | (4,510,365) | (4,920,489) | (4,630,949) | (4,482,166) | (4,897,765) | (4,612,402) | (4,488,890) | (4,540,258) | (4,626,000) | (4,393,270) | (4,555,393) | (55,104,580) |
| NOI | 3,879,225 | 3,743,452 | 3,325,424 | 3,615,773 | 3,856,933 | 3,476,261 | 3,394,550 | 3,482,560 | 3,484,279 | 3,862,666 | 4,025,036 | 3,918,545 | 44,074,706 |
| Tenant Improvements | (280,852) | (411,943) | (66,869) | (1,006,191) | (286,622) | (1,310,056) | (233,296) | (671,178) | (545,392) | (1,187,845) | (2,472,979) | (651,668) | (9,096,594) |
| Leasing Commissions | (75,390) | (40,682) | (151,656) | (655,183) | (117,486) | (527,688) | (61,836) | (279,813) | (499,672) | (489,672) | (383,474) | (329,199) | (3,269,199) |
| Capital | (615,535) | (1,548,000) | (2,737,451) | (2,183,846) | (1,394,451) | (2,623,705) | (992,143) | (2,978,982) | (1,433,250) | (1,940,120) | (743,398) | (877,500) | (19,972,383) |
| Owner's Expenses | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (34,465) | (413,576) |
| Cash Flow | 2,861,428 | 1,708,362 | 332,384 | (272,844) | 2,043,354 | 2,072,646 | 2,072,646 | 371,878 | 1,247,881 | 210,864 | 390,516 | 2,055,982 | 11,290,953 |
| Debt Service | (5,304,784) | (4,794,031) | (5,302,484) | (5,193,746) | (5,306,218) | (5,151,845) | (5,323,806) | (5,324,888) | (5,174,048) | (5,343,557) | (5,179,830) | (5,366,706) | (62,707,741) |
| Advisor Fees | | | | | | | | | | | | | |
| Net Cash Flows | $(2,413,356) | $(3,085,669) | $(4,969,500) | $(5,466,590) | $(3,262,864) | $(3,168,307) | $(3,251,000) | $(5,696,766) | $(3,926,166) | $(5,132,892) | $(4,789,314) | $(3,312,744) | $(51,416,788) |

EXHIBIT B