WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                        :
In re                                   :      Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :      08-13555 (JMP)
                                        :
                    Debtors.            :      (Jointly Administered)
                                        :
                                        :
-----------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a)**
**AND 363(b) OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO**
**ENTER INTO A TRANSITION SERVICES AGREEMENT WITH LEHMAN EUROPE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Background**

1.       On September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On September 15, 2008, Lehman Brothers Europe Limited (in administration), Lehman Brothers International Europe (in administration), Lehman Brothers Holdings Plc (in administration) and Lehman Brothers Ltd (in administration) companies incorporated in England and Wales (collectively, "Lehman Europe") entered into joint administration pursuant to orders of the United Kingdom's High Court of Justice, Chancery Division, wherein Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann and Michael John Andrew Jervis (the "Administrators") were appointed as joint administrators.

3.    On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.    On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

### Jurisdiction

5.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## **Lehman's Business**

6.        Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.

7.        Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to these chapter 11 filings is contained in the Affidavit

of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District

of New York in Support of First-Day Motions and Applications, filed on September 15, 2008

[Docket No. 2].

## **Preliminary Statement**

8.        Prior to the commencement of these chapter 11 cases, the Lehman

empire—consisting of over 4,000 legal entities in over 28 countries—operated on an integrated

and seamless basis.  As part of the operation of their businesses, Lehman Europe provided the

time and effort of its employees, access to information technology platforms and systems, and

other services to a variety of affiliates, including the Debtors; and reciprocally, the Debtors

provided similar access and cooperation to affiliates, including Lehman Europe.  Both the

Debtors and Lehman Europe (together, the "Parties") derive substantial benefits from the

ongoing provision of employees and services among them, and to insure the continuation of such

cooperation postpetition, the Parties have executed a transition services agreement (the "TSA,"

attached hereto as Exhibit 1), dated as of November 13, 2008 (the "TSA Date").  The Debtors

hereby seek approval of the TSA.

**Prepetition Relationship Between the Debtors and Lehman Europe**

9.      Prior to the Commencement Date, Lehman, including the Debtors and Lehman Europe, functioned as an integrated operation.  Employees, information systems and operations between the different entities were seamless.

10.      Historically, Lehman Europe employed approximately five thousand individuals, of which more than one thousand employees provided services to the Debtors.  Lehman Brothers Ltd, now in administration, employed the majority of Lehman's staff in Europe, and then seconded employees to the different Lehman entities in Europe.  These employees provided services to the Debtors across the full range of Lehman's operations.  Front office staff provided services to the Debtors' trading operations, including executing trades and maintaining accurate market data.  These employees were supported by back office staff who provided risk assessment, accounting, analytical and legal support, among a host of other services.  The information systems based in Europe required a significant support staff of their own, and numerous other employees supported Lehman's corporate functions in Europe, such as the administration of payroll.

11.      All Lehman entities were, and largely continue to be, dependent on elements within a shared information technology platform.  The information systems for all Lehman entities are based in Lehman's New York and London facilities, with approximately 200 of the 900 critical systems based in London.  These systems are not specific to any geography, and the Debtors accessed the datacenters in London seamlessly as part of an integrated global network of applications that supported the Lehman entities worldwide.  This unified information system allowed the Debtors to (i) execute trades with internal and external counterparties, and exchanges, (ii) access pricing and valuation data to execute trades and "mark to market" the

value of the Debtors' assets, (iii) access risk-related information to manage the aggregate risk of the Debtors' trading positions, (iv) access counterparty information to manage the aggregate positions with respect to counterparties, (v) obtain financial information to meet reporting requirements, (vi) maintain records for trades, positions and counterparties, as well as corporate records for the Debtors and Lehman Europe.

## Disruption in the Relationship as a Result of Commencement

12.     The unified integration of the Lehman empire ceased with the filing of these chapter 11 cases and the commencement of Lehman Europe's joint administration.  As a result, the Debtors have been severed from employees, assets and services in Europe that remain critical to the Debtors' operations and efforts to maximize the value of their estates.

13.     Of the more than one thousand Lehman Europe employees who provided services to the Debtors prepetition, fewer than half remain and those remaining employees have largely not been made available to the Debtors on a real-time and uninterrupted basis.  Similarly, the Debtors have not received meaningful access to the information systems controlled by Lehman Europe since the Commencement Date.  As of November 11, 2008, the Debtors have no direct access to the systems, and access through Lehman Europe has been severely curtailed. The Administrators, as a result of liability concerns, have been wary of permitting Lehman Europe's employees to act on behalf of the Debtors without any recompense and indemnity for employees and services.

## Urgent Need for the TSA

14.     The Debtors require the TSA primarily to unwind the Debtors' European assets.  The Debtors hold a large book of business in the United Kingdom, consisting of more than one million trading positions and billions of dollars in receivables to the estates.  The Debtors cannot trade or even evaluate these positions without the assistance of Lehman Europe.

15.    The expertise of Lehman Europe's employees in managing this book of business would be difficult, if not impossible, to replicate.  The Debtors' trading position include numerous exotic financial instruments, including complex derivatives and fixed income instruments.  As such, there is a hefty premium on maintaining Lehman Europe's employees and their familiarity with these assets.  Only those employees fully understand the positions and the counterparties involved, and it would prove extremely costly and unfeasibly slow to unwind these positions through other personnel.  In the absence of the TSA, the Administrators of Lehman Europe have transferred many knowledgeable employees to other companies, including Nomura International plc, as part of the sale of assets.  Other employees have been discharged, and some simply left.  For instance, the Administrators discharged eight employees who operated the Debtors' private equity businesses in London.  The Debtors then engaged in protracted negotiations with the Administrators to secure these employees in order to manage the Debtors' private equity holdings.  Without the TSA, additional critical personnel will likely depart Lehman Europe, and the departing employees will take with them irreplaceable knowledge of the Debtors' operations.

16.    In terms of information systems, Lehman Europe controls critical data and applications related to the Debtors' European book of business.  When the joint administration of Lehman Europe commenced, the Debtors' access to these key systems was terminated.  Without access to these information systems, the Debtors are effectively sealed off from their trading positions and other critical data.  The Debtors cannot execute trades or even obtain information on current positions.  In essence, the Debtors' enormous book of business in Europe, worth billions of dollars, sits unmanaged because the Debtors cannot access the employees and information systems that once controlled it.  The Debtors quickly realized that without a flow of

services between them and Lehman Europe, the value of the Debtors' positions may decrease significantly as a result of market volatility or other market activities, such as unchecked termination notices caused by unpaid obligations. Any continued deterioration in these positions deprives the Debtors' estates of value for all stakeholders.

17.     At the same time, Lehman Europe has reciprocally requested employees and services of the Debtors to conduct their operations. Lehman Europe has been equally severed from parts of the information systems since the commencement of these chapter 11 cases, and likewise seeks to access employees of the Debtors who previously provided services for Lehman Europe.

### Relief Requested

18.     By this motion (the "Motion"), the Debtors request authority to enter into the TSA among Lehman Europe, the Administrators, LBHI and Neuberger Berman Holdings LLC ("Neuberger"), dated as of November 13, 2008, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

### Negotiation of the TSA

19.     The Debtors and Lehman Europe agree that the TSA would provide significant benefits to both Parties. The Parties have discussed the ongoing provision of employees and services between them since the Commencement Date, and began negotiating the terms of the TSA on or about October 14, 2008. After negotiating for more than four weeks, the Debtors and Lehman Europe have arrived at an agreement that encompasses their mutual obligations to provide employees, assets and services among them.

20.     The Parties have negotiated the TSA at arms' length and in good faith. The TSA strikes an even-handed balance among the Parties, and is in the best interests of these estates and their creditors.

## The Transition Services Agreement

21.     The TSA provides a mechanism by which the Debtors maintain access to critical employees, services, facilities and other assistance from Lehman Europe; and the same benefits flow reciprocally from LBHI to Lehman Europe.  Most critically for the Debtors, the TSA permits the Debtors to access the information systems of Lehman Europe and the employees at Lehman Europe who provide services for the benefit of the Debtors.

22.     The following are the most salient terms of the TSA[1]:

| | |
|---|---|
| Services | Lehman Europe and LBHI will continue to provide those services that were being provided between them during the period between September 22, 2007 and September 15, 2008 (the "Benchmark Period"), and any services incidental thereto (the "Services").  Though the Services are not specified in detail in the TSA, the Parties will cooperate in good faith to create schedules to the TSA detailing the Services ("Services Schedules") within 60 days following the TSA Date. |
| Employee Services | Lehman Europe will make available to LBHI the employees at Lehman Europe who provide services for the benefit of LBHI.  Reciprocally, LBHI will make available to Lehman Europe the employees at LBHI who provide services for the benefit of Lehman Europe. |
| | Dedicated Employees.  For employees ("Dedicated Employees") employed by Lehman Europe or LBHI who provide services wholly for the benefit of the other Party (the "Exclusive Beneficiary"), the Excusive Beneficiary will have the ability to manage, supervise and control the functions and activities of the relevant Dedicated Employees. |
| | Shared Employees.  For employees ("Shared Employees") employed by Lehman Europe or |

---

[1] The contents of this summary are qualified entirely by the terms of the TSA.  In case of any conflict between the summary and the TSA, the terms of the TSA govern.

LBHI who provide services partially for the benefit of the other Party (the "Joint Beneficiary"), the Joint Beneficiary will have the ability to manage, supervise and control the functions and activities of the relevant Shared Employees to the extent allocated to the Joint Beneficiary in the Services Schedules.

Retention of Employees.  Each Party may designate thirty Dedicated or Shared Employees as Key Employees.  Each Party will take all reasonable steps to insure that it retains the services of all Dedicated Employees and Key Employees, and may not terminate any Dedicated Employees or Key Employees without the other Party's written consent, absent conduct warranting summary dismissal.

Bonus Requests.  From time to time, Lehman Europe or LBHI may request of the other Party to make a payment to an employee of a bonus, retention payment or any other monetary amount (a "Bonus") provided that the requesting Party pre-funds the Bonus at least seven days prior to payment.

| | |
|---|---|
| Computer-based Resources | For a period of 24 months beginning on the TSA Date, Lehman Europe and LBHI will continue to have access to the information systems owned or controlled by the other Party, to the extent access was available immediately prior to the Commencement Date and such access remains necessary to the accessing Party's operations. |

Intellectual Property Licenses.  Lehman Europe and LBHI will grant to the other Party (the "Licensee") an irrevocable, royalty-free license to the intellectual property in any software or technology used by the Licensee in the operation of the Licensee's business during the Benchmark Period.

| | |
|---|---|
| Access | Lehman Europe and LBHI will allow each other reasonable access to each other's facilities, premises, infrastructure and personnel, and will provide such other reasonable cooperation and assistance necessary for the performance of the |

Services.  For a period of 24 months after the TSA Date, Lehman Europe and LBHI will provide each other with reasonable access to the employees and contractors who have material knowledge of the operations or assets of the other Party.  The Parties will also allow each other reasonable access to the books and records that relate to each other's operations.

Cooperating in Setting Up a NewCo

Lehman Europe recognizes that LBHI may from time to time set up new companies or obtain authorization from a governmental or regulatory authority for an LBHI entity (a "NewCo"), and will cooperate with LBHI in the establishment of any such NewCo.

Costs and Disbursements

Services Charges from September 15, 2008 to the TSA Date.  In respect of the period from September 15, 2008 to the TSA Date, the remuneration costs for any employees of Lehman Europe who work in Lehman's investment management business or private equity business will be charged to LBHI, together with an amount equal to 20% of those remuneration costs as payment for the Services.

Services Charges for the Initial 6 Months.  For a period of 6 months beginning on the TSA Date, each Party will be charged (1) the remuneration costs of all employees employed by such Party, (2) an amount equal to 20% of those remuneration costs as payment for the Services, and (3) reasonable additional costs that are agreed between the Parties.

Services Charges After the Initial Period.  After the initial 6 months following the TSA Date, the Party receiving any Service (the "Recipient") will be charged for such Service at a cost equal to the reasonable fully loaded costs and expenses to the Party providing such Service (the "Provider") incurred as a direct result of the Recipient's requirements, plus 15% of such cost.

Indemnification and Limited Liability of

The Recipient will indemnify and hold harmless the Provider for any loss, liability, claim, damage

| a Provider | or expense to the extent owed to third parties. The Provider will not have any liability to any Recipient in connection with Services rendered pursuant to the TSA, except for loss that results from the Provider's gross negligence or willful misconduct. The aggregate liability and indemnification of each Party may not exceed the aggregate amount of 125% of the Services Charges paid or payable to that Party. |
|---|---|
| General Assistance | Throughout the term of the TSA, (i) each Provider and Recipient of any Service will cooperate with one another and use all reasonable endeavors to provide such Service; (ii) each Recipient will use good faith and reasonable endeavors to transition away from the Service; (iii) each Party will assist the other to maximize value in winding down their respective assets and estates; and (iv) the Parties will use all reasonable endeavors to coordinate cooperate in order to allocate their employees, staff, and resources in a manner that prioritizes tasks faced by both Parties in a reasonable manner. |
| Conduct Prior to Court Approval | Until the Court approves the TSA, Lehman Europe will not be required to fulfill any of its obligations under the TSA, with the exception of disbursing any bonuses and remuneration costs for employees where Neuberger pre-funds those disbursements. |

**The Debtors Entry Into the TSA Should be Approved**

23.     Prior to the Commencement Date, the resources, information, and support covered by the TSA flowed freely between the Debtors and Lehman Europe, as one unified enterprise. The TSA insures that the benefits of this relationship continue postpetition.

24.     The Debtors request authorization to enter into the TSA with Lehman Europe pursuant to sections 105(a) and 363(b) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1). Although section 363 of the Bankruptcy Code does not set forth a standard for

determining when it is appropriate for a court to authorize the sale, use or disposition of a

debtor's assets, courts in Second Circuit and other Circuits have required such use to be based

upon the sound business judgment of the debtor.  *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d

141 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from

the evidence presented before him a good business reason to grant such application); *Comm. of

Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983)

(same); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that

"bankruptcy court can authorize [an action] under section 363(b)(1) when a sound business

purpose dictates such action"); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del.

1991) (noting that section 363 of the Bankruptcy Code requires that the debtor's decision be

supported by a "sound business purpose"); *In re Montgomery Ward Holding Corp.*, 242 B.R.

147, 153 (Bankr. D. Del. 1999); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del.

1987) (stating that judicial approval under section 363 requires a showing that the proposed

action is fair and equitable, in good faith and supported by a good business reason).

    25.    It is generally understood that "[w]hen the debtor articulates a reasonable

basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville

Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is

a strong presumption that "'the directors of a corporation acted on an informed basis, in good

faith and in the honest belief that the action taken was in the best interests of the company.'"  *In

re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488

A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting

this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

26.    The Debtors have entered into the TSA in the exercise of their sound business judgment and with a reasonable basis for their decision.  The TSA provides the Debtors with access to critical employees and services controlled by Lehman Europe.  Without the TSA, the Debtors are sealed off from their substantial assets in Europe, while these assets likely diminish in value.  By allowing the Debtors to regain control of their European operations, the TSA provides significant value to the Debtors's estates, and in turn, to all stakeholders in these chapter 11 cases.

## Waiver of Bankruptcy Rule 6004

27.    The Debtors request a waiver of Bankruptcy Rule 6004(h)[2].  For the reasons set forth in this motion, the Debtors seek relief on an urgent basis, and require any order approving the TSA to be effective immediately.

## Notice

28.    No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the attorneys for Lehman Europe; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern

---

[2] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.

District of New York; and (vii) all parties who have requested notice in these chapter 11 cases.

The Debtors submit that no other or further notice need be provided.

       29.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

       WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as the Court deems just and proper.

Dated: November 13, 2008
      New York, New York

          /s/ Shai Y. Waisman
          Harvey R. Miller
          Shai Y. Waisman

          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          Telephone: (212) 310-8000
          Facsimile: (212) 310-8007

          Attorneys for Debtors
          and Debtors in Possession

## **EXHIBIT 1**

TRANSITION SERVICES AGREEMENT

dated as of 12 November 2008

among

LEHMAN BROTHERS HOLDINGS INC.

NEUBERGER BERMAN HOLDINGS LLC

and

LEHMAN BROTHERS EUROPE LIMITED

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

LEHMAN BROTHERS HOLDINGS PLC.

LEHMAN BROTHERS LTD

ANTHONY VICTOR LOMAS, STEVEN ANTHONY PEARSON, DAN YORAM
SCHWARZMANN and MICHAEL JOHN ANDREW JERVIS

# TABLE OF CONTENTS

TRANSITION SERVICES AGREEMENT ................................................................. 5

RECITALS ........................................................................................................... 5

Article 1 DEFINITIONS.......................................................................................... 6

Section 1.01  Certain Defined Terms. ..................................................................... 6

Article 2 SERVICES AND TERMS......................................................................... 13

Section 2.01  Services; Scope. ............................................................................. 13

Section 2.02  Conversion Services, General Assistance and more detailed service
descriptions. ................................................................................. 16

Section 2.03  Transition Services Managers. ......................................................... 18

Section 2.04  Personnel. ..................................................................................... 19

Section 2.05  Performance and Receipt of Services. ............................................... 19

Section 2.06  Termination Services. ..................................................................... 21

Section 2.07  Superseding Provisions. .................................................................. 21

Section 2.08  Similar or Equivalent Service(s). ..................................................... 22

Article 3 ADDITIONAL AGREEMENTS AND ARRANGEMENTS ....................... 22

Section 3.01  Computer-Based Resources. ............................................................ 22

Section 3.02  Intentionally left blank. ................................................................... 23

Section 3.03  Termination of Support. .................................................................. 23

Section 3.04  Intellectual Property Licences. ......................................................... 23

Section 3.05  Access. ......................................................................................... 25

Section 3.06  Intentionally left blank. ................................................................... 25

Section 3.07  Assignment of Shared Contracts. ..................................................... 25

Section 3.08  Further Access. .............................................................................. 25

Section 3.09  Intentionally left blank. ................................................................... 26

Section 3.10  LBHI Employees and Lehman Europe Employees. ............................. 26

Section 3.11  Notices.......................................................................................... 35

Section 3.12  Intentionally left blank. ................................................................... 35

Section 3.13  Access to Books and Records. .......................................................... 35

Section 3.14  Co-operating in Setting up a NewCo. ................................................ 36

Article 4 COSTS AND DISBURSEMENTS; PAYMENTS....................................... 36

Section 4.01  Services Charges from 15 th September 2008 until the Commencement Date....... 36

Section 4.02  Services for the initial six (6) months. ............................................... 36

Section 4.03  Service Charges after the Initial Period. ............................................................... 37

Section 4.04  Taxes. ...................................................................................................................... 37

Section 4.05  Amounts due prior to the Commencement Date. ..................................................... 38

Section 4.06  Increases; Decreases in Service Charges. ............................................................... 38

Section 4.07  Invoicing. ................................................................................................................ 38

Section 4.08  Reconciliation and allocation of Service Charges................................................... 38

Section 4.09  No Right to Set-Off.................................................................................................. 39

Article 5 STANDARD FOR SERVICE; COMPLIANCE WITH LAWS .................................. 39

Section 5.01  Standard for Service. ............................................................................................... 39

Section 5.02  Disclaimer of Warranties. ....................................................................................... 40

Article 6 INDEMNIFICATION; LIMITATION ON LIABILITY ........................................... 40

Section 6.01  Indemnification of Each Provider by the Relevant Recipient................................. 40

