## Exhibit A

## GENERAL TERMS AND CONDITIONS:
## IT PRODUCTS AND SERVICES

**Supplier Name:    Fortify Software, Inc.**
**Supplier Address: 2300 Geng Road, Suite 102, Palo Alto, California 94303**
**Supplier Jurisdiction of Incorporation: Delaware**
**Tax ID: 04-3744573**
**Telephone #: (650) 213-5600**
**Fax #:  (650) 843-1424**
**General Terms and Conditions No.: *CON000000022656***
**General Terms and Conditions Effective Date:  August 17, 2007**

THESE GENERAL TERMS AND CONDITIONS – IT PRODUCTS AND SERVICES are made as of the General Terms and Conditions Effective Date specified above (the "**Effective Date**") between Lehman Brothers Holdings Inc., a Delaware corporation, having an office and place of business at 745 Seventh Avenue, New York, New York 10019, (the **"Customer"**) and the Supplier specified above (the "**Supplier**").  As used in these General Terms and Conditions (as defined below), **"Party"** means either Customer or Supplier and **"Parties"** means both Customer and Supplier.

## ARTICLE 1:  INTRODUCTION

1.1    <u>General Terms and Conditions</u>.  The "**General Terms and Conditions**" consist of the terms and conditions set forth in the Articles and preamble of this document.  As used herein, "**Master Agreement**" means, collectively, these General Terms and Conditions, together with any of the Supplemental Terms and Conditions (as defined below) executed by the Parties (or their respective authorized designees).

1.2    <u>Purpose</u>.  These General Terms and Conditions, together with the applicable Supplemental Terms and Conditions, will provide the terms and conditions that will govern transactions that may be entered into between Customer and Supplier for the purchase, license or lease, as the case may be, of equipment and/or software, (in object code form), including any Documentation or Updates from Supplier (each, a "**Product**" and together, the "**Products**") and/or for the provision of Services (each such individual transaction, a "**Transaction**" and together, the "**Transactions**").  Transactions will be entered into by the Parties through the execution of Transaction Schedules.

1.3    <u>Definitions</u>.  Capitalized terms used in the Master Agreement are defined in-place where the term is used or in the Glossary of Terms located at the end of these General Terms and Conditions (and any Supplement) and have the meanings there given unless the context requires otherwise.  Terms other than those defined within the Master Agreement will be given their plain English meaning, and those terms, acronyms and phrases known in the information technology industry will be interpreted in accordance with their generally known meanings in such industry.

## ARTICLE 2: AGREEMENT STRUCTURE AND PROCESS FOR PLACING ORDERS

2.1   Placement of Orders and Transaction Schedules.

     2.1.1   To enter into a Transaction for Products and/or Services, the Parties (a) will execute a supplement to these General Terms and Conditions that contains terms and conditions, including Exhibits, Annexes, Attachments, applicable to the particular type of Product and/or Services to be delivered and/or performed (each such executed supplement, "**Supplemental Terms and Conditions**" or a "**Supplement**" and together, the "**Supplements**") and (b) will execute a schedule that contains all other terms specific to the Transaction (e.g., price, Product descriptions, statements of work, quantity, delivery dates) (each, a "**Transaction Schedule**" and together, the "**Transaction Schedules**").  Multiple Transaction Schedules may be executed under a single Supplement.

     2.1.2.   The Parties' execution of these General Terms and Conditions and a Supplement will not, by itself, commit Customer to purchase, nor Supplier to provide, any specific Products or Services.  Upon execution of these General Terms and Conditions, the applicable Supplements, and, as applicable, a Transaction Schedule for a specific Transaction, Supplier will provide the Products and/or perform the Services specified on the applicable Transaction Schedule in accordance with the terms of such Transaction Schedule.  Each Transaction Schedule will incorporate by reference these General Terms and Conditions and the applicable Supplemental Terms and Conditions.

     2.1.3.   Each Transaction Schedule, together with any other documents attached to or incorporated therein by reference (including these General Terms and Conditions and the applicable Supplemental Terms and Conditions), will form a separate and independent contract for the applicable Transaction between Supplier and Customer (i.e. the Customer entity that is the party to the Transaction Schedule).  As applied to a specific Transaction, references herein to the "Master Agreement" (or any part thereof) will be considered references to the applicable Transaction Schedule, as appropriate in the context in which such reference is made.

2.2   Execution of Supplements and Transaction Schedules by Other Customer Entities.  Customer's parent company, its subsidiaries and other affiliated companies may enter into Transactions with Supplier pursuant to these General Terms and Conditions through the execution of Supplements and Transaction Schedules.  For the purposes of any such Supplement or Transaction Schedule, the Customer entity executing the Supplement or Transaction Schedule, as applicable, will be considered the "**Customer**" as that term is used herein and therein.

2.3   Order of Precedence.  If there is a conflict between the provisions of any of the General Terms and Conditions, a Supplement or a Transaction Schedule, the following order of priority will control:  (a) a Transaction Schedule (but any conflicting terms in

such Transaction Schedule will apply only with respect to such Transaction Schedule) (b) a Supplement (but any conflicting terms will apply only with respect to that Supplement and the Transaction Schedules that incorporate such Supplement by reference), and (c) these General Terms and Conditions; *provided, however,* that, unless the applicable Supplement or Transaction Schedule has been approved in writing by legal counsel for each Party, a Supplement or Transaction Schedule may not modify or amend the rights or obligations set forth in the following Sections and Articles of these General Terms and Conditions: "Relationship of the Parties"; "Compliance with Laws"; "Record Retention and Inspection"; "Confidential Information and Data Protection"; "Insurance"; "Indemnification"; "Infringement"; "Limitation of Liability" and "Subcontractors".

## ARTICLE 3: NATURE OF THE RELATIONSHIP

3.1    Relationship of the Parties.  Supplier agrees and represents and warrants that: (a) it is an independent contractor, (b) Supplier Personnel are the responsibility of Supplier and solely employees or independent contractors of Supplier (or its subcontractor), (c) no Supplier Personnel are Customer's agents or employees for federal, state, or local tax purposes or any other purposes whatsoever, (d) no Supplier Personnel are entitled to any compensation from Customer or to any Customer employee benefits, (e) Supplier will (or, in the case of its subcontractors, will be responsible for causing the applicable subcontractor to) withhold and pay all applicable taxes, benefits and insurance with respect to such personnel, and (f) Supplier will verify and secure the work eligibility of each Supplier Personnel.  Supplier and its employees, agents and subcontractors have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Customer in any manner whatsoever. Customer agrees that it is an independent contractor and shall have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Supplier in any manner whatsoever.

3.2    No Exclusivity.  Each Party acknowledges that the Master Agreement, and any Transaction Schedules, are non-exclusive and either Party may contract with other parties for the procurement or sale of comparable equipment, software, systems and services.

## ARTICLE 4: PERFORMANCE

4.1    In General.  Except as otherwise expressly provided otherwise in the Master Agreement or any Transaction Schedule, Supplier will be responsible for providing all facilities, personnel and other resources as necessary to deliver the Products and perform the Services purchased by Customer pursuant to each Transaction Schedule.

4.2    Service Locations.  Each Transaction Schedule will identify the Customer sites at which Products purchased from Supplier are to be delivered and, if applicable, at which

Customer site Supplier is required to perform any on-site Services. In addition, a Transaction Schedule may specify the Supplier facilities (or facilities of a Supplier subcontractor) at which (or from which) certain Supplier Services are to be provided.

4.3    Time of Performance. Supplier will deliver the Products purchased by Customer in accordance with the agreed delivery time frame and perform and complete the Services diligently and in accordance with any time frames set forth in the applicable Transaction Schedule. Supplier will promptly notify Customer upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely and successful delivery of any Product or performance and completion of any Deliverable or Service.

4.4    Manner of Performance. Supplier's performance under a Transaction Schedule, and the performance of Supplier's Products and Deliverables, will be in accordance with all applicable requirements of the Transaction Schedule, including any service levels or other specific standards of performance set forth therein.

4.5    Supplier Quality Assurance. In providing the Products and performing the Services purchased by Customer, Supplier will follow quality assurance procedures to ensure that, as applicable, the Products have been manufactured and/or developed and the Services have been performed with a high degree of professional quality and reliability.

4.6    Cooperation and Coordination. If Customer performs itself, or retains a third party to perform, any services that interface or interact with Supplier's Products and/or Services, Supplier will cooperate and coordinate with Customer or such third party as reasonably requested or required by such third parties to perform their duties.

