**<u>Exhibit C</u>**

**Sale and Purchase Agreement**



**FRESHFIELDS BRUCKHAUS DERINGER**

**LB RUSSIA HOLDINGS INC.**

**and**

**NOMURA EUROPE HOLDINGS PLC**

---

**AGREEMENT**

**for the sale and purchase of a 100% participation interest in
OOO "Lehman Brothers"**

---

MOS205460/6

# CONTENTS

**Clause**                                                                                           **Page**

1.    SALE AND PURCHASE ................................................................................................ 1
2.    THE PRICE ................................................................................................................... 1
3.    CONDITIONS TO CLOSING ........................................................................................ 2
4.    PRE-CLOSING SELLER UNDERTAKINGS .................................................................. 5
5.    CLOSING ..................................................................................................................... 5
6.    WARRANTIES ............................................................................................................. 5
7.    SECONDARY TAX LIABILITIES ................................................................................. 5
8.    CONFIDENTIALITY ..................................................................................................... 6
9.    ASSIGNMENT .............................................................................................................. 7
10.   COSTS ......................................................................................................................... 7
11.   NOTICES ...................................................................................................................... 7
12.   WHOLE AGREEMENT ................................................................................................. 8
13.   WAIVERS, RIGHTS AND REMEDIES .......................................................................... 8
14.   EFFECT OF TERMINATION ......................................................................................... 9
15.   EFFECT OF CLOSING .................................................................................................. 9
16.   VARIATIONS ............................................................................................................... 9
17.   FURTHER ASSURANCE ............................................................................................... 9
18.   INVALIDITY ................................................................................................................. 9
19.   THIRD PARTY ENFORCEMENT RIGHTS ................................................................... 10
20.   GOVERNING LAW AND ARBITRATION ..................................................................... 10
21.   COUNTERPARTS ......................................................................................................... 10
SCHEDULE 1      THE COMPANY ....................................................................................... 11
SCHEDULE 2      SELLER'S WARRANTIES .......................................................................... 12
SCHEDULE 3      PURCHASER'S WARRANTIES ................................................................... 14
SCHEDULE 4      (A) CONDUCT OF COMPANY PRE-CLOSING........................................... 15
SCHEDULE 5      CLOSING ARRANGEMENTS ..................................................................... 18
SCHEDULE 6      TRANSFER NOTICE ................................................................................. 19
SCHEDULE 7      DEFINITIONS AND INTERPRETATION ...................................................... 21

# AGREEMENT

dated 24 November 2008

**PARTIES:**

1.      **LB Russia Holdings Inc.**, a company incorporated in the State of Delaware, USA and having its registered office at 2711 Centerville Road, Suite 400, the City of Wilmington, County of New Castle, State of Delaware, United States of America registered under the registration number 5621796 (the *Seller*), and

2.      **Nomura Europe Holdings Plc**, a company incorporated in England and Wales with registration number 01550505 and having its registered office at 1 St Martin's-Le-Grand, London, EC1A 4NP, United Kingdom (the *Purchaser*)

(together the *parties*).

RECITALS

        WHEREAS, the Seller is the beneficial and registered owner of the Participation Interest;

        WHEREAS, the Seller desires to sell and the Purchaser desires to purchase the Participation Interest upon and subject to the conditions set forth herein;

        WHEREAS, concurrently with the execution of this Agreement, and as a condition and inducement to the Seller's and the Purchaser's willingness to enter into this Agreement, LBHI and the Purchaser have entered into the Loan Assignment Agreement pursuant to which, subject to and with effect from the satisfaction of certain conditions, LBHI has agreed to sell and assign to the Purchaser all of LBHI's liabilities and obligations under, rights, title and interest in, over and to the Loan Facility Agreement and all moneys which are now or hereafter become due or owing (whether by way of principal, interest or otherwise) under or pursuant to the Loan Facility Agreement;

        WHEREAS, words and expressions used in this Agreement shall be interpreted in accordance with Schedule 7;

        NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the mutual covenants and agreements set forth in this Agreement the parties agree as follows:

**IT IS AGREED:**

## 1.   SALE AND PURCHASE

The Seller agrees to sell, and the Purchaser agrees to purchase from the Seller the Participation Interest at and with effect from Closing together with all rights then attaching to it including the right to receive all distributions of profit declared, paid or made in respect of the Participation Interest after Closing. The Participation Interest shall be sold free from all Third Party Rights and ownership in it shall pass to the Purchaser with effect from Closing.

## 2.   THE PRICE

2.1      The price for the Participation Interest (the *Price*) shall be US$1.

2.2     The Purchaser shall pay the Price at Closing in accordance with Schedule 5.

### 3.   CONDITIONS TO CLOSING

3.1     Closing shall be conditional on the following conditions (the *Conditions*) having been fulfilled or waived in accordance with this Agreement:

(a)     the Purchaser having obtained FAS Approval which is unconditional or subject only to conditions which are acceptable to the Purchaser (acting reasonably);

(b)     no amount having been paid by the Company on or after 15 September 2008 to any member of the Seller Group, whether in respect of any Indebtedness or otherwise;

(c)     the Bankruptcy Court shall have issued an order, in the form and substance reasonably acceptable to the Purchaser, (i) approving pursuant to Sections 363 and 365 of the United States Bankruptcy Code, the assumption by LBHI of the Loan Facility Agreement and the sale and assignment by LBHI of the Loan Facility Agreement and the Assigned Loan Rights pursuant to, and in accordance with the terms of, the Assignment Agreement (the *Assignment*), and (ii) approving all of the corporate actions of LBHI in connection with the sale of the Participation Interest, including without limitation, appointing authorized persons to act on behalf of LBHI as managing member of LB Russia Holdings LLC, a Delaware limited liability company; and the "cure" amount established by the Bankruptcy Court in connection with the Assignment (*Cure Amount*) shall be zero, or if the Cure Amount is greater than zero, LBHI shall have elected in its sole discretion to pay the Cure Amount, and shall have fully and irrevocably paid to the Company the entirety of the Cure Amount, without any right to be reimbursed or otherwise compensated for such payment by the Purchaser or the Company;

