**HEARING DATE: December 3, 2008 at 10:00 a.m**

Michael S. Feldberg
Laura Martin
ALLEN & OVERY LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 610 6300

*Attorneys for Barclays Capital Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                                :
**In re**                                                       :          **Chapter 11 Case No.**
                                                                :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,  :          **08-13555 (JMP)**
                                                                :
              **Debtors.**                                      :          **(Jointly Administered)**
                                                                :
                                                                :
----------------------------------------------------------------x

### REPLY OF BARCLAYS CAPITAL INC. IN FURTHER SUPPORT OF ITS MOTION FOR RELIEF CONCERNING AMERICAN EXPRESS CONTRACTS ERRONEOUSLY POSTED WITH THE CLOSING DATE CONTRACTS

Barclays Capital Inc. ("Barclays") respectfully submits this reply (the "Reply") in

further support of its motion (the "Motion") under Rule 60(b) of the Federal Rules of Civil

Procedure (the "Federal Rules"), made applicable to bankruptcy cases by Rule 9024 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for certain limited relief from this

Court's (i) Order Under 11 U.S.C. §§ 105(a), 363, And 365 And Federal Rules Of Bankruptcy

Procedure 2002, 6004 And 6006 Authorizing And Approving (A) The Sale Of Purchased Assets

Free And Clear of Liens And Other Interests And (B) Assumption And Assignment Of Executory

Contracts and Unexpired Leases, dated September 19, 2008 (D.I. 258) (the "Sale Order"); and (ii)

Order (I) Approving the Break-Up Fee and Expense Reimbursement, (II) Certain Matters Relating

to Competing Bids, if any, (III) Approving the Form and Manner of Sale Notices, and (IV) Setting

the Sale Hearing Date in Connection with the Sale of Certain of the Debtors' Assets (D.I. 88) (the

"Sale Procedures Order").

## PRELIMINARY STATEMENT

The purchase of certain of assets (the "Transaction") by Barclays from Lehman

Brothers Holding Inc. ("LBHI"), Lehman Brothers Inc. ("LBI") and LB 745 LLC (collectively, the

"Debtors") was complex and unprecedented.  See, e.g., Transcript of Hearing before the

Honorable James M. Peck on September 17, 2008 at 4:28 p.m. (the "Sale Procedures Hearing

Trans.") at 18-19, 28-30; Transcript of Hearing before the Honorable James M. Peck on

September 19, 2008 at 4:36 p.m. (the "Sale Hearing Trans.") at 58-64.  The Transaction required

coordination with and approval from the Debtors, regulators, the Securities Investor Protection

Corporation and others so that the Transaction would preserve wasting assets and protect a

number of outstanding interests.  See, e.g., Sale Procedures Order at ¶¶ 6-8; Sale Procedures

Hearing Trans. at 20-21.  The Transaction and its closing had to be worked on with great haste in

order to avoid a loss of value and to enable many customers to regain access to their accounts as

soon as practicable.  See, e.g., Sale Hearing Trans. at 58-73.

Because Barclays was purchasing an ongoing business, it needed (as American

Express puts it) "to continue business operations without any disruption."  Objection of American

Express to Motion of Barclays for Relief Concerning American Express Contracts Listed as

Closing Date Contracts And Request for Interest, Fees and Expenses dated October 27, 2008

("Second Objection") ¶ 2.  To accomplish this, a list of contracts that were critically needed was

created for the assumption and assignment of those contracts on the date that the Transaction

closed (the "Closing Date Contracts").  Declaration of Patrick Coster dated October 14, 2008

("Coster Decl.") ¶ 2.

The contracts between certain of the Debtors and American Express Travel Related Services Company, Inc. ("American Express") were not critically needed, but were included on one of the lists of Closing Date Contracts by mistake.  See, e.g., Coster Decl. 5; Declaration of Leslie Bernauer dated November 5, 2008 ("Bernauer Decl.") ¶ 19.  The list of non-IT Closing Date Contracts erroneously included a reference to the vendor "American Express Travel Related" with a cure amount of $18 million.  Barclays now understands that this entry and cure amount seems to have been referring to two contracts with American Express: (i) the Global Corporate Services Commercial Account Agreement between American Express and LBHI entered into on October 13, 2006, and last amended in November 2007 (the "Corporate Services Agreement") under which American Express agreed to extend lines of credit through corporate cards issued to the employees of LBHI and its global related entities in exchange for LBHI's agreement to be held liable in accordance with specified terms and conditions; and (ii) the Business Travel Services Agreement between American Express and LBI entered into on September 1, 2000, and last amended in February 2008 (the "Travel Services Agreement") under which American Express agreed to make travel arrangements for the employees of LBI and its subsidiaries and affiliates in exchange for LBI's agreement to pay certain commissions and fees on a regular basis.[1]

The Corporate Services Agreement and the Travel Services Agreement (collectively, the "American Express Contracts") were not critical to the continuing operation of the business.  See, e.g., Bernauer Decl. ¶ 19.  The LBHI personnel who were involved with preparing lists of contracts that ultimately were used to designate certain Closing Date Contracts did not view the Corporate Services Agreement or the Travel Services Agreement to be critical to

---

[1]      In addition to the entry described above, the schedule of non-IT Closing Date Contracts also includes a reference to "American Express" with a cure amount of zero.  Neither of these references corresponds entirely to the contracts at issue.  However, it seems that the two agreements described above are the ones that were designated by this schedule.

