# EXHIBIT B



**Standard Terms and Conditions for Par/Near Par Trade Confirmations**
**(Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006)**

The following are the Standard Terms and Conditions for Par/Near Par Trade Confirmations ("Standard Terms and Conditions") published by the Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006. Capitalized terms used and not defined in these Standard Terms and Conditions shall have the respective meanings ascribed thereto in the LSTA Par/Near Par Trade Confirmation (the "Confirmation") which incorporates these Standard Terms and Conditions by reference. Annex I sets forth the capitalized terms defined in these Standard Terms and Conditions or in the Confirmation and the respective sections herein, if any, in which such capitalized terms are defined. As used herein, the term "Transaction" means the transaction(s) contemplated by the Confirmation.

1.  **Target Settlement/Settlement Date/Transfer of Debt:** The transfer of the Purchase Amount (as defined below) of the Debt (as defined below) specified in the Confirmation shall be effected as soon as practicable after the Trade Date. Any alternative agreement between Buyer and Seller as to a targeted date of settlement shall be specified in the Confirmation. The date payment of the Purchase Price (as defined below) occurs against such transfer is the "Settlement Date" hereunder. Trades that do not settle on a timely basis are subject to the provisions regarding compensation for delayed settlement in accordance with the provisions of Section 6, "Compensation for Delayed Settlement," below.

    Unless an alternative election is made in the "Form of Purchase" section of the Confirmation, the form of purchase of the Purchase Amount of the Debt shall be an assignment.

    If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller. If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effected, the Transaction shall be settled on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade; provided, further, that if a special election of "Assignment Only" has been made, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

2.  **Purchase Amount/Type of Debt:** The amount(s) and type(s) of debt specified in the "Purchase Amount/Type of Debt" section of the Confirmation shall be the "Purchase Amount" and "Debt", respectively, hereunder. Unless otherwise specified in the Confirmation, any Debt identified as (a) term loan indebtedness is fully funded Debt with no further funding obligations, and (b) revolving credit or letter of credit facilities may be subject to further funding and the Purchase Amount includes both funded principal and unfunded commitments (including commitments to participate in letters of credit). If a commitment is indicated, Buyer is assuming all unfunded commitments relating to the Purchase Amount of the Debt unless otherwise specified in the Confirmation. Unless otherwise specified in the Confirmation, Buyer is assuming the obligation to purchase (or to cause a designee to purchase) the Debt as such Debt may be reorganized, restructured, converted or otherwise modified.

3.  **Permanent Reductions:** The economic benefit of permanent commitment reductions and permanent repayments of principal (collectively, "Permanent Reductions") shall be allocated as provided in Section 4, "Purchase Price Calculation," below.

4.  **Purchase Price Calculation:** Except as otherwise set forth in the next succeeding paragraph of this Section 4 with regard to a Multi-Currency Commitment (as defined below), Buyer shall pay Seller a purchase price (the "Purchase Price") (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the Debt on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of such Purchase Amount as of the Settlement Date minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Settlement Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees (as defined below) received by Seller on or before the Settlement Date.   The Purchase Price shall be further adjusted by Delayed Compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees (each as defined below) payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

    With respect to a Multi-Currency Commitment, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the revolving or delayed draw commitment portion, as the case may be, of the Debt on the Settlement Date equal to (a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans as of the Settlement Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount as of the Settlement Date in the Master Currency (as defined below) minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date.  For purposes of the calculation referred to in clause (b) above, the applicable foreign exchange rate shall be the spot rate effective on a Business Day (as defined below) that is no earlier than three (3) Business Days prior to the Settlement Date, as agreed upon by the parties.  The Purchase Price shall be further adjusted by Delayed Compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below. Except for the foregoing specific computations, all other computations shall otherwise be made in the relevant currency in accordance with the calculations set forth in the immediately preceding paragraph of this Section 4.

    As used herein:

    "Multi-Currency Commitment" means a commitment that is, as of the Settlement Date, subject to one or more borrowings in one or more currencies other than the Master Currency.

    "Master Currency" means the currency in which the Facility is principally denominated.

5.  **Interest Payments and Fees:**  Interest and accruing ordinary course fees (such as commitment, facility and letter of credit fees) payable in connection with the Debt in accordance with the Credit Agreement from and after the Trade Date are referred to herein as "Interest and Accruing Fees;" provided that Interest and Accruing Fees shall not include any paid-in-kind interest, fees or other amounts paid or payable in connection with the Debt in accordance with the Credit Documents (such amounts, "PIK Interest").  Amendment, consent, waiver and other similar non-recurring fees that are payable in connection with the Debt from and after the Trade Date are referred to herein as "Non-Recurring Fees."

    All Interest and Accruing Fees are calculated at the contractual rates as in effect at the relevant time(s) under the Credit Agreement.  Any upfront fee shall be paid by the party and on the date specified in the Confirmation.

    Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all Non-Recurring Fees shall be for the account of Buyer.  Unless otherwise specified in the "Trade

Specific Other Terms of Trade" section of the Confirmation, all PIK Interest shall be allocated on a "trades flat" basis as follows, regardless of how Interest and Accruing Fees are allocated: (a) PIK Interest that is capitalized or accreted prior to the Trade Date shall be included in the principal portion of the Purchase Amount and shall be subject to the application of Section 4, "Purchase Price Calculation," above; (b) PIK Interest that is capitalized or accreted on or after the Trade Date shall be for the account of Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalized or accreted as of the Settlement Date shall be for the account of Buyer upon capitalization or accretion for no additional consideration.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, "Settled Without Accrued Interest" shall apply.    Subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees accrued but unpaid before the Settlement Date shall be for the account of Seller. Buyer shall pay to Seller any such Interest and Accruing Fees promptly upon any receipt thereof by Buyer; so long as such amounts are received by Buyer (a) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (b) before a default by any obligor(s) in connection with any other payment obligations of such obligor(s) under the Credit Agreement.    Otherwise, such Interest and Accruing Fees (if and when paid) and any other accrued amounts due from and after the Settlement Date shall be for the account of Buyer, and Seller shall not be entitled to any part thereof.

If "Paid on Settlement Date" is specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees paid by the obligor(s) to but excluding the Settlement Date shall be for the account of Seller and an amount equal to the accrued but unpaid amount of Interest and Accruing Fees to but excluding the Settlement Date (the "Paid On Settlement Date Amount") shall be paid by Buyer to Seller on the Settlement Date.   If the obligor(s) thereafter pay(s) the Paid On Settlement Date Amount to Buyer, Buyer shall be entitled to keep such amount.   If, however, the Paid On Settlement Date Amount is paid to Seller by the obligor(s), Seller shall promptly pay such amount to Buyer.   If the obligor(s) fail(s) to pay the Paid On Settlement Date Amount, Seller shall not be required to reimburse Buyer for such amount.

Partial payments of interest shall be applied in the inverse order of payment dates unless otherwise specified in the Credit Agreement.

Any party that has received funds to which the other party is entitled under this Section 5 shall pay over such funds to the other party (a) on the Settlement Date, if such funds were received on or prior to the Settlement Date, by way of a credit to the other party in the Purchase Price calculations, or (b) on or before the date that is two (2) Business Days (as defined below) after receipt, if such funds were received after the Settlement Date.

As used herein, "Business Day" means any day that is not a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.[1]   In addition, solely for purposes of determining the Commencement Date, Business Day excludes any day on which the New York Stock Exchange is closed.[2]   For purposes of determining the LIBO Rate (as defined below), Business Day means any day on which dealings in U.S. dollar deposits are conducted by and between banks in the London interbank market.

---

[1]  The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

[2]  The Holiday Schedule for the New York Stock Exchange may be found at www.nyse.com/Frameset.html?displayPage=/about/1022963613686.html.

