# EXHIBIT A



# ISDA®

International Swap Dealers Association, Inc.

# MASTER AGREEMENT

### dated as of 18 May 2006

**LEHMAN BROTHERS**     and     **TOTAL GAS & POWER LIMITED**
**COMMODITY SERVICES INC**

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:-

1.     **Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.     **Obligations**

(a)     *General Conditions.*

(i)     Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)     Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)     Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)    *Change of Account*. Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting*. If on any date amounts would otherwise be payable:-

    (i)   in the same currency; and

    (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax*.

    (i)   *Gross-Up*. All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:-

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:-

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

    (ii)  *Liability*. If:-

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts*. Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

3.      **Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:-

(a)    *Basic Representations.*

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)   *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)  *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)   *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)    *Absence of Certain Events*. No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation*. There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information*. All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations*. Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

(a)    *Furnish Specified Information*. It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:-

> (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

> (ii)    any other documents specified in the Schedule or any Confirmation; and

> (iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations*. It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws*. It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement*. It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax*. Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:-

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)*Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:-

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)    *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:-

(i)  *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):-

(1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

(2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)     *Event of Default and Illegality*.  If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6.     Early Termination**

(a)     *Right to Terminate Following Event of Default*. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     *Right to Terminate Following Termination Event*.

(i) *Notice*. If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii) *Transfer to Avoid Termination Event*. If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right

to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii) *Two Affected Parties*. If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv) *Right to Terminate*. If:-

(1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)    *Effect of Designation.*

(i) If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii) Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)    *Calculations.*

(i) *Statement*. On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii) *Payment Date*. An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which

notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)   *Payments on Early Termination*.   If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method"- or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)   *Events of Default*. If the Early Termination Date results from an Event of Default:-

(1)   *First Method and Market Quotation*.   If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2)   *First Method and Loss*. If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3)   *Second Method and Market Quotation*. If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)   *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)   *Termination Events*. If the Early Termination Date results from a Termination Event:-

(1)   *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)   *Two Affected Parties*. If there are two Affected Parties:-

(A)   if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)  if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) *Adjustment for Bankruptcy.*  In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) *Pre-Estimate.*  The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty.  Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7.    Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:-

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8.    Contractual Currency

(a)    *Payment in the Contractual Currency.*  Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency").  To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement.  If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.*  To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the

judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities*.    To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss*.    For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*.    Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*.    Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

**11.    Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:-

(i)    if in writing and delivered in person or by courier, on the date it is delivered;

(ii)    if sent by telex, on the date the recipient's answerback is received;

(iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)    if sent by electronic messaging system, on the date that electronic message is received,unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings'), each party irrevocably:-

(i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)    *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

## 14.    Definitions

As used in this Agreement:-

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:-

(a)    in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)    in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)    in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)    in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

**"*Credit Support Provider*"** has the meaning specified in the Schedule.

**"*Default Rate*"** means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

**"*Defaulting Party*"** has the meaning specified in Section 6(a).

**"*Early Termination Date*"** means the date determined in accordance with Section 6(a) or 6(b)(iv).

**"*Event of Default*"** has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

**"*Illegality*"** has the meaning specified in Section 5(b).

**"*Indemnifiable Tax*"** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

**"*law*"** includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "lawful" and "unlawful" will be construed accordingly.

**"*Local Business Day*"** means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

**"*Loss*"** means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

**"*Market Quotation*"** means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent

and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

"*Non-default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"*Non-defaulting Party*" has the meaning specified in Section 6(a).

"*Office*" means a branch or office of a party, which may be such party's head or home office.

"*Potential Event of Default*" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"*Reference Market-makers*" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"*Relevant Jurisdiction*" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"*Scheduled Payment Date*" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"*Set-off*" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"*Settlement Amount*" means, with respect to a party and any Early Termination Date, the sum of:-

(a)      the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)      such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"*Specified Entity*" has the meaning specified in the Schedule.

**"*Specified Indebtedness*"** means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

**"*Specified Transaction*"** means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

**"*Stamp Tax*"** means any stamp, registration, documentation or similar tax.

**"*Tax*"** means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

**"*Tax Event*"** has the meaning specified in Section 5(b).

**"*Tax Event Upon Merger*"** has the meaning specified in Section 5(b).

**"*Terminated Transactions*"** means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

**"*Termination Currency*"** has the meaning specified in the Schedule.

**"*Termination Currency Equivalent*"** means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

**"*Termination Event*"** means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

**"*Termination Rate*"** means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

**"*Unpaid Amounts*"** owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date

such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| LEHMAN BROTHERS COMMODITY SERVICES INC | TOTAL GAS & ~~SUPPLY~~ LIMITED POWER |
|---|---|

By: _____    By: _____

Name:                           Name:

Title:    Zdenka S. Griswold    Title:

Date:    Senior Vice President  Date:    Philippe Chauvain
                                         General Manager
                                         Risk Control & IT
                                         30/5/06

By: _____

Name:

Title:

Date:

**SCHEDULE**
to the
**Master Agreement**
dated as of 18 May 2006
between
**LEHMAN BROTHERS COMMODITY SERVICES INC.** ("Party A"),
a corporation organized under the laws of
the State of Delaware
and
**TOTAL GAS & POWER LIMITED** ("Party B"),
a corporation organized under the laws of
England & Wales.

**Part 1: Termination Provisions**

In this Agreement:

(a)      **"Specified Entity"** means:

in relation to Party A for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Lehman Brothers Commercial Corporation, Lehman Brothers Special Financing Inc, Lehmans Brother Finance SA. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:

| | |
|---|---|
| Section 5(a)(v), | Not applicable |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

(b)      **"Specified Transaction"** will have the meaning specified below.

"Specified Transaction" means (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread

transaction, repurchase transaction, reverse purchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward or spot purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c)     The **"Cross Default"** provisions of <u>Section 5(a)(vi)</u> will apply to Party A and Party B.

The following provisions apply:

**"Specified Indebtedness"** will have the meaning specified in <u>Section 14</u> of this Agreement.

**"Threshold Amount"** means the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholders' Equity of Lehman Brothers Holdings Inc. ("Lehman Brothers Holdings Inc." or "Holdings"), in the case of Party A (or its equivalent in any other currency), and in the case of Party B, GBP £500,000.

For purposes hereof, **"Stockholders' Equity"** means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied.

(d)     The ***"Credit Event* Upon Merger"** provisions of <u>Section 5(b)(iv)</u> will apply to Party A and Party B. Section 5(b)(iv) is deleted in its entirely and replaced by the following.

If "Credit Event Upon Merger" is specified in the Schedule as applying to the party and a Designated Event (as defined below) occurs with respect to such party, any Credit Support Provider of such party or any applicable Specified Entity of such party (in each case, "X"), and such Designated Event does not constitute a Merger Without Assumption, and the creditworthiness of X or, if applicable, the successor, surviving or transferee entity of X, after taking into account any applicable Credit Support Document, is materially weaker immediately after the occurrence of such Designated Event than that of X immediately prior to the occurrence of such Designated Event (and, in any such event, such party or its successor, surviving or transferee entity, as appropriate, will be the Affected Party).  A "Designated Event" with respect to X means that:—

(1)     X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets (or any substantial part of the assets comprising the business conducted by X as of the date of this Agreement) to, or reorganises, reincorporates or reconstitutes into or as, another entity;

(2)     any person, related group of persons or entity acquires directly or indirectly the beneficial ownership of (A) equity securities having the power to elect a majority of the board of directors (or its equivalent) of X or (B) any other ownership interest enabling it to exercise control of X; or

(3)    X effects any substantial change in its capital structure by means of the issuance, incurrence or guarantee of debt or the issuance of (A) preferred stock or other securities convertible into, or exchangeable for debt or preferred stock or (B) in the case of entities other than corporations, any other form of ownership interest

The term "materially weaker" means (i) with respect to Party A, Lehman Brothers Holdings Inc. or the resulting, surviving or transferee entity of Holdings, as the case may be; and (ii) with respect to Party B, Total S.A, or the resulting, surviving or transferee of Total S.A., as the case may be, fails to have a long-term senior unsecured debt rating of at least Baa2 as determined by Moody's Investors Service, Inc. ("Moody's") and BBB as determined by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P").

(e)    The **"Automatic Early Termination"** provision of <u>Section 6(a)</u> will <u>not</u> apply to Party A and <u>not</u> apply to Party B.

(f)    **Payments on Early Termination**. For the purpose of <u>Section 6(e)</u> of this Agreement, Loss and the Second Method will apply.

