# EXHIBIT C

# EFET

## European Federation of Energy Traders

Amstelveenseweg 998 / 1081 JS Amsterdam
Tel: +31 20 5207970 / Fax: +31 20 64 64 055

E-mail: secretariat@efet.org

Webpage: www.efet.org

<u>**WAIVER**</u>: THE FOLLOWING GENERAL AGREEMENT WAS PREPARED BY EFET'S MEMBERS EXERCISING ALL REASONABLE CARE. HOWEVER, EFET, THE EFET MEMBERS, REPRESENTATIVES AND COUNSEL INVOLVED IN ITS PREPARATION AND APPROVAL SHALL NOT BE LIABLE OR OTHERWISE RESPONSIBLE FOR ITS USE AND ANY DAMAGES OR LOSSES RESULTING OUT OF ITS USE IN ANY INDIVIDUAL CASE AND IN WHATEVER JURISDICTION. IT IS THEREFORE THE RESPONSIBILITY OF EACH PARTY WISHING TO USE THIS GENERAL AGREEMENT TO ENSURE THAT ITS TERMS AND CONDITIONS ARE LEGALLY BINDING, VALID AND ENFORCEABLE AND BEST SERVE TO PROTECT THE USER'S LEGAL INTEREST. USERS OF THIS GENERAL AGREEMENT ARE URGED TO CONSULT RELEVANT LEGAL OPINIONS MADE AVAILABLE THROUGH EFET AS WELL AS THEIR OWN COUNSEL.

---

## General Agreement

## Concerning the Delivery and Acceptance of Electricity

Between

**Total Gas & Power Limited**

(*"Party A"*)

and

**Lehman Brothers Commodity Services Inc., including its London branch**

having its registered office at Corporation Service Company, 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, 19808 Delaware, USA

(*"Party B"*)

(referred to jointly as the "**Parties**" and individually as a "**Party**")

entered into on 6 November 2007 (the "**Effective Date**").

# TABLE OF CONTENTS

§ 1 Subject of Agreement.................................................................................................5

    1.    Subject of Agreement...........................................................................................5
    2.    Pre-Existing Contracts..........................................................................................5

§ 2 Definitions and Construction.....................................................................................5

    1.    Definitions.............................................................................................................5
    2.    Inconsistencies......................................................................................................5
    3.    Interpretation ........................................................................................................5
    4.    References to Time ...............................................................................................5

§ 3 Concluding and Confirming Individual Contracts ...................................................5

    1.    Conclusion of Individual Contracts......................................................................5
    2.    Confirmations .......................................................................................................5
    3.    Objections to Confirmations.................................................................................5
    4.    Authorised Persons ..............................................................................................5

§ 4 Primary Obligations For Delivery and Acceptance of Electricity...........................6

    1.    Delivery and Acceptance......................................................................................6
    2.    Definition of Schedule..........................................................................................6

§ 5 Primary Obligations for Options...............................................................................6

    1.    Delivery and Acceptance Pursuant to an Option..................................................6
    2.    Premium for the Option.........................................................................................6
    3.    Exercise of Option and Deadline..........................................................................6
    4.    Notice of Exercise.................................................................................................6

§ 6 Delivery, Measurement, Transmission and Risk......................................................6

    1.    Current/Frequency/Voltages..................................................................................6
    2.    Delivery Schedules ...............................................................................................6
    3.    Transfer of Rights of Title ....................................................................................6
    4.    Measurement of Electricity Deliveries and Receipts............................................7
    5.    Documentation of Actual Deliveries and Receipts...............................................7
    6.    Reimbursement of External Costs.........................................................................7
    7.    Seller and Buyer Risks .........................................................................................7

§ 7 Non-Performance Due to Force Majeure...................................................................7

    1.    Definition of Force Majeure .................................................................................7
    2.    Release From Delivery and Acceptance Obligations ...........................................7
    3.    Notification and Mitigation of Force Majeure......................................................7
    4.    Effects of Force Majeure on Other Party..............................................................7

§ 8 Remedies for Failure to Deliver and Accept.............................................................8

    1.    Failure to Deliver .................................................................................................8
    2.    Failure to Accept..................................................................................................8
    3.    Amounts Payable..................................................................................................8

§ 9 Suspension of Delivery .............................................................................................8

§ 10 Term and Termination Rights..................................................................................8

    1.    Term......................................................................................................................8
    2.    Expiration Date and 30 Day Termination Notice.................................................9
    3.    Termination for Material Reason:.........................................................................9
    4.    Automatic Termination .........................................................................................9
    5.    Definition of Material Reason ..............................................................................9

§ 11 Calculation of the Termination Amount ...............................................................11

    1.    Termination Amount...........................................................................................11
    2.    Settlement Amount..............................................................................................11

2

§ 12 Limitation of Liability ........................................................................................................ 11
    1.   Application of Limitation .................................................................................. 11
    2.   Exclusion of Liability ....................................................................................... 11
    3.   Consequential Damage and Limitation of Liability ......................................... 12
    4.   Intentional Default, Fraud and Fundamental Rights ......................................... 12
    5.   Duty to Mitigate Losses .................................................................................... 12

§ 13 Invoicing and Payment ..................................................................................................... 12
    1.   Invoice .............................................................................................................. 12
    2.   Payment ............................................................................................................ 12
    3.   Payment Netting ............................................................................................... 12
    4.   Invoicing and Payment of Scheduled Contract Quantities .............................. 12
    5.   Default Interest ................................................................................................. 13
    6.   Disputed Amounts ............................................................................................ 13

§ 14 VAT and Taxes ................................................................................................................. 13
    1.   VAT .................................................................................................................. 13
    2.   Other Taxes ...................................................................................................... 13
    3.   Seller's and Buyer's Tax Obligation ................................................................ 14
    4.   Taxes Targeted at End-Users ........................................................................... 14
    5.   Exemption Certificates ..................................................................................... 14
    6.   Indemnity ......................................................................................................... 14
    7.   New Taxes ........................................................................................................ 15
    8.   Termination for New Tax .................................................................................. 15
    9.   Withholding Tax ............................................................................................... 16

§ 15 Floating Prices and Fallback Procedure for Market Disruption ...................................... 16
    1.   Calculation of Floating Contract Prices ........................................................... 16
    2.   Market Disruption ............................................................................................ 17
    3.   Fallback Mechanism ......................................................................................... 17
    4.   Definition of Market Disruption Event ............................................................ 17
    5.   Calculation Agent ............................................................................................. 18

§ 16 Guarantees and Credit Support ........................................................................................ 18

§ 17 Performance Assurance ................................................................................................... 18
    1.   Right to Require Performance Assurance .......................................................... 18
    2.   Material Adverse Change .................................................................................. 18

§ 18 Provision of Financial Statements and Tangible Net Worth ............................................ 20
    1.   Provision of Financial Statements .................................................................... 20
    2.   Decline in Tangible Net Worth ......................................................................... 20
    3.   Accounting Principles ...................................................................................... 20

§ 19 Assignment ...................................................................................................................... 20
    1.   Prohibition ....................................................................................................... 20
    2.   Assignment to Affiliates ................................................................................... 20

§ 20 Confidentiality ................................................................................................................. 20
    1.   Confidentiality Obligation ................................................................................ 20
    2.   Exclusions from Confidential Information ....................................................... 21
    3.   Expiration ......................................................................................................... 21

§ 21 Representations and Warranties ....................................................................................... 21

§ 22 Governing Law and Arbitration ....................................................................................... 22
    1.   Governing Law ................................................................................................. 22
    2.   Arbitration ........................................................................................................ 22

3

Version 2.1(a)                    Copyright © 2007 by European Federation of Energy Traders

§ 23 Miscellaneous ............................................................................................................22

    1.    Recording Telephone Conversations.................................................................22
    2.    Notices and Communications ...........................................................................22
    3.    Amendments.....................................................................................................23
    4.    Partial Invalidity .............................................................................................23
    5.    Third Party Rights............................................................................................23

**ANNEX 1  -    DEFINED TERMS**

**ANNEX 2A -    CONFIRMATION OF INDIVIDUAL CONTRACT (FIXED PRICE)**

**ANNEX 2B -    CONFIRMATION OF INDIVIDUAL CONTRACT (FLOATING PRICE)**

**ANNEX 2C -    CONFIRMATION OF INDIVIDUAL CONTRACT (CALL OPTION)**

**ANNEX 2D -    CONFIRMATION OF INDIVIDUAL CONTRACT (PUT OPTION)**

**ELECTION SHEET TO THE GENERAL AGREEMENT**

PART I:    CUSTOMISATION OF PROVISIONS IN THE GENERAL AGREEMENT

PART II:   ADDITIONAL PROVISIONS TO THE GENERAL AGREEMENT

4

**Copyright © 2007 by European Federation of Energy Traders**

# § 1
## Subject of Agreement

1.    **Subject of Agreement**: This General Agreement (which includes its Annexes and the election sheet ("**Election Sheet**")) governs all transactions the Parties shall enter into for the purchase, sale, delivery and acceptance of electricity, including Options on the purchase, sale, delivery and acceptance of electricity (each such transaction being an "**Individual Contract**"). All Individual Contracts and this General Agreement shall form a single agreement between the Parties (collectively referred to as the "**Agreement**"). The provisions of this General Agreement constitute an integral part of each Individual Contract.

2.    **Pre-Existing Contracts**: If § 1.2 is specified as applying in the Election Sheet, each transaction between the Parties regarding the purchase, sale, delivery and acceptance of electricity, including Options on such transactions, entered into before the Effective Date but which remain either not yet fully or partially performed by one or both Parties, is deemed to be an Individual Contract under the Agreement.

# § 2
## Definitions and Construction

1.    **Definitions**: Terms used in the Agreement shall have the meanings set out in Annex 1.

2.    **Inconsistencies**: In the event of any inconsistency between the provisions of the Election Sheet and the other provisions of this General Agreement, the Election Sheet shall prevail. In the event of any inconsistency between the terms of an Individual Contract (whether evidenced in a Confirmation or by other means) and the provisions of this General Agreement (including its Election Sheet), the terms of the Individual Contract shall prevail for the purposes of that Individual Contract.

3.    **Interpretation**: Headings and titles are for convenience only and do not affect the interpretation of the Agreement.

4.    **References to Time**: References to time shall be to Central European Time (CET) or as specified in the Election Sheet.

# § 3
## Concluding and Confirming Individual Contracts

1.    **Conclusion of Individual Contracts**: Unless otherwise agreed between the Parties, Individual Contracts may be concluded in any form of communication (whether orally or otherwise) and shall be legally binding and enforceable from the time the terms of such Individual Contract are concluded.

2.    **Confirmations**: In the event that an Individual Contract is not concluded in written form, both Parties shall be free to confirm, or have confirmed, in writing their understanding of the agreed terms of the Individual Contract (each such written confirmation constituting a "**Confirmation**"). A Confirmation shall not constitute a requirement for a legally valid Individual Contract. A Confirmation shall contain the information stipulated in, and shall be substantially in the form of, the applicable confirmation sheet from among those attached to this General Agreement as Annex 2 a - d.

3.    **Objections to Confirmations**: Without prejudice to the provisions of § 3.2, if a Party receives a Confirmation, it shall promptly review the terms of such Confirmation and if they differ from its understanding of the terms of the applicable Individual Contract notify the other Party of any inconsistency without delay. If both Parties send a Confirmation without delay and their terms contradict, then each such Confirmation shall be deemed to be a notice of objection to the terms of the other Party's Confirmation.

4.    **Authorised Persons**: If § 3.4 is specified as applying to a Party in the Election Sheet, Individual Contracts may be negotiated, confirmed and signed on behalf of that Party exclusively by those persons listed by it for such purposes as may be specified in an Annex to this General Agreement. Each Party may unilaterally amend and supplement in writing the list of persons currently authorised to act on its behalf at any time. Such amendments and supplements shall become effective upon their receipt by the other Party.

Version 2.1(a)    Copyright © 2007 by European Federation of Energy Traders

## § 4
## Primary Obligations For Delivery and Acceptance of Electricity

**1.     Delivery and Acceptance:** In accordance with each Individual Contract, the Seller shall Schedule, sell and deliver, or cause to be delivered, and the Buyer shall Schedule, purchase and accept, or cause to be accepted, the Contract Quantity at the Delivery Point; and the Buyer shall pay to the Seller the relevant Contract Price.

**2.     Definition of Schedule:** "Schedule" shall mean, as applicable, those actions necessary for a Party to effect its respective delivery or acceptance obligations, which may include nominating, scheduling, notifying, requesting and confirming with the other Party, their respective designated agents and authorised representatives, and the Network Operator, as applicable, the Contract Quantity, Contract Capacity, Delivery Point, Delivery Schedule, Total Supply Period, and any other relevant terms of the Individual Contract in accordance with all applicable rules of the Network Operator and other customary industry practices and procedures.

## § 5
## Primary Obligations for Options

**1.     Delivery and Acceptance Pursuant to an Option:** When an Individual Contract provides for the purchase and sale of a physical option to buy electricity (a "**Call Option**") or to sell electricity (a "**Put Option**") (each, an "**Option**"), the seller of the Option (the "**Writer**") grants to the purchaser of the Option (the "**Holder**") the right, but not the obligation, by complying with certain designated procedures described below in this § 5, to require each Party to meet its respective obligations under § 4.1 for the delivery and acceptance of electricity in accordance with that respective Individual Contract.

**2.     Premium for the Option:** The Holder shall pay the Writer the Premium for the Option on or before the Premium Payment Date (and if no Premium Payment Date is designated in the terms of the Individual Contract, such Premium shall be due and payable on the fifth (5th) Business Day following the day on which the Parties entered into the Individual Contract). If the Option is Exercised, invoicing and payment of the Contract Price for the Contract Quantity shall be in accordance with § 13 (*Invoicing and Payment*) unless otherwise agreed.

**3.     Exercise of Option and Deadline:** The Holder of an Option may exercise its rights under the Option (in accordance with § 5.4 (*Notice of Exercise*)) by giving the Writer irrevocable notice of such Exercise during the Exercise Period. Unless otherwise agreed, if, in respect of an Individual Contract no Exercise Deadline is specified in respect of an Option, the Exercise Deadline shall be 10:00 am CET.

**4.     Notice of Exercise:** Each notice of Exercise shall be effective upon receipt by the Writer and may be given in writing or verbally, provided that Exercise may not be effected by e-mail and verbal Exercise may not be effected by leaving a message on a voice mail or similar verbal electronic messaging system. In the case of verbal Exercise, the Holder shall promptly confirm the Exercise in writing (including without limitation by facsimile), provided that such written confirmation is not a prerequisite to the validity of verbal Exercise.

## § 6
## Delivery, Measurement, Transmission and Risk

**1.     Current/Frequency/Voltages:** Electricity shall be delivered in the current, frequency and voltage applicable at the relevant Delivery Point agreed in the Individual Contract and in accordance with the standards of the Network Operator responsible for the Delivery Point.

