**Hearing Date: December 16, 2008 at 10:00 a.m (Prevailing Eastern Time)**
**Response Deadline: December 11, 2008 at 4:00 p.m. (Prevailing Eastern Time)**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
Gregory A. Horowitz
Amy Caton

Attorneys for The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | ) |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC., et al. | ) Chapter 11 |
| | ) |
| | ) Case No. 08-13555 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

---

**MOTION OF THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A. AS INDENTURE TRUSTEE, FOR ORDER PURSUANT TO BANKRUPTCY RULE 2004 DIRECTING EXAMINATION OF, AND PRODUCTION OF, DOCUMENTS BY LEHMAN BROTHERS HOLDINGS, INC., LEHMAN BROTHERS, INC., LEHMAN BROTHERS COMMODITY SERVICES INC. AND BARCLAYS CAPITAL INC.**

The Bank of New York Mellon Trust Company, N.A. (formerly known as The Bank of New York Trust Company, N.A.), as trustee for the holders of the Bonds (as defined below) (the "Trustee"), by and through its undersigned counsel, hereby moves (the "Motion") for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the service of subpoenas compelling the production of documents and the provision of deposition testimony by Lehman Brothers Holdings, Inc. ("LBHI"), Lehman Brothers, Inc. ("LBI"), Lehman Brothers Commodity Services Inc. ("LBCS") and Barclays Capital Inc. ("Barclays"). In support of this Motion, the Trustee respectfully represents as follows:

## PRELIMINARY STATEMENT

On September 20, 2008, the Court entered an order approving the sale by LBHI and LBI of substantially all of their U.S. and Canadian investment banking and capital markets businesses, including the fixed income and equities trading, brokerage, dealing, and advisory businesses, investment banking operations and LBI's business as a futures commission merchant to Barclays (the "Sale").  According to representations made on the record at the Sale Hearing, this Sale was not to include the commodities trading business of LBCS, an entity that would later become a debtor in these proceedings on October 3, 2008.  Yet, subsequent Barclays' press releases indicated that Barclays has fully integrated the Lehman Brothers' commodities business, and now services LBCS' clients.

The Trustee has claims of over $700 million against LBCS and LBHI to repay public municipal bonds that are now in default.[1]  The Bonds were publicly issued to investors in April 2008, and the overwhelming majority of the proceeds from the bond issuance (at least $682 million) were transferred directly to LBCS.  As a creditor of LBCS, the Trustee and the bondholders it represents (the "Holders") reasonably expected that they would be paid first from the proceeds of any assets sold by or on behalf of LBCS, including the business comprised of its human capital and client contacts, now presumptively under Barclays' control.  But no consideration seems to have been provided to LBCS for these or other LBCS assets in the Sale Order.

---

[1]	As previously described in the Trustee's limited objection to the sale of Eagle Energy Partners I L.P. (see Docket No. 914), Trustee's claims against LBCS are based on municipal revenue bonds issued to monetize LBCS's long-term gas supply contracts for the supply of natural gas to certain municipalities (the "Bonds").

KL2 2580558.6

Therefore, at the direction of and on behalf of certain Holders, the Trustee moves for leave to conduct Rule 2004 discovery with respect to what human capital, client contacts, and other LBCS assets Barclays acquired in the Sale. To the extent that any assets of LBCS – including intangibles – have been transferred without consideration, various causes of action on behalf of LBCS and its creditors are likely to exist.

To that end, the Trustee attaches a document request to LBHI, LBI, LBCS, and Barclays seeking further information about the presumptive transfer of LBCS's assets. The Trustee requests that the Court enter a discovery, deposition and briefing schedule on these issues to allow the Court to determine whether any of LBCS's assets were in fact transferred to Barclays.

## **BACKGROUND**

Barclays Sale Proceedings

1.      On September 15, 2008, LBHI and LB 745 LLC ("LB 745", and together with LBHI, collectively, the "Initial Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.      On September 17, 2008, the Initial Debtors filed a motion seeking approval for the Sale (the "Sale Motion").

3.      A hearing on the Sale Motion was conducted on September 19, 2008 (the "Sale Hearing").

4.      During the Sale Hearing, counsel for the Initial Debtors disclosed for the first time that the assets of LBCS, among others, were to be excluded from the Sale.

