Hearing Date: December 16, 2008 at 10:00 a.m. (prevailing Eastern Time)
Objection Deadline: December 12, 2008 at 4:00 p.m. (prevailing Eastern Time)

SAUL EWING LLP
Adam H. Isenberg, Esquire
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102
Telephone: (215) 972-8662
Facsimile: (215) 972-1853
E-mail: aisenberg@saul.com

Attorneys for The Pennsylvania
Convention Center Authority

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------x
                                            :
**In re**                                   :   **Chapter 11**
                                            :
**LEHMAN BROTHERS HOLDINGS, INC.,** *et al*. :   Case No. 08-13555 (JMP)
                                            :
**Debtors.**                                :   (Jointly Administered)
                                            :
----------------------------------------------------------x

**MOTION OF THE PENNSYLVANIA CONVENTION
CENTER AUTHORITY FOR: (A) DETERMINATION THAT AUTOMATIC
STAY DOES NOT PREVENT TERMINATION OF RESERVE FUND
AGREEMENT; OR (B) IN THE ALTERNATIVE, RELIEF FROM THE
AUTOMATIC STAY TO TERMINATE RESERVE FUND AGREEMENT**

**TO THE HONORABLE JAMES M. PECK,**
**UNITED STATES BANKRUPTCY JUDGE:**

The Pennsylvania Convention Center Authority (the "Authority"), by and through its undersigned attorneys, hereby seeks a determination by the Court that the Authority is covered by one or more of the so-called "safe harbor" provisions of the Bankruptcy Code, see, e.g., 11 U.S.C. §§ 555, 556, 559, 560, 561 *et al.* (the "Safe Harbor Provisions"), such that the automatic stay of Section 362(a) of the Bankruptcy Code does not prevent the Authority from terminating

1114934.6 11/26/08

its Reserve Fund Agreement dated as of January 28, 2000 (as amended, the "Reserve Fund Agreement" or the "Agreement") with Lehman Brothers Special Financing, Inc. ("Special Financing"), one of the debtors herein. In the event the Court concludes that the Safe Harbor Provisions do not apply, the Authority seeks, pursuant to Section 362(d)(1) of the Bankruptcy Code, 11 U.S.C. § 362(d)(1), relief from the automatic stay so that it may terminate the Reserve Fund Agreement. In support of the relief sought, the Authority respectfully represents as follows:

## Preliminary Statement

1. The Authority, U.S. Bank National Association, as successor trustee ("US Bank") and Special Financing are parties to the Reserve Fund Agreement, by which Special Financing is to deliver Qualified Securities (as defined below) to US Bank every six months, in exchange for contemporaneous payment of the purchase price for such securities. Special Financing's bankruptcy filing constitutes an event of default under the Reserve Fund Agreement, and gives the Authority the contractual right to terminate the Agreement. The Authority believes that the Reserve Fund Agreement is a "securities contract" and that it is a "financial institution", as such terms are defined in the Bankruptcy Code. As a result, the Authority believes that the automatic stay of Section 362(a) of the Bankruptcy Code does not apply, and that it may terminate the Reserve Fund Agreement without obtaining prior permission from the Court. See 11 U.S.C. §§ 555. Having said this, the Authority does not wish to engage in after-the-fact disputes with the Debtors or any other party-in-interest as to whether it was entitled to terminate the Agreement without Court approval. The Authority accordingly seeks a determination by the Court that the automatic stay provisions of the Bankruptcy Code do not apply, and that the Authority can terminate the Agreement without prior Court approval.

2.  In the event the Court determines that the automatic stay provisions of the Bankruptcy Code do apply, the Authority seeks, in the alternative, relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code so that it can terminate the Reserve Fund Agreement. As detailed below, the Reserve Fund Agreement is significantly "out of the money" for Special Financing and thus has no conceivable monetary or other value to Special Financing's bankruptcy estate. Moreover, the Authority may suffer significant prejudice if it is not permitted to terminate the Reserve Fund Agreement promptly. The Authority is in the midst of a long-planned, approximately $700 million expansion of the Pennsylvania Convention Center (as defined below). The financing required for this expansion will be complex, and is anticipated to include the defeasance of certain outstanding Authority bonds, the issuance of new bonds and – most relevant to this Motion – the use of the approximately $22.9 million now invested through the Reserve Fund Agreement. In order to ensure that this financing can proceed as planned, the Authority requires relief from the automatic stay in order to terminate the Reserve Fund Agreement. Without such termination, the use of the funds subject to the Agreement for the financing of the Convention Center expansion may be in doubt, and the anticipated overall financial package for the Convention Center expansion could be delayed, made even more expensive, and/or jeopardized. The Authority submits that such circumstances, coupled with the Reserve Fund Agreement's complete lack of value to the bankruptcy estate, constitute "cause" under Section 362(a)(1) of the Bankruptcy Code for the granting to the Authority of relief from the automatic stay, if it is determined to be applicable.

