Mark N. Berman
NIXON PEABODY, LLP
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3168

and

100 Summer Street
Boston, MA 02110
Telephone: (617) 345-6037

*Counsel to the Metropolitan Transportation Authority*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC., et al., ) | |
| ) | Case No. 08-13555 (JMP) |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |

**LIMITED OBJECTION OF THE METROPOLITAN TRANSPORTATION
AUTHORITY
TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365
OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES
FOR THE SETTLEMENT OR ASSUMPTION AND
<u>ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS</u>**

The Metropolitan Transportation Authority (the "<u>MTA</u>"), by and through its counsel,

Nixon Peabody LLP, hereby submits this limited objection to the motion (the "<u>Motion</u>") of

Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors and debtors in possession in

the above-referenced chapter 11 cases (together, the "<u>Debtors</u>" and, collectively with their non-

debtor affiliates, "<u>Lehman</u>") for an order pursuant to sections 105 and 365 of the Bankruptcy

11229077.5

Code to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts. The MTA respectfully objects as follows:[1]

## I. PRELIMINARY STATEMENT

1. The relief sought in the Motion is overbroad, deprives Counterparties of the statutory protections afforded to them by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and violates the Counterparties' Constitutional due process rights. As demonstrated below, the relief the Debtors seek should be modified to afford the MTA a meaningful opportunity to analyze the creditworthiness and other relevant attributes of any proposed assignee and the ramifications to the MTA of any proposed assignment.

2. The Motion asks the Counterparties and the Court to bless assignments without, in some cases, knowing in advance the identity of the assignee. The proposed procedures (the "Proposed Assignment Procedures") thereby attempt to strip Counterparties, like the MTA, of the right to object to a specific assignment based on the identity of the proposed assignee, leaving a Counterparty like the MTA with no real assurance that the future performance by the assignee will be what they bargained for. It is impossible for the Debtors to meet their obligation to provide adequate assurance without providing Counterparties like the MTA with information beyond a naked credit rating or the Debtors' unilateral determination of an assignee's creditworthiness.

## II. BACKGROUND

3. Commencing on September 15, 2008 and periodically thereafter, LBHI and certain of

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

- 2 -

11229077.5

its subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated and are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.

**The MTA Interest Rate Swap Agreements**

4. The MTA is party to a certain ISDA Master Agreement dated as of April 17, 2003 by and among the MTA and Lehman Brothers Special Financing Inc. ("LBSF") and guaranteed by LBHI. The Master Agreement, together with a related Schedule, an ISDA Credit Support Annex, a Confirmation dated September 9, 2005, an Amendment dated December 12, 2007, and a Confirmation dated December 12, 2007 (collectively, the "Swap Agreements"). The Swap Agreements meet the definition of "swap agreements" set forth in section 101(53B) of the Bankruptcy Code and is therefore are also Derivative Contracts as defined in the Motion.

5. The MTA entered into the Swap Agreements, *inter alia*, to achieve a lower net cost of borrowing for its approved capital program.

**The Reserve Fund Forward Delivery Agreement**

6. The MTA is also party to a certain Reserve Fund Forward Delivery Agreement (the "Forward Delivery Agreement") dated as of July 21, 1999 by and among the United States Trust Company of New York (the "Trustee"), the MTA and Lehman Brothers Special Financing Inc. ("LBSF"). The Forward Delivery Agreement meets the definition of a "securities contract" under section 741(7) of the Bankruptcy Code and is therefore a Derivative Contract as defined in the Motion.

7. The MTA entered into the Forward Delivery Agreement for the purpose of earning a fixed rate of interest on the reserve fund (the "Reserve Fund") established in connection with the issuance of $328,205,000 aggregate principal amount of Certificates of Participation

Evidencing Proportionate Interests in the Principal and Interest Components of Base Rent Paid Severally and not Jointly by the New York City Transit Authority, the MTA and the Triborough Bridge and Tunnel Authority. On each January 1 and July 1 through and including January 1, 2029, LBSF has the option to deliver specified types of low-risk securities (e.g., U.S. government securities or securities issued by federal agencies) to the Trustee in exchange for the cash in the Reserve Fund. The Trustee agrees to purchase the securities on each delivery date for a purchase price which will result in a yield on the securities equal to the fixed rate. The payment of the fixed rate is based upon a notional amount of $11,117,700.00.

