KUTAK ROCK LLP
1650 Farnam Street
Omaha, NE 68102-2186
Tel: (402) 346-6000
Facsimile: (402) 346-1148
John J. Jolley, Jr., Esq. (JJJ 0253)
Peter J. Barrett, Esq. (PJB 9807)
Thomas T. Roubidoux, Esq. (TTR 3428)
jay.jolley@kutakrock.com
peter.barrett@kutakrock.com
thomas.roubidoux@kutakrock.com

*Attorneys for The City and County of Denver, Colorado*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re** | **Chapter 11** |
| **LEHMAN BROTHERS HOLDINGS INC., et al.,** | **Case Nos. 08-13555 (JMP)** |
| **Debtors.** | **(Jointly Administered)** |

**OBJECTION OF THE CITY AND COUNTY OF DENVER, COLORADO**
**TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS**
**105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES**
**FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF**
**PREPETITION DERIVATIVE CONTRACTS**

The City and County of Denver, Colorado ("Denver") hereby objects to the Debtors'

Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish

Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative

Contracts [D.I. #1498] (the "Motion") and in support thereof states as follows:

**Background**

1.   Lehman Brothers Special Financing Inc. ("LBSF") and Denver are parties to (a)

that certain Airport System Master Interest Rate Swap Agreement, dated January 1, 1998,

between LBSF and Denver for and on behalf of the Department of Aviation and the Confirmation thereunder dated January 22, 1998 in the initial notional amount of $100,000,000 and (b) that certain ISDA Master Agreement, dated June 1, 2006, between LBSF and Denver for and on behalf of the Department of Aviation, the Schedule thereto, and the Confirmation thereunder dated June 1, 2006 in the initial notional amount of $120,566,666.67 (the foregoing, collectively, the "Denver Swap Agreements").

2.    Because LBSF had no independent assets as capital, the obligations required of LBFS under each of the Denver Swap Agreements were guaranteed by LBFS's parent, Lehman Brothers Holdings Inc. ("Holdings"), as the credit support provider under the Denver Swap Agreements.

3.    On September 15, 2008, Holdings filed a petition for relief under chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").  On October 3, 2008, LBSF filed its own petition for relief under the Bankruptcy Code.  The chapter 11 cases of Holdings and LBSF, debtors and debtors in possession, together with the Chapter 11 cases of certain affiliates of Holdings and LBSF, are currently jointly administered under Case No. 08-13555 (the "Bankruptcy Cases") currently pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

## The Motion

4.    As described in the Motion, the Debtors seek to create an expedited process (the "Procedures") through which the Debtors will assume and assign derivative contracts ("Derivative Contracts"), including but not limited to swap agreements such as the Denver Swap Agreements, entered into by the Debtors and their debtor affiliates prior to the commencement of the Bankruptcy Cases.

4823-9628-9027.3

5.   If approved by the Bankruptcy Court, the Procedures provide that the Debtors may initiate the assumption and assignment of Derivative Contracts by serving the contract counterparty (a "Counterparty"), such as Denver, with a notice of assignment (the "Assignment Notice") together with a copy of the Order approving the Motion.  Service would be effected by overnight mail delivery, facsimile or e-mail at the last known mail address, facsimile number or e-mail address available to the Debtors.

6.   In addition to basic information, such as the name and address of the Counterparty and the Derivative Contracts to be assigned, the Assignment Notice would also include a proposed amount, calculated by the Debtors, to be paid to a Counterparty (or otherwise available to the Counterparty as a setoff to amounts owed to the Debtors) to cure existing defaults (the "Cure Amount") and, if applicable, provide for the return of any posted collateral or the payment of its equivalent value in cash.

7.   However, what the Assignment Notice does <u>not</u> include is the identity of the proposed assignee of the subject Derivative Contract so long as the assignee contemplated by the Debtors is a "Qualified Assignee." As defined in the Procedures, a "Qualified Assignee" is any entity (or its credit support provider, if any) having a credit rating of at least "A-" (as rated by Standard and Poor's or Fitch) or "A3" (as rated by Moody's).  What is also absent from the Assignment Notice is any documentation or assumption agreement pursuant to which the proposed assumption and assignment would be effected.

