Hearing Date:  December 3, 2008 at 10:00 a.m.

BLANK ROME LLP
Attorneys for the Delaware River Port Authority
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
Andrew B. Eckstein
Rocco A. Cavaliere

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) Jointly Administered |
| Debtors. | |

**OBJECTION OF THE DELAWARE RIVER PORT AUTHORITY TO DEBTORS'
MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE
BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR
ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

The Delaware River Port Authority (the "Authority") hereby submits this objection (the "Objection") to the motion of the above-captioned debtors (the "Debtors") for an order pursuant to §§ 105 and 365 of chapter 11 of title 11 of the United State Code (the "Bankruptcy Code") to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts (the "Motion").  In support of the Objection, the Authority respectfully states as follows:

**Background**

1.     On September 15, 2008, and thereafter, several of the Debtors, including Lehman Brothers Holdings, Inc. ("LBHI") filed Chapter 11 bankruptcy petitions in this Court.  On

103374.00318/6688563v.3

October 5, 2008, Lehman Brothers Financial Products, Inc. ("LB Financial") filed a Chapter 11 bankruptcy petition.

2. On September 17, 2008, the Office of the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "Committee") in the Debtors' cases.

### Debtors' Derivative Contracts with The Authority

3. The Authority and LB Financial entered into an option relating to an interest rate swap in the initial notional amount of $66,065,000. The interest rate swap is governed by an ISDA Master Agreement (the "Master Agreement") and a Schedule to the Master Agreement (the "Schedule") between the parties each dated as of November 15, 2001 and a Confirmation dated November 15, 2001 (collectively, the "Agreement"). LB Financial exercised its option to commence the swap on August 30, 2007 and the swap became effective on January 1, 2008. The Agreement requires the Authority and LB Financial to make periodic payments based upon the outstanding notional amount; as to the Authority, at a specified fixed rate, and as to LB Financial, at a specified percentage of the then- prevailing one month LIBOR index. As provided in the Agreement, only the net payment is made by the applicable party.

4. The filing of a voluntary chapter 11 petition by LB Financial constitutes an "Event of Default" under the Agreement. *See Agreement,* § 5(a)(vii). Pursuant to Section 6(a) and Part 1(e) of the Agreement, upon the occurrence of an Event of Default, the non-defaulting party, in this case, the Authority, may, upon notice to LB Financial, designate an "Early Termination Date" (as defined in the Agreement) in respect of all outstanding transactions under the Agreement. *See Agreement,* § 6(a). On November 24, 2008, the Authority exercised its right to terminate the Agreement by delivering a notice to LB Financial (the "Termination Notice").

The Termination Notice designates December 1, 2008 as the Early Termination Date. The amount of payments due from the Authority will be determined in accordance with specific negotiated provisions under the Agreement.

## The Debtors' Motion

5.  The Debtors' Motion seeks to establish procedures in connection with assumption and assignment of certain "Derivative Contracts" (defined in the Motion) that have not yet been terminated by various counterparties (the "Assignment Procedures"). Furthermore, the Debtors' Motion seeks to establish expedited procedures in connection with settlement of terminated Derivative Contracts (the "Termination Procedures"). The Assignment Procedures and the Termination Procedures vary from the procedures set forth in and negotiated in the Agreement.

## Objection To Motion

6.  The Motion impermissibly seeks to impair counterparties' rights under various derivative contracts which were negotiated by such counterparties with LB Financial. The Agreement between the Authority and LB Financial has been validly terminated by the Authority in accordance with its terms. Accordingly, the Assignment Procedures do not apply to the Agreement. However, because the Debtors, in their Motion, reserve their right to argue that counterparties may not have validly terminated their respective Derivative Contracts, out of an abundance of caution and expressly reserving all of its rights, the Authority submits the following objections to the Assignment Procedures. *See Motion*, p. 4, f.n. 2.

7.  First, the Agreement expressly prohibits assignment or transfer of a counterparty's obligations under the Agreement without the consent of the counterparty (and in the case of the Agreement, AMBAC Assurance Corporation, the insurer of the Authority's obligations). Despite the Debtors' arguments to the contrary, the Derivative Contracts at issue in

3

the Debtors' Motion, unlike the run of the mill executory contract, cannot be assumed and assigned pursuant to section 365 of the Bankruptcy Code, unless the party to such Derivative Contract consents thereto.  Indeed, the Motion severely threatens to undercut counterparties' rights to terminate and setoff under Congress's specially crafted provisions of the Bankruptcy Code designed to protect counterparties to Derivative Contracts. 11 U.S.C. §§ 555-561.

8. Second, the Assignment Procedures indicate that an assignee will automatically be determined a "Qualified Assignee" if such assignee or its credit support provider has a Standard & Poor's ("S&P") or Fitch credit rating equal to or higher than A- or a Moody's credit rating equal to or higher than A3, or any equivalent thereof." *See, Motion,* p. 9.  The Authority objects to this provision.  The Authority has never, as a matter of policy and prudence, approved entering into a transaction with a counterparty whose ratings were as low as the ratings proposed by LB Financial in the Motion.  Moreover, the ratings by S&P, Moody's or Fitch cannot be relied on as the sole determinative factor to qualify a proposed assignee.  A party contemplating the change of a counterparty under a master agreement also considers, and has the right to consider, other factors relating to the choice of a counterparty including but not limited to (i) aggregate credit exposure to the counterparty and compliance with the counterparty's credit policies, (ii) the impact of any tax or withholding obligations and (iii) compliance with underlying debt instruments.  The Assignment Procedures should not abrogate the right of the Authority and other counterparties to object to any proposed assignee on any valid grounds.  For example, the determination of whether a proposed assignee is "Qualified" must include consideration of the effect of the replaced counterparty on the Authority's own credit rating. This will have an impact on the Authority's own debt and contractual obligations as well as its ability

4

to issue additional debt, which is dependent on the rating agencies' evaluation of, among other things, the Authority's exposure to its swap counterparties.

