DUFFY & ATKINS LLP
Todd E. Duffy
James E. Atkins
Dennis J. Nolan
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile:  (212) 500-7972
Attorneys for South Mississippi Electric Power Association and
          Coast Electric Power Association

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | |
|---|---|
| ---------------------------------------------------------------x | |
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS, INC. *et al.,* Debtors. | Case No. 08-13555 (JMP) (Jointly Administered) |
| ---------------------------------------------------------------x | |

**OBJECTION OF SOUTH MISSISSIPI ELECTRIC POWER ASSOCIATION AND COAST ELECTRIC POWER ASSOCIATION TO THE DEBTOR'S MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

South Mississippi Electric Power Association ("SMEPA") and Coast Electric Power Association ("CEPA"), by and through their counsel Duffy & Atkins LLP, hereby object to the Debtor's Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (the "Motion").  In support of its Objection, SMEPA and CEPA represent as follows:

**INTRODUCTION**

1. In violation of the Bankruptcy Code, the Debtors offer virtually no assurance – let alone adequate assurance – of future performance of SMEPA and CEPA's agreements and, accordingly, their Motion should be denied.  Under the Debtors' proposed procedures, the

Debtors seek to assign various derivative contracts to assignees with limited, or in some cases, no opportunity for the counterparties to assess the ability of these entities to perform under the agreements. Under the Debtors' scheme, the Debtors may assign derivative contracts to any "Qualified Assignee" without court approval or even giving the counterparty a right to object to the proposed assignment. Yet, in order to become a "Qualified Assignee", an entity or its credit support provider, need only have a credit rating that is <u>lower</u> than the Debtors' rating on the day before their bankruptcy filings. Given that the Debtors' on the day before their bankruptcy filings could not have met the financial burdens of these agreements and that the rating agencies have had numerous, well publicized, failures in their efforts to predict the financial performance of a potential assignee, the one size fits all procedure that the Debtors seek to impose on their counterparties is woefully inadequate under the law. Accordingly, the Debtors' proposed offering of adequate assurance of future performance of assignees they label "Qualified Assignees" falls short of their burden.

2. Even more distressing, under the Debtors' proposed procedures, if the Debtors chose to sell the agreements to non-qualified assignees, the counterparties to these agreements will be given virtually no notice of the proposed assignment or of the proposed assignee's ability to perform under the agreements. Specifically, the Debtors will not provide any financial information about the unqualified assignee and will allow only five business days <u>from the date they give notice</u> (not the date of receipt of such notice) for the counterparty to determine the financial wherewithal of the proposed assignee. Because the burden of proof of adequate assurance of future performance is the Debtors' obligation and not the obligation of a counterparty to an executory contract, the Motion does not meet the showing required and, therefore, should be denied.

## BACKGROUND

3. On September 15, 2008 (the "Petition Date"), and periodically thereafter, Lehman Brothers Holdings Inc. and certain of its subsidiaries (collectively, the "Debtors") commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (§§ 101-1532) (the "Bankruptcy Code").

4. Prior to the Petition Date, on or about April 30, 2007, SMEPA entered into two separate $20 million interest rate swap contracts and CEPA entered into a $35.5 million interest rate swap contract (collectively, the "Swap Agreements") with Lehman Brothers Special Financing Inc., one of the above-captioned Debtors (the "LBSF"). (Other than the notional amounts, the Swap Agreements are substantially identical.) Annexed hereto as Exhibit A are copies of the ISDA master agreements, schedules and confirmations related to the Swap Agreements.

5. Each Swap Agreement provides that SMEPA and CEPA are to make a fixed monthly payment to LBSF an amount equal to 3.6565% (annualized) multiplied by the notional amount (the notional amount decreases over the life of the agreement beginning in 2011). In exchange, the Swap Agreements require LBSF to make a floating rate monthly payment to SMEPA and CEPA in an amount equal to the notional amount multiplied by .67 which is then multiplied by the then current one-month USD-LIBOR-BBA. When applying that amount to the aggregate notional amount of $75.5 million, the current aggregate monthly payment requirement of LBSF is approximately $62,000.[1]

---

[1] Calculation based upon one month Libor rate of 1.47 obtained from the British Bankers Association's website (www.bba.org.uk). Significantly, this interest rate is near the lowest percentage that the USD-LIBOR-BBA has reached over the last 15 years. During that time, the rate fluctuated between its current low and just over 9%. Thus, the amount that the floating rate payor will have pay under the Swap Agreements likely will increase over the life of these agreements. *See* www.wsjprimerate.us/libor/libor_rates_history.htm.

