Lindsee P. Granfield
Lisa M. Schweitzer
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Bank PLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
                                                    :
**In re**                                           :    **Chapter 11 Case No.**
                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :    **08-13555 (JMP)**
                                                    :
            **Debtors.**                            :    **(Jointly Administered)**
                                                    :
                                                    :
-----------------------------------------------------------------x

### LIMITED OBJECTION OF BARCLAYS BANK PLC TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING THE ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS

Barclays Bank PLC ("BBPLC"), by and through its undersigned counsel, hereby

submit this limited objection (the "Objection") to the Debtors' Motion for an order pursuant to

section 365 of the Bankruptcy Code (the "Code") approving the assumption or rejection of open

trade confirmations, dated November 14, 2008 (the "Motion").[1]  In support of the Objection,

BBPLC respectfully submits the Declaration of Robert Hall, dated November 26, 2008, annexed

hereto as Exhibit A (the "Hall Declaration") and respectfully states as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion

## BACKGROUND

1.        On September 15, 2008, Lehman Brothers Holdings Inc. ("LBHI")

commenced a voluntary case under chapter 11 of Bankruptcy Code; LB 745 LLC soon

commenced its own voluntary case under chapter 11 of the Code. The cases of LBHI and LB

745 LLC are jointly administered with other affiliated chapter 11 debtors (collectively, the

"Debtors"). On September 19, 2008, a proceeding was also commenced under the Securities

Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), and

James W. Giddens was appointed as Trustee under the SIPA to administer LBI's estate.

2.        On information and belief, on September 15, 2008, the English High Court

of Justice entered orders appointing the Administrators as Joint Administrators of Lehman

Brothers Holdings plc, Lehman Brothers Limited, LB UK RE Holdings Limited, and Lehman

Brothers International (Europe), and on September 23, 2008, the English High Court of Justice

appointed the Administrators as Joint Administrators of Lehman Brothers Europe Limited.

3.        On September 17, 2008, LBHI and LB 745 LLC filed a motion (the "Sale

Motion") requesting the Court to schedule a sale hearing at which the Court would approve that

certain Asset Purchase Agreement among LBHI, LBI and LB 745 LLC and Barclays Capital

Inc., dated as of September 16, 2008, as amended (the "Purchase Agreement").[2]

4.        That same day, this Court entered an order (the "Sale Procedures Order")

setting the hearing date for the Sale Motion for September 19, 2008.[3]

---

[2]        See Debtors' Motion to (A) Schedule a Sale Hearing; (B) Establish Sales Procedures; (C) Approve a Break-Up Fee; and (D) Approve the Sale of the Purchased Assets and the Assumption and Assignment of Contracts Relating to the Purchased Assets (D.I. 60).

[3]        Order (I) Approving The Break-Up Fee And Expense Reimbursement, (II) Certain Matters Relating To Competing Bids, If Any, (III) Approving The Form And Manner Of Sale Notices And (IV) Setting The Sale Hearing Date In Connection With The Sale Of Creditors Of The Debtors' Assets (D.I. 88).

5.    On September 19, 2008, this Court held a hearing on the Sale Motion (the "Sale Hearing") and approved the Purchase Agreement. The sale of the Purchased Assets (the "Sale") closed on September 22, 2008.

6.    On November 14, 2008, the Debtors filed the instant Motion seeking an order approving the assumption or rejection of certain Trade Confirmations.

7.    Exhibit A to the Motion lists certain Trade Confirmations that the Debtors intend to assume. Page 5 of this Exhibit lists 28 open trades that "Barclays" and "Barclays Capital (London)" are alleged to have entered into with Lehman Commercial Paper Inc. (UK) ("LCPI UK") for various tranches of loans (such trades, the "Alleged Open Trades"). The Alleged Open Trades consist of various tranches of loans made to Endemol BV as borrower pursuant to the Endemol Facilities Agreement (as defined in the Hall Declaration) (such loans, the "Endemol Loans").

8.    As described in the Hall Declaration, BBPLC acts as Facility Agent under the Endemol Facilities Agreement. See Hall Declaration ¶ 6. One of BBPLC's duties as Facility Agent under the Endemol Facilities Agreement is to record transfers of Endemol Loans from one lender to another. See id. The Alleged Open Trades were not recorded by BBPLC in its capacity as Facility Agent. See id.

