Hearing Date and Time:  December 3, 2008 at 10:00 a.m.
Objection Deadline:  November 28, 2008 at 4:00 p.m.

RICHARDS KIBBE & ORBE LLP
One World Financial Center
New York, NY 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801
Neil S. Binder
Michael Friedman
Keith N. Sambur

Attorneys for the parties listed on Exhibit A hereto

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- x

**In re**                                                                        :  **Chapter 11**
                                                                                        :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,          :  **Case No. 08-13555 (JMP)**
                                                                                        :
                                    **Debtors.**                            :
                                                                                        :  **Jointly Administered**
                                                                                        :
-------------------------------------------------- x

**OBJECTION TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365**
**OF THE BANKRUPTCY CODE APPROVING THE**
**ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

          The parties listed on Exhibit A hereto (collectively, the "Counterparties"), by their

undersigned attorneys, hereby file this objection (the "Objection") to the Debtors' Motion for an

Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection

of Open Trade Confirmations (the "Debtors' Motion").  This Objection is made with respect to

the Debtors' proposed order as it relates to the Counterparties only.[1]  In support of this

Objection, the Counterparties respectfully represent as follows:

## PRELIMINARY STATEMENT

1.    By their motion, the Debtors seek Court authority to use Bankruptcy Code

section 365 to convert executory contracts into risk-free investments whereby a debtor could

profit from a general decline in financial markets.  Indeed, the Debtors' Motion amounts to a

request for them to take a substantial proprietary "short position" with respect to loans and

claims by assuming sales at the relatively high prices that existed prepetition and pairing those

sales with buys at substantially lower postpetition prices.

2.    Prepetition, the Debtors acted as a "market-maker" of trades of par or distressed

loans, participations in par or distressed loans, and claims against third parties (collectively,

"Loans"), which consisted of buying and selling Loans, creating a market for Loans and pairing

third party buy-orders with sell-orders in the secondary market.  The Debtors stood to make a

modest profit on their spread (the difference between the purchase and sale price) for these

market-making activities.  As long as the Debtors' purchase price was lower than their sale price

the trades would be profitable.

3.    The Debtors have offered no evidence that any contract is burdensome; rather

their decision to reject certain trades rests on their belief that they may be able to make large and

unexpected profits due to market conditions following their bankruptcy.  Moreover, because the

Debtors acted as a market-maker of Loans, the Debtors did not treat "buy" and "sell" trade

confirmations in isolation.  Rather, the Debtors treated these as paired, integrated contracts.  As

---

[1] The Counterparties do not waive and expressly reserve their rights to object and seek relief from the Court as appropriate and necessary to the extent errors or omissions exist with respect to Exhibits A, B and C to the Debtors' Motion.

such, the Debtors should be required to assume or reject these integrated contracts in their entirety to the extent they are not burdensome (*i.e.,* their "spread" is positive), and they should not be permitted to assume the sell and reject the buy.  Accordingly, the Debtors' Motion to reject trades should be denied, or, in the alternative the Debtors should be required to treat buy trades in the same manner as sell trades.  Indeed, permitting the Debtors to reject only one side of these paired transactions could have significant negative consequences to the financial markets at a time when stability and liquidity are of paramount importance.

4.      The Debtors have also conditioned assumption on counterparties paying the full purchase price for any assumed trade in cash and have requested that the Court enter an order barring parties from setting off amounts due the Debtors on account of assumption against any prepetition claims owed by the Debtors.  The Debtors have requested this relief even though (i) the Debtors' right to reject open trades has not yet been determined; (ii) the damages resulting from the rejection of trades, if permitted, has not yet been quantified; and (iii) no Counterparty has yet asserted a right to setoff.  In other words, the Debtors request an advisory opinion with respect to the parties' setoff rights.   Nevertheless, were the Court to rule on the issue of setoff, it is clear that the Counterparties have the right to set off amounts due on assumed trades against prepetition claims, including damages from the rejection of trades by the Debtors.  The Debtors' argument that assumption of an executory contract transforms a prepetition claim into a postpetition obligation for setoff purposes is both unpersuasive and unsupported by law.

5.      The Debtors are also seeking to assume executory contracts that were terminated by some of the Counterparties prepetition in accordance with applicable law.  It is black letter law that a contract terminated prepetition is not assumable by a debtor.  As more fully set forth

-3-

below, because certain of the trades were terminated prepetition the Debtors may not assume

those trades.  Similarly, prepetition, the Debtors negotiated binding netting agreements with two

Counterparties concerning "buy" trades and "sell" trades regarding the same loans.  These

netting agreements had the effect of replacing the offsetting buy and sell trades and

extinguishing the parties' rights under those trades.  Accordingly, the Debtors cannot assume or

reject just the buy or sell trades, but rather must either assume or reject the netting agreements in

their entirety.

## BACKGROUND

### I.    THE SECONDARY MARKET FOR COMMERCIAL LOANS AND CLAIMS

6.    The Counterparties' trades subject to the Debtors' Motion (the "Trades") involve

Loans that the Counterparties contracted to buy or sell from or to the Debtors.  Debtors' Motion

at ¶ 8.  These Loans are financial instruments that provide borrowers with access to much

needed liquidity from investors.  These financial instruments are traded in a highly developed,

self-regulated market.  From the first quarter of 2007 through the third quarter of 2008,

approximately $920 billion of leveraged loans were underwritten in the United States.

Moreover, from the first quarter of 2007 through the third quarter of 2008, the total volume of

leveraged loans traded in the United States' secondary market was nearly $1 trillion.

### II.    THE DEBTORS SERVED AS MARKET-MAKERS OF LOANS

7.    Prepetition the Debtors acted as a "market-maker" with respect to trades of

Loans, which consisted of buying and selling Loans, creating a market for Loans and pairing

third party buy-orders with sell-orders in the secondary market.  The Debtors, in their role as a

market-maker, bought and sold Loans on a continuous basis and profited from rapid turnover of

the Loans and not from holding the loans in anticipation of gradual price movements.  Indeed, as

market-makers the Debtors stood ready and willing to buy and sell loans at the bid and ask price, respectively, quoted to third parties.[2]

8.      Typically, a market-maker, such as the Debtors, stands only to make a modest profit for "making a market."  The profit is represented by the market-maker's spread (the difference between its bid-ask price).  Over the past year, the bid-ask spreads were typically between 1% and 3% of the purchase price of the applicable loan.

