# EXHIBIT B

[Seller Letterhead]
## LSTA PAR/NEAR PAR TRADE CONFIRMATION

**To:**  **Buyer Name:**
**Contact Person:**
**Phone No.:**
**Fax No.:**
**E-mail Address:**

**From:**  **Seller Name:**
**Contact Person:**
**Phone No.:**
**Fax No.:**
**E-mail Address:**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Par/Near Par Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. The parties hereto agree to submit any dispute as to the reasonableness of a buy-in or sell-out price to binding arbitration in accordance with the LSTA "Rules Governing Arbitration Between Loan Traders With Regard to Failed Trades" in existence on the Trade Date, and to comply with any award or decision issued in connection with such an arbitration proceeding. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:** _____, ____

**Seller:** _____[2] ☐ Principal[3]  ☐ Agent

**Buyer:** _____[4] ☐ Principal[3]  ☐ Agent

**Credit Agreement:** _____

**Borrower:** _____[5]

**Form of Purchase:** If no election is made, "Assignment" applies.
☐ Assignment
☐ Participation
☐ Other: _____

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Section 14 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

**LSTA EFFECTIVE DECEMBER 2006** Copyright © LSTA 2006. All rights reserved.

**Purchase Amount/ Type of Debt:**

| | Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|---|
| $ | | | | |
| $ | | | | |
| $ | | | | |

**Purchase Rate:** _____ %

**Upfront Fee:**

☐ None; ☐ $_____

Payable on: ☐ Settlement Date; ☐ _____ ___, 20__

Payable by: ☐ Seller; ☐ Buyer

**Credit Documentation to be provided by Seller:**

☐ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date)

☐ No

**Trade Specific Other Terms of Trade:**

☐ Specify Other Terms: _____ [9]


Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *[Closer's Name]* at the following fax number(s) or e-mail address(es): _____.

If you have any questions, please contact *[Closer's Name]* at *[Closer's telephone number]*.

*SELLER*

By:_____

Name:_____

Title:_____

Date:_____

*BUYER*

By:_____

Name:_____

Title:_____

Date:_____

---

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone) or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Par/Near Par Trade Confirmation and/or the LSTA Standard Terms and Conditions for Par/Near Par Trade Confirmations; if more space is needed, attach additional pages.



## Standard Terms and Conditions for Par/Near Par Trade Confirmations
(Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006)

The following are the Standard Terms and Conditions for Par/Near Par Trade Confirmations ("Standard Terms and Conditions") published by the Loan Syndications and Trading Association, Inc.® as of December 1, 2006. Capitalized terms used and not defined in these Standard Terms and Conditions shall have the respective meanings ascribed thereto in the LSTA Par/Near Par Trade Confirmation (the "Confirmation") which incorporates these Standard Terms and Conditions by reference. Annex I sets forth the capitalized terms defined in these Standard Terms and Conditions or in the Confirmation and the respective sections herein, if any, in which such capitalized terms are defined. As used herein, the term "Transaction" means the transaction(s) contemplated by the Confirmation.

1. **Target Settlement/Settlement Date/Transfer of Debt:** The transfer of the Purchase Amount (as defined below) of the Debt (as defined below) specified in the Confirmation shall be effected as soon as practicable after the Trade Date. Any alternative agreement between Buyer and Seller as to a targeted date of settlement shall be specified in the Confirmation. The date payment of the Purchase Price (as defined below) occurs against such transfer is the "Settlement Date" hereunder. Trades that do not settle on a timely basis are subject to the provisions regarding compensation for delayed settlement in accordance with the provisions of Section 6, "Compensation for Delayed Settlement," below.

   Unless an alternative election is made in the "Form of Purchase" section of the Confirmation, the form of purchase of the Purchase Amount of the Debt shall be an assignment.

   If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller. If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effected, the Transaction shall be settled on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade; provided, further, that if a special election of "Assignment Only" has been made, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

2. **Purchase Amount/Type of Debt:** The amount(s) and type(s) of debt specified in the "Purchase Amount/Type of Debt" section of the Confirmation shall be the "Purchase Amount" and "Debt", respectively, hereunder. Unless otherwise specified in the Confirmation, any Debt identified as (a) term loan indebtedness is fully funded Debt with no further funding obligations, and (b) revolving credit or letter of credit facilities may be subject to further funding and the Purchase Amount includes both funded principal and unfunded commitments (including commitments to participate in letters of credit). If a commitment is indicated, Buyer is assuming all unfunded commitments relating to the Purchase Amount of the Debt unless otherwise specified in the Confirmation. Unless otherwise specified in the Confirmation, Buyer is assuming the obligation to purchase (or to cause a designee to purchase) the Debt as such Debt may be reorganized, restructured, converted or otherwise modified.

3. **Permanent Reductions:** The economic benefit of permanent commitment reductions and permanent repayments of principal (collectively, "Permanent Reductions") shall be allocated as provided in Section 4, "Purchase Price Calculation," below.

LSTA EFFECTIVE DECEMBER 2006    Copyright © LSTA 2006. All rights reserved.

4. **Purchase Price Calculation:** Except as otherwise set forth in the next succeeding paragraph of this Section 4 with regard to a Multi-Currency Commitment (as defined below), Buyer shall pay Seller a purchase price (the "Purchase Price") (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the Debt on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of such Purchase Amount as of the Settlement Date minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Settlement Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees (as defined below) received by Seller on or before the Settlement Date. The Purchase Price shall be further adjusted by Delayed Compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees (each as defined below) payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

With respect to a Multi-Currency Commitment, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the revolving or delayed draw commitment portion, as the case may be, of the Debt on the Settlement Date equal to (a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans as of the Settlement Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount as of the Settlement Date in the Master Currency (as defined below) minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date. For purposes of the calculation referred to in clause (b) above, the applicable foreign exchange rate shall be the spot rate effective on a Business Day (as defined below) that is no earlier than three (3) Business Days prior to the Settlement Date, as agreed upon by the parties. The Purchase Price shall be further adjusted by Delayed Compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below. Except for the foregoing specific computations, all other computations shall otherwise be made in the relevant currency in accordance with the calculations set forth in the immediately preceding paragraph of this Section 4.

As used herein:

"Multi-Currency Commitment" means a commitment that is, as of the Settlement Date, subject to one or more borrowings in one or more currencies other than the Master Currency.

"Master Currency" means the currency in which the Facility is principally denominated.

5. **Interest Payments and Fees:** Interest and accruing ordinary course fees (such as commitment, facility and letter of credit fees) payable in connection with the Debt in accordance with the Credit Agreement from and after the Trade Date are referred to herein as "Interest and Accruing Fees;" provided that Interest and Accruing Fees shall not include any paid-in-kind interest, fees or other amounts paid or payable in connection with the Debt in accordance with the Credit Documents (such amounts, "PIK Interest"). Amendment, consent, waiver and other similar non-recurring fees that are payable in connection with the Debt from and after the Trade Date are referred to herein as "Non-Recurring Fees."

All Interest and Accruing Fees are calculated at the contractual rates as in effect at the relevant time(s) under the Credit Agreement. Any upfront fee shall be paid by the party and on the date specified in the Confirmation.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all Non-Recurring Fees shall be for the account of Buyer. Unless otherwise specified in the "Trade

Specific Other Terms of Trade" section of the Confirmation, all PIK Interest shall be allocated on a "trades flat" basis as follows, regardless of how Interest and Accruing Fees are allocated: (a) PIK Interest that is capitalized or accreted prior to the Trade Date shall be included in the principal portion of the Purchase Amount and shall be subject to the application of Section 4, "Purchase Price Calculation," above; (b) PIK Interest that is capitalized or accreted on or after the Trade Date shall be for the account of Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalized or accreted as of the Settlement Date shall be for the account of Buyer upon capitalization or accretion for no additional consideration.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, "Settled Without Accrued Interest" shall apply.  Subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees accrued but unpaid before the Settlement Date shall be for the account of Seller. Buyer shall pay to Seller any such Interest and Accruing Fees promptly upon any receipt thereof by Buyer; so long as such amounts are received by Buyer (a) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (b) before a default by any obligor(s) in connection with any other payment obligations of such obligor(s) under the Credit Agreement.  Otherwise, such Interest and Accruing Fees (if and when paid) and any other accrued amounts due from and after the Settlement Date shall be for the account of Buyer, and Seller shall not be entitled to any part thereof.

If "Paid on Settlement Date" is specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees paid by the obligor(s) to but excluding the Settlement Date shall be for the account of Seller and an amount equal to the accrued but unpaid amount of Interest and Accruing Fees to but excluding the Settlement Date (the "Paid On Settlement Date Amount") shall be paid by Buyer to Seller on the Settlement Date.  If the obligor(s) thereafter pay(s) the Paid On Settlement Date Amount to Buyer, Buyer shall be entitled to keep such amount.  If, however, the Paid On Settlement Date Amount is paid to Seller by the obligor(s), Seller shall promptly pay such amount to Buyer.  If the obligor(s) fail(s) to pay the Paid On Settlement Date Amount, Seller shall not be required to reimburse Buyer for such amount.

Partial payments of Interest shall be applied in the inverse order of payment dates unless otherwise specified in the Credit Agreement.

Any party that has received funds to which the other party is entitled under this Section 5 shall pay over such funds to the other party (a) on the Settlement Date, if such funds were received on or prior to the Settlement Date, by way of a credit to the other party in the Purchase Price calculations, or (b) on or before the date that is two (2) Business Days (as defined below) after receipt, if such funds were received after the Settlement Date.

As used herein, "Business Day" means any day that is not a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.[1]  In addition, solely for purposes of determining the Commencement Date, Business Day excludes any day on which the New York Stock Exchange is closed.[2]  For purposes of determining the LIBO Rate (as defined below), Business Day means any day on which dealings in U.S. dollar deposits are conducted by and between banks in the London interbank market.

---

[1]  The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

[2]  The Holiday Schedule for the New York Stock Exchange may be found at www.nyse.com/Frameset.html?displayPage=/about/1022963613686.html.

6.  **Compensation for Delayed Settlement:** If settlement occurs on a Delayed Settlement Date, then for each day during the Delay Period (a) if the Debt is a Performing Loan (other than a Non-LIBOR Based Loan), Seller shall pay to Buyer Delayed Compensation for such day as calculated herein, (b) if the Debt is a Performing Loan that is a Non-LIBOR Based Loan (i) Buyer shall pay Seller for any day, interest that would accrue for each such day on the funded principal amount of the Purchase Amount of such Debt as of the Commencement Date (excluding any principal amount resulting from PIK Interest that has capitalized on or after the Trade Date), at the Average LIBO Rate and (ii) Seller shall pay Buyer Interest and Accruing Fees and Adequate Protection Payments accrued (free of any withholding, setoff, recoupment or deduction of any kind and regardless of whether paid or otherwise credited to Seller) with respect to such Debt and allocable to the Delay Period and (c) if the Debt is not a Performing Loan or is a PIK Interest Loan, Buyer shall pay to Seller the Seller's Cost of Carry for such day as calculated herein.

As used herein:

"Adequate Protection Order" means any order of the relevant bankruptcy court authorizing or ordering any obligor(s) to make adequate protection payments to the lenders.

"Adequate Protection Payments" means, with respect to the Debt, amounts (other than PIK Interest) authorized and/or ordered to be paid as adequate protection for the loans and obligations owed under the Credit Agreement under an Adequate Protection Order.

"Average LIBO Rate" means, for the Delay Period (i) the sum of all the individual LIBO Rates for each day in the Delay Period (ii) divided by the total number of days in the Delay Period.[3]

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

"Commencement Date" means (a) for Early Day Trades, the date fourteen (14) Business Days after the Trigger Date and (b) for all other trades, the date seven (7) Business Days after the Trade Date.

"Cost of Carry" means, for any day, the interest that would accrue for each such day on the Purchase Price at the Average LIBO Rate minus interest (if any) with respect to the Debt received and accounted for by Seller as interest in accordance with generally accepted accounting principles for such day; provided that, if the interest received and accounted for by Seller exceeds the interest that would accrue at the Average LIBO Rate, then the amount of such excess interest shall be for the account of Buyer.

"Credit Linked Deposits" means a deposit made by a lender into a designated account pursuant to the applicable Credit Agreement in connection with the unutilized portion of such lender's commitment to the borrower under such Credit Agreement.

"Delay Period" means the period from (and including) the Commencement Date to (but excluding) the Delayed Settlement Date.

"Delayed Compensation" means, for any day, interest at a rate per annum equal to (a) for LIBOR Based Loans, the applicable margin specified in the Credit Agreement (or an order of the relevant bankruptcy court) multiplied by the principal amount of such funded loan outstanding for such day (excluding any principal amount resulting from PIK Interest that has capitalized on or after the Trade Date), (b) for Credit Linked Deposits (as defined above), the applicable net margin specified in the

---

[3] When calculating the Average LIBO Rate, parties may find it helpful to visit www.averagelibor.com (the "Website"). The Website permits users to enter the start date and the end date for any period and obtain the Average LIBO Rate for such period. The Website has agreed to offer all LSTA members a free trial period until December 31, 2007. Please see the relevant LSTA Market Advisory for more information about the Website.

4

Credit Agreement, multiplied by the principal amount of such Credit Linked Deposit outstanding for such day (for the avoidance of doubt the applicable net margin shall incorporate the margin for (i) interest paid on the Credit Linked Deposit and (ii) the commitment fee, facility fee and letter of credit fee for the unutilized portion of the Credit Linked Deposit); (c) for unfunded commitments (other than those related to Credit Linked Deposits), the commitment fee (if any) specified in the Credit Agreement multiplied by the unfunded commitment amount and (d) the facility fee and letter of credit fees (other than those related to Credit Linked Deposits), if any, specified in the Credit Agreement, calculated for such day, in each case calculated on the basis set forth in the Credit Agreement.

"Delayed Settlement Date" means the date following the Commencement Date on which settlement actually occurs.

"Early Day Trade" means a trade for which the Trade Date is a date on or before the sixth (6th) Business Day following the Trigger Date for such trade.

"LIBO Rate" means, for any day, the 1-month London Interbank Offered Rate for deposits in the applicable currency as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day.  For any day that is not a Business Day, the LIBO Rate for such day shall be the rate published by the BBA on the immediately preceding Business Day.

"LIBOR Based Loans" means funded floating rate loans for which interest (or Adequate Protection Payments) are calculated pursuant to the terms of the Credit Agreement (or an Adequate Protection Order) by using  a "spread" or "applicable margin" over a London interbank offered rate.

"Non-LIBOR Based Loans" means, other than Credit Linked Deposits, any (i) funded floating rate loans for which interest (or Adequate Protection Payments) are calculated pursuant to the terms of the Credit Agreement (or an Adequate Protection Order) by using a "spread" or "applicable margin" over a reference rate that is not a London interbank offered rate (such as a prime rate or other reference rate) and (ii) funded fixed rate loans for which interest (or Adequate Protection Payments) are calculated pursuant to the terms of the Credit Agreement (or an Adequate Protection Order) by using a fixed rate of interest.

"Performing Loan" means any Debt (including, without limitation, Credit Linked Deposits) with respect to which either (i) interest and Accruing Fees are being paid as of the Commencement Date on the terms specified in the Credit Agreement as in effect on the Trade Date or (ii) if the Borrower is a debtor under the Bankruptcy Code, Adequate Protection Payments are being paid as of the Commencement Date.

"PIK Interest Loan" means any Debt in respect of which the applicable Credit Agreement specifies that all interest is to be paid as paid-in-kind interest.

"Trigger Date" for a trade is the date of initial funding under the Credit Agreement that governs the Debt, unless there is no funding of any facilities under the Credit Agreement at or about the time it becomes effective, in which case the "Trigger Date" is the date the Credit Agreement is executed and delivered.

7.   **Breakfunding:**  No breakfunding compensation shall be paid for settlement of a Transaction on a day other than an interest payment date in respect of the Debt unless otherwise specified in the Confirmation.

8.   **Assignment Fees and Consent to Transfer Fees:**  Unless otherwise specified in the Confirmation, (a) any recordation, processing or similar fee payable to the Agent or otherwise under the Credit Agreement in connection with an assignment ("Assignment Fees") shall be split equally between Buyer and Seller and shall be paid in such amount as specified in the Credit Agreement and (b) any

transfer fee payable to the grantor in connection with the transfer of a participation ("Consent To Transfer Fees") shall be paid by Seller in such amount as specified in the applicable participation agreement (or if not so specified, in a reasonable amount requested by the grantor).

9.  **Costs and Expenses:** Each of Buyer and Seller shall bear its respective costs and expenses in connection with the Transaction. Seller shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents (as defined below) and that are attributable to any period prior to but excluding the Settlement Date. Buyer shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents and that are attributable to any period from and after the Settlement Date.

10. **Transfer Documentation:** In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) or, in the absence of same, a reasonably acceptable assignment agreement containing customary provisions for the purchase and sale of par/near par loan assets. In the case of a participation, the parties shall execute a reasonably acceptable participation agreement containing customary provisions for the purchase and sale of a participation in par/near par loan assets. Any such referenced assignment agreement or participation agreement is hereinafter referred to as the "Transfer Documentation." Unless otherwise specified in the Confirmation, the Transfer Documentation shall be prepared, and any required consents shall be obtained, by Seller. Seller shall use reasonable efforts to send to Buyer the Confirmation no later than one (1) Business Day after the Trade Date. Buyer shall use reasonable efforts to send to Seller the executed Confirmation (or any requested changes thereto) no later than one (1) Business Day after Buyer's receipt of the Confirmation from Seller. Seller shall use reasonable efforts to furnish to Buyer drafts of the applicable Transfer Documentation within three (3) Business Days after the Trade Date and, in the case of an assignment, the parties shall endeavor to execute and deliver to the Agent an assignment agreement within three (3) Business Days after the Trade Date.

As specified in this paragraph, Buyer and Seller shall use reasonable efforts to comply with the following timeline:

| By: T + 1 →
Sender delivers Confirmation to Counterparty | By: T + 2 →
Counterparty returns executed Confirmation (or requested changes thereto) to Sender | By: T + 3 →
Sender delivers draft Transfer Documentation to Counterparty | By: T + 3
In case of assignment, parties shall deliver executed assignment to Agent |
|---|---|---|---|

11. **Credit Documents; Confidentiality Agreement:** If (a) "Yes" is specified in the Confirmation with respect to Credit Documents, (b) Buyer is not a lender on Trade Date and (c) Buyer has requested such documents on or prior to Trade Date, then Seller shall use commercially reasonable efforts to furnish Buyer, or provide access to Buyer, as promptly as practicable following Trade Date, a true and complete copy of the Credit Agreement (including exhibits and schedules thereto) and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and any other Credit Documents reasonably requested by Buyer. If required by the Credit Agreement and/or requested by Seller, prior to Buyer's receipt of any such Credit Documents, Buyer shall execute and deliver to Seller a confidentiality agreement in the form stipulated in the Credit Agreement or, in the absence of same, a mutually acceptable confidentiality agreement containing customary terms.

The effectiveness of the trade is not subject to receipt by Buyer of Credit Documents prior to Trade Date. Seller may provide to Buyer the requested Credit Documents at any time on or prior to the execution and delivery of the Transfer Documentation.

"Credit Documents" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

12. **Participations:** Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, if the Transaction is settled as a participation: (a) Seller shall grant voting rights to Buyer on and after Settlement Date pursuant to the terms of the applicable participation agreement (subject to the terms of the Credit Agreement); and (b) Seller shall not require Buyer to post with Seller cash collateral for any unfunded portion of a revolving loan/commitment in which Buyer participates.

In connection with voting rights granted to Buyer from Seller, it is understood by Buyer that Seller shall vote in accordance with the majority lenders (including, as the case may be, Seller).

