Hearing Date:  December 3, 2008 at 10:00 a.m. EST

KIESELSTEIN LAW FIRM, PLLC
1187 Troy-Schenectady Road
Latham, New York  12110
Telephone:  (518) 785-7800
Facsimile:  (518) 785-7851
Steve Kieselstein

Attorneys for Tennenbaum Opportunities Partners V, L.P.,
Special Value Expansion Fund, LLC and Special Value
Opportunities Fund, LLC

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                      :
**In re**                                             :          **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*  :          **08-13555 (JMP)**
                                                      :
                                     **Debtors.**     :          **(Jointly Administered)**
                                                      :
                                                      :
                                                      :
-------------------------------------------------------------x

## LIMITED OBJECTION OF TENNENBAUM ENTITIES TO DEBTORS' MOTION TO APPROVE ASSUMPTION OF TRADE CONFIRMATIONS AND PROHIBIT SETOFFS OF PREPETITION CLAIMS

Tennenbaum Opportunities Partners V, L.P., Special Value Expansion Fund, LLC

and  Special Value Opportunities Fund, LLC (together, the "Tennenbaum Entities")

hereby submit this limited objection (the "Objection") to the motion (the "Motion"[1]) of

Lehman Brothers Holdings Inc. ("LBHI") and Lehman Commercial Paper, Inc. ("LCPI";

together, the "Debtors") for an Order Pursuant to Section 365 of the Bankruptcy Code

---

[1] Capitalized terms used but not defined herein shall have the respective meanings for such terms set forth in the Motion.

Approving the Assumption or Rejection of Open Trade Confirmations [Docket No. 1541], and in support of the Objection respectfully represent:

## Preliminary Statement

By their Motion, the Debtors seek to assume hundreds of allegedly executory contracts, reject others, and modify and assume still others.  The contracts to be assumed include confirmations for six trades to sell to the Tennenbaum Entities a total of approximately $15.5 million in distressed revolving loans, which are listed on Exhibit  A to the Motion (the "Tennenbaum Purchases")[2].  The Debtors' Motion also seeks declaratory judgment that non-debtor parties, including the Tennenbaum Entities, will be prohibited from using any prepetition claims that the non-debtor parties, including the Tennenbaum Entities, may have to set off against obligations arising under contracts assumed by the Debtors.   The Motion should be denied as it relates to the Tennenbaum Purchases.   Unlike the vast majority (perhaps all) of the other confirmations listed by the Debtors as contracts to be assumed, the Tennenbaum Purchases are not executory contracts.  The reason is that the Debtors have already performed all material obligations thereunder, making these contracts non-executory.  To the extent that the Debtors can demonstrate that any of their remaining obligations are material, the Debtors cannot provide adequate assurances of future performance of such obligations.  Further, the Debtors' request for declaratory judgment on the ability of the Tennenbaum Entities to use prepetition claims—which haven't even been determined yet—to set off against obligations owed on any contracts that the Debtors are permitted to assume is

[2] The Motion also lists several other contracts with the Tennenbaum Entities on Exhibit C thereto, which are to be modified and assumed by the Debtors. The Tennenbaum Entities do not object to the treatment of the contracts on Exhibit C to the Motion, but note that the description of them is inaccurate.

procedurally impermissible.  Such relief can only be granted under an adversary proceeding, which would give the Tennenbaum Entities important due process rights that the Debtors are seeking to abrogate. Assumption should be denied, and any determination of the Tennenbaum Entities' setoff rights deferred until after they have an opportunity to formulate, file and appropriately attempt to enforce their prepetition claims.

## Background

1.      On May 9 and May 16, 2008 (each, a "Trade Date"), the Tennenbaum Entities orally agreed to purchase the aggregate amount of $15,506,738.42 in distressed Hawaiian Telecom revolving loans from LCPI (together, the "Trades" or the "Tennenbaum Purchases").  Shortly thereafter, the parties executed confirmation letters for the Trades (the "Tennenbaum Confirmations", copies of which are attached collectively hereto as Exhibit A.[3]

2.      As the Standard Terms and Conditions incorporated therein by reference[4] reflect, the trade confirmations (including the Tennenbaum Confirmations) act as a way station between the binding oral agreement the parties enter into on the Trade Date[5], and the prescribed forms of final closing documentation the confirmations obligate the parties to sign[6], the execution of which is essentially the only ongoing obligation the confirmations impose on the parties.

---

[3] The purchase price for the Loans has been redacted from the Confirmations consistent with §21 thereof, but is not relevant to this Objection.
[4] Ex. A, LSTA Standard Terms and Conditions for Distressed Trade Confirmations. References to such Standard Terms and Conditions are to are to "Distr. Conf. ST at §__."
[5] Distr. Conf. ST at §§1, 22.
[6] Distr. Conf. ST at §10.

