# EXHIBIT B



# PURCHASE AND SALE AGREEMENT FOR DISTRESSED TRADES

## LSTA STANDARD TERMS AND CONDITIONS

Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006

The following are the LSTA Standard Terms and Conditions for Purchase and Sale published by the LSTA as of December 1, 2006, which shall govern the Transaction described in the Transaction Specific Terms.

1. **Definitions**

   1.1   General.  Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the relevant Transaction Specific Terms, and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the provisions of the Standard Terms, the Transaction Specific Terms shall govern and control.

   1.2   In this Agreement:

   **"Adequate Protection Order"** means any order of the Bankruptcy Court authorizing or ordering Borrower or any Obligor to make adequate protection payments to the Lenders, including any adequate protection order specifically identified in the Annex.

   **"Adequate Protection Payments"** means, with respect to the Transferred Rights, amounts (other than PIK Interest) authorized and/or ordered to be paid by the Bankruptcy Court (if any) as adequate protection for the loans and obligations owed under the Credit Agreement pursuant to an Adequate Protection Order that accrue during the period before (but excluding) the earlier of (a) the Settlement Date and (b) T+20.

   **"Affiliate"** means "affiliate" as defined in either (a) Bankruptcy Code §101(2) or (b) Rule 144 of the Securities Act.

   **"Agent Expenses"** means any costs, liabilities, losses, claims, damages, and expenses incurred by, and any indemnification claims of, the Agent, for which the Agent has recourse under the Credit Documents and that are attributable or allocable to the Transferred Rights.

   **"Agreement"** means this Purchase and Sale Agreement between Seller and Buyer dated as of the Agreement Date governing the Transaction, such Agreement consisting of the Standard Terms as modified and supplemented by the Transaction Specific Terms.

   **"Agreement Date"** means the date specified as such in the Transaction Summary.

   **"Annex"** means the document attached to the Transaction Specific Terms captioned "Annex to Purchase and Sale Agreement."

LSTA EFFECTIVE DECEMBER 2006        Copyright © LSTA 2006.  All rights reserved.

"**Assumed Obligations**" means all obligations and liabilities of Seller with respect to, or in connection with, the Transferred Rights resulting from facts, events or circumstances arising or occurring on or after the Settlement Date; excluding, however, the Retained Obligations.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, 11 U.S.C. §§101 et seq., as amended.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and any corresponding or other local rules of the Bankruptcy Court.

"**Bar Date**" means the last date fixed by the Bankruptcy Court (if any) pursuant to the Bankruptcy Code or the Bankruptcy Rules on which proofs of claim or interest may be filed in the Bankruptcy Case with respect to the Transferred Rights, as specified in Section A of the Transaction Specific Terms.

"**Benefit Plan**" means an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, a "plan" as defined in Section 4975 of the Code or any Entity whose assets include (for purposes of U.S. Department of Labor Regulations Section 2510.3-101 or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan."

"**Borrower**" means, collectively, the Entity or Entities specified as such in the Transaction Summary and such other borrower(s) as may be identified in the Credit Agreement.

"**Buyer**" means the Entity specified as such in the Transaction Summary.

"**Business Day**" means any day that is not (a) a Saturday, (b) a Sunday, (c) any other day on which the Federal Reserve Bank of New York is closed[1] or (d) only with respect to the determination of T+20, any other day on which the New York Stock Exchange is closed.

"**Buyer Excluded Information**" has the meaning specified in Section 5.1(h).

"**Buyer Indemnitees**" has the meaning specified in Section 6.1.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it.

"**Collateral**" means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance has been, or is purported to have been, granted to (or otherwise created) or for the benefit of the Lenders under the Credit Documents.

"**Credit Agreement**" means the agreement specified as such in the Transaction Summary (including all intercreditor agreements, subordination agreements, waivers and amendments entered into pursuant thereto or in connection therewith).

"**Credit Documents**" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

---

[1] The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

2

"**Distribution**" means any payment or other distribution, whether received by setoff or otherwise, of cash (including interest), notes, securities, or other property (including Collateral) or proceeds under or in respect of the Transferred Rights; excluding, however, any Retained Interest Distribution.

