REED SMITH LLP                                          Hearing Date: December 3, 2008
  Andrea Pincus, Esq.
  Michael J. Venditto, Esq
599 Lexington Avenue
New York, NY  10022
Tel:  212-521-5400
Fax:  212-521-5450
    apincus@reedsmith.com
    mvenditto@reedsmith.com

*Counsel to the University of Pittsburgh – Of the Commonwealth System of Higher Education*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                    :

In re                                                    :        Chapter 11
                                                         :
LEHMAN BROTHERS HOLDINGS INC., *et al.*,    :        Case No. 08-13555 (JMP)
                                                         :        (Jointly Administered)
                                          Debtors.       :
                                                         :        Refers to Dkt. No. 1498
----------------------------------------------------------------x

**OBJECTION OF THE UNIVERSITY OF PITTSBURGH**
**TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS  105**
**AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR**
**THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF**
**PREPETITION DERIVATIVE CONTRACTS**

The University of Pittsburgh – Of the Commonwealth System of Higher Education (the

"University") hereby objects to the Debtors' Motion ("Motion") [D.I. 1498] for an Order

Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures For The

Settlement or Assumption and Assignment of  Prepetition Derivative Contracts.   In support of

its objection, the University respectfully represents as follows:

1.        On September 15, 2008 and periodically thereafter (the "Petition Date"), the

Debtors commenced their respective Chapter 11 Cases.   The Debtors' chapter 11 cases have

been consolidated for procedural purposes only and are being jointly administered pursuant to

Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.   Each of the Debtors has been

authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

2.     On November 13, 2008, Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors") filed their Motion, seeking entry of an order establishing and authorizing terms and procedures for the assumption and assignment of prepetition derivative contracts.

3.     While paying lip service to the requirements of section 365 of the Bankruptcy Code, these proposed procedures would violate the legal and contractual rights of counterparties to derivative contracts with the Debtors ("Derivative Contracts").  Indeed, through the Motion Debtors essentially concede that one of the primary purposes of these procedures is to prevent derivative counterparties ("Counterparties") from exercising the "safe harbor" protections guaranteed to them by various provisions of the Bankruptcy Code.  Motion ¶10 at 5.  The significance of these Safe Harbor Protections to the orderly functioning of world financial markets has been recognized repeatedly by Congress.[1]

4.     The Debtors, however, would have this Court eliminate those protections under the guise of approving "procedures designed to promote efficiency and maximize value for the Debtors' estates." Motion ¶12 at 6.  Debtors, however, entirely fail to address the resulting risks to Counterparties of what are, in fact, inadequate procedures.  Such procedures include negligible notice periods, de minimus disclosures, failure to provide adequate assurance of future performance by proposed assignees of Debtors' positions in open Derivative Contracts, and impermissibly circumscribed rights to object to or consent to assignments. Further, the contemplated procedures would not provide adequate notice to affected Counterparties nor an

---

[1]     These protections are set forth in sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 555; 556; 559; 560; and 561 of the Bankruptcy Code and are hereinafter collectively referenced as the "Safe Harbor Protections." Although these protections date back more than two decades, they were most recently extended and refined by Congress in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (P.L. No. 109-8) and the Financial Netting Improvements Act of 2006 (P.L. No. 109-390).

opportunity for them to be heard before their contractual rights would be deemed modified and, for open Derivative Contracts, potentially substantially impaired by exposure to counterparty risk for which they have neither bargained nor consented. As written, the proposed procedures for assumption and assignment or termination of open Derivatives Contracts trample on the due process rights of Counterparties, and should not be approved by this Court. For the reasons discussed herein, the Court cannot permit the Debtors to unilaterally re-write the Bankruptcy Code or eliminate fundamental protections for the financial markets, all in the name of expediency.

5.      Additionally, the Motion seeks general approval for the resolution of disputes relating to terminated Derivative Contracts, particularly where Counterparties have failed to make termination payments to the Debtors or may have set off against collateral or property to satisfy amounts owed by the Debtors. Motion ¶11 at 6 and ¶13 at 7. The Debtors' expressed intent is "to reduce the costs associated with the assumption and assignment of Derivative Contracts and the settlement of claims arising from Terminated Derivative Contracts, as well as to hasten the collection of payments owed to the Debtors." Motion ¶15 at 7. Debtors seek broad authority to (a) enter into and consummate agreements with respect to Terminated Derivative Contracts, (b) fix termination payments, (c) provide releases, and (d) liquidate collateral or margin payments held by Debtors or Counterparties. Motion ¶19 at 12. To the extent that such authority is limited to agreements that the Debtors actually negotiate and resolve to the mutual satisfaction of both the Debtors and the Counterparties, the University has no objection. However, the proposed Termination and Settlement Procedures fail to provide for a dispute resolution process for identifying or settling any outstanding claims associated with Terminated Derivative Contracts. The University would expressly and fully reserves the right to make claims and to assert all defenses to any such dispute, and further reserves all statutory and contractual rights in the event any dispute that may arise concerning the University cannot be consensually resolved.

