Hearing Date and Time: December 3, 2008 at 10:00 a.m (Prevailing Eastern Time)
Objection Date and Time: November 28, 2008 at 4:00 p.m (Prevailing Eastern Time)

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036-8704
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
David S. Elkind
W. Jane Rogers
Morgan E. Bradylyons

Attorneys for Creditor West Corporation

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                     :

**In re**                       :

                     :    Chapter 11 Case No.

**LEHMAN BROTHERS HOLDINGS INC.,**  :

*et al.,*                  :    08-13555 (JMP)

                     :

         **Debtors.**        :    (Jointly Administered)

                     :

-------------------------------------------------------- x

### OBJECTION OF CREDITOR WEST CORPORATION TO DEBTORS' MOTION FOR AN ORDER ESTABLISHING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OR SETTLEMENT OF PREPETITION DERIVATIVE CONTRACTS

Creditor West Corporation ("West"), by its counsel, Ropes & Gray LLP, for its

Objection to the Debtors' Motion for an Order Establishing Procedures for the Assumption and

Assignment or Settlement of Prepetition Derivative Contracts (the "Motion"), respectfully states:

#### Preliminary Statement

1.    This Motion by the Debtors raises important issues relating to swaps and

other derivative contracts. It represents an effort by the Debtors to circumvent the requirements

of section 365 of the Bankruptcy Code (the "Code") relating to the assignment of executory

contracts, and to circumvent the specific provisions of sections 560 and 561 of the Code which

expressly provide that certain rights of parties to swap, derivative and other similar contracts
may not be altered by a debtor, any provision of the Code, or any order of the Court.

2.      Pursuant to their Motion, the Debtors ask, among other things, that this
Court authorize certain "procedures" for the Debtors to assume and assign open derivative
contracts, including swaps.  Among other things, the Debtors' Motion would permit the Debtors
(i) to assume and freely assign any open swap (or other derivative contract) to <u>any</u> third party
with a Standard & Poor's or Fitch credit rating of A- or a Moody's credit rating of A3 (<u>credit
ratings which are actually *lower* than those held by Lehman entities shortly before their own
chapter 11 filings</u>), with any such assignment being deemed, solely by virtue of such credit
ratings, to satisfy the requirement of Bankruptcy Code section 365 of "adequate assurance of
future performance" <u>without any further review of the assignees' financial capability, balance
sheet, or financial exposure</u>.  In addition, the Debtors' Motion would (ii), following the
assignment of an open swap or other derivative contract, cut off the contractual rights of the
party to the contract to terminate the contract as a result of the Lehman defaults, in direct
violation of the agreements and sections 560 and 561 of the Code.  Finally, the Debtors' Motion
would subvert the rights of a non-defaulting party to assert its contractual set-off rights against
the holder of the swap or the other derivative contract following an assignment by Lehman to the
new holder, in violation of the agreements and Code sections 560 and 561.

3.      The Debtors' Motion would undoubtedly serve the convenience of the
Debtors, but it is squarely at odds with the rights of West and other swap participants under the
Code. Specifically:

4.      First, the Debtors' request that they be permitted to assume and assign
open swap agreements to any party with a Standard & Poor's or Fitch credit rating of A- or a

Moody's credit rating of A3 and that such a credit rating be deemed "adequate assurance of future performance." That request is completely at odds with the rights of parties to real "adequate assurance of future performance" under section 365(f) of the Code. Remarkably, the credit ratings which the Debtors propose are *lower* than the ratings which Lehman entities themselves had immediately before their chapter 11 petitions and defaulted on their obligations, and those ratings are plainly no indication of anything, let alone "adequate assurance of future performance." If there is anything that recent events in the marketplace have shown, it is that credit ratings today have little, if any, reliability, particularly in a volatile and rapidly deteriorating market. Under section 365 of the Code, before any contract is assigned to an assignee, the party to that contract has an absolute right to examine, in Court, that proposed assignee's financial condition, its balance sheet, the amount of all contracts which the assignee proposes to take on, the effect of all such obligations upon the assignee's ability to perform over the life of the contracts, changes in the assignees' business, and all other appropriate factors affecting the assignee's ability to perform in the future.

5.    Second, the Debtors' Motion proposes to limit the contractual right of a party to a swap, following a Debtor's default, to terminate that contract at any time, and proposes that the non-defaulting parties to open swap agreements should have no further right to terminate their swaps after the Debtors assign those swaps to another party. Here, the Debtors' motion is directly at odds with sections 560 and 561 of the Bankruptcy Code, which expressly state that the contractual right of a non-defaulting party to a swap agreement to terminate the swap may not be affected or abridged by *any* provision of the Code or by *any* order of the court. Because the liabilities of parties to a swap (such as the interest rate swaps to which West was a party) can change based upon market changes such as rising or falling interest rates or credit conditions

referred to in the swap, swap agreements, including those between West and the Debtors, give the non-defaulting party the essential right, following a default by the other party, to terminate the swap transaction at any time. The non-defaulting party is *not* required to terminate its swap within any fixed or specified period of time, but is instead permitted to wait as long as it deems appropriate to permit the market to recover so that its termination payments upon any such termination will be reduced and so that it will not be penalized by the Debtors' bankruptcy. The Debtors' Motion would fundamentally alter those rights by allowing a debtor to cut off those termination rights upon an assignment to a third party, requiring that the non-defaulting party either terminate before the assignment or not be allowed to terminate at all.

