CREDIT AGREEMENT

Dated as of October 24, 2006

among

WEST CORPORATION,
as Borrower,

THE LENDERS PARTY HERETO,

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent and Swing Line Lender,

DEUTSCHE BANK SECURITIES INC. and
BANK OF AMERICA, N.A.,
as Syndication Agents,

and

WACHOVIA BANK, NATIONAL ASSOCIATION and
GENERAL ELECTRIC CAPITAL CORPORATION,
as Co-Documentation Agents

LEHMAN BROTHERS INC. and
DEUTSCHE BANK SECURITIES INC.,
as Joint Lead Arrangers

and

LEHMAN BROTHERS INC.,
DEUTSCHE BANK SECURITIES INC. and
BANC OF AMERICA SECURITIES LLC,
as Joint Bookrunners

# TABLE OF CONTENTS

Page

ARTICLE I    DEFINITIONS AND ACCOUNTING TERMS ................................................... 1

    SECTION 1.01.    Defined Terms ................................................................................ 1

    SECTION 1.02.    Other Interpretive Provisions ..................................................... 47

    SECTION 1.03.    Accounting Terms ....................................................................... 47

    SECTION 1.04.    Rounding ...................................................................................... 48

    SECTION 1.05.    References to Agreements, Laws, Etc ......................................... 48

    SECTION 1.06.    Times of Day ............................................................................... 48

    SECTION 1.07.    Timing of Payment of Performance ............................................ 48

    SECTION 1.08.    Currency Equivalents Generally ................................................. 48

    SECTION 1.09.    Change of Currency .................................................................... 49

ARTICLE II    THE COMMITMENTS AND CREDIT EXTENSIONS ................................... 49

    SECTION 2.01.    The Loans ..................................................................................... 49

    SECTION 2.02.    Borrowings, Conversions and Continuations of Loans. ................. 49

    SECTION 2.03.    Letters of Credit .......................................................................... 51

    SECTION 2.04.    Swing Line Loans ........................................................................ 59

    SECTION 2.05.    Prepayments ................................................................................. 61

    SECTION 2.06.    Termination or Reduction of Commitments ................................ 65

    SECTION 2.07.    Repayment of Loans .................................................................... 65

    SECTION 2.08.    Interest ......................................................................................... 66

    SECTION 2.09.    Fees .............................................................................................. 66

    SECTION 2.10.    Computation of Interest and Fees ............................................... 67

    SECTION 2.11.    Evidence of Indebtedness ........................................................... 67

    SECTION 2.12.    Payments Generally ..................................................................... 68

    SECTION 2.13.    Sharing of Payments .................................................................... 70

    SECTION 2.14.    Incremental Credit Extensions .................................................... 70

ARTICLE III    TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY ............. 72

    SECTION 3.01.    Taxes ............................................................................................ 72

    SECTION 3.02.    Illegality ...................................................................................... 75

    SECTION 3.03.    Inability to Determine Rates ....................................................... 75

    SECTION 3.04.    Increased Cost and Reduced Return; Capital Adequacy;
                       Reserves on Eurocurrency Rate Loans ........................................... 75

    SECTION 3.05.    Funding Losses ............................................................................ 77

## TABLE OF CONTENTS
### (continued)

Page

SECTION 3.06.    Matters Applicable to All Requests for Compensation ................ 77

SECTION 3.07.    Replacement of Lenders under Certain Circumstances................ 78

SECTION 3.08.    Survival................................................................ 79

ARTICLE IV    CONDITIONS PRECEDENT TO CREDIT EXTENSIONS ........................... 80

SECTION 4.01.    Conditions of Initial Credit Extension ........................... 80

SECTION 4.02.    Conditions to All Credit Extensions .............................. 82

ARTICLE V    REPRESENTATIONS AND WARRANTIES ............................................. 83

SECTION 5.01.    Existence, Qualification and Power; Compliance with Laws......... 83

SECTION 5.02.    Authorization; No Contravention .................................. 83

SECTION 5.03.    Governmental Authorization; Other Consents....................... 83

SECTION 5.04.    Binding Effect................................................... 84

SECTION 5.05.    Financial Statements; No Material Adverse Effect ................. 84

SECTION 5.06.    Litigation....................................................... 85

SECTION 5.07.    No Default ...................................................... 85

SECTION 5.08.    Ownership of Property; Liens..................................... 85

SECTION 5.09.    Environmental Compliance ........................................ 85

SECTION 5.10.    Taxes............................................................ 86

SECTION 5.11.    ERISA Compliance ................................................ 87

SECTION 5.12.    Subsidiaries; Equity Interests; Borrower Information ............. 87

SECTION 5.13.    Margin Regulations; Investment Company Act ...................... 87

SECTION 5.14.    Disclosure ...................................................... 87

SECTION 5.15.    Intellectual Property; Licenses, Etc ............................ 88

SECTION 5.16.    Solvency ........................................................ 88

SECTION 5.17.    Labor Matters.................................................... 88

SECTION 5.18.    Subordination of Junior Financing ............................... 88

ARTICLE VI    AFFIRMATIVE COVENANTS ..................................................... 89

SECTION 6.01.    Financial Statements ............................................ 89

SECTION 6.02.    Certificates; Other Information.................................. 90

SECTION 6.03.    Notices ......................................................... 91

SECTION 6.04.    Payment of Obligations .......................................... 92

SECTION 6.05.    Preservation of Existence, Etc .................................. 92

## TABLE OF CONTENTS
### (continued)

Page

SECTION 6.06.    Maintenance of Properties ................................................ 92

SECTION 6.07.    Maintenance of Insurance ................................................. 92

SECTION 6.08.    Compliance with Laws ..................................................... 92

SECTION 6.09.    Books and Records ......................................................... 93

SECTION 6.10.    Inspection Rights ......................................................... 93

SECTION 6.11.    Covenant to Guarantee Obligations and Give Security ........ 93

SECTION 6.12.    Compliance with Environmental Laws ............................. 95

SECTION 6.13.    Further Assurances and Post-Closing Conditions ............... 96

SECTION 6.14.    Senior Debt ............................................................... 97

SECTION 6.15.    Designation of Subsidiaries ............................................ 97

ARTICLE VII  NEGATIVE COVENANTS ................................................. 97

SECTION 7.01.    Liens ..................................................................... 97

SECTION 7.02.    Investments ............................................................. 100

SECTION 7.03.    Indebtedness ........................................................... 104

SECTION 7.04.    Fundamental Changes ................................................ 108

SECTION 7.05.    Dispositions ........................................................... 109

SECTION 7.06.    Restricted Payments .................................................. 112

SECTION 7.07.    Change in Nature of Business ....................................... 114

SECTION 7.08.    Transactions with Affiliates ......................................... 114

SECTION 7.09.    Burdensome Agreements ............................................. 115

SECTION 7.10.    Use of Proceeds ....................................................... 116

SECTION 7.11.    Financial Covenants ................................................... 116

SECTION 7.12.    Accounting Changes .................................................. 117

SECTION 7.13.    Prepayments, Etc. of Indebtedness ................................ 117

SECTION 7.14.    Equity Interests of the Borrower and Restricted Subsidiaries ...... 117

SECTION 7.15.    Capital Expenditures .................................................. 117

SECTION 7.16.    Holdings .................................................................. 118

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES ........................... 119

SECTION 8.01.    Events of Default ...................................................... 119

SECTION 8.02.    Remedies Upon Event of Default ................................... 121

SECTION 8.03.    Exclusion of Immaterial Subsidiaries ............................. 122

**TABLE OF CONTENTS**
(continued)

Page

SECTION 8.04.    Application of Funds ................................................................ 122

SECTION 8.05.    Borrower's Right to Cure ........................................................ 123

ARTICLE IX    ADMINISTRATIVE AGENT AND OTHER AGENTS................................ 124

SECTION 9.01.    Appointment and Authorization of Agents .................................... 124

SECTION 9.02.    Delegation of Duties ................................................................ 125

SECTION 9.03.    Liability of Agents .................................................................. 125

SECTION 9.04.    Reliance by Agents ................................................................ 125

SECTION 9.05.    Notice of Default .................................................................... 126

SECTION 9.06.    Credit Decision; Disclosure of Information by Agents ................ 126

SECTION 9.07.    Indemnification of Agents ........................................................ 126

SECTION 9.08.    Agents in their Individual Capacities.......................................... 127

SECTION 9.09.    Successor Agents .................................................................. 127

SECTION 9.10.    Administrative Agent May File Proofs of Claim.......................... 128

SECTION 9.11.    Collateral and Guaranty Matters................................................ 129

SECTION 9.12.    Other Agents; Arrangers; Bookrunners and Managers.................. 129

SECTION 9.13.    Appointment of Supplemental Administrative Agents.................. 130

ARTICLE X    MISCELLANEOUS.......................................................................... 131

SECTION 10.01.    Amendments, Etc.................................................................. 131

SECTION 10.02.    Notices and Other Communications; Facsimile Copies .............. 132

SECTION 10.03.    No Waiver; Cumulative Remedies ............................................ 133

SECTION 10.04.    Attorney Costs, Expenses and Taxes........................................ 134

SECTION 10.05.    Indemnification by the Borrower.............................................. 134

SECTION 10.06.    Payments Set Aside .............................................................. 135

SECTION 10.07.    Successors and Assigns .......................................................... 135

SECTION 10.08.    Confidentiality ...................................................................... 139

SECTION 10.09.    Setoff.................................................................................. 140

SECTION 10.10.    Interest Rate Limitation .......................................................... 140

SECTION 10.11.    Counterparts.......................................................................... 141

SECTION 10.12.    Integration............................................................................ 141

SECTION 10.13.    Survival of Representations and Warranties................................ 141

SECTION 10.14.    Severability .......................................................................... 141

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| SECTION 10.15. | Tax Forms | 141 |
| SECTION 10.16. | GOVERNING LAW | 143 |
| SECTION 10.17. | WAIVER OF RIGHT TO TRIAL BY JURY | 144 |
| SECTION 10.18. | Binding Effect | 144 |
| SECTION 10.19. | Judgment Currency | 144 |
| SECTION 10.20. | Lender Action | 145 |
| SECTION 10.21. | USA PATRIOT Act | 145 |
| SECTION 10.22. | Effectiveness of the Merger; Assignment and Delegation to and Assumption by West | 145 |
| SECTION 10.23. | Delivery of Lender Addenda | 145 |

SCHEDULES

| | |
|---|---|
| I | Guarantors |
| 1.01A | Certain Security Interests and Guarantees |
| 1.01B | Unrestricted Subsidiaries |
| 1.01C | Excluded Subsidiaries |
| 1.01D | Existing Letters of Credit |
| 1.01E | Foreign Subsidiaries |
| 1.01F | Excluded Receivables Management Subsidiaries |
| 2.01 | Commitments |
| 5.05 | Certain Liabilities |
| 5.09 | Environmental Matters |
| 5.10 | Taxes |
| 5.11 | ERISA Compliance |
| 5.12(a) | Subsidiaries and Other Equity Investments |
| 5.12(b) | Borrower Information |
| 7.01(b) | Existing Liens |
| 7.02(f) | Existing Investments |
| 7.03(b) | Existing Indebtedness |
| 7.05(l) | Dispositions |
| 7.08 | Transactions with Affiliates |
| 7.09 | Existing Restrictions |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

*Form of*

| | |
|---|---|
| A | Committed Loan Notice |
| B | Swing Line Loan Notice |
| C-1 | Term Note |
| C-2 | Revolving Credit Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Guarantee Agreement |
| G | Security Agreement |
| H | Opinion Matters — Counsel to Loan Parties |
| I | Intellectual Property Security Agreement |
| J | Prepayment Option Notice |
| K | Lender Addendum |
| L | Mortgage |

## CREDIT AGREEMENT

This CREDIT AGREEMENT ("**Agreement**") is entered into as of October 24, 2006, among WEST CORPORATION, a Delaware corporation (the "**Borrower**" or "**West**"), each lender from time to time party hereto (collectively, the "**Lenders**" and individually, a "**Lender**"), LEHMAN COMMERCIAL PAPER INC., as Administrative Agent and Swing Line Lender, DEUTSCHE BANK SECURITIES INC. and BANK OF AMERICA, N.A., as Syndication Agents, and WACHOVIA BANK, NATIONAL ASSOCIATION and GENERAL ELECTRIC CAPITAL CORPORATION, as Co-Documentation Agents.

### PRELIMINARY STATEMENTS

Pursuant to the Merger Agreement (as this and other capitalized terms used in these preliminary statements are defined in Section 1.01 below), Omaha Acquisition Corp., a Delaware corporation ("**Omaha**"), will merge (the "**Merger**") with and into West with West being the surviving corporation.

The Borrower has requested that substantially simultaneously with the consummation of the Merger, the Lenders extend credit to the Borrower in the form of (i) Term Loans in an initial aggregate amount of $2,100,000,000 and (ii) a Revolving Credit Facility in an initial aggregate amount of $250,000,000. The Revolving Credit Facility may include one or more Swing Line Loans and one or more Letters of Credit from time to time.

The proceeds of the Term Loans and the Revolving Credit Loans made on the Closing Date, together with the proceeds of (i) the issuance of the New Notes and (ii) the Equity Contribution, will be used to pay the Merger Consideration and the Transaction Expenses. The proceeds of Revolving Credit Loans made on or after the Closing Date will be used for working capital and other general corporate purposes of the Borrower and its Subsidiaries, including the financing of Permitted Acquisitions. Swing Line Loans and Letters of Credit will be used for general corporate purposes of the Borrower and its Subsidiaries.

The applicable Lenders have indicated their willingness to lend, and the L/C Issuers have indicated their willingness to issue Letters of Credit, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

### ARTICLE I

### DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"**Acquired EBITDA**" means, with respect to any Acquired Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Acquired Entity or Business (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Acquired Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Acquired Entity or Business.

"**Acquired Entity or Business**" has the meaning set forth in the definition of the term "Consolidated EBITDA".

"**Act**" has the meaning set forth in Section 10.21.

"**Additional Lender**" has the meaning set forth in Section 2.14(c).

"**Administrative Agent**" means LCPI, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"**Administrative Agent's Office**" means the Administrative Agent's address as set forth on Schedule 10.02, or such other address as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified. "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"**Agent-Related Persons**" means the Agents, together with their respective Affiliates, and the officers, directors, employees, agents and attorneys-in-fact of such Persons and Affiliates.

"**Agents**" means, collectively, the Administrative Agent, the Syndication Agents, the Co-Documentation Agents and the Supplemental Administrative Agents (if any).

"**Aggregate Commitments**" means the Commitments of all the Lenders.

"**Aggregate Credit Exposures**" means, at any time, the sum of (a) the unused portion of each Revolving Credit Commitment then in effect, (b) the unused portion of each Term Commitment then in effect and (c) the Total Outstandings at such time.

"**Agreement**" means this Credit Agreement.

"**Agreement Currency**" has the meaning specified in Section 10.19.

"**Applicable Rate**" means a percentage per annum equal to:

(a)    with respect to Term Loans, (i) for Eurocurrency Rate Loans, 2.75% and (ii) for Base Rate Loans, 1.75%.

(b)    with respect to Revolving Credit Loans, unused Revolving Credit Commitments and Letter of Credit fees, (i) until delivery of financial statements for the first full fiscal quarter commencing on or after the Closing Date pursuant to Section 6.01, (A) for Eurocurrency Rate Loans, 2.50%, (B) for Base Rate Loans, 1.50%, (C) for Letter of Credit fees, 2.50% and (D) for commitment fees, 0.50% and (ii) thereafter, the following percentages per

annum, based upon the Total Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 6.02(b):

| Applicable Rate | | | | |
|---|---|---|---|---|
| Pricing Level | Total Leverage Ratio | Eurocurrency Rate and Letter of Credit Fees | Base Rate | Commitment Fees |
| 1 | <5.0:1 | 1.75% | 0.75% | 0.375% |
| 2 | ≥ 5.0:1 but < 5.5:1 | 2.00% | 1.00% | 0.50% |
| 3 | ≥ 5.5:1 but < 6.0:1 | 2.25% | 1.25% | 0.50% |
| 4 | ≥ 6.0:1 | 2.50% | 1.50% | 0.50% |

Any increase or decrease in the Applicable Rate resulting from a change in the Total Leverage Ratio shall become effective as of the first Business Day immediately following the date a Compliance Certificate is delivered pursuant to Section 6.02(b); *provided* that at the option of the Administrative Agent or the Required Lenders, the highest Pricing Level shall apply (x) as of the first Business Day after the date on which a Compliance Certificate was required to have been delivered but was not delivered, and shall continue to so apply to and including the date on which such Compliance Certificate is so delivered (and thereafter the Pricing Level otherwise determined in accordance with this definition shall apply) and (y) as of the first Business Day after an Event of Default under Section 8.01(a) shall have occurred and be continuing, and shall continue to so apply to but excluding the date on which such Event of Default is cured or waived (and thereafter the Pricing Level otherwise determined in accordance with this definition shall apply).

"**Appropriate Lender**" means, at any time, (a) with respect to Loans of any Class, the Lenders of such Class, (b) with respect to Letters of Credit, (i) the relevant L/C Issuers and (ii) with respect to any Letters of Credit issued pursuant to Section 2.03(a), the Revolving Credit Lenders and (c) with respect to the Swing Line Facility, (i) the Swing Line Lender and (ii) if any Swing Line Loans are outstanding pursuant to Section 2.04(a), the Revolving Credit Lenders.

"**Approved Bank**" has the meaning specified in clause (c) of the definition of "Cash Equivalents".

"**Approved Fund**" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"**Arrangers**" means Lehman Brothers Inc. and Deutsche Bank Securities Inc., each in its capacity as a Joint Lead Arranger.

"**Assignees**" has the meaning specified in Section 10.07(b).

"**Assignment and Assumption**" means an Assignment and Assumption substantially in the form of Exhibit E.

"**Attorney Costs**" means and includes all reasonable fees, expenses and disbursements of any law firm or other external legal counsel.

"**Attributable Indebtedness**" means, on any date, in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP.

"**Audited Financial Statements**" means the audited consolidated balance sheets of West and its Subsidiaries as of December 31, 2005, and the related audited consolidated statements of income, stockholders' equity and cash flows for West and its Subsidiaries for such date.

"**Auto-Renewal Letter of Credit**" has the meaning specified in Section 2.03(b)(iii).

"**Base Rate**" means for any day a fluctuating rate per annum equal to the higher of (a) the Federal Funds Rate plus 1/2 of 1% and (b) the Prime Rate.

"**Base Rate Loan**" means a Loan that bears interest based on the Base Rate.

"**Bookrunners**" means Lehman Brothers Inc., Deutsche Bank Securities Inc. and Banc of America Securities LLC, each in its capacity as a Joint Bookrunner.

"**Borrower**" has the meaning specified in the introductory paragraph to this Agreement and includes the surviving company of the merger between Omaha and West to be consummated on the Closing Date.

"**Borrower Permitted Subordinated Debt**" has the meaning specified in Section 7.03(r).

"**Borrowing**" means a Revolving Credit Borrowing, a Swing Line Borrowing, or a Term Borrowing, as the context may require.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York City and, if such day relates to any interest rate settings as to a Eurocurrency Rate Loan, any fundings, disbursements, settlements and payments in respect of any such Eurocurrency Rate Loan, or any other dealings to be carried out pursuant to this Agreement in respect of any such Eurocurrency Rate Loan, means any such day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"**Capital Expenditures**" means, for any period, the aggregate of (a) all expenditures (whether paid in cash or accrued as liabilities) by the Borrower and the Restricted Subsidiaries during such period that, in conformity with GAAP, are required to be included as additions during such period to property, plant or equipment reflected in the consolidated balance sheet of the Borrower and the Restricted Subsidiaries and (b) the value of all assets under Capitalized Leases incurred by the Borrower and the Restricted Subsidiaries during such period; *provided* that the term "Capital Expenditures" shall not include (i) expenditures made in connection with the replacement, substitution, restoration or repair of assets to the extent financed with (x) insurance proceeds paid on account of the loss of or damage to the assets being replaced, restored or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced, (ii) the purchase price of equipment that is purchased simultaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment

being traded in at such time, (iii) the purchase of plant, property or equipment to the extent financed with the proceeds of Dispositions that are not required to be applied to prepay Term Loans pursuant to Section 2.05(b), (iv) expenditures that are accounted for as capital expenditures by the Borrower or any Restricted Subsidiary and that actually are paid for by a Person other than the Borrower or any Restricted Subsidiary and for which neither the Borrower nor any Restricted Subsidiary has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such Person or any other Person (whether before, during or after such period), (v) interest capitalized during such period, (vi) capital expenditures relating to the construction or acquisition of any property which will be or has been transferred to a Person that is not a Loan Party pursuant to a sale-leaseback or other transaction permitted under Section 7.05(f), (vii) expenditures that constitute Permitted Acquisitions or (viii) expenditures made with the Net Cash Proceeds of a Permitted Equity Issuance that was Not Otherwise Applied.

"**Capitalized Leases**" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; *provided* that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"**Cash Collateral**" has the meaning specified in Section 2.03(g).

"**Cash Collateral Account**" means a blocked account established by the Administrative Agent in the name of the Administrative Agent and under the sole dominion and control of the Administrative Agent, and otherwise established in a manner satisfactory to the Administrative Agent.

"**Cash Collateralize**" has the meaning specified in Section 2.03(g).

"**Cash Equivalents**" means any of the following types of Investments, to the extent owned by the Borrower or any Restricted Subsidiary:

      (a)    Dollars, Canadian dollars, Mexican pesos, Euros or any national currency of any participating member state of the EMU, or, in the case of any Foreign Subsidiary, such local currencies held by it from time to time in the ordinary course of business;

      (b)    readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union, having average maturities of not more than 12 months from the date of acquisition thereof; *provided* that the full faith and credit of the United States or a member nation of the European Union is pledged in support thereof;

      (c)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) (A) is organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development or is the principal banking Subsidiary of a bank holding company organized under the Laws of the United States, any state thereof, the District of Columbia or any member nation of the Organization for Economic Cooperation and Development, and is a member of the Federal Reserve System, and (B) has combined capital and surplus of at least $250,000,000 (any such bank in the foregoing clauses (i) or (ii) being an "**Approved**

**Bank"**), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d)       commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(e)       repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer, in each case, having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed or insured by the government or any agency or instrumentality of (i) the United States or (ii) any member nation of the European Union, in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a fair market value of at least 100% of the amount of the repurchase obligations;

(f)       securities with average maturities of 12 months or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government having an investment grade rating from either S&P or Moody's (or the equivalent thereof);

(g)       Investments with average maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's;

(h)       Indebtedness or preferred stock issued by Persons with a rating of "A" or higher from S&P or "A2" or higher from Moody's with maturities of 12 months or less from the date of acquisition;

(i)       instruments equivalent to those referred to in clauses (a) through (g) above denominated in any foreign currency comparable in credit quality and tenor to those referred to above and customarily used by corporations for cash management purposes in any jurisdiction outside the United States to the extent reasonably required in connection with any business conducted by any Restricted Subsidiary organized in such jurisdiction;

(j)       Investments, classified in accordance with GAAP as current assets of the Borrower or any Restricted Subsidiary, in money market investment programs which are registered under the Investment Borrower Act of 1940 or which are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (h) of this definition.

        **"Cash Management Obligations"** means obligations owed by the Borrower or any Restricted Subsidiary to any Lender or any Affiliate of a Lender in respect of any overdraft and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds.

"**Casualty Event**" means any event that gives rise to the receipt by the Borrower or any Restricted Subsidiary of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as subsequently amended.

"**CERCLIS**" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"**Change of Control**" means the earliest to occur of (a) the Permitted Holders ceasing to have the power, directly or indirectly, to vote or direct the voting of securities having a majority of the ordinary voting power for the election of directors of the Borrower; *provided* that the occurrence of the foregoing event shall not be deemed a Change of Control if,

        (i)     any time prior to the consummation of a Qualifying IPO, and for any reason whatsoever, (A) the Permitted Holders otherwise have the right, directly or indirectly, to designate (and do so designate) a majority of the board of directors of the Borrower or (B) the Permitted Holders own, directly or indirectly, of record and beneficially an amount of common stock of the Borrower equal to an amount more than fifty percent (50%) of the amount of common stock of the Borrower owned, directly or indirectly, by the Permitted Holders of record and beneficially as of the Closing Date and such ownership by the Permitted Holders represents the largest single block of voting securities of the Borrower held by any Person or related group for purposes of Section 13(d) of the Exchange Act; or

        (ii)    at any time after the consummation of a Qualifying IPO, and for any reason whatsoever, no "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act, but excluding any employee benefit plan of such person and its Subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), excluding the Permitted Holders, shall become the "beneficial owner" (as defined in Rules 13(d)-3 and 13(d)-5 under such Act), directly or indirectly, of more than the greater of (x) thirty-five percent (35%) of the shares outstanding of the Borrower and (y) the percentage of the then outstanding voting stock of the Borrower owned, directly or indirectly, beneficially by the Permitted Holders, and (B) during each period of twelve (12) consecutive months, the board of directors of the Borrower shall consist of a majority of the Continuing Directors;

*provided, further*, that for purposes of calculating the percentage of outstanding shares of the Borrower owned by the Permitted Holders under this clause (a), or otherwise determining whether any condition specified in this clause (a) has been met, the number of shares of stock of the Borrower, if any, transferred by either Sponsor to any Permitted Holder (other than a Sponsor) shall be excluded; *provided, further*, that upon the occurrence of a Holdings Election Event, references to the Borrower in this clause (a) shall instead be to Holdings; or

(b)    upon the occurrence of a Holdings Election Event, Holdings ceases to own directly, of record and beneficially, 100% of the outstanding Equity Interests of the Borrower; or

(c)    any "Change of Control" (or any comparable term) in any document pertaining to the New Notes or any Specified Junior Financing.

"**Class**" (a) when used with respect to Lenders, refers to whether such Lenders are Revolving Credit Lenders or Term Lenders, (b) when used with respect to Commitments, refers to whether such Commitments are Revolving Credit Commitments or Term Commitments and (c) when used with respect to Loans or a Borrowing, refers to whether such Loans, or the Loans comprising such Borrowing, are Revolving Credit Loans or Term Loans.

"**Closing Date**" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 4.01.

"**Code**" means the U.S. Internal Revenue Code of 1986, and the rules and regulations related thereto.

"**Co-Documentation Agents**" means Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents under this Agreement.

"**Collateral**" means all the "Collateral" as defined in any Collateral Document and shall include the Mortgaged Properties.

"**Collateral and Guarantee Requirement**" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received each Collateral Document required to be delivered on the Closing Date pursuant to Section 4.01(a)(iii) or pursuant to Section 6.11 at such time, duly executed by each Loan Party thereto;

(b)    all Obligations shall have been unconditionally guaranteed (the "**Senior Guarantees**") by each Restricted Subsidiary that is a Domestic Subsidiary and not an Excluded Subsidiary and, upon the occurrence of a Holdings Election Event, Holdings (each, a "**Guarantor**");

(c)    all guarantees issued or to be issued in respect of the Senior Subordinated Notes (i) shall be subordinated to the Senior Guarantees to the same extent that the Senior Subordinated Notes are subordinated to the Obligations and (ii) shall provide for their automatic release upon a release of the corresponding Senior Guarantee;

(d)    the Obligations and the Senior Guarantees shall have been secured by a first-priority security interest in all Equity Interests (other than Equity Interests of (i) Immaterial Subsidiaries, (ii) Unrestricted Subsidiaries, (iii) Excluded Receivables Management Subsidiaries pledged to secure Indebtedness permitted under Section 7.03(t)(i) or (ii) or if the creation of a Lien on the Equity Interests of such Excluded Receivables Management Subsidiary is not permitted or would (including upon foreclosure thereof) result in a change of control (or similar event), default, termination, payment, purchase or repurchase obligation pursuant to the terms of any Receivables

Management Financing, any service agreement (or similar arrangement) required by or entered into in connection with such Receivables Management Financing or any credit support provided by it in favor of any financier of such Receivables Management Financing and (iv) any Restricted Subsidiary pledged to secure Indebtedness permitted under Section 7.03(g)) of each wholly owned Subsidiary directly owned by the Borrower or any Guarantor (other than Holdings) and, upon the occurrence of a Holdings Election Event, the Equity Interests of the Borrower owned by Holdings; *provided* that any required pledges of Equity Interests of a Foreign Subsidiary shall be limited to 65% of the issued and outstanding Equity Interests of such Foreign Subsidiary at any time;

(e)    except to the extent otherwise permitted hereunder or under any Collateral Document, the Obligations and the Senior Guarantees shall have been secured by a security interest in, and mortgages on, substantially all tangible and intangible assets of the Borrower and each Guarantor (including accounts, inventory, equipment, investment property, contract rights, intellectual property, other general intangibles, Material Real Property and proceeds of the foregoing), in each case, with the priority required by the Collateral Documents; *provided* that (i) there shall be no security interests taken in (w) motor vehicles or other assets subject to certificates of title, (x) deposit accounts or securities accounts, (y) Receivables Management Assets owned by, or owing to, any Person (other than the Borrower or a Restricted Subsidiary) or held in trust for the benefit of any such Person, and the Equity Interests of Excluded Receivables Management Subsidiaries and (z) any property or assets specifically excluded from the Collateral under the terms of any applicable Collateral Document, (ii) security interests in real property shall be limited to the Mortgaged Properties, (iii) no documents, agreements, instruments or actions shall be required with respect to assets located in a foreign jurisdiction (including no delivery or recordation of recordable security documents with respect to intellectual property registered in non-U.S. jurisdictions) and (iv) no documents, agreements, instruments or actions shall be required to establish "control" (within the meaning of the Uniform Commercial Code) by the Administrative Agent or any Secured Party of any assets in order to create or perfect any security interests therein or to enforce any such security interest, other than control by delivery or possession to the extent required by the Collateral Documents;

(f)    none of the Collateral shall be subject to any Liens other than Liens permitted by Section 7.01; and

(g)    the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to any Material Real Property required to be delivered pursuant to Sections 6.11 or 6.13 (the "**Mortgaged Properties**") duly executed and delivered by the record owner of such property, (ii) a policy or policies of title insurance issued by a nationally recognized title insurance company insuring the Lien of each such Mortgage as a valid Lien on the property described therein, free of any other Liens except as expressly permitted by Section 7.01, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request, and (iii) such existing surveys, existing abstracts, existing appraisals, legal opinions and other documents as the Administrative Agent may reasonably request with respect to any such Mortgaged Property, *provided* that nothing in this clause (iii) shall require the Borrower to update existing surveys or order new surveys with respect to Mortgaged Property.

The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or surveys with respect to, particular assets if and for so long as, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), (a) the cost of creating or perfecting such pledges or security interests in such assets or obtaining title insurance or surveys in respect of such assets shall be excessive in view of the benefits to be obtained by the Lenders therefrom or (b) with respect to intent to use trademark applications, the creation or perfection of such pledges or security interests is likely to have an adverse effect on the validity of title. The Administrative Agent may grant extensions of time for the perfection of security interests in or the obtaining of title insurance with respect to particular assets (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Loan Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the Collateral Documents.

Notwithstanding the foregoing provisions of this definition or anything in this Agreement or any other Loan Document to the contrary, Liens required to be granted from time to time pursuant to the Collateral and Guarantee Requirement shall be subject to exceptions and limitations set forth in the Collateral Documents as in effect on the Closing Date and, to the extent appropriate in the applicable jurisdiction, as agreed between the Administrative Agent and the Borrower.

"**Collateral Documents**" means, collectively, the Security Agreement, the Intellectual Property Security Agreement, the Mortgages, Security Agreement Supplements, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Section 6.11 or Section 6.13, the Guaranty and each of the other agreements, instruments or documents that creates or purports to create a Lien or Senior Guarantee in favor of the Administrative Agent for the benefit of the Secured Parties.

"**Commitment**" means a Term Commitment or a Revolving Credit Commitment, as the context may require.

"**Committed Loan Notice**" means a notice of (a) a Term Borrowing, (b) a Revolving Credit Borrowing, (c) a conversion of Loans from one Type to the other, or (d) a continuation of Eurocurrency Rate Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A.

"**Company Material Adverse Effect**" means any change, development, circumstance, event or effect that, when considered either individually or in the aggregate together with all other changes, developments, circumstances, events or effects, (a) is materially adverse to the business, properties, assets, financial condition, operations or results of operations of the Borrower and its Subsidiaries taken as a whole, or (b) would prevent the timely consummation of the Merger or prevent the Borrower from performing its obligations under this Agreement; *provided, however*, that to the extent any change or effect is caused by or results from any of the following, it shall not be taken into account in determining whether there has been a "Company Material Adverse Effect" with respect to the Borrower: (i) the announcement of the execution of the Merger Agreement or the performance of obligations required by the Merger Agreement, (ii) changes affecting the United States economy or financial markets as a whole or changes that are the result of factors generally affecting the industries in which the Borrower and its Subsidiaries conduct their business, in each case which do not have a disproportionate effect on the Borrower and its Subsidiaries taken as a whole as compared to other persons in the

industry in which the Borrower and its Subsidiaries conduct their business, (iii) the suspension of trading in securities generally on the New York Stock Exchange or the American Stock Exchange or Nasdaq, (iv) any change in GAAP or interpretation thereof after the date hereof, and (v) the commencement, occurrence, continuation or escalation of any war, armed hostilities or acts of terrorism involving the United States of America, in each case which do not have a disproportionate effect on the Borrower and its Subsidiaries taken as a whole as compared to other persons in the industry in which the Borrower and its Subsidiaries conduct their business.

"**Compensation Period**" has the meaning specified in Section 2.12(c)(ii).

"**Compliance Certificate**" means a certificate substantially in the form of Exhibit D.

"**Consolidated EBITDA**" means, for any period, Consolidated Net Income for such period, plus:

(a)    without duplication and to the extent already deducted (and not added back) in arriving at such Consolidated Net Income, the sum of the following amounts for such period:

(i)    total interest expense (other than any portion thereof related to the Receivables Facilities) and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities, and any financing fees (including commitment, underwriting, funding, "rollover" and similar fees and commissions, discounts, yields and other fees, charges and amounts incurred in connection with the issuance or incurrence of Indebtedness) and annual agency or similar fees paid under the Facility or the Loan Documents;

(ii)    provision for taxes based on income, profits or capital of the Borrower and the Restricted Subsidiaries, including state, franchise and similar taxes and foreign withholding taxes paid or accrued during such period;

(iii)    Non-Cash Charges, depreciation and amortization, and amortization of deferred financing fees, debt issuance costs, commissions, fees and expenses;

(iv)    any expenses or charges (other than depreciation or amortization expense) related to any offering (whether in a public or private sale) of Equity Interests of the Borrower (or to the extent the net cash proceeds thereof are contributed to the Borrower, of any direct or indirect parent of the Borrower) or to any Investment permitted under this Agreement, acquisition, disposition, recapitalization or the incurrence of Indebtedness permitted under this Agreement (including a refinancing thereof), in each case, whether or not successful, including (A) such fees, expenses or charges related to the offering of the New Notes and to the Facility and (B) any amendment or other modification of the New Notes or the Facility;

(v)    the amount of any restructuring and restructuring related cost, charge or reserve, including any costs incurred in connection with acquisitions

and dispositions after the Closing Date and costs related to the closure and/or consolidation of facilities;

(vi)    any other non-cash charges, including any write-offs or write-downs, and equity-based compensation expense reducing Consolidated Net Income for such period (provided that if any such non-cash charges represent an accrual or reserve for potential cash items in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period);

(vii)    the amount of any minority interest expense consisting of Subsidiary income attributable to minority equity interests of third parties in any non-wholly owned Subsidiary;

(viii)    the amount of management, monitoring, consulting, transaction and advisory fees (including termination fees) and related indemnities and expenses paid or accrued during such period to the Sponsors;

(ix)    to the extent actually reimbursed, expenses incurred to the extent covered by indemnification provisions in any agreement in connection with a Permitted Acquisition;

(x)    to the extent covered by insurance under which the insurer has been properly notified and has not denied or contested coverage, expenses with respect to liability or casualty events or business interruption;

(xi)    the amount of net cost savings and synergies projected by the Borrower in good faith to be realized as a result of specified actions taken during such period (calculated on a pro forma basis as though such cost savings had been realized on the first day of such period), net of the amount of actual benefits realized during such period from such actions, *provided* that (A) such cost savings are reasonably identifiable and factually supportable, (B) such actions are taken prior to the last day of the sixth full consecutive fiscal quarter immediately following the Closing Date, and (C) the aggregate amount of cost savings added pursuant to this clause (xi) shall not exceed $50,000,000 for any period consisting of four consecutive quarters;

(xii)    the amount of loss on sale of receivables and related assets to a Receivables Subsidiary in connection with a Receivables Facility;

(xiii)    any costs or expenses incurred by the Borrower or a Restricted Subsidiary pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement or any stock subscription or shareholder agreement, to the extent that such costs or expenses are funded with cash proceeds contributed to the capital of the Borrower or net cash proceeds of an issuance of Equity Interests of the Borrower (other than Disqualified Equity Interests), solely to the extent that such net cash proceeds are excluded in the calculation of clause (a) of the definition of Cumulative Growth Amount; and

(xiv)    the amount of loss on the non-ordinary course of business disposition of Receivables Management Assets by any Receivables Management Subsidiary;

(b)    increased or decreased by (without duplication):

(i)    any net gain or loss resulting in such period from hedging obligations and the application of Statement of Financial Accounting Standards No. 133; and

(ii)    any net gain or loss resulting in such period from currency translation gains or losses related to currency remeasurements of Indebtedness (including any net loss or gain resulting from hedge agreements for currency exchange risk),

(c)    decreased by (without duplication) non-cash gains increasing Consolidated Net Income for such period, excluding any non-cash gains to the extent they represent the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period,

in each case, as determined on a consolidated basis for the Borrower and the Restricted Subsidiaries; *provided* that, to the extent included in Consolidated Net Income, there shall be included in determining Consolidated EBITDA for any period, without duplication, (A) the Acquired EBITDA of any Person, property, business or asset acquired by the Borrower or any Restricted Subsidiary during such period (but not the Acquired EBITDA of any related Person, property, business or assets to the extent not so acquired), to the extent not subsequently sold, transferred or otherwise disposed by the Borrower or such Restricted Subsidiary (each such Person, property, business or asset acquired and not subsequently so disposed of, an "Acquired Entity or Business"), based on the actual Acquired EBITDA of such Acquired Entity or Business for such period (including the portion thereof occurring prior to such acquisition) and (B) for the purposes of the definition of the term "Permitted Acquisition" and Section 7.11, an adjustment in respect of each Acquired Entity or Business equal to the amount of the Pro Forma Adjustment with respect to such Acquired Entity or Business for such period (including the portion thereof occurring prior to such acquisition) as specified in a certificate executed by a Responsible Officer and delivered to the Lenders and the Administrative Agent and (C) for purposes of determining the Total Leverage Ratio or Interest Coverage Ratio only, there shall be excluded in determining Consolidated EBITDA for any period the Disposed EBITDA of any Person, property, business or asset sold, transferred or otherwise disposed of, closed or classified as discontinued operations by the Borrower or any Restricted Subsidiary during such period (each such Person, property, business or asset so sold or disposed of, a "Sold Entity or Business"), based on the actual Disposed EBITDA of such Sold Entity or Business for such period (including the portion thereof occurring prior to such sale, transfer or disposition).

For the purpose of the definition of Consolidated EBITDA, "**Non-Cash Charges**" means (a) losses on asset sales, disposals or abandonments, (b) any impairment charge or asset write-off related to intangible assets, long-lived assets, and investments in debt and equity securities pursuant to GAAP, (c) all losses from investments recorded using the equity method, (d) stock-based awards compensation expense, and (e) other non-cash charges (*provided* that if any non-cash charges referred to in this clause (e) represent an accrual or reserve for potential cash items

in any future period, the cash payment in respect thereof in such future period shall be subtracted from Consolidated EBITDA to such extent, and excluding amortization of a prepaid cash item that was paid in a prior period).

"**Consolidated Interest Expense**" means, for any period, the sum of (i) the cash interest expense (including that attributable to Capitalized Leases), net of cash interest income, of the Borrower and the Restricted Subsidiaries, determined on a consolidated basis in accordance with GAAP, with respect to all outstanding Indebtedness of the Borrower and the Restricted Subsidiaries, including all commissions, discounts and other fees and charges owed with respect to letters of credit and bankers' acceptance financing and net costs under Swap Contracts relating to Indebtedness, (ii) any cash payments made during such period in respect of obligations referred to in clause (b) below relating to Funded Debt that were amortized or accrued in a previous period (other than any such obligations resulting from the discounting of Indebtedness in connection with the application of purchase accounting in connection with the Transaction or any Permitted Acquisition) and (iii) from and after the date that a Restricted Payments Interest Expense Election is made, the amount of all Restricted Payments made by the Borrower used to fund cash interest payments in respect of the Indebtedness subject to such Restricted Payments Interest Expense Election, but excluding, however, (a) amortization of deferred financing costs and any other amounts of non-cash interest, (b) the accretion or accrual of discounted liabilities during such period, (c) all non-recurring cash interest expense consisting of liquidated damages for failure to timely comply with registration rights obligations and financing fees, all as calculated on a consolidated basis in accordance with GAAP, (d) fees and expenses associated with the consummation of the Transaction, (e) annual agency or similar fees paid to the Administrative Agent, (f) any fee or expense described in clause (j) of the definition of Consolidated Net Income, (g) costs associated with obtaining or terminating Swap Contracts, (h) commissions, discounts, yield and other fees and charges (including any interest expense) incurred in connection with the Receivables Facilities, (i) retirement of Indebtedness (including any portion thereof in respect of paid-in-kind interest or accretion of original issue discount), (j) financing fees (including commitment, underwriting, funding, "rollover" and similar fees and commissions, discounts, yield and other fees, charges and amounts incurred in connection with the issuance or incurrence of Indebtedness) and (k) interest expense in respect of any Receivables Management Financing; *provided* that for purposes of the definition of the term "Permitted Acquisition" and Section 7.11, there shall be included in determining Consolidated Interest Expense for any period the cash interest expense (or income) of any Acquired Entity or Business acquired during such period, based on the cash interest expense (or income) of such Acquired Entity or Business for such period (including the portion thereof occurring prior to such acquisition) assuming any Indebtedness incurred or repaid in connection with any such acquisition had been incurred or prepaid on the first day of such period and Consolidated Interest Expense shall be calculated on a Pro Forma Basis in calculating the Interest Coverage Ratio pursuant to Section 1.03(b). Notwithstanding anything to the contrary contained herein, for purposes of determining Consolidated Interest Expense for any period ending prior to the first anniversary of the Closing Date, Consolidated Interest Expense shall be an amount equal to actual Consolidated Interest Expense from the Closing Date through the date of determination multiplied by a fraction the numerator of which is 365 and the denominator of which is the number of days from the Closing Date through the date of determination.

"**Consolidated Net Income**" means, for any period, the net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication,

(a)    any after-tax effect of extraordinary, non-recurring or unusual gains or losses (less all fees and expenses relating thereto) or expenses (including relating to the Transaction), restructuring and restructuring related costs and charges (except to the extent incurred more than six full fiscal quarters after implementation of the actions, or occurrence of the events, giving rise thereto), severance and retention, relocation costs and curtailments or modifications to pension and post-retirement employee benefit plans,

(b)    the cumulative effect of a change in accounting principles during such period to the extent included in Consolidated Net Income,

(c)    any after-tax effect of income (loss) from disposed or discontinued operations and any net after-tax gains or losses on disposal of disposed, abandoned or discontinued operations,

(d)    any after-tax effect of gains or losses (less all fees and expenses relating thereto) attributable to asset dispositions other than in the ordinary course of business, as determined in good faith by the Borrower,

(e)    the net income for such period of any Person that is not a Subsidiary, or that is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, shall be excluded; provided that Consolidated Net Income shall be increased by the amount of dividends or distributions or other payments that are paid in cash (or to the extent of property and assets converted into cash) to the Borrower or a Restricted Subsidiary in respect of such period,

(f)    solely for the purpose of determining Cumulative Consolidated Net Income, the net income for such period of any Restricted Subsidiary (other than any Guarantor) to the extent that the declaration or payment of dividends or similar distributions by that Restricted Subsidiary of its net income is not at the date of determination permitted without any prior governmental approval (which has not been obtained) or, directly or indirectly, by the operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule, or governmental regulation applicable to that Restricted Subsidiary or its stockholders, unless such restriction with respect to the payment of dividends or similar distributions has been legally waived, provided that Consolidated Net Income will be increased by the amount of dividends or other distributions or other payments in respect of Equity Interests actually made by such Person in cash and property (valued at the fair value of such property) to the Borrower or a Restricted Subsidiary in respect of such period, to the extent not already included therein,

(g)    any impairment charge or asset write-off pursuant to GAAP and the amortization of intangibles arising pursuant to GAAP,

(h)    effects of adjustments (including the effects of such adjustments pushed down to the Borrower and its Restricted Subsidiaries) in any line item in such Person's consolidated financial statements pursuant to GAAP resulting from the application of purchase accounting in relation to the Transaction or any consummated acquisition and the amortization or write-off of any amounts thereof, net of taxes,

(i)    any after-tax effect of income (loss) from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments,

(j)    any fees and expenses incurred during such period, or any amortization thereof for such period, in connection with any acquisition, Investment, Disposition, incurrence or

repayment of Indebtedness, issuance of Equity Interests, refinancing transaction or amendment or modification of any Indebtedness (in each case, including any such transaction consummated prior to the Closing Date and any such transaction undertaken but not completed) and any charges or non-recurring merger costs incurred during such period as a result of any such transaction,

(k)    non-cash income or charges resulting from mark-to-market accounting under Financial Accounting Standard No. 52 relating to Indebtedness denominated in foreign currencies,

(l)    any non-cash compensation expense recorded from grants of stock appreciation or similar rights, stock options, restricted stock or other rights, and

(m)    any unrealized net gains and losses resulting from hedging obligations and the application of Statement of Financial Accounting Standards No. 133.

Notwithstanding the foregoing, for the purpose of determining Cumulative Growth Amount, there shall be excluded from Consolidated Net Income any income arising from any Disposition of the Equity Interests of an Unrestricted Subsidiary to the extent such amount increases the Cumulative Growth Amount available pursuant to clause (d)(ii) of the definition of Cumulative Growth Amount.

"**Consolidated Senior Secured Debt**" means, as of any date of determination, the outstanding principal amount, without duplication, of (a) all Indebtedness under the Facility and (b) all other Consolidated Total Debt permitted under Sections 7.03(b)(i), (e), (h), (n) and (s) and any Guarantee under Section 7.03(c) in respect of such Consolidated Total Debt, in each case, that is secured by a Lien.

"**Consolidated Total Debt**" means, as of any date of determination, (a) the aggregate principal amount of Indebtedness of the Borrower and the Restricted Subsidiaries outstanding on such date, determined on a consolidated basis in accordance with GAAP (but excluding the effects of any discounting of Indebtedness resulting from the application of purchase accounting in connection with the Transaction or any Permitted Acquisition), consisting of Indebtedness for borrowed money, obligations in respect of Capitalized Leases and debt obligations evidenced by promissory notes or similar instruments (and excluding (i) any Receivables Management Financing to the extent the principal amount of Indebtedness thereunder is limited in recourse to Receivables Management Assets (or is non-recourse to the Borrower or any of its Restricted Subsidiaries other than a special purpose Receivables Management Subsidiary that owns substantially no assets other than Receivables Management Assets) and (ii) for the avoidance of doubt, all Indebtedness outstanding under or in respect of the Receivables Facilities), minus (b) the aggregate amount of unrestricted cash and unrestricted Cash Equivalents (in each case, free and clear of all Liens, other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Section 7.01(r) and clauses (i) and (ii) of Section 7.01(t)) included in the consolidated balance sheet of the Borrower and the Restricted Subsidiaries as of such date. The amount of Consolidated Total Debt denominated in a currency other than Dollars shall be (i) reduced by the amount of any asset of the Borrower and the Restricted Subsidiaries in respect of the Foreign Exchange Component of any related Swap Contract or (ii) increased by the amount of any liability of the Borrower and the Restricted Subsidiaries in respect of the Foreign Exchange Component of any related Swap Contract.

"**Consolidated Working Capital**" means, at any date, the excess of (a) the sum of all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be

set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries at such date, but excluding current deferred income tax assets, over (b) the sum of all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries on such date, including the current portion of deferred revenue but excluding, without duplication, (i) the current portion of any Funded Debt, (ii) all Indebtedness consisting of Loans and L/C Obligations to the extent otherwise included therein, (iii) the current portion of interest and (iv) the current portion of current and deferred income taxes.

"**Continuing Directors**" means the directors of the Borrower on the Closing Date, as elected or appointed after giving effect to the Merger and the other transactions contemplated hereby, and each other director, if, in each case, such other directors' nomination for election to the board of directors of the Borrower is recommended by a majority of the then Continuing Directors or such other director receives the vote of the Permitted Holders in his or her election by the stockholders of the Borrower.

"**Contract Consideration**" has the meaning set forth in the definition of "Excess Cash Flow".

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control**" has the meaning specified in the definition of "Affiliate."

"**Credit Extension**" means each of the following:  (a) a Borrowing and (b) an L/C Credit Extension.

"**Cumulative Consolidated Net Income**" means, at any date of determination, Consolidated Net Income of the Borrower and Restricted Subsidiaries for the period (taken as one accounting period) commencing on October 1, 2006 to the end of the most recently ended fiscal quarter prior to such date for which financial statements have been delivered pursuant to Section 6.01(a) or (b).

"**Cumulative Growth Amount**" means the sum (without duplication), as of any date of determination, of:

> (a)    the amount of Net Cash Proceeds actually received by the Borrower from the issuance by the Borrower of any Equity Interests or from any capital contribution in respect of any Equity Interests of the Borrower after the Closing Date (other than Permitted Equity Issuances made pursuant to Section 8.05) that was Not Otherwise Applied, plus

> (b)    the amount of Net Cash Proceeds actually received by the Borrower from the issuance after the Closing Date of Borrower Permitted Subordinated Debt that was Not Otherwise Applied, plus

> (c)    an amount equal to any Returns actually received by the Borrower or any of the Restricted Subsidiaries in cash or Cash Equivalents in respect of any Investments (including, without limitation, Investments in Unrestricted Subsidiaries

except to the extent included in clause (d) below) made after the Closing Date pursuant to Section 7.02(n), Section 7.02(o) or Section 7.02(v), plus

(d)    without duplication, (i) in the case of the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary (which, for purposes hereof, shall be deemed to include the merger, consolidation or similar transaction of an Unrestricted Subsidiary into the Borrower or a Restricted Subsidiary, so long as the Borrower or a Restricted Subsidiary is the surviving entity, and the transfer of all or substantially all of the assets of an Unrestricted Subsidiary to the Borrower or a Restricted Subsidiary), the fair market value of the Investment in such Unrestricted Subsidiary, determined to be such value at the time of such redesignation (or any such merger, consolidation, transfer or other transaction less the amount of any consideration therefor paid by the Borrower or a Restricted Subsidiary to any Person other than the Borrower or a Restricted Subsidiary), provided that if such Unrestricted Subsidiary is a Foreign Subsidiary at the time thereof, the amount to be included in this clause (d)(i) shall not exceed amounts available for Investments in a Foreign Subsidiary under Section 7.02(c)(iii)(A) (and after full utilization thereof, under Section 7.02(n)) and availability under Section 7.02(c)(iii)(A) (and after full utilization thereof, under Section 7.02(n)) shall be deemed utilized by the amount included in this clause (d)(i), and (ii) the Equity Interests of any Unrestricted Subsidiary or upon the Disposition thereof, the amount of Excluded Net Cash Proceeds realized from such Disposition, plus

(e)    if, as of the last day of the immediately preceding Test Period (after giving Pro Forma Effect to the transaction with respect to which the Cumulative Growth Amount is being calculated) the Total Leverage Ratio is 6.0:1 or less, (i) 50% of Cumulative Consolidated Net Income at such time or (ii) in the case Cumulative Consolidated Net Income at such time is a deficit, minus 100% of such deficit (except for purposes of Section 7.02, the amount under this clause (e)(ii) shall be deemed to be zero if Cumulative Consolidated Net Income at such time is a deficit), minus

(f)    the sum, without duplication, of (A) the aggregate amount of Investments made after the Closing Date pursuant to Section 7.02(o), (B) the aggregate amount of Restricted Payments made after the Closing Date pursuant to subclause (B) of Section 7.06(h) and (C) the aggregate amount of prepayments, redemptions or repurchases made since the Closing Date pursuant to Section 7.13(a)(iv)(B).

"**Debtor Relief Laws**" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally (including, in the case of Loan Parties incorporated or organized in England or Wales, administration, administrative receivership, voluntary arrangement and schemes of arrangement).

"**Default**" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"**Default Rate**" means an interest rate equal to (a) the Base Rate plus (b) the Applicable Rate, if any, applicable to Base Rate Loans plus (c) 2.0% per annum; *provided* that with respect to a Eurocurrency Rate Loan, the Default Rate shall be an interest rate equal to the

interest rate (including any Applicable Rate) otherwise applicable to such Loan plus 2.0% per annum, in each case, to the fullest extent permitted by applicable Laws.

"**Defaulting Lender**" means any Lender that (a) has failed to fund any portion of the Term Loans, Revolving Credit Loans, participations in L/C Obligations or participations in Swing Line Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, unless the subject of a good faith dispute or subsequently cured, (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute or subsequently cured, or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"**Designated Non-Cash Consideration**" means the fair market value of non-cash consideration received by the Borrower or a Restricted Subsidiary in connection with a Disposition pursuant to Section 7.05(k) that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer, setting forth the basis of such valuation (which amount will be reduced by the fair market value of the portion of the non-cash consideration converted to cash within 180 days following the consummation of the applicable Disposition).

"**Disposed EBITDA**" means, with respect to any Sold Entity or Business for any period, the amount for such period of Consolidated EBITDA of such Sold Entity or Business (determined as if references to the Borrower and the Restricted Subsidiaries in the definition of Consolidated EBITDA were references to such Sold Entity or Business and its Subsidiaries), all as determined on a consolidated basis for such Sold Entity or Business.

"**Disposition**" or "**Dispose**" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction and any sale of Equity Interests) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; *provided* that "Disposition" and "Dispose" shall not be deemed to include any issuance by the Borrower of any of its Equity Interests to another Person.

"**Disqualified Equity Interests**" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable and the termination of the Commitments), (b) is redeemable at the option of the holder thereof (other than solely for Qualified Equity Interests), in whole or in part, (c) provides for the scheduled payments of dividends in cash, or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date of the Term Loans.

"**Disqualified Institution**" means the Persons designated by the Borrower in writing to the Administrative Agent as a "Disqualified Institution" on or prior to the Closing Date.

"**Dollar**" and "**$**" mean lawful money of the United States.

"**Domestic Subsidiary**" means any Subsidiary that is organized under the Laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" means any Assignee permitted by and consented to in accordance with Section 10.07(b).

"**EMU**" means the economic and monetary union in accordance with the Treaty of Rome 1957, as amended by the Single European Act 1986, the Maastricht Treaty of 1992 and the Amsterdam Treaty of 1998.

"**Environmental Laws**" means any and all Federal, state, local, and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution, the protection of the environment, natural resources, or, to the extent relating to exposure to Hazardous Materials, human health or to the release of any materials into the environment, including those related to Hazardous Materials, air emissions and discharges to waste or public systems.

"**Environmental Liability**" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Permit**" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"**Equity Contribution**" means the contribution by the Equity Investors (and certain co-investors) of an aggregate amount of cash of not less than $725,750,000 to Omaha.

"**Equity Interests**" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"**Equity Investors**" means the Sponsors and the Management Stockholders.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that is under common control with any Loan Party within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"**ERISA Event**" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to

Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate.

"**Eurocurrency Rate**" means, for any Interest Period with respect to any Eurocurrency Rate Loan:

    (a)    the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate that appears on the page of the Telerate Service (or any successor thereto) that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period, or

    (b)    if the rate referenced in the preceding clause (a) does not appear on such page or service or such page or service shall not be available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate on such other page or other service that displays an average British Bankers Association Interest Settlement Rate for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period, or

    (c)    if the rates referenced in the preceding clauses (a) and (b) are not available, the rate per annum equal to the rate determined by the Administrative Agent to be the offered rate on such other comparable publicly available service for displaying eurocurrency rates as may be selected by the Administrative Agent for deposits in Dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period, determined as of approximately 11:00 a.m. (London time) two (2) Business Days prior to the first day of such Interest Period, or, if different, the date on which quotations would customarily be provided by leading banks in the London Interbank Market for deposits of amounts in the relevant currency for delivery on the first day of such Interest Period.

"**Eurocurrency Rate Loan**" means a Loan that bears interest at a rate based on the Eurocurrency Rate.

"**Event of Default**" has the meaning specified in Section 8.01.

"**Excess Cash Flow**" means, for any period, an amount equal to the excess of:

(a)      the sum, without duplication, of:

(i)      the consolidated net income (loss) of the Borrower and the Restricted Subsidiaries for such period determined on a consolidated basis in accordance with GAAP, excluding, without duplication, (A) extraordinary items for such period, (B) the cumulative effect of a change in accounting principles during such period to the extent included in consolidated net income (loss), (C) the net income for such period of any Person that is not a Subsidiary, or that is an Unrestricted Subsidiary, or that is accounted for by the equity method of accounting, or that is otherwise attributable to investments in joint ventures recorded using the equity method of accounting (provided that the amount of any dividends or distributions or other payments that are paid in cash (or to the extent of property and assets converted into cash) to the Borrower or a Restricted Subsidiary in respect of such period shall not be so excluded), (D) any after-tax effect of income (loss) from the early extinguishment of Indebtedness or Hedging Obligations or other derivative instruments, (E) non-cash income or charges resulting from mark-to-market accounting under Financial Accounting Standard No. 52 relating to Indebtedness denominated in foreign currencies, and (F) any unrealized net gains and losses resulting from hedging obligations and the application of Statement of Financial Accounting Standards No. 133,

(ii)      an amount equal to the amount of all non-cash charges to the extent deducted in arriving at such consolidated net income (loss),

(iii)      decreases in Consolidated Working Capital and long-term account receivables for such period (other than any such decreases arising from acquisitions by the Borrower and the Restricted Subsidiaries completed during such period), and

(iv)      an amount equal to the aggregate net non-cash loss on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent deducted in arriving at such consolidated net income (loss); over

(b)      the sum, without duplication, of:

(i)      an amount equal to the amount of all non-cash credits and cash charges included in arriving at consolidated net income (loss) of the Borrower and the Restricted Subsidiaries in clause (a)(i) above,

(ii)      without duplication of amounts deducted pursuant to clause (xi) below in prior fiscal years, the amount of Capital Expenditures made in cash or accrued during such period pursuant to Section 7.15, except to the extent that such Capital Expenditures were financed with the proceeds of Indebtedness of the Borrower or the Restricted Subsidiaries,

(iii)      the aggregate amount of all principal payments of Indebtedness of the Borrower and the Restricted Subsidiaries (including (A) the principal component of payments in respect of Capitalized Leases and (B) the amount of

any mandatory prepayment of Term Loans pursuant to Section 2.05(b)(ii) to the extent required due to a Disposition that resulted in an increase to consolidated net income (loss) and not in excess of the amount of such increase but excluding (X) all other prepayments of Term Loans and (Y) all prepayments of Revolving Credit Loans and Swing Line Loans) made during such period (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), except to the extent financed with the proceeds of other Indebtedness of the Borrower or the Restricted Subsidiaries,

(iv)    an amount equal to the aggregate net non-cash gain on Dispositions by the Borrower and the Restricted Subsidiaries during such period (other than Dispositions in the ordinary course of business) to the extent included in arriving at such consolidated net income (loss),

(v)    increases in Consolidated Working Capital and long-term account receivables for such period (other than any such increases arising from acquisitions by the Borrower and the Restricted Subsidiaries during such period),

(vi)    cash payments by the Borrower and the Restricted Subsidiaries during such period in respect of long-term liabilities of the Borrower and the Restricted Subsidiaries other than Indebtedness,

(vii)    without duplication of amounts deducted pursuant to clause (xi) below in prior fiscal years, the amount of Investments and acquisitions made during such period pursuant to Section 7.02 (other than Section 7.02(a)) to the extent that such Investments and acquisitions were financed with internally generated cash flow of the Borrower and the Restricted Subsidiaries,

(viii)    the amount of Restricted Payments paid during such period pursuant to Section 7.06(f), (g), (h), (i), (k) and (l) to the extent such Restricted Payments were financed with internally generated cash flow of the Borrower and the Restricted Subsidiaries,

(ix)    without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate amount of expenditures actually made by the Borrower and the Restricted Subsidiaries in cash during such period (including expenditures for the payment of financing fees) to the extent that such expenditures are not expensed during such period,

(x)    the aggregate amount of any premium, make-whole or penalty payments actually paid in cash by the Borrower and the Restricted Subsidiaries during such period that are required to be made in connection with any prepayment of Indebtedness,

(xi)    without duplication of amounts deducted from Excess Cash Flow in prior periods, the aggregate consideration required to be paid in cash by the Borrower or any of the Restricted Subsidiaries pursuant to binding contracts (the "Contract Consideration") entered into prior to or during such period relating to Permitted Acquisitions or Capital Expenditures to be consummated or made during the period of four consecutive fiscal quarters of the Borrower following

the end of such period, provided that to the extent the aggregate amount of internally generated cash actually utilized to finance such Permitted Acquisitions during such period of four consecutive fiscal quarters is less than the Contract Consideration, the amount of such shortfall shall be added to the calculation of Excess Cash Flow at the end of such period of four consecutive fiscal quarters,

(xii)   the amount of cash taxes paid in such period to the extent they exceed the amount of tax expense deducted in determining consolidated net income (loss) for such period,

(xiii)   proceeds received by the Borrower and the Restricted Subsidiaries from insurance claims with respect to casualty events or business interruption which reimburse prior business expenses to the extent such expenses were added to consolidated net income (loss) for such period,

(xiv)   cash indemnity payments received pursuant to indemnification provisions in any agreement in connection with the Merger, any Permitted Acquisition or any other Investment permitted hereunder (or in any similar agreement related to any other acquisition consummated prior to the Closing Date, including the acquisitions of Intrado Inc. and Raindance Communications, Inc.),

(xv)   cash expenses incurred in connection with deferred compensation arrangements in connection with the Transactions,

(xvi)   cash expenditures made in respect of Swap Contracts to the extent not reflected in the computation of consolidated net income (loss) for such period, and

(xvii)   to the extent included in consolidated net income (loss) for such period, the Net Cash Proceeds of any Permitted Equity Issuances made pursuant to Section 8.05.

"Exchange Act" means the Securities Exchange Act of 1934.

"Exchange Rate" means on any day with respect to any currency other than Dollars, the rate at which such currency may be exchanged into Dollars, as set forth at approximately 11:00 a.m. (London time) on such day on the Reuters World Currency Page for such currency; in the event that such rate does not appear on any Reuters World Currency Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such Exchange Rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later.

"Excluded Net Cash Proceeds" means Net Cash Proceeds (determined without regard to the proviso at the end of paragraph (a) of the definition thereof) from any Disposition or Casualty Event in respect of, or by, (a) any Foreign Subsidiary (other than any Foreign Subsidiary to the extent that (i) such Foreign Subsidiary would at such time be permitted to distribute such

Net Cash Proceeds to the Borrower or a Domestic Restricted Subsidiary in accordance with applicable laws, including regulatory and capital requirements, and (ii) no material adverse tax consequence would arise therefrom), (b) any Subsidiary which is not a wholly owned Subsidiary, to the extent such Net Cash Proceeds are used to assure compliance with regulatory capital requirements applicable to such Subsidiary, cannot be distributed to any Loan Party without adverse tax consequences or are otherwise distributed to shareholders of such Subsidiary who are not Loan Parties, (c) Equity Interests of any Unrestricted Subsidiary and (d) property and assets contributed to the Borrower other than by a Subsidiary of the Borrower.

"**Excluded Receivables Management Subsidiary**" means any Receivables Management Subsidiary that (a) is an obligor under any Receivables Management Financing or (b) pursuant to the terms of any Receivables Management Financing, any service agreement (or similar arrangement) required by or entered into in connection with such Receivables Management Financing or any credit support provided by it in favor of any financier of such Receivables Management Financing, (i) is not permitted to be a Guarantor or (ii) the creation of a Lien on the Equity Interests of such Receivables Management Subsidiary is not permitted or would (including upon foreclosure thereof) result in a change of control (or similar event), default, termination, payment, purchase or repurchase obligation. Schedule 1.01F lists the Excluded Receivables Management Subsidiaries as of the Closing Date.

"**Excluded Subsidiary**" means (a) any Subsidiary that is not a wholly-owned Subsidiary, (b) any Receivables Subsidiary, (c) any Excluded Receivables Management Subsidiary, (d) each Subsidiary listed on Schedule 1.01C hereto, (e) any Subsidiary that is prohibited by applicable Law from guaranteeing the Obligations, (f) any Domestic Subsidiary that is a Subsidiary of a Foreign Subsidiary, (g) any Restricted Subsidiary acquired pursuant to a Permitted Acquisition financed with secured Indebtedness incurred pursuant to Section 7.03(g) and each Restricted Subsidiary thereof that guarantees such Indebtedness; *provided* that each such Restricted Subsidiary shall cease to be an Excluded Subsidiary under this clause (g) if such secured Indebtedness is repaid or becomes unsecured or if such Restricted Subsidiary ceases to guarantee such secured Indebtedness, as applicable, (h) any Immaterial Subsidiary and (i) any other Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent (confirmed in writing by notice to the Borrower), the cost or other consequences (including any adverse tax consequences) of providing a Senior Guarantee shall be excessive in view of the benefits to be obtained by the Lenders therefrom.

"**Existing Credit Agreement**" means the Amended and Restated Credit Agreement, dated as of November 15, 2004, among West, the Subsidiaries of West from time to time party thereto as guarantors, the lenders party thereto and Wachovia Bank, National Association, as Administrative Agent.

"**Existing Letters of Credit**" means the letters of credit outstanding on the Closing Date and set forth on Schedule 1.01D.

"**Facility**" means the Term Loans, the Revolving Credit Facility, the Swing Line Sublimit or the Letter of Credit Sublimit, as the context may require.

"**Federal Funds Rate**" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such

transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average of the quotations (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) received by the Administrative Agent from three federal funds brokers of recognized standing selected by it on such day on such transactions as determined by the Administrative Agent.

"**Foreign Exchange Component**" means, with reference to any Swap Contract relating to Indebtedness, the cumulative change in fair value of such Swap Contract resulting exclusively from changes in spot exchange rates.

"**Foreign Lender**" has the meaning specified in Section 10.15(a)(i).

"**Foreign Subsidiary**" means any direct or indirect Restricted Subsidiary of the Borrower which (a) is not a Domestic Subsidiary or (b) is set forth on Schedule 1.01E.

"**Foreign Subsidiary Available Investment Basket**" means the following amounts, to the extent not previously utilized: (a) $100,000,000 (net of any Returns in respect of any Investment made in reliance on this clause (a)), (b) for the purposes of Section 7.02(i) only, the net cash proceeds of any Indebtedness incurred pursuant to Section 7.03(g)(ii), and (c) the amounts referred to in Sections 7.02(n), 7.02(o) and 7.02(v) (and to the extent any of Sections 7.02(n), 7.02(o) and 7.02(v) is relied upon for purposes of this definition, a corresponding amount under such Section shall be deemed to have been utilized).

"**FRB**" means the Board of Governors of the Federal Reserve System of the United States.

"**Fund**" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"**Funded Debt**" means all Indebtedness of the Borrower and the Restricted Subsidiaries for borrowed money that matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including Indebtedness in respect of the Loans.

"**GAAP**" means generally accepted accounting principles in the United States of America, as in effect from time to time; *provided, however,* that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court,

administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Granting Lender**" has the meaning specified in Section 10.07(h).

"**Guarantee**" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or monetary other obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"**Guarantors**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement".

"**Guaranty**" means, collectively, (a) the Guarantee Agreement made by the Guarantors in favor of the Administrative Agent on behalf of the Secured Parties, substantially in the form of Exhibit F and (b) each other guaranty and guaranty supplement delivered pursuant to Section 6.11.

"**Hazardous Materials**" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"**Hedge Bank**" means LCPI, any Lender or L/C Issuer, an Affiliate of LCPI or any Lender or L/C Issuer, or any Person that was a Lender, L/C Issuer or Affiliate thereof at the time it entered into a Secured Hedge Agreement, with respect to any Secured Hedge Agreement entered into prior to, on or after the date of this Agreement.

"**Holdings**" means any Person that becomes the direct parent company of the Borrower owning directly, of record and beneficially, 100% of the outstanding Equity Interests of the Borrower, in which the Permitted Holders at such time shall have acquired, directly or indirectly, Equity Interests; *provided, however*, that upon the occurrence of a Holdings Election Event, Holdings shall comply with and shall be subject to (i) the mandatory prepayment provisions set forth in Section 2.05(b), (ii) the representations and warranties set forth in Article V, (iii) the covenants set forth in Articles VI and VII (and any Collateral Documents to which it becomes a party pursuant to the terms thereof), (iv) the provisions of Article VIII, and (v) in the case of clauses (i), (ii), (iii) and (iv), all related definitions.

"**Holdings Election Event**" means the occurrence of both of the following: (a) the Borrower shall become the Subsidiary of Holdings and (b) the Borrower shall make a Restricted Payments Interest Expense Election.

"**Honor Date**" has the meaning specified in Section 2.03(c)(i).

"**Immaterial Subsidiary**" means any Subsidiary designated in writing by the Borrower to the Administrative Agent as an Immaterial Subsidiary that does not, as of the last day of the most recently completed fiscal quarter of the Borrower, have assets with a value in excess of 3.0% of the consolidated total assets of the Borrower and its Subsidiaries and did not, as of the four-quarter period ending on the last day of such fiscal quarter, have revenues exceeding 3.0% of the consolidated revenues of the Borrower and its Subsidiaries; <u>provided</u> that if (a) such Subsidiary shall have been designated in writing by the Borrower to the Administrative Agent as an Immaterial Subsidiary, and (b) if (i) the aggregate assets then owned by all Subsidiaries of the Borrower that would otherwise constitute Immaterial Subsidiaries shall have a value in excess of 5.0% of the consolidated total assets of the Borrower and its Subsidiaries as of the last day of such fiscal quarter or (ii) the combined revenues of all Subsidiaries of the Borrower that would otherwise constitute Immaterial Subsidiaries shall exceed 5.0% of the consolidated revenues of the Borrower and its Subsidiaries for such four-quarter period, the Borrower shall redesignate one or more of such Subsidiaries to not be Immaterial Subsidiaries within ten (10) Business Days after delivery of the Compliance Certificate for such fiscal quarter such that only those such Subsidiaries as shall then have aggregate assets of less than 5.0% of the consolidated total assets of the Borrower and its Subsidiaries and combined revenues of less than 5.0% of the consolidated revenues of the Borrower and its Subsidiaries shall constitute Immaterial Subsidiaries.

"**Incremental Amendment**" has the meaning set forth in Section 2.14(c).

"**Incremental Facility Closing Date**" has the meaning set forth in Section 2.14(c).

"**Incremental Term Loans**" has the meaning set forth in Section 2.14(a).

"**Indebtedness**" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount (after giving effect to any prior drawings or reductions which may have been reimbursed) of all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than (i) trade accounts payable in the ordinary course of business and (ii) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP);

(e)      indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Attributable Indebtedness;

(g)      all obligations of such Person in respect of Disqualified Equity Interests; and

(h)      all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall (A) include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, except to the extent such Person's liability for such Indebtedness is otherwise limited and only to the extent such Indebtedness would be included in the calculation of Consolidated Total Debt and (B) in the case of the Borrower and its Subsidiaries, exclude all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary of business consistent with past practice. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (e) shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" has the meaning set forth in Section 10.05.

"**Indemnitees**" has the meaning set forth in Section 10.05.

"**Information**" has the meaning specified in Section 10.08.

"**Initial L/C Issuer**" means Deutsche Bank Trust Company Americas, in its capacity as an issuer of Letters of Credit hereunder.

"**Intellectual Property Security Agreement**" means the Intellectual Property Security Agreement, substantially in the form attached as Exhibit I.

"**Interest Coverage Ratio**" means, with respect to the Borrower and the Restricted Subsidiaries on a consolidated basis, as of the end of any fiscal quarter of the Borrower for the Test Period ending on such date, the ratio of (a) Consolidated EBITDA to (b) Consolidated Interest Expense.

"**Interest Payment Date**" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; *provided* that if any Interest Period for a Eurocurrency Rate Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan (including a Swing Line Loan), the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made.

"**Interest Period**" means, as to each Eurocurrency Rate Loan, the period commencing on the date such Eurocurrency Rate Loan is disbursed or converted to or continued as a Eurocurrency Rate Loan and ending on the date one, two, three or six months thereafter, or to the extent agreed to by, or available to, each Lender of such Eurocurrency Rate Loan, nine or twelve months thereafter, as selected by the Borrower in its Committed Loan Notice; *provided* that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date of the Facility under which such Loan was made.

"**Investment**" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities or receivables of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person (excluding, in the case of the Borrower and its Restricted Subsidiaries, intercompany loans, advances, or Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business consistent with past practice) or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"**IP Collateral**" means all "Intellectual Property Collateral" referred to in the Collateral Documents and all of the other IP Rights that are or are required by the terms hereof or

of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"**IP Rights**" has the meaning set forth in Section 5.15.

"**IRS**" means the United States Internal Revenue Service.

"**Judgment Currency**" has the meaning specified in Section 10.19.

"**Junior Financing**" has the meaning specified in Section 7.13.

"**Junior Financing Documentation**" means any documentation governing any Junior Financing.

"**Laws**" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"**L/C Advance**" means, with respect to each Revolving Credit Lender, such Lender's funding of its participation in any L/C Borrowing in accordance with its Pro Rata Share.

"**L/C Borrowing**" means an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Revolving Credit Borrowing.

"**L/C Credit Extension**" means, with respect to any Letter of Credit, the issuance thereof or extension of the expiry date thereof, or the renewal or increase of the amount thereof.

"**L/C Issuer**" means the Initial L/C Issuer and any other Lender that becomes an L/C Issuer in accordance with Section 2.03(k) or 10.07(j), in each case, in its capacity as an issuer of Letters of Credit (including Existing Letters of Credit) hereunder, or any successor issuer of Letters of Credit hereunder.

"**L/C Obligations**" means, as at any date of determination, the aggregate undrawn amount of all outstanding Letters of Credit plus the aggregate of all Unreimbursed Amounts, including all L/C Borrowings.

"**LCPI**" means Lehman Commercial Paper Inc.

"**Lender**" has the meaning specified in the introductory paragraph to this Agreement and, as the context requires, includes an L/C Issuer and the Swing Line Lender, and their respective successors and assigns as permitted hereunder, each of which is referred to herein as a "Lender".

"**Lender Addendum**" means, with respect to any initial Lender, a Lender Addendum, substantially in the form of Exhibit K, to be executed and delivered by such Lender on the Closing Date as provided in Section 10.23.

"**Lending Office**" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**Letter of Credit**" means any letter of credit issued hereunder.  A Letter of Credit may be a commercial letter of credit or a standby letter of credit.

"**Letter of Credit Application**" means an application and agreement for the issuance or amendment of a Letter of Credit in the form from time to time in use by the relevant L/C Issuer.

"**Letter of Credit Expiration Date**" means the day that is five (5) Business Days prior to the scheduled Maturity Date then in effect for the Revolving Credit Facility (or, if such day is not a Business Day, the next preceding Business Day).

"**Letter of Credit Sublimit**" means an amount equal to the lesser of (a) $30,000,000 and (b) the aggregate amount of the Revolving Credit Commitments.  The Letter of Credit Sublimit is part of, and not in addition to, the Revolving Credit Facility.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capitalized Lease having substantially the same economic effect as any of the foregoing).

"**Loan**" means an extension of credit by a Lender to the Borrower under Article II in the form of a Term Loan, a Revolving Credit Loan or a Swing Line Loan.

"**Loan Documents**" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Guaranty, (iv) the Collateral Documents and (v) each Letter of Credit Application.

"**Loan Parties**" means, collectively, the Borrower and each Guarantor.

"**Management Stockholders**" means the members of management of the Borrower or its Subsidiaries who are investors in the Borrower or any direct or indirect parent thereof.

"**Mandatory Prepayment Amount**" has the meaning specified in Section 2.05(b)(vii).

"**Master Agreement**" has the meaning specified in the definition of "Swap Contract."

"**Material Adverse Effect**" means (a) a material adverse effect on the business, operations, assets, liabilities (actual or contingent) or financial condition of the Borrower and its Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of the Borrower or the

Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document to which the Borrower or any of the Loan Parties is a party or (c) a material adverse effect on the rights and remedies of the Lenders under any Loan Document.

"**Material Real Property**" means any real property owned by any Loan Party with a book value in excess of $3,000,000.

"**Maturity Date**" means (a) with respect to the Revolving Credit Facility, October 24, 2012 and (b) with respect to the Term Loans, October 24, 2013.

"**Maximum Rate**" has the meaning specified in Section 10.10.

"**Merger**" has the meaning set forth in the preliminary statements to this Agreement.

"**Merger Agreement**" means the Agreement and Plan of Merger, dated as of May 31, 2006, between Omaha and West.

"**Merger Consideration**" means the total funds required to consummate the Merger.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means, collectively, the deeds of trust, trust deeds, hypothecs and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Lenders, substantially in the form of Exhibit L (with such changes as may be customary to account for local law matters), and any other mortgages executed and delivered pursuant to Section 6.11.

"**Mortgage Policies**" has the meaning specified in Section 6.13(b)(ii).

"**Mortgaged Properties**" has the meaning specified in paragraph (g) of the definition of Collateral and Guarantee Requirement.

"**Multiemployer Plan**" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"**Net Cash Proceeds**" means:

(a)    with respect to the Disposition of any asset by the Borrower or any Restricted Subsidiary or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event actually received by or paid to or for the account of the Borrower or any Restricted Subsidiary) over (ii) the sum of (A) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event

and that is required to be repaid (and is timely repaid) in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents), (B) the out-of-pocket expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred by the Borrower or such Restricted Subsidiary in connection with such Disposition or Casualty Event, (C) taxes paid or reasonably estimated to be actually payable in connection therewith, and (D) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by the Borrower or any Restricted Subsidiary after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities related to environmental matters or against any indemnification obligations associated with such transaction, it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents (i) received upon the Disposition of any non-cash consideration received by the Borrower or any Restricted Subsidiary in any such Disposition and (ii) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (D) of the preceding sentence or, if such liabilities have not been satisfied in cash and such reserve is not reversed within three hundred and sixty-five (365) days after such Disposition or Casualty Event, the amount of such reserve; *provided* that (x) no net cash proceeds calculated in accordance with the foregoing realized in a single transaction or series of related transactions shall constitute Net Cash Proceeds unless such net cash proceeds shall exceed $10,000,000 and (y) no such net cash proceeds shall constitute Net Cash Proceeds under this clause (a) in any fiscal year until the aggregate amount of all such net cash proceeds in such fiscal year shall exceed $20,000,000 (and thereafter only net cash proceeds in excess of such amount shall constitute Net Cash Proceeds under this clause (a)); and

(b)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Restricted Subsidiary and, solely for purposes of the definition of Cumulative Growth Amount, the issuance (or sale) of Equity Interests of the Borrower, the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance over (ii) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by the Borrower or such Restricted Subsidiary in connection with such incurrence or issuance.

"**New Notes**" means the Senior Notes and the Senior Subordinated Notes.

"**New Notes Documentation**" means the New Notes, and all documents executed and delivered with respect to the New Notes, including the Senior Notes Indenture and the Senior Subordinated Notes Indenture.

"**Non-Cash Charges**" has the meaning set forth in the definition of the term "Consolidated EBITDA".

"**Non-Consenting Lenders**" has the meaning specified in Section 3.07(d).

"**Nonrenewal Notice Date**" has the meaning specified in Section 2.03(b)(iii).

"**Note**" means a Term Note or a Revolving Credit Note, as the context may require.

"**Notice of Intent to Cure**" has the meaning specified in Section 6.02(b).

"**Not Otherwise Applied**" means, with reference to any amount of Net Cash Proceeds of any transaction or event, that such amount (a) was not required to be applied to prepay the Loans pursuant to Section 2.05(b), and (b) was not previously applied in determining the permissibility of a transaction under the Loan Documents where such permissibility was (or may have been) contingent on receipt of such amount or utilization of such amount for a specified purpose. The Borrower shall promptly notify the Administrative Agent of any application of such amount as contemplated by (b) above.

"**NPL**" means the National Priorities List under CERCLA.

"**Obligations**" means all (x) advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party and its Subsidiaries arising under any Loan Document or otherwise with respect to any Loan or Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or Subsidiary of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding, (y) obligations of any Loan Party and its Subsidiaries arising under any Secured Hedge Agreement and (z) Cash Management Obligations. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents (and of their Subsidiaries to the extent they have obligations under the Loan Documents) include (a) the obligation (including guarantee obligations) to pay principal, interest, Letter of Credit commissions, reimbursement obligations, charges, expenses, fees, Attorney Costs, indemnities and other amounts payable by any Loan Party or its Subsidiaries under any Loan Document and (b) the obligation of any Loan Party or any of its Subsidiaries to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party or such Subsidiary.

"**Omaha**" has the meaning specified in the preliminary statements to this Agreement.

"**Organization Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"**Other Taxes**" has the meaning specified in Section 3.01(b).

"**Outstanding Amount**" means (a) with respect to Term Loans, Revolving Credit Loans and Swing Line Loans on any date, the principal amount thereof then outstanding

after giving effect to any borrowings and prepayments or repayments of Term Loans, Revolving Credit Loans (including any refinancing of outstanding unpaid drawings under Letters of Credit or L/C Credit Extensions as a Revolving Credit Borrowing) and Swing Line Loans, as the case may be, occurring on such date; and (b) with respect to any L/C Obligations on any date, the amount thereof on such date after giving effect to any L/C Credit Extension occurring on such date and any other changes thereto as of such date, including as a result of any reimbursements of outstanding unpaid drawings under any Letters of Credit (including any refinancing of outstanding unpaid drawings under Letters of Credit or L/C Credit Extensions as a Revolving Credit Borrowing) or any reductions in the maximum amount available for drawing under Letters of Credit taking effect on such date.

"**Participant**" has the meaning specified in Section 10.07(e).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Pension Plan**" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has any obligations or liabilities contingent or otherwise.

"**Permitted Basket Acquisition**" has the meaning specified in Section 7.02(i).

"**Permitted Acquisition**" means any Permitted Basket Acquisition and the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such Person, or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation) made under Section 7.02(n), (o) or (v).

"**Permitted Equity Issuance**" means any sale or issuance of any Qualified Equity Interests of the Borrower to the extent permitted hereunder.

"**Permitted Holders**" means Gary L. West and Mary E. West (together with their respective heirs and any trust established for their benefit or for the benefit of such heirs) and the Equity Investors other than the Management Stockholders to the extent that the amount of the outstanding voting stock of the Borrower owned beneficially or of record by such Management Stockholders in the aggregate at any time exceeds ten percent (10%) of the total amount of the outstanding voting stock of the Borrower at such time.

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal, replacement or extension of any Indebtedness of such Person; *provided* that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed, replaced or extended except by an amount equal to unpaid accrued interest (including interest paid-in-kind) and premium, penalties and similar amounts thereon plus other amounts paid (including any tender premium and similar amounts), and fees and expenses reasonably incurred (including commitment, underwriting and all other financing fees), in connection with such modification, refinancing, refunding, renewal, replacement or extension and by an amount equal to any existing commitments unutilized thereunder, (b) other

than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), such modification, refinancing, refunding, renewal, replacement or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (c) other than with respect to a Permitted Refinancing in respect of Indebtedness permitted pursuant to Section 7.03(e), at the time thereof, no Event of Default shall have occurred and be continuing, and (d) if such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is Indebtedness permitted pursuant to Section 7.03(b), 7.03(h) (solely in respect of Specified Junior Financing) or 7.03(v), (i) to the extent such Indebtedness being modified, refinanced, refunded, renewed, replaced or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal, replacement or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended, (ii) the terms and conditions (including, if applicable, as to collateral but excluding as to subordination, interest rate and redemption premium) of any such modified, refinanced, refunded, renewed, replaced or extended Indebtedness, taken as a whole, are not materially less favorable to the Loan Parties or the Lenders than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended; *provided* that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees) and (iii) such modification, refinancing, refunding, renewal, replacement or extension is incurred by one or more Persons who are the obligors of the Indebtedness being modified, refinanced, refunded, renewed, replaced or extended.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Plan**" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"**Pledged Debt**" has the meaning specified in the Security Agreement.

"**Pledged Equity**" has the meaning specified in the Security Agreement.

"**Post-Acquisition Period**" means, with respect to any Permitted Acquisition, the period beginning on the date such Permitted Acquisition is consummated and ending on the last day of the sixth full consecutive fiscal quarter immediately following the date on which such Permitted Acquisition is consummated.

"**Prepayment Date**" has the meaning specified in Section 2.05(b)(vii).

"**Prepayment Option Notice**" has the meaning specified in Section 2.05(b)(vii).

"**Prime Rate**" means the prime lending rate as set forth on the British Banking Association Telerate Page 5 (or such other comparable page as may, in the opinion of the Administrative Agent, replace such page for the purpose of displaying such rate), as in effect from time to time. Any change in the Base Rate due to a change in the Prime Rate actually available or the Federal Funds Effective Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate or the Federal Funds Effective Rate, respectively. The Prime Rate is a reference rate and does not necessarily represent the lowest or best rate actually available.

"**Pro Forma Adjustment**" means, for any Test Period that includes all or any part of a fiscal quarter included in any Post-Acquisition Period, with respect to the Acquired EBITDA of the applicable Acquired Entity or Business or the Consolidated EBITDA of the Borrower, the pro forma increase or decrease in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, projected by the Borrower in good faith as a result of (a) actions taken during such Post-Acquisition Period for the purposes of realizing reasonably identifiable and factually supportable cost savings or (b) any additional costs incurred during such Post-Acquisition Period, in each case in connection with the combination of the operations of such Acquired Entity or Business with the operations of the Borrower and the Restricted Subsidiaries; *provided* that, so long as such actions are taken during such Post-Acquisition Period or such costs are incurred during such Post-Acquisition Period, as applicable, the cost savings related to such actions or such additional costs, as applicable, it may be reasonably assumed, for purposes of projecting such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, that such cost savings will be realizable during the entirety of such Test Period, or such additional costs, as applicable, will be incurred during the entirety of such Test Period; *provided further* that any such pro forma increase or decrease to such Acquired EBITDA or such Consolidated EBITDA, as the case may be, shall be without duplication for cost savings or additional costs already included in such Acquired EBITDA or such Consolidated EBITDA, as the case may be, for such Test Period.

"**Pro Forma Balance Sheet**" has the meaning set forth in Section 5.05(a)(ii).

"**Pro Forma Basis**", "Pro Forma Compliance" and "Pro Forma Effect" mean, with respect to compliance with any test or covenant hereunder, that (A) to the extent applicable, the Pro Forma Adjustment shall have been made and (B) all Specified Transactions and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such test or covenant: (a) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, (i) in the case of a Disposition of all or substantially all Equity Interests in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any of its Subsidiaries, shall be excluded, and (ii) in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction", shall be included, (b) any repayment, redemption or other retirement of Indebtedness and any assumption of Indebtedness by a third party, and (c) any Indebtedness incurred or assumed by the Borrower or any of the Restricted Subsidiaries in connection therewith and if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination; *provided* that, without limiting the application of the Pro Forma Adjustment pursuant to (A) above, the foregoing pro forma adjustments may be applied to any such test or covenant solely to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and give effect to events (including operating expense reductions) that are (i) (x) directly attributable to such transaction,

(y) expected to have a continuing impact on the Borrower and the Restricted Subsidiaries and (z) factually supportable or (ii) otherwise consistent with the definition of Pro Forma Adjustment.

"**Pro Forma Financial Statements**" has the meaning set forth in Section 5.05(a)(ii).

"**Pro Rata Share**" means, with respect to each Lender at any time a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the applicable Facility or Facilities at such time and the denominator of which is the amount of the Aggregate Commitments under the applicable Facility or Facilities at such time; *provided* that if such Commitments have been terminated, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"**Projections**" shall have the meaning set forth in Section 6.01(c).

"**Qualified Equity Interests**" means any Equity Interests that are not Disqualified Equity Interests.

"**Qualifying IPO**" means the issuance by the Borrower or any direct or indirect parent of the Borrower of its common Equity Interests in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering).

"**Receivables Facility**" means any of one or more receivables financing facilities as amended, supplemented, modified, extended, renewed, restated or refunded from time to time, the Obligations of which are non-recourse (except for customary representations, warranties, covenants and indemnities made in connection with such facilities) to the Borrower or any of its Restricted Subsidiaries (other than a Receivables Subsidiary) and pursuant to which the Borrower or any of its Restricted Subsidiaries sells its accounts receivable to either (a) a Person that is not a Restricted Subsidiary or (b) a Receivables Subsidiary that in turn sells its accounts receivable to a Person that is not a Restricted Subsidiary.

"**Receivables Management Assets**" means any debt or other obligations, including receivables and defaulted, contingent and charged-off obligations, any participation or interest therein, and all rights and interests related to, or arising in connection with, any of the foregoing, including any agreements, documents and instruments.

"**Receivables Management Business**" means the segment of the Borrower's consolidated businesses relating to Receivables Management Assets, including, without limitation, servicing, collecting, purchasing and selling Receivables Management Assets and any financing thereof.

"**Receivables Management Financing**" means, with respect to any Receivables Management Subsidiary, any Indebtedness incurred for the purpose of making Investments in Receivables Management Assets and operating the Receivables Management Business; *provided*, that the Indebtedness thereunder is not (a) repayable or guaranteed by the Borrower or any Restricted Subsidiary other than Receivables Management Subsidiaries and (b) secured by the assets of the Borrower or any Restricted Subsidiary other than the property and assets of

Receivables Management Subsidiaries and the Equity Interests of Receivables Management Subsidiaries.

"**Receivables Management Leverage Ratio**" means, with respect to the Receivables Management Subsidiaries, as of any date of determination, the ratio of (a) Consolidated Total Indebtedness attributable to the Receivables Management Subsidiaries under Receivables Management Financings to (b) Consolidated EBITDA attributable to the Receivables Management Subsidiaries.

"**Receivables Management Subsidiary**" means any Restricted Subsidiary substantially all of whose activities consist of engaging in the Receivables Management Business.

"**Receivables Subsidiary**" means any Subsidiary formed for the purpose of, and that solely engages in, one or more Receivables Facilities and other activities reasonably related thereto.

"**Refinanced Term Loans**" has the meaning specified in Section 10.01.

"**Refunding Loans**" has the meaning set forth in Section 2.03(c)(i).

"**Register**" has the meaning set forth in Section 10.07(d).

"**Replacement Term Loans**" has the meaning specified in Section 10.01.

"**Reportable Event**" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"**Request for Credit Extension**" means (a) with respect to a Borrowing, conversion or continuation of Term Loans or Revolving Credit Loans, a Committed Loan Notice, (b) with respect to an L/C Credit Extension, a Letter of Credit Application, and (c) with respect to a Swing Line Loan, a Swing Line Loan Notice.

"**Required Lenders**" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings (with the aggregate amount of each Lender's risk participation and funded participation in L/C Obligations and Swing Line Loans being deemed "held" by such Lender for purposes of this definition), (b) aggregate unused Term Commitments and (c) aggregate unused Revolving Credit Commitments; *provided* that the unused Term Commitment and unused Revolving Credit Commitment of, and the portion of the Total Outstandings held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Restricted Payment**" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of the Borrower or any Restricted Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to the Borrower's stockholders, partners or members (or the equivalent Persons thereof).

"**Restricted Payments Interest Expense Election**" has the meaning set forth in Section 7.06(k).

"**Restricted Subsidiary**" means any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"**Returns**" means, with respect to any Investment, dividends, distributions, return of capital, interest, fees, premium, repayment of principal, income, profits (from Disposition or otherwise) and other amounts realized from any Investment.

"**Revolving Commitment Increase**" has the meaning set forth in Section 2.14(a).

"**Revolving Commitment Increase Lender**" has the meaning set forth in Section 2.14(d).

"**Revolving Credit Borrowing**" means a borrowing consisting of simultaneous Revolving Credit Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Revolving Credit Lenders pursuant to Section 2.01(b).

"**Revolving Credit Commitment**" means, as to each Revolving Credit Lender, its obligation to (a) make Revolving Credit Loans to the Borrower pursuant to Section 2.01(b), (b) purchase participations in L/C Obligations and (c) purchase participations in Swing Line Loans, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Revolving Credit Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement, including pursuant to a Revolving Commitment Increase. The aggregate Revolving Credit Commitments of all Revolving Credit Lenders shall be $250,000,000 on the Closing Date, as such amount may be adjusted from time to time in accordance with the terms of this Agreement, including pursuant to a Revolving Commitment Increase.

"**Revolving Credit Exposure**" means, as to each Revolving Credit Lender, the sum of the outstanding principal amount of such Revolving Credit Lender's Revolving Credit Loans and its Pro Rata Share of the L/C Obligations and the Swing Line Obligations at such time.

"**Revolving Credit Facility**" means, at any time, the aggregate amount of the Revolving Credit Lenders' Revolving Credit Commitments at such time.

"**Revolving Credit Lender**" means, at any time, any Lender that has a Revolving Credit Commitment at such time.

"**Revolving Credit Loans**" has the meaning specified in Section 2.01(b).

"**Revolving Credit Note**" means a promissory note of the Borrower payable to any Revolving Credit Lender or its registered assigns, in substantially the form of Exhibit C-2 hereto, evidencing the aggregate Indebtedness of the Borrower to such Revolving Credit Lender resulting from the Revolving Credit Loans made by such Revolving Credit Lender.

"**Rollover Amount**" has the meaning set forth in Section 7.15(b).

"**S&P**" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor thereto.

"**Same Day Funds**" means immediately available funds.

"**SEC**" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"**Secured Hedge Agreement**" means any Swap Contract permitted under Article VII that is entered into or has been entered into prior to the date hereof by and between any Loan Party or any Restricted Subsidiary and any Hedge Bank.

"**Secured Obligations**" has the meaning specified in the Security Agreement.

"**Secured Parties**" means, collectively, the Administrative Agent, the Lenders, the Hedge Banks, the Supplemental Administrative Agent and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.01(c).

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement**" means, collectively, the Security Agreement executed by the Loan Parties, substantially in the form of Exhibit G, together with each other security agreement supplement executed and delivered pursuant to Section 6.11.

"**Security Agreement Supplement**" has the meaning specified in the Security Agreement.

"**Senior Guarantees**" has the meaning set forth in the definition of "Collateral and Guarantee Requirement".

"**Senior Notes**" means $650,000,000 in aggregate principal amount of senior notes issued by the Borrower due 2014 and any exchange notes issued in respect thereof on substantially the same terms.

"**Senior Notes Indenture**" means the indenture for the Senior Notes, dated as of October 24, 2006, together with any other agreement documenting the Senior Notes.

"**Senior Secured Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Senior Secured Debt of the Loan Parties as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Senior Subordinated Notes**" means $450,000,000 in aggregate principal amount of senior subordinated notes issued by the Borrower due 2016 and any exchange notes issued in respect thereof on substantially the same terms.

"**Senior Subordinated Notes Indenture**" means the indenture for the Senior Subordinated Notes, dated as of October 24, 2006, together with any other agreement documenting the Senior Subordinated Notes.

"**Sold Entity or Business**" has the meaning set forth in the definition of the term "Consolidated EBITDA".

"**Solvent**" and "**Solvency**" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature and (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"**SPC**" has the meaning specified in Section 10.07(h).

"**Specified Junior Financing**" means, any Junior Financing with an aggregate outstanding principal amount in excess of the Threshold Amount.

"**Specified Junior Financing Document**" means, the Junior Financing Document in respect of any Specified Junior Financing.

"**Specified Transaction**" means, with respect to any period, any Investment, Disposition, incurrence or repayment of Indebtedness, Restricted Payment, Subsidiary designation, Incremental Term Loan or Revolving Commitment Increase that by the terms of this Agreement requires "Pro Forma Compliance" with a test or covenant hereunder or requires such test or covenant to be calculated on a "Pro Forma Basis".

"**Sponsors**" means Thomas H. Lee Partners, L.P. and Quadrangle Group LLC, and their Affiliates and any investment funds advised or managed by any of the foregoing, but not including, however, any portfolio companies of any of the foregoing.

"**Sponsor Management Agreement**" means the Management Agreement between certain of the management companies associated with the Sponsors and the Borrower.

"**Sponsor Termination Fees**" means the one-time payment under the Sponsor Management Agreement of a termination fee to one or more of the Sponsors and their Affiliates in the event of either a Change of Control or the completion of a Qualifying IPO or otherwise pursuant to the Sponsor Management Agreement.

"**Subsidiary**" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person; *provided, however,* that references to a "Subsidiary" or "Subsidiaries" in this Agreement and the other Loan Documents shall not include West Education Foundation so long as such entity is a not-for-profit corporation tax exempt under Section 501(c)(3) of the Code. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"**Successor Borrower**" has the meaning specified in Section 7.04(d).

"**Supplemental Administrative Agent**" has the meaning specified in Section 9.13 and "Supplemental Administrative Agents" shall have the corresponding meaning.

"**Swap Contract**" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"**Swap Termination Value**" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"**Swing Line Borrowing**" means a borrowing of a Swing Line Loan pursuant to Section 2.04.

"**Swing Line Facility**" means the revolving credit facility made available by the Swing Line Lender pursuant to Section 2.04.

"**Swing Line Lender**" means LCPI, in its capacity as provider of Swing Line Loans, or any successor swing line lender hereunder.

"**Swing Line Loan**" has the meaning specified in Section 2.04(a).

"**Swing Line Loan Notice**" means a notice of a Swing Line Borrowing pursuant to Section 2.04(b), which, if in writing, shall be substantially in the form of Exhibit B.

"**Swing Line Obligations**" means, as at any date of determination, the aggregate principal amount of all Swing Line Loans outstanding.

"**Swing Line Sublimit**" means an amount equal to the lesser of (a) $30,000,000 and (b) the aggregate amount of the Revolving Credit Commitments. The Swing Line Sublimit is part of, and not in addition to, the Revolving Credit Commitments.

"**Syndication Agent**" means Deutsche Bank Securities Inc. and Bank of America, N.A., each in its capacity as a Syndication Agent under this Agreement.

"**Taxes**" has the meaning specified in Section 3.01(a).

"**Term Borrowing**" means a borrowing consisting of simultaneous Term Loans of the same Type and currency and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Term Lenders pursuant to Section 2.01.

"**Term Commitment**" means, as to each Term Lender, its obligation to make a Term Loan to the Borrower pursuant to Section 2.01(a) in an aggregate amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01(a) under the caption "Term Commitment" or in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The initial aggregate amount of the Term Commitments is $2,100,000,000.

"**Term Lender**" means, at any time, any Lender that has a Term Commitment or a Term Loan at such time.

"**Term Loan**" means a Loan made pursuant to Section 2.01(a).

"**Term Note**" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C-1 hereto, evidencing the aggregate Indebtedness of the Borrower to such Term Lender resulting from the Term Loans made by such Term Lender.

"**Test Period**" means, for any determination under this Agreement, the four consecutive fiscal quarters of the Borrower then last ended.

"**Threshold Amount**" means $35,000,000.

"**Total Leverage Ratio**" means, with respect to any Test Period, the ratio of (a) Consolidated Total Debt as of the last day of such Test Period to (b) Consolidated EBITDA for such Test Period.

"**Total Outstandings**" means the aggregate Outstanding Amount of all Loans and all L/C Obligations.

"**Tranche**" means a category of Commitments or Credit Extensions thereunder. For purposes hereof, each of the following comprises a separate Tranche: (a) the unused

Revolving Commitments, (b) the outstanding Revolving Credit Loans and L/C Obligations in respect of Letters of Credit and (c) the outstanding Term Loans.

"**Transaction**" means, collectively, (a) the Equity Contribution, (b) the Merger, (c) the issuance of the New Notes, (d) the funding of the Term Loans, (e) the refinancing of the Existing Credit Agreement and certain other Indebtedness of the Borrower and its Subsidiaries, (f) transaction, retention and incentive bonuses and change of control payments to management and other employees of the Borrower and all related transactions, (g) the establishment of equity compensation plans, equity arrangements and employment arrangements with certain of the Borrower's management, (h) the consummation of any other transactions in connection with the foregoing and (i) the payment of fees and expenses incurred in connection with any of the foregoing.

"**Transaction Documents**" means the Merger Agreement and all other material documents, instruments and certificates contemplated by the Merger Agreement.

"**Transaction Expenses**" means any fees or expenses incurred or paid by the Borrower or any Restricted Subsidiary in connection with the Transaction, this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby.

"**Type**" means, with respect to any Loan, its character as a Base Rate Loan or a Eurocurrency Rate Loan.

"**Unaudited Financial Statements**" has the meaning set forth in Section 4.01(f).

"**Uniform Commercial Code**" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"**United States**" and "U.S." mean the United States of America.

"**Unreimbursed Amount**" has the meaning set forth in Section 2.03(c)(i).

"**Unrestricted Subsidiary**" means (i) each Subsidiary of the Borrower listed on Schedule 1.01B and (ii) any Subsidiary of the Borrower designated by the board of directors of the Borrower as an Unrestricted Subsidiary pursuant to Section 6.15 subsequent to the date hereof. Any Subsidiary of any such Unrestricted Subsidiary that is formed or acquired by such Unrestricted Subsidiary after the designation of any such Subsidiary as an Unrestricted Subsidiary (or in the case of clause (i), subsequent to the date hereof) shall automatically be deemed to be an Unrestricted Subsidiary and shall not be subject to Section 6.15.

"**U.S. Lender**" has the meaning set forth in Section 10.15(b).

"**Weighted Average Life to Maturity**" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (a) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (b) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"**West**" has the meaning specified in the introductory paragraph to this Agreement.

"**wholly owned**" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

SECTION 1.02. Other Interpretive Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)

(i)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(ii)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(iii)    The term "including" is by way of example and not limitation.

(iv)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

SECTION 1.03. Accounting Terms.

(a)    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b)    Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement with respect to any period during which any Specified Transaction occurs, the Total Leverage Ratio and Interest Coverage Ratio shall be calculated with respect to such period and such Specified Transaction on a Pro Forma Basis.

SECTION 1.04. <u>Rounding</u>. Any financial ratios required to be maintained by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05. <u>References to Agreements, Laws, Etc.</u> Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document; and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

SECTION 1.06. <u>Times of Day</u>. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.07. <u>Timing of Payment of Performance</u>. When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

SECTION 1.08. <u>Currency Equivalents Generally</u>.

(a)     Any amount specified in this Agreement (other than in Articles II, IX and X or as set forth in paragraph (b) of this Section) or any of the other Loan Documents to be in Dollars shall also include the equivalent of such amount in any currency other than Dollars, such equivalent amount to be determined at the rate of exchange quoted by the Reuters World Currency Page for the applicable currency at 11:00 a.m. (London time) on such day (or, in the event such rate does not appear on any Reuters World Currency Page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Borrower, or, in the absence of such agreement, such rate shall instead be the arithmetic average of the spot rates of exchange of the Administrative Agent in the market where its foreign currency exchange operations in respect of such currency are then being conducted, at or about 10:00 a.m. (New York City time) on such date for the purchase of Dollars for delivery two Business Days later). Notwithstanding the foregoing, for purposes of determining compliance with Sections 7.01, 7.02 and 7.03 with respect to any amount of Indebtedness or Investment in a currency other than Dollars, no Default shall be deemed to have occurred solely as a result of changes in rates of exchange occurring after the time such Indebtedness or Investment is incurred; <i>provided</i> that, for the avoidance of doubt, the foregoing provisions of this Section 1.08 shall otherwise apply to such Sections, including with respect to determining whether any Indebtedness or Investment may be incurred at any time under such Sections.

(b)     For purposes of determining compliance under Sections 7.02, 7.05, 7.06, 7.11 and 7.15, any amount in a currency other than Dollars will be converted to Dollars based on the average Exchange Rate for such currency for the most recent

twelve-month period immediately prior to the date of determination determined in a manner consistent with that used in calculating EBITDA for the applicable period, *provided, however,* that the foregoing shall not be deemed to apply to the determination of any amount of Indebtedness. For purposes of determining compliance with Section 7.11, the equivalent in Dollars of any Indebtedness denominated in a currency other than Dollars will reflect the currency translation effects, determined in accordance with GAAP, of Swap Contracts for currency exchange risks with respect to the applicable currency in effect on the date of determination of the Dollar equivalent of such Indebtedness.

SECTION 1.09.  Change of Currency.  Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Borrower's consent to appropriately reflect a change in currency of any country and any relevant market conventions or practices relating to such change in currency.

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

SECTION 2.01.  The Loans.

(a)     *The Term Borrowings.*  Subject to the terms and conditions set forth herein, each Term Lender severally agrees to make to the Borrower a single loan denominated in Dollars in an amount equal to such Term Lender's Term Commitment on the Closing Date.  Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed.  Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(b)     *The Revolving Credit Borrowings.*  Subject to the terms and conditions set forth herein (i) each Revolving Credit Lender severally agrees to make loans denominated in Dollars to the Borrower (each such loan, a **"Revolving Credit Loan"**) from time to time, on any Business Day until the Maturity Date, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Credit Commitment; *provided* that after giving effect to any Revolving Credit Borrowing, (i) the amount of the Revolving Credit Exposure of any Lender shall not exceed such Lender's Revolving Credit Commitment.  Within the limits of each Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01(b), prepay under Section 2.05, and reborrow under this Section 2.01(b).  Revolving Credit Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.  Notwithstanding anything to the contrary herein, the maximum amount of Revolving Credit Loans that may be borrowed by the Borrower on the Closing Date shall not exceed $50,000,000.

SECTION 2.02.  Borrowings, Conversions and Continuations of Loans.

(a)     Each Term Borrowing, each Revolving Credit Borrowing, each conversion of Term Loans or Revolving Credit Loans from one Type to the other, and each continuation of Eurocurrency Rate Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent.  Each such notice must be received by the Administrative Agent not later than 1:00 p.m. (New York City time) (i) three (3) Business Days prior to the requested date of any Borrowing or continuation

of Eurocurrency Rate Loans or any conversion of Base Rate Loans to Eurocurrency Rate Loans, and (ii) one (1) Business Day before the requested date of any Borrowing of Base Rate Loans. Each notice by the Borrower pursuant to this Section 2.02(a) must be by delivery to the Administrative Agent of a written Committed Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Each Borrowing of, conversion to or continuation of Eurocurrency Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $500,000 in excess thereof. Except as provided in Sections 2.03(c) and 2.04(c), each Borrowing of or conversion to Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof. Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Term Borrowing, a Revolving Credit Borrowing, a conversion of Term Loans or Revolving Credit Loans from one Type to the other, or a continuation of Eurocurrency Rate Loans, (ii) the requested date of the Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Loans to be borrowed, converted or continued, (iv) the Type of Loans to be borrowed or to which existing Term Loans or Revolving Credit Loans are to be converted, and (v) if applicable, the duration of the Interest Period with respect thereto. If the Borrower fails to specify a Type of Loan in a Committed Loan Notice or fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans or Revolving Credit Loans shall be made as, or converted to, Base Rate Loans. Any such automatic conversion to Base Rate Loans shall be effective as of the last day of the Interest Period then in effect with respect to the applicable Eurocurrency Rate Loans. If the Borrower requests a Borrowing of, conversion to, or continuation of Eurocurrency Rate Loans in any such Committed Loan Notice, but fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one (1) month. Notwithstanding anything to the contrary herein, unless the Administrative Agent otherwise agrees, no Loan may be made as or converted into a Eurocurrency Rate Loan with an Interest Period longer than one (1) month prior to the date which is 60 days after the Closing Date.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Pro Rata Share of the applicable Class of Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans or continuation described in Section 2.02(a). In the case of each Borrowing, each Appropriate Lender shall make the amount of its Loan available to the Administrative Agent in Same Day Funds at the Administrative Agent's Office not later than 1:00 p.m. on the Business Day specified in the applicable Committed Loan Notice. Upon satisfaction of the applicable conditions set forth in Section 4.02 (and, if such Borrowing is the initial Credit Extension, Section 4.01), the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower; *provided* that if, on the date the Committed Loan Notice with respect to such Borrowing is given by the Borrower, there are Swing Line Loans or L/C Borrowings outstanding, then the proceeds of such Borrowing shall be applied, first, to the payment in full of any such L/C Borrowings, second, to the payment in full of any such Swing Line Loans, and third, to the Borrower as provided above.

(c)    Except as otherwise provided herein, a Eurocurrency Rate Loan may be continued or converted only on the last day of an Interest Period for such Eurocurrency Rate Loan unless the Borrower pays the amount due, if any, under Section 3.05 in

connection therewith. During the existence of an Event of Default, the Administrative Agent or the Required Lenders may require that no Loans may be converted to or continued as Eurocurrency Rate Loans.

(d)    The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for Eurocurrency Rate Loans upon determination of such interest rate. The determination of the Eurocurrency Rate by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)    After giving effect to all Term Borrowings, all Revolving Credit Borrowings, all conversions of Term Loans or Revolving Credit Loans from one Type to the other, and all continuations of Term Loans or Revolving Credit Loans as the same Type, there shall not be more than twenty (20) Interest Periods in effect.

(f)    The failure of any Lender to make the Loan to be made by it as part of any Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Loan on the date of such Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Loan to be made by such other Lender on the date of any Borrowing.

SECTION 2.03. Letters of Credit.

(a)    *The Letter of Credit Commitment.*

(i)    On and after the Closing Date the Existing Letters of Credit will constitute Letters of Credit under this Agreement and for purposes hereof will be deemed to have been issued on the Closing Date. Subject to the terms and conditions set forth herein, (A) each L/C Issuer agrees, in reliance upon the agreements of the other Revolving Credit Lenders set forth in this Section 2.03, (1) from time to time on any Business Day during the period from the Closing Date until the Letter of Credit Expiration Date, to issue Letters of Credit denominated in Dollars for the account of the Borrower (*provided*, that any Letter of Credit may be for the benefit of any Subsidiary of the Borrower) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 2.03(b), and (2) to honor drafts under the Letters of Credit and (B) the Revolving Credit Lenders severally agree to participate in Letters of Credit issued pursuant to this Section 2.03; *provided* that no L/C Issuer shall be obligated to make any L/C Credit Extension with respect to any Letter of Credit, and no Lender shall be obligated to participate in any Letter of Credit if as of the date of such L/C Credit Extension, (x) the amount of the Revolving Credit Exposure of any Lender would exceed such Lender's Revolving Credit Commitment and (y) the Outstanding Amount of the L/C Obligations would exceed the Letter of Credit Sublimit. Within the foregoing limits, and subject to the terms and conditions hereof, the Borrower's ability to obtain Letters of Credit shall be fully revolving, and accordingly the Borrower may, during the foregoing period, obtain Letters of Credit to replace Letters of Credit that have expired or that have been drawn upon and reimbursed.

(ii)    An L/C Issuer shall be under no obligation to issue any Letter of Credit if:

(A)    any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain such L/C Issuer from issuing such Letter of Credit, or any Law applicable to such L/C Issuer or any directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over such L/C Issuer shall prohibit, or direct that such L/C Issuer refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon such L/C Issuer with respect to such Letter of Credit any restriction, reserve or capital requirement (for which such L/C Issuer is not otherwise compensated hereunder) not in effect on the Closing Date, or shall impose upon such L/C Issuer any unreimbursed loss, cost or expense which was not applicable on the Closing Date (for which such L/C Issuer is not otherwise compensated hereunder);

(B)    subject to Section 2.03(b)(iii), the expiry date of such requested Letter of Credit would occur more than twelve months after the date of issuance or last renewal, unless such L/C Issuer has approved such expiry date;

(C)    the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless all the Revolving Credit Lenders have approved such expiry date;

(D)    the issuance of such Letter of Credit would violate any Laws binding upon such L/C Issuer; or

(E)    such Letter of Credit is in an initial amount less than $100,000 (or such lesser amount agreed to by the L/C Issuer).

(iii)    An L/C Issuer shall be under no obligation to amend any Letter of Credit if (A) such L/C Issuer would have no obligation at such time to issue such Letter of Credit in its amended form under the terms hereof, or (B) the beneficiary of such Letter of Credit does not accept the proposed amendment to such Letter of Credit.

(b)    *Procedures for Issuance and Amendment of Letters of Credit; Auto-Renewal Letters of Credit.*

(i)    Each Letter of Credit shall be issued or amended, as the case may be, upon the request of the Borrower delivered to an L/C Issuer (with a copy to the Administrative Agent) in the form of a Letter of Credit Application, appropriately completed and signed by a Responsible Officer of Borrower. Such Letter of Credit Application must be received by the relevant L/C Issuer and the Administrative Agent not later than 1:00 p.m. at least two (2) Business Days prior to the proposed issuance date or date of amendment, as the case may be; or, in each case, such later date and time as the relevant L/C Issuer may agree in a particular instance in its sole discretion. In the case of a request for an initial issuance of a Letter of Credit, such Letter of Credit Application shall specify in

form and detail reasonably satisfactory to the relevant L/C Issuer: (a) the proposed issuance date of the requested Letter of Credit (which shall be a Business Day); (b) the amount thereof; (c) the expiry date thereof; (d) the name and address of the beneficiary thereof; (e) the documents to be presented by such beneficiary in case of any drawing thereunder; (f) the full text of any certificate to be presented by such beneficiary in case of any drawing thereunder; and (g) such other matters as the relevant L/C Issuer may reasonably request. In the case of a request for an amendment of any outstanding Letter of Credit, such Letter of Credit Application shall specify in form and detail reasonably satisfactory to the relevant L/C Issuer (1) the Letter of Credit to be amended; (2) the proposed date of amendment thereof (which shall be a Business Day); (3) the nature of the proposed amendment; and (4) such other matters as the relevant L/C Issuer may reasonably request.

(ii)     Promptly after receipt of any Letter of Credit Application, the relevant L/C Issuer will confirm with the Administrative Agent (by telephone or in writing) that the Administrative Agent has received a copy of such Letter of Credit Application from the Borrower and, if not, such L/C Issuer will provide the Administrative Agent with a copy thereof. Upon receipt by the relevant L/C Issuer of confirmation from the Administrative Agent that the requested issuance or amendment is permitted in accordance with the terms hereof, then, subject to the terms and conditions hereof, such L/C Issuer shall, on the requested date, issue a Letter of Credit for the account of the Borrower or enter into the applicable amendment, as the case may be. Immediately upon the issuance of each Letter of Credit, each Revolving Credit Lender shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from the relevant L/C Issuer a risk participation in such Letter of Credit in an amount equal to the product of such Lender's Pro Rata Share times the amount of such Letter of Credit.

(iii)     If the Borrower so requests in any applicable Letter of Credit Application, the relevant L/C Issuer shall agree to issue a Letter of Credit that has automatic renewal provisions (each, an "**Auto-Renewal Letter of Credit**"); *provided* that any such Auto-Renewal Letter of Credit must permit the relevant L/C Issuer to prevent any such renewal at least once in each twelve month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "**Nonrenewal Notice Date**") in each such twelve month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the relevant L/C Issuer, the Borrower shall not be required to make a specific request to the relevant L/C Issuer for any such renewal. Once an Auto-Renewal Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the relevant L/C Issuer to permit the renewal of such Letter of Credit at any time to an expiry date not later than the Letter of Credit Expiration Date; *provided* that the relevant L/C Issuer shall not permit any such renewal if (A) the relevant L/C Issuer has determined that it would have no obligation at such time to issue such Letter of Credit in its renewed form under the terms hereof (by reason of the provisions of Section 2.03(a)(ii) or otherwise), or (B) it has received notice (which may be by telephone or in writing) on or before the day that is five (5) Business Days before the Nonrenewal Notice Date from the Administrative

Agent, any Revolving Credit Lender or the Borrower that one or more of the applicable conditions specified in Section 4.02 is not then satisfied.

(iv)    Promptly after its delivery of any Letter of Credit or any amendment to a Letter of Credit to an advising bank with respect thereto or to the beneficiary thereof, the relevant L/C Issuer will also deliver to the Borrower and the Administrative Agent a true and complete copy of such Letter of Credit or amendment.

(c)    *Drawings and Reimbursements; Funding of Participations.*

(i)    Upon receipt from the beneficiary of any Letter of Credit of any notice of a drawing under such Letter of Credit, the relevant L/C Issuer shall notify promptly the Borrower and the Administrative Agent thereof. Not later than 1:00 p.m. on the second Business Day immediately following any payment by an L/C Issuer under a Letter of Credit (each such date, an "**Honor Date**"), the Borrower shall reimburse such L/C Issuer through the Administrative Agent in an amount equal to the amount of such drawing. In order to reimburse any such drawing, the Borrower shall have the option to request in accordance with Section 2.02 a Revolving Credit Borrowing of Base Rate Loans ("**Refunding Loans**"), without regard to the minimum and multiples specified in Section 2.02 for the principal amount of Base Rate Loans but subject to the amount of the unutilized portion of the Revolving Credit Commitments of the Appropriate Lenders and the conditions set forth in Section 4.02. If the Borrower fails to so reimburse such L/C Issuer by such time, the Administrative Agent shall promptly notify each Appropriate Lender of the Honor Date, the amount of the unreimbursed drawing (the "**Unreimbursed Amount**"), and the amount of such Appropriate Lender's Pro Rata Share thereof. Any notice given by an L/C Issuer or the Administrative Agent pursuant to this Section 2.03(c)(i) may be given by telephone if immediately confirmed in writing; *provided* that the lack of such an immediate confirmation shall not affect the conclusiveness or binding effect of such notice.

(ii)    Each Appropriate Lender (including any Lender acting as an L/C Issuer) shall, upon any notice pursuant to Section 2.03(c)(i) make a Refunding Loan to the Borrower, make such funds available to the Administrative Agent for the account of the relevant L/C Issuer, in Dollars, at the Administrative Agent's Office for payments not later than 1:00 p.m. on the Business Day specified in such notice by the Borrower. The Administrative Agent shall remit the funds so received to the relevant L/C Issuer.

(iii)    With respect to any Unreimbursed Amount, the Borrower shall be deemed to have incurred from the relevant L/C Issuer an L/C Borrowing in the amount of the Unreimbursed Amount that is not so refinanced, which L/C Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the Default Rate. In such event, upon demand by the relevant L/C Issuer (through the Administrative Agent), each Appropriate Lender shall make funds available to the Administrative Agent for the account of the relevant L/C Issuer, in Dollars, at the Administrative Agent's Office for payments in an amount equal to its Pro Rata Share of the Unreimbursed Amount not later than 1:00 p.m. on the Business Day following the date of such demand, and such payment to the Administrative Agent for the account of the relevant L/C Issuer shall be deemed payment in respect of its participation in such L/C Borrowing and shall constitute an L/C Advance from such Lender in satisfaction of its participation obligation under this Section 2.03.

(iv)    Until an Appropriate Lender funds its L/C Advance pursuant to this Section 2.03(c) to reimburse the relevant L/C Issuer for any amount drawn under any Letter of Credit, interest in respect of such Lender's Pro Rata Share of such amount shall be solely for the account of the relevant L/C Issuer.

(v)    Each Revolving Credit Lender's obligation to make Refunding Loans or L/C Advances to reimburse an L/C Issuer for amounts drawn under Letters of Credit, as contemplated by this Section 2.03(c), shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the relevant L/C Issuer, the Borrower or any other Person for any reason whatsoever; (B) except for the obligation to make Refunding Loans, the occurrence or continuance of a Default or the failure to satisfy any of the other conditions specified in Section 4.02, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing.  No such making of an L/C Advance shall relieve or otherwise impair the obligation of the Borrower to reimburse the relevant L/C Issuer for the amount of any payment made by such L/C Issuer under any Letter of Credit, together with interest as provided herein.

(vi)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the relevant L/C Issuer any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.03(c) by the time specified in Section 2.03(c)(iii), such L/C Issuer shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such L/C Issuer at a rate per annum equal to the Federal Funds Rate from time to time in effect.  A certificate of the relevant L/C Issuer submitted to any Revolving Credit Lender (through the Administrative Agent) with respect to any amounts owing under this Section 2.03(c)(vi) shall be conclusive absent manifest error.

(d)    *Repayment of Participations.*

(i)    If, at any time after an L/C Issuer has made a payment under any Letter of Credit and has received from any Revolving Credit Lender such Lender's L/C Advance in respect of such payment in accordance with Section 2.03(c), the Administrative Agent receives for the account of such L/C Issuer any payment in respect of the related Unreimbursed Amount or interest thereon (whether directly from the Borrower or otherwise, including proceeds of Cash Collateral applied thereto by the Administrative Agent), the Administrative Agent will distribute to such Lender its Pro Rata Share thereof (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's L/C Advance was outstanding) in the same funds as those received by the Administrative Agent.

(ii)    If any payment received by the Administrative Agent for the account of an L/C Issuer pursuant to Section 2.03(c) is required to be returned under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by such L/C Issuer in its discretion), each Appropriate Lender shall pay to the Administrative Agent for the account of such L/C Issuer its Pro Rata Share thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned by such Lender, at a rate per annum equal to the Federal Funds Rate from time to time in effect.

(e)    *Obligations Absolute.* The obligation of the Borrower to reimburse the relevant L/C Issuer for each drawing under each Letter of Credit issued by it and to repay each L/C Borrowing shall be absolute, unconditional and irrevocable, and shall be paid strictly in accordance with the terms of this Agreement under all circumstances, including the following:

(i)    any lack of validity or enforceability of such Letter of Credit, this Agreement, or any other agreement or instrument relating thereto;

(ii)    the existence of any claim, counterclaim, setoff, defense or other right that any Loan Party may have at any time against any beneficiary or any transferee of such Letter of Credit (or any Person for whom any such beneficiary or any such transferee may be acting), the relevant L/C Issuer or any other Person, whether in connection with this Agreement, the transactions contemplated hereby or by such Letter of Credit or any agreement or instrument relating thereto, or any unrelated transaction;

(iii)    any draft, demand, certificate or other document presented under such Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect; or any loss or delay in the transmission or otherwise of any document required in order to make a drawing under such Letter of Credit;

(iv)    any payment by the relevant L/C Issuer under such Letter of Credit against presentation of a draft or certificate that does not strictly comply with the terms of such Letter of Credit; or any payment made by the relevant L/C Issuer under such Letter of Credit to any Person purporting to be a trustee in bankruptcy, debtor-in-possession, assignee for the benefit of creditors, liquidator, receiver or other representative of or successor to any beneficiary or any transferee of such Letter of Credit, including any arising in connection with any proceeding under any Debtor Relief Law;

(v)    any exchange, release or nonperfection of any Collateral, or any release or amendment or waiver of or consent to departure from the Guaranty or any other guarantee, for all or any of the Obligations any Loan Party in respect of such Letter of Credit; or

(vi)    any other circumstance or happening whatsoever, whether or not similar to any of the foregoing, including any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Loan Party;

*provided* that the foregoing shall not excuse any L/C Issuer from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are waived by the Borrower to the extent permitted by applicable Law) suffered by the Borrower that are caused by such L/C Issuer's gross negligence or willful misconduct when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.

(f)    *Role of L/C Issuers.* Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, the relevant L/C Issuer shall not have any responsibility to obtain any document (other than any sight draft, certificates and

documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document. None of the L/C Issuers, any Agent-Related Person nor any of the respective correspondents, participants or assignees of any L/C Issuer shall be liable to any Lender for (i) any action taken or omitted in connection herewith at the request or with the approval of the Lenders or the Required Lenders, as applicable; (ii) any action taken or omitted in the absence of gross negligence or willful misconduct; or (iii) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Letter of Credit Application. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the L/C Issuers, any Agent-Related Person, nor any of the respective correspondents, participants or assignees of any L/C Issuer, shall be liable or responsible for any of the matters described in clauses (i) through (vi) of Section 2.03(e); *provided* that anything in such clauses to the contrary notwithstanding, the Borrower may have a claim against an L/C Issuer, and such L/C Issuer may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such L/C Issuer's willful misconduct or gross negligence or such L/C Issuer's willful or grossly negligent failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, each L/C Issuer may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no L/C Issuer shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

(g)    *Cash Collateral.* (i) If an L/C Issuer has honored any full or partial drawing request under any Letter of Credit and such drawing has resulted in an L/C Borrowing and the conditions set forth in Section 4.02 to a Revolving Credit Borrowing cannot then be met, (ii) if, as of the Letter of Credit Expiration Date, any Letter of Credit may for any reason remain outstanding and partially or wholly undrawn, (iii) if any Event of Default occurs and is continuing and the Administrative Agent or the Required Lenders, as applicable, require the Borrower to Cash Collateralize the L/C Obligations pursuant to Section 8.02(c) or (iv) an Event of Default set forth under Section 8.01(f) occurs and is continuing, then the Borrower shall Cash Collateralize the then Outstanding Amount of all L/C Obligations (in an amount equal to such Outstanding Amount determined as of the date of such L/C Borrowing or the Letter of Credit Expiration Date, as the case may be), and shall do so not later than 2:00 p.m., New York City time, on (x) in the case of the immediately preceding clauses (i) through (iii), (1) the Business Day that the Borrower receives notice thereof, if such notice is received on such day prior to 12:00 Noon, New York City time, or (2) if clause (1) above does not apply, the Business Day immediately following the day that the Borrower receives such notice and (y) in the case of the immediately preceding clause (iv), the Business Day on which an Event of Default set forth under Section 8.01(f) occurs or, if such day is not a Business Day, the Business Day immediately succeeding such day. For purposes hereof, "**Cash Collateralize**" means to pledge and deposit with or deliver to the Administrative Agent,

for the benefit of the relevant L/C Issuer and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances ("**Cash Collateral**") pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant L/C Issuer (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the L/C Issuers and the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Cash Collateral shall be maintained in blocked accounts established by, and/or under the sole dominion and control of, the Administrative Agent and may be invested in readily available Cash Equivalents. If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent (on behalf of the Secured Parties) or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrower will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited and held in the deposit accounts established by the Administrative Agent as aforesaid, an amount equal to the excess of (a) such aggregate Outstanding Amount over (b) the total amount of funds, if any, then held as Cash Collateral that the Administrative Agent reasonably determines to be free and clear of any such right and claim. Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under applicable Law, to reimburse the relevant L/C Issuer. To the extent the amount of any Cash Collateral exceeds the then Outstanding Amount of such L/C Obligations and so long as no Event of Default has occurred and is continuing, the excess shall be refunded to the Borrower.

(h)     *Letter of Credit Fees.* The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender in accordance with its Pro Rata Share a Letter of Credit fee for each Letter of Credit issued pursuant to this Agreement equal to the Applicable Rate times the daily maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit). Such letter of credit fees shall be computed on a quarterly basis in arrears. Such letter of credit fees shall be due and payable in Dollars on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. If there is any change in the Applicable Rate during any quarter, the daily maximum amount of each Letter of Credit shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(i)     *Fronting Fee and Documentary and Processing Charges Payable to L/C Issuers.* The Borrower shall pay directly to each L/C Issuer for its own account a fronting fee with respect to each Letter of Credit issued by it equal to 0.125% per annum of the daily maximum amount then available to be drawn under such Letter of Credit (whether or not such maximum amount is then in effect under such Letter of Credit if such maximum amount increases periodically pursuant to the terms of such Letter of Credit). Such fronting fees shall be computed on a quarterly basis in arrears. Such fronting fees shall be due and payable on the first Business Day after the end of each March, June, September and December, commencing with the first such date to occur after the issuance of such Letter of Credit, on the Letter of Credit Expiration Date and thereafter on demand. In addition, the Borrower shall pay directly to each L/C Issuer for

its own account the customary issuance, presentation, amendment and other processing fees, and other standard costs and charges, of such L/C Issuer relating to letters of credit as from time to time in effect. Such customary fees and standard costs and charges are due and payable within ten (10) Business Days of demand and are nonrefundable.

(j)     *Conflict with Letter of Credit Application.* Notwithstanding anything else to the contrary in this Agreement, in the event of any conflict between the terms hereof and the terms of any Letter of Credit Application, the terms hereof shall control.

(k)     *Addition of an L/C Issuer.* A Revolving Credit Lender may become an additional L/C Issuer hereunder pursuant to a written agreement among the Borrower, the Administrative Agent, the Initial L/C Issuer for so long as it is an L/C Issuer and such Revolving Credit Lender. The Administrative Agent shall notify the Revolving Credit Lenders of any such additional L/C Issuer.

SECTION 2.04. <u>Swing Line Loans</u>.

(a)     *The Swing Line.* Subject to the terms and conditions set forth herein, the Swing Line Lender agrees to make loans (each such loan, a "**Swing Line Loan**") to the Borrower from time to time on any Business Day (other than the Closing Date) until the Maturity Date in an aggregate amount not to exceed at any time outstanding the amount of the Swing Line Sublimit, notwithstanding the fact that such Swing Line Loans, when aggregated with the Pro Rata Share of the Outstanding Amount of Revolving Credit Loans and L/C Obligations of the Lender acting as Swing Line Lender, may exceed the amount of such Lender's Revolving Credit Commitment; *provided* that, after giving effect to any Swing Line Loan, the aggregate Outstanding Amount of the Revolving Credit Loans of any Lender, plus such Lender's Pro Rata Share of the Outstanding Amount of all L/C Obligations, plus such Lender's Pro Rata Share of the Outstanding Amount of all Swing Line Loans shall not exceed such Lender's Revolving Credit Commitment then in effect; *provided further* that, the Borrower shall not use the proceeds of any Swing Line Loan to refinance any outstanding Swing Line Loan. Within the foregoing limits, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.04, prepay under Section 2.05, and reborrow under this Section 2.04. Each Swing Line Loan shall be a Base Rate Loan. Swing Line Loans shall only be denominated in Dollars. Immediately upon the making of a Swing Line Loan, each Revolving Credit Lender shall be deemed to, and hereby irrevocably agrees to, purchase from the Swing Line Lender a risk participation in such Swing Line Loan in an amount equal to the product of such Lender's Pro Rata Share times the amount of such Swing Line Loan.

(b)     *Borrowing Procedures.* Each Swing Line Borrowing shall be made upon the Borrower's irrevocable written notice to the Swing Line Lender and the Administrative Agent. Each such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the requested borrowing date, and shall specify (i) the amount to be borrowed, which shall be a minimum of $100,000, and (ii) the requested borrowing date, which shall be a Business Day. Each such notice must be by delivery to the Swing Line Lender and the Administrative Agent of a written Swing Line Loan Notice, appropriately completed and signed by a Responsible Officer of the Borrower. Unless the Swing Line Lender has received notice (by telephone or in writing) from the Administrative Agent (including at the request of any Revolving Credit Lender) prior to 2:00 p.m. on the date of the proposed Swing Line Borrowing (A) directing the

Swing Line Lender not to make such Swing Line Loan as a result of the limitations set forth in the proviso to the first sentence of Section 2.04(a), or (B) that one or more of the applicable conditions specified in Section 4.02 is not then satisfied, then, subject to the terms and conditions hereof, the Swing Line Lender will, not later than 3:00 p.m. on the borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrower.

(c)    *Refinancing of Swing Line Loans.*

(i)    The Swing Line Lender at any time in its sole and absolute discretion may request, on behalf of the Borrower (which hereby irrevocably authorizes the Swing Line Lender to so request on its behalf), that each Revolving Credit Lender make a Base Rate Loan in an amount equal to such Lender's Pro Rata Share of the amount of Swing Line Loans then outstanding. Such request shall be made in writing (which written request shall be deemed to be a Committed Loan Notice for purposes hereof) and in accordance with the requirements of Section 2.02, without regard to the minimum and multiples specified therein for the principal amount of Base Rate Loans, but subject to the unutilized portion of the aggregate Revolving Credit Commitments and the conditions set forth in Section 4.02. The Swing Line Lender shall furnish the Borrower with a copy of the applicable Committed Loan Notice promptly after delivering such notice to the Administrative Agent. Each Revolving Credit Lender shall make an amount equal to its Pro Rata Share of the amount specified in such Committed Loan Notice available to the Administrative Agent in Same Day Funds for the account of the Swing Line Lender at the Administrative Agent's Office not later than 1:00 p.m. on the day specified in such Committed Loan Notice, whereupon, subject to Section 2.04(c)(ii), each Revolving Credit Lender that so makes funds available shall be deemed to have made a Base Rate Loan to the Borrower in such amount. The Administrative Agent shall remit the funds so received to the Swing Line Lender.

(ii)    If for any reason any Swing Line Loan cannot be refinanced by such a Revolving Credit Borrowing in accordance with Section 2.04(c)(i), the request for Base Rate Loans submitted by the Swing Line Lender as set forth herein shall be deemed to be a request by the Swing Line Lender that each of the Revolving Credit Lenders fund its risk participation in the relevant Swing Line Loan and each Revolving Credit Lender's payment to the Administrative Agent for the account of the Swing Line Lender pursuant to Section 2.04(c)(i) shall be deemed payment in respect of such participation.

(iii)    If any Revolving Credit Lender fails to make available to the Administrative Agent for the account of the Swing Line Lender any amount required to be paid by such Lender pursuant to the foregoing provisions of this Section 2.04(c) by the time specified in Section 2.04(c)(i), the Swing Line Lender shall be entitled to recover from such Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to the Swing Line Lender at a rate per annum equal to the Federal Funds Rate from time to time in effect. A certificate of the Swing Line Lender submitted to any Lender (through the Administrative Agent) with respect to any amounts owing under this clause (iii) shall be conclusive absent manifest error.

(iv)    Each Revolving Credit Lender's obligation to make Revolving Credit Loans or to purchase and fund risk participations in Swing Line Loans pursuant to

this Section 2.04(c) shall be absolute and unconditional and shall not be affected by any circumstance, including (A) any setoff, counterclaim, recoupment, defense or other right which such Lender may have against the Swing Line Lender, the Borrower or any other Person for any reason whatsoever, (B) except for the obligation to make Revolving Credit Loans, the occurrence or continuance of a Default or the failure to satisfy any of the other conditions specified in Section 4.02, or (C) any other occurrence, event or condition, whether or not similar to any of the foregoing. No such funding of risk participations shall relieve or otherwise impair the obligation of the Borrower to repay Swing Line Loans, together with interest as provided herein.

        (d)    *Repayment of Participations.*

        (i)    At any time after any Revolving Credit Lender has purchased and funded a risk participation in a Swing Line Loan, if the Swing Line Lender receives any payment on account of such Swing Line Loan, the Swing Line Lender will distribute to such Lender its Pro Rata Share of such payment (appropriately adjusted, in the case of interest payments, to reflect the period of time during which such Lender's risk participation was funded) in the same funds as those received by the Swing Line Lender.

        (ii)    If any payment received by the Swing Line Lender in respect of principal or interest on any Swing Line Loan is required to be returned by the Swing Line Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the Swing Line Lender in its discretion), each Revolving Credit Lender shall pay to the Swing Line Lender its Pro Rata Share thereof on demand of the Administrative Agent, plus interest thereon from the date of such demand to the date such amount is returned, at a rate per annum equal to the Federal Funds Rate. The Administrative Agent will make such demand upon the request of the Swing Line Lender.

        (e)    *Interest for Account of Swing Line Lender.* The Swing Line Lender shall be responsible for invoicing the Borrower for interest on the Swing Line Loans. Until a Revolving Credit Lender funds its Base Rate Loan or risk participation pursuant to this Section 2.04 to refinance such Lender's Pro Rata Share of any Swing Line Loan, interest in respect of such Pro Rata Share shall be solely for the account of the Swing Line Lender.

        (f)    *Payments Directly to Swing Line Lender.* The Borrower shall make all payments of principal and interest in respect of the Swing Line Loans directly to the Swing Line Lender.

SECTION 2.05. Prepayments.

        (a)    *Optional.*

        (i)    The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans and Revolving Credit Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Administrative Agent not later than 1:00 p.m. (New York City time) (A) three (3) Business Days prior to any date of prepayment of Eurocurrency Rate Loans and (B) on the date of prepayment of Base Rate Loans; (2) any prepayment of Eurocurrency Rate Loans shall be in a principal amount of $5,000,000 or a whole multiple of $500,000

in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the Class(es) and Type(s) of Loans to be prepaid. The Administrative Agent will promptly notify each Appropriate Lender of its receipt of each such notice, and of the amount of such Lender's Pro Rata Share of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Eurocurrency Rate Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to Section 3.05. Each prepayment of the Loans pursuant to this Section 2.05(a) shall be paid to the Appropriate Lenders in accordance with their respective Pro Rata Shares.

(ii)    The Borrower may, upon notice to the Swing Line Lender (with a copy to the Administrative Agent), at any time or from time to time, voluntarily prepay Swing Line Loans in whole or in part without premium or penalty; *provided* that (1) such notice must be received by the Swing Line Lender and the Administrative Agent not later than 1:00 p.m. on the date of the prepayment, and (2) any such prepayment shall be in a minimum principal amount of $100,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(iii)    Notwithstanding anything to the contrary contained in this Agreement, the Borrower may rescind any notice of prepayment under Section 2.05(a)(i) or 2.05(a)(ii) if such prepayment would have resulted from a refinancing of all of the Facilities, which refinancing shall not be consummated or shall otherwise be delayed.

(iv)    Each prepayment of Term Loans pursuant to this Section 2.05(a) shall be applied to repayments thereof required pursuant to Section 2.07(a) in the manner as directed by the Borrower.

(b)    *Mandatory.*

(i)    Within five (5) Business Days after financial statements have been delivered pursuant to Section 6.01(a) and the related Compliance Certificate has been delivered pursuant to Section 6.02(b), the Borrower shall cause to be prepaid the Term Loans in an amount equal to (A) 50% of Excess Cash Flow, if any, for the fiscal year covered by such financial statements (commencing with the fiscal year ended December 31, 2007) minus (B) the sum of (i) all voluntary prepayments of Term Loans during such fiscal year and (ii) all voluntary prepayments of Revolving Credit Loans during such fiscal year to the extent the Revolving Credit Commitments are permanently reduced by the amount of such payments, in the case of each of the immediately preceding clauses (i) and (ii), to the extent such prepayments are not funded with the proceeds of Indebtedness; *provided* that if the Total Leverage Ratio as of the last day of the fiscal year covered by such financial statements is less than 5.25:1, the Borrower shall make prepayments of Loans in an aggregate amount equal to 25% of Excess Cash Flow for the fiscal year covered by such financial statements and no payment of any Loans shall be

required under this Section 2.05(b)(i) if the Total Leverage Ratio as of the last day of the fiscal year covered by such financial statements is less than 4.5:1.

(ii)    (A)    If (x) the Borrower or any Restricted Subsidiary Disposes of any property or assets (other than any Disposition of any property or assets permitted by Section 7.05(a), (b), (c), (d) (in the case of clause (d)(i) to the extent constituting a Disposition by any Restricted Subsidiary to a Loan Party), (e), (g), (h), (i), (l), (n) or (o)), or (y) any Casualty Event occurs, which in the aggregate results in the realization or receipt by the Borrower or such Restricted Subsidiary of Net Cash Proceeds, the Borrower shall cause to be prepaid on or prior to the date which is ten (10) Business Days after the date of the realization or receipt of such Net Cash Proceeds Term Loans in an amount equal to 100% of all Net Cash Proceeds (other than Excluded Net Cash Proceeds) received; *provided* that no such prepayment shall be required pursuant to this Section 2.05(b)(ii)(A) with respect to such portion of such Net Cash Proceeds that the Borrower shall have, on or prior to such date, given written notice to the Administrative Agent of its intent to reinvest in accordance with Section 2.05(b)(ii)(B) (which notice may only be provided if no Event of Default has occurred and is then continuing);

(B)    With respect to any Net Cash Proceeds realized or received with respect to any Disposition (other than any Disposition specifically excluded from the application of Section 2.05(b)(ii)(A)) or any Casualty Event, at the option of the Borrower, the Borrower may reinvest all or any portion of such Net Cash Proceeds in assets useful for its business within (x) fifteen (15) months following receipt of such Net Cash Proceeds or (y) if the Borrower enters into a legally binding commitment to reinvest such Net Cash Proceeds within fifteen (15) months following receipt thereof, within ninety (90) days of the date of such legally binding commitment; *provided* that (i) so long as an Event of Default shall have occurred and be continuing, the Borrower (x) shall not be permitted to make any such reinvestments (other than pursuant to a legally binding commitment that the Borrower entered into at a time when no Event of Default is continuing) and (y) shall not be required to apply such Net Cash Proceeds which have been previously applied to prepay Revolving Loans to the prepayment of Term Loans until such time as the relevant investment period has expired and no Event of Default is continuing and (ii) if any Net Cash Proceeds are no longer intended to be or cannot be so reinvested at any time after delivery of a notice of reinvestment election, an amount equal to any such Net Cash Proceeds shall be applied within five (5) Business Days after the Borrower reasonably determines that such Net Cash Proceeds are no longer intended to be or cannot be so reinvested to the prepayment of the Term Loans as set forth in this Section 2.05.

(iii)    If the Borrower or any Restricted Subsidiary incurs or issues any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall cause to be prepaid the Term Loans in an amount equal to 100% of all Net Cash Proceeds received therefrom on or prior to the date which is five (5) Business Days after the receipt of such Net Cash Proceeds.

(iv)    If for any reason the aggregate Revolving Credit Exposures at any time exceeds the aggregate Revolving Credit Commitments then in effect (including pursuant to Section 2.17(b)), the Borrower shall promptly prepay or cause to be promptly prepaid Revolving Credit Loans and Swing Line Loans and/or Cash Collateralize the L/C Obligations in an aggregate amount equal to such excess; *provided* that the

Borrower shall not be required to Cash Collateralize the L/C Obligations pursuant to this Section 2.05(b)(iv) unless after the prepayment in full of the Revolving Credit Loans and Swing Line Loans such aggregate Outstanding Amount exceeds the aggregate Revolving Credit Commitments then in effect.

(v)        Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied in direct order of maturity to repayments thereof required pursuant to Section 2.07(a); and each such prepayment shall be paid to the Lenders in accordance with their respective Pro Rata Shares, subject to clause (vii) of this Section 2.05(b).

(vi)       The Borrower shall notify the Administrative Agent in writing of any mandatory prepayment of Term Loans required to be made pursuant to clauses (i) through (iii) of this Section 2.05(b) at least three (3) Business Days prior to the date of such prepayment. Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment. The Administrative Agent will promptly notify each Appropriate Lender of the contents of the Borrower's prepayment notice and of such Appropriate Lender's Pro Rata Share of the prepayment.

(vii)      Each Term Lender may, at its option, decline all or a portion of any mandatory payment applicable to the Term Loans of such Lender pursuant to this Section 2.05(b). With respect to the amount of any mandatory prepayment described in this Section 2.05(b) that is allocated to the Term Loans (such amounts, the "**Mandatory Prepayment Amount**"), the Borrower will, on or prior to the date specified in this Section 2.05(b) for such prepayment, give the Administrative Agent telephonic notice (promptly confirmed in writing) requesting that the Administrative Agent prepare and provide to each Term Lender a notice in substantially the form of Exhibit J (each, a "**Prepayment Option Notice**") as described below and, on such specified prepayment date, deposit with the Administrative Agent the Mandatory Prepayment Amount. As promptly as practicable after receiving such notice from the Borrower (but in any event within two (2) Business Days thereafter), the Administrative Agent will send to each Term Lender a Prepayment Option Notice, and shall include an offer by the Borrower to prepay on the Prepayment Date the Term Loans of such Lender by an amount equal to the portion of the Mandatory Prepayment Amount indicated in such Lender's Prepayment Option Notice as being applicable to such Lender's Term Loans. The "**Prepayment Date**" in respect of any Prepayment Option Notice shall be the date which is five Business Days after the date of such Prepayment Option Notice. On the Prepayment Date, the Administrative Agent shall (A) apply the Mandatory Prepayment Amount toward prepayment of the outstanding Term Loans in respect of which Lenders have accepted mandatory prepayment as described above and (B) return the remaining portion of the Mandatory Prepayment Amount not accepted by the Term Lenders to the Borrower to be retained by it; *provided* that to the extent that any such amounts not accepted by the Term Lenders would give rise to the obligation of the Borrower to make an offer to repurchase any New Notes, such amounts shall instead be applied to repay the Term Loans as otherwise provided herein.

(viii)     *Funding Losses, Etc.* All prepayments under this Section 2.05 shall be made together with, in the case of any such prepayment of a Eurocurrency Rate Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such Eurocurrency Rate Loan pursuant to Section 3.05. Notwithstanding any of the other provisions of this Section 2.05(b), so long as no Event of Default shall

have occurred and be continuing, if any prepayment of Eurocurrency Rate Loans is required to be made under this Section 2.05(b), other than on the last day of the Interest Period therefor, the Borrower may, in its sole discretion, deposit the amount of any such prepayment otherwise required to be made thereunder into a Cash Collateral Account until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Loans in accordance with this Section 2.05(b). Upon the occurrence and during the continuance of any Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Loans in accordance with this Section 2.05(b).

SECTION 2.06.  Termination or Reduction of Commitments.

(a)    *Optional*.  The Borrower may, upon written notice to the Administrative Agent, terminate the unused Commitments of any Class, or from time to time permanently reduce the unused Commitments of any Class; *provided* that (i) any such notice shall be received by the Administrative Agent three (3) Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $500,000 or any whole multiple of $100,000 in excess thereof and (iii) if, after giving effect to any reduction of the Commitments, the Letter of Credit Sublimit or the Swing Line Sublimit exceeds the amount of the Revolving Credit Facility, such sublimit shall be automatically reduced by the amount of such excess, such sublimit shall be automatically reduced by the amount of such excess.  The amount of any such Commitment reduction shall not be applied to the Letter of Credit Sublimit or the Swing Line Sublimit unless otherwise specified by the Borrower.  Notwithstanding the foregoing, the Borrower may rescind or postpone any notice of termination of the Commitments if such termination would have resulted from a refinancing of all of the Facilities, which refinancing shall not be consummated or otherwise shall be delayed.

(b)    *Mandatory*.  The Term Commitment of each Term Lender shall be automatically and permanently reduced to $0 upon the making of such Term Lender's Term Loans pursuant to Section 2.01(a).

(c)    *Application of Commitment Reductions; Payment of Fees*.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of unused portions of the Letter of Credit Sublimit, or the Swing Line Sublimit or the unused Commitments of any Class under this Section 2.06.  Upon any reduction of unused Commitments of any Class, the Commitment of each Lender of such Class shall be reduced by such Lender's Pro Rata Share of the amount by which such Commitments are reduced (other than the termination of the Commitment of any Lender as provided in Section 3.07).  All commitment fees accrued until the effective date of any termination of the Aggregate Commitments shall be paid on the effective date of such termination.

SECTION 2.07.  Repayment of Loans.

(a)    *Term Loans*.  The Borrower shall repay to the Administrative Agent for the ratable account of the Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the second such date to occur after the Closing Date, an aggregate amount equal to 0.25% of the aggregate amount of all Term Loans outstanding on the Closing Date (which payments shall be reduced as a result of

the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (ii) on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date.

(b)     *Revolving Credit Loans.* The Borrower shall repay to the Administrative Agent for the ratable account of the Appropriate Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all of its Revolving Credit Loans outstanding on such date.

(c)     *Swing Line Loans.* The Borrower shall repay its Swing Line Loans on the earlier to occur of (i) the date five (5) Business Days after such Loan is made and (ii) the Maturity Date for the Revolving Credit Facility.

SECTION 2.08.    Interest.    (a) Subject to the provisions of Section 2.08(b), (i) each Eurocurrency Rate Loan shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the Eurocurrency Rate for such Interest Period plus the Applicable Rate; (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate and (iii) each Swing Line Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate plus the Applicable Rate for Revolving Credit Loans.

(b)     The Borrower shall pay interest on past due amounts hereunder (after giving effect to any applicable grace periods) at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)     Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

SECTION 2.09.    Fees.    In addition to certain fees described in Sections 2.03(h) and (i):

(a)     *Commitment Fee.* The Borrower shall pay to the Administrative Agent for the account of each Revolving Credit Lender in accordance with its Pro Rata Share, a commitment fee equal to the Applicable Rate with respect to commitment fees times the actual daily amount by which the aggregate Revolving Credit Commitment exceeds the sum of (A) Outstanding Amount of Revolving Credit Loans and (B) the Outstanding Amount of L/C Obligations; *provided* that any commitment fee accrued with respect to any of the Commitments of a Defaulting Lender during the period prior to the time such Lender became a Defaulting Lender and unpaid at such time shall not be payable by the Borrower so long as such Lender shall be a Defaulting Lender except to the extent that such commitment fee shall otherwise have been due and payable by the Borrower prior to such time; and *provided further* that no commitment fee shall accrue on any of the Commitments of a Defaulting Lender so long as such Lender shall be a Defaulting Lender. The commitment fee shall accrue at all times from the date hereof until the Maturity Date for the Revolving Credit Facility, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly

in arrears on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Closing Date, and on the Maturity Date for the Revolving Credit Facility. The commitment fee shall be calculated quarterly in arrears, and if there is any change in the Applicable Rate during any quarter, the actual daily amount shall be computed and multiplied by the Applicable Rate separately for each period during such quarter that such Applicable Rate was in effect.

(b)     *Other Fees.* The Borrower shall pay to the Agents such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified. Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever (except as expressly agreed between the Borrower and the applicable Agent).

SECTION 2.10.  <u>Computation of Interest and Fees</u>. All computations of interest for Base Rate Loans when the Base Rate is determined by the Prime Rate shall be made on the basis of a year of three hundred and sixty-five (365)/three hundred and sixty-six (366) and actual days elapsed. All other computations of fees and interest shall be made on the basis of a three hundred and sixty (360) day year and actual days elapsed. Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one (1) day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

SECTION 2.11.  <u>Evidence of Indebtedness</u>.

(a)     The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting solely for purposes of Treasury Regulation Section 5f.103-1(c), as agent for the Borrower, in each case in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be prima facie evidence absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note payable to such Lender, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, Type (if applicable), amount and maturity of its Loans and payments with respect thereto.

(b)     In addition to the accounts and records referred to in Section 2.11(a), each Lender and the Administrative Agent shall maintain in accordance with its usual practice accounts or records and, in the case of the Administrative Agent, entries in the Register, evidencing the purchases and sales by such Lender of participations in Letters of Credit and Swing Line Loans. In the event of any conflict between the accounts and records maintained by the Administrative Agent and the accounts and records of any

Lender in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(c)     Entries made in good faith by the Administrative Agent in the Register pursuant to Sections 2.11(a) and (b), and by each Lender in its account or accounts pursuant to Sections 2.11(a) and (b), shall be *prima facie* evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such account or accounts, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of the Borrower under this Agreement and the other Loan Documents.

SECTION 2.12.  Payments Generally.

(a)     All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the applicable Administrative Agent's Office in Dollars and in Same Day Funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Pro Rata Share (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)     If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided* that, if such extension would cause payment of interest on or principal of Eurocurrency Rate Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(c)     Unless the Borrower or any Lender has notified the Administrative Agent, prior to the date any payment is required to be made by it to the Administrative Agent hereunder, that the Borrower or such Lender, as the case may be, will not make such payment, the Administrative Agent may assume that the Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be so required to), in reliance thereon, make available a corresponding amount to the Person entitled thereto. If and to the extent that such payment was not in fact made to the Administrative Agent in Same Day Funds, then:

(i)     if the Borrower failed to make such payment, each Lender shall forthwith on demand repay to the Administrative Agent the portion of such assumed payment that was made available to such Lender in Same Day Funds, together with interest thereon in respect of each day from and including the date such amount was made available by the Administrative Agent to such Lender to the date such amount is repaid to the Administrative Agent in Same Day Funds at the Federal Funds Rate from time to time in effect; and

(ii)    if any Lender failed to make such payment, such Lender shall forthwith on demand pay to the Administrative Agent the amount thereof in Same Day Funds, together with interest thereon for the period from the date such amount was made available by the Administrative Agent to the Borrower to the date such amount is recovered by the Administrative Agent (the "**Compensation Period**") at a rate per annum equal to the Federal Funds Rate from time to time in effect. When such Lender makes payment to the Administrative Agent (together with all accrued interest thereon), then such payment amount (excluding the amount of any interest which may have accrued and been paid in respect of such late payment) shall constitute such Lender's Loan included in the applicable Borrowing. If such Lender does not pay such amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent may make a demand therefor upon the Borrower, and the Borrower shall pay such amount to the Administrative Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to the applicable Borrowing. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(c) shall be conclusive, absent manifest error.

(d)    If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)    The obligations of the Lenders hereunder to make Loans and to fund participations in Letters of Credit and Swing Line Loans are several and not joint. The failure of any Lender to make any Loan or to fund any such participation on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or purchase its participation.

(f)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)    Whenever any payment received by the Administrative Agent under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Administrative Agent and the Lenders under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be distributed by the Administrative Agent and applied by the Administrative Agent and the Lenders in the order of priority set forth in Section 8.04. If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the

manner in which such funds are to be applied, the Administrative Agent may, but at the direction of Required Lenders shall, elect to distribute such funds to each of the Lenders in accordance with such Lender's Pro Rata Share of the sum of (a) the Outstanding Amount of all Loans outstanding at such time and (b) the Outstanding Amount of all L/C Obligations outstanding at such time, in repayment or prepayment of such of the outstanding Loans or other Obligations then owing to such Lender.

SECTION 2.13.  Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Loans made by it, or the participations in L/C Obligations and Swing Line Loans held by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact, and (b) purchase from the other Lenders such participations in the Loans made by them and/or such subparticipations in the participations in L/C Obligations or Swing Line Loans held by them, as the case may be, as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Loans or such participations, as the case may be, pro rata with each of them; *provided* that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by applicable Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.13 and will in each case notify the Lenders following any such purchases or repayments.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

SECTION 2.14.  Incremental Credit Extensions.

(a)     The Borrower may at any time or from time to time after the Closing Date, by notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy to each of the Lenders), request (i) one or more additional tranches of term loans (the **"Incremental Term Loans"**) or (ii) one or more increases in the amount of the Revolving Credit Commitments (each such increase, a **"Revolving Commitment Increase"**), *provided* that (A) both at the time of any such request and upon the effectiveness of any Incremental Amendment referred to below, no Default or Event of Default shall exist and at the time that any such Incremental Term Loan is made (and after giving effect thereto) no Default or Event of Default shall exist and (B) the Borrower shall be in compliance with each of the covenants set forth in Section 7.11 determined on a Pro Forma Basis as of the date of such Incremental Term Loan or Revolving Commitment Increase and the last day of the most recent Test Period, as if

such Incremental Term Loans or Revolving Commitment Increases, as applicable, had been outstanding on the last day of such fiscal quarter of the Borrower for testing compliance therewith. Each tranche of Incremental Term Loans and each Revolving Commitment Increase shall be in an aggregate principal amount that is not less than $25,000,000 (*provided* that such amount may be less than $25,000,000 if such amount represents all remaining availability under the limit set forth in the next sentence). Notwithstanding anything to the contrary herein, the aggregate amount of the Incremental Term Loans and the Revolving Commitment Increases shall not exceed the sum of (x) $500,000,000 plus (y) the aggregate amount of principal payments made in respect of the Term Loans as of such Incremental Facility Closing Date.

(b)    The Incremental Term Loans (i) shall rank pari passu in right of payment and of security with the Revolving Credit Loans and the Term Loans, (ii) shall not mature earlier than the Maturity Date with respect to the Term Loans, (iii) shall not have a weighted average life to maturity that is shorter than the weighted average life to maturity with respect to the Term Loans and (iv) except as set forth above, shall be treated substantially the same as the Term Loans (in each case, including with respect to mandatory and voluntary prepayments), provided that (A) the terms and conditions applicable to Incremental Term Loans may be materially different from those of the Term Loans to the extent such differences are reasonably acceptable to the Arrangers and (B) the interest rates and amortization schedule applicable to the Incremental Term Loans shall be determined by the Borrower and the lenders thereof.

(c)    Each notice from the Borrower pursuant to this Section shall set forth the requested amount and proposed terms of the relevant Incremental Term Loans or Revolving Commitment Increases. Incremental Term Loans may be made, and Revolving Commitment Increases may be provided, by any existing Lender (and each existing Term Lender will have the right, but not an obligation, to make a portion of any Incremental Term Loan, and each existing Revolving Credit Lender will have the right, but not an obligation, to provide a portion of any Revolving Commitment Increase, in each case on terms permitted in this Section 2.14 and otherwise on terms reasonably acceptable to the Administrative Agent) or by any other bank or other financial institution (any such other bank or other financial institution being called an "**Additional Lender**"), *provided* that the Administrative Agent and the Borrower shall have consented (not to be unreasonably withheld) to such Lender's or Additional Lender's making such Incremental Term Loans or providing such Revolving Commitment Increases if such consent would be required under Section 10.07(b) for an assignment of Loans or Revolving Credit Commitments, as applicable, to such Lender or Additional Lender. Commitments in respect of Incremental Term Loans and Revolving Commitment Increases shall become Commitments (or in the case of a Revolving Commitment Increase to be provided by an existing Revolving Credit Lender, an increase in such Lender's applicable Revolving Credit Commitment) under this Agreement pursuant to an amendment (an "**Incremental Amendment**") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, each Lender agreeing to provide such Commitment, if any, each Additional Lender, if any, and the Administrative Agent. The Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the reasonable opinion of the Administrative Agent and the Borrower, to effect the provisions of this Section. The effectiveness of any Incremental Amendment shall be subject to the satisfaction on the date thereof (each, an "**Incremental Facility Closing Date**") of each of the conditions set forth in Section 4.02 (it being understood

that all references to "the date of such Credit Extension" or similar language in such Section 4.02 shall be deemed to refer to the effective date of such Incremental Amendment) and such other conditions as the parties thereto shall agree. The Borrower will use the proceeds of the Incremental Term Loans and Revolving Commitment Increases for any purpose not prohibited by this Agreement. No Lender shall be obligated to provide any Incremental Term Loans or Revolving Commitment Increases, unless it so agrees.

(d)     Upon each increase in the Revolving Credit Commitments pursuant to this Section, (i) each Revolving Credit Lender immediately prior to such increase will automatically and without further act be deemed to have assigned to each Lender providing a portion of the Revolving Commitment Increase (each a "**Revolving Commitment Increase Lender**") in respect of such increase, and each such Revolving Commitment Increase Lender will automatically and without further act be deemed to have assumed, a portion of such Revolving Credit Lender's participations hereunder in outstanding Letters of Credit and Swing Line Loans such that, after giving effect to each such deemed assignment and assumption of participations, the percentage of the aggregate outstanding (A) participations hereunder in Letters of Credit and (B) participations hereunder in Swing Line Loans held by each Revolving Credit Lender (including each such Revolving Commitment Increase Lender) will equal the percentage of the aggregate Revolving Credit Commitments of all Revolving Credit Lenders represented by such Revolving Credit Lender's Revolving Credit Commitment and (ii) if, on the date of such increase, there are any Revolving Credit Loans outstanding, such Revolving Credit Loans shall on or prior to the effectiveness of such Revolving Commitment Increase be prepaid from the proceeds of additional Revolving Credit Loans made hereunder (reflecting such increase in Revolving Credit Commitments), which prepayment shall be accompanied by accrued interest on the Revolving Credit Loans being prepaid and any costs incurred by any Lender in accordance with Section 3.05. The Administrative Agent and the Lenders hereby agree that the minimum borrowing, pro rata borrowing and pro rata payment requirements contained elsewhere in this Agreement shall not apply to the transactions effected pursuant to the immediately preceding sentence.

(e)     This Section 2.14 shall supersede any provisions in Section 2.13 or 10.01 to the contrary.

## ARTICLE III

## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

SECTION 3.01.  Taxes.

(a)     Except as provided in this Section 3.01, any and all payments by the Borrower (the term Borrower under Article III being deemed to include any Subsidiary for whose account a Letter of Credit is issued) to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities (including additions to tax, penalties and interest) with respect thereto, excluding in the case of each Agent and each Lender, taxes imposed on or measured by its net or gross income (including branch profits), and franchise (and similar) taxes imposed on it in lieu of net income taxes, by the

jurisdiction (or any political subdivision thereof) under the Laws of which such Agent or such Lender, as the case may be, is organized or maintains a Lending Office, and all liabilities (including additions to tax, penalties and interest) with respect thereto (in each case, other than any such tax or liability arising solely from any Agent or any Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document). All non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and liabilities described in the immediately preceding sentence are hereinafter referred to as "**Taxes**". If the Borrower shall be required by any Laws to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions, (iii) the Borrower shall pay the full amount deducted to the appropriate Governmental Authority in accordance with applicable Laws, and (iv) within thirty (30) days after the date of such payment (or, if receipts or evidence are not available within thirty (30) days, as soon as possible thereafter), the Borrower shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent. If the Borrower fails to pay any Taxes or Other Taxes when due to the appropriate Governmental Authority or fails to remit to any Agent or any Lender the required receipts or other required documentary evidence, the Borrower shall indemnify such Agent and such Lender for any incremental taxes, interest or penalties that may become payable by such Agent or such Lender arising out of such failure.

(b)     In addition, the Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise, property, intangible or mortgage recording taxes or charges or similar levies which, in each case, arise from any payment made under any Loan Document or from the execution or delivery of any Loan Document or otherwise with respect to the exercise by a Lender of its rights under any Loan Document (hereinafter referred to as "**Other Taxes**").

(c)     The Borrower agrees to indemnify each Agent and each Lender for (i) the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed by any jurisdiction on amounts payable under this Section 3.01) paid by such Agent and such Lender and (ii) any liability (including additions to tax, penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed by the relevant Governmental Authority; provided such Agent or Lender, as the case may be, provides the Borrower with a written statement thereof setting forth in reasonable detail the basis and calculation of such amounts. Payment under this Section 3.01(c) shall be made within thirty (30) days after the date such Lender or such Agent makes a written demand therefor.

(d)     The Borrower shall not be required pursuant to this Section 3.01 to pay any additional amount to, or to indemnify, any Lender or Agent, as the case may be, to the extent that such Lender or such Agent becomes subject to Taxes subsequent to the Closing Date (or, if later, the date such Lender or Agent becomes a party to this Agreement) as a result of a change in the place of organization of such Lender or Agent or a change in the lending office of such Lender, except to the extent that any such

change is requested in writing by the Borrower or is otherwise required pursuant to the terms of this Agreement (and provided that nothing in this clause (d) shall be construed as relieving the Borrower from any obligation to make such payments or indemnification in the event of a change in lending office or place of organization that precedes a change in Law to the extent such Taxes result from a change in Law).

(e)    Notwithstanding anything else herein to the contrary, if a Lender or an Agent is subject to withholding tax imposed by any jurisdiction in which the Borrower is formed or organized at a rate in excess of zero percent at the time such Lender or such Agent, as the case may be, first becomes a party to this Agreement, withholding tax imposed by such jurisdiction at such rate shall be considered excluded from Taxes unless and until such Lender or Agent, as the case may be, provides the appropriate forms certifying that a lesser rate applies, whereupon withholding tax at such lesser rate only shall be considered excluded from Taxes for periods governed by such forms; *provided* that, if at the date of the Assignment and Acceptance pursuant to which a Lender becomes a party to this Agreement, the Lender assignor was entitled to payments under clause (a) of this Section 3.01 in respect of withholding tax with respect to interest paid at such date, then, to such extent, the term Taxes shall include (in addition to withholding taxes that may be imposed in the future or other amounts otherwise includable in Taxes) withholding tax, if any, applicable with respect to the Lender assignee on such date.

(f)    If any Lender or Agent determines, in its reasonable discretion, that it has received a refund or overpayment credit in respect of any Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall promptly remit such refund or the amount of such credit (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 3.01 with respect to the Taxes or Other Taxes giving rise to such refund (or such credit) plus any interest included in such refund by the relevant Governmental Authority attributable thereto) to the Borrower, net of all out-of-pocket expenses of the Lender or Agent, as the case may be and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that the Borrower, upon the request of the Lender or Agent, as the case may be, agrees promptly to return such refund (or such credit) to such party in the event such party is required to repay such refund (or such credit) to the relevant Governmental Authority. Such Lender or Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund (or such credit) received from the relevant Governmental Authority (*provided* that such Lender or Agent may delete any information therein that such Lender or Agent deems confidential). Nothing herein contained shall interfere with the right of a Lender or Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or Agent to claim any tax refund or to make available its tax returns or disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.

(g)    Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to such Lender's overall internal policies of general application and legal and regulatory restrictions) to designate another Lending Office for any Loan or Letter of Credit affected by such event; *provided*

that such efforts are made on terms that, in the sole judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no economic, legal, regulatory or other disadvantage, and *provided further* that nothing in this Section 3.01(g) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.01(a) or (c).

SECTION 3.02.  Illegality.  If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Eurocurrency Rate Loans, or to determine or charge interest rates based upon the Eurocurrency Rate, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, any obligation of such Lender to make or continue Eurocurrency Rate Loans or to convert Base Rate Loans to Eurocurrency Rate Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, the Borrower shall upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all Eurocurrency Rate Loans of such Lender to Base Rate Loans, either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Eurocurrency Rate Loans to such day, or promptly, if such Lender may not lawfully continue to maintain such Eurocurrency Rate Loans.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted and all amounts due, if any, in connection with such prepayment or conversion under Section 3.05.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

SECTION 3.03.  Inability to Determine Rates.  If the Required Lenders determine that for any reason adequate and reasonable means do not exist for determining the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan, or that the Eurocurrency Rate for any requested Interest Period with respect to a proposed Eurocurrency Rate Loan does not adequately and fairly reflect the cost to such Lenders of funding such Loan, or that Dollar deposits are not being offered to banks in the London interbank eurodollar market for the applicable amount and the Interest Period of such Eurocurrency Rate Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, the obligation of the Lenders to make or maintain Eurocurrency Rate Loans shall be suspended until the Administrative Agent (upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of Eurocurrency Rate Loans or, failing that, will be deemed to have converted such request into a request for a Borrowing of Base Rate Loans in the amount specified therein.

SECTION 3.04.  Increased Cost and Reduced Return; Capital Adequacy; Reserves on Eurocurrency Rate Loans.

(a)      If any Lender determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the date hereof, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining Eurocurrency Rate Loans or (as the case may be) issuing or participating in Letters of Credit, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from (i) Taxes or Other Taxes (as to which Section 3.01 shall govern),

(ii) changes in the basis of taxation of net income or gross income (including branch profits), and franchise (and similar) taxes imposed in lieu of net income taxes, by the United States or any foreign jurisdiction or any political subdivision of either thereof under the Laws of which such Lender is organized or maintains a Lending Office, and (iii) reserve requirements contemplated by Section 3.04(c), then from time to time within fifteen (15) days after demand by such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)     If any Lender determines that the introduction of any Law regarding capital adequacy or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy and such Lender's desired return on capital), then from time to time upon demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within fifteen (15) days after receipt of such demand.

(c)     The Borrower shall pay to each Lender, (i) as long as such Lender shall be required to maintain reserves with respect to liabilities or assets consisting of or including Eurocurrency funds or deposits, additional interest on the unpaid principal amount of each Eurocurrency Rate Loan equal to the actual costs of such reserves allocated to such Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive in the absence of manifest error), and (ii) as long as such Lender shall be required to comply with any reserve ratio requirement or analogous requirement of any other central banking or financial regulatory authority imposed in respect of the maintenance of the Commitments or the funding of the Eurocurrency Rate Loans, such additional costs (expressed as a percentage per annum and rounded upwards, if necessary, to the nearest five decimal places) equal to the actual costs allocated to such Commitment or Loan by such Lender (as determined by such Lender in good faith, which determination shall be conclusive absent manifest error) which in each case shall be due and payable on each date on which interest is payable on such Loan, provided the Borrower shall have received at least fifteen (15) days' prior notice (with a copy to the Administrative Agent) of such additional interest or cost from such Lender. If a Lender fails to give notice fifteen (15) days prior to the relevant Interest Payment Date, such additional interest or cost shall be due and payable fifteen (15) days from receipt of such notice.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 3.04 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Borrower shall not be required to compensate a Lender pursuant to Section 3.04(a), (b) or (c) for any such increased cost or reduction incurred more than one hundred and eighty (180) days prior to the date that such Lender demands, or notifies the Borrower of its intention to demand, compensation therefor, *provided* further that, if the circumstance giving rise to such increased cost or

reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower, use commercially reasonable efforts to designate another Lending Office for any Loan or Letter of Credit affected by such event; *provided* that such efforts are made on terms that, in the sole judgment of such Lender, cause such Lender and its Lending Office(s) to suffer no economic, legal, regulatory or other disadvantage, and *provided further* that nothing in this Section 3.04(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Section 3.04(a), (b), (c) or (d).

SECTION 3.05.  Funding Losses.  Upon demand of any Lender (with a copy to the Administrative Agent) from time to time, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Loan other than a Base Rate Loan on a day other than the last day of the Interest Period for such Loan; or

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Loan) to prepay, borrow, continue or convert any Loan other than a Base Rate Loan on the date or in the amount notified by the Borrower;

including any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain such Loan or from fees payable to terminate the deposits from which such funds were obtained.

For purposes of calculating amounts payable by the Borrower to the Lenders under this Section 3.05, each Lender shall be deemed to have funded each Eurocurrency Rate Loan made by it at the Eurocurrency Rate for such Loan by a matching deposit or other borrowing in the London interbank eurodollar market for a comparable amount and for a comparable period, whether or not such Eurocurrency Rate Loan was in fact so funded.

SECTION 3.06.  Matters Applicable to All Requests for Compensation.

(a)     Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower setting forth the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)     With respect to any Lender's claim for compensation under Section 3.01, 3.02, 3.03 or 3.04, no Borrower shall be required to compensate such Lender for any amount incurred more than one hundred and eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that, if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another

Eurocurrency Rate Loans, or to convert Base Rate Loans into Eurocurrency Rate Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)    If the obligation of any Lender to make or continue from one Interest Period to another any Eurocurrency Rate Loan, or to convert Base Rate Loans into Eurocurrency Rate Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's Eurocurrency Rate Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such Eurocurrency Rate Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

(i)    to the extent that such Lender's Eurocurrency Rate Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's Eurocurrency Rate Loans shall be applied instead to its Base Rate Loans; and

(ii)    all Loans that would otherwise be made or continued from one Interest Period to another by such Lender as Eurocurrency Rate Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into Eurocurrency Rate Loans shall remain as Base Rate Loans.

(d)    If any Lender gives notice to the Borrower (with a copy to the Agent) that the circumstances specified in Section 3.01, 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's Eurocurrency Rate Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when Eurocurrency Rate Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding Eurocurrency Rate Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding Eurocurrency Rate Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods) in accordance with their respective Commitments.

SECTION 3.07.    Replacement of Lenders under Certain Circumstances.

(a)    If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 as a result of any condition described in such Sections or any Lender ceases to make Eurocurrency Rate Loans as a result of any condition described in Section 3.02 or Section 3.04, (ii) any Lender becomes a Defaulting Lender or (iii) any Lender becomes a Non-Consenting Lender, then the Borrower may, on ten (10) Business Days' prior written notice to the Administrative Agent and such Lender, replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the

Borrower to find a replacement Lender or other such Person; and *provided further* that (A) in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable Eligible Assignees shall have agreed to the applicable departure, waiver or amendment of the Loan Documents.

(b)        Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Commitment and outstanding Loans and participations in L/C Obligations and Swing Line Loans, and (ii) deliver any Notes evidencing such Loans to the Borrower or Administrative Agent. Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Commitment and outstanding Loans and participations in L/C Obligations and Swing Line Loans, (B) all obligations of the Borrower owing to the assigning Lender relating to the Loans and participations so assigned shall be paid in full by the assignee Lender to such assigning Lender concurrently with such assignment and assumption and (C) upon such payment and, if so requested by the assignee Lender, delivery to the assignee Lender of the appropriate Note or Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Loans, Commitments and participations, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.

(c)        Notwithstanding anything to the contrary contained above, any Lender that acts as an L/C Issuer may not be replaced hereunder at any time that it has any Letter of Credit outstanding hereunder unless arrangements reasonably satisfactory to such L/C Issuer (including the furnishing of a back-up standby letter of credit in form and substance, and issued by an issuer reasonably satisfactory to such L/C Issuer or the depositing of cash collateral into a cash collateral account in amounts and pursuant to arrangements reasonably satisfactory to such L/C Issuer) have been made with respect to each such outstanding Letter of Credit and the Lender that acts as the Administrative Agent may not be replaced hereunder except in accordance with the terms of Section 9.09.

(d)        In the event that (i) the Borrower or the Administrative Agent has requested that the Lenders consent to a departure or waiver of any provisions of the Loan Documents or agree to any amendment thereto, (ii) the consent, waiver or amendment in question requires the agreement of all affected Lenders in accordance with the terms of Section 10.01 or all the Lenders with respect to a certain Class of the Loans and (iii) the Required Lenders have agreed to such consent, waiver or amendment, then any Lender who does not agree to such consent, waiver or amendment shall be deemed a "**Non-Consenting Lender.**"

SECTION 3.08.  <u>Survival</u>. All of the Borrower's obligations under this Article III shall survive termination of the Aggregate Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

SECTION 4.01. Conditions of Initial Credit Extension. The obligation of each Lender to make its initial Credit Extension hereunder is subject to satisfaction of the following conditions precedent:

(a)     The Administrative Agent's receipt of the following, each of which shall be originals or facsimiles (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each in form and substance reasonably satisfactory to the Administrative Agent and its legal counsel:

(i)     executed counterparts of this Agreement and the Guaranty;

(ii)     a Note executed by the Borrower in favor of each Lender that has requested a Note at least two Business Days in advance of the Closing Date;

(iii)     each Collateral Document set forth on Schedule 1.01A, duly executed by each Loan Party party thereto, together with:

(A)     certificates, if any, representing the Pledged Equity referred to therein (except as set forth on Schedule 1.01A) accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank,

(B)     to the extent any Mortgages are delivered on the Closing Date, to the extent required under the Collateral and Guarantee Requirement, opinions of local counsel for the Loan Parties in states in which the Mortgaged Properties are located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent; and

(C)     evidence that all other actions, recordings and filings (other than as set forth on Schedule 1.01A) that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(iv)     such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party on the Closing Date;

(v)     opinion from (x) Ropes & Gray LLP, New York counsel to the Loan Parties substantially in the form of Exhibit H and (y) the legal opinion of

local counsel in Arizona and Nevada as may be required by the Administrative Agent;

(vi)   a certificate signed by a Responsible Officer of the Borrower certifying that there has not occurred any event, development or circumstance since December 31, 2005, that has had or would reasonably be expected to have a Company Material Adverse Effect;

(vii)   a certificate attesting to the Solvency of the Loan Parties (taken as a whole) after giving effect to the Transaction, from the Chief Financial Officer of the Borrower;

(viii)   a certified copy of the Sponsor Management Agreement, including a certification by a Responsible Officer of the Borrower that such agreement is in full force and effect as of the Closing Date;

(ix)   evidence that all insurance (including title insurance) required to be maintained pursuant to the Loan Documents has been obtained and is in effect and that the Administrative Agent has been named as loss payee under each insurance policy with respect to such insurance as to which the Administrative Agent shall have requested to be so named;

(x)   a certified copy of the Merger Agreement, the material provisions of which shall not have been amended, supplemented or otherwise modified (pursuant to a waiver or otherwise) in a manner materially adverse to the Lenders without the prior written consent of the Arrangers (which consent shall not have been and shall not be unreasonably withheld, conditioned or delayed), duly executed by the parties thereto, together with all material agreements, instruments and other documents delivered in connection therewith as the Administrative Agent shall reasonably request, each including certification by a Responsible Officer of the Borrower that such documents are in full force and effect as of the Closing Date;

(xi)   a Committed Loan Notice or Letter of Credit Application, as applicable, relating to the initial Credit Extension; and

(xii)   a completed Perfection Certificate (as defined in the Security Agreement), executed and delivered by a Responsible Officer of the Borrower, together with all attachments contemplated thereby.

(b)   All fees and expenses required to be paid hereunder and invoiced before the Closing Date shall have been paid in full in cash.

(c)   (i) Prior to or simultaneously with the initial Credit Extension, the Equity Contribution shall have been funded in full in cash; and (ii) prior to or substantially concurrently with the initial Credit Extension, (A) the Merger shall be consummated in accordance with the terms of the Merger Agreement and in compliance with applicable material Laws and regulatory approvals and (B) the other Transactions to be consummated on or prior to the Closing Date shall have been consummated.

(d)     Prior to or simultaneously with the initial Credit Extensions, the Borrower shall have received (i) at least $450,000,000 in gross cash proceeds from the issuance of the Senior Subordinated Notes and (ii) at least $650,000,000 in gross cash proceeds from the issuance of the Senior Notes.

(e)     Prior to or simultaneously with the initial Credit Extensions, the Borrower shall have taken all necessary actions such that, after giving effect to the Transaction, (i) the Borrower and its Subsidiaries shall have outstanding no Indebtedness or preferred Equity Interests other than (A) the Loans and L/C Obligations, (B) the New Notes and (C) Indebtedness permitted under Section 7.03 and (ii) the Borrower shall have outstanding no Equity Interests (or securities convertible into or exchangeable for Equity Interests or rights or options to acquire Equity Interests) other than Qualified Equity Interests.

(f)     The Arrangers and the Lenders shall have received (i) the Audited Financial Statements and the audit report for such financial statements (which shall not be subject to any qualification) and (ii) unaudited consolidated balance sheets and related statements of income, stockholders' equity and cash flows of West and its Subsidiaries for (A) the fiscal quarter ended June 30, 2006 and (B) the six month period ended on such date (collectively, the "**Unaudited Financial Statements**"), which financial statements described in clauses (i) and (ii) shall be prepared in accordance with GAAP.

(g)     The Arrangers and the Lenders shall have received the Pro Forma Financial Statements.

(h)     The Administrative Agent shall have received evidence satisfactory to the Administrative Agent that the Existing Credit Agreement shall be simultaneously terminated and all amounts thereunder shall be simultaneously paid in full.

SECTION 4.02.  Conditions to All Credit Extensions.  The obligation of each Lender to honor any Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type, or a continuation of Eurocurrency Rate Loans) is subject to the following conditions precedent:

(a)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document (except for Credit Extensions on the Closing Date, only the representations contained in Sections 5.01, 5.02, 5.04, 5.13, 5.16 and 5.18) shall be true and correct in all material respects on and as of the date of such Credit Extension; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided, further* that, any representation and warranty made on or as of the Closing Date that is qualified as to "Material Adverse Effect" shall be deemed to be qualified by a "Company Material Adverse Effect."

(b)     No Default shall exist, or would result from such proposed Credit Extension or from the application of the proceeds therefrom.

(c)     The Administrative Agent and, if applicable, the relevant L/C Issuer or the Swing Line Lender shall have received a Request for Credit Extension in accordance with the requirements hereof.

Each Request for Credit Extension (other than a Committed Loan Notice requesting only a conversion of Loans to the other Type or a continuation of Eurocurrency Rate Loans) submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in Sections 4.02(a) and (b) have been satisfied on and as of the date of the applicable Credit Extension.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Agents and the Lenders that:

SECTION 5.01.  Existence, Qualification and Power; Compliance with Laws.  Each Loan Party and each of its Restricted Subsidiaries (a) is a Person duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws, orders, writs, injunctions and orders and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (c), (d) or (e), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.02.  Authorization; No Contravention.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transaction, are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Restricted Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (b)(i), to the extent that such conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.03.  Governmental Authorization; Other Consents.  No material approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, or for the consummation of the Transaction, (b) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents (including the priority thereof) or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) filings necessary to perfect the Liens on the Collateral granted by the Loan Parties in favor of the Secured Parties, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, waived, taken, given or made and are in full

force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

SECTION 5.04. Binding Effect. This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto. This Agreement and each other Loan Document constitutes, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

SECTION 5.05. Financial Statements; No Material Adverse Effect.

(a)    (i) The Audited Financial Statements and the Unaudited Financial Statements fairly present in all material respects the financial condition of West and its Subsidiaries as of the dates thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the periods covered thereby, except as otherwise expressly noted therein. During the period from December 31, 2005 to and including the Closing Date, there has been (i) no sale, transfer or other disposition by West or any of its Subsidiaries of any material part of the business or property of West or any of its Subsidiaries, taken as a whole and (ii) no purchase or other acquisition by West or any of its Subsidiaries of any business or property (including any Equity Interests of any other Person) material in relation to the consolidated financial condition of West and its Subsidiaries, in each case, which is not reflected in the foregoing financial statements or in the notes thereto, has not been publicly disclosed in filings with the SEC prior to the Closing Date or has not otherwise been disclosed in writing to the Lenders prior to the Closing Date.

(ii)    The unaudited pro forma consolidated balance sheet of the Borrower and its Subsidiaries as at December 31, 2005 and June 30, 2006 (including the notes thereto) (the "**Pro Forma Balance Sheet**") and the unaudited pro forma consolidated statement of operations and cash flows of the Borrower and its Subsidiaries for the 12-month period ending on each such date (together with the Pro Forma Balance Sheet, the "**Pro Forma Financial Statements**"), copies of which have heretofore been furnished to each Lender, have been prepared giving effect (as if such events had occurred on such date or at the beginning of such period, as the case may be) to the Transaction, each material acquisition by West or any of its Subsidiaries consummated after December 31, 2005 and prior to the Closing Date and all other transactions that would be required to be given pro forma effect by Regulation S-X promulgated under the Exchange Act (including other adjustments consistent with the definition of Pro Forma Adjustment or as otherwise agreed between the Borrower and the Arrangers). The Pro Forma Financial Statements have been prepared in good faith, based on assumptions believed by the Borrower to be reasonable as of the date of delivery thereof, and present fairly in all material respects on a pro forma basis and in accordance with GAAP the estimated financial position of the Borrower and its Subsidiaries as at December 31, 2005 and June 30, 2006, as the case may be, and their estimated results of operations for the periods covered thereby, assuming that the events specified in the preceding sentence had actually occurred at such date or at the beginning of the periods covered thereby.

(b)    Since December 31, 2005, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(c)     The forecasts of consolidated balance sheets, income statements and cash flow statements of the Borrower and its Subsidiaries for each fiscal year ending after the Closing Date through 2011, copies of which have been furnished to the Administrative Agent prior to the Closing Date in a form reasonably satisfactory to it, have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts, it being understood that actual results may vary from such forecasts and that such variations may be material.

(d)     As of the Closing Date, neither the Borrower nor any Subsidiary has any Indebtedness or other obligations or liabilities, direct or contingent (other than (i) the liabilities reflected on Schedule 5.05, (ii) obligations arising under this Agreement and the New Notes, (iii) liabilities reflected or reserved against on the audited consolidated balance sheet of West and its Subsidiaries as of December 31, 2005 or as disclosed in the notes thereto (as supplemented by liabilities reflected or reserved against on consolidated balance sheet of West and its Subsidiaries as of June 30, 2006 or as disclosed in the notes thereto) and (iv) liabilities incurred in the ordinary course of business) that, either individually or in the aggregate, have had or could reasonably be expected to have a Material Adverse Effect.

SECTION 5.06. <u>Litigation</u>. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any of its Subsidiaries or against any of their properties or revenues that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.07. <u>No Default</u>. Neither the Borrower nor any Subsidiary is in default under or with respect to, or a party to, any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

SECTION 5.08. <u>Ownership of Property; Liens</u>. Each Loan Party and each of its Restricted Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, or easements or other limited property interests in, all real property necessary in the ordinary conduct of its business, free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or to utilize such assets for their intended purposes and Liens permitted by Section 7.01 and except where the failure to have such title could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 5.09. <u>Environmental Compliance</u>.

(a)     There are no claims, actions, suits, or proceedings alleging potential liability or responsibility for violation of, or otherwise relating to, any Environmental Law that could, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Except as specifically disclosed in Schedule 5.09 or except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) none of the properties currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries is listed or proposed for listing on the NPL or on the CERCLIS or any analogous foreign, state or local list or is adjacent to any such property;

(ii) there are no and never have been any underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned, leased or operated by any Loan Party or any of its Subsidiaries or, to its knowledge, on any property formerly owned or operated by any Loan Party or any of its Subsidiaries; (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by any Loan Party or any of its Subsidiaries; and (iv) Hazardous Materials have not been released, discharged or disposed of by any Person on any property currently or formerly owned, leased or operated by any Loan Party or any of its Subsidiaries and Hazardous Materials have not otherwise been released, discharged or disposed of by any of the Loan Parties and their Subsidiaries at any other location.

(c)    The properties owned, leased or operated by the Borrower and the Subsidiaries do not contain any Hazardous Materials in amounts or concentrations which (i) constitute, or constituted a violation of, (ii) require remedial action under, or (iii) could give rise to liability under, Environmental Laws, which violations, remedial actions and liabilities, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

(d)    Except as specifically disclosed in Schedule 5.09, neither the Borrower nor any of its Subsidiaries is undertaking, and has not completed, either individually or together with other potentially responsible parties, any investigation or assessment or remedial or response action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law except for such investigation or assessment or remedial or response action that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(e)    All Hazardous Materials generated, used, treated, handled or stored at, or transported to or from, any property currently or formerly owned or operated by any Loan Party or any of its Subsidiaries have been disposed of in a manner not reasonably expected to result, individually or in the aggregate, in a Material Adverse Effect.

(f)    Except as would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect, none of the Loan Parties and their Subsidiaries has contractually assumed any liability or obligation under or relating to any Environmental Law.

SECTION 5.10. Taxes. Except as set forth in Schedule 5.10 and except as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, the Borrower and its Subsidiaries have filed all Federal and state income tax returns and all other material tax returns and reports required to be filed, and have paid all material Federal and state and other taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those (a) which are not overdue by more than thirty (30) days or (b) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP.

SECTION 5.11. ERISA Compliance.

(a)    Except as set forth in Schedule 5.11 or as could not, either individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each Plan is in compliance with the applicable provisions of ERISA, the Code and other Federal or state Laws.

(b)    (i) No ERISA Event has occurred during the five year period prior to the date on which this representation is made or deemed made with respect to any Pension Plan; (ii) no Pension Plan has an "accumulated funding deficiency" (as defined in Section 412 of the Code), whether or not waived; (iii) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither any Loan Party nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA, except, with respect to each of the foregoing clauses of this Section 5.11(b), as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 5.12. Subsidiaries; Equity Interests; Borrower Information. As of the Closing Date, neither the Borrower nor any other Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12(a) and all of the outstanding Equity Interests in material wholly owned Restricted Subsidiaries have been validly issued, are fully paid and nonassessable and all Equity Interests owned by a Loan Party are owned free and clear of all Liens except any Lien that is permitted under Section 7.01. As of the Closing Date, Schedule 5.12(a) (a) sets forth the name and jurisdiction of each Subsidiary, (b) sets forth the ownership interest of the Borrower and any other Subsidiary in each Subsidiary, including the percentage of such ownership and (c) identifies each Subsidiary the Equity Interests of which are required to be pledged on the Closing Date pursuant to the Collateral and Guarantee Requirement. Schedule 5.12(b) sets forth as of the Closing Date the name, address of principal place of business and tax identification number of the Borrower.

SECTION 5.13. Margin Regulations; Investment Company Act.

(a)    Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation T, U or X of the FRB.

(b)    None of the Borrower, any Person Controlling the Borrower, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

SECTION 5.14. Disclosure. No report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to any Arranger, any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with

respect to projected financial information and pro forma financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation; it being understood that such projections may vary from actual results and that such variances may be material.

SECTION 5.15.  Intellectual Property; Licenses, Etc.  Each of the Loan Parties and their Restricted Subsidiaries own, license or possess the right to use, all of the United States and foreign trademarks, service marks, logos, trade names, domain names, copyrights, patents, patent rights, licenses, trade secrets, proprietary information, technology, software, know-how database rights, design rights and other intellectual property rights (collectively, "**IP Rights**") that are reasonably necessary for the operation of their respective businesses as currently conducted, and, without conflict with the rights of any Person, except to the extent such conflicts, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No IP Rights, advertising, product, process, method, substance, part or other material used by any Loan Party or any Subsidiary in the operation of their respective businesses as currently conducted infringes upon any rights held by any Person and no Person infringes upon any rights of any Loan Party or any Subsidiary except for such infringements, individually or in the aggregate, which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any of the IP Rights, is pending or, to the knowledge of the Borrower, threatened against any Loan Party or Subsidiary, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 5.16.  Solvency.  On the Closing Date after giving effect to the Transaction, the Loan Parties, on a consolidated basis, are Solvent.

SECTION 5.17.  Labor Matters.  There are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payment made to employees of the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.  All payments due from the Borrower or any of its Subsidiaries on account of employee health and welfare insurance that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect if not paid have been paid or accrued as a liability on the books of the Borrower or the relevant Subsidiary.  There will be no change in a classification of employees or agents of the Borrower and any of its Subsidiaries that could trigger a requirement on the part of the Borrower or the relevant subsidiary to assume additional obligations or liabilities with respect to wages and benefits of such employees or agents, that (individually or in the aggregate) could reasonably be expected to have a Material Adverse Effect.

SECTION 5.18.  Subordination of Junior Financing.  The Obligations are "Senior Debt," "Senior Indebtedness," "Guarantor Senior Debt" or "Senior Secured Financing" (or any comparable term) under, and as defined in, the Senior Notes Indenture and any Junior Financing Documentation.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each Restricted Subsidiary to:

SECTION 6.01. Financial Statements. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Borrower beginning with the 2006 fiscal year, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, stockholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit;

(b)    as soon as available, but in any event within forty-five (45) days after the end of each of the first three (3) fiscal quarters of each fiscal year of the Borrower, a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related (i) consolidated statements of income or operations for such fiscal quarter and for the portion of the fiscal year then ended and (ii) consolidated statements of cash flows for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, stockholders' equity and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes;

(c)    as soon as available, and in any event no later than ninety (90) days after the end of each fiscal year of the Borrower (or, solely with respect to the first fiscal year immediately following the Closing Date, one hundred twenty (120) days), a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a summary of the material underlying assumptions applicable thereto) (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of a Responsible Officer stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer has no reason to believe that such Projections are incorrect or misleading in any material respect; and

(d)    simultaneously with the delivery of each set of consolidated financial statements referred to in Sections 6.01(a) and 6.01(b) above, the related consolidating

financial statements reflecting the adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements.

Notwithstanding the foregoing, the obligations in paragraphs (a) and (b) of this Section 6.01 may be satisfied with respect to financial information of the Borrower and the Restricted Subsidiaries by furnishing (A) the applicable financial statements of Holdings (or any direct or indirect parent thereof) or (B) the Borrower's or Holdings' (or any direct or indirect parent thereof), as applicable, Form 10-K or 10-Q, as applicable, filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to Holdings (or a parent thereof), such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to Holdings (or such parent), on the one hand, and the information relating to the Borrower and the Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under Section 6.01(a), such materials are accompanied by a report and opinion of Deloitte & Touche LLP or any other independent registered public accounting firm of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit.

SECTION 6.02. Certificates; Other Information. Deliver to the Administrative Agent for prompt further distribution to each Lender:

(a)    no later than five (5) Business Days after the delivery of the financial statements referred to in Section 6.01(a), a certificate of its independent registered public accounting firm certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Event of Default under Section 7.11 or, if any such Event of Default shall exist, stating the nature and status of such event;

(b)    no later than five (5) Business Days after the delivery of the financial statements referred to in Section 6.01(a) and (b), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower and, if such Compliance Certificate demonstrates an Event of Default of any covenant under Section 7.11, any of the Equity Investors may deliver, together with such Compliance Certificate, notice of their intent to cure (a "Notice of Intent to Cure") such Event of Default pursuant to Section 8.05; *provided* that the delivery of a Notice of Intent to Cure shall in no way affect or alter the occurrence, existence or continuation of any such Event of Default or the rights, benefits, powers and remedies of the Administrative Agent and the Lenders under any Loan Document until the Cure Amount has been received (unless the Loans and other obligations under the Loan Documents have been declared due and payable pursuant to Section 8.02(b));

(c)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which the Borrower files with the SEC or with any Governmental Authority that may be substituted therefor (other than amendments to any registration statement (to the extent such registration statement, in the form it became effective, is delivered), exhibits to any registration statement and, if applicable, any registration statement on Form S-8) and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(d)      promptly after the furnishing thereof, copies of any material requests or material notices received by any Loan Party (other than in the ordinary course of business) or material statements or material reports furnished to any holder of debt securities of any Loan Party or of any of its Restricted Subsidiaries pursuant to the terms of any New Notes Documentation or Junior Financing Documentation in a principal amount greater than the Threshold Amount and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.02;

(e)      together with the delivery of each Compliance Certificate pursuant to Section 6.02(b), (i) a report setting forth the information required by Section 3.03(c) of the Security Agreement (or confirming that there has been no change in such information since the Closing Date or the date of the last such report), (ii) a description of each event, condition or circumstance during the last fiscal quarter covered by such Compliance Certificate requiring a mandatory prepayment under Section 2.05(b) and (iii) an updated list of each Subsidiary that identifies each Subsidiary as a Restricted or an Unrestricted Subsidiary as of the date of delivery of such Compliance Certificate (or confirming that there has been no change in such information since the Closing Date or the date of the last such update); and

(f)      promptly, such additional information regarding the business, legal, financial or corporate affairs of any Loan Party or any Restricted Subsidiary, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01(a) or (b) or Section 6.02(d) (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 10.02; or (ii) on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents. Notwithstanding anything contained herein, in every instance the Borrower shall be required to provide paper copies of the Compliance Certificates required by Section 6.02(b) to the Administrative Agent. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents. For purposes of this Section 6.02, paper copies shall include copies delivered by facsimile transmission or electronically (such as "tif", "pdf" and similar file formats delivered by email).

SECTION 6.03. Notices. Promptly after obtaining knowledge thereof, notify the Administrative Agent (for prompt notification to each Lender):

(a)      of the occurrence of any Default; and

       (b)     of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including arising out of or resulting from (i) breach or non-performance of, or any default or event of default under, a Contractual Obligation of any Loan Party or any Subsidiary, (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary and any Governmental Authority, (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary, including pursuant to any applicable Environmental Laws or in respect of IP Rights or the assertion or occurrence of any noncompliance by any Loan Party or as any of its Subsidiaries with, or liability under, any Environmental Law or Environmental Permit, or (iv) the occurrence of any ERISA Event.

Each notice pursuant to this Section shall be accompanied by a written statement of a Responsible Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

      SECTION 6.04. <u>Payment of Obligations</u>. Pay, discharge or otherwise satisfy as the same shall become due and payable, all its obligations and liabilities in respect of taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, except, in each case, to the extent the failure to pay or discharge the same could not reasonably be expected to have a Material Adverse Effect.

      SECTION 6.05. <u>Preservation of Existence, Etc</u>. (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05 and (b) take all reasonable action to maintain all rights, privileges (including its good standing), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except (i) to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or (ii) pursuant to a transaction permitted by Section 7.04 or 7.05.

      SECTION 6.06. <u>Maintenance of Properties</u>. Except if the failure to do so could not reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted, and (b) make all necessary renewals, replacements, modifications, improvements, upgrades, extensions and additions thereof or thereto in accordance with prudent industry practice.

      SECTION 6.07. <u>Maintenance of Insurance</u>. Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries or otherwise consistent with past practices) as are customarily carried under similar circumstances by such other Persons.

      SECTION 6.08. <u>Compliance with Laws</u>. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.09. <u>Books and Records</u>. Maintain proper books of record and account, in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be.

SECTION 6.10. <u>Inspection Rights</u>. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Borrower; *provided* that, excluding any such visits and inspections during the continuation of an Event of Default, only the Administrative Agent on behalf of the Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 6.10 and the Administrative Agent shall not exercise such rights more often than two (2) times during any calendar year absent the existence of an Event of Default and only one (1) such time shall be at the Borrower's expense; *provided further* that when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

SECTION 6.11. <u>Covenant to Guarantee Obligations and Give Security</u>. At the Borrower's expense, take all action necessary or reasonably requested by the Administrative Agent to ensure that the Collateral and Guarantee Requirement continues to be satisfied, including:

(a)     Upon the formation or acquisition of any new direct or indirect wholly owned Domestic Restricted Subsidiary (in each case, other than an Unrestricted Subsidiary or an Excluded Subsidiary) by any Loan Party or the designation in accordance with Section 6.15 of any existing direct or indirect wholly owned Domestic Subsidiary as a Restricted Subsidiary (other than an Excluded Subsidiary):

(i)     within ninety (90) days after such formation, acquisition or designation:

(A)     cause each such Domestic Restricted Subsidiary that is required to become a Guarantor under the Collateral and Guarantee Requirement to furnish to the Administrative Agent a description of the Material Real Properties owned by such Domestic Restricted Subsidiary, in detail reasonably satisfactory to the Administrative Agent;

(B)     cause (x) each such Domestic Restricted Subsidiary that is required to become a Guarantor pursuant to the Collateral and Guarantee Requirement to duly execute and deliver to the Administrative Agent Mortgages, Security Agreement Supplements, Intellectual Property Security Agreements and other security agreements and documents (including, with respect to Mortgages, the documents listed in Section 6.13(b)), as reasonably requested by and in form and substance reasonably satisfactory to the Administrative Agent

(consistent with the Mortgages, Security Agreement, Intellectual
Property Security Agreements and other security agreements in effect on
the Closing Date), in each case granting Liens required by the Collateral
and Guarantee Requirement (*provided* that, if a mortgage tax will be
owed on the entire amount of the indebtedness evidenced hereby, then
the amount secured by the Mortgage shall be limited to the fair market
value of the property at the time the Mortgage is entered into but only if
the effect of such limitation is to cause such mortgage tax to be
calculated based upon such fair market value) and (y) each direct or
indirect parent of each such Domestic Restricted Subsidiary that is
required to be a Guarantor pursuant to the Collateral and Guarantee
Requirement to duly execute and deliver to the Administrative Agent
such Security Agreement Supplements and other security agreements as
reasonably requested by and in form and substance reasonably
satisfactory to the Administrative Agent (consistent with the Security
Agreements in effect on the Closing Date), in each case granting Liens
required by the Collateral and Guarantee Requirement;

(C)     (x) cause each such Domestic Restricted Subsidiary that
is required to become a Guarantor pursuant to the Collateral and
Guarantee Requirement to deliver any and all certificates representing
Equity Interests (to the extent certificated) that are required to be
pledged pursuant to the Collateral and Guarantee Requirement,
accompanied by undated stock powers or other appropriate instruments
of transfer executed in blank and instruments evidencing the
intercompany Indebtedness held by such Domestic Restricted Subsidiary
and required to be pledged pursuant to the Collateral Documents,
indorsed in blank to the Administrative Agent and (y) cause each direct
or indirect parent of such Domestic Restricted Subsidiary that is required
to be a Guarantor pursuant to the Collateral and Guarantee Requirement
to deliver any and all certificates representing the outstanding Equity
Interests (to the extent certificated) of such Domestic Restricted
Subsidiary that are required to be pledged pursuant to the Collateral and
Guarantee Requirement, accompanied by undated stock powers or other
appropriate instruments of transfer executed in blank and instruments
evidencing the intercompany Indebtedness issued by such Domestic
Restricted Subsidiary and required to be pledged in accordance with the
Collateral Documents, indorsed in blank to the Administrative Agent;

(D)     take and cause such Domestic Restricted Subsidiary and
each direct or indirect parent of such Domestic Restricted Subsidiary to
take whatever action (including the recording of Mortgages, the filing of
Uniform Commercial Code financing statements and delivery of stock
and membership interest certificates) may be necessary in the reasonable
opinion of the Administrative Agent to vest in the Administrative Agent
(or in any representative of the Administrative Agent designated by it)
valid Liens required by the Collateral and Guarantee Requirement,
enforceable against all third parties in accordance with their terms,
except as such enforceability may be limited by Debtor Relief Laws and
by general principles of equity;

(ii)      within thirty (30) days after the request therefor by the Administrative Agent, deliver to the Administrative Agent a signed copy of an opinion, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Administrative Agent as to such matters set forth in this Section 6.11(a) as the Administrative Agent may reasonably request; and

(iii)     as promptly as practicable after the request therefor by the Administrative Agent, deliver to the Administrative Agent with respect to each parcel of Material Real Property that is owned by such Domestic Restricted Subsidiary, any existing title reports, surveys or environmental assessment reports;

*provided, however*, that the Borrower may elect, in its sole discretion, to cause any Excluded Subsidiary to become a Guarantor, in which case, such Excluded Subsidiary shall comply with this clause (a).

(b)      The Borrower shall:

(i)      obtain the security interests and Senior Guarantees set forth on Schedule 1.01A on or prior to the dates corresponding to such security interests and Senior Guarantees set forth on Schedule 1.01A; and

(ii)     after the Closing Date, concurrently with (x) the acquisition of any material personal property by any Loan Party or (y) the acquisition of any Material Real Property by any Loan Party and if such personal property or Material Real Property shall not already be subject to a perfected Lien pursuant to the Collateral and Guarantee Requirement, give notice thereof to the Administrative Agent and promptly thereafter shall cause such assets to be subjected to a Lien to the extent required by the Collateral and Guarantee Requirement and will take, or cause the relevant Loan Party to take, such actions as shall be necessary or reasonably requested by the Administrative Agent to grant and perfect or record such Lien, including, as applicable, the actions referred to in Section 6.13(b) with respect to real property.

(c)      Notwithstanding the foregoing, the Borrower shall not be required to deliver any Mortgages or related documentation prior to the date that is three months after the Closing Date, or such later date as the Administrative Agent may agree.

SECTION 6.12. Compliance with Environmental Laws. Except, in each case, to the extent that the failure to do so could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, comply, and take all reasonable actions to cause all lessees and other Persons operating or occupying its properties to comply with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and, in each case to the extent required by Environmental Laws, conduct any investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action necessary to remove and clean up all Hazardous Materials from any of its properties, in accordance with the requirements of all Environmental Laws.

SECTION 6.13.  Further Assurances and Post-Closing Conditions.

(a)        Promptly upon reasonable request by the Administrative Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to carry out more effectively the purposes of the Collateral Documents (subject to the limitations set forth therein and in the definition of Collateral and Guarantee Requirement).

(b)        In the case of any Material Real Property referred to in Section 6.11(b), provide the Administrative Agent with Mortgages with respect to such Material Real Property within ninety (90) days, or such longer period as the Administrative Agent may agree, of the acquisition of such real property together with:

(i)        evidence that counterparts of the Mortgages have been duly executed, acknowledged and delivered and are in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary or desirable in order to create a valid and subsisting perfected Lien on the property and/or rights described therein in favor of the Administrative Agent for the benefit of the Secured Parties and that all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent (*provided* that, if a mortgage tax will be owed on the entire amount of the indebtedness evidenced hereby, then the amount secured by the Mortgage shall be limited to the fair market value of the property at the time the Mortgage is entered into but only if the effect of such limitation is to cause such mortgage tax to be calculated based upon such fair market value);

(ii)        fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in each applicable jurisdiction (the "**Mortgage Policies**") in form and substance, with endorsements and in amount, reasonably acceptable to the Administrative Agent (not to exceed the value of the real properties covered thereby), issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the Mortgages to be valid subsisting Liens on the property described therein, free and clear of all defects and encumbrances except for minor defects in title that do not materially interfere with the Loan Party's ability to conduct business and subject to Liens permitted by Section 7.01, and providing for such other affirmative insurance (including endorsements for future advances under the Loan Documents) and such coinsurance and direct access reinsurance as the Administrative Agent may reasonably request;

(iii)        opinions of local counsel for the Loan Parties in states in which the such Material Real Property is located, with respect to the enforceability and perfection of the Mortgages and any related fixture filings in form and substance reasonably satisfactory to the Administrative Agent; and

(iv)    such other evidence that all other actions that the Administrative Agent may reasonably deem necessary or desirable in order to create valid and subsisting Liens on the property described in the Mortgages has been taken.

SECTION 6.14.  Senior Debt.  The Borrower shall maintain the Obligations as "Senior Debt," "Senior Indebtedness," "Guarantor Senior Debt" or "Senior Secured Financing" (or any comparable term) under, and as defined in, the Senior Notes Indenture and any Junior Financing Documentation.

SECTION 6.15.  Designation of Subsidiaries.  The board of directors of the Borrower may at any time designate any Restricted Subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; *provided* that (i) immediately before and after such designation, no Default shall have occurred and be continuing, (ii) immediately after giving effect to such designation, the Borrower and the Restricted Subsidiaries shall be in compliance, on a Pro Forma Basis, with the covenants set forth in Section 7.11 (and, as a condition precedent to the effectiveness of any such designation, the Borrower shall deliver to the Administrative Agent a certificate setting forth in reasonable detail the calculations demonstrating such compliance), (iii) no Subsidiary may be designated as an Unrestricted Subsidiary if it is a "Restricted Subsidiary" for the purpose of the New Notes or any Junior Financing, as applicable, and (iv) no Restricted Subsidiary may be designated as an Unrestricted Subsidiary if it was previously designated an Unrestricted Subsidiary.  The designation of any Subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Borrower therein at the date of designation in an amount equal to the net book value of the Borrower's (as applicable) investment therein.  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the incurrence at the time of designation of any Indebtedness or Liens of such Subsidiary existing at such time to the extent surviving such designation.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, or any Letter of Credit shall remain outstanding, the Borrower shall not, nor shall it permit any Restricted Subsidiary to, directly or indirectly:

SECTION 7.01.  Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the date hereof and listed on Schedule 7.01(b) and any modifications, replacements, renewals, refinancings or extensions thereof; *provided* that (i) the Lien does not extend to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed or refinanced by Indebtedness permitted under Section 7.03, and (B) proceeds and products thereof, and (ii) the renewal, extension or refinancing of the obligations secured or benefited by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

(c)     Liens for taxes, assessments or governmental charges which are not overdue for a period of more than thirty (30) days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, or for property taxes on property that the Borrower or one if its Subsidiaries has determined to abandon if the sole recourse for such tax, assessment or other charge is to such property;

(d)     statutory Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other like Liens arising in the ordinary course of business which secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     (i) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Restricted Subsidiary;

(f)     deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(g)     easements, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property which, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of the Borrower or any Restricted Subsidiary;

(h)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.01(h);

(i)     Liens securing Indebtedness permitted under Section 7.03(e); *provided* that (i) such Liens attach concurrently with or within two hundred and seventy (270) days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property except for accessions to such property other than the property financed by such Indebtedness and the proceeds and the products thereof and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any assets (except for accessions to such assets) other than the assets subject to such Capitalized Leases; *provided* that individual financings of assets provided by one lender may be cross collateralized to other financings of assets provided by such lender (or its affiliates);

(j)      leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not (i) interfere in any material respect with the business of the Borrower or any Restricted Subsidiary or (ii) secure any Indebtedness;

(k)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(l)      Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business; and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(m)      Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Sections 7.02(g), (i), (n), (o) and (v) to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(n)      Liens on (i) property of any Foreign Subsidiary that is not a Loan Party, which Liens secure Indebtedness of the applicable Foreign Subsidiary permitted under Section 7.03 and (ii) property of any Restricted Subsidiary in favor of any Loan Party;

(o)      Liens existing on property at the time of its acquisition or existing on the property of any Person at the time such Person becomes a Restricted Subsidiary (other than by designation as a Restricted Subsidiary pursuant to Section 6.15), in each case after the date hereof (other than Liens on the Equity Interests of any Person that becomes a Restricted Subsidiary (other than any Person that is a Subsidiary at the time of such acquisition of another Person that becomes a Restricted Subsidiary)); *provided* that (i) such Lien was not created in contemplation of such acquisition or such Person becoming a Restricted Subsidiary, (ii) such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof and other than after-acquired property subjected to a Lien securing Indebtedness and other obligations incurred prior to such time (or incurred pursuant to a commitment entered into prior to such time) and which require, pursuant to their terms at such time, a pledge of after-acquired property, it being understood that such requirement shall not be permitted to apply to any property to which such requirement would not have applied but for such acquisition), and (iii) the Indebtedness secured thereby is permitted under Section 7.03(e), (g), (h), or (k);

(p)      any interest or title of a lessor under leases entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business;

(q)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

(r)     Liens deemed to exist in connection with Investments in repurchase agreements under Section 7.02;

(s)     Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(t)     Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries, (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business and (iv) otherwise to secure Cash Management Obligations in the ordinary course of business;

(u)     Liens solely on any cash earnest money deposits to secure the obligations of the Borrower or any of the Restricted Subsidiaries under any letter of intent or purchase agreement permitted hereunder;

(v)     (i) Liens placed upon the Equity Interests of any Restricted Subsidiary acquired pursuant to a Permitted Acquisition to secure Indebtedness incurred pursuant to Section 7.03(g) in connection with such Permitted Acquisition, (ii) Liens placed upon the assets of such Restricted Subsidiary and any of its Subsidiaries to secure a Guarantee by such Restricted Subsidiary and its Subsidiaries of any such Indebtedness incurred pursuant to Section 7.03(g), and (iii) Liens securing Indebtedness permitted under Section 7.03(s) on the property and assets of the Person or Persons (and its or their Equity Interests) acquired with the proceeds of such Indebtedness;

(w)     ground leases in respect of real property on which facilities owned or leased by the Borrower or any of its Subsidiaries are located;

(x)     Liens on the assets of Receivables Subsidiaries in respect of the Receivables Facilities;

(y)     Liens (i) incurred by a Receivables Management Subsidiary on Receivables Management Assets securing a Receivables Management Financing permitted under Section 7.03, (ii) on the Equity Interests of any Excluded Receivables Management Subsidiary and its property and assets securing a Receivables Management Financing and (iii) on Receivables Management Assets in connection with any Disposition of Receivables Management Assets by a Receivables Management Subsidiary; and

(z)     other Liens securing Indebtedness outstanding in an aggregate principal amount not to exceed $75,000,000.

SECTION 7.02. Investments. Make or hold any Investments, except:

(a)     Investments by the Borrower or a Restricted Subsidiary in assets that were Cash Equivalents when such Investment was made;

(b)      loans or advances to officers, directors and employees of the Borrower and the Restricted Subsidiaries (i) for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes, (ii) in connection with such Person's purchase of Equity Interests of the Borrower and (iii) for purposes not described in the foregoing clauses (i) and (ii), in an aggregate principal amount outstanding not to exceed $5,000,000 (net of Returns);

(c)      Investments (i) by the Borrower or any Restricted Subsidiary in any Loan Party (excluding any new Restricted Subsidiary which becomes a Loan Party other than as the result of the formation of a new Subsidiary), (ii) by any Restricted Subsidiary that is not a Loan Party in any other such Restricted Subsidiary that is also not a Loan Party and (iii) by the Borrower or any Restricted Subsidiary (A) in any Foreign Subsidiary; *provided* that such Investment shall not exceed the Foreign Subsidiary Available Investment Basket, (B) in any Foreign Subsidiary consisting of the contribution of Equity Interests of any other Foreign Subsidiary held directly by the Borrower or such Restricted Subsidiary and if the Foreign Subsidiary to which such contribution is made is not a Wholly Owned Subsidiary, such contribution shall be in exchange for Indebtedness, Equity Interests (including increases in capital accounts) or a combination thereof of the Foreign Subsidiary to which such contribution is made, (C) in any Foreign Subsidiary, constituting an exchange of Equity Interests of such Foreign Subsidiary for Indebtedness of such Foreign Subsidiary and (D) constituting Guarantees of Indebtedness or other monetary obligations of Foreign Subsidiaries owing to any Loan Party (for the avoidance of doubt, it being understood that Investments made pursuant to clause (ii) shall not be deemed to be a utilization of, or an Investment made pursuant to, clause (iii));

(d)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, advances to customers in the ordinary course of business and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(e)      Investments consisting of transactions permitted under Sections 7.01, 7.03, 7.04, 7.05, 7.06 and 7.13, respectively;

(f)      Investments (i) existing or contemplated on the date hereof and set forth on Schedule 7.02(f) and any modification, replacement, renewal, reinvestment or extension thereof and (ii) Investments existing on the date hereof by the Borrower or any Restricted Subsidiary in the Borrower or any other Restricted Subsidiary and any modification, renewal or extension thereof; *provided* that, in the case of clauses (i) and (ii), the amount of the original Investment is not increased except by the terms of such Investment or as otherwise permitted by this Section 7.02;

(g)      Investments in Swap Contracts permitted under Section 7.03;

(h)      (i) promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 7.05 and (ii) Investments received from (A) contributions to the Borrower and (B) distributions to the Borrower and its Restricted Subsidiaries from Persons that are not Restricted Subsidiaries;

(i)      the purchase or other acquisition of property and assets or businesses of any Person or of assets constituting a business unit, a line of business or division of such

Person, or Equity Interests in a Person that, upon the consummation thereof, will be a wholly owned Restricted Subsidiary of the Borrower (including as a result of a merger or consolidation); *provided* that, with respect to each purchase or other acquisition made pursuant to this Section 7.02(i) (each, a "**Permitted Basket Acquisition**"):

    (A)    subject to clause (B) below, the property, assets and businesses acquired in such purchase or other acquisition shall constitute Collateral to the extent required by the Collateral and Guarantee Requirement and, to the extent required by the Collateral and Guarantee Requirement, each applicable Loan Party, any new Subsidiaries created to affect such acquisition and the acquired Person (including any Subsidiaries of such acquired Person (other than Excluded Subsidiaries)) shall be a Guarantor and shall have complied with the requirements of Section 6.11, within the times specified therein;

    (B)    to the extent any consideration is paid directly or indirectly by any Loan Party (other than a Foreign Subsidiary) to acquire any Person that becomes a Foreign Subsidiary or assets that will be owned immediately following such acquisition by a Foreign Subsidiary, such consideration shall not exceed the Foreign Subsidiary Available Investment Basket;

    (C)    the acquired property, assets, business or Person is in a line of business permitted under Section 7.07 (other than non-core assets acquired in connection therewith in contemplation of the Disposition thereof in accordance with Section 7.05(n));

    (D)    (1) immediately before and immediately after giving Pro Forma Effect to any such purchase or other acquisition, no Default shall have occurred and be continuing and (2) immediately after giving effect to such purchase or other acquisition, the Borrower and the Restricted Subsidiaries shall be in Pro Forma Compliance with all of the covenants set forth in Section 7.11, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such purchase or other acquisition had been consummated as of the first day of the fiscal period covered thereby and evidenced by a certificate from the Chief Financial Officer of the Borrower demonstrating such compliance calculation in reasonable detail; and

    (E)    the Borrower shall have delivered to the Administrative Agent, on behalf of the Lenders, a certificate of a Responsible Officer, in form and substance reasonably satisfactory to the Administrative Agent, certifying that all of the requirements set forth in this clause (i) have been satisfied or will be satisfied on or prior to the consummation of such purchase or other acquisition;

    (j)    the Transaction;

    (k)    Investments in the ordinary course of business consisting of (i) endorsements for collection or deposit under Article 3 of the Uniform Commercial Code and (ii) customary trade arrangements under Article 4 of the Uniform Commercial Code with customers consistent with past practices;

(l)       Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers arising in the ordinary course of business or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(m)       loans and advances to any direct or indirect parent of the Borrower in lieu of, and not to exceed, at any time then outstanding, the amount of (after giving effect to any other loans, advances or Restricted Payments in respect thereof), Restricted Payments to the extent permitted to be made to such parent in accordance with Section 7.06(g);

(n)       so long as immediately after giving effect to any such Investment, no Default has occurred and is continuing and the Borrower and the Restricted Subsidiaries will be in Pro Forma Compliance with the covenants set forth in Section 7.11, Investments that do not exceed  $150,000,000 (such amount to be increased to $225,000,000 if the Total Leverage Ratio as of the last day of any Test Period is less than 4.0 to 1.0);

(o)       so long as immediately after giving effect to any such Investment, no Default has occurred and is continuing and the Borrower and the Restricted Subsidiaries will be in Pro Forma Compliance with the covenants set forth in Section 7.11, Investments that do not exceed the Cumulative Growth Amount;

(p)       advances of payroll payments to employees of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(q)       Investments to the extent that payment for such Investments is made solely with capital stock of the Borrower;

(r)       Investments of a Restricted Subsidiary acquired after the Closing Date or of a corporation merged into the Borrower or merged or consolidated with a Restricted Subsidiary in accordance with Section 7.04 after the Closing Date to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(s)       Guarantees by the Borrower or any Restricted Subsidiary of leases (other than Capitalized Leases) or of other obligations of the Borrower or any Restricted Subsidiary that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(t)       Investments in respect of the Receivables Facilities (excluding sales of receivables) in accordance with the terms thereof not to exceed $50,000,000 (net of Returns);

(u)       Investments by (i) Receivables Management Subsidiaries in Receivables Management Assets, (ii) Receivables Management Subsidiaries that are not Loan Parties in any Receivables Management Subsidiaries, (iii) the Borrower or any Restricted Subsidiary that is a Loan Party in any Receivables Management Subsidiary that is not a Loan Party in an amount not to exceed the greater of (A) $150,000,000 and (B) 5.0% of

the consolidated total assets of the Borrower, in each case, net of all Returns, and (iv) Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of account debtors and obligors or in settlement of delinquent obligations of, or other disputes with, account debtors and obligors arising in the ordinary course of business or upon the foreclosure with respect to any Receivables Management Assets or other Disposition of Receivables Management Assets; and

(v)    Investments (together with the aggregate amount of Restricted Payments made pursuant to Section 7.06(i)) that do not exceed an amount equal to any reduction in taxes actually realized by the Borrower and the Restricted Subsidiaries in connection with, or otherwise resulting from, the Transaction in the form of refunds, credits or deductions as a direct result of transaction fees and expenses, commitment and other financing fees and severance, change in control and other compensation expense incurred in connection with the exercise, repurchase, rollover or payout of stock options or bonuses;

*provided* that no Investment shall be made in an Unrestricted Subsidiary except pursuant to Sections 7.02(n), 7.02(o) and 7.02(v), and no Investment in an Unrestricted Subsidiary that would otherwise be permitted under Sections 7.02(n), 7.02(o) and 7.02(v) shall be permitted hereunder to the extent that any portion of such Investment is used to make any prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings that would otherwise not be permitted hereunder; *provided, further,* that no Investment shall be made in a Receivables Management Subsidiary except pursuant to Sections 7.02(c)(i), 7.02(c)(ii) (but only to the extent by a Receivables Management Subsidiary in any other Receivables Management Subsidiary), 7.02(c)(iii), 7.02(n), 7.02(o) or 7.02(u)(iii).

SECTION 7.03. <u>Indebtedness</u>. Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness of the Borrower and any of its Subsidiaries under the Loan Documents;

(b)    Indebtedness (i) outstanding on the date hereof and listed on Schedule 7.03(b) and any Permitted Refinancing thereof and (ii) intercompany Indebtedness outstanding on the date hereof;

(c)    Guarantees by the Borrower and the Restricted Subsidiaries in respect of Indebtedness of the Borrower or any Restricted Subsidiary otherwise permitted hereunder; *provided* that (A) no Guarantee by any Restricted Subsidiary of any New Notes or Junior Financing shall be permitted unless such Restricted Subsidiary shall have also provided a Guarantee of the Obligations substantially on the terms set forth in the Guaranty and (B) if the Indebtedness being Guaranteed is subordinated to the Obligations, such Guarantee shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(d)    Indebtedness of the Borrower or any Restricted Subsidiary owing to the Borrower or any other Restricted Subsidiary to the extent constituting an Investment permitted by Section 7.02; provided that, all such Indebtedness of any Loan Party owed to any Person that is not a Loan Party shall be subject to the subordination terms set forth in Section 5.03 of the Security Agreement;

(e)    (i) Attributable Indebtedness and other Indebtedness (including Capitalized Leases) financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; provided that such Indebtedness is incurred concurrently with or within two hundred and seventy (270) days after the applicable acquisition, construction, repair, replacement or improvement, (ii) Attributable Indebtedness arising out of sale-leaseback transactions permitted by Section 7.05(f) and (iii) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clauses (i) and (ii);

(f)    Indebtedness in respect of Swap Contracts designed to hedge against interest rates, foreign exchange rates or commodities pricing risks incurred in the ordinary course of business and not for speculative purposes;

(g)    Indebtedness of Foreign Subsidiaries (i) assumed in connection with any Permitted Acquisition or (ii) incurred to finance a Permitted Acquisition, in each case, that is secured only by the assets or business acquired in the applicable Permitted Acquisition (including any acquired Equity Interests) and so long as both immediately prior and after giving effect thereto, (A) no Default shall exist or result therefrom, (B) the Borrower and the Restricted Subsidiaries will be in Pro Forma Compliance with the covenants set forth in Section 7.11, and (C) the aggregate principal amount of such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof at any time outstanding pursuant to this paragraph (g) does not exceed $100,000,000;

(h)    Indebtedness of the Borrower and the Restricted Subsidiaries (A) assumed in connection with any Permitted Acquisition or (B) incurred to finance a Permitted Acquisition, including the refinancing of any Indebtedness (other than Indebtedness incurred in contemplation of such Permitted Acquisition) of the Persons or on the assets acquired thereby and payment of related fees and expenses (and any excess amount not in excess of 10% of the Net Cash Proceeds thereof may be used to prepay Term Loans pursuant to Section 2.05(a)), and any Permitted Refinancing of the foregoing; *provided*, in each case that such Indebtedness and all Indebtedness resulting from any Permitted Refinancing thereof (v) is unsecured (except to the extent permitted by Section 7.01(o) and 7.01(z)), (w) both immediately prior and after giving effect thereto, (1) no Default shall exist or result therefrom and (2) the Borrower and the Restricted Subsidiaries will be in Pro Forma Compliance with the covenants set forth in Section 7.11, (x) matures after, and does not require any scheduled amortization or other scheduled payments of principal prior to, the Maturity Date of the Term Loans (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemptions provisions satisfying the requirement of clause (y) hereof), (y) has terms and conditions (other than interest rate, redemption premiums and subordination terms), taken as a whole, that are not materially less favorable to the Borrower as the terms and conditions of the New Notes as of the Closing Date; *provided* that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees); and (z) with respect to such Indebtedness described in the

immediately preceding clause (B), is incurred by the Borrower or a Guarantor; *provided*, that the foregoing clauses (x) and (y) shall not apply with respect to assumed Indebtedness so long as such Indebtedness was not incurred in contemplation of a Permitted Acquisition;

(i)    Indebtedness representing deferred compensation to employees of the Borrower and the Restricted Subsidiaries incurred in the ordinary course of business;

(j)    Indebtedness consisting of promissory notes issued by any Loan Party to current or former officers, directors and employees, their respective estates, spouses or former spouses to finance the purchase or redemption of Equity Interests of the Borrower permitted by Section 7.06;

(k)    Indebtedness incurred by the Borrower or the Restricted Subsidiaries in a Permitted Acquisition, any other Investment expressly permitted hereunder or any Disposition constituting indemnification obligations or obligations in respect of purchase price or other similar adjustments;

(l)    Indebtedness consisting of obligations of the Borrower or the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with the Transaction and Permitted Acquisitions or any other Investment expressly permitted hereunder;

(m)    Cash Management Obligations and other Indebtedness in respect of netting services, overdraft protections and similar arrangements in each case in connection with deposit accounts;

(n)    Indebtedness in an aggregate principal amount not to exceed $275,000,000 at any time outstanding (less the aggregate principal amount of Indebtedness outstanding at any time under Section 7.03(s)); *provided* that a maximum of $125,000,000 of aggregate principal amount of such Indebtedness (less the aggregate principal amount of Indebtedness of Foreign Subsidiaries that are not Guarantors outstanding at any time under Section 7.03(g)) may be incurred on a secured basis by Foreign Subsidiaries that are not Guarantors;

(o)    Indebtedness consisting of (a) the financing of insurance premiums or (b) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(p)    Indebtedness incurred by the Borrower or any of the Restricted Subsidiaries in respect of letters of credit, bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; *provided* that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(q)    obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any of the Restricted Subsidiaries or obligations in respect of letters of

credit, bank guarantees or similar instruments related thereto, in each case in the ordinary course of business or consistent with past practice;

(r)     unsecured Indebtedness of the Borrower ("**Borrower Permitted Debt**" and collectively with any Holdings Permitted Debt (as defined in Section 7.16), "**Permitted Debt**") (i) that is not subject to any Guarantee by any Restricted Subsidiary unless such Restricted Subsidiary is a Guarantor or shall also Guarantee the Obligations substantially on the terms set forth in the Guaranty, (ii) that will not mature prior to the date that is ninety-one (91) days after the Maturity Date of the Term Loans, (iii) that has no scheduled amortization or payments of principal (it being understood that such Indebtedness may have mandatory prepayment, repurchase or redemption provisions satisfying the requirements of clause (iv) hereof), and (iv) that has mandatory prepayment, repurchase or redemption, covenant, default and remedy provisions customary for senior notes or senior subordinated notes (as applicable in the context of the ranking of such Indebtedness) of an issuer that is a borrower under senior secured credit facilities, and in any event, with respect to covenant, default and remedy provisions, no more restrictive than those set forth in the Senior Notes Indenture or the Senior Subordinated Notes Indenture (as applicable in the context of the ranking of such Indebtedness) as of the Closing Date, taken as a whole (determined in the context of, and subject to, then prevailing market conditions) and in the Loan Documents at such time; *provided* that a certificate of a Responsible Officer delivered to the Administrative Agent at least five Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement unless the Administrative Agent notifies the Borrower within such five Business Day period that it disagrees with such determination (including a reasonable description of the basis upon which it disagrees); *provided, further*, that (A) both before and after giving effect to the issuance or incurrence thereof, no Default shall have occurred and be continuing, (B) the Borrower and the Restricted Subsidiaries will be in Pro Forma Compliance with the covenants set forth in Section 7.11, (C) in the case of subordinated Indebtedness ("**Borrower Permitted Subordinated Debt**"), such Indebtedness (and any Guarantee thereof by a Restricted Subsidiary) is subordinated to the Facility on terms reasonably satisfactory to the Administrative Agent (it being understood that subordination terms substantially similar to those set forth in the Senior Subordinated Notes Indenture as of the Closing Date are deemed to be satisfactory) and (D) in the case of senior Indebtedness, after giving Pro Forma Effect to such Indebtedness and all related transactions, the Senior Secured Leverage Ratio is not greater than 3.0 to 1.0;

(s)     Indebtedness of a Restricted Subsidiary (or the Persons so acquired) incurred or issued to finance or assumed in connection with any Permitted Acquisition not to exceed at any one time outstanding $100,000,000, so long as (i) both before and after giving effect to the issuance or incurrence thereof, no Default shall have occurred and be continuing, (ii) the Borrower and the Restricted Subsidiaries will be in Pro Forma Compliance with the covenants set forth in Section 7.11, (iii) after giving Pro Forma Effect to such Indebtedness and all related transactions, the Total Leverage Ratio is not greater than 4.5 to 1.0 and (iv) any liens securing such Indebtedness are limited to Liens permitted by Section 7.01(v) and Section 7.01(z) (limited in such case to Liens on the property of such Restricted Subsidiary only);

(t)    Indebtedness (i) under any Receivables Management Financing; *provided, however* that (x) the amount of such Indebtedness is not more than 90% of the purchase price of the Receivables Management Assets purchased with the proceeds of such Indebtedness and (y) after giving effect to the incurrence thereof, the Receivables Management Leverage Ratio shall not exceed 3.0:1, (ii) of any Receivables Management Subsidiary in an aggregate amount not to exceed $150,000,000 at any time outstanding, and (iii) of any Receivables Management Subsidiary arising as a result of any Investment in, or Disposition of, Receivables Management Assets;

(u)    Indebtedness supported by a Letter of Credit, in a principal amount not to exceed the face amount of such Letter of Credit;

(v)    Indebtedness in respect of the New Notes and any Permitted Refinancing thereof;

(w)    Indebtedness in respect of the Receivables Facilities and any Permitted Refinancing thereof; and

(x)    all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (w) above.

SECTION 7.04. Fundamental Changes. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)    any Restricted Subsidiary may merge with (i) the Borrower (including a merger, the purpose of which is to reorganize the Borrower into a new jurisdiction); provided that (x) the Borrower shall be the continuing or surviving Person and (y) such merger does not result in the Borrower ceasing to be incorporated under the Laws of the United States, any state thereof or the District of Columbia, or (ii) any one or more other Restricted Subsidiaries; provided that (A) when any Restricted Subsidiary that is a Loan Party is merging with another Restricted Subsidiary, a Loan Party shall be the continuing or surviving Person and (B) no Domestic Subsidiary may merge with and into a Foreign Subsidiary;

(b)    (i) any Subsidiary that is not a Loan Party may merge or consolidate with or into any other Subsidiary that is not a Loan Party and (ii) any Subsidiary may liquidate or dissolve or change its legal form if the Borrower determines in good faith that such action is in the best interests of the Borrower and its Subsidiaries and if not materially disadvantageous to the Lenders;

(c)    any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Restricted Subsidiary; *provided* that if the transferor in such a transaction is a Guarantor, then (i) the transferee must either be the Borrower or a Guarantor (and, if the transferor is a Domestic Subsidiary, the transferee must also be a Domestic Subsidiary) or (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in or Indebtedness of a Restricted Subsidiary which is not a Loan Party in accordance with Sections 7.02 and 7.03, respectively;

(d)    so long as no Default exists or would result therefrom, the Borrower may merge with any other Person; *provided* that (i) the Borrower shall be the continuing or surviving corporation or (ii) if the Person formed by or surviving any such merger or consolidation is not the Borrower (any such Person, the "**Successor Borrower**"), (A) the Successor Borrower shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof, (B) the Successor Borrower shall expressly assume all the obligations of the Borrower under this Agreement and the other Loan Documents to which the Borrower is a party pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (C) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Guaranty confirmed that its Guarantee shall apply to the Successor Borrower's obligations under this Agreement, (D) each Guarantor, unless it is the other party to such merger or consolidation, shall have by a supplement to the Security Agreement confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, (E) each mortgagor of a Mortgaged Property, unless it is the other party to such merger or consolidation, shall have by an amendment to or restatement of the applicable Mortgage confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, and (F) the Borrower shall have delivered to the Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such supplement to this Agreement or any Collateral Document comply with this Agreement (and, with respect to such opinion of counsel, otherwise substantially consistent, to the extent reasonably appropriate and applicable, with the opinions delivered with respect to the Borrower on the Closing Date, including as to the enforceability of the applicable Loan Documents against the Successor Borrower, and with such customary and other assumptions and qualifications as may be appropriate); *provided, further*, that if the foregoing are satisfied, the Successor Borrower will succeed to, and be substituted for, the Borrower under this Agreement;

(e)    so long as no Default exists or would result therefrom, any Restricted Subsidiary may merge with any other Person in order to effect an Investment permitted pursuant to Section 7.02; *provided* that (i) the continuing or surviving Person shall be a Restricted Subsidiary, which together with each of its Restricted Subsidiaries, shall have complied with the requirements of Section 6.11, (ii) when any Restricted Subsidiary that is a Loan Party is merging with any other Person, a Loan Party shall be the continuing or surviving Person and (iii) no Domestic Subsidiary may merge with and into any other Person that is not organized under the Laws of the United States, any state thereof or the District of Columbia except to the extent such merger is an Investment permitted under Section 7.02;

(f)    the Borrower and the Restricted Subsidiaries may consummate the Merger; and

(g)    so long as no Default exists or would result therefrom, a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 7.05.

SECTION 7.05. <u>Dispositions</u>. Make any Disposition or enter into any agreement to make any Disposition, except:

(a)     Dispositions of obsolete or worn out property and assets, whether now owned or hereafter acquired, in the ordinary course of business, and Dispositions of property or assets no longer used or useful in the conduct of the business of the Borrower and the Restricted Subsidiaries;

(b)     Dispositions of inventory and immaterial assets in the ordinary course of business;

(c)     Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property;

(d)     Dispositions of property (i) to the Borrower or to a Restricted Subsidiary; provided that if the transferor of such property is a Guarantor or the Borrower, the transferee thereof must either be the Borrower or a Guarantor, or (ii) to the extent such transaction constitutes an Investment permitted under Section 7.02;

(e)     Dispositions permitted by Sections 7.04 and 7.06 and Liens permitted by Section 7.01 and Dispositions of Equity Interests of Unrestricted Subsidiaries;

(f)     Dispositions of property (other than IP Collateral) pursuant to sale-leaseback transactions; provided that (i) with respect to such property owned by the Borrower and its Restricted Subsidiaries on the Closing Date, the fair market value of all property so Disposed of after the Closing Date shall not exceed $100,000,000 and (ii) with respect to such property acquired by the Borrower or any Restricted Subsidiary after the Closing Date, the applicable sale-leaseback transaction occurs within two hundred and seventy (270) days after the acquisition or construction (as applicable) of such property, *provided*, that with respect to any property acquired by the Borrower in connection with a Permitted Acquisition, such two hundred and seventy (270) day shall apply such from the date such Permitted Acquisition is consummated;

(g)     Dispositions of (i) Cash Equivalents and Dispositions of property and assets received as non-cash consideration for any Disposition and (ii) property and assets contributed to the Borrower by any Person other than a Subsidiary;

(h)     Dispositions of accounts receivable (i) in connection with the collection or compromise thereof or (ii) in connection with the Receivables Facilities;

(i)     leases, subleases, licenses or sublicenses (including the provision of software under an open source license), in each case in the ordinary course of business and which do not materially interfere with the business of the Borrower and the Restricted Subsidiaries;

(j)     transfers of property subject to Casualty Events upon receipt of the Net Cash Proceeds of such Casualty Event;

(k)     Dispositions of property not otherwise permitted under this Section 7.05; provided that (i) at the time of such Disposition (other than any such Disposition made pursuant to a legally binding commitment entered into at a time when no Default exists), no Default shall exist or would result from such Disposition and the Net Cash Proceeds

of such Disposition are applied or reinvested in accordance with Section 2.05(b)(ii), (ii) the aggregate book value of all property Disposed of in reliance on this clause (k) (other than any property disposed of in a Disposition or series of related Dispositions involving an aggregate fair market value less than $5,000,000) shall not exceed the greater of (A) 15% of the consolidated total assets of the Borrower at the time of such Disposition or (B) $325,000,000 and (iii) with respect to any Disposition pursuant to this clause (k) for a purchase price in excess of $5,000,000, the Borrower or a Restricted Subsidiary shall receive not less than 75% of such consideration in the form of cash or Cash Equivalents (in each case, free and clear of all Liens at the time received, other than nonconsensual Liens permitted by Section 7.01 and Liens permitted by Section 7.01(r) and clauses (i) and (ii) of Section 7.01(t)); *provided, however,* that for the purposes of this clause (iii), (A) any liabilities (as shown on the Borrower's or such Restricted Subsidiary's most recent balance sheet provided hereunder or in the footnotes thereto) of the Borrower or such Restricted Subsidiary, other than liabilities that are by their terms subordinated to the payment in cash of the Obligations, that are assumed by the transferee with respect to the applicable Disposition and for which the Borrower and all of the Restricted Subsidiaries shall have been validly released by all applicable creditors in writing and (B) any securities received by the Borrower or such Restricted Subsidiary from such transferee that are converted by the Borrower or such Restricted Subsidiary into cash (to the extent of the cash received) within 180 days following the closing of the applicable Disposition and (C) any Designated Non-Cash Consideration received by the Borrower or such Restricted Subsidiary in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (C) that is at the time outstanding, not in excess of 2.5% of the consolidated total assets of the Borrower at the time of the receipt of such Designated Non-Cash Consideration, with the fair market value of each item of Designated Non-Cash Consideration being measured at the time received and without giving effect to subsequent changes in value, shall be deemed to be cash;

(l)       Dispositions listed on Schedule 7.05(l);

(m)      Dispositions of Investments in joint ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

(n)      Dispositions of non-core assets (as determined in good faith by the Borrower) acquired in connection with any Permitted Acquisition in an aggregate amount not to exceed $50,000,000 per calendar year, with unused amounts in any calendar year being carried over to the next succeeding calendar year subject to a maximum of $100,000,000 in any calendar year; and

(o)      Dispositions of (i) Receivables Management Assets and (ii) Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of account debtors and obligors or in settlement of delinquent obligations of, or other disputes with, account debtors and obligors arising in the ordinary course of business or upon the foreclosure with respect to any Receivables Management Assets or other Dispositions of any Receivables Management Assets;

*provided* that any Disposition of any property pursuant to this Section 7.05 (except pursuant to Sections 7.05(a), (e), (g)(ii), (h)(ii) and (j) and except for Dispositions from a Loan Party to another Loan Party), shall be for no less than the fair market value of such property at the time of

such Disposition (as determined in good faith by the Borrower). To the extent any Collateral is Disposed of as expressly permitted by this Section 7.05 to any Person other than the Borrower or any Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent shall be authorized to take any actions deemed appropriate in order to effect the foregoing.

SECTION 7.06. <u>Restricted Payments</u>. Declare or make, directly or indirectly, any Restricted Payment, except:

(a)    (i) each Restricted Subsidiary may make Restricted Payments to the Borrower and to other Restricted Subsidiaries and (ii) each non-wholly owned Restricted Subsidiary may make Restricted Payments to the Borrower and any other Restricted Subsidiary and to each other owner of Equity Interests of such Restricted Subsidiary based on their relative ownership interests of the relevant class of Equity Interests;

(b)    the Borrower and each Restricted Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests (other than Disqualified Equity Interests not otherwise permitted by Section 7.03) of such Person;

(c)    Restricted Payments in connection with the Transaction (including any amounts to be paid under, or contemplated by, the Transaction Agreement) and the fees and expenses related thereto owed to Affiliates, including any payment to holders of Equity Interests of the Borrower (immediately prior to giving effect to the Transactions) in connection with, or as a result of, their exercise of appraisal rights and the settlement of any claims or actions (whether actual, contingent or potential) with respect thereto;

(d)    to the extent constituting Restricted Payments, the Borrower and the Restricted Subsidiaries may enter into and consummate transactions expressly permitted by any provision of Section 7.04 or 7.08 other than Section 7.08(f);

(e)    repurchases of Equity Interests in the Borrower or any Restricted Subsidiary deemed to occur upon exercise of stock options or warrants if such Equity Interests represent a portion of the exercise price of such options or warrants;

(f)    the Borrower and its Restricted Subsidiaries may make Restricted Payments to Holdings, and Holdings may make a corresponding Restricted Payment to any direct or indirect parent thereof:

(i)    the proceeds of which will be used to pay the tax liability to each relevant jurisdiction in respect of consolidated, combined, unitary or affiliated returns for the relevant jurisdiction of Holdings (or any direct or indirect parent thereof) attributable to Holdings, the Borrower or its Subsidiaries determined as if the Borrower and its Subsidiaries filed separately;

(ii)    the proceeds of which shall be used by Holdings (or any direct or indirect parent thereof) to pay operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business, in an aggregate amount not to exceed $3,000,000 in any fiscal year plus any reasonable and customary indemnification claims made by directors or

officers of Holdings (or any direct or indirect parent thereof) attributable to the ownership or operations of the Borrower and its Subsidiaries;

(iii)    the proceeds of which shall be used by Holdings (or any direct or indirect parent thereof) to pay franchise taxes and other fees, taxes and expenses required to maintain its (or any of its direct or indirect parents') corporate existence;

(iv)    if a Holdings Election Event shall occur, to finance any Investment permitted to be made pursuant to Section 7.02; *provided* that (A) such Restricted Payment shall be made substantially concurrently with the closing of such Investment and (B) Holdings shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) to be contributed to the Borrower or its Restricted Subsidiaries or (2) the merger (to the extent permitted in Section 7.04) of the Person formed or acquired into the Borrower or its Restricted Subsidiaries in order to consummate such Permitted Acquisition, and in each case, the Borrower shall cause the requirements of Section 6.11 to be complied with, within the time periods specified therein (to the extent required by the Collateral and Guarantee Requirement); and

(v)    if a Holdings Election Event shall occur, the proceeds of which shall be used by Holdings (or any direct or indirect parent thereof) to pay (or to make Restricted Payments to allow any direct or indirect parent thereof to pay) fees and expenses (other than to Affiliates) related to any unsuccessful equity or debt offering permitted by this Agreement;

(g)    the Borrower may pay for the repurchase, retirement or other acquisition or retirement for value of Equity Interests of the Borrower by any future, present or former employee or director of the Borrower or any of its Subsidiaries pursuant to any employee or director equity plan, employee or director stock option plan or any other employee or director benefit plan or any agreement (including any stock subscription or shareholder agreement) with any employee or director of the Borrower or any of its Subsidiaries; *provided, however,* that the aggregate amount of payments made pursuant to this clause (f) does not exceed in any fiscal year of the Borrower $15,000,000 (which shall increase to $20,000,000 subsequent to the consummation of a Qualifying IPO, with unused amounts in any calendar year being carried over to succeeding calendar years subject to a maximum (without giving effect to the following proviso) of $30,000,000 in any calendar year (which shall increase to $40,000,000 subsequent to the consummation of a Qualifying IPO);

(h)    so long as no Default shall have occurred and be continuing or would result therefrom, the Borrower may make additional Restricted Payments in an aggregate amount, together with the aggregate amount of (i) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings made pursuant to Section 7.13(a)(iv) and (ii) loans and advances made pursuant to Section 7.02(m) in lieu of Restricted Payments permitted by this clause (h), not to exceed the sum of (A) $75,000,000 (such amount to be increased to $100,000,000 upon the Total Leverage Ratio as of the last day of any Test Period being less than 5.0 to 1.0) and (B) the Cumulative Growth Amount;

(i)     so long as no Default shall have occurred and be continuing or would result therefrom, the Borrower may make additional Restricted Payments in an amount (together with the aggregate amount of Investments made pursuant to Section 7.02(v)) not to exceed any reduction in taxes realized by the Borrower and the Restricted Subsidiaries in the form of refunds or deductions realized in connection with the Transactions;

(j)     so long as no Default shall have occurred and be continuing or would result therefrom, the Borrower may make Restricted Payments with the proceeds of the issuance of Qualified Equity Interests of the Borrower;

(k)     if the Borrower shall become the Subsidiary of Holdings, so long as no Default shall have occurred and be continuing or would result therefrom, dividends and distributions which will be used to fund the payment of interest and fees on Indebtedness of Holdings permitted by Section 7.16; *provided*, that the Borrower shall have elected to include such amounts in its Consolidated Interest Expense by delivering an irrevocable written notice to the Administrative Agent stating that the Borrower will make such dividends and distributions (the "**Restricted Payments Interest Expense Election**") in respect of the Indebtedness specified in such notice only so long as no Default shall have occurred and be continuing or would result therefrom; and

(l)     the declaration and payment of dividends and distributions on the Equity Interests of any Receivables Management Subsidiary to holders of minority interests substantially consistent with past practice to the extent such holder (or its affiliates) participates in the Receivables Management Business (including as a lender or financier under any financing provided to a Receivables Management Subsidiary).

SECTION 7.07.  Change in Nature of Business.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the date hereof or any business reasonably related or ancillary thereto.

SECTION 7.08.  Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than (a) transactions among Loan Parties or any Restricted Subsidiary or any entity that becomes a Restricted Subsidiary as a result of such transaction, (b) on terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's-length transaction with a Person other than an Affiliate, (c) consummation of the Transaction including the payment of fees and expenses related to the Transaction, (d) the issuance of Equity Interests to the management of the Borrower or any of its Subsidiaries in connection with the Transaction, (e) the payment of management, consulting, monitoring, transaction and advisory fees to the Sponsors in an aggregate amount in any fiscal year not to exceed the amount permitted to be paid pursuant to the Sponsor Management Agreement as in effect on the date hereof and any Sponsor Termination Fees not to exceed the amount set forth in the Sponsor Management Agreement (and any amendment thereto so long as pursuant to such amendment the management, consulting, advisory and similar fees do not exceed 1.0% of Pro Forma EBITDA per annum (with accrual for, and carryover of, any unpaid amounts) or 1.0% of any transaction and termination fees in respect of the foregoing) and related indemnities, reimbursements and reasonable expenses, (f) equity issuances, repurchases, retirements or other acquisitions or retirements of Equity Interests by the Borrower permitted under Section 7.06, (g) loans and other transactions by the Borrower and the Restricted Subsidiaries to the extent permitted under Article VII, (h) employment and severance

arrangements between the Borrower and the Restricted Subsidiaries and their respective officers and employees in the ordinary course of business, (i) the payment of customary fees and reasonable out of pocket costs to, and indemnities provided on behalf of, directors, officers and employees of the Borrower and the Restricted Subsidiaries in the ordinary course of business to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, (j) transactions pursuant to permitted agreements in existence on the Closing Date and set forth on Schedule 7.08 or any amendment thereto to the extent such an amendment is not adverse to the Lenders in any material respect, (k) dividends, redemptions and repurchases permitted under Section 7.06, (l) transactions entered into in the ordinary course of business in connection with the Disposition or acquisition of Receivables Management Assets or related assets in connection with the Receivables Management Business, including, without limitation, all servicing, collection and financing arrangements with respect thereto, (m) payments by the Borrower and the Restricted Subsidiaries pursuant to tax sharing agreements with Holdings (or any direct or indirect parent thereof), on customary terms to the extent attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, (n) transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods or services, in each case in the ordinary course of business and otherwise in compliance with the terms of the New Notes Documentation which are fair to the Borrower and the Restricted Subsidiaries, in the reasonable determination of the board of directors of the Borrower or the senior management thereof, or are on terms at least as favorable as would reasonably have been obtained at such time from an unaffiliated party, and (o) customary payments by the Borrower and any Restricted Subsidiaries to the Sponsors made for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities (including in connection with acquisitions or divestitures), which payments are approved by the majority of the members of the board of directors or a majority of the disinterested members of the board of directors of the Borrower, in good faith.

SECTION 7.09. Burdensome Agreements. Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability of (a) any Restricted Subsidiary of the Borrower that is not a Guarantor to make Restricted Payments to the Borrower or any Guarantor or (b) the Borrower or any Loan Party to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Facilities and the Obligations or under the Loan Documents; *provided* that the foregoing clauses (a) and (b) shall not apply to Contractual Obligations which (i) (x) exist on the date hereof and (to the extent not otherwise permitted by this Section 7.09) are listed on Schedule 7.09 hereto and (y) to the extent Contractual Obligations permitted by clause (x) are set forth in an agreement evidencing Indebtedness, are set forth in any agreement evidencing any permitted renewal, extension or refinancing of such Indebtedness so long as such renewal, extension or refinancing does not expand the scope of such Contractual Obligation, (ii) are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Borrower, so long as such Contractual Obligations were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Borrower; *provided further* that this clause (ii) shall not apply to Contractual Obligations that are binding on a Person that becomes a Restricted Subsidiary pursuant to Section 6.15, (iii) represent Indebtedness of a Restricted Subsidiary of the Borrower which is not a Loan Party which is permitted by Section 7.03 so long as the limitations described in clauses (a) and (b) apply solely to such Restricted Subsidiary and its Subsidiaries and the direct parent of such Restricted Subsidiary, (iv) arise in connection with any Disposition permitted by Section 7.05 so long as such restrictions relate to the assets subject thereto, (v) are customary provisions in joint venture agreements and other similar agreements applicable to joint ventures permitted under Section 7.02 and applicable solely to such joint venture entered into in the ordinary course of business, (vi) are negative pledges and restrictions

on Liens in favor of any holder of Indebtedness permitted under Section 7.03 but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness (and excluding in any event any Indebtedness constituting any Junior Financing), (vii) are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (viii) comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 7.03(e) or 7.03(g) to the extent that such restrictions apply only to the property or assets securing such Indebtedness or, in the case of Indebtedness incurred pursuant to Section 7.03(g) only, to the Restricted Subsidiaries incurring or guaranteeing such Indebtedness, (ix) are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary, (x) are customary provisions restricting assignment of any agreement entered into in the ordinary course of business, and (xi) are restrictions on cash or other deposits imposed by customers under contracts entered into in the ordinary course of business. Clause (b) of this Section 7.09 shall not apply to restrictions or conditions imposed by any agreement relating to the Receivables Facilities permitted by this Agreement if such restrictions or conditions apply only to the assets that are the subject of the applicable Receivables Facility, and neither clauses (a) or (b) of this Section 7.09 shall apply to restrictions or conditions imposed on any Receivables Management Subsidiary in connection with any Receivables Management Financing or any service agreement (or similar arrangement) required by or entered into in connection with such Receivables Management Financing or any credit support provided by it in favor of any financier of such Receivables Management Financing.

SECTION 7.10.  Use of Proceeds.  Use the proceeds of any Credit Extension, whether directly or indirectly, in a manner inconsistent with the uses set forth in the preliminary statements to this Agreement (with proceeds of Incremental Term Loans to be used for any such purposes and otherwise as permitted under this Agreement).

SECTION 7.11.  Financial Covenants.  (a) *Total Leverage Ratio.*  Permit the Total Leverage Ratio as of the last day of any Test Period (beginning with the Test Period ending on June 30, 2007) to be greater than the ratio set forth below opposite the last day of such Test Period:

| Fiscal Year | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2007 | -- | 7.75:1 | 7.75:1 | 7.75:1 |
| 2008 | 7.50:1 | 7.50:1 | 7.25:1 | 7.00:1 |
| 2009 | 7.00:1 | 6.75:1 | 6.50:1 | 6.25:1 |
| 2010 | 6.25:1 | 6.00:1 | 5.75:1 | 5.50:1 |
| 2011 | 5.50:1 | 5.25:1 | 5.00:1 | 4.75:1 |
| 2012 | 4.75:1 | 4.50:1 | 4.25:1 | 4.00:1 |
| 2013 | 4.00:1 | 3.75:1 | 3.75:1 | 3.75:1 |

(b)      *Interest Coverage Ratio.*  Permit the Interest Coverage Ratio for any Test Period (beginning with the Test Period ending on June 30, 2007) to be less than the ratio set forth below opposite the last day of such Test Period:

| Fiscal Year | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2007 | -- | 1.25:1 | 1.25:1 | 1.25:1 |
| 2008 | 1.25:1 | 1.25:1 | 1.50:1 | 1.50:1 |
| 2009 | 1.50:1 | 1.50:1 | 1.75:1 | 1.75:1 |
| 2010 | 1.75:1 | 1.75:1 | 2.00:1 | 2.00:1 |
| 2011 | 2.00:1 | 2.00:1 | 2.25:1 | 2.25:1 |

| Fiscal Year | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| 2012 | 2.25:1 | 2.25:1 | 2.50:1 | 2.50:1 |
| 2013 | 2.50:1 | 2.50:1 | 2.50:1 | 2.50:1 |

SECTION 7.12. <u>Accounting Changes</u>. Make any change in fiscal year; *provided, however,* that the Borrower may, upon written notice to the Administrative Agent, change its fiscal year to any other fiscal year reasonably acceptable to the Administrative Agent, in which case, the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary to reflect such change in fiscal year.

SECTION 7.13. <u>Prepayments, Etc. of Indebtedness</u>.

(a)    Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner (it being understood that payments of regularly scheduled interest shall be permitted) the Senior Subordinated Notes, any subordinated Indebtedness incurred under Section 7.03(h) or any other Indebtedness that is required to be subordinated to the Obligations pursuant to the terms of the Loan Documents (collectively, "**Junior Financing**") or make any payment in violation of any subordination terms of any Junior Financing Documentation, except (i) the refinancing thereof with the Net Cash Proceeds of any Indebtedness (to the extent such Indebtedness constitutes a Permitted Refinancing and, if applicable, is permitted pursuant to Section 7.03(h)), to the extent not required to prepay any Loans or Facility pursuant to Section 2.05(b), (ii) the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests) of the Borrower or Holdings (or any direct or indirect parent thereof), (iii) the prepayment of Indebtedness of the Borrower or any Restricted Subsidiary to the Borrower or any Restricted Subsidiary to the extent permitted by the Collateral Documents, and (iv) prepayments, redemptions, purchases, defeasances and other payments in respect of Junior Financings prior to their scheduled maturity in an aggregate amount, together with the aggregate amount of (1) Restricted Payments made pursuant to Section 7.06(h) and (2) loans and advances made pursuant to Section 7.02(m) then outstanding, not to exceed the sum of (A) $50,000,000 (such amount to be increased to $65,000,000 if the Total Leverage Ratio as of the last day of any Test Period is less than 4.5 to 1.0) plus (B) the Cumulative Growth Amount.

(b)    Amend, modify or change in any manner materially adverse to the interests of the Lenders any term or condition of any Junior Financing Documentation without the consent of the Arrangers.

SECTION 7.14. <u>Equity Interests of the Borrower and Restricted Subsidiaries</u>. Permit any wholly owned Domestic Subsidiary that is a Restricted Subsidiary to become a non-wholly owned Subsidiary, except (i) as a result of or in connection with a dissolution, merger, consolidation or Disposition of a Restricted Subsidiary permitted by Section 7.04, 7.05 or an Investment in any Person permitted under Section 7.02 or (ii) so long as such Restricted Subsidiary continues to be a Guarantor in accordance with the Collateral and Guarantee Requirement.

SECTION 7.15. <u>Capital Expenditures</u>. (a) Make any Capital Expenditure except for Capital Expenditures not exceeding, in the aggregate for the Borrower and the Restricted Subsidiaries during each fiscal year set forth below, the amount set forth opposite such fiscal year:

| Fiscal Year | Amount |
|---|---|
| 2007 | $125,000,000 |
| 2008 | $125,000,000 |
| 2009 | $130,000,000 |
| 2010 | $135,000,000 |
| 2011 | $140,000,000 |
| 2012 | $150,000,000 |
| 2013 | $155,000,000 |

; *provided* that the amount of Capital Expenditures permitted to be made in respect of any fiscal year (i) shall be increased after the consummation of any Permitted Acquisition in an amount equal to 10% of the pro forma aggregate consolidated revenues of the Acquired Entity or Business so acquired during the fiscal year of such Acquired Entity or Business beginning after such Permitted Acquisition (such amount, the "**Acquired Annual Capital Expenditure Amount**") and (ii) may, at the option of the Borrower, be increased by up to 25% of the next succeeding fiscal year's Capital Expenditure limit (as increased by the Acquired Annual Capital Expenditure Amount), in which case the base amount that may be expended for the next succeeding fiscal year shall be correspondingly reduced.

(b)     Notwithstanding anything to the contrary contained in clause (a) above, to the extent that the aggregate amount of Capital Expenditures made by the Borrower and the Restricted Subsidiaries in any fiscal year pursuant to Section 7.15(a) is less than the maximum amount of Capital Expenditures permitted by Section 7.15(a) with respect to such fiscal year, the amount of such difference (the "**Rollover Amount**") may be carried forward and used to make Capital Expenditures in the next succeeding fiscal year; *provided* that Capital Expenditures in any fiscal year shall be counted against any Rollover Amount available with respect to such fiscal year prior to being counted against the base amount set forth in Section 7.15(a) with respect to such fiscal year

SECTION 7.16.  Holdings.  If a Holdings Election Event shall occur, Holdings shall not (a) other than Indebtedness in respect of loans and advances by the Borrower and its Restricted Subsidiaries otherwise permitted pursuant to Section 7.06, create, incur, assume or suffer to exist any Indebtedness unless such Indebtedness ("**Holdings Permitted Debt**") (i) is not guaranteed by the Borrower or any of its Restricted Subsidiaries, (ii) will not mature prior to the date that is ninety-one (91) days after the Maturity Date of the Term Loans, (iii) has no scheduled amortization or payments of principal other than mandatory prepayment, repurchase or redemption provisions customary for holding company debt securities, (iv) does not require any payments in cash of interest or other amounts in respect of the principal thereof prior to the earlier to occur of (A) the date that is four (4) years from the date of the issuance or incurrence thereof and (B) the date that is ninety-one (91) days after the Maturity Date of the Term Loans, (v) has covenant, default and remedy provisions customary for holding company debt securities, but in no event more restrictive to the Borrower and the Restricted Subsidiaries than those set forth in the Senior Notes Indenture, as of the Closing Date, taken as a whole (determined in the context of, and subject to, then prevailing market conditions), other than provisions customary for senior discount notes of a holding company, (b) create, incur, assume or suffer to exist any Liens on the Equity Interests of the Borrower except nonconsensual Liens imposed by operation of law or pursuant to the Loan Documents, and (c) conduct or engage in any operations or business other than through one or more Subsidiaries or those incidental to the performance of its existence and obligations under the Loan Documents or any Holdings Permitted Debt or in connection with a

Qualifying IPO or otherwise in a manner consistent with transactions otherwise permitted under Article VII.

## ARTICLE VIII

### EVENTS OF DEFAULT AND REMEDIES

SECTION 8.01. <u>Events of Default</u>. Any of the following shall constitute an Event of Default:

(a)    *Non-Payment.* The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Loan, or (ii) within five (5) Business Days after the same becomes due, any interest on any Loan or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    *Specific Covenants.* The Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 6.03(a) or 6.05(a) (solely with respect to the Borrower) or Article VII; provided that any Event of Default under Section 7.11 is subject to cure as contemplated by Section 8.05; or

(c)    *Other Defaults.* Any Loan Party fails to perform or observe any other covenant or agreement (not specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after notice thereof by the Administrative Agent to the Borrower; or

(d)    *Representations and Warranties.* Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document required to be delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(e)    *Cross-Default.* Any Loan Party or any Restricted Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder and Indebtedness of special purpose Receivables Management Subsidiaries that own substantially no assets other than Receivables Management Assets which Indebtedness is limited in recourse to such Receivables Management Assets (or is non-recourse to the Borrower or any Restricted Subsidiaries other than such special purpose Receivables Management Subsidiary)) having an aggregate principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically, or otherwise) or, in the case of a Receivables Facility, to be terminated, or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (e)(B) shall not apply to secured Indebtedness that becomes due as a result of the

voluntary sale or transfer of the property or assets securing such Indebtedness, if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness; or

(f)     *Insolvency Proceedings, Etc.*  Any Loan Party or any of the Restricted Subsidiaries institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for sixty (60) calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for sixty (60) calendar days, or an order for relief is entered in any such proceeding; or

(g)     *Inability to Pay Debts; Attachment.*  (i) Any Loan Party or any Restricted Subsidiary becomes unable or admits in writing its inability or fails generally to pay its debts in excess of the Threshold Amount as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of the Loan Parties, taken as a whole, and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(h)     *Judgments.*  There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and has not denied coverage) and such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) consecutive days; or

(i)     *ERISA.*  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party under Title IV of ERISA in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount which could reasonably be expected to result in a Material Adverse Effect; or

(j)     *Invalidity of Loan Documents.*  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05) or as a result of acts or omissions by the Administrative Agent or any Lender or the satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party contests in writing the validity or enforceability of any provision of any Loan Document; or any Loan Party denies in writing that it has any or further liability or obligation under any Loan Document (other

than as a result of repayment in full of the Obligations and termination of the Aggregate Commitments), or purports in writing to revoke or rescind any Loan Document; or

(k)     *Change of Control.* There occurs any Change of Control; or

(l)     *Collateral Documents.* Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.11 shall for any reason (other than pursuant to the terms thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create a valid and perfected lien, with the priority required by the Collateral Documents, (or other security purported to be created on the applicable Collateral) on and security interest in any material portion of the Collateral purported to be covered thereby, subject to Liens permitted under Section 7.01, or any Loan Party shall so assert in writing, except to the extent that any such loss of perfection or priority results from the failure of the Administrative Agent to maintain possession of certificates actually delivered to it representing securities pledged under the Collateral Documents or to file Uniform Commercial Code continuation statements and except as to Collateral consisting of real property to the extent that such losses are covered by a lender's title insurance policy and such insurer has not denied coverage; or

(m)     *Junior Financing Documentation.* (i) Any of the Obligations of the Loan Parties under the Loan Documents for any reason shall cease to be "Senior Indebtedness" (or any comparable term) or "Senior Secured Financing" (or any comparable term) under, and as defined in any Specified Junior Financing Documentation or (ii) the subordination provisions set forth in any Specified Junior Financing Documentation shall, in whole or in part, cease to be effective or cease to be legally valid, binding and enforceable against the holders of any Specified Junior Financing, if applicable; or

(n)     *Receivables Management Subsidiaries.* Any Receivables Management Subsidiary (A) fails to make any payment beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness (other than Indebtedness hereunder) having an aggregate principal amount of not less than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness, or any other event occurs (other than, with respect to Indebtedness consisting of Swap Contracts, termination events or equivalent events pursuant to the terms of such Swap Contracts), the effect of which default or other event is to cause such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically, or otherwise) or, in the case of a Receivables Facility, to be terminated, or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that up to $25,000,000 in the aggregate of Indebtedness of such Receivables Management Subsidiaries shall be excluded for purposes of calculating such Threshold Amount.

SECTION 8.02. <u>Remedies Upon Event of Default</u>. If any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall take any or all of the following actions:

(a)     declare the commitment of each Lender to make Loans and any obligation of the L/C Issuers to make L/C Credit Extensions to be terminated, whereupon such commitments and obligation shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)    require that the Borrower Cash Collateralize the L/C Obligations (in an amount equal to the then Outstanding Amount thereof); and

(d)    exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law;

*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans and any obligation of the L/C Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender.

SECTION 8.03. Exclusion of Immaterial Subsidiaries. Solely for the purpose of determining whether a Default has occurred under Section 8.01(f) or (g), any reference in any such clause to any Restricted Subsidiary or Loan Party shall be deemed not to include any Immaterial Subsidiary.

SECTION 8.04. Application of Funds. After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable and the L/C Obligations have automatically been required to be Cash Collateralized as set forth in the proviso to Section 8.02), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

*First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest, but including Attorney Costs payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

*Second*, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including Attorney Costs payable under Section 10.05 and amounts payable under Article III) and fees and indemnities payable to the Hedge Banks, ratably among them in proportion to the amounts described in this clause *Second* payable to them;

*Third*, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and L/C Borrowings, ratably among the Lenders in proportion to the respective amounts described in this clause *Third* payable to them;

*Fourth*, to payment of that portion of the Obligations constituting unpaid principal of the Loans and L/C Borrowings, the breakage or termination value under Secured Hedge Obligations and the Cash Management Obligations, ratably among the Lenders and Hedge Banks in proportion to the respective amounts described in this clause *Fourth* held by them;

*Fifth*, to the Administrative Agent for the account of the L/C Issuers, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

*Sixth*, to the payment of all other Obligations of the Loan Parties that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

*Last*, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

Subject to Section 2.03(c), amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause *Fifth* above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as Cash Collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above and, if no Obligations remain outstanding, to the Borrower.

SECTION 8.05. Borrower's Right to Cure.

(a)     Notwithstanding anything to the contrary contained in Section 8.01, in the event of any Event of Default under any covenant set forth in Section 7.11 and until the expiration of the tenth (10th) day after the date on which financial statements are required to be delivered with respect to the applicable fiscal quarter hereunder, the Borrower may engage in a Permitted Equity Issuance to any of the Equity Investors and apply the amount of the Net Cash Proceeds thereof (the "**Cure Amount**") to increase Consolidated EBITDA with respect to such applicable quarter; *provided* that such Net Cash Proceeds (i) are actually received by the Borrower during such fiscal period or after the last day of the fiscal period covered by such financial statements but no later than fifteen (15) days after the date on which financial statements are required to be delivered with respect to such fiscal quarter hereunder, (ii) are Not Otherwise Applied and (iii) do not exceed the aggregate amount necessary to cure such Event of Default under Section 7.11 for any applicable period. The Cure Amount used to calculate Consolidated EBITDA for one fiscal quarter shall be used and included when calculating Consolidated EBITDA for each Test Period that includes such fiscal quarter. The parties hereby acknowledge that this Section 8.05(a) may not be relied on for purposes of calculating any financial ratios other than as applicable to Section 7.11 and shall not result in any adjustment to any amounts other than the amount of the Consolidated EBITDA referred to in the immediately preceding sentence.

(b)     In each period of four fiscal quarters, there shall be at least two (2) fiscal quarters in which no cure set forth in Section 8.05(a) is made.

(c)     For the avoidance of doubt, the subsequent performance or observance of any term, covenant or agreement under Section 6.01, 6.02, 6.11 and 6.13 shall cure any Default in respect thereof under Section 8.01(c) notwithstanding that such performance or observance occurred beyond the time or period specified therefor in such Section and such Default shall thereupon be deemed cured and no longer existing or continuing unless the Loans shall have been accelerated and/or the Commitments terminated

pursuant to Section 8.02(b); *provided* that the Borrower's obligations under Section 6.03(a) shall not be relieved by this Section 8.05(c).

## ARTICLE IX

## ADMINISTRATIVE AGENT AND OTHER AGENTS

SECTION 9.01. Appointment and Authorization of Agents.

(a)    Each Lender hereby irrevocably appoints, designates and authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, the Administrative Agent shall have no duties or responsibilities, except those expressly set forth herein, nor shall the Administrative Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    Each L/C Issuer shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and each such L/C Issuer shall have all of the benefits and immunities (i) provided to the Agents in this Article IX with respect to any acts taken or omissions suffered by such L/C Issuer in connection with Letters of Credit issued by it or proposed to be issued by it and the applications and agreements for letters of credit pertaining to such Letters of Credit as fully as if the term "Agent" as used in this Article IX and in the definition of "Agent-Related Person" included such L/C Issuer with respect to such acts or omissions, and (ii) as additionally provided herein with respect to such L/C Issuer.

(c)    The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders (in its capacities as a Lender, Swing Line Lender (if applicable), L/C Issuer (if applicable) and a potential Hedge Bank) hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of (and to hold any security interest created by the Collateral Documents for and on behalf of or on trust for) such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent), shall be entitled to the benefits of all provisions of this Article IX (including, Section 9.07, as though such co-

agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

SECTION 9.02. <u>Delegation of Duties</u>. The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder) by or through agents, employees or attorneys-in-fact. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or sub-agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

SECTION 9.03. <u>Liability of Agents</u>. No Agent-Related Person shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement or any other Loan Document or the transactions contemplated hereby (except for its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein), or (b) be responsible in any manner to any Lender or participant for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder. No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof.

SECTION 9.04. <u>Reliance by Agents</u>.

(a)    Each Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent. Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.

(b)     For purposes of determining compliance with the conditions specified in Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 9.05. Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, except with respect to defaults in the payment of principal, interest and fees required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default and stating that such notice is a "notice of default." The Administrative Agent will notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; provided that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable or in the best interest of the Lenders.

SECTION 9.06. Credit Decision; Disclosure of Information by Agents. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

SECTION 9.07. Indemnification of Agents. Whether or not the transactions contemplated hereby are consummated, the Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), pro rata (determined at the time such indemnity is sought), and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it in its capacity as such; *provided* that no Lender shall be

liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities resulting from such Agent-Related Person's own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction; provided that no action taken in accordance with the directions of the Required Lenders (or such other number or percentage of the Lenders as shall be required by the Loan Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07; and *provided, further*, that to the extent the indemnification of the L/C Issuer is required hereunder, such obligation shall be limited solely to the Revolving Credit Lenders. In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its ratable share (determined at the time such indemnity is sought) of any costs or out-of-pocket expenses (including Attorney Costs) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower. The undertaking in this Section 9.07 shall survive termination of the Aggregate Commitments, the payment of all other Obligations and the resignation of the Administrative Agent.

SECTION 9.08. <u>Agents in their Individual Capacities</u>. LCPI and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though LCPI were not the Administrative Agent hereunder and without notice to or consent of the Lenders. The Lenders acknowledge that, pursuant to such activities, LCPI or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall be under no obligation to provide such information to them. With respect to its Loans, LCPI shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" include LCPI in its individual capacity.

SECTION 9.09. <u>Successor Agents</u>. The Administrative Agent may resign as the Administrative Agent upon thirty (30) days' notice to the Lenders and the Borrower. If the Administrative Agent resigns under this Agreement, the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, which successor agent shall be consented to by the Borrower at all times other than during the existence of an Event of Default under Section 8.01(f) or (g) (which consent of the Borrower shall not be unreasonably withheld or delayed). If no successor agent is appointed prior to the effective date of the resignation of the Administrative Agent, the Administrative Agent may appoint, after consulting with the Lenders and the Borrower, a successor agent from among the Lenders. Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" shall mean such successor administrative agent and/or supplemental administrative agent, as the case may be, and the retiring Administrative Agent's appointment, powers and duties as the Administrative Agent shall be terminated. After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX and Sections 10.04 and 10.05 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under this Agreement. If no

successor agent has accepted appointment as the Administrative Agent by the date which is thirty (30) days following the retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. Upon the acceptance of any appointment as the Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to (a) continue the perfection of the Liens granted or purported to be granted by the Collateral Documents or (b) otherwise ensure that the Collateral and Guarantee Requirement is satisfied, the Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents. After the retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article IX shall continue in effect for its benefit in respect of any actions taken or omitted to be taken by it while it was acting as the Administrative Agent.

SECTION 9.10. <u>Administrative Agent May File Proofs of Claim</u>. In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan or L/C Obligation shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, L/C Obligations and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.03(h) and (i), 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

SECTION 9.11.  Collateral and Guaranty Matters.  The Lenders irrevocably agree that:

(a)    any Lien on any property granted to or held by the Administrative Agent under any Loan Document shall be automatically released (i) upon termination of the Aggregate Commitments and payment in full of all Obligations (other than (x) obligations under Secured Hedge Agreements not yet due and payable, (y) Cash Management Obligations and (z) contingent indemnification obligations) and the expiration or termination of all Letters of Credit (or cash collateral or other credit support satisfactory to the L/C Issuer thereof in its sole discretion has been provided), (ii) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document to any Person other than the Borrower or any of its Domestic Subsidiaries that are Restricted Subsidiaries, (iii) subject to Section 10.01, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 10.01), or (iv) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to clause (c) below;

(b)    to release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i); and

(c)    any Guarantor shall be automatically released from its obligations under the Guaranty if such Person ceases to be a Restricted Subsidiary as a result of a transaction or designation permitted hereunder; provided that no such release shall occur if such Guarantor continues to be a guarantor in respect of the New Notes or any Junior Financing.

Upon request by the Administrative Agent at any time, the Required Lenders (or such greater number of Lenders as may be required pursuant to Section 10.01) will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11.  In each case as specified in this Section 9.11, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11.

SECTION 9.12.  Other Agents; Arrangers; Bookrunners and Managers.  None of the Lenders or other Persons identified on the facing page or signature pages of this Agreement as a "syndication agent", "co-documentation agent", "joint bookrunner" or "joint lead arranger" shall have any right, power, obligation, liability, responsibility or duty under this Agreement other than those applicable to all Lenders as such. Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any Lender. Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

SECTION 9.13.  Appointment of Supplemental Administrative Agents.

(a)     It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "**Supplemental Administrative Agent**" and collectively as "**Supplemental Administrative Agents**").

(b)     In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)     Should any instrument in writing from the Borrower or any other Loan Party be required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon request by the Administrative Agent.  In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

## ARTICLE X

## MISCELLANEOUS

SECTION 10.01.  Amendments. Etc.  Except as otherwise set forth in this Agreement, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided* that, no such amendment, waiver or consent shall:

(a)    extend or increase the Commitment of any Lender without the written consent of each Lender directly affected thereby (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender);

(b)    postpone any date scheduled for, or reduce or forgive the amount of, any payment of principal or interest under Section 2.07 or 2.08 without the written consent of each Lender directly affected thereby, it being understood that the waiver of (or amendment to the terms of) any mandatory prepayment of the Term Loans shall not constitute a postponement of any date scheduled for the payment of principal or interest;

(c)    reduce or forgive the principal of, or the rate of interest specified herein on, any Loan or L/C Borrowing or (subject to clause (iii) of the second proviso to this Section 10.01) any fees (including fees set forth in Section 2.09 or other amounts payable hereunder or under any other Loan Document), or extend, postpone or waive the date upon which any fees are to be paid, without the written consent of each Lender directly affected thereby, it being understood that any change to the definition of Total Leverage Ratio or in the component definitions thereof shall not constitute a reduction in the rate; *provided* that, only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate;

(d)    change any provision of this Section 10.01, the definition of "Required Lenders" or "Pro Rata Share" or Sections 2.06(c), 2.12(a), 2.13 or 8.04 without the written consent of each Lender affected thereby;

(e)    other than in a transaction permitted under Section 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender; or

(f)    other than in connection with a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the aggregate value of the Senior Guarantees, without the written consent of each Lender;

and *provided further* that (i) no amendment, waiver or consent shall, unless in writing and signed by each L/C Issuer in addition to the Lenders required above, affect the rights or duties of an L/C Issuer under this Agreement or any Letter of Credit Application relating to any Letter of Credit issued or to be issued by it; (ii) no amendment, waiver or consent shall, unless in writing and

signed by the Swing Line Lender in addition to the Lenders required above, affect the rights or duties of the Swing Line Lender under this Agreement; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) Section 10.07(h) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Loans are being funded by an SPC at the time of such amendment, waiver or other modification; and (v) the consent of Lenders holding more than 50% of any Class of Commitments shall be required with respect to any amendment that by its terms adversely affects the rights of such Class in respect of payments hereunder in a manner different than such amendment affects other Classes. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender (it being understood that any Commitments or Loans held or deemed held by any Defaulting Lender shall be excluded for a vote of the Lenders hereunder requiring any consent of the Lenders).

Notwithstanding the foregoing, this Agreement may be amended (or amended and restated) with the written consent of the Required Lenders, the Administrative Agent and the Borrower (a) to add one or more additional credit facilities to this Agreement and to permit the extensions of credit from time to time outstanding thereunder and the accrued interest and fees in respect thereof to share ratably in the benefits of this Agreement and the other Loan Documents with the Term Loans and the Revolving Credit Loans and the accrued interest and fees in respect thereof and (b) to include appropriately the Lenders holding such credit facilities in any determination of the Required Lenders.

In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the Replacement Term Loans (as defined below) to permit the refinancing of all outstanding Term Loans ("Refinanced Term Loans") with a replacement term loan tranche denominated in Dollars ("Replacement Term Loans") hereunder; *provided* that (a) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans, (b) the Applicable Rate for such Replacement Term Loans shall not be higher than the Applicable Rate for such Refinanced Term Loans, (c) the Weighted Average Life to Maturity of such Replacement Term Loans shall not be shorter than the Weighted Average Life to Maturity of such Refinanced Term Loans at the time of such refinancing (except to the extent of nominal amortization for periods where amortization has been eliminated as a result of prepayment of the Term Loans) and (d) all other terms applicable to such Replacement Term Loans shall be substantially identical to, or less favorable to the Lenders providing such Replacement Term Loans than, those applicable to such Refinanced Term Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of the Term Loans in effect immediately prior to such refinancing.

SECTION 10.02. Notices and Other Communications; Facsimile Copies.

(a)    *General.* Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Loan Document shall be in writing (including by facsimile transmission). All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)      if to the Borrower, the Administrative Agent, an L/C Issuer or the Swing Line Lender, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(ii)      if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent, the L/C Issuers and the Swing Line Lender.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii) (A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, four (4) Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of Section 10.02(c)), when delivered; *provided* that notices and other communications to the Administrative Agent, the L/C Issuers and the Swing Line Lender pursuant to Article II shall not be effective until actually received by such Person. In no event shall a voice mail message be effective as a notice, communication or confirmation hereunder.

(b)      *Effectiveness of Facsimile Documents and Signatures.* Loan Documents may be transmitted and/or signed by facsimile. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually signed originals and shall be binding on all Loan Parties, the Agents and the Lenders.

(c)      *Reliance by Agents and Lenders.* The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic Committed Loan Notices and Swing Line Loan Notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct. All telephonic notices to the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

SECTION 10.03.  No Waiver; Cumulative Remedies.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

SECTION 10.04. <u>Attorney Costs, Expenses and Taxes</u>. The Borrower agrees (a) if the Closing Date occurs, to pay or reimburse the Administrative Agent and the Arrangers for all reasonable out-of-pocket costs and expenses incurred in connection with the preparation, negotiation, syndication, execution and delivery of this Agreement and the other Loan Documents, and any amendment, waiver, consent or other modification of the provisions hereof and thereof (whether or not the transactions contemplated thereby are consummated), and the consummation and administration of the transactions contemplated hereby and thereby, including all Attorney Costs of Weil, Gotshal & Manges LLP and, if necessary or advisable, one local counsel in each relevant jurisdiction, and (b) to pay or reimburse the Administrative Agent, the Arrangers and each Lender for all out-of-pocket costs and expenses incurred in connection with the enforcement of any rights or remedies under this Agreement or the other Loan Documents (including all such costs and expenses incurred during any legal proceeding, including any proceeding under any Debtor Relief Law, and including all Attorney Costs of one primary counsel and, if necessary or advisable, one local counsel in each relevant jurisdiction and, if a conflict exists among the Administrative Agent and the Lenders, one additional primary counsel and, if necessary or advisable, one additional local counsel in each relevant jurisdiction). The foregoing costs and expenses shall include all reasonable search, filing, recording and title insurance charges and fees and taxes related thereto, and other reasonable out-of-pocket expenses incurred by the Administrative Agent. The agreements in this Section 10.04 shall survive the termination of the Aggregate Commitments and repayment of all other Obligations. All amounts due under this Section 10.04 shall be paid within ten (10) Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expenses in reasonable detail. If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it hereunder or under any Loan Document, such amount may be paid on behalf of such Loan Party by the Administrative Agent in its sole discretion.

SECTION 10.05. <u>Indemnification by the Borrower</u>. Whether or not the transactions contemplated hereby are consummated, the Borrower shall indemnify and hold harmless each Agent-Related Person, each Lender and their respective Affiliates, directors, officers, employees, counsel, agents, trustees, investment advisors, controlling persons, members and attorneys-in-fact (collectively the "**Indemnitees**") from and against any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including Attorney Costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (a) the execution, delivery, enforcement, performance or administration of any Loan Document or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (b) any Commitment, Loan or Letter of Credit or the use or proposed use of the proceeds therefrom (including any refusal by an L/C Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (c) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by the Borrower, any Subsidiary or any other Loan Party, or any Environmental Liability related in any way to the Borrower, any Subsidiary or any other Loan Party, or (d) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto (all the foregoing, collectively, the "**Indemnified Liabilities**"), in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims,

demands, actions, judgments, suits, costs, expenses or disbursements resulted from the gross negligence, bad faith or willful misconduct of, or the breach of the Loan Documents by, such Indemnitee or of any affiliate, director, officer, employee, counsel, agent or attorney-in-fact of such Indemnitee. No Indemnitee shall be liable for any damages arising from the use by others of any information or other materials obtained through IntraLinks or other similar information transmission systems in connection with this Agreement, nor shall any Indemnitee or any Loan Party have any liability for any special, punitive, indirect or consequential damages relating to this Agreement or any other Loan Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date). In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 10.05 applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, stockholders or creditors or an Indemnitee or any other Person, whether or not any Indemnitee is otherwise a party thereto and whether or not any of the transactions contemplated hereunder or under any of the other Loan Documents is consummated. All amounts due under this Section 10.05 shall be paid within ten (10) Business Days after demand therefore; *provided, however*, that such Indemnitee shall promptly refund such amount to the extent that there is a final judicial or arbitral determination that such Indemnitee was not entitled to indemnification or contribution rights with respect to such payment pursuant to the express terms of this Section 10.05. The agreements in this Section 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

SECTION 10.06. Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.

SECTION 10.07. Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee, (ii) by way of participation in accordance with the provisions of Section 10.07(e), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Sections 10.07(g) or 10.07(i) or (iv) to an SPC in accordance with the provisions of Section 10.07(h) (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in

Section 10.07(e) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees (other than a Disqualified Institution) ("Assignees") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this Section 10.07(b), participations in L/C Obligations and in Swing Line Loans) at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of:

(A)    the Borrower, *provided* that no consent of the Borrower shall be required for an assignment (x) by or to any Arranger or any of their respective Affiliates, (y) to a Lender, an Affiliate of a Lender or an Approved Fund or (z) if an Event of Default under Section 8.01(a), (f) or (g) has occurred and is continuing, to any Assignee;

(B)    the Administrative Agent, *provided* that no consent of the Administrative Agent shall be required for an assignment (x) of all or any portion of a Term Loan to a Lender, an Affiliate of a Lender or an Approved Fund or (y) to an Agent or an Affiliate of an Agent;

(C)    each L/C Issuer at the time of such assignment, *provided* that no consent of the L/C Issuers shall be required for any assignment of a Term Loan or any assignment to an Agent or an Affiliate of an Agent; and

(D)    the Swing Line Lender; *provided* that no consent of the Swing Line Lender shall be required for any assignment of a Term Loan or any assignment to an Agent or an Affiliate of an Agent.

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans of any Class, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 (in the case of each Revolving Credit Facility), or $1,000,000 (in the case of a Term Loan) unless each of the Borrower and the Administrative Agent otherwise consents, *provided* that (1) no such consent of the Borrower shall be required if an Event of Default under Section 8.01(a), (f) or (g) has occurred and is continuing and (2) such amounts shall be aggregated in respect of each Lender and its Affiliates or Approved Funds, if any;

(B)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together

with a processing and recordation fee of $3,500; *provided*, that only one processing and recordation fee shall be required in connection with concurrent assignments to two or more Approved Funds; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

This paragraph (b) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Facilities on a non-pro rata basis.

(c)    Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(d), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment). Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (c) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(e).

(d)    The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, L/C Obligations (specifying the Unreimbursed Amounts), L/C Borrowings and amounts due under Section 2.03, owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or a Disqualified Institution) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans (including such Lender's participations in L/C Obligations and/or Swing Line Loans) owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and

directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or the other Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that directly affects such Participant. Subject to Section 10.07(f), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(c) but shall not be entitled to recover greater amounts under such Sections than the selling Lender would be entitled to recover. To the extent permitted by applicable Law, each Participant also shall be entitled to the benefits of Section 10.09 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.13 as though it were a Lender.

(f)    A Participant shall not be entitled to receive any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant shall not be entitled to the benefits of Section 3.01 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 10.15 as though it were a Lender.

(g)    Any Lender may at any time, without the consent of the Borrower or the Administrative Agent, pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "**Granting Lender**") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "**SPC**") the option to provide all or any part of any Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including its obligations under Section 3.01, 3.04 or 3.05), (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (iii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the lender of record hereunder. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the

Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its right to receive payment with respect to any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its funding of Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(i)     Notwithstanding anything to the contrary contained herein, (1) any Lender may in accordance with applicable Law create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it and (2) any Lender that is a Fund may, without the consent of the Borrower or the Administrative Agent, create a security interest in all or any portion of the Loans owing to it and the Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this Section 10.07, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(j)     Notwithstanding anything to the contrary contained herein, any L/C Issuer or the Swing Line Lender may, upon thirty (30) days' notice to the Borrower and the Lenders, resign as an L/C Issuer or the Swing Line Lender, respectively; *provided* that on or prior to the expiration of such 30-day period with respect to such resignation, the relevant L/C Issuer or the Swing Line Lender shall have identified a successor L/C Issuer or Swing Line Lender reasonably acceptable to the Borrower willing to accept its appointment as successor L/C Issuer or Swing Line Lender, as applicable. In the event of any such resignation of an L/C Issuer or the Swing Line Lender, the Borrower shall be entitled to appoint from among the Lenders willing to accept such appointment a successor L/C Issuer or Swing Line Lender hereunder, in each case, reasonably acceptable to the Administrative Agent and, with respect to any successor L/C Issuer, the Initial L/C Issuer for so long as it is an L/C Issuer; *provided* that no failure by the Borrower to appoint any such successor shall affect the resignation of the relevant L/C Issuer or the Swing Line Lender, as the case may be, except as expressly provided above. If an L/C Issuer resigns as an L/C Issuer, it shall retain all the rights and obligations of an L/C Issuer hereunder with respect to all Letters of Credit outstanding as of the effective date of its resignation as an L/C Issuer and all L/C Obligations with respect thereto (including the right to require the Lenders to make Base Rate Loans or fund risk participations in Unreimbursed Amounts pursuant to Section 2.03(c)). If the Swing Line Lender resigns as Swing Line Lender, it shall retain all the rights of the Swing Line Lender provided for hereunder with respect to Swing Line Loans made by it and outstanding as of the effective date of such resignation, including the right to require the Lenders to make Base Rate Loans or fund risk participations in outstanding Swing Line Loans pursuant to Section 2.04(c).

SECTION 10.08. <u>Confidentiality</u>. Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent requested by any Governmental Authority; (c) to the extent required by applicable Laws or regulations or by

any subpoena or similar legal process; (d) to any other party to this Agreement; (e) subject to an agreement containing provisions substantially the same as those of this Section 10.08 (or as may otherwise be reasonably acceptable to the Borrower), to any pledgee referred to in Section 10.07(g), counterparty to a Swap Contract, Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or Participant in, any of its rights or obligations under this Agreement; (f) with the written consent of the Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.08; (h) to any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any Lender; (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Loan Parties received by it from such Lender); or (j) after the occurrence and during the continuation of an Event of Default, as may be necessary (i) to enable the Administrative Agent or any Lender to exercise its remedies hereunder or (ii) in any action, suit or proceeding related to the enforcement of the Administrative Agent's or any Lender's rights hereunder. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to the Agents and the Lenders in connection with the administration and management of this Agreement, the other Loan Documents, the Commitments, and the Credit Extensions. For the purposes of this Section 10.08, "**Information**" means all information received from any Loan Party relating to any Loan Party or its business, other than any such information that is publicly available to any Agent or any Lender prior to disclosure by any Loan Party other than as a result of a breach of this Section 10.08; provided that, in the case of information received from a Loan Party after the date hereof, such information is clearly identified at the time of delivery as confidential or (ii) is delivered pursuant to Section 6.01, 6.02 or 6.03 hereof.

SECTION 10.09. Setoff. In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Lender and its Affiliates is authorized at any time and from time to time, without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party and its Subsidiaries) to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held by, and other Indebtedness at any time owing by, such Lender and its Affiliates to or for the credit or the account of the respective Loan Parties and their Subsidiaries against any and all Obligations owing to such Lender and its Affiliates hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender or Affiliate shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such set off and application made by such Lender; *provided,* that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent and each Lender under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Lender may have.

SECTION 10.10. Interest Rate Limitation. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "**Maximum Rate**"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest

contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

SECTION 10.11.  Counterparts.  This Agreement and each other Loan Document may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by telecopier of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by telecopier be confirmed by a manually signed original thereof; provided that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by telecopier.

SECTION 10.12.  Integration.  This Agreement, together with the other Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on such subject matter.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; provided that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

SECTION 10.13.  Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied or any Letter of Credit shall remain outstanding.

SECTION 10.14.  Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

SECTION 10.15.  Tax Forms.  (a) (i) Each Lender and Agent that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a **"Foreign Lender"**) shall deliver to the Borrower and the Administrative Agent, on or prior to the date which is ten (10) Business Days after the Closing Date (or upon accepting an assignment of an interest herein), two duly signed, properly completed copies of either IRS Form W-8BEN or any successor thereto (relating to such Foreign Lender and entitling it to an exemption from, or reduction of, United States withholding tax on all payments to be made to such Foreign Lender by the Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document) or IRS Form W-8ECI or any successor thereto (relating to all payments to be made to

such Foreign Lender by the Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document) or such other evidence reasonably satisfactory to the Borrower and the Administrative Agent that such Foreign Lender is entitled to an exemption from, or reduction of, United States withholding tax, including any exemption pursuant to Section 871(h) or 881(c) of the Code, and in the case of a Foreign Lender claiming such an exemption under Section 881(c) of the Code, a certificate that establishes in writing to the Borrower and the Administrative Agent that such Foreign Lender is not (i) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (ii) a 10-percent stockholder within the meaning of Section 871(h)(3)(B) of the Code, or (iii) a controlled foreign corporation related to the Borrower with the meaning of Section 864(d) of the Code. Thereafter and from time to time, each such Foreign Lender shall (A) promptly submit to the Borrower and the Administrative Agent such additional duly completed and signed copies of one or more of such forms or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant United States taxing authorities) as may then be available under then current United States Laws and regulations to avoid, or such evidence as is reasonably satisfactory to the Borrower and the Administrative Agent of any available exemption from, or reduction of, United States withholding taxes in respect of all payments to be made to such Foreign Lender by the Borrower or other Loan Party pursuant to this Agreement, or any other Loan Document, in each case, (1) on or before the date that any such form, certificate or other evidence expires or becomes obsolete, (2) after the occurrence of any event requiring a change in the most recent form, certificate or evidence previously delivered by it to the Borrower and the Administrative Agent and (3) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and (B) promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction.

(ii)      Each Foreign Lender, to the extent it does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Foreign Lender under any of the Loan Documents (for example, in the case of a typical participation by such Foreign Lender), shall deliver to the Borrower and the Administrative Agent on the date when such Foreign Lender ceases to act for its own account with respect to any portion of any such sums paid or payable, and at such other times as may be necessary in the determination of the Borrower or the Administrative Agent (in either case, in the reasonable exercise of its discretion), (A) two duly signed completed copies of the forms or statements required to be provided by such Foreign Lender as set forth above, to establish the portion of any such sums paid or payable with respect to which such Foreign Lender acts for its own account that is not subject to United States withholding tax, and (B) two duly signed completed copies of IRS Form W-8IMY (or any successor thereto), together with any information such Foreign Lender chooses to transmit with such form, and any other certificate or statement of exemption required under the Code, to establish that such Foreign Lender is not acting for its own account with respect to a portion of any such sums payable to such Foreign Lender.

(iii)     The Borrower shall not be required to pay any additional amount or any indemnity payment under Section 3.01 to (A) any Foreign Lender if such Foreign Lender shall have failed to satisfy the foregoing provisions of this Section 10.15(a), or (B) any U.S. Lender if such U.S. Lender shall have failed to satisfy the provisions of Section 10.15(b); *provided* that (i) if such Lender shall have satisfied the requirement of this or Section 10.15(b), as applicable, on the date such Lender became a Lender or ceased to act for its own account with respect to any payment under any of the Loan Documents, nothing in this Section 10.15(a) or Section 10.15(b) shall relieve the Borrower of its obligation to pay any amounts pursuant to Section 3.01 in the event that,

as a result of any change in any applicable Law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender or other Person for the account of which such Lender receives any sums payable under any of the Loan Documents is not subject to withholding or is subject to withholding at a reduced rate and (ii) nothing in this Section 10.15(a) shall relieve the Borrower of its obligation to pay any amounts pursuant to Section 3.01 in the event that the requirements of 10.15(a)(ii) have not been satisfied if the Borrower is entitled, under applicable Law, to rely on any applicable forms and statements required to be provided under this Section 10.15 by the Foreign Lender that does not act or has ceased to act for its own account under any of the Loan Documents, including in the case of a typical participation.

(iv)    The Administrative Agent may deduct and withhold any taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents.

(b)    Each Lender and Agent that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "**U.S. Lender**") shall deliver to the Administrative Agent and the Borrower two duly signed, properly completed copies of IRS Form W-9 on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), certifying that such U.S. Lender is entitled to an exemption from United States backup withholding tax, or any successor form. If such U.S. Lender fails to deliver such forms, then the Administrative Agent may withhold from any payment to such U.S. Lender an amount equivalent to the applicable backup withholding tax imposed by the Code. Thereafter and from time to time, each such U.S. Lender shall (A) promptly submit to the Borrower and the Administrative Agent such additional duly completed and signed copies of one or more of such forms or certificates (or such successor forms) as may then be available under then current United States Laws and regulations to avoid, or such evidence as is reasonably satisfactory to the Borrower and the Administrative Agent of any available exemption from United States back up withholding taxes in respect of all payments to be made to such U.S. Lender by the Borrower or other Loan Party pursuant to this Agreement, or any other Loan Document, in each case, (1) on or before the date that any such form or other evidence expires or becomes obsolete, (2) after the occurrence of any event requiring a change in the most recent form or evidence previously delivered by it to the Borrower and the Administrative Agent and (3) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent, and (B) promptly notify the Borrower and the Administrative Agent of any change in circumstances which would modify or render invalid any claimed exemption.

SECTION 10.16. GOVERNING LAW.

(a)    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    ANY LEGAL ACTION OR PROCEEDING ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS

RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR
HEREAFTER ARISING, MAY BE BROUGHT IN THE COURTS OF THE STATE OF
NEW YORK SITTING IN NEW YORK CITY OR OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF SUCH STATE, AND BY EXECUTION AND
DELIVERY OF THIS AGREEMENT, THE BORROWER, EACH AGENT AND
EACH LENDER CONSENTS, FOR ITSELF AND IN RESPECT OF ITS PROPERTY,
TO THE NON-EXCLUSIVE JURISDICTION OF THOSE COURTS. THE
BORROWER, EACH AGENT AND EACH LENDER IRREVOCABLY WAIVES
ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE
OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY
NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR
PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN
DOCUMENT OR OTHER DOCUMENT RELATED THERETO.

SECTION 10.17. <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>. EACH PARTY TO
THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY
OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY
LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR
INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH
RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO,
IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER
FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY
AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE
OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT
ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A
COPY OF THIS SECTION 10.17 WITH ANY COURT AS WRITTEN EVIDENCE OF THE
CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO
TRIAL BY JURY.

SECTION 10.18. <u>Binding Effect</u>. This Agreement shall become effective when it shall
have been executed by the Borrower and the Administrative Agent shall have been notified by
each Lender, Swing Line Lender and L/C Issuer that each such Lender, Swing Line Lender and
L/C Issuer has executed it and thereafter shall be binding upon and inure to the benefit of the
Borrower, each Agent and each Lender and their respective successors and assigns, except that
the Borrower shall not have the right to assign its rights hereunder or any interest herein without
the prior written consent of the Lenders except as permitted by Section 7.04.

SECTION 10.19. <u>Judgment Currency</u>. If, for the purposes of obtaining judgment in any
court, it is necessary to convert a sum due hereunder or any other Loan Document in one currency
into another currency, the rate of exchange used shall be that at which in accordance with normal
banking procedures the Administrative Agent could purchase the first currency with such other
currency on the Business Day preceding that on which final judgment is given. The obligation of
the Borrower in respect of any such sum due from it to the Administrative Agent or the Lenders
hereunder or under the other Loan Documents shall, notwithstanding any judgment in a currency
(the "**Judgment Currency**") other than that in which such sum is denominated in accordance
with the applicable provisions of this Agreement (the "**Agreement Currency**"), be discharged
only to the extent that on the Business Day following receipt by the Administrative Agent of any
sum adjudged to be so due in the Judgment Currency, the Administrative Agent may in
accordance with normal banking procedures purchase the Agreement Currency with the
Judgment Currency. If the amount of the Agreement Currency so purchased is less than the sum
originally due to the Administrative Agent from the Borrower in the Agreement Currency, the

Borrower agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Administrative Agent or the Person to whom such obligation was owing against such loss. If the amount of the Agreement Currency so purchased is greater than the sum originally due to the Administrative Agent in such currency, the Administrative Agent agrees to return the amount of any excess to the Borrower (or to any other Person who may be entitled thereto under applicable Law).

SECTION 10.20. <u>Lender Action</u>. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party or any other obligor under any of the Loan Documents or the Secured Hedge Agreements (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent. The provision of this Section 10.20 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

SECTION 10.21. <u>USA PATRIOT Act</u>. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Act.

SECTION 10.22. <u>Effectiveness of the Merger; Assignment and Delegation to and Assumption by West</u>. Upon consummation of the Merger, and without any further action by any Person, West automatically assumes and agrees to perform all the obligations of Omaha under the Amended and Restated Commitment Letter dated August 22, 2006, among Omaha, the Arrangers and the Bookrunners and the Fee Letter referred to therein.

SECTION 10.23. <u>Delivery of Lender Addenda</u>. Each initial Lender shall become a party to this Agreement by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, the Borrower and the Administrative Agent.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

WEST CORPORATION

By: _____

Name: Paul M. Mendlik

Title:  Chief Financial Officer and Treasurer

[SIGNATURE PAGE TO CREDIT AGREEMENT]

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent and Swing Line
Lender


By: _____
Name:
Title:     Jeff Ogden
           Managing Director

[SIGNATURE PAGE TO CREDIT AGREEMENT]

DEUTSCHE BANK SECURITIES INC., as
Syndication Agent

By:

Name:    JOHN EYDENBERG
Title:    MANAGING DIRECTOR

By:

Name:    ADAM HITT
Title:    MANAGING DIRECTOR


DEUTSCHE BANK TRUST COMPANY
AMERICAS, as L/C Issuer

By:

Name:    Scottye Lindsey
Title:    Director

By:

Name:    Evelyn Thierry
Title:    Vice President


[SIGNATURE PAGE TO CREDIT AGREEMENT]

BANK OF AMERICA, N.A., as Syndication
Agent

By: _____

Name:

Title:          Robert Klawinski
                Senior Vice President

[SIGNATURE PAGE TO CREDIT AGREEMENT]

WACHOVIA BANK, NATIONAL
ASSOCIATION, as Co-Documentation Agent

By: _____
Name: JACOB PETKOVICH
Title: Vice - President

[SIGNATURE PAGE TO CREDIT AGREEMENT]

GENERAL ELECTRIC CAPITAL CORPORATION,
as Co-Documentation Agent

By:
Name:
Title:    KARL KIEFFER
DULY AUTHORIZED SIGNATORY

[SIGNATURE PAGE TO CREDIT AGREEMENT]

EXECUTION COPY

## AMENDMENT NO. 1 TO CREDIT AGREEMENT

AMENDMENT NO. 1 TO CREDIT AGREEMENT, dated as of February 14, 2007 (this "**Amendment**"), among WEST CORPORATION, a Delaware corporation (the "**Borrower**"), the Subsidiary Borrowers (as defined below) party hereto and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent (in such capacity, the "**Administrative Agent**").

### PRELIMINARY STATEMENTS

A.       The Borrower, each lender from time to time party thereto (the "Lenders") and the Administrative Agent have entered into a Credit Agreement, dated as of October 24, 2006 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**").

B.       The Borrower desires to, among other things, (i) substitute, replace and convert (or refinance, as needed) all outstanding Term Loans under the Credit Agreement (the "**Existing Term Loans**") with and into a new tranche of term loans (the "Term B-2 Loans") and (ii) borrow $165,000,000 of additional Term B-2 Loans (the "**Additional Term B-2 Loan Amount**") as part of the same tranche of Term B-2 Loans, in each case, on behalf of itself and certain of its Restricted Subsidiaries, as listed on Schedule 1.01G hereto (the "**Subsidiary Borrowers**"), on the terms and conditions set forth herein.

C.       The Borrower has requested that (i) each Term Lender holding Existing Term Loans (each, an "**Existing Term Lender**") make commitments to provide Term B-2 Loans (any Term Lender that executes and delivers a Conversion Notice (as defined below) and makes such a commitment, a "**Continuing Term Lender**"; and, any Term Lender that does not execute and deliver a Conversion Notice and make such a commitment, an "**Exiting Term Lender**") in an amount equal to the aggregate principal amount of the Existing Term Loans held by it immediately prior to the Amendment No. 1 Effective Date (as defined below) and (ii) additional proposed Lenders (which may be Continuing Term Lenders) make commitments to provide Term B-2 Loans (such Lenders, together with the Continuing Term Lenders, the "**Term B-2 Lenders**") in an aggregate amount equal to the sum of the Additional Term B-2 Loan Amount and the aggregate principal amount of Existing Term Loans held by Exiting Term Lenders.

D.       The Lenders have agreed, subject to the terms and conditions hereinafter set forth, to amend the Credit Agreement as set forth below.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the sufficiency and receipt of all of which is hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Definitions.  Capitalized terms not otherwise defined in this Amendment have the same meanings as specified in the Credit Agreement.

SECTION 2.  Amendments to Credit Agreement.  Effective as of the Amendment No. 1 Effective Date, and subject to the terms and conditions set forth herein, the Credit Agreement is hereby amended as follows:

(a)       Section 1.01 of the Credit Agreement is amended by adding in the appropriate alphabetical order the following new definitions:

"**Amendment No. 1**" means Amendment No. 1 to this Agreement, dated as of February 14, 2007, among the Borrower, the Subsidiary Borrowers and the Administrative Agent.

"**Amendment No. 1 Effective Date**" has the meaning specified in Amendment No. 1.

"**Designated Amount**" means (i) with respect to the Borrower and each of the Subsidiary Borrowers (other than CenterPost Communications, Inc., a Delaware corporation ("**CenterPost**"), InterCall, Inc., a Delaware corporation ("**InterCall**"), InPulse Response Group, Inc., an Arizona corporation ("**InPulse**"), Intrado Inc., a Delaware corporation ("**Intrado**"), Ringer Acquisition Corp., a Delaware corporation ("**RAC**"), West Asset Management, Inc., a Delaware corporation ("**WAM**"), West Direct, Inc., a Delaware corporation ("**WDI**"), West Interactive Corporation, a Delaware corporation ("**West Interactive**"), West Business Services, LP, a Delaware limited partnership ("**WBS**"), and West Telemarketing, LP, a Delaware limited partnership ("**West Telemarketing**")), $430,500,000, (ii) with respect to CenterPost, $21,000,000, (iii) with respect to InPulse, $45,500,000, (iv) with respect to InterCall, $684,000,000, (v) with respect to Intrado, $439,000,000, (vi) with respect to RAC, $133,600,000, (vii) with respect to WAM, $107,000,000, (viii) with respect to WDI, $25,600,000, (ix) with respect to West Interactive, $118,700,000, (x) with respect to WBS, $134,900,000, and (xi) with respect to West Telemarketing, $125,200,000.

"**Exchanged Term Loans**" has the meaning specified in Section 2.01(a)(ii).

"**Existing Term Borrowing**" means the borrowing of the Existing Term Loans on the Closing Date.

"**Existing Term Lender**" has the meaning specified in the preliminary statements of Amendment No. 1.

"**Existing Term Loan**" has the meaning specified in the preliminary statements of Amendment No. 1.

"**Existing Term Note**" means a promissory note of the Borrower payable to any Existing Term Lender or its registered assigns, in substantially the form of Exhibit C-1 hereto, evidencing the aggregate indebtedness of the Borrower to such Existing Term Lender resulting from the Existing Term Loans made by such Existing Term Lender.

"**Exiting Term Lender**" has the meaning specified in the preliminary statements of Amendment No. 1.

"**Repricing Prepayment**" has the meaning specified in Section 2.05(a)(i).

"**Subsidiary Borrowers**" means the Restricted Subsidiaries of the Borrower set forth on Schedule 1.01G.

"**Term B-2 Borrowing**" means a borrowing consisting of simultaneous Term B-2 Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Term B-2 Lenders pursuant to Section 2.01(a)(ii) or (iii).

"**Term B-2 Commitment**" means, as to each Term B-2 Lender, its obligation to exchange and convert Existing Term Loans for and into Term B-2 Loans pursuant to Section 2.01(a)(ii) or to make Term B-2 Loans on the Amendment No. 1 Effective Date to the Borrower and the Subsidiary Borrowers pursuant to Section 2.01(a)(iii) in an aggregate amount not to exceed the amount set forth in such Term B-2 Lender's Lender Addendum delivered by such Term B-2 Lender on the Amendment No. 1 Effective Date as provided in Amendment No. 1, as

applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate Term B-2 Commitments of all Term B-2 Lenders on the Amendment No. 1 Effective Date is $2,265,000,000.

"**Term B-2 Lender**" means, at any time, any Lender that has a Term B-2 Commitment or a Term B-2 Loan at such time.

"**Term B-2 Loan**" means (a) a Loan received in exchange for Existing Term Loans pursuant to Section 2.01(a)(ii) or (b) any Loan made pursuant to Section 2.01(a)(iii).

"**Term B-2 Note**" means a promissory note of the Borrower and the Subsidiary Borrowers payable to any Term B-2 Lender or its registered assigns, in substantially the form of Exhibit C-3 hereto, evidencing the aggregate Indebtedness of the Borrower and the Subsidiary Borrowers (which shall be allocated among them ratably in accordance with the Designated Amounts) to such Term B-2 Lender resulting from the Term B-2 Loans made or held by such Term B-2 Lender.

(b)     Section 1.01 of the Credit Agreement is hereby amended by amending and restating in its entirety clause (a) of the definition of "**Applicable Rate**" to read as follows:

"(a)     with respect to Term B-2 Loans, (i) commencing on the Amendment No. 1 Effective Date, (A) for Eurocurrency Rate Loans, 2.375% and (B) for Base Rate Loans, 1.375% and (ii) thereafter, the following percentages per annum based on the Borrower's Corporate Family Rating from Moody's and Issuer Credit Rating from S&P as set forth below:

|  | Applicable Rate | | |
| --- | --- | --- | --- |
| Pricing Level | Rating | Eurocurrency Rate | Base Rate |
| 1 | B1 or higher by Moody's and B+ or higher by S&P | 2.125% | 1.125% |
| 2 | less than Pricing Level 1 but at least B2 by Moody's and B by S&P | 2.375% | 1.375% |
| 3 | B3 or lower by Moody's or B- or lower by S&P | 2.75% | 1.75% |

Changes in the Applicable Rate for Term B-2 Loans resulting from changes in ratings by Moody's or S&P shall become effective on the Business Day following the public announcement of such new rating.  If one or more of such rating agencies shall not have in effect a Corporate Family Rating or an Issuer Credit Rating, as applicable (other than by reason of the circumstances referred to in the following sentence), then the rating assigned by the other rating agency shall be used to establish the Applicable Rate for the Term B-2 Loans.  If the rating system of Moody's or S&P shall change, or if either rating agency shall cease to be in the business of providing corporate ratings, the Borrower and the Administrative Agent shall negotiate in good faith to amend this definition to reflect such changed rating system or the unavailability of ratings from such rating agency and, pending the effectiveness of any such amendment, the rating of such rating agency shall be determined by reference to the rating most recently in effect prior to such change or cessation.  At the option of the Administrative Agent or the Required Lenders, the highest Pricing Level shall apply as of the first Business Day after an Event of Default under

Section 8.01(a) shall have occurred and be continuing, and shall continue to so apply to but excluding the date on which such Event of Default is cured or waived (and thereafter the Pricing Level otherwise determined in accordance with this definition shall apply)."

(c)    Section 1.01 of the Credit Agreement is hereby amended by amending and restating in its entirety clause (b) of the definition of "**Collateral and Guarantee Requirement**" to read as follows:

"(b)    all Obligations shall have been unconditionally guaranteed (the "**Senior Guarantees**") by the Borrower, each Subsidiary Borrower and each Restricted Subsidiary that is a Domestic Subsidiary and not an Excluded Subsidiary and, upon the occurrence of a Holdings Election Event, Holdings (each, a "**Guarantor**");"

(d)    Section 1.01 of the Credit Agreement is hereby amended by amending and restating in their entirety the definitions of "**Lender Addendum**", "**Loan Parties**", "**Responsible Officer**", "**Term Borrowing**", "**Term Commitment**", "**Term Lender**", "**Term Loan**" and "**Term Note**" to read, respectively, as follows:

"**Lender Addendum**" means, with respect to any applicable Lender, (i) a Lender Addendum, substantially in the form of Exhibit K, executed and delivered by such Lender on the Closing Date as provided in Section 10.23 or (ii) a Lender Addendum, substantially in the form of Annex D to Amendment No. 1, executed and delivered by such Lender on the Amendment No. 1 Effective Date as provided in Amendment No. 1.

"**Loan Parties**" means, collectively, the Borrower, each Subsidiary Borrower and each Guarantor.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date or the Amendment No. 1 Effective Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Term Borrowing**" means any Existing Term Borrowing or any Term B-2 Borrowing, as applicable.

"**Term Commitment**" means any Term B-2 Commitment.

"**Term Lender**" means any Existing Term Lender or any Term B-2 Lender, as applicable.

"**Term Loan**" means any Existing Term Loan or any Term B-2 Loan, as applicable.

"**Term Note**" means any Existing Term Note or any Term B-2 Note, as applicable.

(e)    Section 2.01(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(a)(i)    *Existing Term Loan.* On the Closing Date, the Existing Term Lenders made Existing Term Loans to the Borrower pursuant to Section 2.01(a) of this Agreement as in effect on the Closing Date.

(ii)    *Term B-2 Exchange.* With respect to each Term B-2 Lender that has Existing Term Loans and a corresponding Term B-2 Commitment, such Term B-2 Lender severally agrees to exchange and convert on the Amendment No. 1 Effective Date an aggregate principal amount of the Existing Term Loans ("**Exchanged Term Loans**") held by it immediately prior to the Amendment No. 1 Effective Date for and into a like principal amount in Dollars of Term B-2 Loans of the Borrower and the Subsidiary Borrowers (which shall be allocated among them ratably in accordance with the Designated Amounts), it being understood and agreed that the Term B-2 Loans are in exchange, substitution and replacement for, but not in payment or satisfaction of, the Exchanged Term Loans.

(iii)    *Term B-2 Borrowings.* Each Term B-2 Lender severally agrees to make to the Borrower and the Subsidiary Borrowers (which shall be allocated among them ratably in accordance with the Designated Amounts) Term B-2 Loans denominated in Dollars on the Amendment No. 1 Effective Date in an amount equal to the excess of (A) its Term B-2 Commitment <u>over</u> (B) the aggregate principal amount of its Exchanged Term Loans, if any. All Existing Term Loans that are not Exchanged Term Loans will be refinanced with the proceeds of such Term B-2 Loans.

(iv)    Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed. Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(v)    On and after the Amendment No. 1 Effective Date, all Term Loans shall continue to have the same terms, rights and benefits as the Term Loans immediately prior to the Amendment No. 1 Effective Date under the Loan Documents, except as expressly modified by Amendment No. 1."

(f)    Section 2.05(a)(i) is hereby amended by (i) adding immediately before the proviso therein the following "(except as otherwise provided below)" and (ii) adding at the end of such section the following:

"In the event that, on or prior to the first anniversary of the Amendment No. 1 Effective Date, any Term B-2 Lender receives a Repricing Prepayment (as defined below), then at the time thereof, the Borrower and Subsidiary Borrowers shall pay to such Term B-2 Lender a prepayment premium equal to 1.0% of the amount of such Repricing Prepayment. As used herein, "**Repricing Prepayment**" means the amount of principal of the Term B-2 Loans of such Term B-2 Lender that is prepaid by the Borrower and the Subsidiary Borrowers with the proceeds of the substantially concurrent incurrence by the Borrower or any of its Subsidiaries of new replacement term loans that have interest rate margins lower than the Applicable Rate then in effect for the Term B-2 Loans so prepaid; *provided*, that a refinancing of the Term B-2 Loans in connection with any refinancing of the Facilities resulting in the termination of this Agreement shall not be a Repricing Prepayment."

(g)    Section 2.05(b)(i) is hereby amended by replacing the reference to "all voluntary prepayments of Term Loans" in clause (B)(i) thereof with "all voluntary prepayments of Terms B-2 Loans".

(h)    Section 2.07(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(a) *Term B-2 Loans.* Each of the Borrower and the Subsidiary Borrowers shall, jointly and severally, repay to the Administrative Agent for the ratable account of the Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Amendment No. 1 Effective Date, an aggregate amount equal to 0.25% of the aggregate amount of all Term Loans (which shall be allocated among them ratably in accordance with the Designated Amounts) outstanding on the Amendment No. 1 Effective Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (ii) on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date."

(i)    Section 2.08 of the Credit Agreement is hereby amended by adding at the end thereof the following new clause (d):

"(d)    All Term B-2 Loans made on the Amendment No. 1 Effective Date will have the same Types (in the same ratable amounts) as applicable at such time to the Existing Term Loans and will have initial Interest Periods ending on the same dates as the Interest Periods applicable at such time to the Existing Term Loans, and the Eurocurrency Rate applicable to such Term B-2 Loans during such initial Interest Periods will be the same as that applicable at such time to the Existing Term Loans. No accrued interest on the Existing Term Loans exchanged and converted into Term B-2 Loans shall be payable on the Amendment No. 1 Effective Date and no amounts under Section 3.05 shall be payable in connection with such exchange and conversion."

(j)    Article II of the Credit Agreement is hereby amended by adding the following as a new Section 2.15 thereof:

"SECTION 2.15. The Administrative Borrower. Each Subsidiary Borrower hereby appoints the Borrower as the administrative borrower hereunder, and the Borrower shall act under this Agreement as the agent, attorney-in-fact and legal representative of such Subsidiary Borrower for all purposes, including receiving account statements and other notices and communications to such Subsidiary Borrower from the Administrative Agent or any Lender and receiving proceeds of the Term B-2 Loans. The Administrative Agent and the Lenders may rely, and shall be fully protected in relying, on any certificate, report, information or any notice or communication made or given by the Borrower, whether in its own name or on behalf of a Subsidiary Borrower, and neither the Administrative Agent nor any Lender shall have any obligation to make any inquiry or request any confirmation from or on behalf of any Subsidiary Borrower as to the binding effect on it of any such notice or request."

(k)    Section 7.10 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"SECTION 7.10. Use of Proceeds. Use the proceeds of (a) any Revolving Credit Borrowing, Swing Line Borrowing, Existing Term Borrowing or L/C Credit Extension, whether directly or indirectly, in a manner inconsistent with the uses set forth in the preliminary statements to this Agreement, or (b) any Term B-2 Borrowing, whether directly or indirectly, in a manner other than (i) to refinance Existing Term Loans and (ii) for general corporate purposes, including Permitted Acquisitions."

(l)     The Schedule 1.01G attached hereto is hereby added to the Credit Agreement as Schedule 1.01G thereto.

(m)     The Exhibit C-3 attached hereto is hereby added to the Credit Agreement as Exhibit C-3 thereto.

SECTION 3. Amendments to Guaranty. Effective as of the Amendment No. 1 Effective Date, and subject to the terms and conditions set forth herein, the Guaranty is hereby amended as follows:

(a)     Section 1.02 of the Guaranty is hereby amended by amending and restating in its entirety the definition of "**Guarantor**" to read as follows:

"**Guarantor**" means the Borrower, each Subsidiary Borrower, each Subsidiary Party and, upon the occurrence of a Holdings Election Event, Holdings.

(b)     Section 3.01 of the Guaranty is hereby amended and restated in its entirety to read as follows:

"In addition to all such rights of indemnity and subrogation as the Guarantors may have under applicable law (but subject to Section 3.03), the Borrower and the Subsidiary Borrowers agree that in the event a payment of an obligation shall be made by any Guarantor under this Agreement, the Borrower and the Subsidiary Borrowers shall indemnify such Guarantor for the full amount of such payment (which shall be allocated among the Borrower and the Subsidiary Guarantors ratably in accordance with the Designated Amounts) and such Guarantor shall be subrogated to the rights of the Person to whom such payment shall have been made to the extent of such payment."

(c)     Section 4.14 of the Guaranty is hereby amended by adding the following immediately prior to the last sentence therein:

"Upon execution and delivery by the Administrative Agent and the Borrower of a Guarantee Agreement Supplement, the Borrower shall become a Guarantor hereunder with the same force and effect as if originally named as a Guarantor herein. The execution and delivery of any such instrument shall not require the consent of any other Guarantor hereunder."

SECTION 4. Waivers and Consents. Upon the occurrence of the Amendment No. 1 Effective Date, (a) the Administrative Agent and the Required Lenders hereby waive any prior notice requirements under Section 2.05(a) of the Credit Agreement in connection with the exchange, conversion, refinancing, substitution and replacement of the Existing Term Loans as contemplated by this Amendment, (b) the Required Lenders and Term B-2 Lenders (including all Continuing Term Lenders) agree that (i) all Existing Term Loans that are not exchanged for and converted into Term B-2 Loans may be paid in full from the proceeds of Term B-2 Loans, together with all accrued and unpaid interest thereon and any other amounts owing with respect thereto, without requiring the payment in full of any other Existing Term Loans and hereby waive the provisions of Section 2.12(a) and Section 2.13 in connection with the transactions contemplated by this Amendment and (ii) interest shall accrue and be payable on such Term B-2 Loans on the basis set forth in Section 2.08(d) of the Credit Agreement, as amended hereby, (c) the Required Lenders and the Term B-2 Lenders (and the Borrower solely to the extent of assignments to Existing Term Lenders) hereby waive the requirements of Section 10.07 of the Credit Agreement with respect to any assignment of Existing Term Loans of any Exiting Term Lender to Term B-2 Lenders made to effectuate the purposes of this Amendment, (d) each Term B-2 Lender (including each Continuing Term Lender) and the Administrative Agent agree that this Amendment constitutes a

Committed Loan Notice under Section 2.02(a) of the Credit Agreement with respect to the Term B-2 Loans and hereby waive any other notice requirements under Section 2.02(a) of the Credit Agreement for purposes of the exchange and conversion of Existing Term Loans for and into Term B-2 Loans and the making of other Term B-2 Loans on the Amendment No. 1 Effective Date, and (e) the Administrative Agent and the Required Lenders hereby consent and agree that, notwithstanding the provisions of the last paragraph of Section 10.01 of the Credit Agreement, all Term B-2 Loans shall constitute Replacement Term Loans and no portion thereof shall constitute Incremental Term Loans.

SECTION 5.    Conditions of Effectiveness of this Amendment. This Amendment shall become effective on the date (the "**Amendment No. 1 Effective Date**") when each of the conditions set forth in this Section 5 shall have been satisfied:

(a)    *Execution of Documents*. The Administrative Agent shall have received (i) this Amendment, duly executed and delivered by the Borrower, each Subsidiary Borrower and the Administrative Agent, (ii) Lender Consents, in the form attached hereto as Annex A (each, a "**Lender Consent**"), or Conversion Notices, in the form attached hereto as Annex B (each, a "**Conversion Notice**"), duly executed and delivered by Lenders constituting the Required Lenders, (iii) a Guarantee Agreement Supplement (as defined in the Guaranty), duly executed and delivered by the Borrower, CenterPost and RAC, (iv) a Security Agreement Supplement, duly executed and delivered by CenterPost and RAC, and (v) a Guarantor Consent and Reaffirmation, in the form attached hereto as Annex C, duly executed and delivered by each Guarantor.

(b)    *Term B-2 Commitments*. The Administrative Agent shall have received (i) commitments from banks and other financial institutions with respect to the Term B-2 Loans in an aggregate principal amount equal to $2,265,000,000 and (ii) as applicable (x) a fully executed Conversion Notice with respect to each Existing Term Lender electing to convert its Existing Term Loans into Term B-2 Loans (and pursuant to which on the Amendment No. 1 Effective Date all of the outstanding principal amount of Existing Term Loans held by such Lender shall convert into Term B-2 Loans) or (y) a fully executed Lender Addendum in the form attached hereto as Annex D with respect to each such bank or other financial institution committing to fund such Term B-2 Loans (and pursuant to which, on the Amendment No. 1 Effective Date, such bank or other financial institution shall become a Term B-2 Lender, for all purposes under the Credit Agreement).

(c)    *Payment of Fees and Expenses*. The Borrower and the Subsidiary Borrowers shall have paid all fees and expenses (including the reasonable fees and expenses of Weil, Gotshal & Manges LLP) incurred by the Administrative Agent in connection with the preparation, negotiation and execution of this Amendment or otherwise required to be paid in connection with this Amendment, to the extent invoiced at least one Business Day prior to the date hereof.

(d)    *Exiting Lenders*. The Borrower shall have paid to each of the Exiting Term Lenders, if any, an amount equal to the aggregate outstanding principal amount of the Existing Term Loans of such Exiting Term Lender at the time of occurrence of the Amendment No. 1 Effective Date from the proceeds of the Term B-2 Loans, together with all accrued but unpaid interest to the Amendment No. 1 Effective Date on such Existing Term Loans and any other amounts payable in connection therewith under the Loan Documents.

(e)    *Secretary's Certificates*. The Administrative Agent shall have received such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Borrower and each Subsidiary Borrower as the Administrative Agent may reasonably request evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to

act as a Responsible Officer in connection with this Amendment and the transactions contemplated hereby.

(f)    *Officer's Certificate*.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower, certifying that the conditions precedent set forth in Sections 4.02(a) and (b) of the Credit Agreement shall have been satisfied on and as of the Amendment No. 1 Effective Date.

(g)    *Legal Opinions*.  The Administrative Agent shall have received an opinion of Ropes & Gray LLP, counsel for the Loan Parties, addressed to the Administrative Agent and each Lender, in form and substance reasonably satisfactory to the Administrative Agent.

(h)    *Collateral and Guarantee Requirement*.  The Administrative Agent shall have received (i) all certificates, if any, representing the Pledged Equity of CenterPost and RAC, accompanied by undated stock powers executed in blank, and (ii) evidence that all other actions, recordings and filings that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement with respect to CenterPost and RAC shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent.

SECTION 6.    Post-Closing Requirements Relating to the Mortgaged Properties.  Within 90 days after the Amendment No. 1 Effective Date (or such later date acceptable to the Administrative Agent in its sole discretion), the Borrower shall deliver to the Administrative Agent:

(a)    Evidence that mortgage amendments (the "**Mortgage Amendments**") with respect to the Mortgaged Properties have been duly executed, acknowledged and delivered by a duly authorized officer of each party thereto on or before such date and are in form suitable for filing and recording in all filing or recording offices that the Administrative Agent may deem necessary or desirable;

(b)    Date-down endorsements to the title insurance policies with respect to the Mortgaged Properties; and

(c)    Evidence that all fees, costs and expenses have been paid in connection with the preparation, execution, filing and recordation of the Mortgage Amendments, including, without limitation, reasonable attorneys' fees, filing and recording fees, title insurance company coordination fees, documentary stamp, mortgage and intangible taxes and title search charges and other charges incurred in connection with the recordation of the Mortgage Amendments and the other matters described in this Section 6 and as, and to the extent, otherwise required to be paid in connection therewith under Section 10.04 of the Credit Agreement.

SECTION 7.    Representations and Warranties.  Each of the Borrower and the Subsidiary Borrowers represents and warrants as follows:

(a)    The execution, delivery and performance by each Loan Party of this Amendment are within such Loan Party's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) contravene the terms of any of such Person's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01 of the Credit Agreement), or require any payment to be made under (A) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Restricted Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which

such Person or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (ii)(A), to the extent that such conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

(b)    This Amendment has been duly executed and delivered by each Loan Party that is party hereto. This Amendment and each Loan Document after giving effect to the amendments pursuant to this Amendment, constitutes a legal, valid and binding obligation of each Loan Party that is party hereto or thereto, as applicable, enforceable against such Loan Party in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

(c)    No Default has occurred and is continuing or will occur as a result of the transactions contemplated by this Amendment.

(d)    Each of the representations and warranties of each Loan Party contained in Article V of the Credit Agreement and each other Loan Document, immediately before and after giving effect to this Amendment and the matters and transactions contemplated hereby, is true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided,* that any representation and warranty made on or as of the Closing Date that is qualified as to "Material Adverse Effect" shall be deemed to be qualified by a "Company Material Adverse Effect."

SECTION 8.    Joinder.    By executing and delivering this Amendment, each Subsidiary Borrower hereby becomes a party to the Credit Agreement as a "Subsidiary Borrower" thereunder and, without limiting the foregoing, hereby expressly assumes all obligations and liabilities of a "Subsidiary Borrower" thereunder.

SECTION 9.    Reference to and Effect on the Credit Agreement and the Loan Documents.

(a)    On and after the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement, as amended by this Amendment.

(b)    The Credit Agreement and each of the other Loan Documents, as specifically amended by this Amendment, are and shall continue to be in full force and effect and are hereby in all respects ratified and confirmed. Without limiting the generality of the foregoing, the Collateral Documents and all of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Loan Documents, in each case, as amended by this Amendment.

(c)    The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents. On and after the effectiveness of this Amendment, this Amendment shall for all purposes constitute a Loan Document.

SECTION 10.    Costs and Expenses.    The Borrower and the Subsidiary Borrower agree to pay or reimburse the Administrative Agent for all costs and expenses of the Administrative Agent in connection with the preparation, execution, delivery and administration, modification and amendment of this Amendment.

SECTION 11.    Execution in Counterparts.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.  Delivery of an executed counterpart of a signature page to this Amendment by telecopier shall be effective as delivery of a manually executed counterpart of this Amendment.

SECTION 12.    Governing Law.  This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

[*The remainder of this page is intentionally left blank*]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

WEST CORPORATION

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

CENTERPOST COMMUNICATIONS, INC.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

INPULSE RESPONSE GROUP, INC.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

INTERCALL, INC.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

INTRADO INC.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

RINGER ACQUISITION CORP.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

WEST ASSET MANAGEMENT, INC.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

WEST DIRECT, INC.

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

[SIGNATURE PAGE TO AMENDMENT NO. 1]

WEST INTERACTIVE CORPORATION

By: _____

Name:  Paul M. Mendlik
Title:    Chief Financial Officer and Treasurer

WEST BUSINESS SERVICES, LP

By: West Transaction Services, LLC, its general
partner

By: _____

Name:  Paul M. Mendlik
Title:    Manager

WEST TELEMARKETING, LP

By: West Transaction Services, LLC, its general
partner

By: _____

Name:  Paul M. Mendlik
Title:    Manager

[SIGNATURE PAGE TO AMENDMENT NO. 1]

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By: _____
Name:
Title:       RITAM BHALLA
             Authorized Signatory

ANNEX A

LENDER CONSENT

Reference is made to the Credit Agreement, dated as of October 24, 2006 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Unless otherwise defined herein, capitalized terms used herein and defined in the Credit Agreement are used herein as therein defined.

The Borrower has requested that the Lenders consent to the amendments to the Credit Agreement and the Guaranty on the terms described in the Amendment No. 1 ("*Amendment No. 1*") to which this Lender Consent is attached.

Pursuant to Section 10.01 of the Credit Agreement, the undersigned Lender hereby consents to the amendments of, and modifications to, the Credit Agreement and the Guaranty contained in Amendment No. 1 and authorizes the Administrative Agent to execute Amendment No. 1 on its behalf.

<div style="margin-left:50%">

Consented to and agreed as of
the date of Amendment No. 1:


_____
[NAME OF LENDER]


By:_____
Name:
Title:

</div>

ANNEX B

CONVERSION NOTICE

Reference is made to Amendment No. 1 (**"Amendment No. 1"**), dated as of February 14, 2007, to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented or otherwise modified prior to the date hereof, the **"Credit Agreement"**), among West Corporation (the **"Borrower"**), the Subsidiary Borrowers party thereto, each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Capitalized terms used but not otherwise defined in this Conversion Notice (this **"Conversion Notice"**) are used with the meanings attributed thereto in the Credit Agreement.

The undersigned Lender hereby irrevocably and unconditionally elects to exchange and convert the aggregate outstanding principal amount of the Existing Term Loan held by such Lender into a Term B-2 Loan (as defined in Amendment No. 1) in a principal amount equal to the amount of the Existing Term Loan exchanged and converted hereby, effective only if, and only as and when Amendment No. 1 becomes effective in accordance with its terms.

Pursuant to Section 10.01 of the Credit Agreement, the undersigned Lender hereby consents to the amendments of, and modifications to, the Credit Agreement and the Guaranty contained in Amendment No. 1 and authorizes the Administrative Agent to execute Amendment No. 1 on its behalf.

This Conversion Notice shall be governed by, and construed and interpreted in accordance with, the laws of the state of New York.

This Conversion Notice may be executed by the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

IN WITNESS WHEREOF, the undersigned has caused the Conversion Notice to be duly executed and delivered by its proper and duly authorized officer as of this ____ day of February, 2007.

[NAME OF LENDER]

By:_____
Name:
Title:

ANNEX C

GUARANTOR CONSENT AND REAFFIRMATION

Reference is made to Amendment No. 1 ("**Amendment No. 1**"), dated as of February 14, 2007, to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Capitalized terms used but not otherwise defined in this Guarantor Consent and Reaffirmation (this "**Consent**") are used with the meanings attributed thereto in Amendment No. 1.

Each Guarantor hereby consents to the execution, delivery and performance of Amendment No. 1 and agrees that each reference to the Credit Agreement in the Loan Documents shall, on and after the Amendment No. 1 Effective Date, be deemed to be a reference to the Credit Agreement as amended by Amendment No. 1.

Each Guarantor hereby acknowledges and agrees that, after giving effect to Amendment No. 1, all of its respective obligations and liabilities under the Loan Documents to which it is a party are reaffirmed, and remain in full force and effect.

After giving effect to Amendment No. 1, each Guarantor reaffirms each Lien granted by it to the Administrative Agent for the benefit of the Secured Parties under each of the Loan Documents to which it is a party, which Liens shall continue in full force and effect during the term of the Credit Agreement as amended by Amendment No. 1, and shall continue to secure the Secured Obligations, in each case, on and subject to the terms and conditions set forth in the Credit Agreement as amended by Amendment No. 1 and the other Loan Documents.

This Consent shall be governed by, and construed and interpreted in accordance with, the laws of the state of New York.

IN WITNESS WHEREOF, the parties hereto have duly executed this Consent as of this
____ day of February, 2007.

WEST CORPORATION
COSMOSIS CORPORATION
INPULSE RESPONSE GROUP, INC.
INTERCALL, INC.
INTRADO COMMUNICATIONS INC.
INTRADO COMMUNICATIONS OF VIRGINIA INC.
INTRADO INC.
NORTHERN CONTACT, INC.
WEST ASSET MANAGEMENT, INC.
WEST DIRECT, INC.
WEST FACILITIES CORPORATION
WEST INTERACTIVE CORPORATION
WEST INTERNATIONAL CORPORATION
WEST RECEIVABLE SERVICES, INC.
WEST TELEMARKETING CORPORATION II

By: _____
Name: Paul M. Mendlik
Title:  Chief Financial Officer and Treasurer

ASSET DIRECT MORTGAGE, LLC
BUYDEBTCO, LLC
INTRADO INTERNATIONAL, LLC
STARGATE MANAGEMENT LLC
THE DEBT DEPOT, LLC
WEST ASSET PURCHASING, LLC
WEST TRANSACTION SERVICES II, LLC
WEST TRANSACTION SERVICES, LLC

By: _____
Name: Paul M. Mendlik
Title:  Manager

ATTENTION FUNDING CORPORATION

By: _____
Name: Paul M. Mendlik
Title:  Treasurer

INTERCALL TELECOM VENTURES, LLC

By: InterCall, Inc., its sole member

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

WEST BUSINESS SERVICES, LP
WEST TELEMARKETING, LP

By: West Transaction Services, LLC, their general
partner

By: _____
Name: Paul M. Mendlik
Title:   Manager

CENTERPOST COMMUNICATIONS, INC.

By:_____
Name:
Title:

RINGER ACQUISITION CORP.

By:_____
Name:
Title:

ANNEX D

LENDER ADDENDUM

Reference is made to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented, waived or otherwise modified from time to time, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent (in such capacity, the "**Administrative Agent**") and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Upon execution and delivery of this Lender Addendum by the parties hereto and effective as of the Amendment No. 1 Effective Date, the undersigned hereby becomes a Lender thereunder having Term B-2 Commitments of $_____.

THIS LENDER ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

The undersigned's address for notices pursuant to the Credit Agreement is as follows:

Name of Lender:    _____
Notice Address:    _____
                   _____
                   _____
Attention:         _____
Telephone:         _____
Facsimile:         _____


IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this _____ day of February, 2007.


                                    _____
                                    [NAME OF LENDER]

                                    By:_____
                                         Name:
                                         Title:

Accepted and agreed:

WEST CORPORATION, as Borrower
and Administrative Borrower

By:_____
Name:
Title:

LEHMAN COMMERCIAL PAPER INC., as
  Administrative Agent

By:_____
Name:
Title:

## SCHEDULE 1.01G

## SUBSIDIARY BORROWERS

1.  CenterPost Communications, Inc., a Delaware corporation
2.  InPulse Response Group, Inc., an Arizona corporation
3.  InterCall, Inc., a Delaware corporation
4.  Intrado Inc., a Delaware corporation
5.  Ringer Acquisition Corp., a Delaware corporation
6.  West Asset Management, Inc., a Delaware corporation
7.  West Direct, Inc., a Delaware corporation
8.  West Interactive Corporation, a Delaware corporation
9.  West Business Services, LP, a Delaware limited partnership
10. West Telemarketing, LP, a Delaware limited partnership

EXHIBIT C-3

FORM OF TERM B-2 NOTE

LENDER: [●]
PRINCIPAL AMOUNT:  $[●]

New York, New York
February 14, 2007

FOR VALUE RECEIVED, each of the undersigned, WEST CORPORATION, a Delaware corporation (the "Borrower"), and the Subsidiary Borrowers listed on the signature pages hereto (the "Subsidiary Borrowers"), hereby promises, jointly and severally, to pay to the Lender set forth above (the "Lender") or its registered assigns, in lawful money of the United States of America in immediately available funds at the Administrative Agent's Office (such term, and each other capitalized term used but not defined herein, having the meaning assigned to it in the Credit Agreement dated as of October 24, 2006 (as the same may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents) (i) on the dates set forth in the Credit Agreement, the principal amounts set forth in the Credit Agreement with respect to Term B-2 Loans made by the Lender to the Borrower and the Subsidiary Borrowers pursuant to the Credit Agreement (which shall be allocated among them ratably in accordance with the Designated Amounts (as defined in the Credit Agreement)) and (ii) on each Interest Payment Date, interest at the rate or rates per annum as provided in the Credit Agreement on the unpaid principal amount of all Term B-2 Loans made by the Lender to the Borrower and the Subsidiary Borrowers pursuant to the Credit Agreement.

Each of the Borrower and the Subsidiary Borrowers promises, jointly and severally, to pay interest, on demand, on any overdue principal and, to the extent permitted by law, overdue interest from their due dates at the rate or rates provided in the Credit Agreement.

Each of the Borrower and the Subsidiary Borrowers hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever. The nonexercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

All borrowings evidenced by this note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided, however, that the failure of the holder hereof to make such a notation or any error in such notation shall not affect the obligations of the Borrower and the Subsidiary Borrowers under this note.

This note is one of the Term B-2 Notes referred to in the Credit Agreement that, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the Credit Agreement, all upon the terms and conditions therein specified.

**THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.**

WEST CORPORATION

By:_____
Name:
Title:

CENTERPOST COMMUNICATIONS, INC.

By:_____
Name:
Title:

INPULSE RESPONSE GROUP, INC.

By:_____
Name:
Title:

INTERCALL, INC.

By:_____
Name:
Title:

INTRADO INC.

By:_____
Name:
Title:

RINGER ACQUISITION CORP.

By:_____
Name:
Title:

WEST ASSET MANAGEMENT, INC.

By:_____
Name:
Title:

WEST DIRECT, INC.

By:_____
Name:
Title:

WEST INTERACTIVE CORPORATION

By:_____
Name:
Title:

WEST BUSINESS SERVICES, LP

By: West Transaction Services, LLC, its general partner

By:_____
Name:
Title:

WEST TELEMARKETING, LP

By: West Transaction Services, LLC, its general partner

By:_____
Name:
Title:

LOANS AND PAYMENTS

| Date | Amount of Loan | Maturity Date | Payments of Principal/Interest | Principal Balance of Note | Name of Person Making the Notation |
|------|----------------|---------------|-------------------------------|---------------------------|-----------------------------------|
|      |                |               |                               |                           |                                   |
|      |                |               |                               |                           |                                   |
|      |                |               |                               |                           |                                   |
|      |                |               |                               |                           |                                   |

EXECUTION COPY

## AMENDMENT NO. 2 TO CREDIT AGREEMENT

AMENDMENT NO. 2 TO CREDIT AGREEMENT, dated as of May 11, 2007 (this "**Amendment**"), among WEST CORPORATION, a Delaware corporation (the "**Borrower**"), OMNIUM WORLDWIDE, INC., a Nebraska corporation ("**Omnium**"), and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent (in such capacity, the "**Administrative Agent**").

### PRELIMINARY STATEMENTS

A.    The Borrower, each lender from time to time party thereto (the "**Lenders**") and the Administrative Agent have entered into a Credit Agreement, dated as of October 24, 2006 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**").

B.    The Borrower and the applicable Subsidiary Borrowers desire to, among other things, borrow $135,000,000 of incremental term loans (the "**Incremental Term Loans**") as part of the same tranche as the Term B-2 Loans outstanding immediately prior to the Amendment No. 2 Effective Date (as defined below) on the terms and conditions set forth herein.

C.    The Borrower and the applicable Subsidiary Borrowers have requested that the Incremental Term Loan Lenders (as defined below) make commitments to provide the Incremental Term Loans on the terms and conditions set forth herein.

D.    The Administrative Agent has agreed, subject to the terms and conditions hereinafter set forth, to amend the Credit Agreement as set forth below.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the sufficiency and receipt of all of which is hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1.  Definitions.  Capitalized terms not otherwise defined in this Amendment have the same meanings as specified in the Credit Agreement.

SECTION 2.  Amendments to Credit Agreement.  Effective as of the Amendment No. 2 Effective Date, and subject to the terms and conditions set forth herein, the Credit Agreement is hereby amended as follows:

(a)    Section 1.01 of the Credit Agreement is amended by adding in the appropriate alphabetical order the following new definitions:

"**Amendment No. 2**" means Amendment No. 2 to this Agreement, dated as of May 11, 2007, among the Borrower, Omnium, and the Administrative Agent.

"**Amendment No. 2 Effective Date**" has the meaning specified in Amendment No. 2.

"**Incremental Term Loan Commitments**" means, as to each Incremental Term Loan Lender, its obligation to make Incremental Term Loans on the Amendment No. 2 Effective Date to the Borrower and the applicable Subsidiary Borrowers pursuant to Section 2.01(a)(iv) in an aggregate amount not to exceed the amount set forth in such Incremental Term Loan Lender's Lender Addendum delivered by such Incremental Term Loan Lender on the Amendment No. 2 Effective Date as provided in Amendment No. 2, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate Incremental Term Loan

Commitments of all Incremental Term Loan Lenders on the Amendment No. 2 Effective Date is $135,000,000.

"**Incremental Term Loan Lender**" has the meaning specified in Amendment No. 2.

"**Incremental Term Loan**" has the meaning specified in the preliminary statements of Amendment No. 2.

"**Omnium**" means Omnium Worldwide, Inc., a Nebraska corporation.

(b)     Section 1.01 of the Credit Agreement is hereby amended by amending and restating in their entirety the definitions of "**Designated Amount**", "**Lender Addendum**", "**Responsible Officer**", "**Term B-2 Borrowing**", "**Term B-2 Lender**", "**Term B-2 Loan**" and "**Term Commitment**" to read, respectively, as follows:

"**Designated Amount**" means (i) with respect to the Borrower and each of the Subsidiary Borrowers (other than CenterPost Communications, Inc., a Delaware corporation ("**CenterPost**"), InterCall, Inc., a Delaware corporation ("**InterCall**"), InPulse Response Group, Inc., an Arizona corporation ("**InPulse**"), Intrado Inc., a Delaware corporation ("**Intrado**"), Ringer Acquisition Corp., a Delaware corporation ("**RAC**"), West Asset Management, Inc., a Delaware corporation ("**WAM**"), West Direct, Inc., a Delaware corporation ("**WDI**"), West Interactive Corporation, a Delaware corporation ("**West Interactive**"), West Business Services, LP, a Delaware limited partnership ("**WBS**"), West Telemarketing, LP, a Delaware limited partnership ("**West Telemarketing**") and Omnium), $430,500,000, (ii) with respect to CenterPost, $21,000,000, (iii) with respect to InPulse, $45,500,000, (iv) with respect to InterCall, $684,000,000, (v) with respect to Intrado, $439,000,000, (vi) with respect to RAC, $133,600,000, (vii) with respect to WAM, $107,000,000, (viii) with respect to WDI, $25,600,000, (ix) with respect to West Interactive, $118,700,000, (x) with respect to WBS, $134,900,000, (xi) with respect to West Telemarketing, $125,200,000 and (xii) with respect to Omnium, $135,000,000.

"**Lender Addendum**" means, with respect to any applicable Lender, (i) a Lender Addendum, substantially in the form of Exhibit K, executed and delivered by such Lender on the Closing Date as provided in Section 10.23, (ii) a Lender Addendum, substantially in the form of Annex D to Amendment No. 1, executed and delivered by such Lender on the Amendment No. 1 Effective Date as provided in Amendment No. 1 or (iii) a Lender Addendum, substantially in the form of Annex B to Amendment No. 2, executed and delivered by such Lender on the Amendment No. 2 Effective Date as provided in Amendment No. 2.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, the Amendment No. 1 Effective Date or the Amendment No. 2 Effective Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Subsidiary Borrowers**" means (i) the Restricted Subsidiaries of the Borrower set forth on Schedule 1.01G, and (ii) effective as of the Amendment No. 2 Effective Date, Omnium.

"**Term B-2 Borrowing**" means a borrowing consisting of simultaneous Term B-2 Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Term B-2 Lenders pursuant to Section 2.01(a)(ii), (iii) or (iv).

"**Term B-2 Lender**" means, at any time, any Lender that has a Term B-2 Commitment, an Incremental Term Loan Commitment or a Term B-2 Loan.

"**Term B-2 Loan**" means (a) a Loan received in exchange for Existing Term Loans pursuant to Section 2.01(a)(ii) or (b) any Loan made pursuant to Section 2.01(a)(iii) or (iv).

"**Term Commitment**" means any Term B-2 Commitment or Incremental Term Loan Commitment.

(c)    Section 2.01(a) of the Credit Agreement is hereby amended by (i) renumbering the existing clause (iv) and (v) thereof as clauses (v) and (vi), respectively, (ii) adding the following a new clause (iv) thereof:

"(iv)    *Incremental Term Loan Borrowings.* Each Incremental Term Loan Lender severally agrees to make to the Borrower and the applicable Subsidiary Borrowers Incremental Term Loans denominated in Dollars on the Amendment No. 2 Effective Date in an aggregate amount not to exceed the amount set forth in such Incremental Term Loan Lender's Lender Addendum delivered by such Incremental Term Loan Lender on the Amendment No. 2 Effective Date as provided in Amendment No. 2, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement."

and (iii) adding the following as a new clause (vii) thereof:

"(vii)    On and after the Amendment No. 2 Effective Date, all Incremental Term Loans shall have the same terms, rights and benefits as the Term B-2 Loans outstanding immediately prior to the Amendment No. 2 Effective Date under the Loan Documents, except as expressly modified by Amendment No. 2."

(d)    Section 2.07(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(a)    *Term Loans.* Each of the Borrower and the Subsidiary Borrowers shall, jointly and severally, repay to the Administrative Agent for the ratable account of the Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Amendment No. 2 Effective Date, an aggregate amount equal to 0.25% of the aggregate amount of all Term Loans (which shall be allocated among them ratably in accordance with the Designated Amounts) outstanding on the Amendment No. 2 Effective Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (ii) on the Maturity Date for the Term Loans, the aggregate principal amount of all Term Loans outstanding on such date."

(e)    Section 2.08 of the Credit Agreement is hereby amended by adding at the end thereof the following new clause (e):

"(e)    All Incremental Term Loans made on the Amendment No. 2 Effective Date will have the same Types (in the same ratable amounts) as applicable at such time to the Term B-2 Loans outstanding immediately prior to the Amendment No. 2 Effective Date and will have initial

Interest Periods ending on the same dates as the Interest Periods applicable at such time to the Term B-2 Loans outstanding immediately prior to the Amendment No. 2 Effective Date, and the Eurocurrency Rate applicable to such Incremental Term Loans during such initial Interest Periods will be the same as that applicable at such time to the Term B-2 Loans outstanding immediately prior to the Amendment No. 2 Effective Date."

SECTION 3. <u>Conditions of Effectiveness of this Amendment</u>. This Amendment shall become effective on the date (the "**Amendment No. 2 Effective Date**") when each of the conditions set forth in this Section 3 shall have been satisfied:

(a) *Execution of Documents*. The Administrative Agent shall have received (i) this Amendment, duly executed and delivered by the Borrower, Omnium and the Administrative Agent, (ii) Guarantee Agreement Supplement (as defined in the Guaranty), duly executed and delivered by Omnium, (iii) a Security Agreement Supplement, duly executed and delivered by Omnium and (iv) a Guarantor Consent and Reaffirmation, in the form attached hereto as Annex A, duly executed and delivered by each Guarantor.

(b) *Incremental Term Loan Commitments*. The Administrative Agent shall have received (i) commitments from banks and other financial institutions that are Eligible Assignees (collectively, the "**Incremental Term Loan Lenders**") with respect to the Incremental Term Loans in an aggregate principal amount equal to $135,000,000 and (ii) a fully executed Lender Addendum in the form attached hereto as Annex B with respect to each such bank or other financial institution committing to fund such Incremental Term Loans (and pursuant to which, on the Amendment No. 2 Effective Date, such bank or other financial institution shall become a Incremental Term Loan Lender, for all purposes under the Credit Agreement).

(c) *Payment of Fees and Expenses*. The Borrower or Omnium shall have paid all fees and expenses (including the reasonable fees and expenses of Weil, Gotshal & Manges LLP) incurred by the Administrative Agent in connection with the preparation, negotiation and execution of this Amendment or otherwise required to be paid in connection with this Amendment, to the extent invoiced at least one Business Day prior to the date hereof.

(d) *Secretary's Certificates; Good Standing Certificates*. The Administrative Agent shall have received (i) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Borrower and Omnium as the Administrative Agent may reasonably request evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Amendment and the transactions contemplated hereby and (ii) good standing certificates (or equivalent documents) from the applicable Governmental Authority of the respective jurisdiction of organization of each Loan Party dated as of a recent date prior to the Amendment No. 2 Effective Date.

(e) *Officer's Certificate*. The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower, certifying that (i) the conditions precedent set forth in Sections 4.02(a) and (b) of the Credit Agreement shall have been satisfied on and as of the Amendment No. 2 Effective Date and (ii) the Borrower is in compliance with each of the covenants set forth in Section 7.11 of the Credit Amendment determined on a Pro Forma Basis as of the Amendment No. 2 Effective Date and the last day of the most recent Test Period, as if the Incremental Term Loans had been outstanding on the last day of such fiscal quarter of the Borrower for testing compliance therewith.

(f)     *Legal Opinions*. The Administrative Agent shall have received an opinion of Ropes & Gray LLP, counsel for the Loan Parties, addressed to the Administrative Agent and each Lender, in form and substance reasonably satisfactory to the Administrative Agent.

(g)     *Collateral and Guarantee Requirement.* The Administrative Agent shall have received (i) all certificates, if any, representing the Pledged Equity of Omnium, accompanied by undated stock powers executed in blank, and (ii) evidence that all other actions, recordings and filings that the Administrative Agent may deem reasonably necessary to satisfy the Collateral and Guarantee Requirement with respect to Omnium shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent.

SECTION 4.    Post-Closing Requirements Relating to the Mortgaged Properties. Within 90 days after the Amendment No. 2 Effective Date (or such later date acceptable to the Administrative Agent in its sole discretion), the Borrower shall deliver to the Administrative Agent:

(a)     Evidence that mortgage amendments (the "**Mortgage Amendments**") with respect to the Mortgaged Properties have been duly executed, acknowledged and delivered by a duly authorized officer of each party thereto on or before such date and are in form suitable for filing and recording in all filing or recording offices that the Administrative Agent may deem necessary or desirable;

(b)     Date-down endorsements to the title insurance policies with respect to the Mortgaged Properties; and

(c)     Evidence that all fees, costs and expenses have been paid in connection with the preparation, execution, filing and recordation of the Mortgage Amendments, including, without limitation, reasonable attorneys' fees, filing and recording fees, title insurance company coordination fees, documentary stamp, mortgage and intangible taxes and title search charges and other charges incurred in connection with the recordation of the Mortgage Amendments and the other matters described in this Section 4 and as, and to the extent, otherwise required to be paid in connection therewith under Section 10.04 of the Credit Agreement.

SECTION 5.    Representations and Warranties. The Borrower and Omnium represent and warrant as follows:

(a)     The execution, delivery and performance by each of the Borrower and Omnium of this Amendment are within the Borrower's and Omnium's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) contravene the terms of any of the Borrower's or Omnium's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01 of the Credit Agreement), or require any payment to be made under (A) any Contractual Obligation to which the Borrower or Omnium is a party or affecting the Borrower or Omnium or the properties of the Borrower or Omnium or any of the Borrower's Restricted Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Borrower or Omnium or their property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (ii)(A), to the extent that such conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

(b)     This Amendment has been duly executed and delivered by each of the Borrower and Omnium. This Amendment and each Loan Document after giving effect to the amendments pursuant

to this Amendment, constitutes a legal, valid and binding obligation of each of the Borrower and Omnium, enforceable against the Borrower and Omnium in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

(c)    No Default has occurred and is continuing or will occur as a result of the transactions contemplated by this Amendment.

(d)    Each of the representations and warranties of the Borrower contained in Article V of the Credit Agreement and each other Loan Document, immediately before and after giving effect to this Amendment and the matters and transactions contemplated hereby, is true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided,* that any representation and warranty made on or as of the Closing Date that is qualified as to "Material Adverse Effect" shall be deemed to be qualified by a "Company Material Adverse Effect."

SECTION 6. Reference to and Effect on the Credit Agreement and the Loan Documents.

(a)    On and after the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement, as amended by this Amendment.

(b)    The Credit Agreement and each of the other Loan Documents, as specifically amended by this Amendment, are and shall continue to be in full force and effect and are hereby in all respects ratified and confirmed. Without limiting the generality of the foregoing, the Collateral Documents and all of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Loan Documents, in each case, as amended by this Amendment.

(c)    The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents. On and after the effectiveness of this Amendment, this Amendment shall for all purposes constitute a Loan Document.

SECTION 7.    Costs and Expenses. The Borrower and Omnium agree to pay or reimburse the Administrative Agent for all costs and expenses of the Administrative Agent in connection with the preparation, execution, delivery and administration, modification and amendment of this Amendment.

SECTION 8.    Execution in Counterparts. This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. Delivery of an executed counterpart of a signature page to this Amendment by telecopier shall be effective as delivery of a manually executed counterpart of this Amendment.

SECTION 9.    Governing Law. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

*[The remainder of this page is intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be
executed by their respective officers thereunto duly authorized, as of the date first above written.

WEST CORPORATION

By: _____

Name:   Paul M. Mendlik
Title:    Chief Financial Officer and Treasurer


OMNIUM WORLDWIDE, INC.

By: _____

Name:   Paul M. Mendlik
Title:    Chief Financial Officer

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By:

Name:          RITAM BHALLA
               Authorized Signatory
Title:

ANNEX A

GUARANTOR CONSENT AND REAFFIRMATION

Reference is made to Amendment No. 2 ("**Amendment No. 2**"), dated as of May 11, 2007, to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Capitalized terms used but not otherwise defined in this Guarantor Consent and Reaffirmation (this "**Consent**") are used with the meanings attributed thereto in Amendment No. 2.

Each Guarantor hereby consents to the execution, delivery and performance of Amendment No. 2 and agrees that each reference to the Credit Agreement in the Loan Documents shall, on and after the Amendment No. 2 Effective Date, be deemed to be a reference to the Credit Agreement as amended by Amendment No. 2.

Each Guarantor hereby acknowledges and agrees that, after giving effect to Amendment No. 2, all of its respective obligations and liabilities under the Loan Documents to which it is a party are reaffirmed, and remain in full force and effect.

After giving effect to Amendment No. 2, each Guarantor reaffirms each Lien granted by it to the Administrative Agent for the benefit of the Secured Parties under each of the Loan Documents to which it is a party, which Liens shall continue in full force and effect during the term of the Credit Agreement as amended by Amendment No. 2, and shall continue to secure the Secured Obligations, in each case, on and subject to the terms and conditions set forth in the Credit Agreement as amended by Amendment No. 1 and the other Loan Documents.

This Consent shall be governed by, and construed and interpreted in accordance with, the laws of the state of New York.

IN WITNESS WHEREOF, the parties hereto have duly executed this Consent as of this
___ day of May, 2007.

WEST CORPORATION
COSMOSIS CORPORATION
INPULSE RESPONSE GROUP, INC.
INTERCALL, INC.
INTRADO COMMUNICATIONS INC.
INTRADO COMMUNICATIONS OF VIRGINIA INC.
INTRADO INC.
NORTHERN CONTACT, INC.
OMNIUM WORLDWIDE, INC.
SMARTTALK, INC.
TELEVOX SOFTWARE, INCORPORATED
WEST ASSET MANAGEMENT, INC.
WEST DIRECT, INC.
WEST FACILITIES CORPORATION
WEST INTERACTIVE CORPORATION
WEST INTERNATIONAL CORPORATION
WEST NOTIFICATIONS GROUP, INC.
WEST RECEIVABLE SERVICES, INC.
WEST TELEMARKETING CORPORATION II

By: _____
Name: Paul M. Mendlik
Title:  Chief Financial Officer and Treasurer

ASSET DIRECT MORTGAGE, LLC
BUYDEBTCO, LLC
INTRADO INTERNATIONAL, LLC
STARGATE MANAGEMENT LLC
THE DEBT DEPOT, LLC
WEST ASSET PURCHASING, LLC
WEST AT HOME, LLC
WEST TRANSACTION SERVICES II, LLC
WEST TRANSACTION SERVICES, LLC

By: _____
Name: Paul M. Mendlik
Title:  Manager

INTERCALL TELECOM VENTURES, LLC

By: InterCall, Inc., its sole member

By: _____
Name: Paul M. Mendlik
Title:  Chief Financial Officer and Treasurer

WEST BUSINESS SERVICES, LP
WEST TELEMARKETING, LP

By: West Transaction Services, LLC, their general
partner

By: _____
Name: Paul M. Mendlik
Title:  Manager

ANNEX B

LENDER ADDENDUM

Reference is made to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented, waived or otherwise modified from time to time, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent (in such capacity, the "**Administrative Agent**") and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents.  Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Upon execution and delivery of this Lender Addendum by the parties hereto and effective as of the Amendment No. 2 Effective Date, the undersigned hereby becomes a Lender thereunder having Incremental Term Loan Commitments of $_____.

THIS LENDER ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page hereof by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

The undersigned's address for notices pursuant to the Credit Agreement is as follows:

Name of Lender:        _____
Notice Address:        _____
                       _____
                       _____
Attention:             _____
Telephone:             _____
Facsimile:             _____

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this ____ day of May, 2007.

_____
[NAME OF LENDER]

By:_____
    Name:
    Title:

Accepted and agreed:

WEST CORPORATION, as Borrower

By:_____
Name:  Paul M. Mendlik
Title:    Chief Financial Officer and Treasurer

LEHMAN COMMERCIAL PAPER INC., as
 Administrative Agent

By:_____
Name:
Title:

EXECUTION COPY

## AMENDMENT NO. 3 TO CREDIT AGREEMENT

AMENDMENT NO. 3 TO CREDIT AGREEMENT, dated as of May 16, 2008 (this "**Amendment**"), among WEST CORPORATION, a Delaware corporation (the "**Borrower**"), INTERCALL, INC., a Delaware corporation, WACHOVIA CAPITAL MARKETS, LLC, as lead arranger for purposes of this Amendment (the "**Lead Arranger**"), and LEHMAN COMMERCIAL PAPER INC., as Administrative Agent (in such capacity, the "**Administrative Agent**").

### PRELIMINARY STATEMENTS

A.      The Borrower, each lender from time to time party thereto (the "**Lenders**") and the Administrative Agent have entered into a Credit Agreement, dated as of October 24, 2006 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**").

B.      The Borrower intends to acquire, directly or indirectly through one or more subsidiaries, up to 100%, and at least 66.66% of the issued and outstanding common stock (the "**Georgia Acquisition**") of Genesys, S.A., a French *société anonyme* ("**Georgia**" and together with its subsidiaries, the "**Acquired Business**"), as contemplated by the Tender Offer Agreement dated as of February 19, 2008 between the Borrower and Georgia (as amended, modified and supplemented as permitted herein, the "**Acquisition Agreement**").

C.      In order to finance the Georgia Acquisition and to pay related fees and expenses , the Borrower and the applicable Subsidiary Borrowers desire to, among other things, borrow $134,000,000 of incremental term loans (the "**Incremental Term B-3 Loans**") as a new tranche of terms loans under the Credit Agreement on the terms and conditions set forth herein. The borrowing of the Incremental Term B-3 Loans, the Georgia Acquisition and payment of fees and expenses related to the Georgia Acquisition and the Incremental Term B-3 Loans are defined herein as "**Georgia Transactions**".

D.      The Borrower and the applicable Subsidiary Borrowers have requested that the Incremental Term B-3 Loan Lenders (as defined below) make commitments to provide the Incremental Term B-3 Loans on the terms and conditions set forth herein.

E.      The Administrative Agent has agreed, subject to the terms and conditions hereinafter set forth, to amend the Credit Agreement as set forth below.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the sufficiency and receipt of all of which is hereby acknowledged, the parties hereto hereby agree as follows:

SECTION 1. Definitions. Capitalized terms not otherwise defined in this Amendment have the same meanings as specified in the Credit Agreement.

SECTION 2. Amendments to Credit Agreement. Effective as of the Amendment No. 3 Effective Date, and subject to the terms and conditions set forth herein, the Credit Agreement is hereby amended as follows:

(a)      Section 1.01 of the Credit Agreement is amended by adding in the appropriate alphabetical order the following new definitions:

"**Amendment No. 3**" means Amendment No. 3 to this Agreement, dated as of May 16, 2008, among the Borrower, InterCall, Wachovia Capital Markets, LLC and the Administrative Agent.

"**Amendment No. 3 Effective Date**" has the meaning specified in Amendment No. 3.

"**Georgia Acquisition**" has the meaning specified in the preliminary statements of Amendment No. 3.

"**Incremental Term B-3 Loan Borrowing**" means a borrowing consisting of simultaneous Incremental Term B-3 Loans of the same Type and, in the case of Eurocurrency Rate Loans, having the same Interest Period made by each of the Incremental Term B-3 Lenders pursuant to Section 2.01(a)(v).

"**Incremental Term B-3 Loan Commitments**" means, as to each Incremental Term B-3 Loan Lender, its obligation to make Incremental Term B-3 Loans on the Amendment No. 3 Effective Date to the Borrower and the applicable Subsidiary Borrowers pursuant to Section 2.01(a)(v) in an aggregate amount not to exceed the amount set forth in such Incremental Term B-3 Loan Lender's Lender Addendum delivered by such Incremental Term B-3 Loan Lender on the Amendment No. 3 Effective Date as provided in Amendment No. 3, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate Incremental Term B-3 Loan Commitments of all Incremental Term B-3 Loan Lenders on the Amendment No. 3 Effective Date is $134,000,000.

"**Incremental Term B-3 Loan Lender**" means, at any time, any Lender that has an Incremental Term B-3 Loan Commitment or an Incremental Term B-3 Loan at such time.

"**Incremental Term B-3 Loan**" has the meaning specified in the preliminary statements of Amendment No. 3.

"**Incremental Term B-3 Note**" means a promissory note of the Borrower and the applicable Subsidiary Borrowers payable to any Incremental Term B-3 Lender or its registered assigns, in substantially the form of Annex B to Amendment No. 3, evidencing the aggregate Indebtedness of the Borrower and the applicable Subsidiary Borrowers (which shall be allocated among them ratably in accordance with the Designated Amounts) to such Incremental Term B-3 Lender resulting from the Incremental Term B-3 Loans made or held by such Incremental Term B-3 Lender.

(b)       Section 1.01(a) of the Credit Agreement is hereby amended by (i) renumbering the existing clause (b) of the definition of "**Applicable Rate**" as clause (c) and (ii) adding the following as a new clause (b) thereof:

"(a)       with respect to Incremental Term B-3 Loans, (i) for Eurocurrency Rate Loans, 5.00% and (ii) for Base Rate Loans, 4.00%.

(c)       Section 1.01 of the Credit Agreement is hereby amended by amending and restating in their entirety the definitions of "**Designated Amount**", "**Lender Addendum**", "**Responsible Officer**", "**Term Borrowing**", "**Term Commitment**", "**Term Lender**", '**Term Loan**" and "**Term Note**" to read, respectively, as follows:

2

"**Designated Amount**" means: (a) with respect to the Term B-2 Loans, (i) with respect to the Borrower and each of the Subsidiary Borrowers (other than CenterPost Communications, Inc., a Delaware corporation ("**CenterPost**"), InterCall, Inc., a Delaware corporation ("**InterCall**"), InPulse Response Group, Inc., an Arizona corporation ("**InPulse**"), Intrado Inc., a Delaware corporation ("**Intrado**"), Ringer Acquisition Corp., a Delaware corporation ("**RAC**"), West Asset Management, Inc., a Delaware corporation ("**WAM**"), West Direct, Inc., a Delaware corporation ("**WDI**"), West Interactive Corporation, a Delaware corporation ("**West Interactive**"), West Business Services, LP, a Delaware limited partnership ("**WBS**"), West Telemarketing, LP, a Delaware limited partnership ("**West Telemarketing**") and Omnium), $430,500,000, (ii) with respect to CenterPost, $21,000,000, (iii) with respect to InPulse, $45,500,000, (iv) with respect to InterCall, $684,000,000, (v) with respect to Intrado, $439,000,000, (vi) with respect to RAC, $133,600,000, (vii) with respect to WAM, $107,000,000, (viii) with respect to WDI, $25,600,000, (ix) with respect to West Interactive, $118,700,000, (x) with respect to WBS, $134,900,000, (xi) with respect to West Telemarketing, $125,200,000 and (xii) with respect to Omnium, $135,000,000 and (b) with respect to the Incremental Term B-3 Loans, (i) with respect to the Borrower and each of the Subsidiary Borrowers (other than InterCall), $84,000,000 and (ii) with respect to InterCall, $50,000,000.

"**Lender Addendum**" means, with respect to any applicable Lender, (i) a Lender Addendum, substantially in the form of Exhibit K, executed and delivered by such Lender on the Closing Date as provided in Section 10.23, (ii) a Lender Addendum, substantially in the form of Annex D to Amendment No. 1, executed and delivered by such Lender on the Amendment No. 1 Effective Date as provided in Amendment No. 1, (iii) a Lender Addendum, substantially in the form of Annex B to Amendment No. 2, executed and delivered by such Lender on the Amendment No. 2 Effective Date as provided in Amendment No. 2 or (iv) a Lender Addendum, substantially in the form of Annex C to Amendment No. 3, executed and delivered by such Lender on the Amendment No. 3 Effective Date as provided in Amendment No. 3.

"**Responsible Officer**" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date, the Amendment No. 1 Effective Date, the Amendment No. 2 Effective Date or the Amendment No. 3 Effective Date, any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"**Term Borrowing**" means any Existing Term Borrowing, any Term B-2 Borrowing or any Incremental Term B-3 Loan Borrowing, as applicable.

"**Term Commitment**" means any Term B-2 Commitment, Incremental Term Loan Commitment or Incremental Term B-3 Loan Commitment.

"**Term Lender**" means any Existing Term Lender, any Term B-2 Lender or any Incremental Term B-3 Lender, as applicable.

"**Term Loan**" means any Existing Term Loan, any Term B-2 Loan or any Incremental Term B-3 Loan, as applicable.

"**Term Note**" means any Existing Term Note, any Term B-2 Note or any Incremental Term B-3 Note, as applicable.

(d)     Section 2.01(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(a)(i)     *Existing Term Loan.* On the Closing Date, the Existing Term Lenders made Existing Term Loans to the Borrower pursuant to Section 2.01(a) of this Agreement as in effect on the Closing Date.

(ii)     *Term B-2 Exchange.* On the Amendment No. 1 Effective Date, each Term B-2 Lender that had Existing Term Loans and a corresponding Term B-2 Commitment exchanged and converted an aggregate principal amount of the Existing Term Loans ("**Exchanged Term Loans**") held by it immediately prior to the Amendment No. 1 Effective Date for and into a like principal amount in Dollars of Term B-2 Loans of the Borrower and the Subsidiary Borrowers (which were allocated among them ratably in accordance with the Designated Amounts) pursuant to Section 2.01(a)(ii) of this Agreement as in effect on the Amendment No. 1 Effective Date.

(iii)     *Term B-2 Borrowings.* On the Amendment No. 1 Effective Date, each Term B-2 Lender made to the Borrower and the Subsidiary Borrowers (which were allocated among them ratably in accordance with the Designated Amounts) Term B-2 Loans denominated in Dollars in an amount equal to the excess of (A) its Term B-2 Commitment over (B) the aggregate principal amount of its Exchanged Term Loans, if any, pursuant to Section 2.01(a)(iii) of this Agreement as in effect on the Amendment No. 1 Effective Date. All Existing Term Loans that were not Exchanged Term Loans were refinanced with the proceeds of such Term B-2 Loans.

(iv)     *Incremental Term Loan Borrowings.* On the Amendment No. 2 Effective Date, each Incremental Term Loan Lender made to the Borrower and the applicable Subsidiary Borrowers (which were allocated among them ratably in accordance with the Designated Amounts) Incremental Term Loans denominated in Dollars in an aggregate amount equal to the amount set forth in such Incremental Term Loan Lender's Lender Addendum delivered by such Incremental Term Loan Lender on the Amendment No. 2 Effective Date pursuant to Section 2.01(a)(iv) of this Agreement as in effect on the Amendment No. 2 Effective Date.

(v)     *Incremental Term B-3 Loan Borrowings.* Each Incremental Term B-3 Loan Lender severally agrees to make to the Borrower and the applicable Subsidiary Borrowers (which shall be allocated among them ratably in accordance with the Designated Amounts) Incremental Term B-3 Loans denominated in Dollars on the Amendment No. 3 Effective Date in an aggregate amount not to exceed the amount set forth in such Incremental Term B-3 Loan Lender's Lender Addendum delivered by such Incremental Term B-3 Loan Lender on the Amendment No. 3 Effective Date as provided in Amendment No. 3, as applicable.

(vi)     Amounts borrowed under this Section 2.01(a) and repaid or prepaid may not be reborrowed. Term Loans may be Base Rate Loans or Eurocurrency Rate Loans, as further provided herein.

(vii)     On and after the Amendment No. 1 Effective Date, all Term Loans shall continue to have the same terms, rights and benefits as the Term Loans immediately prior to the Amendment No. 1 Effective Date under the Loan Documents, except as expressly modified by Amendment No. 1.

(viii)     On and after the Amendment No. 2 Effective Date, all Incremental Term Loans shall have the same terms, rights and benefits as the Term B-2 Loans outstanding immediately

prior to the Amendment No. 2 Effective Date under the Loan Documents, except as expressly modified by Amendment No. 2.

(ix)    On and after the Amendment No. 3 Effective Date, all Incremental Term B-3 Loans shall have the same terms, rights and benefits as the Term B-2 Loans outstanding immediately prior to the Amendment No. 3 Effective Date under the Loan Documents, except as expressly modified by Amendment No. 3."

(e)    Section 2.05(a)(i) is hereby amended by replacing the phrase "(except as otherwise provided below)" immediately before the first proviso therein with the phrase "(except as otherwise provided below and, in the case of the Incremental Term B-3 Loans, subject to Section 2.16)".

(f)    Section 2.05(b)(i) is hereby amended by replacing the reference to "all voluntary prepayments of Term B-2 Loans" in clause (B)(i) thereof with "all voluntary prepayments of Term B-2 Loans and Incremental Term B-3 Loans".

(g)    Section 2.05(b)(v) is hereby amended by adding the following new sentence at the end thereof: "Each prepayment of Term Loans pursuant to this Section 2.05(b) shall be subject to Section 2.16)".

(h)    Section 2.07(a) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(a)    *Term Loans.* Each of the Borrower and the Subsidiary Borrowers shall, jointly and severally, repay to the Administrative Agent for the ratable account of the Term Lenders (i) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Amendment No. 2 Effective Date, an aggregate amount equal to 0.25% of the aggregate amount of all Term B-2 Loans (which shall be allocated among them ratably in accordance with the Designated Amounts) outstanding on the Amendment No. 2 Effective Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (ii) on the Maturity Date for the Term Loans, the aggregate principal amount of all Term B-2 Loans outstanding on such date. Each of the Borrower and the Subsidiary Borrowers shall, jointly and severally, repay to the Administrative Agent for the ratable account of the Incremental Term B-3 Lenders (i) on the last Business Day of each March, June, September and December, commencing with the first such date to occur after the Amendment No. 3 Effective Date, an aggregate amount equal to 0.25% of the aggregate amount of all Incremental Term B-3 Loans (which shall be allocated among them ratably in accordance with the Designated Amounts) outstanding on the Amendment No. 3 Effective Date (which payments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05) and (ii) on the Maturity Date for the Term Loans, the aggregate principal amount of all Incremental Term B-3 Loans outstanding on such date. The portion of the repayment amount attributable to the Incremental Term B-3 Loans shall be subject to Section 2.16."

(i)    Section 2.08(a)(i) is hereby amended by adding the following proviso at the end thereof "*provided* that, in the event that the actual Eurocurrency Rate for the applicable Interest Period shall be less than 3.5%, the Eurocurrency Rate applicable to the Incremental Term B-3 Loans that are Eurocurrency Rate Loans shall be deemed to be 3.5%,".

(j)    Article II of the Credit Agreement is hereby amended by adding at the end thereof the following new Section 2.16:

"Section 2.16. Incremental Term B-3 Loan Call Protection. In the event that on or prior to the second anniversary of the Amendment No. 3 Effective Date, all or any portion of the Incremental Term B-3 Loans are prepaid or repaid, as applicable, including, without limitation, (i) voluntary prepayment (including, without limitation, in connection with any refinancing of all of the Facilities) pursuant to Section 2.05(a)(i), (ii) mandatory prepayment pursuant to Section 2.05(b)(i), (ii) or (iii), or (iii) repayment pursuant to Section 2.07(a), such prepayment or repayment, as applicable, will be made at (i) 105.0% of the amount prepaid or repaid, as applicable, if such prepayment or repayment occurs on or prior to the first anniversary of the Amendment No. 3 Effective Date and (ii) 102.0% of the amount prepaid or repaid, as applicable, if such prepayment or repayment occurs after the first anniversary of the Amendment No. 3 Effective Date, but on or prior to the second anniversary of the Amendment No. 3 Effective Date."

(k)    Section 7.10 of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"SECTION 7.10. Use of Proceeds. Use the proceeds of (a) (i) any Revolving Credit Borrowing, Swing Line Borrowing, Existing Term Borrowing or L/C Credit Extension, whether directly or indirectly, in a manner inconsistent with the uses set forth in the preliminary statements to this Agreement, or (ii) any Term B-2 Borrowing, whether directly or indirectly, in a manner other than (A) to refinance Existing Term Loans and (B) for general corporate purposes, including Permitted Acquisitions and (b) any Incremental Term B-3 Borrowing, whether directly or indirectly, in a manner other than to finance the Georgia Acquisition and to pay fees and expenses related to the Georgia Acquisition and the Incremental Term B-3 Loans and for general corporate purposes, including Permitted Acquisitions."

(l)    Section 8.02(b) of the Credit Agreement is hereby amended and restated in its entirety to read as follows:

"(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder, including pursuant to Section 2.16, or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;"

(m)    Section 8.02 of the Credit Agreement is hereby amended by amending and restating the proviso at the end thereof in its entirety to read as follows:

"*provided* that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans and any obligation of the L/C Issuers to make L/C Credit Extensions shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid, including the amounts payable pursuant to Section 2.16, shall automatically become due and payable, and the obligation of the Borrower to Cash Collateralize the L/C Obligations as aforesaid shall automatically become effective, in each case without further act of the Administrative Agent or any Lender."

(n)    Section 10.01 of the Credit Agreement is hereby amended by adding at the end thereof the following new paragraph:

"In addition, notwithstanding the foregoing, any amendment, waiver or consent that by its terms adversely affects the rights of the Incremental Term B-3 Lenders in a manner different than such amendment, waiver or consent affects the other Lenders hereunder as a group shall be subject to the approval by the Incremental Term B-3 Lenders holding more than 50% of the aggregate Outstanding Amount of the Incremental Term B-3 Loans."

SECTION 3. Conditions of Effectiveness of this Amendment. This Amendment shall become effective on the date (the "**Amendment No. 3 Effective Date**") when each of the conditions set forth in this Section 3 shall have been satisfied:

(a)    *Execution of Documents*. The Administrative Agent shall have received (i) this Amendment, duly executed and delivered by the Borrower, the Lead Arranger and the Administrative Agent in accordance with the requirements of Section 2.14 of the Credit Agreement, and (ii) a Guarantor Consent and Reaffirmation, in the form attached hereto as Annex A, duly executed and delivered by each Guarantor.

(b)    *Syndication*. Since February 19, 2008 and prior to the Amendment No. 3. Effective Date, there shall have been no competing offering, placement or arrangement of any debt securities or syndicated commercial bank financing or other credit facilities of the Borrower, any of its subsidiaries or the Acquired Business without the prior written consent of the Lead Arranger, other than, so long as such indebtedness is issued in compliance with the terms of the Credit Agreement, (w) under the Credit Agreement, (x) the Georgia Transactions, (y) up to the amount previously agreed by the Lead Arranger and the Borrower of foreign indebtedness (including the indebtedness of the Acquired Business) and (z) Borrower's accounts receivable facility in the aggregate amount of up to the amount previously agreed by the Lead Arranger and the Borrower.

(c)    *Consummation of Georgia Acquisition*. The Georgia Acquisition shall have been consummated (or substantially concurrently will be consummated) with the funding of the Incremental Term B-3 Loans (i) in accordance with the Acquisition Agreement without waiver or amendment of any material provisions thereof (other than any such waiver or amendment as is not materially adverse to the Incremental Term B-3 Lenders) unless consented to by the Lead Arranger, which consent shall not be unreasonably withheld, conditioned or delayed and (ii) in compliance with the Credit Agreement.

(d)    *Cash Availability*. After giving effect to the Georgia Transactions, the aggregate unrestricted cash and cash equivalents of the Borrower and its Subsidiaries as of the end of the calendar month preceding the most recently ended calendar month (or, if the Amendment No. 3 Effective Date occurs after the 11th Business Day from the end of the most recently ended calendar month, as of the end of such most recently ended calendar month) together with the amount available for borrowing under the Revolving Credit Facility shall be at least $50,000,000.

(e)    *Financial Statements*. The Lead Arranger and the Administrative Agent shall have received (a) a consolidated pro forma balance sheet and statement of operations of the Borrower for the most recent fiscal quarter ended at least 45 days prior to the Amendment No. 3 Effective Date, adjusted to give pro forma effect to the Georgia Transactions, and (b) a related pro forma consolidating (for the Acquired Business and for the Borrower and its consolidated subsidiaries) balance sheet and statement of operations for the Borrower, adjusted to give pro forma effect to the Georgia Transactions, for the twelve-month period ending on the last day of such quarter, in each case, prepared in a format consistent with the format of the unaudited pro forma condensed consolidated financial statements presented in the offering memorandum for the New Notes; *provided*, that, to the extent the financial statements of the Acquired Business are not available for the periods referred to in clauses (a) and (b) above, or were not provided to the Borrower at least seven days prior to the Amendment No. 3 Effective

Date, then such financial statements referred to in clauses (a) and (b) above shall be provided for the most recently ended prior period; *provided further*, that it is understood and agreed that the financial information relating to the Acquired Business that is part of the financial statements referred to in clauses (a) and (b) above is prepared based on International Financial Reporting Standards and is not reconciled to U.S. GAAP.

(f)     *Payment of Debt Issuance Fee.* The Borrower shall have paid to the Administrative Agent for the account of each Incremental Term B-3 Lender party to the Credit Agreement as of the Amendment No. 3 Effective Date, as compensation for the funding of the Incremental Term B-3 Loans, a debt issuance fee in an amount equal to 3.00% of the stated principal amount set forth in such Incremental Term B-3 Loan Lender's Lender Addendum.

(g)     *Payment of Other Fees and Expenses.* The Borrower shall have paid all fees and expenses (including the reasonable fees and expenses of Weil, Gotshal & Manges LLP) incurred by the Lead Arranger and the Administrative Agent in connection with the preparation, negotiation and execution of this Amendment or otherwise required to be paid in connection with this Amendment (including, without limitation, all fees and expenses described in the Commitment Letter, dated as of February 19, 2008, among the Borrower, Wachovia Bank, National Association and the Lead Arranger and Fee Letter, dated as of February 19, 2008, among the Borrower, Wachovia Bank, National Association and the Lead Arranger) to the extent invoiced at least one Business Day prior to the date hereof.

(h)     *Secretary's Certificates; Good Standing Certificates.* The Administrative Agent shall have received (i) such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of the Borrower as the Lead Arranger may reasonably request evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Amendment and the transactions contemplated hereby and (ii) good standing certificates (or equivalent documents) from the applicable Governmental Authority of the respective jurisdiction of organization of each Loan Party dated as of a recent date prior to the Amendment No. 3 Effective Date.

(i)     *Compliance with Covenants, No Default, Etc.* (i) The conditions precedent set forth in Sections 4.02(a) and (b) of the Credit Agreement shall have been satisfied on and as of the Amendment No. 3 Effective Date, (ii) the Borrower shall be in compliance with each of the covenants set forth in Section 7.11 of the Credit Amendment determined on a Pro Forma Basis as of the Amendment No. 3 Effective Date and the last day of the most recent Test Period, as if the Incremental Term B-3 Loans had been outstanding on the last day of such fiscal quarter of the Borrower for testing compliance therewith and (iii) the Total Leverage Ratio as of the last day of the four consecutive fiscal quarters of the Borrower for which financial statements are required to be delivered to the Administrative Agent under the Credit Agreement, calculated on a Pro Forma Basis giving effect to the Georgia Transactions, shall be no greater than 6.75:1 and the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower, certifying the foregoing.

(j)     *Solvency Certificate.* The Administrative Agent shall have received a certificate attesting to the Solvency of the Loan Parties (taken as a whole) after giving effect to the Georgia Transactions, from the Chief Financial Officer of the Borrower.

(k)     *Legal Opinions.* The Administrative Agent shall have received an opinion of Ropes & Gray LLP, counsel for the Loan Parties, addressed to the Administrative Agent and each Lender, in form and substance reasonably satisfactory to the Lead Arranger and the Administrative Agent.

(l)    *Collateral Requirement.* All actions reasonably necessary to establish that the Administrative Agent will have a perfected security interest in the Collateral consisting of 65% of the equity of the "first-tier" foreign Subsidiary owning equity interests in the Acquired Business shall have been taken or waived by the Lead Arranger and the Administrative Agent.

SECTION 4.    Post-Closing Requirements Relating to the Mortgaged Properties. Within 90 days after the Amendment No. 3 Effective Date (or such later date acceptable to the Administrative Agent in its sole discretion), the Borrower shall deliver to the Administrative Agent:

(a)    Evidence that mortgage amendments (the "**Mortgage Amendments**") with respect to the Mortgaged Properties have been duly executed, acknowledged and delivered by a duly authorized officer of each party thereto on or before such date and are in form suitable for filing and recording in all filing or recording offices that the Administrative Agent may deem necessary or desirable;

(b)    Date-down endorsements to the title insurance policies with respect to the Mortgaged Properties; and

(c)    Evidence that all fees, costs and expenses have been paid in connection with the preparation, execution, filing and recordation of the Mortgage Amendments, including, without limitation, reasonable attorneys' fees, filing and recording fees, title insurance company coordination fees, documentary stamp, mortgage and intangible taxes and title search charges and other charges incurred in connection with the recordation of the Mortgage Amendments and the other matters described in this Section 4 and as, and to the extent, otherwise required to be paid in connection therewith under Section 10.04 of the Credit Agreement.

SECTION 5.    Representations and Warranties. The Borrower represents and warrants as follows:

(a)    The execution, delivery and performance by the Borrower of this Amendment are within the Borrower's corporate or other powers, have been duly authorized by all necessary corporate or other organizational action, and do not and will not (i) contravene the terms of any of the Borrower's Organization Documents; (ii) conflict with or result in any breach or contravention of, the creation of any Lien under (other than as permitted by Section 7.01 of the Credit Agreement), or require any payment to be made under (A) any Contractual Obligation to which the Borrower is a party or affecting the Borrower or the properties of the Borrower or any of the Borrower's Restricted Subsidiaries or (B) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which the Borrower or its property is subject; or (iii) violate any material Law; except with respect to any conflict, breach or contravention or payment (but not creation of Liens) referred to in clause (ii)(A), to the extent that such conflict, breach, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

(b)    This Amendment has been duly executed and delivered by the Borrower. This Amendment and each Loan Document after giving effect to the amendments pursuant to this Amendment, constitutes a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as such enforceability may be limited by Debtor Relief Laws and by general principles of equity.

(c)    No Default has occurred and is continuing or will occur as a result of the transactions contemplated by this Amendment.

(d)       Each of the representations and warranties of the Borrower contained in Article V of the Credit Agreement and each other Loan Document, immediately before and after giving effect to this Amendment and the matters and transactions contemplated hereby, is true and correct in all material respects on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects as of such earlier date; *provided,* that any representation and warranty made on or as of the Closing Date that is qualified as to "Material Adverse Effect" shall be deemed to be qualified by a "Company Material Adverse Effect."

SECTION 6.  Reference to and Effect on the Credit Agreement and the Loan Documents.

(a)       On and after the effectiveness of this Amendment, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement, as amended by this Amendment. The Incremental Term B-3 Loans are the "Incremental Term Loans" as defined in the Credit Agreement.

(b)       The Credit Agreement and each of the other Loan Documents, as specifically amended by this Amendment, are and shall continue to be in full force and effect and are hereby in all respects ratified and confirmed. Without limiting the generality of the foregoing, the Collateral Documents and all of the Collateral described therein do and shall continue to secure the payment of all Obligations of the Loan Parties under the Loan Documents, in each case, as amended by this Amendment.

(c)       The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, operate as a waiver of any right, power or remedy of any Lender or the Administrative Agent under any of the Loan Documents, nor constitute a waiver of any provision of any of the Loan Documents. On and after the effectiveness of this Amendment, this Amendment shall for all purposes constitute a Loan Document.

SECTION 7.   Costs and Expenses.  The Borrower agrees to pay or reimburse the Lead Arranger and the Administrative Agent for all costs and expenses of the Lead Arranger and the Administrative Agent, respectively in connection with the preparation, execution, delivery and administration, modification and amendment of this Amendment.

SECTION 8.   Execution in Counterparts.  This Amendment may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement. Delivery of an executed counterpart of a signature page to this Amendment by telecopier shall be effective as delivery of a manually executed counterpart of this Amendment.

SECTION 9.   Governing Law.  This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

SECTION 10.   Lender Addenda.  Each initial Incremental Term B-3 Loan Lender shall become a party to this Amendment and the Credit Agreement by delivering to the Administrative Agent a Lender Addendum in the form attached hereto as Annex C duly executed by such Incremental Term B-3 Loan Lender, the Borrower and the Administrative Agent. Such initial Incremental Term B-3 Loan Lender shall also provide other customary information to the Administrative Agent, as the Administrative Agent may reasonably request.

SECTION 11.   "Know Your Customer" Information.  The Borrower shall provide the documentation and other information to the Administrative Agent that is required by regulatory

authorities under applicable "*know your customer*" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act, and that is reasonably requested by the Administrative Agent.

*[The remainder of this page is intentionally left blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers thereunto duly authorized, as of the date first above written.

WEST CORPORATION

By: _____

Name:

Title:

INTERCALL, INC.

By: _____

Name:

Title:

[SIGNATURE PAGE TO AMENDMENT NO. 3]

WACHOVIA CAPITAL MARKETS, LLC,
as Lead Arranger

By: _____
Name: Stephen Neill
Title: Managing Director

LEHMAN COMMERCIAL PAPER INC.,
as Administrative Agent

By:
Name:     RITAM BHALLA
Title:     Authorized Signatory

ANNEX A

GUARANTOR CONSENT AND REAFFIRMATION

Reference is made to Amendment No. 3 ("**Amendment No. 3**"), dated as of May 16, 2008 to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented or otherwise modified prior to the date hereof, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Capitalized terms used but not otherwise defined in this Guarantor Consent and Reaffirmation (this "**Consent**") are used with the meanings attributed thereto in Amendment No. 3.

Each Guarantor hereby consents to the execution, delivery and performance of Amendment No. 3 and agrees that each reference to the Credit Agreement in the Loan Documents shall, on and after the Amendment No. 3 Effective Date, be deemed to be a reference to the Credit Agreement as amended by Amendment No. 3.

Each Guarantor hereby acknowledges and agrees that, after giving effect to Amendment No. 3, all of its respective obligations and liabilities under the Loan Documents to which it is a party are reaffirmed, and remain in full force and effect.

After giving effect to Amendment No. 3, each Guarantor reaffirms each Lien granted by it to the Administrative Agent for the benefit of the Secured Parties under each of the Loan Documents to which it is a party, which Liens shall continue in full force and effect during the term of the Credit Agreement as amended by Amendment No. 3, and shall continue to secure the Secured Obligations, in each case, on and subject to the terms and conditions set forth in the Credit Agreement as amended by Amendment No. 1, Amendment No. 2 and Amendment No. 3, and the other Loan Documents.

This Consent shall be governed by, and construed and interpreted in accordance with, the laws of the state of New York.

IN WITNESS WHEREOF, the parties hereto have duly executed this Consent as of this ___ day of May 2008.

WEST CORPORATION
COSMOSIS CORPORATION
INTERCALL, INC.
INTRADO COMMUNICATIONS INC.
INTRADO COMMUNICATIONS OF VIRGINIA INC.
INTRADO INC.
NORTHERN CONTACT, INC.
TELEVOX SOFTWARE, INCORPORATED
WEST ASSET MANAGEMENT, INC.
WEST BUSINESS SERVICES CORPORATION
WEST DIRECT, INC.
WEST DIRECT II, INC.
WEST FACILITIES CORPORATION
WEST INTERACTIVE CORPORATION
WEST INTERNATIONAL CORPORATION
WEST NOTIFICATIONS GROUP, INC.
WEST RECEIVABLE SERVICES, INC.
WEST TELEMARKETING CORPORATION
WEST TELEMARKETING CORPORATION II

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

ASSET DIRECT MORTGAGE, LLC

By: _____
Name: Paul M. Mendlik
Title:  Manager

INTERCALL TELECOM VENTURES, LLC]

By: InterCall, Inc., its sole member

By: _____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

BUYDEBTCO, LLC
THE DEBT DEPOT, LLC
WEST ASSET PURCHASING, LLC

By:  West Receivable Services, Inc.

By:  _____
Name:
Title:


INTRADO INTERNATIONAL, LLC

By:  Intrado Inc.

By:  _____
Name:
Title:


STARGATE MANAGEMENT LLC

By:  Cosmosis Corporation

By:  _____
Name:
Title:


WEST AT HOME, LLC

By:  West Telemarketing Corporation

By:  _____
Name:
Title:

ANNEX B

FORM OF INCREMENTAL TERM B-3 NOTE

LENDER: [●]
PRINCIPAL AMOUNT: $[●]

New York, New York
_____ ___, 20___

FOR VALUE RECEIVED, each of the undersigned, WEST CORPORATION, a Delaware corporation (the "Borrower"), and the Subsidiary Borrowers listed on the signature pages hereto (the "Subsidiary Borrowers"), hereby promises, jointly and severally, to pay to the Lender set forth above (the "Lender") or its registered assigns, in lawful money of the United States of America in immediately available funds at the Administrative Agent's Office (such term, and each other capitalized term used but not defined herein, having the meaning assigned to it in the Credit Agreement dated as of October 24, 2006 (as the same may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrower, each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents) (i) on the dates set forth in the Credit Agreement, the principal amounts set forth in the Credit Agreement with respect to Incremental Term B-3 Loans made by the Lender to the Borrower and the Subsidiary Borrowers pursuant to the Credit Agreement (which shall be allocated among them ratably in accordance with the Designated Amounts (as defined in the Credit Agreement)) and (ii) on each Interest Payment Date, interest at the rate or rates per annum as provided in the Credit Agreement on the unpaid principal amount of all Incremental Term B-3 Loans made by the Lender to the Borrower and the Subsidiary Borrowers pursuant to the Credit Agreement.

Each of the Borrower and the Subsidiary Borrowers promises, jointly and severally, to pay interest, on demand, on any overdue principal and, to the extent permitted by law, overdue interest from their due dates at the rate or rates provided in the Credit Agreement.

Each of the Borrower and the Subsidiary Borrowers hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever. The nonexercise by the holder hereof of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

All borrowings evidenced by this note and all payments and prepayments of the principal hereof and interest hereon and the respective dates thereof shall be endorsed by the holder hereof on the schedule attached hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof, or otherwise recorded by such holder in its internal records; provided, however, that the failure of the holder hereof to make such a notation or any error in such notation shall not affect the obligations of the Borrower and the Subsidiary Borrowers under this note.

This note is one of the Incremental Term B-3 Notes referred to in the Credit Agreement that, among other things, contains provisions for the acceleration of the maturity hereof upon the happening of certain events, for optional and mandatory prepayment of the principal hereof prior to the maturity hereof and for the amendment or waiver of certain provisions of the Credit Agreement, all upon the terms and conditions therein specified.

11086913_1.DOC

THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN
ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

WEST CORPORATION

By:_____
Name:
Title:

INTERCALL, INC.

By:_____
Name:
Title:

## LOANS AND PAYMENTS

| Date | Amount of Loan | Maturity Date | Payments of Principal/Interest | Principal Balance of Note | Name of Person Making the Notation |
|------|----------------|---------------|-------------------------------|---------------------------|-------------------------------------|
|      |                |               |                               |                           |                                     |
|      |                |               |                               |                           |                                     |
|      |                |               |                               |                           |                                     |
|      |                |               |                               |                           |                                     |

ANNEX C

LENDER ADDENDUM

Reference is made to the Credit Agreement dated as of October 24, 2006 (as amended, supplemented, waived or otherwise modified from time to time, the "**Credit Agreement**"), among West Corporation (the "**Borrower**"), each Lender from time to time party thereto, Lehman Commercial Paper Inc., as Administrative Agent (in such capacity, the "**Administrative Agent**") and Swing Line Lender, Deutsche Bank Securities Inc. and Bank of America, N.A., as Syndication Agents, and Wachovia Bank, National Association and General Electric Capital Corporation, as Co-Documentation Agents. Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Upon execution and delivery of this Lender Addendum by the parties hereto and effective as of the Amendment No. 3 Effective Date, the undersigned hereby becomes an Incremental Term B-3 Lender thereunder having Incremental Term B-3 Loan Commitments of $_____.

THIS LENDER ADDENDUM SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

This Lender Addendum may be executed by one or more of the parties hereto on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page hereof by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

The undersigned's address for notices pursuant to the Credit Agreement is as follows:

Name of Incremental
Term B-3 Lender:       _____
Notice Address:        _____
                       _____
                       _____
Attention:             _____
Telephone:             _____
Facsimile:             _____

IN WITNESS WHEREOF, the parties hereto have caused this Lender Addendum to be duly executed and delivered by their proper and duly authorized officers as of this ____ day of _____, 2008.

_____
[NAME OF LENDER]

By:_____
   Name:
   Title:

Accepted and agreed:

WEST CORPORATION, as Borrower

By:_____
Name: Paul M. Mendlik
Title:   Chief Financial Officer and Treasurer

LEHMAN COMMERCIAL PAPER INC., as
 Administrative Agent

By:_____
Name:
Title: