ANDREWS KURTH LLP
450 Lexington Ave., 15th Floor
New York, NY  10017
Telephone:  (212) 850-2800
Facsimile:  (212) 850-2929
Peter Goodman, Esq.

Attorney for EPCO Holdings, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 Case No. |
| | : | |
| LEHMAN BROTHERS HOLDINGS, INC., | : | 08-13555 (JMP) |
| *et al.* | : | |
|     Debtors. | : | |
| | : | |

**OBJECTION OF EPCO HOLDINGS, INC. TO DEBTORS' MOTION FOR AN ORDER
PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO
ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND
<u>ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS</u>**

EPCO Holdings, Inc. ("EPCO Holdings") hereby files this its Objection ("Objection") to

the Debtors' Motion For an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code To

Establish Procedures For The Settlement or Assumption and Assignment of Prepetition

Derivative Contracts (the "Motion").  In support of its Objection, EPCO Holdings respectfully

represents as follows.

<u>**BACKGROUND**</u>

1.    EPCO Holdings previously entered into an ISDA Master Agreement with Lehman

Brothers Special Financing Inc. ("LBSF") dated as of September 6, 2007 (the "Holdings ISDA").

In connection with the Holdings ISDA, Lehman Brothers Holdings Inc. ("LBHI") agreed to

guarantee the obligations of LBSF under the Holdings ISDA.

-1-

2.     On September 15, 2008, LBHI filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with this Court.

3.     On October 3, 2008, LBSF filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with this Court.

4.     To date, EPCO Holdings has not accelerated the event of default that occurred under the Holdings ISDA when LBHI and LBSF each filed respectively for bankruptcy with this Court and EPCO Holdings has not set an early termination date with respect to the Holdings ISDA.  EPCO Holdings reserves all rights to set an early termination date from and after the date hereof with respect to the Holdings ISDA.

5.     As of the date hereof, there exists three underlying derivative transactions entered into in connection with the Holdings ISDA by and between EPCO Holdings and LBSF, each dated as of September 7, 2006.  Each of these derivative transactions are interest rate swap agreements (together, the "Interest Swap Agreements") that were entered into by EPCO Holdings and LBSF in connection with that certain Credit Agreement, originally dated as of August 18, 2005, by and among EPCO Holdings, as borrower, the lenders party thereto, Citicorp North America, Inc., as bank agent and Lehman Commercial Paper Inc., as institutional agent, as amended and restated by that certain Second Amended and Restated Credit Agreement, dated as of August 24, 2007, by and among, EPCO Holdings, as borrower, the lenders a party thereto, and Citicorp North America, Inc., as administrative agent (the "Credit Agreement").

## OBJECTIONS

## I.     THE INTEREST SWAP AGREEMENTS CANNOT BE ASSUMED AND ASSIGNED BY THE DEBTORS BECAUSE THEY ARE NOT EXECUTORY CONTRACTS.

6.     Section 365(f) of the Bankruptcy Court permits a debtor to assume executory contracts or unexpired leases of the Debtors.  Courts in the Second Circuit have adopted the

"Countryman" definition, under which a contract is executory where "the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other." *In re Chateaugay Corp.*, 102 B.R. 335, 344-45 (Bankr. S.D.N.Y. 1989). Importantly, "the Countryman definition of executory contract excludes from the purview of Section 365 of the Code those contracts . . . where the only performance that remains *is the payment of money*." *Id.* (emphasis added).

7. Here, the only performance that remains outstanding under the Interest Swap Agreements, as of the date hereof, is the payment of money on fixed quarterly payment dates. Thus, the Interest Swap Agreements fail to meet the definition of an executory contract and cannot be assumed and assigned by LBSF.[1]

8. The Motion presupposes that the derivative contracts, of which presumably the Interest Swap Agreements would qualify, are executory contracts. There is no provision in the procedures by which EPCO Holdings could argue that the agreements are not executory nature in opposition to their assumption and assignment. Accordingly, the Motion must be denied.

