**Hearing Date: December 3, 2008 at 10:00 a.m.**

Edward H. Tillinghast, III (ET 5566)
Malani J. Cademartori (MS 3882)
**SHEPPARD MULLIN RICHTER & HAMPTON, LLP**
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Telephone:  (212) 332-3800
Facsimile:  (212) 332-3888

*Attorneys for Norton Gold Fields Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| LEHMAN BROTHERS HOLDINGS, INC., et al., | Case No.   08-13555 (JMP) |
| | Chapter 11 |
| Debtors. | (Jointly Administered) |

**OBJECTION OF NORTON GOLD FIELDS LIMITED TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

Norton Gold Fields Limited ("Norton Gold"), by and through its counsel Sheppard Mullin Richter & Hampton, LLP, files this objection and response (the "Objection") to the Debtors' Motion for an Order Pursuant to sections 105 and 365 of Title 11 of the United States Code (the "Bankruptcy Code") to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (the "Procedures Motion") (Docket No. 1498).  In support of its Objection, Norton Gold respectfully states as follows:

**Factual Background**

1.    In 2007, Norton Gold entered into a series of transactions as part of a general equity and debt fundraising to fund its acquisition of a significant Australian gold producing

asset (the "Financing Transaction").    Grange Securities Limited (now known as Lehman Brothers Australia Limited) ("Lehman Australia") was the arranger of the Financing Transaction.

2.        Specifically, as part of the Financing Transaction, Lehman Australia was appointed to act as financial advisor to Norton Gold concerning a planned and negotiated equity and debt financing which sought to raise capital in the amount of AUD75,000,000.  The terms of Lehman Australia's appointment are set out in a letter of appointment prepared by Lehman Australia, dated June 21, 2007 (the "Letter of Appointment").    The Letter of Appointment explicitly provides in the "Conditions Precedent to Drawdown", in pertinent part, that "[e]ntering in production hedging agreements (purchase of put options/forward combinations) [i.e. SWAPS] satisfactory to [Lehman Australia] and the Norton [Gold] Board" was a condition precedent to the Financing Transaction contemplated by the parties.  Letter of Appointment at p. 8.[1]

3.        The equity financing element of the Financing Transaction was carried out through an issue made by Norton Gold and placed with and to sophisticated and institutional investors in the amount of AUD35,000,000 worth of Norton Gold ordinary fully paid shares at AUD0.20 per share (the "Placement").    The terms of the Placement are set out in a letter prepared by Lehman Australia, dated August 10, 2007 (the "Placement Letter").

4.        In connection with the debt portion of the Financing Transaction, Norton Gold issued 400 fixed rate convertible notes due 2011 at a total face value of AUD40,000,000 (the "Notes") on August 24, 2007, the principal amount of the individual Notes each being AUD100,000 pursuant to a Subscription Agreement between Norton Gold and Lehman

---

[1]  The Letter of Appointment and additional documents discussed herein are not attached to this filing because they contain confidential business information with regard to Norton Gold and the Debtor.  Copies of these documents are available upon request to Norton Gold's counsel.

Australia, dated August 23, 2007 (the "Subscription Agreement"). Section 3.1 of the Subscription Agreement also provides, in part, that: (a) Lehman Australia agrees to subscribe for the Notes by paying the subscription price as provided therein, and (b) the obligation of Lehman Australia to pay for the Notes was, in turn, subject to the provision of certain documents and satisfaction of conditions precedent in form and substance reasonably satisfactory to Lehman Australia, including:

> (b) the: (i) Note Deed[2]; (ii) Agency Agreement[3]; (iii) Security Trust Deed[4]; and (iv) each other Transaction Documents[5], have been signed by each of the parties to them . . . (d) that the Placement[6] has been completed in the order of an amount equal to the maximum of the Placement Amount[7]; (e) that agreements for: (i) the Issuer's[8] entry into gold forward contracts of an average forward price of no less than A$850 per ounce of gold . . . and] (ii) the Issuer's entry into gold put options at a put price of no less than A[UD]$760 per ounce of gold ("Gold Put Options") . . . have been executed . . . .

> Subscription Agreement at pp. 6-7.

---

[2] Note Trust Deed, dated August 23, 2007 (the "Note Trust Deed") as further discussed below.

[3] Agency Agreement, dated August 23, 2007 (the "Agency Agreement") between Norton Gold, Citibank N.A., London Branch (Citibank London) and Citibank Global Markets Deutschland AG & Co KGaA (Citibank GMD) as further discussed below.

[4] Security Trust Deed, dated August 24, 2007 (the "Security Trust Deed") between Norton Gold and Lehman Australia referred to below.

[5] Defined in Condition 1.1 (Definitions) of Schedule 1 of the Note Trust Deed to mean "each of the Note Deed, each Note, the Security Documents, any Agency Agreement and any other document which the Issuer acknowledges in writing to be a Transaction Document".

[6] Defined in the Subscription Agreement as the issue of fully paid ordinary shares by Norton Gold.

[7] Defined as AUD35,000,000 in the in the Subscription Agreement.

[8] The Issuer being defined as Norton Gold under the terms of the Subscription Agreement.

5.      Of the original 400 Notes, 20 have been converted by the holders thereof.  Of the remaining 380 Notes, it is Norton Gold's understanding that Lehman Brothers Commercial Corporation Asia ("LBCC Asia") holds a majority of such Notes (approximately 280) with individual non-Lehman related entities holding the remaining Notes (approximately 100).

6.      Rights in respect of the Notes are held on trust by Lehman Australia pursuant to a note trust established by the Note Trust Deed, which appoints Lehman Australia as Note Trustee. The terms and conditions of the Notes are set out in Schedule 1 of the Note Trust Deed as modified by the provisions of the "Global Certificate" issued in respect of the Notes.

