**Hearing Date and Time: December 3, 2008 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time: November 28, 2008 at 4:00 p.m. (Prevailing Eastern Time)**

MOSES & SINGER LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Alan E. Gamza (AG-2014)
Christopher J. Caruso (CC-8005)
Tel: (212) 554-7800

-and-

MULLEN HOLLAND & COOPER P.A.
Mark Heavner
301 South York Street
Gastonia, North Carolina  28052
Tel: (704) 864-6751

*Co-counsel to Gaston Christian School, Inc.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., et al., ) | |
| ) | Case No. 08-13555 (JMP) |
| Debtors. ) | |
| ) | Jointly Administered |
| ) | |

**OBJECTION OF GASTON CHRISTIAN SCHOOL, INC. TO DEBTORS'
MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE
BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR SETTLEMENT OR
ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

Gaston Christian School, Inc. ("GCS"), a counterparty to an interest rate swap with

Lehman Brothers Special Financing Inc. ("LBSF"), by and through its undersigned counsel,

objects to the Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to

Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative

Contracts (the "Motion") filed by the above-captioned debtors and debtors in possession

(collectively, the "Debtors").  In support of this Objection, GCS respectfully represents as

follows:

## BACKGROUND

1.      GCS is a not-for-profit North Carolina corporation that operates a non-denominational Christian school that provides education for children from pre-school up to and through high school.

2.      On or about October 24, 2007, GCS and LBSF, one of the Debtors, entered into a 1992 ISDA Master Agreement (Local Currency-Single Jurisdiction) as supplemented by the Schedule (the "Schedule") and Credit Support Annex ("Annex", and together with the Master Agreement and the Schedule, the "Swap Agreement").  In addition, the obligations of LBSF under the Swap Agreement are unconditionally guaranteed (the "Guarantee") by the lead Debtor, Lehman Brothers Holdings Inc. ("LBHI").  A true and correct copy of the Swap Agreement and Guarantee are annexed hereto as Exhibit "A".

3.      On or about September 15, 2008, and October 3, 2008, respectively, LBHI and LBSF filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      Shortly after the bankruptcy filings, GCS sent a letter to LBSF notifying it, *inter alia,* of the occurrence of events of default under the Swap Agreement because of LBSF's and LBHI's bankruptcy filings and expressly preserving its right to terminate the Swap Agreement (the "Letter").  A true and correct copy of the Letter is attached hereto as Exhibit "B".

5.      On or about November 13, 2008, the Debtors filed the Motion.

## SUMMARY OF OBJECTION

6.      The relief requested in the Motion, relating to the assumption and assignment of derivative contracts, violates the express provisions of the Bankruptcy Code.  After its entry, the fifth decretal paragraph of the Order would in effect prevent a counterparty from terminating a

733062                                          2

derivative contract while the Debtors seek an assignee.  The Debtors are seeking to strip the

rights of non-Lehman counterparties ("Counterparties" or "Counterparty") under sections 362,

365 and 560 of the Bankruptcy Code to terminate (the "Safe Harbor Provisions") while giving

themselves an indefinite amount of time to seek assignees for their contracts by requesting this

Court to effectively find, *inter alia,* that such Counterparties have waived their right to terminate.

Moreover, the Debtors seek to assign derivative contracts that are not assignable under section

365 of the Bankruptcy Code.  The Court should not accept the Debtors' invitation to disregard

the express provisions of the Bankruptcy Code and should deny the Motion.

I.      **THERE HAS BEEN NO WAIVER BY GCS OF THE SAFE HARBOR PROVISIONS**

7.      GCS was under no obligation either contractually or pursuant to the Bankruptcy

Code to determine whether it would terminate the Swap Agreement based on the bankruptcy

filings within a specified time period and certainly not within the short time period that has

elapsed since the bankruptcy filings.

8.      However, the Motion seems to be predicated upon the premise that Counterparties

such as GCS have waived their rights under the Safe Harbor Provisions because they have not

yet terminated their derivative contract based on the bankruptcy filings.  There is no authority to

support finding a blanket waiver by all Counterparties of their right under the Safe Harbor

Provisions to terminate derivative contracts on the bankruptcy filings of LBSF and LBHI simply

because Counterparties have not yet terminated the derivative contract.

