Hearing Date: December 3, 2008 at 10:00 a.m.
Objection Deadline: November 28, 2008 at 4:00 p.m.

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
Bradley P. O'Neill (BO-5832)
Jonathan M. Wagner (JW-7197)
Dana L. Post (DP-3889)

Attorneys for York Capital Management, L.P.

**IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC., et al. | ) Chapter 11 |
| | ) |
| | ) Case No. 08-13555 |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) |

**YORK CAPITAL MANAGEMENT, L.P.'S OBJECTION TO
DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365
OF THE BANKRUPTCY CODE APPROVING THE
ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

York Capital Management, L.P. ("York Capital"), by its attorneys Kramer Levin Naftalis & Frankel LLP, respectfully objects to Debtors' Motion For An Order Pursuant To Section 365 Of The Bankruptcy Code Approving The Assumption Or Rejection Of Open Trade Confirmations (the "Motion").

**Preliminary Statement**

Prior to the bankruptcy filing by Lehman Commercial Paper Inc. ("LCPI"), LCPI and York Capital had been negotiating the terms of an agreement pursuant to which York Capital would purchase, in a single transaction, a portfolio owned by LCPI and one of its affiliates of

1

distressed bank debt consisting of seventeen European companies in the aggregate face amount of approximately U.S. $440 million. York Capital repeatedly made clear to LCPI, and both parties understood throughout the negotiations, that the proposed transaction under consideration was a "portfolio trade" and was not severable into separate sub-transactions for individual borrower names. As part of those negotiations, LCPI sent York Capital a portfolio on which it invited York Capital to bid. York Capital then sent LCPI a bid list dated September 11, 2008 for LCPI's review. Ultimately, LCPI and York Capital were unable to agree on all the material terms of the proposed transaction including, among other things, the structure of the proposed transaction, the type of transfer to occur, and the closing date. The parties were still negotiating the terms of the proposed transaction when Lehman Brothers Holdings Inc. filed for bankruptcy.

By this Motion, LCPI seeks to foist upon York Capital a purported contract that was never entered into. LCPI also purports to sever the purported transaction – accepting some pieces of the proposed transaction while rejecting others – in clear contravention of the parties' intent that the proposed transaction be a package deal and not severable into separate transactions. Finally, because the purported contract was not intended to be severable, LCPI's intentional "cherry picking" of pieces of the proposed contract that it wishes to assume while rejecting other pieces violates Section 365 of the Bankruptcy Code.

Accordingly, the Motion as to York Capital should be denied in its entirety.

## FACTS

**A.    Trading of Distressed Debt**

Debt that is said to trade "distressed" is debt which is or is perceived to be in some degree of financial distress that would impair the prospects of full and timely repayment. In contrast, "par" debt is indebtedness that is expected to be paid in full and on a timely basis. Distressed debt transactions involve significantly more documentary protection than par trades because of

2

the distressed nature of the debt. The Loan Syndications and Trading Association, Inc. ("LSTA") and the Loan Market Association ("LMA"), whose members include participants in the market for corporate loans and other similar private debt, periodically promulgate standards and documentation to guide the distressed debt trading market and influence industry customs.

Generally, trades of distressed loans begin as oral negotiations between the parties. After due diligence is conducted by the potential buyer, if the trade is to go forward the material terms of the transaction, including among other terms the debt, price and settlement terms, would be agreed to orally by the parties and confirmed with a fully-executed written trade confirmation evidencing the material terms of the transaction. Trades are not consummated and settled, however, until the parties execute a purchase and sale or similar agreement, a lengthy agreement which contains extensive representations, warranties, covenants, indemnifications, and other standard or negotiated provisions.

Pursuant to LSTA and LMA guidelines, the suggested time-frame for parties to settle a distressed debt transaction is twenty business days after the Trade Date. The LMA provides that if no settlement date is specified, the seller and buyer shall use reasonable endeavors to settle the transaction "as soon as reasonably practicable."

### B. Prepetition Negotiations Between LCPI And York Capital

York Capital is a Delaware limited partnership which trades, among other instruments and claims, distressed debt. Around August 1, 2008, York Capital contacted LCPI to see if LCPI wished to sell any blocks of distressed debt to York Capital to free up capital for LCPI's trading books before year-end. LCPI expressed interest in selling such debt to York Capital and, on August 27, 2008, LCPI provided York Capital with a potential portfolio of debt LCPI desired to sell. York Capital thereafter devoted substantial time conducting due diligence on that portfolio.

