ALSTON & BIRD LLP
Martin G. Bunin, Esq.
Craig E. Freeman, Esq.
William Hao, Esq.
90 Park Avenue
New York, N.Y. 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

and

John C. Weitnauer, Esq. (*pro hac vice* to be filed)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Bank of America, National Association successor by merger with LaSalle Bank National Association, as Trustee under certain Trust Agreements*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | Chapter 11 |
| **LEHMAN BROTHERS HOLDINGS, INC.,** *et al.* | Case No. **08-13555** (JMP) |
| **Debtor.** | (Jointly Administered) |

---

**LIMITED OBJECTION OF BANK OF AMERICA, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER WITH LASALLE BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS TRUSTEE UNDER CERTAIN TRUST AGREEMENTS, TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND <u>ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

  Bank of America, National Association, successor by merger with LaSalle Bank

National Association, in its capacity as trustee ("Trustee") under certain trust agreements listed in on Exhibit A (the "Listed Trust Agreements"), hereby files this limited objection (the "Limited Objection") to the above-captioned debtors' (the "Debtors") "Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code Establishing Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts" (Docket No. 1498) (the "Motion").

## FACTUAL BACKGROUND

1. In connection with each of the Listed Trust Agreements, the trust under each Listed Trust Agreement (the "Trust") entered into one or more Derivative Contracts (as that term is defined in the Motion) with Lehman Brothers Special Financing Inc. ("LBSF"). Lehman Brothers Holdings, Inc. ("LBHI") guaranteed LBSF's performance on each of the Derivative Contracts to which each Trust was a Counterparty. The Derivative Contracts entered into in connection with the Listed Trust Agreements have not been terminated as of the filing of this Limited Objection.

## LIMITED OBJECTIONS

**A.     The Notice and Objection Periods under the Assumption and Assignment Procedures should be Fifteen Business Days after Actual Receipt of Notice.**

2. The Debtors propose to provide Counterparties with only five business days notice of a proposed notice of assignment and, if the Counterparty has objections, the Counterparty must respond so that the Debtors receive the objection within five business days. *See* Motion ¶ 19(a), (e). Because the proposed procedures would allow the Debtors to provide that notice by regular mail, a Counterparty may only have one or two business days to review the proposed assignment notice, determine whether the Debtors' cure calculation is correct (or if the Counterparty otherwise opposes the

proposed assignment), and, if necessary, prepare and serve a written objection. The proposed notice period is too short. The Trustee submits that (i) the Debtors should be required to give a Counterparty an assignment notice in accordance with the terms of the Derivative Contract (or other related documentation); (ii) the Debtors should be required to deliver a copy of the assignment notice to counsel for a Counterparty (if counsel is known); (iii) Counterparties should be provided fifteen business notice after actual receipt of an assignment notice to object to a proposed assignment. The Debtors should also be required to identify a proposed assignee in the assignment notice.

**B.     When a Derivative Contract (or related agreement) to which a Debtor is a party specifies a minimum credit rating (or other criteria), the Debtors should only be able to assign the Derivative Contract to an assignee that meets the required credit rating (or other criteria).**

3.      In paragraphs 19(b) & (c), the Debtors propose that any proposed assignee (or credit support provider) with a Standard & Poor's or Fitch credit rating equal to or higher than A- or a Moody's credit rating equal to or higher than A3 be deemed a "Qualified Assignee" and that a Counterparty be deemed to have received adequate assurance of future performance if, among other reasons, the assignment is to a Qualified Assignee. The Trustee requests that the definition of "Qualified Assignee" be modified so that, when a Derivative Contract (or ancillary documentation to which a Debtor-assignor is a party) requires the Lehman-side counterparty to maintain a credit rating higher than (or to meet eligibility criteria that are different from or in addition to) that proposed by the Debtors, the agreed credit rating (or the other eligibility criteria so mandated) should govern and any proposed assignee (or credit support provider) should be required to have the credit rating required by the terms of the Derivative Contract (or ancillary documentation) to be a Qualified Assignee.

