BLANK ROME LLP
Attorneys for the New Jersey Housing
and Mortgage Finance Agency
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
Andrew B. Eckstein
Rocco A. Cavaliere

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | Case No. 08-13555 (JMP) Jointly Administered |
| Debtors. | |

---

**OBJECTION OF THE NEW JERSEY HOUSING AND MORTGAGE FINANCE AGENCY TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND <u>ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS</u>**

The New Jersey Housing and Mortgage Finance Agency (the "Agency") hereby submits this objection (the "Objection") to the motion of the above-captioned debtors (the "Debtors") for an order pursuant to §§ 105 and 365 of chapter 11 of title 11 of the United State Code (the "Bankruptcy Code") to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts (the "Motion"). In support of the Objection, the Agency respectfully states as follows:

<u>**Background**</u>

1.     On September 15, 2008, and thereafter, several of the Debtors, including Lehman Brothers Holdings, Inc. ("LBHI") filed Chapter 11 bankruptcy petitions in this Court. On

October 3, Lehman Brothers Special Financing, Inc. ("LBSF") and October 5, 2008, Lehman Brothers Derivative Products, Inc. ("LBDP") each filed a Chapter 11 bankruptcy petition in this Court.

2.  On September 17, 2008, the Office of the United States Trustee for the Southern District of New York appointed the official committee of unsecured creditors (the "Committee") in the Debtors' cases.

### Debtors' Derivative Contracts with The Agency

3.  Commencing in January 2005, the Agency and LBDP entered into various interest rate swap, interest rate lock, and interest rate cap agreements governed by one of three separate master agreements between the Agency and LBDP.

4.  An ISDA Master Agreement and a Schedule to Master Agreement between LBDP and the Agency dated July 29, 2005 governs (i) one interest rate lock (HMFA #1437) for the Trenton Prospect House, (ii) one interest rate cap (MRB 2005-F), and (iii) one interest rate swap (MRB 2005-F) (collectively, the "July 2005 Agreement").

5.  An ISDA Master Agreement and a Schedule to Master Agreement between LBDP and the Agency dated April 28, 2006 governs (i) eight interest rate locks for (a) the King Plaza Apartments (HMFA #1352), (b) Heritage Village at Manalapan (HMFA #1426), (c) Royal Crescent (HMFA #2190), (d) Toms River Crescent (HMFA #2272), (e) Acorn Straight Apartments (HMFA #2101), (f) Royal Oaks Apartments (HMFA #2171), (g) Sharp Road (HMFA #2265), and (h) Patriot's Cove (HMFA #2393) and (ii) two interest rate swaps (MRB 2007-G and MRB 2007-I) (collectively, the "April 2006 Agreement").

6.  Finally, an ISDA Master Agreement and a Schedule to Master Agreement between LBDP and the Agency dated January 27, 2005 and amended and restated as of August

-2-

5, 2008 governs (i) one interest rate cap (MRB 2006-D (2008-F)) and (ii) three interest rate swaps (MRB 2005-E (2008-E), MRB 2008-B, and MRB 2008-C) (collectively, the "August 2008 Agreement", together with the July 2005 Agreement, and the April 2006 Agreement, the "Agreements").

7. On September 16, 2008, pursuant to an Assignment and Amendment Agreement (the "Amendment") between LBDP, LBSF, and the Agency, LBDP assigned all of its rights under the Agreements to LBSF. As such, LBSF is currently the responsible party on each of the Agreements and their underlying derivatives.

8. The filing of a voluntary chapter 11 petition by LBSF constitutes an "Event of Default" under each of the Agreements. *See Agreements,* § 5(a)(vii). Pursuant to Section 6(a) and Part 1(e) of each of the Agreements, as amended by the Amendment, upon the occurrence of an Event of Default, the non-defaulting party, in this case, the Agency, may, upon notice to LBSF, designate an "Early Termination Date" (as defined in the Agreements) in respect of all outstanding transactions under the Agreements. *See Agreements,* § 6(a). As of the date hereof, in managing its financial risk and costs and because some of the Agreements would require the consent of others to terminate, the Agency has not exercised its right to terminate the Agreements in accordance with their terms.

**The Debtors' Motion**

9. The Debtors' Motion seeks to establish procedures in connection with assumption and assignment of certain "Derivative Contracts" (defined in the Motion) that have not yet been terminated by various counterparties (the "Assignment Procedures"). Furthermore, the Debtors' Motion seeks to establish expedited procedures in connection with settlement of terminated

-3-

Derivative Contracts (the "Termination Procedures"). The Assignment Procedures and the Termination Procedures vary from the procedures set forth in and negotiated in the Agreements.

## Objection To Motion

10. The Motion impermissibly seeks to impair the Agency's and other counterparties' rights under various derivative contracts which were negotiated by such counterparties with the Debtors.

