NIXON PEABODY, LLP
Christopher M. Desiderio
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
and
Amanda D. Darwin
Richard C. Pedone (admitted *pro hac vice*)
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000

*Counsel to Deutsche Bank Trust Company Americas*
*and Deutsche Bank National Trust Company,*
*each in their roles as Trustee, Indenture Trustee, Supplemental Interest Trust Trustee*
*and in other related fiduciary, agency and administrative capacities*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| LEHMAN BROTHERS HOLDINGS, INC., et al., ) | Case No. 08-13555 (JMP) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |

**OBJECTION OF DEUTSCHE BANK TRUST COMPANY AMERICAS
AND DEUTSCHE BANK NATIONAL TRUST COMPANY TO DEBTORS' MOTION
FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY
CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION
AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

Deutsche Bank Trust Company Americas and Deutsche Bank National Trust Company each as Trustee, Indenture Trustee, Supplemental Interest Trust Trustee, and in other related fiduciary, agency and administrative capacities for various trusts and other financing arrangements (in such capacities, collectively "DB"), by and through their counsel, Nixon Peabody LLP, hereby state their objection (the "Objection") to the Derivatives Procedures Motion (the "Derivatives Procedures Motion") of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors and debtors-in-possession in the above-referenced chapter 11 cases

12242809.10

(together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman") which seeks an order pursuant to sections 105 and 365 of the Bankruptcy Code establishing procedures for the settlement, or assumption and assignment, of prepetition derivative contracts (the "Proposed Assignment Procedures"). In opposition to the Derivatives Procedures Motion, DB states as follows:[1]

## I. PRELIMINARY STATEMENT AND SUMMARY OF OBJECTIONS

The relief sought in the Derivatives Procedures Motion is overbroad, deprives Counterparties of the statutory protections afforded to them by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, and violates the Counterparties' Constitutional due process rights. While the exigencies of these cases may require the establishment of special procedures, the basic statutory rights of Counterparties should not be trampled and/or rendered unenforceable by unreasonably short deadlines for objections, by stripping Counterparties of their contractual rights enforceable pursuant to Sections 560 through 562 of the Bankruptcy Code, or by a refusal of the Debtors to meet their legal burden. In addition, the proposed procedures fail to, in any way, address the special difficulties that trustees and other fiduciaries face in connection with complex financing transactions. DB's specific objections may be summarized as follows:

- The five-day objection period provided by the Proposed Assignment Procedures is insufficient. The twenty-day period provided for by the Bankruptcy Code should not be shortened.

- Counterparties are statutorily entitled to know the identity of any proposed assignee so that they can evaluate its credit-worthiness and have an effective opportunity to challenge assignment.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Derivatives Procedures Motion.

- 2 -

12242809.10

- The Proposed Assignment Procedures wrongfully strip counterparties of any ability to challenge assignments to a broad class of Qualified Assignees.

- Counterparties should have an opportunity to challenge the Debtors' valuation of collateral posted in connection with a Derivative Contract.

As evidenced by Sections 560 through 562 of the Bankruptcy Code, Congress intended for non-debtor counterparties to derivatives contracts to retain their full contractual rights. The Debtors should not be permitted to override these and other statutory and contractual protections.[2]

## II. BACKGROUND ON ROLES OF DB AND AGREEMENTS AT ISSUE

1. Commencing on September 15, 2008, and periodically thereafter, LBHI and certain of its subsidiaries commenced voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases are being jointly administered pursuant to Federal Rule of Bankruptcy Procedure § 1015(b).

2. DB acts as trustee, indenture trustee, supplemental interest trust trustee and in other related fiduciary, agency and administrative capacities for various trusts and other similar complex financing arrangements including, without limitation, certain of those listed in that letter dated November 25, 2008, from Debtors' counsel to DB (collectively referred to herein as the "Trusts"). These Trusts were established for the purpose of issuing unsecured debt obligations and debt obligations secured by different types of assets including, but not limited to, residential and commercial mortgage loans, corporate bonds, student loans, residential mortgage-backed securities, commercial mortgage-backed securities, collateralized debt obligations, and

---

[2] In addition, it should be noted that the relief sought by the Debtor is predicated on section 105(a) of the Bankruptcy Code. Although section 105(a) is broad in scope, it does not "authorize the bankruptcy courts to create substantive rights that are otherwise available under applicable law, or constitute a roving commission to do equity." U.S. v. Sutton, 786 F.2d 1305, 1308 (5th Cir. 1986).

