KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Matthew A. Cantor (MC 7727)
Robbin L. Itkin (RI 1019)
Michael A. Cohen (MC 1277)

Counsel for Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
**In re**                                                    : **Chapter 11**
                                                             :
**NRG ENERGY, INC., et al.,**                                :
                                                             : **Case No. 03-03-13024 (PCB)**
                        **Debtors.**                         :
                                                             : **(Jointly Administered)**
------------------------------------------------------x

**THIS MOTION APPLIES TO:**

| | | | |
|---|---|---|---|
| X | All Debtors | ___ | NRG Power Marketing, Inc. |
| ___ | NRG Energy, Inc. | ___ | NRG Capital LLC |
| ___ | Arthur Kill Power LLC | ___ | NRG Finance Company I LLC |
| ___ | Astoria Gas Turbine Power LLC | ___ | NRG Central U.S. LLC |
| ___ | Berrians I Gas Turbine Power LLC | ___ | NRG Eastern LLC |
| ___ | Big Cajun II Unit 4 LLC | ___ | NRGenerating Holdings (No. 23) B.V. |
| ___ | Connecticut Jet Power LLC | ___ | NRG New Roads Holdings LLC |
| ___ | Devon Power LLC | ___ | NRG Northeast Generating LLC |
| ___ | Dunkirk Power LLC | ___ | NRG South Central Generating LLC |
| ___ | Huntley Power LLC | ___ | Oswego Harbor Power LLC |
| ___ | Louisiana Generating LLC | ___ | Somerset Power LLC |
| ___ | Middletown Power LLC | ___ | South Central Generation Holding LLC |
| ___ | Montville Power LLC | ___ | Norwalk Power LLC |
| ___ | Northeast Generation Holding LLC | | |

## MOTION FOR AN ORDER (I) ESTABLISHING PROCEDURES FOR SETTLEMENT OF TERMINATED SAFE HARBOR CONTRACTS AND (II) AUTHORIZING THE DEBTORS TO ENTER INTO DERIVATIVE CONTRACTS AND TO PLEDGE COLLATERAL UNDER DERIVATIVE CONTRACTS

**THIS MOTION REPLACES AND SUPERSEDES THE MOTION FILED AS ITEM NO. 18 ON THE COURT'S DOCKET. ITEM NO. 18 ON THE COURT'S DOCKET IS HEREBY WITHDRAWN.**

Safe Harbor Settlement Only v.3.doc

NRG Energy, Inc. ("NRG"), together with certain of its domestic affiliated entities, as debtors and debtors in possession (collectively, the "Debtors"), file this Motion and in support thereof respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

2.      On the date hereof (the "Commencement Date"), the Debtors commenced their respective reorganization cases by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[1] The Debtors remain in possession of their respective properties and are continuing to operate and manage their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      NRG and its direct and indirect Debtor and nondebtor subsidiaries (collectively, the "NRG Companies") comprise a leading global energy company primarily engaged in the ownership and operation of power generation facilities and the sale and marketing of energy, capacity and related products throughout the world. The NRG Companies are one of the largest independent power generation companies in the world, measured by their net ownership interest in power generation facilities. The NRG Companies own interests in power generation projects in approximately 29 states in the United States, as well as in England, Germany, Australia, Taiwan, India, Bolivia, Brazil and Peru. The NRG Companies also own interests in other construction projects in various states of completion, the development of which has been

---

[1] On November 22, 2002, five former executives of NRG filed an involuntary chapter 11 case against NRG in the United States Bankruptcy Court for the District of Minnesota. On May 12, 2003, the Minnesota bankruptcy court dismissed the involuntary proceeding pursuant to 11 U.S.C. § 305(a).

postponed or terminated due to NRG's liquidity situation, as well as other properties not used for operations.

4.    NRG is a wholly-owned subsidiary of Xcel Energy Wholesale Group Inc., which is a wholly-owned subsidiary of Xcel Energy Inc. ("Xcel"). Xcel directly owns 6 utility subsidiaries that serve electric and natural gas customers in 12 states. Xcel also owns or has an interest in a number of non-regulated businesses, the largest of which is NRG.

5.    The NRG Companies' worldwide workforce currently consists of approximately 3,100 full and part-time employees, of which approximately 2,075 are employed in the NRG Companies' domestic operations. NRG directly employs approximately 325 employees, and the remaining approximately 1,750 employees are employed by NRG's domestic affiliates in approximately 64 locations in 29 states throughout the United States. A little less than half of NRG Companies' domestic workforce (i.e., approximately 1,025) are non-union employees, and the other half (i.e., approximately 1,050) are union employees who are represented under 17 different collective bargaining agreements.

6.    As set forth in the Form 10-K filed by NRG on March 31, 2003, for the year ended December 31, 2002, the NRG Companies reported revenues from majority-owned operations of approximately $2.3 billion and equity in earnings of unconsolidated affiliates of approximately $69 million. As of December 31, 2002, the NRG Companies also reported consolidated assets totaling approximately $10.9 billion and liabilities totaling approximately $11.6 billion.

7.    In their drive to be a leader in the independent power industry, the NRG Companies pursued a strategy of rapid growth through acquisitions, growing revenues from approximately $182 million in 1998 to approximately $3 billion in 2001. Starting in 2000, the NRG Companies added the development of new construction projects to this strategy. This growth required significant investments of new capital, which the NRG Companies obtained primarily through the issuance of long-term debt. By the end of 2002, NRG had approximately

3

$9.4 billion of debt on its balance sheet at the corporate and project levels, compared to only approximately $625 million of consolidated long-term indebtedness in 1998.

8.      In order to service their debt obligations, the NRG Companies are highly dependent on the wholesale power markets in the United States for strong and consistent revenues.  In 2000, however, wholesale power prices began to decline dramatically due to overcapacity, the general economic downturn, mild weather conditions, the price of fuel, and the liquidity and volatility of the markets and regulatory environment.  The decline in wholesale prices left the NRG Companies financially vulnerable.

9.      In December 2001, Moody's Investor Service placed NRG's long-term senior unsecured debt rating on review for possible downgrade.  In response, Xcel and NRG negotiated a plan to preserve NRG's investment grade rating and to improve its financial condition, including financial support from Xcel to NRG, marketing certain NRG assets for sale, canceling and deferring capital spending, and reducing corporate expenses.  During 2002, Xcel contributed $500 million to NRG, and NRG and its subsidiaries sold assets and businesses that provided NRG in excess of $286 million in cash and eliminated approximately $432 million in debt.  NRG also cancelled or deferred construction of approximately 3,900 megawatts of new generation projects.

10.      The subsequent collapse of Enron, however, further affected the practices of credit rating agencies, which began to scrutinize the merchant power industry more closely and to tighten their criteria for creditworthiness.  Notwithstanding NRG's restructuring efforts, beginning in July 2002, major credit agencies began to downgrade the credit ratings of NRG, which had severe financial consequences on the NRG Companies.  Since July 2002, the secured NRG Northeast Generating LLC bonds, the secured NRG South Central Generating LLC bonds and the secured LSP Energy bonds also were downgraded multiple times.  Following these downgrades, the NRG Companies were confronted with demands under various financing agreements and power marketing contracts to post cash collateral in an aggregate amount in excess of $1 billion.

