WEIL, GOTSHAL & MANGES LLP
Attorneys for the Debtors
767 Fifth Avenue
New York, New York 10153
Martin J. Bienenstock (MB 3001)
Brian S. Rosen (BR 0571)
Melanie Gray

Presentment Date and Time:
May 30, 2002, 12:00 p.m.

Objection Deadline:
May 24, 2002, 4:00 p.m. EST

CADWALADER, WICKERSHAM & TAFT
Special Counsel for the Debtors
100 Maiden Lane
New York, New York 10038
Gregory M. Petrick (GP 2175)
and
1201 F Street, NW
Washington, DC 20004
Mark C. Ellenberg (ME 6927)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: <br><br> ENRON CORP., et al., <br><br> Debtors. | Chapter 11 <br><br> Case No. 01-16034 (AJG) <br><br> Jointly Administered |

### DEBTORS' APPLICATION FOR ORDER ESTABLISHING
### AND AUTHORIZING PROCEDURES FOR SETTLEMENT OF TERMINATED SAFE
### HARBOR AGREEMENTS

Enron Corp. and certain of its affiliated debtors respectfully submit this Application for an order establishing and authorizing procedures for the settlement of terminated safe-harbor agreements and, in support thereof, state as follows:

### INTRODUCTION

1.   Prior to the commencement of these cases, the Debtors entered into thousands of forward contracts, swap contracts and other agreements ("Safe-Harbor Agreements") that fall within the safe-harbor provisions of sections 555, 556, 559 or 560 of the United States Bankruptcy Code ("Code"). Since the commencement of these cases, many Safe-Harbor Contracts

have been validly terminated by either the contract counterparty or the Debtors. Each time a contract is terminated, a termination payment needs to be calculated. The payment may be owed to the Debtor or by the Debtor, depending on the market value of the contract and the early termination provisions. The Debtors and the Official Committee of Unsecured Creditors ("the Committee") have agreed upon a protocol by which the Debtor will advise the Committee of potential agreements with counterparties on the early termination payment under a Safe-Harbor Agreement. The protocol further requires that each termination payment agreement be submitted to the Court for approval, under expedited procedures. By this Application, which is supported by the Official Committee of Unsecured Creditors, the Debtors seek to establish (1) Court-authorized procedures permitting the settlement of validly terminated Safe-Harbor Agreements pursuant to the protocol and (2) expedited procedures for the approval by the Court of such settlements.

## FACTS

### The Chapter 11 Cases

2. Commencing on December 2, 2001 (the "Petition Date") and, in some instances periodically thereafter, the Debtors and certain of their affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the Petition Date, the Debtors have continued to operate their businesses and manage properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors divide their business operations into four primary business units: Enron Wholesale Services, Enron Retail Services, Enron Transportation Services, and Enron Global Services. The units comprise wholesale and retail commodities trading, gas pipeline businesses, and other global services, including engineering, operation, and construction of power facilities.

4. The Debtors are engaged in the business of, among other things, enabling retail customers in the industrial and commercial business sectors to manage their energy

requirements and reduce their total energy costs. In conjunction therewith, the Debtors have developed long-term, multi-year relationships with their customers, documented in the form of various agreements. Among the services that the Debtors provide their customers are: (1) providing and/or managing commodity supply and commodity price risk; (2) providing outsourcing for energy services; (3) providing facilities management and project construction services; and (4) providing capital for energy related projects and services.

**The Safe-Harbor Agreements**

5.    The nature of the Debtors' businesses involves purchases, sales, trades, swaps, options and other transactions in commodities. These transactions are entered into with various counterparties and are generally subject to market fluctuations in pricing which are often volatile and difficult to predict.

6.    Recognizing the unique status of forward contracts, commodities contracts, securities contracts, certain repurchase agreements, and swap agreements in the financial and commodity markets, Congress has added to the Code certain so-called "safe-harbor" provisions These provisions generally permit non-debtor counterparties to Safe-Harbor Agreements to exercise certain rights and remedies not generally available to parties in a bankruptcy case.

7.    Among the safe-harbor rights and protections under the Code are provisions that (a) allow the non-debtor party to terminate, liquidate and apply collateral held under a Safe-Harbor Agreement upon a bankruptcy of the other party, notwithstanding section 365(e)(1) of the Code; (b) protect prepetition payments made under a Safe-Harbor Agreement by the debtor to the non-debtor party from the avoidance powers of a trustee or debtor-in-possession except in particular cases of actual intent to defraud other creditors; and (c) permit the non-debtor party to setoff mutual

debts and claims against the debtor under a Safe-Harbor Agreement without the need to obtain relief from the automatic stay.[1]

8. Safe-Harbor Agreements are documented in the form of master agreements, confirmations issued under general terms and conditions, enabling agreements, or single transaction agreements ("Transaction Agreements"). The Transaction Agreements set forth terms and conditions that govern various transactions entered into between the parties from time to time.[2]

9. Where a master agreement is used, a number of widely used standard forms exist for both physical and financial transactions of the type entered into by the Debtors and the Counterparties.[3] The parties to a master agreement then enter into individual transactions under the master agreements. These individual transactions are customarily documented in the form of confirmations, which set forth, among other terms and conditions, specified quantities and delivery dates for physical transactions, and specified methods for calculation of payment amounts and specified payment dates for financial transactions.

