Thomas E Lauria
State Bar No. 11998025
White & Case LLP
Wachovia Financial Center
200 South Biscayne Blvd.
Miami, FL 33131
Telephone: (305) 371-2700
Facsimile: (305) 358-5744

Robin Phelan
State Bar No. 15903000
Judith Elkin
State Bar No. 06522200
Haynes and Boone, LLP
901 Main Street
Suite 3100
Dallas, TX 75202
Telephone: (214) 651-5000
Facsimile: (214) 651-5940

ATTORNEYS FOR THE DEBTORS AND DEBTORS-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| In re | ) |
| | ) |
| MIRANT CORPORATION, et al., | ) |
| | ) |
| Debtors. | ) |
| | ) |
| | ) |

Chapter 11 Case

Case No. 03-46590(DML)11
Jointly Administered

**Hearing Date and Time:  Wednesday, January 28, 2004, 12:00 p.m.**

## MOTION PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 ESTABLISHING PROCEDURES FOR SETTLEMENT OF TERMINATED SAFE HARBOR CONTRACTS

TO THE HONORABLE D. MICHAEL LYNN, UNITED STATES BANKRUPTCY JUDGE:

Mirant Corporation and its above-captioned affiliated debtors (collectively, the "Debtors"), as debtors and debtors-in-possession, file this motion (the "Motion") pursuant to section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code") and Rule 9019 of Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") for an order establishing and authorizing procedures for settlement of certain, specified terminated safe harbor contracts. In support of the Motion, the Debtors respectfully represent as follows:

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)

PAGE 1 OF 20

# I. JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §157(b).  Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. PROCEDURAL BACKGROUND

2.      The Cases.  Commencing on July 14, 2003, and concluding in the early

morning hours of July 15, 2003, (the "Petition Date"), certain of the Debtors (collectively, the

"Initial Debtors") filed voluntary petitions in this Court for relief under chapter 11 of title 11 of

the United States Code, 11 U.S.C. §§ 101-1330, as amended.   On August 18, 2003, Mirant

EcoElectrica Investments I, Ltd. and Puerto Rico Power Investments, Ltd. (collectively, the

"New Debtors") commenced chapter 11 cases under the Bankruptcy Code.  On October 3, 2003,

the following additional Debtors filed voluntary petitions in this Court for relief under chapter

11: (i) Mirant Wrightsville Management, Inc.; (ii) Mirant Wrightsville Investments, Inc.; (iii)

Wrightsville Power Facility, L.L.C.; and (iv) Wrightsville Development Funding, L.L.C.

(collectively, the "Wrightsville Debtors").  On November 18, 2003, the following additional

Debtors filed voluntary petitions in this Court for relief under chapter 11: (i) Mirant Americas

Energy Capital, LP; and (ii) Mirant Americas Energy Capital Assets, LLC (the "MAEC Debtors"

and collectively with the Initial Debtors, the New Debtors, and the Wrightsville Debtors, the

"Debtors").  The Debtors continue to manage and operate their businesses as debtors-in-

possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

3.      The Cases are Jointly Administered.  On July 15, 2003, this Court granted

the motion for an order requesting that the bankruptcy estates of the Initial Debtors be jointly

administered.  On September 8, 2003, this Court entered an order approving joint administration

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)                                                    PAGE 2 OF 20

of the cases of the New Debtors with those of the Initial Debtors. On October 20, 2003, this Court entered an order approving the joint administration of the cases of the Wrightsville Debtors with those of the Initial Debtors. On November 20, 2003, this Court entered an order approving the joint administration of the cases of the MAEC Debtors with those of the Initial Debtors.

     4.     <u>The Committees</u>. Three official committees have been appointed by the Office of the United States Trustee for the Northern District of Texas in these administratively consolidated cases. Specifically, an official unsecured creditors' committee and an official committee of equity security holders have been appointed for Mirant Corporation and an official unsecured creditors' committee has been appointed for Mirant Americas Generation, LLC (collectively, the "Committees").

