SHEPPARD MULLIN RICHTER &
HAMPTON, LLP
30 Rockefeller Plaza, 24th Floor
New York, New York  10112
Tel:  (212) 332-3800
Fax:  (212) 332-3888
Carren Shulman. (CS-2804)
Russell Reid (RR-2011)

-and-

333 South Hope Street, 48th Floor
Los Angeles, California  90071-1448
Tel:  (213) 620-1780
Fax:  (213) 620-1398
Kyle Mathews (KM-3255)
(admitted *pro hac vice*)

*Counsel to The Bank of New York Mellon, and*
*The Bank of New York Mellon Trust Company,*
*N.A., in their representative capacities*

REED SMITH LLP
599 Lexington Avenue
New York, NY  10022
Tel:  (212) 521-5400
Fax:  (212) 521-5450
Eric A. Schaffer (ES-6415)
Michael J. Venditto (MV-6715)
*Counsel to BNY Corporate Trustee Services*
*Limited, in its representative capacity*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| LEHMAN BROTHERS HOLDINGS INC., *et al*., | : | Case No. 08-13555 (JMP) |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : | Refers to Dkt. No. 1498 |

------------------------------------------------------------x

**DECLARATION OF ROBERT MAJOR IN SUPPORT**
**OF THE LIMITED OBJECTION OF THE BANK OF NEW YORK**
**MELLON, THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A., AND**
**BNY CORPORATE TRUSTEE SERVICES LIMITED  TO**
**TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105**
**AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR**
**THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF**
**<u>PREPETITION DERIVATIVE CONTRACTS</u>**

ROBERT MAJOR, declares the following to be true under the penalty of perjury:

1.      I am employed by The Bank of New York Mellon Trust Company, N.A. ("BNYM") in the Default Administration Group of the Corporate Trust Department ("DAG"). DAG is charged with, among other things, overseeing and managing corporate trust defaulted issues, including issues where affiliated entities, such as BNY Corporate Trustee Services Limited ("BNY CTS"; together with BNYM, the "Bank"), serve as Trustee. I submit this declaration based upon my personal knowledge and information and belief in support of the Bank's accompanying objection (the "Objection") to the Debtors' motion (the "Motion"), referenced above.

2.      As Trustee, the Bank typically acts for and at the direction of the beneficiaries of an underlying transaction. In most cases, the Trustee is required by the transaction documents to serve notices upon the transaction beneficiaries and to solicit direction from them in connection with the exercise of their contractual rights. The Trustee therefore acts in a representative capacity only and has no financial interest in the underlying transactions.

3.      I understand that the Debtors seek approval of certain procedures to replace the Debtors and their affiliates as counterparties to certain transactions, and to take certain other action regarding derivatives contracts upon five (5) days' notice. Because the beneficiaries of the transactions ultimately must approve or disapprove of the Debtors' proposed action, five days is wholly inadequate for the Debtors or the Trustee to give the beneficiaries notice and an opportunity to respond. The deal structures are complex. The investors are located around the world. Moreover, the structure of these transactions is such that the Debtors do not have a mechanism to identify promptly all of the investors who could be affected adversely and to give these investors a meaningful opportunity to raise any objections to the proposed actions. In fact, in many instances (as described below), the deal structure requires a meeting of holders before any proposed action may be voted upon.

4.      BNY CTS is a trust company organized under English law. BNY CTS acts as trustee ("Trustee") in connection with certain notes (the "Notes") issued under the Multi-Issuer Secured Obligation Programme (the "Programme") of Dante Finance Public Limited Company

("Dante Finance") and certain other issuers (collectively, the "Issuers") pursuant to a Programme

Agreement, dated October 10, 2002, and most recently amended and restated on July 18, 2008.

**The Programme**

5.      The Programme, as arranged by Lehman Brothers International (Europe)

("LBIE"), includes 19 separate Issuers that were organized by LBIE.  Parties to the original

Programme Agreement include Dante Finance, as Issuer; LBIE, as Dealer and Arranger; the

Trustee; an Issuing and Paying Agent; and a Registrar.  Each of the Issuers (other than Dante

Finance as original issuer) joined in the Programme pursuant to a Deed of Accession.

