**Hearing Date: December 3, 2008 at 10 a.m. (Prevailing Eastern Time)**
**Objection Deadline: November 28, 2008 at 4 p.m. (Prevailing Eastern Time)**

Lee S. Attanasio
Alex R. Rovira
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

Attorneys for Aircraft Finance Trust

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** | Case No. 08-13555 (JMP) |
| the Debtors. | (Jointly Administered) |

**OBJECTION OF AIRCRAFT FINANCE TRUST TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

Aircraft Finance Trust ("AFT"), hereby files this objection (the "Objection") to the Debtors' Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (the "Motion")[1] [Docket No. 1498]. In support of this Objection, AFT respectfully states as follows:

**PRELIMINARY STATEMENT**

1. Under the guise of a procedural motion, and without citation of any meaningful or relevant authority,[2] the Debtors seek this Court's approval to severely limit

---
[1] Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Motion.
[2] It is worth noting that the three orders cited by the Debtors deal only with settlement procedures, not the

Counterparties' contractual and statutory rights in respect of the assumption and assignment of certain financial contracts (i.e., securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements or master netting agreements, collectively, the "<u>Protected Contracts</u>").  While many derivative contracts use similar standard forms, each contract is unique and modifications are heavily negotiated and bargained for.  As such, the assumption and assignment of these contracts must allow Counterparties a meaningful opportunity to address specific, contractual issues on a case by case basis, and any procedures approved must contain appropriate and reasonable protections and safeguards to the contractual and statutory rights of Counterparties.

    2.  The Motion also appears to seek to limit Counterparties' rights to terminate Protected Contracts, and to exercise rights of setoff or netting against any termination value, payment amount, other transfer obligation or other collateral.  While AFT  recognizes that this Court is not making any ruling as to the several reservation of rights littered throughout the Debtors' Motion, this Court should make absolutely clear to all Counterparties (as well as the securities and financial markets) that nothing in the Debtors' Motion or any order approving the Motion shall encroach upon Counterparties' contractual and statutory rights, nor provide the Debtors with  leverage to threaten the validity of a Counterparty's' right to exercise these protections.

    3.  Given the magnitude of the contracts at issue in the Motion, it is no wonder the Debtors seek procedures to streamline the process for assumption, assignment and settlement, and AFT does not fundamentally object to the creation of such procedures.  The Debtors' requests, however, go far beyond what the exigencies of these cases require or the law permits.  The Assumption and Assignment Procedures must be modified consistent with these

---

assignment and assumption procedures primarily addressed in this Objection.

objections (and the dozens of other objections filed) and Counterparties' rights in respect of the procedures and the Debtors' various reservations of rights clarified.

## BACKGROUND TO OBJECTION

4.      AFT is a Delaware statutory business trust created to finance, purchase and lease aircraft. Pursuant to its trust document and financing documents related to its securitization program, AFT is required to make interest payments on notes issued by it under its securitization program to finance the aircraft from the proceeds received by it from leasing the aircraft. In order to hedge the difference between the fixed lease proceeds and the floating rate of interest due on the notes, prior to the Petition Date (defined below), AFT entered into a certain ISDA Master Agreement (as amended, supplemented or otherwise modified from time to time, and including all annexes, schedules, exhibits, confirmations and any related agreements and other documents, collectively, the "AFT ISDA Master Agreement") with Lehman Brothers Special Financing Inc. ("LBSF") dated December 12, 2003.

5.      Under the terms of the AFT ISDA Master Agreement, AFT entered into various Protected Contracts, including various interest rate swap and cap transactions, in order to hedge its interest rate exposure under the aircraft securitization program. Pursuant to a guarantee agreement, Lehman Brothers Holdings Inc. ("LBHI") guaranteed the obligations of LBSF under the AFT ISDA Master Agreement. Neither the AFT ISDA Master Agreement, nor the various Protected Contracts thereunder, have been terminated.

