Hearing Date and Time: December 3, 2008 at 4:00 p.m. (Prevailing Eastern Time)

Fabyanske, Westra, Hart & Thomson, P.A.
Paul L. Ratelle (MN Bar No. 127632)
Admitted *Pro Hac Vice*
800 LaSalle Avenue, Suite 1900
Minneapolis, MN 55402
Telephone: (612) 359-7600

*Attorneys for Bremer Financial Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X
                                              :
In re :                                       :   Case No. 08-13555 (JMP)
                                              :
LEHMAN BROTHERS HOLDINGS, INC.,               :
et al.,                                       :   (Jointly Administered)
                                              :
            Debtors                           :   (Chapter 11)
---------------------------------------------------------------X

**OBJECTION OF BREMER FINANCIAL CORPORATION IN OPPOSITION TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

Bremer Financial Corporation ("Bremer") submits this objection to the Debtors' Motion for an Order pursuant to Sections 105 and 365 of the United States Bankruptcy Code to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts (the "Motion") and in support of this objection states as follows:

**FACTUAL BACKGROUND**

*The Bremer Derivative Contract*

1.    Bremer is a regional financial services company operating in Minnesota, Wisconsin and North Dakota, offering banking and related financial services through its banks and financial service companies and affiliates. The business of Bremer is regulated as a Bank Holding

Company by the Federal Reserve Bank and Bremer's companies are also subject to federal and state regulations.

2.      On April 27, 2005 (the "Trade Date"), Lehman Brothers Special Financing Inc. ("LBSF") and Bremer entered into an interest rate swap agreement to terminate June 1, 2016 (the "Termination Date"), for a Notional Amount of $60,000,000 (the "Derivative Transaction"). The Derivative Transaction commenced as of an effective of June 1, 2006 (the "Effective Date").

3.      The Derivative Transaction is evidenced by a series of documents including, principally, the following:

   a. A written confirmation, dated May 19, 2005, (the "Confirmation") between LBSF and Bremer confirming the terms and conditions of a Derivative Transaction under the terms of which, among other thing, LBSF, as Party A, and Bremer, as Party B, agreed to negotiate, execute and deliver and agreement in the form of the ISDA ("International Swap Dealers Association, Inc.") Master Agreement with such modifications as LBSF and Bremer agree;

   b. Pursuant to the terms of the Confirmation, LBSF and Bremer entered into a Master Agreement (the "Master Agreement") and a Schedule to the Master Agreement (the "Schedule") both dated as of April 27, 2005;

   c. Pursuant to the Confirmation, Master Agreement and the Schedule, LBSF and Bremer also entered into a Credit Support Annex to the Schedule (the "Annex"); and

   d. Under the terms of the Master Agreement, Schedule and Annex, Lehman Brothers Holdings Inc., ("LBHI") executed a Guarantee and, thereby, became a "Credit Support Provider" under the Master Agreement (the "LBHI Guarantee"); (the

        Confirmation, Master Agreement, Schedule, Annex and LBHI Guarantee are cumulatively referred to herein as the "Bremer Derivative Contract" and are attached here to as **Exhibit A**).  Pursuant to the terms of the LBHI Guarantee, LBHI guaranteed the obligations of LBSF by, in effect, backstopping LBSF's payment obligations under the Master Agreement, Schedule and Annex and, thereby, reduced Bremer's risk that LBSF would not perform its obligations including, without, limitation, its obligation to fund its payment obligations in favor of Bremer.

4. Pursuant to the terms of the Bremer Derivative Contract, when the Fixed Rate Payment Amount exceeded the Floating Rate Payment Amount, Bremer (the "Fixed Rate Payer") would pay to LBSF (the "Floating Rate Payer") the excess; if the Floating Rate Payment amount exceeded the Fixed Rate Payment Amount, LBSF would pay to Bremer the excess.  These transaction settlement mechanics between LBSF and Bremer continued routinely through September 1, 2008.  Consequently, on September 1, 2008, pursuant to the terms of the Bremer Derivative Contract, LBSF notified Bremer of the setting of the Floating Rate for the Calculation Period beginning on September 1, 2008.

5. The Bremer Derivative Contract also provides for, among other provisions, Security Interests, Credit Support Obligations, Holding and Using Posted Collateral, Events of Default, and Certain Rights and Remedies.

