Hearing Date and Time: December 3, 2008 at 10:00 a.m.
Objection Date and Time: November 28, 2008 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603
Telephone: (312) 845-3000
Facsimile: (312) 701-2361
James E. Spiotto (admitted pro hac vice)
Ann E. Acker (admitted pro hac vice)
Franklin H. Top, III (admitted pro hac vice)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE<br><br>LEHMAN BROTHERS HOLDINGS INC., ET AL.,<br><br>Debtors. | CHAPTER 11 CASE NO. 08-13555 (JMP)<br><br>(Jointly Administered) |

**OBJECTION OF U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE TO THE DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES U.S. Bank National Association, not individually but as Trustee, ("*U.S. Bank*") by and through its counsel, Chapman and Cutler LLP, to object to the Debtors' Motion for an Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement and Assignment and Assumption of Prepetition Derivative Contracts (the

U.S.BankOBJ.doc

"*Motion*", and U.S. Bank's objection thereto, the "*Objection*")). In support of its Objection, U.S. Bank states as follows:

## SUMMARY OF OBJECTIONS

1.  U.S. Bank serves as Trustee for a variety of transactions involving Lehman Brothers Holdings, Inc. or one of its debtor or nondebtor affiliates. U.S. Bank believes that they are involved in more then eight hundred transactions involving Lehman. These transactions include corporate and municipal bond issues (in which, among other things, a Lehman entity is involved as a party to a forward purchase agreement or a reserve account agreement), collateralized debt obligations, collateralized loan obligations, various swap transactions, collateralized bond obligations, mortgage securitization transactions and other structured finance transactions. Many of these transactions involve a derivative contract involving Lehman Brothers Holdings Inc. ("*LBHI*") or one of its debtor affiliates (collectively, the "*Debtors*") as a counterparty, and in some of these transactions the Debtors are counterparties to multiple derivative contracts. These transactions are highly sophisticated financial transactions involving a large number of parties. While not all of the parties are "counterparties" to the specific derivative contract, many of the parties in these transactions have an economic interest in the derivative contract. These structured finance transactions, collateralized debt obligations and other similar transactions are too complex both in terms of structure and the number of affected parties to lend themselves to the procedures proposed by the Debtors. A separate procedure should be developed for these transactions.

2.  The Debtors proposed actions and procedures must be viewed in light of the significant and substantial damage caused (some of which may be irreparable) by virtue of their respective defaults as counterparties under the terms of derivative contracts. In some instances these derivative contracts provide the entire income stream to a third party special purpose entity,

causing such special purpose entity to default on its own obligations to make payments to investors under various Indentures[1]. These defaults in some cases have caused a change in the waterfall under these Indentures and in some instances created additional rights for some holders of notes issued under these Indentures vis-à-vis holders of other notes. In some cases, these changes in the waterfalls change the priority of the amount due the Debtors as a counterparty, placing them lower in the waterfall. These effects on the waterfall, causing damage to some of the investors in the transaction (and in some cases putting the Debtors at the bottom) may not be able to be unwound. The Debtors proposed actions, including the ability of the Debtors to assume and assign some of these derivatives, must be carefully considered to insure that further and/or additional damage is not incurred by the Trustee and investors in these transactions.

3. By the filing of this Objection, U.S. Bank by no means intends to signal that it is unwilling to work with the Debtors in this proceeding upon an acceptable mechanism to resolve, *on a truly final basis and in a manner and method which is fair and equitable to all*, the parties' respective rights and interest with respect to derivative contracts. In fact it has already been working with the Debtors on a number of such resolutions. U.S. Bank, however, believes the proposed procedures are not appropriate in large public transactions or complex structured finance transactions and do not adequately protect the bona fide interests of the Trustee and the investors therein, particularly where there are persons with interests in the derivative contracts beyond the nominal counterparties thereto and where the terms or nature of the public debt or structured finance transaction would limit or preclude the ability of the Trustee or investors to

