Hearing Date: December 3, 2008 at 10:00 a.m.
Objection Date:  November 28, 2008 at 4:00 p.m.

**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
William M. Goldman (WMG-2013)
John P. McNicholas (JPM-0694)

Attorneys for Hank's Living Trust,
Lahde Capital Management Inc.,
Osterreichische Volksbanken-Aktiengesellschaft
and Etihad Airways

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
**In re**                                                         :   Chapter 11 Case No.
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*                      :   08-13555 (JMP)
                                                                  :
                    Debtors.                                      :   (Jointly Administered)
                                                                  :
                                                                  :
------------------------------------------------------------------x

**OBJECTION OF HANK'S LIVING TRUST, LAHDE CAPITAL MANAGEMENT INC., OSTERREICHISCHE VOLKSBANKEN-AKTIENGESELLSCHAFT AND ETIHAD AIRWAYS TO DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR ASSUMPTION AND ASSIGNMENT OF <u>PREPETITION DERIVATIVE CONTRACTS</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

       Hank's Living Trust, by Harry Cheung, Lahde Capital Management Inc. o/b/o

Short Credit Master Fund, L.P., Osterreichische Volksbanken-Aktiengesellschaft, individually

EAST\42256340.1

and on behalf of its customers, and Etihad Airways (collectively, the "Objectants"), by their attorneys, DLA Piper LLP (US), as and for their objection to Debtors' Motion for an Order Pursuant To Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts (the "Motion"), respectfully represent as follows:

## PRELIMINARY STATEMENT

In the Motion, the Debtors state that they are counterparties to approximately 930,000 derivative contracts and seek the Court's approval of Procedures (as defined in the Motion) to "reduce the burdensome administrative expense" of preparing separate motions with respect to such contracts. Motion ¶ 19. The Objectants are parties to contracts that may fall within the Motion's definition of Derivative Contracts. Although, in the abstract, the reduction of administrative expense is a worthy goal, such reduction should not be allowed when it violates the due process rights of creditors, as well as the letter and spirit of the Bankruptcy Code and Bankruptcy Rules (as defined below). Unfortunately, the Debtors are seeking to do both in the Motion. Consequently, the Motion must be denied.

## I.    BACKGROUND

1.    Commencing on September 15, 2008 and periodically thereafter, Lehman Brothers Holdings Inc. ("LBHI") and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and

manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On September 17, 2008, the United States Trustee for the Southern District of New York appointed a statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Committee").

3. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

4. On or about November 13, 2008, the Debtors filed the Motion pursuant to sections 105 and 365 of the Bankruptcy Code, Bankruptcy Rules 6006 and 9019, and Rules 6006-1 and 9019-1 of the Local Bankruptcy Rules for the Southern District of New York, for an order approving (a) certain procedures for the Debtors' assumption and assignment of derivative contracts, including resolution of cure amounts; and (b) the procedures for what the Debtors claim to be efficient processing of settlement agreements that may establish termination payments and the return of collateral and/or property under terminated derivative contracts.

## II. OBJECTIONS

### A. Procedural Objections.

5. In the Motion, the Debtors seek to establish "Assignment and Assumption Procedures" and "Termination and Settlement Procedures" that would be binding on "Counterparties" to "Derivative Contracts." However, the Debtors neither list, nor clearly define, which contracts they deem to be Derivative Contracts, other than to state (a) that a Derivative Contract is a contract where "the contractual obligations and values are keyed to one

or more underlying assets or indices of asset values and subject to movements in the financial markets" and (b) that "[i]n most cases Derivative Contracts are 'securities contracts,' 'forward contracts,' 'repurchase agreements,' or 'swap agreements' and in some cases were governed by a 'master netting agreement,' each as defined under the Bankruptcy Code." Motion, ¶8. (emphasis added). As a result, it is impossible to determine exactly to which contracts the Motion applies. Simply put, the Motion is fundamentally flawed because it fails to specify which parties are affected by the proposed procedures (the "Procedures") and therefore violates the due process rights of those parties.

6. In 2007, the Committee on Rules of Practice and Procedure of the Judicial Conference of the United States addressed this issue when amending the rules governing omnibus motions and objections to claims (the "2007 Amendments"). Notably, the 2007 Amendments added subdivision (f) to Rule 6006 of the Bankruptcy Rules, which provides, in pertinent part:

> Omnibus Motions. [A] motion to assume or assign multiple executory contracts or unexpired leases that are not between the same parties shall:
>
> 1) state in a conspicuous place that parties receiving the omnibus motion should locate their names and their contracts or leases listed in the motion;
>
> 2) list parties alphabetically and identify the corresponding contract or lease;
>
> 3) specify the terms, including the curing of defaults, for each requested assumption or assignment;
>
> 4) specify the terms, including the identity of each assignee and the adequate assurance of future performance by each assignee, for each requested assignment;
>
> 5) be numbered consecutively with other omnibus motions to assume, assign, or reject executory contracts or unexpired leases; and
>
> 6) be limited to no more than 100 executory contracts or unexpired leases.

