Brian Trust (BT-0347)
Jeffrey G. Tougas (JT-5533)
Amit Trehan (AT-4677)
**MAYER BROWN LLP**
1675 Broadway
New York, New York 10019
Tel. 212.506.2500
Fax  212.262.1910

*Counsel to Société Générale and Canadian Imperial Bank Commerce*

Andrew Brozman (APB-2456)
Wendy Rosenthal (WR-4461)
Sara Tapenikis (ST-4382)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York 10019
Tel. - 212.878.8000
Fax. - 212.878.8375

*Counsel to Calyon; Dexia Banque Internationale á Luxembourg SA; Dexia Credit Local; Dexia Kommunalbank Deutschland AG; Dexia Banque Belgique SA; and Banif - Banco de Investimento, S.A.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x
                               :

In re:                         :    Chapter 11
                               :

LEHMAN BROTHERS HOLDINGS INC., *et al.*,  :    Case No. 08-13555 (JMP)
                             :

        Debtors.        :    (Jointly Administered)
                             :
------------------------------------------------------------- x

**LIMITED OBJECTION TO DEBTORS' MOTION FOR AN ORDER
PURSUANT TO SECTIONS 105 AND 365 OF THE BANKRUPTCY
CODE TO ESTABLISH PROCEDURES FOR THE SETTLEMENT OR
ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

TO:    THE HONORABLE JUDGE JAMES M. PECK
        UNITED STATES BANKRUPTCY JUDGE

*Société Générale* and certain of its affiliates, Canadian Imperial Bank Commerce and its

affiliates, Calyon and certain of its affiliates; Dexia Banque Internationale á Luxembourg SA;

Dexia Credit Local; Dexia Kommunalbank Deutschland AG; Dexia Banque Belgique SA; and

Banif - Banco de Investimento, S.A. (collectively, the "**Objecting Counterparties**"), by and

through their respective undersigned counsel, hereby file this limited objection to the Motion of

Lehman Brothers Holdings Inc. ("**LBHI**") and its affiliated debtors in the above-referenced

Chapter 11 cases (together with LBHI, the "**Debtors**") For An Order Pursuant To Sections 105

And 365 Of The Bankruptcy Code To Establish Procedures For The Settlement Or Assumption

And Assignment Of Prepetition Derivative Contracts (Docket No. 1498) (the "**Motion**")[1].

## PRELIMINARY STATEMENT

It is not lost on the Objecting Counterparties that, in complex cases such as those of the

Debtors and their affiliated world-wide entities in insolvency proceedings (the "**Foreign

Debtors**"), it becomes essential to avoid the elevation of form over substance when the effect

would be to grind the reorganization machine to a halt.  In this respect, the Objecting

Counterparties do not oppose the efforts of the Debtors to streamline through the Motion the

process by which counterparty disputes may be resolved and open derivative transactions

assumed and assigned.

However, it is precisely because of the complexities of these cases, their relationships to

those of the Foreign Debtors and the Debtors' admitted inability to account for the flow of funds

and assets among them prior to the Petition Date that these efforts cannot be permitted to offend

the essential and related bankruptcy notions of transparency, due process and the judicious

---

[1]       Terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.  The
Transactions between certain of the Objecting Counterparties and the respective Lehman entities are described
generally on **Exhibit A** hereto.  Each of the Objecting Counterparties reserves its right to supplement and modify the
Transactions and the descriptions related to each.

exercise of equitable powers for the benefit of the creditor commonweal to achieve equality of treatment among creditors of like priority holding allowed claims.

The Motion strips these basic bankruptcy principles from the process to the demonstrable detriment of derivative counterparties and other parties in interest.

### The Procedures Are Impenetrably Opaque

Faced with this Motion, neither a counterparty nor the Court is able to discern what business judgment will underlie a decision by a Debtor to reach an accord with a counterparty. Worse, even if a general business predicate may be articulated, no one can reasonably understand the criteria to be employed to craft the nature and extent of any given settlement. What considerations impelled the grant of a release of what claims? Why was collateral or its value returned to one counterparty but not to another? How was the cash equivalent of that collateral valued? What is the source of the cash given that the Debtors acknowledge the pre-petition movement of cash among them and the Foreign Debtors has thus far confounded them? What is the effect of a settlement of Debtor "A" on the creditors of, not only Debtor "A" but also Debtor "B?"

