Hearing Date:  December 3, 2008 at 10:00 a.m. (Prevailing Eastern Time)
Objection Deadline:  November 28, 2008 at 4:00 p.m. (Prevailing Eastern Time)

ORRICK, HERRINGTON & SUTCLIFFE LLP
666 Fifth Avenue
New York, New York 10103-0002
Telephone: (212) 506-5000
Facsimile: (212) 506-5151
Raniero D'Aversa, Jr., Esq.
Weston T. Eguchi, Esq.
Courtney M. Rogers, Esq.
—and—
Columbia Center
1152 15th Street, N.W.
Washington, D.C.  20005-1706
Telephone: (202) 339-8400
Facsimile:  (202) 339-8500
Jonathan P. Guy, Esq.

*Attorneys for The Bank of Nova Scotia*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x
| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | : Case No. 08-13555 (JMP) |
| | : |
| Debtors. | : Jointly Administered |

------------------------------------------------------------------------ x

**LIMITED OBJECTION OF THE BANK OF NOVA SCOTIA TO
DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365
OF THE BANKRUPTCY CODE APPROVING THE ASSUMPTION OR
REJECTION OF OPEN TRADE CONFIRMATIONS**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

The Bank of Nova Scotia ("Scotiabank"), by and through its undersigned counsel, files this Limited Objection ("Objection") to the motion of Lehman Brothers Holdings Inc. ("Lehman") and Lehman Commercial Paper Inc., as debtors and debtors-in-possession (together, the "Debtors"), for an Order pursuant to Section 365 of Title 11 of the United States Code (the "Bankruptcy Code") approving the assumption or rejection of certain open trade confirmations

OHS East:160506433.8
14975-4

(together with all supplements thereto, the "Open Trades Motion"). In support of this Objection, Scotiabank respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Section 553 makes explicit and the case law uniformly holds that the Bankruptcy Code preserves the state law rights of a creditor to offset mutual debts and claims.

2. Here, Lehman and Scotiabank are parties to four prepetition executory trade confirmations that are governed by New York law. Under New York common and statutory law, and the custom and practice of the parties, Scotiabank has undisputed setoff rights. The Debtors wish to assume three of the confirmations and reject the fourth. Scotiabank does not object to this specific relief and recognizes the need for the Debtors to move forward with an orderly treatment of their open trade confirmations. But, in addition to cherry-picking their contracts, the Debtors also seek entry of an Order prohibiting Scotiabank from offsetting its damages from the rejection of the one "buy" contract against its payment obligation under the one assumed "sell" contract. Such an Order would force creditors like Scotiabank to perform, in full, under the assumed contracts, while allowing the Debtors the luxury of paying fractional dollars on any breach claim in bankruptcy. Scotiabank objects to this relief.

3. The Debtors argue that their assumption of a counterparty's trade confirmations creates a postpetition "debt" and their rejection, under Sections 365(g) and 502(g), creates a prepetition "claim" and, by reference to that argument, asks this Court to strip the counterparties of their valid setoff rights. But that argument is at odds with Section 553, which expressly preserves these setoff rights and makes no exception for Section 365 or 502. Further, denying Scotiabank its setoff rights would be otherwise inequitable in that it would grant, at Scotiabank's expense, a windfall to the Debtors that they do not need to reorganize, in that they are liquidating

their businesses, and would only inure to the benefit of unsecured creditors, *i.e.*, those parties without protected state law setoff rights.

4.  For these and other reasons discussed in detail below, Scotiabank respectfully requests that the Court enter an Order approving the assumption and rejection of the trade confirmations; deny the Debtors' request to strip Scotiabank of its state law setoff rights; and implement a streamlined procedure to allow Scotiabank and other similarly situated parties to effect such a setoff.

## BACKGROUND

5.  On September 15, 2008 (the "Petition Date"), and periodically thereafter, the Debtors and certain of their affiliates commenced voluntarily chapter 11 cases in this Court.

