Objection Deadline:  November 28, 2008 at 4:00 p.m.
Hearing Date:  December 3, 2008 at 10:00 a.m.

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
Deryck A. Palmer, Esq.
John J. Rapisardi, Esq.
George A. Davis, Esq.
Andrew Troop, Esq.

Attorneys for Citigroup Inc. and
all of its affiliates, including Citibank, N.A. and Citibank International plc

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS INC. et al.,<br><br>                        Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP)<br><br>(Jointly Administered) |

**LIMITED OBJECTION OF CITIBANK TO DEBTORS' MOTION FOR AN ORDER
PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING THE
ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

Citigroup Inc. on behalf of itself and its affiliates ("Citibank") by and through its

undersigned counsel, respectfully submits this limited objection (the "Objection") to the

*Debtors' Motion For An Order Pursuant to Section 365 of the Bankruptcy Code Approving The*

*Assumption Or Rejection Of Open Trade Confirmations* [Docket No. 1541] (the "Motion").  In

support of this Objection, Citibank states as follows:

**PRELIMINARY STATEMENT**

The Debtors seek to assume or reject certain trade confirmations, including 19

trade confirmations between Lehman Brothers Holdings Inc., ("LBHI"), Lehman Commercial

Paper Inc. ("LCPI") or Lehman Commercial Paper Inc. UK ("LCPIUK") and Citibank and one purported trade confirmation between R3 Capital Management ("R3"), a non-debtor in these chapter 11 cases, and Citibank. The Court should deny the Motion for three reasons. First, R3 is not a debtor in these chapter 11 cases and therefore the Debtors cannot assume the relevant trade confirmation. In addition, Citibank terminated the trade with R3 and accordingly there is nothing to assume. Second, the Motion improperly seeks to deny Citibank its right to set off pre-petition claims under the Bankruptcy Code and applicable law. Third, the Debtors have failed to provide Citibank with any assurance of their ability to close the trades in a timely manner.

## BACKGROUND

### I.    Procedural Background.

Commencing on September 15, 2008 (the "Petition Date"), LBHI and its affiliated debtors (including LCPI and LCPIUK) filed voluntary petitions under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

On November 14, 2008, the Debtors filed the Motion seeking authorization to assume and reject certain trade confirmations, including certain trade confirmations with Citibank.

### II.    Trade Confirmation Background.

In September 2008, Citibank International plc orally agreed to purchase certain debt from R3 pursuant to two trades. Following R3's failure to perform, Citibank terminated the trades on the basis that R3 failed to provide a confirmation reflecting the terms of the trade in accordance with standard procedure under the LMA Standard Terms. For one of those trades, (Prosieben Opco Tranche C3 EUR 3,000,000.00 @ 79.5%), the Debtors apparently had a back to back trade with R3 and have correctly listed that trade on their schedule of rejected trades as being between R3 and LCPI (i.e. recognizing that LCPI's trade was with R3 and not Citibank).

However, the Debtors now are attempting to assume the other trade that Citibank entered into with R3, which is not a Debtor. See Schedule A to the Motion (listing as assumed the trade confirmation between LCPIUK and Citibank, N.A. Master regarding the NTL Cable PLC debt) (the "Purported R3 Trade"). The Debtors can only assume or reject contracts to which they are a party and have provided no evidence that they are a party to the Purported R3 Trade. Any assignment from R3 to Lehman would have required Citibank's consent. Accordingly, the Debtors cannot assume or reject this trade confirmation.

Citibank is party to approximately nineteen other open trade confirmations with various Lehman entities, some of which the Debtors are seeking to assume and some of which the Debtors are seeking to reject.[1]

## OBJECTION

### I.    The Debtors Cannot Assume the Purported R3 Trade Confirmation.

The Debtors seek to assume the Purported R3 Trade, a Trade Confirmation which Citibank terminated on November 19, 2008 in accordance with the LMA Standard Terms and to which the Debtors are not and have never been a party. It is axiomatic that a debtor can only

---

[1] By the Motion, the Debtors are seeking to assume (i) LMA Trade Confirmations between Citibank International plc. and LCPIUK, dated June 2, 2008, June 4, 2008, June 17, 2008 and July 31, 2008, (ii) an LSTA Distressed Trade Confirmation between Citibank N.A. and LBHI, dated July 9, 2008, (iii) an LMA Trade Confirmation between LCPIUK and Citibank N.A., London, dated September 3, 2008, and (iv) an LSTA Trade Confirmation between LCPI and Citibank N.A., dated September 8, 2008, which the Debtors have scheduled to be assumed with modifications (together the "Trade Confirmations Pending Assumption").

The Debtors are seeking to reject (i) an LSTA Par/Near Par Trade Confirmation between Citibank, N.A. and LBHI, dated December 14, 2007, (ii) an LSTA Distressed Trade Confirmation between Citibank N.A. and LBHI, dated May 30, 2008, (iii) LMA Trade Confirmations Par between Citibank International plc and LCPIUK, dated July 15, 2008, August 7, 2008, August 19, 2008 and September 25, 2008 (iv) LSTA Distressed Trade Confirmations between Citibank Financial Products, Inc. and LCPI, dated July 17, 2008, July 21, 2008, July 29, 2008 and August 15, 2008, (v) an LSTA Par/Near Par Trade Confirmation between LCPI and FD CBNA Loan Funding LLC, dated September 3, 2008 (together, the "Trade Confirmations Pending Rejection"; and together with the Trade Confirmations Pending Assumption, the "Trade Confirmations").

assume or reject contracts to which it is a party. The only "evidence" that the Debtors have presented Citibank with respect to the Purported R3 Trade Confirmation is an unsigned draft trade confirmation between Citibank and LCPI. That is simply insufficient.

## II.    **The Motion Improperly Prohibits Setoff.**

Citibank meets each of the elements necessary for setoff; most importantly, Citibank's claims against the Debtors, and any obligations it owes to the Debtors under the assumed Trade Confirmations, were incurred pre-petition. Citibank is therefore clearly entitled to setoff.

The Debtors' legal argument that assumption of the Trade Confirmations renders Citibank's obligations to the Debtors post-petition contradicts applicable law and the plain terms of the Trade Confirmations. The Debtors' "policy" arguments against setoff are equally misplaced. Setoff is a well-recognized legal right under the Bankruptcy Code and applicable law. Courts consider setoff rights analogous to rights of secured creditors. The Debtors' attempt to eviscerate the doctrine of setoff on "policy" grounds should be denied.

The Debtors improperly seek a blanket prohibition on the rights of any party to set off of its pre-petition claims against any pre-petition obligations it owes to the Debtors under the assumed Trade Confirmations. The Debtors argue that assumption of the Trade Confirmations converts the counterparties' obligations to the Debtors from pre-petition to post-petition, thus destroying the required "mutuality" between the counterparties' claims against, and obligations to, the Debtors. The Debtors' argument is inconsistent with the better interpretation of the Bankruptcy Code. Recognizing this, the Debtors put forth a "policy argument" that invites the Court to ignore parties' (including Citibank's) statutory setoff right. As explained below, this argument is wholly without merit.

A.     *Citibank has setoff rights under the Bankruptcy Code and applicable law.*

Section 553(a)(1) of the Bankruptcy Code states that the Bankruptcy Code

does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case . . . against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

There are four conditions required for setoff under section 553 of the Bankruptcy Code.  First, the creditor must hold a pre-petition "claim" against the debtors.  Second, the creditor must owe a pre-petition "debt" to the debtor.  Third, the claim and the debt must be "mutual."  Finally, the claim and debt must each be valid and enforceable.  See, 5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 553.01 (15th Ed. Rev. 2008) (detailing four conditions to setoff; citing, e.g., Public Serv. Co. of N.H. v. N.H. Elec. Coop., Inc. (In re Public Serv. Co. of N.H.), 884 F.2d 11, 14 (1st Cir. 1989); Davidovic v. Welton (In re Davidovic), 901 F.2d 1533, 1537 (10th Cir. 1990)).

"The central tenet of the doctrine of setoff [and the only issue contested by the Debtors] has been the mutuality of obligations . . . .  Hence pre-petition obligations have been setoff against pre-petition obligations and post-petition obligations against post-petition obligations."  In re Genuity, Inc., 323 B.R. 79, 82 (Bankr. S.D.N.Y. 2005).

A claim is a "right to payment" whether or not "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, [or] unmatured . . . ."  11 U.S.C. § 101(5).  Similarly, the debtor's debt is "a liability on a claim."  11 U.S.C. § 101(12).  "'Debt' should be read as being coextensive with the term 'claim.'"  United States v. Gerth, 991 F.2d 1428, 1433 (8th Cir. 1993).

To determine mutuality between a debt and a claim, one must look at when the parties incurred the respective obligations.  A claim will be deemed pre-petition when it arises out of a relationship recognized in, for example, the law of contracts or torts.

> A claim exists only if before the filing of the bankruptcy petition, the relationship between the debtor and the creditor contained all of the elements necessary to give rise to a legal obligation – "a right to payment" – under the relevant non-bankruptcy law.

In re Chateaugay Corp., 53 F.3d 478, 497 (2d Cir. 1995).  Similarly, an obligation to the debtor "is considered to have arisen before the commencement of the case if the obligation was incurred before the petition date."  5 Lawrence P. King, COLLIER ON BANKRUPTCY ¶ 553.01 (15th Ed. Rev. 2008).

Citibank's obligations to purchase the underlying debt – although subject to negotiation of definitive documentation – arose when the parties entered into the Trade Confirmations – prepetition.  See, e.g. May 30 Trade LSTA Confirmation Standard Terms and Conditions for Distressed Trade Confirmations ("LSTA Standard Terms")[2] ¶ 1; June 4 Trade Confirmation LMA Standard Terms And Conditions For Par Trade Transactions ("LMA Standard Terms") ¶ 7.1.[3]  The Trade Date for each Trade Confirmation is prior to the Petition Date.  See Trade Confirmations p. 1.  Moreover, as even the Debtors acknowledge, any rejection damages with respect to the any rejected Trade Confirmations were incurred pre-petition.  Motion ¶ 28.  Accordingly, there is mutuality between Citibank's obligations to the Debtors and Citibank's claims against the Debtors.

---

[2] All references in this Objection to the LSTA Standard Terms refer to the Standard Terms attached to the May 30 Trade Confirmation (attached hereto as Exhibit A).  These LSTA Standard Terms apply to all LSTA Trade Confirmations.

[3] All references in this Objection to the LMA Standard Terms refer to the Standard Terms attached to the June 4 Trade Confirmation (attached hereto as Exhibit B).  These LMA Standard Terms apply to all LMA Trade Confirmations.

B.    *The Debtors' arguments rely on inapplicable law.*

The critical issue here is the Debtors' incorrect assertion that assumption of a pre-petition contract causes the obligations thereunder to become post-petition obligations, destroying mutuality.  Motion ¶ 30.

The Debtors rely heavily on Judge Beatty's decision in In re Genuity, 323 B.R. 79, 82 (Bankr. S.D.N.Y. 2005) that the "Debtors' post-petition assumption of their executory contracts transformed the pre-petition claims of the [counterparties] once not cured into new claims arising post-petition."  Id.  This statement (and Genuity generally) has little relevance in this case for several reasons.

First, Genuity stands for the uncontroverted proposition that cure costs must be paid in full.  In re Genuity, 323 B.R. 79, 84 (Bankr. S.D.N.Y. 2005) (in addressing a debtor's argument that cure obligations were pre-petition obligations, the Court noted the novel nature of this argument and held that the debtors' failure to cure post-assumption gave rise to a post-petition cure claim that must be paid in full).  Indeed, the language cited by the Debtors makes clear that the failure to cure was critical to the Court's decision.  Genuity clearly does not stand for the legal "theory" that the Debtors attribute to it — that assumption by itself converts pre-petition obligations into post-petition obligations.

