# SCHEDULE

**to the**
**Master Agreement**
dated as of as of date
between
## LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. ("Party A"),
a corporation organized under the laws of
the State of Delaware
and the
## MASSACHUSETTS WATER RESOURCES AUTHORITY ("Party B"),
a body politic and corporate and a public instrumentality of
the Commonwealth of Massachusetts

Part 1. **Termination Provisions**

In this Agreement:-

(a)  "*Specified Entity*" means in relation to Party A for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Not applicable. |
| Section 5(b)(iv), | Not applicable. |

and in relation to Party B for the purpose of:-

| | |
|---|---|
| Section 5(a)(v), | Not applicable. |
| Section 5(a)(vi), | Not applicable. |
| Section 5(a)(vii), | Financial Guaranty Insurance Company ("Insurer"). |
| Section 5(b)(iv), | Not applicable. |

(b)  "*Specified Transaction*" will have the meaning specified in Section 12 of this Agreement.

(c)  The "*Cross Default*" provisions of Section 5(a)(vi) will apply to Party A and Party B; provided however that Section 5(a)(vi) is hereby amended by deleting, in the seventh line thereof, the phrase ", or becoming capable at such time of being declared,".

The following provisions apply:-

"*Specified Indebtedness*" will have the meaning specified in Section 12.

"*Threshold Amount*" means, in the case of Party A, USD 20,000,000 (or its equivalent in any other currency), and, in the case of Party B, USD 20,000,000 (or its equivalent in any other currency).

(d)  The "*Credit Event Upon Merger*" provisions of Section 5(b)(iv) will not apply to Party A and will apply to Party B.

(e)  The "*Automatic Early Termination*" provisions of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)  *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement, Market Quotation and the Second Method will apply.

(g)  *Additional Termination Event* will apply. The occurrence of a Trigger Event shall constitute an Additional Termination Event:-

(i)      *Trigger Events.* Each of the following events shall constitute a Trigger Event:

(1)      *Downgrade.* Party A ceases to maintain a Single A Quality financial program, counterparty or similar rating from both of the Relevant Rating Agencies

(2)      *Failure To Deliver Collateral.* LBSF shall fail to deliver, or procure delivery of, collateral to Party A in the amounts and within the time (subject to any applicable cure period) required by the LBSF Collateral Agreement dated July 16, 1998 between Party A and LBSF, as amended from time to time without the consent of, or notice to, Party B

(3)      *Bankruptcy.* Lehman Brothers Holdings Inc. ("Holdings"), or LBSF: (A) is dissolved (other than pursuant to a consolidation, amalgamation or merger) (B) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due (C) makes a general assignment, arrangement or composition with or for the benefit of its creditors (D) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (x) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (y) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof (E) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger) (F) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets (G) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter (H) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (A) through (G) inclusive or (I) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts and

(4)      *Capital Requirement.* Party A shall fail to maintain capital in the amount contemplated by the LBDP Operating Guidelines dated July 16, 1998, as amended from time to time without the consent of, or notice to, Party B.

(h)     *Event of Default or Other Termination Event After Trigger Event.* If a Trigger Event shall have occurred and an event or circumstance which would otherwise constitute or give rise to (1) an Event of Default with Party A as the Defaulting Party (other than an Event of Default pursuant to Sections 5(a)(vii) or 5(a)(ix)) (2) a Termination Event other than a Trigger Event shall occur, or (3) a Credit Assignment Event (as defined in part 4(h)(i) hereof), such Trigger Event will prevail and such other event or circumstance will not constitute an Event of Default, a Termination Event or a Credit Assignment Event, as the case may be.

(i)      *Effect of Trigger Event.* Notwithstanding anything to the contrary contained in this Agreement, if a Trigger Event occurs the following provisions shall apply:

(1)      *Notice.* Party A shall, within one Business Day of becoming aware of such occurrence, notify Party B by facsimile transmission or electronic messaging system

2

(the date such notice is transmitted, the "Notice Date"), specifying the nature of the Trigger Event and designating the Early Termination Date in respect of all Transactions. The Early Termination Date so designated shall be no later than the fifth Universal Business Day following such Notice Date. The Early Termination Date so designated shall be subject to change as specified in paragraph (i)(4)(a) below and, in the case of affected Transactions only, as specified in paragraph (i)(4)(b) below.

(2) ***Market Quotation.*** For the purposes of determining the Settlement Amount pursuant to Section 6(e)(ii)(3), the "Market Quotation" of a Terminated Transaction (which may be positive or negative) shall be the amount determined by Party A, using Market Rates and Volatilities and by polling the Dealer Group as required, to be the mid-market value of the Transaction as of the close of business (New York time) on the Early Termination Date. Party A shall perform such determinations in good faith in accordance with its usual operating procedures and pursuant to industry standards. For purposes of this definition, if the Market Quotation of a Terminated Transaction represents an amount payable to Party A, it shall be expressed as a negative number, and if the Market Quotation represents an amount payable to Party B, it shall be expressed as a positive number. For purposes of determining the Settlement Amount, Unpaid Amounts (which shall be determined by Party A) in respect of the Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after the Early Termination Date is to be included. Party A shall notify Party B of the Market Quotation of each Terminated Transaction, the Settlement Amount and the Termination Currency Equivalent of any Unpaid Amounts within two Business Days following the Early Termination Date.

(3) ***Payment Date.*** The amount calculated as being due as a result of a Termination Event that arises as a result of a Trigger Event pursuant to Section 6(e)(ii)(3) will be payable, in the case of an amount due and owing to Party A, within five Universal Business Days following the Early Termination Date, and in the case of an amount due and owing to Party B, within ten Universal Business Days following the Early Termination Date. Party A and Party B agree that the party that is required to pay such amount shall be required to pay interest on such amount for the period from (and including) the Early Termination Date to (but excluding) the date payment is required to be made, at the Agreed Interest Rate. If either party fails to pay such amount on the due date, such failure shall constitute a breach of this Agreement, but shall not constitute an Event of Default (including an Event of Default pursuant to Section 5(a)(i) or 5(a)(ii)) for purposes of this Agreement. In the event of any such failure by either party, such party shall be required to pay interest on such overdue amount for the period from (and including) such due date to (but excluding) the date of actual payment, at the default rate, which is the Agreed Interest Rate plus 3% per annum. Interest payable under this paragraph will be calculated on the basis of daily compounding and the actual number of days elapsed divided by 360.

(4) ***Effect of Market Disruption Event.*** (a) In the event that a Market Disruption Event exists on any Early Termination Date, such date shall not be an Early Termination Date for any outstanding Transaction. In such event Party A shall notify Party B and the earlier to occur of (i) the next succeeding Universal Business Day on which a Market Disruption Event does not exist and (ii) the eighth Universal Business Day following the day on which notice of the occurrence of a Trigger Event was given shall be considered the Early Termination Date for all outstanding Transactions and a Settlement Amount shall be obtained for that Early Termination Date in accordance with the terms set forth in this paragraph (i). As used herein, "Market Disruption Event"

3

means any of the following events, the existence of which shall be determined by Party A: (i) any suspension or material limitation of trading (excluding daily settlement limits in the normal course of trading) on the New York Stock Exchange, London Stock Exchange or other recognized stock exchange the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, (ii) the declaration of a banking moratorium by the Bank of England, United States federal authorities, New York State or other recognized international, national or regional banking authority authorities to the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, (iii) the occurrence of any outbreak or escalation of hostilities or a declaration by the United States of a national emergency or war the effect of which on financial markets makes it impracticable or inadvisable, in the view of Party A, to proceed with the determination of the Settlement Amount, or (iv) the occurrence of any other calamity or crisis or any other event the effect of which, in the view of Party A and a majority of eleven randomly selected unaffiliated Qualified Counterparties of Party A (who are not Affiliates of Party A) whose Settlement Amounts otherwise would have been determined on such Early Termination Date, makes it impracticable or inadvisable to proceed with the determination of such Settlement Amounts on such Early Termination Date.

