**Hearing Date and Time: December 22, 2008 at 10:00 a.m (Prevailing Eastern Time)**
**Objection Date and Time:  December 17, 2008 at 4:00 p.m (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                                                  :
**In re**                                                         :        **Chapter 11 Case No.**
                                                                  :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*    :        **08-13555 (JMP)**
                                                                  :
                               **Debtors.**                       :        **(Jointly Administered)**
                                                                  :
                                                                  :
------------------------------------------------------------------x

**NOTICE OF LBHI'S MOTION, PURSUANT TO SECTIONS 105(a)**
**AND 365 OF THE BANKRUPTCY CODE, FOR AUTHORIZATION**
**TO ASSUME ADMINISTRATIVE SERVICES AGREEMENT WITH AETNA**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization and approval of, among other things, the

assumption of an administrative services agreement by and between Aetna Life Insurance

Company, on the one hand, and LBHI, on the other, as supplemented by a letter agreement, all as

more fully described in the Motion, will be held before the Honorable James M. Peck, United

States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs

House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy

Court"), on **December 22, 2008 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and

Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee

for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New

York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian

Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley

& McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F.

Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee

of unsecured creditors appointed in these cases; and (v) any person or entity with a particularized

interest in the Motion, so as to be so filed and received by no later than **December 17, 2008 at

4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated:  December 8, 2008
   New York, New York

       /s/ Richard P. Krasnow
       Richard P. Krasnow

       WEIL, GOTSHAL & MANGES LLP
       767 Fifth Avenue
       New York, New York 10153
       Telephone: (212) 310-8000
       Facsimile: (212) 310-8007

       Attorneys for Debtors
       and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                                    :
**In re**                                                           :    **Chapter 11 Case No.**
                                                                    :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*                        :    **08-13555 (JMP)**
                                                                    :
                                   **Debtors.**                     :    **(Jointly Administered)**
                                                                    :
                                                                    :
-------------------------------------------------------------------x

### LBHI'S MOTION, PURSUANT TO SECTIONS 105(a)
### AND 365 OF THE BANKRUPTCY CODE, FOR AUTHORIZATION
### TO ASSUME ADMINISTRATIVE SERVICES AGREEMENT WITH AETNA

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

### Background

1.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

## Jurisdiction

4.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Lehman's Business

5.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States. For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

6.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy

Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

### Relief Requested

7.      By this Motion, LBHI seeks authorization, pursuant to sections 105(a) and 365 of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, to assume an administrative services agreement by and between Aetna Life Insurance Company and its affiliated health maintenance organizations (collectively, "Aetna"), on the one hand, and LBHI, on the other, as supplemented by a letter agreement, dated July 25, 2007 (collectively, the "Agreement").  A complete copy of the Agreement is attached hereto at Exhibit "A."

### The Administrative Services Agreement

8.      Prior to and since the Commencement Date, Aetna has provided certain administration and management services to enable Lehman to offer health and medical coverage to its employees nationally.  Currently, Lehman operates under a "self-funded" group medical benefits plan (the "Group Benefits Plan").  That is, in exchange for a monthly service fee (the "Service Fee"), Aetna performs administrative functions associated with providing medical coverage to Lehman's employees and makes its network of medical providers available to Lehman at agreed upon reduced rates with Aetna.  While Aetna pays the actual medical claims, LBHI reimburses Aetna for such claims on an almost daily basis pursuant to the Agreement.

9.      As detailed in the Agreement, Aetna performs a wide variety of medical administration and patient management services.  Most importantly, Aetna processes payment of medical claims submitted by medical providers that have rendered services to Lehman employees.  If LBHI fails to pay for those medical claims, there could be a disruption in the

employees' medical coverage.  Aetna's other services include record-keeping and patient management, such as assistance with in-patient certification and discharge planning.

10.     For the 2008 calendar year, the monthly Service Fee payable to Aetna is calculated at a rate of between $33.29 - $34.30 (depending on the range of total employees enrolled) multiplied by the actual number of employees enrolled in an Aetna medical coverage plan.  Since the sale of the broker dealer business to Barclays Capital Inc. ("Barclays") on September 22, 2008 (the "Sale"), the average monthly cost to Lehman for its portion of the Service Fee has been approximately $173,500.  Barclays has been paying its portion of the Service Fee and medical claims for employees transferred in connection with the Sale.

11.     The Group Benefits Plan is self-funded by Lehman.  The monthly Service Fee and the underlying medical claims have been paid by a voluntary employee beneficiary association ("VEBA") established at the direction of LBI on September 12, 2008 under section 501(c)(9) of the Internal Revenue Code of 1986.  A $95 million contribution was made to the VEBA to ensure the uninterrupted coverage of active employees and other participants in the LBHI Group Benefits Plan and thereby to protect the enterprise values of Lehman.  Subsequent to its establishment, the VEBA has been funding Lehman's obligations under the Group Benefits Plan.  The funds placed in the VEBA backstop any inability by Lehman to fund medical, dental, prescription drug, death benefits and other benefits under the Group Benefits Plan that are eligible for payment by a VEBA for active U.S.-based Lehman employees and other participants in the Group Benefits Plan.

12.     In light of the changed circumstances of Lehman's business, in particular, the massive reduction of its workforce, a "self-funded" program is no longer cost-efficient for LBHI and exposes it to greater risk.  As a result, Aetna and LBHI have been negotiating a new

insurance agreement (the "Insurance Agreement") that will govern their relationship from January 1, 2009 forward.[1]  Under the Insurance Agreement, LBHI will pay a monthly premium and Aetna will pay the cost of medical claims.  The amount of the monthly premium payable by LBHI is still being negotiated by the parties.  Under the Insurance Agreement, Aetna will continue to provide claims administration, management and patient services through third-party contractors for claims arising after January 1, 2009 for no additional fee.

13.    The Insurance Agreement will not, however, include coverage by Aetna for claims incurred prior to January 1, 2009, including those incurred under the current Agreement (otherwise known as "runoff claims").  As a result, to ensure that Aetna will continue to process "runoff claims" under the terms and conditions of the current Agreement and to avoid any interruption in employee medical coverage as a result of the transition to the new Insurance Agreement, LBHI has determined to assume the Agreement with modifications to provide: (a) administration of runoff claims through the end of 2009 for a fee of approximately $530,000;[2] (b) termination of application of the Agreement as to claims arising after December 31, 2008; and (c) termination of all obligations by the parties on December 31, 2009.

### Assuming the Administrative Services Agreement
### Is an Appropriate Exercise of LBHI's Business Judgment

14.    Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  In determining whether an executory contract or unexpired lease should be assumed, courts apply the "business judgment"

---

[1]  LBHI believes that its entry into the Insurance Agreement with Aetna is an ordinary course transaction and does not require Court approval under section 363(c)(1) of the Bankruptcy Code.

[2]  The precise amount of the fee will be determined under a formula that will be agreed to by the parties.

test.  *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures*), 4 F.3d 1095, 1099

(2d Cir. 1993); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th

Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and

increase its cost, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially"); *In re

Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("The decision to assume or reject an

executory contract is within the sound business judgment of the debtor-in-possession. . . ."). A

court should approve the assumption of a contract under section 365(a) of the Bankruptcy Code

if it finds that a debtor has exercised its sound business judgment in determining that assumption

of an agreement is in the best interests of its estate. *See, e.g.*, *In re Child World, Inc.*, 142 B.R.

87, 89-90 (Bankr. S.D.N.Y. 1992).

15.     LBHI has determined in its sound business judgment that assumption of

the Agreement is in the best interests of its estate.  By assuming the Agreement, employees –

whether employed by Lehman or transferred to Barclays – are assured that there will be no

disruption in their medical coverage during LBHI's transition to the Insurance Agreement with

Aetna.

16.     Currently, upon providing medical care, medical providers submit claims

to Aetna for processing and payment.  Aetna then verifies the services rendered, issues a check

for the amounts charged, and simultaneously requests payment from LBHI.  There is a

possibility, however, that not all medical providers will timely submit their claims by December

31, 2008.  As a result, to ensure that Aetna will continue to process "runoff claims" and that

LBHI will continue to be able to take advantage of the reduced network rates negotiated by

Aetna, LBHI has determined to assume the Agreement.  LBHI also believes that assumption of

the Agreement, which was an element of the negotiations over the Insurance Agreement, will enhance its relationship with Aetna going forward and enable a smooth transition to the new Insurance Agreement.

17.    The sound business reasons in favor of assuming the Agreement are bolstered by the lack of any additional cost associated with the Motion.  As explained, there are no pre-petition amounts (i.e., Service Fees) owed to Aetna that need to be cured because all such payments have been fully satisfied by the VEBA.  Additionally, continuing the administration of runoff claims under the Agreement is far less expensive than any feasible alternative available to LBHI.  The assumption of the Agreement clearly represents a reasonable exercise of LBHI's business judgment, and, therefore, should be approved.

## **Notice**

18.    No trustee or examiner has been appointed in these chapter 11 cases.  In compliance with Bankruptcy Rules 6006(c) and 9014, LBHI has served notice of this Motion on Aetna.  In addition, LBHI has served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  LBHI submits that no other or further notice need be provided.

19.    No previous request for the relief sought herein has been made by LBHI to this or any other court.

WHEREFORE LBHI respectfully requests that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated: December 8, 2008
     New York, New York


/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# Exhibit "A"

# ADMINISTRATIVE SERVICES AGREEMENT

## AGREEMENT NUMBER ASA-697759-A

This Administrative Services Agreement (hereinafter "Services Agreement") is made and entered into between and among Aetna Life Insurance Company on behalf of itself and its affiliated health maintenance organizations ("HMOs") identified at the end of this Services Agreement (collectively "Aetna") and Lehman Brothers Holdings Inc. ("Lehman") as sponsor of the Plan (as herein defined) and on behalf of its Affiliates and the Committee as herein defined, and collectively referred to hereinafter as "Customer").

WHEREAS, Customer has established the Lehman Brothers Holdings Inc. Group Benefits Plan, a self-funded employee health benefits plan for certain eligible individuals, which is subject to the Employee Retirement Income Security Act of 1974; and

WHEREAS, Lehman's Employee Benefit Plans Committee ("Committee") is the plan administrator (within the meaning of section 3(16)(A) of ERISA) and named fiduciary of the aforesaid Plan responsible for operation and administration of the Plan, and in order to carry out its responsibilities as such named fiduciary desires to engage the services of Aetna to provide certain administrative services for the Plan; and

WHEREAS, pursuant to the Plan, Customer wishes to make available one or more coverage Products/Programs offered by the HMOs as specified below; and

WHEREAS, Aetna has arranged to provide integrated administration of these Product(s) and, if requested by the Customer, has also agreed to provide certain administrative services and products not available through the HMOs;

THEREFORE, in consideration of the mutual covenants and promises stated herein and other good and valuable consideration, the parties hereby enter into this Services Agreement. This Services Agreement includes and incorporates by reference the attached Service and Fee Schedule, General Conditions Addendum, Description of Services Addendum, National Advantage Program, Addendum, Appendices and Attachments.

Any term used in capital form is defined in this Services Agreement and shall have the same definition and meaning throughout this Services Agreement.

Customer hereby elects to receive the Services for Products/Programs designated in the Service and Fee Schedule attached hereto and made a part hereof. The corresponding Service Fees effective for the period beginning January 1, 2004 and ending December 31, 2004 are specified in the Service and Fee Schedule, which shall be amended for future periods, in accordance with Section 3 of the General Conditions Addendum, to reflect the Services elected and corresponding Service Fees for such periods.

The HMOs include the following entities to the extent that Plan beneficiaries elect coverage under Products offered in geographic areas serviced by such entity: Aetna Health Inc. (CT), Aetna Health Inc. (ME), Aetna Health Inc. (MA), Aetna Health Inc. (NH), Aetna Health Inc. (NY), Aetna Health Inc. (DE), Aetna Health Inc. (NJ), Aetna Health Inc. (PA), Aetna Health Inc. (MD), Aetna Health Inc. (FL), Aetna Health Inc. (TN), Aetna Health Inc. (GA), Aetna Health of the Carolinas Inc., Aetna Health Inc. (LA), Aetna Health Inc. (CO), Aetna Health of Illinois Inc., Aetna Health Inc. (MI), Aetna Health Inc. (MO), Aetna Health Inc. (OH), Aetna Health Inc. (OK), Aetna Health Inc. (TX), Aetna Health Inc. (AZ). Aetna Life Insurance Company is authorized to represent the HMOs for purposes of the execution and administration of this Services Agreement, including receipt of any notices to Aetna hereunder.

This Services Agreement (including incorporated attachments) constitutes the complete and exclusive contract between the parties and supersedes any and all prior or contemporaneous oral or written communications, agreements or proposals not expressly included herein. No modification or amendment of this Services Agreement shall be valid unless in writing signed by a duly authorized representative of Aetna and a duly authorized representative of Customer. Changes in medical protocols, practices and procedures, provided that they do not materially alter the Summary Plan Description, are not considered modifications or amendments of this Services Agreement. By executing this Services Agreement, the parties acknowledge and agree that they have reviewed all terms and conditions incorporated into this Services Agreement and intend to be legally bound by the same.

The effective date of this Services Agreement shall be January 1, 2004 ("Effective Date") except for the prior written consent requirement of Section 14 (C) which will become effective October 1, 2004.

IN WITNESS WHEREOF, the parties hereto have caused this Services Agreement to be executed by their duly authorized representatives.

**LEHMAN BROTHERS HOLDINGS INC.,**
acting as Plan Sponsor and on behalf of the
Committee as Plan Administrator and Named
Fiduciary

By: _Tracy Binkley_

Name: _Tracy Binkley_

Title: _Managing Director_

Date: _12/14/2004_

Address: _745 7th Avenue_

City: _New York_

State: _NY_  Zip: _10019_

**AETNA LIFE INSURANCE COMPANY
("AETNA")**

By: _Ronald A. Williams_

Ronald A. Williams
President

Registrar: _Charlotte B. Mahs_

Date: _12/1/04_

Financial Verification: _Susan Sayl_
_12/1/04_

# SERVICE AND FEE SCHEDULE

This Service and Fee Schedule is an attachment to the Services Agreement Number ASA-697759-A between Aetna and Customer (as identified therein) and is incorporated by reference.

Customer hereby elects to receive the Services for Products/Programs designated below. The corresponding Service Fees effective for the period beginning January 1, 2004 and ending December 31, 2004 are specified below. It shall be amended for future periods, in accordance with Section 3 of the General Conditions Addendum to reflect the Services elected and corresponding Service Fees for such periods.

