**Hearing Date and Time:  December 22, 2008 at 10:00 a.m. (Prevailing Eastern Time)**
**Objection Date and Time:  December 18, 2008 at 4:00 p.m. (Prevailing Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                    :

In re                               :        **Chapter 11 Case No.**

                                      :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :       **08-13555 (JMP)**

                                      :

               **Debtors.**      :        **(Jointly Administered)**

                                      :

                                      :

---------------------------------------------------------------x

## NOTICE OF FILING OF EXHIBIT A TO DEBTORS' MOTION FOR ENTRY OF ORDER PURSUANT TO SECTIONS 105 AND 363 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 9019 (I) AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO ENTER INTO A SETTLEMENT AGREEMENT WITH CERTAIN FRENCH AFFILIATES RELATING TO INTERCOMPANY CLAIMS, (II) AUTHORIZING LEHMAN BROTHERS HOLDINGS INC. TO VOTE ITS SHARES IN FRENCH AFFILIATE TO APPROVE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF AND VOLUNTARY DISSOLUTION OF <u>SUCH AFFILIATE AND (III) GRANTING CERTAIN RELATED RELIEF</u>

       **PLEASE TAKE NOTICE** that on December 8, 2008, Lehman Brothers Holdings
Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors
and debtors-in-possession (filed the motion (the "<u>Motion</u>") pursuant to sections 105 and 363
of the Bankruptcy Code and Rules 2002, 6004, and 9019 of the Bankruptcy Rules for
authorization and approval of, among other things, (i) a Settlement Agreement, dated
December 3, 2008 (the "<u>Settlement Agreement</u>"), among LBHI, Banque Lehman Brothers
S.A. ("<u>BLB</u>"), Lehman Brothers Conseil S.A. ("<u>LBC</u>"), and Lehman Brothers Services
SNC ("<u>LBS</u>" and collectively with BLB and LBC, the "<u>Lehman French Companies</u>"),
attached to the Motion as Exhibit A, (ii) the settlement of intercompany claims between

LBHI, on the one hand, and the Lehman French Companies, on the other hand, contemplated thereby, (iii) the approval by LBHI in its capacity as a shareholder of BLB of (x) the sale of BLB's businesses to Banque Nomura France ("BNF") pursuant to a certain Business Sale and Purchase Agreement, dated November 17, 2008 (as amended, the "BSA"), among the Lehman French Companies and BNF and (y) the voluntary dissolution of BLB; (iv) any and all other actions contemplated by the Settlement Agreement; and (v) certain related relief [Docket No. 2089].

**PLEASE TAKE FURTHER NOTICE** that the Exhibit A to the Motion (the Settlement Agreement) is attached hereto as Exhibit A.

Dated: December 9, 2008
New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## Exhibit A

**Settlement Agreement**

## SETTLEMENT AGREEMENT

This settlement agreement (the "**Agreement**") is entered into in Paris on this 3rd day of December 2008,

**BETWEEN:**

1.   **Lehman Brothers Holdings Inc.**, a company incorporated under the laws of Delaware USA, currently a debtor in a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Southern District of New York (the "**Chapter 11 Case**"), duly represented for the purpose hereof (hereafter referred to as "**LBHI**"),

**AND**

2.   **Banque Lehman Brothers S.A.**, a French *société anonyme*, with a share capital of €33,538,784, having its registered office at 7, place d'Iéna, 75116 Paris, and registered with the Trade and Companies Registry of Paris under number 339 449 225, represented by Mr. Alain Bachelot, in his capacity as *Administrateur provisoire* (hereafter referred to as "**BLB**"),

**AND**

3.   **Lehman Brothers Services SNC**, a French *société en nom collectif*, with a share capital of €1,524, having its registered office at 7, place d'Iéna, 75116 Paris and registered with the Trade and Companies Registry of Paris under number 343 763 157, duly represented by its two co-managers (*co-gérants*), BLB represented by Mr. Alain Bachelot, and Lehman Brothers Conseil S.A. represented by Mr. Michele Chu (hereafter referred to as "**LBS**"),

**AND**

4.   **Lehman Brothers Conseil S.A.**, a French société anonyme with a share capital of €76,244, having its registered office at 7, place d'Iéna, 75116 Paris and whose registration number is 377 718 697 RCS Paris, represented by Mr. Michele Chu (hereafter referred to as "**LBC**"),

BLB, LBS and LBC are collectively referred to as the "**Lehman French Companies**".

LBHI, BLB, LBS and LBC are collectively referred to as the "**Parties**" and individually as a "**Party**".

**IN THE PRESENCE OF:**

**Mr. Laurent Le Guernevé,** residing at 41 rue du Four, 75006 Paris, acting as *conciliateur* of BLB, LBC and LBS, appointed by the President of the Commercial Court of Paris on 17 November, 2008.

**WHEREAS:**

A.  Following the commencement of the Chapter 11 Case on September 15, 2008, the *Commission Bancaire* appointed on the same day Mr. Alain Bachelot to act as trustee (*administrateur provisoire*) for BLB and who shall be in charge of the general management and administration of BLB.

 After such application of Chapter 11 rules to LBHI, BLB faced a critical cash position as a consequence of a freeze on its cash resources deposited with LBHI and/or affiliates thereof.

 Under Mr. Bachelot's management, BLB overcame its difficulties, and has sought since to make its business and workforce durable.

