Hearing Date and Time: January 14, 2009 at 10:00 a.m.
Objection Deadline: January 9, 2009 at 4:00 p.m.

Kane Kessler, P.C.
Robert Kolodney, Esq. (RK-2605)
1350 Avenue of the Americas
New York, New York 10019-4896
(212) 541-6222

Attorneys for Jarden Corporation

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             )    Chapter 11
In re:                                                       )
                                                             )    Case No. 08-13555 (JMP)
LEHMAN BROTHERS HOLDINGS INC.,                               )
et al.,                                                      )    (Jointly Administered)
                                                             )
                                    Debtors.                 )
                                                             )
-------------------------------------------------------------x

**MOTION OF JARDEN CORPORATION FOR AN ORDER PURSUANT
TO BANKRUPTCY CODE SECTIONS 105, 363, 365 AND 1107
COMPELLING LEHMAN COMMERCIAL PAPER INC. TO RESIGN AS
ADMINISTRATIVE AGENT AND SWING LINE LENDER UNDER
CREDIT AGREEMENT, TO COMPEL IMMEDIATE ASSUMPTION OR
REJECTION OF CREDIT AGREEMENT AND GRANTING RELATED
RELIEF**

**Preliminary Statement**

1.      Jarden Corporation ("Jarden") is a Fortune 500 company engaged in the business of designing, manufacturing and marketing, nationally and internationally, a diverse portfolio of consumer products. Jarden's products include dozens of well-known and leading brands such as Ball® jars, Bee® and Bicycle® playing cards, Coleman® lanterns, Diamond® matches, K2® and Volkl® skis, Mr. Coffee® coffee makers, Oster®, Sunbeam® and Rival® kitchen products and Rawlings® baseball gloves.

Jarden's products are marketed through a wide variety of distribution channels, including club stores, department stores, drug stores, mass market stores, grocery stores, sporting goods stores as well as other specialty retailers. Its operations span the entire globe and its revenues exceed $4.7 billion annually. Jarden has over 25,000 employees worldwide.

2. Jarden is a borrower under a $1,530,000,000 Credit Agreement (the "Credit Agreement") between Jarden and Lehman Commercial Paper Inc. ("LCPI") as Administrative Agent ("Administrative Agent"), Citicorp USA, Inc. as Syndication Agent, Bank of America, N.A., National City Bank of Indiana, and Suntrust Bank as Co-Documentation Agents, the Lenders ("Lenders") and L/C Issuers as parties thereto and Lehman Brothers Inc. and Citigroup Global Markets Inc. as Joint-Lead Arrangers and Joint Book-Running Managers, originally entered into as of January 24, 2005 and amended, waived or modified by nine subsequent amendments. Pursuant to the Credit Agreement, several types of loans are and have been made available to Jarden, including Term Loans, Revolving Loans, Swing Line Loans, and Letters of Credit, each as defined in the Credit Agreement. Pursuant to the Credit Agreement, LCPI is the current Administrative Agent and the Swing Line Lender ("Swing Line Lender").

3. Since LCPI and its related Lehman Brothers Holdings Inc. ("Lehman") entities filed these Chapter 11 cases, LCPI has defaulted in its obligations as Swing Line Lender under the Credit Agreement, presumably because it does not have funds available to lend. LCPI's inability to meet its obligations as Swing Line Lender has a significant detrimental impact on Jarden's worldwide operations. The availability of Swing Line Loans is critical to Jarden's ability to effectively manage its daily cash position. Since the beginning of 2008 alone, Jarden has requested and obtained Swing Line Loans on

five separate occasions.  Swing Line Loans can be requested up to 2:30 P.M. (New York time) and such funds must be wired to Jarden's concentration bank accounts by 5:00 P.M. (New York time).  This provides Jarden with the necessary flexibility to manage its cash positions that is not provided by Revolving Loans alone (the cutoff request time of which is Noon (New York time), and can therefore help prevent daily overdrafts in its concentration bank accounts.  As a global company with extensive and varied businesses and ever-changing financial needs, Jarden could suffer irreparable consequences as a result of LCPI's breach of the Credit Agreement.  Without assurance that it has access to Swing Line Loans, as needed, and as agreed upon in the Credit Agreement, undue and significant burdens are being placed on Jarden to operate its business in the normal course.

