**Hearing Date:  December 16, 2008 at 10:00 a.m.**

Dennis F. Dunne
Wilbur F. Foster, Jr.
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                     :
In re:                                               :        Chapter 11 Case
                                                     :
LEHMAN BROTHERS HOLDINGS INC., et al.,               :        No. 08-13555 (JMP)
                                                     :
                    Debtors.                         :        (Jointly Administered)
                                                     :
------------------------------------------------------------------ x

### OBJECTION OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ORDER PURSUANT TO 11 U.S.C. §§ 105 AND 365 TO ESTABLISH PROCEDURES FOR SETTLEMENT AND/OR ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS

The Official Committee of Unsecured Creditors (the "Committee") appointed in

the chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in

possession (collectively, the "Debtors"), hereby objects to the Debtors' motion (the "Derivatives

Procedures Motion") for an order, pursuant to sections 105 and 365 of title 11 of the United

States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code") and rules 6006 and

9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving

procedures for the Debtors to (1) assume and assign Derivative Contracts,[1] the termination of

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Derivatives Procedures Motion.

which would result in a net payment to the Debtors ("In the Money Derivative Contracts"),

including fixing cure amounts (the "Assumption and Assignment Procedures"), and (2) settle

Derivative Contracts that have been terminated by the counterparties thereto ("Terminated

Derivative Contracts") by agreeing to termination payments and/or the return to counterparties of

collateral currently held by the Debtors (the "Termination and Settlement Procedures" and

together with the Assumption and Assignment Procedures, the "Procedures"), and respectfully

states as follows:

## PRELIMINARY STATEMENT

1.      The Debtors seek unfettered authority to winddown the Debtors' book of

Derivative Contracts, without Court oversight or any meaningful role for the Committee.  In

addition to the Committee, more than 125 counterparties to the Derivative Contracts have

objected to this course of action, suggesting a need for improved procedures with respect to the

disposition of these assets.  The Committee appreciates the need for Court-approved procedures

to resolve the Derivative Contracts and to enable the Debtors to realize significant embedded

value for the benefit of creditors.  The volume of Derivative Contracts at issue and the

importance of timely contract assignments render the usual procedures for Court approval of

each transaction impractical and perhaps unworkable.  Notwithstanding the benefits to be

achieved, the Debtors should not be authorized to make unilateral decisions with respect to the

disposition of estate property that trample reasonable creditor expectations of transparency and

committee oversight.

2.      The Procedures reflect no balancing of debtor and creditor interests and

cannot, in their current form, be squared with the Committee's duties to unsecured creditors –

duties that are heightened by the fact that the Debtors are in the process of a managed

liquidation.  To discharge its duties and ensure that appropriate value is realized from each

transaction, the Committee must receive adequate information and be granted a comprehensive

oversight role with respect to proposed transactions, including consent rights for transactions that

exceed certain thresholds, and the ability to obtain Court review on shortened notice in instances

if and when the views of the Debtors and the Committee diverge.  The Committee and its

advisors are well-equipped to evaluate such transactions on an expedited basis and obtain

Committee consent where necessary.

   3.  The Debtors cite to <u>Enron</u>, <u>NRG</u> and <u>Mirant</u> as precedent for the

Procedures; however, the debtors in those cases did not seek or receive *carte blanche* authority to

liquidate their trading books.  Rather, in each of those cases, and in contrast to the Procedures,

the creditors' committees and their advisors (certain of which also advise the Committee) spent

weeks collaborating with the debtors and ultimately agreed upon procedures pursuant to which

the committee's advisors received certain categories of information with respect to every

proposed transaction, an opportunity to raise questions with the debtors, and the ability to be

heard by the Court in the event that the committees and their advisors did not believe a particular

transaction to be in the best interests of the estates.

   4.  During the limited time available since the filing of the Derivatives

Procedures Motion, the Committee's advisors have endeavored to work with the Debtors to

develop an appropriate protocol.  Unfortunately, given the self-imposed time constraints, the

Debtors have been unable to satisfy the Committee's requests for information that will allow its

professionals to develop appropriate procedures.  In light of the Debtors' inability to provide the

fundamental  information requested by the Committee and the parties' inability to come to terms

with respect to a protocol, the Committee suggested that the Debtors proceed on an interim basis

until informed negotiations toward a consensual resolution could take place.  Instead, the

Debtors have insisted on pushing forward without an agreed-upon framework.  As a result, the Committee respectfully objects.

## BACKGROUND

5.        Commencing on September 15, 2008 and periodically thereafter, the Debtors commenced these chapter 11 cases by filing with this Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On September 17, 2008, the United States Trustee for the Southern District of New York appointed the Committee.  No trustee or examiner has been appointed in these chapter 11 cases.

## I.   Derivatives Procedures Motion

6.        On November 13, 2008, the Debtors filed the Derivatives Procedures Motion requesting entry of an order approving the Procedures to resolve the nearly one million Derivative Contracts to which one or more of the Debtors are a party.  The Procedures consist of the (a) Assumption and Assignment Procedures with respect to In the Money Derivative Contracts and (b) Settlement Procedures in connection with Terminated Derivative Contracts.  The Debtors have modified the Procedures in certain respects to accommodate objections to the Motion.

### A.   Assumption and Assignment Procedures

7.        The ***sole*** role envisioned for the Committee in the Assumption and Assignment Procedures is to consent to a proposed transaction, in the event the Debtors seek to assume and assign a Derivative Contract to an assignee (i) whose bid was selected from a marketing process in which the Debtors solicited bids from **less** than four (4) potential assignees or (b) that did not make the highest or best bid for such Derivative Contract in a marketing process in which the Debtors solicited bids from at least four (4) potential assignees.  See Derivative Procedures Motion at 11.

8.      So long as the Debtors solicit bids from at least four (4) potential assignees, and select the highest or best bid received within a reasonable period of time from such potential assignees, the Debtors may take any of the following actions without so much as notifying the Committee or the Court, regardless of the value of the assets at issue:

- Distribute to a Derivative Contract counterparty estate property that the Debtors believe to be collateral under such Derivative Contract and, if such putative collateral is no longer in the Debtors' possession, pay an amount equal to the current value of the collateral as of the date of the Assignment Notice.

- Fix cure amounts and, in the case of any dispute with the relevant counterparty, negotiate with respect to proposed cure amounts or the existence of defaults or termination events and litigate with respect to same.

B.      Termination and Settlement Procedures

9.      The Termination and Settlement Procedures contemplate that, with respect to any Derivative Contract, the Debtors may enter into and consummate a termination agreement, which can include any of the following features: (a) resolve and fix amounts owed between the Debtors and the Counterparty, (b) provide a release to the Counterparty, and/or (c) address and permit the liquidation or return of the collateral or margin held by the Debtors or counterparties in accordance with the Derivative Contract or termination agreement. ***The Termination and Settlement Procedures do not include any requirement for Committee consent or even notice***, regardless of the value of the assets at issue. As with the Assumption and Assignment Procedures, and notwithstanding Bankruptcy Rule 9019, the Debtors would not be obligated to file any notice of such settlements with the Court.

## II.      The Committee Has Attempted To Negotiate With The Debtors

10.      Since the filing of the Derivatives Procedures Motion, the Committee, through its advisors, has worked with the Debtors and their advisors to develop procedures for

the winddown of the Derivative Contracts.  In connection with such discussions and, specifically, to enable the Debtors and the Committee to form educated views on appropriate parameters and value thresholds for Committee oversight and consent, the Debtors agreed to provide the Committee's financial advisors data reflecting, among other things, the nature and value of all of the Derivatives Contracts.  To date, the Debtors have provided some but not all of the requested information.

11.     Despite the Debtors' inability to compile the information that they agreed to provide to the Committee to facilitate an informed evaluation of the Procedures, and the Debtors' stated interest in agreeing upon a protocol with the Committee, the Debtors denied the Committee's request to adjourn the hearing on the Derivatives Procedures Motion until the relevant information regarding the universe of Derivative Contracts was compiled and accessible.  In fact, the Debtors have even denied the Committee's repeated offers to support approval of the Derivative Procedures Motion on an interim basis (during which interim period the Committee would review all proposed transactions, and the implementation of transactions would be conditioned on the Committee's approval) such that a final hearing on the Procedures might await development of a protocol that reflects an appropriate level of Committee oversight.

## OBJECTION

**I.      The Proposed Procedures Fail To Provide an
        Appropriate Oversight Role for the Committee**

12.     As the Court has recognized, the active participation of official creditors' committees is vital to the effective administration of chapter 11 cases.  <u>See</u>, <u>e.g.</u>, <u>In re Refco, Inc.</u>, 336 B.R. 187, 195 (Bankr. S.D.N.Y. 2006) ("'An official committee of creditors plays a pivotal role in the bankruptcy process.  The function of an official creditors committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are heard and their

6

interests promoted and protected.'") (quoting <u>Pan Am Corp. v. Delta Air Lines, Inc.</u>, 175 B.R. 438, 514 (S.D.N.Y. 1994)).  Where, as here, the Debtors are working towards a managed liquidation of their affairs, the role of the Committee -- as representative of the true parties in interest -- is of even greater importance.  <u>In re After Six, Inc.</u>, 154 B.R. 876, 882 (E.D. Pa.1993) (when Chapter 11 goal is liquidation, rather than rehabilitation, greater deference to the viewpoints of the creditors' committee is justified); <u>In re Walnut Equipment Leasing Co., Inc.</u>, 2003 WL 21262710, at *1 n.1 (Bankr. E.D. Pa. May 28, 2003) (where "the reorganization had taken the form of a liquidation of assets in Chapter 11 for the benefit of creditors . . . the creditors as represented by the Committee were the real party in interest in the Chapter 11 liquidation proceeding [and] the Debtors deferred to the Committee's decisions with respect to maximizing value from estate assets"); <u>In re S.N.A. Nut Co.</u>, 186 B.R. 98, 105 (Bankr. N.D. Ill. 1995) ("In a liquidating Chapter 11, more deference is shown to the unsecureds' viewpoint than in a reorganization case 'because the principle [sic] underlying rationale for the "business judgment rule", i.e., that a DIP is entitled to some free reign in fulfilling its perceived mission of aiding the economy . . . is lacking in such circumstances.'") (citation omitted) (alterations in original).

