## Exhibit A

## GENERAL TERMS AND CONDITIONS:
## IT PRODUCTS AND SERVICES

**Supplier Name: Arcot Systems, Inc.**
**Supplier Address: 455 W Maude Avenue, Suite 210, Sunnyvale, CA 94085**
**Supplier Jurisdiction of Incorporation: California Corporation**
**Tax ID:77-0467-362**

**Telephone #:408 969 6100**
**Fax #:408 969 6290**
**General Terms and Conditions No.:** *CON000000025790*
**General Terms and Conditions Effective Date: December 20, 2007**

THESE GENERAL TERMS AND CONDITIONS – IT PRODUCTS AND SERVICES are
made as of the General Terms and Conditions Effective Date specified above (the
"**Effective Date**") between Lehman Brothers Holdings Inc. a Delaware corporation,
having an office and place of business at 745 Seventh Avenue, New York, New York
10019, (the **"Customer"**) and the Supplier specified above (the "**Supplier**"). As used in
these General Terms and Conditions (as defined below), **"Party"** means either
Customer or Supplier and **"Parties"** means both Customer and Supplier.

## ARTICLE 1: INTRODUCTION

1.1    General Terms and Conditions. The "**General Terms and Conditions**" consist
of the terms and conditions set forth in the Articles and preamble of this document. As
used herein, "**Master Agreement**" means, collectively, these General Terms and
Conditions, together with any of the Supplemental Terms and Conditions (as defined
below) executed by the Parties (or their respective authorized designees).

1.2    Purpose. These General Terms and Conditions, together with the applicable
Supplemental Terms and Conditions, will provide the terms and conditions that will
govern transactions that may be entered into between Customer and Supplier for the
purchase, license or lease, as the case may be, of equipment and/or software from
Supplier (each, a "**Product**" and together, the "**Products**") and/or for the provision of
Services (each such individual transaction, a "**Transaction**" and together, the
"**Transactions**"). Transactions will be entered into by the Parties through the execution
of Transaction Schedules.

1.3    Definitions. Capitalized terms used in the Master Agreement are defined in-place
where the term is used or in the Glossary of Terms located at the end of these General
Terms and Conditions (and any Supplement) and have the meanings there given unless
the context requires otherwise. Terms other than those defined within the Master
Agreement will be given their plain English meaning, and those terms, acronyms and
phrases known in the information technology industry will be interpreted in accordance

with their generally known meanings in such industry.

## ARTICLE 2:  AGREEMENT STRUCTURE AND PROCESS FOR PLACING ORDERS

2.1    Placement of Orders and Transaction Schedules.

2.1.1   To enter into a Transaction for Products and/or Services, the Parties (a) will execute a supplement to these General Terms and Conditions that contains terms and conditions, including Exhibits, Annexes, Attachments, applicable to the particular type of Product and/or Services to be delivered and/or performed (each such executed supplement, "**Supplemental Terms and Conditions**" or a "**Supplement**" and together, the "**Supplements**") and (b) will execute a schedule that contains all other terms specific to the Transaction (e.g., price, Product descriptions, statements of work, quantity, delivery dates) (each, a "**Transaction Schedule**" and together, the "**Transaction Schedules**").  Multiple Transaction Schedules may be executed under a single Supplement.

2.1.2.  The Parties' execution of these General Terms and Conditions and a Supplement will not, by itself, commit Customer to purchase, nor Supplier to provide, any specific Products or Services.  Upon execution of these General Terms and Conditions, the applicable Supplements, and, as applicable, a Transaction Schedule for a specific Transaction, Supplier will provide the Products and/or perform the Services specified on the applicable Transaction Schedule in accordance with the terms of such Transaction Schedule.  Each Transaction Schedule will incorporate by reference these General Terms and Conditions and the applicable Supplemental Terms and Conditions.

2.1.3.  Each Transaction Schedule, together with any other documents attached to or incorporated therein by reference (including these General Terms and Conditions and the applicable Supplemental Terms and Conditions), will form a separate and independent contract for the applicable Transaction between Supplier and Customer (i.e. the Customer entity that is the party to the Transaction Schedule).  As applied to a specific Transaction, references herein to the "Master Agreement" (or any part thereof) will be considered references to the applicable Transaction Schedule, as appropriate in the context in which such reference is made.

2.2    Execution of Supplements and Transaction Schedules by Other Customer Entities.  Customer's parent company, its subsidiaries and other affiliated companies may enter into Transactions with Supplier pursuant to these General Terms and Conditions through the execution of Supplements and Transaction Schedules.  For the purposes of any such Supplement or Transaction Schedule, the Customer entity executing the Supplement or Transaction Schedule, as applicable, will be considered the "**Customer**" as that term is used herein and therein.

2.3    Order of Precedence.  If there is a conflict between the provisions of any of the General Terms and Conditions, a Supplement or a Transaction Schedule, the following order of priority will control:  (a) a Transaction Schedule (but any conflicting terms in such Transaction Schedule will apply only with respect to such Transaction Schedule) (b) a Supplement (but any conflicting terms will apply only with respect to that Supplement and the Transaction Schedules that incorporate such Supplement by reference), and (c) these General Terms and Conditions; *provided, however,* that, unless the applicable Supplement or Transaction Schedule has been approved in writing by legal counsel for Customer, a Supplement or Transaction Schedule may not modify or amend the rights or obligations set forth in the following Sections and Articles of these General Terms and Conditions: "Relationship of the Parties"; "Compliance with Laws"; "Record Retention and Inspection"; "Confidential Information and Data Protection"; "Insurance"; "Indemnification"; "Infringement"; "Limitation of Liability" and "Subcontractors".

## ARTICLE 3:  NATURE OF THE RELATIONSHIP

3.1    Relationship of the Parties.  Supplier agrees and represents and warrants that: (a) it is an independent contractor, (b) Supplier Personnel are the responsibility of Supplier and solely employees or independent contractors of Supplier (or its subcontractor), (c) no Supplier Personnel are Customer's agents or employees for federal, state, or local tax purposes or any other purposes whatsoever, (d) no Supplier Personnel are entitled to any compensation from Customer or to any Customer employee benefits, (e) Supplier will (or, in the case of its subcontractors, will be responsible for causing the applicable subcontractor to) withhold and pay all applicable taxes, benefits and insurance with respect to such personnel, and (f) Supplier will verify and secure the work eligibility of each Supplier Personnel.  Supplier and its employees, agents and subcontractors have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Customer in any manner whatsoever.

3.2    No Exclusivity.  Each Party acknowledges that the Master Agreement, and any Transaction Schedules, are non-exclusive and either Party may contract with other parties for the procurement or sale of comparable equipment, software, systems and services.

## ARTICLE 4:  PERFORMANCE

4.1    In General.  Except as otherwise expressly provided otherwise in the Master Agreement or any Transaction Schedule, Supplier will be responsible for providing all facilities, personnel and other resources as necessary to deliver the Products and perform the Services purchased by Customer pursuant to each Transaction Schedule.

4.2    Service Locations.  Each Transaction Schedule will identify the Customer sites at

which Products purchased from Supplier are to be delivered and, if applicable, at which Customer site Supplier is required to perform any on-site Services. In addition, a Transaction Schedule may specify the Supplier facilities (or facilities of a Supplier subcontractor) at which (or from which) certain Supplier Services are to be provided.

4.3    Time of Performance.  Supplier will deliver the Products purchased by Customer in accordance with the agreed delivery time frame and perform and complete the Services diligently and in accordance with any time frames set forth in the applicable Transaction Schedule.  Supplier will promptly notify Customer upon becoming aware of any circumstances that may reasonably be expected to jeopardize the timely and successful delivery of any Product or performance and completion of any Deliverable or Service.

4.4    Manner of Performance.  Supplier's performance under a Transaction Schedule, and the performance of Supplier's Products and Deliverables, will be in accordance with all applicable requirements of the Transaction Schedule, including any service levels or other specific standards of performance set forth therein.

4.5    Supplier Quality Assurance.  In providing the Products and performing the Services purchased by Customer, Supplier will follow quality assurance procedures to ensure that, as applicable, the Products have been manufactured and/or developed and the Services have been performed with a high degree of professional quality and reliability.

4.6    Cooperation and Coordination.  If Customer performs itself, or retains a third party to perform, any services that interface or interact with Supplier's Products and/or Services, Supplier will cooperate and coordinate with Customer or such third party as reasonably requested or required by such third parties to perform their duties.

4.7    Compliance with Laws.

    4.7.1  Compliance Generally.  Supplier agrees to obtain all necessary regulatory approvals, licenses and/or permits applicable to its business, and Supplier will comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority.

    4.7.2  Export.  Supplier represents and warrants that as of the date a Product or Deliverable, as applicable, is delivered to Customer, except where Supplier has expressly stated otherwise in a Transaction Schedule, all Products and Deliverables, as applicable, provided to Customer hereunder are exportable without restriction except to countries or nationals of those countries to which exports are prohibited by the Export Administration Regulations, the Office of Foreign Assets Control ("OFAC") regulations, or any applicable successor regulation thereto.  Each Party that exports, re-exports or

4

imports any Product or Deliverable, as applicable, assumes responsibility for complying with applicable laws and regulations, including OFAC, and for obtaining required export and import authorizations. To facilitate Customer's compliance with this Section, if any equipment, software or other technology (including technical data, technical assistance or training) provided to Customer hereunder (or any component thereof) contains or concerns encryption, Supplier will promptly provide in writing Customer with information relating to the type of encryption, level of encryption (measured by key lengths in bits), Export Control Classification Number (ECCN), export license or export license exception information, Commodity Classification Automated Tracking System number (CCATS#) and any other similar information requested by Customer.

4.8    Savings Clause. Except as provided in Section 9.3, Customer's failure to perform any of its responsibilities set forth in the Master Agreement or a particular Transaction Schedule will not constitute a material breach of the Master Agreement or the Transaction Schedule or be deemed grounds for termination by Supplier; provided, however, that Supplier's nonperformance of its obligations under the Master Agreement or a Transaction Schedule will be excused if and to the extent (a) such Supplier nonperformance results from Customer's failure to perform Customer responsibilities under the Master Agreement or the Transaction Schedule, and (b) Supplier provides Customer prompt written notice of such Customer nonperformance and uses Commercially Reasonable Efforts to perform notwithstanding Customer's failure to perform Customer's responsibilities under the Master Agreement or the Transaction Schedule.

## ARTICLE 5: SUPPLIER COMPENSATION

5.1    Fees and Expenses. The applicable prices and/or rates and allowable reimbursable expenses for Products and Services purchased from Supplier will be specified in the applicable Transaction Schedule. In no event will any charges to Customer by Supplier exceed the prices or rates set forth in the applicable Transaction Schedule, or if prices or rates are not set forth in the applicable Transaction Schedule, Supplier's best available published rates then in effect, which published rates will be provided to Customer upon request. Such Supplier prices and rates will be subject to any agreed discounts, most favored customer or similar arrangement between the Parties set forth in the Master Agreement or the applicable Transaction Schedule.

5.2    Taxes. Customer will pay all sales, use, property, ad valorem, value added or similar taxes imposed on Products purchased from Supplier hereunder or as a result of the Services and/or Deliverables provided by Supplier hereunder, exclusive of corporate business and franchise taxes, taxes based on Supplier's income or gross receipts, withholding taxes and personnel-related taxes. If the transaction contemplated by this Master Agreement is exempt from tax, Customer will provide Supplier with a valid exemption certificate or other evidence of such exemption in a form reasonably acceptable to Supplier. Supplier will, at its own expense, use Commercially Reasonable Efforts to recover refundable or recoverable taxes. Each Party will cooperate with the

other in minimizing applicable tax. Supplier will provide to Customer, in a form reasonably acceptable to Customer, original or certified copies of all tax payment receipts or other evidence of payment of taxes by Supplier with respect to transactions or payments under this Master Agreement.

5.3    Payment Terms.

5.3.1   Unless another payment schedule is specified in the applicable Transaction Schedule, Supplier will invoice Customer (a) after Customer's acceptance of the Products or Deliverables (or other agreed payment milestones) in the case of Products sold or Services performed on a fixed price basis, or (b) monthly in arrears for all other charges, including charges for Services priced on a variable unit rate or time and materials basis, recurring license fees, lease payments, and for out-of pocket costs and expenses; *provided, however,* that Supplier will submit to Customer's project manager the amounts to be invoiced for review prior to actual invoicing. For Services performed on a time and materials basis, Supplier will also submit time reports to Customer showing the hours worked during the billing period by each Supplier Personnel, with copies of individual time tracking sheets. To the extent applicable, in addition to the charge(s), each invoice will contain a listing of the following: (a) the type, quantity and serial number (if any), (b) any discounts, (c) applicable taxes and transportation and other costs, and (d) shipping date(s).

