UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- x
                                :

In re:                            :     Chapter 11
                                  :

LEHMAN BROTHERS HOLDINGS INC., *et. al.,*   :     Case No. 08-13555 (JMP)
                                  :

                Debtors.           :     (Jointly Administered)
                                  :
------------------------------------------------------- x

## STIPULATION AND ORDER GRANTING ADEQUATE PROTECTION

Lehman Brothers Holdings Inc. ("*LBHI*") and its affiliated debtor in the above referenced chapter 11 cases, Lehman Commercial Paper Inc. ("*LCPI*"), as debtors and debtors-in-possession (together, the "*Debtors*" and together with their debtor and non-debtor affiliates, "*Lehman*") and Sumitomo Mitsui Banking Corporation ("*SMBC*"), by and through their respective counsel hereby enter into this Stipulation and Agreed Order (this "*Stipulation*") and

THE PARTIES HEREBY STIPULATE AND THE COURT HEREBY FINDS as follows:

A.      Commencing on September 15, 2008 (the "*LBHI Commencement Date*") LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*").  On October 5, 2008 (the "*LCPI Commencement Date*") LCPI and certain other affiliates of LBHI commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code.

B.      Prior to the LBHI Commencement Date, LBHI, SMBC entered into a Loan and Security Agreement dated as of May 27, 2008 (the "*Loan Agreement*") pursuant to which SMBC made loans and other financial accommodations to LBHI, the proceeds of which are stated in the Loan Agreement to be used to finance assets owned by LCPI.

C.       Pursuant to the Loan Agreement, LCPI pledged to SMBC certain financial assets together with any and all replacements, substitutions, distributions on or proceeds thereof (the "*Collateral*") to secure LBHI's obligations to SMBC.  The Collateral includes, without limitation, the corporate loans identified on Exhibit A hereto (the "*Pledged Assets*").

D.       SMBC has valid, perfected, and unavoidable first priority liens upon and security interests in the Collateral.

E.       As of the LBHI Commencement Date, the principal amount of $350,000,000, together with accrued and unpaid interest in an amount equal to $573,307.29, was outstanding under the Loan Agreement (the "*Obligations*").

F.       LCPI hereby represents and warrants that (i) it is the sole legal and beneficial owner of the loan identified as Imperial Tobacco SFA 18 Jul 07 Term B Loan on Exhibit A (the "*Imperial Tobacco Loan*") and has good title to the Imperial Tobacco Loan, free and clear of any options, pledges, interests, mortgages, security interests, liens, claims, rights of first refusal, purchase or repurchase rights, or any other third party rights of any kind or nature, charges or other encumbrances or restrictions on or conditions to transfer or assignment of any kind, whether direct or indirect, absolute or contingent, matured or unmatured, liquidated or unliquidated, other than the claims and interests of SMBC under the Loan Agreement and (ii) as of the LCPI Commencement Date, LCPI was not the owner or beneficiary of, and as of the date hereof, is not the owner or beneficiary of, credit insurance or credit default protection in respect of the Pledged Assets.

G.       On October 15, 2008, SMBC filed a Motion for an Entry of an Order Pursuant to 11 U.S.C. §362(d) and Fed. R. Bankr. P. 4001 Granting Relief from the Automatic Stay to Foreclose on its Collateral (the "*Motion*") [LCPI Doc. No. 17].  On October 31, 2008, objections

to the Motion were filed by (i) LCPI [LBHI Doc. No. 1312], (ii) the Official Committee of

Unsecured Creditors [LBHI Doc. No. 1317] and (iii) an informal group of noteholders [LBHI

Doc. No. 1304] (the "*Objections*").  On November 4, 2008, SMBC filed a reply to the Objections

[LBHI Doc. No. 1356].  On November 5, 2008, this Court held a preliminary hearing on the

Motion.  On November 20, 2008, this Court held a status conference with respect to the Motion.

H.      The Debtors and SMBC have consented, subject to approval of this Court, to

resolve the Motion and the Objections, on the terms set forth below.

NOW, THEREFORE, IT IS HEREBY STIPULATED, AGREED, AND UPON COURT

APPROVAL HEREOF, IT IS ORDERED THAT:

1.      To adequately protect SMBC for any diminution in the value of the Collateral

from and after the LCPI Commencement Date resulting from the stay imposed under Section 362

of the Bankruptcy Code, and to enable the Debtors to reduce interest accrual, LCPI shall make

the following payments to SMBC: (a) within five (5) business days of the entry of this

Stipulation, an amount equal to $3,720,208.34 (accrued and unpaid interest from August 29,

2008 through December 1, 2008 at non-default rate), (b) on the last business day of each month,

an amount equal to accrued and unpaid interest on the unpaid principal amount of the

Obligations outstanding under the Loan Agreement at the non-default rate of interest set forth

therein, and (c) within five (5) business days following the later of (i) the entry of this Stipulation

and (ii) the date of receipt by LCPI thereof, an amount equal to any permanent principal

payments made to LCPI in respect of the Pledged Assets, including, without limitation, any

voluntary or mandatory prepayments received in connection with any refinancing (which

principal payments shall be applied to reduce the amount of the Obligations).   All such

payments shall be made in immediately available funds by wire transfer to an account identified by SMBC.

2.      As further adequate protection, (a) LCPI shall irrevocably sell, transfer, assign, grant and convey the Imperial Tobacco Loan and the related transferred rights to SMBC with effect on and after the date upon which the agent makes the transfer effective (the "*Effective Date*"); and (b) SMBC shall irrevocably acquire the Imperial Tobacco Loan, and assume and agree to perform and comply with all obligations and liabilities of LCPI with respect to, or in connection with, the Imperial Tobacco Loan resulting from facts, events or circumstances arising or occurring on or after the Effective Date (the "*Assumed Obligations*").  To accomplish the assignment of the Imperial Tobacco Loan, LCPI shall, within five (5) business days of the entry of this Stipulation, execute and deliver an LMA Transfer Agreement, substantially in the form attached hereto as <u>Exhibit B</u> (the "*Transfer Agreement*").  Subject to any payments made in respect of the Imperial Tobacco Loan pursuant paragraph 1(c), immediately upon the Effective Date, the amount of the outstanding Obligations shall be reduced by an amount equal to the product of (i) the U.S. dollar equivalent of the principal amount outstanding on the Imperial Tobacco Loan on the date that the Transfer Agreement is effective (exchange rate determined by reference to Bloomberg Benchmark Currency Rates), *multiplied* by (ii) .97.  Any transfer fee associated with the Transfer Agreement shall be split between LCPI and SMBC and paid by SMBC to the agent on or before the Effective Date.

3.      LCPI is authorized and directed, without further Order of this Court, to execute and deliver, and empowered and directed to perform under, consummate and implement, the terms of this Stipulation and the Transfer Agreement, together with all additional documents that may be reasonably necessary or desirable to consummate the transfer of the Imperial Tobacco

4

Loan to SMBC and to take all further actions as may be reasonably requested by SMBC for the purpose of performing its obligations under this Stipulation, including, without limitation, the assignment and transfer of the Imperial Tobacco Loan to SMBC.

4.       LCPI shall at all times hold the Collateral, other than cash, separate and identifiable from any other property of LCPI and shall mark its books and records to record SMBC's interests therein.

5.       LCPI shall promptly provide to SMBC copies of all loan documentation at any time in its possession relating to the Pledged Assets, including, without limitation, any promissory notes held in respect thereof.   LCPI shall promptly forward to SMBC copies of all information and materials received by LCPI in respect of the Pledged Assets, including, without limitation, all correspondence, financial statements, compliance certificates or other reporting, whether received from the underlying borrowers, agents or otherwise.

6.       LCPI shall provide to SMBC a schedule identifying any fixed payment dates for principal, interest and/or fees for each of the Pledged Assets.  On or before the last business day of each month, LCPI shall provide to SMBC a rolling schedule identifying for each of the Pledged Assets all amounts received by LCPI from and after the LCPI Commencement Date.

7.       LCPI shall at all times monitor and administer the Pledged Assets in a commercially reasonable manner.  On an ongoing basis, LCPI shall advise SMBC of the identity of the person or persons charged with such monitoring and administration and shall provide SMBC reasonable access to such person or persons.   LCPI shall consult reasonably and in good faith with SMBC concerning the management of the Pledged Assets.  LCPI shall not execute any amendments, waivers or other loan documents in respect of the Pledged Assets without first obtaining the consent of SMBC.

8.      Upon entry of this Stipulation, SMBC shall withdraw the Motion; provided, however, that SMBC reserves the right to seek additional adequate protection or relief from the stay after March 15, 2009.

9.      To the extent permitted under applicable law, the terms and provisions of this Stipulation shall be binding upon the Debtors and their successors and assigns, including, but not limited to, any trustee appointed in these cases, in any superseding case or in any case related hereto, and shall survive for the benefit of SMBC and the Debtors.

