## OPERATING AGREEMENT OF
## LPJ AIRCRAFT FINANCE LLC

**THIS OPERATING AGREEMENT** of **LPJ AIRCRAFT FINANCE LLC,** a Delaware limited liability company, is made as of April 9, 2007 by and among the entities and individuals set forth on the signature page hereto (collectively, the "Members" and each individually, a "Member").

### RECITALS

The parties hereto desire to form a limited liability company under the laws of the State of Delaware for the purposes and in accordance with terms and conditions hereof, and have filed a Certificate of Formation for the Company with the Secretary of State of Delaware on April 9, 2007.

### COVENANTS

In consideration of the mutual covenants and agreements hereinafter set forth, the parties hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.1 Definitions. When used in this Agreement the following terms shall have the meanings set forth below:

"Act" means the Delaware Limited Liability Company Act, as supplemented, amended or restated from time to time.

"Affiliate" means as to any Person any Person which directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with such Person. For purposes of this definition, "control" shall include the ownership of five percent (5%) or more of the voting securities of such Person.

"Agreement" means this Operating Agreement, as may be amended, modified or restated from time to time.

"Assignee" means a person to whom an interest in the Company has been transferred in accordance with the provisions of this Agreement.

"Available Cash" means, with respect to any Fiscal Year, all cash receipts of the Company during such Fiscal Year (other then Capital Contributions) and amounts released from reserves previously established by the Managing Members, less the sum of (a) all cash operating expenditures and all cash debt service payments (including payments of principal, interest and penalties, if any), and (b) all additional reserves deemed reasonably appropriate by the Managing Member, including reserves for any capital expenditures, working capital, legal expenses and contingent liabilities.

"Bankruptcy" has the meaning given it in the Act.

"Capital Account" of a Member means the Capital Account established for such Member under Section 4.2 of this Agreement.

"Capital Contribution" means, with respect to any Member or Assignee, the amount of cash and the net fair market value of any property other than cash contributed by a Member or Assignee (or its predecessor in interest) to the Company.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" means LPJ Aircraft Finance LLC, the limited liability company created pursuant to this Agreement.

"Company Property" means all real, tangible and intangible personal property or other assets owned by the Company.

"Depreciation" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using a reasonable method selected by the Managing Member.

"Distribution" means, with respect to any Member, the amount of cash and the net fair market value of any property other than cash distributed by the Company to the Member.

"Fiscal Year" shall mean the calendar year ending December 31.

"Gross Asset Value" means, with respect to any asset, the adjusted basis for federal income tax purposes of such asset, except as follows:

(i)    The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined in good faith by the Managing Member;

(ii)    The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member, as of the following times:  (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations; provided, however, that adjustments pursuant to clauses (i) and (ii) of this sentence shall be made only if the Managing

2

Member determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

       (iii)    The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution as determined in good faith by the Managing Member; and

       (iv)    The Gross Asset Value of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent that such adjustments are required in determining Capital Accounts pursuant to Section 1.704-1(b)(2)(iv)(m) of the Treasury Regulations; provided, however, that Gross Asset Value shall not be adjusted pursuant to this subsection (iv) to the extent the Managing Member determine that an adjustment pursuant to subsection (ii) hereof is not necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subsection (i), (ii) or (iv), above, such Gross Asset Value shall thereafter be adjusted in the same manner as would the asset's basis for federal income tax purposes except that in lieu of regular depreciation, the Company shall take deductions for Depreciation.

"Managing Member" shall mean Lehman Commercial Paper Inc., or any successor appointed pursuant to Section 7.1(a).

"Member" shall mean each Person who makes a Capital Contribution to the Company as set forth on Exhibit A hereto and executes this Agreement as a Member, as well as each Person who may hereafter become a Member in accordance with the terms hereof and all Assignees who, subsequent to the date of this Agreement, become Members in accordance with the terms hereof.

"Membership Interest" means a Member's right to share in the Profits and Losses, the right to receive distributions of the Company assets and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Agreement and the Act. Each Member shall have the Membership Interest set forth opposite such Member's name on Schedule A attached hereto.

"Member Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(i)(2) of the Treasury Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Treasury Regulations.

