# EXHIBIT 1

# (PART I)

# CONSTRUCTION LOAN AGREEMENT

### MADE BY AND BETWEEN

**RIVERWALK SQUARE DEVELOPMENT, LLC**
c/o
**The Wolff Company**
**8320 East Hartford Drive, Suite 100**
**Scottsdale, Arizona 85255**

### AND

**CORUS BANK, N.A., as Lender**
**3959 North Lincoln Avenue**
**Chicago, Illinois 60613**

**Dated as of January 3, 2006**

## Table of Contents

|  |  | Page |
|---|---|---|
| Article 1 | INCORPORATION OF RECITALS AND EXHIBITS | 1 |
| 1.1 | Incorporation of Recitals. | 1 |
| 1.2 | Incorporation of Exhibits. | 1 |
| Article 2 | DEFINITIONS. | 2 |
| 2.1 | Defined Terms. | 2 |
| 2.2 | Other Definitional Provisions. | 11 |
| Article 3 | BORROWER'S REPRESENTATIONS AND WARRANTIES | 11 |
| 3.1 | Representations and Warranties. | 11 |
| 3.2 | Survival of Representations and Warranties. | 15 |
| Article 4 | LOAN AND LOAN DOCUMENTS. | 15 |
| 4.1 | Agreement to Borrow and Lend; Lender's Obligation to Disburse; Excess Disbursements. | 15 |
| 4.2 | Loan Documents. | 17 |
| 4.3 | Term of the Loan. | 18 |
| 4.4 | Prepayments. | 20 |
| 4.5 | Required Principal Payments. | 20 |
| 4.6 | Receipt of Payments. | 20 |
| 4.7 | Termination of Lender's Unfunded Commitment. | 21 |
| Article 5 | INTEREST. | 21 |
| 5.1 | Interest Rate. | 21 |
| Article 6 | COSTS OF MAINTAINING LOAN | 21 |
| 6.1 | Increased Costs and Capital Adequacy. | 21 |
| 6.2 | Borrower Withholding. | 22 |
| Article 7 | LOAN EXPENSE AND ADVANCES | 22 |
| 7.1 | Loan and Administration Expenses. | 22 |
| 7.2 | Loan Fee. | 23 |
| 7.3 | Draw Fees. | 23 |
| 7.4 | Exit Fee. | 23 |
| 7.5 | Lender's Attorneys' Fees and Disbursements. | 23 |
| 7.6 | Time of Payment of Fees and Expenses. | 24 |
| 7.7 | Expenses and Advances Secured by Loan Documents. | 24 |
| 7.8 | Right of Lender to Make Advances to Cure Borrower's Defaults. | 24 |
| Article 8 | NON-CONSTRUCTION REQUIREMENTS PRECEDENT | 24 |
| 8.1 | Non-Construction Conditions Precedent. | 24 |
| Article 9 | CONSTRUCTION REQUIREMENTS PRECEDENT TO THE OPENING OF THE LOAN | 30 |
| 9.1 | Required Construction Documents for Loan Opening. | 30 |
| 9.2 | Requirements for Phase II. | 32 |
| Article 10 | BUDGET, CONTINGENCY FUND AND CHANGE ORDERS | 33 |
| 10.1 | Budget. | 33 |
| 10.2 | Budget Line Items. | 33 |

i

Table of Contents

|  |  | Page |
|---|---|---|
| 10.3 | Contingency Fund. | 34 |
| 10.4 | Optional Method for Payment of Interest. | 35 |
| 10.5 | Changes Orders. | 36 |
| Article 11 | SUFFICIENCY OF LOAN | 36 |
| 11.1 | Loan In Balance. | 36 |
| Article 12 | CONSTRUCTION PAYOUT REQUIREMENTS. | 38 |
| 12.1 | Applicability of Sections. | 38 |
| 12.2 | Monthly Payouts. | 38 |
| 12.3 | Documents to be Furnished for Each Disbursement | 39 |
| 12.4 | Retainages. | 41 |
| 12.5 | Disbursements for Materials Stored On-Site. | 41 |
| 12.6 | Disbursements for Offsite Materials. | 41 |
| 12.7 | Specific Limitation on Disbursements. | 42 |
| Article 13 | FINAL DISBURSEMENT FOR CONSTRUCTION | 42 |
| 13.1 | Final Disbursement for Construction. | 42 |
| Article 14 | SALE OF UNITS. | 43 |
| 14.1 | Price List Schedule. | 43 |
| 14.2 | Sales Agreements. | 44 |
| 14.3 | Purchaser Deposits. | 44 |
| 14.4 | Unit Sales. | 46 |
| 14.5 | Sales Operations and Seller's Obligations. | 48 |
| 14.6 | Delivery of Sales Information and Documents. | 48 |
| 14.7 | Borrower's Acknowledgment Regarding Buyer Financing. | 48 |
| 14.8 | Condominium Regime. | 48 |
| 14.9 | Release of Units. | 49 |
| 14.10 | Application of Sales Proceeds. | 51 |
| Article 15 | OTHER COVENANTS | 52 |
| 15.1 | Borrower further covenants and agrees as follows: | 52 |
| 15.2 | Single Purpose Entity Covenants. | 60 |
| 15.3 | Authorized Representative. | 62 |
| Article 16 | CASUALTIES AND CONDEMNATION. | 63 |
| 16.1 | Lender's Election to Apply Proceeds on Indebtedness. | 63 |
| 16.2 | Borrower's Obligation to Rebuild and Use of Proceeds Therefor. | 63 |
| Article 17 | ASSIGNMENTS BY LENDER AND BORROWER | 64 |
| 17.1 | Assignments and Participations. | 64 |
| 17.2 | Prohibition of Assignments and Transfers by Borrower. | 64 |
| 17.3 | Prohibition of Transfers in Violation of ERISA. | 65 |
| 17.4 | Successors and Assigns. | 65 |
| Article 18 | TIME OF THE ESSENCE. | 65 |
| 18.1 | Time is of the Essence. | 65 |

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

Table of Contents

| | | Page |
|---|---|---|
| Article 19 | EVENTS OF DEFAULT | 65 |
| Article 20 | LENDER'S REMEDIES IN EVENT OF DEFAULT | 68 |
| 20.1 | Remedies Conferred Upon Lender. | 68 |
| Article 21 | GENERAL PROVISIONS | 69 |
| 21.1 | Captions. | 69 |
| 21.2 | Modification; Waiver. | 69 |
| 21.3 | Governing Law. | 69 |
| 21.4 | Acquiescence Not to Constitute Waiver of Lender's Requirements. | 69 |
| 21.5 | Disclaimer by Lender. | 69 |
| 21.6 | Partial Invalidity; Severability. | 70 |
| 21.7 | Definitions Include Amendments. | 70 |
| 21.8 | Execution in Counterparts. | 71 |
| 21.9 | Entire Agreement. | 71 |
| 21.10 | Waiver of Damages. | 71 |
| 21.11 | Claims Against Lender. | 71 |
| 21.12 | Jurisdiction. | 71 |
| 21.13 | Set-Offs. | 72 |
| 21.14 | Binding Effect. | 72 |
| 21.15 | Waiver of Accord and Satisfaction. | 72 |
| Article 22 | NOTICES | 73 |
| Article 23 | WAIVER OF JURY TRIAL | 74 |

