# EXHIBIT 1

# (PART III)

Borrower may enter into Sales Agreements for up to twenty (20) Units in the aggregate for sale in shell condition (i.e., without completion of the Unit in accordance with some or all of the Approved Finish Standards) so long as: (i) the List Price and other requirements of the Sales Agreement otherwise comply with all requirements hereof (without the sales price being reduced below List Price or the Unit Purchaser being granted a concession of equivalent effect), (ii) the Unit Purchaser's Earnest Money Deposit is at least fifteen percent (15%) of the sale price; (iii) the Unit Purchaser is obligated to contract with the General Contractor to finish its Unit, and (iv) closing of the Unit must be required to occur at the time of shell completion of such Unit, so that if such closing does not timely occur, Borrower may discharge its obligation to cause such Unit to be completed in accordance with the Approved Finish Standards. Except for Units which are under Qualifying Sales Agreements to be sold in shell condition prior to the time of shell completion, Borrower shall complete all Units in accordance with the Approved Finish Standards and shall not hold Units for sale in a shell state without finishing them. Borrower shall cause a Change Order to be executed by the General Contractor reducing the General Contract Price for each Unit sold in shell condition by the resulting cost savings, and upon execution of each such Change Order, such portion of the Budget Line Item for payments to the General Contractor shall be reallocated to the Owner's Hard Cost Contingency.

**14.5    Sales Operations and Seller's Obligations.**

Borrower shall at all times maintain adequate marketing capability, and shall timely perform all obligations required to be performed by it under each Sales Agreement.

**14.6    Delivery of Sales Information and Documents.**

Within ten (10) days after the end of each month, Borrower shall deliver to Lender a sales report showing all currently pending sales (separated into new sales entered into during the month being reported on and previous sales contracted for in preceding months), all closings which took place during the month being reported on, and all sales previously reported that for any reason will not close. Such report shall include the amount and status of all Earnest Money Deposits and Upgrade Deposits for all Units that have not been conveyed. Borrower shall also promptly deliver to Lender such other sales information and documents that Lender from time to time may reasonably request, including operating statements, all new Sales Agreements, and notice of or information regarding any claimed breach or disavowal of buyer's or seller's obligations under any one or more Sales Agreements.

**14.7    Borrower's Acknowledgment Regarding Buyer Financing.**

Borrower acknowledges that Lender is not committed to provide any financing to or for the buyers of any individual Units.

**14.8    Condominium Regime.**

(a)    Prior to filing with any Governmental Authority, Borrower shall have delivered to Lender, and Lender shall have approved, the Condominium Documents. The Condominium Documents shall not provide for any transfer fee in connection with the sale of Parking Spaces.

48

(b)    Borrower shall on an ongoing basis comply with all requirements of the Interstate Land Sales Act, Arizona Laws and all other applicable Laws relating to the sale or marketing of the Units. Borrower shall obtain all needed Governmental Approvals of the Condominium Documents (including the final public report to be approved by the state of Arizona) within four (4) months of the date hereof. Without limiting the foregoing, Borrower shall have made all filings under the Interstate Land Sales Act (without relying on an exemption) so that Sales Agreements will not be terminable thereunder. Borrower shall to the extent required to comply with the Interstate Land Sales Act, (i) timely file its Annual Report of Activity with HUD each year during the term hereof; (ii) pay any fees in connection therewith before the due date; (iii) deliver financial statements to HUD within one hundred and twenty (120) days after the close of Borrower's fiscal year; and (iv) amend the HUD Property Report (or equivalent) to reflect any change in any material representation of a material fact required in the Statement of Record within fifteen (15) days of learning of the change. Borrower shall deliver to Lender (simultaneously with delivery to the applicable Governmental Authority) copies of all filings and notices delivered to HUD in accordance with the Interstate Land Sales Act or delivered by Borrower to the State of Arizona, and Borrower shall, within five (5) Business Days after receipt thereof, deliver to Lender all notices, requests, correspondence and demands delivered by HUD or the State of Arizona to Borrower.

(c)    Borrower shall promptly, and in any event prior to the closing of the first purchase and sale of a Unit, cause the Condominium Documents to be filed or recorded, as appropriate. Prior to recording or filing any documents, Borrower shall submit to Lender for Lender's final review and approval, executed copies of the proposed Condominium Documents, which, once approved, shall be filed or recorded, as applicable. Any changes or additions to such documents from those previously submitted to Lender shall be subject to Lender's consent, which consent shall not unreasonably be withheld. Provided that no Event of Default exists, Lender, prior to the initial conveyance of Units, shall execute such subordinations of the Mortgage and other documents as are needed to permit the recordation or filing of such documents. Prior to such execution by Lender and as a condition thereto, Borrower shall furnish to Lender a copy of (i) a notice sent by Borrower to the condominium association informing the association of Lender's rights under the declaration as a mortgagee and furnishing the association with Lender's address for notice purposes, (ii) resignations of all Borrower-appointed directors and officers, which Lender may deliver at any time an Event of Default exists and (iii) such other documents in connection with the establishment of such condominium regime as Lender reasonably requests.

(d)    Borrower shall not permit control of the condominium association to be turned over to the Unit owners more than thirty (30) days prior to the date that is required by Arizona law.

### 14.9    Release of Units.

(a)    At Borrower's request upon the closing of a Unit sale, Lender shall issue a partial release of the Unit from the Mortgage, so long as all of the following conditions are satisfied at the time of, and with respect to, the partial release:

(i)    No Event of Default exists;

49

(ii)    Such sale is pursuant to a Qualifying Sales Agreement;

(iii)    Lender has been paid, in immediately available funds, a Release Price (defined below) for the Unit in an amount determined as set forth below to be applied first, to payment of the Exit Fee in the amount specified in <u>Section 7.4</u>, and second, to reduce the outstanding principal balance of the Loan (and, after repayment thereof in full, to any remaining indebtedness under the Loan Documents);

(iv)    Lender receives a copy of the closing statement and applicable Unit release no later than 9:00 a.m. (Chicago time) at least one (1) Business Day prior to any Unit sale; and

(v)    All escrow, closing and recording costs have been paid at no expense to Lender.

(b)    The execution of a Sales Agreement shall not by itself satisfy the conditions for release of the Unit that is being sold; those conditions must be satisfied in full at the time the Unit is to be released.

(c)    If Lender does not require satisfaction of all of the conditions described above before releasing one or more Units, that alone shall not be a waiver of such conditions, and Lender reserves the right to require their satisfaction in full before releasing any further Units from the Mortgage.

(d)    The "<u>Release Price</u>" for a Unit (including one Parking Space per Unit) shall be the greatest of (i) 100% of Net Sales Proceeds from the sale of the applicable Unit, (ii) (x) 94% of the gross purchase price (inclusive of all amounts paid by Unit Purchasers, but exclusive of any extras and/or upgrades) under the applicable Qualifying Sales Agreement, <u>plus</u> (y) 100% of any Upgrade Profits for such Unit, and (iii) (x) 90% of the List Price (including Parking Spaces included in the List Price but excluding amounts paid for extras and/or upgrades) <u>plus</u> (z) 100% of any Upgrade Profits for such Unit.

If (x) no Event of Default exists and (y) the aggregate sales prices (excluding upgrades and extras) of the Units sold and conveyed to date equals or exceeds 95% of the aggregate List Price for such Units, then:

(A)    After sufficient Units have been conveyed and Release Prices paid to Lender such that Lender's Remaining Exposure is less than 50% of the aggregate List Prices of the Remaining Units, then Units shall be released with a reduced Release Price equal to (i) 75% of the List Price for each applicable Unit, <u>plus</u> (ii) 100% of any Upgrade Profits for such Unit;

(B)    After sufficient Units have been conveyed and Release Prices paid to Lender such that Lender's Remaining Exposure is less than 40% of the aggregate List Prices of the Remaining Units, then Units shall be released with a reduced Release Price equal to (i) 60% of the List Price for each applicable Unit, plus (ii) 100% of any Upgrade Profits for such Unit; and

(C)    After sufficient Units have been conveyed and Release Prices paid to Lender such that Lender's Remaining Exposure is less than 30% of the aggregate List Prices of the

50

Remaining Units, then Units shall be released with a reduced Release Price equal to (i) 45% of the List Price for each applicable Unit, plus (ii) 100% of any Upgrade Profits for such Unit.

The Release Price for any Unit is subject to reduction for Earnest Money Deposits applied to pay Hard Costs pursuant to <u>Section 14.3(f)</u>.

