# EXHIBIT 1

# (PART IV)

## EXHIBIT A

Legal Description of Land

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

## LEGAL DESCRIPTION

Parcel No. 1:

A portion of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, and described as follows:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, said point also bearing South 00 degrees 00 minutes 00 seconds East a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right of way line of Scottsdale Road, said point also being the Northwest corner of PARADISE TRIANGLE, Tract "A", as recorded in Book 46 of Maps, Page 26, records of the Maricopa County, Arizona recorders office;

Thence continuing East a distance of 252.73 feet to the Northwest corner of the aforementioned RIVERWALK SQUARE, said point also being the TRUE POINT OF BEGINNING;

Thence continuing East a distance of 687.78 feet to a point located at the Northeast corner of RIVERWALK SQUARE;

Thence South 40 degrees 44 minutes 00 seconds West along the Southeast property line of RIVER WALK SQUARE a distance of 335.53 feet;

Thence leaving said property line, North 49 degrees 17 minutes 13 seconds West a distance of 111.82 feet;

Thence South 89 degrees 58 minutes 04 seconds West a distance of 74.88 feet;

Thence South a distance of 37.51 feet to a point of curvature having a radius of 40.00 feet;

Thence proceeding Southwesterly along said curve through a central angle of 217 degrees 16 minutes 02 seconds a distance of 151.68 feet to a point of non-tangency;

Thence North a distance of 166.07 feet;

Thence South 89 degrees 58 minutes 04 seconds West a distance of 237.67 feet to a point located along the West line of RIVERWALK SQUARE;

Thence North 00 degrees 00 minutes 20 seconds West along said West line a distance of 28.40 feet to the TRUE POINT OF BEGINNING.

Parcel No. 2:

A part of the Southwest quarter of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, known

as Tract "A" of the PARADISE TRIANGLE, according to Book 45 of Maps, page 26, records of Maricopa County, Arizona, more particularly described as follows:

Beginning 1722.38 feet South and 33 feet East of the Northwest corner of Section 23, Township 2 North, Range 4 East;

Thence East 795.90 feet;

Thence South 40 degrees 44 minutes West, 649.39 feet;

Thence North 49 degrees 16 minutes West, 377.42 feet;

Thence West 86.16 feet;

Thence North 245.80 feet to the point of beginning;

Except the West 32 feet thereof.

Parcel No. 3:

Part of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

From the Southwest corner of said Northwest quarter, running North, assumed bearing, along the West line of the said Northwest quarter, 934 feet to the point of beginning of the parcel of land herein described and the Southwest corner thereof;

Thence continuing North along the West line of said Northwest quarter, 205 feet;

Thence East, at right angles to the West line of said Northwest quarter, 1005.44 feet;

Thence South 40 degrees 44 minutes West along a line 50 feet from measured at right angles to the water line of the Arizona Canal, 270.54 feet;

Thence West along a line perpendicular to the West line of said Northwest quarter, 828.90 feet to the point of beginning;

Except the West 65 feet thereof.

Except from Parcel No. 2 and Parcel No. 3 the following described property:

That part of Tract "A", PARADISE TRIANGLE, according to Book 46 of Maps, page 26, records of Maricopa County, Arizona, and that part of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at the West quarter corner of said Section 23;

2

Thence North 00 degrees 00 minutes 00 seconds East along the West line of the Northwest quarter of said Section 23, 688.12 feet;

Thence North 90 degrees 00 minutes 00 seconds East, 65.00 feet to a point on a line which is parallel with and 65.00 feet Easterly, as measured at right angles from the West line of the Northwest quarter of said Section 23, said point being the point of beginning;

Thence North 00 degrees 00 minutes 00 seconds East along said parallel line, 451.18 feet;

Thence North 89 degrees 57 minutes 53 seconds East, 252.66 feet;

Thence South 00 degrees 02 minutes 07 seconds East, 293.50 feet;

Thence South 49 degrees 15 minutes 13 seconds East, 329.75 feet;

Thence South 40 degrees 42 minutes 38 seconds West, 249.27 feet;

Thence North 49 degrees 15 minutes 13 seconds West, 377.41 feet;

Thence South 90 degrees 00 minutes 00 seconds West, 54.15 feet to the point of beginning.

And further excepting from Parcel No. 2 and Parcel No. 3 the following described property:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, said point also bearing South 00 degrees 00 minutes 00 seconds East, a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right-of-way line of Scottsdale Road, said point also being the Northwest corner of PARADISE TRIANGLE, Tract "A", as recorded in Book 46 of Maps, page 26, of the Maricopa County Recorder's Office;

Thence continuing East a distance of 252.73 feet to the Northwest corner of the aforementioned RIVERWALK SQUARE, said point also being the TRUE POINT OF BEGINNING;

Thence continuing East a distance of 687.78 feet to a point located at the Northeast corner of RIVERWALK SQUARE;

Thence South 40 degrees 44 minutes 00 seconds West along the Southeast property line of RIVERWALK SQUARE, a distance of 335.53 feet;

Thence leaving said property line, North 49 degrees 17 minutes 13 seconds West, a distance of 111.82 feet;

Thence South 89 degrees 58 minutes 04 seconds West, a distance of 74.88 feet;

Thence South a distance of 37.51 feet to a point of curvature having a radius of 40.00 feet;

Doc #:CHI01 (320527-00057) 50326119v2;12/30/2005/Time:10:36

Thence proceeding Southwesterly along said curve, through a central angle of 217 degrees 16 minutes 02 seconds, a distance of 151.68 feet to a point of non-tangency;

Thence North a distance of 166.07 feet;

Thence South 89 degrees 58 minutes 04 seconds West, a distance of 237.67 feet to a point located along the West line of RIVERWALK SQUARE;

Thence North 00 degrees 00 minutes 20 seconds West along said West line, a distance of 28.40 feet to the TRUE POINT OF BEGINNING.

