# EXHIBIT 2

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

KATTEN MUCHIN ROSENMAN LLP
525 WEST MONROE STREET
CHICAGO, ILLINOIS 60661
ATTN: MARK C. SIMON, ESQ.

---

## SUBORDINATION AND INTERCREDITOR AGREEMENT

---

THIS SUBORDINATION AND INTERCREDITOR AGREEMENT (this "**Agreement**") is made and entered into as of January 3, 2006, between **LEHMAN BROTHERS HOLDINGS INC.**, a Delaware corporation ("**Subordinate Lender**") and **CORUS BANK, N.A.**, a national banking association ("**CORUS Bank**"); and acknowledged and agreed to by **RIVERWALK SQUARE DEVELOPMENT, LLC**, an Arizona limited liability company ("**Property Owner**"), **RIVERWALK SQUARE DEVELOPMENT II, LLC**, an Arizona limited liability company, **RIVERWALK SQUARE HOLDINGS, LLC**, a Washington limited liability company, **WC RIVERWALK, LLC**, an Arizona limited liability company, **BROTHERS COMPANY, LLC**, a Washington limited liability company, **VANGUARD CITY HOME, LLC**, an Arizona limited liability company (individually or collectively, as the context shall infer, "**Equity Owner**"), **A. CHRISTOPHER CAMBERLANGO**, an individual residing in the State of Arizona, **MICHAEL TRAILOR**, an individual residing in the State of Arizona and **JAMES NUNEMACHER**, an individual residing in the State of California (each, a "**Guarantor**" and collectively, the "**Guarantors**").

### W I T N E S S E T H :

WHEREAS, CORUS Bank is the owner and holder of a certain Promissory Note, dated as of the date hereof, executed by Property Owner and payable to the order of CORUS Bank, in the original principal amount of NINETY SEVEN MILLION AND NO/DOLLARS ($97,000,000.00) (as renewed, extended, modified, amended or restated from time to time (subject to the limitations provided herein), the "**CORUS Bank Note**"; and the mortgage loan evidenced by the CORUS Bank Note is herein referred to as the "**CORUS Bank Loan**"); and

WHEREAS, the CORUS Bank Note and the indebtedness evidenced thereby is secured by (i) that certain Construction Deed of Trust, Security Agreement, Assignment of Rents and Fixture Filing, dated as of the date hereof, executed by Property Owner to Fidelity National Title Insurance Company, for the benefit of CORUS Bank and recorded or to be recorded among the land records of Maricopa County, Arizona (the "**Land Records**") (as amended, supplemented, modified, restated, renewed or extended from time to time (subject to the

limitations provided herein), the "**CORUS Bank Deed of Trust**"), granting a first priority lien on the real estate situated in Scottsdale, Maricopa County, Arizona, and more particularly described in Exhibit A, attached hereto and incorporated herein, and all other collateral for the CORUS Bank Loan (collectively the "**Property**"); (ii) that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Guarantors and Property Owner in favor of CORUS Bank (the "**CORUS Bank Indemnity**"); (iii) that certain Completion and Non-Recourse Carveout Guaranty, dated as of the date hereof, executed by Guarantors in favor of CORUS Bank (the "**CORUS Bank Completion Guaranty**"); the CORUS Bank Indemnity and the CORUS Bank Completion Guaranty are individually referred to as the "CORUS Bank Guaranty" and collectively referred to as the "**CORUS Bank Guaranties**"); (iv) that certain Assignment of Construction Documents, dated as of the date hereof, executed by Property Owner in favor of CORUS Bank (the "**Assignment of Construction Documents**"); and (v) that certain Assignment of Condominium Documents, dated as of the date hereof, executed by Property Owner in favor of CORUS Bank ("**Assignment of Condominium Documents**") (the CORUS Bank Deed of Trust, the CORUS Bank Guaranties, and all other documents securing the CORUS Bank Note and the CORUS Bank Obligations are referred to herein collectively as the "**CORUS Bank Security Documents**"). The CORUS Bank Note, the CORUS Bank Security Documents, the CORUS Bank Guaranties, and all other documents issued in connection therewith, including, without limitation, that certain Construction Loan Agreement, dated as of as of the date hereof, executed by CORUS Bank, and Property Owner (the "**CORUS Bank Loan Agreement**"; each as renewed, extended, modified, amended or restated from time to time (subject to the limitations provided herein), are herein referred to collectively as the "**CORUS Bank Documents**"; the obligations created under and pursuant to the CORUS Bank Documents are herein referred to collectively as the "**CORUS Bank Obligations**"); and

WHEREAS, the Subordinate Lender is the owner and holder of a certain Secured Promissory Note, dated as of the date hereof, executed by Equity Owner and payable to the order of Subordinate Lender in the aggregate original principal amount of $18,720,000.00 (as renewed, extended, modified, amended or restated from time to time (subject to the limitations provided herein), the "**Subordinate Lender Note**"; and the loan evidenced by the Subordinate Lender Note is herein referred to as the "**Subordinate Lender Loan**"); and

WHEREAS, the Subordinate Lender Note and the indebtedness evidenced thereby is secured by (i) certain Membership Pledge and Security Agreements, each dated as of the date hereof, executed by each Equity Owner and their respective direct and indirect constituent members (all of the foregoing, including Equity Owner, referred to herein, individually or collectively, as the context shall infer, as "**Pledgors**") wherein Pledgors pledge to Subordinate Lender their direct and indirect membership interests in Property Owner (collectively, the "**Pledge Agreement**"); (ii) that certain Conditional Guaranty, dated as of the date hereof, executed by Guarantors in favor of Subordinate Lender (the "**Conditional Guaranty**"); (iii) that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Equity Owner and Guarantors in favor of Subordinate Lender (the "**Indemnity**"); (iv) that certain Completion Guaranty, dated as of the date hereof, executed by Guarantors in favor of Subordinate Lender (the "**Completion Guaranty**"); (v) those certain UCC-1 Financing Statements naming Property Owner, Equity Owner and other Pledgors, respectively, as debtors, in favor of Subordinate Lender, as secured party (the "**UCC's**"); (vi) that certain Assignment of Title Insurance Policy and Proceeds dated as of the date hereof by Property Owner and

2

Subordinate Lender (the "**Assignment of Title**") ; and (vii) that certain Loan Agreement, dated as of the date hereof, executed by Subordinate Lender and Equity Owner (the "**Subordinate Lender Loan Agreement**"; the Pledge Agreement, the Conditional Guaranty, the Indemnity, the Assignment of Title, the Completion Guaranty, and the UCC's are referred to herein collectively as the "**Subordinate Lender Security Documents**"; the Subordinate Lender Note and Subordinate Lender Security Documents and all other documents issued in connection therewith, including, without limitation, the Subordinate Lender Loan Agreement and the other documents listed on **Exhibit B** attached hereto and made a part hereof and each as renewed, extended, modified, amended or restated from time to time [subject to the limitations provided herein], are herein referred to collectively as the "**Subordinate Lender Documents**"; the obligations created under and pursuant to the Subordinate Lender Documents are herein referred to collectively as the "**Subordinate Lender Obligations**"); and

WHEREAS, in connection with the making of the CORUS Bank Loan and the Subordinate Lender Loan, the Subordinate Lender has agreed to subordinate and make inferior (i) the right, title, lien, and interest created by the Subordinate Lender Security Documents to the right, title, lien, and interest of the CORUS Bank Security Documents and (ii) Subordinate Lender's rights to receive any payments under or on account of the Subordinate Lender Obligations to CORUS Bank's rights to receive payments under or on account of the CORUS Bank Obligations, so that the Subordinate Lender Obligations and the Subordinate Lender Documents shall be subordinate and inferior to the CORUS Bank Obligations and the CORUS Bank Documents in all respects.

NOW, THEREFORE, for and in consideration of Ten Dollars ($10.00), the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt, adequacy, and sufficiency of all of which are hereby acknowledged, the parties hereto hereby covenant and agree as follows:

1. **Recitals Incorporated**. The recitals set forth hereinabove are incorporated herein by reference to the same extent and with the same force and effect as if fully set forth hereinbelow, provided, however, that such recitals shall not be deemed to modify the express provisions hereinafter set forth.

2. **Subordination**.

(a) Subordinate Lender, for itself, its successors, and assigns (including, without limitation, all subsequent holders of the Subordinate Lender Note and the Subordinate Lender Documents), subject to the conditions and limitations set forth in this Agreement, does hereby subordinate (i) the Subordinate Lender Documents, (ii) all of the indebtedness now or hereafter secured by the Subordinate Lender Security Documents, and (iii) all of its right, title, lien, and interest in and to the collateral for the Subordinate Lender Loan (the "**Subordinate Loan Collateral**"), to (A) the CORUS Bank Documents, (B) all of the indebtedness now or hereafter secured by the CORUS Bank Documents, and (C) all of the right, title, lien, and interest held by CORUS Bank, its successors, and assigns (including, without limitation, all subsequent holders of the CORUS Bank Note and the CORUS Bank Deed of Trust), in and to the Property and the rents, issues, and profits therefrom, under and pursuant to the CORUS Bank Documents, and, subject to the terms of this Agreement, any and all extensions, renewals, modifications, and

3

replacements thereof. From and after the date hereof, all of the documents, indebtedness, right, title, lien, and interest described in clauses (i), (ii), and (iii) hereinabove shall be subject and subordinate to all of the documents, indebtedness, right, title, lien, and interest described in clauses (A), (B) and (C) hereinabove. Subordinate Lender agrees that until the CORUS Bank Obligations have been paid in full, Subordinate Lender shall not accept a deed of trust, lien or security interest in any of the collateral for the CORUS Bank Obligations which is subject to the CORUS Bank Security Documents, shall not record a deed of trust or file financing statements against Property Owner and shall not otherwise make or bring any claim, lien or action against Property Owner. Until the CORUS Bank Obligations have been paid in full, Subordinate Lender shall not acquire, by subordination or otherwise, any lien, estate, right or interest in any of the collateral under the CORUS Bank Security Documents. Subordinate Lender agrees that any execution by Property Owner of any of the Subordinate Lender Documents prior to repayment of the CORUS Bank Obligations is solely to consent to the provisions thereof and shall not give rise to any lien, security interest or claim or action against Property Owner for payment of the Subordinate Lender Obligations or for monetary damages. Notwithstanding the foregoing, CORUS Bank hereby acknowledges that Subordinate Lender, pursuant to the Pledge Agreement, has a first priority lien in and to all of the outstanding membership interests in the Property Owner and Equity Owner and CORUS Bank hereby agrees that it does not have a lien on any membership interests in the Property Owner or Equity Owner and that no subordination contained herein is intended to subordinate, or shall be construed as subordinating, Subordinate Lender's lien on such membership interests in Property Owner and Equity Owner.

