LATHAM & WATKINS LLP
Michael J. Riela (MR-7829)
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email: michael.riela@lw.com

and

Richard A. Levy
Sears Tower, Suite 5800
233 South Wacker Drive
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: richard.levy@lw.com

Attorneys for GE Corporate Financial Services, Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** ) | **Chapter 11** |
| ) | |
| **LEHMAN BROTHERS HOLDINGS INC., et al.** ) | **Case No. 08-13555 (JMP)** |
| ) | |
| **Debtors.** ) | **Jointly Administered** |
| ) | |
| ) | |

**OBJECTION OF GE CORPORATE FINANCIAL SERVICES, INC., AS LOAN SERVICER FOR FUSION FUNDING LIMITED, TO DEBTORS' SECOND MOTION FOR AN ORDER PURSUANT TO SECTION 365 OF THE BANKRUPTCY CODE APPROVING THE ASSUMPTION OF OPEN TRADE CONFIRMATIONS**

GE Corporate Financial Services, Inc., by and through its undersigned counsel, hereby submits this objection (the "Objection") to the Debtors' Second Motion for an Order Pursuant To Section 365 of the Bankruptcy Code Approving the Assumption of Open Trade Confirmations (the "Second Trade Confirmation Motion"). GE Corporate Financial Services,

1

CH\1073568.3

Inc. (and any affiliate thereof serving as a sub-servicer, collectively, "GECFS"), as loan servicer and sub-servicer (collectively, "Loan Servicer") for Fusion Funding Limited ("Fusion") and its Luxembourg affiliate, Fusion Funding Luxembourg, S.A.R.L. ("Fusion-Lux" and together with Fusion, the "Fusion Entities"), objects to the assumption by Lehman Commercial Paper Inc., including its UK Branch (collectively, "LCPI"), of the Specified Fusion Trade Confirmations (as defined below) between Fusion and LCPI.[1] In support of this Objection, GECFS, as Loan Servicer on behalf of Fusion, respectfully represents as follows:

## INTRODUCTION

1.  On October 5, 2008 (the "Petition Date"), LCPI filed with this Court a voluntary petition for relief (the "Petition") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  LCPI's chapter 11 case is being jointly administered for procedural purposes only with the chapter 11 cases commenced by Lehman Brothers Holdings Inc. and certain other U.S. affiliates (together with LCPI, the "Debtors").  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.  This Court has jurisdiction over the Debtors' chapter 11 cases and the Objection pursuant to 28 U.S.C. §§ 157 and 1334.  Consideration of the Objection constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Debtors' chapter 11 cases and the Objection in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.  Fusion is a Bermuda exempted limited liability company, and Fusion-Lux is a Luxembourg limited liability company.  As described in greater detail below, the Fusion Entities

---

[1] Fusion-Lux is not a party to the Specified Fusion Trade Confirmations.

2

are special purpose vehicles formed to purchase certain commercial loans from the Lehman Sellers, funded almost exclusively from the proceeds of a secured credit facility provided by General Electric Capital Corporation ("GECC").

4. GECFS, in its capacity as the Loan Servicer for the Fusion Entities, is authorized to perform certain services on behalf of the Fusion Entities pursuant to that certain Loan Servicing Agreement (the "Loan Servicing Agreement"), dated as of August 18, 2008, by and among the Fusion Entities and GECFS, as Loan Servicer. With the approval of the Fusion Board of Directors, GECFS, as Loan Servicer, is filing this Objection on behalf of Fusion.

5. On or about August 18, 2008, LCPI and the Fusion Entities executed a Master Loan Purchase Agreement (the "MLPA"), pursuant to which LCPI and the other Lehman Seller agreed to use commercially reasonable efforts to sell, and the Fusion Entities agreed to use commercially reasonable efforts to purchase, certain specified commercial loans (the "Lehman Loan Assets") for a 75-day period, ending November 1, 2008 (the "Termination Date"). A true and correct copy of the MLPA is attached as Exhibit A to this Objection.[2] The aggregate principal amount of the Lehman Loan Assets intended to be covered by the MLPA exceeded $913 million.

