# EXHIBIT A

**EXECUTION COPY**

# MASTER LOAN PURCHASE AGREEMENT

This MASTER LOAN PURCHASE AGREEMENT (this "Agreement") is entered into as of August 18, 2008, by and among Fusion Funding Limited, a company organized and existing under the laws of Bermuda (the "FFL"), Fusion Funding Luxembourg S.à r.l., a private limited liability company (*société à responsabilité limitée*) organized as a securitisation company (*société de titrisation*) within the meaning of the Luxembourg act dated 22 March 2004 relating to securitisation under the laws of Luxembourg, with registered office at 2-8, avenue Charles de Gaulle, L-1653 Luxembourg, having a share capital of EUR12,500 and in the process of being registered with the Luxembourg trade and companies register ("FFLS" and together with FFL, collectively the "Buyers" and each a "Buyer"), and Lehman Commercial Paper Inc., a New York corporation ("LCP"), Lehman Commercial Paper Inc. – UK Branch, a United Kingdom branch of LCP ("LCPUK"), and Lehman Brothers Bankhaus AG – UK Branch ("Bankhaus" and together with LCP and LCPUK, collectively, the "Sellers" and each a "Seller", and together with the Buyers, collectively, the "Parties" and each a "Party").

## PRELIMINARY STATEMENT

A.    Capitalized terms used herein are defined in Article I hereof.

B.    Pursuant to the Credit Agreement, the Lenders have agreed to make available to FFL certain loans and the proceeds of such loans will be used by the Buyers (i) to acquire the Financial Assets and (ii) to pay certain other amounts and expenses contemplated by the Credit Agreement.

C.    The Sellers wish to provide for the sale, assignment, transfer and conveyance to the Buyers, and the Buyers wish to provide for the purchase from the Sellers and the assumption of the obligations of the Sellers with respect to, the Financial Assets, on the terms and conditions set forth herein.

## AGREEMENT

In consideration of these premises and the mutual agreements hereinafter contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1    Defined Terms.  Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement. All other defined terms used herein and not defined herein shall have the meanings specified in the Credit Agreement.

(a)    "Action" means any claim, action or cause of action, suit, inquiry, proceeding, audit or investigation by or before any governmental entity, or any other arbitration, mediation or similar proceeding.

LEGAL_US_E # 80454727.11

(b) "Agreement" has the meaning set forth in the Preliminary Statement hereto.

(c) "Bankhaus" has the meaning set forth in the Preliminary Statement hereto.

(d) "Buyer" or "Buyers" has the meaning set forth in the Preliminary Statement hereto.

(e) "Credit Agreement" means that certain Credit Agreement, dated as of the date hereof (as the same may be supplemented or otherwise modified from time to time in accordance with the terms thereof), among FFL, the Lenders and the Administrative Agent.

(f) "FFL" has the meaning set forth in the Preliminary Statement hereto.

(g) "FFLS" has the meaning set forth in the Preliminary Statement hereto.

(h) "Financial Assets" means those Financial Assets set forth on Schedule I (as such Schedule may be amended, supplemented or modified pursuant to the terms and conditions of the Credit Agreement) to this Agreement and identified as Financial Assets to be sold by the applicable Seller, and acquired by the applicable Buyer, in accordance with the terms of this Agreement. Financial Assets includes the Merlin Financial Assets.

(i) "LCP" has the meaning set forth in the Preliminary Statement hereto.

(j) "LCPUK" has the meaning set forth in the Preliminary Statement hereto.

(k) "Merlin Financial Assets" means those Financial Assets set forth on Schedule I to this Agreement owing by Merlin Entertainments Group Luxembourg 2 S.à r.l. and related companies to be sold by Bankhaus to FFLS by purchase and sale of a participation interest in accordance with the terms of this Agreement.

(l) "Order" means any order, writ, injunction, judgment or decree of any court, arbitrator or other governmental entity.

(m) "Party" or "Parties" has the meaning set forth in the Preliminary Statement hereto.

(n) "Seller" or "Sellers" has the meaning set forth in the Preliminary Statement hereto.

(o) "Settlement Date" has the meaning set forth in Section 2.1 hereof.

(p) "Termination Date" has the meaning set forth in Section 2.1 hereof.