Section 6.02  Limited Liability of a Provider. .............................................................................. 41

Section 6.03  Limited Liability of a Recipient. ............................................................................ 42

Section 6.04  Additional Limitation on Liability. ......................................................................... 43

Section 6.05  Liability for Payment Obligations........................................................................... 43

Section 6.06  Obligations Several and Not Joint........................................................................... 43

Section 6.07  Due Enquiry. ........................................................................................................... 43

Section 6.08  Acknowledgements. ................................................................................................ 44

Section 6.09  Intentionally left blank ........................................................................................... 44

Section 6.10  The Administrators.................................................................................................. 44

Section 6.11  Administrators' Liability.......................................................................................... 44

Section 6.12  THE DISCLAIMER OF WARRANTY .................................................................. 44

Article 7 DISPUTE RESOLUTION ............................................................................................ 45

Section 7.01  Dispute Resolution. ................................................................................................ 45

Article 8 TERMINATION............................................................................................................ 46

Section 8.01  Termination. ............................................................................................................ 46

Section 8.02  Effect of Termination. ............................................................................................. 48

Section 8.03  Survival. .................................................................................................................. 49

Section 8.04  Force Majeure. ........................................................................................................ 49

Article 9 GENERAL PROVISIONS ............................................................................................ 50

Section 9.01  Independent Contractors. ........................................................................................ 50

Section 9.02  Subcontractors......................................................................................................... 50

Section 9.03  Books and Records.................................................................................... 50

Section 9.04  Treatment of Confidential Information. ................................................... 50

Section 9.05  Notices...................................................................................................... 52

Section 9.06  Regulatory and Compliance. ................................................................... 53

Section 9.07  Further Assurances. .................................................................................. 54

Section 9.08  Severability. ............................................................................................. 54

Section 9.09  Entire Agreement. .................................................................................... 54

Section 9.10  Assignment; Third-Party Beneficiaries................................................... 54

Section 9.11  Governing Law; Submission to Jurisdiction. .......................................... 56

Section 9.12  Amendment. ............................................................................................. 56

Section 9.13  Rules of Construction............................................................................... 57

Section 9.14  Counterparts. ............................................................................................ 57

Section 9.15  Intentionally left blank. ........................................................................... 57

Section 9.16  Enforcement. ............................................................................................ 57

Section 9.17  Non-Recourse........................................................................................... 58

**TRANSITION SERVICES AGREEMENT**

This Transition Services Agreement, dated 12 November 2008 (this "<u>Agreement</u>"), is made among Lehman Brothers Holdings Inc., a Delaware corporation ("<u>LBHI</u>"), Neuberger Berman Holdings LLC, a Delaware corporation ("<u>Neuberger</u>")  and Lehman Brothers Europe Limited (in administration), Lehman Brothers International Europe (in administration), Lehman Brothers Holdings Plc (in administration) and Lehman Brothers Ltd (in administration) companies incorporated in England and Wales (together "<u>Lehman Europe</u>") and Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann and Michael John Andrew Jervis (the "<u>Administrators</u>")

**RECITALS**

WHEREAS, LBHI is a debtor-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 *et seq* (the "<u>Bankruptcy Code</u>"), and filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on 15 September 2008 in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>") (Case No. 08-13555) (the "<u>Bankruptcy Case</u>");

WHEREAS, the Administrators have been appointed to act as joint administrators of Lehman Brothers International Europe (in administration), Lehman Brothers Holdings Plc (in administration) and Lehman Brothers Ltd (in administration) on 15 September 2008 pursuant to orders of the High Court of Justice, Chancery Division set out in the Schedule  and as joint administrators of Lehman Brothers Europe Limited (in administration) on 23 September 2008 pursuant to an appointment by the directors set out in the Schedule;

WHEREAS, it is has been agreed that (a) Lehman Europe shall provide, or cause to be provided, to LBHI (and/or its Affiliates existing on the date hereof and NewCo and, with Lehman Europe's agreement (not to be unreasonably withheld or delayed), such other entities which become LBHI's Affiliates after the Commencement Date, (collectively hereinafter referred to as the "<u>LBHI Entities</u>") certain employees, services, use of facilities and other assistance on a transitional basis and in accordance with the terms and subject to the conditions set forth herein and (b) LBHI shall provide, or cause to be provided, to Lehman Europe (and/or its Affiliates existing on the date hereof and, with LBHI's agreement (not to be unreasonably withheld or delayed), such other entities which may come within the control of the Administrators, relating to Lehman Brothers, after the Commencement Date, (collectively hereinafter referred to as the "<u>Lehman Europe Entities</u>") certain employees, services, use of facilities and other assistance on a transitional basis and in accordance with the terms and subject to the conditions set forth herein.

WHEREAS Lehman Europe and LBHI agree that Neuberger is expressly referred to in this Agreement solely for the purpose of making payments to Lehman Europe, in respect of the operation of the LBHI Scheme for IMD Employees pursuant to Section 8.01(h) and obliging Lehman Europe to comply with its obligations in relation thereto as set out Section 8.01(h).

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE 1

## DEFINITIONS

Section 1.01    <u>Certain Defined Terms</u>.

The following capitalised terms used in this Agreement shall have the meanings set forth below:

"<u>Accessing Party</u>" has the meaning given in Section 3.01.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, control by a general partner, by contract or otherwise; whether or not such control arises as a result of the appointment as liquidators, provisional liquidators, administrators, administrative receivers, supervisors, conservators, chapter 11 trustees or equivalent, or similar office holder, provided that such other Person shall  no longer be deemed an Affiliate once such control ceases.

"<u>Agreed Employee List</u>" means the list of LBHI Employees and Lehman Europe Employees initialled at the date hereof as varied subsequently by the parties pursuant to Section 2.02(d) and as varied subsequently by the parties from time to time by agreement in writing.

"<u>Applicable Law</u>" means any applicable federal, state, local or foreign law, statute, ordinance, rule or regulation and all applicable requirements, rules and standards of any Governmental Body, including industry codes of practice, the FSA rules and regulations and any individual guidance, direction or written request of the FSA from time to time.

"<u>Approval</u>" has the meaning given in Section 8.01(h).

"<u>Bankruptcy Case</u>" has the meaning given in the recitals.

"<u>Bankruptcy Code</u>" has the meaning given in the recitals.

"<u>Bankruptcy Court</u>" has the meaning given in the recitals.

"<u>BarCap</u>" means Barclays Capital Inc.

"<u>BarCap TSA</u>" means the transitional services agreement entered into between LBHI and BarCap on 22 September 2008.

"BarCap/Lehman Europe TSA" means the transitional services agreement which may be entered into between BarCap and Lehman Europe.

"Benchmark Period" means the period between 22 September 2007 and 15 September 2008.

"Business Day" means any day of the year on which national banking institutions in London and New York are open to the public for conducting business and are not required or authorised to close.

"Charges Increase Notice" has the meaning given in Section 4.08(b).

"Commencement Date" means the date of this Agreement.

"Confidential Information" has the meaning given in Section 9.04(a).

"Contract Year" has the meaning given in Section 6.04(b).

"Dedicated Employees" means the LBHI Dedicated Employees and the Lehman Europe Dedicated Employees.

"Dispute" has the meaning given in Section 7.01(a).

"Employee Services" has the meaning given in Section 2.01(a).

"Expiry Date" has the meaning given in Section 8.01(a).

"Force Majeure" means, with respect to a Person, an event beyond the control of such Person (or any Person acting on its behalf), including acts of God, storms, floods, riots, fires, sabotage, labour stoppage, civil commotion or civil unrest, interference by civil or military authorities, acts of war (declared or undeclared) or armed hostilities or other national or international calamity or one or more acts of terrorism or failure of energy sources or of Internet or telecommunications services.

"FSA" means the UK Financial Services Authority.

"FSMA" means the Financial Services and Markets Act 2000.

"Governmental Body" means any government or governmental or regulatory, judicial or administrative, body thereof, or political subdivision thereof, whether foreign, federal, state, national, supranational or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private) or any self-regulatory organisation, including, but not limited to, the US Financial Industry Regulatory Authority and the FSA.

"IMD Business" means the investment management business conducted by the IMD Entities.

"IMD Employees" means the LBHI Employees and Lehman Europe Employee carrying out functions for the IMD Business who will be identified in the Agreed Employee List as "IMD".

"IMD Entities" means (i) the LBHI Entities that conducted or conduct the investment management business, (ii) Lehman Europe Entities which conducted or conduct elements of the investment management business; and (iii) in each case solely to the extent permitted under Section 9.10, their successors and assigns with respect to such business.

"Information Services" means computing, telecommunications or other digital operating or processing systems or environments, including computer programs, data, databases, computers, computer libraries, communications equipment, networks, systems, management information systems ("MIS") and MIS reporting services.

"Information Systems" means computing, telecommunications or other digital operating or processing systems or environments, including computer programs, data, databases, computers, computer libraries, communications equipment, networks and systems.  When referenced in connection with the Services, Information Systems shall mean the Information Systems accessed and/or used in connection with the Services.

"Initial Period" has the meaning given in Section 4.02.

"Inside Information" has the meaning given in Section 9.04(d).

"Intellectual Property" means, collectively, all intellectual property and other similar proprietary rights in any jurisdiction, whether registered or unregistered, including without limitation such rights in and to:   (i) patents and applications therefor, including continuations, divisionals, continuations-in-part, reissues, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom and patents issuing thereon and inventions, invention disclosures, discoveries and improvements, whether or not patentable, (ii) all trade marks, service marks, trade names, service names, brand names, all trade dress rights, logos, slogans, Internet domain names and corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, and all applications, registrations and renewals thereof and all common law rights thereto, (iii) copyrights and registrations and applications therefor and renewals and extensions thereof, and works of authorship, databases and mask work rights, and all moral rights, (iv) all trade secrets and market and other data, and rights to limit the use or disclosure of any of the foregoing by any Person, and (v) all claims, causes of action and defenses relating to the enforcement of any of the foregoing.

"Interruption" has the meaning given in Section 2.01(c).

"Key Employees" means the LBHI Key Employees and the Lehman Europe Key Employees.

"LBHI Dedicated Employees" means those named employees, consultants and contractors employed or engaged by a LBHI Entity who provide services wholly for the benefit

of any Lehman Europe Entity (some of which may also be LBHI Key Employees) who will be identified in the Agreed Employee List as "Dedicated".

"LBHI Employees" means the LBHI Dedicated Employees, LBHI Shared Employees and LBHI Service Provider Employees.

"LBHI Employee Services" has the meaning given in Section 2.01(a).

"LBHI Entities" has the meaning given in the recitals.

"LBHI Key Employees" means not more than 30 of those named LBHI Dedicated Employees and/or LBHI Shared Employees identified as in the Agreed Employee List as "Key Employee".

"LBHI Scheme" has the meaning given in Section 3.10(f)(i).

"LBHI Service Provider Employees" means those unnamed employees, consultants and contractors employed or engaged by a LBHI Entity or its chapter 11 trustees or equivalent in relation to such entity in each case who provide services to Lehman Europe as part of the Services.

"LBHI Services" has the meaning given in Section 2.01(b)(ii).

"LBHI Services Manager" has the meaning given in Section 2.03(b).

"LBHI Shared Employees" means those employees, consultants and contractors employed or engaged by a LBHI Entity who provide services for the benefit of both any Lehman Europe Entity and any other entity (some of which may also be LBHI Key Employees) who will be identified in the Agreed Employee List as "Shared".

"LBHI Software and Technology" has the meaning given in Section 3.04(a).

"Lehman Europe Dedicated Employees" means those named employees, consultants and contractors employed or engaged by a Lehman Europe Entity who provide services wholly for the benefit of any LBHI Entity (some of which may also be Lehman Europe Key Employees) who will be identified in the Agreed Employee List as "Dedicated".

"Lehman Europe Employees" means the Lehman Europe Dedicated Employees, Lehman Europe Shared Employees and Lehman Europe Service Provider Employees.

"Lehman Europe Employee Services" has the meaning given in Section 2.01(a).

"Lehman Europe Entities" has the meaning given in the recitals.

"Lehman Europe Key Employees" means (i) the IMD Employees; and (ii) not more than 30 of those named Lehman Europe Dedicated Employees and/or Lehman Europe Shared Employees identified as in the Agreed Employee List as "Key Employee".

"Lehman Europe / Nomura India TSA" means the transitional services agreement which may be entered into between Lehman Europe and Nomura Holdings Inc or any other Affiliate of or Person connected to Nomura Holdings Inc relating to amongst other things the provision of services to Lehman Europe from India.

"Lehman Europe Scheme" has the meaning given in Section 3.10(g)(i)

"Lehman Europe Service Provider Employees" means those unnamed employees, consultants and contractors employed or engaged by a Lehman Europe Entity including its administrators and/or their employees, consultants or contractors in relation to the administration of such entity in each case who provide services to LBHI as part of the Services.

"Lehman Europe Services" has the meaning given in Section 2.01(b)(i).

"Lehman Europe Services Manager" has the meaning given in Section 2.03(a).

"Lehman Europe Shared Employees" means those employees, consultants and contractors employed or engaged by a Lehman Europe Entity who provide services for the benefit of both any LBHI Entity and any other entity (some of which may also be Lehman Europe Key Employees) who will be identified in the Agreed Employee List as "Shared".

"Lehman Europe Software and Technology" has the meaning given in Section 3.04(b).

"Losses" means all loss, liability, claims, damage or expense (including legal fees and expenses).

"Migration Plan" has the meaning given in Section 2.02(c).

"MIS" has the meaning given in the definition of "Information Systems".

"NewCo" has the meaning given in Section 3.14.

"Nomura Asia TSA" means the transitional services agreement entered into between LBHI and Nomura Holdings Inc on 29 September 2008.

"Nomura Europe TSA" means the transitional services agreement entered into between Lehman Europe and Nomura International Plc on 4 October 2008.

"Nomura India TSA" means the transitional services agreement entered into between LBHI and Nomura Holdings Inc on 6 October 2008.

"Nomura/LBHI TSA" means the transitional services agreement which may be entered into between LBHI and Nomura Holdings Inc or any other Affiliate of or Person connected to Nomura Holdings Inc relating to amongst other things the European investment banking and equities businesses previously owned by Lehman Europe.

"party" or "Party" shall mean each of Lehman Europe, LBHI and the Administrators but excluding always Neuberger and "Parties" and "parties" shall mean all of Lehman Europe, LBHI and the Administrators but excluding always Neuberger.

"PE Employees" means those employees carrying out functions for the private equity business of a LBHI Entity or a Lehman Europe Entity who will be identified in the Agreed Employee List as "PE"

"Person" means any individual, corporation, limited liability company, partnership, firm, joint venture, association, joint-stock company, trust, unincorporated organisation, Governmental Body or other entity.

"Prime Rate" means the prime rate published in the Eastern Edition of The Wall Street Journal or a comparable newspaper if The Wall Street Journal shall cease to publish the prime rate.

"Provider" means either (i) Lehman Europe and its Affiliates or (ii) LBHI and its Affiliate providing a Service or fulfilling any other obligation under this Agreement.

"Providing Party" has the meaning given in Section 3.01.

"Recipient" means either (i) Lehman Europe and its Affiliates or (ii) LBHI and its Affiliate to whom a Service is being provided or who receives the benefit of any other obligation under this Agreement.

"Remuneration Costs" means all payments (in each case before any taxes or employee social security, national insurance or analogous contributions are deducted, and including any tax or employer social security, national insurance or analogous contributions which become due) relating to a Lehman Europe Employee (including IMD Employees or PE Employees employed or engaged by a Lehman Europe Entity) or a LBHI Employee (as the case may be) in respect of:

(a)    any wages, salary and bonus or incentive arrangements in accordance with the employee's terms and conditions; and

(b)    the cost of providing any other direct benefits to the employees (including employer pension contributions, travel loans, reimbursement of expenses which expenses are approved by the Recipient or are otherwise reasonable and child care account contributions), including any amounts which may be payable to a third party for the benefit of an employee, in accordance with their terms and conditions (including, for clarity, any housing assistance costs which are paid directly to a lessor for the benefit of the employees).  For the avoidance of doubt the costs in (a) and (b) shall not include any mark-up or profit element for the Provider.

"Representative" of a Person means any director, officer, employee, agent, consultant, accountant, auditor, attorney or other representative of such Person.

"Requesting Party" has the meaning given in Section 3.04(e).

"Responding Party" has the meaning given in Section 3.04(e).

"Service Charges" means those charges payable by the Recipient to the Provider hereunder (whether for a Service or any other obligation set out in this Agreement) as set out in Sections 4.01, 4.02 and 4.03.

"Service Managers" has the meaning given in Section 2.03(b).

"Service Provider Employees" means the LBHI Service Provider Employees and the Lehman Europe Service Provider Employees.

"Services" has the meaning given in Section 2.01(b)(ii).

"Severance Costs" means all or any costs or liabilities including redundancy costs, notice pay and any other payment lawfully due under the relevant contract of employment and/or at Applicable Law and, subject to Section 3.10(a)(iv) and (b)(iv), any other contractual arrangement entered into with the relevant employee.

"Shared Contracts" has the meaning given in Section 3.07.

"Shared Employees" means the LBHI Shared Employees and the Lehman Europe Shared Employees.

"Software" means any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies and application programming interfaces, interactive data language, database schema, in each case whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organise and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (iv) all software-related specifications documentation including user manuals and other training documentation related to any of the foregoing.

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, business and marketing information, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, non-public or Confidential Information, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not specifically listed herein, and all related technology.

"Termination Charges" shall mean any portion of any fees or expenses payable to any unaffiliated, third-party provider as a result of any early termination or reduction of a Service that cannot reasonably be avoided by the Provider excluding for the avoidance of doubt Severance Costs.

"<u>TSA</u>" means the Nomura India TSA, the Nomura Asia TSA, BarCap TSA, Nomura Europe TSA, Lehman Europe/Nomura India TSA, Nomura/LBHI TSA and BarCap/Lehman Europe TSA.

"<u>Uncontrolled Entity</u>" has the meaning given in Section 2.01(i).

"<u>Virus</u>" shall mean any computer instructions (i) that adversely affect the operation, security or integrity of a computing, telecommunications or other digital operating or processing system or environment, including without limitation, other programs, data, databases, computer libraries and computer and communications equipment, by altering, destroying, disrupting or inhibiting such operation, security or integrity; (ii) that without functional purpose, self-replicate without manual intervention; and/or (iii) that purport to perform a useful function but which actually perform either a destructive or harmful function, or perform no useful function and utilise substantial computer, telecommunications or memory resources.

"<u>Wilful Default</u>" means breach or default under or in relation to this Agreement which either: (i) at the time of the breach or default the party committing that breach or default knew it was a breach or default of this Agreement; or (ii) at the time of the breach or default the party committing that breach or default was reckless as to whether it was a breach or default of the Agreement.

# ARTICLE 2

## SERVICES AND TERMS

Section 2.01    <u>Services; Scope</u>.

(a)    <u>Employee Services</u>. Subject to the terms and conditions set forth in this Agreement (i) Lehman Europe shall provide, or cause to be provided, to the LBHI Entities the Lehman Europe Dedicated Employees and Lehman Europe Shared Employees (the "<u>Lehman Europe Employee Services</u>"), and (ii) LBHI shall provide, or cause to be provided, to Lehman Europe the LBHI Dedicated Employees and LBHI Shared Employees (the "<u>LBHI Employee Services</u>" and collectively with Lehman Europe Employee Services the "<u>Employee Services</u>").