4.7    Compliance with Laws.

4.7.1    Compliance Generally. Each Party agrees to obtain all necessary regulatory approvals, licenses and/or permits applicable to its business, and each Party will comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority.

4.7.2    Export. Supplier represents and warrants that as of the date a Product or Deliverable, as applicable, is delivered to Customer, except where Supplier has expressly stated otherwise in a Transaction Schedule, all Products and Deliverables, as applicable, provided to Customer hereunder are exportable without restriction except to countries or nationals of those countries to which exports are prohibited by the Export Administration Regulations, the Office of Foreign Assets Control ("OFAC") regulations, or any applicable successor regulation thereto. Each Party that exports, re-exports or imports any Product or Deliverable, as applicable, agrees that it assumes responsibility

for complying with applicable laws and regulations, including OFAC, and for obtaining required export and import authorizations. To facilitate Customer's compliance with this Section, if Supplier is aware of any equipment, software or other technology (including technical data, technical assistance or training) that Supplier has provided to Customer hereunder (or any component thereof) that contains or concerns encryption, Supplier will make commercially reasonable efforts to promptly provide in writing Customer with information relating to the type of encryption, level of encryption (measured by key lengths in bits), Export Control Classification Number (ECCN), export license or export license exception information, Commodity Classification Automated Tracking System number (CCATS#) and any other similar information requested by Customer.

4.8    Savings Clause. Except as provided in Section 9.3, Customer's failure to perform any of its responsibilities set forth in the Master Agreement or a particular Transaction Schedule will not constitute a material breach of the Master Agreement or the Transaction Schedule or be deemed grounds for termination by Supplier; provided, however, that Supplier's nonperformance of its obligations under the Master Agreement or a Transaction Schedule will be excused if and to the extent such Supplier nonperformance results from Customer's failure to perform Customer responsibilities under the Master Agreement or the Transaction Schedule.

## ARTICLE 5:  SUPPLIER COMPENSATION

5.1    Fees and Expenses. The applicable prices and/or rates and allowable reimbursable expenses for Products and Services purchased from Supplier will be specified in the applicable Transaction Schedule. In no event will any charges to Customer by Supplier exceed the prices or rates set forth in the applicable Transaction Schedule, or if prices or rates are not set forth in the applicable Transaction Schedule, Supplier's best available published rates then in effect, which published rates will be provided to Customer upon request. Such Supplier prices and rates will be subject to any agreed discounts between the Parties set forth in the Master Agreement or the applicable Transaction Schedule.

5.2    Taxes. Customer will pay all sales, use, property, ad valorem, value added or similar taxes imposed on Products purchased from Supplier hereunder or as a result of the Services and/or Deliverables provided by Supplier hereunder, exclusive of corporate business and franchise taxes, taxes based on Supplier's income or gross receipts, withholding taxes and personnel-related taxes. If the transaction contemplated by this Master Agreement is exempt from tax, Customer will provide Supplier with a valid exemption certificate or other evidence of such exemption in a form reasonably acceptable to Supplier. Supplier will, at its own expense, use Commercially Reasonable Efforts to recover refundable or recoverable taxes. Each Party will cooperate with the other in minimizing applicable tax. Supplier will provide to Customer, in a form reasonably acceptable to Customer, original or certified copies of all tax payment receipts or other evidence of payment of taxes by Supplier with respect to transactions or payments under this Master Agreement.

5.3    Payment Terms.

    5.3.1   Unless another payment schedule is specified in the applicable Transaction Schedule, Supplier will invoice Customer (a) after Customer's acceptance of the Products or Deliverables (or other agreed payment milestones) in the case of Products sold or Services performed on a fixed price basis, or (b) monthly in arrears for all other charges, including charges for Services priced on a variable unit rate or time and materials basis, recurring license fees, lease payments, and for out-of pocket costs and expenses; *provided, however,* that Supplier will submit to Customer's project manager the amounts to be invoiced for review prior to actual invoicing.  For Services performed on a time and materials basis, Supplier will also submit time reports to Customer showing the hours worked during the billing period by each Supplier Personnel, with copies of individual time tracking sheets.  To the extent applicable, in addition to the charge(s), each invoice will contain a listing of the following: (a) the type, quantity and serial number (if any), (b) any discounts, (c) applicable taxes and transportation and other costs, and (d) shipping date(s).

    5.3.2   Except for amounts disputed by Customer (of which Customer shall provide Supplier written notice within thirty (30) days of receipt of invoice) validly rendered Supplier invoices will be payable within thirty (30) days after Customer's receipt of the invoice.  In the event Customer disputes amounts under this Section in good faith, Customer will specify the basis for its good faith dispute in writing to Supplier and the Parties will meet promptly to discuss and address the dispute.  Any such dispute will not affect Supplier's right to payment of undisputed amounts and expenses or the Parties' obligations to perform hereunder or Customer's audit rights pursuant to Section 5.4.

5.4    Audit.

    5.4.1.  Record Retention by Supplier and Inspection by Customer.  During the term of each Transaction Schedule and for a period of at least three (3) years after the date of the final payment under such Transaction Schedule, Supplier will maintain complete and accurate accounting records in connection with Products and Deliverables provided and Services performed under such Transaction Schedule, in accordance with generally accepted accounting principles applied on a consistent basis, to substantiate its charges thereunder.  Such records will include, without limitation, payroll records, attendance cards, time tracking sheets and job summaries.  Supplier will provide Customer (or a third party auditor designated by Supplier and reasonably acceptable to Customer) access to such records for audit purposes during the term of each Transaction Schedule and for three (3) years after the date of the final payment under such Transaction Schedule.  Any such audit shall be upon thirty (30) days advance written notice at a time that is acceptable to Supplier and shall occur no more than once per year during business hours.

5.4.2.  <u>Overcharges to Customer</u>.  If any audit reveals that Customer has overpaid any amounts, Supplier will remit to Customer such amounts due within thirty (30) days after receiving from Customer an invoice therefor.

5.4.3.  <u>Audit by Supplier</u>.  During the term of each Transaction Schedule and for twelve (12) months thereafter, Supplier (or a third party auditor designated by Supplier and reasonably acceptable to Customer) may audit Customer's facilities and records to ensure that Customer's use of the Products are in compliance with the Master Agreement.  Any such audit will be conducted during normal business hours at a time acceptable to Customer and upon at least thirty (30) days prior written notice

## ARTICLE 6:  REPRESENTATIONS, WARRANTIES AND COVENANTS

Supplier represents, warrants and covenants as follows, which representations, warranties and covenants will be considered to be given anew for each Transaction upon the execution of each applicable Transaction Schedule:

6.1    <u>Authority</u>.  Supplier has the requisite corporate power and authority and the right or third party licenses, to the best of its knowledge, (a) to enter into the Master Agreement and each Transaction Schedule, (b) to provide the Products and Deliverables thereunder, and (c) to perform the Services thereunder.

6.2    <u>No Destructive Elements</u>.  The Products, Deliverables, and/or material(s) provided by Supplier do not, upon delivery, contain or involve any computer code, programs, procedures, mechanisms or programming devices that are designed to, or would enable Supplier to, disrupt, modify, delete, damage, deactivate, disable, harm or otherwise impede in any manner the operation of the Products, Deliverables, any Customer system or any other associated software, firmware, hardware, computer system or network (e.g., a virus, Trojan horse, worm, backdoor, etc.) (collectively, **"Destructive Elements"**).  If Supplier breaches this Section, Supplier further agrees to use Commercially Reasonable Efforts to timely eliminate any and all Destructive Elements and reverse their adverse effects.  However, in the event it is determined that Supplier's Products, Deliverables or materials are not the cause of the foregoing problem, Customer shall pay Supplier at its standard time and materials rate, plus expenses for any services that Supplier provides in correcting or determining the problem.  Prior to delivery to Customer, Supplier will test each element of the Deliverables or Products utilizing the most recent version and the most recent data file of a reputable, commercially available anti-virus-checking software program to ensure that it is free of Destructive Elements upon delivery. Supplier acknowledges that it does not have any right to electronically repossess any Products or Deliverables.