(d)     each Relevant Seller Group Member having unconditionally and irrevocably waived in writing all of its rights in respect of any Indebtedness (other than Indebtedness owed, outstanding or accrued under or pursuant to the Loan Facility Agreement) which the Company owes or may owe, or otherwise has or may have any obligation in respect of, to such Relevant Seller Group Member on terms which are in form and substance reasonably acceptable to the Purchaser;

(e)     before Closing, the Company not having taken any action (or failed to take any action) and no other event or circumstance having occurred that has resulted in or is reasonably likely to result in either Licence or the Company's status as a trade member of MICEX being revoked or suspended, or having imposed on it any conditions or restrictions that are materially adverse to the Company or its business, operations, assets, liabilities, financial condition or prospects;

(f)     the Company not being insolvent or unable to pay its debts as they fall due, and no Order having been made, petition presented, meeting convened or other step, legal proceeding or procedure being taken or commenced for the winding up of the Company or the initiation of any other insolvency procedure with respect to the Company (other than a petition, or any similar application, which has been dismissed, withdrawn or discharged prior to Closing and without a winding-up order being made in respect of the Company or any other Order being made which places the Company into any form of insolvency procedure), or for the appointment of any provisional liquidator or arbitration manager in relation to the Company or in relation to any other

process whereby the business of the Company is terminated and the assets of the Company are distributed amongst the creditors and/or participants of the Company, and no person having taken or commenced any step, legal proceeding or other procedure for the purpose of the appointment of an administrator, whether out of court or otherwise, in relation to the Company or the implementation of any court approved settlement between the Company and any of its creditors, and no receiver (including any administrative receiver or arbitration manager) having been appointed in respect of the whole or any substantial part of any of the property, assets and/or undertaking of the Company and no Order in respect of any such matter having been made (including, in any relevant jurisdiction, any order by which, during the period it is in force, the affairs, business and assets of the Company are managed by a person appointed for the purpose by a Governmental Authority);

(g)     there not being in effect any Order issued by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transaction;

(h)     the Court Orders contemplated by clause 3.3 shall have been issued and entered by the Bankruptcy Court; and

(i)     there being no breach of the Warranties or breach of the obligations of the Seller set out in Schedule 4(a) which has not been remedied to the Purchaser's reasonable satisfaction.

3.2     The Purchaser undertakes (at its own cost) to use reasonable endeavours to procure that the Condition set out in clause 3.1(a) is satisfied as soon as reasonably practicable after the date of this Agreement.

3.3     The Seller undertakes (at its own cost) to use its reasonable endeavours to procure that the Condition set out in clause 3.1(d) (save to the extent that such Condition has been waived in accordance with clause 3.8) is satisfied as soon as reasonably practicable after the date of this Agreement, including, without limitation, the use of its reasonable endeavours to cause any Relevant Seller Group Member for which approval of the Bankruptcy Court is required to file with the Bankruptcy Court not later than five Business Days after the date of this Agreement a motion seeking entry of an order, in form and substance reasonably acceptable to the Purchaser (the **Court Order**), approving the waivers described in clause 3.1(d). All such motions shall be provided to the Purchaser prior to filing. Thereafter, the Seller shall use its reasonable endeavours to cause any Relevant Seller Group Member for which Bankruptcy Court approval is required to: (i) take all actions as may be reasonably necessary to cause such Court Order to be issued and entered and become a final non-appealable order, and (ii) timely serve a copy of the notice setting forth the hearing date for approval of such Court Order upon any and all parties in interest entitled or required to receive notice under all applicable laws, rules and regulations and orders of the Bankruptcy Court prior to the hearing on such motion.

3.4     The Seller shall give notice to the Purchaser promptly after it becomes aware of any act, omission, event or circumstance which will result or is likely to result in any Condition (other than the Condition set out in clause 3.1(a)) not being satisfied, containing such details as are reasonably available to it in respect of such act, omission, event or circumstance.

3.5     The Seller shall (and shall procure that its Affiliates (except a Specified Affiliate) and the officers, agents and employees of the Seller and its Affiliates (except a Specified Affiliate)):

MOS20546006

3

(a)     provide to the Purchaser and its professional advisers (promptly after such request is made) all information and documents the Purchaser may reasonably request in order to enable the Purchaser to apply for and to obtain FAS Approval or to make a filing with or submission to any other Governmental Authorities in connection with the Transaction;

(b)     provide such other reasonable assistance as the Purchaser may request for the purposes of obtaining FAS Approval and any other approval required from or for the purposes of any filing or submission to any Governmental Authority in connection with the Transaction; and

(c)     provide such evidence to the Purchaser as the Purchaser reasonably requests in order to confirm the satisfaction or non-satisfaction of any Condition (other than the Condition set out in clause 3.1(a)).

3.6     The Purchaser shall give written notice to the Seller of the satisfaction of the Condition set out in clause 3.1(a) promptly after the Purchaser becomes aware of the satisfaction of such Condition (and in any event within one (1) Business Day of it becoming so aware).

3.7     The Seller shall give written notice to the Purchaser of the satisfaction of the Conditions set out in clause 3.1(c), 3.1(d) and 3.1(h) promptly after the Seller becomes aware of the satisfaction of such Condition (and in any event within one (1) Business Day of it becoming so aware).

3.8     The Conditions set out in clauses 3.1(b), 3.1(d), 3.1(e), 3.1(f), and 3.1(i) may be waived (in whole or in part) solely at the discretion of the Purchaser by giving written notice to the Seller, to the extent permitted by applicable law.