3

the continuing operation of the business being purchased by Barclays because American Express had stopped performing its obligations under these contracts and the contracts concerned Lehman globally, not just the North American business being purchased.  See Coster Decl. ¶ 5; Bernauer Decl. ¶¶ 9, 16-19.  The American Express Contracts were included on a list of contracts prepared at a time when LBHI's global travel department believed that every outstanding contract needed to be included.  See Bernauer Decl. ¶ 16.  Although the American Express Contracts either should have not been included at that time or should have been removed when the list of contracts was refined to designate only Closing Date Contracts, these contracts remained on the list of Closing Date Contracts by mistake.

Submissions made by both Barclays and American Express in connection with this Motion confirm that the American Express Contracts were not critical to continuing the business being purchased by Barclays.  American Express stopped performing the breadth of its obligations under these contracts on September 15, 2008 (the date on which LBHI commenced its case under chapter 11 of the U.S. Bankruptcy Code (the "Code")) and, as a result, was not supplying any services that were critically needed.  See, e.g., Bernauer Decl. ¶¶ 4-15; Second Objection ¶ 28.  In addition, and importantly, the American Express Contracts were not contracts that could be assumed and assigned under section 365 of the Code.  See Section II.A.3 infra.

No party has suffered any prejudice by the inclusion of the American Express Contracts on a list of Closing Date Contracts for (at most) the twelve days that elapsed between entry of the Sale Order and correction of the list of Closing Date Contracts by Barclays on October 1, 2008.  Although American Express summarily asserts that it reasonably believed that the American Express Contracts had been assigned to Barclays as executory contracts under section 365, this assertion is severely undermined by the fact that American Express was not performing

the services required by these contracts.  See, e.g., Second Objection ¶ 28 (stating that American

Express provided "transition services").  Indeed, American Express suspended its performance of

the Corporate Services Contract with LBHI on the day that LBHI commenced its bankruptcy case

without obtaining relief from the automatic stay, indicating either that American Express

understood that this contract could not be assumed and assigned under section 365 or improperly

suspended performance.

In addition, American Express benefited more than it was detrimentally affected

during this period.  Although American Express extended credit under the Corporate Services

Agreement for a small handful of charges to accounts in the U.S. during this period

(approximately $3,557), American Express also reversed a large number of pre-petition charges

(approximately $273,212) and accepted substantial payments (approximately $401,293) for U.S.

accounts during this time.  See Bernauer Decl. Exs. A and B.  American Express' assertions of

detrimental reliance in respect of the Travel Services Agreement are also unfounded given that

American Express was not performing the agreed services and had to be replaced by another

company.  See Bernauer Decl. ¶¶ 11-14.

Because the relief requested by this Motion would effectively put all parties back to

the position in which they would have found themselves had the mistake not occurred, Barclays'

request for relief causes no prejudice to any parties in interest.  Although the Debtors have

objected to this Motion to the extent it would give rise to administrative expense priority claims,

the amounts due under the American Express Contracts should not be given this priority for the

reasons already stated and, in any event, this issue is not before the Court for determination by this

Motion.  The Official Committee of Unsecured Creditors (the "Creditors' Committee") has

objected to the imposition of any rejection damages against the estates for the American Express

Contracts.  However, the assertion of American Express' claims against the estates as a general

unsecured creditor would simply put the estates and American Express in the positions in which

they would have found themselves had the mistake not occurred.  Barclays is not aware of any

additional burden that the estates would bear as a direct result of the mistake that occurred.

Barclays has demonstrated that it has satisfied the requirements for the limited

relief requested from the Sale Order and Sale Procedures Order under Federal Rule 60(b).

Barclays, therefore, requests that this Court grant Barclays relief from the Sale Order and Sale

Procedure Order to remove the American Express Contracts from the schedule of non-IT Closing

Date Contracts.

## ARGUMENT

## I.      BARCLAYS HAS STANDING TO SEEK THE RELIEF REQUESTED

Because Barclays is a party in interest for both the Sale Procedures Order and Sale

Order, Barclays has standing to request relief from these Orders under Federal Rule 60(b).  See

Lawrence v. Wink (In re Lawrence), 293 F.3d 615, 627 n.11 (2d Cir. 2002) (citing several circuit

court decisions that permitted parties in interest to seek relief under Federal Rule 60(b) when their

interests were "strongly affected" by the order or judgment from which relief was requested); see

also Hasso v. Mozsgai (In re La Sierra Fin. Services, Inc.), 290 B.R. 718, 731 (B.A.P. 9th Cir.

2002) (holding that subsequent purchasers of real estate sold at a bankruptcy sale pursuant to a

sale order to which the subsequent purchasers were not a party had standing to move pursuant to

Rule 60(b) for vacatur of orders that "directly and pecuniarily affect their interests").

Section 1109 of the Code grants broad rights of participation to parties in interest.