6. **Compensation for Delayed Settlement:** If settlement occurs on a Delayed Settlement Date, then for each day during the Delay Period (a) if the Debt is a Performing Loan (other than a Non-LIBOR Based Loan), Seller shall pay to Buyer Delayed Compensation for such day as calculated herein, (b) if the Debt is a Performing Loan that is a Non-LIBOR Based Loan (i) Buyer shall pay Seller for any day, interest that would accrue for each such day on the funded principal amount of the Purchase Amount of such Debt as of the Commencement Date (excluding any principal amount resulting from PIK Interest that has capitalized on or after the Trade Date), at the Average LIBO Rate and (ii) Seller shall pay Buyer Interest and Accruing Fees and Adequate Protection Payments accrued (free of any withholding, setoff, recoupment or deduction of any kind and regardless of whether paid or otherwise credited to Seller) with respect to such Debt and allocable to the Delay Period and (c) if the Debt is not a Performing Loan or is a PIK Interest Loan, Buyer shall pay to Seller the Seller's Cost of Carry for such day as calculated herein.

As used herein:

"<u>Adequate Protection Order</u>" means any order of the relevant bankruptcy court authorizing or ordering any obligor(s) to make adequate protection payments to the lenders.

"<u>Adequate Protection Payments</u>" means, with respect to the Debt, amounts (other than PIK Interest) authorized and/or ordered to be paid as adequate protection for the loans and obligations owed under the Credit Agreement under an Adequate Protection Order.

"<u>Average LIBO Rate</u>" means, for the Delay Period (i) the sum of all the individual LIBO Rates for each day in the Delay Period (ii) divided by the total number of days in the Delay Period.[3]

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 <u>et seq.</u>, as amended.

"<u>Commencement Date</u>" means (a) for Early Day Trades, the date fourteen (14) Business Days after the Trigger Date and (b) for all other trades, the date seven (7) Business Days after the Trade Date.

"<u>Cost of Carry</u>" means, for any day, the interest that would accrue for each such day on the Purchase Price at the Average LIBO Rate <u>minus</u> interest (if any) with respect to the Debt received and accounted for by Seller as interest in accordance with generally accepted accounting principles for such day; <u>provided</u> that, if the interest received and accounted for by Seller exceeds the interest that would accrue at the Average LIBO Rate, then the amount of such excess interest shall be for the account of Buyer.

"<u>Credit Linked Deposits</u>" means a deposit made by a lender into a designated account pursuant to the applicable Credit Agreement in connection with the unutilized portion of such lender's commitment to the borrower under such Credit Agreement.

"<u>Delay Period</u>" means the period from (and including) the Commencement Date to (but excluding) the Delayed Settlement Date.

"<u>Delayed Compensation</u>" means, for any day, interest at a rate per annum equal to (a) for LIBOR Based Loans, the applicable margin specified in the Credit Agreement (or an order of the relevant bankruptcy court) multiplied by the principal amount of such funded loan outstanding for such day (excluding any principal amount resulting from PIK Interest that has capitalized on or after the Trade Date), (b) for Credit Linked Deposits (as defined above), the applicable net margin specified in the

---

[3] When calculating the Average LIBO Rate, parties may find it helpful to visit www.averagelibor.com (the "<u>Website</u>"). The Website permits users to enter the start date and the end date for any period and obtain the Average LIBO Rate for such period. The Website has agreed to offer all LSTA members a free trial period until December 31, 2007. Please see the relevant LSTA Market Advisory for more information about the Website.

Credit Agreement, multiplied by the principal amount of such Credit Linked Deposit outstanding for such day (for the avoidance of doubt the applicable net margin shall incorporate the margin for (i) interest paid on the Credit Linked Deposit and (ii) the commitment fee, facility fee and letter of credit fee for the unutilized portion of the Credit Linked Deposit); (c) for unfunded commitments (other than those related to Credit Linked Deposits), the commitment fee (if any) specified in the Credit Agreement multiplied by the unfunded commitment amount and (d) the facility fee and letter of credit fees (other than those related to Credit Linked Deposits), if any, specified in the Credit Agreement, calculated for such day, in each case calculated on the basis set forth in the Credit Agreement.

"Delayed Settlement Date" means the date following the Commencement Date on which settlement actually occurs.

"Early Day Trade" means a trade for which the Trade Date is a date on or before the sixth (6th) Business Day following the Trigger Date for such trade.

"LIBO Rate" means, for any day, the 1-month London Interbank Offered Rate for deposits in the applicable currency as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day. For any day that is not a Business Day, the LIBO Rate for such day shall be the rate published by the BBA on the immediately preceding Business Day.

"LIBOR Based Loans" means funded floating rate loans for which interest (or Adequate Protection Payments) are calculated pursuant to the terms of the Credit Agreement (or an Adequate Protection Order) by using a "spread" or "applicable margin" over a London interbank offered rate.

"Non-LIBOR Based Loans" means, other than Credit Linked Deposits, any (i) funded floating rate loans for which interest (or Adequate Protection Payments) are calculated pursuant to the terms of the Credit Agreement (or an Adequate Protection Order) by using a "spread" or "applicable margin" over a reference rate that is not a London interbank offered rate (such as a prime rate or other reference rate) and (ii) funded fixed rate loans for which interest (or Adequate Protection Payments) are calculated pursuant to the terms of the Credit Agreement (or an Adequate Protection Order) by using a fixed rate of interest.

"Performing Loan" means any Debt (including, without limitation, Credit Linked Deposits) with respect to which either (i) Interest and Accruing Fees are being paid as of the Commencement Date on the terms specified in the Credit Agreement as in effect on the Trade Date or (ii) if the Borrower is a debtor under the Bankruptcy Code, Adequate Protection Payments are being paid as of the Commencement Date.

"PIK Interest Loan" means any Debt in respect of which the applicable Credit Agreement specifies that all interest is to be paid as paid-in-kind interest.

"Trigger Date" for a trade is the date of initial funding under the Credit Agreement that governs the Debt, unless there is no funding of any facilities under the Credit Agreement at or about the time it becomes effective, in which case the "Trigger Date" is the date the Credit Agreement is executed and delivered.

7. **Breakfunding:** No breakfunding compensation shall be paid for settlement of a Transaction on a day other than an interest payment date in respect of the Debt unless otherwise specified in the Confirmation.

8. **Assignment Fees and Consent to Transfer Fees:** Unless otherwise specified in the Confirmation, (a) any recordation, processing or similar fee payable to the Agent or otherwise under the Credit Agreement in connection with an assignment ("Assignment Fees") shall be split equally between Buyer and Seller and shall be paid in such amount as specified in the Credit Agreement and (b) any

transfer fee payable to the grantor in connection with the transfer of a participation ("Consent To Transfer Fees") shall be paid by Seller in such amount as specified in the applicable participation agreement (or if not so specified, in a reasonable amount requested by the grantor).

9. **Costs and Expenses:** Each of Buyer and Seller shall bear its respective costs and expenses in connection with the Transaction. Seller shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents (as defined below) and that are attributable to any period prior to but excluding the Settlement Date. Buyer shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents and that are attributable to any period from and after the Settlement Date.

10. **Transfer Documentation:** In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) or, in the absence of same, a reasonably acceptable assignment agreement containing customary provisions for the purchase and sale of par/near par loan assets. In the case of a participation, the parties shall execute a reasonably acceptable participation agreement containing customary provisions for the purchase and sale of a participation in par/near par loan assets. Any such referenced assignment agreement or participation agreement is hereinafter referred to as the "Transfer Documentation." Unless otherwise specified in the Confirmation, the Transfer Documentation shall be prepared, and any required consents shall be obtained, by Seller. Seller shall use reasonable efforts to send to Buyer the Confirmation no later than one (1) Business Day after the Trade Date. Buyer shall use reasonable efforts to send to Seller the executed Confirmation (or any requested changes thereto) no later than one (1) Business Day after Buyer's receipt of the Confirmation from Seller. Seller shall use reasonable efforts to furnish to Buyer drafts of the applicable Transfer Documentation within three (3) Business Days after the Trade Date and, in the case of an assignment, the parties shall endeavor to execute and deliver to the Agent an assignment agreement within three (3) Business Days after the Trade Date.