(g)    **"Termination Currency"** means Pounds Sterling ("GBP")

(h)    **Additional Termination Events** will apply. Each of the following shall constitute an Additional Termination Event:

(i)    **Ratings Decline.**

Party A:    If Lehman Brothers Holdings Inc (i) is rated below BBB by S&P or Baa2 by Moody's or their respective equivalents for the time being or, (ii) ceases to be rated by S&P or Moody's

Party B:    If Total S.A. (i) is rated below BBB by S&P or Baa2 by Moody's or their respective equivalents for the time being or, (ii) ceases to be rated by S&P or Moody's

and the defaulting Party fails to procure a guarantee, letter of credit, or other credit support from a person, for an amount and in a form which is acceptable in the reasonable opinion of the other Party for the performance of the defaulting Party's financial obligations under this Agreement within 2 Banking Days of the other Party's written request for that guarantee, letter of credit or other credit support. For the purpose of the foregoing Termination Event, Party A and Party B, shall be the Affected Party.

(ii)    **Ownership Maintenance**

Party B    If Total S.A., at any time and for any reason, ceases to own beneficially, and of record (directly or indirectly) at least fifty one per cent (51%) (determined on a fully diluted basis) of the capital stock of each class of Party B.

For the purpose of the foregoing Termination Event, Party B shall be the Affected Party

**Part 2: Tax Representations**

(a)     **Payer Tax Representations.** For the purpose of Section 3(e) of this Agreement, Party A and Party B will each make the following representation:

    It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Sections 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement, (ii) the satisfaction(s) of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) of this Agreement by reason of material prejudice to its legal or commercial position.

(b)     **Payee Tax Representations.** For the purpose of Section 3(f) of this Agreement, Party A represents that it is a corporation duly organized and validly existing under the laws of the State of Delaware and Party B represents that it is a company duly organized and validly existing under the laws of England & Wales.

**Part 3: Agreement to Deliver Documents**

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable:

(a)    Party A and Party B will deliver forms and/or documents described in Section 4(a)(iii) of this Agreement upon reasonable demand by the other party.

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A and Party B | Incumbency certificate or other evidence reasonably satisfactory to the other party of the authority of the individual signing the Agreement and any Credit Support Document on behalf of such party to execute the same. | Upon execution of this Agreement. | Yes |
| Party A and Party B | Evidence reasonably satisfactory to the other party of the authority of such party and its Credit Support Provider to enter into the Agreement, any Credit Support Document and each Transaction entered into hereunder. | Upon execution of this Agreement. | Yes |
| Party A and Party B | A copy of the most recent annual report (i) in the case of Party A, of its Credit Support Provider and (ii) in the case of Party B, Party B, containing audited consolidated financial statements for such fiscal year certified by independent public accountants and prepared in accordance with generally accepted accounting principles consistently applied. | Upon request. | Yes |
| Party A and Party B | Any Credit Support Document(s) specified in Part 4 of this Schedule. | Upon execution of this Agreement. | No |

(a)    **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notices or communications to **Party A**:

Address:          Lehman Brothers Commodity Services Inc.
                  c/o Lehman Brothers Inc.
                  Transaction Management Group
                  Corporate Advisory Division
                  745 Seventh Avenue
                  New York, NY 10019

Attention:        Documentation Manager
Telephone No.:    (212) 526-7187
Facsimile No.:    (212) 526-7672

                  For all purposes.

Address for notices or communications to **Party B**:

Address:          Total Gas & Power Limited
                  10 Upper Bank Street
                  Canary Wharf
                  London E14 5BF

Attention:        Treasury and Credit Manager
Telephone No.:    020 7718 6115
Facsimile No.:    020 7718 6138

                  For all purposes.

(b)    **Process Agent.** For the purpose of <u>Section 13(c)</u> of this Agreement:

       Party A appoints as its Process Agent:        Lehman Brothers International (Europe)
                                                     Attention: Head of Transaction Management Group,
                                                     Europe
                                                     25 Bank Street
                                                     London E14 5LE
                                                     England

       Party B appoints as its Process Agent:        None

(c)    **Offices.** The provisions of <u>Section 10(a)</u> will apply to this Agreement.

(d)    **Multibranch Party.** For the purpose of <u>Section 10(c)</u> of this Agreement:

       Party A is a Multibranch Party and may act through the following Offices: London

       Party B is not a Multibranch Party.

(e)    **Calculation Agent.** The Calculation Agent is Party A. unless Party A is the Defaulting Party in which
       case the Calculation Agent shall be Party B until such time Party A is no longer a Defaulting Party.
       All calculations made by Party A may be independently confirmed by Party B at its sole discretion. In the
       event that the parties' initial calculations are inconsistent, the undisputed amount will be paid. Both parties

will seek to resolve the inconsistency in good faith, and until the inconsistency is resolved as set forth below, the failure to pay the disputed amount will not constitute an Event of Default, and the parties' initial calculations will not be binding upon either party. The inconsistency shall be mutually resolved as follows: If a party disagrees in good faith with any calculation made by the Calculation Agent (the "Calculated Amount"), then each party will select two independent leading dealers in the relevant underlying commodity market to make the relevant calculation. Such dealers shall be selected in good faith (A) from among dealers of the highest credit standing which satisfy all the criteria that the parties apply generally at the time in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is the subject to the relevant calculation, and (B) to the extent practicable, from among dealers having an office in the same city. In making the calculation, such dealers shall take into consideration the latest available quotation for the relevant Commodity Reference Price, if applicable, and any other information that in good faith they deem relevant. The parties shall provide such calculations within one (1) Business Day. The Calculated Amount shall be the arithmetic mean of those calculations obtained from such dealers, which shall be binding and conclusive absent manifest error. even if one party was able to obtain only one quote or no quotes within the time provided.

(f)    **Credit Support Document.**

In the case of **Party A**:

Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A to this Schedule.

In the case of **Party B**: None

(g)    **Credit Support Provider.**

Credit Support Provider means in relation to Party A:    Lehman Brothers Holdings Inc.

Credit Support Provider means in relation to Party B:    None

(h)    **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of England and Wales.

(i)    **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any Transactions.

(j)    **"Affiliate"** will have the meaning specified in Section 14 of this Agreement, provided, however, that with respect to Party A, such definition shall be understood to exclude Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc.

**Part 5: Other Provisions**

(a)    **Representations.** Section 3 of this Agreement is hereby amended by adding the following additional subsections:

(g)    *No Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of the Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(h)    *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(i)    *Status of Parties.* The other party is not acting as a fiduciary for or an advisor to it in respect of that Transaction.

(j)    *No Agency.* It is entering into this Agreement, including each Transaction, as principal and not as agent of any person or entity.

(k)    *Eligible Contract Participant.* It is an "eligible contract participant" within the meaning of Section 1a (12) of the Commodity Exchange Act.

(b)    *Default Under Specified Transaction.* Section 5(a)(v) is hereby amended to read as follows:

(v)    *Default Under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:

(1)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

(2)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment or exchange date of, or any payment on early termination of, a Specified Transaction (or, if there is no applicable notice requirement or grace period, such default continues for at least one Local Business Day);

(3)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

(4)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other

confirming evidence executed and delivered by that party, Credit Support Provider or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(c)    **Set-off.** Section 6 of this Agreement is hereby amended by adding the following new subsection 6(f):

    (f)    *Set-off.*

    (i)    In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default, Credit Event Upon Merger, or an Additional Termination Event and the designation of an Early Termination Date pursuant to Section 6 of the Agreement with respect to a party ("X"), the other party ("Y") will have the right (but not be obliged) without prior notice to X or any other person to set-off or apply any obligation of X owed to Y (and to any Affiliate of Y) (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Y (and of any Affiliate of Y) owed to X (whether or not matured or contingent and whether or not arising under this Agreement, and regardless of the currency, place of payment or booking office of the obligation).

    (ii)    For the purpose of cross-currency set-off, Y may convert either obligation at the applicable market exchange rate selected by Y on the relevant date.

    (iii)    If the amount of an obligation is unascertained, Y may in good faith estimate that amount and set-off in respect of the estimate, subject to the relevant party accounting to the other when the amount of the obligation is ascertained.

    (iv)    This clause (f) shall not constitute a mortgage, charge, lien or other security interest upon any of the property or assets of either party to this Agreement.

(d)    **Transfer.** Notwithstanding anything to the contrary in Section 7 of this Agreement, Party A may assign its rights and obligations under this Agreement, in whole and not in part, to any Affiliate of Holdings effective upon delivery to Party B of the guarantee by Holdings, in favor of Party B, of the obligations of such Affiliate, such guarantee to be materially the same as the guarantee then in effect of the obligations of the transferor.

(e)    **Notices.** For the purposes of subsections (iii) and (v) of Section 12(a), the date of receipt shall be presumed to be the date sent if sent on a Local Business Day or, if not sent on a Local Business Day, the date of receipt shall be presumed to be the first Local Business Day following the date sent.