**2.     Delivery Schedules:** Electricity shall be delivered according to the Delivery Schedules specified in each Individual Contract.

**3.     Transfer of Rights of Title:** Delivery shall be effected by making available the Contract Quantity at the Contract Capacity at the Delivery Point. Delivery and receipt of the Contract Quantity, and the transfer from Seller to Buyer of all rights to title free and clear of any adverse claims thereto, shall take place at the Delivery Point.

Version 2.1(a)                              Copyright © 2007 by European Federation of Energy Traders

4. **Measurement of Electricity Deliveries and Receipts**: Each Party is responsible for ensuring that electricity deliveries and receipts are measured or verified by means that can be reasonably evidenced in accordance with the Network Operator's procedures governing the relevant Delivery Point.

5. **Documentation of Actual Deliveries and Receipts**: Upon reasonable request, a Party shall:

    (a)    provide to the other Party documentation in its possession or control that evidences Schedules, quantities, deliveries and receipts of electricity for the purposes of determining the cause of any deviations between the terms of an Individual Contract and actual deliveries and receipts of electricity; and

    (b)    use its reasonable and diligent efforts to request and acquire from the Network Operator, and shall share with the requesting Party, any additional documentation necessary to reconcile inconsistencies between Scheduled and actual flows of electricity.

6. **Reimbursement of External Costs**: In the event a Party, at the request of the other Party or to resolve a dispute raised by the other Party, incurs reasonable external expenses in verifying that the other Party has failed to properly perform its obligations under the terms of an Individual Contract, such expenses shall be reimbursed upon demand by the Party that failed to perform.

7. **Seller and Buyer Risks**: Seller shall bear all risks associated with, and shall be responsible for any costs or charges imposed on or associated with Scheduling, transmission and delivery of the Contract Quantity up to the Delivery Point. Buyer shall bear all risks associated with, and shall be responsible for any costs or charges imposed on or associated with acceptance and transmission of, the Contract Quantity at and from the Delivery Point.

## § 7
## Non-Performance Due to Force Majeure

1. **Definition of Force Majeure**: <u>Unless otherwise specified in the Election Sheet,</u> for purposes of the Agreement "Force Majeure" means an occurrence beyond the reasonable control of the Party claiming Force Majeure (the **"Claiming Party"**) which it could not reasonably have avoided or overcome and which makes it impossible for the Claiming Party to perform its delivery or acceptance obligations, including, but without limitation, due to one or more of the following:

    (a)    the failure of communications or computer systems of the relevant Network Operator(s) which prevents the Claiming Party from performing its obligations of delivery or acceptance; or

    (b)    the relevant Network Operator's suspension of delivery or acceptance or its disregard of the Claiming Party's obligations with regard to Scheduling under the Individual Contract.

2. **Release From Delivery and Acceptance Obligations**: If a Party is fully or partly prevented due to Force Majeure from performing its obligations of delivery or acceptance under one or more Individual Contracts and such Party complies with the requirements of § 7.3 (***Notification and Mitigation of Force Majeure***), no breach or default on the part of the Claiming Party shall be deemed to have occurred and it shall be released (and not merely suspended) from those obligations for the period of time and to the extent that such Force Majeure prevents its performance. No obligation to pay damages pursuant to § 8 (***Remedies for Failure to Deliver and Accept***) will accrue to the Claiming Party with respect to those quantities not delivered or received.

3. **Notification and Mitigation of Force Majeure**: The Claiming Party shall as soon as practical after learning of the Force Majeure notify the other Party of the commencement of the Force Majeure and, to the extent then available, provide to it a non-binding estimate of the extent and expected duration of its inability to perform. The Claiming Party shall use all commercially reasonable efforts to mitigate the effects of the Force Majeure and shall, during the continuation of the Force Majeure, provide the other Party with reasonable updates, when and if available, of the extent and expected duration of its inability to perform.

4. **Effects of Force Majeure on Other Party**: In the event, and to the extent, a Seller's delivery obligations are released by Force Majeure, the Buyer's corresponding acceptance and payment obligations

7

shall also be released. In the event and to the extent a Buyer's acceptance obligations are released by Force Majeure, Seller's corresponding delivery obligations shall also be released.

## § 8
### Remedies for Failure to Deliver and Accept

**1.    Failure to Deliver:** To the extent that the Party obliged to deliver electricity (the **"Delivering Party"**) fails to deliver the Contract Quantity in whole or in part in accordance with the terms of an Individual Contract and such failure is not excused by an event of Force Majeure or the other Party's non-performance, the Delivering Party shall pay the other Party (the **"Accepting Party"**) as compensation for damages an amount for such quantity of undelivered electricity equal to the product of:

(a)    the amount, if positive, by which the price, if any, at which the Accepting Party acting in a commercially reasonable manner is or would be able to purchase or otherwise acquire in the market the quantity of undelivered electricity exceeds the Contract Price; and

(b)    the quantity of undelivered electricity.

Such amount shall be increased by any incremental transmission costs and other reasonable and verifiable costs and expenses incurred by the Accepting Party as a result of the Delivering Party's failure.

**2.    Failure to Accept:** To the extent that the Accepting Party fails in whole or in part to accept the Contract Quantity in accordance with an Individual Contract and such failure is not excused by an event of Force Majeure or the other Party's non-performance, the Accepting Party shall pay the Delivering Party as compensation for damages an amount for the quantity of non-accepted electricity equal to the product of:

(a)    the amount, if positive, by which the Contract Price exceeds the price at which the Delivering Party is or would be able to sell the quantity of non-accepted electricity in the market acting in a commercially reasonable manner; and

(b)    the quantity of the non-accepted electricity.

Such amount shall be increased by any incremental transmission costs and other reasonable and verifiable costs and expenses incurred by the Delivering Party as a result of the Accepting Party's failure.

**3.    Amounts Payable:** Amounts that are due according to this § 8 shall be invoiced and paid in accordance with § 13 (*Invoicing and Payment*).

## § 9
### Suspension of Delivery

In addition to any other rights or remedies available to a Party (the **"Non-Defaulting Party"**), should a Party (the **"Defaulting Party"**) default on any payment that is due under the Agreement, or should it or its Credit Support Provider fail to provide, replace or increase the amount of any Performance Assurance required pursuant to the Agreement or any Credit Support Document, the Non-Defaulting Party shall be entitled, no earlier than three (3) Business Days after sending a written notice to the Defaulting Party to immediately cease further deliveries of electricity (and be released and not merely suspended) from its underlying delivery obligations) under all Individual Contracts until such time as the Non-Defaulting Party, has received either the required collateral or full payment (including all applicable default interest and expenses) of all outstanding amounts owed to the Non-Defaulting Party.

## § 10
### Term and Termination Rights

**1.    Term:** This General Agreement shall come into force as of the Effective Date. It may be terminated in accordance with either § 10.2 (*Expiration Date and 30 Day Termination Notice*) or § 10.3 (*Termination for Material Reason*) through § 10.5 (*Definition of Material Reason*).

8

Copyright © 2007 by European Federation of Energy Traders

2.    **Expiration Date and 30 Day Termination Notice**:  This General Agreement will terminate on the Expiration Date (if one is specified in the Election Sheet) or if no Expiration Date has been specified in the Election Sheet, by a Party by giving the other Party thirty (30) days prior written notice of termination (in both cases **"Ordinary Termination"**). In the event of Ordinary Termination, the General Agreement shall remain legally binding on the Parties until, but only in respect of, all rights and obligations already created or existing under the Agreement prior to the date of the Ordinary Termination are fully performed by both Parties.

3.    **Termination for Material Reason**:

   (a)    If a Material Reason (as defined below) with respect to a Party has occurred and is continuing, the other Party (the **"Terminating Party"**) may terminate the Agreement (**"Early Termination"**) by giving the other Party notice. A notice of Early Termination may be given by telephone if that notice is confirmed in writing within two (2) Business Days.

   (b)    A notice of Early Termination shall specify the relevant Material Reason for the Early Termination and shall designate a day as an early termination date (the **"Early Termination Date"**). The Early Termination Date may not be earlier than the day the notice is deemed to have been received under the Agreement nor later than twenty (20) days after such day. With effect from the Early Termination Date all further payments and performance in respect of all Individual Contracts shall be released (and not merely suspended) and existing duties and obligations of the Parties shall be replaced by the obligation of one Party to pay damages for non-fulfilment to the other Party in an amount (if any) calculated in accordance with § 11.1 (the **"Termination Amount"**).

   (c)    If notice designating an Early Termination Date is given, the Early Termination Date shall occur on the date so designated even if the applicable Material Reason is no longer continuing. On, or as soon as practicable after, the Early Termination Date, the Terminating Party shall calculate in a commercially reasonable manner, and shall notify the other Party of, the Termination Amount (if any) to be received or paid by it deriving from aggregating all Settlement Amounts as stipulated in § 11 (*Calculation of the Termination Amount*).

   (d)    The Termination Amount shall be payable by the relevant Party to the other Party within three (3) Business Days of its notification by the Terminating Party.

   (e)    The Terminating Party may take into account any Performance Assurance or credit support available pursuant to the Agreement or any Credit Support Document.

   (f)    The right to designate an Early Termination Date under this § 10.3 (*Termination for Material Reason*) is in addition to any other remedies available under the Agreement or at law.

4.    **Automatic Termination**:  If "Automatic Termination" is specified as applying to a Party in the Election Sheet, and upon the occurrence of a Material Reason described in § 10.5(c) (*Winding-up/Insolvency/Attachment*), the Terminating Party need not send that Party any notice of the designation of an Early Termination Date and the Early Termination Date in such event shall be as specified in the Election Sheet. Except as provided in this § 10.4, Early Termination by virtue of operation of Automatic Termination shall be as provided in § 10.3 (*Termination for Material Reason*).

5.    **Definition of Material Reason**:  The Agreement may be terminated at any time for one or more of the following reasons (each, a "Material Reason"):

   (a)    **Non Performance**:  The failure of a Party or its Credit Support Provider, when required, to make a payment, to deliver any Performance Assurance or to perform any other material obligation (other than when such obligation is released pursuant to § 7 (*Non-Performance Due to Force Majeure*)):

      (i)    under the Agreement; provided, that in the case of a failure to pay, such failure is not cured within two (2) Business Days of a written demand, or, in the case of any other failure of performance, such failure is not cured within ten (10) Business Days of a written demand;

9

(ii)  under any Credit Support Document (after giving effect to any applicable notice or grace period thereunder); or

(iii)  under any Performance Assurance in accordance with § 17 (*Performance Assurance*).

(b)  **Cross Default and Acceleration**: Unless otherwise specified in the Election Sheet,

(i)  any payment default under any Specified Indebtedness with an aggregate outstanding principal balance equal to three percent (3%) of the Tangible Net Worth of such (aa) Party's, or (bb) such Party's Credit Support Provider (if such Party has a Credit Support Provider) or (cc) such Party's Controlling Party (if such Party does not have a Credit Support Provider but has a Controlling Party), as the case may be, as of the date of the default, or

(ii)  the failure of a Party or its Credit Support Provider or Controlling Party to make one or more payments in an aggregate amount (individually or collectively) of not less than the Threshold Amount specified in the Election Sheet for that Party under such agreements or instruments entered into between such Parties or their Affiliates (after giving effect to any applicable notice requirement or grace period).

(c)  **Winding-up/Insolvency/Attachment**:  A Party or its Credit Support Provider:

(i)  is dissolved (other than pursuant to a consolidation, amalgamation or merger);

(ii)  becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due;

(iii)  makes a general assignment, arrangement or composition with or for the benefit of its creditors;

(iv)  institutes or has instituted against it a proceeding seeking a judgement of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation and, if specified in the Election Sheet, is not withdrawn, dismissed, discharged, stayed or restrained within such period as specified in the Election Sheet;

(v)  has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger);

(vi)  seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets;

(vii)  has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets;

(viii)  causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (i) to (vii) (inclusive); or

(ix)  takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts referred to in this § 10.5(c).

(d)  **Failure to Deliver or Accept**: If specified as applying in the Election Sheet, the failure of a Party to comply with its obligation to deliver or accept electricity under an Individual Contract, (other than, when such obligation is released pursuant to §7 (*Non-Performance Due*

10

Copyright © 2007 by European Federation of Energy Traders

*to Force Majeure*)) for more than seven (7) consecutive days or for more than seven (7) days in aggregate within a period of sixty (60) days.

(e) **Force Majeure:** A Party is released from its obligations under the Agreement due to Force Majeure for more than thirty (30) consecutive days or for more than sixty (60) days in aggregate within a period of one calendar year.

(f) **Representation or Warranty:** A representation or warranty when made or repeated or deemed to have been made or repeated by a Party to this General Agreement or an Individual Contract or by its Credit Support Provider in a Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated.

Unless otherwise specified in the Election Sheet, the above Material Reasons shall constitute the exclusive reasons for Early Termination under this § 10.

## § 11
## Calculation of the Termination Amount

**1.    Termination Amount:** The Terminating Party shall calculate an amount (the "**Termination Amount**") to be paid in accordance with § 10.3 (*Termination for Material Reasons*) and § 10.4 (*Automatic Termination*) by calculating the sum (whether positive or negative) of all Settlement Amounts for all Individual Contracts plus any or all other amounts payable between the Parties under or in connection with the Agreement.

**2.    Settlement Amount:** The "**Settlement Amount**" for an Individual Contract shall be the Gains less the aggregate of the Losses and Costs which the Terminating Party incurs as a result of the termination of the Individual Contract. For the purpose of this provision:

(a) "**Costs**" means brokerage fees, commissions and other third party costs and expenses reasonably incurred by the Terminating Party either in terminating any arrangement pursuant to which it has hedged its obligation or entering into new arrangements which replace a terminated Individual Contract and all reasonable legal fees, costs and expenses incurred by the Terminating Party in connection with its termination of such Individual Contract;

(b) "**Gains**" means an amount equal to the present value of the economic benefit to the Terminating Party, if any (exclusive of Costs), resulting from the termination of an Individual Contract, determined in a commercially reasonable manner; and

(c) "**Losses**" means an amount equal to the present value of the economic loss to the Terminating Party, if any (exclusive of Costs), resulting from its termination of an Individual Contract, determined in a commercially reasonable manner.

In calculating the Settlement Amounts, the Terminating Party may, but is not obliged, to calculate its Gains and Losses as at the Early Termination Date, at its discretion, without entering into any replacement transactions.

## § 12
## Limitation of Liability

**1.    Application of Limitation:** This § 12 will apply unless otherwise specified by the Parties in the Election Sheet.