KL2 2580558.6

5.      On September 20, 2008, the Court entered an order approving the Sale (the "Sale Order") pursuant to an Asset Purchase Agreement, dated September 16, 2008, among Initial Debtors, LBI (collectively with Initial Debtors, the "Seller") and Barclays (the "Purchaser"), collectively with that First Amendment Clarifying Asset Purchase Agreement dated September 19, 2008, and that letter agreement clarifying and supplementing the Asset Purchase Agreement dated September 20, 2008 (as same may be subsequently modified, amended or clarified, the "Purchase Agreement").

6.      According to the Purchase Agreement, "the equity interests and assets of Lehman Brothers Commodity Services, Inc. . . . [were to be] Excluded Assets."

7.      The Sale was consummated on September 22, 2008.

Lehman Brothers Commodity Services Inc. Corporate Information

8.      LBCS, a Delaware corporation, was formed on August 30, 2005.

9.      According to the Form 10-Q for the quarter ended May 31, 2008, the Debtors' "commodity and energy derivatives product business [was] conducted through [LBCS]." Lehman Brothers Holdings, Inc., Quarterly Report (Form 10-Q), at 92 (Jul. 10, 2008).

10.      Upon information and belief, prior to the Sale, LBCS had offices in New York, Houston, Calgary, London, Tokyo and Singapore, with a staff of approximately 200 employees in the United States.

11.      On October 3, 2008, LBCS (together with the Initial Debtors and the debtor affiliates in these jointly administered cases, collectively, the "Debtors") filed a voluntary petition under the Bankruptcy Code in the Court.

KL2 2580558.6

<u>Barclays' Post-Sale Disclosures</u>

12.     Subsequent news articles indicate that Barclays has employed LBCS's employees since the consummation of the Sale.

13.     On October 7, 2008, Barclays issued a press release announcing the resumption and full integration of Lehman Brothers' commodities business under the Barclays name.

## ARGUMENT

### 1.   Barclays May Have Acquired Assets of LBCS

14.     Prior to the Sale, LBCS conducted the "Lehman Brothers" global commodity and energy derivatives product business.   Lehman Brothers Holdings, Inc., Quarterly Report (Form 10-Q), at 92 (Jul. 10, 2008).   LBCS was in some ways no different than other "Lehman" entities.   As this Court observed, Lehman collectively "was an operation the value of which is really embedded in the talent of the employees, their knowledge, their relationship, their expertise and their ability to create value to the economy." (Sale Hearing Tr. at 250:25-251:3). The same can be said of LBCS, which is described in the Bonds' offering memorandum as follows:

> [LBCS], a wholly-owned subsidiary of [LBHI], is staffed by more than 200 employees in the United States and has natural gas financial and physical delivery capabilities to manage and optimize supply, transportation, transmission, load and storage portfolios on behalf of wholesale natural gas and power clients.

(Offering Mem. at 39.)   The inclusion of the description of LBCS's business – including as consisting "of more than 200 employees in the United States" – induced investor reliance on the business acumen LBCS and its staff.   Moreover, it is likely that this is not the only time LBCS's business would have been described in this fashion.   To the contrary, it is likely LBCS held itself out as having 200 employees in the U.S., for all transactions, regardless of whether the employees received salaries from LBCS or LBI.

KL2 2580558.6

15.     Since its formation in August 2005, LBCS, as a service business, relied heavily on human capital.  Thus, LBCS's enterprise value would have been derived primarily from the discounted future cash flow from its employees, its proprietary risk management system, an extensive client list and any in-the-money trades. See generally Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business, Issue No. 98-3 (2000) (Emerging Issues Task Force) at ¶6 (identifying employees among other relevant inputs for determining whether a business has been transferred); Richard Brealey & Stewart Myers, Principles of Corporate Finance at 872 (6th ed. 2000) (acknowledging the value of human capital).  Although intangible, these assets would have formed a significant portion of the property of LBCS's estate – had such assets remained in LBCS's "possession" after the Sale.  It is the Trustee's belief, however, based on public disclosures, that such assets currently reside with Barclays.