### The Debtors' Bankruptcy Filings

3. Commencing on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings, Inc. and certain of its subsidiaries, including Special Financing (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code")[1]. Special Financing filed its bankruptcy petition on October 3, 2008. Since filing their petitions for relief, the Debtors have served as "debtors-in-possession" pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4. An official committee of unsecured creditors (the "Creditors Committee") was appointed by the Office of the United States Trustee on September 17, 2008.

### Jurisdiction and Venue

5. This Court has jurisdiction to hear and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Background

A. **The Authority**

6. The Authority was created pursuant to the Pennsylvania Convention Center Act, the Act of June 27, 1986, P.L. 267, No. 70, as repealed and replaced by the Act of February 5, 2004, P.L. 7, No. 3. The Authority is responsible for maintaining, managing,

---

[1] In addition to these bankruptcy filings, on September 19, 2008, a proceeding with respect to Lehman Brothers Inc. was commenced under the Securities Investor Protection Act of 1970 ("SIPA"). A trustee appointed under SIPA is administering the estate of Lehman Brothers Inc.

furnishing and operating the Pennsylvania Convention Center (the "Convention Center"), a multipurpose, first-class, 1,361,000 square foot convention facility located in the central business district in downtown Philadelphia, which it leases from the City of Philadelphia.

7. The Convention Center is currently financed in part by $229,600,000 of Refunding Revenue Bonds, 2005 Series A (the "2005 Bonds"), which were issued pursuant to a Trust Indenture dated as of December 15, 1989, as amended by a First Supplemental Indenture dated as of December 15, 1989, a Second Supplemental Indenture dated as of June 1, 1994, and a Third Supplemental Indenture dated as of November 1, 2005 (collectively, the "Indenture"), to refund the Authority's Refunding Revenue Bonds, 1994 Series A (the "1994 Bonds").[2] As part of the 2005 refunding, substantially all of the Debt Service Reserve Fund for the 1994 Bonds was transferred to serve as a Debt Service Reserve Fund for the 2005 Bonds, in the amount of approximately $22,960,000 (the "Debt Service Reserve Fund") to serve as a Debt Service Reserve Fund therefore.

B.   **The Reserve Fund Agreement**

8. The proceeds of the Debt Service Reserve Fund are invested through the Reserve Fund Agreement. The Reserve Fund Agreement was originally executed on January 28, 2000 (as so executed, the "Original Agreement"), when the 1994 Bonds were outstanding, and was amended pursuant to an Amendment Agreement dated as of October 25, 2005 (the "Amendment Agreement"), in connection with the issuance of the 2005 Bonds. In connection with such amendment, the Debt Service Reserve Fund was reduced from $24,280,516 to $22,960,000. True and correct copies of the Original Agreement and the Amended Agreement

---

[2]   The 1994 Bonds were issued to advance refund to maturity the Authority's Revenue Bonds, 1989 Series, which had been issued to fund a portion of the cost of building and equipping the Convention Center.

are attached at Exhibit "A". The Original Agreement and the Amended Agreement collectively comprise the Reserve Fund Agreement.

9. Under the terms of the Reserve Fund Agreement, Special Financing is obligated to deliver Qualified Securities[3] to US Bank every six months, in exchange for contemporaneous payment of the purchase price for such Qualified Securities. See Original Agreement, at §§ 2.1, 2.2. Qualified Securities are required to provide a 6.75% annual return to the Authority, and are to mature in sufficient time to provide liquidity, if needed, for the making of semi-annual payments on the 2005 Bonds. Original Agreement, at p. 2 (definition of "Guaranteed Rate"). The Qualified Securities are held in the name of US Bank as trustee under the Indenture for the benefit of the holders of the 2005 Bonds. See Exhibit "B" hereto (US Bank letter dated October 14, 2008 describing manner in which Qualified Securities are held and containing asset holding report as of October 9, 2008).