8. LBSF has defaulted under each of the Forward Delivery Agreement[2] and the Swap Agreements as a result of its having voluntarily filed a petition under chapter 11 of the Bankruptcy Code.

### III.   ARGUMENT[3]

**A.   Counterparties are Statutorily Entitled to Know the Identity of any Proposed Assignee to Evaluate its Credit-Worthiness as well as any other impact the Proposed Assignee might have on the Counterparty and an Opportunity to Challenge an Assignment to Any Proposed Assignee**

9. If a debtor wishes to assume a contract or, as proposed in the Motion, to assume and assign a contract, even if a contract is not in default, the debtor must provide the non-debtor counterparty adequate assurance of future performance. 11 U.S.C. § 365(f); see e.g. In re C&S Grain Co., 47 F.3d 233 (7th Cir. 1995) (adequate assurance of future performance seeks to assure

---

[2] See Sections 5.4(e) and 7.3(b) and (d) of the Forward Delivery Agreement and Sections 5(a)(vii) of the Swap Agreements. The MTA reserves the right to identify additional defaults.

[3] This Objection primarily addresses the procedural aspects of the Proposed Assignment Procedures. Accordingly, the MTA reserves its right to object to the applicability of section 365 of the Bankruptcy Code to the Forward Delivery Agreement or the Swap Agreements or that either the Forward Delivery Agreement or the Swap Agreements can be assumed or assumed and assigned pursuant to Section 365(b) in light of Section 365(c)(2).

- 4 -

11229077.5

that the non-debtor party will receive the benefit of its bargain); Cinicola v. Scharffenberger, 248 F.3d 110 (3d Cir. 2001). Because the Bankruptcy Code provides no general definition of what constitutes adequate assurance, Courts must make a determination on a case by case basis.

10. A Debtor must present financial evidence about the party from whom such future performance will be required, demonstrating the likelihood that such party has the financial capacity to perform its future obligations. See, e.g., In re PRK Enterprises, Inc., 235 B.R. 597 (E. D. Tex. 1999). Further, a basic tenet of due process in the context of the assumption and assignment of an executory contract is that the non-debtor counterparty is entitled to notice of the identity of the assignee. In re Golden Books Family Enm't, Inc., 269 B.R. 300, 306 (Bankr. D. Del. 2001).

    **(i)**     **Counterparties are Wrongfully Stripped of the Ability to Challenge Assignments to "Qualified Assignees"**

11. The Proposed Assignment Procedures provide that "any assignee or its credit support provider [that has] a Standard & Poor's or Fitch credit rating equal to or higher than A- or a Moody's credit rating equal to or higher than A3, or *any equivalent thereof*" shall be deemed a "Qualified Assignee." Motion at ¶19(b) (emphasis added). Under the Proposed Assignment Procedures a Counterparty is deemed to have received adequate assurance of future performance if a proposed assignee is a Qualified Assignee. Accordingly, the Counterparty is precluded from objecting to the assignment based on a lack of adequate assurance of future performance if the Debtor proposes to assign a Derivative Contract to a Qualified Assignee. Because the Debtors are not obligated to disclose the identity of the Qualified Assignee, a Counterparty has only the credit rating on which to rely.

12. Even assuming that the Debtors will be able to locate Qualified Assignees with the

- 5 -

requisite credit ratings, or alternatively, determine in good faith what constitutes the equivalent of such a credit rating, the Debtors' extremely narrow formulation of adequate assurance is problematic for the MTA.  Under the Proposed Assignment Procedures, the sole indication of a Qualified Assignee's ability to perform in the future is its credit rating.  As has been readily apparent in the recent financial crisis, credit ratings are not always the best indication of a party's creditworthiness.  For example, as recently as September 12, 2008, the Friday before the lead debtor in this case filed for bankruptcy, Standard & Poor's Ratings Services ("S&P") maintained 'A' long-term and 'A-1' short-term counterparty credit ratings, on LBHI.  See *S&P: Lehman Brothers CreditWatch Revised to Developing After Reports of Potential Sale of Company*, *available at* http://www.reuters.com/article/pressRelease/idUS167660+12-Sep-2008+PRN20080912.