8.   Under the Procedures proposed by the Debtors, a Counterparty receiving an Assignment Notice would have five business days to object to the proposed assumption and assignment of the related Derivative Contract identified in the Assignment Notice (the "Objection Deadline").  Counterparties would be required to effect service of any such objection,

in writing, to the Debtors so that it is <u>actually received</u> by the Debtors no later than the Objection Deadline.

9.   For Counterparties objecting to the Cure Amount proposed by the Debtor, the Procedures would require that such an objection provide the amount of the Cure Amount alleged by the Counterparty, with such Cure Amount identified on a transaction-by-transaction basis, together with supporting "calculations and detail of specific charges and dates, and any other amounts receivable or payable . . . and, in any event, containing no less detail than the calculations of the Cure Amount provided by the Debtors . . . ."

10.   However, to the extent the Debtors contemplate an assignment to a Qualified Assignee, the Procedures prohibit a Counterparty from objecting to any Assignment Notice on the basis that the Counterparty has not received adequate assurance of future performance with the Procedures.   Instead, the Procedures dictate that a Qualified Assignee (even one whose identity is withheld from the Counterparty) is deemed *per se* adequate assurance of future performance.

11.   Under the Procedures, if a Counterparty fails to timely object to an Assignment Notice, the Counterparty is deemed to have consented or agreed: (a) to the Cure Amount, if any, set by the Debtors; (b) that the assignee has given adequate assurance of future performance within the meaning of Section 365(b)(1)(C) of the Bankruptcy Code; (c) that all defaults or early termination events under the Derivative Contact (such defaults and events, other than the commencement of the Bankruptcy Cases, "Defaults") arising or continuing prior to the assignment have been cured by the Debtors or waived by the Counterparty; and (d) that the terms of the order approving the Motion apply to the assignment.

12.    In the event a Counterparty timely serves an objection to the Assignment Notice, the Procedures provide that the Debtors and the Counterparty may attempt to resolve any dispute by consensual agreement or permit the Debtors to petition the Bankruptcy Court for authorization to consummate the assignment notwithstanding such objection.

13.    The Debtors' Procedures do not contemplate any form of assignment and assumption agreement be entered into among the Debtors, the assignee, the Counterparty or any combination thereof.

14.    As more fully set forth below, because the Debtors' Procedures fail to satisfy the requirements of Sections 365(c) and 365(b) of the Bankruptcy Code, impose unreasonable requirements that do not satisfy due process and seek relief beyond the scope of Section 105 of the Bankruptcy Code, the Debtors Motion must be denied.

<u>**Objections and Arguments**</u>

**A.    Section 365(c) Prevents Assignment of the Denver Swap Agreements to an Assignee Contemplated By the Motion.**

15.    Section 365(c) of the Bankruptcy Code provides that a trustee or debtor-in-possession:

> may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession whether or not such contract, or lease, prohibits or restricts assignment of rights or delegation of duties; and
>
> (B)  such party does not consent to such assumption or assignment . . . .

11 U.S.C. § 365(c).  Although personal service contracts are almost universally held to fall within the ambit of Section 365(c) as contracts that may not be assumed and assigned absent

consent of the non-debtor party, the section is not to be read so narrowly as to exclude other forms of contracts. *In re Grove Realty*, 200 B.R. 502, 506 (Bankr. E.D.N.Y. 1996) (stating "it is now well established that Section 365(c)(1) does not apply solely to personal service contracts.").

### Withholding the Identity of a "Qualified Assignee" Renders the Procedures Fundamentally Flawed Under Section 365(c)

16.    It is a foundational tenet of the law of contracts that "everyone has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent, '[imbued with] the right to the benefit you anticipate from the character, credit and substance of the party with whom you contract.'" *Arkansas Valley Smelting Co. v. Belden Mining Co.*, 127 U.S. 379, 387 (1888) (quoting Lord Denman). That this most basic right is preserved in the Bankruptcy Code is evidenced by Section 365(c), which operates to prevent the assumption and assignment of an executory contract where a material change in the identity of the entity from whom performance is to be rendered excuses a party from accepting such performance. Essential to any such determination is the <u>identity</u> of the proposed assignee, something that the Debtors seek to withhold from Denver and other Counterparties to Derivative Contracts.