9. Third, the Assignment Procedures provide counterparties with a mere five business days to file an objection to a proposed Assignment Notice (as defined in the Motion) on the grounds of, among other things, (i) an improper cure amount, and (ii) adequate assurance of future performance. The suggested timeframe is clearly inadequate. Calculations concerning open trades can be very difficult and time-consuming and more time is needed to properly calculate cure amounts. Also, five business days from the date of service may not be sufficient time to determine whether the requirement of adequate assurance of future performance has been met. The Authority submits that counterparties should be provided with at least ten business days notice to formulate an objection to an Assignment Notice. Only then will counterparties be assured a fair opportunity to protect their rights.

10. Fourth, the Assignment Procedures should not adversely impact counterparties' valid rights of termination and setoff under the Bankruptcy Code. The Assignment Procedures unfairly expedite the termination process thereby affecting counterparties' rights under the Bankruptcy Code to determine when to offset and terminate Derivative Contracts. At the very least, the Authority and other counterparties' rights to terminate Derivative Contracts should not be abrogated unless and until an assignment has been finally consummated. The Assignment Procedures should make it clear that a counterparty which may receive a notice of a proposed assignment (triggering the five business day objection period), should still have the right, prior to consummation of the assignment, to terminate its Derivative Contracts and related master agreements with the Debtors.

11.     Fifth, the Assignment Procedures should not interfere with the Authority's and other counterparties' rights to object to a proposed assignment on any valid grounds including but not limited to a proposed assignee's failure to provide a separate unconditional guarantee from an affiliated third party or otherwise.

12.     Sixth, the Assignment Procedures state that "In any instance where a Derivative Contract is memorialized pursuant to a master agreement, the Debtors may assume and assign, pursuant to the Assignment Procedures, only all, but not fewer than all of the Derivative Contract transactions entered into pursuant to the master agreement." *See, Motion,* p. 12.  The definition of "Derivative Contracts" in the Motion does not appear to directly include the underlying master agreement.  Thus, this provision could suggest that the Debtors may only be required to assign the Derivative Contracts and not necessarily the master agreement.  This provision should be amended to make it abundantly clear that to the extent that the Debtors seek to assign the Schedule, that the Debtors must also be required to assign the Master Agreement to the same proposed assignee.

13.     Seventh, the Assignment Procedures state that the Debtors will attempt to resolve each objection to an Assignment Notice consensually but to the extent that an objection cannot be resolved, the Debtors may seek Court authorization of the proposed assignment.  The Authority does not object to the proposed goal of a consensual resolution of an objection to an Assignment Notice.  However, the Assignment Procedures should be amended to specify a more definitive timeframe for resolution and also provide counterparties the right to seek a Court hearing to the extent that the Debtors are unnecessarily delaying the resolution of a particular objection.

103374.00318/6688563v.3

14.     As stated at the outset, the Agreement has been validly terminated in accordance with the explicit terms of the Agreement.  The Authority has terminated the Agreement because it does not wish to be obligated thereunder, whether to LB Financial or an assignee.  The Authority will agree to voluntarily withdraw its objections to the Assignment Procedures if, <u>prior to</u> the hearing on the Motion, the Debtors confirm that the Agreement was validly terminated and therefore the Assignment Procedures do not impact the Authority in any way.

15.     Finally, the Authority submits that the Termination Procedures for terminated Derivative Contracts should be amended and clarified to (i) specify that the termination payments and expenses should be calculated in accordance with the Agreement, (ii) specify timeframes in which parties will submit information in support of their calculation of the appropriate termination payment due, and (iii) allow for Court intervention and an opportunity to be heard to the extent a settlement cannot be reached consensually within a specified timeframe. Further, the Debtors must clarify what they mean when they indicate that they "may" provide a release to counterparties in the event that the parties enter into a termination agreement.  If Agreements are terminated in accordance with the terms thereof or as a result of an order of this Court, all parties should be released.

## Joinder In Other Objections To Motion

16.     The Authority joins in other objections filed to the Motion to the extent not inconsistent with this Objection.

## Reservation Of Rights

17.     The Authority hereby reserves all of its rights to submit additional arguments in support of this Objection either prior to or at the hearing to consider the Motion and reserves all of its rights under the Agreement.

103374.00318/6688563v.3

**Waiver of Memorandum of Law**

18.    The Authority requests a waiver of the requirement of a memorandum of law required under Local Bankruptcy Rule 9013-1(a).

WHEREFORE, The Authority respectfully requests that this Court deny the Motion consistent with this Objection.

Dated: New York, New York
       November 26, 2008

                              BLANK ROME LLP
                              Attorneys for The Delaware River
                              Port Authority

                              By: */s/ Andrew B. Eckstein*
                                  Andrew B. Eckstein
                                  Rocco A. Cavaliere
                                  The Chrysler Building
                                  405 Lexington Avenue
                                  New York, New York 10174
                                  (212) 885-5000

                                    and

                                  Robert I. Tuteur
                                  Karen Du Brul
                                  One Logan Square
                                  Philadelphia, Pennsylvania 19103
                                  (215) 569-5500