3

6.  On November 13, 2008, the Debtors filed the Motion seeking to establish procedures to assume and assign various derivative agreements including the Swap Agreements to undisclosed purchasers.

## RELIEF REQUESTED

7.  As a result of the Debtors failure provide adequate assurance of future performance, SMEPA and CEPA request that this Court deny the Motion.

## BASIS FOR OBJECTION

8.  The procedures proposed by the Debtors are designed to railroad through assignments of financial contracts by minimizing the opportunity for counterparties to derivative contracts to review and object to such assignments.  The Motion fails to provide adequate assurance of future performance as required under the Bankruptcy Code.  Specifically, the qualifications set forth in the Motion describing a "Qualified Purchaser" fall woefully short of satisfying the Debtors' burden of demonstrating adequate assurance of future performance.  Furthermore, in the event that the Debtors seek to assign the Swap Agreements to non-qualified (i.e. substandard) assignees, SMEPA and CEPA are given only a few days, at most, to review the proposal, assess the proposed purchaser's ability to perform – without any disclosure by the Debtors – and prepare and serve a written objection.  Accordingly, the Motion must be denied.

### The Debtors' Measure of a "Qualified Assignee" Does Not Satisfy the Standard for Adequate Assurance of Future Performance

9.  Section 365(f) of the Bankruptcy Code provides that a debtor-in-possession may only assign an unexpired executory contract if that assignee provides adequate assurance of future performance.  11 U.S.C. § 365(f)(2)(B).  The Bankruptcy Code does not define the term "adequate assurance".  However, the legislative history reveals that this requirement was added by Congress to balance the broad powers of a debtor to assume and assign an unexpired

4

agreement with the rights of the non-debtor party to that agreement. *See In re U.L. Radio Corp.,* 19 B.R. 537, 542 (Bankr. S.D.N.Y. 1982) (citing H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 347, 348 (1977), U.S. Code Cong. & Admin News 1978, p. 6304; U.S. Code Cong. & Admin News 1978, p. 5845). In writing this section of the Bankruptcy Code, Congress borrowed the phrase "adequate assurance of future performance" from Uniform Commercial Code section 2-609. *U.L. Radio Corp.,* 19 B.R. at 542 (citing Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93rd Cong., 1st Sess. Pt. II 156-157 (1973)) . The Official Comment to the UCC discussing the application of the term "adequate assurance" "indicates that 'adequate assurance' focuses on the financial condition of a contracting party and his ability to meet his financial obligations." *U.L. Radio Corp.*, 19 B.R. at 542. Indeed, courts have held that the financial wherewithal to fulfill the obligations under the executory contract to be assigned is the primary focus of an inquiry to determine whether the debtor has provided adequate assurance of future performance. *See In re Martin Paint Stores*, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996); *In re Bygaph, Inc.*, 56 B.R. 596, 603 (Bankr. S.D.N.Y. 1986); *U.L. Radio Corp.,* 19 B.R. at 542 n. 6. It is a debtor's burden to show that all of the requirements of section 365 of the Bankruptcy Code have been met to assign an executory contract. *See In re M. Fine Lumber Co., Inc.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008). Courts considering whether the debtor has met its burden of showing the element of adequate assurance of future performance, have considered numerous factors including the following:

- presence of a guarantee;
- presence of a security deposit;
- evidence of profitability;
- a plan which would earmark money exclusively for the non-debtor counterparty; and

- whether the unexpired lease or executory contract is at, or below, the prevailing rate.

See *M. Fine Lumber Co.*, 383 B.R. at 573.

10. The Debtors' Motion considers none of these factors. Instead, the Debtors' procedures simply impose various qualifications of what it misleadingly labels a Qualified Assignee. Yet, these qualifications, even if present, are not a satisfactory predictor of financial performance and could not satisfy its burden of providing adequate assurance of future performance.

11. Pursuant to the Debtor's Motion, a Qualified Assignee is an assignee or its credit support provider that has "a Standard & Poor's or Fitch credit rating equal to or higher than A- or a Moody's credit rating equal to or higher than A3, or any equivalent thereof." Motion at ¶ 19(b). Indeed, the proposed procedures state that if the proposed assignee is a "Qualified Assignee", the counterparty to the executory contract will have conceded that the Debtors have met their burden of showing adequate assurance of future performance and no opportunity to object is allowed. *See* Motion at ¶ 19(c).