9.    As part of the primary syndication process, the various Mandated Lead Arrangers (as defined in the Hall Declaration) (other than BBPLC) transferred loan positions under the Endemol Facilities Agreement to third party investors such as CLOs and hedge funds (the "Investors") by entering into back to back trades whereby BBPLC would purchase such loans and onsell them to the Investors. See id. ¶¶ 9-10. The primary syndication began on July 14, 2008 and concluded on August 8, 2008. See id. ¶ 6. Any positions transferred to BBPLC

3

from Lehman Commercial Paper Inc. or any other Lehman affiliates and transferred to Investors as part of the primary syndication process were paid for at the time of such transfers. See id. ¶10. The Alleged Open Trades were purportedly entered into on June 30, 2008, two weeks before commencement of the primary syndication process. See id. ¶ 7. It would be extremely unusual for any portion of the loans to trade before commencement of primary syndication for those loans. See id.

10. BBPLC has reviewed its records and have found no records of entering into the Alleged Open Trades with LCPI UK. Indeed, neither BBPLC nor any other Barclays entity is aware of making any purchase of Endemol Loans for its own accounts on the secondary markets. See id. ¶¶ 8, 13-14.

## LIMITED OBJECTION

11. BBPLC does not object as a general matter to the Debtors' request to assume open trade confirmations that could yield value for the Debtors' estates. However, BBPLC objects to the Motion, insofar as the Debtors attempt to assume Trade Confirmations with BBPLC or any other Barclays entity that do not exist. BBPLC also objects to the Motion insofar as it improperly attempts to abrogate setoff rights in a wholesale fashion that Counterparties may have to offset claims arising prior to the petition date, including claims for rejection damages for Rejected Trades, against payments that Counterparties may be required to make with respect to Assumed Trades or Amended Trades.

### A.    The Debtors May Not Assume the Alleged Open Trades -- No Contract Exists for Such Trades.

12. As described above and in the Hall Declaration, BBPLC has reviewed its records and have found no records showing any Barclays entity to have entered into the Alleged Open Trades with LCPI UK. Indeed, neither BBPLC nor any other Barclays entity is

4

aware of making any purchase of Endemol Loans for its own accounts on the secondary markets.
Moreover, the fact that the Alleged Open Trades were allegedly entered into on June 30, 2008,
two weeks before commencement of the primary syndication process, is strong evidence that the
Alleged Open Trades were listed by the Debtors in error.  This is because it would be extremely
unusual for any portion of the Endemol Loans to trade before commencement of primary
syndication for those loans.  See id. ¶ 7.

13.    It is axiomatic that in order for a debtor to assume a contract under section
365 of the Code, such a contract must exist.  See In re Sanshoe Worldwide Corp., 993 F.2d 300
(2nd Cir. 1993) (making a threshold determination as to the existence of the lease to be
assumed); In re 611 Sixth Ave. Corp., 191 B.R. 295, 301 (Bankr. S.D.N.Y. 1996) ("Presumably,
Orion permits the bankruptcy court to take evidence in connection with its threshold inquiry into
whether there is a lease or contract to assume or reject"); Moody v. Amoco Oil Co., 734 F.2d
1200, 1214 (7th Cir. 1984) (holding that a contract that has been terminated pre-petition cannot
be assumed); In re III Enters., Inc. V, 163 B.R. 453, 459 (Bankr. E.D.P.A. 1994), aff'd 169 B.R.
551 (E.D. Pa. 1994) ("It is elementary to observe that, before the Debtor can assume or reject a
contract . . . there must be a contract to assume . . ."); In re W.F. Martin Co., 66 B.R. 409, 411-13
(Bankr. E.D. Tenn. 1986) (debtor not allowed to assume contract that did not legally exist).[4]
Because there is no contract between BBPLC (or any other Barclays entity) and LCPI UK with
respect to the Alleged Open Trades, the Debtors may not assume the Alleged Open Trades.

---

[4]    In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993), is not to the contrary.  As recognized by Chief
Judge Bernstein in In re 611 Sixth Ave. Corp., the Second Circuit's decision in Orion "does not change the duty
under Sanshoe to make [an] inquiry" as to the existence of the executory contract.  In re 611 Sixth Ave. Corp., 191
B.R. at 301.

**B.    The Debtors Improperly Attempt to Abrogate Rights of Counterparties to Offset Prepetition Claims Against Payments Required to be Made Under Assumed and/or Amended Trades.**

14.    Upon assumption of the Trade Confirmations, the Debtors will seek payment with respect to the assumed trades from the Counterparties. The Motion improperly seeks to preclude Counterparties as a matter of law from setting off claims arising prior to the petition date, including rejection damages with respect to Rejected Trades, against amounts owed under Assumed Trades or Amended Trades.

15.    First, the Debtors seek an improper advisory opinion from this court in the absence of an actual "case" or "controversy" as required under Article III of the U.S. Constitution with respect to the setoff rights of numerous counterparties without putting forth any factual basis to deny such setoff rights. Indeed, no party has attempted to obtain relief from the automatic stay to set off claims arising prior to the petition date against amounts owing to the Debtors for Assumed Trades/Amended Trades. At the time such relief from stay is sought, or a purported secured claim is filed, or a defense of setoff is raised by a Counterparty, the Debtors can argue that the Counterparty at issue cannot set off prepetition claims against amounts owed for a particular Assumed Trade or Amended Trade.[5] Such arguments will be made and determined, however, with respect to an actual dispute and a specific set of facts.