9.      In its role as a market-maker, the Debtors entered into oral and written agreements ("Trade Confirmations") with each of the Counterparties to buy and/or sell Loans.  Each Trade Confirmation between the Debtors and a Counterparty was "a binding agreement" which was intended to be settled within a few weeks of the parties executing the Trade Confirmation.  Debtors' Motion at ¶ 8.  Consummation of the Trades required only execution of standard documentation and the transfer of funds.  *Id.*  As of the petition date, the Trades with the Counterparties had not settled.[3]

10.     As is clear from the Motion, the Debtors did not consider the Loans as their own investments; rather, any Loan purchased was "inventory" available to match a sale.  *See* Debtors' Motion at ¶ 21(indicating that any Trade to buy a Loan that is terminated will be

---

[2]  In fact, the Debtors were one of the market-makers who were regularly polled by The Loan Syndications & Trading Association, Inc. ("LSTA") in order to provide critical information to participants in the secondary loan market.  For example, the Debtors were one of the relatively few market-makers polled to provide participants with "shift-date" information to facilitate determinations within the industry as to when a particular loan switched from being traded on "par" documents to being traded on "distressed" documents.  Moreover, in order to provide non-market-makers with mark-to-market pricing for secondary loan holdings, the LSTA (in conjunction with Reuters Loan Pricing Corporation) would seek price quotes on a daily basis from a group of market-makers.  The LSTA sought price quotes from the Debtors because they served as market-makers.

[3] The information contained in paragraphs 6 - 9 was provided by the LSTA, a not-for-profit trade organization whose members include participants in the market for corporate loans and other similar private debt.  Should the Court determine that an evidentiary hearing is appropriate, a representative of the LSTA will be available to testify at such hearing to the facts set out in these paragraphs.

replaced with an identical Loan), ¶22 (explaining that where the price of a buy Trade is

sufficiently close to current market price, the Debtors will assume the Trade because the Debtors

need the "inventory to complete open 'sell' trades").

## III.    SEVERAL OF THE LOANS WERE TERMINATED PREPETITION AND CANNOT BE ASSUMED

11.    Prior to the commencement of the Debtors' bankruptcy proceedings, the Debtors

indicated that they had no authority to settle certain Trades and had no intention of settling them.

Further, as more fully described below, the Debtors failed to return phone calls and e-mails

made from certain of the Counterparties seeking to confirm that the Debtors intended to settle

the open Trades.  The Debtors failed to respond to repeated inquires, and, as a result, these

Counterparties terminated the Trades prepetition.

## IV.    THE TRADES WITH LONGACRE MASTER FUND, LTD. AND LONGACRE CAPITAL PARTNERS (QP), L.P. WERE SUBSUMED WITHIN A NETTING AGREEMENT

12.    Each of Longacre Master Fund, Ltd. ("LMF") and Longacre Capital Partners

(QP), L.P. ("LP" and, together with LMF, "Longacre") and Debtor Lehman Brothers

Commercial Paper Inc. ("LCPI") entered into two Trades covering loans to the same borrower.

In one of the Trades with LMF and LP, LCPI acted as purchaser and in the other Trade with

LMF and LP LCPI acted as seller.  As more fully set forth below, each of LMF and LP and

LCPI entered into an agreement prepetition to "net" the two transactions.  The Trades between

these parties were subsumed within these netting agreements and therefore LCPI cannot reject or

assume either of the LMF or LP buy or sell Trades, but may only assume or reject the netting

agreements in their entirety.

## ARGUMENT

I.    **THE DEBTORS' MOTION TO REJECT TRADES SHOULD BE DENIED, OR, IN THE ALTERNATIVE, THE DEBTORS SHOULD BE REQUIRED TO TREAT BUY TRADES IN THE SAME MANNER AS SELL TRADES**

   A.    **Debtors Have Not Demonstrated That Any Of The Trades Are Burdensome And Therefore The Debtors' Motion Should Be Denied To The Extent Debtors Seek To Reject Trades**

13.    The Debtors operated as market-makers with respect to the Loans.  For each Trade they entered into to purchase a Loan (a "Buy Trade"), they entered into a corresponding Trade or Trades to sell that Loan to a third party or parties (a "Sell Trade").  In other words, the Debtors were acting as an intermediary and did not purchase Loans for their own account.  The profits generated from completing any given trade were limited to the spread between the buy and the sell side of each Loan Trade.  Because the Debtors were merely facilitating the transaction, they took little risk and received a profit commensurate with that risk.  A typical paired trade resulted in a modest fee for the Debtors.

14.    Because each Buy Trade was matched with a Sell Trade or Trades, the Debtors' profit was locked-in around the time of each Trade, and any subsequent change in the value of the underlying Loans did not alter the value of the transaction as a whole or the Debtors' profit. In other words, for each current Buy Trade, there exists a corresponding Sell Trade or Trades, and in almost every case the Debtors will realize their bargained for profit on the entire transaction.  (This is apparent from the fact that the Debtors seek to reject almost every Buy Trade while simultaneously assuming every Sell Trade.[4])  The Debtors have failed to

---

[4] As the Debtors acknowledge, "most of the Rejected Trades are transactions in which the applicable Debtor was a buyer.  The same market gyrations that render the 'sell' trades favorable to the Debtors, render the 'buy' trades inimical to the best interests of the Debtors' estates. Specifically, the Debtors can likely purchase loan positions today at significantly lower prices than the prevailing market prices that existed prior to September 15, 2008."

demonstrate that the Trades are burdensome.  Accordingly, the Debtors' Motion should be denied to the extent that it seeks the rejection of any Trade.  *See, e.g., In re Chateaugay Corp.*, 10 F.3d 944, 954-55 (2d Cir. 1993) (purpose of permitting rejection of executory contract is to relieve estate of burdensome contract); *In re Minges*, 602 F.2d 38, 42 (2d Cir. 1979) ("[T]he power to reject derives from the long held doctrine that the bankrupt estate may abandon burdensome property.").

### B.    If The Debtors Are Permitted To Reject Trades, Each Buy Trade Should Be Treated In the Same Manner as the Corresponding Sell Trade

#### 1.    Separating The Buy Side And The Sell Side Of A Transaction Concerning The Same Loan Would Result In The Debtors Receiving An Improper Windfall

15.    Ignoring its role as market-maker, and plainly seeking an extraordinary windfall, the Debtors seek to terminate only one side of each transaction in which they act as both a buyer and seller of a Loan, even though the Debtors' profit was locked-in prepetition when both the ultimate buyer and seller became obligated to close their side of the transaction at the agreed upon price.  However, to permit the rejection of only one Trade—in this case typically the Buy Trade—would remove the Trade from its proper context, improperly recharacterize the Debtors' role in the transaction, and fail to treat the buy and sell side of a Loan as an integrated transaction.  *See, e.g.*, *TVT Records v. The Island Def Jam Music Group*, 412 F.3d 82 (2d Cir. 2005) (New York law requires that "all writings which form the part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties."); *In re Progressive Restaurant Sys.*, 1997 U.S. Dist. LEXIS 6668, at **11-12 (W.D.N.Y. 1997) (holding that when

---

Motion at ¶ 21.

multiple executory contracts are integrated, the Debtor must assume or reject the integrated agreement in its entirety); *see also In re Atlantic Computer Systems, Inc.*, 173 B.R. 844 (S.D.N.Y. 1994).