13. **Syndicate Confidential Information:** Unless otherwise specified in the Confirmation, Buyer represents to Seller that (a) Buyer is sophisticated, understands the nature and importance of Syndicate Confidential Information (as defined in the Confidential Information Supplement to the LSTA Code of Conduct, as amended, supplemented or otherwise modified from time to time ) and the manner in which such information can be obtained and has requested such information from Seller in connection with the Transaction, if it so desired such information and (b) where it has not requested Syndicate Confidential Information in connection with such Transaction it has otherwise obtained such information as it has deemed appropriate under the circumstances to make an informed decision regarding the Transaction without reliance on Seller. If Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, unless otherwise agreed, Seller represents to Buyer that Seller has used reasonable efforts to maintain Syndicate Confidential Information and that it has disclosed to Buyer all material Syndicate Confidential Information retained by it as of the Trade Date. Unless otherwise specified, Buyer acknowledges to Seller that (i) such Syndicate Confidential Information has been disclosed to it, (ii) the Syndicate Confidential Information so disclosed may not be complete because Seller may not have retained all such information and (iii) Buyer has taken all steps it deems necessary under the circumstances to assure that it has the information it deems appropriate to make an informed decision regarding the Transaction. Subject to the foregoing, if Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, Seller shall use commercially reasonable efforts to provide to Buyer (if Buyer is not already a lender as of Trade Date) notice with respect to all amendments and waivers of the Credit Documents arising between Trade Date and Settlement Date (but Seller need not solicit a vote from Buyer with respect to any such amendment or waiver). Buyer agrees to keep all Syndicate Confidential Information disclosed to it confidential in accordance with the terms of the confidentiality provisions of the Credit Agreement. Buyer acknowledges that Syndicate Confidential Information may include material non-public information concerning any obligors(s), or the securities of the obligor(s), that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with applicable law, including federal and state securities laws.

14. **Principal/Agency Status:** Each of Buyer and Seller shall indicate in the Confirmation whether it is acting as a principal or an agent in the Transaction. If applicable, each of Buyer and Seller shall identify in the Confirmation (or in separate Confirmations) the specific funds that are counterparties and the appropriate allocations in respect thereof. A Buyer or Seller that holds itself out in the Confirmation as a "principal" is directly liable for the completion of the Transaction. A principal may, however, specify in the Confirmation that it is acting as a riskless principal if it has on or prior to Trade Date agreed with the other party that its obligation to complete the Transaction is subject to successful completion of the purchase from or sale to a third party of the Debt specified in the Confirmation ("Riskless Principal").

A Buyer or Seller that holds itself out to a counterparty in the Confirmation as an "agent" acts on behalf of one or more principals to the Transaction. A Buyer or Seller that holds itself out as an agent in the Confirmation and discloses the identity of such principal(s) in the Confirmation (a) is not liable to such counterparty for the successful completion of the Transaction (unless the parties otherwise agree), and (b) except as expressly provided herein, shall have no liability or obligation to such counterparty in connection with the Transaction. A Buyer or Seller that holds itself out as an agent and does not disclose the identity of such principal(s) in the Confirmation will be liable to the counterparty as agent for an undisclosed principal to the extent provided under applicable New York law. A Buyer or Seller that indicates in the Confirmation its status as an agent represents to the counterparty that it is authorized to bind its principal(s) to the terms of the Transaction.

15. **Nonreliance:** Each of Buyer and Seller represents and warrants to the other that (a) it is a sophisticated buyer or seller (as the case may be) with respect to the Transaction, (b) it has, or has access to, such information as it deems appropriate under the circumstances concerning, among other things, the obligor(s)'s business and financial condition to make an informed decision regarding the transfer of the Debt, and (c) it has independently and without reliance on the other party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into the Transaction, except that Buyer and Seller have each relied upon the express representations, warranties, covenants, agreements and indemnities made by the other in the Confirmation. Each of Buyer and Seller acknowledges that the other has not given it any investment advice or opinion on whether the Transaction is prudent. Except as otherwise provided in the Confirmation and these Standard Terms and Conditions (including with respect to Syndicate Confidential Information), Buyer has not relied, and will not rely, on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition, or business of the obligor(s), or any other matter concerning the obligor(s). Each of Buyer and Seller acknowledges that (i) the other party currently may have, and later may come into possession of, information regarding the Debt or the obligor(s) that is not known to it and that may be material to a decision to enter into the Transaction ("Excluded Information"), (ii) it has determined to enter into the Transaction notwithstanding its lack of knowledge of the Excluded Information, and (iii) the other party shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the other party, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of such party in the Confirmation or these Standard Terms and Conditions.

16. **Buy-in/Sell-out:** If Buyer and Seller are unable to effect settlement on or prior to the date that is seven (7) Business Days after the Trade Date because of the failure of either Buyer or Seller to perform its obligations (for any reason whatsoever other than failure to obtain necessary consents), then the nondefaulting party may send to the defaulting party within five (5) Business Days thereafter a written notice advising of the nondefaulting party's intent to terminate its obligations under the Confirmation and to effect a cover transaction for the specified Debt. Such cover transaction is a "buy in" if Buyer purchases the specified Debt from a counterparty other than the original Seller, and is a "sell out" if Seller sells the specified Debt to a counterparty other than the original Buyer. Such notice shall be substantially in the form most recently published by the LSTA, and the party receiving such notice shall promptly acknowledge receipt of same. The Trade Date for the buy-in/sell-out shall be the fifth Business Day following delivery of such notice (the "Close-Out Trade Date"). During the first three (3) Business Days following delivery of such notice, the defaulting party shall use best efforts to identify a substitute party acceptable to the nondefaulting party to perform its obligations. If such an acceptable substitute party is identified, the buy-in/sell-out shall be made with such substitute party. If the defaulting party fails to identify such an acceptable substitute party, then both parties will in good faith consider other alternatives to settle or resolve the failed trade by mutual consent. With respect to a default in payment, the defaulting party may remedy its default at any time prior to the Close-Out Trade Date by making payment to the nondefaulting party in an amount calculated in accordance with Section 4, "Purchase Price Calculation." Notice of the buy-in/sell-out price shall be sent within one (1) Business Day following the date of execution of the Confirmation for the buy-in/sell-out (the "Close-Out Confirmation"). If the party receiving such notice disputes the

reasonableness of the buy-in/sell-out price, it shall send notice of such dispute no later than the second Business Day thereafter. **Such price dispute shall be submitted to binding arbitration pursuant to, and shall be governed in all respects by, the "Rules Governing Arbitration Between Loan Traders With Regard to Failed Trades" (the "Arbitration Rules") in existence on the Trade Date.** With respect to any arbitration conducted pursuant to the Arbitration Rules, Buyer and Seller waive any right to a hearing and acknowledge that the arbitrators shall not be required to take an oath.

17. **Buy-In Damages:** Seller shall pay to Buyer on the Settlement Date (as determined in accordance with the Close-Out Confirmation) of the buy-in (a) the amount (if any) by which the buy-in price exceeds the original Purchase Price for the specified Debt, plus (b) if the specified Debt is fully performing, Delayed Compensation with respect to the Purchase Amount for each day from (and including) the specified Settlement Date for the failed trade to (but excluding) the date that is the earlier of (i) the actual settlement of buy-in or (ii) seven (7) Business Days following Close-Out Trade Date.

18. **Sell-out Damages:** Buyer shall pay to Seller on the Settlement Date (as determined in accordance with the Close-Out Confirmation) of the sell-out (a) the amount (if any) by which the sell-out price is less than the original Purchase Price for the specified Debt, plus (b) Seller's Cost of Carry if specified Debt is not fully performing for each day from (and including) the specified Settlement Date for the failed trade to (but excluding) the date that is the earlier of (i) actual settlement of sell-out or (ii) seven (7) Business Days following Close-Out Trade Date.

19. **Failure to Obtain Consents:** If Buyer and Seller are unable to effect settlement on or prior to the date that is seven (7) Business Days after the Trade Date because required consents have been denied, the following procedures shall apply. On such date (the "Notification Date") as one of the parties to the trade (the "Notifying Party") reasonably determines that the trade will not settle because of required consents having been denied, the Notifying Party shall notify the other party in writing of its determination. The parties will in good faith consider alternatives for resolving the trade for seven (7) additional Business Days. Thereafter, unless the parties otherwise agree, Seller will use its best efforts to sell the specified Debt or to determine the then market sell-out price. If the sell-out price is greater than the original Purchase Price for the specified Debt, Seller will pay to Buyer on the Settlement Date (as determined in accordance with the Close-Out Confirmation) (a) the amount by which the sell-out price exceeds the original Purchase Price plus (b) if the specified Debt is fully performing, Delayed Compensation for each day during the period (the "Fail Period") from (and including) the Settlement Date for the failed trade to (but excluding) the Settlement Date (as determined in accordance with the Close-Out Confirmation), minus (c) if the specified Debt is not fully performing, Seller's Cost of Carry for each day during the Fail Period. If the sell-out price is less than the original Purchase Price for the specified Debt, Buyer will pay to Seller on the Settlement Date (as determined in accordance with the Close-Out Confirmation) (a) the amount by which the original Purchase Price exceeds the sell-out price plus (b) if the specified Debt is not fully performing, Seller's Cost of Carry for each day during the Fail Period, minus (c) if the specified Debt is fully performing, Delayed Compensation for each day during the Fail Period. Notice of the sell-out price shall be sent by Seller to Buyer within one (1) Business Day following the date of execution of the Close-Out Confirmation. If Buyer disputes the reasonableness of the sell-out price, it shall send notice of such dispute no later than the second Business Day thereafter. **Such price dispute shall be submitted to binding arbitration pursuant to, and shall be governed in all respects by the Arbitration Rules in existence on the Trade Date.** With respect to any arbitration conducted pursuant to the Arbitration Rules, Seller and Buyer waive any right to a hearing and acknowledge that the arbitrators shall not be required to take an oath.

20. **Confidentiality of Terms of Transaction:** Both parties shall maintain the confidentiality of the terms of the Transaction unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose the terms of the Transaction to their respective affiliates, attorneys, accountants, and other professionals and in connection with the enforcement of the parties' rights and obligations hereunder. Buyer shall be permitted to make any necessary

disclosures to prospective purchasers from Buyer regarding the terms of the Transaction (other than the Purchase Rate or Purchase Price), provided that such purchasers shall be subject to substantially the same confidentiality restrictions.

21. **Binding Effect:** By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank par/near par loans, or any interest therein, upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction. Neither party will assert as a defense to liability under such agreement the lack of a writing signed by it that would otherwise be required to satisfy any statute of frauds, including §1-206 of the New York Uniform Commercial Code, or any comparable statute (collectively, the "Statute of Frauds"). Nothing herein shall be deemed a waiver of any claim or defense other than the Statute of Frauds that either party may have regarding such agreement.

Each of Buyer and Seller shall record on the trade date of each transaction between the parties and retain in its files a written or electronically recorded trade ticket or similar internal record containing or reflecting evidence of agreement to such transaction, including (a) the date of the agreement, (b) a description of the type of debt including obligor(s) and purchase amount, (c) the identity of the other party to the transaction, and (d) the purchase price or purchase rate.

22. **Governing Law; Confirmation Controls:** The Confirmation and the Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York (without regard to any conflicts of law provision thereof that would require the application of the laws of any other jurisdiction. In case of any conflict between the terms of the Confirmation and these Standard Terms and Conditions, the Confirmation shall govern and control.

23. **Execution by Electronic Transmission:** It is understood by the parties that the custom in the loan trading market is to execute and deliver any confirmations, confidentiality agreements, Transfer Documentation and other transaction documents by telecopy, telefax, e-mail attachment or other means of electronic transmission. The parties agree that all telecopied, telefaxed, e-mailed or electronically transmitted confirmations, confidentiality agreements, Transfer Documentation and other transaction documents, including the Confirmation, and signatures thereto, shall be duplicate originals.

24. **Electronic Records and Signatures:** It is agreed by the parties that, notwithstanding the use herein or in the Confirmation of the words "writing," "execution," "signed," "signature," or other words of similar import, the parties intend that the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system (as the case may be) to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.[4]

---

[4] To help ensure effectiveness of this provision, parties should manually or electronically sign the initial confirmation between them and retain a hard copy in their records.

**Annex I**

**Capitalized Term**

**Defined In**

Arbitration Rules ........................................................................................................... Section 16

Assignment Fees ........................................................................................................... Section 8

Business Days ............................................................................................................... Section 5

Buyer ........................................................................................................................... Confirmation

Close-Out Confirmation ................................................................................................. Section 16

Close-Out Trade Date .................................................................................................... Section 16

Commencement Date ..................................................................................................... Section 6

Confirmation ................................................................................................................. Preamble

Consent to Transfer Fees ............................................................................................... Section 8

Cost of Carry ................................................................................................................. Section 6

Credit Agreement .......................................................................................................... Confirmation

Credit Documents .......................................................................................................... Section 11

Debt .............................................................................................................................. Section 2

Delayed Compensation .................................................................................................. Section 6

Delayed Settlement Date ............................................................................................... Section 6

Delay Period .................................................................................................................. Section 6

Early Day Trade ............................................................................................................. Section 6

Excluded Information ...................................................................................................... Section 15

Facility .......................................................................................................................... Confirmation

Fail Period ..................................................................................................................... Section 19

Interest and Accruing Fees ............................................................................................. Section 5

LIBO Rate ...................................................................................................................... Section 6

LSTA ............................................................................................................................. Preamble

Master Currency ............................................................................................................ Section 4

Multi-Currency Commitment ........................................................................................... Section 4

Non-Recurring Fees ........................................................................................................................Section 5

Notification Date ...........................................................................................................................Section 19

Notifying Party ............................................................................................................................Section 19

Paid on Settlement Date Amount ..................................................................................................Section 5

Performing Loan ...........................................................................................................................Section 6

Permanent Reductions .................................................................................................................Section 3

PIK Interest .................................................................................................................................Section 5

Purchase Amount .........................................................................................................................Section 2

Purchase Price .............................................................................................................................Section 4

Purchase Rate ........................................................................................................................Confirmation

Riskless Principal .......................................................................................................................Section 14

Seller ...................................................................................................................................Confirmation

Settlement Date ...........................................................................................................................Section 1

Standard Terms and Conditions ..................................................................................................Preamble

Statute of Frauds ........................................................................................................................Section 21

Trade Date .............................................................................................................................Confirmation

Transaction ................................................................................................................................Preamble

Transfer Documentation .............................................................................................................Section 10

Trigger Date ................................................................................................................................Section 6

**[Seller Letterhead]**
## LSTA DISTRESSED TRADE CONFIRMATION

**To:**   **Buyer Name:**                              **From:**   **Seller Name:**
          **Contact Person:**                                     **Contact Person:**
          **Phone No.:**                                          **Phone No.:**
          **Fax No.:**                                            **Fax No.:**
          **E-mail Address:**                                     **E-mail Address:**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:** _____, ____

**Seller:** _____ [2] ☐ Principal[3] ☐ Agent

**Buyer:** _____ [4] ☐ Principal[3] ☐ Agent

**Credit Agreement:** _____

**Borrower:** _____ [5]

**Form of Purchase:**   If no election is made, "Assignment" applies.

☐ Assignment

☐ Participation

☐ Other: _____

**Purchase Amount/ Type of Debt:**

| Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|
| $ | | | |
| $ | | | |
| $ | | | |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Sections 11 and 19 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

**LSTA EFFECTIVE DECEMBER 2006** Copyright © LSTA 2006. All rights reserved.

2

| | |
|---|---|
| **Purchase Rate:** | _____% |
| **Accrued Interest:** | ☐ Settled Without Accrued Interest |
| | ☐ Trades Flat |
| **Credit Documentation to be provided by Seller:** | ☐ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date) |
| | ☐ No |
| **LSTA Standard Other Terms of Trade:** | ☐ This Transaction shall be subject to the successful completion of the purchase by Seller of the Purchase Amount of the Debt to be sold to Buyer hereunder |
| | ☐ This Transaction shall be subject to the successful completion of the sale by Buyer of the Purchase Amount of the Debt to be purchased from Seller hereunder |
| | ☐ Flip representations shall apply (election is applicable only if Seller is a Riskless Principal (i.e., the first box above has been checked), the settlement of the sale of the Purchase Amount of the Debt to Buyer from Seller occurs no later than one (1) business day after the settlement of the purchase of the Purchase Amount of the Debt by Seller from Seller's immediate prior seller(s) and the other criteria specified in Section 11 of the Standard Terms and Conditions are met) |
| **Trade Specific Other Terms of Trade:** | ☐ Specify Other Terms: _____ [9] |
| **Subject to:** | Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith. |

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *[Closer's Name]* at the following fax number(s) or e-mail address(es): _____.

If you have any questions, please contact *[Closer's Name]* at *[Closer's telephone number]*.

*SELLER*                                          *BUYER*

By:_____          By:_____

Name:_____          Name:_____

Title:_____          Title:_____

Date:_____          Date:_____

---

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.



## Standard Terms and Conditions for Distressed Trade Confirmations
(Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006)

The following are the Standard Terms and Conditions for Distressed Trade Confirmations ("Standard Terms and Conditions") published by the Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006.  Capitalized terms used and not defined in these Standard Terms and Conditions shall have the respective meanings ascribed thereto in the LSTA Distressed Trade Confirmation (the "Confirmation") which incorporates these Standard Terms and Conditions by reference. Annex I sets forth the capitalized terms defined in these Standard Terms and Conditions or in the Confirmation and the respective sections herein, if any, in which such capitalized terms are defined.  All references to specific section numbers in Sections 11 and 12 below, "Flip Representations" and "Step-Up Provisions," respectively, relate to the December 2006 version of the LSTA Purchase and Sale Agreement for Distressed Trades and successor provisions thereto.  As used herein, the term "Transaction" means the transaction(s) contemplated by the Confirmation.

1. **Target Settlement/Settlement Date/Transfer of Debt:**  The transfer of the Purchase Amount (as defined below) of the Debt (as defined below) specified in the Confirmation shall be effected as soon as practicable after the Trade Date. Any alternative agreement between Buyer and Seller as to a targeted date of settlement shall be specified in the Confirmation. The date payment of the Purchase Price (as defined below) occurs against such transfer is the "Settlement Date" hereunder.

   Unless an alternative election is made in the "Form of Purchase" section of the Confirmation, the form of purchase of the Purchase Amount of the Debt shall be an assignment.

   If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller.  If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effected, the Transaction shall be settled on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade; provided, further, that if a special election of "Assignment Only" has been made, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

2. **Purchase Amount/Type of Debt:**  The amount(s) and type(s) of debt specified in the "Purchase Amount/Type of Debt" section of the Confirmation shall be the "Purchase Amount" and "Debt," respectively, hereunder. Unless otherwise specified in the Confirmation, any Debt identified as (a) term loan indebtedness is fully funded Debt with no further funding obligations, (b) revolving credit or letter of credit facilities may be subject to further funding and the Purchase Amount includes both funded principal and unfunded commitments (including commitments to participate in letters of credit or loans), and (c) a claim amount is fully funded with no further funding obligations (but may be subject to adjustment). If a commitment is indicated, Buyer is assuming all unfunded commitments relating to the Purchase Amount of the Debt unless otherwise specified in the Confirmation. Unless otherwise specified in the Confirmation, Buyer is assuming the obligation to purchase (or to cause a designee to purchase) the Debt as such Debt may be reorganized, restructured, converted or otherwise modified.

3. **Permanent Reductions:**   The economic benefit of permanent commitment reductions and permanent repayments of principal (collectively, "Permanent Reductions") shall be allocated as provided in Section 4, "Purchase Price Calculation," below.

LSTA EFFECTIVE DECEMBER 2006      Copyright © LSTA 2006.  All rights reserved.

4. **Purchase Price Calculation:** Except as otherwise set forth in the next succeeding paragraphs of this Section 4 with regard to a Multi-Currency Commitment or Proceeds (each as defined below), Buyer shall pay Seller a purchase price (the "Purchase Price") (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the Debt on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of such Purchase Amount as of the Settlement Date minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Settlement Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees (as defined below) received by Seller on or before the Settlement Date. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees (each as defined below) payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

With respect to a Multi-Currency Commitment, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the revolving or delayed draw commitment portion, as the case may be, of the Debt on the Settlement Date equal to (a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans as of the Settlement Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount as of the Settlement Date in the Master Currency (as defined below) minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date. For purposes of the calculation referred to in clause (b) above, the applicable foreign exchange rate shall be the spot rate effective on a Business Day (as defined below) that is no earlier than three (3) Business Days prior to the Settlement Date, as agreed upon by the parties. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below. Except for the foregoing specific computations, all other computations shall otherwise be made in the relevant currency in accordance with the calculations set forth in the immediately preceding paragraph of this Section 4.