3.      The final closing documents prescribed by the confirmations for distressed trades like those at issue here (the "Closing Documents") are (i) the same short-form assignment generally annexed as an exhibit to the governing credit agreement and requiring agent and in some instances borrower approval (the "A&A"), (ii) a lengthy two-part purchase and sale agreement (the "PSA"), comprised of an extensive set of substantive representations and warranties, indemnities and covenants[7] and a brief summary of trade-specific terms reflecting the details of the current trade, and (iii) a pricing calculation distributed at closing based upon the agreed purchase rate and pricing adjustment formulas contained in the confirmations.  Because there is generally no promissory note or other instrument evidencing the loans being assigned, once all of the Closing Documents have been executed and agent and borrower consent have been obtained, the transfer of the loans happens automatically once buyer pays the purchase price.[8] Execution of the PSA also merges the confirmations out of existence.[9]

4.      On August 18, 2008, LCPI and the Tennenbaum Entities executed Closing Documents for the Trades (the "Tennenbaum Closing Documents", copies of which are attached collectively hereto as Exhibit C).  Shortly thereafter, as reflected in the A&A included in the Tennenbaum Closing Documents[10], agent and borrower consent was obtained.  All that remained for the transactions to close upon calculation of the final purchase price was the Tennenbaum Entities' payment of that sum (the "Revolver Purchase Price") to LCPI.

---

[7] References to such standard terms are to "Distr. PSA ST at §_."
[8] Hawaiian Telecom Agreement at §9.04 (d) – (e).
[9] Id. at §17.1.
[10] Exhibit C, A&As at pp. 3-5.

5.      Prior to LCPI's commencement of its Chapter 11 case (the "Petition Date"), LCPI orally agreed to net the Tennenbaum Entities' obligations in respect of the purchase price payable under the Tennenbaum Closing Documents against the purchase price payable by LCPI to the Tennenbaum Entities under their separate sale of Hawaiian Telecom term loans to LCPI (the "Term Loan Trades").  However, LCPI initially agreed then refused to execute the netting agreement the Tennenbaum Entities circulated to it for this purpose, and declined Tennenbaum's repeated requests to circulate final pricing so that the parties could close on this basis.  Shortly thereafter, LCPI commenced its Chapter 11 case.

6.      After the Petition Date, the Tennenbaum Entities agreed to compromise LCPI's obligations in respect of the Term Loan Trades.[11]  As the letter agreements evidencing this compromise, redacted copies of which (excluding the exhibits annexed thereto) are attached hereto as Exhibit C (the "Term Debt Settlement Documentation"), reflect that the Tennenbaum Entities waived solely their right to setoff LCPI's obligations in respect of the Term Loan Trades against other prepetition obligations to LCPI, and did not waive any setoff rights they may have in respect of the Tennenbaum Confirmations.

## A.      The Confirmations and Tennenbaum Closing Documents are unassumable.

### These agreements are not executory contracts because the Debtors have performed all of their material obligations.

7.      For a contract to be "executory" within the meaning of Section 365 of the Bankruptcy Code, the obligations of the debtor and the non-debtor contracting party

---

[11] The Term Loan Trades are accordingly Amended Trades, though due to an apparent clerical error they appear to be listed on Exhibit C to the Motion incorrectly in the name of "Tennenbaum Capital Master" rather than in the names of the individual Tennenbaum Entities.

must be so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. In re Penn Traffic Co., 524 F.3d 373, 379 (2nd Cir. 2008). Accord, In re Wireless Data, Inc., ___ F.3d ___, 2008 WL 4724366 (2nd Cir. 2008).

8.     The Debtors assert, without analysis, that all Open Trade Confirmations are executory contracts.[12] Whether or not this is true for other Open Trade Confirmations, it is not true for the Tennenbaum Confirmations and the Tennenbaum Closing Documents.[13] Presumably unlike virtually all other Open Trade Confirmations, the Tennenbaum Confirmations were fully performed when the parties executed the Tennenbaum Closing Documents, fully satisfying their principal obligation under the Confirmations.[14] (Cf. In re Penn Traffic Co., 524 F.3d 373, 383 (2nd Cir. 2008) (tender of signed lease tendered after bankruptcy filing insufficient to destroy executoriness of contract)). All material obligations on the part of the Debtor also have been performed under the Tennenbaum Closing Documents. These had already been executed by the Debtors, and all consents to the assignment of the LCPI's loans thereunder had already been obtained prepetition. The only remaining material pre-settlement obligation thereunder was the Tennenbaum Entities' payment of the Revolver Purchase Price to LCPI. Contracts under which the only obligation remaining is for one of the parties to pay money are not executory within the meaning of Section 365. In re Chateaugay Corp., 102 B.R. 335 (Bankr. S.D.N.Y. 1989). Neither the Tennenbaum Confirmations nor the

---

[12] Motion at ¶¶9-10.
[13] The Motion alleges only that the Confirmations are executory contracts, and does not even consider whether Closing Documents were executed or their import. The Tennenbaum Entities' position is that this should end the inquiry. However, in the interest of judicial economy, the Objection also addresses whether the Closing Documents merit treatment as executory contracts under Section 365 of the Bankruptcy Code.
[14] Supra at ¶4.