"**Encumbrance**" means any (a) mortgage, pledge, lien, security interest, charge, hypothecation, security agreement, security arrangement or encumbrance or other adverse claim against title of any kind; (b) purchase, option, call or put agreement or arrangement; (c) subordination agreement or arrangement other than as specified in the Credit Documents; (d) prior sale, transfer, assignment or participation by Seller of the Transferred Rights, the Loans or the Commitments (if any) other than pursuant to the Predecessor Transfer Agreements (if any) specified in the Annex; or (e) agreement or arrangement to create or effect any of the foregoing.

"**Entity**" means any individual, partnership, corporation, limited liability company, association, estate, trust, business trust, Governmental Authority, fund, investment account or other entity.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it.

"**Federal Funds Rate**" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Parties from three federal funds brokers of recognized standing selected by the Parties. For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"**Governmental Authority**" means any federal, state, or other governmental department, agency, institution, authority, regulatory body, court or tribunal, foreign or domestic, and includes arbitration bodies, whether governmental, private or otherwise.

"**Guaranty**" means a guaranty of any of Borrower's obligations under the Credit Documents, including Borrower's obligations in connection with the Loans.

"**Immediate Prior Seller**" means (a) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, none or (b) if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, the Entity or, collectively, the Entities from which Seller acquired the Loans, the Commitments (if any) and the other Transferred Rights.

"**Impairment**" means any claim, counterclaim, setoff, defense, action, demand, litigation (including administrative proceedings or derivative actions), Encumbrance, right (including expungement, avoidance, reduction, contractual or equitable subordination, or otherwise) or defect, other than those created pursuant to the Credit Documents, the effect of which does, or would, materially and adversely affect the Transferred Rights, in whole or in part.

"**Indemnified Party**" has the meaning specified in Section 6.3.

"**Indemnifying Party**" has the meaning specified in Section 6.3.

"**Insider**" means insider as defined in Bankruptcy Code §101(31).

3

"**Interest and Accruing Fees**" means all interest and accruing ordinary course fees (such as commitment, facility, letter of credit and other similar fees) that are paid in connection with the Loans and Commitments (if any) in accordance with the Credit Documents from and after the Trade Date; provided that Interest and Accruing Fees shall not include any PIK Interest.

"**Lender**" means a lender under the Credit Agreement, and its successors, transferees and permitted assigns.

"**Loans**" means the Loan(s) in the amount(s) specified in the Transaction Specific Terms, and includes the note(s) (if any) evidencing such Loan(s) issued under the Credit Agreement.

"**LSTA**" means The Loan Syndications and Trading Association, Inc.®

"**Majority Holders**" has the meaning specified in Section 11.

"**Manager**" has the meaning specified in Section 10.1.

"**Non-Recurring Fees**" means amendment, consent, waiver and other similar non-ordinary course fees that are paid in connection with the Loans and Commitments (if any) under the Credit Documents from and after the Trade Date and any other amounts not constituting Interest and Accruing Fees.

"**Obligor**" means any Entity (other than Borrower, the Lenders and any administrative, collateral, syndication, documentation or other similar agent under the Credit Agreement) that is obligated under the Credit Documents.

"**Operative Documents**" means (a) if "No" is specified opposite "Netting Arrangements" in the Transaction Summary, (i) this Agreement, (ii) the Assignment, (iii) the Purchase Price Letter and (iv) if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice, and (b) if "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary, (i) this Agreement, (ii) the Assignment, (iii) the Netting Letter and (iv) if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice.

"**Party**" means Buyer or Seller, as applicable.

"**PIK Interest**" means any paid-in-kind interest, fees or other amounts paid or payable from and after the Trade Date in connection with the Loans and Commitments (if any) in accordance with the Credit Documents or Adequate Protection Order (if any), as applicable.

"**Predecessor Transfer Agreements**" means (a) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary and Seller is a signatory to the Credit Agreement, none, (b) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary and Seller is a not signatory to the Credit Agreement, the Assignment that names Seller as assignee therein and that relates to the primary syndication or (c) if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, the transfer agreements under which Seller and any Prior Seller acquired the rights and obligations underlying or constituting a part of the Transferred Rights.

"**Pre-Settlement Date Accruals**" means all Interest and Accruing Fees that accrue during the period before (but excluding) the earlier of (a) the Settlement Date and (b) T+20; so long as payment or distribution of such Interest and Accruing Fees is made (i) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (ii) before a default by Borrower or any Obligor in connection with other payment obligations of Borrower or any Obligor under the Credit

4

Agreement; otherwise such Interest and Accruing Fees (if and when paid) and any other accrued amounts due thereafter shall be for the account of Buyer, and Seller shall not be entitled to any part thereof.