**Background**

6.    The University is a non-sectarian, coeducational, state-related, research university.  The University derives its corporate existence under the laws of the Commonwealth of Pennsylvania (the "Commonwealth") by reason of an act of the State Legislature of the Commonwealth establishing an "Academy or Public School in the town of Pittsburgh" on February 28, 1787 and from the act of February 18, 1819 incorporating the "Western University of Pennsylvania."  On July 11, 1908, the name was changed to "University of Pittsburgh" by order of the Court of Common Pleas of Allegheny County.  Because a strong system of private higher education existed in the Commonwealth and it was the intention of the Commonwealth to provide quality education at reasonable cost to Pennsylvania residents, the commonwealth elected to provide significant financial support to four existing private universities, including the University of Pittsburgh.  On July 28, 1966, the Pennsylvania State Legislature enacted the "University of Pittsburgh-Commonwealth Act" which changed the name of the University to "University of Pittsburgh – Of the Commonwealth System of Higher Education" and established the University as an instrumentality of the Commonwealth to serve as a state-related institution of the Commonwealth System of Higher Education.  The Commonwealth appoints twelve (12) members of the University's fifty-one (51) member Board of Trustees, and all of the Commonwealth Trustees are among the thirty-six (36) voting members of the University's Board of Trustees.

7.    The University's primary campus is located in Pittsburgh, Pennsylvania, and the University has four other campuses located in western Pennsylvania. The University offers approximately 425 distinct degree programs and additionally offers numerous combined major, dual, joint and cooperative degree programs.  The University's full-time equivalent enrolment in Fall Term 2007 was 22,766 undergraduate students and 8,021 graduate students.  In support of its educational and research programs, the University employs 12,224 full-time and part-time faculty, research associates and staff.

8.    For the fiscal year ended June 30, 2008, the University had total net assets of approximately $3.14 billion.  The University has long-term credit ratings of "AA" by Standard & Poor's Ratings Services and "Aa2" by Moody's Investors Service, Inc.

9.    The University and Lehman Brothers Special Financing Inc. (" LBSF") entered into a certain ISDA Master Agreement dated as of August 3, 2000 (the ISDA Master Agreement, the Schedule to the ISDA Master Agreement and all Exhibits thereto, as amended, are collectively referred to herein as the "Pittsburgh Master Agreement").

10.    Each Interest Rate Swap is memorialized by a separate confirmation (collectively, the "Confirmations") and together with the Pittsburgh Master Agreement constitutes one integrated agreement.

11.    With respect to each of the Confirmations, LBSF is identified as "Party A," also known as the floating rate payer, and LBHI is identified as the Credit Support Provider and Specified Entity for all of LBSF's obligations under the Pittsburgh Master Agreement. Confirmations prior to August 2004 impose no collateral posting requirements on the University, only on Party A.

12.    The Pittsburgh Master Agreement was entered into by the University in order to effect interest rate hedges in connection with the issuance of its $200,000,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, consisting of $100,000,000 Series A of 2000 Bonds (the "2000A Bonds"), $50,000,000 Series B of 2000 (the "2000B Bonds'), and $50,000,000 Series C of 2000 Bonds (the "2000C Bonds").  The 2000A Bonds, 2000B Bonds and the 2000C Bonds are collectively referred to herein as the "2000 Bonds").  Within each series there are multiple maturity dates for the 2000 Bonds, and there are a total of eleven (11) different maturity dates applicable to the 2000 Bonds.

13.    At the time of the issuance of the 2000 Bonds, Lehman Brothers Inc. ("Lehman") served as one of three underwriters for the University's 2000 Bonds.  In addition, Lehman was also selected to serve as the University's remarketing agent for the 2000B and 2000C Bonds.

14.     The 2000 Bonds are variable rate debt instruments, which may operate in a Daily Mode, Weekly Mode, Commercial Paper Mode, Term Rate Mode, Fixed Rate Mode or SAVRS Mode as determined by the University in accordance with the underlying bond documents.  The 2000 Bonds remain outstanding and have and continue to operate in a Weekly Mode.  The Weekly Rate for the Bonds is determined by the assigned remarketing agents for the 2000 Bonds.

15.     In order to hedge the interest rate risk associated with the 2000 Bonds, the University entered into interest rate swaps with notional amounts and expiration dates based on the principal amount and underlying maturity dates of the 2000 Bonds.  In certain instances, the floating rate to be paid by LBSF as the Floating Rate Payer is determined based on the actual bond rate applicable to the hedged bonds, and the related Confirmations also provide for alternative floating rate calculations in the event that Lehman is replaced or terminated by the University as remarketing agent or if the University elects to change the interest rate mode for the 2000 Bonds.

16.     Subsequent to the issuance of the 2000 Bonds, the University has also issued (i) $60,500,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, Series A of 2002 (the "2002A Bonds"), (ii) $29,500,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, Series B of 2002 (the "2002B Bonds") (the 2002A Bonds and 2002B are collectively referred to herein as the "2002 Bonds"), (iii) $150,000,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project Bonds, comprised of $75,000,000 Series A of 2005 (the "2005A Bonds"), $45,000,000 Series B of 2005 (the "2005B Bonds"), and $30,000,000 Series C of 2005 (the "2005C Bonds") (the 2005A Bonds, 2005B Bonds and the 2005C Bonds are collectively referred to herein as the "2005 Bonds") and (iv) $255,000,000 University of Pittsburgh – Of the Commonwealth System of Higher Education University Capital Project and Refunding Bonds, comprised of $150,379,000 Series A of 2007 (the "2007A Bonds") and $104,621,000 Series B of

2007 (the "2007B Bonds") (the 2007A Bonds and the 2007B Bonds are collectively referred to herein as the "2007 Bonds"). The 2000 Bonds, the 2002 Bonds, the 2005 Bonds and the 2007 Bonds are collectively referred to herein as the "Bonds."