6.      Finally, the Debtors' Motion proposes that any set-off rights which a party may have under a swap agreement will terminate upon the Debtors' assignment of a swap to a third party. Again, the Debtors' motion is in direct violation of sections 560 and 561 of the Code, which expressly provide that the contractual rights of a party to set-off may not be affected by any provision of the Code or by any order of the Court.

7.      Creditor West is a party to two interest rate swaps with Debtor Lehman Brothers Special Financing Inc. ("LBSF") entered into in connection with a senior secured credit facility with Lehman Commercial Paper Inc. ("LCPI"), as both a lender and as administrative agent for a syndicate of lenders. West's swaps clearly and expressly provide, among other things, (i) that, following an event of default by the Debtors, West has the absolute right to terminate its swap transactions at any time prior to maturity; and (ii) that West has the absolute right, in the case of one of the swaps, upon any such termination, to offset any liability which it may have against the present or future liabilities of any Lehman affiliate under the swap agreements or any other agreements, and, in the case of the other swap, to offset against

liabilities of certain Lehman entities under the swap or other agreements and transactions. The
Lehman entities are in breach of the agreements relating to the secured credit facility with West
(which they have refused to perform) and in breach of the swap agreements. Sections 365, 560,
and 561 make clear that the Debtors may not modify, abridge, or re-write West's contractual
termination or set-off rights by assigning the swap agreements to third parties and that the
Debtors may not assign the swap agreements without affording West and other parties an
opportunity to examine the ability of any assignee to perform all obligations under the Swap
Agreements.

## THE FACTS

### A.    Background

8.    Creditor West is a leading provider of outsourced communication
solutions to many of the world's largest companies, organizations, and government agencies.

9.    In October, 2006, West entered into senior secured credit facilities with
Lehman Commercial Paper Inc. ("LCPI"), a subsidiary of Lehman Brothers Holdings Inc.
("LBH"), and a syndicate of financial institutions (collectively with LCPI, the "Lenders"),
pursuant to which the Lenders (including LCPI) agreed to make $250 million of revolving credit
loans (the "Revolving Credit Loans") and $2.1 billion of term loans to West. West relies upon
the Revolving Credit Loans to fund its ongoing operations.

10.    Pursuant to the Credit Agreement among the foregoing parties dated
October 24, 2006 (the "Credit Agreement"), LCPI is the administrative agent for the syndicate of
Lenders. (A copy of the Credit Agreement is submitted as Exhibit A.) Pursuant to the Credit
Agreement, LCPI (and an affiliate of LCPI) are currently obligated to make 11.25% of all
Revolving Credit Loans drawn down by West. In addition, LCPI is further obligated under the
Credit Agreement, at West's request, to make additional "swing line" Revolving Credit Loans to

West in an amount up to $30 million. The Revolving Credit Loan advances were to be made upon one days' notice by West to LCPI requesting each advance, with the exception that "swing line" advances were to be made on the same day such advances were requested. The loans under the Credit Agreement bear interest at a floating rate based either on LIBOR or the prime rate.[1]

11.    The Credit Agreement expressly contemplated that, in order to hedge its interest rate exposure with respect to the loans under the Credit Agreement, West might enter into interest rate swaps with Lehman entities. (Credit Agreement, Exhibit A, pp. 35, 42, 44.) As contemplated by the Credit Agreement, West entered into a number of interest rate swaps, including two interest rate swaps with Lehman Brothers Special Financing Inc. ("LBSF"), an affiliate of LCPI and LBH, which are at issue on this motion. West's obligations to LBSF under the swaps constitute part of West's "Obligations" under the Credit Agreement and are secured by the same collateral securing the loans under the Credit Agreement. The two swaps at issue on this motion which West entered into with LBSF are as follows:

12.    West entered into an interest rate swap with LBSF (the "2006 Swap") memorialized by a confirmation between West and LBSF dated October 25, 2006 (the "2006 Confirmation," a copy of which is submitted as Exhibit B). The 2006 Confirmation, by its terms, expressly incorporated the terms of the International Swaps and Derivatives Association ("ISDA") 1992 Master Agreement (the "ISDA Form"). (Exhibit B, p. 1.)[2]

13.    Pursuant to a confirmation dated September 2, 2008 (the "2008 Confirmation," a copy of which is submitted as Exhibit C), West entered into a further interest rate swap with LBSF (the "2008 Swap," and, together with the 2006 Swap, the "Swaps."). The

---

[1] Although the Credit Agreement provided for loans to be made either based upon a spread over LIBOR or a spread over the prevailing prime rate, at West's election, a majority of the outstanding loans are based upon a spread over LIBOR.

[2] A copy of the ISDA Form appears as part of Exhibit D referred to below, excluding the Supplement thereto.