9. In fact, a dispute regarding whether the agreements are executory must be resolved in an adversary proceeding. In *Orion Pictures Corp.*, the Second Circuit held that a contract assumption involves a summary proceeding in which "the bankruptcy court plac[es] itself in the position of the trustee or debtor-in-possession and determi[es] whether assuming the

---

[1]    EPCO Holdings recognizes that a different result was alluded to by Judge Gonzalez in a footnote in an unpublished decision in the *Enron* case with regard to a swap agreement. *In re Enron Corp.*, No. 01-B-16034 (AJG), 2005 WL 3874285, at * 4  n.11 (Bankr. S.D.N.Y. Oct. 5, 2005). Judge Gonzalez appeared to reason that the swap was executory because both parties were required to make a fixed payment each month based on an agreed upon formula. *Id.* Nevertheless, the obligations still consisted simply in the payment of money and would not create an executory contract based on the principles cited above. Accordingly, EPCO Holdings respectfully requests that the Court not follow this unpublished *Enron* decision and apply *In re Chateaugay* and the long line of authority upon which it relies instead.

HOU:2872514.5

contract would be a good business decision or a bad one" not a place "to resolve questions involving the validity of contracts before deciding whether to permit the trustee or debtor-in-possession to assume the contracts." *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d. Cir. 1993). Accordingly, fundamental questions regarding the nature of the contract cannot be decided as part of a contract assumption motion, much less a streamlined proceeding such as that proposed by the Debtors.

II.    **EVEN IF THEY WERE EXECUTORY, THE INTEREST SWAP AGREEMENTS CANNOT BE ASSUMED AND ASSIGNED SEPARATELY FROM THE HOLDINGS ISDA AND THE HOLDINGS ISDA CANNOT BE ASSIGNED TO ANY PARTY.**

10.    A fundamental requirement of the Bankruptcy Code is that an executory contract must be assumed or rejected as a whole. *See, e.g., Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.)*, 780 F.2d 1482, 1488 (9th Cir. 1986). In applying this rule, bankruptcy courts recognize state law principles that related individual contracts may in some cases be viewed as creating one unified agreement. *See Byrd v. Gardinier, Inc. (In re Gardinier, Inc.)*, 831 F.2d 974, 975-76 (11th Cir. 1987); *In re Teligent, Inc.*, 268 B.R. 723, 729 (Bankr. S.D.N.Y. 2001); *In re Integrated Health Services, Inc.*, No. 00-389, 2000 WL 33712484, at * 3 (Bankr. D. Del. July 7, 2000); *but see In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 846 & n.10 (Bankr. C.D. Cal. 1999) (claiming that although state law is a guide, courts must also look to federal bankruptcy law). Among factors courts consider are the intent of the parties and whether the parties would have entered into one agreement without having entered into the other. *In re Teligent*, 268 B.R. at 729.

11.    The Interest Swap Agreements and the Holdings ISDA are unified agreements which provide essential terms governing each particular swap and the relationship between EPCO Holdings and LBSF. Specifically, Section 1(c) of the Holdings ISDA provides that "[a]ll

Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties . . . and the parties would not otherwise enter into any Transaction."    The Interest Swap Agreements are  "Transactions" entered into in reliance on the specific representations, warranties, covenants and agreements set forth in the Holdings ISDA and provide essential terms in governing the credit relationship specific to EPCO Holdings and LBSF.    Together the Holdings ISDA and Interest Swap Agreements form one single, unified agreement.    Accordingly, the Interest Swap Agreements cannot be assumed and assigned without the Holdings ISDA.