7.      In order to comply with its payment obligation under the Notes, Norton Gold appointed Citibank as Paying, Transfer and Conversion Agent and Registrar pursuant to the Agency Agreement.  In its capacity as Principal Paying Agent, Citibank London is responsible to pay, on behalf of Norton Gold, the amount of principal and interest due to the holders of the Notes (the "Holders").   Under the Agency Agreement, Citibank GMD was appointed as the Registrar, and as such is responsible to maintain a record of the Global Certificates and Definitive Certificates delivered concerning the Notes and of their redemption, conversion, payment, cancellation, and loss, among other things.

8.      In connection with the provision of security for payment on the Notes, Norton Gold and Lehman Australia entered into the Security Trust Deed.  Pursuant to the terms of the Security Trust Deed, Lehman Australia was also appointed as Security Trustee.  The Australian subsidiaries of Norton Gold, i.e. Norton Gold Holdings Pty Ltd ("Norton Gold Holdings"), Norton Gold Mine Pty Ltd ("Norton Gold Mine") and Paddington Gold Pty Ltd ("Paddington Gold") (together, the "Norton Subsidiaries") are all described as obligors under the Security

Trust Deed and as such are bound by the terms of the Security Trust Deed.  Security Trust Deed at p.22.

9.      Norton Gold and the Norton Subsidiaries also entered into various documents to provide further security to Lehman Australia in connection with the debt portion of the Financing Transaction, including (a) a Fixed and Floating Charge, dated August 24, 2007, between Lehman Australia, Norton Gold, Norton Gold Holdings and Norton Gold Mine (the "Charge"), (b) a Mortgage, dated August 24, 2007, between Lehman Australia and Paddington Gold (the "First Mortgage"), and (c) a further Mortgage, dated October 12, 2007, between Lehman Australia and Paddington Gold (the "Second Mortgage").  The Charge creates a fixed charge over specified property listed in the Charge and a floating charge over other assets of Norton Gold, Norton Gold Holdings and Norton Gold Mine.  The First Mortgage creates a legal mortgage over Paddington Gold's assets generally, and a fixed charge over the specified property listed in the First Mortgage and a floating charge over all assets generally.  The Second Mortgage creates a legal mortgage over a particular mining tenement held by Paddington Gold and any replacement mining tenements.

10.      In addition, as part of the debt component (an issuance of convertible notes) of the Financing Transaction, and as required by Lehman Australia under the terms of the Letter of Appointment and Subscription Agreement to secure the debt portion of the Financing Transaction, Norton Gold entered into certain gold hedge transactions with Lehman Brothers Commercial Corporation ("LBCC") pursuant to the terms of a 2002 ISDA Master Agreement. Accordingly, on August 29, 2007, Norton Gold entered into a 2002 ISDA Master Agreement and the Schedule thereto (collectively, the "ISDA Agreement") with LBCC, and thereafter a series of hedge transactions, as evidenced by confirmations issued by the parties (the "Confirmations")

pursuant to the ISDA Agreement, comprised of: (a) initial hedge transactions documented by Confirmations, dated August 30, 2007; (b) a transaction entered into and evidenced by a Confirmation, dated February 22, 2008, which replaced the initial hedge profile with a new hedge profile; and (c) a series of weekly transactions entered into between May 2008 and September 12, 2008, evidenced by various Confirmations, which were meant to align more closely Norton Gold's and LBCC's payments to the production of gold.  Additionally, pursuant to a Confirmation, dated August 30, 2008, Norton Gold and Lehman Australia entered into a put option concerning gold.

11.    Concurrently with the execution of the ISDA Agreement, Lehman Brothers Holding, Inc. ("LB Holdings" or "Credit Support Provider", and together with Lehman Australia and LBCC, "Lehman") provided a guarantee (the "Guarantee") in favor of Norton Gold in connection with and in support of LBCC's obligations under the ISDA Agreements.  The Guarantee is a "Credit Support Document" under the ISDA Agreement and LB Holdings is a "Credit Support Provider."

12.    Thus, the Financing Transaction was negotiated, documented and consummated as a single integrated transaction, where the entry into the ISDA Agreement was a specific prerequisite of obtaining the AUD75,000,000 in debt and equity financing, and which included certain measures to ensure repayment of the Notes, including entry into the hedge pursuant to the terms of the ISDA Agreement and the Confirmations.

13.    In or about August 2008, Lehman Australia and Norton Gold initiated discussions relating to a proposed restructure of the Financing Transaction.  The general premise of the renegotiation, which is ongoing, related to the possible conversion of some of the Notes into Norton Gold shares (that is, a conversion of debt to equity), or the cancellation of certain Notes

in return for the payment of a cash sum by Norton Gold. The purpose of such proposed changes was to release provisioned funds and reduce interest payments.  Those negotiations are with the administrators of LBCC Asia (as holder in respect of a majority of the Notes) and the holders of the remaining Notes.[9]

14.     On September 15, 2008, LB Holdings filed a petition for relief under chapter 11 of the Bankruptcy Code, and on September 26, 2008, LBCC filed a petition for relief under chapter 11 of the Bankruptcy Code.

15.     Section 5(a) of the ISDA Agreement provides that:

> The occurrence at any time with respect to a party [to the ISDA Agreement], or, if applicable, any Credit Support Provider of such party . . . of any of the following events constitutes . . . an event of default (an "Event of Default") with respect to such party: -

> (vii) Bankruptcy.  The party, [or] any Credit Support Provider of such party . . . (4)(A) institutes . . . a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights.

> ISDA Agreement at pp. 6-7.

The bankruptcy filing of LB Holdings as Credit Support Provider, in the first instance, and then of LBCC thereafter, each constitute an Event of Default under the ISDA Agreement.