9.      The Debtors cite no authority for the premise that a Counterparty waives its rights

under the Safe Harbor Provisions by not acting within a specified time period.[1]  The Safe Harbor

---

[1]      Those courts that have found that a counterparty is not entitled to the Safe Harbor Provisions to the
automatic stay have done so because the actions taken were not grounded upon one of the three *ipso facto* clauses
contained in section 365(e)(1) of the Bankruptcy Code.  *See, e.g., In re Enron Corp.*, 306 B.R. 465, 474 (Bankr.
S.D.N.Y. 2004) (holding that the initiation and continued prosecution of a state court action concerning the

Provisions set no time limit for exercising the rights provided therein and expressly prohibit the

Court from doing so.

10.     The only case we are aware of that discusses whether a counterparty waived its

rights under the Safe Harbor Provisions because it failed to act on a timely basis held that such

rights were *not* waived. *In re Mirant Corp.*, 314 B.R. 347, 353 (Bankr. N.D. Tex. 2004).  In

*Mirant*, the debtor entered into a swap agreement with a counterparty and subsequently filed for

bankruptcy.  Seven weeks after the bankruptcy filing, the counterparty sought to terminate the

swap agreement because of a ground specified in section 365(e)(1) (the debtor's filing) and

pursuant to sections 362(b)(17) and 560 of the Bankruptcy Code.  In response, the debtor moved

for an order enforcing the automatic stay and prohibiting the counterparty from terminating the

swap agreement on the grounds (i) that sections 362(b)(17) and 560 are only applicable if the

termination is in response to and is solely motivated by a bankruptcy filing (as alleged by the

debtor, the counterparty's delayed termination was motivated by economic reasons and not

because of the debtor's filing), and (ii) the counterparty's calculation of its exposure under the

swap agreement and its offer to buy-out the debtor from that contract constituted a waiver of that

counterparty's rights under section 362(b)(17) and 560 of the Bankruptcy Code pursuant to the

terms of a final order, which provided that a counterparty who enters into a transaction with the

debtor post-petition waives its rights under such sections.  The court expressly rejected both

arguments holding, in part, that a counterparty's motivation for delaying to exercise its rights

under sections 362(b)(17) and 560 of the Bankruptcy Code was irrelevant so long as the

termination of the swap agreement was because of the debtor's bankruptcy filing.  The court

---

consequences of terminating a derivative contract was not exempt from the automatic stay under section 560
because the relied upon ground was not specified in section 365(e)(1)); *In re Amcor Funding Corp.*, 117 B.R. 549
(D. Ariz. 1990) (denying the protections of the safe harbor exceptions because the expressly stated ground for
terminating the derivative contract was not one of the grounds specified in section 365(e)(1)).

733062                                          4

found that by calculating its exposure under the swap agreement and shopping the transaction the

counterparty's conduct did not constitute a waiver of its rights under sections 362(b)(17) and 560

of the Bankruptcy Code.

11.     Waiver is an intentional relinquishment of a right.  Absolutely no basis exists here

to find that GCS intentionally relinquished its right to terminate the Swap Agreement.  On the

contrary, GCS specifically reserved the right to terminate the Swap Agreement in the Letter.

12.     There is nothing in the Bankruptcy Code that places a limit on the amount of time

a counterparty may take to assess the effects of a debtor's bankruptcy and other relevant factors

so that it can properly determine whether or not to terminate.[2]

13.     GCS has the contractual right to terminate the Swap Agreement because of these

bankruptcies.  In fact, the Safe Harbor Provisions provide that such right cannot be limited "by

operation of any provisions of this title or by order of a court . . . in any proceeding under this

title."  11 U.S.C. § 560.  However, that is exactly what the proposed procedures seek to have this

Court do and as a result, the Motion must be denied.[3]

## II.     THE SWAP AGREEMENT IS NOT ASSIGNABLE

14.     Without any discussion, the Motion assumes that all derivative contracts,

including the Swap Agreement, are executory contracts subject to the assumption and

assignment provisions of section 365 of the Bankruptcy Code.  However, where, as here, the

---

[2]     To the extent the Debtors contend, despite *Mirant*, that the Counterparties' motivation for terminating (as opposed to legal grounds for terminating) a derivative contract are relevant, GCS would dispute that. But, in any case, this Court cannot do what the Debtors demand which is enter a blanket order on no evidentiary record finding, in effect, that all Counterparties who would terminate a derivative contract hereafter are acting based on improper motivation.