3

KL3 2687460.7

1. <u>York Capital sends LCPI a draft bid list</u>

On September 11, 2008, York Capital sent LCPI a bid list (the "Bid List") which included the debt to be traded, the amount of the debt to be traded, and York Capital's bid on the debt. The Bid List, which did not contain a closing date, encompassed multiple tranches of debt (*i.e.*, mezzanine loans and revolving credit commitments) for seventeen companies which York Capital had analyzed as a whole in conducting its due diligence on the proposed transaction. York Capital made clear to LCPI, and both parties understood throughout the negotiations, that the proposed transaction under consideration was a package deal and was not severable into separate transactions. Indeed, the only reason York Capital was willing to consider including in the proposed transaction certain tranches of debt that were less desirable to it was because, as part of the give and take of the negotiations, LCPI insisted that York Capital take those loans in exchange for proposed loans that York Capital believed were desirable.

After receiving the Bid List, LCPI sent initial drafts of trade confirmations (the "Draft Trade Confirmations") to York Capital containing standard LMA provisions for distressed bank debt trades. The Draft Trade Confirmations contained a blank signature block for both parties to execute when they had finally come to agreement.

2. <u>The parties fail to reach agreement on material terms of the proposed transaction</u>

On or about September 18, 2008, York Capital relayed two critical comments to LCPI concerning material terms of the structure of the proposed transaction. Both comments were designed to prevent the proposed transaction from being caught up in the affairs of the estate in the event LCPI filed for bankruptcy. York Capital was aware of LCPI's deteriorating financial condition at the time and therefore a prompt closing was of critical importance to York Capital so that it could avoid any delay in closing the proposed transaction that would be occasioned by a potential bankruptcy filing by LCPI.

First, York Capital proposed that Section 5 of the LMA Trade Confirmations (Distressed/Bank Debt) be modified to have the "Buyer" be "York or its designated fronting bank." This change was necessary to permit York Capital to designate a qualified bank to be the purchaser of the bank loans (i) if tax issues prohibited York Capital from becoming a direct lender or (ii) to facilitate a prompt closing which might be delayed if an agent's and/or a borrower's approval were delayed.

Second, York Capital informed LCPI that the proposed transaction was conditioned upon LCPI's agreement that (i) the proposed transaction be effectuated on or before December 15, 2008, and (ii) the form of transfer of the loans be "by assignment only" and that Clause 5.2 of the LMA Trade Confirmations proposed by LCPI be deleted in its entirety. Without such deletion, if York Capital (or its designee) were unable to be approved as a direct assignee of LCPI with respect to any of the loans, the LMA Standard Terms and Conditions would require York Capital to purchase such loans on the basis of the "LMA recommended form of funded participation of distressed trades." Such form of funded participation would expressly create a debtor-creditor relationship between York Capital and LCPI, thereby denying York Capital certain rights and benefits conferred by Section 541(d) of the Bankruptcy Code. In light of the unfolding credit crisis, a funded participation was unacceptable to York Capital.

To that end, York Capital required the deletion of Section 10 of the LMA Trade Confirmations (Distressed/Bank Debt) in its entirety to be replaced with:

> Section 10.  Form of Purchase:
>
> Legal Transfer only, using Transfer Certificate in form prescribed by the Credit Agreement. The parties agree to use best efforts to effectuate a Legal Transfer as promptly as practicable. If a Legal Transfer cannot be effected on or before December 15, 2008, the obligations of Seller and Buyer hereunder shall terminate and be of no force or effect. Without limiting the generality of any of the foregoing, Clause 5.2 of the LMA Standard Terms and Conditions

5

for Distressed Trade Transactions (Bank Debt/Claims) shall be deemed deleted in its entirety.

Representatives of York Capital and LCPI intended to speak again to attempt to resolve outstanding issues and to address York Capital's comments. However, the discussion never occurred in light of the bankruptcy petition filed by Lehman Brothers Holdings on September 15, 2008 and, reflecting the absence of a meeting of the minds, the Draft Trade Confirmations were never finalized or executed. The parties did not engage in any further negotiations concerning the Draft Trade Confirmations between September 15 and October 3, when LCPI filed for bankruptcy, nor have they engaged in any discussions since that time.