- 3 -

4. Requiring a Qualified Assignee to have the credit rating or meet other requirements of the contract is consistent with the requirements of Section 365 of the Bankruptcy Code. First, the Debtors must provide "adequate assurance of future performance" by the assignee to be entitled to assume and assign. When the underlying contract specifies a minimum financial condition or rating that is material and economically significant to the overall transaction, case law recognizes that a debtor (or its assignee) should be required to satisfy those obligations to provide adequate assurance of future performance. *See In re Fleming Companies, Inc.*, 499 F.3d 300, 305 (3d Cir. 2007) (holding that an assignee must be capable of performing material and economically significant provisions of an executory contract to provide the counterparty with adequate assurance of future performance). When a Derivative Contract (or ancillary document) specifies a minimum credit rating or other requirement, those terms are material and economically significant to the transaction.

5. Second, because the Debtors may only assume an executory contract *cum onere*, any assignee will assume a Derivative Contract subject to the contractual credit rating provisions and other requirements. *See In re Leslie Fay Cos., Inc.*, 166 B.R. 802, 808 (S.D.N.Y. 1994) ("An executory contract cannot be assumed in part and rejected in part."). If the assignee does not satisfy these minimum contractual financial conditions or other requirements, it will automatically be in default under the Derivative Contract. This would be inappropriate and inconsistent with the requirements of Section 365. And, if, by the Motion, the Debtors are attempting to modify any contractual credit rating condition or other requirements, that too is impermissible because the Debtors would not be assuming and assigning the Derivative Contract *cum onere*.

**C.  The Debtors should be required to assign the Derivative Contracts only to a Qualified Assignee if they want to avail themselves of expedited assumption and assignment provisions such as those set forth in the Motion.**

6.  Nowhere in the Debtors' proposed assumption and assignment procedures is there any <u>requirement</u> that an assignee be a Qualified Assignee. For purposes of the expedited procedures that this Motion seeks to establish, the assumption and assignment provisions should be limited to assumption by the Debtors and assignment to a Qualified Assignee. The Trustee does not dispute that, in a particular case, the Debtors *may* be able to establish "adequate assurance of future performance" with respect to an assignee that is not a Qualified Assignee. However, in instances where the Debtors propose to assume and assign to a non-Qualified Assignee, it is more likely that there will be disputes over issues of "adequate assurance of future performance." When there is likely to be such a dispute, the Debtors should not be permitted to use the expedited procedures that they request in the Motion. Counterparties in these instances should be entitled to notice and a hearing before this Court, or the Debtors should propose alternative procedures that are calculated to address the adequate assurance of future performance issue in a more systematic fashion.

**D.  The Debtors should be required to provide the same detailed calculations of proposed Cure Amounts that they request Counterparties provide in objections to proposed Cure Amounts.**

7.  In paragraph 19(e), the Debtors request that this Court require a Counterparty objecting to a proposed Cure Amount to include in the objection "on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting such alleged Cure Amount, and in any event containing no less detail than the calculation of the Cure Amount provided by

the Debtors." The proposed procedures do not require the Debtors to provide the Counterparty with the same detailed data. The Debtors should have an obligation to provide transaction by transaction data similar to what Counterparties are being asked to provide.

### E. The Order should clarify that the procedures do not limit a Counterparty's rights under the Federal Rules of Bankruptcy Procedure.