11. First, the Agreements expressly prohibit assignment or transfer of a counterparty's obligations under the Agreements without the consent of the counterparty (and in the case of some of the Transactions, Financial Security Assurance, insurer of the Agency's obligations under such Transactions). Despite the Debtors' arguments to the contrary, the Derivative Contracts at issue in the Debtors' Motion, unlike the conventional executory contract, cannot be assumed and assigned pursuant to section 365 of the Bankruptcy Code, unless the party to such Derivative Contract consents thereto. Indeed, the Motion severely threatens to undercut counterparties' rights to terminate and setoff under Congress's specially crafted provisions of the Bankruptcy Code designed to protect counterparties to Derivative Contracts. 11 U.S.C. §§ 555-561.

12. Second, the Assignment Procedures, if implemented in their proposed form, could potentially impact the Agency's ability to determine who it does business with and to ensure that such party is in compliance with state law. The Agency, by law, has the discretion to determine which parties it will contract with and in that context, the Agency, prior to entering into any contracts, closely evaluates the underlying businesses of such parties to ensure that (i) such businesses are in compliance with New Jersey state law and (ii) the Agency knows, in advance, the identity of the entities with which it does business. Further, entities such as the Agency are

prohibited from entering into agreements (including swaps, caps, and locks) with parties that have made certain political contributions. The Debtors' proposed Assignment Procedures could be read to eliminate the Agency's discretion under New Jersey state law to consider all of the foregoing factors and allow the Debtors themselves to exercise this discretion by assigning the Agreements. As such, any attempt to assign the Agreements by the Debtors to a proposed assignee under the Assignment Procedures would violate section 365(c)(1) of the Bankruptcy Code's requirement that assignments of contracts be in accordance with applicable law. Therefore, the Assignment Procedures must be modified to ensure that any proposed assignee of the Agreements complies with the requirements of New Jersey state law.

13. Third, the Assignment Procedures indicate that an assignee will automatically be determined a "Qualified Assignee" if such assignee or its credit support provider has a Standard & Poor's ("S&P") or Fitch Ratings ("Fitch") credit rating equal to or higher than A- or a Moody's Investors Service ("Moody's") credit rating equal to or higher than A3, or any equivalent thereof. *See, Motion,* p. 9. The Agency has never, as a matter of policy and prudence, approved entering into a transaction with a counterparty whose ratings were as low as the ratings proposed by the Debtors in the Motion. In fact, the Agency's various multi-family financing documents require that counterparties have ratings of not less than AA, Aa2, and AA from S&P, Moody's, and Fitch, respectively, at the time a transaction is consummated. Moreover, the ratings by S&P, Moody's and Fitch cannot be relied on as the sole determinative factor to qualify a proposed assignee. The Assignment Procedures should not abrogate the right of the Agency and other counterparties to object to any proposed assignee on any valid grounds. Among other things, a party contemplating the change of a counterparty under a master agreement also considers, and has the right to consider, other factors relating to the choice of a

-5-

counterparty including but not limited to (i) aggregate credit exposure to the counterparty and compliance with the counterparty's credit policies, (ii) the impact of any tax or withholding obligations and (iii) compliance with underlying debt instruments.  Also, as stated above, in this case, any potential assignee must be in compliance with applicable New Jersey state law.  Finally, in determining a "Qualified Assignee" for the Agreements, consideration should also be given to the impact that an assignment to an assignee with the ratings threshold proposed by the Debtors may have on the Agency's own contractual and debt obligations, the Agency's own credit rating, and its ability to incur further indebtedness due to a possible downgrade by the rating agencies in the credit ratings on the Agency's multi-family debt obligations.  Under such circumstances, a lower credit rating could impact the Agency's ability to issue additional multi-family housing debt, thereby interfering with the Agency's statutory mandate to promote affordable housing in New Jersey.  In sum, the Agency submits that the determination of who might be a "Qualified Assignee" must include all of the aforementioned considerations to protect the Agency's rights and statutory mandates.

14.     Fourth, the Assignment Procedures provide counterparties with a mere five business days to file an objection to a proposed Assignment Notice (as defined in the Motion) on the grounds of, among other things, (i) an improper cure amount, and (ii) adequate assurance of future performance.  The suggested timeframe is clearly inadequate.  Calculations concerning open trades can be very difficult and time-consuming and more time is needed to properly calculate cure amounts.  Also, five business days from the date of service may not be sufficient to determine whether the requirement of adequate assurance of future performance has been met.  The Agency submits that counterparties should be provided with at least ten business days notice

to formulate an objection to an Assignment Notice.  Only then will counterparties be assured a fair opportunity to protect their rights.

15. Fifth, the Assignment Procedures should not adversely impact counterparties' valid rights of termination and setoff under the Bankruptcy Code.  The Assignment Procedures unfairly expedite the termination process thereby affecting counterparties' rights under the Bankruptcy Code to determine when to offset and terminate Derivative Contracts.  At the very least, the Agency and other counterparties' rights to terminate Derivative Contracts should not be abrogated unless and until an assignment has been finally consummated.  The Assignment Procedures should be revised to provide that a counterparty which may receive a notice of a proposed  assignment (triggering the five business day objection period), still has the right, prior to consummation of the assignment, to terminate its Derivative Contracts and related master agreements with the Debtors.