- 3 -

12242809.10

other types of asset-backed securities (such debt obligations collectively referred to as the "Swap-Related Securities").[3] The issuers (the "Issuers"), of the Swap-Related Securities, or DB on behalf of the Issuers, contemporaneously with the issuance of the Swap-Related Securities or subsequent to such issuances, often entered into Derivative Contracts, including agreements documented on or pursuant to standardized forms published by the International Swap Dealers Association, Inc., with Lehman for the purpose of credit enhancement or for hedging interest-rate, cash-flow timing or other risks associated with the Swap-Related Securities. In addition, some Issuers also entered into other types of Derivative Contracts with Lehman, such as credit default swap transactions (the Derivative Contracts described above being collectively referred to herein as the "Swap Agreements"). The notional amounts under the Swap Agreements total billions of dollars.

3.      Many of the Swap Agreements were entered into by the Issuers with Lehman Brothers Special Financing Inc. ("LBSF"). LBHI, in turn, guaranteed LBSF's obligations as a credit support provider under many of the Swap Agreements. Under the standard terms of a Swap Agreement, a voluntary bankruptcy filing by a counterparty (or its credit support provider) is an event of default giving the non-defaulting counterparty the right, but not the obligation, to terminate all outstanding derivative transactions under the Swap Agreement. Accordingly, in those cases where LBHI guaranteed the obligations of LBSF, the bankruptcy filing by LBHI on September 15, 2008 was an event of default under the Swap Agreement, giving the Issuers, or DB, as applicable, the right, but not the obligation, to terminate all transactions under the

---

[3]     The following paragraphs are offered as a summary and general overview of the financing arrangements impacted by the Derivatives Procedures Motion. Details of specific transactions are available upon request. In all cases the terms of the actual documents, not the summary provided herein, shall govern the parties' rights.

- 4 -

relevant Swap Agreement.[4] The subsequent bankruptcy filing by LBSF on October 3, 2008, was an additional and independent event of default under many of the Swap Agreements, giving the Issuers, or DB, as applicable, the right, but not the obligation, to terminate the transactions.

### III.    ARGUMENT

**A.    The Five (5) Day Objection Period Provided by the Proposed Assignment Procedures is Insufficient**

4.    The Debtors' Proposed Assignment Procedures provide that, upon the receipt of an Assignment Notice, a Counterparty shall have five (5) business days to object on the basis of: (i) the proposed cure amount; (ii) the need to cure a default or early termination event, other than a bankruptcy default; and/or (iii) the proposed adequate assurance of future performance offered if neither the assignee nor its credit support provider is a Qualified Assignee.

**i.    DB May be Required to Consult with Other Interested Parties Before Accepting or Objecting to a Proposed Assignment**

5.    As discussed more fully above, DB acts in various roles with respect to the Trusts. While the applicable Issuer is typically the Counterparty to the Derivative Contracts with Lehman, under the applicable Trusts pursuant to which DB was appointed, the noteholders or certificateholders (collectively, "Trust Investors") are the beneficiaries of any proceeds of the Derivative Contracts.

6.    The structuring of the Trusts is extremely complex and often involves many different parties. Given the complexity of the Trusts, DB may not be in a position to act unilaterally to agree or object to a proposed assignment. Often, DB is required, consistent with its contractual duties, to notify various constituencies (including Trust Investors, collateral managers charged with managing collateral held by the Trusts, Issuers, rating agencies,

---

[4]    This description of one type of default that occurred is offered by way of example and in no way constitutes a waiver of DB's, or any Counterparties', rights arising out of any other type of default.

depositors and servicers responsible for administering the Trusts) and to consult with these constituencies to determine whether a proposed assignment is acceptable. A five (5) day period is wholly insufficient for the various constituencies to receive notice and for a determination to be made on how to proceed. Without an adequate opportunity to notify and confer with Trust Investors or their representatives, the rights and interests of Trust Investors may be in jeopardy and DB may not be able to meet its contractual obligations.

7. In order to allow DB additional time to notify its constituents, the Debtors should be required to provide the Counterparty and DB notice at the time they determine the Derivative Contract will be submitted for bidding, and then twenty (20) days to object to the proposed assignment after the proposed assignee is identified. The delivery of such early notice will not prejudice the Debtors.