4

11.    By September 2002, certain of the NRG Companies became unable to service their debt, and began missing scheduled interest and/or principal payments under certain debt and bond obligations.    These missed payments also may have resulted in cross defaults of numerous other non-recourse and limited recourse debt instruments of NRG.    The downgrades also reduced access to supply chains and to trade credit -- requiring the NRG Companies to prepay for fuel and other related delivery and transportation services and provide security deposits in certain instances -- which further reduced the NRG Companies' gross margins and business opportunities.

12.    Realizing that a complete restructuring of their debt would be needed, in August 2002 the NRG Companies began to negotiate with certain of their primary bank lenders and noteholders, which had formed ad hoc committees (collectively, the "Ad Hoc Committees"), regarding the terms of an overall restructuring plan.    On August 19, 2002, NRG executed a collateral call extension letter with various secured project lender groups, pursuant to which the lenders agreed to extend, until September 13, 2002, the deadline by which NRG was to post approximately $1 billion of cash collateral in connection with certain bank loan agreements. Effective as of September 13, 2002, NRG entered into a second collateral call extension letter with its lenders, pursuant to which the cash collateral call deadline was extended to November 15, 2002, and NRG agreed to submit to the lenders a comprehensive restructuring plan.    On November 4, 2002, NRG submitted a restructuring plan to the lenders and their advisors.[2]    This restructuring plan has served as a basis for continuing negotiations between Xcel, NRG, and the Ad Hoc Committees.

13.    On March 26, 2003, Xcel announced that its board of directors had approved a tentative settlement agreement with the Ad Hoc Committees.    The settlement provides for, among other things, Xcel to make payments to NRG over the next 13 months totaling up to $752 million for the benefit of NRG creditors in consideration for their waiver of any existing and

---

[2]  NRG did not post the required collateral on November 15, 2002.

potential claims against Xcel, which payment consists of: (i) $350 million at or shortly following the consummation of a restructuring of NRG's debt; (ii) $50 million on January 1, 2004, which may be cash or Xcel common stock or any combination thereof at Xcel's option; and (iii) up to $352 million in April 2004. The proposed settlement agreement will provide the basis for a consensual and comprehensive financial restructuring and deleveraging of the NRG Companies' balance sheet, and will be implemented through a chapter 11 plan of reorganization. Accordingly, the Debtors intend to prepare and file a chapter 11 plan and related disclosure statement in the immediate future, obtain confirmation of such plan pursuant to applicable bankruptcy law, and emerge from these chapter 11 cases as expeditiously as possible.

## THE DEBTORS' DERIVATIVE STRATEGY

14.    The Debtors' businesses are sensitive to fluctuations in energy and energy related commodities prices, interest rates and foreign currency exchange rates. In the ordinary course of business, the Debtors enter into derivative contracts to reduce the risks associated with such fluctuations. As a general matter, derivative contracts are financial contracts whose values are based on, or "derived" from, the price of a traditional security such as a stock or bond, an asset such as a commodity (e.g., coal, fuel oil, natural gas), or a market index (collectively, the "Derivative Contracts"). Derivative contracts can take a number of different forms, including forward contracts, futures contracts, swap contracts, option contracts or combinations of the foregoing.

15.    Forward Contracts. A forward contract obligates the purchaser of such contract to acquire or deliver a commodity or asset on a specified date in the future at a specified price.

16.    Futures Contracts. A futures contract is similar to a forward contract in that a futures contract also obligates the purchaser of such contract to acquire or deliver a commodity or asset at a specified price on a specified date in the future. A futures contract differs from a forward contract in that it is generally available for purchase only on an organized commodity exchange or similar marketplace which serves as the contract counterparty to all participants and generally requires the posting of margin by contract participants. Posting of margin requires

6

participants to deposit money in an account with the exchange to be transferred to the exchange to the extent that the participant owes money on account of the futures contract or is in default on its obligation to the exchange.

17.    Swap Contracts.  A swap contract obligates each party to the contract to exchange or swap cash flows at specified intervals.  For example, an interest rate swap contract might obligate one party to pay a cash flow calculated based on the application of a fixed rate of interest on a hypothetical principal amount, known as a notional amount, while the other party might be obligated to pay a cash flow calculated based on the application of a floating rate of interest on the same notional amount.

18.    Option Contracts.  An option contract provides the purchaser the right, but not the obligation, to purchase or sell a security or asset at a specified price on a specified date.  Each of these contracts may be used for purposes of hedging or reducing risk or for purposes of speculating on the prices of underlying securities, assets or indices.

19.    In certain circumstances, and in the ordinary course of the Debtors' business operations, the Debtors' counterparties to the Derivative Contracts have required that the Debtors' performance obligations under the Derivative Contracts be secured by cash collateral, letters of credit or pledges of certain of the Debtors' assets to the counterparty where the Debtors' obligations to the counterparty under outstanding Derivative Contracts exceed a predetermined threshold.

## THE SAFE HARBOR CONTRACTS

20.    Recognizing the unique status of certain Derivative Contracts, such as forward contracts, commodities contracts, securities contracts, certain repurchase agreements, and swap agreements, in the financial and commodity markets (collectively, 'Safe Harbor Contracts"), Congress has added to the Bankruptcy Code certain so-called "safe harbor" provisions of sections 555, 556, 559 or 560 of the Bankruptcy Code regarding such Derivative Contracts to which a debtor in possession is a party.  These provisions generally permit non-debtor

7

counterparties to Safe Harbor Contracts to exercise certain rights and remedies not generally available to other contract counterparties in a bankruptcy case.

21.    Among the "safe harbor" rights and protections under the Bankruptcy Code are provisions that (a) allow the non-debtor party to terminate, liquidate and apply collateral held under a Safe Harbor Contract upon a bankruptcy of the other party, notwithstanding section 365(e)(1) of the Bankruptcy Code; (b) protect prepetition payments made under a Safe Harbor Contract by the debtor to the non-debtor party from the avoidance powers of a trustee or debtor in possession except in particular cases of actual intent to defraud other creditors; and (c) permit the non-debtor party to setoff mutual debts and claims against the debtor under a Safe Harbor Contract without the need to obtain relief from the automatic stay; provided that such Safe Harbor Contracts allow for such setoff.[3]

22.    As mentioned above, prior to the Commencement Date, the Debtors entered into various Derivative Contracts, many of which are also Safe Harbor Contracts, in the ordinary course of business for the purpose of reducing or hedging existing or expected risks associated with fluctuations in energy and energy related commodities prices, interest rates and foreign currency exchange rates.

23.    The Debtors anticipate that after the Commencement Date many of the Safe Harbor Contracts will be validly terminated by either the contract counterparty or the Debtors.[4] Each time a contract is terminated, a termination payment needs to be calculated. The Debtors also anticipate that certain contracts may be terminated prior to the Commencement Date but the termination payment may not be determined until after the Commencement Date. The payment may be owed to the Debtor or by the Debtor, depending on the market value of the contract and the early termination provisions.

---

[3] These provisions are contained in sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 548(d)(2)(B), (C), and (D); 553(e)(1); 555, 556, 559 and 560 of the Bankruptcy Code.