**Early Termination and Termination Payments**

10. Among the safe-harbor rights noted above is the right of a qualifying non-debtor party to terminate a Safe-Harbor Agreement due to, among other things, the commencement

---

[1] These provisions are contained in sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 548(d)(2)(B), (C), and (D); 553(b)(1); 555, 556, 559 and 560 of the Bankruptcy Code.

[2] The Debtors, by filing this motion, are not expressing a view as to whether any particular Transaction Agreement is or is not a Safe-Harbor Contract or any particular counterparty is a party entitled to exercise rights pursuant to a safe harbor.

[3] Examples of forms of Transaction Agreements used by market participants in general and by the Debtors and the Counterparties in particular are the Enfolio® Master Firm Purchase/Sale Agreement for physical gas contracts and the ISDA® Master Agreement for financial contracts.

of a bankruptcy case by the other party.[4] Such an event is generally designated under the Transaction Agreements as an "early termination event."

11. An early termination by the Debtors could result from counterparty defaults, such as failure to perform obligations under the agreement.

12. Under the Transaction Agreements, proper termination upon an early termination event – whether the transactions under the Transaction Agreements are forward contracts, swap agreements, repurchase agreements, or otherwise – is typically accomplished by both parties ceasing all further performance under the transactions, the non-defaulting party determining the amounts payable by each party to the other party at the time of termination, and the netting of the amounts due to and from each party, thereby reaching a net settlement amount payable by one party ("Termination Payment").

13. Under many Transaction Agreements, a Termination Payment would be payable by either the defaulting party or the non-defaulting party. Thus, termination could, and often will, result in a net payment to the Debtors. These "in the money" agreements, where an embedded net amount due to the Debtors is present, constitute significant assets of the Debtors' estates.

**The Master Netting, Setoff and Security Agreements**

14. Many Transaction Agreements expressly address the rights of setoff and netting. Some agreements may restrict common law setoff rights. Other agreements may expand setoff and netting rights to include multiple Transaction Agreements and multiple affiliates of the contracting parties.

---

[4] The Debtors reserve the right to assert that a counterparty who did not terminate promptly after the commencement of these cases waived the right to terminate solely on account of the Debtors' bankruptcies or financial condition.

15. In addition, various Debtors and counterparties have entered into master netting, setoff and security agreements ("Master Netting Agreement") pursuant to which one or more Debtors, on the one hand, and one or more affiliated counterparties, on the other hand, agreed to aggregate their respective exposures under two or more Transaction Agreements (physical and/or financial) for purposes of determining exposure thresholds and collateral requirements, as well as to exercise termination, liquidation, netting and setoff rights across different Transaction Agreements and different affiliated parties that have signed the Master Netting Agreement. As a rule, the Counterparties under a Master Netting Agreement are affiliated entities, usually under the ownership of a common parent company.

16. Where the Debtors and the counterparties have entered into a Master Netting Agreement, the default and termination remedies of the Master Netting Agreement generally replace the default and termination remedies of those particular Transaction Agreements covered by the Master Netting Agreement. As such, the Master Netting Agreement provides its own Termination Payment (denominated therein as the "Final Settlement Amount") payable upon the occurrence of an early termination event.

## Negotiation and Settlement of Termination Payments With the Counterparties

17. The Debtors are parties to numerous Transaction Agreements and Master Netting Agreements.

18. The commencement of these chapter 11 cases by the Debtors constituted an early termination event under most of the Transaction Agreements and Master Netting Agreements, giving rise to the right of the counterparties to terminate such agreements and to determine the amount of Termination Payments payable by or to the Debtors. Many counterparties have exercised their rights under the safe harbors to terminate Transaction Agreements and Master Netting

Agreements.[5] In certain instances, where a counterparty did not terminate an agreement, and has itself defaulted under the agreement, a Debtor has noticed an early termination.

### RELIEF REQUESTED

19. The Debtors and the Committee have negotiated a protocol for the efficient processing of settlement agreements that establish the termination payment under Safe-Harbor Agreements. A copy of the protocol is attached as Exhibit A.

20. The protocol creates two categories of settlements. The first category includes Safe-Harbor Agreements involving values that exceed certain defined thresholds or settlements with affiliates of the Debtors. For settlements in this category, the Debtors will not execute a settlement agreement with the counterparty without 10 business days' prior notice to the Committee. In addition, the protocol prescribes certain information concerning the proposed settlement that must be included in the Debtors' notice.