### III. **FACTUAL BACKGROUND**

#### A.     **The Debtors' Business Operations**.

     5.     Mirant and its direct and indirect subsidiaries comprise one of the world's largest generators and marketers of electricity. Through its direct and indirect subsidiaries, Mirant produces, sells and delivers reliable energy products and services to utilities, municipal systems, aggregators, electric-cooperative utilities, producers, generators, marketers and large industrial customers in North America, the Philippines and the Caribbean. Mirant's core business centers on the production and sale of electricity and electrical capacity (essentially the ability to produce electricity on demand). Mirant currently owns or controls more than 21,800 megawatts of electric generating capacity around the world, of which more than 18,000 megawatts is located in the United States. In 2002, Mirant produced 73 million megawatt-hours

**MOTION PURSUANT TO SECTIONS 105 AND 363 OF**
**THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019**
**ESTABLISHING PROCEDURES FOR SETTLEMENT**
**OF TERMINATED SAFE HARBOR CONTRACTS**
**D-1200402.1**
**LOSANGELES 212399 (2K)**                               **PAGE 3 OF 20**

of electricity, sold 312 million megawatt-hours of electricity and sold or marketed an aggregate average of 21 billion cubic feet per day of natural gas.

6.    Mirant employs in excess of 7,000 employees worldwide, of which approximately 1,100 employees are based at Mirant's corporate headquarters in Atlanta and approximately 5,900 employees are based at operating facilities.  In 2002, Mirant recorded a $542 million loss in earnings before interest, taxes and depreciation on a consolidated basis.  Its 2002 operating revenues were approximately $6.4 billion.

### B.    Facts Specifically Relevant to the Motion.

#### (i)    *The Trading Contracts.*

7.    The Debtors use various contracts for physical delivery and derivative financial instruments primarily to hedge and optimize their generating assets, and also take proprietary commodity positions.  Hedging contracts are part of a larger category of contracts referred to as "derivative contracts."  As a general matter, derivative contracts are financial contracts whose values are based on, or "derived" from, the price of a traditional security such as a stock or bond, an asset such as a commodity (*e.g.*, coal, fuel oil, natural gas), or a market index. Physical and financial derivative contracts take many forms, including (among others):

- ξ  back-to-back forward contracts, in which a trader buys power from one source, and then resells it to another party at a higher price.  Such arrangements can "lock in" a profit on a power sale.

- ξ  privately negotiated options to purchase a portion of the required power from another source at a given price – so that if a seller is unable to deliver the power from its own plant, the seller can exercise the option and have the power delivered to the buyer at a known price.

- ξ  electricity and natural gas futures contracts purchased on a commodity exchange such as NYMEX (New York mercantile exchange).  NYMEX offers standardized futures contracts for delivery of natural gas at Henry Hub in Louisiana and for delivery of electricity at PJM (Pennsylvania-New Jersey-Maryland).

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOS ANGELES 212399 (2K)

PAGE 4 OF 20

    ξ   options to purchase electricity futures contracts (a "call") at a future date on a commodity exchange.

    ξ   contracts (or options) to purchase the required fuel (*e.g.* natural gas) for delivery at a given time to a power plant, thus "locking in" one major variable cost in producing the power.

    ξ   collars, which provide financial protection if the price goes outside a defined range, either up or down.

    ξ   contracts that will provide financial protection if transmission line congestion makes it impossible or more costly to deliver power to the recipient.

8.    Recognizing the unique status of forward contracts, commodities contracts, securities contracts, certain repurchase agreements and swap agreements in the financial and commodity markets, Congress added to the Bankruptcy Code the "safe harbor" provisions of sections 555, 556, 559 and 560 of the Bankruptcy Code which generally permit non-debtor counterparties to such contracts to exercise certain rights and remedies not generally available to other contract counterparties in a bankruptcy case.

9.    Among the safe harbor rights and protections under the Bankruptcy Code are provisions that (a) allow the non-debtor party to terminate, liquidate and apply collateral held under a safe harbor contract upon a bankruptcy of the other party, notwithstanding section 365(e)(1) of the Bankruptcy Code; (b) protect prepetition payments made under a safe harbor contract by the debtor to the non-debtor party from the avoidance powers of a trustee or debtor-in-possession except in cases of actual intent to defraud other creditors; and (c) permit the non-debtor party to setoff mutual debts and claims against the debtor under a safe harbor contract without the need to obtain relief from the automatic stay.[1]

---

[1] These provisions are contained in section 362(b)(6), (7) and (17); 546(e), (f) and (g); 548(d)(2)(B), (C) and (D); 553(e)(1); 555, 556, 559 and 560 of the Bankruptcy Code.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)                            PAGE 5 OF 20

10.    In connection with the operation of their core businesses, the Debtors have historically engaged in asset risk management and optimization activities as well as proprietary trading activities pursuant to their internal risk management policy, as amended or modified from time to time (collectively, the "Trading Activities"). As a result of their historic Trading Activities, the Debtors maintain a portfolio consisting of active physical commodities and financial products trading positions (the "Existing Positions").

11.    Prior to the Petition Date, in connection with their Trading Activities, the Debtors utilized and entered into with their counterparties various industry standard trading contracts, including, but not limited to, ISDA, EEI, WSPP, GISB and/or NAESB master agreements, and various other master agreements, "long-form confirmations," netting agreements, master netting agreements, collateral agreements and/or credit support agreements or annexes relating thereto (including all related schedules, exhibits, annexes and confirmations) and any transactions thereunder, as may have been amended, restated or supplemented from time to time (collectively, the "Prepetition Trading Contracts").

*(ii)    The Prepetition Adequate Assurance Program.*

12.    Prior to the Petition Date, the Debtors and certain counterparties to the Prepetition Trading Contracts entered into Assurance and Amendment Agreements ("Prepetition Assurance Agreements"), for the purpose of, among other things, limiting the risks and uncertainties that may arise with respect to the Prepetition Trading Contracts after the Petition Date. The Debtors entered into many such agreements with its various counterparties in an effort to preserve the value of such relationships.

**MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOS ANGELES 212399 (2K)**

**PAGE 6 OF 20**

(iii)    *Orders Entered by this Court Affecting the Trading Contracts.*

As noted, the Debtors commenced their cases on the Petition Date. On July 14, 2003, the Debtors filed a motion with this Court seeking (a) an Interim Order Authorizing the Debtors to (i) Comply with Terms of Pre-Petition Trading Contracts, (ii) Enter Into Post-Petition Trading Contracts in the Ordinary Course of Business, and (iii) Provide Credit Support Relating to Both Pre- and Post-Petition Trading Contracts, and (b) a Final Order Authorizing on a Final Basis the Relief Set Forth in the Interim Order and Authorizing Assumption of Pre-Petition Trading Contracts (the "Trading Motion"). The purpose of the Trading Motion was to request the authority for the Debtors to continue trading in a manner consistent with their prepetition practice, and provide certain protections to the non-Debtor counterparties to the Debtors' Prepetition Trading Contracts.

13.    This Court conducted a hearing on the Trading Motion on July 14, 2003 (the "Interim Hearing") wherein the Debtors requested certain relief on an interim basis, and on that day, entered an order (the "Interim Order") in the case of debtor Mirant Americas Energy Marketing, L.P. ("MAEM") granting the Debtors interim relief on an emergency basis with respect to the Trading Motion.

14.    Following entry of the Interim Order, the Debtors and certain counterparties to the Prepetition Trading Contracts entered into Postpetition Assurance Agreements (together with the Prepetition Assurance Agreements, the "Assurance Agreements"). Any counterparty that agreed, or agrees, with the Debtors to accept the benefits and protections of the Interim Order pursuant to the terms of their respective Assurance Agreement is referred to herein individually as a "Protected Counterparty" and collectively, "Protected Counterparties."

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOS ANGELES 212399 (2K)

PAGE 7 OF 20

15.    On July 15, 2003, the Court entered an order (the "Supplemental Order") in the case of MAEM implementing certain provisions of the Interim Order regarding the Assurance Agreements.

16.    The Assurance Agreements provide, among other things, the parameters under which the Protected Counterparties agree to continue their relationships with the Debtors under the Prepetition Trading Contracts. The Assurance Agreements further indicate the Debtors' desire and intent to conduct postpetition trading activity in the ordinary course of business and grant appropriate credit support. The Debtors were willing to enter into the Assurance Agreements and grant certain protections to the Protected Counterparties, including agreeing to seek authority to assume the Prepetition Trading Contracts of the Protected Counterparties and to pay the prepetition claims arising thereunder, because such Protected Counterparties possessed the right to terminate or liquidate their respective Prepetition Trading Contracts notwithstanding the commencement of these cases. The Debtors' relationships with the Protected Counterparties are integral to the on-going and future success of the Debtors' operations and maintaining the value of the Debtors' estates.

17.    On August 27, 2003, this Court entered the "Final Order Authorizing The Debtors To (I) Comply With Terms Of Pre-Petition Trading Contracts, (II) Enter Into Post-Petition Trading Contracts In The Ordinary Course Of Business, (II) Provide Credit Support Relating To Both Pre- And Post-Petition Trading Contracts, And (IV) Authorizing Assumption Of Pre-Petition Trading Contracts" (the "Final Order").

18.    Among other things, the Final Order authorized the Debtors to (a) engage in Trading Activities in the ordinary course of business pursuant to the terms of the Prepetition Trading Contracts; (b) assume numerous Prepetition Trading Contracts under Bankruptcy Code

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)                                      PAGE 8 OF 20

section 365(a); (c) secure the Debtors' obligations under the Prepetition Trading Contracts with first-priority liens and security interests on any collateral and grant superpriority administrative expenses status to such obligations.

> *(iv)* *Protocol to Deal with Trading Contracts That Have Not Been Assumed by the Debtors.*

19.    As noted, not all Prepetition Trading Contracts have been, or will be, assumed by the Debtors. Indeed, since the Petition Date, some of the Prepetition Trading Contracts that have not been assumed by the Debtors have in fact been terminated. Each time such a contract is terminated (without regard to whether it was entered into prepetition or postpetition), a termination payment must be calculated.

20.    Under most terminated trading contracts, a termination payment would be payable by either the defaulting party or the non-defaulting party. Thus, termination could, and often will, result in a net payment to the Debtors. These "in-the-money" agreements which have not been assumed by the Debtors, where an embedded net amount due to the Debtors is present, constitute significant assets of the Debtors' estates. For agreements that are "out of the money" for the Debtors, it is appropriate to set the Debtors' liability to the counterparty as to such claims.

21.    In some cases, both the Debtors and the contract counterparty will agree from the outset on the value of the termination payment at issue based on the guidelines or equations set forth in the terminated contract. In any such case, the agreement as to the value of the termination payment would not constitute a "settlement" under the Federal Rule of Bankruptcy Procedures 9019 and Bankruptcy Court approval would not be required. However, when the Debtors and the contract counterparty initially disagree on the amount of the termination payment and only later negotiate an agreed value for such termination payment, such settlement would constitute a settlement requiring Court approval under Bankruptcy Rule 9019.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)                                                                            PAGE 9 OF 20

22.     Many trading contracts expressly address the rights of setoff and netting. Some agreements may restrict common law setoff rights. Other agreements may expand setoff and netting rights to include multiple agreements and multiple affiliates of the contracting parties.

23.     Prior to the Petition Date, the Debtors and their counterparties also entered into master netting, setoff and security agreements (the "Master Netting Agreements") pursuant to which the Debtors, on the one hand, and one or more affiliated counterparties, on the other hand, agree to aggregate their respective exposures under two or more agreements (physical and/or financial) for purposes of determining exposure thresholds and collateral requirements. As a rule, the counterparties under a Master Netting Agreement are affiliated entities, usually under the ownership of a common parent company. As with ordinary Master Agreements, Master Netting Agreements that provide triangular offsets permit the Debtors to minimize collateral requirements, and therefore, are an important tool in the efficient management of the Debtors' businesses.

24.     Where the Debtors and the counterparties have entered into a Master Netting Agreement, if provided therein, the default and termination remedies of the Master Netting Agreement replace the default and termination remedies of those particular Transaction Agreements covered by the Master Netting Agreement. In such instances, the Master Netting Agreement provides its own termination payment payable upon the occurrence of an early termination event.

25.     Because of the admittedly complex substance of the contracts discussed herein, and the importance to the Debtors of resolving termination payment issues that in many

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)                                                                      PAGE 10 OF 20

instances will result in positive cash payments to the Debtors, a streamlined and efficient

protocol to resolve such ordinary course of business issues must be implemented.

## IV.  RELIEF REQUESTED

26.     By this Motion, the Debtors seek entry of an order, in the form of Exhibit

A attached hereto, establishing Court-authorized procedures permitting the settlement of certain

terminated prepetition or postpetition "Trading Contracts" as defined below[2] (the "Trading

Contract Settlement Protocol").[3]  The Trading Contract Settlement Protocol will not govern

prepetition trading contracts that have been assumed by the Debtors or are otherwise governed

by the Final Order.  Debtors also request that any hearings in regard to settlements under the

Trading Contract Settlement Protocol be exempted from the procedures set forth in that certain

"Order Granting Debtors' Motion Pursuant to Section 105 of the Bankruptcy Code and Federal

Rule of Bankruptcy Procedure 9014(a) for an Order Establishing Uniform Schedule for the filing

and Service of Responses and Objections to Contested Motions" signed December 19, 2003.

### A.     Trading Contract Settlement Protocol.

27.     As discussed above, when the value of a termination payment in regard to

a Trading Contract is in dispute, the Debtors and the counterparty to such agreement may settle

---

[2] The contracts which are subject to the settlement protocol, approval of which is requested herein, include prepetition and postpetition contracts defined as follows:

"Trading Contract" means any contract that a party thereto asserts in good faith is a forward contract, futures contract, swap agreement, option or similar instrument contract; provided, however, "Trading Contract" shall not include a contract that has been assumed by the Debtors under Bankruptcy Code section 365, or is subject to the Final Trading Order.

(hereinafter defined as a "Trading Contract").

[3] Because the Trading Contract Settlement Protocol deals with sensitive parameters, it has been filed under seal with the Bankruptcy Court.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)

PAGE 11 OF 20

on an amount which differs from each party's original calculation of such termination payment amount. In such case, the amount agreed on between the two parties, would constitute a settlement and would generally require Bankruptcy Court approval. To minimize the time and expense to the Debtors' estate as well as the parties in interest, and to preserve the confidential nature of such sensitive settlements, the Debtors seek authorization to settle any such disputed termination payments pursuant to Bankruptcy Rule 9019, and to execute all documents in connection therewith as set forth in the Trading Contract Settlement Protocol and summarized generally below. To the extent of any inconsistencies between the Trading Contract Settlement Protocol and the summary, the terms of the Trading Contract Settlement Protocol control.

(i)    *Category 1: De Minimus Settlements.*

28.    The first category of settlements that would be subject to the protocol deals with "de minimus" settlements of Trading Contracts and governs settlements with relatively small dollar amounts. Such settlements may be settled without prior notice to the Committees or Bankruptcy Court approval. However, the Debtors are required to inform (i) the Committees and (ii) any entity that provides (or has provided) financing authorized by the Bankruptcy court pursuant to and authorized by Bankruptcy Code section 364 (the "DIP Lenders") (collectively, the "Notice Parties") not later than the first and fifteenth day of each calendar month as to the details of any such "de minimus" settlements. Moreover, the Debtors have an ongoing obligation to respond to reasonable inquiries and information requests in regard to such de minimus settlements. Thus, the Committees maintain the ability to keep apprised of the liquidation and settlement of claims with even a relatively small dollar value.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOS ANGELES 212399 (2K)

PAGE 12 OF 20

       *(ii)*   *Category 2:  Non-De Minimus Settlements.*

29.    The second category relates to settlements of Trading Contracts where the settlement amounts exceed the "de minimus" settlement amounts, but are still within a reasonable range designed to ensure the fairness of a proposed settlement.  This *non-de minimus* settlement category contains basket amounts and percentages within which the Debtors must settle in order to come within the Trading Contract Settlement Protocol.  Such settlements require advance notice upon the Notice Parties.[4]  If no Notice Party objects to the proposed settlement within ten (10) days after notice of the proposed settlement (or if requested by the Notice Parties, an additional extension of time not to exceed an additional ten (10) days), the Debtors are authorized to consummate the settlement without further order of the Bankruptcy Court.  If any Notice Party timely objects, the Debtors may obtain a hearing date seeking Court approval of the proposed settlement within at least five (5) days of the date of the objection (subject, of course, to the Court's schedule).

       *(iii)*   *Information to be Provided to the Notice Parties.*

30.    The Debtors must provide the following information to the Notice Parties in connection with the Trading Contract Settlement Protocol in regard to Trading Contracts settled pursuant thereto:  (a) copies of all the Trading Contracts which are being settled, including but not limited to Confirmations (unless the Committees' advisors agree otherwise),

---

[4] Because of the sensitive nature of Trading Contract settlements, the Trading Contract Settlement Protocol does not require notice to parties on the Limited Service List, or the filing of such notices with the Bankruptcy Court.  Such information, if widely known, would hinder the Debtors' ability to settle amounts owing under the terminated Trading Contracts for the best amount possible.  However, the proposed protocol requires the Debtors to provide sufficient information to enable the Committees to evaluate the propriety of the settlements, and provides the Committees an opportunity to object to certain proposed settlements.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)
PAGE 13 OF 20

master agreements, termination notices, netting agreements; (b) a spreadsheet listing the details

of each of the Trading Contracts which are being settled, including but not limited to, the term of

the contract, when and by which party the contract was terminated, the amount of collateral held

by the settling party and the amount of damages or replacement costs and associated

methodology (if applicable); (c) a spreadsheet listing the details of other balances included

within the settlement agreement, including accounts receivable and accounts payable; (d) a copy

of the proposed settlement agreement and the history of settlement negotiations (if applicable).

> (iv)    *Setoff and Recoupment.*

31.    The Trading Contract Settlement Protocol also specifically provides that

settlements may provide for setoff or recoupment of claims and debts, and resort to collateral.

> (v)    *Provisional Allocation.*

32.    The Trading Contract Settlement Protocol specifically states that any

monies paid to or received by the Debtors under such protocol shall be provisionally allocated in

accordance with the Debtors' prior practice, subject to reallocation.  **All rights are reserved in**

**regard to final allocation**.

> (vi)    *Modifications to the Protocol.*

33.    Finally, the Trading Contract Settlement Protocol reserves the right of the

Notice Parties to seek relief from this Court to request modifications to the protocol, if deemed to

be necessary.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)

PAGE 14 OF 20

## V.  APPLICABLE AUTHORITY

A.   **The Trading Contract Settlement Protocol Should be Approved under Section 105(a) and Federal Rule of Bankruptcy Procedure 9019.**

      *(i)    The Protocol Should Be Approved Under Section 105.*

34.    Section 105(a) of the Bankruptcy Code allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Under section 105(a) of the Bankruptcy Code, the Court has expansive equitable power to fashion any order or decree that is in the interest of preserving or protecting the value of the debtor's assets so long as it is not in conflict with the rest of the Bankruptcy Code. *See, e.g. In re Davis,* 170 F.3d 475 (5th Cir. 1999) ("The broad grant of authority conferred upon bankruptcy courts and district courts by 11 U.S.C. §105 permits these courts to issue 'any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.'") (citation omitted). *See, e.g., In re Zale Corp.,* 62 F.3d 746 (5th Cir. 1995) ("Although we interpret §105 liberally, [its exercise] must be consistent with the rest of the Bankruptcy Code.") (citation omitted). *See, e.g., United States v. Sutton,* 786 F.2d 1305 (5th Cir. 1986) (While the bankruptcy courts have fashioned relief under Section 105(a) in a variety of situations, the powers granted by that statute may be exercised only in a manner consistent with the provisions of the Bankruptcy Code.") (citation omitted). *See, e.g., In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.") (citation omitted). *See, also, In re NWFX, Inc.,* 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern.")(citations omitted).; *In re Cooper Properties Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)
                                          PAGE 15 OF 20

equities a debtor may have in property for the benefit of its creditors so long as that protection is implemented in a manner consistent with the bankruptcy laws.")(citation omitted).

35.    Authorizing the efficient settlement of matters discussed herein pursuant to the Trading Contract Settlement Protocol is clearly an appropriate use of this Court's powers under section 105 of the Bankruptcy Code. The Trading Contract Settlement Protocol will enhance the efficient administration of the Debtors' cases and thereby serve to protect and preserve the value of the Debtors' estates. Generally, utilization of the Trading Contract Settlement Protocol will prevent unnecessary costs and expenses which would be incurred if the Debtors are required to file and serve motions for each and every claim in question. For example, the Trading Contract Settlement Protocol would further the intent of section 105(a) by allowing the Debtors to realize the value embedded in a terminated Prepetition Trading Contract efficiently and more quickly than if the Trading Contract Settlement Protocol were not in effect.

36.    The Debtors reiterate that the settlement parameters must remain confidential, and the terms of each settlement should also remain confidential. Such confidentiality is necessary to enable the Debtors to obtain the most favorable settlement possible which will further the Debtors' obligations to maximize the value of their estates and reduce prepetition claims.

(ii)    *The Protocol Satisfies Rule 9019.*

37.    Bankruptcy Rule 9019(a) provides, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). Bankruptcy Rule 9019(b) provides, in part, that "[a]fter a hearing on such notice as the court may direct, the court may fix a class or classes of controversies and authorize

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1                                                      PAGE 16 OF 20
LOSANGELES 212399 (2K)

the trustee to compromise or settle controversies within such class or classes without further hearing or notice." Fed. R. Bankr. P. 9019(b).

38.    Bankruptcy Rule 9019(a) empowers the Bankruptcy Court to approve compromises and settlements if they are "fair and equitable and in the best interest of the estate." *Official Committee of Unsecured Creditors v. Cajun Electric Power Cooperation, Inc. (In re Cajun Electric Power Cooperative, Inc.)*, 119 F.3d 349, 355 (5th Cir. 1997); *see also, Feld v. Zale Corporation (In re Zale Corp.)*, 62 F.3d 746, 754 (5th Cir. 1995) (stating that "the 'fair and equitable' determination does not give the bankruptcy court jurisdiction over settlement conditions that do not bear on the court's duties to preserve the estate and protect creditors."). A decision to accept or reject a compromise or settlement is within the sound discretion of the Court. *See* 9 *Collier on Bankruptcy* ¶ 9019.02 (15th ed. Rev. 2001). "Compromises are favored in bankruptcy" because they minimize the costs of litigation and further the parties' interest in expediting administration of a bankruptcy estate. *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citing 9 *Collier on Bankruptcy* ¶ 9019.03[1] (15th ed. Rev. 2001)). The settlement need not result in the best possible outcome for the debtor, but must not "fall beneath the lowest point in the range of reasonableness." *Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Basic to the process of evaluating proposed settlements, then, is "the need to compare the terms of the compromise with the likely rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 425 (1968).

39.    Accordingly, Bankruptcy Rules 9019(a) and 9019(b) authorize the Court to approve the Trading Contract Settlement Protocol and provide for the settlement of the class of the respective controversies. By maximizing and preserving the estates of Debtors and

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOS ANGELES 212399 (2K)                                                      PAGE 17 OF 20

simultaneously maintaining the Committees' right to reasonable notice (and preserving their

right to object), the Trading Contract Settlement Protocol safeguards both the interests of the

estates and the creditors.

40.    The Settlement parameters set forth in the Trading Contract Settlement

Protocol are designed to give the Debtors a flexible and reasonable range within which to settle

terminated Trading Contracts.  The Notice Parties have not objected to such settlement ranges

and the Debtors believe that settlement within such predetermined ranges (i.e., in a manner that

comes within one of the Trading Contract Settlement Protocol categories) is, by definition, a

reasonable settlement.

41.    The Trading Contract Settlement Protocol also serves the best interests of

the Debtors' estate by preserving the value of volatile assets of the Debtors' estates, expediting

the collection of payments owed to the Debtors, and reducing the costs associated with the

determination of the termination payments.

**B.    The Settlement of Trading Contracts is Within the Ordinary Course of the Debtors' Business.**

42.    Section 363(c)(1) of the Code provides explicit statutory authority for a

debtor-in-possession to enter into transactions in the ordinary course of its business.  *See*, 11

U.S.C. § 363(c)(1).  Pursuant to sections 1107(a) and 1108 of the Code, the debtor-in-possession

has the authority to operate the debtor's business without obtaining prior court approval.  *See*, 11

U.S.C. §§ 1107 and 1108.

43.    As noted previously, the Debtors have historically entered into contracts

such as the Trading Contracts and settlement thereof is standard within the Debtors' industry and

according to the Debtors' past business practices.  Indeed, prompt settlement of trading contracts

and "truing up of accounts" is critical to the relevant business relationships as it hastens the

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)                                                    PAGE 18 OF 20

finalization of obligations owing between the parties and provides reliability and stability for the parties going forward.  Therefore, the Trading Contract Settlement Protocol, if approved and implemented by the Debtors, is within the ordinary course of the Debtors' business.

    44.  It should also be noted that the Trading Contract Settlement Protocol, approval of which is sought herein, is consistent with the Debtors' Risk Management Policy, which this Court has approved.  In other words, compliance with the proposed Trading Contract Settlement Protocol equates with compliance with the settlement parameters set forth in the Mirant Global Risk Management Policy, as of March, 2003 (the "Risk Management Policy").[5]

## VI. <u>CONCLUSION</u>

    WHEREFORE, based upon the foregoing, the Debtors request that the Court grant the relief requested herein.

Dated: Fort Worth, Texas
    December 31, 2003

         **HAYNES AND BOONE, LLP**
         901 Main Street
         Suite 3100
         Dallas, TX 75202
         (214) 651-5000

         By  /s/ Meredyth A.  Purdy
           Robin Phelan
           State Bar No. 15903000
           Judith Elkin
           State Bar No. 06522200
           Meredyth A. Purdy

---

[5] On November 5, 2003, this Court entered the "Final Order Regarding Debtors' Risk Management Policy" pursuant to which the Debtors were authorized to conduct their trading activities in accordance with their Risk Management Policy.  The Debtors note that a settlement that exceeds the Trading Contract Settlement Protocol may also be consistent with the Debtors' Risk Management Policy.  Such settlements, however, would not be eligible for resolution pursuant to the Trading Contract Settlement Protocol.

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)
                      PAGE 19 OF 20

State Bar No. 24007882

-and-

Thomas E Lauria
State Bar No. 11998025
Craig H. Averch
State Bar No. 01451020
WHITE & CASE LLP
Wachovia Financial Center
200 South Biscayne Blvd.
Miami, Florida 33131
(305) 371-2700

ATTORNEYS FOR THE DEBTORS AND
DEBTORS-IN-POSSESSION

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that she has authorized BSI as service agent to cause to serve a true and correct copy of the foregoing document upon all persons on the Limited Service List via United States first class mail, postage prepaid, on the 31st day of December 2003 in accordance with the Federal Rules of Bankruptcy Procedure.

/s/      Meredyth A. Purdy_____

MOTION PURSUANT TO SECTIONS 105 AND 363 OF
THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT
OF TERMINATED SAFE HARBOR CONTRACTS
D-1200402.1
LOSANGELES 212399 (2K)

PAGE 20 OF 20