Collectively, these Issuers have issued in excess of 160 series of notes (the "Series"), many of

which comprise multiple tranches, which Series and tranches are held by an unknown number of

holders (the "Noteholders") in Europe, Asia, Australia, and North America.

6.      Each transaction undertaken as part of the Programme includes a series of

interrelated agreements including, *inter alia*, a Principal Trust Deed (as amended and restated,

the "Principal Trust Deed"); an Agency Agreement; and a Supplemental Trust Deed and

Drawdown Agreement (each a "Supplemental Trust Deed").  The Principal Trust Deed,

Supplemental Trust Deeds, and related documents are referred to collectively as the "Trust

Documents."[1]

7.      With regard to each Series, the Trustee acts as trustee pursuant to the Trust

Documents.  As part of the Principal Trust Deed, as acceded to by each of the Issuers (other than

Dante Finance PLC as original issuer), the individual Issuers covenanted to perform certain

functions and to take certain actions on behalf of the Trustee and Noteholders.  The

Supplemental Trust Deed for each individual Series provides Series-specific terms and otherwise

---

[1]      The Trust Documents, including the Notes, are governed by and construed in accordance with
English law.  In this Declaration, citations referencing particular provisions of Trust Documents, or other Series
specific documents, are references to clauses in the documentation relating to the Series transaction known as Onxy
2006-1.  There are variations in the documentation for each Series and Issuer.  This Series, therefore, is identified by
way of example only and is generally representative of the other Series in the Programme.

supplements and modifies the terms of the Principal Trust Deed.  Each Supplemental Trust Deed identifies the underlying collateral for that Series or the eligibility criteria for such collateral.

8.      To secure the performance of the individual Issuers' obligations and repayment of the notes issued by each, the Issuers individually assigned or pledged certain financial assets to the Trustee.  Pursuant to the Trust Documents, the Issuers granted the Trustee liens on and security interests in all mortgaged property and associated powers of enforcement and possession.  The Trustee also has obligations imposed upon it as to the application of money received by it in its capacity as trustee, and a right to full indemnification (including payment of fees and expenses) for any steps it may take pursuant to the Trust Documents or in the exercise of its powers as trustee.

9.      The collateral for many of the Series includes rights under swap agreements (the "Swap Agreements") between the Issuers and Lehman Brothers Special Financing Inc. ("LBSF").  Another of the Debtors, Lehman Brothers Holdings Inc. ("LBHI"), acted as the credit support provider under the Swap Agreements.  The Swap Agreements are Derivative Contracts within the definition of the Motion.

10.     The Trustee's authority to act on behalf of the Noteholders with respect to collateral, including any Swap Agreements, is limited by the terms of the relevant Trust Documents.  In many circumstances, that authority can be exercised only upon instruction from the Noteholders for a particular Series.[2]

11.     The terms and conditions of the Notes, and the underlying collateral (including proceeds) securing obligations to Noteholders, differ from Series to Series.  An event of default under the terms of any one Swap Agreement and/or Notes of one Series does not result in a default under another Series.  Each Series stands alone.

---

[2]      *See, e.g.*, Schedule 3, ¶ 2 of the Principal Trust Deed (2006 restatement), particularly ¶ 2.9(i) relating to Mortgaged Property, providing for the requirement for extraordinary resolutions of Noteholders in relation to certain matters and the related provisions in ¶ 13.1 of the Principal Trust Deed).

12.     Because the Notes in each Series are traded in the financial markets, the Trustee communicates with the Noteholders through the Euroclear System ("Euroclear") and Clearstream Banking S.A. ("Clearstream"), the major European bond clearing systems.  These clearing systems are the registered owners and are responsible for holding, clearing, and settling transactions in each of the Series.  As a consequence, the Trustee believes that the Debtors are unable to identify each of the Noteholders and must rely upon the clearing system to communicate with the ultimate beneficial holders.

13.     Upon information and belief, the Debtors have not provided notice of the Motion to the Noteholders.

**The Trustee's Position**

14.     In their Motion, the Debtors seek authorization to assume and assign contracts that they deem to be "Open Derivative Contracts" to third parties pursuant to procedures designed by the Debtors.

15.     Pursuant to the Programme documents, the Trustee has interests in certain Derivative Contracts between LBSF and the Issuers.  However, the Trustee's authority to act with respect to Derivative Contracts is limited by, and dependent upon, the terms of the Trust Documents and instructions from the Noteholders for whose benefit the Trustee holds such interests.

16.     For reasons set forth below, the procedures contemplated by the Debtors are inadequate to address the complex structures of the Programme.

17.     The Debtors propose to offer Open Derivative Contracts for sale and close on transactions "within 24 hours of selecting a bid."  (Motion ¶ 16 at 8).  Counterparties are to be given notice of a proposed transaction by email, fax, or overnight delivery.  Any counterparty that fails to deliver a written objection to the Debtors' counsel in New York within five business days would be deemed to have waived its substantive rights under the Bankruptcy Code or applicable non-bankruptcy law and to have (i) consented to any cure amounts proposed by the

Debtors, (ii) agreed that the assignee has provided adequate assurance of future performance, (iii) agreed that all defaults have been cured, (iv) waived any right to terminate the Open Derivative Contract, and (v) agreed that the terms of the Court's order apply to the proposed assignment. (Motion ¶ 19(f) at 11)

18.     The proposed procedures would eliminate the legal and contractual rights of counterparties that do not respond to the Debtors' notice within five business days of service. In the case of the Swap Agreements that are part of the Programme, it appears that the Debtors would give such notice only to the Issuers, entities created by the Debtors which have little actual interest in the Swap Agreements. Such a procedure would be wholly inadequate because it would not provide for any notification to the Noteholders, who are the actual parties-in-interest. As noted above, the Trustee believes the Debtors do not know the identities of many of the Noteholders.

19.     Even if the Debtors were to provide notice to either the Trustee or the clearing systems – which they have not proposed – their contemplated timeframe would be insufficient due to the complex nature of the financial structure, the number of parties involved, and the requirements of the governing documents. For example, if the Trustee received notices, it would have to transmit them to the clearing systems, which in turn would have to send the notices to the appropriate participants (i.e. the holders of record), which then must forward the notices to their customers (located in Europe, Asia, Australia and North America) who are the ultimate beneficiaries of the transactions. Thus, notice cannot possibly reach the parties actually affected by the proposed assignment within five days, and afford these parties a meaningful opportunity to respond in accordance with the proposed procedures.

20.     The Debtors' proposed timetable is even more unworkable with regard to those Series that have multiple Noteholders. While the holder of 100% of the Notes issued for a particular Series theoretically could raise an objection directly, without giving instruction to the Trustee, a number of the Series have multiple Noteholders and these Noteholders typically do not know the identities of their fellow Noteholders. Under the Trust Documents, the holders of

Notes in a Series with multiple Noteholders could take action only if the Trustee called a meeting at which the requisite majority of Noteholders gave instruction.

21.     In certain instances, where the Notes are rated by one or more rating agencies and the proposed swap counterparty assignee has obtained a rating at least equal to the rating obtained by LBSF when it entered into a particular Swap Agreement, the Noteholders' rights to object to the assignment may be limited.  Where the Notes are not rated, however, or where the proposed assignee does not have the requisite rating, Noteholders are entitled to hold a meeting upon 21 days' notice (exclusive of the day on which the notice is given and the day of the meeting) at which they may determine whether or not to instruct the Trustee to object to a proposed assignment.[3]

22.     Under these circumstances, the type of notice provided also is relevant.  For example, if the Debtors provide notices of assignments to the Trustee in batches of up to 100 different swap agreements, see Motion at ¶ 9 n. 7, or without identifying the relevant Issuer and Series, efforts to notify the relevant Noteholders will be delayed as the Trustee will be required to research the identities of the affected Noteholders.

23.     The scope and substance of any notice are no less important than the form, and any notices sent to Noteholders also must identify fully the agreements that are proposed to be assigned.

24.     Swap Agreements executed as part of the Programme arguably are not freestanding agreements.[4]  Each Swap Agreement typically operates as an integral part of a larger agreement that includes the Trust Documents to which it relates.  Paragraph (g) of part 5 of the Schedule to the ISDA Master Agreement (as amended and restated in 2006) says "each party confirms that it is bound by the terms of the Trust Deed and that the terms of such Trust

---

[3]     *See* Principal Trust Deed, ¶ 13.4 and Schedule 3, ¶¶ 2 and 4.

[4]     Certain swap agreements may be freestanding agreements that are not integrated with the other transaction documents.

Deed prevail to the extent they conflict with terms relating to such Transaction" and it then goes on to recite the limited recourse provisions. By way of further example:

(a)   The Trust Documents executed in connection with any Swap Agreement preclude amendment of the Swap Agreement without the Trustee's consent; limit the Swap Counterparty's recourse to the Mortgaged Property for the relevant Series; and preclude any Enforcement Proceedings by the Swap Counterparty against the relevant Issuer.[5]

(b)   Each Swap Agreement requires a "Calculation Agent" to perform certain defined administrative tasks.[6] Although LBIE is designated as the Calculation Agent in connection with most of the Swap Agreement, LBIE is not performing that function.[7] The Swap Agreements themselves do not provide a mechanism for replacing the Calculation Agent, and assignment of individual Swap Agreements would not remedy this shortcoming. To the contrary, assignment of Swap Agreements without providing for a functioning Calculation Agent and collection of relevant information could make assigned Swap Agreements unworkable in practice.

(c)   The Trust Documents require substantial communication from Swap Counterparty to the Issuer and the Trustee and the Noteholders.[8]

Because each Swap Agreement functions as part of a larger, integrated agreement, it cannot be assigned without the concurrent assignment of related Trust Documents. Accordingly, any notices to Noteholders must identify the full scope of documents being assigned, and not just the subject Swap Agreement.

---

[5]   *See* Principal Trust Deed at ¶ 7.2.1. and Supplemental Trust Deed at ¶ 6.

[6]   *See,* by way of example, Condition 6(ii) of the Terms and Conditions of the Note found in the Series Prospectus; see also, the Swap Confirmation which includes the obligation upon the Calculation Agent, inter alia, to maintain the "Reference Registry"; to replace "Reference Entities" that are subject to a "Succession Event"; to determine the "Succession Event Date"; to determine the "Credit Protection Entity Valuation Date"; and to calculate the "Valuation Day"

[7]   LBIE is in administration in the UK and is not performing. Information previously held by LBIE in relation to Swap Agreements may no longer be available. Indeed, the lack of a functioning Calculation Agent may preclude determination of the adequacy of a proposed cure amount.

[8]   *See,* Condition 6 (ii) of the Terms and Conditions of the Note of the Series Prospectus.

25.    For all of these reasons, the Trustee reserves any and all objections, rights, claims, and defenses of the Noteholders and Issuers to the proposed waivers and consents embedded in the procedures, under the Bankruptcy Code, or applicable non-bankruptcy law, including any objection to jurisdiction over them.  Further, the Trustee reserves the rights of Noteholders and Issuers to object to or challenge any action taken by the Debtors in reliance upon these procedures.

26.    With regard to Terminated Derivative Contracts, the Debtors appear to seek authority to resolve any disputes with counterparties.  To the extent that such authority is limited to agreements that the Debtors actually negotiate with the counterparties, the Trustee has no objection.  Any Court-approved procedures should recognize, however, that all statutory and contractual rights of these counterparties are reserved if any disputes cannot be consensually resolved.

[Balance of this page is intentionally blank]

I declare the foregoing to be true.


Dated: New York, New York
      November 28, 2008

_____
Robert Major