6.      In addition, on or about May 5, 1999, AFT entered into that certain Capital Markets Advisory Agreement (the "CMAA") with Lehman Brothers Inc. ("LBI") under which LBI was engaged as AFT's capital markets advisor and provided certain investment banking, financial and analytical advice in respect of AFT's aircraft lease securitization program,

including financial advice to assist AFT in evaluating its interest rate risk management policies. LBI had been AFT's advisor since AFT's inception.

7. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Petition Date"), LBHI and certain of its subsidiaries each filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). LBSF filed its chapter 11 petition on October 5, 2008. Certain of the Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to LBI and James W. Giddens was appointed as LBI's trustee (the "LBI Trustee") to administer the liquidation of LBI's estate.

9. On October 31, 2008, AFT sent a letter to the LBI Trustee requesting assurances with regard to its intentions to fulfill its obligations under the CMAA. In addition, AFT provided the LBI Trustee with notice that AFT intended to enter into replacement interest rate hedging contracts and requested confirmation as to whether the LBI Trustee would exercise LBI's right of first refusal to provide such interest rate hedge contract on current market terms and by an LBI affiliate with a rating consistent with maintaining the rating of AFT's rated securities as required under the CMAA, trust documents and the AFT ISDA Master Agreement. To date, AFT has not received a response from the LBI Trustee. In order to protect the interests of its investors, on or about November 20, 2008, AFT hired a new capital markets advisor, which

4

is currently in the process of evaluating AFT's hedging positions and is advising AFT on the appropriate course of action which currently includes terminating the AFT ISDA Master Agreement and entering into new hedging contracts.[3]

11. On November 13, 2008, the Debtors filed the Motion requesting, among other things, approval of (i) procedures for the Debtors' assumption and assignment of derivative contracts, including the deemed provision of adequate assurance of future performance and the resolution of cure amounts; and (ii) procedures for entering into termination and settlement agreements with respect to derivative contracts.

**OBJECTION**

A. The Proposed Assumption and Assignment Procedures Fail to Provide a Reasonable Period of Time to Object to an Assignment Notice

11. Generally, motions to assume and assign a contract must provide twenty (20) days notice to the counterparty of the contract unless the court for cause shown shortens the time or directs another method of giving notice. See, e.g., Bankruptcy Rule 2002(2). Without providing any basis for the apparent urgency required for Counterparties to respond, the proposed Assumption and Assignment Procedures provide that a Counterparty wishing to object to the assumption and assignment must serve on specified parties a written objection so that such objection is actually received no later than five (5) business days after the date of service of the Assignment Notice. Given that an Assignment Notice may not actually be received by a Counterparty until several days after the date of service of the Assignment Notice, that Counterparty may only have a few days to assemble all of the information requested by the Assumption and Assignment Procedures, which require a counterparty to provide extensive and

---

[3] In light of LBI's lack of response to AFT's inquiries regarding the existing CMAA, AFT had no choice but to protect its interests by proceeding to hire a new advisor. AFT reserves all of its rights to damages and otherwise under the CMAA (including as to fees paid in advance for services not rendered), and all of its defenses with respect to LBI's right of first refusal on any new hedging agreements sought by AFT.

5

detailed information (including, on a transaction by transaction basis, calculations and detail of specific charges and dates, and any other amounts receivable or payable supporting a Counterparty's Cure Amount). Limiting a Counterparty to only a few days to object to the assumption and assignment of multi-million dollar contracts with numerous underlying transactions is unreasonable.

12. Moreover, there are draconian consequences for failing to meet this unrealistic deadline. If a Counterparty fails to timely serve an objection, the Counterparty is deemed (i) to have consented to the Debtors' proposed Cure Amount, (ii) to have agreed that the assignee has provided adequate assurance of future performance, (iii) to have agreed that all Defaults under the Contracts have been cured as a result or precondition of the assignment, such that the assignee or the Debtors shall have no liability or objection with respect to any Default occurring or continuing prior to the assignment, and such Derivative Contract shall remain in full force and effect for the benefit of the assignee and the Counterparty, and (iv) to have waived any right to terminate the Derivative Contract or designate an early termination date as a result of any Default that occurred and/or was continuing prior to the assignment date. Given the unrealistically short five (5) business day response deadline, these consequences are not simply improper, they are potentially a violation of Counterparties' procedural and substantive due process rights.

B. <u>The Assumption and Assignment Procedures Fail to Provide Adequate Assurance of Future Performance</u>

13. The proposed adequate assurance of future performance under the Assumption and Assignment Procedures violates fundamental precepts of the Bankruptcy Code. Assuming that section 365 is sufficient authority for the procedures sought – which is entirely unclear given that the Motion deals with Protected Contracts given unique statutory rights –

6

section 365(f)(2)(B) of the Bankruptcy Code provides that a debtor may assign an executory contract only if "adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease." This "statutory requirement of 'adequate assurance of future performance by the assignee' affords 'needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment.'" See In re Fleming Cos., Inc., 499 F.3d 300, 305 (3d Cir. 2007) (citing Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. 2001)). The Debtors' proposed Assumption and Assignment Procedures ignore this broad statutory requirement and instead create an inadequate concept of a "Qualified Assignee" as a proxy for the statutory protections otherwise available to Counterparties. This proposed process unjustly deprives a Counterparty of the ability to know who will be the assignee of its contract, the ability to challenge whether such proposed assignee will be able to perform its obligations under the contract in the future and the ability to require adequate assurance of future performance of their particular contract.

14. Specifically, the Assumption and Assignment Procedures provide, in pertinent part, that a

> "Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code, notwithstanding any right of a Counterparty to consent to any assignment or any requirement in a Derivative Contract regarding the identity of assignees, if either (i) an assignee or its credit support provider is a Qualified Assignee, or (ii) the Debtors, after payment of any Cure Amounts, would no longer have any payment or delivery obligations under the Derivative Contract (other than upon exercise of an option exerciseable in the Debtors'/assignee's discretion)."

"Qualified Assignee" is defined as "any assignee or its credit support provider" that has "a Standard & Poor's or Fitch credit rating equal to or higher than A- or a Moody's credit rating

7

equal to or higher than A3, or any equivalent thereof."[4] The proposed Qualified Assignee credit rating designation is inadequate to satisfy the statutory requirement of adequate assurance of future performance because, among other things, it does not provide an accurate indication of whether such assignee will actually be able to perform its obligations under the contract. For example, a credit agency may assign a proposed assignee with a long-term credit rating of A-, but may also assign such assignee a negative watch designation indicating that there is a good chance of a credit downgrade event. Moreover, current financial market conditions illustrate that credit ratings alone cannot be used to reliably indicate a company's financial condition. Thus, a credit rating alone can not provide an accurate indication of whether such assignee will be able to perform the obligations of the assigned derivative agreement. Indeed, as drafted, the Assumption and Assignment Procedures do not even require that the non-debtor Counterparty be told of the identity of the Qualified Assignee until the assignment is complete, thereby depriving the Counterparty of fundamental bankruptcy protections. The determination of whether a proposed assignee will be able to perform its obligations going forward must be made on a case by case basis, and a Counterparty must be afforded the right to challenge whether adequate assurance <u>as to its particular contract</u> has been provided.

C.   Any Proposed Assumption and Assignment Must be Done Consistent with the Terms of the AFT ISDA Master Agreement

15.   It is well established law that if a debtor assumes a contract, it must do so <u>cum onere</u>, with all the benefits as well as the burdens. <u>Cinicola v. Scharffenberger</u>, 248 F.3d 110, 119-120 (3d Cir. 2001); <u>American Flint Glass Workers Union v. Anchor Resolution Corp.</u>, 197 F.3d 76, 78 (3d Cir. 1999). <u>See also</u> <u>In re Beverage Canners Int'l Corp.</u>, 255 B.R. 89, 95 (Bankr. S.D. Fla. 2000) ("It is black letter law that an executory contract must be either assumed

---

[4] Clearly, this Court should not approve procedures that would provide the Debtors the unfettered discretion to determine "any equivalent" standard for providing a Counterparty its statutory right to adequate protection.

8

in its entirety, cum onere, or completely rejected."); In re Rigg, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("If a debtor chooses to assume…an executory contract or unexpired lease, he must assume them according to their terms."). The assumption and assignment of an executory contract does not give the debtor or the assignee the ability or the right to modify the terms of the agreement being assumed and assigned. See, e.g., Medtronic Ave., Inc. v. Advanced Cardiovascular Sys., Inc., 247 F.3d 44, 60 (3d Cir. 2001). In the Medtronic case, the court explained that:

> [a]n assignment does not modify terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed. An assignment is intended to change only who performs an obligation, not the obligation to be performed.

Id. See also In re Federal-Mogul Global, Inc., No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9 (3d Cir. Mar. 15, 2007) (explaining that debtor is not able to modify obligations in a contract assumed and assigned pursuant to section 365 of the Bankruptcy Code). Thus, if the Debtors seek to assume and assign the AFT ISDA Master Agreement they must do so cum onere, with all of its benefits and burdens, including, among others, those listed below.

   (a)  Any Assignee Must Meet the Higher Credit Rating under the AFT ISDA Master Agreement

   16.  The AFT ISDA Master Agreement specifically provides that LBSF "may assign its rights and obligations under this Agreement, in whole and not in part, to" "any swap counterparty that has a short-term rating of at least "A-1" by S&P and (i) a long-term senior unsecured debt or counterparty rating of at least "Aa3" by Moody's or (ii) both a long-term unsecured debt or counterparty rating of at least "A1" and a short-term rating of at least "P1" by Moody's." Substituting the proposed credit rating set forth in the Debtors' definition of Qualified Assignee for the higher credit ratings threshold required for assignees under the AFT

9

ISDA Master Agreement subjects AFT to an increased credit risk exposure for which it did not bargain. In addition, any assignment to an assignee not satisfying the higher credit ratings threshold in the AFT ISDA Master Agreement may subject AFT and the notes it has issued to adverse ratings actions by the rating agencies. Thus, if the Debtors seek to assume and assign the AFT ISDA Master Agreement any assignee must meet the higher credit rating under the AFT ISDA Master Agreement.

17. In addition, the AFT ISDA Master Agreement requires that the agreement must be transferred to a new counterparty if at any time the existing counterparty has a short term rating less than 'P-1' as determined by Moody's, less than 'A-1' as determined by S&P or less than 'F-1' as determined by Fitch. Since the Assumption and Assignment Procedures only reference a long term rating of 'A-' from any rating agency, AFT has no assurance that the downgrade trigger would not immediately be applicable if assigned to a Qualified Assignee who did not have the appropriate short term rating.

(b) <u>Any Assumption and Assignment Cannot Result in a Deduction or Withholding For Or On Account of Any Tax</u>

18. The AFT ISDA Master Agreement expressly provides that any assignment "shall not be permitted if, as a result thereof, a payment becomes subject to any deduction or withholding for or on account of any tax which would not have arisen had such assignment not been effected." <u>See</u> AFT ISDA Master Agreement, Schedule: Part 5(b). Similarly, section 2(d)(i) of the AFT ISDA Master Agreement provides that all payments made under the ISDA Agreement will be made "without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law."

19. This requirement is not an anti-assignment clause since it does not preclude assignment but rather provides reasonable safeguards to protect the parties' bargained

for deal.  Under the proposed Assumption and Assignment Procedures, AFT would be unable to determine whether the proposed assignee would satisfy this tax restriction which was expressly bargained for by the parties.  This Court should not allow the Debtors to modify the AFT ISDA Master Agreement in such a way that would subject AFT to negative tax effects upon an assignment of the AFT ISDA Master Agreement, especially where the parties specifically bargained for this protection.  See In re Fleming Cos., Inc., 499 F.3d 300, 305 (3d Cir. 2007) (noting that "[w]hile the Bankruptcy Court has discretion to excise or waive a bargained for element of a contract, 'Congress has suggested that the modification of a contracting party's rights is not to be taken lightly.  Rather, a bankruptcy court ... must be sensitive to the rights of the non-debtor contracting party ... and the policy requiring that the non-debtor receive the full benefit of his or her bargain.'")

20. This Court should not approve blanket procedures that would eviscerate the contractual and statutory rights of non-debtor Counterparties like AFT.

D. The Assumption and Assignment Procedures seek to Improperly Limit the Grounds Upon Which A Party May Object to the Assumption and Assignment of its Contract

21. The proposed Assumption and Assignment Procedures seek to improperly limit the grounds upon which a party may object to the assumption and assignment of its contract.  Specifically, the procedures provide that a Counterparty may object solely on the following grounds: (i) the proposed Cure Amount, (ii) the need to cure a default or early termination event, or (iii) the adequate assurance of future performance under the applicable Derivative Contract if neither the assignee nor its replacement credit support provider (if any) is a Qualified Assignee.  However, there are various other potentially applicable grounds for objecting to the assumption and assignment of a contract under the Bankruptcy Code and/or other applicable law, including, without limitation: (i) the contract is not an executory contract,

11

(ii) the contract is not assumable because it has been properly terminated (see discussion in paragraph 26 below), or (iii) the contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the Debtors.  It would be improper for this Court to limit the grounds upon which a Counterparty may object to the assumption and assignment of its contracts to the narrow grounds proposed by the Motion.

E.   The Motion Appears to Allow for the Release of Credit Support Obligations

22. If approved, the Assumption and Assignment Procedures apparently would allow the Debtors to assume and assign a Protected Contract and, by doing so, obtain the release of obligations owing, for example, by LBHI under any guarantee or credit support arrangements.  See Motion, Exhibit A: Proposed Order, at p. 9 ( . . .except as provided in the Assignment Notice or this Order, upon assignment of a Derivative Contract pursuant to the Assumption and Assignment Procedures, the Debtors and their estates shall have no further liabilities or obligations under the Derivative Contracts, and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, each of their respective affiliates, successors or assigns, their property or their estates . . .").

23. This result is unsupported by bankruptcy or other applicable law (and none is cited).  The Assumption and Assignment Procedures therefore must make clear that in connection with any proposed assignment, Counterparties must also be provided with a replacement credit support provider unless they otherwise consent.

F.   The Motion Improperly Seeks to Restrict A Counterparty's Right to Exercise its Contractual Rights under Safe Harbor Provisions of the Bankruptcy Code

24. As indicated above, AFT has retained a new advisor to act on its behalf, including in evaluating whether or not to terminate the AFT ISDA Master Agreement.  The

12

Debtors' Motion acknowledges that sections 362(b)(6), (7) and (17), 546(e), (f) and (g), 555, 556, 559, 560 and 561 of the Bankruptcy Code (the "Safe Harbor Provisions") provide certain qualified parties powerful statutory protections, including the right to exercise their contractual right to liquidate, terminate or accelerate Protected Contracts, and to exercise rights of setoff or netting against any termination value, payment amount, other transfer obligation or other collateral because of a condition of the kind specified in section 365(e)(1) of the Bankruptcy Code, and notwithstanding the automatic stay.  As the legislative history provides, these provisions were "intended to reduce 'systemic risk' in the banking system and financial marketplace. To minimize the risk of disruption when parties to these transactions become bankrupt or insolvent, … to allow the expeditious termination or netting of certain types of financial transactions."  See H.R. Rep. No. 109-31, 109th Cong., 1st Sess. 20, 44, 127-134 (2005).

25. The Debtors, however, seek to upend the certainty and stability which these provisions are intended to provide to Counterparties of bankrupt entities by reserving the right to challenge counterparties' exercise of such contractual rights under the Safe Harbor Provisions.  These misplaced threats to challenge Counterparties' rights to exercise their contractual rights can only be seen as the Debtors' attempt at gaining leverage in negotiating with Counterparties, and this Court should not make any blanket ruling regarding the Debtors' ability to challenge, or the merits of challenging, any Counterparties' exercise of any of its contractual rights.

26. For example, the Debtors reserve all rights with respect to any "alleged" termination of any Derivative Contract, including the right to assert that a Counterparty who did not terminate promptly after the commencement of these cases waived the right to terminate on

account of the Debtors' bankruptcies or financial condition. This broad reservation of rights ignores the strength of the Safe Harbor Protections which the Debtors themselves cite, as well as the specific and unique circumstances applicable to each Protected Contract and Counterparty. In AFT's case, for example, LBI was the capital markets advisor to AFT and, pursuant to the CMAA, had a right of first refusal in connection with AFT's entering into any new interest rate hedges. Subsequent to the Petition Date, on October 31, 2008, AFT sought assurances from LBI as to whether it intended to fulfill its obligations under the CMAA, but to date has not received any response. AFT has now hired a new advisor which is currently in the process of evaluating AFT's hedging positions and is advising AFT on the appropriate course of action which currently includes terminating the AFT ISDA Master Agreement and entering into new hedging contracts, rights clearly available to AFT by statute and contract. The Debtors can not be permitted to use a procedural motion to run roughshod over these rights, or to create a presumption that parties like AFT have waived their right to terminate Protected Contracts at this early stage of the these complicated proceedings and without regard to the particular factual circumstances.

27.    The Debtors also inject insecurity into already jittery securities and financial markets by reserving their rights to challenge whether the exercise of set off or netting against any termination value, payment amount, other transfer obligation or other collateral to satisfy amounts owed by the Debtors were valid and/or barred by the automatic stay. Without citation of any kind, the Debtors appear to question the scope of the Safe Harbor Provisions with regard to these issues. This Court should not grant any procedures which encroach on Counterparties' contractual and statutory rights, or provide the Debtors with leverage to threaten the validity of a counterparties' exercise of these protected rights.

**RESERVATION OF RIGHTS**

28. AFT reserves all rights, privileges and remedies with respect to the AFT ISDA Master Agreement, including, without limitation, its contractual right to terminate the AFT ISDA Master Agreement – a right expressly protected under section 560 of the Bankruptcy Code and currently being evaluated by AFT with its new advisor. Nothing in the Motion nor this Objection shall be deemed or otherwise relied upon as a waiver of any of AFT's rights, privileges and remedies under the AFT ISDA Master Agreement, and/or applicable law, including, without limitation, the Safe Harbor Provisions and AFT's rights to calculate damages and loss, including the assessment of fees, expenses and other claims against LBSF. See 11 U.S.C. § 362(o) ("the exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or 27 of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title").

**CONCLUSION**

WHEREFORE, for the forgoing reasons, AFT respectfully requests that the Court deny the Motion unless modified by the relief requested herein and grant such further relief as the Court deems just and appropriate.

Dated: New York, New York
November 28, 2008

        **SIDLEY AUSTIN LLP**

        By: /s/ Lee S. Attanasio
            Lee S. Attanasio (LA 3054)
            Alex R. Rovira (AR 9837)
            787 Seventh Avenue
            New York, New York 10019
            (212) 839-5300

        *Attorneys for Aircraft Finance Trust*

NY1 6801339