6. On September 1, 2008, LBHI provided to Bremer "Collateral Data" setting forth the collateral posted by Bremer and held by LBHI as collateral according to the Bremer Derivative Contract, as disclosed on the "Lehman Brothers Derivatives MTM Statement" dated September 1, 2008 and valued as of August 29, 2008.  LBHI emailed this Statement to Bremer on

September 1, 2008 (the MTM Statement and transmitting email are attached hereto as **Exhibit B**.) The "Collateral Data" shows that LBHI is holding, as of September 1, 2008, a Bremer owned bond with a "face value" of $6,000,000 with an estimated Market Value of $5,313,484.

### *The Bremer Derivative Contract is in Default*

7.     Default provisions are included in paragraph 5 ("*Events of Default and Termination*")of the Master Agreement and paragraph 7 of the Annex to the Schedule.

8.     Paragraph 5 of the Master Agreement provides defaults including (i) *Failure to Pay or Deliver.* (ii) *Breach of Agreement* (iii) *Credit Support Default (*v) *Default Under Specified Transaction, and* (vii) *Bankruptcy.* Each of the foregoing default provisions under the Master Agreement are triggered by the filing by LBHI on September 14, 2008 and LBSF on October 3, 2008 of their bankruptcy cases.

9.     Paragraph 7 of the Annex to the Schedule, includes subparagraph (i) providing that as an event of default:

> (i) that party [LBHI and LBSF] fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party.

10.    Paragraph 6(d)(i) of the Annex to the Schedule provides:

> Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer as calculated by the Valuation Agent.

11.    LBHI and LBSF have failed to pay to Bremer amounts distributed to LBHI and LBSF from the collateral posted by Bremer. The evidence of the LBHI and LBSF "Lehman Brothers Derivatives MTM Statement" dated September 1, 2008, shows excess collateral and evidences

that a Delivery Amount would not be created or increased by the Transfer, and the Transfer is therefore required.

12.   On March 20, 2008, Bremer delivered to LBHI and LBSF as "Posted Collateral" under the terms of the Annex and pursuant to written instructions of LBSF Bremer's a Fannie Mae mortgage-backed security bearing CUSIP number 31412W2Z8 in the then current principal amount of $5,645,871.90 (an original face amount of $6,000,000) and described as FNMA Pool #937392 (the "Security"). In exchange for Bremer's delivery of the Security, LBSF returned to Bremer cash collateral in the sum of $4,060,000, which Bremer had previously posted under the Bremer Derivative Contract. This cash collateral was "Posted Collateral" and had been held in an account with JPMorgan Chase Bank, N.A. ("Chase"), Account No. 66143543. Under the terms of the Annex, the Security is considered "Posted Collateral."

13.   The Security provides for monthly distribution of principal and interest, which LBHI and LBSF paid over to Bremer in April, May, June, July and August according to the requirements of Paragraph 5(d)(i) of the Annex to the Schedule on the next business day after receipt by LBHI and LBSF. Although the principal and interest payments have been made under the Security for September, October, and November LBHI and LBSF have failed to turn these payments over to Bremer according to the provisions of the Bremer Derivative Contract and, specifically, Paragraph 5(d)(i) of the Annex to the Schedule, and such failure by LBHI and LBSF to deliver to Bremer the distribution on principal and interest on its security have triggered the default of Paragraph 7(i) of the Annex to the Schedule.

14.   LBHI, its affiliates and LBSF are in default under the Agreements, as a result of, among other things, their commencement of cases under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and their failure to make payment to Bremer. By

virtue of the occurrence of these and other Defaults under the terms of the Bremer Derivative Contract, Bremer has the right to declare the Bremer Derivative Contract in default and declare, pursuant to Section 6(a) of the Master Agreement and Schedule, an Early Termination Event.

### *Early Termination is among the Remedies Allowed Bremer*

15. The Master Agreement provides for Early Termination in the event of default:

> 6. *Early Termination*. (a) Right to Terminate Following Event of Default. If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto.

### **LBHI and LBSF are obligated to transfer payments to Bremer**

16. Paragraph 6(d) of the Annex, LBSF (and LBHI as its guarantor) is required to "Transfer" (which, under Paragraph 12 of the Annex to mean, in the case of Cash, is a payment or delivery by wire transfer) to Bremer no later than the Local Business Day immediately following the Local Business Day upon which LBSF (or its guarantor, LBHI) receives or is deemed to have received any Distributions (which is defined under paragraph 12 of the Annex to include any and all principal and interest payments with respect to the Security). Since September 1, 2008, Distributions have been paid with respect to the Security in the amount of $152,139.59 as of November 28, 2008. Despite LBSF and LBHI's obligation to Transfer to do so, they have failed to Transfer to Bremer Distributions in the amount of $152,139.59.

17. Bremer has not acted to terminate the contract without first obtaining information from the Debtor as to the status of the defaults (other than bankruptcy) the potential and timeframe for turning over the payments, and the status of the collateral pledged by Bremer. Further, the pending motion appears to seek a resolution of the state of Bremer's contract. Bremer is amenable to either a Termination Agreement or an Assignment in a form agreeable to Bremer.

## ARGUMENT

A. **Debtors' Motion is premature and should be denied by the Court because the Debtors cannot establish as to the Bremer Derivative Contract that the "Posted Collateral" remains intact and available to Bremer as a Counterparty pursuant to the terms of the Contract nor can the Debtors establish a source of replacement Posted Collateral.**

18. Paragraph 6(c) of the Annex provides that if the Secured Party may "sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business, any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor including any equity or right of redemption by the Pledgor . . ." Paragraph 6(a) of the Annex provides, however, that LBSF, as the Secured Party, and LBHI, as the guarantor of LBSF's obligations as the Secured Party, are obligated "to exercise reasonable care to assure the case safe custody of all Posted Collateral to the extent required by applicable law."

19. The Bremer Derivative Contract is governed by and construed in accordance with the laws of the state of New York. Sections 9-623 and 9-624 of New York Uniform Commercial Code (the "NYUCC") limit the rights of LBSF and LBHI as to the Security that Bremer delivered to LBSF on March 20, 2008.

20. Under Sections 9-623 and 9-624 of the NYUCC, Bremer has a right to redeem the Security, which cannot be waived except "only by an agreement to that effect entered into an authenticated after defaults." Bremer and LBSF have not entered in to such an agreement. Since

under New York law, Bremer cannot waive its redemption rights to the Security, then the right of LBSF to "sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business, any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor including any equity or right of redemption by the Pledgor . . ." requires that it must preserve Bremer's redemption rights to the Security.

21. Since the commencement of the Cases, parties in interest have sought information from LBSF and/or LBHI as to their "Posted Collateral" under Derivative Contracts. To date, the Debtors have not evidenced that they have or can respond to such requests. Therefore, for example, there are presently pending before this Court numerous adversary proceedings commenced by Counterparties to Derivative Contracts which have specifically sought to recover their "Posted Collateral."[1] In only one of these cases, *Royal Bank America v. Lehman Brothers Special Financing, Inc*., Adv. Pro. No. 08-1640,[2] has LBSF offered to provide documents (to be provided no later than December 2, 2008), "to show the last known location, status and party in possession of the "Posted Collateral."[3] In its Answer and Affirmative Defenses dated November 24, 2008, LBSF admitted that it may have disposed of "all or part of the Posted Collateral to third parties, and to the extent is (sic) has done so it has failed to remit any proceeds

---

[1] *Rye Select Market XL Portfolio Limited, et al., v. Lehman Brothers Special Financing, Inc., et al.,* Adv. Pro. No. 08-1652; *Federal Home Loan Bank v. Lehman Brothers Special Financing, Inc., et al.,* Adv. Pro. No. 08-1610; *Carolina First Bank v. Lehman Brothers Special Financing, Inc.,* Adv. Pro. No. 08-1745; *Southern Community Financial Corporation, Southern Community Bank and Trust v. Lehman Brothers Special Financing, Inc., et al.,* Adv. Pro. No. 08-1744.

[2] In this action, Royal Bank America seeks the turnover of Posted Collateral, proceeds form the sale of Posted Collateral an accounting of said proceeds, an injunction and redemption of Posted Collateral.

[3] This Stipulation was reached on November 13, 2008, over a month and a half after Royal Bank of America demanded return of the Posted Collateral. Docket No. 8. The Bankruptcy Court is a part of the Federal Electronic Case Filing System (ECF). The pleadings referenced herein have been filed with the United States Bankruptcy Court for the Southern District of New York in the instant matter (or in a related adversary proceeding) and are available on the ECF at the Docket No. indicated and will be referred to herein as "Docket No. ___."

received on account if such disposition to Royal Bank." *Compare* ¶ 44 of *Royal Bank America's Complaint with* ¶44 of *LBSF's Answer and Affirmative Defenses* (Docket Nos. 1 and 10).

22.    Given this response a month after Royal Bank America filed its Complaint, it is unlikely that the Debtors can or will recover the "Posted Collateral" under the Derivative Contracts and, therefore, cannot cure prepetition defaults. In its *Motion*, the Debtors claim to be counterparties to approximately 930,000 Derivative Contracts and they challenge the termination of all or some of these contracts as to which the non-debtor counterparty has purportedly terminated the relevant Derivative Contract. *Motion* at ¶ 8 & n.2. This challenge is asserted by the Debtors notwithstanding 11 U.S.C. §§ 362 (b)(17) and (27), 559, 560 and 561. As explained above, NYUCC protects a pledging Counterparty's right of redemption and, accordingly, the Debtor's disposition of the Posted Collateral to third parties and its concomitant failure to remit proceeds received on account of such disposition to the Counterparty is in contravention of NYUCC because the Debtors cannot honor return the redeeming Counterparty's property.

23.    The Debtors' *Motion* also provides that "any Counterparty will be deemed to have received adequate assurance of future performance as required by section 365 of the Bankruptcy Code notwithstanding any right of a counterparty to consent to any assignment or any requirement in a derivative contract regarding the identity of assignees." (*Motion*, p. 10, ¶ (c).)

24.    Section 365 (b)(1) of the Bankruptcy Code requires the Debtors to cure defaults. Following Section 365(b)(1), Section 365(f)(2) of the Bankruptcy Code requires the Debtors to provide adequate assurance of future performance as a condition to assumption and assignment of any contract. See, e.g., *In re Wills Motors, Inc.*, 133 B.R. 297, 302 (Bankr. S.D.N.Y. 1991). Debtors have the burden of showing "adequate assurance of future performance." *In re M. Fine Lumber Co.*, 383 B.R. 565, 573 (Bankr. E.D.N.Y. 2008) (citation omitted). Adequate assurance

of future performance is determined by existing factual conditions, and the Court may look to many factors in determining what is necessary to provide adequate assurance of future performance under section 365 of the Bankruptcy Code. *In re Lafayette Radio Elecs. Corp.*, 9 B.R. 993, 998 (Bankr. E.D.N.Y. 1981); *Pan Am. World Airways, Inc. v. Belize Airways Ltd. (In re Belize Airways)*, 5 B.R. 152, 156 (Bankr. S.D. Fla. 1980). The statutory requirement of "adequate assurance of future performance by the assignee" affords "needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches after the assignment." *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 (3d Cir. 2001).

25. Unless and until the Debtors have provided evidence to Bremer that the Security and Distributions with respect to the Security are intact and remain available to Bremer as required by the Annex, the Debtors' proposal that a Counterparty be deemed to have received adequate assurance of future performance as required by Section 365 if either (i) an assignee or its credit support provider is a Qualified Assignee *or* (ii) the Debtors, after payment of nay Cure Amounts, would no longer have any payment or delivery obligations under the Derivative Contract does not satisfy the requirements of Section 365 and, therefore, should not be approved by the Court. In other words, Debtors propose that a Counterparty such as Bremer, is deemed to have received adequate assurance even though the Debtors are silent as to the Security and the Distributions.

**B.     Information as to Bremer's Security and Distributions is unavailable to the Debtors.**

26. Numerous motions filed with this Court seeking discovery from the Debtors as well as the Debtors' responses to these motions evidence that information regarding the "Posted Collateral" as to nay Counterparty, including Bremer's Security and the Distributions is not readily available, if at all.

27.     The Distributions paid to Bremer through August of 2008 by wire transfer from Chase. Shortly after the commencement of LBHI's case, the Official ("OCUC") Committee of Unsecured Creditors (brought a motion fro leave to conduct discovery of JP Morgan Chase Bank, N.A. ("Chase"). (Docket No. 566.)  In this Motion, the OCUC asserted that Chase terminated LBHI's on-line access to its accounts with Chase and froze approximately $17 billion of "excess assets in the form of cash and securities." OCUC Motion, ¶¶ 1, 16-28.  In response to the OCUC's motion, Chase asserted that: (i) on days one and two of LBHI's, Case Chase provided tens of billions of dollars of critical financing for the benefit of LBHI; (ii) in making these advances, Chase was given collateral by LBHI "consisting of cash and securities to secure LBHI's guarantees of advances made to LBI . . . It was these LBHI collateral accounts that were held by [Chase] during the prepetition period . . The vast bulk of [Chase's] exposure to Lehman relates to: . . . (b) claims arising under derivative contracts for amounts owing upon termination ad for failure of Lehman entities to return collateral posted by [Chase]." (Docket No.884, ¶¶ 6, 7 and 10.)[4]  By Stipulation dated November 4, 2008 between Chase and the OCUC, the OCUC's Motion was adjourned for 90 days and that Chase would produce on a rolling basis documents indentified in an Exhibit A to the Stipulation. (Docket No. 1402.)  Pertinent to the Debtors' *Motion*, Chase agreed to inform the OCUC of the sources and currently known amounts of Chase's principal claims against LBHI and will provide documents supporting both amount and validity of such claims.  These consist of (i) derivative transactions—"for which [Chase] will

---

[4] Further confirming that Chase in all likelihood has Bremer's Security, if not all of the "Posted Collateral" under the Derivative Contracts at issue in Debtors' *Motion* is Chase's Answer to the complaint of Home Loan Bank in *Federal Home Loan Bank v. Lehman Brothers Special Financing, Inc., et al.,* Adv. Pro. No. 08-1610. In its Answer, Chase admits that "wire transfers from the Plaintiff were received into Account No. 66143543 . . . that Account No. 66143543 is a regular deposit account maintained by LBSF at [Chase] to and from which upon information and belief thousands of deposits and withdrawal occurred each year." Chase Answer ¶ 15 (Docket No. 6.)

provide calculation statements and ISDA Master Agreements but will not provide confirmations . . ." (*Id.* Exhibit A.)

28. The circumstances surrounding Chase, Chase's handling of "Posted Collateral," Chase's post-petition advances and claimed interest in cash and securities that LBHI and/or LBSF had deposited with Chase prior to Chase's post-petition advances, the OCUC's Motion and the Stipulation concerning the motion all point to the fact that the Debtors do not have the information as to the location or availability of "Posted Collateral" or Bremer's Security and Distributions.[5]  In other words, even if Bremer's Security and Distributions were located by Chase, which is in all likelihood unknown to the Debtors (or at least they make no showing that they can disclose such information), that is still far short of the Debtors' obligation to restore Bremer's Security and Transfer the Distributions.  Hence, the Debtors cannot satisfy the their cure obligations under § 365 (b)(1) and cannot demonstrate that they will ever be in a position to do so.

**C.     At Bremer's election the Bremer Derivative Contract can be terminated at any time prior to any assignment proposed by the Debtors.**

29. The Bremer Derivative Contract is a "swap agreement" as defined under 11 U.S.C. § 101(53B)(A).  Accordingly, Bremer has a right, pursuant to 11 U.S.C. § 560, to terminate the Bremer Derivative Contract that cannot be "stayed, avoided or otherwise limited by operation of

---

[5] Significantly, Royal Bank America in its objection to the Debtors' *Motion* explains that its "Posted Collateral" may have been "transferred, sold, or otherwise disposed of by [LBSF] to, upon information and belief, Barclays Capital." (Docket No. 1736; ¶ 22.)  The confusion surrounding who has obtained "Posted Collateral" simply underscores the impossible task confronting the Debtors in resolving this problem.

any provision of this title or by order of a court. . .".[6]

30. The procedures proposed by the Debtors in their *Motion* comprise an unprecedented attempt to modify Bremer's statutorily protected rights to terminate the Contract. (Motion, ¶ 19(e); Procedures Order, P.8). Bremer may terminate the Bremer Derivative Contract due to the occurrence of events of default thereunder (including the bankruptcy filings of LBSF and LBHI).[7] Debtors' procedures, however, contravene Bremer's rights under § 560 to terminate the Bremer Derivative Contract. The Debtor's *Motion*, for example, purports to eliminate Bremer's objections to a proposed assignment "relating to the commencement of a case under the Bankruptcy Code by any of the Debtors" (*Motion*, p. 10, ¶ (e)). In addition, because validly terminated contract are not executory contracts subject to the assumption and assignment provisions of Section 365 of the Bankruptcy Code, Debtors' *Motion* ignores the efficacy of contract terminations regardless of when the termination occurs and proposes to embroil counterparties in costly litigation where the issue of termination could not reasonably be challenged by the Debtors. In Debtors' *Motion* (*Motion*, p. 11, ¶(f)), the Debtors seek an order which would result in a waiver by a Counterparty of any right to terminate, even if the

---

[6] The court in *Thrifty Oil Co. v. Bank of America National Trust and Savings Association*, 322 F.3d 1039, 1050-51 (9th Cir. 2003), explained the preferential treatment of a creditor-counterparty to a swap agreement under the Bankruptcy Code and discussed the relevant legislative history as follows:

> Congress enacted the Swap Amendments to ensure that the swap markets "are not destabilized by uncertainties regarding the treatment of their financial instruments under the Bankruptcy Code."H.R.Rep. No. 101-484, at 1 (May 14, 1990), *reprinted in* 1990 U.S.C.C.A.N. 223, 223; *accord*136 Cong. Rec. H2281, 2283 (May 15, 1990) (remarks of Rep. Fish) ("The swap market serves essential functions today-including reducing vulnerability to fluctuations in exchange and interest rates. Explicit Bankruptcy Code references to swap agreements will remove ambiguities that undermine the swap market."); 136 Cong. Rec. S7535 (remarks of Sen. DeConcini) ("The effect of the swap provisions will be to provide certainty for swap transactions and thereby stabilize domestic markets by allowing the terms of the swap agreement to apply notwithstanding the bankruptcy filing"). Congress addressed these concerns by bestowing preferential treatment on the creditor-counterparty who seeks to terminate a swap agreement and collect termination damages from the bankruptcy debtor.

[7] Section 560 expressly permits contract termination on account of a bankruptcy event default specified under § 365(e)(i) irrespective of the timing of contract termination relative to the Debtors' Chapter 11 case.

Counterparty (such as Bremer) were to terminate a derivative contract after receiving notice of assignment to which that Counterparty refused to consent.

31. Since Bremer has a statutory right under Section 560 to avoid any of the Debtors' proposed assignments simply by terminating the Bremer Derivative Contract, then no such assignment can be effective as to Bremer without Bremer's express consent. Because Debtors' proposed procedures attempt to override this right by failing to recognize that an assignment as to Bremer will be effective only if Bremer consents, they should not be approved by the Court.

**D.  Bremer's Objection to the Debtors' Procedures for Settlement of Terminated Derivative Contracts.**

32. The Debtors' *Motion* purports to establish procedures for the assumption and assignment of derivative contracts as well as procedures for the settlement of terminated derivative contracts. The objection of Royal Bank America addresses the short comings concerning the procedures proposed by the Debtors for the settlement of terminated derivative contracts. (Docket No. 1736.) Bremer joins in these objections. In addition, Bremer also objects to these procedures because they fail to provide transparency to other counterparties to derivative contracts as to the settlements reached by the Debtors. In the interest of fairness and equitable treatment of counterparties to terminated derivative contracts, Bremer requests that any and all settlements reached by the Debtors as to concerning such contracts should be a matter of public record and, accordingly, any procedure short of such transparency should be rejected by the Court.

**E.  Summary.**

33. Following the bankruptcy filings of LBHI and the subsequent bankruptcy filings of its subsidiaries and affiliates (including LBSF), Debtors have proposed, through their *Motion*, procedures which ignore the fact that the contracts at issue are complex and varied and that they involve significant sums of money. In addition, the Debtors cannot locate any "Posted

Collateral" and, accordingly, cannot begin the process of discussing assignments with Counterparties. Finally, the Debtors' proposed procedures are fatally flawed. In essence, any procedures for the assignment of derivative contracts (such as Bremer's Derivative Contract) which become effective without the consent of the Counterparty, such as Bremer, as to the restructuring of the relevant derivative contract with some third party must fail.

34.   Bremer reserves all of its rights with respect to the Bremer Derivative Contract, including, but not limited to, that any assignment of that contract must be subject to all of the express terms and conditions provided therein. Bremer also reserves the right to supplement this Objection.

## CONCLUSION

WHEREFORE, Bremer respectfully requests that the Court deny the Debtors' motion in its entirety or at least as to the Bremer Derivative Contract and grant Bremer such other and further relief as the Court may deem just and proper.

Dated: Minneapolis, Minnesota
　　　　November 28, 2008　　　　　　　　**FABYANSKE, WESTRA, HART & THOMSON, P.A.**

　　　　　　　　　　　　　　　　　　　　　By: /s/ Paul L Ratelle, Esq.
　　　　　　　　　　　　　　　　　　　　　Paul L. Ratelle
　　　　　　　　　　　　　　　　　　　　　Admitted *Pro Hac Vice*
　　　　　　　　　　　　　　　　　　　　　Suite 1900
　　　　　　　　　　　　　　　　　　　　　800 LaSalle Avenue
　　　　　　　　　　　　　　　　　　　　　Minneapolis, Minnesota
　　　　　　　　　　　　　　　　　　　　　Telephone: (612) 338-0115
　　　　　　　　　　　　　　　　　　　　　Facsimile: (612) 338-3857

　　　　　　　　　　　　　　　　　　　　　*Attorneys for Bremer Financial Corporation*