---

[1] In the Dow CDX transactions, for example, a special purpose entity is a counterparty with Lehman under a credit default swap, serving as the risk party thereunder. This special purpose entity issued notes and/or received financing commitments to meet any obligation it may have under the credit default swap upon a "Credit Event". This entities' sole income stream to make payments of interest on these notes are the periodic payments from the other counterparties to the credit default swap to compensate the special purpose entity for taking the risk under the swap.

protect their interests if the actions or procedures proposed by the Debtors were to be implemented. U.S. Bank suggests that the Debtors work with U.S. Bank and other Trustees to identify all the transactions in which assumption and assignment of rights and obligations are appropriate, and develop a protocol for transactions containing derivatives. In summary, special procedures should be developed for transactions involving public debt or Trustees.

    4.    U.S. Bank objects to the Motion for the following reasons:

    a.    The term Derivative Contracts is generically defined to mean a derivative contract, leaving it uncertain as to the types of contracts to which the procedures are designed to apply; the Debtors should identify those transactions that the Debtors are trying to affect.

    b.    The proposed procedures fail to provide notice to all parties with an interest in the derivative contract of the assignment or proposed termination and settlement thereof; notice should be provided to all affected parties, particularly, for example, where "special purpose entities" are the counterparties under derivative contracts in structured finance transactions including those which are "managed" by one of the Debtors or an affiliate thereof.

    c.    Many of these transactions are complicated financial transactions, and the proposed procedures provide for an inadequate amount of time, a mere five business days, for a Trustee or other affected party to evaluate the relevant derivative contract, the proposed assumption and assignment, the affect of the assumption and assignment on the transaction and to communicate with the investors to determine whether to object to a proposed assumption and assignment. Trustees are unable to respond in a meaningful way in a five business day period.

    d.    An appropriate procedure needs to be developed with respect to both assumptions and assignments and terminations to ensure that the rights and remedies of each trust, the Trustees, the related noteholders and investors are not being impaired, and that neither the trust

nor the Trustee are taking on any personal risk or liability as a result of the assignment and assumption.

   e.  It may be impossible to accurately calculate a Cure Amount, settlement amounts or amounts due upon termination, or to determine whether to exercise an available right of termination in the time period provided before an objection to the assignment and assumption is due.

   f.  Under the facts and circumstances of particular derivative contracts, the Debtors may be required to make additional findings of adequate assurance of future performance beyond whether the assignee is a Qualified Assignee as defined in the Motion;

   g.  The proposed procedures with respect to assignments fail to consider and provide for any other obligations that the Debtors may have under an individual transaction; further defaults in payments due in other capacities may affect the applicable waterfalls, and the transaction parties' rights with respect to any such assignment must be reserved.

   h.  The proposed procedures, and any assignment and assumption should not affect any rights of set off a Trustee or counterparty may have against the Debtors.

   i.  Some derivative contracts may be (or be similar to) financial accommodations which may not be assumed and assigned under the Bankruptcy Code.

**BACKGROUND**

   5.  U.S. Bank National Association serves as Trustee (or some other similar capacity) in over *eight hundred* transactions involving the Debtors in this proceeding. Attached as Exhibit A is a list including transactions identified by U.S. Bank to date that involve derivative contracts that might be the subject of the Motion. This list may not include all relevant transactions and therefore U.S. Bank reserves the right to amend or supplement this at any time as its investigation reveals other transactions with derivative contracts. These transactions are

generally sophisticated transactions in which the Debtors or an affiliate of the Debtors have multiple roles and responsibilities. These transactions include securitization transactions in which U.S. Bank serves as custodial or collateral agent; other securitization transactions in which U.S. Bank serves as Trustee; Collateralized Loan Obligations and Collateralized Bond Obligations for which U.S. Bank serves as Trustee; complicated credit default swap transactions for which U.S. Bank serves as Trustee; and corporate and municipal debt transactions pursuant to which U.S. Bank serves as a Trustee. Many of these transactions, in some way, include derivative contracts. Some of these transactions are described below:

6. *Corporate/Municipal Transactions*. U.S. Bank serves as Trustee under Indentures for certain bonds or notes issued by municipal or corporate entities. U.S. Bank believes it serves as Trustee for 115 corporate or municipal transactions in which Lehman has provided some sort of derivative contract. In many of these transactions, the issuer of the indebtedness is required to establish a reserve fund which is used in the event that the issuer is unable itself to make a payment of interest on the notes or bonds. The funds in the reserve account are invested. In order to insure that the issuer received a set return on the reserve funds, the issuer sometimes entered into forward purchase agreements, or reserve account agreements with one of the Debtors, whereby the Debtors guarantee the issuer a certain return (either through a guaranteed interest rate or an initial payment) in exchange for the right to direct the investment of the reserve fund. The relevant Debtor either receives the positive difference between the return on the investments and the guaranteed rate or reimburses the reserve account for the negative difference between the return on the investments and the reserve account. The Debtor is being "loaned" the reserve funds to attempt to make an investment return. In today's marketplace where even the most conservative investments not only run the risk of the repayment of interest,

but a risk in the return of principal, these reserve funds have a real risk for a negative return. The Issuer, the Trustee and a Lehman entity are the "counterparties" to these arrangements.

7. *Collateralized Bond Obligations*. In these transactions, the Issuer, a special purpose entity, is a counterparty to a Credit Default Swap Agreement, with one of the Debtors a counterparty thereto. A Credit Default Swap Agreement is a form of insurance against certain "Credit Events" occurring with respect to a designated portfolio of unrelated notes or indebtedness, in particular high yield debt. The "Credit Events" typically are bankruptcy, restructuring or certain defaults related to any such high yield debt.

8. If a Credit Event occurs, the Issuer is required to pay the Debtor counterparty (through one of a number of different mechanisms) the amount of the loss on the indebtedness subject to the Credit Event. The Issuer funds any obligations it may have to the Debtor counterparty from funds it receives through the issuance of notes. The notes that are issued pursuant to an Indenture between the Issuer and U.S. Bank as Trustee. There are usually several tranches of notes are issued under the Indenture, with varying priorities and rights to payment.

9. In exchange for taking on the risk of Credit Events, the Issuer receives periodic payments from the Debtor. The Issuer uses these payments to make payments of interest on any issued notes, or to pay commitment fees to those who have made a commitment to purchase notes. In many cases the Debtors failure to make these periodic payments has rendered the Issuer (generally, a nominal "shell" type entity) unable to make payments on the notes, creating an Event of Default under the Indenture and changing, perhaps permanently, the relative rights of holders of different tranches of notes under the Indenture.

10. As a result, although not a counterparty to the derivative contract, the Trustee and the noteholders have a huge interest in what happens to the contract as a result of the bankruptcy proceedings, and if assigned, the identity and wherewithal of the assignee. U.S. Bank has

identified more than 60 collateralized bond obligations or collateralized debt obligations involving a derivative contract with one of the Debtors as a counterparty.

11.     *Securitization Transactions*.  U.S. Bank has identified approximately 46 securitization transactions in which it serves as Trustee for Lehman sponsored mortgage backed securitization transactions.  In these transactions a special purpose entity or trust issues various tranches of certificates to fund its purchase of mortgage loans from a Lehman related entity.  Some of the tranches are supported by swap agreements, some of which have the applicable special purpose entity or trust and the Debtor as counterparties.  In some cases these are interest rate swaps; in other cases these swaps take on the risk of non-payment of certain amounts due and owing a particular tranche of certificates.  Of course, the special purpose entity or the trust may have no real interest in the swap arrangement, rather it is the Trustee and the affected tranches of certificateholders that have the real economic interest in connection with the swap agreement.

## OBJECTIONS

**A.     The Motion is not clear as to the Universe of Contracts it intends to Govern**

12.     The Motion lacks clarity with respect to the universe of derivative contracts the procedures set forth in the Motion re intended to govern.  The Motion defines Derivative Contract generically:

> "The Debtors are parties to thousands of derivative contracts (the "*Derivative Contracts*") in which the contractual obligations and values are keyed to one or more underlying assets or indices of asset values and subject to movements in the financial markets.  In most cases, the Derivative Contracts are "securities contracts", "forward contracts", "repurchase agreements" or "swap agreements" and in some cases were governed by a master netting agreement each as defined under the Bankruptcy Code."

The definition contained in the Motion states what a derivative contract is styled "in most cases". However there are a number of contracts involving the Trustee that may be derivative contracts, but are not styled in that manner. For example, some of the municipal bond transactions contain agreements styled as a Reserve Account Agreement that appear to have some of the same features as a forward purchase agreement. The procedures ought to be clear as to the contracts covered by the procedures. The Debtors ought to identify the particular transactions that are the subject of this motion to provide notice to the counterparties and other interested parties given the economic structure that they may be affected by the procedures ultimately determined to be appropriate with respect to the Motion.

B. **The Proposed Procedures Must Provide Notice to all Parties With an Economic Interest in a Transaction.**

13. Other parties to the transaction in which the derivative contract is issued should receive notice. As noted in some of the examples above, in many of the transactions for which U.S. Bank serves as Trustee, the counterparty to Lehman is either a special purpose vehicle, or lacks a real economic interest with respect to the derivative contract. Some of these entities are "managed" by a Lehman entity. Further, other parties to the transaction in which the derivative contract is a party may have the right to direct the swap counterparty with respect thereto. These "other parties" are interested parties for purposes of the Bankruptcy Code. Section 1109(b), for example, is expansive as to who constitutes a party-in-interest for purposes of Chapter 11 proceedings generally. While the term party-in-interest is not defined anywhere, it has been held to include those parties who are "sufficiently affected" by a Chapter 11 proceeding. See e.g. *In re Ionosphere Clubs, Inc.*, 101 B.R. 844 (Bankr. S.D.N.Y. 1989); *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985). As a result these parties (known to Lehman by virtue of Lehman's underwriting or participation in these transactions) should be given notice of any action relating

to the derivative contracts. The address for notices is typically found in the transactional documents.

### C. The Proposed Procedures Provide for an Inadequate Amount of Time for the Trustee to Respond and Communicate with Its Constituents

14. Even assuming that the procedures providing for notice to the Trustee in connection with a derivative contract relating to a transaction are adequate, a mere five business days is an inadequate period of time to permit the Trustee to act on the Notice. As noted in the background section of this Objection, the transactions are sophisticated financial transactions involving a number of different parties with a variety of rights. Given the complexity of these transactions, in those situations in which it may have a duty to do so, it will take time for the Trustee to evaluate the proposed assumption and assignment and any ramifications of such action on the Trust and the investors. This will include, but is not limited to, a full evaluation of the defaults existing under the derivative contract and the calculation of the amount necessary to cure such default. In some instances the Trustee believes that the calculation is complex and may take a significant amount of time to complete, especially in today's investment market, and their may be differing methods to calculate any cure amounts. Further, the Trustee may need to evaluate what other defaults, if any, may exist under the terms of the derivative contract. Finally, the time period should be sufficient to permit a Trustee to submit to the investors information and other interested parties to enable the investors and other interested parties time to assess the situation and provide directions and instructions to the Trustee with respect to the proposed transaction.

### D. The Procedures Should Not Subject The Trustee to any Risk or Liability

15. All of the rights and remedies of the Trusts and Trustee need to be preserved, and the Trustee should not be subjected to risk or liability. U.S. Bank serves as Trustee with respect

to these transactions and, as such, has no individual monetary stake in the transaction. Generally, under the terms of an Indenture or similar trust document, a Trustee is not required to enter into agreements or take other action unless it receives a suitable indemnity or other assurances that it is not subjecting itself to liability. The procedures ought to be designed to provide some mechanism to provide notice to investors so that they may provide direction and instructions to the Trustee in a timely manner (or in the absence of such instructions, time for the Trustee to pursue obtaining the direction of the Court to accept the assumption and assignment). Notification to investors at large might be provided by listing those derivative contacts (noting the transaction to which it relates) that the Debtors (a) intend to assume and assign or (b) intend to enter into a termination agreement with respect thereto. In the absence of direction from investors, this Court, as a court of equity has the ability to instruct the Trustee on matters relating to a Trust. See e.g. *In re A.H. Robbins*, 880 F.2d 769 (4th Cir. 1989)(matters relating to control and supervision of trusts were properly within the equity jurisdiction of the district court, as sections 157 and 1334 of chapter 28 of the U.S. Code authorize district courts to take certain actions in bankruptcy cases and section 105 of the Bankruptcy Code authorizes the court to issue any order, process or judgment that is necessary or appropriate to carry out the provision of this title); (*see also Celotex v. Edwards*, 514 U.S. 300 (S.Ct. 1995)).

16. Finally, the procedures should include a bar order for the benefit of Trustees, barring investors or other third parties from bringing or asserting any rights, claims or causes of action against the Trustee as a result of any assumption or assignment of the relevant derivative contract.

E. **The Debtors May Not Assume And Assign Any Agreement Until All Defaults Are Cured**

17. All defaults must be cured. The Debtors may not assume and assign any executory contract unless they have cured all existing defaults. 11 U.S.C. § 365(b)(1);

- 11 -

*Metropolitan Airports Comm. v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 496 (7th Cir. 1993); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996) ("The language of § 365(b)(1) is unequivocal. A party to an executory contract must be paid all amounts due him under the contract before the contract may be assumed."); *see generally In re Burger Boys, Inc.*, 94 F.3d 755 (2d. Cir. 1996).

18. Given the complexity of some of the derivative contracts and the related underlying transactions to which they relate, it may be difficult, if not impossible, for the Trustee to evaluate the appropriateness of the proposed cure amount in the short amount of time provided. For example, under the terms of certain forward purchase agreements or reserve account agreements, upon termination a Termination Amount is determinable. In that certain Reserve Fund Agreement with Summit Academy, Marshall Academy and Pansophia Academy dated as of April 22, 2003, for example, the Termination Amount is determined by obtaining quotes from at least three different dealers as to the amount the Trust would have to pay, or alternatively the amount the Dealer would be willing to pay, to enter into an agreement which would preserve the rights of the parties thereunder. This raises issues as to whether the assignee steps into the shoes of the Debtor, and whether these types of transactions are assumable (and thereafter assignable) as a financial accommodation.

19. Further, assuming that the Debtors "cure" the defaults, the default may have caused an irreparable change in the waterfall of some of these transactions. Tranches with a higher priority in some of these transactions have the right to repayment in full of principal and interest prior to payments being made on junior tranches. More importantly, any settlement payment due the Debtors may be subordinated to the payment of noteholders in full. The assignment and assumption of the derivative contract cannot change these relative rights. In the *United Air Lines* case, Case No. 02-B-48191 pending in the United States Bankruptcy Court for

the Northern District of Illinois, the Debtor purchased some certificates in a structured finance transaction that were junior in terms of rights and payment. See Transcript of Proceedings Before the Honorable Eugene R. Wedoff dated November 18, 2005 at p.29-33, a copy of which is attached hereto as *Exhibit B*. Upon obtaining ownership of these certificates, the Debtors argued that the automatic stay affected the rights of senior certificateholders in a structured finance transaction such that these senior certificateholders could not exercise rights and remedies with respect to the transaction because they would adversely affect the Debtor's rights as a certtificateholder in the transaction. The Court specifically held that the bankruptcy did not affect the relative rights of holders of interests in the structured finance transaction citing *In re Lyons*, 193 B.R. 637, 645 (Bankr. D. Mass. 1996), and *In re Stowell*, 232 B.R. 823, 826 (Bankr. N.D.N.Y., 1998). Therefore, the assignment and assumption cannot affect the relative rights of these holders. If by virtue of a default there has been a change in the waterfall, the Debtors, and their assignee are stuck with that change, and therefore the rights of other parties to each relevant transaction ought to be reserved.

F. **THE DEBTORS MAY NOT ASSUME AND ASSIGN ANY DERIVATIVE CONTRACT ABSENT ADEQUATE ASSURANCE OF FUTURE PERFORMANCE**

20. The assignee must provide adequate assurance of future performance of such contract "whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2)(B). Although the term "adequate assurance of future performance" is not defined in the Bankruptcy Code, adequate assurance of future performance "is to be given a practical, pragmatic construction based upon . . . the circumstances of [the] case." *In re Texas Health Enter., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000) (*quoting In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D.Fla. 1994)).

21. "Assurance of future performance is adequate 'if performance is likely (i.e., more probable than not)' and the degree of assurance necessary to be deemed adequate 'falls

considerably short of an absolute guaranty.'" *Id.* at 835 (*quoting In re PRK Enterprises, Inc.*, 235 B.R. 597, 603 (Bankr. S.D.Tex. 1999)). Courts generally "evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee." *Id.* (*citing In re Casual Male Corp.*, 120 B.R. 256, 264-65 (Bankr. D. Mass 1990)). In particular, courts interpreting the requirement have focused on the assignee's "ability to fulfill the financial obligations" under the contract. *In re Glycogenesys, Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) (*citing In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996)); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524 (Bankr. D.N.J. 1988)); *In re Old South Coors, Inc.*, 27 B.R. 923, 926 (Bankr. N.D. Miss. 1983) (court considered long and successful business experience and financial strength of each proposed assignee in evaluating assignment by debtor in possession of its rights under a beer distributorship agreement). *cf. In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28-30 (1st Cir. 1984) (in a case decided under Bankruptcy Code Section 365(c)(1)(A) and Rhode Island law, court held that the counterparty to a franchise contract acted reasonably in withholding consent to assignment of a contract where assignee could not meet working capital requirements of the franchise contract). The burden of proving adequate assurance of future performance is on the movant-debtor. *Texas Health,* 246 B.R. at 834.

22. The procedures appear to deem any entity with a specified credit rating as a qualified entity, and thereby one that will be able to perform in the future. The notice provided ought to provide more information about the financial condition of the purported assignee (or at least offer to provide such information), especially in light of current financial market conditions. In addition the notice ought to provide some description of the functional capabilities of the assignee to enable counterparties to assess the ability of the proposed assignee to administer and perform under the derivative contract at issue. Even if the Debtors believe that the relevant

Debtor has no ongoing obligation and therefore could assign their rights to a Qualified Assignee or any other person or entity, the same information should be provided and the same showing made in the event the counterparty disputes the Debtors position that they have no ongoing obligations.

G.     **The Debtors are Prohibited from Modifying the Terms and Conditions of Any of the Derivative Contracts**

23.    The Debtors must assume all of their obligations with respect to a transaction, and cannot cherry pick those rights they want and get rid of the respective obligations. A decision to assume or reject an executory contract is "an all or nothing proposition." *Schlumberger Resource Management Serv., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.2d 242, 249 (3d Cir. 2003). Thus, if a debtor assumes a contract, it must do so *cum onere*, with all the benefits as well as the burdens. *Cinicola v. Scharffenberger*, 248 F.3d 110, 119-120 (3d Cir. 2001); *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 78 (3d Cir. 1999). *See also In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 95 (Bankr. S.D. Fla. 2000) ("It is black letter law that an executory contract must be either assumed in its entirety, *cum onere*, or completely rejected."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("If a debtor chooses to assume . . . an executory contract or unexpired lease, he must assume them according to their terms."). The assumption and assignment of an executory contract does not give the Debtor or the assignee the ability or the right to modify the terms of the agreement being assumed and assigned. *See, e.g., Medtronic Ave., Inc., v. Advanced Cardiovascular Sys., Inc.*, 247 F. 3d 44, 60 (3d Cir. 2001). In the *Medtronic* case, the court explained that:

> [a]n assignment does not modify terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed. An assignment is intended to change only who performs an obligation, not the obligation to be performed.

*Id. See also In re Federal-Mogul Global, Inc.*, No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9 (3d Cir. Mar. 15, 2007) (explaining that debtor is not able to modify obligations in contract assumed and assigned pursuant to Section 365 of the Bankruptcy Code).

24.    In some cases the derivative contract is an integral part of a more complex transaction in which the Debtors have multiple roles *and* responsibilities. The Debtors should be required to assume and assign all of their rights and responsibilities in these transactions.

**H.    THE PROCEDURES MUST PRESERVE ANY RIGHT OF SETOFF THE TRUST OR THE TRUSTEE MAY HAVE AGAINST THE RELEVANT DEBTOR**

25.    As is evident for the discussion above, U.S. Bank is involved as Trustee in a large number of highly sophisticated transactions with the Debtors. The five business day period is woefully inadequate for the Trustee to review the relative rights and obligations of the Debtors in connection with the transaction, and to evaluate and calculate any amount that might be due and owing to the Debtors, as well as assess and monetize the amount that is owed the Trust or Trustee, or the damages that have been incurred as a result of any defaults by the Debtor. The relevant trust and Trustee may be entitled to setoff amounts that it may be determined to owe the Debtors as a "settlement amount" with amounts that may be due and owing (or for damages that may have been incurred) the Trust or Trustee in the same transaction. Section 553 of the Bankruptcy Code specifically preserves the right of a creditor to offset a mutual debt owing by such creditor to the debtor under the terms and conditions set forth in Section 553 of the Bankruptcy Code. *See*, *In re Enron Corp.*, 307 B.R. 372 (S.D.N.Y. 2004) (*citing In re Bennett Funding Group, Inc.*, 146 F.3d 136, 138-39 (2d Cir. 1998)); *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995). These setoff rights must be protected and the affected parties ought to have sufficient time to determine whether any such right exists.

**I.   SOME OF THESE DERIVATIVE CONTRACTS MAY BE A FINANCIAL ACCOMMODATION, AND THEREFORE NOT A CONTRACT THAT MAY BE ASSUMED AND ASSIGNED**

26.   Some of the derivative contracts are forward purchase agreements or perhaps reserve account agreements, where, in essence, the Debtors "borrow" reserve account funds and invest those funds in investments as provided under the terms of the relevant agreement. The Debtors are obligated to fund any losses that may be generated by their investment activities. While these investments generally tend to be more conservative, none of these investments are immune to a loss of principal. These contracts, in essence are nothing less than a loan, and the Trust and the Trustee should not be required to permit the assumption and assignment of these contracts.

WHEREFORE U.S. Bank National Association, as Trustee respectfully requests that, to the extent this Court enters an order with respect to derivative contract procedures, it require (a) the Debtors to list the transactions with derivative contracts that are the subject of these procedures; (b) the Debtors provide notice to all of the parties in a transaction who have an economic interest with respect to the Debtors' actions with respect to a derivative contract; (c) the Debtors to develop alternative procedures for public debt transactions (including but not limited to structured finance transactions, collateralized debt transactions and forward purchase agreements issued in connection with corporate or municipal bonds) and transactions involving trusts to, *inter alia*, provide a more appropriate notice and approval procedure for the Debtors' proposed actions; (d) that the procedure be clear that any assignment and assumption does not impair the rights and remedies of the noteholder, investors, trusts and trustees, and that the Trustees be protected from liability as a result thereof by means of a bar order; (e) that the debtors provide additional information with respect to any assignee sufficient for the counterparty and others in the related transaction to determine whether the assignee is truly qualified to carry out the obligations provided for under the derivative contract; (f) that any

assignee be required to assume all of the relevant obligations of the Debtor in the transactions relating to the derivative contract; (g) that all rights of setoff be reserved and preserved; and (h) the substantive rights of other parties in these transactions remain unaffected.

                                  Respectfully submitted,

                                  U.S. Bank National Association, not
                                     individually but as Trustee

                              By  /s/ Ann Acker
                                    One of Its Attorneys

James E. Spiotto, Esq., *admitted pro hac vice*
Ann E. Acker, Esq., *admitted pro hac vice*
Franklin H. Top, III, Esq., *admitted pro hac vice*
James Heiser, Esq. (JH-3660)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, IL 60603
Telephone: (312) 845-3000