Fed.R.Bankr.P.6006(f). Although the Debtors apparently seek to avoid Rule 6006(f) by styling the Motion as a motion to establish procedures as opposed to a motion to assume executory contracts, the substance of the motion clearly falls within the spirit, if not, the letter of Rule 6006(f).

7. In addition, the 2007 Amendments amended Rule 3007 of the Bankruptcy Rules to include similar procedural requirements pertaining to the use of omnibus objections in cases involving numerous claims. As with the amendment to Rule 6006, the drafters were attempting to "balance the advantages of procedure with concerns of due process." See 9 Collier on Bankruptcy ¶ 3007.04 (15th ed. rev. 2006). To that end, the procedures contained in Rule 6006 require that the omnibus motion include the names of the parties affected, identify the contract or lease to be assumed or assigned, identify the assignee and the adequate assurance of future performance by each assignee, and identify the specific terms for each requested assignment.

8. Although the Debtors propose to include specific information in the notice of assignment ("Assignment Notice") to be delivered to each counterparty pursuant to the Procedures (Motion, ¶ 19(b)), by the time a counterparty receives an Assignment Notice providing the necessary information for such counterparty to assess that it is subject to the Motion, the deadline to object to the Motion—and, by extension, the Procedures—will have expired. At that point, the counterparty will only have the right to object to the assignment, but will have waived its right to object to the procedures governing such assignment and certain critical elements of such assignment.

9.  The proposed Procedures provide for the assumption and assignment of the various Derivative Contracts upon five (5) business days notice from the Debtors. The proposed notice and objection period does not provide Counterparties with adequate time to consider the financial and other ramifications associated with such assignment. These contracts often have high notional amounts and the Counterparties' exposure to the transactions are often hedged to reduce potential losses. Indeed, five (5) business days is not a sufficient amount of time to make an informed determination and subsequently find a replacement transaction, in the event that the original transaction is subsequently terminated or cancelled. Due process requires that each of the Counterparties be afforded adequate time to consider the factual circumstances and business considerations prior to making an informed decision. The uncertainties associated with the proposed assignments will make it inherently difficult for Counterparties to properly hedge their transactions in merely five (5) business days and are patently unfair.

10. Similarly, the Procedures provide a five (5) business day period, from the service of the notice of assignment, to object to that assignment. In light of the complexity of the underlying transactions, the proposed time period to object is inadequate because, among other reasons, Counterparties must take immediate action to protect their interests or they are deemed to have consented to the proposed assignments and to have waived any termination rights. The proposed Procedures are wholly inadequate to serve their intended purpose and protect Counterparties' rights.

11. In addition, in the event that the proposed Procedures are approved, the Debtors are permitted to pay Counterparties a dollar amount equal to the appraised value of any collateral which is no longer in the Debtors' possession. According to the Procedures, the appraisal is to be made by independent third-party pricing servicers. The Procedures will thus

trump, in many cases, the method of valuation provided for in the Derivative Contracts. The Debtors should not be permitted to alter the Counterparties' contractual arrangements in this regard.

**B. <u>Substantive Objections</u>.**

12. The Objectants hereby object to the Debtors' proposed Procedures to the extent that the proposed Procedures seek to modify any of the Safe Harbor Provisions (as defined in the Motion) and hereby reserve all rights and protections afforded to them under the Bankruptcy Code and Bankruptcy Rules. In fact, the Bankruptcy Code explicitly states that the liquidation, termination, acceleration rights of counterparties to protected securities contracts, commodities contracts, forward contracts, repurchase agreements, swap agreements and master netting agreements shall not be stayed, avoided, <u>or otherwise limited by operation of any provision of the Bankruptcy Code or by order of a bankruptcy] court</u>. <u>See</u> 11 U.S.C. §§555, 556, 559, 560 and 561.

13. Additionally, to the extent that the Derivative Contracts can be assumed and assigned as proposed by the Debtors, section 365(b)(1)(C) of the Bankruptcy Code requires that before such assumption and assignment, this Court determine that "adequate assurance of future performance" be given. 11 U.S.C. §365(b)(1)(c). The Debtors seek to circumvent that requirement by seeking the right to assign an "in-the-money" derivative contract to any third party that meets the minimum credit rating threshold criteria. That is, the Motion, in effect, seeks to limit a counterparty's right to object to the assignee to situations where the assignee or its credit support provider does not have an A-/A3 credit rating and seeks to establish as the <u>sole</u> indication of the assignee's ability to perform in the future, the assignee's credit rating. The one

thing that should be obvious from the current economic environment is that the credit ratings are a poor substitute for proper credit analysis.[1]

14.  Furthermore, the proposed procedures appear to grant the Debtors sole discretion to determine the equivalent of an A-/A3 rating. That is totally inappropriate.

15.  No counterparty should be forced to consent to an assignee based solely on the assignee's credit rating. Indeed, the Bankruptcy Code and Rules require that this Court, not some rating agency, determine whether adequate assurance of further performance is provided after notice and a hearing where all relevant evidence can be presented to the Court, including, but not limited to the aggregate credit exposure of the assignee, cash balances and reserves of the assignee.

16.  Exacerbating the situation is the fact that Debtors propose that they do not have to identify the assignee at the time of assignment. What if the assignee is a competitor of the counterparty? What if the assignee is adverse to the counterparty in a litigation or other dispute? What if the agreement provides for confidential financial reporting to an assignee whom the counterparty does not want to report to (e.g., competitors)? At a minimum, counterparties should know who the proposed assignee is.

---

[1]  *See, e.g.*, Cyrus Sanati, *Ratings Agencies Draw Fire on Capitol Hill*, THE NEW YORK TIMES, October 22, 2006 (discussing the practice of rating agencies of assigning super-safe, triple-A ratings to companies and structured products that later turned out to be extremely risky); Louise Armistead, *Deepening Financial Crisis Engulfs the Banking Industry*, TELEGRAPH.CO.UK (stating that the risk systems at credit ratings agencies were not sophisticated enough to analyze the risk with AIG); Adrianne Appel, *Blame Credit Raters for Crisis, Lawmakers Say*, INTERPRESS SERVICE, October 23, 2008 (discussing how Standard and Poor's gave a high rating to Enron just days before it collapsed).

Furthermore, the Debtors' criteria for adequate assurance of future performance does not accurately identify the risk of assignment where for instance, Standard & Poor's has assigned the assignee an A- rating, but also has issued a negative watch designation. The designation would indicate that there is a strong chance that a credit downgrade event could be forthcoming, but the counterparty would never know this from the proposed notice or have any ability to raise the issue in an objection to assignment, because the Procedures eliminate the ability to object to an assignee with a credit rating of A-/A3..

17. Furthermore, the foregoing assumes that Derivative Contract can be assumed and assigned. However, section 365(c)(2) of the Bankruptcy Code has the effect of prohibiting the assignment or assumption of an executory contract if it is "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor."

18. Specifically, section 365(c)(2) provides in pertinent part, as follows:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if --
>
> (2) such contract is a contract to make a loan, or extend other debt financing or **financial accommodations**, to or for the benefit of the debtor, or to issue a security of the debtor; . . .

11 U.S.C. § 365(c)(2) (emphasis added).

19. Here, the Debtors admit that they entered into Derivative Contracts with various counterparties for a variety of reasons, including, without limitation, for the purpose of "**financing**." See Motion ¶ 8. Thus, as a threshold matter, there can be no question that certain of the Derivative Contracts in question qualify as "financial accommodations" under section 365(c)(2) based on the Debtors' admission disclosing the purpose of the underlying transaction.

20. Moreover, there is further support for the proposition that these Derivative Contracts qualify as "financial accommodations" under section 365(c)(2) because courts have found that loan commitments, guaranty and surety contracts, and other contracts, the principle purpose of which is to extend financing to or guarantee the financial obligations of the debtor are contracts to extend financial accommodations within the meaning of section 365(c)(2). See

Citizens & Southern Nat'l Bank (In re Thomas B. Hamilton Co.), 969 F.2d 1013, 1019 (11th Cir 1992); In re United Airlines, 368 F.3d 720, 723-724 (7th Cir. 2004).  In the circumstances presented here, LBHI is in fact the guarantor under a majority of the Derivative Contracts as well as the debtor-in-possession.  The guarantees were an integral part of the Derivative Contracts and were given to secure the performance of the contracts, and accordingly, they must be regarded as one contract.  Therefore, these Derivative Contracts may qualify as "contracts to extend financial accommodations" under section 365(c)(2), thus prohibiting assumption or assignment by the Debtors.

21.     Accordingly, the Debtors should be prohibited from assuming or assigning these contracts as they qualify as contracts to extend "financial accommodations" to or for the benefit of the Debtors pursuant to Section 365(c)(2), based on: (i) the Debtors' admission that they entered into these Derivative Contracts for the **purpose** of entering into "**financing**" transactions, as set forth in the underlying Motion; (ii) the Debtors' further admission that in most cases, the Derivative Contracts are "swap agreements," which would include "any guarantee or reimbursement obligation by or to a swap participant or financial participant" under Section 101(53B)(A)(vi); (iii) LBHI is the guarantor under a majority of the Derivative Contracts which further qualify as "financial accommodations" under the circumstances of this case under Section 365(c)(2); and (iv) case law reveals that LBHI's guarantees underlying the Derivative Contracts are considered just one type of "financial accommodations" under Section 365(c)(2), whereby the purpose is to guarantee the financial obligations of the Debtors.

**WHEREFORE**, the Objectants respectfully request that the Court deny the Motion and provide such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 28, 2008

**DLA PIPER LLP (US)**

By:   /s/William M. Goldman
    William M. Goldman (WG -2013)
    John P. McNicholas (JM – 0694)
    1251 Avenue of the Americas
    New York, New York  10020
    Tel:  (212) 335-4500
    Fax:  (212) 335-4501

    Attorneys for for Hank's Living Trust,
    Lahde Capital Management Inc.,
    Osterreichische Volksbanken-
    Aktiengesellschaft
    and Etihad Airways