However valid a business judgment may prove to be, it cannot be shrouded and a mystery to parties that certainly will be affected by the resolution of a non-particularized dispute by an underexposed settlement between one counterparty and one of several Debtors.[2]

---

[2]     Given the myriad of complex derivative transactions among counterparties, the Debtors and the Foreign Debtors, it cannot be ignored that the approval of settlements in the U.S. cases will have both intended and unintended impacts upon the rights of creditors of the Foreign Debtors, most particularly those in administration in the United Kingdom. For example, the Administrators of Lehman Brothers International (Europe) ("**LBIE**"), one of the group's primary derivative counterparties, have stated publicly that they lacked cash for their administration because all of LBIE's cash was swept by a U.S. Debtor prior to the Administration. For this reason alone, it is not sufficient for a U.S. creditors' committee to protect the interests of counterparties, the rights of which against Foreign Debtors will be affected.

### Due Process Requires Both Adequacy of Information and an Opportunity to be Heard

The ingenuity of certain of the financial arrangements among the Debtors, the Foreign Debtors and other parties in interest is manifest.  The means, reasons and impact of the manner in which those arrangements are unwound or resolved will be no less complex.  From these certain premises, it also must be plain that the impact of many of the settlements contemplated by the Motion will not be readily discernable, especially given the state of the Debtors' fundamental disclosures as to their respective assets, liabilities and financial affairs.

Yet, the Motion asks both the Court and affected counterparties to accept on faith not only that, given the apparent inability at this juncture of the Debtors and the Foreign Debtors to reconcile their respective rights and interests in the inter-company flow of funds and assets, a sound business judgment based upon a reasonable inquiry into underlying facts has been made but also that the effect of that business judgment upon other parties and counterparties is or will be no worse than neutral.  How is the Court assured that the cumulative affect of these as-yet-uncircumscribed-as-to-number-or-amount settlements will not have a dramatic and *irremediable* impact on counterparties with whom settlement approaches are made late in the game or which had rights against Debtors which, by virtue of the fungibility of cash, have now been deprived of the ability to meet its obligations to the extent it could have absent the settlement?

So, too, are the Debtors trammeling the due process rights of the Objecting Counterparties in that each of them has duly terminated its respective derivative contracts in accordance with their terms but the Debtors purport to their ability to disregard the effect of the termination, challenge its efficacy and, presumably, proceed to assume and to assign them without the due process required by, among other things, *In re Orion Pictures Corporation v.*

4

*Showtime Networks, Inc. (In re Orion Pictures Corporation)*, 4 F.3d 1095, 1098-99 (2d Cir. 1993) and its progeny.

At base, the Motion leaves everyone, except the parties to a proposed settlement, without any notice and an opportunity to be heard armed with sufficient understanding as to whether it has lost property rights without a modicum of due process.

## The Motion Positions the Court to Overreach its Jurisdiction and Exercise of its Powers

It is commonly understood that derivative contracts between counterparties and Foreign Debtors had received a form of credit support from the assets of a U.S. Debtor, in many instances in the form of an LBHI guarantee.  But it is also the case that, because of cross-affiliate and cross-product netting agreements, the extension of derivative contractual set off rights beyond obligations arising under, or the signatories to, derivative contracts, and the impact of applicable non-bankruptcy law, including the law of foreign jurisdictions, that the resolution of a particular Counterparty transaction could have broad and greater consequences than meet the settlement eye.  Moreover, to the extent the Motion intends the Court to cut off or otherwise constrain the exercise of rights held by the Objecting Counterparties arising under agreements with Foreign Debtors or under foreign law, it leads the Court into dangerous territory beyond the assets and liabilities of the Debtors.  This pan-debtor impact holds the potential to intrude upon rights existing in favor of the Objecting Counterparties under applicable non-U.S. law as to contracts that, by agreement of the parties, are not governed by U.S. law.

Given these and related issues raised by other parties in interest, it is apparent the Debtors have determined to use this Court as a vehicle of unbridled expediency.  Expedition in the cause of maximizing the value of the assets of these estates is salutary without question.  However, even a salutary cause should not prompt a process that could achieve that purpose (or not, we

cannot now tell) at the expense of basic bankruptcy law and rights or at the expense of

unidentified classes of creditors which might find their plights worsened as a result of the *de

facto* consolidating effect of the use of currently admixed assets in the settlement process.

### Summary of Legal Points

The Motion contains numerous deficiencies and violates, or is inconsistent with,

numerous sections of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure

("**FRBP**"), and the Local Bankruptcy Rules for the Southern District of New York ("**Local

Rules**"), as outlined below. *First*, the proposed Termination and Settlement Procedures violate

11 U.S.C. §502 by failing to state whether the amount fixed pursuant to a settlement agreement

will constitute an "allowed claim." *Second*, such procedures violate FRBP 9019 by failing to

provide creditors with notice and an opportunity to object to proposed settlements which could

affect their distributions. *Third*, the proposed procedures violate 11 U.S.C. §365 because they

improperly apply to validly Terminated Derivative Contracts, and improperly prevent a

Counterparty from objecting to the assumption of a Terminated Derivative Contract on any

ground available to such Counterparty.

The Assumption and Assignment Procedures also contain numerous provisions that

contravene the Bankruptcy Code and Local Rules. *First*, such procedures violate 11 U.S.C.

§365(b), by improperly deeming satisfaction of the obligation to provide adequate assurance of

future performance by virtue of a (potentially unreliable) credit rating. *Second*, such procedures

violate Local Rule 6006-1 by failing to provide Counterparties an adequate notice and

opportunity to object to a proposed assignment. *Third*, the proposed procedures violate 11

U.S.C. §553 by diminishing Counterparties' pre-existing setoff rights. All of the foregoing

6

deficiencies would need to be corrected before the relief sought by the Debtors in the Motion is approved.

## BACKGROUND FACTS

1.        On September 15, 2008 (the "**LBHI Petition Date**"), LBHI filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").  LBHI was the ultimate parent company (either directly or indirectly) of each of the Lehman counterparties.  LBHI also served as a credit support provider to certain Lehman counterparties under such Derivative Contracts.  In such capacity, LBHI guaranteed the due and punctual payment of all amounts payable by such Lehman counterparties under their Derivative Contracts.  On the LBHI Petition Date, LBHI's bankruptcy filing constituted an "Event of Default" under such Derivative Contracts, which entitled the Objecting Counterparties to terminate such Derivative Contracts.  The Objecting Counterparties validly have terminated all of their respective Derivative Contracts with its Lehman counterparty in accordance with the terms of its applicable Derivative Contract.[3]

2.        On October 3, 2008 and October 5, 2008, several LBHI subsidiaries, many of which constitute Lehman counterparties, filed voluntary petitions for relief under the Bankruptcy Code.  In several Derivative Contract transactions, the filing of each of the petitions of the Debtors constituting Lehman counterparties entitled the Objecting Counterparties, to terminate such Derivative Contracts.  Additionally, LBIE and certain of its affiliates commenced administrations on September 15, 2008 under applicable law in the United Kingdom.  Other Foreign Debtors similarly have commenced insolvency proceedings in their local jurisdictions.

---

[3]        Banif-Banco do Investimento, SA retains one open Derivatives Contract with Lehman Brothers Finance SA. Each of the Objecting Parties make this assertion based upon the current state of its knowledge.

The commencement of these proceedings also afforded a contractual right for the Objecting

Counterparties to terminate affected Derivative Contracts.

3.        On November 13, 2008, the Debtors filed the Motion.

## OBJECTION

**A.        *The Proposed Termination And Settlement Procedures Violate 11 U.S.C. §502
and FRBP 9019.***

4.        The Termination and Settlement Procedures in the Motion authorize Debtors to

"enter into and consummate" a termination agreement with a Counterparty, which "may resolve

and fix amounts owing between the Debtors and the Counterparty," "provide a release to the

Counterparty," and "may address and permit the collateral or margin held by the Debtors to be

liquidated or returned."  (Motion, p. 12, ¶¶(b), (c) and (d)).

5.        As proposed, the Termination and Settlement Procedures violate both the

Bankruptcy Code and the FRBP.  For example, a creditor's right to payment under a termination

agreement constitutes a "claim" pursuant to 11 U.S.C. §101(5).  Section 502 of the Bankruptcy

Code provides that allowance of a claim is the exclusive mechanism for fixing amounts owed by

a debtor's bankruptcy estate.  The Termination and Settlement Procedures violate 11 U.S.C.

§502 by failing to state whether the amounts "fixed" pursuant to a settlement agreement will

constitute an "allowed claim" pursuant to Section 502.

6.        FRBP 9019(a) governs the compromise of controversies in bankruptcy, requiring

that notice "shall be given to creditors, the United States trustee, the debtor, and indenture

trustees and any other entity as the court may direct."  While the Court may fix a class or classes

of controversies that can be settled without further hearing or notice, the Debtors have failed to

provide the Court with even the most basic information to determine whether that relief is

appropriate.  By providing the Debtors with the ability to settle claims, provide releases, and

liquidate or return collateral, the Termination and Settlement Procedures provide the Debtors

with virtually unfettered discretion to control, and provide no party in interest the opportunity to

understand or be heard as to, the business judgment underlying a proposed termination and

settlement between the Debtors and a Counterparty.  For certain of the Debtors, settlement of

disputes with the Counterparties collectively may determine the course of the bankruptcy cases

of those Debtors.  As a result, creditors and other parties in interest will be deprived of notice and

an opportunity to be heard in connection with a settlement that could affect the distribution it

might receive from the Debtors.

7.       The proposed Termination and Settlement Procedures contain additional

deficiencies.  *First*, under the proposed procedures, such creditor or party in interest will have no

basis to understand the predicates for the release of estate claims against a settling party.  *Second*,

the criteria or judgment employed for the return of collateral to certain parties but not others will

be completely opaque to creditors.  *Third*, if cash will be substituted for collateral in cases where

collateral cannot be returned, creditors should know how such collateral will be valued, and the

source of such funds.  The source of funds issue is all the more acute, given that (i) billions of

dollars were transferred "at the speed of light" just prior to the bankruptcy filing of the Debtors,

and (ii) Alvarez and Marsal has yet to complete even its preliminary funds flow analysis.

(*Transcript of October 16, 2008 Hearing, 30:22-23*).  Such obfuscation fails to comport with the

Debtors' requirement to provide parties in interest with notice of the compromise of a claim as

required by FRBP 9019.  *Fourth*, the proposed procedures have the potential to result in

disparate treatment of creditors that are similarly situated, in violation of a foundational premise

of the Bankruptcy Code.

8.      The Court's most important role in this process is to assure that the assets of the various estates are maximized in a manner that is reasonable under the circumstances but does not deprive the Objecting Counterparties and other parties in interest of fundamental rights, including the rights afforded under arms' length contracts with the Debtors and the Foreign Debtors, certainly sophisticated parties motivated by economic gain.  Some balance must be struck between the rights of parties to be apprised of settlements that could affect their distributions and to safeguard their contractual and bankruptcy and non-bankruptcy statutory and common law rights and the administrative burden that might be placed upon the Debtors.

9.      The Objecting Counterparties propose the following mitigants for the more egregious non-transparencies of the Proposed Order:

> *First*, that the Debtors make available on their website a list of proposed settlements, with appropriate details regarding the return of collateral, the valuation of collateral for purposes of payment if collateral cannot be returned, the source of funds if substituted for return of physical collateral, releases, and all other information necessary to evaluate the appropriateness of a proposed settlement.

> *Second*, that the Proposed Order identifies any Derivative Contract terminated in accordance with its terms that the Debtors contend may be assumed and assigned and to require notice to any affected Counterparty by the service and filing of a summons and complaint in connection with the commencement of an adversary proceeding.

**B.      <u>The Proposed Termination And Settlement Procedures Violate 11 U.S.C. §365.</u>**

10.     The Debtors have reserved their rights to dispute numerous issues with respect to a particular Derivative Contract, including:

- All rights with respect to any alleged termination of any derivative contract, including the rights to assert that (i) a Counterparty who did not terminate promptly after the commencement of the cases waived the right to terminate on account of LBHI's bankruptcies or financial condition and/or (ii) certain alleged terminations were not effective because they were not exercised in accordance with the applicable contractual provisions;

- All rights as to whether (i) any particular Derivative Contract constitutes an agreement subject to the "safe harbor provisions" of the Bankruptcy Code, or (ii) any particular Counterparty is a party entitled to exercise rights pursuant to a "safe harbor provision";
- All rights with respect to whether refusals of Counterparties to make ongoing payments due to LBHI under Derivative Contracts constitute breaches of the automatic stay under the Bankruptcy Code or are otherwise impermissible under the terms of the Derivative Contracts, the Bankruptcy Code, or other law, regulation, or statute; and
- All rights regarding whether any purported setoff was valid and/or barred by the automatic stay.

(Motion, p.4 fn2, p. 5 fn4, p. 6. fn5, p. 7 fn6).

11.     By reopening terminated contracts in this way and subjecting them to this assumption/assignment/termination process, the Debtors create the potential to ambush Counterparties which have already closed these contracts on their books. As a threshold matter, the proposed assumption and assignment of a validly terminated contract contravenes 11 U.S.C. §365. Furthermore, combined with the five-day notice period, the Motion does not afford affected Counterparties an adequate notice or opportunity to be heard with respect to the efficacy of termination of previously terminated Derivative Contracts.

12.     "Validity of termination" issues should not be decided as part of the process of assumption and assignment, as currently contemplated under the Motion, but by adversary proceeding. As stated in *Orion Pictures*, 4 F.3d at 1098-99:

> At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues…adversary proceeding issues are not to be decided as part of a motion to assume.

Moreover, it is a commonplace that a terminated contract is not executory and, as a consequence, may not be assumed and assigned under the Bankruptcy Code. *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300 (2d Cir. 1993); *In re 611 Sixth Avenue Corp.*, 191 B.R. 295, 301 (Bankr. S.D.N.Y. 1996); *Moody v. Amoco Oil Co.*, 734 F.2d (7th Cir. 1984). The Objecting

Counterparties submit that only *undisputed* contracts should be subject to these protocols (as otherwise modified).

13.     Additionally, the Court would lack jurisdiction or, alternatively, should abstain from the exercise thereof, to terminate, modify or condition any right of an Objecting Counterparty arising under and by virtue of a contract with a Foreign Debtor, under applicable foreign law (mindful that many of the Objecting Counterparties' Derivative Contracts are governed under non-U.S. law) or under a U.S. law governed Derivative Contract which by its terms affords an Objecting Counterparty rights or defenses respecting amounts allegedly payable to a Debtor, including the rights of set off.  Indeed, it cannot be forgotten that the construction of certain if not many of the Derivative Contracts of the Objecting Counterparties will be the subject of review by a foreign court, including in the context of the LBIE-related administrations. It would be at least improvident, if not legally improper, for this Court to act as a medium for the Debtors to affect the rights of Objecting Counterparties either pending before or subject to the jurisdiction of foreign courts.  To mitigate certain of these risks inherent in the Debtors' Motion, the Objecting Counterparties assert that, at a minimum, the Proposed Order provide specifically:

> *First*, that the validity of the termination of a Derivative Contract may not be contested except in accordance with FRBP 7001;

> *Second*, that no such contract may be the subject of a motion for assumption and assignment unless and until the termination effected by the Counterparty has been determined by final judgment to have been improper or otherwise without legal effect; and

> *Third*, in no event may the Settlement and Termination Procedures be employed to eliminate the rights of the Objecting Counterparties, including set off and similar rights, as to any Foreign Debtor, under applicable foreign law and as may affect rights under any contract with any Debtor arising under or by virtue contracts with Foreign Debtors or under applicable foreign or non-bankruptcy law.

### C.    The Proposed Assumption and Assignment Procedures Violate 11 U.S.C. §365 and Local Rule 6006-1.

14.    The Proposed Assumption and Assignment Procedures also violate provisions of the Bankruptcy Code and Local Rules.[4]  *First*, the Debtors have co-opted the requirements of 11 U.S.C. §365(b) by deeming that any assignee that meets the requirements of a Qualified Assignee automatically satisfies the obligation to provide adequate assurance of future performance.  Pursuant to the Motion, any Counterparty will be deemed to have received adequate assurance of future performance notwithstanding any right of a Counterparty to consent to any assignment or requirement in a Derivative Contract regarding the identity of assignees, if either the assignee or its Credit Support Provider is a Qualified Assignee (that is, if such assignee or its Credit Support Provider has an S+P or Fitch Rating of "A-", or a Moody's Rating of "A3"). (Motion, p. 10, ¶¶(b), (c)).  However, a credit rating would be a poor substitute for the protections afforded contract counterparties under the Bankruptcy Code.  Given that the current market climate may have resulted, in part, from potentially inflated ratings, and given that Lehman itself had an S&P rating of "A" and a Moody's rating of "A2" on the eve of bankruptcy (both of which are superior ratings to those proposed by Debtors), the Objecting Counterparties disagree that such a rating, in and of itself, would confer adequate assurance of future performance.  Indeed, the entire 'black box" notion that pervades these procedures is diametrically opposed to the right of any party to an executory contract to understand who its new contract party will be and whether it will be capable of performing the terms on which it

---

[4]    The Objecting Counterparties deny that any of their respective terminated Derivative Contracts is susceptible to assumption or assignment.  This discussion is afforded as a prophylactic objection to the assumption and assignment procedures in the event of a final determination vitiating any such Derivative Contract.

relied as consideration.  Counterparties should be given a chance to evaluate fairly whether or not a proposed assignee could provide adequate assurance of future performance.[5]

15.    *Second*, the five-day notice period for assumption and assignment of Derivative Contracts currently proposed in the Derivative Procedures Motion is insufficient for an affected Counterparty to respond, and violates Local Rule 6006-1.  Within five days after service of the Assignment Notice, affected Counterparties are expected to evaluate fully (i) proposed Cure Amounts, (ii) the need to cure Defaults (other than with respect to Defaults arising by virtue of the bankruptcy, insolvency, or financial condition of the Debtors), or (iii) adequate assurance of future performance.  The provision of only five days to object is far too short, given that (a) Counterparties will need to evaluate, at a minimum, (1) the credit quality of the proposed assignee, (2) issues regarding the valuation and manner of return of collateral, (3) the proposed Cure Amount, (4) whether adequate assurance of future performance is being provided, (b) five days notice may amount to only four days after the service by overnight mail is received and (c) many of these contracts involve international affiliates and Counterparties (and international addressees) with different operating hours.  Based on its past experience resolving matters such as this, the Objecting Counterparties propose a minimum of *ten business days* to evaluate any proposed assignment.

**D.    The Assumption And Assignment Procedures Proposed By The Motion Violate 11 U.S.C. §553.**

16.    The Assumption and Assignment Procedures allow a Counterparty to object only on one or more of three grounds: (a) the proposed Cure Amount; (b) the need to cure a default

---

[5]    The Motion's other means to "deem" adequate performance to have been demonstrated arises through its equally improper re-construction of Section 365 described at paragraph 19(c)(ii) of the Motion at page 10.  In this regard, adequate assurance is posited to have been given so long as the "Debtors . . .  would no longer have any payment or delivery obligations . . . . " after payment of the Cure Amounts.  This construct significantly circumscribes the rights of a Counterparty under Section 365, and does so totally without warrant or authority.

or early termination event; and/or (c) adequate assurance of future performance.  (Motion, p. 10, ¶19(e)).  The Assumption and Assignment Procedures violate 11 U.S.C. §365 by failing to allow a Counterparty to contest assumption and assignment on any grounds available pursuant to applicable law, including the ground that a subject Derivative Contract is ineligible for assumption, or was validly terminated.

17.     The Assumption and Assignment Procedures violate the Counterparties' right to assert claims against the Debtors, including claims supported by a right of setoff under Section 553 of the Bankruptcy Code and other applicable law, whether arising under contract or under common law.  The assignment of a contract cannot be implemented in a way which diminishes a Counterparty's setoff rights.  In addition, Counterparties' claims against (i) other Debtors, including claims against guarantors such as LBHI and (ii) other LBHI-affiliated, Foreign Debtors and non-Debtor counterparties, *must be preserved.* As set forth earlier, this concern applies equally to the Termination and Settlement Procedures.  As presently constituted, the Assumption and Assignment Procedures fail to require the Debtors to recognize valid claims against the Debtors' bankruptcy estates, including those supported by a right of setoff protected by, without limitation, Section 553 of the Bankruptcy Code.

## **RESERVATION OF RIGHTS**

18.     Nothing in this Objection shall constitute a waiver of, and the Objecting Counterparties reserve in all respects, their rights under their respective agreements, the Bankruptcy Code, and applicable State, Federal and foreign law, including (but not limited to) the rights (i) to dispute that such agreements do not constitute executory contracts, (ii) to assert that that such agreements (1) constitute financial accommodations, (2) are subject to the "safe

harbor provisions" of the Bankruptcy Code and (3) were validly terminated, and (iii) to institute

an adversary proceeding to assert any of the issues presented herein.[6]

[*Remainder of Page Intentionally Left Blank*]

---

[6]     The Objecting Counterparties also join in the objections filed by other parties in interest to the extent applicable to and consistent with the contents of this Objection.  They reserve their rights to make further and different objections at any hearing on the Motion.

## CONCLUSION

WHEREFORE, the Objecting Counterparties request that this Court deny the

Motion and presently constituted, grant the relief requested herein and grant such other and

further relief as this Court deems appropriate under the circumstances.

Dated: New York, New York
       November 28, 2008

Respectfully Submitted,


By: /s/ Brian Trust_____

Brian Trust (BT-0347)
Jeffrey G. Tougas (JT-5533)
Amit Trehan (AT-4677)
**MAYER BROWN LLP**
1675 Broadway
New York, New York 10019
Tel. 212.506.2500
Fax  212.262.1910

*Counsel to Société Générale and Canadian
Imperial Bank Commerce*


By: /s/ Andrew Brozman

Andrew Brozman (APB-2456)
Wendy Rosenthal (WR-4461)
Sara Tapenikis (ST-4382)
**CLIFFORD CHANCE US LLP**
31 West 52nd Street
New York, New York 10019
Tel. 212.878.8000
Fax. 212.878.8375

*Counsel to Calyon; Dexia Banque
Internationale á Luxembourg SA; Dexia
Credit Local; Dexia Kommunalbank
Deutschland AG; Dexia Banque Belgique
SA; and Banif - Banco de Investimento, S.A.*

## EXHIBIT A

## OBJECTING COUNTERPARTIES

1.     Dexia Banque Internationale á Luxembourg SA, Dexia Credit Local, Dexia

Kommunalbank Deutschland AG, Dexia Banque Belgique SA, (collectively for ease of reference

only, "Dexia") were parties to various derivative agreements between Dexia and Lehman

Brothers Finance S.A. ("LBF"), Lehman Brothers Special Financing Inc. ("LBSF"), Lehman

Brothers Financial Products Inc. ("LBFP"), and Lehman Brothers Commercial Corporation

("LBCC") (collectively, the "Dexia Derivative Agreements").[7]  In addition, certain of the Dexia

entities hold claims against Lehman Brothers Holdings Inc. ("LBHI") under various guarantees

issued by LBHI in connection with the Dexia Derivative Agreements.[8]  Each of the Dexia

Derivative Agreements duly was terminated in accordance with the provisions of the respective

agreements.

---

[7] The Dexia Derivative Agreements include, but are not limited to, (a) the 1992 ISDA Master Agreement dated 8 February 2000 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 8 February 2000, each with LBF, (b) the 1992 ISDA Master Agreement dated 28 October 2002 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 28 October 2002, each with LBSF, (c) the 1992 ISDA Master Agreement dated 11 April 1996, with LBFP, (d) the 1992 ISDA Master Agreement dated 6 January 2003, with LBF, (e) the 1992 ISDA Master Agreement dated 29 October 1997 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 29 October 1997, each with LBSF, (f) the 1992 ISDA Master Agreement dated 15 July 1999 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 15 July 1999, each with LBF (g) the 1992 ISDA Master Agreement dated 6 June 2000 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 6 June 2000, each with LBSF, (h) the 1992 ISDA Master Agreement dated 6 November 1997, with LBFP, (i) the 1992 ISDA Master Agreement dated 3 April 2001 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 3 April 2001, each with LBCC.  Dexia reserves all rights to amend or supplement the list of Dexia Derivative Agreements and to set off net or assert other claims, rights or defenses in connection with the Dexia Derivative Agreements as here described or as may be amended in the future.

[8] Dexia also was party to derivative and other financial agreements with other Lehman affiliates including but not limited to Lehman Brothers, Inc., Lehman Brothers International (Europe), and Lehman Brothers Bankhaus AG. The failure to address such agreements in the context of this objection intends no waiver of any right of Dexia under or in connection with such agreements, including as such agreements might affect the legal rights of the parties to the Dexia Derivative Agreements.  To the extent the motion intends to affect rights of Dexia under or in connection these additional agreements, Dexia objects to it on the bases set forth herein and reserves its right to object on further and different grounds, including the jurisdiction of the Court.  Additionally, Dexia specifically reserves all rights in any pending case or administration respecting such affiliates as well as to the assertion of such rights in any case, proceeding or controversy that might arise in the future.

NYA911770.1

2.     Calyon and certain of its affiliates (collectively for ease of reference only, "Calyon")

were parties to various derivative agreements between Calyon and Lehman Brothers Finance

S.A. ("LBF"), Lehman Brothers Commodity Services Inc. ("LBCS"), Lehman Brothers Special

Financing Inc. ("LBSF") and Lehman Brothers Commercial Corporation ("LBCC")

(collectively, the "Calyon Derivative Agreements").[9]  In addition, Calyon holds claims against

Lehman Brothers Holdings Inc ("LBHI") under various guarantees  issued by LBHI in

connection with the Calyon Derivative Agreements.[10]  Each of the Calyon Derivative

Agreements duly was terminated in accordance with the provisions of the respective agreements.

3.     Banif-Banco do Investimento, S.A. ("Banif") was party to a derivative agreement (the

"Banif Derivative Agreement") between Banif and Lehman Brothers Special Financing Inc.

("LBSF").[11]  In addition, Banif holds a claim against Lehman Brothers Holdings Inc. ("LBHI")

---

[9] The Calyon Derivative Agreements include, but are not limited to, (a) the 1992 ISDA Master Agreement dated 29 June 2000 and the 1995 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 29 June 2000, each with LBF, (b) the 1992 ISDA Master Agreement dated 30 September 1997 and the 1994 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 30 September 1997, each with LBCC, (c) the 1992 ISDA Master Agreement dated 2 October 2006 and the 1994 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 2 October 2006, each with LBCS and (d) the 1992 ISDA Master Agreement dated 21 December 2006 and the 1994 ISDA Credit Support Annex to the Schedule to the Master Agreement dated as of 21 December 2006, each with LBSF.  Calyon reserves all rights to amend or supplement the list of Calyon Derivative Agreements and to set off net or assert other claims, rights or defenses in connection with the Calyon Derivative Agreements as here described or as may be amended in the future.

[10] Calyon also was party to derivative and other financial agreements with other Lehman affiliates including but not limited to Lehman Brothers, Inc. and Lehman Brothers International (Europe).  The failure to address such agreements in the context of this objection intends no waiver of any right of Calyon under or in connection with such agreements, including as such agreements might affect the legal rights of the parties to the Calyon Derivative Agreements.  To the extent the motion intends to affect rights of Calyon under or in connection these additional agreements, Calyon objects to it on the bases set forth herein and reserves its right to object on further and different grounds, including the jurisdiction of the Court.  Additionally, Calyon specifically reserves all rights in any pending case or administration respecting such affiliates as well as to the assertion of such rights in any case, proceeding or controversy that might arise in the future.

[11] The Banif Derivative Agreement includes, but is not limited to, that certain 1992 ISDA Master Agreement dated 17 December 2002.  Banif reserves all rights to amend or supplement this description of the Banif Derivative Agreement and to set off net or assert other claims, rights or defenses in connection with the Banif Derivative Agreement as here described or as may be amended in the future.  Banif is party to one open Derivatives Contract with Lehman Brothers Finance SA.

under a guarantee issued by LBHI in connection with the Banif Derivative Agreement.  The

Banif Derivative Agreement duly was terminated in accordance with the provisions of the

agreement.

4.       Canadian Imperial Bank of Commerce and certain of its affiliates (collectively, "**CIBC**")

were parties to various derivative agreements between CIBC and certain of the Debtors

(collectively, the "**CIBC Derivative Agreements**").  In addition, CIBC holds claims against

LBHI and such other applicable Debtors under various guarantees issued by LBHI and such

other applicable Debtors in connection with the CIBC Derivative Agreements. [12]  As noted

above, each CIBC Derivative Agreement was duly terminated in accordance with the provisions

thereof.

---

[12]       CIBC entities are parties to derivative and other financial agreements with other Lehman affiliates
including but not limited to Lehman Brothers, Inc. and Lehman Brothers International (Europe).  The failure to
address such agreements in the context of this objection intends no waiver of any right of CIBC under or in
connection with such agreements.  To the extent the motion intends to affect rights of CIBC under or in connection
these additional agreements, CIBC objects to it on the bases set forth herein and reserves its right to object on further
and different grounds, including the jurisdiction of the Court.  Additionally, CIBC specifically reserves all rights in
any pending case or administration respecting such affiliates as well as to the assertion of such rights in any case,
proceeding or controversy that might arise in the future.

5.     Société Générale, and certain of its affiliates (collectively, "**SG**") were parties to various derivative agreements between SG and certain of the Debtors (collectively, the "**SG Derivative Agreements**").  In addition, SG holds claims against LBHI and such other applicable Debtors under various guarantees issued by LBHI and such other applicable Debtors in connection with the SG Derivative Agreements.  As noted above, each SG Derivative Agreement was duly terminated in accordance with the provisions thereof.[13].

---

[13]     SG entities are parties to derivative and other financial agreements with other Lehman affiliates including but not limited to Lehman Brothers, Inc. and Lehman Brothers International (Europe).  The failure to address such agreements in the context of this objection intends no waiver of any right of SG under or in connection with such agreements.  To the extent the motion intends to affect rights of SG under or in connection these additional agreements, SG objects to it on the bases set forth herein and reserves its right to object on further and different grounds, including the jurisdiction of the Court.  Additionally, SG specifically reserves all rights in any pending case or administration respecting such affiliates as well as to the assertion of such rights in any case, proceeding or controversy that might arise in the future.