6.  The Debtors have stated that, through the bankruptcy process, they are "engaged in the orderly liquidation of their businesses" (Open Trades Motion at ¶ 21). Accordingly, the Debtors have no prospect of reorganizing and continuing their businesses beyond the bankruptcy.

7.  Prior to the Petition Date, the Debtors and Scotiabank participated in numerous transactions for the purchase or sale of par or distressed commercial loans. As of the Petition Date, trade confirmations for four such transactions between Lehman[1] and Scotiabank had been executed by the parties, but the transactions had not yet been settled.

8.  On November 14, 2008, the Debtors filed the Open Trades Motion, which seeks, *inter alia*, to assume, as executory contracts, three of the open trade confirmations with Scotiabank and to reject the fourth.

---

[1] Exhibits A ("Assumed Trades") and B ("Rejected Trades") to the Open Trades Motion incorrectly schedule Lehman Commercial Paper Inc. as the Debtor entity on the open trades.

9. Specifically, the Open Trades Motion seeks to assume the following three open trade confirmations:

a. the Loan Syndications and Trade Association ("LSTA") Distressed Trade Confirmation dated April 17, 2008, between Lehman as buyer and Scotiabank as seller (the "April 17 Trade");

b. the LSTA Distressed Trade Confirmation dated April 30, 2008, between Lehman as buyer and Scotiabank as seller (the "April 30 Trade"); and

c. the LSTA Distressed Trade Confirmation dated May 1, 2008, between Scotiabank as buyer and Lehman as seller (the "May 1 Trade").

10. The Open Trades Motion also seeks to reject the open LSTA Distressed Trade Confirmation dated May 6, 2008, between Lehman as buyer and Scotiabank as seller (the "May 6 Trade," and together with the aforementioned trade confirmations, the "Trades").[2] All four trade confirmations involve the same underlying credit agreement (the "Credit"). As can be expected (and as the Debtors recognize), the current market prices for this Credit have decreased substantially. As a result, based on current market prices for the Credit, Scotiabank estimates that rejection of the May 6 Trade would result in a significant rejection damages claim of between $1,250,000 to $1,500,000,[3] which the Debtors undoubtedly intend to pay, perhaps years in the future, in fractional dollars.

11. Conversely, by assuming the May 1 Trade, the Debtors expect Scotiabank to pay the full amount due on that Trade now, placing Scotiabank in the unenviable position of

---

[2] Scotiabank has not filed copies of the Trades because these documents are confidential and Scotiabank believes that the Debtors already have copies of the same. At the Court's request, Scotiabank will file under seal true and correct copies of the Trades with the Court.

[3] This value is approximate and based on calculations as of the date hereof. Nothing herein shall be deemed to fix any amounts related to the Trades for any purpose, including without limitation the amount of Scotiabank's rejection damages claim or the purchase prices to be paid in connection with the assumed Trades.

OHS East:160506433.8
14975-4

4

overpaying approximately $1,250,000 to $1,500,000 over today's market prices. Absent Lehman's bankruptcy, the parties would have netted these May 1 and May 6 Trades (per industry standard) and effectuated a setoff.

12. Through the Open Trades Motion, the Debtors are attempting to reap a windfall by arguing that it would be impermissible to allow a counterparty to offset its claims against the Debtors for damages arising from its rejected trade confirmations against its obligations to the Debtors under its assumed trade confirmations. Although Scotiabank does not, in principle, object to the Debtors' decision to assume or reject the open trade confirmations, it does object to the Debtors' attempt to foreclose it from exercising its setoff right.

## **LIMITED OBJECTION**

**A.    Under New York Common and Statutory Law, and the Custom and Practice of the Parties, Scotiabank Has Undisputed Setoff Rights, Which are Enforceable under Section 553.**

13. Section 553 of the Bankruptcy Code preserves whatever right of setoff a creditor possesses under non-bankruptcy law. Official Comm. of Unsecured Creditors v. Mfrs. and Traders Trust Co. (In re Bennett Funding Group, Inc.), 146 F.3d 136, 141 (2d Cir. 1998). Under New York law, which is the governing law specified in the Trades, there is no doubt that Scotiabank possesses a valid and enforceable right to offset any damages resulting from Lehman's breach of the May 6 Trade against its purchase obligation under the May 1 Trade. "New York has long recognized a common law right of setoff. . . [and] has codified the right" under Section 151 of New York Debtor & Creditor Law. Id. (citing Straus v. Tradesmen's Nat'l Bank, 122 N.Y. 379 (1890)). Moreover, under industry customs and practices in transactions like this, the parties would ordinarily net their two trades (*i.e.*, the May 1 Trade and May 6 Trade) against one another either through a formal netting agreement or the parties' agreement to

send a single wire for the total net payment of both trades.

14. Setoff under Section 553 is permitted provided (a) the debtor owes a debt to the creditor which arose prepetition, (b) the debtor has a claim against the creditor which arose prepetition, and (c) the debt and claim are mutual. Official Comm. of Unsecured Creditors v. Mfrs. and Traders Trust Co. (In re Bennett Funding Group, Inc.), 212 B.R. 206, 212 (B.A.P. 2nd Cir. 1997), aff'd, 146 F.3d 136 (2d Cir. 1998); Eastern Airlines, Inc. v. Chem. Bank, Inc., No. 95 Civ. 3981(JSR), 1997 WL 282264, at *2 (S.D.N.Y. May 28, 1997).

15. Mutuality is satisfied where the debt and claim are between the same parties, in the same capacity and are of the same quality. See In re O.P.M. Leasing Servs. Inc., 68 B.R. 979, 986 (S.D.N.Y. 1987). The claim and debt need not, however, arise from the same transaction. In re Genuity Inc., 323 B.R. 79, 83 (Bankr. S.D.N.Y. 2005) (citing Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n, 743 F. Supp. 176, 182 (S.D.N.Y. 1990)).

16. Here, mutuality is met because Scotiabank and Lehman possess valid, enforceable claims against one another. Specifically, Lehman will owe Scotiabank for damages sustained in the Debtors' rejection of the May 6 Trade, and Scotiabank will owe Lehman monies arising from its obligations under the assumed May 1 Trade. Moreover, the May 1 and May 6 Trades not only involve the same parties acting in the same capacities, but they (a) are for the exact same amounts of the same Credit under identical terms and conditions (except the purchase rate), (b) were executed nearly contemporaneously and (c) would have closed on the same day. As such, there is no legitimate dispute that Scotiabank has an enforceable setoff right under New York common and statutory law, and based on the custom and practices of the parties.

B.   **Scotiabank's Setoff of Its Prepetition Damages on the Rejected "Buy" Trade Against Its Prepetition Payment Obligation under the Assumed "Sell" Trade Is Permissible**

17.   It is well settled that prepetition claims may be offset against prepetition debts and postpetition claims against postpetition debts. In re Genuity, 323 B.R. at 82; In re Shoppers Paradise, Inc., 8 B.R. 271, 277 (Bankr. S.D.N.Y. 1980) (holding that postpetition obligations may only be offset against other postpetition obligations); Dery v. Gen. Motors Corp. (In re Fordson Eng'g Corp.), 25 B.R. 506, 511 (Bankr. E.D. Mich. 1982) (noting that "section 553 is silent as to the right of setoff for obligations arising postpetition" but "authority exists for the application of the concept of setoff to postpetition obligations").

18.   Accordingly, the Debtors acknowledge that such setoff of either type of claim and debt may be effected, as long as such setoff does not "crossover" between prepetition claims and postpetition debts (see Open Trades Motion at ¶¶ 26, 32). Here, the assumption of the May 1 Trade and the rejection of the May 6 Trade will provide Scotiabank with a valid right of setoff because the debt and claim which arise therefrom will both be prepetition.

19.   The arguments for the former conclusion – that the resulting debt and claim are both prepetition, and therefore subject to setoff (the "Prepetition Setoff Argument") – have been thoroughly and persuasively advanced in other counterparties' objections (collectively, the "Prepetition Setoff Argument Objections") – including, *inter alia*, Docket Nos. 1749 (the "Goldentree Objection"), 1819 (the "Barclays Objection"), 1841 (the "P. Schoenfeld Objection") and 1849 (the "Blue Mountain Credit Objection") – and Scotiabank hereby joins in these objections and incorporates the Prepetition Setoff Arguments therein as if set forth fully herein.[4]

---

[4]   Because the relief sought by the Open Trades Motion has not been granted, and no Trades have yet been assumed or rejected, the Debtors' attempt to foreclose its counterparties' setoff rights arguably seeks an advisory position. Accordingly, Scotiabank otherwise reserves, and does not waive, all related argument by reference to, *inter alia*, integration, recoupment or safe-harbor provisions. Scotiabank submits that the Court need not determine

In the interests of relieving the Court from the burden of reviewing these arguments again, Scotiabank will not reiterate these arguments in detail here. In summary, Scotiabank notes briefly that (a) the Debtors acknowledge that the rejection of the trade confirmations (*e.g.*, the May 6 Trade) will create a prepetition claim against the Debtors (Open Trades Motion at ¶ 29; P. Schoenfeld Obj. at ¶ 25); (b) amounts owed to the Debtors under the assumed trades (*e.g.*, May 1 Trade) are prepetition obligations because these trades became binding agreements prior to the Petition Date, when they were executed since all of the transactions necessary for liability occurred at that time (P. Schoenfeld Obj. at ¶ 27; Barclays Obj. at ¶¶ 17-18); and (c) the Debtors' reliance on authority that suggests that the assumption of the May 1 Trade transforms its prepetition obligations into a debt that arises postpetition (i) runs contrary to the majority of authority, which holds that mere assumption of an executory contract does not alter when the obligations arose, and (ii) is based on the inappropriate distinction that the debtor and debtor-in-possession are separate entities, which has been overruled by the Supreme Court (P. Schoenfeld Obj. at ¶ 32; Barclays Obj. at ¶¶ 20-24; Goldentree Obj. at ¶¶ 22, 28).

C. **Alternatively, Rejection of the "Buy" Trade and Assumption of the "Sell" Trade Both Give Rise to Postpetition Claims for Which Setoff Is Permitted**

20.     Alternatively, even if the Debtors are right that assumption of a Trade gives rise to postpetition debts or claims (which Scotiabank disputes), it would still be inappropriate to strip away creditor setoff rights. This is because the Debtors theorize that assumption of a prepetition contract magically transforms claims/debts that "arose" prepetition into postpetition events simply because the debtor-in-possession will perform postpetition. But if that is so, the Debtors cannot have their cake and eat it too because this Court has recently noted that rejection

---

these issues at this time because, as an initial matter, the Debtors cannot abrogate the counterparties' state law setoff rights.

is a postpetition temporal event. See In re Delta Air Lines, Inc., 341 B.R. 439, 446 (Bankr. S.D.N.Y. 2006) ("The rejection claim did not 'arise' pre-petition. . . either as an actual claim or as a contingent claim, any more than the possibility of some future breach of contract claim can be said to 'arise' or exist before the actual breach."). Of course, postpetition debts and claims may be setoff. And again, no injury is done to the principle that state setoff rights should be preserved.

21.     Accordingly, whether the Debtors' assumption gives rise to debts that "arose" prepetition or postpetition, Scotiabank should be permitted to exercise its valid right to offset its rejection damages claim on the May 6 Trade against its payment obligation under the May 1 Trade. This is fair and appropriate because it recognizes and preserves Scotiabank's state law setoff right as "part of the bundle of substantive rights that may comprise. . . [Scotiabank's] claim" and upon which Scotiabank (and Lehman, for that matter) relied when entering these trades. Lawrence P. King, Collier on Bankruptcy, ¶ 553.02[1] (15th ed. rev. 2008); see also N.J. Nat'l Bank v. Gutterman (In re Applied Logic Corp.), 576 F.2d 952, 957-58 (2d Cir. 1978) ("The rule allowing setoff, both before and after bankruptcy. . . has been embodied in every bankruptcy act the nation has had, and creditors. . . have long acted in reliance upon it.") (quoted in In re Whimsy, Inc., 221 B.R. 69, 74 (S.D.N.Y. 1998)).

**D.    This Court Recently Concluded that Damages Claims on Rejected Executory Contracts Arise Postpetition and Code Sections 365(g) and 502(g) Do Not Affect a Party's Valid Setoff Rights under Non-Bankruptcy Law**

22.     The Debtors, however, contend that they should be allowed to foreclose their counterparties' setoff rights based on their theory that assumption "arises" postpetition but rejection does not because, under Sections 365(g) and 502(g) of the Bankruptcy Code, it gives rise to prepetition claims (Open Trades Motion at ¶ 28). Assuming, *arguendo*, that this were

true, it would lead to the implausible result that Sections 365(g) and 502(g) – the texts of which make no reference to setoff at all – would trump the Bankruptcy Code's broad aim of preserving the long-recognized and relied-upon state law right of setoff, as codified in Section 553. Section 553 completely preserves the state law setoff rights of a creditor except in certain limited applications which are explicitly set forth in Section 553 and which do not include Sections 365 or 502. See 11 U.S.C. § 553 ("*Except as otherwise provided in this section and in sections 362 and 363 of this title*, this title does not affect *any* right of a creditor to offset. . . ") (emphases added).

23.     This approach embodies the "long recognized. . . basic federal rule in bankruptcy," which the Supreme Court recently reemphasized in Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co., that "state law governs the substance of claims. . . unless some federal interest requires a different result." 127 S. Ct. 1199, 1205 (2007) (internal citations and quotations omitted). See also Delta, 341 B.R. at 446 (determining issue of whether rejection damages claim arose before or after commencement of the case "as a matter of state law"). Accordingly, unless the Bankruptcy Code or other overruling federal law expressly provides otherwise, "the determination of property rights in the assets of a bankrupt's estate" will be "generally left. . . to state law." Butner v. United States, 440 U.S. 48, 54 (1979); Travelers, 127 S. Ct. at 1205.

24.     The recent decision of this Court in Delta recognizes this very point[5] that Section 553 is subject, by its express terms, to Sections 362 and 363, and only these sections. 341 B.R.

---

[5]     The Delta decision is the only case law from this district to consider the issues of whether Sections 365(g) and 502(g) can trump state law setoff rights and whether rejection damages constitute postpetition claims for the purposes of setoff. It is well-settled that where precedent within a district exists, courts look to that decision for instruction. See e.g., O'Brien v. First Marblehead Educ. Res. (In re O'Brien), 299 B.R. 725, 730 (Bankr. S.D.N.Y. 2003); In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, 160 B.R. 882, 898 (Bankr. S.D.N.Y. 1993) (noting that bankruptcy court opinions within the same multi-judge district hold persuasive precedential value).

at 447. As such, Sections 365(g) and 502(g) do not provide an exception to the unambiguous language of Section 553 that a party could invoke to either create or destroy a right of setoff contrary to state law. See id. As such, Delta's conclusion rests squarely in accord with the Bankruptcy Code's longstanding deference to state law in determining the property rights of parties-in-interest.

25. Based on the plain text of Section 553 and the Delta decision, and contrary to the Debtors' assertions, nothing in Sections 365(g) or 502(g) requires the Court to mandate the extreme measure of abrogating Scotiabank's well-established and relied-upon state law setoff rights which would result in prejudice to Scotiabank.

E.  **Allowing Scotiabank to Offset Prevents the Inequitable Result of Conferring a Windfall on the Debtors Where No Reorganization Purpose Would be Served**

26. Further, in addition to being the correct legal position, allowing Scotiabank to exercise its setoff rights would also lead to the most equitable outcome possible. Otherwise, if Scotiabank were not permitted to offset its claim against its debt, this would lead to the unfair result of preserving a windfall to the Debtors while requiring Scotiabank "to pay [its] debts to the debtor in full, but only receiving a small fraction of the money owed to [it] by the debtor." In re BOUSA Inc., No. 89-B-13380 (JMP), 2006 WL 2864964, at *6 n.8 (Bankr. S.D.N.Y. Sept. 29, 2006) (Peck, B.J.) (discussing Carolco Television Inc. v. Nat'l Broad. Co. (In re De Laurentiis Entm't Group Inc.), 963 F.2d 1269, 1276-77 (9th Cir. 1992), cert. denied, 506 U.S. 918 (1992), and also noting Tenth Circuit precedent which "[s]imilarly. . . reasoned that a creditor's right to setoff is a universally recognized right grounded in principles of fairness" (internal citations and quotations omitted)). Requiring Scotiabank to receive "fractional dollars" on its claim for the May 6 Trade rejection but pay "whole ones" to Lehman on the assumed May 1 Trade – even though both Trades were executed by the same parties within a few days of one another, involve

the same underlying Credit and would have been subject to netting under the usual custom and practices between the parties – is precisely the inequitable result that the Debtors are requesting (see Open Trades Motion, ¶ 32) and that state and bankruptcy setoff law seeks to prevent.

27. Importantly, this windfall would serve no reorganization purpose for the Debtors because they are seeking the "orderly *liquidation* of their business" and "have no need" for the resources (whether loan inventories or cash) to continue their prior trading activities as a going concern (Open Trades Motion at ¶ 21) (emphasis added). To this end, Congress[6] and courts in this district have recognized that allowing setoff is "particularly appropriate where. . . setoff would not interfere with a debtor's efforts to reorganize." In re Whimsy, 221 B.R. at 75 ("Allowing a setoff in this case could not possibly have interfered with the operation of the Debtor's business since the Debtor's efforts at reorganization had already failed and the court had already approved the sale of the Debtor's assets."); see also In re BOUSA, 2006 WL 2864964, at *9 (Peck, B.J.) (holding that setoff was permitted, notwithstanding diminished distributions to other creditors, because it would have no effect on debtor's plan of liquidation which had been confirmed over eleven years prior and did not provide for distributions from future litigation recoveries).

28. Instead of furthering any reorganization goal, this windfall would be distributed to, and inure to the benefit of, the Debtors' unsecured creditors (*i.e.*, parties without protected setoff rights) at the expense of Scotiabank's status as the preferred holder of a right of setoff that

---

[6] Specifically, Congress has stated:

> In a liquidation case, any setoff that occurs after the commencement of the case has no effect on the debtor. The amount that the creditor recovers through setoff will permit him to recover a higher percentage of his total claim than other creditors, but it will not interfere with the debtor's operation or business in any way, because the debtor has already gone out of business.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 183-84, reprinted in 1978 U.S.C.A.A.N. at 6144-45 (quoted in In re Whimsy, 221 B.R. at 75).

acts as security for its claim.  Boston Ins. Co. v. Nogg (In re Yale Express Sys., Inc.), 362 F.2d 111, 114 (2d Cir. 1966) (setoff provides "security of the most perfect kind"); Bohack Corp. v. Borden, Inc., 599 F.2d 1160, 1165 (2d Cir. 1979) (stating that it is in the very nature of setoff to confer preferential advantages which the Bankruptcy Code preserves and upholds as long-recognized rights).

29.    For these reasons, there are no "compelling circumstances" that mandate disturbing Scotiabank's valid and enforceable setoff rights.  Bohack, 599 F.2d at 1165 (stating "a decision disallowing a setoff must not be made cavalierly" unless "compelling circumstances require it").  Rather, prohibiting Scotiabank from exercising setoff would produce the truly inequitable result of defying long-standing expectations that such claim would be entitled to treatment as a secured claim by forcing Scotiabank to pay "whole dollars" on its obligations to the Debtors while receiving only "fractional dollars" in return on its own claims, all for no purpose other than to visit a financial windfall on the Debtors and undeserving unsecured creditors without furthering any reorganization.  For the foregoing reasons, the Debtors' request for such relief must be denied.

**F.    Streamlined Procedures to Effect Setoff Should Be Permitted.**

30.    If the Court agrees that Scotiabank should be permitted to offset its rejection damage claim for the May 6 Trade against amounts owing to Lehman upon closing of the May 1 Trade, Scotiabank respectfully requests that the Court implement streamlined procedures to allow for the setoff of such amounts by providing written notice to Lehman of (i) Scotiabank's intent to offset, (ii) the amount of Scotiabank's rejection damages claim for the May 6 Trade, and (iii) the method by which such rejection damages were calculated.[7]

---

[7]    Scotiabank submits that the Debtors have been provided sufficient notice to allow the Court to implement such streamlined procedures at this time: not only have the Debtors anticipated that counterparties would seek to

31. This procedure would further two of the principal considerations of setoff in bankruptcy – namely, the creation of an orderly bankruptcy process and the preservation of the non-bankruptcy expectations of the parties – by allowing setoff to occur on the closing date of the trades without requiring Scotiabank to file a proof of claim or apply separately for relief from the automatic stay. See Lawrence P. King, Collier on Bankruptcy, ¶ 553.01[1] (15th ed. rev. 2008) ("In general, setoff is favored under the law in order to avoid a multiplicity of suits, added expense, inconvenience, injustice and inefficient use of judicial resources."). Such relief, however, would not sacrifice the Debtors' ability to invoke judicial scrutiny of the amount and computation of Scotiabank's rejection damages claim since sufficient notice would be provided to allow the Debtors to seek protective relief. See In re BOUSA, 2006 WL 2864964, at *6 (Peck, B.J.) (holding that relief from stay is permissible to exercise setoff because it "does not impose undue harm on the Debtor's estate" and would "avoid. . . the absurdity of making A pay B when B owes A" as described by the Supreme Court).

## WAIVER OF MEMORANDUM

32. Scotiabank respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be waived as there are no novel issues of law presented herein.

## CONCLUSION

WHEREFORE, Scotiabank respectfully requests that this Court enter an Order (1) approving the assumption of the April 17 Trade, the April 30 Trade and May 1 Trade, and the rejection of the May 6 Trade; (2) denying the Debtors' request for an Order that Scotiabank shall not be entitled to assert or take any act to exercise a right to offset any claim that it might have

---

offset their damages claims for the rejected trades against their obligations under the assumed trades, but they have placed the issue squarely before the Court as to the proper limits of such ability.

against Lehman, including, without limitation, claims for damages arising from the rejection of the May 6 Trade, against any obligation to Lehman under the May 1 Trade; (3) implementing streamlined procedures to allow Scotiabank to offset as described herein; and (4) granting such other and further relief as is just.

Dated: New York, New York
       November 28, 2008

                          ORRICK, HERRINGTON & SUTCLIFFE LLP

                By:    */s/ Raniero D'Aversa, Jr.*
                         Raniero D'Aversa, Jr., Esq.
                         Weston T. Eguchi, Esq.
                         Courtney M. Rogers, Esq.
                         666 Fifth Avenue
                         New York, NY  10103-0001
                         Telephone: (212) 506-5000
                         Facsimile:  (212) 506-5151

                         —and—

                         Jonathan P. Guy, Esq.
                         Columbia Center
                         1152 15th Street, N.W.
                         Washington, D.C.  20005-1706
                         Telephone: (202) 339-8400
                         Facsimile:  (202) 339-8500

                         *Attorneys for The Bank of Nova Scotia*