Second, to the extent Judge Beatty correctly decided the Genuity case on its facts, the language cited by the Debtors, when applied here, would contravene Second Circuit law as detailed in In re Chateaugay Corp.  Under Chateaugay, a claim or obligation exists when it arises under non-bankruptcy law.  In re Chateaugay Corp., 53 F.3d at 497.  Here, as noted above, Citibank's claims and potential obligations all arise pre-petition.  There is no legal reason for assumption to convert these claims to post-petition claims.

Finally, the <u>Genuity</u> opinion, to the extent it sets aside applicable law, focuses on fairness to the creditors, stating that it would not be fair to the creditors to permit the debtors to pay post-petition obligations in fractional pre-petition dollars.  <u>See</u>, <u>In re Genuity</u>, 323 B.R. at 82 (detailing equitable analysis).   Just as the <u>Genuity</u> Court did not permit the debtors to use assumption to impair creditors' rights, neither should the Debtors in this case use assumption to eliminate Citibank's setoff rights under applicable law.

In contrast to <u>Genuity</u>, which is inapposite to the situation at hand, numerous courts outside of the Second Circuit have decided that assumed contracts arise pre-petition for purposes of setoff. In <u>Gerth</u>, for example, the United States Court of Appeals for the Eighth Circuit rejected the argument raised by the Debtors here.  The Court held that the Bankruptcy Code does not cause a pre-petition obligation "to become postpetition . . . [;] the obligations arise under the contract as the parties originally agreed."  <u>United States v. Gerth</u>, 991 F.2d at 1433.[4]

In <u>Gerth</u>, the parties entered into two contracts prior to the debtor's bankruptcy. The debtor moved to assume the contracts.  Subsequently, the government sought to set off the amounts owed under the contracts with amounts owed by the debtor to the government.  <u>Id.</u> 991 F.2d at 1429-30.  The debtor argued, as the Debtors do in this case, that when he assumed the contracts, the counter-party's obligations to pay became post-petition obligations.  <u>Id.</u> 991 F.2d at 1431.  The Court of Appeals for the Eighth Circuit held that the "mere assumption of an executory contract does not alter when the obligations under the contract arose."  <u>Id.</u> 991 F.2d at 1432.  Therefore, if the contract terms are such that the counter-party's

---

[4] This is the "majority" rule among the courts that have considered this issue.  <u>Id.</u> 991 F.2d at 1432.  The Debtors' argument reflects the minority rule, as embodied in <u>Walat Farms, Inc. v. United States (In re Walat Farms)</u>, 69 B.R. 529 (Bankr. E.D Mich. 1987).   In <u>Gerth</u>, the Court of Appeals for the Eighth Circuit considered the <u>Walat Farms</u> ruling, but determined it wrongly decided for, <u>inter</u>, <u>alia</u>, the reasons detailed herein.

> obligation to pay arose prepetition, then a holding by this court that simply assuming the contract causes the obligation to arise post-petition would have the effect of modifying those contract terms.  11 U.S.C. § 365 which governs assumption of executory contracts, contains nothing which would allow such modification.

Id.  The Court in Farmers Home Admin. v. Buckner (In re Buckner), 218 B.R. 137, 145-49 (B.A.P. 10th Cir. 1998) considered similar facts and held that obligations enforceable on the petition date were pre-petition obligations for purposes of mutuality in setoff.  Id. 218 B.R. at 148-49 ("The [lower court] Judgment was in error in holding that the United States' obligation [to the debtors] arose postpetition . . . .").  See also, e.g., In re Allen, 135 B.R. 856, 863-64 (Bankr. N.D. Iowa 1992) ("To find that assuming the contract changes the effective date obligations arise under the contract to a postpetition time essentially would allow the debtor to modify the contract . . . .  Nothing in § 365 states or even suggests that the assumption of a contract allows the debtor to escape or modify terms which do not work to its benefit.").

> C.    The Debtors misunderstand Bankruptcy policy and equity with respect to setoff.

The Debtors also argue that Bankruptcy policy and equity do not permit setoffs in this case.  Motion ¶ 35 ("Here setoff should not be permitted where it would allow parties with claims for rejection damages to receive, in effect, payment in full of such claims.").  The Debtors state that permitting setoff would improperly treat Citibank's pre-petition rejection damages claims like administrative expense claims.  Motion ¶ 33.  The Debtors' argument demonstrates a fundamental misunderstanding of the policy behind setoff.  Indeed, to the extent Citibank has setoff rights, the rejection damages claims should be paid in full and should be treated like secured claims.

"There is little to distinguish between a creditor's preferred status arising from a right of setoff and the preferred status arising from some other type of security."  5 Lawrence P.

King, COLLIER ON BANKRUPTCY ¶ 553.02 (15th Ed. Rev. 2008).  This policy is consistent with section 506(a) of the Bankruptcy Code which "recognizes the similarity and treats rights arising through setoff in the same manner as rights arising from a security agreement or other relevant security device.  **Indeed, a right of setoff has been described as 'security of the most perfect kind.**'"  Id. (quoting Elcona Homes Corp. v. Green Tree Acceptance, Inc., (In re Elcona Homes Corp.) 863 F.2d 483, 485 (7th Cir. 1988)) (emphasis added).  Secured creditors are entitled to predictability regarding their collateral.  The Debtors should not be able to just eviscerate a secured creditor's collateral.  In this case, Citibank is entitled to be treated like any other setoff creditor (and any other secured creditor) and should be permitted to set off its rejection damages against its obligations to the Debtors under the assumed Trade Confirmations.

The Debtors also rely on a statement in In re Bennett Funding Group, Inc., that the Bankruptcy Court "may 'invoke equity to bend the rules' if required, to avert injustice." Motion ¶ 32 (quoting In re Bennett Funding Group, Inc., 212 B.R. 206, 212 (B.A.P. 2d Cir. 1997)).  It bears noting that the Court in Bennett Funding did not "bend the rules."  In Bennett, the court found no improper activities even in the face of allegations by the debtors that the creditor's debt to the debtor had been created for the purpose of obtaining a setoff right against the debtor "given the alleged existence of a 'Ponzi' scheme," and held that "given the strong notion of equity in favor of setoff" the Bankruptcy Court had properly permitted setoff.  Id. 212 B.R. at 215 (emphasis added).  The Debtors' effort to invoke Bennett in support of an equitable argument against setoff is simply backwards.  In this case, the Debtors make no allegations of improper behavior.  Thus, even if the Court did consider equity, the Court has no justification for

"bending the rules" under the Bankruptcy Code and should preserve Citibank's setoff rights in light of the "strong notion of equity in favor of setoff."[5]

### III.    The Debtors Cannot Assume The Trade Confirmations Absent Adequate Assurance Of Future Performance.

In addition, Citibank is entitled to adequate assurance of future performance under the Trade Confirmations that the Debtors are seeking to assume. The conclusory _ipse_ _dixit_ assertion in the Motion that they can provide adequate assurance to all counterparties is simply insufficient.[6] The Debtors should be required to demonstrate that not only do they have the underlying debt to satisfy their obligations under the Trade Confirmations to sell this debt to Citibank, but that they are able to close the trades shortly after the Motion is approved (assuming it is approved).

Under section 365(b)(1) of the Bankruptcy Code, the Debtors can only assume a breached contract if they either cure the default or provide "adequate assurance" that they will cure the default, and provide "adequate assurance of future performance" under the contract. Congress included section 365(b)(1) of the Bankruptcy Code to "protect the rights of non-bankrupt parties to executory contracts and leases by insuring that the non-bankrupt parties will get the full value of their bargain." Aetna Cas. & Sur. Co. v. Gamel, 45 B.R. 345, 348 (N.D.N.Y. 1984) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 348 (1977); S. Rep. No. 989, 95th Cong. 2d Sess 59 (1978).

---

[5] The form of Order submitted with Motion contains a decretal paragraph that the Debtors are not required to pay any cure costs to any counterparty on an assumed trade. Generally with respect to the assumed trades that are sales by the Debtors, the payments are from the counterparty to the Debtor. However, if the agreement obligates the Debtors to pay an amount (such as delay damages), such obligation should remain and the order should not preclude payment by the Debtor.

[6] The Trade Confirmations require the parties to enter into definitive Transfer Documentation or Transaction Documentation (each, as defined in the Trade Confirmations). Citibank reserves all rights with respect to the negotiation and documentation of the definitive Transfer Documentation and Transaction Documentation to the extent such documentation has not already been agreed and signed.

The Bankruptcy Code does not define "adequate assurance." Bankruptcy Courts in this District have given the phrase a "pragmatic" and fact-based construction. In re Martin Paint Stores, 199 B.R. 258, 263 (Bankr. S.D.N.Y. 1996) (citing, e.g., In re Fifth Ave. Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983).

The burden of proof for adequate assurance falls on the party seeking to assume the contract. See, e.g., In re Grant, 201 B.R. 216, 220 (Bankr. N.D. Ill. 1996) ("The Debtors have the burden of proof in order to assume the unexpired leases . . . . It is also the Debtors' burden to show adequate assurance of future performance . . . [and] to compensate (or provide adequate assurance that compensation will be forthcoming) . . . for any actual loss resulting from the defaults.") (overturned on other grounds).

In this case, the Debtors breached their obligations under the Trade Confirmations by failing to take the steps necessary to settle the Trade Confirmations within the time prescribed by the documents.[7] Accordingly, there are defaults under the Trade Confirmations and Citibank is entitled to adequate assurance that the Debtors hold the subject loans in inventory and are ready to settle the trades in short order – on or before a date to be fixed by the Court.[8]

The Debtors have failed to even attempt to carry their burden of proof of demonstrating adequate assurance of future performance. In the Motion, the Debtors address only briefly their adequate assurance obligations, stating there is "no monetary default" under the Trade Confirmations and requesting that the Court enter an order finding "that there are no cure

---

[7] Even if the Court permits the assumption of the Trade Confirmations, Citibank reserves all of its rights with respect to the negotiation and documentation of the Transfer Documentation and Transaction Documentation, including, but not limited to, any argument that adequate assurance of future performance under the Trade Confirmations is not adequate assurance of future performance under the Transfer Documentation and Transaction Documentation.

[8] The Debtors have agreed that Delayed Settlement Compensation will be payable by the Debtors to Citibank with respect to any Trade Confirmations that are assumed, and that Citibank will be entitled to deduct such Delayed Settlement Compensation from the purchase price payable by Citibank.

amounts owed."  Motion at ¶ 16.  The Debtors have not shown that they are able to close the trades and, therefore, have completely failed to meet the statutory prerequisite for assumption. Accordingly, the Debtors should not be permitted to assume the Trade Confirmations absent such showing.

WHEREFORE, Citibank requests that the Court (i) deny the request to assume the Trade Confirmations, absent adequate assurance from the Debtors that they are able to and will close the trades in the immediate future and, if adequate protection is provided, to fix a date for the settlement of those trades, (ii) deny the request to assume the Purported R3 Trade Confirmation, and (iii) grant such other and further relief as may be just and proper.


Dated:  New York, New York
November 28, 2008

By: */s/ Deryck A. Palmer*_____
        Deryck A. Palmer, Esq.
        John J. Rapisardi, Esq.
        George A. Davis, Esq.
        Andrew Troop, Esq.
        CADWALADER, WICKERSHAM & TAFT LLP
        One World Financial Center
        New York, New York  10281
        Telephone: (212) 504-6000
        Facsimile:  (212) 504-6666
        deryck.palmer@cwt.com
        john.rapisardi@cwt.com
        george.davis@cwt.com
        Andrew.troop@cwt.com

        Attorneys for Citigroup Inc. and
        all of its affiliates, including Citibank, N.A. and
        Citibank International plc

# <u>EXHIBIT A</u>



### Standard Terms and Conditions for Distressed Trade Confirmations
**(Published by The Loan Syndications and Trading Association, Inc.® as of December 1, 2006)**

The following are the Standard Terms and Conditions for Distressed Trade Confirmations ("Standard Terms and Conditions") published by the Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006. Capitalized terms used and not defined in these Standard Terms and Conditions shall have the respective meanings ascribed thereto in the LSTA Distressed Trade Confirmation (the "Confirmation") which incorporates these Standard Terms and Conditions by reference. Annex I sets forth the capitalized terms defined in these Standard Terms and Conditions or in the Confirmation and the respective sections herein, if any, in which such capitalized terms are defined. All references to specific section numbers in Sections 11 and 12 below, "Flip Representations" and "Step-Up Provisions," respectively, relate to the December 2006 version of the LSTA Purchase and Sale Agreement for Distressed Trades and successor provisions thereto. As used herein, the term "Transaction" means the transaction(s) contemplated by the Confirmation.

1.  **Target Settlement/Settlement Date/Transfer of Debt:** The transfer of the Purchase Amount (as defined below) of the Debt (as defined below) specified in the Confirmation shall be effected as soon as practicable after the Trade Date. Any alternative agreement between Buyer and Seller as to a targeted date of settlement shall be specified in the Confirmation. The date payment of the Purchase Price (as defined below) occurs against such transfer is the "Settlement Date" hereunder.

    Unless an alternative election is made in the "Form of Purchase" section of the Confirmation, the form of purchase of the Purchase Amount of the Debt shall be an assignment.

    If Buyer and Seller are unable to effect settlement of the Transaction as specified in the Confirmation, a valid and binding obligation to settle the trade nevertheless continues to exist between Buyer and Seller. If a Transaction that is to be settled by assignment cannot be settled on such basis, such Transaction shall be settled as a participation; provided that if settlement by participation cannot be effected, the Transaction shall be settled on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade; provided, further, that if a special election of "Assignment Only" has been made, Buyer and Seller shall not settle the Transaction as a participation but shall instead settle on the basis of a mutually agreeable alternative structure or other arrangement that affords Buyer and Seller the economic equivalent of the agreed-upon trade.

2.  **Purchase Amount/Type of Debt:** The amount(s) and type(s) of debt specified in the "Purchase Amount/Type of Debt" section of the Confirmation shall be the "Purchase Amount" and "Debt," respectively, hereunder. Unless otherwise specified in the Confirmation, any Debt identified as (a) term loan indebtedness is fully funded Debt with no further funding obligations, (b) revolving credit or letter of credit facilities may be subject to further funding and the Purchase Amount includes both funded principal and unfunded commitments (including commitments to participate in letters of credit or loans), and (c) a claim amount is fully funded with no further funding obligations (but may be subject to adjustment). If a commitment is indicated, Buyer is assuming all unfunded commitments relating to the Purchase Amount of the Debt unless otherwise specified in the Confirmation. Unless otherwise specified in the Confirmation, Buyer is assuming the obligation to purchase (or to cause a designee to purchase) the Debt as such Debt may be reorganized, restructured, converted or otherwise modified.

3.  **Permanent Reductions:** The economic benefit of permanent commitment reductions and permanent repayments of principal (collectively, "Permanent Reductions") shall be allocated as provided in Section 4, "Purchase Price Calculation," below.

LSTA EFFECTIVE DECEMBER 2006        Copyright © LSTA 2006. All rights reserved.

4. **Purchase Price Calculation:** Except as otherwise set forth in the next succeeding paragraphs of this Section 4 with regard to a Multi-Currency Commitment or Proceeds (each as defined below), Buyer shall pay Seller a purchase price (the "Purchase Price") (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the Debt on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of such Purchase Amount as of the Settlement Date minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Settlement Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees (as defined below) received by Seller on or before the Settlement Date. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees (each as defined below) payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

With respect to a Multi-Currency Commitment, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Purchase Amount of the revolving or delayed draw commitment portion, as the case may be, of the Debt on the Settlement Date equal to (a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans as of the Settlement Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount as of the Settlement Date in the Master Currency (as defined below) minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date. For purposes of the calculation referred to in clause (b) above, the applicable foreign exchange rate shall be the spot rate effective on a Business Day (as defined below) that is no earlier than three (3) Business Days prior to the Settlement Date, as agreed upon by the parties. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below. Except for the foregoing specific computations, all other computations shall otherwise be made in the relevant currency in accordance with the calculations set forth in the immediately preceding paragraph of this Section 4.

With respect to Proceeds, Buyer shall pay Seller a Purchase Price (or, if such calculations produce a negative number, Seller shall pay Buyer a Purchase Price) for the Proceeds on the Settlement Date equal to (a) the Purchase Rate multiplied by the funded principal amount of the Debt on the date immediately prior to the Restructuring Date (as defined below) minus (b) (100% minus the Purchase Rate) multiplied by the unfunded commitments (if any), which shall include the face amount of any issued but undrawn letter of credit, assumed by Buyer as of the Restructuring Date minus (c) (100% minus the Purchase Rate) multiplied by any Permanent Reductions on or after the Trade Date through the Restructuring Date minus (d) any Non-Recurring Fees received by Seller on or before the Settlement Date minus (e) 100% multiplied by the amount of any cash Proceeds received by Seller from the Restructuring Date through and including the Settlement Date. Subject to the terms of Section 5, "Interest Payments and Fees" below, Buyer shall be entitled to receive all proceeds or other distributions received by Seller with respect to the Proceeds from and after the Restructuring Date, including, without limitation, pursuant to clause (e) above, a credit equal to 100% multiplied by the amount of any cash Proceeds and including a credit equal to 100% multiplied by any Permanent Reductions effected with respect to any Proceeds. If the Debt immediately prior to the Restructuring Date was a Multi-Currency Commitment, then clauses (a) and (b) of the immediately preceding sentence shall be replaced by the following clauses: "(a) 100% multiplied by the funded principal amount of such revolving or delayed draw loans immediately prior to the Restructuring Date in the applicable currency of the funded portion of the revolving or delayed draw loans minus (b) (100% minus the Purchase Rate) multiplied by the Purchase Amount immediately prior to the Restructuring Date in the Master Currency". Notwithstanding any other provision of this paragraph, if the Transaction settles on a "Settled Without Accrued Interest" basis, then any interest and Accruing

2

Fees paid with respect to any debt instrument included within the Proceeds shall be allocated between Buyer and Seller in accordance with the sixth paragraph of Section 5, "Interest Payments and Fees", below. The Purchase Price shall be further adjusted by delayed compensation (if any), payable in accordance with Section 6, "Compensation for Delayed Settlement," below, and Assignment Fees or Consent to Transfer Fees payable in accordance with Section 8, "Assignment Fees and Consent to Transfer Fees," below.

As used herein:

"Restructuring Date" means the effective date of any reorganization, restructuring or conversion with respect to the Debt.

"Multi-Currency Commitment" means a commitment that is, as of the Settlement Date, subject to one or more borrowings in one or more currencies other than the Master Currency.

"Master Currency" means the currency in which the Facility is principally denominated.

"Proceeds" means if, prior to the Settlement Date, the Debt has been reorganized, restructured, converted or otherwise modified, any proceeds or other distributions received by Seller with respect to the Debt pursuant to such reorganization, restructuring, conversion or other modification.

5.  **Interest Payments and Fees:**  Interest and accruing ordinary course fees (such as commitment, facility and letter of credit fees) payable in connection with the Debt in accordance with the Credit Agreement from and after the Trade Date are referred to herein as "Interest and Accruing Fees;" provided that Interest and Accruing Fees shall not include any paid-in-kind interest, fees or other amounts paid or payable in connection with the Debt in accordance with the Credit Documents or the Adequate Protection Order (such amounts, "PIK Interest"). Amendment, consent, waiver and other similar non-recurring fees that are payable in connection with the Debt from and after the Trade Date are referred to herein as "Non-Recurring Fees."

All Interest and Accruing Fees are calculated at the contractual rates as in effect at the relevant time(s) under the Credit Agreement.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all Non-Recurring Fees shall be for the account of Buyer.

Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, all PIK Interest shall be allocated on a "trades flat" basis as follows, regardless of how Interest and Accruing Fees and Adequate Protection Payments (as defined below) are allocated: (a) PIK Interest that is capitalized or accreted prior to the Trade Date shall be included in the principal portion of the Purchase Amount and shall be subject to the application of Section 4, "Purchase Price Calculation," above; (b) PIK Interest that is capitalized or accreted on or after the Trade Date shall be for the account of Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalized or accreted as of the Settlement Date shall be for the account of Buyer upon capitalization or accretion for no additional consideration.

If "Trades Flat" is specified in the Confirmation, subject to the application of clause (a) of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees and, if applicable, Adequate Protection Payments unpaid as of the Trade Date, whether accruing before, on or after the Trade Date, if and when paid on or after the Trade Date, shall be for the account of Buyer and, if paid to Seller after the Settlement Date, shall promptly be paid by Seller to Buyer.

If "Settled Without Accrued Interest" is specified in the Confirmation, subject to the application of Section 6, "Compensation for Delayed Settlement," below, all Interest and Accruing Fees accrued but unpaid before the Settlement Date shall be for the account of Seller. Buyer shall pay to Seller any

3

such Interest and Accruing Fees promptly upon any receipt thereof by Buyer, so long as such amounts are received by Buyer (a) on or before the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Agreement as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty (30) days from such due date), and (b) before a default by any obligor(s) in connection with any other payment obligations of the obligor(s) under the Credit Agreement. Otherwise, such Interest and Accruing Fees (if and when paid) and any other accrued amounts due from and after the Settlement Date shall be for the account of Buyer, and Seller shall not be entitled to any part thereof. The foregoing notwithstanding, if (i) Buyer and Seller agree that the treatment of Interest and Accruing Fees shall be on a "Settled Without Accrued Interest" basis and (ii) the obligor(s) is/are making Adequate Protection Payments in accordance with an Adequate Protection Order (as defined below), then any such Adequate Protection Payments shall, subject to Section 6, "Compensation for Delayed Settlement," below, be allocated on a "Settled Without Accrued Interest" basis as if such Adequate Protection Payments were Interest and Accruing Fees. The parties may elect to have terms contrary to those of the immediately preceding sentence control their Transaction by expressly specifying such contrary terms in the "Trade Specific Other Terms of Trade" section of the Confirmation.

If "Paid on Settlement Date" is specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, subject to the application of Section 6, "Compensation For Delayed Settlement," below, all Interest and Accruing Fees paid by the obligor(s) to but excluding the Settlement Date shall be for the account of Seller and an amount equal to the accrued but unpaid amount of Interest and Accruing Fees to but excluding the Settlement Date (the "Paid On Settlement Date Amount") shall be paid by Buyer to Seller on the Settlement Date. If the obligor(s) thereafter pay(s) the Paid on Settlement Date Amount to Buyer, Buyer shall be entitled to keep such amount. If, however, the Paid on Settlement Date Amount is paid to Seller by the obligor(s), Seller shall promptly pay such amount to Buyer. If the obligor(s) fail(s) to pay the Paid on Settlement Date Amount, Seller shall not be required to reimburse Buyer for such amount.

Partial payments of interest shall be applied in the inverse order of payment dates unless otherwise specified in the Credit Agreement.

Any party that has received funds to which the other party is entitled under this Section 5 shall pay over such funds to the other party (a) on the Settlement Date, if such funds were received on or prior to the Settlement Date, by way of a credit to the other party in the Purchase Price calculations, or (b) on or before the date that is two (2) Business Days (as defined below) after receipt, if such funds were received after the Settlement Date.

As used herein:

"Adequate Protection Order" means any order of the relevant bankruptcy court authorizing or ordering any obligor(s) to make adequate protection payments to the lenders.

"Adequate Protection Payments" means, with respect to the Debt, amounts (other than PIK Interest) authorized and/or ordered to be paid as adequate protection for the loans and obligations owed under the Credit Agreement under an Adequate Protection Order.

"Business Day" means any day that is not a Saturday, a Sunday or any other day on which the Federal Reserve Bank of New York is closed.[1] In addition, solely for purposes of determining the Commencement Date (as defined below), Business Day excludes any day on which the New York

---

[1] The Holiday Schedule for the Federal Reserve Bank of New York may be found at www.newyorkfed.org/aboutthefed/holiday_schedule.html.

Stock Exchange is closed.[2]  For purposes of determining the LIBO Rate (as defined below) Business Day means any day on which dealings in U.S. dollar deposits are conducted by and between banks in the London interbank market.

6. **Compensation for Delayed Settlement:**  If settlement occurs on a Delayed Settlement Date (as defined below), the parties shall pay "delayed compensation" for each day during the Delay Period (as defined below) as follows:

(a)    Buyer shall pay Seller (or if Seller is required to pay Buyer the Purchase Price, Seller shall pay Buyer) on the Delayed Settlement Date an amount equal to interest that would accrue for each day during the Delay Period at the Average LIBO Rate (as defined below) on an amount equal to the Purchase Price calculated as of the Commencement Date according to the applicable method described in Section 4, "Purchase Price Calculation," above (but without adjustment for delayed compensation payable hereunder or any Assignment Fees or Consent to Transfer Fees) substituting the phrase "Commencement Date" for the phrase "Settlement Date" appearing therein (and utilizing the loan and commitment amounts outstanding on the Commencement Date); provided that if the Purchase Price so calculated as of the Delayed Settlement Date has increased or decreased more than 25% from the Purchase Price so calculated as of the Commencement Date, then such payment shall be calculated based on the Purchase Price so calculated on each day during the Delay Period.

(b)    If the applicable trade settles on a "Settled Without Accrued Interest" basis, then Seller shall pay or credit to Buyer on the Delayed Settlement Date (free of any withholding, setoff, recoupment or deduction of any kind) any Interest and Accruing Fees and, if applicable, Adequate Protection Payments accrued (regardless of whether paid or otherwise credited to Seller) with respect to the Purchase Amount and allocable to the Delay Period.  If Borrower fails to pay on or prior to the scheduled due date thereof (taking into account any applicable grace period) in accordance with the Credit Agreement or the Adequate Protection Order, as applicable, any Interest and Accruing Fees or Adequate Protection Payments that were paid or credited to Buyer on the Delayed Settlement Date pursuant to this paragraph (b), then Buyer shall, upon demand by Seller, pay Seller an amount equal to the portion of such Interest and Accruing Fees or Adequate Protection Payments that were not paid to Seller, plus interest that would accrue for each day on such amounts at the Federal Funds Rate (as defined below).  If all or part of such Interest and Accruing Fees and, if applicable, Adequate Protection Payments is paid other than in cash, and the property received cannot be transferred to Buyer, the parties shall mutually agree as soon as practicable on the cash value thereof to be transferred by Seller to Buyer or, if the parties shall mutually agree, on the appropriate participation arrangements in respect thereof.

As used herein:

"Average LIBO Rate" means, for the Delay Period (i) the sum of all the individual LIBO Rates for each day in the Delay Period (ii) divided by the total number of days in the Delay Period.[3]

"Commencement Date" means the date twenty (20) Business Days after the Trade Date.

"Delayed Settlement Date" means the date following the Commencement Date on which settlement actually occurs.

---

[2]  The Holiday Schedule for the New York Stock Exchange may be found at www.nyse.com/Frameset.html?displayPage=/about/1022963613666.html.

[3]  When calculating the Average LIBO Rate, parties may find it helpful to visit www.averagelibor.com (the "Website"). The Website permits users to enter the start date and the end date for any period and obtain the Average LIBO Rate for such period.  The Website has agreed to offer all LSTA members a free trial period until December 31, 2007. Please see the relevant LSTA Market Advisory for more information about the Website.

"Delay Period" means the period from (and including) the Commencement Date to (but excluding) the Delayed Settlement Date.

"Federal Funds Rate" means, for any date, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates set by the Federal Reserve Bank of New York on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day in The Wall Street Journal (Eastern Edition), or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the parties from three federal funds brokers of recognized standing selected by the parties. For a day that is not a Business Day, the Federal Funds Rate shall be the rate applicable to federal funds transactions on the immediately preceding day for which such rate is reported.

"LIBO Rate" means, for any day, the 1-month London Interbank Offered Rate for deposits in the applicable currency as set by the British Bankers Association ("BBA") and published by the BBA at approximately 11:00 a.m. London time on such day. For any day that is not a Business Day, the LIBO Rate for such day shall be the rate published by the BBA on the immediately preceding Business Day.

7.  **Breakfunding:** No breakfunding compensation shall be paid for settlement of a Transaction on a day other than an interest payment date in respect of the Debt unless otherwise specified in the Confirmation.

8.  **Assignment Fees and Consent to Transfer Fees:** Unless otherwise specified in the Confirmation, (a) any recordation, processing or similar fee payable to the Agent or otherwise under the Credit Agreement in connection with an assignment ("Assignment Fees") shall be split equally between Buyer and Seller and shall be paid in such amount as is specified in the Credit Agreement and (b) any transfer fee payable to the grantor in connection with the transfer of a participation ("Consent to Transfer Fees") shall be paid by Seller in such amount as is specified in the applicable participation agreement (or, if not so specified, in a reasonable amount requested by the grantor).

9.  **Costs and Expenses:** Each of Buyer and Seller shall bear its respective costs and expenses in connection with the Transaction. Seller shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents (as defined below) and that are attributable to any period prior to but excluding the Settlement Date. Buyer shall be responsible for all costs, fees and expenses in respect of the Debt that are chargeable to lenders under the terms of the Credit Documents and that are attributable to any period from and after the Settlement Date.

10. **Transfer Documentation:** In the case of an assignment, the parties shall execute an assignment (or similar) agreement in the form stipulated in the Credit Agreement (if so stipulated) and, unless otherwise specified in the Confirmation, a supplemental purchase and sale agreement substantially similar to the current LSTA form of Purchase and Sale Agreement for Distressed Trades (taking into account related predecessor transfer documents ("Predecessor Transfer Documentation"), if any). In the case of a participation, the parties shall execute a reasonably acceptable participation agreement containing customary provisions for the purchase and sale of a participation in distressed loan assets. Any such referenced assignment agreement, supplemental purchase and sale agreement and/or participation agreement is hereinafter referred to as the "Transfer Documentation." Unless otherwise specified in the Confirmation, the Transfer Documentation shall be prepared, and any required consents obtained, by Seller. Seller shall use reasonable efforts to send Buyer the Confirmation no later than one (1) Business Day after the Trade Date. Buyer shall use reasonable efforts to send to Seller the executed Confirmation (or any requested changes thereto) no later than one (1) Business Day after Buyer's receipt of the Confirmation from Seller. Seller shall use reasonable efforts to furnish Buyer drafts of the applicable Transfer Documentation, together with any related Predecessor Transfer Documentation, subject to applicable confidentiality provisions contained in such documents, within six (6) Business Days after the Trade Date.

6

As specified in this paragraph, Buyer and Seller shall use reasonable efforts to comply with the following timeline:

| By: T + 1 → | By: T + 2 → | By: T + 6 → |
|---|---|---|
| Sender delivers Confirmation to Counterparty | Counterparty returns executed Confirmation (or requested changes thereto) to Sender | Sender delivers Predecessor Transfer Documentation and draft Transfer Documentation to Counterparty |

11. **Flip Representations:**  Flip representations are appropriate only if Seller is acting as a Riskless Principal (as defined below), and only if the settlement of the purchase of the Debt by Buyer from Seller occurs no later than one (1) Business Day after the settlement of the sale of the Debt to Seller by Seller's immediate prior seller(s) (the "Flip Representation Deadline").  In the event that flip representations are applicable, the Transfer Documentation shall contain representations with respect to title (Section 4.1(d)), outstanding principal amount and commitment (Section 4.1(f)), future funding obligations (Section 4.1(g)) and, if applicable, the proof of claim filing (Section 4.1(v)) that will be limited by assuming the truth and accuracy of the representations and warranties on such matters made to Seller by the immediate prior seller(s).  In addition, Seller shall give Buyer a reasonable opportunity to (a) review and comment on Seller's Predecessor Transfer Documentation prior to Seller's execution and delivery thereof and (b) close its purchase from Seller contemporaneously with Seller's upstream purchase.  However, if Seller is ready, willing and able to close its sale to Buyer within the Flip Representation Deadline, but is unable to do so because Buyer is unable or unwilling to close at such time, then the Flip Representation Deadline shall be deemed met and flip representations shall apply; provided that, if both Seller and Buyer are willing and able to close Seller's sale to Buyer within the Flip Representation Deadline but are unable to do so because the required consents for Buyer's purchase from Seller have not been obtained within the Flip Representation Deadline despite the exercise by each of Buyer and Seller of commercially reasonable efforts to obtain such consents, then flip representations shall not apply.

12. **Step-Up Provisions:**  Seller shall provide to Buyer customary step-up provisions with respect to those prior sellers, if any, that transferred the Debt on par documents on or after such date as is reasonably determined to be the date on which market convention for transferring the Debt shifted from par documentation to distressed documentation.  Such representations, indemnities and other provisions shall reference only such prior sellers that transferred the Debt on a par documentation basis at a time that market convention for transferring such Debt was to use distressed documentation.  If step-up provisions apply, the purchase and sale agreement or participation agreement with respect to the Purchase Amount of the Debt shall be modified to include a reference to all appropriate prior sellers in (a) the definition of "Retained Obligations" (Section 1.2), (b) the representations with respect to actual or threatened proceedings (Section 4.1(e)), funding obligation (Section 4.1(g)), acts and omissions (Section 4.1(h)), performance of obligations (Section 4.1(i)), no setoff (Section 4.1(j)), no consents or waivers (Section 4.1(t)) and no execution of other documents (Section 4.1(u)), (c) the disgorgement section of the indemnity provision (Section 6.1(b)) and (d) the distributions section (Section 8.2).

In consulting as to the appropriate date on which market convention shifted from a par documentation basis to a distressed documentation basis, the parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the date on which such market convention shifted or, if results have not been published with respect to the Debt, either party may request in writing that the LSTA endeavor to conduct such a poll.  To initiate a poll, send a request that includes the name of the Borrower and either the CUSIP number (if available) or the date

7

of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between Seller and Buyer and have no binding effect.

13. **ERISA Representation:** Unless otherwise specified in the Confirmation, the Transfer Documentation shall not contain the "Alternative ERISA Representation," as referenced in a footnote to Sections 4.1(q) and 5.1(j) of the current LSTA form of Purchase and Sale Agreement for Distressed Trades.

14. **Credit Documents; Confidentiality Agreement:** If (a) "Yes" is specified in the Confirmation with respect to Credit Documents, (b) Buyer is not a lender on the Trade Date and (c) Buyer has requested such documents on or prior to the Trade Date, then Seller shall furnish Buyer, or provide access to Buyer, as promptly as practicable following the Trade Date, a true and complete copy of the Credit Agreement (including exhibits and schedules thereto) and all intercreditor agreements, subordination agreements, waivers and amendments executed in connection therewith, in each case as currently in effect, and any other Credit Documents reasonably requested by Buyer. If required by the Credit Agreement and/or requested by Seller, prior to Buyer's receipt of any such Credit Documents, Buyer shall execute and deliver to Seller a confidentiality agreement in the form stipulated in the Credit Agreement or, in the absence of same, a mutually acceptable confidentiality agreement containing customary terms.

The effectiveness of the trade is not subject to receipt by Buyer of Credit Documents prior to the Trade Date. Seller may provide to Buyer the requested Credit Documents at any time on or prior to the execution and delivery of the Transfer Documentation.

"Credit Documents" means the Credit Agreement and all guarantees, security agreements, mortgages, deeds of trust, letters of credit, reimbursement agreements, waivers, amendments, modifications, supplements, forbearances, intercreditor agreements, subordination agreements and all other agreements, documents or instruments executed and delivered in connection therewith.

15. **Participations:** Unless otherwise specified in the "Trade Specific Other Terms of Trade" section of the Confirmation, if the Transaction is settled as a participation: (a) Seller shall grant voting rights to Buyer on and after the Settlement Date pursuant to the terms of the applicable participation agreement (subject to the terms of the Credit Agreement); and (b) Seller shall not require Buyer to post with Seller cash collateral for any unfunded portion of a revolving loan/commitment in which Buyer participates.

In connection with voting rights granted to Buyer from Seller, it is understood by Buyer that Seller shall vote in accordance with the majority lenders (including, as the case may be, Seller).

16. **Syndicate Confidential Information:** Unless otherwise specified in the Confirmation, Buyer represents to Seller that (a) Buyer is sophisticated, understands the nature and importance of Syndicate Confidential Information (as defined in the Confidential Information Supplement to the LSTA Code of Conduct, as amended, supplemented or otherwise modified from time to time) and the manner in which such information can be obtained and has requested such information from Seller in connection with the Transaction, if it so desired such information and (b) where it has not requested Syndicate Confidential Information in connection with the Transaction, it has otherwise obtained such information as it has deemed appropriate under the circumstances to make an informed decision regarding the Transaction without reliance on Seller. If Buyer has requested Seller to provide Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, unless otherwise agreed, Seller represents to Buyer that Seller has used reasonable efforts to maintain Syndicate Confidential Information and that it has disclosed to Buyer all material Syndicate Confidential Information retained by it as of the Trade Date. Unless otherwise specified, Buyer acknowledges to Seller that (i) such Syndicate Confidential Information has been disclosed to it, (ii) the Syndicate Confidential Information so disclosed may not be complete because Seller may not have retained all such information and (iii) Buyer has taken all steps it deems necessary under the circumstances to assure that it has the information it deems appropriate to make an informed decision regarding the Transaction. Subject to the foregoing, if Buyer has requested Seller to provide

Syndicate Confidential Information, and Seller has agreed to provide such information to Buyer, Seller shall use commercially reasonable efforts to provide to Buyer (if Buyer is not already a lender as of the Trade Date) notice with respect to all amendments and waivers of the Credit Documents arising between the Trade Date and the Settlement Date (but Seller need not solicit a vote from Buyer with respect to any such amendment or waiver). Buyer agrees to keep all Syndicate Confidential Information disclosed to it confidential in accordance with the terms of the confidentiality provisions of the Credit Agreement. Buyer acknowledges that Syndicate Confidential Information may include material non-public information concerning any obligors(s), or the securities of the obligor(s), that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with applicable law, including federal and state securities laws.

17. **Standstill:** With respect to the Purchase Amount of the Debt, until the Settlement Date or Delayed Settlement Date, as the case may be, Seller shall cease any discussions with other purchasers and shall decline all offers.

18. **Principal/Agency Status:** Each of Buyer and Seller shall indicate in the Confirmation whether it is acting as a principal or an agent in the Transaction. If applicable, each of Buyer and Seller shall identify in the Confirmation (or in separate Confirmations) the specific funds that are counterparties and the appropriate allocations in respect thereof. A Buyer or Seller that holds itself out in the Confirmation as a principal is directly liable for the completion of the Transaction. A principal may, however, specify in the Confirmation that it is acting as a riskless principal if it has on or prior to the Trade Date agreed with the other party that its obligation to complete the Transaction is subject to successful completion of the purchase from or sale to a third party of the Debt specified in the Confirmation ("Riskless Principal").

A Buyer or Seller that holds itself out to a counterparty in the Confirmation as an agent acts on behalf of one or more principals to the Transaction. A Buyer or Seller that holds itself out as an agent in the Confirmation and discloses the identity of such principal(s) in the Confirmation: (a) is not liable to such counterparty for the successful completion of the Transaction (unless the parties otherwise agree), and (b) except as expressly provided herein, shall have no liability or obligation to such counterparty in connection with the Transaction. A Buyer or Seller that holds itself out as an agent and does not disclose the identity of such principal(s) in the Confirmation will be liable to the counterparty as agent for an undisclosed principal to the extent provided under applicable New York law. A Buyer or Seller that indicates in the Confirmation its status as an agent represents to the counterparty that it is authorized to bind its principal(s) to the terms of the Transaction.

19. **Bankruptcy Proceedings:** In the case of a bankruptcy proceeding involving any of the obligor(s) under the Credit Agreement, (a) Seller shall use commercially reasonable efforts to provide to Buyer within six (6) Business Days after the Trade Date copies of any Proof(s) of Claim that have been filed in such bankruptcy proceeding relating to the Debt specified in the Confirmation (if such Proof(s) of Claim were filed individually by Seller or any immediate prior sellers (and was not filed by the Agent under the Credit Agreement on behalf of the lenders generally) and (b) Buyer shall be responsible for the preparation and filing of any necessary Bankruptcy Rule 3001(e) Notices of Transfer relating to such Proof(s) of Claim.

20. **Nonreliance:** Each of Buyer and Seller represents and warrants to the other that (a) it is a sophisticated buyer or seller (as the case may be) with respect to the Transaction, (b) it has, or has access to, such information as it deems appropriate under the circumstances concerning, among other things, the obligor(s)'s business and financial condition to make an informed decision regarding the transfer of the Debt, and (c) it has independently and without reliance on the other party, and based on such information as it has deemed appropriate, made its own analysis and decision to enter into the Transaction, except that Buyer and Seller have each relied upon the express representations, warranties, covenants, agreements and indemnities made by the other in the Confirmation. Each of Buyer and Seller acknowledges that the other has not given it any investment advice or opinion on whether the Transaction is prudent. Except as otherwise provided in the Confirmation and these

9

Standard Terms and Conditions (including with respect to Syndicate Confidential Information), Buyer has not relied, and will not rely, on Seller to furnish or make available any documents or other information regarding the credit, affairs, financial condition, or business of the obligor(s), or any other matter concerning the obligor(s). Each of Buyer and Seller acknowledges that (i) the other party currently may have, and later may come into possession of, information regarding the Debt or the obligor(s) that is not known to it and that may be material to a decision to enter into the Transaction ("Excluded Information"), (ii) it has determined to enter into the Transaction notwithstanding its lack of knowledge of the Excluded Information, and (iii) the other party shall have no liability to it, and it hereby to the extent permitted by law waives and releases any claims it may have against the other party, with respect to the nondisclosure of the Excluded Information; provided that the Excluded Information shall not and does not affect the truth or accuracy of the representations or warranties of such party in the Confirmation or these Standard Terms and Conditions.

21. **Confidentiality of Terms of Transaction:** Both parties shall maintain the confidentiality of the terms of the Transaction unless otherwise required by law or regulatory authority, or other legal process, except that the parties may disclose the terms of the Transaction to their respective affiliates, attorneys, accountants, and other professionals and in connection with the enforcement of the parties' respective rights and obligations hereunder. Buyer shall be permitted to make any necessary disclosures to prospective purchasers from Buyer regarding the terms of the Transaction (other than the Purchase Rate or Purchase Price), provided that such purchasers shall be subject to substantially the same confidentiality restrictions.

22. **Binding Effect:** By execution of a Confirmation incorporating by reference the Standard Terms and Conditions, each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank loans, or any interest therein, on "distressed terms" upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed. Each of Buyer and Seller further agrees that any such transaction shall be governed by and construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions that would require the application of the laws of any other jurisdiction. Neither party will assert as a defense to liability under such agreement the lack of a writing signed by it that would otherwise be required to satisfy any statute of frauds, including §1-206 of the New York Uniform Commercial Code, or any comparable statute (collectively, the "Statute of Frauds"). Nothing herein shall be deemed a waiver of any claim or defense other than the Statute of Frauds that either party may have regarding such agreement.

Each of Buyer and Seller shall record on the trade date of each transaction between the parties and retain in its files a written or electronically recorded trade ticket or similar internal record containing or reflecting evidence of agreement to such transaction, including (a) the date of the agreement, (b) a description of the type of debt including obligor(s) and purchase amount, (c) the identity of the other party to the transaction, and (d) the purchase price or purchase rate.

23. **Governing Law; Confirmation Controls:** The Confirmation and the Standard Terms and Conditions shall be governed by and construed in accordance with the laws of the State of New York (without regard to any conflicts of law provision that would require the application of the laws of any other jurisdiction). In case of any conflict between the terms of the Confirmation and these Standard Terms and Conditions, the Confirmation shall govern and control.

24. **Execution by Electronic Transmission:** It is understood by the parties that the custom in the loan trading market is to execute and deliver any confirmations, confidentiality agreements, Transfer Documentation and other transaction documents by telecopy, telefax, e-mail attachment or other means of electronic transmission. The parties agree that all telecopied, telefaxed, e-mailed or electronically transmitted confirmations, confidentiality agreements, Transfer Documentation and

other transaction documents, including the Confirmation, and signatures thereto, shall be duplicate originals.

25. **Electronic Records and Signatures:** It is agreed by the parties that, notwithstanding the use herein or in the Confirmation of the words "writing," "execution," "signed," "signature," or other words of similar import, the parties intend that the use of electronic signatures and the keeping of records in electronic form be granted the same legal effect, validity or enforceability as a signature affixed by hand or the use of a paper-based record keeping system (as the case may be) to the extent and as provided for in any applicable law including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.[4]

---

[4] To help ensure effectiveness of this provision, parties should manually or electronically sign the initial confirmation between them and retain a hard copy in their records.

# EXHIBIT B

> For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.[1]

## LOAN MARKET ASSOCIATION ("LMA")

## STANDARD TERMS AND CONDITIONS FOR PAR TRADE TRANSACTIONS

1.  **APPLICABILITY AND INTERPRETATION**

1.1 **Applicability**

These Conditions apply to a par trade transaction in respect of which:

(a)   they are expressly incorporated; and

(b)   the Trade Date occurs on or after 3 September 2008 and before the date on which they are superseded by revised conditions.

1.2 **Interpretation**

For the purpose of construing these Conditions in relation to a par trade transaction to which they apply (the "**transaction**"):

"**Agreed Terms**" means the terms agreed between the Buyer and the Seller in relation to the transaction, as evidenced by the Confirmation;

"**Average LIBOR**" means, for the Delayed Settlement Period, the result of dividing (a) the sum of all the individual LIBORs for each day during the Delayed Settlement Period by (b) the total number of days in the Delayed Settlement Period;

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in each financial centre appropriate for the transaction;

"**Confirmation**" means the confirmation executed and delivered by the Seller and the Buyer in relation to the transaction;

"**Credit Agreement**" means the credit agreement to which the transaction relates;

"**Credit Documentation**" means the Credit Agreement (including all schedules and appendices to the Credit Agreement), any amendments to the Credit Agreement and all guarantee and security documentation relating to the Credit Agreement;

"**Delayed Settlement Compensation**" means, for any day an amount equal to:-

(a)   the cash pay element of the Contractual Margin and Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the funded principal amount of the Purchased Assets) multiplied by the funded principal amount of the Purchased Assets

---

[1] Please delete this box before sending out document.

(excluding the amount of any PIK Interest that has capitalised on or after the Trade Date in respect of the Purchased Assets) for each such day; and

(b)     the Recurring Fees for each such day (to the extent payable by each Obligor under the Credit Agreement in respect of all or any part of the unfunded portion of the Purchased Assets) multiplied by the unfunded portion of the Purchased Assets for each such day.

"**Delayed Settlement Costs of Carry**" means, for any day an amount equal to the amount payable for the Purchased Assets (calculated in accordance with Condition 10.1 (*Settlement Amount Calculation*) but without being adjusted to take account of Delayed Settlement Compensation, Delayed Settlement Costs of Carry and any applicable recordation, processing, transfer or similar fee) multiplied by Average LIBOR for each such day minus the amount of interest actually received by the Seller (and not capitalised or deferred) in respect of the Purchased Assets for each such day.

"**Delayed Settlement Period**" means the period from (and including) the later of (i) the date falling 10 Business Days after the Trade Date and (ii) the Settlement Date[2] to (but excluding) the day on which settlement of the transaction actually occurs.

"**LIBOR**" means, for any day, the British Bankers' Association Interest Settlement Rate for the offering of deposits in the relevant currency for a period of one month displayed on the appropriate page of the Reuters screen as of 11.00 a.m. (London time) on such day. If the appropriate page is replaced or service ceases to be available, the Seller, acting reasonably, may specify another page or service displaying the appropriate rate.

"**Obligor**" means any Borrower or Guarantor and any other obligor under the Credit Documentation;

"**PIK Interest**" means any interest, fees or other amounts payable by an Obligor under the Credit Agreement which are either:-

(a)     automatically deferred or capitalised; or

(b)     deferred or capitalised at the option of any Obligor.

"**Purchased Assets**" means (except as provided in Condition 11.4 (*Settled without accrued interest (Pro Rata)*)) the loans, other utilisations and other rights of the Seller included in the Traded Portion, together with and subject to the obligations and liabilities of the Seller attributable to the Traded Portion (together with corresponding rights and benefits under any guarantee or security relating to the Traded Portion);

"**Relevant Participation**" means, in the case of a risk participation, the commitment included in the Traded Portion including any drawn portion of that commitment;

---

[2] This ensures that if a Settlement Date of less than 10 business days has been selected, Delayed Settlement Compensation/Costs of Carry will nevertheless only be payable after T + 10.

"**Transaction Documentation**" means the documentation required to implement the transaction (including the agreed Form of Purchase) and "**Transaction Document**" shall be construed accordingly.

1.3 **Construction**

(a) Unless a contrary indication appears, capitalised terms used in these Conditions have the meaning given to them in the Confirmation.

(b) If the parties agree to enter into a par trade transaction using an electronic medium (for example an internet website) then the terms applicable to that electronic medium shall prevail to the extent they are binding on the parties and are inconsistent with these Conditions.

(c) A par trade transaction means a transaction for the sale or participation of a loan or other form of credit, or participation in a credit facility, which the parties to a transaction, by applying these Conditions, designate as a par loan or other form of credit.

(d) Headings are for ease of reference only.

1.4 **Agreed Terms prevail**
In the case of any inconsistency between the Agreed Terms and these Conditions, the Agreed Terms shall prevail.

2. **CONTRACT POINT**

A binding contract for the sale or participation by the Seller to the Buyer of the Purchased Assets (and/or, in the case of a risk participation, the Relevant Participation) shall come into effect between the Seller and the Buyer upon oral or, as the case may be, written agreement of the terms on the Trade Date and shall be documented and completed in accordance with Conditions 6 (*Transaction Documentation*) and 7 (*Settlement Date and Payment*).

3. **CONFIRMATION**

(a) The Seller shall send to the Buyer not later than the first Business Day after the Trade Date, a duly completed form of confirmation, signed on behalf of the Seller and in the form most recently published by the LMA.

(b) The Buyer shall sign that confirmation and return it to the Seller not later than the second Business Day after the Trade Date.

(c) The Buyer shall immediately after receipt of that confirmation and, in any event, not later than the close of business on the second Business Day after the Trade Date, raise with the Seller any disagreement with any of the terms of that confirmation.

4.    **CONDITIONALITY**

4.1    **Conditionality**

(a)    A transaction is subject to any conditions specified in the Agreed Terms.

(b)    Subject to paragraph (c) below, each of the Seller and the Buyer agrees to use all reasonable endeavours to ensure that the conditions referred to in paragraph (a) above are duly fulfilled on or before the Settlement Date.

(c)    The Seller shall use all reasonable endeavours to obtain any third party consents required in connection with the transaction.

4.2    **Conditions unfulfilled**

(a)    If any condition referred to in paragraph (a) of Condition 4.1 (*Conditionality*) remains unfulfilled on the proposed Settlement Date then:

(i)    the Settlement Date shall be postponed for such period or periods as the Seller and the Buyer agree ( the "**Postponement Period**"); and

(ii)    during the Postponement Period, the Seller and the Buyer shall (A) use all reasonable endeavours to ensure fulfilment of each condition which remains unfulfilled and (B) consider in good faith whether or not there is an alternative means, acceptable to both parties, of implementing the transaction.

(b)    If:

(i)    within 5 Business Days of the proposed Settlement Date no Postponement Period is agreed; or

(ii)    a Postponement Period is agreed within the time specified in paragraph (i) above but one or more condition specified in paragraph (a) of Condition 4.1(*Conditionality*) remains unfulfilled on the last day of the Postponement Period and no alternative means of settling the transaction has been agreed on or before the last day of the Postponement Period,

then the transaction shall be cancelled and neither party shall have any further liability to the other except that if any amounts have already been paid under the transaction by either party to the other those amounts shall promptly be returned.

(c)    Neither party is obliged to take any steps under this Condition 4.2, if in the opinion of that party to do so might be prejudicial to it.

(d)    Notwithstanding any other provision of this Condition 4.2, if the parties have specified in the Agreed Terms an alternative means of implementing the transaction they shall use all reasonable efforts (subject to the terms of the Credit Documentation and otherwise on such of the Agreed Terms as are applicable) to settle the transaction in that way within 10 Business Days of the original Settlement Date.

5.    **DUE DILIGENCE**

5.1    **Credit appraisal by Buyer**

The Buyer agrees that it has satisfied itself as to the creditworthiness of each Obligor and the acceptability of the transaction prior to the Trade Date and the transaction shall not be conditional upon this.

5.2    **Confidentiality**

If the Agreed Terms specify that the Credit Documentation shall be delivered to the Buyer then:

(a)    the Buyer shall sign and deliver to the Seller at its request a confidentiality agreement in the form prescribed by the Credit Documentation or, if none is so prescribed, in the then current form prescribed by the LMA; and

(b)    subject to receipt of the confidentiality agreement where requested and to all necessary consents (if any) having been obtained, the Seller shall provide to the Buyer a true and complete copy of the Credit Documentation as promptly as practicable following the Trade Date.

5.3    **Legal review**

If the Agreed Terms specify that the transaction shall be subject to a satisfactory legal review of the sufficiency of the Credit Documentation, then the Buyer shall review the Credit Documentation as soon as reasonably practicable and promptly notify the Seller if the results of that review are not satisfactory.  Any such review shall be limited to a legal review of the sufficiency of the Credit Documentation.

5.4    **Events of default**

The occurrence before the Settlement Date of an event of default or potential event of default under the Credit Documentation, or an event which affects (either adversely or beneficially) the ability of an Obligor to perform its obligations under the Credit Documentation, shall not relieve either party of its obligations in relation to the transaction.

5.5    **Seller not lender of record**

If the Seller is not a lender of record and the Agreed Terms specify that the transaction shall be conditional upon a satisfactory review by the Buyer of the arrangements pursuant to which the interest of the Seller in the Traded Portion derives from a lender of record then:

(a)    subject to obtaining all necessary consents, the Seller shall make full disclosure of those arrangements to the Buyer (other than any such arrangements which relate to pricing and are not required to establish the Seller's interest in the Traded Portion); and

(b)    the Buyer shall promptly notify the Seller if the results of that review are not satisfactory.

6.  **TRANSACTION DOCUMENTATION**

    (a)    The party specified in the Agreed Terms shall prepare the Transaction Documentation on the agreed basis and, subject to any relevant condition specified in the Agreed Terms, endeavour to deliver it to the other party within three Business Days after the Trade Date.

    (b)    The parties shall endeavour to sign the Transaction Documentation and, where appropriate, provide copies to the agent bank under the Credit Agreement, within five Business Days after the Trade Date.

    (c)    The time limits in this Condition 6 shall be subject to Condition 20 (*When Issued Trades*).

7.  **SETTLEMENT DATE AND PAYMENT**

7.1  **Settlement date**

The transaction shall be settled on the Settlement Date by the taking of all necessary action to complete the transaction. Subject to Condition 20 in relation to "when issued trades", the Settlement Date shall be the date falling ten Business Days after the Trade Date.

7.2  **Delayed settlement**

    (a)    If for any reason the transaction settles after the Settlement Date then, subject to paragraph (b) below, for the purpose of allocating interest and fees (including PIK Interest) under these Conditions and for the purposes of the Seller's representations in paragraphs (a) and (b) of Condition 18.2, the Settlement Date shall be the date of actual settlement of the transaction.

    (b)    If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, then if the transaction settles after the Settlement Date, for each day during the Delayed Settlement Period:-

        (i)    the Seller shall pay to the Buyer, Delayed Settlement Compensation for each such day; and

        (ii)    if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the Delayed Settlement Period, the Buyer shall pay to the Seller the Seller's Delayed Settlement Costs of Carry for each such day unless the Delayed Settlement Costs of Carry in respect of the Delayed Settlement Period result in a negative amount in which case the Seller shall pay to the Buyer the absolute value of that amount.

7.3  **Necessary action**

The action necessary to complete a transaction shall include the payment for the Purchased Assets on the Settlement Date, unless the transaction is to take effect only as a risk participation.

7.4 **Funded participations**

Where the transaction is to take effect as a funded participation, any payment in respect of the principal amount of the Purchased Assets shall be by way of limited recourse loan by the Buyer to the Seller on the terms of the applicable Transaction Documentation.

8. **PURCHASE AMOUNT**

Unless the Agreed Terms and/or the Credit Documentation otherwise provide, the amount of the Purchased Assets and/or Relevant Participation to be sold or participated by the Seller to the Buyer shall be allocated *pro rata* to the facilities provided under the Credit Agreement and, within each facility, *pro rata* to the tranches thereof, if more than one.

9. **PERMANENT REDUCTION**

(a) The economic benefit of permanent commitment reductions and permanent repayments of principal applicable to the Purchased Assets under the Credit Documentation (collectively the **"Permanent Reductions"**) shall be treated in accordance with Condition 10 (*Settlement Amount Calculation*). In the case of a risk participation, any permanent commitment reductions relating to the Traded Portion after the Trade Date shall reduce the Relevant Participation accordingly.

(b) Permanent repayments of principal which occur in respect of the Purchased Assets (or otherwise) after the Trade Date and on or before the Settlement Date are for the account of the Seller. If on or after the Settlement Date any such repayments of principal in respect of the Purchased Assets are paid to the Buyer, the Buyer shall promptly after receipt pay a corresponding amount to the Seller.

10. **SETTLEMENT AMOUNT CALCULATION**

10.1 **Settlement amount calculation**

The amount payable for the Purchased Assets shall be equal to the Purchase Rate (as specified in the Agreed Terms) multiplied by the funded principal amount of the Purchased Assets as of the Settlement Date less:

(a) (100% minus the Purchase Rate) multiplied by the unfunded portion of the Purchased Assets as of the Settlement Date; and

(b) (100% minus the Purchase Rate) multiplied by any Permanent Reductions (as defined in Condition 9 (*Permanent Reductions*)) which occur in respect of the Purchased Assets after the Trade Date and on or before the Settlement Date,

adjusted to take account of any Delayed Settlement Compensation and Delayed Settlement Costs of Carry payable in accordance with paragraph (b) of Condition 7.2 (*Delayed Settlement*) and any applicable recordation, processing, transfer or similar fee which under the Agreed Terms is to be payable by either party.

10.2   **Payments**

If the amount is positive it shall be payable by the Buyer to the Seller; if negative the absolute value of the amount shall be payable by the Seller to the Buyer.

10.3   **Currencies**

Where any amounts are to settle in more than one currency on any day the appropriate calculation and payment shall be made in respect of each relevant currency in accordance with this Condition 10.

11.   **INTEREST PAYMENTS AND FEES**

11.1   **Interest rates**

All interest and fees referred to in this Condition 11 which are expressed to accrue by reference to time elapsed are based on the rates contained in the Credit Agreement.

11.2   **Settled without accrued interest**

(a)   Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if "**Settled Without Accrued Interest**" is specified in the Agreed Terms then, subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, upon receipt by the Buyer of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date), the Buyer shall promptly pay to the Seller an amount equal to the amount of such interest or fees.

(b)   If the Buyer pays any amount to the Seller in accordance with paragraph (a) above and either:

(i)   the Buyer does not receive all or part of such amount under the Credit Documentation; or

(ii)   after the Buyer has made that payment to the Seller, the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement requiring the Buyer to repay the whole or any part of any amounts paid by or through such agent to which that payment was attributable,

then the Seller shall promptly, after demand by the Buyer, repay to the Buyer the whole or a proportionate part of such payment.

11.3   **Paid on settlement date**

(a)   Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if "**Paid on Settlement Date**" is specified in the Agreed Terms then subject to paragraph (b) of Condition 7.2 (*Delayed Settlement*) if applicable, the Buyer shall pay to the Seller on the Settlement Date an amount equal to the amount of any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than (i) PIK Interest and (ii) the fees

referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date).

(b)    Other than where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies, if, on or after the Settlement Date, any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets are paid to the Seller, the Seller shall promptly after receipt pay a corresponding amount to the Buyer.

(c)    The Buyer shall have no right of recourse to the Seller in relation to any amounts paid to the Seller in accordance with paragraph (a) above including, without limitation, in circumstances where the Buyer does not receive all or part of any interest or fees on their due date or the agent under the Credit Agreement invokes any right of clawback under the Credit Agreement.

### 11.4   Settled without accrued interest (Pro Rata)

If under the terms of the Credit Documentation in relation to a transaction the Seller is to retain the right to receive its portion of any interest or fees, accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than the fees referred to in paragraph (b) of Condition 11.9 (*Allocation of interest and fees*) which are payable after the Trade Date) then, notwithstanding Conditions 11.2 (*Settled without accrued interest*) and 11.3 (*Paid on settlement date*): (a) the Seller shall be so entitled pursuant to these Conditions; and (b) the Seller shall have no recourse whatsoever to the Buyer if such interest or fees are not received by it.

### 11.5   Discounted from next roll-over date

If "**Discounted from next roll-over date**" and "**Paid on Settlement Date**" are each specified in the Agreed Terms then any interest or fees accrued up to but excluding the Settlement Date in respect of the Purchased Assets (other than PIK Interest) but which are not payable until the next roll-over date applicable under the Credit Agreement shall be discounted from such roll-over date back to the Settlement Date at IBOR (as such rate is calculated in accordance with Condition 12 (*Breakfunding*)) on a simple interest basis.

### 11.6   N/A

If "N/A" is specified in the Agreed Terms then, subject to Condition 11.10 (*PIK Interest*), the Buyer shall not be obliged to make any payment to the Seller in respect of accrued interest or accrued fees, either on the Settlement Date or on receipt of any such interest or fees.

### 11.7   Partial payments of interest

Partial payments of interest shall be applied to payment dates pro rata to the amounts due on such payment dates (unless otherwise specified in the Credit Agreement).

### 11.8   Upfront fee

Any Upfront Fee shall be paid on the Settlement Date in the amount and by the party specified in the Agreed Terms.

11.9 **Allocation of interest and fees**

Unless these Conditions otherwise provide (and save where the transaction is to take effect as a risk participation only) or where Condition 11.4 (*Settled without accrued interest (Pro Rata)*) applies:

(a)     any interest or fees (other than PIK Interest) which are payable under the Credit Agreement in respect of the Purchased Assets and which are expressed to accrue by reference to the lapse of time shall, to the extent they accrue in respect of the period before (and not including) the Settlement Date, be for the account of the Seller and, to the extent they accrue in respect of the period after (and including) the Settlement Date, be for the account of the Buyer; and

(b)     all other fees shall, to the extent attributable to the Purchased Assets and payable after the Trade Date, be for the account of the Buyer.

11.10 **Payments clear of deduction or withholding**

All payments made under this Condition 11 shall be made free and clear of any deduction or withholding save for such deduction or withholding as may be required to be made from such payments by any law, regulation or practice. If any such deduction or withholding is made or is required to be made, the payer shall increase the amount to be paid to the payee to ensure that the payee receives and retains a sum equal to the sum which it would have received and retained had no such deduction or withholding been made or required to be made.

11.11 **PIK Interest**

(a)     PIK Interest that is deferred or capitalised before the Trade Date in respect of the Purchased Assets shall be for the account of the Seller and shall therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(b)     PIK Interest that is deferred or capitalised on or after the Trade Date in respect of the Purchased Assets shall be for the account of the Buyer at no cost to the Buyer and shall not therefore be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

(c)     PIK Interest that has accrued but not deferred or capitalised as at the Settlement Date in respect of the Purchased Assets shall be for the account of the Buyer upon capitalisation at no cost to the Buyer and shall not be included in the funded principal amount of the Purchased Assets for the purposes of Condition 10 (*Settlement Amount Calculation*).

12. **BREAKFUNDING**

(a)     If the Agreed Terms specify that this Condition will apply then, in relation to each funded portion of the Purchased Assets, the Seller and the Buyer shall agree upon the relevant IBOR.

(b)　For the purposes of this Condition 12 (*Breakfunding*) and each funded portion of the Purchased Assets:

(i)　"IBOR" means the Interbank Offered Rate which shall be calculated, where necessary, by interpolating on a linear basis between the rate quoted in respect of the longest period (for which a rate is quoted) which is less than the Relevant Period and that quoted in respect of the shortest period (for which a rate is quoted) which exceeds the Relevant Period on the appropriate Reuters screen specified by the Seller (or if there is no Reuters screen, such other appropriate screen as the Seller may specify) at or about 11.00 a.m. (local time) on the date upon which quotations would ordinarily be given by prime banks in the relevant interbank market for deposits in the relevant currency for delivery on the Settlement Date for the Relevant Period; and

(ii)　"Relevant Period" means the period from the Settlement Date to the next roll-over date applicable under the Credit Agreement for that funded portion.

(c)　With respect to any such funded portion, if IBOR is higher than the relevant funding rate in effect for that funded portion under the Credit Agreement on the Settlement Date (the "Relevant IBOR Rate") then the Seller will pay to the Buyer on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

(d)　With respect to any such funded portion, if IBOR is lower than the Relevant IBOR Rate then the Buyer will pay to the Seller on the Settlement Date an amount equal to interest on the amount of such funded portion at the rate which is the difference between IBOR and the Relevant IBOR Rate for the Relevant Period.

## 13.　TRANSFER COSTS

### 13.1　Transfer fees

The Buyer shall pay any recordation, processing, transfer or similar fee payable to the agent bank under the Credit Documentation in connection with the transaction. Such fee shall be paid by the Buyer to such agent bank:

(c)　if the Agreed Terms provide that all or part of such fee is to be payable by the Seller, promptly following receipt by the Buyer of the whole or such part (as applicable) of such fee from the Seller or, if later, on the date upon which such fee is payable under the Credit Documentation; or

(d)　otherwise, on the date upon which such fee is payable under the Credit Documentation.

13.2 **Stamp taxes**

Unless otherwise specified in the Agreed Terms, stamp duties and other applicable transfer taxes and duties (including notarial fees) and any costs attributable to the transfer of security are payable by the Buyer.

14.    **TURNOVER OBLIGATIONS**

(a)    If any amount to which the Buyer is entitled pursuant to the Agreed Terms is received or recovered by the Seller, the Seller shall promptly pay to the Buyer an amount equal to such amount.

(b)    If any amount to which the Seller is entitled pursuant to the Agreed Terms is received or recovered by the Buyer, the Buyer shall promptly pay to the Seller an amount equal to such amount.

15.    **COSTS AND EXPENSES**

Each of the Buyer and the Seller shall pay its own costs and expenses (including legal expenses) in connection with the transaction.

16.    **PRINCIPAL/AGENCY STATUS**

16.1 **Principal or agent**

Each of the Buyer and the Seller shall indicate whether it is acting as a principal or an agent in the transaction.

16.2 **Principal**

A Buyer or Seller that holds itself out as a "principal" is directly liable for the completion of the transaction. A principal may, however, specify in the Agreed Terms that its obligation to complete the transaction is subject to successful completion of the purchase or participation from, or sale or participation to, a third party of the Purchased Assets or Relevant Participation.

16.3 **Agent**

(a)    A Buyer or Seller that holds itself out to its counterparty as an "agent" acts on behalf of one or more principals to the transaction and is not itself a party to the transaction.

(b)    A Buyer or Seller that holds itself out as an agent:

(i)    is not liable to its counterparty for the successful completion of the transaction; and

(ii)    shall have no liability or obligation to its counterparty in connection with the transaction other than (a) in circumstances where it does not have authority to bind its principal(s) to the transaction or (b) pursuant to any confidentiality agreement entered into by it in connection with the transaction.

(c)     Notwithstanding the provisions contained in paragraph (b) above, a Buyer or Seller that holds itself out to its counterparty as an agent represents to its counterparty its authority to bind its principal(s) to the transaction (which principal(s) shall be bound as if it/they were named as "Buyer" or "Seller" as the case may be) and shall provide the counterparty with evidence of that authority if requested to do so.

17.     **NON-RELIANCE AND INDEPENDENT INVESTIGATION**

17.1    **Acknowledgement**

Each party acknowledges to the other that:

(a)     it is a sophisticated Buyer or Seller (as the case may be) with respect to the transaction; and

(b)     it has such information as it deems appropriate under the circumstances (however obtained), concerning for example the business and financial condition of the obligor(s) under the Credit Agreement, to make an informed decision regarding the transaction.

17.2    **Independent investigation**

Each of the Buyer and the Seller agrees that it has made its own independent analysis and decision to enter into the transaction, based on such information as it has deemed appropriate under the circumstances, and without reliance on the other party (except for reliance on any express representation made by the other party in the Agreed Terms or pursuant to these Conditions).

17.3    **Exclusion of liability**

The Seller does not make, and the Buyer does not rely upon, any representation, warranty or condition (express or implied) about, and the Seller shall have no liability or responsibility to the Buyer for;

(a)     the effectiveness, validity or enforceability of the Credit Documentation or other documentation delivered by the Seller to the Buyer, or any of the terms, covenants or conditions contained in the Credit Documentation or other documentation;

(b)     any non-performance by any party to the Credit Documentation or other documentation; or

(c)     the financial condition, status or nature of any Obligor.

17.4    **No Obligation to repurchase**

The Seller and the Buyer agree that:

(a)     the Seller shall have no obligation to repurchase or reacquire all or any part of the Purchased Assets or, as the case may be, the Relevant Participation from the Buyer or to support any losses directly or indirectly sustained or incurred

by the Buyer for any reason whatsoever, including the non-performance by any Obligor of its obligations under the Credit Documentation; and

(b)    any rescheduling or renegotiation of the Purchased Assets or, as the case may be, the Relevant Participation shall be for the account of, and the responsibility of, the Buyer, who will be subject to the rescheduled or renegotiated terms.

### 17.5    Material information

Each of the Buyer and Seller acknowledges and agrees that:

(a)    the other may possess material information not known to it;

(b)    the other shall have no liability and no action or proceedings may be taken with respect to the non-disclosure of any such information except to the extent that such information renders inaccurate an express representation made pursuant to the Agreed Terms or these Conditions by the party possessing such information.

## 18.    REPRESENTATIONS AND UNDERTAKINGS

### 18.1    Representations

Each of the Buyer and the Seller represents to the other that:

(a)    it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(b)    it has the power to enter into the transaction and to execute and deliver the Confirmation and the Transaction Documentation; and

(c)    its obligations in relation to the transaction constitute legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application).

### 18.2    Seller's representations

The Seller represents to the Buyer that:

(a)    as at the Settlement Date, it will own beneficially all the Purchased Assets or, as the case may be, the Relevant Participation to be sold or participated pursuant to the transaction free from any rights of set-off in favour of any Obligor or any lien, security interest or other encumbrance, any purchase or option agreement or arrangement, or any agreement to create or effect any of the same;

(b)    as at the Settlement Date, it will not be in default of any of its obligations in relation to the Purchased Assets or, as the case may be, the Relevant Participation;

(c)     so far as it is aware, no decision has been taken by the lenders party to the Credit Documentation to accelerate or enforce their rights under the Credit Documentation and no amount of principal or interest is due and unpaid under the Credit Documentation; and

(d)     subject to the obtaining of any necessary consents, all rights and benefits (including proprietary rights under any relevant security documentation) and, where applicable, all obligations under the Credit Documentation which the parties have agreed will be novated, assigned or otherwise effectively transferred to the Buyer pursuant to the transaction are capable of being so novated, assigned or otherwise transferred.

### 18.3    Buyer's undertaking

The Buyer undertakes to the Seller that it will not use any information received by it from the Seller in relation to the Obligors, the Purchased Assets or, as the case may be, the Relevant Participation for any unlawful purpose or in breach of any confidentiality agreement entered into by it in connection with the transaction.

### 18.4    Survival of representations

All express representations made by the parties pursuant to the Agreed Terms and these Conditions shall survive the execution and delivery of the Transaction Documentation.

## 19.    DEFAULT

### 19.1    Defaults

(a)     Subject to Condition 19.4, if:

(i)     either party defaults in the performance of its obligations to the other under any Transaction Document; or

(ii)    any representation or acknowledgement made by either party to the other in the Agreed Terms or these Conditions proves to have been incorrect when made,

the non-defaulting party shall be entitled to give notice to the defaulting party for such period as the non-defaulting party may specify.

(b)     If the default is not remedied within the period specified in the notice referred to in paragraph (a) above, or such further period or periods as the non-defaulting party may agree, the non-defaulting party may, by written notice to the defaulting party, terminate the transaction immediately.

(c)     If the non-defaulting party terminates the transaction in accordance with paragraph (b) above, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

19.2    **Breach of representation or undertakings**

Each party shall compensate the other for any properly quantified loss, liability or expense which the other suffers as a consequence of a breach of any of its representations or undertakings made pursuant to the Agreed Terms and these Conditions.

19.3    **Notification**

If a claim for any losses, liabilities and expenses is made pursuant to this Condition 19 (*Default*), that claim must be notified by the non-defaulting party to the defaulting party within 60 days after the Settlement Date (such notice to include quantification by the non-defaulting party of such losses, liabilities and expenses) and the defaulting party shall not be liable for any claim not so notified within that period.

19.4    **Buy-in/Sell-out**

    (a)    If the Agreed Terms specify that the transaction shall be subject to delayed settlement compensation and buy-in/sell-out damages then this Condition 19.4 will apply. For the avoidance of doubt, if any transaction has been cancelled in accordance with Condition 4.2 (*Conditions unfulfilled*), this Condition 19.4 will not apply to that transaction.

    (b)    If the transaction is not settled on the Settlement Date because:

        (i)    either party defaults in the performance of its obligations to the other under any Transaction Document; or

        (ii)    any representation or acknowledgement made by either party to the other in any Transaction Document proves to have been incorrect when made,

    the other party ("**the non-defaulting party**") may, by no later than 10 Business Days after the Settlement Date, give written notice to that party ("**the defaulting party**") of its intention to terminate its obligations under the Confirmation and to effect a Substitute Transaction (as defined below) in respect of the Traded Portion.

    (c)    During the 3 Business Days following receipt of the notice referred to in paragraph (b) above, the defaulting party shall use all reasonable endeavours to identify a counterparty acceptable to the non-defaulting party to enter into a Substitute Transaction.

    (d)    If the defaulting party:

        (i)    identifies a substitute counterparty acceptable to the non-defaulting party, the Substitute Transaction shall be entered into with such counterparty and the Substitute Trade Date (as defined below) shall be the fifth Business Day following delivery of the notice referred to in paragraph (b) above; or

        (ii)    fails to identify a substitute counterparty acceptable to the non-defaulting party within the time period referred to in paragraph (c) above, then the

Seller and the Buyer shall consider in good faith for a further period of up to 5 Business Days whether or not there is an alternative means, acceptable to both parties, of settling or resolving the failed transaction. If the parties fail to agree such alternative means within such further 5 Business Day period, or such further period or periods as the non-defaulting party may agree, the defaulting party shall compensate the non-defaulting party for any properly quantified loss, liability or expense which the non-defaulting party suffers as a consequence of the default.

(e)    If the transaction is not settled on the Settlement Date because either party defaults in a payment obligation under the Transaction Documents, the defaulting party may remedy such default at any time prior to the Substitute Trade Date by making payment to the non-defaulting party of an amount calculated in accordance with Condition 10 (*Settlement Amount Calculation*).

(f)

(i)    The non-defaulting party shall send to the defaulting party not later than the first Business Day after the date of signing of the Substitute Confirmation (as defined below) by the parties to it, notice (the "**Purchase Price Notice**") of the purchase price payable under the Substitute Transaction.

(ii)    If the defaulting party disputes the reasonableness of the purchase price specified in the Purchase Price Notice the defaulting party shall send notice of such dispute (the "**Price Dispute Notice**") to the non-defaulting party not later than the second Business Day after receipt of the Purchase Price Notice.

(iii)    As soon as reasonably practicable following receipt of the Price Dispute Notice the non-defaulting party shall use reasonable endeavours to obtain indicative quotations for a transaction on the same terms as the Substitute Transaction from three members of the Valuation and Trading Practices Committee of the LMA at that time (or any successor of such Valuation and Trading Practices Committee carrying on substantially the same functions), such three members to be chosen by the non-defaulting party in its sole discretion.    The non-defaulting party will calculate the average of the three indicative quotations received and such amount will be the Indicative Price for the purposes of paragraphs (g) and (h) below.

(iv)    Any determination by the non-defaulting party pursuant to paragraph (iii) above shall, in the absence of manifest error, be conclusive and binding on all parties.

(g)    If the Seller is the defaulting party, the Seller shall pay to the Buyer on the Substitute Settlement Date (as defined below)as follows:

(i)    if no Price Dispute Notice was issued in relation to the Substitute Transaction, the amount (if any) by which the price in respect of the Buy-in Transaction (as defined below) exceeds the original price for the Traded Portion; or

(ii)    if a Price Dispute Notice was issued in relation to the Buy-in Transaction the amount (if any) by which the Indicative Price in respect of the Buy-in Transaction exceeds the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages, the Seller shall in addition pay an amount equal to (a) Delayed Settlement Compensation for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)    actual settlement of the Buy-in Transaction; and

(ii)    10 Business Days following the Substitute Trade Date; and

(b) if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to above and the Delayed Settlement Costs of Carry calculation for that period results in a negative amount, the absolute value of that amount

(h)    If the Buyer is the defaulting party, the Buyer shall pay to the Seller on the Substitute Settlement Date as follows:

(i)    if no Price Dispute Notice was issued in relation to the Substitute Transaction the amount (if any) by which the price in respect of the Sell-out Transaction (as defined below) is less than the original price for the Traded Portion; or

(ii)    if a Price Dispute Notice was issued in relation to the Sell-out Transaction the amount (if any) by which the Indicative Price in respect of the Sell-out Transaction is less than the original price for the Traded Portion.

If the Agreed Terms specify that the transaction shall be subject to compensation for delayed settlement and buy-in/sell-out damages and if PIK Interest applies to all or any part of the Purchased Assets under the Credit Agreement during the period referred to below, the Buyer shall in addition pay an amount equal to Delayed Settlement Costs of Carry (if any) for each day from (and including) the Settlement Date to (but excluding) the earlier of:

(i)    actual settlement of the Sell-out Transaction; and

(ii)    10 Business Days following the Substitute Trade Date.

(i)    For the purposes of this Condition 19.4:

"**Buy-in Transaction**" means a transaction in which the Buyer purchases the equivalent of the Traded Portion from a counterparty other than the Seller;

"**Sell-out Transaction**" means a transaction in which the Seller sells the Traded Portion to a counterparty other than the Buyer;

"**Substitute Confirmation**" means the confirmation signed on behalf of the non-defaulting party and the substitute counterparty in the form most recently published by the LMA evidencing the agreed terms for the Substitute Transaction;

"**Substitute Settlement Date**" means the settlement date specified in the Substitute Confirmation;

"**Substitute Transaction**" means a Buy-in Transaction or, as the case may be, a Sell-out Transaction; and

"**Substitute Trade Date**" means the date on which the non-defaulting party agrees the terms (whether orally or in writing) of the Substitute Transaction with a substitute counterparty.

20.    **WHEN ISSUED TRADES**

If the Trade Date for the transaction is to occur prior to signing of the Credit Agreement (a "**when issued trade**") then the Settlement Date shall be ten Business Days after such signing.  Except with respect to exchanging a Confirmation, all other times for when issued trades shall be calculated from the signing of the Credit Agreement.

21.    **CONFIDENTIALITY**

Either party shall be permitted to make any disclosures regarding the terms of the transaction (other than the identity of the counterparty) subject to the requirements of law or regulation or of the Credit Documentation.   If there is any inconsistency between this Condition and any confidentiality agreement entered into between the parties, the terms of that confidentiality agreement shall prevail.

22.    **TAX**

The Buyer acknowledges that it is responsible for making its own independent tax analysis of the Credit Documentation and the transaction.

23.    **SET-OFF**

Either party may (but is not obliged to) set off any amount due and payable by the other party under the transaction against any such amounts due and payable by it to the other party under the transaction.  The party exercising its rights under this provision may effect such currency exchanges as it considers necessary to implement the set off.

24.   **FURTHER ASSURANCE**

Each of the parties agrees, at its own expense, to take any further action and to execute any further documents and/or instruments as the other may reasonably request to give effect to the transaction.

25.   **THIRD PARTY RIGHTS**

A person who is not a party to the Confirmation or other Transaction Document has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of the Confirmation or other Transaction Document.

26.   **GOVERNING LAW AND JURISDICTION**

26.1   **Governing law**
The transaction, the Agreed Terms and these Conditions are governed by English law.

26.2   **Jurisdiction**
The parties submit to the non exclusive jurisdiction of the English courts.

26.3   **Service of process**
The Seller and the Buyer each irrevocably appoints the person described as its process agent (if any) in the Agreed Terms to receive on its behalf service of any action, suit or other proceedings in connection with the transaction, the Agreed Terms or these Conditions. If any person appointed as process agent ceases to act for any reason the appointing party shall notify the other party and shall promptly appoint another person incorporated within England and Wales to act as its process agent.

27.   **EXECUTION IN COUNTERPARTS AND BY FAX OR EMAIL**

27.1   **Counterparts**
Any Confirmation, confidentiality agreement or other Transaction Document may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Confirmation, confidentiality agreement or other Transaction Document.

27.2   **Fax and electronic communication**

(a)   Transmission by fax of a signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(b)   Transmission by electronic mail of an electronically scanned signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart.

(c)   The Buyer and the Seller shall deliver to each other an original counterpart of the Transaction Documents (and, upon the request of either party, the Confirmation, confidentiality agreement or any other document) promptly after delivery by fax or electronic mail.