(b)    If on an Early Termination Date as to which there is no Market Disruption Event, there are conditions in a local market that, in the judgment of Party A, materially would impede its ability to determine the Market Quotation for certain Transactions in that market (a "Local Market Disruption Event"), Party A shall notify Party B of those conditions no later than one hour prior to the scheduled time for determining the Market Quotation for such affected Transactions on that date. Upon receipt of such notice, Party B shall have the right to delay the Early Termination Date for the affected Transactions (without affecting the Early Termination Date for any other Transactions under this Agreement) by notifying Party A in writing within one hour of its election to exercise that right. In such event, the Early Termination Date for each such affected Transaction shall be the next day on which Party A and Party B agree that the Local Market Disruption Event ceases to exist, but in any case not later than the due date for Settlement Amount payments owed to Party A with respect to unaffected Transactions as provided in paragraph (i)(3). Market Quotations so obtained for any affected Transaction shall be included in the calculation of the Settlement Amount to paid as provided in paragraph (i)(3). No delay in the Early Termination Date for any affected Transaction as provided above shall affect the days on which payments would otherwise be required to be made pursuant to paragraph (i)(3) had no such delay occurred, it being understood, however, that interest shall begin to accrue pursuant to such paragraph with respect to any such affected Transaction only from (and including) the delayed Early Termination Date.

(5)    *Payments on Early Termination.* This Agreement shall be amended by adding the following new subsection (3) to Section 6(e)(ii):

"(3)    *Trigger Event.* If an Early Termination Date results from a Trigger Event, Party A shall determine the Settlement Amount of all Terminated Transactions on such date, and the amount payable will be equal to (A) the Settlement Amount in respect of the Terminated Transactions plus (B) the Termination Currency Equivalent of Unpaid Amounts owing to Party B minus (C) the Termination Currency Equivalent of Unpaid Amounts owing to Party A.

4

If that amount is a positive number, Party A will pay it to Party B if it is a negative number, Party B will pay the absolute value of that amount to Party A. For purposes of determining the Settlement Amount under this subsection, clause (b) of the definition of Settlement Amount shall not apply."

(j)    ***Additional Definitions.***

As used in this Schedule, the following terms shall have the following meanings:

"***Agreed Interest Rate***" for any day means the overnight ask rate in effect for such day, as set forth opposite the caption "ON" under the heading "Euro-Dollar" on Telerate Page 4756 (or any successor page thereto), as of 11:00 a.m., New York time, on such day.

"***Business Day***" means any day other than a Saturday or Sunday on which banks in New York are not required or authorized by law to be closed.

"***Dealer Group***" means the following entities and such other entities as may be selected by Party A from time to time: J.P. Morgan, Citibank, N.A., Barclays Bank PLC, Bankers Trust Company, Merrill Lynch Capital Services, Inc., The Chase Manhattan Bank, Deutsche Bank, National Westminster Bank PLC, Banque Nationale de Paris, Hong Kong and Shanghai Bank, The Sumitomo Bank Ltd., Bank of Tokyo-Mitsubishi Bank Limited, Westpac Bank Corp., Goldman, Sachs & Co. and Banque Paribas.

Notwithstanding the definition of Dealer Group, (i) for U.S. dollar and Canadian dollar information, the dealers that may be polled shall be J.P. Morgan, Citibank, N.A., Bankers Trust Company, Merrill Lynch Capital Services, Inc., The Chase Manhattan Bank and Goldman, Sachs & Co. and (ii) for European currency information, the dealers that may be polled shall be those listed in clause (i) of this paragraph and, in addition, Barclays Bank PLC, Deutsche Bank, National Westminster Bank PLC, Banque Nationale de Paris and Banque Paribas.

"***LBSF***" means Lehman Brothers Special Financing Inc.

"***Market Rates and Volatilities***" means, in the case of interest rates and volatilities, the interest rates and volatilities obtained from the Telerate and Reuters screens where practicable and from polling the Dealer Group and, in the case of foreign exchange rates and volatilities and other pricing parameters, the foreign exchange rates and volatilities or pricing parameters obtained from polling the Dealer Group. In each case, for all rates, volatilities or other parameters obtained, at least five members of the Dealer Group shall be polled, the highest and lowest of such returns (including, in the case of interest rates and volatilities, the rates and volatilities obtained from the Telerate and Reuters screens, if any) shall be discarded and the simple mathematical average of the remaining values shall be used to perform the applicable determination.

"***Moody's***" means Moody's Investors Service, Inc.

"***Person***" means any individual, partnership, joint venture, firm, corporation, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"***Relevant Rating Agencies***" means, S&P and Moody's, or such of them as then assigns a financial program, counterparty or similar rating to Party A at Party A's request, or any other nationally recognized rating agency then rating Party A at Party A's request (each, individually, a Relevant Rating Agency).

"***S&P***" means Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies, Inc.

5

"Single A Quality" means, in the case of S&P, A, in the case of Moody's, A, in the case of Fitch, A, and, in the case of any other Relevant Rating Agency, a designation of similar quality.

"*Universal Business Day*" means a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) in Frankfurt, London, New York, Tokyo and the city in which Party B's head or home office is located.

(k)     *Insurer Provisions.*  The following provisions shall apply to any Transaction to which the Swap Insurance Policy issued by the Insurer, as Credit Support Provider, to the account of Party B, as principal, and for the benefit of Party A, as beneficiary (the "Swap Insurance Policy"), relates (the "Insured Transactions").

(i)     Notwithstanding anything to the contrary in Section 6(a) of this Agreement, if any:

(A)     Event of Default in respect of any Insured Transaction under Section 5(a) of this Agreement occurs, except an Event of Default under either Section 5(a)(vii) or Section 5(a)(viii) of this Agreement but only with respect to Party B as the Defaulting Party (when such event has occurred in respect of Insurer as Credit Support Provider); or

(B)     Termination Event in respect of any Insured Transaction under Section 5(b) of this Agreement occurs, except a Termination Event under either Section 5(b)(i)(2) or Section 5(b)(iii) of this Agreement but only with respect to Party B as the Affected Party (when such event has occurred in respect of Insurer as Credit Support Provider) or any Additional Termination Event set forth in Part 1(k)(ix) of this Schedule but only with respect to Party B as the Affected Party,

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date in respect of any such Insured Transaction unless:

(Y)     Insurer has failed to pay any payment due to Party A under the terms and conditions of the Swap Insurance Policy; or

(Z)     Insurer has otherwise consented in writing to such designation.

(ii)     The definition of "Reference Market Makers" set forth in Section 12 of this Agreement shall be amended in its entirety to read as follows:

" `Reference Market Makers' means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same city.  The rating classification assigned to any outstanding long-term senior debt securities issued by such dealers shall be at least (x) Aa or higher as determined by Moody's Investors Service, Inc. ("Moody's") (2) AA or higher as determined by Standard & Poor's Corporation ("S&P") or (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties and the Insurer, provided, however, that, in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Insurer, one (1) or more leading dealer whose long-term senior debt bears a lower investment grade rating.

6

(iii)   Section 8(b) of this Agreement is hereby amended by adding the phrase "and their respective Credit Support Providers" following after the word "parties" in the second line thereof.

(iv)   No amendment, modification, supplement or waiver of this Agreement will be effective unless in writing and signed by each of the parties hereto and unless the parties hereto shall have obtained the prior written consent of Insurer.

(v)   If any Event of Default under Section 5(a) of this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under Section 5(b) of this Agreement occurs with respect to Party B as the Affected Party, then Insurer (unless Insurer has failed to meet its payment obligations under the Swap Insurance Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A.

(vi)   Party A and Party B hereby acknowledge and agree that (a) Insurer shall be a third party beneficiary under any Insured Transaction and any Credit Support Document of Party A, entitled to enforce its rights thereunder and (b) Insurer's obligation with respect to Insured Transactions shall be limited to the terms of the Swap Insurance Policy.

(vii)   No Insured Transaction may be assigned by Party B without the prior written consent of Party A which consent shall not be given without the prior written consent of Insurer.

(viii)   Party A and Party B hereby acknowledge that to the extent of payments made by Insurer to Party A under the Swap Insurance Policy, Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Transaction to which such payments relate including, but not limited to, the right to receive payment from Party B, the enforcement of any remedies and the recovery of all reasonable out-of-pocket expenses, including, but not limited to, the costs of collection. Party A hereby agrees to assign to the Insurer its right to receive payment from Party B under any Insured Transaction to the extent of any payment thereunder by Insurer to Party A and to execute all such instruments or agreements as the Insurer deems reasonably necessary to effect such assignment. Party B hereby acknowledges and consents to the assignment by Party A to Insurer of any rights and remedies that Party A has under any Insured Transaction or any other document executed in connection herewith.

(ix)   ***Additional Termination Event*** will apply.   The following shall constitute Additional Termination Events:-

(a)   Insurer fails to meet its payment obligations under its Swap Insurance Policy and such failure is continuing with respect to Insurer under the Swap Insurance Policy; provided, however, that, in any such case,

(X) an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

(Y) a Termination Event has occurred or is continuing with respect to Party B; or

(Z) Party B has either (1) no issues of rated senior debt or (2) one or more outstanding issues of rated senior debt, but it fails to have at least one of such issues with an unenhanced rating of at least (1) A3 or higher as determined by Moody's, (2) A- or higher as determined by S&P, (3) A- or higher as determined by Fitch IBCA Inc. ("Fitch") or (4) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties.

7

For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

(b)    Insurer fails to maintain at least one of the following:

(A)    A financial strength rating of at least Aa3 from Moody's;

(B)    a claims paying ability rating of at least AA- from S&P;

(C)    an equivalent rating of at least AA- from Fitch; or

(D)    an equivalent rating determined by a nationally-recognized ratings service acceptable to both parties,

and Party B fails, within fifteen (15) Business Days thereof, to replace Insurer with a replacement insurer having a financial strength rating of at least Aa3 from Moody's, a claims paying ability rating of at least AA- from S&P and an equivalent rating of at least AA- from Fitch;

provided, however, that in any such case, either

(X)    an Event of Default has occurred and is continuing with respect to Party B as the Defaulting Party;

(Y)    a Termination Event has occurred and is continuing with respect to Party B as the Affected Party; or

(Z)    Party B has either (1) no issues of rated senior debt or (2) one or more outstanding issues of rated senior debt, but it fails to have at least one of such issues with an unenhanced rating of at least (i) A3 or higher as determined by Moody's, (ii) A- or higher as determined by S&P, (iii) A- or higher as determined by Fitch or (iv) an equivalent investment grade rating determined by a nationally-recognized ratings service acceptable to both parties.

For the purpose of the foregoing Termination Event, the Affected Party shall be Party B.

(c)    Party A has either (1) no issues of rated senior debt or (2) one or more outstanding issues of rated senior debt, but it fails to have at least one of such issues with an unenhanced rating of at least (i) A3 or higher as determined by Moody's, (ii) A- or higher as determined by S&P, (iii) A- or higher as determined by Fitch or (iv) an equivalent investment grade rating determined by a nationally-recognized ratings service acceptable to both parties.

For the purpose of the foregoing Termination Event, the Affected Party shall be Party A.

(x)    Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Transactions by Insurer or by Party A with the consent of Insurer pursuant to paragraph (i) above shall apply only to the Insured Transactions and not to any other Transaction under this Agreement, unless Party A shall designate an Early Termination Date in respect of such other Transaction. Nothing contained in this paragraph (x) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction other than the Insured Transactions, which designation shall not apply to the Insured Transactions unless expressly provided in such designation and unless Insurer shall have designated, or consented to the

8

designation by Party A of, an Early Termination Date in respect of the Insured Transactions in accordance with paragraph (i) above.

(xi)    Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Transactions against the payment obligations of such party under Insured Transactions, it being the intention of the parties that their payment obligations under Insured Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Transactions with the same effect as if the Insured Transactions constituted a single master agreement. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Transaction shall be determined without regard to any Transactions other than the Insured Transactions, it being the intention of the parties that their payment obligations under the Insured Transactions be treated separate and apart from all other Transactions unless otherwise specified in such other Transaction and agreed to in writing by Insurer.

(xii)    None of the rights and obligations of the Insurer with respect to the Insured Transactions shall affect the rights and obligations of the parties hereto pursuant to any Transaction that is not an Insured Transaction.

(xiii)    The "Credit Event Upon Merger" provisions of Section 5(b)(ii) will apply to Party A and Party B but not with respect to Insurer.

(xiv)    Notice of any Change of Account under Section 2(b) shall be delivered or given to the Insurer.

(xv)    No Transfer under Section 7 of an Insured Transaction may occur without the prior written consent of the Insurer, and such consent will not be unreasonably withheld.

(xvi)    Pursuant to Section 8(c) of this Agreement, all obligations of the parties will survive the termination of any Transaction or the term of this Agreement so long as amounts owed under the Swap Insurance Policy remain outstanding.

(l)    *Events of Default.*

(i)    *Bankruptcy.* Clause (6) of Section 5(a)(vii) of this Agreement is hereby amended to read in its entirety as follows:—

"(6)(A) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets or (B) in the case of a Government Entity, any Credit Support Provider of such Government Entity or any applicable Specified Entity of such Government Entity, (I) there shall be appointed or designated with respect to it, an entity such as an organization, board, commission, authority, agency or body to monitor, review, oversee, recommend or declare a financial emergency or similar state of financial distress with respect to it or (II) there shall be declared or introduced or proposed for consideration by it or by any legislative or regulatory body with competent jurisdiction over it, the existence of a state of financial emergency or similar state of financial distress in respect of it;".

9

NYB 1120603.5

(ii)     ***Merger Without Assumption.***  Section 5(a)(viii) of this Agreement is hereby amended to read in its entirety as follows:—

>    "(viii)  ***Merger Without Assumption.***  The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if such party is a Government Entity, an entity such as an organization, board, commission, authority, agency, or body succeeds to the principal functions of, or powers and duties granted to, such party or any Credit Support Provider of such party) and, at the time of such consolidation, amalgamation, merger, transfer or succession:—

>>      (1)  the resulting, surviving, transferee, or successor entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

>>      (2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving, transferee or successor entity of its obligations under this Agreement."

(m)    ***Termination Events***.  Section 5(b)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

>    "(ii)  ***Credit Event Upon Merger.***  If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity (or, without limiting the foregoing, if X is a Government Entity, an entity such as an organization, board, commission, authority, agency or body succeeds to the principal functions of, or powers and duties granted to, X, any Credit Support Provider of X or any Specified Entity of X) and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving, transferee or successor entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or".

**Part 2.    Agreement to Deliver Documents.**

For the purpose of <u>Section 4(a)</u> of this Agreement, each party agrees to deliver the following documents, as applicable:-

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | An opinion of counsel for Party A substantially in the form of Exhibit A to this Schedule | Promptly after execution of this Agreement | Yes |

NYB 1120603.5

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party A | A guarantee of Holdings in the form of Exhibit B to this Schedule | Upon substitution of LBSF for Party A pursuant to Part 4(h) of this Schedule | Yes |
| Party A | Evidence reasonably satisfactory to Party B of (i) the authority of Party A to enter into this Agreement and the relevant Confirmation of a Transaction and (ii) the authority and genuine signature of the signatory of Party A who executes the same. | (i) Upon execution of this Agreement, (ii) if requested by Party B, as soon as practicable after execution of any Confirmation of any other Transaction, and (iii) with respect to each Transaction not covered by evidence previously furnished hereunder, within five Local Business Days of the applicable Trade Date. | Yes |
| Party B | An opinion of counsel for Party B substantially in the form of Exhibit C to this Schedule | Promptly after execution of this Agreement | Yes |

11

NYB 1120603.5

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | Evidence reasonably satisfactory to Party A of (i) the authority of Party B to enter into this Agreement and the relevant Confirmation of a Transaction and (ii) the authority and genuine signature of the signatory of Party B who executes the same. | (i) Upon execution of this Agreement, (ii) if requested by Party A, as soon as practicable after execution of any Confirmation of any other Transaction, and (iii) with respect to each Transaction not covered by evidence previously furnished hereunder, within five Local Business Days of the applicable Trade Date. | Yes |
| Party B | Annual Report of Party B and Party B's Credit Support Provider, if any, containing audited consolidated financial statements for each fiscal year certified by independent certified public accountants for each such fiscal year. | As soon as available and in any event within 120 days (or as soon as practicable after becoming publicly available) after the end of each of its fiscal years. | Yes |
| Party B | An opinion of counsel to Insurer in the form of Exhibit H to this Schedule. | Simultaneously with the delivery of a Swap Insurance Policy. | Yes |
| Party B | A Swap Insurance Policy in the form of Exhibit G to this Schedule. | Promptly after execution of this Agreement. | Yes |

NYB 1120603.5

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) |
|---|---|---|---|
| Party B | A copy of the statutory or regulatory authority pursuant to which Party B is authorized to enter into this Agreement and each Transaction. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | An incumbency certificate with respect to the signatory of this Agreement. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certified copy of the resolution or resolutions (or the equivalent thereof) of the governing body of Party B, certified by an appropriate official of Party B, pursuant to which Party B is authorized to enter into this Agreement and each Transaction. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | A certificate from the Chief Executive Officer or the Chief Financial Officer of Party B, or the equivalent of any thereof, to the effect that any requirements of the statutory or regulatory authority referred to above have been satisfied, substantially in the form of Exhibit I to this Schedule. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |
| Party B | An executed copy of the Covered Indenture. | Prior to the execution of this Agreement and, with respect to each Transaction, prior to the execution of such Transaction. | Yes |

Part 3. **Miscellaneous.**

(a)    *Addresses for Notices*.  For the purpose of Section 12(a):-

    Address for notices or communications to Party A:-

13

NYB 1120603.5

Address:          Lehman Brothers Derivative Products Inc.
3 World Financial Center, 7th floor
New York, New York  10285-0700 USA

Attention:  Municipal Financial Products - Middle Office
Telephone: 212-526-7133
Fax:        212-526-7372

For all purposes.

Address for notices or communications to Party B:-

Address:          Charlestown Navy Yard
100 First Avenue
Boston, Massachusetts 02129

Attention: Treasurer

Facsimile No.: (617) 788-4895

Telephone No.: (617) 242-6000

with a copy to Insurer:—

Address:    115 Broadway, New York, New York 10006

Attention: Research and Risk Management

Facsimile No.:  (212) 312-3220

Telephone No.: (212) 312-3000

(b)      ***Calculation Agent.***  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.  The failure of Party A to perform its obligations as Calculation Agent shall not be construed as an Event of Default or Termination Event.

(c)      ***Credit Support Document.***  Details of any Credit Support Document:-

In the case of Party A: Not applicable, provided that, from and after the substitution of LBSF for Party A hereunder pursuant to Part 4(h) of this Schedule, the Credit Support Document applicable in the case of Party A shall be Guarantee of Holdings in the form of Exhibit B to this Schedule.

In the case of Party B: A Swap Insurance Policy to be issued by Insurer in the form annexed hereto as Exhibit G, and any successor or supplement to, or replacement of, such Swap Insurance Policy.

(d)      ***Credit Support Provider.***

In relation to Party A: Not applicable, provided that from and after the substitution of LBSF for Party A hereunder pursuant to Part 4(h) of this Schedule, the Credit Support Provider in relation to Party A shall be Holdings.

In relation to Party B: Insurer.

14

NYB 1120603.5

(e)   **Governing Law.** This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(f)   **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will not apply to any of the Transactions from the date of this Agreement.

(g)   "**Affiliate**" will have the meaning specified in Section 12 of this Agreement.

(h)   "**Covered Indenture**" means, collectively, the Original Resolution and the Supplemental Resolutions, each as amended and supplemented in accordance with the terms hereof and thereof.

(i)   "**Covered Indenture Incorporation Date**" means the date of this Agreement.

(j)   "**Government Entity**" means Party B.

(k)   "**Original Resolution**" means the General Revenue Bond Resolution of Party B adopted January 24, 1990.

(l)   "**Supplemental Resolutions**" means, collectively, the Thirtieth Supplemental Resolution and the Thirty-first Supplemental Resolution, each adopted by Party B on January 26, 2000.

Part 4.  **Other Provisions.**

(a)   **Obligations.**  Section 2(a)(iii) of this Agreement is hereby amended to read in its entirety as follows:—

"(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default, Potential Event of Default or Incipient Illegality with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement."

(b)   **Representations**.

(i)   The introductory clause of Section 3 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a) and 3(e), at all times until the termination of this Agreement) that:—".

(ii)   Section 3(a)(ii) of this Agreement is hereby amended to read in its entirety as follows:—

"(ii) **Powers**.  It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action and made all necessary determinations and findings to authorize such execution, delivery and performance;".

(iii)   Section 3(b) of this Agreement is hereby amended to read in its entirety as follows:—

"(b) **Absence of Certain Events**.  No Event of Default or Potential Event of Default or, to its knowledge, Incipient Illegality (in the case of a Government Entity) or Termination Event with

15

respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party."

(iv)    Section 3 of this Agreement is hereby amended by adding the following subsection "(e)" thereto, which subsection shall only apply to the Government Entity:—

"(e) *Non-Speculation*.  This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for purposes of managing its borrowings or investments and not for purposes of speculation."

(v)    Section 3 of this Agreement is hereby amended by adding the following subsection "(f)" thereto:—

"(f) *No Immunity*. Subject to the limitations of Section 6(f) of Chapter 372 of the Massachusetts Acts of 1984, it is not entitled to claim immunity on the grounds of sovereignty or other similar grounds with respect to itself or its revenues or assets (irrespective of their use or intended use) from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) or (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be made subject to in any Proceedings (as defined in Section 11(b)) in the courts of any jurisdiction and no such immunity (whether or not claimed) may be attributed to such party or its revenues or assets."

(vi)    Section 3 of this Agreement is hereby amended by adding the following subsection "(g)" thereto:—

"(g) *Eligible Swap Participant*.  It is an "eligible swap participant" as defined in the Part 35 Regulations of the U.S. Commodity Futures Trading Commission."

(vii)    The representations of Section 3 of this Agreement made by each party to the other party shall also be deemed made to Insurer as provided in such Section 3.

(c)    *Agreements.*

(i)    The introductory clause of Section 4 of this Agreement is hereby amended to read in its entirety as follows:—

"Each party agrees with the other (or, in the case of Section 4(d), (e) and (f), the Government Entity agrees with the other party) that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—".

(ii)    Section 4 of this Agreement is hereby amended by adding the following subsections "(d)", "(e)" and "(f)" thereto:—

"(d) *Compliance with Covered Indenture*. Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B, as any of those provisions may be amended, supplemented or modified from time to time; provided that Party B agrees that it shall not amend, supplement, waive or otherwise modify the Supplemental Resolutions in any manner that would adversely affect Party A's rights and interests hereunder without the prior written consent of Party A.

(e) *Notice of Incipient Illegality*. If an Incipient Illegality occurs, the Government Entity will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Incipient

16

NYB 1120603.5

Illegality and will also give such other information about that Incipient Illegality as the other party may reasonably require.

(f) ***Security and Source of Payment of Party B's Obligations.*** Party B's regularly scheduled payment obligations under this Agreement and the Transaction entered into in the Confirmation dated the date hereof (the "Initial Transaction") (such payment obligations, the "Scheduled Amounts") shall be secured on a parity with the Massachusetts Water Resources Authority Multi-Modal Subordinated General Revenue Refunding Bonds, 2000 Series B and 2000 Series C (the "Bonds") by the same security as secures the Bonds as such security is set forth in Section 501(b) of the Original Resolution and Sections 8.1 and 8.4 of the applicable Supplemental Resolution. Party B represents that this Agreement constitutes a Qualified Swap, and that the Scheduled Amounts payable hereunder constitute Regularly Scheduled Qualified Swap Payments, payable in accordance with Section 506 of the Original Resolution. Party B further represents that all payments due on early termination of this Agreement pursuant to Section 6 hereof (other than Unpaid Amounts) shall be payable from the Commonwealth Obligation Fund pursuant to Section 512 of the Original Resolution. Capitalized terms used in this Section 4(f) and not defined herein have the respective meanings given such terms in the Covered Indenture."

(d) ***Jurisdiction.*** Section 11(b) of this Agreement is hereby amended to read in its entirety as follows:—

"(b) ***Jurisdiction***. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

(i) submits, to the fullest extent permitted by applicable law, to the non-exclusive jurisdiction of each of the courts of the State of New York, the United States District Court located in the Borough of Manhattan in New York City, the courts of the state in which the Government Entity or other party's principal executive offices are located and the United States District Court with jurisdiction over the location of the Government Entity or the other party's principal executive offices; and

(ii) waives, to the fullest extent permitted by applicable law, (1) any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, (2) any claim that such Proceedings have been brought in an inconvenient forum and (3) the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction."

(e) ***Definitions***. Section 12 of this Agreement is hereby amended to add the following definitions in their appropriate alphabetical order:—

"***Covered Indenture'*** has the meaning specified in the Schedule."

"***Covered Indenture Incorporation Date'*** has the meaning specified in the Schedule."

"***Government Entity'*** has the meaning specified in the Schedule."

"***Incipient Illegality'*** means (a) the enactment by any legislative body with competent jurisdiction over a Government Entity of legislation which, if adopted as law, would render unlawful (i) the performance by such Government Entity of any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of a Transaction or the compliance by such Government Entity with any other material provision of this Agreement relating to such Transaction or (ii) the performance

17

by a Government Entity or a Credit Support Provider of such Government Entity of any contingent or other obligation which the Government Entity (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction, (b) any assertion in any proceeding, forum or action by a Government Entity, in respect of such Government Entity or in respect of any entity located or organized under the laws of the state in which such Government Entity is located to the effect that performance under this Agreement or similar agreements is unlawful or (c) the occurrence with respect to a Government Entity or any Credit Support Provider of such Government Entity of any event that constitutes an Illegality."

<u>Miscellaneous</u>:

(f)       Confirmation. A form of Confirmation is set forth as Exhibit D hereto.

(g)       This Agreement is hereby amended by adding the following Section "13" hereto:—

**"13.       Relationship Between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):—

(a)       ***Non-Reliance***. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. It has not received from the other party any assurance or guarantee as to the expected results of that Transaction.

(b)       ***Assessment and Understanding***. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(c)       ***Status of Parties***. The other party is not acting as a fiduciary for or as an advisor to it in respect of that Transaction."

(h)       ***Credit Assignment Event.***

(i)       A "***Credit Assignment Event***" shall occur if at any time during the term of this Agreement, Party B or any Credit Support Provider of Party B ceases to maintain the Minimum Rating Requirement (as defined below) from both Moody's and S&P. Following the occurrence of a Credit Assignment Event, the rights and obligations of Party A under this Agreement and all Transactions hereunder shall automatically, and without any further action by any party, be deemed to have been assigned and delegated to LBSF, effective on the third Business Day following notification by Party A to Party B of such assignment and Party B expressly and irrevocably consents to such assignment and assumption, except that no such assignment and assumption shall occur at any time after the occurrence of any event of default under any master agreement between Party A and LBSF. As of and from the effective date of such assignment, LBSF shall succeed to all rights and obligations of Party A under this Agreement and all Transactions hereunder.

18

NYB 1120603.5

Notwithstanding the above, if at the time of such assignment LBSF and Party B are parties to a master agreement that sets forth general terms and conditions applicable to swap and related transactions between LBSF and Party B, the Transactions hereunder transferred to LBSF pursuant to the above provision will be governed by such master agreement.

"*Minimum Rating Requirement*" means (A) with respect to Moody's, a long-term senior unsecured debt rating, counterparty rating, or long-term deposit-paying rating of at least Baa3 or a financial strength rating of at least Baa2 (or, in the event that Moody's does not provide the long-term or other types of ratings referred to above with respect to Party B or Party B's Credit Support Provider, a commercial paper or short-term rating of at least P-3) and (B) with respect to S&P, a long-term senior unsecured debt rating, counterparty rating, financial program rating or certificate of deposit rating of at least BBB- or a financial strength rating of at least BB- (or, in the event that S&P does not provide the long-term or other types of ratings referred to above with respect to Party B or Party B's Credit Support Provider, a commercial paper rating or short-term rating of A-2).

(ii)     Party A represents that it has provided separate consideration to LBSF for the right to assign this Agreement and the Transactions hereunder to LBSF pursuant to clause (i), and Party B shall not owe Party A any termination or other payment upon any such assignment.

(iii)    Notwithstanding clause (i) above, no assignment of any Transaction to LBSF shall occur if, prior to the effective date of the assignment described in such clause (i), Party B notifies Party A that Party B agrees to (A) terminate all Transactions as if a Termination Event has occurred with Party B as the Affected Party or (B) assign all Transactions to a third party on terms acceptable to Party A and Party B.

(iv)     Notwithstanding clauses (i) through (iii) above, no transfer or assignment payment shall be due to or owing from either Party A or Party B other than its obligations under the Transactions.

(v)      Notwithstanding the foregoing, the assignment provisions of this paragraph shall not take effect if, at the time such assignment would be required, Party B shall have satisfied in full all of its payment obligations under Section 2(a) of this Agreement and shall at such time have no future payment obligations, whether absolute or contingent, under such Section.

(vi)     Upon an assignment pursuant to this Part 4(h), (1) a Trigger Event shall cease to constitute an Additional Termination Event, and (2) this Part 4(h) and Parts 1(g) through (i) of this Schedule shall cease to apply.

(i)    *Country of Domicile.* The country of domicile of Party A is the United States of America. The country of domicile of Party B is the United States of America.

(j)    *Confirmation.* Each Confirmation supplements, forms part of, and will be read and construed as one with, this Agreement. A form of Confirmation is set forth as Exhibit D hereto.

(k)    "*Stockholders' Equity*" means with respect to an entity, at any time, the sum at such time of (i) its capital stock (including preferred stock) outstanding, taken at par value, (ii) its capital surplus and (iii) its retained earnings, minus (iv) treasury stock, each to be determined in accordance with generally accepted accounting principles.

19

NYB 1120603.5

(l)     ***Sovereign Immunity.***   In the case of Party B, it represents that, subject to the limitations of Section 6(f) of Chapter 372 of the Massachusetts Acts of 1984, either (a) it and its properties and assets have no right to sovereign immunity, or (b) to the extent that it and/or its properties and assets has the right to sovereign immunity, the party executing the Master Agreement on its behalf has the authority to waive such immunity.

(m)    ***Commencement of Voluntary Bankruptcy.***   So long as Party A is solvent, Party A shall not (i) admit in writing its inability generally to pay its debts as they become due (ii) make a general assignment, arrangement or composition with or for the benefit of its creditors (iii) institute a proceeding seeking a judgment of insolvency or bankruptcy or any other relief in respect of Party A under any bankruptcy or insolvency law or other similar law affecting creditors' rights (iv) pass a resolution for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger) or (v) seek the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets.

(n)     ***No Capital Contribution to Party A.***   Party A, Holdings and LBSF have each acknowledged to and agreed with each other, and Party B hereby acknowledges, that neither Holdings nor LBSF nor any Affiliate of Party A is under any obligation whatsoever (whether express or implied) to contribute capital to Party A.   Party B represents and warrants to Party A that in executing and delivering this Agreement, and performing its obligations hereunder, Party B is relying on the credit of Party A alone, and not on the credit of any other entity that may be affiliated with Party A.

(o)     ***Intention to Enter into a "Swap Agreement".***   Each of Party A and Party B hereby acknowledges and agrees that this Agreement and all Additional Direct Agreements and each Transaction hereunder or thereunder is intended to be a "swap agreement" as that term is defined in the U.S. Bankruptcy Code (as amended from time to time) and that the rights granted to each party under Section 6 include a contractual right to terminate a "swap agreement" and to offset and net out termination values and payments in conjunction therewith.

(p)     ***Waiver of Right to Trial by Jury.***   Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document.   Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this section.

(q)     ***Severability.***   In the event that any one or more of the provisions contained in this Agreement should be held invalid, illegal, or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.   The parties shall endeavor, in good faith negotiations, to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(r)     ***Additional Representations.***   For purposes of Section 3 of this Agreement, the following shall be added, immediately following paragraph (f) thereof:

        (g)     ***No Reliance.***   In connection with the negotiation of, entering into, and confirming of the execution of, this Agreement, any Credit Support Document to which it is a party, each Confirmation and each Transaction: (i) the other party hereto or thereto has not given to it (directly or indirectly) any assurance, guaranty, or representation whatsoever as to the

20

expected or projected success, profitability, return, performance, result, effect, consequence or benefit (either economic, legal, regulatory, tax, financial, accounting or otherwise) of this Agreement, such Credit Support Document or any Transaction (ii) it is capable of understanding and has evaluated (alone or in consultation with independent professional adviser(s)) all of the terms, conditions and risks (economic or otherwise) of this Agreement, any Credit Support Document and each Transaction and is capable of assuming and willing to assume such risks and (iii) it has made its own investment, hedging and trading decisions (including decisions regarding the suitability or appropriateness of any Transaction in light of its circumstances) based upon its own judgment and upon advice from such independent professional advisers and such information as it has deemed necessary or appropriate and not upon any advice, view, recommendation, counsel or representations of the other party except as expressly set forth in this Agreement, in such Credit Support Document or in such Confirmation.

(h)    *No Agency.*  It is entering into this Agreement and each Transaction as principal (and not as agent or in any other capacity, fiduciary or otherwise).

(i)    *Swap Agreement.*  This Agreement and each Transaction is intended to constitute a "swap agreement" within the meaning of CFTC Regulation Section 35.1(b)(1).

(j)    *Eligible Swap Participant.*  It is an "eligible swap participant" within the meaning of CFTC Regulation Section 35.1(b)(2).

(k)    *Agreement not Standardized.*  Neither this Agreement nor any Transaction is one of a fungible class of agreements that are standardized as to their material economic terms, within the meaning of CFTC Regulation Section 35.2(b).

(l)    *Creditworthiness a Consideration.*  The creditworthiness of the other party was or will be a material consideration in entering into or determining the terms of this Agreement and each Transaction, including pricing, cost or credit enhancement terms of the Agreement or Transaction, within the meaning of CFTC Regulation Section 35.2(c).

(m)    *Line of Business.*  It has entered into this Agreement (including each Transaction evidenced hereby) in conjunction with its line of business (including financial intermediation services) or the financing of its business.

(n)    *Financial Institution.*  It is a "financial institution" as defined in the FDIC Improvement Act of 1991 and Regulation EE promulgated by the Federal Reserve Board thereunder.

(s)    *Recording.*  Each party may record telephone conversations in connection with this Agreement and any Transaction or potential Transaction.  Each party consents to such recordings being made and adduced in evidence in any proceedings.

(t)    *Setoff.*  Without affecting the provisions of this Agreement requiring the calculation of certain net payment amounts, all payments and deliveries under this Agreement shall be made without setoff or counterclaim and will not be subject to any conditions except as provided in Section 2(c) of this Agreement, provided however, that:

Following the occurrence of a Termination Event or Event of Default, each party will have the right to set off, counterclaim or withhold payment or delivery in respect of any payment due by the other party under this Agreement or any other transaction between the parties to this Agreement (including any guarantee issued by one party to the other party), whether matured or unmatured, regardless in each case of the office or branch through which a party is acting, and the

NYB 1120603.5

relevant party's obligations hereunder shall be deemed to be satisfied and discharged to the extent of such setoff, counterclaim or withholding.

Upon the exercise by one party of any such right of setoff, counterclaim or withholding of payment or delivery, notice of such exercise shall be provided promptly to the other party (and in any event, not later than one Local Business Day prior to the date such payment is due).

(u)     *No Setoff to Party A Affiliates.*  Except as provided in paragraph 4(t) above, Party B agrees that all payments required to be made by it under this Agreement shall be made without setoff or counterclaim and, for that it shall not withhold payment or delivery under this Agreement in respect of, any default by any Affiliate of Party A under any Other Agreement or any amount relating to any Other Agreement between Party B and such Affiliate of Party A or between an Affiliate of Party B and such Affiliate of Party A. As used herein, "Other Agreement" means any agreement, including, but not limited to, (i) any transaction (including an agreement with respect thereto) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (ii) any liability, claim or obligation (whether present or future, contingent or otherwise), or (iii) any combination of one or more of the transactions described above. This paragraph (u) shall supersede any setoff right contained in any Other Agreement or any agreement relating to any Other Agreement between Party B and any such Affiliate of Party A or between an Affiliate of Party B and such Affiliate of Party A.

(v)     *Transfer.*  Section 7 of the Agreement is hereby modified by inserting the following after the word "party" but before the comma in the third line thereof:

", provided, however, that such consent shall not be unreasonably withheld"

(w)     Tax Forms means any form or document that may be required or reasonably requested in order to allow the other party to make a payment under the Transaction without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate.

(x)     *Pledge of Swap Payment Rights and Other Property by Party A.*  Party A has pledged its rights to receive payments under this Agreement and under certain other swap agreements entered into or to be entered into by Party A ("Other Swap Agreements"), and has pledged or will pledge certain other property for the benefit of Party B and the counterparties under such Other Swap Agreements, ratably to secure Party A's obligations to make certain payments to Party B and such counterparties under this Agreement and the Other Swap Agreements. To the extent of any payments made by the provider(s) of any Qualified Credit Enhancement (as defined in Party A's Operating Guidelines) for the benefit of Party B, such provider(s) will be subrogated to the rights of Party B under this Agreement provided that such provider(s) shall not be entitled to enforce such subrogation hereunder until all obligations of Party A to Party B under this Agreement shall have been paid in full.

(y)     *Assignment by Party A.*  Section 7 of this Agreement is hereby amended by adding the following subsection "(c)" thereto:—

"(c) Party A may transfer this Agreement to Lehman Brothers Financial Products Inc. ("LBSF") without the consent of Party B or the Insurer, provided that LBSF has, at the time of such transfer, a long-term senior unsecured debt rating of AA2 or higher, as determined by Moody's, AA or higher as determined by S&P and, if rated by Fitch, AA or higher as determined by Fitch."

NYB 1120603.5

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

| | |
|---|---|
| LEHMAN BROTHERS DERIVATIVE PRODUCTS INC. | MASSACHUSETTS WATER RESOURCES AUTHORITY |

By:_____

    Name:     **VICE PRESIDENT**
           **LEHMAN BROTHERS DERIVATIVE PRODUCTS**
    Title:
    Date:

By:_____

    Name:
    Title:
    Date:

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1120603

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

LEHMAN BROTHERS DERIVATIVE
PRODUCTS INC.

MASSACHUSETTS WATER RESOURCES
AUTHORITY

By:_____

By:_____

    Name:

    Name:

    Title:

    Title:   Kenneth Wissman

    Date:

    Date:     Treasurer

Copyright © 1992 by International Swaps and Derivatives Association, Inc.

NYB 1120603

EXHIBIT A to Schedule
[Form of Opinion of Counsel for
Lehman Brothers Derivative Products Inc.]

[date]

Massachusetts Water Resources Authority
Charlestown Navy Yard
100 First Avenue
Boston, Massachusetts 02129

Gentlemen:

I have acted as counsel to Lehman Brothers Derivative Products Inc., a Delaware corporation ("Party A"), and am familiar with matters pertaining to the execution and delivery of the 1992 ISDA Master Agreement (the "Master Agreement") dated as of March 22, 2000 between Party A and the Massachusetts Water Resources Authority ("Party B"). The Master Agreement is to be supplemented by confirmations of swap transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement, together with all such Confirmations, shall constitute one agreement.

In connection with this opinion, I have examined or had examined on my behalf an executed copy of the Master Agreement and the form of Confirmation attached thereto, and certificates of public officials and officers of Party A and such other documents as I have deemed necessary or appropriate for the purposes of this opinion. In such opinion, I have assumed the genuineness of all the signatures, the authenticity of all documents submitted to me as originals and the conformity to authentic original documents of all documents submitted to me as certified, conformed or photostatic copies. I have also assumed that each Confirmation will be in substantially the form of Exhibit D to the Master Agreement.

Based upon the foregoing, I am of the opinion that:

1.      Party A is a corporation duly organized, validly existing and in good standing under the laws of Delaware.

2.      The execution, delivery and performance of the Master Agreement and each Confirmation are within the corporate power of Party A, have been duly authorized by all necessary corporate action and do not, or, with respect to each Confirmation, will not, conflict with any provision of its articles of incorporation or by-laws.

3.      The Master Agreement has been duly executed and delivered by Party A and constitutes, and with respect to each Confirmation, upon due execution and delivery by Party A, will constitute, a legally valid and binding obligation of Party A, enforceable against it in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the General Corporation Law of the State of Delaware.

Very truly yours,

EXHIBIT A
Page 1

NYB 1120603.5

EXHIBIT B to Schedule
GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("Party A") and the MASSACHUSETTS WATER RESOURCES AUTHORITY ("Party B") have entered into a Master Agreement dated as of March 22, 2000, (the "Master Agreement") pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "Transaction"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "Agreement").  This Guarantee is a Credit Support Document as contemplated in the Agreement. For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("Guarantor"), hereby agrees to the following:

(a)    Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under each Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement.  In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)    Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)    Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability thereof against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement and agrees that the obligations of the Guarantor under this Guarantee will upon the execution of any such Transaction by Party A and Party B extend to all such Transactions without the taking of further action by the Guarantor.

(d)    Guarantor shall be subrogated to all rights of Party B against Party A in respect of any amounts paid by Guarantor pursuant to the provisions of this Guarantee provided, however, that Guarantor shall not be entitled to enforce or to receive any payments arising out of, or based upon, such right of subrogation until all amounts then due and payable by Party A under the Agreement, shall have been paid in full.

(e)    Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded or must otherwise be restored by Party B upon an Event of Default as set forth in Section 5(a)(vii) of the Agreement affecting Party A or Guarantor.

(f)    Guarantor hereby waives (1) promptness, diligence, presentment, demand of payment, protest, order and, except as set forth in paragraph (a) hereof, notice of any kind in connection with the Agreement and this Guarantee, or (ii) any requirement that Party B exhaust any right to take any action against Party A or any other person prior to or contemporaneously with proceeding to exercise any right against Guarantor under this Guarantee.

EXHIBIT B
Page 1

NYB 1120603.5

[Guarantor makes the same representations to and agreements with Party B as those made by Party A pursuant to Sections 3 and 4 of the Agreement, at the times set forth therein, except that references therein to "the party" will be deemed to be references to "the Guarantor" and references therein to "the Agreement" will be deemed to be references to "the Guarantee." Section 13 of the Agreement is incorporated by reference in this Guarantee except that references therein to "the Agreement" will be deemed to be references to "the Guarantee."]  This Guarantee shall be governed by and construed in accordance with the laws of the State of New York, without reference to choice of law doctrine.  All capitalized terms not defined in this Guarantee but defined in the Agreement, shall have the meaning assigned thereto in the Agreement.

Any notice hereunder will be sufficiently given if given in accordance with the provisions for notices under the Agreement and will be effective as set forth therein.  All notices hereunder shall be delivered to Lehman Brothers Holdings Inc., Attention:  Treasurer, at 200 Vesey Street, 28th Floor, New York, New York  10285 USA (Facsimile No. (212) 526-1467) with a copy to Lehman Brothers Special Financing Inc., Attention:  _____, LBSF Swap Settlement at 200 Vesey Street, 7th Floor, New York, New York  10285 (Facsimile No. (212) 528-6927).

IN WITNESS WHEREOF, Guarantor has caused this Guarantee to be executed in its corporate name by its duly authorized officer as of the date of the Agreement.

LEHMAN BROTHERS HOLDINGS INC.

Name:
Title:
Date:

EXHIBIT B
Page 2

NYB 1120603.5

EXHIBIT C to Schedule
[Form of Opinion of Counsel for Party B]

[Date]

Lehman Brothers Derivative Products Inc.
3 World Financial Center
New York, New York 10285 USA

Gentlemen:

We have acted as counsel to the Massachusetts Water Resources Authority, a _____ organized under the laws of the Commonwealth of Massachusetts ("Party B") in connection with the execution and delivery of the 1992 ISDA Master Agreement ("the Master Agreement") dated as of March 22, 2000 between Lehman Brothers Derivative Products Inc. ("Party A") and Party B. The Master Agreement is to be supplemented by confirmations of swap transactions to be entered into by Party A and Party B from time to time (each a "Confirmation") and the Master Agreement, together with all such Confirmations, shall constitute one agreement.

In connection with this opinion, we have examined an executed copy of the Master Agreement and the form of Confirmation attached thereto and such corporate documents and records of Party B, certificates of public officials and officers of Party B and such other documents as we have deemed necessary or appropriate for the purposes of this opinion. In such opinion, we have assumed the genuineness of all the signatures, the authenticity of all documents submitted to us as originals and the conformity to authentic original documents of all documents submitted to us as certified, conformed or photostatic copies. I have also assumed that each Confirmation will be in substantially the form of Exhibit A to the Master Agreement.

Based upon the foregoing, we are of the opinion that:

1.     Party B is a _____ duly organized, validly existing and in good standing under the laws of the Commonwealth of Massachusetts.

2.     The execution, delivery and performance of the Master Agreement and each Confirmation by Party B are within Party B's corporate power, have been duly authorized by all necessary corporate action and do not, or, in the case of each Confirmation, will not, conflict with any provisions of Party B's articles of incorporation or by-laws.

3.     The Master Agreement has been duly executed and delivered by Party B and constitutes, and each Confirmation, upon due execution and delivery by Party B, will constitute, a legally valid and binding obligation of Party B enforceable against Party B in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

4.     To the best of our knowledge, no consent, authorization, license (including exchange control licenses) or approval of, or registration or declaration with, any United States of America federal, New York or Massachusetts governmental authority is required in connection with the execution, delivery and performance of the Master Agreement and each Confirmation by Party B.

5.     The choice of law provision in the Master Agreement is valid and binding under the laws of Massachusetts or any political subdivision thereof and would be given effect by the courts of Massachusetts or any political subdivision thereof. The provision incorporated by reference in the Master Agreement whereby Party B irrevocably submits to [the jurisdiction of the English courts] [the nonexclusive jurisdiction of the courts of the State of New York and the United States District Court

EXHIBIT C
Page 1

located in the County of New York (the "New York Courts")] [*] is valid and binding on Party B under the laws of _____ and any political subdivision thereof and if any final judgment of the New York Courts is rendered against Party B with respect to the Master Agreement, such judgment would be recognized and enforced by the courts of _____ and any political subdivision thereof without reexamination or relitigation on the merits of the subject matter thereof

6. [Opinion re: security and source of payment of Party B's obligations, enforceability of Covered Indenture and related bond documents.]

The opinions expressed herein are limited to matters concerning the federal laws of the United States of America, the laws of the State of New York and the laws of the Commonwealth of Massachusetts.

Very truly yours,

---

[*]    *Delete as applicable*

EXHIBIT C
Page 2

<u>EXHIBIT D to Schedule</u>
<u>LBDP SHORT FORM CONFIRMATION</u>

Date:

To:              Massachusetts Water Resources Authority
Charlestown Navy Yard
100 First Avenue
Boston, Massachusetts 02129
Telephone:
Telecopier:

From:          Lehman Brothers Derivative Products Inc.
3 World Financial Center
New York, NY 10285-1200
[Documentation Contact]
Telephone:     (212) ___-____
Telecopier:     (212) ___-____

SUBJECT:       TRANSACTION (Ref: S-00)

The purpose of this communication is to set forth the terms and conditions of the Transaction entered into on the Trade Date specified below (the "Transaction"), between Lehman Brothers Derivative Products Inc. ("Party A") and the Massachusetts Water Resources Authority ("Party B"). This communication constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below, and supersedes all or any prior written or oral agreements in relation to the Transaction.

The definitions and provisions contained in the 1991 ISDA Definitions (as published by the International Swaps and Derivatives Association, Inc.) (the "Definitions") are incorporated into this Confirmation. In the event of any inconsistency between those definitions and provisions and this Confirmation, this Confirmation will govern.

1.      This confirmation supplements, forms a part of, and is or will be subject to the 1992 ISDA Master Agreement, dated as of March 22, 2000, as amended and supplemented from time to time (the "Agreement"), between you and us. All provisions contained in the Agreement govern this Confirmation except as expressly modified below.

2.      References in this Confirmation to "Transaction" shall be deemed to be references to "Swap Transaction" for the purposes of interpreting the Definitions, and references in the Definitions to "Swap Transaction" shall be deemed to be references to "Transaction" for the purposes of interpreting this Confirmation.

3.      The terms of the particular Transaction to which this communication relates are as follows:

Trade Date:

Effective Date:

Termination Date:             _____, [subject to adjustment in accordance with the Modified Following Business Day Convention]

Notional Amount:

Fixed Amounts-

EXHIBIT D
Page 1

NYB 1120603.5

Fixed Rate Payer:                         Party A/B

Fixed Rate Payer                          _____ and _____ of each year, commencing
Payment Dates:                            _____, 199__ and ending on the Termination Date,
                                          [subject to adjustment in accordance with the _____
                                          Business Day Convention] [with No Adjustment of Period
                                          End Dates]

Fixed Rate:                               0.00% (percent)

Fixed Rate
Day Count Fraction:

Floating Amounts-

Floating Rate Payer:                      Party A/B

Floating Rate Payer                       _____ and _____ of each year, commencing
Payment Dates:                            _____, 199__ and ending on the Termination Date,
                                          [subject to adjustment in accordance with the _____
                                          Business Day Convention] [with No Adjustment of Period
                                          End Dates]

Floating Rate for initial                 To be determined (0.00%)
Calculation Period:

Floating Rate Option:

Designated Maturity:

Spread:                                   Plus / Minus 0.00% / None

Floating Rate Day Count Fraction:

Reset Dates:                              The first day of each Calculation [Compounding] Period

Compounding:                              Applicable/Inapplicable

[Method of Averaging]:                    [Weighted/Unweighted Average]

[Rate Cut-off Date]:

Calculation Agent:                        Party A

Business Days:

Business Day Convention:                  Modified Following/Following

[Credit Support Document:                 Party B agrees to provide the following Credit Support
                                          Documents.]

EXHIBIT D
Page 2

Payment Instructions for Party A in   [_____ ABA Number [_____],
USD:                                  account of Lehman Brothers Derivative Products Inc.,
                                      Account Number [      ]

Payment Instructions for Party B in   Please advise
USD:


     Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us within five (5) Business Days of Trade Date.

     NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS CONFIRMATION OR THE AGREEMENT, PARTY A SHALL BE UNDER NO OBLIGATION TO MAKE ANY SCHEDULED PAYMENT WITH RESPECT TO THIS TRANSACTION UNTIL PARTY B HAS EXECUTED AND DELIVERED THIS CONFIRMATION TO PARTY A.

Yours sincerely,

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.


By:   _____
Name: _____
Title: _____


Confirmed as of the
date first written:
MASSACHUSETTS WATER RESOURCES AUTHORITY


By:   _____
Name: _____
Title: _____

[Internal ID/Focus ID]


EXHIBIT D
Page 3

NYB 1120603.5

EXHIBIT E to Schedule

*[insert form of Party B's Credit Support Document, if applicable]*

NYB 1120603.5

EXHIBIT F to Schedule
LETTER OF UNDERTAKING

Letter of Undertaking

[date]

Massachusetts Water Resources Authority
Charlestown Navy Yard
100 First Avenue
Boston, Massachusetts 02129

Attention:

Lehman Brothers Derivative Products Inc.
3 World Financial Center
New York, New York 10285-0700

Attention:        Notice Generation

Ladies/Gentlemen:

        Reference is hereby made to the Master Agreement dated as of March 22, 2000 between Lehman Brothers Derivative Products Inc. ("LBDP") and the Massachusetts Water Resources Authority, which Master Agreement we have reviewed for the purposes of: (1) determining the acceptability of the provisions pertaining to the assignment of LBDP's rights and obligations to us subject to the terms and conditions set forth therein, and (2) delivering this Letter of Undertaking to you.

        In return for separate and adequate consideration provided to us by LBDP, receipt of which is hereby acknowledged, we hereby agree to accept assignment of the rights and obligations of LBDP under the Master Agreement, subject to the terms and conditions set forth in such Master Agreement.

Sincerely,

LEHMAN BROTHERS SPECIAL FINANCING INC.

Name:
Title:
Date:

Name:
Title:
Date:

EXHIBIT F
Page 1

NYB 1120603.5

Exhibit G to Schedule

Swap Insurance Policy

EXHIBIT G
Page  1

Exhibit H to Schedule

[Form of Opinion of Counsel to Insurer]

EXHIBIT H
Page 1

NYB 1120603.5

EXHIBIT I to Schedule

Officer's Certificate

The undersigned the [Chief Executive Officer] [Chief Financial Officer] of the Massachusetts Water Resources Authority  (the "Authority") hereby certifies in connection with the Master Agreement (the "Master Agreement") dated as of March 22, 2000, between Lehman Brothers Financial Products Inc. ("Lehman") and the Authority that:

(i)      The Authority has taken all action required to be taken to ensure that the Master Agreement and any Confirmation entered into or to be entered into, and the Transactions contemplated thereby, are authorized under and comply in all respects with [specify statutory and/or regulatory authority] (the "Statute"), [its charter and/or its by-laws], including

[set forth any actions required by the Statute to be taken]; and

(ii)     The Authority is entering into the Master Agreement and any Transactions entered into or to be entered into thereunder, for hedging purposes and not for the purpose of speculation.

Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Master Agreement.

IN  WITNESS  WHEREOF, this  Certificate  has  been  executed  as  of  this  _____  day  of _____, ____.

EXHIBIT I
Page 1

NYB 1120603.5