## PRODUCTS/PROGRAMS

| Services | Indemnity Medical | Aetna Choice™ POS II | PPO Medical |
|---|---|---|---|
| I. Administration Services | Included | Included | Included |
| II. Patient Management Services | | | |
| Precertification | Included | Included | Included |
| Concurrent Review/Discharge Planning | Included | Included | Included |
| Case Management | Included | Included | Included |
| National Medical Excellence/ Institutes of Excellence | Included | Included | Included |
| Behavioral Health | Not Included | Included | Not Included |
| Focused Psychiatric Review | Included | N/A | Included |
| Healthy Outlook Program Comprehensive | Not Included | Not Included | Not Included |
| Informed Health Line: 1-800 # | Not Included | Included | Not Included |
| IHL Materials | Not Included | Not Included | Not Included |
| IHL Reports | Not Included | Not Included | Not Included |
| Moms-To-Babies Maternity Management Program™ | Not Included | Included | Not Included |
| Simple Steps To A Healthier Life™ | Not Included | Not Included | Not Included |
| Medquery | Not Included | Not Included | Not Included |
| III.   Network Access Services | N/A | Included | Included |
| Total Fee (Per Employee Per Month) | $18.50 | $28.05 | $28.05 |
| IV.   Aetna Subrogation Program | 27% of recovered amount will be retained for administrative expenses | | |
| V.   National Advantage Program (NAP) | Included | Included | Included |
| National Advantage-Facility Charge Review (NAP-FCR) | Included | Included | Included |
| National Advantage Access Fee: 35% of Aggregate Savings-Fee will be included in Plan Benefit Funding Request from Bank. | | | |

Aetna also may adjust Service Fees effective as of the date on which any of the following occurs.

(1)  If, for any Product/Program, there is a:

- 15% decrease in the number of average enrolled lives during the guarantee period from the guaranteed fee assumptions assumed in Aetna's quotation of October 21, 2003 (Attached hereto as Attachment A and incorporated herein by reference) (hereinafter "Guaranteed Fee Assumptions") such decrease to be determined in total for all Medical products combined for indemnity and choice POS II, or from any reset assumptions (reset if a new Service Fee is established).

  In addition, if such a decrease occurs, Aetna will make a charge for processing runoff for the terminated employees.

- 15% increase in the processed claim transactions per employee (PCTs/EE) ratio from the ratio in the Guaranteed Fee Assumptions, or from any subsequently reset assumptions (reset if a new Service Fee is established).

- 15% increase in the retiree percentage from the Guaranteed Fee Assumptions or from any subsequently reset assumptions (reset if a new Service Fee is established).

- 15% increase in the Member to Employee ratio from the Guaranteed Fee Assumptions or from any subsequently reset assumptions (reset if a new Service Fee is established).

(2)  Change in Plan - A material change in Plan is initiated by Customer or by legislative action.

(3)  Change in Claim Administration - A material change in claim payment requirements or procedures, account structure, or any other changes materially affecting the manner or cost of paying benefits.

(4)  If the National Advantage Program is terminated by Lehman Brothers.

**Late Payment Charges**
If Customer fails to provide funds on a timely basis to cover benefit payments as provided in Section 5 of the General Conditions Addendum, and/or fails to pay Service Fees on a timely basis as provided in Section 3 of such Addendum, Aetna will assess a late payment charge.  The per annum charge for 2004 will be as follows:

(i)   late funds to cover benefit payments (e.g., late wire transfers):  9% annual rate
(ii)  late payments of Service Fees:  9% annual rate

The amount of the late charge will be calculated by determining the number of full days the payment is late, dividing by the number of days in the calendar year (365), multiplying the result by the amount of payment which is late and the appropriate annual percentage fee (currently 9%).

In addition, Aetna will make a charge to recover its cost of collection, including reasonable attorneys' fees.

Aetna will provide written notice to Customer of the late payment charges for subsequent years.

0IN WITNESS WHEREOF, the parties hereto have caused this Service and Fee Schedule to be executed by their duly authorized representatives.

**LEHMAN BROTHERS HOLDINGS INC.,**
**acting as Plan Sponsor and on behalf of the**
**Committee as Plan Administrator and Named**
**Fiduciary**

By: *Tracy Binkley*

Name: _Tracy Binkley_

Title: _Managing Director_

Date: _12/14/2004_

Address: _745 7th Avenue_

City: _New York_

State: _NY_  Zip: _10019_

**AETNA LIFE INSURANCE COMPANY**
**("AETNA")**

By: *Ronald A. Williams*

Ronald A. Williams
President

Registrar: *Charlotte B. Marks*

Date: _12/1/04_

Financial Verification: *Susan Day*
_12/1/04_

# GENERAL CONDITIONS ADDENDUM

This General Conditions Addendum is an addendum to the Services Agreement Number ASA-697759-A between Aetna and Customer (as identified therein) and is incorporated by reference.

Definitions:

For the purposes of this Services Agreement the following terms shall have the following meanings:

(A)     "Plan(s)" means Lehman Brothers Holdings Inc. Group Benefits Plan described in Appendix I which Customer represents (i) is self-funded with respect to the medical care benefits that are the subject of this Services Agreement, and (ii) is an "Employee Welfare Benefit Plan" as this term is defined under ERISA.

(B)     "Plan Medical Benefits" means, collectively, all medical care benefits of whatever nature payable to Members, Network Provider, or Non-Aetna Provider including any benefits paid pursuant to capitated rates rather than on a fee-for-service basis, under and subject to the terms and conditions of the Plan, but not including any benefits under a flexible spending component of the Plan or copayments, coinsurance or deductibles required by the Plan.

(C)     "Employee" means only a person in those classes of employees and retirees that are specifically described in Appendix I, including employees and retirees of subsidiaries and affiliates of Customer who are reported, in writing, to Aetna for inclusion in the Services Agreement.

(D)     "Dependent" means only a person in a class described in Appendix I as a dependent of an Employee, including an Employee's lawful spouse or domestic partner and other eligible members of the Employee's family, as described in the Plan.

(E)     "Members" means Employees and Dependents covered under the Plan.

(F)     "Bank" means the bank selected by Aetna on which benefit payment checks are drawn in satisfaction of a claim for Plan Medical Benefits.

(G)     The term "Payment Due Date" shall have the meaning set forth in Section 3 of this General Conditions Addendum.

(H)     "Product" and/or "Programs" collectively mean a health benefit plan arrangement, including, but not limited to, an indemnity, point of service (POS), preferred provider organization (PPO) or exclusive provider organization (EPO) arrangement.

(I)     The term "Service Fees" shall have the meaning set forth in Section 3 of this General Conditions Addendum.

(J)     The term "Services Agreement Period" shall have the meaning set forth in Section 2 of this General Conditions Addendum.

(K)     The term "Services" shall have the meaning set forth in Section 1 to this General Conditions Addendum.

(L)     "ERISA" means the federal Employee Retirement Income Security Act of 1974, as amended.

(M)     "Concurrent Care Claim" means a previously approved claim for an ongoing course of treatment to be provided for a period of time or for a number of treatments.

(N)     "Pre-Service Claim" means any claim for a benefit under the Plan with respect to which the terms of the Plan conditions receipt of the benefit, in whole or in part, on approval of the benefit in advance of obtaining medical care.

(O)     "Post-Service Claim" means any claim for a benefit under the Plan that is not a Pre-Service Claim or an Urgent Care Claim.

(P)     "Urgent Care Claim" means any claim for medical care or treatment with respect to which the application of the time periods for making non-Urgent determinations:

could seriously jeopardize the life or health of the claimant or the ability of the claimant to regain maximum function, or

in the opinion of a physician with knowledge of the claimant's medical condition, would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

(Q)   "Confidential Information" of each party means  (i) information exchanged hereunder, both specifically related to this Services Agreement, its terms and existence, as well as all other non-public information relating to each party, its subsidiaries and Affiliates or their respective employees, customers or third party contractors, and shall include without limitation data, rates, procedures, materials, lists, fees, Documentation (as defined in Section 11 below), (ii) Protected Health Information relating to the Plans, pricing, processes, and financial data.  Confidential Information does not include information that is not identifiable as to Member or Plan Sponsor.

(R)   "Affiliate" shall mean when used in conjunction with Aetna, subsidiaries or affiliated entities under common control which are providing Services under this agreement.  When used in conjunction with Customer, means entities under common control which have members covered under the Plan or serve as the sponsor of the Plan.  With respect to either party, the term "Affiliate" shall not include independent contractors, third party subcontractors and vendors used by such party.

(S)   "Network Provider" means hospitals, physicians and other health care providers who have agreed with Aetna to provide services at agreed upon rates and are participating in the Plan covering Members.

(T)   "Non-Aetna Provider" means hospitals, physicians and other health care providers who are not participating in an Aetna network.

(U)   "Summary Plan Description" or "SPD" means the sections of the summary plan description for the Lehman Brothers Group Insurance Plan that directly relate to the medical benefits.  This includes, but is not limited to, the sections titled Introduction, Medical Plan, and  ERISA Rights and Other Important Information.

The following are the terms and conditions under which Aetna agrees to perform Services for Customer:

1.   **Purpose.** Customer will purchase and Aetna will provide to Customer the services designated in the Services Agreement and such other services Customer requests of Aetna and Aetna agrees in writing to perform, as described in the Service and Fee Schedule and the Description of Services Addendum with respect to the Plan(s) (the "Services").

2.   **Term.** The initial term of the Services Agreement shall commence on its Effective Date  and shall continue to the first anniversary of the Effective Date (the "Initial Term"), unless terminated by either party in accordance with Section 4 of this General Conditions Addendum. Following the Initial Term, the Services Agreement shall automatically be renewed from year to year, unless terminated by either party in accordance with Section 4 of this General Conditions Addendum.  The Initial Term and subsequent year to year renewals ("Renewal Periods") shall hereafter be collectively referred to as "Services Agreement Periods."

3.   **Service Fees; Renewal Periods.** The Service Fees payable by Customer to Aetna for the Services shall be determined in accordance with the Service and Fee Schedule attached hereto and in keeping with Aetna's quotation which shall be valid through the end of the guarantee period, as defined in the quotation. No Services other than those identified in the Service and Fee Schedule and the Description of Services Addendum are included in the Service Fees. The Services to be provided by Aetna and the Service Fees may be adjusted annually (the "Contract Anniversary Date") by Aetna upon the expire of the guarantee period, as identified in Attachment A, and as mutually agreed upon in writing and signed by the parties. Aetna shall give Customer one hundred and twenty (120) days prior written notice of such adjustments in Services and Service Fees.  Aetna is also obligated to adjust the Service Fees in accordance with the terms and conditions of the Service and Fee Schedule.

Aetna shall submit to Customer a statement for each month this Services Agreement is in effect showing the Service Fees for that month. Customer shall pay Aetna the amount of the Service Fees no later than thirty-one (31) calendar days following the first calendar day of the month in which the services are provided (the "Payment Due Date").

Aetna shall provide such other services at Customer's written request for an agreed upon additional fee. Customer shall reimburse Aetna for additional expenses incurred by Aetna on behalf of the Plan or Customer with respect to special hospital audits and fees paid for expenses incurred to recover Plan assets.

All overdue amounts shall be subject to the late charges set forth in the Service and Fee Schedule.

Following the close of a Services Agreement Period, Aetna will prepare and submit to the Customer a report showing the Service Fees paid.

4.    **Termination.** The Services Agreement may be terminated by Aetna or the Customer as follows:

(A)    **Legal Prohibition** - If any state or other jurisdiction enacts a law which prohibits the continuance of this Services Agreement, or an existing law is interpreted to so prohibit the continuance of this Services Agreement, the Services Agreement shall terminate automatically as to such state or jurisdiction on the effective date of such law or interpretation; provided, however, that if only a portion of the Services Agreement is prohibited by such law, only that portion of the Services Agreement shall be affected, and the Services Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

(B)    **Customer Termination** – Customer may terminate the Services Agreement for any reason with respect to the Members or any group of Employees included under the Services Agreement or any subsidiary or Affiliate of Customer that is covered under the Services Agreement by giving Aetna at least thirty-one (31) days written notice stating when, after the date of such notice, such termination shall become effective. Notwithstanding the foregoing, if Aetna breaches its obligations under Appendix A, Customer will provide Aetna with a cure period as provided for in Section VI(b) of Appendix A at the end of which, if Aetna has not cured the breach, Customer will provide written notice and will have immediate rights of termination.

(C)    **Aetna Termination** –

(1)    Aetna may terminate the Services Agreement by giving to Customer at least one hundred and twenty (120) days written notice stating when, after the date of such notice, such termination shall become effective.

(2)    If Customer fails to respond to Aetna's or the Bank's initial request to provide funds to the Bank for the payment of checks or other payments approved and recorded by Aetna, Aetna shall have the right to cease processing of benefit payment requests and suspend other Services until the requested funds have been provided. Aetna may terminate the Services Agreement immediately upon transmission of notice to Customer by mail, facsimile transmission or other means of communication (including electronic mail) if Customer fails to provide the requested funds within (5) business days of such notice by Aetna. If failure to provide funds with respect to benefit payments is due to a system failure, Aetna will not take any action to terminate the Services Agreement, provided all funds requested on and after the date of failure are furnished immediately following correction of the problem causing such failure.

(3)    If Customer fails to pay Service Fees by the Payment Due Date, less disputed amounts, Aetna may suspend Services until the charges have been paid. Aetna may terminate the Services Agreement immediately upon transmission of notice to Customer by mail, facsimile transmission or other means of communication (including electronic mail) if Customer fails to provide such Service Fees within 15 business days of written notice of unpaid Service fees by Aetna.

If failure to provide Service Fees is due to a system failure, Aetna will not take any action to terminate the Services Agreement, provided all Fees requested on and after the date of failure are furnished immediately following correction of the problem causing such failure.

Customer shall not be obligated to remit any disputed amounts on any statement until such dispute is resolved.

(4)    Any acceptance by Aetna of funds or Service Fees described in paragraphs (2) or (3) above, after the grace periods specified therein have elapsed and prior to any action by Aetna to suspend Services or terminate the Services Agreement, shall not constitute a waiver of Aetna's right to suspend Services or terminate the

(D)   **Responsibilities on Termination** - With respect to the Choice POS II medical claims, upon termination of the Services Agreement, Aetna will continue to process runoff claims for Plan Medical Benefits that were incurred prior to but not processed as of the termination date and which are received by Aetna not more than twelve (12) months following the termination date. The Service Fee for such activity is included in the Service Fee described in Section 3 of this General Conditions Addendum. With respect to all other medical claims, Aetna may be requested by the Customer, and Aetna may agree, to continue processing Plan Medical Benefits that were incurred prior to, but unpaid as of the termination date which are received by Aetna not more than twelve (12) months following the termination date, subject to payment of an additional Service Fee which is mutually agreed upon. The procedures, obligations, quality and level of performance described in the Services Agreement, to the extent applicable, shall not be degraded and shall survive the termination of the Services Agreement and remain in effect with respect to all such claims.

Benefit payments processed by Aetna with respect to such claims which are pended or disputed will be handled to their conclusion by Aetna and the procedures and obligations described in the Services Agreement, to the extent applicable, shall survive the expiration of the twelve (12) month period. Requests for benefit payments received after such twelve (12) month period will be returned to the Customer or, upon its direction, to a successor administrator at the Customer's expense.

Customer will be liable for all Plan Medical Benefit payments made by Aetna in accordance with the preceding paragraph following the termination date or which are outstanding on the termination date. Customer will continue to fund benefit payments through the banking arrangement described in Section 5 of this General Conditions Addendum and agrees to instruct its bank to continue to make funds available until all outstanding benefit payments have been funded by the Customer or until such time as mutually agreed upon in writing by Aetna and Customer.

A stop payment will be made on all outstanding benefit payment checks (checks which have not been presented for payment) on the sooner of:

(1)   one (1) year following the date Aetna completes its runoff processing obligations;

(2)   the date the Customer ceases to fund benefit payments, provided Customer has failed to respond to Aetna's or the Bank's written request to provide funds to the Bank for the payment of checks or other payments approved and recorded by Aetna, and funding is not received five (5) business days after the receipt by Customer of written notification of the late funding.

Notwithstanding the foregoing, if Customer's failure to respond is due to a system failure, Aetna will not make stop payments on any outstanding benefit payment checks, provided further that all funds requested on and after the date of failure are provided to the Bank immediately following correction of the problem causing such failure.

Upon termination of the Services Agreement and provided all Service Fees, less disputed amounts, have been paid, Aetna will release to Customer or to a successor administrator, in Aetna's standard format or such other commercially acceptable format agreeable to Aetna or legally required format, all claim data, records, and files within a reasonable time period following the termination date, but no later than thirty (30) days after termination. All reasonable costs associated with the release of data, records, and files from Aetna to Customer shall be paid by Customer.

5.   **Funding of Plan Medical Benefits.** Benefit payments and related charges of any amount payable under the Plan shall be made by check drawn by Aetna payable through the Bank or by electronic funds transfer or other reasonable transfer method. Customer, by execution of the Services Agreement, authorizes Aetna to issue and accept such checks on behalf of Customer for the purpose of payment of Plan Medical Benefits and other related charges. Customer agrees to provide funds through its designated bank sufficient to satisfy all Plan Medical Benefits and related charges upon notice from Aetna or the Bank of the amount of payments approved and recorded by Aetna. Customer agrees to instruct its bank to forward an amount in Federal funds on the day of the request equal to such liability by wire transfer or such other transfer method agreed upon between Customer and Aetna in writing. Plan Medical Benefits shall be deemed paid when (i) a check drawn

in accordance with Aetna's regular practices in satisfaction of a claim for benefits, has been accepted for payment by the drawee bank and has been approved and recorded by Aetna, or (ii) a benefit payment has been made by electronic funds transfer or other reasonable transfer method.

6.   **Customer's Responsibilities.** Customer shall supply Aetna in writing or by electronic medium acceptable to Aetna all information it considers appropriate and necessary, regarding the eligibility of Members including but not limited to the identification of any Dependents defined in Appendix I and shall notify Aetna by the tenth day of the month following any changes in Plan participation. Aetna has no responsibility for determining whether an individual meets the definition of a Dependent. Aetna shall not be responsible in any manner, including but not limited to, any obligations set forth in Section 12 below, for any delay or error caused by the Customer's failure to furnish accurate eligibility information in a timely fashion. Customer shall provide Aetna with all Plan documents least thirty (30) days prior to the Effective Date or such other date as may be mutually agreed upon by the parties. Customer shall notify Aetna in writing of any changes in Plan Medical Benefits or, to the extent that they relate to Plan Medical Benefits, Plan documents at least thirty (30) days prior to the effective date of such changes. Unless otherwise agreed to by the parties, Aetna shall have thirty (30) days following receipt of such notice to inform Customer whether it will be unable to administer such proposed changes due to, but not limited to, Aetna's inability to provide services to a class of employees, division, affiliate or subsidiary (e.g., a foreign subsidiary), the proposed plan design runs contrary to Aetna's business policy (e.g., limits or excludes specific physical diseases), or state or federal employer directed laws (e.g., anti-discrimination laws), or the benefit is not processible in Aetna's systems. The description of Plan Medical Benefits in Appendix I may otherwise be amended only by mutual written agreement of the parties. Aetna may charge additional fees relating to any increase in cost to administer the Plan because of changes which Aetna agrees to administer.

Customer shall promptly provide Aetna with such information regarding administration of the Plan as Aetna may reasonably request from time to time. Aetna shall utilize the information most recently supplied by Customer in connection with Aetna's Services and its other obligations under the Services Agreement. Aetna shall not be responsible for any delay or error caused by Customer's failure to furnish correct information in a timely manner.

Customer agrees that it will provide Aetna with a copy of the sections from the Summary Plan Description (SPD) that reference the Plan Medical Benefits. To the extent that Aetna identifies any potential differences that may exist among the SPD, the description of benefits in Appendix I and Aetna's internal policies and procedures, Aetna shall consult with the Customer as to the reconciliation of such potential differences. Customer also agrees that it is responsible for satisfying any and all Plan reporting and disclosure requirements imposed by law, except to the extent provided otherwise in Appendix A to the Services Agreement.

7.   **Services.** Aetna shall perform the Services set forth in the Service and Fee Schedule and the Description of Services Addendum identified in the Services Agreement. Customer acknowledges that, subject to the requirements of Section 20, Aetna may utilize the services of external reviewers or contractors in performing these Services.

8.   **Representations**

   (A) Aetna represents that it has the authority to enter into this Services Agreement and perform Services and provide materials and information hereunder and that its obligations hereunder are not in conflict with any other Aetna obligations;

   (B) Aetna represents that each of its employees has the proper skill, training and background necessary to accomplish their assigned tasks;

   (C) Aetna and Customer represent that they will each comply with the U.S. Foreign Corrupt Practices Act of 1977 and all regulations promulgated thereunder.

   (D) Aetna agrees and represents that it is an independent contractor and its employees are not Customer's agents or employees for federal, state, and local tax purposes or any other purposes whatsoever, and are not entitled to any Customer employee benefits.

   (E) Aetna represents that each of its employees providing Services under this Services Agreement is an employee of Aetna and that Aetna will withhold and pay all applicable income and payroll taxes with respect to such employees.

(F) Aetna, and not Customer, is solely responsible for the compensation of Aetna's employees assigned to perform Services hereunder, and payment of workers' compensation, disability and other similar benefits, unemployment and other similar insurance, for withholding income and payroll taxes and for verifying the work eligibility of Aetna's employees performing Services hereunder, including the completion and maintenance of Form I-9.

9.    **Standard of Care.** Aetna will discharge its obligations under the Services Agreement with that level of reasonable care which a similarly situated administrator of claims would exercise under similar circumstances. In connection with its fiduciary powers and duties hereunder, Aetna shall observe the standard of care and diligence required of a fiduciary under ERISA Section 404(a)(1)(B).

10.    **Fiduciary Duty.** Customer and Aetna agree that with respect to Section 503 of the Employee Retirement Income Security Act of 1974, as amended:

Aetna will be the "appropriate named fiduciary" of the Plan for all first level appeals and for second level appeals for Urgent Care Claims for purpose of reviewing denied claims under the Plan.

The Employee Benefit Plans Committee of the Customer will be the "appropriate named fiduciary" of the Plan for all other second level appeals (i.e., Pre-Service Claims, Post-Service Claims, and Concurrent Care Claims that are not Urgent Care Claims) for purpose of reviewing denied claims under the Plan.

The appropriate named fiduciary will have discretionary authority to determine entitlement to Plan benefits as determined by the Plan documents for each claim received and to construe the terms of the Plan.

Customer has the sole and complete authority to determine eligibility of persons to participate in the Plan. It is also agreed that, except as provided in this Section 10 Aetna has no other ERISA fiduciary responsibility under the Plan.

11.    **Records.** All Member identifiable or plan sponsor identifiable documents, records, reports, and data, including data recorded in Aetna's data processing systems ("Documentation"), related to the receipt, processing, and payment of claims, including all claim historics, shall at all times be the property of Customer, subject to Aetna's right to possession and use during the continuance of the Services Agreement and Aetna's right to maintain such Documentation in such form and in such locations as Aetna normally maintains such Documentation. Customer acknowledges and agrees that Aetna or one of its Affiliates or authorized agents shall have the right to use Documentation for legitimate Plan or health related purposes associated with its obligations hereunder, such as: claims payment and fraud prevention; preventive health, early detection and disease management programs; coordination of patient care; quality improvement/management assessment; utilization review and management; fulfilling certain state and federal requirements; HEDIS and similar data collection and reporting; accreditation by the National Committee for Quality Assurance and other accrediting organizations; and statistical research.

Upon reasonable prior written request, subject to the provisions of Sections 12 and 17 hereof, and as permitted by law or regulation, the benefit payment information contained in the Documentation shall be made available to Customer or, at Customer's request, to a third party designated by Customer for inspection during regular business hours at the place or places of business where it is maintained by Aetna, for purposes related to the administration of the Plan. Aetna may assess a charge to recover costs in connection with documentation requests which are excessively repetitive or burdensome. Such Documentation will be kept by Aetna for seven (7) years after the year in which a claim is paid or recorded, unless Aetna turns all such Documentation over to Customer or a designee of Customer.

12. **Audit rights.**

(A)    **General Guidelines** - For the purpose of this contract, an "Audit" is defined as performing a review of claim transactions for the purpose of assessing the accuracy of benefit determinations.

Audits must be commenced within two (2) years following the period being audited.

Audits of performance guarantees must be commenced in the year following the period to which the performance guarantee results apply.

The size of the Audit sample may not exceed 250 claims, without Aetna's written consent, which consent shall not be unreasonably withheld.

Audits must be performed at the location where Customer's claims are processed.

Aetna is not responsible for paying Customer's Audit fees or the costs associated with the Audit. Customer shall pay reasonable administrative costs incurred by Aetna for any Audit which (i) cannot be completed within a five (5) day period, provided that all necessary data for the claims to be audited is available within that 5 day period, (ii) contains a sample size in excess of 250 claims, or (iii) otherwise creates exceptional administrative demands upon Aetna. To the extent practicable, Aetna will communicate the basis for these charges to Customer prior to the Audit.

Any payment by Aetna resulting from the Audit must be based upon documented findings, agreed to by both parties, and must be solely due to Aetna's actions or inactions.

(B)    **Auditor Qualifications and Requirements** - Customer will utilize individuals to conduct Audits on its behalf who are qualified by appropriate training and experience for such work, will perform its review in accordance with American Institute of Certified Public Accountants' published administrative safeguards or procedures against unauthorized use or disclosure (in the audit report or otherwise) of any individually identifiable information (including health care information) contained in the information to be audited, and will not make or retain any record of provider negotiated rates included in the audited transactions, or payment identifying information concerning treatment of drug or alcohol abuse, mental/nervous or HIV/AIDS or genetic markers, in connection with any Audit. There must be no conflict of interest which would prevent the auditor from performing an independent Audit. Auditors may not be compensated on the basis of a contingency fee or a percentage of overpayments identified, in accordance with the provisions of Section 8.8 of the International Federation of Accountant's (IFAC) Code of Ethics For Professional Accountants (Revised 1999).

Audits of any services are subject to any related proprietary and confidentiality requirements protecting the nature of the data.

(C)    **Audit Coordination** - The account representative must be contacted to initiate an Audit. The representative will identify an Audit coordinator who will have day-to-day responsibility for coordinating and facilitating the audit.

Customer will provide reasonable advance notice of its intent to Audit and will complete an Audit request form providing information reasonably requested by Aetna. Further, Customer or its representative will provide the account representative at least four (4) weeks advance notice of the Audit, with a complete and accurate listing of the transactions to be pulled for the Audit. Notification requirements may exceed four weeks for unusual audit requests, including but not limited to audits involving large sample sizes (e.g., greater than 250 transactions). Aetna will communicate these requirements to Customer upon receipt of the completed Audit request form.

(D)    **Identification of Audit Sample** - Prior to the Audit, the auditors will provide a listing of the transactions selected for testing and the specific service for which each item is being tested. Unless otherwise specified in Appendix II, Performance Guarantees, the sample must be based on a statistical random sampling methodology (e.g., systematic random sampling, simple random sampling, stratified random sampling).

(E)   **Closing Meeting** - The auditors will provide their draft Audit findings to both Aetna and Customer, in writing. This draft will provide the basis for discussions between Aetna and the auditors regarding disagreements surrounding the auditor's findings and to summarize the Audit findings.

(F)   **Audit Reports** – Auditors shall provide Aetna with a copy of the final Audit report delivered to the Customer, and Aetna shall have the right to provide under separate cover a supplementary statement containing facts that Aetna considers pertinent to the Audit.

13.   **Recovery of Overpayments.** The parties will cooperate fully to make reasonable efforts to recover overpayments of benefits under the Plan. If it is determined that any payment has been made by Aetna to or on behalf of an ineligible person or if it is determined that more than the appropriate amount has been paid, Aetna shall undertake good faith efforts to recover the erroneous payment. For the purpose of this provision, "good faith efforts" means that Aetna will contact the responsible party twice via letter, phone, email or other means to try to make the recovery. If those efforts are unsuccessful in obtaining recovery, Aetna may use an outside vendor, collection agency or attorney to pursue recovery. Except as stated in this section, Aetna has no other obligation with respect to the recovery of overpayments.

Overpayment recoveries made through third party recovery vendors, collection agencies, or attorneys are credited to the Customer net of fees charged by them.

Overpayments must be determined by direct proof of specific claims. Overpayments may not be determined by (a) indirect or inferential methods of proof, such as statistical sampling, extrapolation of error rate to the population, etc. or (b) application of software or other review processes that analyze claims in a manner different from claim determination and payment procedures and standards used by Aetna.

Customer may not seek collection, or use a third party to seek collection, of overpayments from contracted providers pursuant to audits conducted in accordance with Sections 12 and 14 since all such recoveries are subject to the terms and provisions of the provider's contracts with Aetna. For the purpose of determining whether a provider has or has not been overpaid, Customer agrees that the rates paid to contracting providers for Covered Services shall be governed by Aetna's contracts with those providers, and shall be effective upon the loading of those contract rates into Aetna's systems, but no later than three (3) months after the effective date of the provider.

14.   **Indemnification.**

(A)   Aetna shall indemnify and hold harmless Customer, its directors, officers, employees (acting in the course of their employment, but not as Members) and agents (collectively, "Indemnitees") for that portion of any loss, liability, damage, expense, settlement, cost or obligation (including reasonable attorneys' fees) (collectively "Loss") which was caused solely and directly by Aetna's acts or omissions which constitute: breach of its confidentiality obligations, breach of its ERISA obligations, willful misconduct, criminal conduct, breach of the Services Agreement, fraud, breach of fiduciary responsibility, or failure to comply with Section 9 above, related to or arising out of the Services provided under the Services Agreement (hereinafter referred to as an Indemnifiable Event).

Aetna's Indemnification obligation in this section 14(A) includes Loss caused by employees, Affiliates and authorized subcontractors (in accordance with section 20 of this Agreement) of Aetna and Aetna assumes sole and full responsibility for the acts of such employees, Affiliates and authorized subcontractors, which constitute an Indemnifiable Event as defined above, and Aetna agrees to indemnify and save Customer harmless from any such Loss, provided however, that Aetna's obligation to indemnify shall not apply to that portion of any loss or liability caused by the misconduct or negligence of Customer's employees.

Aetna shall defend, indemnify and hold harmless Indemnitees from Loss incurred by or asserted against such Indemnitees and arising from physical injury to persons or property caused by the fault or negligence of Aetna's officers, employees, authorized sub-contractors, agents or representatives. The parties expressly agree that indemnification arising from physical injury to persons or property is limited to claims arising from premises liability, and does not include Losses arising out of acts or omissions of medical providers or out of Aetna's benefit determinations.

(B)   Lehman shall indemnify and hold harmless Aetna, its Affiliates and their respective directors, officers, employees and agents for that portion of any Loss (i) which was caused solely and directly by willful misconduct, criminal

conduct, breach of the Services Agreement, fraud, negligence (meaning a failure to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims) or breach of fiduciary duty by Customer or any employee of Customer, related to or arising out of the Services Agreement or Customer's role as employer or Plan sponsor or fiduciary, whichever may be applicable; (ii) in connection with the release or transfer of Member-identifiable information to Customer or a third party designated by Customer where such release was made in connection with Aetna's fulfillment of its responsibilities under this Agreement or upon Customer's request, or the use or further disclosure by Customer or such third party of any information so released or transferred; or (iii) resulting from the inclusion of third party vendor information on identification cards, provided that the information was included at the request of Customer.

Lehman shall defend, indemnify and hold harmless Aetna from Loss incurred by or asserted against Aetna and arising from physical injury to persons or property caused by the fault or negligence of Customer's officers, employees, authorized sub-contractors, agents or representatives.

(C)    The party seeking indemnification under (A) or (B) above must notify the indemnifying party within 30 days in writing of any actual or threatened action, suit or proceeding to which it claims such indemnification applies. Failure to so notify the indemnifying party shall not be deemed a waiver of the right to seek indemnification, unless the actions of the indemnifying party have been prejudiced by the failure of the other party to provide notice within the required time period.

The indemnifying party may then take steps to be joined as a party to such proceeding, and the party seeking indemnification shall not oppose any such joinder. Whether or not such joinder takes place, the indemnifying party shall provide the defense with respect to claims to which this Section applies and in doing so shall have the right to control the defense and settlement with respect to such claims.    Provided however, that in no event may the indemnifying party agree to any settlement of any claims or action for which it has agreed to provide indemnification under this Agreement where such settlement would adversely affect the rights of the indemnified party under this Agreement, or otherwise bind the indemnified party, without the indemnified party's prior written consent.

Notwithstanding the foregoing, the party seeking indemnification may assume responsibility for the direction of its own defense at any time, including the right to settle or compromise any claim against it without the consent of the indemnifying party, provided that in doing so it shall be deemed to have waived its right to indemnification except in cases where the indemnifying party has declined to defend against the claim.

(D)    Customer and Aetna agree that: (i) Aetna does not render medical services or treatments to Members; (ii) neither Customer nor Aetna are responsible for the health care that is delivered by contracting health care providers; (iii) health care providers are solely responsible for the health care they deliver to Members; (iv) health care providers are not the agents or employees of Customer or Aetna; and (v) the indemnification obligations of (A) or (B) above do not apply to any portion of any loss, liability, damage, expense, settlement, cost, or obligation caused by the acts or omissions of health care providers with respect to Members.

(E)    The indemnification obligations under (A) above shall not apply to that portion of any Loss caused by Aetna's act or omission undertaken at the direction of Customer (other than services described in the Services Agreement), and the indemnification obligations under (B) above shall not apply to that portion of any Loss caused by Customer's act or omission undertaken at the direction of Aetna.

(F)    The indemnification obligations under this Section 14 shall terminate upon the expiration of this Agreement, except as to any matter concerning which a claim has been asserted by notice to the other party at the time of such expiration or within two (2) years thereafter.

15.    **Defense of Claim Litigation.** In the event of a legal, administrative or other action ("Action") arising out of the administration, processing or determination of a claim for Plan Medical Benefits, the party designated in this document as responsible for the services at issue in the Action ("appropriate named fiduciary") shall undertake the defense of such Action at its expense and settle such Action when in its reasonable judgment it appears expedient to do so. If the other party is also named as a party to such Action, the appropriate named fiduciary will defend the other party PROVIDED the Action relates solely and directly to actions or failure to act by the appropriate named fiduciary and there is no conflict of interest between the parties. Lehman agrees to pay the amount of Plan Medical Benefits included in any judgment or settlement in such Action. The other party shall not be liable for any other part of such judgment or settlement, including but not limited to legal expenses and punitive damages, except to the extent provided in Section 14 above.

16.    **Remedies and Limitation of Liability.** Neither party shall be liable to the other for any lost profits, consequential, indirect, incidental, special, exemplary or punitive damages whatsoever, provided that the foregoing limitation shall in no way limit either party's responsibilities under Section 14 (Indemnification) and Section 18 (Confidentiality) .

17.    **Dispute Resolution.** If a controversy should arise out of this Agreement or the breach thereof, the individuals executing this Agreement on behalf of each party, or their respective successors or designees (hereinafter referred to as "the parties") will attempt in good faith to resolve the dispute informally through discussion, the exchange of documents, or meetings following either party's written notice of the existence and nature of the dispute. The parties agree that exhaustion of this dispute resolution process is not a condition precedent to seeking injunctive or other equitable relief before a court of competent jurisdiction

If a dispute cannot be settled by good faith negotiation between the parties, Aetna and Customer will submit the dispute to arbitration by a sole arbitrator in accordance with the rules of JAMS/ENDISPUTE, and judgment upon the award rendered by the arbitrator may be entered by any court having jurisdiction thereof.

18.    **Confidentiality:**

(A) Save and except as provided in this Agreement and section 18(B) below, each party acknowledges that pursuant to the Services Agreement and to fulfill its performance hereunder, each party may disclose or make available ("Disclosing Party") to the other party ("Receiving Party") Confidential Information belonging to the Disclosing Party. In addition, each party agrees to maintain the confidentiality of Protected Health Information (as defined in Appendix A), as required under Section 26 hereof and Appendix A to the Services Agreement and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the administrative regulations established pursuant to HIPAA by the Department of Health and Human Services.

(B) The Receiving Party may not disclose the Confidential Information to any third party other than representatives of such Receiving Party who have a "need to know" such information, provided that such representatives are informed of the confidentiality provisions hereof and are bound by the same or substantially similar terms as those contained herein and agree to abide by them. Each party agrees to make its employees and agents familiar with, and require them to abide by the terms of this Confidentiality provision. Aetna employees are required to sign a Code of Conduct containing terms substantially similar to this provision.

(C) In addition to the provisions of the foregoing paragraph (A), any information with respect to Aetna's or any of its Affiliate's fees or specific rates of payment to health care providers, and any information which may allow determination of such fees or rates, and any of the terms and provisions of the health care providers' agreements with Aetna or its Affiliates are deemed to be Aetna's Confidential Information. No disclosure of any such information may be made or permitted to Customer or to any third party whatsoever, including, but not limited to, any broker, consultant, auditor, reviewer, administrator, or agent unless (i) Aetna has consented in writing to such disclosure and (ii) each such recipient has executed a confidentiality agreement in form satisfactory to Aetna's counsel.

(D) Both parties acknowledge and agree that, except with respect to Personal Health Information, information shall not be considered "Confidential Information" only to the extent that such information is: (a) previously known to the Receiving Party, free from any obligation to keep it confidential; (b) publicly disclosed by the Disclosing Party either prior to or subsequent to receipt by the Receiving Party of such information; (c) independently developed by the Receiving Party without any access to the Confidential Information of the Disclosing Party; (d) rightfully obtained from a third party lawfully in possession of the Confidential Information who is not bound by confidentiality obligations to the Disclosing Party or (e) deidentified Member or plan sponsor data. The Receiving Party may disclose Confidential Information of the Disclosing Party if the Receiving Party is required to do so under applicable law, rule or order; provided that the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of the required disclosure so that the disclosing party may seek a protective order or other appropriate remedy; and provided further that the Receiving Party discloses no more Confidential Information than is reasonably necessary in order to respond to the required disclosure.

(E) The taxpayer (and each employee, representative, or other agent of the taxpayer) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the taxpayer relating to such tax treatment and tax structure. In this regard, the parties acknowledge and agree that any disclosure of the structure or tax aspects of the transactions contemplated by this Services Agreement is not limited in any way by an express or implied understanding or agreement, oral or written (whether or not such understanding or agreement is legally binding). The foregoing is intended solely to comply with the presumption set forth in Treasury Regulation 1.6011-4T(b)(3)(iv) and is not intended to permit the disclosure of any information to the extent such disclosure is not required in order to avoid the transactions contemplated by this Services Agreement being treated as a "reportable transaction" within the meaning of Treasury Regulation 1.6011-4(b)(3)(iii).

The parties further acknowledge and agree that both parties operate in a highly regulated and competitive environment and that the unauthorized disclosure or use of Confidential Information will cause irreparable harm and significant injury to the Disclosing Party which will be difficult to measure with certainty or to compensate through monetary damage. Accordingly, the parties agree that injunctive or other equitable relief shall be appropriate in the event of any breach by either party of this Confidentiality Provision in addition to such other remedies as may be available to the Disclosing Party at law or under this Services Agreement. In the event of any unauthorized disclosure of Confidential Information the termination provisions of Article VI of Appendix A will apply.

(F) Upon termination of the Services Agreement or at any time upon the request of the Disclosing Party the Receiving Party, will return or destroy all copies of all of the other's Confidential Information including all copies thereof and notes and other materials incorporating such Confidential Information, whether in physical or electronic form, in its possession or control except to the extent such information must be retained pursuant to applicable law, provided however, that Aetna may retain copies of any such Information it deems necessary for the defense of litigation concerning the Services it provides under this Services Agreement.

(G) The confidentiality obligations set forth above shall survive expiration or termination of this Services Agreement.

19.   **Relationship of the Parties.** It is understood and agreed that Aetna is an agent with respect to claim payments and an independent contractor with respect to all other Services being performed pursuant to the Services Agreement. Aetna further acknowledges that it is a Business Associate within the meaning of 45 C.F.R. §160.103. Aetna makes no guarantee and disclaims any obligation to make any specific health care providers or any particular number of health care providers available for use by Members or that any level of discounts or savings will be afforded to or realized by Customer, the Plan, or Members.

20.   **Subcontractors.** The work to be performed by Aetna under the Services Agreement may be performed directly by it and upon written notice to Customer, wholly or in part through a subsidiary or Affiliate or under a contract with an organization of its choosing. Aetna shall hold such Affiliates, subsidiaries and other organizations to the same standard of care for their delegated services as those to which Aetna is held for the same services under this Services Agreement. Aetna will remain primarily liable for the performance of such obligations and for the Service under the Services Agreement and will be responsible for the acts or omissions of its subcontractors, with respect to the performance of the Services, as if such acts and omissions were those of its employees. Aetna shall be liable with respect to all payments to such sub-contracting entity and shall be liable for all Services performed.

21. **Advancement of Funds.** If, in the normal course of business under the Services Agreement, Aetna, or any other financial organization with which Aetna has a working arrangement, chooses to advance any funds, Customer shall reimburse Aetna or such other financial organization for such payment. In no event shall such advances by Aetna or any other financial organization be construed as obligating Aetna or such organization to make further advances, or to assume liability of Customer for the payment of Plan Medical Benefits.

22. **Communications.** Aetna and Customer shall be entitled to rely upon any communication believed by them to be genuine and to have been signed or presented by the proper party or parties.

Neither party shall be bound by any notice, direction, requisition or request unless and until it shall have been received in writing at (i) in the case of Aetna, 151 Farmington Avenue, Hartford, Connecticut 06156, Attention: Employer Services Team Leader, Aetna, (ii) in the case of Customer, at the address shown below, or (iii) at such other address as either party specifies for the purposes of the Services Agreement by notice in writing addressed to the other party. Notices or communications shall be sent by mail, facsimile transmission, or other means of communication.

Address: Paul Imbimbo
Lehman Brothers Holdings Inc.
399 Park Avenue, 11th Floor
New York, NY 10022

With copy to General Counsel at 745 Seventh Avenue, New York, New York 10019

23. **Employee Notices.** Customer agrees to furnish each Employee covered by the Plan written notice, developed in consultation with Aetna, that Customer has complete financial liability for the payment of Plan Medical Benefits. Lehman agrees to indemnify Aetna and hold Aetna harmless against any and all loss, damage, and expense (including reasonable attorneys' fees) sustained by Aetna as a result of any failure by Customer to give such notice.

24  **Force Majeure.** Except for obligations to make payments under this Agreement, neither party shall be liable for any failure to meet any of the obligations or provide any of the Services or benefits specified or required under the Services Agreement where such failure to perform is due to any event or contingency beyond the reasonable control of such party, its employees, officers, or directors, provided however that such party shall not have contributed in any way to such event or contingency.  Such contingencies include, but are not limited to: acts or omissions of any person or entity not employed or reasonably controlled by such party, its employees, officers or directors; acts of God; fires; wars; accidents; labor disputes or shortages; governmental laws, ordinances, rules, regulations, or the opinions rendered by any Court, whether valid or invalid. Aetna shall maintain commercially reasonable disaster recovery plans to cure any such event or contingency. When a party's delay or non-performance resulting from events defined in this Section 24 continues for a period beyond seven (7) calendar days, the other party shall have the right to terminate this agreement in whole or in part upon transmission of written notice to the other party.

25. **Non-Aetna Networks.** If Aetna is requested by Customer to arrange for network services to be provided for Members in a geographic area where Aetna does not have a network of providers under contract to provide those services, Aetna may contract with another network of non-contracted providers ("non-Aetna networks") to provide the requested services. With respect to the services provided by providers who are not under contract to Aetna or any of its subsidiaries ("non-Aetna providers"), Customer acknowledges and agrees that, any other provisions of the Services Agreement notwithstanding:

1. Aetna does not credential, monitor, or oversee the providers or the administrative procedures or practices of any non-Aetna networks;

2. No particular discounts may, in fact, be provided or made available by any particular providers;

3. Such providers may not necessarily be available, accessible, or convenient;
4. Any performance guarantees appearing in the Services Agreement shall not apply to services delivered by non-Aetna providers or networks;

5.  Neither non-Aetna providers nor non-Aetna networks are to be considered contractors or subcontractors of Aetna; and

6.  Such providers are providers in private practice, are neither agents nor employees of Aetna, and are solely responsible for the health care services they deliver.

Customer further agrees that, if Aetna subsequently establishes its own contracted provider network in a geographic area where services are being provided by a non-Aetna network, Aetna may terminate the non-Aetna network contract, and begin providing services through a network that is subject to the terms and provisions of the Services Agreement. Customer acknowledges that such conversion may cause disruption, including the possibility that a particular provider in a non-Aetna network may not be included in the replacement network.

26.  **Health Insurance Portability And Accountability Act (HIPAA) Privacy Rule**

In accordance with the services being provided under the Services Agreement, Aetna will have access to, create, and/or receive certain Protected Health Information ("PHI" as defined in Appendix A to the Services Agreement), thus necessitating a written agreement that meets the applicable requirements of the privacy rules promulgated by the Federal Department of Health and Human Services ("HHS"). Customer and Aetna mutually agree to satisfy the foregoing regulatory requirements through Appendix A to the Services Agreement. The provisions of Appendix A supercede any other provision of the Services Agreement, to the extent such other provisions are in conflict with such Appendix A.

The provisions contained within Appendix A shall take effect on the effective date of the Services Agreement and at such time shall supercede the Business Associate Agreement between Aetna and the Customer dated April 14, 2003.

27.  **Miscellaneous.** The Services Agreement shall be governed by, and interpreted in accordance with, applicable federal law, including but not limited to ERISA. To the extent such federal law does not govern, the Services Agreement shall be governed by the laws of the State of New York, excluding its conflict of law rules and the courts in New York shall have sole and exclusive jurisdiction of any dispute related hereto or arising hereunder. No delay or failure of either party in exercising any right hereunder shall be deemed to constitute a waiver of that right.

28.  **Survival.** The obligations set forth in Sections 3 through 13 and 15 through 18 shall survive expiration or termination of the Services Agreement. The provisions of Section 14 shall survive expiration or termination only to the extent stated therein.

29.  **Headings.** The headings in the Services Agreement are for reference only and shall not affect the interpretation or construction of the Services Agreement and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

30.  **Insurance.** Aetna agrees to obtain and maintain and keep in full force and effect at Aetna's expense statutory workers' compensation, for those of its employees performing services under this Agreement. In addition, Aetna agrees to obtain and maintain professional and commercial general liability insurance. At its discretion, in lieu of insurance, Aetna agrees to maintain a program of self-insurance to satisfy its insurance obligations under this Agreement. The limits of such insurance shall not be less than two million dollars ($2,000,000) per occurrence for commercial general liability and five million dollars ($5,000,000) per claim for professional liability. Furthermore, Aetna agrees to obtain fidelity bond coverage for each of its personnel engaged by it to perform services under this Agreement in an amount not less than five million dollars ($5,000,000). Each such insurance policy shall: (a) be maintained with an insurer having a rating of at least A- in the most currently available Best's Insurance Reports. Aetna or its insurer shall also endeavor to notify Customer at least thirty (30) days in advance of cancellation or non renewal of any such insurance. Aetna shall furnish Customer with certificates of insurance with Customer as certificate holder to evidence its compliance with the provisions hereof.

31.  **Assignment.** Except as provided in Section 20, neither this Services Agreement nor any part hereof may be assigned (whether by operation of law or otherwise) by either party without the other party's prior written consent and any such assignment shall be void.

32.  **No Publicity.** Aetna shall not use the name or marks, refer to, or identify "Lehman" or any affiliate in publicity releases, interviews, promotional or marketing materials, announcements, customer listings, testimonials, or advertising. Aetna may

GCA

make lawful references to Customer in informing health care providers as to the organization and plans for which services are to be provided.

33.   **Certification of Compliance.** Where applicable, Aetna will comply with all applicable requirements of Executive Order 11246, the Vietnam Veterans' Readjustment Assistance Act of 1974, as amended, the Rehabilitation Act of 1973, as amended, and the applicable implementing regulations and reporting requirements under each of the foregoing, each of which is incorporated herein by reference.

34.   **Taxes.** Customer will pay, or reimburse Aetna for sales, use, value added or similar taxes and assessments incurred by Aetna by reason of Plan benefit payments made or Services performed hereunder, and, as long as Aetna has performed in accordance with Section 9, any penalties and interest thereon; provided that Customer shall not be required to pay Aetna's net income, personnel, franchise or other tax, however designated, based upon or measured by Aetna's net income, receipts, capital or net worth.

IN WITNESS WHEREOF, the parties hereto have caused this General Conditions Addendum to be executed by their duly authorized representatives.

**LEHMAN BROTHERS HOLDINGS INC.,**
acting as Plan Sponsor and on behalf of the
Committee as Plan Administrator and Named
Fiduciary

By: *Tracy Barkley*
Name: *Tracy Barkley*
Title: *Managing Director*
Date: *12/14/2004*
Address: *745 7th Avenue*
City: *New York*
State: *NY*   Zip: *10019*

**AETNA LIFE INSURANCE COMPANY**
("AETNA")

By: *Ronald A. Williams*

Ronald A. Williams
President

Registrar: *Charlotte B. Marks*
Date: *12/1/04*
Financial Verification: *Susan Sieg*
*12/1/04*

# DESCRIPTION OF SERVICES ADDENDUM

This Description of Services Addendum is an addendum to the Services Agreement Number ASA-697759-A between Aetna and Customer (as identified therein) and is incorporated by reference.

Subject to the terms and conditions of the Services Agreement, the Services available from Aetna are described below. Unless otherwise agreed in writing, only the Services selected by Customer in the Service and Fee Schedule (as modified by Aetna from time to time pursuant to Section 3 of the General Conditions Addendum) will be provided by Aetna. Additional Services may be provided at Customer's written request under the terms of the Services Agreement.

## I.   Administration Services:

### A.   Member and Claim Services:

1.   Requests for Plan Medical Benefit payments for claims shall be made to Aetna on forms or other appropriate means. Such forms (or other appropriate means) may include a consent to the release of medical, claims, and administrative records and information to Aetna. Aetna will process and pay the claims for Plan Medical Benefits incurred after the Effective Date using Aetna's normal claim determination, payment, and audit procedures, and applicable cost control standards in a manner consistent with the terms of the Plan and the Services Agreement. With respect to any Member whose request for Plan Medical Benefits is denied, Aetna will notify said Member of the denial and of said Plan Member's right of review of the denial in accordance with ERISA.

2.   Whenever it is determined that benefits and related charges are payable under the Plan, Aetna will issue a payment of such benefits and related charges on behalf of the Customer. Funding of benefits and related charges shall be made as provided in Section 5 of the General Conditions Addendum.

3.   Where the Plan contains a coordination of benefits clause, antiduplication clause, or provision(s) reducing benefits for injuries or illness caused or alleged to be caused by third parties, Aetna will administer all claims consistent with such provisions and any information concurrently in its possession as to duplicate coverage or the cause of the injury or illness. Aetna shall have no obligation to recover sums owed to the Plan by virtue of the Plan's rights to coordinate where the claim was incurred prior to the Effective Date. Aetna has no obligation to bring actions based on subrogation or lien rights, unless Subrogation Services are included herein, in which event its obligations are governed by Article IV of this Description of Services Addendum.

### B.   Plan Sponsor Services:

1.   Aetna will assign an Account Executive to the Customer's account. The Account Executive will be available to assist the Customer in connection with the general administration of the Plan, ongoing communications with the Customer and administration, and record-keeping systems for ongoing operation of the Plan. The customer service center shall be available during the hours of 8:00 a.m. to 6:00 p.m. Monday through Friday (ET)

2.   Upon request by the Customer and consent by Aetna, which consent shall not be unreasonably withheld, Aetna will implement amendments or modifications to the Customer's Plan. A charge may be assessed for implementing such amendment or modification. The Customer's administration Services Fees, as set forth in the Service and Fee Schedule, may be revised if the foregoing amendments or modifications increase Aetna's costs, provided however, that Aetna is also obligated to adjust the Service Fees in accordance with the other terms and conditions of the Service and Fee Schedule.

3.  Aetna will provide the following reports to the Customer for no additional charge:

(a)  Monthly/Quarterly/Annual Accounting Reports - Aetna shall prepare the following accounting reports in accordance with the benefit-account structure, which has been reviewed by Customer and which is incorporated herein by reference, for use by the Customer in the financial management and administrative control for the Plan Medical Benefits:

(i)  a monthly listing of funds requested and received for payment of Plan Medical Benefits;

(ii)  a monthly reconciliation of funds requested to claims paid within the benefit-account structure;

(iii)  a monthly or quarterly or annual listing of paid benefits;

(iv)  quarterly or annual standard claim analysis report.

(b)  Annual Accounting Reports - Aetna shall prepare standard annual accounting reports for each major benefit line under the Plan for the Services Agreement Period that include the following:

(i)  forecast of claim costs;

(ii)  accounting of experience; and

(iii)  calculation of Customer reserve.

Any additional reporting formats and the price for any such reports shall be mutually agreed upon by the Customer and Aetna.

4.  Aetna shall develop and install all agreed upon administrative and record keeping systems, including the production of employee identification cards.

5.  Aetna shall design and install a benefit-account structure separately by class of Employees, division, subsidiary, associated company, or other classification desired by the Customer.

6.  Aetna shall provide plan design and underwriting services in connection with benefit revisions, additions of new benefits, and extensions of coverage to new Employees and their Dependents.

7.  Aetna shall provide cost estimates and actuarial advice for benefit revisions, new benefits, and extensions of coverage being considered by Customer.

8.  Upon request of the Customer, Aetna will provide the Customer with information available to Aetna which is necessary for the Customer to prepare reports for the United States Internal Revenue Service and Department of Labor.

9.  (a)  Upon request of and subject to review and signed consent of the Customer, Aetna shall prepare and distribute to employees an Aetna standard Plan description, including benefit revisions, additions of new benefits, and extension of coverage under the Plan.  If the Customer elects to have an Aetna non-standard Plan description, Aetna will provide a custom Plan description with all costs borne by the Customer; or

(b)  Upon request of the Customer, Aetna will review the Customer prepared employee Plan descriptions, subject to the Customer's final and sole authority regarding benefits and provisions in the self-insured portion of the Plan.  The Customer acknowledges its responsibility to review and approve all Plan descriptions and any revisions thereto, and to consult the Customer's legal counsel, at its discretion, with said review and approval.

Aetna shall have no responsibility or liability for the content of any of Customer's Plan documents, regardless of the role Aetna may have played in the preparation of such documents.

If the Customer requires both preparation (a) and review (b), there may be an additional charge.

10. Upon request by the Customer, Aetna will arrange for the printing of Plan descriptions, with all costs borne by the Customer.

11. Upon request by the Customer, Aetna will arrange for the custom printing of forms and identification cards, with all costs borne by the Customer.

**II.   Patient Management Services:**

**A.   Precertification:**

1. **Inpatient Precertification:**  A process for collecting information prior to an inpatient confinement. Proposed treatment plans are reviewed.  The goals of this process are:

    a.  Assessment of the level and quality of the services provided;

    b.  Determination of the coverage of the proposed treatment;

    c.  Identification of care and treatment alternatives, when appropriate; and

    d.  Identification of Members for referral to specialized programs, such as Disease Management, Case Management, or the prenatal program; and

    e.  Determination of the initial length of stay.

    The request for Services is reviewed against a set of criteria established by clinical experts and administered by trained staff. Those cases not meeting criteria are subject to further review by the medical director or a specialist in the appropriate area prior to final determination.

    Inpatient Precertification involves medical, surgical, behavioral health, inpatient hospice, and skilled nursing facility admissions.

2. **Outpatient Precertification (not applicable to Indemnity or PPO Products):**  A process for reviewing selected ambulatory procedures, surgeries, diagnostic tests, home health care, and durable medical equipment. The goals of this process are:

    a.  Assessment of the level and quality of the services provided;

    b.  Determination of the coverage of the proposed treatment;

    c.  Identification of care and treatment alternatives, when appropriate; and

    d.  Identification of members for referral to specialized programs.

    The request for Services is reviewed against a set of criteria established by clinical experts and administered by trained staff. Those cases not meeting criteria are subject to further review by the medical director or a specialist in the appropriate area prior to final determination.

**B.   Concurrent Review:**  This is a program in which Aetna monitors a patient's progress toward recovery after a patient is admitted to a hospital. This program focuses on the timely delivery of Services and confirms the necessity of continued inpatient care. Appropriate alternatives to continued inpatient care may be identified.

**C.   Discharge Planning:**  This is an interdisciplinary process that assists Members as their medical condition changes and as they transition from the inpatient setting. The discharge planning process begins upon identification of the Members' post discharge needs (which may occur during the registration, precertification, or concurrent review process). This program may include evaluation of alternate care settings and identification of care needed after

discharge. The goal is to provide continuing quality of care and to avoid delay in discharge due to lack of outpatient support.

D.   **Case Management:** This program focuses on improving health and wellness. Case Management is a process of identifying persons at high risk for problems associated with complex healthcare needs, assessing opportunities to coordinate care, and identifying treatment options to improve quality of care, quality of life, and control costs. Case Managers generally assist Members in managing their illnesses, coordinate a series of intensive interventions designed to alter the natural history of a specific illness and facilitate the accessibility of resources. By integrating the record of a Member's contact with the medical delivery system, Case Managers can focus internal and external resources in an effort designed to improve the individual Member's clinical condition.

E.   **National Medical Excellence Program:** This program was created to help arrange for access to effective care for Members with particularly difficult conditions requiring transplants or complex cardiac, neurosurgical, or other procedures, when the needed care is not available in a Member's service area. The program utilizes a national network of experienced providers and facilities selected based on their volume of cases and outcomes. The National Medical Excellence Unit provides specialized Case Management through the use of nurse case managers, each with procedure and/or disease specific training.

F.   **Behavioral Health:** This program provides immediate 24-hour access to mental health benefits through a dedicated 1-800 number. Calls are received by a direct services team which verifies eligibility and then transfers the call to a behavioral health clinician. The clinician performs an assessment, determines medical necessity and appropriate level of care, and then facilitates a referral to a network provider. Local professionals may perform concurrent review and case management.

G.   **Focused Psychiatric Review (FPR):** This is a program which provides phone-based utilization review of inpatient behavioral health admissions intended to contain confinements to appropriate lengths, assure medical necessity and appropriateness of care, and reduce costs. FPR is integrated with Inpatient Precertification.

H.   **Healthy Outlook Program:** This program directs focused support and resources toward Members within a defined disease population, as determined by Aetna. The goal of this program is to provide disease management services for Members with chronic conditions, in an effort to improve health status and quality of life. This program identifies Member populations at risk for certain chronic diseases, with a focus on education for the Member and provider to maximize positive health outcomes. This program offers individual disease management focused on assisting Member to identify and address health risk factors associated with their chronic condition. It also offers Members the opportunity to order educational materials that contain information about certain chronic diseases or conditions (e.g., asthma, congestive heart failure, coronary artery disease, diabetes, low back pain, depression).

I.   **INFORMED HEALTH Line:** For products other than any Aetna Health Fund product(s) elected, this service includes a toll-free 24-hour/7 day health information hotline through which Members can speak with registered nurses about a variety of health topics. The service includes a self-help handbook, entitled *INFORMED HEALTH Handbook* (or *INFORMED HEALTH Handbook for Health Aging*). The nurses can contribute to informed health care decision-making and optimal patient/provider relationships through coaching and support. The nurses cannot diagnose, prescribe treatment or give medical advice but they can provide Members with information on a broad spectrum of health issues, including self-care, prevention, chronic conditions, and complex medical situations.

For any Aetna Health Fund product(s) elected, this service includes a toll-free 24-hour/7 day health information line through which Members can speak with registered nurses about a variety of health topics. The nurses encourage informed health care decision-making and optimal patient/provider relationships through coaching and support. Members can also call to listen to their topic of interest through a new audio health library, available in English and Spanish. The nurses cannot diagnose, prescribe or give medical advice.

J.   **Moms-To-Babies Maternity Management Program™:** Moms-To-Babies Maternity Management Program™ provides services that complement covered maternity benefits including access to obstetrical nurse case management, a pregnancy risk survey, educational materials for both expectant mothers and fathers, the Smoke-free Moms-to-Be™ smoking cessation program and more. Case management nurses help coordinate services for Members provided by the obstetrician, perinatologists, any other needed specialists, and hospitals or other facilities.

DSA                                                    Page 23

K.    **Simple Steps To A Healthier Life™:**  A new online service that offers disease prevention, condition education, behavior modification and health promotion programs that may contribute to the health and productivity of employees.  Simple Steps To A Healthier Life™ provides an easy approach to creating a health assessment profile that generates a personalized health action plan.  The health action plan identifies certain risks and directs participants to personalized programs and services encouraging healthy lifestyle changes.

III.    **Network Access Services:**

A.    Aetna shall provide Members with access to Aetna's Network Providers.

B.    Aetna reserves the right to set a minimum plan benefit design structure for in-area network claims to which Customer must comply in order to participate in Aetna's Network Program.

C.    Aetna will provide Customer with physician directories in an amount up to 100% of eligible Employees plus 20% of the current enrolled Employees.  Customer shall pay the costs of providing any additional directories which it requests.

IV.    **Subrogation Services:**

Aetna will provide assistance to Customer for subrogation services, some or all of which may be delegated to an organization of Aetna's choosing in accordance with Section 20 of the General Conditions Addendum.  Aetna or its contracted representative shall retain a percentage of any monies collected to recover reasonable expenses incurred while pursuing subrogation recoveries.  Reasonable expenses include but are not limited to (a) collection agency fees, (b) police and fire reports, (c) asset checks, (d) locate reports, and (e) attorneys' fees.  Aetna shall advise Customer if the pursuit of recovery requires formal litigation.  In such event, Customer shall have the sole option to instruct Aetna to cease further action toward recovery.

Aetna will credit net recoveries to Customer's accounting.

Aetna has the exclusive discretion: (a) to decide whether to pursue potential recoveries on subrogated claims; (b) to determine the reasonable methods used to pursue recoveries on subrogated claims, subject to the provision with respect to formal litigation above; and (c) to decide whether to accept any settlement offer relating to a subrogation claim.

If no monies are recovered as a result of the subrogation pursuit, no fees or expenses incurred by Aetna or its contracted representative for subrogation activities will be charged to Customer.

If Customer notifies Aetna of its election to terminate the Services provided by Aetna, all claims identified for potential subrogation recovery prior to the date notification of such election is received (i.e., pending claims) shall be handled to conclusion by Aetna at Customer's discretion, and shall be governed by the terms of this Services Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Description of Services Addendum to be executed by their duly authorized representatives.

**LEHMAN BROTHERS HOLDINGS INC.,**
acting as Plan Sponsor and on behalf of the
Committee as Plan Administrator and named
fiduciary

By: *Tracy Binkley*
Name: Tracy Binkley
Title: Managing Director
Date: 12/14/2004
Address: 745 7th Avenue
City: New York
State: NY  Zip: 10019

**AETNA LIFE INSURANCE COMPANY
("AETNA")**

By: *Ronald A Williams*

Ronald A. Williams
President

Registrar: *Charlotte B. Marks*
Date: 12/1/04
Financial Verification: *Susan Say*
12/1/04

# NATIONAL ADVANTAGE PROGRAM ADDENDUM

The National Advantage Program ("NAP") Addendum is an addendum to Services Agreement Number ASA-697759-A between Aetna and Customer (as identified therein) (the "Services Agreement") and is incorporated by reference

I. National Advantage Program

A. Summary

NAP provides access to contracted rates for many medical claims that would otherwise be paid as billed under indemnity plans, the out-of-network portion of managed care plans, or for emergency/medically necessary services not provided within the network. When available, these contracted rates will produce savings for the Customer.

Aetna contracts with several national third-party vendors to access their contracted rates. In addition, a significant number of Aetna directly-contracted rates are available for members with indemnity benefits. Aetna will access third-party vendor rates where Aetna directly-contracted rates are not available. If no contracted rate is available, Aetna (or one of its vendors) will attempt to negotiate an Ad-Hoc Rate (case specific discount) with non-NAP participating providers for certain larger claims or will apply Facility Charge Review, as applicable and as described below.

B. Claim Submission/Payment Process

Providers should bill Aetna directly for Covered Services. The Member should not make payment at the time of service. When the Provider submits the claim, Aetna will process it at the contracted rate (when applicable) and reflect the contracted amount in any explanation of payments made that the Member and Provider receives. The Member would then be responsible for any applicable coinsurance, deductible or non-covered service, based upon the plan of benefits.

Because claims must be paid within specific timeframes in order to take advantage of the negotiated arrangements, the bulk payment feature will be eliminated for affected claims, and payments will be issued on a daily basis.

II. National Advantage Program – Facility Charge Review

Facility Charge Review is an optional component of NAP. It is only available in conjunction with the National Advantage Program, and is not available separately.

A. Summary

Where a contracted rate is not available under NAP, the Facility Charge Review Program provides reasonable charge allowances for most inpatient and outpatient facility claims under Members' indemnity plans and the out-of-network portion of Members' managed care plans or for emergency/medically necessary services not provided within the network. When utilized, these reasonable charges will produce savings for the Customer.

B. Claim Submission/Payment Process

When an inpatient or outpatient facility claim exceeds a threshold (currently $1,000) and Aetna does not have access to a contracted rate, Aetna will forward the claim to its Facility Charge Review vendor for review. The billed charges will be reviewed for financial reasonableness for the geographic area where the service was provided. Payment to the facility will be based on the Reasonable Charge Amount. Any excess will be considered not covered as it exceeds the reasonable charge (as defined under the Plan).

Though many facilities accept the Reasonable Charge Amount as payment in full, there may be circumstances where facilities may not accept the determination of the reasonable charge and may balance bill the Member. In the event that a Member is balance billed, the vendor for the Facility Charge Review Program has a review process and will initiate negotiations with the facility in an attempt to come to a mutually agreeable payment amount. However, should the vendor be unable to negotiate a mutually agreeable rate, consistent with the terms of the Member's plan of benefits, the Member may be responsible for any charges in excess of the reasonable charge.

When an inpatient or outpatient facility claim is reduced based on the Reasonable Charge Amount, the Member will receive a letter alerting them to the possibility of balance billing. The letter will ask the Member to contact the vendor in the event that the Member is balance billed, in order to obtain information about the review process. The explanation of

benefits that the Member receives from Aetna, if applicable, will also indicate that the amount paid is based upon the Reasonable Charge Amount and will request that the Member contact the vendor should the Member be balance billed.

The amount actually paid to the provider under the Facility Charge Review Program will be used as the basis for the calculation of the Member's coinsurance and deductibles.

## III. Terms and Conditions

### A. Customer Charges For Provider Payments

Subject to the terms herein, Aetna agrees that for Covered Services rendered by a Provider for which Aetna has a) accessed a contracted rate, or b) negotiated an Ad-Hoc rate, or c) applied a Reasonable Charge Amount for facility services, Customer shall be charged the amount paid to the Provider. This amount shall be equal to the contracted rate, Ad-Hoc Rate, or Reasonable Charge Amount less any payments made by the Member in accordance with the Plan.

### B. Access Fees

1.  As compensation for the Services provided by Aetna under NAP for savings achieved, Customer shall pay an Access Fee to Aetna as described in the Service and Fee Schedule (excluding Aggregate Savings with respect to claims for which Aetna is liable for funding, e.g., claims in excess of an individual or aggregate stop loss point).

2.  Access Fees shall be paid by the Bank to Aetna via wire transfer or such other reasonable transfer method agreed upon by Aetna and the Bank. The Customer agrees to provide funds through its designated bank sufficient to satisfy the Access Fee in accordance with the banking agreement between the Customer and the Bank, i.e., Access Fees will be included in the request from the Bank for payment/funding of claims.

3.  Aetna shall provide a quarterly report of Aggregate Savings and Access Fees. Access Fees may be included with claims in other reports.

### C. ID Cards

For most products/plans, Customer must inform Members of the availability of NAP and Aetna will distribute ID cards with a NAP logo. Further, a Customer's Plan document language must conform to Aetna requirements. Aetna shall provide information regarding participating Providers on DocFind®, Aetna's online provider listing, on our website at www.Aetna.com or by other comparable means.

### D. Definitions

As used herein:

"Access Fee" means the amount(s) to be paid by Customer to Aetna for access to the savings provided under NAP.

"Ad-Hoc Rate" means the rate which was negotiated for a specific claim in the absence of a pre-negotiated contracted rate with a Provider.

"Aggregate Savings" means the difference between (i) the amount which would have been due or otherwise paid to Providers for Covered Services without the benefit of NAP, and (ii) the amount due Providers for Covered Services as a result of NAP.

"Covered Services" means the health services subject to NAP for which charges are paid pursuant to the Plan. "Providers" means those physicians, hospitals and other health care providers whose services are available at a savings under NAP.

"Reasonable Charge Amount" means the amount determined by Aetna (or its chosen vendor) to be a reasonable charge for a service in the geographic area where the service was provided to the Member.

E.   Customer Acknowledgements

Customer acknowledges that:

1.   The NAP listing of Providers includes Providers that are (i) participating by virtue of direct contracts with Aetna and its affiliates, and (ii) participating by virtue of Aetna's contracts with unaffiliated third parties that have contracts with Providers, and provide Aetna with access to these contracted rates for the purpose of NAP.

2.   Aetna does not guarantee (a) any particular discounts or any level of discount will be made available through providers listed as participating in NAP; (b) any obligation to make any specific Providers or any particular number of Providers available for use by Plan participants.   Aetna does not credential, monitor or oversee those Providers who participate through third party contracts. Providers listed as participating in NAP may not necessarily be available or convenient.

3.   Aetna is not responsible for the acts or omissions of any provider listed as participating in NAP. All such providers are providers in private practice, are neither agents nor employees of Aetna, and are solely responsible for the health care services they deliver.

4.   The following claim situations may not be eligible for NAP:

   •   Small claims (currently certain claims below $151 and claims below $1000 for which there is no contracted rate).
   •   Claims involving Medicare or coordination of benefits (COB).
   •   Certain claims that have already been paid directly by the Member.
   •   Claims of physicians under non-indemnity plans.

F.   General Provisions

1.   Aetna's aggregate cumulative liability to the Customer for all losses or liabilities arising under or related to NAP, regardless of the form of action, shall be limited to the Access Fees actually paid to Aetna by the Customer for Covered Services rendered.   Provided however that the foregoing limitation shall not apply to Aetna's indemnification, or confidentiality obligations as set forth in the Services Agreement.

2.   The terms and conditions of this Addendum shall remain in effect for any claims incurred prior to the termination date that are administered by Aetna after the termination date.   Except as provided herein, this Addendum is subject to all of the provisions of the Services Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this National Advantage Program Addendum to be executed by their duly authorized representatives.

LEHMAN BROTHERS HOLDINGS INC.,
acting as Plan Sponsor and on behalf of the
Committee as named fiduciary and Plan
Administrator

By: _Tracy Binkley_

Name: _Tracy Binkley_

Title: _Managing Director_

Date: _12/14/2004_

Address: _745 7th Avenue_

City: _New York_

State: _NY_ Zip: _10019_

AETNA LIFE INSURANCE COMPANY
("AETNA")

By: _Ronald A Williams_

Ronald A. Williams
President

Registrar: _Charlotte B. Marks_

Date: _12/1/04_

Financial Verification: _Susan Day_
_12/1/04_

## APPENDIX A
### HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT (HIPAA)

**THIS APPENDIX** between Lehman Brothers Holdings Inc., as plan sponsor and on behalf of the Committee servicing as named fiduciary and administrator of, and on behalf of the Lehman Brothers Holdings Inc. Group Benefits Plan ("Covered Entity") and Aetna Life Insurance Company or any of its corporate affiliates ("Business Associate") is an attachment to Services Agreement Number ASA-697759-A between Aetna and Customer (the "Services Agreement") and is incorporated by reference therein.

I.   **Preamble**
The Covered Entity and the Business Associate enter into this Appendix pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  This Appendix addresses the HIPAA requirements with respect to business associates, as defined under HIPAA.

This Appendix is intended to ensure that Business Associate will establish and implement appropriate safeguards for the Protected Health Information ("PHI") (as defined under 45 C.F.R. § 164.501) that Business Associate may receive, create, use or disclose in connection with the functions, activities and services that Business Associate performs for Covered Entity. The functions, activities and services that Business Associate performs for Covered Entity are defined under the "Services Agreement"

Unless the context clearly indicates otherwise, capitalized terms in this Appendix shall have the same meanings as set forth in HIPAA and the regulations thereunder.

II.   **Obligations of Business Associate**

(a)   Business Associate agrees not to use or disclose PHI, other than as permitted or required by this Appendix or as required by law.

(b)   Business Associate agrees to use appropriate safeguards to ensure compliance with Section II(a) of this Appendix.

(c)   If Business Associate conducts any Standard Transactions on behalf of Covered Entity, Business Associate shall comply with the applicable requirements of 45 C.F.R. Part 162.

(d)   Business Associate agrees to mitigate, to the extent practicable, any harmful effect that is known to Business Associate of a use or disclosure of PHI by Business Associate in violation of this Appendix's requirements.

(e)   Business Associate agrees to report to Covered Entity any use or disclosure of PHI other than as provided for by this Appendix.

(f)   Business Associate agrees to ensure that any agent or subcontractor, to whom it provides PHI, agrees to the same restrictions and conditions that apply to Business Associate under this Appendix.

(g)   Business Associate agrees to make available PHI in accordance with 45 CFR §164.524 and to make any amendments to PHI that Covered Entity directs or agrees to at the request of Covered Entity or at the request of an individual after their review of their personal PHI.

(h)   Business Associate agrees to make internal practices, books, and records, including policies and procedures and Protected Health Information relating to the use and disclosure of Protected Health Information received from, or created or received by Business Associate on behalf of, Covered Entity available to the Covered Entity or the Secretary, in a time and manner designated by the Covered Entity or the Secretary, for purposes of the Secretary determining Covered Entity's compliance with the Privacy Rule.

(i) If Covered Entity acquires information that leads it to believe in good faith that Business Associate is in material breach of this Appendix A, Covered Entity will share such information with Business Associate and will afford Business Associate 30 days to rebut or refute the claim that Business Associate is in material breach. Covered Entity will also independently investigate the situation. Based on that investigation and the additional information provided by Business Associate, Covered Entity will determine whether the alleged breach is verifiable. Additionally, if Covered Entity has verifiable proof that an alleged material breach of this Appendix A has occurred and the parties agree that the alleged breach would constitute a material breach of this Appendix A, then Covered Entity will have the limited right to conduct a reasonable inspection of Business Associate's internal practices, books and records, including policies and procedures relating to the use or disclosure of PHI for the sole purpose of investigating the material breach. Any audit and/or inspection conducted pursuant to this Section (II)(i) shall be subject to the following: (i) Business Associate and Covered Entity shall mutually agree in advance upon the scope, timing and location of such an inspection; (ii) Covered Entity shall protect the confidentiality of all confidential and proprietary information of Business Associate to which Covered Entity has access during the course of such inspection; and (iii) Covered Entity shall execute a nondisclosure agreement, upon terms mutually agreed upon by the parties, if requested by Business Associate.

(j) Business Associate agrees to document disclosures and any information relating to the disclosure of PHI in a manner as would be required for Covered Entity to respond to a request by an individual or the Secretary for an accounting of PHI disclosures.

(k) Business Associate agrees to provide to Covered Entity, or to an individual at Covered Entity's request, information collected in accordance with Section II(j) of this Appendix, to permit Covered Entity to respond to a request by an individual or the Secretary for an accounting of PHI disclosures.

III.  Permitted Uses and Disclosures by Business Associate

(a) *General Uses and Disclosures.* Business Associate agrees to receive, create, use or disclose PHI only in a manner that is consistent with this Appendix and the Privacy Rule and only in connection with providing services to Covered Entity, as stated in the Services Agreement and the conditions and restrictions stated therein, provided that the use or disclosure would not violate the Privacy Rule if the use or disclosure would be done by Covered Entity. For example, the use and disclosure of PHI will be permitted for "treatment, payment and health care operations", in accordance with the Privacy Rule.

(b) *Other Uses and Disclosures.* Except as otherwise limited in this Appendix, Business Associate may use PHI to provide Data Aggregation Services to Covered Entity as permitted by HIPAA.

(c) Except as otherwise limited in this Appendix or under HIPAA, Business Associate may use Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate.

(d) Except as otherwise limited in this Appendix or under HIPAA, Business Associate may disclose Protected Health Information for the proper management and administration of the Business Associate, provided that disclosures are required by law, or Business Associate obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as required by law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

IV.  Obligations of the Covered Entity

(a) *Provisions for Covered Entity to Inform Business Associate of Privacy Practices and Restrictions.*
   (i)   Covered Entity shall provide Business Associate with the notice of privacy practices that Covered Entity produces in accordance with the Privacy Rule, as attached to the Services Agreement.
   (ii)  Covered Entity agrees that it will not furnish or impose by arrangements with third parties or other Covered Entities or Business Associates special limits or restrictions to the uses and disclosures of its PHI that may impact in any manner the permitted use and disclosure of PHI by Business Associate under the Services Agreement and this Appendix, including, but not limited to, restrictions on the use and/or disclosure of PHI as defined in 45 CFR 164.522,. Covered Entity shall notify Business Associate of any restriction to the use or

ASA-HIPAA                                    Page 31

disclosure of PHI that, pursuant to and subject to Section VII(e) hereof, Covered Entity has agreed to under the Privacy Rule to the extent that such restriction may affect Business Associate's use or disclosure of PHI.

(iii)    In the event that an individual permits the use or disclosure of PHI pursuant to 45 C.F.R. §164.508, Covered Entity shall provide Business Associate with any changes in or revocation of such permission by such individual, if such change or revocation affects Business Associate's permitted or required uses and disclosures.

(b) *Possible Requests by Covered Entity.*  Covered Entity shall not request Business Associate to use or disclose PHI in any manner that would not be permissible under the Privacy Rule if done by Covered Entity, except as provided under Section III.

## V.  Indemnification

Business Associate shall indemnify, defend and hold harmless Covered Entity and its sponsor, their directors, officers, employees (acting in the course of their employment, but not as Members), and agents  (the "Indemnified Parties") from and against that portion of any and all losses, expense, damage or injury (including, without limitation, all costs and reasonable attorneys' fees)(collectively, "Loss") that the Indemnified Parties may sustain  which was caused solely and directly  by (i) a breach of this Appendix by Business Associate or its agents or subcontractors ; (ii) any improper use or disclosure of PHI by Business Associate or its agents or subcontractors, but only to the extent Covered Entity, its sponsor, or its agents or subcontractors did not request or direct Business Associate to perform the use or disclosure; (iii) any willful misconduct, criminal conduct or fraud by Business Associate or its agents or subcontractors in connection with the services provided under this Appendix A ; or (iv) Business Associate's failure to substantially perform its obligations under the Privacy Rule. Notwithstanding the foregoing, Business Associate shall not be obligated to indemnify Covered Entity  with respect to a Loss to the extent due to the negligence or willful misconduct of Covered Entity, its sponsor, agents or subcontractors.

Notwithstanding the foregoing, nothing in this Section V shall limit any rights any of the Indemnified Parties or the Business Associate may have to additional remedies under the Services Agreement or under applicable law for any acts or omissions of the parties or their respective agents or subcontractors.

## VI.  Terms and Termination

(a) *Term.*  This Appendix shall take effect on the effective date of the Services Agreement, and shall continue in effect after the termination of the Services Agreement until all of the PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity.  If it is not feasible to return or destroy PHI, protections are extended in accordance with the Termination provision of this Section.

(b) *Termination for Cause.*  Upon Covered Entity's knowledge of material breach by Business Associate, Covered Entity shall provide an opportunity for Business Associate to cure the breach or end the violation, to the extent that a cure is possible.  Such cure period may be as short or as long as Covered Entity deems appropriate, but in no event shall the cure period exceed 60 days from the notification of the breach.  If Business Associate does not cure the breach or end the violation, as applicable, within the cure period, or if a material term of this Appendix has been breached and a cure is not possible, Covered Entity may terminate this Appendix and the Services Agreement immediately, upon written notice to the Business Associate.

(c) *Effect of Termination.*

(i)    Except as provided in Section VI(c)(ii), upon termination of this Appendix, Business Associate shall return all of the PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity, to Covered Entity.  All PHI that can not be returned shall be destroyed.  This provision shall also apply to all PHI that is in the possession of agents or subcontractors of Business Associate.  Business Associate, including their agents and contractors, shall retain no copies of the PHI.

(ii)    In the event that Business Associate determines that returning or destroying the PHI is not feasible, Business Associate will provide Covered Entity an explanation as to the conditions that make return or destruction not feasible.  Upon mutual agreement that the return or destruction of the PHI is not feasible, Business Associate shall protect such PHI as though this Appendix remained in full force and effect, and shall limit further uses and

disclosures to those purposes that make the return or destruction not feasible. This protection and limitation of use and disclosure shall remain in effect for as long as Business Associate maintains such PHI.

### VII. Miscellaneous

(a) A reference in this Appendix to the Privacy Rule means the Privacy Rule codified under sections 1171 through 1179 of the Social Security Act (42 USC 1320d et seq.) which was added by section 262 of Pub. L. 104-191, 110 Stat. 2021-2031 and section 264 of Pub. L. 104-191 (42 U.S.C. 1320d-2), as interpreted under applicable regulations and guidance of general application published by the U. S. Department of Health and Human Services ("HHS"), including all amendments thereto for which compliance is required.

(b) The parties agree to take such action as necessary to amend this Appendix as is necessary to comply with the requirements of the Privacy Rule and HIPAA.

(c) The respective rights and obligations of the parties under Sections V and VI shall survive the termination of this Appendix.

(d) *Interpretation.*
  (i) Any ambiguity shall be resolved in favor of a meaning that permits Covered Entity to comply with the Privacy Rule.
  (ii) Any inconsistency between the Appendix provisions and the Privacy Rule, including all amendments, as interpreted by HHS, court or another regulatory agency with authority over the Parties, shall be interpreted according to the interpretation of the HHS, the court or the regulatory agency.
  (iii) Any provision of this Appendix that differs from those mandated by the Privacy Rule, but is nonetheless permitted by the Rule, shall be adhered to as stated in this Appendix.

(e) Business Associate shall permit individuals to request additional privacy protections for Protected Health Information as outlined in 45 C.F.R. §164.522(a), but Business Associate is not obligated to agree to any such requested restrictions. Covered Entity agrees that, without Business Associate's written approval, it will not agree to any such requested restrictions that would impede or impact in any manner the ability of Business Associate to properly perform its obligations under the Services Agreement. Pursuant to 45 C.F.R. §164.522(b), Business Associate will accommodate reasonable requests to receive communications by alternative means or at alternative locations if the individual clearly states that the disclosure of protected health information would endanger the individual.

(f) This Appendix constitutes the entire agreement between the parties related to the subject matter of this Appendix, except to the extent that the Service Agreement imposes more stringent requirements related to the use and protection of PHI upon Business Associate. It supercedes all prior negotiations, discussions, representations or proposals, whether oral or written in relation to the subject matter hereof. This Appendix may not be modified unless done so in writing and signed by a duly authorized representative of both parties. If any provision of this Appendix, or part thereof, is found to be invalid, the remaining provisions shall remain in effect.

(g) This Appendix will be binding on the successors and assigns of the Covered Entity and the Business Associate. However, this Appendix may not be assigned.

(h) This Appendix may be executed in two or more counterparts, each of which may be deemed an original.

(i) Except to the extent preempted by Federal law, this Appendix shall be governed by the same internal laws of the Service Agreement, disregarding principles of conflict of laws.

IN WITNESS WHEREOF, the parties hereto have caused this Appendix to be executed by their duly authorized representatives.

LEHMAN BROTHERS HOLDINGS INC.,
Acting as Plan Sponsor and on behalf of the
Committee as named fiduciary and Plan
Administrator

By: _Tracy Binkley_

Name: _Tracy Binkley_

Title: _Managing Director_

Date: _12/14/2004_

Address: _745 7th Avenue_

City: _New York_

State: _NY_  Zip: _10019_

AETNA LIFE INSURANCE COMPANY
("AETNA")

By: _Ronald A. Williams_

Ronald A. Williams
President

Registrar: _Charlotte B. Marks_

Date: _12/1/04_

Financial Verification: _Susan Day_
_12/1/04_

ATTACHMENT A

MEDICAL COVERAGES FINANCIAL ASSUMPTIONS

## General Financial Assumptions

- **Services Agreement ("Contract") Period** - The contract period begins on the effective date of January 1, 2004. Our contracts provide for automatic renewal upon the completion of each contract period unless either party invokes the termination provision, which requires 31 days advance written notice of termination to the other party. This provision may be invoked at any time during the continuance of the contract and is not limited to termination occurring on the renewal date.

- **Enrollment and Funding Assumptions** - We have assumed that the proposed plan of benefits will be extended to the employee groups included on the census file that was submitted with the RFP. Our quotation assumes we will provide coverage for all employees currently enrolled in PPO and Managed Indemnity plans.

  Based on this census information and the subsequent access analysis, we have assumed that approximately 8,405 employees will be eligible for medical coverage and 8,405 will be enrolled. Our proposal assumes that coverage will not be extended to additional employees without review of supplemental census information and other underwriting information for appropriate financial review. The following illustrates the funding arrangement and enrollment assumptions by line of coverage. We have assumed that all coverages will be offered on a self-funded basis.

| Coverage | Funding Arrangement | Assumed Enrollment |
|---|---|---|
| Choice POS II or PPO | Self-Funded | 7,247 |
| Managed Indemnity | Self-Funded | 1,158 |
| Total Medical Enrollment | | 8,405 |

- **Plan Design** – This proposal response is based on the benefit plan designs, plus any noted deviations, as outlined in the proposal. Aetna standard provisions, contract wording and claim settlement practices will apply for items not specifically outlined in the proposal.

- **Plan Offering** – We have quoted a PPO or Choice POS II and Managed Indemnity for your employees residing in an Aetna network service area. Please refer to the access exhibit provided in our response for information regarding specific service areas applicable to Customer's employee population.

- **Policies and Claim Settlement Practices** - Our quotation assumes that our standard contract provisions and claim settlement practices will apply. If a material change is initiated by Customer or by legislative or regulatory action in the claim payment requirements or procedures, account structure, or any changes materially affecting the manner or cost of paying benefits, we reserve the right to adjust our proposal accordingly.

- **Run-In Claim Processing** - Our proposal excludes run-in claim processing from the prior carrier (claims incurred prior to the effective date of the plan).

- **PPO, Choice POS II and Managed Indemnity Medical Service Center** - We have assumed that claim administration and member services for the quoted PPO, Choice POS II, and Managed Indemnity plans will be provided centrally by the Blue Bell Service Center.

- **Toll-Free Member Services** - The cost for toll-free access to our Member Service representatives is included in our quotation. Members will be able to reach the Member Service representatives Monday through Friday, 8:00 a.m. to 6:00 p.m. (service center local time zone).

- **Patient Management Center** – Patient Management services for Customer will be administered centrally by one of our regional Patient Management Centers for our PPO and Managed Indemnity products. For our Choice POS II product, patient management is administered regionally.

- **Medical ID Cards and Directories** - Our medical fees include the cost for standard medical ID cards and directories. Each enrolled family member will receive a plastic ID card that includes a toll-free number for accessing member services, a claim submission address and important information customized to the member's benefit plan. A bulk supply of standard Aetna provider directories is included for 100% of the eligible employee population plus 20% of the enrolled employee population per year.

- **Eligibility Transmission** - Our proposal assumes we will receive eligibility information monthly, or more frequently, from one Customer location by electronic connectivity. Submission of eligibility information by more than one location or via multiple methods will result in additional charges. Costs associated with any custom programming necessary to accept Customer's eligibility information are excluded. During the installation, we will review all available methods of submitting eligibility information and identify the approach that best meets Customer's needs.

**Self-Funded Products**

- **Self-Funded Fee Guarantee** – The first-year fees for the self-funded coverages included in this proposal for the period January 1, 2004 through December 31, 2006 are guaranteed according to the per employee, per month fees as illustrated on the financial exhibit(s). We guarantee that the second-year fees will increase over the first-year mature fees by 5%. We also guarantee that the third-year fees will increase over the second-year fees by 5%.

- **Guarantee Parameters** – Aetna reserves the right to recalculate the guaranteed fees to take effect on the date a contingent event described below occurs. In such case, Customer will be required to pay any difference between the fees collected and the new fees calculated.

Aetna may recalculate:

1. If, for any product:

   a. There is a 15% decrease in the number of employees from our enrollment assumptions or from any subsequently reset enrollment assumptions.

   b. The member-to-employee ratio is greater than 2.4. We have assumed a member-to-employee ratio of 1 for Managed Indemnity and 2.09 for POS II.

   c. As indicated on page 4, Aetna may adjust Service Fees if there is a 15% increase in the processed claim transaction (PCTs) per employee. We have assumed 24.1 PCTs (POSII) and 36.7 PCTs (Managed Indemnity) per employee. We define a processed claim transaction, or PCT, for medical benefits as any transaction with respect to a benefit request for expenses incurred or expected to be incurred by one claimant in any one calendar year for a major line of coverage, including but not limited to benefit payment, benefit denial, pended request or decision on an appeal of a denied benefit request.

   d. If Medicare Direct is not offered to over 65 retirees, there will be an additional per employee per month charge. We have assumed that any over 65 retirees will be enrolled in the Medicare Direct program. Patient Management programs are excluded for over 65 retirees. If Customer would like Aetna to market this program directly to their retirees, an additional charge will apply.

2. If maximum account structure exceeds 300 units per product. Account structure determines the reporting format. During the installation process, we will work with Customer to finalize the account structure and determine which report formats will be most meaningful. Maximum total account structure includes ERGs, controls, suffixes, billing and claim accounts.

3. If there is a material change in the plan of benefits initiated by Customer or by legislative or regulatory action.

4. There is a material change initiated by Customer or by legislative or regulatory action in the claim payment requirements or procedures, account structure, or any change materially affecting the manner or cost of paying benefits and/or administering the plan.

4. There is a material change initiated by Customer or by legislative or regulatory action in the claim payment requirements or procedures, account structure, or any change materially affecting the manner or cost of paying benefits and/or administering the plan.

5. If the contract is terminated by Customer requiring Aetna to incur charges for maintaining plan structure to report and/or process runoff claims.

- **Participation** - There is a minimum requirement of 250 enrolled employees for administration of our self-funded plans.

- **Run-Off Claims Processing** – The original Customer contract was written on an immature fee basis. While the quoted fees in our proposal reflect an incurred (mature) claim base, they do not take into account the expenses associated with the processing of run-off claims following cancellation. Upon contract termination, we reserve the right apply a run-off processing fee based on Customer's current enrollment.

- **Mental Health/Substance Abuse Benefits** - Our quotation assumes that mental health/chemical dependency benefits are included.

- **National Advantage Program** - Aetna's National Advantage Program (NAP) offers access to contracted rates for many hospital and physician claims that would otherwise be paid at billed charges under indemnity plans, the out-of-network portion of managed care plans, or for emergency/medically necessary services not provided within the network.   The Facility Charge Review Program (FCR) is an optional feature of NAP.  These programs are available to all customers nationwide. The fee for the National Advantage program is 35% of savings and is not included in the per employee per month fee. Since the fee is only charged when contracted rates or R&C savings are applied, there is no downside to enrolling in the program.

  When available, NAP contracted rates can produce savings - before Aetna's NAP fees - of approximately 15-25 percent (depending on product) for charges by participating providers.

- **National Advantage Facility Charge Review Program** - The Facility Charge Review Program (FCR) provides reasonable charge allowance review for most inpatient and outpatient facility claims where a National Advantage contracted rate is not available.  FCR is only available in conjunction with NAP.

  A listing of participating NAP hospitals, facilities, and physicians can be found on Docfind®, Aetna's online provider listing, on our website at www.aetna.com.  Physicians are not available to members located in AL, MS, and in Louisville, KY.

- **Appeal Administration Services (Option 5)** – We have assumed that Aetna will perform appeal administration services.  The Employee Benefit Plans Committee of the Customer will retain fiduciary responsibility for non-urgent second level appeals.
- **Health Insurance Portability and Accountability Act (HIPAA)** - Our proposal assumes that Aetna will be providing HIPAA certifications of coverage for terminated employees for the PPO and Choice POS II products.

ASA                                          Page 38

- **Banking** – We have assumed that Customer provides funds via wire transfer for drafts clearing the bank under the self-funded arrangement assumed in this proposal. We have assumed that no more than three primary banking lines will be utilized by Customer. Additional wire lines and customized banking arrangements will result in an adjustment to the proposed pricing.

- **Late Wire Transfer Charges** - We will assess a late wire transfer charge for requests that are not responded to on the day they are requested. This charge is equal to the time-weighted amounts of the delayed transfers multiplied by an annualized interest charge factor. Our proposal assumes that wire requests will be responded to on a same-day basis.

- **Data Transfer at Termination** - Upon contract termination, we agree to cooperate with succeeding administrators in producing and transferring required claim and enrollment data. Data will be transferred within 30 days after determination of Customer's specific format and content requirements, subject to a charge that is based on direct labor cost and data processing time.

- **Late Fee Payment** - Late payment charges are assessed after the expiration of a 31-day grace period and will be charged as incurred.

- **Third Party Stop Loss Reporting** - Our fees do not include the cost for third party stop loss reports. Reporting options and associated fees can be provided upon request.

- **Plan Installation** – Included.

- **Legal Review** - 50 hours of legal review of the Administrative Services Only Agreement.

- **USQA Reporting and Consulting** - In addition to our electronic tool, e.Plan Sponsor Monitor (e.PSM), Customer will receive 50 hours of support for report generation and/or consulting services for customer data resident in Aetna's Plan Sponsor Monitor system.

- **Medical EOB Suppression** – Unless required by state law, we do not produce EOBs for Choice POS II and PPO claims when there is no member liability.

- **Claims Subrogation** - Aetna has entered into an agreement with the firm of Rawlings & Associates to provide comprehensive subrogation services. There is no administration charge from Aetna to utilize the subrogation program, however, a contingency fee of 27.0% is collected upon recovery for self-funded customers.

- **Consultant Compensation** - The quoted fees do not include consultant compensation.

- **Third-Party Audits** - While in most cases we do not request reimbursement for internal costs associated with a third-party audit, we reserve the right to recoup these expenses if significant time and materials are required. A complete description of the terms and conditions of our audit policies is outlined in our Services Agreement.

- **Additional Products and Services** - Costs for special services rendered, which are not included or assumed in the pricing guarantee will be direct billed. For example, Customer would be subject to additional charges for customized communication materials, as well as costs associated with custom

reporting, booklet and SPD printing, etc. The costs for these types of services would depend upon the actual services performed and would be determined at the time the service is requested.

**Ӿ Aetna®**

**Gregory Mittelmann**
Regional Director
National Businesses
Phone: (860) 636-6990
E-mail: MittelmannG@aetna.com

**Kathy Miklencic**
Senior Underwriting Consultant
National Businesses
Phone: (973) 244-3558
E-mail: MiklencicK@aetna.com

July 25, 2007

Mr. Paul Imbimbo
Vice President
Lehman Brothers Holdings Inc.
399 Park Avenue – 11ᵗʰ Floor
New York, NY 10022-4679

ADMINISTRATIVE SERVICES AGREEMENT NO. ASC-697759

Dear Mr. Imbimbo:

This letter agreement between Lehman Brothers Holdings Inc. (hereinafter "Lehman Brothers") and Aetna Life Insurance Company (hereinafter "Aetna") describes Fees for services performed by Aetna under the above captioned Administrative Services Agreement (hereinafter "Agreement") for the Guarantee Period January 1, 2008 through December 31, 2008. This letter agreement replaces the Fees described in the Agreement for the Guarantee Period January 1, 2007 through December 31, 2007.

In this letter agreement:

- The components of the Fees will be referred to as *Guaranteed Fees*.

- The period January 1, 2008 through December 31, 2008 will be referred to as the *Second Guarantee Period.* The period January 1, 2009 through December 31, 2009 will be referred to as the *Third Guarantee Period*.

**Guaranteed Fees**

The guaranteed fees shall be determined in accordance with the Service and Fee Schedule outlined on Attachment A. The attached fees do not include charges for additional services (see "Additional Services" section below).

Page 2
Mr. Paul Imbimbo

## SERVICE AND FEE SCHEDULE

Lehman Brothers hereby elects to receive the Services for Products/Programs designated on Attachment A.

The Fees contained in the Service and Fee Schedule on Attachment A are inclusive of an amount to be charged to the Customer for the degree of service Aetna provides in support of the fiduciary option contained in ASC Agreement Number-697759.

### Guarantee Parameters For the Guarantee Periods Defined Above

Aetna reserves the right to recalculate the Guaranteed Fees using its then current book of business formula under the circumstances described below. In such case, Lehman Brothers will be required to pay any difference between the fees collected and the new fees calculated retroactive to the date on which any of the following occurs:

1.  If, for any product identified below, there is a:

    *   15% decrease in the number of average enrolled lives during the guarantee period from the Guaranteed Fee Assumptions on Attachment B (such decrease to be determined in total for all Medical products combined for Indemnity, PPO and Choice POS II), or from any reset assumptions (reset if a new Fee is established).

        In addition, if such a decrease occurs, Aetna will make a charge for processing runoff for the terminated employees as noted in the Service Agreement Number ASA-697759.

    *   15% increase in the retiree percentage from the Guaranteed Fee Assumptions on Attachment B or from any subsequently reset assumptions (reset if a new Fee is established).

    *   15% increase in the Member to Employee ratio from the Guaranteed Fee Assumptions on Attachment B or from any subsequently reset Assumptions (reset if a new Fee is established).

2.  If a material change in the plan of benefits is initiated by Lehman Brothers or by legislative or regulatory action.

3.  If a material change is initiated by Lehman Brothers or by legislative or regulatory action in the claim payment requirements or procedures, claim fiduciary option, account structure, or any other change materially affecting the manner or cost of paying benefits.

4.  If the Agreement is terminated by Lehman Brothers on a date other than the anniversary date requiring Aetna to incur charges for maintaining plan structure to report and/or process runoff claims.

Page 3
Mr. Paul Imbimbo

5. If the National Advantage Program (NAP) is terminated by Lehman Brothers.

**Guaranteed Fee Assumptions for the Guarantee Periods Defined Above**

The assumptions used in deriving the Guaranteed Fees above are defined on Attachment B.

**Additional Services (Direct Charges)**

The Guaranteed Fees exclude provisions for certain additional services which may be requested by Lehman Brothers. Please see the attached "Services/Direct Charges" document for more information and examples of included and excluded charges. Fees for any additional services requested by Lehman Brothers will be billed as described on page 1 of the "Services/Direct Charges" document.

**Late Payment Charges**

If Lehman Brothers fails to provide funds on a timely basis to cover benefit payments as provided in the Agreement, and/or fails to pay Service Fees on a timely basis as provided in such Agreement, Aetna will assess a late payment charge. The charges for 2008 are estimated to be:

(i)     late funds to cover benefit payments (e.g., late wire transfers): 9.0% annual rate
(ii)    late payments of Service Fees: 9.0% annual rate

In addition, Aetna will make a charge to recover its costs of collection including reasonable attorney's fees.

The late payment charges described in this section are without limitation to any other rights or remedies available to Aetna under the Agreement or at law or in equity for failure to pay.

**Billing of Fees**

We will bill and collect your monthly Medical fees as outlined on Attachment A. At the end of the Agreement year we will compare this collected fee to the fee produced as result of the Guaranteed Fees on Attachment A. Any overage or shortfall will be reconciled at that time, with any such overage due Lehman Brothers and any such shortfall due Aetna within the time frame specified in the Agreement.

We will bill and collect the NAP fee as 35% of retained discounts via the claim wire account.

Page 4
Mr. Paul Imbimbo

**Guaranteed Fees**

**Self-Funded Fee Guarantee** - The fees for the self-funded coverages included in this renewal for the Guarantee Periods defined on the first page of this letter are guaranteed according to the per employee, per month fees provided on Attachment A.

We look forward to a continued relationship with Lehman Brothers.  Please contact Kate Mellor of our New York City Marketing Office, if you need any further information or explanation of the contents of this package.

Sincerely,


_____
Gregory Mittelmann
Regional Director


_____
Kathy Miklencic
Senior Underwriting Consultant


c:  Kate Mellor, Account Executive