B.  A Business Sale and Purchase Agreement was entered into on November 17, 2008 between the Lehman French Companies on the one hand, and Banque Nomura France on the other hand, and amended by a letter dated December 2, 2008 (the agreement as amended being referred to as the **"BSA"**). On a confidential basis, BLB delivered a copy of the executed BSA to LBHI in the framework of the conciliation proceedings decided by the President of the Paris commercial court in favour of BLB and its subsidiaries LBS and LBC and run under the supervision of Mr. Laurent Le Guernevé. The Nomura group had at that time already acquired part of the business of Lehman Brothers International (Europe) in Europe and in particular in the UK for 1 £, as well as the businesses of other LBHI's European subsidiaries on the same conditions.

 BLB did not receive any offer or indication of interest for the acquisition of the BLB business other than the one made by Banque Nomura France.

 The BSA provides for the sale of BLB's business (*fonds de commerce*), which includes mainly some of its work force, to Banque Nomura France for 1 Euro.

 This sale pursuant to the BSA shall be followed by a request of withdrawal of the banking licence to the *CECEI* pursuant to article L 511-16 of the Monetary and Financial Code, thereby allowing for the voluntary liquidation of BLB, as well as the voluntary dissolution of LBS and LBC.

 The above transaction was agreed upon in the framework of the aforementioned conciliation proceedings, and is subject to the "*homologation*" by a court decision.

 Because of the pendency of the Chapter 11 Case, LBHI is not in a position to participate in the financing of the voluntary liquidation of the Lehman French Companies. The Lehman French Companies and Mr. Alain Bachelot, trustee of BLB and future liquidator of the Lehman French Companies, ensured that the Lehman French Companies have sufficient resources to settle their liabilities, with adequate and reasonable efforts from their creditors, without contributions from LBHI, as evidenced

2



by the liquidation budget of the Lehman French Companies that he prepared. Such efforts from creditors must still be negotiated with the creditors in question, to avoid a liquidation by the court. However, on the date hereof, Mr. Bachelot is not aware of any fact or event according to which the creditors would not be willing to make such efforts.

C.  The transfer of BLB's business pursuant to the BSA is conditional upon the receipt by the Lehman French Companies from each of their intra-group creditors (including under the *dette subordonnée*) of an acknowledgment of the full and final settlement or an irrevocable and unconditional waiver, or other contractual arrangements relating to the settlement of all of the intra-group debts.

D.  As of the date hereof:

1)  LBHI asserts that it holds a claim against LBS resulting from the cash pooling arrangement within the Lehman Brothers group, for an amount of € 8,056,444 as of September 12, 2008 (the "**Alleged LBS Receivable**").

2)  LBHI asserts that it holds a claim against BLB resulting from the cash pooling arrangement within the Lehman Brothers group, for an amount of € 41,529,491 as of September 12, 2008 (the "**Alleged BLB Receivable**").

3)  LBHI holds the following intra-group claims against BLB, representing an alleged total amount of € 35,223,590 as of September 12, 2008 (the "**BLB Receivables**"):

    -  a claim resulting from the intercompany agreement entered between LBHI and BLB concerning the employee incentive plan of the group, for an alleged amount of € 8,087,665 as of September 12, 2008; and

    -  a claim resulting from the subordinated loan agreement entered into on October 19, 1994 between LBHI and BLB, as amended, for an amount of € 27,135,925 as of September 12, 2008.

4)  BLB asserts that it holds a claim against LBHI resulting from the cash pooling arrangement within the Lehman Brothers group, for an amount of € 178,021,639 as of September 12, 2008 (the "**Alleged LBHI Receivable**").

5)  There are no other intra-group claims between LBHI, on the one hand, and any of the Lehman French Companies, on the other hand.

E.  Considering the above and the interest of all the Parties that the transfer of the business of the Lehman French Companies to Banque Nomura France be completed and that the Lehman French Companies go to the contemplated voluntary liquidation proceedings, the Parties agreed to settle their intra-group debts under the terms and conditions of the present Agreement.

3



**IT IS HEREBY AGREED AS FOLLOWS:**

1. **FORGIVENESS OF RECEIVABLES**

Subject to the terms and conditions of this Agreement, including the conditions precedent and conditions subsequent set out in Articles 4 and 5 below:

(a)    LBHI hereby irrevocably and definitely forgives ("*abandonne*") the Alleged LBS Receivable, representing an amount of € 8,056,444 as of September 12, 2008, and any claim it may have in respect thereof;

(b)    LBHI hereby irrevocably and definitely forgives ("*abandonne*") the Alleged BLB Receivable, representing an amount of € 41,529,491 as of September 12, 2008, and any claim it may have in respect thereof;

(c)    LBHI hereby irrevocably and definitely forgives ("*abandonne*") the BLB Receivables, representing an aggregate amount of € 35,223,590 as of September 12, 2008, and any claim it may have in respect thereof; and

(d)    BLB hereby irrevocably and definitely forgives ("*abandonne*") the Alleged LBHI Receivable up to an amount of € 84,809,525 as well as any interest or penalty due on the Alleged LBHI Receivable since September 12, 2008, and any claim it may have in respect thereof.

LBHI and each of the Lehman French Companies hereby agree that, after the above forgiveness of debts, there are no intra-group claims remaining between LBHI, on the one hand, and each such Lehman French Company, on the other hand, except for the remaining Alleged LBHI Receivable in an aggregate amount not exceeding € 93,212,114 (the "**Remaining Alleged LBHI Receivable**").

Notwithstanding anything to the contrary, it shall remain BLB's duty to file the Remaining Alleged LBHI Receivable with the United States court exercising jurisdiction over the Chapter 11 Case and, if such receivable is challenged by any party entitled to do so under applicable law, to prove that the Remaining Alleged LBHI Receivable is a valid allowed claim in the Chapter 11 Case, provided that the amount of such receivable shall in any case not exceed € 93,212,114.

2. **CONDITIONAL UNDERTAKING TO FORGIVE LBHI RECEIVABLE**

Subject to the terms and conditions of this Agreement, including the conditions precedent and conditions subsequent set out in Articles 4 and 5 below:

2.1    During the full duration of the voluntary liquidation proceeding of BLB, the liquidator shall make his best efforts to settle all of BLB's liabilities with all BLB's assets other than the Remaining Alleged LBHI Receivable (the "**Other Assets**").

2.2    If BLB's liquidator can settle all of BLB's liabilities with the Other Assets in the context of the voluntary liquidation proceeding of BLB, BLB shall irrevocably and

definitely forgive ("*abandonner*") at that date the Remaining Alleged LBHI Receivable and any claim it may have in respect thereof.

2.3     If BLB's liquidator cannot settle all of BLB's liabilities with the Other Assets, BLB shall retain a claim against LBHI on account of the Remaining Alleged LBHI Receivable in the amount that such claim is allowed pursuant to a final order of the United States court exercising jurisdiction over the Chapter 11 Case (or, if the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the superseding chapter 7 case) or agreement between LBHI and BLB; *provided, however*, BLB agrees to the following conditions (the **"Recovery Limitation"**): (i) any recovery under a plan that may be confirmed or approved in the Chapter 11 Case (or, if the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the superseding chapter 7 case) in respect of the Remaining Alleged LBHI Receivable shall be no greater than BLB's remaining liabilities, if any, that cannot be settled with BLB's Other Assets (the **"Shortfall"**) and (ii) no payments shall be made in respect of the Remaining Alleged LBHI Receivable until the amount of the Shortfall is finally determined and notified to LBHI in accordance with Article 2.4 below.

2.4     Once the amount of the Shortfall is finally determined, the liquidator shall send a notice to LBHI (the **"Shortfall Notice"**) including (i) the liquidation outcome statement of BLB specifying, *inter alia*, the amount of the Shortfall (if any), and (ii) the supporting documentation, including all settlement agreements and other agreements with BLB's creditors pursuant to which they waive all their claims against BLB except for those reflected in the liquidation outcome statement; *provided, however*, that such supporting documentation shall only serve for information purposes to compute the amount of the Shortfall. LBHI acknowledges that the liquidation operations will be the sole responsibility of BLB's liquidator and LBHI shall not use the supporting documentation referred to in (ii) above to challenge any of its obligations under this Agreement.

2.5     Only upon having sent the Shortfall Notice to LBHI, BLB may sell to any third parties that portion of its rights and interest in the Remaining Alleged LBHI Receivable that will entitle it to receive a consideration that shall not exceed the Shortfall. Following such sale, BLB shall irrevocably and definitely forgive ("*abandonner*") its rights on the portion of the Remaining Alleged LBHI Receivable retained by it, if any.

2.6     LBHI will benefit from a pre-emptive right on the sale of the Remaining Alleged LBHI Receivable by which LBHI or any person substituted by LBHI will have the right to acquire the portion of the Remaining Alleged LBHI Receivable which is intended to be sold to a third party under the same terms and conditions offered by such third party.

In order for LBHI to exercise such pre-emptive right, BLB will send a written notice to LBHI to inform LBHI of its decision to sell the Remaining Alleged LBHI Receivable with a copy of the third party binding, irrevocable and unconditional offer (except upon the pre-emptive right mentioned hereafter) (the **"Transfer Notice"**).

LBHI shall be entitled to exercise its pre-emptive right within nine (9) business days from the date of receipt of the Transfer Notice by sending a written notice of acceptance to BLB which shall be unconditional and irrevocable.

If LBHI declines (either expressly or tacitly by not answering to BLB's notice within the abovementioned nine (9) business day period) to purchase the Remaining Alleged LBHI Receivable, BLB shall be free to sell its rights and interest in the Remaining Alleged LBHI Receivable to the third party identified in the Transfer Notice, at the terms and conditions set out in the Transfer Notice, during a period of nine (9) business days following the date on which LBHI will have declined or will have been deemed to decline to purchase Remaining Alleged LBHI Receivable.

In case BLB does not complete such sale within the abovementioned ten-day period, BLB shall restart the whole procedure set out in this Article 2.5 to sell its rights and interest in the Remaining Alleged LBHI Receivable.

2.7    Notwithstanding the foregoing, until the date on which the Support Letter (as this term is defined below) becomes void (*caduc*) for any reason whatsoever (including a waiver by the Banque de France) and may no longer be exercised by the Banque de France or the Commission Bancaire, as the case may be, BLB shall not be allowed to assign the Remaining Alleged LBHI Receivable or to receive any amount pursuant to such receivable under any plan that may be confirmed or approved in the Chapter 11 Case (or, if the Chapter 11 Case is converted to a case under Chapter 7 of the Bankruptcy Code, the superseding chapter 7 case); provided, in any case, that any amount unduly received shall be forthwith remitted to LBHI. In addition, BLB shall waive any right or claim it may have in connection with the Remaining Alleged LBHI Receivable if the Banque de France or the Commission Bancaire, as the case may be, exercises its rights under the Support Letter.

3.    **TERMINATION OF THE SUPPORT LETTER ISSUED BY LBHI**

BLB hereby agrees that it will make its best efforts, in the context of its voluntary liquidation and of the withdrawal of its banking licence (*agrément*) by the French *Comité des établissements de crédit et des entreprises d'investissement*, to obtain from the Banque de France or the Commission Bancaire, as the case may be, the formal termination of the support letter (*lettre de confort*) issued by LBHI in relation to BLB on 15 June 1994 (the "**Support Letter**"), with no residual claim, right or recourse whatsoever against LBHI as from the effective date of the withdrawal of BLB's banking licence.

In addition, BLB hereby waives any past, actual or future right or claim it may have against LBHI in relation to such Support Letter, if any. BLB's waiver is without prejudice of the rights that the Banque de France or the Commission Bancaire, as the case may be, may have pursuant to the Support Letter until the termination thereof.

Notwithstanding anything to the contrary, nothing in this Agreement shall be construed as an acknowledgment by LBHI of any liability whatsoever in connection with the Support Letter.

6

4.    **CONDITIONS PRECEDENT AND CONDITION SUBSEQUENT**

**4.1**    Conditions precedent

The respective rights and obligations of each of the Parties hereto pursuant to this Agreement are subject to the satisfaction of each of the following conditions:

(i)    the prior approval on or prior to December 23rd, 2008 by the United States court exercising jurisdiction over the Chapter 11 Case of (a) the vote in the shareholders' meeting of BLB in favor of the transactions contemplated by the BSA, (b) the terms and conditions of this Agreement, and (c) the vote in the shareholders' meeting of BLB in favor of the voluntary liquidation of BLB;

(ii)    the prior approval on or prior to January 20th, 2009 of the sale of BLB's business *(fonds de commerce)* by BLB's relevant corporate bodies substantially in the form of the report to the shareholders and draft resolutions of the shareholders' meeting of BLB attached as Schedule 1 ;

(iii)    this Agreement being formally approved *(homologation)* by the Commercial Court of Paris in conciliation proceedings pursuant to Article L. 611-8-11 of the French Commercial Code *(Code de commerce)* on or prior to January 20th, 2009.

**4.2**    Conditions subsequent *(conditions résolutoires)*

The respective rights and obligations of each of the Parties pursuant to this Agreement shall become null and void if:

(i)    LBHI does not vote the voluntary dissolution of BLB at the general meeting of the shareholders of BLB on or prior to June 30th, 2009 substantially in the form of the report to the shareholders and draft resolutions of the shareholders' meeting of BLB attached as Schedule 1 ; provided however that LBHI shall vote the voluntary dissolution of BLB on the basis of the report to the shareholders and draft resolutions of the shareholders' meeting of BLB attached as Schedule 1 provided that the liquidation budget attached to the report to the shareholders is in line in all material respect with the liquidation budget delivered to LBHI at the date hereof ;

(ii)    the chairman in office of BLB does not vote the voluntary dissolution of BLB at the general meeting of the shareholders of BLB on or prior to June 30th, 2009 substantially in the form of the report to the shareholders and draft minutes of the shareholders' meeting of BLB attached as Schedule 1 ; provided however that the chairman in office of BLB shall vote the voluntary dissolution of BLB on the basis of the report to the shareholders and draft resolutions of the shareholders' meeting of BLB attached as Schedule 1 provided that the liquidation budget attached to the report to the shareholders is in line in all material respect with the liquidation budget delivered to LBHI at the date hereof ;

7

(iii)   the shareholders of LBS and LBC do not vote the voluntary dissolution of LBS and LBC at the general meetings of such entities on or prior to June 30th, 2009; provided however that the shareholders of LBS and LBC shall vote the voluntary dissolution of LBS and LBC provided that the liquidation budget attached to the report to the shareholders of BLB is in line in all material respect with the liquidation budget delivered to LBHI at the date hereof;

(iv)   the withdrawal of the banking licence (*agrément*) of BLB by the French *Comité des Etablissements de crédit et des entreprises d'investissement* has not become effective on or prior to June 30th, 2009, or if the Banque de France or the Commission Bancaire, as the case may be, exercised its rights under the Support Letter   prior to the date on which such withdrawal has become effective;

(v)   the formal approval (*homologation*) of this Agreement by the Commercial Court of Paris having not become final within ten (10) days of the publication in the BODACC of such formal approval.

Condition subsequent (i) is only in favour of BLB and may be waived by BLB.

Conditions subsequent (ii) and (iv) are only in favour of LBHI and may be waived by LBHI alone.

5.     **INDIVISIBILITY ("*INDIVISIBILITÉ*")**

As an additional condition subsequent (*condition résolutoire*), it is hereby agreed that the sale of BLB's business (*fonds de commerce*) under the conditions set forth in the BSA and the provisions of this Agreement shall be indivisible ("*indivisibles*"). As a result, the respective rights and obligations of the Parties under this Agreement shall become null and void in the event that the closing of the sale of BLB's business does not occur on or prior to January 20th, 2008.

As a consequence of the above-mentioned indivisibility (*indivisibilité*), the BSA may not be amended without LBHI's prior written approval.

6.     **REPRESENTATIONS AND WARRANTIES**

BLB hereby represents and warrants as follows:

(i)    BLB is not currently a party to any contract with a client, all of such contracts being entered into by Lehman Brothers Europe Limited or LB Bankhaus in accordance with the profit contribution split agreement; and

(ii)   except for a €8,853,773.04 claim of Lehman Brothers International (Europe) against BLB and except as disclosed in Schedule 2, the Lehman French Companies do not have any intra-group debts *vis-à-vis* any entity of the Lehman Group. For the purpose of this Agreement, the **"Lehman Group"** shall mean LBHI and its direct and indirect subsidiaries, other than the Lehman French Companies, as of September 12, 2008.

8

7.    **MISCELLANEOUS PROVISIONS**

7.1    The Parties undertake to make the required book entries relating to the operations provided for in Article 1 of this Agreement so as to allow their respective financial statements to accurately reflect the provisions of this Agreement.

7.2    This Agreement is strictly confidential and, except as required by law, by court order, by an authority or for the purpose of fulfilling the conditions precedents and the conditions subsequent set out in Article 4 of this Agreement or the conditions precedent and the condition subsequent set out in Article 4 of the BSA or to allow BLB to sell the Remaining Alleged LBHI Receivable, there shall be no disclosure of any information concerning this Agreement (including its existence and the provisions thereof) without the prior written consent of all Parties hereto. The form and the contents of any disclosure shall be subject to the prior approval of all Parties hereto. Notwithstanding anything to the contrary in this Agreement, all Parties acknowledge that LBHI may disclose the Agreement and any information concerning this Agreement (including the contents of the BSA) to the United States court exercising jurisdiction over the Chapter 11 case and/or the committee of creditors appointed in the Chapter 11 Case and that LBHI may file the Agreement and any information concerning this Agreement (including the contents of the BSA) in the Chapter 11 Case in connection with seeking court approval of the Agreement, thereby making them publicly available.

7.3    All communications, notices and disclosures required or permitted by this Agreement shall be in writing and shall be given by hand delivery, by prepaid registered or certified mail (with return receipt requested), by an established overnight courier providing proof of delivery or by facsimile, addressed to the address mentioned in the heading of this Agreement, unless and until any Party notifies the other Party in accordance with this Article 7.3 of a change of address.

7.4    Any notification under this Agreement shall be deemed made on the date of its receipt.

7.5    This Agreement constitutes the entire agreement and understanding between the Parties with respect to its subject matter and replaces and supersedes all prior agreements, arrangements, undertakings or statements regarding such subject matter.

7.6    No variation of this Agreement shall be effective unless made in writing and signed by the Parties.

7.7    If part of this Agreement is or becomes invalid or non-binding, the Parties shall remain bound to the remaining part. The relevant Parties shall in that event replace the invalid or non-binding part by provisions which are valid and binding and the effect of which, given the contents and purpose of this Agreement, is to the greatest extent possible similar to the invalid or non-binding part.

9

8. **GOVERNING LAW AND DISPUTE RESOLUTION**

8.1     This Agreement shall be governed by French law.

8.2     Any proceedings concerning the existence, validity, interpretation or execution of this Agreement shall be subject to the exclusive jurisdiction of the Commercial Court of Paris.

9. **EFFECT**

This Agreement is entered into with accordance with article 2044 *and sub.* of the French Civil Code, and definitively settles any ongoing or future dispute relating to the intra-group receivables between LBHI and/or its subsidiaries, on the one hand, and the Lehman French Companies, on the other hand, and more generally definitively settles any ongoing or future claims (*réclamations*) that the Lehman French Companies may have against LBHI and/or its subsidiaries and/or any claims LBHI may have against the Lehman French Companies save LBHI's right to any *boni de liquidation*, and entails the waiver of all rights, complaints and assertions in this respect. Pursuant to article 2052 of the Civil Code, this Agreement shall have the effect of a final and binding judgment, which may not be subject to an appeal.

Subject to each Party's compliance with its obligations hereunder, the Parties undertake not to challenge any of the provisions of this compromise agreement based on any reason whatsoever for legal or factual errors.

**IN WITNESS WHEREOF**, the Parties have executed this Agreement in five (5) original copies.

**Lehman Brothers Holdings Inc.**

Name: CARLES THOMA
Title:

**Lehman Brothers Conseil**

Name: Mr. Michele Chu
Title: Directeur general délégué

**Lehman Brothers Services SNC**

Name: Mr. Alain Bachelot

**Banque Lehman Brothers S.A.**

Name: Mr. Alain Bachelot

10

Title: *Administrateur provisoire* of BLB          Title: *Administrateur provisoire*

Name: Mr. Michele Chu

Title: *Directeur général délégué* of
      Lehman Brothers Conseil S.A.

In the presence of the *conciliateur*, Mr. Laurent Le Guerneve or any other individual jointly
approved by the Parties.

Mr. Laurent Le Guerneve, *conciliateur*

**Schedule 1**
**Reports and draft resolutions of the shareholders' meetings of BLB**
**(sale of the business and dissolution)**

**Banque Lehman Brothers**

Société anonyme au capital de 33.538.784 Euros

Siège social : 7 place d'Iéna - 75116 Paris

339 449 225 R.C.S. Paris

## RAPPORT DE L'ADMINISTRATEUR PROVISOIRE

## A L'ASSEMBLEE GENERALE EXTRAORDINAIRE

## EN DATE DU [●] 2008

Messieurs,

Nous vous avons réunis en Assemblée Générale Extraordinaire à l'effet de vous demander de bien vouloir vous prononcer sur un projet de dissolution anticipée de la Banque Lehman Brothers (ci-après la **"Société"** ou **"BLB"**).

### DISSOLUTION ANTICIPEE DE LA SOCIETE

A la suite des difficultés rencontrées par Lehman Brothers Holdings Inc. (ci-après **"LBHI"**), société mère de BLB, ayant abouti à sa mise en « *Chapter 11* » le 15 septembre 2008, la Commission Bancaire nous a désigné le même jour en qualité d'administrateur provisoire de BLB, avec mission d'exercer tous les pouvoirs de gestion et de direction.

BLB a été confrontée à une situation de trésorerie très tendue, du fait du gel, par application des règles du « *Chapter 11* », de sa trésorerie déposée auprès des différentes entités du groupe Lehman Brothers.

BLB a, sous notre égide, surmonté ces difficultés et tenté de trouver une solution permettant d'assurer la pérennité de ses activités et d'un maximum de ses emplois.

La banque Lazard a été mandatée par LBHI et un appel d'offre concurrentiel a été lancé afin de trouver un acquéreur pour le fonds de commerce de BLB et/ou les actions de BLB.

Un accord intitulé *business sale and purchase agreement* (le **"BSA"**)est intervenu le 17 novembre 2008 avec le groupe Nomura, qui avait déjà acquis certaines activités de Lehman Brothers International (Europe) (ci-après **"LBIE"**) en Europe et en particulier en Grande Bretagne pour 1 £, et les activités d'autres filiales européennes dans les mêmes conditions et qui a été le seul à faire une offre.

2.

BLB n'a pas reçu d'offre ou indication d'intérêt pour l'acquisition du fonds de commerce de BLB et/ou des actions de BLB autre que celle de Nomura.

L'accord conclu avec Nomura organise la vente pour un euro du fonds de commerce de BLB à Banque Nomura France, incluant principalement le transfert d'un certain nombre d'emplois sous certaines conditions suspensives. Il porte sur l'activité de conseil de banque d'investissement du groupe Lehman Brothers en France, comprenant fusions et acquisitions et opérations de conseil (ci-après "**IBD Business**"), sur une partie des activités support ainsi que sur la cession de certains actifs liés à *l'Equities Business* détenus par Lehman Brothers Services ("**LBS**").

Les transactions suivantes relatives au règlement des dettes et créances intra-groupes ont également été conclues :

-   aux termes d'un accord intitulé *settlement agreement*, BLB d'une part et LBHI d'autre part ont mutuellement abandonné les créances pour les montants mentionnés dans le *settlement agreement*. BLB pourra faire valoir sa créance résiduelle sur LBHI dans les conditions du *settlement agreement*. BLB pourra également, sous certaines conditions, vendre cette créance résiduelle sur LBHI à un tiers sous réserve de l'exercice d'un droit de préemption par LBHI.

-   Un protocole transactionnel a été conclu le 24 octobre 2008 entre BLB et LBIE. A l'issue de ce protocole et du paiement effectué par BLB, LBIE ne détient plus sur BLB qu'une créance de 8.853.773,04 € subordonnée au paiement des autres créanciers dans le cas où la liquidation amiable laisserait apparaître un actif. .

A l'exception de l'accord intervenu avec LBIE, les opérations ci-dessus ont été conclues dans le cadre d'une conciliation ouverte par Monsieur le Président du Tribunal de commerce de Paris au bénéfice de BLB et de ses filiales, homologuée par jugement du [ ● ].

Compte tenu de la cession du fonds de commerce de BLB, et en plein accord avec les autorités bancaires et judiciaires françaises, nous vous appelons à voter la dissolution anticipée de BLB, à ouvrir sa liquidation amiable et à demander à la Commission Bancaire de nous désigner en qualité de liquidateur bancaire.

L'actionnaire principal de BLB, LBHI, est actuellement soumis aux contraintes d'une procédure de Chapter 11, et n'est pas actuellement en mesure de contribuer au financement de cette liquidation amiable. Par conséquent, nous nous sommes assurés avec BLB, sur la base d'un budget liquidatif prévisionnel de BLB et de ses filiales dont une copie figure en annexe au présent rapport, en notre qualité d'administrateur provisoire et futur liquidateur bancaire de BLB, que BLB disposerait des ressources permettant d'apurer son passif, sans contribution de LBHI et moyennant des efforts équilibrés et raisonnables consentis par ses créanciers et restant à négocier avec ces derniers, le tout afin d'éviter l'ouverture d'une liquidation judiciaire de BLB.

Le retrait d'agrément de BLB par le CECEI a été demandé postérieurement à la cession du fonds de commerce de BLB. Conformément à la pratique de l'article L 511-16 du Code Monétaire et Financier, [cette demande] de retrait d'agrément est une condition préalable à la dissolution et liquidation bancaire de BLB.

3.

Nous vous suggérons en conséquence de procéder à la dissolution anticipée de la Société.

### NOMINATION D'UN LIQUIDATEUR BANCAIRE

Nous vous précisons que, du fait de cette dissolution anticipée, il serait mis fin au mode de gestion actuel de la Société, les mandats des administrateurs, du Président du Conseil d'Administration, du Directeur Général et du Directeur Général Délégué prenant fin.

En conséquence, nous vous proposons, sous cette même condition et avec l'approbation de la Commission Bancaire de la Banque de France, de nous désigner aux fonctions de Liquidateur bancaire de la société dissoute jusqu'au [ ● ], lesdites fonctions de Liquidateur bancaire pouvant être renouvelées, une ou plusieurs fois, dans l'hypothèse où des opérations de liquidation seraient toujours en cours à l'expiration de la période considérée, étant entendu que la clôture de liquidation de la Société avant cette date mettrait fin de façon anticipée au mandat du Liquidateur.

Nous disposerions en notre qualité de Liquidateur bancaire et à compter de notre nomination effective de tous les pouvoirs pour procéder aux opérations de liquidation en se conformant aux dispositions impératives de la Loi prévues aux articles L 237-2 à L 237-13 et R 237-1 à R 237-9 du Code de Commerce, concernant notamment la cession ou transmission des éléments d'actifs, l'approbation des comptes définitifs de liquidation et la clôture des opérations de liquidation.

Nous vous proposons par ailleurs de mettre fin aux mandats des Commissaires aux comptes titulaire et suppléant à compter de la date de dissolution effective.

**[procédure exacte à valider avec la Banque de France]**

Si ces propositions vous agréent, nous vous demandons de bien vouloir les consacrer par le vote des résolutions que nous allons vous soumettre.

**L'Administrateur Provisoire**



4.

**Annexe**
**Budget liquidatif de BLB et ses filiales**

**Banque Lehman Brothers**

**Société anonyme au capital de 33.538.784 Euros**

**Siège social : 7 place d'Iéna - 75116 Paris**

**339 449 225 R.C.S. Paris**

### PROJET DE RESOLUTIONS

### DE L'ASSEMBLEE GENERALE EXTRAORDINAIRE

### EN DATE DU [ ● ] 2008

**PREMIERE RESOLUTION**

L'Assemblée Générale, connaissance prise du rapport de l'Administrateur Provisoire, décide la dissolution de la Société.

Conformément à la Loi, la Société subsistera pour les besoins de la liquidation jusqu'à la clôture de celle-ci.

Durant ce temps :

-    la dénomination sociale sera suivie de la mention :
     **"Banque en liquidation"**,

-    le siège de la liquidation restera fixé au siège social.

A la clôture des opérations afférentes à la liquidation bancaire de la Société, notamment après recouvrement des créances et règlement des dettes, le solde positif sera le cas échéant attribué aux actionnaires par décision de l'assemblée générale ordinaire des actionnaires.

**DEUXIEME RESOLUTION**

L'Assemblée Générale, connaissance prise du rapport de l'Administrateur Provisoire, (i) prend acte de la fin des mandats des administrateurs, du Président du Conseil d'Administration, du Directeur Général et du Directeur Général Délégué et (ii), avec l'approbation de la Commission Bancaire de la Banque de France, désigne Monsieur Alain Bachelot, Liquidateur bancaire de la société dissoute jusqu'au [ ● ], les fonctions du Liquidateur bancaire pouvant

2.

être renouvelées, une ou plusieurs fois, dans l'hypothèse où des instances seraient toujours en cours à l'expiration de la période considérée, étant entendu que la clôture de liquidation de la Société avant cette date mettrait fin de façon anticipée au mandat du Liquidateur bancaire.

L'Assemblée Générale confère au Liquidateur bancaire à compter de sa nomination effective tous pouvoirs pour procéder aux opérations de liquidation en se conformant aux dispositions impératives de la Loi prévues aux articles L 237-2 à L 237-13 et R 237-1 à R 237-9 du Code de Commerce, concernant notamment la cession ou transmission des éléments d'actifs, l'approbation des comptes définitifs de liquidation et la clôture des opérations de liquidation.

2 WS0101.5889434.1

3.

Elle lui confère à compter de sa nomination effective les pouvoirs suivants qui sont énonciatifs et non limitatifs :

- Représenter la Société dans tous ses droits et actions.

- Continuer pendant la période de liquidation les affaires en cours.

- Vendre, soit de gré à gré, soit aux enchères publiques, selon qu'il avisera, sans aucune formalité de justice, en bloc ou en détail, aux prix, charges et conditions qu'il jugera convenables, les divers éléments composant l'actif de la Société.

- Céder ou résilier tous baux et locations, tous traités ou marchés, avec ou sans indemnité.

  Toutefois, sauf consentement unanime des actionnaires, la cession de tout ou partie de l'actif à une personne ayant eu la qualité d'Administrateur, de Directeur Général ou de Commissaire aux comptes, ne pourra avoir lieu, sauf accord unanime des actionnaires, qu'avec l'autorisation du Tribunal de Commerce, le Liquidateur et entendu.

  Il ne pourra, d'autre part, céder tout ou partie de l'actif à lui-même ou ses employés, leur conjoint, ascendants ou descendants.

  Enfin, la cession globale de l'actif de la Société ou l'apport de l'actif à une autre société, notamment par voie de fusion, ne pourra être consentie sans l'autorisation de l'Assemblée Générale Extraordinaire des actionnaires.

- Recevoir toutes sommes dues à la Société, payer toutes dettes sociales, faire tous dépôts, se faire ouvrir tous comptes, signer, endosser, accepter tous chèques et effets de commerce, régler et arrêter tous comptes.

- Exercer toutes poursuites et actions judiciaires, tant en demandant qu'en défendant, devant tous degrés de juridiction, et représenter la Société dans toutes les opérations de liquidation de biens ou règlements judiciaires.

- En tout état de cause, traiter, transiger, compromettre, donner toutes mainlevées et tous désistements, avec ou sans paiement, et consentir toutes subrogations avec ou sans garantie.

- Aux effets ci-dessus, passer et signer tous actes, constituer tous mandataires tant généraux que spéciaux, pour la gestion des affaires de la liquidation et pour toutes les opérations de celle-ci ; remplir toutes formalités et, généralement, faire tout ce qui sera nécessaire sans aucune restriction, pour la réalisation de l'actif, le règlement du passif et la liquidation complète et définitive de la Société.

La rémunération du liquidateur bancaire a été fixée par la Commission bancaire à [ ● ]

**TROISIEME RESOLUTION**

4.

L'Assemblée Générale, connaissance prise du rapport de l'Administrateur Provisoire, décide de mettre fin aux mandats des Commissaires aux comptes titulaire et suppléant.

### QUATRIEME RESOLUTION

L'Assemblée Générale confère tous pouvoirs au porteur d'un original, d'une copie ou d'un extrait du présent procès-verbal à l'effet de procéder à toutes les formalités prescrites par la loi.



**Banque Lehman Brothers**

**Société anonyme au capital de 33.538.784 Euros**

**Siège social : 7 place d'Iéna - 75116 Paris**

**339 449 225 R.C.S. Paris**

## RAPPORT DE L'ADMINISTRATEUR PROVISOIRE

## A L'ASSEMBLEE GENERALE EXTRAORDINAIRE

### EN DATE DU [ ● ] 2008

Messieurs,

Nous vous avons réunis en Assemblée Générale Extraordinaire à l'effet de vous demander de bien vouloir autoriser une cession de fonds de commerce de la Banque Lehman Brothers (ci-après la "**Société**" ou "**BLB**").

A la suite des difficultés rencontrées par Lehman Brothers Holdings Inc. (ci-après "**LBHI**"), société mère de BLB, ayant abouti à sa mise en « *Chapter 11* » le 15 septembre 2008, la Commission Bancaire nous a désigné le même jour en qualité d'administrateur provisoire de BLB, avec mission d'exercer tous les pouvoirs de gestion et de direction.

BLB a été confrontée à une situation de trésorerie très tendue, du fait du gel, par application des règles du « *Chapter 11* », de sa trésorerie déposée auprès des différentes entités du groupe Lehman Brothers.

BLB a, sous notre égide, surmonté ces difficultés et tenté de trouver une solution permettant d'assurer la pérennité de ses activités et d'un maximum de ses emplois.

La banque Lazard a été mandatée par LBHI et un appel d'offre concurrentiel a été lancé afin de trouver un acquéreur pour le fonds de commerce de BLB et/ou les actions de BLB.

Un accord intitulé *business sale and purchase agreement* (le "**BSA**") est intervenu le 17 novembre 2008 avec le groupe Nomura, qui avait déjà acquis certaines activités de Lehman Brothers International (Europe) (ci-après "**LBIE**") en Europe et en particulier en Grande Bretagne pour 1 £, et les activités d'autres filiales européennes dans les mêmes conditions et qui a été le seul à faire un offre.

BLB n'a pas reçu d'offre ou indication d'intérêt pour l'acquisition du fonds de commerce de BLB et/ou des actions de BLB autre que celle de Nomura.

WS0101.5778589.3
PA1:\176437\02\3S51021.DOC\58399.0003 WS0101.5889433.3

2.

L'accord conclu avec Nomura organise la vente pour un euro du fonds de commerce de BLB à Banque Nomura France, incluant principalement le transfert d'un certain nombre d'emplois sous certaines conditions suspensives. Il porte sur l'activité de conseil de banque d'investissement du groupe Lehman Brothers en France, comprenant fusions et acquisitions et opérations de conseil (ci-après "**IBD Business**"), sur une partie de l'activité support ainsi que sur la cession de certains actifs liés à *l'Equities Business* détenus par Lehman Brothers Services ("**LBS**").

Les transactions suivantes relatives au règlement des dettes et créances intra-groupes ont également été conclues :

-   aux termes d'un accord intitulé *settlement agreement*, BLB d'une part et LBHI d'autre part ont mutuellement abandonné les créances pour les montants mentionnés dans le *settlement agreement*. BLB pourra faire valoir sa créance résiduelle sur LBHI dans les conditions du *settlement agreement*. BLB pourra également, sous certaines conditions, vendre cette créance résiduelle sur LBHI à un tiers sous réserve de l'exercice d'un droit de préemption par LBHI.

-   Un protocole transactionnel a été conclu le 24 octobre 2008 entre BLB et LBIE. A l'issue de ce protocole et du paiement effectué par BLB, LBIE ne détient plus sur BLB qu'une créance de 8.853.773,04 € subordonnée au paiement des autres créanciers dans le cas où la liquidation amiable laisserait apparaître un actif.

Immédiatement après la réalisation de la cession du fonds de commerce de BLB, une demande de retrait d'agrément sera déposée auprès du CECEI .

L'opération de cession du fonds de commerce a été conclue dans le cadre d'une conciliation ouverte par Monsieur le Président du Tribunal de commerce de Paris au bénéfice de BLB et de ses filiales, et a été homologuée par jugement du [ ● ].

Nous vous demandons par conséquent de consentir au transfert par BLB de son fonds de commerce au profit de Banque Nomura France pour le prix d'un Euro symbolique, lequel porte sur les éléments suivants de l'IBD Business :

-   la clientèle,

-   la propriété intellectuelle de l'IBD Business,

-   tous les contrats auxquels BLB est partie, à l'exception des contrats conclus avec d'autres entités du groupe Lehman,

-   documents commerciaux,

-   les éléments d'informatique relatifs à l'IBD Business,

-   les contrats de propriété intellectuelle de l'IBD Business,

-   le mobilier et le matériel,

-   tout autre actif utilisé dans le cadre de l'IBD Business, important et nécessaire à l'exploitation en France de l'IBD Business et dont BLB est propriétaire,

**Banque Lehman Brothers**

**Société anonyme au capital de 33.538.784 Euros**

**Siège social : 7 place d'Iéna - 75116 Paris**

**339 449 225 R.C.S. Paris**

**PROJET DE RESOLUTIONS**

**DE L'ASSEMBLEE GENERALE EXTRAORDINAIRE**

**EN DATE DU [ ● ] 2008**

**RESOLUTION UNIQUE**

L'Assemblée Générale autorise la cession par la Société de l'IBD Business en tant que fonds de commerce pour un prix d'un Euro symbolique, lequel comporte les éléments suivants :

- la clientèle,

- la propriété intellectuelle de l'IBD Business,

- tous les contrats auxquels BLB est partie, à l'exception des contrats conclus avec d'autres entités du groupe Lehman,

- les documents commerciaux,

2.

- les éléments d'informatique relatifs à l'IBD Business,

- les contrats de propriété intellectuelle de l'IBD Business,

- le mobilier et le matériel,

- tout autre actif utilisé dans le cadre de l'IBD Business important et nécessaire à l'exploitation en France de l'IBD Business,

ainsi que certains des actifs liés à l'*Equities Business* détenus par LBS.

Les disponibilités, valeurs mobilières de placement et les créances détenues par BLB sont exclues de la cession envisagée.

Schedule 2

**BLB intercompany debts (€)**

| | |
|---|---:|
| **LB Ltd** | 226,199 |
| **LBF Inc. Tokyo Branch** | 16 |
| **LBSF Inc.** | 1,282 |
| | |
| **Total** | 227,497 |

13