4. Despite its defaults as Jarden's Swing Line Lender, Administrative Agent and Revolving Lender, LCPI has refused to resign and allow itself to be replaced as the Administrative Agent and Swing Line Lender under the Credit Agreement.  LCPI has taken this unreasonable and untenable position despite the fact that LCPI, on its own motion, previously sought authorization from this Court to terminate its agency relations with borrowers such as Jarden.  Under these circumstances, LCPI's refusal to voluntarily resign is nothing more than a specious effort to hold Jarden hostage under the Credit Agreement in order to gain leverage and extract value in Jarden's dealings with other Lehman entities, including with respect to Jarden's hedging contracts with other Lehman entities.  In sum, LCPI is not acting in good faith.  As set forth in detail below, there is no legitimate reason for LCPI to continue serving as Swing Line Lender and Administrative

3

Agent. LCPI's current defaults render it entirely inappropriate for LCPI to continue to do so.

5. By this motion (the "Motion"), Jarden therefore requests an Order, pursuant to Sections 105, 363, 365 and 1107 of Title 11 of the United States Code (the "Bankruptcy Code"), (a) authorizing Jarden to appoint an agent to replace LCPI as Administrative Agent (the "Replacement Administrative Agent") and as Swing Line Lender (the "Replacement Swing Line Lender") and (b) requiring LCPI to immediately assume or reject the Credit Agreement and, should it assume the Credit Agreement, to cure all of its existing defaults thereunder.

## JURISDICTION AND VENUE

6. The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C §§ 157 and 1334. Venue is proper under 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The Statutory bases on which the Motion is predicated are Sections 105, 363, 365, and 1107 of the Bankruptcy Code.

## BACKGROUND

**The Chapter 11 Cases**

7. On September 15, 2008, Lehman Brothers Holdings Inc. commenced a voluntary case under Chapter 11 of the Bankruptcy Code in this Court. Periodically thereafter, the other Debtors commenced voluntary cases under Chapter 11 of the Bankruptcy Code in this Court, including LCPI, on October 5, 2008 (the "Petition Date"). The Debtors are authorized to operate their businesses and manage their properties as

4

debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' Chapter 11 cases are jointly administered for procedural purposes only.

8. On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed a statutory committee of unsecured creditors pursuant to Section 1102 of the Bankruptcy Code.

9. On or about October 6, 2008, upon motion of LCPI, the Court issued the Order Pursuant to Sections 105(a) 363(b), 363(c) and 541(d) of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing LCPI to (A) Continue to Utilize its Agency Bank Account, (B) Terminate Agency Relationships, and (C) Elevate Loan Participations (the "LCPI Agency Order").  Among other things, the LCPI Agency Order authorized LCPI to "transfer, assign or resign from any and all Administrative Agent positions . . ." (LCPI Agency Order, p. 3).

**The Credit Agreement**

10. As set forth above, the Credit Agreement was originally entered into as of January 24, 2005 and was amended, waived and modified by nine subsequent amendments.

11. Under the Credit Agreement, LCPI is a Term Lender, one of the Revolving Lenders, as well as the Administrative Agent and the Swing Line Lender.

**LCPI's Funding Obligations Under the Credit Agreement**

12. Section 2.05(a) of the Credit Agreement provides, in relevant part, that "the Swing Line Lender agrees to make loans (each such loan, a "Swing Line Loan") in Dollars, to the Borrower [Jarden] from time to time on any Business Day during the

5

period from the Closing Date to the Revolving Credit Maturity Date in an aggregate amount not to exceed the amount of the Swing Line Sublimit…"

13. Section 2.05(b) of the Credit Agreement further provides that if Jarden gives the proper Swing Line Loan Notice to LCPI as Swing Line Lender, not later than 2:30 p.m. New York time on the requested Borrowing date, LCPI shall, not later than "5:00 p.m., New York time … on the Borrowing date specified in such Swing Line Loan Notice, make the amount of its Swing Line Loan available to the Borrower [Jarden] by wire transfer of such funds, in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower." A copy of Sections 2.05(a) and 2.05(b) of the Credit Agreement, conformed through all nine amendments, is annexed hereto as Exhibit A.

**LCPI's Defaults in Satisfying its Obligations**

14. On December 4, 2008 at approximately 1:50 P.M. (New York time), Jarden submitted to LCPI, as Swing Line Lender, a Swing Line Loan Notice ("Notice"), a copy of which is annexed hereto as Exhibit B. As set forth in the Notice, Jarden requested a Swing Line Loan in the amount of U.S. $10,000,000.00. The Notice gave the wiring instructions to the Swing Line Lender and, pursuant to Section 2.05(b) of the Credit Agreement, the funds were required to be wired to Jarden's bank account at Bank of America, N.A. by 5:00 P.M. the day of the Notice. LCPI failed to wire the funds to Jarden pursuant to the Notice on December 4, 2008. In fact, on December 4, 2008, Jarden received an e-mail from Maritza Ospina, Vice President of Lehman Brothers Holdings Inc. (acting in her capacity for LCPI) advising that LCPI "will not be funding this request." A copy of the e-mail is attached hereto as Exhibit C. Accordingly, LCPI

6

has materially breached the Credit Agreement and indicated clearly its intention to continue to materially breach the Credit Agreement.

15. LCPI has also defaulted on its obligations as Administrative Agent. As Administrative Agent, LCPI has the duty to safeguard and deliver collateral to Jarden as requested. In the course of Jarden's dealings with LCPI since its bankruptcy, Jarden has requested collateral documents to be delivered to it in accordance with its duties as Administrative Agent under the Credit Agreement, only to find that LCPI has failed to do so. For example, LCPI, as Administrative Agent, has, after repeated requests, (i) failed to deliver and release certain industrial revenue bonds issued to The Coleman Company, Inc., one of Jarden's subsidiaries and (ii) certain pledged stock certificates which it is holding as Administrative Agent. These failures constitute a breach of LCPI's duties as Administrative Agent. While these defaults may be viewed as only a minor inconvenience to Jarden, LCPI's continued failure to release collateral pursuant to the Credit Agreement could have serious implications to Jarden in the future. Jarden's inability to access the collateral could impact Jarden's ability to dispose of assets or to engage in internal restructuring transactions in accordance with the provisions of the Credit Agreement, which could have tax, financial and other implications.

16. LCPI has also defaulted with respect to other obligations under the Credit Agreement. Most significantly, LCPI has defaulted in its capacity as a Revolving Loan Lender under the Credit Agreement by failing to fund its proportional share of a Revolving Loan request making it necessary for Jarden to request increased amounts for Revolving Loans in the future, based upon the expectation that LCPI's portion will not be funded. This effectively increases any draws against non-defaulting Revolving Loan

Lenders. Moreover, LCPI's failure to fund its portion of Revolving Loan requests reduces the aggregate amount of total Revolving Loan credit available to Jarden.

17. As indicated above, based on LCPI's defaults, Jarden requests that the Court take action pursuant to its powers under Sections 105, 363, 365 and 1107 to authorize Jarden to replace LCPI as Administrative Agent and Swing Line Lender under the Credit Agreement and to require LCPI to immediately assume or reject the Credit Agreement.

## BASIS FOR RELIEF REQUESTED

### A. The Court Should Authorize Jarden to Replace LCPI as Administrative Agent and Swing Line Lender

18. LCPI's defaults under the Credit Agreement, particularly those in its capacity as Swing Line Lender and Administrative Agent, necessitate the immediate resignation, removal and replacement of LCPI as both Administrative Agent and Swing Line Lender under the Credit Agreement.

19. LCPI has not acted in a commercially reasonable manner with respect to the Credit Agreement since the Petition Date. Jarden has requested LCPI to fund a Swing Line Loan and LCPI has refused to do so. LCPI's refusal to fund the Swing Line Loan causes significant disruption to Jarden's worldwide operations. Jarden depends upon the flexibility and certainty of immediate credit for its day-to-day business operations. Without the assurance that it can obtain Swing Line Loans on short notice (as bargained for in the Credit Agreement), it is difficult for Jarden to manage its daily finances. The seriousness of this situation cannot be overstated; with over $4.7 billion in revenue,

8

numerous lines of products, over 25,000 employees, and operations all over the world, Jarden's inability to obtain Swing Line loans to meet its fluid financial obligations could severely impact its business operations.  For this very reason, Jarden's ability to obtain Swing Line Loans on short notice was an integral aspect of the Credit Agreement specifically bargained for by Jarden in its negotiations, precisely so that it would not find itself in the current, uncertain position.  Allowing LCPI to continue in its capacity as Swing Line Lender, *when it cannot lend*, and preventing Jarden from replacing LCPI with a viable swing line lender is unjustifiable and extremely prejudicial.

20.    In addition to replacing LCPI as Swing Line Lender, it is imperative that LCPI also be removed and replaced as Administrative Agent.  Having the same entity serve in the capacities of both Swing Line Lender and Administrative Agent was a fundamental basis for, and a condition precedent to, Jarden's entering into the Credit Agreement in the first instance.  An administrative agent is far more likely to discharge its duties effectively when it is financially exposed to the obligations of also being a swing line lender.  Throughout the history of this credit facility and prior facilities, which date back to 2002, Jarden has always relied upon a single lender to serve in both capacities.

21.    As set forth in the accompanying declaration of Jason Wong, VP, Treasury of Jarden, in support of this Motion, Jarden has made several attempts to replace LCPI as the Swing Line Lender but none of the Lenders with whom Jarden has negotiated will agree to be the Replacement Swing Line Lender unless they may also serve as the Replacement Administrative Agent.  In fact, Jarden's negotiations with one

9

of its Lenders who will agree to serve as a Swing Line Lender have come to a standstill because of LCPI's ongoing refusal to resign as Administrative Agent.

22. LCPI must also be removed as Administrative Agent because it no longer has the same prospective interests and concerns as other Lenders under the Credit Agreement, given that it has ceased funding as Swing Line Lender (and also as a Revolving Lender). It is crucial that the interests of the Administrative Agent and the group of Lenders it leads and coordinates be aligned. Indeed, the Credit Agreement requires, in Section 9.09(a) that any successor Administrative Agent be appointed from among the Lenders, presumably for that reason. A copy of Section 9.09(a) of the Credit Agreement, conformed to reflect all nine amendments thereto, is annexed hereto as Exhibit D. As a defaulting lender in bankruptcy with an interest in maximizing the short term collection of assets rather than fulfilling its contractual commitments and nurturing an ongoing business relationship, an interest divergent from that of the other Lenders, it is entirely inappropriate for LCPI to represent all of the Lenders by continuing to serve as Administrative Agent.

23. Indeed, the two positions (Swing Line Lender and Administrative Agent) are linked within most credit agreements. In fact, the two positions are so linked, that Section 9.09(a) of the Credit Agreement, governing successor Administrative Agents, provides that "[T]he Administrative Agent may resign as Administrative Agent upon 30 days' notice to the Lenders; provided that any such resignation by the Administrative Agent shall also constitute its resignation … as the *Swing Line Lender*" (emphasis added). It is therefore apparent that under the Credit Agreement, the Administrative Agent must be the Swing Line Lender and cannot just resign its position without also

10

resigning its position as Swing Line Lender. For that reason, Jarden is unable to replace LCPI as Swing Line Lender unless LCPI is forced to resign as Administrative Agent.

24. As Administrative Agent, LCPI also is in the position of coordinating and communicating with all the Lenders under the Credit Agreement, and serves as the main liaison through which Jarden deals with the other Lenders. As Administrative Agent, LCPI has the authority to notify other Lenders when they have defaulted and the discretion to pursue remedies for such defaults. *See* Notice from LCPI to Lenders, annexed hereto as Exhibit E (asserting LCPI's authority and discretion to pursue remedies against other defaulting Lenders). With LCPI itself in default, it is difficult to see how it could possibly be effective in performing its duties as Administrative Agent. LCPI's default has clearly caused it to be conflicted in serving in its Administrative Agent capacity.

25. Finally, based upon LCPI's own determination, it is obvious that the appropriate action is for LCPI to be replaced as Administrative Agent and Swing Line Lender. LCPI, in its own motion in support of the LCPI Agency Order, stated:

> In order to limit any further liability arising from its role as Administrative Agent and its possible inability to perform its role in the future, LCPI has determined that it is in [LCPI's] best interest to transfer or resign its Administrative Agent positions as expeditiously as possible. Inasmuch as the fees generated from its Administrative Agent positions do not actually cover the administrative expense of operating that aspect of its business, LCPI does not believe that the sale, transfer or resignation of such positions represents the transfer of an asset of its estate. Nevertheless, LCPI seeks authority to terminate its agency relationships pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.

11

LCPI further argued:

> [a]uthorization [for LCPI] to terminate its agency relations is both necessary and appropriate in order to operate the Debtor's business in a manner that is both consistent with the provisions of the Bankruptcy Code and gives due regard to the interest of third parties with which LCPI dealt in operating its business.  The relief requested will minimize the liabilities of LCPI's estate and is also in the best interests of the unstable credit markets.

(LCPI, Docket No. 3, p.10).

In considering the interests of the bankruptcy estate, its creditors, and the credit markets at large, LCPI has identified compelling reasons why it must resign as Swing Line Lender and Administrative Agent.  Should LCPI continue to default on its obligations to Jarden, its estate could incur liability for the exponential losses to which Jarden is exposed, particularly in light of the unstable credit markets.  These circumstances have only worsened since the date of LCPI's motion.  Given that *LCPI itself* has requested authority to resign as Administrative Agent and has cited valid reasons for doing so, there appears to be no legitimate reason for allowing LCPI to continue in those capacities.

26.    It is highly inappropriate at this stage for LCPI to insist on remaining as Administrative Agent if it can no longer fund its commitments as Swing Line Lender. For the reasons detailed above, the Court should compel LCPI to act in a commercially reasonable manner by authorizing Jarden to replace LCPI as Administrative Agent and to find a new lender to take over LCPI's future funding obligations as a Swing Line Lender.

**B.      The Court Should Require LCPI to Immediately Assume or Reject the Credit Agreement**

27.     In addition to requesting authorization to remove LCPI as Administrative Agent and Swing Line Lender, Jarden also requests that the Court enter an Order, pursuant to Section 365(d) (2) and 105(d) (2)(A) of the Bankruptcy Code, compelling LCPI to either assume or reject the Credit Agreement, in its entirety, by no later than the date scheduled for the hearing on this Motion.  If LCPI chooses to assume the Credit Agreement now, Jarden further requests that LCPI be required to cure all defaults arising from its breach of the Credit Agreement, as detailed herein, and provide adequate assurance of future performance pursuant to Section 365(b)(1) of the Bankruptcy Code.

28.     By refusing to resign as Administrative Agent even while defaulting on its funding obligations as Swing Line Lender and Revolving Lender, LCPI is effectively assuming part of the Credit Agreement while rejecting its other parts.  It is a fundamental principle of U.S. bankruptcy law that a debtor in possession seeking to assume or reject an executory contract may not assume it in part and reject it in part.  *See, e.g. In re: Village Rathskeller, Inc.*, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992); *In re: Nitec Paper Corp.*, 43 B.R. 492 (S.D.N.Y. 1984).  LCPI should not be permitted by the Court to pick and choose which obligations of the Credit Agreement it assumes at the expense of Jarden.

29.     Setting a date by which the debtor must assume or reject executory contracts is one of the specifically enumerated powers granted to the Bankruptcy Court.  11 U.S.C. § 105(d)(2)(A).  Section 365(d)(2) of the Bankruptcy Code provides, in pertinent part, that "the court, on the request of any party to [an executory contract], may

13

order the [debtor in possession] to determine within a specified period of time whether to assume or reject such contract…" This is a codification of a case law remedy that had developed under the prior Act, including a leading Second Circuit opinion. 3 Collier on Bankruptcy Sec. 365.04[2][b], *citing In re Greenpoint Metallic Bed Co.*, 113F.2d 881, 883-884 (2d Cir. N.Y. 1940) ("the holder of an executory contract with the debtor…is not helpless, for he may insist that his contract be either rejected or assumed under the plan and may apply to the bankruptcy court to protect his interest at the confirmation hearing or before").

30.     Under Section 365(d)(2), a debtor is allowed a reasonable time to decide whether to assume or reject its executory contracts. However, what constitutes a "reasonable" time depends upon the facts and circumstances of the particular case and is within the discretion of the Court. *See In re Teligent, Inc*. 268 B.R. 723, 738 (Bankr. S.D.N.Y. 2001); 3 Collier on Bankruptcy Sec. 365.04[2][b]. In setting a time to assume or reject an executory contract, courts will consider, *inter alia*, the nature of the interest at stake, the balance of the harm to the parties, the good to be achieved and the safeguards afforded all of the parties. *See In re Lionel Corp*., B.R. 224, 225-26 (Bankr. S.D.N.Y. 1982). *See also In re Teligent, Inc. supra* 268 B.R. at 738 (courts will consider the "damage that the non-debtor will suffer beyond the compensation available under the Bankruptcy Code" in deciding whether to expedite the time frame in which the Debtor must decide whether to assume or reject an executory contract).

31.     Here, time is clearly of the essence. Jarden cannot wait any longer for a decision from LCPI as to whether it will cure its defaults and honor its obligations to fund the Revolving Loan and the Swing Line Loan. LCPI has already refused Jarden's

14

request, made December 4, 2008, to fund the Swing Line Loan, and has failed to fund its portion of the Revolving Loan request from Jarden on September 26, 2008 under the Credit Agreement. To date, the total amount which Jarden has not received due to LCPI's defaults is $19,777,777.78. The potential for economic harm to Jarden flowing from LCPI's continued refusal to resign far outweighs any argument LCPI may have that it needs further time to decide whether to assume or to reject. "Congress intended [Section 365(d)(2)] to 'prevent parties in contractual or lease relationships with the Debtor from being left in doubt concerning their status vis à vis the estate.'" S. Rep. No. 989, 95th Cong., 2d Sess. 59. (1978). The Court should exercise its discretion and require LCPI to decide, by no later than the date scheduled for the hearing on this Motion, whether to assume or reject the Credit Agreement.

32. Finally, a prompt resolution of whether LCPI will accept or reject the Credit Agreement is also required in order to protect the interests of the bankruptcy estate. Presently, LCPI is continuing to incur liabilities as a result of its failure to fund as the Swing Line Lender and as a Revolving Lender and to fulfill its duties as Administrative Agent. As time passes, the value of the Credit Agreement, if it is to be assumed and assigned to a third party, is continually decreasing because the amount payable by LCPI to cure any defaults, should it assume the Credit Agreement, is continually increasing. In addition, LCPI would be responsible for any damage suffered by Jarden as a result of LCPI's defaults, which would increase its liabilities. A timely determination to assume or reject the Credit Agreement would be most beneficial to the estate, in that it would reduce the amount that LCPI would have to pay if it were to make the determination to assume or reject at a later date and still incur additional unfunded

15

commitments which it would have to cure if ultimately it decided to assume the Credit Agreement.

## NOTICE

33. Notice of this motion has been served in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for this case [Docket No. 285] on (i) the attorneys for the Debtor; (ii) the U.S. Trustee; (iii) the attorneys for the Creditors' Committee; (iv) the attorneys for the Debtor's post-petition lenders; and (v) all parties who have requested notice in these chapter 11 cases. No other or further notice need be provided.

Dated: New York, New York
      December 10, 2008                      **KANE KESSLER, P.C.**

                                          By: /s/ Robert Kolodney
                                              Robert Kolodney (RK-2605)
                                              1350 Avenue of the Americas
                                              New York, New York  10019
                                              Tel. #: (212) 541-6222
                                              Fax #: (212) 245-3009