13.     Although the Debtors and the Committee are generally working on a cooperative basis, the Procedures do not afford sufficient responsibility to, or permit adequate involvement by, the Committee and its advisors in the administration of the process for the assumption and assignment, or settlement, of Derivative Contracts.  When viewed in light of (a) the fact that the Procedures provide for minimal Court oversight of the Debtors' decisions in connection with Derivative Contracts (unless there is a dispute and the Debtors ***choose*** to take the issue before the Court); and (b) the recognized expertise of the Committee's advisors in

working with such financial contracts, the need for the Committee and its advisors' involvement in the process is clear.

### A.    Cases Cited By Debtors Demonstrate Necessity and Precedent for Meaningful Committee Involvement

14.    There is little doubt that the Debtors' estates will be best served by implementation of a protocol for the efficient monetization of In the Money Derivative Contracts and settlement of Terminated Derivative Contracts.  Furthermore, the Committee is aware that procedures to further such goals have been approved by this and other Courts.  Indeed, the Debtors cite In re NRG Energy, Inc., Case No. 03-13024 (Bankr. S.D.N.Y. 2003) [Docket No. 414]; In re Mirant Corp., Case No. 03-46590 (DML) (Bankr. N.D. Tex. 2003) [Docket No. 3033]; and In re Enron Corp., Case No 01-16034 (AJG) (Bankr. S.D.N.Y. 2001) [Docket No. 4129], for the proposition that "other chapter 11 courts have entered similar orders creating procedures for the assignment or settlement of derivative contracts."  Derivative Procedures Motion at 14.  The settlement procedures approved in each of those cases, however, contemplated a far more significant role for the applicable creditors' committee than that which the Debtors propose for the Committee here, and in certain instances, the debtor was still required to seek Court approval for transactions.  Therefore, the cited authority does not support the relief requested in the Derivatives Procedures Motion.

15.    Specifically, in procedures approved in Mirant (a copy of which is attached hereto as Exhibit A), the creditors' committee was a "Notice Party" in respect of *every* proposed settlement of "Trading Contract" claims or obligations, and was afforded time to review and, if necessary, object to the proposed settlement after determining whether the proposed settlement was in the best interest of the debtors' estates.  Similarly, under the procedures approved by the Court in NRG (a copy of which is attached hereto as Exhibit B), any

8

"NRG Settling Party" was *required to obtain the creditors' committee's approval prior to the settlement of obligations under any* "Trading Contract".  In addition, the NRG procedures required that a "Settlement Notice" be filed with the Court after the creditors' committee determined whether or not to approve the settlement.  Finally, the procedures approved in Enron (a copy of which is attached hereto as Exhibit C) *required* any "Enron Settling Party" *to obtain the creditors' committee's approval prior to the settlement of obligations under all* "Trading Contracts" valued above a specified threshold and to provide advance notice of all such transactions (regardless of size).  Another feature of the Enron protocol was that every settlement was filed with the Court.  The procedures approved in Enron were later amended, although not in a way that materially changed the role of the creditors' committee.  See In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2001) [Docket No. 11,748].  A copy of the amended procedures is attached hereto as Exhibit D.

16.     Contrary to the procedures approved in the cases relied upon by the Debtors, under the Procedures, obtaining Committee consent is the limited exception rather than the rule.  For example, the Assumption and Assignment Procedures provide that by selecting what the Debtors determine to be the highest *or best* of four (4) bids by potential assignees, no Committee consent will be sought regardless of the value or significance of the Derivative Contract to the Debtors' estates.  With respect to the proposed Termination Procedures that may apply to more than 750,000 Derivatives Contracts (see Derivatives Procedures Motion at 4), the Procedures envision *no Committee role*.

17.     The Committee also believes that periodic public disclosure of the progress being made in winding down the Debtors' derivatives book would promote

transparency and would not compromise confidentiality.  Accordingly, the Committee intends to work with the Debtors to incorporate an appropriate disclosure mechanism into the protocol.

        **B.**    <u>**Additional Time Is Needed To Develop Appropriate Procedures**</u>

18.     More time is needed to develop appropriate procedures with the Debtors and their advisors that contemplate a more significant role for the Committee and its advisors in the administration of procedures governing Derivative Contracts.  In <u>Enron</u>, for example, it took months for an appropriate protocol to be agreed upon and approved by the Court.  Although the Committee and its advisors are working diligently to reach a consensual resolution of this issue, time does not allow the parties to agree upon a protocol in advance of the December 16 hearing.

19.     Accordingly, the Committee requests that until an appropriate protocol is agreed upon, it should be afforded consent rights with respect to each transaction that contemplates the assignment of In The Money Derivative Contracts or the settlement of Terminated Derivative Contracts.  As detailed above, consent rights are necessary, especially in the absence of Court review and approval of the transactions, to ensure that the creditor interests are protected.

## CONCLUSION

WHEREFORE, the Committee respectfully requests entry of an Order

(1) granting the relief requested on an interim basis, during which time all transactions with

respect to the Derivatives Contracts will be subject to and conditioned on Committee approval,

and (2) granting such other relief as is just and proper.

Dated:    New York, New York
          December 12, 2008

                        **MILBANK, TWEED, HADLEY & McCLOY LLP**

                        By:  /s/ Dennis F. Dunne
                        Dennis F. Dunne
                        Wilbur F. Foster, Jr.
                        Dennis C. O'Donnell
                        Evan R. Fleck
                        1 Chase Manhattan Plaza
                        New York, NY 10005
                        Telephone:  (212) 530-5000

                        Counsel for Official Committee of Unsecured
                        Creditors of Lehman Brothers Holdings Inc., et al.

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 Case |
|  | ) |  |
| MIRANT CORPORATION, et al., | ) | Case No. 03-46590(DML) |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
|  | ) |  |
|  | ) |  |

**ORDER GRANTING DEBTORS' MOTION PURSUANT TO SECTIONS
105 AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019
ESTABLISHING PROCEDURES FOR SETTLEMENT OF
TERMINATED SAFE HARBOR CONTRACTS**

Upon the "Motion Pursuant To Sections 105 And 363 Of The Bankruptcy Code

And Bankruptcy Rule 9019 Establishing Procedures For Settlement Of Terminated Safe Harbor

Contracts" (the "Motion")[1] dated December 31, 2003, filed by Mirant Corporation and its

affiliated debtors (collectively, the "Debtors") for the entry of an order establishing and

authorizing procedures for settlement of certain, specified terminated safe harbor contracts

pursuant to that certain Trading Contract Settlement Protocol which has been filed with this

Court under seal (the "Original Protocol"); and it appearing that this Court has jurisdiction to

consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and

1334; and it appearing that this matter is a core proceeding within the meaning of 28 U.S.C. §

157(b); and it appearing that venue of this proceeding and this Motion is proper in this district in

accordance with 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having

---

[1] Unless otherwise defined herein, capitalized terms have the same meaning ascribed to them in
the Motion.

been given as set forth on the certificate of service annexed to the Motion and the affidavit filed

by Bankruptcy Services LLC; and it appearing that no other or further notice is necessary; and it

further appearing that the Debtors have withdrawn their request to approve the Original Protocol

and now seek approval of a Revised Trading Contract Settlement Protocol (the "Revised

Protocol), a copy of which is attached hereto as Exhibit A; and this Court finding that the

Trading Contracts are within the class of controversies that may be resolved pursuant to the

Revised Protocol without notice or a hearing (except as required under the Revised Protocol)

under Federal Rule of Bankruptcy Procedure 9019(b); and this Court further finding that

permitting settlement of Trading Contracts pursuant to the Revised Protocol is in the best

interests of the Debtors, their estates and their creditors; and after due consideration and

sufficient cause appearing therefor,

It is hereby:

**ORDERED**, pursuant to Federal Rule of Bankruptcy Procedure 9019(b), the Debtors are

authorized to settle Trading Contracts according to, and in the manner provided by, the Revised

Protocol, a copy of which is attached hereto as Exhibit A (and incorporated herein as though set

forth in full) without further hearing or notice except as required under the Revised Protocol;  the

Notice Parties shall comply with their obligations set forth therein; it is further

**ORDERED**, that non-Debtor parties to the Trading Contracts that are the subject of a

settlement under the Revised Protocol are entitled to rely on the written representations of an

officer of the Debtors that the Revised Protocol has been complied with in the same manner as

though an order approving the particular settlement had been entered by the Court; it is further

**ORDERED**, that the Notice Parties shall treat all information received in connection

with the Revised Protocol as highly sensitive and confidential information (and as "Subject

Material" under that certain "Order Approving Specified Information Blocking Procedures and

Permitting Trading in the Debtors' Securities, Bank Debt, Purchase or Sale of Trade Debt and

Issuing of Analyst Reports Upon Establishment of a Screening Wall Effective July 25, 2003"

signed by this Court on August 18, 2003, hereinafter referred to as the "Screening Order"), and

no Notice Party shall file with the Bankruptcy Court or serve upon (or deliver to) other parties in

interest (other than the Debtors or other Notice Parties) any pleading or notice which discloses

such information; provided however, such confidential information may be filed with this Court

under seal pursuant to an order authorizing such information to be filed under seal and in

accordance with the Screening Order; it is further

ORDERED, that this Court, in its discretion, will hear objections by a Notice Party to a

settlement under the Revised Protocol in camera, as necessary to protect the confidentiality of a

particular settlement; it is further

ORDERED, that notwithstanding the fact that settlement of Trading Contracts may be

authorized hereunder without the entry by this Court of a specific order approving same, in

undertaking their obligations under the Revised Protocol, the members of the "Committees," the

"Protected Managers," and the "Protected Professionals" shall be deemed "Protected Persons"[2]

under the "Order Restricting Pursuit of Certain Persons" signed by this Court on September 29,

2003, and extended by the "Order Extending Order Restricting Pursuit of Certain Persons"

signed by this Court on August 5, 2003 (as such orders may be further extended or modified

from time to time, collectively, the "Orders"); such "Protected Persons" shall be afforded the

---

[2]  As those terms are defined in the "Order Restricting Pursuit of Certain Persons" signed by this
Court on September 29, 2003, and extended by the "Order Extending Order Restricting Pursuit
of Certain Persons" signed by this Court on August 5, 2003.

protections contained in the Orders as though an order approving each settlement of a Trading

Contract authorized under the Revised Protocol had been entered by this Court.

Dated:  February 24, 2004

_____

D. Michael Lynn,
United States Bankruptcy Judge

**EXHIBIT A**

**REVISED TRADING CONTRACT SETTLEMENT PROTOCOL**

1.      **Settlement of Trading Contracts**.  The Debtors may enter into agreements with a counterparty to a Trading Contract that provide for the settlement of claims and obligations arising out of a Trading Contract.  The Debtors will provide to each Committee and the DIP Lender (collectively, the "Notice Parties") full and complete details of any proposed settlement of Trading Contract claims or obligations, including but not limited to the Settlement Information.  Such information shall be delivered in accordance with Section 10 below.  The Debtors may enter into agreements reasonably necessary to memorialize or facilitate the settlement of a Trading Contract (which may include mutual releases of claims relating to or arising solely from the settled Trading Contract).  Notwithstanding anything herein to the contrary, the Debtors shall not submit any more than five (5) Trading Contract settlements to the Notice Parties for review in any calendar week.

2.      **Response to Settlement of Trading Contracts**.  The Notice Parties will have ten (10) calendar days after service of the information described in Section 1 to review the proposed settlement (and, if requested prior to the expiration of the 10-day period, an additional five calendar (5) days) and determine whether or not the proposed settlement (a) falls within the standard of approval required by Fed. R. Bankr. P. 9019(a); (b) is "fair and equitable and in the best interest of the estate." *In re Cajun Electric Power Cooperative, Inc.*, 119 F.3d 349, 355 (5th Cir. 1997); and (c) "fall[s] beneath the lowest point in the range of reasonableness." *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).

3.      **Resolution of Responses to Settlement of Trading Contracts**.  (a)  If no Notice Party timely objects to a proposed settlement, the proposed settlement shall be approved and the Debtors may consummate said settlement without further order of the Bankruptcy Court.  (b) If any Notice Party timely informs the Debtors in writing that they object to the proposed settlement, and sets forth the reasons why the proposed settlement does not comport with the requirements of Section 2, the Debtors will (i) seek to resolve the objection with the objecting Notice Party; and/or (ii) file a motion (a "Settlement Motion") with the Bankruptcy Court seeking approval of the settlement in accordance with the Bankruptcy Rules and orders of the Bankruptcy Court.  In such an event, such settlement agreements shall not be approved unless and until the objections are resolved or the Bankruptcy Court orders such relief.  No Notice Party shall file any objection to a settlement with the Bankruptcy Court; provided however, a Notice Party may file with the Bankruptcy Court an objection to a Settlement Motion, subject to the requirements of Section 6 hereof.

4.      **Allocation**.  Any monies paid to, or received by, the Debtors (or associated claim determination) relating to a combined settlement of Trading Contract claims of more than one of the Debtors (through master netting agreements or otherwise) pursuant to this Protocol or a Settlement Motion, shall be provisionally allocated in accordance with the example set forth on Exhibit A attached hereto; provided however, such allocations are subject to reallocation pursuant to agreement among the Notice Parties and the Debtors, or order of the Bankruptcy Court.  All rights are reserved in regard to final allocation.  The Debtors shall disclose to the Notice Parties the allocation set forth in the previous paragraph in regard to settlements entered

into hereunder at the same time other information required to be disclosed under said protocol is disclosed to the Notice Parties.

5.      **Set-off and Resort to Collateral.** (a) To the extent any settlement of claims and obligations arising out of a terminated Trading Contract under this Protocol involves the right (or asserted right) of recoupment or the setting off of debts and claims between the parties thereto, such rights (or asserted rights) may be taken into consideration and resolved in good faith in reaching a settlement under this Protocol and without further order of the Bankruptcy Court. (b) Any settlement of claims and obligations arising out of a terminated Trading Contract may include provisions relating to the exhaustion of collateral (or a draw upon a letter of credit) in favor of either party to the Trading Contract.

6.      **Confidentiality**. The Notice Parties shall treat all information received in connection with this Protocol as highly sensitive and confidential information (and as "Subject Material" under that certain "Order Approving Specified Information Blocking Procedures and Permitting Trading in the Debtors' Securities, Bank Debt, Purchase or Sale of Trade Debt and Issuing of Analyst Reports Upon Establishment of a Screening Wall Effective July 25, 2003" signed by the Bankruptcy Court on August 18, 2003 and hereinafter defined as the "Screening Order"). No Notice Party shall file with the Bankruptcy Court or serve upon (or deliver to) other parties in interest (other than the Debtors or other Notice Parties) any pleading or notice which discloses such information unless and until such information is no longer "Subject Material" as defined in the Screening Order; provided however, such confidential information may be filed under seal with the Bankruptcy Court pursuant to an order authorizing such information to be filed under seal and in accordance with the Screening Order.

7.      **Previously Filed Protocol Superceded**. This Protocol shall supercede that certain protocol filed under seal with the Bankruptcy Court pursuant to the *Ex Parte* Order Authorizing Debtor to File Trading Contract Settlement Protocol Under Seal signed by the Bankruptcy Court on January 5, 2004. The terms of this Protocol shall govern the settlement of a Trading Contract.

8.      **Procedure Review.** If at any time during the period in which the Protocol is in effect, the Notice Parties believe that the procedures set forth herein do not adequately protect the rights of creditors or equity holders, any of the Notice Parties may, on ten (10) days notice to the other Notice Parties and the Debtors file a motion with the Bankruptcy Court requesting that the Protocol be altered, revised or terminated. A response to any such motion must be filed not later than two (2) days before the hearing on such motion.

9.      **Definitions.** The following terms have the definitions set forth below.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas (Fort Worth Division).

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court.

"Confirmation" means a document evidencing a transaction under a Trading Contract.

"Committees" means (a) the Official Committee of Unsecured Creditors of Mirant Corporation ("Mirant Committee"), (b) the Official Committee of Unsecured Creditors of Mirant Americas Generation, LLC ("MAG Committee"), (c) the Equity Committee for Mirant Corporation ("Equity Committee").

"Debtors" mean, collectively, the debtors and debtors-in-possession in the administratively consolidated case of In re Mirant Corporation currently pending in the United States Bankruptcy Court for the Northern District of Texas (case number 03-46590).

"DIP Lender" means any entity that provides (or has provided) financing authorized by the Bankruptcy Court pursuant to, and authorized by, Bankruptcy Code section 364.

"Final Trading Order" means the "Final Order Authorizing The Debtors To (I) Comply With Terms Of Pre-Petition Trading Contracts, (II) Enter Into Post-Petition Trading Contracts In The Ordinary Course Of Business, (II) Provide Credit Support Relating To Both Pre- And Post-Petition Trading Contracts, And (IV) Authorizing Assumption Of Pre-Petition Trading Contracts" entered on August 27, 2003 in the Debtors' bankruptcy case.

"Protocol" means this revised Protocol for the settlement of Trading Contracts.

"Settlement Information" means (a) copies of all the Trading Contracts which are being settled, including but not limited to Confirmations (unless the Committees' advisors agree otherwise), master agreements, termination notices, netting agreements; (b) a spreadsheet listing the details of each of the Trading Contracts which are being settled, including but not limited to, the term of the contract, when and by which party the contract was terminated, the amount of collateral held by the settling party and the amount of damages or replacement costs and associated methodology (if applicable); (c) a spreadsheet listing the details of other balances included within the settlement agreement, including accounts receivable and accounts payable; (d) a copy of the proposed settlement agreement and the history of settlement negotiations (if applicable); and (e) the Spreadsheet defined below.

"Spreadsheet" means a spreadsheet listing (a) the name of the settling parties; (b) the proposed settlement amount; (c) the amount of the settling party's original settlement offer; (d) a description of settlement terms; (e) the amount and type of collateral held by the settling parties and the extent and manner in which such collateral is being exhausted in connection with the proposed settlement; (f) the Debtors' mark-to-market value of each Trading Contract being settled; and the counterparty's best offer; and (g) a description of the Trading Contracts being settled (e.g., power swaps, coal options, physical gas contracts, etc.).

"Trading Contract" means any contract that a party thereto asserts in good faith (a) is subject to section 555, 556, 559, or 560 of the Bankruptcy Code, and (b) has (i) been validly liquidated, terminated or rejected by the Debtors, or automatically, or (ii) expired in accordance with its terms, including without limitation amounts shown on the books and records of the Debtors as accounts receivable or accounts payable; provided, however, "Trading Contract" shall not include a contract that has been assumed by the Debtors under Bankruptcy Code section 365, or is subject to the Final Trading Order.

Terms used in the singular include the plural.

10.    **Notices.**

(a)    Notice Parties.  All information required to be provided to the Notice Parties under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

      To:    The MAG Committee:

           Gregory M. Petrick
           Cadwalader Wickersham & Taft, LLP
           100 Maiden Lane
           New York, NY 10038
           E-mail:     gregory.petrick@cwt.com
           Telephone:  (212) 504-6373
           Facsimile:  (212) 504-6666

           Salvatore LoBiondo
           Kroll Zolfo Cooper
           101 Eisenhower Parkway
           3rd Floor
           Roseland, NJ 07068
           E-mail:     SLobiondo@krollzolfocooper.com
           Telephone:  (973) 618-5155
           Facsimile:  (973) 618-9432

      To:    The Mirant Committee:

           Mark Thompson
           Simpson Thatcher & Bartlett
           425 Lexington Avenue
           New York, NY 10017-3954
           E-mail: mthompson@stblaw.com
           Telephone: (212) 455-2000
           Facsimile:  (212) 455-2502

           Mr. David Shimko
           Risk Capital Management Partners,
           1790 Broadway Suite 1500,
           New York, NY 10019
           E-mail:     shimko@e-rcm.com
           Telephone:  (212) 918-1880
           Facsimile:  (212) 918-1879

      To:    The Equity Committee:

           Leslie H. Scharf, Esq.
           Brown Rudnick Berlack Israels LLP

120 West 45th Street
New York, New York 10036
E-mail: lscharf@brbilaw.com
Telephone: (212) 704-0100
Facsimile: (212) 704-0196

-and-

Anders J. Maxwell, Managing Director
Peter J. Solomon Company
767 5th Avenue
New York, New York 10153
E-mail: amaxwell@pjsolomon.com
Telephone: (212)508-1600
Facsimile: (212)508-1633

To:     DIP Lender:

Stephen Youngman, Esq.
Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, TX 75201
E-mail: stephen.youngman@weil.com
Telephone: (214) 746-7758
Facsimile: (214) 746-7777

    (b)     Debtors.   All information required to be provided to the Debtors under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Sonnet Edmonds, Esq.
1155 Perimeter Center West
Atlanta, GA 30338
Email: sonnet.edmonds@mirant.com
Telephone: (678) 579-5119
Facsimile: (678) 579-5890

Jason D. Schauer, Esq.
633 West Fifth Street Suite 1900
Los Angeles, California 90071-2007
Email: jschauer@whitecase.com
Telephone: (213) 620-7729
Facsimile: (213) 687-0758

## EXHIBIT A

*(Provisional Allocation Method)*

Facts:  MAEM is $10M out of the money with a non-Debtor counterparty to a Trading Contract and MAG is in the money $5M with that same counterparty.  In a termination, assuming that the Debtors settle with the counterparty for $6M (versus the $5M that the Debtors would have calculated the counterparty to be owed), both MAG and MAEM would share that burden.  On an absolute value basis, MAEM is contributing 67% of the total gross value and MAG is contributing 33% of the gross value.

Allocation:  Therefore, MAEM would owe $10.67M ($10M + .67($1M)) and MAG would be due $4.67M ($5M - .33($1M)).  Of the $10.67M owed by MAEM, $6M would be allocated to the counterparty, and $4.67 would be allocated to MAG as settlement for MAG's in the money positions.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x
In re                                                   :   **Chapter 11**
                                                        :
**NRG ENERGY, INC., <u>et</u> <u>al.</u>,**                        :
                                                        :   **Case No. 03-13024 (PCB)**
                            **Debtors.**                 :
                                                        :   **(Jointly Administered)**
---------------------------------------------------------- x

THIS ORDER APPLIES TO:

| | | | |
|---|---|---|---|
| _X_ | All Debtors | ___ | NRG Power Marketing, Inc. |
| ___ | NRG Energy, Inc. | ___ | NRG Capital LLC |
| ___ | Arthur Kill Power LLC | ___ | NRG Finance Company I LLC |
| ___ | Astoria Gas Turbine Power LLC | ___ | NRG Central U.S. LLC |
| ___ | Berrians I Gas Turbine Power LLC | ___ | NRG Eastern LLC |
| ___ | Big Cajun II Unit 4 LLC | ___ | NRGenerating Holdings (No. 23) B.V. |
| ___ | Connecticut Jet Power LLC | ___ | NRG New Roads Holdings LLC |
| ___ | Devon Power LLC | ___ | NRG Northeast Generating LLC |
| ___ | Dunkirk Power LLC | ___ | NRG South Central Generating LLC |
| ___ | Huntley Power LLC | ___ | Oswego Harbor Power LLC |
| ___ | Louisiana Generating LLC | ___ | Somerset Power LLC |
| ___ | Middletown Power LLC | ___ | South Central Generation Holding LLC |
| ___ | Montville Power LLC | ___ | Norwalk Power LLC |
| ___ | Northeast Generation Holding LLC | | |

**ORDER (I) ESTABLISHING PROCEDURES FOR SETTLEMENT**
**OF TERMINATED SAFE HARBOR CONTRACTS AND**
**(II) AUTHORIZING THE DEBTORS TO ENTER INTO DERIVATIVE**
<u>**CONTRACTS AND TO PLEDGE COLLATERAL UNDER DERIVATIVE CONTRACTS**</u>

Upon the Debtors' Motion for An Order (I) Establishing Procedures for Settlement of Terminated Safe Harbor Contracts and (II) Authorizing the Debtors to Enter Into Derivative Contracts and to Pledge Collateral Under Derivative Contracts (the "<u>Motion</u>"), filed by the above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>"); the Court having reviewed the Motion and having heard the statements of counsel regarding the relief requested in the Motion at a hearing before the Court (the "<u>Hearing</u>"); the Court finding that

1

(a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and (c) notice of the Motion and the Hearing was sufficient under the circumstances; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT**:[1]

1.  The Motion is GRANTED.

2.  The Debtors are hereby authorized to establish and implement the Protocol For The Settlement Of Trading Contracts ("Protocol") attached hereto as <u>Exhibit A</u>, including but not limited to, the Court approval procedures set forth in sections 3.1, 3.2 and 3.3 of the Protocol, with respect to the contracts defined and described in the Motion as Derivative Contracts (financial contracts whose values are based on, or derived from the price of a traditional security such as a stock or bond, an asset such as a commodity or a market index, such as forward contracts, futures contracts, swap contracts, option contracts or combinations of the foregoing) containing "safe harbor provisions" in accordance with sections 555, 556, 559 and 560 of the Bankruptcy Code (the "Trading Contracts").

3.  The Protocol shall not alter, modify or limit in any way the terms of the Trading Contracts.

4.  The Protocol shall not limit the rights of the Debtors (except as otherwise provided in the Protocol) or any counterparty to the Trading Contracts under the Trading Contracts, the relevant provisions of the Bankruptcy Code, or otherwise.

---

[1] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Motion.

5.    The Debtors are hereby authorized to enter into Derivative Contracts and related transactions without further order of the Court.

6.    The Debtors are hereby authorized to pledge collateral, letters of credit or other similar security under the Derivative Contracts as the Debtors deem appropriate without further order of the Court.

Dated:  New York, New York
         June 30, 2003

                                        /s/ Prudence Carter Beatty
                                        UNITED STATES BANKRUPTCY JUDGE

## EXHIBIT A

## PROTOCOL FOR THE SETTLEMENT OF TRADING CONTRACTS

1.0    Definitions

*"Affiliate"* means (i) any "affiliate" of NRG as defined in section 101(2) of the Bankruptcy Code, (ii) any Entity that directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest in NRG or in any such affiliate of NRG, and (iii) any Entity in which NRG, or any such affiliate of NRG, directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest.

*"Bankruptcy Code"* means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York.

*"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure.

*"Business Day"* means any day, other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

*"Confirmation"* means a document evidencing a transaction under a Trading Contract.

*"Controlling Ownership Interest"* means an ownership interest in any Entity equal to 20% or greater of the total equity interest in such Entity, whether (i) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (ii) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (iii) otherwise.

*"Controlling Voting Interest"* means the power to direct, or to cause the direction of, management and policies of another Entity, whether (i) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (ii) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (iii) otherwise.

*"Creditors Committee"* means the statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the U.S. Trustee in the chapter 11 cases of NRG and certain Affiliates.

*"Debtor"* means a debtor in a case under chapter 11 of the Bankruptcy Code filed by NRG and/or (an) Affiliate(s).

*"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

4

"*Marked-To-Market Value*" means the marked-to-market value of any one confirmation or Trading Contract based on valuations approved and validated by NRG or an Affiliate.

"*Net Marked-To-Market Value*" means the sum of the Marked-to-Market Values (whether positive or negative) of two or more Trading Contracts between an NRG Settling Party and a Settling Party.    For example, if one Trading Contract has a Marked-to-Market Value of +$15,000, and another Trading Contract has a Marked-to-Market Value of -$10,000, the Net Marked-to-Market Value for those two Trading Contracts is +$5,000.

"*NRG*" means NRG Energy, Inc.

"*NRG Settling Party*" means NRG or an Affiliate that wants to enter into a settlement agreement.

"*Protocol*" means this Protocol for (I) the Settlement of Trading Contracts and (II) Determining (A) Whether a Contract Constitutes a Safe Harbor Contract and/or (B) Whether a Safe Harbor Contract Has Been Validly Terminated.

"*Safe Harbor Contract*" means any contact that is subject to section 555, 556, 559 or 560 of the Bankruptcy Code.

"*Settling Party*" means any Entity that is not an NRG Settling Party and that wants to enter into a settlement agreement with an NRG Settling Party.

"*Trading Contract*" means any contract that either the Settling Party or the NRG Settling Party asserts (i) is a Safe Harbor Contract, and (ii) has been validly liquidated or terminated by NRG, an NRG Affiliate, a Settling Party or automatically by operation of law or in accordance with the terms of such Trading Contract.

"*U.S. Trustee*" means Office of the United States Trustee for the Southern District of New York.

Terms used in the singular include the plural.

2.0    Procedures for Presenting Settlements to the Creditors Committee Before Filing Notice
for Approval with the Bankruptcy Court

2.1    As a precondition to any NRG Settling Party that is a Debtor entering into a settlement agreement which involves, in whole or in part, the settlement of obligations under a Trading Contract, the NRG Settling Party shall first obtain the Creditors Committee's approval, and the approval of Xcel Energy Inc. ("Xcel") if a Debtor's obligations under a Trading Contract are guaranteed by Xcel ("Xcel Guaranteed Trading Contract") for such settlement agreement in accordance with the terms of this Protocol; provided, however, that, to the extent a member of the Creditors Committee is (i) a counterparty to a Safe Harbor Contract and/or Trading Contract which is a Settling Party; or (ii) a competitor of Debtors, such member shall not participate in the review process set forth in Section 2.3 of the Protocol and shall not receive or review any of the detailed information provided

5

to the Creditors Committee other than the Settlement Notice (defined below) filed with the Court.

2.2     Prior to undertaking any actions to settle obligations under a Trading Contract, the Settling Party shall provide the respective NRG Settling Party with a copy of such Safe Harbor Contract and/or Trading Contract and detailed information about the termination of such Trading Contract.

2.3     After the NRG Settling Party reaches a settlement with the Settling Party, the NRG Settling Party shall provide the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved, and the Ad Hoc Committee for the Northeast and South Central Bondholders (as set forth in paragraph 4.4 hereof) if contracts related to the Northeast or South Central Debtor entities are involved[1]) with the following information at least ten (10) Business Days (unless the Creditors Committee (and/or Xcel if applicable) agrees in writing to a shorter period) prior to executing the settlement agreement:

(a)     Copies of all the Trading Contracts which are being settled, including but not limited to Confirmations, master agreements, termination notices, netting agreements, and any related hedging contracts;

(b)     A spreadsheet listing the details of each of the Trading Contracts which are being settled, including but not limited to, the term of the Trading Contract, when and by which party the contract was terminated, the amount of collateral held by the NRG Settling Party and/or the Settling Party, and the amount of damages or replacement costs and associated methodology (if applicable);

(c)     A spreadsheet listing the details of other balances included within the settlement agreement, including accounts receivable and accounts payable;

(d)     A spreadsheet setting forth (i) the Marked-to-Market Value of each of the Trading Contracts which are being settled and (ii) the Net Marked-to-Market Value among the Trading Contracts which are being settled; and

(e)     A copy of the proposed settlement agreement and a brief history of settlement negotiations (if applicable).

---

[1]     The Northeast Debtor entities consist of the following 15 Debtors: NRG Northeast Generating LLC; Northeast Generation Holding LLC; Arthur Kill Power LLC; Astoria Gas Turbine Power LLC; Connecticut Jet Power LLC; Devon Power LLC; Dunkirk Power LLC; Huntley Power LLC; Middletown Power LLC; Montville Power LLC; Norwalk Power LLC; NRG Eastern LLC; Oswego Harbor Power LLC; Somerset Power LLC; and Berrians I Gas Turbine Power LLC.   The South Central Debtor entities consist of the following 6 Debtors: NRG South Central Generating LLC; South Central Generation Holding LLC; Big Cajun II Unit 4 LLC; Louisiana Generating LLC; NRG New Roads Holdings LLC; and NRG Central US LLC.

2.4     Within ten (10) Business Days after receiving the information set forth in section 2.3 of this Protocol, the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is Involved) shall provide written notice to the NRG Settling Party stating whether the Creditors Committee (and Xcel if applicable) approves or does not approve the proposed settlement.

3.0   <u>Court Approval</u>

3.1     If the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) either (a) approves a proposed settlement submitted for the Creditors Committee's and Xcel's approval in accordance with sections 2.1 through 2.4 of this Protocol or (b) during the ten Business Day period provided for in section 2.3 of this Protocol, does not provide written notice to the NRG Settling Party stating that the Creditors Committee (and Xcel as applicable) does not approve the proposed settlement, the Debtors shall file with the Bankruptcy Court a notice of proposed settlement (the "<u>Settlement Notice</u>"). The Settlement Notice shall identify each Trading Contract subject to the settlement, identify the NRG Settling Party and the Settling Party, summarize the terms of the settlement agreement, and provide a concise statement by the Debtors of the rationale for the settlement. The Settlement Notice shall be filed and served on the Settling Party or the Settling Party's counsel, if known, counsel to the Creditors Committee (and Xcel if an Xcel Guarantied Trading Contract is involved), the U.S. Trustee, counsel to any postpetition lenders and all parties that requested special notice in the Debtors' chapter 11 cases. Unless an objection is filed and served within five (5) Business Days after the Settlement Notice is filed and notice thereof is served upon the appropriate parties, the Debtors shall be authorized to consummate the proposed settlement, and the parties receiving the Settlement Notice of the proposed settlement shall be deemed to have consented to it. If an objection to the proposed settlement is timely filed and served, the matter will be heard at a hearing before the Bankruptcy Court; <u>provided</u> that the Debtors may move the Bankruptcy Court to set such a hearing on an expedited basis.

3.2     If the Creditors Committee (and Xcel if an Xcel Guaranteed Trading Contract is involved) does not approve a proposed settlement submitted for the Creditors Committee's and Xcel's approval in accordance with sections 2.1 and 2.3 of this Protocol, the Debtors shall not proceed with the proposed settlement pursuant to the procedures in this Protocol, but may seek Bankruptcy Court approval of the proposed settlement upon notice and a hearing in accordance with Bankruptcy Rule 9019(a); <u>provided</u> that the Debtors may move the Bankruptcy Court to set such a hearing on an expedited basis.

3.3     In the event that a net payment is due to the NRG Settling Party under a proposed settlement, such payment shall be collected by the NRG Settling Party and appropriate releases shall be entered into among the NRG Settling Party and the Settling Party. In the event that a net payment is due from the NRG Settling Party, no payment shall be made, but the Settling Party may have a liquidated

7

claim in the actual amount of any such net payment payable to such Settling Party.

4.0    Notice

4.1    All information required to be provided to the Creditors Committee under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Evan D. Flaschen, Esq.
Bingham McCutchen LLP
One State Street
Hartford, CT  06103
evan.flaschen@bingham.com

4.2    All information required to be provided to Xcel under this Protocol shall be delivered to the following persons by hand delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Scott Friedman, Esq.
Jones, Day, Reavis & Pogue
222 E. 41st Street
New York, NY  10017
sjfriedman@jonesday.com

4.3    All information required to be provided to an NRG Settling Party under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Lisa Balder
NRG ENERGY, INC.
901 Marquette Avenue
Suite 2500
Minneapolis, MN 55402
lisa.balder@nrgenergy.com

Elaine M. Walsh, Esq.
KIRKLAND & ELLIS
655 Fifteenth Street, N.W.
Washington, DC 20005-5793
elaine_walsh@dc.kirkland.com

Matthew A. Cantor, Esq.
KIRKLAND & ELLIS
Citigroup Center
153 East 53rd Street
New York, NY 10022-4675
matthew_cantor@ny.kirkland.com

4.4     All information required to be provided to the Ad Hoc Committee for the
Northeast and South Central Bondholders under paragraph 2.3 of this Protocol
shall be delivered to the following persons by hand-delivery, first-class mail,
Federal Express (or other next-day courier service), or e-mail:

Andrew Scruton
Ernst & Young Corporate Finance LLC
5 Times Square
New York, NY 10036
Phone: 212 773 8419
Fax: 212 773 0221
E-mail: andrew.scruton@eycf.com

Christopher A. Provost
Fred S. Hodara
Akin Gump Strauss Hauer & Feld LLP
590 Madison Avenue
New York, New York  10022
(212) 872-1000
(212) 872-1002 (fax)
Email: cprovost@akingump.com
        fhodara@akingump.com

9

# EXHIBIT C

WEIL, GOTSHAL & MANGES LLP          Presentment Date and Time:
Attorneys for the Debtors                        May 30, 2002, 12:00 p.m.
767 Fifth Avenue
New York, New York  10153                  Objection Deadline:
Martin J. Bienenstock (MB 3001)          May 24, 2002, 4:00 p.m. EST
Brian S. Rosen (BR 0571)
Melanie Gray

CADWALADER, WICKERSHAM & TAFT
Special Counsel for the Debtors
100 Maiden Lane
New York, New York 10038
Gregory M. Petrick (GP 2175)
and
1201 F Street, NW
Washington, DC  20004
Mark C. Ellenberg (ME 6927)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>ENRON CORP., et al.,<br><br>                                        Debtors. | Chapter 11<br><br>Case No. 01-16034 (AJG)<br><br>Jointly Administered |

## ORDER ESTABLISHING AND AUTHORIZING PROCEDURES
## FOR SETTLEMENT OF TERMINATED SAFE HARBOR AGREEMENTS

Upon the Debtors' Application for An Order Establishing And Authorizing
Procedures For Settlement Of Terminated Safe Harbor Agreements dated May 2, 2002 (the
"Application") and the Debtors' Notice Of Technical Corrections To Order Establishing And
Authorizing Procedures For Settlements Of Terminated Safe Harbor Agreements dated May 22,
2002, and the Limited Objection of and Reservation of Rights By Dominion Entities To Debtors'
Motion For Order Establishing And Authorizing Procedures For Settlement Of Terminated Safe
Harbor Agreements, and the Limited Objection Of And Reservation Of Rights By City Of Santa
Clara/Silicon Valley Power To Debtors' Motion For Order Establishing And Authorizing
Procedures For Settlement Of Terminated Safe Harbor Agreements, and The Response Of

Conectiv Energy Supply, Inc. to Enron Corp. And Certain Of Its Affiliates' Application For

Order Establishing And Authorizing Procedures For Settlement Of Certain Terminated Safe

Harbor Agreements, it is

ORDERED, that the Application is granted in all respects; and it is further

ORDERED, that the Debtors are hereby authorized to establish and implement the

attached Protocol For The Settlement Of Trading Contracts, including but not limited to, the

Court Approval procedures set forth in sections 4.1, 4.2 and 4.3 of the Protocol; and it is further

ORDERED, that the Protocol shall not alter, modify or limit in any way the terms

of the Safe Harbor Agreements; and it is further

ORDERED, that the Protocol shall not limit the rights of the Debtors (except as

otherwise provided in the Protocol) or any counter-party to the Safe Harbor Agreements under

the applicable Safe Harbor Agreements, the relevant provisions of the Bankruptcy Code, or

otherwise.

Dated:   New York, New York
         May 30, 2002

                         **s/Arthur J. Gonzalez**
                         UNITED STATES BANKRUPTCY JUDGE

## ATTACHMENT

Document4

## PROTOCOL FOR THE SETTLEMENT OF TRADING CONTRACTS

### 1.0    Definitions

"*Affiliate*" means (1) any "affiliate" of Enron as defined in section 101(2) of the Bankruptcy Code, (2) any Entity that directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest in Enron or in any such affiliate of Enron, and (3) any Entity in which Enron, or any such affiliate of Enron, directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest.

"*Aggregate Gross Mark-to-Market Absolute Value*" means the sum of the absolute Gross Mark-to-Market Values of two or more Trading Contracts. For example, if one Trading Contract has a Gross Mark-to-Market Value of +$15,000, and another Trading Contract has a Gross Mark-to-Market Value of -$10,000, the Aggregate Gross Mark-to-Market Absolute Value for those two Trading Contracts is $25,000.

"*Bankruptcy Code*" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York.

"*Confirmation*" means a document evidencing a transaction under a Trading Contract.

"*Controlling Ownership Interest*" means an ownership interest in any Entity equal to 20% or greater of the total equity interest in such Entity, whether (1) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (2) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (3) otherwise.

"*Controlling Voting Interest*" means the power to direct, or to cause the direction of, management and policies of another Entity, whether (1) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (2) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (3) otherwise.

"*Creditors' Committee*" means the statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the Office of the United States Trustee in the chapter 11 cases of Enron and affiliated debtors.

"*Debtor in Possession*" means a debtor in a case under chapter 11 of the Bankruptcy Code.

"*Enron*" means Enron Corp.

"*Enron Settling Party*" means Enron or an Affiliate that wants to enter into a settlement agreement.

"*Entity*" means an "entity" as defined in section 101(15) of the Bankruptcy Code.

"*Gross Mark-To-Market Value*" means the mark-to-market value of any one Confirmation or Trading Contract based on valuations approved and validated by Enron or an Affiliate.

"*Net Mark-To-Market Value*" means the sum of the Gross Mark-to-Market Values (whether positive or negative) of two or more Trading Contracts. For example, if one Trading Contract has a Gross Mark-to-Market Value of +$15,000, and another Trading Contract has a Gross Mark-to-Market Value of -$10,000, the Net Mark-to-Market Value for those two Trading Contracts is +$5,000.

"*Protocol*" means this Protocol for the Settlement of Trading Contracts.

"*Settling Party*" means any Entity that is not an Enron Settling Party and that wants to enter into a settlement agreement with an Enron Settling Party.

"*Trading Contract*" means any contract that either the Settling Party or the Enron Settling Party asserts (1) is subject to section 555, 556, 559 or 560 of the Bankruptcy Code, and (2) has been validly liquidated or terminated by Enron, an Enron Affiliate a Settling Party or automatically.

Terms used in the singular include the plural.

2.0    Settlements To Be Presented to the Creditors' Committee Before Filing Motion for Approval with the Bankruptcy Court

   2.1    As a precondition to any Enron Settling Party that is a Debtor in Possession entering into a settlement agreement which involves, in whole or in part, the settlement of obligations under a Trading Contract, the Enron Settling Party shall first obtain Creditors' Committee approval for such settlement agreement in accordance with the terms of this Protocol if any one of the following is present:

      (a) The Gross Mark-To-Market Value of any one Trading Contract or Confirmation is equal to or (i) greater than $10,000,000, or (ii) less than negative $10,000,000;
      (b) The Aggregate Gross Mark-To-Market Absolute Value (determined irrespective of the identity of the party in whose favor a Trading Contract is "in the money") of the Trading Contracts that are being

2

settled with a Settling Party since the Petition Date is equal to or greater than $50,000,000;

(c) The Net Mark-To-Market Value of all the Trading Contracts being settled is equal to or (i) greater than $10,000,000, or (ii) less than negative $10,000,000;

(d) The net payment due to the Enron Settling Party plus the value of any collateral which is being applied by the Enron Settling Party or the Settling Party is equal to or in excess of $10,000,000;

(e) The other party to the settlement agreement is an Enron Settling Party; or

(f) The proposed settlement involves the assets or liabilities of more than one Enron Settling Party or more than one Settling Party.

2.2    If the Enron Settling Party is required to obtain Creditors' Committee approval in accordance with section 2.1, the Enron Settling Party shall provide the Creditors' Committee with the following information at least ten (10) business days (unless the Creditors' Committee agrees in writing to a shorter period) prior to executing the settlement agreement:

(a) Copies of all the Trading Contracts which are being settled, including but not limited to Confirmations, master agreements, termination notices, netting agreements; and any related hedging contracts;

(b) A spreadsheet listing the details of each of the Trading Contracts which are being settled, including but not limited to, the term of the contract, when and by which party the contract was terminated by the Settling Party, the amount of collateral held by the Enron Settling Party and/or the Settling Party, and the amount of damages or replacement costs and associated methodology (if applicable);

(c) A spreadsheet listing the details of other balances included within the settlement agreement, including accounts receivable and accounts payable;

(d) A spreadsheet setting forth the Gross Mark-to-Market Value of each of the Trading Contracts which are being settled; and

(e) A copy of the proposed settlement agreement and the history of settlement negotiations (if applicable).

2.3    Within ten (10) business days after receiving the information set forth in section 2.2, the Creditors' Committee shall provide written notice to the Enron Settling Party (a) stating whether the Creditors' Committee approves or does not approves the proposed settlement, or (b) asking for a fourteen (14) business day extension.

3.0    Settlements To Be Presented to the Creditors' Committee Before Filing Notice of Intent To Settle with the Bankruptcy Court

3

3.1     Commencing on the first Friday that is at least five (5) days after the entry
of an order by the Bankruptcy Court approving this protocol, and every Friday
thereafter, Enron shall provide the Creditors' Committee and its advisors with a
spreadsheet listing all proposed settlements involving Trading Contracts of an
Enron Settling Party (whether or not such Enron Settling Party is a debtor,
prvoided that this section 3.1 shall not apply to an Enron Settling Party that is
subject to a foreign proceeding, as defined in section 101(23) of the Bankruptcy
Code) that are not subject to section 2.1.   The spreadsheet shall include the
following information:

    (a) The name of the Enron Settling Party;

    (b) The name of the Settling Party;

    (c) The proposed settlement amount;

    (d) The amount of the Settling Party's original settlement offer;

    (e) A description of settlement terms;

    (f) The amount of collateral held by the Enron Settling Party and/or the
Settling Party;

    (g) The Gross Mark-to-Market Value of each Trading Contract being
settled; and the counterparty's best offer; and

    (h) A description of the Trading Contracts being settled (e.g., power
swaps, coal options, physical gas contracts, etc.), including any related
hedging contracts.

3.2     An Enron Settling Party (except for an Enron Settling Party that is the
subject of a foreign proceeding, as defined in section 101(23) of the Bankruptcy
Code) will not execute any settlement agreement that is not subject to section 2.1
until at least five (5) business days (unless the Creditors' Committee agrees in
writing to a shorter period) after it has been disclosed to the Creditors' Committee
in accordance with section 3.1.

3.3     Upon a written request by the Creditors' Committee within the five (5)
business day period provided in section 3.2, the Enron Settling Party will provide
the Creditors' Committee with the information set forth in section 2.2 with respect
to any proposed settlement.

3.4     Within ten (10) business days after receiving the information set forth in
section 3.3, the Creditors' Committee shall provide written notice to the Enron
Settling Party stating whether the Creditors' Committee approves or does not
approve the proposed settlement.

4.0     Court Approval

4.1     If the Creditors' Committee approves a settlement agreement of the kind
described in section 2.0, the Debtors shall file a motion with the Bankruptcy
Court requesting entry of an order approving the settlement agreement.   The

4

motion will be filed and served in accordance with Paragraph 3 of the Bankruptcy Court's February 26, 2002, "Amended Case Management Order Establishing, Among Other Things, Noticing Electronic Procedures, Hearing Dates, Independent Website and Alternative Methods of Participation at Hearings" (the "Case Management Order"). The motion will be noticed for hearing on the next Hearing Day (as defined in the Case Management Order) that is at least ten (10) calendar days after the motion is filed and notice thereof is served upon the appropriate parties, with objections to the motion being due three business days before the hearing.

4.2    If the Creditors' Committee either (a) approves a proposed settlement of the kind described in section 3.0, or (b) during the five business day period provided in section 3.2 does not (i) provide written notice to the Enron Settling Party stating that the Creditors' Committee does not approve the proposed settlement, or (ii) request information regarding the proposed settlement in accordance with section 3.3, the Debtors shall file with the Bankruptcy Court a notice of proposed settlement. The notice will identify each Trading Contract subject to the settlement, identify the Enron Settling Party and the Settling Party, summarize the terms of the settlement agreement, and provide a concise statement by the Debtors of the rationale for the settlement. The notice will be filed and served in accordance with Paragraph 3 of the Case Management Order. Unless an objection is filed and served within five (5) business days after the notice is filed and notice thereof is served upon the appropriate parties, the Debtors shall be authorized to consummate the proposed settlement, and the parties receiving notice of the proposed settlement shall be deemed to have consented to it. If an objection to the proposed settlement is timely filed and served, the matter will be heard on the next Hearing Day (as defined in the Case Management Order). The failure of the Creditors Committee to take an action of the kind described in clause (b) of this Section 4.2 shall not limit or prejudice its right to file and serve such an objection to a proposed settlement.

4.3    Except as provided in section 4.2(b), if the Creditors' Committee does not approve a proposed settlement of the kind described in either section 2.0 or 3.0, the Debtors shall not proceed with the proposed settlement pursuant to the procedures in this Protocol, but may seek Bankruptcy Court approval of the proposed settlement upon notice and a hearing in accordance with the Case Management Order.

5.0    Notice

5.1    All information required to be provided to the Creditors' Committee under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Wilbur F. Foster, Jr., Esq.

5

Milbank, Tweed, Hadley & M<sup>c</sup>Cloy LLP
1 Chase Manhattan Plaza
New York, NY 10005-1413
wfoster@milbank.com

Mr. Hank Prybylski
Ernst & Young LLP
787 Seventh Avenue
New York, NY 10019
lawrence.prybylski@ey.com

5.2    All information required to be provided to an Enron Settling Party under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

Victoria T. Sharp, Esq.
General Counsel, Enron Wholesale Services
Enron Corp.
1400 Smith Street
Houston, TX 77002-7361
vicki.sharp@enron.com

Mr. Daniel P. Leff
Chairman, Enron Wholesale Services
Enron Corp.
1400 Smith Street
Houston, TX 77002-7361
dan.leff@enron.com

Brian S. Rosen, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
brian.rosen@weil.com

Mark C. Ellenberg, Esq.
Cadwalader, Wickersham & Taft
1201 F Street, NW
Washington, DC 20004
mark.ellenberg@cwt.com

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

ENRON CORP., et al.,

Debtors.

Chapter 11

Case No. 01-16034 (AJG)

Jointly Administered

## ORDER AMENDING PROCEDURES FOR
## SETTLEMENT OF TERMINATED SAFE HARBOR AGREEMENTS

Upon the Debtors' Application For An Order Amending Procedures For Settlement of Terminated Safe Harbor Agreements dated June 16, 2003 (the "Application"), it is

ORDERED, that the Application is granted in all respects; and it is further

ORDERED, that the Debtors are hereby authorized to implement to attached Amended Protocol For The Settlement Of Trading Contracts, including but not limited to, the Court Approval procedures set forth in sections 4.1, 4.2 and 4.3 of the Amended Protocol.

Dated:    New York, New York
          July 15, 2003

                                    _s/ Arthur J. Gonzalez_____
                                    HONORABLE ARTHUR J. GONZALEZ
                                    UNITED STATES BANKRUPTCY JUDGE

NYLIB5 716853.1

## AMENDED PROTOCOL FOR THE SETTLEMENT OF TRADING CONTRACTS

1.0    Definitions

*"Affiliate"* means (1) any "affiliate" of Enron as defined in section 101(2) of the Bankruptcy Code, (2) any Entity that directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest in Enron or in any such affiliate of Enron, and (3) any Entity in which Enron, or any such affiliate of Enron, directly or indirectly owns or controls a Controlling Ownership Interest or a Controlling Voting Interest.

*"Aggregate Gross Mark-to-Market Absolute Value"* means the sum of the absolute Gross Mark-to-Market Values of two or more Trading Contracts. For example, if one Trading Contract has a Gross Mark-to-Market Value of +$15,000, and another Trading Contract has a Gross Mark-to-Market Value of -$10,000, the Aggregate Gross Mark-to-Market Absolute Value for those two Trading Contracts is $25,000.

*"Bankruptcy Code"* means the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

*"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York.

*"Confirmation"* means a document evidencing a transaction under a Trading Contract.

*"Controlling Ownership Interest"* means an ownership interest in any Entity equal to 20% or greater of the total equity interest in such Entity, whether (1) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (2) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (3) otherwise.

*"Controlling Voting Interest"* means the power to direct, or to cause the direction of, management and policies of another Entity, whether (1) through ownership of voting or nonvoting securities, membership interests, partnership interests, or beneficial interests, (2) by contract (including a partnership agreement, limited liability company agreement, trust agreement, management agreement, or servicing agreement), or (3) otherwise.

*"Creditors' Committee"* means the statutory committee of unsecured creditors appointed pursuant to section 1102 of the Bankruptcy Code by the Office of the United States Trustee in the chapter 11 cases of Enron and affiliated debtors.

*"Debtor in Possession"* means a debtor in a case under chapter 11 of the Bankruptcy Code.

*"Enron"* means Enron Corp.

*"Enron Settling Party"* means Enron or an Affiliate that wants to enter into a settlement agreement.

*"Entity"* means an "entity" as defined in section 101(15) of the Bankruptcy Code.

*"Gross Mark-To-Market Value"* means the mark-to-market value of any one Confirmation or Trading Contract based on valuations approved and validated by Enron or an Affiliate.

*"Net Mark- To-Market Value"* means the sum of the Gross Mark-to-Market Values (whether positive or negative) of two or more Trading Contracts. For example, if one Trading Contract has a Gross Mark-to-Market Value of +$15,000, and another Trading Contract has a Gross Mark-to-Market Value of -$10,000, the Net Mark-to-Market Value for those two Trading Contracts is +$5,000.

*"Protocol"* means this Protocol for the Settlement of Trading Contracts.

*"Settling Party"* means any Entity that is not an Enron Settling Party and that wants to enter into a settlement agreement with an Enron Settling Party.

*"Trading Contract"* means any contract that either the Settling Party or the Enron Settling Party asserts (1) is subject to section 555, 556, 559 or 560 of the Bankruptcy Code, and (2) has (a) been validly liquidated ~~or~~, terminated, or rejected by Enron, an Enron Affiliate, a Settling Party, or automatically, or (b) expired in accordance with its terms.

Terms used in the singular include the plural.

2.0   <u>Settlements To Be Presented to the Creditors' Committee Before Filing (As Applicable) Motion for Approval or Notice of Intent To Settle with the Bankruptcy Court</u>

    2.1   As a precondition to any Enron Settling Party that is a Debtor in Possession entering into a settlement agreement which involves, in whole or in part, the settlement of obligations under a Trading Contract, the Enron Settling Party shall first obtain Creditors' Committee approval for such settlement agreement in accordance with the terms of this Protocol if any one of the following is present:

        (a)   The Gross Mark-To-Market Value of any one Trading Contract or Confirmation is equal to or (i) greater than $~~10,000,000~~15,000,000, or (ii) less than negative $~~10,000,000~~15,000,000;

        (b)   The Aggregate Gross Mark-To-Market Absolute Value (determined irrespective of the identity of the party in whose favor a Trading Contract is "in the money") of the Trading Contracts that are being settled with a Settling Party since the Petition Date is equal to or greater than $50,000,000;

        (c)   The Net Mark-To-Market Value of all the Trading Contracts being settled is equal to or (i) greater than $~~10,000,000~~15,000,000, or (ii) less than negative $~~10,000,000~~15,000,000;

        (d)   The net payment due to the Enron Settling Party plus the value of any collateral which is being applied by the Enron Settling Party or the Settling Party is equal to or in excess of $~~10,000,000~~15,000,000;

2

(e)    The other party to the settlement agreement is an Enron Settling Party; or

(f)    The proposed settlement involves the assets or liabilities of more than one Enron Settling Party or more than one Settling Party.

2.2    If the Enron Settling Party is required to obtain Creditors' Committee approval in accordance with section 2.1, the Enron Settling Party shall provide the Creditors' Committee with the following information at least ten (10) business days (unless the Creditors' Committee agrees in writing to a shorter period) prior to executing the settlement agreement:

(a)    Copies of all the Trading Contracts which are being settled, including but not limited to Confirmations (unless the Creditors' Committee's advisors agree otherwise), master agreements, termination notices, netting agreements;, and any related hedging contracts;

(b)    A spreadsheet listing the details of each of the Trading Contracts which are being settled, including but not limited to, the term of the contract, when and by which party the contract was terminated ~~by the Settling Party~~, the amount of collateral held by the Enron Settling Party and/or the Settling Party, and the amount of damages or replacement costs and associated methodology (if applicable);

(c)    A spreadsheet listing the details of other balances included within the settlement agreement, including accounts receivable and accounts payable;

(d)    A spreadsheet setting forth the Gross Mark-to-Market Value of each of the Trading Contracts which are being settled; and

(e)    A copy of the proposed settlement agreement and the history of settlement negotiations (if applicable).

2.3    Within ten (10) business days after receiving the information set forth in section 2.2, the Creditors' Committee shall provide written notice to the Enron Settling Party (a) stating whether the Creditors' Committee approves or does not ~~approves~~approve the proposed settlement, or (b) asking for a fourteen (14) business day extension.

3.0    <u>Settlements To Be Presented to the Creditors' Committee Before Filing Notice of Intent To Settle with the Bankruptcy Court</u>

3.1    Commencing on the first Friday that is at least five (5) days after the entry of an order by the Bankruptcy Court approving this ~~protocol~~Protocol, and every Friday thereafter, Enron shall provide the Creditors' Committee and its advisors with a spreadsheet listing all proposed settlements involving Trading Contracts of an Enron Settling Party (whether or not such Enron Settling Party is a ~~debtor~~Debtor

3

in Possession, provided that this section 3.1 shall not apply to an Enron Settling Party that is subject to a foreign proceeding, as defined in section 101(23) of the Bankruptcy Code) that are not subject to section 2.1. The spreadsheet shall include the following information:

(a)    The name of the Enron Settling Party;

(b)    The name of the Settling Party;

(c)    The proposed settlement amount;

(d)    The amount of the Settling Party's original settlement offer;

(e)    A description of settlement terms;

(f)    The amount of collateral held by the Enron Settling Party and/or the Settling Party;

(g)    The Gross Mark-to-Market Value of each Trading Contract being settled; and the counterparty's best offer; and

(h)    A description of the Trading Contracts being settled (e.g., power swaps, coal options, physical gas contracts, etc.), including any related hedging contracts.

3.2    An Enron Settling Party (except for an Enron Settling Party that is the subject of a foreign proceeding, as defined in section 101(23) of the Bankruptcy Code) will not execute any settlement agreement that is not subject toof the kind described in section 2.1 until at least five (5) business days (unless the Creditors' Committee agrees in writing to a shorter period) after it has been disclosed to the Creditors' Committee in accordance with section 3.1.

3.3    Upon a written request by the Creditors' Committee within the five (5) business day period provided in section 3.2, the Enron Settling Party will provide the Creditors' Committee with the information set forth in section 2.2 with respect to any proposed settlement.

3.4    Within ten (10) business days after receiving the information set forth in section 3.3, the Creditors' Committee shall provide written notice to the Enron Settling Party stating whether the Creditors' Committee approves or does not approve the proposed settlement

4.0.    Court Approval

4.1    If the Creditors' Committee approves a settlement agreement (a) of the kind described in section 2.0, the Debtors2.1(a)-(e), or (b) of the kind described in section 2.1(f) that is also of the kind described in section 2.1(a)-(e), the Enron

4

Settling Party shall file a motion with the Bankruptcy Court requesting entry of an order approving the settlement agreement. The motion will be filed and served in accordance with Paragraph 3 of the Bankruptcy Court's ~~February 26,~~December 17, 2002, "Second Amended Case Management Order Establishing, Among Other Things, Noticing Electronic Procedures, Hearing Dates, Independent Website and Alternative Methods of Participation at Hearings" (the "Case Management Order"). The motion will be noticed for hearing on the next Hearing Day (as defined in the Case Management Order) that is at least ten (10) calendar days after the motion is filed and notice thereof is served upon the appropriate parties, with objections to the motion being due three business days before the hearing.

4.2   If the Creditors' Committee either (a) approves a proposed settlement (i) of the kind described in section 2.1(f) that is not also of the kind described in section 2.1(a)-(e), or (ii) of the kind described in section 3.0, or (b) during the five ~~-~~ business ~~-~~day period provided in section 3.2 does not (i) provide written notice to the Enron Settling Party stating that the Creditors' Committee does not approve the~~a~~ proposed settlement~~,~~ of the kind described in section 3.0, or (ii) request information regarding the proposed settlement in accordance with section 3.3, the ~~Debtors~~Enron Settling Party, if it is a Debtor in Possession, shall file with the Bankruptcy Court a notice of proposed settlement. The notice will identify each Trading Contract subject to the settlement, identify the Enron Settling Party and the Settling Party, summarize the terms of the settlement agreement, and provide a concise statement by the ~~Debtors~~Enron Settling Party of the rationale for the settlement. The notice will be filed and served in accordance with Paragraph 3 of the Case Management Order. Unless an objection is filed and served within five (5) business days after the notice is filed and notice thereof is served upon the appropriate parties, the ~~Debtors~~Enron Settling Party shall be authorized to consummate the proposed settlement, and the parties receiving notice of the proposed settlement shall be deemed to have consented to it. If an objection to the proposed settlement is timely filed and served, the matter will be heard on the next Hearing Day (as defined in the Case Management Order). The failure of the Creditors' Committee to take an action of the kind described in clause (b) of this Section 4.2 shall not limit or prejudice its right to file and serve such an objection to a proposed settlement.

4.3   Except as provided in section 4.2(b), if the Creditors' Committee does not approve a proposed settlement of the kind described in either section 2.0 or 3.0, the ~~Debtors~~Enron Settling Party shall not proceed with the proposed settlement pursuant to the procedures in this Protocol, but may, if the Enron Settling Party is a Debtor in Possession, seek Bankruptcy Court approval of the proposed settlement upon notice and a hearing in accordance with the Case Management Order.

5.0   Notice

5

5.1    All information required to be provided to the Creditors' Committee under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

> Wilbur F. Foster, Jr., Esq.
> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005-1413
> wfoster@milbank.com
>
> Eric Sanford, Esq.
> Milbank, Tweed, Hadley & McCloy LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005-1413
> esanford@milbank.com
>
> Mr. Hank Prybylski
> Ernst & Young LLP
> 787 Seventh Avenue
> New York, NY 10019
> lawrence.prybylski@ey.com

5.2    All information required to be provided to an Enron Settling Party under this Protocol shall be delivered to the following persons by hand-delivery, first-class mail, Federal Express (or other next-day courier service), or e-mail:

> Victoria T. Sharp, Esq.
> General Counsel, Enron Wholesale Services
> Enron Corp.
> 1400 Smith Street
> Houston, TX 77002-7361
> vicki.sharp@enron.com
>
> ~~Mr. Daniel P. Leff~~
> Mr. L. Don Miller
> ~~Chairman~~President, Enron ~~Wholesale Services~~~~Enron~~North America Corp.
> 1400 Smith Street
> Houston, TX 77002-7361
> ~~dan.leff~~don.miller@enron.com
>
> Brian S. Rosen, Esq.
> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, NY 10153
> brian.rosen@weil.com

6

08-13555-mg    Doc 2194    Filed 12/12/08    Entered 12/12/08 18:15:21    Main Document
Pg 51 of 52

Mark C. Ellenberg, Esq.
Cadwalader, Wickersham & Taft LLP
1201 F Street, NW
Washington, DC 20004
mark.ellenberg@cwt.com

7

Document comparison done by DeltaView on Thursday, June 12, 2003 15:46:50

| Input: | |
|---|---|
| Document 1 | pcdocs://nylib5/716728/1 |
| Document 2 | pcdocs://nylib5/716727/1 |
| Rendering set | Standard |

| Legend: |
|---|
| Insertion |
| Deletion |
| Moved from |
| Moved to |
| Style change |
| Format change |
| Moved deletion |

| | |
|---|---|
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 47 |
| Deletions | 27 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 74 |