5.3.2   Except for amounts disputed by Customer, validly rendered Supplier invoices will be payable within sixty (60) days after Customer's receipt of the invoice. Any such dispute will not affect Supplier's right to payment of undisputed amounts and expenses or the Parties' obligations to perform hereunder.

5.3.3   Customer will receive an early payment discount (the **"Early Payment Discount"**) on all Supplier charges incurred under each Transaction Schedule as described in this Section. If Customer transmits payment to Supplier on or before the tenth (10th) business day after Customer's receipt of the invoice, the Early Payment Discount will be 2% of the invoiced amount.

5.4    Most Favored Customer. Supplier represents and warrants that the rates, prices and the terms and conditions with respect to all Deliverables, Products and Services provided under the Transaction Schedules are at least as favorable to or better than the rates, prices and terms and conditions as of the effective date of the applicable Transaction Schedule by Supplier to any of its other commercial customers who are similarly situated to Customer with respect to types and volumes of Deliverables, Products and Services purchased.

5.5    Audit.

5.5.1. <u>Record Retention and Inspection</u>. During the term of each Transaction Schedule and for a period of at least three (3) years after the date of the final payment under such Transaction Schedule, Supplier will maintain complete and accurate accounting records in connection with Products and Deliverables provided and Services performed under such Transaction Schedule, in accordance with generally accepted accounting principles applied on a consistent basis, to substantiate its charges thereunder. Such records will include, without limitation, payroll records, attendance cards, time tracking sheets and job summaries. Supplier will provide Customer or its designees access to such records for audit purposes during the term of each Transaction Schedule and for three (3) years after the date of the final payment under such Transaction Schedule.

5.5.2. <u>Overcharges</u>. If any audit reveals that Customer has overpaid any amounts, Supplier will remit to Customer such amounts due within thirty (30) days after receiving from Customer an invoice therefor. If any audit reveals that Customer has overpaid any amounts under a particular Transaction Schedule (exclusive of reimbursable expenses and taxes) during the audited period by ten percent (10%) or more of the total charges payable under such Transaction Schedule during such period, Supplier will, within thirty (30) days after receiving an invoice therefor, reimburse Customer for all reasonable fees and expenses incurred to conduct the audit and otherwise detect and rectify such overpayment.

## ARTICLE 6: REPRESENTATIONS, WARRANTIES AND COVENANTS

Supplier represents, warrants and covenants as follows, which representations, warranties and covenants will be considered to be given anew for each Transaction upon the execution of each applicable Transaction Schedule:

6.1    <u>Authority</u>. Supplier has the requisite corporate power and authority and the right (a) to enter into the Master Agreement and each Transaction Schedule, (b) to provide the Products, Deliverables, works and information thereunder, and (c) to perform the Services thereunder.

6.2    <u>No Destructive Elements</u>. The Products, Deliverables, and/or material(s) provided by Supplier do not and will not contain or involve any computer code, programs, procedures, mechanisms or programming devices that are designed to, or would enable Supplier to, disrupt, modify, delete, damage, deactivate, disable, harm or otherwise impede in any manner the operation of the Products, Deliverables, any Customer system or any other associated software, firmware, hardware, computer system or network (e.g., a virus, Trojan horse, worm, backdoor, etc.) (collectively, **"Destructive Elements"**). If Supplier breaches this Section, Supplier further agrees to use Commercially Reasonable Efforts to immediately eliminate any and all Destructive Elements and reverse their adverse effects. Prior to delivery to Customer, Supplier will test each element of the Deliverables or Products utilizing the most recent version and

the most recent data file of a reputable, commercially available anti-virus-checking software program to ensure that it is free of Destructive Elements. Supplier acknowledges that it does not have any right to electronically repossess any Products or Deliverables.

6.3    No Improper Inducements. Supplier is familiar with, has complied with, and will comply, in all respects, with the laws and regulations regarding the offering of unlawful or improper inducements (including the U.S. Foreign Corrupt Practices Act, as amended, and other anti-corruption and anti-bribery laws), as applicable to its relationship with Customer, and with any other applicable Customer policies regarding inducements of which Supplier has been given notice. If at any time during the term of these General Terms and Conditions, Supplier breaches the foregoing representation, warranty and covenant, then, in addition to any other rights Customer may have under the Master Agreement, at law or in equity, Customer may terminate the Master Agreement and/or any affected Transaction Schedules.

6.4    Equal Opportunity and Affirmative Action Requirements. To the extent applicable, the equal employment opportunity and affirmative action requirements set forth in 41 C.F.R. Part 60-1.4(a) (women and minorities), 41 C.F.R. Part 60-250.5(a) (covered veterans) and 41 C.F.R. Part 60-741-5(a) (individuals with disabilities) are hereby incorporated by reference into this Master Agreement.

6.5    DISCLAIMER OF IMPLIED WARRANTIES. EXCEPT AS SPECIFICALLY PROVIDED IN THE MASTER AGREEMENT OR IN A TRANSACTION SCHEDULE, THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 7:  CONFIDENTIAL INFORMATION AND DATA PROTECTION

7.1    Confidential Information. "**Confidential Information**" means any information obtained by a Party (the **"Receiving Party"**) from or on behalf of the other Party (the **"Disclosing Party"**) that relates to the past, present or future business activities of the Disclosing Party or its subsidiaries or affiliates, or their respective employees, customers or third party suppliers or contractors, including the terms and conditions of the Master Agreement, information exchanged in the course of negotiating Supplements and Transaction Schedules, any Transaction Schedule, and any information relating to the applicable entity's (or person's) plans, pricing, methods, methodologies, processes, financial data, lists, Intellectual Property Rights, customer information, apparatus, statistics, programs, research, development, and/or information technology.

7.2    Exceptions. Confidential Information does not include any particular information that the Receiving Party can demonstrate is (a) currently in the public domain, (b) previously known to the Receiving Party free from any obligation to keep it

confidential, (c) publicly disclosed by or on behalf of the Disclosing Party either prior to or subsequent to the receipt of such information by the Receiving Party, (d) independently developed by the Receiving Party without any access to or use of Confidential Information of the Disclosing Party, or (e) rightfully obtained by the Receiving Party from a third party lawfully in possession of the Confidential Information and who is not bound by confidentiality obligations to the Disclosing Party.

7.3    Treatment of Confidential Information.  The Receiving Party will hold all Confidential Information of the Disclosing Party in trust and confidence for the Disclosing Party and, except as set forth in the Master Agreement or as otherwise may be authorized by the Disclosing Party in writing, the Receiving Party will not disclose to any person, firm or enterprise, or use for its own benefit, any Confidential Information of the Disclosing Party.  The Receiving Party will treat all Confidential Information of the Disclosing Party with the same degree of care that the Receiving Party treats its own confidential or proprietary information, but in no event less than using standards of reasonable care.  The Receiving Party may disclose Confidential Information of the Disclosing Party to the Receiving Party's employees, and to any of the Receiving Party's contractors who are bound to the Receiving Party by confidentiality obligations substantially equivalent to those set forth in this Article, solely as required in order for the Receiving Party to perform its obligations under the Master Agreement or a Transaction Schedule, or in the case of Customer, to receive the Services and/or to use the Products and Deliverables.  In addition, in the case of Customer, Customer may also disclose Supplier's Confidential Information to employees of its parent, subsidiaries and affiliates.  The Receiving Party may disclose Confidential Information of the Disclosing Party if required to do so under applicable law, rule or order provided that the Receiving Party, where reasonably practicable and to the extent legally permissible, provides the Disclosing Party with prior written notice of the required disclosure so that the Disclosing Party may seek a protective order or other appropriate remedy, and provided further that the Receiving Party discloses no more Confidential Information of the Disclosing Party than is reasonably necessary in order to respond to the required disclosure.

7.4    Customer Sensitive Data.  Supplier hereby acknowledges that Customer is subject to certain privacy and information security laws and regulations, pursuant to which Customer is required to ensure that Supplier appropriately safeguards personal or financial information regarding Customer's former, current or prospective clients or employees ("**Customer Sensitive Data**").  To the extent that Supplier receives any Customer Sensitive Data as a result of any exchange of information under the Master Agreement or a Transaction Schedule, and notwithstanding anything to the contrary contained in the Master Agreement, Supplier agrees that it will (a) not disclose or use any Customer Sensitive Data except to the extent necessary to carry out its obligations under the Master Agreement or a Transaction Schedule and for no other purpose, (b) not disclose Customer Sensitive Data to any third party, including its third party service providers without the prior written consent of Customer and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Customer Sensitive Data, (d)

promptly provide such information regarding its privacy and information security systems, policies and procedures as Customer may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Customer Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Customer notice thereof, and such further information and assistance as may be reasonably requested. With respect to any third party provided access to Customer Sensitive Data pursuant to subsection (b) of this Section, Supplier will enter into a written agreement with such third party requiring safeguarding of Customer Sensitive Data in a manner no less restrictive than Supplier's obligations under the Master Agreement, and including those affirmative obligations described in this Section.

7.5    Return of Information. At any time at the request and option of the Disclosing Party and in the event of termination or expiration of the Master Agreement (or any part thereof) or any applicable Transaction Schedule, the Receiving Party agrees to promptly: (a) return to the Disclosing Party the Confidential Information and/or Customer Sensitive Data, as applicable; or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Customer Sensitive Data, as applicable and, if requested by the Disclosing Party, acknowledge in writing that all such Confidential Information and/or Customer Sensitive Data, as applicable, has been destroyed or permanently erased. Notwithstanding the foregoing, each party may retain copies of the Confidential Information and/or Customer Sensitive Data, as applicable, to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information and/or Customer Sensitive Data, as applicable, will remain subject to the terms and conditions herein.

7.6    Title. The Parties acknowledge and agree that any disclosure of Confidential Information, and in the case of Customer, Customer Sensitive Data, will in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such Confidential Information or Customer Sensitive Data. In addition, Customer's obligations under this Article with respect to Supplier's Confidential Information will not be construed to limit Customer's rights to own or use intellectual property under the Master Agreement and any applicable Transaction Schedules.

7.7    Injunctive Relief. In the event of a breach or threatened or attempted breach of the provisions of this Article, the Disclosing Party may have no adequate remedy in money or damages and, accordingly, may immediately seek an injunction against such breach.

## ARTICLE 8: INSURANCE

8.1    Forms of Insurance. Supplier agrees to obtain and maintain and keep in full force

and effect, at Supplier's expense, the forms of insurance with the minimum limits of insurance stated in Exhibit 1.

8.2    Coverage. All insurance coverage required herein will provide primary coverage, without contribution from other insurance, for all losses and damages caused by the perils or causes of loss covered thereby. Supplier agrees to have included in each of the insurance policies required herein, a waiver of the insurer's rights of subrogation against Customer, its subsidiaries and affiliates and its insurers.

8.3    Certificates of Insurance. Each insurance policy will be maintained with an insurer having a rating of at least an "A-" in the most currently available Best's Insurance Reports and will provide for at least thirty (30) days prior written notice to Customer in the event of any modification or cancellation. Supplier will furnish Customer with certificates of insurance in satisfactory form, evidencing its compliance with these provisions.

## ARTICLE 9: TERM AND TERMINATION

9.1    Generally. These General Terms and Conditions will commence as of the Effective Date and will continue in full force and effect thereafter unless and until terminated as provided herein.

9.2    Termination by Customer.

9.2.1    For Convenience.

(a)    If, at any time, there are no outstanding Transaction Schedules in effect, Customer may terminate these General Terms and Conditions and/or any then existing Supplements upon written notice to Supplier without liability for any charges of any kind.

(b)    Customer may terminate any Transaction Schedule for convenience by giving Supplier at least thirty (30) days' prior written notice specifying the termination date (or such other period of advance notice as may be specified in the applicable Transaction Schedule). In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all Products delivered, Deliverables delivered and Services performed up to the effective date of termination.

9.2.2    For Supplier Insolvency. Customer may terminate any Transaction Schedule(s) upon written notice specifying the termination date if Supplier becomes insolvent or unable to pay its debts as they come due or enters into or files (or has filed or commenced against it) a petition, arrangement, application, action or other proceeding seeking relief or protection under the bankruptcy laws of the United States

11

or any similar laws of the United States or any state of the United States or any other country or transfers all or substantially all of its assets to another person or entity. In such event, Customer will be obliged to pay Supplier at the contracted rates for all Products, Deliverables and Services performed and Accepted up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

9.2.3  For Cause. In the event of any material breach of the Master Agreement or a Transaction Schedule by Supplier, Customer may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved or affected by such breach, in whole or in part, by giving Supplier thirty (30) days' prior written notice of termination thereof; *provided, however,* that such termination will not be effective if Supplier has cured the breach of which it has been notified prior to the expiration of such thirty (30) day notice period.

9.2.4  Additional Rights Upon Termination For Cause. If Customer terminates a Transaction Schedule, in whole or in part, for cause: (a) Customer may, at its option either (i) return any Products and/or Deliverables received from Supplier thereunder, in whole or in part (and, in the case of software, destroy all copies thereof), after which Supplier will promptly refund the aggregate payments made by Customer for or in respect of the returned Products and/or Deliverables (including amounts paid in respect of any Services performed in relation to the returned Products and/or Deliverables), less a reasonable deduction for amortization if Customer has been using the Products and/or Deliverables for at least twelve (12) months, except in the case of a termination for willful or knowing infringement by Supplier in which case there will be no such amortization, or (ii) keep the Products and/or Deliverables, in whole or in part, upon payment of the applicable undisputed portion of the fees incurred for such Products and/or Deliverables as of the date of such termination; and (b) Supplier will promptly issue a refund of any prepaid fees unearned as of the date of such termination.

9.2.5  Termination Notices. Notice of termination under this Section of any specific Transaction Schedule will not be effective as notice of termination of the Master Agreement (or any part thereof) or any other Transaction Schedules then in effect unless specifically stated in the notice; provided, further, that any such notice that purports to be notice of termination of these General Terms and Conditions or any Supplement will not be considered or effective as notice of termination of these General Terms and Conditions or such Supplement unless such notice specifically states that (a) in the case of termination of these General Terms and Conditions, all Transaction Schedules have been terminated and/or expired, or (b) in the case of termination of such Supplement, all Transaction Schedules executed pursuant to such Supplement have been terminated and/or expired, as applicable.

9.3  Termination by Supplier. In the event Customer (a) breaches in a material respect its obligation to pay any undisputed fees under a particular Transaction Schedule, or (b) fails to meet its confidentiality obligations under the Master Agreement

with respect to a particular Transaction Schedule such that Customer materially breaches the Master Agreement or the applicable Transaction Schedule, then Supplier may (reserving cumulatively all other remedies and rights under the Master Agreement, at law and in equity) terminate the Transaction Schedule(s) involved by giving Customer thirty (30) days' prior written notice thereof; *provided, however,* that any such termination will not be effective if Customer has cured such material breach prior to the expiration of such thirty (30) day period. In such event, Customer will be obliged to pay Supplier at the contracted rates for all Products accepted, Deliverables accepted and Services performed up to the effective date of termination.

## ARTICLE 10: INDEMNIFICATION

10.1   "Claim" and "Losses" Defined. **"Claim"** means any demand, or any civil, criminal, administrative, or investigative claim, action, or proceeding (including arbitration) asserted, commenced or threatened against an entity or person. **"Losses"** means all judgments, awards, settlements, liabilities, damages, liens and claims, and all related costs, expenses and other charges suffered or incurred as a result of or in connection with a Claim, including reasonable attorneys' fees and disbursements, costs of investigation, litigation, settlement and judgment, and any taxes, interest, penalties and fines with respect to any of the foregoing.

10.2   Indemnification by Supplier. Supplier will, at its sole cost and expense, indemnify, defend and hold harmless Customer and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assigns (collectively, **"Customer Indemnitees"**) from and against any and all Losses suffered or incurred by any of them arising out of or in connection with a Claim of or for any of the following, whenever made:

10.2.1 that any Product(s), Deliverable(s), works, information, material(s) and/or Services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Rights of a third party; or

10.2.2 that Supplier has failed to comply with any applicable laws, regulations or orders of any governmental, judicial or administrative authority; or

10.2.3 for death or bodily injury, or the damage, loss or destruction of real or tangible personal property of third parties (including employees of Customer and Supplier and their respective subcontractors) brought against a Customer Indemnitee and alleged to have been caused by the fault or negligence of Supplier, its officers, personnel (including Supplier Personnel), agents and/or representatives; or

13

10.2.4 by or on behalf of any subcontractors or independent contractors of Supplier, or any of Supplier's personnel (including Supplier Personnel); or

10.2.5 (a) in respect of Supplier's obligations as an employer of its personnel (including any Supplier Personnel), or (b) any claim or action alleging that a Customer Indemnitee should be deemed the "employer" or "joint employer" of any of Supplier's personnel (including any Supplier Personnel).

10.3   Indemnification Procedures.  Customer agrees to give Supplier prompt written notice of any Claim for which a Customer Indemnitee seeks indemnification; provided, however, any failure by Customer to provide such notice will not relieve Supplier of its indemnification obligations under the Master Agreement except to the extent Supplier can demonstrate actual prejudice as a result of such failure.  Within thirty (30) days after receiving Customer's notice of a Claim, but no later than ten (10) days before the date on which any formal response to the Claim is due, Supplier will notify Customer in writing as to whether Supplier acknowledges its indemnification obligation and elects to assume control of the defense and settlement of the Claim (a **"Notice of Election"**).  If Supplier delivers a timely Notice of Election to Customer, Supplier will have the right to conduct the defense of the Claim and, consistent with the rights of Customer Indemnitees hereunder, all negotiations for its settlement; *provided, however,* that the Customer Indemnitee(s) may participate in such defense or negotiations to protect its (or their) interests, at Customer's expense, and that any settlement will be for the payment of money by Supplier and will not, without the prior written approval of Customer, obligate or impose liability on Customer or any Customer Indemnitee in any way, including without limitation, to any determination or admission regarding Customer's or any Customer Indemnitee's interest.  If Supplier does not deliver a timely Notice of Election, the affected Customer Indemnitee(s) may defend and/or settle the Claim in such manner as it (or they) may deem appropriate, at the cost and expense of Supplier, including payment of any settlement, judgment or award and the costs of defending or settling the Claim.  Supplier will promptly reimburse the Customer Indemnitee(s) upon demand for all Losses suffered or incurred as a result of or in connection the Claim.

## ARTICLE 11: INFRINGEMENT

11.1   Corrective Actions.  Supplier will give Customer prompt written notice of any threat, warning or notice of any Claim asserted against Supplier that any Products, Deliverables, information, materials and/or Services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Rights of a third party.  In addition to Customer's other rights and Supplier's other obligations hereunder, if all or any part of a Product or Deliverable is, or in the opinion of Supplier's intellectual property counsel may become, the subject of any claim or suit for infringement of any Intellectual Property Right, Supplier may, and in the event of any adjudication that the

14

Product or Deliverable, or any part thereof, does infringe or if the use of the Product or Deliverable, or any part thereof, is enjoined, Supplier will promptly: (a) procure for Customer, at no additional cost or expense to Customer, the right to use the Product or Deliverable, or the affected part thereof; or, (b) to the extent such option is not available to Supplier on commercially reasonable terms following Commercially Reasonable Efforts to procure such right, replace, at no additional cost or expense to Customer, the Product or Deliverable, or affected part thereof, with a modified or substituted Product, Deliverable or part, that does not violate any third party's Intellectual Property Rights and that is qualitatively and functionally at least the equivalent of the affected Product or Deliverable, or part thereof.

11.2   Return.   If neither (a) nor (b) above is available to Supplier on commercially reasonable terms following Commercially Reasonable Efforts to procure the same, and Supplier has so advised Customer, or if Supplier has not promptly performed in accordance with (a) or (b) above, Customer may, at its option, surrender the Products and/or Deliverables purchased under the applicable Transaction Schedule, in whole or in part, and receive a refund of the aggregate payments made by Customer for or in respect of the returned Products and/or Deliverables (including amounts paid in respect of any Services performed in relation to the returned Products and/or Deliverables) less a reasonable deduction for amortization if Customer has been using the Products and/or Deliverables for at least twelve (12) months, except in the case of a willful or knowing infringement by Supplier in which case there will be no such amortization.

## ARTICLE 12:  LIMITATION OF LIABILITY

IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION OF LIABILITY WILL NOT APPLY TO ANY OF THE FOLLOWING: (A) A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PROTECTION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; OR (B) ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.  WITH THE EXCEPTION OF SUPPLIER'S INDEMNIFICATION OBLIGATIONS IN ARTICLE 10 AND BOTH PARTIES' CONFIDENTIALITY OBLIGATIONS IN ARTICLE  7, IN NO EVENT SHALL EITHER PARTY'S LIABILITY FOR ANY CLAIM WHATSOEVER HEREUNDER (OR ASSOCIATED HEREWITH) EXCEED THE TOTAL SUM RECEIVED BY SUPPLIER FROM CUSTOMER UNDER THIS AGREEMENT.  THE FOREGOING LIMITATIONS, EXCLUSIONS AND DISCLAIMERS SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE.

## ARTICLE 13:  RULES OF CONSTRUCTION

13.1   Entire Agreement.  The Master Agreement constitutes the entire agreement between the Parties with respect to its subject matter contained therein, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to such subject matter.  When executed by both Parties, each Transaction Schedule will constitute the entire agreement between the Parties with respect to its subject matter, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the Parties pertaining to the subject matter thereof.

13.2   Amendment.  No modification or amendment of, or supplement to, the Master Agreement or any Transaction Schedule, or any provisions thereof, will be binding upon the Parties unless made in writing and signed by a duly authorized representative of both Parties.

13.3   Governing Law and Jurisdiction.  In all respects the Master Agreement and each Transaction Schedule will be governed by and construed in accordance with the substantive laws of the State of New York without regard to conflict of law principles. Any claim or action brought by one of the Parties connection with the Master Agreement or a Transaction Schedule will be brought in the appropriate Federal or State court located in the County of New York, and the Parties irrevocably consent to the exclusive jurisdiction of such court.

13.4   Third Party Beneficiaries.  Except as expressly set forth herein, no person not a Party hereto will be a third party beneficiary of any provision of the Master Agreement or any Transaction Schedule.  Notwithstanding the foregoing, it is agreed that Customer Indemnitees are not such excluded third party beneficiaries.

13.5   Waiver.  At no time will any failure or delay on the part of any Party in exercising any right or remedy provided in the Master Agreement or in any Transaction Schedule operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at law or in equity.

13.6   Remedies Not Exclusive.  Except as expressly provided herein, no remedy specified in the Master Agreement or in any Transaction Schedule is intended to be exclusive of any other remedy, and each and every remedy will be cumulative and in addition to every other right or remedy provided herein or available at law or in equity.

13.7   Headings.  Headings in the Master Agreement and in the Transaction Schedule(s) are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

13.8   Section References.  Unless otherwise indicated or required by the context, references to articles and sections of the Master Agreement and any Transaction Schedule(s) also refer to and include all sections and subsections of the referenced article or section.

13.9   Use of Certain Words.  Unless the context requires otherwise, (a) **"including"** (and any of its derivative forms) means including but not limited to, (b) **"will"** and **"shall"** are expressions of command, not merely expressions of future intent or expectation, and (c) use of the singular imports the plural and vice versa.

13.10  Severability.  If any term, provision or part of the Master Agreement or any Transaction Schedule is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of the Master Agreement or Transaction Schedule, as applicable, will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.

13.11  Survival.  Any provision of the Master Agreement or any Transaction Schedule that contemplates performance or observance subsequent to termination or expiration of the Master Agreement or such Transaction Schedule (including confidentiality and data protection, limitation of liability, indemnification provisions and perpetual licenses) will survive termination or expiration of the Master Agreement or such Transaction Schedule, as applicable, and continue in full force and effect thereafter.

13.12  Counterparts.  The Master Agreement and any Transaction Schedule may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  A facsimile of a signed copy of the Master Agreement or other copy made by reliable mechanical means may be relied upon as an original.

13.13  Other Purported Agreements.   Neither the Master Agreement nor any Transaction Schedule may be supplemented, modified, or governed by any shrink-wrap or click-wrap agreement or any confirmation, acknowledgement, or other sales or shipping form of Supplier, or executed via electronic signature, unless Customer first agrees in a writing that is not an electronic communication to be bound by such purported agreements.

13.14  Licenses Survive Bankruptcy.  All rights and licenses (if any) granted by Supplier to Customer under or pursuant to the Master Agreement or any Transaction Schedule are, and will otherwise be deemed to be, for purposes of Article 365(n) of the United States Bankruptcy Code (the **"Code"**), licenses to rights to "intellectual property" as defined under Article 101(35A) of the Code.  The Parties agree that Customer, as licensee of such rights under the Master Agreement or such Transaction Schedule, will

retain and may fully exercise all of its rights and elections under the Code. The Parties further agree that, in the event of the commencement of bankruptcy proceedings by or against Supplier under the Code, Customer will be entitled to retain all of its rights under this license.

## ARTICLE 14: GENERAL

14.1   Binding Nature and Assignment.  Neither Party may assign these General Terms and Conditions, any Supplement or any Transaction Schedule (whether by operation of law or otherwise) without the other Party's prior written consent, which consent will not be unreasonably withheld or delayed.  Any purported assignment in breach of this Section will be void.  Notwithstanding the foregoing, in the event that Customer files for protection under the United States Bankruptcy Code, the trustee of Customer's bankruptcy estate may assume these General Terms and Conditions, any Supplement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier, and Supplier hereby consents to such assumption. In addition, Customer may assign these General Terms and Conditions, any Supplement, any Transaction Schedule or any of its rights, duties and/or obligations hereunder or thereunder upon written notice to Supplier to (a) any Customer entity; (b) in the case of any merger or sale of its stock or assets, to the successor in a merger of Customer or to any entity that acquires all or substantially all of its stock or assets, or (c) any service provider contracted by Customer to perform data processing, facilities management or other outsourced services on Customer's behalf.

14.2   Notices.

14.2.1 All formal notices and communications relating to the Master Agreement or any Transaction Schedule will be in writing and delivered personally, by overnight delivery service or by first class prepaid mail with return receipt requested to (a) in the case of Supplier, its address as first set forth above and (b) in the case of Customer, to Director of Global Sourcing Services, 745 Seventh Avenue, New York, New York 10019, with a copy marked to the attention of the General Counsel at the same address.  A copy of each notice or communication relating to an affected Supplement or Transaction Schedule will also be sent to the applicable Parties' principal points of contact identified in the applicable Supplement or Transaction Schedule.

14.2.2 Either party may change the address(es) or addressee(s) for notice hereunder upon written notice to the other.  Any notice hereunder will be effective upon receipt by the Party to which such notice is addressed.

14.3   Force Majeure.  Neither Party will be liable for delay or failure to perform its obligations hereunder caused by an event of natural disaster, casualty, acts of God, riots, terrorism, governmental acts or such other event of similar nature that is beyond the reasonable control of the Party seeking to rely in this Section to excuse its delay or

failure provided such Party did not contribute in any way to such event. Supplier will maintain commercially reasonable disaster recovery plans to cure any such delays or failures. Supplier will keep the plans under review and make such changes, from time to time, as are required in accordance with industry best practice, and will make such plans available to Customer for review upon request. Notwithstanding the foregoing, if any Supplier delay or failure to perform that is attributable to a force majeure event continues beyond thirty (30) calendar days, Customer will nevertheless have the right to terminate any affected Transaction Schedule, in whole or in part, with no further liability and receive a refund of any unearned, prepaid fees.

14.4   Publicity. Neither Party will use the name or marks of, refer to, or identify the other Party (or any related entity) in publicity releases, interviews, promotional or marketing materials, public announcements, customer listings, testimonials or advertising without the prior written consent of the other Party.

14.5   Subcontractors.   Supplier will be solely responsible for its subcontractors and will remain fully responsible at all times for providing the Services. Supplier will be Customer's sole point of contact regarding the Products and Services (including Deliverables), including with respect to payment.

## ARTICLE 15:  GLOSSARY OF DEFINED TERMS

Certain definitions of capitalized terms used in the Master Agreement and the Transaction Schedules are set out below. Other capitalized terms will have the meanings as assigned throughout the Master Agreement (including the Supplements) and the Transaction Schedules.

| Defined Term: | Meaning: |
|---|---|
| **Commercially Reasonable Efforts** | Taking all such steps and performing in such a manner as a well managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit. |
| **Deliverable** | Any work product, in any form, resulting from performance of the Services that is either specifically identified as a Deliverable in a Transaction Schedule or is developed for Customer pursuant to a Transaction Schedule. |
| **Intellectual Property Rights** | All intellectual and industrial property rights, including copyrights, mask work rights, moral rights, trade secrets, patent rights, rights in inventions, trademarks, trade names, and service marks (including applications for, and registrations, extensions, renewals, and re-issuances of, the |

| Defined Term: | Meaning: |
|---|---|
| | foregoing). |
| **Services** | Any functions, responsibilities, activities and/or tasks Supplier performs (whether directly or indirectly) or is responsible for performing under the Master Agreement or any Transaction Schedule. |
| **Supplier Personnel** | Any and all personnel assigned by Supplier to perform any part of the Services, including employees and independent contractors and agents of Supplier and any of its subcontractors. |

(The Next Page Is The Signature Page)

The Parties have caused these General Terms and Conditions to be executed by their respective duly authorized representatives.

| Arcot Systems, Inc. (SUPPLIER) | Lehman Brothers Holdings Inc. (CUSTOMER) |
|---|---|
| By: *David E. Kaplan* | By: *Janet Bradley* |
| Name: DAVID E. KAPLAN | Name: *Janet Bradley* |
| (Type, Print or Stamp) | (Type, Print or Stamp) |
| Title: CFO | Title: *Auth Signatory* |

## EXHIBIT 1

### INSURANCE

| Form of Insurance | Minimum Limits of Insurance |
|---|---|
| (a) (1) Workers Compensation and (2) Employers Liability | As required by law $1,000,000 per occurrence (BI/disease) |
| (b) Professional Liability (aka Errors & Omissions Liability). Such insurance should be endorsed to cover services provided by subcontractors if any. | $3,000,000 per occurrence and aggregate |
| (c) Commercial General Liability on an occurrence basis, including premises operations, products and completed operations, contractual liability, and personal and advertising injury coverages. Supplier will name Lehman Brothers Holdings, Inc. and its subsidiaries and affiliates as an additional insured by certificate of insurance. | $1,000,000 per occurrence and aggregate |
| | |
| (d) Umbrella Liability on a follow form basis | $3,000,000 per occurrence and aggregate excess of the Commercial General Liability and Commercial Automobile Liability Insurance |
| | |

## PRODUCT LICENSE SUPPLEMENT

**Supplier Name: Arcot Systems**
**Supplier Jurisdiction of Incorporation: California Corporation**
**Supplier Address: 455 W Maude Avenue, Suite 210, Sunnyvale, CA 94085**
**Tax ID:  77-0467-362**

**Telephone #: 408 969 6100**
**Fax #:  408 969 6290**
**General Terms and Conditions No.:** *CON000000025790*
**General Terms and Conditions Effective Date:  December 20, 2007**
**Product License Supplement Effective Date:  December 20, 2007**


THIS PRODUCT LICENSE SUPPLEMENT (the "**License Supplement**") is made as of the Product License Supplement Effective Date specified above ("**Supplement Effective Date**") between Lehman Brothers Holdings Inc. , a Delaware corporation, having an office and place of business at 745 Seventh Avenue, New York, NY 10019 (as used herein, the "**Customer**") and the Supplier specified above (as used herein, the "**Supplier**").  This License Supplement sets forth additional terms and conditions applicable to software Product(s) licensed to Customer and incorporates by reference the above-referenced General Terms and Conditions.  This License Supplement includes the attached Exhibits, Annexes and Attachments hereto.  Capitalized terms defined in this License Supplement have the meanings given herein, and other capitalized terms not defined in this License Supplement will have the meanings given elsewhere in the Master Agreement.

## ARTICLE 1:  PROVISION OF SOFTWARE

From time to time the Parties may, under this License Supplement, execute Transaction Schedules pursuant to which Supplier agrees to grant Customer a license to use Supplier's proprietary computer programs and associated materials and documentation thereto, which are listed and described in such Transaction Schedules. Each such Transaction Schedule will be substantially in the form of the attached Exhibit 1 and, together with any other documents attached thereto or incorporated therein by reference (including the General Terms and Conditions and this License Supplement) will constitute a separate and independent contract for the applicable Transaction between Supplier and Customer (i.e., the Customer entity that is the party to the Transaction Schedule).  Each Transaction Schedule will incorporate by reference the General Terms and Conditions and this License Supplement and will be consecutively numbered to facilitate identification.

## ARTICLE 2:  DELIVERY AND INSTALLATION

2.1    Delivery.  Unless otherwise defined on the applicable Transaction Schedule, Supplier agrees to deliver to Customer, on or before the applicable Scheduled Delivery

U02

Date and at the applicable Installation Site(s), each Product and/or Update listed in a Transaction Schedule. If any Product is not delivered on or before its Scheduled Delivery Date, Customer may, on written notice any time before formal Acceptance thereof in accordance with the Product Acceptance Article of this License Supplement, terminate the applicable Transaction Schedule, in whole or in part, without obligation, liability or penalty of any kind. In the event that Customer so elects, Supplier will, within thirty (30) days, provide Customer with a refund of any amounts paid by Customer with respect to such Product and/or Update.

2.2    Installation - Generally. If the applicable Transaction Schedule indicates that Supplier is responsible for installation of a Product, Supplier agrees to install each Product and/or Update at the applicable Installation Site(s) as soon after delivery as reasonably possible, but in no event later than ten (10) days after delivery (or such other period as may be set forth in the applicable Transaction Schedule). Prior to assigning any Supplier Personnel to perform any installation Services in Customer's facilities, Customer has the right to perform background checks on Supplier Personnel in accordance with Customer's standard requirements for independent contractors. Supplier will notify Customer in writing when each Product and/or Update has been installed and is ready for Acceptance testing.

2.3    Installation by Customer. If "Customer Installed" is specified on the applicable Transaction Schedule, then Customer will install the Product and/or Update in accordance with the written specifications provided by Supplier and such Product and/or Update will be deemed to be installed within forty-five (45) days (or such other time period as the Parties may mutually agree upon in the applicable Transaction Schedule) after the later of (i) its delivery to the Installation Site(s), and (ii) the Scheduled Delivery Date, unless Customer notifies Supplier of an installation problem within such period. Unless the Parties otherwise agree on the applicable Transaction Schedule, Supplier, at no additional cost to Customer, will provide all technical assistance necessary for Customer or its agents to install each Product.

2.4    Installation Delays. If Supplier has not completed installation of any Product within ten (10) days after the Scheduled Delivery Date for such Product (or such other period as may be set forth in the applicable Transaction Document), Customer, at its option, may terminate the applicable Transaction Schedule, in whole or in part.

2.5    Installation Site Readiness. Customer agrees to be responsible for preparing and making available the Installation Site for each Product, including all facilities and equipment conditions specified by Supplier in (or in accordance with) the applicable Transaction Schedule.

## ARTICLE 3: PRODUCT ACCEPTANCE

3.1    Installed & Ready for Acceptance Testing. When each Product and/or any subsequent revision, update, improvement, modification, enhancement, correction or new release thereto (collectively, "**Updates**" and each, an "**Update**") has been delivered to the Installation Site(s) (and, where Supplier is responsible for installation, installed

2

and made ready for Acceptance testing by Supplier), Supplier will notify Customer in writing (following installation if Supplier is responsible for installation and following delivery in the case of "Customer Installed") and Customer will commence Acceptance testing of such Product and/or Update in accordance with the procedures set forth in this Article. Supplier Personnel will provide Customer with such assistance and support as may be reasonably necessary. For avoidance of doubt, unless otherwise agreed to on the applicable Transaction Schedule, the Acceptance testing will test the Product and/or Updates on the systems of Customer and/or its designee. Sample or live input selected by Customer will be utilized for the Acceptance test.

3.2    Product Acceptance Process. Unless otherwise agreed to in writing by the Parties in an applicable Transaction Schedule, Acceptance of a Product and/or Update will be based on Customer's written determination that the Product and/or Update meets the applicable Acceptance Criteria, Documentation, Specifications and any other performance standards and criteria mutually agreed upon and set forth in the applicable Transaction Schedule. If a Product and/or Update does not pass Acceptance testing, Customer will notify Supplier, specifying in reasonable detail in what respects the Product and/or Update has failed to perform. Supplier will, at no additional cost to Customer, promptly correct any deficiencies disclosed by the Acceptance testing and Customer will repeat the entire test until the Product and/or Update has successfully passed. If the Product and/or Update fails to pass Acceptance within sixty (60) days after the date Customer commenced Acceptance testing, Customer may, at its option and without obligation or liability of any kind: (a) terminate the applicable Transaction Schedule, in whole or in part, and/or return all affected Products and/or Updates, and receive a full refund for the returned Products and/or Updates, or (b) without prejudice to Customer's right to implement (a) above, extend the time for Supplier to correct the Product and/or Update and continue the Acceptance testing. When Customer determines that a Product and/or Update meets the applicable Acceptance Criteria, Customer will notify Supplier in writing of its Acceptance.

## ARTICLE 4: DOCUMENTATION AND TRAINING

4.1    Documentation. Upon delivery of each Product at the Installation Site, Supplier will also deliver to Customer at least one (1) printed copy of all available documentation for such Product and/or Update sufficient to enable Customer personnel to use and to fully understand the use and operations of the Product and/or Update involved (**"Documentation"**). Such Documentation will include user and reference manuals, technical specifications, complete operating information and any other documentation that is generally provided by Supplier to its other customers. Supplier will promptly deliver to Customer any updates or enhancements to such Documentation when such updates or enhancements become available to Supplier. If Supplier's Documentation is available in electronic form, Supplier will also deliver to Customer at least one (1) copy of the Documentation in electronic form for each different type of Product purchased by Customer. Customer may copy the Documentation in order to satisfy its own internal requirements or may request Supplier to furnish additional copies at Supplier's current standard prices, less any applicable discounts.

3

4.2     Training.  If training is required and/or included for a Product and/or Update, the nature, duration and other particulars applicable to such training will be specified on the applicable Transaction Schedule.  Unless otherwise agreed on in the applicable Transaction Schedule, such training will be at no additional cost or expense to Customer.

## ARTICLE 5:  SCOPE OF LICENSE AND PROPRIETARY RIGHTS

5.1     Unless otherwise agreed on the applicable Transaction Schedule, Supplier grants to Customer, its affiliates, its contractors under contract to provide services to Customer or its affiliates (provided that such contractors' use shall be limited solely to providing such services) and any non-Customer entity designated in the Transaction Schedule (each, a "**Designated User**") a non-exclusive, irrevocable, perpetual, worldwide license to use each Product, in object code form only, including Updates provided hereunder or otherwise generally available to Supplier's customers at no additional cost and all related Documentation.  The license will commence upon its delivery to Customer and will continue perpetually thereafter; provided, that in the event the Parties agree in the applicable Transaction Schedule that the license will not be perpetual, the term of such license will commence upon the delivery of the Product and/or Update to Customer and will continue from the date of Acceptance by Customer of the Product and/or Update for the applicable License Term specified in the Transaction Schedule, unless, in each case, terminated earlier in accordance with the Master Agreement.  For example, if the Product is delivered to Customer on January 1 and passes Acceptance testing on February 1, then the License Term will be measured from February 1.  Customer shall not: (a) disassemble, reverse engineer, decompile, modify, enhance, translate or create a derivative work from the Product or Updates; (b) transfer, rent or grant any rights in the Product or Updates in any form to any person or entity except for wholly owned Customer entities;or (c) copy the Product or Updates except as strictly necessary for archival or backup purposes.  If any Customer activity violates provision (a) above, in addition to other remedies Supplier may have hereunder and under applicable law, Licensee hereby quitclaims and assigns all Intellectual Property Rights resulting from or arising out of such activity to Supplier, and shall take all necessary steps to perfect or cause to be perfected Supplier's title therein.

5.2     Unless otherwise agreed in the applicable Transaction Schedule, Customer and any Designated Users may use the Product(s), Updates, Documentation and/or other materials provided to Customer hereunder, in Customer's business on any of its computers and systems, at the Installation Site(s) or any other Customer location, and on more than one (1) computer or system at a time.  Unless otherwise agreed and specified in the applicable Transaction Schedule, Supplier agrees that Customer and any Designated Users will have the right without limitation to (directly or through a third party) (a) use, copy, execute, and/or display, any of the Products, Updates, Documentation and/or other materials provided to Customer hereunder, and (c)  use the Products, Updates, Documentation and/or other materials provided to Customer hereunder in conjunction with other programs and/or materials (collectively, "Use").  In addition to the foregoing, notwithstanding anything to the contrary in this License Supplement, Customer may elect to outsource some or all of the activities for which

4

Customer uses the Products, Updates, Documentation and/or other materials provided to Customer hereunder, in which case, any service provider providing such services will have the right to use the Products, Updates, Documentation and/or other materials provided to Customer hereunder, to the same extent as Customer for the purpose of performing activities for which Customer may use the Products, Updates, Documentation and/or other materials provided to Customer hereunder; provided that, Customer shall be responsible for all acts of outsourcers or service providers in connection with the Products, Updates, Documentation and/or other materials provided to Customer. In addition, Customer, subject to an appropriate confidentiality agreement consistent with Customer's confidentiality obligations set forth in the Master Agreement, may disclose the terms of the Master Agreement, the Products, Updates, Documentation and/or other materials provided to Customer hereunder to any contractor or potential contractor.

5.2.1  Nothing herein will limit Customer's right to access and use the Products and/or Updates in connection with any associated or interconnected networks, peripherals, equipment and devices, or other systems networks or equipment, unless otherwise specifically prohibited or limited in the applicable Transaction Schedule.

5.2.2  Without limiting the foregoing, Customer will have the right to use the Products and/or Updates on temporary, substitute or back-up equipment. Customer will also be entitled to make and keep copies of and, in the event of a disaster, use the Product, Update and Documentation at a separate facility for purposes of safekeeping, back-up and disaster recovery.

5.3    Supplier retains title to the Products and Documentation provided hereunder and does not convey any proprietary rights or other interest therein to Customer, other than the licenses granted hereunder.

5.4    If the Parties agree in the applicable Transaction Schedule that a Product is governed by a License Term, at least one hundred eighty (180) days prior to the expiration of each License Term, Supplier will notify Customer in writing of such expiration. Customer will have the option to continue the license of any Product for an additional one (1) year term ("**License Renewal Term**"), on the same terms and conditions. Customer will notify Supplier in writing if it elects to continue a Product license for the License Renewal Term. The License Fee applicable to any continuation of a Product license during the License Renewal Term ("**Renewal Fee**") will be the lesser of: (a) the License Fee applicable to the current License Term (if the terms are equivalent); (b) Supplier's then current License Fee applicable to the renewal License Term; or (c) such other license fee as is mutually agreed upon in writing by the Parties. Notwithstanding anything herein to the contrary, Customer will have the right to continue to Use the Products licensed under a Transaction Schedule, at no additional charge, for sixty (60) days after the end of the applicable License Term (or License Renewal Term).

## ARTICLE 6: ESCROW MATERIALS

The Parties may agree on a Transaction Schedule to put source code for a Product or Update and the documentation thereto, which documentation will include all relevant commentary, including, but not limited to, explanation, flow charts, algorithm and subroutine descriptions, memory and overlay maps, and other similar materials that were required in the development environment to generate the executables or that are required to enable Customer to use and support the Product or Update, in escrow with an independent third party escrow agent. If the Parties mutually agree to set up an escrow arrangement, then the Parties will specify such agreement to such arrangement in the applicable Transaction Schedule. The Parties agree that additional terms and conditions will apply and be specified in the applicable Transaction Schedule for purposes of any such escrow arrangement.

## ARTICLE 7: PRODUCT CUSTOMIZATION SERVICES

Supplier agrees to offer services to customize, modify and/or enhance all Products licensed by Customer under this License Supplement, to develop programs, software and materials related to such Products, and/or such other services as the Parties mutually agree upon. Upon or at any time following execution of a Transaction Schedule under this License Supplement, Customer will have the right, on commercially reasonable terms, to contract with Supplier to provide Product customization services for any ordered Products. If Product customization services are contracted for, they will be provided in accordance with mutually agreed upon terms and conditions and any other terms and conditions to which the Parties agree and are set forth in the applicable Transaction Schedule (or an amendment to a Transaction Schedule by which Product customization services are added to a previously existing Transaction Schedule).

## ARTICLE 8: PRODUCT MAINTENANCE SERVICES

8.1     During the Warranty Period, at no charge to Customer, and thereafter during each Maintenance Period, in consideration of Customer's payment of the applicable Maintenance Fee, Supplier agrees to provide Customer with the maintenance and support services specified in this Article, the Maintenance Warranty and the applicable Transaction Schedule ("**Maintenance Services**") for the Products licensed thereunder.

8.2     At all times, Supplier will perform the Maintenance Services at least at the same level and with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and efficiency that is equal to or better than as is provided by Supplier to its other customers. Quantitative performance standards for certain of the Maintenance Services ("**Service Levels**") are established and set forth in the applicable Transaction Schedule. As part of the Maintenance Services, Supplier will apply continuous efforts and resources to resolve any failure, malfunction, defect, problem or non-conformity, which is classified as a Severity 1, identified by Customer or otherwise brought to Supplier's attention (e.g., detected by Supplier).

8.3     As part of Maintenance Services, Supplier will provide Customer with Updates to each Product and to the Documentation no later than the date that such Update is produced and generally made available by Supplier. Supplier will simultaneously

6

provide revised and/or updated Documentation for such Updates to Customer when such Updates are made available to Customer. In addition, Supplier will provide to Customer (a) a detailed, written report on the affect the installation of the applicable Update will have on the Product currently in use by Customer, and (b) all automated conversion tools that Supplier develops which it makes available to its other customers (whether or not such customers are charged therefore) to assist Customer with the upward compatibility for any Updates to the Product. If any Update is acceptable to Customer, Customer will allow Supplier to install the same (or if "Customer Installed", provide documentation and materials necessary to successfully install such Update) and provide such services as are required, if any, to enable Customer to continue Customer's intended use of the Product. If any such Update adversely affects Customer's use of the Product, Customer's operations or other systems or processes, in Customer's sole judgment, acting reasonably and in good faith, Customer may refuse to accept such Update, and in such event, Supplier will maintain the Product in the form in effect immediately prior to Supplier's request that Customer accept such Update and Supplier will continue to provide Maintenance Services for such Product in such form. If Supplier satisfactorily resolves the problems that gave rise to Customer's refusal, Customer will permit Supplier to install the Update and repeat the process set forth in this section. For purposes of the Master Agreement, once an Update is incorporated into any Product or Documentation, it will be considered a part thereof for all purposes hereunder. Notwithstanding any other provision contained in the Master Agreement or this License Supplement, Supplier will always provide Maintenance Services and Updates for the then current version of each Product, as well as for the two most recent prior versions of each such Product.

8.4    As new releases of the underlying operating system become generally available and supported by Supplier, Supplier will continue to support the Products for the prior releases of the underlying operating system for a period of at least twelve (12) months.

8.5    If Customer attempts to perform unauthorized maintenance and/or repair service on the Product and, as a result, further service is required to restore the Product to proper operating condition, such service will be provided by Supplier hereunder; provided, however, that Supplier will have the right to charge Customer for such services at the best rate it provides to any of its other customers for similar services.

8.6    Customer may change the type of and nature of services elected for any Product licensed hereunder, at any time, in whole or in part, upon thirty (30) days' written notice to Supplier. Any change decreasing the level of Maintenance Services received will result in a pro-rata refund of any fees previously paid by Supplier in advance and the Maintenance Fees for upcoming periods will be adjusted.

8.7    The Maintenance Services will renew automatically following the initial Maintenance Period for twelve (12) month Maintenance Periods unless Customer provides Supplier with written notice of its desire not to renew within sixty (60) days of receipt of the invoice for Maintenance Fees for the upcoming Maintenance Period. Notwithstanding the foregoing, the Maintenance Services will automatically terminate upon the termination or expiration of the License Term (or License Renewal Term).

Unless otherwise agreed to in an applicable Transaction Schedule, the Maintenance Fee will be fixed for the first three (3) Maintenance Periods (the "Fixed Maintenance Fee Period"). After the Fixed Maintenance Fee Period, the Maintenance Fee will be subject to increase by Supplier at the beginning of any Maintenance Period upon at least one-hundred eighty (180) days prior written notice to Customer, provided that no such increased fee will exceed the lesser of (a) the prior year's Maintenance Fee *plus* the percentage change over the prior year's U.S. Consumer Price Index for Urban Consumers, All U.S. Cities Average, published by the Bureau of Labor Statistics of the Department of Labor, and (b) Supplier's then current published maintenance fee. Customer may terminate Maintenance Services for any Product licensed hereunder, at any time, in whole or in part, upon thirty (30) days' written notice to Supplier. Any termination or expiration of Maintenance Services prior to the end of the then current Maintenance Period (including one resulting from a termination or expiration of the License Term or License Renewal Term) will result in a pro-rata refund of any fees previously paid to Supplier in advance by Customer for such Maintenance Services and the Maintenance Fees for upcoming periods will be adjusted to reflect any partial terminations. Termination of Maintenance Services by Customer will not terminate Customer's right to use the Product under the applicable Transaction Schedule as an unsupported license. If Customer elects to re-instate Maintenance Services, the reinstated Maintenance Fee will exclude any fees that would have been payable during the lapsed maintenance period.

8.8    Supplier will make Maintenance Services available to Customer for the Product(s) for so long as Supplier offers maintenance to any other customer for the Product. In the event that the source code is provided to Customer hereunder, Customer will use such source code only for the purpose of supporting and maintaining Customer's use of the Product as provided in the applicable Transaction Schedule; provided that Customer may modify the source code to maintain currency with external requirements, and to modify, enhance, and correct errors in the Product. Customer may form a consortium with other licensees of the Product that have similar rights to the source code in order to maintain and modify the source code and/or Product in accordance with the rights granted to each such member of the consortium pursuant to their respective agreements with Supplier.

## ARTICLE 9: SUPPLEMENTAL REPRESENTATIONS, WARRANTIES AND COVENANTS

Supplier represents, warrants and covenants as follows, which representations, warranties and covenants will be considered to be given anew for each Transaction upon the execution of the applicable Transaction Schedule:

9.1    Each Product will perform in accordance with the applicable Acceptance Criteria, Documentation and other Specifications set forth in the applicable Transaction Schedule at the time of Customer's Acceptance of such Product and for six (6) months following such Acceptance (the "**Warranty Period**"), and Supplier will correct, repair and/or replace, at no cost to Customer, any defect, malfunction or nonconformity that

prevents such Product from conforming and performing as so warranted and that occurs during such Warranty Period (the "**Maintenance Warranty**").

9.2     (a) Supplier has the right to sell the Products to Customer hereunder.

9.3     No Products, Updates, Documentation, and/or materials provided by Supplier or Services performed by Supplier (whether directly or indirectly through its agents and/or subcontractors), nor the use thereof by Customer, will constitute an infringement, misappropriation or unlawful use or disclosure of any Intellectual Property Right of any third party.

9.4     The Specifications and Documentation and other materials provided by Supplier under a Transaction Schedule will accurately reflect the Products provided to Customer hereunder.

9.5     Supplier shall provide Customer with a list of any "open source" software or any code derived therefrom (in any format or medium whatsoever) which is part of Products or Updates.

9.6     (a) Supplier personnel will observe and comply with Customer's security procedures, rules, regulations, policies, working hours and holiday schedules; and (b) in performing Services at Customer locations, Supplier personnel will minimize any disruption to Customer's normal business operations.

9.7     Any Products, Documentation, Updates, and/or materials provided by Supplier under a Transaction Schedule that are intended to interact or otherwise work together as part of a functioning system will be compatible and will properly inter-operate and work together as components of an integrated system.

9.8     Updates provided to Customer under any Transaction Schedule will not degrade, impair or otherwise adversely affect the performance or operation of the Products provided hereunder.

9.9     All Products and Updates will accurately recognize, calculate, process and store all same century and multi-century formulas, dates and date notations (including leap years), will resolve ambiguities in date input and output and will have capacity to interoperate with other products used by Customer that may deliver to or receive records from the Products and Updates, including backup and archived data.

9.10    Any of the Products and Updates that work with security prices will accurately recognize, calculate, process, and store all numbers, whether expressed in decimal form, fraction form, or both.

9.11    Any of the Products and Updates that process multiple currency denominations, will correctly input, store, process, convert, retrieve, output, and display monetary amounts denominated in the Euro.

9

9.12    Except as expressly set forth in the applicable Transaction Schedule, (a) no additional software or licenses are required for effective use of the Product, including, without limitation, for effective use of any database components thereof, and (b) to the extent that the Product is used in conjunction with a Web browser, no plug-ins or non-standard browser components are required for effective use of the Product.

9.13    EXCEPT AS SPECIFICALLY PROVIDED IN THIS LICENSE SUPPLEMENT, THE GENERAL TERMS AND CONDITIONS OR IN A TRANSACTION SCHEDULE, THERE ARE NO OTHER WARRANTIES BY EITHER PARTY, EXPRESSED OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

## ARTICLE 10:  TERM AND TERMINATION

10.1    Term.

10.1.1.        License Supplement.  This License Supplement will commence as of the Supplement Effective Date and will continue in full force and effect thereafter unless and until terminated as provided herein.

10.1.2.        Transaction Schedules.  Each Transaction Schedule will become effective on the Order Date set forth in the Transaction Schedule and will continue in effect thereafter; provided, that in the event the Parties agree in the applicable Transaction Schedule that the license will not be perpetual, the Transaction Schedule will continue until the expiration of the applicable License Term specified in the Transaction Schedule (and any renewal License Term); *provided, however*, that a Transaction Schedule will terminate prior to the occurrence of such expiration if such Transaction Schedule is terminated by a Party as permitted under the Master Agreement.

10.2    Termination.  The Parties' respective rights of termination with respect to this License Supplement and any Transaction Schedules executed hereunder will be as set forth in the General Terms and Conditions.

## ARTICLE 11:  USE OF SUBCONTRACTORS

Supplier may subcontract the performance of Services to be provided under this Supplement and under the applicable Transaction Schedules (including the Maintenance Services) only in accordance with the following:

11.1    Supplier may, in the ordinary course of business and without obtaining Customer's prior written approval, utilize third party services or products that are not dedicated to performance of such Services for Customer and that are not a material aspect of Supplier's Services under a particular Transaction Schedule.

11.2    Except as set forth in Section 11.1 above, Supplier will obtain the prior written approval of Customer for all Supplier subcontractors performing such Services under a particular Transaction Schedule.

## ARTICLE 12:  GLOSSARY OF DEFINED TERMS

Certain definitions of capitalized terms used in this License Supplement are set out below.

| Defined Term | Meaning |
|---|---|
| **Acceptance** | Customer's agreement that a Product or Update meets the applicable Acceptance Criteria and Documentation. |
| **Acceptance Criteria** | The acceptance criteria, requirements and/or Specifications set out in the applicable Transaction Schedule.  If no such criteria, requirements or specifications are provided for particular Products or Updates, then the Supplier's published or generally available Documentation. |
| **Master Agreement** | As provided in the General Terms and Conditions. |
| **Maintenance Period** | A period of twelve (12) consecutive months commencing upon the end of the Warranty Period or on any anniversary date thereof. |
| **Specifications** | The technical specifications, design characteristics, functions and features, and performance and operating characteristics specified in the applicable Transaction Schedule or otherwise mutually agreed by Supplier and Customer. |
| **Transaction** | As provided in the General Terms and Conditions. |
| **Transaction Schedule** | As provided in the General Terms and Conditions. |

(The Next Page is the Signature Page)

The undersigned parties have caused this License Supplement to be executed by their respective duly authorized representatives.

| Arcot Systems, Inc. (SUPPLIER) | Lehman Brothers Holdings Inc. (CUSTOMER) |
|---|---|
| By: *David E. Kaplan* | By: *Janet Bradley* |
| Name: DAVID E. KAPLAN | Name: Janet Bradley |
| (Type, Print or Stamp) | (Type, Print or Stamp) |
| Title: CFO | Title: Auth Sig |

## EXHIBIT 1:  FORM OF PRODUCT LICENSE TRANSACTION SCHEDULE

**[SAMPLE TEMPLATE ONLY – APPROPRIATE VERSION TO BE DEVELOPED FOR EACH TRANSACTION]**

**Supplier Name:**
**Supplier Jurisdiction of Incorporation:**
**Supplier Address:**
**Tax ID:**
**Telephone #:**
**Fax #:**
**General Terms and Conditions No.:**
**General Terms and Conditions Effective Date:**
**Product License Supplement Effective Date:**
**Schedule No.:  PLTS-_____**
**Order Date:**

This Product License Transaction Schedule ("**Transaction Schedule**"), made effective as of the Order Date above, is issued pursuant to the above-referenced General Terms and Conditions and License Supplement between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the specific software Product(s) being licensed by Customer.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced General Terms and Conditions, License Supplement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the Transaction described herein.

Documents, in addition to this Transaction Schedule and the above-referenced General Terms and Conditions and the License Supplement, that form this Transaction Schedule **[INSTRUCTIONS: LIST ANNEXES BELOW, CREATE ADDITIONAL ANNEXES AS NEEDED, AND ATTACH COPIES OF EACH DOCUMENT TO THIS TRANSACTION SCHEDULE, AS APPROPRIATE]**:

Annex 1:  Product  [Required]

Annex 2:  Installation [Required]

Annex 3:  Specifications [Required]

Annex 4:  Acceptance Criteria and Procedures [Optional]

Annex 5:  Maintenance Services [Optional]

Annex 6:  Prices, Fees and Charges [Required]

Annex 7:  Escrow Provisions [Optional]

Annex 8:  Training [Optional]

**[Annex 9:  Export Control [Required, when applicable]]**

Annex 10:  Additional Agreed-Upon Provisions [Optional]

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the General Terms and Conditions or the License Supplement referenced above

(The Next Page is the Signature Page)

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives.

**[LEGAL NAME OF SUPPLIER ENTITY] (SUPPLIER)**

By:_____

Name:_____
      (Type, Print or Stamp)

Title:_____

**[LEGAL NAME OF CUSTOMER ENTITY] (CUSTOMER)**

By:_____

Name:_____
      (Type, Print or Stamp)

Title:_____

# ANNEX 1: PRODUCT

**[INSTRUCTIONS: COMPLETE THE INFORMATION REQUIRED BELOW FOR ALL SOFTWARE PRODUCTS TO BE LICENSED UNDER THIS TRANSACTION SCHEDULE.]**

Product Name:

Product Description:

Scope of License (if different from Scope of License and right to Use provisions in License Supplement):

Designated Users (if any, in accordance with Scope of License provisions in License Supplement):

License Term (if not perpetual): _____ years

Source Code in Escrow:   Yes        No     (Bracket or Circle One)

**[(If "YES" then the additional escrow provisions will be attached hereto as Annex 7 and will apply.)]**

In addition, the Parties agree to execute an escrow agreement (Place an "X" next to the selection):

_____ Upon execution of the Transaction Schedule pursuant to which the Parties agree to put source code and the documentation related thereto for the Products and Updates into escrow.

_____ Within thirty (30) days after the date of the Transaction Schedule pursuant to which the Parties agree to put source code and the documentation related thereto for the Products and Updates into escrow.

_____ Other (Fill in number of days): Within _____ (__) days after the date of the Transaction Schedule pursuant to which the Parties agree to put source code and the documentation related thereto for the Products and Updates into escrow.

## ANNEX 2:  INSTALLATION

**[INSTRUCTIONS: COMPLETE THE INFORMATION REQUIRED BELOW FOR ALL SOFTWARE PRODUCTS TO BE LICENSED UNDER THIS TRANSACTION SCHEDULE]**

Installation Site:

Scheduled Delivery Date:

Customer Installed:        YES        NO      (Bracket or Circle One)

If YES: **[INSTRUCTIONS: INSERT SUPPLIER'S INSTALLATION INSTRUCTIONS AND OTHER INFORMATION HERE]**

If NO: **[INSTRUCTIONS: INSERT A DESCRIPTION OF ANY CUSTOMER FACILITIES AND OTHER RESOURCES (E.G., EQUIPMENT) CUSTOMER WILL BE REQUIRED TO FURNISH OR MAKE AVAILABLE TO SUPPLIER TO ENABLE OR FACILITATE SUPPLIER'S INSTALLATION OF THE PRODUCT.]**

## ANNEX 3:  SPECIFICATIONS

**[INSTRUCTIONS: INSERT OR ATTACH DETAILED SPECIFICATIONS OF SOFTWARE PRODUCT(S) TO BE LICENSED, INCLUDING TECHNICAL ASPECTS, FUNCTIONALITY AND PERFORMANCE STANDARDS]**

## ANNEX 4:  ACCEPTANCE CRITERIA AND PROCEDURES

**[INSTRUCTIONS: INSERT OR ATTACH ACCEPTANCE CRITERIA OR THE PROCESS FOR DEVELOPING ACCEPTANCE CRITERIA]**

## ANNEX 5:  MAINTENANCE SERVICES

**[INSTRUCTIONS:  COMPLETE THE INFORMATION REQUIRED BELOW FOR ALL SOFTWARE PRODUCTS LICENSED UNDER THIS TRANSACTION SCHEDULE FOR WHICH CUSTOMER IS ACQUIRING MAINTENANCE SERVICES.  THESE ARE SAMPLE EXAMPLES ONLY – APPROPRIATE VERSION TO BE DEVELOPED FOR EACH TRANSACTION]**

In addition to the Maintenance Services as generally described in the License Supplement, Supplier will provide Customer with the following Maintenance Services: **[INSTRUCTIONS: CHECK APPLICABLE BOXES]**

☐    web-based support service to correct and repair any failure, malfunction, defect or nonconformity which prevents the Products from performing in accordance with the warranties, Documentation, Specifications, or other mutually-agreed criteria (including Acceptance Criteria), and other descriptions and/or materials provided to Customer

☐    live telephone support service (during the hours specified below) to correct and repair any failure, malfunction, defect or nonconformity which prevents the Products from performing in accordance with the warranties, Documentation, Specifications, or other mutually-agreed criteria (including Acceptance Criteria), and other descriptions and/or materials provided to Customer

☐    Monday – Friday, between the hours of _____ (Installation Site local time)

☐    Saturday, between the hours of _____ (Installation Site local time)

☐    Sunday, between the hours of _____ (Installation Site local time)

☐    after-hours support services (for all hours not covered by live telephone support) through paging and similar devices to correct and repair any failure, malfunction, defect or nonconformity which prevents the Products from performing in accordance with the warranties, Documentation, Specifications, or other mutually-agreed criteria (including Acceptance Criteria), and other descriptions and/or materials provided to Customer.

Customer may elect to extend the hours of maintenance coverage, arrange for on-site or other services available from Licensor at mutually agreed upon rates.

**[SAMPLE EXAMPLES ONLY – APPROPRIATE VERSION TO BE DEVELOPED FOR EACH TRANSACTION]**

Customer will determine the Problem Severity Level for each problem.  If Supplier fails to comply with any of the following Service Levels, Customer, at Customer's option, will be entitled to (a) promptly receive a credit of the pro-rata portion of the Maintenance

Fees for the month of such non-compliance, or (b) terminate Maintenance Services and receive a refund of the pro-rated portion of any prepaid, unearned Maintenance Fees.

| Problem Severity Level Response Time Resolution Time | Response Time Service Level | Resolution Time Service Level |
|---|---|---|
| Level 1: Product is not working, a significant function of the Product is not properly working or a significant number of Customer users are unable to access or use some functionality. There is or, if the problem is not promptly remedied, is likely to be a significant impact to Customer's business | Supplier will respond to and Supplier's senior engineers will commence efforts to fix Level 1 problems within [__] hour after Customer reports such problem or Supplier's detection of such problem, whichever is earlier. | Supplier will use best and continuous efforts, twenty-four (24) hours per day, seven (7) days per week to resolve or provide Customer with an acceptable work-around for the Level 1 problem within [__] hours, and will provide a permanent fix no later than [__] days after Customer reports such problem or Supplier's detection of such problem, whichever is earlier |
| Level 2: Functionality of the Product is impaired or some Customer users are unable to access or use some functionality. There is some impact to Customer's business. | Supplier will respond to and Supplier's senior engineers will commence efforts to fix Level 2 problems no later than [__] hours after Customer reports such problem or Supplier's detection of such problem, whichever is earlier. | Supplier will use reasonable and continuous efforts, during normal business hours to resolve or provide Customer with an acceptable work-around for the Level 2 problem within [__] days, and will provide a permanent fix no later than [__] days after Customer reports such problem or |

| Problem Severity Level<br>Response Time<br>Resolution Time | Response Time<br>Service Level | Resolution Time<br>Service Level |
|---|---|---|
| | | Supplier's detection of such problem, whichever is earlier |
| Level 3: Low impact to Customer users of the Product. | Supplier will respond to Level 3 problems no later than [___] hours after Customer reports such problem or Supplier's detection of such problem, whichever is earlier, during Customer's normal business hours (or on the next business day, if the problem is reported outside of Customer's normal business hours). | Supplier will resolve or provide Customer with an acceptable work-around for the Level 1 problem within [___] days after Customer reports such problem or Supplier's detection of such problem, whichever is earlier. Supplier will provide a permanent fix in the next Update. |

## ANNEX 6:  PRICES, FEES AND CHARGES

**[INSTRUCTIONS:  INSERT OR ATTACH THE LICENSE FEES AND MAINTENANCE FEES (IF APPLICABLE) FOR SOFTWARE PRODUCT(S) LICENSED FROM SUPPLIER.  ALSO SET OUT ANY DISCOUNTS, MOST FAVORED CUSTOMER OR SIMILAR ARRANGEMENT, IF NOT ALREADY COVERED IN THE GENERAL TERMS AND CONDITIONS OR LICENSE SUPPLEMENT.  IF THERE ARE MILESTONE PAYMENTS AND THE LIKE, CROSS-REFERENCE SCHEDULED DELIVERY DATES, ACCEPTANCE AND THE LIKE, AS APPLICABLE.  PROVIDE INVOICING INSTRUCTIONS.]**

License Fee:

Amount:

Paid: In accordance with the General Terms and Conditions, and thereafter, if applicable:    (Bracket or Circle One)

Annually        Quarterly        Monthly        Other _____

Maintenance Fee:

Amount: _____

Paid:  (Bracket or Circle One)

Annually        Quarterly        Monthly        Other _____

## ANNEX 7:  ESCROW PROVISIONS

**[INSTRUCTIONS: INCLUDE OR ATTACH ANY APPLICABLE ESCROW PROVISIONS]**

## ANNEX 8:  TRAINING

**[INSTRUCTIONS: INCLUDE OR ATTACH ANY TRAINING TO BE PERFORMED BY SUPPLIER]**

## ANNEX 9:  EXPORT CONTROL

**[INSTRUCTIONS: SUPPLIER TO DETAIL WHETHER THE SOFTWARE PRODUCT(S) CONTAIN ANY ENCRYPTION FUNCTIONALITY THAT MAY REQUIRE A SPECIAL LICENSE FOR EXPORT]**

## ANNEX 10:  ADDITIONAL AGREED-UPON PROVISIONS

**[SAMPLE EXAMPLES ONLY – APPROPRIATE VERSION
TO BE DEVELOPED FOR EACH TRANSACTION]**

1.    Subcontractors

**[INSTRUCTIONS: IF ANY SUBCONTRACTORS WILL BE USED TO PERFORM THE
WORK (E.G., MAINTENANCE SERVICES) IDENTIFY THEM AND THEIR ROLE]**

2.    Other Terms.

**[INSTRUCTIONS: INSERT OR ATTACH ANY OTHER TERMS AGREED BY THE
PARTIES THAT ARE NOT WITHIN THE SCOPE OF THE ABOVE SECTIONS.]**

# Purchase Order

| | |
|---|---|
| **Lehman Brothers - Americas** | **CHANGE ORDER** |
| 70 Hudson Street | |
| LEHMAN BROTHERS | |
| Jersey City NJ 07302 | |
| United States | |

**CHANGE ORDER**                                      **Dispatch via E-Mail**

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| LBUSA-0000057496 | Jan-23-2008 | 1 - Aug-06-2008 | 1 |

| Payment Terms | Freight Terms | Ship Via |
|---|---|---|
| Net 30 | Destination, PPD | Common |

| Buyer | Phone | Currency |
|---|---|---|
| Nuzzela,Danielle | 1 201 499 2721 | USD |

**Vendor:** 1000002908
ARCOT SYSTEMS, INC.
455 West Maude Avenue
Sunnyvale CA 94085

**Ship To:** 70HXXVSOFT
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

**Bill To:** P.O. Box 2339
Secaucus NJ 07096
United States

**Tax Exempt?** N    **Tax Exempt ID:**                **Replenishment Option:** Standard

| Line-Sch | Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|
| 1- 1 | N/A | ARCOT SYST | 1.00 EA | 100,000.00 | 100,000.00 | Feb-06-2008 |
| | RISKFORT-OTHER-FULL LICENSE | | | | | |
| | 000000000090007307 | | | | | |
| | | | **Schedule Total** | | 100,000.00 | |
| | | | **Item Total** | | 100,000.00 | |
| 2- 1 | N/A | ARCOT SYST | 1.00 EA | **18,000.00** | 18,000.00 | Feb-06-2008 |
| | RISKFORT-OTHER-MAINT & SUPPORT | | | | | |
| | 000000000090007306 | | | | | |
| | | | **Schedule Total** | | 18,000.00 | |
| | | | **Item Total** | | 18,000.00 | |

Original PO reflected a maintenance cost of $30k. Since then price has been renegotiated to 18% of
license cost. Price has been updated to reflect updated price.

**Total PO Amount**                    118,000.00

PURCHASE ORDER TERMS AND CONDITIONS
ACCEPTANCE; TERM; TERMINATION -- These terms and conditions (the "T&Cs") constitute Customer's
acceptance of Supplier's offer (the "Offer," together with the T&Cs, the "Order") to sell and/or
license products and/or services, as applicable, to the Customer identified in this Order.  Customer'
s acceptance of this Order is expressly subject to the terms and conditions contained herein, unless
otherwise expressly agreed to in a writing signed by Customer pursuant to the Section titled
"Miscellaneous" below. If ongoing services are to be provided pursuant to this Order, the term of
such services shall be one year unless otherwise specified in the T&Cs or in a writing signed by the
parties. Customer may renew services under the same T&Cs at any time by providing written notice to
Supplier for subsequent one-year terms unless Supplier provides notice of non-renewal to Customer no
later than sixty days prior to the end of the then-current term. If neither party gives notice of
renewal or non-renewal, upon the expiration of the term, this Order shall continue month-to-month
under these T&Cs.

FEES -- Invoices shall be sent to Customer's address set forth in this Order.  Undisputed invoices
shall be payable within sixty (60) days of receipt.  Supplier shall not invoice any products or
services provided hereunder at a price higher than that shown on this Order, which price includes all
applicable federal, state and local taxes.  If the price is omitted on the Order, the price will be
the lowest prevailing market price for such products or services.  Customer shall not be responsible
for any charges for delivery, installation, transportation or packaging.  Supplier will not be
entitled to reimbursement from Customer for any expenses it incurs in connection with fulfilling this
Order.

DELIVERY AND ACCEPTANCE; RISK OF LOSS; CUSTOMER'S PROPERTY -- Title and risk of loss shall remain
with Supplier until products purchased under this Order have been delivered to  Customer at the
location specified in the Order and have been accepted by Customer. If Supplier does not comply with
Customer's delivery schedule, Customer may either approve a revised schedule or terminate the Order
without liability. Upon delivery, Customer may inspect all products and services purchased hereunder
to determine if they meet all applicable requirements, and are otherwise in good condition, suitable
for their intended business use. IF, IN THE REASONABLE JUDGMENT OF CUSTOMER, THE PRODUCTS OR SERVICES
ARE UNSATISFACTORY, CUSTOMER MAY REJECT SUCH PRODUCTS OR SERVICES. Customer shall return rejected
products to Supplier at Supplier's expense.  Except for Software licensed to Customer hereunder, all

**Signature not required on emailed Pos**

# Purchase Order

## Lehman Brothers - Americas
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

|  |  |
|---|---|
| **CHANGE ORDER** | **Dispatch via E-Mail** |

| Purchase Order | Date | Revision | Page |
|---|---|---|---|
| LBUSA-0000057496 | Jan-23-2008 | 1 - Aug-06-2008 | 2 |

| Payment Terms | Freight Terms | Ship Via |
|---|---|---|
| Net 30 | Destination, PPD | Common |

| Buyer | Phone | Currency |
|---|---|---|
| Nuzzela,Danielle | 1 201 499 2721 | USD |

**Vendor:** 1000002908
ARCOT SYSTEMS, INC.
455 West Maude Avenue
Sunnyvale CA 94085

**Ship To:** 70HXXVSOFT
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

**Bill To:** P.O. Box 2339
Secaucus NJ 07096
United States

Tax Exempt? N    Tax Exempt ID:        Replenishment Option:  Standard

| Line-Sch | Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt | Due Date |
|---|---|---|---|---|---|---|

products and services provided to Customer under this Order shall be and remain the personal property of Customer. Any developed works or other intellectual property or materials created by Supplier under this Order shall be owned exclusively by Customer.

SOFTWARE  -- This Section will apply to the extent that this Order includes Software (embedded or stand-alone). Unless otherwise specified in the T&Cs or in another applicable agreement between the parties, Supplier grants to Customer a worldwide, perpetual, royalty-free license to use, display and perform the Software identified in this Order in the ordinary course of Customer's business operations and for its own business purposes, including, but not limited to, processing its own information and that of its affiliates and clients as part of its business. Use includes use by or on behalf of Customer or Customer's affiliates, and use by third parties under contract to provide services to Customer or its affiliates, on any number of PCs and in any number of instances, subject to the restrictions set forth herein. If applicable, Use also includes the right of Customer to freely use and distribute, internally within Customer, among Customer's affiliates, and with Customer's clients, data produced by the Software, including data in any proprietary formats used by the Software. Customer may make a reasonable number of copies of the Software solely for backup, training, archiving, testing and disaster recovery. "Software" means the software programs listed in this Order and any upgrades, updates, enhancements, modifications, alterations, improvements, revisions, releases, and new versions. Customer may transfer the Software from one hardware platform or operating system to another (or both) for which the Software is or becomes generally available, at no additional charge. Customer will not modify, reverse assemble, or reverse compile any part of the Software, except as permitted by applicable law. Customer may make copies of and incorporate any documentation for the Software in other works prepared for Customer's business, so long as all intellectual property notices of Supplier are included as they appear on or in the documentation.

COMPLIANCE WITH LAWS -- In connection with the products provided and/or services performed hereunder, Supplier shall at Supplier's sole cost, comply with, and shall require all Suppliers, subcontractors and/or consultants retained by Supplier  to comply with (i) all requirements of applicable laws, orders, rules and regulations of governmental authorities, and (ii) all policies, rules and regulations of Customer (including, without limitation, Customer's policies regarding security and testing for controlled substances) and of the building in which the products are provided and/or the services are to be performed.  Supplier shall not file any mechanic's or materialman's lien or claim against Customer's property nor against the buildings in which the products are provided and/or the services are performed, nor shall Supplier suffer or permit any such lien to be filed by any of its subcontractors and/or consultants.

CONFIDENTIALITY -- Supplier shall preserve as confidential all information related to the business activities of Customer and its affiliates, clients, and entities with whom Customer does business that may be obtained by Supplier from any source (such information, together with the existence and terms of this Order, constituting the "Confidential Information"). Supplier shall hold Confidential Information in trust and confidence for Customer and shall not disclose Confidential Information to any person, firm or enterprise, or use any Confidential Information for its own benefit or the benefit of any other party, unless specifically authorized by Customer in writing, and to limit access and disclosure of such Confidential Information to Supplier's personnel on a "need to know" basis only.  Confidential Information does not include any particular information that the Supplier can demonstrate (i) is currently in the public domain, (ii) was previously known to Supplier free from any obligation to keep it confidential, (iii) was or is publicly disclosed by or on behalf of the Customer either prior to or subsequent to the receipt of such information by Supplier, (iv) is independently developed by the Supplier without any access to or use of Confidential Information of Customer, or (v) is rightfully obtained by Supplier from a third party lawfully in possession of the Confidential Information and who is not bound by confidentiality obligations to Customer.  Supplier may disclose Confidential Information of Customer if required to do so under applicable law, rule or order provided that Supplier, where reasonably practicable and to the extent legally permissible, provides Customer with prior written notice of the required disclosure so that Customer may seek a protective order or other appropriate remedy, and provided further that Supplier discloses no more Confidential Information of the Customer than is reasonably necessary in order to respond to the

**Signature not required on emailed Pos**

# Purchase Order

## Lehman Brothers - Americas
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

| **CHANGE ORDER** | | | **Dispatch via E-Mail** |
|---|---|---|---|
| **Purchase Order** | **Date** | **Revision** | **Page** |
| LBUSA-0000057496 | Jan-23-2008 | 1 - Aug-06-2008 | 3 |
| **Payment Terms** | **Freight Terms** | | **Ship Via** |
| Net 30 | Destination, PPD | | Common |
| **Buyer** | **Phone** | | **Currency** |
| Nuzzela,Danielle | 1 201 499 2721 | | USD |

**Vendor:** 1000002908
ARCOT SYSTEMS, INC.
455 West Maude Avenue
Sunnyvale CA 94085

**Ship To:** 70HXXVSOFT
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

**Bill To:** P.O. Box 2339
Secaucus NJ 07096
United States

Tax Exempt? N      Tax Exempt ID:                **Replenishment Option:** Standard

| Line-Sch  Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt  Due Date |
|---|---|---|---|---|

required disclosure.  At any time at the request and option of the Customer and in the event of termination or expiration of the Order (or any part thereof), Supplier agrees to promptly:  (i) return to Customer the Confidential Information; or (ii) destroy or permanently erase (on all forms of recordation) the Confidential Information and, if requested by Customer, acknowledge in writing that all such Confidential Information has been destroyed or permanently erased.  In addition, Supplier acknowledges and agrees that any disclosure of Confidential Information will in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such Confidential Information.

WARRANTY -- Supplier warrants that all products sold under this Order are free from defects in material, workmanship and design, and that all services provided under this Order shall be performed in a high-quality, professional and workmanlike manner by qualified personnel.

PUBLICITY – Supplier will not use the name or marks of, refer to, or identify Customer (or any related entity) in publicity releases, interviews, promotional or marketing materials, public announcements, customer listings, testimonials or advertising without the prior written consent of Customer in each such instance.

INSURANCE --  Supplier at its sole cost and expense, shall maintain with insurance companies having a Best's rating of A or better, (i) comprehensive general liability insurance in an amount not less than $2,000,000 and (ii) automobile liability insurance in an amount not less than $1,000,000 and (iii) worker's compensation insurance as required by law.  Such policies shall include an endorsement naming Customer and any other entities designated by the Customer as additional insureds and shall include a waiver by the insurance carrier of any subrogation rights.  Within ten (10) days after the date hereof., Supplier shall deliver to Customer binders or certificates of insurance showing that each policy of insurance which Supplier is required to maintain hereunder is in full force and effect and that the premium therefore has been paid in full and providing that such policies may not be canceled, supplemented, amended or modified before the expiration date thereof without issuing company giving at least thirty (30) days prior written notice to Customer.

INDEMNIFICATION -- Supplier shall, at its own expense, indemnify, defend and hold harmless Customer, Customer's parent, subsidiaries and affiliates and any additional indemnified parties that may be designated by Customer, together with the respective partners, agents, officers, directors and employees of all of the foregoing, from and against any loss, cost, expense, claim, injury or damage (including, without limitation, reasonable attorneys' fees and expenses), whether incurred due to third party claims or otherwise, arising or resulting from or caused by (i) any act or omission or willful misconduct of Supplier or any consultant, engineer or other party retained by Supplier or any of its or their partners, directors, officers, employees, agents or subcontractors; (ii) any breach or default by Supplier in the performance of any of its obligations under this Order, or (iii) any claim that any product and/or services furnished by or on behalf of Supplier, or the use thereof by Customer, constitutes  an infringement, misappropriation or unlawful use or disclosure of any intellectual property rights of a third party.

LIMITATION OF LIABILITY -- IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS ORDER; PROVIDED, HOWEVER, THAT THE FOREGOING LIMITATION OF LIABILITY WILL NOT APPLY TO ANY OF THE FOLLOWING:  (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS HEREUNDER; (B)  SUPPLIER'S BREACH OF ITS CONFIDENTIALITY OBLIGATIONS UNDER THIS ORDER; OR (C) ANY UNLAWFUL OR WILLFUL MISCONDUCT BY SUPPLIER.

RECORD RETENTION AND INSPECTION -- During the term of this Order and for a period of at least three (3) years after the date of the final payment under this Order, Supplier will maintain complete and accurate accounting records in connection with products provided and Services performed under this Order, in accordance with generally accepted accounting principles applied on a consistent basis, to substantiate its charges hereunder.  Such records will include, without limitation, payroll records, attendance cards, time tracking sheets and job summaries.  Supplier will provide Customer or its

**Signature not required on emailed Pos**

# Purchase Order
Pg 55 of 55

## Lehman Brothers - Americas
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

**Vendor:**  1000002908
ARCOT SYSTEMS, INC.
455 West Maude Avenue
Sunnyvale CA 94085

| CHANGE ORDER | | | Dispatch via E-Mail |
|---|---|---|---|
| **Purchase Order** | **Date** | **Revision** | **Page** |
| LBUSA-0000057496 | Jan-23-2008 | 1 - Aug-06-2008 | 4 |
| **Payment Terms** | **Freight Terms** | | **Ship Via** |
| Net 30 | Destination, PPD | | Common |
| **Buyer** | **Phone** | | **Currency** |
| Nuzzela,Danielle | 1 201 499 2721 | | USD |

**Ship To:**  70HXXVSOFT
70 Hudson Street
LEHMAN BROTHERS
Jersey City NJ 07302
United States

**Bill To:**  P.O. Box 2339
Secaucus NJ 07096
United States

---

Tax Exempt?  N        Tax Exempt ID:                Replenishment Option:  Standard

| Line-Sch  Item/Description | Mfg ID | Quantity UOM | PO Price | Extended Amt  Due Date |
|---|---|---|---|---|

designees access to such records for audit purposes during the term of this Order and for three (3) years after the date of the final payment under this Order.

BREACH/REMEDIES – In the event of any breach of this Order by Supplier, Customer may (reserving cumulatively all other remedies and rights under this Order, at law and in equity) terminate this Order, in whole or in part, by giving Supplier thirty (30) days' prior written notice of termination thereof; provided, however, that such termination will not be effective if Supplier has cured the breach of which it has been notified prior to the expiration of such thirty (30) day notice period. Additionally, Customer may terminate this Order for convenience by giving Supplier written notice specifying the termination date.  In such event, Customer will be obliged to pay Supplier at the agreed upon rates for all products and services accepted by Customer up to the effective date of termination, subject to a refund of any unearned, prepaid fees, but will not be liable for any other termination-related charges.

MISCELLANEOUS -- Except to the extent the parties have entered into an agreement covering the products and/or services provided hereunder (in which case such other agreement's terms shall apply), (a) this Order constitutes the entire agreement between the Customer and the Supplier and voids all prior agreements concerning the subject matter hereof; and (b) no modification, amendment, supplement to, or waiver of this Order or any of its provisions shall be binding upon the parties unless made in a writing duly signed by both parties, and specifically referencing these T&Cs, and stating that such modification, amendment, or supplement is made to modify, amend or supplement these T&Cs.  No amendment or modification to these T&Cs may be executed via electronic signatures unless the parties first agree in a writing that is not an electronic communication to be bound by electronic signatures.  Any purchase order printed on a form provided by Supplier may be used for convenience only, but these T&Cs shall solely control the terms of this Order, and any such terms contained on any form(s) received from Supplier shall be of no force and effect.  Failure or delay on the part of Customer to exercise any right hereunder shall not operate as a waiver thereof.  Any services performed by Supplier will be performed as an independent contractor, and Supplier will be solely responsible for any applicable payroll or income taxes.  This Order shall be governed under the laws of the State of New York, excluding its conflicts of laws rules.  If any term, provision or part of these T&Cs is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of these T&Cs will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.  Supplier may not assign this Order or delegate any of its responsibilities hereunder without the prior written consent of the Customer, and any such purported assignment or delegation shall be null and void.  Customer may freely assign this order to any affiliate, or to any entity acquiring all or substantially all of its assets or which is a successor by merger to Customer, or to any party acquiring that portion of Customer's business to which the products and/or services purchased or licensed under this Order pertain.  Any provision of this Order that contemplates performance or observance subsequent to termination or expiration of the Order (including confidentiality, limitation of liability, indemnification provisions and perpetual licenses) will survive termination or expiration of this Order and continue in full force and effect thereafter.

---

**Signature not required on emailed Pos**