10.     The automatic stay imposed by Section 362 of the Bankruptcy Code shall be, and hereby is, lifted and vacated to the extent necessary, if any, to authorize the payments hereunder and to implement and effectuate the terms and conditions of this Stipulation.

11.     The Court shall retain jurisdiction to resolve any disputes or controversies arising from or related to this Stipulation.

12.     This Stipulation can only be amended or otherwise modified by a signed writing executed by the parties hereto.

13.     Each person who executes this Stipulation on behalf of a party hereto represents that he is duly authorized to execute this Stipulation on behalf of such party.

14.     This Stipulation may be executed in multiple counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

15.     If this Stipulation is not approved by the Bankruptcy Court, it shall be deemed

null and void and shall not be referred to or used for any purpose by any of the parties hereto or

any of the other parties in the Debtors' chapter 11 cases.


Dated:  December 16, 2008                          **WEIL, GOTSHAL & MANGES LLP**

                                                   By: /s/ Jacqueline Marcus__

                                                   767 Fifth Avenue
                                                   New York, New York 10153
                                                   Telephone: 212.310.8000
                                                   Facsimile: 212.310.8007

                                                   Attorneys for Debtors and Debtors in
                                                   Possession


                                                   **MAYER BROWN LLP**

                                                   By: /s/ Fredrick D. Hyman__

                                                   1675 Broadway
                                                   New York, New York 10019
                                                   Telephone: 212.506.2500
                                                   Facsimile: 212.262.1910

                                                   Attorneys for SMBC


Dated: New York, New York
       December 17, 2008

                                         __*s/ James M. Peck*_____
                                         UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT A**

| Credit Facility | Facility | Currency | Commitment | Outstanding |
|---|---|---|---|---|
| FORD MOTOR COMPANY (12/15/06) | 7-yr term | USD | 45,129,596.33 | 45,129,596.33 |
| TXU ENERGY (10/10/07) CITI | Term Loan E-2 | USD | 24,999,999.63 | 24,999,999.63 |
| TXU ENERGY (10/10/07) CITI | Term Loan E-3 | USD | 46,946,169.67 | 46,946,169.67 |
| US INVESTIGATION SERVICES 08/21/07 | Term Loan | USD | 79,373,496.68 | 79,373,496.68 |
| IMPERIAL TOBACCO SFA 18JUL07 | Term Loan B | EUR | 78,340,663.60 | 78,340,663.60 |
| CARLSBERG (27OCT07) | Term Loan A | GBP | 12,805,358.57 | 12,805,358.57 |
| CARLSBERG REFI (12OCT05) | Multi-Currency Revolver | EUR | 64,473,684.21 | 42,231,449.47 |
| WEST CORPORATION | Term Loan B-2 | USD | 19,142,811.76 | 19,142,811.76 |

**LMA TRADE CONFIRMATION (DISTRESSED/BANK DEBT)**

To:    Lehman Commercial Paper Inc.          Date:  December ____, 2008

Attention:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Transactions (Bank Debt/Claims) of the Loan Market Association ("LMA") as in effect on the Trade Date, which are incorporated herein by reference.

1.    **Credit Agreement Details:**

Borrower(s):  Imperial Tobacco Finance PLC and Imperial Tobacco Enterprise Finance Limited

Agent Bank: The Royal Bank of Scotland as Facility Agent

Date: 18 July 2007

Total Original Facility Amount:
•3,000,000,000

Original Lender:  ☐ Yes    ☒ No

Additional Information: _____

☐   Details of other credits are set out on the attached Schedule.

2.    **Trade Date:**  December ___, 2008

3.    **Settlement Date:**

☒   as soon as reasonably practicable

☐   no later than _____ unless otherwise extended by mutual consent of the Buyer and the Seller which consent shall not be unreasonably withheld

☐   _____ (being the date 20 business days after the Trade Date)

4.    **Seller:** Lehman Commercial Paper Inc.

As  ☒ principal

☐ agent for_____

5.    **Buyer:**  Sumitomo Mitsui Banking Corporation

As  ☒ principal

☐ agent for_____

6.    **Details of Traded Portion:**

Name of Tranche/Facility:

The B Term Loan Facility

Nature (Revolving, Term, Acceptances, Guarantee, Letter of Credit, Other):

Term _____

Final Maturity:

For the B Term Loan Facility, the date falling three years after the date of this Agreement _____

*Traded Portion of Commitment:*

•78,340,663.60

7.    **Pricing:**    Tranche/Facility

Name:    The B Term Loan Facility

Purchase Rate:  97%

8.    **Accrued Interest:**

☒   Settled Without Accrued Interest

☐   Trades Flat (accrued interest to Buyer)

☐   Other_____

9.    **Transfer Costs:** Recordation and Transfer fee payable by

☐   Buyer     ☐   Seller

☒   Buyer and Seller in equal shares

☐   N/A (Participations)

Stamp duties and/or other applicable transfer taxes and any costs attributable to transfer of security are payable by:

☐ Buyer    ☐ Seller

☒ Buyer and Seller in equal shares

☐ N/A (Participations)

(specify)    _____

10. **Form of Purchase:**

*Legal Transfer*

☒ Transfer Certificate in form prescribed by the Credit Agreement

☐ (Where there is no form of transfer provided under the Credit Agreement) Novation using LMA standard form of Transfer Agreement for distressed trades (Bank Debt)

☐ (Where there is no form of transfer provided under the Credit Agreement) Assignment Agreement using LMA standard form of Assignment Agreement for distressed trades (Bank Debt)

☐ Funded Participation using LMA standard form of Participation Agreement for distressed trades

☐ Legal Transfer only (*applicable only if the Seller and the Buyer do not wish to settle the transaction by a Funded Participation if as at the proposed Settlement Date a condition to a legal transfer remains unsatisfied*)

If this transaction settles by Funded Participation, the Participation Agreement will grant:

- Voting rights:    ☐ Yes    ☐ No

- Information rights:    ☐ Yes    ☐ No

If this transaction settles by Funded Participation the Participation Agreement will specify:

- Collateral for undrawn commitment:    ☐ Yes    ☐ No

To be prepared by:    ☐ Seller

☒ Buyer

12. **Credit Documentation to be provided by Seller:**

☐ Yes    ☒ No

13. **Process Agents:**

Buyer:    ☐ Yes    ☒ No

If yes, details of process agent:

Name:    _____

Address:    _____

_____

Seller:    ☐ Yes    ☒ No

If yes, details of process agent:

Name:    _____

Address:    _____

_____

14. **Other Terms of Trade:**

☒ The settlement of this transaction by (as the case may be) novation, assignment or funded participation is subject to the granting of any third party consents required under the terms of the Credit Agreement, or otherwise by law

☒ The Purchased Assets shall include the Retained Rights subject to (i) the granting of any third party consents required under the Predecessor Transfer Agreements (as specified in the Schedule hereto) and (ii) a satisfactory review by the Buyer of such Predecessor Transfer Agreements and the assignment to the Buyer of the Seller's right, title, interest and benefit in, to and under such Predecessor Transfer Agreements

The settlement of this transaction by (as the case may be) novation, assignment or funded participation shall also be subject to the successful completion of the purchase or participation by the Seller of the asset to be sold or participated hereunder

☐ The settlement of this transaction by (as the case may be) novation, assignment or funded participation shall also be subject to the successful completion of the sale or participation by the Buyer of the asset to be purchased or participated hereunder

☐ This transaction shall incorporate the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Original Lender) which are incorporated herein by reference

LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Secondary Lender) which are incorporated herein by reference

☒ This transaction shall be subject to the negotiation of mutually acceptable representations and warranties of the Seller with respect to the assets to be sold or participated hereunder

☒ This transaction incorporates Delayed Settlement Compensation

☐ _____

Please sign and return this letter to the attention of the contact person mentioned below no later than the close of business on December ____, 2008 at the fax number or electronic mail address mentioned below. Please note that, in accordance with the LMA Standard Terms and Conditions for Distressed Trade Transactions (Bank Debt/Claims), any disagreement with the terms set out above must be notified to us no later than this time.

If you have any questions, please contact _____ at _____ (tel no.).

| SELLER | BUYER |
|---|---|
| **Lehman Commercial Paper Inc.** | **Sumitomo Mitsui Banking Corporation** |
| Contact Person: | Contact Person: |
| Fax No.: | Fax No.: |
| E-mail: | E-mail: |
| Phone No.: | Phone No.: |
| By:_____ | By:_____ |
| Name: | Name: |
| Title: | Title: |
| Date: December ___, 2008 | Date: December ___, 2008 |

## TRANSFER CERTIFICATE

To:     The Royal Bank of Scotland as Facility Agent

From:   Lehman Commercial Paper Inc. (the **Existing Lender**) and Sumitomo Mitsui
        Banking Corporation (the **New Lender**)

                                                        Date:    [●]December 2008.

### IMPERIAL TOBACCO FINANCE PLC - 
### Credit Agreement dated 18 July 2007
### (the Agreement)

1.      We refer to the Agreement. This is a Transfer Certificate.

2.      The Existing Lender transfers by novation to the New Lender the Existing Lender's
        rights and obligations referred to in the Schedule below in accordance with the terms
        of the Agreement.

3.      The proposed Transfer Date is [●] December 2008

4.      The administrative details of the New Lender for the purposes of the Agreement are
        set out in the Schedule.

5.      This Transfer Certificate is governed by English law.


**EXISTING LENDER**                      **NEW LENDER**

**Lehman Commercial Paper Inc.**         **Sumitomo Mitsui Banking Corporation,**



By:                                      By:



The Transfer Date is confirmed by the Facility Agent as [●]December 2008.

**The Royal Bank of Scotland** as Facility Agent

By:

## THE SCHEDULE
### Rights and obligations to be transferred by novation

| Name of Existing Lender | A Term Loan Commitments (Euro) | B Term Loan Commitments (Euro) | A Revolving Credit Commitments (U.S. Dollars) |
|---|---|---|---|
| Lehman Commercial Paper Inc. | N/A | € 78,340,663.60 | N/A |
| **Total** | N/A | € 78,340,663.60 | N/A |

## Administrative Details of the New Lender

**Name of BANK/Fund**
**(Lender of Record)**

**Sumitomo Mitsui Banking Corporation**

Need to Insert SMBC's Admins

> For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.

## LOAN MARKET ASSOCIATION ("LMA")

## STANDARD TERMS AND CONDITIONS FOR DISTRESSED TRADE TRANSACTIONS (BANK DEBT/CLAIMS)

1. **APPLICABILITY OF CONDITIONS AND INTERPRETATION**

1.1 These Conditions shall apply to a distressed trade transaction in respect of which (a) they are incorporated by reference in the applicable Confirmation and (b) the Trade Date occurs on or after 1 February 2008 (the "**Revision Date**") and before the date on which they are superseded by revised conditions.

1.2 For the purpose of construing these Conditions in relation to a transaction to which they apply (the "**transaction**"):

"**Agents**" means any facility, security or other agent, trustee, representative or co-ordinator under the Credit Documentation and "**Agent**" shall be construed accordingly;

"**Agent's Expenses**" means any costs, liabilities, losses, claims, damages and expenses incurred by, and any indemnification of, any Agent or any person being a member of a steering committee, a co-ordinator or otherwise involved in any standstill or other arrangement in relation to the Borrower(s) for which such Agent or person has recourse under the Credit Documentation to the Seller but only to the extent attributable to or applicable by reference to the Purchased Assets or the Purchased Obligations;

"**Agreed Terms**" means the terms agreed between the Buyer and the Seller in relation to the transaction, as evidenced by the Confirmation;

"**Ancillary Rights and Claims**" means (to the extent that the same are capable of being or permitted to be assigned, or (in the case of a transaction which settles as a funded participation) capable of being or permitted to be made the subject of a funded participation, by the Seller in contract and under applicable law) all claims, suits, causes of action, and any other right of the Seller (including where such claims, suits, causes of action or other rights have been acquired by the Seller from its Predecessor-in-Title), whether known or unknown, against, any Obligor, or any of their respective affiliates, agents, representatives, contractors, advisors, or any other person that in any way is based upon, arises out of or is related to assets referred to in paragraph (a) of the definition of Purchased Assets, including all claims (in contract or in tort), suits, causes of action, and any other right of the Seller (including where such claims, suits, causes of action or other rights have been acquired by the Seller from its Predecessor-in-Title), against any auditor, legal, tax, financial or other professional advisor, or

other person arising under or in connection with the Credit Documentation but, excluding for the avoidance of doubt, the Retained Rights;

"**Average EURIBOR**" means, for the Delay Period, the result of dividing (i) the sum of all the individual EURIBORs for each day in the Delay Period by (ii) the total number of days in the Delay Period;

"**Average LIBOR**" means, for the Delay Period, the result of dividing (i) the sum of all the individual LIBORs for each day in the Delay Period by (ii) the total number of days in the Delay Period;

"**Benefit Plan**" means an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, a "plan" as defined in Section 4975 of the Code or any entity whose assets include (for purposes of United States Department of Labour Regulations Section 2510.3-101 as modified by Section 3(42) of ERISA or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan";

"**Business Day**" means a day (other than a Saturday or Sunday) on which banks are open for general business in London and New York City and, where the Traded Portion is denominated in euros, is a TARGET Day;

"**Buyer Warranties**" means the warranties, representations and indemnities made by, and the covenants and agreements of, the Buyer in the Agreed Terms;

"**Claim Impairment**" means (a) any right of any person or authority in respect of the Purchased Assets or any part thereof, the effect of which is or would be to reduce, impair or otherwise materially and prejudicially affect the Purchased Assets and the Purchased Obligations or any part thereof or any guarantee or Collateral thereto; or (b) any claim or action of any person or authority whatsoever in respect of the Purchased Assets or any part thereof, the effect of which, if determined adversely, is or would be to reduce, impair or otherwise materially and prejudicially affect the Purchased Assets and the Purchased Obligations or any part thereof or any guarantee or Collateral thereto; or (c) any right of set-off of any person in respect of the Purchased Assets;

"**Code**" means the United States Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated under it;

"**Collateral**" means any property, whether real or personal, tangible or intangible, of whatever kind and wherever located, whether now owned or hereafter acquired or created, in or over which an Encumbrance has been, or is purported to have been, granted to or for the benefit of the Lenders under the Credit Documentation;

"**Confirmation**" means the confirmation executed and delivered by the Seller and the Buyer in relation to the transaction;

"**Credit Agreement**" means the credit agreement to which the transaction relates as set out in the applicable Confirmation;

"**Credit Documentation**" means the Credit Agreement, together with all schedules and appendices thereto, any amendments, supplements, accessions, waivers, or variations thereto and all ancillary guarantee, security, intercreditor and restructuring documentation;

"**Delay Period**" means the period from (and including) the Delay Period Commencement Date to (but excluding) the Settlement Date;

"**Delay Period Commencement Date**" means the date twenty Business Days after the Trade Date;

"**Delayed Settlement Compensation**" means any amounts payable pursuant to Condition 9.2 (other than pursuant to Condition 9.2.4);

"**Encumbrance**" means any:

(a)     mortgage, pledge, lien, charge, hypothecation, security interest or other encumbrance, security agreement or security arrangement of any kind;

(b)     purchase or option agreement or arrangement;

(c)     subordination agreement or arrangement; or

(d)     agreements to create or effect any of the foregoing;

"**ERISA**" means the United States Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated under it;

"**EURIBOR**" means for any day, the percentage rate per annum determined by the Banking Federation of the European Union for a period of one month displayed on the appropriate page of the Reuters screen. If the appropriate page is replaced or service ceases to be available the Seller, acting reasonably, may specify another page or service displaying the appropriate rate;

"**Governmental Authority**" means any federal, state or other governmental agency or body, authority, administrative or regulatory body, arbitrator, court or other tribunal, foreign or domestic;

"**Group**" means, in respect of any person, such person and each of its holding companies and subsidiaries and each subsidiary of each of its holding companies (as each such term is defined in the Companies Act 1985 as from time to time amended or re-enacted);

"**Insolvency Officer**" means any receiver, administrator, liquidator, provisional liquidator, administrative receiver, trustee, supervisor of a voluntary arrangement, similar officer appointed pursuant to a scheme of arrangement under section 425 of the Companies Act 1985 (as from time to time amended or re-enacted) or similar officer

appointed under the Insolvency Act 1986 (as from time to time amended or re-enacted) or any other officer appointed under any other procedure under any law or any jurisdiction of, or having, similar or analogous powers over all or any of the assets of an Obligor;

"**Insolvency Proceedings**" means receivership, administration, liquidation, winding-up, dissolution or any insolvency procedure under the Insolvency Act 1986 (as amended or re-enacted from time to time) or any other procedure under any law of any jurisdiction having a similar or analogous nature or effect;

"**Lenders**" means the persons originally named as lenders in the Credit Agreement and their successors and assigns from time to time;

"**LIBOR**" means for any day, the British Bankers' Association Interest Settlement Rate for the relevant currency for a period of one month displayed on the appropriate page of the Reuters screen. If the appropriate page is replaced or service ceases to be available the Seller, acting reasonably, may specify another page or service displaying the appropriate rate;

"**Non-Cash Distribution**" means any note, debenture or other financial instrument, non-cash asset or right, whether debt, equity or otherwise, issued in satisfaction or purported satisfaction of any obligation of an Obligor to make any payment in respect of the Traded Portion or any part thereof;

"**Non-Recurring Fees**" means any fees that are to be paid to a Lender under the Credit Documentation (such as amendment, consent or waiver fees) that are not Recurring Fees in respect of the Traded Portion;

"**Obligor**" means the Borrower or, if more than one, each Borrower and each other obligor under the Credit Documentation;

"**Other Party**" means the counterparty to a transaction which is not the Responsible Party;

a "**person**" includes any person, firm, company, corporation, government, state or agency of a state or any association, trust or partnership (whether or not having separate legal personality) or two or more of the foregoing;

"**PIK Interest**" means any paid-in-kind interest, fees or other amounts which are compounded under the Credit Documentation and treated as outstanding principal amounts thereunder;

"**Predecessor-in-Title**" means any of the Seller's predecessors-in-title to the Purchased Assets or the Purchased Obligations or any part thereof;

"**Predecessor Transfer Agreements**" means all transfer agreements under which (a) the Seller and (b) any of the Seller's Predecessors-in-Title acquired the Purchased Assets or any part thereof;

"**Pricing Letter**" means any letter agreement made or to be made between the Seller and the Buyer that specifies the calculations for determining the Settlement Amount with respect to the Purchased Assets;

"**PTE**" means a prohibited transaction class exemption issued by the United States Department of Labour;

"**Purchased Assets**" means any and all of the Seller's right, title and interest in and to:

(a)     the advances, other utilisations (including letters of credit), claims and other rights of the Seller (including to any Non-Cash Distributions other than Non-Cash Distributions which are to be held by the Buyer as agent for the Seller pursuant to Clause 13.3) included in the Traded Portion of the Seller's participation under or in respect of the Credit Documentation together with any and all corresponding rights and benefits under any ancillary guarantee or security relating to the Traded Portion;

(b)     the Ancillary Rights and Claims; and

(c)     if the Agreed Terms provide for the assignment to the Buyer of the Seller's right, title, interest and benefit in, to and under the Predecessor Transfer Agreements, the Retained Rights,

provided that the Purchased Assets shall not include (i) any of the Seller's rights that are attributable to the Seller's rights in any capacity other than as a Lender; or (ii) unless sub-paragraph (c) immediately above applies, the Retained Rights;

"**Purchased Obligations**" means all of the obligations under the Credit Documentation expressly assumed or to be assumed by the Buyer from the Settlement Date in accordance with the provisions of the Transaction Documentation including without limitation the obligations of the Seller with respect to the Traded Portion but excluding the Retained Obligations;

"**Recurring Fees**" means fees (such as commitment, facility and letter of credit fees and commissions) that are expressed to accrue by reference to time elapsed in connection with the Traded Portion in accordance with the Credit Documentation;

"**Relevant Rate**" means: (i) in respect of a sum denominated in euros and where interest under the Credit Documentation in respect of sums denominated in euros is calculated using the percentage rate per annum determined by the Banking Federation of the European Union, the Average EURIBOR; and (ii) in any other case, the Average LIBOR;

"**Responsible Party**" means either the party responsible for preparing the Confirmation as agreed between the Seller and the Buyer on the Trade Date or the party responsible for preparing the Transaction Documentation as specified in the Confirmation, as the context may require;

"**Retained Obligations**" means, save as otherwise provided in the Agreed Terms, all obligations of the Seller (a) under the Credit Documentation that relate to facts, events or circumstances arising or occurring before the Settlement Date, (b) under the Predecessor Transfer Agreements (or, if the Agreed Terms provide that the Purchased Assets shall include the Retained Rights, under the Predecessor Transfer Agreements that relate to facts, events or circumstances arising or occurring before the Settlement Date and do not result from a breach by the Seller of the terms of any Predecessor Transfer Agreement), (c) that relate to a breach of any of the Seller Warranties, (d) that arise out of the Seller's bad faith, gross negligence or wilful misconduct, (e) unless the Agreed Terms provide that the Purchased Assets shall include the Retained Rights, that arise out of any Predecessor-in-Title's bad faith, gross negligence or wilful misconduct, (f) that do not relate to the Purchased Assets or (g) that are attributable to the Seller's actions or obligations in any capacity other than as a Lender;

"**Retained Rights**" means all of the Seller's right, title, interest and benefit in, to and under the Predecessor Transfer Agreements (but excluding, for this purpose, any Ancillary Rights and Claims acquired by the Seller from its Predecessor-in-Title);

"**Revision Date**" has the meaning given to it in Condition 1.1;

"**Seller Warranties**" means the warranties, representations and indemnities made by, and the covenants and agreements of, the Seller in the Agreed Terms;

"**Settlement Amount**" means the amount payable for the Purchased Assets pursuant to Condition 12;

"**Settlement Date**" means the date on which settlement of the transaction occurs.

"**TARGET**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises interlinked national real time gross settlement systems and the European Central Bank's payment mechanism and which began operations on 4 January 1999;

"**TARGET2**" means the Trans-European Automated Real-time Gross Settlement Express Transfer payment system which utilises a single shared platform and which was launched on 19 November 2007;

"**TARGET Day**" means:

(a)    until such time as TARGET is permanently closed down and ceases operations, any day on which both TARGET and TARGET2 are; and

(b)    following such time as TARGET is permanently closed down and ceases operations any day on which TARGET2 is,

open for the settlement of payments in euro;

"**Transaction Documentation**" means the documentation required to implement the transaction (including the agreed Form of Purchase and any Pricing Letter) and, "**Transaction Document**" shall be construed accordingly.

1.3     Other capitalised terms used in these Conditions shall have the meaning given to them in the Confirmation.

1.4     In the case of any inconsistency between the Confirmation and these Conditions, the Confirmation shall prevail.  If the parties agree to enter into a distressed trade transaction using an electronic medium (for example an internet website) then the terms applicable to that electronic medium shall prevail to the extent they are binding on the parties and are inconsistent with these Conditions.

1.5     A distressed trade transaction means a transaction for the sale or participation of a loan or other form of credit, or participation in a credit facility or a claim in relation to any of the foregoing, which the parties to a transaction, by applying these Conditions, designate as a distressed loan or other form of credit or claim at the time of trade.

1.6     Headings are for ease of reference only.

2.      **CONTRACT POINT**

A binding contract for the sale or participation by the Seller to the Buyer of the Purchased Assets shall, unless otherwise specified in the Agreed Terms, come into effect between the Seller and the Buyer upon oral agreement of the terms on the Trade Date and shall be documented and completed in accordance with Conditions 7, 8 and 9. The Seller and the Buyer acknowledge that events occurring subsequent to the Trade Date shall not relieve the parties of their obligations under the Confirmation.

3.      **CONFIRMATION**

Unless otherwise specified in the Agreed Terms, the Responsible Party shall send to the Other Party a form of Confirmation, duly completed, signed on behalf of the Responsible Party and substantially in the form most recently published by the LMA, not later than the second Business Day after the Trade Date and the Other Party shall sign, and return to the Responsible Party, the Confirmation not later than the fourth Business Day after the Trade Date.  The Other Party shall immediately and, in any event, not later than the close of business on the third Business Day after the Trade Date, raise with the Responsible Party any disagreement with any of the terms of such Confirmation.

4.      **SALE OF ANCILLARY RIGHTS AND CLAIMS/RETAINED RIGHTS**

4.1     Pursuant to these Conditions the Seller sells, assigns and conveys to the Buyer, and the Buyer purchases and accepts, the Ancillary Rights and Claims and, if the Agreed Terms provide for the same to be assigned, the Retained Rights, in each case with effect from the Settlement Date.

4.2     Condition 4.1 shall not apply to any transaction which settles as a funded participation.

5.    **CONDITIONALITY**

5.1    A transaction is subject to any conditions specified in the Agreed Terms and, subject to the next following sentence, the parties undertake with each other to use all reasonable endeavours to ensure that such conditions are duly fulfilled. Unless otherwise specified in the Agreed Terms, the Seller shall use all reasonable endeavours to obtain any required consents in connection with the transaction.

5.2    Subject to Condition 5.3, if, nevertheless, one or more of such conditions remains unfulfilled on the proposed Settlement Date, the transaction shall be settled on the terms of a funded participation (using the LMA recommended form of funded participation for distressed trades with such changes as are mutually agreed between the parties). If settlement of the transaction cannot be effected by a funded participation, the transaction shall be settled on the basis of an alternative structure or arrangement mutually acceptable to the Seller and the Buyer that provides the Seller and the Buyer with the economic equivalent of the agreed-upon trade. The Seller and the Buyer shall be under no obligation to settle a transaction by a funded participation if the Agreed Terms specify that the transaction is to be settled by "Legal Transfer only" but instead shall be obliged to settle the transaction on the basis of an alternative structure or arrangement mutually acceptable to the Seller and the Buyer which provides the Seller and the Buyer with the economic equivalent of the agreed-upon trade.

5.3    If the Agreed Terms provide that the transaction is to be settled by a legal transfer (whether by way of novation or assignment in accordance with the Credit Agreement or other form of transfer agreement) and that the Purchased Assets include the Retained Rights but any necessary third party consents to the transfer of the Retained Rights under the Predecessor Transfer Agreements have not been obtained by the proposed Settlement Date, then (with respect only to that portion of the Retained Rights for which consent to transfer cannot be obtained) the transaction shall be settled as a legal transfer with the Seller giving Predecessor-in-Title representations and warranties to the Buyer on the terms of the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Secondary Lender) and the Purchased Assets shall not include such Retained Rights.

6.    **DUE DILIGENCE**

6.1    Unless otherwise specified in the Agreed Terms, it shall be assumed that the Buyer shall have satisfied itself as to the creditworthiness of each Obligor and acceptability of the transaction prior to the Trade Date, and the transaction shall not be conditional upon this.

6.2    If the Agreed Terms specify that the Credit Documentation shall be delivered to the Buyer after the Trade Date then:

(a)    the Buyer shall sign and deliver to the Seller at its request a confidentiality agreement in the form prescribed by the Credit Documentation or, if no such

form is prescribed, in the then current recommended form of the LMA or such other form agreed between the Buyer and the Seller; and

(b)    subject to receipt of the confidentiality agreement where requested and to all necessary consents (if any) having been obtained, the Seller shall provide to the Buyer a true and complete copy of the Credit Documentation as promptly as practicable following the Trade Date.

6.3    If the Agreed Terms specify that the transaction shall be conditional upon the negotiation of mutually acceptable representations and warranties of the Seller with respect to the transaction, the Responsible Party shall endeavour to deliver to the Other Party within five Business Days after the Trade Date a draft set of representations and warranties to be made by the Seller with respect to the sale of the Purchased Assets and the Purchased Obligations to the Buyer. The Seller and the Buyer shall negotiate in good faith the terms of such representations and warranties and endeavour to agree the terms of the representations and warranties to apply to the transaction within fifteen Business Days after the Trade Date. The Agreed Terms shall be deemed to include the representations and warranties which the Seller and the Buyer agree shall apply to the transaction.

7.    **TRANSACTION DOCUMENTATION**

The Responsible Party shall prepare the Transaction Documentation on the agreed basis and, subject to any relevant conditions specified in the Agreed Terms, endeavour to deliver it to the Other Party within five Business Days after the Trade Date. The parties shall endeavour to execute the Transaction Documentation and, where appropriate, provide copies to the Agents as required under the Credit Documentation, within fifteen Business Days after the Trade Date.

8.    **INSOLVENCY PROCEEDINGS**

8.1    Where Insolvency Proceedings involving one or more Obligors have been commenced as at the Trade Date the Seller shall use all reasonable endeavours to provide the Buyer within ten Business Days after the Trade Date copies of any existing proofs of debt or other claims which have been submitted by or on behalf of the Seller.

8.2    The Seller shall notify the Buyer promptly upon becoming aware of the same of any Insolvency Proceedings that are commenced against any Obligor following the Trade Date and prior to the Settlement Date and shall use all reasonable endeavours to provide the Buyer with any proofs of debt or other claims which, prior to the Settlement Date, have been submitted by or on behalf of the Seller. The Seller may redact such proofs of debt or other claims to conceal information which does not relate to the Traded Portion and which is commercially sensitive to it.

8.3    To the extent that the same is received by the Seller on or prior to the Settlement Date and to the extent that the Seller is lawfully able to do so without breaching any duty of confidentiality or other obligation owed to any person, the Seller shall provide copies to the Buyer of:

(a)     any information circulated by an Agent to the Lenders generally which relates to Insolvency Proceedings which have been commenced against any Obligor; and

(b)     any information received by the Seller in connection with Insolvency Proceedings which have been commenced against any Obligor where such Seller has been admitted as a claimant in such Insolvency Proceedings in its own right and has received such information in its capacity as a claimant in such Insolvency Proceedings,

including (in each case and without limitation): details of deadlines for the submission of claims; the status of any notifications to any Insolvency Officer; and the status of any filings of any proof of debt or other claim against any Obligor relating to the Purchased Assets.

## 9.     SETTLEMENT DATE AND PAYMENT

9.1     The Seller and the Buyer shall use all reasonable endeavours to settle the transaction on the settlement date specified in the Agreed Terms. If no settlement date is specified in the Agreed Terms, the Seller and the Buyer shall use all reasonable endeavours to settle the transaction as soon as reasonably practicable.

9.2     If the Agreed Terms specify that the transaction incorporates Delayed Settlement Compensation then, if the transaction settles after the Delay Period Commencement Date, the parties shall pay Delayed Settlement Compensation for each day during the Delay Period as set out below:

9.2.1     The Buyer shall pay to the Seller (or if the Seller is required to pay the Buyer the Settlement Amount pursuant to Condition 12 the Seller shall pay the Buyer) on the Settlement Date an amount equal to interest that would accrue for each day during the Delay Period at the Relevant Rate on an amount (the "**Original Settlement Amount**") (subject to Condition 9.2.2) equal to the Settlement Amount calculated as of the Delay Period Commencement Date pursuant to Condition 12, but without being adjusted to take account of:

(a)     any applicable recordation, processing, transfer or other fee and Agent's Expenses; and

(b)     any Delayed Settlement Compensation.

9.2.2     If the Settlement Amount calculated as of the Settlement Date pursuant to Condition 12 (but without being adjusted to take account of:

(a)     any applicable recordation, processing, transfer or other fee and Agent's Expenses; and

(b)     any Delayed Settlement Compensation),

differs by a factor of more than 25% from the Original Settlement Amount, then the payment of Delayed Settlement Compensation pursuant to Condition 9.2.1 shall be calculated on a daily basis based on the Settlement Amount calculated pursuant to Condition 12 on each day during the Delay Period (but without being adjusted to take account of:

(a)    any applicable recordation, processing, transfer or other fee and Agent's Expenses; and

(b)    any Delayed Settlement Compensation).

9.2.3    If **"Settled Without Accrued Interest"** is specified in the Agreed Terms, then the Seller shall pay the Buyer on the Settlement Date an amount equal to any interest or Recurring Fees (based on contractual rates, as set forth in the Credit Documentation) accrued in respect of the Traded Portion and attributable to the Delay Period, whether or not the Seller has received payment of such amounts from an Obligor.

9.2.4    If the relevant Obligor does not pay on the scheduled payment date or within any applicable grace period (each as specified in the Credit Documentation as in effect on the Trade Date) or, if no such grace period exists, the expiration of thirty days from such date any interest or Recurring Fees an amount equal to which was paid or credited to the Buyer on the Settlement Date then the Buyer shall, upon demand by the Seller, pay the Seller an amount equal to such interest or Recurring Fees that were not paid to the Seller plus interest on such amount (from (and including) the day the Seller makes payment pursuant to Condition 9.2.3 to (but excluding) the day the Buyer makes such payment) at EURIBOR (in respect of sums denominated in euros) or LIBOR (in respect of any other sum) (in each case determined on the day the Buyer makes such payment) applied on a daily basis.

9.2.5    If all or part of such interest or Recurring Fees are settled in favour of the Seller by way of a Non-Cash Distribution, the Seller shall hold such Non-Cash Distribution as agent of the Buyer and, as soon as practicable thereafter (but not earlier than the Settlement Date) and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution registered in the name of the Buyer (or such other name or names as the Buyer may reasonably and lawfully require) and until it does so (but not earlier than the Settlement Date), the Seller shall account to the Buyer for any income or other sums yielded in respect of such Non-Cash Distribution.    Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Buyer.

9.3    The action necessary to complete the transaction shall include the payment for the Purchased Assets on the Settlement Date.

9.4    Where the transaction is to take effect as a funded participation, any payment in respect of the principal amount of the Purchased Assets shall be by way of limited recourse loan by the Buyer to the Seller on the terms of the applicable Transaction Documentation.

10.    **PURCHASE AMOUNT**

Unless the Agreed Terms and/or the Credit Documentation otherwise provide, the amount of the Purchased Assets to be sold or participated by the Seller to the Buyer shall be allocated *pro rata* to the facilities provided under the Credit Agreement, including revolving credit, acceptance credit, letter of credit and term loan facilities and, within each facility, *pro rata* to the tranches thereof, if more than one.

11.    **PERMANENT REDUCTION**

The economic benefit of permanent commitment reductions and permanent repayments of principal applicable to the Purchased Assets under the Credit Documentation (collectively "**Permanent Reductions**") shall be treated in accordance with the Settlement Amount Calculation (see Condition 12 below).

12.    **SETTLEMENT AMOUNT CALCULATION**

12.1    The amount payable for the Purchased Assets shall be equal to the Purchase Rate multiplied by the funded principal amount of the Purchased Assets as of the Settlement Date less:

(a)    (100% minus the Purchase Rate) multiplied by the unfunded portion of the Purchased Assets as of the Settlement Date;

(b)    (100% minus the Purchase Rate) multiplied by any Permanent Reductions which occur in respect of the Purchased Assets on or after the Trade Date and on or before the Settlement Date; and

(c)    without double counting, any Non-Recurring Fees received by the Seller on or before the Settlement Date to which the Buyer is entitled pursuant to the Agreed Terms,

adjusted to take account of any Delayed Settlement Compensation and any applicable recordation, processing, transfer or other fee and Agent's Expenses which under the Agreed Terms is to be payable by either party.

12.2    If the amount is positive it shall be payable by the Buyer to the Seller; if negative the absolute value of the amount shall be payable by the Seller to the Buyer.

12.3    Where any amounts are to settle in more than one currency on any day the appropriate calculation and payment shall be made in respect of each relevant currency in accordance with this Condition 12.

13.    **INTEREST PAYMENTS AND FEES**

13.1    All interest and all Recurring Fees are based on contractual rates, as set forth in the Credit Documentation. Unless the Agreed Terms otherwise provide, the fees to which the Buyer shall be entitled in all cases in accordance with this Condition 13 shall include all Non-Recurring Fees paid or capitalised on or after the Trade Date in respect of the Traded Portion.

13.2    Subject to the Agreed Terms, all PIK Interest shall be allocated on a 'trades flat' basis as follows (regardless of how cash interest and Recurring Fees are allocated): (a) PIK Interest that is capitalised prior to the Trade Date shall be included in the Traded Portion and shall be treated as part of the funded principal amount of the Purchased Assets for the purposes of Condition 12; (b) PIK Interest that is capitalised on or after the Trade Date shall be for the account of the Buyer for no additional consideration; and (c) PIK Interest that has accrued but not yet capitalised as of the Settlement Date shall be for the account of the Buyer upon capitalisation for no additional consideration.

13.3    If "Settled Without Accrued Interest" is specified in the Agreed Terms then, subject to Condition 9.2, any interest or Recurring Fees accrued up to but excluding the Settlement Date (the "Seller's Portion") shall be for the account of the Seller. Upon receipt by the Buyer from any Obligor of any interest or Recurring Fees in respect of the Seller's Portion, the Buyer shall promptly (and, in any event, within two Business Days of receipt) pay to the Seller an amount equal to the amount of such interest or Recurring Fees except where such payment by such Obligor is made (a) after the due date thereof or the expiration of any applicable grace period, each as specified in the Credit Documentation as in effect on the Trade Date (or, if no such grace period exists, the expiration of thirty days from such date), or (b) after a default in connection with any other payment obligations of such Obligor or any other Obligor under the Credit Documentation (irrespective of any subsequent remedy or waiver of such default), in which case such accrued amounts (if and when paid by the Obligor(s)) and any other accrued amounts due thereafter shall be for the account of the Buyer and the Seller shall not be entitled to any part thereof. If, for any reason, the Seller receives any such amounts the Seller shall promptly (and in any case within two Business Days of receipt) pay the same to the Buyer. If the Buyer receives a Non-Cash Distribution in respect of the Seller's Portion, the Buyer shall hold such Non-Cash Distribution as agent of the Seller and, as soon as practicable thereafter and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution registered in the name of the Seller (or such other name or names as the Seller may reasonably and lawfully require) and until it does so, the Buyer shall account to the Seller for any income or other sums yielded in respect of such Non-Cash Distribution. Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Seller. If the Seller receives a Non-Cash Distribution that is for the account of the Buyer, the Seller shall hold such Non-Cash Distribution as agent of the Buyer and, as soon as practicable thereafter and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution

registered in the name of Buyer (or such other name or names as the Buyer may reasonably and lawfully require) and until it does so, the Seller shall account to the Buyer for any income or other sums yielded in respect of such Non-Cash Distribution. Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Buyer.

13.4    Partial payments of interest shall be applied to payment dates *pro rata* to the amounts due on such payment dates (unless otherwise specified in the Credit Documentation).

13.5    If "**Trades Flat**" is specified in the Agreed Terms any interest, Recurring Fees or other fees paid by any Obligor on or after the Trade Date in respect of the Traded Portion shall be for the account of the Buyer and the Buyer shall not be obliged to make any payment to the Seller in respect of interest, Recurring Fees or any other fees, either on the Settlement Date or on receipt of any such interest, Recurring Fees or other fees. If the Seller receives any interest, Recurring Fees or other fees which are for the account of the Buyer, the Seller shall promptly (and, in any event, within two Business Days of receipt but not earlier than the Settlement Date) pay the same to the Buyer.  If any interest, Recurring Fees or other fees are settled in favour of the Seller by way of a Non-Cash Distribution, the Seller shall hold such Non-Cash Distribution as agent of the Buyer and, as soon as practicable thereafter  (but not earlier than the Settlement Date) and to the extent permitted by the Credit Documentation, have such Non-Cash Distribution registered in the name of the Buyer (or such other name or names as the Buyer may reasonably and lawfully require) and until it does so (but not earlier than the Settlement Date), the Seller shall account to the Buyer for any income or other sums yielded in respect of such Non-Cash Distribution.  Any transfer or registration fees payable in connection with the registration of such Non-Cash Distribution shall be for the account of the Buyer.

13.6    The Seller shall not be obliged to make any payment of interest, Recurring Fees or other fees or account for any Non-Cash Distribution to the Buyer under Condition 13.5 unless and until it has first received payment or such Non-Cash Distribution from the relevant Obligor or, if the Seller is not a lender of record in respect of the Traded Portion, its Predecessor-in-Title, provided that:

(a)    The Seller shall enforce its rights against its Predecessor-in-Title and take all steps reasonably available to it to recover any sums (including Non-Cash Distributions) due to the Seller from and unpaid or unissued by its Predecessor-in-Title under its Predecessor Transfer Agreement as if, in spite of the transaction specified in the Agreed Terms, the Seller remained the sole legal and beneficial owner of any interest, Recurring Fees, other fees or Non-Cash Distributions payable or due in respect of the Traded Portion; and

(b)    the Seller shall be obliged to make payment of interest, Recurring Fees or other fees and account for the benefit of any Non-Cash Distributions to the Buyer under Condition 13.5 in respect of any amounts paid or Non-Cash Distributions issued by the relevant Obligor but not received by the Seller if the cause of non-receipt or any shortfall in receipt by the Seller arises from

any limitation in the terms of its Predecessor Transfer Agreement regarding the Seller's entitlement to such sums (including Non-Cash Distributions) which does not form part of the Agreed Terms with the Buyer.

14.   **BREAKFUNDING**

No breakfunding compensation shall be paid for settlement of any transaction under these Conditions.

15.   **AGENT'S EXPENSES**

15.1   The Seller shall be responsible for and shall promptly pay any Agent's Expenses incurred or arising under or in connection with the Credit Documentation which are chargeable to the period up to but excluding the Settlement Date or, if Trades Flat is specified in the Agreed Terms, the Trade Date (except for, in each case, any fee or other amount referred to in Condition 16 below arising in connection with this Agreement), and shall, without limiting the generality of the foregoing, promptly pay on demand such Agent's Expenses attributable to the Purchased Assets or Purchased Obligations which have accrued but have not yet been billed or invoiced prior to the Settlement Date or, if Trades Flat is specified in the Agreed Terms, the Trade Date.

15.2   The Buyer shall be responsible for and shall promptly pay all other Agent's Expenses.

16.   **TRANSFER COSTS**

16.1   The Seller shall pay any recordation, processing, transfer or similar fee payable to the Agents under the Credit Documentation in connection with the transaction to the Agents:

(a)   if the Agreed Terms provide that all or part of such fee is to be payable by the Buyer, promptly following receipt by the Seller of the whole or such part (as applicable) of such fee from the Buyer or, if later, on the date upon which such fee is payable under the Credit Documentation; or

(b)   otherwise, on the date upon which such fee is payable under the Credit Documentation.

16.2   Unless otherwise specified in the Agreed Terms or these Conditions, any stamp duties, stamp duty reserve tax and any other applicable transfer taxes and duties (including notarial fees) and any costs attributable to the transfer or perfection of Collateral are payable by the Buyer.

17.   **COSTS AND EXPENSES**

Unless otherwise specified in the Agreed Terms, each of the Buyer and the Seller shall bear its own respective out-of-pocket costs and expenses (including legal expenses) in connection with any transaction.  The Buyer shall be responsible for any costs, fees and expenses in respect of the Purchased Assets that are chargeable under the terms of

the Credit Documentation to any period after Settlement Date or, if Trades Flat is specified in the Agreed Terms, the Trade Date.

18.    **PRINCIPAL/AGENCY STATUS**

18.1    Each of the Buyer and the Seller shall indicate whether it is acting as a principal or an agent in the transaction. A Buyer or Seller that holds itself out as a "principal" is directly liable for the completion of the transaction. A principal may, however, specify in the Agreed Terms that its obligation to complete the transaction is subject to successful completion of the purchase or participation from, or sale or participation to a third party of the Purchased Assets.

18.2    A Buyer or Seller that holds itself out to a counterparty as an "agent" acts on behalf of one or more principals to the transaction and is not itself a party to the transaction. Accordingly, a Buyer or Seller that holds itself out as an agent: (a) is not liable to such counterparty for the successful completion of the transaction (unless otherwise specified in the Agreed Terms); and (b) for the avoidance of doubt, shall have no liability or obligation to such counterparty in connection with the transaction other than (i) in circumstances where it does not have authority to bind its principal(s) to the transaction or (ii) pursuant to any confidentiality agreement entered into by it in connection with the transaction. However, a Buyer or Seller that indicates its status as an agent does represent to the counterparty its authority to bind its principal(s) to the transaction (which principal(s) shall be bound as if it/they were named as **"Buyer"** or **"Seller"** as the case may be) and shall provide the counterparty with evidence of that authority if requested to do so.

19.    **NON-RELIANCE AND INDEPENDENT INVESTIGATION**

19.1    Each party acknowledges to the other that it is a sophisticated Buyer or Seller (as the case may be) with respect to the transaction and has such information as it deems appropriate under the circumstances (however obtained), concerning for example the business and financial condition of the Obligor(s) under the Credit Documentation, to make an informed decision regarding the transaction. Each of the Buyer and the Seller hereby agrees that it has made its own independent analysis and decision to enter into the transaction, based on such information as it has deemed appropriate under the circumstances, and without reliance on the other party (except for reliance on any express representation made by the other party in the Agreed Terms, pursuant to these Conditions or in the Form of Purchase).

19.2    Except only as otherwise specified in the Agreed Terms (including Condition 20) or expressly set out in the Form of Purchase, the Seller does not make, and the Buyer does not rely upon, any representation, warranty or condition (express or implied) about, and the Seller shall have no liability or responsibility to the Buyer for, the effectiveness, validity or enforceability of the Credit Documentation (other than against the Seller by reason of any lack of authority or capacity of, or due execution by, the Seller), or other documentation delivered by the Seller to the Buyer, or any of the terms, covenants or conditions contained in the Credit Documentation or other

documentation, or any non-performance by any party to it (other than the Seller), or the financial condition of any Obligor under the Credit Documentation.

19.3    The Seller and the Buyer agree that:

(a)    the Seller shall have no obligation to repurchase or reacquire all or any part of the Purchased Assets from the Buyer or to support any losses directly or indirectly sustained or incurred by the Buyer for any reason whatsoever, including the non-performance by any Obligor of its obligations under the Credit Documentation; and

(b)    any rescheduling or renegotiation of the Purchased Assets that occurs on or after the Trade Date shall be for the account of, and the responsibility of, the Buyer, who will be subject to the rescheduled or renegotiated terms.

19.4    Each of the Buyer and the Seller acknowledges and agrees that the other may possess material information not known to it. Each agrees that the other shall have no liability with respect to the non-disclosure of any such information except to the extent that such information renders inaccurate an express representation made pursuant to the Agreed Terms or these Conditions by the party possessing such information.

20.    **REPRESENTATIONS AND UNDERTAKINGS**

20.1    Each of the Buyer and the Seller as of the Trade Date and the Settlement Date represents and undertakes to the other that:

(a)    it is duly organised and validly existing under the laws of the jurisdiction in which it is incorporated;

(b)    it has the power to enter into the transaction and to execute and deliver the Confirmation and the Transaction Documentation;

(c)    its obligations in relation to the transaction constitute legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application);

(d)    in the case of the Buyer only, it will not use any information received by it from the Seller in relation to the Obligors, or the Purchased Assets for any unlawful purpose or in breach of any confidentiality agreement entered into by it in connection with the transaction;

(e)    no broker, finder or other person acting pursuant to the instructions of one party is entitled to any broker's fee or other commission in connection with the transaction for which the other party may be responsible; and

(f)    other than as specified in the Confirmation, no notice to, registration with, consent or approval of or any other action by any relevant Governmental

Authority is or will be required for it to execute, deliver, and perform its obligations under the Agreed Terms.

20.2    If the Agreed Terms specify that the transaction shall be subject to one set of the LMA Standard Representations and Warranties for Distressed Trade Transactions, the Seller as of the Settlement Date represents and undertakes to the Buyer the representations and warranties set out therein which are in addition to the representations set out in Condition 20.1. Any of the Seller's Warranties which are qualified by reference to the Seller's state of knowledge or awareness shall be deemed to be qualified by reference to the state of knowledge or awareness of those of its officers directly responsible for the administration of the Traded Portion.

20.3    If the Agreed Terms specify that the Purchased Assets shall include the Retained Rights:

(a)     the Seller represents and warrants to the Buyer that the Seller has provided to the Buyer a true, complete and accurate copy of each Predecessor Transfer Agreement to which the Seller is a party and the remaining Predecessor Transfer Agreements to the extent and in the form received by the Seller from its immediate Predecessor-in-Title; and

(b)     to the extent that the Agreed Terms specify that the transaction shall be subject to the LMA Standard Representations and Warranties for Distressed Trade Transactions (Bank Debt/Secondary Lender), the representations contained therein made with respect to a Predecessor-in-Title shall not apply.

20.4    The Buyer represents and warrants to and agrees with the Seller that either (a) no interest in the Purchased Assets is being acquired by or on behalf of a person who is, or at any time while the Purchased Assets are held thereby will be, one or more Benefit Plans or (b) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the purchase and holding of the Purchased Assets and the exercise of the Buyer's rights thereunder.

20.5    The Seller represents and warrants to and agrees with the Buyer that either (a) no interest in the Purchased Assets is being sold by or on behalf of a person who is one or more Benefit Plans or (b) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank

collective investment funds), and PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers) is applicable with respect to the sale of the Purchased Assets.

20.6    All express representations made by the parties pursuant to the Agreed Terms and these Conditions shall survive the execution and delivery of the Transaction Documentation and consummation of the transactions contemplated therein.

21.    **DEFAULT AND INDEMNITIES**

21.1    The Seller shall indemnify, defend and hold the Buyer and its officers, directors and employees and agents harmless from and against any liability, claim, cost, loss, damage or expense (including, without limitation, reasonable legal fees and disbursements and VAT thereon), or judgments which they (or any of them) incur or suffer as a result of:

(a)    the Seller's breach of any of the provisions of the Agreed Terms or the Transaction Documentation; or

(b)    the breach of any of the Seller Warranties; or

(c)    the failure by the Seller to perform any of its obligations under the Credit Documentation and, where the Purchased Assets include the Retained Rights, the Predecessor Transfer Agreements during the period prior to the Settlement Date; or

(d)    any obligation of any party or entity to, in whole or in part, disgorge, or reimburse any party or entity for, payments or property received, effected by or applied for the account of the Seller or (unless the Purchased Assets include the Retained Rights) any of its Predecessors-in-Title under or in connection with the Purchased Assets.

21.2    The Buyer shall indemnify, defend and hold the Seller and its respective officers, directors, employees and agents harmless from and against any liability, claim, cost, loss, damage or expense (including, without limitation, reasonable legal fees and disbursements and VAT thereon) or judgments which they (or any of them) incur or suffer as a result of:

(a)    the Buyer's breach of any of the provisions of the Agreed Terms or the Transaction Documentation; or

(b)    the breach of the Buyer Warranties by the Buyer; or

(c)    the failure by the Buyer to perform any of the Purchased Obligations from the Settlement Date; or

(d)    any obligation of the Seller, in whole or part, to disgorge, or reimburse any party or entity for, payment or property received or applied by the Seller or the Buyer for the account of the Buyer under or in connection with the

Purchased Assets (save in the case of an obligation of the Seller, where such obligation arose from a breach of the warranties of the Seller under the Credit Agreement or the Seller Warranties or from (except where the Purchased Assets include the Retained Rights) a corresponding breach by any Predecessor-in-Title).

21.3    Each indemnity in the Agreed Terms is a continuing obligation, separate and independent from the other obligations of the parties and survives termination of the transaction and it is not necessary for a party to incur expense or make payment before enforcing a right of indemnity conferred by the Agreed Terms, provided that no party thereto shall be obliged to indemnify any other party to the Agreed Terms if the loss of the indemnified party is due to the negligence or wilful misconduct of such other party.

22.    **CONFIDENTIALITY**

Both parties shall maintain the confidentiality of the terms of the transaction and the Transaction Documentation unless otherwise required by law or regulation. Each of the Seller and the Buyer shall be permitted to make any necessary disclosures to members of its respective Group subject to the same confidentiality constraints. The Buyer shall additionally be permitted to make any necessary disclosures to prospective purchasers from the Buyer regarding the terms of the transaction (other than the Purchase Rate or other pricing arrangements) and to its or their professional advisers and auditors regarding the terms of the transaction and in connection with the enforcement of a party's rights and obligations hereunder subject, in each case, to the same confidentiality constraints. If there is any inconsistency between this Condition and any confidentiality agreement entered into between the parties, the terms of that confidentiality agreement shall prevail.

23.    **TAX**

The Buyer acknowledges that it is responsible for making its own independent tax analysis of the Credit Documentation and the transaction.

24.    **SET-OFF**

Either party may (but is not obliged to) set off any amount due and payable by the other party under the transaction against any such amounts due and payable by it to the other party thereunder. The party exercising its rights under this provision may effect such currency exchanges as it considers necessary to implement the set-off.

25.    **FURTHER ASSURANCE**

Each of the parties agrees, at its own expense, to take any further action and to execute any further documents and/or instruments as the other may reasonably request to give effect to the transaction.

26.  **WITHHOLDING**

All payments made under these Conditions and the Transaction Documentation shall be made free and clear of any deduction or withholding save for such deduction or withholding as may be required to be made from such payments by any law, regulation or practice.

27.  **ASSIGNMENT**

Unless the Agreed Terms provide that the Purchased Assets shall include the Retained Rights or that a party's rights under the Agreed Terms or the Transaction Documentation shall be freely assignable, neither the Seller nor the Buyer may assign the benefit of all or any part of its rights against the other party under the Agreed Terms or the Transaction Documentation in respect of the transaction without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

28.  **THIRD PARTY RIGHTS**

A person who is not a party to the Confirmation or other Transaction Document has no rights under the Contracts (Rights of Third Parties) Act 1999 to enforce or to enjoy the benefit of any term of the Confirmation or other Transaction Document.

29.  **GOVERNING LAW AND JURISDICTION**

29.1  The transaction, the Agreed Terms and these Conditions shall be governed by English law, and the parties submit to the non-exclusive jurisdiction of the English courts.

29.2  The Seller and the Buyer each irrevocably appoints the person described as its process agent (if any) in the Agreed Terms to receive on its behalf service of any action, suit or other proceedings in connection with the transaction, the Agreed Terms or these Conditions. If any person appointed as process agent ceases to act for any reason the appointing party shall notify the other party and shall promptly appoint another person incorporated within England and Wales to act as its process agent.

30.  **EXECUTION IN COUNTERPARTS AND BY FAX OR EMAIL**

30.1  Any Confirmation, confidentiality agreement or other Transaction Document may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of the Confirmation, confidentiality agreement or other Transaction Document.

30.2  Transmission by fax of an executed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart. Transmission by electronic mail of an electronically scanned signed counterpart of a Confirmation, confidentiality agreement or any other Transaction Document shall be deemed to constitute due and sufficient delivery of such counterpart. Unless otherwise agreed, the Buyer and the Seller shall deliver to each other an original counterpart of the Transaction Documents (and, upon the request of either party, the Confirmation, confidentiality agreement or any other document) promptly after delivery by fax or electronic mail.

For the avoidance of doubt, this document is in a non-binding, recommended form. Its intention is to be used as a starting point for negotiation only. Individual parties are free to depart from its terms and should always satisfy themselves of the regulatory implications of its use.

# LOAN MARKET ASSOCIATION

## STANDARD REPRESENTATIONS AND WARRANTIES FOR DISTRESSED TRADE TRANSACTIONS (BANK DEBT/SECONDARY LENDER)

1.    **APPLICABILITY OF REPRESENTATIONS AND WARRANTIES AND INTERPRETATION**

1.1    These representations and warranties shall apply to a distressed trade transaction in respect of which they are incorporated by reference in the applicable Confirmation and are made as of the Settlement Date.

1.2    Capitalised terms used herein shall have the meaning given to them in the Confirmation.

1.3    Any representation or warranty of the Seller regarding the actions, conduct or omission of or otherwise relating to any Predecessor-in-Title shall be deemed to be a representation or warranty as to the state of affairs that existed as at the date such Predecessor-in-Title disposed of the Traded Portion.

1.4    Where the Purchased Assets include the Retained Rights, the Seller makes no representations or warranties regarding the actions, conduct or omission of or otherwise relating to any Predecessor-in-Title and Section 2 below shall be construed accordingly.

2.    **SELLER'S REPRESENTATIONS AND WARRANTIES**

2.1    the Seller is the sole legal and beneficial owner of, and has good title to, the Purchased Assets and the Purchased Obligations, free and clear of any Encumbrances save for such Encumbrances as may be contained in any of the Credit Documentation and the Seller conveys the Purchased Assets with full title guarantee (but excepting any Encumbrance contained in any of the Credit Documentation) and the Seller has not made any prior sale, transfer or sub-participation of its interest in the Purchased Assets which is subsisting;

2.2    other than the Credit Documentation, there are no other documents executed by the Seller or any of its Predecessors-in-Title which would materially and adversely affect the Purchased Assets or the Purchased Obligations and (other than the Predecessor Transfer Agreements, the Confirmation and as contemplated by the Confirmation) neither the Seller nor any of its Predecessors-in-Title has executed any Credit Documentation or documents relating to the Credit Documentation which have not also been executed by or on behalf of the Lenders (of the same class as the Seller and its Predecessors-in-Title) generally;

2.3    the amounts utilised in calculating the Settlement Amount for the Purchased Assets in the Pricing Letter are true and correct as of the date thereof and any PIK Interest that capitalised to the principal amount of the Purchased Assets on or after the Trade Date but on or prior to the Settlement Date is specified in the Pricing Letter and is a proportionate share of the PIK Interest

that capitalised to the Seller's participation under or in respect of the tranche or facility from which the relevant Traded Portion derives;

2.4    except where the Seller and the Buyer have agreed in the Agreed Terms that the Buyer will not be provided with the Credit Documentation, the Seller has provided to the Buyer on or prior to the Settlement Date (i) the Credit Agreement and all intercreditor agreements, subordination agreements and material waivers and amendments executed in connection therewith in each case as currently in effect and (ii) any other Credit Documentation reasonably requested by the Buyer;

2.5    the Seller and each of its Predecessors-in-Title have fulfilled all of their material obligations and satisfied all of their material liabilities under the Credit Documentation which have fallen due for performance or satisfaction;

2.6    neither the Seller nor any of its Predecessors-in-Title is or has been at any time "connected" with any Obligor as such term is used in the Insolvency Act 1986 as amended or re-enacted from time to time (or any similar provision in any relevant jurisdiction);

2.7    neither the Seller nor any of its Predecessors-in-Title has engaged in any acts or conduct, or made any omissions, independently of the other Lenders that would result in the Buyer receiving proportionately less payments or distributions or less favourable treatment in respect of the Purchased Assets or Purchased Obligations than any other Lender holding advances or a participation (of a similar nature to the Traded Portion) and similar claims under the Credit Documentation or result in any Purchased Assets, or any part thereof, being subject to a Claim Impairment and, in particular, neither the Seller nor any of its Predecessors-in-Title has set off any amounts against the Purchased Assets and no rights of set-off of, or against the Seller or (to the best of its knowledge) its Predecessors-in-Title exist which will permit any set-off of, or against the Seller or (to the best of its knowledge its Predecessors-in-Title) or counterclaim against the Purchased Assets;

2.8    neither the Seller nor any of its Predecessors-in-Title has received any notice and the Seller is not otherwise to the best of its knowledge aware that the Purchased Assets or any portion thereof or any guarantees or Collateral or any of the Credit Documentation are subject to any Claim Impairment or are invalid or void;

2.9    the Seller has no obligations to make loans or advances or other extensions of credit or to provide any other facility or financial accommodation under or in accordance with the Credit Agreement which will be transferred to the Buyer hereunder other than the Purchased Obligations and it has no other liabilities or obligations in respect of the Purchased Assets other than Agent's Expenses;

2.10    no proceedings of or before any Governmental Authority have been commenced or, to the best of the Seller's knowledge, are threatened against the Seller or any of its Predecessors-in-Title which would adversely affect the Purchased Assets, the Purchased Obligations or any of the rights of the Buyer under any of the Transaction Documentation; and

2.11    none of the terms of any Predecessor Transfer Agreement in respect of any trade made on or after the Revision Date has the effect of limiting the scope of, or otherwise reserving to the

Predecessor-in-Title which is selling, any of the Ancillary Rights and Claims assigned by any Predecessor-in-Title to its immediate successor-in-title in any material respect when compared to the definition of Ancillary Rights and Claims contained in Condition 1.2 and either (a) the terms of their assignment under Condition 4.1 of the Standard Terms and Conditions for Distressed Trade Transactions of the Loan Market Association as in effect on the Trade Date or (b) if the Seller and the Buyer have agreed in the applicable Confirmation to settle the transaction as a Funded Participation, the terms on which the Ancillary Rights and Claims are sub-participated to the Buyer under the terms of the LMA Funded Participation for Distressed Trade Transactions as in effect on the Trade Date.