"Person" means an individual, corporation, partnership, limited liability company, association, trust, joint venture, unincorporated organization or other entity or group.

CHICAGO/#1620531.9

"Profits" or "Losses" means, for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code shall be included in taxable income or loss), with the following adjustments:

(i)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)    any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)    in the event the Gross Asset Value of any Company asset is adjusted pursuant to subsection (ii), (iii) or (iv) of the definition of "Gross Asset Value," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)    gain or loss resulting from any disposition of any property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(v)    in lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the definition of "Depreciation."

"Secretary of State" means the Secretary of State of the State of Delaware.

"Tax Matters Partner" has the meaning ascribed to it in Section 7.5 of this Agreement.

"Transfer" has the meaning ascribed to it in Section 8.1 of this Agreement.

"Treasury Regulations" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time.

## ARTICLE II

## GENERAL COMPANY MATTERS

Section 2.1 Formation and Continuation of Company. The Company has been organized as a member managed Delaware limited liability company by executing or filing with the Secretary of State a Certificate of Formation in accordance with and pursuant to the Act and,

4

except as herein otherwise expressly provided, the rights and liabilities of the Members shall be as provided in the Act.

Section 2.2  Company Name.  The business of the Company shall be conducted under the name "LPJ Aircraft Finance LLC" or under such other name as the Members may from time to time determine.

Section 2.3  Purpose of Company.  The purpose and business of the Company shall be to transact any and all lawful business for which limited liability companies may be organized under the Act, including to acquire, sell and lease aircraft and claims.

Section 2.4  Company Property.  Title to property of the Company shall be held in the name of the Company or its nominee.

Section 2.5  Registered Office; Principal Place of Business.

(a)    The name of the Company's registered agent for service of process is Corporation Service Company, and the address of the Company's registered office in the State of Delaware is c/o Corporation Service Company, 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, Delaware  19808.  The principal place of business of the Company shall be at 745 7th Avenue, Fourth Floor, New York, New York 10019.  The Managing Member may change the Company's registered agent or the location of the Company's registered office or principal place of business from time to time as it may deem appropriate.

(b)    The Managing Member shall cause to be executed and filed such forms or certificates and shall take any and all other actions as may be reasonably necessary to perfect and maintain the status of the Company under the laws of any other states or jurisdictions in which the Company engages in business.

## ARTICLE III

## TERM

Section 3.1  Term of Company.  Subject to the provisions of Article IX, the term of the Company commenced upon the filing of its Certificate of Formation in the office of the Secretary of State, and shall continue until terminated in accordance with this Agreement.

## ARTICLE IV

## CAPITAL MATTERS

Section 4.1  Capital Contributions of the Members.

(a)    In connection with the execution of this Agreement, each Member irrevocably agrees to make a Capital Contribution on or before the Settlement Date (as defined in that certain Assignment of Claim dated as of April 11, 2007 among the Company, Lehman Brothers Inc. and U.S. Bank National Association) equal to that amount of cash and/or property,

5

and the Company is hereby issuing those amounts of Membership Interests, each as set forth opposite each Member's name on Schedule A attached hereto, unless other amounts are agreed by each of the Members. Upon the making of each Member's respective Capital Contribution on or before such Settlement Date, the Company will acknowledges its receipt of such Capital Contribution, and thereafter will acknowledge receipt of subsequent Capital Contributions, if any, by amendment of Schedule A and attachment thereof to this Agreement. All Capital Contributions to the Company shall be made by the Members in proportion to their Membership Interests. If any Member fails to make its Capital Contribution in accordance with the first sentence of this subsection, its Membership Interest will be forfeited to the Company and such Member shall receive no consideration therefor.

(b)    The Members acknowledge that, for federal income tax purposes, any disparity between the fair market value and the adjusted basis of any assets being contributed by the Members shall be subject to the provisions of Section 704(c) of the Code, as provided in Section 5.4 hereof.

Section 4.2 Capital Accounts. The Company shall create upon its books and records a capital account (the "Capital Account") for each Member, which shall be maintained in accordance with the following provisions:

(a)    To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 5.2, and the amount of any Company liabilities which are assumed by such Member or which are secured by any property distributed to such Member.

(b)    To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of deductions or losses which are specially allocated pursuant to Section 5.2, and the amount of any liabilities of such Member which are assumed by the Company or which are secured by any property contributed by such Member to the Company.

(c)    In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d)    In determining the amount of any liability assumed for purposes of subsections (a) and (b), above, there shall be taken into account Section 752(c) of the Code and any other applicable provisions of the Code and Treasury Regulations.

(e)    The manner in which Capital Accounts are to be maintained pursuant to this Section 4.2 is intended to comply with the requirements of Code Section 704(b) and the Regulations promulgated thereunder. If the Managing Member determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 4.2 should be modified in order to comply with Code Section 704(b) and the Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section

6

4.2, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in this Agreement.

## ARTICLE V

## ALLOCATIONS

Section 5.1 Allocation of Profits and Losses.    After giving effect to the special allocations in Section 5.2 hereof, Profits and Losses of the Company for any Fiscal Year or other period as required under the Code shall be allocated to the Members in proportion to their Membership Interests.

Section 5.2 Special Allocations.    Notwithstanding Section 5.1, the following special allocations shall be made in the following order:

(a)    Profits and Losses and items thereof will be allocated as though this Agreement contained (and there is hereby incorporated herein by reference):  (i) a minimum gain chargeback provision that complies with the requirements of Section 1.704-2(f) of the Treasury Regulations; (ii) a nonrecourse debt minimum gain chargeback provision that complies with the requirements of Section 1.704-2(i)(4) of the Treasury Regulations; and (iii) a qualified income offset provision that complies with the requirements of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(b)    Any Member Nonrecourse Deductions for any Fiscal Year or other period will be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1) and (2).

(c)    Any Nonrecourse Deductions for any Fiscal Year or other period will be allocated to the Members in proportion to their Membership Interests.

(d)    The allocations set forth in this Section 5.2 (the "Regulatory Allocations") are intended to comply with certain provisions of Sections 1.704-1 and 1.704-2 of the Treasury Regulations.    Notwithstanding any other provisions of this Agreement, the Regulatory Allocations shall be taken into account in allocating Profits and Losses and other items of income and deduction among the Members and Assignees so that, to the extent possible, the net amount of such allocations of Profits and Losses, other items of income, gain, loss and deduction, and the Regulatory Allocations to each Member, shall, as determined by the Managing Member, be equal to the net amount that would have been allocated to each Member or Assignee if the Regulatory Allocations had not occurred.

Section 5.3 Allocation of Tax Credits.    Except as otherwise required by the Treasury Regulations, all tax credits allowed in connection with any depreciable property shall be allocated in the same manner as deductions for Depreciation of such property, and all tax credits allowed in connection with other expenditures shall be allocated in the same manner as deductions arising out of such other expenditures.

7

Section 5.4 <u>Section 704(c) Allocations</u>.

(a)    In accordance with Section 704(c) of the Code and the Treasury Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial fair market value.

(b)    In the event the Gross Asset Value of any asset is adjusted pursuant to the definition of "Gross Asset Value," subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and the value at which such asset is reflected in the Capital Accounts of the Members, to the extent such variation was not previously taken into account pursuant to <u>Section 5.4(a)</u>, in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder.

(c)    Allocations pursuant to <u>Sections 5.4(a) and (b)</u> shall be determined by the Managing Member using any permissible method under Section 704(c) of the Code and the Treasury Regulations thereunder.

(d)    Allocations pursuant to <u>Sections 5.4(a) and (b)</u> are solely for purposes of federal, state, and local income taxes, and notwithstanding any other provision of this Agreement, such allocations shall not affect, or in any way be taken into account in computing, any Member's Capital Account or Distributions pursuant to any provision of this Agreement.

Section 5.5 <u>Certain Other Allocation Rules</u>.

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly or other basis, as determined by the Managing Member using any permissible method under Section 706 of the Code and the Treasury Regulations thereunder.

(b)    Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, and credit, for any Fiscal Year or other period, and any other allocations not otherwise provided for shall be divided among the Members in the same proportions as they share Profits or Losses, as the case may be, for such year or other period.

(c)    For federal income tax purposes, items of income, gain, loss and deduction shall be allocated as nearly as possible in the manner in which such items of "book" income are allocated under <u>Sections 5.1 and 5.2</u>, unless otherwise required by the Code or the Treasury Regulations.

## ARTICLE VI

## DISTRIBUTIONS

Section 6.1 <u>Distributions</u>. Except as otherwise provided in <u>Sections 6.2, 6.3 and 9.3</u>, Distributions shall be made monthly only from Available Cash and in such amounts as may be

8

determined by the Managing Member, subject to compliance with the Act.  Such Distributions shall be distributed, pari passu, to the Members in proportion to their Membership Interests.  The Managing Member shall provide a reconciliation of Available Cash at the time of such distribution.

Section 6.2 <u>Tax Distributions</u>.

Each year the Company shall distribute out of Available Cash, if any, to its Members at least an amount sufficient to enable the Members to pay their federal and state income taxes on their pro-rata share of the Company's income for that year.  The determination of the timing of and amount to be distributed, including the assumed tax rates to be used in computing such distributions, shall be made in the sole and absolute discretion of the Managing Member.

Section 6.3 <u>Payment and Withholding of Certain Taxes</u>.  Notwithstanding anything to the contrary herein, to the extent that the Company is required, pursuant to any applicable law, (i) to pay tax (including estimated tax) on a Member's allocable share of Company items of income or gain, whether or not distributed, or (ii) to withhold and pay over to any tax authority any portion of a Distribution or other payment otherwise payable to a Member, the Company may pay over such tax or such withheld amount to the tax authorities, and such amount shall be treated as a Distribution to such Member at the time it is paid to the tax authorities, and shall reduce subsequent Distributions otherwise payable to such Member.

## ARTICLE VII

## <u>MANAGEMENT OF COMPANY</u>

Section 7.1 <u>Management of the Company</u>.

(a)     The business and affairs of the Company shall be managed by its Managing Member.  The Managing Member shall direct, manage and control the business of the Company subject to the terms of this Agreement.  Except as otherwise provided in this Agreement, the Managing Member shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions in its sole discretion regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, including, without limitation, engaging legal counsel, aircraft remarketers, storage providers, insurance brokers, and other entities to assist in the maintenance and sale of the Company's assets and, so long as the Managing Member beneficially owns a majority of the Membership Interests of the Company, the Managing Member shall have full and complete authority, power and discretion to sell the Company's assets.  The Managing Member shall consult with the other Members with respect to any sale of the Company's assets.  The Managing Member shall also have full and complete authority, power and discretion to appoint its successor.  Notwithstanding the foregoing, no Member (other than the Managing Member), acting alone, shall have the authority to act for, in the name of, or as a representative of the Company, or to deal with the Company's assets in any way, or to undertake or assume any obligation, debt, duty or responsibility on behalf of any other Member or the Company.  No Member (other than the Managing Member) shall have any power or authority to bind the Company unless the Member has been authorized by the Managing

CHICAGO/#1620531.9

Member to act as an agent or representative of the Company. Any violation of this Section 7.1(a) shall be deemed to constitute willful misconduct.

        (b)    The Company may have such officers and employees as the Managing Member may deem appropriate. The Members hereby create the position of President, Secretary and Assistant Secretary and so designate Daniel B. Kamensky as the Company's President and Assistant Secretary and Michael Herr as the Secretary. The President, Secretary and Assistant Secretary positions shall have the limited authority to execute such agreements and documents on behalf of the Company as the Managing Member may designate. The President, Secretary and Assistant Secretary positions shall not have any management or execution authority, and may not bind the Company to any agreement, without the express consent of the Managing Member.

        Section 7.2 <u>Liability of Managing Member; Omissions</u>. The doing of any act or the failure to do any act by the Managing Member, the effect of which may cause or result in loss or damage to the Company, shall not subject the Managing Member to any liability to the other Members if the Managing Member acted in good faith and in a manner the Managing Member reasonably believed to be in or not opposed to the best interests of the Company.

        Section 7.3 <u>Conflicts of Interest: Other Business Ventures</u>. The Members acknowledge and agree that the Managing Member may cause the Company to sell its assets to the Managing Member, any other Member, or any Affiliate of the Managing Member or any other Member on commercially reasonable terms and that any fee paid to Lehman Commercial Paper Inc. in connection with a sale of any unsecured claim to an unaffiliated third party shall not exceed 1% of the principal amount of the claim sold. Each Member hereby waives, relinquishes and renounces any claim in respect of any such transaction. Any Member or any member, partner, shareholder, officer, director, employee or Affiliate of a Member or other Person holding a legal or beneficial interest in any entity which is a Member, may engage in or possess an interest in other business ventures of every nature and description, independently or with others, whether or not such ventures are competitive with the Company. The Members expressly acknowledge that none of the Members or their respective Affiliates have any obligation to offer any venture, whether or not competitive with the Company, to the Company or any Member. It is the express understanding of the Members that the doctrine of "corporate opportunity" shall not apply to the Company and each Member hereby waives, relinquishes and renounces any such right or claim, whether now in existence or arising in the future.

        Section 7.4 <u>Indemnification</u>.

        (a)    The Managing Member shall not be liable, responsible or accountable in damages or otherwise to any of the other Members for any act or omission performed or omitted by the Managing Member in good faith pursuant to the authority granted to the Managing Member by this Agreement and in a manner reasonably believed by the Managing Member to be within the scope of the authority granted to the Managing Member by this Agreement and in the best interests of the Company, provided that the Managing Member was not guilty of fraud, bad faith or gross negligence.

CHICAGO/#1620531.9

(b)    The Officers of the Company shall not be liable, responsible or accountable in damages or otherwise to any of the other Members for any act or omission performed or omitted by such Officers in good faith pursuant to the authority granted to the Officers by this Agreement and in a manner reasonably believed by such Officers to be within the scope of the authority granted to the Officer by this Agreement and in the best interests of the Company, provided that such Officer was not guilty of fraud, bad faith or gross negligence.

(c)    The Company shall indemnify, defend and hold harmless its Officers and the Managing Member (and its officers and employees) against any loss or damage, including costs and attorneys' fees (which fees may be paid as incurred) and any amounts expended in settlement of any claims, liability, loss or damage incurred by any such Person on behalf of the Company or in furtherance of the Company's interests for any action taken in good faith pursuant to the authority granted to the Officers by this Agreement and in a manner reasonably believed by such Officers to be within the scope of the authority granted to the Officer by this Agreement, without relieving such Person of liability for fraud, bad faith, gross negligence or conversion of Company assets, and no Member shall have any personal liability on account thereof.

Section 7.5 <u>Tax Matters Partner</u>.

(a)    The Managing Member is hereby appointed the "Tax Matters Partner" (as defined in Section 6231(a) of the Code) of the Company for all purposes pursuant to the Code and the Treasury Regulations.

(b)    The Company will indemnify, defend and hold the Tax Matters Partner harmless from and against any loss, liability, damage, cost or expense (including reasonable attorneys' and other professional fees) sustained or incurred as a result of any act or decision concerning Company tax matters and within the scope of such Tax Matters Partner's responsibilities as Tax Matters Partner, so long as such act or decision was not made fraudulently or in bad faith and did not constitute willful or wanton misconduct or gross negligence.

(c)    Each Member irrevocably appoints the Tax Matters Partner as its attorney-in-fact with full power and authority to act on its behalf in negotiating, settling, or refusing to settle all tax issues raised relating to the Company.

Section 7.6 <u>Meetings</u>.

(a)    An annual meeting of the Members shall be required in order to conduct the business and affairs of the Company. Special meetings of the Members, for any purpose or purposes, may be called by the Managing Member upon 15 days prior written notice to the other Members. Upon 15 days prior written notice to all Members, the Managing Member shall designate the place and times for any meeting of the Members. When any notice is required to be given to any Member, a waiver thereof in writing signed by the Members, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

(b)    Any meeting of the Members may be held by conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear and communicate with each other, and such participation shall constitute presence in

11

person at the meeting. For convenience, the Members hereby agree that any live meeting of Members shall also have telephonic conference capabilities for other non-physically attending Members to dial into.

(c)    A majority of the Membership Interests of the Company, represented in person or by proxy, shall constitute a quorum at any meeting of Members. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. If a quorum is present, the affirmative vote of the Members representing a majority of the Membership Interests of the Company shall constitute an action by all Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, and except that the affirmative vote of the Members representing three-fourths of the Membership Interests of the Company shall be necessary to remove the Managing Member and (except as contemplated by Section 7.1(a)) appoint its successor.

Section 7.7 Action by Members Without a Meeting. Any action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by Members holding not less than the number of votes required to approve the matter in question at a meeting, and such writing or writings are filed with the records of the meeting of the Members. Such consent shall be treated for all purposes as the act of the Members. Members who do not execute any consent described in this Section 7.6 shall be provided prompt notice of the action taken by any such written consent.

Section 7.8 Resignation of Members. No Member shall have the right to resign or withdraw from the Company as a Member (except that this restriction shall not prevent any Member from transferring his or its interest in the Company to the extent permitted in Section 8.1) without the consent of the Managing Member.

Section 7.9 Limitation of Liability. For each Member, liability shall be limited as set forth in this Agreement, the Act, and other applicable law. A Member will not be personally liable for any debts or losses of the Company beyond its respective Capital Contributions; provided, however, that any Member who receives a distribution or the return in whole or in part of its Capital Contribution is liable to the Company only to the extent provided by the Act.

## ARTICLE VIII

## MEMBERSHIP INTERESTS

Section 8.1 Transfer by Members and Assignees. Neither a Member nor an Assignee may transfer, assign, pledge, mortgage, hypothecate, sell, or otherwise dispose or encumber (hereinafter referred to as a "Transfer"), all or any part of their Membership Interest in the Company to any Assignee unless (i) the Managing Member shall have consented in writing to such Transfer, it being understood that the Managing Member may in its sole discretion refuse to consent to any such proposed Transfer, (ii) the Assignee of the Membership Interest shall execute and deliver to the Company the New Member Assent and Certification attached hereto as Schedule B and make the representations and warranties set forth therein, and (iii) the Managing Member is reasonably satisfied that such Transfer under this Section 8.1 is in

12

accordance with all applicable laws and that the purchase agreement or any similar documentation used to effectuate such Transfer is reasonably satisfactory to the Managing Member. The Managing Member reserves the right to require an opinion of counsel in form and substance satisfactory to the Managing Member with respect to such Transfer. Any Member may participate all or any part of its Membership Interest in the Company hereunder to any third party without the consent of the Managing Member; provided that the Company shall be entitled to continue to treat the Member as the Member for all purposes hereunder.

Section 8.2 <u>Assumption by Successors</u>. Notwithstanding anything contained herein to the contrary, it is expressly agreed that any Assignee which shall acquire a Membership Interest in an arm's length transaction and for value or by reason of any other permitted Transfer or successorship, shall succeed to all of the rights (except as otherwise hereinabove provided) and shall be bound by all of the obligations of and restrictions upon a Member under this Agreement. Contemporaneously with any such Transfer, the Assignee shall expressly assume, in writing, all of the obligations of a Member under this Agreement pursuant to the form of Member's Assent attached hereto as <u>Schedule B</u>.

## ARTICLE IX

## DISSOLUTION AND WITHDRAWAL

Section 9.1 <u>Dissolution of Company</u>. The Company shall be dissolved only upon the happening of any of the following events:

(a)     by the discretion of the Managing Member; or

(b)     the entry of a decree of judicial dissolution under the Act.

Subject to Section 9.1(a), a Member shall not take any voluntary action which directly causes a dissolution of the Company or a withdrawal by the Member from the Company.

Section 9.2 <u>Final Accounting</u>. Upon dissolution and termination of the Company, an accounting shall be made of the accounts of each Member and of the Company's assets, liabilities and operations, from the date of the last previous accounting to the date of such termination at the Company's expense.

Section 9.3 <u>Liquidation; Distribution</u>. In the event of the dissolution of the Company, the Tax Matters Partner shall act in an orderly manner as liquidating trustee and, in an orderly manner, shall wind up the affairs of the Company and, after paying all debts and liabilities of the Company (including all bona fide debts owed to Members), including all costs of dissolution, shall distribute the remaining assets in the following order of priority:

(a)     first, to the establishment of any reserves which the liquidating trustee may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company, which reserves may, at the option of the liquidating trustee, be paid over by the liquidating trustee to an escrow agent, to be held by it for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies, and, at the expiration of such period as the liquidating trustee shall deem

13

advisable, for distributing the balance thereunder remaining in the manner hereinafter provided; and

(b)    thereafter, to each Member in accordance with their positive Capital Account balances, after taking into account all Capital Account adjustments for the taxable year during which the liquidation occurs, in compliance with Treasury Regulation Section 1.704-1(b)(2)(ii)(b)(2).

Section 9.4 <u>Termination</u>.  A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the liquidating trustee to minimize the normal losses attendant upon a liquidation.  Each of the Members shall be furnished with a statement prepared by the Company's then certified public accountant, which shall set forth the assets and liabilities of the Company as at the date of complete liquidation.  Upon compliance with the distribution plan set forth in <u>Sections 9.3</u> (including any payment over to any escrowee if there are sufficient funds therefor), the Members shall cease to be such, and the Managing Member or the liquidating trustee shall execute, acknowledge, and cause to be filed a certificate of cancellation of the Company.  Upon completion of the dissolution, winding up, liquidation and distribution of the liquidation proceeds, the Company shall terminate.

## ARTICLE X

## MISCELLANEOUS

Section 10.1 <u>Notices</u>.    All notices and demands required or permitted under this Agreement shall be in writing and may be sent by certified U.S. mail, first class, postage prepaid, overnight air courier, via facsimile or by hand delivery to the Members at their addresses as shown from time to time on the records of the Company, and notice to the Company may be sent to the attention of the Managing Member.  Any Member may specify a different address by notifying the Managing Member in writing of such different address.  Such notices shall be deemed given three days after mailing, the day after deposit with an overnight air courier or when delivered in person, as the case may be.

Section 10.2 <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Act.

Section 10.3 <u>Amendments</u>.  This Agreement may be amended only in writing with the written consent of the Managing Member; provided however, such amendment may not change the timing of or amount of distributions amongst the Members without the consent of the effected Members.

Section 10.4 <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the Members, the Assignees and their respective legal representatives, heirs, successors and assigns.

Section 10.5 <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute one instrument.

14

Section 10.6 <u>Modifications to be in Writing</u>.   This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and no amendment, modification or alteration of the terms hereof shall be binding unless the same be in writing and adopted in accordance with the provisions of <u>Section 10.3</u>.

Section 10.7 <u>Action for Partition or Distribution in Kind</u>.   Each of the parties hereto irrevocably waives any right which he or it may have to partition Company property or maintain an action for distribution of Company property in kind.

Section 10.8 <u>Captions</u>.   The captions herein are inserted for convenience of reference only and shall not affect the construction of this Agreement.

Section 10.9 <u>Pronouns and Plurals</u>.   Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

Section 10.10 <u>Validity and Severability</u>.   If any provision herein shall be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any other provisions hereof, all of which other provisions shall, in such case, remain in full force and effect.

Section 10.11 <u>Statutory References</u>.   Each reference in this Agreement to a particular statute or regulation, or a provision thereof, shall, at any particular time, be deemed to be a reference to such statute or regulation, or provision thereof, or to any similar or superseding statute or regulation, or provision thereof, as at such time in effect.

Section 10.12 <u>Accounting Method and Fiscal Year</u>.   The Fiscal Year of the Company shall be on a calendar year, and the books of the Company shall use the accrual method of accounting.  An alternative financial period or method of accounting may be fixed as determined by the Managing Member.

**[SIGNATURE PAGES FOLLOW]**

15

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement of LPJ AIRCRAFT FINANCE LLC as of the date first above written.

**MEMBER:**

LEHMAN COMMERCIAL PAPER INC.

By:
Name:
Title: James P. Seery Jr
Authorized Signatory

**MEMBER:**

PIPER JAFFRAY & CO.

By: _____
Name: _____
Title: _____

16

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement of LPJ AIRCRAFT FINANCE LLC as of the date first above written.

MEMBER:

LEHMAN COMMERCIAL PAPER INC.

By: _____
Name:
Title:


MEMBER:

PIPER JAFFRAY & CO.

By: _____
Name: _____David B. Holden_____
Title: _____Managing Director_____

16

## SCHEDULE A
## MEMBERS' CAPITAL CONTRIBUTIONS

| Names and Addresses of Members | Capital Contributions | Membership Interest |
|---|---|---|
| LEHMAN COMMERCIAL PAPER INC.<br>745 7th Avenue, Fourth Floor<br>New York, New York 10019<br>Attn: Daniel B. Kamensky<br>     Senior Vice President<br>     High Yield Distressed Trading | $122,811,150.64 | 81.43% |
| PIPER JAFFRAY & CO<br>800 Nicollet Mall<br>Minneapolis, MN 55402-7020<br>Attn: David Holden<br>     Head of Debt Capital Markets | $28,006,914.74 | 18.57% |

A-1

## SCHEDULE B

## <u>NEW MEMBER ASSENT AND CERTIFICATION</u>

The undersigned proposes to acquire a Membership Interest in LPJ Aircraft Finance LLC, a Delaware limited liability company (the "Company"). In connection with such proposed acquisition, the undersigned hereby assents to the Operating Agreement dated as of April 9, 2007 (the "Agreement"), by and among the Company and certain other parties named therein, as such Agreement may be amended from time to time, and hereby agrees to become a party to such Agreement and be bound by all of the applicable terms and provisions thereof as fully as if the undersigned had been named as an original party in such Agreement.

In connection with such proposed acquisition, the undersigned hereby further represents, warrants and agrees as follows:

(a)    The undersigned is an "accredited investor" as that term is defined in Rule 501 of Regulation D under the Securities Act of 1933;

(b)    The undersigned has no need for liquidity of its investment in the Membership Interest and has a net worth sufficient to bear the risk of losing its entire investment in the Membership Interest;

(c)    The undersigned has received and read and is familiar with the Operating Agreement, and is familiar with the assets held, or to be acquired by, the Company, and further confirms that all documents, records and books pertaining to the investment in the Membership Interest and requested by the undersigned have been made available or delivered to the undersigned;

(d)    The undersigned is not relying on the Managing Member in any way with respect to the undersigned's proposed investment in the Membership Interest, and the undersigned has relied solely on the advice of, or has consulted with, only its own legal, tax, financial and other advisors;

(e)    The undersigned understands that the Membership Interest has not been, and will not be, registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws and is being acquired in a transaction in reliance upon federal and state exemptions for transactions not involving a public offering. The undersigned understands and agrees that reliance upon such exemptions is based in part upon its representations contained herein. The undersigned further acknowledges that it is acquiring the Membership Interest without being furnished any offering literature.

(f)    The undersigned is acquiring the Membership Interest solely for its own account for investment and not with a view to or for the resale, distribution, subdivision or fractionalization thereof; the undersigned has no present plans to enter into any such contract, undertaking, agreement or arrangement.

B-1

(g)    The undersigned acknowledges and agrees as follows:

(i)    There is no readily ascertainable market value for the assets held by, or to be acquired by the Company, and the Company may not be able to sell such assets on desirable terms in the near future, or at all;

(ii)    The undersigned may suffer a loss of all or a substantial portion of its investment if such assets can not be sold on desirable terms; and

(iii)    There are substantial restrictions on the transferability of the Membership Interest and the Membership Interest will not be, and the undersigned will have no right to require that the Membership Interest be, registered under the 1933 Act; there will not be any public market for the Membership Interest, and, accordingly, the undersigned may have to hold the Membership Interest indefinitely.  The undersigned further acknowledges that it understands the meaning and legal consequences of the representations, warranties and covenants contained herein, and hereby agrees to indemnify and hold harmless the Company, the Managing member and each other Member from and against any and all loss, damage or liability due to or arising out of a breach of any representation, warranty or undertaking of the undersigned contained herein.

(h)    The undersigned agrees that any assignment and transferability of the Membership Interest shall be made only in accordance with the Agreement.

THE MEMBERSHIP INTEREST HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS SUCH MEMBERSHIP INTEREST IS INCLUDED IN AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN OPINION OF COUNSEL HAS BEEN RENDERED TO THE COMPANY AND THE MANAGING MEMBER IN FORM AND SUBSTANCE SATISFACTORY TO THE COMPANY AND THE MANAGING MEMBER  TO THE EFFECT THAT REGISTRATION OF SAME IS NOT REQUIRED.

Executed as of _____ _____, 200__.

_____

Print Name, Address and Fax Number:

_____
_____
_____
_____

2