EXHIBITS TO LOAN AGREEMENT

Exhibit A....................Legal Description of Land
Exhibit B ....................Permitted Exceptions
Exhibit C ....................Title Requirements
Exhibit D....................Form of Survey Certification
Exhibit E ....................Insurance Requirements
Exhibit F....................Architect's Certificate
Exhibit G....................Initial Budget
Exhibit H....................Draw Request Forms
Exhibit I ....................Control Letter
Exhibit J ....................Approved Plans and Specifications
Exhibit K....................Bailment Letter (Warehousemen)
Exhibit L ....................Bailment Letter (Other Than Warehousemen)
Exhibit M ...................Price List Schedule

iii

## CONSTRUCTION LOAN AGREEMENT
Project Commonly Known as
"Safari Drive Condominiums"

THIS CONSTRUCTION LOAN AGREEMENT ("Agreement") is made as of January 3, 2006, by and between RIVERWALK SQUARE DEVELOPMENT, LLC, an Arizona limited liability company ("Borrower"), and CORUS BANK, N.A., a national banking association, its successors and assigns ("Lender").

## W I T N E S S E T H:

### RECITALS

A.      Borrower is the owner in fee simple of an approximately 4.6 acre parcel of land on the western bank of the Arizona Canal just north of the intersection of Camelback and Scottsdale Road in Scottsdale, Arizona, and legally described in Exhibit A attached hereto (the "Land"). Borrower proposes to construct on the Land a project to be known as "Safari Drive Condominiums," consisting of nine buildings and other facilities containing: (a) garage parking spaces for at least 320 automobiles (each a "Parking Space"), (b) 214 residential condominium units (each a "Residential Unit") and four (4) retail units ("Retail Units") containing in the aggregate at least 277,453 Saleable Square Feet (defined below), and (c) common area amenity space. Ninety-nine (99) of the Units containing 154,165 Saleable Square Feet (plus the entire parking garage and a portion of the amenities) are "Phase I" of the Project. One hundred nineteen (119) Units containing 123,288 Saleable Square Feet and the remainder of the amenities constitute "Phase II" of the Project.

B.      Borrower has applied to Lender for a loan in the aggregate amount of up to Ninety-Seven Million Dollars ($97,000,000) to fund construction and development costs of the Project, and Lender is willing to make the Loan on the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## Article 1
## INCORPORATION OF RECITALS AND EXHIBITS

**1.1      Incorporation of Recitals.**

The foregoing preambles and all other recitals set forth herein are made a part hereof by this reference.

**1.2      Incorporation of Exhibits.**

Exhibits A through M to this Agreement, attached hereto, are incorporated in this Agreement and expressly made a part hereof by this reference.

## Article 2
## DEFINITIONS

**2.1    Defined Terms.**

The following terms as used herein shall have the following meanings:

Additional Collateral:  As such term is defined in Section 8.1(t).

Affiliate:    With respect to a specified person or entity, any individual, partnership, corporation, limited liability company, trust, unincorporated organization, association or other entity that, directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such person or entity, including, without limitation, any general or limited partnership in which such person or entity is a partner.

Agreement:  This Construction Loan Agreement.

Appraisal:  An MAI certified appraisal of the Project performed in accordance with FIRREA and Lender's appraisal requirements by an appraiser selected and retained by Lender.

Approved Finish Standards:  As such term is defined in Section 9.1(f).

Approved Plans and Specifications:  As such term is defined in Section 9.1(f).  A list of the Approved Plans and Specifications is attached hereto as Exhibit J.  The Approved Plans and Specifications shall also include the Approved Finish Standards described in Section 9.1(f).

Architect:  The Miller-Hull Partnership, LLP.

Architect's Certificate:  A certificate in the form of Exhibit F attached hereto executed by the Architect in favor of Lender.

Authorized Representative:  Either of A. Christopher Camberlango or Timothy Michael Wolff.

Available Sources of Funds:  As such term is defined in Section 11.1(c).

Bankruptcy Code:  Title 11 of the United States Code entitled "Bankruptcy" as now or hereafter in effect, or any successor thereto or any other present or future bankruptcy or insolvency statute.

Bonds:  As such term is defined in Section 9.1(d).

Borrower:  As such term is defined in the opening paragraph of this Agreement.

Budget:  The budget for the Project specifying all costs and expenses of every kind and nature whatsoever to be incurred by Borrower in connection with the Project prior to the Maturity Date, as approved by Lender as set forth in Section 10.1.

Budget Line Item:  As such term is defined in Section 10.2.

2

Business Day:  Any Monday through Friday, excluding days on which Lender is closed for business.

Change Order:  Shall mean any of the following: (i) a request for changes in the Approved Plans and Specifications (other than minor field changes involving no extra cost) or for a change to the General Contract Price, (ii) an amendment to the General Contract, (iii) a construction change directive or (iv) a written order for a minor change in the work issued by the architect.

Commitment:  Lender's maximum aggregate funding obligation hereunder of up to Ninety-Seven Million Dollars ($97,000,000), less any reduction thereof in accordance with the terms of this Agreement.

Completion Date:  (i) As to Phase I, the date that is twenty-two (22) months after the date hereof and (ii) as to Phase II, the date that is thirty (30) months after the date hereof.

Completion and Carveout Guaranty:  A guaranty of performance and completion, executed by the Guarantors and pursuant to which the Guarantors guarantee the lien-free and timely completion of the Project in accordance with all provisions of this Agreement and Borrower's obligation to keep the Loan In Balance and to pay for all cost overruns, subject to the limits stated therein, and guarantees specified non-recourse carve-out obligations.

Condominium Documents:  As such term is defined in Section 8.1(s).

Construction or construction:  The construction and equipping of the Improvements in accordance with the Approved Plans and Specifications, and related improvements required to be performed by Borrower under Sales Agreements (including all off-site improvements reasonably required for use and operation of the Improvements) and the installation of all personal property, fixtures and equipment required for the operation of the Project or required under Sales Agreements.

Construction Disbursement:  As such term is defined in Section 7.3.

Construction Schedule:  A schedule reasonably satisfactory to Lender, establishing a timetable for completion of the Construction, showing, on a monthly basis, the anticipated progress of the Construction, and showing that the Improvements can be completed on or before the Completion Date and that the Units will be delivered prior to any outside dates, if any, provided for in the Sales Agreements.

Contingency Fund:  As such term is defined in Section 10.3.

Contractor's Contingency:  As such term is defined in Section 10.3.

Control:  As such term is used with respect to any person or entity, including the correlative meanings of the terms "controlled by" and "under common control with," shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of such person or entity, whether through the ownership of voting securities, by contract or otherwise.

Declaration of Condominium:  That certain Condominium Declaration to be recorded against the Project.

Default or default:  Any event, circumstance or condition, which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default hereunder.

Default Rate:  As such term is defined in the Note.

Deficiency Deposit:  As such term is defined in Section 11.1(b).

Deposits:  The Earnest Money Deposits and the Upgrade Deposits.

Design Professionals:  As such term is defined in Section 9.1(a).

Earnest Money Deposits:  As such term is defined in Section 14.3 (a).

Environmental Indemnity:  An environmental indemnity from the Borrower and the Guarantors, jointly and severally, indemnifying Lender with regard to matters related to Hazardous Material and other environmental matters.

Environmental Proceedings:  Any environmental proceedings, whether civil (including actions by private parties), criminal, or administrative proceedings, relating to the Project.

Environmental Report:  An environmental report prepared at Borrower's expense by a qualified environmental consultant approved by Lender addressed to Lender (or subject to separate letter agreement permitting Lender to rely on such environmental report).

ERISA:  The Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder from time to time.

Escrow Agent:  As such term is defined in Section 14.3(a).

Escrow Agreement:  As such term is defined in Section 14.3(a).

Event of Default:  As such term is defined in Article 19.

Exit Fee:  As such term is defined in Section 7.4.

Extension Fee:  As such term is defined in Section 4.3(b)(iii).

Extension Option:  As such term is defined in Section 4.3(a).

FIRREA:  The Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended from time to time.

First Additional Collateral:  As defined in Section 8.1(t).

4

First Extended Maturity Date: The date that is three (3) years and six (6) months after the date of this Agreement, as the Maturity Date may first be extended by Borrower under the conditions contained in Section 4.3.

First Extension Option: As such term is defined in Section 4.3(a).

General Contract: As such term is defined in Section 9.1(a).

General Contract Price: As such term is defined in Section 9.1(a).

General Contractor: Okland Construction, Inc.

Governmental Approvals: Collectively, all consents, licenses, and permits and all other authorizations or approvals required from any Governmental Authority for the Construction in accordance with the Approved Plans and Specifications or the sale of the Units.

Governmental Authority: Any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality, or public body, or any court, administrative tribunal, or public utility.

Guarantors: A. Christopher Camberlango, a resident of Arizona; Michael Trailor, a resident of Arizona; and James Nunemacher, a resident of California.

Hard Costs: Any and all costs related to or incurred in connection with the construction of the Project, including, without limitation, the cost of all labor, materials and equipment, but excluding any fees for architectural and engineering services, marketing fees, financing costs, developers' fees and other similar soft fees and costs. The Hard Costs include the items delineated as such on the Budget.

Hazardous Material: Means and includes gasoline, petroleum, asbestos containing materials, explosives, radioactive materials or any hazardous or toxic material, substance or waste which is defined by those or similar terms or is regulated as such under any Law of any Governmental Authority having jurisdiction over the Project or any portion thereof or its use, including: (i) any "hazardous substance" defined as such in (or for purposes of) the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C.A. § 9601(14) as may be amended from time to time, or any so-called "superfund" or "superlien" Law, including the judicial interpretation thereof; (ii) any "pollutant or contaminant" as defined in 42 U.S.C.A. § 9601(33); (iii) any material now defined as "hazardous waste" pursuant to 40 C.F.R. Part 260; (iv) any petroleum, including crude oil or any fraction thereof; (v) natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel; (vi) any "hazardous chemical" as defined pursuant to 29 C.F.R. Part 1910; (vii) any mold or fungus that may cause an allergic, toxic or inflammatory response in humans arising from exposure to such mold or fungus in indoor air; and (viii) any other toxic substance or contaminant that is subject to any other Law or other past or present requirement of any Governmental Authority. Any reference above to a Law, includes the same as it may be amended from time to time, including the judicial interpretation thereof.

5

HUD:  United States Department of Housing and Urban Development.

Improvements:  The improvements referred to in Recital A hereto (both Phase I and Phase II) and more particularly described in the Approved Plans and Specifications and any offsite improvements reasonably required to be constructed for the use or operation of the improvements described in Recital A.

In Balance or in balance:  As such term is defined in Article 11.

Including or including:  Means "including but not limited to".

Indemnified Party:  As such term is defined in Section 15.1(t).

Initial Maturity Date:  The date that is three (3) years from the date of this Agreement.

Insurance Policy:  As such term is defined in Section 8.1(e).

Intercreditor Agreement:  As such term is defined in Section 8.1(v).

Interest Rate:  As such term is defined in the Note.

Interest Reserve Budget Line Item:  As such term is defined in Section 10.4.

Internal Revenue Code:  The Internal Revenue Code of 1986, as amended from time to time.

Land:  As such term is defined in Recital A.

Laws:  Collectively, all federal, state and local laws, statutes, codes, ordinances, orders, rules and regulations, including judicial opinions or precedential authority in the applicable jurisdiction.

Leases:  The collective reference to all leases, subleases and occupancy agreements affecting the Project or any part thereof now existing or hereafter executed and all amendments, modifications or supplements thereto approved in writing by Lender.

Lender:  As such term is defined in the opening paragraph of this Agreement and including any successor holder of the Loan from time to time.

Lender's Consultant:  An independent consulting architect, inspector, and/or engineer designated by Lender in Lender's sole discretion.

Lender's Estimate of Remaining Costs:  As such term is defined in Section 11.1(d).

Lender's Remaining Exposure:  The sum, at any date, of the outstanding principal balance of the Loan and the Unfunded Commitment.

List Price:  As such term is defined in Section 14.1.

6

Loan:  As such term is defined in Recital B.

Loan Documents:  The collective reference to this Agreement, the documents and instruments listed in Section 4.2, and all the other documents and instruments entered into from time to time, evidencing or securing the Loan or any obligation of payment thereof or performance of Borrower's or Guarantors' obligations in connection with the transaction contemplated hereunder, each as amended.

Loan Opening Date:  The date of Loan Opening.

Loan Opening or Opening of the Loan:  The first disbursement of Loan proceeds.

Loan Term:  The period of time commencing on the date of this Agreement through and including the Maturity Date.

Major Subcontractor:  Any subcontractor under a Major Subcontract.

Major Subcontracts:  All subcontracts between the General Contractor and any subcontractors and material suppliers that provide for an aggregate contract price equal to or greater than $1,000,000.

Material Adverse Change or material adverse change:  If, in Lender's sole discretion, the business, operations or financial condition of a person, entity, or property has changed in a manner likely to impair materially the value of Lender's security for the Loan, prevent timely repayment of the Loan, or otherwise prevent the applicable person or entity from timely performing any of its material obligations under the Loan Documents.

Maturity Date:  As such term is defined in Section 4.3.

Mezzanine Borrower:  Riverwalk Square Development II, LLC, an Arizona limited liability company, the sole member of Borrower and the borrower under the Mezzanine Loan.

Mezzanine Lender:  Lehman Brothers Holdings Inc., a Delaware corporation.

Mezzanine Loan:  The mezzanine loan from Mezzanine Lender to Mezzanine Borrower in the amount of Eighteen Million Seven Hundred Twenty Thousand Dollars ($18,720,000).

Mezzanine Loan Documents:  The documents which evidence and secure the Mezzanine Loan, which include a pledge of the membership interests in Borrower (and do not include a deed of trust on the Project).

Mortgage:  A construction deed of trust, assignment of rents, security agreement and fixture filing executed by Borrower for the benefit of Lender securing this Agreement, the Note, and all obligations of Borrower in connection with the Loan, granting a first priority lien on Borrower's fee interest in the Project, subject only to the Permitted Exceptions.

Net Operating Income:  For the applicable month, the gross income from the Project less operating expenses.

7

Net Sales Proceeds:  The gross sales price paid by any Unit Purchaser for its respective Unit (exclusive of Unit customization items paid for from Upgrade Deposits, but inclusive of all Upgrade Profits and inclusive of all other amounts paid by Unit Purchasers) minus brokerage commissions, title costs, legal fees and other customary closing costs associated with the sale of such Unit that are paid or incurred by Borrower, provided that in calculating Net Sales Proceeds closing costs shall be excluded to the extent funded from the Loan (rather than being paid from gross sales proceeds).  The closing costs deductible under this definition shall exclude the amounts to be escrowed pursuant to subparagraphs (b) and (c) of Section 14.10, which amounts must be paid to Lender and escrowed.

Note:  A promissory note in the amount of Ninety-Seven Million Dollars ($97,000,000), executed by Borrower and payable to the order of Lender, evidencing the Loan.

OFAC:  As such term is defined in Section 3.1(x).

Opening of the Loan or Loan Opening:  The first disbursement of Loan proceeds.

Owner's Hard Cost Contingency:  As such term is defined in Section 10.3.

Parking Space:  As such term is defined in Recital A.

Permitted Affiliate Expenses:  As such term is defined in Section 12.7.

Permitted Exceptions:  Those matters listed on Exhibit B attached hereto, to which title to the Project may be subject at the Loan Opening, and thereafter such other title exceptions as are acceptable to Lender in its sole discretion and approved by Lender in writing.

Person:  Any natural person, partnership, limited liability company, corporation, trust, Governmental Authority or other entity.

Phase I:  As such term is defined in Recital A.

Phase II:  As such term is defined in Recital A.

Phase II Overrun:  The amount by which the General Contract Price for Phase II as contained in a General Contract for Phase II approved by Lender exceeds Twenty-Six Million One Hundred Ninety-Five Thousand Dollars ($26,195,000).

Plans and Specifications:  As such term is defined in Section 9.1(f).

Price List Schedule:  As such term is defined in Section 14.1.

Proceeding:  As such term is defined in Section 21.12.

Proceeds:  As such term is defined in Section 16.1(a).

Project:  The collective reference to (i) the Land, together with all buildings, structures and improvements located or to be located thereon, including the Improvements (both Phase I and Phase II), (ii) all rights, privileges, easements and hereditaments relating or appertaining

8

thereto, (iii) all personal property, fixtures and equipment required or beneficial for the operation thereof, and (iv) all offsite improvements reasonably required for use of the improvements described in Recital A.

Proposed Finish Standards: As such term is defined in Section 9.1(f).

Qualifying Sales Agreement: As such term is defined in Section 14.4.

Release Price: As such term is defined in Section 14.9(d).

Remaining Units: All Units which have not been sold and conveyed and remain subject to the Mortgage, provided that if Borrower's right to borrow Tranche B expires without Borrower qualifying to borrow Tranche B, the Units to be constructed in Phase II shall no longer be considered Remaining Units.

Required Construction Commencement Date: On or prior to December 1, 2005 (Construction has already commenced).

Required Equity Investment: As such term is defined in Section 8.1(a).

Required Permits: Each building permit, environmental permit, utility permit, land use permit, wetland permit and any other permits, approvals or licenses issued by any Governmental Authority that are required in connection the Construction, marketing, sale or operation of the Project.

Residential Unit: As such term is defined in Recital A.

Retail Units: As such term is defined in Recital A.

Retainage: As such term is defined in Section 12.4.

Saleable Square Feet: The number of indoor net saleable square feet in a Unit or Units as measured from the interior of the glass in the exterior walls, the middle of demising walls between Units and to the public side of any common area walls but excluding balconies, terraces, common hallways, lobbies, structural walls and areas of exit stairs, elevator shafts, common mechanical shafts and other common areas (but in no event shall Saleable Square Feet include parking or storage areas). (One such saleable square foot is referred to in the singular as a "Saleable Square Foot".)

Sales Agreement: As such term is defined in Section 14.2.

Second Additional Collateral: As defined in Section 8.1(t).

Second Extended Maturity Date: The date that is four (4) years after the date of this Agreement, as the Maturity Date may be extended for the second time by Borrower under the conditions contained in Section 4.3.

Second Extension Option: As such term is defined in Section 4.3(a).

9

Soft Cost Contingency: As such term is defined in Section 10.3.

Soft Costs: All costs incurred or to be incurred in connection with the Project, other than the Hard Costs, including, without limitation, interest on the Loan, fees incurred in connection with the Loan, commissions, appraisal fees, architectural and engineering fees, title and recording charges, legal fees, real estate taxes and other impositions and sales and marketing costs. Soft Costs shall include the items delineated as such on the Budget.

Soil Report: A soil test report prepared by a licensed engineer satisfactory to Lender indicating to the satisfaction of Lender that the soil and subsurface conditions underlying the Project will support the Improvements.

State: The state in which the Land is located.

Subcontracts: Subcontracts for labor or materials to be furnished to the Project.

Tenant: The tenant under a Lease.

Title Insurer: Fidelity National Title Insurance Company, or such other title insurance company licensed in the State as may be approved in writing by Lender.

Title Policy: An ALTA Mortgagee's Loan Title Insurance Policy with extended coverage issued by the Title Insurer insuring the lien of the Mortgage as a valid first, prior and paramount lien upon the Project and all appurtenant easements, and subject to no other exceptions other than the Permitted Exceptions and otherwise satisfying the requirements of Exhibit C attached hereto and made a part hereof, all to the extent permitted by the Laws of the State.

Tranche A: Sixty-Three Million Dollars ($63,000,000) consisting of the portion of the Loan shown as available in the column labeled "Phase I and Phase II Predevelopment" in the Budget.

Tranche B: Thirty-Four Million Dollars ($34,000,000) of the Loan, consisting of the portion of the Loan shown as available in the column labeled "Phase II" in the Budget.

Transfer: Any sale, transfer, lease (other than a Lease approved by Lender), conveyance, alienation, pledge, assignment, mortgage, encumbrance, hypothecation or other disposition of (a) all or any portion of the Project or any portion of any other security for the Loan, (b) all or any portion of the Borrower's right, title and interest (legal or equitable) in and to the Project or any portion of any other security for the Loan, or (c) any interest in Borrower or any interest in any entity which directly or indirectly holds an interest in, or directly or indirectly controls, Borrower.

Unfunded Commitment: The Commitment (as reduced from time to time pursuant to the provisions of this Agreement), less all disbursements of the Loan made prior to the date on which the amount of the Unfunded Commitment is being calculated.

Unit: A Residential Unit and/or a Retail Unit, as the context infers.

10

<u>Unit Purchaser</u>: The contract purchaser(s) under each Sales Agreement.

<u>Upgrade Deposits</u>: As such term is defined in <u>Section 14.3(b)</u>.

<u>Upgrade Profit</u>: The amount by which Borrower's costs of providing any upgrades is less than the cost charged to the Unit Purchaser for any upgrades.

**2.2    Other Definitional Provisions.**

All terms defined in this Agreement shall have the same meanings when used in the Note, Mortgage, any other Loan Documents, or any certificate or other document made or delivered pursuant hereto. The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement.

**Article 3**
**BORROWER'S REPRESENTATIONS AND WARRANTIES**

**3.1    Representations and Warranties.**

To induce Lender to execute this Agreement and perform its obligations hereunder, the Borrower hereby represents and warrants to Lender as follows:

(a)    Borrower has good and marketable fee simple title to the Project, subject only to the Permitted Exceptions.

(b)    Except as previously disclosed to Lender in writing, no litigation or proceedings are pending, or to the best of Borrower's actual knowledge threatened, against Borrower or any Guarantor, that could, if adversely determined, be reasonably expected to cause a Material Adverse Change with respect to Borrower, any Guarantor or the Project. There are no pending Environmental Proceedings and Borrower has no knowledge of any threatened Environmental Proceedings or any facts or circumstances that may give rise to any future Environmental Proceedings.

(c)    Borrower is a duly organized and validly existing limited liability company and has full power and authority to execute, deliver and perform all Loan Documents to which Borrower is a party, and such execution, delivery and performance have been duly authorized by all requisite action on the part of Borrower.

(d)    No consent, approval or authorization of or declaration, registration or filing with any Governmental Authority or nongovernmental person or entity, including any creditor, partner, or member of Borrower or any Guarantor, is required in connection with the execution and delivery of this Agreement or any of the Loan Documents other than the recordation of the Mortgage and Declaration of Condominium for the Project and the filing of UCC-1 Financing Statements, except for such consents, approvals or authorizations of or declarations or filings with any Governmental Authority or non-governmental person or entity where the failure to so obtain would not have an adverse effect on Borrower or such Guarantor or which have been obtained as of any date on which this representation is made or remade.

11

(e)    The execution, delivery and performance of this Agreement, the execution and payment of the Note and the granting of the Mortgage and other security interests under the other Loan Documents have not constituted and will not constitute, upon the giving of notice or lapse of time or both, a breach or default under any other agreement to which Borrower or Guarantors are a party or may be bound or affected, or a violation of any law or court order that may affect the Project, any part thereof, any interest therein, or the use thereof.

(f)    There is no default under this Agreement or the other Loan Documents, nor any condition that, after notice or the passage of time or both, would constitute a default or an Event of Default under said documents.

(g)    (i) No condemnation of any portion of the Project, (ii) no condemnation or relocation of any roadways abutting the Project, and (iii) no proceeding to deny access to the Project from any point or planned point of access to the Project, has commenced or, to the best of Borrower's actual knowledge, is contemplated by any Governmental Authority.    No casualty has occurred with respect to the Project (except as previously restored).

(h)    The amounts set forth in the Budget present a full and complete itemization by category of all costs, expenses and fees that Borrower reasonably expects to pay or reasonably anticipates becoming obligated to pay to complete the Construction (including all off-site improvements to be paid for by Borrower), operate the Project and market and sell the Units. Borrower is unaware of any other such costs, expenses or fees that are material and are not covered by the Budget.    Borrower further warrants that neither the Borrower, the Guarantors, nor any of their respective Affiliates are receiving any other payments, distributions, or other consideration directly or indirectly from the Borrower, the Project, its seller, contractors or any other party associated with the Project other than the Permitted Affiliate Expenses.

(i)    Neither the construction of the Improvements nor the use of the Project when completed in accordance with the Approved Plans and Specifications and the contemplated accessory uses will violate (i) any Laws (including subdivision, zoning, building, environmental protection and wetland protection Laws), or (ii) any building permits, restrictions of record, or agreements affecting the Project or any part thereof.    Except as may be set forth in the Permitted Exceptions, neither the zoning authorizations, approvals or variances nor any other right to construct or to use the Project is to any extent dependent upon or related to any real estate other than the Land.    All Governmental Approvals required for the Construction in accordance with the Approved Plans and Specifications have been obtained or will be obtained prior to the Loan Opening (except for those Governmental Approvals that cannot or need not be obtained until a later stage of the Construction or completion of Construction, in which case such Governmental Approvals will be obtained by Borrower on a timely basis and copies will be delivered to Lender on the earliest possible date) and all Laws relating to the Construction and operation of the Improvements have been complied with and to Borrower's knowledge, after due inquiry, all permits and licenses, required for the operation of the Project that cannot be obtained until the Construction is completed can be obtained if the Improvements are completed in accordance with the Approved Plans and Specifications.

(j)    The Project will have adequate water, gas and electrical supply, storm and sanitary sewerage facilities, other required public utilities, fire and police protection, and means

12

of access between the Project and public highways, and none of the foregoing will be foreseeably delayed or impeded by virtue of any requirements under any applicable Laws.

(k)    No brokerage fees or commissions are payable by or to any person in connection with this Agreement or the Loan to be disbursed hereunder (except for fees internal to Borrower).

(l)    All financial statements and other information previously furnished by Borrower or any Guarantor to Lender in connection with the Loan are true, complete and correct and fairly present the financial conditions of the subjects thereof as of the respective dates thereof and do not fail to state any material fact necessary to make such statements or information not misleading, and no Material Adverse Change with respect to Borrower or any Guarantor has occurred since the respective dates of such statements and information. Neither Borrower nor any Guarantor has any material liability, contingent or otherwise, not disclosed in such financial statements and that all charges payable with respect to the Project are current and not in default. Except as previously disclosed in writing to Lender, neither the Borrower, nor any Guarantor, nor any manager or director of the Borrower or any of the Guarantors, nor any equity owner of the Borrower or any of the Guarantors, or any of their respective Affiliates (not including investors in the Borrower who are not Guarantors or Affiliates of the Guarantors): (i) has ever been the subject of any criminal proceedings (other than minor traffic violations); (ii) has ever been the owner, whether directly or indirectly, of a parcel of real property that has been the subject of foreclosure proceedings (whether judicial or non-judicial); (iii) has ever been a party, whether directly or indirectly, to a deed in lieu of foreclosure; or (iv) is currently a party to any material pending litigation or administrative proceedings, or subject to any judicial or non-judicial orders or consent agreements.

(m)    Except as disclosed in any Environmental Report delivered by Borrower to Lender prior to the date hereof, (i) to the best of Borrower's knowledge, the Project is in a clean, safe and healthful condition, and, except for small quantities of Hazardous Materials lawfully used in the ordinary course of construction, maintenance and operation of the Project, is free of all Hazardous Material and is in compliance with all applicable Laws; (ii) except for small quantities of Hazardous Materials lawfully used in the ordinary course of construction, maintenance and operation of the Project, neither Borrower nor, to the best knowledge of Borrower, any other person or entity, has ever caused or permitted any Hazardous Material to be placed, held, located or disposed of on, under, at or in a manner to affect the Project, or any part thereof, and the Project has never been used (whether by Borrower or, to the best knowledge of Borrower, by any other person or entity) for any activities involving, directly or indirectly, the use, generation, treatment, storage, transportation, or disposal of any Hazardous Material; (iii) neither the Project nor Borrower is subject to any existing, pending, or, to the best of Borrower's knowledge, threatened investigation or inquiry by any Governmental Authority, and the Project is not subject to any remedial obligations under any applicable Laws pertaining to health or the environment; and (iv) to the best knowledge of Borrower, there are no underground tanks, vessels, or similar facilities for the storage, containment or accumulation of Hazardous Materials of any sort on, under or affecting the Project.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

(n)     The Project is taxed separately from any other land for real estate tax purposes. For all purposes, the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel.

(o)     Borrower and its agents have not entered into any Leases, subleases or other arrangements for occupancy of space within the Project (other than Sales Agreements that permit occupancy by the Unit Purchasers following closing thereunder).

(p)     When the Construction is completed substantially in accordance with the Approved Plans and Specifications, no building or other improvement will encroach upon any property line, building line, setback line, side yard line or any recorded or visible easement (or other easement of which Borrower is aware or has reason to believe may exist) in violation thereof.

(q)     The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation T, U or X issued by the Board of Governors of the Federal Reserve System, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

(r)     Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

(s)     Borrower is not a "foreign person" within the meaning of Section 1445 or 7701 of the Internal Revenue Code.

(t)     Borrower uses no trade name other than its actual name set forth herein.  The principal place of business of Borrower is as stated in Article 22.

(u)     Borrower's place of formation or organization is the State of Arizona.

(v)     There are, as of the date hereof, no Sales Agreements to purchase Units; commencing at such time as Sales Agreements are executed, all Sales Agreements comply with the requirements of Section. 14.4.

(w)     Commencing at such time as Sales Agreements are executed, all Sales Agreements are exempt from or will comply with the requirements of the Interstate Land Sales Act, as amended, and Laws of the State (and any applicable local Laws), so that (i) the sale of the Units is lawful and will not be subject to interruption due to a violation of Laws, (ii) no Sales Agreement is terminable under any of such Laws (other than the termination rights contained in such Sales Agreement), and (iii) neither Borrower nor the Project will be subject to any civil or criminal penalties by reason of failure to comply with such Laws.  The marketing and sale of Units by Borrower (and any marketing or sales of Units) is, and at all times has been, in compliance with all Laws pertaining to the sale of condominiums (and/or residential real estate generally).  All consents and approvals needed for the sale of Units under applicable federal, state and local Laws have been received and remain in full force and effect.

14

(x)    Neither Borrower, any Guarantor or any other person owning an interest in Borrower is (or will be) a person with whom Lender is restricted from doing business with under regulations of the Office of Foreign Asset Control ("OFAC") of the Department of the Treasury of the United States of America (including, those persons named on OFAC's Specially Designated and Blocked Persons list) or under any statute, executive order (including the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), or other governmental action and is not and shall not knowingly engage in any dealings or transactions or otherwise be associated with such persons. In addition, Borrower hereby agrees to provide the Lender with any additional information that the Lender deems reasonably necessary from time to time in order to ensure compliance with all applicable Laws concerning money laundering and similar activities.

(y)    Borrower shall have complied, in all respects, with the provisions of the USA PATRIOT Act of 2001 (as amended), as applicable to Borrower and the Project.

(z)    All statements set forth in the Recitals are true and correct.

**3.2    Survival of Representations and Warranties.**

Borrower and each Guarantor agrees that all of the representations and warranties set forth in Section 3.1 and elsewhere in this Agreement are true as of the date hereof, will be true at the Loan Opening and, except for matters that have been disclosed by Borrower or the Guarantors and approved by Lender in writing, will be true at all times thereafter until the Loan has been repaid and Borrower's obligations hereunder have been satisfied in full. Each request for a disbursement under the Loan Documents shall constitute a reaffirmation of such representations and warranties, as deemed modified in accordance with the disclosures made and approved as aforesaid, as of the date of such request. It shall be a condition precedent to the Loan Opening and each subsequent disbursement that each of said representations and warranties is true and correct as of the date of such requested disbursement. In addition, at Lender's request, Borrower and the Guarantors shall reaffirm such representations and warranties in writing prior to each disbursement hereunder.

### Article 4
### LOAN AND LOAN DOCUMENTS

**4.1    Agreement to Borrow and Lend; Lender's**
**      Obligation to Disburse; Excess Disbursements.**

Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower the Loan, for the purposes and subject to all of the terms, provisions and conditions contained in this Agreement. No portion of the Loan which is repaid may be reborrowed. If Lender consists of more than one party, the obligations of each such party with respect to the amount it has agreed to loan to Borrower shall be several (and not joint and several) and each lending party's obligations shall be limited to its proportionate share of the Loan and of each advance.

15

(a)    The maximum aggregate principal amount of the Loan to be funded hereunder shall be the amount of the Commitment.  In addition to the other requirements of this Agreement: (I) Borrower shall have no right to borrow Tranche B until Borrower has satisfied the requirements set forth in Section 9.2, and Borrower's right to borrow Tranche B shall terminate (and the portion of the Commitment consisting of Tranche B cancelled) unless all such conditions are satisfied on or before June 30, 2006, and (II) Borrower shall not be entitled to borrow more than $10,000,000 of the Loan until the condominium tract map for the Project has been approved by each required Governmental Authority (the tract map need not be recorded yet so long as no further Governmental Approvals are needed).

(b)    Lender agrees, upon Borrower's compliance with and satisfaction of all conditions precedent to the Loan Opening set forth in this Agreement and provided (i) the Loan is In Balance, (ii) no Material Adverse Change has occurred with respect to Borrower, any Guarantor or the Project, (iii) no material casualty to the Project has occurred that has not been repaired and there is no existing or threatened condemnation or taking which could cause a Material Adverse Change with respect to Borrower or the Project and (iv) no default or Event of Default has occurred and is continuing hereunder, to open the Loan to reimburse Borrower for costs incurred by Borrower in connection with the acquisition and development of the Project and the construction of the Improvements, to the extent provided for in the Budget.

(c)    After the Opening of the Loan, Borrower shall be entitled to receive further successive disbursements of the proceeds of the Loan in accordance with Articles 9, 12 and 13 following compliance with all conditions precedent thereto set forth in this Agreement, provided that (i) the Loan remains In Balance; (ii) Borrower has complied with all conditions precedent to disbursement from time to time set forth in this Agreement including the requirements of Section 3.2 and Articles 8, 9, 12 and 13; (iii) no Material Adverse Change has occurred with respect to Borrower, any Guarantor or the Project, (iv) no material casualty to the Project has occurred that has not been repaired and there is no existing or threatened condemnation or taking which could cause a Material Adverse Change with respect to Borrower or the Project and (v) no Event of Default and no default exists hereunder or under any other Loan Document.  Lender shall make commercially reasonable efforts to fund such subsequent disbursements within ten (10) Business Days after receipt of all of the documents required under this Agreement, including a draw request together with all items listed in Section 12.3.

(d)    To the extent that Lender may have acquiesced in noncompliance with any requirements set forth in this Agreement precedent to the Opening of the Loan or precedent to any subsequent disbursement of Loan proceeds, such acquiescence shall not constitute a waiver by Lender, and Lender may at any time after such acquiescence require Borrower to comply with all such requirements.

(e)    All payments by Borrower on account of the Loan shall be made as such amounts become due or are declared due pursuant to the terms of this Agreement and the other Loan Documents.  All payments shall be made without deduction, defense, setoff or counterclaim as follows:

16

For payments made by Regular Mail:
> Corus Bank N.A.
> P.O. Box 102865
> Atlanta, Georgia 30368-2865

For payments made by Federal Express:
> Corus Bank N.A. – #102865
> Lockbox Mail Department
> Georgia Operations Center
> 100 South Crest Drive
> Stockbridge, Georgia 30281

For payments made by Wire Transfer and ACH:
> SUNTRUST BANK, ATLANTA
> ABA 061000104
> TO CREDIT ACCOUNT 1000008140328
> ACCOUNT NAME:  CORUS BANK NA
> FOR FURTHER CREDIT TO: Corus Bank Loan
> [_____]

**4.2    Loan Documents.**

Borrower agrees that it will, on or before the Loan Opening Date, execute and deliver or cause to be executed and delivered to Lender the following documents in form and substance acceptable to Lender:

(a)    The Note.

(b)    The Mortgage.

(c)    The Completion and Carveout Guaranty.

(d)    The Environmental Indemnity.

(e)    A collateral assignment, to the extent assignable, of construction documents, including, without limitation, the General Contract, all architecture, Design Professional and engineering contracts, Plans and Specifications, permits, licenses, approvals and development rights, together with consents to the assignment and continuation agreements from the General Contractor, the architect, real estate broker and other parties reasonably specified by Lender.

(f)    A collateral assignment, to the extent assignable, of all Sales Agreements, Earnest Money Deposits, Upgrade Deposits and all other documents relating to the establishment of a condominium regime at the Project.

(g)    Such UCC financing statements as Lender determines are advisable or necessary to perfect or notify third parties of the security interests intended to be created by the Loan Documents.

17

(h)     A collateral assignment, to the extent assignable, of any management contract entered into with respect to the Project.

(i)     Such other documents, instruments or certificates as Lender and its counsel may reasonably require, including such documents as Lender in its reasonable discretion deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the Loan Documents, and to comply with the laws of the State.

**4.3     Term of the Loan.**

(a)     All principal, interest and other sums due under the Loan Documents shall be due and payable in full on the Initial Maturity Date, provided that Borrower shall have the option to extend the Maturity Date for two (2) additional six (6) month periods (the "First Extension Option" and the "Second Extension Option," respectively and each, an "Extension Option") if Borrower has satisfied the conditions set forth in subparagraph (b) or (c) below, as applicable. All references herein to the "Maturity Date" shall mean the Initial Maturity Date, or, in the event Borrower satisfies the conditions to the exercise of the Extension Options in accordance with this Section 4.3, the "Maturity Date" shall mean the First Extended Maturity Date or the Second Extended Maturity Date, as applicable. Interest only payments shall continue to be due and payable on the first of the month according to the Interest Rate then in effect on the outstanding principal balance of the Loan during both of the extensions.

(b)     Borrower may only exercise the First Extension Option upon satisfying the following conditions:

(i)     The entire Project or, if Borrower did not qualify to borrow Tranche B and has not commenced construction of Phase II, Phase I of the Project shall be completed and a certificate of occupancy shall have been issued by the appropriate Governmental Authority; provided, however, that Units which pursuant to Qualifying Sales Agreements are to be sold in "shell" condition (as permitted by the last grammatical paragraph of Section 14.4) need only have been completed to the condition required for closing pursuant to such Qualifying Sales Agreements;

(ii)     Borrower shall have delivered to Lender written notice of such election no earlier than seventy-five (75) days and no later than thirty (30) days prior to the Initial Maturity Date;

(iii)     Borrower shall have paid, together with its written notice of such election, an extension fee (an "Extension Fee") equal to 0.50% of the Lender's Remaining Exposure at the time the Extension Option is requested;

(iv)     Borrower shall have paid to Lender the Release Price for at least seventy (70) Units and the sum of the sales prices (excluding upgrades and extras) of the Units sold and conveyed to date was at least ninety-five percent (95%) of the sum of the List Prices of the conveyed Units;

(v)     The Loan has not matured and no Default or Event of Default exists under the Loan Documents and no condition exists which, with the passing of time or giving of notice, would constitute a Default or Event of Default; and

(vi)     The maturity date of the Mezzanine Loan (as extended) shall be not earlier than the First Extended Maturity Date.

(c)     Borrower may only exercise the Second Extension Option upon satisfying the following conditions:

(i)     The entire Project or, if Borrower did not qualify to borrow Tranche B and has not commenced construction of Phase II, Phase I of the Project shall be completed and a certificate of occupancy shall have been issued by the appropriate Governmental Authority;

(ii)     Borrower shall have delivered to Lender written notice of such election no earlier than seventy-five (75) days and no later than thirty (30) days prior to the First Extended Maturity Date;

(iii)     Borrower shall have paid, together with its written notice of such election, an Extension Fee equal to 0.50% of the Lender's Remaining Exposure at the time the Extension Option is requested;

(iv)     Borrower shall have paid to Lender the Release Price for at least eighty (80) Units (including those referred to in Section 4.3(b)(iv)) and the sum of the sales prices (excluding upgrades and extras) of the Units sold and conveyed to date was at least ninety-five percent (95%) of the sum of the List Prices of the conveyed Units;

(v)     The Loan has not matured and no Default or Event of Default exists under the Loan Documents and no condition exists which, with the passing of time or giving of notice, would constitute a Default or Event of Default; and

(vi)     The maturity date of the Mezzanine Loan (as extended) shall be not earlier than the Second Extended Maturity Date.

(d)     Notwithstanding the above provisions of this Section 4.3, in the event that (x) Borrower does not repay the Loan in full on or before the Initial Maturity Date and (y) the Maturity Date is not extended pursuant to the provisions of Section 4.3(b) (whether because Borrower did not request the extension or Borrower requested the extension but did not qualify for such extension) then the Maturity Date shall nevertheless be extended from the Initial Maturity Date to a date that is thirty (30) days after the Initial Maturity Date and the Extension Fee (in the amount equal to 0.50% of the Lender's Remaining Exposure at the Initial Maturity Date) shall be due and payable from Borrower to Lender on the Initial Maturity Date and the Mortgage will not be released until the Extension Fee and all other amounts due under the Loan have been paid in full. In such event, Borrower shall not be entitled to any further extensions of the Maturity Date. No such extension shall occur if the Loan has been accelerated prior to the Initial Maturity Date. In addition, in the event that (x) the First Extension Option was exercised but Borrower does not repay the Loan in full on or before the First Extended Maturity Date and (y) the Maturity Date is not extended pursuant to the provisions of Section 4.3(c) (whether

19

because Borrower did not request the extension or Borrower requested the extension but did not qualify for such extension) then the Maturity Date shall nevertheless be extended from the First Extended Maturity Date to a date that is thirty (30) days after the First Extended Maturity Date and the Extension Fee (in the amount equal to 0.50% of the Lender's Remaining Exposure at the First Extended Maturity Date) shall be due and payable from Borrower to Lender on the First Extended Maturity Date and the Mortgage will not be released until the Extension Fee and all other amounts due under the Loan have been paid in full. In such event, Borrower shall not be entitled to any further extensions of the Maturity Date. No such extension shall occur if the Loan has been accelerated prior to the First Extended Maturity Date.

(e)    If Borrower sends written notice of Borrower's election to exercise the First Extension Option, Lender shall no later than twenty (20) days prior to the Initial Maturity Date notify Borrower ("Lender's Response Notice") whether, with respect to the First Extension Option, the conditions set forth in Section 4.3(b) have been satisfied and accordingly the Maturity Date has been extended to the First Extended Maturity Date. If Borrower sends written notice of Borrower's election to exercise its Second Extension Option, Lender shall no later than twenty (20) days prior to the First Extended Maturity Date notify Borrower through the Lender's Response Notice whether, with respect to the Second Extension Option, the conditions set forth in Section 4.3(c) have been satisfied and accordingly the Maturity Date has been extended to the Second Extended Maturity Date.

(f)    If Lender fails to timely send Lender's Response Notice but Borrower has not qualified for such First Extension Option or Second Extension Option, as applicable, then Lender shall not thereby be deemed to have waived the Extension Fee payable under subparagraph (d); provided, however, that in such circumstance, if (x) Borrower repays the Loan in full prior to receipt of Lender's Response Notice or (y) Borrower repays the Loan in full no later than the date twenty (20) days after receipt of Lender's Response Notice, then no Extension Fee shall be owed under subparagraph (d).

## 4.4    Prepayments.

Borrower shall have the right to make prepayments of the Loan in accordance with and subject to the terms of the Note.

## 4.5    Required Principal Payments.

All principal shall be paid on or before the Maturity Date.

## 4.6    Receipt of Payments.

All payments received by Lender prior to or at 3:00 p.m. (Chicago time) on a Business Day shall be credited to Borrower on the day of receipt; all payments received after 3:00 p.m. (Chicago time) on a Business Day shall be deemed received on the next succeeding Business Day.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

**4.7    Termination of Lender's Unfunded Commitment.**

Upon the repayment in full of the outstanding principal balance of the Loan, Lender's obligation to fund the Unfunded Commitment shall thereupon terminate and Lender shall have no further obligation to fund Loan proceeds hereunder.  If Lender agrees in writing (in its sole and absolute discretion) not to terminate its obligation to fund any Unfunded Commitment after the repayment in full of the outstanding principal balance of the Loan, Borrower shall thereafter escrow the Release Price from the sale of Units with Lender until such time as Lender's obligation to fund the Commitment expires or is terminated.

**Article 5
INTEREST**

**5.1    Interest Rate.**

The Loan shall bear interest as set forth in the Note.  Interest shall be paid on the Loan when and as set forth in the Note.

**Article 6
COSTS OF MAINTAINING LOAN**

**6.1    Increased Costs and Capital Adequacy.**

(a)    Borrower recognizes that the cost to Lender of maintaining the Loan or any portion thereof may fluctuate, and Borrower agrees to pay Lender additional amounts to compensate Lender for any increase in its actual costs incurred in maintaining the Loan or any portion thereof outstanding or for the reduction of any amounts received or receivable from Borrower as a result of any change after the date hereof in any applicable Law, regulation or treaty, or in the interpretation or administration thereof, or by any domestic or foreign court, (i) changing the basis of taxation of payments under this Agreement and/or the Note to Lender (other than taxes imposed on all or any portion of the overall net income or receipts of Lender), or (ii) imposing, modifying or applying any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, credit extended by, or any other acquisition of funds for loans by Lender (which includes the Loan or any applicable portion thereof) or (iii) imposing on Lender any other condition affecting the Loan, provided that the result of the foregoing is to increase the cost to Lender of maintaining the Loan or any portion thereof or to reduce the amount of any sum received or receivable from Borrower by Lender under the Loan Documents.

(b)    If the adoption after the date hereof of any Law, rule, regulation or guideline regarding capital adequacy, or any change after the date hereof in any of the foregoing, or in the interpretation or administration thereof by any domestic or foreign Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has the effect of reducing the rate of return on Lender's capital to a level below that which Lender would have achieved but for such application, adoption, change or compliance, then, from time to time

21

Borrower shall pay to Lender such additional amounts as will compensate Lender for such reduction with respect to any portion of the Loan outstanding.

(c)    Any amount payable by Borrower under subsection (a) or subsection (b) of this Section 6.1 shall be paid within five (5) days of receipt by Borrower of a certificate signed by an authorized officer of Lender setting forth the amount due and the basis for the determination of such amount, which statement shall be conclusive and binding upon Borrower absent manifest error. Failure on the part of Lender to demand payment from Borrower for any such amount attributable to any particular period shall not constitute a waiver of Lender's right to demand payment of such amount for any subsequent or prior period.

(d)    Notwithstanding the foregoing, Borrower shall only be obligated to pay such costs and expenses described above in this Article 6 as are (i) imposed on all or a substantial number of national banks (as opposed to costs unique to Lender) and (ii) assessed by Lender against all or substantially all similarly situated customers.

**6.2    Borrower Withholding.**

If by reason of a change in any applicable Laws occurring after the date hereof, Borrower is required by Law to make any deduction or withholding in respect of any taxes (other than taxes imposed on or measured by the net income of Lender or any franchise tax imposed on Lender), duties or other charges from any payment due under the Note to the maximum extent permitted by law, the sum due from Borrower in respect of such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, Lender receives and retains a net sum equal to the sum that it would have received had no such deduction or withholding been required to be made.

### Article 7
### LOAN EXPENSE AND ADVANCES

**7.1    Loan and Administration Expenses.**

Borrower unconditionally agrees to pay all reasonable expenses of the Loan, including all amounts payable pursuant to Sections 7.2 and 7.3 and any and all other fees owing to Lender pursuant to the Loan Documents, and also including, without limiting the generality of the foregoing, all recording, filing and registration fees and charges, mortgage, intangible or documentary taxes, escrow charges, title charges, all insurance premiums, title insurance premiums and other charges of the Title Insurer, printing and photocopying expenses, survey fees and charges, cost of certified copies of instruments, cost of premiums on the Title Policy, charges of the Title Insurer or other escrowee for administering disbursements, all fees and disbursements of Lender's Consultant, all appraisal fees, insurance consultant's fees, investigator's fees, environmental consultant's fees, reasonable travel related expenses and all reasonable costs and expenses incurred by Lender in connection with the determination of whether or not Borrower has performed the obligations undertaken by Borrower hereunder or has satisfied any conditions precedent to the obligations of Lender hereunder. Borrower shall pay the airfare and other travel expenses for each officer or analyst of Lender who inspects the Project as part of Lender's due diligence. The amount charged for the airfare will be the lesser of

22