The "<u>Release Price</u>" for a Parking Space (to the extent not included in the List Price for a Unit) or storage space shall be 100% of the Net Sales Proceeds but in no event less than 80% of the pro forma sale price assigned to such Parking Space or storage space by Lender. Borrower shall pay such Release Price upon the assignment by Borrower of any Parking Space or storage space, whether such Parking Space or storage space is sold together with a Unit or is sold separately.

At any time an Event of Default exists, Lender may require Borrower to pay a Release Price equal to all Net Sales Proceeds of the Unit (or other Project component being sold), notwithstanding any lesser price that would otherwise be payable hereunder.

(e)    Borrower shall pay all reasonable costs and expenses associated with the sale of the Unit, including title expenses, reasonable legal fees, brokerage and sales commissions and other closing costs, from the portion of the sales price in excess of such Release Price and, if such excess is insufficient for such purpose, shall pay such excess costs from its own funds.

(f)    If requested by Lender, Borrower shall also deposit with Lender (to the extent not required to be deposited in condominium association bank accounts) all amounts deducted or set aside for real estate taxes or retained for assessments or working capital (and pledges its interest in such account(s) to Lender). Lender shall hold such amount subject to the rights of Unit Purchasers and the condominium association therein, provided, however, Lender shall permit Borrower to use the funds deposited in such accounts for their legally required purposes.

(g)    Individual Parking Spaces may be transferred to Unit Purchasers upon payment of the applicable Release Price payable as set forth above (including one (1) parking Space included in the price of a Unit), but if the parking garage is a unit pursuant to the Condominium Documents, such parking unit shall not be subject to release until repayment in full of the Loan (and termination of any remaining Commitment).

**14.10    Application of Sales Proceeds.**

Except as otherwise expressly provided herein, all sales proceeds received by Lender in connection with the sale of a Unit shall be applied by Lender as follows (regardless of any contrary order of payment specified by Borrower):

(a)    First, to the payment of any Exit Fee then due;

(b)    Second, Ten Thousand Dollars ($10,000) per Unit to be held by Lender in an escrow account for warranty claims;

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

(c)     Third, amounts requested by Borrower and reasonably acceptable to Lender to be held by Lender in escrow to pay City of Scottsdale sales taxes (in the amount of 1.7%, as reduced by credits for other taxes paid) when due;

(d)     Fourth, to the payment of principal then due and owing under the Note, until the amounts due thereunder have been paid in full; and

(e)     Finally, to any other amounts payable to Lender under the Loan Documents, including any costs and expenses of Lender.

Notwithstanding the foregoing, if an Event of Default exists, Lender may apply all amounts received to the indebtedness under the Loan Documents in such order as Lender may elect in its sole discretion.

The amounts to be held in escrow pursuant to subparagraphs (b) and (c) above shall, so long as no Event of Default exists, be disbursed for their intended purposes when Borrower presents to Lender evidence acceptable to Lender that bona fide third-party expenditures are required for such purposes.  Borrower grants to Lender a security interest in all such funds and accounts.

### Article 15
### OTHER COVENANTS

**15.1    Borrower further covenants and agrees as follows:**

(a)     <u>Opening of Loan on or Prior to Loan Opening Date</u>.  All conditions precedent in Article 8 and in Section 9.1 shall (except as otherwise expressly set forth in Section 8.1(t) and Section 9.1) be satisfied on or before January 3, 2006, and Borrower shall request and qualify for (i) the initial disbursement of the Loan and (ii) the first disbursement of the Loan for Hard Costs on or before the date sixty (60) days after the date hereof.  If the Borrower fails to satisfy timely any of the requirements set forth in the preceding sentence, an Event of Default shall exist and Lender may terminate its commitment to fund the Loan.

(b)     <u>Compliance with Condominium Documents</u>.  Borrower shall pay all general and special assessments for common charges and expenses and insurance premiums made against or relating to the Units or otherwise payable by Borrower under the Condominium Documents as the same shall become due and payable and prior to delinquency, and not later than the tenth (10th) day of each month provide to Lender evidence of such payments, and in the event Borrower shall fail to make such payments as the same become due and payable and prior to delinquency, Lender may from time to time at its option, but without any obligation to do so and without notice or demand upon Borrower, make such payments, and all expenses paid by Lender for such purpose, including, without limitation, attorneys' fees, shall be added to the outstanding principal amount of the Loan and shall be payable on demand and bear interest at the Default Rate until repaid.  Borrower shall not, without the prior written consent of the Lender, give any consent or perform any action in furtherance of any material modification or amendment of the Condominium Documents, including any modifications or amendments to the Condominium Documents which would permit a Unit Purchaser to rescind its Sales Agreement under Arizona

52

Laws. Borrower shall comply with all of the terms, covenants and conditions on its part to be performed under the Condominium Documents, as the same shall be in force and effect from time to time; provided, however, that if Borrower fails to cure such non-compliance within any applicable cure periods provided in the Condominium Documents, Lender may from time to time at its option, but without any obligation to do so, cure or remedy any such default by Borrower (Borrower hereby authorizing Lender to enter upon the Project as may be necessary for such purposes), and all expenses paid by Lender for such purpose, including, without limitation, attorneys' fees, shall be added to the outstanding principal balance of the Loan and shall be payable on demand and bear interest at the Default Rate until repaid. Borrower shall deliver to Lender a true and complete copy of each and every notice of default, if any, received by Borrower with respect to Borrower under any of the Condominium Documents or applicable law regarding the condominium. Borrower shall not, without the prior written consent of Lender, exercise any right it may have to vote for (x) the expenditure of insurance proceeds (which are governed by Article 16 below) or condemnation awards for the repair or restoration of the Project or (y) any additions or improvements to the common elements of the Project.

(c)    Construction of Improvements. The Improvements shall be constructed and fully equipped in a good and workmanlike manner with materials of high quality, substantially in accordance with the Approved Plans and Specifications (or in accordance with any changes therein that may be approved in writing by Lender or as to which Lender's approval is not required), and such construction and equipping will be commenced on or before the Required Construction Commencement Date and prosecuted with due diligence and continuity in accordance with the Construction Schedule and fully completed not later than the Completion Date.

(d)    Payment for Work. Borrower agrees to fully pay and discharge when due and payable all claims for labor done and material and services furnished in connection with the construction of the Project and to take all other steps to forestall the assertion of claims against the Project or the Loan.

(e)    Inspection by Lender. Borrower shall cooperate with Lender in arranging for inspections by representatives of Lender of the progress of the Construction from time to time including an examination of (i) the Improvements, (ii) all materials to be used in the Construction, (iii) all plans and shop drawings that are or may be kept at the construction site, (iv) any contracts, bills of sale, statements, receipts or vouchers in connection with the Improvements, (v) all work done, labor performed, and materials furnished in and about the Improvements, (vi) all books, contracts and records with respect to the Improvements, and (vii) any other documents relating to the Improvements or the Construction. Borrower shall cooperate with Lender's Consultant to enable him to perform his functions hereunder and will promptly comply with Lender's requirements and remove any defect regarding the Construction of the Improvements or the progress thereof.

(f)    Materialmen's Liens and Contest Thereof. Borrower shall not suffer or permit any materialmen's lien claims to be filed or otherwise asserted against the Project or any funds due to the General Contractor, and shall promptly discharge the same in case of the filing of any claims for lien or proceedings for the enforcement thereof, provided, however, that Borrower shall have the right to contest in good faith by appropriate legal proceeding and with reasonable

53

diligence the validity of any such lien or claim, provided that Borrower either (i) posts a statutory lien bond in form and substance acceptable to Lender that removes such lien from title to the Project, (ii) deposits with Lender, in cash, an amount equal to the lien plus any interest and penalties that in Lender's reasonable judgment may accrue thereon during such contest, or (iii) obtains endorsements to the Title Policy (at Borrower's sole cost and expense) insuring over the exception created by the lien, within thirty (30) days of written notice by Lender to Borrower of the existence of the lien. Borrower agrees that Lender may require a funded title indemnity to be held by the Title Insurer, in an amount sufficient to pay the cost of the unpermitted lien, which amount the Title Insurer may be instructed by Lender to use to pay the amount of the unpermitted lien upon the occurrence of an Event of Default. Lender shall not be required to make any further disbursements of the proceeds of the Loan until any materialmen's lien claims have been removed or insured over by the Title Insurer and Lender may, at its option, restrict disbursements to reserve sufficient sums to pay 150% of the face amount of the lien.

(g)     Settlement of Materialmen's Lien Claims.  If Borrower shall fail promptly either (i) to discharge any such lien, or (ii) post a statutory lien bond in the manner provided in Section 15.1(f), Lender may, at its election (but shall not be required to), procure the release and discharge of any such lien and any judgment or decree thereon and, further, may in its sole discretion effect any settlement or compromise of the same, or may furnish such security or indemnity to the Title Insurer, and any amounts so expended by Lender, including premiums paid or security furnished in connection with the issuance of any surety company bonds, shall be deemed to constitute disbursement of the proceeds of the Loan hereunder.  In settling, compromising or discharging any claims for lien, Lender shall not be required to inquire into the validity or amount of any such claim.

(h)     Proceedings.  In addition to (and not in lieu of Borrower's covenants set forth in Section 15.1(f)), if any action, claim or proceeding affecting title to the Land, the construction of the Project, Borrower, Guarantor, the rights of Lender under any Loan Document, or otherwise affecting the Project, be filed or commenced, then at the request of Lender, Borrower shall appear in and defend, at Borrower's sole cost and expense, any such action or proceeding and, if applicable, Borrower shall insure or bond over such action, claim or proceeding in accordance with Section 15.1(f).  If Borrower fails to appear and defend any such action or proceeding, then Lender may commence, intervene in, and defend actions or proceedings affecting the Project or the transactions contemplated herein, and compromise or settle any claim or controversy pertaining thereto, employing legal counsel acceptable to Lender to defend such claims at Borrower's sole cost.  Lender shall not be liable to Borrower for any action, error, mistake, omission or delay pertaining to the actions described in this Section or any damages resulting therefrom.  Any cost incurred by Lender under this Section shall be deemed to be expenses of the Loan payable by Borrower pursuant to Article 7 of this Agreement.

(i)     Insurance.  Borrower shall cause insurance policies to be maintained in compliance with Exhibit E, or such other insurance requirements as may be reasonably required by Lender, at all times.  Borrower shall provide Lender, at least ten business days prior to any Loan disbursements, a certificate(s) demonstrating appropriate insurance coverage(s), which shall demonstrate insurance coverage that meets or exceeds the requirements on Exhibit E. Borrower shall timely pay all premiums on all insurance policies required hereunder, and as and when additional insurance is required, from time to time, during the progress of Construction,

54

and as and when any policies of insurance may expire, furnish to Lender, premiums prepaid, additional and renewal insurance policies with companies, coverage and in amounts reasonably satisfactory to Lender in accordance with Exhibit E.

(j)    Payment of Taxes.  Borrower shall pay all real estate taxes and assessments and charges of every kind upon the Project before the same become delinquent. Borrower may use Loan proceeds for such purpose to the extent available in the Budget for such purpose upon meeting all conditions precedent set forth in this Agreement to any such disbursement. Borrower shall have the right to pay such tax under protest or to otherwise contest any such tax or assessment, but only if (i) such contest has the effect of preventing the collection of such taxes so contested and also of preventing the sale or forfeiture of the Project or any part thereof or any interest therein, (ii) Borrower has notified Lender of Borrower's intent to contest such taxes, and (iii) Borrower has deposited security in form and amount reasonably satisfactory to Lender, in its reasonable discretion, and has increased the amount of such security so deposited promptly after Lender's request therefor. If Borrower fails to commence such contest or, having commenced to contest the same, and having deposited such security required by Lender for its full amount, shall thereafter fail to prosecute such contest in good faith or with due diligence, or, upon adverse conclusion of any such contest, shall fail to pay such tax, assessment or charge, Lender may, at its election (but shall not be required to), pay and discharge any such tax, assessment or charge, and any interest or penalty thereon, and any amounts so expended by Lender shall be deemed to constitute disbursements of the Loan proceeds hereunder (even if the total amount of disbursements would exceed the face amount of the Note). Borrower shall furnish to Lender evidence that taxes are paid at least five (5) days prior to the last date for payment of such taxes and before imposition of any penalty or accrual of interest.

(k)    Tax Escrow Accounts.  After the earlier to occur of (i) an Event of Default or (ii) the Budget Line Item for real estate taxes having been exhausted, Borrower shall make monthly tax escrow deposits in the amount of one-twelfth (1/12) of one hundred ten percent (110%) of the annual real estate taxes as reasonably estimated by Lender, such deposit to be held in an interest bearing escrow account held by Lender in Lender's name and under its sole dominion and control. If at any time Lender determines in its sole discretion that the amount of the monthly escrow payments made pursuant to this Section 15.1(k) are not sufficient to pay in full the next installment of real estate taxes then due, then upon written notice from Lender of the amount of any expected deficiency, Borrower shall then deposit funds equal to such amount with Lender. All payments deposited in the escrow account, and all interest accruing thereon, are pledged as additional collateral for the Loan. Notwithstanding Lender's holding of the escrow account, nothing herein shall obligate Lender to pay any real property taxes with respect to any portion of the Project at any time an Event of Default exists.

(l)    Personal Property.  All of Borrower's personal property, fixtures, attachments and equipment delivered upon, attached to or used in connection with the Construction or the operation of the Project shall always be located at the Project and shall be kept free and clear of all liens, encumbrances and security interests, other than as otherwise permitted under the Loan Documents.

(m)    Leasing Restrictions.  Without the prior written consent of Lender, Borrower and Borrower's agents shall not (i) enter into any Leases, (ii) modify, amend or terminate any Lease,

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

or (iii) accept any rental payment in advance of its due date. Borrower shall provide Lender with a copy of all proposed Leases no less than ten (10) days prior to the proposed execution date of such Leases. Borrower shall provide Lender with a copy of any approved fully executed Leases promptly following their execution.

(n)    <u>Defaults Under Leases</u>. Borrower will not suffer or permit any breach or default to occur in any of Borrower's obligations under any of the Leases nor suffer or permit the same to terminate by reason of any failure of Borrower to meet any requirement of any Lease including those with respect to any time limitation within which any of Borrower's work is to be done or the space is to be available for occupancy by the lessee. Borrower shall notify Lender promptly in writing in the event a tenant commits a material default under a Lease.

(o)    <u>Lender's Attorneys' Fees for Enforcement of Agreement</u>. In case of any Event of Default hereunder, Borrower (in addition to Lender's attorneys' fees, if any, to be paid pursuant to <u>Section 7.5</u>) will pay Lender's attorneys' and paralegal fees (including, without limitation, any attorney and paralegal fees and costs incurred in connection with any litigation or bankruptcy or administrative hearing and any appeals therefrom and any post-judgment enforcement action including, without limitation, supplementary proceedings) in connection with the enforcement of this Agreement; without limiting the generality of the foregoing, if at any time or times hereafter Lender employs counsel (whether or not any suit has been or shall be filed and whether or not other legal proceedings have been or shall be instituted) for advice or other representation with respect to the Project, this Agreement, or any of the other Loan Documents, or to protect, collect, lease, sell, take possession of, or liquidate any of the Project, or to attempt to enforce any security interest or lien in any portion of the Project, or to enforce any rights of Lender or Borrower's obligations hereunder, then in any of such events all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto (including fees and costs of paralegals), shall constitute an additional liability owing by Borrower to Lender, payable on demand. Such attorneys' fees and expenses shall include fees and expenses of Lender's in-house counsel as specified in <u>Section 7.5</u>.

(p)    <u>Appraisals</u>. Lender shall have the right to obtain a new or updated Appraisal of the Project from time to time, but not more frequently than one (1) time per calendar year. Borrower shall cooperate with Lender in this regard. If the Appraisal is obtained to comply with this Agreement or any applicable law or regulatory requirement, or bank policy promulgated to comply therewith, or if an Event of Default exists, Borrower shall pay the reasonable costs for any such Appraisal upon Lender's request.

(q)    <u>Financial Statements</u>. Borrower shall deliver or cause to be delivered to Lender annual financial statements with respect to Borrower and each Guarantor within sixty (60) days after the end of each fiscal year. All such financial statements shall be in a format approved in writing by Lender in Lender's reasonable discretion and in substance acceptable to Lender. Each financial statement shall be certified as true, complete and correct by its preparer and by Borrower or, in the case of each of the Guarantor's financial statements, by the Guarantor to whom it relates. Financial statements of the Guarantors shall include verifications, supporting schedules and additional statements as needed to substantiate the information contained in such statements. In addition, such financial statements shall include disclosure of any pending or threatened litigation and judgments entered against the Borrower or any Guarantor. Borrower

shall deliver to Lender Borrower's and each Guarantor's federal and state tax returns by April 15 of each year (except that if the date on which such returns may be filed is extended beyond April 15, then Borrower shall provide Lender with a copy of the extension request and shall furnish such tax returns to Lender within thirty (30) days after the date such returns are filed) and the tax returns for entities in which the Guarantors have a material interest. Borrower shall inform Lender as to any filed or threatened (in writing) litigation which would have a material adverse effect on Borrower's or Guarantors' ability to perform their respective obligations under the Loan Documents promptly after learning thereof. Borrower and each Guarantor shall provide such additional financial information as Lender reasonably requires. Borrower shall during regular business hours permit Lender or any of its agents or representatives to have access to and examine all of its books and records regarding the development and operation of the Project and, in addition, agrees to provide the Lender with copies of any purchase contracts pertaining to the Project. Borrower agrees that Lender may retain an investigator to research available public records and information relating to Borrower, the principals of Borrower and each of the Guarantors.

(r)     Sign and Publicity. Upon Lender's request, Borrower shall, at Lender's sole cost and expense, promptly erect a sign approved in advance by Lender in a conspicuous location on the Project during the Construction indicating that the financing for the Project is provided by Lender, so long as such sign complies with Laws and requirements of all Governmental Authority. Lender reserves the right to publicize the making of the Loan. Without limiting the foregoing, following Loan Opening, Lender shall have the right to announce publicly in print or otherwise that Lender has made and closed the Loan to Borrower. In connection therewith, Lender shall have the right to describe the Loan, including Borrower's name, the type of loan and the amount thereof, and to identify the Project and the location thereof by way of description and/or photographs of the Project.

(s)     Lost Note. Upon Lender's furnishing to Borrower an affidavit to such effect, Borrower shall, if the Note is mutilated, destroyed, lost or stolen, deliver to Lender, in substitution therefor, a new note containing the same terms and conditions as the Note, provided that Lender indemnifies Borrower against any liability arising out of a claim by a third party that it is a holder of the lost Note.

(t)     Indemnification. Borrower shall indemnify Lender, including each party owning an interest in the Loan and their respective officers, directors, employees and consultants (each, an "Indemnified Party") and defend and hold each Indemnified Party harmless from and against all claims, injury, damage, loss, liability, cost and/or expense (including reasonable attorneys' fees, costs and expenses) of any and every kind to any persons or property by reason of (i) the Construction; (ii) the sale, operation or maintenance of the Project; (iii) any claim with respect to application, disposition or return of any Earnest Money Deposit or Upgrade Deposit, (iv) any breach of representation or warranty, default or Event of Default under this Agreement or any other Loan Document or related Document; or (v) any other matter arising in connection with the Loan, Borrower, Guarantors, any Unit Purchaser or Sales Agreement, or the Project. No Indemnified Party shall be entitled to be indemnified against its own gross negligence or willful misconduct. The foregoing indemnification shall survive repayment of the Loan.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

(u)    No Additional Debt.  Except for the Loan, Borrower shall not incur or guarantee any indebtedness (whether personal or nonrecourse, secured or unsecured) other than customary trade payables paid within sixty (60) days after they are incurred.  (Additionally, Mezzanine Borrower may borrow the Mezzanine Loan.)

(v)    Compliance With Laws.  Borrower shall comply with all applicable requirements (including applicable Laws) of any Governmental Authority having jurisdiction over Borrower or the Project.

(w)    Organizational Documents.  Borrower shall not, without the prior written consent of Lender, permit or suffer (i) a material amendment or modification of its organizational documents, (ii) the admission of any new member, partner or shareholder in violation of Section 17.2 of this Agreement, or (iii) any dissolution or termination of its existence.

(x)    Furnishing Reports.  Upon Lender's request, Borrower shall provide Lender with copies of all inspections, reports, test results and other information received by any Borrower, that in any way relate to the Project or any part thereof.

(y)    Management Contracts.  Borrower shall not enter into, modify, amend, terminate or cancel any management, sales or marketing contracts for the Project, without the prior written approval of Lender.

(z)    Furnishing Notices.  Borrower shall provide Lender with copies of all material notices pertaining to the Project received by Borrower from any Governmental Authority or insurance company within seven (7) days after such notice is received.  Borrower shall promptly notify Lender of any judgment entered against, or any material litigation filed against, Borrower or Guarantor.

(aa)    Construction Contracts.  Borrower shall not enter into, modify, amend, terminate or cancel any material contracts for the Construction, without the prior written approval of Lender.  Borrower shall not enter into any contract which would cause the Loan to cease to be In Balance.  Borrower will furnish Lender promptly after execution thereof, executed copies of all contracts between Borrower, architects, engineers and contractors and all subcontracts between the General Contractor or contractors and all of their subcontractors and suppliers, which contracts and subcontracts may not have been furnished pursuant to Section 9.1(a) at the time of the Opening of the Loan.

(bb)    Correction of Defects.  Within five (5) days after Borrower acquires knowledge of or receives notice of a material defect in the Improvements or any material departure from the Approved Plans and Specifications, or any other requirement of this Agreement, Borrower shall proceed with diligence to correct all such defects and departures.

(cc)    Hold Disbursements in Trust.  Borrower shall receive and hold in trust for the sole benefit of Lender (and not for the benefit of any other person, including, but not limited to, contractors or any subcontractors) all advances made hereunder directly to Borrower, for the purpose of paying costs of the Construction in accordance with the Budget.  Borrower shall use the proceeds of the Loan solely for the payment of costs as specified in the Budget.  Borrower

58

shall pay all other costs, expenses and fees relating to the acquisition, equipping, use, sale and operation of the Project.

(dd)    Foundation Survey.    Not later than thirty (30) days after completion of the foundation with respect to the Improvements, Borrower shall furnish to Lender a survey of the Land with the foundation of the Improvements located thereon satisfying the requirements set forth in Section 8.1(d).

(ee)    Alterations.    Without the prior written consent of Lender, Borrower shall not make any material alterations to the Project (other than completion of the Construction in accordance with the Approved Plans and Specifications).

(ff)    Cash Distributions.    Borrower shall not make any distributions to itself, the Guarantors or any Affiliate of Borrower or the Guarantors until the Loan has been repaid, except that so long as no Event of Default exists Borrower shall be entitled to distribute (x) the disbursements set forth in Section 12.7 and Section 12.8 hereof, (y) Net Sales Proceeds in excess of the applicable Release Price.

(gg)    Injunctive Proceedings.    If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the construction, sale, occupancy, maintenance or operation of the Project or the Units, Borrower shall cause such proceedings to be vigorously contested in good faith, and in the event of an adverse ruling or decision, shall prosecute all allowable appeals therefrom, and shall, without limiting the generality of the foregoing, resist the entry or seek the stay of any temporary or permanent injunction that may be entered and use commercially reasonable efforts to bring about a favorable and speedy disposition of all such proceedings.    Lender's reasonable costs and disbursements (including attorney's fees) in connection with any such proceedings, whether or not Lender is a party thereto, shall be deemed to be expenses of the Loan payable by Borrower in accordance with Article 7 of this Agreement.

(hh)    Title Policy.    No work or Construction of any character shall be commenced upon, nor shall any materials be delivered to, the Project until (i) the Title Policy has been received by Lender or, if work has commenced with Lender's consent, the Title Company has agreed to insure Lender to Lender's satisfaction and (ii) any bonds required by Lender have been properly received and approved by Lender.

(ii)    Operating Revenues.    In the event the Project produces gross operating revenues from Leases (or otherwise), Borrower shall establish with Lender a non-interest bearing operating account for the Project into which all revenue associated with the Project shall be deposited and from which all operating expenses and interest of the Project shall be paid. Borrower's failure to deposit operating revenues into such account shall constitute an Event of Default hereunder.    Borrower hereby grants to Lender a security interest in such operating account.

(jj)    Phase III.    Borrower or an entity affiliated with Borrower or Guarantors is the purchaser under a contract to purchase property ("Phase III") adjacent to (and generally westerly of) the Land owned by PALS Land, Inc., which land Borrower may use for "Phase III" of the Project.    Borrower agrees not to commence (and agrees not to permit any Affiliate of Borrower

59

or of one or more Guarantors or controlled by Borrower or one or more Guarantors to commence) construction of a residential condominium project on Phase III or enter into unit sales contracts until the first to occur of (x) 140 Units at the Project (being the approximate number projected to be needed to repay the Loan) being subject to Qualifying Sales Agreements, (y) repayment of the Loan in full and termination of the Commitment or (z) one year after of the Maturity Date. Violation of this covenant shall be an Event of Default. The following shall not be deemed to violate this covenant: (i) the sale of Phase III to a party not affiliated with Borrower or any Guarantor and the subsequent development of Phase III by such purchaser for residential condominiums, (ii) development of Phase III for purposes other than residential condominiums (and for this purpose a hotel condominium shall not be deemed a residential condominium) or (iii) Borrower obtaining entitlements, performing land clearance or grading or conducting other pre-development activities on Phase III short of construction.

**15.2   Single Purpose Entity Covenants.**

Borrower hereby represents, warrants and covenants that without Lender's prior written consent, which may be withheld in Lender's sole discretion, and except as otherwise expressly permitted hereunder, Borrower:

(a)   shall not enter into any transaction of merger or consolidation, or liquidate or dissolve itself (or suffer any liquidation or dissolution), or acquire by purchase or otherwise all or substantially all the business or assets of, or stock or other evidence of beneficial ownership of, any Person;

(b)   has not and shall not guarantee or otherwise become liable on or in connection with any obligation of any other Person;

(c)   does not own and shall not own any asset other than the Project;

(d)   is not engaged and shall not engage, directly or indirectly, in any business other than the ownership, management and operation of the Project and shall remain organized solely for the purpose of the ownership, management and operation of the Project;

(e)   shall not enter into any contract or agreement with any Affiliate, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms' length basis with third parties other than an Affiliate;

(f)   has not incurred and shall not incur any indebtedness, secured or unsecured, direct or contingent (including any contingent obligation), other than indebtedness expressly permitted hereunder;

(g)   has not made and shall not make any loans or advances to any third party;

(h)   is and expects to remain solvent and pay its own liabilities, indebtedness and obligations of any kind, including all administrative expenses, as the same shall become due; it shall pay all such liabilities, indebtedness and obligations from its own separate assets;

(i)      has done or caused to be done and shall do all things necessary to preserve its existence, and shall not, nor will any member or partner, amend, modify or otherwise change its articles of organization, partnership agreement or operating agreement in a manner that adversely affects each such Person's existence as a single purpose entity;

(j)      shall conduct and operate its business generally as presently conducted and operated subject to such operational changes as may be reasonably necessary or appropriate to construct, operate and maintain the Project;

(k)      shall maintain bank accounts separate from any other Person;

(l)      shall maintain separate books and records and shall prepare separate financial statements that are not consolidated or combined with the financial statements of any other Person;

(m)      shall be, and at all times shall not hold itself out to the public as being other than, a legal entity separate and distinct from any other Person (including any Affiliate);

(n)      shall file its own tax returns, shall not permit its financial results to be consolidated or combined with those of any other Person for financial reporting purposes, and shall not permit any of its funds to be distributed, loaned or otherwise transferred to any other person;

(o)      is and expects to be at all times adequately capitalized for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(p)      shall not seek its dissolution or winding up, in whole or in part;

(q)      shall not commingle its funds and assets with those of any other Person;

(r)      has and shall maintain its assets in such manner that it is not costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(s)      does not and shall not hold itself out to be responsible for the debts or obligations of any other Person;

(t)      shall not do any act that would make it impossible to carry on its ordinary business;

(u)      except as otherwise permitted in the Loan Documents, shall not possess or assign the Project for other than a business or company purpose;

(v)      except as expressly permitted in the Loan Documents, shall not sell, encumber or otherwise dispose of all or substantially all of the Project;

(w)      shall not hold title to its assets other than in its name;

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

(x)    shall not institute proceedings to be adjudicated bankrupt or insolvent; or consent to the institution of bankruptcy or insolvency proceedings against it; or file a petition seeking, or consent to, reorganization or relief under any applicable federal or state law relating to bankruptcy; or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of it or a substantial part of its property; or make any assignment for the benefit of creditors; or admit in writing its inability to pay its debts generally as they become due;

(y)    shall maintain its books, records, resolutions and agreements as official records;

(z)    has observed and shall continue to observe all limited liability company or partnership formalities;

(aa)    has not and shall not fail to correct any known misunderstandings regarding its separate identity;

(bb)    shall not amend any provisions of its organizational documents in any material respect without Lender's express written consent, which consent shall not unreasonably be withheld;

(cc)    shall not affirmatively seek in any case, action, suit or proceeding to suspend, reduce, impede, or impair Lender's right of recourse to the Project or any part thereof (provided however, that: (1) the bringing of a good faith counterclaim which, if not raised in the foreclosure, would be barred and which does not seek to enjoin the enforcement action of the Lender; or (2) the good faith denial of facts alleged by the Lender in an enforcement action, shall not give rise to liability under this subsection (cc)); and

(dd)    shall not engage in any act, omission, or misrepresentation which has the effect of suspending, delaying, reducing, impeding, or impairing Lender's right of recourse to the Project or any part thereof.

## 15.3    Authorized Representative.

Borrower hereby appoints the Authorized Representatives as its authorized representative for purposes of dealing with Lender on behalf of Borrower in respect of any and all matters in connection with this Agreement, the other Loan Documents, and the Loan. Each Authorized Representative, acting alone, shall have the power, in his discretion, to give and receive all notices, monies, approvals, and other documents and instruments, and to take any other action on behalf of Borrower. All actions by an Authorized Representative shall be final and binding on Borrower. Lender may rely on the authority given to each Authorized Representative until actual receipt by Lender of a duly authorized resolution substituting a different person as the Authorized Representative.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

## Article 16
## CASUALTIES AND CONDEMNATION

**16.1    Lender's Election to Apply Proceeds on Indebtedness.**

(a)    Subject to the provisions of Section 16.1(b) below, Lender may elect to negotiate, settle, collect, retain and apply upon the indebtedness of Borrower under this Agreement or any of the other Loan Documents all proceeds of insurance or condemnation (individually and collectively referred to as "Proceeds") after deduction of all expenses of collection and settlement, including reasonable attorneys' and adjusters' fees and charges.  Lender shall have the right to participate with Borrower in negotiation of any settlement, adjustment or compromise of any claim arising in connection with a casualty to the Improvements or any condemnation of all or part of the Project; provided, however, if an Event of Default exists, Lender shall have the right to settle any claim without Borrower's participation or consent.  Any Proceeds remaining after repayment of the indebtedness under the Loan Documents shall be paid by Lender to Borrower.

(b)    Notwithstanding anything in Section 16.1(a) to the contrary, in the event of any casualty to the Improvements or any condemnation of part of the Project, Lender agrees to make available the Proceeds for restoration of the Improvements if (i) no Event of Default exists, (ii) all Proceeds are deposited with Lender, (iii) in Lender's reasonable judgment, the amount of Proceeds available for restoration of the Improvements (together with undisbursed proceeds of the Loan, if any, allocated for the cost of the Construction and any sums deposited with Lender by Borrower for such purpose) is sufficient to pay the full and complete costs of such restoration, (iv) if Lender determines that the cost of restoration exceeds $2,500,000, Lender determines in its sole discretion that the loan to value ratio created by the Appraisal received by Lender pursuant to Section 8.1(i) remains satisfied (and for that purpose Lender may order an updated Appraisal at Borrower's expense); (v) in Lender's sole determination, the Project can be restored to an architecturally and economically viable project in compliance with applicable Laws, (vi) each Guarantor reaffirms its Guaranty in writing, (vii) Borrower shall have provided evidence reasonably acceptable to Lender that following restoration (and completion of the Project) any Sales Agreements will remain in effect and (viii) in Lender's reasonable determination, such restoration is likely to be completed so that the Units may be delivered to all Unit Purchasers prior to the outside delivery dates contained in their respective Sales Agreements and in any event not later than the Maturity Date.  On and after such time as the condominium is formed, Borrower agrees to vote its votes with respect to all unsold Units in a manner consistent with the provisions of this Article 16.

**16.2    Borrower's Obligation to Rebuild and Use of Proceeds Therefor.**

In case Lender does not elect to apply or does not have the right to apply the Proceeds to the indebtedness, as provided in Section 16.1 above, Borrower shall:

(a)    Proceed with diligence to make settlement with insurers or the appropriate Governmental Authorities and cause the Proceeds to be deposited with Lender;

63

(b)    In the event of any unreasonable delay in making settlement with insurers or the appropriate Governmental Authorities or effecting collection of the Proceeds, deposit with Lender the full amount required to complete construction as aforesaid;

(c)    In the event the Proceeds and the available proceeds of the Loan are insufficient to assure the Lender that the Loan will be In Balance, promptly deposit with Lender any amount necessary to place the Loan In Balance; and

(d)    Promptly proceed with the assumption of construction of the Improvements, including the repair of all damage resulting from such fire, condemnation or other cause and restoration to its former condition.

Any request by Borrower for a disbursement by Lender of Proceeds and funds deposited by Borrower shall be treated by Lender as if such request were for an advance of the Loan hereunder, and the disbursement thereof shall be conditioned upon Borrower's compliance with and satisfaction of the same conditions precedent as would be applicable under this Agreement for an advance of the Loan.

## Article 17
## ASSIGNMENTS BY LENDER AND BORROWER

### 17.1    Assignments and Participations.

Lender may from time to time, with written notice to Borrower, sell the Loan and the Loan Documents (or any interest therein) and may grant participations in the Loan. Borrower agrees to cooperate with Lender's efforts to do any of the foregoing and to execute all documents reasonably required by Lender in connection therewith that do not materially adversely affect Borrower's rights under the Loan Documents.

### 17.2    Prohibition of Assignments and Transfers by Borrower.

Borrower shall not assign or attempt to assign its rights under this Agreement and any purported assignment shall be void. An Event of Default shall occur if, without the prior written consent of Lender (which consent shall be in Lender's sole discretion), Borrower Transfers or creates any other encumbrance of any right, title to, or interest in the Project (whether legal or equitable) or any portion thereof, or sells, transfers or assigns (either outright or collaterally) any part of the beneficial interest in any trust holding title to the Project. In addition, there shall be no material modification or Transfer of the ownership, management or economic interests in the Borrower or its constituent entities, whether direct or indirect.

The sale and conveyance of Units shall be permitted only in accordance with Article 14 hereof. The Borrower may dispose of immaterial quantities of personal property, without Lender's prior consent.

**17.3   Prohibition of Transfers in Violation of ERISA.**

In addition to the prohibitions set forth in <u>Section 17.2</u> above, Borrower shall not assign, sell, pledge, encumber, transfer, hypothecate or otherwise dispose of its interest or rights in this Agreement or in the Project, or attempt to do any of the foregoing or suffer any of the foregoing, nor shall any party owning a direct or indirect interest in Borrower assign, sell, pledge, mortgage, encumber, transfer, hypothecate or otherwise dispose of any of its rights or interest (direct or indirect) in Borrower, attempt to do any of the foregoing or suffer any of the foregoing, if such action would cause the Loan, or the exercise of any of Lender's rights in connection therewith, to constitute a prohibited transaction under ERISA or the Internal Revenue Code or otherwise result in Lender being deemed in violation of any applicable provision of ERISA. Borrower agrees to indemnify and hold Lender free and harmless from and against all losses, costs (including reasonable attorneys' fees and expenses), taxes, damages (including consequential damages) and expenses Lender may suffer by reason of the investigation, defense and settlement of claims and in obtaining any prohibited transaction exemption under ERISA necessary or desirable in Lender's sole judgment or by reason of a breach of the foregoing prohibitions. The foregoing indemnification shall be a recourse obligation of Borrower and shall survive repayment of the Note, notwithstanding any limitations on recourse contained herein or in any of the Loan Documents.

**17.4   Successors and Assigns.**

Subject to the foregoing restrictions on transfer and assignment contained in this <u>Article 17</u>, this Agreement shall inure to the benefit of and shall be binding on the parties hereto and their respective successors and permitted assigns.

**Article 18
TIME OF THE ESSENCE**

**18.1   Time is of the Essence.**

Time is of the essence under this Agreement.

**Article 19
EVENTS OF DEFAULT**

The occurrence of any one or more of the following shall constitute an "Event of Default" as said term is used herein:

(a)      Failure of Borrower (i) (A) to make any principal payment when due, (B) to pay any interest within ten (10) days after the date when due or (C) to observe or perform any of the other covenants or conditions by Borrower to be performed under the terms of this Agreement or any other Loan Document concerning the payment of money, for a period of ten (10) days after written notice from Lender that the same is due and payable; or (ii) for a period of thirty (30) days after written notice from Lender, to observe or perform any non-monetary covenant or condition contained in this Agreement or any other Loan Documents, provided that if any such failure concerning a non-monetary covenant or condition is susceptible to cure and cannot

65

reasonably be cured within said thirty (30) day period, then Borrower shall have an additional sixty (60) day period to cure such failure and no Event of Default shall be deemed to exist hereunder so long as Borrower commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Lender's notice; and provided further that if a different notice or grace period is specified under any other subsection of this Article 19 with respect to a particular breach, or if another subsection of this Article 19 applies to a particular breach and does not expressly provide for a notice or grace period, the specific provision shall control.

(b)    The disapproval by Lender or Lender's Consultant at any time of any aspect of the construction work and failure of Borrower to cause the same to be corrected to the satisfaction of Lender within the cure period provided in Section 19(a)(ii) above.

(c)    (i) Failure of Borrower to commence Construction of the Project on or before the Required Construction Commencement Date, (ii) failure of Borrower to request and qualify for the first disbursement of Hard Costs on or before the date sixty (60) days after the date of this Agreement, (iii) a delay in the Construction or a discontinuance for a period of twenty (20) consecutive days after written notice from Lender concerning such discontinuance, or in any event a delay in the Construction so that the same is not, in Lender's sole judgment, likely to be completed on or before the Completion Date, (iv) failure of Borrower to complete Phase I according to the Approved Plans and Specifications no later than the Completion Date for Phase I or (v) if Borrower qualifies to borrow Tranche B, failure of Borrower to complete Phase II according to the Approved Plans and Specifications on or before the Completion Date for Phase II.

(d)    The bankruptcy or insolvency of the General Contractor and failure of Borrower to procure a contract with a new contractor satisfactory to Lender within thirty (30) days from the occurrence of such bankruptcy or insolvency.

(e)    Any Transfer or other disposition in violation of Section 17.2 or 17.3.

(f)    Any warranty, representation, statement, report or certificate made now or hereafter by Borrower or any Guarantor is untrue or incorrect in any material respect at the time made or delivered, provided that if such breach is reasonably susceptible to cure, then no Event of Default shall exist so long as Borrower cures said breach (i) within the notice and cure period provided in (a)(i) above for a breach that can be cured by the payment of money or (ii) within the notice and cure period provided in (a)(ii) above for any other breach.

(g)    Borrower or any Guarantor shall commence a voluntary case concerning Borrower or such Guarantor under the Bankruptcy Code; or an involuntary proceeding is commenced against Borrower or any Guarantor under the Bankruptcy Code and relief is ordered against Borrower or such Guarantor, or the petition is controverted but not dismissed or stayed within sixty (60) days after the commencement of the case, or a custodian (as defined in the Bankruptcy Code) is appointed for or takes charge of all or substantially all of the property of Borrower or any Guarantor; or the Borrower or any Guarantor commences any other proceedings under any reorganization, arrangement, readjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar Law of any jurisdiction whether now or hereafter in effect

66

relating to the Borrower or any Guarantor; or there is commenced against Borrower or any Guarantor any such proceeding that remains undismissed or unstayed for a period of sixty (60) days; or the Borrower or any Guarantor fails to controvert in a timely manner any such case under the Bankruptcy Code or any such proceeding, or any order of relief or other order approving any such case or proceeding is entered; or the Borrower or any Guarantor by any act or failure to act indicates its consent to, approval of, or acquiescence in any such case or proceeding or the appointment of any custodian or the like of or for it for any substantial part of its property or suffers any such appointment to continue undischarged or unstayed for a period of sixty (60) days.

(h)     Borrower or any Guarantor shall make an assignment for the benefit of creditors, or shall admit in writing its inability to pay its debts generally as they become due, or shall consent to the appointment of a receiver or trustee or liquidator of all of its property or the major part thereof or if all or a substantial part of the assets of Borrower or any Guarantor are attached, seized, subjected to a writ or distress warrant, or are levied upon, or come into the possession of any receiver, trustee, custodian or assignee for the benefit of creditors.

(i)     Any Guarantor shall die or shall be declared legally incompetent; provided, however, that no Event of Default shall exist if, within sixty (60) days of the occurrence of any such event, a substitute guarantor acceptable to Lender joins in the Completion and Carveout Guaranty and the Environmental Indemnity in a manner acceptable to Lender.

(j)     Borrower is enjoined, restrained or in any way prevented by any court order from constructing or operating the Project or marketing or selling Units.

(k)     Failure by Borrower to make any Deficiency Deposit with Lender within the time and in the manner required by Article 11 hereof.

(l)     One or more final, unappealable judgments are entered against (i) Borrower in amounts aggregating in excess of $25,000, or (ii) against any Guarantor in amounts aggregating in excess of $25,000, and said judgments are not stayed or bonded over within thirty (30) days after entry.

(m)     Borrower or any Guarantor shall fail to pay any debt owed by it or is in default under any agreement with Lender or any other party (other than a failure or default for which Borrower's maximum liability does not exceed $100,000 and such Guarantor's maximum liability does not exceed $250,000) and such failure or default continues after any applicable grace period specified in the instrument or agreement relating thereto. Nothing herein shall be construed to mean that a default or event of default under the Mezzanine Loan is an Event of Default hereunder.

(n)     If a Material Adverse Change occurs with respect to Borrower, the Project or any Guarantor.

(o)     Borrower shall fail to deliver the Insurance Policy within ninety (90) days after the date hereof.

67

(p)     The occurrence of any other event or circumstance identified as an Event of Default in this Agreement or under any of the other Loan Documents and the expiration of any applicable grace or cure periods, if any, specified for such Event of Default herein or therein, as the case may be.

## Article 20
## LENDER'S REMEDIES IN EVENT OF DEFAULT

**20.1    Remedies Conferred Upon Lender.**

Upon the occurrence of any Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other:

(a)     Take possession of the Project and complete the Construction and do anything that is necessary or appropriate in its sole judgment to fulfill the obligations of Borrower under this Agreement and the other Loan Documents, including either the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others.   Without restricting the generality of the foregoing and for the purposes aforesaid, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution in the Project to complete the Construction in the name of Borrower; to use unadvanced funds remaining under the Note or that may be reserved, escrowed or set aside for any purposes hereunder at any time, or to advance funds in excess of the face amount of the Note, to complete the Construction; to make changes in the Plans and Specifications that shall be necessary or desirable to complete the Construction in substantially the manner contemplated by the Plans and Specifications; to retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims that may be liens or security interests, or to avoid such bills and claims becoming liens against the Project; to execute all applications and certificates in the name of Borrower prosecute and defend all actions or proceedings in connection with the Improvements or Project; and to do any and every act that the Borrower might do in its own behalf; it being understood and agreed that this power of attorney shall be a power coupled with an interest and cannot be revoked;

(b)     Withhold further disbursement of the proceeds of the Loan and/or terminate Lender's obligations to make further disbursements hereunder;

(c)     Declare the Note to be immediately due and payable;

(d)     Use and apply any monies or letters of credit deposited by Borrower with Lender, regardless of the purposes for which the same was deposited, to cure any such default or to apply on account of any indebtedness under this Agreement that is due and owing to Lender;

(e)     Fund proceeds of the Loan to any Guarantor to complete the Project (if such Guarantor is entitled to receive such proceeds under the Completion and Carveout Guaranty or Lender otherwise elects to fund such proceeds to such Guarantor), and in such event such

68

proceeds shall be considered disbursements of the Loan, whether or not requested by Borrower (Borrower's authorization of such disbursements being deemed given hereby);

(f)      Assess interest on all amounts outstanding under the Note at the Default Rate; and

(g)      Exercise or pursue any other remedy or cause of action permitted under this Agreement or any other Loan Documents, or conferred upon Lender by operation of Law.

Notwithstanding the foregoing, upon the occurrence of any Event of Default under Section 19.1(g) with respect to Borrower, all amounts evidenced by the Note shall automatically become due and payable, without any presentment, demand, protest or notice of any kind to Borrower.

## Article 21
## GENERAL PROVISIONS

**21.1    Captions.**

The captions and headings of various Articles, Sections and subsections of this Agreement and Exhibits pertaining hereto are for convenience only and are not to be considered as defining or limiting in any way the scope or intent of the provisions hereof.

**21.2    Modification; Waiver.**

No modification, waiver, amendment or discharge of this Agreement or any other Loan Document shall be valid unless the same is in writing and signed by the party against which the enforcement of such modification, waiver, amendment or discharge is sought.

**21.3    Governing Law.**

Irrespective of the place of execution and/or delivery, this Agreement shall be governed by, and shall be construed in accordance with, the laws of the State of Illinois.

**21.4    Acquiescence Not to Constitute Waiver of Lender's Requirements.**

Each and every covenant and condition for the benefit of Lender contained in this Agreement may be waived by Lender, provided, however, that to the extent that Lender may have acquiesced in any noncompliance with any construction or nonconstruction conditions precedent to the Opening of the Loan or to any subsequent disbursement of Loan proceeds, such acquiescence shall not be deemed to constitute a waiver by Lender of such requirements with respect to any future disbursements of Loan proceeds.

**21.5    Disclaimer by Lender.**

This Agreement is made for the sole benefit of Borrower and Lender, and no other person or persons shall have any benefits, rights or remedies under or by reason of this Agreement, or by reason of any actions taken by Lender pursuant to this Agreement. Lender shall not be liable to any contractors, subcontractors, supplier, architect, engineer, tenant or other party for labor or

69

services performed or materials supplied in connection with the Construction. Lender shall not be liable for any debts or claims accruing in favor of any such parties against Borrower or others or against the Project. Lender, by making the Loan or taking any action pursuant to any of the Loan Documents, shall not be deemed a partner or a joint venturer with Borrower or fiduciary of Borrower. No payment of funds directly to a contractor or subcontractor or provider of services shall be deemed to create any third-party beneficiary status or recognition of same by the Lender. Without limiting the generality of the foregoing:

(a)     Lender shall have no liability, obligation or responsibility whatsoever with respect to the Construction. Any inspections of the Construction made by or through Lender are for purposes of administration of the Loan only and neither Borrower nor any third party is entitled to rely upon the same with respect to the quality, adequacy or suitability of materials or workmanship, conformity to the Plans and Specifications, state of completion or otherwise;

(b)     Lender neither undertakes nor assumes any responsibility or duty to Borrower to select, review, inspect, supervise, pass judgment upon or inform Borrower of any matter in connection with the Project, including matters relating to the quality, adequacy or suitability of: (i) the Plans and Specifications, (ii) architects, contractors, subcontractors and material suppliers employed or utilized in connection with the Construction, or the workmanship of or the materials used by any of them, or (iii) the progress or course of Construction and its conformity or nonconformity with the Plans and Specifications; Borrower shall rely entirely upon its own judgment with respect to such matters, and any review, inspection, supervision, exercise of judgment or supply of information to Borrower by Lender in connection with such matters is for the protection of Lender only, and neither Borrower nor any third party is entitled to rely thereon; and

(c)     Lender owes no duty of care to protect Borrower, Guarantor, or any Tenant or Unit Purchaser against negligent, faulty, inadequate or defective building or construction.

**21.6    Partial Invalidity; Severability.**

If any of the provisions of this Agreement, or the application thereof to any person, party or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement, or the application of such provision or provisions to persons, parties or circumstances other than those as to whom or which it is held invalid or unenforceable, shall not be affected thereby, and every provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**21.7    Definitions Include Amendments.**

Definitions contained in this Agreement that identify documents, including, but not limited to, the Loan Documents, shall be deemed to include all amendments and supplements to such documents from the date hereof, and all future amendments, modifications, and supplements thereto entered into from time to time to satisfy the requirements of this Agreement or otherwise with the consent of Lender. Reference to this Agreement contained in any of the foregoing documents shall be deemed to include all amendments and supplements to this Agreement.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

**21.8    Execution in Counterparts.**

This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**21.9    Entire Agreement.**

This Agreement, taken together with all of the other Loan Documents and all certificates and other documents delivered by Borrower to Lender, embodies the entire agreement and supersede all prior agreements, written or oral, relating to the subject matter hereof.

**21.10    Waiver of Damages.**

In no event shall Lender be liable to Borrower for consequential, punitive or exemplary damages, whatever the nature of a breach by Lender of its obligations under this Agreement or any of the Loan Documents, and Borrower, for itself and Guarantor, waives all claims for consequential, punitive or exemplary damages.

**21.11    Claims Against Lender.**

Lender shall not be in default under this Agreement, or under any other Loan Documents, unless a written notice specifically setting forth the claim of Borrower shall have been given to Lender and Lender shall have failed to cure such default within thirty (30) days after receipt of written notice from Borrower, provided that if any such default cannot reasonably be cured within said thirty (30) day period, then Lender shall have an additional sixty (60) day period to cure such failure and no default shall be deemed to exist hereunder so long as Lender commences such cure within the initial thirty (30) day period and diligently and in good faith pursues such cure to completion within such resulting ninety (90) day period from the date of Borrower's notice. Borrower waives any claim, set-off or defense against Lender arising by reason of any alleged default by Lender as to which Borrower does not give such notice timely as aforesaid. Borrower acknowledges that such waiver is or may be essential to Lender's ability to enforce its remedies without delay and that such waiver therefore constitutes a substantial part of the bargain between Lender and Borrower with regard to the Loan.

**21.12    Jurisdiction.**

TO THE GREATEST EXTENT PERMITTED BY LAW, BORROWER HEREBY WAIVES ANY AND ALL RIGHTS TO REQUIRE MARSHALLING OF ASSETS BY LENDER. WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDINGS RELATING TO THIS AGREEMENT (EACH, A "PROCEEDING"), BORROWER IRREVOCABLY (A) SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS HAVING JURISDICTION IN THE COUNTY OF COOK AND STATE OF ILLINOIS, AND (B) WAIVES ANY OBJECTION THAT IT MAY HAVE AT ANY TIME TO THE LAYING OF VENUE OF ANY PROCEEDING BROUGHT IN ANY SUCH COURT, WAIVES ANY CLAIM THAT ANY PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM AND FURTHER WAIVES THE RIGHT TO OBJECT, WITH RESPECT TO SUCH PROCEEDING, THAT SUCH COURT DOES NOT HAVE

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

JURISDICTION OVER SUCH PARTY. NOTHING IN THIS AGREEMENT SHALL PRECLUDE LENDER FROM BRINGING A PROCEEDING IN ANY OTHER JURISDICTION NOR WILL THE BRINGING OF A PROCEEDING IN ANY ONE OR MORE JURISDICTIONS PRECLUDE THE BRINGING OF A PROCEEDING IN ANY OTHER JURISDICTION. BORROWER FURTHER AGREES AND CONSENTS THAT, IN ADDITION TO ANY METHODS OF SERVICE OF PROCESS PROVIDED FOR UNDER APPLICABLE LAW, ALL SERVICE OF PROCESS IN ANY PROCEEDING IN ANY ILLINOIS STATE OR UNITED STATES COURT HAVING JURISDICTION OVER THE COUNTY OF COOK MAY BE MADE, TO THE EXTENT PERMITTED BY LAW, BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, DIRECTED TO BORROWER AT THE ADDRESS INDICATED BELOW, AND SERVICE SO MADE SHALL BE COMPLETE UPON RECEIPT; EXCEPT THAT IF BORROWER SHALL REFUSE TO ACCEPT DELIVERY (AS OPPOSED TO UNABLE TO RECEIVE DELIVERY), SERVICE SHALL BE DEEMED COMPLETE FIVE (5) DAYS AFTER THE SAME SHALL HAVE BEEN SO MAILED.

### 21.13  Set-Offs.

After the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably authorizes and directs Lender from time to time to charge Borrower's accounts and deposits with Lender (or its Affiliates), and to pay over to Lender an amount equal to any amounts from time to time due and payable to Lender hereunder, under the Note or under any other Loan Document. Borrower hereby grants to Lender a security interest in and to all such accounts and deposits maintained by the Borrower with Lender (or its Affiliates).

### 21.14  Binding Effect.

The covenants, conditions, waivers, releases and agreements contained in this Agreement shall bind, and the benefits thereof shall inure to the parties hereto and their respective heirs, executors, administrators, successors and assigns.

### 21.15  Waiver of Accord and Satisfaction.

Borrower hereby expressly waives any and all rights to effect an accord and satisfaction of any secured obligation or any other debt of Borrower to Lender in accordance with section 3-311 of the UCC. Notwithstanding anything to the contrary contained in this agreement or any other loan document, except as expressly directed in a writing addressed to Borrower after the date hereof, any and all communications or notices by Borrower or any other loan party to Lender concerning disputed debts, obligations or liabilities, whether arising under this agreement or otherwise, including without limitation any instrument tendered as full satisfaction of a debt, shall be, in addition to the notices required under Article 22 hereof, delivered to Corus Bank, Department 311, attention Rosa Paz, 3959 North Lincoln Avenue, Chicago Illinois 60613.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:15:03

## Article 22
## NOTICES

Any notice, demand, request or other communication that any party hereto may be required or may desire to give hereunder shall be in writing and shall be deemed to have been properly given (a) if hand delivered, when delivered; (b) if mailed by United States Certified Mail (postage prepaid, return receipt requested), three (3) Business Days after mailing; (c) if by Federal Express or other reliable overnight courier service, on the next Business Day after delivered to such courier service or (d) if by telecopier on the day of transmission so long as copy is sent on the same day by overnight courier as set forth below:

If to Borrower:

Riverwalk Square Development, LLC
c/o The Wolff Company
8320 East Hartford Drive, Suite 100
Scottsdale, Arizona 85255
Attention:      Jared Black, Esq.
Telephone:     480-315-9595
Facsimile:      480-313-1739

and:

Riverwalk Square Development, LLC
c/o The Wolff Company
8320 East Hartford Drive, Suite 100
Scottsdale, Arizona 85255
Attention:      Timothy M. Wolff
Telephone:     480-993-0471
Facsimile:      602-296-0443

With a copy to:

Lukins & Annis, P.S.
Washington Trust Financial Center
717 W. Sprague Avenue, Suite 1600
Spokane, Washington 99201
Attention:      James S. Black, Esq.
Telephone:     509-623-2031
Facsimile:      509-363-2466

If to Lender:

CORUS Bank, N.A.
3959 North Lincoln Avenue
Chicago, Illinois 60613
Attention:      Brian Brodeur
Telephone      773-832-3452
Facsimile:      773-832-3540

73

<u>With a copy to:</u>
      CORUS Bank, N.A.
      3959 North Lincoln Avenue
      Chicago, Illinois 60613
      Attention:    Joel Solomon, General Counsel
      Telephone:   773-832-3526
      Facsimile:    773-549-1603

<u>And to:</u>
      Katten Muchin Rosenman LLP
      525 West Monroe Street
      Chicago, Illinois 60661
      Attention:    Mark C. Simon, Esq.
      Telephone:   312-902-5301
      Facsimile:    312-577-4517

or at such other address as the party to be served with notice may have furnished in writing to the party seeking or desiring to serve notice as a place for the service of notice.

## Article 23
## WAIVER OF JURY TRIAL

**BORROWER AND LENDER EACH WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS OR RELATING THERETO OR ARISING FROM THE LENDING RELATIONSHIP THAT IS THE SUBJECT OF THIS AGREEMENT AND AGREE THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.**

EXECUTED as of the date first set forth above.

**BORROWER:**     **RIVERWALK SQUARE DEVELOPMENT, LLC,** an Arizona
limited liability company

By:    Riverwalk Square Development II, LLC, an Arizona limited
liability company, its Sole Member

By:    Riverwalk Square Holdings, LLC, a Washington limited
liability company, its Sole Member

By:    WC Riverwalk LLC, an Arizona limited liability
company, its Manager

By:  Vanguard City Home, LLC, an Arizona
limited liability company, its Manager

By:    ACC Homes, Inc., an Arizona
corporation, its Manager

By: _____
Name:  A. Christopher Camberlango
Title:    President

**LENDER:**     **CORUS BANK, N.A.**

By: _____
Name: _____
Title: _____

EXECUTED as of the date first set forth above.

**BORROWER:**    **RIVERWALK SQUARE DEVELOPMENT, LLC**, an Arizona
limited liability company

By:    Riverwalk Square Development II, LLC, an Arizona limited
liability company, its Sole Member

By:    Riverwalk Square Holdings, LLC, a Washington limited
liability company, its Sole Member

By:    WC Riverwalk LLC, an Arizona limited liability
company, its Manager

By:  Vanguard City Home, LLC, an Arizona
limited liability company, its Manager

By:    ACC Homes, Inc., an Arizona
corporation, its Manager

By:_____
Name:  A. Christopher Camberlango
Title:    President

**LENDER:**    **CORUS BANK, N.A.**

By:_____
Name:____BRIAN J. BRODEUR_____
Title:_____SENIOR VICE PRESIDENT____