A non-exclusive easement for vehicular and pedestrian ingress and egress appurtenant to the land described in Parcel Nos. 1, 2 and 3 herein over, across and through the North Drive Easement Area, as granted in the Permanent, Non-Exclusive Easements Agreement recorded February 14, 2005, in Instrument No. 2005-0185399, records of Maricopa County, Arizona, over land described as follows:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, said point bearing South 00 degrees 00 minutes 00 seconds East a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right of way line of Scottsdale Road, said point being the True Point of Beginning;

Thence North 89 degrees 58 minutes 04 seconds East, a distance of 252.73 feet to a point, said point being the Northwest corner of the land described in Deed recorded in Instrument No. 2005-0185398, records of Maricopa County, Arizona;

Thence departing said North line, South 00 degrees 00 minutes 20 seconds East along the West line of the land described in said Deed, a distance of 38.00 feet;

Thence South 89 degrees 58 minutes 04 seconds West a distance of 217.71 feet;

Thence South 81 degrees 50 minutes 18 seconds West, a distance of 35.36 feet to a point located on the East right of way line of Scottsdale Road;

Thence North 00 degrees 00 minutes 00 seconds West along said right of way line a distance of 43.00 feet to the True Point of Beginning.

Parcel No. 5:

A non-exclusive easement for vehicular and pedestrian ingress and egress appurtenant to the land described herein as Parcel Nos. 1, 2, and 3 over, across and through the Pals Loop Road Easement Area as granted in the Interruptible, Reciprocal, Non-Exclusive Easements Agreement recorded February 14, 2005, in Instrument No. 2005-0185400 and in the Permanent, Non-Exclusive Easements Agreement recorded February 14, 2005, in Instrument No. 2005-0185399, records of Maricopa County, Arizona, over land described as follows:

4

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23 Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, said point also bearing South 00 degrees 00 minutes 00 seconds East a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right of way line of Scottsdale Road;

Thence North 89 degrees 58 minutes 04 seconds East a distance of 252.73 feet to a point, said point being the Northwest corner of the land described in Deed recorded in Instrument No. 2005-0185398, records of Maricopa County, Arizona, said point also being the true Point of Beginning;

Thence departing said North line and proceeding South 00 degrees 00 minutes 20 seconds East along the West line of the land described in said Deed, a distance of 293.71 feet;

Thence continuing along said property line South 49 degrees 15 minutes 13 seconds East a distance of 19.78 feet;

Thence departing said property line and proceeding South 00 degrees 00 minutes 20 seconds East a distance of 14.45 feet to the beginning of a curve concave to the West and having a radius of 150.00 feet;

Thence continuing along said curve through a central angle of 90 degrees 00 minutes 20 seconds a distance of 235.63 feet to a point of tangency;

Thence North 90 degrees 00 minutes 00 seconds West a distance of 40.32 feet to a point located on the Northeast property line of Tract "B", Paradise Triangle, according to Book 46 of Maps, Page 26, records of Maricopa County, Arizona;

Thence North 49 degrees 16 minutes 00 seconds West along said Tract "B" a distance of 30.65 feet;

Thence South 90 degrees 00 minutes 00 seconds West along said Tract "B" a distance of 54.19 feet to a point located on the East right of way line of Scottsdale Road;

Thence leaving the property line of said Tract "B" and proceeding along said right of way line a distance of 30.00 feet;

Thence departing said right of way line and proceeding South 90 degrees 00 minutes 00 seconds East a distance of 137.74 feet to the beginning of a curve concave to the West having a radius of 100.00 feet;

Thence proceeding along said curve through a central angle of 90 degrees 00 minutes 20 seconds a distance of 157.09 feet to a point of tangency;

Thence North 00 degrees 00 minutes 20 seconds West a distance of 321.05 feet to a point located on said North line of Paradise Triangle;

Doc #:CHI01 (320527-00057) 50326119v2;12/30/2005/Time:10:36

Thence North 89 degrees 58 minutes 04 seconds East along said North line a distance of 15.00 feet to the True Point of Beginning.

6

## EXHIBIT B

Permitted Exceptions

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

1.  **Property taxes**, including any personal property taxes and any assessments collected with taxes, for the second half of 2005, not yet due or delinquent, and subsequent years.

2.  Reservations, exceptions and provisions contained in the patent from the United States of America recorded February 7, 1891, in Book 25 of Deeds, Page 588, or in the acts authorizing the issuance thereof, as follows:

    "Subject to any vested and accrued water rights for mining, agriculture, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby grants, as provided by law."

3.  **Water rights, claims or title to water**, whether or not disclosed by the public records.

4.  Recitals, courses and distances as shown on plat of Paradise Triangle, recorded in Book 46 of Maps, Page 26.

5.  **Covenants, conditions and restrictions** (deleting therefrom any restrictions indicating any preference, limitation or discrimination based on race, color, religion, sex, handicap, familial status or national origin) as set forth in the document

    Recorded: December 5, 1958, in Docket 2678, Page 522

6.  **Easement(s)** for the purpose(s) shown below and rights incidental thereto as granted in a document.

    | | |
    |---|---|
    | Granted to: | Salt River Project Agricultural Improvement and Power District |
    | Purpose: | electric transmission lines |
    | Recorded: | October 23, 1959, Docket 3036, Page 582 |
    | Affects: | as set forth therein |

7.  Easements along the North line, courses and distances shown on the record of survey recorded in Book 709 of Maps, Page 19.

8.  Permanent, Reciprocal, Non-Exclusive Easements Agreement recorded in Instrument No. 2005-0185399.

9.  Interruptible, Reciprocal, Non-Exclusive Easements Agreement recorded in Instrument No. 2005-0185400.

10. Memorandum of Agreement (for Joint Development Agreement) recorded in Instrument No. 2005-0185655.

11. The following matters shown on survey prepared by Brooks Engineers & Surveyors, Inc., as Job No. 1184-01FP, Dated October 4, 2005, last revised December 28, 2005:

       a. Overhead electric lines on Parcel No. 1:

       b. Gas valve on Parcel No. 1.

12.     **Property taxes,** including any personal property taxes and any assessments collected with the taxes, for the full year 2006, a lien not yet due or payable.

## EXHIBIT C

### Title Requirements

1.  <u>Title Insurance Company Requirements</u>.  The maximum single risk (i.e., the amount insured under any one policy) by a title insurer may not exceed 25% of that insurer's surplus and statutory reserves.  Reinsurance must be obtained by closing for any policy exceeding such amount.

2.  <u>Loan Policy Forms</u>.  Standard 1992 American Land Title Association ("<u>ALTA</u>") form of loan title insurance policy, or the 1970 (amended October 17, 1970) ALTA loan form policies must be used.

3.  <u>Insurance Amount</u>.  The amount insured must equal at least the original principal amount of the Loan.

4.  <u>Named Insured</u>.  The named insured under the Title Policy must be substantially the same as the following: "Corus Bank, N.A. and its respective successors and assigns."

5.  <u>Creditors' Rights</u>.  Any "creditors' rights" exception or other exclusion from coverage for voidable transactions under bankruptcy, fraudulent conveyance, or other debtor protection laws or equitable principles must be removed by either an endorsement or a written waiver or issuance of a 1970 Form Policy with 1982 modifications.

6.  <u>Arbitration</u>.  In the event that the form policy which is utilized includes a compulsory arbitration provision, the insurer must agree, if permitted by law, that such compulsory arbitration provisions do not apply to any claims by or on behalf of the insured. Please note that the 1987 and 1992 ALTA form loan policies include such provisions.

7.  <u>Date of Policy</u>.  The effective date of the Title Policy must be as of the date and time of the closing.

8.  <u>Legal Description</u>.  The legal description of the property contained in the Title Policy must conform to (a) the legal description shown on the survey of the property, and (b) the legal description contained in the Mortgage.  In any event, the Title Policy must be endorsed to provide that the insured legal description is the same as that shown on the survey.

9.  <u>Easements</u>.  Each Title Policy shall insure, as separate parcels: (a) all appurtenant easements and other estates benefiting the property, and (b) all other rights, title, and interests of the borrower in real property under reciprocal easement agreements, access agreements, operating agreements, and agreements containing covenants, conditions, and restrictions relating to the Project.

10. <u>Exceptions to Coverage</u>.  With respect to the exceptions, the following applies:

    a)    Each Title Policy shall afford the broadest coverage available in the state in which the subject property is located.

C-i

b)    The "standard" exceptions (such as for parties in possession or other matters not shown on public records) must be deleted.

c)    The "standard" exception regarding tenants in possession under residential leases, should also be deleted.  For commercial properties, a rent roll should be attached in lieu of the general exception.

d)    The standard survey exception to the Title Policy must be deleted. Instead, a survey reading reflecting the current survey should be incorporated.

e)    Any exception for taxes, assessments, or other lienable items must expressly insure that such taxes, assessments, or other items are not yet due and payable.

f)    Any lien, encumbrance, condition, restriction, or easement of record must be listed in the Title Policy, and, if permitted by law, the Title Policy must affirmatively insure that the improvements do not encroach upon the insured easements or insure against all loss or damage due to such encroachment.

g)    The Title Policy may not contain any exception for any filed or unfiled mechanic's or materialmen's liens.

h)    In the event that a comprehensive endorsement has been issued and any Schedule B exceptions continue to be excluded from the coverage provided through that endorsement, then a determination must be made whether such exceptions would be acceptable to Lender.  In the event that it is determined that such exception is acceptable, a written explanation regarding the acceptability must be submitted as part of the delivery of the loan documents.

(i)    No exception(s) relating to the use of a purchaser's upgrade deposits or earnest money deposits in the construction of the Project shall be permitted.

If Schedule B indicates the presence of any easements that are not located on the survey, the Title Policy, if permitted by law, must provide affirmative insurance against any loss resulting from the exercise by the holder of such easement of its right to use or maintain that easement. ALTA Form 103.1 or an equivalent endorsement is required for this purpose.

11.    <u>Endorsements</u>.  With respect to endorsements, the following applies:

a)    Each Title Policy must include an acceptable environmental protection lien endorsement on ALTA Form 8.1.  Please note that Form 8.1 may take exception for an entire statute which contains one or more specific sections under which environmental protection liens could take priority over the Mortgage, provided, however, that such specific sections under which the lien could arise must also be referenced.

b)    Each Title Policy must contain an endorsement which provides that the insured legal description is the same as shown on the survey.

C-ii

c)      Each Title Policy must contain a comprehensive endorsement (ALTA Form 9) if a lien, encumbrance, condition, restriction, or easement is listed in Schedule B to the title insurance policy.

d)      Lender may require the following endorsements where applicable and available:

| | | |
|---|---|---|
| -access | -due execution | -single tax lot |
| -address | -first loss | -subdivision |
| -adjustable rate | -last dollar | -tie in |
| -assessments | -leasehold | -usury |
| -assignment of leases and rents | -mineral rights | -zoning (ALTA 3.1 |
| -assignment of loan documents | -mortgage tax | -with parking) |
| -condominium endorsement | -reverter | |
| -contiguity | -revolving credit | |
| -doing business | | |

12.     Other Coverages.  If permitted by applicable law, each Title Policy shall insure the following by endorsement or affirmative insurance to the extent such coverage is not afforded by the ALTA Form 9 or its equivalent in a particular jurisdiction:

a)      that no conditions, covenants, or restrictions of record affecting the property:

(i)      have been violated,

(ii)     create lien rights which prime the insured mortgage,

(iii)    contain a right of reverter or forfeiture, a right of reentry, or power of termination, or

(iv)    if violated in the future would result in the lien created by the insured mortgage or title to the property being lost, forfeited, or subordinated; and

b)      that except for temporary interference resulting solely from maintenance, repair, replacement, or alteration of lines, facilities, or equipment located in easements and rights of way taken as certain exceptions to each Title Policy, such exceptions do not and shall not prevent the use and operation of the Property or the improvements as used and operated on the effective date of the Title Policy.

13.     Informational Matters.  The Policy must include, as an informational note, the following:

a)      The recorded plat number together with recording information; and

b)      The property parcel number or the tax identification number, as applicable.

14.    <u>Delivery of Copies</u>.  Legible copies of all easements, encumbrances, or other restrictions shown as exceptions on the Title Policy must be delivered with the first draft of the title commitment.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

**EXHIBIT D**

Form of Survey Certification

**CERTIFICATION FOR SURVEYS (LONG-FORM)**

I hereby certify to CORUS Bank, N.A., its successors and assigns, and _____ (insert Borrower and Title Insurance Company) that the survey prepared by me entitled "_____" was actually made upon the ground and that it and the information, courses and distances shown thereon are correct; that the title lines and lines of actual possession are the same; that the size, location and type of buildings and improvements are as shown and all are within the boundary lines of the property; that there are no violations of zoning ordinances, restrictions or other rules and regulations with reference to the location of said building and improvements; that there are no easements, encroachments or use affecting this property appearing from a careful physical inspection of the same, other than those shown and depicted thereon; that all utility services required for the operations of the premises either enter the premises through adjoining public streets, or the survey shows the point of entry and location of any utilities which pass through or are located on adjoining private land; that the survey shows the location and direction of all storm drainage systems for the collection and disposal of all roof and surface drainage; that any discharge into streams, rivers or other conveyance system is shown on the survey; and that the parcels described heron do not lie within **[or lie within]** flood hazard areas in accordance with the document entitled "Department of Housing and Urban Development, Federal Insurance Administration–Special Flood Hazard Area Maps." This survey is made in accordance with the "Minimum Standard Detail Requirements for Land Title Surveys" jointly established and adopted by ALTA and ACSM in 1999 for Class A Urban Survey and includes items 1-4, 6-7(b)(i), 8-10, 11(b) and 13 of Table A. Pursuant to the Accuracy Standards as adopted by ALTA, NSPS, and ACSM and in effect on the date of this certification, the undersigned further certifies that: [Surveyor to complete with appropriate choice from Minimum Standard Detail Requirement]

D-i

## EXHIBIT E

### INSURANCE REQUIREMENTS DURING AND POST CONSTRUCTION

**I. Insurance.** Borrower shall obtain, and maintain at all times during term of the Loan, such insurance as Corus Bank, N.A. ("Lender") may reasonably require, including, but not limited to the insurance coverage set forth below. Unless otherwise expressly defined herein, capitalized terms set forth in this Exhibit are terms of art, as used in and understood in the insurance industry or are defined terms in the Application or Commitment Letter to which this is attached.

### A. During Construction.

(a)     Builder's Risk. From the closing of the loan until replaced by permanent property insurance, "All Risk" form of Builder's Risk Insurance, in such amount as Lender shall reasonably require, but in no event less than 100% of the replacement cost value of the Project (including upgrades and any leasehold improvements) (the **"Builder's Risk Insurance"**). Such policy shall be written on a Builder's Risk Completed Value Form (100% non-reporting) or its equivalent and shall not contain a permission to occupy limitation. Such policy shall not have exclusion for sidewalks, retaining walls or underground property. The policy shall include coverage for Flood and Earth Movement with sub-limits of at least $18 million each. Such insurance policy shall also include coverage for:

(i)     Loss suffered with respect to Borrower's materials, equipment, machinery, and supplies whether on-site, in transit, or stored off site, with a limit of no less than $500,000 or 100% replacement cost, whichever is greater;

(ii)     At least $4 million Soft Costs contained in the Approved Budget, and including coverage for all types (including but not limited to interest expense; fees; and plans, specifications, blueprints and models, in connection with any restoration following an insured loss);

(b)     Comprehensive Broad Form Boiler and Machinery Insurance, covering all mechanical and electrical apparatus and pressure vessels. Such insurance shall provide coverage against loss or damage from an accident to and/or caused by boilers and machinery, including but not limited to: heating apparatus, pressure vessels, pressure pipes, electrical or air conditioning equipment on a blanket comprehensive coverage form, in such amount as Lender shall reasonably approve but no less than $10,000,000. All exclusions for testing shall be removed.

(c)     Professional Liability. The Borrower will require the architect, engineers (including Structural and MEP contractors) and all other design professionals retained by the Borrower to purchase and maintain continuous professional liability coverage in the amount of $1,000,000 per claim / and $1,000,000 annual aggregate. This policy may be on a "claims made" basis, and shall include coverage for bodily injury and property damage and retroactive coverage back to the first date that professional services were

E-i

provided to the Project. Evidence of this insurance shall be provided to Borrower in form of insurance certificate for a period of 3 years after substantial completion of the Project (unless the loan is paid off).

(d)    Commercial General Liability and Umbrella Liability coverage, including but not limited to, coverage for Personal Injury, Bodily Injury, Death, Property Damage, Fire Damage Legal Liability, with limits of not less than $20,000,000 per occurrence and in the annual aggregate **per location**. It is understood that Contractor and any enrolled subcontractors will be named insureds under this described insurance. The policies described in this paragraph shall cover, without limitation: elevators, escalators, independent contractors, contractual liability (covering, to the maximum extent permitted by the commercial general liability policy, the Borrower's obligation to indemnify the Lender as required under this Exhibit) and Products and Completed Operations Liability coverage. Coverage should also include host liquor liability. Borrower shall add Lender, its directors, officers, employees and agents as additional insured.

(e)    Worker's Compensation. Worker's compensation insurance covering Borrower and its employees at the site to the extent required, and in the amounts required by applicable Laws.

(f)    Employers Liability. In the amount of $1,000,000 per accident, $1,000,000 per illness, per employee and $1,000,000 per illness, in the aggregate.

(g)    Contractor's Liability. Borrower shall cause the Contractor to maintain Automobile Liability insurance with no less than $10,000,000 in limits per occurrence and in the aggregate through primary and umbrella liability policies. All parties engaged in work on the Project shall maintain statutory Workers Compensation, Employer's Liability with limits of at least $1,000,000 and any legally mandated Disability insurance in force for all employees on the job.

(h)    Performance Bond. A Performance Bond and Labor and Material Payment Bond in an amount equal to 100% of any subcontract sum greater than $1 million shall be required by the Borrower and each bond shall be in a form approved by Lender.

(i)    Borrower may provide the Commercial General and Umbrella Liability and Workers Compensation and Employers Liability required to be carried pursuant to Sections I.A., Subsections (d), (e) and (f) of this Exhibit through the purchase of a Wrap-up or Owner Controlled Insurance Program. This program shall provide coverage for all parties engaged in construction operations at the Project with limits approved by Lender.

**B. Post Construction**. After the earlier of: (i) substantial completion of the Project, or (ii) cancellation or expiration of the Builder's Risk Policy, the Borrower shall provide the following coverages:

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

(a)  "All Risk" insurance including Flood and Earthquake, and such other insurable hazards as, under good insurance practices are insured against for other property and buildings similar to the premises in nature, use, location, height, and type of construction. The amount of such insurance shall be not less than one hundred percent (100%) of the replacement cost without depreciation of the Project. Such insurance policy shall contain an agreed amount endorsement. Flood and Earthquake sublimits shall be at least $18 million each. Such insurance shall cover increased cost of law or ordinance insurance, costs of demolition and increased cost of construction with a sublimit of not less than $1,000,000. If coverage is provided under a blanket policy, Lender shall be named as sole Loss Payee and Mortgagee for the unsold units of the Project.

(b)  Comprehensive Broad Form Boiler and Machinery. Insurance, in the minimum amount of $10,000,000 covering all mechanical and electrical equipment against physical damage and covering, without limitation, all tenant improvements and betterments that the Borrower is required to insure pursuant to any lease on a replacement cost basis. Such insurance shall provide coverage against loss or damage from an accident to and/or caused by boilers and machinery, including but not limited to: heating apparatus, pressure vessels, pressure pipes, and electrical or air conditioning equipment on a blanket comprehensive coverage form, in such amount Lender shall reasonably approve. All exclusions for testing shall be removed. Coverage shall be extended to include loss of rental income for 6 months as a result of damage from an insured peril.

(c)  Intentionally Omitted.

(d)  Commercial General Liability. Commercial General Liability Insurance, including, but not limited to, Owned (if any), Hired and Non Owned Auto Liability, and Umbrella Liability coverage for Personal Injury, Bodily Injury, Death, Accident and Property Damage providing in combination no less than $10,000,000 per occurrence and in the annual aggregate, **per location**. The policies described in this paragraph shall cover, without limitation: elevators, escalators, independent contractors, contractual liability and Products and Completed Operations Liability coverage.

(e)  Dram Shop. Upon Lender's reasonable request or prior to any tenant selling alcoholic beverages on any part of the Project, Borrower either itself or through the Tenant shall provide evidence of so-called "Dram Shop" against claims or liabilities arising directly or indirectly to Persons or property on account of the sale or dispensing of alcoholic beverages. Coverage shall include loss of means of support. Limits shall equal those limits as may be required by applicable Laws or as Lender may reasonably specify. If state law allows, Lender shall be named as an additional insured on such policy.

(f)  Worker's Compensation.  Worker's compensation insurance covering Borrower and its employees at the site to the extent required, and in the amounts required by applicable Laws.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

(g)    <u>Employers Liability</u> in the amount of $1,000,000 per accident; $1,000,000 per illness, per employee; and $1,000,000 per illness, in the aggregate.

(h)    <u>Other.</u> Such other insurances as may be reasonably requested by Lender.

## II. <u>Requirements of Insurance Policies.</u>

(a)    All insurance policies shall be issued by an insurer or insurers with an A.M. Best rating of A-:IX or better or a Standard and Poor's rating of "AA", or equivalent rating from another agency acceptable to the Lender and be authorized in the state where the Project is located. All insurance acquired pursuant to this Exhibit shall be in form, amounts and with coverage and deductibles satisfactory to Lender, in Lender's sole discretion.

(b)    The Builder's Risk insurance policies required to be carried pursuant to Section I.A., Subsections (a) and (b) of this Exhibit, and the All Risk required pursuant to Section I.B, Subsections (a) and (b), shall name Borrower as the insured and shall also name Lender as Loss Payee and Mortgagee, under a non-contributing standard mortgagee clause. Without the Lender's prior written consent, Borrower shall not name any Person other than the Lender, as loss payee under any property insurance policies that Borrower is required to insure pursuant to any Lease.

(c)    The Commercial General Liability, Auto Liability and Employer's Liability and Contractors Liability set forth in Section I.A., Subsections (d), (f), and (g) and Section I.B., Subsections (d) (e) and (g), shall name Lender, its directors, officers, and employees as Additional Insured.

(d)    The amount of any deductible under any insurance policy must be reasonably acceptable to the Lender.

(e)    Borrower may provide required insurance under blanket policies. Borrower shall not maintain any insurance on the Project that does not name Lender as Loss Payee.

(f)    Borrower shall pay the premiums for the insurance policies as the same become due and payable. Borrower shall deliver to the Lender certified copies of the insurance policies required to be maintained pursuant to this Exhibit within sixty (60) days after the date hereof or ten (10) days after the issuance of the policies by the insurer, whichever is later, but in all events, no later than ninety (90) days after the date hereof, and failure to do so will be an immediate Event of Default. Notwithstanding the foregoing, Lender shall not be deemed by reason of the custody of such insurance policies to have knowledge of the contents thereof. Borrower also shall deliver to the Lender, within ten (10) days of the Lender's request, a certificate of the Borrower or the Borrower's insurance agent setting forth the particulars as to all such insurance policies, that all premiums due thereon have been paid currently and that the same are in full force and effect. BORROWER SHALL DELIVER A CERTIFICATE OR OTHER EVIDENCE OF INSURANCE ACCEPTABLE TO LENDER EVIDENCING THE INSURANCE REQUIRED HEREUNDER ON THE DATE HEREOF, TOGETHER WITH RECEIPTS FOR THE PAYMENT OF PREMIUMS THEREON. ALL CERTIFICATES FOR PROPERTY INSURANCE MUST BE

E-iv

ON ACORD FORM 27 or the equivalent; ACORD 25 certificates are acceptable for liability insurance. Not later than fifteen (15) days prior to the expiration date of each of the insurance policies the Borrower shall deliver to the Lender a certificate of insurance evidencing renewal of coverage as required herein. Within ten (10) days after such renewal, Borrower shall deliver to the Lender evidence of payment of premium satisfactory to the Lender. Not later than ninety (90) days after the renewal of each of the insurance policies, Borrower shall deliver to Lender an original or certified copy (as required pursuant to this Section) of a renewal policy or policies.

(g)    Each insurance policy shall contain a provision whereby the insurer agrees that so long as the Loan is outstanding, such policy shall not be canceled or fail to be renewed, lapsed or materially changed without in each case, at least thirty (30) days prior written notice to the Lender, except ten (10) days for non-payment of premium

(h)    In the event any insurance policy (except for general and other liability and Workers Compensation insurance) shall contain breach of warranty provisions, such policy shall provide that with respect to the interest of the Lender, such insurance policy shall not be invalidated by and shall insure the Lender regardless of; (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such policy by any named insured; (B) the occupancy or use of the property for purposes more hazardous than permitted by the terms thereof; or (C) any foreclosure or other action or proceeding taken by the Lender pursuant to any provision of this Agreement.

(i)    Any insurance maintained pursuant to this Agreement may be evidenced by blanket insurance policies covering the premises and other properties or assets of the Borrower or its affiliates; provided that any such policy shall in all other respects comply with the requirements of this section. Lender, in its reasonable discretion, shall determine whether such blanket policies contain sufficient limits of insurance.

(j)    Any insurance carried by Lender shall be for its sole benefit and shall not inure to the benefit of the Borrower and Insurance required from Borrower shall be primary to any available, if any, to Lender.

(k)    All required policies, other than professional liability, shall provide that insurers have waived rights of subrogation against Lender. The required insurance shall be primary without right of contribution from any insurance which may be carried by Lender.

(l)    The required limits are minimum limits established by Lender and nothing contained herein shall be construed to mean the required limits are adequate or appropriate to protect the Borrower from greater loss.

E-v

Final insurance policies should be sent to the attention of:

Josefina Reyes
Corus Bank, N.A.
3959 N. Lincoln Avenue
Chicago, IL 60613
Tel: (773) 832-3543


If there are any questions regarding our insurance requirements, please contact our insurance
consultants:

Marsh
500 West Monroe Street, Chicago, Illinois
Attention: Anne Roberts
anne.c.roberts@marsh.com
Tel: 312-627-6711/Fax: 312-627-6437

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

## Illinois Collateral Protection Act Notice

Unless Borrower provides Lender with evidence of the insurance coverage required by this Agreement, Lender may purchase insurance at Borrower's expense to protect Lender's interest in the Project. This insurance may, but need not, protect Borrower's interest. The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the Project. Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by this Agreement. If Lender purchases insurance for the Project, Borrower will be responsible for the cost of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The cost of the insurance may be added to Borrower's total outstanding balance or obligation. The cost of insurance may be more than the cost of insurance Borrower may be able to obtain on its own.

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

**EXHIBIT F**

Architect's Certificate

The firm of _MILLER/HULL ARCHITECTURE & PLANNING_ hereby certifies for the benefit of CORUS Bank, N.A. that:

The firm has been employed by _RIVER WALK SQUARE DEVELOPMENT, LLC_ pursuant to a contract dated _3/25/04_ to provide architectural and engineering services commonly known as _SAFARI DRIVE_ which is located at _SAFARI DRIVE & 72ND WAY, SCOTTSDALE, AZ. PHASE 1_

The contract provides for the following services:

| | |
|---|---|
| ✓ | preparation of plans and specifications |
| | Pre-qualification of contractors |
| ✓ | Contract administration and supervision of construction |
| ✓ | Tenant space design |

The firm is duly licensed and in good standing under laws of the state of _ARIZONA_. License No. _41313, CRAIG CURTIS_.

The foundations were designed in accordance with the recommendations contained in a soil report dated _SEPT. 30, 2004_ which was prepared by _FIRCE & VANN, INC._

The following are all of the permits or governmental agency approvals required for the construction and occupancy of the building:

| | Issuing Agency | Date Issued |
|---|---|---|
| Excavation Permit | City of Scottsdale | 10/24/05 |
| Foundation Permit | " | 12/16/05 |
| Building Permit | " | 2/17/06 |
| EPA – Water | N/A | |
| EPA – Sewer | N/A | |
| EPA – Air | N/A | |
| Cert. Of Occupancy Bldg. | City of Scottsdale | 11/06 – 06/07 |
| Cert. Of Occupancy – Tenant | City of Scottsdale | 11/06 – 06/07 |
| Other (Specify) | | |

_C OF O PHASED PER BUILDING_

F-i

All utilities necessary for the operation of the project are available with sufficient capacity at the boundaries of the project. If utility services must be brought to site, please explain: _____

_____

The plans listed on the attached Schedule I comprise all of the plans which will be necessary for the complete construction of the project, excepting tenant space designs, and when the project is built in accordance therewith the project will (excepting completion of tenant improvements) be ready for occupancy. The plans are complete and contain all detail necessary for construction. Calculations of the gross building and the net rentable building area are attached as Schedule II. The plans (and the project will, when constructed in accordance therewith) comply with all applicable building, zoning, land use, subdivision, environmental, fire, safety and other applicable governmental laws, statutes, codes, ordinances, rules and regulations.

The attached Schedule III, establishing a timetable for completion of the project and showing on a monthly basis the anticipated progress of the work, is realistic and can be adhered to.

The following design drawings or plans have been or will be prepared by other designers or contractors.

| Type of Plans | Name of Preparing Firm |
|---|---|
| *ELECTRICAL* | *WILSON ELECTRIC w/ HAWKINS DESIGN GROUP* |
| | |
| | |

The Specifications are: _____ shown on plans

_____ ✓ Bound separately

By: *MICHAEL JONES*

Title: *ASSOCIATE*

Date: *12/22/05*

F-ii

Doc #:CHI01 (320527-00057) 50316526v05:4412/415/2005/Time:4514:52



# SAFARI DRIVE, VOL.1

PHASE 1 - GARAGE CONSTRUCTION SET
NOVEMBER 30, 2005

SAFARI DRIVE
SCOTTSDALE ARIZONA

PHASE 1 GARAGE
CONSTRUCTION SET

COVER SHEET
VOLUME 1

T10.1











SAFARI DRIVE, VOL.3
SCOTTSDALE, AZ

PHASE 2: ARCHITECTURAL SHELL & INTERIOR ARCHITECTURAL IMPROVEMENTS ONLY
DECEMBER 22, 2005

SAFARI DRIVE
SCOTTSDALE ARIZONA

PHASE 1
100% CONSTRUCTION
DOCUMENTS

DRAWING INDEX
VOLUME 3

T10.01



December 22, 2005

Shannon Gabrilson
Riverwalk Square Development, LLC
8320 East Hartford Drive
Suite 104
Scottsdale, AZ 85255

Reference:   Safari Drive – Phase 1:  Exhibit F, Schedule 2

To Whom It May Concern:

To the best of our knowledge, the Project Tabulation attached and dated December 22, 2005 accurately reflects the gross building and net saleable areas for Safari Drive – Phase 1.

Sincerely,

Mike Jobes, Associate
Miller|Hull Architecture and Planning

SAFARI DRIVE - PHASE 1
SCHEDULE 2: PROJECT TABULATION
22-Dec-05
The Miller/Hull Partnership

**PHASE 1**

### BUILDING C

| UNIT | #UNITS | BEDS | #BA | UNIT | TYPE | SALEABLE SF | DECK/PATIO SF | CIRC./SUPPORT | TOTAL GSF |
|---|---|---|---|---|---|---|---|---|---|
| C101/117-119 | | | | | BUSINESS/CONC | 991 | | 155 | |
| C102 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,546 | | 200 | |
| C103 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,553 | | 191 | |
| C104 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,546 | | 200 | |
| C105 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,553 | | 191 | |
| C106 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,546 | | 200 | |
| C107 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,553 | | 191 | |
| C108 | 1 | | 1 | 1BR/1.5BA | LIVE/WORK/LOFT | 1,396 | | 200 | |
| C109 | 1 | | 1 | 1BR/1.25BA | LIVE/WORK/LOFT | 1,272 | | 100 | |
| C201 | 1 | | 2 | 2BR/2.25BA/OFFICE | TOWNHOUSE | 1,824 | | 184 | |
| C302 | 1 | | 1 | 1BR/1.75BA/FLEX | FLAT | 962 | | 102 | |
| C303 | 1 | | 2 | 2BR/2.5BA/OFFICE | FLAT | 1,690 | | 220 | |
| C304 | 1 | | 1 | 1BR/1.75BA/FLEX | FLAT | 962 | | 102 | |
| C305 | 1 | | 1 | 1BR/1.75BA/FLEX | FLAT | 962 | | 102 | |
| C306 | 1 | | 1 | 1BR/1.75BA/FLEX | FLAT | 962 | | 102 | |
| C309 | 1 | | 2 | 2BR/2.5BA | FLAT | 1,690 | | 222 | |
| C401 | 1 | | 2 | 2BR/2.5BA | TOWNHOUSE | 1,390 | | 153 | |
| C402 | 1 | | 2 | 2BR/2.5BA | TOWNHOUSE | 1,629 | | 155 | |
| C403 | 1 | | 2 | 2BR/2.5BA/OFFICE | TOWNHOUSE | 1,518 | | 110 | |
| C404 | 1 | | 2 | 2BR/2.5BA | TOWNHOUSE | 1,628 | | 105 | |
| C405 | 1 | | 2 | 2BR/2.5BA/OFFICE | TOWNHOUSE | 1,518 | | 110 | |
| C406 | 1 | | 2 | 2BR/2.5BA | TOWNHOUSE | 1,628 | | 105 | |
| C407 | 1 | | 2 | 2BR/2.5BA/OFFICE | TOWNHOUSE | 1,518 | | 110 | |
| C408 | 1 | | 2 | 2BR/2.5BA | TOWNHOUSE | 1,628 | | 105 | |
| C409 | 1 | | 2 | 2BR/2.5BA | TOWNHOUSE | 1,396 | | 114 | |
| | **24** | | **43** | | | **35,603** | | **3,432** | **5,994** | **45,533** |

### BUILDING D

| UNIT | #UNITS | BEDS | #BA | UNIT | TYPE | SALEABLE SF | DECK/PATIO SF | CIRC./SUPPORT | TOTAL GSF |
|---|---|---|---|---|---|---|---|---|---|
| D101 | 1 | | 2 | 1BR/1.5BA/OFFICE | LIVE/WORK/LOFT | 1,526 | | 607 | |
| D103 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,526 | | 962 | |
| D105 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,526 | | 962 | |
| D106 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,303 | | 112 | |
| D107 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,074 | | 941 | |
| D108 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,303 | | 112 | |
| D109 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,074 | | 941 | |
| D110 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,303 | | 112 | |
| D111 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,074 | | 941 | |
| D113 | 1 | | 2 | 2BR/1.75BA | LIVE/WORK/LOFT | 1,074 | | 941 | |
| D301 | 1 | | 2 | 2BR/2BA | FLAT | 1,306 | | 228 | |
| D305 | 1 | | 2 | 2BR/2BA | FLAT | 1,390 | | 220 | |
| D306 | 1 | | 1 | 2BR/2BA/FLEX | TOWNHOUSE | 1,034 | | 167 | |
| D308 | 1 | | 2 | 2BR/2BA/FLEX | FLAT | 1,000 | | 150 | |
| D309 | 1 | | 2 | 1BR/2BA/FLEX | FLAT | 1,034 | | 167 | |
| D310 | 1 | | 2 | 2BR/2BA/FLEX | TOWNHOUSE | 1,034 | | 167 | |
| D311 | 1 | | 1 | 1BR/2BA/FLEX | FLAT | 1,000 | | 150 | |
| D313 | 1 | | 1 | 1BR/2BA/FLEX | FLAT | 1,000 | | 150 | |
| D401 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,484 | | 90 | |
| D403 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,484 | | 90 | |
| D405 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,494 | | 90 | |
| D407 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,500 | | 67 | |
| D409 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,500 | | 67 | |
| D411 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,500 | | 67 | |
| D413 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,550 | | 67 | |
| | **28** | | **43** | | | **37,275** | | **8,758** | **4,803** | **50,936** |

### BUILDING E

| UNIT | #UNITS | BEDS | #BA | UNIT | TYPE | SALEABLE SF | DECK/PATIO SF | CIRC./SUPPORT | TOTAL GSF |
|---|---|---|---|---|---|---|---|---|---|
| E101 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E103 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E105 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E107 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E201 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E203 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E205 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E207 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,357 | | 461 | |
| E301 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 1,960 | | 791 | |
| E303 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 1,960 | | 791 | |
| E305 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 1,960 | | 791 | |
| E307 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 1,960 | | 791 | |
| | **12** | | **36** | | | **19,596** | | **6,852** | **3,835** | **29,167** |

### BUILDING F

| UNIT | #UNITS | BEDS | #BA | UNIT | TYPE | SALEABLE SF | DECK/PATIO SF | CIRC./SUPPORT | TOTAL GSF |
|---|---|---|---|---|---|---|---|---|---|
| F101 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 2,150 | | 890 | |
| F103 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 2,150 | | 890 | |
| F105 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 2,150 | | 803 | |
| F107 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 2,150 | | 890 | |
| F301 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,512 | | 635 | |
| F303 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,512 | | 635 | |
| F305 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,512 | | 635 | |
| F307 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,512 | | 635 | |
| | **8** | | **20** | | | **14,808** | | **6,100** | **1,266** | **22,174** |

### BUILDING G

| UNIT | #UNITS | BEDS | #BA | UNIT | TYPE | SALEABLE SF | DECK/PATIO SF | CIRC./SUPPORT | TOTAL GSF |
|---|---|---|---|---|---|---|---|---|---|
| G100 | | | | | RETAIL | 1,152 | | 997 | |
| G101 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,475 | | 340 | |
| G102 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,440 | | 230 | |
| G103 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,475 | | 340 | |
| G104 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,440 | | 230 | |
| G105 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 1,970 | | 840 | |
| G106 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,495 | | 550 | |
| G201 | 1 | | 3 | 3BR/4BA | FLAT | 2,510 | | 170 | |
| G301 | 1 | | 2 | 2BR/2BA | FLAT | 1,320 | | 335 | |
| G302 | 1 | | 2 | 2BR/2BA | FLAT | 1,570 | | 525 | |
| G303 | 1 | | 2 | 2BR/2BA/OFFICE | FLAT | 1,320 | | 1,140 | |
| G401 | 1 | | 2 | 2BR/2BA | FLAT | 1,550 | | 815 | |
| G402 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,825 | | 660 | |
| G501 | 1 | | 3 | 3BR/4BA | FLAT | 2,470 | | 1,550 | |
| | **13** | | **29** | | | **23,322** | | **9,712** | **3,313** | **36,347** |

### BUILDING H

| UNIT | #UNITS | BEDS | #BA | UNIT | TYPE | SALEABLE SF | DECK/PATIO SF | CIRC./SUPPORT | TOTAL GSF |
|---|---|---|---|---|---|---|---|---|---|
| H100 | | | | | RETAIL | 1,285 | | 842 | |
| H101 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,475 | | 340 | |
| H102 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,440 | | 230 | |
| H103 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,475 | | 340 | |
| H104 | 1 | | 2 | 2BR/2BA | TOWNHOUSE | 1,440 | | 230 | |
| H105 | 1 | | 3 | 3BR/3BA/OFFICE | TOWNHOUSE | 1,970 | | 840 | |
| H106 | 1 | | 2 | 2BR/2BA/OFFICE | TOWNHOUSE | 1,495 | | 550 | |
| H201 | 1 | | 3 | 3BR/3BA | FLAT | 2,175 | | 245 | |
| H301 | 1 | | 2 | 2BR/2BA | FLAT | 1,320 | | 335 | |
| H302 | 1 | | 2 | 2BR/2BA | FLAT | 1,570 | | 200 | |
| H303 | 1 | | 2 | 2BR/2BA/OFFICE | FLAT | 1,320 | | 1,140 | |
| H304 | 1 | | 2 | 2BR/2BA | FLAT | 2,145 | | 815 | |
| H402 | 1 | | 3 | 3BR/3BA/OFFICE | FLAT | 1,825 | | 650 | |
| H501 | 1 | | 3 | 3BR/4BA | FLAT | 2,470 | | 1,550 | |
| | **14** | | **31** | | | **25,255** | | **9,347** | **3,924** | **37,635** |

**PHASE 1 TOTALS**



December 22, 2005

Shannon Gabrilson
Riverwalk Square Development, LLC
8320 East Hartford Drive
Suite 104
Scottsdale, AZ 85255

Reference:    Safari Drive – Phase 1: Exhibit F, Schedule 3

To Whom It May Concern:

To the best of our knowledge, the Project Construction Schedule by Okland Construction enclosed and
dated November 21, 2005, is realistic and, apart from unforeseen conditions, Owner changes or other
delays out of our control, can be adhered to.

Sincerely,

Mike Jobes, Associate
Miller|Hull Architecture and Planning

**EXHIBIT G**

Initial Budget

Doc #:CHI01 (320527-00057) 50316526v9;12/30/2005/Time:10:44

**Exhibit A**
**Proposed Project Budget – Safari Drive**

| Project Costs: | Phase I plus Phase II Predevelopment | | Phase II | | Total | | per s.f. | |
|---|---|---|---|---|---|---|---|---|
| Land | $ | 24,360,000 | $ | - | $ | 24,360,000 | $87.80 | |
| | | | | | | | | |
| General Contract - Okland* ** | $ | 54,490,000 | $ | 24,900,000 | $ | 79,390,000 | $286.14 | |
| Owner's Hard Cost Contingency | $ | 2,625,000 | $ | 1,245,000 | $ | 3,870,000 | $13.95 | |
| Total hard costs | $ | 57,115,000 | $ | 26,145,000 | $ | 83,260,000 | $300.09 | |
| | | | | | | | | |
| Soft Costs: | | | | | | | | |
| Due Diligence | $ | 280,000 | $ | - | $ | 280,000 | $1.01 | |
| Architect and Engineering | $ | 3,775,000 | $ | 300,000 | $ | 4,075,000 | $14.69 | |
| Owner's Permits and Fees | $ | 460,000 | $ | - | $ | 460,000 | $1.66 | |
| Insurance | $ | 3,965,000 | $ | - | $ | 3,965,000 | $14.29 | |
| Property Taxes | $ | 150,000 | $ | 150,000 | $ | 300,000 | $1.08 | |
| Condominium Formation | $ | 100,000 | $ | - | $ | 100,000 | $0.36 | |
| Sales and Marketing | $ | 1,600,000 | $ | 100,000 | $ | 1,700,000 | $6.13 | |
| Developer's Fee | $ | 1,100,000 | $ | 3,900,000 | $ | 5,000,000 | $18.02 | |
| Bank upfront fee | $ | 970,000 | $ | - | $ | 970,000 | $3.50 | |
| Bank loan expenses | $ | 125,000 | $ | - | $ | 125,000 | $0.45 | |
| Mezzanine Loan Expenses | $ | 315,000 | $ | - | $ | 315,000 | $1.14 | |
| Interest reserve Tranche A/B | $ | 4,500,000 | $ | 1,500,000 | $ | 6,000,000 | $ 22 | |
| Contingency | $ | 350,000 | $ | 105,000 | $ | 455,000 | $ 2 | 2.0% |
| Total soft costs | $ | 17,690,000 | $ | 6,055,000 | $ | 23,745,000 | $ 86 | |
| | | | | | | | | |
| Total project costs | $ | 99,165,000 | $ | 32,200,000 | $ | 131,365,000 | $ 473 | |
| | | | | | | | | |
| Project Funding: | | | | | | | | |
| Equity | $ | 19,645,000 | $ | (6,000,000) | $ | 13,645,000 | $ 49 | |
| Deferred Equity* | $ | 2,000,000 | $ | - | $ | 2,000,000 | | |
| Mezzanine Loan - principal amount | $ | 18,720,000 | $ | - | $ | 18,720,000 | $ 67 | |
| Corus Loan Tranche A/B* | $ | 58,800,000 | $ | 38,200,000 | $ | 97,000,000 | $ 350 | 73.8% |
| Total sources | $ | 99,165,000 | $ | 32,200,000 | $ | 131,365,000 | $ 473 | |
| check: | - | | - | | - | | | |
| | | | | | | | | |
| | 277,453 | | | | | | | |

\* – Tranche A loan balance may not exceed $5mm in proceeds until the Deferred Equity amount is eliminated through either (a) reductions in the General Contract (with Bank review and approval) or (b) the contribution of additional cash equity.

\** – Assumes Okland general contract contingency is eliminated prior to closing.