(b) Subordinate Lender, for itself, its successors, and assigns (including, without limitation, all subsequent holders of the Subordinate Lender Note and the Subordinate Lender Documents) does hereby agree that, notwithstanding anything provided in the Subordinate Lender Documents to the contrary, so long as the CORUS Bank Obligations remain outstanding, unless CORUS Bank shall consent in writing: (i) all of the CORUS Bank Obligations shall be paid and satisfied in full before any payment is made on account of the Subordinate Lender Obligations, other than (w) any up front loan fee payable prior hereto or contemporaneously herewith under the Subordinate Lender Loan Agreement and customary out-of-pocket expenses incurred by Subordinate Lender in connection with its documentation, closing and administration of the Subordinate Lender Obligations (including, without limitation, reasonable attorney's fees incurred in connection with the documentation of the Subordinate Lender Loan and review of compliance with applicable State and local laws, rules and regulations (including without limitation, zoning and condominium offering laws, rules and regulations), appraisal fees, environmental audit fees, and fees for loan servicers and construction and other consultants); (x) payments of interest in respect of the Subordinate Lender Loan, provided such payments are derived solely from an interest reserve contained in the Subordinate Lender Loan; (y) provided that there is no Senior Loan Default or Senior Loan Event of Default, repayment of all or a portion of the Subordinate Lender Loan only to the extent such repayment is pursuant to the recapitalization of Riverwalk Square Holdings, LLC (or a direct or indirect member thereof) with equity provided by Subordinate Lender (or its Affiliate) or a separate fund operated by Subordinate Lender; and (z) reimbursements (only to the extent such reimbursements are not derived from the Property or the assets of Property Owner) of any "protective advances" under the Subordinate Lender Loan Documents made by Subordinate Lender in respect of the Subordinate Lender Loan, in each case, and paid prior to the occurrence of an Event of Default (as defined in the CORUS Bank Loan Agreement) under the CORUS

4

Bank Documents; and (ii) except for payments described in <u>Section 2(b)(i)</u> above, no prepayment of the Subordinate Lender Obligations shall be hereafter made. In the event that any payment is made to Subordinate Lender on account of the principal, interest, fees, or other amounts on or with respect to the Subordinate Lender Obligations which is not permitted hereunder (such amount being referred to herein as a "**Wrongful Payment**"), such Wrongful Payment shall be held by Subordinate Lender in trust for the benefit of CORUS Bank and shall be paid forthwith over and delivered to CORUS Bank for application to the payment of all of the CORUS Bank Obligations remaining unpaid. CORUS Bank acknowledges and agrees that if a foreclosure or transfer in lieu of foreclosure under the Pledge Agreement is permitted under this Agreement and occurs, neither the amount of any credit bid made by Subordinate Lender or any subsidiary or affiliate thereof in connection with any such foreclosure nor the portion of the Subordinate Lender Loan which is allocated as consideration for a transfer in lieu of foreclosure under the Pledge Agreement to Subordinate Lender or any subsidiary or affiliate thereof shall be deemed to be a Wrongful Payment.

3. **Amendments to the Subordinate Lender Loan Documents**.

(a) Subordinate Lender may extend, renew, modify, or amend the terms of the Subordinate Lender Obligations and any of the Subordinate Lender Documents, or extend, renew, modify, or amend the terms of any security therefor, and release, transfer, assign, sell, or exchange such security, and otherwise deal freely with Pledgors, Equity Owner and/or Guarantors to the same extent as could any person, all, except as provided below, without notice to or consent of CORUS Bank and without affecting the liabilities and obligations of CORUS Bank pursuant to the provisions hereof, provided, however, that no such amendment or modification shall, without the prior written consent of CORUS Bank: (i) increase the principal amount of the Subordinate Lender Note or otherwise increase the amount of the Subordinate Lender Obligations (whether through any document styled as an amendment or other documentation evidencing or creating additional loans or indebtedness) other than "protective advances" or "self-help advances" made by Subordinate Lender pursuant to the terms of the Subordinate Lender Documents and other increases in the principal amount of the Subordinate Lender Note by reason of an advance by Subordinate Lender of any interest reserve included in the Subordinate Lender Loan; (ii) increase the interest rate payable under the Subordinate Lender Note (other than increases specifically provided for in the Subordinate Lender Documents in effect on the date hereof, including, without limitation, interest accruals and accretions by virtue of the effect of compounding and for application of any default rate or late charges); (iii) provide for payment of participations, "kickers", or other similar equity features; (iv) shorten the maturity date of the Subordinate Lender Note; (v) shorten the cure periods or times for performance contained in the Subordinate Lender Documents; (vi) add defaults to the Subordinate Lender Documents; or (vii) add prepayment premiums or prohibitions (other than any such premiums or prohibitions specifically provided for in the Subordinate Lender Documents in effect on the date hereof). Subordinate Lender shall endeavor to provide to CORUS Bank copies of any such extensions, renewals, modifications, or amendments, but failure to so provide any of the foregoing shall not: (A) affect the liabilities and obligations of CORUS Bank pursuant to the provisions hereof, (B) result in any liability of Subordinate Lender or any of its employees or agents, or (C) affect the enforceability of any such extension, renewal, modification, or amendment as to any person or entity (including, without limitation, Pledgors, Equity Owner, Guarantors or Subordinate Lender). In addition, Subordinate Lender shall, upon

5

the written request by CORUS Bank, deliver to CORUS Bank copies of all such extensions, renewals, modifications, or amendments in effect on the date of such request.

(b) Subordinate Lender hereby agrees, however, that, notwithstanding any provision to the contrary in the Subordinate Lender Documents, so long as the CORUS Bank Obligations remain outstanding, unless CORUS Bank shall consent in writing, Subordinate Lender shall not: (i) except as provided in Section 3(c) below, seek to foreclose the Subordinate Lender Security Documents, accept any transfer in lieu of foreclosure or otherwise enforce its lien against the Subordinate Lender Collateral; or (ii) except as provided in Section 3(d) below, seek to enforce any of its rights or remedies against Equity Owner, Pledgors, Property Owner, Guarantors or any other party pursuant to the Subordinate Lender Note, the Subordinate Lender Security Documents, or any other Subordinate Lender Document, other than foreclosure or transfer in lieu of foreclosure pursuant to Section 3(c) below. The foregoing clause (ii) shall not limit Subordinate Lender's right to charge default interest or late charges pursuant to the Subordinate Lender Documents, accelerate the Subordinate Lender Loan in order to foreclose its interest in the Pledge Agreement in accordance with Section 3(c) below or exercise "self-help" or other performance rights under the Subordinate Lender Documents regarding Equity Owner's obligations thereunder strictly for the purpose of curing an Event of Default pursuant to the provisions set forth in Section 21 of this Agreement.

(c) Notwithstanding the foregoing, upon the occurrence of an Event of Default under the Subordinate Lender Documents, Subordinate Lender (or a wholly owned [except for any non-voting stock representing less than 20% of the ultimate economic interest in such entity] and controlled direct or indirect subsidiary of Subordinate Lender) (referred to herein collectively as a "**Permitted Assignee**") shall be entitled to foreclose its interest under, or to accept a transfer in lieu of foreclosure under, the Pledge Agreement, and become the owner of all of the membership interests in the Property Owner or any Equity Owner, to the extent permitted by the Pledge Agreement and applicable law. So long as the Subordinate Lender causes all Defaults or Events of Default (including, but not limited to, the deposit of any required amounts to cause the CORUS Bank Loan to be "In-Balance," as provided in the CORUS Bank Loan Agreement) then existing under the CORUS Bank Documents (specifically excluding, however, any Defaults or Events of Default resulting from the existence of a Default or Event of Default under the Subordinate Lender Documents) to be cured within the periods set forth in Section 21 hereof (unless such Default or Event of Default is not required to be cured pursuant to Section 21(b)(iii) and (iv) and Subordinate Lender has satisfied all conditions set forth in such Sections), then the change in control of Property Owner resulting from such foreclosure or transfer in lieu of foreclosure of the Pledge Agreement (but not any subsequent changes in control which may occur as a result of a subsequent transfer by Subordinate Lender or any such Permitted Assignee (which are hereby expressly prohibited except to the extent permitted by the CORUS Bank Documents) shall not, in and of itself, notwithstanding any contrary provision contained in the CORUS Bank Documents, constitute a Default or an Event of Default under any of the CORUS Bank Documents.

(d) Notwithstanding the foregoing, upon the occurrence of an Event of Default under the Subordinate Lender Documents, and upon the delivery by Subordinate Lender of an "**Additional Guaranty**" or "**Acceptable Letter of Credit**" (as hereinafter defined) to CORUS Bank, Subordinate Lender shall be entitled to pursue any and all rights and remedies it

6

may have against Guarantors in their capacity as guarantors under the Subordinate Lender Documents; provided, that, Subordinate Lender shall not be required to deliver the Additional Guaranty or Acceptable Letter of Credit in connection with an enforcement action limited solely to any foreclosure or transfer in lieu of foreclosure under the Pledge Agreement pursuant to Section 3(c) above. Nothing contained in this Agreement is intended to, nor shall it, delay, limit, or impair in any manner the right of CORUS Bank to pursue any and all rights and remedies, subject to the terms of Section 21 of this Agreement, it may have against Guarantors under the CORUS Bank Documents (which include the obligations of Guarantors under the CORUS Bank Guaranties) at any time or from time to time. Subordinate Lender acknowledges and agrees that CORUS Bank may pursue any such right or remedy prior to or contemporaneously with the pursuit by Subordinate Lender of any rights or remedies as permitted by this Section 3(d). CORUS Bank shall be entitled to draw any proceeds under the Acceptable Letter of Credit to the same extent CORUS Bank would have been entitled to payments under the CORUS Bank Guaranties. For purposes of this Agreement, the following capitalized terms shall have the following meanings:

"Additional Guaranty" means a guaranty agreement executed by an "**Acceptable Guarantor**" (as hereinafter defined) in favor of CORUS Bank, pursuant to which such Acceptable Guarantor guarantees the prompt and complete payment and performance of the CORUS Bank Obligations, to the same extent as the CORUS Bank Guaranties and which guaranty agreement shall be in the same form and substance as the CORUS Bank Guaranties, provided that the obligations under the Additional Guaranty shall date back to the date the CORUS Bank Guaranties were executed and delivered.

"Acceptable Guarantor" means a person or entity: (i) which is Subordinate Lender or a Qualified Transferee or an Affiliate of any such entity and (ii) which has and agrees to maintain a net worth (calculated in accordance with generally accepted accounting principles) of not less than $40,000,000 and an unencumbered liquid cash balance of not less than $10,000,000.

"Acceptable Letter of Credit" means a letter of credit in an amount equal to the outstanding principal balance of the CORUS Bank Note plus any amounts remaining unfunded by CORUS Bank, together with an additional amount reasonably required by CORUS Bank for interest under the CORUS Bank Note, taking into account unfunded interest reserves under the CORUS Bank Loan Agreement, in form satisfactory to CORUS Bank in its sole discretion and issued by a financial institution reasonably satisfactory to CORUS Bank.

"Affiliate" means, as to any particular Person (as defined in the CORUS Bank Loan Agreement), any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with the Person or Persons in question.

"Control" means the ownership, directly or indirectly, in the aggregate of more than fifty percent (50%) of the beneficial ownership interests of an entity and the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of an entity, whether through the ability to exercise voting power, by contract or otherwise. "Controlled by," "controlling" and "under common control with" shall have the respective correlative meaning thereto.

7

"Qualified Transferee" means: (i) Subordinate Lender, (ii) any of the parties listed on Exhibit D hereto, and (iii) one or more of the following:

(A)    a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or pension advisory firm, mutual fund, government entity or plan, provided that any such Person (as defined in the CORUS Bank Loan Agreement) referred to in this clause (A) satisfies the Eligibility Requirements;

(B)    an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, provided that any such Person referred to in this clause (B) satisfies the Eligibility Requirements;

(C)    an institution substantially similar to any of the foregoing entities described in clauses (iii)(A) or (iii)(B) that satisfies the Eligibility Requirements;

(D)    any entity Controlled by any of the entities described in clause (i), clause (ii) or clauses (iii)(A) or (iii)(C) above;

(E)    a Qualified Trustee in connection with a securitization of, the creation of collateralized debt obligations ("**CDO**") secured by or financing through an "owner trust" of the Subordinate Lender Loan;

(F)    an investment fund, limited liability company, limited partnership or general partnership where a Permitted Fund Manager or an entity that is otherwise a Qualified Transferee under clauses (iii)(A), (B), (C) or (D) of this definition acts as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are owned, directly or indirectly, by one or more entities that are otherwise Qualified Transferees under clauses (iii)(A), (B), (C) or (D) of this definition;

(G)    an Affiliate of Subordinate Lender that satisfies the Eligibility Requirements;

(H)    an entity whose obligations under this Agreement are guaranteed by any of the entities described in clause (i), clause (ii) or clause (iii)(A), (iii)(B) or (iii)(C); or

(I)    any real estate fund or investment partnership that satisfies the Eligibility Requirements and the managing member or general partner of which is Controlled, directly or indirectly, by Subordinate Lender.

"Eligibility Requirements" means, with respect to any Person, that such Person:

8

(i) has total assets (in name or under management) in excess of $500,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus or shareholder's equity of $250,000,000 and (ii) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial mortgage properties.

"Permitted Fund Manager" means any Person that on the date of determination is: (i) a nationally-recognized manager of investment funds investing in debt or equity interests relating to commercial real estate, (ii) investing through a fund with committed capital of at least $250,000,000 and (iii) not subject to a Proceeding (as hereinafter defined).

"Qualified Trustee" means: (i) a corporation, national bank, national banking association or a trust company, organized and doing business under the laws of any state or the United States of America, authorized under such laws to exercise corporate trust powers and to accept the trust conferred, having a combined capital and surplus of at least $100,000,000 and subject to supervision or examination by federal or state authority, (ii) an institution insured by the Federal Deposit Insurance Corporation or (iii) an institution whose long-term senior unsecured debt is rated either of the then in effect top two rating categories of each of the Rating Agencies.

"Rating Agencies" shall mean each of S&P, Moody's Investors Service, Inc. and Fitch, Inc., or their successors.

4. **Bankruptcy**. Subordinate Lender agrees that it is not a creditor of Property Owner and has no claim against Property Owner for the Subordinate Lender Obligations or otherwise for breach of the Subordinate Lender Documents. For so long as the CORUS Bank Loan shall remain outstanding, Subordinate Lender shall not, and shall not solicit any person or entity to, and shall not direct or cause Equity Owner to direct or cause either Property Owner or any entity which controls Property Owner (the "**Borrower Group**") to: (i) commence any Proceeding; (ii) institute proceedings to have Property Owner adjudicated a bankrupt or insolvent; (iii) consent to, or acquiesce or collude in, the institution of bankruptcy or insolvency proceedings against Property Owner; (iv) file a petition or consent to the filing of a petition seeking reorganization, arrangement, adjustment, winding-up, dissolution, composition, liquidation or other relief by or on behalf of Property Owner; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for Property Owner, the Property (or any portion thereof) or any other collateral securing the CORUS Bank Loan (or any portion thereof); (vi) make an assignment for the benefit of any creditor of Property Owner; (vii) seek to consolidate the Property or any other assets of the Property Owner with the assets of Equity Owner, Pledgors or any member of the Borrower Group in any proceeding relating to bankruptcy, insolvency, reorganization or relief of debtors; or (viii) take any action in furtherance of any of the foregoing. Upon any distribution of the assets or properties of Property Owner or upon any dissolution, winding up, liquidation, bankruptcy, or reorganization involving Property Owner (whether in bankruptcy, insolvency, or receivership proceedings, or upon an assignment for the benefit of creditors or otherwise, herein referred to as a "**Proceeding**"):

(a) CORUS Bank shall first be entitled to receive payment in full of the principal of and interest on the CORUS Bank Obligations and all fees and any other payments

9

(including post-petition interest and all costs and expenses) due pursuant to the terms of the CORUS Bank Documents, before Subordinate Lender is entitled to receive any payment on account of the Subordinate Lender Obligations; and

(b) any payment or distribution of the assets or properties of Property Owner of any kind or character, whether in cash, property, or securities, to which Subordinate Lender would be entitled except for the provisions of this Agreement, shall be paid by the debtor in possession, liquidating trustee, or agent, or other person making such payment or distribution directly to CORUS Bank; and

(c) in the event that, notwithstanding the foregoing, any payment or distribution of the assets or properties of Property Owner, Pledgors or Equity Owner of any kind or character, whether in cash, property, or securities, shall be received by Subordinate Lender on account of principal, interest, fees, or other amounts on or with respect to the Subordinate Lender Obligations before all of the CORUS Bank Obligations are paid in full, such payment or distribution shall be received and held in trust for and shall be paid over to CORUS Bank forthwith, for application to the payment of the CORUS Bank Obligations until all such CORUS Bank Obligations shall have been paid in full in accordance with the terms of the CORUS Bank Documents; and

(d) if payments received by CORUS Bank pursuant to Section 4(b) and/or Section 4(c) hereof are sufficient to pay the CORUS Bank Obligations in full, without any obligation of CORUS Bank to repay or return any such payments, then Subordinate Lender shall be subrogated to the rights and claims of CORUS Bank under the CORUS Bank Documents.

To the extent necessary to effectuate the foregoing, Subordinate Lender does hereby: (i) agree in any Proceeding to vote or refrain from voting claims arising out of the Subordinate Lender Obligations in the manner required by CORUS Bank provided that such requirements shall only relate to any claims which arise out of the Subordinate Lender Obligations; (ii) agree not to accept in any Proceeding any payment or distribution made with respect to any claim arising from the Subordinate Lender Obligations unless such payment or distribution is paid to CORUS Bank as provided herein; (iii) agree not to reject any such payment or distribution which can be paid to CORUS Bank as provided herein; and (iv) indemnify and hold CORUS Bank harmless from any loss, cost, expense or cause of action resulting from Subordinate Lender's failure to act in accordance with this Section.

5. **Continuing Benefits**.

(a) No right of CORUS Bank or any present or future holder of the CORUS Bank Obligations to enforce the subordination as provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Property Owner, Equity Owner, Guarantors, Pledgors or any other party, whether borrower, guarantor, or otherwise, or by any act or failure to act, in good faith, by the holder of the CORUS Bank Obligations, or by any noncompliance by Property Owner, Equity Owner, Guarantors, Pledgors or any borrower, guarantor, or otherwise with the terms of the CORUS Bank Note or any other of the CORUS Bank Documents regardless of any knowledge thereof which such holder may have or be otherwise charged with; provided, however, that the foregoing part of this Section

10

5(a) shall not limit or prohibit Subordinate Lender from foreclosing under, or accepting any transfer in lieu of foreclosure under, the Pledge Agreement, if such foreclosure or transfer in lieu of foreclosure is otherwise permitted under this Agreement.

(b) No right of Subordinate Lender or any present or future holder of the Subordinate Lender Obligations to enforce the rights as provided herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of Property Owner, Equity Owner, Guarantors, Pledgors or any other party, whether borrower, guarantor, or otherwise, or by any act or failure to act, in good faith, by the holder of the Subordinate Lender Obligations, or by any noncompliance by Property Owner, Equity Owner, Guarantors, Pledgors or any borrower, guarantor, or otherwise with the terms of the Subordinate Lender Documents regardless of any knowledge thereof which such holder may have or be otherwise charged with.

(c) This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of all or any portion of the CORUS Bank Loan is rescinded or must otherwise be returned by CORUS Bank upon the insolvency, bankruptcy or reorganization of Property Owner or otherwise, all as though such payment had not been made.

6. **Intentionally Omitted**.

7. **Subordinate Lender Documents and CORUS Bank Documents**.

(a) Subordinate Lender hereby warrants and represents to CORUS Bank that: (i) attached hereto as Exhibit B is a true, correct and complete list of the Subordinate Lender Documents, in effect on the date hereof, (ii) Subordinate Lender has delivered to CORUS Bank true and correct copies of the Subordinate Lender Documents in effect on the date hereof, and (iii) Subordinate Lender has no knowledge, as of the date hereof, of any Default or Event of Default under the Subordinate Lender Note or the Subordinate Lender Documents which has not been cured or waived. Subordinate Lender hereby warrants and represents that none of the documents and instruments referred to in this Section 7(a) have, as of the date hereof, been modified or amended except as set forth on Exhibit B hereto. Subordinate Lender expressly covenants and agrees that in no event shall Subordinate Lender require Property Owner to execute or deliver a mortgage, deed of trust, encumbrance or other lien with respect to the Property so long as any of the CORUS Bank Obligations are outstanding and in no event shall Subordinate Lender accept or record any mortgage, deed of trust, encumbrance or lien against the Property while any of the CORUS Bank Obligations are outstanding.

(b) CORUS Bank hereby warrants and represents to Subordinate Lender that: (i) attached hereto as Exhibit C is a true, correct and complete list of the CORUS Bank Documents, in effect on the date hereof, (ii) CORUS Bank has delivered to Subordinate Lender true and correct copies of the CORUS Bank Documents, and (iii) CORUS Bank has no knowledge, as of the date hereof, of any Default or Event of Default under the CORUS Bank Documents which has not been cured or waived. CORUS Bank hereby warrants and represents that none of the documents and instruments referred to in this Section have, as of the date hereof, been modified or amended except as set forth on Exhibit C hereto.

11

8. **Representations, Warranties and Covenants of Subordinate Lender.** Subordinate Lender hereby covenants, agrees, warrants, represents, and certifies unto CORUS Bank that:

(a) Subordinate Lender is the owner and holder of the Subordinate Lender Note and the Subordinate Lender Documents;

(b) Neither the Subordinate Lender Note, nor any of the other Subordinate Lender Documents, have been extended, renewed, amended, transferred, or otherwise modified except as set forth herein;

(c) This Agreement has been duly authorized by Subordinate Lender, the persons executing, acknowledging, and delivering this Agreement on behalf of Subordinate Lender are fully authorized to do so, and all of the terms and provisions of this Agreement are fully enforceable against Subordinate Lender and its successors and assigns;

(d) All fees, costs and expenses due and payable under the Subordinate Lender Note to date have been paid;

(e) The indebtedness evidenced by the Subordinate Lender Note is the only indebtedness secured by the Subordinate Lender Security Documents;

(f) To the knowledge of Subordinate Lender, there exists no Default or Event of Default of any nature under the terms and provisions of the Subordinate Lender Note, the Subordinate Lender Security Documents, or any of the other Subordinate Lender Documents, or combination thereof, and no condition which, with the giving of notice and/or the passage of time, would result in such an Event of Default;

(g) Subordinate Lender agrees and covenants to deliver to CORUS Bank copies of all notices of defaults and Events of Default and to endeavor to deliver copies of all other notices of potential defaults, cost overruns, quality of construction issues, plan modification issues, or other material matters delivered to Equity Owner, Guarantors, Pledgor or Property Owner under the Subordinate Lender Note, the Subordinate Lender Security Documents, or the other Subordinate Lender Documents. Such notices shall be sent to CORUS Bank at the address specified in Section 15 hereof, or at such other address as CORUS Bank shall furnish to Subordinate Lender in the manner provided in Section 15 hereof, provided that any failure to deliver such notices to CORUS Bank shall not give rise to any cause of action by CORUS Bank against Subordinate Lender; and

(h) Subordinate Lender acknowledges and understands that CORUS Bank will rely upon the certifications, warranties, representations, covenants, and agreements contained herein as a material consideration and inducement in making the CORUS Bank Loan.

(i) Subordinate Lender will not withhold its consent to the sale of any Unit so long as the sale price is at least ninety percent (90%) of the List Price set forth in the Price List Schedule attached to the CORUS Bank Loan Agreement as Exhibit M.

12

9. **Representations, Warranties and Covenants of CORUS Bank.** CORUS Bank hereby covenants, agrees, warrants, represents, and certifies unto Subordinate Lender that:

(a) CORUS Bank is the owner and holder of the CORUS Bank Note and the CORUS Bank Documents;

(b) Neither the CORUS Bank Note, nor any of the other CORUS Bank Documents, have been extended, renewed, amended, transferred, or otherwise modified except as set forth herein;

(c) This Agreement has been duly authorized by CORUS Bank, the persons executing, acknowledging, and delivering this Agreement on behalf of CORUS Bank are fully authorized to do so, and all of the terms and provisions of this Agreement are fully enforceable against CORUS Bank and its successors and assigns;

(d) All fees, charges, costs, and expenses due and payable by Property Owner under or with respect to the CORUS Bank Note or otherwise with respect to the CORUS Bank Loan on or before the date hereof have been paid;

(e) The indebtedness evidenced by the CORUS Bank Note (and other CORUS Bank Documents) is the only indebtedness secured by the CORUS Bank Security Documents;

(f) To the knowledge of CORUS Bank, there exists no Default or Event of Default of any nature under the terms and provisions of the CORUS Bank Documents and no condition which, with the giving of notice and/or passage of time, would result in such an Event of Default;

(g) CORUS Bank acknowledges and understands that Subordinate Lender will rely upon the certifications, warranties, representations, covenants, and agreements contained herein as a material consideration and inducement in making the Subordinate Lender Loan; and

(h) CORUS Bank agrees and covenants to deliver to Subordinate Lender copies of all notices of defaults and Events of Default and to endeavor to deliver copies of all other notices of potential defaults, cost overruns, quality of construction issues, plan modification issues, or other material matters delivered to Guarantors, Equity Owner or Property Owner under the CORUS Bank Note, the CORUS Bank Security Documents, or the other CORUS Bank Documents. Such notices shall be sent to Subordinate Lender at the address specified in Section 15 hereof, or at such other address as Subordinate Lender shall furnish to CORUS Bank in the manner provided in Section 15 hereof, provided that any failure to deliver such notices to Subordinate Lender shall not give rise to any cause of action by Subordinate Lender against CORUS Bank, and provided further that Subordinate Lender shall have the right (but no obligation) to cure any Default or Event of Default under the CORUS Bank Documents at any time prior to the expiration of the applicable cure periods set forth in Section 21, which cure periods reference the delivery of certain notices from CORUS Bank to Subordinate Lender.

13

10. **Dealings with Property Owner**. CORUS Bank may extend, renew, modify, or amend the terms of the CORUS Bank Obligations and any of the CORUS Bank Documents, or extend, renew, modify, or amend the terms of any security therefor and release, transfer, assign, sell, or exchange such security and otherwise deal freely with Property Owner and/or Guarantors to the same extent as could any person, all, except as provided below, without notice to or consent of Subordinate Lender and without affecting the liabilities and obligations of Subordinate Lender pursuant to the provisions hereof, provided, however, that no such amendment or modification shall, without the prior written consent of Subordinate Lender: (a) increase the principal amount of the CORUS Bank Note or otherwise increase the principal amount of the CORUS Bank Obligations (whether through any document styled as an amendment or modification or through any other documentation evidencing or creating additional loans or indebtedness) other than "protective advances" or "self-help advances" made by CORUS Bank pursuant to the terms of the CORUS Bank Documents, (b) expressly modify the CORUS Bank Documents so as to add conditions to funding, (c) increase the interest rate payable under the CORUS Bank Note (other than increases specifically provided for in the CORUS Bank Documents in effect on the date hereof, such as increases in the prime rate of CORUS Bank, increases in the London interbank offering rate and application of the Default Rate), (d) provide for payment of participations, "kickers", or other similar equity features, (e) shorten the cure periods or times for performance contained in the CORUS Bank Documents, (f) shorten the maturity date of the CORUS Bank Note, (g) add defaults to the CORUS Bank Documents, (h) add prepayment premiums or prohibitions (other than LIBOR breakage fees and other prepayment premiums specifically provided in the CORUS Bank Documents in effect on the date hereof), or (i) reduce the List Price for any Residential Unit such that the resulting average List Price for the Residential Units is less than $540 per square foot. CORUS Bank shall endeavor to provide to Subordinate Lender copies of any such extensions, renewals, modifications, or amendments, but failure to so provide any of the foregoing shall not: (i) affect the liabilities and obligations of Subordinate Lender pursuant to the provisions hereof, (ii) result in any liability of CORUS Bank or any of its employees or agents, or (iii) affect the enforceability of any such extension, renewal, modification, or amendment as to any person or entity (including, without limitation Property Owner, Equity Owner, Guarantors or Subordinate Lender). In addition, CORUS Bank shall, upon the written request by Subordinate Lender, deliver to Subordinate Lender copies of all such extensions, renewals, modifications, or amendments in effect on the date of such request.

11. **Assignment of the CORUS Bank Obligations**. CORUS Bank may assign or transfer any or all of the CORUS Bank Obligations and/or any interest therein or herein, and, notwithstanding any such assignment or transfer or any subsequent assignment or transfer thereof, such CORUS Bank Obligations shall be and remain senior to the Subordinate Lender Obligations, and the Subordinate Lender Obligations shall be and remain subject and subordinate to the CORUS Bank Obligations for the purposes of and as and to the extent provided in this Agreement, and every immediate and successive assignee or transferee of any of the CORUS Bank Obligations or of any interest therein or herein shall, to the extent of the interest of such assignee or transferee in the CORUS Bank Obligations, be entitled to the benefits of, and subject to the obligations under, this Agreement to the same extent as if such assignee or transferee were CORUS Bank; provided, however, that, unless CORUS Bank shall otherwise consent in writing, CORUS Bank shall have an unimpaired right, prior and superior to that of any such assignee or transferee, to enforce this Agreement, for the benefit of CORUS Bank, as to those portions of the

14

CORUS Bank Obligations which CORUS Bank has not assigned or transferred. Any assignee or transferee of CORUS Bank shall take its interest in the CORUS Bank Documents subject to the terms of this Agreement. The foregoing to the contrary notwithstanding, each of the transfer or assignment instruments from CORUS Bank effecting any transfer or assignment of any of the CORUS Bank Documents or of any interest therein shall expressly inform the transferee or assignee thereof of the existence of this Agreement and that any such transfer or assignment is subject to the terms of this Agreement.

12. **Waiver; Modification**. No delay on the part of CORUS Bank or Subordinate Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by CORUS Bank or Subordinate Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy; nor shall any modification or waiver of any of the provisions of this Agreement be binding upon CORUS Bank or Subordinate Lender except as expressly set forth in a writing duly signed and delivered by or on behalf of CORUS Bank and Subordinate Lender.

13. **Waiver of Rights**. Property Owner, Equity Owner and Guarantors hereby waive notice of acceptance of this Agreement by CORUS Bank and Subordinate Lender.

14. **Legend**. Subordinate Lender, Property Owner and Equity Owner hereby agree to cause all instruments evidencing indebtedness or other obligations of Property Owner and/or Equity Owner to Subordinate Lender which are or may be subject to the provisions of this Agreement to be subject to an appropriate legend to the effect that such indebtedness or other obligation evidenced by such instrument is subordinated to the CORUS Bank Obligations in the manner and to the extent set forth in this Agreement, and Subordinate Lender will make appropriate entries in the books and records of Subordinate Lender to indicate that the Subordinate Lender Obligations are subject to the CORUS Bank Obligations; provided, however, the foregoing shall be satisfied if a legend referencing this Agreement is included on the cover of the Subordinate Lender Loan Agreement and on the first page of the Subordinate Lender Note.

15. **Notices**. Any notice, demand, designation, or other communication which is required or permitted to be given under the terms and provisions of this Agreement shall be deemed to by duly given and received on the date the same shall be personally delivered to the addressee at the address hereinbelow specified (including delivery by a reputable professional overnight courier service), or on the date delivered or rejected if delivered by United States certified mail, return receipt requested postage prepaid, addressed to the addressee at the address hereinbelow specified:

If to Subordinate Lender:
Lehman Brothers Holdings Inc.
399 Park Avenue, 8th floor
New York, NY 10022
Attention: Mr. Christopher Westfahl
MTS No. WC62/ Asset No. 1129101

with copies to:
    Lehman Brothers Holdings Inc.
    399 Park Avenue, 8th floor
    New York, NY 10022
    Attention: David Broderick, Esq.
    MTS No.WC62 / Asset No. 1129101

and to:
    Trimont Real Estate Advisors, Inc.
    2 Park Plaza, Suite 500
    Jamboree Center
    Irvine, California 92614
    Attention: Mr. Rick Garvin
    MTS No.WC62 / Asset No. 1129101

and to:
    Windels Marx Lane & Mittendorf, LLP
    156 West 56th Street
    New York, New York 10019
    Attention: James T. Thomas, Esq.

If to CORUS Bank:
    CORUS Bank, N.A.
    3959 N. Lincoln Avenue
    Chicago, Illinois 60613
    Attention: Mr. Brian Brodeur

with copies to:
    CORUS Bank, N.A.
    3959 N. Lincoln Avenue
    Chicago, Illinois 60613
    Attention: Joel C. Solomon, Esq.

and to:
    Katten Muchin Rosenman LLP
    525 West Monroe Street
    Chicago, Illinois 60661
    Attention: Mark C. Simon, Esq.

Any party hereto may by written notice given to the others in the manner herein provided change the address to which any such notice, demand, designation, or other communication shall be thereafter given to it.

16. **Priority**. The priorities herein specified are applicable irrespective of the time of creation or perfection of the CORUS Bank Obligations or the Subordinate Lender Obligations.

17. **No Modification to Senior Loan Documents or Subordinate Lender Documents**. This Agreement is not intended to modify and shall not be construed to modify any

term or provision of the CORUS Bank Documents or the Subordinate Lender Documents as to Property Owner, Equity Owner, Pledgors or Guarantors. The provisions of this Agreement are solely for the benefit of CORUS Bank and Subordinate Lender, and their respective successors and permitted assigns, and are not enforceable by Property Owner, Equity Owner, Guarantors, Pledgors or any other party not a party to this Agreement. Except as otherwise expressly set forth in this Agreement, none of Property Owner, Equity Owner, Guarantors and Pledgors shall assume or be responsible for any obligations or liabilities under this Agreement.

18. **Further Assurances**. So long as the CORUS Bank Obligations are outstanding, Subordinate Lender, its successors or assigns, or any other legal holder of the Subordinate Lender Documents, as the case may be, shall execute, acknowledge, and deliver upon the reasonable demand of CORUS Bank, at any time or times, any and all further documents or instruments in recordable form (if applicable) for the purpose of further confirming the subordination and the agreements herein set forth. So long as the Subordinate Lender Obligations are outstanding, CORUS Bank, its successors or assigns, or any other legal holder of the CORUS Bank Documents, as the case may be, shall execute, acknowledge, and deliver upon the reasonable demand of Subordinate Lender, at any time or times, any and all further documents or instruments in recordable form (if applicable) for the purpose of further confirming the subordination and the agreements herein set forth.

19. **Estoppel Certificate**. Subordinate Lender hereby agrees that within ten (10) days after written demand of CORUS Bank, it shall execute, acknowledge, and deliver a certification setting forth the total amount of indebtedness owed to it which shall be then secured by any portion of the Subordinate Loan Collateral, and any and all such certifications shall be conclusive as to the matters set forth therein, and shall be fully binding upon Subordinate Lender, its successors, and assigns. Notwithstanding the foregoing, Subordinate Lender shall not be obligated to give such a certification more frequently than once every calendar quarter. CORUS Bank hereby agrees that within ten (10) days after written demand of Subordinate Lender, it shall execute, acknowledge, and deliver a certification setting forth the total amount of indebtedness owed to it which shall be then secured by any portion of the Property, and any and all such certifications shall be conclusive as to the matters set forth therein, and shall be fully binding upon CORUS Bank, its successors, and assigns. Notwithstanding the foregoing, CORUS Bank shall not be obligated to give such a certification more frequently than once every calendar quarter.

20. **Consent**. Notwithstanding any provision to the contrary contained in any of the CORUS Bank Documents, CORUS Bank, by its execution of, and subject to the terms of, this Agreement, hereby consents to the making of the Subordinate Lender Loan evidenced by the Subordinate Lender Note and the other Subordinate Lender Documents and the taking of the Subordinate Loan Collateral as collateral for such Subordinate Lender Loan. Notwithstanding any provision to the contrary contained in any of the Subordinate Lender Documents, Subordinate Lender, by its execution of, and subject to the terms of, this Agreement, hereby consents to the making of the CORUS Bank Loan evidenced by the CORUS Bank Note and the other CORUS Bank Documents and the taking of the Property and all other Collateral as collateral for such CORUS Bank Loan.

17

21. **Notices of Events of Default:  Cure Right**.

(a) CORUS Bank, by its execution of this Agreement, hereby agrees to provide to Subordinate Lender, in the manner provided in Section 15 hereof, copies of all written notices that a Default or an Event of Default has occurred under the CORUS Bank Documents which are given by CORUS Bank to Property Owner and/or to Guarantors.  In addition, Subordinate Lender shall have the right (but no obligation) to cure any Default or Event of Default under the CORUS Bank Documents at any time prior to the expiration of the applicable cure periods set forth below, and CORUS Bank shall accept such cure from Subordinate Lender as though such cure had been made by the Property Owner thereunder.

(b) If a Default (i.e., for the purposes of this Agreement a default of any kind, whether or not a notice or grace period, is applicable thereto) shall occur under any of the CORUS Bank Documents (any such Default is also occasionally referred to as a "**Senior Loan Default**") or, with respect to any default under any of the CORUS Bank Documents as to which no grace or cure period is provided under the CORUS Bank Documents, an Event of Default shall occur under any of the CORUS Bank Documents (any such Event of Default is also occasionally referred to as a "**Senior Loan Event of Default**"), Subordinate Lender shall have the right (but not the obligation) to cure such Senior Loan Default or Senior Loan Event of Default which right to cure shall extend for the permitted cure periods set forth below, it being agreed that until the expiration of such permitted cure periods, CORUS Bank shall not accelerate the CORUS Bank Note, commence a foreclosure of the CORUS Bank Deed of Trust, or pursue any other remedy under the CORUS Bank Documents (except for such remedies [excluding the commencement of a foreclosure] as are needed to preserve collateral for the CORUS Bank Loan or preserve the enforceability of the CORUS Bank Documents), nor shall CORUS Bank impose any default rate, late payment charges, or other fees as a result of such Senior Loan Default or Senior Loan Event of Default (provided CORUS Bank may accrue such amounts after an Event of Default, but such amounts will not be payable in the event Subordinate Lender shall cure the applicable Event of Default as provided herein):

(i)    In the case of any Senior Loan Default or Senior Loan Event of Default which can be cured solely by the payment of money, including, without limitation, scheduled payments of principal and interest under the CORUS Bank Note (such Senior Loan Defaults and Senior Loan Events of Default being hereinafter referred to as "**Monetary Defaults**"), Subordinate Lender's right to cure shall extend through and including the later of (A) five (5) Business Days after receipt by Subordinate Lender of written notice from CORUS Bank that such Monetary Default has occurred or (B) three (3) Business Days after the expiration of the grace period available to Property Owner or Guarantors, as applicable, with respect to such Monetary Default; provided, however, the extended right to cure shall only be granted to Subordinate Lender three (3) times during any twelve (12) month period during the term of the Loan (commencing on the date hereof).  Upon the occurrence of the fourth Monetary Default, CORUS Bank may immediately pursue all remedies available pursuant to the CORUS Bank Documents, including, but not limited to, imposition of the Default Rate and foreclosure.

(ii)    In the case of any Senior Loan Default or Senior Loan Event of Default which is not a Monetary Default (other than a Senior Loan Default

18

described in clause (b)(iii) below) (such Senior Loan Defaults or Senior Loan Events of Default being hereinafter referred to individually as "**Other Default**" and collectively as "**Other Defaults**"), Subordinate Lender's right to cure shall extend through and including thirty (30) days after the later of (A) receipt by Subordinate Lender of written notice from CORUS Bank that such Other Default has occurred or (B) the expiration of the grace period or cure period following notice, as the case may be, available to Property Owner or Guarantors, as applicable, with respect to such Other Default; provided, however, that if (x) such Other Default cannot reasonably be cured within such thirty (30) days or before expiration of the otherwise applicable grace or cure period, (y) Subordinate Lender commences to cure such Other Default within such thirty (30) days or before expiration of the otherwise applicable grace or cure period and thereafter diligently prosecutes such cure to completion, and (z) each scheduled payment of principal and interest coming due pursuant to the CORUS Bank Documents continues to be paid when due, then Subordinate Lender shall have such additional time as is reasonably necessary under the circumstances to cure such Other Default, including such time as may be necessary to permit Subordinate Lender to foreclose under or to accept a transfer in lieu of foreclosure under the Pledge Agreement, provided that the aggregate cure period available to Subordinate Lender under this Section 21(b)(ii) shall not exceed sixty (60) days after the later of (A) or (B) above.

(iii)    CORUS Bank agrees that in the case of any Senior Loan Event of Default with respect to the filing of a case in bankruptcy by Property Owner, or any Equity Owner or Guarantors, CORUS Bank shall not exercise its rights to accelerate the CORUS Bank Note (except for any automatic acceleration occurring by reason of Property Owner's bankruptcy), to commence a foreclosure of the CORUS Bank Deed of Trust, or to take any other action to enforce its rights or pursue any other remedy under the CORUS Bank Documents (except for such remedies [excluding the commencement of a foreclosure] as are needed to preserve collateral for the CORUS Bank Loan or preserve the enforceability of the CORUS Bank Documents), nor shall CORUS Bank seek relief from the automatic stay in bankruptcy in order to foreclose the CORUS Bank Deed of Trust or to exercise any other remedy under any of the CORUS Bank Documents, for so long as and provided that:

(A)    (1) Property Owner or Guarantors pay or cause to be paid all scheduled principal and interest payments due under the CORUS Bank Documents in accordance with the terms and provisions of the CORUS Bank Documents when such payments are due or no later than the expiration of the grace period applicable thereto as provided in the CORUS Bank Note, or (2) Subordinate Lender or a Permitted Assignee pays or causes to be paid all scheduled principal and interest payments due under the CORUS Bank Documents in accordance with the terms and provisions of the CORUS Bank Documents when such payments are due or no later than the expiration of the cure period applicable thereto as provided in Section 21(b)(i) above;

(B)    Subordinate Lender:    (x) commences actions required in order to foreclose under the Pledge Agreement within thirty (30) days (1) if Equity Owner is not a debtor party to such bankruptcy case and Subordinate

19

Lender is not subject to the automatic stay of §362(a) of the Bankruptcy Code or any other stay of enforcement imposed pursuant to §105 of the Bankruptcy Code or otherwise with respect to realization on the Pledge Agreements against Equity Owner, then after receipt by Subordinate Lender of actual notice that such bankruptcy case has been commenced, or (2) if Equity Owner is a debtor party to such bankruptcy case and/or Subordinate Lender is otherwise subject to the automatic stay of §362(a) of the Bankruptcy Code or any other stay of enforcement imposed pursuant to §105 of the Bankruptcy Code or otherwise with respect to realization on the Pledge Agreements against Equity Owner, and Subordinate Lender diligently pursues entry of a lift stay order in such bankruptcy case to permit foreclosure under the Pledge Agreement, then after entry of an order in such bankruptcy case lifting the automatic stay of §362(a) of the Bankruptcy Code or any other stay of enforcement imposed pursuant to §105 of the Bankruptcy Code or otherwise, with respect to any foreclosure under the Pledge Agreement, and (y) Subordinate Lender or any Permitted Assignee consummates such foreclosure sale as soon as reasonably practicable after commencement of such foreclosure process, or, to the extent necessary, the lifting of any applicable stay; and

> (C)    Subordinate Lender obtains dismissal of any such bankruptcy case as to Property Owner within sixty (60) days after receipt by Subordinate Lender of actual notice that any such bankruptcy case has been commenced.

It is expressly agreed that the foregoing portion of this Section 21(b)(iii) shall not be deemed to limit CORUS Bank's right to file a proof of claim for the full accelerated amount of the CORUS Bank Note, defend against any objections to such claim, seek "adequate protection" in such proceeding pursuant to 11 U.S.C. Sections 362 or 363, or take any action in such bankruptcy proceeding (subject to the terms of this Agreement) to protect its interest, other than seeking relief from the automatic stay in bankruptcy in order to foreclose the CORUS Bank Deed of Trust.

> (iv)    In the case of any Senior Loan Default or Senior Loan Event of Default under the CORUS Bank Documents related to (A) the financial condition, bankruptcy or death of any Guarantor, or (B) any transfer of any interest, directly or indirectly, in Property Owner or any Equity Owner not permitted by the CORUS Bank Documents or this Agreement (unless, as a result of such transfer, Subordinate Lender or a Qualified Transferee, within thirty (30) days after notice of the Senior Loan Default or Senior Loan Event of Default, has commenced foreclosure or enforcement of its lien or security interest under the Pledge Agreement against the membership interests in the Property Owner or the applicable Equity Owner, and becomes the owner of all of the membership interests in Property Owner or the applicable Equity Owner within ninety (90) days after notice of such Senior Loan Default or Senior Loan Event of Default) (the defaults described in the foregoing portion of this Section 21(b)(iv), subject to the foregoing parenthetical, are collectively referred to as "**Material Guarantor Defaults**"), CORUS Bank agrees that, if Subordinate Lender shall deliver to

20

CORUS Bank an Additional Guaranty or Acceptable Letter of Credit within ten (10) Business Days after the receipt by Subordinate Lender of CORUS Bank's written notice that a Material Guarantor Default exists, CORUS Bank shall not exercise its rights and remedies under the CORUS Bank Documents as a result of such Material Guarantor Default other than any rights or remedies it is entitled to exercise solely against Guarantors. In the case of (x) any Other Default related solely to Guarantors other than Material Guarantor Defaults or (y) any Other Default relating to Borrower personally (and not the Property) which does not materially adversely affect Lender and which is not reasonably susceptible of cure by Subordinate Lender (collectively, "**Other Uncurable Defaults**"), CORUS Bank agrees that, so long as no Event of Default exists under the CORUS Bank Documents other than (i) Other Uncurable Default(s) or (ii) Defaults or Events of Default for which Subordinate Lender's cure periods specified in this Agreement have not yet expired, CORUS Bank shall not exercise its rights and remedies under the CORUS Bank Documents as a result thereof other than any rights and remedies it is entitled to exercise solely against Guarantors and will not require delivery of an Additional Guaranty or Acceptable Letter of Credit. Subordinate Lender covenants and agrees to deliver written notice to CORUS Bank of any transfer of any interest, directly or indirectly, in Property Owner or Equity Owner upon its actual knowledge of such transfer.

(c) CORUS Bank expressly agrees that the curing by Subordinate Lender of any Default or Event of Default under the CORUS Bank Documents or the taking of any action by Subordinate Lender in connection therewith shall not be deemed an assumption by Subordinate Lender of any of the obligations of Property Owner and/or Equity Owner or of Guarantors under the CORUS Bank Documents. If Subordinate Lender or a Permitted Assignee becomes the owner and holder of the membership interests in Property Owner and/or Equity Owner in accordance with the provisions of this Agreement, the CORUS Bank Documents shall continue in full force and effect upon the terms and conditions set forth in the CORUS Bank Documents; provided, however, that any Default or Event of Default resulting from any Default or Event of Default under the Subordinate Lender Documents shall thereupon be deemed to have been cured.

22. **Assignment or Participation of Subordinate Note**. Subordinate Lender shall not, without the prior written consent of CORUS Bank, assign or participate the Subordinate Note or any of the Subordinate Lender Obligations to any person other than a Permitted Assignee or a Qualified Transferee. Each assignee or transferee of the Subordinate Lender Obligations (or any of them) shall be subject to the provisions of this Agreement (including, without limitation, the provisions of Section 3 hereof), and each permitted transferee or assignee of the Subordinate Note or any part thereof shall be entitled to the benefits of this Agreement to the same extent as if such transferee or assignee were Subordinate Lender. Each of the transfer and assignment documents effecting any assignment or transfer of the Subordinate Lender Documents or any interest therein shall expressly inform the transferee or assignee thereof of the existence of this Agreement and that any such transfer or assignment is subject to the terms of this Agreement.

23. **Condemnation Proceeds**. The Subordinate Lender Documents contain a provision that Equity Owner shall, upon certain conditions, deliver the proceeds of a casualty at

21

or condemnation of all or part of the Property to Subordinate Lender ("**Casualty/Condemnation Proceeds**"). Notwithstanding any contrary provision contained in the Subordinate Lender Documents, if there occurs a casualty at or condemnation of all or part of the Property, then any such Casualty/Condemnation Proceeds shall be delivered to CORUS Bank to be applied as provided in the CORUS Bank Documents. Any receipt of such Casualty/Condemnation Proceeds by Subordinate Lender contrary to the terms of this Section 23 shall be a Wrongful Payment and shall be delivered to CORUS Bank as provided in Section 2(b) above.

24. **Subordinate Lender's Right to Purchase the CORUS Bank Note**. In the event that (a) CORUS Bank has accelerated the CORUS Bank Note, and/or commenced foreclosure of the CORUS Bank Deed of Trust, and/or agreed to accept a deed-in-lieu of foreclosure after the expiration of Subordinate Lender's cure periods specified hereunder (CORUS Bank to provide Subordinate Lender notice of such events), (b) CORUS Bank has ceased funding the CORUS Bank Loan for a period of sixty (60) days after a request for funding by Property Owner and Property Owner is in compliance with all of the terms of the CORUS Bank Documents and has satisfied all conditions for an Advance, (c) a bankruptcy proceeding shall have commenced and be continuing with respect to the Property Owner, any Equity Owner or Guarantors, or (d) the Subordinate Lender shall have otherwise requested in writing to purchase the CORUS Bank Note and CORUS Bank consents to such purchase, then and in any of the foregoing cases, CORUS Bank agrees that Subordinate Lender shall have the right (but not the obligation) to purchase the CORUS Bank Note, upon the payment to CORUS Bank of all principal, interest and other charges (including any prepayment premium and Exit Fees, whether or not such purchase would technically constitute a "prepayment") outstanding and due under the CORUS Bank Documents (collectively, the "**Loan Purchase Price**"), including, without limitation, the CORUS Bank Note and the CORUS Bank Deed of Trust. Subordinate Lender's right to purchase the CORUS Bank Note may be exercised by written notice to CORUS Bank of its commitment to do so and payment of the Loan Purchase Price provided that the Loan Purchase Price is actually received by CORUS Bank within thirty (30) days after notice of Subordinate Lender's election to purchase, and in all events Subordinate Lender's right to purchase the CORUS Bank Note shall expire unless such purchase has closed prior to the Purchase Cut-Off Time. "Purchase Cut-Off Time" means (i) in the case of a judicial or non-judicial foreclosure of the CORUS Bank Deed of Trust, 3:00 pm (Chicago Time) on the business day prior to the day on which any foreclosure, trustee's or equivalent sale takes place and (ii) in the case of a deed in lieu of foreclosure, on the closing of a deed in lieu of foreclosure; provided, however, that CORUS Bank shall not accept a deed in lieu of foreclosure without giving Subordinate Lender prior written notice of CORUS Bank's intention to do so, in which event CORUS Bank shall not accept a deed in lieu of foreclosure for thirty (30) days after such notice, and, if such purchase option is exercised prior to the expiration of such thirty (30) day period, CORUS Bank shall afford Subordinate Lender thirty (30) days after timely exercise of such purchase option to close such purchase in accordance herewith before accepting a deed in lieu of foreclosure. Upon payment to CORUS Bank of the Loan Purchase Price, CORUS Bank will execute assignment documents to assign (without recourse, representations or warranties, except for representations of the outstanding balance of the CORUS Bank Note and that CORUS Bank has not assigned or encumbered its rights in the CORUS Bank Documents) the CORUS Bank Documents to the Subordinate Lender or its designee. Notwithstanding any provision to the contrary hereinabove in this Section 24, or elsewhere in this Agreement, or in any of the CORUS Bank Documents, the occurrence of any Default or Event of Default under the Subordinate

22

Lender Documents shall not constitute a Default or Event of Default per se under any of the CORUS Bank Documents.

25. **Successors and Assigns**. This Agreement shall be binding on and inure to the benefit of CORUS Bank, Subordinate Lender and their respective successors and permitted assigns.

**[Signature Page Follows]**

**IN WITNESS WHEREOF,** Subordinate Lender and CORUS Bank have each caused this Agreement to be executed by its duly authorized officer as of the day and year first above written.

**SUBORDINATE LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By: _____
    Name:   Chris Westfahl
    Title:
              Authorized Signatory

**CORUS BANK:**

**CORUS BANK, N.A.,**
a national banking association

By: _____
    Name:  Brian Brodeur
    Title:   Senior Vice President

**IN WITNESS WHEREOF,** Subordinate Lender and CORUS Bank have each caused this Agreement to be executed by its duly authorized officer as of the day and year first above written.

<u>**SUBORDINATE LENDER:**</u>

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation

By:_____
Name:_____
Title:_____

<u>**CORUS BANK:**</u>

**CORUS BANK, N.A.,**
a national banking association

By:    _____
Name:   Brian Brodeur
Title:    Senior Vice President

S-1

## ACKNOWLEDGMENT AND AGREEMENT

**FOR $10.00** and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned have set their respective hands and seals hereto to acknowledge and agree to the terms and conditions of the foregoing Subordination and Intercreditor Agreement dated as of December 3, 2005, by and between Lehman Brothers Holdings Inc., a Delaware corporation, and CORUS Bank, N.A., a national banking association and each of the undersigned acknowledges and agrees that it is not in any way a third party beneficiary of any provision of the Subordination and Intercreditor Agreement. Furthermore, each of the undersigned hereby irrevocably consents to the delivery by Subordinate Lender to CORUS Bank and by CORUS Bank to Subordinate Lender of any and all information, documents, agreements, instruments, reports, certificates and analyses prepared by or in the possession of either such lender to the other, and consents to free and unfettered discussions, negotiations and sharing of information and the analysis of such information between CORUS Bank and Subordinate Lender relating to Property Owner, Equity Owner, Guarantors, the Project, or the Property and the undersigned hereby expressly waive any rights they may have, with respect to Subordinate Lender or CORUS Bank, to maintain such information as privileged or private.

**EXECUTED** as of ~~December~~ January 3, 2006 ~~, 2005~~.

### PROPERTY OWNER:

**RIVERWALK SQUARE DEVELOPMENT, LLC,** an Arizona limited liability company

By: Riverwalk Square Development II, LLC, an Arizona limited liability company, its Sole Member

By: Riverwalk Square Holdings, LLC, a Washington limited liability company, its Sole Member

By: WC Riverwalk, LLC, an Arizona limited liability company, its Manager

By: Vanguard City Home, LLC, an Arizona limited liability company, its Manager

By: ACC Homes, Inc., an Arizona corporation, its Manager

By: _____
Name:  A. Christopher Camberlango
Title:   President

Doc #:CHI01 (320527-00057) 50319111v6;12/22/2005/Time:17:12

**EQUITY OWNER:**

**RIVERWALK SQUARE DEVELOPMENT II, LLC**, an
Arizona limited liability company

By: Riverwalk Square Holdings, LLC, a Washington
    limited liability company, its Sole Member

    By: WC Riverwalk, LLC, an Arizona limited liability
        company, its Manager

        By: Vanguard City Home, LLC, an Arizona limited
            liability company, its Manager

            By: ACC Homes, Inc., an Arizona corporation, its
                Manager

            By: _____
            Name: A. Christopher Camberlango
            Title: President

**PLEDGORS:**

**RIVERWALK SQUARE HOLDINGS, LLC**, a Washington
limited liability company

By: WC Riverwalk, LLC, an Arizona limited liability company,
    its Manager

    By: Vanguard City Home, LLC, an Arizona limited liability
        company, its Manager

        By: ACC Homes, Inc., an Arizona corporation, its
            Manager

        By: _____
        Name: A. Christopher Camberlango
        Title: President

**WC RIVERWALK, LLC**, an Arizona limited liability company

By:  Vanguard City Home, LLC, an Arizona limited liability
company, its Manager

By:  ACC Homes, Inc., an Arizona corporation, its Manager

By: _____
Name:  A. Christopher Camberlango
Title:   President

**BROTHERS COMPANY, LLC**, a Washington limited liability
company

By: _____
Name:  ALVIN J. WOLFF, JR.
Title:  MANAGER

**VANGUARD CITY HOME, LLC**, an Arizona limited liability
company

By:  ACC Homes, Inc., an Arizona corporation, its Manager

By: _____
Name:  A. Christopher Camberlango
Title:   President

**GUARANTORS AND INDEMNITORS:**

_____

A. CHRISTOPHER CAMBERLANGO an
individual resident of the State of Arizona

_____

**MICHAEL TRAILOR,** an individual resident
of the State of Arizona

_____

**JAMES NUNEMACHER,** an individual
resident of the State of California

S-5

**GUARANTORS AND INDEMNITORS:**

_____
**A. CHRISTOPHER CAMBERLANGO** an
individual resident of the State of Arizona


**MICHAEL TRAILOR**, an individual resident
of the State of Arizona


_____
**JAMES NUNEMACHER**, an individual
resident of the State of California

S-5

STATE OF NEW YORK

ss.

COUNTY OF NEW YORK

On this _27th_ day of December, 2005, before me,
Richard Cole a Notary Public in and for the State of New York,
personally appeared Christopher Westfahl, an Authorized Signatory of **LEHMAN BROTHERS HOLDINGS, INC.**, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person(s) acted, executed the instrument.

**WITNESS** my hand and official seal

_____
Signature

My commission expires: _1-28-06_

RICHARD ARLEN COLE, JR.
Notary Public, State of New York
No. 01CO6069239
Qualified in New York County
Commission Expires Jan. 28, 2006

STATE OF ILLINOIS

                    ss.

COUNTY OF COOK

        On this 29th day of December, 2005, before me, Susan W. DeLisle a Notary Public in and for the State of Illinois, personally appeared Brian Brodeur, Senior Vice President of **CORUS BANK, N.A.**, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

        **WITNESS** my hand and official seal

                                *Susan W. DeLisle*
                                     Signature

My commission expires:

                      OFFICIAL SEAL
                     SUSAN W DELISLE
            NOTARY PUBLIC - STATE OF ILLINOIS
           MY COMMISSION EXPIRES:05/12/08

N-2

STATE OF ARIZONA

ss.

COUNTY OF MARICOPA

On this 27 day of December, 2005, before me, _Lisa M. Marchal_ a Notary Public in and for the State of Arizona, personally appeared A. Christopher Camberlango, authorized signatory, on behalf of **RIVERWALK SQUARE DEVELOPMENT, LLC,** personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_Lisa M. Marchal_
Signature

My commission expires: 10-25-07

> OFFICIAL SEAL
> LISA M. MARCHAL
> NOTARY PUBLIC-ARIZONA
> MARICOPA COUNTY
> My Comm. Expires Oct 25, 2007

N-1

STATE OF ARIZONA

ss.

COUNTY OF MARICOPA

On this 27 day of December, 2005, before me, *Lisa M. Marchal* a Notary Public in and for the State of Arizona, personally appeared A. Christopher Camberlango, authorized signatory, on behalf of **RIVERWALK SQUARE DEVELOPMENT II, LLC**, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

**WITNESS** my hand and official seal

*Lisa M. Marchal*
Signature

My commission expires: 10-25-07

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

N-2

STATE OF ARIZONA

ss.

COUNTY OF MARICOPA

On this *27* day of December, 2005, before me, _Lisa M. Marchal_ a Notary Public in and for the State of Arizona, personally appeared A. Christopher Camberlango, authorized signatory, on behalf of **RIVERWALK SQUARE HOLDINGS, LLC**, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

**WITNESS** my hand and official seal

_Lisa M. Marchal_

Signature

My commission expires: 10-25-07

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

STATE OF ARIZONA

ss.

COUNTY OF MARICOPA

On this _22_ day of December, 2005, before me, _Lisa M. Marchal_ a Notary Public in and for the State of Arizona, personally appeared A. Christopher Camberlango, authorized signatory, on behalf of **WC RIVERWALK SQUARE, LLC**, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

**WITNESS** my hand and official seal

_Lisa M. Marchal_
Signature

My commission expires: 10-25-07

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

STATE OF _Arizona_

COUNTY OF _Maricopa_    ss.

On this _27th_ day of December, 2005, before me, _Lisa M. Marchal_ a Notary Public in and for the State of _Arizona_, personally appeared _Alvin J. Wolff Jr.,_ authorized signatory, on behalf of **BROTHERS COMPANY, LLC,** personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

**WITNESS** my hand and official seal

_Lisa M. Marchal_
Signature

My commission expires: _10-25-07_

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

STATE OF ARIZONA

                 ss.

COUNTY OF MARICOPA

On this _22_ day of December, 2005, before me, _Lisa M. Marchal_ a Notary Public in and for the State of Arizona, personally appeared A. Christopher Camberlango, authorized signatory, on behalf of **VANGUARD CITY HOME, LLC,** personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

       **WITNESS** my hand and official seal

                                _Lisa M. Marchal_
                              Signature

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

STATE OF ARIZONA

ss.

COUNTY OF MARICOPA

On this _21_ day of December, 2005, before me, _Lisa M. Marchal_ a Notary Public in and for the State of Arizona, personally appeared A. Christopher Camberlango, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal

_____
Signature

My commission expires:

10-25-07

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

N-9

STATE OF ARIZONA

ss.

COUNTY OF MARICOPA

On this 2̲5̲ day of December, 2005, before me,
_L̲i̲s̲a̲ ̲M̲.̲ ̲M̲a̲r̲c̲h̲a̲l̲_ a Notary Public in and for the State of Arizona,
personally appeared Michael Trailor, personally known to me (or proved on the basis of
satisfactory evidence) to be the person whose name is subscribed to the within instrument and
acknowledged to me that he executed the same in his authorized capacity, and that by his
signature on the instrument the person, or the entity upon behalf of which the person acted,
executed the instrument.

**WITNESS** my hand and official seal

_Lisa M. Marchal_
Signature

My commission expires: 1̲0̲-̲2̲5̲-̲0̲7̲

OFFICIAL SEAL
LISA M. MARCHAL
NOTARY PUBLIC-ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct 25, 2007

N-10

STATE OF CALIFORNIA

COUNTY OF San Francisco <sup>ss.</sup>

On this _22_ day of December, 2005, before me, _MARYANNE DIAZ_ a Notary Public in and for the State of California, personally appeared James Nunemacher, personally known to me (or proved on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

**WITNESS** my hand and official seal



Signature

My commission expires:

11-15-07

```
MARYANNE DIAZ
COMM. # 1451116
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires November 15, 2007
```

Doc #:CHI01 (320527-00057) 50319111v6;12/20/2005/Time:14:58

## EXHIBIT A

### LEGAL DESCRIPTION

Parcel No. 1:

A portion of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, and described as follows:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, said point also bearing South 00 degrees 00 minutes 00 seconds East a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right of way line of Scottsdale Road, said point also being the Northwest corner of PARADISE TRIANGLE, Tract "A", as recorded in Book 46 of Maps, Page 26, records of the Maricopa County, Arizona recorders office;

Thence continuing East a distance of 252.73 feet to the Northwest corner of the aforementioned RIVERWALK SQUARE, said point also being the TRUE POINT OF BEGINNING;

Thence continuing East a distance of 687.78 feet to a point located at the Northeast corner of RIVERWALK SQUARE;

Thence South 40 degrees 44 minutes 00 seconds West along the Southeast property line of RIVER WALK SQUARE a distance of 335.53 feet;

Thence leaving said property line, North 49 degrees 17 minutes 13 seconds West a distance of 111.82 feet;

Thence South 89 degrees 58 minutes 04 seconds West a distance of 74.88 feet;

Thence South a distance of 37.51 feet to a point of curvature having a radius of 40.00 feet;

Thence proceeding Southwesterly along said curve through a central angle of 217 degrees 16 minutes 02 seconds a distance of 151.68 feet to a point of non-tangency;

Thence North a distance of 166.07 feet;

Thence South 89 degrees 58 minutes 04 seconds West a distance of 237.67 feet to a point located along the West line of RIVERWALK SQUARE;

Thence North 00 degrees 00 minutes 20 seconds West along said West line a distance of 28.40 feet to the TRUE POINT OF BEGINNING.

Parcel No. 2:

A part of the Southwest quarter of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, known as Tract "A" of the PARADISE TRIANGLE, according to Book 45 of Maps, page 26, records of Maricopa County, Arizona, more particularly described as follows:

Beginning 1722.38 feet South and 33 feet East of the Northwest corner of Section 23, Township 2 North, Range 4 East;

Thence East 795.90 feet;

Thence South 40 degrees 44 minutes West, 649.39 feet;

Thence North 49 degrees 16 minutes West, 377.42 feet;

Thence West 86.16 feet;

Thence North 245.80 feet to the point of beginning;

Except the West 32 feet thereof.

Parcel No. 3:

Part of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

From the Southwest corner of said Northwest quarter, running North, assumed bearing, along the West line of the said Northwest quarter, 934 feet to the point of beginning of the parcel of land herein described and the Southwest corner thereof;

Thence continuing North along the West line of said Northwest quarter, 205 feet;

Thence East, at right angles to the West line of said Northwest quarter, 1005.44 feet;

Thence South 40 degrees 44 minutes West along a line 50 feet from measured at right angles to the water line of the Arizona Canal, 270.54 feet;

Thence West along a line perpendicular to the West line of said Northwest quarter, 828.90 feet to the point of beginning;

Except the West 65 feet thereof.

Except from Parcel No. 2 and Parcel No. 3 the following described property:

That part of Tract "A", PARADISE TRIANGLE, according to Book 46 of Maps, page 26, records of Maricopa County, Arizona, and that part of the Northwest quarter of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, described as follows:

Commencing at the West quarter corner of said Section 23;

Thence North 00 degrees 00 minutes 00 seconds East along the West line of the Northwest quarter of said Section 23, 688.12 feet;

Thence North 90 degrees 00 minutes 00 seconds East, 65.00 feet to a point on a line which is parallel with and 65.00 feet Easterly, as measured at right angles from the West line of the Northwest quarter of said Section 23, said point being the point of beginning;

Thence North 00 degrees 00 minutes 00 seconds East along said parallel line, 451.18 feet;

Thence North 89 degrees 57 minutes 53 seconds East, 252.66 feet;

Thence South 00 degrees 02 minutes 07 seconds East, 293.50 feet;

Thence South 49 degrees 15 minutes 13 seconds East, 329.75 feet;

Thence South 40 degrees 42 minutes 38 seconds West, 249.27 feet;

Thence North 49 degrees 15 minutes 13 seconds West, 377.41 feet;

Thence South 90 degrees 00 minutes 00 seconds West, 54.15 feet to the point of beginning.

And further excepting from Parcel No. 2 and Parcel No. 3 the following described property:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, said point also bearing South 00 degrees 00 minutes 00 seconds East, a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right-of-way line of Scottsdale Road, said point also being the Northwest corner of PARADISE TRIANGLE, Tract "A", as recorded in Book 46 of Maps, page 26, of the Maricopa County Recorder's Office;

Thence continuing East a distance of 252.73 feet to the Northwest corner of the aforementioned RIVERWALK SQUARE, said point also being the TRUE POINT OF BEGINNING;

Thence continuing East a distance of 687.78 feet to a point located at the Northeast corner of RIVERWALK SQUARE;

Thence South 40 degrees 44 minutes 00 seconds West along the Southeast property line of RIVERWALK SQUARE, a distance of 335.53 feet;

Thence leaving said property line, North 49 degrees 17 minutes 13 seconds West, a distance of 111.82 feet;

Thence South 89 degrees 58 minutes 04 seconds West, a distance of 74.88 feet;

Thence South a distance of 37.51 feet to a point of curvature having a radius of 40.00 feet;

Thence proceeding Southwesterly along said curve, through a central angle of 217 degrees 16 minutes 02 seconds, a distance of 151.68 feet to a point of non-tangency;

Thence North a distance of 166.07 feet;

Thence South 89 degrees 58 minutes 04 seconds West, a distance of 237.67 feet to a point located along the West line of RIVERWALK SQUARE;

Thence North 00 degrees 00 minutes 20 seconds West along said West line, a distance of 28.40 feet to the TRUE POINT OF BEGINNING.

A non-exclusive easement for vehicular and pedestrian ingress and egress appurtenant to the land described in Parcel Nos. 1, 2 and 3 herein over, across and through the North Drive Easement Area, as granted in the Permanent, Non-Exclusive Easements Agreement recorded February 14, 2005, in Instrument No. 2005-0185399, records of Maricopa County, Arizona, over land described as follows:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23, Township 2 North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona, said point bearing South 00 degrees 00 minutes 00 seconds East a distance of 1517.38 feet from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right of way line of Scottsdale Road, said point being the True Point of Beginning;

Thence North 89 degrees 58 minutes 04 seconds East, a distance of 252.73 feet to a point, said point being the Northwest corner of the land described in Deed recorded in Instrument No. 2005-0185398, records of Maricopa County, Arizona;

Thence departing said North line, South 00 degrees 00 minutes 20 seconds East along the West line of the land described in said Deed, a distance of 38.00 feet;

Thence South 89 degrees 58 minutes 04 seconds West a distance of 217.71 feet;

Thence South 81 degrees 50 minutes 18 seconds West, a distance of 35.36 feet to a point located on the East right of way line of Scottsdale Road;

Thence North 00 degrees 00 minutes 00 seconds West along said right of way line a distance of 43.00 feet to the True Point of Beginning.

Parcel No. 5:

A non-exclusive easement for vehicular and pedestrian ingress and egress appurtenant to the land described herein as Parcel Nos. 1, 2, and 3 over, across and through the Pals Loop Road Easement Area as granted in the Interruptible, Reciprocal, Non-Exclusive Easements Agreement recorded February 14, 2005, in Instrument No. 2005-0185400 and in the Permanent, Non-Exclusive Easements Agreement recorded February 14, 2005, in Instrument No. 2005-0185399, records of Maricopa County, Arizona, over land described as follows:

Commencing at a point 1139.00 feet North of the West quarter corner of Section 23 Township 2
North, Range 4 East of the Gila and Salt River Base and Meridian, Maricopa County, Arizona,
said point also bearing South 00 degrees 00 minutes 00 seconds East a distance of 1517.38 feet
from the Northwest corner of said Section 23;

Thence East a distance of 65.00 feet to a point located on the East right of way line of Scottsdale
Road;

Thence North 89 degrees 58 minutes 04 seconds East a distance of 252.73 feet to a point, said
point being the Northwest corner of the land described in Deed recorded in Instrument No. 2005-
0185398, records of Maricopa County, Arizona, said point also being the true Point of
Beginning;

Thence departing said North line and proceeding South 00 degrees 00 minutes 20 seconds East
along the West line of the land described in said Deed, a distance of 293.71 feet;

Thence continuing along said property line South 49 degrees 15 minutes 13 seconds East a
distance of 19.78 feet;

Thence departing said property line and proceeding South 00 degrees 00 minutes 20 seconds
East a distance of 14.45 feet to the beginning of a curve concave to the West and having a radius
of 150.00 feet;

Thence continuing along said curve through a central angle of 90 degrees 00 minutes 20 seconds
a distance of 235.63 feet to a point of tangency;

Thence North 90 degrees 00 minutes 00 seconds West a distance of 40.32 feet to a point located
on the Northeast property line of Tract "B", Paradise Triangle, according to Book 46 of Maps,
Page 26, records of Maricopa County, Arizona;

Thence North 49 degrees 16 minutes 00 seconds West along said Tract "B" a distance of 30.65
feet;

Thence South 90 degrees 00 minutes 00 seconds West along said Tract "B" a distance of 54.19
feet to a point located on the East right of way line of Scottsdale Road;

Thence leaving the property line of said Tract "B" and proceeding along said right of way line a
distance of 30.00 feet;

Thence departing said right of way line and proceeding South 90 degrees 00 minutes 00 seconds
East a distance of 137.74 feet to the beginning of a curve concave to the West having a radius of
100.00 feet;

Thence proceeding along said curve through a central angle of 90 degrees 00 minutes 20 seconds
a distance of 157.09 feet to a point of tangency;

Thence North 00 degrees 00 minutes 20 seconds West a distance of 321.05 feet to a point located
on said North line of Paradise Triangle;

Thence North 89 degrees 58 minutes 04 seconds East along said North line a distance of 15.00 feet to the True Point of Beginning.

## EXHIBIT B

### LIST OF SUBORDINATE LENDER DOCUMENTS

1. Note
2. Assignment of Architect's Agreement
3. Assignment of General Contractor's Agreement
4. Assignment of Permits
5. Assignment of Title Insurance proceeds
6. Certificate of Financing Term Sheet
7. Certificate of Organization Structure
8. Certificate of Personal Property
9. Certificate of Preliminary Construction Budget
10. Certificate of Sources & Uses
11. Completion Guaranty
12. Conditional Guaranty
13. Consent and Agreement of Architect
14. Consent and Agreement of Developer
15. Environmental Indemnity Agreement
16. Financing Statements
17. Guarantor's Financial Certificate (Camberlango)
18. Guarantor's Financial Certificate (Nunemacher)
19. Guarantor's Financial Certificate (Trailor)
20. Loan Agreement
21. Membership Pledge and Security Agreement (Riverwalk Square Development II, LLC)
22. Membership Pledge and Security Agreement (Riverwalk Square Holdings, LLC)
23. Membership Pledge and Security Agreement (WC Riverwalk, LLC)
24. Membership Pledge and Security Agreement (Brothers Company, LLC)
25. Membership Pledge and Security Agreement (Vanguard City Home, LLC)
26. Option Agreement
27. Payment Direction Letter
28. Post Closing Letter

Doc #:CHI01 (320527-00057) 50319111v8;12/29/2005/Time:13:41

## EXHIBIT C

### LIST OF CORUS BANK DOCUMENTS

Construction Loan Agreement

Promissory Note

Construction Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing

Assignment of Condominium Documents

Assignment of Construction Documents

Completion and Non-Recourse Carveout Guaranty (executed by Guarantors)

Environmental Indemnity Agreement (executed by Property Owner and Guarantors)

UCC-1 Financing Statement to be filed with the Secretary of State of Property Owner's formation

UCC Fixture Filing to be filed in the County where the Property is located

C-1

## EXHIBIT D

## QUALIFIED TRANSFEREES

Aareal Bank AG

AEW Capital Management

Angelo Gordon & Company

Apollo Real Estate Advisors

Barclay's Bank

Blackacre Capital Group, L.P.

Blackstone Real Estate Partners

Capital Trust

Colony Investors (Colony Capital)

Emmes & Company

Eurohypo AG

Heitman Financial

Lend Lease & Company

Meadowbrook Real Estate Fund

Northstar Capital Investment Corp.

Oaktree Capital Management

Olympus Real Estate Fund (Hicks Muse)

PB Capital

Praedium Group

Starwood Opportunity Fund (Starwood Capital)

Sterling Equities

Westbrook Real Estate Fund

Deutsche Bank

D-1

CS First Boston

UBS Paine Weber

JP Morgan Chase

Wells Fargo

Goldman Sachs

Whitehall Funds

I-Star Financial

CIBC

Citigroup/Salomon Smith Barney

Bear Stearns

D-2