6. To effectuate the loan acquisition arrangement contemplated by the MLPA, the applicable Lehman Seller and the applicable Fusion Entity entered into individual LSTA Par/Near Par Trade Confirmation (collectively, the "Fusion Trade Confirmations") for each of the Lehman Loan Assets covered by the MLPA. A true and correct copy of the LSTA Standard Terms and Conditions for Par/Near Par Trade Confirmations (the "LSTA Standard Terms and Conditions"), which are incorporated into each of the Fusion Trade Confirmations, is attached as

---

[2] Confidential pricing information not relevant to this Objection has been redacted from the MLPA attached as Exhibit A.

3

CH\1073568.3

Exhibit B to this Objection. Each of the Fusion Trade Confirmations is dated shortly before the MLPA. Each Fusion Trade Confirmation is subject to, and qualified by, the provisions of the MLPA.[3]

7.     To finance its acquisition of the Lehman Loan Assets, Fusion obtained a secured credit facility in a maximum principal amount of approximately $775,389,297 from GECC pursuant to a Credit Agreement (the "Credit Agreement"), dated as of August 18, 2008, by and among Fusion and GECC as Administrative Agent and as the sole Lender. Pursuant to various security documents, the loan obligations owing to GECC under the Credit Agreement are secured by first priority liens on all or substantially all of Fusion's assets, including all Lehman Loan Assets acquired by Fusion from time to time.

8.     Because the MLPA contemplated that the parties might not be able to consummate the sale/purchase of certain of the Lehman Loan Assets until after the August 18, 2008 closing, the parties expressly and unambiguously structured the loan acquisition arrangement to protect the Fusion Entities (and GECC, as Fusion's secured lender) against the market risks associated with any undue delay in consummating any loan acquisitions under the MLPA.

9.     First, the parties expressly limited the time period for the sale and purchase of Lehman Loan Assets to 75 days (the so-called "Ramp-Up Period"), which ended on November 1, 2008 (the so-called "Termination Date"). Upon the expiration of the Ramp-Up Period, neither

---

[3] See also Section 21 of the LSTA Standard Terms and Conditions, which provides "each of Buyer and Seller agrees to be legally bound to any other transaction between them (whether entered into before or after the Trade Date) with respect to the assignment, purchase, sale and/or participation of commercial and/or bank par/near par loans, or interest therein, upon reaching agreement to the terms thereof (whether by telephone, exchange of electronic messages or otherwise, directly or through their respective agents, and whether the subject of a confirmation), subject to all the other terms and conditions set forth in any confirmation relating to such transaction, or otherwise agreed." Ex. B (emphasis added).

4

the Lehman Sellers nor the Fusion Entities had any obligation to continue to use commercially reasonable efforts to sell or purchase any further Lehman Loan Assets.

10. Second, and most important, once the Termination Date occurred, Section 5.1(b) of the MLPA entitled each of the Fusion Entities in its sole discretion to terminate at any time any unconsummated Fusion Trade Confirmation:

> [T]o the extent that the purchase and sale of any Financial Asset has not settled on or prior to the Termination Date [defined as seventy-five (75) days after August 18, 2008] in accordance with the terms hereof, the applicable Buyer may, in its sole discretion, elect to terminate its obligations to purchase such Financial Asset under this Agreement, and any applicable Trade Confirmation, by notifying the applicable Seller of such election in writing. [4]

Because the MLPA fully addressed the parties' termination and other rights with respect to any Lehman Loan Asset not sold on the August 18 closing date, the parties agreed in the Fusion Trade Confirmations to make inapplicable the provisions of the LSTA Standard Terms and Conditions that provide for delayed settlement compensation and other damages and remedies for trades not consummated within specified time frames. In any event, each Fusion Trade

---

[4] The parties also agreed to protect the Fusion Entities (and GECC) from the failure of the Lehman Sellers to sell to the Fusion Entities a specified threshold amount of the Lehman Loan Assets (set at $800 million in face amount of the Lehman Loan Assets) by the Termination Date. Upon the occurrence of this so-called "Ramp-Up Failure Event" (as defined in the Credit Agreement), GECC is entitled to unwind the arrangement by directing Fusion to liquidate all Lehman Loan Assets then owned by Fusion, at which point the MLPA automatically terminates. See Section 2.12 of the Credit Agreement. As of the Termination Date, LCPI and the other Lehman Seller had sold to Fusion far less than the minimum threshold of $800 million in Lehman Loan Assets. Consequently, a Ramp-Up Failure Event has occurred, and the MLPA is therefore subject to automatic termination pursuant to Section 5.1(a) thereof. Moreover, as a result of various Events of Default under the Credit Agreement and the occurrence of the Ramp-Up Failure Event, GECC has advised Fusion that all financing commitments under the Credit Agreement have terminated. Consequently, Fusion no longer has access to any funding to purchase any additional Lehman Loan Assets, including those that are the subject of the open Fusion Trade Confirmations.

5

CH\1073568.3

Confirmation is subject to the Fusion Entities' termination rights under Section 5.1(b) of the MLPA.

11.   Because November 1, 2008 marked the seventy-fifth day after the August 18, 2008 closing date, the Termination Date under the MLPA has occurred and Fusion has an irrefutable contractual right to terminate each and every open Fusion Trade Confirmation. In accordance with the MLPA and the open Fusion Trade Confirmations, GECFS, as Loan Servicer acting on behalf of the Fusion Entities, may elect in its sole discretion to terminate any or all of the Fusion Trade Confirmations at any time after November 1, 2008. For a variety of reasons, including the termination of the GECC credit facility and the appreciable decline in the market value of the Lehman Loan Assets that are the subject of the open Fusion Trade Confirmations, the Board of Directions of Fusion has authorized GECFS, as Loan Servicer, to proceed to exercise this termination right with respect to all open Fusion Trade Confirmations.

12.   On November 14, 2008, the Debtors filed the *Debtors' Motion for An Order Pursuant to Section 365 of the Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations* (the "<u>First Trade Confirmation Motion</u>"). In this First Trade Confirmation Motion, the Debtors sought, among other things, to reject one of the Fusion Trade Confirmations, and in an Order dated December 16, 2008, the Court granted in part the First Trade Confirmation Motion, including the Debtor's rejection of that one Fusion Trade Confirmation.

13.   On December 15, 2008, the Debtors filed the Second Trade Confirmation Motion. In the Second Trade Confirmation Motion, LCPI seeks, among other things, to assume seven (7) of the Fusion Trade Confirmations between LCPI and Fusion (the "<u>Specified Fusion Trade Confirmations</u>"), all of which are now terminable at will by Fusion as a result of the occurrence

6

of the Termination Date. True and correct copies of the Specified Fusion Trade Confirmations are attached as Exhibit C to this Objection.[5] Fusion-Lux is not a party to any of the Specified Fusion Trade Confirmations.

## **OBJECTION**

### A. The Specified Fusion Trade Confirmations Are Subject To The Terminable-At-Will Provisions Of The MLPA And Cannot Be Assumed Without The Consent Of Fusion

14. The Fusion Trade Confirmations, including the Specified Fusion Trade Confirmations, were indisputably executed as part of, and in order to effectuate, the overall loan acquisition arrangement memorialized by the MLPA, pursuant to which LCPI and the other Lehman Seller agreed to use commercially reasonable efforts to sell, and the Fusion Entities agreed to use commercially reasonable efforts to purchase, more than $900 million of Lehman Loan Assets during a 75-day period ending November 1, 2008. Even the most cursory review of the MLPA confirms that the parties clearly intended the MLPA and the Fusion Trade Confirmations to comprise a single integrated and indivisible agreement.

15. Indeed, one of the critical features of the MLPA was to impose an outer date (i.e., the November 1, 2008 Termination Date) by which each trade evidenced by a Fusion Trade Confirmation had to be consummated and to give Fusion an unrestricted termination right with respect to all Fusion Trade Confirmations not consummated by that Termination Date. In order to harmonize these MLPA termination provisions with the Fusion Trade Confirmations, the parties agreed to strike from the Fusion Trade Confirmations those provisions in the LSTA Standard Terms and Conditions (incorporated by reference into the Fusion Trade Confirmations)

---

[5] Confidential pricing information not relevant to this Objection has been redacted from the Specified Fusion Trade Confirmations attached as Exhibit C.

that provide for delayed settlement compensation and other damages and remedies for trades which are not timely consummated.

16. Moreover, pursuant to section 21 of the LSTA Standard Terms and Conditions, in executing the Specified Fusion Trade Confirmations, the parties agreed to be bound by the terms of any other agreement they reached with respect to the sale and purchase of the Lehman Loan Assets. Exhibit B, Section 21. Certainly, the MLPA constitutes one such agreement.

17. Finally, the execution of the MLPA and the Specified Fusion Trade Confirmations and the Credit Agreement by the parties was substantially contemporaneous[6] and, "[u]nder New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together." Carvel Corporation v. Diversified Management Group, Inc., 930 F.2d 228, 233 (2nd Cir. 1991). While the Specified Fusion Trade Confirmations and the MLPA were not executed on the same day, they are still part of the same agreement under New York law. See This Is Me v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998) ("New York law requires that all writings which form part of a single transaction and are designed to effectuate the same purpose be read together, even though they were executed on different dates and were not all between the same parties."); Nau v. Vulcan Rail & Constr. Co., 36 N.E.2d 106, 110 (N.Y. 1941) (holding one integrated contract, because "[e]ven though they had been made at different dates, . . . [the agreements] effectuate the same purpose and formed a part of the same transaction").

18. Accordingly, under New York law and under the terms of the MLPA and the Specified Fusion Trade Confirmations and because the parties intended the MLPA and the

---

[6] Both the Credit Agreement and the MLPA are dated August 18, 2008, and all but one of the Specified Fusion Trade Confirmations was dated August 7, 2008, with the remaining Specified Fusion Trade Confirmation dated July 29, 2008.

8

CH\1073568.3

Specified Fusion Trade Confirmations to form a single integrated and indivisible agreement, the terms and conditions of the Specified Fusion Trade Confirmations and the MLPA must be assumed in their entirety.  Those terms and conditions include the negotiated, bargained for and mutually promised right under Section 5.1(b) of the MLPA to terminate the Specified Fusion Trade Confirmations at will if the trades subject to the confirmations were not consummated before the November 1, 2008 Termination Date.

19. But even if LCPI could somehow allege and prove that the MLPA and the Specified Fusion Trade Confirmation were not part of a single integrated agreement, LCPI cannot escape the undisputed fact that the MLPA modified each of the Fusion Trade Confirmations by conferring upon Fusion the unfettered right to terminate any Fusion Trade Confirmation that remained open after the November 1, 2008 Termination Date.  After all, though entered into contemporaneously with the Fusion Trade Confirmations, the MLPA was still executed more than 10 days after the Specified Fusion Trade Confirmations.  That fact, combined with the parties' recognition in Section 21 of the LSTA Standard Terms and Conditions that trade confirmation may be subject to the terms and conditions of "any other transaction [i.e., the MLPA] between them (whether entered into before or after the Trade Date)," compels the conclusion that the Specified Fusion Trade Confirmations are subject to the at will termination provisions of Section 5.1(b) of the MLPA.   Ex. B.

20. Accordingly, whether the Specified Fusion Trade Confirmations are viewed as part of a single integrated agreement governed by the MLPA or as having been subsequently modified by the MLPA, it cannot be denied that each of the Specified Fusion Trade Confirmations is subject to the MLPA, including the terminable at will provisions of Section 5.1(b).

21.     Significantly, the terminable-at-will nature of the Specified Fusion Trade Confirmations is not altered upon assumption.  See, e.g., In re Nitec Paper Corp., 43 B.R. 492, 498 (S.D.N.Y. 1984) ("A contract assumed in bankruptcy is accompanied by all its provisions, and conditions."); See also Thomas Salerno & Jordan Kroop, Bankruptcy Litigation and Practice § 4.27 (3d ed. 2000). ("[A]n 'at will' contract retains such character after assumption.").

22.     For the reasons noted above, GECFS, on behalf of Fusion, intends to exercise its termination right with respect to all of the Specified Fusion Trade Confirmations, and out of an abundance of caution, has contemporaneously filed a motion for relief from the automatic stay to deliver a termination notice to LCPI pursuant to the MLPA.  Accordingly, LCPI should not be permitted to assume these terminable-at-will Specified Fusion Trade Confirmations, and in any event, once GECFS exercises Fusion's right of termination, there will be nothing to assume.

**B.      The Debtors Improperly Attempt to Abrogate Rights of Counterparties to Offset Prepetition Claims Against Payments Required to be Made Under Assumed Trade Confirmations**

23.     Fusion has certain claims against LCPI, including, without limitation, claims for breach of the MLPA and the Specified Fusion Trade Confirmations.[7]  In the event LCPI is permitted to assume the Specified Fusion Trade Confirmations, Fusion would be entitled to offset these claims as a setoff or recoupment against amounts it may owe under any assumed Specified Fusion Trade Confirmation.

---

[7] These claims are not ripe for adjudication, and the Debtors' Second Trade Confirmation Motion is certainly not the appropriate vehicle for their resolution.  There are no facts before the Court upon which to make a legal ruling, nor is there an actual controversy before the Court with respect to setoff.  See JRT, Inc. v. TCBY Systems, Inc., 121 B.R. 314 (Bankr. W.D. Mich. 1990) (declining to resolve whether covenant to compete may be enforced after rejection on the ground that judicial determination would be an advisory opinion).

CH\1073568.3

24. In its Second Trade Confirmation Motion, the Debtors have requested that the Court include in any assumption order a provision prohibiting any counterparty from asserting such rights of offset. Specifically, the Debtors contend that a counterparty's obligations under a prepetition executory contract are transformed, upon assumption, into post-petition obligations that cannot setoff by a counterparty against pre-petition amounts owed by the Debtors.

25. To support their argument, the Debtors primarily rely on the holdings in two cases, In re Evatt, 112 B.R. 405 (Bankr. W.D. Okla. 1989), and In re Walat Farms, Inc., 69 B.R. 529 (Bankr. E.D. Mich. 1987), which are directly contrary to the majority of authority on the issue and the conclusion reached by the Eighth Circuit, the only United States Court of Appeals to directly address the issue. See In re Gerth, 991 F.2d 1428, 1433 (8th Cir. 1993); In re Allen, 135 B.R. 856, 867 (Bankr. N.D. Iowa 1992); In re Mohar, 140 B.R. 273, 277 (Bankr. D. Mont. 1992); In re Affiliated Food Stores Inc., 123 B.R. 747, 748 (Bankr. N.D. Tex. 1991); In re Ratliff, 79 B.R. 930, 933 (Bankr. D. Colo. 1987).

26. That majority holds that, contrary to the Debtors' contentions, a debt owing to a debtor arises for purposes of section 553 "when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed." In re Bousa, Inc., 2006 WL 2864964, Case No. 89-B-13380 (JMP), *3 (Bankr. S.D.N.Y. Sept. 29, 2006) (citing In re Gerth, 991 F.2d at 1433); see also In re Gerth, 991 F.2d at 1433 ("In this case, Gerth's claim—his right to payment—came into existence at the time the contract was signed and ASCS promised to pay him."); In re Buckner, 218 B.R. 137, 147 (B.A.P. 10th Cir. 1998) (when a debt arises for purposes of section 553 depends on "whether the debt was valid and enforceable" upon the commencement of the case) (internal quotation omitted); In re Telephone Warehouse, Inc., 259 B.R. 64, 69 (Bankr. D. Del. 2001); 5 Collier on Bankruptcy, 15th Rev. Ed.

11

¶ 553.03 ("In general, a claim is considered to have arisen pre-petition if all of the elements of liability arose before the petition date.") (citing In re Gerth, 991 F.2d at 1433).

27.     Here, the parties' obligations under the Specified Fusion Trade Confirmations, although always subject to termination if not settled before the Termination Date, arose and were fully accrued pre-petition. Consequently, for this reason and for all the other reasons advanced by other objecting counterparties in their respective objections to the Debtors' First and Second Trade Confirmation Motions, the Court should deny the Second Trade Confirmation Motion insofar as it seeks to bar as a matter of law the setoff of prepetition claims against amounts due to the Debtors with respect to any assumed trade confirmations.

## RESERVATION OF RIGHTS

28.     GECFS expressly reserves its right to amend or supplement this Objection, to introduce evidence supporting this Objection at the hearing on the Objection, and to file additional and supplemental pleadings.

29.     GECFS expressly reserves all of its rights and remedies under or in connection with any agreements with any of the Debtors of their affiliates.

CH\1073568.3

WHEREFORE, GECFS respectfully requests that this Court deny the Second Trade Confirmation Motion insofar as it seeks to assume the Specified Fusion Trade Confirmations and prevent the Fusion Entities from offsetting prepetition claims against payments required to be made under assumed trade confirmations, and to award such other and further relief as is just and equitable.

Dated: December 24, 2008
New York, NY

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: /s/ Michael J. Riela
    Michael J. Riela (MR-7829)
885 Third Avenue, Suite 1000
New York, New York 10022
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

233 S. Wacker Drive, Suite 5800
Chicago, Illinois 60606
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Richard A. Levy

Attorneys for GE Corporate Financial Services, Inc.