(q) "Trade Confirmation" means, with respect to (i) a sale and purchase between a Buyer, on the one hand, and a Seller (other than Bankhaus), on the other hand that is (a) governed by the laws of the United States or any other jurisdiction other than England, an LSTA Par/Near Par Trade Confirmation in the form attached hereto as Exhibit A, and (b)

2

LEGAL_US_E # 80454727.11

governed by the laws of England, an LMA Trade Confirmation (Par) in the form attached hereto as <u>Exhibit B</u>; and (ii) a sale and purchase between FFLS as Buyer and Bankhaus as a Seller of a participation interest in the Merlin Financial Assets, an LMA Trade Confirmation (Par) and participation agreement in form and substance satisfactory to FFLS, Bankhaus and the Administrative Agent.

## ARTICLE II
## PURCHASE AND SALE

2.1    <u>Purchase and Sale of the Financial Assets</u>.  Until the date that is seventy-five (75) days after the date hereof (the "<u>Termination Date</u>"), each Seller hereby agrees to use its commercially reasonable efforts to sell, assign, transfer and convey to the applicable Buyer, and each Buyer hereby agrees to use its commercially reasonable efforts to purchase and acquire from the applicable Seller, as soon as practicable, all of such Seller's right, title and interest in and to the applicable Financial Assets (or, in the case of Merlin Entertainments Group Luxembourg 2 S.à r.l. and related companies, a participation interest in the Merlin Financial Assets) on the terms and for the applicable purchase prices designated for each such Financial Asset specified to be sold to the applicable Buyer on <u>Schedule I</u> to this Agreement; <u>provided</u> that any sale and purchase of a Financial Asset effected pursuant to this Section 2.1 may only be made (a) on Mondays, Wednesdays or Fridays of each calendar week prior to the Termination Date so long as any such day is a Business Day (each a "<u>Settlement Date</u>") and (b) following delivery by the applicable Seller to the Administrative Agent by no later than 11:00 a.m. (New York time) on the second (2nd) Business Day immediately preceding the relevant Settlement Date of (1) written notice of such purchase and (2) all documentation requests relating to such purchase, including, without limitation, the "set up" information specified in <u>Schedule 2.12</u> of the Credit Agreement; and <u>provided</u> <u>further</u>, that no Party shall take into account any fluctuation in the market price of any Financial Asset for the purposes of determining whether it has used its "commercially reasonably efforts" to satisfy its obligations hereunder.

2.2    <u>Financial Asset Transfer Documentation</u>.  For each Financial Asset that a Seller shall transfer and sell to a Buyer, and that a Buyer shall purchase and acquire from a Seller, pursuant to Section 2.1 hereof, (a) such Seller and such Buyer shall execute and deliver to one another (and such Buyer shall promptly provide a copy thereof to the Administrative Agent) a properly completed Trade Confirmation, and such Trade Confirmation shall govern the terms and conditions of the transfer and sale of the applicable Financial Asset and (b) such Seller shall deliver to the Buyer any assignment or other transfer documentation required pursuant to the applicable Trade Confirmation and the underlying loan documentation governing the applicable Financial Asset which is necessary to effectuate the assignment and transfer of such Financial Asset (or, in the case of the Merlin Financial Asset, the sale of a participation) to such Buyer in accordance with the terms hereof; <u>provided</u>, <u>however</u>, that if any such assignment or other transfer documentation does not contain representations, warranties and other terms that are at least as favorable to the Buyer as those contained in the "Standard Form of Assignment and Assumption Agreement" published by the LSTA dated May 2005, then such Seller shall execute and deliver to the applicable Buyer a letter agreement, for the benefit of such Buyer, which contains such more favorable terms.

3

2.3    Settlement Date; Payment.  Each sale and purchase of a Financial Asset effected pursuant to this Agreement shall be settled and payment for each such sale and purchase shall be made by a Buyer to a Seller in accordance with the applicable Trade Confirmation; provided, however, that Financial Assets denominated in Euro shall not be settled for or paid for prior to the earlier of (a) the establishment of deposit accounts in the United Kingdom, and (b) September 4, 2008.

2.4    Confirmation Regarding Absence of Liens.  Sellers shall, as soon as practicable and to the extent required to complete the same for a period of up to seventy five (75) days from the Closing Date:

(a)    use their commercially reasonable efforts to provide to the Buyers and the Administrative Agent, with respect to any entity listed as a secured party on a financing statement listed on Schedule II to this Agreement (a "Secured Party"), (A) written confirmation (addressed to (x) the relevant Seller and (y) to the extent practicable, the Buyers and the Administrative Agent) that none of the Financial Assets listed on Schedule I to this Agreement is part of the collateral covered by such financing statement, (B) written confirmation that the Secured Party has authorized the Sellers to file in the appropriate filing office a UCC-3 amendment (which shall be reasonably satisfactory to the Administrative Agent), the effect of which would clarify that the collateral covered by such financing statement does not include any of the Financial Assets listed on Schedule I to this Agreement, (C) written evidence that the Secured Party has been dissolved or that its security interest in the collateral covered by such financing statement has been terminated, or (D) any other evidence that the Secured Party does not have a security interest in any of the Financial Assets that will be sold to a Buyer, which evidence shall be in form and substance satisfactory to the Administrative Agent; and

(b)    (A) to the extent they are unable to obtain any of the foregoing from, or with respect to, any Secured Party after using commercially reasonable efforts, provide to the Buyers and the Administrative Agent, the governing documents underlying the creation of the security interest granted to such Secured Party, to the extent legally and contractually permitted to do so; and (B) to the extent they are not legally and contractually permitted to provide documents pursuant to clause (A), to direct their legal counsel, Allen & Overy LLP, to review such governing documents and to discuss with the Buyers and the Administrative Agent, any relevant findings of fact with respect to any interest (including any lien) of such Secured Party relating to or potentially relating to the Financial Assets listed on Schedule I to this Agreement;

it being agreed and understood that, notwithstanding any of the foregoing or any other provision of the Credit Agreement or any other Loan Document, the Sellers' failure to provide any of the foregoing to the Buyers and the Administrative Agent shall not, under any circumstances, constitute (A) an Event of Default or similar event under the Credit Agreement or any other Loan Document, (B) a failure to satisfy any condition precedent contemplated by Article III of the Credit Agreement or (C) unless the Sellers shall have failed to use commercially reasonable efforts to perform their obligations under this Section 2.4, a breach of this Agreement, the Credit Agreement or any other Loan Document.

2.5    Commingled Assets Acknowledgments and Disclaimers of Liens.  Sellers shall, prior to or upon the transfer and sale of any Financial Asset listed on Schedule III to this

4

LEGAL_US_E # 80454727.11

Agreement, deliver to Buyers and Administrative Agent a duly executed and properly completed acknowledgment and disclaimer of liens with respect to such asset in the applicable form attached hereto as part of Exhibit C.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

Each Seller hereby represents and warrants to the Buyers, as of the date hereof and as of each Settlement Date, as follows:

3.1    Authority.  Such Seller is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization with full power, right and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

3.2    Organization and Qualification.  The execution and delivery of this Agreement by such Seller, and the performance of such Seller's obligations hereunder have been duly authorized by all necessary action on the part of such Seller.  This Agreement has been, and when executed, each Trade Confirmation will have been, duly executed and delivered by such Seller.  This Agreement constitutes, and when so executed and delivered each Trade Confirmation will constitute, assuming in each case due authorization, execution and delivery by the applicable Buyer, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditor's rights generally and by general equitable principals (whether enforcement is sought in law or equity).

3.3    No Conflicts.  The execution, delivery and performance by such Seller of this Agreement, and the consummation of the transactions contemplated hereby, do not conflict with, violate or breach any provision of the organizational documents of such Seller.

3.4    Financial Assets.  None of the underlying loan documentation governing the Financial Assets contains, or is subject to, any agreement(s) or memorandum (or memoranda) of understanding pertaining to "troubled syndications" or "hung deals" regarding the Sale of the Financial Assets pertaining thereto.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

Each Buyer hereby represents and warrants to the Sellers, as of the date hereof and as of each Settlement Date, as follows:

4.1    Authority.  Such Buyer is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization with full power, right and authority to execute, deliver and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

5

LEGAL_US_E # 80454727.11

4.2     Organization and Qualification.  The execution and delivery of this Agreement by such Buyer, and the performance of such Buyer's obligations hereunder have been duly authorized by all necessary action on the part of such Buyer.  This Agreement has been, and when executed, each Trade Confirmation will have been, duly executed and delivered by such Buyer.  This Agreement constitutes, and when so executed and delivered each Trade Confirmation will constitute, assuming in each case due authorization, execution and delivery by the applicable Seller, the legal, valid and binding obligations of such Buyer, enforceable against such Buyer in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditor's rights generally and by general equitable principals (whether enforcement is sought in law or equity).

4.3     No Conflicts.  The execution, delivery and performance by such Buyer of this Agreement, and the consummation of the transactions contemplated hereby, do not conflict with, violate or breach any provision of the organizational documents of such Buyer.

## ARTICLE V
## TERMINATION

5.1     Termination.

(a)     Agreement.  This Agreement (i) may be terminated by the Parties with the written consent of each of the Parties; provided, however, that the Administrative Agent shall have given its prior written consent to such termination, and (ii) shall automatically terminate upon the occurrence of a Ramp-Up Failure Event, provided that the Administrative Agent shall have exercised its right pursuant to Section 2.12(c) of the Credit Agreement to cause FFL to liquidate the Financial Assets.

(b)     Termination Date.  Subject to the earlier termination of this Agreement pursuant to Section 5.1(a) hereof, to the extent that the purchase and sale of any Financial Asset has not settled on or prior to the Termination Date in accordance with the terms hereof, the applicable Buyer may, in its sole discretion, elect to terminate its obligation to purchase such Financial Asset under this Agreement and any applicable Trade Confirmation, by notifying the applicable Seller of such election in writing.  Upon delivery to the applicable Seller of such notice, such Buyer's obligation to purchase, and such Seller's obligation to sell, such Financial Asset shall automatically terminate and any applicable Trade Confirmation shall be automatically terminated and of no further force and effect in respect of such Financial Asset.

## ARTICLE VI
## GENERAL PROVISIONS

6.1     Further Actions.  Each of the Parties agrees to (a) execute and deliver, or cause to be executed and delivered, all such other and further agreements, documents and instruments and (b) take or cause to be taken all such other and further actions as the other Parties may reasonably request to effectuate the intent and purposes, and carry out the terms, of this Agreement, including the procurement of any required assignments and consents.

6

6.2     Assignment; Successors.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of the other Parties and without the prior written approval of the Administrative Agent, and any such assignment without such prior written consent shall be null and void.  Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of, and be enforceable by, the Parties and their respective permitted successors and assigns.

6.3     Third-Party Beneficiaries.  This Agreement shall be binding upon and inure solely to the benefit of the Parties hereto and each of their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement, except that the Administrative Agent is an express third party beneficiary of this Agreement, the Trade Confirmations and the other transfer documentation contemplated hereby.

6.4     Waiver.  No failure or delay of any Party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Parties hereunder are cumulative and are not exclusive of any rights or remedies which they would otherwise have hereunder.  Any agreement on the part of any Party to any such waiver shall be valid only if set forth in a written instrument executed and delivered by a duly authorized officer on behalf of such Party.

6.5     Amendment.  This Agreement may be amended only by written instrument signed by the Parties, provided that the Administrative Agent shall have given its prior written consent to any such amendment.

6.6     Governing Law.  This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to the conflicts of law principles thereof (except any law of that State that would render such choice of laws ineffective).

6.7     Counterparts; Facsimile Signature.  This Agreement may be executed in any number of counterparts, each of which shall be enforceable against the Parties executing such counterparts, and all of which together shall constitute one instrument.  This Agreement may be executed by facsimile signature and a facsimile signature shall constitute an original for all purposes.

6.8     Governing Law.  Any legal action or proceeding with respect to this Agreement may be brought in the courts of the State of New York located in the City of New York, Borough of Manhattan, or of the United States of America for the Southern District of New York and, by execution and delivery of this Agreement, each Party hereby accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  The Parties hereby irrevocably waive any objection, including any objection to the laying of venue or based

7

on the grounds of forum non conveniens, that any of them may now or hereafter have to the bringing of any such action or proceeding in such jurisdictions.

6.9     <u>Non-petition</u>.  Notwithstanding anything contained herein to the contrary, each of the Sellers hereby covenants and agrees that it will not at any time institute against any of the Buyers, or voluntarily join in any institution against any of the Buyers of, any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings, or other proceedings under any Bermuda insolvency laws, Luxembourg insolvency laws, United States federal or state bankruptcy laws or any similar law of any jurisdiction within or without the United States in connection with any obligations relating to this Agreement for a period of one-year or, if longer, the applicable preference period in effect, and one-day following the payment in full of all Obligations under the Credit Agreement.  This Section 6.9 shall survive the expiration or termination of this Agreement.

**[SIGNATURE PAGE FOLLOWS]**

8

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

FUSION FUNDING LIMITED

By: _____
    Name:
    Title:

FUSION FUNDING LUXEMBOURG S.À R.L.

By: _____
    Name:
    Title:

LEHMAN COMMERCIAL PAPER INC.

By: _____
    Name:
    Title:

LEHMAN COMMERCIAL PAPER INC. – UK BRANCH

By: _____
    Name:
    Title:

LEHMAN BROTHERS BANKHAUS AG, UK BRANCH

By: _____
    Name:
    Title:

**Schedule I**

[Redacted]

## Schedule II

[Redacted]

# **Schedule III**

[Redacted]

## Exhibit A

[Redacted]

## Exhibit B

[Redacted]

**Exhibit C**

[Redacted]