(b)    <u>Services</u>. Subject to the terms and conditions set forth in this Agreement:

(i)    Lehman Europe shall provide, or cause to be provided, to the LBHI Entities those services that were being provided during the Benchmark Period by the businesses and operations owned by a Lehman Europe Entity at or after the date hereof (or being provided by a vendor of a Lehman Europe Entity at or after the date hereof) to any businesses of the LBHI Entities, where (subject to Section 2.01(h)) such businesses are owned by an LBHI Entity at or after the date hereof (the "<u>Lehman Europe Services</u>"). Subject to Section 2.01(c) and Section 2.07(e) and in relation to the Lehman Europe Dedicated Employees and Lehman Europe Shared Employees Section 3.10, below, if, for any reason, Lehman Europe is unable to provide any Lehman Europe Service to the LBHI Entities pursuant to the terms of this Agreement, Lehman Europe shall provide to the applicable LBHI Entity a substantially equivalent service in accordance with the terms of this Agreement, which such service shall be considered a Lehman Europe Service for purposes of this Agreement.  The scope of each Lehman Europe Services

shall be substantially the same as the scope of such services provided by the applicable Lehman
Europe Entity to the applicable LBHI Entity in the ordinary course during the Benchmark
Period, and the use of each Lehman Europe Service by an LBHI Entity shall include use by such
LBHI Entity's contractors in substantially the same manner as used by such contractors in the
ordinary course, during the Benchmark Period.

(ii)    LBHI shall provide, or cause to be provided, to Lehman Europe
Entities those services that were being provided during the Benchmark Period by the businesses
and operations owned by an LBHI Entity at or after the date hereof (or being provided by a
vendor of a LBHI Entity at or after the date thereof) to any businesses of the Lehman Europe
Entities, where (subject to Section 2.01(h)) such businesses are owned by an Lehman Europe
Entity at or after the date hereof (the "<u>LBHI Services</u>" and collectively with Lehman Europe
Services and Employee Services, the "<u>Services</u>").  Subject to Section 2.01(c) and Section 2.07(e)
and in relation to the LBHI Dedicated Employees and LBHI Shared Employees Section 3.10,
below if, for any reason, an LBHI Entity is unable to provide any LBHI Service to Lehman
Europe pursuant to the terms of this Agreement, LBHI shall provide to Lehman Europe a
substantially equivalent service in accordance with the terms of this Agreement, which such
service shall be considered a LBHI Service for purposes of this Agreement.  The scope of each
of the LBHI Services shall be substantially the same as the scope of such services provided by
the applicable LBHI Entity in the ordinary course during the Benchmark Period, and the use of
each LBHI Service by a Lehman Europe shall include use by such Lehman Europe's contractors
in substantially the same manner as used by such contractors in the ordinary course, during the
Benchmark Period.

(iii)    All Services shall be for the sole use and benefit of the respective
Recipient, including any of such Recipient's customers or clients of the type who received the
use and benefit of the equivalent services in the ordinary course during the Benchmark Period;
<u>provided</u>, <u>however</u>, that the Recipient agrees that it shall not re-market or act as a service
provider with respect to any of the Services hereunder to a third party (including acting as prime
brokerage), save where such activities took place with that same third party legal entity in the
ordinary course during the Benchmark Period.

(c)    <u>Dependencies on Nomura and BarCap.</u>  Notwithstanding LBHI's
obligations to provide or cause to be provided the LBHI Employee Services and the LBHI
Services pursuant to Sections 2.01(a) and (b) above, neither the LBHI Services nor the LBHI
Employee Services shall include those services provided or may be provided by BarCap to
Lehman Europe under the BarCap/Lehman Europe TSA and those services provided or may be
provided by Nomura International plc under the Nomura Europe TSA. Notwithstanding Lehman
Europe's obligations to provide or cause to be provided the Lehman Europe Employee Services
and Lehman Europe Services pursuant to Sections 2.01(a) and (b) above, neither the Lehman
Europe Services nor the Lehman Europe Employee Services shall include those services
provided or may be provided by Nomura Holdings Inc or any other Affiliate of or Person
connected to Nomura Holdings Inc to LBHI under the Nomura/LBHI TSA and those services
provided or may be provided under the BarCap TSA, Nomura Asia TSA or Nomura India TSA.

No LBHI Entity or Lehman Europe Entity will be liable for any failure or continuing
failure to provide Services to each other (nor shall either party be obliged to provide alternative

services in accordance with Section 2.01(b) above), to the extent that such failure is caused by any third party provider under the TSAs failing to provide, preventing the provision of, or delaying in providing a service (or credibly threatening to terminate or suspend a service; or credibly claiming or threatening to claim (in each case in writing) that the provision of a Service to the Recipient would breach (or give rise to an infringement under) the TSA to which they are a party) (each an "Interruption") which in each case would materially threaten, delay, prevent or cause failure in the provision of the Services to LBHI or Lehman Europe (as applicable).  In such event, LBHI or Lehman Europe (as a Provider) shall promptly notify the other of such Interruption; and LBHI or Lehman Europe shall cooperate and assist the other and if appropriate (in the good faith reasonable opinion of the Provider) the Provider shall enforce its agreement with such third party provider under the TSAs in order to remedy or seek compensation for such Interruption; or the Provider shall use all reasonable endeavours to seek alternative arrangements in order to enable the provision of the Services.

(d)     Assistance in Obtaining a TSA. Without prejudice to Section 9.10(c), LBHI will use all reasonable endeavours to assist Lehman Europe enter into transitional service arrangements with BarCap or any other Affiliate of or Person connected to BarCap and Nomura Holdings Inc including disclosing to Lehman Europe the terms and conditions of the BarCap TSA, Nomura Asia TSA and Nomura India TSA (to the extent permitted under applicable confidentiality and privacy obligations which obligation, where contractual, arose prior to the Commencement Date). Without prejudice to Section 9.10(c) Lehman Europe will use all reasonable endeavours to assist LBHI enter into transitional service arrangements with Nomura International Plc or any other Affiliate of or Person connected to Nomura International Plc including disclosing to LBHI the terms and conditions of the Nomura Europe TSA (to the extent permitted under applicable confidentiality or privacy obligations which obligation where contractual, arose prior to the Commencement Date).  Where a party is prevented from making a disclosure pursuant to this Section 2.01(d) as a result of privacy or confidentiality obligation it shall use all reasonable endeavours to identify and implement a means by which such disclosure can be made in any event.

(e)     Incidental Services. Each Service shall include, and the Service Charges reflect charges for, such maintenance, support, error correction, updates and enhancements normally and customarily provided by the relevant Provider to its Affiliates that receive such Service.  Each Service shall include all functions, responsibilities, activities and tasks, and the materials, documentation, resources, rights and licenses to be used, granted or provided by the relevant Provider that are not specifically described in this Agreement as a part of such Service, but are incidental to, and would normally be considered an inherent part of, or necessary subpart included within, such Service or are otherwise necessary for such Provider to provide, or the Recipient to receive, such Service.

(f)     Intentionally left blank.

(g)     Intentionally left blank.

(h)     Clarity about LBHI Entities. Notwithstanding anything to the contrary herein, for the avoidance of doubt, Lehman Brothers Holdings plc, Lehman Brothers Limited, LB UK RE Holdings Limited, Lehman Brothers International (Europe), Storm Funding Limited,

Mable Commercial Funding Limited, Lehman Brothers UK holdings Limited, Lehman Brothers Europe Limited and Cherry Tree Mortgages shall not be deemed an LBHI Entity under this Agreement.

(i)    Provisions of Services by and to Entities that cease to be controlled by a Party. Subject to Section 9.10(c), notwithstanding anything to the contrary herein where an LBHI Entity ceases to be controlled by an LBHI Entity or a Lehman Europe Entity ceases to be controlled by Lehman Europe (including where such control ceases as a result of the appointment of liquidators, provisional liquidators, administrators, administrative receivers, supervisors, conservators, chapter 11 trustees or equivalent) (the "Uncontrolled Entity") the relevant Provider shall no longer be obliged to provide Services (or any other items, services or access) to the Uncontrolled Entity under this Agreement and that Uncontrolled Entity shall no longer be obliged to provide Services (or any other items, services or access) to the Recipient unless (i) any third party controlling the Uncontrolled Entity consents in writing to be bound by this Agreement and (ii) both LBHI and Lehman Europe each consent in writing to the third party being bound by this Agreement (such consent not to be unreasonably withheld or delayed).

Section 2.02    Conversion Services, General Assistance and more detailed service descriptions.

(a)    Conversion Services. During the term of this Agreement, the parties shall provide, or cause to be provided, the following information and support to the other party, as applicable, which support shall be included within the Services described herein or in the Schedules hereto:

(i)    current and reasonably available historical data or documentation owned by or in the possession or control of the Provider and the Provider has access to and the right to provide or cause to be provided to the Recipient and related to the Services and predecessor services thereto as reasonably required by the relevant Recipient in connection with the conduct of their operations, assets and properties retained at the date hereof or for investigation, litigation or regulatory purposes (whether instigated by a Government Body or otherwise), in a manner and within a time period as mutually agreed by the parties; and

(ii)    the services of the employees and contractors of the relevant Provider whose assistance, expertise or presence is necessary to assist the Recipient's transition team in establishing a target IT environment (it being understood that the services of employees and contractors pursuant to this Section (ii) are not intended to be a substitute for the services of its own employees and third party consultants and advisors to be engaged by the relevant Recipient in connection with such transition or similar services, but instead to facilitate coordination with such individuals).

(b)    General Assistance. Throughout the term of this Agreement, (i) each Provider and each Recipient of any Service shall cooperate with one another and use their good faith and all reasonable endeavours to effect the efficient, timely and seamless provision and receipt of such Service; (ii) save in respect of  Services being provided on a longer term basis as set out in Section 8.01(e) and save as otherwise agreed between the parties, the Recipient shall use its good faith and all reasonable endeavours to transition away and wind down its use of the

Services (subject to the terms of the Migration Plan); (iii) each Party shall use all reasonable endeavours to assist the other to maximise value in winding down their respective estate and assets; and (iv) the parties shall use all reasonable endeavours to cooperate in order to allocate their employees, staff and resources in a manner that prioritises tasks faced by both parties in a rational and reasonable manner (recognising always the respective parties duties owed to the Bankruptcy Court and in their role as administrators or in administration as the case maybe).

        (c)      <u>Migration Plan</u>.  Commencing no later than twenty (20) Business Days after the Commencement Date, representatives of Lehman Europe and LBHI with authority in the area of Information Systems shall meet at such reasonable time, place and manner as they may agree, to develop a plan for migrating from the Information System infrastructure, Software, Technology and employees as deployed as of the Commencement Date, to a final Information Systems infrastructure satisfactory to both Lehman Europe and LBHI and which shall bear in mind and if appropriate, be dependant upon the related requirements of BarCap, Nomura Holdings Inc and Nomura International Plc (the "<u>Migration Plan</u>").  The parties shall use all reasonable endeavours to enter into the Migration Plan no later than ninety (90) days after the Commencement Date and shall include, among other provisions, a time line for completing the migration of Information Services and where appropriate a final migration deadline after which neither Lehman Europe nor any LBHI Entity shall have access to all or any part of the Information Systems of the other party, except to the extent reasonably necessary for the receipt of the Services (subject to the accessing party complying with all reasonable security measures implemented by the providing party as deemed necessary by such providing party to protect its Information Systems), or as otherwise agreed in a separate agreement.  When finalised in writing and executed by the authorised representatives Services Managers of Lehman Europe and the LBHI Entities, the Migration Plan shall be deemed to be incorporated into this Agreement as an amendment and addition hereto.  The parties acknowledge that the Migration Plan may provide for Services being provided on a long term basis pursuant to Section 8.01(e).

        (d)      <u>Detailed Services Schedules</u>.  The parties acknowledge and agree that the Services contemplated to be provided hereunder are not enumerated, defined or described in detail.  In addition to the Employee Services the Services shall include (or include aspects of), but are not limited to operational, financial, corporate, human resources, information technology, front office (trading), back office (technology, systems, record keeping, accounting, finance, legal, treasury), payroll, disaster recovery, MIS, provision of office space, equipment, access to systems and other services.  The parties shall cooperate in good faith to create Schedules to this Agreement, within sixty (60) days following the Commencement Date, that will contain a specific list of the Services to be provided pursuant hereto, services descriptions, required service standards and the anticipated Service Charges in respect of such Services. For the avoidance of doubt, but subject to Section 3.08, none of the Services shall require the relevant Provider to provide the legal services of any attorney to the Recipient in connection with any such Service (unless otherwise agreed in writing by the parties hereto).  The Agreed Employee List attached to this Agreement sets out a list of the Dedicated Employees and Shared Employees, highlighting which of these employees are designated as Key Employees and which business area such employees' service.  The Agreed Employee List will be developed further in the ten (10) Business Days following the Commencement Date otherwise in accordance with the provisions of this Section 2.02(d). The Agreed Employee List maybe updated from time to time by agreement between the parties in writing.

Section 2.03    <u>Transition Services Managers</u>.

(a)    Lehman Europe shall appoint an individual, by giving written notice thereof to LBHI within three (3) Business Days following the Commencement Date, to act as its initial services manager (the "<u>Lehman Europe Services Manager</u>"), who will be directly responsible for coordinating and managing the delivery of the Lehman Europe Employee Services and the Lehman Europe Services and have authority to act on Lehman Europe's behalf with respect to matters relating to this Agreement.  The Lehman Europe Services Manager will work with the personnel of Lehman Europe to periodically address issues and matters raised by LBHI relating to this Agreement.  Notwithstanding the requirements of Section 9.05, all communications from LBHI to Lehman Europe pursuant to this Agreement regarding routine matters involving the Lehman Europe Services shall be made through the Lehman Europe Services Manager, or such other individual as specified by the Lehman Europe Services Manager in writing and delivered to LBHI by email or facsimile transmission with receipt confirmed.  Lehman Europe shall promptly notify LBHI of the appointment of a different Lehman Europe Services Manager, if necessary, in accordance with Section 9.05.

(b)    LBHI shall appoint an individual, by giving written notice thereof to Lehman Europe within three (3) Business Days following the Commencement Date, to act as its initial services manager (the "<u>LBHI Services Manager</u>" together with the Lehman Europe Services Manager the "<u>Services Managers</u>"), who will be directly responsible for coordinating and managing the delivery of the LBHI Employee Services and the LBHI Services and have authority to act on LBHI's behalf with respect to matters relating to this Agreement.  The LBHI Services Manager will work with the personnel of LBHI to periodically address issues and matters raised by Lehman Europe relating to this Agreement.  Notwithstanding the requirements of Section 9.05, all communications from Lehman Europe to LBHI pursuant to this Agreement regarding routine matters involving the LBHI Services shall be made through the LBHI Services Manager, or such other individual as specified by the LBHI Services Manager in writing and delivered to Lehman Europe by email or facsimile transmission with receipt confirmed.  LBHI shall promptly notify Lehman Europe of the appointment of a different LBHI Services Manager, if necessary, in accordance with Section 9.05.

(c)    The Services Managers will hold weekly meetings during the first nine (9) months from the Commencement Date and monthly meetings thereafter (each a "<u>Review Meeting</u>") to discuss the provision of the Services under this Agreement as well as the process for managing the transition away from, and wind down of, the use of the Services and quarterly projections of likely reasonable Service Charges to be levied by both parties to the other.  The Review Meetings will take place at times and places agreed by the Services Managers and may take place by way of telephone or video conferencing (or similar means) as mutually agreed by the Services Managers.

(d)    If either party wishes to change the level, standard, quality, volume or range of the Services provided under this Agreement in a material way, it will promptly notify the other party and make a request to the other party in writing at least five (5) Business Days prior to the next Review Meeting setting out in as much detail as reasonably possible the change required and the reason for requesting the change.  That request will be considered in good faith at the next Review Meeting.

Section 2.04    Personnel.

Save as set out in Section 3.10, the Provider will have the right, in its sole discretion, to (i) designate which personnel or third party service providers it will assign to perform Services, and (ii) remove and replace such personnel or third party service providers at any time.

Section 2.05    Performance and Receipt of Services.

The following provisions shall apply to the Services:

(a)     Security and Privacy.  Each Provider and Recipient shall at all times comply with its own then in-force security guidelines and policies (including policies on information flows) applicable to the performance, access and/or use of the Services and Information Systems.  Where a Provider or Recipient receives access to the other party's Information Systems, then it shall also comply with such other party's security guidelines and policies.  The parties acknowledge that historically the Services governed by this Agreement have been rendered within a single group of related entities and a shared security environment, and that in order for Services to be rendered among and between Lehman Europe and the LBHI Entities as unrelated entities additional systems, procedures, guidelines and policies may need to be established to render the Services in compliance with Applicable Law, regulation, and applicable privacy and security policies.  Each of the LBHI Entities and Lehman Europe shall use its reasonable endeavours to establish such additional systems, procedures, guidelines and policies in a manner that will not disrupt the rendering of Services or the Provider's operations respectively.  Until such additional systems, procedures, guidelines and policies have been established, each of the LBHI Entities receiving the Lehman Europe Employee Services or Lehman Europe Services and Lehman Europe shall provide training to relevant staff to remind them of the then in-force security guidelines and policies and of their obligations regarding confidentiality and information flows.  Recipient shall bear all of its own costs and expenses in connection with such an endeavour; Provider's costs and expenses in connection with such an endeavour will be included in the Service Charges to the extent directly related to providing the Services.

(b)     No Viruses.  Each of LBHI and Lehman Europe shall take commercially reasonable measures to ensure that no Viruses or similar items are coded or introduced into the Services or Information Systems.  If a Virus is found to have been introduced into the Services or Information Systems, the parties hereto shall use all reasonable endeavours to cooperate and to diligently work together to eliminate the effects of such Virus.

(c)     Reasonable Care.  Each Provider and Recipient shall exercise reasonable care in providing and receiving the Services to (i) prevent access to the Services or Information Systems by unauthorised Persons and (ii) not damage, disrupt or interrupt the Services or Information Systems.  Where LBHI Employees are on Lehman Europe premises they shall comply with Lehman Europe's site rules, health and safety requirements and reasonable standards of decorum and decency.  Where Lehman Europe Employees are on LBHI premises, they shall comply with LBHI's site rules, health and safety requirements and reasonable standards of decorum and decency.

(d)    Regulatory and Compliance.  Each Provider and each Representative of such Provider, shall at all times, in connection with the provision of the Services, comply with any relevant regulatory and compliance policies and procedures of the Recipient that were in effect for the Recipient immediately prior to 15 September 2008 and that were applicable to and complied with by the Provider prior to 15 September 2008 in connection with the provision of the Services (and as such policies are subsequently amended by the Recipient  from time to time acting reasonably and in good faith). For the avoidance of doubt and without limitation, this will include such regulatory and compliance policies and procedures which govern:

(i)    personal account dealing;

(ii)    conflicts of interest; and

(iii)    record keeping;

The Recipient shall provide reasonable notice to the Provider of amendments to its relevant regulatory and compliance policies and procedures and the Provider may charge Service Charges in respect of achieving compliance with such amended compliance policies and procedures pursuant to Article 4.

If Newco becomes a Recipient, the Provider of Services to Newco shall at all times, in connection with the provision of the Services, comply with any relevant regulatory and compliance policies and procedures of Newco that are applicable to the Provider (and as such policies are subsequently amended by Newco from time to time acting reasonably and in good faith). To the extent that Newco becomes a Provider, it shall be subject to the obligations set out in this section 2.05(d).

(e)    Regulatory Information Provision. Each Provider shall provide such other services, documentation or information as are reasonably required by any Recipient in order to assist such Recipient to comply with any regulatory reporting and other regulatory requirements. Each Provider shall co-operate with the FSA and any other competent authority in connection with the discharge of its duties and responsibilities under the Agreement.  Each Provider shall provide the Recipient with any information that the Recipient may request in order to assist the Recipient in complying with its regulatory obligations to the FSA or any other relevant competent authority.

(f)    Data Protection. Each Party confirms that, when acting as data processor on behalf of another Party pursuant to the terms of this Agreement, it shall: (a) only process personal data in accordance with the relevant data controller party instructions; (b) take appropriate technical and organisational measures to protect personal data against accidental or unlawful destruction or accidental loss, alteration, unauthorised disclosure or access and against all other unlawful forms of processing; and (c) not transfer personal data outside of the European Economic Area except if and to the extent that (i) such personal data was transferred outside of the European Economic Area prior to the Commencement Date, (ii) it is lawful for the data controller to transfer such personal data outside of the European Economic Area, or (iii) the transfer is necessary for the performance or receipt of the Services.  In this Section 2.05(f), the

terms "data processor", "data controller" and "personal data" shall have the meaning set out in the Data Protection Act 1998.

Section 2.06    Termination Services.

Each Provider shall reasonably cooperate with the Recipient of each Service to facilitate such Recipient's transition to provision of such services by a replacement provider or by its own employees, consultants or contractors.

Section 2.07    Superseding Provisions.

Notwithstanding anything to the contrary contained in this Agreement:

(a)    no Provider shall be required hereunder to take any action (including by providing any Services) that would constitute, or that the Provider reasonably believes would constitute, (i) a violation of Applicable Law, including any requirement of any Governmental Body, (ii) without prejudice to Section 2.01(c), a breach of such Provider's contractual obligations, where such contract was entered into prior to the Commencement Date or (iii) any other violation of a third party's rights; provided that in each of the foregoing circumstances the Provider shall promptly notify the Recipient and shall use reasonable endeavours to work around the impediment and use all reasonable endeavours to provide Services in a manner that does not violate Applicable Law, contractual obligations or third party rights including (but not limited to) using all reasonable endeavours to contact and co-operate with the FSA or any other relevant competent authority and jointly discuss with the FSA or relevant competent authority in order to explore in good faith a commercially reasonable work around the impediment;

(b)    no Provider shall be required hereunder to fund the Services or otherwise provide financial support, benefits or other consideration on the Recipient's behalf to third parties, and the obligation to perform any Service involving funds shall be subject to the Recipient having previously made such funds available to the Provider specifically for such purpose;

(c)    any obligation to provide Services or otherwise undertake activities hereunder shall be limited to the Provider's use of good faith and all reasonable endeavours (other than the obligations set out in Section 2.05(d)); and

(d)    the Provider shall not be responsible for any failure to provide Services hereunder to the extent arising from (i) the Recipient's operations or systems or otherwise by the acts or omissions of the Recipient or individuals acting on its behalf or (ii) subject to the other party's obligation to assist the other party in relation to  any third party provider under the TSAs as set out in Section 2.01(c), a third party's failure to provide such Services or (iii) the failure of Recipient or its Affiliates to provide Services to Provider.

(e)    Decreased Use of the Services. The Provider shall be relieved from its obligations to provide a Service where (i) to provide such Service would cause the Provider to incur unavoidable and additional material costs solely on account of the Recipient's requirements; and (ii) the Recipient's requirements are materially greater in scale and complexity than those required by Provider; and (iii) such costs would not be incurred in the absence of an

obligation under this Agreement. Where the Provider claims such relief, the Provider shall provide the Recipient with ninety (90) days (in the case of continuing the Services in their current form) or reasonable (where a Service has been discontinued prior to, or not recommenced as at the Commencement Date) prior written notice (and such notice shall contain (to the extent known to the Provider after making reasonable enquiries at the Recipient's reasonable costs) details of any proposed alternative service of materially similar functionality, quality and scope and an estimate of the likely costs to be incurred in providing or recommencing the Service (or a service of materially similar functionality, quality and scope)) and the Recipient shall respond to such notice as soon as reasonably practicable and in any event within thirty (30) days (in the case of continuing the Services in their current form) or sixty (60) days (where a Service has been discontinued or not recommenced) indicating whether the Recipient requires the Service(s) (or, at the Provider's option a service of materially similar functionality, quality and scope)  to be continued or recommenced (notwithstanding the Provider's claim for relief). Where the Recipient gives such a notice it shall be responsible for all of the reasonable additional costs incurred by Provider (which the Provider has notified to the Recipient in advance in reasonable detail) in providing the relevant Service (or a service of materially similar functionality, quality and scope) from the date of the Recipient's notice and the Provider shall be obliged to continue to provide the Service(s) either immediately (in the case of continuing the Services in their current form) or as soon as reasonably practicable (where a Service has been discontinued or not recommenced). Where a Service has been discontinued or not recommenced in each case prior to 4 November 2008, for the avoidance of doubt the Provider shall have no obligation to provide the Service(s) until the Service(s) recommences.

Where the Provider claims such relief, at the Recipient's request, the parties shall enter into good faith discussions in relation to whether, to what extent and on what terms the Provider will transfer or license to the Recipient assets (including Intellectual Property), licences and employees which are owned or primarily used by the Provider to provide the Services in respect of which relief has been requested.

Section 2.08    Similar or Equivalent Service(s).

Where the Provider intends to provide for its own use a substantially similar or equivalent service(s) as replacement for the Service(s), the Provider shall provide the Recipient with prior written notice of such intent (including indicative costs) and the parties shall enter into good faith discussions with respect to the Recipient receiving such similar or equivalent service.

## ARTICLE 3

## ADDITIONAL AGREEMENTS AND ARRANGEMENTS

Section 3.01    Computer-Based Resources.

Commencing on the Commencement Date, and for twenty four (24) months thereafter, each party (the "Accessing Party") shall continue to have access to the Information Systems owned or controlled by the other party (the "Providing Party"), to the extent such access to such Information Systems was available to the Accessing Party immediately prior to the 15 September 2008 and remains necessary for the Accessing Party to operate its operations, assets

or properties; provided, that (a) Lehman Europe may take reasonable measures to restrict access by the LBHI Entities to any systems or data unrelated to the needs of LBHI Entities (b) the LBHI Entities may take reasonable measures to restrict access by Lehman Europe, to any systems or data unrelated to the needs of Lehman Europe, (c) such continued access shall be subject to the Accessing Party complying with all reasonable security measures implemented by the Providing Party as deemed necessary by such Providing Party to protect its Information Systems and (d) the Providing Party shall not be obliged to continue access if the Providing Party is unable to do so due to regulatory or legal restrictions or it is no longer technically possible to do so in which event the Providing Party shall notify the Accessing Party and the parties shall enter into good faith discussions in order to determine whether suitable alternative arrangements can be put in place and if so, the nature of such arrangements (the costs of which shall be included within the Services Charges).

Section 3.02    Intentionally left blank.

Section 3.03    <u>Termination of Support</u>.

Each Provider shall promptly notify the Recipient if the Provider's supplier under any of the TSAs notifies the Provider of its intent to cease to support any material software used to provide any of the Services provided by that Provider. Upon written request by the Recipient, the Provider shall exercise such rights as it has under the relevant TSA, and otherwise use reasonable endeavours, to obtain the source code of the software in respect of which the relevant supplier proposes to cease to offer support.

Section 3.04    <u>Intellectual Property Licences.</u>

(a)    LBHI hereby grants (or shall procure the grant from the relevant LBHI Entity of) a non-exclusive, perpetual, irrevocable, worldwide, royalty-free licence to the Intellectual Property in any Software and Technology used by any Lehman Europe Entity in the Benchmark Period which is (i) owned solely by any LBHI Entity or jointly owned with a Lehman Europe Entity at the date hereof or any date hereafter or (ii) licensed to any LBHI Entity at the date hereof with the ability for LBHI to sub-license to a third party for the purpose set out in this Section (the "<u>LBHI Software and Technology</u>").  Such licence shall (save as set out below) be for the benefit of the Lehman Europe Entities, successors and assigns to use, update, modify, enhance and adapt the Software and Technology in order to run down any books of business retained by any Lehman Europe Entity and operate the business of any Lehman Europe Entity retained by a Lehman Europe Entity at the date hereof in each case in such territories as the LBHI Software and Technology was used by the Lehman Europe Entities during the Benchmark Period.  All such updates, modifications, enhancements and adaptations shall be owned by Lehman Europe and automatically licensed to LBHI on the same terms as set out above.  To the extent permissible under any relevant head licence to which any LBHI Entity is a party, the licences granted hereunder shall be fully and freely sublicensable and assignable, save that notwithstanding anything to the contrary in this Agreement, no licence, sub-licence, forbearance to sue or similar, right or interest may be granted over such Intellectual Property, and no licence or sub-licence of such intellectual Property assigned, transferred or novated and no Software and Technology in which such Intellectual property subsists shall be made available, to Nomura International Plc or to any of its Affiliates, suppliers (other than Lehman Europe and

its Affiliates), employees or agents from time to time by any Lehman Europe Entity.  Until the
Expiry Date, LBHI shall provide Lehman Europe with the source code and object code for the
LBHI Software and Technology (as applicable) to the extent that such object and/or source code
is in the possession of an LBHI Entity and where the LBHI Software and Technology is licensed
to LBHI, to the extent permissible, on compact disc (or via online source code repositories from
which such code maybe copied) and shall promptly provide further copies of the source code and
object code following each and every material update, modification, enhancement or adaptation.
Lehman Europe shall provide LBHI with the source code and object code for the material
updates, modifications, enhancements and adaptations made by them to the LBHI Software and
Technology (as applicable) on compact disc (or via online source code repositories from which
such code maybe copied).

(b)    Lehman Europe hereby grants (or shall procure the grant from the relevant
Lehman Europe Entity of) a non-exclusive, perpetual, irrevocable, worldwide, royalty-free
licence to the Intellectual Property in any Software and Technology used by any LBHI Entity in
the Benchmark Period which is: (i) owned solely by any Lehman Europe Entity or jointly owned
with a LBHI Entity at the date hereof or any date hereafter or (ii) licensed to any Lehman Europe
Entity at the date hereof with the ability for Lehman Europe to sub-license to a third party for the
purpose set out in this Section (the "Lehman Europe Software and Technology").  Such licence
shall (save as set out below) be for the benefit of the LBHI Entities, successors and assigns to
use, modify, enhance and adapt the Software and Technology in order to run down any books of
business retained by any LBHI Entity and operate the business of any LBHI Entity retained by a
LBHI Entity at the date hereof in each case in such territories as the Lehman Europe Software
and Technology was used by the LBHI Entities during the Benchmark Period. All such
modifications, enhancements and adaptations shall be owned by LBHI and automatically
licensed to Lehman Europe on the same terms as set out above. To the extent permissible, under
any relevant head licence to which Lehman Europe is a party, the licences granted hereunder
shall be fully and freely sublicensable and assignable, save that notwithstanding anything to the
contrary in this Agreement, no licence, sub-licence, forbearance to sue or similar, right or interest
may be granted over such Intellectual Property, and no licence or sub-licence of such Intellectual
Property assigned, transferred or novated and no Software and Technology in which such
Intellectual Property subsists shall be made available, to BarCap or to any of BarCap's Affiliates,
suppliers (other than LBHI or its Affiliates), employees or agents from time to time by any LBHI
Entity.  Until the Expiry Date Lehman Europe shall provide LBHI with the source code and
object code for the Lehman Europe Software and Technology (as applicable) to the extent that
such object and/or source code is in the possession of a Lehman Europe Entity and where the
Lehman Europe Software and Technology is licensed to Lehman Europe, to the extent
permissible, on compact disc (or via online source code repositories from which such code
maybe copied) and shall promptly provide further copies of the source code and object code
following each and every material update, modification, enhancement or adaptation. LBHI shall
provide Lehman Europe with the source code and object code for the material updates,
modifications, enhancements and adaptations made by them to the Lehman Europe Software and
Technology (as applicable) on compact disc (or via online source code repositories from which
such code maybe copied).

(c)    This Agreement shall not assign any ownership rights to Software,
Technology or Intellectual Property between the parties hereto.

(d)      If either party is in discussions with a third party in relation to such third party acquiring the Software or Technology owned by that party, on written request, the parties shall use all reasonable endeavours, for a reasonable period, to seek to obtain increased value for both parties from the coordinated sale or offer for sale of each party's Software and Technology to the same third party.

(e)      If either party (being the licensee party under the terms of Section 3.04, the "Requesting Party") requests, the other party (the "Responding Party") shall (after making reasonable enquiries) within fourteen (14) days inform the Requesting Party whether, in the Responding Party's reasonable opinion, the relevant head licences referred to in Section 3.04 allows the Responding Party to sub-license or assign the relevant Intellectual Property pursuant to the terms of Section 3.04.  The Requesting Party acknowledges and agrees that the Responding Party (acting in good faith) may not be able to provide any substantive response.

Section 3.05      Access.

Lehman Europe or LBHI, as the case may be, will allow the relevant Provider and its Representatives reasonable access to the facilities premises, infrastructure and personnel of the relevant Recipient, and shall provide such other reasonable cooperation and assistance necessary for the performance of the Services for the Provider to fulfil its obligations under this Agreement.

Section 3.06      Intentionally left blank.

Section 3.07      Assignment of Shared Contracts.

With respect to contracts to which an LBHI Entity or a Lehman Europe Entity is a party that relate both to (i) the assets and operations of Lehman Europe Entities; and (ii) the assets and operations of LBHI Entity (save to the extent such assets and operations were acquired by or assigned or novated to any third party (or agreed to be assigned or novated) after 15 September 2008, such as BarCap, Nomura Holdings Inc or Nomura International Plc or one or more purchaser of the IMD Business) ("Shared Contracts"), the parties shall cooperate in good faith to novate, assign or enter into replacement agreements on comparable terms in order that the LBHI Entities and the Lehman Europe Entities may each enjoy the benefit of the terms provided under the Shared Contracts without having to rely on contracts to which neither they (nor an Affiliate) is a party.

Section 3.08      Further Access.

(a)      For a period of twenty four (24) months after the Commencement Date, Lehman Europe shall provide, or use all reasonable endeavours to cause to be provided to, the LBHI Entities with reasonable access to all individuals who were employees, consultants or contractors of the Lehman Europe Entities prior to the Commencement Date (and are employees or contractors of any Lehman Europe Entity at the time of requested access), and who have material knowledge about the operations or assets of LBHI Entities, and Lehman Europe shall use all reasonable endeavours to provide such individuals' cooperation therewith. For the avoidance of doubt, Lehman Europe shall not be obliged to continue access to such individuals if it is unable to do so due to contractual or legal restrictions in which event Lehman Europe shall

notify LBHI and the parties shall enter into good faith discussions in order to determine whether suitable alternative arrangements can be put in place (and if so, the costs of which shall be included within the Services Charges). As part of the foregoing, such employees, consultants or contractors shall provide reasonably necessary assistance to the LBHI Entities in the operations and/or unwinding of the operations and/or assets of the LBHI Entities provided that such assistance shall be deemed Services as to which the Service Charges apply and in all instances shall be subject to any confidentiality, professional or ethical obligations or restrictions (including without limitation any potential conflicts).

(b)     For a period of twenty four (24) months after the Commencement Date, the LBHI Entities shall provide, or use all reasonable endeavours to cause to be provided to, Lehman Europe Entities with reasonable access to all individuals who were employees or contractors of the LBHI Entities prior to the Commencement Date (and are employees or contractors of the LBHI Entities at the time of requested access), and who have material knowledge about the operations or assets of Lehman Europe or the Services to be provided by Lehman Europe, and the LBHI Entities shall use all reasonable endeavours to provide such individuals' cooperation therewith.  For the avoidance of doubt, LBHI shall not be obliged to continue access to such individuals if it is unable to do so due to contractual or legal restrictions in which event LBHI shall notify Lehman Europe and the parties shall enter into good faith discussions in order to determine whether suitable alternative arrangements can be put in place (and if so, the costs of which shall be included within the Services Charges). As part of the foregoing, (i) such employees or contractors shall provide reasonably necessary assistance to Lehman Europe Entities in the operations and/or unwinding of the operations and/or assets of Lehman Europe Entities and (ii) such employees that are attorneys shall provide reasonably necessary legal services in the unwinding of the operations and/or assets of Lehman Europe, provided that such assistance in (i) and (ii) shall be deemed Services as to which the Service Charges apply and in all instances shall be subject to any confidentiality, professional or ethical obligations or restrictions (including without limitation any potential conflicts).

(c)     The parties recognise and understand that there will be substantial endeavours following the Commencement Date in the continuing efforts of LBHI and Lehman Europe to divest the remaining assets and wind down the operations and/or assets while maintaining the continuity thereof.  As such, the parties will work together to reasonably accommodate each other in such endeavours while balancing each other's needs for information and support.

Section 3.09    Intentionally left blank.

Section 3.10    <u>LBHI Employees and Lehman Europe Employees</u>.

(a)     Dedicated Employees

(i)     To the extent permitted by Applicable Law, LBHI, in the case of Lehman Europe Dedicated Employees and Lehman Europe, in the case LBHI Dedicated Employees shall have the ability to solely manage, supervise, instruct and control the function and activities of the relevant Dedicated Employees in relation to provision of the Services (whether or not such activities were similar to the activities which took place during the

Benchmark Period) whether remotely at the other party's premises or otherwise (in which event the other party shall provide all access to and use of all Dedicated Employees (as applicable), premises, infrastructure and facilities as is reasonably required to so manage, supervise, instruct and control such employees).

            (ii)    Lehman Europe will provide written notice to LBHI if any Lehman Europe Dedicated Employee hands in their resignation (save where such an Employee is threatened with summary dismissal).  LBHI will provide written notice to Lehman Europe if any LBHI Dedicated Employee hands in their resignation (save where such employee is threatened with summary dismissal).  Each employing party, whether LBHI or Lehman Europe (as applicable) will, where requested by the other party, co-operate with the other party following notice of the resignation at the other party's cost undertake any reasonably commercial measures which are consistent with the employing party's employment practice to retain such resigning employee.  From the date that any Dedicated Employee ceases to be employed by the employing party (for whatever reason), the employing party shall be released from its obligation to make available such Dedicated Employee to the other party and, subject to sub-section (iii) below, the other party shall be released from liability to pay the Service Charges in relation to such Dedicated Employee.

            (iii)    LBHI shall be liable for all and any Severance Costs payable by Lehman Europe as a result of any Lehman Europe Entity terminating the employment of any Lehman Europe Dedicated Employee provided, however, that the relevant Lehman Europe Entity has provided reasonable prior written notice to LBHI and LBHI has approved both the termination (save that LBHI shall have no such right to approve (or not approve) the terminations where it has given notice to terminate the relevant Employee Service pursuant to Section 8.01(b)) and the level of any such Severance Costs (such approval not to be unreasonably withheld or delayed).  Lehman Europe shall be liable for all and any Severance Costs payable by LBHI as a result of any LBHI Entity terminating the employment of any LBHI Dedicated Employee provided, however, that the relevant LBHI Entity has provided reasonable prior written notice to Lehman Europe and Lehman Europe has approved both the termination (save that Lehman Europe  shall have no such right to approve (or not approve) the terminations where it has given notice to terminate the relevant Employee Service pursuant to Section 8.01(b)) and the level of any such Severance Costs (such approval not to be unreasonably withheld or delayed).

            (iv)    LBHI shall not, in the case of LBHI Dedicated Employees and Lehman Europe, in the case of Lehman Europe Dedicated Employees shall not change any material terms or conditions of their employment without obtaining the other party's prior written consent (such consent not to be unreasonably withheld or delayed) including but not limited to terms and conditions relating to notice periods, wages, salary and bonus or incentive arrangements unless and to the extent that LBHI or Lehman Europe (as applicable) as employer, is required to change such terms and conditions pursuant to Applicable Law.  Where changes are required pursuant to Applicable Law, the employing entity shall provide the other party with timely notice of such change.

            (v)    LBHI shall, in the case of LBHI Dedicated Employees and Lehman Europe shall in the case of Lehman Europe Dedicated Employees, provide the other

party with a copy of all formal communications and notices that it has sent to a LBHI Dedicated Employee in the case of LBHI and Lehman Europe Dedicated Employee in the case of Lehman Europe, in each case which relate to such employees employment.

(vi)     LBHI shall, in the case of LBHI Dedicated Employees and Lehman Europe shall in the case of Lehman Europe Dedicated Employees, provide the other party with a copy of each Dedicated Employees terms and conditions of employment within thirty (30) days of the Commencement Date.

(vii)     LBHI, in the case of LBHI Dedicated Employees and Lehman Europe in the case of Lehman Europe Dedicated Employees, shall use all reasonable endeavours to recover their share of any payments (net of reasonable expenses) made to their employees which are subsequently returnable pursuant to the terms of the employee's employment contract and/or terms of a bonus scheme as a result of the employee resigning. All monies recovered shall be promptly returned to the other party net of reasonable expenses.

(viii)     With effect from the end of the Initial Period (or earlier where agreed between the parties in writing, such agreement not to be unreasonably withheld or delayed), LBHI, in the case of LBHI Dedicated Employees and Lehman Europe in the case of Lehman Europe Dedicated Employees shall not restrict, prevent or interfere (or seek to restrict, prevent or interfere) the other such party from employing or engaging any Dedicated Employee or seek to enforce any restrictive covenant or similar right against the Dedicated Employee.

(1)     During the Initial Period, Lehman Europe shall not (and shall procure that the Lehman Europe Entities shall not), in respect of the LBHI Dedicated Employees, whether on its own behalf or for or with any other person, and whether directly or indirectly, solicit or entice away from any LBHI Entity (or attempt to do so), any such LBHI Dedicated Employee (save with the express prior permission of LBHI, not to be unreasonably withheld or delayed).

(2)     During the Initial Period, LBHI shall not (and shall procure that the LBHI Entities shall not), in respect of the Lehman Europe Dedicated Employees, whether on its own behalf or for or with any other person, and whether directly or indirectly, solicit or entice away from any Lehman Europe Entity (or attempt to do so), any such Lehman Europe Dedicated Employee (save with the express prior permission of Lehman Europe, not to be unreasonably withheld or delayed).

(3)     During the Initial Period, LBHI or Lehman Europe (as applicable) shall give the other party seven (7) days prior written notice of any offer of employment it makes to such Dedicated Employee.

(4)     For the avoidance of doubt, this Section 3.10(a) (viii) shall not prohibit any advertisement or general solicitation (or hiring as a result thereof) which is not specifically targeted at a Dedicated Employee nor shall it prohibit the solicitation or hiring of such person who initiates employment discussions with LBHI or Lehman Europe (as applicable).

(5)     After the Initial Period the parties will co-operate with each other in good faith, in relation to either party employing or engaging any Dedicated Employee employed or engaged by

the other party, except that this obligation shall not apply to those IMD Employees who wholly or mainly manage or control investment management division funds in Europe which are controlled by a Lehman Europe Entity.

      (b)      Shared Employees

      (i)      To the extent permitted by Applicable Law, LBHI, in the case of Lehman Europe Shared Employees and Lehman Europe, in the case LBHI Shared Employees shall have the ability to solely manage, supervise, instruct and control the function and activities of the relevant Shared Employees in relation to provision of the Services (whether or not such activities were similar to the activities which took place during the Benchmark Period) to the extent that such Shared Employees are allocated to the non-employing party as described in the Service Schedules whether remotely at the other party's premises or otherwise (in which event the other party shall provide all access to and use of all Shared Employees (as applicable), premises, infrastructure and facilities as is reasonably required to so manage, supervise, instruct and control such employees).

      (ii)      Lehman Europe will provide written notice to LBHI if any Lehman Europe Shared Employee hands in their resignation (save where such an employee is threatened with summary dismissal).  LBHI will provide written notice to Lehman Europe if any LBHI Shared Employee hands in their resignation (save where such employee is threatened with summary dismissal).  Each employing party, whether LBHI or Lehman Europe (as applicable) will, where requested by the other party, co-operate with the other party following notice of the resignation at the other party's cost undertake any reasonably commercial measures which are consistent with the employing party's employment practice to retain such resigning employee.  The parties shall discuss in good faith the re-allocation of the remaining Shared Employees between the parties to mitigate where reasonably possible the impact of the resigning employee ceasing to be a Shared Employee**.**

      (iii)      LBHI shall be liable for a percentage of the total Severance Costs payable by Lehman Europe as a result of any Lehman Europe Entity terminating the employment of any Lehman Europe Shared Employee to reflect the percentage of the work load and average employment time of such employee as set out in the Agreed Employee List provided, however, that the relevant Lehman Europe Entity has provided reasonable prior written notice to LBHI and LBHI has approved both the termination (provided that the relevant employee provides not less than 40% of their time to LBHI as set out in the Agreed Employee List) (save that LBHI will have no such right to approve or not approve the termination where it has given notice to terminate the relevant Employee Service pursuant to Section 8.01(b)) and the level of any such Severance Costs (such approval not to be unreasonably withheld or delayed).  Lehman Europe shall be liable for a percentage of the total Severance Costs payable by LBHI as a result of a LBHI Entity terminating the employment of any LBHI Shared Employee to reflect the percentage of the work load and average employment time of such employee as set out in the Agreed Employee List provided, however, that the relevant LBHI Entity has provided reasonable prior written notice to Lehman Europe and Lehman Europe has approved both the termination (provided that the relevant employee provides not less than 40% of their time to Lehman Europe as set out in the Agreed Employee List) (save that Lehman Europe will have no such right to approve or not approve the termination where it has given notice to terminate the relevant

Employee Service pursuant to Section 8.01(b)) and the level of any such Severance Costs (such approval not to be unreasonably withheld or delayed).

(iv)    LBHI shall not, in the case of LBHI Shared Employees and Lehman Europe, in the case of Lehman Europe Shared Employees shall not change any material terms or conditions of their employment without obtaining the other party's prior written consent (such consent not to be unreasonably withheld or delayed) including but not limited to terms and conditions relating to notice periods, wages, salary and bonus or incentive arrangements unless and to the extent that LBHI or Lehman Europe (as applicable) as employer, is required to change such terms and conditions pursuant to Applicable Law.  Where changes are required pursuant to Applicable Law, the employing entity shall provide the other party with timely notice of such change.

(v)    Lehman Europe shall provide timely and reasonable notice to LBHI prior to it or any Lehman Europe Entity terminating the employment of any Lehman Europe Shared Employees. LBHI shall provide timely and reasonable notice to Lehman Europe prior to it or any LBHI Entity terminating the employment of any LBHI Shared Employee. On receipt of such notification, the receiving party shall be given the option of requiring the other party to keep such employee in employment in which event such employee shall become a Dedicated Employee for the purposes of this Agreement.  The employing party shall pay to the other party their pro rata share based on the percentage allocation of employee time as set out in the Agreed Employee List of the Severance Costs for such employee (whether or not a liability to pay Severance Costs arises) on the date such employee becomes a Dedicated Employee.

(vi)    From the date that any Shared Employee ceases to be employed by the employing party (for whatever reason), the employing party shall be released from its obligation to make available such Shared Employee to the other party and the other party shall be released from liability to pay the Service Charges in relation to such Shared Employee.

(vii)    LBHI shall, in the case of LBHI Shared Employees and Lehman Europe shall in the case of Lehman Europe Shared Employees, provide the other party with a copy of each Shared Employees terms and conditions of employment within thirty (30) days of the Commencement Date.

(viii)    LBHI, in the case of LBHI Shared Employees and Lehman Europe in the case of Lehman Europe Shared Employees, shall use all reasonable endeavours to recover their share of any payments (net of reasonable expenses) made to their employees which are subsequently returnable pursuant to the terms of the employee's employment contract and/or terms of a bonus scheme as a result of the employee resigning.  All monies recovered shall be promptly returned to the other party.

(ix)    For the period of twenty four (24) months from the Commencement Date, Lehman Europe shall not (and shall procure that the Lehman Europe Entities shall not):

(1)    In respect of the LBHI Shared Employees (other than those to whom (2) below applies), whether on its own behalf or for or with any other person, and whether directly or

indirectly, solicit or entice away from any LBHI Entity (or attempt to do so), any such LBHI Shared Employee (save with the express prior permission of LBHI, not to be unreasonably withheld or delayed);

(2)      In respect of the LBHI Shared Employees who are wholly or mainly assigned to provide services to LBHI, whether on its own behalf or for or with any other person, and whether directly or indirectly, solicit or entice away from any LBHI Entity or employ or engage (or attempt to do so), any such LBHI Shared Employee (save with the express prior permission of LBHI, not to be unreasonably withheld or delayed).

(3)      For the avoidance of doubt, Section 3.10(b)(ix)(1) shall not prohibit any advertisement or general solicitation (or hiring as a result thereof) which is not specifically targeted at a LBHI Shared Employee nor shall it prohibit the solicitation or hiring of such person who initiates employment discussions with LBHI or Lehman Europe (as applicable).

(x)      For the period of twenty four (24) months from the Commencement Date, LBHI shall not (and shall procure that the LBHI Entities shall not):

(1)      In respect of the Lehman Europe Shared Employees (other than those to whom (2) below applies), whether on its own behalf or for or with any other person, and whether directly or indirectly, solicit or entice away from any Lehman Europe Entity (or attempt to do so), any such Lehman Europe Shared Employee (save with the express prior permission of LBHI not to be unreasonably withheld or delayed);

(2)      In respect of the Lehman Europe Shared Employees who are wholly or mainly assigned to provide services to Lehman Europe, whether on its own behalf or for or with any other person, and whether directly or indirectly, solicit or entice away from any Lehman Europe Entity or employ or engage (or attempt to do so), any such Lehman Europe Shared Employee (save with the express prior permission of Lehman Europe, not to be unreasonably withheld or denied).

(3)      For the avoidance of doubt, Section 3.10(b)(x)(1) shall not prohibit any advertisement or general solicitation (or hiring as a result thereof) which is not specifically targeted at a Lehman Europe Shared Employee nor shall it prohibit the solicitation or hiring of such person who initiates employment discussions with LBHI or Lehman Europe (as applicable).

(c)      Retention of Employees

For those employees who are Key Employees or Dedicated Employees the following requirements (which shall be in addition to those set out in 3.10 (a) and (b)) shall apply:

(i)      The Provider shall take all reasonable steps to ensure it retains the services of Key Employees or Dedicated Employees and shall not without the Recipient's prior written consent (such consent not to be unreasonably withheld or delayed) terminate the employment of any Key Employee or a Dedicated Employee unless such Key Employee or Dedicated Employee is reasonably considered to be guilty of conduct warranting summary dismissal. If a Key Employee or Dedicated Employee resigns, the Provider shall not be obliged

to replace the Key Employee or Dedicated Employee and the Recipient may itself make arrangements to employ or engage replacement staff at any time thereafter. The Provider shall co-operate with the Recipient and provide the Recipient with all reasonable assistance in recruiting, hiring and training such replacement.

(d)    Service Provider Employees

(i)    Where the provision of the Lehman Europe Services or the LBHI Services is or is likely to be adversely affected by the resignation or potential resignation of any Lehman Europe Service Provider Employees or LBHI Service Provider Employees (as the case may be), the relevant Provider shall: (a) promptly notify the Recipient of the potential or actual adverse impact and (b) shall use all reasonable endeavours to avoid or mitigate the adverse impact.  To the extent that a Provider, having used all reasonable endeavours to avoid or mitigate the impact, is unable to provide a Service to the required level or at all, the Provider shall be released from its obligation to provide the Service and the Recipient shall be released from its obligations to pay the Service Charges in respect of the affected Service, for the period during which the Service is affected.

(e)    IMD Employees

For those employees who are IMD Employees the following requirements (which shall be in addition to those set out in Section 3.10 (a) and (b) where the IMD Employee is a Dedicated Employee or Shared Employee respectively) shall apply:

(i)    LBHI shall not (and shall procure that the LBHI Entities shall not) for a period of twenty four (24) months from the Commencement Date, in respect of the IMD Employees who are wholly or mainly engaged in the management or control of the investment management funds in Europe which are controlled by a Lehman Europe Entity, whether directly or indirectly, solicit or entice away from any Lehman Europe Entity or employ or engage (or attempt to do so), any such IMD Employee (save with the express prior permission of Lehman Europe, not to be unreasonably withheld or delayed, which for the avoidance of doubt includes where there is a sale (or agreement to sell) the IMD Entities (or part thereof) or IMD Business (or part thereof) in either case where a Lehman Europe Entity gives permission in writing for the sale of the relevant part the IMD Business or relevant IMD Entity in each case controlled by a Lehman Europe Entity, and such sale includes assets, entities and/or funds controlled by Lehman Europe in each case as approved by the Bankruptcy Court and having regard to the parties' obligations under Section 2.02(b)(iii)).

(ii)    Lehman Europe shall not (and shall procure that the Lehman Europe Entities shall not) for a period of twenty four (24) months from the Commencement Date, in respect of the IMD Employees who are wholly or mainly engaged in the management or control of the investment management funds not controlled by a Lehman Europe Entity but which are controlled by a LBHI Entity, whether directly or indirectly, solicit or entice away from any LBHI Entity (or attempt to do so) or employ or engage any such IMD Employee (save with the express prior permission of LBHI, not to be unreasonably withheld or delayed).

(f)    LBHI request to Lehman Europe to pay a bonus

(i)    From time to time, LBHI may request Lehman Europe to arrange for the relevant employing entity of any Lehman Europe Employee(s) to make a payment or payments to that employee of a bonus, retention payment, or any other monetary amount, on such terms as LBHI may direct (a "LBHI Scheme"). Such request shall be made in writing. Upon receipt of the request, Lehman Europe shall, as soon as is practicable, implement the LBHI Scheme provided that it is legally possible, and not commercially unreasonable, to do so. Implementation of any LBHI Scheme is subject to the following further provisions:

(ii)    Any payment or payments under any such LBHI Scheme shall be borne entirely by LBHI and LBHI shall put Lehman Europe in funds at least 7 days prior to the date on which any payment is due to be paid (including an amount in respect of any tax or employer national insurance contributions that Lehman Europe may be required at any time to account for).

(iii)    Lehman Europe and LBHI shall agree the content (such agreement not to be unreasonably withheld or delayed) of all communications sent or intended to be sent in relation to the LBHI Scheme. In any such communication, Lehman Europe may state that the LBHI Scheme is being implemented at the request of LBHI, and Lehman Europe shall further be entitled to make it a condition precedent of any payment being made to any employee under any such LBHI Scheme that LBHI puts Lehman Europe in funds prior to payment in accordance with this Section 3.10(f).

(iv)    LBHI shall be liable for, and shall indemnify, defend and hold harmless, Lehman Europe and any other relevant Lehman Europe Entities (including, for the avoidance of doubt, each relevant employing entity of any relevant Lehman Europe Employee and any entity to which that employee may be seconded from time to time) in respect of any Losses (including but not limited to any action or claim in respect of any failure to put Lehman Europe in funds as set out herein, any action or claim that any amount is payable under the terms of any such LBHI Scheme, any action or claim as to quantum of any such payment and any action or claim for constructive dismissal (including unfair dismissal) arising out of or related to the said LBHI Scheme) arising as a result of any action or claim relating to any LBHI Scheme except to the extent that any Losses result from Lehman Europe's or any other relevant Lehman Europe Entities' gross negligence, fraud, Wilful Default or failure to comply with the provisions of this Section 3.10 and save to the extent that Lehman Europe has failed to do any of the following:

(1)    Lehman Europe promptly notifies LBHI in writing of the claim and provides all details in relation thereto;

(2)    Lehman Europe makes no admissions or settlements without obtaining LBHI's prior written consent (such consent not to be unreasonably withheld or delayed);

(3)    Lehman Europe gives LBHI all information and assistance that LBHI may reasonably require;

(4)    Lehman Europe acts reasonably to mitigate any Losses; and

(5)    Lehman Europe gives LBHI complete control over the investigation or litigation and settlement of any action or claim provided however that LBHI consults Lehman Europe in relation to all material developments in relation thereto.

As a separate and freestanding obligation, Lehman Europe shall use reasonable endeavours to carry out the actions listed in (1) to (5) above.

(v)    LBHI shall not, and shall procure that no LBHI Entity shall, offer any Lehman Europe Employee participation in any scheme providing for any bonus, retention payment, or any other monetary amount, other than a LBHI Scheme on the terms set out herein, without the prior written consent of Lehman Europe (not to be unreasonably withheld or delayed).

(g)    Lehman Europe request to LBHI to pay a bonus

(i)    From time to time, Lehman Europe may request LBHI to arrange for the relevant employing entity of any LBHI Employee(s) to make a payment or payments to that employee of a bonus, retention payment, or any other monetary amount, on such terms as Lehman Europe may direct (a "Lehman Europe Scheme"). Such request shall be made in writing. Upon receipt of the request, LBHI shall, as soon as is practicable, implement the Lehman Europe Scheme provided that it is legally possible, and not commercially unreasonable, to do so. Implementation of any Lehman Europe Scheme is subject to the following further provisions:

(ii)    Any payment or payments under any such Lehman Europe Scheme shall be borne entirely by Lehman Europe and Lehman Europe shall put LBHI in funds at least 7 days prior to the date on which any payment is due to be paid (including an amount in respect of any tax or employer national insurance contributions that LBHI may be required at any time to account for).

(iii)    LBHI and Lehman Europe shall agree the content (such agreement not to be unreasonably withheld or delayed) of all communications sent or intended to be sent  in relation to the Lehman Europe Scheme. In any such communication, LBHI may state that the Lehman Europe Scheme is being implemented at the request of Lehman Europe, and LBHI shall further be entitled to make it a condition precedent of any payment being made to any employee under any such Lehman Europe Scheme that Lehman Europe puts LBHI in funds prior to payment in accordance with this section 3.10(g).

(iv)    Lehman Europe shall be liable for, and shall indemnify, defend and hold harmless, LBHI and any other relevant LBHI Entities (including, for the avoidance of doubt, each relevant employing entity of any relevant Lehman Europe Employee and any entity to which that employee may be seconded from time to time) in respect of any Losses (including but not limited to any action or claim in respect of any failure to put LBHI in funds as set out herein, any action or claim that any amount is payable under the terms of any such Lehman Europe Scheme, any action or claim as to quantum of any such payment and any action or claim for constructive dismissal (including unfair dismissal) arising out of or related to the  said Lehman Europe Scheme) arising as a result of any action or claim   relating to any Lehman

Europe Scheme except to the extent that any Losses result from LBHI's or any other relevant LBHI Entities' gross negligence, fraud, Wilful Default or failure to comply with the provisions of this Section 3.10, and save to the extent that LBHI has failed to do any of the following:

(1)    LBHI promptly notifies Lehman Europe in writing of the claim and providing all details in relation thereto;

(2)    LBHI makes no admissions or settlements without obtaining Lehman Europe's prior written consent (such consent not to be unreasonably withheld or delayed);

(3)    LBHI gives Lehman Europe all information and assistance that LBHI may reasonably require;

(4)    LBHI acts reasonably to mitigate any Losses; and

(5)    LBHI gives Lehman Europe complete control over the investigation or litigation and settlement of any action or claim provided however that Lehman Europe consults LBHI in relation to all material developments in relation thereto.

As a separate and freestanding obligation, LBHI shall use reasonable endeavours to carry out the actions listed in (1) to (5) above

(v)    Lehman Europe shall not, and shall procure that no Lehman Europe Entity shall, offer any LBHI Employee participation in any scheme providing for any bonus, retention payment, or any other monetary amount, other than a Lehman Europe Scheme on the terms set out herein, without the prior written consent of LBHI (not to be unreasonably withheld or delayed).

Section 3.11    Notices.

If any of the LBHI Entities receive any notices related to the operations and/or assets of Lehman Europe Entities it shall (in a timely fashion) forward them to Lehman Europe and if Lehman Europe receive any notices related to the operations and/or assets of LBHI Entities it shall (in a timely fashion) forward them to LBHI.

Section 3.12    Intentionally left blank.

Section 3.13    Access to Books and Records.

(a) the Lehman Europe Entities shall provide the LBHI Entities and their Representatives reasonable access to its business premises and to books and records that are related and material to the assets or operations of  the LBHI Entities (to the extent such books and records are in a Lehman Europe Entities' possession at the time of requested access); and (b) the LBHI Entities shall provide Lehman Europe Entities and their Representatives reasonable access to its business premises and to books and records that are related and material to the assets or operations of Lehman Europe Entities (to the extent such books and records are in LBHI Entity's possession at the time of requested access).  The Lehman Europe Entities and the LBHI Entities shall also provide the FSA (or any other Governmental Body pursuant to a mandatory

requirement of Applicable Law) with access to their business premises and to books and records related to this Agreement on request by the FSA.

Section 3.14    Co-operating in Setting up a NewCo.

Lehman Europe recognises and understands that LBHI may, from time to time, need to set up one or more new companies or obtain authorisation(s) from a Governmental Body for an existing LBHI Entity (such new or existing company (for so long as an authorisation is being applied for or maintained in respect of that existing entity) is defined in this Agreement as "NewCo") in order to employ certain employees or wind down the operations and/or assets of any LBHI Entity.  As such, Lehman Europe will work together and co-operate with LBHI, and provide LBHI with all reasonable assistance and information, so that NewCo may be set up and authorised by any Governmental Authority.

## ARTICLE 4

## COSTS AND DISBURSEMENTS; PAYMENTS

Section 4.01    Services Charges from 15th September 2008 until the Commencement Date.

In respect of the period from 15th September 2008 until the Commencement Date, the Remuneration Costs solely for the IMD Employees and PE Employees employed by Lehman Europe together with an amount equal to 20% of those Remuneration Costs as payment for the Services (for the avoidance of doubt covering Lehman Europe Employee Services and the Lehman Europe Services) shall be charged to LBHI by Lehman Europe.  In respect of the period from 15th September 2008 until the Commencement Date, the Remuneration Costs solely for the LBHI Employees identified in the Agreed Employee List together with an amount equal to 20% of those Remuneration Costs as payment for the Services (for the avoidance of doubt covering LBHI Employee Services and LBHI Services) shall be charged to Lehman Europe by LBHI.

Section 4.02    Services for the initial six (6) months.

From the Commencement Date until the date that is six (6) months after the Commencement Date (the "Initial Period"), Services Charges shall be charged to the Recipient at a cost equal to:

(a)    in the case of LBHI as Provider:

(i)    the Remuneration Costs accruing after the Commencement Date of the LBHI Dedicated Employees and LBHI Shared Employees (notwithstanding the definition of Remuneration Costs) who are still employed by an LBHI Entity;

(ii)    an amount equal to 20% of those Remuneration Costs as payment for the Services (for the avoidance of doubt covering both the LBHI Employee Services and the LBHI Services); and

(iii)    any costs properly levied pursuant to Section 2.07(e) where LBHI is the Provider.

(b)    in the case of Lehman Europe as Provider:

(i)    the Remuneration Costs accruing after the Commencement Date of the Lehman Europe Dedicated Employees and Lehman Europe Shared Employees (notwithstanding the definition of Remuneration Costs) who are still employed by a Lehman Europe Entity;

(ii)    an amount equal to 20% of those Remuneration Costs as payment for the Services (for the avoidance of doubt covering both the Lehman Europe Employee Services and Lehman Europe Services); and

(iii)    any costs properly levied pursuant to Section 2.07(e) where Lehman Europe is the Provider.

The parties acknowledge that the actual cost to the Provider of providing the Services during the Initial Period may materially vary from or exceed the aforementioned percentage amounts and it is to the benefit of both parties to agree to this fee structure in light of the fundamental need to enter into this Agreement as soon as possible and the delay and cost which would be incurred by both parties in calculating the actual level of costs.

Section 4.03    Service Charges after the Initial Period.

The Service Charges for any Service or any other obligation to be provided by any Provider hereunder shall be charged to the Recipient on and after the Initial Period (including and limited to during any extension of the term of this Agreement), at a cost equal to the Provider's reasonable fully loaded costs and expenses for providing such Service or fulfilling such obligation as a direct result of the Recipients' requirements under this Agreement (including in such reasonable fully-loaded costs and expenses (x) an allocation for overhead costs to the extent directly related to providing the Services, (y) the amount of actual payments made by the Provider to third-party providers for providing the Services and (z) associated overhead costs relating to the Services provided by such third-party providers) plus 15% of such cost.

Section 4.04    Taxes.

Service Charges shall be exclusive of value-added taxes and all other taxes payable in respect of the provision of the Services which, if required by Applicable Law, will be added to the Services Charges. No taxes imposed on the net income of the Provider will be payable by the Recipient. If LBHI or Lehman Europe (as applicable) is required, by Applicable Law or to otherwise avoid legal penalties under Applicable Law, to pay, directly or indirectly, to an Affiliate any transfer pricing markup or equivalent cost in order to deliver a Service and such transfer pricing mark up or equivalent cost is reasonably appropriate in structure and quantum, then such transfer pricing markup or cost shall be included in the relevant Service Charges, unless such mark-up or cost is subsequently recoverable by LBHI or Lehman Europe (as applicable)

Section 4.05    Amounts due prior to the Commencement Date.

Save as set out in Section 4.01 above, Service Charges shall not include any amounts owed by a party (whether to third parties or Affiliates) prior to the Commencement Date.

Section 4.06    Increases; Decreases in Service Charges.

After the Initial Period  (save in respect of Remuneration Costs) the Service Charges may increase or decrease, including, as a result of (i) an increase or decrease in the amount of such Services being provided to the Recipient (ii) an increase or decrease in the rates or charges imposed by any third-party provider that is providing goods or services used by the Provider in providing the Services (as compared to the rates or charges underlying a Service Charge), (iii) subject to Section 3.10 an increase or decrease in the payroll or benefits for any employees used by the Provider in providing the Services, or (iv) any increase or decrease in costs relating to any changes requested by the Recipient in the nature or volume of the Services provided (including relating to newly installed products or equipment or any upgrades to existing products or equipment).

Section 4.07    Invoicing.

The Provider shall deliver an invoice to the Recipient on a monthly basis (or, if the Provider has, with the Recipient's prior agreement, entered into a legally binding commitment with LBHI Employees or Lehman Europe Employees (as applicable) to provide Remuneration Costs for a period longer than one (1) month at such other frequency as is consistent with this commitment) in advance for the Service Charges due to the Provider under this Agreement.  This amount shall be based on an estimated usage of Services by the Recipient. The Recipient shall pay the amount of such invoice by wire transfer to the Provider within five (5) days of the date of such invoice as instructed by the Provider; provided that to the extent consistent with past practice with respect to Services rendered outside the United States, payments may be made in local currency.  If the Recipient fails to pay such amount by such date, the Recipient shall be obligated to pay to the Provider, in addition to the amount due, interest at an interest rate of the higher of 1.5% per month over the Prime Rate or 1.5% per month over the Bank of England Base Rate, compounded monthly, accruing from the date the payment was due through the date of actual payment.  As soon as practicable after receipt of any reasonable written request by the Recipient, the Provider shall provide the Recipient with data and documentation reasonably satisfactory to the Recipient supporting the calculation of a particular Service Charge for the purpose of verifying the accuracy of such calculation.  If, after reviewing such data and documentation, the Recipient disputes the Provider's calculation of any amount due to the Provider, then the Dispute shall be resolved pursuant to Section 7.01.

Section 4.08    Reconciliation and allocation of Service Charges.

Without prejudice to the Recipient's other rights and remedies:

(a)    in the event that the Service Charges paid by the Recipient in advance are agreed by the parties (each acting in good faith and on reasonable grounds) to be materially greater or lesser than the Service Charges properly due for Services (and for the Initial Period the

costs for the Employee Services and any additional expenses properly levied pursuant to Section 2.07(e) only) actually used by or provided to the Recipient, then the Provider shall immediately reimburse or invoice the Recipient accordingly. Section 4.07 shall apply to the payment of such invoice.  The Provider shall conduct reconciliations on a monthly basis and when appropriate shall update the allocation of employee time as set out in the Agreed Employee List.  The parties may meet on a quarterly basis (or more frequently if either party requests) to discuss such reconciliations;

(b)       notwithstanding any term in this Agreement, the Service Charges shall reflect the cost incurred by the Provider in providing the Service to the Recipient based on the Recipients' actual use of the Service (to the extent that such usage is measurable), such that if the cost to the Provider of providing the Service to the Recipient reduces as a result of there being additional third party users of such Service, then the Service Charge thereof shall be reduced accordingly. If the cost to the Provider for providing the Service to the Recipient increases as a result of fewer third party users of such Service and/or the Provider (and/or any of its Affiliates) ceasing to need the Service (or part thereof) itself, then, to the extent that Provider proposes to increase the Service Charges to the Recipient in respect of such Service, the Provider shall give ninety (90) days' prior written notice of such proposed increase ("Charges Increase Notice"). Following receipt of a Charges Increase Notice, the Recipient may (i) elect to continue receiving the Service in which case the increase in Service Charges shall take effect at the end of the 90 day notice period or (ii) elect to terminate receipt of the Service in which case (A) notwithstanding Section 8.01(b) below, the Recipient shall serve notice in writing to terminate the Service as soon as reasonably practicable following receipt of the Charges Increase Notice and, in any event, within thirty (30) days of receipt of the Charges Increase Notice and (B) notwithstanding Section 8.02 below, the Recipient shall not be obliged to pay the Termination Charges in respect of the terminated Service.

Section 4.09    No Right to Set-Off.

The Recipient shall pay the full amount of costs and disbursements incurred under this Agreement, and shall not set-off, counterclaim or otherwise withhold any other amount owed to the Provider on account of any obligation owed by the Provider to the Recipient.

## ARTICLE 5

## STANDARD FOR SERVICE; COMPLIANCE WITH LAWS

Section 5.01    Standard for Service.

Subject to the terms and conditions of this Agreement, the Provider agrees to perform the Services such that the nature, quality, standard of care and the service levels at which such Services are performed are no less than the nature, quality, standard of care and service levels at which the substantially same services were performed by or on behalf of the Provider prior to the Commencement Date in the ordinary course of business during the Benchmark Period; provided, however, that notwithstanding the foregoing, the Provider shall have no liability hereunder for any Losses incurred by the Recipient except to the extent arising from (i) the Provider's fraud; (ii) notwithstanding any term of this Agreement, a situation where

the Provider owes a duty of care to the Recipient and the Provider materially failed to meet the standard required by that duty of care which results in a breach of the Provider's obligations under this Agreement (it being herein assumed and agreed between the parties that such duty of care exists for the purposes of this exception only); or (iii)  the Provider's Wilful Default  (and in any case subject to the limitations set forth in Article 6).

Section 5.02    Disclaimer of Warranties.

Except as expressly set forth herein, the parties hereto acknowledge and agree that the Services are provided as-is, that the applicable Recipient assumes all risks and liabilities arising from or relating to its use of and reliance upon the Services and each Provider makes no representation or warranty with respect thereto.  EXCEPT AS EXPRESSLY SET FORTH HEREIN, THE PROVIDERS HEREBY EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NON-INFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS OF THE SERVICES FOR A PARTICULAR PURPOSE.

## ARTICLE 6

## INDEMNIFICATION; LIMITATION ON LIABILITY

Section 6.01    Indemnification of Each Provider by the Relevant Recipient.

(a)        Subject to the limitations set forth in this Article 6, each Recipient shall indemnify and hold harmless each relevant Provider and its Affiliates and Representatives (each, a "Provider Indemnified Party") from and against any Losses to the extent owed to third parties, and reimburse each relevant Provider Indemnified Party for all Losses as they are incurred, whether or not in connection with pending litigation and whether or not any Provider Indemnified Party is a party, arising out of any claim by a third party to the extent caused by, resulting from or in connection with any of the Services rendered or to be rendered by or on behalf of such Provider pursuant to this Agreement, the transactions contemplated by this Agreement or such Provider's actions or inactions in connection with any such Services or transactions; provided that such Recipient shall not be responsible for any Losses of such Provider Indemnified Party to the extent that such Loss is caused by, results from, or arises out of or in connection with: (i) a Provider Indemnified Party's fraud; (ii) notwithstanding any other term of this Agreement, where the Provider owes a duty of care to the Recipient, the Provider Indemnified Party's material failure to meet the standard required by that duty of care (it being herein assumed and agreed between the parties that such duty of care exists for the purposes of this proviso only); or (iii)  the Provider Indemnified Party's Wilful Default in each case in solely in relation to this Agreement; but not where the Provider Indemnified Party would be vicariously liable for any such matter in (i), (ii) or (iii) above as a direct result of the Recipient's instruction or management of the Dedicated Employees pursuant to Section 3.10(a)(i) or the Shared Employees pursuant to Section 3.10(b)(i).  For the avoidance of doubt, for the purposes of this Section 6.01, a "third party" shall include any employee of the Recipient, the Provider or their Affiliate or Representative.  Save that Losses may not be recouped under this indemnity by a

Provider Indemnified Party to the extent that the Provider Indemnified Party has failed to do any of the following:

(i)    notify the indemnifying party in writing of the claim and providing all details in relation thereto;

(ii)    make no admissions or settlements without obtaining the indemnifying party's prior written consent (such consent not to be unreasonably withheld or delayed);

(iii)    give the indemnifying party all information and assistance that the indemnifying may reasonably require;

(iv)    act reasonably to mitigate any Losses; and

(v)    give the indemnifying party complete control over the investigation or litigation and settlement of any action or claim provided however that the indemnifying party consults with the indemnified party notified in relation to all material developments in relation thereto.

As a separate and freestanding obligation, the Provider Indemnified Party shall use reasonable endeavours to carry out the actions listed in (1) to (5) above.

(b)    Except for indemnification obligations under Section 6.01, each Provider Indemnified Party and Recipient agrees that it shall use all reasonable endeavours to mitigate and otherwise minimise its respective Losses, whether direct or indirect, due to, resulting from or arising in connection with any failure by a Provider Indemnified Party or Recipient, as applicable, to comply fully with any obligations under this Agreement.

(c)    Notwithstanding anything herein to the contrary the Provider Indemnified Party shall not be indemnified or held harmless to the extent such Losses are covered by the Provider Indemnified Party's insurance.

Section 6.02    Limited Liability of a Provider.

(a)    Notwithstanding Article 5 or anything else to the contrary contained herein (except for Section 6.02(b) and 6.11 below, each of which take precedence), no Provider Indemnified Party shall have any liability in contract, tort or otherwise, for or in connection with any Services rendered or to be rendered by any Provider Indemnified Party pursuant to this Agreement, the transactions contemplated by this Agreement or any Provider Indemnified Party's actions or inactions in connection with any such Services or transactions, to any Recipient, except:

(i)    to the extent that any such Recipient suffers a Loss that results from (i) a Provider Indemnified Party's fraud; (ii) notwithstanding any term of this Agreement, where the Provider owes a duty of care to the Recipient, the Provider Indemnified Party's material failure to meet the standard required by that duty of care (it being herein assumed and agreed between the parties that such duty of care exists solely for the purposes of this exception);

or (iii) the Provider Indemnified Party's Wilful Default,  in each case in connection with any such Services or transactions, actions or inactions related thereto;

(ii)        in respect of personal injury or death arising from that Provider Indemnified Party's negligence;

(iii)        fraud or fraudulent misrepresentation by that Provider Indemnified Party; and

(iv)        any other liability that cannot be excluded by virtue of Applicable Law.

(b)        Neither Lehman Europe nor LBHI shall have any liability in contract, tort or otherwise in respect of any acts or omissions directly attributable to the decisions taken by or functional performance of, in the case of Lehman Europe, the Lehman Europe Employees and, in the case of LBHI, the LBHI Employees in either case which are under the direct management control of the other party provided however, that such acts or omissions do not arise as a result of a fault or defect in the infrastructure, facilities or equipment provided by the Provider in breach of its obligations under this Agreement and except to the extent arising from (i) the Provider's fraud; (ii) notwithstanding any term of this Agreement, a situation where the Provider owes a duty of care to the Recipient and the Provider materially failed to meet the standard required by that duty of care which results in a breach of the Provider's obligations under this Agreement (it being herein assumed and agreed between the parties that such duty of care exists solely for the purposes of this exception); or (iii)  the Provider's Wilful Default; but not where the Provider would be vicariously liable for any such matter in (i), (ii) or (iii) above as a direct result of the other party's instruction or management of the Dedicated Employees pursuant to Section 3.10(a)(i) or the Shared Employees pursuant to Section 3.10(b)(i).

Section 6.03    Limited Liability of a Recipient.

(a)        Notwithstanding Article 5 or anything else to the contrary contained herein (except for Section 6.05 and 6.11), no Recipient shall have any liability in contract, tort or otherwise, for or in connection with the transactions contemplated by this Agreement or such Recipient's actions or inactions in connection with any Services or transactions, to any Provider except:

(i)        to the extent that any such Provider suffers a Loss that results from such (i) Recipient's fraud; (ii) notwithstanding any term of this Agreement, where the Recipient owes a duty of care to the Provider, the Recipient's material failure to meet the standard required by that duty of care it being herein assumed and agreed between the parties that such duty of care exists solely for the purposes of this exception only); or (iii)  Recipient's Wilful Default, in each case in connection with any such transactions, actions or inactions related thereto;

(ii)        in respect of personal injury or death arising from that Recipient's negligence;

(iii)        fraud or fraudulent misrepresentation by the Recipient; and

(iv)    any other liability that cannot be excluded by virtue of Applicable Law

Section 6.04    Additional Limitation on Liability.

(a)    Notwithstanding any other provision contained in this Agreement, no party shall be liable for any exemplary, special, indirect, punitive, incidental or consequential losses, damages or expenses, including any damages due to business interruption or loss of profits regardless if such liability arises in tort (including negligence), contract, breach of warranty, strict liability, indemnification or otherwise and regardless of whether any such damages are foreseeable or whether an indemnified person has been advised of the possibility of such losses save that this exclusion shall not apply to the circumstances described in sections 6.05, 6.02(a)(ii-iv) and 6.03(ii-iv).

(b)    Notwithstanding any other provision contained in this Agreement the total and aggregate liability and indemnification of each of Lehman Europe and LBHI (or their respective assignees in accordance with Section 9.10) with respect to this Agreement in tort (including negligence), contract, breach of warranty, strict liability, indemnification or otherwise shall not exceed, for liabilities and obligations to indemnify accruing in each twelve (12) month period of this Agreement commencing on the Commencement Date ("Contract Year"), 125% of the aggregate amount of Service Charges paid or payable hereunder to that party (or such respective assignees) in that Contract Year (and where (i) Service Charges were paid or payable for only part of a Contract Year, the amounts of Service Charges paid or payable for the purposes of this Section 6.04(b) shall be increased pro rata as if they were paid or payable for the full Contract Year or (ii) no Service Charge were paid or payable in that Contract Year, the amount of Service Charges paid or payable for that Contract Year shall be deemed for the purposes of this Section 6.04(b) to be the amount of Service Charges paid or payable in the last Contract Year in which Service Charges were paid or payable (pro rated as for (i) where relevant), as the case may be) save that in each case this exclusion shall not apply to the circumstances described in sections 6.05, 6.02(a)(ii-iv) and 6.03(ii-iv).

Section 6.05    Liability for Payment Obligations.

Nothing in this Article 6 shall be deemed to eliminate or limit, in any respect, a party's express obligation in this Agreement to pay or reimburse, as applicable, for (i) Termination Charges, (ii) Service Charges for Services rendered in accordance with this Agreement, (iii) amounts in respect of conversion services provided pursuant to Section 2.02(a), or (iv) other costs and expenses to the extent expressly provided herein.

Section 6.06    Obligations Several and Not Joint.

As between a Recipient and a permitted third-party assignee of the Recipient, the obligations of each such party under this Agreement shall be several and not joint.

Section 6.07    Due Enquiry.

Each party acknowledges that it will have to make its own enquiries to satisfy itself as to the accuracy and completeness of the information supplied to it in connection with

this Agreement.  Accordingly all liability on the part of LBHI, Lehman Europe and the Administrators in connection with the content of any such information and any representations or statements made in respect of the same is excluded to the fullest extent permitted by law.

Section 6.08    Acknowledgements.

(a)    Each party agrees that the terms and conditions of this Agreement and the exclusions and limitations contained in it are fair and reasonable having regard to the following:

(i)    That this Agreement is related to services provided by insolvent companies in circumstances where it is usual that no representations and warranties can be given by or on behalf of Lehman Europe or the Administrators;

(ii)    That this Agreement is related to services provided by a company in the Bankruptcy Case in circumstances where it is usual that no representations and warranties can be given by or on behalf of LBHI; and

(iii)    Each party has relied solely upon the opinions of itself and its professional advisors concerning the services to be provided under this Agreement; their quality, condition, description, fitness and/or suitability for any purpose, the possibility that some or all of them may have defects not apparent on inspection and examination, and the use it intends or proposes to put them to.

Section 6.09    Intentionally left blank

Section 6.10    The Administrators.

A reference to the Administrators shall be construed as being to the Administrators both jointly and severally and to any other person who is appointed as an administrator in substitution for any administrator or as an additional administrator in conjunction with the Administrators.

Section 6.11    Administrators' Liability.

The Administrators have entered into and signed this Agreement as agents for and on behalf of Lehman Europe and neither they, their firm, or representatives shall incur any personal liability whatever in respect of any of the obligations undertaken by Lehman Europe; or in respect of any failure on the part of Lehman Europe to observe, perform or comply with any such obligations; or under or in relation to any associated arrangements or negotiations; or under any document or assurance made pursuant to this Agreement. The Administrators are party to this Agreement in their personal capacities only for the purpose of receiving the benefit of all limitations, exclusions, undertakings, covenants and indemnities in their favour contained in this Agreement. The Administrators firm, employees and agents may enforce and rely on this Section 6.11 under this Agreement, to the same extent as if they or it were a party.

Section 6.12    THE DISCLAIMER OF WARRANTY

THE DISCLAIMER OF WARRANTY, LIMITATION OF LIABILITY AND OVERALL ALLOCATION OF RISK BETWEEN THE PARTIES ARE FUNDAMENTAL ELEMENTS OF THE BASIS OF THE BARGAIN BETWEEN THE PARTIES.  THE PROVIDER WOULD NOT BE ABLE OR WILLING TO PROVIDE THE SERVICES WITHOUT THE PROTECTIONS PROVIDED TO PROVIDER PURSUANT TO SUCH PROVISIONS.  IF ANY APPLICABLE COURT HOLDS ANY DISCLAIMER, LIMITATION OF LIABILITY OR ALLOCATION OF RISK CONTAINED IN THIS SECTION TO BE UNENFORCEABLE, THEN A PARTY'S LIABILITY WILL BE LIMITED TO THE FULLEST POSSIBLE EXTENT PERMITTED BY APPLICABLE LAW.

## ARTICLE 7

## DISPUTE RESOLUTION

Section 7.01    Dispute Resolution.

(a)    In the event of any dispute, controversy or claim arising out of or relating to the transactions contemplated by this Agreement, or the validity, interpretation, breach or termination of any provision of this Agreement, or calculation or allocation of the costs of any Service, including claims seeking redress or asserting rights under any Applicable Law (each, a "Dispute"), the parties hereto agree that the Lehman Europe Services Manager and LBHI Services Manager (or such other Persons as Lehman Europe and LBHI may designate) shall negotiate in good faith in an attempt to resolve such Dispute amicably.  If such Dispute has not been resolved to the mutual satisfaction of Lehman Europe and LBHI within sixty (60) days after the initial notice of the Dispute (or such longer period as such parties may agree), then, a senior executive on behalf of Lehman Europe and a senior executive on behalf of LBHI shall negotiate in good faith in an attempt to resolve such Dispute amicably for an additional twenty (20) days (or such longer period as such parties may agree).  If such Dispute has not been finally resolved at the end of such twenty (20) day period, then either party may pursue remedies in accordance with Section 9.11.  Notwithstanding the foregoing, a party shall have no obligation to comply with this Section 7.01(a) before exercising any rights or remedies it may have under this Agreement which are of an interim or temporary nature (such as an interim injunction or order for interim performance).

(b)    In any Dispute regarding the amount of a Service Charge, if after such Dispute is finally adjudicated pursuant to the dispute resolution and/or judicial process set forth in Section 7.01(a) or Section 9.11, it is determined that the Service Charge that the Provider has invoiced the Recipient, and that the Recipient has paid to the Provider, is greater or less than the amount that the Service Charge should have been, then (i) if it is determined that the Recipient has overpaid the Service Charge, the Provider shall within five (5) Business Days after such determination reimburse the Recipient an amount of cash equal to such overpayment, plus the higher of 1.5% per month over the Prime Rate or 1.5% per month over the Bank of England Base Rate, compounded monthly, accruing from the date of payment by the Recipient to the time of reimbursement by the Provider and (ii) if it is determined that the Recipient has underpaid the Service Charge, the Recipient shall within five (5) Business Days after such determination reimburse the Provider an amount of cash equal to such underpayment, plus the higher of 1.5% per month over the Prime Rate or 1.5% per month over the Bank of England Base Rate,

compounded monthly, accruing from the date such payment originally should have been made by the Recipient to the time of reimbursement by the Recipient.

# ARTICLE 8

# TERMINATION

Section 8.01    Termination.

(a)    This Agreement shall commence on the Commencement Date and shall terminate as to any particular Service upon the earliest to occur of (i) the mutual written agreement of the parties to terminate this Agreement in its entirety or (ii) as further set out below.  All Services shall terminate no later than twenty four (24) months following the Commencement Date (the "Expiry Date") except as set out in Section 8.01(e). This Agreement shall terminate once the provision of Services hereunder has terminated, and, for the avoidance of doubt, this Agreement shall terminate at the end of the time periods set forth above.

(b)    In addition, (i) a Recipient may from time to time terminate this Agreement with respect to any particular Service, in whole but not in part (save that a Service may be terminated in part where the relevant part of the Service is severable from the other Services or parts thereof and the Recipient reimburses the Provider all of the reasonable costs of such termination in part where such costs (as evidenced by the Provider) cannot be reasonably be avoided by the Provider) (1) for any reason or no reason upon providing at least ninety (90) days prior written notice to the Provider or thirty (30) prior written notice if the termination of the Agreement with respect to any particular Service would not directly result in the termination of the employment of a LBHI Employee or Lehman Europe Employee or a third party contract (or such other shorter period as the parties may agree) subject to the obligation to pay Termination Charges, as provided for under Section 8.02, (2) if the Provider of such Service has failed to perform any of its material obligations under this Agreement with respect to such Service (whether or not it wilfully defaulted in doing so), and such failure shall continue to exist thirty (30) days after receipt by the Provider of written notice of such failure from the Recipient, or (3) immediately upon mutual written agreement of the parties hereto, and (ii) a Provider may terminate this Agreement with respect to one or more Services, in whole but not in part, at any time upon prior written notice to the Recipient if the Recipient has failed to perform any of its material obligations under this Agreement relating to such Service or Services, and such failure shall be continued uncured for a period of thirty (30) days after receipt by the Recipient of a written notice of such failure from the Provider.  In the event that the effective date of the termination of any particular Service is a day other than at the end of a billing period, the Service Charge associated with such Service shall be pro-rated appropriately.

(c)    A Recipient may from time to time request a reduction in part of the scope or amount of any particular Service.  If requested to do so by Recipient, the Provider agrees to discuss in good faith appropriate reductions to the relevant Service Charges in light of all relevant factors including the costs and benefits to the Provider of any such reductions.  In the event that any particular Service is reduced other than at the end of a billing period, the Service Charge associated with such Service for the billing period in which such Service is reduced shall be pro-rated appropriately.

(d)    The Recipient may terminate this Agreement or any Service upon the occurrence of a Force Majeure event pursuant to Section 8.04 below that materially disrupts the provision of Services, and Provider's failure to fully restore such Services within ninety (90) days, and the Provider's further failure to fully restore such Services thirty (30) days after its receipt of written notice of Recipient's intention to so terminate pursuant to this Section 8.01(d) sent after the expiration of the initial ninety (90) day period.  For the avoidance of doubt, only 90% of the Service Charge shall be payable for those Services (or part thereof) (other than Service Charges for Dedicated Employees and Shared Employees) disrupted by the Force Majeure in respect of  the first thirty (30) days of disruption in those Services (or part thereof), only 60% of those Service Charges for the next thirty (30) days disruption in those Services (or part thereof), only 30% of those Service Charges of the next thirty (30) days of disruption in those Services (or part thereof) and 0% of those Service Charges thereafter.

(e)    The parties shall meet on or about eighteen (18) months following the Commencement Date to discuss in good faith implementing reasonable measures to provide for an extension of the provision of one or more Services beyond the Expiry Date should the Recipient so require or relief for the Provider from the provision of one or more Services because such Services are unduly burdensome or inconsistent with the strategic and operational objectives of Provider.

(f)    Lehman Europe may suspend the Services to an LBHI Entity (but no other LBHI Entity) that materially defaults in its obligation to perform or provide Services to Lehman Europe hereunder, for so long as such default continues.  Without limiting the forgoing, such a default shall be deemed to exist where, had such Services been provided by or been obligated to be provided by a LBHI Entity to Lehman Europe, the failure to perform or provide such Services would constitute a default by LBHI.

(g)    LBHI may suspend the Services to a Lehman Europe Entity (but no other Lehman Europe entity) that materially defaults in its obligation to perform or provide Services to LBHI hereunder, for so long as such default continues.  Without limiting the forgoing, such a default shall be deemed to exist where, had such Services been provided by or been obligated to be provided by Lehman Europe to a LBHI Entity, the failure to perform or provide such Services would constitute a default by Lehman Europe.

(h)    <u>Conduct Prior to Bankruptcy Court Approval</u>.

(i)    LBHI shall use all reasonable endeavours to obtain the entry of a final order by the Bankruptcy Court approving this Agreement and authorising LBHI to perform all of its obligations hereunder, which order (1) shall be in a form and substance satisfactory to the Administrators (such approval not to be unreasonably withheld or delayed) acting in good faith and (2) shall be in full force and effect and shall not have been reversed or modified and shall not be stayed or subject to a motion to stay, and no appeal or petition for review, rehearing or certiorari with respect thereto shall be pending no later than 12 December 2008 (the "<u>Approval</u>").

(ii)    Until such time as the Approval has been obtained, neither party shall be required to fulfil any of its obligations under this Agreement.  Notwithstanding the

previous sentence, Lehman Europe shall comply with its obligations under Sections 3.10(a), (c) and (f) in respect of any LBHI Scheme relating to the IMD Employees who are Lehman Europe Dedicated Employees where Neuberger (where Neuberger has not entered Chapter 11 proceedings, liquidation or similar) has made payment in advance in cleared funds covering (1) all of Lehman Europe's obligations accrued or contemplated as a result of the proper operation of the LBHI Scheme in respect of the IMD Employees (including all payment obligations in respect of bonuses under the LBHI Scheme) together with an amount equal to 20% of the same and (2) additional Remuneration Costs together with an amount equal to 20% of those additional Remuneration Costs not included in sub-section (1) above for the IMD Employees for the period 15 September 2008 to 12 December 2008, such payment to be cleared, notwithstanding Section 3.10(f)(ii), prior to any communication being issued in respect of the LBHI Scheme, but Neuberger shall not be required to make payments in respect of payments not accrued or contemplated as a result of the proper operation of the LBHI Scheme or Remuneration Costs under this Section (such as, by way of example, Severance Costs or payments in respect of unfair dismissal claims in relation to contingent claims by Lehman Europe Employees) and which are not otherwise required to be paid pursuant to the other Articles and Sections of this Agreement. Notwithstanding any other provision contained in this Agreement to the contrary the total and aggregate liability of Neuberger with respect to this Agreement in tort (including negligence), contract, breach of warranty, strict liability, indemnification or otherwise shall not exceed, 125% of the aggregate amount of Remuneration Costs paid or payable hereunder pursuant to this Section 8.01(h).

(iii)    Where the Approval has not been obtained by 6 December 2008, the parties will work together, acting reasonably and in good faith, to seek to agree variations to this Agreement which would, in the parties' opinion, allow the Approval to take place.  Where the Approval has not been obtained by 12 December 2008, this Agreement shall terminate with immediate effect. Up to and until Approval is obtained, the parties shall co-operate and work together in good faith in relation to the activities, duties and rights contemplated in this Agreement, provided that no material additional expenses or losses are incurred by either party in doing so.

(iv)    Any sums paid by Neuberger to Lehman Europe pursuant to this Section are made for the express and sole purpose of funding the Remuneration Costs and LBHI Scheme in respect of the IMD Employees.  Accordingly, these sums are impressed with a purpose trust and must not be used for any purpose other than paying Remuneration Costs or funding the LBHI Scheme in respect of the IMD Employees as specified in this Section.

(v)    Neuberger shall have the benefit of all of Lehman Europe's obligations as set out in  Sections 3.10(a), (c), (f), 9.04 and 8.01(h), in each case subject to the other limitations (including Section 6.04) set out in this Agreement. Subject to the foregoing, Neuberger shall not take the benefit of, or have any obligations under, this Agreement.  Once Approval has been obtained pursuant to Section 8.01(h), (save for any accrued liabilities and obligations relating to the matters set out or referred to in this Section 8.01(h)) Neuberger shall have no further liability or obligation under or in relation to this Agreement.

Section 8.02    Effect of Termination.

Upon termination of any particular Service pursuant to this Agreement, the Provider of the terminated Service will have no further obligation to provide the terminated Service, and the relevant Recipient will have no obligation to pay any future Service Charges relating to any such Service; provided, however, that the Recipient shall remain obligated to the relevant Provider for (i) the Service Charges owed and payable in respect of Services provided prior to the effective date of termination and (ii) subject to Section 4.08(b) any Termination Charges. Upon termination of any particular Service pursuant to this Agreement, the relevant Provider shall reduce for the next billing period the amount of the Service Charge for the category of Services in which the terminated Service was included (such reduction to reflect the elimination of all costs incurred in connection with the terminated service to the extent the same are not required to provide other Services to the Recipient), and, upon request of the Recipient, the Provider shall provide the Recipient with documentation and/or information regarding the calculation of the amount of the reduction. Prior to termination of any Service or this Agreement the parties shall in good faith continue to fully implement the Migration Plan and where appropriate provide reasonable assistance to the other so as to give effect insofar as reasonably practicable to a smooth transfer of any Services (or part thereof) to the Recipient or any third party supplier which will provide the equivalent service to the Recipient.

Section 8.03    Survival.

In connection with termination of any Service, the provisions of this Agreement not relating solely to such terminated Service shall survive any such termination, and in connection with a termination of this Agreement, Article 1, Article 6 (including liability in respect of any indemnifiable Losses under this Agreement arising or occurring on or prior to the date of termination), Article 7, Article 8, Article 9, all confidentiality obligations under this Agreement and liability for all due and unpaid Service Charges and Termination Charges shall continue to survive indefinitely.

Section 8.04    Force Majeure.

No party hereto (nor any Person acting on its behalf) shall have any liability or responsibility for failure to fulfil any obligation (other than a payment obligation) under this Agreement so long as and to the extent to which the fulfilment of such obligation is prevented, frustrated, hindered or delayed as a consequence of circumstances of Force Majeure; provided that (i) such party (or such Person) shall have exercised commercially reasonable endeavours to minimise the effect of Force Majeure on its obligations (including seeking to identify and pursue alternative means of providing the Services) and (ii) the nature, quality and standard of care that the Provider shall provide in delivering a Service after a Force Majeure shall be substantially the same as the nature, quality and standard of care that the Provider provides to its Affiliates and its other business components with respect to such Service. In the event of an occurrence of a Force Majeure, the party hereto whose performance is affected thereby shall give notice of suspension as soon as reasonably practicable to the other stating the date and extent of such suspension and the cause thereof, and such party shall resume the performance of such obligations as soon as reasonably practicable after the removal of the cause.

## ARTICLE 9

## GENERAL PROVISIONS

Section 9.01    Independent Contractors.

In providing the Services hereunder, the Provider shall act solely as independent contractor and nothing in this Agreement shall constitute or be construed to be or create a partnership, joint venture, or principal/agent relationship between the Provider, on the one hand, and the Recipient, on the other.  All Persons employed by the Provider in the performance of its obligations under this Agreement shall be the sole responsibility of the Provider.

Section 9.02    Subcontractors.

Any Provider may hire or engage one or more subcontractors to perform any or all of its obligations under this Agreement; provided that such Provider shall in all cases remain responsible for all its obligations under this Agreement and the acts and omissions of any Subcontractor.  Under no circumstances shall any Recipient be responsible for making any payments directly to any subcontractor engaged by a Provider.

Section 9.03    Books and Records.

All books, records and data maintained by a Provider and owned by the Recipient with respect to the provision of a Service to such Recipient shall be the exclusive property of such Recipient.  The Recipient, at its sole cost and expense, shall have the right to inspect, and make copies of, any such books, records and data during regular business hours upon reasonable advance notice to the Provider.  At the sole cost and expense of the Recipient, upon termination of the provision of any Service, the relevant books, records and data relating to such terminated Service shall be delivered by the Provider to the Recipient in a mutually agreed upon format to the address of the Recipient set forth in Section 9.05 or any other mutually agreed upon location; provided, however, that the Provider shall be entitled to retain one copy of all such books, records and data relating to such terminated Service for archival purposes and for purposes of responding to any dispute that may arise with respect thereto.

Section 9.04    Treatment of Confidential Information.

(a)    The parties hereto and Neuberger shall not, and shall cause all other Persons providing Services or having access to information of the other party or Neuberger that is known or ought reasonably be known to such Person as confidential or proprietary ("Confidential Information") not to, disclose to any other Person or use, except for purposes of this Agreement, any Confidential Information of the other party; provided, however, that each party and Neuberger may disclose Confidential Information of the other party or Neuberger, to the extent permitted by Applicable Law (i) to its Representatives on a need-to-know basis in connection with the performance of such party's obligations under this Agreement, (ii) in any report, statement, testimony or other submission required to be made to any Governmental Body having jurisdiction over the disclosing party or Neuberger as the case may be, or (iii) in order to comply with Applicable Law, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to the disclosing party or Neuberger in the course

of any litigation, investigation or administrative proceeding.  In the event that a party or Neuberger hereto becomes legally compelled (based on advice of counsel) by deposition, interrogatory, request for documents subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information of the other party or Neuberger (as the case may be), such disclosing party or Neuberger shall provide the other party or Neuberger (as the case may be) with prompt prior written notice of such requirement, and, to the extent reasonably practicable, cooperate with the other party or Neuberger as the case may be (at such other party's or Neuberger's expense) to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege.  In the event that such protective order or other similar remedy is not obtained, the disclosing party or Neuberger as the case may be shall furnish only that portion of the Confidential Information that has been legally compelled, and shall exercise its best endeavours (at such other party's expense) to obtain assurance that confidential treatment will be accorded such Confidential Information.

(b)     Each Provider and Recipient hereto and Neuberger shall, and shall cause its Representatives to protect the Confidential Information of the other parties and Neuberger by using the same degree of care to prevent the unauthorised disclosure of such as the party or Neuberger as the case may be uses to protect its own Confidential Information of a like nature.

(c)     Each Provider and Recipient shall comply with all applicable state, federal and foreign privacy and data protection laws that are or that may in the future be applicable to the provision of the Services hereunder.

(d)     The parties acknowledges that, under the operation of this Agreement, they or their Affiliates may come into possession of inside information as that term is defined in FSMA or any such equivalent legislation or regulation outside the UK ("Inside Information").

(e)     Each Recipient and Provider undertakes that it will not use or disclose any Confidential Information including Inside Information in any way that may amount to a breach of any Applicable Laws concerning the handling, use and disclosure of such Confidential Information including Inside Information.

(f)     Each Recipient and Provider shall ensure that appropriate information barriers are put in place to ensure no breach of confidence or Applicable Laws takes place.

(g)     Wherever possible, Lehman Europe Entities and LBHI Entities shall not view or inspect details of the trading positions, outstanding obligations, trading records, real time trades or other Inside Information of the other without the prior written consent of the other Party.

(h)     Where Lehman Europe Entities or LBHI Entities are entitled to disclose Confidential Information and/or information about trading positions and/or outstanding obligations or rights to a third party, they shall ensure that the third party is under a contractual obligation no less onerous than the obligations set out in this Section 9.04(h) to keep the information confidential.

(i)      Notwithstanding the provisions of Article 6, each party and Neuberger hereby acknowledges that money damages are an inadequate remedy for a breach or anticipated breach of this Section 9.04 because of the difficulty of ascertaining the amount of damage that will be suffered in the event that this Section is breached.  Therefore, in the event of a breach or anticipated breach of this Section 9.04 by the other party or Neuberger, each party or Neuberger (as the case may be) may, in addition to any other remedies available to it, obtain a restraining order and/or injunction to prohibit such violation.  In addition, each party and Neuberger hereby waives any requirement for the securing or posting of any bond in connection with such remedy. Each party and Neuberger acknowledges and agrees that an injunction is a proper, but not exclusive, remedy available to each party and Neuberger and that the harm from any violation of the covenants set forth in this Section 9.04 would be irreparable and immediate.

Section 9.05    Notices.

Except with respect to routine communications by the Lehman Europe Services Manager and LBHI Services Manager under Section 2.03, all notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by overnight courier service, by facsimile with receipt confirmed (followed by delivery of an original via overnight courier service) or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties and Neuberger at the following addresses (or at such other address for a party or Neuberger as shall be specified in a notice given in accordance with this Section 9.05).

(a)      if to Lehman Europe:

Mike Jervis
PricewaterhouseCoopers
Plumtree Court
London EC4A 4HT

with a copy to:

Linklaters LLP
One Silk Street
London EC2Y 8HQ

Attention: Richard Cumbley

(b)      if to LBHI or Neuberger:

Lehman Brothers Holdings Inc.
745 Seventh Avenue
New York, NY 10019
Attention:  Steven Berkenfeld, Esq.
Facsimile:  (646) 758-4226

with a copy to:

Weil, Gotshal & Manges
One South Place
London, EC2M 2WG
Attention:  Barry Fishley
Facsimile:  +44 207 903 0990

with a copy to:

Weil, Gotshal & Manges
767 Fifth Avenue
New York, NY 10153
Attention:  Jeffrey Osterman
Facsimile: (+1 212) 310 8007

with a copy to:

Alvarez & Marsal Europe LLP
10th Floor, One Canada Square
Canary Wharf
London, EC14 5AA
Attention: Mark Gillett, Senior Director
Facsimile:  +44 207 715 5201

with a copy to:

Alvarez & Marsal
600 Lexington Avenue
6th Floor
New York, NY10022
Attention:  William Gordon
Facsimile:  (+1 212) 759 5532

Section 9.06    <u>Regulatory and Compliance</u>.

(a) Each party hereto shall be responsible for its own compliance with any and all Applicable Laws applicable to its performance under this Agreement; <u>provided</u>, <u>however</u>, that each Lehman Europe Entity and LBHI Entity shall, subject to reimbursement of out-of-pocket expenses by the requesting party, cooperate and provide one another with all reasonably requested assistance (including the execution or provision of documents and the provision of relevant information such as, but without limitation, personal account dealing information of any Representative and access to premises) required by the requesting party to ensure compliance with all Applicable Laws in connection with any regulatory action, requirement, inquiry or examination related to this Agreement or the Services.

(b)    Each Provider and Recipient shall, save to the extent prevented by Applicable Law notify the other of (1) any material regulatory or compliance issue arising under this Agreement of which it becomes aware (2) any development that may have a material impact on its ability to carry out the Services effectively and in compliance with Applicable Law and shall co-operate in good faith to resolve those issues.

(c)    If a party is contacted by a Governmental Body in connection with this Agreement, it shall, if permitted by the Governmental Body to do so:

(i)    promptly notify the other party and co-ordinate any interaction with the Regulator; and

(ii)    keep the other party informed of all discussions and correspondence with the Government Body,

unless it reasonably determines that to do so would create a conflict of interest between the parties.

Section 9.07    Further Assurances.

Each party hereto covenants and agrees that, without any additional consideration, it shall execute and deliver any further legal instruments and perform any acts that are or may become reasonably necessary to effectuate this Agreement.

Section 9.08    Severability.

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced under any Applicable Law or as a matter of public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to any party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of such parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement can be consummated as originally contemplated to the greatest extent possible.

Section 9.09    Entire Agreement.

Except as otherwise expressly provided in this Agreement, this Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter of this Agreement and supersede all prior agreements and undertakings, both written and oral, between or on behalf of the parties hereto with respect to the subject matter of this Agreement.

Section 9.10    Assignment; Third-Party Beneficiaries.

(a)    This Agreement shall not be assigned or sublicensed by operation of Applicable Law or otherwise without the prior written consent of the parties hereto; <u>provided, however</u>:

(i)    the LBHI Entities shall have a right to assign their rights and obligations hereunder, in whole or in part, (A) with respect to the IMD Business (or any part thereof) or the IMD Entities to one or more related purchasers (in a single transaction or a series of related transactions) of (x) any or all of the IMD Business (or any part thereof) or (y) any or all of the assets of, or entities that conduct, the IMD Business (or any part thereof), and (B) with respect to any other acquirers of the LBHI Entities or their businesses, assets or properties if the absence of such Service would cause a material adverse effect on the value of the underlying business operations or assets, and subject always to Section 9.10(b) below, Lehman Europe may assign their rights and obligations hereunder, in whole or in part, (A) with respect to any other acquirers of the business, assets or properties of the Lehman Europe Entities', if the absence of such Service would cause a material adverse effect on the value of the underlying business operations or assets, and (B) to a single purchaser (in a single transaction or a series of related transactions) of (x) any or all of the businesses, assets or properties of Lehman Europe Entity or (y) any or all of the entities that conduct, the operations  of Lehman Europe Entities.

(b)    For so long as LBHI pays the Service Charges in respect of the IMD Employees and <u>provided that</u> LBHI has not issued a notice to terminate the Employee Services in respect of the IMD Employees, Lehman Europe shall not assign, transfer, novate or otherwise dispose (or attempt any of the foregoing) of any right, title or interest it may hold in and to the IMD Business (or any part thereof) or IMD Entities (or any part thereof) without LBHI's prior written consent (not to be unreasonably withheld or delayed). The restriction in this Section 9.10(b), shall still apply if LBHI terminates the Employee Services in respect of the IMD Employees for Lehman Europe's material breach pursuant to Section 8.01(b)(i)(2). On request by LBHI or Lehman Europe, the parties shall co-operate and negotiate in good faith in order to agree any allocation of the proceeds from the sale of the IMD Business (including any assets controlled by Lehman Europe or LBHI) (including without limitation the IMD Employees) and where the IMD Business is sold to any buyer whether approved by the Bankruptcy Court or not and the parties shall take into account in such discussions the costs incurred directly or indirectly by LBHI in respect of the Employee Services in respect of the IMD Employees.

(c)    Any permitted assignee in accordance with this Section 9.10 shall be required to execute a counterpart to this Agreement, agreeing to be bound by the terms and conditions set forth herein.  Further, permitted assignees hereunder shall not themselves be permitted to assign any part of the rights or obligations assigned to them without the prior written consent of the non-assigning party.  Each party shall require any assignee or purchaser of any business or asset that had been providing (or had been used to provide) Services hereunder, the absence of which would cause a material adverse effect to the Recipient, to continue to provide Services to the Recipient pursuant to the terms and conditions of this Agreement as a condition to such assignment or purchase.

(d)    Third Party Rights.

(i)    This Agreement does not create any right or benefit enforceable by any person not a party (within the meaning of the Contracts (Rights of Third Parties) Act 1999) to it except for Provider Indemnified Parties as provided for in Article 6.

(ii)    If a Provider is in breach of this Agreement, the Parties intend that the Recipient may recover from the Provider on behalf of its Affiliates any sum in respect of the Affiliates' loss arising from that breach.

(iii)    The Parties agree that no consent from a Provider Indemnified Party, who is not also a Party, is required for the Parties to vary or rescind this Agreement (whether or not in a way that varies or extinguishes rights or benefits in favour of such third parties).

(iv)    For the avoidance of doubt and notwithstanding any other term of this Agreement, Lehman Europe irrevocably agrees that Neuberger's rights and obligations under or in relation to this Agreement and Lehman Europe's rights against Neuberger under or in relation to this Agreement are in each case set out or referred to in Section 8.01(h).

Section 9.11    Governing Law; Submission to Jurisdiction.

(a) This Agreement (and any claims or disputes arising out of or related hereto or to the transactions contemplated hereby or to the inducement of any party or Neuberger to enter herein, whether for breach of contract, tortious conduct or otherwise, and whether predicated on common law, statute or otherwise) shall in all respects be governed by, and construed in accordance with, the Laws of England, including all matters of construction, validity and performance, in each case without reference to any conflict of Applicable Law principles that might lead to the application of the Laws of any other jurisdiction.

(b)    The Parties and Neuberger irrevocably agree that the courts of England are to have exclusive jurisdiction to settle any disputes which may arise out of or in connection with this Agreement and that accordingly any proceedings arising out of or in connection with this Agreement shall be brought in such courts. Each of the Parties and Neuberger irrevocably submits to the jurisdiction of such courts and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum.

(c)    Each of the parties and Neuberger hereto hereby consents to process being served by any party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 9.05.

Section 9.12    Amendment.

No provision of this Agreement, including any Schedule hereto, may be amended, supplemented or modified except by a written instrument making specific reference hereto or thereto signed by all the parties to this Agreement.  No waiver by any party or Neuberger of any provision hereof shall be effective unless explicitly set forth in writing and executed by the party so waiving.  The waiver by any party or Neuberger hereto of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any other subsequent breach.

Section 9.13    Rules of Construction.

Interpretation of this Agreement shall be governed by the following rules of construction (a) words in the singular shall be held to include the plural and vice versa and words of one gender shall be held to include the other gender as the context requires, (b) references to the terms Article, Section, paragraph and Schedule are references to the Articles, Sections, paragraphs and Schedules of this Agreement unless otherwise specified, (c) the terms "hereof," "herein," "hereby," "hereto," "hereunder" and derivative or similar words refer to this entire Agreement, including the Schedules hereto, (d) references to "$" shall mean U.S. dollars, (e) the word "including" and words of similar import when used in this Agreement shall mean "including, without limitation," unless otherwise specified, (f) the word "or" shall not be exclusive, (g) references to "written" or "in writing" include in electronic form, (i) the headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement, (j) Lehman Europe and LBHI have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favouring or burdening any such party by virtue of the authorship of any of the provisions in any of this Agreement, (k) a reference to any Person includes such Person's successors and permitted assigns, (l) any reference to "days" means calendar days unless Business Days are expressly specified, and (m) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded, if the last day of such period is not a Business Day, the period shall end on the next succeeding Business Day.

Section 9.14    Counterparts.

This Agreement may be executed in two or more counterparts, and by each party and Neuberger in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by facsimile shall be as effective as delivery of a manually executed counterpart of this Agreement.

Section 9.15    Intentionally left blank.

Section 9.16    Enforcement.

The parties agree that irreparable damage may result, and that the parties or Neuberger may not have any adequate remedy at Applicable Law, if any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached. It is accordingly agreed that, notwithstanding the penultimate sentence of Section 7.01(a) in relation to interim relief, if either party breaches any of its obligation under or relating to this Agreement, the non-breaching party and/or Neuberger shall be entitled to seek equitable relief, in addition to all other remedies available to the parties at Applicable Law or in equity (including without limitation an order for specific performance) as a remedy for any such breach or threatened breach. Such equitable remedies may be sought in any court referred to in Section 9.11(b).

Section 9.17    <u>Non-Recourse</u>.

No past, present or future director, officer, employee, incorporator, member, partner, stockholder, Affiliate, agent, attorney or representative of Lehman Europe, LBHI or Neuberger or their respective Affiliates shall have any liability for any obligations or liabilities of Lehman Europe, LBHI or Neuberger respectively, under this Agreement of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their respective duly authorised officers.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

Name: Ann Cairns
Title: VP Lehman

NEUBERGER BERMAN HOLDINGS LLC.

By: _____

Name:
Title:

LEHMAN BROTHERS HOLDING PLC

By: _____

one of the Administrators (as their agent without personal liability) in the presence of:

Witness's Signature:

Name:

Address:

Occupation:

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first written above by their respective duly authorised officers.

LEHMAN BROTHERS HOLDINGS INC.

By: _____

    Name:
    Title:

NEUBERGER BERMAN HOLDINGS LLC.

By: _____

    Name: MAXINE L. GERSON
    Title: Vice President

LEHMAN BROTHERS HOLDING PLC

By: _____

one of the Administrators (as their agent without personal liability) in the presence of:

Witness's Signature:

Name:

Address:

Occupation:

SIGNATURE PAGE TO
TRANSITION SERVICES AGREEMENT

LEHMAN BROTHERS INTERNATIONAL (EUROPE)

By: _____

one of the Administrators (as their agent without
personal liability) in the presence of:

Witness's Signature:

Name:

Address:


Occupation:


LEHMAN BROTHERS EUROPE LIMITED


By: _____
one of the Administrators (as their agent without
personal liability) in the presence of:

Witness's Signature:

Name:

Address:


Occupation:


LEHMAN BROTHERS LTD


By: _____
one of the Administrators (as their agent without
personal liability) in the presence of:

Witness's Signature:

Name:

Address:


Occupation:

SIGNED by one of the Administrators on behalf
of all of them (without personal liability and
solely for the purpose of receiving the benefit of
the provisions of this Agreement in their favour)
in the presence of:

Witness's Signature:

Name:

Address:


Occupation:

**Schedule**

**Copies of Administration Court Orders**

**(PROPOSED ORDER)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
                         :

In re                         :        Chapter 11 Case No.
                         :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :        **08-13555 (JMP)**
                         :

             **Debtors.**      :        **(Jointly Administered)**
                         :
                         :
------------------------------------------------------------------x

**ORDER PURSUANT TO SECTIONS 105(A) AND 363(B)**
**OF THE BANKRUPTCY CODE FOR AUTHORIZATION**
**TO ENTER INTO A TRANSITION SERVICES AGREEMENT**

Upon the motion, dated November [12], 2008 (the "Motion"), of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases, as debtors and debtors-in-possession (collectively, the "Debtors"), pursuant to sections

105(a) and 363(b) of title 11 of the United States Code for authorization to enter into a transition

services agreement (the "TSA") among the Debtors, Neuberger Berman Holdings LLC, Lehman

Brothers Europe Limited (in administration), Lehman Brothers International Europe (in

administration), Lehman Brothers Holdings Plc (in administration), Lehman Brothers Ltd (in

administration), Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann

and Michael John Andrew Jervis, dated as of November 13, 2008, all as more fully described in

the Motion; and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Standing Order M-61 Referring to

Bankruptcy Judges for the Southern District of New York Any and All Proceedings Under Title

11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided in accordance with the procedures set forth in the order entered

September 22, 2008 governing case management and administrative procedures [Docket No.

285] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for

the Official Committee of Unsecured Creditors; (iii) the attorneys for Lehman Europe; (iv) the

Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States

Attorney for the Southern District of New York; and (v) all parties who have requested notice in

these chapter 11 cases, and it appearing that no other or further notice need be provided;  and a

hearing having been held to consider the relief requested in the Motion; and the Court having

found and determined that the relief sought in the Motion is in the best interests of the Debtors,

their estates and creditors, and all parties in interest and that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that the Debtors are authorized to enter into the TSA; and it is further

ORDERED that the TSA is approved; and it is further

ORDERED that the Debtors authorized to execute, deliver, implement and fully

perform any and all obligations, instruments, documents and papers and to take any and all

actions reasonably necessary or appropriate to consummate the TSA and perform any and all

obligations contemplated therein, including entering into any amendments to the TSA without

further order from the Court; and it is further

ORDERED that, notwithstanding Rule 6004(h)[1] of the Federal Rules of

Bankruptcy Procedure, this Order shall take effect immediately; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good

and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation or interpretation of this Order.


Dated:  November __, 2008
        New York, New York


_____
UNITED STATES BANKRUPTCY JUDGE

---

[1] Bankruptcy Rule 6004(h) is an interim bankruptcy rule adopted pursuant to standing General Order M-308 of the United States Bankruptcy Court for the Southern District of New York, signed on October 11, 2005 by Chief Judge Stuart M. Bernstein.