6.3    <u>No Improper Inducements</u>.  Supplier is familiar with, has complied with, and will comply, in all respects, with the laws and regulations regarding the offering of unlawful or improper inducements (including the U.S. Foreign Corrupt Practices Act, as

amended, and other anti-corruption and anti-bribery laws), as applicable to its
relationship with Customer, and with any other applicable Customer policies regarding
inducements of which Supplier has been given notice.  If at any time during the term of
these General Terms and Conditions, Supplier breaches the foregoing representation,
warranty and covenant, then, in addition to any other rights Customer may have under
the Master Agreement, at law or in equity, Customer may terminate the Master
Agreement and/or any affected Transaction Schedules.

6.4    Equal Opportunity and Affirmative Action Requirements.  To the extent
applicable, the equal employment opportunity and affirmative action requirements set
forth in 41 C.F.R. Part 60-1.4(a) (women and minorities), 41 C.F.R. Part 60-250.5(a)
(covered veterans) and 41 C.F.R. Part 60-741-5(a) (individuals with disabilities) are
hereby incorporated by reference into this Master Agreement.

6.5    DISCLAIMER OF IMPLIED WARRANTIES.  EXCEPT AS SPECIFICALLY
PROVIDED IN THE MASTER AGREEMENT OR IN A TRANSACTION SCHEDULE,
THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, EXPRESSED OR
IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY,
FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NONINFRINGEMENT.
SUPPLIER DOES NOT WARRANT THAT ANY PRODUCTS, DELIVERABLES OR
SERVICES WILL BE PROVIDED ERROR FREE.  TO THE EXTENT THAT A
WARRANTY CANNOT BE DISCLAIMED AS A MATTER OF APPLICABLE LAW, THE
SCOPE AND DURATION OF SUCH WILL BE THE MINIMUM REQUIRED UNDER
SUCH LAW.

**ARTICLE 7:  CONFIDENTIAL INFORMATION AND DATA PROTECTION**

7.1    Confidential Information.  "**Confidential Information**" means any information
obtained by a Party (the **"Receiving Party"**) from or on behalf of the other Party (the
**"Disclosing Party"**) that relates to the past, present or future business activities of the
Disclosing Party or its subsidiaries or affiliates, or their respective employees,
customers or third party suppliers or contractors, including the terms and conditions of
the Master Agreement, information exchanged in the course of negotiating Supplements
and Transaction Schedules, any Transaction Schedule, and any information relating to
the applicable entity's (or person's) plans, pricing, methods, methodologies, processes,
financial data, lists, Intellectual Property Rights, customer information, apparatus,
statistics, programs, research, development, and/or information technology.

7.2    Exceptions.  Confidential Information does not include any particular information
that the Receiving Party can demonstrate is (a) currently in the public domain,
(b) previously known to the Receiving Party free from any obligation to keep it
confidential, (c) publicly disclosed by or on behalf of the Disclosing Party either prior to
or subsequent to the receipt of such information by the Receiving Party,
(d) independently developed by the Receiving Party without any access to or use of
Confidential Information of the Disclosing Party, or (e) rightfully obtained by the

Receiving Party from a third party lawfully in possession of the Confidential Information and who is not bound by confidentiality obligations to the Disclosing Party.

7.3    Treatment of Confidential Information.  The Receiving Party will hold all Confidential Information of the Disclosing Party in trust and confidence for the Disclosing Party and, except as set forth in the Master Agreement or as otherwise may be authorized by the Disclosing Party in writing, the Receiving Party will not disclose to any person, firm or enterprise, or use for its own benefit, any Confidential Information of the Disclosing Party.  The Receiving Party will treat all Confidential Information of the Disclosing Party with the same degree of care that the Receiving Party treats its own confidential or proprietary information, but in no event less than using standards of reasonable care.  The Receiving Party may disclose Confidential Information of the Disclosing Party to the Receiving Party's employees, and to any of the Receiving Party's contractors who are bound to the Receiving Party by confidentiality obligations substantially equivalent to those set forth in this Article, solely as required in order for the Receiving Party to perform its obligations under the Master Agreement or a Transaction Schedule, or in the case of Customer, to receive the Services and/or to use the Products and Deliverables.  In addition, in the case of Customer, Customer may also disclose Supplier's Confidential Information to employees of its parent, subsidiaries and affiliates.  The Receiving Party may disclose Confidential Information of the Disclosing Party if required to do so under applicable law, rule or order provided that the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of the required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy, and provided further that the Receiving Party discloses no more Confidential Information of the Disclosing Party than is reasonably necessary in order to respond to the required disclosure.

7.4    Customer Sensitive Data.  Supplier hereby acknowledges that Customer is subject to certain privacy and information security laws and regulations, pursuant to which Customer is required to ensure that Supplier appropriately safeguards personal or financial information regarding Customer's former, current or prospective clients or employees ("**Customer Sensitive Data**").  To the extent that Supplier receives any Customer Sensitive Data as a result of any exchange of information under the Master Agreement or a Transaction Schedule, and notwithstanding anything to the contrary contained in the Master Agreement, Supplier agrees that it will (a) not disclose or use any Customer Sensitive Data except to the extent necessary to carry out its obligations under the Master Agreement or a Transaction Schedule and for no other purpose, (b) not disclose Customer Sensitive Data to any third party, including its third party service providers without the prior written consent of Customer and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Customer Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems, policies and procedures as Customer may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Customer Sensitive

Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Customer notice thereof, and such further information and assistance as may be reasonably requested. With respect to any third party provided access to Customer Sensitive Data pursuant to subsection (b) of this Section, Supplier will enter into a written agreement with such third party requiring safeguarding of Customer Sensitive Data in a manner no less restrictive than Supplier's obligations under the Master Agreement, and including those affirmative obligations described in this Section.

7.5     Return of Information.  At any time at the request and option of the Disclosing Party and in the event of termination or expiration of the Master Agreement (or any part thereof) or any applicable Transaction Schedule, the Receiving Party agrees to promptly:  (a) return to the Disclosing Party the Confidential Information and/or Customer Sensitive Data, as applicable; or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Customer Sensitive Data, as applicable and, if requested by the Disclosing Party, acknowledge in writing that all such Confidential Information and/or Customer Sensitive Data, as applicable, has been destroyed or permanently erased.  Notwithstanding the foregoing, each party may retain copies of the Confidential Information and/or Customer Sensitive Data, as applicable, to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information and/or Customer Sensitive Data, as applicable, will remain subject to the terms and conditions herein.

7.6     Title.  The Parties acknowledge and agree that any disclosure of Confidential Information, and in the case of Customer, Customer Sensitive Data, will in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such Confidential Information or Customer Sensitive Data.  In addition, Customer's obligations under this Article with respect to Supplier's Confidential Information will not be construed to limit Customer's rights to own or use intellectual property under the Master Agreement and any applicable Transaction Schedules.

7.7     Injunctive Relief.  In the event of a breach or threatened or attempted breach of the provisions of this Article, the Disclosing Party may have no adequate remedy in money or damages and, accordingly, may immediately seek an injunction against such breach.

## ARTICLE 8:  INSURANCE

8.1     Forms of Insurance.  Supplier agrees to obtain and maintain and keep in full force and effect, at Supplier's expense, the forms of insurance with the minimum limits of insurance stated in Exhibit 1.

8.2     Coverage.  All insurance coverage required herein will provide primary coverage,

without contribution from other insurance, for all losses and damages caused by the perils or causes of loss covered thereby. Supplier agrees to have included in each of the insurance policies required herein, a waiver of the insurer's rights of subrogation against Customer, its subsidiaries and affiliates and its insurers.

8.3    Certificates of Insurance. Each insurance policy will be maintained with an insurer having a rating of at least an "A-" in the most currently available Best's Insurance Reports and will provide for at least thirty (30) days prior written notice to Customer in the event of any modification or cancellation. Supplier will furnish Customer with certificates of insurance in satisfactory form, evidencing its compliance with these provisions.

## ARTICLE 9:  TERM AND TERMINATION

9.1    Generally.  These General Terms and Conditions will commence as of the Effective Date and will continue in full force and effect thereafter unless and until terminated as provided herein.

9.2    Termination by Customer.

    9.2.1    For Convenience.

        (a)    If, at any time, there are no outstanding Transaction Schedules in effect, Customer may terminate these General Terms and Conditions and/or any then existing Supplements upon written notice to Supplier without liability for any charges of any kind, assuming all fees or charges due under any Transaction Schedules have been paid.

        (b)    Customer may terminate any Transaction Schedule for convenience by giving Supplier at least thirty (30) days' prior written notice specifying the termination date (or such other period of advance notice as may be specified in the applicable Transaction Schedule).  In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all Products delivered, Deliverables delivered and Services performed up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

    9.2.2    For Supplier Insolvency.  Customer may terminate any Transaction Schedule(s) upon written notice specifying the termination date if Supplier becomes insolvent or unable to pay its debts as they come due or enters into or files (or has filed or commenced against it) a petition, arrangement, application, action or other proceeding seeking relief or protection under the bankruptcy laws of the United States or any similar laws of the United States or any state of the United States or any other country.  In such event, Customer will be obliged to pay Supplier at the contracted rates for all Products, Deliverables and Services performed and Accepted up to the effective

date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

9.2.3    For Cause.    In the event of any material breach of the Master Agreement or a Transaction Schedule by Supplier, Customer may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved by or affected by such breach, in whole or in part, by giving Supplier thirty (30) days' prior written notice of termination thereof; *provided, however,* that such termination will not be effective if Supplier has cured the breach of which it has been notified prior to the expiration of such thirty (30) day notice period.

9.2.4    Additional Rights Upon Termination For Cause.    If Customer terminates a Transaction Schedule, in whole or in part, for cause: (a) Customer may, at its option, keep the Products (to the extent they are under a perpetual license) and/or Deliverables, in whole or in part, upon payment of the applicable undisputed portion of the fees incurred for such Products and/or Deliverables as of the date of such termination, provided, however, if there is a dispute as to the fees, Customer shall provide Supplier written notification of such within 45 days of its receipt of invoice; and (b) Supplier will promptly issue a refund of any prepaid fees unearned as of the date of such termination.

9.2.5    Termination Notices.    Notice of termination under this Section of any specific Transaction Schedule will not be effective as notice of termination of the Master Agreement (or any part thereof) or any other Transaction Schedules then in effect unless specifically stated in the notice; provided, further, that any such notice that purports to be notice of termination of these General Terms and Conditions or any Supplement will not be considered or effective as notice of termination of these General Terms and Conditions or such Supplement unless such notice specifically states that (a) in the case of termination of these General Terms and Conditions, all Transaction Schedules have been terminated and/or expired, or (b) in the case of termination of such Supplement, all Transaction Schedules executed pursuant to such Supplement have been terminated and/or expired, as applicable.

9.3    Termination by Supplier.    In the event Customer (a) breaches in a material respect its obligation to pay any undisputed fees under a particular Transaction Schedule or otherwise materially breaches the Master Agreement or a Transaction Schedule, or (b) fails to meet its confidentiality obligations under the Master Agreement with respect to a particular Transaction Schedule, or (c) any breaches its license restrictions under a particular Transaction Schedule as specified in Section 5.4(a-d) such that Customer materially breaches the Master Agreement or the applicable Transaction Schedule, then Supplier may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved by giving Customer thirty (30) days' prior written notice thereof; *provided, however,* that any such termination will not be effective if Customer has cured such material breach, if it can be cured, prior to the expiration of such thirty (30) day

period.  In such event, Customer will be obliged to pay Supplier at the contracted rates for all Products accepted, Deliverables accepted and Services performed up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

9.4    Effects of Termination.  Upon expiration or termination of the Master Agreement or a Transaction Schedule, as the case may be, Customer shall pay all amounts due to Supplier, if any, in accordance with Section 5.3.  If the Master Agreement or a Transaction Schedule expires or terminates for any reason other than in accordance with Section 9.3, Customer's license rights for which perpetual license fees have been paid shall survive.  If Customer's license rights are terminated due to its breach in accordance with Section 9.3, Customer shall immediately cease its use of the Products and remove from Customer's system, and all copies thereof, to Supplier.

## ARTICLE 10:  INDEMNIFICATION

10.1   "Claim" and "Losses" Defined.  **"Claim"** means any demand, or any civil, criminal, administrative, or investigative claim, action, or proceeding (including arbitration) asserted, commenced or threatened by a third party against Customer Indemnitees, as defined below.  **"Losses"** means all judgments, awards, settlements, liabilities, damages, liens and claims, and all related costs, expenses and other charges suffered or incurred as a result of or in connection with a Claim, including reasonable attorneys' fees and disbursements, costs of investigation, litigation, settlement and judgment, and any taxes, interest, penalties and fines with respect to any of the foregoing.

10.2   Indemnification by Supplier.  Supplier will, at its sole cost and expense, indemnify, defend and hold harmless Customer and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assigns (collectively, **"Customer Indemnitees"**) from and against any and all Losses suffered or incurred by any of them arising out of or in connection with a Claim of or for any of the following, whenever made:

10.2.1 that any Product(s), Deliverable(s), and/or Services furnished by or on behalf of Supplier, or the use thereof by Customer constitutes an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Rights of a third party; or

10.2.2 for death or bodily injury, or the damage, loss or destruction of real or tangible personal property of third parties (including employees of Customer and Supplier and their respective subcontractors) brought against a Customer Indemnitee and alleged to have been caused by the fault or negligence of Supplier, its officers, personnel (including Supplier Personnel), agents and/or representatives; or

10.2.3 by or on behalf of any subcontractors or independent contractors of Supplier, or any of Supplier's personnel (including Supplier Personnel) that perform Services on Customer's premises, except to the extent such Claim is caused by the willful misconduct or gross negligence of Customer

10.2.4 (a) in respect of Supplier's obligations as an employer of its personnel (including any Supplier Personnel), or (b) any claim or action alleging that a Customer Indemnitee should be deemed the "employer" or "joint employer" of any of Supplier's personnel (including any Supplier Personnel).

10.3   Indemnification Procedures.  Customer agrees to give Supplier prompt written notice of any Claim for which a Customer Indemnitee seeks indemnification; provided, however, any failure by Customer to provide such notice will not relieve Supplier of its indemnification obligations under the Master Agreement except to the extent Supplier can demonstrate actual prejudice as a result of such failure.  Within thirty (30) days after receiving Customer's notice of a Claim, but no later than ten (10) business days before the date on which any formal response to the Claim is due, Supplier will notify Customer in writing as to whether Supplier acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the Claim (a **"Notice of Election"**). If Supplier delivers a timely Notice of Election to Customer, Supplier will have the right to conduct the defense of the Claim and, consistent with the rights of Customer Indemnitees hereunder, all negotiations for its settlement; *provided, however,* that the Customer Indemnitee(s) shall provide Supplier cooperation and assistance in any defense (at Supplier's expense) and may participate in such defense or negotiations, at its (or their) own expense, to protect its (or their) interests and that any settlement will be for the payment of money by Supplier and will not, without the prior written approval of Customer, obligate or impose liability on Customer or any Customer Indemnitee in any way, including without limitation, to any determination or admission regarding Customer's or any Customer Indemnitee's interest.  If Supplier does not deliver a timely Notice of Election, upon prior written notice to Supplier, the affected Customer Indemnitee(s) may defend and/or settle the Claim in such manner as it (or they) may deem appropriate, at the reasonable cost and expense of Supplier, including payment of any settlement, judgment or award and the costs of defending or settling the Claim. Supplier will promptly reimburse the Customer Indemnitee(s) upon demand for all Losses suffered or incurred as a result of or in connection with the Claim, as such Losses have been agreed upon in a settlement or awarded by a court of competent jurisdiction.

## ARTICLE 11: INFRINGEMENT

11.1   Corrective Actions.  Supplier will give Customer prompt written notice of any threat, warning or notice of any Claim asserted against Supplier under Section 10.2.1. In addition to Customer's other rights and Supplier's other obligations hereunder, if all or any part of a Product or Deliverable is, or in the opinion of Supplier's intellectual

property counsel may become, the subject of any claim or suit for infringement of any Intellectual Property Right, Supplier may, and in the event of any adjudication that the Product or Deliverable, or any part thereof, does infringe or if the use of the Product or Deliverable, or any part thereof, is enjoined, Supplier will promptly:  (a) procure for Customer, at no additional cost or expense to Customer, the right to use the Product or Deliverable, or the affected part thereof; or, (b) to the extent such option is not available to Supplier on commercially reasonable terms following Commercially Reasonable Efforts to procure such right, replace, at no additional cost or expense to Customer, the Product or Deliverable, or affected part thereof, with a modified or substituted Product, Deliverable or part, that does not violate any third party's Intellectual Property Rights and that is qualitatively and functionally the equivalent of the affected Product or Deliverable, or part thereof.

11.2   Return.  If neither (a) nor (b) above is available to Supplier on commercially reasonable terms following Commercially Reasonable Efforts to procure the same, and Supplier has so advised Customer, or if Supplier has not promptly performed in accordance with (a) or (b) above, Customer shall surrender the Products and/or Deliverables purchased under the applicable Transaction Schedule, and receive a refund of the aggregate payments made by Customer for or in respect of the returned Products and/or Deliverables (including amounts paid in respect of any Services performed in relation to the returned Products and/or Deliverables) less a reasonable deduction for amortization based on a period of five (5) years if Customer has been using the Products and/or Deliverables for at least four (4) months, except in the case of a willful or knowing infringement by Supplier prior to delivery of the Products and/or Deliverables to Customer in which case there will be no such amortization.

11.3   Exclusions.  Notwithstanding the foregoing, Supplier will have no obligation to indemnify Customer for infringement of Intellectual Property Rights of a third party pursuant to Section 10.2.1 to the extent the Claim is based upon:  (a) any use of the Products or Deliverables expressly in contravention with the terms of this Master Agreement and the applicable Transaction Schedule; (b) any use of the Products or Deliverables in combination with other product, equipment, and/or software not provided or approved of by Supplier in writing or reasonably foreseeable by Supplier and only to the extent that the Claim would not have arisen in the absence of such combination; (c) any modification of the Products or Deliverables by any person other than Supplier or its authorized agents or subcontractors, or as authorized or endorsed by Supplier in writing and only to the extent that the Claim would not have arisen in the absence of such modification; or (d) Customer's failure to implement a release of a particular Product or Deliverable that includes a modified or substituted component that does not violate any third party's Intellectual Property Rights provided to Customer by Supplier pursuant to Section 11.1(b) after a reasonable period of time after Customer receives the applicable release.

## ARTICLE 12:  LIMITATION OF LIABILITY

12.1  IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL,

SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE EVEN IF SUCH PARTY KNOWS OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES.

*PROVIDED, HOWEVER,* THAT THE LIMITATIONS OF LIABILITY IN THIS ARTICLE 12 WILL NOT APPLY TO ANY OF THE FOLLOWING:  (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PROTECTION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (C) BREACH OF LICENSE RESTRICTIONS IN SECTION 5.4(a-d) IN THE PRODUCT LICENSE SUPPLMENT OR (D) ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.

12.2  EACH PARTY'S TOTAL LIABILITY TO THE OTHER, WHETHER IN CONTRACT OR IN TORT (INCLUDING BREACH OF WARRANTY, NEGLIGENCE AND STRICT LIABILITY IN TORT) WILL BE LIMITED TO AN AMOUNT EQUAL TO THE GREATER OF (I)  TWO-HUNDRED FIFTY THOUSAND DOLLARS ($250,000) OR (II) THE TOTAL AGGREGATE FEES PAID OR PAYABLE UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION WILL NOT APPLY TO ANY OF THE FOLLOWING:  (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PROTECTION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (C)  BREACH OF LICENSE RESTRICTIONS IN SECTION 5.4(a-d ) IN THE PRODUCT LICENSE SUPPLEMENT OR (D) ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.

## ARTICLE 13:  RULES OF CONSTRUCTION

13.1   Entire Agreement.  The Master Agreement constitutes the entire agreement between the Parties with respect to its subject matter contained therein, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to such subject matter.  When executed by both Parties, each Transaction Schedule will constitute the entire agreement between the Parties with respect to its subject matter, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to the subject matter thereof.

13.2   Amendment.  No modification or amendment of, or supplement to, the Master Agreement or any Transaction Schedule, or any provisions thereof, will be binding upon the Parties unless made in writing and signed by a duly authorized representative of both Parties.

13.3   Governing Law and Jurisdiction.  In all respects the Master Agreement and each

Transaction Schedule will be governed by and construed in accordance with the substantive laws of the State of New York without regard to conflict of law principles. Any claim or action brought by one of the Parties connection with the Master Agreement or a Transaction Schedule will be brought in the appropriate Federal or State court located in the County of New York, and the Parties irrevocably consent to the exclusive jurisdiction of such court.

13.4   Third Party Beneficiaries.  Except as expressly set forth herein, no person not a Party hereto will be a third party beneficiary of any provision of the Master Agreement or any Transaction Schedule.  Notwithstanding the foregoing, it is agreed that Customer Indemnitees are not such excluded third party beneficiaries.

13.5   Waiver.  At no time will any failure or delay on the part of any Party in exercising any right or remedy provided in the Master Agreement or in any Transaction Schedule operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at law or in equity.

13.6   Remedies Not Exclusive.  Except as expressly provided herein, no remedy specified in the Master Agreement or in any Transaction Schedule is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other right or remedy provided herein or available at law or in equity.

13.7   Headings.  Headings in the Master Agreement and in the Transaction Schedule(s) are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

13.8   Section References.  Unless otherwise indicated or required by the context, references to articles and sections of the Master Agreement and any Transaction Schedule(s) also refer to and include all sections and subsections of the referenced article or section.

13.9   Use of Certain Words.  Unless the context requires otherwise, (a) **"including"** (and any of its derivative forms) means including but not limited to, (b)  **"will"** and **"shall"** are expressions of command, not merely expressions of future intent or expectation, and (c) use of the singular imports the plural and vice versa.

13.10  Severability.  If any term, provision or part of the Master Agreement or any Transaction Schedule is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of the Master Agreement or Transaction Schedule, as applicable, will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.

13.11 <u>Survival</u>.  Any provision of the Master Agreement or any Transaction Schedule that contemplates performance or observance subsequent to termination or expiration of the Master Agreement or such Transaction Schedule (including confidentiality and data protection, limitation of liability, indemnification provisions and perpetual licenses and the corresponding license restrictions) will survive termination or expiration of the Master Agreement or such Transaction Schedule, as applicable, and continue in full force and effect thereafter.  Notwithstanding the foregoing, the following provisions in the Master Agreement shall survive termination:  Article 1, Section 3.1, Article 5, Section 6.5, Article 7, Section 9.4, and Articles 10 through 15.

13.12 <u>Counterparts</u>.  The Master Agreement and any Transaction Schedule may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  A facsimile of a signed copy of the Master Agreement or other copy made by reliable mechanical means may be relied upon as an original.

13.13 <u>Other Purported Agreements</u>.   Neither the Master Agreement nor any Transaction Schedule may be supplemented, modified, or governed by any shrink-wrap or click-wrap agreement or any confirmation, acknowledgement, or other sales or shipping form of Supplier, or executed via electronic signature, unless Customer first agrees in a writing that is not an electronic communication to be bound by such purported agreements.

13.14 <u>Licenses Survive Bankruptcy</u>.  All rights and licenses (if any) granted by Supplier to Customer under or pursuant to the Master Agreement or any Transaction Schedule are, and will otherwise be deemed to be, for purposes of Article 365(n) of the United States Bankruptcy Code (the **"Code"**), licenses to rights to "intellectual property" as defined under Article 101(35A) of the Code.  The Parties agree that Customer, as licensee of such rights under the Master Agreement or such Transaction Schedule, will retain and may fully exercise all of its rights and elections under the Code.  The Parties further agree that, in the event of the commencement of bankruptcy proceedings by or against Supplier under the Code, Customer will be entitled to retain all of its rights under this license.

## ARTICLE 14:  GENERAL

14.1   <u>Binding Nature and Assignment</u>.  Neither Party may assign these General Terms and Conditions, any Supplement or any Transaction Schedule (whether by operation of law or otherwise) without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed.  Any purported assignment in breach of this Section will be void.  Notwithstanding the foregoing, in the event that Customer files for protection under the United States Bankruptcy Code, the trustee of Customer's bankruptcy estate may assume these General Terms and Conditions, any Supplement,

any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier, and Supplier hereby consents to such assumption. In addition, Customer may assign these General Terms and Conditions, any Supplement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier to (a) any Customer entity; or (b) in the case of any merger or sale of its stock or assets, to the successor in a merger of Customer or to any entity that acquires all or substantially all of its stock or assets. Supplier may assign this Master Agreement in the case of any merger or sale of its stock or assets, to the successor in a merger of Supplier or to any entity that acquires all or substantially all of its stock or assets, provided that the successor is not a competitor of Customer.  Subject to the foregoing, this Master Agreement will bind and inure to the benefit of each Party's permitted successors and assigns.

14.2    Notices.

14.2.1 All formal notices and communications relating to the Master Agreement or any Transaction Schedule will be in writing and delivered personally, by overnight delivery service or by first class prepaid mail with return receipt requested to (a) in the case of Supplier, its address as first set forth above and (b) in the case of Customer, to Director of Global Sourcing Services, 745 Seventh Avenue, New York, New York 10019, with a copy marked to the attention of the General Counsel at the same address.  A copy of each notice or communication relating to an affected Supplement or Transaction Schedule will also be sent to the applicable Parties' principal points of contact identified in the applicable Supplement or Transaction Schedule.

14.2.2 Either party may change the address(es) or addressee(s) for notice hereunder upon written notice to the other.  Any notice hereunder will be effective upon receipt by the Party to which such notice is addressed.

14.3    Force Majeure.  Neither Party will be liable for delay or failure to perform its obligations hereunder caused by an event of natural disaster, casualty, acts of God, riots, terrorism, governmental acts or such other event of similar nature that is beyond the reasonable control of the Party seeking to rely in this Section to excuse its delay or failure provided such Party did not contribute in any way to such event.  Supplier will maintain commercially reasonable disaster recovery plans to cure any such delays or failures.  Supplier will keep the plans under review and make such changes, from time to time, as are required in accordance with industry best practice, and will make such plans available to Customer for review upon request.  Notwithstanding the foregoing, if any Supplier delay or failure to perform that is attributable to a force majeure event continues beyond ten (10) calendar days, Customer will nevertheless have the right to terminate any affected Transaction Schedule, in whole or in part, with no further liability and receive a refund of any unearned, prepaid fees.

14.4    Publicity.  Neither Party will use the name or marks of, refer to, or identify the

other Party (or any related entity) in publicity releases, interviews, promotional or marketing materials, public announcements, customer listings, testimonials or advertising without the prior written consent of the other Party.

14.5   Subcontractors.   Supplier will be solely responsible for its subcontractors and will remain fully responsible at all times for providing the Services.  Supplier will be Customer's sole point of contact regarding the Products and Services (including Deliverables), including with respect to payment.

## ARTICLE 15:  GLOSSARY OF DEFINED TERMS

Certain definitions of capitalized terms used in the Master Agreement and the Transaction Schedules are set out below.  Other capitalized terms will have the meanings as assigned throughout the Master Agreement (including the Supplements) and the Transaction Schedules.

| Defined Term: | Meaning: |
| --- | --- |
| **Commercially Reasonable Efforts** | Taking all such steps and performing in such a manner as a well managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit. |
| **Deliverable** | Any work product, in any form, resulting from performance of the Services that is either specifically identified as a Deliverable in a Transaction Schedule or is developed for Customer pursuant to a Transaction Schedule. |
| **Documentation** | The standard end user documentation provided with and made commercially available for the software provided under a Transaction Schedule. |
| **Intellectual Property Rights** | All intellectual and industrial property rights, including copyrights, mask work rights, moral rights, trade secrets, patent rights, rights in inventions, trademarks, trade names, and service marks (including applications for, and registrations, extensions, renewals, and re-issuances of, the foregoing). |
| **Services** | Any functions, responsibilities, activities and/or tasks Supplier performs (whether directly or indirectly) or is responsible for performing under the Master Agreement or any Transaction Schedule. |
| **Supplier Personnel** | Any and all personnel assigned by Supplier to perform any |

| **Defined Term:** | **Meaning:** |
|---|---|
| | part of the Services, including employees and independent contractors and agents of Supplier and any of its subcontractors. |

(The Next Page Is The Signature Page)

The Parties have caused these General Terms and Conditions to be executed by their respective duly authorized representatives.

| FORTIFY SOFTWARE, INC. (SUPPLIER) | Lehman Brothers Holdings Inc. (CUSTOMER) |
|---|---|
| By:_____ | By: _John A Greco_ |
| Name:_____ <br> (Type, Print or Stamp) | Name: _John A. Greco_ <br> (Type, Print or Stamp) |
| Title:_____ | Title: _Authorized Signatory_ |

# EXHIBIT 1

## INSURANCE

| Form of Insurance | Minimum Limits of Insurance |
|---|---|
| (a) (1) Workers Compensation and (2) Employers Liability | As required by law $1,000,000 per occurrence (BI/disease) |
| (b) Professional Liability (aka Errors & Omissions Liability). Such insurance should be endorsed to cover services provided by subcontractors if any. | $2,000,000 per occurrence and aggregate |
| (c) Commercial General Liability on an occurrence basis, including premises operations, products and completed operations, contractual liability, and personal and advertising injury coverages. Supplier will name Lehman Brothers Holdings, Inc. and its subsidiaries and affiliates as an additional insured by certificate of insurance. | $1,000,000 per occurrence and aggregate |
| (d) Commercial Automobile Liability covering all leased, owned and non-owned vehicles and naming Lehman Brothers as an additional insured by certificate of insurance. | $1,000,000 per occurrence combined single limit for bodily injury and property damage liability |
| (e) Umbrella Liability on a follow form basis | $2,000,000 per occurrence and aggregate excess of the Commercial General Liability and Commercial Automobile Liability Insurance |

## PRODUCT LICENSE TRANSACTION SCHEDULE

**Supplier Name:  Fortify Software, Inc.**
**Supplier Jurisdiction of Incorporation: Delaware**
**Supplier Address:  2215 Bridgepointe Parkway, Suite 400, San Mateo, CA 94404**
**Tax ID:  04-3744573**
**Telephone #:  (650) 358-5600**
**Fax #: (650) 358-4704**
**General Terms and Conditions No.:** CON000000022656
**General Terms and Conditions Effective Date: August 17, 2007**
**Product License Supplement Effective Date: August 17, 2007**
**Schedule No.:  PLTS-2**  *CON000000028773*
**Order Date:  May 30, 2008**

This Product License Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and License Supplement between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the specific software Product(s) being licensed by Customer.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, License Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the License Supplement, that form this Transaction Schedule :

Annex 1:  Product  [Required]

Annex 2:  Installation [Required]

Annex 3:  Specifications [Required]

Annex 4:  Acceptance Criteria and Procedures [Optional]

Annex 5:  Maintenance Services [Optional]

Annex 6:  Prices, Fees and Charges [Required]

Annex 7:  Escrow Provisions [Optional]

Annex 8:  Training [Optional]

**[Annex 9:  Export Control [Required, when applicable]**

Annex 10:  Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the License Supplement referenced above

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives.

**FORTIFY SOFTWARE, INC.**
**(SUPPLIER)**

By:_____

Name:_____
     (Type, Print or Stamp)

Title:_____

**Lehman Brothers Holdings Inc.**
**(CUSTOMER)**

By:___Janet Bradley___

Name:___Janet Bradley___
     (Type, Print or Stamp)

Title:___Auth Signatory___

## ANNEX 1:  PRODUCT

**Product Name:  Fortify 360 Source Code Analyzer (SCA) Enterprise Edition**

| Product Description | Authorized Users |
|---|---|
| **Fortify 360 Source Code Analyzer - Enterprise Edition:** | 5,000 |
| **Perpetual License** | |
| Unlimited Build Servers | |
| Unlimited projects | |
| All languages | |
| Unlimited Fortify 360 SCA Servers | |
| Fortify 360 SCA IDE Plug-In | |
| Audit Workbench | |
| Rules Builder | |
| Collaboration Module for Fortify 360 SCA Server | |
| | |
| **Annual Support and Maintenance** | Included   for   1st Year |
| Web and Telephone support, product upgrades | |
| | |
| **Annual Subscription - Enterprise Secure Coding** | |
| **and Extended Rules** | Included   for   1st Year |
| Includes all supported languages | |

**Scope of License** (if different from Scope of License and right to Use provisions in License Supplement):

Supplier grants to Customer, and its contractors that are under contract with Customer to provide services to Customer, provided that such contracts between Customer and contractors protect Supplier's Intellectual Property Rights and Confidential Information at least to the same extent as the Master Agreement, and Customer assumes full liability for contractors' conduct hereunder (each, a "**Designated User**") a non-exclusive, perpetual and/or subscription, worldwide license to use each Product on a Customer machine solely for the benefit of Customer, in object code form, including Updates provided hereunder as part of Maintenance Services and all related Documentation.

Designated Users (if any, in accordance with Scope of License provisions in License Supplement).  **Each Designated User must also be an Authorized User**.

Authorized User means: means the number of authorized users specified on this Annex 1.

Each and every developer or other user who, regardless of the mode of access (i.e., via a copy from a server, remotely, concurrently, etc.), either (i) uses the Products, or (ii) works on the body of source code analyzed by the Products, whether with or without actual usage of the Products, shall each count as one Authorized User.

**License Term (if not perpetual):**  Three (3) Year Perpetual License with the right to renegotiate Software, Support and Maintenance, and Rules Subscription costs at the end of the term.  For the purposes of renegotiation, pricing included in Annex 6 is based on 5,000 Authorized Users.  At the end of three years Supplier  and Customer will examine the number of Authorized Users using the Software and if it is greater than 5,000 Authorized Users, Supplier  and Customer will negotiate in good faith on additional Software License, Support and Maintenance, and Rules Subscription costs. For avoidance of doubt, there will be no additional license fees for the initial 5,000 licenses purchased in this Transaction Schedule, which are perpetual.    Rules Subscription costs for the initial 5,000 licenses are not perpetual and will be renewed annually along with Support and Maintenance.

Source Code in Escrow:    Yes

**If "YES" then the additional escrow provisions will be attached hereto as Annex 7 and will apply.**

In addition, the Parties agree to execute an escrow agreement (Place an "X" next to the selection):

__x__  Upon execution of the Transaction Schedule pursuant to which the Parties agree to put source code and the documentation related thereto for the Products and Updates into escrow.

_____  Within thirty (30) days after the date of the Transaction Schedule pursuant to which the Parties agree to put source code and the documentation related thereto for the Products and Updates into escrow.

_____  Other (Fill in number of days): Within _____ (__) days after the date of the Transaction Schedule pursuant to which the Parties agree to put source code and the documentation related thereto for the Products and Updates into escrow.

## ANNEX 2:  INSTALLATION

Installation Site:   Lehman Brothers – Jersey City, New Jersey

Scheduled Delivery Date:  Within 72 business hours of receipt of signed contract

Customer Installed:        **[YES]**        NO     (Bracket or Circle One)

If YES: The Parties acknowledge and agree that a PDF document with such instructions has been provided by Supplier.

## ANNEX 3:  SPECIFICATIONS

Documentation referenced or to be attached.

## ANNEX 4:  ACCEPTANCE CRITERIA AND PROCEDURES

There will be no acceptance criteria or acceptance testing for this Transaction Schedule as Customer has already fully tested the Software.

## ANNEX 5:  MAINTENANCE SERVICES

In addition to the Maintenance Services as generally described in the License Supplement, Supplier will provide Customer with the following Maintenance Services:

☐    web-based support service to correct and repair any failure, malfunction, defect or nonconformity which prevents the Products from performing in accordance with the warranties, Documentation, Specifications, or other mutually-agreed criteria (including Acceptance Criteria), and other descriptions and/or materials provided to Customer

☐    live telephone support service (during the hours specified below) to correct and repair any failure, malfunction, defect or nonconformity which prevents the Products from performing in accordance with the warranties, Documentation, Specifications, or other mutually-agreed criteria (including Acceptance Criteria), and other descriptions and/or materials provided to Customer

☒    Monday – Friday, between the hours of 6:00 a.m. to 6 p.m. (PST, excluding holidays) ("Support Hours")

☐    Saturday, between the hours of _____ (Installation Site local time)

☐    Sunday, between the hours of _____ (Installation Site local time)

☐    after-hours support services (for all hours not covered by live telephone support) through paging and similar devices to correct and repair any failure, malfunction, defect or nonconformity which prevents the Products from performing in accordance with the warranties, Documentation, Specifications, or other mutually-agreed criteria (including Acceptance Criteria), and other descriptions and/or materials provided to Customer.

Customer may elect to extend the hours of maintenance coverage, arrange for on-site or other services available from Licensor at mutually agreed upon rates.

Supplier and Customer will determine and agree upon the Problem Severity Level for each problem.  Supplier will make commercially reasonable efforts to comply with the below Service Levels, and if Supplier fails to comply with any of the following Service Levels, Customer, at Customer's option, will be entitled to terminate Maintenance Services and receive a refund of the pro-rated portion of any prepaid, unearned Maintenance Fees.

| Problem Severity Level Response Time Resolution Time | Response Time Service Level | Resolution Time Service Level |
|---|---|---|
| Level 1: Product is not working, a significant function of the Product is not properly working or a significant number of Customer users are unable to access or use some functionality.  There is or, if | Supplier will respond to and Supplier's senior engineers will commence efforts to fix Level 1 problems within 2 hours after | Supplier's engineers will work continuously during Support Hours to endeavor to provide Customer with an acceptable work-around for the Level |

| Problem Severity Level Response Time Resolution Time | Response Time Service Level | Resolution Time Service Level |
|---|---|---|
| the problem is not promptly remedied, is likely to be a significant impact to Customer's business | Customer reports such problem during Support Hours. | 1 problem within 3 business days after Customer reports such problem. |
| Level 2: Functionality of the Product is impaired or some Customer users are unable to access or use some functionality.  There is some impact to Customer's business. | Supplier will respond to Customer within 4 hours of Customer reporting the problem during Support Hours. | Within one business day of reporting the problem, Supplier will use reasonable efforts, during Support Hours to provide Customer with an acceptable work-around for the Level 2 problem within 7 business days. |
| Level 3: Low impact to Customer users of the Product. | Supplier will respond to Level 3 problems no later than 24 hours after Customer reports such problem during Support Hours. | To the extent it is commercially reasonable, Supplier will endeavor to provide Customer with a work-around for the Level 3 problem in the next Update or version of the Product. |

## ANNEX 6:  PRICES, FEES AND CHARGES

## License Fee: $690,000

Amount:  $690,000

Paid: In accordance with the General Terms and Conditions, and thereafter, if
applicable:    (Bracket or Circle One)

Annually       Quarterly       Monthly        **[Other]  One time fee**

## Annual Maintenance and Rules Subscription Fee:

Year One:  Included in License Fee

Year Two:  $150,000  for the period June 1, 2009- May 31, 2010

Year Three:  $195,000  for the period  June 1, 2010 – May 31, 2011

## Additional Software Purchase Options:

1.   Customer  will have the right to buy an Enterprise License for Fortify 360 Program Trace
Analyzer (PTA) at a price of $500,000, if purchase is made by November 2, 2008..  Annual
Maintenance and Rules Subscription Fees will be included for the first year, and then 25%
annually for subsequent years.

2.  Customer will have the right to buy an Enterprise License for Fortify 360 Real Time Analyzer
(RTA) at a price of $500,000, if purchase is made by November 2, 2008.  Annual Maintenance
and Rules Subscription Fees will be included for the first year, and then 25% annually for
subsequent years.

3.  If both RTA and PTA are purchased at the same time by Customer  by November 2, 2008,
the price for both analyzers will be $800,000.

## Notes:

Note 1:  The above pricing and details of this proposal are considered Confidential Information
per the Mutual Non-Disclosure Agreement signed by Lehman Brothers and Fortify Software on
July 23, 2007.

## ANNEX 7:  ESCROW PROVISIONS

Escrow Agreement provided in a separate PDF document.

## ANNEX 8:  TRAINING

Not applicable

**ANNEX 9:  Statement of Work**



# Statement of Work
## Initial Rollout Pilot Package

## Prepared for
## Lehman Brothers

## May 19, 2008

# Table of Contents

1.    **EFFECTIVE DATE** ........................................................... **13**~~3~~

2.    **SCOPE OF SERVICES** .................................................. **13**~~3~~

3.    **ASSUMPTIONS** ............................................................. **14**~~3~~

4.    **SYSTEM REQUIREMENTS** ............................................ **15**~~3~~

5.    **TERM & SCHEDULING** .................................................. **16**~~3~~

6.    **SCHEDULE** ................................................................... **16**~~3~~

7.    **PRICING** ...................................................................... **18**~~3~~

8.    **PAYMENT** ..................................................................... **18**~~3~~

9.    **CHANGE MANAGEMENT** ............................................... **18**~~3~~

10.   **FORTIFY'S PERSONNEL REQUIREMENTS** ...................... **19**~~3~~

11.   **PROPRIETARY RIGHTS** ................................................. **19**~~3~~

12.   **SOW EXECUTION**.............ERROR! BOOKMARK NOT DEFINED.~~3~~

# 1. EFFECTIVE DATE

The effective date of this Statement of Work is: May 30, 2008.

This Statement of Work ("SOW") is subject to the General Terms and Conditions:  IT Products and Services (the "Master Agreement") and the relevant Transaction Schedule between Fortify Software, Inc. ("Fortify") and Lehman Brothers Holdings Inc. ("Customer"), the Master Agreement effective as of August 17, 2007 and the Transaction Schedule effective as of May 30, 2008.  To the extent that there is any conflict or inconsistency between the terms and conditions contained in this SOW and the Master Agreement and/or Transaction Schedule, this SOW shall prevail. Capitalized terms not specifically defined herein shall have the meanings set forth in the Master Agreement and/or Transaction Schedule.

# 2. SCOPE OF SERVICES

Fortify will perform the Services and provide the Deliverables as described in this SOW.

A member of the Fortify services team ("Fortify Resource") will travel to a Customer location to deliver the following Services:

* Install Fortify 360 software and install Collaboration module on primary and disaster recovery (DR) servers.

* Provide assistance in determining the adequacy of Lehman's DR plans.

* Work with internal authentication group/systems to establish sign-on for Fortify 360.  All effort should be taken to minimize new user provisioning                                                              tasks.

* Develop a mechanism for dynamically importing information from our in-house application database. This will provide the place-holders for applications to automatically upload their results.

* Upon request, create a project plan and manage the pilot deployment.

* If the SCA software can be called directly from NAS storage, then install SCA on NAS and provide instructions on running it. If

it requires host-specific installation, then work with respective packaging teams to develop packages for deployment.


* For Build Forge integration, provide methods of calling SCA and related command-line tools from scripts for each of our top 5 build scenarios. This includes shell scripts to simplify scanning applications. It includes documentation and samples for typical Lehman configurations. It must cover samples for use with Ant, Maven and generic shell scripts. It must cover languages Java, JSP, C++, C#, SQL and .Net code. It must cover environment-specific idiosyncrasies for Weblogic, JBoss and IIS. It must provide a simple mechanism for uploading results of scan to appropriate Fortify 360 server.

* Provide initial training for security group, build group and key developers on the use of SCA with Fortify 360 and the Collaboration module. 3 Training Classes are included. Training classes can accommodate up to 12 individuals.

* Train key security personnel on how to create Custom Rules to minimize false positives and focus on specific issues.

* Develop weekly progress reports during the Engagement Period.


Any changes to the SOW regarding the Services or the Deliverables must be submitted in accordance with Section 9 prior to implementation.


# 3. <u>ASSUMPTIONS</u>

The Services performed by Supplier will be based on the Assumptions described below.


1. Customer shall allow appropriate access to its work environment including physical access and access to the Customer VPN, if needed. The Supplier resource(s) will work on site at Customer during normal Customer hours as requested by Customer and as required to complete the Services outlined herein.

2.  Customer shall provide time and resources for installation, integration and running of Fortify 360 SCA. This requires at least one developer or software build engineer be allocated to the project for at least a day and possibly more if there are complications.

3.  Customer shall identify and provide all source files, compiled libraries and software tools required to correctly build a Customer software application at the outset of any scanning work.   Ideally, all the required tools and code will reside on the same machine for performance purposes.

# 4. <u>SYSTEM REQUIREMENTS</u>

Using Fortify 360 SCA will also require suitable hardware with the following minimum specifications:

### A. Hardware Minimum Requirements
- A high-end Pentium processor or equivalent
- At least 2 GB of RAM.
- Free hard disk space:
  - Enterprise Edition – 1 GB
  - IDE Plug-ins – 500 MB

### B. Supported Operating Systems
- SCA: Windows, Linux, Mac OS X, AIX, Solaris or HPUX
- RTA/DEA: Windows, Linux, Mac OS X, Solaris

As a general rule of thumb for Fortify SCA, for large applications with over 1 million lines of code, a Linux machine with over 4 GB of RAM is recommended.

## 5. <u>TERM & SCHEDULING</u>

This SOW will be effective upon the effective date specified in Section 1 and will continue through the duration of the Schedule identified in the section titled, "Schedule," unless sooner terminated, in whole or in part, according to the terms of the Master Agreement or as set forth herein. Upon termination of this SOW, Supplier will deliver all Customer confidential information and all Deliverables and/or works in progress, provided Lehman Brothers has paid all fees due for such Deliverables and/or works in progress.

Customer may reschedule Services up to ten (10) business days prior to the first day of the engagement with no penalty for rescheduling. If a day of service is rescheduled with less than ten (10) business days of notice, the day will be considered delivered and will be charged to Customer accordingly.

Regardless of the notice given, if a day of service has been rescheduled after Supplier travel arrangements have been made, Customer will be responsible for any financial penalties that are incurred as a result of the change, e.g., airline change fees.

In addition, the minimum engagement will be at least two (2) continuous days.  Supplier will deliver fractional days (beyond two (2) days) at Customer's request; fractional days will be charged in one half (½) day increments.

If unforeseen third-party technical or Customer environmental factors prevent completion of custom integration work within the contracted Consulting Days specified in Section 7, this SOW may be amended to accommodate said work.

Services not completed within 240 days of the SOW effective date of this SOW will be assumed to be complete, and Supplier will bill Customer for any unpaid remaining days.

## 6. <u>SCHEDULE</u>

The engagement start date will occur within thirty (30) days of the effective date of the SOW, provided Customer gives Supplier notice of Customer availability.  Supplier will endeavor to complete each Deliverable within twenty (20) business days of receiving notice of Customer's availability.

## 7. <u>PRICING</u>

| Service Description | # Days | Extended Price |
|---|---|---|
| Consulting | 20 | |
| Practice Management | 6 | |
| Fortify 360 Training | 6 | |
| Rules Training | 2 | |
| **Sub-Total** | **34** | **$90,000** |
| **Travel & Expenses** | | **18,000** |
| **Total** | | **$108,000** |

**Travel & Expense Reimbursement:**

Customer will compensate Supplier for travel and expenses incurred while delivering this engagement. Travel and expenses are limited to twenty percent (20%) of the total SOW price without the advance written authorization of Customer.

## 8. <u>PAYMENT</u>

Payment for Services will be as set forth in the Master Agreement or Transaction Schedule. Supplier will invoice for Services upon execution of the SOW. Supplier will invoice Customer following the end of that month for travel and related expenses incurred during each month.

Customer will not be obligated to pay Supplier for any Services performed that are not within the scope of this SOW unless such Services are authorized in writing by Customer as described in Section 9.

## 9. <u>CHANGE MANAGEMENT</u>

Customer may at any time request a modification to the scope of services upon ten (10) business days written notice to Supplier. Said notice shall describe the requested modifications in detail sufficient to permit Supplier to submit to Customer, within five (5) business days following receipt of notice,

an estimate of the cost and schedule impact to effect the modifications. Supplier shall implement the modifications only upon written authorization from Customer in the form of a change order. Until such an agreement is reached, the original SOW will be delivered.

# 10.   SUPPLIER'S PERSONNEL REQUIREMENTS

Supplier represents that the Supplier resources staffed on this project have the necessary experience to meet the stated objectives and to provide Customer with professional and high-quality services. Supplier retains the right to rotate resources dependent upon specific task, function, or other circumstances. Customer retains the right to request replacement of a Supplier resource for cause.

# 11.   PROPRIETARY RIGHTS

All Services and Deliverables (and all Intellectual Property Rights therein) are and will remain the exclusive property of Supplier or its suppliers, regardless of whether Customer or Customer's employees or agents contribute to the conception or join the development of the deliverable.

With regard to custom development work, such is considered Deliverables, and Supplier also owns such and all copies, modifications, upgrades and updates thereto.   Supplier will maintain deliverables at standard consulting rates except in cases where a deliverable is integrated as part of Supplier's standard product.   In this case, the standard product and the included deliverable will be maintained through Supplier's then current support and maintenance policies Customer and its suppliers own or have any and all right, title and interest in and to proprietary Customer-provided materials. Customer will have ten (10) days from the date the Deliverables are completed to ensure that such conform with this SOW and accept such.  If no written acceptance is given on or before the expiration of that time period, the Deliverables will be deemed accepted by Customer.