3.9     If any of the Conditions has not been satisfied (or waived in accordance with clause 3.8) by 30 December 2008 ("**_Termination Date_**"), then either the Seller or the Purchaser may terminate this Agreement (other than the Surviving Provisions) by written notice to the other party; provided however that the Termination Date shall be automatically extended to 31 January 2009 if all of the Conditions are satisfied (or have been waived in accordance with clause 3.8) as at 30 December 2008, except for the Condition set out in clause 3.1(a).

3.10     Neither the Seller nor the Purchaser may rely on a failure of any Condition to be satisfied if such failure was primarily due to the failure of such party to perform any of its obligations under this Agreement.

3.11     If the Loan Assignment Agreement is terminated in accordance with its terms, then this Agreement (other than the Surviving Provisions) shall automatically terminate.

## 4.   PRE-CLOSING SELLER UNDERTAKINGS

From the date of this Agreement until Closing, the Seller shall comply with the obligations set out in Schedule 4(a), and the Seller and the Purchaser shall comply with their respective obligations set out in Schedule 4(b).

## 5.  CLOSING

5.1     Closing shall take place at the Moscow offices of the Purchaser's lawyers, Freshfields Bruckhaus Deringer LLP (or at such other place as may be agreed in writing by the Seller and the Purchaser) by no later than the date falling two (2) Business Days after the last of the Conditions is satisfied (or waived in accordance with clause 3.8), provided that all Conditions remain satisfied (or have been waived in accordance with clause 3.8) on such date.

5.2     At Closing, each of the Seller and the Purchaser shall deliver or perform (or ensure that there is delivered or performed) all those documents, items and actions respectively listed in relation to that party in Schedule 5.

5.3     If the Seller fails or is unable to perform any of its obligations under clause 5.2 and Schedule 5, the Purchaser  shall not be obliged to complete the sale and purchase of the Participation Interest and to pay or procure the payment of the Price and may, by written notice to the Seller before or at the time Closing would otherwise be due to take place (without prejudice to any rights it may have in relation to such failure or inability) elect:

(a)     to defer Closing to such other date as it may specify in such notice (in which event the provisions of this clause 5.3 shall apply, mutatis mutandis, if the Seller fails or is unable to perform any of its obligations under clause 5.2 and Schedule 5 on such other date); or

(b)     to terminate this Agreement (other than the Surviving Provisions).

## 6.  WARRANTIES

6.1     The Seller warrants to the Purchaser in the terms of the Warranties.

6.2     The Purchaser warrants to the Seller in the terms of the warranties set out in Schedule 3.

6.3     The Seller agrees and undertakes to the Purchaser (for the Purchaser itself and as agent for each individual and entity referred to in this clause 6.3) that, except in the case of fraud, it has no rights against and shall not make any claim against any present or former employee, director, agent or officer of the Company on whom it may have relied before agreeing any term of or before entering into this Agreement (including in relation to any information supplied or omitted to be supplied by any such person in connection with the Warranties or this Agreement).

## 7.  SECONDARY TAX LIABILITIES

The Seller covenants with the Purchaser to pay to the Purchaser an amount equivalent on an after-tax basis to any tax or any amount on account of tax which the Purchaser or any Affiliate of the Purchaser is required to pay which is properly attributable to the Seller or any Associated Person of the Seller (other than, from Closing, the Company). In this clause 7, *Associated Person* means, in relation to a person (the *Relevant Person*), any person that is, or becomes after Closing or has prior to Closing been connected or associated with the Relevant Person for any tax purpose.

MOS2054606

## 8. CONFIDENTIALITY

8.1    For the purposes of this clause 8:

(a)    *Confidential Information* means:

(i)    (in relation to the obligations of any party) any information received or held by such party (or any of its Representatives) relating to the other party; and

(ii)    any information relating to the provisions and subject matter of, and negotiations leading to, this Agreement;

and includes written information and information transferred or obtained orally, visually, electronically or by any other means;

(b)    *Representatives* means, in relation to a party, its respective Affiliates (except, in the case of the Seller, its Specified Affiliates) and the directors, officers, employees, agents, advisers, accountants and consultants of that party and/or of its respective Affiliates (except, in the case of the Seller, its Specified Affiliates).

8.2    Each party shall (and shall ensure that each of its Representatives shall) maintain Confidential Information in confidence and not disclose that information to any person except (i) as this clause 8 permits or (ii) as the other party approves in writing.

8.3    Clause 8.2 shall not prevent disclosure by LBHI or its Affiliates in connection with its Chapter 11 cases pending in the Bankruptcy Court or by a party or its Representatives to the extent that it can demonstrate that:

(a)    disclosure is required by law or by any stock exchange or any regulatory, governmental or antitrust body (including, without limitation, any tax authority or in connection with obtaining FAS Approval) having applicable jurisdiction (provided that the disclosing party shall first inform the other party of its intention to disclose such information and take into account the reasonable comments of the other party);

(b)    disclosure is of Confidential Information which was lawfully in the possession of that party or any of its Representatives (in either case as evidenced by written records) without any obligation of secrecy prior to its being received or held;

(c)    disclosure is of Confidential Information which has previously become publicly available other than through that party's fault (or that of its Representatives);

(d)    disclosure is required for the purpose of any arbitral or judicial proceedings arising out of or in connection with this Agreement, the Business Sale Agreement or the insolvency of any member of the Seller Group.

8.4    Each party undertakes that it (and its Affiliates (except, in the case of the Seller, for Specified Affiliates)) shall only disclose Confidential Information to Representatives if it is reasonably required for purposes connected with this Agreement and only if the Representatives are informed of the confidential nature of such information (without prejudice to the liability of any party for any breach of this clause caused by the action of its Representative).

8.5     Other than in connection with the Seller's obligations with respect to the Bankruptcy Court, neither party shall make any announcement or issue any circular in connection with the existence or the subject matter of this Agreement without the prior written approval of the other party (such approval not to be unreasonably withheld or delayed).

## 9.   ASSIGNMENT

Neither party shall assign, transfer, charge or otherwise deal with all or any of its rights under this Agreement nor grant, declare, create or dispose of any right or interest in it.

## 10.  COSTS

Each party shall be responsible for its own costs, charges and other expenses incurred in connection with the Transaction.

## 11.  NOTICES

11.1    Except as provided in Schedule 4(a) and Schedule 4(b), All notices and other communications under this Agreement shall be in writing and delivered by hand, fax, registered post or courier using an internationally recognised courier company to the address set out below (or to such other address as is notified to the other party in accordance with this clause 11.1):

| | |
|---|---|
| **The Seller** | Lehman Brothers Holdings, Inc. |
| | 1271 Avenue of the Americas, |
| Address: | New York, New York 10020 |
| | |
| Fax: | +1 212 646 9668 |
| | |
| For the attention of: | General Counsel |
| **The Purchaser** | Nomura Europe Holdings Plc |
| | |
| Address: | 1 St Martin's-Le-Grand, London, EC1A 4NP |
| | |
| Fax: | |
| | |
| For the attention of: | Mark Chapman (General Counsel) |

11.2    A notice or other communication under this Agreement shall be effective upon receipt and shall be deemed to have been received (i) at the time of delivery, if delivered by hand, registered post or courier or (ii) at the time of transmission if delivered by fax provided that in either case, where delivery occurs outside Working Hours, notice shall be deemed to have been received at the start of Working Hours on the next following Business Day.

## 12.  WHOLE AGREEMENT

12.1    This Agreement, the Loan Assignment Agreement, and the schedules and exhibits hereto and thereto, set out the whole agreement between the parties and their respective Affiliates in respect of the sale and purchase of the Participation Interest and the assignment

of the Loan Facility Agreement and the Assigned Loan Rights, and supersedes any prior agreement (whether oral or written) relating to the Transaction. It is agreed that:

(a)    no party shall have any claim or remedy in respect of any statement, representation, warranty or undertaking made by or on behalf of the other party (or any of its Connected Persons) in relation to the Transaction which is not expressly set out in this Agreement, the Loan Assignment Agreement, or the schedules and exhibits hereto and thereto;

(b)    any terms or conditions implied by law in any jurisdiction in relation to the Transaction are excluded to the fullest extent permitted by law or, if incapable of exclusion, any right, or remedies in relation to them are irrevocably waived;

(c)    the only right or remedy of a party in relation to any provision of this Agreement shall be for breach of this Agreement; and

(d)    except for any liability in respect of a breach of this Agreement, the Loan Assignment Agreement, or the schedules and exhibits hereto and thereto, neither party (or any of its Connected Persons) shall owe any duty of care or have any liability in tort or otherwise to the other party (or its respective Connected Persons) in relation to the Transaction,

provided that this clause shall not exclude any liability for (or remedy in respect of) fraudulent misrepresentation. Each party agrees to the terms of this clause 12 on its own behalf and as agent for each of its Connected Persons. For the purpose of this clause, *Connected Persons* means (in relation to a party) the officers, employees, agents and advisers of that party or any of its Affiliates.

### 13.  WAIVERS, RIGHTS AND REMEDIES

No failure or delay by any of the parties in exercising any right or remedy provided by law or under this Agreement shall (save to the extent expressly provided for in this Agreement) impair such right or remedy or operate or be construed as a waiver or variation of it or preclude its exercise at any subsequent time and no single or partial exercise of any such right or remedy shall preclude any further exercise of it or the exercise of any other remedy.

### 14.  EFFECT OF TERMINATION

14.1    If this Agreement is terminated pursuant to clause 3.9, 3.11 or 5.3(b), neither the Seller nor the Purchaser (nor any of their respective Affiliates (except, in the case of the Seller, for a Specified Affiliate)) shall have any Claim of any nature against the other party (or any of its Affiliates (except, in the case of the Seller, for a Specified Affiliate)) except in respect of any rights and liabilities which have accrued before termination or under any of the Surviving Provisions.

14.2    Save as (i) provided in clauses 3.9, 3.11 and 5.3(b), or (ii) by the mutual agreement of the parties, neither party shall have any right to terminate this Agreement.

### 15. EFFECT OF CLOSING

Notwithstanding Closing, (i) each provision of this Agreement not performed at or before Closing (if any) but which remains capable of performance; (ii) the Warranties and (iii) all covenants, obligations and other undertakings and assurances contained in or entered into pursuant to this Agreement, will remain in full force and effect and (except as otherwise expressly provided) without limit in time.

### 16. VARIATIONS

No amendment of this Agreement shall be valid unless it is in writing and duly executed by or on behalf of the parties.

### 17. FURTHER ASSURANCE

Each party at its own cost shall (and shall procure that its Affiliates (except, in the case of the Seller, the Specified Affiliates) shall) execute all such documents and take such steps and do all such acts or things as may reasonably be required for the purpose of giving effect to the provisions of this Agreement and in particular to ensure that its terms are binding on or enforceable against each party in any relevant jurisdiction and to ensure that any changes required to be made to the charter of the Company in order to give effect to the sale and purchase of the Participation Interest are registered with the Unified State Register of Legal Entities of the Russian Federation.

### 18. INVALIDITY

Each of the provisions of this Agreement is severable. If any such provision is held to be or becomes invalid or unenforceable in any respect under the law of any jurisdiction, it shall have no effect in that respect and the parties shall use all reasonable efforts to replace it in that respect with a valid and enforceable substitute provision the effect of which is as close to its intended effect as possible.

### 19. THIRD PARTY ENFORCEMENT RIGHTS

19.1    The persons referred to in clause 6.3 shall have the right to enforce clause 6.3 by reason of the Contracts (Rights of Third Parties) Act 1999.

19.2    Except as provided in clause 19.1, a person who is not a party to this Agreement shall have no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any of its terms.

### 20. GOVERNING LAW AND ARBITRATION

20.1    This Agreement shall be governed by, and interpreted in accordance with, English law.

20.2    Except as expressly provided otherwise in this Agreement, the courts of England are to have exclusive jurisdiction to settle any disputes which may arise in connection with the creation, validity, effect, interpretation or performance of, or the legal relationships established by, this Agreement. For such purposes each party irrevocably submits to the jurisdiction of the English courts, waives any objections to the jurisdiction of those courts and

irrevocably agrees that a judgment or order of the English courts in connection with this Agreement is conclusive and binding on it and may be enforced against it in the courts of any other jurisdiction.

20.3    The Seller shall at all times maintain an agent for service of process and any other documents in proceedings in England or any other proceedings in connection with this Agreement.  Such agent shall be Law Debenture Corporate Services Limited, Fifth Floor, 100 Wood Street, London EC2V 7EX and any claim form, judgment or other notice of legal process shall be sufficiently served on the Seller if delivered to such agent at its address for the time being.  The Seller irrevocably undertakes not to revoke the authority of this agent and if, for any reason, the Purchaser requests the Seller to do so it shall promptly appoint another such agent with an address in England and advise the Purchaser.  If, following such a request, the Seller fails to appoint another agent, the Purchaser shall be entitled to appoint one on behalf of the Seller at the Seller's expense.

## 21.  COUNTERPARTS

This Agreement shall be executed in two (2) original counterparts, of which one (1) counterpart shall be held by Purchaser and one (1) counterpart shall be held by the Seller.

## SCHEDULE 1

## THE COMPANY

### OOO "LEHMAN BROTHERS"

| | | |
|---|---|---|
| 1. | Main State Registration Number: | 1077757805267 |
| 2. | Date of Incorporation: | 11 July 2007 |
| 3. | Place of Incorporation: | Moscow, Russian Federation |
| 4. | Registered office: | 3 Smolenskaya ploshad, office 1409, Moscow 121099 Russian Federation |
| 5. | General director: | Ms Volkova Irina Andreevna |
| 6. | Charter Capital: | |
| | (a) Amount: | Fifteen million (15,000,000) |
| | (b) Participants/percentage participation interest: | LB RUSSIA HOLDINGS INC.– 100% |
| 7. | Subsidiaries of the Company | None |

**SCHEDULE 2**

**SELLER'S WARRANTIES**

**1.    THE SELLER GROUP AND THE PARTICIPATION INTEREST**

1.1    Authorisations, valid obligations, filings and consents

(a)    The Seller has obtained all corporate authorisations and (other than to the extent relevant to the Conditions) all other governmental, statutory, regulatory or other consents, licences or authorisations required to empower it to enter into and perform its obligations under this Agreement where failure to obtain them would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement.

(b)    Entry into and performance by the Seller of this Agreement will not (i) breach any provision of its constitutional documents or (ii) (subject to fulfilment of the Conditions) result in a breach of any laws or regulations in its jurisdiction of incorporation or of any order, decree or judgment of any court or any governmental or regulatory authority, where (in either case) the breach would materially and adversely affect its ability to enter into or perform its obligations under this Agreement.

1.2    The Seller, the Company and the Participation Interest

(a)    Each of the Seller and the Company is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation.

(b)    The Participation Interest constitutes the entire participation interest in the Company and no person other than the Seller has any interest in the charter capital of the Company. The Participation Interest is fully paid and there is no outstanding liability to pay any additional contributions on it, and the Seller is and will immediately prior to Closing be (i) the sole legal and beneficial owner of the Participation Interest free from all Third Party Rights and (ii) entitled to transfer or procure the transfer of the Participation Interest on the terms of this Agreement.

(c)    No member of the Seller Group (except a Specified Affiliate) has entered into any agreement whereby any person has any legally enforceable right (exercisable now or in the future and whether contingent or not) to call for the issue of any interest in the charter capital or any loan capital of the Company.

(d)    The Company does not own or have any interest of any nature in any participation interest, shares, debentures or other securities in or issued by any undertaking.

(e)    The information in respect of the Company set out in Schedule 1 is accurate in all material respects.

(f)    No amount has been paid by the Company to any member of the Seller Group on or after 15 September 2008, whether in respect of any Indebtedness or otherwise.

(g)     Save for any Indebtedness which is owed, outstanding or accrued pursuant to the Loan Facility Agreement, the Company does not have any Indebtedness owed, outstanding or accrued to any Relevant Seller Group Member.

## SCHEDULE 3

## PURCHASER'S WARRANTIES

1.1     The Purchaser has obtained all corporate authorisations and (other than to the extent relevant to the Conditions) all other governmental, statutory, regulatory or other consents, licences or authorisations required to empower it to enter into and perform its obligations under this Agreement where failure to obtain them would adversely affect to a material extent its ability to enter into or perform its obligations under this Agreement.

1.2     Entry into and performance by the Purchaser of this Agreement will not (i) breach any provision of its constitutional documents or (ii) (subject to fulfilment of the Conditions) result in a breach of any laws or regulations in its jurisdiction of incorporation or of any order, decree or judgment of any court or any governmental or regulatory authority, where (in either case) the breach would materially and adversely affect its ability to enter into or perform its obligations under this Agreement.

1.3     The Purchaser is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation.

**SCHEDULE 4(A)**

**CONDUCT OF COMPANY PRE-CLOSING**

1.  From the date of this Agreement until Closing, the Seller shall ensure that (except with the Purchaser's written consent):

(a)  the affairs of the Company are conducted only in the ordinary and usual course and that the Company does not make or agree to make any payments (other than payments of salary and other monthly entitlements of the Employees which have been disclosed to the Purchaser in writing prior to the date of this Agreement) and does not incur any other liability other than routine payments and other liabilities incurred in the ordinary and usual course of business which are each in an amount of less than $5000;

(b)  all reasonable steps are taken to preserve and protect the assets of the Company and to preserve and retain its goodwill (including the existing relationships of the Company with employees, clients, prospective clients and suppliers);

(c)  all reasonable steps are taken to preserve and maintain in full force and effect the licences, permissions, authorisations and memberships issued to the Company which are required for carrying on its business effectively in the places and in the manner in which it is carried on at the date of this Agreement and in accordance with all applicable laws and regulations in each case in all material respects, including without limitation the Licences and the Company's trade membership of MICEX;

(d)  subject to clause 8 (Confidentiality), the Purchaser's representatives shall be allowed such access as is reasonably requested, upon reasonable notice and during Working Hours, to (i) the books and records of the Company (including all statutory books, minute books, leases, contracts, supplier lists and client lists), and (ii) the premises used by, and management of, the Company;

(e)  the Company does not declare or pay any dividend or other distribution (whether in cash, stock or in kind), reduce, purchase or redeem any part of its paid-up charter capital or make any payment to any member of the Seller Group (whether in respect of any Indebtedness or otherwise);

(f)  the Company does not (i) create, allot or issue or agree to create, allot, or issue any charter capital or loan capital, or any form of securities, or (ii) grant any option over or right to acquire or subscribe for any participation interest or loan capital, or any form of securities;

(g)  no transactions are entered into between the Company and other members of the Seller Group, except as contemplated by the Loan Assignment Agreement or as required for the purposes of satisfying the Condition set out in clause 3.1(d);

(h)  save as required by law, no changes are made (or agreed by the Company to be made) to the terms of employment (including base salary, bonus entitlement, benefits or other direct, indirect or deferred compensation or severance entitlements) of any Employee, and no changes are made to the duties or title of any Employee;

MOS205460/6

(i)     the Company does not employ or agree to employ any new persons fully or part time or dismiss or give notice of termination of employment to any existing Employee (except for incompetence or gross misconduct or other reasonable cause justifiable in law);

(j)     the Company does not transfer or relocate any Employee away from the business of the Company;

(k)     the Company does not transfer to the business of the Company any employee of any member of the Seller Group who is not, as at the date of this Agreement, working in the business of the Company;

(l)     the Company does not agree to amend the terms of any lease, tenancy or licence agreement to which it is a party, enter into any lease, tenancy or licence agreement (including any long term lease agreement with respect to the Premises) or exercise any option it has available to it to lease or license any additional premises;

(m)     the Company does not enter into, amend or voluntarily terminate any contract that has annual payments (or under which such payments are reasonably expected) in excess of $5000 (***Material Contract***) or make any bid, tender, proposal or offer likely to lead to any Material Contract;

(n)     the Company does not create any Third Party Right over the Participation Interest and/or, except in the ordinary and usual course, the assets of the Company, or any part thereof (or agree to do so);

(o)     except in the ordinary and usual course, the Company does not (i) acquire any asset for an amount in excess of $5000 or (ii) dispose of any asset;

(p)     no action is taken by any member the Seller Group (except a Specified Affiliate) or the Company, which is inconsistent with the provisions of this Agreement or implementation of the Transaction.

2.     Any request made by the Seller to the Purchaser pursuant to paragraph 1 shall be sent by e-mail to Nathan Archer (nathan.archer@uk.nomura.com) and Nicholas Probert (nick.probert@uk.nomura.com). The Purchaser shall use reasonable endeavours to grant or refuse its consent to any request made by the Seller pursuant to paragraph 1 above within two (2) Business Days after receiving such request.

## SCHEDULE 4(B)
## WORKING CAPITAL SHORTFALL

1.      From the date of this Agreement until Closing, in the event that the Company has insufficient working capital to operate in the ordinary course of business (a *WC Shortfall*), the Purchaser shall, upon three Business Days' notice by the Company (or such earlier date as the circumstances of such payment may reasonably require), which notice shall specify (i) the amount of the WC Shortfall, and (ii) payment instructions (a *WC Payment Request*), pay to the Company by way of a loan repayable on demand (such demand not to be made prior to Closing or the date of termination of this Agreement) to be used only for the purpose of eliminating or reducing the WC Shortfall, by wire transfer of immediately available funds into the account designated in the WC Payment Request, the amount specified in the WC Payment Request.

2.      The Seller shall use reasonable endeavours to give the Purchaser at least 10 Business Days notice that it expects to issue a WC Payment Request.

3.      Any WC Payment Request or notice issued by the Seller pursuant to paragraph 2 above shall be sent by e-mail to Nathan Archer (nathan.archer@uk.nomura.com) and Nicholas Probert (nick.probert@nomura.com).

MOS2054606

17

## SCHEDULE 5

## CLOSING ARRANGEMENTS

At Closing, the following actions shall take place in the following order:

(a)     the Seller shall, by no later than 11am Moscow time on the date of Closing, deliver to the Purchaser copies of bank statements (certified by the General Director of the Company as true and correct copies of the relevant originals) showing the cash balances of the Company as at the date of Closing;

(b)     the Seller shall execute a notice of transfer of the Participation Interest substantially in the form set out in Schedule 6 (the *Transfer Notice*) in three counterparts and shall deliver all such counterparts to the Purchaser;

(c)     the Purchaser shall execute the three counterparts of the Transfer Notice delivered to it by the Seller and the Seller shall cause the General Director of the Company to execute all such counterparts of the Transfer Notice in acknowledgement of receipt thereof;

(d)     the Seller shall deliver one original counterpart of the Transfer Notice (executed by the Seller and the Purchaser and acknowledged by the General Director of the Company) to the Purchaser; and

(e)     the Purchaser shall pay the Price to the Seller by electronic transfer of funds to such bank account of the Seller as the Seller notifies to the Purchaser at least one Business Day prior to the date of Closing.  The  Purchaser's obligation to pay the Purchase Price to the Seller shall not be subject to set-off, counterclaim or recoupment of any amounts owed by the Seller Group to the Purchaser or its Affiliates, including, without limitation, with respect to any amounts paid by the Purchaser to the Company pursuant to Schedule 4(b).

## SCHEDULE 6

### TRANSFER NOTICE

[•] 2008

To:    Ms Volkova I. A.
OOO "Lehman Brothers"
(the *Company*)
3 Smolenskaya ploshad, office 1409,
Moscow 121099 Russian Federation

From:

LB Russia Holdings Inc. (the *Seller*)
2711 Centerville Road, Suite 400,
the City of Wilmington, County of New
Castle, State of Delaware, USA

and

Nomura Europe Holdings Plc (the
*Purchaser*)
1 St Martin's-Le-Grand, London, EC1A
4NP, United Kingdom

The Seller and the Purchaser hereby notify
the Company that pursuant to an Agreement
between the Seller and the Purchaser dated
24 November 2008 for the sale and purchase
of a 100% participation interest in the
Company (the *Agreement*), the Seller has
sold and the Purchaser has purchased from
the Seller a 100% participation interest in the
charter capital of OOO "Lehman Brothers"
with a nominal value of fifteen million
Russian roubles (RUR 15,000,000).

The Purchaser shall have the rights and shall
bear the obligations of the Company's
participant from the moment of receipt by the
Company of this notice.

Please acknowledge receipt of this notice by
signing, affixing a stamp and dating the three
counterparts of this notice sent to you and
returning one of the counterparts to the
Purchaser.

[•] 2008 г.

Адресат:    г-же Волковой И. А.
OOO «Лиман Бразерс»
(далее – «*Общество*»)
Россия 121099 г. Москва, Смоленская
площадь, 3 офис 1409

Отправитель:

компания LB Russia Holdings Inc.
2711 Centerville Road, Suite 400, the City of
Wilmington, County of New Castle, State of
Delaware, USA (далее – «*Продавец*»),

и

компания Nomura Europe Holdings Plc
1 St Martin's-Le-Grand, London, EC1A
4NP, United Kingdom (далее –
«*Покупатель*»)

Продавец    и    Покупатель    настоящим
уведомляют   Общество   о   том,   что   в
соответствии с Договором купли-продажи
100%-ной    доли    в    уставном    капитале
Общества      от      24      ноября 2008 г.,
заключенного     между     Продавцом     и
Покупателем    (далее    –    «*Договор*»),
Продавец продал, а Покупатель приобрел
долю   в   уставном   капитале   Общества
номинальной     стоимостью     пятнадцать
миллионов     (15 000 000)     российских
рублей,   составляющую   сто   процентов
(100%) уставного капитала Общества.

Покупатель   приобретает   права   и   несет
обязанности     участника     Общества     с
момента получения Общества настоящего
уведомления.

Просим      Вас      засвидетельствовать
получение     настоящего     уведомления,
проставив свою подпись, печать и дату на
трех его экземплярах, направленных Вам,
и   возвратив   один   из   экземпляров
Покупателю.

On behalf of the Seller:                     От имени Продавца:

_____

Full name/ФИО_____

Title/Должность_____

On behalf of the Purchaser:                  От имени Покупателя:

_____

Full name/ФИО_____

Title/Должность_____

Received by the Company:                     Получено Обществом:

_____

Date/Дата_____

Full name/ФИО_____

Title/Должность_____

## SCHEDULE 7

### DEFINITIONS AND INTERPRETATION

1.      <u>Definitions.</u>  In this Agreement, the following words and expressions shall have the following meanings:

*Affiliate* means in relation to any party, any subsidiary or parent company of that party and any subsidiary of any such parent company, in each case from time to time (and for the avoidance of doubt, in relation to the Purchaser, includes the Company from Closing);

*Assigned Loan Rights* has the meaning given in the Loan Assignment Agreement;

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York;

*Business Day* means a day other than a Saturday or Sunday or public holiday in the Russian Federation or the United Kingdom on which banks are open in Moscow and London for general commercial business;

*Business Sale Agreement* means the business sale agreement relating to the sale and purchase of the investment banking, global finance and equities business carried on by LBH, LBIE, LBEL and LBL dated 23 September 2008 between LBH, LBIE, LBEL and LBL, the Administrators (as defined therein) and Nomura International plc;

*Claim* means any claim for breach of any Warranty, or any other claim by the Purchaser arising out of this Agreement;

*Closing* completion of the sale and purchase of the Participation Interest in accordance with the provisions of this Agreement;

*Company* means Limited Liability Company "Lehman Brothers", a company incorporated in the Russian Federation the details of which are set out in Schedule 1;

*Conditions* has the meaning given in clause 3.1;

*Confidential Information* has the meaning given in clause 8.1;

*Employees* means the employees of the Company;

*FAS* means the Federal Antimonopoly Service of the Russian Federation;

*FAS Approval* means the approval of FAS to the acquisition of the Participation Interest by the Purchaser pursuant to this Agreement;

*Governmental Authority* means any national, federal, regional, state, local or other executive body, legislative body, court, arbitral tribunal, administrative agency or commission, or other governmental administrative or regulatory body, authority (including any tax authority), agency or instrumentality of any country having jurisdiction over either of the parties or any of their Affiliates;

MOS205460/6

21

***Indebtedness*** means any amounts owed, outstanding or accrued between any member of the Seller Group and the Company, whether by arising by way of borrowing, inter-company trading activity, the provision of services, facilities or benefits or otherwise, and in each case whether payable now or in the future and whether contingent or not;

***LBEL*** means Lehman Brothers Europe Limited (in administration), a company incorporated in England and Wales with registration number 03950078 whose registered office is at 25 Bank Street, London E14 5LE;

***LBH*** means Lehman Brothers Holdings plc (in administration), a company incorporated in England and Wales with registration number 01854685 whose registered office is at 25 Bank Street, London E14 5LE;

***LBHI*** means Lehman Brothers Holdings Inc., acting through its UK branch, whose registered branch address is 25 Bank Street, London, E14 5LE;

***LBIE*** means Lehman Brothers International (Europe) Limited (in administration), a company incorporated in England and Wales with registration number 02538254 whose registered office is at 25 Bank Street, London E14 5LE;

***LBL*** means Lehman Brothers Limited (in administration), a company incorporated in England and Wales with registration number 00846922 whose registered office is at 25 Bank Street, London E14 5LE;

***Licences*** means the following licences of professional participant of the Russian securities market issued to the Company by the Federal Service on Financial Markets:

(a)     Licence No. 177-10961-0010000 dated 22 January 2008 for dealer activity, and

(b)     Licence No. 177-10958-1000000 dated 22 January 2008 for broker activity;

***Loan Assignment Agreement*** means a loan assignment agreement dated on or about the date of this Agreement between LBHI and the Purchaser;

***Loan Facility Agreement*** means the Loan Facility Agreement dated 25 September 2007 between Lehman Brothers Holdings Inc. and the Company;

***MICEX*** means ZAO Moscow Interbank Currency Exchange;

***Order*** means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award issued by a Governmental Authority;

***parent company*** means any company which holds a majority of the voting rights in another company, or which is a member of another company and has the right to appoint or remove a majority of its board of directors, or which is a member of another company and controls a majority of the voting rights in it under an agreement with the other members, in each case whether directly or indirectly through one or more companies;

***Participation Interest*** means a one hundred per cent (100%) participation interest in the charter capital of the Company, with a nominal value of fifteen million Russian roubles (RUR 15,000,000);

*Premises* means the offices of the Company situated at Krasnopresnenskaya naberezhnaya, bld.18, block C, 21 floor, Moscow 123317 Russian Federation;

*Price* has the meaning given in clause 2.1;

*Relevant Seller Group Member* means each member of the Seller Group listed in Exhibit A;

*Representatives* has the meaning given in clause 8.1;

*Seller Group* means the Seller and its Affiliates;

*Specified Affiliate* means, in relation to the Seller, an Affiliate of the Seller that is in administration, insolvency or a similar proceeding in a jurisdiction other than the United States of America;

*subsidiary* and *subsidiaries* means any company in relation to which another company is its parent company;

*Surviving Provisions* means clauses 7 (Secondary Tax Liabilities) 8 (Confidentiality), 9 (Assignment), 10 (Costs), 11 (Notices), 12 (Whole Agreement), 13 (Waivers, Rights and Remedies), 16 (Variations),18 (Invalidity), 19 (Third Party Enforcement Rights), 20 (Governing Law and Arbitration) and Schedule 7 (Definitions and Interpretation);

*Third Party Right* means any interest or equity of any person (including any right to acquire, option or right of pre-emption or conversion) or any mortgage, charge, pledge, lien, assignment, hypothecation, security interest, title retention or any other security agreement or arrangement, or any agreement to create any of the above as well as seizure or another restriction imposed by any governmental entity or arbitral tribunal or any third party rights or any agreement to create any of the above;

*Transaction* means the sale and purchase of the Participation Interest pursuant to this Agreement;

*Warranties* means the warranties set out in Schedule 2;

*WC Payment Request* has the meaning set out in Schedule 4(b);

*WC Shortfall* has the meaning set out in Schedule 4(b); and

*Working Hours* means 9.30am to 5.30pm in the relevant location on a Business Day.

2.      Interpretation. In this Agreement, unless the context otherwise requires:

(a)     references to a person include any individual, firm, body corporate (wherever incorporated), government, state or agency of a state or any joint venture, association, partnership, works council or employee representative body (whether or not having separate legal personality);

(b)     headings do not affect the interpretation of this Agreement; the singular shall include the plural and vice versa; and references to one gender include all genders;

(c)    references to any English legal term or concept shall, in respect of any jurisdiction other than England, be construed as references to the term or concept which most nearly corresponds to it in that jurisdiction;

(d)    any phrase introduced by the terms *including, include, in particular* or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(e)    references to *US$* or *US dollars* shall be to the lawful currency of the United States of America; and

(f)    references to *RUR* or *Russian roubles* shall be to the lawful currency of the Russian Federation.

3.    <u>Schedules.</u>  The Schedules comprise schedules to this Agreement and form part of this Agreement.

## SIGNATURES

This Agreement is signed by duly authorised representatives of the parties:

| | | |
|---|---|---|
| **SIGNED** | ) | SIGNATURE: _____ |
| on behalf of | ) | |
| **LB RUSSIA HOLDINGS INC.** | ) | NAME: _____ |

| | | |
|---|---|---|
| **SIGNED** | ) | SIGNATURE: _____ |
| on behalf of | ) | |
| **NOMURA EUROPE HOLDINGS PLC** | ) | NAME: _PAUL SPANSWICK_ |
| | | _DIRECTOR._ |

**SIGNATURES**

This Agreement is signed by duly authorised representatives of the parties:

| | | |
|---|---|---|
| **SIGNED**<br>on behalf of<br>**LB RUSSIA HOLDINGS INC.** | )<br>)<br>) | SIGNATURE: *[signature]*<br>NAME: BRYAN MARSAL<br>CHIEF RESTRUCTURING OFFICER |
| **SIGNED**<br>**ON BEHALF OF**<br>NOMURA EUROPE HOLDINGS PLC | )<br>) | SIGNATURE: _____<br>NAME: _____ |

**Exhibit A**
**Relevant Seller Group Members**


Lehman Brothers Holdings Inc.

LB Russia Inc.

LB Russia Holdings LLC

LB Russia Holdings Inc.