11 U.S.C. § 1109(b) ("A party in interest … may raise and may appear and be heard on any issue

in a case under this chapter"); In re Quigley Co., Inc., 391 B.R. 695, 703 (Bankr. S.D.N.Y. 2008)

("[A]nyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains." (quoting <u>In the Matter of James Wilson Assocs.</u>, 965 F.2d 160, 169 (7th Cir. 1992))).

Barclays is a party in interest in seeking relief from both the Sale Procedures Order and Sale Order because Barclays purchased certain assets pursuant to these Orders and, as such, has legally protected interests arising from these Orders.  <u>See</u> <u>In re Koch</u>, 229 B.R. 78, 82 (Bankr. E.D.N.Y. 1999) (holding that the NBA was a "party in interest" due to its "actual, direct interest" in the disputed ownership of certain property); 7 COLLIER ON BANKRUPTCY ¶ 1109.02[1] (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2008) ("In general, a 'party in interest' under section 1109(b) is any person with a direct financial stake in the outcome of the case.").  Indeed, the Sale Order expressly provides that it shall inure to the benefit of Barclays.  <u>See</u> Sale Order ¶ 16.

Despite this clear legal authority, American Express asserts that Barclays lacks standing to bring this Motion.  American Express, however, cites no support for its position. Second Objection ¶¶ 3-4, 29-37.

In addition, American Express asserts that relief cannot be granted under Rule 60(b) because the mistake occurred in preparing the list of non-IT Closing Date Contracts and, as a result, is not a mistake that is seen on the face of the Orders themselves.  <u>See</u> Second Objection ¶ 5.  This argument, however, is not supported by Federal Rule 60(b) or any decisional authority, and is inconsistent with American Express' prior assertions that the American Express Contracts had been assumed and assigned by the Sale Order.  <u>See</u> Objection of American Express To Relief Requested In Notice Of Revisions To Schedules Of Contracts Assumed And Assigned To Purchaser And To Proposed Cure Amount dated October 14, 2008 (D.I. 945) ("First Objection")

7

¶¶10, 26.  In any event, the assumption and assignment of the American Express Contracts under section 365 would have been ineffective without an order of this Court.  See 11 U. S. C. § 365(a).

For these reasons, Barclays has standing to request relief from the Sale Order and Sale Procedures Order, and the relief requested is clearly within the discretionary powers of this Court under Federal Rule 60(b).

## II.    BARCLAYS' REQUEST FOR LIMITED RELIEF FROM THE SALE PROCEDURES ORDER AND SALE ORDER SHOULD BE GRANTED

As set forth more fully in Barclays' Motion (see Motion ¶¶ 18-24), Federal Rule 60(b), made applicable to bankruptcy cases by Bankruptcy Rule 9024, gives bankruptcy courts the discretion to "relieve a party or its legal representative from a final judgment, order, or proceeding" in cases of "mistake, inadvertence, surprise, or excusable neglect."  When the party who made the mistake promptly gives notice and no parties have been prejudiced as a result of the mistake, courts have granted relief from a prior order or judgment pursuant to their discretionary authority under Federal Rule 60(b).  Compania Trasatlantica Espanola, S.A. v. Hartford Accident & Indemnity Co., 950 F.2d 105, 107 (2d Cir. 1991); In re UAL Corp., 411 F.3d 818 (7th Cir. 2005).

As demonstrated in Barclays' Motion and as further demonstrated in this Reply, Barclays has established that a mistake was made in designating the American Express Contracts as Closing Date Contracts, Barclays promptly notified all parties in interest of the mistake and no party was prejudiced as a result of the mistake, making the mistaken designation of the American Express Contracts precisely the type of mistake that Federal Rule 60(b) aims to address.[2]

---

[2]    Given that the submissions made by Barclays and American Express establish the factual predicate required for granting the relief requested, this Court may grant this relief on this basis.  In re Adelphia Business Solutions, Inc., 322 B.R. 51, 56 (Bankr. S.D.N.Y. 2005) (finding that an evidentiary hearing was not required when no material disputed issues of fact existed).

A.    **The Corporate Services Agreement and Travel Services Agreement were designated as Closing Date Contracts by mistake.**

In at least three ways, Barclays has demonstrated that the designation of the American Express Contracts as Closing Date Contracts was a mistake: (1) the LBHI personnel involved in designating the Closing Date Contracts have explained that the American Express Contracts were designated due to a mistake that occurred in preparing and reducing one of the lists of Closing Date Contracts; (2) the contracts were not critical to the continuing operations of the business being purchased given that American Express had ceased performing its obligations under both contracts and, as a result, the contracts were not supporting the business being purchased; and (3) neither of the American Express Contracts were assumable and assignable under section 365.

1.    The LBHI personnel involved in designating the Closing Date Contracts have explained that a mistake occurred with respect to the designation of the American Express Contracts.

As the declarations of Patrick Coster and Leslie Bernauer make clear, the LBHI personnel who assembled lists of contracts to be used for the schedules of Closing Date Contracts included the American Express Contracts solely by mistake.

Patrick Coster, a Senior Vice President within LBHI's Expense and Sourcing Services Department, explained that the schedules of Closing Date Contracts being prepared were only supposed to include contracts that were critically needed to continue business operations. Coster Decl. ¶ 2. The American Express Contracts were not viewed to be critically needed by Mr. Coster or by Leslie Bernauer, a Senior Vice President in LBHI's Global Corporate Travel Department who initially included the American Express Contracts on a list of contracts that her department had prepared. Coster Decl. ¶ 5; Bernauer Decl. ¶¶ 7-15. Ms. Bernauer included it on the list because, at that time, she understood that her department should include _all_ outstanding

contracts on the list, not just critical ones.  Ms. Bernauer knew that the American Express

Contracts were not critical because she was told by the LBHI person to whom she reported that

she would be informed if and when American Express would be designated a critical vendor;

however, she never received such notification.  Bernauer Decl. ¶ 9.  Moreover, Ms. Bernauer

understood that American Express was not performing the agreed services under these contracts

and that the American Express Contracts concerned Lehman <u>globally</u>, and as a result, were not

contracts that were limited to the North American business being purchased by Barclays.

Bernauer Decl. ¶¶ 4-15.

         The American Express Contracts mistakenly remained on the list that ultimately

became the schedule of non-IT Closing Date Contracts even though these agreements were not

critically needed.  Coster Decl. ¶ 5.  Neither Mr. Coster nor Ms. Bernauer believed then—or

believes now—that the American Express Contracts should have been designated as contracts to

be assumed and assigned as part of the Transaction.  Rather, both Mr. Coster and Ms. Bernauer

state that a mistake occurred in the inclusion of these contracts on the final list of Non-IT Closing

Date Contracts.  Coster Decl. ¶ 5; Bernauer Decl. ¶ 19.

         Although American Express asserts that Barclays "changed its mind" about the

American Express Contracts in seeking this relief requested (Second Objection ¶ 46), there is no

scenario offered by American Express under which the Corporate Services Agreement and Travel

Services Agreement would have been (as American Express puts it) "a good deal" (Second

Objection ¶ 7).  The American Express Contracts were only liabilities at the point in time that they

were mistakenly designated as Closing Date Contracts and it is implausible—except by reason of

mistake—that Barclays would accept responsibility for Lehman's <u>global</u> corporate card debt (not

just the corporate card exposure of the business being purchased) and travel services, especially

when American Express was not providing the breadth of services agreed under these contracts.[3]

> 2.      Because the American Express Contracts were no longer being
> performed, they were not critical to the continuing operations of
> the business being purchased.

American Express had suspended nearly all of its performance under both the

Corporate Services Agreement and the Travel Services Agreement beginning on September 15,

2008, the day that LBHI filed its chapter 11 case.  Coster Decl. ¶ 5; Bernauer Decl. ¶ 7-13.

American Express' Objection to this Motion refers to American Express' provision of "transition

services" (see Second Objection ¶ 28), not the agreed scope of services under the American

Express Contracts.  Given that American Express was not providing the agreed services under

these contracts, these contracts were not critical to the continuing operation of the business being

purchased by Barclays.

The Corporate Services Agreement was not being performed by American Express

(except for a very few instances) at the time that the lists of Closing Date Contracts were being

prepared.  On LBHI's petition date, American Express contacted Ms. Bernauer at LBHI to inform

her that American Express would no longer honor requests for charge authorizations with the

exception of employees who were traveling at the time that LBHI commenced its chapter 11 case.

Bernauer Decl. ¶ 7.  Around this same time, Ms. Bernauer also learned that American Express was

reversing a large volume of travel-related charges that had been made prior to LBHI's petition

date—something it was able to orchestrate through its dual role as corporate card provider and

---

[3]      American Express' statements regarding conversations with LBHI or Barclays personnel that it
offers to suggest the contrary either concern conversations that took place before the LBHI or Barclays
personnel understood the nature of the Closing Date Contracts (compare Affidavit of Lydia C. Schulz in
support of Objection of American Express dated October 27, 2008 ("Schulz Aff.") ¶ 6 with Bernauer
Decl. ¶19) or have been disputed (see Declaration of Jason White dated November 7, 2008 ¶ 4 ("I spoke
with Eugene Chikowski [outside counsel for American Express] and informed him of the error in the
original Schedule and that the Contract would be removed from the revised Schedule.")).

travel services provider.  She was informed that American Express was taking this step to reduce its overall exposure under the Corporate Services Agreement.  Bernauer Decl. ¶ 12.[4]

      Ms. Bernauer's recollections of these conversations are confirmed by the activity recorded to the corporate cards, American Express' witnesses and correspondence around this time.  American Express' own records offered concerning the charges made under the American Express Corporate Services Agreement from September 15, 2008 through October 22, 2008 demonstrate that only approximately $669,000 of charges are recorded globally for this five-week period, a quantity substantially lower than the average charges of around $19 million that was typically seen on a monthly basis under the Corporate Services Agreement.  Affidavit of Daniel J. Massoni in Support of Objection by American Express dated October 27, 2008 ("Massoni Aff."), Ex. A; Declaration of Michael S. Feldberg dated November 25, 2008 ("Feldberg Decl.") ¶ 5; Bernauer Decl. ¶ 3.  Corporate card records also indicate numerous reversals of travel-related charges, evidencing American Express' reversals of pre-petition travel services.  See, e.g., Bernauer Decl., Ex. B.  In addition, Lydia Schulz, Vice President of Account Development of American Express, states in her affidavit that other than charges by certain limited personnel, she advised Ms. Bernauer that American Express "required assurances of payment to provide services."  Schulz Aff. ¶4.  Further, American Express' counsel stated in correspondence dated September 25, 2008, that "various Barclays businesspeople have contacted their counterparts at Amex in an effort to restart the Amex programs."  Declaration of Eugene J. Chikowski in Support

---

[4]    The reversal of American Express' pre-petition extensions of credit to LBHI may have violated provisions of the Code and may be subject to avoidance.  See 11 U.S.C. § 362(a)(3) and (6); see also Chase Manhattan Bank v. Iridium Africa Corp., No. Civ.A. 00-564, 2004 WL 323178, at *4 (D. Del. Feb. 13, 2004) ("Section 365(c)(2) of the Bankruptcy Code 'permits the trustee to continue to use and pay for property already advanced.'") (quoting Berliner Handels-und Frankfurter Bank v. East Tex. Steel Facilities, Inc. (In re East Tex. Steel Facilities, Inc.), 117 B.R. 235, 242 (Bankr.N.D.Tex.1990)).

of Objection of American Express Travel Related Services Company, Inc. dated October 14, 2008 ("First Chikowski Decl.") Ex. F (emphasis added).[5]

The Travel Services Agreement was also not being performed by American Express at the time that the lists of Closing Date Contracts were being compiled.  Ms. Bernauer was informed on September 16 and 17, 2008 by American Express that American Express was not accepting new reservations, was cancelling existing reservations, was redeploying some of its employees to other accounts and was removing equipment from Lehman offices at 1271 Avenue of the Americas.  Bernauer Decl. ¶ 11-13.  Her recollections of these conversations are, again, confirmed, not only by the reversed charges discussed above, but also by the fact that Ms. Bernauer's travel department began working with Travel Inc. on September 17, 2008 as a replacement company.  Bernauer Decl. ¶ 14.

As a result, given that the services were not being performed, they could not have been categorized as critical for the <u>continuing</u> operation of the business.

3.      The American Express Contracts were not assumable and assignable
        <u>under section 365 of the Code.</u>

Because the American Express Contracts were not assumable and assignable under section 365 of the Code, their inclusion on a schedule of contracts to be assumed and assigned pursuant to this section was clearly a mistake.

Pursuant to section 365 of the Code, a debtor may assume an executory contract upon approval from the bankruptcy court within the limitations and requirements provided by this section.  However, section 365(c)(2) prohibits the assumption or assignment of a contract to make a loan or extend other debt financing or financial accommodations.  In addition, section 365 only applies to contracts for which performance remains due to some extent on both sides.  <u>COR Route</u>

---

[5]      For purposes of convenience, this declaration has been attached as Exhibit D to the Feldberg Declaration.

5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.), 524 F.3d 373, 379 (2d Cir. 2008).  If one party has committed a pre-petition, material breach that excuses the other party from future performance, the contract is no longer executory and, as a result, not assumable and assignable under section 365.  See Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.), 247 B.R. 51 (Bankr. S.D.N.Y. 1999) ("A contract is no longer executory if one party has breached the contract prepetition and the other party has no further duty to perform."), aff'd, 263 B.R. 406 (S.D.N.Y. 2001); see also Matter of C & S Grain Co., Inc., 47 F.3d 233 (7th Cir. 1995) (debtor's pre-petition repudiation of its contractual obligations gave the other party the right to rescind, resulting in the contract no longer being assumable under section 365); EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 356 B.R. 631, 638 (Bankr. D.Del.  2006) ("[I]f a contract is terminated pre-petition it is no longer executory and section 365 is not applicable.").

Neither the Corporate Services Agreement nor the Travel Services Agreement could be assumed or assigned under section 365.  The Corporate Services Agreement was a contract to make a loan or extend other debt financing or financial accommodations.  Through the Corporate Services Agreement, American Express agreed to extend lines of credit through corporate cards to the employees of LBHI and its global related entities in exchange for LBHI's agreement to be held liable in accordance with specified terms and conditions.  See Bernauer Decl. ¶ 4; Feldberg Decl. ¶ 11-12.  Card members were able to use their cards to incur expenses on behalf of LBHI and its global related entities, including purchases, cash advances and American Express Corporate Travelers Cheque encashments, among other things.  Feldberg Decl. ¶12.  Given that the Corporate Services Agreement was an agreement to extend lines of credit for the benefit of LBHI and its global related entities, Section 365(c)(2) prohibits the assumption and assignment of the Corporate Services Agreement.  See Citizens and Southern National Bank v.

<u>Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.)</u>, 969 F.2d 1013, 1018 (11th Cir. 1992) (explaining that contracts to make a loan, or extend other debt financing or financial accommodations includes "the extension of cash or a line of credit") (quoting 124 CONG. REC. H11089 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards), <u>reprinted</u> in 1978 U.S.C.C.A.N. 5787, 6436, 6447; 124 CONG. REC. S17406 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini), <u>reprinted</u> in 1978 U.S.C.C.A.N. 6505, 6515).[6]

Section 365(c)(2)'s prohibition cannot be waived by consent of the parties or otherwise. <u>Transamerica Commercial Fin. Corp. v. Citibank, N.A. (In re Sun Runner Marine, Inc.)</u>, 945 F.2d 1089, 1092-93 (9th Cir. 1991) (adopting portions of a Bankruptcy Appellate Panel opinion in which it explains that post-petition credit must be extended under section 364 and that section 365(c)(2)'s prohibition on the assumption of loans and debt financing is not waivable or overcome by the consent of the parties); <u>Greenwich Insurance Co. v. Greenwich Street Capital Partners II, L.P. (In re Metro Affiliates, Inc.)</u>, Adversary No. 03-6364, 2008 WL 656788, at *6 (Bankr. S.D.N.Y. Mar. 6, 2008) ("It is clear that Code §365(c)(2) is intended to prevent a debtor in possession from assuming or assigning contracts that would require loans or financial

---

[6]    If American Express disagrees with this conclusion and contends that the Corporate Services Agreement is a contract that is assumable and assignable under section 365, American Express' suspension of the breadth of services provided under the Corporate Services Agreement may have violated its obligation to continue performing under the contract notwithstanding LBHI's commencement of this bankruptcy case. <u>See</u> <u>Pub. Serv. Co. of N.H. v. N.H. Elec Coop., Inc. (In re Public Serv. Co. of N.H.)</u>, 884 F.2d 11, 14 (1st Cir. 1989) (stating that pending a decision to assume or reject a contract, "the executory contract remains in effect and creditors are bound to honor it"); <u>see also</u> <u>In re Enron Corp.</u>, 300 B.R. 201, 212 (Bankr. S.D.N.Y. 2003) ("Courts have consistently held that contract rights are property of the estate, and that therefore those rights are protected by the automatic stay." (quoting <u>In re Eldger-Beerman Stores Corp.</u>, 195 B.R. 1019, 1023 (Bankr. S.D.Ohio 1996)).

The prohibition on assumption and assignment of agreements to make a loan or extend other debt financing or financial accommodations runs parallel to the right to terminate these types of contracts subsequent to the commencement of a bankruptcy case. <u>See</u> 11 U.S.C. § 365(c)(2) and (e)(2)(B). Thus, there are only two possible outcomes: either (i) the Corporate Services Agreement is not assumable, in which case American Express was excused from extending additional credit, or (ii) the Corporate Services Agreement is assumable and American Express was obligated to perform until such time as the contract was rejected by the Debtors or the Court granted American Express relief from the automatic stay.

accommodations to be made in the future, i.e., post-filing date."); <u>Chase Manhattan Bank</u>, 2004

WL 323178, at *4 ("It is clear that parties cannot waive the protective provisions of Section 365(c)

of the Bankruptcy Code through private agreement . . . Section 365 of the Bankruptcy Code is

intended to protect all creditors of the debtor and a contract with one or a few creditors cannot

waive the Bankruptcy Code's protections.").

      The Travel Services Agreement is also not assumable and assignable under section

365 due to American Express' pre-petition breaches of the Travel Services Agreement and LBI's

pre-petition abandonment of the contract through replacement of the services with another

company.  American Express committed material breaches of the Travel Services Agreement prior

to the commencement of proceedings under the Securities Investors Protection Act of 1970 on

September 19, 2008 in respect of LBI, the counterparty to the Travel Services Agreement.

American Express cancelled numerous travel arrangements without the authorization (and over the

objection) of the Debtors and stopped providing travel services (except possibly for a few limited

instances) by September 16, 2008.  <u>See</u> Bernauer Decl. ¶¶ 11-14.  American Express' material

breaches of the Travel Services Agreement caused the Debtors to abandon the Travel Services

Agreement and replace the services with Travel Inc. on September 17, 2008.  <u>See</u> Bernauer Decl.

¶ 14.[7]

      Given that the Court ordered the assumption and assignment of the American

Express Contracts on the basis of finding that the contracts were assumed in accordance with

section 365 (<u>see</u> Sale Order ¶¶ 12-13), the fact that neither of these contracts were assumable and

assignable under this section makes clear that their inclusion on a list of Closing Date Contracts

was a mistake.

---

[7]    Again, if American Express contends that the Travel Services Agreement was an executory
contract that was assumable and assignable under Section 365, then it failed to honor its obligations to
perform.

**B.** **Barclays promptly notified American Express and all parties in interest that a mistake had been made in the designation of the American Express Contracts.**

American Express does not dispute that by October 1, 2008, it knew that its contracts would not be assumed by and assigned to Barclays. Second Objection ¶¶ 17-18. Indeed, the docket in these proceedings demonstrates that Barclays filed a notice on that date, indicating this correction to the lists of Closing Date Contracts. See Notice of Revisions to Schedules of Certain Contracts and Leases Assumed and Assigned to Purchaser dated October 1, 2008 (D.I. 504).

In addition, American Express was notified by September 23, 2008 that a mistake had occurred in the listing of the American Express Contracts and that these contracts were under review. Declaration of Lindsee P. Granfield dated October 14, 2008 ("Granfield Decl.") ¶¶ 5-8. American Express disputes that these conversations put American Express on notice that a mistake had occurred in the listing of these contracts. However, the correspondence from this period demonstrates that American Express was at least on notice that Barclays was puzzled that the global credit card bill for all Lehman entities had been listed on this schedule, believed that a mistake had occurred and was reviewing the matter.[8]

---

[8]   See First Chikowski Decl. ¶ 10 ("Barclays' counsel initially informed me that Barclays did not feel the proposed cure amount for the AmEx Corporate Services Contract was accurate, given the scope of the assets purchased by Barclays."), Ex. F (Letter dated September 25, 2008 from Eugene J. Chikowski to Lindsee P. Granfield stating that "AmEx also can provide copies of the various account statements for the approximately 12,600 cards that it issued worldwide under the Lehman Contract" and that "[a]s you will see, the Lehman Contract is a single agreement that governs the entire global relationship between AmEx and Lehman Brothers.") and Ex. H (E-mail exchange dated September 29, 2008 between Mr. Chikowski, Ms. Granfield and Shai Waisman in which Ms. Granfield states that "listing the Amex contract with the cure amount of $18 million was a mistake" and that "I immediately told you that the listing was a mistake last week (not for the first time below).").

17

**C.**    **Neither American Express nor any other party in interest was not prejudiced by the inclusion of the Corporate Services Agreement and Travel Services Contract on a schedule of Closing Date Contracts for twelve days.**

1.    American Express did not reasonably rely on the mistaken designation of the American Express Contracts as Closing Date Contracts.

American Express could not have reasonably believed that the American Express Contracts were being assumed and assigned under section 365 of the Code. American Express had already sought critical vendor status prior to the Transaction, but its requests went unanswered. Bernauer Decl. ¶¶ 7-10. If American Express had thought that the American Express Contracts were being (and had been) assumed and assigned, it would have been performing its obligations under these contracts. However, American Express was not performing the agreed services. Bernauer Decl. ¶¶ 7, 11-14.

Notwithstanding its failure to provide the agreed services, American Express asserts that it "would not have continued to provide services to Lehman/Barclays under the AmEx Contracts if not for the fact that the AmEx Contracts were assumed and assigned" (Second Objection ¶ 20); however, this statement is wholly inconsistent with the obligations of a party to an executory contract that is assumable under section 365. If American Express believed that the contract was assumable and assignable under section 365, it would have been obligated to perform all agreed services under the American Express Contracts until such time as the Court granted relief from the automatic stay or the contracts were rejected. By its own account, American Express offered only "transition services" under these contracts. <u>See</u> Second Objection ¶ 28. American Express does not—and cannot—explain how it claims to have relied on the assumption of these contracts under section 365 and at the same time did not believe that it was obligated to continue to perform those contracts.

18

In addition, the limited number of charges that were recorded under the Corporate Services Agreement do not correspond with accounts associated with the business that Barclays was purchasing.  It was well known that Barclays was only purchasing certain assets of the Debtors within North America and that Nomura was purchasing Lehman businesses in Europe and Asia (including Australia).  See, e.g., Feldberg Decl. Exs. E-G.  However, as American Express' own submissions in this case demonstrate, American Express permitted certain limited charges to be posted to accounts held throughout the world—not just accounts associated with the business purchased by Barclays in North America.  From September 20, 2008 through October 23, 2008, charges totaling approximately $3,557 were recorded for U.S. accounts (the only accounts listed that could have been associated with the business purchased by Barclays) while approximately $40,288 in charges were recorded to accounts of personnel in Europe and Asia.  See Feldberg Decl. ¶¶ 3-6 and Exs. A-C.  As a result, American Express' extensions of credit to this limited extent in the U.S. seem to be unrelated to the designation of the American Express Contracts as Closing Date Contracts.

Further, American Express' conduct during the twelve-day period during which the American Express Contracts were mistakenly designated was no different from its conduct before entry of the Sale Order on September 19, 2008 or after the removal of the American Express

Contracts from the list on October 1, 2008.  Throughout these periods, it purportedly offered only "transition services," not the agreed services under the American Express Contracts.[9]

> 2.      American Express was not prejudiced during the twelve-day period that the American Express Contracts were <u>mistakenly designated as Closing Date Contracts.</u>

The submissions made by American Express and Barclays in connection with this Motion indicate that American Express benefited more than it was harmed during the twelve days at issue.  Around the same time that the U.S. accounts had incurred charges of $3,557, American Express was reversing numerous charges that had been made pre-petition (amounting to credits totaling approximately $273,212 recorded on the U.S. accounts alone from September 22, 2008 through October 10, 2008) and accepting payments on these accounts (amounting to approximately $401,293 recorded on the U.S. accounts from September 22, 2008 through October 10, 2008).  <u>See</u> Bernauer Decl. Exs. A and B.  Given this, the net benefit to American Express during this period well exceeds any purported detriment.

Although American Express contends that it retained the services of the certain employees "so that it could provide full services under the AmEx Travel Contract" (Affidavit of Stephanie Deihl in Support of Objection of American Express dated October 27, 2008 ("Deihl Aff.") ¶5), it was not in fact providing these services.  Instead, American Express was undoing the pre-petition services that had been provided in order to reduce exposure under the Corporate

---

[9]      American Express ignores the lack of any change in its position during this period in asserting that it relied on this designation.  For example, the affidavit of Lydia Schulz submitted by American Express states that, had she known that the Corporate Services Contract was not being assumed and assigned by Barclays, she would have "informed our AmEx credit risk team," and that her understanding was that "AmEx's credit risk team would have cancelled the corporate cards and would not have allowed the Lehman/Barclays officers with Rev-Coded accounts to continue charging."  Schulz Aff. ¶ 7.  However, American Express was unquestionably on notice by October 1, 2008 that the Corporate Services Agreement would not be assumed and assigned.  However, as the evidence submitted by American Express demonstrates, the same few credit cards remained active well after October 1, 2008.  Massoni Aff., Ex. A; Feldberg Decl. Ex. A-C.

Services Agreement, redeploying some of its employees and removing equipment.  See Bernauer
Decl. ¶ 11-13 and Ex. B.

American Express further asserts that it provided "confidential and proprietary
information to its competitor Barclays."  (Second Objection ¶ 52.)  While the objection does not
specify this confidential and proprietary information, the prior objection filed by American
Express in connection with the revised list of Closing Date Contracts asserts that the Corporate
Services Agreement itself was the confidential and proprietary information that had been
provided.  See First Objection ¶¶ 15-16.  This argument does not make sense, nor is it supported
by facts.  Copies of both the Corporate Services Agreement and Travel Services Agreement were
collected by the LBHI employees who were preparing the lists of contracts and would have been
available to Barclays as part of the Transaction.  See Bernauer ¶ 16.  Given this, American
Express' later circulation of the Corporate Services Agreement merely provided information to
which Barclays already would have had access.  In addition, American Express has not identified
any confidential or proprietary information contained within the Corporate Services Agreement.

Given this, American Express has not demonstrated any reasonable reliance on the
mistaken designation of the American Express Contracts for the twelve days at issue.

### D.    Debtors' Response and Creditors' Committee's Objection to Barclays' Motion

The Debtors and the Creditors' Committee have both responded to Barclays'
Motion.  The Debtors object to this Motion to the extent that the relief requested results in
administrative expense priority claims.  See Debtors' Response to the Motions of Barclays Capital
Inc. For Relief Pursuant to Federal Rule of Civil Procedure 60(b) and Federal Rule of Bankruptcy
Procedure 9024, Concerning Various Closing Date Contracts (D.I. 1212).  The Creditors'
Committee objects to any rejection damages claims being made against the estates in respect of

the American Express Contracts.  <u>See</u> Objection of Official Committee of Unsecured Creditors of

Lehman Brothers Holdings Inc., <u>et al</u>. to Motions of Barclays Capital Inc. For Relief, Pursuant to

Federal Rule of Civil Procedure 60(b), Concerning Certain Contracts Erroneously Posted with the

Closing Date Contracts (D.I. 1672).

Barclays' Motion requests that the Court grant relief with respect to both the

assumption and the assignment of the American Express Contracts, and seeks to return the parties

to the positions in which they would have been had the mistaken listing of the American Express

Contracts as Closing Date Contracts not occurred.  As such, American Express would be returned

to its status as a general unsecured creditor with rights to file claims.  Because the American

Express Contracts were designated due to a mistake and because the American Express Contracts

were not assumable under section 365 of the Code, claims concerning the American Express

Contracts should not be elevated to administrative expense priority status.  In any event, whether

or not American Express has any administrative priority claim is an issue that is not before the

Court on this Motion.

Barclays is not aware of any additional burden that the estates would bear as a

direct result of the mistake that occurred.  The mistake occurred and was corrected within the first

few weeks of the commencement of these cases.  No plan has been formulated and the claims bar

date has not even been proposed for the chapter 11 debtors.  Neither the Debtors nor the Creditors'

Committee have been prejudiced given this procedural status.

For these reasons, this Motion seeks relief for precisely the type of mistake that

Federal Rule 60(b) aims to address.

## REQUEST FOR RELIEF

WHEREFORE, for the reasons set forth in Barclays' Motion, in this Reply and in the accompanying Declarations, Barclays respectfully requests that this Court: (a) grant its motion for relief under Federal Rule of Civil Procedure 60(b); (b) order that notwithstanding anything in the Sale Order, Sale Procedures Order, and/or any notices filed pursuant thereto to the contrary, the American Express Contracts were erroneously posted and have not been assumed by and assigned to Barclays; and (c) grant such other and further relief as this Court may deem just or proper.

Dated: New York, New York
      November 26, 2008

                    Respectfully submitted,

                    Allen & Overy LLP

                    By:_____ /s/ Michael S. Feldberg____

                      Michael S. Feldberg
                      Laura Martin

                    1221 Avenue of the Americas
                    New York, NY 10020
                    Tel: (212) 610 6300
                    Facsimile: (212) 610 6399

                    *Attorneys for Barclays Capital Inc.*