As specified in this paragraph, Buyer and Seller shall use reasonable efforts to comply with the following timeline:

| **By: T + 1 →**<br>Sender delivers Confirmation to Counterparty | **By: T + 2 →**<br>Counterparty returns executed Confirmation (or requested changes thereto) to Sender | **By: T + 3 →**<br>Sender delivers draft Transfer Documentation to Counterparty | **By: T + 3**<br>In case of assignment, parties shall deliver executed assignment to Agent |
| --- | --- | --- | --- |

11. **Credit Documents; Confidentiality Agreement:** If (a) "Yes" is specified in the Confirmation with respect to Credit Documents, (b) Buyer is not a lender on Trade Date and (c) Buyer has requested such documents on or prior to Trade Date, then Seller shall use commercially reasonable efforts to furnish Buyer, or provide access to Buyer, as promptly as practicable following Trade Date, a true and complete copy of the Credit Agreement (including exhibits and schedules thereto) and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and any other Credit Documents reasonably requested by Buyer. If required by the Credit Agreement and/or requested by Seller, prior to Buyer's receipt of any such Credit Documents, Buyer shall execute and deliver to Seller a confidentiality agreement in the form stipulated in the Credit Agreement or, in the absence of same, a mutually acceptable confidentiality agreement containing customary terms.

The effectiveness of the trade is not subject to receipt by Buyer of Credit Documents prior to Trade Date. Seller may provide to Buyer the requested Credit Documents at any time on or prior to the execution and delivery of the Transfer Documentation.

"Credit Documents" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

12. **Participations:** Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, if the Transaction is settled as a participation: (a) Seller shall grant voting rights to Buyer on and after Settlement Date pursuant to the terms of the applicable participation agreement (subject to the terms of the Credit Agreement); and (b) Seller shall not require Buyer to post with Seller cash collateral for any unfunded portion of a revolving loan/commitment in which Buyer participates.

In connection with voting rights granted to Buyer from Seller, it is understood by Buyer that Seller shall vote in accordance with the majority lenders (including, as the case may be, Seller).

13. **Syndicate Confidential Information:** Unless otherwise specified in the Confirmation, Buyer represents to Seller that (a) Buyer is sophisticated, understands the nature and importance of Syndicate Confidential Information (as defined in the Confidential Information Supplement to the LSTA Code of Conduct, as amended, supplemented or otherwise modified from time to time ) and the manner in which such information can be obtained and has requested such information from Seller in connection with the Transaction, if it so desired such information and (b) where it has not requested Syndicate Confidential Information in connection with such Transaction it has otherwise obtained such information as it has deemed appropriate under the circumstances to make an informed decision regarding the Transaction without reliance on Seller. If Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, unless otherwise agreed, Seller represents to Buyer that Seller has used reasonable efforts to maintain Syndicate Confidential Information and that it has disclosed to Buyer all material Syndicate Confidential Information retained by it as of the Trade Date. Unless otherwise specified, Buyer acknowledges to Seller that (i) such Syndicate Confidential Information has been disclosed to it, (ii) the Syndicate Confidential Information so disclosed may not be complete because Seller may not have retained all such information and (iii) Buyer has taken all steps it deems necessary under the circumstances to assure that it has the information it deems appropriate to make an informed decision regarding the Transaction. Subject to the foregoing, if Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, Seller shall use commercially reasonable efforts to provide to Buyer (if Buyer is not already a lender as of Trade Date) notice with respect to all amendments and waivers of the Credit Documents arising between Trade Date and Settlement Date (but Seller need not solicit a vote from Buyer with respect to any such amendment or waiver). Buyer agrees to keep all Syndicate Confidential Information disclosed to it confidential in accordance with the terms of the confidentiality provisions of the Credit Agreement. Buyer acknowledges that Syndicate Confidential Information may include material non-public information concerning any obligors(s), or the securities of the obligor(s), that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with applicable law, including federal and state securities laws.

14. **Principal/Agency Status:** Each of Buyer and Seller shall indicate in the Confirmation whether it is acting as a principal or an agent in the Transaction. If applicable, each of Buyer and Seller shall identify in the Confirmation (or in separate Confirmations) the specific funds that are counterparties and the appropriate allocations in respect thereof. A Buyer or Seller that holds itself out in the Confirmation as a "principal" is directly liable for the completion of the Transaction. A principal may, however, specify in the Confirmation that it is acting as a riskless principal if it has on or prior to Trade Date agreed with the other party that its obligation to complete the Transaction is subject to successful completion of the purchase from or sale to a third party of the Debt specified in the Confirmation ("Riskless Principal").

A Buyer or Seller that holds itself out to a counterparty in the Confirmation as an "agent" acts on behalf of one or more principals to the Transaction. A Buyer or Seller that holds itself out as an agent in the Confirmation and discloses the identity of such principal(s) in the Confirmation (a) is not liable to such counterparty for the successful completion of the Transaction (unless the parties otherwise agree), and (b) except as expressly provided herein, shall have no liability or obligation to such counterparty in connection with the Transaction. A Buyer or Seller that holds itself out as an agent and does not disclose the identity of such principal(s) in the Confirmation will be liable to the counterparty as agent for an undisclosed principal to the extent provided under applicable New York law. A Buyer or Seller that indicates in the Confirmation its status as an agent represents to the counterparty that it is authorized to bind its principal(s) to the terms of the Transaction.

15. **Nonreliance:** Each of Buyer and Seller represents and warrants to the other that (a) it is a sophisticated buyer or seller (as the case may be) with respect to the Transaction, (b) it has, or has access to, such information as it deems appropriate under the circumstances concerning, among other things, the obligor(s)'s business and financial condition to make an informed decision regarding the transfer of the Debt, and (c) it has independently and without reliance on the other party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into the Transaction, except that Buyer and Seller have each relied upon the express representations, warranties, covenants, agreements and indemnities made by the other in the Confirmation. Each of Buyer and Seller acknowledges that the other has not given it any investment advice or opinion on whether the Transaction is prudent. Except as otherwise provided in the Confirmation and these Standard Terms and Conditions (including with respect to Syndicate Confidential Information), Buyer has not relied, and will not rely, on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition, or business of the obligor(s), or any other matter concerning the obligor(s). Each of Buyer and Seller acknowledges that (i) the other party currently may have, and later may come into possession of, information regarding the Debt or the obligor(s) that is not known to it and that may be material to a decision to enter into the Transaction ("Excluded Information"), (ii) it has determined to enter into the Transaction notwithstanding its lack of knowledge of the Excluded Information, and (iii) the other party shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the other party, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of such party in the Confirmation or these Standard Terms and Conditions.

16. **Buy-in/Sell-out:** If Buyer and Seller are unable to effect settlement on or prior to the date that is seven (7) Business Days after the Trade Date because of the failure of either Buyer or Seller to perform its obligations (for any reason whatsoever other than failure to obtain necessary consents), then the nondefaulting party may send to the defaulting party within five (5) Business Days thereafter a written notice advising the nondefaulting party's intent to terminate its obligations under the Confirmation and to effect a cover transaction for the specified Debt. Such cover transaction is a "buy in" if Buyer purchases the specified Debt from a counterparty other than the original Seller, and is a "sell out" if Seller sells the specified Debt to a counterparty other than the original Buyer. Such notice shall be substantially in the form most recently published by the LSTA, and the party receiving such notice shall promptly acknowledge receipt of same. The Trade Date for the buy-in/sell-out shall be the fifth Business Day following delivery of such notice (the "Close-Out Trade Date"). During the first three (3) Business Days following delivery of such notice, the defaulting party shall use best efforts to identify a substitute party acceptable to the nondefaulting party to perform its obligations. If such an acceptable substitute party is identified, the buy-in/sell-out shall be made with such substitute party. If the defaulting party fails to identify such an acceptable substitute party, then both parties will in good faith consider other alternatives to settle or resolve the failed trade by mutual consent. With respect to a default in payment, the defaulting party may remedy its default at any time prior to the Close-Out Trade Date by making payment to the nondefaulting party in an amount calculated in accordance with Section 4, "Purchase Price Calculation." Notice of the buy-in/sell-out price shall be sent within one (1) Business Day following the date of execution of the Confirmation for the buy-in/sell-out (the "Close-Out Confirmation"). If the party receiving such notice disputes the

reasonableness of the buy-in/sell-out price, it shall send notice of such dispute no later than the second Business Day thereafter. **Such price dispute shall be submitted to binding arbitration pursuant to, and shall be governed in all respects by, the "Rules Governing Arbitration Between Loan Traders With Regard to Failed Trades" (the "Arbitration Rules") in existence on the Trade Date.** With respect to any arbitration conducted pursuant to the Arbitration Rules, Buyer and Seller waive any right to a hearing and acknowledge that the arbitrators shall not be required to take an oath.

17. **Buy-in Damages:** Seller shall pay to Buyer on the Settlement Date (as determined in accordance with the Close-Out Confirmation) of the buy-in (a) the amount (if any) by which the buy-in price exceeds the original Purchase Price for the specified Debt, plus (b) if the specified Debt is fully performing, Delayed Compensation with respect to the Purchase Amount for each day from (and including) the specified Settlement Date for the failed trade to (but excluding) the date that is the earlier of (i) the actual settlement of buy-in or (ii) seven (7) Business Days following Close-Out Trade Date.

18. **Sell-out Damages:** Buyer shall pay to Seller on the Settlement Date (as determined in accordance with the Close-Out Confirmation) of the sell-out (a) the amount (if any) by which the sell-out price is less than the original Purchase Price for the specified Debt, plus (b) Seller's Cost of Carry if specified Debt is not fully performing for each day from (and including) the specified Settlement Date for the failed trade to (but excluding) the date that is the earlier of (i) actual settlement of sell-out or (ii) seven (7) Business Days following Close-Out Trade Date.

19. **Failure to Obtain Consents:** If Buyer and Seller are unable to effect settlement on or prior to the date that is seven (7) Business Days after the Trade Date because required consents have been denied, the following procedures shall apply. On such date (the "Notification Date") as one of the parties to the trade (the "Notifying Party") reasonably determines that the trade will not settle because of required consents having been denied, the Notifying Party shall notify the other party in writing of its determination. The parties will in good faith consider alternatives for resolving the trade for seven (7) additional Business Days. Thereafter, unless the parties otherwise agree, Seller will use its best efforts to sell the specified Debt or to determine the then market sell-out price. If the sell-out price is greater than the original Purchase Price for the specified Debt, Seller will pay to Buyer on the Settlement Date (as determined in accordance with the Close-Out Confirmation) (a) the amount by which the sell-out price exceeds the original Purchase Price plus (b) if the specified Debt is fully performing, Delayed Compensation for each day during the period (the "Fail Period") from (and including) the Settlement Date for the failed trade to (but excluding) the Settlement Date (as determined in accordance with the Close-Out Confirmation), minus (c) if the specified Debt is not fully performing, Seller's Cost of Carry for each day during the Fail Period. If the sell-out price is less than the original Purchase Price for the specified Debt, Buyer will pay to Seller on the Settlement Date (as determined in accordance with the Close-Out Confirmation) (a) the amount by which the original Purchase Price exceeds the sell-out price plus (b) if the specified Debt is not fully performing, Seller's Cost of Carry for each day during the Fail Period, minus (c) if the specified Debt is fully performing, Delayed Compensation for each day during the Fail Period. Notice of the sell-out price shall be sent by Seller to Buyer within one (1) Business Day following the date of execution of the Close-Out Confirmation. If Buyer disputes the reasonableness of the sell-out price, it shall send notice of such dispute no later than the second Business Day thereafter. **Such price dispute shall be submitted to binding arbitration pursuant to, and shall be governed in all respects by the Arbitration Rules in existence on the Trade Date.** With respect to any arbitration conducted pursuant to the Arbitration Rules, Seller and Buyer waive any right to a hearing and acknowledge that the arbitrators shall not be required to take an oath.

20. **Confidentiality of Terms of Transaction:** Both parties shall maintain the confidentiality of the terms of the Transaction unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose the terms of the Transaction to their respective affiliates, attorneys, accountants, and other professionals and in connection with the enforcement of the parties' rights and obligations hereunder. Buyer shall be permitted to make any necessary

9

disclosures to prospective purchasers from Buyer regarding the terms of the Transaction (other than the Purchase Rate or Purchase Price), <u>provided</u> that such purchasers shall be subject to substantially the same confidentiality restrictions.

21. **Binding Effect:** By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank par/near par loans, or any interest therein, upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction. Neither party will assert as a defense to liability under such agreement the lack of a writing signed by it that would otherwise be required to satisfy any statute of frauds, including §1-206 of the New York Uniform Commercial Code, or any comparable statute (collectively, the "<u>Statute of Frauds</u>"). Nothing herein shall be deemed a waiver of any claim or defense other than the Statute of Frauds that either party may have regarding such agreement.

Each of Buyer and Seller shall record on the trade date of each transaction between the parties and retain in its files a written or electronically recorded trade ticket or similar internal record containing or reflecting evidence of agreement to such transaction, including (a) the date of the agreement, (b) a description of the type of debt including obligor(s) and purchase amount, (c) the identity of the other party to the transaction, and (d) the purchase price or purchase rate.

22. **Governing Law; Confirmation Controls:** The Confirmation and the Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York (without regard to any conflicts of law provision thereof that would require the application of the laws of any other jurisdiction). In case of any conflict between the terms of the Confirmation and these Standard Terms and Conditions, the Confirmation shall govern and control.

23. **Execution by Electronic Transmission:** It is understood by the parties that the custom in the loan trading market is to execute and deliver any confirmations, confidentiality agreements, Transfer Documentation and other transaction documents by telecopy, telefax, e-mail attachment or other means of electronic transmission. The parties agree that all telecopied, telefaxed, e-mailed or electronically transmitted confirmations, confidentiality agreements, Transfer Documentation and other transaction documents, including the Confirmation, and signatures thereto, shall be duplicate originals.

24. **Electronic Records and Signatures:** It is agreed by the parties that, notwithstanding the use herein or in the Confirmation of the words "writing," "execution," "signed," "signature," or other words of similar import, the parties intend that the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system (as the case may be) to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.[4]

---

[4] To help ensure effectiveness of this provision, parties should manually or electronically sign the initial confirmation between them and retain a hard copy in their records.

**Annex I**

| **Capitalized Term** | **Defined In** |
|---|---|
| Arbitration Rules | Section 16 |
| Assignment Fees | Section 8 |
| Business Days | Section 5 |
| Buyer | Confirmation |
| Close-Out Confirmation | Section 16 |
| Close-Out Trade Date | Section 16 |
| Commencement Date | Section 6 |
| Confirmation | Preamble |
| Consent to Transfer Fees | Section 8 |
| Cost of Carry | Section 6 |
| Credit Agreement | Confirmation |
| Credit Documents | Section 11 |
| Debt | Section 2 |
| Delayed Compensation | Section 6 |
| Delayed Settlement Date | Section 6 |
| Delay Period | Section 6 |
| Early Day Trade | Section 6 |
| Excluded Information | Section 15 |
| Facility | Confirmation |
| Fail Period | Section 19 |
| Interest and Accruing Fees | Section 5 |
| LIBO Rate | Section 6 |
| LSTA | Preamble |
| Master Currency | Section 4 |
| Multi-Currency Commitment | Section 4 |

11

Non-Recurring Fees ................................................................................................ Section 5

Notification Date .................................................................................................... Section 19

Notifying Party ...................................................................................................... Section 19

Paid on Settlement Date Amount ........................................................................... Section 5

Performing Loan ..................................................................................................... Section 6

Permanent Reductions ........................................................................................... Section 3

PIK Interest ............................................................................................................ Section 5

Purchase Amount ................................................................................................... Section 2

Purchase Price ....................................................................................................... Section 4

Purchase Rate ....................................................................................................... Confirmation

Riskless Principal ................................................................................................... Section 14

Seller ..................................................................................................................... Confirmation

Settlement Date ..................................................................................................... Section 1

Standard Terms and Conditions ............................................................................ Preamble

Statute of Frauds ................................................................................................... Section 21

Trade Date ............................................................................................................. Confirmation

Transaction ............................................................................................................ Preamble

Transfer Documentation ......................................................................................... Section 10

Trigger Date ........................................................................................................... Section 6



### Standard Terms and Conditions for Distressed Trade Confirmations
### (Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006)

The following are the Standard Terms and Conditions for Distressed Trade Confirmations ("Standard Terms and Conditions") published by the Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006. Capitalized terms used and not defined in these Standard Terms and Conditions shall have the respective meanings ascribed thereto in the LSTA Distressed Trade Confirmation (the "Confirmation") which incorporates these Standard Terms and Conditions by reference. Annex I sets forth the capitalized terms defined in these Standard Terms and Conditions or in the Confirmation and the respective sections where, if any, in which such capitalized terms are defined. All references to specific section numbers in Sections 11 and 12 below, "Flip Representations" and "Step-Up Provisions," respectively, relate to the December 2006 version of the LSTA Purchase and Sale Agreement for Distressed Trades and successor provisions thereto. As used herein, the term "Transaction" means the transaction(s) contemplated by the Confirmation.

1. **Target Settlement/Settlement Date/Transfer of Debt:** The transfer of the Purchase Amount (as defined below) of the Debt (as defined below) specified in the Confirmation shall be effected as soon as practicable after the Trade Date. Any alternative agreement between Buyer and Seller as to a targeted date of settlement shall be specified in the Confirmation. The date payment of the Purchase Price (as defined below) occurs against such transfer is the "Settlement Date" hereunder.

   Unless an alternative election is made in the "Form of Purchase" section of the Confirmation, the form of purchase of the Purchase Amount of the Debt shall be an assignment.

   If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller. If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effected, the Transaction shall be settled on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade; provided, further, that if a special election of "Assignment Only" has been made, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

2. **Purchase Amount/Type of Debt:** The amount(s) and type(s) of debt specified in the "Purchase Amount/Type of Debt" section of the Confirmation shall be the "Purchase Amount" and "Debt," respectively, hereunder. Unless otherwise specified in the Confirmation, any Debt identified as (a) term loan indebtedness is fully funded Debt with no further funding obligations, (b) revolving credit or letter of credit facilities may be subject to further funding and the Purchase Amount includes both funded principal and unfunded commitments (including commitments to participate in letters of credit or loans), and (c) a claim amount is fully funded with no further funding obligations (but may be subject to adjustment). If a commitment is indicated, Buyer is assuming all unfunded commitments relating to the Purchase Amount of the Debt unless otherwise specified in the Confirmation. Unless otherwise specified in the Confirmation, Buyer is assuming the obligation to purchase (or to cause a designee to purchase) the Debt as such Debt may be reorganized, restructured, converted or otherwise modified.

3. **Permanent Reductions:** The economic benefit of permanent commitment reductions and permanent repayments of principal (collectively, "Permanent Reductions") shall be allocated as provided in Section 4, "Purchase Price Calculation," below.

4. **Purchase Price Calculation:** Except as otherwise set forth in the next succeeding paragraphs of this Section 4 with regard to a Multi-Currency Commitment or Proceeds (each as defined below), Buyer shall pay Seller a purchase price (the "Purchase Price") (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the Debt on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of such Purchase Amount as of the Settlement Date minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Settlement Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees (as defined below) received by Seller on or before the Settlement Date.   The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees (each as defined below) payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

With respect to a Multi-Currency Commitment, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the revolving or delayed draw commitment portion, as the case may be, of the Debt on the Settlement Date equal to (a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans as of the Settlement Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount as of the Settlement Date in the Master Currency (as defined below) minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date.   For purposes of the calculation referred to in clause (b) above, the applicable foreign exchange rate shall be the spot rate effective on a Business Day (as defined below) that is no earlier than three (3) Business Days prior to the Settlement Date, as agreed upon by the parties. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below. Except for the foregoing specific computations, all other computations shall otherwise be made in the relevant currency in accordance with the calculations set forth in the immediately preceding paragraph of this Section 4.

With respect to Proceeds, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Proceeds on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of the Debt on the date immediately prior to the Restructuring Date (as defined below) minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Restructuring Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date through the Restructuring Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date minus (e) 100% multiplied by the amount of any cash Proceeds received by Seller from the Restructuring Date through and including the Settlement Date.  Subject to the terms of Section 5, "Interest Payments and Fees" below, Buyer shall be entitled to receive all proceeds or other distributions received by Seller with respect to the Proceeds from and after the Restructuring Date, including, without limitation, pursuant to clause (e) above, a credit equal to 100% multiplied by the amount of any cash Proceeds and including a credit equal to 100% multiplied by any Permanent Reductions effected with respect to any Proceeds.  If the Debt immediately prior to the Restructuring Date was a Multi-Currency Commitment, then clauses (a) and (b) of the immediately preceding sentence shall be replaced by the following clauses:  "(a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans immediately prior to the Restructuring Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount immediately prior to the Restructuring Date   in the Master Currency".  Notwithstanding any other provision of this paragraph, if the Transaction settles on a "Settled Without Accrued Interest" basis, then any Interest and Accruing

Fees paid with respect to any debt instrument included within the Proceeds shall be allocated between Buyer and Seller in accordance with the sixth paragraph of Section 5, "Interest Payments and Fees", below. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

As used herein:

"Restructuring Date" means the effective date of any reorganization, restructuring or conversion with respect to the Debt.

"Multi-Currency Commitment" means a commitment that is, as of the Settlement Date, subject to one or more borrowings in one or more currencies other than the Master Currency.

"Master Currency" means the currency in which the Facility is principally denominated.

"Proceeds" means if, prior to the Settlement Date, the Debt has been reorganized, restructured, converted or otherwise modified, any proceeds or other distributions received by Seller with respect to the Debt pursuant to such reorganization, restructuring, conversion or other modification.

5. **Interest Payments and Fees:**  Interest and accruing ordinary course fees (such as commitment, facility and letter of credit fees) payable in connection with the Debt in accordance with the Credit Agreement  from and after the Trade Date are referred to herein as "Interest and Accruing Fees;" provided that Interest and Accruing Fees shall not include any paid-in-kind interest, fees or other amounts paid or payable in connection with the Debt in accordance with the Credit Documents or the Adequate Protection Order (such amounts, "PIK Interest").  Amendment, consent, waiver and other similar non-recurring fees that are payable in connection with the Debt from and after the Trade Date are referred to herein as "Non-Recurring Fees."

All Interest and Accruing Fees are calculated at the contractual rates as in effect at the relevant time(s) under the Credit Agreement.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all Non-Recurring Fees shall be for the account of Buyer.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all PIK Interest shall be allocated on a "trades flat" basis as follows, regardless of how Interest and Accruing Fees and Adequate Protection Payments (as defined below) are allocated:  (a) PIK Interest that is capitalized or accreted prior to the Trade Date shall be included in the principal portion of the Purchase Amount and shall be subject to the application of Section 4, "Purchase Price Calculation," above; (b) PIK Interest that is capitalized or accreted on or after the Trade Date shall be for the account of Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalized or accreted as of the Settlement Date shall be for the account of Buyer upon capitalization or accretion for no additional consideration.

If "Trades Flat" is specified in the Confirmation, subject to the application of clause (a) of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees and, if applicable, Adequate Protection Payments unpaid as of the Trade Date, whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, shall be for the account of Buyer and, if paid to Seller after the Settlement Date, shall promptly be paid by Seller to Buyer.

If "Settled Without Accrued Interest" is specified in the Confirmation, subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees accrued but unpaid before the Settlement Date shall be for the account of Seller.  Buyer shall pay to Seller any

such Interest and Accruing Fees promptly upon any receipt thereof by Buyer; so long as such amounts are received by Buyer (a) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (b) before a default by any obligor(s) in connection with any other payment obligations of the obligor(s) under the Credit Agreement. Otherwise, such Interest and Accruing Fees (if and when paid) and any other accrued amounts due from and after the Settlement Date shall be for the account of Buyer, and Seller shall not be entitled to any part thereof. The foregoing notwithstanding, if (i) Buyer and Seller agree that the treatment of Interest and Accruing Fees shall be on a "Settled Without Accrued Interest" basis and (ii) the obligor(s) is/are making Adequate Protection Payments in accordance with an Adequate Protection Order (as defined below), then any such Adequate Protection Payments shall, subject to Section 6, "Compensation for Delayed Settlement," below, be allocated on a "Settled Without Accrued Interest" basis as if such Adequate Protection Payments were Interest and Accruing Fees. The parties may elect to have terms contrary to those of the immediately preceding sentence control their Transaction by expressly specifying such contrary terms in the "Trade Specific Other Terms of Trade" section of the Confirmation.

If "Paid on Settlement Date" is specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, subject to the application of Section 6, "Compensation For Delayed Settlement," below, all Interest and Accruing Fees paid by the obligor(s) to but excluding the Settlement Date shall be for the account of Seller and an amount equal to the accrued but unpaid amount of Interest and Accruing Fees to but excluding the Settlement Date (the "Paid On Settlement Date Amount") shall be paid by Buyer to Seller on the Settlement Date. If the obligor(s) thereafter pay(s) the Paid on Settlement Date Amount to Buyer, Buyer shall be entitled to keep such amount. If, however, the Paid on Settlement Date Amount is paid to Seller by the obligor(s), Seller shall promptly pay such amount to Buyer. If the obligor(s) fail(s) to pay the Paid on Settlement Date Amount, Seller shall not be required to reimburse Buyer for such amount.

Partial payments of interest shall be applied in the inverse order of payment dates unless otherwise specified in the Credit Agreement.

Any party that has received funds to which the other party is entitled under this Section 5 shall pay over such funds to the other party (a) on the Settlement Date, if such funds were received on or prior to the Settlement Date, by way of a credit to the other party in the Purchase Price calculations, or (b) on or before the date that is two (2) Business Days (as defined below) after receipt, if such funds were received after the Settlement Date.

As used herein:

"Adequate Protection Order" means any order of the relevant bankruptcy court authorizing or ordering any obligor(s) to make adequate protection payments to the lenders.

"Adequate Protection Payments" means, with respect to the Debt, amounts (other than PIK Interest) authorized and/or ordered to be paid as adequate protection for the loans and obligations owed under the Credit Agreement under an Adequate Protection Order.

"Business Day" means any day that is not a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.[1] In addition, solely for purposes of determining the Commencement Date (as defined below), Business Day excludes any day on which the New York

---

[1] The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

Stock Exchange is closed.[2] For purposes of determining the LIBO Rate (as defined below) Business Day means any day on which dealings in U.S. dollar deposits are conducted by and between banks in the London interbank market.

6. **Compensation for Delayed Settlement**: If settlement occurs on a Delayed Settlement Date (as defined below), the parties shall pay "delayed compensation" for each day during the Delay Period (as defined below) as follows:

(a) Buyer shall pay Seller (or if Seller is required to pay Buyer the Purchase Price, Seller shall pay Buyer) on the Delayed Settlement Date an amount equal to interest that would accrue for each day during the Delay Period at the Average LIBO Rate (as defined below) on an amount equal to the Purchase Price calculated as of the Commencement Date according to the applicable method described in Section 4, "Purchase Price Calculation," above (but without adjustment for delayed compensation payable hereunder or any Assignment Fees or Consent to Transfer Fees) substituting the phrase "Commencement Date" for the phrase "Settlement Date" appearing therein (and utilizing the loan and commitment amounts outstanding on the Commencement Date); provided that if the Purchase Price so calculated as of the Delayed Settlement Date has increased or decreased more than 25% from the Purchase Price so calculated as of the Commencement Date, then such payment shall be calculated based on the Purchase Price so calculated on each day during the Delay Period.

(b) If the applicable trade settles on a "Settled Without Accrued Interest" basis, then Seller shall pay or credit to Buyer on the Delayed Settlement Date (free of any withholding, setoff, recoupment or deduction of any kind) any Interest and Accruing Fees and, if applicable, Adequate Protection Payments accrued (regardless of whether paid or otherwise credited to Seller) with respect to the Purchase Amount and allocable to the Delay Period. If Borrower fails to pay on or prior to the scheduled due date thereof (taking into account any applicable grace period) in accordance with the Credit Agreement or the Adequate Protection Order, as applicable, any Interest and Accruing Fees or Adequate Protection Payments that were paid or credited to Buyer on the Delayed Settlement Date pursuant to this paragraph (b), then Buyer shall, upon demand by Seller, pay Seller an amount equal to the portion of such Interest and Accruing Fees or Adequate Protection Payments that were not paid to Seller, plus interest that would accrue for each day on such amounts at the Federal Funds Rate (as defined below). If all or part of such Interest and Accruing Fees and, if applicable, Adequate Protection Payments is paid other than in cash, and the property received cannot be transferred to Buyer, the parties shall mutually agree as soon as practicable on the cash value thereof to be transferred by Seller to Buyer or, if the parties shall mutually agree, on the appropriate participation arrangements in respect thereof.

As used herein:

"Average LIBO Rate" means, for the Delay Period (i) the sum of all the individual LIBO Rates for each day in the Delay Period (ii) divided by the total number of days in the Delay Period.[3]

"Commencement Date" means the date twenty (20) Business Days after the Trade Date.

"Delayed Settlement Date" means the date following the Commencement Date on which settlement actually occurs.

---

[2] The Holiday Schedule for the New York Stock Exchange may be found at www.nyse.com/Frameset.html?displayPage=/about/1022963613686.html.

[3] When calculating the Average LIBO Rate, parties may find it helpful to visit www.averagelibor.com (the "Website"). The Website permits users to enter the start date and the end date for any period and obtain the Average LIBO Rate for such period. The Website has agreed to offer all LSTA members a free trial period until December 31, 2007. Please see the relevant LSTA Market Advisory for more information about the Website.

"Delay Period" means the period from (and including) the Commencement Date to (but excluding) the Delayed Settlement Date.

"Federal Funds Rate" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the parties from three federal funds brokers of recognized standing selected by the parties.  For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"LIBO Rate" means, for any day, the 1-month London Interbank Offered Rate for deposits in the applicable currency as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day.  For any day that is not a Business Day, the LIBO Rate for such day shall be the rate published by the BBA on the immediately preceding Business Day.

7.  **Breakfunding:**  No breakfunding compensation shall be paid for settlement of a Transaction on a day other than an interest payment date in respect of the Debt unless otherwise specified in the Confirmation.

8.  **Assignment Fees and Consent to Transfer Fees:**  Unless otherwise specified in the Confirmation, (a) any recordation, processing or similar fee payable to the Agent or otherwise under the Credit Agreement in connection with an assignment ("Assignment Fees") shall be split equally between Buyer and Seller and shall be paid in such amount as is specified in the Credit Agreement and (b) any transfer fee payable to the grantor in connection with the transfer of a participation ("Consent to Transfer Fees") shall be paid by Seller in such amount as is specified in the applicable participation agreement (or, if not so specified, in a reasonable amount requested by the grantor).

9.  **Costs and Expenses:**  Each of Buyer and Seller shall bear its respective costs and expenses in connection with the Transaction.  Seller shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents (as defined below) and that are attributable to any period prior to but excluding the Settlement Date.  Buyer shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents and that are attributable to any period from and after the Settlement Date.

10. **Transfer Documentation:**  In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) and, unless otherwise specified in the Confirmation, a supplemental purchase and sale agreement substantially similar to the current LSTA form of Purchase and Sale Agreement for Distressed Trades (taking into account related predecessor transfer documents ("Predecessor Transfer Documentation"), if any).  In the case of a participation, the parties shall execute a reasonably acceptable participation agreement containing customary provisions for the purchase and sale of a participation in distressed loan assets.  Any such referenced assignment agreement, supplemental purchase and sale agreement and/or participation agreement is hereinafter referred to as the "Transfer Documentation."  Unless otherwise specified in the Confirmation, the Transfer Documentation shall be prepared, and any required consents obtained, by Seller.  Seller shall use reasonable efforts to send Buyer the Confirmation no later than one (1) Business Day after the Trade Date.  Buyer shall use reasonable efforts to send to Seller the executed Confirmation (or any requested changes thereto) no later than one (1) Business Day after Buyer's receipt of the Confirmation from Seller.  Seller shall use reasonable efforts to furnish Buyer drafts of the applicable Transfer Documentation, together with any related Predecessor Transfer Documentation, subject to applicable confidentiality provisions contained in such documents, within six (6) Business Days after the Trade Date.

6

As specified in this paragraph, Buyer and Seller shall use reasonable efforts to comply with the following timeline:

| By: T + 1 → | By: T + 2 → | By: T + 6 |
|---|---|---|
| Sender delivers Confirmation to Counterparty | Counterparty returns executed Confirmation (or requested changes thereto) to Sender | Sender delivers Predecessor Transfer Documentation and draft Transfer Documentation to Counterparty |

11. **Flip Representations:**  Flip representations are appropriate only if Seller is acting as a Riskless Principal (as defined below), and only if the settlement of the purchase of the Debt by Buyer from Seller occurs no later than one (1) Business Day after the settlement of the sale of the Debt to Seller by Seller's immediate prior seller(s) (the "Flip Representation Deadline").  In the event that flip representations are applicable, the Transfer Documentation shall contain representations with respect to title (Section 4.1(d)), outstanding principal amount and commitment (Section 4.1(f)), future funding obligations (Section 4.1(g)) and, if applicable, the proof of claim filing (Section 4.1(v)) that will be limited by assuming the truth and accuracy of the representations and warranties on such matters made to Seller by the immediate prior seller(s).  In addition, Seller shall give Buyer a reasonable opportunity to (a) review and comment on Seller's Predecessor Transfer Documentation prior to Seller's execution and delivery thereof and (b) close its purchase from Seller contemporaneously with Seller's upstream purchase.  However, if Seller is ready, willing and able to close its sale to Buyer within the Flip Representation Deadline, but is unable to do so because Buyer is unable or unwilling to close at such time, then the Flip Representation Deadline shall be deemed met and flip representations shall apply; provided that, if both Seller and Buyer are willing and able to close Seller's sale to Buyer within the Flip Representation Deadline but are unable to do so because the required consents for Buyer's purchase from Seller have not been obtained within the Flip Representation Deadline despite the exercise by each of Buyer and Seller of commercially reasonable efforts to obtain such consents, then flip representations shall not apply.

12. **Step-Up Provisions:**  Seller shall provide to Buyer customary step-up provisions with respect to those prior sellers, if any, that transferred the Debt on par documents on or after such date as is reasonably determined to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation.  Such representations, indemnities and other provisions shall reference only such prior sellers that transferred the Debt on a par documentation basis at a time that market convention for transferring such Debt was to use distressed documentation.  If step-up provisions apply, the purchase and sale agreement or participation agreement with respect to the Purchase Amount of the Debt shall be modified to include a reference to all appropriate prior sellers in (a) the definition of "Retained Obligations" (Section 1.2), (b) the representations with respect to actual or threatened proceedings (Section 4.1(e)), funding obligation (Section 4.1(g)), acts and omissions (Section 4.1(h)), performance of obligations (Section 4.1(i)), no setoff (Section 4.1(l)), no consents or waivers (Section 4.1(t)) and no execution of other documents (Section 4.1(u)), (c) the disgorgement section of the indemnity provision (Section 6.1(b)) and (d) the distributions section (Section 8.2).

In consulting as to the appropriate date on which market convention shifted from a par documentation basis to a distressed documentation basis, the parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the date on which such market convention shifted or, if results have not been published with respect to the Debt, either party may request in writing that the LSTA endeavor to conduct such a poll.  To initiate a poll, send a request that includes the name of the Borrower and either the CUSIP number (if available) or the date

7

of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org.  The results of such LSTA polls are available to facilitate discussions between Seller and Buyer and have no binding effect.

13. **ERISA Representation:**  Unless otherwise specified in the Confirmation, the Transfer Documentation shall not contain the "Alternative ERISA Representation," as referenced in a footnote to Sections 4.1(q) and 5.1(j) of the current LSTA form of Purchase and Sale Agreement for Distressed Trades.

14. **Credit Documents; Confidentiality Agreement:**  If (a) "Yes" is specified in the Confirmation with respect to Credit Documents, (b) Buyer is not a lender on the Trade Date and (c) Buyer has requested such documents on or prior to the Trade Date, then Seller shall furnish Buyer, or provide access to Buyer, as promptly as practicable following the Trade Date, a true and complete copy of the Credit Agreement (including exhibits and schedules thereto) and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and any other Credit Documents reasonably requested by Buyer.  If required by the Credit Agreement and/or requested by Seller, prior to Buyer's receipt of any such Credit Documents, Buyer shall execute and deliver to Seller a confidentiality agreement in the form stipulated in the Credit Agreement or, in the absence of same, a mutually acceptable confidentiality agreement containing customary terms.

The effectiveness of the trade is not subject to receipt by Buyer of Credit Documents prior to the Trade Date.  Seller may provide to Buyer the requested Credit Documents at any time on or prior to the execution and delivery of the Transfer Documentation.

"Credit Documents" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

15. **Participations:**  Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, if the Transaction is settled as a participation: (a) Seller shall grant voting rights to Buyer on and after the Settlement Date pursuant to the terms of the applicable participation agreement (subject to the terms of the Credit Agreement); and (b) Seller shall not require Buyer to post with Seller cash collateral for any unfunded portion of a revolving loan/commitment in which Buyer participates.

In connection with voting rights granted to Buyer from Seller, it is understood by Buyer that Seller shall vote in accordance with the majority lenders (including, as the case may be, Seller).

16. **Syndicate Confidential Information:**  Unless otherwise specified in the Confirmation, Buyer represents to Seller that (a) Buyer is sophisticated, understands the nature and importance of Syndicate Confidential Information (as defined in the Confidential Information Supplement to the LSTA Code of Conduct, as amended, supplemented or otherwise modified from time to time) and the manner in which such information can be obtained and has requested such information from Seller in connection with the Transaction, if it so desired such information and (b) where it has not requested Syndicate Confidential Information in connection with the Transaction, it has otherwise obtained such information as it has deemed appropriate under the circumstances to make an informed decision regarding the Transaction without reliance on Seller.  If Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, unless otherwise agreed, Seller represents to Buyer that Seller has used reasonable efforts to maintain Syndicate Confidential Information and that it has disclosed to Buyer all material Syndicate Confidential Information retained by it as of the Trade Date.  Unless otherwise specified, Buyer acknowledges to Seller that (i) such Syndicate Confidential Information has been disclosed to it, (ii) the Syndicate Confidential Information so disclosed may not be complete because Seller may not have retained all such information and (iii) Buyer has taken all steps it deems necessary under the circumstances to assure that it has the information it deems appropriate to make an informed decision regarding the Transaction.  Subject to the foregoing, if Buyer has requested Seller to provide

8

Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, Seller shall use commercially reasonable efforts to provide to Buyer (if Buyer is not already a lender as of the Trade Date) notice with respect to all amendments and waivers of the Credit Documents arising between the Trade Date and the Settlement Date (but Seller need not solicit a vote from Buyer with respect to any such amendment or waiver).   Buyer agrees to keep all Syndicate Confidential Information disclosed to it confidential in accordance with the terms of the confidentiality provisions of the Credit Agreement.   Buyer acknowledges that Syndicate Confidential Information may include material non-public information concerning any obligors(s), or the securities of the obligor(s), that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with applicable law, including federal and state securities laws.

17. **Standstill:**  With respect to the Purchase Amount of the Debt, until the Settlement Date or Delayed Settlement Date, as the case may be, Seller shall cease any discussions with other purchasers and shall decline all offers.

18. **Principal/Agency Status:**  Each of Buyer and Seller shall indicate in the Confirmation whether it is acting as a principal or an agent in the Transaction.   If applicable, each of Buyer and Seller shall identify in the Confirmation (or in separate Confirmations) the specific funds that are counterparties and the appropriate allocations in respect thereof.   A Buyer or Seller that holds itself out in the Confirmation as a principal is directly liable for the completion of the Transaction.   A principal may, however, specify in the Confirmation that it is acting as a riskless principal if it has on or prior to the Trade Date agreed with the other party that its obligation to complete the Transaction is subject to successful completion of the purchase from or sale to a third party of the Debt specified in the Confirmation ("Riskless Principal").

A Buyer or Seller that holds itself out to a counterparty in the Confirmation as an agent acts on behalf of one or more principals to the Transaction.   A Buyer or Seller that holds itself out as an agent in the Confirmation and discloses the identity of such principal(s) in the Confirmation: (a) is not liable to such counterparty for the successful completion of the Transaction (unless the parties otherwise agree), and (b) except as expressly provided herein, shall have no liability or obligation to such counterparty in connection with the Transaction.   A Buyer or Seller that holds itself out as an agent and does not disclose the identity of such principal(s) in the Confirmation will be liable to the counterparty as agent for an undisclosed principal to the extent provided under applicable New York law.   A Buyer or Seller that indicates in the Confirmation its status as an agent represents to the counterparty that it is authorized to bind its principal(s) to the terms of the Transaction.

19. **Bankruptcy Proceedings:**  In the case of a bankruptcy proceeding involving any of the obligor(s) under the Credit Agreement, (a) Seller shall use commercially reasonable efforts to provide to Buyer within six (6) Business Days after the Trade Date copies of any Proof(s) of Claim that have been filed in such bankruptcy proceeding relating to the Debt specified in the Confirmation if such Proof(s) of Claim were filed individually by Seller or any immediate prior sellers (and was not filed by the Agent under the Credit Agreement on behalf of the lenders generally) and (b) Buyer shall be responsible for the preparation and filing of any necessary Bankruptcy Rule 3001(e) Notices of Transfer relating to such Proof(s) of Claim.

20. **Nonreliance:**  Each of Buyer and Seller represents and warrants to the other that (a) it is a sophisticated buyer or seller (as the case may be) with respect to the Transaction, (b) it has, or has access to, such information as it deems appropriate under the circumstances concerning, among other things, the obligor(s)'s business and financial condition to make an informed decision regarding the transfer of the Debt, and (c) it has independently and without reliance on the other party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into the Transaction, except that Buyer and Seller have each relied upon the express representations, warranties, covenants, agreements and indemnities made by the other in the Confirmation.   Each of Buyer and Seller acknowledges that the other has not given it any investment advice or opinion on whether the Transaction is prudent.   Except as otherwise provided in the Confirmation and these

9

Standard Terms and Conditions (including with respect to Syndicate Confidential Information), Buyer has not relied, and will not rely, on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition, or business of the obligor(s), or any other matter concerning the obligor(s). Each of Buyer and Seller acknowledges that (i) the other party currently may have, and later may come into possession of, information regarding the Debt or the obligor(s) that is not known to it and that may be material to a decision to enter into the Transaction ("<u>Excluded Information</u>"), (ii) it has determined to enter into the Transaction notwithstanding its lack of knowledge of the Excluded Information, and (iii) the other party shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the other party, with respect to the nondisclosure of the Excluded Information; <u>provided</u> that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of such party in the Confirmation or these Standard Terms and Conditions.

21. **Confidentiality of Terms of Transaction:** Both parties shall maintain the confidentiality of the terms of the Transaction unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose the terms of the Transaction to their respective affiliates, attorneys, accountants, and other professionals and in connection with the enforcement of the parties' respective rights and obligations hereunder. Buyer shall be permitted to make any necessary disclosures to prospective purchasers from Buyer regarding the terms of the Transaction (other than the Purchase Rate or Purchase Price), <u>provided</u> that such purchasers shall be subject to substantially the same confidentiality restrictions.

22. **Binding Effect:** By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank loans, or any interest therein, on "distressed terms" upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction. Neither party will assert as a defense to liability under such agreement the lack of a writing signed by it that would otherwise be required to satisfy any statute of frauds, including §1-206 of the New York Uniform Commercial Code, or any comparable statute (collectively, the "<u>Statute of Frauds</u>"). Nothing herein shall be deemed a waiver of any claim or defense other than the Statute of Frauds that either party may have regarding such agreement.

Each of Buyer and Seller shall record on the trade date of each transaction between the parties and retain in its files a written or electronically recorded trade ticket or similar internal record containing or reflecting evidence of agreement to such transaction, including (a) the date of the agreement, (b) a description of the type of debt including obligor(s) and purchase amount, (c) the identity of the other party to the transaction, and (d) the purchase price or purchase rate.

23. **Governing Law; Confirmation Controls:** The Confirmation and the Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York (without regard to any conflicts of law provision thereof that would require the application of the laws of any other jurisdiction). In case of any conflict between the terms of the Confirmation and these Standard Terms and Conditions, the Confirmation shall govern and control.

24. **Execution by Electronic Transmission:** It is understood by the parties that the custom in the loan trading market is to execute and deliver any confirmations, confidentiality agreements, Transfer Documentation and other transaction documents by telecopy, telefax, e-mail attachment or other means of electronic transmission. The parties agree that all telecopied, telefaxed, e-mailed or electronically transmitted confirmations, confidentiality agreements, Transfer Documentation and

other transaction documents, including the Confirmation, and signatures thereto, shall be duplicate originals.

**25. Electronic Records and Signatures:** It is agreed by the parties that, notwithstanding the use herein or in the Confirmation of the words "writing," "execution," "signed," "signature," or other words of similar import, the parties intend that the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system (as the case may be) to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.[4]

---

[4] To help ensure effectiveness of this provision, parties should manually or electronically sign the initial confirmation between them and retain a hard copy in their records.

**Annex I**

**Capitalized Term**                                                                                    **Defined In**

Adequate Protection Payments ........................................................................................... Section 5

Adequate Protection Order ................................................................................................ Section 5

Assignment Fees ............................................................................................................... Section 8

Borrower............................................................................................................................. Confirmation

Business Day ..................................................................................................................... Section 5

Buyer .................................................................................................................................. Confirmation

Commencement Date ........................................................................................................ Section 6

Confirmation ...................................................................................................................... Preamble

Consent to Transfer Fees .................................................................................................. Section 8

Credit Agreement ............................................................................................................... Confirmation

Credit Documents .............................................................................................................. Section 14

Debt.................................................................................................................................... Section 2

Delayed Settlement Date ................................................................................................... Section 6

Delay Period....................................................................................................................... Section 6

Excluded Information ......................................................................................................... Section 20

Facility ............................................................................................................................... Confirmation

Federal Funds Rate ........................................................................................................... Section 6

Flip Representation Deadline............................................................................................. Section 11

Interest and Accruing Fees ............................................................................................... Section 5

LIBO Rate........................................................................................................................... Section 6

LSTA .................................................................................................................................. Preamble

Master Currency................................................................................................................. Section 4

Multi-Currency Commitment .............................................................................................. Section 4

Non-Recurring Fees........................................................................................................... Section 5

Paid on Settlement Date Amount....................................................................................... Section 5

12

Permanent Reductions........................................................................................................ Section 3

PIK Interest ..................................................................................................................... Section 5

Predecessor Transfer Documentation ............................................................................ Section 10

Purchase Amount............................................................................................................ Section 2

Purchase Price................................................................................................................ Section 4

Purchase Rate ................................................................................................................ Confirmation

Riskless Principal ........................................................................................................... Section 19

Seller .............................................................................................................................. Confirmation

Settlement Date .............................................................................................................. Section 1

Standard Terms and Conditions ..................................................................................... Preamble

Statute of Frauds............................................................................................................ Section 22

Trade Date ...................................................................................................................... Confirmation

Transaction ..................................................................................................................... Preamble

Transfer Documentation.................................................................................................. Section 10