(f)    **Service of Process.** The penultimate sentence of Section 13(c) shall be amended by adding the following language at the end thereof: "if permitted in the jurisdiction where the proceedings are initiated and in the jurisdiction where service is to be made."

(g)    **Accuracy of Specified Information.** Section 3(d) is hereby amended by adding in the third line thereof after the word "respect" and before the period the words "or, in the case of audited or unaudited financial statements or balance sheets, a fair presentation of the financial condition of the relevant person."

(h)     **Failure to Pay or Deliver.** Section 5(a)(i) of this Agreement is hereby amended by deleting the word "third" and inserting in lieu thereof the word "first".

(i)     **Escrow Payments.** If (whether by reason of the time difference between the cities in which payments are to be made or otherwise), it is not possible for simultaneous payments to be made on any date on which both parties are required to make payments hereunder, either party may, at its option and in its sole discretion, notify the other party that payments on that date are to be made in escrow. In this case, deposit of the payment due earlier on that date shall be made by 2:00 p.m. (local time at the place for the earlier payment) on that date with an escrow agent selected by the notifying party, accompanied by irrevocable payment instructions (1) to release the deposited payment to the intended recipient upon receipt by the escrow agent of the required deposit of the corresponding payment from the other party on the same date accompanied by irrevocable payment instructions to the same effect or (2) if the required deposit of the corresponding payment is not made on that same date, to return the payment deposited to the party that paid it into escrow. The party that elects to have payments made in escrow shall pay all costs of the escrow arrangements and shall cause those arrangements to provide that the intended recipient of the payment due to be deposited first shall be entitled to interest on that deposited payment for each day in the period of its deposit at the rate offered by the escrow agent for that day for overnight deposits in the relevant currency in the office where it holds that deposited payment (at 11:00 a.m. local time on that day) if that payment is not released by 5:00 p.m. local time on the date it is deposited for any reason, other than the intended recipient's failure to make the escrow deposit it is required to make hereunder in a timely fashion.

(j)     **Severability.** If any term, provision, covenant, or condition of this Agreement, or the application thereof to any party or circumstance, shall be held to be illegal, invalid or unenforceable (in whole or in part) for any reason, the remaining terms, provisions, covenants and conditions hereof shall continue in full force and effect as if this Agreement had been executed with the illegal, invalid or unenforceable portion eliminated, so long as this Agreement as so modified continues to express, without material change, the original intentions of the parties as to the subject matter of this Agreement and the deletion of such portion of this Agreement will not substantially impair the respective benefits or expectations of the parties to this Agreement. It shall in particular be understood that this Severability clause shall not affect the "single agreement" concept of Section 1(c) of the Master Agreement.

(k)     **Recording of Conversations.** Each party consents to the recording of telephone conversations between trading, marketing and other relevant personnel of the parties in connection with this Agreement or any potential Transaction.

(l)     **LIMITATION OF LIABILITY.** FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY

INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

(m)     **Statute of Frauds.**  The parties agree not to contest, or to enter any defense concerning the validity or enforceability of any Transaction on the grounds that the documentation for such Transaction fails to comply with the requirements of any jurisdiction's (of whatever country, province, or state) statute of frauds or any other statute, regulation or judicial decision that agreements be written or signed.


**Part 6: Additional Terms for FX Transactions and Currency Options**

(a)     **Incorporation and Amendment of 1998 FX and Currency Option Definitions**

    (i)     Incorporation of 1998 FX and Currency Option Definitions.  The 1998 FX and Currency Option Definitions, as amended or supplemented from time to time (the "1998 Definitions"), published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee, are hereby incorporated by reference with respect to any "Currency Option Transactions" and "FX Transactions" as defined by the 1998 Definitions, except as otherwise specifically provided herein or in the Confirmation.

    (ii)     Amendment of 1998 FX and Currency Option Definitions.  The following amendments are made to the 1998 Definitions:

        Section 2.1 of the 1998 Definitions is amended by adding the following as Section 2.1(b):

        **Currency Obligation.**  "Currency Obligation" means the undertaking of a party hereunder to receive or deliver an amount of currency, including a netted Currency Obligation, and including any Currency Obligation previously entered into by the parties.

(b)     **Confirmations.** Any confirmation (whether provided by mail, facsimile or other electronic means) in respect of any FX Transaction or Currency Option Transaction into which the parties may enter, or may have entered into prior to the date hereof, that fails by its terms to expressly exclude the application of this Agreement shall (to the extent not otherwise provided for in this Agreement) (i) constitute a "Confirmation" as referred to in this Agreement, even where not so specified in such confirmation; and (ii) supplement, form a part of, and be subject to this Agreement, and all provisions in this Agreement will govern such Confirmation except as expressly modified therein.

(c)     **Netting and Related Provisions.**  Section 2(c) shall not apply to FX Transactions or Currency Option Transactions.  In lieu thereof, the following shall apply:

    (i)     Netting, Discharge and Termination of FX Transactions. The following provisions shall apply to FX Transactions:

Unless otherwise agreed by the parties, whenever an FX Transaction is entered into between the parties which creates a Currency Obligation in the same currency and for the same Settlement Date as an existing Currency Obligation between the parties, such Currency Obligations shall automatically and without further action be netted, individually canceled and simultaneously replaced through novation by a new Currency Obligation under which the party having the obligation to deliver the greater aggregate amount of currency shall be obligated to deliver the excess of such greater aggregate currency amount over such lesser aggregate currency amount. Such new Currency Obligation shall be considered a "Currency Obligation" under this Agreement.

    (ii)    <u>Netting, Discharge and Termination with Respect to Currency Option Transactions</u>.  The following provisions shall apply to Currency Option Transactions:

Unless otherwise agreed by the parties, any Call or Put written by a party will automatically be terminated and discharged, in whole or in part, as applicable, against a Call or a Put, respectively, having the same identical terms, written by the other party; and, upon the occurrence of such termination or discharge, neither party shall have any further obligation to the other party in respect of the parts so terminated and discharged (except for the obligation of either party to pay any Premium due, but not paid, thereunder); and the remaining portion of any Currency Option Transaction, which is partially discharged and terminated, shall continue to be a Currency Option Transaction under this Agreement.

(d)    **Inconsistencies**. In the event of any conflict between:

    (i)    the terms of a Deliverable FX Transaction Confirmation and this Agreement, the terms of this Agreement shall supersede;

    (ii)    the terms of a Deliverable FX Transaction Confirmation, where the Confirmation explicitly states that it shall so prevail and has been signed by both parties, its terms shall supersede the terms of this Agreement;

    (iii)    the terms of a Currency Option Transaction or a Non-Deliverable FX Transaction Confirmation and this Agreement, the terms of the Confirmation shall supersede.

(e)    **Definitions.** Section 14 is hereby amended as follows:

The definition of "Terminated Transactions" shall be deemed to include Currency Obligations.

## Part 7: Additional Terms for Commodity Transactions

(a)    **Definitions.** This Agreement and each Transaction are subject to the 2000 ISDA Definitions (the "2000 Definitions"), and the 2005 ISDA Commodity Definitions (the "2005 Definitions"), (collectively, the "Definitions"), each as published by the International Swaps and Derivatives Association, Inc. ("ISDA"), and will be governed in all respects by the Definitions, but without regard to any further amendments, supplements, updates or restatements made to the Definitions unless otherwise agreed to in a Confirmation (except that any references to "Swap Transactions" in the Definitions will be deemed to be references to "Transactions"). The Definitions are incorporated herein by reference in and made a part of, this Agreement as if set forth in full herein. In the event of any inconsistency between the 2000 Definitions and the 2005 Definitions, the 2005 Definitions will

prevail. In the event of any inconsistency between the provisions of this Part of the Schedule and the provisions of any other Part of the Schedule the application of which is limited to any class of Transactions (as defined in the Commodity Definitions) including, without limitation, NBP Transactions, GTMA Transactions and ZBT Transactions, that other Part shall prevail with respect to such class of Transactions. In the event of any inconsistency between the provisions of this Master Agreement (including the Schedule) and the Definitions, this Master Agreement (including the Schedule) will prevail. In the event of any inconsistency between the provisions of a Confirmation and this Master Agreement (including the Schedule) or the Definitions, the Confirmation will prevail for the purpose of such Transaction.

(b)     **Disruption Fallback.** The definition of "Fallback Reference Dealers" shall be deleted in its entirety and replaced with the following: "Fallback Reference Dealers means that: the Relevant Price will be determined and calculated as set forth in the definition "Commodity-Reference Dealers" (provided that, if the basis that the Specified Price for a Transaction is determined on an hourly basis, all references to Pricing Date shall be read as Pricing Hour) except that each party shall select, in good faith, a price quote from at least two (2) independent, impartial and unaffiliated Reference Dealers in the relevant market which satisfy all the criteria that a party applies generally at the time in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event, and shall obtain such quotes within six (6) Business Days of the Market Disruption Event. The Relevant Price shall be the arithmetic mean of the prices so obtained, and such calculation shall be binding and conclusive absent manifest error even if one party was able to obtain only one quote or no quotes within the time provided. However, if the parties have not obtained at least two (2) prices in total on or before the sixth Business Day following the first Pricing Date on which the Market Disruption Event occurred or existed, the next applicable Disruption Fallback will apply to the Transaction."

Subject to the change in Part 7(b) above, Section 7.5(d)(i) of the 2005 Definitions shall be applicable to all Transactions unless specified in a confirmation.

(c)     **Rounding.** Section 9 of the Commodity Definitions is deleted in its entirety and the following is substituted therefore:

"**Section 9.** For purposes of preparing any calculations referred to in the Commodity Definitions, unless otherwise agreed and specified in a Confirmation, rounding conventions shall be as follows:

| | |
|---|---|
| Commodity Pricing in MWh: | rounded to four (4) decimals; |
| Commodity Pricing in MMBtus: | rounded to four (4) decimals; |
| Commodity Pricing in Gal: | rounded to four (4) decimals; |
| Commodity Pricing in BBL: | rounded to three (3) decimals; |
| Commodity Pricing in NGL: | rounded to five (5) decimals; |
| Commodity Pricing in MT: | rounded to three (3) decimals; |
| All Dollar Amounts: | rounded to the nearest cent." |

**Part 8. Provisions Relating to NBP Transactions and NBP Options.**

(a)    **Incorporation of NBP Terms.** The Short Term Flat NBP Trading Terms & Conditions (Ref. NBP 1997) (the "NBP Terms"), as amended by this Part 8 of the Schedule, are hereby incorporated by reference in this Agreement. The NBP Terms, as amended hereby, are applicable only to Transactions which are NBP Transactions or NBP Options. Except, as otherwise provided in this Part 8, terms defined in the NBP Terms shall have the same meaning when used in this Part 8 and in any Confirmation. "NBP Option" shall mean: (i) an oral or written agreement to enter into an option on an NBP Transaction; and (ii) each transaction identified in the related confirmation to be an NBP Option. Any reference in this Part 8 to a Clause or Clauses is a reference to a clause or clauses in the NBP Terms as amended hereby. In the event of any conflict between the NBP Terms and any other provision of this Agreement, that other provision shall prevail.

(b)    **NBP Transactions and NBP Options.** Any NBP Transaction or NBP Option into which the Parties have entered will be governed by this Agreement. Any NBP Transaction or NBP Option into which the Parties may enter will be governed by this Agreement in all circumstances except when the Parties expressly agree that this Part 8 will not apply. Each such NBP Transaction and NBP Option will be deemed to be a Transaction and the related confirmation or other confirming evidence will be deemed to constitute a Confirmation for purposes of this Agreement.

(c)    **Applicable NBP Terms.**

    (i)    Clauses 1, 2, 3, 4, 5, 6, 7 and 10.3 of the NBP Terms (as amended hereby) shall be applicable to NBP Transactions between the Parties. Clauses 8, 9, 10 (other than Clause 10.3), 11, 12, 13, 14, 15, 16 and 17 of the NBP Terms shall not be applicable to NBP Transactions between the Parties.

    (ii)    Unless otherwise agreed between the Parties or specified in a Confirmation, the compensation payable in the event of a breach of Clauses 4.1.1, 4.1.2 or 4.1.5 of the NBP Terms in respect of an NBP Transaction, for the purposes of Clause 4.2 and 4.3 of the NBP Terms, shall be in accordance with option A.

(d)    **Additional Provisions for NBP Transactions.** The following additional provisions shall apply:

    (i)    The following shall constitute an additional Event of Default for the purposes of this Agreement

        (aa)    **Material Breach**: Any material breach of the NBP Terms by a Party (which shall be the Defaulting Party) (including, without limitation, a persistent failure by the Party to make Trade Nominations in respect of one or more NBP Transactions), which is not remedied on or before the next NBP Banking Day after notice from the other Party.

    (ii)    Failure by a Party to make, when due, any delivery (including, without limitation, by nomination or notification) under Section 2(a)(i) or 2(e) of this Agreement required to be made by it in relation to any NBP Transaction shall not constitute an Event of Default under Section 5(a)(i).

(iii)    Failure by a Party to accept, deliver, nominate or notify in relation to an NBP Transaction shall not constitute an Event of Default under Section 5(a)(ii).

(iv)    For the avoidance of doubt, each representation made by a Party in respect of an NBP Transaction pursuant to Clause 3 of the NBP Terms is a representation for purposes of this Agreement. In addition, each party further represents and warrants to the other that it is not an end-user, burner or consumer of Gas for Climate Change Levy (CCL) purposes. Gas supplied under the terms of this contract will be traded wholesale, used to generate electricity or onward supplied to end use consumers and is exempt from CCL under the provisions of Paragraphs 11 and 14, Schedule 6, Finance Act 2000 as appropriate.

(v)    The termination of an NBP Transaction pursuant to Clause 7.2 of the NBP Terms shall not be deemed to be the termination of that NBP Transaction pursuant to a Termination Event or an Event of Default

(vi)    Notwithstanding any designations made in Part 4 of the Schedule, the NBP Terms will be governed by, and construed and enforced in accordance with English law.

(e)    **Amendments to NBP Terms.** The following amendments are made to the NBP Terms:

(i)    Clause 1 of the NBP Terms is amended:

    (aa)    by deleting the definitions of the terms "Affiliate", "Confirmation", "LIBOR" and "Transco";

    (bb)    by deleting the definition of the term "Party" and inserting the following new definition:

        " "**Party**" shall mean one or the other of the parties to this Agreement;"

    (cc)    by inserting the following new definitions:

        " "**Contract Price** " in relation to a NBP Transaction shall have the meaning specified in the relevant Confirmation;

        ""**Market Disruption Event**" shall mean (1) a failure to commence, a material suspension or a permanent discontinuation of trading in the relevant futures contract, options contract or commodity on the exchange or market that is relevant for the purposes of calculating the Contract Price, (2) material limitations being imposed on trading in the relevant futures contract, options contract or commodity on the exchange or market that is relevant for the purposes of calculating the Contract Price, (3) a material change in the formula for or the method of calculating any price used in calculating the Contract Price, or (4) a material change in the content, composition or constitution of the relevant commodity;"

"**NGG**" shall mean National Grid Gas plc or any successor to the NGG NTS gas transporter licence;"

(dd) by deleting the definition of the term "Network Code" and inserting the following new definition:

" "**Network Code**" shall mean the document, as modified from time to time, setting out the transportation arrangements established by NGG pursuant to its NTS gas transporter licence;"

(ee) by deleting sub-paragraph (a) of the definition of "**NBP Trade**" and inserting the following new sub-paragraph (a):

"in respect of any Day two Users make corresponding Trade Nominations in respect of that quantity of Gas subject to and in accordance with TPD Section C5 of the Network Code."

(ff) by deleting Clause 7.2 and replacing it with the following:

"either Party may terminate a Transaction by giving notice to the other if Force Majeure in respect of that Transaction continues for eight (8) NBP Banking Days or more."

(ii) All Clauses of the NBP Terms:

(aa) in which the term "Banking Day" is defined or appears are amended to substitute the term "NBP Banking Day" for the term "Banking Day" each place that the latter term appears;

(bb) in which the term "Transaction" is defined or appears are amended to substitute the term "NBP Transaction" for the term "Transaction" each place that the latter term appears; and

(cc) in which the term "Transco" is defined or appears are amended to substitute the term "NGG" for the term "Transco" each place that the latter term appears.

(iii) Clause 4.1.4 shall be amended by inserting the following at the end thereof:

"If in respect of the Day, neither Party has notified an Accurate Trade Nomination to NGG in respect of the Transaction, neither Party shall have any liability to the other in respect thereof;

(iv) The following shall be added as a new Clause 4.5:

"4.5    **Amendments to the Network Code**

(a) If the SAP, SMBP, and/or SMSP are no longer available to a User and/or their definition or method of calculation under the Network Code is amended, either Party may give notice to the other Party that it wishes to agree with the other Party an

appropriate replacement for that price and/or any other appropriate amendments to this Agreement, so as to maintain as closely as possible the commercial intent of Clauses 4.2 and 4.3 as at the date of each Transaction entered into in accordance with this Agreement. If the Parties do not reach agreement on such matters within three (3) NBP Banking Days of such notice, either Party may refer the matter to an expert knowledgeable in the relevant market who shall be appointed by agreement between the Parties or, absent such agreement, by the President of the Energy Institute in the United Kingdom. The expert shall act as an expert and not as an arbitrator and the fees, costs and expenses of the expert shall be borne equally between the Parties.

(b) Any replacement and/or other amendment agreed by the Parties or determined by the expert pursuant to Clause 4.5(a) shall be effective in relation to all Transactions between the Parties from the date of the notice served pursuant to Clause 4.5(a)."

(v) Clause 5.2 of the NBP Terms is amended by inserting after "VAT" the words "and climate change levy or other similar environmental tax, duty or levy, if any, due".

(vi) The following shall be added as a new Clause 5.4:

"5.4    **Market Disruption**

If the Contract Price is determined by reference to any price, and on any day which is relevant for calculating the Contract Price (a "**Trading Day**") there is a Market Disruption Event in respect of the relevant price, the Parties shall promptly negotiate in good faith to agree the value of the price, or a method for determining that price for that Trading Day and if the Parties have not so agreed on or before the third NBP Banking Day following that Trading Day, each Party shall at its own cost and in good faith obtain an estimate for the value of that price for that Trading Day from at least two (2) independent, impartial and unaffiliated recognized leading dealers or brokers in the relevant market which satisfy all the criteria that a Party applies generally at the time in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Transaction that is affected by the Market Disruption Event for the purposes of calculating the Contract Price. The Parties shall obtain such estimates within six NBP Banking Days of that Trading Day. The value of that price for that Trading Day shall be the arithmetic mean of such estimates, and such calculation shall be binding and conclusive absent manifest error even if one Party was able to obtain only one quote or no quotes within the time provided. However, if the Parties have not obtained at least two (2) estimates in total on or before the sixth NBP Banking Day after that Trading Day the value of that price for that Trading Day shall be as determined by an expert knowledgeable in the relevant market appointed by the President of the Energy Institute in the United Kingdom. The expert shall act as an expert and not as an arbitrator and the

fees, costs and expenses of the expert shall be borne equally between the Parties.

(vii)  Clause 6 of the NBP Terms is amended as follows:

(aa)  Clause 6.2 is amended by adding the words "and subject to Section 2(c) of the Agreement" after the words "the Monthly Statement" in the third line;

(bb)  Clause 6.5 is amended by deleting the words "shown in the Monthly Statement" in the first line;

(cc)  Clause 6.6.3 is amended by deleting the words "the Transaction" and replacing such words with "all NBP Transactions"; and

(dd)  Clauses 6.6.1, 6.6.2 and 6.7 are deleted.

(viii)  Clause 10.3 of the NBP Terms is to be deleted and replaced with the following:

"The termination of NBP Transactions, however occurring, shall not affect any rights or obligations that may have accrued to either Party prior to such termination and, without limitation to the foregoing, any amounts that would be payable (but for such termination are not then due) in respect of the performance or non-performance of any NBP Trades pursuant to such terminated NBP Transactions on or prior to such termination shall become immediately due and payable upon the date of such termination whether or not such amounts are included in a Monthly Statement."

(f)  A new Clause 18 of the NBP Terms is added as follows:

**"Additional Payer Tax Representations**

Party A gives the following Additional Payer Tax Representations when acting as a Buyer:

(a)  it is a taxable dealer as defined in Article 1 of the EU Council Directive 2003/92/EC of 7th October 2003 (the **Directive**); and

(b)  its place of belonging for value added tax purposes is United Kingdom

Party A gives the following Additional Payer Tax Representations when acting as Option Buyer: its place of belonging for value added tax purposes is the United Kingdom

Party B gives the following Additional Payer Tax Representations when acting as a Buyer:

(a)  it is a taxable dealer as defined in Article 1 of the EU Council Directive 2003/92/EC of 7th October 2003 (the **Directive**); and

(b)      its place of belonging for value added tax purposes is The United Kingdom

Party B gives the following Additional Payer Tax Representations when acting as Option Buyer:  its place of belonging for value added tax purposes is The United Kingdom.

(g)    **Additional Provisions for NBP Options.** The following definitions, terms and conditions shall apply to each NBP Option:

    (i)    Definitions

"Call" means an NBP Option entitling, but not obligating, the Option Buyer upon exercise to enter into an NBP Transaction as the Buyer.

"Exercise Period" means:

For European style NBP Options, in respect of each Supply Period, at any time between 0900 hours London Time and the Expiration Time solely on the Expiration Date.

For American style NBP Options, in respect of each Supply Period, at any time between 0900 – 1700 hours London Time on any NBP Banking Day prior to the Expiration Time on the Expiration Date(s).

For Daily Expiring NBP Options, in respect of each Day at any time between 0900 hours London Time and the Expiry Time on the applicable Expiration Date.

"Expiration Date" means the date on which an NBP Option expires as agreed between the Parties at the time the NBP Option is entered into, provided that in respect of a Daily Expiring style NBP Option, Expiration Date means the NBP Banking Day preceding the Day (in the Term of the relevant Daily Expiring style NBP Option) to which the Daily Expiring style NBP Option relates.

"Option Buyer" means the person identified as such by the Parties at the time of entering into an NBP Option.

"Option Seller" means the person identified as such by the Parties at the time of entering into an NBP Option.

"Put" means an NBP Option Transaction entitling, but not obligating, the Option Buyer upon exercise to enter into an NBP Transaction as the Seller.

"Premium" means the price to be paid by the Option Buyer for an NBP Option but exclusive of VAT and other applicable taxes and expressed in pence/Therm, as agreed between the Parties at the time of entering into an NBP Option.

"Premium Payment Date" means in respect of an NBP Option, the day which falls three (3) NBP Banking Days after the Trade Date or such other day as the Parties may expressly agree at the time of entering into the NBP Option.

"Reference Price", save where otherwise specified in the NBP Option Confirmation, means: In respect of each Supply Period, the arithmetic average of the Argus Price, Heren Price and the IPE Price quoted in respect of the Expiration Date; where:

"Argus Price" shall be the mean of the high and low prices for that Supply Period under the heading "Over the counter: NBP and North Sea Terminals p/th (subheading 'NBP')" as reported for the Expiration Date in "Petroleum Argus European Natural Gas" published by Petroleum Argus Ltd.

"Heren Price" shall be the mean of the high and low prices for that Supply Period under the heading "ESGM Price Assessment (subheading 'NBP')" as reported for the Expiration Date in "The Heren Report European Spot Gas Markets".

"IPE Price" shall mean closing settlement price for the Expiration Date on the International Petroleum Exchange for the IPE Natural Gas Futures Contract for that Supply Period.

"Strike Price" means the price agreed between the Parties as the strike price at the time of entering into the NBP Option (being also the Contract Price at which the Option Buyer may exercise its option under that NBP Option to buy or sell pursuant to an NBP Transaction).

(ii)     Confirmation

Each Confirmation of an NBP Option shall be in substantially the form of a Confirmation (as set forth in Part II of Appendix 1 to this Agreement (an "NBP Option Confirmation")). The terms and conditions provided for in the NBP Option Confirmation shall apply to that NBP Option.

(iii)    Exercise Provisions

Unless provided otherwise in the NBP Option Confirmation, an NBP Option shall be exercised in its Exercise Period by the Option Buyer by so advising the Seller of its intention to do so. If the Buyer fails to exercise this option by the Expiration Time on the Expiration Date, this option shall expire and no payment or delivery shall be due thereunder (except that any outstanding Total Premium shall remain payable by the Option Buyer to the Option Seller).

(iv)     Exercise Mechanism:

Notice of Exercise may be given by the Option Buyer orally advising an authorised representative of the Option Seller of its intention to do so. In no event shall notice be effected by leaving a message on a voicemail or other messaging system. Without prejudice to the effectiveness of such oral exercise, the Option Buyer shall confirm such oral exercise within three (3) NBP Banking Days by written notice to the Option Seller. For the avoidance of doubt if the Option Buyer is unable to give Notice of Exercise orally to an authorised representative of the Option Seller it may exercise an Option by giving notice by facsimile transmission.

(v)     Automatic Exercise:

Unless the parties otherwise agree at the time of agreeing an NBP Option, unless the Option Seller is otherwise instructed by the Option Buyer at or prior to the Expiration Time of that NBP Option, that NBP Option shall be deemed to have been exercised at the Expiration Time where the In-the-Money Amount payable to the Buyer equals or exceeds the product of (A) 10 per cent (or such other percentage as may have been agreed by the parties) of the Strike Price and (B) the Daily Quantity for that Day or Supply Period as the case may be.

For the purposes of hereof "In-the-Money Amount" means:

(aa)     in the case of a call option, the amount, if any, by which (x) the product of the Total Quantity times the Reference Price exceeds (y) the product of the Total Quantity times the Strike Price; and

(bb)     in the case of a put option, the amount, if any, by which (x) the product of the Total Quantity times the Strike Price exceeds (y) the product of the Total Quantity times the Reference Price.

(vi)    Premium and VAT

The Premium payer shall pay the Total Premium specified in the NBP Option Confirmation to the Premium payee on the Premium Payment Date. The Total Premium payable shall be exclusive of VAT and the Premium payer shall pay any VAT due in relation to the Total Premium on the Premium Payment Date against appropriate tax invoice(s) from the Premium payee.

(vii)   Settlement Provisions

In respect of each Day or Supply Period, as the case may be, in relation to which an NBP Option is exercised, upon the Buyer exercising that NBP Option it shall cease to be outstanding (but without prejudice to any claim that the Option Seller may have in respect of any unpaid Total Premium or other amount relating to such NBP Option) in respect of that Day or Supply Period, as the case may be, and a binding NBP Transaction shall automatically and immediately arise between the Seller and the Buyer (without any further action by the Parties) to undertake one or more NBP Trades for the period, Total Quantity, Daily Quantity and Strike Price (being the Contract Price) set out above for that Day or Supply Period, as the case may be, in accordance with the terms of the NBP Transaction Confirmation attached to the NBP Option Confirmation for that NBP Option. The terms of such NBP Transaction Confirmation shall be consistent with the terms set out in the NBP Option Confirmation and shall be subject to the Agreement.

(viii)  Late Payment

If the Total Premium payable in respect of an NBP Option is not received on or before the Premium Payment Date for that NBP Option, the Seller may elect: (i) to accept a late payment of such Total Premium; (ii) to give written notice of such non-payment and, if such payment shall not be received within

one (1) NBP Banking Day of such notice the Buyer shall be in default under that NBP Option and the Seller may treat that NBP Option as void; (iii) to give written notice of such non-payment and, if such payment shall not be received within one (1) NBP Banking Day of such notice, treat such non-payment as a breach under Section 5(a)(i) of the Agreement entitling the Seller to terminate all Transactions. If the Seller elects to act under either (i) or (ii) of the preceding sentence, the Buyer shall pay all out-of-pocket costs and actual damages incurred in connection with such unpaid or late Premium or void NBP Option, including, without limitation, interest on such Total Premium from and including the relevant Premium Payment Date to but excluding the late payment date at the Default Rate together with, in either case, any other losses, costs or expenses incurred by the Seller in covering its obligations in connection with such NBP Option for the loss of its bargain, its actual cost of funding, or the loss incurred as a result of terminating, liquidating, obtaining or re-establishing a hedge or related trading position with respect to such NBP Option.

(f)     **Payment Instructions.** All payments to be made hereunder in respect of NBP Transactions and NBP Options shall be made in accordance with the standing payment instructions provided by the Parties (or as otherwise specified in a Confirmation).

**APPENDIX 1 TO THE**
**1992 ISDA MASTER**
**AGREEMENT (MULTICURRENCY – CROSS BORDER) DATED AS OF**

**BETWEEN PARTY A AND PARTY B**

## PART I - FORM OF CONFIRMATION OF NBP TRANSACTION:

This is to confirm the terms and conditions of the NBP Transaction entered into between Party A and Party B on the Trade Date specified below (the "NBP Transaction"). This constitutes a "Confirmation" as referred to in the 1992 ISDA Master Agreement (Multicurrency – Cross Border) specified below.

This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of [date], as amended and supplemented from time to time (the "Agreement"), between Party A and Party B. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

The SELLER and the BUYER named below hereby agree that this Confirmation confirms the details of an agreement to undertake NBP Trades in accordance with the Short Term Flat NBP Trading Terms and Conditions Ref. NBP 1997 (as amended by, and only to the extent specified in, the Agreement) and TPD Section C5 of the Network Code.

REFERENCE NUMBER:

TRADE DATE:

SELLER:

(including AT LINK Reference) [To be advised]

BUYER:

(including AT LINK Reference) [Please advise]

SUPPLY PERIOD:

DAILY QUANTITY:

TOTAL QUANTITY                             TOTAL FOR
                                          SUPPLY PERIOD

CONTRACT PRICE:

COMPENSATION FOR BREACH WITHIN            SMP IN ACCORDANCE WITH OPTION A
CLAUSES 4.2 OR 4.3:

SPECIAL CONDITIONS:

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to this NBP Transaction (contract Reference number: _____ ) by signing this Confirmation in the space provided below and immediately returning a copy of the executed Confirmation via facsimile to the attention of Commodity operations at:

For the sake of good order, please note that the terms of this NBP Transaction shall be agreed solely between the parties and that any brokers' confirmation telex referencing the details of this NBP Transaction is for informational purposes only.

Regards,

[Party A] [Party B]


By: _____
Name:
Title:


[Party A] [Party B]

Agreed:

Signed on behalf of [Party A] [Party B]


By: _____
Name:
Title:

**PART II – FORM OF CONFIRMATION OF NBP OPTION:**

| | |
|---|---|
| To: | [Party A][Party B] |
| Attention: | [                    ] |
| CC: | [                    ] |
| Attention: | [                    ] |
| CC: | [                    ] |
| Attention: | [                    ] |
| From: | [Party A] [Party B] |

This is to confirm the terms and conditions of the NBP Option entered into between Party A and Party B on the Trade Date specified below (the "Transaction"). This constitutes a "Confirmation" as referred to in the 1992 ISDA Master Agreement (Multicurrency – Cross Border) specified below.

This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of [date], as amended and supplemented from time to time (the "Agreement"), between Party A and Party B. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

All terms that are defined in the Short Term Flat NBP Trading Terms and Conditions Ref. NBP 1997 (the "NBP Terms"), as amended by the Agreement shall have the same meanings herein as are ascribed to them in the NBP Terms, as so amended.

| | |
|---|---|
| Reference number: | [_____] |
| Trade Date: | [ , 200_] |
| Buyer: | |
| Seller: | |
| Commodity: | NBP Trades. |
| Option type: | [Call][Put] |
| Option style: | [European][American][Daily Expiring] |
| Settlement: | Physical<br>(see Settlement Provisions as set out in the Agreement)) |

Automatic Exercise:                                [Not to apply]

Supply Period:

[For a daily option:

Any day in respect of which this option is exercised from the Start Day to the End Day (inclusive)

Start Day:

End Day:]

[For an American/European option:

Each period specified below:

| Expiration Date | Start Day | End Day | Supply Period Quantity (Therms) |
|---|---|---|---|
| [ | | | ]] |

Expiration Date:

[For a daily expiring option: For any day, the NBP Banking Day immediately preceding that day]

[For an American/European option: For each Supply Period, the Expiration Date specified above]

Expiration Time:                    In respect of each [day][Supply Period], [12]
                                     [17]:00 hrs. London Time on the Expiration Date

Daily Quantity:                      _____ Therms

Total Quantity:                      _____ Therms

Strike Price:                        GBP_____ per Therm

Premium:                             GBP_____ per Therm

Total Premium:                       GBP

                                     _____

Premium Payment Date:

Due to:

Reference Price:                     [                              ]

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to this Transaction (contract Reference number: _ ) by signing this Confirmation in the space provided below and immediately returning a copy of the executed Confirmation via facsimile to the attention of Commodity operations at:

For the sake of good order, please note that the terms of this Transaction shall be agreed solely between the Parties and that any brokers' confirmation telex referencing the details of this Transaction is for informational purposes only.

[We are pleased to have been able to conclude this Transaction with [Party A] [Party B].]

Regards,

[Party A] [Party B]


Agreed:

Signed on behalf of [Party A] **[Party B]**

By: _____
Name:
Title:

**Form of NBP Transaction Confirmation to be attached to Confirmation of NBP Option and to be issued upon exercise of such NBP Option:**

This is to confirm the terms and conditions of the NBP Transaction entered into between Party A and Party B on the Trade Date specified below (the "NBP Transaction"). This constitutes a "Confirmation" as referred to in the 1992 ISDA Master Agreement (Multicurrency – Cross Border) specified below.

This Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement (Multicurrency – Cross Border) dated as of [date], as amended and supplemented from time to time (the "Agreement"), between Party A and Party B. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

The SELLER and the BUYER named below hereby agree that this Confirmation confirms the details of an agreement to undertake NBP Trades in accordance with the Short Term Flat NBP Trading Terms and Conditions Ref. NBP 1997 (as amended by, and only to the extent specified in, the Agreement) and TPD Section C5 of the Network Code.

REFERENCE NUMBER:

TRADE DATE:

SELLER:

(including AT LINK Reference) [To be advised]

BUYER:

(including AT LINK Reference) [Please advise]

SUPPLY PERIOD:

DAILY QUANTITY:

TOTAL QUANTITY

CONTRACT PRICE:                                     TOTAL FOR
                                                    SUPPLY PERIOD

COMPENSATION FOR BREACH WITHIN          SMP IN ACCORDANCE WITH OPTION A
CLAUSES 4.2 OR 4.3:

[CREDIT:                    ]

SPECIAL CONDITIONS:

Please confirm that the foregoing correctly sets forth the terms of our agreement with respect to this NBP Transaction (contract Reference number: _____ ) by signing this Confirmation in the space provided

below and immediately returning a copy of the executed Confirmation via facsimile to the attention of Commodity operations at:

For the sake of good order, please note that the terms of this NBP Transaction shall be agreed solely between the parties and that any brokers' confirmation telex referencing the details of this NBP Transaction is for informational purposes only.

[We are pleased to have been able to conclude this NBP Transaction with [Party A] [Party B].] Regards,


[Party A] [Party B]

Agreed:

Signed on behalf of [Party A] [Party B]

By: _____
Name:
Title:

The parties executing this Schedule have executed the Master Agreement and have agreed as to the contents of this Schedule.

**LEHMAN BROTHERS**
**COMMODITY SERVICES INC.**

**TOTAL GAS & POWER LIMITED**

By: _____

Name:

Title:      Zdenka S. Griswold

Date:      Senior Vice President

By: _____

Name:

Title:      Philippe Chauvain

Date:      General Manager

Risk Control & IT

30/5/06

EXHIBIT A to Schedule

GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and TOTAL GAS & POWER LIMITED ("Party B") have entered into a Master Agreement dated as of [date], as amended from time to time (the "Master Agreement"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement"). This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby absolutely and unconditionally guarantees to Party B by way of continuing obligation the payment within five (5) Banking Days of receipt of a written demand of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay by the due date any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay any such amounts in accordance with the foregoing provisions of this clause.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or Potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Master Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)     Guarantor hereby agrees to pay to Party B upon its request all reasonable costs and expenses, including reasonable legal fees and disbursements, incurred by Party B in connection with any enforcement proceedings against the Guarantor hereunder.

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine. All capitalized terms not defined in this Guarantee, but defined in the Agreement, shall have the meanings assigned thereto in the Agreement.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____

Name:

Title:

Date:

[Bilateral Form - Transfer]    (ISDA Agreements Subject to English Law)

# CREDIT SUPPORT ANNEX

to the Schedule to the

# ISDA Master Agreement

dated as of 18 May 2006

between

### LEHMAN BROTHERS COMMODITY SERVICES INC and    TOTAL GAS & POWER LIMITED
### ("Party A")                                                                    ("Party B")

This Annex supplements, forms part of, and is subject to, the ISDA Master Agreement referred to above and is part of its Schedule. For the purposes of this Agreement, including, without limitation, Sections 1(c), 2(a), 5 and 6, the credit support arrangements set out in this Annex constitute a Transaction (for which this Annex constitutes the Confirmation).

## Paragraph 1. Interpretation

Capitalised terms not otherwise defined in this Annex or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 10, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 11 and the other

---

[1] This document is not intended to create a charge or other security interest over the assets transferred under its terms. Persons intending to establish a collateral arrangement based on the creation of a charge or other security interest should consider using the ISDA Credit Support Deed (English law) or the ISDA Credit Support Annex (New York law), as appropriate.

[2] This Credit Support Annex has been prepared for use with ISDA Master Agreements subject to English law. Users should consult their legal advisers as to the proper use and effect of this form and the arrangements it contemplates. In particular, users should consult their legal advisers if they wish to have the Credit Support Annex made subject to a governing law other than English law or to have the Credit Support Annex subject to a different governing law than that governing the rest of the ISDA Master Agreement (e.g., English law for the Credit Support Annex and New York law for the rest of the ISDA Master Agreement).

Copyright © 1995 by International Swaps and Derivatives Association, Inc.

10

**CREDIT SUPPORT ANNEX**
Elections and Variables
dated as of 18 May 2006
between
**LEHMAN BROTHERS COMMODITY SERVICES INC**
(hereinafter referred to as "Party A")
and
**TOTAL GAS & POWER LIMITED**  (hereinafter referred to as "Party B")

## PARAGRAPH 11. ELECTIONS AND VARIABLES

(a)    **Base Currency and Eligible Currency.**

    (i)    **"Base Currency"** means Sterling.

    (ii)    **"Eligible Currency"** means the Base Currency.

(b)    **Credit Support Obligations.**

    (i)    **Delivery Amount, Return Amount and Credit Support Amount**

        (1)    **"Delivery Amount"** has the meaning specified in Paragraph 2(a).

        (2)    **"Return Amount"** has the meaning specified in Paragraph 2(b).

        (3)    **"Credit Support Amount"** means, for any Valuation Date (A) the Transferee's Exposure for that Valuation Date plus (B) the aggregate of all Independent Amounts applicable to the Transferor, if any, minus (C) the Transferor's Threshold; provided, however, that (x) in the case where the sum of the Independent Amounts applicable to the Transferor exceeds zero, the Credit Support Amount will not be less than the sum of all Independent Amounts applicable to the Transferor and (y) in all other cases, the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields an amount less than zero.

    (ii)    **Eligible Credit Support.**  The following items will qualify as **"Eligible Credit Support"** for the party specified:

|     |     | Party A | Party B | Valuation Percentage |
|-----|-----|---------|---------|----------------------|
| (1) | Cash in an Eligible Currency. | Yes | Yes | 100% |
| (2) | Letter of Credit (as defined in Paragraph 11(b)(iv)(i)) but only to the extent that the Value of the Letters of Credit comprised in a party's Credit Support Balance does not (or would not if as of the Valuation Date one or more Letters of Credit were comprised in Eligible Credit Support Transferred pursuant to Paragraph 2(a), 3(c) or 4(a)) exceed $100,000,000 (USD one hundred million) or its equivalent in Euros | No | Yes | 100% of the Value of the undrawn portion of any Letter of Credit unless a Letter of Credit Default shall occur and be continuing with respect to such Letter of Credit, in which case the Valuation Percentage shall be zero. |

(1)    **"Independent Amount"** shall mean any amount agreed at the time of entering into the relevant Transaction with respect to Party A.

    **"Independent Amount"** shall mean any amount agreed at the time of entering into the relevant Transaction with respect to Party B.

(2)    **"Threshold"** means, with respect to Party A, GBP 8,000,000; provided, that if an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to such party shall be zero.

    **"Threshold"** means, with respect to Party B, GBP 8,000,000; provided, that if an Event of Default, Credit Event Upon Merger, or Additional Termination Event has occurred and is continuing, then the Threshold with respect to such party shall be zero.

(3)    **"Minimum Transfer Amount"** means, with respect to a party, GBP 250,000; provided that, notwithstanding anything to the contrary contained herein, the Minimum Transfer Amount shall not apply to the Independent Amount, and provided further that if (A) an Event of Default, Credit Event Upon Merger, or Additional Termination Event with respect to Transferor has occurred and is continuing, then the Minimum Transfer Amount with respect to the Defaulting Party or the Affected Party shall be zero and (B) if Transferor, or its Credit Support Provider, as the case may be, ceases to be rated by either S&P or Moody's or ceases to have a Credit Rating, then the Minimum Transfer Amount with respect to Transferor shall be zero.

(4)    **Rounding.** The Delivery Amount and the Return Amount will be rounded up and down respectively to the nearest integral multiple of GBP 50,000.

(c)    **Valuation and Timing.**

(i)    **"Valuation Agent"** means Party A.

(ii)    **"Valuation Date"** means any Local Business Day.

(iii)    **"Valuation Time"** means the close of business in the location where the relevant product is traded provided that the calculations of Value and Exposure will be made as of approximately the same time on the same date.

(iv)    **"Notification Time"** means by 4:00 p.m., London time, on a Local Business Day.

(d)    **"Exchange Date"** has the meaning specified in Paragraph 3(c)(ii).

(e)    **Dispute Resolution.**

(i)    **"Resolution Time"** means 1:00 p.m., London time on the Local Business Day following the time at which notice is given that gives rise to a dispute under Paragraph 4.

(ii)    **Alternative.** Paragraph 4 will apply.

(f)    **Distributions and Interest Amount.**

    **Interest Rates**

    **With respect to:**

(i)    **Sterling Cash.** The Interest Rate will be SONIA. "SONIA" for any day means the reference rate equal to the overnight rate as calculated by the Wholesale Market Brokers Association which appears on the

Telerate Page 3937 under the heading "Sterling Overnight Index" as of 9.00 a.m., London time, on the first London Banking Day following that day. If such rate does not appear on the Telerate Page 3937, the rate for that day will be the rate agreed between the parties.

(ii)    **Transfer of Interest Amount.** A notice confirming the Interest Amount due will be sent by the Transferee to the Transferor on the first Local Business Day of each calendar month. A transfer of the Interest Amount will be made as soon as reasonably practicable (and in any event no later than the following Local Business Day) after receipt by the Transferee from the Transferor of confirmation of the Interest Amount to be transferred.

(ii)    **Alternative to Interest Amount.** Paragraph 5(c)(ii) will apply.

(g)    **Addresses for Transfers.**

Party A:

To be advised at the time of request for the transfer

Party B:

To be advised at the time of request for the transfer

(h)    **Other Provisions.**

(i)    **Paragraph 6.** For the purposes of determining the Credit Support Balance pursuant to Paragraph 6, the definition of Value in Paragraph 10 shall be amended by deleting the words "multiplied by the applicable Valuation Percentage, if any" from subsection (i)(A) and (B).

(ii)    **Minimum Transfer Amount.** Notwithstanding the provisions of 11(b)(iii)(3), when the Credit Support Amount with respect to both parties on a Valuation Date is zero, the Minimum Transfer Amount with respect to both parties will be zero.

(iii)    **No offset.** The following subparagraph (c) is hereby added to Paragraph 2 of this Annex:

(c)    *No offset.* On any Valuation Date, if either (i) each party is required to make a Transfer under Paragraph 2(a) or (ii) each party is required to make a transfer under Paragraph 2(b), then the amounts of those obligations will not offset each other.

(iv)    **Letters of Credit – Definitions**

(i) **Letter of Credit** means an irrevocable, transferable, standby letter of credit denominated in the Base Currency or an Eligible Currency issued by a financial institution acceptable to the other Party with a Credit Rating at the time of issue of at least A by S&P or A2 by Moody's, in a form acceptable to the Transferee.

(ii) **Transfer** means, with respect to Eligible Credit Support or Equivalent Credit Support in the form of Letters of Credit meeting the criteria set out in Paragraph 11(b)(ii)(C):

(1) for the purposes of Paragraph 2(a), by delivery of a duly executed Letter of Credit or duly executed amendment to such Letter of Credit (extending the term or increasing the amount available to the Transferee thereunder) by the Transferor or issuer of the Letter of Credit to the Transferee at the address specified in the Notices Section of this Agreement.

(2) for the purposes of Paragraph 2(b), by return of an outstanding Letter of Credit or delivery of a duly executed amendment to the Letter of Credit in form and substance acceptable to the Transferee (reducing the amount available to the Transferee thereunder), by the Transferor or the issuer of the

13

Letter of Credit to the Transferee at the Transferee's address specified in the Notices Section of this Agreement.

If:

(1) he Credit Support Balance comprises or includes a Letter of Credit (the "specified Letter of Credit");

(2) the Transferor of such Credit Support Balance duly demands a Return Amount;

(3) the Transferor does not deliver by 1:00 p.m. on the second Local Business Day following such demand an amendment to the specified Letter of Credit to reduce the amount available to the Transferee which is in form and substance satisfactory to the Transferee; and

(4) the Value of the specified Letter of Credit exceeds the sum of the Return Amount minus the Value of all Equivalent Credit Support (that is not the specified Letter of Credit) Transferred to meet the relevant demand,

then the Transferee shall not be obliged to return the specified Letter of Credit to the Transferor.

(iii) **Value** means, with respect to Eligible Credit Support in the form of Letters of Credit, the Base Currency Equivalent of the stated amount (undrawn portion) of any Letter of Credit multiplied by the Valuation Percentage.

(iv) **Letter of Credit Default** means, with respect to an outstanding Letter of Credit, the occurrence of any of the following events:

(1) the issuer of such Letter of Credit failing to maintain a Credit Rating of at least A by S&P or A2 by Moody's;

(2) the issuer of the Letter of Credit failing to comply with or perform its obligations under such Letter of Credit if such failure shall be continuing after the lapse of any applicable grace period;

(3) the issuer of such Letter of Credit disaffirming, disclaiming, repudiating or rejecting, in whole or in part, or challenging the validity of, such Letter of Credit;

(4) the issuer of such Letter of Credit fails to ensure the renewal or replacement of the Letter of Credit to the Transferee at least thirty (30) Local Business Days prior to the expiration of such Letter of Credit;

(5) such Letter of Credit expiring or terminating, or failing or ceasing to be in full force and effect at any time during the term of this Agreement, in any such case without replacement; or

(6) any event analogous to an event specified in Section 5(a)(vii) of the Agreement shall occur with respect to the issuer of such Letter of Credit,

provided, however, that no Letter of Credit Default shall occur in any event with respect to a Letter of Credit after the time such Letter of Credit is required to be cancelled or returned to the Transferor in accordance with the terms of this Annex.

(v)       <b>Letters of Credit – Other Provisions</b>

(1) **Default.** For the purposes of Paragraph 6:

(aa) the Value of Eligible Credit Support comprised of a Letter of Credit shall be excluded from the calculation of the Value of the Credit Support Balance; and

(bb) in respect of any Letter of Credit, to the extent that the Transferee draws under such Letter of Credit, the Transferee may apply any proceeds of such drawing against any amount payable to it

14

as a result of a Termination Event, an Event of Default or an Early Termination Date and exercise any other applicable rights it may have in respect of such proceeds.

(2) **Requirements for Letters of Credit**.    A Letter of Credit shall provide that the Transferee may draw upon the Letter of Credit in one or more drawings in an aggregate amount (up to the face amount for which the Letter of Credit has been issued) that is equal to all amounts that are due and payable by the Transferor but have not been paid to the Transferee within the time allowed for such payments under this Agreement (including any related notice or grace period or both).    A Letter of Credit shall provide that a drawing be made on the Letter of Credit upon submission to the issuer thereof of one or more documents specifying the amounts due and payable to the Transferee in accordance with specific requirements of the Letter of Credit.

(3)      **Drawing**. If:

(aa)    an Event of Default or Termination Event has occurred and is continuing with respect to a Transferor of an outstanding Letter of Credit; or

(bb)    an Early Termination Date is designated or deemed to occur as a result of an Event of Default or Termination Event with respect to a Transferor of an outstanding Letter of Credit; or

(cc)    the Transferor of an outstanding Letter of Credit shall fail to pay or deliver, when due, any amount payable by it under the Agreement and such failure is continuing; or

(dd)    a Letter of Credit Default has occurred and is continuing with respect to a Letter of Credit comprised in a party's Credit Support Balance,

then the Transferee may draw on the entire or part of the undrawn portion of any outstanding Letter of Credit upon submission to the issuer thereof of one or more documents specifying the amounts due and payable to the Transferee in accordance with the specific requirements of the Letter of Credit. The Transferor shall remain liable for any amounts due and payable to the Transferee and remaining unpaid after the application of the amounts so drawn by the Transferee.

(4)      **Other**

(a) Notwithstanding Paragraph 8, in all cases, the costs and expenses (including, but not limited to the reasonable costs, expenses and attorney's fees of the Transferee) of establishing, renewing, substituting, canceling, increasing and reducing the amount of (as the case may be) one or more Letters of Credit shall be borne by the Transferor.

(b) Notwithstanding any other provision of this Annex, any Letter of Credit Default that occurs with respect to a Letter of Credit comprised in the Transferor's Credit Support Balance and is not cured by the Transferor in accordance with the terms of this Annex shall constitute an Event of Default with respect to the Transferor under Section 5(a)(iii) of this Agreement.

(c) For the avoidance of doubt and notwithstanding that the Value of Eligible Credit Support comprised of a Letter of Credit shall be excluded from the calculation of the Value of the Credit Support Balance for the purpose of Paragraph 6, the amount of any drawing of a Letter of Credit shall constitute Eligible Credit Support and shall be comprised in the Credit Support Balance of the Letter of Credit's Transferor.

The parties executing this Credit Support Annex have executed the Master Agreement and have agreed as to the contents of this Credit Support Annex.

| LEHMAN BROTHERS COMMODITY | TOTAL GAS & POWER LIMITED |
| SERVICES INC | |
| *Party A* | *Party B* |

By: _____

Name:

Title:    Zdenka S. Griswold

Date:    Senior Vice President

By: _____

Name:

Title:    **Philippe Chauvain**

Date:    **General Manager**

**Risk Control & IT**

30/5/06

16

## CERTIFICATE OF INCUMBENCY AND SIGNATURE

I, Jin Lee, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Commodity Services Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the title in the Corporation indicated opposite her name on the date hereof and that the signature appearing opposite her name is a genuine signature of such person.

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Zdenka Griswold | Senior Vice President | |

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Corporation as of this 6 day of February, 2006.

[SEAL]

Name: Jin Lee
Title: Assistant Secretary

648017.2