**2.    Exclusion of Liability:** Subject to §§ 12.3 and 12.4 and except in respect of any amounts payable under § 8 (*Remedies for Failure to Deliver and Accept*) or § 10.3 (*Termination for Material Reason*), a Party and its employees, officers, contractors and/or agents , are not liable to the other Party for any loss, cost, expense or damages ("**Damages**"), (including, without limitation, any liability due to the irregularities in the supply of electricity under an Individual Contract) incurred by the other Party under or in connection with the Agreement, except where such Damages are due to gross negligence, intentional default or fraud of a Party or

11

 Copyright © 2007 by European Federation of Energy Traders

its employees, officers, contractors and/or agents used by such Party in performing its obligations under the Agreement.

3.    **Consequential Damage and Limitation of Liability:**  Subject to § 12.4, the liability of a Party under or in connection with this Agreement:

(a)    does not include liability for any indirect and/or consequential Damages, including, without limitation, loss of profit, goodwill, business opportunity or anticipated saving; and

(b)    is limited to an amount equal to the amounts payable for electricity supplied or to be supplied by a Party under any relevant Individual Contract provided that such limitation shall not apply to payments under § 8 (*Remedies for Failure to Deliver and Accept*) and § 11 (*Calculation of the Termination Amount*).

4.    **Intentional Default, Fraud and Fundamental Rights:**  Nothing in the Agreement operates to exclude or limit a Party's liability for:

(a)    intentional default,

(b)    fraud; or

(c)    any action which endangers the fundamental legal rights of a Party or which violates a Party's fundamental contractual obligations ("*Kardinalspflichten*").

5.    **Duty to Mitigate Losses:**  For the avoidance of doubt, and subject to applicable law, each Party agrees that it has a duty to mitigate its Damages and covenants that it will use commercially reasonable efforts to minimise any Damages it may incur under or in connection with the Agreement.

## § 13
## Invoicing and Payment

1.    **Invoice:**  Each Party who is a Seller of electricity in an Individual Contract shall transmit to the other Party in the course of the calendar month following a delivery of electricity according to the Delivery Schedule for the previous month an invoice setting forth the total quantities of electricity that were sold by it under Individual Contracts in the previous calendar month. In connection with such invoice the Party may state all amounts then owed between the Parties pursuant to the Individual Contracts including, without limitation, all amounts owed for the purchase and sale of electricity, fees, charges, reimbursements, damages, interest, and other payments or credits owed between the Parties and, if applicable, any net amount due for payment pursuant to § 13.3 (*Payment Netting*). Invoicing of Premiums due under an Individual Contract for Options shall be as agreed by the Parties in the Individual Contracts.

2.    **Payment:**  On or before the later to occur of (a) the twentieth (20th) day of the calendar month or if not a Business Day the immediately following Business Day or (b) the fifth (5th) Business Day following receipt of an invoice (the "**Due Date**"), a Party owing an invoiced amount shall pay, by wire transfer in freely available funds, the amount set forth on such invoice to the payment address  or bank account provided by the other Party  as specified in the Election Sheet. Such payment shall be made, unless otherwise agreed, in EURO, and subject to § 14 (*VAT and Taxes*) and the remitter shall pay its own bank charges. Notwithstanding the foregoing, the Due Date for payment of a Premium under an Individual Contract for Options shall be the Premium Payment Date specified in the Individual Contract.

3.    **Payment Netting:**  If this § 13.3 is specified as applying in the Election Sheet, if on any day the Parties are each required to pay one or more amounts in the same currency (for which purpose all EURO currencies shall be considered a single currency) under one or more Individual Contracts then such amounts with respect to each Party shall be aggregated and the Parties shall discharge their respective payment obligations through netting, in which case the Party, if any, owing the greater aggregate amount shall pay the other Party the difference between the amounts owed.

4.    **Invoicing and Payment of Scheduled Contract Quantities:**  Invoicing and payment shall be based on Scheduled Contract Quantities in accordance with all applicable Delivery Schedules for the respective month.

Version 2.1(a)          Copyright © 2007 by European Federation of Energy Traders

When and if data becomes available confirming that the actual quantities of electricity delivered and received differs from that set out in the Delivery Schedules, invoicing and payment will be adjusted to reflect any deviations between the Contract Quantities and actual deliveries.

**5.     Default Interest:**  Overdue payments shall accrue interest from, and including, the Due Date to, but excluding, the date of payment, at the Interest Rate. For this purpose the **"Interest Rate"** shall be the rate of interest specified in the Election Sheet.

**6.     Disputed Amounts:**  If a Party, in good faith, disputes the accuracy of an invoice, it shall on or before the Due Date provide a written explanation of the basis for the dispute and shall pay:

    (a)    if this § 13.6(a) is specified as applying in the Election Sheet, the full amount invoiced no later than the Due Date. If any amount paid under dispute is finally determined to have not been due, such overpayment shall, at the election of the owed Party, be credited or returned to it within ten (10) days of such determination, along with interest accrued at the Interest Rate from, and including, the date such amount was paid, to the other Party, but excluding, the date returned or credited; or

    (b)    if this § 13.6 (b) is specified as applying in the Election Sheet, the undisputed amount invoiced no later than the Due Date. If any amount withheld under dispute is finally determined to have been due, such withheld amount shall, at the election of the owed Party, be credited or returned to it within ten (10) days of such determination, along with interest accrued at the Interest Rate from, and including, the date such amount was due, to the other Party, but excluding, the date paid or credited.

## § 14
## VAT and Taxes

**1.     VAT:**  All amounts referred to in this General Agreement are exclusive of VAT. The VAT treatment of the supply of electricity under an Individual Contract shall be determined pursuant to the VAT laws of the jurisdiction where a taxable transaction for VAT purposes is deemed to take place. If VAT is payable on any such amounts, the Buyer shall pay to the Seller an amount equal to the VAT at the rate applicable from time to time; provided that such amount shall only be required to be paid once the Seller provides the Buyer with a valid VAT invoice (applicable in the jurisdiction of supply) in relation to that amount.

Where, in accordance with EU and/or national legislation, any supplies under an Individual Contract may be Zero-Rated and/or subject to the reverse charge in accordance with Articles 38, 39 or 195 of Council Directive 2006/112/EC, the following shall apply:

    (a)    the Buyer and the Seller hereby covenant that they will do all such proper acts, deeds and things as are necessary (which may include and shall not be limited to providing to the Seller all such proper, true and accurate documentation or assistance as may reasonably be required by the relevant taxing authority) to ensure that such supply is Zero-Rated or subject to the reverse charge for the purposes of such legislation;

    (b)    in the event that the Buyer or the Seller fails to comply with such obligation, the non-complying Party shall indemnify the other Party in respect of any and all VAT, penalties and interest incurred by the other Party as a result of the non-complying Party's failure to comply with the above covenant; and

    (c)    in the absence of the Buyer providing any documentation as referred to in (a) above, the Seller reserves the right to charge local VAT.

**2.     Other Taxes:**  All amounts referred to in this General Agreement are exclusive of Other Taxes. In the case of Other Taxes, if the cost of an Other Tax is charged or passed on by the Seller to the Buyer, the Buyer shall pay this amount of Other Tax to the Seller; provided that such amount of Other Tax is identified separately on the invoice issued by the Seller and confirmation is received by the Buyer, where applicable, that such amount of Other Tax has been duly paid or accounted for to the relevant Tax authority, as appropriate.

Where in accordance with EU and/or national legislation there is an exemption or other relief, as applicable,

13

from Other Taxes in respect of any supplies under an Individual Contract, the following shall apply:

    (a)    the Buyer and the Seller hereby covenant that they will do all such proper acts, deeds and things as are necessary (which may include and shall not be limited to providing to the Seller all such proper, true and accurate documentation or assistance as may reasonably be required by the relevant taxing authority) to ensure that such supply is exempt from Other Taxes for the purposes of such legislation;

    (b)    in the event that the Buyer or the Seller fails to comply with such obligation, the non-complying Party shall indemnify the other Party in respect of any and all Other Taxes, penalties and interest incurred by the other Party as a result of the non-complying Party's failure to comply with the above covenant; and

    (c)    in the absence of the Buyer providing any documentation as referred to in (a) above the Seller reserves the right to charge Other Taxes.

**3.**    **Seller's and Buyer's Tax Obligation:** The Seller shall pay or cause to be paid all Tax on or with respect to electricity delivered pursuant to an Individual Contract arising before the transfer of risk and title at the Delivery Point. The Buyer shall pay or cause to be paid all Tax on or with respect to the electricity delivered pursuant to an Individual Contract arising after the transfer of risk and title at the Delivery Point. Subject to §14.2, the Parties shall pay all Tax arising at the transfer of risk and title at the Delivery Point in accordance with applicable local laws. In the event that the Seller is required by law to pay any Tax which is properly for the account of the Buyer, the Buyer shall promptly indemnify or reimburse the Seller in respect of such Tax. In the event that the Buyer is required by law to pay any Tax which is properly for the account of the Seller, the Buyer may deduct the amount of any such Tax from the sums due to the Seller under the Agreement and the Seller shall promptly indemnify or reimburse the Buyer in respect of any such Tax not so deducted.

**4.**    **Taxes Targeted at End-Users:** The Buyer covenants to the Seller that, for the purposes of a Tax which is targeted at the end-user or consumer of electricity, either:

    (a)    it will not be an end-user or consumer of such electricity delivered to it under any Individual Contract, or

    (b)    that the Buyer has the status of an intermediary or any equivalent status as defined in any applicable legislation, or

    (c)    that the electricity so delivered will either be transported out of the jurisdiction in which the Delivery Point is situated under such Individual Contract or will be re-sold within such jurisdiction,

and the Buyer will provide such documentation as may be required by applicable legislation to evidence any of the foregoing.

**5.**    **Exemption Certificates:** If, however, the Buyer intends to consume any of the electricity delivered under an Individual Contract, the Buyer shall provide to the Seller, if required under the applicable legislation, a Valid Certificate evidencing the exemption of the Buyer's relevant facility from the Tax which is targeted at the end-user or consumer of electricity, in respect of its energy supply to the reasonable satisfaction of the Seller. If such a Valid Certificate, which is required by any applicable legislation, is not provided and/or the Seller is not so satisfied by the relevant time of invoicing and the Seller is liable to pay the Tax targeted at the end-user or consumer of electricity, the Seller shall charge the Buyer and the Buyer shall pay to the Seller in addition to the Contract Price an amount equal to the Tax which is applicable to the end-user or consumer of electricity on the electricity delivered under such Individual Contract, at the rate applicable at the time of the sale. If the Buyer, subsequent to the Seller charging such Tax, provides the Seller within the applicable time (if any) with a Valid Certificate, the Seller shall reimburse the Buyer for any such Taxes paid by the Buyer, provided the Seller has reclaimed such Tax.

**6.**    **Indemnity:** In the event that, in respect of an Individual Contract, a Party is in breach of its obligations under §14.4 *(Taxes Targeted at End-Users)* or §14.5 *(Exemption Certificates)*, it shall indemnify and hold harmless the other Party against any liability for Tax which is targeted at the end-user or consumer of electricity (and any associated charges or penalties) in respect of electricity delivered under such Individual Contract.

Version 2.1(a)                          Copyright © 2007 by European Federation of Energy Traders

**7.     New Taxes:**  If any New Tax is applicable to an Individual Contract, and the Buyer is, by the use of reasonable endeavours, able to obtain any available exemption or relief therefrom or is contractually able to pass the same through to or be reimbursed in respect thereof by , a third party, the Buyer shall pay or cause to be paid, or reimburse the Seller if the Seller has paid, such New Tax, and the Buyer shall indemnify, defend and hold harmless the Seller from and against any claims for such New Tax.

**8.     Termination for New Tax:**  Unless otherwise specified in the Election Sheet or in the terms of an Individual Contract, the provisions of this §14.8 shall only apply in respect of an Individual Contract if the period from the date on which the Parties concluded such Individual Contract pursuant to § 3.1 *(Conclusion of Individual Contracts)* to the end of the Total Supply Period exceeds two years.

Where the provisions of this § 14.8 apply in respect of an Individual Contract and:

(a)     a New Tax is imposed on a Party (the **"Taxed Party"**) in respect of the Contract Quantity; and

(b)     having used reasonable endeavours to do so, the Taxed Party is unable contractually to pass on the cost of the New Tax to the other Party or a third party; and

(c)     the total amount of the New Tax that would be payable in respect of the balance of the total amount of electricity to be delivered during the remainder of the Total Supply Period (the **"Remaining Contract Quantity"**), unless otherwise specified in the Election Sheet, shall exceed five percent (5%) of the product of the Remaining Contract Quantity and the Contract Price

then, the Taxed Party shall be entitled to terminate the Individual Contract subject to the following conditions:

(a)     the Taxed Party must give the other Party (the **"Non-Taxed Party"**) at least five (5) Business Days' prior written notice (the **"Negotiation Period"**) of its intent to terminate the Individual Contract (and which notice shall be given no later than 180 Days after the later of the enactment or the effective date of the relevant New Tax), and prior to the proposed termination the Taxed Party and the Non-Taxed Party shall attempt to reach an agreement as to the sharing of the New Tax;

(b)     if such agreement is not reached, the Non-Taxed Party shall have the right, but not the obligation, upon written notice to the Taxed Party within the Negotiation Period, to pay the New Tax for any continuous period it so elects on a calendar month to calendar month basis, and in such case the Taxed Party shall not have the right during such continuous period to terminate the Individual Contract on the basis of the New Tax;

(c)     should the Non-Taxed Party elect to pay the New Tax on a calendar month to calendar month basis, the Non-Taxed Party may elect to cease the payment of the New Tax upon giving five (5) Business Days' prior written notice to the Taxed Party of its election to cease payment of such New Tax, in which case the Non-Taxed Party shall indemnify the Taxed Party for the New Tax and related interest and penalties that may be incurred by the Taxed Party in respect of the period during which the Non-Taxed Party had elected to pay the New Tax and the Taxed Party shall again be subject to the provisions of this § 14.8 as if the New Tax had an effective date as of the date on which the Non-Taxed Party ceased payment of such New Tax;

(d)     if agreement as to sharing a New Tax is not reached and the Non-Taxed Party does not elect to pay the New Tax for any period of time within the Negotiation Period, the Individual Contract affected shall be terminated on the expiry of the Negotiation Period;

(e)     upon termination of the Individual Contract, the provisions of § 11 *(Calculation of the Termination Amount)* relating to the calculation and payment of the Termination Amount shall apply but only in respect of the Individual Contract(s) so terminated, and for these purposes:

(i)     the Non-Taxed Party shall be understood to be the Terminating Party for the calculation of the Termination Amount; and

15

(ii)    the effect (if any) of the relevant New Tax on the calculation of the Termination Amount (or any Settlement Amount) shall be expressly excluded.

**9.    Withholding Tax:**  If this § 14.9 is specified as applying in the Election Sheet, the following shall apply between the Parties:

(a)    **Payments Free and Clear:**  All payments under an Individual Contract shall be made without any withholding of or deduction for or on account of any Tax unless such withholding or deduction is required by law. If a Party is so required to withhold or deduct Tax from a payment to be made by it, then that Party ("**Paying Party**") shall notify the other Party ("**Receiving Party**") immediately of such requirement and pay to the appropriate authorities all amounts withheld or deducted by it. If a receipt or other evidence can be issued evidencing the payment to the authorities, the Paying Party shall deliver such evidence (or a certified copy thereof) to the Receiving Party.

(b)    **Grossing-Up:**  The Paying Party shall increase the amount of any payment which is required to be made subject to a withholding or deduction to the extent necessary to ensure that, after the making of the required withholding or deduction, the Receiving Party receives the same amount it would have received had no such withholding or deduction been made or required to be made, except that no increase shall be made in respect of any Tax:

(i)    which is only imposed as a result of a connection between the Receiving Party and the jurisdiction of the authority imposing the Tax (including, without limitation, a connection arising from the Receiving Party having or having had a permanent establishment or other fixed place of business in that jurisdiction, or having been present or engaged in business in that jurisdiction) other than the mere execution or delivery of this General Agreement, any Confirmation or any Credit Support Document; or

(ii)    which could have been avoided if the Receiving Party had delivered to the Paying Party or to the appropriate authority as reasonably requested by the Paying Party, any declaration, certificate, or other documents specified in the Election Sheet in a form reasonably satisfactory to the Paying Party; or

(iii)    which is only imposed as a result of any Tax representation made by the Receiving Party in the Election Sheet for the purposes of this § 14.9 failing or ceasing to be true and accurate provided that this paragraph (iii) shall not apply (and the Paying Party shall be obliged to increase the amount of any payment pursuant to this § 14.9(b)) if such representation has failed or ceased to be true and accurate by reason of:

(aa)    any change in, or in the application or interpretation, of any relevant law, enactment, directive, or published practice of any relevant Tax authority being a change occurring on or after the date on which the relevant Individual Contract is entered; or

(bb)    any action taken by a Tax authority, or brought in a court of competent jurisdiction, on or after the date on which the relevant Individual Contract is entered into.

## § 15
### Floating Prices and Fallback Procedure for Market Disruption

**1.    Calculation of Floating Contract Prices:**  In the event the Contract Price is based on an index, exchange or any other kind of variable reference price (such price being a "**Floating Price**") the Contract Price shall be determined on the Settlement Date at the Settlement Price as specified in the applicable Individual Contract. The Settlement Price shall be determined in accordance with the Calculation Method on the Calculation Date as specified in the Individual Contract. The Calculation Date is the date specified as such in the Individual Contract on which the Settlement Price for the specific delivery is determined. The Calculation

16

Copyright © 2007 by European Federation of Energy Traders

Agent shall provide prompt notice of the Settlement Price determined as well as the amount to be paid on the Due Date. Payment shall be made pursuant to § 13 (*Invoicing and Payment*).

**2.    Market Disruption:**  Upon the occurrence of a Market Disruption Event as specified in § 15.4 (*Definition of Market Disruption Event*), the Calculation Agent shall determine an alternative price to which the relevant Individual Contract shall be settled (the "**Alternative Settlement Price**") according to the applicable Fallback Mechanism contained in the provisions of § 15.3 (*Fallback Mechanism*). In the event of a Market Disruption Event, the order of succession of §15.3 from (a) to (c) shall be binding upon the Calculation Agent. The Calculation Agent can only use the next following Fallback Mechanism provision if the previous Fallback Mechanism provision is not available due to a Market Disruption Event or otherwise as provided in §15.3, as applicable.

**3.    Fallback Mechanism:**  In the event of a Market Disruption Event the Calculation Agent shall determine the Alternative Settlement Price according to the following procedure (each a "Fallback Mechanism"):

(a)    **Fallback Reference Price:**  The Calculation Agent shall determine the Alternative Settlement Price based upon the price for that Calculation Date of the first Alternate Commodity Reference Price, if any, specified in the applicable Individual Contract and which is not itself subject to a Market Disruption Event; if an Alternate Commodity Reference Price has not been agreed on in the Individual Contract, the next applicable Fallback Mechanism shall apply for the relevant Individual Contract;

(b)    **Negotiated Fallback:**  Each Party shall promptly negotiate in good faith to agree with the other on an Alternative Settlement Price (or a method for determining the Alternative Settlement Price), and, if the Parties have not so agreed on or before the fifth (5th) Business Day following the first Calculation Date on which the Market Disruption Event existed, the next applicable Fallback Mechanism shall apply;

(c)    **Dealer Fallback:**  On or after six (6) Business Days following the first Calculation Date on which the Market Disruption Event occurred or existed, the Parties shall promptly and jointly agree upon three independent leading participants in the relevant market ("Dealers") selected in good faith from among participants of the highest credit standing which satisfy all the criteria that the Parties apply generally in deciding whether to offer or to make an extension of credit or to enter into a transaction comparable to the Individual Contract that is affected by the Market Disruption Event. The Dealers shall be appointed to make a determination of the Alternative Settlement Price taking into consideration the latest available quotation for the relevant commodity reference price and any other information that in good faith is deemed relevant. The Alternative Settlement Price shall be the arithmetic mean of the three amounts determined to be the Alternative Settlement Price by each Dealer, in which case the calculation shall be binding and conclusive in the absence of manifest error.

**4.    Definition of Market Disruption Event:**  "**Market Disruption Event**" under this § 15 shall mean the events stipulated under § 15.4 (a) through (f) (the existence of which shall be determined in a commercially reasonable manner by the Calculation Agent). For purposes of this § 15.4, "**Price Source**" shall mean any institution determining and publishing the price for a relevant commodity (a "**Commodity Reference Price**") including exchanges trading in any relevant future contracts or commodities on which the Floating Price is based.

(a)    the failure of any relevant Price Source to announce or publish information necessary for determining the Commodity Reference Price;

(b)    the temporary or permanent objective unavailability of any relevant Commodity Reference Price;

(c)    a temporary or permanent closing of the Price Source of any relevant Commodity Reference Price;

17

                          Copyright © 2007 by European Federation of Energy Traders

(d)    the discontinuance or suspension of, or the imposition of a material limitation on, trading in any relevant futures contract or commodity offered by the relevant exchange for the Commodity Reference Price;

(e)    the occurrence since the date such Individual Contract was entered into of a material change in the details of the composition of or specifications for any relevant commodity or Commodity Reference Price (i) which are entered into or incorporated in any relevant futures contract or offered by the relevant exchange or (ii) which are used by any other relevant institution for determining the Commodity Reference Price in compiling the price information necessary for determining such Floating Price; or

(f)    the occurrence since the commencement of the relevant Individual Contract of a material change in the method of calculation used for any relevant Commodity Reference Price to determine the price information necessary for determining such floating price.

**5.    Calculation Agent:**  Unless the Parties otherwise specify in the Election Sheet or in the relevant Individual Contract, the Seller shall be the Calculation Agent.

## § 16
## Guarantees and Credit Support

To address each Party's risk relating to the creditworthiness of the other Party, and to secure the prompt fulfilment of all obligations resulting from this General Agreement and Individual Contracts, the Parties may agree, on or at any time after the Effective Date, or at the time of the concluding of each Individual Contract, upon the circumstances in which Credit Support Documents may be required to be provided for the benefit of a Party, including, the form of Credit Support Documents, the amount of credit support, and the identity of one or more acceptable Credit Support Providers.

## § 17
## Performance Assurance

**1.    Right to Require Performance Assurance:**  At any time and from time to time, when a Party (the **"Requesting Party"**) believes in good faith that a Material Adverse Change has occurred in respect of the other Party, the Requesting Party shall be entitled to require, by written notice, that the other Party provide to it or increase in amount:  (a) a Letter of Credit; (b) cash; or (c) other security (including a bank or parent guarantee), in a form and amount reasonably acceptable to the Requesting Party (each a **"Performance Assurance"**). Upon receipt of such written notice, the other Party shall within three (3) Business Days provide to the Requesting Party the Performance Assurance required.

**2.    Material Adverse Change:**  A Material Adverse Change shall have occurred if any one or more of following events has occurred and is continuing insofar as such event is specified as applying to a Party in the Election Sheet:

(a)    **Credit Rating:**  If the Credit Rating of an Entity listed in (i)-(iii), each such Entity being a **"Relevant Entity"** of such Party, is withdrawn or downgraded below the rating set out for such Party in the Election Sheet:

(i)    the other Party (unless all of that other Party's financial obligations under the Agreement are fully guaranteed or assured under a Credit Support Document); or

(ii)    the other Party's Credit Support Provider (other than a bank); or

(iii)    any Entity who is a party to a control and/or profit transfer agreement (*Berherrschungs-Gewinnabführungsvertrag*) within the meaning of the German Stock Corporation Act (*Aktiengesetz; AktG*) (a **"Control and Profit Transfer Agreement"**) with the other Party and such other Party is in relation to such Entity, its subsidiary over which such Entity has control (a **"Controlling Party"**); or

18

    Copyright © 2007 by European Federation of Energy Traders

(b) **Credit Rating of a Credit Support Provider that is a Bank:** If the Credit Rating of a bank serving as the other Party's Credit Support Provider is withdrawn or downgraded below the <u>Credit Rating set out in the Election Sheet</u>; or

(c) **Financial Covenants:** Insofar as a Relevant Entity does not have a Credit Rating, if such Relevant Entity does not fulfill any of the following financial requirements as determined by reference to its most recent financial statement:

    (i) **EBIT to Interest:** The ratio of EBIT to the sum of all interest and any amounts in the nature of interest charged to expense relating to financial indebtedness for borrowed money (which includes debts payable to Affiliates as well as debt instruments to financial institutions) for such Relevant Entity in any fiscal year is greater than the ratio <u>specified in the Election Sheet</u>;

    (ii) **Funds from Operations:** The ratio of Funds from Operations to Total Debt for such Relevant Entity in any fiscal year is greater than the <u>ratio specified in the Election Sheet</u>; or

    (iii) **Total Debt to Total Capitalisation:** The ratio of Total Debt to Total Capitalisation for such Relevant Entity in any fiscal year is less than the <u>ratio specified in the Election Sheet</u>; or

(d) **Decline in Tangible Net Worth:** If the Tangible Net Worth of a Relevant Entity falls below the <u>amount specified in the Election Sheet</u>; or

(e) **Expiry of Performance Assurance or Credit Support Document:** If any Performance Assurance or any Credit Support Document expires or terminates with respect to any outstanding obligations of the other Party under the Agreement, or, if a Performance Assurance or Credit Support Document is due to expire or terminate within the <u>period of time, if any, specified in the Election Sheet</u>, or the failing or ceasing of such Credit Support Document to be in full force or effect for the purpose of the Agreement (in each case other than in accordance with the its terms or the terms of the Agreement) before the satisfaction of all outstanding obligations of such other Party under the Agreement to which such Credit Support Document relates, without the written consent of the Requesting Party.

(f) **Failure of Performance Assurance or Credit Support Document:** If any Credit Support Provider or Performance Assurance provider of the other Party disaffirms, disclaims, revokes, repudiates or rejects in whole or in part, or challenges the validity of, any Credit Support Document or Performance Assurance provided by it or otherwise fails to comply with or perform its obligations under or in respect of such Credit Support Document or Performance Assurance and such failure is continuing after any applicable grace or cure period; or

(g) **Failure of Control and Profit Transfer Agreement:** If any Controlling Party of the other Party disaffirms, disclaims, revokes, repudiates or rejects in whole or in part, or challenges the validity of, any Control and Profit Transfer Agreement entered into by it or otherwise fails to comply with or perform its obligations under such Control and Profit Transfer Agreement; or

(h) **Impaired Ability to Perform:** If in the reasonable and good faith opinion of the Requesting Party, the ability of the Relevant Entity to perform its obligations under the Agreement, any Credit Support Document or any Control and Profit Transfer Agreement, as the case may be, is materially impaired.

(i) **Amalgamation/Merger:** If the other Party or its Credit Support Provider undergoes a change of control, consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, or reorganises, incorporates, reincorporates, or reconstitutes into or as, another Entity, or another Entity transfers all or substantially all its assets to, or reorganises, incorporates, reincorporates, or reconstitutes into or as, such other Party or its Credit Support Provider and:

19

     **Copyright © 2007 by European Federation of Energy Traders**

(i)     the creditworthiness of such Party, its Credit Support Provider or the resulting, surviving, transferee or successor Entity is materially weaker than that of the other Party or such Credit Support Provider, as the case may be, immediately prior to such action;

(ii)     the resulting, surviving, transferee or successor Entity fails to assume all the obligations of that other Party or such Credit Support Provider under the Agreement or any Credit Support Document to which it or its predecessor was a party by either operation of law or pursuant to an agreement reasonably satisfactory to the Requesting Party; or

(iii)     the benefits of any Credit Support Document cease or fail to extend (without the consent of the Requesting Party) to the performance by such resulting, surviving, transferee or successor Entity of its obligations under the Agreement.

## § 18
## Provision of Financial Statements and Tangible Net Worth

**1.**     **Provision of Financial Statements:** Unless otherwise specified in the Election Sheet, if requested by a party, the other Party shall deliver

(a)     within 120 days following the end of each fiscal year, a copy of such other Party's, or for such period the other Party's obligation are supported by a Credit Support Provider or if it is a party to a Control and Profit Transfer Agreement, its Credit Support Provider's or its Controlling Party's, as the case may be, annual report containing audited consolidated financial statements for such fiscal year, and

(b)     within sixty (60) days after the end of each of its first three fiscal quarters of each fiscal year, a copy of its quarterly report containing unaudited consolidated financial statements; and

**2.**     **Decline in Tangible Net Worth:** If this § 18.2 is specified as applying in the Election Sheet, as soon as it becomes aware of such decline, each Party shall promptly notify the other Party of the occurrence of a decline in its Tangible Net Worth or the Tangible Net Worth of its Credit Support Provider or Controlling Party, to a level below the amount specified in the Election Sheet.

**3.**     **Accounting Principles:** In all cases the financial statements referred to in this §18 shall be prepared in accordance with generally accepted accounting principles in the relevant jurisdiction.

## § 19
## Assignment

**1.**     **Prohibition:** Neither Party shall be entitled to assign its rights and obligations under the Agreement to a third party without the prior written consent of the other Party. Such consent shall not be unreasonably delayed, refused or withheld.

**2.**     **Assignment to Affiliates :** If this § 19.2 is specified as applying in the Election Sheet, each Party shall be entitled to assign its rights and obligations under the Agreement without the prior written consent of the other Party to an Affiliate of an equivalent or greater creditworthiness. Such Assignment shall only become effective upon notice being received by the other Party and; provided that any Credit Support Document issued or agreed on behalf of the assigning Party has first been reissued or amended to support the obligations of the Affiliate for the benefit of the other Party.

## § 20
## Confidentiality

**1.**     **Confidentiality Obligation:** Unless this § 20 is specified as not applying in the Election Sheet, and subject to § 20.2 (*Exclusions from Confidential Information*), neither Party shall disclose the terms of an Individual Contract ("Confidential Information") to a third party.

20

**2.    Exclusions from Confidential Information:**  Confidential Information shall not include information which:

    (a)    is disclosed with the other Party's prior written consent;

    (b)    is disclosed by a Party to the Network Operator, its directors, employees, Affiliates, agents, professional advisers, bank or other financing institution, rating agency or intended assignee;

    (c)    is disclosed to comply with any applicable law, regulation, or rule of any exchange, system operator or regulatory body, or in connection with any court or regulatory proceeding; provided that each Party shall, to the extent practicable and permissible under such law, regulation, or rule, use reasonable efforts to prevent or limit the disclosure and to give the other Party prompt notice of it;

    (d)    is in or lawfully comes into the public domain other than by a breach of this § 20; or

    (e)    is disclosed to price reporting agencies or for the calculation of an index provided that such disclosure shall not include the identity of the other Party.

**3.    Expiration:**  A Party's obligation in respect of an Individual Contract under this § 20 shall expire one (1) year after the expiration of such Individual Contract.

# § 21
## Representations and Warranties

<u>If specified as applying to a Party in the Election Sheet</u>, that Party hereby represents and warrants to the other Party upon entering into this General Agreement and each time it enters into an Individual Contract as follows:

    (a)    it is an Entity duly organised, validly existing and in good standing under the laws of its jurisdiction of incorporation or organisation;

    (b)    the signing and the entering by it into of the General Agreement, any Credit Support Document to which it is a party and each Individual Contract and the carrying out of the transactions contemplated therein, shall not violate any provision of its constitutional documents;

    (c)    it has the power and is authorised to execute, deliver and perform its obligations under the Agreement and any Credit Support Document to which it is a party and has taken all necessary action to authorise that execution, delivery, performance and its entry into the Agreement and its execution, delivery and the performance of the Agreement and any Credit Support Document do not violate or conflict with any other term or condition of any contract to which it is a party or any constitutional document, rule, law or regulation applicable to it;

    (d)    no Material Reason for termination as outlined in § 10.5 (*Definition of Material Reason*), with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under the Agreement;

    (e)    it has all governmental and regulatory authorisations, approvals and consents necessary for it to legally perform its obligations under the Agreement and any Credit Support Document to which it is party;

    (f)    it has negotiated, entered into and executed the Agreement and any Credit Support Document to which it is a party as principal (and not as agent or in any other capacity, fiduciary or otherwise);

    (g)    it regularly enters into agreements for the trading of electricity as contemplated by the Agreement, and does so on a professional basis in connection with its principal line of business, and may be reasonably characterised as a professional market party;

21

(h)  it is acting for its own account (and not as advisor, agent, broker or in any other capacity, fiduciary or otherwise), has made its own independent decision to enter into this General Agreement and each Individual Contract and as to whether this General Agreement and each such Individual Contract is appropriate or proper for it based upon its own judgement, is not relying upon the advice or recommendations of the other Party in so doing, and is capable of assessing the merits of, and understands and accepts, the terms, conditions and risks of the Agreement;

(i)  the other Party is not acting as its fiduciary or adviser;

(j)  it is not relying upon any representation made by the other Party other than those expressly set forth in the Agreement or any Credit Support Document to which it is a party;

(k)  [DELETED];

(l)  it is a supplier ("*Versorger*") within the meaning of the German Electricity Tax Act (*Stromsteuergesetz* ("*StromStG*")) of March 24, 1999 and does not accept electricity as an end user ("*Letztverbraucher*"). (In this case, if it has its registered office within Germany, and upon the other Party's request, it shall forward evidence of its permission according to § 4 of StromStG);

(m)  with respect to a Party that *is* a governmental Entity or public power system, such governmental Entity or public power system represents and warrants to the other Party as follows: (i) all acts necessary for the valid execution, delivery and performance of the Agreement, including without limitation, competitive bidding, public notice, election, referendum, prior appropriation or other required procedures have or shall be taken and performed; (ii) entry into and performance of the Agreement by a governmental Entity or public power system are for a proper public purpose within the meaning of relevant constitutional or other governing documents and applicable law; and (iii) the term of the Agreement does not extend beyond any applicable limitation imposed by any relevant constitutional or other governing documents and applicable law; and

(n)  with respect to a Party, it is not insolvent, and there are no pending or threatened legal or administrative proceedings to which it is a party which to the best of its knowledge would materially adversely affect its ability to perform any Individual Contract under the Agreement or any Credit Support Document to which it is party, such that it could become insolvent.

## § 22
## Governing Law and Arbitration

**1.     Governing Law:**  Unless otherwise specified in the Election Sheet, this Agreement shall be construed and governed by the substantive law of the Federal Republic of Germany, excluding any application of the "United Nations Convention on Contracts for the International Sale of Goods of April 11, 1980."

**2.     Arbitration:**  Unless otherwise specified in the Election Sheet, any disputes which arise in connection with the Agreement shall be referred for resolution to the German Institution of Arbitration (DIS) and decided according to its rules, ousting the jurisdiction of the ordinary courts. The number of arbitrators shall be three. The arbitration shall be conducted in the language specified in the Election Sheet.

## § 23
## Miscellaneous

**1.     Recording Telephone Conversations:**  Each Party is entitled to record telephone conversations held in connection with the Agreement and to use the same as evidence. Each Party waives any further notice of such recording and acknowledges that it has obtained all necessary consents of its officers and employees to such recording.

**2.     Notices and Communications:**  Except as otherwise provided herein or agreed with respect to an Individual Contract, all notices, declarations or invoices sent by one Party to the other shall be in writing and

22

shall be delivered by letter (overnight mail or courier, postage prepaid) or facsimile as provided in the Election Sheet. Each Party may change its notice information by written notice to the other. Written notices, declarations and invoices shall be deemed received and effective:

    (a)    if delivered by hand, on the Business Day delivered or on the first Business Day after the date of delivery if delivered on a day other than a Business Day;

    (b)    if sent by first class post, on the 2nd Business Day after the date of posting, or if sent from one country to another, on the 5th Business Day after the day of posting; or

    (c)    if sent by facsimile transmission and a valid transmission report confirming good receipt is generated, on the day of transmission if transmitted before 17.00 hours (recipient's time) on a Business Day or otherwise at 09.00 hours (recipient's time) on the first Business Day after transmission.

**2.**    **Amendments:** Except as provided in § 3 (*Concluding and Confirming Individual Contracts*) with respect to Confirmations, any amendments or additions to this General Agreement shall be made only in writing signed by both Parties.

**3.**    **Partial Invalidity:** If, at any time, any provision of this General Agreement or an Individual Contract is or becomes illegal, invalid or unenforceable, in any respect, under the law of any relevant jurisdiction, neither the legality, validity nor enforceability of the remaining provisions of this General Agreement or of any Individual Contract, shall be in any way affected or impaired thereby. The Parties undertake to replace any illegal, invalid or unenforceable provision with a legal, valid and enforceable provision which comes as close as possible to the invalid provision as regards its economic intent.

**4.**    **Third Party Rights:** The Parties do not intend that any third party shall have any rights under or be able to enforce the Agreement and the Parties exclude to the extent permitted under applicable law any such third party rights that might otherwise be implied.

Executed by the duly authorised representative of each Party effective as of the Effective Date.

*Total Gas & Power Limited*

*Lehman Brothers Commodity Services Inc.,*
*including its London branch*

Kianga M. Ellis
Vice President

**Philippe Lautard**
**Deputy General Manager**
**Gas & Power Trading**

# EFET

# European Federation of Energy Traders

## Election Sheet
## to the
## General Agreement

with an Effective Date of 6 November 2007

between **Total Gas & Power Limited**
("Party A")

AND

**Lehman Brothers Commodity Services Inc. including its London branch**

("Party B")

## PART I: CUSTOMIZATION OF PROVISIONS IN THE GENERAL AGREEMENT

### §1
### Subject of Agreement

§ 1.2 Pre-Existing Contracts:      [X] § 1.2 shall apply.

### §2
### Definitions and Construction

§ 2.4 References to Time: time references shall be as provided in the General Agreement (CET).

### §3
### Concluding and Confirming Individual Contracts

§ 3.2 Confirmations and § 3.3 Objections to Confirmations:

[X] § 3.2 shall apply as amended in Part II of this Election Sheet.

§ 3.4 Authorised Persons:      [X] § 3.4 shall apply as amended in Part II of this Election Sheet.

### §7
### Non-Performance Due to Force Majeure

§ 7.1 Definition of Force Majeure: [X] § 7.1 shall apply as written in the General Agreement.

### §10
### Term and Termination Rights

§ 10.2 Expiration Date:      [X] § 10.2 shall apply and no Expiration Date should be specified.

§ 10.4 Automatic Termination:    [X] §10.4 shall not apply to Party A and shall not apply to Party B.

§ 10.5(a) Definition of Material Reason and Non Performance:

§ 10.5(a) shall apply amended as follows:

"(a) Non-Performance: The failure of a Party or its Credit Support Provider, when required, to make a payment, to deliver any Performance Assurance or to perform any other material obligation (other than when such obligation is released pursuant to § 7 (*Non-Performance Due to Force Majeure*)):
under the Agreement; provided, that in the case of a failure to pay, such failure is not cured within two (2) Business Day of a written demand, or, in the case of any other failure of performance below), such failure is not cured within ten (10) Business Days of a written demand."

### § 10.5(b) Cross Default and Acceleration:

[X] §10.5 (b) (i) and (ii) shall apply as follows and the Threshold Amount shall be:

Party A: GBP500,000, and for:

Party B: the lesser of (i) USD 75 million and (ii) two percent (2%) of the Stockholder's Equity of Party A's Credit Support Provider (or its equivalent in any other currency)

For purposes hereof, **"Stockholder's Equity"** means, with respect to an Entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles consistently applied

(i)     "any default, event of default or other similar condition or event (however described) in respect of such Party, such Party's Credit Support Provider (if such Party has a Credit Support Provider) or such Party's Controlling Party (if such Party does not have a Credit Support Provider but has a Controlling Party) under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the Threshold Amount (as specified for that Party in the Election Sheet) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable, or

(ii)    the default of a Party or its Credit Support Provider or Controlling Party (individually or collectively) to make one or more payments on the due date thereof in an aggregate amount of not less than the Threshold Amount (as specified for that Party in the Election Sheet) under one or more agreements or instruments (after giving effect to any applicable notice requirement or grace period)."

(iii)   The "Cross Default and Acceleration" provisions of § 10.5(b) will apply to Party A and Party B; provided, however, that notwithstanding the foregoing, a Material Reason shall not occur under either (i) or (ii) above if (a) the default, event of default or other similar condition or event referred to in (i) or the default referred to in (ii) is a failure to pay caused solely by error or omission of an administrative or operational nature and the relevant agreement or instrument contains no grace period; and (b) funds were available to such party, Credit Support Provider of such party or any applicable Specified Entity of such party, as the case may be, to enable it to make the relevant payment when due; and (c) such relevant payment is made within three local Business Days of receipt of written notice from an interested party of such failure to pay.

### § 10.5(c) Winding-up/Insolvency/Attachment:

[X] § 10.5(c)(iv) shall apply to both parties without any applicable grace period for the Party to have such proceedings (as are referred to in § 10.5(c)(iv) withdrawn, dismissed, discharged, stayed or restrained unless the proceeding, relief or petition referred to in § 10.5(c)(iv) is being instituted against, and not by a Party or its Credit support Provider, in which case the applicable time period is within fifteen (15) Days.

**§ 10.5(d) Failure to Deliver or Accept:** [X] § 10.5(d) shall apply in respect of affected Individual Transactions only.

**§ 10.5 (e) Force Majeure:**        § 10.5(e) shall not apply.

**§ 10.5 Other Material Reasons:**

[X] The following Material Reasons shall be added:

(i)    **Default under Specified Transaction:** a Party, any Credit Support Provider, any Controlling Party or any applicable Specified Entity of such Party:

    (aa)    defaults (other than by failing to make a delivery) under a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction;

    (bb)    defaults, after giving effect to any applicable notice requirement or grace period, in making any payment due on the last payment, or exchange date of, or any payment on early termination of, a Specified Transaction (or if there is no applicable notice requirement or grace period, such default continues for at least one (1) Business Day);

    (cc)    defaults in making any delivery due under (including any delivery due on the last delivery or exchange date of) a Specified Transaction or any credit support arrangement relating to a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, such default results in a liquidation of, an acceleration of obligations under, or any early termination of, all transactions outstanding under the documentation applicable to that Specified Transaction; or

    (dd)    disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, a Specified Transaction or any credit support arrangement relating to a Specified Transaction that is, in either case, confirmed or evidenced by a document or other confirming evidence executed and delivered by that Party, Credit Support Provider, Controlling Party or Specified Entity (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

    (ee)    provided, however, that notwithstanding the foregoing, a Material Reason shall not occur under any of sub-paragraphs (aa) to (dd) inclusive above if (a) the default, event of default or other similar condition or event or the default referred to in any of the above sub-paragraphs is a failure to pay or failure to deliver caused solely by error or omission of an administrative or operational nature and the relevant agreement or instrument contains no grace period; and (b) funds were available to such party, Credit Support Provider of such party or any applicable Specified Entity of such party, as the case may be, to enable it to make the relevant payment when due; and (c) such relevant payment is made within three local Business Days of receipt of written notice from an interested party of such failure to pay.

For the purposes of this provision, Specified Entity means:

(i)    in relation to Party A:        Not applicable; and

(ii)   in relation to Party B:        Not applicable.

(ii)    **Ownership maintenance**

If Total SA, at any time and for any reason, ceases to own beneficially, and of record, (directly or indirectly) at least fifty one per cent (51%)(determined on a fully diluted basis) of the capital stock of each class of Party A.

## §12
## Limitation of Liability

**§ 12 Application of Limitation:**    [X] § 12 shall apply as written in the General Agreement.

## §13
## Invoicing and Payment

**§ 13.2 Payment:**    initial billing and payment information for each Party is set out in § 23 of this Election Sheet.

**§ 13.3 Payment Netting:**    [X] § 13.3 shall apply.

**§ 13.5 Interest Rate:**    the Interest Rate shall be the one month EURIBOR interest rate for 11:00 a.m. on the Due Date, plus 3 percent (3 %) per annum.

**§ 13.6 Disputed Amounts:**    [X] §13.6 (b) shall apply.

## §14
## VAT and Other Taxes

**§ 14.8 Termination for New Tax:** [X] unless otherwise specified in the terms of an Individual Contract the provisions of § 14.8 shall apply to such Individual Contract only in the circumstances specified in the first paragraph of § 14.8.

**§ 14.9 Withholding Tax:**    [X] § 14.9 shall apply.

## §15
## Settlement of Floating Prices and Fallback Procedures For Market Disruption

**§ 15.5 Calculation Agent:**    [X] the Calculation Agent shall be Seller, unless Seller is experiencing a Material Reason, for which case the Calculation Agent shall be Buyer.

## §16
## Guarantees and Credit Support

**§ 16 Credit Support Documents:** Party A shall provide Party B with the following Credit Support Document (s): As agreed from time to time between the Parties.

Party B shall provide Party A with the following Credit Support Document (s): Guarantee of Party A's obligations hereunder in the form annexed hereto as Exhibit A.

**§ 16 Credit Support Provider:**    Credit Support Provider(s) of Party A shall be: As agreed from time to time between the Parties.

Credit Support Provider(s) of Party B shall be: Lehman Brothers Holdings Inc.

## §17
## Performance Assurance

**§ 17.1 Right to Require Performance Assurance:**  § 17.1 shall apply, amended as follows:

The second sentence of § 17.1 shall be amended to read as follows:

"Upon receipt of such written notice, the other Party shall within two (2) Business Days provide to the Requesting Party the Performance Assurance required, *provided that*, in the event that

4

Party A elects to provide Performance Assurance from an entity that is not a Bank, such Performance Assurance will be subject to acceptance from Party B, acting in its sole discretion."

**§ 17.2 Material Adverse Change:** the following categories of Material Adverse Change shall apply to Party A:

[X] § 17.2 (a) **(Credit Rating)**, and the minimum rating shall be: BBB/ Baa2 (S&P/ Moody's), and for the avoidance of doubt, the relevant Entity shall be Total S.A.;

[X] § 17.2 (b)), as amended and set out below:

**Credit Rating of a Credit Support Provider that is a Bank)**, the minimum rating shall be A/A2 (S&P/ Moody's);

[X] § 17.2 (e) **(Expiry of Performance Assurance or Credit Support)**, and the relevant time period shall be 30 Business Days;

[X] § 17.2 (f) **(Failure of Performance Assurance or Credit Support)**;

[ ] §17.2 (g) **(Failure of Control & Profit Transfer Agreement)**;

[ ] §17.2 (h) **(Impaired Ability to Perform)**; and

[X] § 17.2 (i) **(Amalgamation/Merger)**;

the following categories of Material Adverse Change shall apply to Party B:

[X] § 17.2 (a) **(Credit Rating)** and the minimum rating shall be: BBB/Baa2 (S&P/ Moody's), and for the avoidance of doubt, the relevant Entity shall be Lehman Brothers Holdings Inc.;

[X] § 17.2 (b) **(Credit Rating of a Credit Support Provider a Bank)**, the minimum rating shall be A/A2 (S&P/ Moody's);

[X] § 17.2 (e) **(Expiry of Performance Assurance or Credit Support)**, and the relevant time period shall be 30 Business Days;

[X] § 17.2 (f) **(Failure of Performance Assurance or Credit Support)**;

[ ] §17.2 (g) **(Failure of Control & Profit Transfer Agreement)**;

[ ] §17.2 (h) **(Impaired Ability to Perform)**; and

[X] § 17.2 (i) **(Amalgamation/Merger)**, provided that the term "materially weaker" means that Party B's Credit Support Provider or the resulting, surviving, transferee or successor Entity of Party B's Credit Support Provider, as the case may be, fails to maintain a Credit Rating of at least BBB by S&P and Baa2 by Moody's.

## §18
## Provision of Financial Statements and Tangible Net Worth

**§ 18.1 (a) Annual Reports:**        [X] Party A shall deliver annual reports on request to the extent that the same are not available at www.total.com

[X] Party B shall deliver annual reports on request to the extent that the same are not available at www www.lehman.com

**§ 18.1(b) Quarterly Reports:**

[X] Party A need _not_ deliver quarterly reports, and

[X] Party B need _not_ deliver quarterly reports.

**§18.2 Tangible Net Worth:**

[X] Party A shall have _no_ duty to notify as provided in §18.2, and

[X] Party B shall have _no_ duty to notify as provided in §18.2.

## §19
## Assignment

**§ 19.2 Assignment to Affiliates:**

[X] Party A may not assign in accordance with § 19.2, subject
[X] Party B may <u>not</u> assign in accordance with § 19.2 provided that notwithstanding anything to the contrary in § 19.2 of this Agreement, Party B may so transfer, assign or novate its rights and obligations in respect of this Agreement to Lehman Brothers International (Europe) effective upon delivery to Party A of the guarantee by Lehman Brothers Holdings Inc. ("Holdings"), in favour of Party A, of the obligations of Lehman Brothers International (Europe), such guarantee to be substantially the same as the guarantee then in effect of the obligations of the transferor. For the avoidance of doubt, such guarantee from Holdings in respect of the General Agreement obligations of Party B will be no weaker in scope and application than the guarantee provided as at the Effective Date, although Holdings template revisions may mean the precise wording of such guarantee may vary slightly.

## §20
## Confidentiality

**§ 20.1 Confidentiality Obligation:** [X] § 20 shall apply.

## §21
## Representation and Warranties

The following Representations and Warranties are made:

|         | by Party A:       | by Party B:       |
|---------|-------------------|-------------------|
| §21(a)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(b)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(c)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(d)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(e)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(f)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(g)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(h)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(I)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(j)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(k)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(l)  | [  ] yes [X] no   | [  ] yes [X] no   |
| §21(m)  | [X] yes [  ] no   | [X] yes [  ] no   |
| §21(n)  | [X] yes [  ] no   | [X] yes [  ] no   |

In §21 shall be amended by adding the following subsections:

(o)    its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations enforceable in accordance with their respective terms subject only to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject only, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law).

(p)    Party A gives the following VAT representations when acting as a Buyer:

    (a)    it is a taxable dealer as defined in Article 38 of the EU Council Directive 2006/112 EC (the **Directive**); and

    (b)    its place of belonging for value added tax purposes is the United Kingdom with VAT Registration Number GB 689 638 949.

6

Party B gives the following VAT representations when acting as a Buyer:

(a)     it is a taxable dealer as defined in Article 38 of the EU Council Directive 2006/112 EC (the **Directive**); and

(b)     its place of belonging for value added tax purposes is the United Kingdom with VAT Registration Number GB 446 9315 28.

**§22**
**Governing Law and Arbitration**

**§ 22.1 Governing Law:**

[X] § 22.1 shall <u>not</u> apply as written in the General Agreement but instead shall apply as follows: "22.1 Governing Law: "This Agreement shall be construed and governed by and enforced under the substantive laws of England and Wales, excluding any application of the "United Nations Convention on Contracts for the international Sale of Goods of April 11, 1980."

**§ 22.2 Arbitration:**

[X] § 22.2 shall <u>not</u> apply as written but instead shall be as follows:

The Parties submit to the exclusive jurisdiction of the English courts.

**§23**
**Miscellaneous**

**§ 23.2 Notices, Invoices and Payments:**

(a)     **TO PARTY A:**                    Total Gas & Power Limited

**Notices & Correspondence**

Address:                                  Total Gas & Power Limited
                                          10 Upper Bank Street
                                          Canary Wharf
                                          London E14 5BF
                                          United Kingdom

Telephone No:                             +44 (0)20 7718 6801

Fax No:                                   +44 (0)20 7718 6557

Attention:                                Back Office Manager

**Invoices**

Fax No:                                   +44 (0)20 7718 6557

Attention:                                Back Office Manager

**Payments**

Bank account details                      HSBC Bank Plc
                                          133 Regent Street
                                          London W1A 4BQ

                                          Sterling account:

                                          Swift code: MIDLGB2110H
                                          Sort code: 40-06-02

Account number: 21737295

Euro account:

Swift code: MIDLGB22
Sort code: 40-05-15
Account number: 37976642

(b)    **TO PARTY B:**

**Notices & Correspondence**

| Address: | Lehman Brothers Commodity Services Inc.<br>c/o Lehman Brothers Inc. Transaction Management Group<br>Corporate Advisory Division<br>745 Seventh Avenue<br>New York, NY 10019 | With a copy to:<br>Lehman Brothers Commodity Services Inc.<br>c/o Lehman Brothers International (Europe)<br>25 Bank Street<br>London E14 5LE<br>England |
|---|---|---|
| Telephone No: | +1 212 526 7187 | +44 201 102 1209 |
| Fax No: | +1 212 526 7672 | +44 201 102 2044 |
| Attention: | Documentation Manager | Documentation Manager |

**Invoices**

| Fax No: | To be advised. |
|---|---|
| Attention: | To be advised. |

**Payments**

| Bank account details | To be advised. |
|---|---|

PART II: ADDITIONAL PROVISIONS TO THE GENERAL AGREEMENT

(1)     § 3.2 and § 3.3:   § 3.2 and § 3.3 shall be deleted and replaced by the following:

"§ 3.2                              In the event that an Individual Contract is not concluded in
written form, the Parties shall confirm their understanding of the
agreed terms of the Individual Contract (each such written
confirmation constituting a "Confirmation"). A Confirmation shall
contain the information stipulated in and shall be substantially in
the form of the applicable confirmation sheet from among those
attached to this General Agreement as Annex 2A-D and shall be
exchanged between the Parties in accordance with the following
procedure:

(a)     the Seller or the Writer (as applicable) shall within three Business
Days of the Individual Contract being concluded send by facsimile
to the Buyer or the Holder (as applicable) a signed Confirmation
recording the details of the Individual Contract;

(b)     if the Buyer or the Holder (as applicable) is satisfied the
Confirmation accurately reflects the Individual Contract it shall sign
and return the Confirmation by facsimile to the Seller or the Writer
(as applicable) within three Business Days of receipt of the
Confirmation;

(c)     if the Buyer or the Holder is not so satisfied, it shall inform the
Seller or the Writer (as applicable) of any inaccuracies within three
Business Days and the Seller or the Writer (as applicable) shall, if it
agrees that the Confirmation is inaccurate, issue a new
Confirmation and the provisions of § 3.2(a) shall apply;

(d)     if the Buyer or the Holder (as applicable) does not receive a
Confirmation within three Business Days of an Individual Contract
being entered into, the Buyer or the Holder (as applicable) shall
send the Seller or the Writer (as applicable) a Confirmation and §
3.2(b), (c), and (d) shall apply, mutatis mutandis, in relation to such
Confirmation by replacing all references to "Buyer or the Holder"
with references to "Seller or the Writer" and vice versa."

§ 3.4             shall be renumbered § 3.3:

Individual Contracts may only be concluded between the Authorised Traders
of the Parties in the absence of prior notice to the contrary, each Party
acknowledges and represents to the other that each of its employees
purporting to represent, negotiate and enter into one or more Individual
Contracts on such Party's behalf shall be deemed to be an Authorised Trader
of that Party.

(2)     The following § 7.5 shall be added:

""5. Long Term Force Majeure Limit: Where in respect of an Individual Contract the obligations of
the Claiming Party have been adversely affected by Force Majeure for a consecutive period of days
exceeding the Long Term Force Majeure Limit, then the Party which is not the Claiming Party shall
have the right to terminate such Individual Contract forthwith by written notice to the Claiming Party.
Should more than one Individual Contract be adversely affected by the same Force Majeure event, then
a termination of one such Individual Contract shall terminate all such Individual Contracts. Such
termination shall be without prejudice to the accrued rights and obligations of the Parties under such
Individual Contract up to the date of termination but neither Party shall have any liability whatsoever to

the other in respect of the unexpired portion of the Total Supply Period under such Individual Contract after the date of termination.

For the purposes of this clause "Long Term Force Majeure Limit" shall mean thirty (30) consecutive days or sixty (60) days in aggregate within a period of one calendar year, as the case may be.

(3)     §10.3(d) is amended by the deletion of the "." at the end of the sentence and the addition of the words:

"provided, however, that where the Termination Amount is payable by the Terminating Party the obligations of the Terminating Party to pay the other Party shall not arise until, and subject to the conditions precedent that (A) the Terminating Party shall have received confirmation satisfactory to it in its sole discretion, (which may include an unqualified opinion of its counsel) that (x) all Individual Contracts are terminated in accordance with this Agreement and (y) each Specified Transaction shall have been terminated pursuant to its specified termination date or been terminated through the exercise by a Party of a right to terminate and all amounts due under each Specified Transaction by the other Party (or Credit Support Provider of such Party or any applicable Controlling Party of such Party) shall have been fully and finally paid, and (B) all obligations, contingent or absolute, matured or unmatured, of the other Party and any Affiliate of the other Party to make any payment to the Terminating Party shall be fully and finally performed.

(4)     §11.3 Setoff: §11 is amended by the addition of the following new §11.3:

"The Terminating Party may, at its option, set off the Termination Amount against any or all other amounts owing (whether or not matured, contingent or invoiced) between the Parties under this Agreement or under any other agreements, instruments or undertakings between the Parties. The right of set off shall be without prejudice and in addition to any right of set off, combination of accounts, lien, charge or other right to which any Party is at any time otherwise entitled (whether by operation of law, by contract or otherwise). If an amount
For this purpose, either the Termination Amount or the Other Amounts (or the relevant portion of such amounts) may be converted by the Terminating Party into the currency in which the other is denominated at the rate of exchange at which the Terminating Party would be able, in good faith and using commercially reasonable procedures, to purchase the relevant amount of such currency.

If an obligation is unascertained, the Terminating Party may reasonably in good faith estimate the amount to be set-off in respect of the estimate, subject to the relevant Party accounting to the other when the obligation is ascertained, and in good faith determine and make any adjustment payment required within a commercially reasonable time."

(5)     **§ 10.5(f) Representation or Warranty**

§ 10.5(f) shall be amended to read as follows:

"**Representation or Warranty:** A representation or warranty (other than a representation or warranty made under § 21(k)) when made or repeated or deemed to have been made, repeated by a Party to this General Agreement or an Individual Contract or its Credit Support Provider or Controlling Party in a Credit Support Document proves to have been incorrect or misleading in any material respect when made or deemed to have been made or repeated."

(6)     **§17.2(e) Expiry of Performance Assurance or Credit Support Document**

§ 17.2(e) is amended as follows: In lines 5 and 8 the words "or Performance Assurance" are inserted after the words "Credit Support Document".

(7)     **§ 22 Governing Law and Arbitration**

A new § 22.3 shall be added after § 22.2 as follows:

"3.     **Service of Process:** Party B appoints the Process Agent (if any) specified below to receive, for it and on its behalf, service of process in any action, suit or proceedings.

Party B's Process Agent is:    Lehman Brothers International (Europe)
Attention: Head of Transaction Management Group, Europe
25 Bank Street, London E14 5LE, England.

(8)    **§ 23.2 Notices and Communications**

§ 23.2 shall be amended by inserting the following at the end of the first sentence:

"except that a notice or declaration under §10 many not be given by facsimile."

(9)    **§ 23.4 Partial Invalidity**

§ 23.4 shall be amended by inserting the following sentence at the end thereof:

"It shall in particular be understood that this § 23.4 shall not affect the "single-agreement" concept of § 1.1."

## Annex 1 to the General Agreement (Defined Terms)

The following amendments are made to "Annex 1 to the General Agreement" (Defined Terms):

(1)    The definition of **Affiliate** is amended by adding at the end thereof:

"except that "Affiliate" shall not include Lehman Brothers Derivative Products Inc. and Lehman Brothers Financial Products Inc."

(2)    The definition of **Credit Rating** is amended to read as follows:

""**Credit Rating**" means in respect of an Entity, its long-term senior unsecured debt rating by S&P or Moody's. For clarification, in the event either S&P or Moody's assigns a rating that is lower than the other, then such rating shall be determinative."

(3)    The definition of **Tangible Net Worth** is amended as follows:

the word "not" is inserted in the final line between the words "but" and "limited to".

The following new definitions are added to "Annex 1 to the General Agreement" (Defined Terms):

"**Moody's**" means Moody's Investors Service, Inc. or any successor thereto;

"**S&P**" means Standard & Poor's Rating Group (a division of McGraw-Hill Inc.) or any successor thereto;

"**Specified Transaction**" means (a) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one Party to this Agreement (or any Credit Support Provider or Controlling Party of such Party) and the other Party to this Agreement (or any Credit Support Provider or Controlling Party of such other Party) which is not an Individual Contract under this Agreement but (i) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse purchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward or spot purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (ii) which is a type of transaction that is similar to any transaction referred to in clause (i) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such

agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant Confirmation;

Executed by the duly authorised representative of each Party effective as of the Effective Date.

"Party A"
*Total Gas & Power Limited*

Name: .......Phillppa Lautard..............
Title:.........Deputy General Manager
             Gas & Power Trading

"Party B"
*Lehman Brothers Commodity Services Inc., including its London branch*

Name...............Kianga M. Ellis
Title:................Vice President

12

## EXHIBIT A

### GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS COMMODITY SERVICES INC. ("Party A") and TOTAL GAS & POWER LIMITED ("Party B") have entered and/or anticipate entering into one or more transactions under an ISDA Master Agreement and/or other agreements for the purchase, sale, delivery or transfer of one or more Commodities and swap, option, spot and forward transactions relating to any such Commodity (each a "Transaction"). The confirmation of each Transaction together with any ISDA Master Agreement or other master trading agreement or standard terms and conditions that apply to such Transaction is collectively referred to as "the Agreement". For this purpose, "Commodity" means any tangible or intangible commodity of any type or description (including, without limitation, crude oil, oil products, chemical products, natural gas, coal, precious and base metals, pulp, paper, softs, freight, electricity, electricity transmission capacity or any other form of energy or energy related products and by-products thereof, weather, greenhouse emissions allowances, tradable renewable energy credits, bandwidth, natural gas liquids and currency).

For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A in connection with each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement (whether at maturity by acceleration or otherwise). Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into any amendments to the Agreement, additional Transactions or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor (excluding the defense of payment or statute of limitations, neither of which is waived) provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of the occurrence of any event that may terminate the Transaction, or where applicable, an event which, with the giving of notice or lapsing of time, or both, would lead to the occurrence of an event that may terminate the Transaction in respect of Party B or any affiliate, but only to the extent such right is provided to Party A. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon the occurrence of a bankruptcy or insolvency event which affects Party A or Guarantor and that may terminate the Transaction.

(f)    Guarantor hereby waives (i) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

(g)     Guarantor represents and warrants that:

(i)     Guarantor is a corporation duly incorporated, validly existing and in good standing under the laws of Delaware;

(ii)    Guarantor has the legal capacity and the legal right to execute and deliver this Guarantee and to perform Guarantor's obligations hereunder;

(iii)   no consent or authorization of, filing with, or other act by or in respect of, governmental authority and no consent of any other person (including, without limitation, any creditor of Guarantor) is required in connection with the execution, delivery, performance, validity or enforceability of this Guarantee;

(iv)    this Guarantee has been duly executed and delivered by Guarantor and constitutes a legal, valid and binding obligation of Guarantor enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws; and

(v)     the execution, delivery and performance of this Guarantee will not violate any provision of the certificate of incorporation, by laws or other organizational documents of Guarantor, or any law, treaty, rule or regulation or determination of an arbitrator, a court or other governmental authority, applicable to or binding upon Guarantor or any of its property or to which Guarantor or any of its property is subject.

(h)     At such time as this Guarantee is delivered to Party B, this Guarantee shall entirely supersede and replace any other guarantee previously delivered by the Guarantor or any of their affiliates to Party B with regard to the obligations of Party A under the Transactions, and no previously delivered guarantee with regard thereto shall be honoured by us or any of our, successors or assigns

This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflicts of laws principles.

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed by its duly authorized officer.

**LEHMAN BROTHERS HOLDINGS INC.**

By: _____
Name:
Title:
Date:

14

*Annexes:*

*1:*        *Definitions*

*2a-d:*     *Confirmation Forms for Fixed Price, Floating Price, Put Options and Call Options*

*3:*        *Cross Border Annex*

# EFET

## European Federation of Energy Traders

### Annex 1
### to the
### General Agreement

### <u>Defined Terms</u>

Terms used in the General Agreement shall have the following meanings:

"**Accepting Party**" has the meaning specified in § 8.1 (*Failure to Deliver*);

"**Affiliate**" means with respect to a Party, any Entity Controlled, directly or indirectly, by that Party, any Entity that Controls, directly or indirectly that Party or any Entity directly or indirectly under the common Control of a Party;

"**Agreement**" has the meaning specified in § 1.1 (*Subject of Agreement*);

"**Alternate Commodity Reference Price**" has the meaning, if any, specified in each Individual Contract containing a Floating Price;

"**Alternative Settlement Price**" has the meaning specified in § 15.2 (*Market Disruption*);

"**American Style Option**" means a style of Option which may be Exercised during an Exercise Period that consists of more than one day;

"**Automatic Termination**" has the meaning specified in § 10.4 (*Automatic Termination*);

"**Business Day**" means a day (other than Saturday or Sunday) on which commercial banks are open for general business at the places where each Party has its registered office;

"**Buyer**" has the meaning specified in the Individual Contract;

"**Calculation Agent**" has the meaning specified in § 15.5 (*Calculation Agent*);

"**Calculation Date**" has the meaning specified in a Floating Price Individual Contract;

"**Calculation Method**" has the meaning specified in a Floating Price Individual Contract;

"**Call Option**" has the meaning specified in § 5.1 (*Delivery and Acceptance Pursuant to an Option*);

"**Central European Time**" or "**CET**" means Central European Time and shall include Central European Winter Time and Central European Summer Time as applicable;

"**Commodity Reference Price**" has the general meaning specified in § 15.4, and with respect to a Floating Price Individual Contract, as specified in that Floating Price Individual Contract;

"**Confidential Information**" has the meaning specified in § 20.1 (*Confidentiality*);

"**Confirmation**" has the meaning specified in § 3.2 (*Confirmations*);

"**Contract Capacity**" means, in respect of an Individual Contract, the capacity agreed between the Parties, expressed in MW;

Version 2.1(a)

Copyright © 2007 by European Federation of Energy Traders

**"Contract Price"** means, in respect of an Individual Contract, the price agreed between the Parties;

**"Contract Quantity"** means, in respect of an Individual Contract, the quantity agreed between the Parties, expressed in MWh;

**"Control"** means ownership of more than fifty per cent (50%) of the voting power of a Party or Entity and **"Controlled"** or **"Controlling"** shall be construed accordingly;

**"Control and Profit Transfer Agreement"** has the meaning specified in § 17.2(a)(iii) (***Credit Rating***);

**"Controlling Party"** has the meaning specified in § 17.2(a)(iii) (***Credit Rating***);

**"Costs"** has the meaning specified in § 11.2(a) (***Settlement Amount***);

**"Credit Rating"** means in respect of an Entity any of the following: (i) the long-term unsecured, unsubordinated (unsupported by third party credit enhancement) public debt rating; (ii) the debt issuer's credit rating; or (iii) the corporate credit rating given to that entity, in each of cases (i) to (iii) by Standard & Poor's Rating Group (a division of McGraw-Hill Inc.) or Moody's Investor Services Inc.;

**"Credit Support Documents"** has the meaning specified with respect to a Party specified in the Election Sheet, which may include, without limitation, a parent guarantee, bank guarantee, letter of awareness, letter of credit or any credit support agreement;

**"Credit Support Provider"** has the meaning specified with respect to a Party specified in the Election Sheet;

**"Damages"** has the meaning specified in § 12.2 (***Exclusion of Liability***);

**"Dealers"** has the meaning specified in § 15.3(c) (***Dealer Fall Back***);

**"Defaulting Party"** has the meaning specified in § 9.1 (***Suspension of Delivery***);

**"Delivering Party"** has the meaning specified in § 8.1 (***Failure to deliver***);

**"Delivery Point"** means, in respect of an Individual Contract, the delivery point agreed between the Parties;

**"Delivery Schedule"** means, in respect of an Individual Contract, the delivery schedule agreed between the Parties;

**"Due Date"** has the meaning specified in § 13.2 (***Payment***);

**"Early Termination"** has the meaning specified in § 10.3 (a) (***Termination for Material Reason***);

**"Early Termination Date"** has the meaning specified in § 10.3 (b) (***Termination for Material Reason***);

**"EBIT"** means earnings before interest and taxes which, shall be in respect of the relevant fiscal year, the net revenue of the Relevant Entity before deducting corporate taxes (or any other tax on income or gains in the relevant jurisdiction of the Relevant Entity); plus the sum of all interest and any amounts in the nature of interest charged to expense relating to financial indebtedness for borrowed money (which amounts include debts payable to Affiliates as well as debt instruments to financial institutions) of the Relevant Entity;

**"Effective Date"** has the meaning set out on the first page of this General Agreement;

**"Election Sheet"** has the meaning specified in § 1.1 (***Subject of Agreement***);

**"Entity"** means an individual, government or state or division thereof, government or state agency, corporation, partnership or such other entity as the context may require;

**"EU"** means the European Community as it exists from time to time;

                    Copyright © 2007 by European Federation of Energy Traders

**"European Style Option"** means a style of Option which may be Exercised only on the day of the Exercise Deadline;

**"Exercise"** means the exercise of an Option pursuant to § 5.3 (*Exercise of Option and Deadline*) and **"Exercises"** and **"Exercised"** shall be construed accordingly;

**"Exercise Deadline"** means the day and time by which Exercise must be given under § 5.3 (*Exercise of Option and Deadline*);

**"Exercise Period"** means: (i) in respect of a European Style Option, the day of the Exercise Deadline; and (ii) in respect of any other Option including an American Style Option, each of the periods specified in the Individual Contract;

**"Expiration Date"** has the meaning specified in § 10.2 (*Expiration Date and 30 Day Termination Notice*) of the Election Sheet;

**"Fallback Mechanism"** has the meaning specified in § 15.3 (*Fall Back Mechanism*);

**"Floating Price"** has the meaning specified in § 15.1 (*Settlement Price Calculation*);

**"Force Majeure"** has the meaning specified in § 7.1 (*Definition of Force Majeure*);

**"Funds from Operations"** means the amount of cash generated or employed by the Relevant Entity in its operating activities;

**"Gains"** has the meaning specified in § 11.2(b) (*Settlement Amount*);

**"General Agreement"** means this General Agreement Concerning the Delivery and Acceptance of Electricity;

**"Holder"** has the meaning specified in § 5.1 (*Delivery and Acceptance Pursuant to an Option*);

**"Interest Rate"** has the meaning specified in § 13.5 (*Default Interest*);

**"Individual Contract"** has the meaning specified in § 1.1 (*Subject of Agreement*);

**"Letter of Credit"** means an irrevocable standby letter of credit payable on demand in a form and substance satisfactory to the Requesting Party and issued by a financial institution whose Credit Rating is at least the rating specified in the Election Sheet as provided in § 17.2 (b) (*Credit Rating of a Credit Support Provider that is a Bank*);

**"Losses"** has the meaning specified in § 11.2(c) (*Settlement Amount*);

**"Market Disruption Event"** has the meaning specified in § 15.4 (*Definition of Market Disruption Event*);

**"Material Adverse Change"** has the meaning specified in § 17.2 (*Material Adverse Change*);

**"Material Reason"** has the meaning specified in § 10.5 (*Definition of Material Reason*);

**"Negotiation Period"** has the meaning specified in § 14.8 (*Termination for New Tax*);

**"Network Operator"** means collectively the relevant transmission providers and network, grid or system operators;

**"New Tax"** means in respect of an Individual Contract, any Tax enacted and effective after the date on which the Individual Contract is entered into, or that portion of an existing Tax which constitutes an effective increase (taking effect after the date on which the Individual Contract is entered into) in applicable rates, or extension of any existing Tax to the extent that it is levied on a new or different class of persons as a result of any law, order, rule, regulation, decree or concession or the interpretation thereof by the relevant taxing authority, enacted and effective after the date on which the Individual Contract is entered into;

Annex 1 - 3

 Copyright © 2007 by European Federation of Energy Traders

**"Non-Defaulting Party"** has the meaning specified in § 9 (*Suspension of Delivery*);

**"Non-Taxed Party"** has the meaning specified in § 14.8 (*Termination for New Tax*);

**"Option"** has the meaning specified in § 5.1 (*Delivery and Acceptance Pursuant to an Option*);

**"Ordinary Termination"** has the meaning specified in § 10.2 (*Expiration Date and 30 Day Termination Notice*);

**"Other Tax"** means any energy Tax or excise duty but not including Taxes targeted at end users;

**"Party A"** means the Party identified as such in the Election Sheet;

**"Party B"** means the Party identified as such in the Election Sheet;

**"Paying Party"** has the meaning specified in § 14.9(a) (*Payments Free and Clear*);

**"Performance Assurance"** has the meaning specified in § 17.1 (*Performance Assurance*);

**"Premium"** has the meaning specified in the Individual Contract for an Option;

**"Premium Payment Date"** has the meaning specified in the Individual Contract for an Option;

**"Price Source"** has the meaning specified in § 15.4 (*Definition of Market Disruption Event*);

**"Put Option"** has the meaning specified in § 5.1 (*Delivery and Acceptance Pursuant to an Option*);

**"Receiving Party"** has the meaning specified in § 14.9(a) (*Payments Free and Clear*);

**"Relevant Entity"** has the meaning specified in § 17.2(a) (*Credit Rating*);

**"Remaining Contract Quantity"** has the meaning specified in § 14.8 (*Termination for New Tax*);

**"Requesting Party"** has the meaning specified in § 17.1 (*Credit Rating*);

**"Schedule"** has the meaning specified in § 4.2 (*Definition of Schedule*) and **"Scheduled"** and **"Scheduling"** shall be construed accordingly;

**"Seller"** has the meaning specified in the Individual Contract;

**"Settlement Amount"** has the meaning specified in § 11.2 (*Settlement Amount*);

**"Settlement Date"** has the meaning specified in the Individual Contract;

**"Settlement Price"** has the meaning specified in the Individual Contract;

**"Specified Indebtedness"** means any financial indebtedness (whether present or future, contingent or otherwise, as principal or surety or otherwise) for borrowed money (which includes debts payable to Affiliates as well as debt instruments to financial institutions);

**"Tangible Net Worth"** means the sum of all paid up shareholder cash contributions to the share capital account or any other capital account of the Relevant Entity ascribed for such purposes of the Relevant Entity and any accumulated earnings less any accumulated retained losses and intangible assets including, but limited to, goodwill;

**"Tax"** means any present or future tax, levy, impost, duty, charge, assessment royalty, tariff or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority (whether or not for its benefit) in respect of any payment, nomination and allocation under any Individual Contract or under this Agreement, and **"Taxes"** shall be construed accordingly. For the avoidance of doubt, Tax

Version 2.1(a)                              Copyright © 2007 by European Federation of Energy Traders

shall exclude; (i) any tax on net income or wealth; (ii) a stamp, registration, documentation or similar tax; and (iii) VAT;

**"Taxed Party"** has the meaning specified in § 14.8 (*Termination for New Tax*);

**"Terminating Party"** has the meaning specified in § 10.3 (*Termination for Material Reason*);

**"Termination Amount"** has the meaning specified in § 11.1 (*Termination Amount*);

**"Threshold Amount"** with respect to a Party, shall have the meaning as specified for that Party pursuant to § 10.5(b)(ii);

**"Total Capitalisation"** means in respect of the relevant period the sum of Total Debt and all paid up shareholder cash contributions to the share capital account or any other capital account of the Relevant Entity ascribed for such purposes of the Relevant Entity;

**"Total Debt"** means in respect of the relevant period the sum of financial indebtedness for borrowed money (which includes debts payable to affiliated companies as well as debt instruments to financial institutions) of the Relevant Entity;

**"Total Supply Period"** means, in respect of an Individual Contract, the supply period agreed between the Parties;

**"Valid Certificate"** means any appropriate documentation accepted by the relevant taxing authorities or as required by applicable law, order, rule, regulation decree or concession or the interpretation thereof;

**"VAT"** means any value added tax or any tax analogous thereto but excluding any statutory late payment interest or penalties;

**"VAT Rules"** means any VAT law, order, rule, regulation, decree or concession or the interpretation thereof;

**"Zero-Rated"** means, in respect of a supply, a tax exempt export or tax-free export under applicable VAT Rules and **"Zero-Rating"** shall be construed accordingly; and

**"Writer"** has the meaning specified in § 5.1 (*Delivery and Acceptance Pursuant to an Option*).

Version 2.1(a)                    Copyright © 2007 by European Federation of Energy Traders

# EFET

## European Federation of Energy Traders

### Annex 2a
### to the
### General Agreement
### <u>Confirmation of Individual Contract</u>
### <u>*(Fixed Price)*</u>

between

_____ as Seller

and

_____ as Buyer.

concluded on:  __/__/____, __. __ hours

Delivery Schedule

| *Total Supply Period* | | From CET | To CET | Contract Capacity MW | Contract Quantity MWh | Contract Price Euro / MWh | Total amount Euro |
|---|---|---|---|---|---|---|---|
| First Date | Last Date | | | | | | |
| | | | | | (Total) | | (Total) |
| | | | | | (Total) | | (Total) |
| | | | | | (Total) | | (Total) |
| | | | | | (Total) | | (Total) |
| | | | | | (Total) | | (Total) |

and additional (for single-block contracts)

| Mon | Tue | Wed | Thu | Fri | Sat | Sun | including Holidays | excluding Holidays as specified below |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Delivery Point (Trading zone)          _____

Voltage Level:                         _____

Excluded Holidays:                     _____

Other arrangements:

Annex 2A - 1

This Confirmation confirms the Individual Contract entered into pursuant to the EFET General Agreement Concerning the Delivery of Electricity between the Parties (General Agreement) and supplements and forms part of that General Agreement. In case of any inconsistencies between the terms of this Confirmation and the Individual Contract, please contact us immediately.

Date:_____        Signature:_____

Version 2.1(a)                    Copyright © 2007 by European Federation of Energy Traders

# EFET

## European Federation of Energy Traders

**Annex 2b**
**to the**
**General Agreement**

### Confirmation of Individual Contract

### *(Floating Price)*

between

_____ as Seller

and

_____ as Buyer.

Date and time of conclusion:    __/__/___, __. __ hours

Delivery Schedule

| First Date | Last Date | From CET | To CET | Contract Capacity MW | Contract Quantity MWh | Floating Price | Settlement Date |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  | (Total) | (variable) |  |
|  |  |  |  |  | (Total) | (variable) |  |
|  |  |  |  |  | (Total) | (variable) |  |
|  |  |  |  |  | (Total) | (variable) |  |
|  |  |  |  |  | (Total) | (variable) |  |

and additional (for single-block contracts)

| Mon | Tue | Wed | Thu | Fri | Sat | Sun | Including Holidays | excluding Holidays as specified below |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |

Price Source:                                    _____
Commodity Reference Price:              _____
Alternate Commodity Reference Price:  _____
Calculation Date:                            _____
Calculation Agent:                          _____
Calculation Method:                        _____
Delivery Point (Trading zone):          _____

Annex 2B - 1

Copyright © 2007 by European Federation of Energy Traders

Voltage level: _____

Excluded Holidays: _____

Other arrangements:

This Confirmation confirms the Individual Contract entered into pursuant to the General Agreement Concerning the Mutual Delivery of Electricity between the Parties (General Agreement) and supplements and forms part of that General Agreement. In case of any inconsistencies between the terms of this Confirmation and the Individual Contract, please contact us immediately.

Date:_____    Signature:_____

Annex 2B - 2

# EFET

## European Federation of Energy Traders

### Annex 2c
### to the
### General Agreement

### Confirmation of Individual Contract

### (Call Option)

between

_____ as Writer

and

_____ as Holder

Date and time of conclusion:__/__/____, __.__ hours

Option Details:

a) Option Type:        Call

b) Exercise Deadline:

c) Premium:

d) Premium Payment Date:

Delivery Schedule:

| First Date | Last Date | From CET | To CET | Contract Capacity MW | Contract Quantity MWh | Strike Price (Contract Price) Euro / MWh | Total amount Euro |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |

Annex 2C - 1

and additional (for single-block contracts)

| Mon | Tue | Wed | Thu | Fri | Sat | Sun | including Holidays | excluding Holidays as specified below |
|-----|-----|-----|-----|-----|-----|-----|--------------------|---------------------------------------|
|     |     |     |     |     |     |     |                    |                                       |

Delivery Point (Trading zone): _____

Voltage Level: _____

Excluded Holidays: _____

Other arrangements:


This Confirmation confirms the Individual Contract entered into pursuant to the General Agreement Concerning Delivery of Electricity between the Parties (General Agreement) and supplements and forms part of that General Agreement. In case of any inconsistencies between the terms of this Confirmation and the Individual Contract, please contact us immediately.


Date:_____    Signature:_____

Annex 2C - 2

# EFET

## European Federation of Energy Traders

### Annex 2d
### to the
### General Agreement

### <u>Confirmation of Individual Contract</u>

### *<u>(Put Option)</u>*

between

_____ as Writer

and

_____ as Holder

Date and time of conclusion: __/__/____, __.__ hours

Option Details:

    a)        Option Type:    Put

    b)        Exercise Deadline:

    c)        Premium:

    d)        Premium Payment Date:

Delivery Schedule:

| First Date | Last Date | From CET | To CET | Contract Capacity MW | Contract Quantity MWh | Strike Price (Contract Price) Euro / MWh | Total amount Euro |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |
|  |  |  |  |  | (Total) |  | (Total) |

Annex 2D - 1

Copyright © 2007 by European Federation of Energy Traders

and additional (for single-block contracts)

| Mon | Tue | Wed | Thu | Fri | Sat | Sun | including Holidays | excluding Holidays as specified below |
|-----|-----|-----|-----|-----|-----|-----|--------------------|----------------------------------------|
|     |     |     |     |     |     |     |                    |                                        |

Delivery Point (Trading zone):          _____

Voltage Level:                                   _____

Excluded Holidays:                           _____

Other arrangements:

This Confirmation confirms the Individual Contract entered into pursuant to the General Agreement Concerning Delivery of Electricity between the Parties (General Agreement) and supplements and forms part of that General Agreement. In case of any inconsistencies between the terms of this Confirmation and the Individual Contract, please contact us immediately.

Date:_____    Signature:_____

Annex 2D - 2

Copyright © 2007 by European Federation of Energy Traders

# EFET

## European Federation of Energy Traders

### Election Sheet
### to the
### General Agreement

with an Effective Date of ...........................

between............................and ........................................
("Party A")                              ("Party B")

**PART I: CUSTOMISATION OF PROVISIONS IN THE GENERAL AGREEMENT**

### §1
### Subject of Agreement

**§1.2 Pre-Existing Contracts:**  [ ] § 1.2 shall apply, or
[ ] § 1.2 shall not apply

### §2
### Definitions and Construction

**§ 2.4 References to Time:**  time references shall be: (CET), or   [ ] as provided in the General Agreement

[ ] to the following time:

_____

### §3
### Concluding and Confirming Individual Contracts

**§ 3.4 Authorised Persons:**  [ ] § 3.4 shall apply to Party A and shall be as designated in Annex
_____, or
[ ] § 3.4 shall not apply to Party A
[ ] § 3.4 shall apply to Party B and shall be as designated in Annex
_____, or
[ ] § 3.4 shall not apply to Party B

### §7
### Non-Performance Due to Force Majeure

**§ 7.1 Definition of Force Majeure:**
[ ] § 7.1 shall apply as written in the General Agreement, or
[ ] § 7.1 shall not apply as written but instead shall be as follows:

_____

### §10
### Term and Termination Rights

**§ 10.2 Expiration Date:**  [ ] § 10.2 shall apply and the Expiration Date shall be:

A

# EFET

# European Federation of Energy Traders

### Annex 3
### to the
### General Agreement

### <u>Cross Border Annex</u>

**1.    Tax Representation**

For the purposes of § 21 (k) of this General Agreement, each Party represents, warrants and undertakes to the other Party (which representation will be deemed to be repeated at all times until termination of this General Agreement) in relation to each Individual Contract that, where applicable:

(a)    **Payer Representation**

As paying Party, it is not required by any applicable law of any Relevant Jurisdiction to make any withholding of or deduction for or on account of Tax from any payment (other than interest) to be made by it to the other Party under this General Agreement. In making this representation, it may rely on (i) the accuracy of any representations made by the other Party pursuant to Section 1(b) of this Annex, (ii) the satisfaction of the agreement contained in Section 2(a) of this Annex and the accuracy of any document provided by the other Party pursuant to Section 2(a) of this Annex, and (iii) the satisfaction of the agreement of the other Party contained in Section 2(b) of this Annex.

For these purposes,

the "**Relevant Jurisdiction(s)**" of Party A shall be: United Kingdom, and

the "**Relevant Jurisdiction(s)**" of Party B shall be: United States.

(b)    **Payee Representation**

Payee Representation of Party A:

It is a "foreign person" (as that term is used in section 1.6041-4(a)(4) of U.S. Treasury Regulations) for U.S. federal income tax purposes and each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a U.S. trade or business (within the meaning of the U.S. Internal Revenue Code of 1986, as amended) and it is a corporation duly organised and validly existing under the laws of the United Kingdom (its Relevant Jurisdiction).

The term "Relevant Jurisdiction" is where the Party is (a) incorporated, organized, managed and controlled, (b) where an office through which the Party is acting for purposes of the Agreement, (c) in which the Party executes this Agreement and (d) in relation to any payment, from or through which such payment is made. The Relevant Jurisdiction provided by the Parties will ascertain whether the Parties are eligible for treaty benefits under the income tax treaty.

Payee Representation of Party B:

It is a "U.S person" (as that term is used in section 1.1441-4(a)(3)(ii) of U.S. Treasury Regulations and as that term is used in section 7701(a)(30) of the U.S. Internal Revenue Code of 1986, as amended) for U.S. federal income tax purposes and it is a corporation duly organized and validly existing under the

laws of the State of Delaware (its Relevant Jurisdiction) and the federal taxpayer identification number is 20-3364079.

**2.**     **Agreement to Deliver Documents and Notification**

(a)     For the purpose of this General Agreement, each Party agrees to deliver the following documents, as applicable:

(i)     Party A agrees to complete (accurately and in a manner reasonably satisfactory to Party B), execute, and deliver to Party B a United States Internal Revenue Service Form W-9, or any successor form, (i) at the earlier of the execution of this General Agreement or before the first Due Date under this Agreement, (ii) promptly upon reasonable demand by Party B, and (iii) promptly upon learning that any such form previously provided by Party A has become obsolete or incorrect.

(ii)     Party B agrees to complete (accurately and in a manner reasonably satisfactory to Party A), execute, and deliver to Party A a United States Internal Revenue Service Form W-9, applicable Form W-8, or any successor form, (i) at the earlier of the execution of this General Agreement or before the first Due Date under this Agreement, (ii) promptly upon reasonable demand by Party A, and (iii) promptly upon learning that any such form previously provided by Party B has become obsolete or incorrect.

(iii)     Party A and Party B will deliver forms and/or documents of this General Agreement upon reasonable demand by the other party.

(b)     It will give notice of any failure of a representation made by it under section 1(b) of this Annex to be true and accurate promptly upon learning of such failure.

## CERTIFICATE OF INCUMBENCY

I, Aaron Guth, a duly elected, qualified and acting Assistant Secretary of Lehman Brothers Commodity Services Inc., a Delaware corporation (the "Corporation"), do hereby certify that the person listed below holds the title in the Corporation indicated opposite her name on the date hereof and that the signature appearing opposite her name is a specimen signature of such person; and that such person is authorized and empowered to execute and deliver any and all documents, instruments and agreements in the name and on behalf of the Corporation as of the date hereof.

| NAME | OFFICE | SIGNATURE |
|------|--------|-----------|
| Kianga Ellis | Vice President | |

IN WITNESS WHEREOF, I have hereunto set my hand this 24 day of ___MAY_____, 2007.

LEHMAN BROTHERS COMMODITY SERVICES INC.

Aaron Guth
Assistant Secretary