16.     In the whirlwind that followed LBHI's bankruptcy filing, the Court expedited the Sale in light of exceptional circumstances.  (Sale Hearing Tr. at 251.)  The collaborative effort of the Initial Debtors and Barclays in sifting, packaging, and distributing assorted U.S. and Canadian assets of LBHI and LBI for delivery to Barclays, though commendable, was similarly rushed.  As a result, eight days after the LBHI's bankruptcy filing, on or about September 23, 2008, approximately 9,000 "Transferred Employees" (as defined in the Purchase Agreement) arrived at Barclays for their first day of work – apparently including the 200-plus employees that had previously been held out as LBCS's key assets.[2]

---

[2]     A "Transferred Employee" was a fluid concept:

> Effective as of the Closing Date, Purchaser shall, or shall cause one of Purchaser's Subsidiaries to, continue to employ (where employment continues or is transferred to Purchaser or a Subsidiary of Purchaser automatically by operation of Law), or offer employment to (where employment does not continue or transfer automatically by operation of Law), each Offeree.  For purposes of this Agreement, the term "Offeree"

17.    Not surprisingly, concerns about the potential for over-inclusiveness were raised

prior to the Sale.  At the Sale Hearing, the possibility that assets of then non-debtor LBCS might

have been included in the Sale was highlighted.  Debtors' counsel, Ms. Fife was quick to diffuse

such concerns, as evidenced by the following exchange:

> MR. ELROD: Thank you, Your Honor. David Elrod on
> behalf of TransCanada Pipelines and its affiliates. We filed a
> limited objection and I think that it has been essentially in part
> resolved by statements that occurred when the Court left the
> courtroom and we had an update by counsel for the debtor on
> what's not included in the sale.[3] And I just wanted to make that
> clarified on the record, Your Honor, because it hasn't been
> confirmed yet. It's our understanding that Lehman Brothers
> Commodity Services, Inc., Eagle Energy [Management LLC] and
> Eagle Energy Partners I, L.P. assets are not part of this transaction,
> this purchase agreement, and that the transaction will not affect
> their ability to operate as an entity.
>
> THE COURT: It was hours ago that I heard that but I
> believe that to be true. Ms. Fife, is that true?
>
> MS. FIFE: Yes it is, Your Honor.

(Sale Hearing Tr. at 226:3-19) (emphasis added).  Based on these statements, at the time of the

Sale Hearing the Initial Debtors expected LBCS to continue as a going concern.  Perhaps in a

---

means each active employee employed primarily in connection with the Business at the
Closing, other than such employees who are identified by Purchaser to Seller prior to
Closing, such identified persons shall not include any person who is in the targeted
population referred to in Section 10.1(b). Each Offeree who accepts Purchaser's or one of
its subsidiaries' offer of employment, together with each person whose employment
transfers to Purchaser or a subsidiary of Purchaser automatically by operation of law,
shall be referred to herein as a "Transferred Employee." Each Person who is not a
Transferred Employee shall be referred to herein as an "Excluded Employee". An
Offeree who performs work at his then applicable place of employment on the first
Business Day immediately following the Closing shall be deemed for all purposes of this
Agreement to have accepted Purchaser's or one of its subsidiaries' offer of employment
and shall be deemed to be a Transferred Employee for all purposes of this Agreement.

(Purchase Agreement § 9.1(a).)  Each Offeree who began work at Barclays became a Transferred Employee.

[3]    It is not known what clarification was made off the record.  It is believed that such a clarification may have
had the effect of recanting testimony of Herbert McDade with respect to LBCS.  (See Sale Hearing Tr. at 91-138.)

further attempt achieve this result, Section 1(c) of the letter agreement, dated as of September 20, 2008, by and among the Initial Debtors, LBI and Barclays (amending the initial Asset Purchase Agreement) was drafted to clarify the parties collective intentions, providing in relevant part:

> For the avoidance of doubt, the equity interests and assets of Lehman Brothers Commodity Services, Inc., including the equity of, as well as the assets of the energy marketing and services business of Eagle Energy Management LLC, are Excluded Assets (rather than Purchased Assets).

(Letter Agreement § 1(c).) Yet, by all accounts, LBCS no longer "operates as an entity." Barclays' post-Sale disclosures suggest that the business of LBCS – for all intents and purposes, all of the valuable assets of LBCS – has in fact been conveyed to Barclays in the Sale.

18.    On October 7, 2008, Barclays announced the resumption of the Lehman Brothers' commodities business under the Barclays name (See Barclays Oct. 7, 2008 Press Release attached as Exhibit 1 hereto). It would appear that, despite the Debtors' disclosures that LBCS assets would be carved out from the Sale, it is likely that Barclays now employs LBCS employees, has access to LBCS clients and is using LBCS's proprietary risk management system.[4]

## 2.  Discovery of Barclays' Acquired Commodities Business is Appropriate

19.    The statements of Debtors' counsel at the Sale Hearing (and the subsequent exclusion from the Purchase Agreement of any of LBCS's assets in the letter agreement) are seemingly at odds with Barclays' post-Sale disclosures. These circumstances beg for Rule 2004 discovery, to meaningfully reconcile these disparate positions and confirm what assets of LBCS and the commodities business were transferred to Barclays, and what legal rights might arise as a

---

[4]    Whether or not the LBCS employees were technically employees of LBI (see Sale Hearing Tr. at 114:20-116:10 indicating that all LBCS employees were technically LBI employees), their allocation to LBCS as its "200 employees" and such employees' institutional knowledge of the LBCS business make such employees human capital of LBCS. In any event, this is one of the key issues for which discovery is needed.

result.  Conversely, if LBCS assets were left behind with LBCS, the parties need to discovery to determine who is now monitoring those assets and attempting to maximize their value.

20.     The scope of inquiry under Bankruptcy Rule 2004 is intended to be very broad and permits the moving party great latitude.  In re Valley Forge Plaza Assocs., 109 B.R. 669, 674 (Bankr. E.D. Pa. 1990); In re GHR Energy Corp., 33 B.R. 451, 453 (Bankr. D. Mass. 1983) (stating that scope of Rule 2004 is "unfettered and broad").  In fact, a Rule 2004 discovery request can "legitimately be in the nature of a fishing expedition."  In re Wilcher, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985).  See also In re Johns-Manville Corp., 42 B.R. 362, 364 (S.D.N.Y. 1984).  Moreover, "[b]ecause the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation."  In re Ionosphere Clubs, Inc., 156 B.R. 414, 432 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994).

21.     The discovery that the Trustee seeks from LBHI, LBI, LBCS, and Barclays is plainly within the scope of permissible discovery under Rule 2004.  Discovery sought by the Trustee, as set forth in the document request as Schedule A and the notice of deposition in Schedule B attached to the proposed order as Exhibit 2, will allow the creditors of LBCS's estate to complete a prompt evaluation of whether assets of LBCS were transferred to Barclays and aid in the assessment of the LBCS estate's potential claims against Barclays, as well as ensure that the assets of LBCS – which was to be maintained as an operating business – are being appropriately operated and maximized.[5]  Barclays, LBHI and LBI should be able to comply with

---

[5]     The more integrated such LBCS's business becomes in Barclays' commodities business, the more difficult it will be to ascertain what assets have been transferred to Barclays without compensation to the LBCS estate. Accordingly, it is requested and expected that any relief granted hereunder will be prompt.

this reasonable discovery given that they are already under an obligation to preserve such records pursuant to the Sale Order. (Sale Order at ¶ 31.)

WHEREFORE, the Trustee respectfully requests that the Court: (1) grant certain discovery requests as identified on <u>Schedules A</u> and <u>B</u> to <u>Exhibit 2</u>; (2) order that a discovery and briefing schedule be set with respect to these issues; and (3) grant such other or further relief as is just and proper.

Dated: November 26, 2008

KRAMER LEVIN NAFTALIS & FRANKEL LLP

By: <u>/s/ Amy Caton</u>
    Amy Caton
    Gregory A. Horowitz
    1177 Avenue of the Americas
    New York, New York 10036
    (212) 715-9100

Attorneys for The Bank of New York Mellon Trust Company, N.A., as Indenture Trustee

KL2 2580558.6