10. The current set of Qualified Securities is due to mature on February 23, 2009, in the amount of approximately $23,698,000.00. Under the terms of the Reserve Fund Agreement, Special Financing is obligated to deliver the next set of Qualified Securities on March 1, 2009. Amendment Agreement, at p. A-1. The last delivery date for Qualified Securities is March 1, 2019, unless the Reserve Fund Agreement is terminated earlier. Amendment Agreement, at p. A-1.

---

[3] "Qualified Securities" are defined in the Reserve Fund Agreement as, generally, (i) direct obligations of, or obligations the timely payment of principal and interest on which are fully and unconditionally guaranteed by the United States, and (ii) any bond, debenture, notes, participation certificates or other similar obligations issued by any one or combination of the following agencies: Government National Mortgage Association ("GNMA"), Federal National Mortgage Association (if guaranteed by GNMA or back by the full faith and credit of the United States), Federal Land Banks, Federal Home Loan Banks, Federal Intermediate Credit Banks, Banks for Cooperatives, Tennessee Valley Authority, United States Postal Service, Farmers Home Administration, Student Loan Marketing Association, and Export-Import Bank of the United States. See Reserve Fund Agreement, at p. 4 (definition of "Qualified Securities") and p. 2 (definition of "Eligible Securities").

## Relief Requested

11. By the within Motion, the Authority respectfully requests a determination by the Court that the automatic stay of Section 362(a) of the Bankruptcy Code does not apply, such that the Authority may terminate the Reserve Fund Agreement without obtaining prior permission from the Court. In the event the Court determines that the automatic stay provisions of the Bankruptcy Code do apply, the Authority respectfully requests, in the alternative, relief from the automatic stay of Section 362(a) of the Bankruptcy Code, so as to permit the Authority to take all actions necessary or appropriate to terminate its Reserve Fund Agreement with Special Financing.

## Basis for Relief Requested

A. **The Authority is Permitted to Terminate the Reserve Fund Agreement Pursuant to the Safe Harbor Provisions of the Bankruptcy Code**

12. As noted above, the Authority believes that it is within the Safe Harbor Provisions of the Bankruptcy Code such that it may terminate the Reserve Fund Agreement without obtaining prior permission from the Court. Nevertheless, the Authority does not wish to be subjected to potential after-the-fact disputes with the Debtors or other parties as to whether it was entitled to terminate the Agreement without Court approval. It accordingly seeks a Court determination that the Safe Harbor Provisions apply.

13. The Bankruptcy Code sections that comprise the applicable Safe Harbor Provisions are the following:

(a) <u>Section 555</u> – this Section provides in relevant part that:

> The exercise of a contractual right of a . . . financial institution . . . to cause the liquidation, termination, or acceleration of a securities contract, as defined in section 741 of this title, because of a condition of the kind specified in section 365(e)(1) of this title

> shall not be stayed, avoided, or otherwise limited by operation of any provision of this title . . .

11 U.S.C. § 555.

(b) <u>Section 101(22)</u> – this Section provides in relevant part that:

> The term "financial institution" means . . . a Federal reserve bank or an entity that is a commercial or savings bank, industrial savings bank, savings and loan association, trust company, federally-insured credit union, or receiver, liquidating agent, or conservator for such entity <u>and, when any such Federal reserve bank, receiver, liquidating agent, conservator or entity is acting as agent or custodian for a customer . . . in connection with a securities contract . . . such customer</u> . . .

11 U.S.C. § 101(22) (emphasis added).

(c) <u>Section 365(e)(1)</u> – this Section provides in relevant part that:

> Notwithstanding a provision in an executory contract . . . , an executory contract . . . may not be terminated . . . at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on . . . (B) the commencement of a case under this title . . .

11 U.S.C. § 365(e)(1).

(d) <u>Section 741(7)</u> – this Section provides in relevant part that:

> [the term "securities contract" means] (i) a contract for the purchase, sale, or loan of a security . . . [or] a group or index of securities . . . ; . . . (vii) any other agreement or transaction that is similar to an agreement or transaction referred to in this subparagraph. . . .

11 U.S.C. § 741(7).

14. The Authority and the Reserve Fund Agreement would appear to fit squarely within these provisions, in that: (a) the Reserve Fund Agreement is a contract for the "purchase, sale, or loan of a security . . . [or] group of securities" (See <u>Original Agreement</u>, at §

2.1); (b) the Reserve Fund Agreement contains the type of provision referenced in Section 365(e)(1) – that is, that the Agreement can be terminated solely as a result of the bankruptcy filing of Special Financing (See <u>Original Agreement</u>, at § 7.6(c)); and (c) the Authority would appear to be a "financial institution", in that such term, as defined in the Bankruptcy Code, includes a customer where an entity, including a trust company, is acting as agent for that customer. The Authority is a customer[4] of Special Financing and US Bank is a trust company acting as an agent[5] for the Authority. Accordingly, the Authority believes, and respectfully requests that the Court determine, that it is within the Safe Harbor Provisions of the Bankruptcy Code such that it is entitled to terminate the Reserve Fund Agreement without violating the automatic stay of Section 362(a).

**B.     Section 362(d)(1) of the Bankruptcy Code**

15.    As stated above, in the event the Court determines that the automatic stay provisions of the Bankruptcy Code do apply, the Authority respectfully requests, in the alternative, relief from the automatic stay of Section 362(a) of the Bankruptcy Code so as to permit the Authority to terminate the Reserve Fund Agreement.

---

[4] Section 101(22)(A) specifies that a person may be a customer under section 101(22)(A) whether or not a customer as defined in Section 741. Since the Bankruptcy Code provides no other definition of customer, Section 741 is nonetheless instructive. Pursuant to that section, a "customer" includes –

(A) entity with whom a person deals as principal or agent and that has a claim against such person on account of a security received, acquired, or held by such person in the ordinary course of such person's business as a stockbroker, from or for the securities account . . . of such entity . . . (i) for safekeeping; . . . (iii) to cover a consummated sale; (iv) pursuant to a purchase . . .

11 U.S.C. § 741(2)(A).

[5] An agent is a person who is "authorized to act for or in place of another." BLACK'S LAW DICTIONARY 26 (2d ed. 2001). Pursuant to the Reserve Fund Agreement, US Bank is authorized to act for the Authority. For example, if "Lehman causes a Qualified Dealer to deliver Qualified Securities, . . . [US Bank] shall, out of funds available under the Indenture . . . or as otherwise provided by the Issuer . . . purchase such Qualified Securities . . ." See <u>Original Agreement</u>, at § 2.1(b).

16. Pursuant to Section 362(d)(1) of the Bankruptcy Code, the Court, after notice and a hearing, may terminate, annul, modify or condition the automatic stay "for cause, including the lack of adequate protection of an interest in property" of the party seeking relief. 11 U.S.C. § 362(d)(1). The movant has the initial burden of showing a legally sufficient basis, or cause, for lifting the automatic stay. In re Sonnax Indus., Inc., 907 F.2d 1280, 1285 (2d Cir. 1990). Once the movant makes such a showing, the burden shifts to the debtor to prove that it is entitled to the protections afforded by the stay. Id.

17. Except for the "lack of adequate protection" circumstance specified in Section 362(d)(1), neither the Bankruptcy Code nor the legislative history defines the term "for cause." In re Bogdanovich, 292 F.3d 104, 110 (2d Cir. 2002). Whether cause exists to grant relief from the automatic stay must be addressed on a case-by-case basis. In re Enron Corp., 306 B.R. 465, 476 (Bankr. S.D.N.Y. 2004). The court "must consider the particular circumstances of the case and ascertain what is just to the claimants, the debtor, and the estate." In re Mego Int'l Inc., 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983). The court should assess the impact of the stay on all parties and balance the harms as among them. Bogdanovich, 292 F.3d at 110.

18. Affirmative harm to the movant from the continuance of the automatic stay constitutes grounds for relief from the automatic stay. In re Boodrow, 192 B.R. 57, 60 (Bankr. N.D.N.Y. 1995). Bankruptcy courts have consistently held that a failure to perform under a contract post-petition is cause to lift the automatic stay. See, e.g., In re Davis, 64 B.R. 358, 359 (S.D.N.Y. 1986) (debtor's failure to make mortgage payments deem to be grounds for lifting the stay). See also In re M.J. & K. Co., Inc., 161 B.R. 586 (Bankr. S.D.N.Y. 1993) (movant permitted to terminate contract where the debtor's inability to perform under the contract was detrimental to the movant's business).

19. In light of the facts that (a) the Reserve Fund Agreement has no conceivable value for the bankruptcy estate, and (b) the Authority may be significantly prejudiced if it is not permitted to terminate the Agreement promptly, "cause" clearly exists for granting the Authority relief from the automatic stay so that it may terminate the Reserve Fund Agreement.

20. <u>The Reserve Fund Agreement is Significantly "Out of the Money" for Special Financing</u>. Even if Special Financing is able to perform on March 1, 2009, when it is next required to deliver Qualified Securities under the Agreement,[6] it is extremely doubtful that it will do so. As noted above, the Qualified Securities are required to provide a 6.75% annual interest rate to the Authority. This is well above any currently available market rate of interest for securities such as Qualified Securities and would require Special Financing to, in essence, take a substantial loss in order to fulfill its obligations under the Reserve Fund Agreement. For the same reason, Special Financing is extremely unlikely to locate a third party willing to accept an assignment of the Reserve Fund Agreement. What party would agree to be burdened with an agreement that, by the Authority's calculation, is "out of the money" in the amount of approximately $5.0 million? See Exhibit "C" hereto (Affidavit of Michael W. Harris of PFM Asset Management LLC).

21. <u>The Authority Has a Present Need to Terminate the Reserve Fund Agreement</u>. The Authority may be significantly prejudiced if it is not permitted to terminate the Reserve Fund Agreement promptly. As set forth in the Affidavit of Ahmeenah Young, President and Chief Executive Officer of the Authority, attached hereto as Exhibit "D" (the "<u>Young</u>

---

[6] Special Financing's ability to perform under the Reserve Fund Agreement is highly questionable. Available reports indicate that Special Financing has failed to perform under similar contracts with other parties since filing for bankruptcy.

Affidavit"), the Authority is in the process of a significant expansion of the Convention Center, at an anticipated overall cost of approximately $700 million. Young Affidavit, at § 6. This expansion will increase the size of the Convention Center by approximately 960,000 square feet and will bring its total size to approximately 2.2 million square feet. Construction on the expansion has commenced, and is expected to be completed in 2011. Young Affidavit, at § 6.

22.    The financing required for this expansion will be complex, and is anticipated to include the defeasance of the Authority's outstanding bonds, the issuance of new bonds and – most significant for this Motion – use of the approximately $22.9 million now invested through the Reserve Fund Agreement. See Young Affidavit, at § 7. More specifically, this financing is anticipated to include the following:

(a)    The issuance by the Commonwealth of Pennsylvania (the "Commonwealth") of General Obligation Bonds, in one or more series, on a taxable or tax-exempt basis to fund the Commonwealth's contributions under (i) the Capital Budget Itemization Act of 2003-2004, Act of June 22, 2004, No. 40, in which the Pennsylvania General Assembly allocated up to $400 million in capital funds for the expansion of the Convention Center, subject to certain terms and conditions; and (ii) the Capital Budget Itemization Act of 2005-2006, Act of July 7, 2006, No. 83, in which the Pennsylvania General Assembly allocated an additional $300 million in capital funds for the Convention Center expansion, subject to certain terms and conditions. See Young Affidavit, at § 7(a).

(b)    The legal defeasance of the 2005 Bonds through the issuance of one or more series of taxable or tax-exempt bonds (the "Defeasance Bonds"), on a variable and/or a fixed rate basis, by the Pennsylvania Economic Development Financing Authority or such other issuing authority selected by the Commonwealth. See Young Affidavit, at § 7(b).

(c)    The conveyance by the City of Philadelphia to the Philadelphia Authority for Industrial Development, and the conveyance by the Philadelphia Authority for Industrial Development to the Commonwealth or such other authority as the Commonwealth designates, of title to all buildings, improvements and/or fixtures in connection with the Convention Center as well as leasehold interest in the land underlying the Convention Center. See Young Affidavit, at § 7(c).

(d)    The conveyance by the Commonwealth (or its designee) to the Authority of a leasehold interest in the Convention Center. See Young Affidavit, at § 7(d).

(e)    The use of the funds held in the Debt Service Reserve Fund to create a reserve fund in connection with the Defeasance Bonds. See Young Affidavit, at § 7(e).

23.    Unless the Authority is permitted to terminate the Reserve Fund Agreement, its ability to rely upon the Debt Service Reserve Fund in connection with the financing of the Convention Center expansion will be in doubt, and the anticipated overall financial package for the Convention Center expansion could be delayed, made more expensive, and/or jeopardized. Young Affidavit, at § 8.

24.    The Authority submits that the above-described circumstances constitute "cause" under Section 362(d)(1) of the Bankruptcy Code, for the granting to the Authority of relief from the automatic stay to terminate the Agreement.[7]

---

[7] The Authority notes that the Reserve Fund Agreement contains several provisions that permit the termination of the Agreement. As stated above, the Agreement is subject to termination as a result of Special Financing's bankruptcy filing. See Original Agreement, at § 7.6(c). It also can be terminated as a result of the failure of Special Financing to deliver Qualified Securities as required under the Agreement. See Original Agreement, at § 7.6(b). The Agreement also contains provisions permitting it to be terminated in the event of the defeasance of the 2005 Bonds:

> (a)    The [Authority] may, by giving [Special Financing] at least fifteen Business Days prior notice . . . defease . . . the Bonds . . . provided that if the Issuer takes any such action (i) if the Termination Amount is a positive number, the [Authority] shall pay or cause [US Bank] to pay to [Special Financing] in

## Conclusion

25. For the reasons set forth above, the Authority respectfully requests a determination by the Court that the automatic stay of Section 362(a) of the Bankruptcy Code does not apply, and that the Authority may terminate the Reserve Fund Agreement without obtaining prior permission from the Court. In the event the Court determines that the automatic stay provisions of the Bankruptcy Code do apply, the Authority seeks, in the alternative, relief from the automatic stay of Section 362(a) of the Bankruptcy Code, so as to permit the Authority to terminate the Reserve Fund Agreement.

---

> immediately available funds the Termination Amount and (ii) if the Termination Amount is a negative number, [Special Financing] shall pay such amount to [US Bank]. . . .
>
> (b)    Immediately upon payment of the Termination Amount in accordance with this Section 3.1 this Agreement shall terminate . . .

Original Agreement, at § 3.1.

> Assuming the Court grants the Authority the relief requested herein, the Authority likely will terminate the Agreement due to Special Finance's bankruptcy filing rather than in connection with the anticipated defeasance of the 2005 Bonds. In the context of a defeasance, it is not until the Termination Amount (as defined in the Agreement) is paid that the Reserve Fund Agreement terminates. Original Agreement, at § 3.1(b). Given current market conditions, the Termination Amount will almost certainly be payable by Special Financing, and not by the Authority. The likelihood that Special Financing will actually pay the Termination Amount to the Authority is negligible; Special Financing will almost certainly take the position that the Termination Amount, in the context of a defeasance, is a pre-petition claim payable only pursuant to a confirmed plan of reorganization. See 11 U.S.C. § 503(b) (governing administrative claims). Thus, in the context of the defeasance of the 2005 Bonds, the Reserve Fund Agreement may not be terminated, leaving the parties in some degree of uncertainty regarding their rights and, more significantly, potentially jeopardizing the ability of the Authority and others to use the proceeds of the Debt Service Reserve Fund in connection with the financing of the Convention Center expansion. Accordingly, assuming relief from the automatic stay is granted, the Authority anticipates that it will terminate the Agreement due to Special Finance's bankruptcy filing. See Reserve Fund Agreement, at § 7.6(c).

## Notice

26. Notice of this Motion has been provided in accordance with the procedures set forth in the Order entered on September 22, 2008 governing case management and administrative procedures for the Debtors' cases [Docket No. 285].

## No Prior Request

27. No prior request for the relief sought herein has been made to this or any other Court.

Dated: November 26, 2008

                SAUL EWING LLP

                By: /s/ Adam H. Isenberg
                   Adam H. Isenberg, Esquire
                   Centre Square West
                   1500 Market Street, 38th Floor
                   Philadelphia, PA 19102
                   Telephone: (215) 972-8662
                   Facsimile: (215) 972-1853
                   E-mail: aisenberg@saul.com

                   Attorneys for The Pennsylvania
                   Convention Center Authority