13. A credit rating is not the only measure of the true risk of a potential assignee to the MTA.  For example, the Debtors' Proposed Assignment Procedures do not contemplate how a Qualified Assignee's status is affected if at the time of the transfer it has an A- rating from S&P, but is also issued a negative watch designation.  Such a designation could indicate that the Qualified Assignee's credit rating is subject to an imminent downgrade event which is certainly relevant to a determination that the Qualified Assignee will be able to fully perform in the future.  However, under the Proposed Assignment Procedures, a Counterparty would not know of these circumstances until after an assignment has been made, at which point it would be too late for it to object to such assignment.

14. Beyond the financial capability of the assignee, other attributes of the potential assignee could have a substantial impact upon the MTA should either of the Swap Agreements be assumed and then assigned pursuant to the Debtors' Proposed Assignment Procedures.   For

- 6 -

example, if the potential assignee is a foreign entity, an assignment of the Swap Agreements to that entity might have tax consequences to the MTA because of foreign country tax laws not relevant when LBSF was the Counterparty and LBHI the Credit Support Provider. If either LBHI or LBSF had been a foreign entity, then the parties would have used an alternative ISDA swap agreement form tailored to a foreign entity as a counterparty. Accordingly, it is reasonable for the MTA to seek assurance that, as part of the assumption and assignment process, the consequences of performance by the proposed assignee, whether a Qualified Assignee or otherwise, will be the same to the MTA as if LBHI and LBSF were continuing to perform their obligations under the Swap Agreements.

15. To protect MTA's interests, including its interest in having adequate assurance of future performance, the MTA completed a rigorous selection process in 2006 to identify and approve eligible counterparties. This process required proposers to respond in writing to detailed questions concerning their fitness to serve as a counterparty to MTA on derivative transactions. MTA selected the group of eligible counterparties on four distinct criteria that were independently scored by a selection committee. The selections and the rationale were then presented to the Board of Directors for approval on February 27, 2007. The list was further amended on October 31, 2008 directly in response to the bankruptcy filing by LBSF.

16. To now provide this assurance in connection with future performance, the MTA believes that the following criteria should be imposed beyond the simple credit rating of the proposed assignee:

- the proposed assignment will not result in the violation of any law, regulation, rule, judgment, order or other legal limitation or restriction applicable to the MTA;
- the proposed assignment will not result in a violation of the MTA's counterparty eligibility or credit practices or policies or exposure limitations; and

- such transfer does not result in any actual or potential adverse tax consequences to the MTA, including the obligation to deduct or withhold an amount with respect to any tax from payments required to be made to the proposed assignee, the receipt of payments from the proposed assignee from which amounts with respect to any tax may be deducted or withheld or the imposition of any tax, levy, impost, duty charge, or fee of any nature by any government or taxing authority which would not have been imposed but for such the proposed assignee.

**(ii)    The Proposed Assignment Procedures Allow the Debtors to Unilaterally Designate Qualified Assignees Without any Oversight**

17. The Proposed Assignment Procedures do not provide adequate assurance of an assignee's future performance. The Proposed Assignment Procedures simply state, without any further explanation, that a Qualified Assignee must meet a minimum credit rating as issued by the three ratings agencies or "any equivalent thereof." This expansive definition of Qualified Assignee appears to grant the Debtors the sole discretion to determine what constitutes the equivalent of an A-/A3 rating, and accordingly provides the Debtors with unchecked latitude to designate almost anyone a Qualified Assignee without any justification or clarification.

18. The Proposed Assignment Procedures do not provide any opportunity for Counterparties to object to this "equivalency" standard. Further, the Proposed Assignment Procedures do not even require the Debtors to disclose how such a determination was made. As long as the Debtors designate a proposed assignee a Qualified Assignee, Counterparties will not know the credit rating, identity or financial condition of the proposed assignee, and will have to rely solely on the Debtor's judgment based on an amorphous standard. Such a broad and expansive definition of Qualified Assignee does not protect a Counterparty's statutory right to adequate assurance.

**(iii)    Counterparties Should be Provided With the Same Rights and Information That the Debtors Provide to the Committee**

19. The Debtors propose that in an instance where the Debtors fail to obtain bids from at

- 8 -

11229077.5

least four (4) potential assignees they will seek the Committee's consent for the designation of an assignee. This ignores the rights of, and impact to, the actual party-in-interest, the Counterparty. The Proposed Assignment Procedures should require that in the event the Debtors fail to obtain bids from at least four (4) potential assignees, that it should obtain the consent of the Counterparty for such assignment. In addition, the MTA believes that all bids received by the Debtors relative to the Forward Delivery Agreement or either of the Swap Agreements should be shared with MTA so that it is in a position to evaluate the impact of each on the MTA and to make a presentation to the Court based upon all relevant information should it decide to object to the Debtors' proposed assignee.

20. Although the assignments are sought to monetize the Debtors' assets and maximize distributions to creditors, this should not be done at the expense of the Counterparties. In certain circumstances, it may be appropriate for the Debtors to accept a lower bid for a given Derivative Contract to provide a Counterparty with an assignee with a higher credit rating or appropriate level of creditworthiness. The onus is on the Debtors to demonstrate that the Counterparty is adequately protected. This is an independent and distinct analysis from the Debtors' determination that it has received the "highest and best offer" in its business judgment for the assignment of a particular Derivative Contract. Therefore, the Debtors should be required to disclose to the MTA the identity, credit rating, and any other pertinent financial information of each of the parties placing a bid on such Derivative Contract.

### IV.    RESERVATIONS OF TERMINATION RIGHTS

21. Each of the Swap Agreements and the Forward Delivery Agreement permits the MTA to terminate either Swap Agreement or the Forward Delivery Agreement because either LBHI or LBSF, or both, have filed chapter 11 petitions. Sections 555, 560, and 362(b)(6) and

11229077.5

(7) of the Bankruptcy Code provide the MTA with the absolute right to terminate either of the Swap Agreements or the Forward Delivery Agreement as a result of the default occasioned by LBHI or LBSF having filed their chapter 11 petitions. Assuming the Court grants the relief sought by the Debtors in their Motion, i.e. putting in place either the procedure requested by the Debtors or a modified procedure that accommodates the concerns expressed above, the MTA reserves the right to terminate either of the Swap Agreements or the Forward Delivery Agreement prior to their assumption and assignment by the applicable Debtor.

## V.   CONCLUSION

WHEREFORE, the MTA requests that any Order granting the relief sought in the Motion be modified to:

(a) require that the Debtors provide to the MTA, contemporaneously with any Assignment Notice, the credit rating, identity, and any other known financial information regarding any proposed assignee that demonstrates such assignee's creditworthiness irrespective of whether such proposed assignee is a Qualified Assignee as well as the identity, credit rating, and any other pertinent financial information of each of the parties placing a bid on such Derivative Contract;

(b) afford the MTA the opportunity to file and for this Court to consider on a prompt basis an objection to any proposed assignment, whether to a Qualified Assignee or otherwise, based upon the considerations identified in this Motion;

(c) clarify the methodology the Debtors will use in determining what constitutes the equivalent of an A-/A3 credit rating; and

(d) grant such other and further relief as this Court deems necessary and appropriate.

Dated: New York, New York
November 26, 2008

Respectfully Submitted,

By: /s/ Mark N. Berman
Mark N. Berman
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3168
Facsimile: (212) 940-3111

and

100 Summer Street
Boston, MA 02110
Telephone: (617) 345-6037
Facsimile: (866) 382-5868
*Counsel to the Metropolitan Transportation Authority*

- 11 -

11229077.5