### Ordinances Enacted by Denver Are "Applicable Law" That Excuse Acceptance of Performance From a "Qualified Assignee"

17.    For purposes of Section 365(c)(1)(A), "applicable law" means "*all laws* which are concerned with both the assignment of rights and the delegation of duties." *In re Grove Realty*, 200 B.R. at 506 (emphasis added). Moreover, "applicable law" has been held to include municipal and local ordinances which are "entitled to [no] less respect than legislation enacted on a statewide basis" so long as such ordinance is a "law of general applicability" and not one

which "merely embod[ies] or make[s] enforceable limitations on assignment that are contained within a contract . . ." *In re Adelphia Comm. Corp.*, 359 B.R. 65, 75-77 (Bankr. S.D.N.Y. 2007).

18.    Denver has promulgated ordinances and extensive and comprehensive policies, as have many municipalities, governing with whom and on what terms they may enter into contracts such as the Derivative Contracts. Beyond good business sense, such ordinances and policies are enacted and adopted by municipalities and their officials in furtherance of their obligations as prudent stewards and fiduciaries of the public trust.

19.    In furtherance of its authority to enter into agreements such as Derivative Contracts, Denver adopted its Master Derivatives Policy dated March 1, 2005 (the "Master Policy"). In connection with each of the Denver Swap Agreements, Denver enacted a "swap ordinance" consistent with the Master Policy (the "Swap Ordinances") to permit Denver to enter into the Denver Swap Agreements. Under the Master Policy and the related Swap Ordinances, Denver is only permitted to enter into the Denver Swap Agreements with a counterparty who's credit rating is at least "Aa3" or "AA-" or, if rated lower than these categories, with a counterparty providing additional credit enhancement, including but not limited to posting additional collateral, etc., all as more fully set forth in the Master Policy and the Swap Ordinances.

20.    Through their Motion, the Debtors' seek to force upon Denver an unnamed assignee solely on the basis of a credit rating of A-/A3. Without more—and Debtors propose nothing more—Debtors will effectively cause Denver to do what it could not otherwise do without violating its Master Policy and the related Swap Ordinance, *i.e,.* enter into a swap contract and accept performance from a counterparty without the requisite creditworthiness.

21.    Because applicable law excuses Denver from accepting performance from an assignee whose identity is unknown or, alternatively, from an assignee who does not meet the eligibility criteria established by ordinance, an assignment made pursuant to the Procedures, absent Denver's consent, violates Section 365(c) of the Bankruptcy Code and therefore the Debtors' Motion must be denied.

**B.    An Assignee's Credit Rating, Without More, Does Not Constitute Adequate Assurance of Future Performance As Required By Section 365(b)(1)(C).**

22.    Section 365(b)(1) sets forth the following conjunctive tripartite test:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> > (A)  cures, or provides adequate assurance that the trustee will promptly cure, such default;
> >
> > (B)  compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)   provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  With respect to Section 365(b)(1)(C), the terms "'adequate assurance of future performance' are not terms of art, but were intended to be given practical, pragmatic construction [and] what constitutes adequate assurance is to be determined by factual conditions."  *In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981). Inherent in Section 365 is that such a determination is properly the province of the Bankruptcy Court, not the Debtors.  *See, e.g., cf. In re Ames Dept. Stores, Inc.*, 316 B.R. 772, 794-95 (Bankr. S.D.N.Y. 2004) (discussing the court's responsibility to examining the particular facts and circumstances in making the determination of assignability for purposes of  § 365(f)).

23.   If approved, the Debtors' Procedures will deem as a "Qualified Assignee" any entity solely on the basis that such assignee meets the A-/A3 credit rating proposed by the Debtors.   Moreover, the Debtors' Procedures will deem any assignment made to a Qualified Assignee as *per se* "adequate assurance of future performance" satisfying the requirements of Section 365(b)(1)(C).   Through their Motion, the Debtors are asking this Court to forego any other factual inquiry as relevant and adopt the position of the Debtors that no other factor— including, but not limited to, the identity of such assignee—need be considered in order to satisfy Section 365(b)(1)(C).

24.   As discussed above, Denver's Master Policy sets forth the criteria for evaluating and identifying the universe of acceptable swap providers with whom it may contract.   Although the credit rating of the provider of such contracts is an important element in the evaluative process dictated by such policies, it is by no means the only factor to be considered.   In fact, the Derivatives Checklist developed by the Government Finance Officers Association[1] sets forth some forty-seven criteria to be considered by municipalities when entering into contracts such as Derivative Contracts.   With respect to the selection of a provider of such contracts, no less than six criteria are directly relevant to the evaluation process, including but not limited to the amount of risk to which a municipality is exposed vis-à-vis a given counterparty, a criterion also found in the Master Policy adopted by Denver.

25.   The existence of adequate assurance of future performance is a factual determination to be made by Courts on a case-by-case basis to ensure that the non-debtor party gets the bargain for which they have contracted.   *See, e.g.*, *Matter of National Shoes, Inc.*, 20 B.R. 55, 59 (Bankr. S.D.N.Y. 1982); *In re Lafayette*, 9 B.R. at 998.   Through their Motion and,

---

[1] Derivatives Checklist supplementing "Use of Debt-related Derivatives Products and the Development of a Derivatives Policy (2003 and 2005)(DEBT)," Government Finance Officers Association (Approved by the GFOA's Executive Board on October 11, 2005).

more specifically, the Debtors' "one size fits all" credit ratings approach being proposed in the Motion, the Debtors essentially seek to remove from the Bankruptcy Court's purview the factual determination required of the Bankruptcy Court by Section 365(b)(1)(C).  Although the Debtors ask the Bankruptcy Court to accept an assignee's credit rating as a perfect substitute for adequate assurance of future performance, conspicuous by its absence is the Debtors' explanation as to how credit rating, alone, is predictive of the *future* performance of such assignee.[2]

26.    Because an assignment made pursuant to the Debtors' Procedures does not provide adequate assurance of future performance, such an assignment fails to satisfy the requirements of Section 365(b) of the Bankruptcy Code and therefore the Debtors' Motion must be denied.

**C.    The Five-Day Period for Notice and the Objection Deadline is Unreasonable and Raises Procedural and Substantive Due Process Issues.**

27.    As set forth in the Procedures, Debtors propose serving an Assignment Notice with as little as five days' notice of a proposed assignment and require that a Counterparty deliver a written objection no later than five business days following service of the Assignment Notice.  In addition to the five-day deadline, the Debtors also require that any objection be *actually received* by the Debtors within such five-day objection period.  Counterparties are required to state with specificity their objection to any Cure Amount proposed by the Debtor, supported by calculations, detail of specific charges and dates, and any other amounts receivable or payable—all on a transaction-by-transaction basis—and identify any other defaults that must be cured, or risk being subject to the finality of the Order that the Debtors now request.

---

[2]  Such omission is made all the more interesting given that, on the morning it commenced its bankruptcy case, Holdings' own credit rating (as the credit support provider for LBSF) was at or above the very credit rating category that Debtors now propose.

28.     Through their Procedures, Debtors effectively set into motion a de facto proceeding, commenced upon service of an Assignment Notice, that will impose upon the Counterparty a five-day objection deadline that, if not timely or falling short of the content required by the Debtors' Procedure, will result in a deemed acceptance of assignment subject to the terms of the prospective Order sought by the Debtors.

29.     As stated by the United States Supreme Court in *Mullane, Special Guardian v. Central Hanover Bank & Trust Co.*:

> [a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  The notice must be of such nature as reasonably to convey the required information and *it must afford a reasonable time* for those interested to make their appearance.  But when notice is a person's due, process which is a mere gesture is not due process.

*Mullane, Special Guardian v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314-315 (1950).  Under the guidance articulated in *Mullane* or by any measure, the Objection Deadline and the requirements imposed by the Debtors in order for an objection to be deemed effective is patently unreasonable.

30.     As justification for the imprimatur they ask the Bankruptcy Court to affix to the Debtors' Procedures, the Debtors point to "similar orders creating procedures for the assignment or settlement of derivatives contracts" entered by bankruptcy courts in the *Mirant*, *Enron* and *NRG Energy* bankruptcies.  Although the orders entered in these cases may have involved procedures and may have also involved derivatives contracts, the Debtors have apparently overlooked the fact that the procedures approved in the referenced orders bear little resemblance to the procedures the Debtors now ask the Bankruptcy Court to approve through their Motion.  One need only perform a cursory review of the *Mirant*, *Enron* and *NRG* orders to determine that

the procedures approved by these orders did not involve or address the assumption and assignment of executory contracts or the issues associated with satisfying the Bankruptcy Code's requirements for adequate assurance of future performance. To the contrary, the procedures approved by the *Mirant*, *Enron* and *NRG* courts, unlike the instant Motion being presented by the Debtors, merely established expedited processes for the approval of previously negotiated settlements of the type permitted by and pursuant to Fed. Bankr. R. 9019 relating to terminated derivative contracts.

31. The Debtors' Procedure does not satisfy the basic requirements of due process articulated in *Mullane* because the Objection Deadline imposed by the Procedures does not afford the reasonable opportunity for a Counterparty to present their objections to an Assignment Notice or a Cure Amount. Accordingly, the Debtors Motion should be denied.

**D.    The Relief That the Debtors Seek Pursuant to Section 105 of the Bankruptcy Code Cannot Be Granted as it Modifies the Substantive Rights of the Counterparties Set Forth Under the Derivatives Contracts.**

<u>**The Debtors Seek to Alter Substantive Rights of Counterparties**</u>

32. Unlike the procedures approved by the *Mirant*, *Enron* and *NRG* courts cited by the Debtors, the authority that the Debtors seek by their Motion is not merely procedural in nature. Through their Motion, the Debtors seek to alter contractual rights set forth in the Derivative Contracts, including the Denver Swap Agreements, as negotiated between the Debtors and the affected Counterparty, and restrict the application of the provisions of the Bankruptcy Code and applicable non-bankruptcy law.

33. Although the exigencies of the Debtors' circumstances may be significant, Section 105 of the Bankruptcy Code, under which the Debtors seek their relief, does not allow the Bankruptcy Court to override explicit mandates of other sections of the Bankruptcy Code or mandates of other state or federal statutes. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197,

206 (1988); *In re Barbieri*, 199 F.3d 616, 620-12 (2d Cir. 1999); *In re Rashid*, 97 B.R. 610, 615

(W.D. Okla. 1989). As frequently stated and followed by bankruptcy, district and courts of

appeal, Section 105 of the Bankruptcy Code does not authorize the bankruptcy courts to create

substantive rights that are otherwise unavailable under applicable law, or constitute a roving

commission to do equity. *United States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986).

34.    The Denver Swap Agreements provide (with comparable provisions likely to be

found in most, if not all, Derivative Contracts) that it is the non-defaulting party who is vested

with the right to calculate damages arising as a result of a default. In the case of the Denver

Swap Agreements, Denver is entitled, as the non-defaulting party, to calculate the amount of any

payment to be made to the Debtors or to Denver, as the case may be, pursuant to the terms of the

Denver Swap Agreements. This right is more than a ministerial function, as it is the non-

defaulting party—Denver, in this case—that is entitled to offset against amounts otherwise owed

to the Debtors (or, conversely, increase the amount owed by the Debtors) for, among other

things, costs and expenses incurred in the enforcement of the agreement, loss of bargain, and the

applicable rate of interest owed by the defaulting party—in this case, the Debtors—all calculated

as a function of non-defaulting party's cost of funds. However, through their Procedures and,

more specifically, the Debtors' calculation of the Cure Amount included in an Assignment

Notice, the Debtors seek to preemptively take control of the calculation process by presenting to

the Counterparty a Cure Amount calculated without any actual knowledge as to the costs,

expenses or cost of funds of the Counterparty. For example, Denver has already incurred

substantial expenses and costs in trying to protect its rights and to enter into an acceptable

replacement transaction as a result of the termination event precipitated by the Debtors'

Bankruptcy Cases. It is not clear that the definition of Cure Amount includes all such amounts

that Denver would have been entitled to recover had Denver had been allowed to find a replacement swap provider and then terminated the Denver Swap Agreements, something that Denver is clearly permitted to do under the agreements, rather than having an assignment thrust upon them as contemplated under the Debtors Procedures.

35.    Having hijacked the Counterparty's contractual rights, the Debtors would present such Cure Amount, apparently calculated out of whole cloth, to a Counterparty in the Assignment Notice, an action taken at a point in time solely at the Debtors choosing.  Having shifted the burden to the Counterparty, the Debtors essentially leave it to the Counterparty to sort out the Cure Amount, requiring the Counterparty to make such adjustments, perform such supportable calculations, and properly serve its objection all in a mere five days.

### Absent an Assumption Agreement, any Assumption and Assignment Made Under the Procedures Fails to Satisfy Established Case Law and Essential Contract Principles

36.    The Debtors do not propose a form of assumption agreement nor do they propose any other form of agreement between a Counterparty and any assignee to establish that such assignee has, in fact, even agreed to assume the obligations of the Debtors under the Derivative Contract.  It is well established in case law that an executory contract must be assumed with all its burdens and its material provisions unchanged.  *See*, *e.g.*, *In re Klein Sleep Products, Inc.*, 78 F.3d 18, 24 (2d Cir. 1996) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract *cum onere* . . .) (quoting *NLRB v. Bildisco & Bildisco*, 465 U.S. 513 (1984)).

37.    At a minimum, an assumption agreement provides at least some level of assurance to a contracting party, such as a Counterparty, that the assumption and assignment satisfies one of the essential requirements of Section 365, that *all* obligations are being assumed by the Debtors and assigned.  This requirement is not satisfied merely because the assignment is

4823-9628-9027.3

deemed to have been consented to by a Counterparty, as the Debtors propose under their Procedures, nor is the requirement satisfied by a statement to that effect made by an assignee. Although such a statement may satisfy one of the basic tenets of contract law—assent—it does nothing to establish whether the assignee has the requisite capacity, ability or even the legal authority to meet its obligations under the Denver Swap Agreements or any other Derivative Contact for that matter.  This can only be established through diligence, customary closing opinions of counsel addressing corporate matters and enforceability issues and obtaining the basic representations and warranties, none of which are provided for under their Procedures.

38.   Because the Debtors Procedures seek to modify substantive rights of Denver and similarly-situated Counterparties under the terms of their Derivative Contracts, including the Denver Swap Agreements,  the relief requested by the Debtors exceeds to scope of Section 105 of the Bankruptcy Code.  Accordingly, the Debtors' Motion should be denied.

### Reservation of Rights

39.   Denver reserves its rights to terminate the Denver Swap Agreements in accordance with the terms thereof, the relevant sections of the Bankruptcy Code, including but not limited to  Sections 365 and 560 thereunder, and other applicable law.

[remainder of page intentionally left blank]

WHEREFORE, for the reasons set forth herein, The City and County of Denver, Colorado requests:

1.      that the Court enter an order denying the Debtors' Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts; and

2.      such other and further relief to which it may show itself to be entitled.


Dated: Omaha, Nebraska
        November 26, 2008


                          Respectfully submitted,

                          KUTAK ROCK LLP


                          By:    *s/s John J. Jolley*
                                John J. Jolley, Jr., Esq. (JJJ 0253)
                                Peter J. Barrett, Esq. (PJB 9807)
                                Thomas T. Roubidoux, Esq. (TTR 3428)
                                Kutak Rock LLP
                                1650 Farnam Street
                                Omaha, NE 68102-2186
                                Tel:  (402) 346-6000
                                Facsimile:  (402) 346-1148

                          *Attorneys for The City and County of Denver,
                          Colorado*

4823-9628-9027.3