12. Yet the rating systems established by Moody's and others, as the sole measure, have shown themselves to be poor predictors of whether a company will be able to satisfy its financial obligations. For example, on September 14, 2008 – only twenty-four hours prior to the Petition Date – Lehman Brothers Holdings Inc. had a Moody's credit rating of A2, which is better than the minimum allowable rating under the motion for "Qualified Assignees." Similarly, AIG, on the day before it received an $85 billion cash infusion from the federal government, and Bear Stearns, on the day before it was forced to merge with JP Morgan (with $30 billion of federal loan guarantees), each had Moody's ratings of A2. (Annexed as <u>Exhibit B</u> are printouts from Moody's website confirming the "investment grade" ratings for Lehman

6

Brothers Holdings, Inc., AIG and Bear Stearns.) Thus, each of these financially unstable entities would meet the Debtors' criteria for a "Qualified Assignee." Accordingly, the Debtors' blind use of the systems used by various rating agencies is inadequate to satisfy their burden of proof as to the assurances of the proposed assignees' future performance.

**The Objection Period for Assignments to Unqualified Assignees is Impractical and Far Too Short**

13. Moreover, if the Debtors cannot find an assignee that they categorize as "Qualified" (as described above), or they simply choose to transfer the Swap Agreements to non-qualified assignees, the Debtors offer only five days from the date of service for SMEPA and CEPA to object to the unqualified assignee. The Debtors' proposed procedures lifts the burden of showing the Court adequate assurance of future performance from the Debtors and places it upon the non-debtor party to determine the financial ability of the proposed assignee to fulfill its obligations under the Swap Agreements. The counterparty would be required to research the financial condition of the proposed assignee, review the applicable paperwork and draft an objection to the Debtors' counsels so that it is received within five business days of date the notice is served. But it is not the non-debtor party's responsibility to show the Court that a proposed assignee is qualified; rather, it is the Debtors' affirmative obligation to show that a proposed assignee is qualified. *See M. Fine Lumber*, 383 B.R. at 573. Such burden shifting – particularly in light of the minimal notice period – is improper and unfair.[2]

**Debtors Cite to no Authority for this Radical Motion**

14. The Debtors do not point this Court to any case law or precedent for their proposed procedure. Instead, they simply recite boilerplate legal standards for motions to assume under section 365. Even the docket entries from other cases that the Debtors list apply

---

[2] In addition, SMEPA and CEPA reserve the right to exercise all rights they may have under the Swap Agreements, including, but not limited to, termination rights. *See* 11 U.S.C. § 560.

only to procedures dealing with terminated swap agreements, not assignments to total strangers on just a few days notice.[3]  This is not surprising, given the extraordinary relief requested.

## CONCLUSION

15.    The Debtor's proposed cookie cutter approach to these derivative contracts fails to consider the importance of each of these contracts to the businesses of the counterparties, such as SMEPA and CEPA.  However, Congress understood that executory contracts could be important to non-debtor counterparties and insisted that the Debtor show adequate assurance of future performance for each executory contract it wished to assume and assign.  The process proposed by the Debtors fails to satisfy that burden imposed by the statute and would leave non-debtor counterparties like SMEPA and CEPA with significant risk of nonperformance of these essential agreements.

---

[3] In support of their statement that the relief they seek is not unique, Debtors cite to three cases where debtors in front of this and other bankruptcy courts have allegedly requested similar relief.  *See* Motion at 14.  However, none of the movants in the cited examples requested that the court effectively waive the Debtor's required showing of adequate assurance of future performance as the Debtors have here.  True and correct copies of the "similar" motions cited by the Debtors are annexed hereto as Exhibit C.

**WHEREFORE**, the South Mississippi Electric Power Association and Coast Electric Power Association respectfully request that the Court enter an Order: i) denying the Motion for its failure to demonstrate adequate assurance of future performance; and ii) granting such other and further relief that the Court deems just and proper.

Dated: November 26, 2008
      New York, New York

# DUFFY & ATKINS LLP

By: /s/ Todd E. Duffy
      Todd E. Duffy
      James E. Atkins
      Dennis J. Nolan
Seven Penn Plaza, Suite 420
New York, New York 10001
Telephone: (212) 268-2685
Facsimile: (212) 500-7972
*Attorneys for South Mississippi Electric Power Association and Coast Electric Power Association*