16.    Even if it were appropriate to obtain such an opinion at this juncture, the Debtors are wrong as a matter of law with respect to the proposition that section 553 of the Code

---

[5] Additionally, it may be that certain of the Code's financial contract safe harbors are applicable to one or more of the Open Trades. For example, a contract for the sale of loans or participations could constitute a "swap agreement" and qualify for the safe harbor protections applicable to "swap agreements" set forth in, among other sections, sections 362(b)(17) and 560 of the Code. This is because a "swap agreement" is defined under section 101(53) of the Code to include, among other things, a "debt... forward agreement" and most loan trades would appear to fit neatly within that definition. In addition, it is conceivable that the safe harbors for "securities contracts" set forth in, among other sections, sections 362(b)(6) and 555 of the Code could apply to one or more of the Open Trades to the extent such trades involve the sale of "mortgage loans." This is because "securities contract" means, among other things, a contract for the purchase or sale of "mortgage loans." See Code section 741(7).

6

would preclude setoff of claims arising prepetition against amounts owing to a debtor in respect

of an assumed contract. Section 553 of the Code preserves the rights that the Counterparties may

have under non-bankruptcy law to offset mutual debts owing to the Debtors arising prior to the

commencement of the Debtors' bankruptcy cases against claims of the Counterparties against the

Debtors that arose prior to the commencement of the Debtors' bankruptcy cases. See 11 U.S.C.

§553(a).

          17.      The Debtors attempt to argue that amounts owing under a contract entered

into prepetition (here, the Assumed Trades or Amended Trades) that is assumed do not arise

before the petition date for purposes of section 553 and, as a result, may not be setoff against

claims arising before the petition date. Contrary to the Debtors' assertion, debts owed by the

Counterparties under Assumed Trades or Amended Trades arose prior to the petition date for

purposes of section 553 because they are due in respect of contracts that were entered into prior

to the petition date. A debt owing to a debtor arises for purposes of section 553 "when all

transactions necessary for liability have occurred, regardless of whether the claim was contingent

when the petition was filed." In re Bousa, Inc., 2006 WL 2864964, Case No. 89-B-13380 (JMP),

*3 (Bankr. S.D.N.Y. Sept. 29, 2006) (citing In re Gerth, 991 F.2d 1428, 1433 (8th Cir. 1993)); 5

Collier on Bankruptcy, 15th Rev. Ed. ¶ 553.03 ("In general, a claim is considered to have arisen

pre-petition if all of the elements of liability arose before the petition date." (citing In re Gerth,

991 F.2d at 1433)); see also In re Buckner, 218 B.R. 137, 147 (B.A.P. 10th Cir. 1998) (when a

debt arises for purposes of section 553 depends on "whether the debt was valid and enforceable"

upon the commencement of the case) (internal quotation omitted). The terms of the particular

contract at issue must be examined to determine when the obligations under it arose. See In re

Gerth, 991 F.2d at 1433 ("In this case, Gerth's claim--his right to payment--came into existence

7

at the time the contract was signed and ASCS promised to pay him"); In re Buckner, 218 B.R. at
147-49.

18.     Here, because the Trade Confirmations were entered into prior to the
Commencement Date, obligating the Counterparties under the Trade Confirmations at such time,
the debt owing under such contracts arose prior to the petition date for purposes of section 553.
See In re Buckner, 991 F.2d at 148 (finding that the debts under the contract at issue at issue
arose when they were signed); In re Greseth, 78 B.R. 936 (D. Minn. 1987) (holding that
contractual payments due postpetition on prepetition contract constituted prepetition claim for
setoff purposes); In re Communication Dynamics, Inc., 382 B.R. 219 (Bankr. D. Del. 2008)
(creditor could setoff amounts owed to debtor under two seller's notes against claim for rejection
damages because obligation under notes arose on date creditor executed them even though
payment on those notes only became due postpetition); In re Telephone Warehouse, Inc., 259
B.R. 64, 69 (Bankr. D. Del. 2001) (commissions which were payable only upon third-party's use
of product considered prepetition debt for purposes of setoff even though use took place
postpetition because sale of product giving rise to obligation took place prepetition).

19.     The Debtors admit in the Motion that the Trade Confirmations were
entered into prior to the dates of the Debtors' bankruptcy filings (i.e., before the Commencement
Date). See Motion ¶ 8. Consequently, section 553 should not bar Counterparties from setting
off claims against the Debtors that arose prior to the Commencement Date against amounts owed
for Assumed Trades or Amended Trades.

20.     The Debtors argue that setoff of claims that arose prepetition against
amounts owed with respect to the Assumed and Amended Trades is precluded because the
assumption by the Debtors of Trade Confirmations somehow transforms a debt arising

8

prepetition into a debt that arises postpetition. To support their argument, the Debtors primarily

rely on two cases, In re Evatt, 112 B.R. 405 (Bankr. W.D. Okla. 1989), and In re Walat Farms,

Inc., 69 B.R. 529 (Bankr. E.D. Mich. 1987). These decisions run directly contrary to the

majority of authority on the subject.

21.    The Evatt and Walat decisions run contrary to the opinion of the only

United States Court of Appeals to directly address the issue of whether the assumption of an

executory contract entails that the debts under that contract arose post-petition. In In re Gerth the

United States Court of Appeals for the Eighth Circuit, holding that the "mere assumption of an

executory contract does not alter when the obligations under the contract arose," expressly

rejected the argument that the Debtor made in the Motion. Id. at 1432. The majority of the

courts that have addressed this issue have sided with the Gerth Court. See In re Allen, 135 B.R.

856, 867 (Bankr. N.D. Iowa 1992); In re Mohar, 140 B.R. 273, 277 (Bankr. D. Mont. 1992); In

re Affiliated Food Stores, Inc., 123 B.R. 747, 748 (Bankr. N.D. Tex. 1991) ("A creditor has a

right to offset mutual claims arising under a pre-petition contract without regard to the executory

nature of the contract"); In re Ratliff, 79 B. R. 930, 933 (Bankr. D. Colo. 1987).

22.    This Court should follow the Gerth line of cases—and reject the Walat and

Evatt cases. If the Debtors' argument were accepted, the Court effectively would be granting the

Debtors the unilateral right to amend the Trade Confirmations by reading the effective dates and

any applicable setoff rights out of such contracts. Nothing in the Code gives the Debtors this

power. In re Gerth, 991 F.2d, at 1432 ("Neither the word 'assume' nor any other phrase in § 365

suggests that assuming a contract allows the debtor to do anything other than carry on with the

contract according to its terms" (citing In re Allen, 135 B.R. at 864-65)). To the contrary, when

a debtor elects to assume a contract, it "assumes the contract *cum onere*." NLRB v. Bildisco,

9

465 U.S. 513, 531 (1984). One of the burdens that the Debtors must consider when they
determine whether to assume or reject a contract is its counterparties' rights to setoff resulting
from the contracts having been entered into prepetition. See In re Gerth, 991 F.2d at 1432-33
(stating that one of the burdens of the contract assumed is its effective date); In re Allen, 135
B.R. at 864 ("The benefit of continuing to receive payments under the contract which the debtor
assumed is accompanied by the burdens under the contract, including the effective date of the
obligations . . ."); In re Ratliff, 79 B. R. at 933.

        23.     Moreover, the Evatt and Walat decisions should be rejected as they rely on
the now discredited premise that the prepetition debtor and the debtor-in-possession are separate
entities. These decisions reason that because a debt under an executory contract is first owed to a
debtor-in-possession upon assumption of that contract, the debt owed to the debtor-in-possession
under an assumed contract can only be owed post-petition. See In re Evatt, 112 B.R. at 411-12;
In re Walat Farms, 69 B.R. at 531.

        24.     This reasoning was rejected by the Supreme Court in Bildisco. Opining
on whether a debtor in possession could be found to have engaged in unfair labor practices, the
Bildisco Court stated:

                Obviously if the latter were a wholly "new entity," it would be
                unnecessary for the Bankruptcy Code to allow it to reject
                executory contracts, since it would not be bound by such contracts
                in the first place. For our purposes, it is sensible to view the
                debtor-in-possession as the same "entity" which existed before the
                filing of the bankruptcy petition, but empowered by virtue of the
                Bankruptcy Code to deal with its contracts and property in a
                manner it could not have employed absent the bankruptcy filing.

Bildisco, 465 U.S. at 528. Courts in this Circuit and elsewhere commenting on the effects of this
language on the analysis under sections 365 and 553 of the Code have read it to suggest that the
new entity theory is no longer viable in these contexts. See In re Gerth, 991 F.2d at 146

                                            10

("[W]hen a debtor-in-possession assumes an executory contract, the debtor and the debtor-in-possession are the same entity for purposes of mutuality under § 553."); In re Allen, 135 B.R. at 868 (agreeing that "Bildisco laid to rest the separate entity doctrine"); In re Affiliated Food Stores, Inc., 123 B.R. at 748-49 (rejecting the argument that the pre-petition debtor and debtor-in-possession are different entities and citing cases rejecting the theory); In re Ontario Locomotive & Industrial Railway Supplies, 126 B.R. 146, 147 (Bankr. W.D.N.Y. 1990) ("[T]he [Bildisco] Court would appear to have laid to rest the separate entity doctrine for all time."). Because the new entity theory is arguably no longer viable, and this theory is essential to the holdings in Evatt and Walat, these cases should be rejected by this Court.

25.     Consequently, the Court should deny the Motion without prejudice insofar as it seeks to bar as matter of law the setoff of prepetition claims against amounts due to the Debtors with respect to Assumed Trades or Amended Trades.  This issue should be addressed as it relates to actual specific contracts and requests for setoff that come up under purported secured claims that are filed, with respect to relief from stay motions, or as a defense to the Debtors' action for payment against a Counterparty.

26.     BBPLC reserves all of its rights and remedies under or in connection with any agreements with any of the Debtors or their affiliates.

11

## REQUEST FOR RELIEF

WHEREFORE, for the reasons set forth herein, BBPLC respectfully requests that

this Court (a) deny the Motion, insofar as it seeks to assume the Alleged Open Trades, and (b)

deny the Motion without prejudice to the extent the Motion seeks a blanket denial of the rights of

Counterparties to offset claims arising prepetition against amounts owing to the Debtors in

respect of Assumed Trades and/or Amended Trades; and (c) grant such other and further relief as

this Court may deem just or proper.

Dated: New York, New York
      November 26, 2008

                Respectfully submitted,

                CLEARY GOTTLIEB STEEN & HAMILTON LLP

                By: /s/ Lindsee P. Granfield

                Lindsee P. Granfield
                Lisa M. Schweitzer
                One Liberty Plaza
                New York, New York 10006
                (212) 225-2000

                *Attorneys for Barclays Bank PLC*

.

# EXHIBIT A

Lindsee P. Granfield
Lisa M. Schweitzer
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
(212) 225-2000

*Attorneys for Barclays Bank PLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------x
                       :

**In re**                     :     **Chapter 11 Case No.**
                       :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :    **08-13555 (JMP)**
                       :

        **Debtors.**            :     **(Jointly Administered)**
                       :
                       :
------------------------------------------------------x

**DECLARATION OF ROBERT HALL IN SUPPORT OF BARCLAYS BANK PLC'S**
**LIMITED OBJECTION TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO**
**SECTION 365 OF THE BANKRUPTCY CODE APPROVING THE ASSUMPTION OR**
**REJECTION OF OPEN TRADE CONFIRMATIONS**

       I, Robert Hall, hereby declare as follows:

       1.     I am a Manager at Barclays Bank PLC ("BBPLC"), an international

banking firm with its principal office located at 1 Churchill Place London E14 5HP. I am duly

authorized to make this Declaration on behalf of BBPLC and its affiliates in connection with the

limited objection of BBPLC (together, "Barclays") to the Motion of the Debtors (in the above

captioned case) for an order pursuant to section 365 of the Bankruptcy Code approving the

assumption or rejection of open trade confirmations (the "Limited Objection" relating to the

Debtors' "Motion").

[New York #1978626 v5]

2.    Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein and, if called as a witness, I would testify thereto.

3.    I reviewed the Motion and Exhibit A thereto, which lists the Trade Confirmations that the Debtors seek Court approval to assume.

4.    Page 5 of Exhibit A to the Motion lists 28 Trade Confirmations under which "Barclays" or "Barclays Capital (London)" are purported to have agreed to purchase loans issued under the Deal Name "ENDEMOL SEN (3/07/07)" (the " Alleged Endemol Trades").

5.    The Deal Name "ENDEMOL SEN (3/07/07)" refers to the Loan Market Association trades (the "LMA Trades") of loans under that certain Senior Facilities Agreement dated July 3rd, 2007, as amended and restated on September 27th, 2007, December 12th, 2007, and May 14th, 2008 (the "Endemol Facilities Agreement"), regarding the primary syndication of the loans made to Endemol Finance BV (the "Endemol Loans") in the amounts of EUR 1,750,000,000, USD 524,667,000 and GBP 191,648,250.

6.    BBPLC participated in the initial syndication of the Endemol Loans in its capacity as Facility Agent under the Endemol Facilities Agreement. I am personally familiar with BBPLC's role under the Endemol Facilities Agreement because I was directly responsible for processing the trades and preparing the transfer documents sent through to BBPLC in its capacity as Facility Agent on a day to day basis during the primary syndication process. Further, one of BBPLC's duties as Facility Agent under the Endemol Facilities Agreement is to record transfers of Endemol Loans from one lender to another. The Alleged Endemol Trades were not recorded by BBPLC in its capacity as Facility Agent.

7.    The primary syndication of the Endemol Loans began on July 14th, 2008, and concluded on August 8th, 2008. While BBPLC participated in the primary syndication of the

[New York # 1978626 v5]

Endemol Loans as Facility Agent, its records indicate that all of the Endemol Loans that were acquired were immediately distributed to the initial lenders in the syndicate. The Alleged Endemol Trades were purportedly entered into on June 30th, 2008, two weeks before commencement of the primary syndication process. It would be extremely unusual for any portion of the loans to trade before commencement of primary syndication for those loans.

8.      A search of the records indicate that that neither BBPLC nor any other Barclays entity have subsequently acquired any of the Endemol Loans issued under this deal. Accordingly, the 28 Alleged Endemol Trades listed above appear to have been included among those to be assumed in error.

9.      In June 2008, the Mandated Lead Arrangers in respect of the Endemol Facilities Agreement (the "MLAs" and each an "MLA"), with the exception of BBPLC, agreed to sell part of their holds as lenders in various of the tranches under the Endemol Facilities Agreement to a group of investors (the "Investors").

10.     These transfers were conducted by way of assignment agreements from the relevant MLA to BBPLC and from BBPLC to the relevant Investor. These trades were back to back; immediately upon receiving the Endemol Loans, BBPLC transferred them to the relevant Investor. BBPLC did not retain any of the Endemol Loans that it received. Any positions transferred to BBPLC from Lehman Commercial Paper Inc. or any other Lehman affiliates and transferred to Investors as part of the primary syndication process were paid for at the time of such transfers.

11.     Additional trades of Endemol loans were entered into on a leveraged basis outside of the primary syndication. These were dealt with on a secondary basis and were conducted between the relevant MLAs and buyers directly; they were not conducted

through BBPLC as agent. None of the Endemol Loans traded in the secondary markets nor the money transferred with respect to these trades went through BBPLC or any other Barclays entity of which I am aware (save for recording the transfers in its role as Facility Agent).

12.     According to our records, no Barclays entity has purchased any of the loans issued under the Endemol syndication on the secondary market.

13.     Thus, to the best of my knowledge no Barclays entity has agreed to enter into the 28 Alleged Endemol Trades listed on Exhibit A to the Motion.

14.     On November 5th, 2008, BBPLC received four letters from the Debtors (the "November 5th Letters") regarding trades under the Endemol Facilities Agreement. It alleged that Barclays entities had agreed to purchase Endemol Loans issued under the Endemol Facilities Agreement, and demanded payment.

15.     In a letter dated November 17th, 2008, attached as Exhibit 1 hereto, BBPLC promptly responded to the November 5th Letters explaining that it had not agreed to enter into the Alleged Endemol Trades.

16.     The Debtors have not responded to BBPLC's November 17, 2008 letter. Barclays has not been provided by the Debtors with any documentation showing that the Alleged Endemol Trades were entered into by BBPLC or any other Barclays entity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on November 26, 2008

London, United Kingdom

_____
Robert Hall

5

## **EXHIBIT 1 TO EXHIBIT A**



5 The North Colonnade
Canary Wharf
London E14 4BB
United Kingdom

Tel  +44 (0)20 7623 2323

17 November 2008

**By email and registered letter**

Lehman Commercial Paper Inc, UK Branch ("**LCPI**")
25 Bank Street
London E14 5LE

Attention :          Amy Lee

                            Raymond Chin

                            Sally M Nancoz

RE:  Primary syndication of Endemol Finance BV's €1,750,000,000,
        US$524,667,000 and £191,648,250 Senior Facilities Agreement dated 3rd July
        2007 as amended and restated on 27th September 2007, 12th December 2007 and
        14th May 2008 (the "**Endemol Facilities Agreement**")

Dear Sir/Madam,

We refer to your four letters dated 5 November 2008 (see attached for convenience)
in which you outline various Loan Market Association trades under tranches of the
Endemol Facilities Agreement which you allege were agreed between LCPI as seller
and Barclays Capital as buyer and dated 30 June 2008 and request payment of the
purchase price of such trades from us. We do not recognise any of these Loan Market
Association trades and do not agree that any such payment is owing from Barclays
Capital or Barclays Bank PLC.

We note that in June 2008 the Mandated Lead Arrangers in respect of the Endemol
Facilities Agreement (with the exception of Barclays Capital) agreed to sell part of
their holds as lenders in various of the tranches under the Endemol Facilities
Agreement to a group of investors (the "**Investors**") at a price of 70%. Barclays Bank
PLC ("**BBPLC**") is the Facility Agent under the Endemol Facilities Agreement and
acted as agent on the Endemol primary syndication which took place on 14 July, 21
July and 8 August 2008. On these dates the agreed reduction of the existing holds of
the Mandated Lead Arrangers as lenders and transfers on to the relevant Investors
were settled and all relevant payment amounts paid across to the Mandated Lead
Arrangers. As agreed among the Mandated Lead Arrangers, the transfers were
conducted by way of assignment agreements firstly from the relevant Mandated Lead
Arranger's lender entity to BBPLC and then from BBPLC to the relevant Investors.
In the case of Lehman Brothers International (Europe) as a Mandated Lead Arranger
there were two such lender entities, LCPI and Thalia European CLO BV ("**Thalia**").

We **attach** the spreadsheet agreed among the Mandated Lead Arrangers at the time of the Endemol primary syndication which shows the total amounts sold down under each tranche as part of the Endemol primary syndication, the LCPI and Thalia portion of such total amounts, the dates of sell down and the relevant Investors. This spreadsheet also shows you the amounts still held under each tranche by each of LCPI and Thalia at the close of the Endemol primary syndication.

We note that additional trades were entered into on a leveraged basis outside of primary syndication. These were dealt with on a secondary basis pursuant to which the transfers were conducted directly between the relevant Mandated Lead Arranger and the relevant buyer by way of assignment agreements from the relevant Mandated Lead Arranger's lender entity to the buyer and not via BBPLC as was the case with the Endemol primary syndication. All payments in respect of these secondary trades were dealt with directly between the Mandated Lead Arranger lender entity and the buyer with no involvement from BBPLC as agent. These trades are not detailed in the attached spreadsheet which deals only with the Endemol primary syndication.

We trust the above explanation and attached documentation suffice to explain our position that no such payments are owing from Barclays Capital or Barclays Bank PLC to LCPI or Thalia.

Should you have any questions with respect to the above, please contact Robert Hall in the first instance on telephone number: 0207 773 7387 or email: Robert.hall@barcap.com.

Sincerely

Sinead Harris
Associate Director
European Leveraged Finance


**Copies of the following enclosed:**
1. Endemol primary syndication spreadsheet
2. Four letters dated 5 November 2008 received from LCPI re Endemol Facilities Agreement

November 5, 2008

Barclays Capital
Scott.Barnett@barclayscapital.com

RE: EDAM ACQUISITION HOLDING IV B.V. (the "Borrower")

Sir / Madam:

Reference is made to the Loan Market Association Trade, dated 30 June, 2008 between Barclays Capital (the "Counterparty") and Lehman Commercial Paper Inc., UK Branch ("LCPI" or the "Debtor") pursuant to which LCPI agreed to sell and the Counterparty agreed to purchase GBP 463,872.17 in principal amount of facility Holdco Pushdown B GBP and EUR 2,845,557.49 in principal amount of facility Opco Pushdown C EUR and USD 2,408,105.49 in principal amount of facility Opco Pushdown B USD and EUR 650,226.55 in principal amount of facility Opco Refinancing B EUR and GBP 250,741.72 in principal amount of facility Opco Refinancing B GBP and USD1,204,052.75 in principal amount of facility Opco Refinancing B USD and EUR 261,966.30 in principal amount of facility Opco Spanish C EUR made to the Borrower at a purchase price of rate of 70.00% (the "Trade").

As you are aware, on October 5, 2008, the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York.

Please take notice that Debtor has made the determination to assume the Trade Confirmation in accordance with its rights under section 365 of the Bankruptcy Code. Such determination has been made on the basis that Counterparty will not assert any right of recoupment or setoff that it may have under a master netting agreement or otherwise with respect to its obligations under the Trade Confirmation and that, upon settlement of the Trade Confirmation, Counterparty shall pay Debtor in cash or other immediately available funds the purchase price set forth in the Trade Confirmation in full, without setoff, recoupment or counterclaims of any kind whatsoever.

Very truly yours,

Lehman Commercial Paper Inc., UK Branch

By:
Name:          SALLY M. NANCOZ
Title:          AUTHORIZED SIGNATURY

November 5, 2008

Barclays Capital
Scott.Barnett@barclayscapital.com

RE: EDAM ACQUISITION HOLDING IV B.V. (the "Borrower")

Sir / Madam:

Reference is made to the Loan Market Association Trade, dated 30 June, 2008 between
Barclays Capital (the "Counterparty") and Lehman Commercial Paper Inc., UK Branch
("LCPI" or the "Debtor") pursuant to which LCPI agreed to sell and the Counterparty
agreed to purchase GBP 3,232,079.74 in principal amount of facility Holdco Pushdown B
GBP and EUR 13,628,273.43 in principal amount of facility Opco Pushdown C EUR
and USD 9,087,466.64 in principal amount of facility Opco Pushdown B USD and EUR
3,897,100.45 in principal amount of facility Opco Refinancing B EUR and GBP
1,747,070.11 in principal amount of facility Opco Refinancing B GBP and USD
4,543,733.32 in principal amount of facility Opco Refinancing B USD and EUR
7,534,876.01 in principal amount of facility Opco Spanish C EUR made to the Borrower
at a purchase price of rate of 74.00% (the "Trade").

As you are aware, on October 5, 2008, the Debtor commenced a voluntary
case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with
the United States Bankruptcy Court for the Southern District of New York.

Please take notice that Debtor has made the determination to assume the
Trade Confirmation in accordance with its rights under section 365 of the Bankruptcy
Code. Such determination has been made on the basis that Counterparty will not assert
any right of recoupment or setoff that it may have under a master netting agreement or
otherwise with respect to its obligations under the Trade Confirmation and that, upon
settlement of the Trade Confirmation, Counterparty shall pay Debtor in cash or other
immediately available funds the purchase price set forth in the Trade Confirmation in
full, without setoff, recoupment or counterclaims of any kind whatsoever.

Very truly yours,

Lehman Commercial Paper Inc., UK Branch

By:
Name:
Title:        SALLY M. NANCOZ
              AUTHORIZED SIGNATORY

November 5, 2008

Barclays Capital
Scott.Barnett@barclayscapital.com

RE: EDAM ACQUISITION HOLDING IV B.V. (the "Borrower")

Sir / Madam:

Reference is made to the Loan Market Association Trade, dated 30 June, 2008 between Barclays Capital (the "Counterparty") and Lehman Commercial Paper Inc., UK Branch ("LCPI" or the "Debtor") pursuant to which LCPI agreed to sell and the Counterparty agreed to purchase GBP 5,747,459.03 in principal amount of facility Holdco Pushdown B GBP and EUR 33,319,091.02 in principal amount of facility Opco Pushdown C EUR and USD 27,419,600.11 in principal amount of facility Opco Pushdown B USD and EUR 7,857,346.85 in principal amount of facility Opco Refinancing B EUR and GBP 3,106,734.58 in principal amount of facility Opco Refinancing B GBP and USD 13,709,800.25 in principal amount of facility Opco Refinancing B USD and EUR 5,115,181.89 in principal amount of facility Opco Spanish C EUR made to the Borrower at a purchase price of rate of 70.00% (the "Trade").

As you are aware, on October 5, 2008, the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York.

Please take notice that Debtor has made the determination to assume the Trade Confirmation in accordance with its rights under section 365 of the Bankruptcy Code. Such determination has been made on the basis that Counterparty will not assert any right of recoupment or setoff that it may have under a master netting agreement or otherwise with respect to its obligations under the Trade Confirmation and that, upon settlement of the Trade Confirmation, Counterparty shall pay Debtor in cash or other immediately available funds the purchase price set forth in the Trade Confirmation in full, without setoff, recoupment or counterclaims of any kind whatsoever.

Very truly yours,

Lehman Commercial Paper Inc., UK Branch

By: _____
Name: EMILY M. NANGOZ
Title: AUTHORIZED SIGNATORY

November 5, 2008

Barclays Capital
Scott.Barnett@barclayscapital.com

RE: EDAM ACQUISITION HOLDING IV B.V. (the "Borrower")

Sir / Madam:

Reference is made to the Loan Market Association Trade, dated 30 June, 2008 between Barclays Capital (the "Counterparty") and Lehman Commercial Paper Inc., UK Branch ("LCPI" or the "Debtor") pursuant to which LCPI agreed to sell and the Counterparty agreed to purchase GBP 8,714,084.06 in principal amount of facility Holdco Pushdown B GBP and EUR 29,077,848.67 in principal amount of facility Opco Pushdown C EUR and USD 11,173,037.36 in principal amount of facility Opco Pushdown B USD and EUR 9,075,326.15 in principal amount of facility Opco Refinancing B EUR and GBP 4,524,937.59 in principal amount of facility Opco Refinancing B GBP and USD 5,586,518.68 in principal amount of facility Opco Refinancing B USD and EUR 31,967,205.19 in principal amount of facility Opco Spanish C EUR made to the Borrower at a purchase price of rate of 73.50.00% (the "Trade").

As you are aware, on October 5, 2008, the Debtor commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York.

Please take notice that Debtor has made the determination to assume the Trade Confirmation in accordance with its rights under section 365 of the Bankruptcy Code. Such determination has been made on the basis that Counterparty will not assert any right of recoupment or setoff that it may have under a master netting agreement or otherwise with respect to its obligations under the Trade Confirmation and that, upon settlement of the Trade Confirmation, Counterparty shall pay Debtor in cash or other immediately available funds the purchase price set forth in the Trade Confirmation in full, without setoff, recoupment or counterclaims of any kind whatsoever.

Very truly yours,

Lehman Commercial Paper Inc., UK Branch

By: 
Name: 
Title:   SALLY M. NANCOZ
         AUTHORIZED SIGNATORY