16.    To separate the buy and sell side of each paired transaction would also result in an extraordinary and unfair windfall to the Debtors at the expense of the Counterparty to a rejected Trade.  By way of example, assume that prepetition the Debtors entered into a trade to buy a loan with a $10,000,000 principal amount at a purchase rate of 95% and, at the same time, entered into a transaction to sell the same loan at a purchase rate of 97%.  If the price of the loan remained the same postpetition as it was at the time of the trade, the Debtors would earn $200,000.  Now assume that postpetition the market price to purchase the same loan drops to 67%.  Were the Debtors to assume both the buy and sell side of the integrated Trades, it would still realize a profit of $200,000.  However, if permitted to reject only the buy side of the transaction, the Debtors will then enter into a new trade to buy at 67%, and the Debtors will realize a profit of $3,000,000 (the difference in the price of the loans between 97% and 67%).

17.    As the example illustrates, the Debtors' proposed approach is not designed to relieve it from a burdensome contract—the Trades remain just as profitable postpetition as they were prepetition—but to allow the Debtors to act as investors who benefit from the change in the value of the markets they themselves established.  Moreover, under the Debtors' approach, a party in its position could never lose:  if the value of Loans increased, a debtor would simply reject the sell side and assume the buy side.  Although the Bankruptcy Code permits a debtor to avoid a burdensome contract, it does not create a framework for risk free investing at the expense of a contractual counterparty.

-9-

18.    What is particularly unfair about such an outcome is that all of the windfall would come at the expense of the Counterparties whose Trades are rejected.  Because the Counterparties did not know whether or not Debtors were going to assume the Trade, they held the Loan that was subject to the Trade and thus assumed all of the risk associated with market fluctuations postpetition.  The Debtors now want to reject the Trade and seek to take for themselves the profit resulting from the decline in the value of the Loans.  In essence, the Debtors' proposed approach asks the Court to ratify a strategy that results in the Debtors shorting the Loans, with all risks assumed by the Counterparties.

19.    The Court should reject the Debtors' efforts to achieve this unfair outcome and deny the Debtors' Motion to the extent the Debtors seek to reject one side of a profitable, integrated Trade.  Accordingly, the Debtors should only be permitted to reject Trades—and as set forth above, they have made no showing that any Trade when considered as part of an integrated transaction is actually burdensome—to the extent they reject all Trades concerning the same Loan that are burdensome.

> **2.      Permitting The Debtors To Reject Only One Side Of The
> Transactions Would Create Instability In The Secondary Loan
> Market**

20.    Permitting Debtors to separate each side of a transaction for purposes of deciding whether or not to reject a Trade would undermine the ability of financial institutions to act as market-makers whenever concerns are raised about that institution's credit-worthiness.  Market participants will not be willing to transact with an institution where questions arise regarding its stability because there would be a risk that if the institution seeks bankruptcy protection, the counterparty will be unfairly exposed to market fluctuation.  In other words, the approach

proposed by the Debtors would create a rule that would compound a crisis of confidence that surrounds a firm when concerns about its credit-worthiness causes a downward spiral in its ability to act as a financial intermediary leading an otherwise stable financial company into bankruptcy.  Further, the additional risk to parties buying and selling loans in the secondary market if the Debtors' proposed approach were followed would further weaken the market for secondary loans at a time when such markets are already under pressure and the liquidity provided by market participants is much needed.

II.    **THE DEBTORS' REQUEST THAT THE COURT ISSUE AN ADVISORY OPINION WITH RESPECT TO THE PARTIES' SETOFF RIGHTS SHOULD BE DENIED, OR, IN THE ALTERNATIVE, SETOFF SHOULD BE PERMITTED**

A.    **The Issue Of Setoff Is Not Ripe For Adjudication**

21.    "The United States Constitution limits the jurisdiction of federal court to actual 'cases' or 'controversies.'"  *In re Adelphia Communications Corp.*, 307 B.R. 432, 436 (Bankr. S.D.N.Y. 2004) (noting that bankruptcy courts "are subject to the jurisdictional constraints of Article III to the extent that they exercise the judicial power of the United States").  "[T]he Supreme Court has stressed not only that the controversy must be sufficiently real and immediate, allowing specific and conclusive relief, but that it must also be ripe for adjudication."  *Id.* at 437 (quoting *Dow Jones & Co., Inc. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 406 (S.D.N.Y. 2002)); *see also Flast v. Cohen*, 392 U.S. 83, 96 (U.S. 1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.").  "Central to the ripeness requirement is that courts should not endeavor to resolve contingencies that may or may not occur as expected or may not happen at all."  *Id.* (quoting *Dow Jones*, 237 F. Supp. 2d at 407, n.39.).  "An advisory opinion results if the court

resolves a question of law that is not presented by the facts of the case." 20 Charles Alan

Wright & Arthur R. Miller, Federal Practice and Procedure Deskbook § 13 (citing *In re Chi.,*

*Rock Island & Pac. R.R. Co.*, 772 F.2d 299, 303 (7th Cir. 1985)).

22.      Notwithstanding the plain jurisdictional requirement that a dispute be ripe for

resolution, the Debtors ask that this Court enter "an order providing that no Counterparty shall

be entitled to assert or take any act to exercise a right to set off any prepetition Claim of such

Counterparty." Motion at ¶ 36.  The Debtors seek this relief even though (i) the Debtors' right

to reject open trades has not yet been determined; (ii) the damages resulting from the rejection of

trades, if permitted, has not yet been quantified; and (iii) no Counterparty has yet asserted a right

to setoff.  Rather, Debtors seek to bar any claim for setoff on the ground that they "*anticipate* . . .

that one or more Counterparties *may* seek to assert setoff rights upon settlement of the Assumed

Trades." *Id.* at ¶ 24 (emphasis added).

23.      Because there are neither facts before the Court upon which to make a legal

ruling, nor is there an actual controversy before the Court with respect to setoff, the issue is not

ripe for adjudication.  *See JRT, Inc. v. TCBY Systems, Inc.*, 121 B.R. 314 (Bankr. W.D. Mich.

1990) (in the context of debtor's motion to reject an executory contract concerning a franchise

agreement, court declined to resolve request by debtor and counterparty that court determine

whether covenant not to compete clause may be enforced after rejection on the ground that a

judicial determination would constitute an advisory opinion); *see generally In re Adelphia*

*Communications Corp.*, 307 B.R. at 440 (Bankr. S.D.N.Y. 2004) (although sympathetic to the

benefit a ruling may have on parties' ability to know what litigation positions they may wish to

take, such benefit "[does] not confer subject matter jurisdiction where it is lacking").

Accordingly, the Court should deny the Debtors' requested relief.[5]

> ### B. Should Debtors Owe Any Counterparty Any Payment Following The Rejection Of A Trade Confirmation, Such Amounts Should Be Eligible For Setoff Against Any Amounts That Same Counterparty Is Obligated To Pay The Debtors With Respect To Any Assumed Trade Confirmation

24.     It is well-established that the Bankruptcy Code grants a creditor, with certain

exceptions, the right to set off claims held against a debtor against claims the debtor has against

the creditor.  *See Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18 (1995).  To effectuate a

setoff, a creditor must demonstrate the following:

> i.   The creditor has a claim against the debtor which arose prior to the commencement of the bankruptcy case;
>
> ii.  A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the bankruptcy case; and
>
> iii. The debt and the claim are mutual obligations.

*See, e.g.*, *In re Bennett Funding Group Inc.*, 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997).   A

Counterparty to both a rejected trade and an assumed trade will satisfy the Bankruptcy Code's

requirements for setoff.

> ### 1. Counterparties Whose Trades Have Been Rejected Will Have A Prepetition Claim Against The Debtor

25.     As the Debtors acknowledge, the rejection of any Trade will create a prepetition

unsecured claim against the relevant Debtor's estate.  Debtors' Motion at ¶ 29; *see, e.g.*, *In re*

*Communications Dynamics, Inc.*, 382 B.R. 219, 232 (Bankr. D. Del 2008); *In re Clintondale*

---

[5] The Debtors' purported reservation of the right to modify which Trades it assumes and rejects subject to the Court's ruling on the issue of setoff is without merit.  The Debtors are not permitted to condition their assumption or rejection of an executory contract on the determination of an ancillary legal issue.  *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) (holding that § 365 does not permit a bankruptcy court to resolve questions concerning the validity of a contract before deciding whether to permit a trustee or debtor-in-possession to assume a contract).

*Mills, Inc.*, 216 B.R. 742, 746 (Bankr. M.D. Pa. 1998); *In re Express Freight Lines, Inc.*, 130

B.R. 288, 291–92 (Bankr. E.D. Wis. 1991); *In re Mace Levin Assocs., Inc.*, 103 B.R. 141, 143–

44 (Bankr. N.D. Ohio 1989); *but see In re Delta Air Lines*, 341 B.R. 439, 449 (Bankr. S.D.N.Y.

2006) (a decision that, as the Debtors observe, has been criticized by courts and commentators).

<b>2.    Any Amounts Owed By The Counterparties To The Debtors<br>Under The Assumed Trades Would Be Prepetition Obligations</b>

26.    As the Second Circuit Court of Appeals has explained, "[a] claim will be deemed

to have arisen pre-petition if the relationship between the debtor and the creditor contained all of

the elements necessary to give rise to a legal obligation—'a right to payment'—under relevant

non-bankruptcy law." *In re Manville Forest Prods. Corp.*, 209 F.3d 125, 129 (2d Cir. 2000)

(citation and internal quotation marks omitted)).  "[M]ere assumption of an executory contract

does not alter when the obligations under the contract arose."  *In re Gerth,* 991 F.2d 1428, 1432

(8th Cir. 1993); *see In re Buckner*, 218 B.R. 137, 145-146 (B.A.P. 10th Cir. 1998) (amounts due

debtor postpetition on account of assumed executory contract are prepetition claims "absolutely

owed" for setoff purposes); *In re Pathnet Operating, Inc.*, 2005 U.S. Dist. Lexis 43793, **21-23

(E.D. Va. 2005) (debtor could set off amounts due creditor prepetition against postpetition

payments creditor was obligated to share under executory contract to be assumed because

obligation to share funds arose prepetition when creditor's right to payments subject to sharing

was established); *In re Greseth*, 78 B.R. 936, 941-43 (D. Minn. 1987) (holding that contractual

payments due postpetition on prepetition contract constituted prepetition claim for setoff

purposes); *In re Communication Dynamics, Inc.*, 382 B.R. 219, 233-36 (Bankr. D. Del. 2008)

(creditor could set off amounts owed to debtor under two sellers' notes against rejection

damages claims because obligation under sellers' notes arose on date creditor executed them

-14-

even though payment on those notes only became due postpetition); *In re Bousa, Inc.*, 2006 WL 2864964, Case No. 89-B-13380 (JMP), at *3 (Bankr. S.D.N.Y. Sept. 29, 2006) ("For purposes of setoff, a debt arises when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed." (citing *Gerth*)); *In re Telephone Warehouse, Inc.*, 259 B.R. 64, 69 (Bankr. D. Del. 2001) (commissions which were payable only upon third-party's use of product considered prepetition debt for purposes of setoff even though use took place postpetition because sale of product giving rise to obligation took place prepetition); *In re GP Express Airlines, Inc.*, 192 B.R. 954, 958-60 (Bankr. D. Neb. 1996) (creditor could set off amounts owed to the debtor under an inter-airline code sharing agreement notwithstanding that amount of creditor's debt was unknown as of the petition date because creditor obligated itself to pay debtor prepetition which was determinative for setoff purposes); *In re Ratliff*, 79 B.R. 930, 933 (Bankr. D. Colo. 1987) (adopting reasoning applied in *Gerth*).

27.    With respect to the Sell Trades, it is undisputed that each of the Trades constituted a binding agreement as of the date of each Trade to pay the purchase amount and that each Trade took place prepetition.  Debtors' Motion at ¶ 8.  As Debtors acknowledge, all that remained to be done with respect to each Trade was the execution of standard documentation and the transfer of funds to which each party obligated itself to pay prepetition.  *Id.*  (Attached as Exhibit B are copies of form trade confirmations, including standard terms and conditions, for LSTA and Loan Market Association ("LMA") par and distressed loan purchases and participations.  As these documents make clear, the purchaser obligated itself to pay to the seller the purchase price upon delivery of the loan.)  Because it was the entry into the Trades and not the assumption of any of the Trades that gives rise to claims under any assumed Trades, any

claim by the Debtors to be paid under an assumed Trade would be a prepetition claim.  *See In re Manville Forest Prods. Corp.*, 209 F.3d at 129; *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1036 (5th Cir. 1987); *In re Jensen*, 127 B.R. 27, 32 (B.A.P. 9th Cir. 1991) (holding that a claim arises when "the time when the acts giving rise to the alleged liability were performed").

28.     Debtors argument that the Counterparties' obligations with respect to assumed Trades are postpetition claims for setoff purposes is at odds with the Bankruptcy Code and based on a sleight of hand.  Debtors state that once they assume a Trade, "any failure by the Debtors to comply with *their* obligations under an Assumed Trade . . . will be treated as postpetition administrative obligations."  Debtors' Motion at ¶ 29 (emphasis added).  From this fact the Debtors' reach the unsupported and unfounded conclusion that the *Counterparties'* prepetition obligations are somehow converted into postpetition obligations.  However, the issue here is whether a Counterparty to an assumed trade had a prepetition obligation to make payments pursuant to a Trade, not the Debtors' obligation to the Counterparty or the priority of payment were the Debtors to breach the terms of an assumed agreement at some point in the future.

29.     The Bankruptcy Code is clear that a claim arises "when the right to payment accrues, not when payment is due." *In re Communication Dynamics, Inc.*, 382 B.R. at 233-34; *see also In re Buckner*, 218 B.R. at 145-146 ("holding that for setoff purposes contingent, unmatured and unliquidated debts qualify as "absolutely owed" so long as such obligations arose prepetition within the meaning of Bankruptcy Code § 101(5)).  In other words, obligations on any assumed Trade will be based on a prepetition claim, even if the Counterparties would

-16-

receive an administrative expense claim were the Debtors to breach their obligations under the terms of the Trade at some point after assumption.[6]

### 3.     Rejection Damages And Assumption Obligations Represent Mutual Obligations

30.     Mutuality would exist in this case to the extent any Counterparty seeks to set off prepetition claims, including rejection damage claims, against amounts due under assumed Trades so long as the Debtor and Counterparty were the same parties to the Trades. *See In re Gerth,* 991 F.2d 1428, 1435-36 (8th Cir. 1993) (holding that when a debtor-in-possession assumes an executory contract, the debtor and the debtor-in-possession are the same entity for purposes of mutuality under Bankruptcy Code section 553). As the *Gerth* court explained, if the debtor-in-possession were a different entity than the prepetition debtor then "every assumed executory contract would automatically fail to satisfy the requirement of mutuality," and it would also be unclear that any right to setoff would satisfy this obligation upon an entity becoming a "debtor-in-possession" by operation of law. *Gerth,* 991 F.2d at 1436.

31.     Debtors ask this Court to endorse an approach that would convert prepetition claims due a Debtor into postpetition claims on the theory—only implicitly acknowledged—that the debtor-in-possession is a different entity than that which existed prior to the filing of the bankruptcy petition. Indeed, this is the reasoning of the only two cases upon which the Debtors rely to support their position: *In re Evatt*, 112 B.R. 405, 411 (Bankr. W.D. Okla. 1989) ("Upon assumption of the contract, [creditor] would then owe the debt which arose under the contract to

---

[6] For a similar reason, Debtors' reliance on *In re Genuity Inc.*, 323 B.R. 79 (Bankr. S.D.N.Y. 2005) is misplaced. In *Genuity,* the debtor assumed an executory contract and sought to offset its cure obligations against prepetition security deposits held by creditors. The current case does not involve "cure claims" owed by a debtor and the statutorily imposed mandate which requires cure claims to be paid in cash. Moreover, in *Genuity,* the court held that the debtor had no greater right to the security deposit postpetition than it did prepetition and that by assuming the contract it assumed all its provisions including the obligation to provide the creditor with a security deposit.

the debtor-in-possession, rather than the pre-petition debtor.") and *In re Walat Farms, Inc.*, 69 B.R. 529, 531 (Bankr. E.D. Mich. 1987) ("It follows then that if the contract is properly assumed by the debtor in possession, any right to a deficiency payment could only arise post-petition, and be owed to the debtor in possession *qua* trustee, and not the debtor."). These cases are poorly reasoned, at odds with the Bankruptcy Code and, as a result, have been widely criticized. *See, e.g.*, *In re Buckner*, 165 B.R. 942, 946 (D. Kan. 1994) ("the recent trend of cases deciding the issue ... have ... reject[ed] the analysis in Walat Farms."), *aff'd*, 218 B.R. 137 (B.A.P. 10th Cir. 1998); *In re Allen*, 135 B.R. 856, 866 (Bankr. N.D. Iowa 1992) (rejecting *Evatt* and *Walat Farms* rationale that assumption transforms prepetition claim into postpetition obligation); *In re Mohar*, 140 B.R. 273, 277 (Bankr. D. Mont. 1992) (adopting rationale of *Allen*); *In re Affiliated Food Stores, Inc.*, 123 B.R. 747, 748 (Bankr. N.D. Tex. 1991) (rejecting *Walat Farms* and holding that mutuality exists for setoff purposes when debtor assumes an executory contract).

32.    The Debtors' position and the decisions in *In re Walat Farms* and *In re Evatt* are also at odds with the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 525-26 (U.S. 1984), which has "made it inappropriate to make distinctions between the 'debtor' and 'debtor in possession.'" *In re Adelphia Comm. Corp.*, 359 B.R. 65, 74 (Bankr. S.D.N.Y. 2007); *In re Footstar, Inc.*, 323 B.R. 566, 574, n.4 (Bankr. S.D.N.Y. 2005) ("The Supreme Court has laid to rest the notion that the debtor in possession should be deemed a different entity than the prepetition debtor."). Indeed, were the Debtors' approach to be adopted, it would not be permitted to assume or reject any of the Trades since the Debtors (as debtors-in-possession) would not be parties to any of the Trades. *See Bildisco,* 465 U.S. at 528 (observing that if the debtor-in-possession were treated as a "wholly 'new entity,' it would be unnecessary for the

-18-

Bankruptcy Code to allow it to reject executory contracts, since it would not be bound by such contracts in the first place").

33.      Finally, even if this Court were to adopt the analysis of the decisions of *Evatt* and *Walat Farms,* those cases are inapposite because—unlike here—each case involved a contract where there remained "substantial performance" due by the debtor prior to the creditor having an obligation to pay the debtor.  *See In re Evatt*, 112 B.R at 411; *In re Walat Farms*, 69 B.R. at 531.

34.      For the foregoing reasons, the Counterparties will be able to satisfy each of the three requirements set forth in Bankruptcy Code section 553 and will have a valid right to set off amounts owed with respect to assumed Trades against prepetition claims including prepetition claims arising from rejected Trades.  Accordingly, the relief requested in the Debtors' Motion to prohibit Counterparties from asserting their rights of setoff should be denied and Counterparties should retain the ability to assert any rights of setoff that may exist.

## III.    OPEN TRADES TERMINATED PREPETITION CANNOT BE ASSUMED

35.      Prior to the commencement of Debtors' bankruptcy proceedings, a number of open Trades were terminated by certain Counterparties in accordance with applicable law.  It is well-established that a contract terminated prepetition is not capable of assumption.  *See, e.g.*, *In re Best Film & Video Corp.*, 46 B.R. 861, 869-70 (Bankr. E.D.N.Y. 1985); *In re Scarsdale Tires Inc.*, 47 B.R. 478, 480 (Bankr. S.D.N.Y. 1985) (contract terminated prepetition is unassumable). Accordingly, to the extent open Trades were terminated prepetition in accordance with applicable law, they are not assumable by the Debtors.

**A.    LMA Transactions Between Debtors And Field Point IV S.à.r.l., BDF Limited And Banc Of America Securities Limited Were Terminated Prepetition Under English Law And Therefore Cannot Be Assumed**

36.    Field Point IV S.à.r.l. ("Field Point") and BDF Limited ("BDF" and, together with Field Point, "Field Point/BDF") entered into separate LMA distressed trade confirmations each dated July 14, 2008 with LCPI to purchase certain loans made to Pertus Sechzente GmbH (the "Field Point/BDF Distressed Confirmations").  On August 4, 2008, Field Point/BDF entered into two additional LMA par trade confirmations with LCPI to purchase certain loans made to Pertus Sechzente GmbH (the "Field Point/BDF Par Confirmations" and, together with the Field Point/BDF Distressed Confirmations, the "Field Point/BDF Confirmations").  Attached as Exhibit C hereto are redacted copies of the Field Point/BDF Confirmations.

37.    Banc of America Securities Limited ("BancAmerica") entered into a certain LMA trade confirmation dated February 7, 2008 with LCPI to purchase certain loans made to Yell Group plc (the "BancAmerica Yell Confirmation").  In addition, BancAmerica entered into certain LMA trade confirmations dated September 2, 2008 with LCPI to purchase certain loans made to NTL Cable plc (the "BancAmerica NTL Confirmations," and together with the BancAmerica Yell Confirmation, the "BancAmerica Confirmations" and together with the Field Point/BDF Confirmations, the "Terminated LMA Confirmations").  Attached as Exhibit D hereto are redacted copies of the BancAmerica Confirmations.

38.    The BancAmerica Confirmations and Field Point/BDF Par Confirmations were expressly subject to, and incorporated, the Standard Terms and Conditions for Par Trade Transactions of the Loan Market Association as in effect on the applicable trade debt (the "LMA Par Terms") and are governed by the English law. The Field Point/BDF Distressed

Confirmations were expressly subject to, and incorporated, the Standard Terms and Conditions for Distressed Trade Transactions of the Loan Market Association as in effect on the applicable trade debt (the "LMA Distressed Terms") and are governed by English law.

39.      Field Point/BDF exercised its right to terminate each of the Field Point/BDF Confirmations by separate letters to LCPI dated September 30, 2008 (the "Field Point/BDF Termination Letters").  Attached as <u>Exhibit E</u> hereto are redacted copies of each of the Field Point/BDF Termination Letters.  Accordingly, the Field Point/BDF Confirmations were terminated prior to LCPI's bankruptcy filing.  Similarly, BancAmerica exercised its rights to terminate the BancAmerica Yell Confirmation by letter to LCPI dated October 1, 2008 and the BancAmerica NTL Confirmations by letter to LCPI dated October 3, 2008 (collectively, the "BancAmerica Termination Letters").  Attached as <u>Exhibit F</u> hereto are redacted copies of each of the BancAmerica Termination Letters.  Accordingly, the BancAmerica Confirmations were terminated prior to LCPI's bankruptcy filing.

40.      Under English law, a party to a contract will be discharged from future performance under a contract where the other party has breached the terms of the contract and the breach is so serious as to deprive the innocent party of substantially the whole benefit which it was intended to obtain from the contract.  *See* Chitty on Contracts, 12-025, 12-034.[7]  English law also provides that a party to a contract will be discharged from future performance under a contract where the other party has (i) renounced its obligations under the contract or has rendered performance impossible in some essential respect, or (ii) by words or conduct evinced

---

[7] Attached as <u>Exhibit K</u> hereto are relevant excerpts from Chitty on Contracts cited herein.

an intention not to perform its obligations under the contract.  *See* Chitty on Contracts, 12-034, 24-018.

41.    Each of the Terminated LMA Confirmations provided that (i) LCPI shall prepare the transaction documentation and endeavor to deliver it to the other party a short time after the Trade date; (ii) the parties shall endeavor to sign the transaction documentation and, where appropriate, provide copies to the agent bank under the applicable credit agreement, shortly after the Trade date; and (iii) the parties settle the Trade within 10 business days of the Trade date for the BancAmerica Confirmations and fifteen business days for the Field Point/BDF Confirmations.  *See* §§ 6-7 LMA Distressed Terms; §§ 6-7 of LMA Par Terms and definition of "Delayed Settlement Period."

42.    Both the LMA Par Terms and LMA Distressed Terms make clear that the "conditions" contained therein would govern the Terminated LMA Confirmations.  *See* LMA Par Terms § 1; LMA Distressed Terms § 1.  Accordingly, Conditions 6 and 7 of each of the LMA Par Terms and LMA Distressed Terms governing the Terminated LMA Transactions qualify as "conditions" under English law.  Moreover, English law also treats stipulations as to time contained in a contract as a "condition" of the contract even if it is not expressly described as such in the contract.  *See* Chitty on Contracts, 12-037.

43.    In each case, LCPI breached these conditions by failing to prepare the required transaction documentation and to take all necessary action to settle the Terminated LMA Confirmations as soon as reasonably practicable.  As a result, BancAmerica and Field Point/BDF were entitled prepetition to treat their respective Terminated LMA Confirmations as having come to an end and to treat themselves as discharged from further performance.

-22-

44.     In addition to these breaches, LCPI also indicated, through words and conduct, that it did not intend to perform its obligations under the Terminated LMA Confirmations, nor did it take all necessary action to settle the Terminated LMA Confirmations as soon as reasonably practicable.  In particular, each of Field Point/BDF and BancAmerica made numerous inquiries by telephone and e-mail to determine the status the Terminated LMA Confirmations and to seek assurances that LCPI intended to perform its obligations thereunder. Notwithstanding these multiple prepetition inquiries, LCPI refused to confirm with Field Point/BDF or BancAmerica that it intended to settle these trades and communicated to Field Point/BDF and BancAmerica that it would no longer be processing and/or could no longer process open trades because it lacked authority to do so.

45.     Following weeks of LCPI's refusal to confirm that it would settle the Field Point/BDF Confirmations, Field Point/BDF delivered the Field Point/BDF Termination Letters in which Field Point/BDF confirmed their willingness to settle the applicable trades and advised LCPI that (i) it accepted LCPI's repudiations as of September 30, 2008 (prior to the commencement of LCPI's bankruptcy proceeding) and (ii) the Field Point/BDF Confirmations were terminated.  LCPI did not respond to these letters.

46.     Similarly, after failing to receive any indication from LCPI that it intended to settle the BancAmerica Confirmations, BancAmerica delivered the BancAmerica Termination Letters in which BancAmerica confirmed its willingness to settle the trade and informed LCPI that because it had not provided BancAmerica with adequate assurances it was accepting LCPI's repudiations as of September 26, 2008 (prior to the commencement of LCPI's bankruptcy proceeding) and considered the BancAmerica Confirmations terminated as of such date.

-23-

47.    Accordingly, LCPI, through its words and conduct, renounced its obligations in respect of the Terminated LMA Confirmations and therefore each of Field Point/BDF and BancAmerica had the right to terminate the Terminated LMA Confirmations. The Terminated LMA Confirmations were therefore terminated prior to the commencement of LCPI's bankruptcy proceeding and LCPI cannot assume them.

**B.    BofA's LSTA Transaction Terminated Prepetition Under New York Law**

48.    Bank of America, N.A. ("BofA") entered into a Trade Confirmation with LCPI dated August 19, 2008 to purchase certain loans made to Landsource Communities Development LLC (the "BofA LSTA Confirmation"). The BofA LSTA Confirmation was subject to, and incorporated, the Standard Terms and Conditions for Distressed Confirmations ("LSTA Distressed Terms") as in effect on the trade date. Attached as <u>Exhibit G</u> hereto are redacted copies of the BofA LSTA Confirmation. The BofA LSTA Confirmation is governed by New York law.

49.    Under New York law, a party may terminate a contract upon the counterparty's repudiation or anticipatory breach of its future obligations under the contract. *See Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *AG Props. of Kingston, LLC v. Besicorp-Empire Dev. Co., LLC*, 14 A.D.3d 971, 973 (N.Y. 3d Dep't 2005). Repudiation or anticipatory breach may take the form "either [of] 'a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach' or 'a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.'" *Computer Possibilities Unlimited, Inc. v. Mobil Oil Corp.*, 301 A.D.2d 70, 77 (N.Y. 1st Dep't 2002) (citing *Norcon Power Partners, L.P.*

-24-

*v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (N.Y. 1998)). Indeed, a party may repudiate by communicating its intent to perform only upon the satisfaction of extra-contractual conditions. *Id.* (citations omitted); *O'Connor v. Sleasman*, 37 A.D.3d 954, 957 (N.Y. 3d Dep't 2007) (citations omitted).

50.    The BofA LSTA Confirmation (i) specified the Settlement Date to be twenty (20) days after the Trade date or as soon as reasonably practicable, and (ii) provided that Seller shall use reasonable efforts to furnish to Buyer drafts of the applicable Transfer Documentation within six (6) business days after the Trade date. *See* LSTA Distressed Terms §§6, 10. As seller, LCPI undertook these obligations under the BofA LSTA Confirmation. LCPI did not fulfill these obligations prepetition.

51.    Moreover, LCPI indicated, through words and conduct, that it did not intend to perform its obligations thereunder. In particular, prepetition, LCPI indicated that it was unable to process open trades for an extended period of time. LCPI's unwillingness to close the trade constituted a repudiation under New York law. Further, after LCPI stated that it was presently unable to settle trades, BofA delivered a letter to LCPI dated October 2, 2008 in which BofA confirmed its willingness to settle the trade and provided LCPI with a time certain to complete the trades. The letter further provided that if LCPI did not respond by such time it would consider the BofA LSTA Confirmation terminated. No response whatsoever was received to these letters. As a result, on October 2, 2008 the BofA LSTA Confirmation was terminated. Attached as Exhibit H hereto is a redacted copy of this October 2, 2008 letter.

52.    For the foregoing reasons the Terminated LMA Confirmations and BofA LSTA Confirmation were terminated prepetition and therefore cannot be assumed by the Debtors.

-25-

## IV.    LONGACRE AND LCPI AGREED TO NETTING AGREEMENTS TO "NET" CERTAIN TRADES BETWEEN THE PARTIES

53.    On April 18, 2008, LMF entered into a Trade (the "LMF First Trade Confirmation") with LCPI, pursuant to which LCPI agreed to purchase from Longacre $2,475,000 principal amount of loans made to Wimar Landco, LLC (n/k/a Tropicana Las Vegas Resort & Casino LLC) ("Tropicana") under a Credit Agreement, dated January 3, 2007 (such loans made thereunder, the "Tropicana Loans").  On April 25, 2008, LMF entered into a second Trade (the "LMF Second Trade Confirmation" and, together with the LMF First Trade Confirmation, the "LMF Confirmations") with LCPI, pursuant to which LMF agreed to purchase from LCPI $1,650,000 principal amount of the Tropicana Loans.

54.    On April 18, 2008, LP entered into a Trade (the "LP First Trade Confirmation") with LCPI, pursuant to which LCPI agreed to purchase from LP $525,000 principal amount of Tropicana Loans.  On April 25, 2008, LP entered into a second Trade (the "LP Second Trade Confirmation" and, together with the LP First Trade Confirmation, the "LP Confirmations") with LCPI, pursuant to which LP agreed to purchase from LCPI $350,000 principal amount of the Tropicana Loans.

55.    Pursuant to the Motion, Debtors propose to reject each of the LMF First Trade Confirmation and the LP First Trade Confirmation (together, the "First Trade Confirmation") and assume the LMF Second Trade Confirmation and LP Second Trade Confirmation (together, the "Second Trade Confirmation").  However, prepetition (i) LMF and LCPI agreed to enter into a LSTA Bilateral Netting Agreement (the "LMF Netting Agreement"), and (ii) LP and LCPI agreed to enter into a LSTA Bilateral Netting Agreement (the "LP Netting Agreement" and, together with the LMF Netting Agreement, the "Netting Agreements") and "net" the

-26-

transactions described in the First Trade Confirmation and the Second Trade Confirmation.

Attached as Exhibit I hereto is a copy of the LMF Netting Agreement.  Attached as Exhibit L

hereto is a copy of the LP Netting Agreement.

56.     By agreeing to net the transactions, the parties intended to extinguish the

obligations under the LMF Confirmations and LP Confirmations (collectively, the "Longacre

Confirmations") and replace them with the terms set out in the Netting Agreements and

therefore it is the Netting Agreements, and not the Longacre Confirmations, that govern the

obligations of the parties and are the agreements that may be assumed or rejected by the

Debtors.

### A.     The Netting Agreements Are A Binding Agreement

57.     New York courts have long recognized that parties are free to enter into a binding

contract without memorializing their agreement in a fully executed document.  *Municipal*

*Consultants & Publishers, Inc. v. Town of Ramapo*, 47 N.Y.2d 144, 149 (1979) (contract

enforceable against the town without the signature of the town supervisor).  These agreements

are known as binding "type I" preliminary agreements and are "fully binding preliminary

agreement[s], which [are] created when the parties agree on all the points that require

negotiation (including whether to be bound) but agree to memorialize their agreement in a more

formal document."  *Vacold LLC, Immunotherapy, Inc. v. Cerami*, 2008 U.S. App. LEXIS 20807,

at * 26 (2d Cir. Oct. 2, 2008) (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d

543, 548 (2d Cir. 1998)); *see also Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996) ("Type I is

where all essential terms have been agreed upon in the preliminary contract, no disputed issues

are perceived to remain, and a further contract is envisioned primarily to satisfy formalities.").

Moreover, these types of agreements "[render the parties] fully bound to carry out the terms of the agreement even if the formal instrument is never executed." *Adjustrite*, 145 F.3d at 548.

58.     The four factors courts generally consider in determining whether parties have reached a type I preliminary agreement are:  (i) whether there has been an express reservation of right not to be bound in the absence of a writing; (ii) whether there has been partial performance of the contract; (iii) whether all of the terms of the alleged contract have been agreed upon; and (iv) whether agreement at issue is the type of contract that is usually committed to writing. *Cerami*, 2008 U.S. App. LEXIS 20807, at *29 n.2 (affirming that the letter agreement at issue was a binding and enforceable type I agreement).  The ultimate issue, however, "is the intent of the parties:  whether the parties intended to be bound, and if so, to what extent." *Id.* at 29.

59.     Here, there was no reservation of a right not to be bound by the Netting Agreements until they were signed.  The Netting Agreements do not contain any express reservation that the agreement would not be effective if not fully executed, but instead demonstrate that the documents merely confirm the parties' intent to be bound.  The Netting Agreements each provide that "it *reflects the agreement* of [the parties] to net the transactions described above. . . ."  LMF Netting Agreement, at 1 (emphasis added); LP Netting Agreement, at 1 (emphasis added).  Furthermore, rather than stating that the terms of the agreement become binding only upon execution and delivery of the final document, the Netting Agreements provide that payment shall be rendered upon "execution and delivery" of the agreement.  *Id.* The execution and delivery of the Netting Agreements are not a condition to the enforceability of the agreement, but merely establishes when the terms shall be performed.[8]  *See Bitumenes*

---

[8] The Netting Agreements are not the type of contract that can be performed in parts.  At the moment Longacre pays

-28-

*Orinoco v. New Brunswick Power Holding Corp.*, 2007 U.S. Dist. LEXIS 10138 at \*\*55-56 ,

No. 05Civ. 9485 (LAP) (S.D.N.Y. Feb. 13, 2007) (the absence of a signature is not dispositive

as to whether the parties intended to be bound). Nothing in the Netting Agreements disclaims

the parties' intent to be bound.

60.    Moreover, the language of the Netting Agreements demonstrates that they are

final, binding contracts. Like the letter agreement in *Cerami*, the Netting Agreements are not a

proposal, draft or memorandum of understanding, nor does it use "non-committal" language

"suggesting, at most, a promise to 'work together.'" 2008 U.S. App. LEXIS 20807, at \*31.

Instead, the Netting Agreements clearly and specifically provide the parties' intent and

obligations, as well as wire instructions for payment, and instructions in the event of receipt of

future interest or fees. The contract also contains representations and warranties, confidentiality

and choice of law and forum provisions. The parties did not leave any open terms for future

negotiation.

61.    The parties' drafting history also reinforces the fact that the parties understood

the Netting Agreements to serve only to confirm their existing agreement to net the Longacre

Confirmations. Drafts of the Netting Agreements were exchanged between the parties during

September 2008 and on October 2, 2008. On October 2, 2008, David Tomea (assistant to

LCPI's counsel) and Tom Shollar on behalf of Longacre exchanged e-mails concerning the

Netting Agreements (the "October 2, 2008 E-mails"). In this exchange, David Tomea confirmed

the parties' agreement in an email, stating "Tom, we intend to partially net the 4-18 trade

(aggregate $3M sale by Longacre to LCPI) against the 4-25 trade (aggregate sale of 2M by LCPI

---

the agreed upon "netting amount," the parties are deemed to have fully performed and satisfied all rights and
obligations under the trade confirmations referenced in the Agreement. See LMF Netting Agreement, at 2; LP
Netting Agreement, at 2.

to Longacre).  This contemplated arrangement creates a residual sale of 1M by Longacre to

Lehman . . . ."[9]  *See* October 2, 2008 E-mails attached hereto as <u>Exhibit J</u>.  Following

Longacre's request, David Tomea then sent Longacre the most recent version of the Netting

Agreements along with other supporting documentation."  *See id*.  Shortly upon receipt, Tom

Shollar acknowledged in an e-mail to LCPI's counsel that the documents sent on behalf of LCPI

confirmed the parties' understanding, advised that the "docs are in for signature" and asked

when LCPI "can close."  *See id*.  On October 2, 2008, Tom Shollar sent David Tomea via e-mail

the executed Netting Agreements along with other executed supporting documentation.

Attached hereto as <u>Exhibit M</u> is a copy of this e-mail.

62.      It is customary in the secondary loan market for distressed debt trades for the

principals to orally agree to all material terms of a trade and then have their counsel confirm the

agreement in writing and include any additional "boilerplate" language as necessary.  *See* N.Y.

Gen. Oblig. Law § 5-701 (McKinney 2008) (oral contracts for the "assignment, sale, trade,

participation, or exchange of indebtedness or claims . . . arising in the course of the claimant's

business or profession (including but not limited to commercial and/or bank loans ...)" are

binding so long as there is a form of written or electronic corroboratory evidence).  Under these

circumstances, "the task of formalizing contract documentation does not negate the finding of a

type I agreement, so long as the parties 'viewed their contract as . . . a binding Type I agreement

. . . in which everything had been agreed and all that remained was the need for lawyer's

embellishments.'"  *Cerami*, 2008 U.S. App. LEXIS 20807, at *41 (quoting *Shann*, 84 F.3d at

77-78).   Here, LCPI and Longacre had agreed to net the Longacre Confirmations and

---

[9] As in *Cerami*, the term "contemplate" means "anticipate doing or performing," "plan on" and "intend," to describe
future performance called for under a binding agreement.  See *Cerami*, 2008 U.S. App. LEXIS 20807, at *34.

negotiated all material terms of the Netting Agreements.  There were no open terms and there was nothing more to be done other than for the parties' counsel to reduce the agreement to writing, which is what occurred.  LCPI's attorneys finalized the Netting Agreements, sent them to Longacre for review and signature, and after executing them, Longacre returned the partially executed agreement to LCPI.  LCPI's failure to execute the Netting Agreements does not change the parties' agreement to net the trades or their original intent to be bound to such an agreement. Therefore, the Netting Agreements are binding agreements and supersede the Longacre Confirmations.[10]

63.    For similar reasons, when the parties agreed upon the terms of the Netting Agreements, they entered into a novation which replaced all terms of the prior Longacre Confirmations.  The elements of novation are: "(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract." *Palm Desert Art, Inc. v. Mohr*, 2001 U.S. Dist. LEXIS 620, at *6-7 (N.D.N.Y. 2001) (citing *Callanan Indus., Inc. v. Micheli Contracting Corp.*, 508 N.Y.S.2d 711, 712 (N.Y. App. Div. 3rd Dep't 1986)); see also *In re Balfour MacLaine Int'l Ltd.*, 85 F.3d 68, 82 (2d Cir. 1996); *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 140 (2d Cir. 1993) (defining novation under New York law as "an agreement for an existing obligation to be extinguished immediately by the acceptance of a new promise.").  A novation may be established by evidence of an express understanding or by circumstances showing agreement.  *In re Chateaugay Corp.*, 116 B.R. 887, at 57 (Bankr. S.D.N.Y. 1990) (novation supported by letters and surety adjustment

---

[10]  Even if the Netting Agreements were deemed not to be a valid and binding agreement, for the reason set forth above in section I.B., the Longacre Confirmations should be construed as a single, integrated transaction and therefore, the Debtors should have to assume or reject the Longacre Confirmations as demonstrated by the language of the Netting Agreements.

reports that three bonds were replaced by a new bond). A novation may be implied or inferred from the totality of the circumstances and the intention of the parties to effect a novation or substituted contract may be shown by other writings, words, conduct or by all three. *Id.*

64. For these reasons, LCPI may not assume or reject the Longacre Confirmations, but rather must assume or reject the Netting Agreements.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Counterparties respectfully request that the Court deny the relief requested in the Debtors' Motion, schedule evidentiary hearings as it deems necessary and provide other and further relief as it deems just and proper.

Dated: New York, NY
      November 26, 2008

RICHARDS KIBBE & ORBE LLP

/s/ Neil S. Binder
Neil S. Binder
Michael Friedman
Keith N. Sambur

One World Financial Center
New York, New York 10281
Telephone: (212) 530-1800
Facsimile: (212) 530-1801

Attorneys for the parties listed on
Exhibit A hereto