With respect to Proceeds, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Proceeds on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of the Debt on the date immediately prior to the Restructuring Date (as defined below) minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Restructuring Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date through the Restructuring Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date minus (e) 100% multiplied by the amount of any cash Proceeds received by Seller from the Restructuring Date through and including the Settlement Date. Subject to the terms of Section 5, "Interest Payments and Fees" below, Buyer shall be entitled to receive all proceeds or other distributions received by Seller with respect to the Proceeds from and after the Restructuring Date, including, without limitation, pursuant to clause (e) above, a credit equal to 100% multiplied by the amount of any cash Proceeds and including a credit equal to 100% multiplied by any Permanent Reductions effected with respect to any Proceeds. If the Debt immediately prior to the Restructuring Date was a Multi-Currency Commitment, then clauses (a) and (b) of the immediately preceding sentence shall be replaced by the following clauses: "(a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans immediately prior to the Restructuring Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount immediately prior to the Restructuring Date in the Master Currency". Notwithstanding any other provision of this paragraph, if the Transaction settles on a "Settled Without Accrued Interest" basis, then any interest and Accruing

2

Fees paid with respect to any debt instrument included within the Proceeds shall be allocated between Buyer and Seller in accordance with the sixth paragraph of Section 5, "Interest Payments and Fees", below. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

As used herein:

"Restructuring Date" means the effective date of any reorganization, restructuring or conversion with respect to the Debt.

"Multi-Currency Commitment" means a commitment that is, as of the Settlement Date, subject to one or more borrowings in one or more currencies other than the Master Currency.

"Master Currency" means the currency in which the Facility is principally denominated.

"Proceeds" means if, prior to the Settlement Date, the Debt has been reorganized, restructured, converted or otherwise modified, any proceeds or other distributions received by Seller with respect to the Debt pursuant to such reorganization, restructuring, conversion or other modification.

5.  **Interest Payments and Fees:**  Interest and accruing ordinary course fees (such as commitment, facility and letter of credit fees) payable in connection with the Debt in accordance with the Credit Agreement from and after the Trade Date are referred to herein as "Interest and Accruing Fees;" provided that Interest and Accruing Fees shall not include any paid-in-kind interest, fees or other amounts paid or payable in connection with the Debt in accordance with the Credit Documents or the Adequate Protection Order (such amounts, "PIK Interest"). Amendment, consent, waiver and other similar non-recurring fees that are payable in connection with the Debt from and after the Trade Date are referred to herein as "Non-Recurring Fees."

All Interest and Accruing Fees are calculated at the contractual rates as in effect at the relevant time(s) under the Credit Agreement.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all Non-Recurring Fees shall be for the account of Buyer.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all PIK Interest shall be allocated on a "trades flat" basis as follows, regardless of how Interest and Accruing Fees and Adequate Protection Payments (as defined below) are allocated: (a) PIK Interest that is capitalized or accreted prior to the Trade Date shall be included in the principal portion of the Purchase Amount and shall be subject to the application of Section 4, "Purchase Price Calculation," above; (b) PIK Interest that is capitalized or accreted on or after the Trade Date shall be for the account of Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalized or accreted as of the Settlement Date shall be for the account of Buyer upon capitalization or accretion for no additional consideration.

If "Trades Flat" is specified in the Confirmation, subject to the application of clause (a) of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees and, if applicable, Adequate Protection Payments unpaid as of the Trade Date, whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, shall be for the account of Buyer and, if paid to Seller after the Settlement Date, shall promptly be paid by Seller to Buyer.

If "Settled Without Accrued Interest" is specified in the Confirmation, subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees accrued but unpaid before the Settlement Date shall be for the account of Seller. Buyer shall pay to Seller any

3

such Interest and Accruing Fees promptly upon any receipt thereof by Buyer; so long as such amounts are received by Buyer (a) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (b) before a default by any obligor(s) in connection with any other payment obligations of the obligor(s) under the Credit Agreement.  Otherwise, such Interest and Accruing Fees (if and when paid) and any other accrued amounts due from and after the Settlement Date shall be for the account of Buyer, and Seller shall not be entitled to any part thereof.  The foregoing notwithstanding, if (i) Buyer and Seller agree that the treatment of Interest and Accruing Fees shall be on a "Settled Without Accrued Interest" basis and (ii) the obligor(s) is/are making Adequate Protection Payments in accordance with an Adequate Protection Order (as defined below), then any such Adequate Protection Payments shall, subject to Section 6, "Compensation for Delayed Settlement," below, be allocated on a "Settled Without Accrued Interest" basis as if such Adequate Protection Payments were Interest and Accruing Fees.  The parties may elect to have terms contrary to those of the immediately preceding sentence control their Transaction by expressly specifying such contrary terms in the "Trade Specific Other Terms of Trade" section of the Confirmation.

If "Paid on Settlement Date" is specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, subject to the application of Section 6, "Compensation For Delayed Settlement," below, all Interest and Accruing Fees paid by the obligor(s) to but excluding the Settlement Date shall be for the account of Seller and an amount equal to the accrued but unpaid amount of Interest and Accruing Fees to but excluding the Settlement Date (the "Paid On Settlement Date Amount") shall be paid by Buyer to Seller on the Settlement Date.  If the obligor(s) thereafter pay(s) the Paid on Settlement Date Amount to Buyer, Buyer shall be entitled to keep such amount.  If, however, the Paid on Settlement Date Amount is paid to Seller by the obligor(s), Seller shall promptly pay such amount to Buyer.  If the obligor(s) fail(s) to pay the Paid on Settlement Date Amount, Seller shall not be required to reimburse Buyer for such amount.

Partial payments of interest shall be applied in the inverse order of payment dates unless otherwise specified in the Credit Agreement.

Any party that has received funds to which the other party is entitled under this Section 5 shall pay over such funds to the other party (a) on the Settlement Date, if such funds were received on or prior to the Settlement Date; by way of a credit to the other party in the Purchase Price calculations, or (b) on or before the date that is two (2) Business Days (as defined below) after receipt, if such funds were received after the Settlement Date.

As used herein:

"Adequate Protection Order" means any order of the relevant bankruptcy court authorizing or ordering any obligor(s) to make adequate protection payments to the lenders.

"Adequate Protection Payments" means, with respect to the Debt, amounts (other than PIK Interest) authorized and/or ordered to be paid as adequate protection for the loans and obligations owed under the Credit Agreement under an Adequate Protection Order.

"Business Day" means any day that is not a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.[1]  In addition, solely for purposes of determining the Commencement Date (as defined below), Business Day excludes any day on which the New York

---

[1] The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

4

Stock Exchange is closed.[2] For purposes of determining the LIBO Rate (as defined below) Business Day means any day on which dealings in U.S. dollar deposits are conducted by and between banks in the London interbank market.

6. **Compensation for Delayed Settlement**: If settlement occurs on a Delayed Settlement Date (as defined below), the parties shall pay "delayed compensation" for each day during the Delay Period (as defined below) as follows:

(a)    Buyer shall pay Seller (or if Seller is required to pay Buyer the Purchase Price, Seller shall pay Buyer) on the Delayed Settlement Date an amount equal to interest that would accrue for each day during the Delay Period at the Average LIBO Rate (as defined below) on an amount equal to the Purchase Price calculated as of the Commencement Date according to the applicable method described in Section 4, "Purchase Price Calculation," above (but without adjustment for delayed compensation payable hereunder or any Assignment Fees or Consent to Transfer Fees) substituting the phrase "Commencement Date" for the phrase "Settlement Date" appearing therein (and utilizing the loan and commitment amounts outstanding on the Commencement Date); provided that if the Purchase Price so calculated as of the Delayed Settlement Date has increased or decreased more than 25% from the Purchase Price so calculated as of the Commencement Date, then such payment shall be calculated based on the Purchase Price so calculated on each day during the Delay Period.

(b)    If the applicable trade settles on a "Settled Without Accrued Interest" basis, then Seller shall pay or credit to Buyer on the Delayed Settlement Date (free of any withholding, setoff, recoupment or deduction of any kind) any Interest and Accruing Fees and, if applicable, Adequate Protection Payments accrued (regardless of whether paid or otherwise credited to Seller) with respect to the Purchase Amount and allocable to the Delay Period. If Borrower fails to pay on or prior to the scheduled due date thereof (taking into account any applicable grace period) in accordance with the Credit Agreement or the Adequate Protection Order, as applicable, any Interest and Accruing Fees or Adequate Protection Payments that were paid or credited to Buyer on the Delayed Settlement Date pursuant to this paragraph (b), then Buyer shall, upon demand by Seller, pay Seller an amount equal to the portion of such Interest and Accruing Fees or Adequate Protection Payments that were not paid to Seller, plus interest that would accrue for each day on such amounts at the Federal Funds Rate (as defined below). If all or part of such Interest and Accruing Fees and, if applicable, Adequate Protection Payments is paid other than in cash, and the property received cannot be transferred to Buyer, the parties shall mutually agree as soon as practicable on the cash value thereof to be transferred by Seller to Buyer or, if the parties shall mutually agree, on the appropriate participation arrangements in respect thereof.

As used herein:

"Average LIBO Rate" means, for the Delay Period (i) the sum of all the individual LIBO Rates for each day in the Delay Period (ii) divided by the total number of days in the Delay Period.[3]

"Commencement Date" means the date twenty (20) Business Days after the Trade Date.

"Delayed Settlement Date" means the date following the Commencement Date on which settlement actually occurs.

---

[2] The Holiday Schedule for the New York Stock Exchange may be found at www.nyse.com/Frameset.html?displayPage=/about/1022963613688.html.

[3] When calculating the Average LIBO Rate, parties may find it helpful to visit www.averagelibor.com (the "Website"). The Website permits users to enter the start date and the end date for any period and obtain the Average LIBO Rate for such period. The Website has agreed to offer all LSTA members a free trial period until December 31, 2007. Please see the relevant LSTA Market Advisory for more information about the Website.

5

"Delay Period" means the period from (and including) the Commencement Date to (but excluding) the Delayed Settlement Date.

"Federal Funds Rate" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the parties from three federal funds brokers of recognized standing selected by the parties. For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"LIBO Rate" means, for any day, the 1-month London Interbank Offered Rate for deposits in the applicable currency as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day. For any day that is not a Business Day, the LIBO Rate for such day shall be the rate published by the BBA on the immediately preceding Business Day.

7. **Breakfunding:** No breakfunding compensation shall be paid for settlement of a Transaction on a day other than an interest payment date in respect of the Debt unless otherwise specified in the Confirmation.

8. **Assignment Fees and Consent to Transfer Fees:** Unless otherwise specified in the Confirmation, (a) any recordation, processing or similar fee payable to the Agent or otherwise under the Credit Agreement in connection with an assignment ("Assignment Fees") shall be split equally between Buyer and Seller and shall be paid in such amount as is specified in the Credit Agreement and (b) any transfer fee payable to the grantor in connection with the transfer of a participation ("Consent to Transfer Fees") shall be paid by Seller in such amount as is specified in the applicable participation agreement (or, if not so specified, in a reasonable amount requested by the grantor).

9. **Costs and Expenses:** Each of Buyer and Seller shall bear its respective costs and expenses in connection with the Transaction. Seller shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents (as defined below) and that are attributable to any period prior to but excluding the Settlement Date. Buyer shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents and that are attributable to any period from and after the Settlement Date.

10. **Transfer Documentation:** In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) and, unless otherwise specified in the Confirmation, a supplemental purchase and sale agreement substantially similar to the current LSTA form of Purchase and Sale Agreement for Distressed Trades (taking into account related predecessor transfer documents ("Predecessor Transfer Documentation"), if any). In the case of a participation, the parties shall execute a reasonably acceptable participation agreement containing customary provisions for the purchase and sale of a participation in distressed loan assets. Any such referenced assignment agreement, supplemental purchase and sale agreement and/or participation agreement is hereinafter referred to as the "Transfer Documentation." Unless otherwise specified in the Confirmation, the Transfer Documentation shall be prepared, and any required consents obtained, by Seller. Seller shall use reasonable efforts to send Buyer the Confirmation no later than one (1) Business Day after the Trade Date. Buyer shall use reasonable efforts to send to Seller the executed Confirmation (or any requested changes thereto) no later than one (1) Business Day after Buyer's receipt of the Confirmation from Seller. Seller shall use reasonable efforts to furnish Buyer drafts of the applicable Transfer Documentation, together with any related Predecessor Transfer Documentation, subject to applicable confidentiality provisions contained in such documents, within six (6) Business Days after the Trade Date.

As specified in this paragraph, Buyer and Seller shall use reasonable efforts to comply with the following timeline:

| **By: T + 1 →** | **By: T + 2 →** | **By: T + 6** |
|---|---|---|
| Sender delivers Confirmation to Counterparty | Counterparty returns executed Confirmation (or requested changes thereto) to Sender | Sender delivers Predecessor Transfer Documentation and draft Transfer Documentation to Counterparty |

11. **Flip Representations:** Flip representations are appropriate only if Seller is acting as a Riskless Principal (as defined below), and only if the settlement of the purchase of the Debt by Buyer from Seller occurs no later than one (1) Business Day after the settlement of the sale of the Debt to Seller by Seller's immediate prior seller(s) (the "Flip Representation Deadline"). In the event that flip representations are applicable, the Transfer Documentation shall contain representations with respect to title (Section 4.1(d)), outstanding principal amount and commitment (Section 4.1(f)), future funding obligations (Section 4.1(g)) and, if applicable, the proof of claim filing (Section 4.1(v)) that will be limited by assuming the truth and accuracy of the representations and warranties on such matters made to Seller by the immediate prior seller(s). In addition, Seller shall give Buyer a reasonable opportunity to (a) review and comment on Seller's Predecessor Transfer Documentation prior to Seller's execution and delivery thereof and (b) close its purchase from Seller contemporaneously with Seller's upstream purchase. However, if Seller is ready, willing and able to close its sale to Buyer within the Flip Representation Deadline, but is unable to do so because Buyer is unable or unwilling to close at such time, then the Flip Representation Deadline shall be deemed met and flip representations shall apply; provided that, if both Seller and Buyer are willing and able to close Seller's sale to Buyer within the Flip Representation Deadline but are unable to do so because the required consents for Buyer's purchase from Seller have not been obtained within the Flip Representation Deadline despite the exercise by each of Buyer and Seller of commercially reasonable efforts to obtain such consents, then flip representations shall not apply.

12. **Step-Up Provisions:** Seller shall provide to Buyer customary step-up provisions with respect to those prior sellers, if any, that transferred the Debt on par documents on or after such date as is reasonably determined to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation. Such representations, indemnities and other provisions shall reference only such prior sellers that transferred the Debt on a par documentation basis at a time that market convention for transferring such Debt was to use distressed documentation. If step-up provisions apply, the purchase and sale agreement or participation agreement with respect to the Purchase Amount of the Debt shall be modified to include a reference to all appropriate prior sellers in (a) the definition of "Retained Obligations" (Section 1.2), (b) the representations with respect to actual or threatened proceedings (Section 4.1(e)), funding obligation (Section 4.1(g)), acts and omissions (Section 4.1(h)), performance of obligations (Section 4.1(i)), no setoff (Section 4.1(l)), no consents or waivers (Section 4.1(t)) and no execution of other documents (Section 4.1(u)), (c) the disgorgement section of the indemnity provision (Section 6.1(b)) and (d) the distributions section (Section 8.2).

In consulting as to the appropriate date on which market convention shifted from a par documentation basis to a distressed documentation basis, the parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the date on which such market convention shifted or, if results have not been published with respect to the Debt, either party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of the Borrower and either the CUSIP number (if available) or the date

of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between Seller and Buyer and have no binding effect.

13. **ERISA Representation:** Unless otherwise specified in the Confirmation, the Transfer Documentation shall not contain the "Alternative ERISA Representation," as referenced in a footnote to Sections 4.1(q) and 5.1(j) of the current LSTA form of Purchase and Sale Agreement for Distressed Trades.

14. **Credit Documents; Confidentiality Agreement:** If (a) "Yes" is specified in the Confirmation with respect to Credit Documents, (b) Buyer is not a lender on the Trade Date and (c) Buyer has requested such documents on or prior to the Trade Date, then Seller shall furnish Buyer, or provide access to Buyer, as promptly as practicable following the Trade Date, a true and complete copy of the Credit Agreement (including exhibits and schedules thereto) and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and any other Credit Documents reasonably requested by Buyer. If required by the Credit Agreement and/or requested by Seller, prior to Buyer's receipt of any such Credit Documents, Buyer shall execute and deliver to Seller a confidentiality agreement in the form stipulated in the Credit Agreement or, in the absence of same, a mutually acceptable confidentiality agreement containing customary terms.

The effectiveness of the trade is not subject to receipt by Buyer of Credit Documents prior to the Trade Date. Seller may provide to Buyer the requested Credit Documents at any time on or prior to the execution and delivery of the Transfer Documentation.

"Credit Documents" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

15. **Participations:** Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, if the Transaction is settled as a participation: (a) Seller shall grant voting rights to Buyer on and after the Settlement Date pursuant to the terms of the applicable participation agreement (subject to the terms of the Credit Agreement); and (b) Seller shall not require Buyer to post with Seller cash collateral for any unfunded portion of a revolving loan/commitment in which Buyer participates.

In connection with voting rights granted to Buyer from Seller, it is understood by Buyer that Seller shall vote in accordance with the majority lenders (including, as the case may be, Seller).

16. **Syndicate Confidential Information:** Unless otherwise specified in the Confirmation, Buyer represents to Seller that (a) Buyer is sophisticated, understands the nature and importance of Syndicate Confidential Information (as defined in the Confidential Information Supplement to the LSTA Code of Conduct, as amended, supplemented or otherwise modified from time to time) and the manner in which such information can be obtained and has requested such information from Seller in connection with the Transaction, if it so desired such information and (b) where it has not requested Syndicate Confidential Information in connection with the Transaction, it has otherwise obtained such information as it has deemed appropriate under the circumstances to make an informed decision regarding the Transaction without reliance on Seller. If Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, unless otherwise agreed, Seller represents to Buyer that Seller has used reasonable efforts to maintain Syndicate Confidential Information and that it has disclosed to Buyer all material Syndicate Confidential Information retained by it as of the Trade Date. Unless otherwise specified, Buyer acknowledges to Seller that (i) such Syndicate Confidential Information has been disclosed to it, (ii) the Syndicate Confidential Information so disclosed may not be complete because Seller may not have retained all such information and (iii) Buyer has taken all steps it deems necessary under the circumstances to assure that it has the information it deems appropriate to make an informed decision regarding the Transaction. Subject to the foregoing, if Buyer has requested Seller to provide

8

Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, Seller shall use commercially reasonable efforts to provide to Buyer (if Buyer is not already a lender as of the Trade Date) notice with respect to all amendments and waivers of the Credit Documents arising between the Trade Date and the Settlement Date (but Seller need not solicit a vote from Buyer with respect to any such amendment or waiver). Buyer agrees to keep all Syndicate Confidential Information disclosed to it confidential in accordance with the terms of the confidentiality provisions of the Credit Agreement. Buyer acknowledges that Syndicate Confidential Information may include material non-public information concerning any obligors(s), or the securities of the obligor(s), that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with applicable law, including federal and state securities laws.

17. **Standstill:** With respect to the Purchase Amount of the Debt, until the Settlement Date or Delayed Settlement Date, as the case may be, Seller shall cease any discussions with other purchasers and shall decline all offers.

18. **Principal/Agency Status:** Each of Buyer and Seller shall indicate in the Confirmation whether it is acting as a principal or an agent in the Transaction. If applicable, each of Buyer and Seller shall identify in the Confirmation (or in separate Confirmations) the specific funds that are counterparties and the appropriate allocations in respect thereof. A Buyer or Seller that holds itself out in the Confirmation as a principal is directly liable for the completion of the Transaction. A principal may, however, specify in the Confirmation that it is acting as a riskless principal if it has on or prior to the Trade Date agreed with the other party that its obligation to complete the Transaction is subject to successful completion of the purchase from or sale to a third party of the Debt specified in the Confirmation ("Riskless Principal").

A Buyer or Seller that holds itself out to a counterparty in the Confirmation as an agent acts on behalf of one or more principals to the Transaction. A Buyer or Seller that holds itself out as an agent in the Confirmation and discloses the identity of such principal(s) in the Confirmation: (a) is not liable to such counterparty for the successful completion of the Transaction (unless the parties otherwise agree), and (b) except as expressly provided herein, shall have no liability or obligation to such counterparty in connection with the Transaction. A Buyer or Seller that holds itself out as an agent and does not disclose the identity of such principal(s) in the Confirmation will be liable to the counterparty as agent for an undisclosed principal to the extent provided under applicable New York law. A Buyer or Seller that indicates in the Confirmation its status as an agent represents to the counterparty that it is authorized to bind its principal(s) to the terms of the Transaction.

19. **Bankruptcy Proceedings:** In the case of a bankruptcy proceeding involving any of the obligor(s) under the Credit Agreement, (a) Seller shall use commercially reasonable efforts to provide to Buyer within six (6) Business Days after the Trade Date copies of any Proof(s) of Claim that have been filed in such bankruptcy proceeding relating to the Debt specified in the Confirmation if such Proof(s) of Claim were filed individually by Seller or any immediate prior sellers (and was not filed by the Agent under the Credit Agreement on behalf of the lenders generally) and (b) Buyer shall be responsible for the preparation and filing of any necessary Bankruptcy Rule 3001(e) Notices of Transfer relating to such Proof(s) of Claim.

20. **Nonreliance:** Each of Buyer and Seller represents and warrants to the other that (a) it is a sophisticated buyer or seller (as the case may be) with respect to the Transaction, (b) it has, or has access to, such information as it deems appropriate under the circumstances concerning, among other things, the obligor(s)'s business and financial condition to make an informed decision regarding the transfer of the Debt, and (c) it has independently and without reliance on the other party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into the Transaction, except that Buyer and Seller have each relied upon the express representations, warranties, covenants, agreements and indemnities made by the other in the Confirmation. Each of Buyer and Seller acknowledges that the other has not given it any investment advice or opinion on whether the Transaction is prudent. Except as otherwise provided in the Confirmation and these

9

Standard Terms and Conditions (including with respect to Syndicate Confidential Information), Buyer has not relied, and will not rely, on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition, or business of the obligor(s), or any other matter concerning the obligor(s). Each of Buyer and Seller acknowledges that (i) the other party currently may have, and later may come into possession of, information regarding the Debt or the obligor(s) that is not known to it and that may be material to a decision to enter into the Transaction ("Excluded Information"), (ii) it has determined to enter into the Transaction notwithstanding its lack of knowledge of the Excluded Information, and (iii) the other party shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the other party, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of such party in the Confirmation or these Standard Terms and Conditions.

21. **Confidentiality of Terms of Transaction:** Both parties shall maintain the confidentiality of the terms of the Transaction unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose the terms of the Transaction to their respective affiliates, attorneys, accountants, and other professionals and in connection with the enforcement of the parties' respective rights and obligations hereunder. Buyer shall be permitted to make any necessary disclosures to prospective purchasers from Buyer regarding the terms of the Transaction (other than the Purchase Rate or Purchase Price), provided that such purchasers shall be subject to substantially the same confidentiality restrictions.

22. **Binding Effect:** By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank loans, or any interest therein, on "distressed terms" upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction. Neither party will assert as a defense to liability under such agreement the lack of a writing signed by it that would otherwise be required to satisfy any statute of frauds, including §1-206 of the New York Uniform Commercial Code, or any comparable statute (collectively, the "Statute of Frauds"). Nothing herein shall be deemed a waiver of any claim or defense other than the Statute of Frauds that either party may have regarding such agreement.

Each of Buyer and Seller shall record on the trade date of each transaction between the parties and retain in its files a written or electronically recorded trade ticket or similar internal record containing or reflecting evidence of agreement to such transaction, including (a) the date of the agreement, (b) a description of the type of debt including obligor(s) and purchase amount, (c) the identity of the other party to the transaction, and (d) the purchase price or purchase rate.

23. **Governing Law; Confirmation Controls:** The Confirmation and the Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York (without regard to any conflicts of law provision thereof that would require the application of the laws of any other jurisdiction). In case of any conflict between the terms of the Confirmation and these Standard Terms and Conditions, the Confirmation shall govern and control.

24. **Execution by Electronic Transmission:** It is understood by the parties that the custom in the loan trading market is to execute and deliver any confirmations, confidentiality agreements, Transfer Documentation and other transaction documents by telecopy, telefax, e-mail attachment or other means of electronic transmission. The parties agree that all telecopied, telefaxed, e-mailed or electronically transmitted confirmations, confidentiality agreements, Transfer Documentation and

10

other transaction documents, including the Confirmation, and signatures thereto, shall be duplicate originals.

25. **Electronic Records and Signatures:** It is agreed by the parties that, notwithstanding the use herein or in the Confirmation of the words "writing," "execution," "signed," "signature," or other words of similar import, the parties intend that the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system (as the case may be) to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.[4]

---

[4] To help ensure effectiveness of this provision, parties should manually or electronically sign the initial confirmation between them and retain a hard copy in their records.

Annex I

| **Capitalized Term** | **Defined In** |
| --- | --- |
| Adequate Protection Payments | Section 5 |
| Adequate Protection Order | Section 5 |
| Assignment Fees | Section 8 |
| Borrower | Confirmation |
| Business Day | Section 5 |
| Buyer | Confirmation |
| Commencement Date | Section 6 |
| Confirmation | Preamble |
| Consent to Transfer Fees | Section 8 |
| Credit Agreement | Confirmation |
| Credit Documents | Section 14 |
| Debt | Section 2 |
| Delayed Settlement Date | Section 6 |
| Delay Period | Section 6 |
| Excluded Information | Section 20 |
| Facility | Confirmation |
| Federal Funds Rate | Section 6 |
| Flip Representation Deadline | Section 11 |
| Interest and Accruing Fees | Section 5 |
| LIBO Rate | Section 6 |
| LSTA | Preamble |
| Master Currency | Section 4 |
| Multi-Currency Commitment | Section 4 |
| Non-Recurring Fees | Section 5 |
| Paid on Settlement Date Amount | Section 5 |

Permanent Reductions.................................................................................................... Section 3

PIK Interest .................................................................................................................... Section 5

Predecessor Transfer Documentation ......................................................................... Section 10

Purchase Amount........................................................................................................... Section 2

Purchase Price.............................................................................................................. Section 4

Purchase Rate ......................................................................................................... Confirmation

Riskless Principal ......................................................................................................... Section 19

Seller ...................................................................................................................... Confirmation

Settlement Date ............................................................................................................ Section 1

Standard Terms and Conditions .................................................................................. Preamble

Statute of Frauds......................................................................................................... Section 22

Trade Date ............................................................................................................ Confirmation

Transaction ................................................................................................................... Preamble

Transfer Documentation................................................................................................ Section 10

> For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.

[Letterhead of Seller/Seller's agent]
## LMA TRADE CONFIRMATION (PAR)

To          Buyer Name:

Date:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Par Trade Transactions of the Loan Market Association ("LMA") as in effect on the Trade Date, which are incorporated in this Confirmation.

1.    **Credit Agreement Details:**
      Borrower(s):
      Guarantor(s):
      Agent Bank:
      Date:
      Facility Amount:                              Governing Law: _____

2.    **Trade Date:** _____

3.    **Settlement Date:** ☐ _____ (TD+10)
                          ☐ _____

4.    **Seller:** _____
      as ☐ principal ☐ agent for
      _____

5.    **Buyer:** _____
      as ☐ principal ☐ agent for
      _____

6.    **Details of Traded Portion:**
      Name of Tranche/Facility:
      _____
      Nature (Revolving, Term, Acceptances)
      Guarantee/Letter of Credit, Other):
      _____
      Contractual Margin: _____
      Recurring Fees: _____
      Final Maturity: _____
      Traded Portion of Commitment:
      - Amount: _____
      On risk until (*Risk Participation only*):
      ☐ Final maturity
      ☐ Date: _____

      *Details of drawn Credits and undrawn commitments should be set out on a separate sheet detailing the nature of the Credit (eg revolver/bills) and the Maturity or Rollover Date if this differs from the Settlement Date*

7.    **Pricing**
      Name of Tranche/Facility: _____
      Purchase Rate (*not applicable for risk participations*): _____ %

      Upfront Fee (if any): _____
      payable on:
      ☐ Settlement Date
      ☐ _____
      by: ☐ Buyer ☐ Seller
      Traded Margin:
      either _____ % of Contractual Margin
      or _____ %
      accruing from
      (*risk participations only*):
      ☐ Trade Date
      ☐ Settlement Date

8.    **Accrued Interest:**
      ☐ settled without accrued interest
      ☐ paid on Settlement Date
             ☐ discounted from next roll-over date
      ☐ N/A

9.    **Break Costs:**
      ☐ as specified in Condition 12 of LMA Terms and Conditions
      ☐ None
      ☐ Other (specify) _____

10.   **Transfer Costs:**
      Recordation and Transfer fee of _____
      Payable by
      ☐ Buyer
      ☐ Buyer and Seller in equal shares
      ☐ Seller
      ☐ N/A (*participations*)
      Stamp duties and other applicable transfer taxes and any costs attributable to transfer of security are:
      ☐ payable by Buyer
      ☐ payable by other
      ☐ N/A (*participations*)

11.  **Form of Purchase:**
☐  Transfer  Certificate  (from  Credit Agreement)
☐  LMA Transfer Agreement
☐  LMA Assignment
☐  LMA Funded Participation
☐  LMA Funded/Risk Participation
☐  LMA Risk Participation
☐  LMA Risk to Funded Participation
☐  Other [specify details]

The transaction ☐ will, ☐ will not be, disclosed to the Borrower(s) by the Seller.

12.  **Transaction Documentation:**
To be prepared by:
☐ Seller
☐ Buyer

13.  **Credit Documentation to be provided:**
☐ Yes    ☐ No

14.  **Process Agents:**
Buyer: ☐ No ☐ Yes
(details)_____

Seller: ☐ No ☐ Yes
(details)_____

15.  **Other Terms of Trade**
☐  This transaction is subject to the granting of any third party consents required under the terms of the Credit Agreement, or otherwise by law.

☐  If any required consent is not obtained by the proposed Settlement Date (or such other date as the parties may agree) each of the Buyer and the Seller agrees to use all reasonable efforts (subject to the terms of the Credit Documentation) to settle this transaction as a:
☐  Funded Participation
☐  Risk Participation
☐  Funded/Risk Participation
☐  Risk to Funded Participation

☐  This transaction is subject to a satisfactory legal review by the Buyer of the sufficiency of the Credit Documentation.

☐  This transaction is subject to a satisfactory review by the Buyer of the arrangements pursuant to which the interest of the Seller in the Traded Portion derives from the lender of record (applicable only where the Seller is not a lender of record).

☐  This transaction shall also be subject to the successful completion of the sale/purchase or participation by the Buyer/Seller of the asset to be purchased/sold or participated hereunder.

☐  This transaction is subject to compensation for delayed settlement and buy-in/sell-out damages.

☐  _____

Please sign and return this letter to the attention of the contact person mentioned below no later than the close of business on _____ at the fax number or electronic mail address mentioned below. Please note that, in accordance with the LMA Standard Terms and Conditions for Par Trade Transactions, any disagreement with the terms set out above must be notified to us no later than this time.

If you have any questions, please contact _____ at _____ (tel no)

**SELLER** [as agent for _____ ]
Contact Person:
Fax No:
E-Mail:
Phone No:
By:
Name:
Title:
Date:

**BUYER** [as agent for _____ ]
Contact Person:
Fax No:
E-Mail:
Phone No:
By:
Name:
Title:
Date:

For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.[1]

# LOAN MARKET ASSOCIATION ("LMA")

## STANDARD TERMS AND CONDITIONS FOR PAR TRADE TRANSACTIONS

### 1.    APPLICABILITY AND INTERPRETATION

#### 1.1    Applicability

These Conditions apply to a par trade transaction in respect of which:

(a)    they are expressly incorporated; and

(b)    the Trade Date occurs on or after 3 September 2008 and before the date on which they are superseded by revised conditions.

#### 1.2    Interpretation

For the purpose of construing these Conditions in relation to a par trade transaction to which they apply (the "**transaction**"):

"**Agreed Terms**" means the terms agreed between the Buyer and the Seller in relation to the transaction, as evidenced by the Confirmation;

"**Average LIBOR**" means, for the Delayed Settlement Period, the result of dividing (a) the sum of all the individual LIBORs for each day during the Delayed Settlement Period by (b) the total number of days in the Delayed Settlement Period;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in each financial centre appropriate for the transaction;

"**Confirmation**" means the confirmation executed and delivered by the Seller and the Buyer in relation to the transaction;

"**Credit Agreement**" means the credit agreement to which the transaction relates;

"**Credit Documentation**" means the Credit Agreement (including all schedules and appendices to the Credit Agreement), any amendments to the Credit Agreement and all guarantee and security documentation relating to the Credit Agreement;

"**Delayed Settlement Compensation**" means, for any day an amount equal to:-

(a)    the cash pay element of the Contractual Margin and Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the funded principal amount of the Purchased Assets) multiplied by the funded principal amount of the Purchased Assets

---

[1] Please delete this box before sending out document.

(excluding the amount of any PIK Interest that has capitalised on or after the Trade Date in respect of the Purchased Assets) for each such day; and

(b)   the Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the unfunded portion of the Purchased Assets) multiplied by the unfunded portion of the Purchased Assets for each such day.

"**Delayed Settlement Costs of Carry**" means, for any day an amount equal to the amount payable for the Purchased Assets (calculated in accordance with Condition 10.1 (*Settlement Amount Calculation*) but without being adjusted to take account of Delayed Settlement Compensation, Delayed Settlement Costs of Carry and any applicable recordation, processing, transfer or similar fee) multiplied by Average LIBOR for each such day minus the amount of interest actually received by the Seller (and not capitalised or deferred) in respect of the Purchased Assets for each such day.

"**Delayed Settlement Period**" means the period from (and including) the later of (i) the date falling 10 Business Days after the Trade Date and (ii) the Settlement Date[2] to (but excluding) the day on which settlement of the transaction actually occurs.

"**LIBOR**" means, for any day, the British Bankers' Association Interest Settlement Rate for the offering of deposits in the relevant currency for a period of one month displayed on the appropriate page of the Reuters screen as of 11.00 a.m. (London time) on such day. If the appropriate page is replaced or service ceases to be available, the Seller, acting reasonably, may specify another page or service displaying the appropriate rate.

"**Obligor**" means any Borrower or Guarantor and any other obligor under the Credit Documentation;

"**PIK Interest**" means any interest, fees or other amounts payable by an Obligor under the Credit Agreement which are either:-

(a)   automatically deferred or capitalised; or

(b)   deferred or capitalised at the option of any Obligor.

"**Purchased Assets**" means (except as provided in Condition 11.4 (*Settled without accrued interest (Pro Rata)*)) the loans, other utilisations and other rights of the Seller included in the Traded Portion, together with and subject to the obligations and liabilities of the Seller attributable to the Traded Portion (together with corresponding rights and benefits under any guarantee or security relating to the Traded Portion);

"**Relevant Participation**" means, in the case of a risk participation, the commitment included in the Traded Portion including any drawn portion of that commitment;

---

[2] This ensures that if a Settlement Date of less than 10 business days has been selected, Delayed Settlement Compensation/Costs of Carry will nevertheless only be payable after T + 10.

"**Transaction Documentation**" means the documentation required to implement the transaction (including the agreed Form of Purchase) and "**Transaction Document**" shall be construed accordingly.

1.3 **Construction**

(a) Unless a contrary indication appears, capitalised terms used in these Conditions have the meaning given to them in the Confirmation.

(b) If the parties agree to enter into a par trade transaction using an electronic medium (for example an internet website) then the terms applicable to that electronic medium shall prevail to the extent they are binding on the parties and are inconsistent with these Conditions.

(c) A par trade transaction means a transaction for the sale or participation of a loan or other form of credit, or participation in a credit facility, which the parties to a transaction, by applying these Conditions, designate as a par loan or other form of credit.

(d) Headings are for ease of reference only.

1.4 **Agreed Terms prevail**

In the case of any inconsistency between the Agreed Terms and these Conditions, the Agreed Terms shall prevail.

2. **CONTRACT POINT**

A binding contract for the sale or participation by the Seller to the Buyer of the Purchased Assets (and/or, in the case of a risk participation, the Relevant Participation) shall come into effect between the Seller and the Buyer upon oral or, as the case may be, written agreement of the terms on the Trade Date and shall be documented and completed in accordance with Conditions 6 (*Transaction Documentation*) and 7 (*Settlement Date and Payment*).

3. **CONFIRMATION**

(a) The Seller shall send to the Buyer not later than the first Business Day after the Trade Date, a duly completed form of confirmation, signed on behalf of the Seller and in the form most recently published by the LMA.

(b) The Buyer shall sign that confirmation and return it to the Seller not later than the second Business Day after the Trade Date.

(c) The Buyer shall immediately after receipt of that confirmation and, in any event, not later than the close of business on the second Business Day after the Trade Date, raise with the Seller any disagreement with any of the terms of that confirmation.

4.    CONDITIONALITY

4.1   **Conditionality**

(a)    A transaction is subject to any conditions specified in the Agreed Terms.

(b)    Subject to paragraph (c) below, each of the Seller and the Buyer agrees to use all reasonable endeavours to ensure that the conditions referred to in paragraph (a) above are duly fulfilled on or before the Settlement Date.

(c)    The Seller shall use all reasonable endeavours to obtain any third party consents required in connection with the transaction.

4.2   **Conditions unfulfilled**

(a)    If any condition referred to in paragraph (a) of Condition 4.1 (*Conditionality*) remains unfulfilled on the proposed Settlement Date then:

(i)    the Settlement Date shall be postponed for such period or periods as the Seller and the Buyer agree ( the "**Postponement Period**"); and

(ii)    during the Postponement Period, the Seller and the Buyer shall (A) use all reasonable endeavours to ensure fulfilment of each condition which remains unfulfilled and (B) consider in good faith whether or not there is an alternative means, acceptable to both parties, of implementing the transaction.

(b)    If:

(i)    within 5 Business Days of the proposed Settlement Date no Postponement Period is agreed; or

(ii)    a Postponement Period is agreed within the time specified in paragraph (i) above but one or more condition specified in paragraph (a) of Condition 4.1(*Conditionality*) remains unfulfilled on the last day of the Postponement Period and no alternative means of settling the transaction has been agreed on or before the last day of the Postponement Period,

then the transaction shall be cancelled and neither party shall have any further liability to the other except that if any amounts have already been paid under the transaction by either party to the other those amounts shall promptly be returned.

(c)    Neither party is obliged to take any steps under this Condition 4.2, if in the opinion of that party to do so might be prejudicial to it.

(d)    Notwithstanding any other provision of this Condition 4.2, if the parties have specified in the Agreed Terms an alternative means of implementing the transaction they shall use all reasonable efforts (subject to the terms of the Credit Documentation and otherwise on such of the Agreed Terms as are applicable) to settle the transaction in that way within 10 Business Days of the original Settlement Date.

5.   DUE DILIGENCE

5.1   **Credit appraisal by Buyer**

The Buyer agrees that it has satisfied itself as to the creditworthiness of each Obligor and the acceptability of the transaction prior to the Trade Date and the transaction shall not be conditional upon this.

5.2   **Confidentiality**

If the Agreed Terms specify that the Credit Documentation shall be delivered to the Buyer then:

(a)   the Buyer shall sign and deliver to the Seller at its request a confidentiality agreement in the form prescribed by the Credit Documentation or, if none is so prescribed, in the then current form prescribed by the LMA; and

(b)   subject to receipt of the confidentiality agreement where requested and to all necessary consents (if any) having been obtained, the Seller shall provide to the Buyer a true and complete copy of the Credit Documentation as promptly as practicable following the Trade Date.

5.3   **Legal review**

If the Agreed Terms specify that the transaction shall be subject to a satisfactory legal review of the sufficiency of the Credit Documentation, then the Buyer shall review the Credit Documentation as soon as reasonably practicable and promptly notify the Seller if the results of that review are not satisfactory. Any such review shall be limited to a legal review of the sufficiency of the Credit Documentation.

5.4   **Events of default**

The occurrence before the Settlement Date of an event of default or potential event of default under the Credit Documentation, or an event which affects (either adversely or beneficially) the ability of an Obligor to perform its obligations under the Credit Documentation, shall not relieve either party of its obligations in relation to the transaction.

5.5   **Seller not lender of record**

If the Seller is not a lender of record and the Agreed Terms specify that the transaction shall be conditional upon a satisfactory review by the Buyer of the arrangements pursuant to which the interest of the Seller in the Traded Portion derives from a lender of record then:

(a)   subject to obtaining all necessary consents, the Seller shall make full disclosure of those arrangements to the Buyer (other than any such arrangements which relate to pricing and are not required to establish the Seller's interest in the Traded Portion); and

(b)   the Buyer shall promptly notify the Seller if the results of that review are not satisfactory.

6. **TRANSACTION DOCUMENTATION**

  (a) The party specified in the Agreed Terms shall prepare the Transaction Documentation on the agreed basis and, subject to any relevant condition specified in the Agreed Terms, endeavour to deliver it to the other party within three Business Days after the Trade Date.

  (b) The parties shall endeavour to sign the Transaction Documentation and, where appropriate, provide copies to the agent bank under the Credit Agreement, within five Business Days after the Trade Date.

  (c) The time limits in this Condition 6 shall be subject to Condition 20 (*When Issued Trades*).

7. **SETTLEMENT DATE AND PAYMENT**

7.1 **Settlement date**

The transaction shall be settled on the Settlement Date by the taking of all necessary action to complete the transaction. Subject to Condition 20 in relation to "when issued trades", the Settlement Date shall be the date falling ten Business Days after the Trade Date.

7.2 **Delayed settlement**

  (a) If for any reason the transaction settles after the Settlement Date then, subject to paragraph (b) below, for the purpose of allocating interest and fees (including PIK Interest) under these Conditions and for the purposes of the Seller's representations in paragraphs (a) and (b) of Condition 18.2, the Settlement Date shall be the date of actual settlement of the transaction.

  (b) If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, then if the transaction settles after the Settlement Date, for each day during the Delayed Settlement Period:-

    (i) the Seller shall pay to the Buyer, Delayed Settlement Compensation for each such day; and

    (ii) if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the Delayed Settlement Period, the Buyer shall pay to the Seller the Seller's Delayed Settlement Costs of Carry for each such day unless the Delayed Settlement Costs of Carry in respect of the Delayed Settlement Period result in a negative amount in which case the Seller shall pay to the Buyer the absolute value of that amount.

7.3 **Necessary action**

The action necessary to complete a transaction shall include the payment for the Purchased Assets on the Settlement Date, unless the transaction is to take effect only as a risk participation.

7.4    **Funded participations**

Where the transaction is to take effect as a funded participation, any payment in respect of the principal amount of the Purchased Assets shall be by way of limited recourse loan by the Buyer to the Seller on the terms of the applicable Transaction Documentation.

8.    **PURCHASE AMOUNT**

Unless the Agreed Terms and/or the Credit Documentation otherwise provide, the amount of the Purchased Assets and/or Relevant Participation to be sold or participated by the Seller to the Buyer shall be allocated *pro rata* to the facilities provided under the Credit Agreement and, within each facility, *pro rata* to the tranches thereof, if more than one.

9.    **PERMANENT REDUCTION**

(a)    The economic benefit of permanent commitment reductions and permanent repayments of principal applicable to the Purchased Assets under the Credit Documentation (collectively the **"Permanent Reductions"**) shall be treated in accordance with Condition 10 (*Settlement Amount Calculation*). In the case of a risk participation, any permanent commitment reductions relating to the Traded Portion after the Trade Date shall reduce the Relevant Participation accordingly.

(b)    Permanent repayments of principal which occur in respect of the Purchased Assets (or otherwise) after the Trade Date and on or before the Settlement Date are for the account of the Seller. If on or after the Settlement Date any such repayments of principal in respect of the Purchased Assets are paid to the Buyer, the Buyer shall promptly after receipt pay a corresponding amount to the Seller.

10.    **SETTLEMENT AMOUNT CALCULATION**

10.1    **Settlement amount calculation**

The amount payable for the Purchased Assets shall be equal to the Purchase Rate (as specified in the Agreed Terms) multiplied by the funded principal amount of the Purchased Assets as of the Settlement Date <u>less</u>:

(a)    (100% minus the Purchase Rate) multiplied by the unfunded portion of the Purchased Assets as of the Settlement Date; and

(b)    (100% minus the Purchase Rate) multiplied by any Permanent Reductions (as defined in Condition 9 (*Permanent Reductions*) which occur in respect of the Purchased Assets after the Trade Date and on or before the Settlement Date,

adjusted to take account of any Delayed Settlement Compensation and Delayed Settlement Costs of Carry payable in accordance with paragraph (b) of Condition 7.2 (*Delayed Settlement*) and any applicable recordation, processing, transfer or similar fee which under the Agreed Terms is to be payable by either party.

10.2  **Payments**

If the amount is positive it shall be payable by the Buyer to the Seller; if negative the absolute value of the amount shall be payable by the Seller to the Buyer.

10.3  **Currencies**

Where any amounts are to settle in more than one currency on any day the appropriate calculation and payment shall be made in respect of each relevant currency in accordance with this Condition 10.

11.  **INTEREST PAYMENTS AND FEES**

11.1  **Interest rates**

All interest and fees referred to in this Condition 11 which are expressed to accrue by reference to time elapsed are based on the rates contained in the Credit Agreement.

11.2  **Settled without accrued interest**

(a)  Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if **"Settled Without Accrued Interest"** is specified in the Agreed Terms then, subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, upon receipt by the Buyer of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date), the Buyer shall promptly pay to the Seller an amount equal to the amount of such interest or fees.

(b)  If the Buyer pays any amount to the Seller in accordance with paragraph (a) above and either:

(i)  the Buyer does not receive all or part of such amount under the Credit Documentation; or

(ii)  after the Buyer has made that payment to the Seller, the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement requiring the Buyer to repay the whole or any part of any amounts paid by or through such agent to which that payment was attributable,

then the Seller shall promptly, after demand by the Buyer, repay to the Buyer the whole or a proportionate part of such payment.

11.3  **Paid on settlement date**

(a)  Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if **"Paid on Settlement Date"** is specified in the Agreed Terms then subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, the Buyer shall pay to the Seller on the Settlement Date an amount equal to the amount of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees

referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date).

(b)   Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if, on or after the Settlement Date, any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets are paid to the Seller, the Seller shall promptly after receipt pay a corresponding amount to the Buyer.

(c)   The Buyer shall have no right of recourse to the Seller in relation to any amounts paid to the Seller in accordance with paragraph (a) above including, without limitation, in circumstances where the Buyer does not receive all or part of any interest or fees on their due date or the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement.

## 11.4   Settled without accrued interest (Pro Rata)

If under the terms of the Credit Documentation in relation to a transaction the Seller is to retain the right to receive its portion of any interest or fees, accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than the fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date) then, notwithstanding Conditions 11.2 (*Settled without accrued interest*) and 11.3 (*Paid on settlement date*): (a) the Seller shall be so entitled pursuant to these Conditions; and (b) the Seller shall have no recourse whatsoever to the Buyer if such interest or fees are not received by it.

## 11.5   Discounted from next roll-over date

If "Discounted from next roll-over date" and "Paid on Settlement Date" are each specified in the Agreed Terms then any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than PIK Interest) but which are not payable until the next roll-over date applicable under the Credit Agreement shall be discounted from such roll-over date back to the Settlement Date at IBOR (as such rate is calculated in accordance with Condition 12 (*Breakfunding*)) on a simple interest basis.

## 11.6   N/A

If "N/A" is specified in the Agreed Terms then, subject to Condition 11.10 (*PIK Interest*), the Buyer shall not be obliged to make any payment to the Seller in respect of accrued interest or accrued fees, either on the Settlement Date or on receipt of any such interest or fees.

## 11.7   Partial payments of interest

Partial payments of interest shall be applied to payment dates pro rata to the amounts due on such payment dates (unless otherwise specified in the Credit Agreement).

## 11.8   Upfront fee

Any Upfront Fee shall be paid on the Settlement Date in the amount and by the party specified in the Agreed Terms.

11.9   **Allocation of interest and fees**

Unless these Conditions otherwise provide (and save where the transaction is to take effect as a risk participation only) or where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies:

(a)   any interest or fees (other than PIK Interest) which are payable under the Credit Agreement in respect of the Purchased Assets and which are expressed to accrue by reference to the lapse of time shall, to the extent they accrue in respect of the period before (and not including) the Settlement Date, be for the account of the Seller and, to the extent they accrue in respect of the period after (and including) the Settlement Date, be for the account of the Buyer; and

(b)   all other fees shall, to the extent attributable to the Purchased Assets and payable after the Trade Date, be for the account of the Buyer.

11.10  **Payments clear of deduction or withholding**

All payments made under this Condition 11 shall be made free and clear of any deduction or withholding save for such deduction or withholding as may be required to be made from such payments by any law, regulation or practice. If any such deduction or withholding is made or is required to be made, the payer shall increase the amount to be paid to the payee to ensure that the payee receives and retains a sum equal to the sum which it would have received and retained had no such deduction or withholding been made or required to be made.

11.11  **PIK Interest**

(a)   PIK Interest that is deferred or capitalised before the Trade Date in respect of the Purchased Assets shall be for the account of the Seller and shall therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(b)   PIK Interest that is deferred or capitalised on or after the Trade Date in respect of the Purchased Assets shall be for the account of the Buyer at no cost to the Buyer and shall not therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(c)   PIK Interest that has accrued but not deferred or capitalised as at the Settlement Date in respect of the Purchased Assets shall be for the account of the Buyer upon capitalisation at no cost to the Buyer and shall not be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

12.   **BREAKFUNDING**

(a)   If the Agreed Terms specify that this Condition will apply then, in relation to each funded portion of the Purchased Assets, the Seller and the Buyer shall agree upon the relevant IBOR.

(b)     For the purposes of this Condition 12 (*Breakfunding*) and each funded portion of the Purchased Assets:

(i)     "**IBOR**" means the Interbank Offered Rate which shall be calculated, where necessary, by interpolating on a linear basis between the rate quoted in respect of the longest period (for which a rate is quoted) which is less than the Relevant Period and that quoted in respect of the shortest period (for which a rate is quoted) which exceeds the Relevant Period on the appropriate Reuters screen specified by the Seller (or if there is no Reuters screen, such other appropriate screen as the Seller may specify) at or about 11.00 a.m. (local time) on the date upon which quotations would ordinarily be given by prime banks in the relevant interbank market for deposits in the relevant currency for delivery on the Settlement Date for the Relevant Period; and

(ii)    "**Relevant Period**" means the period from the Settlement Date to the next roll-over date applicable under the Credit Agreement for that funded portion.

(c)     With respect to any such funded portion, if IBOR is higher than the relevant funding rate in effect for that funded portion under the Credit Agreement on the Settlement Date (the "**Relevant IBOR Rate**") then the Seller will pay to the Buyer on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

(d)     With respect to any such funded portion, if IBOR is lower than the Relevant IBOR Rate then the Buyer will pay to the Seller on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

## 13.    TRANSFER COSTS

### 13.1   Transfer fees

The Buyer shall pay any recordation, processing, transfer or similar fee payable to the agent bank under the Credit Documentation in connection with the transaction. Such fee shall be paid by the Buyer to such agent bank:

(c)     if the Agreed Terms provide that all or part of such fee is to be payable by the Seller, promptly following receipt by the Buyer of the whole or such part (as applicable) of such fee from the Seller or, if later, on the date upon which such fee is payable under the Credit Documentation; or

(d)     otherwise, on the date upon which such fee is payable under the Credit Documentation.

13.2 **Stamp taxes**

Unless otherwise specified in the Agreed Terms, stamp duties and other applicable transfer taxes and duties (including notarial fees) and any costs attributable to the transfer of security are payable by the Buyer.

14. **TURNOVER OBLIGATIONS**

(a) If any amount to which the Buyer is entitled pursuant to the Agreed Terms is received or recovered by the Seller, the Seller shall promptly pay to the Buyer an amount equal to such amount.

(b) If any amount to which the Seller is entitled pursuant to the Agreed Terms is received or recovered by the Buyer, the Buyer shall promptly pay to the Seller an amount equal to such amount.

15. **COSTS AND EXPENSES**

Each of the Buyer and the Seller shall pay its own costs and expenses (including legal expenses) in connection with the transaction.

16. **PRINCIPAL/AGENCY STATUS**

16.1 **Principal or agent**

Each of the Buyer and the Seller shall indicate whether it is acting as a principal or an agent in the transaction.

16.2 **Principal**

A Buyer or Seller that holds itself out as a "principal" is directly liable for the completion of the transaction. A principal may, however, specify in the Agreed Terms that its obligation to complete the transaction is subject to successful completion of the purchase or participation from, or sale or participation to, a third party of the Purchased Assets or Relevant Participation.

16.3 **Agent**

(a) A Buyer or Seller that holds itself out to its counterparty as an "agent" acts on behalf of one or more principals to the transaction and is not itself a party to the transaction.

(b) A Buyer or Seller that holds itself out as an agent:

(i) is not liable to its counterparty for the successful completion of the transaction; and

(ii) shall have no liability or obligation to its counterparty in connection with the transaction other than (a) in circumstances where it does not have authority to bind its principal(s) to the transaction or (b) pursuant to any confidentiality agreement entered into by it in connection with the transaction.

(c)     Notwithstanding the provisions contained in paragraph (b) above, a Buyer or Seller that holds itself out to its counterparty as an agent represents to its counterparty its authority to bind its principal(s) to the transaction (which principal(s) shall be bound as if it/they were named as "Buyer" or "Seller" as the case may be) and shall provide the counterparty with evidence of that authority if requested to do so.

## 17. NON-RELIANCE AND INDEPENDENT INVESTIGATION

### 17.1 Acknowledgement

Each party acknowledges to the other that:

(a)     it is a sophisticated Buyer or Seller (as the case may be) with respect to the transaction; and

(b)     it has such information as it deems appropriate under the circumstances (however obtained), concerning for example the business and financial condition of the obligor(s) under the Credit Agreement, to make an informed decision regarding the transaction.

### 17.2 Independent investigation

Each of the Buyer and the Seller agrees that it has made its own independent analysis and decision to enter into the transaction, based on such information as it has deemed appropriate under the circumstances, and without reliance on the other party (except for reliance on any express representation made by the other party in the Agreed Terms or pursuant to these Conditions).

### 17.3 Exclusion of liability

The Seller does not make, and the Buyer does not rely upon, any representation, warranty or condition (express or implied) about, and the Seller shall have no liability or responsibility to the Buyer for;

(a)     the effectiveness, validity or enforceability of the Credit Documentation or other documentation delivered by the Seller to the Buyer, or any of the terms, covenants or conditions contained in the Credit Documentation or other documentation;

(b)     any non-performance by any party to the Credit Documentation or other documentation; or

(c)     the financial condition, status or nature of any Obligor.

### 17.4 No Obligation to repurchase

The Seller and the Buyer agree that:

(a)     the Seller shall have no obligation to repurchase or reacquire all or any part of the Purchased Assets or, as the case may be, the Relevant Participation from the Buyer or to support any losses directly or indirectly sustained or incurred

by the Buyer for any reason whatsoever, including the non-performance by any Obligor of its obligations under the Credit Documentation; and

(b) any rescheduling or renegotiation of the Purchased Assets or, as the case may be, the Relevant Participation shall be for the account of, and the responsibility of, the Buyer, who will be subject to the rescheduled or renegotiated terms.

### 17.5 Material information

Each of the Buyer and Seller acknowledges and agrees that:

(a) the other may possess material information not known to it;

(b) the other shall have no liability and no action or proceedings may be taken with respect to the non-disclosure of any such information except to the extent that such information renders inaccurate an express representation made pursuant to the Agreed Terms or these Conditions by the party possessing such information.

## 18. REPRESENTATIONS AND UNDERTAKINGS

### 18.1 Representations

Each of the Buyer and the Seller represents to the other that:

(a) it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(b) it has the power to enter into the transaction and to execute and deliver the Confirmation and the Transaction Documentation; and

(c) its obligations in relation to the transaction constitute legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application).

### 18.2 Seller's representations

The Seller represents to the Buyer that:

(a) as at the Settlement Date, it will own beneficially all the Purchased Assets or, as the case may be, the Relevant Participation to be sold or participated pursuant to the transaction free from any rights of set-off in favour of any Obligor or any lien, security interest or other encumbrance, any purchase or option agreement or arrangement, or any agreement to create or effect any of the same;

(b) as at the Settlement Date, it will not be in default of any of its obligations in relation to the Purchased Assets or, as the case may be, the Relevant Participation;

(c)    so far as it is aware, no decision has been taken by the lenders party to the Credit Documentation to accelerate or enforce their rights under the Credit Documentation and no amount of principal or interest is due and unpaid under the Credit Documentation; and

(d)    subject to the obtaining of any necessary consents, all rights and benefits (including proprietary rights under any relevant security documentation) and, where applicable, all obligations under the Credit Documentation which the parties have agreed will be novated, assigned or otherwise effectively transferred to the Buyer pursuant to the transaction are capable of being so novated, assigned or otherwise transferred.

18.3   **Buyer's undertaking**

The Buyer undertakes to the Seller that it will not use any information received by it from the Seller in relation to the Obligors, the Purchased Assets or, as the case may be, the Relevant Participation for any unlawful purpose or in breach of any confidentiality agreement entered into by it in connection with the transaction.

18.4   **Survival of representations**

All express representations made by the parties pursuant to the Agreed Terms and these Conditions shall survive the execution and delivery of the Transaction Documentation.

19.   **DEFAULT**

19.1   **Defaults**

(a)    Subject to Condition 19.4, if:

    (i)    either party defaults in the performance of its obligations to the other under any Transaction Document; or

    (ii)   any representation or acknowledgement made by either party to the other in the Agreed Terms or these Conditions proves to have been incorrect when made,

the non-defaulting party shall be entitled to give notice to the defaulting party for such period as the non-defaulting party may specify.

(b)    If the default is not remedied within the period specified in the notice referred to in paragraph (a) above, or such further period or periods as the non-defaulting party may agree, the non-defaulting party may, by written notice to the defaulting party, terminate the transaction immediately.

(c)    If the non-defaulting party terminates the transaction in accordance with paragraph (b) above, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

19.2   **Breach of representation or undertakings**

Each party shall compensate the other for any properly quantified loss, liability or expense which the other suffers as a consequence of a breach of any of its representations or undertakings made pursuant to the Agreed Terms and these Conditions.

19.3   **Notification**

If a claim for any losses, liabilities and expenses is made pursuant to this Condition 19 (*Default*), that claim must be notified by the non-defaulting party to the defaulting party within 60 days after the Settlement Date (such notice to include quantification by the non-defaulting party of such losses, liabilities and expenses) and the defaulting party shall not be liable for any claim not so notified within that period.

19.4   **Buy-in/Sell-out**

(a)   If the Agreed Terms specify that the transaction shall be subject to delayed settlement compensation and buy-in/sell-out damages then this Condition 19.4 will apply. For the avoidance of doubt, if any transaction has been cancelled in accordance with Condition 4.2 (*Conditions unfulfilled*), this Condition 19.4 will not apply to that transaction.

(b)   If the transaction is not settled on the Settlement Date because:

(i)   either party defaults in the performance of its obligations to the other under any Transaction Document; or

(ii)   any representation or acknowledgement made by either party to the other in any Transaction Document proves to have been incorrect when made,

the other party ("**the non-defaulting party**") may, by no later than 10 Business Days after the Settlement Date, give written notice to that party ("**the defaulting party**") of its intention to terminate its obligations under the Confirmation and to effect a Substitute Transaction (as defined below) in respect of the Traded Portion.

(c)   During the 3 Business Days following receipt of the notice referred to in paragraph (b) above, the defaulting party shall use all reasonable endeavours to identify a counterparty acceptable to the non-defaulting party to enter into a Substitute Transaction.

(d)   If the defaulting party:

(i)   identifies a substitute counterparty acceptable to the non-defaulting party, the Substitute Transaction shall be entered into with such counterparty and the Substitute Trade Date (as defined below) shall be the fifth Business Day following delivery of the notice referred to in paragraph (b) above; or

(ii)   fails to identify a substitute counterparty acceptable to the non-defaulting party within the time period referred to in paragraph (c) above, then the

Seller and the Buyer shall consider in good faith for a further period of up to 5 Business Days whether or not there is an alternative means, acceptable to both parties, of settling or resolving the failed transaction. If the parties fail to agree such alternative means within such further 5 Business Day period, or such further period or periods as the non-defaulting party may agree, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

(e)     If the transaction is not settled on the Settlement Date because either party defaults in a payment obligation under the Transaction Documents, the defaulting party may remedy such default at any time prior to the Substitute Trade Date by making payment to the non-defaulting party of an amount calculated in accordance with Condition 10 (*Settlement Amount Calculation*).

(f)

(i)     The non-defaulting party shall send to the defaulting party not later than the first Business Day after the date of signing of the Substitute Confirmation (as defined below) by the parties to it, notice (the "**Purchase Price Notice**") of the purchase price payable under the Substitute Transaction.

(ii)    If the defaulting party disputes the reasonableness of the purchase price specified in the Purchase Price Notice the defaulting party shall send notice of such dispute (the "**Price Dispute Notice**") to the non-defaulting party not later than the second Business Day after receipt of the Purchase Price Notice.

(iii)   As soon as reasonably practicable following receipt of the Price Dispute Notice the non-defaulting party shall use reasonable endeavours to obtain indicative quotations for a transaction on the same terms as the Substitute Transaction from three members of the Valuation and Trading Practices Committee of the LMA at that time (or any successor of such Valuation and Trading Practices Committee carrying on substantially the same functions), such three members to be chosen by the non-defaulting party in its sole discretion.     The non-defaulting party will calculate the average of the three indicative quotations received and such amount will be the Indicative Price for the purposes of paragraphs (g) and (h) below.

(iv)    Any determination by the non-defaulting party pursuant to paragraph (iii) above shall, in the absence of manifest error, be conclusive and binding on all parties.

(g)     If the Seller is the defaulting party, the Seller shall pay to the Buyer on the Substitute Settlement Date (as defined below)as follows:

(i)     if no Price Dispute Notice was issued in relation to the Substitute Transaction, the amount (if any) by which the price in respect of the Buy-in Transaction (as defined below) exceeds the original price for the Traded Portion; or

(ii)    if a Price Dispute Notice was issued in relation to the Buy-in Transaction the amount (if any) by which the Indicative Price in respect of the Buy-in Transaction exceeds the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, the Seller shall in addition pay an amount equal to (a) Delayed Settlement Compensation for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)     actual settlement of the Buy-in Transaction; and

(ii)    10 Business Days following the Substitute Trade Date; and

(b) if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to above and the Delayed Settlement Costs of Carry calculation for that period results in a negative amount, the absolute value of that amount

(h)     If the Buyer is the defaulting party, the Buyer shall pay to the Seller on the Substitute Settlement Date as follows:

(i)     if no Price Dispute Notice was issued in relation to the Substitute Transaction the amount (if any) by which the price in respect of the Sell-out Transaction (as defined below) is less than the original price for the Traded Portion; or

(ii)    if a Price Dispute Notice was issued in relation to the Sell-out Transaction the amount (if any) by which the Indicative Price in respect of the Sell-out Transaction is less than the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages and if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to below, the Buyer shall in addition pay an amount equal to Delayed Settlement Costs of Carry (if any) for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)     actual settlement of the Sell-out Transaction; and

(ii)    10 Business Days following the Substitute Trade Date.

(i)     For the purposes of this Condition 19.4:

"**Buy-in Transaction**" means a transaction in which the Buyer purchases the equivalent of the Traded Portion from a counterparty other than the Seller;

"**Sell-out Transaction**" means a transaction in which the Seller sells the Traded Portion to a counterparty other than the Buyer;

"**Substitute Confirmation**" means the confirmation signed on behalf of the non-defaulting party and the substitute counterparty in the form most recently published by the LMA evidencing the agreed terms for the Substitute Transaction;

"**Substitute Settlement Date**" means the settlement date specified in the Substitute Confirmation;

"**Substitute Transaction**" means a Buy-in Transaction or, as the case may be, a Sell-out Transaction; and

"**Substitute Trade Date**" means the date on which the non-defaulting party agrees the terms (whether orally or in writing) of the Substitute Transaction with a substitute counterparty.

20.    **WHEN ISSUED TRADES**

If the Trade Date for the transaction is to occur prior to signing of the Credit Agreement (a "**when issued trade**") then the Settlement Date shall be ten Business Days after such signing. Except with respect to exchanging a Confirmation, all other times for when issued trades shall be calculated from the signing of the Credit Agreement.

21.    **CONFIDENTIALITY**

Either party shall be permitted to make any disclosures regarding the terms of the transaction (other than the identity of the counterparty) subject to the requirements of law or regulation or of the Credit Documentation. If there is any inconsistency between this Condition and any confidentiality agreement entered into between the parties, the terms of that confidentiality agreement shall prevail.

22.    **TAX**

The Buyer acknowledges that it is responsible for making its own independent tax analysis of the Credit Documentation and the transaction.

23.    **SET-OFF**

Either party may (but is not obliged to) set off any amount due and payable by the other party under the transaction against any such amounts due and payable by it to the other party under the transaction. The party exercising its rights under this provision may effect such currency exchanges as it considers necessary to implement the set off.

24.   **FURTHER ASSURANCE**

Each of the parties agrees, at its own expense, to take any further action and to execute any further documents and/or instruments as the other may reasonably request to give effect to the transaction.

25.   **THIRD PARTY RIGHTS**

A person who is not a party to the Confirmation or other Transaction Document has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of the Confirmation or other Transaction Document.

26.   **GOVERNING LAW AND JURISDICTION**

26.1   **Governing law**

The transaction, the Agreed Terms and these Conditions are governed by English law.

26.2   **Jurisdiction**

The parties submit to the non exclusive jurisdiction of the English courts.

26.3   **Service of process**

The Seller and the Buyer each irrevocably appoints the person described as its process agent (if any) in the Agreed Terms to receive on its behalf service of any action, suit or other proceedings in connection with the transaction, the Agreed Terms or these Conditions. If any person appointed as process agent ceases to act for any reason the appointing party shall notify the other party and shall promptly appoint another person incorporated within England and Wales to act as its process agent.

27.   **EXECUTION IN COUNTERPARTS AND BY FAX OR EMAIL**

27.1   **Counterparts**

Any Confirmation, confidentiality agreement or other Transaction Document may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Confirmation, confidentiality agreement or other Transaction Document.

27.2   **Fax and electronic communication**

(a)   Transmission by fax of a signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(b)   Transmission by electronic mail of an electronically scanned signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(c)   The Buyer and the Seller shall deliver to each other an original counterpart of the Transaction Documents (and, upon the request of either party, the Confirmation, confidentiality agreement or any other document) promptly after delivery by fax or electronic mail.

For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.

## LMA TRADE CONFIRMATION (DISTRESSED/BANK DEBT)

To:      [Seller/Buyer Name]                    Date:

Attention:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Transactions (Bank Debt/Claims) of the Loan Market Association ("**LMA**") as in effect on the Trade Date, which are incorporated herein by reference.

1.    **Credit Agreement Details:**

      Borrower(s):  _____

      Agent Bank:  _____

      Date:  _____

      Total Original Facility Amount:

                        _____

      Original Lender:     ☐Yes     ☐No

      Additional Information:  _____

      ☐    Details of other credits are set out on the attached Schedule.

2.    **Trade Date:**  _____

3.    **Settlement Date:**

      ☐    as soon as reasonably practicable

      ☐    no later than _____ unless otherwise extended by mutual consent of the Buyer and the Seller which consent shall not be unreasonably withheld

      ☐    _____ (being the date 20 business days after the Trade Date)

4.    **Seller:**  _____

      As   ☐ principal

           ☐ agent for  _____

5.    **Buyer:**  _____

      As   ☐ principal

           ☐ agent for  _____

6. **Details of Traded Portion:**

Name of Tranche/Facility:

_____   _____

Nature (Revolving, Term, Acceptances, Guarantee, Letter of Credit, Other):

_____   _____

Final Maturity:

_____   _____

*Traded Portion of Commitment:*

_____   _____

7. **Pricing:**   Tranche/Facility Tranche/Facility

Name:        _____   _____

Purchase Rate:   _____%   _____%

8. **Accrued Interest:**

❏   Settled Without Accrued Interest

❏   Trades Flat (accrued interest to Buyer)

❏   Other

9. **Transfer Costs:** Recordation and Transfer fee payable by

❏   Buyer      ❏   Seller

❏   Buyer and Seller in equal shares

❏   N/A (Participations)

Stamp duties and other applicable transfer taxes and any costs attributable to transfer of security are payable by:

❏   Buyer      ❏   Seller

❏   Buyer and Seller in equal shares

❏   N/A (Participations)

(specify)     _____

10. **Form of Purchase:**

*Legal Transfer*

❏   Transfer Certificate in form prescribed by the Credit Agreement

❏   (Where there is no form of transfer provided under the Credit Agreement) Novation using LMA standard form of Transfer Agreement for distressed trades (Bank Debt)

❏   (Where there is no form of transfer provided under the Credit Agreement) Assignment Agreement using LMA standard form of Assignment Agreement for distressed trades (Bank Debt)

❏   Funded Participation using LMA standard form of Participation Agreement for distressed trades

❏   Legal Transfer only *(applicable only if the Seller and the Buyer do not wish to settle the transaction by a Funded Participation if as at the proposed Settlement Date a condition to a legal transfer remains unsatisfied)*

If this transaction settles by Funded Participation, the Participation Agreement will grant:

- Voting rights:     ❏  Yes    ❏  No

- Information rights:   ❏  Yes    ❏  No

If this transaction settles by Funded Participation the Participation Agreement will specify:

- Collateral for undrawn commitment:   ❏  Yes    ❏  No

11. **Transaction Documentation:**

To be prepared by:   ❏  Seller

❏  Buyer

12. **Credit Documentation to be provided by Seller:**

   ❑ Yes    ❑ No

13. **Process Agents:**

   Buyer:    ❑ Yes    ❑ No

   If yes, details of process agent:

   Name: _____

   Address: _____

   _____

   Seller:    ❑ Yes    ❑ No

   If yes, details of process agent:

   Name: _____

   Address: _____

   _____

14. **Other Terms of Trade:**

   ❑ The settlement of this transaction by (as the case may be) novation, assignment or funded participation is subject to the granting of any third party consents required under the terms of the Credit Agreement, or otherwise by law

   ❑ The Purchased Assets shall include the Retained Rights subject to (i) the granting of any third party consents required under the Predecessor Transfer Agreements (as specified in the Schedule hereto) and (ii) a satisfactory review by the Buyer of such Predecessor Transfer Agreements and the assignment to the Buyer of the Seller's right, title, interest and benefit

in, to and under such Predecessor Transfer Agreements

   ❑ The settlement of this transaction by (as the case may be) novation, assignment or funded participation shall also be subject to the successful completion of the purchase or participation by the Seller of the asset to be sold or participated hereunder

   ❑ The settlement of this transaction by (as the case may be) novation, assignment or funded participation shall also be subject to the successful completion of the sale or participation by the Buyer of the asset to be purchased or participated hereunder

   ❑ This transaction shall incorporate the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Original Lender) which are incorporated herein by reference

   ❑ This transaction shall incorporate the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Secondary Lender) which are incorporated herein by reference

   ❑ This transaction shall be subject to the negotiation of mutually acceptable representations and warranties of the Seller with respect to the assets to be sold or participated hereunder

   ❑ This transaction incorporates Delayed Settlement Compensation

   ❑ _____

Please sign and return this letter to the attention of the contact person mentioned below no later than the close of business on _____ at the fax number or electronic mail address mentioned below. Please note that, in accordance with the LMA Standard Terms and Conditions for Distressed Trade Transactions (Bank Debt/Claims), any disagreement with the terms set out above must be notified to us no later than this time.

If you have any questions, please contact _____ at _____ (tel no.).

| **SELLER** | **BUYER** |
|---|---|
| Contact Person: | Contact Person: |
| Fax No.: | Fax No.: |
| E-mail: | E-mail: |
| Phone No.: | Phone No.: |
| | |
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |
| [as agent for _____ ] | [as agent for _____ ] |

For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.

## LOAN MARKET ASSOCIATION ("LMA")

## STANDARD TERMS AND CONDITIONS FOR DISTRESSED
## TRADE TRANSACTIONS (BANK DEBT/CLAIMS)

1.      **APPLICABILITY OF CONDITIONS AND INTERPRETATION**

1.1     These Conditions shall apply to a distressed trade transaction in respect of which (a) they are incorporated by reference in the applicable Confirmation and (b) the Trade Date occurs on or after 1 February 2008 (the **"Revision Date"**) and before the date on which they are superseded by revised conditions.

1.2     For the purpose of construing these Conditions in relation to a transaction to which they apply (the **"transaction"**):

**"Agents"** means any facility, security or other agent, trustee, representative or co-ordinator under the Credit Documentation and **"Agent"** shall be construed accordingly;

**"Agent's Expenses"** means any costs, liabilities, losses, claims, damages and expenses incurred by, and any indemnification of, any Agent or any person being a member of a steering committee, a co-ordinator or otherwise involved in any standstill or other arrangement in relation to the Borrower(s) for which such Agent or person has recourse under the Credit Documentation to the Seller but only to the extent attributable to or applicable by reference to the Purchased Assets or the Purchased Obligations;

**"Agreed Terms"** means the terms agreed between the Buyer and the Seller in relation to the transaction, as evidenced by the Confirmation;

**"Ancillary Rights and Claims"** means (to the extent that the same are capable of being or permitted to be assigned, or (in the case of a transaction which settles as a funded participation) capable of being or permitted to be made the subject of a funded participation, by the Seller in contract and under applicable law) all claims, suits, causes of action, and any other right of the Seller (including where such claims, suits, causes of action or other rights have been acquired by the Seller from its Predecessor-in-Title), whether known or unknown, against, any Obligor, or any of their respective affiliates, agents, representatives, contractors, advisors, or any other person that in any way is based upon, arises out of or is related to assets referred to in paragraph (a) of the definition of Purchased Assets, including all claims (in contract or in tort), suits, causes of action, and any other right of the Seller (including where such claims, suits, causes of action or other rights have been acquired by the Seller from its Predecessor-in-Title), against any auditor, legal, tax, financial or other professional advisor, or

other person arising under or in connection with the Credit Documentation but, excluding for the avoidance of doubt, the Retained Rights;

"**Average EURIBOR**" means, for the Delay Period, the result of dividing (i) the sum of all the individual EURIBORs for each day in the Delay Period by (ii) the total number of days in the Delay Period;

"**Average LIBOR**" means, for the Delay Period, the result of dividing (i) the sum of all the individual LIBORs for each day in the Delay Period by (ii) the total number of days in the Delay Period;

"**Benefit Plan**" means an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, a "plan" as defined in Section 4975 of the Code or any entity whose assets include (for purposes of United States Department of Labour Regulations Section 2510.3-101 as modified by Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan";

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York City and, where the Traded Portion is denominated in euros, is a TARGET Day;

"**Buyer Warranties**" means the warranties, representations and indemnities made by, and the covenants and agreements of, the Buyer in the Agreed Terms;

"**Claim Impairment**" means (a) any right of any person or authority in respect of the Purchased Assets or any part thereof, the effect of which is or would be to reduce, impair or otherwise materially and prejudicially affect the Purchased Assets and the Purchased Obligations or any part thereof or any guarantee or Collateral thereto; or (b) any claim or action of any person or authority whatsoever in respect of the Purchased Assets or any part thereof, the effect of which, if determined adversely, is or would be to reduce, impair or otherwise materially and prejudicially affect the Purchased Assets and the Purchased Obligations or any part thereof or any guarantee or Collateral thereto; or (c) any right of set-off of any person in respect of the Purchased Assets;

"**Code**" means the United States Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it;

"**Collateral**" means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance has been, or is purported to have been, granted to or for the benefit of the Lenders under the Credit Documentation;

"**Confirmation**" means the confirmation executed and delivered by the Seller and the Buyer in relation to the transaction;

"**Credit Agreement**" means the credit agreement to which the transaction relates as set out in the applicable Confirmation;

"**Credit Documentation**" means the Credit Agreement, together with all schedules and appendices thereto, any amendments, supplements, accessions, waivers, or variations thereto and all ancillary guarantee, security, intercreditor and restructuring documentation;

"**Delay Period**" means the period from (and including) the Delay Period Commencement Date to (but excluding) the Settlement Date;

"**Delay Period Commencement Date**" means the date twenty Business Days after the Trade Date;

"**Delayed Settlement Compensation**" means any amounts payable pursuant to Condition 9.2 (other than pursuant to Condition 9.2.4);

"**Encumbrance**" means any:

(a)     mortgage, pledge, lien, charge, hypothecation, security interest or other encumbrance, security agreement or security arrangement of any kind;

(b)     purchase or option agreement or arrangement;

(c)     subordination agreement or arrangement; or

(d)     agreements to create or effect any of the foregoing;

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it;

"**EURIBOR**" means for any day, the percentage rate per annum determined by the Banking Federation of the European Union for a period of one month displayed on the appropriate page of the Reuters screen. If the appropriate page is replaced or service ceases to be available the Seller, acting reasonably, may specify another page or service displaying the appropriate rate;

"**Governmental Authority**" means any federal, state or other governmental agency or body, authority, administrative or regulatory body, arbitrator, court or other tribunal, foreign or domestic;

"**Group**" means, in respect of any person, such person and each of its holding companies and subsidiaries and each subsidiary of each of its holding companies (as each such term is defined in the Companies Act 1985 as from time to time amended or re-enacted);

"**Insolvency Officer**" means any receiver, administrator, liquidator, provisional liquidator, administrative receiver, trustee, supervisor of a voluntary arrangement, similar officer appointed pursuant to a scheme of arrangement under section 425 of the Companies Act 1985 (as from time to time amended or re-enacted) or similar officer

appointed under the Insolvency Act 1986 (as from time to time amended or re-enacted) or any other officer appointed under any other procedure under any law or any jurisdiction of, or having, similar or analogous powers over all or any of the assets of an Obligor;

"**Insolvency Proceedings**" means receivership, administration, liquidation, winding-up, dissolution or any insolvency procedure under the Insolvency Act 1986 (as amended or re-enacted from time to time) or any other procedure under any law of any jurisdiction having a similar or analogous nature or effect;

"**Lenders**" means the persons originally named as lenders in the Credit Agreement and their successors and assigns from time to time;

"**LIBOR**" means for any day, the British Bankers' Association Interest Settlement Rate for the relevant currency for a period of one month displayed on the appropriate page of the Reuters screen. If the appropriate page is replaced or service ceases to be available the Seller, acting reasonably, may specify another page or service displaying the appropriate rate;

"**Non-Cash Distribution**" means any note, debenture or other financial instrument, non-cash asset or right, whether debt, equity or otherwise, issued in satisfaction or purported satisfaction of any obligation of an Obligor to make any payment in respect of the Traded Portion or any part thereof;

"**Non-Recurring Fees**" means any fees that are to be paid to a Lender under the Credit Documentation (such as amendment, consent or waiver fees) that are not Recurring Fees in respect of the Traded Portion;

"**Obligor**" means the Borrower or, if more than one, each Borrower and each other obligor under the Credit Documentation;

"**Other Party**" means the counterparty to a transaction which is not the Responsible Party;

a "**person**" includes any person, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) or two or more of the foregoing;

"**PIK Interest**" means any paid-in-kind interest, fees or other amounts which are compounded under the Credit Documentation and treated as outstanding principal amounts thereunder;

"**Predecessor-in-Title**" means any of the Seller's predecessors-in-title to the Purchased Assets or the Purchased Obligations or any part thereof;

"**Predecessor Transfer Agreements**" means all transfer agreements under which (a) the Seller and (b) any of the Seller's Predecessors-in-Title acquired the Purchased Assets or any part thereof;

"**Pricing Letter**" means any letter agreement made or to be made between the Seller and the Buyer that specifies the calculations for determining the Settlement Amount with respect to the Purchased Assets;

"**PTE**" means a prohibited transaction class exemption issued by the United States Department of Labour;

"**Purchased Assets**" means any and all of the Seller's right, title and interest in and to:

(a)     the advances, other utilisations (including letters of credit), claims and other rights of the Seller (including to any Non-Cash Distributions other than Non-Cash Distributions which are to be held by the Buyer as agent for the Seller pursuant to Clause 13.3) included in the Traded Portion of the Seller's participation under or in respect of the Credit Documentation together with any and all corresponding rights and benefits under any ancillary guarantee or security relating to the Traded Portion;

(b)     the Ancillary Rights and Claims; and

(c)     if the Agreed Terms provide for the assignment to the Buyer of the Seller's right, title, interest and benefit in, to and under the Predecessor Transfer Agreements, the Retained Rights,

provided that the Purchased Assets shall not include (i) any of the Seller's rights that are attributable to the Seller's rights in any capacity other than as a Lender; or (ii) unless sub-paragraph (c) immediately above applies, the Retained Rights;

"**Purchased Obligations**" means all of the obligations under the Credit Documentation expressly assumed or to be assumed by the Buyer from the Settlement Date in accordance with the provisions of the Transaction Documentation including without limitation the obligations of the Seller with respect to the Traded Portion but excluding the Retained Obligations;

"**Recurring Fees**" means fees (such as commitment, facility and letter of credit fees and commissions) that are expressed to accrue by reference to time elapsed in connection with the Traded Portion in accordance with the Credit Documentation;

"**Relevant Rate**" means: (i) in respect of a sum denominated in euros and where interest under the Credit Documentation in respect of sums denominated in euros is calculated using the percentage rate per annum determined by the Banking Federation of the European Union, the Average EURIBOR; and (ii) in any other case, the Average LIBOR;

"**Responsible Party**" means either the party responsible for preparing the Confirmation as agreed between the Seller and the Buyer on the Trade Date or the party responsible for preparing the Transaction Documentation as specified in the Confirmation, as the context may require;

"**Retained Obligations**" means, save as otherwise provided in the Agreed Terms, all obligations of the Seller (a) under the Credit Documentation that relate to facts, events or circumstances arising or occurring before the Settlement Date, (b) under the Predecessor Transfer Agreements (or, if the Agreed Terms provide that the Purchased Assets shall include the Retained Rights, under the Predecessor Transfer Agreements that relate to facts, events or circumstances arising or occurring before the Settlement Date and do not result from a breach by the Seller of the terms of any Predecessor Transfer Agreement), (c) that relate to a breach of any of the Seller Warranties, (d) that arise out of the Seller's bad faith, gross negligence or wilful misconduct, (e) unless the Agreed Terms provide that the Purchased Assets shall include the Retained Rights, that arise out of any Predecessor-in-Title's bad faith, gross negligence or wilful misconduct, (f) that do not relate to the Purchased Assets or (g) that are attributable to the Seller's actions or obligations in any capacity other than as a Lender;

"**Retained Rights**" means all of the Seller's right, title, interest and benefit in, to and under the Predecessor Transfer Agreements (but excluding, for this purpose, any Ancillary Rights and Claims acquired by the Seller from its Predecessor-in-Title);

"**Revision Date**" has the meaning given to it in Condition 1.1;

"**Seller Warranties**" means the warranties, representations and indemnities made by, and the covenants and agreements of, the Seller in the Agreed Terms;

"**Settlement Amount**" means the amount payable for the Purchased Assets pursuant to Condition 12;

"**Settlement Date**" means the date on which settlement of the transaction occurs.

"**TARGET**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises interlinked national real time gross settlement systems and the European Central Bank's payment mechanism and which began operations on 4 January 1999;

"**TARGET2**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007;

"**TARGET Day**" means:

(a)      until such time as TARGET is permanently closed down and ceases operations, any day on which both TARGET and TARGET2 are; and

(b)      following such time as TARGET is permanently closed down and ceases operations any day on which TARGET2 is,

open for the settlement of payments in euro;



"**Transaction Documentation**" means the documentation required to implement the transaction (including the agreed Form of Purchase and any Pricing Letter) and, "**Transaction Document**" shall be construed accordingly.

1.3   Other capitalised terms used in these Conditions shall have the meaning given to them in the Confirmation.

1.4   In the case of any inconsistency between the Confirmation and these Conditions, the Confirmation shall prevail.   If the parties agree to enter into a distressed trade transaction using an electronic medium (for example an internet website) then the terms applicable to that electronic medium shall prevail to the extent they are binding on the parties and are inconsistent with these Conditions.

1.5   A distressed trade transaction means a transaction for the sale or participation of a loan or other form of credit, or participation in a credit facility or a claim in relation to any of the foregoing, which the parties to a transaction, by applying these Conditions, designate as a distressed loan or other form of credit or claim at the time of trade.

1.6   Headings are for ease of reference only.

2.   **CONTRACT POINT**

A binding contract for the sale or participation by the Seller to the Buyer of the Purchased Assets shall, unless otherwise specified in the Agreed Terms, come into effect between the Seller and the Buyer upon oral agreement of the terms on the Trade Date and shall be documented and completed in accordance with Conditions 7, 8 and 9. The Seller and the Buyer acknowledge that events occurring subsequent to the Trade Date shall not relieve the parties of their obligations under the Confirmation.

3.   **CONFIRMATION**

Unless otherwise specified in the Agreed Terms, the Responsible Party shall send to the Other Party a form of Confirmation, duly completed, signed on behalf of the Responsible Party and substantially in the form most recently published by the LMA, not later than the second Business Day after the Trade Date and the Other Party shall sign, and return to the Responsible Party, the Confirmation not later than the fourth Business Day after the Trade Date.  The Other Party shall immediately and, in any event, not later than the close of business on the third Business Day after the Trade Date, raise with the Responsible Party any disagreement with any of the terms of such Confirmation.

4.   **SALE OF ANCILLARY RIGHTS AND CLAIMS/RETAINED RIGHTS**

4.1   Pursuant to these Conditions the Seller sells, assigns and conveys to the Buyer, and the Buyer purchases and accepts, the Ancillary Rights and Claims and, if the Agreed Terms provide for the same to be assigned, the Retained Rights, in each case with effect from the Settlement Date.

4.2   Condition 4.1 shall not apply to any transaction which settles as a funded participation.

5.   **CONDITIONALITY**

5.1   A transaction is subject to any conditions specified in the Agreed Terms and, subject to the next following sentence, the parties undertake with each other to use all reasonable endeavours to ensure that such conditions are duly fulfilled.  Unless otherwise specified in the Agreed Terms, the Seller shall use all reasonable endeavours to obtain any required consents in connection with the transaction.

5.2   Subject to Condition 5.3, if, nevertheless, one or more of such conditions remains unfulfilled on the proposed Settlement Date, the transaction shall be settled on the terms of a funded participation (using the LMA recommended form of funded participation for distressed trades with such changes as are mutually agreed between the parties).   If settlement of the transaction cannot be effected by a funded participation, the transaction shall be settled on the basis of an alternative structure or arrangement mutually acceptable to the Seller and the Buyer that provides the Seller and the Buyer with the economic equivalent of the agreed-upon trade. The Seller and the Buyer shall be under no obligation to settle a transaction by a funded participation if the Agreed Terms specify that the transaction is to be settled by "Legal Transfer only" but instead shall be obliged to settle the transaction on the basis of an alternative structure or arrangement mutually acceptable to the Seller and the Buyer which provides the Seller and the Buyer with the economic equivalent of the agreed-upon trade.

5.3   If the Agreed Terms provide that the transaction is to be settled by a legal transfer (whether by way of novation or assignment in accordance with the Credit Agreement or other form of transfer agreement) and that the Purchased Assets include the Retained Rights but any necessary third party consents to the transfer of the Retained Rights under the Predecessor Transfer Agreements have not been obtained by the proposed Settlement Date, then (with respect only to that portion of the Retained Rights for which consent to transfer cannot be obtained) the transaction shall be settled as a legal transfer with the Seller giving Predecessor-in-Title representations and warranties to the Buyer on the terms of the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Secondary Lender) and the Purchased Assets shall not include such Retained Rights.

6.   **DUE DILIGENCE**

6.1   Unless otherwise specified in the Agreed Terms, it shall be assumed that the Buyer shall have satisfied itself as to the creditworthiness of each Obligor and acceptability of the transaction prior to the Trade Date, and the transaction shall not be conditional upon this.

6.2   If the Agreed Terms specify that the Credit Documentation shall be delivered to the Buyer after the Trade Date then:

(a)   the Buyer shall sign and deliver to the Seller at its request a confidentiality agreement in the form prescribed by the Credit Documentation or, if no such

form is prescribed, in the then current recommended form of the LMA or such other form agreed between the Buyer and the Seller; and

(b)     subject to receipt of the confidentiality agreement where requested and to all necessary consents (if any) having been obtained, the Seller shall provide to the Buyer a true and complete copy of the Credit Documentation as promptly as practicable following the Trade Date.

6.3     If the Agreed Terms specify that the transaction shall be conditional upon the negotiation of mutually acceptable representations and warranties of the Seller with respect to the transaction, the Responsible Party shall endeavour to deliver to the Other Party within five Business Days after the Trade Date a draft set of representations and warranties to be made by the Seller with respect to the sale of the Purchased Assets and the Purchased Obligations to the Buyer. The Seller and the Buyer shall negotiate in good faith the terms of such representations and warranties and endeavour to agree the terms of the representations and warranties to apply to the transaction within fifteen Business Days after the Trade Date. The Agreed Terms shall be deemed to include the representations and warranties which the Seller and the Buyer agree shall apply to the transaction.

7.      **TRANSACTION DOCUMENTATION**

The Responsible Party shall prepare the Transaction Documentation on the agreed basis and, subject to any relevant conditions specified in the Agreed Terms, endeavour to deliver it to the Other Party within five Business Days after the Trade Date. The parties shall endeavour to execute the Transaction Documentation and, where appropriate, provide copies to the Agents as required under the Credit Documentation, within fifteen Business Days after the Trade Date.

8.      **INSOLVENCY PROCEEDINGS**

8.1     Where Insolvency Proceedings involving one or more Obligors have been commenced as at the Trade Date the Seller shall use all reasonable endeavours to provide the Buyer within ten Business Days after the Trade Date copies of any existing proofs of debt or other claims which have been submitted by or on behalf of the Seller.

8.2     The Seller shall notify the Buyer promptly upon becoming aware of the same of any Insolvency Proceedings that are commenced against any Obligor following the Trade Date and prior to the Settlement Date and shall use all reasonable endeavours to provide the Buyer with any proofs of debt or other claims which, prior to the Settlement Date, have been submitted by or on behalf of the Seller. The Seller may redact such proofs of debt or other claims to conceal information which does not relate to the Traded Portion and which is commercially sensitive to it.

8.3     To the extent that the same is received by the Seller on or prior to the Settlement Date and to the extent that the Seller is lawfully able to do so without breaching any duty of confidentiality or other obligation owed to any person, the Seller shall provide copies to the Buyer of:

(a)     any information circulated by an Agent to the Lenders generally which relates
        to Insolvency Proceedings which have been commenced against any Obligor;
        and

(b)     any information received by the Seller in connection with Insolvency
        Proceedings which have been commenced against any Obligor where such
        Seller has been admitted as a claimant in such Insolvency Proceedings in its
        own right and has received such information in its capacity as a claimant in
        such Insolvency Proceedings,

including (in each case and without limitation): details of deadlines for the submission
of claims; the status of any notifications to any Insolvency Officer; and the status of
any filings of any proof of debt or other claim against any Obligor relating to the
Purchased Assets.

## 9.     SETTLEMENT DATE AND PAYMENT

9.1     The Seller and the Buyer shall use all reasonable endeavours to settle the transaction on
        the settlement date specified in the Agreed Terms. If no settlement date is specified in
        the Agreed Terms, the Seller and the Buyer shall use all reasonable endeavours to
        settle the transaction as soon as reasonably practicable.

9.2     If the Agreed Terms specify that the transaction incorporates Delayed Settlement
        Compensation then, if the transaction settles after the Delay Period Commencement
        Date, the parties shall pay Delayed Settlement Compensation for each day during the
        Delay Period as set out below:

        9.2.1   The Buyer shall pay to the Seller (or if the Seller is required to pay the Buyer
                the Settlement Amount pursuant to Condition 12 the Seller shall pay the
                Buyer) on the Settlement Date an amount equal to interest that would accrue
                for each day during the Delay Period at the Relevant Rate on an amount (the
                "Original Settlement Amount") (subject to Condition 9.2.2) equal to the
                Settlement Amount calculated as of the Delay Period Commencement Date
                pursuant to Condition 12, but without being adjusted to take account of:

                (a)     any applicable recordation, processing, transfer or other fee and Agent's
                        Expenses; and

                (b)     any Delayed Settlement Compensation.

        9.2.2   If the Settlement Amount calculated as of the Settlement Date pursuant to
                Condition 12 (but without being adjusted to take account of:

                (a)     any applicable recordation, processing, transfer or other fee and Agent's
                        Expenses; and

                (b)     any Delayed Settlement Compensation),



differs by a factor of more than 25% from the Original Settlement Amount, then the payment of Delayed Settlement Compensation pursuant to Condition 9.2.1 shall be calculated on a daily basis based on the Settlement Amount calculated pursuant to Condition 12 on each day during the Delay Period (but without being adjusted to take account of:

(a)    any applicable recordation, processing, transfer or other fee and Agent's Expenses; and

(b)    any Delayed Settlement Compensation).

9.2.3    If **"Settled Without Accrued Interest"** is specified in the Agreed Terms, then the Seller shall pay the Buyer on the Settlement Date an amount equal to any interest or Recurring Fees (based on contractual rates, as set forth in the Credit Documentation) accrued in respect of the Traded Portion and attributable to the Delay Period, whether or not the Seller has received payment of such amounts from an Obligor.

9.2.4    If the relevant Obligor does not pay on the scheduled payment date or within any applicable grace period (each as specified in the Credit Documentation as in effect on the Trade Date) or, if no such grace period exists, the expiration of thirty days from such date any interest or Recurring Fees an amount equal to which was paid or credited to the Buyer on the Settlement Date then the Buyer shall, upon demand by the Seller, pay the Seller an amount equal to such interest or Recurring Fees that were not paid to the Seller plus interest on such amount (from (and including) the day the Seller makes payment pursuant to Condition 9.2.3 to (but excluding) the day the Buyer makes such payment) at EURIBOR (in respect of sums denominated in euros) or LIBOR (in respect of any other sum) (in each case determined on the day the Buyer makes such payment) applied on a daily basis.

9.2.5    If all or part of such interest or Recurring Fees are settled in favour of the Seller by way of a Non-Cash Distribution, the Seller shall hold such Non-Cash Distribution as agent of the Buyer and, as soon as practicable thereafter (but not earlier than the Settlement Date) and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution registered in the name of the Buyer (or such other name or names as the Buyer may reasonably and lawfully require) and until it does so (but not earlier than the Settlement Date), the Seller shall account to the Buyer for any income or other sums yielded in respect of such Non-Cash Distribution.  Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Buyer.

9.3    The action necessary to complete the transaction shall include the payment for the Purchased Assets on the Settlement Date.

9.4    Where the transaction is to take effect as a funded participation, any payment in respect of the principal amount of the Purchased Assets shall be by way of limited recourse loan by the Buyer to the Seller on the terms of the applicable Transaction Documentation.

10.    **PURCHASE AMOUNT**

Unless the Agreed Terms and/or the Credit Documentation otherwise provide, the amount of the Purchased Assets to be sold or participated by the Seller to the Buyer shall be allocated *pro rata* to the facilities provided under the Credit Agreement, including revolving credit, acceptance credit, letter of credit and term loan facilities and, within each facility, *pro rata* to the tranches thereof, if more than one.

11.    **PERMANENT REDUCTION**

The economic benefit of permanent commitment reductions and permanent repayments of principal applicable to the Purchased Assets under the Credit Documentation (collectively "**Permanent Reductions**") shall be treated in accordance with the Settlement Amount Calculation (see Condition 12 below).

12.    **SETTLEMENT AMOUNT CALCULATION**

12.1    The amount payable for the Purchased Assets shall be equal to the Purchase Rate multiplied by the funded principal amount of the Purchased Assets as of the Settlement Date less:

(a)    (100% minus the Purchase Rate) multiplied by the unfunded portion of the Purchased Assets as of the Settlement Date;

(b)    (100% minus the Purchase Rate) multiplied by any Permanent Reductions which occur in respect of the Purchased Assets on or after the Trade Date and on or before the Settlement Date; and

(c)    without double counting, any Non-Recurring Fees received by the Seller on or before the Settlement Date to which the Buyer is entitled pursuant to the Agreed Terms,

adjusted to take account of any Delayed Settlement Compensation and any applicable recordation, processing, transfer or other fee and Agent's Expenses which under the Agreed Terms is to be payable by either party.

12.2    If the amount is positive it shall be payable by the Buyer to the Seller; if negative the absolute value of the amount shall be payable by the Seller to the Buyer.

12.3    Where any amounts are to settle in more than one currency on any day the appropriate calculation and payment shall be made in respect of each relevant currency in accordance with this Condition 12.

13.    **INTEREST PAYMENTS AND FEES**

13.1    All interest and all Recurring Fees are based on contractual rates, as set forth in the Credit Documentation. Unless the Agreed Terms otherwise provide, the fees to which the Buyer shall be entitled in all cases in accordance with this Condition 13 shall include all Non-Recurring Fees paid or capitalised on or after the Trade Date in respect of the Traded Portion.

13.2    Subject to the Agreed Terms, all PIK Interest shall be allocated on a 'trades flat' basis as follows (regardless of how cash interest and Recurring Fees are allocated): (a) PIK Interest that is capitalised prior to the Trade Date shall be included in the Traded Portion and shall be treated as part of the funded principal amount of the Purchased Assets for the purposes of Condition 12; (b) PIK Interest that is capitalised on or after the Trade Date shall be for the account of the Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalised as of the Settlement Date shall be for the account of the Buyer upon capitalisation for no additional consideration.

13.3    If "**Settled Without Accrued Interest**" is specified in the Agreed Terms then, subject to Condition 9.2, any interest or Recurring Fees accrued up to but excluding the Settlement Date (the "**Seller's Portion**") shall be for the account of the Seller. Upon receipt by the Buyer from any Obligor of any interest or Recurring Fees in respect of the Seller's Portion, the Buyer shall promptly (and, in any event, within two Business Days of receipt) pay to the Seller an amount equal to the amount of such interest or Recurring Fees except where such payment by such Obligor is made (a) after the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Documentation as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty days from such date), or (b) after a default in connection with any other payment obligations of such Obligor or any other Obligor under the Credit Documentation (irrespective of any subsequent remedy or waiver of such default), in which case such accrued amounts (if and when paid by the Obligor(s)) and any other accrued amounts due thereafter shall be for the account of the Buyer and the Seller shall not be entitled to any part thereof. If, for any reason, the Seller receives any such amounts the Seller shall promptly (and in any case within two Business Days of receipt) pay the same to the Buyer. If the Buyer receives a Non-Cash Distribution in respect of the Seller's Portion, the Buyer shall hold such Non-Cash Distribution as agent of the Seller and, as soon as practicable thereafter and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution registered in the name of the Seller (or such other name or names as the Seller may reasonably and lawfully require) and until it does so, the Buyer shall account to the Seller for any income or other sums yielded in respect of such Non-Cash Distribution. Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Seller. If the Seller receives a Non-Cash Distribution that is for the account of the Buyer, the Seller shall hold such Non-Cash Distribution as agent of the Buyer and, as soon as practicable thereafter and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution

registered in the name of Buyer (or such other name or names as the Buyer may reasonably and lawfully require) and until it does so, the Seller shall account to the Buyer for any income or other sums yielded in respect of such Non-Cash Distribution. Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Buyer.

13.4    Partial payments of interest shall be applied to payment dates *pro rata* to the amounts due on such payment dates (unless otherwise specified in the Credit Documentation).

13.5    If "**Trades Flat**" is specified in the Agreed Terms any interest, Recurring Fees or other fees paid by any Obligor on or after the Trade Date in respect of the Traded Portion shall be for the account of the Buyer and the Buyer shall not be obliged to make any payment to the Seller in respect of interest, Recurring Fees or any other fees, either on the Settlement Date or on receipt of any such interest, Recurring Fees or other fees. If the Seller receives any interest, Recurring Fees or other fees which are for the account of the Buyer, the Seller shall promptly (and, in any event, within two Business Days of receipt but not earlier than the Settlement Date) pay the same to the Buyer. If any interest, Recurring Fees or other fees are settled in favour of the Seller by way of a Non-Cash Distribution, the Seller shall hold such Non-Cash Distribution as agent of the Buyer and, as soon as practicable thereafter (but not earlier than the Settlement Date) and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution registered in the name of the Buyer (or such other name or names as the Buyer may reasonably and lawfully require) and until it does so (but not earlier than the Settlement Date), the Seller shall account to the Buyer for any income or other sums yielded in respect of such Non-Cash Distribution. Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Buyer.

13.6    The Seller shall not be obliged to make any payment of interest, Recurring Fees or other fees or account for any Non-Cash Distribution to the Buyer under Condition 13.5 unless and until it has first received payment or such Non-Cash Distribution from the relevant Obligor or, if the Seller is not a lender of record in respect of the Traded Portion, its Predecessor-in-Title, provided that:

(a)    The Seller shall enforce its rights against its Predecessor-in-Title and take all steps reasonably available to it to recover any sums (including Non-Cash Distributions) due to the Seller from and unpaid or unissued by its Predecessor-in-Title under its Predecessor Transfer Agreement as if, in spite of the transaction specified in the Agreed Terms, the Seller remained the sole legal and beneficial owner of any interest, Recurring Fees, other fees or Non-Cash Distributions payable or due in respect of the Traded Portion; and

(b)    the Seller shall be obliged to make payment of interest, Recurring Fees or other fees and account for the benefit of any Non-Cash Distributions to the Buyer under Condition 13.5 in respect of any amounts paid or Non-Cash Distributions issued by the relevant Obligor but not received by the Seller if the cause of non-receipt or any shortfall in receipt by the Seller arises from

any limitation in the terms of its Predecessor Transfer Agreement regarding the Seller's entitlement to such sums (including Non-Cash Distributions) which does not form part of the Agreed Terms with the Buyer.

14.    **BREAKFUNDING**

No breakfunding compensation shall be paid for settlement of any transaction under these Conditions.

15.    **AGENT'S EXPENSES**

15.1    The Seller shall be responsible for and shall promptly pay any Agent's Expenses incurred or arising under or in connection with the Credit Documentation which are chargeable to the period up to but excluding the Settlement Date or, if Trades Flat is specified in the Agreed Terms, the Trade Date (except for, in each case, any fee or other amount referred to in Condition 16 below arising in connection with this Agreement), and shall, without limiting the generality of the foregoing, promptly pay on demand such Agent's Expenses attributable to the Purchased Assets or Purchased Obligations which have accrued but have not yet been billed or invoiced prior to the Settlement Date or, if Trades Flat is specified in the Agreed Terms, the Trade Date.

15.2    The Buyer shall be responsible for and shall promptly pay all other Agent's Expenses.

16.    **TRANSFER COSTS**

16.1    The Seller shall pay any recordation, processing, transfer or similar fee payable to the Agents under the Credit Documentation in connection with the transaction to the Agents:

    (a)    if the Agreed Terms provide that all or part of such fee is to be payable by the Buyer, promptly following receipt by the Seller of the whole or such part (as applicable) of such fee from the Buyer or, if later, on the date upon which such fee is payable under the Credit Documentation; or

    (b)    otherwise, on the date upon which such fee is payable under the Credit Documentation.

16.2    Unless otherwise specified in the Agreed Terms or these Conditions, any stamp duties, stamp duty reserve tax and any other applicable transfer taxes and duties (including notarial fees) and any costs attributable to the transfer or perfection of Collateral are payable by the Buyer.

17.    **COSTS AND EXPENSES**

Unless otherwise specified in the Agreed Terms, each of the Buyer and the Seller shall bear its own respective out-of-pocket costs and expenses (including legal expenses) in connection with any transaction. The Buyer shall be responsible for any costs, fees and expenses in respect of the Purchased Assets that are chargeable under the terms of

the Credit Documentation to any period after Settlement Date or, if Trades Flat is specified in the Agreed Terms, the Trade Date.

18. **PRINCIPAL/AGENCY STATUS**

18.1 Each of the Buyer and the Seller shall indicate whether it is acting as a principal or an agent in the transaction. A Buyer or Seller that holds itself out as a "principal" is directly liable for the completion of the transaction. A principal may, however, specify in the Agreed Terms that its obligation to complete the transaction is subject to successful completion of the purchase or participation from, or sale or participation to a third party of the Purchased Assets.

18.2 A Buyer or Seller that holds itself out to a counterparty as an "agent" acts on behalf of one or more principals to the transaction and is not itself a party to the transaction. Accordingly, a Buyer or Seller that holds itself out as an agent: (a) is not liable to such counterparty for the successful completion of the transaction (unless otherwise specified in the Agreed Terms); and (b) for the avoidance of doubt, shall have no liability or obligation to such counterparty in connection with the transaction other than (i) in circumstances where it does not have authority to bind its principal(s) to the transaction or (ii) pursuant to any confidentiality agreement entered into by it in connection with the transaction. However, a Buyer or Seller that indicates its status as an agent does represent to the counterparty its authority to bind its principal(s) to the transaction (which principal(s) shall be bound as if it/they were named as "**Buyer**" or "**Seller**" as the case may be) and shall provide the counterparty with evidence of that authority if requested to do so.

19. **NON-RELIANCE AND INDEPENDENT INVESTIGATION**

19.1 Each party acknowledges to the other that it is a sophisticated Buyer or Seller (as the case may be) with respect to the transaction and has such information as it deems appropriate under the circumstances (however obtained), concerning for example the business and financial condition of the Obligor(s) under the Credit Documentation, to make an informed decision regarding the transaction. Each of the Buyer and the Seller hereby agrees that it has made its own independent analysis and decision to enter into the transaction, based on such information as it has deemed appropriate under the circumstances, and without reliance on the other party (except for reliance on any express representation made by the other party in the Agreed Terms, pursuant to these Conditions or in the Form of Purchase).

19.2 Except only as otherwise specified in the Agreed Terms (including Condition 20) or expressly set out in the Form of Purchase, the Seller does not make, and the Buyer does not rely upon, any representation, warranty or condition (express or implied) about, and the Seller shall have no liability or responsibility to the Buyer for, the effectiveness, validity or enforceability of the Credit Documentation (other than against the Seller by reason of any lack of authority or capacity of, or due execution by, the Seller), or other documentation delivered by the Seller to the Buyer, or any of the terms, covenants or conditions contained in the Credit Documentation or other

documentation, or any non-performance by any party to it (other than the Seller), or the financial condition of any Obligor under the Credit Documentation.

19.3    The Seller and the Buyer agree that:

(a)    the Seller shall have no obligation to repurchase or reacquire all or any part of the Purchased Assets from the Buyer or to support any losses directly or indirectly sustained or incurred by the Buyer for any reason whatsoever, including the non-performance by any Obligor of its obligations under the Credit Documentation; and

(b)    any rescheduling or renegotiation of the Purchased Assets that occurs on or after the Trade Date shall be for the account of, and the responsibility of, the Buyer, who will be subject to the rescheduled or renegotiated terms.

19.4    Each of the Buyer and the Seller acknowledges and agrees that the other may possess material information not known to it. Each agrees that the other shall have no liability with respect to the non-disclosure of any such information except to the extent that such information renders inaccurate an express representation made pursuant to the Agreed Terms or these Conditions by the party possessing such information.

## 20.    REPRESENTATIONS AND UNDERTAKINGS

20.1    Each of the Buyer and the Seller as of the Trade Date and the Settlement Date represents and undertakes to the other that:

(a)    it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(b)    it has the power to enter into the transaction and to execute and deliver the Confirmation and the Transaction Documentation;

(c)    its obligations in relation to the transaction constitute legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application);

(d)    in the case of the Buyer only, it will not use any information received by it from the Seller in relation to the Obligors, or the Purchased Assets for any unlawful purpose or in breach of any confidentiality agreement entered into by it in connection with the transaction;

(e)    no broker, finder or other person acting pursuant to the instructions of one party is entitled to any broker's fee or other commission in connection with the transaction for which the other party may be responsible; and

(f)    other than as specified in the Confirmation, no notice to, registration with, consent or approval of or any other action by any relevant Governmental

Authority is or will be required for it to execute, deliver, and perform its obligations under the Agreed Terms.

20.2    If the Agreed Terms specify that the transaction shall be subject to one set of the LMA Standard Representations and Warranties for Distressed Trade Transactions, the Seller as of the Settlement Date represents and undertakes to the Buyer the representations and warranties set out therein which are in addition to the representations set out in Condition 20.1. Any of the Seller's Warranties which are qualified by reference to the Seller's state of knowledge or awareness shall be deemed to be qualified by reference to the state of knowledge or awareness of those of its officers directly responsible for the administration of the Traded Portion.

20.3    If the Agreed Terms specify that the Purchased Assets shall include the Retained Rights:

(a)     the Seller represents and warrants to the Buyer that the Seller has provided to the Buyer a true, complete and accurate copy of each Predecessor Transfer Agreement to which the Seller is a party and the remaining Predecessor Transfer Agreements to the extent and in the form received by the Seller from its immediate Predecessor-in-Title; and

(b)     to the extent that the Agreed Terms specify that the transaction shall be subject to the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Secondary Lender), the representations contained therein made with respect to a Predecessor-in-Title shall not apply.

20.4    The Buyer represents and warrants to and agrees with the Seller that either (a) no interest in the Purchased Assets is being acquired by or on behalf of a person who is, or at any time while the Purchased Assets are held thereby will be, one or more Benefit Plans or (b) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the purchase and holding of the Purchased Assets and the exercise of the Buyer's rights thereunder.

20.5    The Seller represents and warrants to and agrees with the Buyer that either (a) no interest in the Purchased Assets is being sold by or on behalf of a person who is one or more Benefit Plans or (b) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank

collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the sale of the Purchased Assets.

20.6    All express representations made by the parties pursuant to the Agreed Terms and these Conditions shall survive the execution and delivery of the Transaction Documentation and consummation of the transactions contemplated therein.

## 21.    DEFAULT AND INDEMNITIES

21.1    The Seller shall indemnify, defend and hold the Buyer and its officers, directors and employees and agents harmless from and against any liability, claim, cost, loss, damage or expense (including, without limitation, reasonable legal fees and disbursements and VAT thereon), or judgments which they (or any of them) incur or suffer as a result of:

(a)     the Seller's breach of any of the provisions of the Agreed Terms or the Transaction Documentation; or

(b)     the breach of any of the Seller Warranties; or

(c)     the failure by the Seller to perform any of its obligations under the Credit Documentation and, where the Purchased Assets include the Retained Rights, the Predecessor Transfer Agreements during the period prior to the Settlement Date; or

(d)     any obligation of any party or entity to, in whole or in part, disgorge, or reimburse any party or entity for, payments or property received, effected by or applied for the account of the Seller or (unless the Purchased Assets include the Retained Rights) any of its Predecessors-in-Title under or in connection with the Purchased Assets.

21.2    The Buyer shall indemnify, defend and hold the Seller and its respective officers, directors, employees and agents harmless from and against any liability, claim, cost, loss, damage or expense (including, without limitation, reasonable legal fees and disbursements and VAT thereon) or judgments which they (or any of them) incur or suffer as a result of:

(a)     the Buyer's breach of any of the provisions of the Agreed Terms or the Transaction Documentation; or

(b)     the breach of the Buyer Warranties by the Buyer; or

(c)     the failure by the Buyer to perform any of the Purchased Obligations from the Settlement Date; or

(d)     any obligation of the Seller, in whole or part, to disgorge, or reimburse any party or entity for, payment or property received or applied by the Seller or the Buyer for the account of the Buyer under or in connection with the

Purchased Assets (save in the case of an obligation of the Seller, where such obligation arose from a breach of the warranties of the Seller under the Credit Agreement or the Seller Warranties or from (except where the Purchased Assets include the Retained Rights) a corresponding breach by any Predecessor-in-Title).

21.3   Each indemnity in the Agreed Terms is a continuing obligation, separate and independent from the other obligations of the parties and survives termination of the transaction and it is not necessary for a party to incur expense or make payment before enforcing a right of indemnity conferred by the Agreed Terms, provided that no party thereto shall be obliged to indemnify any other party to the Agreed Terms if the loss of the indemnified party is due to the negligence or wilful misconduct of such other party.

22.   **CONFIDENTIALITY**

Both parties shall maintain the confidentiality of the terms of the transaction and the Transaction Documentation unless otherwise required by law or regulation. Each of the Seller and the Buyer shall be permitted to make any necessary disclosures to members of its respective Group subject to the same confidentiality constraints. The Buyer shall additionally be permitted to make any necessary disclosures to prospective purchasers from the Buyer regarding the terms of the transaction (other than the Purchase Rate or other pricing arrangements) and to its or their professional advisers and auditors regarding the terms of the transaction and in connection with the enforcement of a party's rights and obligations hereunder subject, in each case, to the same confidentiality constraints. If there is any inconsistency between this Condition and any confidentiality agreement entered into between the parties, the terms of that confidentiality agreement shall prevail.

23.   **TAX**

The Buyer acknowledges that it is responsible for making its own independent tax analysis of the Credit Documentation and the transaction.

24.   **SET-OFF**

Either party may (but is not obliged to) set off any amount due and payable by the other party under the transaction against any such amounts due and payable by it to the other party thereunder. The party exercising its rights under this provision may effect such currency exchanges as it considers necessary to implement the set-off.

25.   **FURTHER ASSURANCE**

Each of the parties agrees, at its own expense, to take any further action and to execute any further documents and/or instruments as the other may reasonably request to give effect to the transaction.

26.    **WITHHOLDING**

All payments made under these Conditions and the Transaction Documentation shall be made free and clear of any deduction or withholding save for such deduction or withholding as may be required to be made from such payments by any law, regulation or practice.

27.    **ASSIGNMENT**

Unless the Agreed Terms provide that the Purchased Assets shall include the Retained Rights or that a party's rights under the Agreed Terms or the Transaction Documentation shall be freely assignable, neither the Seller nor the Buyer may assign the benefit of all or any part of its rights against the other party under the Agreed Terms or the Transaction Documentation in respect of the transaction without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

28.    **THIRD PARTY RIGHTS**

A person who is not a party to the Confirmation or other Transaction Document has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of the Confirmation or other Transaction Document.

29.    **GOVERNING LAW AND JURISDICTION**

29.1    The transaction, the Agreed Terms and these Conditions shall be governed by English law, and the parties submit to the non-exclusive jurisdiction of the English courts.

29.2    The Seller and the Buyer each irrevocably appoints the person described as its process agent (if any) in the Agreed Terms to receive on its behalf service of any action, suit or other proceedings in connection with the transaction, the Agreed Terms or these Conditions. If any person appointed as process agent ceases to act for any reason the appointing party shall notify the other party and shall promptly appoint another person incorporated within England and Wales to act as its process agent.

30.    **EXECUTION IN COUNTERPARTS AND BY FAX OR EMAIL**

30.1    Any Confirmation, confidentiality agreement or other Transaction Document may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Confirmation, confidentiality agreement or other Transaction Document.

30.2    Transmission by fax of an executed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart. Transmission by electronic mail of an electronically scanned signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart. Unless otherwise agreed, the Buyer and the Seller shall deliver to each other an original counterpart of the Transaction Documents (and, upon the request of either party, the Confirmation, confidentiality agreement or any other document) promptly after delivery by fax or electronic mail.

For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.

## LOAN MARKET ASSOCIATION

## STANDARD REPRESENTATIONS AND WARRANTIES FOR DISTRESSED TRADE TRANSACTIONS (BANK DEBT/ORIGINAL LENDER OF RECORD)

1.  **APPLICABILITY OF REPRESENTATIONS AND WARRANTIES AND INTERPRETATION**

1.1   These representations and warranties shall apply to a distressed trade transaction in respect of which they are incorporated by reference in the applicable Confirmation and are made as of the Settlement Date.

1.2   Capitalised terms used herein shall have the meaning given to them in the Confirmation.

2.  **SELLER'S REPRESENTATIONS AND WARRANTIES**

2.1   the Seller is, and has been since their creation, the sole legal and beneficial owner of, and has good title to, the Purchased Assets and the Purchased Obligations, free and clear of any Encumbrances save for such Encumbrances as may be contained in any of the Credit Documentation and the Seller conveys the Purchased Assets with full title guarantee (but excepting any Encumbrance contained in any of the Credit Documentation) and the Seller has not made any prior sale, transfer or sub-participation of its interest in the Purchased Assets which is subsisting;

2.2   other than the Credit Documentation, there are no other documents executed by the Seller which would materially and adversely affect the Purchased Assets or the Purchased Obligations and (other than the Confirmation and as contemplated by the Confirmation) the Seller has not executed any Credit Documentation or documents relating to the Credit Documentation which have not also been executed by or on behalf of the Lenders (of the same class as the Seller) generally;

2.3   the amounts utilised in calculating the Settlement Amount for the Purchased Assets in the Pricing Letter are true and correct as of the date thereof and any PIK Interest that capitalised to the principal amount of the Purchased Assets on or after the Trade Date but on or prior to the Settlement Date is specified in the Pricing Letter and is a proportionate share of the PIK Interest that capitalised to the Seller's participation under or in respect of the tranche or facility from which the relevant Traded Portion derives;

2.4   except where the Seller and the Buyer have agreed in the Agreed Terms that the Buyer will not be provided with the Credit Documentation, the Seller has provided to the

Buyer on or prior to the Settlement Date (i) the Credit Agreement and all intercreditor agreements, subordination agreements and material waivers and amendments executed in connection therewith in each case as currently in effect and (ii) any other Credit Documentation reasonably requested by the Buyer;

2.5    the Seller has fulfilled all of its material obligations and satisfied all of its material liabilities under the Credit Documentation which have fallen due for performance or satisfaction;

2.6    the Seller is not and has not been at any time "connected" with any Obligor as such term is used in the Insolvency Act 1986 as amended or re-enacted from time to time (or any similar provision in any relevant jurisdiction);

2.7    the Seller has not engaged in any acts or conduct, or made any omissions, independently of the other Lenders that would result in the Buyer receiving proportionately less payments or distributions or less favourable treatment in respect of the Purchased Assets or Purchased Obligations than any other Lender holding advances or a participation (of a similar nature to the Traded Portion) and similar claims under the Credit Documentation or result in any Purchased Assets, or any part thereof, being subject to a Claim Impairment and, in particular, the Seller has not set off any amounts against the Purchased Assets and no rights of set-off of, or against the Seller exist which will permit any set-off of, or against the Seller or counterclaim against the Purchased Assets;

2.8    the Seller has not received any notice and the Seller is not otherwise to the best of its knowledge aware that the Purchased Assets or any portion thereof or any security, guarantees or Collateral or any of the Credit Documentation are subject to any Claim Impairment or are invalid or void;

2.9    the Seller has no obligations to make loans or advances or other extensions of credit or to provide any other facility or financial accommodation under or in accordance with the Credit Agreement which will be transferred to the Buyer hereunder other than the Purchased Obligations and it has no other liabilities or obligations in respect of the Purchased Assets other than Agent's Expenses; and

2.10    no proceedings of or before any Governmental Authority have been commenced or, to the best of the Seller's knowledge, are threatened against the Seller which would adversely affect the Purchased Assets, the Purchased Obligations or any of the rights of the Buyer under any of the Transaction Documentation.