Tennenbaum Closing Documents are executory contracts, or are capable of being assumed.

9.      The only remaining obligations to be completed of the Debtors under the Closing Documents prior to closing are ministerial and non-material.  These include the obligation by LCPI to recalculate pricing based upon paydowns, and similar events, that have occurred since the closing documents were executed.  This ministerial requirement is clearly insufficient to change the Tennenbaum Closing Documents into executory contracts.  The obligation of one party to a sale transaction solely to perform a ministerial act at closing is insufficient to make a contract "executory" within the meaning of Section 365 of the Bankruptcy Code.  In re Soter, 26 B.R. 838 (Bankr. D. Vt. 1983).  See also, In re Wade Cook Financial Corp., 375 B.R. 580 (B.A.P. 9th Cir. 2007) (computation of the final price for the transaction is not a prerequisite in order for alleged liability to constitute a prepetition debt capable of being offset against another prepetition debt).

**LCPI's defaults and pending liquidation prevent it from adequately assuring the Tennenbaum Entities that it will perform any remaining material contractual obligations.**

10.      There are no remaining obligations under the Tennenbaum Confirmations. The only obligations of LCPI remaining under the Tennenbaum Closing Documents post-closing are LCPI indemnification obligations.  LCPI therefore faces a dilemma.  If LCPI's remaining obligations under the Tennenbaum Closing Documents are not material, then the Tennenbaum Closing Documents are not executory and cannot be assumed.  But if the Debtors contend that there are material, unperformed obligations on LCPI's part, then

LCPI will be unable to provide the Tennenbaum Entities with adequate assurance of the future performance of those obligations. The reason is that, as the Debtors freely acknowledge[15], they are currently liquidating themselves, and will not exist when called upon to perform their remaining obligations.

11.    Before a debtor can assume an executory contract, it must provide adequate assurance of its future performance of the contract, provided that the debtor is in default, 11 U.S.C. §§365(b)(1)(C), 365(b)(2) (2008), though, in the present case, the Debtors appear to concede that they were required to provide adequate assurance of their future performance, claiming in conclusory fashion that they have done so.[16]

12.    Defaults sufficient to trigger the debtor's adequate assurance obligation under Section 365(b)(1)(C) are not limited to prepetition defaults. Any default occurring prior to the assumption of the contract in question will suffice.[17]

13.    There are numerous breaches by the Debtors under the Tennenbaum Closing Documents. These include, but are not limited to, anticipatory breach of contract.[18] Under New York law, a party is guilty of "anticipatory breach" of a bilateral contract that contemplates some future performance by the non-breaching party where, before the time of performance of the contract arrives, the breaching party divests itself

---

[15] Motion at ¶21.
[16] Motion at ¶16.
[17] Collier on Bankruptcy 15th Ed. Rev. 365.05[2].
[18] Apart from LCPI's anticipatory breach, technical defaults of several of these representations and warranties under the Tennenbaum Closing Documents also already exist. As an example, the signed Closing Documents apparently do not accurately reflect the current outstanding amount of the loans, (E-mail from David Tomea to Erik Koenitzer (November 18, 2008 2:23:34 PM EST), and also fail to list the Debtor's bankruptcy proceedings as a pending litigation. (A breach of the pending litigation representation would appear not to run afoul of the proscription in §365(b)(2)(B) against breaches arising from bankruptcy filings because Distr. PSA ST §4.1(e) does not give rise to an *ipso facto* termination right, the prohibition of which is the real purpose of §365(b)(2)(B). (Collier on Bankruptcy 15th Ed. Rev. 365.05[4])

of the ability to act in accordance with the terms of the contract. <u>Gardiner Int'l, Inc. v.</u>

<u>J.W. Townsend & Associates, Inc.</u>, 13 A.D.3d 246, 247, 788 N.Y.S.2d 312, 314 (1st

Dept. 2004).

14.    One of the primary inducements for an institutional investor to enter into

an agreement to purchase loans that are already distressed is the protections that the

investor receives under the governing PSA.  Unlike in the case of a purchase of so-called

par loans on the secondary market, which are documented solely by an A&A generally

containing a substantive representation only as to the seller's title to the asset[19], the PSA

that a seller of distressed loans like LCPI executes in favor of its purchasers is replete

with valuable, specifically bargained-for protections for the purchaser.  These include

representations from seller that it has not engaged in any acts or omissions adversely

affecting the loans[20]; that Seller is unaware of any problems with the enforceability of the

loans[21]; and that there are no material adverse proceedings pending with respect to the

loans[22] and have been no material modifications to the documents evidencing or

otherwise affecting the loans.[23] The most important of these is an indemnity by the seller

under the PSA, covering all purchaser damages and attorneys' fees and expenses, against

both any breaches of seller representations and warranties, and any future obligation of

seller to disgorge or otherwise return any property previously received.

15.    Significant as these obligations may appear to be on their face, the

difficulty of the Debtors in performing them is manifest when one considers that the

---

[19] LSTA Standard Terms and Conditions for Par/Near Par Trade Confirmations at § 10 (December 1, 2006).
[20] Distr. PSA ST at §4.1(h).
[21] Distr. PSA ST at §4.1(c).
[22] Distr. PSA ST at §4.1(e).
[23] Distr. PSA ST at §4.1(f).

likelihood the obligations will be triggered depends not upon the status of the seller, but on the status of the underlying borrower, whose own defaults and restructurings, or liquidations, may not commence or conclude for a material length of time, and can be nearly impossible to predict.

16.    Indeed, the one thing that is virtually certain about LCPI's obligations under the Tennenbaum Closing Documents is that LCPI will not be around to satisfy them.  The Debtors have already sold substantially all of their assets and are planning to liquidate.  Given the Debtors' liquidation and absence of ongoing business operations, there is little assurance that the Debtors will be able to honor their obligations under the Tennenbaum Closing Documents even if they remain in existence.

17.    The potential need to honor these indemnity obligations is more than a merely theoretical risk.  The obligor on the underlying credit that is the subject of the Tennenbaum Confirmations, Hawaiian Telecom, has defaulted on the Loans.  LCPI has apparently owned the claims it seeks to sell to the Tennenbaum Entities for an extended period, and is also the agent under the Hawaiian Telecom Credit Agreement, a function that it may be unable to perform.  There is a very real possibility that the Debtors' indemnities may have to be called upon.  There is simply no way to tell at this early stage whether LCPI has breached its obligations to Hawaiian Telecom or engaged in other actions that may result in a demand for indemnification under the Tennenbaum Closing Documents.

18.    The unavailability of the Debtors to stand behind such representations, warranties, agreements and indemnities threatens Tennenbaum with real harm.   LCPI's

10

inability to stand behind its obligations under the Tennenbaum Closing Documents will reduce the value of the Loans both to the Tennenbaum Entities and to their prospective transferees.  The value and marketability of the Loans, already impaired by the precipitous drop that occurred in the market price of the Loans during the Debtors' long delay in closing the subject transactions, will be significantly further impaired by the inability of the Debtors, as upstream sellers in the chain of title, to stand behind their warranties and indemnification obligations.

19.    Recent evidence of the unlikelihood LCPI will be able to perform its ongoing obligations under the Tennenbaum Closing Documents from the allegations of non-performance of obligations under credit documents and similar agreements that have already been filed against the Debtors in their respective capacities as agent and lender in the Chapter 11 Cases.  See, e.g., Motion of Express, Inc. and Delek US Holdings, Inc. for Relief from the Automatic Stay, dated November 21, 2008 [Docket No. 1663] (alleging LCPI defaults as agent and lender under Credit Agreement); Motion of Central Pacific Bank, et al., for Relief from the Automatic Stay to Enforce Contractual Rights to Remove Lehman Brothers Holdings Inc. as Agent under Loan Facility, dated November 24, 2008 [Docket No. 1692] (alleging LBHI failure to fund pro rata share of advances under construction loan agreement); Motion of TPG-Austin Portfolio Holdings LLC to Compel Immediate Assumption or Rejection of Credit Agreement or in the Alternative, Grant Relief from the Automatic Stay to Permit Alternative Financing on a Senior Secured Basis, dated November 13, 2008 [Docket No. 1514] (alleging breach of credit agreement resulting from failure of LCPI to fund).

11

20.     LCPI has accordingly anticipatorily breached the Tennenbaum Closing Documents, and committed technical defaults thereunder as well. Because these defaults have occurred, and not yet been cured, under the Tennenbaum Closing Documents prior to LCPI's assumption of them, LCPI is obligated to provide Tennenbaum with adequate assurance of the future performance of its obligations thereunder.

21.     A liquidating entity cannot provide adequate assurance that it will meet ongoing obligations under 365(b), let alone obligations as substantial as the ones that may exist under the Tennenbaum Closing Documents. See, e.g., In re Southwest Florida Heart Group, P.A., 342 B.R. 639, 643 (Bankr. M.D. Fla. 2006) (even though debtor has sufficient amount of cash to cure defaults, the fact that "Debtor is economically defunct . . . and does not intend to operate in the future and will not generate the income necessary to perform . . .." render the lease at issue unassumable; In re M. Fine Lumber Co., Inc., 383 B.R. 565 (Bankr. E.D.N.Y. 2008)(guarantee of lease obligations by party that has not demonstrated ability to perform insufficient).

22.     Adequate assurance doesn't require certainty of ability to perform, but it does require some notion that the contract will actually be performed, and that the means will be there to do it.  See, e.g., In re Embers 86th Street, Inc., 184 B.R. 892 (Bankr. S.D.N.Y. 1995) (Chapter 11 debtor cannot provide adequate assurances that it will make cure payments as condition to assuming sublease, where its projected net profit is at best speculative, being based on proposal to improve profitability by offering reduced services at increased prices in leased space which will not allow it to substantially increase sales).

23.     By proposing to assume the PSAs it executed with the Tennenbaum Entities without having any expectation or ability of surviving long enough to perform

12

them, the Debtors are performing a *de facto* conversion of the distressed closing

documentation they agreed to into par documentation that never would have been

acceptable to the Tennenbaum Entities, given the status of the underlying borrower.

24.     It is black letter law that to take the benefits of a contract, a debtor must

accept its burdens; piecemeal assumption of contracts, and cherrypicking favorable

contractual provisions, is strictly prohibited.  In re Jamesway Corp., 201 B.R. 73 (Bankr.

S.D. N.Y. 1996); In re S.E. Nichols Inc., 120 B.R. 745 (Bankr. S.D. N.Y. 1990); In re

Harry C. Partridge, Jr. & Sons, Inc., 43 B.R. 669 (Bankr. S.D. N.Y. 1984).  See also In re

Buffets Holdings, Inc., 387 B.R. 115 (Bankr. D. Del. 2008) (if debtor decides to assume

unexpired lease, it must generally assume all the terms of lease and may not pick and

choose only the favorable terms to be assumed; debtor may not blow hot and cold but, if

it accepts the benefits of contract, must accept them *cum onere*).  Indeed, one of the

burdens that a debtor must accept when it assumes a contract is the burden of the date the

obligations under the contract became effective.  In re Gerth, 991 F.2d 1428, 1432-33 (8th

Cir. 1993).

## B.    The Debtors' request for a preemptive declaratory judgment against all future prepetition setoffs by the Tennenbaum Entities was required to be commenced by adversary proceeding, and is premature.

25.     In their Motion, the Debtors seek declaratory relief that prepetition claims

cannot be used to setoff obligations owed by the non-debtor parties under contracts

assumed by the Debtors.   Even if the Debtors are permitted to assume any of the Open

Trade Confirmations (most of which are, unlike the Tennenbaum Closing Documents,

presumably executory contracts), the Debtors' request for declaratory judgment depriving

non-debtor parties of setoff rights should be denied.   The relief requested by the Debtors

can only be granted in an adversary proceeding, not in a motion.  The Debtor's failure to

seek this relief by filing a complaint would improperly deny the Tennenbaum Entities

important procedural rights.

26.    Bankruptcy Rule 7001(9) provides that any proceeding seeking to obtain a

declaratory judgment relating to clauses (1)-(8) of Rule 7001 (the "Referenced Clauses")

must itself be commenced by adversary proceeding. Fed. R. Bankr. P. 7001(9)(2008).

This requirement is to be strictly followed.  See In re Smith and Son Septic and Sanitation

Service, 88 B.R. 375, 381 (Bankr. D. Utah 1988).

27.    The preemptive declaratory relief the Motion seeks to bar all future

prepetition setoffs by the Tennenbaum Entities relates directly to several of the

Referenced Clauses.

28.    First, as the Debtors plainly admit, the setoff rights the Debtors seek to

preempt are equitable in nature. "Even if Counterparties were able to demonstrate that

the literal requirements for setoff have been satisfied, the Debtors request that such setoff

be precluded on equitable grounds (citation omitted)." [24] Compare In re Bevill, Bresler &

Schulman Asset Management Corp., 896 F.2d 54 (3d Cir. 1990). ("[An e]quitable right

of setoff has long been recognized in bankruptcy and it allows parties that have mutual

debts to state accounts between them, subtract one from the other, and pay only the

balance.")  See also In re Sun Belt Elec. Constructors, Inc., 56 B.R. 686 (Bankr. N.D.Ga.

---

[24] Motion at ¶35.

14

1986) (equitable relief adjunct to attempt to enforce executory contract under 365

improper as not having been sought by adversary proceeding). The Motion is therefore is

clearly a "proceeding to obtain. . . other equitable relief." Fed. R. Bankr. P. 7001 (7)

(2008).

29.     It is also well-settled that, in the bankruptcy context, setoff, if allowed, in

essence elevates unsecured claims to secured status. In re Myers, 362 F.3d 667 (10th Cir.

2004). See also In re Haizlett, 261 B.R. 393 (Bankr. W.D. Pa. 2000) (creditor is secured

creditor to extent that it has setoff right).  Because it seeks to eliminate the secured status

that the Tennenbaum Entities would enjoy if their setoff rights were subsequently

upheld, the Motion also is within the scope of Rule 7001(2). Fed. R. Bankr. P. 7001

7001(2)(2008).

30.     In Harry C. Partridge, Jr. & Sons, Inc., the debtor coupled a cross-motion

to assume an executory contract with a request for a declaration that it had not defaulted

on the contract. The court held that a proceeding with respect to such a contract dispute

was a proceeding to recover money or property under Rule 7001(1), and thus, by virtue

of Rule 7001(9), a proceeding to obtain a declaratory judgment relating to such a contract

dispute, which would be required to be brought as an adversary proceeding, rather than

by motion. Fed. R. Bankr. P. 7001(1), (9)(2008).

31.     Not only does the Motion fail to provide to the Tennenbaum Entities the

procedural safeguards Rule 7001(9) requires, it also forces them to litigate the allowability

of their prepetition claims before they have had an opportunity to file or even formulate

them.  A bar date has not even been set yet in the Chapter 11 cases, and the Debtors have

already had their time to file their Schedules extended twice, with the current extension

(subject to further renewals) running until at least January 13, 2009.[25]

32.    Creditors generally have the right to set off their claims at any time until,

and in some cases even after, confirmation of a plan.  See, e.g., In re BOUSA Inc., 2006

WL 2864964 (Bankr. S.D.N.Y., September 29, 2006) (Peck, J.).  The only exception is if

there is a waiver of the right to set off.[26]

33.    The Tennenbaum Entities granted LCPI a limited waiver of their right of

setoff in connection with their compromise of LCPI's obligations in respect of the Term

Loan Trades[27], but, as the Term Debt Settlement Documentation reflects, the waiver

covered only prepetition claims arising from the Term Loan Trades, and did not affect

any setoff rights the Tennenbaum Entities may have in respect of other prepetition claims

against the Debtors.[28]

34.    As the Debtors acknowledge[29], the revolving Hawaiian Telecom loans that

are the subject of the Tennenbaum Purchases continue to trade on the secondary loan

market.  Unlike with the brokerage operations that were the subject of the LBHI's sale of

substantially all of its assets, such loans are not a wasting asset certain to diminish in

value if they are not immediately disposed of.  There is no potential bidder for these loans

that will walk away if the Trades do not close immediately.  The Tennenbaum Entities are

not responsible for moving to accelerate the Debtors' determination to assume or reject

---

[25] Order Pursuant to Bankruptcy Rule 1007(C) Further Extending the Time to File the Debtors' Schedules,
Statements of Financial Affairs, and Related Documents, dated November 21, 2008 [Docket No. 1667]
[26] Id.
[27] Supra at ¶6.
[28] Id.
[29] Motion at ¶21.

the Trades. The Debtors are free to delay their decision to seek to assume or reject the

Trades until it can be made properly.  Their decision to pursue this relief immediately

should not come at the expense of the Tennenbaum Entities' fundamental procedural and

substantive rights.

## C.    Whether or not the Tennenbaum Closing Documents are assumable, the Tennenbaum Entities' obligations thereunder arose prepetition, and can be setoff against other prepetition claims.

35.      For the reasons discussed above, LCPI cannot assume the Confirmations

or the Tennenbaum Closing Documents.  But even if the Court permits these contracts to

be assumed, the obligations owed by Tennenbaum under the contracts will remain

prepetition obligations for setoff purposes.

36.      The plain language of Section 553 of the Bankruptcy Code provides in

relevant part:

> [T]his title does not affect any right of a creditor to offset a mutual debt
> owing by such creditor to the debtor that arose before the commencement
> of the case under this title against a claim of such creditor against the
> debtor that arose before the commencement of the case . . . (emphasis
> added).

11 U.S.C. §553 (2008).

37.      "For purposes of setoff, a debt arises when all transactions necessary for

liability have occurred . . ." In re BOUSA Inc., 2006 WL 2864964 (Bankr. S.D.N.Y.,

September 29, 2006) (Peck, J.) (citation omitted). The key question in determining

whether a claim arose prepetition or postpetition is when the act giving rise to the claim

was performed.  In re Pan American Hosp. Corp., 364 Bankr. 839 (Bankr. S.D. Fla.

2007).

38.    That act, for purposes of LCPI's claim against the Tennenbaum Entities

under the Tennenbaum Closing Documents, was the execution of the Closing Documents,

because once this had occurred, the Tennenbaum Entities were obligated to pay LCPI the

Revolver Purchase Price.  Because the Tennenbaum Entities executed the Tennenbaum

Closing Documents prior to the occurrence of the Petition Date[30], LCPI's claim against

the Tennenbaum Entities in respect thereof is a prepetition claim.

39.    The Purchase Price Claims should not be deemed to have been rendered

"postpetition" simply by virtue of the fact that the timing of the payment by the

Tennenbaum Entities of the Revolver Purchase Price would be triggered by an event that

occur after the Petition Date.  In re NextWave Personal Communications Inc., 244 B.R.

253, 274 (Bankr. S.D.N.Y. 2000).

40.    The two cases that the Debtors cited to support the theory that

assumption of the Tennenbaum Closing Documents will cause the Debtors' claim for the

Revolver Purchase Price to metamorphose into a postpetition claim are both inapposite.

In In re Evatt, 112 B.R. 405, 408-409 (Bankr. W.D. Okl. 1989), unlike in the present

case, payments to the debtor under the assumed contracts were never due prepetition, as

they were here.[31]  In In re Walat Farms Inc., 69 B.R. 529 (Bankr. E.D. Mich. 1987),

though the date upon which payment was required to be made to the debtor is not clearly

---

[30] Supra at ¶4.
[31] Supra at ¶4.

identified in the Court's opinion, payment may have also been due postpetition in the

first instance, since it apparently fell due "after the harvest" the same year as the debtor's

July 1985 Chapter 11 filing.[32]

41.    Although the Debtors cite In re Genuity, 323 B.R. 79 (Bankr. S.D.N.Y.

2005) in support of reclassifying the Tennenbaum Entities' obligations in respect of the

Revolver Purchase Price as arising postpetition, the facts are the reverse of those in the

case at bar:  it was the creditor that was owed money prepetition that had its claim

"transformed" into a postpetition claim because the creditor was given administrative

priority treatment for its right to receive postpetition payment from the debtor.[33]  In the

present case, by contrast, it is LCPI, not the Tennenbaum Entities, that is owed an

amount prepetition, and Tennenbaum's obligation to pay this amount would be the same

whether the amount had been paid immediately upon the execution of the Tennenbaum

Closing Documents prepetition, or immediately after these contracts were assumed.

42.    Consistent with the apparent weight of authority on this issue, the Court

should find, that the assumption of a contract under which a non-debtor has a prepetition

obligation to the debtor does not magically transform that obligation into a postpetition

one, and that the obligation should be classified according to when it arose, not when it

ultimately was performed.  In re Gerth, 991 F.2d at 1432; In re Buckner, 218 B.R. 137,

145-49 (B.A.P. 10th Cir. 1998).

---

[32] Id., 69 B.R. at 530.
[33] Id.  This language from Genuity was also arguably *dicta*, because the case turned in large part upon the
court's conclusion that the deposits upon which the claims in question were based did not represent debts at
all, but rather were prepetition security interests.  Genuity at 84.

19

43.     The Tennenbaum Entities expressly reserve the right to setoff any prepetition claims they may hold against the Debtors at a later date, based on the facts and authorities set forth in this Motion, and such additional facts and authorities as may be developed in the event the Debtors reapply for the relief currently sought in the Motion in a procedurally appropriate proceeding, after the Tennenbaum Entities have had a sufficient opportunity to formulate and file their prepetition claims.

## D.     Leaving the Tennenbaum Entities' rights of setoff unimpaired is consistent with the policies of the Bankruptcy Code and prevailing market practices.

44.     The Debtors argue in their Motion that the Tennenbaum Entities should be barred from setting off their obligations to pay the Revolver Purchase Price against other prepetition claims—even if such setoff is permitted under applicable law—as a matter of equity, and in order to carry out policies which the Debtors claim are embodied in Sections 365(g) and 502(g) of the Bankruptcy Code.[34]

45.     The Debtors cite no authority, and give no explanation, for why they believe these two sections bar the prepetition setoff of claims under assumed contracts. Their logic appears to be that, since these sections afford a creditor of an assumed contract that is subsequently rejected a postpetition administrative priority claim, it necessarily follows that all claims under assumed contracts should receive postpetition treatment.  But, as Collier points out,

---

[34] Motion at ¶¶35-36.

20

> This is because the basis of the potential administrative expense claim
> does not depend upon the terms or provisions of the rejected contract or
> lease but rather arises under the standards contained in Section 503 of the
> Bankruptcy Code.[35]

By contrast, it is not the Tennenbaum Entities' claim against LCPI, but LCPI's claim

against the Tennenbaum Entities for the Revolver Purchase Price, that would be payable

postpetition in the event of the assumption of the Tennenbaum Closing Documents.  Such

claim does not implicate Section 503 because the claim is not held by a creditor but by

the Debtors.  It is the same claim against the Tennenbaum Entities that existed

prepetition.  The policies underlying Sections 362(g) and 502(g) therefore do not support

the Debtors' policy arguments.

46.    To the contrary, upholding the Tennenbaum Entities' setoff rights would

also be consistent not only with the express language of and policies underlying

Bankruptcy Code, but also with prevailing practices in the secondary loan market, and

the expectations of market participants.

47.    Like the participants in the derivatives transactions that are permitted to

be offset under master netting agreements in accordance with Section 561 of the

Bankruptcy Code, the large, sophisticated institutions that regularly participate in the

secondary loan market net off purchases and sales of par and distressed loans so routinely

that forms of standardized Multilateral and Bilateral Netting Agreements are used by

market participants as a normal part of their everyday trading activities.[36]  Indeed, it was

---

[35] Collier on Bankruptcy 15th Ed. Rev. 502.08[2][a]
[36] Standard Documents & Market Practice – LSTA - Trading Documents,
http://www.lsta.org/hub_stddoc.aspx?id=110 (April 2004)

a variation on such an agreement that the Tennenbaum Entities attempted to have
executed to effectuate a similar setoff with LCPI before the Petition Date.[37]

48.    Not unlike some of the particular forms of derivatives that were believed
to, but were not certain to, have been covered by the special derivatives provisions of the
Bankruptcy Code until this became explicit with the enactment of the Financial Netting
Improvements Act of 2006[38], resales of secondary loans are not explicitly covered by
Sections 555-562 of the Bankruptcy Code, but appear to either fall within, or to closely
approximate, the types of assets these provisions currently encompass.

49.    If the Debtors commence an adversary proceeding to determine the
availability of setoff rights against any of the contracts they assume (as they are required
to do under Rule 7001), the Tennenbaum Entities are likely to assert that the Trades are
actually "securities contracts" under Section 741(A)(i) and/or (viii) of the Bankruptcy
Code, to the extent that either the revolving HTEL loans are themselves "securities"
within the meaning of Section 101(49) of the Bankruptcy Code, or the Confirmations are
similar to securities sales agreements.

50.    The Debtors imply that creditors such as the Tennenbaum Entities obtain
a "serendipitous advantage" when permitted to setoff their claims.[39]  The reality is that
the Debtors are already reaping an enormous windfall from the recent collapse of the
secondary loan market by assuming Open Trade Confirmation sales, and simultaneously

---

[37] <u>Supra</u> at ¶5.
[38] H.R. 5585--109th Congress (2006): Financial Netting Improvements Act of 2006, GovTrack.us (database
of federal legislation),  http://www.govtrack.us/congress/bill.xpd?bill=h109-5585  (accessed Nov 26,
2008); <u>See</u>, <u>e.g.</u>, Collier on Bankruptcy 15th Ed. Rev. 561.01.
[39] Motion at ¶34 (citing <u>In re Public Service of New Hampshire</u>, 884 F.2d 11, 13 (1st Cir. 1989)).

rejecting Open Trade Confirmation purchases that in typical market practice often would have been matched to afford the Debtors a spread of a fraction of a point, but may currently yield them spreads 25 to 100 times that amount. This windfall derives instead almost entirely from the Debtors having commenced their Chapter 11 cases at the precise moment when they had a substantial amount of offsetting Open Trade Confirmations on their books. It is, accordingly, the Debtors that already enjoy a "serendipitous advantage". They should not be permitted to build upon this advantage at the expense of the legitimate procedural and substantive rights of their creditors.

WHEREFORE, the Tennenbaum Entities respectfully request that the Court deny the Motion except to the limited extent provided in the Term Loan Settlement Documentation, and grant to the Tennenbaum Entities such other and further relief as may be just and proper.

Dated: November 26, 2008
       Latham, New York


                                        /s/ Steve Kieselstein
                                        Steve Kieselstein

                                        KIESELSTEIN LAW FIRM PLLC
                                        1187 Troy-Schenectady Road
                                        Latham, New York  12110
                                        Telephone:  (518) 785-7800
                                        Facsimile:  (518) 785-7851

                                        Attorneys for Tennenbaum Opportunities
                                        Partners V, L.P., Special Value Expansion
                                        Fund, LLC and Special Value Opportunities
                                        Fund, LLC