"**Prior Sellers**" means (a) if "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, none or (b) if "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, (i) Immediate Prior Seller and (ii) any other Entity or Entities that transferred any of the rights and obligations underlying or constituting a part of the Transferred Rights.

"**Proof of Claim**" means (a) if "No" is specified opposite "Borrower In Bankruptcy" in the Transaction Summary, none or (b) if "Yes" is specified opposite "Borrower In Bankruptcy" in the Transaction Summary, any and all proofs of claim filed in the Bankruptcy Case in respect of the Transferred Rights, including any proof of claim specifically identified in the Annex.

"**PTEs**" means the prohibited transaction class exemptions issued by the U.S. Department of Labor.

"**Purchase Price**" has the meaning given to it in the Purchase Price Letter.

"**Purchase Price Letter**" means the letter agreement between Buyer and Seller that specifies the calculations determining the Purchase Price with respect to the Transferred Rights.

"**Purchase Rate**" means the purchase rate specified in the Purchase Price Letter.

"**Reimbursement Claims**" means any claim of Seller arising in connection with the return, disgorgement or reimbursement by Seller to Borrower, or any other Entity, of all or any portion of any payment or transfer received by Seller on account of the Transferred Rights prior to the Settlement Date, including any claims arising under Bankruptcy Code §502(h).

"**Retained Interest**" means, if "Settled Without Accrued Interest" is specified in the Transaction Specific Terms, the right retained by Seller to receive, in accordance with the provisions of Section 8.3, payments or other distributions, whether received by setoff or otherwise, of cash (including interest), notes, securities or other property (including Collateral) or proceeds paid or delivered in respect of the Pre-Settlement Date Accruals or the Adequate Protection Payments (if any); provided that Retained Interest shall not include any PIK Interest.

"**Retained Interest Distribution**" means a payment or other distribution, whether received by setoff or otherwise, of cash (including interest), notes, securities or other property (including Collateral) or proceeds payable or deliverable to Seller in respect of a Retained Interest.

"**Retained Obligations**" means (a) if "No" is specified opposite "Step-Up Provision, all obligations and liabilities of Seller relating to the Transferred Rights that (i) result from facts, events or circumstances arising or occurring prior to the Settlement Date, (ii) result from Seller's breach of its representations, warranties, covenants, or agreements under this Agreement, the Credit Documents or the Predecessor Transfer Agreements, (iii) result from Seller's bad faith, gross negligence, or willful misconduct or (iv) are attributable to Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents, and (b) if "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, all obligations and liabilities of Seller and each Covered Prior Seller relating to the Transferred Rights that (i) result from facts, events or circumstances arising or occurring prior to the Settlement Date, (ii) result from Seller's breach of its representations, warranties, covenants or agreements under this Agreement, the Credit Documents or the Predecessor Transfer Agreements, (iii) result from any Covered Prior Seller's breach of its representations, warranties, covenants or agreements contained in the Credit Documents or the Predecessor Transfer Agreements, (iv) result from Seller's or any Covered

5

Prior Seller's bad faith, gross negligence, or willful misconduct or (v) are attributable to Seller's or any Covered Prior Seller's actions or obligations in any capacity other than as a Lender under the Credit Documents.

**"Securities Act"** means the Securities Act of 1933, 15 U.S.C. §§77a et seq., as amended, and the rules and regulations promulgated under it.

**"Seller"** means the Entity specified as such in the Transaction Summary.

**"Seller Excluded Information"** has the meaning specified in Section 4.1(o).

**"Seller Indemnitees"** has the meaning specified in Section 6.2.

**"Settlement Date"** means (a) if "No" is specified opposite "Netting Arrangements" in the Transaction Summary, the date on which Seller receives the Purchase Price, and (b) if "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary, the date on which Seller receives the Seller Purchase Price.

**"Shift Date"** means, if applicable, the date specified as such in the Transaction Summary.

**"Standard Terms"** means the LSTA Standard Terms and Conditions for Purchase and Sale in the form published by the LSTA as of _____, 2005.

**"T+20"** means the date that is twenty (20) Business Days after the Trade Date.

**"Trade Date"** means the date(s) specified as such in the Transaction Summary.

**"Transaction"** means the purchase and sale of Loans, Commitments (if any) and the other Transferred Rights to which this Agreement relates.

**"Transaction Documents"** means the Credit Documents, the Operative Documents and the Predecessor Transfer Agreements (if any).

**"Transaction Specific Terms"** means the specific terms and elections governing the Transaction that are set forth in the Transaction Summary and Sections A through H of this Agreement.

**"Transaction Summary"** means the Transaction Summary set forth in the Transaction Specific Terms.

**"Transfer Notice"** means any notice and evidence of transfer with respect to the Transferred Rights filed in the Bankruptcy Case in accordance with the Bankruptcy Rules, including Bankruptcy Rule 3001(e).

**"Transferred Rights"** means any and all of Seller's right, title, and interest in, to and under the Loans and the Commitments (if any) and, to the extent related thereto, the following (excluding, however, the Retained Interest, if any):

    (a)    all other amounts (including any PIK Interest) funded by or payable to Seller or any Prior Seller (if any) under the Credit Documents, and all obligations owed to Seller or any Prior Seller in connection with the Loans and the Commitments (if any);

    (b)    the Credit Documents;

6

(c)     the Proof of Claim (if any);

(d)     the Predecessor Transfer Agreements (if any) (but only to the extent related to the Loans or the Commitments (if any), as specified in the Annex);

(e)     all claims (including "claims" as defined in Bankruptcy Code §101(5)), suits, causes of action, and any other right of Seller or any Prior Seller, whether known or unknown, against Borrower, any Obligor, or any of their respective Affiliates, agents, representatives, contractors, advisors, or any other Entity that in any way is based upon, arises out of or is related to any of the foregoing, including, to the extent permitted to be assigned under applicable law, all claims (including contract claims, tort claims, malpractice claims, and claims under any law governing the purchase and sale of, or indentures for, securities), suits, causes of action, and any other right of Seller or any Prior Seller against any attorney, accountant, financial advisor, or other Entity arising under or in connection with the Credit Documents or the transactions related thereto or contemplated thereby;

(f)     all Guarantees and all Collateral and security of any kind for or in respect of the foregoing;

(g)     all cash, securities, or other property, and all setoffs and recoupments, received, applied, or effected by or for the account of Seller or any Prior Seller under the Loans or the Commitments (if any) and other extensions of credit under the Credit Documents (whether for principal, interest, fees, reimbursement obligations, or otherwise) from and after the Trade Date (unless excluded pursuant to Section 8.1), including all Distributions obtained by or through redemption, consummation of a plan of reorganization, restructuring, liquidation, or otherwise of Borrower, any Obligor or the Credit Documents, and all cash, securities, interest, dividends, and other property that may be exchanged for, or distributed or collected with respect to, any of the foregoing;

(h)     the economic benefit of permanent commitment reductions, permanent repayments of principal and Non-Recurring Fees received by Seller or any Prior Seller from and after the Trade Date; and

(i)     all proceeds of the foregoing.

2. **Assignment and Assumption**

In consideration of the mutual covenants and agreements in, and subject to the terms and conditions of, this Agreement:

(a)     subject to the satisfaction or waiver of the conditions in Section 3.2, Seller irrevocably sells, transfers, assigns, grants and conveys the Transferred Rights to Buyer with effect on and after the Settlement Date;

(b)     subject to the satisfaction or waiver of the conditions in Section 3.1, Buyer irrevocably acquires the Transferred Rights, and assumes and agrees to perform and comply with the Assumed Obligations, with effect on and after the Settlement Date; and

(c)     Seller agrees to remain responsible for, and assumes and agrees to perform and comply with, the Retained Obligations. Buyer assumes no obligations other than the Assumed Obligations.

3. **Conditions Precedent**

   3.1  Buyer's obligations to pay the Purchase Price to Seller, to acquire the Transferred Rights and to assume the Assumed Obligations shall be subject to the conditions that (a) Seller's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and/or the Settlement Date (as specified in Section 4.1), (b) Seller shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Settlement Date and (c) Buyer shall have received (i) the Transaction Specific Terms duly executed on behalf of Seller, (ii) the Purchase Price Letter duly executed on behalf of Seller, and (iii) the Assignment duly completed and executed on behalf of Seller and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents.

   3.2  Seller's obligation to sell, transfer, assign, grant, and convey the Transferred Rights to Buyer shall be subject to the conditions that (a) Buyer's representations and warranties in this Agreement shall have been true and correct on the Agreement Date and/or the Settlement Date (as specified in Section 5.1), (b) Buyer shall have complied in all material respects with all covenants required by this Agreement to be complied with by it on or before the Settlement Date, (c) Seller shall have received (i) the Transaction Specific Terms duly executed on behalf of Buyer, (ii) the Purchase Price Letter duly executed on behalf of Buyer, and (iii) the Assignment duly completed and executed on behalf of Buyer and any other Entity the consent or acknowledgement of which is specified in the definition of Required Consents and (d) Seller shall have received payment of the Purchase Price from Buyer.

   3.3  If "Yes" is specified opposite "Netting Arrangements" in the Transaction Summary: (a) the reference to the phrase "Purchase Price to Seller" in the first clause of Section 3.1 shall be deemed a reference, in lieu thereof, to "the Buyer Purchase Price to Original Buyer or Penultimate Buyer, as applicable,"; (b) clause (ii) of Section 3.1(c) and clause (ii) of Section 3.2(c) shall be revised as follows: "the Netting Letter duly executed on behalf of all parties thereto"; and (c) clause (d) of Section 3.2 shall be revised to read as follows: "(d) Seller shall have received payment of the Seller Purchase Price from Original Buyer or Penultimate Buyer, as applicable."

4. **Seller's Representations and Warranties**

   4.1  Seller represents and warrants to Buyer (as of the Settlement Date and, where specifically indicated, the Agreement Date) that:

   (a)  Seller (i) is, and was on the Agreement Date, duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is, and was on the Agreement Date, in good standing under such laws and (iii) has, and had on the Agreement Date, full power and authority to execute, deliver and perform its obligations under the Transaction Documents to which it is or will become a party.

   (b)  Seller's execution, delivery, and performance of the Transaction Documents to which it is or will become a party has not resulted, did not result on the Agreement Date and will not result in a breach or violation of any provision of (i) Seller's organizational documents, (ii) any statute, law, writ, order, rule or regulation of any Governmental Authority applicable to Seller, (iii) any judgment, injunction, decree or determination of any Governmental Authority applicable to Seller or (iv) any contract, indenture, mortgage, loan agreement, note, lease or other agreement, document or instrument to which Seller may be a party, by which Seller may be bound or to which any of the assets of Seller is subject.

   (c)  (i)  The Transaction Documents to which Seller is, and was on the Agreement Date, a party (A) have been duly and validly authorized, executed and delivered by Seller and (B) are the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except that such enforceability against Seller may be limited by bankruptcy, insolvency, or other similar laws of general applicability

8

affecting the enforcement of creditors' rights generally and by a court's discretion in relation to equitable remedies; and

(ii) other than the Required Consents, no notice to, registration with, consent or approval of or any other action by any relevant Governmental Authority or other Entity is, will be or was on the Agreement Date required for Seller to execute, deliver, and perform its obligations under, the Transaction Documents (other than, if "Yes" is specified opposite "Transfer Notice" in the Transaction Summary, the Transfer Notice) to which Seller is or will become a party.

(d) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i) Seller is the sole legal and beneficial owner of and has good title to each of the Loans, the Commitments (if any) and the other Transferred Rights free and clear of any Encumbrance; OR

(ii) To the same extent that Seller received such ownership and title from Immediate Prior Seller, Seller is the sole legal and beneficial owner of and has good title to each of the Loans, the Commitments (if any) and the other Transferred Rights free and clear of any Encumbrance.

(e) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i) Other than the Bankruptcy Case (if any) and any proceedings thereunder, no proceedings are pending against Seller or, to the best of Seller's knowledge, threatened against Seller before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect (A) the Transferred Rights or Assumed Obligations or (B) any action taken or to be taken by Seller under this Agreement; OR

(ii) Other than the Bankruptcy Case (if any) and any proceedings thereunder, no proceedings are pending against Seller or any Covered Prior Seller or, to the best of Seller's knowledge, threatened against Seller or any Covered Prior Seller before any relevant Governmental Authority that, in the aggregate, will materially and adversely affect (A) the Transferred Rights or Assumed Obligations or (B) any action taken or to be taken by Seller under this Agreement.

(f) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i) (A) The outstanding principal amount(s) of the Loans and the principal amount(s) of the Commitments (if any) as of the Settlement Date are accurately stated in the Transaction Specific Terms, (B) any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is specified in Section 6 of the Annex and is a proportionate share of PIK Interest that accreted during such period to all of Seller's loans of the same tranche under the Credit Agreement as the Loans, and (C) all PIK Interest, if any, that accreted to the principal amount of the Loans after the applicable settlement date on which Seller acquired the Loans from each Immediate Prior Seller but on or prior to the Settlement Date is included in the outstanding principal amount(s) of the Loans listed in the Transaction Specific Terms; OR

(ii) Assuming the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller, (A) the outstanding principal amount(s) of the Loans and the

9

principal amount(s) of the Commitments (if any) as of the Settlement Date are accurately stated in the Transaction Specific Terms, (B) any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is specified in Section 6 of the Annex and is a proportionate share of PIK Interest that accreted during such period to all of Seller's loans of the same tranche under the Credit Agreement as the Loans, and (C) all PIK Interest, if any, that accreted to the principal amount of the Loans after the applicable settlement date on which Seller acquired the Loans from each Immediate Prior Seller but on or prior to the Settlement Date is included in the outstanding principal amount(s) of the Loans listed in the Transaction Specific Terms.

(g) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, one of the following:

(i) Except for (A) (x) if "No" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Commitments (if any) or (y) if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Unfunded Commitments (if any) and (B) Agent Expenses, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit or loans under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller or Buyer is or shall be required to pay or otherwise perform that Seller has not paid or otherwise performed in full. The principal amount of the Unfunded Commitments (if any) as of the Settlement Date is accurately stated in the Transaction Specific Terms; OR

(ii) Assuming the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller, except for (A) (x) if "No" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Commitments (if any) or (y) if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Unfunded Commitments (if any) and (B) the Agent Expenses, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit or loans under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller or Buyer is or shall be required to pay or otherwise perform that Seller has not paid or otherwise performed in full. Assuming the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller, the Unfunded Commitments (if any) as of the Settlement Date is accurately stated in the Transaction Specific Terms; OR

(iii) Except for (A) (x) if "No" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Commitments (if any) or (y) if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, the Unfunded Commitments (if any) and (B) Agent Expenses, there is no funding obligation of any kind (whether fixed, contingent, conditional, or otherwise) in respect of the Transferred Rights or the Assumed Obligations (including any obligation to make advances or to purchase participations in letters of credit or loans under any Credit Documents or any obligation relating to any currency or interest rate swap, hedge, or similar arrangement) that Seller, any Covered Prior Seller or Buyer is or shall be required to pay or otherwise perform that Seller or any Covered Prior Seller has not paid or otherwise performed in full. The principal amount of the Unfunded Commitments (if any) as of the Settlement Date is accurately stated in the Transaction Specific Terms.

(h)  As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)  Seller has not engaged in any acts or conduct or made any omissions (including by virtue of Seller's holding any funds or property of, or owing amounts or property to, Borrower or any Obligor), that will result in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche, class or type as the Loans and Commitments (if any); OR

(ii)  Neither Seller nor any Covered Prior Seller has engaged in any acts or conduct or made any omissions (including by virtue of Seller's or any Covered Prior Seller's holding any funds or property of, or owing amounts or property to, Borrower or any Obligor), that will result in Buyer's receiving proportionately less in payments or distributions under, or less favorable treatment (including the timing of payments or distributions) for, the Transferred Rights than is received by other Lenders holding loans or commitments of the same tranche, class or type as the Loans and the Commitments (if any).

(i)  As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)  Seller has complied with, and has performed, all obligations required to be complied with or performed by it under the Credit Documents and the Predecessor Transfer Agreements (if any), and Seller has not breached any of its representations, warranties, obligations, agreements or covenants under any of the Credit Documents or the Predecessor Transfer Agreements; OR

(ii)  Seller and each Covered Prior Seller have complied with, and have performed, all obligations required to be complied with or performed by it or them under the Credit Documents and the Predecessor Transfer Agreements, and neither Seller nor any Covered Prior Seller has breached any of its representations, warranties, obligations, agreements or covenants under any of the Credit Documents or the Predecessor Transfer Agreements.

(j)  No broker, finder or other Entity acting under the authority of Seller or any of its Affiliates is entitled to any broker's commission or other fee in connection with the Transaction for which Buyer could be responsible.

(k)  The amounts utilized in calculating the Purchase Price as specified in the Purchase Price Letter are true and correct as of each applicable date, and the Purchase Price specified in the Purchase Price Letter has been calculated in accordance with that certain Distressed Trade Confirmation between Seller and Buyer dated as of the Trade Date.

(l)  As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i)  Seller has not effected or received the benefit of any setoff against Borrower or any Obligor on account of the Transferred Rights; OR

(ii)  Neither Seller nor any Covered Prior Seller has effected or received the benefit of any setoff against Borrower or any Obligor on account of the Transferred Rights.

(m) Seller acknowledges that the consideration paid under this Agreement for the purchase of the Transferred Rights and the assumption of the Assumed Obligations may differ both in kind and amount from any Distribution.

(n) Seller (i) is a sophisticated Entity with respect to the sale of the Transferred Rights and the retention of the Retained Obligations, (ii) has adequate information concerning the business and financial condition of Borrower and Obligors and the status of the Bankruptcy Case (if any) to make an informed decision regarding the sale of the Transferred Rights and the retention of the Retained Obligations and (iii) has independently and without reliance upon Buyer, and based on such information as Seller has deemed appropriate, made its own analysis and decision to enter into this Agreement, except that Seller has relied upon Buyer's express representations, warranties, covenants, agreements and indemnities in this Agreement. Seller acknowledges that Buyer has not given Seller any investment advice, credit information or opinion on whether the sale of the Transferred Rights or the retention of the Retained Obligations is prudent.

(o) Seller acknowledges that (i) Buyer currently may have, and later may come into possession of, information with respect to the Transferred Rights, the Retained Obligations, Borrower, Obligors or any of their respective Affiliates that is not known to Seller and that may be material to a decision to sell the Transferred Rights and to retain the Retained Obligations ("Seller Excluded Information"), (ii) Seller has determined to sell the Transferred Rights and to retain the Retained Obligations notwithstanding its lack of knowledge of Seller Excluded Information and (iii) Buyer shall have no liability to Seller or any Seller Indemnitee, and Seller waives and releases any claims that it might have against Buyer or any Buyer Indemnitee whether under applicable securities laws or otherwise, with respect to the nondisclosure of Seller Excluded Information in connection with the Transaction; provided, however, that Seller Excluded Information shall not and does not affect the truth or accuracy of Buyer's representations or warranties in this Agreement.

(p) Seller is an "accredited investor" as defined in Rule 501 under the Securities Act. Without characterizing the Transferred Rights as a "security" within the meaning of applicable securities laws, Seller has not made any offers to sell, or solicitations of any offers to buy, all or any portion of the Transferred Rights in violation of any applicable securities laws.

(q) Either (i) no interest in the Transferred Rights is being sold by or on behalf of one or more Benefit Plans or (ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the sale of the Transferred Rights.[2]

(r) As specified in the Transaction Summary, either:

---

[2] If the Parties agreed in their Distressed Trade Confirmation that Seller may make an alternative ERISA representation, such alternative representation shall be included in Section H of the Transaction Specific Terms. Suggested language for such alternative representation may be found on the LSTA website at www.lsta.org/lsta-documents/lsta-MarketAdvisories.php.

12

(i) If "Original Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, Seller (A) became a Lender on the closing date of the Credit Agreement or in connection with the primary syndication therefor, as applicable, and (B) made the Loans and made available the Commitments (if any) on the closing date of the Credit Agreement or in connection with the primary syndication therefor, as applicable; OR

(ii) If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, Seller makes the representation and warranty set forth in Section B of the Transaction Specific Terms as to the type of Predecessor Transfer Agreements executed in connection with Seller's purchase of the Transferred Rights. With respect to the portion (if any) of the Transferred Rights that Seller or any Prior Seller acquired pursuant to Predecessor Transfer Agreements relating to distressed loans, Seller has provided to Buyer (A) true, correct and complete copies of each such Predecessor Transfer Agreement to which Seller is a party and (B) to the extent and in the form received by Seller from Immediate Prior Seller, any other Predecessor Transfer Agreements specified in the Annex. A true and complete list of such Predecessor Transfer Agreements is set forth in the Annex. With respect to the portion (if any) of the Transferred Rights that Seller acquired pursuant to Predecessor Transfer Agreements relating to par/near par loans, Seller acquired such portion of the Transferred Rights from Immediate Prior Seller pursuant to a document or documents substantially in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any), which document(s) effected the transfer of such portion of the Transferred Rights from Immediate Prior Seller to Seller pursuant to and in accordance with the terms of the Credit Agreement. A true and complete list of such Predecessor Transfer Agreements between Seller and Immediate Prior Seller is set forth in the Annex.

(s) (i) If "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary, and if a proof of claim was filed individually by Seller or any Prior Seller (i.e., not by the Agent on behalf of the Lenders), Seller provided to Buyer, on or prior to the Settlement Date, a true, correct and complete copy of the Proof of Claim; and

(ii) If as of the Trade Date Buyer was not a Lender and if "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Seller provided to Buyer, on or prior to the Settlement Date (A) the Credit Agreement and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and (B) any other Credit Documents reasonably requested by Buyer and set forth in the Annex. A true and complete list of the Credit Documents specified in the immediately preceding sentence is set forth in the Annex.

(t) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i) Except for consents and waivers given by Lenders generally pursuant to and in accordance with the Credit Agreement, Seller has not given its consent to change, nor has it waived, any term or provision of any Credit Document or the Predecessor Transfer Agreements (if any), including with respect to the amount or time of any payment of principal or the rate or time of any payment of interest; OR

(ii) Except for consents and waivers given by Lenders generally pursuant to and in accordance with the Credit Agreement, neither Seller nor any Covered Prior Seller has given its consent to change, nor has it waived, any term or provision of any Credit Document or the Predecessor Transfer Agreements, including with respect to the amount or time of any payment of principal or the rate or time of payment of interest.

(u) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i) Seller is not a party to, or bound by, any document or agreement (other than (A) the Credit Documents to which all Lenders are party, or by which all Lenders are bound, (B) the Predecessor Transfer Agreements (if any), (C) the other documents, if any, set forth in Section B of the Transaction Specific Terms and (D) orders entered in the Bankruptcy Case (if any) by which all Lenders are bound) that could materially and adversely affect the Transferred Rights, the Assumed Obligations or Buyer's rights and remedies under this Agreement; OR

(ii) Neither Seller nor any Covered Prior Seller is a party to, or bound by, any document or agreement (other than (A) the Credit Documents to which all Lenders are party, or by which all Lenders are bound, (B) the Predecessor Transfer Agreements, (C) the other documents, if any, set forth in Section B of the Transaction Specific Terms and (D) orders entered in the Bankruptcy Case by which all Lenders are bound) that could materially and adversely affect the Transferred Rights, the Assumed Obligations or Buyer's rights and remedies under this Agreement.

(v) As specified in the Transaction Summary and Section B of the Transaction Specific Terms, either:

(i) Seller makes the representation and warranty set forth in Section B of the Transaction Specific Terms as to the status and the filing of the Proof of Claim and the setting of the Bar Date; OR

(ii) Seller makes the representation and warranty set forth in Section B of the Transaction Specific Terms as to the status and the filing of the Proof of Claim and the setting of the Bar Date, which representation and warranty assume the truth and accuracy of the representations and warranties made to Seller by Immediate Prior Seller in the Predecessor Transfer Agreements between Seller and Immediate Prior Seller.

(w) Except as set forth in the Annex, Seller has not received any written notice other than those publicly available in the Bankruptcy Case (if any) or otherwise, that (i) any payment or other transfer made to or for the account of Seller from or on account of Borrower or any Obligor under the Transferred Rights is or may be void or voidable as an actual or constructive fraudulent transfer or as a preferential transfer or (ii) the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any Impairment.

4.2 Except as expressly stated in this Agreement and the Assignment, Seller makes no representations or warranties, express or implied, with respect to the Transaction.

4.3 Seller acknowledges that: (a) its sale of the Transferred Rights to Buyer is irrevocable; (b) Seller shall have no recourse to the Transferred Rights; and (c) Seller shall have no recourse to Buyer, except for (i) Buyer's breaches of its representations, warranties or covenants and (ii) Buyer's indemnities, in each case as expressly stated in this Agreement.

5. **Buyer's Representations and Warranties**

5.1 Buyer represents and warrants to Seller (as of the Settlement Date and, where specifically indicated, the Agreement Date) that:

(a) Buyer (i) is, and was on the Agreement Date, duly organized and validly existing under the laws of its jurisdiction of organization or incorporation, (ii) is, and was on the Agreement Date, in good standing under such laws and (iii) has, and had on the

14