17.    All of the Bonds are variable rate demand obligations with essentially the same terms as the 2000 Bonds.  All of the Bonds continue to operate in a Weekly Mode.

18.    Similarly to the 2000 Bonds, the University has entered into corresponding interest rate swaps to hedge the variable rate interest risk associated with each maturity of its outstanding Bonds.  In total, there are more than 50 separate interest rate swaps in effect, with maturities ranging from less than two (2) to more than thirty (30) years.

19.    The University solicited bids for all of its interest rate swaps.  However, in light of the University's underlying interest rate hedging objectives and the direct interrelationship of the interest rate swaps with the Bonds, all of the University's interest rate swaps have been entered into with affiliate organizations associated with the University's Bond underwriters or remarketing agents.

20.    Currently, there are a total of sixteen (16) Interest Rate Swaps outstanding with LBSF, with a notional amount of approximately $244,321,000 having maturities ranging from approximately eighteen (18) to thirty-three (33) years.

21.    Any (i) termination and necessary replacement or (ii) assignment of the Interest Rate Swaps therefore needs to be undertaken by the University with exacting care as such Interest Rate Swaps cannot be readily separated from the University's overall debt financing program.

22.    The Debtors' Motion suggests that Derivative Contracts such as the University's Interest Rate Swaps have not been terminated because the Debtors' are "in the money."  That is an overly simplistic explanation of the derivatives markets. Since the filing of these cases, the University has engaged a swap advisor and special swap counsel and has been working diligently with its Bond counsel, underwriters and remarketing agents so that it can simultaneously terminate and replace the Pittsburgh Master Agreement without adverse impact to the

University's substantial and complex Bond portfolio and at all times remain hedged.  Due to the disruptions in the markets, largely due to Debtors' cases and the sudden impact of a large number of derivative transactions which now need to be replaced, the University cannot predict definitively if and when such terminations can be effectuated.  The pace of this effort and the cautious deliberation required to minimize harm to the University from the LBSF and LBHI bankruptcies is affected by practical considerations including the University's Guidelines for Using Interest Rate Derivatives to Hedge Debt Financings, the sheer number of Confirmations which must be replaced at the same time, the long-term nature of each Confirmation, the total outstanding notional amount under the Pittsburgh Master Agreement, the central role of these interest rate hedges in the University's debt structure, the current state of the financial markets and the University's broader financing program goals and objectives.

23.    The University has repeatedly provided written notices to the Debtors outlining the existing defaults under the Pittsburgh Master Agreement and the reservation of all of its rights, including the right to terminate, under the terms of the Pittsburgh Master Agreement.

### The Motion

24.    In their Motion, the Debtors represent that they are parties to approximately 930,000 derivative contracts (the "Derivative Contracts") in which contractual obligations and values are tied to underlying assets or indices of asset values and subject to movements in the financial markets. Motion ¶8 at 4.  They further acknowledge that in most cases, these Derivative Contracts are "securities contracts," "forward contracts," "repurchase agreements," or "swap agreements" and in some cases were governed by a "master netting agreement," each as defined under the Bankruptcy Code. Motion ¶9 at 4. Consequently, each of the non-Debtor counterparties to these Derivative Contracts are entitled to rely upon the Safe Harbor Protections, which permit them to exercise certain contractual rights triggered by the Debtors' chapter 11 case or financial condition, including the right to terminate the contract and accelerate the

amounts owed thereunder, and to exercise rights of setoff against any collateral in their possession.

25.    The Debtors calculate that approximately 733,000 Derivative Contracts have been terminated in the period between the commencement of these cases and the filing of the Motion (Motion ¶8 at 4), pursuant to contractual rights as well as the Safe Harbor Protections, yet Debtors expressly reserve:

> all rights with respect to any alleged termination of any Derivatives Contract, including the right to assert that a Counterparty who did not terminate promptly after the commencement of these cases waived the right to terminate on account of the Debtors' bankruptcies or financial condition and/or certain alleged terminations were not effective because they were not exercised in accordance with the applicable contractual provisions.

Id.  Debtors offer no support for their a purported right to assert Safe Harbor Protections can be deemed waived.

26.    The Motion targets the approximately 200,000 remaining Derivative Contracts (see Motion ¶¶ 10 - 12 at 5-6) and seeks to deprive the Counterparties to those Derivative Contracts of their statutory right to invoke the Safe Harbor Protections by instead subjecting the open Derivative Contracts to a fast track assumption and assignment procedures through which the Debtors seek Court authority to deem the Safe Harbor Protections waived.  Motion  ¶19(a) – (c), (e) – (g), and (j), at 9 -12.

27.    The denial of this statutory protection is predicated on the Debtors' speculation as to the possible motivation for the actions of these Counterparties.  See, Motion ¶ 11 at 5 – 6. The Debtors surmise that these parties have not terminated their Derivative Contracts "because termination of the Derivative Contract would result in a net payment to the Debtors."  Motion ¶11 at 6.   The Debtors provide no evidence to support their speculation but, in the case of the University, this statement is incorrect for the reasons noted above.

28.     Despite the absence of evidence to support their assumptions of value, the Debtors press the Court to abrogate the Safe Harbor Protections and permit them to assign Derivative Contracts in contravention of their terms and over the objections of the Counterparties.

29.     The Debtors attempt to stifle objections to this process by proposing procedures that would allow the assignment of Derivative Contracts to occur outside the process required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), effectively delegating this Court's oversight of the process to two ratings agencies. These procedures would deny Counterparties their statutory rights, as well as the procedural protections that are intended to protect those rights.  Accordingly, the University objects to the Motion.

### University Of Pittsburgh's Objection

**A.      Objection To Abrogation Of Safe Harbor Protections By Order Of This Court**

30.     As Congress recognized when enacting the most recent refinements to the statutory scheme, the Safe Harbor Protections represent years of work by financial regulators, including the President's Working Group on Financial Markets, the United States Department of the Treasury, the Federal Reserve Board, the Securities and Exchange Commission, the Commodity Futures Trading Commission and the Federal Deposit Insurance Corporation.[2]

31.     Through these years of analysis, review and revisions to the Bankruptcy Code, Congress has sought to expand and clarify the application of the Safe Harbor Provisions to swap agreements and master netting agreements.  Consistently throughout these efforts, Congress has firmly held to the public policy of protecting American financial markets and institutions from the ripple effects resulting from a bankruptcy filing by a major player in the financial markets.[3] As new financial instruments have been developed, Congress has recognized the need to amend

---

[2]  Representative McHenry (N.C.), "Financial Netting Improvements Act of 2006",  Congressional Record (Nov. 15, 2006) p. H8650.ds.

[3] 135 Cong. Rec. S1414 (daily ed. Feb. 9, 1989).

certain aspects of the Bankruptcy Code in order to continue to provide the necessary certainty in complex financial transactions,[4] and to assure counterparties that they will be able to terminate these agreements and exercise contractual liquidation and netting rights if a party to the agreement files for bankruptcy relief.[5]

32.    Most recently, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, signed into law on April 20, 2005, amended the Bankruptcy Code effective October 17, 2005, and contains provisions further expanding the protections for derivative and financial contract transactions.  The Financial Netting Improvements Act of 2006, Pub. L. 109-390, signed into law on December 12, 2006, makes certain technical amendments and clarifications to the various provisions dealing with derivative and financial contract transactions.

33.    During the more than two decades that Congress has refined these Safe Harbor Provisions, it has never imposed the temporal limitation which the Debtors now seek to impose sub rosa through their proposed procedures.  Artificially imposing court-determined deadlines on the exercise of such rights would violate the statutory language and be antithetical to the public policy embraced by Congress.

34.    Section 560 of the Bankruptcy Code,  as amended in 2005, provides:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title  or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation,  or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. …

---

[4] Id. at S1416.

[5] Id. at S1417.

11 U.S.C. §560 (emphasis added).  While the balance of section 560 defines "contractual right," nowhere does it limit exercise of such rights to any time period, nor to any actions that may be taken by the debtors or any other creditors or parties in interest.  Id. Had Congress intended to set such limits or give the Bankruptcy Court the authority to set such limits, it clearly could have done so.  Instead, it has expressly excepted such rights from "operation of any provision of this title or by order of a court" in a bankruptcy proceeding. Id.

35.    Importantly, through the 2005 amendments to the Bankruptcy Code, Section 561 of the Bankruptcy Code was added in its entirety as a further clarification of the scope of Safe Harbor Protections afforded non-debtor parties to master netting agreements, and further underscores the Court's inability to use its powers under Section 105 to curtail temporally or otherwise modify such rights.   Section 561 (a) provides, in relevant part:

> … the exercise of any contractual  right … to cause the termination, liquidation, or acceleration of or to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more (or the termination, liquidation or acceleration of one or more) --
>
> (5) swap agreements; or
>
> (6) master netting agreements.
>
> shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceedings under this title.

11 USC §561(a) (emphasis added).

36.    To the extent Debtors rely on the Court's powers under section 105(a) to abrogate the Safe Harbor Protections with respect to the Interest Rate Swaps and the master netting provisions, under the guise of procedures for settlement and/or assignment and assumption of Derivative Contracts, such reliance is misplaced.  Although section 105(a) provides the Court with broad equitable powers, the Court cannot use section 105 (a) to disregard a specific section of the Bankruptcy Code addressing an issue and to achieve a result not contemplated by the

Bankruptcy Code. <u>See,</u> <u>In re Moon</u>, 385 B.R. 541, 551 (Bankr. S.D.N.Y. 2008) (holding that "[i]t is well settled that a bankruptcy court's equitable powers are not boundless, and they cannot be exercised in direct contravention of provisions of the Code."); <u>see also,</u> <u>In re Momentum Mfg. Corp.</u>, 25 F.3d 1132, 1136 (2d. Cir. 1994) (finding that bankruptcy court's equitable powers are not unlimited and its powers under 105(a) may not be exercised in contravention of Bankruptcy Code's provisions). The relevant sections of the Bankruptcy Code -- whether read separately or in tandem --  expressly prohibit this Court from imposing limitations on such protections for swap agreements and master netting agreements like those between the University and LBSF, and thus protects against the very limitations Debtors seek to impose on the Derivative Contracts by invoking the "all writs" provisions of Section 105(a).  <u>See,</u> *Colliers on Bankruptcy* (15th Ed.) ¶561.04 [2].

37.    Debtors attempt to obfuscate the consequences of their procedures by characterizing the failure to object timely to assignment as tantamount to a voluntary waiver of the statutory rights to Safe Harbor Protections.  Debtors cannot impose through the back door a blanket temporal limitation on rights Congress deemed so critical to the functioning of the financial markets in times of crisis that Congress itself twice prohibited the Court's use of Section 105 as a basis for imposing such relief on swap transactions and master netting agreements.  To the extent the Debtors seek directly or indirectly the authority to abrogate or otherwise modify the Safe Harbor Protections, the Motion should be denied.

**B.    <u>Objection To Adequacy Of Notice In Procedures For Open Derivative Contracts</u>**

38.    Assuming the existence of value in open Derivative Contracts, the Debtors propose to offer open Derivative Contracts for sale and close on transactions "within 24 hours of selecting a bid because prices may undergo material shifts beyond this 24 hour period."  Motion ¶16 at 8.  Counterparties are to be given five (5) business days notice of a proposed transaction by email, fax or overnight delivery.  Any Counterparty that fails to deliver a written objection to the Debtors' counsel in New York City so as to be actually received by Debtors within five (5)

business days of the date of the service of the notice would be deemed to have waived its substantive rights and: (i) to have consented to any cure amounts proposed by the Debtors, (ii) to have agreed that the assignee has provided adequate assurance of future performance, (iii) to have agreed that all defaults have been cured, (iv) to have waived any right to terminate the Open Derivative Contract, and (v) to have agreed that the terms of the Court's order apply to the proposed assignment.  Motion ¶19f at 11.  These procedures deny Counterparties due process and an opportunity to be heard before irreparably losing contractual and statutory rights, and should be denied.

39.    First, the time frame for these procedures are commercially unreasonable and impracticable and may allow for Debtors to deem Counterparties to have waived objections before their objection deadline has in fact expired.  See Motion ¶19 (a) and (e).  For example, if Debtors served a notice on a Monday, the procedures would allow for the assignment of the subject Derivatives Contract on the following Monday, five (5) business days later.  Assuming the Counterparty received the notice on the day it was served, the Counterparty also would have until the following Monday to object. The Motion fails to address the fact that a Counterparty's right to object timely may be overcome or terminated when the Debtors' authorization to assume and assign the contracts attaches.  If the notice is delivered by overnight courier, a Counterparty's actual notice and objection deadline could exceed the time frame in which Debtors would arguably have authorization to assume and assign the subject contract.  The Motion fails to define when service of a notice is effective.  The Motion in effect requires an instantaneous objection upon receipt of the notice; otherwise, the counterparty risks being deemed to have consented to assignment, adequate assurance, and elimination of the Safe Harbor Protections.

40.    Second, compounding the defective notice provisions, the Motion fails to provide a mechanism for resolving disputes over the timing of notice and objections before Debtors may effectively assign a Derivative Contract, and does not provide any opportunity for judicial

oversight before Debtors simply assume no objections have been timely filed and thereupon take actions to eliminate the legal and contractual rights of Counterparties.

41.     Third, the time frame for delivery of notices with up to 100 Derivative Contracts contained therein is simply too short a period for reasonable review of the disclosures it may contain and analysis of the same in connection with complex financial investments and portfolios.  While a transfer may be effectuated within days, the non-debtor parties, as in the case of the University, would have to live with a substituted counterparties for years, if not decades. Counterparties must be able to analyze the impact of any proposed assignment in the context not only of the actual underlying transaction but also the impact on the related institutional financial structure.   In major institutions, the internal controls may require reviews at multiple levels among multiple parties. The Debtors' contemplated timeframe would be entirely insufficient due to the complex nature and size of the financial structures, the number of parties involved and the requirements of the governing documents.

42.     Due process requires that the Court provide "notice reasonably calculated, under all the circumstances, to apprise interested parties" of proceedings and afford them an opportunity to present their objections.  See, Jones v. Flowers, 547 U.S. 220, 226 (2006)(quoting Mullane v. Central Hanover Bank & Trust Co., 339 U. S. 306, 314 (1950).  Five (5) business days notice of the assignment of a 30 year contract involving hundred of millions of dollars of financial exposure is simply inadequate. Logistically, the procedures the Debtors envision occuring in this short period are unworkable.  But adding a day or two to make them technically feasible still leaves them wholly inappropriate and would not afford counterparties any meaningful opportunity to respond and object.

43.     The significance of the due process concerns is magnified by the substantive statutory and contractual provisions that Debtors would have deemed waived in the absence of a timely response. The procedures detailed in the Motion are not reasonably calculated, under the circumstances, to apprise Counterparties of the consequences of the actions contemplated by the Debtors and should, therefore, be denied.

C.    <u>Objection To Assignment Of Derivative Contracts Without Counterparty Consent</u>

44.    Pursuant to Section 365(c) of the Bankruptcy Code, Debtors cannot assume and assign an agreement in cases in which "applicable law" other than the Bankruptcy Code excuses the non-debtor party from being compelled to accept performance from or render performance to anyone other than the Debtors, absent that party's consent. <u>See</u> 11 U.S.C. §365(c)(1).

45.    While the Bankruptcy Code does not define "applicable law," the underlying concept of  is "that a contract counterparty might be prejudiced if contractual obligations were to be satisfied (or purportedly satisfied) by a person or entity other than the one from whom the contract counterparty originally was expecting to receive performance." <u>See</u> <u>eg.</u>, <u>In re Adelphia Communications Corp.</u> 359 B.R. 65,73-74 (Bkrtcy. S.D.N.Y. 2007).  Personal service contracts are an example of those subject to such applicable law, and may be extended to contracts between corporate entities.  <u>See,</u> <u>Nassau Hotel Co. v. Barnett & Barse Corp.</u>, 162 A.D. 381, 384 (N.Y. App. Div. 1914) (finding that hotel lease was an unassignable personal contract and stating that the reason that underlies the rule is that "a party has the right to the benefit contemplated from the character, credit, and substance . . . of him with whom he contracts," and that original contract party's long and successful experience in the business "was undoubtedly an inducing cause for plaintiff's making the agreement in question); <u>see also</u> <u>Ford, Bacon & Davis, Inc. v. Holahan</u>, 311 F.2d 901, 904 (5th Cir. 1962) (finding that a contract in which a firm agreed to perform a variety of services, ranging from the preparation of engineering reports to financial services and legal advice, was a personal service contract that could not be assigned without consent because those services "were not merely mechanical, capable of successful completion by someone picked at random, or necessarily by other firms engaged in the same type of business").  Further, the universe of law that can constitute "applicable law" is not limited to law applicable to personal service contracts.  <u>See,</u> <u>In re Adelphia Communications Corp.</u> 359 B.R. at 74.; <u>see also</u> <u>In re Pioneer Ford Sales, Inc.</u>, 729 F.2d 27, 29 (1st Cir. 1984); <u>In re Braniff Airways Inc.</u>, 700 F.2d 935, 943 (5th Cir. 1983).

- 16 -

46.     Moreover, even if this Court finds non-bankruptcy law does not otherwise prohibit assignment of Derivative Contracts without Counterparty consent, sections 365(c) and (f) of the Bankruptcy Code do not mandate that Debtors be allowed to assign executory contracts over the objection of Counterparties. See 11 U.S.C. §§365 (c ) and (f). The Bankruptcy Code merely permits such assignment subject to Court approval, and then only if Debtors can both cure defaults and provide adequate assurance of future performance by the assignee. Id.; see also Ford Motor Co. v. Claremont Acquisition Corp., Inc. (In re Claremont Acquisition Corp., Inc.), 186 B.R. 977, 983-986 (Bankr. C.D. Cal. 1995) (in determining whether a non-debtor party's refusal to consent to an assignment is reasonable, the court should balance fairness to the non-debtor party with maximizing the bankruptcy estate; holding  that the non-debtor party presented substantial evidence exhibiting the assignee's serious deficiency in one or more performance related criteria and therefore its refusal to consent to the assignment was reasonable).

47.     In addition, where consent to assignment is contractually required, even in the absence of applicable non-bankruptcy law enforcing such restrictions, the Court should not authorize assignment of executory contracts where such assignment might prejudice the counterparty. See In re Adelphia Communications Corp. 359 B.R. at 73. As a threshold matter, before turning to the requirement of adequate assurance, the procedures should provide for the Court to consider the prejudice to Counterparties and the reasonableness of withholding consent to assignment, before determining whether or not to approve of an assignment that would otherwise require consent.

48.     Under applicable New York law, the Pittsburgh Master Agreement is not assignable because non-bankruptcy law would excuse the University from accepting performance from a counterparty-assignee to which it did not consent.  The Derivative Contracts were entered into with Debtors based on trust and confidence in Lehman's specialized knowledge, skill, expertise and judgment in complex swap agreements of this nature, along with the long-standing relationships with the University as financial advisor, Bond underwriter and remarketing agent. As such, under applicable law, they cannot be assigned without the

Counterparty's consent.  Lehman's expertise, intimate knowledge of the University's financial objectives and debt structure, along with its ongoing close working relationship was clearly an inducement for Counterparties to enter into the Derivative Contracts with Debtors and, in the spirit of personal service contracts, rely on Lehman's professional judgment and expertise of the Debtors family of companies and their employees.  Counterparties who placed their trust and trades in Debtors' hands now should not be forced to accept the substitution and risks of another unknown entity having no knowledge or appreciation of the interrelationships of the Derivative Contracts with the Bonds, especially one from which there is no adequate assurance of future performance.

49.    For bilateral over-the-counter derivative transactions where mutual obligations may be required over years if not decades, control over the identity of the counterparty and the ability to manage specific associated counterparty risks is of paramount importance – assignment of such contracts without the counterparty's consent may well subject the counterparty to prejudice and undue risk. The critical importance of managing risk by restricting assignment without consent  is demonstrated in the express language of the ISDA Master Agreements which conditions any transfer of a party's interests and obligations on the prior written consent of the remaining counterparty. Section 7 of the Pittsburgh Master Agreement (the standard consent provision in the published form of ISDA Master Agreement) thus conditions the effectiveness of any assignment on the University's prior written consent and, therefore, actual written consent would be a condition to any assignment by the Debtors.[6]

50.    Significantly, the University and LBSF negotiated several revisions of the published form of ISDA Master Agreement, but did not choose to amend or otherwise disturb the Section 7 consent requirements. To permit the Debtors to assign the Pittsburgh Master

---

[6] The paramount importance of counterparty consent in writing to assignment of position in interest rate hedges is further evidenced by the  ISDA Novation Protocol II published to implement a uniform process through which consents to transfers are obtained and to establish consequences between parties for such transfers. See, www.isda.org/whatsnew/pdf/isdastatement.pdf .

Agreement without the University's consent would be to allow assignees to modify the contract. Such modification is not permitted under the Bankruptcy Code, which requires assignees to take assignment of the contract as written.  See AGV Prods., Inc. v. Metro-Goldwyn-Mayer, Inc., 115 F.Supp.2d 378, 391 (S.D.N.Y. 2000) (finding that "under the law of bankruptcy a contract cannot be assumed in part or rejected in part."); see also In re Leslie Fay Cos., Inc., 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) ("If an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens.").

51.    These Derivative Contracts are not fungible, yet Debtors fail to address the highly customized and privately negotiated nature of these over-the-counter Derivative Contracts, and the parties' election to transact with specific counterparties that meet the institutional needs and requirements for such transactions.  Importantly, interest rate transactions are two-way agreements through which payment obligations between the parties, as well as collateral posting obligations, if any, may reverse time and again during the life of the agreement.  Relevant factors in a party's decision whether or not to consent to an assignment may include, among other things, funding costs, credit exposure concerns, collateral, netting, taxes, operational concerns, regulatory risks, legal risks (including changes in applicable law arising from jurisdiction of assignee or collateral posted to the same), availability of legal opinions, transfer to assignee of margin payments or collateral previously posted with Debtors, accounting, relationships and other considerations relating to the Debtors or assignee as may be relevant to the balance of the contract term.

52.    Even if this Court were to find that the exception to assignment set out in 365(c ) (1) does not apply to the Pittsburgh Master Agreement, assignment of the contract could materially prejudice the University and therefore should not be permitted without the University's consent.  Derivative Contract parties like the University, which expressly bargained for protection against random assignment without their consent, cannot be forced to accept a new counterparty that does not fit the respective institution's investor risk profile and which cannot provide adequate assurance of future performance.  Importantly (and as discussed further below),

Debtors' Motion fails to provide any mechanism for satisfying this precondition of assignment as required by section 365(f) of the Bankruptcy Code.  See, 11 U.S.C. §365(f).

53.    Moreover, Debtors' Motion fails to provide for a hearing in the event of objections to assignment which cannot otherwise be resolved between the parties, and instead simply asks for authority to assign contracts where either no objection has been timely made, or where consent cannot be obtained.  The proposed procedures could enable the Debtors' to circumvent the requirements of Section 365(f) entirely unless a Counterparty makes a timely objection during the highly circumscribed notice period.  11 U.S.C. §365(f).  Under such circumstances, deeming the lack of response to be a waiver of statutory rights and and/or consent to the proposed transaction is patently improper and should be rejected. At a barest minimum, Counterparties should in no way forced to accept an assignment by default.

54.    The very fact of Debtors' bankruptcy cases demonstrate the critical nature of the counterparty credit risk analysis, which in this moment of global financial crisis requires more attention and oversight, not the short shrift Debtors propose. A balancing of the equities requires that any proposed assumption and assignment that effectively writes out of a Derivatives Contract the express consent requirements for which the parties bargained first must be subject to critical factual review before the Court on the equities of assignment.  In addition, as discussed below, any assignment must also be subject to the rigors of adequate assurance of future performance as mandated by section 365(f),  and fully subject to review by the Court following a hearing on the merits. 11 U.S.C. § 365(f).

**D.    Objection To Procedures For Adequate Assurance Of Future Performance**

55.    Debtors' proposal of an overly simplistic determination of adequate assurance based on nothing more than credit ratings irresponsibly ignores the potentially devastating impact to market participants of the risk of a potential second counterparty failure heaped upon the Debtors' own collapse.

56.    Section 365(f)(2) of the Bankruptcy Code addresses the assignment of executory contracts and unexpired leases, and states, in relevant part:

> (f) (2) The trustee may assign an executory contract or unexpired lease of the debtor, only if
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365 (f)(2).

57.    As such, section 365(f)(2) of the Bankruptcy Code requires debtors to provide adequate assurance of future performance as a condition to assumption and assignment of any contract. See, e.g., In re Wills Motors, Inc., 133 B.R. 297, 302 (Bankr. S.D.N.Y. 1991). Debtors have the burden of showing "adequate assurance of future performance." In re M. Fine Lumber Co., 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008) (citation omitted). Adequate assurance of future performance is determined by existing factual conditions, and the Court may look to many factors in determining what is necessary to provide adequate assurance of future performance under section 365 of the Bankruptcy Code. In re Lafayette Radio Elecs. Corp., 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981); Pan Am. World Airways, Inc. v. Belize Airways Ltd. (In re Belize Airways), 5 B.R. 152, 156 (Bankr. S.D. Fla. 1980).

58.    For example, courts look to the operating experience of the proposed assignee. In re Fleming Cos., Inc., No. 03-10945, 2004 WL 385517, *4 (Bankr. D. Del. Feb. 27, 2004), aff'd, 499 F.3d 300 (3d Cir. Del. 2007) (allowing assignment after assignee established that it had the size, expertise and experience in the business); In re Serv. Merch. Co., Inc., 297 B.R. 675, 682-83 (Bankr. M.D. Tenn. 2002), aff'd, 293 B.R. 169 (M.D. Tenn. 2003) (finding that debtor amply demonstrated adequate assurance of future performance of lease assignee by reviewing financial strength, operating performance, and tenant mix as well as number of locations, employees, and type of sales and business); In re Bygaph, Inc., 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986).

- 21 -

Moreover, courts require a specific factual showing through competent evidence to determine whether adequate assurance of future performance has been provided. See, e.g., In re Haute Cuisine, Inc., 58 B.R. 390, 393-94 (Bankr. M.D. Fla. 1986) (holding that although debtor's evidence would establish adequate assurance of future performance as a facial matter, such evidence lacked sufficient documentation). The statutory requirement of "adequate assurance of future performance by the assignee" affords "needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches after the assignment." Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. 2001).

59.    Here, the Debtors have not met their burden insofar as they have not provided sufficient information to establish that there can and will be adequate assurance of future performance by any assignee for any transaction. The Debtors have not clarified who will assume the liabilities of the subject Derivative Contracts and have set no parameters for the identity and business of a proposed assignee other than a mere credit rating grade from one of several ratings agencies currently under attack for the unreliability of their practices. Essentially, Debtors would substitute the ratings agencies' evaluation of credit risk for the Court's judgment of adequate assurance of future performance. But these rating agencies are not rating an assignee's ability to provide adequate assurance of performance. The rating is based on statistical calculations of a company's likelihood of defaulting on its obligations. The Debtors do not suggest that there is any correlation between that statistic and adequate assurance of future performance.

60.    The Debtors provide in the first instance to assign transactions where an assignee or its credit support provider "shall have a Standard & Poor's or Fitch credit rating equal to or higher than A- or  Moody's credit rating equal to or higher that A3, or any equivalent thereof" and defines assignees with such ratings as "Qualified Assignees." Motion ¶19(a) and (b) at 9. Debtors' Motion also contemplates assignment to entities that are not "Qualified Assignees" but provides no information as to what evidence of adequate assurance they will provide in such circumstances. Motion ¶19(b) and (e) at 9-10.  Debtors' Motion limits adequate assurance

objections only to assignees which are not Qualified Assignees and provides for no objections on any basis for Qualified Assignees. Instead, Counterparties are simply deemed to have received adequate assurance of future performance if Debtors propose an assignment to a Qualified Assignee. Motion ¶19 (b), (c) and (e) at 9-10.

61.     One lesson that has clearly been recently learned by participants in the global financial markets is that ratings agency determinations of credit worthiness and investment grade quality cannot be singularly relied upon in connection with any complex financial products or financial institutions.  Yet, the Debtors make no other provisions for assessing or demonstrating an assignee's actual ability to perform under the Derivative Contracts for the life of the transactions. Simply relying on a rating with no further investigation of proposed assignee's business, finances or credit exposure or other risks is to impose a potential time bomb on the non-debtor Counterparties, in complete disregard of market realities.

62.     Debtors propose a one-size-fits-all ratings standard as a proxy for adequate assurance, regardless of whether the assignee's credit rating may be lower than that of the remaining non-debtor Counterparty, and regardless of whether such a Counterparty would be permitted under its own institutional investment guidelines or other applicable regulations to transact with an entity that comes to the table with a lower credit rating.  Debtors presume that credit ratings alone are sufficient to satisfy the requirements of section 365, delegating the entirety of the Court's discretion to the ratings agencies.  Clearly, ratings agencies were not intended to substitute for judicial review under the Bankruptcy Code.

63.     Debtors must be able to show, clearly and definitively, adequate assurance of future performance of an assignee's ability to perform all obligations that may be required under the subject Derivative Contract, including without limitation all collateral posting obligations, all regular periodic payments under the applicable hedging provisions, delivery of a guarantee by a solvent and credit-worthy guarantor, and to perform such obligations for the life of the contract regardless of whether it has a 1 year term or a 30 year term.  The Motion fails to do this and must be denied for this reason as well.

**E.    Limited Objection To Procedures For Settlement Of Terminated Derivative Contracts**

64.    With regard to Terminated Derivative Contracts, the Debtors principally appear to seek authority to negotiate a resolution of disputes with Counterparties.  To the extent that such authority is limited to agreements that the Debtors actually negotiate with the Counterparties to the mutual agreement of both parties, the University has no objection.  However, these procedures should recognize that all statutory and contractual rights of the University are reserved, and to the extent that any disputes cannot be consensually resolved the University reserves the right to make any claims and to assert all defenses available at law or equity to any such dispute. As written, the procedures do not.

**Reservation Of Rights**

65.    The University reserves its rights to assert such other and further objections as may be warranted including, but not limited to, objections to any proposed modifications by the Debtors following the objections deadline for the Motion.

**Conclusion**

WHEREFORE, University of Pittsburgh  respectfully objects to the Motion and requests that the Court deny the relief requested.


Dated: New York, New York
        November 28, 2008

                              Respectfully submitted,

                              REED SMITH LLP

                              By:  /s/  Andrea Pincus_____
                                   Andrea Pincus
                                   Michael J. Venditto
                                   599 Lexington Avenue
                                   New York, NY  10022
                                   Tel:  212-521-5400
                                   Fax:  212-521-5450

- 24 -

*Counsel to the University of Pittsburgh – Of the
Commonwealth System of Higher Education*

**TO**:

Weil, Gotshal & Manges LLP
  Attention: Lori R. Fife
        Robert J. Lemons
767 Fifth Avenue
New York, New York 10153

Curtis, Mallet-Prevost, Colt & Mosle LLP
  Attention:  Steven J. Reisman
       L. P. Harrison 3rd
101 Park Avenue
New York, New York 10178

Office of the United States Trustee
  Attention: Andy Velez-Rivera
        Paul Schwartzberg
        Brian Masumoto
        Linda Riffkin
        Tracy Hope Davis
33 Whitehall Street, 21st Floor
New York, New York 10004

Milbank, Tweed, Hadley & McCloy LLP
  Attention: Dennis F. Dunne
        Dennis O'Donnell
        Evan Fleck, Esq.
One Chase Manhattan Plaza
New York, New York 10005