2008 Confirmation contemplated that the parties would execute the ISDA Form Master
Agreement with certain riders and expressly incorporated that agreement by reference. At or
shortly after execution of the 2008 Confirmation, LBSF prepared the ISDA Form Master
Agreement with the applicable rider for the transaction and forwarded it to West for signature,
and West duly signed and returned the Master Agreement with Supplement to LBSF. (A copy of
the Master Agreement and Supplement executed by West (the "Master Agreement") is submitted
as Exhibit D.)

14.     The 2006 and 2008 Confirmations, the ISDA Form, and the Master
Agreement (collectively, the "Swap Agreements"), clearly and expressly set forth the rights of
the parties relating to the Swaps.

15.     First, under both the 2006 and the 2008 Confirmations, and pursuant to
Section 5(a) of the ISDA Form, events of default by LBSF are defined to include, among other
things, a bankruptcy filing by LBSF or LBH, a default by LBSF or LBH under the agreements
related to certain material indebtedness of LBSF or LBH, or a determination by LBSF not to pay
its obligations when due. (2008 Confirmation, para 1; 2006 Confirmation, para 1; Master
Agreement, sections 5(vi) and (vii), and Schedule, Parts 1(c) and Part 5(m)(v); ISDA Form,
sections 5(vi) and (vii)).

16.     Pursuant to both the ISDA Form and the Master Agreement, following the
occurrence of any such event of default, the non-defaulting party has an absolute right, at any
time, to terminate the swap agreements and transactions. (Master Agreement and ISDA Form,
section 6). Specifically, the non-defaulting party has the right to terminate the agreements, but is
not obligated to do so or to do so within any specified period of time. This right of the non-
defaulting party to elect to terminate or not to terminate the Swaps at any time prior to maturities

of the Swaps is an essential and critical right of a non-defaulting party because the non-defaulting party's rights and obligations pursuant to the swaps, including its obligation to make termination payments upon any termination, can fluctuate dramatically, particularly in markets such as those currently prevailing. The ability of the non-defaulting party to make or defer its termination can allow it to follow the markets and to elect when to make the termination when its termination payments will be reduced in order to minimize the loss resulting from the defaulting party's defaults. Accordingly, under the swap agreements, the non-defaulting party has the absolute right to wait until the market is more favorable to its position before making the decision to terminate a swap and this is a fundamental right belonging to the non-defaulting party.

17.    Pursuant to the 2008 Swap Agreement and the Master Agreement, the parties agreed that, upon any termination of the Swap transactions following an event of default by either party (the "Defaulting Party") the non-defaulting party would have the right to set-off, against its liability, if any, to the Defaulting Party, any and all liabilities of the Defaulting Party or any of its affiliates under the swap agreements, the Credit Agreement, or any other agreements or transactions, and pursuant to the 2006 Confirmation and the related ISDA Form, the parties agreed that the offset right likewise applied to certain Lehman obligations under the Swap or certain other transactions. (2008 Confirmation, p. 7; Master Agreement, section 6 and Schedule, Part 5(f)(i); 2006 Confirmation, p. 1 (incorporating the provisions of the ISDA Form) and ISDA Form, section 6 and section 14, p. 16).

18.    Finally, the ISDA Form and the Master Agreement each provide that the Swaps may not be transferred without the written consent of the other party. (Master Agreement, Schedule, section 5(g); ISDA Form, section 7.)

19.    The rights of the parties to a swap -- the right to assurances of the creditworthiness and future performance of a counterparty, the right of the non-defaulting party to terminate at any time prior to maturity, and the broad right of set-off as set forth in the agreements -- are critical to the parties to a swap. As we shall describe, such rights are also expressly protected by the provisions of the Bankruptcy Code.

**B.    The Lehman Defaults Under the Swaps and the Credit Agreements
And the Damages Incurred and Likely to Be Incurred By West**

20.    On September 15, 2008, LBH filed a petition in this Court pursuant to chapter 11 of the Code. On October 3, 2008, LBSF and various of its affiliates filed chapter 11 petitions, and on October 5, 2008, LCPI and additional Lehman affiliates filed chapter 11 petitions. As set forth above, such filings with respect to LBSF and LBH  constituted events of default under the Swap Agreements.

21.    Since September 16, 2008, LCPI and its affiliate that holds a revolver commitment have almost completely defaulted on their obligations under the Credit Agreement, including their funding obligations as Lenders and the obligations of LCPI as Administrative Agent, causing severe financial loss to creditor West and threatening to cause substantial additional loss to West in the future. Specifically:

(a)    On September 16, 2008, LCPI refused to fund a $5 million "swing line" request which it was obligated to fund under the Credit Agreement;

(b)    On September 16, 2008, West made a request for $5 million under the revolving credit facility[3]; although the LCPI affiliate funded its 9.625% of that request, LCPI failed to fund any portion of its 1.625% commitment;

(c)    On September 22, 2008, West made a $100 million revolving loan request; LCPI and its affiliate refused to fund any portion of their aggregate commitment of 11.25% or $11.25 million of the request;

---

[3] Immediately prior to September 16, 2008, only $15 million was outstanding under the revolving loan facility.

> (d)      On September 29, 2008, West made a request for an additional $130
> million under the revolving loan facility; LCPI and its affiliate refused to
> fund any portion of their 11.25% commitment amounting to $14,625,000.

(Copies of the requests made for funding of the revolving loan and "swing line" commitments,

and the emails reflecting the refusals of LCPI and its affiliate to honor their obligations under the

Credit Agreement, are submitted as Exhibit E.)  As a result of the refusal of LCPI and its affiliate

to fund their commitments under the secured credit facilities, West has been left with an

unfunded revolver commitment of $25,956,250 and a refusal of LCPI to honor its "swing line"

commitment of $30 million.[4]

22.      As a result of the defaults of LCPI, its affiliate, and LBSF, West has

suffered and will in the future suffer substantial damages. As set forth in the accompanying

affidavit of Paul M. Mendlik, Chief Financial Officer of West, sworn to November 26, 2008 (the

"Mendlik Aff."), those damages include (i) added financing and related costs for procuring

revolving substitute revolving loans which LCPI and its affiliate have refused to fund, estimated

to be at least $9.5 million, if such loans can be obtained at all; (ii) the potential damage to West's

business resulting from LCPI's and its affiliate's refusal to honor their funding commitments;

(iii) the costs of obtaining a new administrative agent to replace LCPI; and (iv) the legal and

other costs incurred as a result of LCPI's, its affiliate's, and LBSF's defaults.

## C.      The Debtors' Motion

23.      Pursuant to their Motion, the Debtors ask that this Court authorize certain

"procedures" for the Debtors to assume  and assign open derivative contracts, including swaps.

Among other things, the Debtors' Motion would permit the Debtors (i) to assume and freely

---

[4] West is working with Bank of America to transfer the administrative agency role under the Credit Agreement from
LCPI to Bank of America.  Although Bank of America has agreed to act as a "swing line" lender in place of LCPI, it
has agreed to do so on a discretionary basis only.  Thus, West is no longer guaranteed any "swing line" borrowings
at all and is no longer guaranteed access to same day borrowings.

assign any open swap (or other derivative contract) to <u>any</u> third party with a Standard & Poor's or

Fitch credit rating of A- or a Moody's credit rating of A3 (<u>credit ratings lower than those held by</u>

<u>Lehman immediately prior to its chapter 11 filings</u>), with any such assignment being deemed,

solely by virtue of such credit ratings, to satisfy the requirement of Bankruptcy Code section 365

of "adequate assurance of future performance" <u>without any further review of the assignees'</u>

<u>financial capability, balance sheet, or financial exposure</u>. In addition, the Debtors' Motion

would (ii), following the assignment of an open swap or other derivative contract, cut off the

contractual rights of the party to the contract to terminate the contract as a result of the Lehman

defaults, in direct violation of the agreements and sections 560 and 561 of the Bankruptcy Code

(the "<u>Code</u>"). Finally, the Debtors' Motion would subvert the rights of a non-defaulting party to

assert its contractual set-off rights against the holder of the swap or the other derivative contract

following an assignment by Lehman to the new holder, in violation of the specific provisions of

the agreements and sections 560 and 561 of the Code.

        24.    Remarkably, the Debtors ask this Court for *carte blanche* to assign open

swap agreements to any party with a Standard & Poor's or Fitch credit rating of A- or a Moody's

credit rating of A3 with that rating being deemed "adequate assurance of future performance."

As is shown by the documents annexed as <u>Exhibit F</u>, from at least July 2007 until immediately

prior to their own chapter 11 filings, LBH had Fitch and Moody's credit ratings of A+ and A2

and Lehman Brothers Special Financing Inc. had a Moody's credit rating of A2-- ratings higher

than those proposed for "Qualifying Parties" to "assure" future performance. Surely, Lehman

would not contend that the assignment of swap or other financial agreements to an entity with

such credit ratings as Lehman had immediately before its chapter 11 petitions provides any

"assurance," let alone "adequate assurance," of future performance.

25.    While the relief which the Debtors seek undoubtedly serves the Debtors'

interests, that requested relief plainly violates the rights of West and other parties to swap and

derivative transactions under both their written agreements and the recently adopted provisions

of the Bankruptcy Code.  The Debtors' Motion should be denied.

I.

### THE DEBTORS' MOTION IMPERMISSIBLY SEEKS AUTHORITY TO ASSIGN SWAP AGREEMENTS TO ANY ASSIGNEE BASED SOLELY UPON AN INADEQUATE CREDIT RATING WITHOUT PROVIDING ANY OPPORTUNITY FOR A PARTY TO CONTEST THE ADEQUACY OF THE ASSIGNEE'S FINANCIAL ABILITY TO PERFORM AND THE "ASSURANCES OF FUTURE PERFORMANCE"

26.    The liabilities of parties to swap contracts, like the underlying financial

markets upon which they are based, fluctuate dramatically inamount, particularly in volatile

markets such as those existing today.  A party to a swap agreement can be "out of the money"

today by millions of dollars, but "in the money" at a future time by millions of dollars, and the

payment obligations of the respective parties upon the termination of a swap transaction can be

significant.

27.    By their Motion, the Debtors seek authority to assign open swaps to any

third party with a Standard & Poor's or Fitch credit rating of A- or a Moody's credit rating of A3,

with any such person deemed automatically to provide "adequate assurance of future

performance."  Since the credit rating proposed by the Debtors to "assure future performance" is

lower than the credit rating which the Debtors, themselves, had shortly prior to their own chapter

11 filings, their proposed credit rating for a "Qualified Assignee" is patently inadequate and

insufficient on its face to "adequately assure future performance" of swap agreements.[5]  More

importantly, the Debtors' Motion seeks to impermissibly deny West and other parties to open

contracts their absolute right under Bankruptcy Code section 365 to examine and to contest the

financial condition of the proposed assignee, the assets and liabilities of the proposed assignee

including the totality of obligations being assumed, and the ability of the proposed assignee to

perform the underlying agreement and the other obligations being assumed by that assignee now

and in the future.

28.    As the Debtors acknowledge in their Motion, section 365(f)(2) expressly

provides that an executory contract may be assigned only if the Debtors provide adequate

assurance of future performance by the assignee.  Section 365(f)(2) states:

> (2) The trustee may assign an executory contract or unexpired lease of the debtor
> only if –
>    (A) the trustee assumes such contract or lease in accordance with the
> provisions of this section; and
>    (B) adequate assurance of future performance by the assignee of such
> contract or lease is provided, whether or not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2) (emphasis added).  As the Courts have emphasized, "Congress while

discussing assumption under section 365(b) and the bankruptcy clause under section 365(f),

provided this explanation of adequate assurance:  'If a trustee is to assume a contract or lease, the

courts will have to insure that the trustee's performance under the contract or lease gives the

other contracting party the full benefit of the bargain.'"  In re U.L. Radio Corp., 19 B.R. 537, 541

(Bankr. S.D.N.Y. 1982) (quoting H.R. Rep. No. 95-595, at 348 (1977); S. Rep. No. 95-989, at 59

(1978)).

29.    The Debtors contend that "adequate assurance of future performance" is

shown by any assignee which has a Standard & Poor's or Fitch credit rating of A- or a Moody's

---

[5] Indeed, the Credit Agreement between West and LCPI, itself, requires West to hold its cash in investments with a
Standard & Poor's credit rating of at least A and Moody's credit rating of at least A2.  (Credit Agreement, Exhibit
A, p. 6, section 1.01(h)(definition of "Cash Equivalents")).

credit rating of A3. That is patently untrue. The Debtors, themselves, had higher credit ratings

prior to their chapter 11 petitions, and surely they would not contend that their financial

condition provided "assurances" of any kind of future performance. Moreover, if there is

anything that recent events in the marketplace have shown, it is that credit ratings have little, if

any, reliability in these turbulent and declining markets. While a rating may show something

about an assignee's financial condition at some time in the past, it says little about the assignee's

ability to perform in the future, particularly in a changing and rapidly deteriorating market.

            30.      Moreover, as the cases make clear, under section 365 of the Code, before

any contract is assigned to an assignee, the party to that contract has a right to examine, in Court,

that proposed assignee's financial condition, its balance sheet, the amount of all contracts which

the assignee proposes to take on, the effect of all such obligations upon the assignee's ability to

perform over the life of the contracts, changes in the assignees' business, and all other

appropriate factors affecting the assignee's ability to perform in the future. See, e.g., In re Res.

Tech., Corp., No. 08 C 2425, 2008 WL 4876846, at *4 (N.D. Ill. Nov. 7, 2008) (in considering

section 365(f)(2), the court noted that "[f]actors that courts have considered include financial

data submitted by the debtor or movant, the presence of a guarantee (though it is not required),

industry outlooks, the nature and relationship of the parties, past dealings of the parties, and the

willingness of the parties to fund payments."); In re Memphis-Friday's Assocs., 88 B.R. 830, 841

(Bankr. W.D. Tenn. 1988) (with respect to the assumption of a lease under section 365(b)(1),

"[f]inancial statements, tax returns, bank statements, letters of credit, loan commitments, bonds,

as well as cash are some of the evidence of adequate assurance which could have been offered. ...

The Code requires adequate assurance of future performance. The unsubstantial promises of the

Debtor are insufficient."). As the courts have repeatedly emphasized, the existence of "adequate

assurance of future performance" is a <u>factual</u> determination to be made by the Courts on the basis

of an examination of each proposed assignee on a case-by-case basis.  <u>See, e.g.,</u> <u>Matter of</u>

<u>National Shoes, Inc.,</u> 20 B.R. 55, 59 (Bankr. S.D.N.Y. 1982); <u>In re Lafayette Radio Electronics</u>

<u>Corp.,</u> 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981)("adequate assurance of future performance"

must be determined "by the factual conditions" of each case); <u>In re Ames Departments Stores,</u>

<u>Inc.,</u> 316 B.R. 772, 794-95 (Bankr. S.D.N.Y. 2004)(court's responsibility to examine particular

facts justifying assignment under section 365(f)).

      31.    As the Courts have made clear, "[a]dequate assurance of future

performance are not words of art, but are to be given practical, pragmatic construction.  What

constitutes 'adequate assurance' is to be determined by factual conditions." <u>U.L. Radio Corp.,</u>

19 B.R. at 542.  With respect to the assignment of a lease, "[t]he chief determinant of adequate

assurance of future performance is whether the rent will be paid." <u>In re Bygaph, Inc.,</u> 56 B.R.

596, 605 (Bankr. S.D.N.Y. 1986).  In applying section 365(f)(2), "it is appropriate to evaluate the

financial condition of the assignee and the likelihood that the non-debtor party will receive the

benefit of its bargain from the assignee." <u>In re GlycoGenesys, Inc.,</u> 352 B.R. 568, 578 (Bankr.

D. Mass. 2006).  A creditor has the right to examine a proposed assignee's financial condition <u>in</u>

<u>detail</u> before its contract is assigned.  <u>See, e.g.,</u> <u>U.L. Radio Corp.,</u> 19 B.R. at 542-43; <u>Bygaph,</u>

<u>Inc.,</u> 56 B.R. at 599-600, 605-06.

      32.    Here, the Debtors' proposed "procedure" -- authorizing Debtors to assign

swap agreements to any assignee with a Standard & Poor's or Fitch credit rating of A- or a

Moody's credit rating of A3 -- while possibly suiting the Debtors' convenience or financial

objectives, does not even remotely begin to comply with the requirements of section 365(f)(2).

## II.

## THE DEBTORS ARE NOT ENTITLED TO LIMIT WEST'S ABSOLUTE RIGHT
## UNDER THE SWAP AGREEMENTS TO TERMINATE THE SWAPS AT ANY TIME

33.     As set forth above, the Swap Agreements clearly provide that, following
the defaults by the Lehman entities, West may terminate the Swaps at any time prior to the
maturity of the Swaps.    Because the amount of the termination payments which a non-
defaulting party will be required to make upon termination of a swap as a result of the other
party's defaults can fluctuate significantly, particularly in volatile markets, a non-defaulting
party has the essential right, following a default by the other party, to terminate the agreement at
any time or to defer any decision to terminate so that its termination liabilities will be decreased
and its liabilities resulting from the defaulting party's defaults will be reduced.  This is a
fundamental and essential right belonging to a non-defaulting party under the Swap Agreements.
Here, the Swap Agreements entitled West to terminate the Swaps immediately after the defaults,
or to defer terminating the Swaps for as long as West might determine in the hope that changes
in the market might limit its termination liabilities upon any such a termination.  Under the
agreements, West had, and it has, the absolute right to keep the Swaps open for as long as it
might choose until maturity, or to terminate the Swaps based upon market conditions at any time
prior to maturity.

34.     In violation of West's rights under the Swap Agreements, the Debtors'
Motion asks this Court for an order which would preclude West from terminating the Swaps as a
result of the Lehman defaults at any time after the assignment of the Swaps to a third party.  In
other words, the Debtor proposes that the assignment of the Swaps to a third party will cut off
West's rights to terminate the Swaps at a future time.  This would fundamentally and
impermissibly violate West's rights under the Swap Agreements and under the plain language of

sections 560 and 561of the Code.  Under the Debtors' theory, a non-defaulting party's

contractual rights to terminate at any time prior to maturity can be cut off if the debtor assigns a

swap agreement a day, a month, or a year after filing for chapter 11.

35.     Sections 560 and 561 of the Bankruptcy Code make clear that a

contractual right of termination in a swap agreement following a bankruptcy default by the other

party may not be limited or abridged in any way by the provisions of the Bankruptcy Code or by

any order of the Court.  In terms that could not be more clear, section 560 states that the non-

defaulting party's right of termination resulting from a bankruptcy default shall not be "stayed,

avoided, *or otherwise limited*" by the Code *or by any order of the Court*.  Section 560 states:

> The exercise of any contractual right of any swap participant or
> financial participant to cause the liquidation, termination, or
> acceleration of one or more swap agreements because of a
> condition of the kind specified in section 365(e)(1) of this title or
> to offset or net out any termination values or payment amounts
> arising under or in connection with the termination, liquidation, or
> acceleration of one or more swap agreements shall not be stayed,
> avoided, or otherwise limited by operation of any provision of this
> title or by order of a court or administrative agency in any
> proceeding under this title.

11 U.S.C. § 560 (emphasis added).  Section 561(a) further states:

> (a) Subject to subsection (b), the exercise of any contractual right,
> because of a condition of the kind specified in section 365(e)(1), to
> cause the termination, liquidation, or acceleration of or to offset or
> net termination values, payment amounts, or other transfer
> obligations arising under or in connection with one or more (or the
> termination, liquidation, or acceleration of one or more) –
>> (1) securities contracts, as defined in section 741(7);
>> (2) commodity contracts, as defined in section 761(4);
>> (3) forward contracts;
>> (4) repurchase agreements;
>> (5) swap agreements; or
>> (6) master netting agreements,
> shall not be stayed, avoided, or otherwise limited by operation of
> any provision of this title or by any order of a court or
> administrative agency in any proceeding under this title.

11 U.S.C. § 561(a).

36.    The language of sections 560 and 561 is clear that the rights of a non-defaulting party to terminate its swap in accordance with the language of the agreements may not be altered or in any way "otherwise limited." In enacting sections 560 and 561, Congress sought to preserve the full termination rights of a party under a swap agreement as those rights would have existed under the terms of the agreement outside of bankruptcy. See, e.g., In re Mirant Corp., 314 B.R. 347, 352 n.10 (Bankr. N.D. Tex. 2004) (rejecting claim that swap participant had waived its right to terminate swap because of failure to comply with a court's order in a timely way, emphasizing that "Congress, in enacting sections 560 and related provisions, did not intend that its will would be frustrated by the courts creating barriers to the exercise by a debtor's contract parties of the rights so given them."). As stated in the legislative history, Congress added section 560 "to preserve a swap participant's contractual right to terminate a swap agreement ... in the event that one of the parties to the agreement files a bankruptcy petition or becomes insolvent, or in the event that a trustee or custodian is appointed for the party." H.R. Rep. No. 101-484, at 5 (1990). "For the purposes of Bankruptcy Code sections 555, 556, 559, 560, and 561, it is intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate or accelerate ... swap agreements and master netting agreements with the bankrupt or insolvent party." H.R. Rep. No. 109-31(I), at 133 (2005).

37.    As Congress and the Courts have emphasized, sections 560 and 561, and the certainty they provide that swap and derivative agreements will be honored in accordance with their terms, play an essential role in maintaining stability and certainty in the financial markets. Sections 560 and 561 reflect Congress' determination that termination rights set forth in

swap and derivative agreements must be honored in order to "ensure that swap and forward

contract financial markets are not destabilized by uncertainties regarding the treatment of their

financial instruments under the Bankruptcy Code." H.R. Rep. 101-484, at 1 (1990) As the Court

wrote in In re Board of Directors of Compañía General de Combustibles S.A., 269 B.R. 104

(Bankr. S.D.N.Y. 2001):

> The policy underlying the swap transaction provisions of the
> Bankruptcy Code is not to protect the rights of United States
> creditors entering into swap transactions with foreign corporations,
> but rather those of creditors ... of United States counterparties that
> may be subject to the United States bankruptcy laws. Congress
> saw the need to ensure the ability of United States corporations to
> take advantage of the swap market by reducing the uncertainty
> about the potential impact of a bankruptcy filing in the United
> States of a U.S. party to such a swap agreement.

Id. at 112. The termination rights of parties to a swap agreement are a critical feature of such

agreements. As the Court stated in In re Enron Corp., 306 B.R. 465 (Bankr. S.D.N.Y. 2004),

"[s]wap agreements typically provide the non-defaulting counterparty the right to terminate the

agreement upon the other party's default" and section 560 affords swap participants "a safe

harbor under the Bankruptcy Code to terminate swap agreements with a debtor-counterparty."

Id. at 471-72.

46. 38. Accordingly, the Debtors' Motion, to the extent that it purports to alter or

"otherwise limit" (in the words of section 560) West's right to terminate the Swaps based upon

the Debtors' defaults following assignment to a third party, is in direct violation of sections 560

and 561 of the Bankruptcy Code and should be denied.

## III.

### THE DEBTORS ARE NOT ENTITLED TO IMPAIR
### WEST'S SET-OFF RIGHTS UNDER THE SWAP AGREEMENTS

39.     As set forth above, the agreements governing West's Swaps with Lehman entities give West, in the case of the 2008 Swap, the right to set off against any liabilities which it might have upon an eventual termination of the Swap transactions any liabilities of LCFS, LCPI, LBH, or any of their affiliates under the Swap agreements, the Credit Agreement, or any other agreements or transactions, and in the case of the 2006 Swap, the right to set-off against liabilities of certain Lehman entities under that swap or other transactions.  West already has claims against Lehman entities that likely aggregate more than $9.5 million, and it is likely that West will have substantial additional claims accruing in the future as a result of Lehman defaults which it will be entitled to offset against any Swap termination obligations.

40.     While the Debtors' Motion proposes that creditors be paid any "cure amounts" to which they are entitled, the Motion contemplates that parties incurring future liabilities or losses as a result of the Lehman breaches will have no recourse under their contractually negotiated set-off rights against any new holder of the Swaps to which Lehman assigns its rights.  Put another way, the Debtors' Motion proposes to significantly alter the contractual set-off rights of West, and other parties to swap agreements, by proposing that West will no longer have the right to set off any liabilities which may in the future be owed to it by Lehman entities against its own obligations, if any, under the Swap Agreements, if those agreements are assumed and assigned by Lehman to another party.  The Debtors' request for such relief would allow it to rewrite the set-off provisions of the Swap Agreements in plain violation of sections 560 and 561 of the Code.

41.    Section 560 and 561, both of which are quoted above, provide that the setoff rights of a party to a swap may not be limited by the provisions of the Code or by an order of the Court. Those sections state that a non-defaulting party's set-off rights "shall not be stayed, avoided, or otherwise limited by operation of any provision of [the Bankruptcy Code] or by order of a court or administrative agency in any proceeding under this title." 11 U.S.C. § 560.

42.    Here, West has set-off rights against any claims of the Debtors which it will be entitled to assert upon any future termination of the Swaps, including a termination based upon the Debtors' chapter 11 filings, which constitutes an enforceable event of default under sections 560 and 561 of the Code. The Debtors are not entitled to alter or truncate those set-off rights by assigning the Swap Agreements to another party.

43.    Sections 560 and 561 was adopted by Congress (the latter provision as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005) to preserve the setoff rights of a participant under its swap agreements from encroachment by debtors or the courts. As stated in the legislative history, section 561 is intended "to protect the contractual right of a master netting agreement participant to enforce any rights of termination, liquidation, acceleration, offset or netting under a master netting agreement.... This reflects ... the current treatment of rights under swap agreements under section 560 of the Bankruptcy Code." H.R. Rep. No. 109-31(I), at 132-33 (2005).

44.    As noted in the legislative history pertaining to the adoption of section 560, "U.S. bankruptcy law has long accorded special treatment to transactions involving financial markets, to minimize volatility." H.R. Rep. No. 101-484, at 2 (1990). This special treatment accorded swap agreements reflects Congress' concern that "the swap and forward contract financial markets [not be] destabilized by uncertainties regarding the treatment of their

financial instruments under the Bankruptcy Code." H.R. Rep. No. 101-484, at 1 (1990). As new financial instruments have come into widespread use, Congress has updated the Bankruptcy Code to mitigate market volatility relating to these new instruments. With respect to swap agreements, Congress recognized that, due to the unique nature of swap agreements, "[t]he setoff process, which is at the center of the swap agreement, may be skewed if one of the parties has filed for bankruptcy." H.R. Rep. No. 101-484, at 3 (1990).

45.     Similarly, the Courts interpreting sections 560 and 561 have recognized that the need to maintain certainty and stability in the financial markets justifies departures from traditional bankruptcy law in the case of swaps and other derivative contracts. See, e.g., In re Nat'l Gas Distribs., LLC, 369 B.R. 884, 899 (Bankr. E.D.N.C. 2007) ("The court understands that if contracts traded on a financial market are unraveled, the market itself could become unstable and a domino effect could occur.... [S]etoffs by a swap participant of mutual debt, and claims under a swap agreement, are excepted from the automatic stay.... These exceptions to the trustee's avoidance powers were intended to avoid the greater danger of market disruption and instability in the financial markets[.]") (citations omitted).

46.     The Debtors' Motion proposes to significantly alter West's contractual set-off rights by proposing that West will no longer have the right to set off any liabilities which may in the future be owed to it by Lehman entities against its own obligations, if any, under the Swap Agreements, if those agreements are assumed and assigned by Lehman to another party. The Bankruptcy Code does not entitle Lehman to alter the contractual set-off provisions of the Swap Agreements by assigning those agreements to another party.

## IV.

## THE DEBTORS' MOTION SHOULD ALSO
## BE DENIED FOR ADDITIONAL REASONS

47.    In addition to the grounds set forth above, the Debtors' Motion should also
be denied on each of a variety of additional grounds.

### A.    Assignee Subject to Terms of Agreements

48.    Under section 365 of the Code, a party may only assume and assign an
executory contract *cum onere*, subject to its full terms and conditions except those terms
specifically superseded by the Code; a debtor may not re-write the terms of the contract to be
assigned, and any assignee takes subject to the terms and conditions set forth in the agreement.
Any order of the Court should make clear that any assignment is on the terms and conditions of
the Swap Agreements and that any proposed assignee is subject to the complete terms and
conditions thereof.

### B.    Proposed Time Limits

49.    The Debtors' request that they be permitted to give only five days notice
of any proposed assignment, with only five days to object to the assignment or any cure amount,
is patently inadequate.  A more reasonable amount of time should be allowed.

### C.    The Debtors May Not Assign the Swap Agreements

50.    Where the only material unperformed terms of an agreement are for the
payment of money, the agreement is not deemed to be an executory contract.  Here, the only
material unperformed terms relate to the payment of money obligations.  Accordingly, the
Debtors may not assume and assign the Swap Agreements under section 365 of the Code.  See,
e.g., South Chicago Disposal, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 130 B.R.

162, 165-66 (Bankr. S.D.N.Y. 1991); In re Spectrum Information Technologies, Inc., 190 B.R.

741, 747 (Bankr. E.D.N.Y. 1996).

**D.    Joinder in Other Objections and Preservation of Rights**

51.    West expressly incorporates in this Objection and joins in the objections

filed by other parties to the Motion.

52.    West further reserves its right to assert other and additional objections.

**Waiver of Memorandum of Law**

53.    West requests that the requirement of a memorandum of law under Local

Bankruptcy Rule 9013-1(a) be waived to avoid the submission of unnecessary papers and in light

of the treatment of the issues above.

**CONCLUSION**

54.    For the foregoing reasons, the Debtors' Motion should be denied, together

with such other and further relief as the Court may deem proper.


Dated:  New York, New York
        November 26, 2008

                                            Respectfully submitted,

                                            ROPES & GRAY LLP

                                            By:    /s/      David S. Elkind
                                                   David S. Elkind, Esq. (DE 4054)
                                            W. Jane Rogers, Esq.
                                            Morgan E. Bradylyons, Esq.
                                            1211 Avenue of the Americas
                                            New York, NY 10036-8704
                                            Tel:  (212) 596-9000
                                            Fax:  (212) 596-9090

                                            Attorneys for Creditor West Corporation