12.    The Holdings ISDA is particular to the parties and cannot be assigned to any party.  As one example, the schedule to the Holdings ISDA contains specific tax representations regarding the domicile and entity type of each party.    Both LBSF and EPCO Holdings each represent in the schedule to the Holdings ISDA that neither of them are required to withhold or make deductions under the laws and regulations of the applicable taxing authorities (with limited exceptions).  If LBSF were permitted to assume and assign the unified Interest Swap Agreements and Holdings ISDA to a foreign entity, for example, these representations may be false and could require the foreign entity to withhold on payments made to EPCO Holdings under the Interest Swap Agreements.    To allow LBSF to assume and assign these unified contracts when doing so may render false the representations and warranties upon which EPCO Holdings specifically relied upon when entering into the agreements would be unfair and unjust, and for this reason alone such assumption and assignment procedures proposed by the Debtors cannot be allowed.

HOU:2872514.5

**III.    EVEN IF THEY WERE EXECUTORY AND CAPABLE OF SEPARATE ASSUMPTION, THE INTEREST RATE SWAP AGREEMENTS ARE FINANCIAL ACCOMMODATION CONTRACTS, INCAPABLE OF ASSUMPTION UNDER SECTION 365(C)(2) OF THE BANKRUPTCY CODE.**

13.    Even if the court were to find that the Interest Swap Agreements are executory in nature and separable from the Holdings ISDA, LBSF would nevertheless be unable to assume the obligations because these interest rate swap transactions were entered into by and among EPCO Holdings and LBSF to hedge each party's risks with respect to interest rates and were done as a financial accommodation by each party to the other party.  Under Section 365(c)(2) of the Bankruptcy Code, the Debtors "may not assume or assign any executory contract if . . . such contract is a . . . financial accommodation, to or for the benefit of the debtor . . . ."  11 U.S.C. § 365(c)(2).    The term "financial accommodation" is not defined in the Bankruptcy Code.  The legislative history of Section 365(c)(2) indicates that it has a narrow meaning: "[c]haracterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time." 124 Cong.Rec. H11089 (daily ed. September 28, 1978) (statement of Rep. Edwards), reprinted in 1978 U.S.C.C.A.N. 5787, 6436, 6447 (1978); 124 Cong. Rec. S17406 (daily ed. October 6, 1978) (statement of Sen. DeConcini), reprinted in 1978 U.S.C.C.A.N. 6505, 6515.  As such, "courts define the term 'financial accommodations' narrowly, as 'the extension of money or credit to accommodate another.'"  *Citizens And Southern Nat'l Bank v. Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.)*, 969 F.2d 1013, 1019 (11th Cir. 1992) (internal citations omitted).

14.    A functional characterization adopted by some courts holds that financial accommodation contracts are those involving the exchange of money for a promise to pay, as

opposed to those involving the exchange of money for goods or services. *In re Easebe Enterprises, Inc.*, 900 F.2d 1417, 1419 (9th Cir. 1990), *overruled on other grounds by In re Robert L. Helms Construction & Development Co., Inc.*, 139 F.3d 702, 705-706 (9th Cir. 1998). Contracts to extend a financial accommodation within the meaning of section 365(c)(2) include "loan commitments, guaranty and surety contracts, and other contracts the principle [sic] purpose of which is to extend financing or guarantee [sic] the financial obligations of the debtor." *Thomas B. Hamilton*, 945 F.2d at 1019.

15.     Here the Interest Swap Agreements were entered into, in part, as a financial accommodation to the Debtors to hedge their exposure as a lender under the aforementioned Credit Agreement.  They are analogous to a certain degree to guaranty and surety contracts which are held to be within the ambit of "financial accommodation." *Thomas B. Hamilton*, 945 F.2d at 1019.  They are not incidental to the provision of goods or services.  For these reasons, these Interest Swap Agreements are contracts made as a "financial accommodation" by each party to the other not capable, under Section 365(c)(2), of being assumed and assigned by the Debtors.

## IV.     THE PROPOSED PROCEDURES ARE OTHERWISE FLAWED.

16.     If the Court were to find that these Interest Swap Agreements are executory in nature that are capable of being assumed and assigned to third parties, EPCO Holdings hereby further objects to the proposed procedures set forth by the Debtors in their Motion and proposed order.  Essentially, the proposed procedures provide contract counterparties, such as EPCO Holdings, an inadequate opportunity to object and be heard with regard to possible assumption and assignment of their agreements.  The procedures are unduly favorable to the Debtors and unfairly onerous upon the counterparties and do not provide the adequate protections necessary to counterparties, of among other things, the creditworthiness of any proposed assignee,

especially in light of the unprecedented current credit crisis facing the Country. Note that Section 7 of the Holdings ISDA (which is the standard form master agreement published by ISDA) provides that no obligation under the agreement "may be transferred . . . by either party without the prior written consent of the other party . . . ." While anti-assignment provisions are not generally enforceable under Section 365(f) of the Bankruptcy Code, this provision in the Holdings ISDA underscores the importance of adequate assurance of future performance, which is required by the Bankruptcy Code in order to assume and assign an executory contract. *See* 11 U.S.C. § 365(f)(2)(B). The reason that the standard form of master agreements promulgated by ISDA sets forth this limitation is, in part, because of the credit risk that one party would be exposed to, if its counterparty could unilaterally assign and delegate its obligations under derivative transactions to third parties without obtaining the consent of the remaining party. Although the proposed procedures set forth by the Debtors attempt to take into account providing some assurances that the new third party to a derivative contract would be creditworthy they are not adequate for a multitude of reasons.

17.     First, the procedures provide an inadequate notice period of only five (5) business days for assumption and assignment of the derivative contract. The notice period should be at least fifteen (15) business days to give counterparties adequate time to evaluate the proposed notice of assignment and respond.

18.     Second, the procedures permit the Debtors to assign an agreement without identifying the proposed assignee or the type of credit support to be provided by a credit support provider. While the procedures would require that the assignee or its credit support provider have a credit rating equal to A- or higher on the Fitch or S&P scale or A3 or higher on Moody's scale, a credit rating is no substitute for a fact specific analysis of the actual assignee. After all,

HOU:2872514.5

LBHI itself enjoyed high credit ratings for its senior debt of A2 from Moody's, A+ from Fitch and A- from S&P right up until the date that LBHI filed for bankruptcy with this Court.   The counterparty should be entitled to know the identify of the proposed assignee and the credit support provider, if applicable, as well as the type and form of credit support to be provided by any credit support provider, so that it may properly object if so warranted.   Further, given the current economic turmoil, and the lack of reliability of credit ratings adequately representing risk of counterparties in economic distress, the assignee or the credit support provider, if applicable, should have a credit rating for its senior unsecured debt of either A+ or more from S&P or A1 or more from Moody's.

19.     Third, the procedures appear to shift the burden of proof with regard to adequate assurance of future performance to the counterparty.   *Cf. In re Texas Health Enterprises, Inc.*, 246 B.R. 832, 835 (Bankr. E.D. Tex. 2000) (burden of demonstrating adequate assurance of future performance under Section 365(b) rests with the movant).   The procedures must make clear that the Debtors have the burden to demonstrate adequate assurance of future performance by the assignee.

20.     Fourth, the procedures do not allow the counterparty to raise the non-assumability and/or assignability of the derivative contract.   The procedures should be amended to permit the contract counterparty to raise these defenses.

21.     Set forth below is a mark up of the proposed procedures promulgated by the Debtors that EPCO Holdings respectfully submits would be a much more fair and balanced approach to assumption and assignment of any derivative contracts by Debtors including the Interest Swap Agreements.

<u>Assumption and Assignment Procedures</u>

a.    For any Derivative Contract to be assumed and assigned pursuant to these Assumption and Assignment Procedures, and without the prior consent of the Counterparty **(subject to compliance with the terms and conditions set forth herein)**, the Debtors shall, at least ~~five~~**fifteen** (~~5~~**15**) business days (or such shorter period as may be agreed by the Counterparty) before such assumption and assignment, serve a **written** notice (the "Assignment Notice") by overnight mail delivery service, fax, or email (where available) on the Counterparty under each applicable Derivative Contract (and its attorney, if known) at the last known mail address, fax number, or email address available to the Debtors.

b.    Each Assignment Notice shall set forth the following information: (i) the names and addresses of the Counterparties, (ii) identification of the Derivative Contracts, (iii) either a statement that any assignee or its credit support provider shall have a Standard & Poor's or Fitch credit rating equal to or higher than A~~-~~**+** or a Moody's credit rating equal to or higher than A~~3, or any equivalent thereof~~**1** (a "Qualified Assignee")~~, or~~ **and** the identity of any proposed assignee and its credit support provider, if any, ~~if neither is a Qualified Assignee, and (iv)~~**(iv) if applicable, the type, form and substance of credit support to be provided by a credit support provider, and (v) a detailed calculation statement of** any amounts proposed by the Debtors to be paid to cure existing defaults ("Cure Amounts"). All Assignment Notices will be accompanied by a copy of the Order granting this Motion.

c.    ~~Any~~**Subject to any timely objection made by a Counterparty after receipt of the Assignment Notice, a** Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code, notwithstanding any right of a Counterparty to consent to any assignment ~~or any requirement in a Derivative Contract regarding the identity of assignees, if either~~**, if** (i) an assignee or its credit support provider is a Qualified Assignee, or (ii) the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the Derivative Contract ~~(other than upon exercise of an option exercisable in the Debtors'/assignee's discretion)~~.

d.    With respect to Derivative Contracts that may require the return of posted collateral as part of a Cure Amount, the Debtors will either return such collateral or, if such collateral is no longer in the Debtors' possession, the Debtors will pay an amount equal to the value of such collateral as of the business day prior to service of the Assignment Notice based upon independent third-party pricing services, which payment will be considered in full satisfaction of the posted collateral. The Debtors' proposed manner of returning any such collateral, including any amount proposed to be paid for collateral no longer in the Debtors' possession, shall be included in the Assignment Notice as a Cure Amount.

e.    To the extent that any Counterparty wishes to object on the grounds of (i) the proposed Cure Amount; (ii) the need to cure a default or early termination event, including, without limitation, any default or early termination event with respect

-10-

to the Debtors and each of their respective affiliates, successors and assigns (a "Default") ~~or~~ (iii) the adequate assurance of future performance under the applicable Derivative Contract ~~if neither the assignee nor its replacement credit support provider (if any) is a Qualified Assignee~~**or (iv) whether the Derivative Contract is capable of being assumed and assigned**, then such Counterparty must serve a written objection, so that such objection is actually received no later than ~~five~~**fifteen** (~~5~~**15**) business days after the date of service of the Assignment Notice, on the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153-0119 (Attn: Lori R. Fife and Robert J. Lemons) and Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York 10178 (Attn: Steven J. Reisman and L.P. Harrison 3rd). Any ~~such objection must specify the grounds for such objection, including stating the Counterparty's alleged Cure Amount (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount, and in any event containing no less detail than the calculation of the Cure Amount provided by the Debtors) if the Counterparty disagrees with the Debtors' proposed Cure Amount and any other defaults or termination events the Counterparty alleges must be cured to effect assignment of~~**objection to adequate assurances of future performance and whether** the Derivative Contract ~~.~~ **requested is a contract capable of being assumed and assigned or otherwise shall be heard by this court.**

f.      ~~To the extent that any~~**Subject to compliance by the Debtors with all the procedures set forth herein, including, without limitation, by providing the Counterparty with a proper Assignment Notice in form and substance as required herein, and to the extent that a** Counterparty does not timely serve an objection ~~as set forth above~~**to such Assignment Notice**, such Counterparty will be deemed (i) to have consented to such Cure Amounts, if any, and to the assumption and assignment of the Derivative Contract; (ii) to have agreed that the assignee has provided adequate assurance of future performance within the meaning of Bankruptcy Code section 365(b)(1)(C); (iii) to have agreed that all Defaults under the **Derivative** Contracts arising or continuing prior to the assignment have been cured as a result or precondition of the assignment, such that the assignee or the Debtors shall have no liability or obligation with respect to any Default occurring or continuing prior to the assignment, and from and after the date of the assignment the Derivative Contract shall remain in full force and effect for the benefit of the assignee and the Counterparty in accordance with its terms; (iv) to have waived any right to terminate the Derivative Contract or designate an early termination date under the applicable Derivative Contract as a result of any Default that occurred and/or was continuing prior to the assignment date; and (v) to have agreed that the terms of this Order shall apply to the assignment.

g.      If the Debtors are unable to consensually resolve any timely served objection, the Debtors shall (i) seek authorization of the Court to consummate the proposed assignment, and/or (ii) if the dispute relates solely to the amount of the Cure

-11-

Amount, at the time of the assignment, pay to the Counterparty any undisputed portion of the proposed Cure Amount and place any disputed portion into a segregated interest-bearing account such that, upon any resolution by the Court of the Cure Amount dispute, or agreement between the Debtors and the Counterparty, the Counterparty will be entitled to payment from the segregated account of any disputed portion and interest earned thereon to which the Court finds, or the Debtors and Counterparty agree, it is entitled.

h.  Unless the Debtors solicit bids from at least four (4) potential assignees and select the highest or best bid received within a reasonable time period from such assignees, the Debtors shall request consent of the Committee through its advisors to assume and assign a Derivative Contract pursuant to these Assumption and Assignment Procedures.

i.  If no objection is timely served by a Counterparty or a Counterparty affirmatively consents to the assignment (including by resolving its objection), and any required Committee consent (including through its advisors) has been received, the Debtors shall be authorized, but not required, to assume and assign any Derivative Contract subject to the applicable Assignment Notice, and, upon such assumption and assignment, the assignee and any replacement credit support provider shall assume the Derivative Contract with all Defaults having been deemed cured or waived.

j.  ~~Within a reasonable~~**Contemporaneously with or prior to the** time ~~period after~~**of the** consummation of an assignment transaction, the Debtors will provide **(i) written** notice to any Counterparty of the effective date of the assignment~~. Any purported termination notice sent by a Counterparty of a Derivative Contract based on a Default occurring prior to the assignment shall be ineffective unless a termination notice is received by the Debtors pursuant to the terms of the Derivative Contract prior to the assignment's consummation.~~ **and (ii) a copy of the assignment transaction executed by the assignee and its credit support provider, if any, whereby each of the assignee and the credit support provider, if any, agree for the benefit of the Counterparty to be bound by all of the terms and conditions of the Derivative Contract being assigned. Additionally, to the extent that an assignee does not have an underlying ISDA master agreement in place with the Counterparty prior to the effectiveness of such assignment, such assignee agrees to negotiate in good faith with the Counterparty and to use commercially reasonable efforts to promptly enter into an ISDA master agreement with the Counterparty on terms and conditions acceptable to the Counterparty.**

k.  In any instance where a Derivative Contract is memorialized pursuant to a master agreement, the Debtors may assume and assign, pursuant to these Assumption and Assignment Procedures, only all, but not fewer than all, of the Derivative Contract transactions entered into pursuant to the master agreement.

-12-

l.      ~~As part of and/or to facilitate any assignment transaction~~**Without limiting the obligations of the Debtors as set forth herein,** the Debtors may agree to make payments, including to or for the benefit of the assignee **as part of and/or to facilitate any assignment transaction**.

## CONCLUSION

WHEREFORE, EPCO Holdings requests that the Court deny the Motion and grant it all

further relief to which it is justly entitled.

Dated: November 28, 2008
      New York, New York

                    /s/ Peter Goodman
                    Peter Goodman, Esq.
                    ANDREWS KURTH LLP
                    450 Lexington Ave., 15th Floor
                    New York, NY  10017
                    Telephone:  (212) 850-2800
                    Facsimile:  (212) 850-2929

                    Attorney for EPCO Holdings, Inc.