16.     In addition, Section 2 of the ISDA Agreement provides that "[e]ach party will make each payment or delivery specified in each Confirmation to be made by it," provided, however, that the obligation to make payment is subject to "the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing."  ISDA Agreement at § 2(a)(i) and (iii) (emphasis added).  Section 560 of the

---

[9] Given the current U.S. bankruptcy of LBCC and provisional liquidation of LBCC Asia, negotiations for the proposed restructure have not advanced.

Bankruptcy Code provides that a non-defaulting swap participant, such as Norton Gold, is entitled to exercise its rights under the ISDA Agreement upon the occurrence of an Event of Default which is based on the insolvency of the other swap participant notwithstanding section 365(e) of the Bankruptcy Code which ordinarily provides that an executory contract cannot be terminated or modified at any time after commencement of a bankruptcy case "solely because of a provision in such contract or lease that is conditioned on . . . the insolvency or financial condition of the debtor." 11 U.S.C. §§ 365(e) and 560. Thus, since the filing of LB Holdings' chapter 11 petition, Norton Gold has exercised its rights to suspend payment under the hedges and Confirmations pursuant to Section 2(a)(iii) of the ISDA Agreement.

## **Grounds for Objection**

17.     Norton Gold objects to the Procedures Motion to the extent that it seeks to put procedures in place which would provide the Debtors with the ability to assume and assign the Norton Gold ISDA Agreement and/or the Guarantee, neither of which are capable of assumption and assignment under section 365 of the Bankruptcy Code as detailed below.   In addition, Norton Gold objects to the proposed procedures themselves in that the Debtors seek to impose unreasonable restrictions on further objections which Norton Gold may have upon, and which are not ripe until, the receipt of an Assumption Notice which reveals the identity and details about the proposed assignee,[10] and other unduly burdensome procedures.

18.     First, the ISDA Agreement between Norton Gold and LBCC is indivisible from the on-going Financing Transaction by and among Lehman and Norton Gold.  It is well settled

---

[10]  Norton Gold expressly reserves its rights to raise other objections to the assumption and assignment of the ISDA Agreement and/or the Guarantee upon notice of assumption and assignment of such agreements from the Debtors, if the Procedures Motion is granted as to Norton Gold's ISDA Agreement and/or Guarantee, over this Objection.

that a loan and/or financing transaction, such as the Financing Transaction between Norton Gold

and Lehman, is not an executory contract under section 365 of the Bankruptcy Code and is,

therefore, not capable of assignment.  *See In re Calpine Corp.*, No. 05-60200, 2008 WL 3154763

*4 (Bankr. S.D.N.Y. 2008).  Because the ISDA Agreement was a prerequisite of the Financing

Transaction between Norton Gold and Lehman, the ISDA Agreement cannot now be separated

from such integrated Financing Transaction for the purpose of seeking to assume and assign this

portion of the transaction without regard to the substance of the overall transaction.

19.     The inter-related nature of the various documents comprising the Financing

Transaction are supported by the terms of the ISDA Agreement itself as detailed in the Schedule

attached thereto.  For example: (a) Section 4(f) thereof refers specifically to the Security Trust

Deed as a "Credit Support Document;" (b) Section 5(a) thereof provides that the definition of

"Charge" shall be as provided for in the Note Deed and that certain other defined terms used

therein shall have the meaning provided to them in the Security Trust Deed; and (c) Section 5(b)

thereof includes certain cross-default provisions which provide that an "Event of Default" under

the Security Trust Deed shall be an Event of Default therein.  Moreover, Section 5(c)(1) of the

Schedule to the ISDA Agreement states that "[t]he parties agree that this [ISDA] Agreement is a

"Hedge Agreement" as defined in the Security Trust Deed and a "Transaction Document" as

defined in the Conditions (as defined in the Note Deed)."

20.     Second, the Guarantee is not an executory contract subject to or otherwise capable

of assumption and assignment under section 365 of the Bankruptcy Code.  *In re Leibinger-*

*Roberts, Inc.*, 105 B.R. 208, 213 (Bankr. E.D.N.Y. 1989) (*citing In re Unishops, Inc.*, 422

F.Supp. 75, 76 (S.D.N.Y. 1975), *aff'd*, 543 F.2d 1017 (2d Cir. 1976) (stating that "[a] guaranty

agreement is not executory because it holds no future benefit for the guarantor.")).  Thus, even if

the ISDA Agreement itself could be assigned to a third party, LB Holdings' bankruptcy filing (as

Credit Support Provider in connection with the ISDA Agreement) constitutes a continuing Event

of Default under the terms of the ISDA Agreement, which cannot be cured and thereby would

prohibit assignment of the ISDA Agreement.  Specifically, because the Guarantee itself and by

its nature is not subject to assignment under section 365 of the Bankruptcy Code, the default

created by LB Holdings' bankruptcy under the ISDA Agreement cannot be excepted from the

cure requirements or otherwise avoided by the application of section 365(b)(2) of the Bankruptcy

Code. [11]  Accordingly, and as further described below, the ISDA Agreement may not be assigned

due to this continuing and incurable Event of Default, and any attempt to so assign the ISDA

Agreement would be patently inequitable and contrary to applicable law.[12]  In addition to the

---

[11]  This Event of Default is independent from the bankruptcy of LBCC and, thus, is not covered by or exempted under section 365(b)(2) of the Bankruptcy Code.  Specifically, use of the term "debtor" under section 365(b)(2) would refer to LBCC as counterparty to the ISDA Agreement, which the Debtors would presumably seek to assume and assign pursuant to the Procedures Motion.

[12]  It should be further noted that any assignment of the ISDA Agreement, where such continuing Event of Default is present, would continue to excuse Norton Gold's performance thereunder.  As such, any assignment of the ISDA Agreement would be an assignment of a contract for which no performance is required by Norton Gold and to would therefore have no realizable value.

Moreover, the ISDA Agreement is governed by English law (see Section 4(h) of the Schedule to the ISDA Agreement).  As a matter of English law, the provisions of Section 7 of the ISDA Agreement, which require the prior written consent of Norton Gold to any transfer of the ISDA Agreement (or any interest or obligation thereunder), would be effective notwithstanding the commencement of any insolvency or bankruptcy proceedings in respect of LBCC or LB Holdings either in the US or in England.  As a matter of English law, the bankruptcy proceedings under chapter 11 of the Bankruptcy Code in respect of LBCC and LB Holdings may not be automatically recognized in England.  Although either LBCC or LB Holdings could seek recognition of the U.S. bankruptcy proceedings pursuant to the English Cross-Border Insolvency Regulations 2006 (SI 2006/1030) (the "Regulations") if it could be established that the "centre of main interests" of these companies was in the United States, no such application for recognition has yet been made.  Even if it were to be made, and the English court were to find that the U.S. bankruptcy proceedings were "foreign main proceedings" for the purposes of the Regulations, this would not have the effect that the English court would be bound by any order made by the U.S. Bankruptcy Court concerning the Procedures Motion.  Upon recognition of a foreign main proceeding, there is a limited automatic stay on certain types of creditor action pursuant to Article 19 of Schedule 1 to the Regulations but this automatic relief would not include the recognition of an order made by the U.S. Bankruptcy Court pursuant to section 365 of the Bankruptcy Code.  The English court also has the discretion to grant certain types of relief pursuant to Article 21 of Schedule 1 to the Regulations.  This includes the granting of any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the English Insolvency Act 1986 (which sets out a moratorium on certain types of

(footnote continued)

extent the ISDA Agreement is assigned, and given that the Credit Support Agreement cannot be assigned, the resulting failure to so provide acceptable and agreed-upon credit support in connection therewith shall constitute an additional Event of Default under of the ISDA Agreement, namely "Credit Support Default" as provided for under Section 5(a)(iii) thereof.

21.      Third, Norton Gold objects to the Procedures Motion on the grounds that it seeks to establish an inadequate procedure for providing adequate assurance.  The Debtors' proposal that ISDA counterparties will be "deemed to have received adequate assurance of future performance" based solely on the fact that a proposed assignee or the assignee's proposed credit support provider have certain credit ratings at the time of assignment, is inadequate in the case of Norton Gold.  Norton Gold sought out, and specifically requires, a global investment bank with a presence in Australia and experience and expertise in the mining and production of gold and other precious metals in connection with the on-going Financing Transactions.  Any assignee lacking such capabilities is an inadequate substitute and would not be able to perform the services required by Norton Gold in connection with the Financing Transaction of which the ISDA Agreement was a required part.  Thus, the proposed assignee's credit rating alone will not adequately assure Norton Gold of continued performance under the entire Financing Transaction.

22.      Moreover, the Debtors' apparent proposal in the Procedures Motion that ISDA counterparties may not make any further objection to adequate assurance so long as such

---

creditor action and legal process).  However, there is no equivalent to section 365 of the Bankruptcy Code, allowing a British insolvency officeholder to disregard contractual restrictions on transfer, under English insolvency law and therefore the English court would have no discretion to grant relief similar to that which is sought by the Procedures Motion.

These facts raise issues of enforceability of any attempt by the Debtors to assign the ISDA Agreement to, and thereby force Norton Gold to accept performance from, some unspecified third party pursuant to the terms of an order approving the Procedures Motion, if any.  Thus, Norton Gold explicitly reserves its rights to raise these issues upon any proposed assumption and assignment, and in the proper venue therefore.

objections are based on anything other than the fact that a proposed assignee or its proposed credit support provider do not have such threshold credit ratings, is unreasonable and strips counterparties of their rights to object to proposed assignees on potentially legitimate grounds after receipt of an Assignment Notice and revelation of the actual identity of such proposed assignees. *See* Procedures Motion ¶ 19(e). It is impossible for Norton Gold to know all of the potential bases for its objections to any alleged provision of adequate assurance, or any other objections it may have, concerning a particular proposed assignee until the identity of such assignee is known. Seeking to restrict the bases for objections based on adequate assurance at the time of an Assignment Notice and through the Procedures Motion, in effect removes Norton Gold's rights to effectively protect its interests and the benefit of its bargain as is intended by section 365(f)(2)(B) of the Bankruptcy Code which requires adequate assurance of future performance by such proposed assignee.

23.    Finally, even if the ISDA Agreement may be assumed and assigned, the Procedures Motion's 5-day notice provision is unreasonable. Norton Gold is an Australian company under an ISDA Agreement that is governed by English law that was negotiated outside the United States, and must be provided with sufficient time to seek further advice from counsel in the U.S. and in the U.K. and to formulate any objections thereto. Five business days is unreasonable and insufficient.

## The ISDA Agreement Cannot be Assigned

24.    Section 365 of the Bankruptcy Code gives a debtor-in-possession the power to assume, assume and assign, or reject certain executory contracts to which it is a party. 11 U.S.C. §§ 365(a) and (f). While not specifically defined in the Bankruptcy Code, the most widely accepted test for whether a contract is executory is the Countryman standard, which provides that an executory contract is one "under which the obligations of both the bankrupt and the other

party to the contract are so far underperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *In re Drexel Burnham Lambert Group, Inc.*, 138 B.R. 687, 704 (Bankr. S.D.N.Y. 1992) (citations omitted). *See also COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, 378 (2nd Cir. 2008) (recognizing the Countryman test).

25.    The ISDA Agreement is part of, and not divisible from, the larger overall Financing Transaction between Lehman and Norton Gold.  Indeed, it was such an integral part of the overall Financing Transaction that Lehman refused to provide financing to Norton Gold unless Norton Gold agreed to enter into the ISDA Agreement.  In turn, Norton Gold would not have entered into the ISDA Agreement unless Lehman agreed to secure and provide the required financing.  Thus, the ISDA Agreement is indivisible from the larger Financing Transaction and whether the contract is executory must be evaluated by reviewing the Financing Transaction as a whole.

26.    Multiple agreements may constitute a single transaction for purposes of application of certain provisions of the Bankruptcy Code, including section 365.  *See In re Mirant Corp.*, 327 B.R. 262, 267 (Bankr. N.D.Tex. 2005); *In re Karfakis*, 162 B.R. 729, 725 (Bankr. E.D.Pa. 1993) (stating that "[t]wo contracts which are essentially inseparable can be, and should be, viewed as a single, indivisible agreement between the parties.")  Specifically, bankruptcy courts recognize that certain agreements are indivisible under section 365 of the Bankruptcy Code and must be assumed or rejected as a whole.  *See Karfakis*, 162 B.R. at 725 (*citing In re Cole Bros.,* 137 B.R. at 651; *In re T & H Diner, Inc.,* 108 B.R. 448, 454 (Bankr. D.N.J. 1989); *In re Ritchey,* 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988); *Bistrian v. East Hampton Sand & Gravel Co., Inc.* (*In re East Hampton Sand & Gravel Co.*), 25 B.R. 193, 199

(Bankr. E.D.N.Y. 1982).  "One test used to determine whether separate contracts constitute an indivisible agreement is whether the parties assented to all of the promises as a single whole, so that there would have been no agreement whatever if any promise or set of promises were struck out."  *Karfakis*, 162 B.R. at 725.

27.    Under these circumstances, case law supports a finding that the ISDA Agreement in this case is not divisible from the Financing Transaction and whether the contract can be assumed and assigned must be evaluated by viewing whether the Financing Transaction, as a whole, can be assumed and assigned.  *See, e.g., In re Mirant Corp.*, 327 B.R. 262, 267 (Bankr. N.D. Tex. 2005).  As set forth below, the Financing Transaction is not executory and, therefore, neither it nor the ISDA Agreement can be assumed and/or assigned pursuant to section 365 of the Bankruptcy Code.

28.    As a general rule, loan agreements are not executory because no mutual obligations remain on the face of such agreements after the money has been loaned and the only remaining obligation is the remittance and payment of such money.  *See In re Calpine Corp.*, 2008 WL 3154763 *4 (Bankr. S.D.N.Y. 2008) (finding a loan agreement was not executory in nature because the only obligation remaining was repayment).  *See also In re Digicon, Inc.*, 71 Fed.Appx. 442 (5th Cir. 2003) ("A contract is not executory if the only performance required by one side is the payment of money.");  *In re Chateaugay Corp.*, 102 B.R. 335, 347 (Bankr. S.D.N.Y. 1989) (holding that obligations for the payment of money only are insufficient to make an agreement executory); H.R.Rep. No. 95-595, 95th Cong. 2d Sess. 347, reprinted in 1978 U.S. Code Cong. & Admin. News 6303-304 (The legislative history of the Bankruptcy Reform Act of 1978 states that a "note is not usually an executory contract if the only performance that remains is repayment.").

29.     Similarly, the Financing Transaction between Norton Gold and Lehman is not executory because the only remaining substantive obligation thereunder is for Norton Gold to pay back the funds borrowed pursuant thereto, in accordance with the terms of the agreements underlying the Financing Transaction (as such terms may be amended as a result of the ongoing renegotiation of such terms).  Each of the "obligations" remaining under the various documents which comprise the Financing Transaction are ordinary obligations attendant to the repayment of secured Notes and the required documentation in connection therewith, including without limitation, obligations of Lehman Australia as trustee under various trust documents and covenants for record-keeping.

30.     As such, to allow the Debtor to now carve the ISDA Agreement out from the larger, singular Financing Transaction would provide the Debtors with the inequitable ability to completely disregard the facts and circumstances giving rise to the ISDA Agreement.  The applicable case law does not support such an abuse of section 365 of the Bankruptcy Code.[13]  *See Lifemark Hospitals, Inc. v. Liljeberg Enters.* (*In re Liljeberg Enters.*), 304 F.3d 410, 445-46 (5th Cir. 2002).  As a result, the Norton Gold ISDA Agreement cannot be assumed and assigned pursuant to the Procedures Motion and must, at the very least, and given the facts of this particular situation, be carved out from the relief sought in the Procedures Motion.

**The ISDA Agreement is Subject to an Incurable Event of Default**

31.     Even assuming arguendo that the ISDA Agreement is a stand-alone agreement divisible from the larger Financing Transaction, the ISDA Agreement is subject to a continuing,

---

[13]  To the extent that when viewing the Financing Transaction as a whole, such overall transaction would be seen as executory given the obligations under the ISDA Agreement, which Norton Gold vehemently disputes, Norton Gold respectfully asserts that such transaction would not be covered by the Procedures Motion and therefore if the Debtors wish to seek to assume and assign the Financing Transaction, they would need to make a separate motion covering such agreement.

incurable Event of Default that would, on its own, render the ISDA Agreement incapable of assumption and assignment.

32.     Under Section 5(a)(iii) of the ISDA Agreement, an Event of Default by the Credit Support Provider under the Guarantee (or Credit Support Document) is an Event of Default under the ISDA Agreement.[14]  Under Section 5(a)(vii)(4)(A) of the ISDA Agreement, the filing of a bankruptcy by the Credit Support Provider, here LB Holdings, under chapter 11 of the Bankruptcy Code, is an express Event of Default under the ISDA Agreement.  Because the Credit Support Provider filed its petition for relief under chapter 11 of the Bankruptcy Code on September 15, 2008, and remains in bankruptcy, there is an on-going Event of Default under the ISDA Agreement.

33.     Under section 365(b) of the Bankruptcy Code, a debtor-in-possession cannot assume an executory contract that is in default unless, at the time of the assumption, the debtor-in-possession:

> (A) cures, or provides adequate assurance that the [debtor-in-possession] will promptly cure, such default . . . ; (B) compensates, or provides adequate assurance that the [debtor-in-possession] will promptly compensate, a party other than the debtor to such contract . . ., for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract.

11 U.S.C. § 365(b).

34.     However, if a default under an executory contract is not curable, and is material or causes "substantial economic detriment", a debtor cannot assume (or assign) such contract.  *In re New Breed Realty Enterprises, Inc.*, 278 B.R. 314, 321 (Bankr. E.D.N.Y. 2002) ("Where the

---

[14]  As previously mentioned, the bankruptcy filing of LBCC was a second, and separate Event of Default under the ISDA Agreement.

default is non-monetary and is not curable, the debtor is precluded from assuming an executory

contract only if the default was material or if the default caused "substantial economic

detriment."). Thus, the Event of Default caused by the filing of LB Holdings' bankruptcy, as an

expressly enumerated, material default under the ISDA Agreement, must be cured before the

ISDA Agreement can be assigned or before Norton Gold would be required to render any

performance thereunder. *See In re Liljeberg Enters.*, 304 F.3d 410 (5th Cir. 2002).

35.     Any reliance by the Debtors on section 365(b)(2) to avoid having to cure such

Event of Default as based on LB Holdings' bankruptcy filing prior to a proposed assignment of

the ISDA Agreement is misplaced. Specifically, section 365(b)(2) of the Bankruptcy Code

provides an exception to the fact that, with respect to a contract which the Debtor seeks to

assume or assign, the Debtor must first cure or provide adequate assurance that it will promptly

cure a default under the subject contract. *See* 11 U.S.C. § 365(b)(1)(A). While section 365(b)(2)

states that this requirement to cure such a default does not apply to a breach based on the

insolvency of "the debtor" or the commencement of a case under the Bankruptcy Code, that

exception refers specifically to the debtor who is counterparty to the contract being assumed (and

assigned). *See* 11 U.S.C. § 365(b)(2). It does not refer to a third party and an Event of Default

caused thereby which may be based on insolvency or the commencement of a bankruptcy case of

such third party.

36.     To the extent the Debtors are arguing in the Procedures Motion that such a default

is curable through the apparent assumption and assignment of the Credit Support Document to a

non-debtor entity, any such proposal or argument is both vague, at best, and unsustainable. First,

it is unclear from the Procedures Motion whether the Debtors will be seeking authority to assume

and assign credit support agreements relating to the Debtors' Derivative Contracts, and if so, how

and when this will occur.  Therefore, even if the Guarantee could be assigned under section 365, which Norton Gold disputes and applicable authority (as outlined below) does not support, the Debtors fail to provide any details of how they propose to assume and assign the Guarantee (or any similar or other credit support agreement).

37.    Even if the Debtors had outlined a procedure for assumption and assignment of the Credit Support Document, the fact remains that the Credit Support Document cannot be assumed or assigned because it is a guarantee, and guaranties are not executory contracts subject to assumption and assignment under section 365 of the Bankruptcy Code.  *In re Leibinger-Roberts, Inc.*, 105 B.R. 208, 213 (Bankr. E.D.N.Y. 1989) (*citing In re Unishops, Inc.*, 422 F.Supp. 75, 76 (S.D.N.Y. 1975), *aff'd*, 543 F.2d 1017 (2d Cir. 1976) (stating that "[a] guaranty agreement is not executory because it holds no future benefit for the guarantor."); *In re Grayson-Robinson Stores, Inc.*, 321 F.2d 500, 502 (2d Cir. 1963); *Van Dyk Research Corp. v. SCM Corp.* (*In re Van Dyk Research Corp.*), 13 B.R. 487 (Bankr. D.N.J. 1981).  Consequently, the ISDA Agreement is not assignable.

38.    In addition, if the ISDA Agreement is assigned, and the Credit Support Document is not assigned because it is not capable of assignment based on the foregoing, there will not only be a continuing Event of Default under the ISDA Agreement, as caused by the bankruptcy of LB Holdings, but there will be also be an additional Event of Default thereunder by reason of the failure of the Credit Support Document and the resulting "Credit Support Default" pursuant to Section 5(a)(iii) thereof which, as with the existing default attributable to LB Holdings bankruptcy, will not be capable of cure.

39.    Moreover, the Debtors may argue that precluding assumption of the ISDA Agreement based solely on the Event of Default caused by the bankruptcy filing of the Credit

Support Provider is against the policy behind Bankruptcy Code section 365. However, Norton Gold respectfully asserts that a holding that section 365 of the Bankruptcy Code prohibits the assumption and assignment of the ISDA Agreement, based on an incurable Event of Default thereunder, is appropriate in this instance. In *In re Liljeberg Enters.*, the Fifth Circuit reversed the district court's order granting the debtor's motion to assume a pharmacy agreement entered into as part of larger finance transaction. *Liljeberg*, 304 F.3d 410, 446 (5th Cir. 2002). The pharmacy agreement contained a cross-default provision that provided that a default of the other contractual agreements in the finance transaction, including a lease and collateral mortgage on the hospital, would constitute a breach of the pharmacy agreement. *Id.* at 441. Like the Event of Default provisions in the ISDA Agreement, the effect of the cross default provision in the *Liljeberg* case was that the condition of a party related to the operative agreement, and since it was involved in the overall, singular financing transaction, it could affect the parties' rights under the subject agreement in acknowledgement of the inter-connectedness of the relevant agreements and parties.

40.     In the *Liljeberg* case, the debtor argued that the cross-default provision should not be enforced under Bankruptcy Code section 365's prohibition on the enforcement of cross-default provisions where enforcement would restrict the debtor's ability to assume an executory contract. However, in evaluating the circumstances in *Liljeberg*, the Fifth Circuit found "ample support for the conclusion that the lease and collateral mortgage of the hospital are interrelated with the pharmacy agreement and that there would have been no pharmacy agreement without the lease of the hospital or the loan secured by the collateral mortgage." *Id.* at 445. Further, the court held that "[n]on-enforcement of the cross-default provision, providing that a default under the collateral mortgage or lease would collapse the pharmacy agreement, would thwart

Lifemark's bargain in agreeing to enter into the pharmacy agreement, all a part of the overall transaction to finance the building of the hospital through a loan secured by a collateral mortgage." *Id.*  As a result, the Fifth Circuit held that the district court erred in allowing the debtor to assume the pharmacy agreement, and held that assumption of the pharmacy agreement was barred pursuant to 11 U.S.C. § 365(b)(1)(A) due to the defaults under the collateral mortgage, which in turn resulted in an incurable default under the pharmacy agreement. *Id.* at 446.

41.     In this case, Norton Gold would not have entered into the ISDA Agreement had it not been a condition of obtaining financing from Lehman Australia and as part thereof, would not have agreed to the ISDA Agreement if LB Holdings did not act Credit Support Provider under the Guarantee.  The ISDA Agreement includes a provision that is similar to the cross-default provision in *Liljeberg*: that a bankruptcy filing by the Credit Support Provider constitutes an Event of Default under the ISDA Agreement.  Moreover, as stated above, the  bankruptcy filing by the Credit Support Provider, which caused the (first) Event of Default, is not governed by Bankruptcy Code section 365(b)(2) since that section only relates to the insolvency of the "debtor" – in this case, LBCC.  Thus, although the Credit Support Provider is a related entity, its bankruptcy filing is a unique Event of Default that cannot be cured prior to assigning the ISDA Agreement and is not a default which is excepted from the cure requirements of section 365(b)(1)(A).

42.     Further, "[i]t is clear law that an assignee steps into the shoes of the assignor and gains only that to which the assignor is entitled." *Bronx Entertainment, LLC v. St. Paul's Mercury Ins. Co.*, 265 F. Supp. 2d 359, 361 (*citing Int'l Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36 N.Y.2d 121, 365 N.Y.S.2d 808, 325 N.E.2d 137 (1975) ("It is elementary ancient law that an

assignee never stands in any better position than his assignor.  He is subject to all equities and burdens which attach to the property assigned because he receives no more . . . than his assignor.")).    An assignee is in no better or worse position than the assignor.  *Bronx Entertainment*, 265 F. Supp. 3d at 359.

43.    In essence, the procedures outlined in the Procedures Motion, to the extent approved, would require Norton Gold to become a party to the ISDA Agreement with an as yet unknown assignee: (a) while the Event of Default caused by the Credit Support Provider's bankruptcy remains uncured, and (b) who will likely seek superior rights to that of the assignor, LBCC, at the time of assignment.  As stated by the Debtors in paragraph 12 of the Procedures Motion, they seek to assign "in the money" contracts to third parties "for consideration that will provide realizable value to the estates."  Procedures Motion at ¶ 12.  Clearly, potential assignees would only be interested in purchasing and taking assignment of such Derivative Contracts so that they may collect on such "in the money" contracts that the Debtors otherwise cannot collect on.  Thus, an assignee in the case of the Norton Gold ISDA Agreement will likely endeavor to, and will be purchasing the right to endeavor to, seek to collect from Norton Gold.  However, under the ISDA Agreement LBCC is prohibited from collecting from Norton Gold due to the Event of Default caused by Credit Support Provider's bankruptcy filing.  The very purpose of the Procedures Motion is to place the assignees of the ISDA agreement in a better position than the Debtor-assignors are currently in, i.e. one that was not bargained for and is not contractually provided for.  Because this is contrary to applicable law, such an attempted act should be prohibited.

**The Proposed Adequate Assurance is Insufficient**

44.    In the Procedures Motion, the Debtors propose that ISDA counterparties will be deemed to have received adequate assurance of future performance by simply requiring that the

proposed assignee of the relevant Debtor, or its credit support provider, have a Standard & Poor's or Fitch rating equal to or higher than A- or Moody's rating equal to or higher than A3. *See* Motion at ¶ 19. To seek to limit Norton Gold's section 365(b) right to adequate assurance of future performance to the credit rating of the assignee overlooks, in this situation, the need for LBCC to prove that any assignee is able to provide adequate assurance that it can provide investment banking advice and continued financing in the Australian markets and with expertise in the gold mining and producing, and other metal industries.

45.    Norton Gold entered into the ISDA Agreement with Lehman because it was a global investment institution with a presence in Australia and with expertise in the gold mining and producing, and other metal industries which can and has continued to support Norton Gold under and pursuant to the larger on-going Financing Transaction. Therefore, adequate assurance, in this case, must include or take into account the proposed assignee's ability to deliver such services.

46.    Further, Norton Gold requires a counterparty able to undertake the collaborative role that Lehman (via Lehman Australia) was able to undertake – that is to enable the efficient and profitable operation of Norton Gold's business. No assurances can be given that an assignee chosen based solely on credit rating, would be able, either as a matter of skills or licensure, to undertake this or any of the other roles for which Norton Gold chose to transact with Lehman.

47.    Moreover, there is little disagreement that the current market conditions have shown that credit ratings may not be reliable indicators of a company's economic stability and are insufficient and inadequate to determine future performance.[15] *See, e.g.*, Staff of the Office

---

[15] The Securities and Exchange Commission published its report on the examination of select credit rating agencies. The ten month examination reported significant weaknesses in ratings practices and the need for remedial action by

(footnote continued)

of Compliance and Examinations Division of Trading and Markets and Office of Economic

Analysis, United States Securities and Exchange Commission, *Summary Report of Issues*

*Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* (July 2008)

http://www.sec.gov/news/studies/2008/craexamination070808.pdf.    In    these    circumstances,

ratings cannot be a sufficient guarantee to Norton Gold that future and imminent bankruptcy

related Events of Default would not occur with a new assignee or that Norton Gold could

otherwise be adequately assured.

48.    The Bankruptcy Code does not define "adequate assurance," but courts have

concluded that "Congress intended that the words 'adequate assurance' be given a practical

pragmatic construction . . . to be determined under the facts of each particular case." *In re*

*Bygaph, Inc*., 56 B.R. 596, 605 (Bankr. S.D.N.Y. 1986); *In re Natco Industries, Inc*., 54 B.R.

436, 440 (Bankr. S.D.N.Y. 1985); *In re Sanshoe Worldwide Corp.*, 139 B.R. 585, 592 (S.D.N.Y.

1992); *See also In re Lafayette Radio Electronics Corp.*,  9 B.R. 993, 998 (Bankr. E.D.N.Y.

1981) ("What constitutes adequate assurances of performance depends upon the factual

conditions present, and must be determined on a case by case basis.").  The legislative history of

section 365 of the Bankruptcy Code notes that the phrase "adequate assurance of future

performance" was borrowed from Article 2 of the Uniform Commercial Code.  H.R. No. 93-137,

93d Congress, 1st Sess. Pt. II p. 156-57 (1973).

49.    Accordingly, Article 2 of the Uniform Commercial Code provides that "adequate

assurance" is "necessary where the counter-party has reasonable grounds for insecurity with

---

the ratings agencies.  Staff of the Office of Compliance and Examinations Division of Trading and Markets and
Office of Economic Analysis, United States Securities and Exchange Commission, *Summary Report of Issues
Identified in the Commission Staff's Examinations of Select Credit Rating Agencies* (July 2008)
http://www.sec.gov/news/studies/2008/craexamination070808.pdf.

respect to the debtor's ability to fully perform its obligations under the contract." *In re Metromedia Fiber Network, Inc.*, 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005). Thus, "[t]he requirement [of adequate assurance] is based on a recognition that an essential element of any contract is performance, not merely the right to win a lawsuit, and that a continuing sense of reliance and security that the promised performance will be forthcoming when due, is an important feature of the bargain'" *In re Metromedia Fiber Network, Inc*., 335 B.R. 41, 50 (Bankr. S.D.N.Y. 2005) (quoting Uniform Commercial Code § 2-609, Comment 1 (2003)).

50.    In the case of Norton Gold and Lehman, it was essential to the overall Financing Transaction, and therefore the ISDA Agreement as part thereof, that the Lehman entities involved in the instant transactions were part of a global investment institution with a presence in Australia and with expertise in the gold mining and producing, and other metal industries.  As such, any replacement counterparty must provide adequate assurance that it has similar characteristics in the form of "a continuing sense of reliance and security that the promised performance will be forthcoming when due."  *Id*.  The Procedures Motion does not even assert any such assurances for the benefit of Norton Gold.  Accordingly, the "adequate assurance" proposed in the Procedures Motion is insufficient and does not comply with applicable law as to Norton Gold and the ISDA Agreement.

51.    In addition, the Debtors propose to restrict the bases upon which the ISDA counterparties may pose objections based on adequate assurance after receipt of an Assumption Notice, through the proposed procedures therefor.  Procedures Motion at ¶ 19(e).  This proposal is patently unreasonable, premature and is intended to strip the counterparties' rights under the Bankruptcy Code to demand and receive adequate assurance under their particular circumstances and once they are provided with the identity of the proposed assignee.  As stated above, what

will be sufficient to satisfy the requirement for adequate assurance of future performance under section 365(f) of the Bankruptcy Code is a fact specific inquiry which cannot be addressed without all the information on the proposed assignee first being known.  As such, and at the very least, the ISDA counterparties' rights to object on all grounds as to the identity of the proposed assignee and based on the rights provided by the Bankruptcy Code should be preserved under all circumstances.

## **The Proposed Notice Procedure Is Unreasonable**

52.     In addition, the Debtors' proposal to only provide counterparties with five business days' notice to object to any proposed assignees of derivative contracts, is unreasonable as to Norton Gold.

53.     Such a limited notice period is unreasonable and unduly burdensome on Norton Gold for a number of reasons.  Once Norton Gold is given notice of any proposed assignee, Norton Gold should be given sufficient time to evaluate the proposed assignee, consult the necessary counsel and prepare an objection, if necessary.  Any objection must include "defaults or termination events" that Norton Gold believes must be cured, which requires analysis.  The limited timeframe of five days to complete these tasks is unreasonable.  This difficulty is compounded by the fact that Norton Gold is an Australian company based in Australia, and the contract is governed by UK law.  In sum, any order establishing such a limited notice period for the assumption and assignment of the ISDA Agreement is inadequate.  Therefore, Norton Gold respectfully proposes that if the Procedures Motion is granted over Norton Gold's Objection, it be provided a period of not less than 20 business days to object to any specific proposed assignee.

## Conclusion

WHEREFORE, Norton Gold respectfully requests that the (a) Court deny the

Procedures Motion as to Norton Gold's ISDA Agreement, or (b) in the alternative, provide a

specific carve-out excepting the Norton Gold ISDA Agreement from the application of the relief

requested in the Procedures Motion to the extent approved by the Court, and (c) granting such

other and further relief as the Court may deem just and proper.


Dated:  New York, New York
        November 28, 2008

**SHEPPARD MULLIN RICHTER & HAMPTON LLP**

By:   /s/ Malani J. Cademartori
Malani J. Cademartori (MS 3882)
Edward H. Tillinghast, III (ET 5566)
30 Rockefeller Plaza, 24th Floor
New York, New York 10112
Tel: (212) 332-3800

*Attorneys for Norton Gold Fields Limited*