[3]     Nothing in the proposed procedures would require LBSF to perform its obligations under the Swap Agreement while it is seeking to assign that agreement. Thus, if the proposed procedures were approved, GCS (as well as any other Counterparty to other derivative contracts) would be precluded from terminating the Swap Agreement pursuant to its terms via the Safe Harbor Provisions even if as a result of its bankruptcy a Debtor fails to keep performing it obligations under the derivative contract. Fairness dictates that if a counterparty's right to terminate based on the bankruptcy filing is restricted, the Debtors should be required to perform their obligations under the Swap Agreement while they decide whether to assign that agreement.

only remaining obligation is the payment of money, section 365 does not apply. *South Chicago Disposal, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 130 B.R. 162, 165-66 (Bankr. S.D.N.Y. 1991); *see also In re Spectrum Information Technologies, Inc.*, 190 B.R. 741, 747 (Bankr. E.D.N.Y. 1996). The only material obligation under the Swap Agreement is each party's obligation to pay the other money on a monthly basis depending on the relevant applicable interest rate. Accordingly, the Swap Agreement is not an executory contract that the Debtors can assume and assign.

III.     <u>**NOT ONLY DO THE DEBTORS SEEK TO PREVENT COUNTERPARTIES FROM EXERCISING THEIR CONTRACTUAL RIGHTS PROTECTED BY THE SAFE HARBOR PROVISIONS AND TO ASSIGN CONTRACTS THAT ARE NOT ASSIGNABLE AND THE PROPOSED PROCEDURES ARE UNFAIR AND DO NOT SATISFY THE REQUIREMENTS OF SECTION 365 OF THE BANKRUPTCY CODE**</u>

15.     The Debtors have the burden of demonstrating adequate assurance of future performance by an assignee as a condition precedent to assignment. 11 U.S.C. § 365(b)(1)(C). However, the proposed procedures seek to relieve the Debtors of this burden by deeming them to have satisfied the adequate assurance of future performance requirement by merely showing that an assignee satisfies the credit rating requirements contained therein. Those credit rating requirements are illusionary because a satisfactory rating could be any rating level if the assignee is not qualified. The Debtors' requested credit ratings should not be the sole factor in determining whether the Debtors have satisfied their burden of demonstrating adequate assurance of future performance. For the reasons set forth below, the Debtors must be required to demonstrate significantly more than what they seek to do in order for this Court to find adequate assurance of future performance by an assignee.

733062           6

A.    **LBSF Should Not Be Permitted To Assign The Swap Agreement
To A Party That Does Not Satisfy The Threshold Credit Rating
<u>Requirements In The Swap Agreement.</u>**

16.    The Swap Agreement is premised upon the creditworthiness of LBSF and LBHI. To that end, pursuant to Part 1(g) of the Schedule, LBSF and LBHI are required to maintain certain credit ratings as determined by Moody's or S&P, but not Fitch.  However, the Debtors' proposed procedures will permit the Debtors to assign the Swap Agreement without the consent of the Counterparty so long as the assignee has a certain credit rating as determined by either Moody's, S&P or Fitch.  Fitch was expressly excluded from the Swap Agreement.  The proposed procedures would also allow LBSF to assign the Swap Agreement to a non-qualified assignee, an entity whose credit rating could be well below the threshold requirements, without providing GCS with any financial information about it.  In that event, GCS would have a mere five days to obtain and assess the creditworthiness of the unqualified assignee.

17.    Like many derivate contracts, the specified credit ratings were hand-tailored to the Swap Agreement and form an integral part of the consideration given in connection therewith.  It was those credit ratings that were determined to be appropriate in analyzing the creditworthiness of the Debtors.  There is no reason whatsoever to permit an assignee to have a credit rating below the ratings specified in the Swap Agreement.

B.    **Assignment Should Be Conditioned On Execution
<u>Of An Appropriate Replacement Guaranty.</u>**

18.    The Debtors also seek to assign the Swap Agreement and their other derivative contracts without replacing LBHI's now worthless guarantee.  A significant part of the consideration bargained for by GCS was the Guarantee from LBHI of LBSF's performance under the Swap Agreement.  As a result, LBHI's bankruptcy filing is a separate and independent event of default under the Swap Agreement that permits GCS to terminate that agreement.  The

Debtors' however seek to preclude GCS from terminating the Swap Agreement in the future based on LBHI's bankruptcy filing notwithstanding that LBSF will not be obtaining an appropriate replacement guarantee. It is not only reasonable but necessary that the Debtors be required to provide a replacement guarantor as a condition precedent to finding adequate assurance of future performance of the assignee when the derivative contract required a guarantor of the Debtors' obligations thereunder. Without this requirement GCS would be forced into the untenable position of taking on greater exposure by having to rely upon the creditworthiness of one party when it had bargained for the creditworthiness of two parties.

C.      **LBSF Should Not Be Permitted To Assign
        The Swap Agreement To An Offshore Entity.**

19.     The proposed procedures would permit LBSF to assign the Swap Agreement to an offshore entity without any further adequate assurance of that foreign entity's performance thereunder so long as that entity's credit rating satisfied the requirements in the proposed procedures. LBSF can assign the Swap Agreement to such offshore entity without so much as identifying it or providing any financial information about it to GCS. This cannot be the standard by which to determine adequate assurance of future performance of the assignee.

20.     Assigning the Swap Agreement to an offshore entity outside the jurisdictional reach of the U.S. Courts, particularly in these extraordinary times, dramatically changes the risk calculus of the Swap Agreement. Assigning the Swap Agreement to an offshore entity will create severe issues for GCS with another third party in connection with a separate but related transaction and can ultimately destroy any economic benefit GCS sought to obtain by entering into the Swap Agreement and the related transaction. This is precisely why GCS intentionally avoided entering into a derivative contract with an offshore entity that is outside the jurisdictional reach of the U.S. Courts and subject to its sovereign's laws.

733062                                        8

## IV.   REASONABLE PROCEDURES

21.     In the event that the Debtors' are authorized to assign the Swap Agreement, the procedures must be modified to address the following:

(a)     As a condition precedent to the Debtors assumption and assignment of a derivative contract, the Debtors must be required to perform their obligations under the contract while they pursue assignment.  During this time, changes in the market could create obligations on the part of the Debtors to make payments or post collateral.

(b)     Counterparties must be permitted to terminate at anytime until the Court approves an assignment or, alternatively, a short time limit must be placed on the Debtors' right to assign.

(c)     Counterparties must be entitled to completely contest any proposed assignment, including, but not limited to, asserting that their derivative contract is not an assignable executory contract and that their right to terminate because of the bankruptcy filings has not been waived.

(d)     In order to provide the counterparty with the benefit of their bargain, the procedures must require an assignee to satisfy the threshold rating requirements by the appropriate agency as stated in the governing documents.

(e)     The proposed procedures must prohibit the Debtors' from assigning a derivative contract to an offshore entity when contracting with such entity was intentionally avoided when the parties originally entered into the derivative contract.

(f)     When the derivative contract was guaranteed by another Lehman entity, the Debtors must be expressly required to find an appropriate replacement guarantor.  In the

733062                                           9

event the Debtors produce a replacement guarantor, that guarantor should be to the

Counterparty's satisfaction, whose consent cannot be unreasonably withheld.

(g)     Finally, the Counterparty should be given the right to object to a proposed

replacement guarantor to the same extent that they can object to the primary assignee.

22.     GCS reserves all of its rights with respect to the Swap Agreement, including, but

not limited to, that any assignment of that contract must be subject to all of the express terms and

conditions provided therein.  GCS also reserves the right to supplement this Objection.

### CONCLUSION

GCS respectfully requests that the Court deny the Motion or, in alternative, modify the

requested procedures as set forth in this Objection and that it provide GCS with such other and

further relief as it deems just and proper.

Dated: November 28, 2008
        New York, New York

MOSES & SINGER, LLP

By:    /s/ Alan E. Gamza
        Alan E. Gamza (AG-2014)
        Christopher J. Caruso (CC-8005)
        The Chrysler Building
        405 Lexington Avenue
        New York, NY 10174
        (212) 554-7800

-and-

MULLEN HOLLAND & COOPER P.A.
Mark Heavner
301 South York Street
Gastonia, North Carolina  28052
(704) 864-6751

Co-counsel to Gaston Christian School, Inc.

733062                                        10