3. The LCPI stipulation and purported acceptance of only certain portions of the aborted transaction

On October 17, 2008, LCPI filed a stipulation with the Bankruptcy Court requiring LCPI to notify all parties to open trades by November 7, 2008 whether it would assume, assume and assign, or reject open trades (the "Stipulation"). LCPI agreed to file the Stipulation in response to a motion filed by parties to open trades with LCPI seeking an order compelling LCPI to assume or reject the open trades because "absent the requested relief, the Movants will be in the position of having to wait an undefined and potentially extended period of time for LCPI to determine whether it wishes to assume or reject the Trade Confirmations after which point LCPI will only assume those Trade Confirmations in which it is 'in the money' *i.e.*, market prices have moved in a direction favorable to LCPI and unfavorable to the applicable Movant, and reject those Trade Confirmations in which it is 'out of the money', *i.e.*, market prices have moved in direction unfavorable to LCPI and favorable to the applicable Movant." This Court "So Ordered" the Stipulation on November 5, 2008.

On November 7, 2008, LCPI notified York Capital that it had purported to accept a portion of the proposed transaction consisting of tranches of loans of eight of the seventeen

6

companies at issue. One of the six purported loans accepted by LCPI (with respect to debt of ASPropulsion Capital B.V.) contained a purchase price that was materially different from the price for the loan discussed by the parties. LCPI also notified York Capital that it was rejecting a portion of the proposed transaction relating to a loan held by Lehman Brothers Bank AG ("LBBAG"), a German affiliate of LCPI, with respect to debt of First Chemical (BORSODCHEM), even though this potential asset is being administered in Germany as part of the assets of LBBAG.

In the current Motion, filed by LCPI on November 16, 2008, LCPI requests an order pursuant to Section 365(a) of the Bankruptcy Code approving either the assumption, rejection, or modification of the trades listed in exhibits attached to the Motion. With respect to these trades, LCPI represents that its "prepetition trades were reflected in various oral and written trade confirmations" and that "each Trade Confirmation represented a binding agreement to purchase or sell positions in par or distressed loans." (Motion at 3). LCPI also seeks an order that no Counterparty shall be entitled to "assert or take any act to exercise a right to set off any prepetition claim that it might have against either Debtor, including, without limitation, claims for damages arising from the rejection of a Rejected Trade, against any obligation to the Debtors under any Assumed Trade or Amended Trade." (Motion at 6).

With respect to York Capital, LCPI in the exhibits attached to the Motion indicates that it seeks to (i) accept the sale of only certain tranches of loans connected with eight of the seventeen borrowers at issue, and (ii) reject tranches of the proposed transaction relating to a loan held by LBBAG, constituting one borrower. LCPI in its Motion has failed to give any notice as to whether it would accept or reject the other loans or tranches of debt encompassed in the proposed transaction.

7

## ARGUMENT

LCPI's Motion should be denied on any one of a number of independent grounds.

*First,* because there was no meeting of the minds between the parties concerning the proposed transaction, no enforceable agreement for the sale of the loans exists. The parties never executed or even finalized the Draft Trade Confirmations, precisely because the parties had not reached an agreement on material terms concerning the structure of the proposed transaction. In addition, the parties disputed the closing date of the proposed transaction. The failure to execute the Draft Trade Confirmations establishes that the parties neither had a meeting of the minds on all material terms, nor did they intend to be bound by the un-executed Draft Trade Confirmations.

*Second,* and related, that LCPI has purported to sever the proposed transaction at issue, accepting the sale of some loans while rejecting others even though the parties clearly viewed the potential transaction as an all-or-nothing package deal, highlights that there was no meeting of the minds. LCPI has further violated the terms of the Stipulation by failing to state whether it would accept or reject the entire proposed transaction.

*Third,* even if there were somehow an enforceable agreement between York Capital and LCPI, LCPI cannot assume some aspects of the supposed contract and reject other aspects. The proposed transaction under consideration was a package deal, and thus under the Bankruptcy Code, LCPI cannot sever the proposed transaction and use hindsight to its advantage by cherry picking those portions of the portfolio that LCPI determines to be "in the money."

## I.

## No Contract Exists Because
## There Was No Meeting Of The Minds

Section 365(a) of the Bankruptcy Code empowers a debtor in possession, "subject to the court's approval, [to] assume or reject any executory contract or unexpired leases of the debtor." 11 U.S.C. § 365(a). A debtor, however, can accept a contract under this section only if there was in fact a contract in existence as of the commencement of the bankruptcy case. *See In re III Enterprises, Inc. V*, 163 B.R. 453, 459 (Bankr. E.D. Pa.) ("It is elementary to observe that, before the Debtor can assume or reject a contract, or, for that matter, before [a party] can seek to enforce a contract, there must be a contract to assume, reject, or enforce."), *aff'd*, *Pueblo Chem., Inc. v. III Enterprises, Inc. V.*, 169 B.R. 551 (Bankr. E.D. Pa. 1994); 2 Collier on Bankruptcy, ¶ 365.02, at 365-16 (15th ed. 1993) ("[F]or section 365 to apply, the contract or lease must be in existence."). Here, LCPI's Motion as to York Capital fails at the outset because there was no binding contract between LCPI and York Capital for the purchase and sale of the single portfolio of bank loans.

It is a bedrock principle of contract law that "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are true in agreement with respect to all material terms." *In re Express Indus. & Terminal Corp.*, 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 860 (1999). *See also Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249 (1981) ("[B]efore the power of law can be involved to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."); *Brands v. Urban*, 182 A.D.2d 287, 289, 587 N.Y.S.2d 698, 700 (2d Dep't 1992) ("It is well established that a contract is unenforceable where there is no meeting of the minds between the parties thereto regarding a material element thereof."); *Judal Indus.,*

9

*Inc. v. Welsbach Elec. Corp.*, 138 A.D.2d 573, 574, 526 N.Y.S.2d 154, 156 (2d Dep't 1988) ("For a contract to be enforceable, it must be definite as to its essential terms."). Indeed, "definiteness as to material matters is of the very essence of contract law" because, without it, a court would be forced to intervene and "impos[e] its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves." *Schumacher*, 52 N.Y.2d at 109, 436 N.Y.S.2d at 249.[1]

As demonstrated below, it is abundantly clear that the parties had no binding contract since there was no meeting of the minds with respect to several critical terms.

1. There was no meeting of the minds with respect to the structure of the proposed transaction

The parties were at clear loggerheads concerning the structure of the proposed transaction. Given the deteriorating financial condition of LCPI and the fluctuating market values of the trades involved in the proposed transaction, a prompt closing was of critical importance to York Capital. To that end, the two principal comments relayed by York Capital to LCPI regarding the structure of the proposed transaction were specifically designed to prevent the trades from being caught up in the affairs of the estate in the event LCPI filed for bankruptcy – the very contingency that has now come to pass. The bankruptcy filing of Lehman

---

[1] New York law governs the parties' dispute since New York is the forum state, York Capital is a Delaware corporation headquartered in New York, LCPI is headquartered in New York, and LCPI is a New York corporation. *See, e.g.*, *Indosuez Int'l Fin. B.V. v. Nat'l Reserve Bank*, 98 N.Y.2d 238, 747 N.Y.S.2d 631 (2002) (New York law rather than Russian law applied to 14 non-deliverable forward currency exchange transactions because New York had paramount interest in enforcement of the transactions: parties agreed that payment was to be made in United States dollars, parties relied on New York's experience with and ability to ensure orderly dollar currency transactions by choosing New York law in 10 of the 14 confirmations, and choosing a New York forum in at least six of the confirmations). But even if British law were to apply, the same principles set forth above bar enforcement of the purported transaction.

10

Brothers Holdings Inc. on September 15, 2008 underscores York Capital's concern regarding assuming a debtor-creditor relationship under a funded participation. Simply put, York Capital would not have agreed to the proposed transaction if the critical terms it sought were not included.

Against this backdrop, and since there was no meeting of the minds concerning these terms, our case falls squarely within the ambit of settled authority uniformly dismissing breach of contract claims when, as here, there was no meeting of the minds. *See Angelo, Gordon & Co. v. Dycom Indus., Inc.*, No. 04 Civ. 1570 (RMB), 2006 WL 870453, at *7 (S.D.N.Y. March 31, 2006) (email confirmations of distressed debt trade not enforceable; "In this [proposed distressed debt trade], there was never an executed final agreement or a meeting of the minds [because] [c]ertain material terms were never finalized or agreed to."); *Resurgence Asset Mgmt., LLC v. Bastion Capital Fund, L.P.*, 306 A.D.2d 336, 337, 760 N.Y.S.2d 662, 663 (2d Dep't 2003) (distressed debt trade not enforceable where trade confirmations were never executed; "The documentary record alone established that the parties never agreed to all the material terms of the proposed sale [of distressed debt] and therefore the defendants were not contractually bound."); *In re Express Indus. & Terminal Corp.*, 93 N.Y.2d at 589, 693 N.Y.S.2d at 860 (affirming lower court ruling that that parties "did not reach a meeting of the minds on all essential terms of the [contract]" because they had left "certain important items open for further negotiation").

2. There was no meeting of the minds as to the closing date of the proposed transaction

The parties' failure to agree to a closing date for the proposed transaction likewise precludes enforcement of the proposed transaction. A closing date is a material term to a distressed debt transaction because without a closing date a buyer would be in the untenable

11

KL3 2687460.7

position of having to wait an undefined period of time and bear all the risk of the fluctuations of the market price for the commercial loans at issue; the seller could delay the closing until the market price for the loans made the transaction profitable for the seller and unprofitable for the buyer. Courts have consistently found that the failure to agree to a closing date demonstrates that there was no meeting of the minds. *See, e.g., Angelo, Gordon & Co.,* 2006 WL 870453, at *11 (holding contract for distressed debt sale unenforceable because, among other things, there was no formal documentation evidencing a closing date); *Judal*, 138 A.D.2d at 574, 526 N.Y.S.2d at 156 ("the parties' dispute over the delivery term manifested a lack of agreement as to the contract" where defendant stipulated that time is of the essence); *Cooper-Rutter Assocs., Inc. v. Anchor Nat'l Life Ins. Co.*, 193 A.D.2d 944, 946, 597 N.Y.S.2d 799, 800 (3d Dep't 1993) (time of performance an essential term of the contract given that the sale "involved fluctuating value and any delay in completion would involve serious financial loss").

    3.    The parties' continued negotiations over and failure to execute <u>trade confirmations confirms that there was no meeting of the minds</u>

That the Draft Trade Confirmations were not signed by either party is compelling evidence that the parties did not reach agreement on all material terms and, further, did not intend to enter into a binding transaction without final agreement on all the terms set forth therein. *Angelo, Gordon & Co.*, 2006 WL 870453, at *7 (no agreement for sale of distressed debt where no signed trade confirmation, even though parties had confirmed trade by email; "'there is a strong prescription against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents'. . . . In this case, there was never an executed final agreement or a meeting of the minds. Certain material terms were never finalized or agreed to") (citation omitted); *Resurgence Asset Mgmt., LLC*, 306 A.D.2d 336, 760 N.Y.S.2d 662 (dismissing suit for breach of

12

contract for sale of distressed debt where parties did not sign trade confirmation and were still negotiating its terms); *Greystone P'ship Group, Inc. v. Koninklijke Luchtvaart Maatschappi N.V.*, 815 F. Supp. 745, 754 (S.D.N.Y. 1993) ("By refusing to sign the contracts" at issue, defendant made its intent not be bound "clear").

Moreover, the inclusion of the signature lines on the Draft Trade Confirmations demonstrates that the parties intended to be bound only upon the execution of a document. *See Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT & T Communications, Inc.*, No. 92 Civ. 7862 (KMW), 1994 WL 463014, at *3 (S.D.N.Y. Aug. 24, 1994) (letter characterized as "confirmation" but containing signature line for addressee "tends to show an intention not to be bound in the absence of a signed writing"); *Technology Fin. Group, Inc. v. Grumman Data Sys. Corp.*, 159 A.D.2d 385, 385, 553 N.Y.S.2d 11, 11 (1st Dep't 1990) (granting summary judgment dismissing contract claim where "the correspondence exchanged by the parties expressed an intention not to be contractually bound unless certain specific documents were executed and until their preliminary negotiations had culminated in the execution of a formal lease agreement."). *Cf. R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984) ("[W]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.").

In *Winston v. Mediafare Entm't. Corp.*, 777 F.2d 78, 82-83 (2d Cir. 1986), the Court of Appeals explained why parties are not legally bound by purported oral agreements when, as here, they specifically contemplate execution of a written agreement:

> The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to a signed writing. That these 'unnoticed' or 'passed by' points of disagreement may in the long view be fairly

13

> characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out.

(citation omitted).

As in *Winston*, when York Capital reviewed the Draft Trade Confirmations, it realized that there were material points in disagreement concerning the structure of the transaction that needed to be worked out. To bind York Capital to a contract when there were critical terms that the parties needed to agree on would thus "deprive the parties of their right to enter into only the exact contract they desired." *Id.* at 83.

It is also worthy of emphasis that the nature of the parties' proposed transaction – pursuant to which York Capital would purchase a debt portfolio with a face amount of more than U.S. $400 million – is of the type that courts have required to be reduced to a signed writing in order to be enforceable. *See Angelo, Gordon & Co.,* 2006 WL 870453, at *11 (plaintiff suing to enforce oral agreement and unsigned trade confirmation for sale of distressed debt "failed to meet its burden of proving that the distressed debt market considers agreements binding based solely on phone conversations and emails"). *See also Adjustrite Sys., Inc. v. GAB Business Servs., Inc.,* 145 F.3d 543, 551 (2d Cir. 1998) (dismissing suit on summary judgment where multi-million dollar acquisition "clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties . . . usually found in sophisticated, formal contacts"); *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir. 1984) ("The proposed deal involved a $4 million sale of six companies which were incorporated under the laws of five different countries and which had assets of over $17 million, sales of $40 million, and profits of $4 million . . . . Thus, the magnitude and complexity of the deal as reflected in the numerous written contract drafts not only reinforce the

14

parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.").

    4.    <u>The parties intended a unitary transaction</u>

Further confirming that there was no meeting of the minds between the parties is LCPI's attempt to sever the proposed transaction – accepting the sale of only certain tranches of debt in some loans while rejecting or remaining silent as to other tranches and loans – even though the parties clearly viewed the potential transaction as an all-or-nothing package deal. As set forth above, York Capital made clear to LCPI, and both parties understood throughout the negotiations, that the proposed transaction under consideration was a unitary transaction and was not severable into separate transactions. The only reason York Capital was willing to consider including certain trades in the proposed transaction that were less desirable to it was because, as part of the give and take of the negotiations, LCPI insisted that York Capital take those loans in exchange for proposed loans that York Capital believed were desirable. Moreover, in conducting its due diligence on the proposed transaction, York Capital had analyzed *as a whole* the multiple tranches of debt encompassed in the Bid List.

Under these circumstances, LCPI's severance of the proposed transaction contravenes the intent of the parties and should be rejected. *See, e.g., In re Annabel*, 263 B.R. 19, 25 (Bankr. N.D.N.Y. 2001) (finding that parties to contract for the sale and purchase of a chiropractic practice had not "intended anything other than a single, unseverable contract" and rejected the contract in its entirety under Section 365); *In re Enrique M. Lopez, M.D.S.C.*, 93 B.R. 155, 157 (N.D. Ill. 1988) (court found that in a contract for the purchase of a medical practice, "the various sections of the Agreement are intimately bound with one another" and that the agreement "reflects an intent that its various components not be performed independently, but that they be viewed as part of a single transaction").

15

## II.

## The Motion Should Be Denied
## On Other Grounds As Well

Even if, against the overwhelming record facts, there were somehow an enforceable agreement between the parties, the Court should still deny LCPI's motion on several independent grounds.

1. LCPI cannot cherry pick pieces of the purported contract it wishes to assume or reject

As set forth above, LCPI's Motion ignores the parties' intent that the proposed transaction was to be a package deal and instead purports to sever the proposed transaction by accepting only certain tranches of eight of the seventeen loans at issue while rejecting one other and remaining silent as to the other tranches and loans. Under Section 365, however, a debtor must assume or reject a contract in its entirety. *In re Leslie Fay Cos.*, 166 B.R. 802, 808 (Bankr. S.D.N.Y. 1994) ("If an executory contract is assumed, it is said to be assumed *cum onere*, with all of its benefits and burdens.") (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)); *In re Atlantic Computer Sys., Inc.,* 173 B.R. 844, 849 (S.D.N.Y. 1994) (noting that a debtor may not "cherry pick" pieces of a contract it wishes to assume or reject). Any rule to the contrary would allow the debtor to use hindsight to its advantage by enabling it cherry pick those parts of the contract that are economically beneficial while rejecting the disadvantageous portions or provisions. For these reasons, if this Court finds that the proposed contract at issue exists, LCPI must assume or reject the contract in its entirety.

Courts look to the state law – here New York – to determine whether the agreement is severable for Section 365 assumption and rejection purposes. *See, e.g., Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 738 (5th Cir. 1996); *In re*

*Convenience USA, Inc.*, Nos. 01-81478, 01-81479, 01-81480, 01-81481, 01-81482, 01-81483, 01-81489, 2002 WL 230772, at *2 (Bankr. M.D.N.C. Feb. 12, 2002). Under New York law:

> Whether a contract is entire or severable generally is a question of intention, to be determined from the language employed by the parties, viewed in the light of the circumstances surrounding them at the time they contracted.

*Christian v. Christian*, 42 N.Y.2d 63, 73, 396 N.Y.S.2d 817, 824 (1977). *See also Rudman v. Cowles Communications, Inc.*, 30 N.Y.2d 1, 330 N.Y.S.3d 33 (1972). Moreover, in determining the intent of the parties, New York courts consider the "fair construction of the terms and provisions of the contract itself . . . the subject matter to which it has a reference, and . . . the circumstances existing at the time of contracting." *Municipal Capital Appreciation Partners I, L.P. v. Page*, 181 F. Supp. 2d 379, 394 (S.D.N.Y. 2002).

The parties clearly intended for the proposed transaction to be a package deal and not to be severable into separate transactions. York Capital analyzed the tranches of debt involved in the proposed transaction as a whole and made clear to LCPI throughout the negotiations that the loans were being purchased as part of a single transaction. The only reason York Capital agreed to consider including certain potential trades it deemed undesirable was because, as part of the negotiations, LCPI insisted that York Capital take those loans in exchange for the proposed loans York Capital wanted to purchase. Because the proposed contract was therefore not intended to be severable, allowing LCPI to cherry pick the parts of the purported contract it wishes to assume or reject would be contrary to the bankruptcy laws and would yield an inequitable result. *See In re Atlantic Computer Systems, Inc.*, 173 B.R. at 849 ("[T]he Court notes that it is elemental that if the various instruments at issue are deemed a single contract, then

[the Debtor] may not assume only the benefits (*i.e.,* payment) while rejecting the obligations of the bargain.").[2]

    2.    **LCPI has waived its right to accept the balance of the proposed transaction**

LCPI agreed in the Stipulation which was "So Ordered" by the Court on November 5, 2008 to notify all counterparties to all Open Trade Confirmations whether it will reject, assume, or assume and assign such open trade confirmation "in no event later that the close of business on November 7, 2008." Because LCPI addressed only portions of the trades that formed the proposed transaction, LCPI has violated the terms of the Stipulation, and, furthermore, the remaining portions of the proposed transaction are deemed rejected under the Bankruptcy Code. *See, e.g., Sinicropi v. Milone,* 915 F.2d 66, 68 (2d Cir. 1990) (enforcing court ordered stipulation when appellees "knowingly and voluntarily entered into the Stipulation"); *Sanchez v. Maher,* 560 F.2d 1105, 1108 (2d Cir. 1977) (The district court has a "duty to enforce the stipulation which it had approved").

---

[2] Additionally, LCPI's purported rejection of that portion of the proposed transaction reflecting a potential trade between York Capital and LBBAG may expose York Capital to inconsistent obligations in this proceeding and the bankruptcy proceedings in Germany in the event LBBAG decides to assume the purported trade at issue.

18

KL3 2687460.7

<u>Conclusion</u>

For these reasons, LCPI's motion should be denied as to York Capital.

Dated: New York, New York
November 28, 2008

                    Kramer Levin Naftalis & Frankel LLP

                    By: /s/ Bradley P. O'Neill____
                        Bradley P. O'Neill (BO-5832)
                        Jonathan M. Wagner (JW-7197)
                        Dana L. Post (DP-3889)

                        *Attorneys for York Capital Management L.P.*

                        1177 Avenue of the Americas
                        New York, New York 10036
                        Telephone: (212) 715-9100

KL3 2687460.7