8.  If the Debtors and a Counterparty cannot resolve an objection to a Cure Amount, the proposed procedures should not limit the Counterparty's (or the Debtors') right to take discovery (and otherwise avail themselves of their legal rights) in accordance with the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (as such an objection will or should, procedurally, be a contested matter). The proposed procedures related to a determination of the Cure Amount should be seen for what they are – a vehicle for the Debtors and the Counterparties to (a) agree to a Cure Amount where there is no dispute, and (b) identify material areas where there may be a dispute about Cure Amounts and provide a mechanism for the parties to resolve those differences if they can. If the parties cannot come to a prompt mutual resolution of any disputes and judicial resolution is required to resolve any dispute, the proposed procedures should not limit the procedural or evidentiary rights of the Debtor or the Counterparty to develop an appropriate evidentiary record to support their position.

### F. The Debtors' ability to cure should not be a substitute for providing adequate assurance of future performance.

9.  In subparagraph 19(c) of the proposed procedures, the Debtors propose to provide two _alternative_ means for the Debtor to satisfy the "adequate assurance of future performance" requirement of section 365(b)(1)(C) of the Bankruptcy Code. Under the

proposed procedures, the Debtors contend that they will have provided adequate assurance of future performance if:

> (i) an assignee or its credit support provider is a Qualified Assignee, **_or_** (ii) the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the Derivative Contract (other than upon exercise of an option exercisable in the Debtors'/assignee's discretion).

*See* Motion ¶ 19(c) (emphasis added).

10. The "or" should be an "and." As written, the proposed procedures appear to conflate the concept of "cure" – which is backward looking and focuses on past defaults – with "adequate assurance of future performance" – which is forward looking and focuses on avoiding future defaults.[1] Even if the Debtors pay an agreed Cure Amount, there is no assurance that the assignee will be financially capable of performing future obligations under the Derivative Contract. Payment of a Cure Amount is not, and should not be, a substitute for providing Counterparties adequate assurance of future performance.

**G.  Subparagraph 19(g) should be clarified to specify that, when the Debtors and a Counterparty are unable to resolve an objection and Court intervention is sought, the procedural protections of the Federal Rules of Bankruptcy Procedure apply.**

11. Subparagraph 19(g) provides, in part, that "the Debtors may (i) seek authorization of the Court to consummate the proposed assignment." Subparagraph 19(g) does not specify the procedures by which the Debtors "may seek authorization of the Court to consummate the proposed assignment." Because such an unresolved objection is, functionally, a contested matter under the Bankruptcy Rules, the Debtors should be

---

[1] If clause (ii) is intended to refer to a Derivative Contract where there are absolutely no **future** payment, delivery or other executory obligations, then with such a clarification the word "or" would be

required to observe the procedural provisions related to contested matters if they "seek authorization of the Court to consummate the proposed assignment."

12. The Debtors emphasize their need to act expeditiously in consummating assignments. However, when there is a dispute between the parties, the Motion should not be used as an avenue to circumvent a Counterparty's procedural rights. If, in a specific instance, there is a dispute with a Counterparty and a true exigency, the Bankruptcy Rules and the Local Rules of this Court are sufficiently flexible to address such a situation. Under Local Rule 9077-1, the Debtors may seek an order to show cause "upon a clear and specific showing by affidavit of good and sufficient reasons why proceeding other than by notice of motion is necessary." However, when there is a dispute between the Debtors and a Counterparty, the default rules should be the Bankruptcy Rules. The burden should be upon the Debtor to show an exigency sufficient to circumvent these procedural rights in accordance with Local Rule 9077-1. The Trustee therefore requests that subparagraph 19(g) be clarified as follows (proposed changes are in boldface):

> …the Debtors may (i) seek authorization of the Court to consummate the proposed assignment **in accordance with the Federal Rules of Bankruptcy Procedure applicable to contested matters and the Local Rules of this Court …**"

**H. The Debtors should be required to provide a Counterparty actual notice of the consummation of an assignment before they are able to limit or otherwise modify a Counterparty's right to terminate the Derivative Contract.**

13. Subparagraph 19(j) is unclear on (i) the timing of when the Debtors must provide a Counterparty with notice of a consummation of an assignment, and (ii) the

---

appropriate. However, this could not be true with respect to the Derivative Contracts relating to the Trust

- 8 -

cutoff date after which a Counterparties' termination will be deemed to be ineffective. As drafted, the Debtors need only provide notice of the consummation of the assignment within a "reasonable time period," but a Counterparty's "purported termination notice … shall be ineffective unless a termination notice is received … prior to the assignment's consummation."

14. The Debtors should be required to provide notice of consummation of an assignment in accordance with the terms of the Derivative Contract being assigned, or, if the Derivative Contract does not address notice provisions, delivery of a proper notice of consummation should be a condition precedent for consummation of an assignment.

15. The proposed procedures, as drafted, are ambiguous. If the Debtors seek to cut off a Counterparty's right to terminate, the Counterparty should be provided notice of this *at the time that right is cut off*. As drafted, Counterparties will only have notice of this "within a reasonable time period." Because the proposed procedures require only that the Debtor give notice of consummation of an assignment "within a reasonable time," there may be a period of time when the Counterparty does not know its Lehman-side counterparty. This is inappropriate and invites disputes when, for instance, a Counterparty may owe a payment to a Lehman-side counterparty, but will not know to whom the payment should be directed. This should be resolved at the outset so that Counterparties understand (i) when their Derivative Contract has been assigned, and (ii) when their right to terminate because of the Debtors' insolvency has been cut off.

---

Agreements listed on Exhibit A.

**I.  Subsection (d) of the second decretal paragraph on page 7 of the proposed Order improperly limits a Counterparty's right to liquidate, terminate or accelerate a Derivative Contract.**

16.    The second decretal paragraph on page 7 of the proposed Order improperly limits a Counterparty's right to liquidate, terminate or accelerate a Derivative Contract.  That decretal paragraph provides as follows:

> … the Debtors may assign each assigned Derivative Contract in accordance with section 365 of the Bankruptcy Code, *and any provisions in any assigned Derivative Contract that prohibit, restrict, or condition the assignment of such assigned Derivative Contract or allow the Counterparty to such assigned Derivative Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such assigned Derivative Contract, constitute unenforceable anti-assignment provisions which are void and of no effect…*

*See* Proposed Order at 7 (the emphasized language is referred to as the "Underlined Page 7 Language").

17.    This provision is inconsistent with a Counterparty's rights under the Bankruptcy Code because it limits a Counterparty's right to liquidate, terminate, or accelerate a Derivative Contract.  Any Order granting the Motion should strike this language or otherwise modify it so that it is consistent with the provisions of the Bankruptcy Code.  Section 560 of the Bankruptcy Code (among other provisions) provides as follows:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365 (e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements *shall not be stayed, avoided, or otherwise limited by operation of any*

> ***provision of this title or by order of a court or administrative agency in any proceeding under this title***.

See 11 U.S.C. § 560 (emphasis added).

18. By its terms, the Proposed Order limits, among other things, a Counterparty's termination rights. As set forth in section 560 of the Bankruptcy Code, such a limitation is both prohibited by the express terms of the Bankruptcy Code and any Order limiting such termination rights is unenforceable. The Underlined Paragraph 7 Language should therefore be stricken. At the time of an assumption and assignment the parties can agree that, on and after that assignment, the Counterparty could not terminate based on an *ipso facto* default relating to the assignor, but all such rights would be preserved with respect to the assignee.

**J.  Subsection (f) of the second decretal paragraph on page 7 (which actually appears on page 8) should be clarified so that assignees succeed to the duties and obligations of the Debtors.**

19. The second decretal paragraph on page 7 (which actually appears on page 8) provides as follows. "[U]pon closing of any assignment transaction, in accordance with section 365 of the Bankruptcy Code, the assignee(s) shall be fully and irrevocably vested in all right, title, and interest of each assigned Derivative Contract…" Because an executory contract such as a Derivative Contract may only be assigned, if at all, *cum onere*, this subsection of this decretal paragraph should be clarified so that each assignee assumes all of the duties, obligations and liabilities of each Derivative Contract, as well as succeeding to all of the "right, title and interest" of each assigned Derivative Contract.

**K.  The decretal paragraph on page 8 improperly strips a Counterparty's counterclaims, defenses, setoff, and other claims.**

20. The decretal paragraph on page 8 purports to strip a Counterparty of a "counterclaim, defense, setoff or any other claim asserted or assertable against the

- 11 -

Debtors…" As set forth above, an executory contract must be assumed *cum onere*. Any assignee of a Derivative Contract therefore must take the Derivative Contract subject to, among other things, all of the Counterparty's "counterclaim[s], defense[s], setoff [rights], or other claims asserted or assertable against the Debtors." Additionally, with respect to rights of setoff specifically, the Bankruptcy Code expressly preserves rights of setoff. *See* 11 U.S.C. § 553. Similarly, counterclaims, defenses, setoff rights, and other claims are not "interests" within the meaning of section 365(f) of the Bankruptcy Code and therefore a purported assignment cannot be "free and clear" of such counterclaims, defenses, setoff rights, and other claims. *See, e.g., Folger Adam Security, Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252 (3d Cir. 2000) ("We find that the affirmative defenses do not constitute an "interest" for purposes of section 363(f) and, therefore, were not extinguished by the bankruptcy sale."). Therefore, this decretal paragraph of the proposed Order should be stricken.

L.  **The first decretal paragraph on page 9 should be limited to the Debtor that is the assignee.**

21.  The language in the first decretal paragraph on page 9 provides that: "... upon assignment ... the Debtors and their estates shall have no further liabilities or obligations under the Derivative Contract...." The scope of this language is not clear – broadly construed, it would eliminate the guarantee obligations of LBHI that relate to a Derivative Contract. If, following cure, assumption and assignment, and assuming there is no future default by the assignee, there should be no claims under such a guarantee. But recent history teaches that counterparties thought to be solid can sometimes fail. No provision for a release of a third party is contained in § 365 of the Bankruptcy Code, and the Order should be clear that it does not create one here.

**M.    The fourth decretal paragraph on page 9 should be clarified so that it does not apply to Derivative Contracts that the Debtors assign.**

22.    The fourth decretal paragraph on page 9 provides that: "…entry of this Order is without prejudice to the rights of the Debtors, including, but not limited to, the right to seek further, other, or different relief regarding the Derivative Contracts pursuant to, among other things, section 365 of the Bankruptcy Code."  The Trustee does not oppose this decretal paragraph insofar as a Derivative Contract is *not* assigned pursuant to the Motion.  However, if and to the extent that the Debtors assign Derivative Contracts pursuant to the Motion, such an assignment will divest the Debtors of any of their remaining rights, title, and interest in an assigned Derivative Contract.  The proposed Order should be clarified to provide that this decretal paragraph does not apply insofar as a Derivative Contract is assigned pursuant to the Motion and any Order granting the Motion.

**N.    The sixth decretal paragraph on page 9 should be clarified so that it cannot be construed to limit a Counterparty's jury trial and similar rights.**

23.    The sixth decretal paragraph on page 9 should be clarified to ensure that it does not compromise a Counterparty's jury trial and similar rights.  The proposed Order contains potential ambiguities in this respect.  The decretal paragraph acknowledges that the Court would only be *retaining* jurisdiction, and it does not purport to grant jurisdiction in areas in which none presently exists.  However, the same sentence also provides that the jurisdiction retention provision extends to this Court hearing "all matters arising from or related to the implementation and/or interpretation of this Order and/or the terms of any assumption and assignment and/or termination agreement consummated

pursuant to the terms of the Assumption and Assignment Procedures and/or Termination and Settlement Procedures."

24. The latter quoted provision is overly broad and suggests that the Court may be reserving to itself the authority to decide and resolve disputed factual issues in the context of an assumption and assignment proceeding. This is improper under binding Second Circuit law. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993) ("In reviewing a trustee's or debtor-in-possession's decision to assume an executory contract, then, a bankruptcy court sits as an overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate. Although several bankruptcy courts have read § 365 as authorizing them to resolve questions involving the validity of contracts before deciding whether to permit the trustee or debtor-in-possession to assume the contracts, we believe that nothing in § 365 provides such authorization.") (internal citations omitted).

25. Additionally, to the extent that this decretal paragraph purports to provide this Court with jurisdiction to resolve disputes concerning assumption and assignment, it improperly impinges on a Counterparty's otherwise valid right to a jury trial on those issues. *Id.* at 1099 ("…allowing a bankruptcy court to decide a disputed *legal* contract issue in the course of deciding a motion to assume could usurp litigants' Seventh Amendment jury-trial rights."). This, as well, is improper and the proposed Order should be clarified to specifically provide that the Order does not grant this Court with jurisdiction to resolve disputed issues or otherwise abrogate valid jury trial rights.

## **CONCLUSION**

The proposed procedures and the Order should be qualified and limited as set forth above.

/s/ Martin G. Bunin
ALSTON & BIRD LLP
Martin G. Bunin, Esq.
Craig E. Freeman, Esq.
William Hao, Esq.
90 Park Avenue
New York, N.Y. 10016
Telephone: (212) 210-9400
Facsimile: (212) 210-9444

and

John C. Weitnauer, Esq. (*pro hac vice* to be filed)
1201 West Peachtree Street
Atlanta, Georgia 30309
Telephone: (404) 881-7000
Fax: (404) 881-7777

*Counsel for Bank of America, National Association successor by merger with LaSalle Bank National Association, as Trustee under certain Trust Agreements*

# EXHIBIT A

1. Trust Agreement, dated as of January 1, 2005, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, Wells Fargo Bank, N.A., as Securities Administrator, The MurrayHill Company, as Credit Risk Manager, and Bank of America, as Trustee for the Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2005-1.

2. Trust Agreement, dated as of January 1, 2005, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, Wells Fargo Bank, N.A., as Securities Administrator, The MurrayHill Company, as Credit Risk Manager, and Bank of America, as Trustee for the Structured Asset Investment Loan Trust, Mortgage Pass-Through Certificates, Series 2005-2.

3. Trust Agreement, dated as of January 1, 2005, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, Risk Management Group, LLC, as Credit Risk Manager, and Bank of America, as Trustee for the Structured Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2005-NC1.

4. Trust Agreement, dated as of January 1, 2005, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, Wells Fargo Bank, N.A., as Securities Administrator, The MurrayHill Company, as Credit Risk Manager, and Bank of America, as Trustee for the Structured Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2005-WF1.

5. Trust Agreement, dated as of December 1, 2005, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, and Bank of America, as Trustee for the Lehman Mortgage Trust, Mortgage Pass-Through Certificates, Series 2005-3.

6. Trust Agreement, dated as of July 1, 2006, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, and Bank of America, as Trustee for the Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-11.

7. Trust Agreement, dated as of September 1, 2006, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, and Bank of America, as Trustee for the Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-15.

8. Trust Agreement, dated as of November 1, 2006, among Structured Asset Securities Corporation, as Depositor, Aurora Loan Services LLC, as Master Servicer, and Bank of America, as Trustee for the Lehman XS Trust, Mortgage Pass-Through Certificates, Series 2006-19.

9. Trust Agreement, dated as of March 1, 2004, among Structured Asset

Securities Corporation, as Depositor, Wells Fargo Bank, N.A., as Master Servicer, Wells Fargo Home Mortgage, Inc., as Seller, The MurrayHill Company, as Credit Risk Manager, and Bank of America, as Trustee for the Wells Fargo Home Equity Trust, Mortgage Pass-Through Certificates, Series 2004-1.