16. Sixth, the Assignment Procedures should not interfere with the Agency's and other counterparties' rights to object to a proposed assignment on any valid grounds including but not limited to a proposed assignee's failure to provide a separate unconditional guarantee from an affiliated third party or otherwise.

17. Seventh, the Assignment Procedures state that "In any instance where a Derivative Contract is memorialized pursuant to a master agreement, the Debtors may assume and assign, pursuant to the Assignment Procedures, only all, but not fewer than all of the Derivative Contract transactions entered into pursuant to the master agreement." *See, Motion,* p. 12. The definition of "Derivative Contracts" in the Motion does not appear to directly include the underlying master agreement.  Thus, this provision could suggest that the Debtors may only be required to assign the Derivative Contracts and not necessarily the master agreement.  This

-7-

provision should be amended to make it abundantly clear that to the extent that the Debtors seek to assign any of the swaps, caps, or locks between the parties, that the Debtors must also be required to assign the related Master Agreements to the same proposed assignee.

18. Eight, the Assignment Procedures state that the Debtors will attempt to resolve each objection to an Assignment Notice consensually but to the extent that an objection cannot be resolved, the Debtors may seek Court authorization of the proposed assignment. The Agency does not object to the proposed goal of a consensual resolution of an objection to an Assignment Notice. However, the Assignment Procedures should be amended to specify a more definitive timeframe for resolution and also provide counterparties the right to seek a Court hearing to the extent that the Debtors are unnecessarily delaying the resolution of a particular objection.

19. Finally, the Agency submits that the Termination Procedures for terminated Derivative Contracts should be amended and clarified to (i) specify that the termination payments and expenses should be calculated in accordance with the Agreements, (ii) specify timeframes in which parties will submit information in support of their calculation of the appropriate termination payment due, and (iii) allow for Court intervention and an opportunity to be heard to the extent a settlement cannot be reached consensually within a specified timeframe. Further, the Debtors must clarify what they mean when they indicate that they "may" provide a release to counterparties in the event that the parties enter into a termination agreements. If agreements are terminated in accordance with the terms thereof or as a result of an order of this Court, all parties should be released.

**Joinder In Other Objections To Motion**

20. The Agency joins in other objections filed to the Motion to the extent not inconsistent with this Objection.

900200.00001/6689025v.3

**Reservation Of Rights**

21.     The Agency hereby reserves all of its rights to submit additional arguments in support of this Objection either prior to or at the hearing to consider the Motion and reserves all of its rights under the Agreement.

**Waiver of Memorandum of Law**

22.     The Agency requests a waiver of the requirement of a memorandum of law required under Local Bankruptcy Rule 9013-1(a).

**Conclusion and Recommendation**

23.     The Assignment Procedures and its proposed standards for assignees threaten to impact the issuance of multi-family housing bonds by the Agency in furtherance of its statutory mandate to promote affordable housing.  The Agency was put in place to help facilitate the construction and availability of multi-family rental housing for low and moderate income families.  The Agency's master bond resolution under which it issues multi-family debt requires it to obtain from ratings agencies confirmation that the existing underlying ratings on the Agency's multi-family debt will not be adversely affected.  The rating agencies, in turn, make that determination, in part, upon cash flows related to existing bonds because all the bonds are secured under the same resolution.  If the counterparties on the swaps, caps, or locks are of a low or marginal credit rating, the rating agencies will take those facts into consideration which could adversely affect the Agency's ability to issue multi-family housing bonds to the detriment of many New Jersey citizens.

24.     In light of the multiple objectionable aspects to the Motion, the Agency recommends that the Debtors allow the Agency, with LBSF's cooperation, to seek its own replacement counterparties for the Agreements in accordance with a bidding process with

qualified dealers, while the Agency simultaneously terminates the Agreements in accordance with their respective terms.  This recommended approach will assure the Agency that a creditworthy party is chosen in compliance with New Jersey law while at the same time assures LBSF of prompt payment of any termination amounts due in accordance with the Agreements.  To the extent this flexible consensual approach is acceptable to the Debtors, the Agency requests that appropriate protections be provided in the order approving the Motion to allow this collaborative effort to take place.

WHEREFORE, the Agency respectfully requests that this Court deny the Motion consistent with this Objection.

Dated: New York, New York
       November 28, 2008

BLANK ROME LLP
Attorneys for The New Jersey Housing
and Mortgage Finance Agency


By:  /s/Andrew B. Eckstein
    Andrew B. Eckstein
    Rocco A. Cavaliere
    The Chrysler Building
    405 Lexington Avenue
    New York, New York 10174
    (212) 885-5000

        and

    Robert I. Tuteur
    Karen Du Brul
    One Logan Square
    Philadelphia, Pennsylvania 19103
    (215) 569-5500

-10-