8. The Federal Rules of Bankruptcy Procedure provide for parties-in-interest to a contract to be assumed or assigned to be given at least twenty (20) days notice. Fed. R. Bankr. P. 2002(a)(2). Due to DB's roles with respect to Trust Investors, and because of the nature and complexity of the Derivative Contracts, this period is both reasonable and necessary.[5]

> **ii. The Five (5) Day Objection Period is Insufficient to Allow a Counterparty to Perform Due Diligence on Assignees That Are Not Qualified Assignees**

9. The Proposed Assignment Procedures regarding assignees that are not designated Qualified Assignees are inadequate. The Debtors state that if neither the proposed assignee nor its credit support provider is a Qualified Assignee, they will simply disclose the identity of each to the Counterparty and nothing further. This presents numerous issues for a Counterparty. In

---

[5] It is not clear from the Derivatives Procedures Motion whether the Debtors are requesting a waiver of the ten (10) day mandatory stay period of an order authorizing the assumption and assignment of a contract provided for under Fed. R. Bankr. P. 6006(d). Rule 6006(d) should not be suspended. The Debtors have not provided any legal or equitable justification in the Derivatives Procedures Motion a waiver of this period.

- 6 -

such instances, it is clear that a Counterparty will need more than five (5) days to complete the proper due diligence to determine the creditworthiness of such party and whether it is receiving adequate assurance. Because the five (5) day period is unreasonably short, it is appropriate to require that the Debtors furnish detailed financial information regarding the proposed assignee in order to facilitate the Counterparty's due diligence. Contrary to settled bankruptcy law, the Proposed Assignment Procedures incorrectly place the burden on the Counterparties to demonstrate that they are not adequately protected, rather than requiring the Debtors to demonstrate that the requisite adequate assurance is provided.

10. The Debtors should be required to provide a Counterparty additional information regarding a proposed assignee if neither the assignee nor its credit support is a Qualified Assignee so that Counterparties can be assured of future performance.

**B.    Counterparties are Statutorily Entitled to Adequate Assurance of Future Performance**

11. If a debtor wishes to assign a contract, even a contract that is not in default, the debtor must provide the non-debtor counterparty adequate assurance of future performance. 11 U.S.C. § 365(f)(2).

12. The report issued by the Commission on Bankruptcy Laws explains that:

> The Commentaries to the Code note that " 'adequate' assurance is to be 'defined by commercial rather than legal standards.' . . . What constitutes "adequate assurance" is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious.

In re Texas Health Enters., 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000) (internal citations omitted)(quoting Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1310-1311 (5th Cir. 1985)).

13. The burden is on the Debtors to present financial evidence about the proposed assignee and to demonstrate the likelihood that such party has the financial capacity to perform its future obligations. In re Texas Health Enters., 246 B.R. at 834.

14. As has been readily apparent in the recent financial crisis, credit ratings are not always the best indication of a party's creditworthiness, and are in any event not necessarily an indication of a party's ability to perform. For example, as recently as September 12, 2008, the Friday before the lead debtor in this case filed for bankruptcy, Standard & Poor's Ratings Services maintained 'A' long-term and 'A-1' short-term counterparty credit ratings, on LBHI. See "*S&P: Lehman Brothers CreditWatch Revised to Developing After Reports of Potential Sale of Company*," *available at* http://www.reuters.com/article/pressRelease/idUS167660+12-Sep-2008+PRN20080912. Additionally, the Debtors' Proposed Assignment Procedures do not contemplate how a Qualified Assignee's status is affected if at the time of the transfer the assignee has an A- rating from Standard & Poor's, but is also issued a negative watch designation. Such a designation could indicate that the proposed Qualified Assignee's credit rating is subject to an imminent downgrade event and that any adequate assurance would be in jeopardy.

15. By the Proposed Assignment Procedures, the Debtors shift the burden from having to demonstrate that Counterparties receive adequate assurance, to the Counterparties having to demonstrate that they are not receiving such assurance, without proper justification or evidence.[6]

---

[6] In addition, certain requirements of the Patriot Act, and other United States statutes require the disclosure of counterparties to a Derivative Contract. Such disclosures are required before an assignment can be effective. There is no provision of the Bankruptcy Code that would permit the Debtors to skirt these statutory restrictions. As such, it is reasonable, and mandated by U.S. law, to require the Debtors to disclose the identity of the assignee to the Counterparty and DB.

**C. The Proposed Assignment Procedures Wrongfully Strip Counterparties of Any Ability to Challenge Assignments to Qualified Assignees**

16. The Proposed Assignment Procedures provide that "any assignee or its credit support provider [that has] a Standard & Poor's or Fitch credit rating equal to or higher than A- or a Moody's credit rating equal to or higher than A3, or *any equivalent thereof*" shall be deemed a "Qualified Assignee." Derivatives Procedures Motion ¶ at 19(b) (emphasis added). Under the Proposed Assignment Procedures, once the Debtors designate a Qualified Assignee, a Counterparty is deemed to have received adequate assurance of future performance, and the Counterparty cannot then object to such an assignment in order to perform its own due diligence.

17. The principles of adequate assurance provide that a non-debtor counterparty is entitled to know the identity of an assignee. COLLIER ON BANKRUPTCY, ¶ 365.08[1], (15TH ED. 2008). Therefore, a Counterparty is entitled to know the identity of an assignee, even if the Debtor has determined that such party is a "Qualified Assignee."

18. Further, in order to provide Counterparties the requisite adequate assurance, any assignee should have a credit rating at least equal to the Debtor-counterparty at the time the Derivative Contract was entered into. The Debtors should not be permitted to set an arbitrary credit rating for the purposes of designating Qualified Assignees. See In re Texas Health Enters., 246 B.R. at 834.

19. In all cases "Qualified Assignees" should, at a minimum, be required to have: (a) a credit rating equal to or higher than the credit rating of the Debtor-counterparty at the time the Derivative Contract was entered into; or (b) a credit rating equal to or higher than the credit rating for assignees as provided for in Derivative Contract. In addition, in all circumstances the Counterparty and/or DB should have an opportunity to object to any particular assignment regardless of the Debtors' unilateral designation of a particular proposed assignee as qualified.

**D.    The Proposed Assignment Procedures Allow the Debtors to Unilaterally Designate Qualified Assignees Without Explanation**

20.    The Proposed Assignment Procedures simply state, without further explanation, that a Qualified Assignee must meet a minimum credit rating issued by the three rating agencies or "any equivalent thereof." This expansive definition of Qualified Assignee appears to grant the Debtors the sole discretion to determine the creditworthiness of any potential assignee, and accordingly provides the Debtors with unchecked latitude to designate almost anyone a Qualified Assignee without any justification or clarification.

21.    The Proposed Assignment Procedures do not provide any opportunity for Counterparties to object to this "equivalency" standard. Further, the Proposed Assignment Procedures do not even require the Debtors to disclose how such a determination was made. In such instances, Counterparties will not know the credit rating, identity, or true financial condition of the proposed assignee and will be forced to rely on the Debtors' judgment based on an amorphous standard. Permitting the Debtors to assign Derivative Contracts to virtually anyone they deem creditworthy eviscerates a Counterparty's statutory right to adequate assurance.

**E.    Counterparties Should be Entitled to Dispute the Valuation of Collateral**

22.    The Proposed Assignment Procedures provide that in circumstances where a Derivative Contract requires a return of posted collateral as part of a Cure Amount, the Debtors will either return such collateral or pay an amount equal to the value of such collateral as of the business day prior to service of the Assignment Notice based upon independent third-party pricing services.

23.    The valuation of collateral and the calculation of Cure Amounts and termination amounts are complex and fluid. These valuations are inherently subject to differing interpretations and cannot be determined in a summary process. Additionally, many of the

Derivative Contracts provide specific methods for valuing collateral, and such bargained-for provisions must be honored.[7]

24. The Proposed Assignment Procedures do not permit a Counterparty to dispute such valuation and/or the qualifications or methods of the "independent third-party" pricing services. DB proposes that either (a) the valuation methodology provided for in the Derivative Contract be followed, or (b) give Counterparty the opportunity to refute the valuation provided by the Debtors' chosen pricing service or method before this Court.

**F.     Reservation of Rights**

25. Although this Objection primarily addresses the procedural aspects of the Proposed Assignment Procedures, DB reserves the right to object to the assumption and assignment of specific Derivative Contracts pursuant to its rights under such contracts and applicable Bankruptcy law. The grounds that DB may put forward in connection with any future objection include, but are not limited to, those discussed below.

**(i)     The Bankruptcy Code Does Not Permit The Debtors to Cure Nonmonetary Defaults and thus the Debtors May Not Assign Certain Derivative Contracts Absent Counterparty's Consent**

26. Section 365(b)(1)(A) of the Bankruptcy Code requires that a debtor cure all defaults under an executory contract in conjunction with any assumption. Where a nonmonetary default has occurred that is not specifically covered by the exceptions in 11 U.S.C. § 365(b)(2), assumption and assignment may not take place without the express consent of the Counterparty. DB reserves its right to object to any proposed assignment where a nonmonetary default has occurred.

---

[7] The Debtors' failure to honor such a contractual provision may constitute a nonmonetary default which could operate as an absolute bar to assignment absent Counterparty consent.

- 11 -

12242809.10

### (ii) The "Safe-Harbor" Provisions of Section 560 Through 562 Protect the Counterparty's Termination Rights Before and After Assumption and Assignment

27. The Bankruptcy Code provides numerous "safe harbor" provisions allowing counterparties to Derivative Contracts to exercise their contractual termination and other legal rights notwithstanding any party's bankruptcy filing. See 11 U.S.C. § 560-562 (providing counterparties with the right to terminate derivatives contracts notwithstanding 365(e)(1)).

28. The Bankruptcy Code is clear on this point: a Counterparty's right to terminate a "swap agreement" (as defined in section 101(53B) of the Bankruptcy Code) because of the Debtors' bankruptcy would survive any assignment, irrespective of a court order to the contrary. Section 560 of the Bankruptcy Code provides in relevant part "[t]he exercise of any contractual right of any swap participant…to cause…the termination…because of a condition of the kind specified in section 365(e)(1)…shall not be stayed, avoided, or *otherwise limited…by order of a court…in any proceeding under this title…*(Emphasis added). See also, In Re Mirant Corporation, 314 B.R. 347 (Bankr. N.D. Tex. 2004) (seven-week delay in terminating a swap agreement did not constitute a waiver of the nondebtor counterparty's right to terminate the swap agreement because of the counterparty's inherent right to terminate under section 560 of the Bankruptcy Code). Furthermore, many of the Swap Agreements contain provisions that state that a failure or delay in exercising any right, power or privilege under such Swap Agreement is not presumed to operate as a waiver.

29. Absent the assent of the Counterparty, any assignee of the Debtors' will assume any Derivative Contracts subject to the Counterparties' ongoing termination rights.

12242809.10

### (iii) Reservation of Guaranty Rights

30. Many of the Swap Agreements were supplemented by guarantees or other credit support. DB reserves all rights against any credit support provider in the event of any assignment of a Swap Agreement.

### (iv) Reservation of Setoff, Recoupment, Netting and other Related Rights

31. In many instances, pursuant to contractual rights and/or other applicable law, Counterparties have the right to exercise recoupment, setoff or netting rights. While the Derivatives Procedure Motion does not explicitly seek to alter such rights (nor would the Bankruptcy Code permit the alteration of such rights), DB reserves the right to object to any proposed assignment that could interfere with such rights.

## IV. CONCLUSION

32. For the foregoing reasons DB objects to the Debtors' Derivatives Procedures Motion.

WHEREFORE, DB requests that this Court:

A. Deny the relief sought in the Derivatives Procedures Motion;

B. Modify the Proposed Assignment Procedures to incorporate appropriate protections for DB as trustee and in its other capacities including without limitation:

    (a) grant DB at least twenty (20) days to object to any proposed assignment;

    (b) require that the Assignment Notice be served on DB's counsel of record and to other parties required to receive notice pursuant to the applicable Derivative Contract;

    (c) require that the Debtors notify the Counterparty and DB as soon as they determine that they will submit a Derivative Contract for bids;

(d) require that a "Qualified Bidder" have a credit rating equal to, or higher than either

  (i) the Debtor-counterparty at the time the Derivative Contract was entered into, or

  (ii) the credit rating required for an assignment by the terms provided for in the Derivative Contract;

(e) require that the Debtors provide to DB, contemporaneously with any Assignment Notice, the credit rating, identity, and any other known financial information regarding any proposed assignee that demonstrates such assignee's creditworthiness irrespective of whether such proposed assignee is a Qualified Assignee and afford DB and/or the Counterparty the opportunity to object to any assignment to any assignee;

(f) require that the Debtors provide to DB, contemporaneously with any Assignment Notice, the credit rating, identity, and any other known financial information regarding all bidders for a Derivative Contract;

(g) require either (i) that the valuation methodology provided for in the Derivative Contract be adhered to, or (ii) that the Debtors give the Counterparty the opportunity to refute any valuation provided by the Debtors' chosen pricing service before this Court;

(h) deny the Debtors the ability to assign or terminate any guarantees or other credit support provided by Lehman affiliates; and

C. Grant DB such other and further relief this Court deems necessary and appropriate.

- 14 -

12242809.10

Dated: New York, New York
November 28, 2008

Respectfully Submitted,

By: */s/ Christopher M. Desiderio*
Christopher M. Desiderio
NIXON PEABODY LLP
437 Madison Avenue
New York, NY 10022
Telephone: (212) 940-3000
Facsimile: (212) 940-3111

and

Amanda D. Darwin
Richard C. Pedone (admitted *pro hac vice*)
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
Telephone: (617) 345-1000

*Counsel to Deutsche Bank Trust Company America, and Deutsche Bank National Trust Company, each in their roles as Trustee, Indenture Trustee, Supplemental Interest Trust Trustee and in other related fiduciary, administrative and agency capacities*