[4] In fact, since the Commencement Date, numerous Derivative Contracts have been terminated by counterparties.

8

24.     Generally, Safe Harbor Contracts are documented in the form of (a) master agreements, including the Master Netting Agreements (as defined below), (b) confirmations issued under general terms and conditions, (c) enabling agreements, or (d) single transaction agreements (collectively, "Transaction Agreements"). The Transaction Agreements set forth terms and conditions that govern various transactions entered into between the parties from time to time.[5]

25.     Where a master agreement is used, a number of widely used standard forms exist for both physical and financial transactions of the type entered into by the Debtors and the counterparties.[6] The parties to a master agreement then enter into individual transactions under the master agreements. These individual transactions are customarily documented in the form of confirmations, which set forth, among other terms and conditions, specified quantities and delivery dates for physical transactions, and specified methods for calculation of payment amounts and specified payment dates for financial transactions.

**Early Termination And Termination Payments**

26.     Among the typical "safe harbor" provisions noted above is the right of a qualifying non-debtor party to terminate a Safe Harbor Contract due to, among other things, the commencement of a bankruptcy case by the other party.[7] Such an event is generally designated under the Transaction Agreements as an "early termination event" or an "event of default."

27.     Subject to the terms of the Transaction Agreements, proper termination upon an early termination event or an event of default - whether the transactions under the Transaction

---

[5]  The Debtors, by filing this motion, are not expressing a view as to whether any particular Transaction Agreement is or is not a Safe Harbor Contract or any particular counterparty is a party entitled to exercise rights pursuant to the "safe harbor" provisions of the Bankruptcy Code.

[6]  An example of the form of a Transaction Agreement used by market participants in general and by the Debtors in particular is the EEI Master Power Purchase and Sale Contract, which may or may not be a Safe Harbor Contract.

[7]  The Debtors reserve the right to assert that a counterparty who did not terminate promptly or properly after the commencement of these cases waived the right to terminate solely on account of the Debtors' bankruptcies or financial condition. Further, any improper termination of a Derivative Contract will be in violation of the automatic stay under Bankruptcy Code section 362 and will be dealt with accordingly.

Agreements are forward contracts, swap contracts, repurchase agreements, or otherwise - is typically accomplished by (a) both parties ceasing all performance under the transactions, (b) the non-defaulting party determining the amounts payable by each party to the other party at the time of termination, and (c) the "netting" of the amounts due to and from each party to a Transaction Agreement, thereby reaching a net settlement amount payable by one party (the "Termination Payment").

28.    Under many Transaction Agreements, a Termination Payment would be payable by either the defaulting party or the non-defaulting party. Thus, termination may result in a net payment to the Debtors. These "in-the-money" agreements, where an embedded net amount due to the Debtors is present, constitute significant assets of the Debtors' estates.

**The Master Netting, Setoff and Security Agreements**

29.    Many Transaction Agreements expressly address the rights of setoff and netting. Some agreements may restrict common law setoff rights. Other agreements may expand setoff and netting rights to include multiple Transaction Agreements and multiple affiliates of the contracting parties.

30.    In addition, certain Debtors and counterparties have entered into master netting, setoff and security agreements ("Master Netting Agreements") pursuant to which one or more Debtors, on the one hand, and one or more affiliated counterparties, on the other hand, agree to aggregate their respective exposures under two or more Transaction Agreements (physical and/or financial) for purposes of determining exposure thresholds and collateral requirements, as well as to exercise early termination, liquidation, netting and setoff rights across different Transaction Agreements and different affiliated counterparties that have signed the Master Netting Agreement. In all cases, the counterparties under a Master Netting Agreement are affiliated entities, usually under the ownership of a common parent company.

31.    Where the Debtors and the counterparties have entered into a Master Netting Agreement, if provided therein, the default and termination remedies of the Master Netting Agreement replace the default and termination remedies of those particular Transaction

Agreements covered by the Master Netting Agreement.  In such instances, the Master Netting Agreement provides its own Termination Payment payable upon the occurrence of an early termination event.

## **RELIEF REQUESTED**

32.    By this Motion, the Debtors seek entry of an order (i) establishing Court-authorized procedures permitting the settlement of validly terminated Safe Harbor Contracts pursuant to the protocol annexed hereto as "Exhibit A" (the "Protocol") and (ii) authorizing the Debtors (x) to continue entering into, "rolling over," adjusting, modifying and settling Derivative Contracts for the purpose of hedging the Debtors' risk to fluctuations in energy and energy-related commodities prices and changes in interest rates and foreign currency exchange rates and (y) to perform all such other actions necessary or appropriate to implement, execute and perform such transactions, including, but not limited to, posting letters of credit, entering into escrow agreements, opening and funding escrow accounts, posting collateral or margin, prepayment and delivery of settlement on account of Derivative Contracts.[8]

### **Proposed Protocol Re:  Settlement of Amounts under Terminated Safe Harbor Contracts**

33.    The Debtors propose the Protocol (attached hereto as Exhibit A) by which the Debtors will advise the Official Committee of Unsecured Creditors (the "Creditors Committee"), and Xcel where Xcel as guarantied the Debtors' obligations under a terminated Safe Harbor Contract, of potential settlement agreements with counterparties with respect to a Termination Payment under a Safe Harbor Contract.  The Protocol provides that, prior to entering into a settlement agreement with respect to a Termination Payment under a Safe Harbor Contract, the Debtors must submit such proposed settlement agreement to the Creditors Committee (and where applicable, Xcel) for approval.  The Creditors Committee and Xcel will have ten (10) business

---

[8]  In addition to the Derivative Contracts, the Debtors enter into certain other related ordinary course transactions, including, but not limited to, transportation agreements, transmission agreements, storage agreements, leasing agreements and service agreements.  Accordingly, the Debtors request that the relief sought in this Motion with respect to Derivative Contracts (but not with respect to settlements related to the termination of the Safe Harbor Contracts) is also granted with respect to such other ordinary course transactions.

days to approve or disapprove the settlement. However, the Debtors request that, to the extent a member of the Creditors Committee is (i) a counterparty to a Safe Harbor Contract, which is a Settling Party (as defined in the Protocol); or (ii) a competitor of Debtors, such member shall not participate in the review process set forth in Section 2.3 of the Protocol and shall not receive or review any of the detailed information provided to the Creditors Committee other than the Settlement Notice (defined below) filed with the Court.

34.    Where each of the Creditors Committee and Xcel either approves the proposed settlement or does not disapprove it during the ten-business-day period, the Debtors will file a notice of the settlement with the Court (the "Settlement Notice"). The Settlement Notice will (a) identify each Safe Harbor Contract subject to the settlement, (b) identify the parties to the settlement agreement, (c) summarize the terms of the settlement agreement and (d) provide a concise statement by the Debtors of the rationale for the settlement. The Settlement Notice will be served on the counterparties or their counsel, if known, counsel to the Creditors Committee, Xcel, the United States Trustee for the Southern District of New York (the "U.S. Trustee"), counsel to any postpetition lenders and all parties that filed requests for special notice in these chapter 11 cases. Unless an objection is filed and served within five (5) business days after the Settlement Notice is filed and served upon the parties listed above, the Debtors shall be authorized to consummate the proposed settlement, and the parties receiving notice of the proposed settlement shall be deemed to have consented to the settlement. If an objection to the proposed settlement is timely filed and served, the matter will be heard at a hearing before this Court. The Debtors reserve their rights to move the Court to set such a hearing on an expedited basis.

35.    In the event that a net payment is due to the Debtors under a proposed settlement, such payment shall be collected by the Debtors and the appropriate releases shall be entered into among the Debtors and the counterparty. In the event that a net payment is due from the Debtors, no payment shall be made, but the counterparty may have a liquidated claim in the actual amount of any such net payment payable to such counterparty.

12

36.    If the Creditors Committee or Xcel does not approve a proposed settlement agreement, the Debtors may seek approval of the proposed settlement upon notice and a hearing in accordance with Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors reserve their rights to move the Court to set such a hearing on an expedited basis.

## BASIS FOR RELIEF

### A.    Safe Harbor Protocol And Settlement Procedures

37.    Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Bankruptcy Rule 9019(a) empowers the Bankruptcy Court to approve compromises and settlements if they are in the best interests of the estate. See, e.g., Protective Comm. V. Anderson (In re TMT Trailer), 390 U.S. 414, 424-25 (1968); Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994); In re Drexel Burnham Lambert Group, Inc., 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). The Second Circuit has expressed a strong preference for settlements. See, e.g., Newman v. Stein, 464 F.2d 689 (2d Cir. 1972), cert. denied, 409 U.S. 1039 (1972).

38.    Bankruptcy Rule 9019(b) provides, in part, that "[a]fter a hearing on such notice as the court may direct, the court may fix a class or classes of controversies and authorize the trustee to compromise or settle controversies within such class or classes without further hearing or notice." Fed. R. Bankr. P. 9019(b).

39.    Accordingly, Bankruptcy Rule 9019 authorizes the Court to approve the Protocol. Bankruptcy Rule 9019(b) would permit the Court to authorize certain classes of settlements to occur without further Court approval. Here, each settlement will be filed with the Court. Accordingly, the Debtors seek only to expedite the approval process under Bankruptcy Rule 9019(b).

40.    Section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets. The Second Circuit has acknowledged that section 105 of the Bankruptcy Code confers broad powers on bankruptcy courts:

> [Section] 105 [of the Bankruptcy Code] 'is an omnibus provision phrased in such general terms as to be the basis for a broad exercise of power in the administration of a bankruptcy case. The basic purpose of section 105 [of the Bankruptcy Code] is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction . . . .'

Casse v. Key Bank Nat'l Ass'n (In re Casse), 198 F.3d 327, 336 (2d Cir. 1999) (citation omitted). See also Bird v. Crown Convenience (In re NWFX, Inc.), 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern.") (citations omitted); In re Cooper Properties Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws") (citation omitted).

41.    Authorizing the efficient settlement of Termination Payments under Safe Harbor Contracts is clearly an appropriate use of this Court's powers under section 105 of the Bankruptcy Code. The procedures would enhance the efficient administration of the Debtors' cases and permit the Debtors to realize the value embedded in terminated Safe Harbor Contracts expeditiously.

42.    The relief sought in this Motion is intended to preserve the value of volatile assets of the Debtors' estates, expedite the collection of payments owed to the Debtors, and reduce the costs associated with the determination of Termination Payments. The proposed procedure for settlement of Termination Payments under Safe Harbor Contracts will not only minimize costs to the Debtors' estates by providing an economic and efficient resolution process, it will also

provide a means for protecting assets of the estates in the form of net Termination Payments due to the Debtors.

43.     The Debtors believe that the proposed Protocol will streamline the process of settlement of terminated Transaction Agreements yielding benefits that are in the best interests of the Debtors, their estates and creditors.

44.     Relief similar to that sought herein has been granted in at least one other chapter 11 case in this district.  See In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. May 30, 2002).

**B.     Authority to Enter into Derivative Contracts and Related Ordinary Course Transactions**

45.     Although the Debtors believe that entering into Derivative Contracts postpetition is within the ordinary course of their businesses since it is the Debtors' usual practice to enter into such contracts, as described above, certain counterparties in other bankruptcy cases have taken the position that they will not do business with the debtors in such bankruptcies without specific authorization from the bankruptcy court for such transactions.  See, e.g., Motion for Order Authorizing Debtors to Enter into Risk Management Transactions, at 3-4; In re USG Corporation, Case No. 01-2094 (RJN) (Bankr. D. Del. Nov. 15, 2001); Motion for Order Authorizing Armstrong World Industries, Inc. to Continue Its Risk Hedging Facilities, at 5; In re Armstrong World Indus., Inc., Case No. 00-4471 (JJF) (Bankr. D. Del. Feb. 7, 2001).

46.     Thus, out of an abundance of caution, Debtors request that the Court determine that Derivative Contracts are "ordinary course transactions" within the meaning of section 363(c)(1) of the Bankruptcy Code, or in the alternative, allow the Debtors to continue this business practice pursuant to section 105(a) of the Bankruptcy Code.

47.     As described above, to effectively manage risks inherent to the Debtors' businesses, the Debtors must be able to enter into Derivative Contracts and must be able to maintain the confidentiality of the basic terms of the Derivative Contracts.   Given the

15

confidential and immediate nature of entering into Derivative Contracts, it is impracticable and counterproductive to require the Debtors to seek separate approval of each Derivative Contract.

48.     Moreover, bankruptcy courts in this and other districts have authorized debtors to enter into Derivative Contracts in a manner similar to that which is sought by the Motion. See, e.g., In re UAL Corporation, et al., Case No. 02-48191 (Bankr. N.D. Ill. Dec. 11, 2002); In re US Airways Group, Inc., Case No. 02-83984 (SSM) (Bankr. E.D. Va. Nov. 8, 2002); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. May 14, 2002); In re USG Corporation, Case No. 01-2044 (RJN) (Bankr. D. Del. Dec. 6, 2001); In re Armstrong World Indus., Inc., Case No. 00-4471 (JJF) (Bankr. D. Del. Mar. 7, 2001).

### *The Derivative Contracts are Ordinary Course Transactions*

49.     Section 363 of the Bankruptcy Code provides, in relevant part, that a debtor in possession "may enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing." 11 U. S. C. § 363(c)(1).

50.     The Debtors believe that entering into, "rolling over," adjusting, modifying and settling Derivative Contracts are in the ordinary course of their businesses, and therefore, that they can consummate such transactions without notice and a hearing. See In re Lavigne, 114 F.3d 379, 384 (2d Cir. 1997) (finding that "ordinary course of business" is meant to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business). However, to provide important assurances to existing and potential counterparties, the Debtors are requesting that a Court order granting this Motion be entered.

51.     While the Bankruptcy Code does not define "ordinary course," courts generally apply a two-step inquiry in determining whether this standard has been met. In re Lavigne, 114 F.3d at 384-385 (2d Cir. 1997); In re NextWave Personal Communications, Inc., 244 B.R. 253, 275 (Bankr. S.D.N.Y. 2000); In re Crystal Apparel, Inc., 220 B.R. 816, 831

16

(Bankr. S.D.NY. 1998); In re Coordinated Apparel, Inc., 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995).

52.    The first part of the test, referred to as the "vertical test" (also known as the "creditors expectation test"), considers the expectations of creditors based on the debtor's past business practices. See In re Lavigne, 114 F.3d at 385; see In re Coordinated Apparel, Inc., 179 B.R. at 43 (vertical dimension test satisfied because "a hypothetical creditor could reasonably expect a debtor engaged in the business of manufacturing and distributing clothing to enter into a contract for the manufacture of clothing."). "[U]nder the vertical test, the court 'views the disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to' enter into a contract with the debtor." In re Lavigne, 114 F.3d at 385; see In re The Leslie Fay Companies, Inc., 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).

53.    The second part of the test is the "horizontal test" (also known as the "industry-wide test"), which considers whether the postpetition transaction is of a type that other companies in the debtor's industry would engage in the ordinary course of business. In re Lavigne, 114 F.3d at 385; In re Johns-Manville Corp., 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986), rev'd on other grounds, 801 F.2d 60 (2d Cir. 1986) (the debtor's prepetition practice of employing lobbyists satisfied "horizontal test" because other "Fortune 500" corporations and asbestos manufacturers routinely retained lobbyists); In re Coordinated Apparel, Inc., 179 B.R. 40, 43 (Bankr. S.D.N.Y. 1995) ("horizontal test" satisfied where debtor, a clothing manufacturer and distributor, entered into a clothing manufacturing contract postpetition because it was the type of transaction similar companies would enter into).

54.    The Derivative Contracts into which the Debtors will enter postpetition are the same types of Derivative Contracts as those the Debtors entered into prepetition, with the same types of parties, and for the same reasons.

55.    Based upon the application of the horizontal and the vertical tests described above, the Debtors should be authorized to consummate the Derivative Contracts without further

17

order of this Court.  First, companies in the Debtors' industry routinely enter into such transactions.  See, e.g., Motion of Debtors and Debtors in Possession for an Order Authorizing the Debtors to Enter Into Risk Management Transactions For Limited Purposes of Protecting Existing Open Trading Contracts, In re Enron Corp., Case No. 01-16034 (AIG) (Bankr. S.D.N.Y. April 30, 2002).  Second, as described above, the Debtors routinely entered into such transactions in the past and, accordingly, a hypothetical creditor would not be exposed to a different risk than it previously expected when it provided credit to the Debtors.  See NRG Energy, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2002, at 78.

56.    Although the Debtors believe that entering into Derivative Contracts is within the ordinary course of their businesses and that they can consummate such transactions without notice and a hearing, the Debtors request that the Court enter an order authorizing the Debtors to enter into, roll over, modify, adjust and settle the Derivative Contracts in part because certain counterparties may be unwilling to take any "risk" on the "ordinary course issue" fearing that the Derivative Contracts may later be avoided under section 549 of the Bankruptcy Code.  If the Court grants the relief requested in the Motion, the counterparties will be satisfied that the Debtors will be authorized to enter into Derivative Contracts and the Debtors will be able to continue their sound hedging practices and business operations without interruption.

57.    To the extent this Court is not satisfied that entering into the Derivative Contracts is within the Debtors' ordinary course of business, the relief requested in this Motion should be granted pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the Bankruptcy Code may be applied by a Bankruptcy Court where the relief requested is essential to the Debtors' reorganization efforts and does not pose a burden on the Debtors' creditors.  See In re Advisory Info. Mgmt. Systems, Inc., 40 B.R. 1001, 1006 (M.D. Tenn. 1984) ("Section 105 [of the Bankruptcy Code] may be applied by a bankruptcy court to avoid termination of contracts or business relations where such relief is indispensable to reorganization. . .").  Accordingly, the Court is authorized to enter an order providing that the Debtors may enter into, roll over, modify,

18

adjust and settle Derivative Contracts without further order of the court, and the Debtors request that this Court enter such an order for the reasons previously stated.

**Authority to Pledge Collateral Under Derivative Contracts**

58.    As stated above, the Debtors entered into Derivative Contracts before the Commencement Date that expire in the future. Under certain Derivative Contracts, on an ongoing basis, the Debtors are required to (a) post cash collateral or letters of credit or (b) to pledge certain of the Debtors' assets or (c) make a prepayment to the counterparty in circumstances where the Debtors' obligations to the counterparty exceeds a predetermined threshold. The Debtors may make similar commitments for the Derivative Contracts that they enter into postpetition.

59.    The Debtors are concerned that without the express authority to continue to pledge collateral under certain of the Derivative Contracts, counterparties may terminate such Derivative Contracts out of concern that if the Debtors post collateral, such transaction may be avoided under section 549 of the Bankruptcy Code. Therefore, in order to preserve the value of the Debtors' estates, the Debtors request the express authority to pledge collateral under Derivative Contracts as appropriate.

60.    Limiting the Debtors' ability to enter into the Derivative Contracts would (a) cause disruption to the Debtors' operations, (b) require the immediate attention of the Debtors' management at a time when their resources are extremely stressed and (c) expose the Debtors' ability to successfully reorganize to fluctuations in energy and related commodities prices, interest rates and foreign currency exchange rates, which is counter-productive to Debtors' reorganization efforts.

61.    Generally, the Debtors' Derivative Contracts provide for collateral, letters of credit, pre-payment or other security in an amount that does not exceed the reasonable determination of their counterparties' exposure on a rolling basis. Under many Derivative Contracts, these obligations are reciprocal. The Debtors can be entitled to similar collateral, letters of credit, pre-payment or other security. Fulfilling these security obligations is not unduly

19

burdensome on the Debtors, and, more importantly, is necessary to continue with the Debtors' business and trading activities.

62.     As stated above, entering into, "rolling over," adjusting, modifying and settling Derivative Contracts is within the ordinary course of the Debtors' business. Accordingly, pledging collateral and margin under Derivative Contracts is within the ordinary course of the Debtors' business.

63.     In light of the foregoing, the Debtors believe that the relief requested in this Motion is appropriate and is in the best interests of the Debtors, their estates and their creditors.

## NOTICE

64.     Notice of this Motion has been provided to: (a) the United States Trustee for the Southern District of New York; (b) counsel to the Creditors Committee; (c) counsel to the administrative agents for the Debtors' prepetition secured lenders; (d) the indenture trustees pursuant to the Debtors' secured indentures; (e) counsel to the Debtors' proposed postpetition lenders; and (f) Xcel's counsel. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

65.     While a portion of the relief sought in this motion was requested by the Debtors as part of the Debtors' "first day" pleadings pursuant to the motion appearing as item no. 18 on the Court's docket, the matter was not ruled on by the Court and the relief previously requested pursuant to item no. 18 on the Court's docket has been modified herein to address issues raised by creditors to that previous request. This Motion supersedes and replaces the previous request made through the motion appearing as item no.18 on the Court's docket.

## MEMORANDUM OF LAW

66.     This Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, the Debtors respectfully request that the Court waive the requirement contained in Rule 9013-1(b) of the Local Bankruptcy Rules for the Southern District of New York that a separate memorandum of law be submitted.

Safe Harbor Settlement Only v.3.doc

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit B granting the relief requested herein and such other and further relief as the Court may deem appropriate.

Dated: New York, New York
       June 6, 2003

Respectfully submitted,


      /s/ Michael A. Cohen
Matthew A. Cantor, Esq. (MC 7727)
Robbin L. Itkin, Esq. (RI 1019)
Michael A. Cohen (MC 1277)

KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

Counsel for Debtors and Debtors in Possession

Safe Harbor Settlement Only v.3.doc

# **EXHIBIT A**

Safe Harbor Settlement Only v.3.doc

## PROTOCOL FOR THE SETTLEMENT OF TRADING CONTRACTS

1.0    Definitions

*"Affiliate"* means (i) any "affiliate" of NRG as defined in section 101(2) of the Bankruptcy Code, (ii) any Entity that directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest in NRG or in any such affiliate of NRG, and (iii) any Entity in which NRG, or any such affiliate of NRG, directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest.

*"Bankruptcy Code"* means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York.

*"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure.

*"Business Day"* means any day, other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*"Confirmation"* means a document evidencing a transaction under a Trading Contract.

*"Controlling Ownership Interest"* means an ownership interest in any Entity equal to 20% or greater of the total equity interest in such Entity, whether (i) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (ii) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (iii) otherwise.

*"Controlling Voting Interest"* means the power to direct, or to cause the direction of, management and policies of another Entity, whether (i) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (ii) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (iii) otherwise.

*"Creditors Committee"* means the statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee in the chapter 11 cases of NRG and certain Affiliates.

*"Debtor"* means a debtor in a case under chapter 11 of the Bankruptcy Code filed by NRG and/or (an) Affiliate(s).

*"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

*"Marked-To-Market Value"* means the marked-to-market value of any one confirmation or Trading Contract based on valuations approved and validated by NRG or an affiliate.

*"Net Marked-To-Market Value"* means the sum of the Marked-to-Market Values (whether positive or negative) of two or more Trading Contracts between an NRG Settling Party and a Settling Party. For example, if one Trading Contract has a Marked-to-Market Value of +$15,000, and another Trading Contract has a Marked-to-Market Value of -$10,000, the Net Marked-to-Market Value for those two Trading Contracts is +$5,000.

*"NRG"* means NRG Energy, Inc.

*"NRG Settling Party"* means NRG or an Affiliate that wants to enter into a settlement agreement.

*"Protocol"* means this Protocol for (I) the Settlement of Trading Contracts and (II) Determining (A) Whether a Contract Constitutes a Safe Harbor Contract and/or (B) Whether a Safe Harbor Contract Has Been Validly Terminated.

*"Safe Harbor Contract"* means any contact that is subject to section 555, 556, 559 or 560 of the Bankruptcy Code.

*"Settling Party"* means any Entity that is not an NRG Settling Party and that wants to enter into a settlement agreement with an NRG Settling Party.

*"Trading Contract"* means any contract that either the Settling Party or the NRG Settling Party asserts (i) is a Safe Harbor Contract, and (ii) has been validly liquidated or terminated by NRG, an NRG Affiliate, a Settling Party or automatically by operation of law or in accordance with the terms of such Trading Contract.

*"U.S. Trustee"* means Office of the United States Trustee for the Southern District of New York.

Terms used in the singular include the plural.

2.0  <u>Procedures for Presenting Settlements to the Creditors Committee Before Filing Notice for Approval with the Bankruptcy Court</u>

    2.1  As a precondition to any NRG Settling Party that is a Debtor entering into a settlement agreement which involves, in whole or in part, the settlement of obligations under a Trading Contract, the NRG Settling Party shall first obtain the Creditors Committee's approval (and the approval of Xcel Energy Inc. ("Xcel") if a Debtor's obligations under a Trading Contract are guaranteed by Xcel ("<u>Xcel Guaranteed Trading Contract</u>")) for such settlement agreement in accordance with the terms of this Protocol; <u>provided</u>, <u>however</u>, that, to the extent a member of the Creditors Committee is (i) a counterparty to a Safe Harbor Contract and/or Trading Contract which is a Settling Party; or (ii) a competitor of Debtors, such member shall not participate in the review process set forth in Section 2.3 of the Protocol and shall not receive or review any of the detailed information provided to the Creditors Committee other than the Settlement Notice (defined below) filed with the Court.

Safe Harbor Settlement Only v.3.doc

2.2    Prior to undertaking any actions to settle obligations under a Trading Contract, the Settling Party shall provide the respective NRG Settling Party with a copy of such Safe Harbor Contract and/or Trading Contract and detailed information about the termination of such Trading Contract.

2.3    After the NRG Settling Party reaches a settlement with the Settling Party, the NRG Settling Party shall provide the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) with the following information at least ten (10) Business Days (unless the Creditors Committee (and/or Xcel if applicable) agrees in writing to a shorter period) prior to executing the settlement agreement:

(a)    Copies of all the Trading Contracts which are being settled, including but not limited to Confirmations, master agreements, termination notices, netting agreements, and any related hedging contracts;

(b)    A spreadsheet listing the details of each of the Trading Contracts which are being settled, including but not limited to, the term of the Trading Contract, when and by which party the contract was terminated, the amount of collateral held by the NRG Settling Party and/or the Settling Party, and the amount of damages or replacement costs and associated methodology (if applicable);

(c)    A spreadsheet listing the details of other balances included within the settlement agreement, including accounts receivable and accounts payable;

(d)    A spreadsheet setting forth (i) the Marked-to-Market Value of each of the Trading Contracts which are being settled and (ii) the Net Marked-to-Market Value among the Trading Contracts which are being settled; and

(e)    A copy of the proposed settlement agreement and a brief history of settlement negotiations (if applicable).

2.4    Within ten (10) Business Days after receiving the information set forth in section 2.3 of this Protocol, the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is Involved) shall provide written notice to the NRG Settling Party stating whether the Creditors Committee (and Xcel if applicable) approves or does not approve the proposed settlement.

3.0    Court Approval

3.1    If the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) either (a) approves a proposed settlement submitted for the Creditors Committee's and Xcel's approval in accordance with sections 2.1 through 2.4 of this Protocol or (b) during the ten Business Day period provided for in section 2.3 of this Protocol, does not provide written notice to the NRG Settling Party stating that the Creditors Committee (and Xcel as applicable) does not approve the

proposed settlement, the Debtors shall file with the Bankruptcy Court a notice of proposed settlement (the "Settlement Notice"). The Settlement Notice shall identify each Trading Contract subject to the settlement, identify the NRG Settling Party and the Settling Party, summarize the terms of the settlement agreement, and provide a concise statement by the Debtors of the rationale for the settlement. The Settlement Notice shall be filed and served on the Settling Party or the Settling Party's counsel, if known, counsel to the Creditors Committee (and Xcel if an Xcel Guarantied Trading Contract is involved), the U.S. Trustee, counsel to any postpetition lenders and all parties that requested special notice in the Debtors' chapter 11 cases. Unless an objection is filed and served within five (5) Business Days after the Settlement Notice is filed and notice thereof is served upon the appropriate parties, the Debtors shall be authorized to consummate the proposed settlement, and the parties receiving the Settlement Notice of the proposed settlement shall be deemed to have consented to it. If an objection to the proposed settlement is timely filed and served, the matter will be heard at a hearing before the Bankruptcy Court; provided that the Debtors may move the Bankruptcy Court to set such a hearing on an expedited basis.

3.2     If the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) does not approve a proposed settlement submitted for the Creditors Committee's and Xcel's approval in accordance with sections 2.1 and 2.3 of this Protocol, the Debtors shall not proceed with the proposed settlement pursuant to the procedures in this Protocol, but may seek Bankruptcy Court approval of the proposed settlement upon notice and a hearing in accordance with Bankruptcy Rule 9019(a); provided that the Debtors may move the Bankruptcy Court to set such a hearing on an expedited basis.

3.3     In the event that a net payment is due to the NRG Settling Party under a proposed settlement, such payment shall be collected by the NRG Settling Party and appropriate releases shall be entered into among the NRG Settling Party and the Settling Party. In the event that a net payment is due from the NRG Settling Party, no payment shall be made, but the Settling Party may have a liquidated claim in the actual amount of any such net payment payable to such Settling Party.

Safe Harbor Settlement Only v.3.doc

4.0   <u>Notice</u>

4.1   All information required to be provided to the Creditors Committee under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Evan D. Flaschen, Esq.
Bingham McCutchen LLP
One State Street
Hartford, CT  06103
evan.flaschen@bingham.com

4.2   All information required to be provided to Xcel under this Protocol shall be delivered to the following persons by hand delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Scott Friedman, Esq.
Jones, Day, Reavis & Pogue
222 E. 41st Street
New York, NY  10017
sjfriedman@jonesday.com

4.3   All information required to be provided to an NRG Settling Party under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Lisa Balder
NRG ENERGY, INC.
901 Marquette Avenue
Suite 2500
Minneapolis, MN 55402
lisa.balder@nrgenergy.com

Elaine M. Walsh, Esq.
KIRKLAND & ELLIS
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
elaine_walsh@dc.kirkland.com

Matthew A. Cantor, Esq.
KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675
matthew_cantor@ny.kirkland.com

Safe Harbor Settlement Only v.3.doc

**EXHIBIT B**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------x
In re                                 :    Chapter 11
                                      :
NRG ENERGY, INC., et al.,             :
                                      :    Case No. 03-13024 (PCB)
                    Debtors.          :
                                      :    (Jointly Administered)
------------------------------------------------------x
```

THIS ORDER APPLIES TO:

| | | | |
|---|---|---|---|
| _X_ | All Debtors | ___ | NRG Power Marketing, Inc. |
| ___ | NRG Energy, Inc. | ___ | NRG Capital LLC |
| ___ | Arthur Kill Power LLC | ___ | NRG Finance Company I LLC |
| ___ | Astoria Gas Turbine Power LLC | ___ | NRG Central U.S. LLC |
| ___ | Berrians I Gas Turbine Power LLC | ___ | NRG Eastern LLC |
| ___ | Big Cajun II Unit 4 LLC | ___ | NRGenerating Holdings (No. 23) B.V. |
| ___ | Connecticut Jet Power LLC | ___ | NRG New Roads Holdings LLC |
| ___ | Devon Power LLC | ___ | NRG Northeast Generating LLC |
| ___ | Dunkirk Power LLC | ___ | NRG South Central Generating LLC |
| ___ | Huntley Power LLC | ___ | Oswego Harbor Power LLC |
| ___ | Louisiana Generating LLC | ___ | Somerset Power LLC |
| ___ | Middletown Power LLC | ___ | South Central Generation Holding LLC |
| ___ | Montville Power LLC | ___ | Norwalk Power LLC |
| ___ | Northeast Generation Holding LLC | | |

## ORDER (I) ESTABLISHING PROCEDURES FOR SETTLEMENT OF TERMINATED SAFE HARBOR CONTRACTS AND (II) AUTHORIZING THE DEBTORS TO ENTER INTO DERIVATIVE CONTRACTS AND TO PLEDGE COLLATERAL UNDER DERIVATIVE CONTRACTS

Upon the Debtors' Motion for An Order (I) Establishing Procedures for Settlement of Terminated Safe Harbor Contracts and (II) Authorizing the Debtors to Enter Into Derivative Contracts and to Pledge Collateral Under Derivative Contracts (the "Motion"), filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); the Court finding that (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (c) notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having determined that the legal and

1

factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:[1]**

1.   The Motion is GRANTED.

2.   The Debtors are hereby authorized to establish and implement the Protocol For The Settlement Of Trading Contracts ("Protocol") attached hereto as <u>Exhibit A</u> including but not limited to, the Court Approval procedures set forth in sections 3.1, 3.2 and 3.3 of the Protocol, with respect to the contracts defined and described in the Motion as Derivative Contracts (financial contracts whose values are based on, or derived from the price of a traditional security such as a stock or bond, an asset such as a commodity or a market index, such as forward contracts, futures contracts, swap contracts, option contracts or combinations of the foregoing) containing "safe harbor provisions" in accordance with sections 555, 556, 559 and 560 of the Bankruptcy Code (the "Trading Contracts").

3.   The Protocol shall not alter, modify or limit in any way the terms of the Trading Contracts.

4.   The Protocol shall not limit the rights of the Debtors (except as otherwise provided in the Protocol) or any counterparty to the Trading Contracts under the Trading Contracts, the relevant provisions of the Bankruptcy Code, or otherwise.

5.   The Debtors are hereby authorized to enter into Derivative Contracts and related transactions without further order of the Court.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion.

Safe Harbor Settlement Only v.3.doc

6.  The Debtors are hereby authorized to pledge collateral, letters of credit or other similar security under the Derivative Contracts as the Debtors deem appropriate without further order of the Court.

Dated: New York, New York
_____, 2003

_____
UNITED STATES BANKRUPTCY JUDGE

3

# EXHIBIT A

## PROTOCOL FOR THE SETTLEMENT OF TRADING CONTRACTS

1.0     Definitions

*"Affiliate"* means (i) any "affiliate" of NRG as defined in section 101(2) of the Bankruptcy Code, (ii) any Entity that directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest in NRG or in any such affiliate of NRG, and (iii) any Entity in which NRG, or any such affiliate of NRG, directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest.

*"Bankruptcy Code"* means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York.

*"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure.

*"Business Day"* means any day, other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*"Confirmation"* means a document evidencing a transaction under a Trading Contract.

*"Controlling Ownership Interest"* means an ownership interest in any Entity equal to 20% or greater of the total equity interest in such Entity, whether (i) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (ii) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (iii) otherwise.

*"Controlling Voting Interest"* means the power to direct, or to cause the direction of, management and policies of another Entity, whether (i) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (ii) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (iii) otherwise.

*"Creditors Committee"* means the statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee in the chapter 11 cases of NRG and certain Affiliates.

*"Debtor"* means a debtor in a case under chapter 11 of the Bankruptcy Code filed by NRG and/or (an) Affiliate(s).

*"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

4

"*Marked-To-Market Value*" means the marked-to-market value of any one confirmation or Trading Contract based on valuations approved and validated by NRG or an affiliate.

"*Net Marked-To-Market Value*" means the sum of the Marked-to-Market Values (whether positive or negative) of two or more Trading Contracts between an NRG Settling Party and a Settling Party. For example, if one Trading Contract has a Marked-to-Market Value of +$15,000, and another Trading Contract has a Marked-to-Market Value of -$10,000, the Net Marked-to-Market Value for those two Trading Contracts is +$5,000.

"*NRG*" means NRG Energy, Inc.

"*NRG Settling Party*" means NRG or an Affiliate that wants to enter into a settlement agreement.

"*Protocol*" means this Protocol for (I) the Settlement of Trading Contracts and (II) Determining (A) Whether a Contract Constitutes a Safe Harbor Contract and/or (B) Whether a Safe Harbor Contract Has Been Validly Terminated.

"*Safe Harbor Contract*" means any contact that is subject to section 555, 556, 559 or 560 of the Bankruptcy Code.

"*Settling Party*" means any Entity that is not an NRG Settling Party and that wants to enter into a settlement agreement with an NRG Settling Party.

"*Trading Contract*" means any contract that either the Settling Party or the NRG Settling Party asserts (i) is a Safe Harbor Contract, and (ii) has been validly liquidated or terminated by NRG, an NRG Affiliate, a Settling Party or automatically by operation of law or in accordance with the terms of such Trading Contract.

"*U.S. Trustee*" means Office of the United States Trustee for the Southern District of New York.

Terms used in the singular include the plural.

2.0    Procedures for Presenting Settlements to the Creditors Committee Before Filing Notice for Approval with the Bankruptcy Court

2.1    As a precondition to any NRG Settling Party that is a Debtor entering into a settlement agreement which involves, in whole or in part, the settlement of obligations under a Trading Contract, the NRG Settling Party shall first obtain the Creditors Committee's approval (and the approval of Xcel Energy Inc. ("Xcel") if a Debtor's obligations under a Trading Contract are guaranteed by Xcel ("Xcel Guaranteed Trading Contract")) for such settlement agreement in accordance with the terms of this Protocol; provided, however, that, to the extent a member of the Creditors Committee is (i) a counterparty to a Safe Harbor Contract and/or Trading Contract which is a Settling Party; or (ii) a competitor of Debtors, such member shall not participate in the review process set forth in Section 2.3 of the Protocol and shall not receive or review any of the detailed information provided

5

to the Creditors Committee other than the Settlement Notice (defined below) filed with the Court.

2.2    Prior to undertaking any actions to settle obligations under a Trading Contract, the Settling Party shall provide the respective NRG Settling Party with a copy of such Safe Harbor Contract and/or Trading Contract and detailed information about the termination of such Trading Contract.

2.3    After the NRG Settling Party reaches a settlement with the Settling Party, the NRG Settling Party shall provide the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) with the following information at least ten (10) Business Days (unless the Creditors Committee (and/or Xcel if applicable) agrees in writing to a shorter period) prior to executing the settlement agreement:

(a)    Copies of all the Trading Contracts which are being settled, including but not limited to Confirmations, master agreements, termination notices, netting agreements, and any related hedging contracts;

(b)    A spreadsheet listing the details of each of the Trading Contracts which are being settled, including but not limited to, the term of the Trading Contract, when and by which party the contract was terminated, the amount of collateral held by the NRG Settling Party and/or the Settling Party, and the amount of damages or replacement costs and associated methodology (if applicable);

(c)    A spreadsheet listing the details of other balances included within the settlement agreement, including accounts receivable and accounts payable;

(d)    A spreadsheet setting forth (i) the Marked-to-Market Value of each of the Trading Contracts which are being settled and (ii) the Net Marked-to-Market Value among the Trading Contracts which are being settled; and

(e)    A copy of the proposed settlement agreement and a brief history of settlement negotiations (if applicable).

2.4    Within ten (10) Business Days after receiving the information set forth in section 2.3 of this Protocol, the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is Involved) shall provide written notice to the NRG Settling Party stating whether the Creditors Committee (and Xcel if applicable) approves or does not approve the proposed settlement.

3.0    <u>Court Approval</u>

3.1    If the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) either (a) approves a proposed settlement submitted for the Creditors Committee's and Xcel's approval in accordance with sections 2.1 through 2.4 of

6

this Protocol or (b) during the ten Business Day period provided for in section 2.3 of this Protocol, does not provide written notice to the NRG Settling Party stating that the Creditors Committee (and Xcel as applicable) does not approve the proposed settlement, the Debtors shall file with the Bankruptcy Court a notice of proposed settlement (the "Settlement Notice").   The Settlement Notice shall identify each Trading Contract subject to the settlement, identify the NRG Settling Party and the Settling Party, summarize the terms of the settlement agreement, and provide a concise statement by the Debtors of the rationale for the settlement.  The Settlement Notice shall be filed and served on the Settling Party or the Settling Party's counsel, if known, counsel to the Creditors Committee (and Xcel if an Xcel Guarantied Trading Contract is involved), the U.S. Trustee, counsel to any postpetition lenders and all parties that requested special notice in the Debtors' chapter 11 cases.  Unless an objection is filed and served within five (5) Business Days after the Settlement Notice is filed and notice thereof is served upon the appropriate parties, the Debtors shall be authorized to consummate the proposed settlement, and the parties receiving the Settlement Notice of the proposed settlement shall be deemed to have consented to it.  If an objection to the proposed settlement is timely filed and served, the matter will be heard at a hearing before the Bankruptcy Court; provided that the Debtors may move the Bankruptcy Court to set such a hearing on an expedited basis.

3.2    If the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) does not approve a proposed settlement submitted for the Creditors Committee's and Xcel's approval in accordance with sections 2.1 and 2.3 of this Protocol, the Debtors shall not proceed with the proposed settlement pursuant to the procedures in this Protocol, but may seek Bankruptcy Court approval of the proposed settlement upon notice and a hearing in accordance with Bankruptcy Rule 9019(a); provided that the Debtors may move the Bankruptcy Court to set such a hearing on an expedited basis.

3.3    In the event that a net payment is due to the NRG Settling Party under a proposed settlement, such payment shall be collected by the NRG Settling Party and appropriate releases shall be entered into among the NRG Settling Party and the Settling Party.  In the event that a net payment is due from the NRG Settling Party, no payment shall be made, but the Settling Party may have a liquidated claim in the actual amount of any such net payment payable to such Settling Party.

4.0    Notice

    4.1    All information required to be provided to the Creditors Committee under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

        Evan D. Flaschen, Esq.
Bingham McCutchen LLP
One State Street
Hartford, CT 06103
evan.flaschen@bingham.com

    4.2    All information required to be provided to Xcel under this Protocol shall be delivered to the following persons by hand delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:
Scott Friedman, Esq.
Jones, Day, Reavis & Pogue
222 E. 41st Street
New York, NY 10017
sjfriedman@jonesday.com

    4.3    All information required to be provided to an NRG Settling Party under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

        Lisa Balder
NRG ENERGY, INC.
901 Marquette Avenue
Suite 2500
Minneapolis, MN 55402
lisa.balder@nrgenergy.com

        Elaine M. Walsh, Esq.
KIRKLAND & ELLIS
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
elaine_walsh@dc.kirkland.com

        Matthew A. Cantor, Esq.
KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675
matthew_cantor@ny.kirkland.com