21. Where the Committee approves the proposed settlement, the protocol requires the Debtors to file with this Court a motion for approval of the settlement. The motion will be filed and served in accordance with Paragraph 3 of the Bankruptcy Court's February 26, 2002, "Amended Case Management Order Establishing, Among Other Things, Noticing Electronic Procedures, Hearing Dates, Independent Website and Alternative Methods of Participation at Hearings" (the 'Case Management Order"). The motion will be noticed for hearing on the next Hearing Day (as defined in the Case Management Order) that is at least ten (10) calendar days after the motion is filed and notice thereof is served upon the appropriate parties, with objections to the motion being due three business days before the hearing.

---

[5] See note 4, above.

22.  The second category of settlements includes those that fall below the specified value thresholds. The protocol requires the Debtors to provide weekly notice of these settlements to the Committee. The Committee will have 5 business days to approve or disapprove the settlement or to request more detailed information.

23.  Where the Committee either approves the proposed settlement, does not disapprove it, or does not request more detailed information on it during the five-business-day period, the Debtors will file a notice of the settlement with the Court. The notice will (a) identify each Safe-Harbor Agreement subject to the settlement, (b) identify the parties to the settlement agreement, (c) summarize the terms of the settlement agreement, and (d) provide a concise statement by the Debtors of the rationale for the settlement. The notice will be filed and served in accordance with Paragraph 3 of the Case Management Order. Unless an objection is filed and served within five (5) business days after the notice is filed and notice thereof is served upon the appropriate parties, the Debtors shall be authorized to consummate the proposed settlement, and the parties receiving notice of the proposed settlement shall be deemed to have consented to it. If an objection to the proposed settlement is timely filed and served, the matter will be heard on the next Hearing Day (as defined in the Case Management Order).

24.  If the Creditors' Committee does not approve a settlement agreement in either category, the Debtors may seek approval of the proposed settlement upon notice and a hearing in accordance with Bankruptcy Rule 9019 and the Case Management Order.

25.  Rule 9019 authorizes the Court to approve the protocol attached hereto and the expedited hearing procedures. Rule 9019(b) would permit the Court to authorize certain classes of settlements to occur without further Court approval. Here, each settlement will be filed with the Court. The Debtors seek only to expedite the approval process.

26.     In addition, this Court clearly has the authority under section 105 of the Bankruptcy Code to establish and authorize procedures for the efficient settlement of termination obligations under Safe-Harbor Agreements. Pursuant to section 105, this Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of . . . title [11]." 11 U.S.C. § 105(a). The Second Circuit has acknowledged that section 105 confers broad powers conferred on bankruptcy courts:

> 11 U.S.C. § 105 'is an omnibus provision phrased in such general terms as to be the basis for a broad exercise of powers in the administration of a bankruptcy case. The basic purpose of section 105 is to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid at the exercise of their jurisdiction . . . .'

Casse v. Key Nat'l Bank Ass'n (In re Casse), 198 F.3d 327, 336 (2d Cir. 1999) (citation omitted). Authorizing the efficient settlement of termination payments under Safe-Harbor Agreements is clearly an appropriate use of this Court's powers under section 105. The procedures would enhance the efficient administration of the Debtors' cases and permit the Debtors to realize the value embedded in terminated agreements expeditiously. Section 363(b)(1) of the Code provides additional authority for the relief requested. 11 U.S.C. § 363(b)(1); see Northview Motors, Inc. v. Chrysler Motors Corporation, 186 F.3d 346 (3d Cir. 1999).

### WAIVER OF LOCAL BANKRUPTCY RULE 9013-1(B)

27.     The Debtors request that the requirement of filing and serving a memorandum of law pursuant to Local Bankruptcy Rule 9013-1(b) be waived, as this Application does not raise any novel legal issues, and is supported by citations to legal authorities.

### CONCLUSION

28.     For the foregoing reasons, the Debtors respectfully request entry of the proposed Order granting the Application, a copy of which is attached hereto as exhibit B.

9

Dated:    May 2, 2002
             New York, New York

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT

By: /s/ Gregory M. Petrick
    Gregory M. Petrick (GP 2175)
    100 Maiden Lane
    New York, New York 10038
    Telephone: (212) 504-6000

Mark C. Ellenberg (ME 6927)
1201 F Street, NW
Washington, DC 20004
Telephone: (202) 862-2200

SPECIAL COUNSEL FOR DEBTORS AND
DEBTORS IN POSSESSION

and

Martin J. Bienenstock (MB 3001)
Brian S. Rosen (BR 0571)
Melanie Gray
WEIL, GOTSHAl & MANGES LLP
767 Fifth Avenue
New York, New York
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION