1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

       08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

     Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

     Debtor.

- - - - - - - - - - - - - - - - - - - -x

       United States Bankruptcy Court

       One Bowling Green

       New York, New York


       December 22, 2008

       10:14 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    I.   UNCONTESTED MATTERS:

3    HEARING re Debtors' Motion for Entry of Order Pursuant to

4    Sections 105 and 363 of the Bankruptcy Code and Federal Rules

5    of Bankruptcy Procedure 2002, 6004, and 9019 (i) Authorizing

6    Lehman Brothers Holdings Inc. to Enter into a Settlement

7    Agreement with Certain French Affiliates Relating to

8    Intercompany Claims, (ii) Authorizing Lehman Brothers Holdings

9    Inc. to Vote Its Shares in French Affiliate to Approve Sale of

10   Substantially All of the Assets of and Voluntary Dissolution of

11   Such Affiliate and (iii) Granting Certain Related Relief

12

13   HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365

14   of the Bankruptcy Code, for Authorization to Assume

15   Administrative Services Agreement with Aetna

16

17   HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 365

18   of the Bankruptcy Code and Bankruptcy Rules 6006 and 9014, for

19   Authorization to Reject Prescription Drug Program Master

20   Agreement with Medco

21

22   II.   CONTESTED MATTERS:

23   HEARING re Motion for Relief from Stay Motion of OMX Timber

24   Finance Investments II, L.L.C. For Limited Relief from the

25   Automatic Stay

3

1

2    HEARING re Debtors' Motion for an Order Pursuant to Section 365

3    of the Bankruptcy Code Approving the Assumption or Rejection of

4    Open Trade Confirmations

5

6    HEARING re Debtors Motion to (A) Establish Sales Procedures;

7    (B) Approve a Seller Termination Fee and a Reimbursement

8    Amount; and (C) Approve the Sale of the Purchased Assets and

9    the Assumption and Assignment of Contracts Relating to the

10   Purchased Assets

11

12   SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

13   III. CONTESTED MATTERS:

14   HEARING re Trustee's Motion under 11 U.S.C. 105 and 363 and

15   Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving

16   Settlement Agreement

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

4

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4         Attorneys for Debtors

5         767 Fifth Avenue

6         New York, NY 10153

7

8    BY:  HARVEY R. MILLER

9         LORI R. FIFE, ESQ.

10        JACQUELINE MARCUS, ESQ.

11        GARRETT AVERY FAIL, ESQ.

12

13   HUGHES HUBBARD & REED LLP

14        Attorneys for James W. Giddens, SIPC Trustee

15        One Battery Park Plaza

16        New York, NY 10004

17

18   BY:  JAMES B. KOBAK, JR.

19        DAVID W. WILTENBURG, ESQ.

20

21

22

23

24

25

5

 1

 2    SECURITIES INVESTOR PROTECTION CORPORATION

 3          Attorneys for SIPC

 4          805 15th Street, N.W.

 5          Suite 800

 6          Washington, DC 20005

 7

 8    BY:  KENNETH J. CAPUTO, ESQ.

 9

10    MILBANK, TWEED, HADLEY & MCCLOY LLP

11          Attorneys for the Official Committee of Unsecured

12           Creditors

13          One Chase Manhattan Plaza

14          New York, NY 10005

15

16    BY:  DENNIS F. DUNNE, ESQ.

17          EVAN R. FLECK, ESQ.

18

19

20

21

22

23

24

25

6

1

2    QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

3         Special Counsel for Creditors' Committee

4         51 Madison Avenue

5         22nd Floor

6         New York, NY 10010

7

8    BY:  JAMES C. TECCE, ESQ.

9         SUSHEEL KIRPALANI, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Barclays Capital Inc.; Goldman Sachs Credit

13         Partners L.P. and GS European Performance Fund Limited;

14         Wachovia Bank, N.A.; Evergreen Investment Management

15         Company, LLC

16        One Liberty Plaza

17        New York, NY 10006

18

19   BY:  LINDSEE P. GRANFIELD, ESQ.

20        LISA M. SCHWEITZER, ESQ.

21        THOMAS J. MOLONEY, ESQ.

22        LUKE A. BAREFOOT, ESQ.

23

24

25

7

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3        Office of the United States Trustee

4        33 Whitehall Street

5        Suite 2100

6        New York, NY 10004

7

8    BY:  ANDREW D. VELEZ-RIVERA, ESQ.

9

10   BINGHAM MCCUTCHEN LLP

11       Attorneys for Harbinger Capital Partners Special

12        Situations Fund, L.P. and Harbinger Capital Master

13        Fund I, Ltd.; Deutsche Bank AG; Halbis Distressed

14        Opportunity Master Fund Limited

15       399 Park Avenue

16       New York, NY 10022

17

18   BY:  MARK W. DEVENO, ESQ.

19       STEVEN WILAMOWSKY, ESQ.

20

21

22

23

24

25

8

```
1

2    BLANK ROME LLP

3         Attorneys for Iconix Brand Group, Inc.; Capital Automotive

4          L.P.; Delaware River Port Authority; BANCA ITALEASE,

5          S.p.A.; ITALEASE FINANCE, S.p.A.; New Jersey Housing and

6          Mortgage Financing Agency; Thomas Reuters

7         The Chrysler Building

8         405 Lexington Avenue

9         New York, NY 10174

10

11   BY:   EDWARD J. LOBELLO, ESQ.

12

13   BOIES, SCHILLER & FLEXNER LLP

14        Attorneys for Barclays Capital Inc.

15        575 Lexington Avenue

16        7th Floor

17        New York, NY 10022

18

19   BY:   JOHNATHAN D. SCHILLER, ESQ.

20

21

22

23

24

25
```

9

1

2    DAY PITNEY LLP

3          Attorneys for Oracle USA, Inc.

4          7 Times Square

5          New York, NY 10036

6

7    BY:  AMISH R. DOSHI, ESQ.

8

9    DRINKER BIDDLE & REATH LLP

10         Attorneys for Allianz Global Advisors, AG

11         500 Campus Drive

12         Florham Park, NJ 07932

13

14   BY:  ROBERT K. MALONE, ESQ.

15

16   FEDERAL RESERVE BANK OF NEW YORK

17         Assistant General Counsel and Senior Vice President

18         33 Liberty Street

19         New York, NY 10045

20

21   BY:  SHARI D. LEVENTHAL, ESQ.

22

23

24

25

10

1

2    HANLY CONROY BIERSTEIN SHERIDAN FISHER HAYES LLP

3         Attorneys for Ben Gamoran

4         112 Madison Avenue

5         New York, NY 10016

6

7    BY:  THOMAS I. SHERIDAN, III

8

9    KLEIN, DENATALE, GOLDNER, COOPER, ROSENLIEB & KIMBALL, LLP

10        Attorneys for Superior Pipelines, Inc.

11        4550 California Avenue

12        Second Floor

13        Bakersfield, CA 93309

14

15   BY:  T. SCOTT BELDEN, ESQ.

16        (TELEPHONICALLY)

17

18   KLESTADT & WINTERS, LLP

19        Attorneys for OMX Timber Finance Investments II, LLC

20        292 Madison Avenue

21        17th Floor

22        New York, NY 10017

23

24   BY:  JOHN E. JURELLER, JR.

25

11

1

2    LINKLATERS LLP

3         Attorneys for Joint Administrators of the Lehman European

4          Group Administration Companies

5         1345 Avenue of the Americas

6         New York, NY 10105

7

8    BY:  MARY K. WARREN, ESQ.

9         MARTIN FLICS, ESQ.

10

11   MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

12        Attorneys for the SunGard Creditors

13        990 Steward Avenue

14        Suite 300

15        Garden City, NY 11530

16

17   BY:  JIL MAZER-MARINO, ESQ.

18

19   PAUL, HASTINGS, JANOFSKY & WALKER LLP

20        75 East 55th Street

21        New York, NY 10022

22

23   BY:  THOMAS L. KENT, ESQ.

24

25

12

1

2    PENSION BENEFIT GUARANTY CORPORATION

3         Office of the Chief Counsel

4         1200 K Street, NW

5         Washington, DC 20005

6

7    BY:  STEPHANIE THOMAS, ESQ.

8

9    PROSKAUER ROSE LLP

10        Attorneys for NBSH Acquisition LLC

11        1585 Broadway

12        New York, NY 10036

13

14   BY:  JAMES P. GERKIS, ESQ.

15        JEFFREY LEVITAN, ESQ.

16

17

18

19

20

21

22

23

24

25

13

1

2    RICHARDS KIBBE & ORBE LLP

3         Attorneys for DK Acquisition Partners, L.P., Farallon

4         entities, Goldman Sachs Credit Partners L.P., Greywolf

5         entities, Halcyon Structured Asset Management European

6         CLO 2007-1 B.V., Longacre entities, Morgan Stanley Bank

7         International Limited, Morgan Stanley Senior Funding,

8         Inc. Rowayton Loan Funding Company, Royal Bank of

9         Scotland, PLC, P. Schoenfeld Asset Management LLC

10        One World Financial Center

11        New York, NY 10281

12

13   BY:  MICHAEL  FRIEDMAN, ESQ.

14

15   SEWARD & KISSEL LLP

16        Attorneys for Global Thematic Opportunities Fund LP;

17         Panton Master Fund, L.P.; CFIP Master Fund, Ltd.; Cura

18         Fixed Income Arbitrage Master Fund, Ltd.; and Turnberry

19         Leveraged Credit Master Fund, L.P.

20        One Battery Park Plaza

21        New York, NY 10004

22

23   BY:  JUSTIN L. SHEARER, ESQ.

24

25

14

1

2    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

3         Attorneys for BlackRock Financial Management, Inc.; H/2

4          Credit Partners Master Fund Ltd.; Region Marche; JA Solar

5         Holdings Co., Ltd.

6         Four Times Square

7         New York, NY 10036

8

9    BY:  ANDREW M. THAU, ESQ.

10

11   STEMPEL BENNETT CLAMAN & HOCHBERG, P.C.

12        Attorneys for SLG 220 News Owner LLC

13        675 Third Avenue

14        31st Floor

15        New York, NY 10017

16

17   BY:  JAMES E. SCHWARTZ, ESQ.

18

19

20

21

22

23

24

25

15

1

2    STEPTOE & JOHNSON LLP

3        Attorneys for Korea Investment & Securities Co. and

4        True Friend Forth Specialty Co.

5        2121 Avenue of the Stars

6        Suite 2800

7        Los Angeles, CA 90067

8

9    BY:  KATHERINE C. PIPER, ESQ.

10        (TELEPHONICALLY)

11

12    STEVENS & LEE PC

13        Attorneys for Royal Bank America

14        485 Madison Avenue

15        20th Floor

16        New York, NY 10022

17

18    BY:  ALEC P. OSTROW, ESQ.

19

20

21

22

23

24

25

16

1

2   SUSMAN GODFREY LLP

3        Attorneys for Susman Godfrey

4        1000 Louisiana

5        Suite 5100

6        Houston, TX 77002

7

8   BY:  CHARLES R. ESKRIDGE III, ESQ.

9

10  THOMPSON & KNIGHT LLP

11        Attorneys for Crossmark Investment Company L.P.

12        919 Third Avenue

13        39th Floor

14        New York, NY 10022

15

16  BY:  IRA L. HERMAN, ESQ.

17

18  WACHTELL, LIPTON, ROSEN & KATZ

19        Attorneys for JPMorgan Chase Bank, N.A.

20        51 West 52nd Street

21        New York, NY 10019

22

23  BY:  HAROLD S. NOVIKOFF, ESQ.

24

25

17

1

2    WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP

3        Attorneys for Hartford

4        3 Gannett Drive

5        White Plains, NY 10604

6

7    BY:  MARK G. LEDWIN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

18

1                    P R O C E E D I N G S

2            THE COURT:  Please be seated.  Mr. Miller, you look

3     even taller in person.

4            MR. MILLER:  Thank you, Your Honor.  Must be the

5     weather.  Must be the weather.  Good morning, Your Honor.

6            THE COURT:  Good morning.

7            MR. MILLER:  With Your Honor's permission, may we

8     take the SIPA proceeding, item number 9 (sic) on the agenda,

9     first?

10            THE COURT:  Sure.

11            MR. MILLER:  Mr. Kobak?

12            MR. KOBAK:  Thank you, Your Honor, and good morning,

13     Your Honor.  It's James B. Kobak, Jr. of the firm Hughes

14     Hubbard & Reed representing -- on behalf of the trustee, Mr.

15     Giddens, in the SIPA proceeding.  Before you today, Your Honor,

16     is a motion seeking approval for a settlement agreement between

17     Barclays and JPMorgan and the trustee for a transaction that,

18     in effect, completes a significant part of the purchase

19     agreement approved by this Court.

20            This settlement involves a transaction sponsored by

21     the Federal Reserve Board of New York to try to accomplish a

22     wind down of LBI's business and an orderly transfer of accounts

23     as explained in the declaration of Ms. Leventhal of the Fed.

24     Although it has a large monetary value, it actually only has a

25     positive impact on LBI's estate because of the declining value

19

of securities being transferred against an obligation of seven

billion dollars or more.

      The facts are set forth in uncontroverted affidavits

or declarations, principally, Ms. Leventhal's of the Fed as

well as Mr. LaRocca's of Barclays.  And I'll only briefly

summarize here.

      THE COURT:  I've read the declarations.

      MR. KOBAK:  All right.

      THE COURT:  But you may wish to advert to particular

sections of them for emphasis or for the benefit of the record.

      MR. KOBAK:  Sure, Your Honor.  Well, let me just

explain.  At the time of the purchase agreement, Barclays had

loaned LBI forty-five billion dollars.  And Barclays was to

receive securities valued at over forty-nine billion dollars to

cancel the loan.  Under the purchase agreement approved by Your

Honor, that party became a significant part of what Barclays

obtained under the agreement, the agreement that this Court

approved and that allowed tens of thousands of customer

accounts to be transferred.  For various operational reasons,

the great bulk of securities was transferred on the evening of

the 18th but approximately seven billion dollars as then valued

could not be.  Cash was supposed to be transferred as a

temporary substitute but as described by Ms. Leventhal and Mr.

LaRocca, the circumstances did not allow that and the SIPA

proceeding intervened.  The cash ended up at JPMorgan to which

20

1    LBI had and still has very substantial indebtedness.  Barclays

2    never received the securities which it was supposed to receive

3    which everyone expected it to receive and which the Court's

4    order entitled it to receive.  Neither did it receive the cash

5    substitute.

6           In essence, the settlement before Your Honor today

7    completes this part of the transaction by transferring

8    securities and to the extent they had already been liquidated

9    or already declined in value, some additional cash from

10   JPMorgan.  I want to make it clear that the settlement doesn't

11   affect anything else in the purchase agreement or anything else

12   that happened in the time preceding LBI's filing under SIPA.

13   It doesn't determine any issues of interpretation, possible

14   reformation under anything else under any other provisions of

15   the purchase agreement and clarification letter.  The trustee,

16   for example, may well have disputes with Barclays and others

17   over other provisions and other aspects of the agreement.  We

18   tried to make that clear in paragraph 32 of our application

19   where we said that the trustee is not taking a position on or

20   conceding anything else and that there is much, as Your Honor

21   knows, that we intend to investigate on his behalf.

22          We have a clarifying amendment, which at the end of

23   remarks, if Your Honor permits, I'll hand up to Your Honor,

24   that spells out this point even more clearly for the avoidance

25   of doubt.

21

1          THE COURT:  When you say clarifying amendment, is

2    that of the order?

3          MR. KOBAK:  Of the order.  I'm sorry, Your Honor.

4          THE COURT:  Okay.

5          MR. KOBAK:  And I think that satisfies or may satisfy

6    the objections of Royal Bank and anyone else who, even though

7    they haven't filed a paper has expressed any reservations other

8    than the creditors' committee --

9          THE COURT:  Has that language been shared --

10         MR. KOBAK:  -- and the Chapter 11 --

11         THE COURT:  Has that language been shared --

12         MR. KOBAK:  Yes, it has.  Yes, it has, Your Honor.

13         THE COURT:  Okay.

14         MR. KOBAK:  I want to note that this Court

15   specifically reserved a 40 to compel delivery of purchased

16   assets to Barclays and otherwise to implement and enforce the

17   terms of the purchase agreement under paragraph 20 of the

18   Court's order approving the sale.  That order is incorporated

19   in the SIPA proceeding through the separate order that Your

20   Honor also entered in our case on September 19th.  If the

21   trustee refused to implement this settlement, he or JPMorgan or

22   both could well be required to transfer a full seven billion

23   dollars of cash or property plus possibly substantial interest

24   to Barclays whereas, as Mr. Moore of the Fed states in his

25   uncontroverted declaration, the value of the securities

22

1    involved is substantially less than the value attributed to

2    them for settlement purposes.

3            I also note that every security that will be

4    transferred had already been pledged by LBI by September 19th

5    and was contemplated to be transferred in the purchase

6    agreement.  So no creditor can really claim that this changes

7    anything.  And, indeed, we learned over the weekend that the

8    CUSIP claim -- or in which Royal Bank of America is interested

9    in fact isn't included in the schedule of securities that's

10   going over as part of this agreement.

11           I want to make clear that the trustee undertook a

12   very careful consideration of this settlement and the factual

13   bases that are set forth in their affidavits by Ms. Leventhal

14   and Mr. LaRocca.  The trustee and his lawyers and accountants

15   met several times with representatives of other parties and

16   with the Fed to ask questions and make sure we understood the

17   facts and the circumstances.  Mr. Caputo, on behalf of SIPC,

18   who's in court today and I believe would like to make a few

19   remarks when I'm done, participated in or oversaw a good deal

20   of that activity.

21           Barclays and their attorneys, particularly,

22   frequently remind us, and I'll advert to this in a minute that

23   this matter has considerable urgency because of the market risk

24   involved with the securities that are being transferred, and as

25   they remind us, we first met with them back in October which is

23

1    more than five weeks before we filed this motion.  But despite

2    the importuning of the parties, we insisted on asking questions

3    and looking at the facts and circumstances, a process that took

4    until early December.  We also insisted that attorneys for Mr.

5    Miller and other attorneys for LBHI and Alvarez & Marsal be

6    informed of the settlement terms and have opportunities for

7    meetings and to obtain information all of which has occurred.

8    We provided information to LBIE informally and to Linklaters

9    which was acting as its counsel.

10            The trustee thinks that this settlement clearly falls

11   within the range of reasonableness and meets the standards for

12   approval under Bankruptcy Rule 9019.  It's far above the low

13   point of reasonableness.  As noted, we feel that there's a good

14   possibility that the Court could order this transfer or even a

15   more costly one by the estate under paragraph 20 of the order

16   approving the sale.  The estate could be diminished by a full

17   seven billion dollars and perhaps considerable interest.  And

18   on top of all that, the estate would have to bear the

19   considerable expense and disruption of potentially a major

20   litigation.

21            And again, I just want to make it clear that what

22   this settlement really accomplishes is completing the very

23   transaction contemplated in the purchase agreement as approved

24   by this Court.  And as Ms. Leventhal and the Fed note, this is

25   also a transaction that bears with it a considerable amount of

24

1    public interest.

2         There is urgency here because of the market risk

3    involved with the securities.  From the trustee's point of

4    view, it's urgent because if the agreement is not approved by

5    the Court and signed by the trustee, it could be terminated by

6    the other parties as early as tomorrow and that would have all

7    the adverse consequences that I've outlined.

8         Only two sets of papers purporting to be objections

9    to the settlement have been -- to the motion have been filed.

10   And as I said, I think that we have been able to resolve one of

11   them with some language which I'll have to hand up to Your

12   Honor in a minute.  We've also provided, as I indicated,

13   information that I think resolved any concerns that LBIE may

14   have had.

15        The one remaining objection, as I understand it, is

16   the objection of the committee in the Chapter 11 case.  And

17   their objection, as I understand it, is primarily that they

18   seek extensive information about some background facts leading

19   up to the transaction.  The information that they seek we think

20   really has nothing to do with this aspect of the purchase

21   agreement itself and it's just using this motion as a vehicle

22   either to reopen the Court's approval of the purchase agreement

23   or to investigate unrelated claims and transactions.  We think

24   it's too late to do the former and with respect to the latter,

25   nothing in the motion or the proposed order forecloses any

25

1   investigation or claims that might be made about anything else.

2   And as I've said, the trustee himself intends to investigate

3   some of these matters himself.

4          I also want to make clear for the record that we do

5   not believe that the creditors' committee should be considered

6   a party in interest or to have any special status in the SIPA

7   proceeding where, among other things, SIPA already plays

8   substantial oversight roles.

9          And as I mentioned, I do have a blackline which I'll

10  be happy to hand up to Your Honor if Your Honor wishes to see

11  it which does have some clarifying language making clear that

12  this really doesn't affect the rights as to other matters of

13  other parties.

14         THE COURT:  Thank you.  This hearing was noticed as

15  an evidentiary hearing.  Do you assert that the declarations in

16  support of this motion constitute the evidentiary record on the

17  basis of which relief should be afforded?

18         MR. KOBAK:  We do, Your Honor.

19         THE COURT:  Is there anyone who has requested an

20  opportunity to examine or cross-examine further the witnesses

21  whose declarations have been offered?

22         MR. KOBAK:  Not as far as I'm aware, Your Honor.

23         THE COURT:  Let me ask openly in court right now if

24  there's anyone who wishes to examine any of the declarants.

25  Hearing no response, I'll deem that to be a no.  And I will

26

1    accept the declarations of each of the witnesses, notably the

2    declaration of Shari Leventhal which provides considerable

3    detail concerning the circumstances of this transaction.

4         Let me ask you a question before hearing from counsel

5    for Royal Bank and the committee who appear to be the only

6    objectors at this point.  Both objections, as I read them,

7    assert a somewhat common theme.  Royal Bank, and I probably

8    distort their position by characterizing it simply, say we

9    shouldn't be bound by somebody else's settlement.  The

10   creditors' committee, and I make the same comment about not

11   attempting to characterize their remarks by this shorthand,

12   need some more time to investigate further the circumstances of

13   this extraordinarily complex transaction that was approved in

14   such a hurry.  And we're concerned that if it's approved now,

15   we may not have access to all the facts with which to assess

16   the reasonableness of the trustee's business judgment in saying

17   yes to this now.  Is that a fair characterization?

18        MR. KOBAK:  I think it's a -- I mean, I'll let them

19   speak for yourself (sic), Your Honor, but I think that's a fair

20   characterization.

21        THE COURT:  Okay.  That said, one of the questions I

22   have is this.  Assuming that I approve this and we later

23   discover that despite the utmost good faith on the part of

24   everybody involved and the reasonable skill and insight of

25   those involved, that another mistake is uncovered.  I'm not

27

1    calling this a mistake as much as something -- it's a seven

2    billion dollar item which, even in this case, is not a rounding

3    error.  And let's just say that there's a recognition upon

4    further diligence that there's a need for further adjustment.

5    How can that be affected if this settlement is approved today?

6         MR. KOBAK:  Well, Your Honor, first of all, I know

7    mistakes can happen but I don't think that's going to happen.

8    I don't even think Royal Bank of America's security is involved

9    in the securities that are going over.  So I think that's

10   basically a nonissue.  Again, this is all securities that were

11   supposed to go over on September 19th.  So, in essence, it's a

12   transaction that's already been approved.  Now, it certainly

13   doesn't take away any rights that people have as -- in our

14   proceeding anyway, as of September 19th.  Our universe is kind

15   of fixed as of that date.

16        THE COURT:  Okay.

17        MR. KOBAK:  May I hand up the blackline, Your Honor?

18        THE COURT:  Do you want me to read it now --

19        MR. KOBAK:  Well, I guess --

20        THE COURT:  -- or you want me to just have it.

21        MR. KOBAK:  I think Your Honor should have it.  I

22   don't know if the other parties will refer to it.

23        THE COURT:  Certainly you may approach and hand it

24   up.

25        MR. KOBAK:  Thank you, Your Honor.

28

1          THE COURT:  Thank you.

2          MR. KOBAK:  And, Your Honor, I believe Mr. Caputo of

3     SIPC would like to say a few words in support of the motion.

4     And it may be that some of the other parties would also like to

5     be heard.

6          THE COURT:  All right.  Well, given the fact that

7     we're dealing with those who support the motion first, why

8     don't we just hear from those.  And then we'll hear from the

9     objectors.  And then we can try to wrap this up.

10         MR. KOBAK:  Right.  Thank you, Your Honor.

11         MR. CAPUTO:  Good morning, Your Honor.

12         THE COURT:  Mr. Caputo, good morning.

13         MR. CAPUTO:  Kenneth Caputo on behalf of the

14    Securities Investor Protection Corporation.  Your Honor, SIPC

15    has reviewed the trustee's motion and the settlement agreement.

16    As Mr. Kobak stated, we've met with and engaged in numerous

17    comprehensive discussions with various parties among others,

18    the trustee, the parties to the settlement agreement, the New

19    York Fed, representatives of the LBHI and the Securities and

20    Exchange Commission.  We've discussed the facts and

21    circumstances leading to the dispute between the parties, the

22    content and parameters of the settlement agreement and the

23    present motion seeking its approval.

24         SIPC has reviewed the matter in accordance with its

25    oversight role in the SIPA liquidation proceeding of LBI and,

29

1    specifically, pursuant to SIPA Section 78EEE(d) which makes

2    SIPC a party by right to all matters within the liquidation

3    proceeding.

4         We've also reviewed the settlement agreement and the

5    motion in light of the guidelines set forth under Bankruptcy

6    Rule 9019 and the six factors considered by courts in the

7    Second Circuit under 9019 as set forth in such cases as In re

8    WorldCom and In re Ashford Hotels.  In that regard, Your Honor,

9    SIPC has considered first that absent approval of the

10   settlement agreement, the parties would likely engage in

11   complex, expensive and potentially lengthy litigation that

12   would burden the estate.

13        Second, the probability of success on the merits for

14   either party is not clear.  But what is clear is that if

15   litigation were to ensue, both parties would vigorously defend

16   their positions which lends support to the conclusion that the

17   exchange of the consideration contemplated by the settlement

18   agreement may reasonably be determined to be due and owing

19   under and after such litigation.

20        Third, the parties have agreed to exchange mutual

21   general releases making settlement agreement a fair resolution

22   of outstanding claims between the parties.

23        Fourth, creditors generally support the motion.  That

24   includes two of the largest creditors of the estate of LBI, of

25   course, the parties.  LBHI has not objected.  And SIPC, which

30

1    stands to be one of the largest creditors in the estate, is

2    standing in support.

3           Fifth, the settlement agreement represents a fair and

4    beneficial outcome for the estate especially given what Mr.

5    Kobak alluded to a couple of times which is the market risk of

6    the securities in Annex A.

7           Finally, Your Honor, and sixth, the settlement

8    agreement is the product clearly of significant arm's length

9    negotiation between the parties.  So all of the factors the

10   Courts have considered in approving settlement agreements in

11   this circuit have been met, we believe.

12          Very simply, Your Honor, based upon the foregoing, we

13   determined and we believe that resolution of the issues as set

14   forth under the settlement agreement and in the motion is in

15   the best interest of the estate of LBI, its creditors and

16   interested parties.  And we respectfully recommend that the

17   Court approve the motion.

18          THE COURT:  Mr. Caputo, thank you for those remarks.

19   Let me just ask you if you can endeavor to describe what this

20   litigation would look like that's being settled.  One of the

21   things that is, frankly, not clear to me from the papers I have

22   reviewed at least to this point is precisely what is being

23   settled in terms of the claims and defenses that are before the

24   Court in the settlement agreement.  And based upon the

25   presentation that has been made, this appears to be the

31

1  reasonably contemplated completion of the transaction that was

2  before the Court on September 19th.

3       MR. CAPUTO:  Right.

4       THE COURT:  To that extent, it would seem that there

5  wouldn't be much to be arguing about.  What is the estate

6  giving up, if anything, in achieving this settlement other than

7  avoided cost?

8       MR. CAPUTO:  We giving certainty to the estate

9  because it would undoubtedly be the case that if the settlement

10 agreement were not approved that a claim would be made against

11 the estate for far more, at least the seven billion if not

12 costs contemplated in relation thereto.  So the estate gains by

13 the settlement is a certainty of what was contemplated in the

14 APA and in the paragraph 20 of the order that was entered

15 approving the sale on 9/19 and then thereafter 'cause, I

16 believe, 9/20, 1, 2, 3, etcetera.

17      So what litigation would entail would be a recitation

18 of and a delving into all of the facts and circumstances that

19 were in existence on the 18th and the 19th leading up to the

20 APA.  That would be detailed, voluminous.  It would be lengthy.

21 So if I'm answering the question correctly, I think what you're

22 getting here is a certainty for the estate of what would

23 undoubtedly be a very large claim against the estate.  And the

24 certainty is that the assets contemplated to be distributed and

25 delivered, even as of 9/19, would indeed now be delivered and

32

1    both JPMorgan Chase, of course, and Barclays will walk away

2    from any of those claims they would have against the estate and

3    that's a significant benefit.

4         THE COURT:  Okay.  Thank you.  Is there anyone else

5    who wishes to speak in support of this proposed settlement?

6         MR. MILLER:  If Your Honor please, Harvey Miller, on

7    behalf of the Chapter 11 debtors.  I don't rise, Your Honor, in

8    the context of support but rather no objection.  This is a

9    compromise and settlement, Your Honor, in which the Chapter 11

10   debtors have a very significant interest.  Just to give Your

11   Honor some background, LBI, the SIPC debtor, has substantial

12   collateral which was posted with JPMorgan Chase.  In connection

13   with the resolution of claims that JPMorgan Chase may have

14   against the LBI estate, the Chapter 11 debtors and, in

15   particular, Your Honor, LBHI likewise posted a considerable

16   amount of collateral security consisting of cash and

17   securities.  As the claim of the bank against LBI is processed

18   and settled, Your Honor, and that collateral is used to settle

19   that claim, if that collateral is insufficient then JPMorgan

20   Chase will look to the collateral that LBHI has posted.  So

21   there was a very significant interest in this transaction, Your

22   Honor.  And we spent a considerable amount of time with the

23   SIPC trustee, with the staff, with the former Lehman people in

24   going through the facts relating to this transaction.  And it's

25   very significant, Your Honor, because in addition to the

33

1    transfer of the securities which are alluded to as having a

2    value, at some point in time, of 5.7 billion dollars in round

3    figures.  The assertion in the declarations is that those

4    securities are now worth substantially less than 5.7 billion

5    dollars.  But to make up what is facially the seven billion

6    dollars, an additional one billion 250 million dollars of cash

7    is going over to Barclays if you approve the settlement.  And

8    that was very significant, Your Honor, to the Chapter 11

9    debtors and Mr. Marsal.  And I can't tell you, Your Honor, how

10   much time we have spent on this with the cooperation of Mr.

11   Giddens as the trustee.

12        There are still facts, Your Honor, that have to be

13   determined.  So when Mr. Kobak refers to the facts stated in

14   declarations as being uncontradicted, we understand the spirit

15   of the settlement, Your Honor.  We understand what was to be

16   contemplated and to be performed under the asset purchase

17   agreement.  And this is within the spirit of that agreement.

18        However, Your Honor, we were very concerned that

19   something would occur in this compromise and settlement which

20   would preclude future discovery, future determination, that

21   perhaps some assets were transferred to Barclays that may not

22   have been transferred to Barclays (sic) and, as Your Honor

23   knows, this is tripartheid settlement and there may be some

24   relationships with JPMorgan Chase in which LBHI and the related

25   Chapter 11 debtors may have some claims, or they may not have

34

1     some claims.  But we were very concerned,  Your Honor, in the

2     shortness of time between the filing of this motion and the

3     time to do some discovery and, as I said, Your Honor, a lot of

4     discovery, informal discovery, was done, Your Honor, the

5     considerations were raised with Mr. Giddens as the trustee,

6     raised with Mr. Novikoff as the attorney for JPMorgan Chase.

7     And as I understand it, even though Mr. Kobak refers to the

8     facts alleged in the declarations as being uncontradicted, all

9     rights are reserved by all parties as I understand the order.

10    And there is nothing in this that presents collateral estoppel

11    with a binding effect in any future proceedings.  So when Your

12    Honor mentioned in the future, there is still a great deal of

13    work being done by the unsecured creditors' committee in

14    looking to the transfer of assets from all of the Chapter 11

15    debtors and LBI to Barclays.

16         So I don't think, Your Honor, as I understand the

17    order, that that kind of discovery, the assertion of claims in

18    the future, if there are any claims, are precluded by the

19    approval of this compromise and settlement.  And it's on that

20    basis, Your Honor, that the Chapter 11 debtors do not object to

21    this compromise and settlement.

22         THE COURT:  Fine.  Thank you very much.

23         MR. MILLER:  Thank you.

24         THE COURT:  And I'd like others who are parties to

25    the settlement to confirm that what you've just said is their

35

1    understanding as well.  If it's not, I want to know what

2    differences may exist.

3              MR. SCHILLER:  Jonathan Schiller for Barclays

4    Capital.  That is our understanding and we confirm what Mr.

5    Miller has brought before Your Honor.

6              We have some other points but I believe the reserved

7    ones should be heard first --

8              THE COURT:  Okay.

9              MR. SCHILLER:  -- with Your Honor's permission.

10             MS. LEVENTHAL:  Good morning, Your Honor.  Shari

11   Leventhal for the Federal Reserve Bank of New York.  The

12   salient facts of how this settlement came to be are set forth

13   in my declaration.  And as has been stated a number of times

14   are not being contested here today.  Of course, if you have any

15   questions, Your Honor, I'm prepared to address those.  But if

16   not, I would like to note again that the Federal Reserve Bank

17   of New York believes that the interest of fairness dictate that

18   this settlement should be approved.  And I'd like to highlight

19   a few of the reasons why.

20             Barclays stepped in as the only party willing and

21   able to purchase LBI's assets.  Your Honor acknowledged that in

22   approving the asset purchase agreement.  Part of that ability

23   included the ability to step into the Fed's shoes and fund

24   LBI's payroll and operations.  And Barclays did this on the

25   night of September 18th.  The plan was for Barclays and LBI to

36

1    execute or reverse repo transactions whereby Barclays would

2    fund LBI to the tune of seven billion dollars.  And -- I'm

3    sorry, to the tune of forty-five billion dollars and received

4    49.7 billion dollars in securities.  Because of the operational

5    difficulties that I highlighted in my declaration, that reverse

6    repo transaction changed.  And, in fact, Barclays paid thirty-

7    nine billion dollars and received 42.7 billion dollars in

8    securities.  The seven billion dollar differential went into an

9    account at JPMorgan Chase for Barclays but somehow it ended up

10   in LBI's account and didn't remain in Barclays' account.  Those

11   funds were Barclays' on the night of September 18th, the early

12   morning of September 19th.  And as the Court noted, this was

13   the transaction that was contemplated in the asset purchase

14   agreement.

15         As Mr. Kobak noted, the estate could face a claim

16   here in excess of seven billion dollars.  By our calculations,

17   I believe the interest on seven billion dollars is something in

18   the range of around thirty-five million dollars a month.  So if

19   this settlement is not approved, we're talking about a sizeable

20   cash claim against the estate.  And, in fact, what the estate

21   gains here is it has 5.7 billion dollars in cash remaining in

22   the estate in exchange for giving up securities that have a

23   value that's been noted both in the declarations and here today

24   as being far less than that.

25         Seven billion dollars is a lot of money at any time.

37

1 But it's particularly so in the current economic climate.  The

2 parties with the Federal Reserve's assistance have been working

3 diligently to reach a resolution of this matter.  And while the

4 delay in bringing this matter to the Court may seem to negate a

5 sense of urgency, as Mr. Kobak and Mr. Caputo noted, there is a

6 continuing and substantial market risk that the securities are

7 going to decline.  And it's important, therefore, that the

8 settlement be approved as expeditiously as possible.  As the

9 host country supervisor for Barclays, we believe it's important

10 that Barclays get its money.  In conversations with the FSA,

11 the home country regulator, they believe the same.  And,

12 therefore, we ask Your Honor that the settlement be approved as

13 soon as possible.  Thank you.

14    THE COURT:  Thank you.

15    MR. NOVIKOFF:  Good morning, Your Honor.  Harold

16 Novikoff, Wachtell, Lipton, Rosen & Katz on behalf of JPMorgan

17 --

18    THE COURT:  Good morning.

19    MR. NOVIKOFF:  -- Chase Bank, N.A.  Good morning,

20 Your Honor.  We are a party to and support the settlement

21 that's currently before the Court.  As has been noted, this is

22 essentially designed to achieve what was intended by the

23 parties to occur during the period on September 18th and 19th

24 to complete a delivery of securities that was intended at that

25 time which, largely due to operational issues, simply did not

38

1    occur.

2         JPMorgan's interest in this matter are largely

3    aligned with those of LBI and, indirectly, with the LBHI estate

4    in that all of us have an interest in maximizing the value of

5    the collateral pool that is held by JPMorgan to cover the

6    obligations owing to it by LBI, particularly, those arising

7    from the clearance advances pre-petition.  These securities, if

8    they are not delivered to Barclays Capital, remain in that

9    collateral pool and would essentially have to be liquidated in

10   order to achieve a payment and realize their value.  In looking

11   at it, we believe that, from JPMorgan's economic perspective,

12   which, as I noted, is aligned with those of the two estates, we

13   feel it is far better at this point to deliver those

14   securities, the entire settlement consideration here to

15   Barclays Capital, than to retain those derived value from them

16   but run a risk of -- a serious risk of a claim which could

17   result in seven billion plus of real value going to Barclays

18   Capital.

19        With respect to the timing, Your Honor, we believe

20   that any further delay here is potentially harmful.  As I

21   noted, these securities right now are shown as property of LBI

22   in which JPMorgan holds a security interest.  These securities

23   are not like fine wine.  They do not improve over time in an

24   adverse market.  Particularly, many of these are mortgage-

25   backed securities and they have been going down in value while

39

1    we've been putting the settlement into place.  We would like to

2    know now, I'm sure Barclays would like to know now, whether

3    this transaction will be allowed to go forward.  These

4    securities were set aside at some time in October to allow this

5    transaction to happen.  The reality is, is the value during

6    that period of time, is the reality is the value of the

7    securities have gone down and we've got a market which, as Your

8    Honor knows, is quite volatile.  And there can be further drops

9    in value.  We want this to go forward now.  We do not believe

10   it should be held up by any tangential issues where, at this

11   point, parties want to find additional information about the

12   overall sales transaction.

13          We confirm Your Honor's understanding that what is

14   being done here is we are approving a settlement agreement.

15   There will not be any collateral estoppel or other similar

16   effects.  As to the facts laid out in the declarations or

17   otherwise in the order or the motion, we are approving a

18   transaction.  People would remain free to pursue claims if they

19   feel that there is something in the overall sales transaction

20   which gives rise to a claim.

21          Essentially, what we're doing here at this point,

22   Your Honor, is allowing a portfolio of securities and proceeds

23   of sales of securities that previously have been set aside at

24   this point to move.  Nobody's going to lose the record of what

25   moved or how it got there.

40

1      I would have more, Your Honor, to say about the Royal

2   Bank objection although I understand that objection is going to

3   be withdrawn and would reserve time if, in fact, my

4   understanding is incorrect.

5      THE COURT:  Fine.

6      MR. NOVIKOFF:  Thank you, Your Honor.

7      THE COURT:  Thank you, Mr. Novikoff.

8      MR. SCHILLER:  Your Honor, briefly, Jonathan Schiller

9   again on behalf of Barclays.  The order that the trustee has

10  put before you and which we've reviewed and to which Mr. Miller

11  referred preserves rights, as Mr. Novikoff just explained.

12  What will be final, Your Honor, is your approval of the

13  settlement agreement and the intended transfer of the

14  settlement securities and the settlement payment to Barclays.

15  Your Honor has heard from both the Fed and JPMorgan about the

16  risk of these securities in the marketplace.  We have put

17  before you through Gerard LaRocca, chief administrative officer

18  of Barclays -- and Mr. LaRocca is here this morning, Your

19  Honor.

20      THE COURT:  Good morning, Mr. LaRocca.

21      MR. SCHILLER:  In support of the motion to shorten

22  time, I just want to draw the Court's attention to the second

23  paragraph of Mr. LaRocca's declaration there where he said

24  insofar as a settlement agreement contemplates the transfer to

25  Barclays of those securities that remain from the Fed portfolio

1   that were originally intended to be transferred to Barclays

2   pursuant to the transaction described in the declarations that

3   accompany the motion before you, Barclays has been exposed and

4   continues to be exposed to continued market risk associated

5   with these securities at a time when the markets have been

6   experiencing and considerable risk.

7           We regard the creditor committee objection, Your

8   Honor, as not germane to your decision whether to accept this

9   motion and approve the settlement.  They want to exhume

10  information related back to the sale.  That is not pertinent

11  and does not bear upon the question before you today.  Thank

12  you, Judge.

13          THE COURT:  Mr. Schiller, before you --

14          MR. SCHILLER:  Yes.

15          THE COURT:  -- sit down, you may not be the right

16  person to answer this question and Mr. LaRocca might be.  And I

17  just want you to know that before we close the record as to

18  this aspect of this morning's agenda, I would like greater

19  clarity than I currently have on a valuation question.  And

20  this is not just addressed to you.  It's addressed to anybody

21  who can answer it.  I believe, if I'm understanding the

22  transaction correctly, that the working premise of it is that

23  the 1.25 billion dollars in cash consideration, which is going

24  to Barclays, upon approval, along with the securities that have

25  been identified, is intended to compensate Barclays for the

42

1    diminution in value over time of those securities such that

2    Barclays is receiving the same seven billion dollars in value,

3    assuming it's approved today and consummated tomorrow, that it

4    would have received if the transaction had been consummated as

5    contemplated in September.  Am I right in understanding that?

6    That's a premise that I have.  I just want to confirm it.  And

7    then assuming that's correct, I want to know what the current

8    value of the transaction is.

9            MR. SCHILLER:  It's a bit different than that, Judge.

10   The cash component is designed to address the liquidation of

11   certain securities from the Federal portfolio that occurred.

12   And it makes up for that portion of the securities.

13           THE COURT:  As of what date?

14           MR. SCHILLER:  As of the date --

15           THE COURT:  I mean, recog --

16           MR. SCHILLER:  -- the settlement agreement was

17   entered.  The liquidation occurred after the 19th and the

18   values were established at the time the parties agreed in their

19   settlement.

20           THE COURT:  I'm still not clear on this.  And I know

21   a lot of people have spent a lot of time on it.  I'm just

22   trying to understand the basic math that is supposed to equal

23   seven billion.  It's 1.25 billion in cash plus a basket of

24   securities equals seven billion, is that right?

25           MR. SCHILLER:  That is, as Mr. Miller said, that's

43

1    the facial value.  All the parties before you believe that the

2    current value of those securities is below that.  And that's

3    why it would be a benefit to the estate to resolve it on this

4    basis.

5            THE COURT:  Understood.  And I take it that while

6    everybody represents, and I accept the representations, that

7    this is a net benefit to the estate, no one is prepared on

8    today's record to quantify what that benefit is.

9            MR. SCHILLER:  Well, the evidence before you, Judge,

10   submitted by the Fed by Mr. Moore is that the Federal

11   securities, and I quote, "would be substantially less than the

12   50.62 billion".  And that in paragraph 6 of his affidavit, he

13   relates that the subject of the motion is going to be

14   substantially less than the difference.  And he does the math

15   there.  The precise value today of the securities in the Fed

16   portfolio, I can't make a representation other than agreeing

17   with Mr. Moore that the values have declined and are

18   substantially below the seven billion dollar value.

19           THE COURT:  Okay.  All that I was really trying to

20   get a sense of -- and it may be that the parties involved in

21   this would prefer not to sharpen their pencils on this and

22   prefer the record to speak for itself that it's substantially

23   less and allow me to use my own powers of interpretation to

24   assume that means a lot of money.  But I don't know what we're

25   talking about in terms of the order of magnitude.  It may be

44

1   that I don't need to know that.  But missing from the equation

2   of determining that this is a 9019 settlement that warrants

3   approval is the quantification of what that benefit actually

4   is.  It may be that parties would prefer that that not be part

5   of the public record.  I'd like to know it.  And I'd be

6   prepared to learn it through an in camera submission.

7            MR. SCHILLER:  Very well, Your Honor.  I would just

8   add to that that the trustee, of course, with Deloitte, has

9   looked at this as has Mr. Moore to make their representation to

10   you.  It doesn't offer the precision of the value that you're

11   asking but it is testimony as to that number being less than

12   the full value of the settlement.

13            THE COURT:  I understand.  I simply trying to get

14   some sense.  In a universe in which we're talking about seven

15   billion dollars which is quite a lot of money --

16            MR. SCHILLER:  Yes, sir.

17            THE COURT:  -- I'm trying to understand what, in

18   fact, is the value of what is being transferred to Barclays

19   today.

20            MR. SCHILLER:  If I may just take one minute, because

21   it's an important question, confer with my client and Mr.

22   LaRocca and see if there's something that we can throw a light

23   on publicly at this point in time for you.

24            THE COURT:  That would be helpful.

25        (Pause)

45

```
 1        MR. SCHILLER:  Your Honor, we are prepared to proffer

 2   through Mr. LaRocca off the record in camera the value of the

 3   securities that Barclays assigned on the night of the 19th.

 4        THE COURT:  Fine.  Thank you.  Is there anyone else

 5   who wishes to speak in support of the proposed settlement?  All

 6   right.  Let's hear from anyone who wishes to speak against it.

 7        MR. KIRPALANI:  Good morning, Your Honor.  Susheel

 8   Kirpalani from Quinn Emanuel on behalf of the official

 9   committee of unsecured creditors of the Chapter 11 debtors.

10        THE COURT:  Good morning.

11        MR. KIRPALANI:  Your Honor, first of all, I want to

12   thank you for letting me be heard at least to outline what our

13   position is.  I appreciate the offer to include in the proposed

14   form of order language and all the representations that this

15   would not be collateral estoppel.  But I did want to explain to

16   the Court, and I won't take up too much of Your Honor's time,

17   exactly why did the committee feel it so necessary to appear on

18   this particular settlement if, in fact, all rights are reserved

19   and if, in fact, there's not supposed to be any collateral

20   damage -- or, hopefully not damage but collateral estoppel.

21        Your Honor, I think the issues -- Your Honor knows

22   better than I -- from the Friday night when you approved the

23   sale going forward were thereafter spun into a whole variety of

24   additional discussions and negotiations into Saturday and

25   Sunday.  And we did submit the declaration of Mr. Saul Burian
```

46

1    from Houlihan Lokey who was intimately involved in those

2    negotiations.  The sale order itself made the creditors'

3    committee a party, if you will, to the transaction in the sense

4    that it couldn't be changed without the creditors' committee's

5    consent, even an immaterial change.

6         The transaction, Your Honor, did change.  It changed

7    and you heard about the changes.  Your Honor yourself probably

8    sees the numbers in the affidavit and went back and looked at

9    your transcript and said that wasn't exactly the numbers that I

10   remember being told on the Friday.  At least that's the

11   learning process I've gone through.  And so, the question that

12   we had when this has come before the Court in an emergency

13   basis order to show cause three months after the transaction is

14   these new numbers.  If they're not footing with the numbers

15   that were told to the creditors' committee during the weekend,

16   why is that?  And what are the right numbers?  Because as of

17   that late Sunday night, early Monday morning, our financial

18   advisors were told that, look, this is the transaction that has

19   to close.  These are the numbers -- they're actually given a

20   manila folder, which I photocopied here, that has all of the

21   numbers that Mr. Burian outlined in his declaration.  And it's

22   for these reasons we need to go forward.  Don't worry.  There

23   will be a reconciliation post-closing.

24        And so, here we are, three months hence and we assume

25   that parties are busy, there's a lot of other things that need

47

1    to happen in the estate and we're not faulting anybody for

2    that.  But then when we see three declarations submitted by

3    various parties to some settlement agreement that, although I

4    say it's tangential, it was part and parcel of the transaction,

5    Your Honor.  I mean, I'm not going to use a microscope and say

6    that this is something separate than the sale transaction.

7    When we see declarations that have different numbers, different

8    understandings than what people were told, we agree with the

9    Court's comments that these aren't rounding errors.  These are

10   billions of dollars.  And Your Honor mentioned that seven

11   billion dollars is a lot of money.  I would posit that five

12   billion dollars is also a lot of money.  And one of the major

13   changes from that weekend was the securities or the assets that

14   were being transferred to Barclays would need to be trued up

15   that the value from Ms. Fife's comments on that Friday up until

16   Sunday had gotten even worse than the 47.4 and that they have

17   actually decreased now to forty-four or forty-five billion

18   dollars.  And Mr. Burian goes through that in his declaration.

19        And so, our request was simply that in addition to

20   the language that Your Honor sees in the court order that by

21   mid-January, at least, there be a final reconciliation of this

22   mess of transactions.  There are a lot of smart people who

23   worked on it.  But not everything -- in fact, close to nothing

24   has come to light.  And while we understand that the creditors'

25   committee sits in the Chapter 11 case and this is the SIPA

48

1    proceeding, we thought someone should bring it to the Court's

2    attention that Your Honor, I can tell from your questions, are

3    asking, how do I know what the values are or who ascribed the

4    value, as of what date, these are all the same types of

5    questions that we've been asking.  And we thought it's

6    important to bring it to the Court's attention because,

7    frankly, at the end of the day, Your Honor lowers the gavel and

8    says this is a fair deal or not a fair deal.  But without the

9    right information or without understanding how numbers kept

10   changing, I think it gives us a little bit of pause, Your

11   Honor.  And if what everybody in this courtroom is telling me

12   is we want to get on with the agenda and you've made your

13   point, all rights are reserved, all I would say is if the

14   parties could agree to provide us with the information rather

15   than force us to go through the hoops of filing a Rule 2004

16   against three different entities, yeah, that would be, I think,

17   the most efficient way to proceed.

18          It's not that the information doesn't exist.  The

19   declarants are relying on something when they're making

20   statements about assumed liabilities and asset values of

21   particular dates.  When people market to market securities, we

22   want to make sure they didn't stick their finger in the air and

23   say, hmm, five billion dollars additional assets, please,

24   Lehman Brothers.  And that's our concern.  If everything turns

25   out that it was a frenzied time but that, in fact, was the

49

1    market to market value as of that weekend and the transaction

2    was permitted to close and had to close to save the various

3    jobs that we're very happy that they did save, then that would

4    be fine.  But there are major discrepancies between what we

5    were told that weekend and what's being put forth here today.

6    Now, I understand none of that is part of the factual record

7    which is comforting.  When we filed our objection, that was not

8    the case but I think that's now been made very clear.  And what

9    we have asked is, and we asked them on Friday, could we please

10   get some final reconciliation of the numbers and Houlihan Lokey

11   will work with Deloitte and work with Barclays.  And the

12   problem we face, which, I think, Your Honor has heard in other

13   contexts is the critical people on Lehman Brothers' side don't

14   work at Lehman Brothers anymore.  And so, it's difficult that

15   they were the ones who were assisting in the consummation of

16   the transaction.  They're not there anymore when the questions

17   are to be asked.  And we just want to get the final answer,

18   Your Honor.  That's really all we want.

19        THE COURT:  When you asked the question on Friday

20   about getting together and trying to work cooperatively to get

21   to the bottom of all this, was there a response?

22        MR. KIRPALANI:  Their response was we'll give you the

23   language in the order and that's it.  This morning, the parties

24   did tell me that they would be happy to look at the list, it's

25   five items, look at the list that Houlihan helped me put

50

1    together and we can talk about it sometime in mid-January.  You

2    know, I guess, that's where we are.  They said they don't think

3    it's appropriate for the Court to have to order them to comply

4    and I said you're just causing us to file a motion to do that.

5    It's hard to argue that the information shouldn't be made

6    available.  But, I guess, that's probably where we are.  We'd

7    have to file something if they don't give us the information.

8            THE COURT:  All right.  I'll just make the general

9    comment.  It's not a ruling and I'm not ordering anybody to do

10   anything because there's nothing before me that leads to the

11   entry of an order at least at this point other than an order

12   with respect to the settlement agreement itself.

13           It's obviously in the best interest of orderly case

14   administration that information be shared as promptly as it can

15   be consistent with the other conflicting obligations that the

16   financial advisors and lawyers have in this massive case with

17   enormously complicated issues.

18           Nonetheless, I consider it to be important for us to

19   get to what I'll call closure with respect to the basics of the

20   transaction that was approved by order entered September 20th.

21   And this motion with respect to the settlement agreement is a

22   reasonable platform on which to address some of these issues

23   because while this is not fairly to be characterized as a

24   cleanup item, it's a very significant matter.  It does draw all

25   of our attention back to what happened in September.  And I

51

1    think it important that there be reasonably prompt resolution

2    of outstanding questions that the committee may have on the

3    subject.  I would hope that it's not necessary for the

4    committee to have to file 2004 requests in order to get the

5    information that it seeks which seems to be reasonable and

6    consistent with its mandate.

7            As it relates to the issue of standing that has been

8    alluded to during the course of this hearing and in your own

9    remarks at the outset, by making this comment, I am not making

10   any judgment as to the standing of the creditors' committee

11   appointed in the LBHI case to participate actively and directly

12   in the LBI case.  But it is apparent to me that the transaction

13   that was approved on September 20th was approved by means of

14   two orders, one entered in the LBHI case and one entered in the

15   LBI case.  It is reasonable for the creditors' committee which

16   represents substantial creditor interest in LBHI to have access

17   to information so that it can fulfill its functions in the LBHI

18   case.

19           Additionally, it appears to me reasonable for the

20   LBHI committee not just in the context of what's before me now

21   but in other settings to be a party in interest for purposes of

22   major transactions affecting the LBI case.

23           This does not constitute a ruling with respect to

24   standing.  I do, however, note that these cases operate off the

25   same agenda, very frequently have overlapping agenda items and

52

1    regardless of their actual procedural status as stand alone

2    cases are in many material respects linked.

3           To the extent that there is a reasonable standing

4    objection made at some point in the future by the LBI trustee,

5    I'm prepared to consider it on its merits.  But to the extent

6    that the parties can work cooperatively, I consider that to be

7    desirable and something to be pursued in good faith.

8           MR. KIRPALANI:  Thank you, Your Honor.  I appreciate

9    your remark.

10          THE COURT:  Whatever happened with Royal Bank?  Mr.

11   Ostrow, do you wish to make your way to the front of the room?

12          MR. OSTROW:  Thank you, Your Honor.  Good morning,

13   Your Honor.  Alec Ostrow from Stevens & Lee on behalf of Royal

14   Bank America.

15          THE COURT:  Good morning.

16          MR. OSTROW:  Your Honor, Royal Bank America objected

17   to this settlement on four grounds.  One is that it didn't want

18   to be bound and, in particular, drew attention to particular

19   language in the order that said anyone who objects is deemed to

20   consent.  We objected to that.

21          We were also concerned that our particular property,

22   collateral that was posted with Lehman Brothers Special

23   Financing somehow made its way to Lehman Brothers Inc. and

24   somehow made its way to Barclays might be affected in this

25   particular transaction.  And we didn't know whether it was or

53

1    it wasn't.  And to the extent that it was and we had interest

2    in it, we wanted those interests protected.

3         The other aspect to which we objected was that we

4    just didn't see the basis for the compromise.  Over the weekend

5    I received a proposed revised order from counsel for the

6    trustee.  And this morning, I had an opportunity to speak with

7    counsel for Barclays and counsel for JPMorgan Chase.  And based

8    on the discussions that I've had with that counsel and the

9    things that were agreed to among counsel, I'm prepared to

10   withdraw the objection.

11        And let me tell you what the things are.  I haven't

12   seen the precise order that was handed up to Your Honor and I

13   would like to see a copy of it.  But the deemed consent

14   language that I had objected to is to be stricken and the

15   limitation on the binding effect language that was inserted

16   over the weekend is to be retained.

17        There is to be a representation by Barclays that

18   Royal Bank's posted collateral, as we've described it in our

19   papers, is not involved in this transaction at all.  That upon

20   the signing of appropriate confidentiality agreements we would

21   be able to get complete access to the Schedules A and B to the

22   asset purchase agreement and to Annex A to the settlement

23   agreement.  And that Barclays and JPMorgan Chase will provide

24   to Royal Bank on a confidential basis information as to their

25   banks -- to the extent that their banks acquired or disposed of

54

1    Royal Bank's posted collateral.  With respect to JPMorgan

2    Chase, that will take place after the first of the year.  And

3    David advised me that they can only trace me CUSIP numbers and

4    that's acceptable to me.  If that's acceptable to the other

5    parties, then I'm prepared to withdraw the objection.

6           THE COURT:  It sounds like it's a conditional

7    withdrawal.  Is there agreement that those conditions have been

8    met?

9           MS. GRANFIELD:  Lindsee Granfield, Cleary Gottlieb

10   Steen & Hamilton LLP on behalf of Barclays Capital, Your Honor.

11   I think Mr. Ostrow's recitation is correct.  One little

12   clarification or amendment may just simply be that obviously we

13   were checking as to -- again, and something similar.  He said

14   with respect to JPMorgan, we can check on CUSIP number with

15   respect to the CUSIP number that he has put in his objection

16   and any securities that may be on different schedules.  It is

17   represented that that CUSIP number does not appear on Annex A

18   to the settlement agreement.  To the extent that it were to

19   appear on schedules related to the clarification letter, we'll

20   check whether that amount and that CUSIP is still at Barclays.

21   That's what we agreed we would do and we will do that.

22          Obviously, if -- the CUSIP is the same, just as a

23   clarification, doesn't mean that that's Royal Bank's posted

24   collateral.  That's a different question.  But we will check

25   and get that answer at least for Mr. Ostrow.

55

1          THE COURT:  Thank you.

2          MR. NOVIKOFF:  Your Honor, on behalf of JPMorgan, we

3     confirm.  I do want to clarify that what JPMorgan will do is

4     determine from its records whether it believes that this CUSIP

5     number was involved in a transfer of the amounts that were --

6     of the securities that were delivered to Barclays Capital on

7     September 18th or whether it was a CUSIP that was contained in

8     the clearance accounts on September 19th.  I understand, if I

9     understand the complaint properly, the security was originally

10    posted as collateral in January of 2006.  We are not going to

11    be checking for some period of two and a half or two and three-

12    quarter years on the security.  But we will -- what we will

13    endeavor to find out -- if that CUSIP was there during that

14    period.  Obviously, Your Honor, there is no assurance that that

15    CUSIP on September 19th, if it was present, is in any way the

16    same security that was posted in January of 2006.

17         THE COURT:  Mr. Ostrow, does all of that satisfy you

18    to the point of confirming that your objection is withdrawn?

19         MR. OSTROW:  Yes, Your Honor.  It does.

20         THE COURT:  Thank you.  The objection is deemed

21    withdrawn.

22         MR. MILLER:  Your Honor, please, Harvey Miller again.

23    Your Honor, I just want to respond to something that Mr.

24    Kirpalani said in connection with this particular transaction.

25    We had two situations, Your Honor, the sale that you approved

56

1    by the order of September 19th and this particular transaction.

2    I don't want Your Honor to believe that this was not part of

3    discussions that occurred over the weekend of the 19th, the

4    20th, the 21st into early that Monday morning.

5              THE COURT:  I think Mr. Kirpalani confirmed that, in

6    fact, it was discussed over that weekend and Mr. Burian was

7    part of those discussions.

8              MR. MILLER:  The problem is, Your Honor, that at 3 or

9    4:00 in the morning, Mr. Burian had left.  And the Houlihan

10   Lokey people had left.  And the Fed was present through

11   telephone, Your Honor.  JPMorgan was present.  Barclays was

12   present.  The representatives of LBHI were present.  And in

13   those transactions, Your Honor, this seven billion dollars was

14   an issue of extended discussion.  And Your Honor has to

15   remember that this goes back to what was a reverse repo that

16   was done on the evening of the 18th.  And normally, when that

17   repo comes off in the morning, cash is exchanged, securities

18   are released and so on.  The 19th occurred; the securities were

19   not there to deliver to Barclays in connection with that

20   reverse repo.  It was converted into purchased assets.

21             That's what happened, Your Honor.  And at the

22   closing -- and this, Your Honor -- there were very few people

23   awake.  They were lying on the floors and all over the place.

24   And we were talking -- and as Senator Dirksen said, we were

25   talking about real money.  And it was very clear, Your Honor,

57

1    that Barclays was to either get seven billion dollars in cash

2    or to get the securities that were to be released.

3          At that point in time, Your Honor, there was an

4    election by Barclays, so to speak, that it would take the seven

5    billion dollars in cash.  It was under the impression that

6    there was seven billion dollars in cash in a bank account at

7    JPMorgan Chase.  It turned out after the closing, Your Honor,

8    that that bank account did not exist.  So what has been

9    happening over this period of time is the parties have been

10   trying to resolve that difference.  And while it's facially

11   seven billion dollars, the representations that have been made

12   all the way through these discussions, Your Honor, that that

13   5.7 billion dollar securities has eroded in value to a

14   substantial sum that nobody wants to release publicly.  But

15   it's our understanding, on behalf of the Chapter 11 debtors,

16   Your Honor, that it is significantly less than 5.7 billion

17   dollars.

18         So what is really happening here, Your Honor, is the

19   LBI estate is getting credit for seven billion dollars being

20   paid to Barclays which reduces the claim that Barclays would

21   have against that estate.  That preserves value for the LBHI

22   estate because the collateral that has been posted by LBHI will

23   not be eroded to the extent of a full seven billion dollars.

24   So there is real value here, Your Honor, to the LBHI estate.

25   And that's the reason why we don't object to this.

58

1        And I would point out, Your Honor, the seven billion

2   dollars is different than the APA.  That seven billion dollars

3   was a separate discussion.  And there's no question in my mind,

4   Your Honor, that Barclays thought it had seven billion dollars

5   in cash in a bank account.  It wasn't there.  And that's what's

6   being resolved today, Your Honor.  Thank you.

7        THE COURT:  Thank you.  Is there anyone else who

8   wishes to make any comments in connection with the proposed

9   settlement agreement between the SIPA trustee, Barclays Capital

10  and JPMorgan Chase Bank?  I'll deem the record closed for

11  purposes of both evidence and argument and I will approve the

12  settlement based upon the record and the representations that

13  have been made including the comments confirming that the

14  settlement is not intended to have collateral estoppel impact

15  that would preclude the further examination of the

16  circumstances surrounding the original sales transaction

17  between the estates and Barclays Capital approved by order

18  entered September 20.

19       I accept the representations that have been made by

20  the various parties concerning the benefit to the estate

21  associated with this 9019 settlement notwithstanding the fact

22  that the record is murky with respect to the quantification of

23  the actual benefit.  References have been made to the avoidance

24  of the burden and expense of litigation but also to the fact

25  that the notional amount applicable to the settlement

59

1    represents a significant but unquantified saving with respect

2    to the amount that would be paid if we were counting out seven

3    billion dollars in actual cash.  That difference apparently is

4    the current market value of the basket of securities that has

5    been referenced during the course of today's hearing.

6           For reasons stated earlier during the course of the

7    hearing, I am interested in learning what that delta is to the

8    extent that it's possible to estimate what the actual benefit

9    is in dollars recognizing that it is just that, an estimate,

10   and not a precise calculation.  But I do accept the statements

11   that have been made by counsel for all parties and that no one

12   has objected to that this settlement represents a significant

13   benefit to the estate and is the right thing to do,

14   particularly, since Barclays had every reason to expect that

15   this value would be part of its agreement with the New York

16   Fed.

17          I was particularly impressed the declarations

18   submitted in support of this motion of Shari D. Leventhal and

19   her remarks made amplifying on the language of that declaration

20   during the course of this morning's hearing.  Without going

21   into specifics, in effect, what the New York Fed is saying,

22   this was what the parties contemplated when Barclays stepped

23   into the shoes of the New York Fed at a time when this case was

24   going through its most difficult early days.

25          Based upon the declarations that have been supported

60

1    -- that have been submitted in support of the proposed

2    settlement agreement and the various statements that have been

3    made by interested counsel, I approve the settlement.  I'm

4    prepared to enter the order in the form that it has been

5    modified to take into account some of the concerns of Royal

6    Bank whose objection has been withdrawn.  And I incorporate

7    into that order by reference the statements that have been made

8    on the record indicating that this is without prejudice to

9    further investigation by the creditors' committee.

10            MR. KOBAK:  Thank you, Your Honor.

11            THE COURT:  Thank you.

12            MS. GRANFIELD:  Your Honor, could I approach with a

13    hard copy of that revised order and a diskette with the order

14    on it?

15            THE COURT:  That will be fine.

16            MS. GRANFIELD:  Thank you.

17            THE COURT:  Thank you.

18        (Pause)

19            THE COURT:  We seem to be --

20            MR. OSTROW:  Your Honor, may I be excused from the

21    remainder of the hearing?

22            THE COURT:  We seem to be clearing the courtroom.  So

23    let's take a moment to do that.  And this may be a reasonable

24    time to take a break anyway.  Let me just ask people to stop

25    for a moment while I'm commenting.  We're going to clear the

61

1    courtroom but there's just a statement I wanted to make.  I

2    would like to have the chambers conference, if that's what it's

3    going to be, now in reference to the representations as to

4    value.  So if anybody is leaving who's needed for that, you can

5    certainly appear with your coats on but let's use this time to

6    go into the conference room across from my chambers' entrance

7    which is right outside in the hall.  And during the course of

8    that chambers conference, I would like to also have an

9    administrative discussion with counsel for the debtor about a

10   matter that involves a possible emergency hearing that has been

11   requested by a litigant that does not appear on today's agenda.

12   So let's meet across the hall in five minutes and let's plan on

13   a total break of fifteen minutes.

14          MR. MILLER:  Thank you, Your Honor.

15          THE COURT:  We're adjourned.

16      (Recess from 11:25 a.m. until 11:58 a.m.)

17          THE COURT:  Be seated, please.

18          MS. FIFE:  Good morning, Your Honor, if it still is

19   morning.

20          THE COURT:  Just barely morning.

21          MS. FIFE:  Yeah, that's right.  Lori Fife from Weil

22   Gotshal & Manges on behalf of the debtors.  The first thing on

23   the calendar for the LBHI case is an uncontested matter, the

24   debtors' motion authorizing entry into a settlement agreement

25   with certain of its French affiliates.  The motion seeks

62

1   approval of the settlement and also seeks authority for LBHI to

2   vote in its capacity as shareholder of BLB, which is one of the

3   French affiliates for the sale of the business to Nomura.  And

4   also for the voluntary dissolution of BLB, both of which are

5   predicated upon the approval of this settlement.

6           There were no responses received.  And I can go into

7   the terms of the settlement in more detail if you'd like.

8   Otherwise --

9           THE COURT:  It's probably not necessary.  I have

10  looked at it.

11          MS. FIFE:  Okay.

12          THE COURT:  And I think it's fine.  I'll approve it.

13          MS. FIFE:  Thank you.  The second motion on the

14  calendar is LBHI's motion for authorization to assume

15  administrative services agreement with Aetna.  Aetna is our

16  administrator of what is now self-funded medical and health

17  plan.  We are in the process of entering into a new agreement

18  with Aetna to have Aetna become the insurer.  But we still need

19  the administrative services of Aetna.  So we have entered into

20  this amended agreement.

21          There were no responses received so I'd ask the Court

22  to approve the motion.

23          THE COURT:  That motion is approved.

24          MS. FIFE:  Thank you, Your Honor.  The third thing on

25  the calendar is LBHI's motion for authorization to reject the

63

1    prescription drug program master agreement with Medco.  This is

2    the pharmaceutical plan that LBHI and its subsidiaries had.  As

3    I just mentioned, we're entering into a new agreement with

4    Aetna so we no longer need this prescription plan.  We'd ask

5    that the motion for rejection be approved.

6         THE COURT:  That is granted.

7         MS. FIFE:  The fourth item on the calendar, Your

8    Honor, is a motion to amend orders authorizing the sale of

9    aircraft.  You may recall that earlier you approved the sale of

10   the Gulf Stream G-4 and the Falcon 50.  Neither of those

11   transactions were consummated mostly because of the decline in

12   the market for airplanes.  In addition, the Falcon 50 had some

13   issues with inspection on the aircraft.  We continued to market

14   those two aircrafts and were unsuccessful.  However, the

15   original purchasers came back and offered to buy those two

16   planes as long as we were able to consummate the sale prior to

17   December 24th which was the reason we needed to shorten notice

18   for this motion.

19        We believe that this transaction continues to

20   represent the highest and best price for the aircraft and seek

21   the modification.  The purchase price for the G-4 went from

22   24,892,000 to 23,400,000 which is a reduction of 1,492,000.

23   And the Falcon 50, which was originally sold for 6,200,000 has

24   been reduced to 5,900,000 which is a reduction of 300,000.

25        There were no responses that were filed and the

64

1    creditors' committee has reviewed the transaction and supports

2    it as well.  So we'd ask that you approve the amended orders.

3         THE COURT:  I will approve the amended order although

4    when I first saw all the paperwork surrounding these retrades

5    of transactions that have only recently been approved, it all

6    got my attention.  And I know that a tremendous amount of work

7    had been invested in the original transactions which were

8    presented by your colleague on two separate hearing occasions.

9    And understand that the market for a pre-owned aircraft appears

10   to be in steep descent and, as a consequent, the business

11   judgment that's being exercised here seems appropriate although

12   it's somewhat painful, I might add, to have to revisit these

13   transactions as recently as a month after approval and that

14   these deals are not simply being closed by responsible

15   purchasers as agreed.  But I fully recognize that liquidated

16   damages are what they are and that business is what it is.

17        And so, I approve these with some regret.

18        MS. FIFE:  We have regret as well, Your Honor, but

19   this is the highest and best offer we have.

20        THE COURT:  Understood.  And if it weren't the

21   highest and best offer for these assets, I wouldn't be

22   approving it.

23        MS. FIFE:  Thank you, Your Honor.  The next matter on

24   the calendar is a contested matter, a motion of OMX Timber

25   Finance Investments LLC.  And I'll let --

65

1          MR. MILLER:  Your Honor, just before -- I think we

2     resolved the other matter --

3          MS. FIFE:  Oh.

4          THE COURT:  Wonderful.

5          MR. MILLER:  -- without the necessity for a hearing.

6          THE COURT:  So there's no need to schedule an

7     emergency.

8          MR. MILLER:  Correct, Your Honor.

9          THE COURT:  Fine.

10         MR. MILLER:  Your Honor, may I be excused?

11         THE COURT:  You may.  Have a good holiday, Mr.

12    Miller.

13         MR. MILLER:  Happy holidays to you, Your Honor.

14         MR. FLECK:  Good afternoon, Your Honor.  Evan Fleck

15    of Milbank Tweed Hadley & McCloy on behalf of the official

16    committee of unsecured creditors.  As Ms. Fife mentioned, this

17    is the motion of OMX Timber Finance for limited relief from the

18    stay.  The committee filed an objection on Friday evening and

19    the debtors filed a joinder yesterday.

20         The parties have met this morning and I'm pleased to

21    report that there is a resolution of the motion.  The parties

22    intend to submit an order to the Court for entry later on this

23    afternoon.  By way of preview, if I may, Your Honor, just

24    mention the contours of the agreement that's been reached.

25         The parties have agreed for limited relief from the

66

1    stay solely for the purpose of OMX to submit demand notices

2    with respect to the guaranty.  That would apply to OMX and also

3    with respect to the indenture trustee for one of the underlying

4    notes on a going forward basis.  All parties would reserve all

5    rights with respect to those notices including to argue that

6    the automatic stay applies and that cause does not exist to

7    lift the automatic stay with respect to those notices.

8         THE COURT:  Let me make sure I understand what you've

9    just said.  Are you saying that notices will be given as

10   requested in the motion but that the giving of the notice is

11   without prejudice to the argument that it violates the

12   automatic stay?

13        MR. FLECK:  Yes, Your Honor.  That is the agreement

14   of the parties in order to allow the parties to continue to

15   discuss the matter and return to the court at a later date, if

16   appropriate, in connection with either a hearing on a motion or

17   in connection with claims reconciliation process.  That is the

18   agreement of the parties if it's satisfactory to the Court.

19        THE COURT:  I'll simply say that it's a pretty

20   unusual agreement.

21        MR. DEVENO:  Your Honor, Mark Deveno of Bingham

22   McCutchen on behalf of Wells Fargo.  Your Honor, Wells Fargo is

23   the indenture trustee on certain notes issued by OMX and in

24   that capacity receives a pledge of the guaranty.  I'll ask Mr.

25   Fleck to confirm my understanding but just to clarify it, I

67

1    think, slightly, I don't believe there will be a reservation of

2    whether there has been a violation of the automatic stay for

3    purpose of sanctions or otherwise but I believe the committee's

4    objection was based on a premise that a claim does not

5    currently exist because a demand has to be given.  During the

6    claims process, all rights of the parties will be reserved for

7    the committee to argue that that demand, although we've

8    permitted it today, should not have been given in which case at

9    least for a claims resolution process, we'll treat it as though

10   the demand, in fact, hadn't been given and the parties' rights

11   with respect to the various claims that OMX or the indenture

12   trustee might assert would be based on that outcome.

13            THE COURT:  I'm completely befuddled by this.  And

14   it's probably -- it's not because of anything you've said.  But

15   you can reach any agreement you wish that resolves this.

16   That's fine.  I'm all in favor of consensual resolution.  But

17   the motion practice that has been teed up for today calls for a

18   very difficult decision to be made absent such an agreement.

19   And that difficult decision effectively deals with the balance

20   of harms standard in the Sonnax case.  And you should know,

21   both sides, that I've spent some considerable time in

22   preparation for today's hearing thinking about this very issue.

23   I don't know when it is that you came up with the structure

24   that you're now describing.  And I'm glad that you did if it

25   satisfies this dispute at least for today.  But in terms of

68

1    courtesy to the bench, if this is something that was known

2    earlier than five minutes ago, it would have been very helpful

3    to me to have known it earlier.  And I say that because I

4    dedicated very significant amounts of time to this particular

5    dispute over the weekend.  In doing so, I might add, I was

6    looking forward to hearing whatever arguments were going to be

7    made today because I consider this to be an extremely close

8    question.  Furthermore, it is still not clear to me whether or

9    not a claim currently exists on the part of OMX Timber Finance

10   Investments II, LLC or whether or not that claim is only

11   triggered upon the giving of the notice which, ordinarily,

12   would be barred by the automatic stay.  The stipulation you

13   describe is one that so finesses the issue that it seems to me

14   that it creates more trouble than it solves.

15        And so while I am almost always anxious to approve

16   stipulations, unless I'm misunderstanding something, all you

17   have done is kick the can down the road.  You've done nothing

18   about fixing the problem.

19        MR. DEVENO:  Again, Mark Deveno on behalf of the

20   indenture trustee, Your Honor.  And we certainly -- I can't

21   stress enough -- appreciate the Court's time and energy put

22   into the issue.  And it is, in fact, an issue that has been

23   resolved this morning.  So we certainly apologize for the

24   inconvenience to the Court.

25        THE COURT:  No, no.  No.  I'm not looking for an

1      apology.  I'm looking for a better understanding as to the

2      stipulation that has been reached.  Is this a matter which has

3      been resolved to the point that the stay relief before the

4      Court is now moot?  Or is this something which simply defers

5      consideration to another date under a different guise by virtue

6      of reserved rights?  And I don't understand, and it's probably

7      just because I'm hearing this for the first time, how you can

8      reserve rights with respect to the giving of notice by

9      stipulation which is being so ordered?  Because if it's being

10     given in a so ordered stipulation, it would appear that stay

11     relief has been, in fact, given for purposes of giving that

12     notice.  And if there are rights which are triggered by virtue

13     of that, I don't know how those rights are effectively

14     reserved.

15          So I think you need to do -- all of you need to do a

16     better job explaining what this consists of as a matter of law

17     because I'm not getting it.

18          MR. DEVENO:  Excuse me, Your Honor.

19          (Pause)

20          MR. DEVENO:  Apologize, Your Honor.

21          THE COURT:  We're going to defer this matter.  This

22     is not going to continue.  We're going to go to the next matter

23     on the agenda.  The parties to this stipulation can spend some

24     time in the hall or conference room conferring so that I can

25     have better clarity on the answer to the question just posed.

70

1          MR. DEVENO:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MS. MARCUS:  Good afternoon, Your Honor.  Jacqueline

4     Marcus, Weil Gotshal & Manges on behalf of LBHI and LCPI.  Your

5     Honor, number 6 on the agenda is the continued hearing with

6     respect to the debtors' motion for assumption or rejection of

7     open trades.  When we were last here on December 16th, we

8     postponed eight objections representing eighteen parties to

9     today's hearing.  As we knew it would, today's hearing came

10    upon us very quickly.  Nevertheless, I'm pleased to report that

11    we have reached and signed agreements with ten parties.  And

12    for Your Honor's benefit, I'll name them.  They are Bank of

13    America Securities, BDF Limited, Millenium Management, DK

14    Acquisition, Longacre Capital Partners and Longacre Master

15    Fund, Morgan Stanley Senior Funding, Inc., the Royal Bank of

16    Scotland, UFAA, the Bank of Nova Scotia and BlackRock Financial

17    Management.

18          With respect to the yet unresolved objections that

19    were on the calendar for today, all of the parties have agreed

20    to adjourn those matters to January 14th.  So those are AIB

21    International, Putnam, Tennenbaum, Deutsche Bank, Field Point,

22    Bank of America, N.A., Morgan Stanley International Limited and

23    P. Schoenfeld Asset Management.

24          In addition to the agreements, Your Honor, and the

25    adjournments, there are a few corrections and clarifications to

71

1    the December 16th order that we had been requested to make.

2    And we have consulted with the parties that have made those

3    requests and they are all in agreement with the proposed terms.

4    But for Your Honor's benefit, I'll just run through them.

5           First, there were a series of trades with funds

6    affiliated with Hartford Insurance that were inadvertently

7    included on Exhibit A to the December 16th order.  Those trades

8    were actually supposed to be part of the second trades motion

9    which will also be heard on January 14th.  The debtors and the

10   counterparties have agreed to treat those trades as if they had

11   not been assumed on December 16th and as if they had been

12   listed on Exhibit A to the second trades motion.  Accordingly,

13   any objection to the assumption of such trades will be filed by

14   January 9th in accordance with the second trades motion.

15          Second, there was an assumed trade with Avenue

16   Investments which was included on Exhibit A to the December

17   16th order.  Subsequent to the hearing last week, Avenue

18   Investments contacted us and told us that they had not received

19   notice of the debtors' intent with respect to this trade until

20   December 14th.  Cognizant of Your Honor's ruling at the last

21   hearing, we agreed to deem the Avenue trade deleted from the

22   December 16th order and to provide Avenue with a period of time

23   to object to the assumption of the trade.  The debtors and

24   Avenue have agreed that Avenue will have until January 2 to

25   file an objection and that the matter will be heard on January

72

1    14th as well.

2            The third one, Your Honor, is with respect to the

3    objection of P. Schoenfeld Asset Management.  While that's one

4    that's expected to be heard on January 14th, there was a trade

5    with P. Schoenfeld where there was a dispute as to who the

6    correct counterparty is.  The debtors believe that the correct

7    counterparty was an affiliate of Credit Suisse and P.

8    Schoenfeld believes that they are the true party in interest.

9    So, although that was included on Exhibit A, the debtors and P.

10   Schoenfeld have agreed to give P. Schoenfeld the opportunity to

11   argue that they are indeed the correct party in interest.  And

12   the proposed order would deal with that as well.

13           THE COURT:  Does that happen on the 14th?

14           MS. MARCUS:  Yes.

15           THE COURT:  The 14th is shaping up to be a pretty

16   long day.

17           MS. MARCUS:  Hopefully, we'll get a number of them

18   out of the way before the 14th.  But we're not sure yet.

19           THE COURT:  I agree.  Hopefully.

20           MS. MARCUS:  Finally, Your Honor, in the December

21   16th order, although we indicated on the record that the R3

22   objection would be heard on January 14th, when we submitted the

23   proposed order, we inadvertently failed to include R3 on the

24   list for January 14th.  So the proposed order that we're

25   submitting later this afternoon will also make that correction.

73

1          In addition, R3 has a similar situation to P.

2     Schoenfeld in which there is a trade that we believe is with

3     Credit Suisse but R3 believes they are the correct

4     counterparty.  So the proposed order also gives relief to R3

5     with respect to that.  And we have agreed just this morning on

6     proposed language with R3.

7          I think that covers all the issues.  And we'd like to

8     submit a proposed order later this afternoon.

9          THE COURT:  That's fine.  Let me ask one question

10    unrelated to the comments you've just made but it does relate

11    to the hearing on January 14th.  Last week, Mr. Brozman, on

12    behalf of various clients that he represented, made a number of

13    arguments.  I don't know if he's present today and I'm not

14    inviting him up unless he feels the need to speak.  But he did

15    raise the question as to whether the hearing on the 14th would

16    be an evidentiary hearing in connection with the matters that

17    concerned him and his clients.  Has any progress been made, and

18    the answer could be no, in working out the parameters of the

19    hearing as it relates at least to his clients?  And also, as it

20    relates to the others that you've mentioned, are we talking

21    about evidentiary hearings or argument?

22         MS. MARCUS:  Mr. Brozman's clients were on the other

23    motion, the derivatives motion.

24         THE COURT:  Yes.

25         MS. MARCUS:  So I can't --

74

1          THE COURT:  Oh, am I on the wrong -- oh, the open

2     trades --

3          MS. MARCUS:  That's the derivatives motion.

4          THE COURT:  I'm in the wrong one?  I apologize

5     completely.

6          MS. MARCUS:  That's okay.  But --

7          THE COURT:  I confused you, too.

8          MS. MARCUS:  But with respect to -- no, you didn't

9     confuse me.  With respect to the parties that are objecting

10    here, there is -- Mr. Friedman -- I don't know if he's here.

11    But there's one party that has served the debtors with a

12    discovery request.  But in light of the fact that we've now

13    settled, I think, nine of the eleven objections and hope to

14    settle the remaining two, I think the expectation is that if we

15    proceed to litigate with one or both of those clients that the

16    14th probably would not be an evidentiary hearing because they

17    will not have gotten their discovery by then.

18         THE COURT:  Okay.  There's someone standing up.

19         MS. MARCUS:  There he is.

20         THE COURT:  I should have kept my mouth shut.  I

21    obviously opened a can of worms.

22         MS. MARCUS:  Hopefully not.

23         MR. FRIEDMAN:  Good morning, Your Honor.  Michael

24    Friedman on behalf of P. Schoenfeld and a number of other

25    clients that some of which have settled today and a number of

75

1    which have been adjourned to the 14th.

2         Your Honor, I believe that the response deadline for

3    the discovery that we have served is actually on the 14th as of

4    now.  I think that we would work with the debtors to continue

5    the discovery process.  We're also working to try to resolve

6    these matters.  So I believe that it would be difficult to go

7    forward on an evidentiary basis on the 14th given where we are

8    with our discovery requests.  So there may be some preliminary

9    argument or perhaps we would set another date for an

10   evidentiary hearing.

11        THE COURT:  All right.  I'm going to assume then that

12   the hearing on the open trades matter will not be an

13   evidentiary hearing on the 14th at least as it relates to your

14   clients.  And I'm hopeful that we can avoid an evidentiary

15   hearing as to any of the others as well.  But if there is going

16   to be a need for an evidentiary hearing, I just need reasonable

17   notice in advance for purposes of allocating appropriate time

18   and resources.

19        MR. FRIEDMAN:  Your Honor, I would propose that we

20   decide over the next several days whether we're far close

21   enough that we'll settle or whether we're far enough that we

22   think that we will need an evidentiary hearing and then maybe

23   we'd set a schedule for that.

24        THE COURT:  That's fine.  Thank you.

25        MS. MARCUS:  Thank you, Your Honor.  We'll submit an

76

1       order this afternoon.

2               THE COURT:  That's fine.

3               MS. MARCUS:  May I be excused?

4               THE COURT:  Yes.

5               MS. MARCUS:  Thank you.

6               MS. FIFE:  Pretty soon I'm going to be the only one

7       left.

8               THE COURT:  They're bailing on you.

9               MS. FIFE:  Let me just suggest the question that you

10      asked about the derivatives motion, Your Honor.  We do

11      anticipate that there will be some evidence needed for the

12      hearing unless we're able to resolve all of the derivative

13      objections.  So we will coordinate with your clerk and --

14              THE COURT:  And is that in connection with only

15      certain parties who have objected?  Or is there a sense that

16      the entire matter to the extent that there are open issues will

17      involve the need for evidence presented by the debtor?

18              MS. FIFE:  I believe that most of the general issues

19      are legal issues so probably will not require evidence.  But

20      there may be evidence required with respect to individual

21      derivative contracts.

22              THE COURT:  Okay.

23              MS. FIFE:  So the next item on the agenda is the

24      consideration of the debtors' motion to sell their interest in

25      the investment -- Lehman Brothers investment management

1    division to NBSH Acquisition LLC.

2          As I'm sure Your Honor will recall, on October 16th,

3    the Court conducted a hearing to consider the bidding

4    procedures for the sale of the IMD division.  At that hearing,

5    we heard testimony of Barry Ridings, the cochairman of the

6    restructuring group at Lazard Freres, who stated that the IMD

7    division was a valuable but highly sensitive collection of

8    assets whose value is greatly dependent upon its ability to

9    assure its clients and customers of its financial and

10   operational integrity.  And he further stated that Lehman's

11   current instability affected IMD's ability to maintain its

12   clients, customers and employees where it would face material

13   disruption of value.

14         We also heard about the debtors' pre-petition

15   marketing efforts and post-petition marketing efforts and

16   negotiations with Bain and Hellman & Friedman which led to the

17   execution of a stalking horse purchase agreement.

18         At the conclusion of the hearing on October 16th, the

19   Court approved the bidding procedures and had found that they

20   were reasonable and appropriate and represented the best method

21   for maximizing the value of the assets being sold.  In

22   accordance with those bidding procedures, the debtors conducted

23   an auction on December 3rd and, after consultation with the

24   creditors' committee, selected the bid submitted by NBSH

25   Acquisition LLC.  NBSH Acquisition LLC, Your Honor, is an

78

1   acquisition vehicle formed by and controlled by certain members

2   of senior management of the IMD division.

3        A copy of the purchase agreement dated December 1st

4   and an amendment to such purchase agreement dated December 19th

5   were filed with the Court.  I'll just briefly describe the

6   terms of the new agreement.  The key assets being transferred

7   are the Neuberger Berman business, the fixed income business,

8   parts of the hedge fund of funds and single manager businesses,

9   the private funds investment group of the private equity

10  business and certain assets related to the Asian and European

11  asset management businesses.

12       The liabilities that are being assumed by NBSH

13  Acquisition or its subsidiaries including substantially all of

14  the liabilities incurred on or prior to the closing and also

15  liabilities under contracts assigned to the company or any

16  subsidiaries.  They're also assuming some unfunded commitments

17  of LBHI and its affiliates in certain partnerships.

18       The consideration for the transaction is as follows.

19  LBHI, on behalf of the sellers, will receive ninety-three

20  percent of the preferred units and forty-nine percent of the

21  common units.  Management will receive seven percent of the

22  preferred units and fifty-one percent of the common units.

23  Management's consideration vests over time and requires a

24  management to be employed in order to receive that

25  consideration.

1          The preferred units have an aggregate liquidation

2     preference of 875 million dollars.  And subject to approval

3     today, the transaction is expected to close the first quarter

4     of 2009.

5          The agreement includes customary termination rights

6     which really boil down to closing of the transaction has to

7     occur prior to June 30th, 2009 and the sale order needs to be

8     entered prior to January 31st, 2009.  There's no other party

9     consents or client consents required.

10          The board of the new company following this

11     consummation will consist of seven managers, two managers

12     appointed by LBHI, four managers appointed by management, two

13     of which must be independent, and George Walker, the current

14     global head of investment management for Lehman Brothers.  If

15     dividends aren't paid on the preferred, then the preferred

16     holders have the right to nominate additional directors.

17          The structure of this transaction is intended to

18     permit the distribution of the preferred units and the common

19     units that LBHI and its subsidiaries receive to creditors of

20     LBHI and creditors of the subsidiaries pursuant to a plan of

21     reorganization.  So, during the Chapter 11 case, LBHI and its

22     subsidiaries will hold the preferred stock and common units and

23     then will ultimately distribute it out to its creditors.

24          Your Honor, in the courtroom today is Mr. Ridings.

25     With the Court's permission, I would offer to proffer his

80

1    testimony regarding the debtors' participation in the diligence

2    and auction process and also why the debtors determined that

3    this bid was the best and highest bid.

4         THE COURT:  Is there any objection to the offer of a

5    proffer of Mr. Ridings' direct testimony?  There's no objection

6    so you can proceed by means of a proffer.

7         MS. FIFE:  Thank you, Your Honor.  Mr. Ridings'

8    educational and professional background and Lazard's

9    involvement in the sale process are also set forth in the

10   record on October 16th so I'm not going to repeat them here.

11        If Mr. Ridings was called to testify in support of

12   this sale motion, his direct testimony would be as follows:

13   Mr. Ridings would testify that after the bid procedures were

14   approved, Lazard began a comprehensive marketing process.

15   Lazard contacted eighty parties consisting of forty-three

16   potential strategic and thirty-seven potential financial

17   buyers.  Thirty-nine of the potential buyers requested an

18   initial diligence package which included an NDA bid procedures

19   letter, bid procedures order and a copy of the stalking horse

20   purchase agreement.  Ten parties signed NDAs and were given

21   access to a data room and also the ability to meet with

22   management.  Several groups had diligence meetings with

23   management.  Fifteen Lazard professionals were involved in this

24   process including nine managing directors who assisted in

25   soliciting potential buyers.  Mr. Ridings would testify,

1    however, that a total of three qualified bids were received in

2    accordance with the bid procedures order:  the stalking horse

3    bid, the bid NBSH Acquisition LLC and a bid by Crossmark

4    Investment Company L.P.

5         Mr. Ridings worked very closely with Alvarez and

6    Marsal and with the professionals of the creditors' committee

7    to review the bids.  He would testify that Lazard assessed a

8    deteriorating value of the stalking horse due to the declines

9    in the S&P 500 and related purchase price adjustments and the

10   uncertainties surrounding the stalking horse obligation to

11   close a transaction given various significant closing

12   conditions.

13        Mr. Ridings would also testify that Lazard spent

14   significant time and resources negotiating the terms of the

15   management bid on behalf of the estate.  Lazard participated in

16   a series of meetings and calls in the weeks leading up to the

17   December 3rd auction including over the Thanksgiving holiday.

18   Lazard held discussions with the management team and with

19   portfolio managers.  Mr. Ridings would testify that the

20   debtors' estate and management team negotiated at arm's length

21   and in good faith.  The management team was represented by

22   separate counsel.

23        The purchase agreement represents the result of a

24   competitive purchasing process and extensive negotiation.  Mr.

25   Ridings would testify that the cross-market bid was only for

82

1    the private equity funds managed by Lehman Brothers Private

2    Equity Fund Management LP.  The consideration for the bid was

3    sixty million dollars in cash and 105 million in assumed

4    contingent liabilities.  He would testify that neither the

5    stalking horse nor the management team would agree to separate

6    out these assets from their bid.  Mr. Ridings would testify

7    that Crossmark proposed an alternative bid at the auction.

8    After several hours of discussion, however, that bid was deemed

9    not competitive by virtue of being extremely difficult to

10   structurally implement.  And also Mr. Ridings would testify

11   that the value of the stalking horse bid and the management bid

12   were higher and better than the Crossmark bid.

13        Mr. Ridings would testify that the debtors estimated

14   the stalking horse bid to be worth approximately 745 million

15   dollars to the estate.  This assumed that the stalking horse

16   actually closed the transaction.  The purchase by its

17   adjustments to that offer were primarily, as I said, the S&P

18   adjustment and also an adjustment that lowered the price of the

19   bid in proportion to the run rate revenue which had declined

20   given the market conditions.

21        Additionally, the stalking horse had the ability to

22   withdraw its bid under a number of circumstances.  Mr. Ridings

23   would testify that at the auction the estate determined the

24   management there to be worth at least 922 million dollars to

25   the estate and, therefore, at least 176 million higher than the

83

1    stalking horse bid.  Accordingly, the management bid was

2    determined to be the starting bid even after taking account of

3    the breakup fee and expense reimbursement that would have to be

4    paid by the estate in the event we took another bid.

5         The valuation that Lazard did was determined by

6    utilizing current projected normalized EBITDA of 152 million

7    dollars assuming operational restructuring and a normalized 8.6

8    times multiple.  The estate receives 814 million dollars face

9    value preferred equity plus forty-nine percent of the implied

10   common equity value equal to 212 million dollars less the

11   breakup fee of fifty-two million dollars and expense

12   reimbursement of thirteen million.  Plus, the management bid

13   provides the estate with the upside in the form of the retained

14   forty-nine percent equity interest.  The stalking horse bid

15   would have meant selling the entire IMD business at valuations

16   which were extremely low given the market conditions.

17        At the auction date alone, the value of the S&P had

18   fallen twenty-nine percent since the stalking horse bid was

19   signed, and forty-six percent off the peak in October 2008.

20   Current value of the S&P 500 is the lowest it's been since the

21   dot.com bubble in 2002.

22        An index of comparable investment management

23   companies were looked at by Lazard and compared the trading

24   values.  Current trading values are at their lowest level in

25   the last ten years.  This compares to the last twelve month

84

1    average valuation of 8.6 times a five year average valuation of

2    11.2 times, and a ten-year average valuation of 10.5.

3              Additionally, since 2002, comparable investment

4    management companies have been sold at an average purchase

5    price of 13.6 last twelve months EBITDA in change of control

6    transactions.  So it was determined that the stalking horse bid

7    was at the lowest possible, and management bid was higher.

8              During the auction the stalking horse, Bain and

9    Hellman & Friedman were given the opportunity of overbid.  We

10   met with them and they determined that not to provide an

11   additional bid, Your Honor.

12             Mr. Ridings would also testify that the management

13   bid was also deemed to be better in qualitative terms,

14   including the certainty of price and consummation in the market

15   of an unprecedented volatility.  There's no downward purchase

16   price adjustment in the management bid, and there are only

17   customary closing conditions.  There are no walk away rights in

18   the management deal versus walk away rights in the stalking

19   horse bid.

20             And, importantly, the management bid does not require

21   additional bankruptcy filings, whereas the stalking horse bid

22   would have required LBHI to have filed numerous subsidiaries.

23   Such filings would have further unnerved the client base and

24   led to significant withdrawals as well as portfolio manager

25   defections.

85

1        Based on the advice provided by Lazard and after

2    consultation with the creditors' committee, the debtors

3    determined in their business judgment to accept the bid of NBSH

4    Acquisition and to move forward to consummate the transaction

5    subject to the Court's approval.

6        This would be the conclusion of Mr. Ridings'

7    testimony.

8        THE COURT:  Does anyone wish to examine Mr. Ridings

9    in connection with the offer of proof just completed by

10   counsel?  Evidently not, I accept the proffer.

11       MS. FIFE:  Thank you, Your Honor.  Your Honor, the

12   debtors filed a revised proposed order to reflect the terms of

13   the new agreement and a selection of NBSH LLC as the successful

14   bidder.  We have copies available for parties that have not

15   seen them.  Since the filing of the proposed order we have

16   received certain comments and suggestions for corrections, and

17   we've made those as well.  And we have a further blackline

18   reflecting those changes.

19       There were seven limited objections filed and one

20   objection to the proposed sale.  As I said, we had discussions

21   with other parties, including Barclays and the creditors'

22   committee, and have resolved those.

23       As noted in the reply filed by the debtors, none of

24   the objections dispute the proposed sale in the reasonable

25   exercise of the debtors' business judgment, or that it's in the

86

1     best interest of the debtors and their creditors to consummate

2     the sale.  However, four of the eight objections relate to

3     executory contracts and unexpired leases.  And the time for

4     assuming and rejecting those contracts and leases.  The

5     objections point out that the debtors do not provide

6     counterparties to those contracts with notice of assumption and

7     cure amounts.  A proposed order that we filed, however, does

8     take this into account and provides that the debtors will file

9     with the Court and provide notice of assumption, assignment and

10    cure amounts to counterparties, to all purchase contracts,

11    transfer the real property leases or sublease real property

12    leases.  And that counterparties will have fifteen days notice

13    and an opportunity to object to the proposed assumption and the

14    cure amounts before the debtors assume and assign any of those

15    contracts.

16         The debtors believe that with this revision we should

17    resolve the objections filed by SunGard Creditors, Oracle USA,

18    Thomson Reuters PLC and 605 Third Avenue PLLC, although my

19    understanding is that attorneys for some of these parties are

20    here and would like to be heard, Your Honor.

21         THE COURT:  Well, we'll find out what they think

22    about whether or not what you just said satisfies them.

23         MS. FIFE:  Right.  I also just want to point out for

24    one of the parties, in particular, but it applies to everyone,

25    that the rights of all contract counterparties to reject to the

1   assumability or assignability of their contracts with the

2   debtors is also reserved such that if a party believes that its

3   contract cannot be assigned, that they can make that argument

4   after we have provided them with notice.

5          The objections filed by Benjamin Gamaron, Crossmark

6   and 220 News Owners LLC I have grouped because, in essence,

7   these creditors are creditors of nondebtor subsidiary that --

8   as to which the Court really has no jurisdiction.  As we

9   discussed on October 16th, this sale includes the sale of

10  property of the estate and also the property of nondebtor

11  subsidiaries.  These parties have claims against nondebtor

12  subsidiaries.  Benjamin Gamaron has brought a lawsuit.

13  Crossmark has a claim against some of the funds for an earn-

14  out.  And 220 News Owner has a guaranty from Neuberger Berman

15  Holdings LLC, also a nondebtor.

16         As creditors of nondebtors they really have no

17  standing here and have no rights to object to the sale.

18  However, if the entities as to which these parties have claims

19  are sold in a stock sale, then the parties will continue to

20  have a claim against the purchaser.  If those entities, as to

21  which they have a claim, are sold in asset sales, then those

22  parties will have claims against the proceeds of this sale.

23  And what we intend to do, Your Honor, is higher an independent

24  party to allocate the proceeds in each of the debtors or

25  companies or their subsidiaries that are being sold, so that we

88

1    will properly identify the amount of the value that was sold to

2    the buyer.  And we will distribute the consideration in

3    accordance with that valuation and allocation.  And the

4    agreement also provides that while the allocation will be of

5    the preferred stock and the common stock, LBHI will have the

6    right to replace that with cash, so as to satisfy any claims of

7    creditors, if necessary.  So we believe that that deals with

8    those objections.

9            Finally, the PBGC objected to the proposed sale on

10   two grounds.  The first is that we asked the Court to waive the

11   ten-day stay.  We have modified the order to put in the ten-day

12   stay because the reality is that this transaction will not

13   close for several months as we're seeking consents of the

14   customers.  PBGC also objected to the extent that the debtor

15   sought to transfer nondebtor control group members to NBSH LLC

16   free and clear of their joint and several ERISA liabilities

17   arising out of Title 4 of ERISA.  We have had discussions with

18   the PBGC and as a result we have revised the order to make it

19   clear that we are not transferring nondebtor control group

20   members free and clear of their joint and several ERISA

21   liabilities.  Nothing in the proposed order is intended to

22   prejudice the PBGC rights with respect to control group members

23   or as a general unsecured creditor against LBHI's estate.

24   They're permitted to share in the proceeds of any sale to the

25   extent they have a valid claim.

89

1          With the changes made to the proposed order and the

2     representations that I have just made, I believe that the

3     PBGC's objection has been resolved.

4          And, Your Honor, I have a blackline order that

5     demonstrates those revisions, which I hope resolves the PBGC's,

6     if I can it up to you.

7          THE COURT:  That's fine, you may approach.  Thank

8     you.

9          MS. FIFE:  With that, Your Honor, the debtors believe

10    that entry of the sale order at this time is appropriate and in

11    the best interest of the debtors, the creditors and all

12    parties-in-interest.  Unless Your Honor has any other

13    questions, I would ask that the objections be denied and the

14    sale approved.

15         THE COURT:  I'm prepared to hear from counsel for the

16    various objectors who either confirm that their objections have

17    been taken care of by the various adjustments that you've made

18    to the order, or the comments that you've made on the record.

19    Or will continue to press their objections to the extent that

20    they're not satisfied.

21         I do have one question, which is just for my own

22    curiosity.  During the hearing that took place on October 16th,

23    we spent quite a lot of time discussing the procedures

24    applicable to the transfer of customer's accounts.  To what

25    extent, if at all, did the procedures that had been adopted by

90

1    the stalking horse impact the decision of the debtor, through

2    Mr. Ridings and otherwise, to choose as between the competing

3    bids.  And to what extent does NBSH Acquisition get a benefit

4    of any sort as a result of the continuity of operations

5    associated with -- in effect having the very same investment

6    managers continuing to do what they do under, what I assume,

7    will be the same trade dress for the most part, but simply with

8    a different equity split?

9         MS. FIFE:  Well, first of all, Your Honor, as I

10   briefly mentioned, the Bain and Hellman & Friedman bid required

11   that we put many, many entities into Chapter 11, which we

12   viewed as extremely detrimental.  We had hoped that following

13   the hearing, we could provide sufficient information to Bain

14   and Hellman & Friedman to get them comfortable so that a

15   Chapter 11 case, with respect to a lot of the subsidiaries,

16   would be unnecessary, but we were unsuccessful in doing that.

17   They insisted that we file quite a number of subsidiaries which

18   we believed would have resulted in a drastic loss of value,

19   very, very significant.

20        With respect to the actual consent process, we are

21   required to go through the same consent process.  However, Bain

22   and Hellman had -- because Bain and Hellman had insisted on

23   filing these other Chapter 11 cases, it would have been

24   necessary for us to put in the letters that we sent to each of

25   the customers and in the proxy statement and the letters that

1    went out to the shareholders the possibility or probability

2    that their entities may end up in Chapter 11.  And that, in and

3    of itself, management viewed as extremely detrimental to their

4    client base and to the ongoing viability of the company.  So we

5    thought that there would be a significant deterioration in

6    value.  With management continuing, the letters that we're

7    writing to our clients and to the stockholders of the mutual

8    funds are much better phrased and termed and will give the

9    customers comfort that the managers, whom they had invested

10   money with, are continuing.  And, in particular, the portfolio

11   managers themselves are now part of the equity team.  And I

12   think that gives -- we believe that it gives a lot of comfort

13   to the customers and will help maintain the client base.

14          THE COURT:  Am I correct in concluding from your

15   comments, that at least as of this moment, customers have not

16   been solicited for their consents on behalf of the stalking

17   horse bidder, so there is no conflict in the solicitation

18   process?

19          MS. FIFE:  That's correct, Your Honor.  We really ran

20   into some issues over the disclosure that would be necessary.

21   And we've determined that we could not -- we actually couldn't

22   get it out prior to the auction.  So there is not going to be

23   any conflicting.

24          THE COURT:  So the issue that occupied so much of our

25   time and attention on October 16th turned out to be moot?

92

1          MS. FIFE:  That's correct, Your Honor.

2          THE COURT:  Okay.  Let's hear from the parties who

3     are either satisfied or dissatisfied with the consequences of

4     your adjustments.

5          MR. DOSHI:  Good afternoon, Your Honor.  Amish Doshi

6     with the firm of Day Pitney on behalf of Oracle USA Inc.  I

7     think for the most part, the additional representations by

8     counsel satisfy Oracle.  However, there are two points that I

9     wanted to just clarify.  With respect to the first, that any

10    executory contracts or unexpired leases, notwithstanding

11    anything either in the order or the unit purchase agreement,

12    are subject to the notice procedures outlined in paragraph 12,

13    I believe, of the order because there's language in different

14    parts of the order that might be deemed contradictory to

15    paragraph 11.  So if we can have that representation that

16    notwithstanding anything in the order or the unit purchase

17    agreement, any assumption and assignment of executory contracts

18    or unexpired leases with -- I only care about Oracle, but with

19    respect to any counterparties, will be subject to the notice

20    provisions outlined in Paragraph 11.

21          And, secondly, that the same applies to -- there was

22    a bid notice that was filed on December 9th identified NBSH as

23    the successful bidder.  And in that bid agreement, there were

24    certain references to the transfer of intellectual property

25    rights.  So I just want clarification that similarly any

93

1    intellectual property rights that where Oracle is a

2    counterparty are not being transferred and are subject to the

3    same notice provisions with an opportunity for Oracle to file

4    any additional pleadings upon receiving notice and all of its

5    rights are reserved with respect to those items as well.

6        THE COURT:  I think it's probably best to just

7    comment one at a time.  Is that a satisfactory arrangement from

8    the debtor's perspective, because it was a lot more specific

9    than what heard during your presentation?

10        MS. FIFE:  That's correct, Your Honor.  What we

11    propose to do is give parties to contracts with a debtor

12    fifteen days notice prior to the assumption and assignment of

13    that contract.  But to the extent that we are seeking to

14    transfer contracts and leases of nondebtors that are not

15    subject to the jurisdiction of this bankruptcy court, we will

16    comply with whatever the requirements are in that particular

17    contract or lease.  I don't see what else we can do.

18        THE COURT:  Okay.  I don't want to convert this into

19    a negotiating session in open court over the form of the order,

20    but there is a legal issue that has just been articulated that

21    applies across a number of objections.  And so, rather than

22    make Oracle the one party who's in the middle of this one, why

23    don't we just move on, Oracle can make further comments with

24    respect to what was just stated at the end.  But I have a

25    strong strength that issues as it relates to the nondebtor

94

1  counterparty part will be presented across the board here, to

2  the extent that there are affected parties.

3         MR. DOSHI:  Thank you.

4         MR. KENT:  Good afternoon, Your Honor.  Tom Kent from

5  Paul Hastings on behalf of 605 Third Avenue.  Our client is a

6  landlord with a lease to the nondebtor.  And I understand by

7  the representations made by counsel here there is no intention

8  to put this nondebtor into bankruptcy.  So we're here simply as

9  a nondebtor and as creditor to the nondebtor.  And our concern,

10  Your Honor, is --

11         THE COURT:  Ordinarily, that would be enough for me

12  to say you're excused.

13         MR. KENT:  But, Your Honor, I have tremendous

14  concerns that the form of the order that is being proposed to

15  be entered is inappropriate and potentially is binding on my

16  client.  And I'm here simply to raise my point.

17         Your Honor, on Friday afternoon, the debtor submitted

18  some changes to the form of the agreement.  And that

19  agreement -- and those changes have been set forth in our

20  papers that we filed a day later on Sunday afternoon, basically

21  sets forth the possibility that the debtor, could, in fact,

22  exclude assets or exclude liabilities of nondebtors.  And as

23  set forth in our papers, Your Honor, what we can find as a

24  landlord is that our asset is excluded from the shares of this

25  nondebtor that potentially is being sold.  That's certainly

95

1    listed on the scheduled of shares of nondebtors that are to be

2    sold.  But notwithstanding that the shares are going to be

3    sold, I believe that the changes that the debtor proposed on

4    Friday would allow assets of these nondebtors to be excluded

5    from the sale.  So we may end up somewhere, I don't know where

6    we would end up, what entity we would end up, but stripped away

7    from the assets of the nondebtor that are there now.

8              THE COURT:  Who's your client's tenant here?

9              MR. KENT:  I'm sorry?

10             THE COURT:  Who's the tenant?

11             MR. KENT:  Neuberger Berman LLC, which is a second

12   tier Neuberger Berman entity.

13             THE COURT:  And there's no dispute that Neuberger

14   Berman LLC is a nondebtor?

15             MR. KENT:  That's correct.

16             THE COURT:  And there's no dispute that Neuberger

17   Berman LLC is not on account of this transaction, at least,

18   likely to become a debtor any time soon.

19             MR. KENT:  Well, that's the representation that

20   counsel made this morning.

21             THE COURT:  What then is before me to decide as a

22   bankruptcy judge as it relates to your objection?  Your

23   counterparty is a nondebtor; you represent a nondebtor.

24   Ordinarily, somebody in your position would be talking in state

25   court not in federal court.

96

1        MR. KENT:  That's correct, Your Honor.  However, the

2   definition of assets that's included in the sale include the

3   assets of nondebtors.  There are potential transactions that

4   Your Honor is being asked to approve as part of this

5   transaction that affects nondebtors.

6        THE COURT:  Bankruptcy affects all kinds of

7   nondebtors all the time, that's not unusual.  I might add that

8   the papers that you filed on Sunday, which I read, were

9   untimely.  No special permission was asked to file papers on a

10  Sunday afternoon.  There's no provision for filing papers of

11  the sort that you filed, within hours of a commencement of a 10

12  a.m. hearing on Monday.  And, frankly, I don't understand why

13  you did it.

14       MR. KENT:  Your Honor, this was solely in response to

15  the amendment that was filed by the debtor Friday evening after

16  6:00.

17       THE COURT:  You didn't think it would be sufficient

18  for you to be able to stand up and make whatever arguments

19  you're now making, but instead to do something that's not

20  authorized by the rules or the case management order?

21       MR. KENT:  Your Honor, we tried to reply as quickly

22  as we could to --

23       THE COURT:  There's no question that you replied

24  quickly.  You replied in a manner that was prejudicial to me.

25  I ended up having to read a tremendous amount of material over

97

1    the weekend.  I thought whether or not I should read yours or

2    delete it from my computer.  I read it.  But I don't think it's

3    good practice.

4            MR. KENT:  Your Honor, I apologize if the papers were

5    improper.

6            THE COURT:  No.  What I'm saying this is in part to

7    you and in part it relates to orderly case management.  This is

8    a very large and important case, and there are a lot of people

9    who are interested in it.  But that doesn't mean that everybody

10   has the license to file papers willy-nilly.  You did and you

11   shouldn't in the future.

12           MR. KENT:  Accepted, Your Honor.

13           THE COURT:  Now, let's get to the merits.  Just

14   because there may be some consequences as between a nondebtor

15   and a nondebtor to the approval of a transaction doesn't to me

16   amount to an objection that cognizable as a matter of

17   bankruptcy law.  In what respect do I have jurisdiction to even

18   deal with what you're complaining about?

19           MR. KENT:  Your Honor, the issue is whether in

20   fact -- first of all, we don't know whether this is going to

21   occur or not, or whether there will be any transactions

22   affecting my client or not, these are all potentially set forth

23   in the amendment that was filed by the debtor Friday evening.

24   However, the form of the order that Your Honor's being asked to

25   enter has findings with respect to whether this was a

98

1    fraudulent conveyance, whether fair consideration was being

2    received, whether parties have had an opportunity to review the

3    transaction, all of which, Your Honor, I don't think should be

4    binding on any potential subsequent action that my client may

5    have in state court, any rights that my client may currently

6    have that potentially they may raise in state court, and that

7    there should be nothing in this order that should be binding

8    upon parties that are really not before you.

9         THE COURT:  Well, it's kind of definitional, isn't

10   it?  If you represent a nondebtor and your counterparty tenant

11   is a nondebtor, a bankruptcy court order should not be, at

12   least directly affecting anything that involves that

13   relationship.  There may be indirect consequences of all sorts

14   that arise out of bankruptcy court orders that affect

15   nondebtors and other, but there's not much I can do about that.

16   And I don't know what you're asking for other than a

17   clarification from the debtor that there's no intention in the

18   order that affects the relief being sought today that directly

19   impacts a transaction between your client, a nondebtor, and

20   your tenant, a nondebtor.

21        MR. KENT:  Your Honor, what I'm asking for is a

22   specific provision in this order that there's nothing in this

23   order that would be binding upon my client if, in fact, there

24   are any claims that my client may have against the nondebtor's

25   assets that are being sold pursuant to this transaction.  That

99

1   to the extent that this -- in terms of Neuberger Berman LLC is

2   a fraudulent transfer, that if certain assets of Neuberger

3   Berman LLC are being transferred as part of this sale, if

4   that's a fraudulent conveyance, my client should have the right

5   to allege and bring those causes of action.  There should be

6   nothing in the order.

7       THE COURT:  Your client has whatever rights your

8   client has.  And you're not going to get anything from me to

9   either improve or clarify those rights.  If you're able to get

10   such language or understandings from debtors' counsel, you're

11   certainly free to have that conversation.  This is not a

12   bankruptcy issue as far as I'm concerned.  You've already

13   confirmed multiple times in this colloquy that you represent a

14   nondebtor and that your counterparty is a nondebtor.  And you

15   really don't belong here.

16       I refuse to grant your client any relief based upon

17   the papers you've submitted or the argument you just made.  If

18   you wish to get clarification from the debtor you're free to do

19   that.

20       MR. KENT:  Thanks, Your Honor.

21       MS. MAZER-MARINO:  Good afternoon, Your Honor.  Jill

22   Mazer-Marino, Mayer Suozzi English & Klein for the SunGard

23   creditors.  I'm happy to report that our objection is resolved

24   by the debtors' representation on the record that the rights of

25   SunGard with respect to its contract, that is all of its rights

100

1    and claims with respect to its contracts, are reserved.  And we

2    would have the opportunity to assert those rights and claims

3    through the end of the fifteen-day window period.  And I thank

4    debtor for their cooperation.

5            THE COURT:  Fine, thank you.

6            MR. SCHWARTZ:  Your Honor, good afternoon.  James

7    Schwartz, Stempel Bennett Claman Hochberg for SLG 220 News

8    Owner LLC.

9            My position is very similar to that of Mr. Kent's.

10   The only reason -- I am a nondebtor guarantor of my client's

11   lease.  The only concern that we had was that the order that

12   Your Honor was going to enter here could somehow prejudice our

13   state law rights, whatever they may be.  But I think you've

14   clarified that already and I'm not going to press the point any

15   further.

16           THE COURT:  Fine.

17           MR. SCHWARTZ:  Thank you.

18           MR. LOBELLO:  Good afternoon, Your Honor.  Edward

19   LoBello, Blank Rome for Thompson Reuters.

20           Your Honor, we have filed a limited objection and

21   reservation of rights.  I'd like to confirm for the record what

22   Weil Gotshal indicated, that based upon the proposed order

23   that's before you and the debtor's representations in its

24   omnibus reply, and also before the Court, that our papers are

25   simply a reservation of rights to reserve our rights

101

1   accordingly and before our limited objected.

2           THE COURT:  Fine, thank you.

3           MR. HERMAN:  Good afternoon, Your Honor.  Ira Herman

4   from Thompson & Knight for the Crossmark entities.

5           Your Honor, we've had colloquy with the Weil Gotshal

6   attorneys and representative of the debtors.  I've been

7   authorized to stand down at this time as a result of

8   discussions.

9           THE COURT:  Fine.

10          MR. SHERIDAN:  Good afternoon, Tom Sheridan from

11  Hanley Conroy on behalf of Benjamin Gamoran.

12          And as my colleagues -- based on the representations

13  that have been made and the rulings that Your Honor indicated

14  on the record, we withdraw that objection.

15          THE COURT:  Thank you.  Is there anyone else who

16  wishes to be heard on this point?

17          MS. THOMAS:  Good afternoon, Your Honor.  Stephanie

18  Thomas on behalf of the Pension Benefit Guaranty Corporation.

19  Based on the changes to the sale order the representations in

20  the omnibus objection and made here today, we also withdraw our

21  objection to the sale order.

22          THE COURT:  Thank you.  Now let me ask Oracle if

23  Oracle wishes to say anything more, or if you're now satisfied.

24          MR. KENT:  I'm satisfied with --

25          THE COURT:  You may not be, I don't know.

102

1          MR. KENT:  I'm satisfied with respect to the

2    contracts with the debtor and the notice and the reservation of

3    rights.  However, I'm a little troubled by the statement made

4    with respect to nondebtor entities and any contracts that the

5    debtors herein are seeking to assume and assign contracts that

6    nondebtors may have with Oracle.

7          THE COURT:  That can't happen.

8          MR. KENT:  And that's exactly the point.  If that's

9    the representation, then I think we're fine.  Thank you.

10          THE COURT:  It's just a basic principle of bankruptcy

11    law.  I can't do it.

12          MR. KENT:  Thank you.

13          MS. FIFE:  Just very quickly, Your Honor, about the

14    same thing.  We're not seeking to assume and assign any

15    contracts with nondebtors because it's not appropriate and you

16    don't have jurisdiction over that.

17          If we choose to assign a contract, as I said before,

18    we'll comply with whatever requirements are in that particular

19    contract.  And right now we have no present intention to file

20    any other companies.  So I just want you to understand that.

21          THE COURT:  Okay.

22          MS. FIFE:  Thank you.

23          THE COURT:  Is there anything more?

24          Based upon the record that has been presented, the

25    argument of counsel, the withdrawal of various objections or

1    the overruling of objections, I am satisfied that the debtor

2    has demonstrated cause for approval of the sale of its

3    investment management division, which is being sold to NBSH

4    Acquisition, the highest bidder at a duly noticed auction which

5    was conducted in accordance with the Court approved bidding

6    procedures.  The transaction, as represented, represents the

7    highest and best value for the assets that are being sold, and

8    represents what appears to the Court to be a creative means to

9    preserve the potential for the debtor to realize higher value

10   in the future at a time when market conditions may be

11   materially more favorable than they are today.

12        Under the circumstances I'm prepared to enter the

13   order in the form that it has been submitted, with a proviso

14   that to the extent that there are parties that have expressed

15   concerns, reservations and objections with regard to the form

16   of the order, that they at least be afforded an opportunity to

17   review the order as it has been revised.  And to the extent

18   there are some language adjustments that may make the order a

19   more comforting document than it is today, and are not

20   objectionable to the debtor, that the debtor at least give some

21   consideration to those comments.  With that, the transaction's

22   approved.

23        MS. FIFE:  Thank you, Your Honor.  And we will

24   provide copies of the order to everybody.

25        And, in addition, Your Honor, we have orders and

104

1    disks for the uncontested matters, which we'll take care of

2    shortly.  One of them needs to get entered today, if possible.

3              THE COURT:  We'll try to enter all the orders today.

4              MS. FIFE:  Thank you, Your Honor.  I appreciate it.

5              THE COURT:  Now, in terms of the agenda, we had one

6    deferred matter, OMX.

7              MR. FLECK:  Your Honor, Evan Fleck of Milbank Tweed

8    on behalf of the committee.  Unfortunately, in light of the

9    other matters the Court has been dealing with, we hadn't all

10   had an opportunity to discuss whether a consensual resolution

11   is appropriate even among the parties.  We would request, if

12   the Court pleases, to have a brief recess so that we can all

13   confer.

14             THE COURT:  Here's my suggestion.  It's now after 1

15   p.m. and this is an omnibus day, not an omnibus morning, so we

16   can certainly return at 2:30, which would give everybody

17   hopefully time to get some lunch and to perhaps also confer.

18   This is a matter which is somewhat parochial in that it

19   involves particular parties.  And so unless there are people

20   who are very interested in knowing the outcome, no one else

21   needs to come back, but all are welcome.

22             So we're adjourned until 2:30.

23             (Recess from 1:08 p.m. until 3:01 p.m.)

24             THE COURT:  Please be seated.  First of all, let me

25   apologize for the delay, I was dealing with an emergency that

105

1   was unexpected.  What's going on?

2            MR. JURELLER:  Good afternoon, Your Honor.  John

3   Jureller from Klestadt & Winters on behalf of OMX Timber

4   Finance Investment II LLC, I'll just refer to as OMX Timber, if

5   you don't mind.

6            I do apologize early on for the confusion, parties

7   did think up they came up with a good resolution --

8            THE COURT:  It may be, I just don't understand it.

9            MR. JURELLER:  I think at this point, after

10  discussing it further, that we're just going to proceed forward

11  with the motion.

12           THE COURT:  Okay.  So the result of what I said is

13  that instead of having a settlement you have a bloodbath.

14           MR. JURELLER:  Well, we'll see if that's the case or

15  not.  I think, basically, again, we've reached the agreement

16  five minutes before you got back on the bench the second time,

17  so that's why there was no prior notice to you about the

18  proposed stipulation.  But we had an understanding that was

19  merely a claims issue whether or not this was deemed a valid

20  claim or not a valid claim, and that's why we were going to

21  push it off until the claims process.  But I think after

22  discussing it we're willing to go forward at this time and

23  argue the relief from stay motion.

24           THE COURT:  Well, I think it's uncharacteristic for

25  the Court to be in the spot of unsettling something that's

106

1    already been settled.  Is everybody comfortable that the right

2    procedure for this aspect of the case right now is to have it

3    head now?  Because I'm certainly prepared to hear it.

4         MR. FLECK:  Your Honor, Evan Fleck of Milbank on

5    behalf of the committee.

6         We are, Your Honor, prepared to go forward.  We also

7    thought that a settlement, albeit a temporary settlement, was

8    acceptable to -- as Your Honor said, it did push the can down

9    the road a little bit.  But we've also said we were comfortable

10   going forward, I think the debtors are comfortable going

11   forward at this point.  And it's OMX's motion.  And I think

12   based upon the relief that they seek, it's appropriate and

13   we're certainly comfortable doing that on behalf of the

14   committee.

15        THE COURT:  Fine, let's go forward then.

16        MR. JURELLER:  As I said, Your Honor, John Jureller

17   from Klestadt & Winters on behalf of OMX Timber.  Also present

18   is Mark Deveno, who represents Wells Fargo, who is the

19   indentured trustee.  This note was securitized.

20        I could go through the details, the facts, if you'd

21   like, but they were set forth in the papers.  Essentially, this

22   is a motion for relief from the automatic stay under 362(d) for

23   the limited purpose of issuing a demand notice to Lehman

24   Brothers Holdings pursuant to the terms of the guarantee.  This

25   motion does not seek to deem the claim allowed, this motion

107

1   does not seek to compel payment.  Basically, the motion is to

2   reserve rights of OMX Timer under the guarantee and pursuant to

3   its terms.

4          THE COURT:  Let me ask you a question.

5          MR. JURELLER:  Sure.

6          THE COURT:  As a matter of law, if hypothetically, I

7   don't grant your motion, do you have a claim?

8          MR. JURELLER:  I believe that we do, Your Honor.  And

9   as part of the presentation I was going to set forth that.  But

10  if the Court were to look to In re Texaco, which was cited by

11  the committee as joined by the debtor, as well as the other

12  case that was cited, essentially what the Court stated, and

13  I'll actually read it, because I think it's very instructive

14  here, and really kind of shows the precautionary nature of this

15  motion.  We believe that we need to make this motion in order

16  to comply with the terms.  However, at the end of the day if

17  the relief is not granted, I believe that the claim is still in

18  place.

19         In Texaco, what they stated was "the debtor should

20  not be permitted to use the automatic stay and argue that a

21  formal notice of acceleration is a condition proceeded to the

22  noteholder's right to claim the higher interest rate."

23         Essentially in that case, what they said was that you

24  couldn't not lift the automatic stay but then hold the claimant

25  to that in not being able to assert the claim themselves.  So

1    that's what we sort of see as this case here.  And I think it's

2    actually dead-on with the In re Texaco matter.

3              As I go forward I'll differentiate those two cases.

4    But I think actually the cases cited by the committee actually

5    support the motion rather than go against the motion.

6              Essentially, Your Honor, it's admitted that

7    submission cause exists for this limited modification of the

8    automatic stay.  Of all the Sonnax factors I believe the

9    balancing of the harm factor is really the only one that

10   applies here.

11             THE COURT:  That's the one I'm most concerned with.

12             MR. JURELLER:  Sure.  Under the terms of the

13   contract, OMX Timber must serve a demand notice within sixty

14   days of the interest payment default, which is the trigger

15   event for this particular motion.  There was an interest

16   payment default on October 29, 2008 which was post-petition.

17   Arguably, in order to comply with the terms OMX Timber will

18   have to serve this demand notice by December 27th of this year

19   in order to comply with its terms.  Again, taking into

20   consideration the fact that the relief is not granted we

21   believe we still have a claim.

22             It's our position that there's no harm to the debtors

23   in this case because we're not seeking to compel payment, we're

24   not seeking to deem the claim allowed, that process will happen

25   down the road.  Basically, all we're trying to do is preserve

109

1    the rights that were contracted for in the both, the

2    installment note and the guarantee itself.

3            The committee as joined by the debtor essentially

4    attempts to cloud the issues here.  Generally speaking, they

5    have I think four arguments that are set forth in the papers.

6    The first argument is the demand notice creates an obligation

7    in and of itself, and without it there is no claim.  However,

8    the obligation is a pre-petition obligation that became ripe as

9    a result of the default, not of the debtor, not as a result of

10   the bankruptcy of the debtor, but as a result of the default of

11   the counterparty under the installment note.  This is

12   essentially a timing issue.  The parties contracted to

13   basically a statute of limitations within their installment

14   note and within their guarantee.

15           The second argument that's set forth by the committee

16   is the argument that the automatic stay was not contemplated by

17   the guarantee.  And I think they really spent a lot of time on

18   that saying that these are sophisticated parties, that they

19   should have contemplated this bankruptcy and automatic stay.

20   And, therefore, because the bankruptcy was filed, the guarantee

21   is automatically terminated.  Now, I don't think that basically

22   has any basis in law or in fact.  In fact, what I think the

23   debtor is attempting to do and what the committee is attempting

24   to do here is to use the automatic stay as a sword rather than

25   a shield.  And essentially --

110

1          THE COURT:  I think you can make that

2     characterization if you like.  But I think what I'm reading

3     into their papers is that sophisticated parties are able to

4     rather easily avoid the problem by not providing for a notice

5     period and in sophisticated business transactions bankruptcy

6     planning is a natural part of what business lawyers think about

7     and pay attention to.  And since bankruptcy planning appears

8     not to have been part of the thinking in connection with this

9     transaction, you should, in affect, be stuck with the

10    consequences.  That's my reading of what they've said.

11         MR. JURELLER:  Well, on the opposite side of that, if

12    they were sophisticated parties and bankruptcy was

13    contemplated, then they could have easily put into the

14    agreement that upon the filing of a bankruptcy of the

15    guarantor, the guarantee is being terminated.  And that wasn't

16    in the agreement either.

17         THE COURT:  Do you happen to have any knowledge or

18    information as you stand here as to the reason for the various

19    notice periods that were set forth here and why notice wasn't

20    waived, and what the purpose notice was to serve in the

21    transaction?

22         MR. JURELLER:  I do not, Your Honor.  Maybe Mr.

23    Deveno on behalf of the trust could shed some light on that.

24         THE COURT:  If he can, that's fine.  I'm just

25    interested in knowing why this transaction was structured so

1   awkwardly.

2          MR. JURELLER:  I really don't know, to tell you the

3   truth.  I mean, it was a transaction that was put together five

4   years ago.  Whether or not anybody ever thought that Lehman

5   Brothers would ever file bankruptcy or Wachovia, which is

6   another of the guarantors, would ever file bankruptcy, it

7   probably never crossed their mind, to tell you the truth.  But

8   I'm just speculating, I do not know the actual reason for that.

9   And I will defer counsel, if he does know, although I'm not

10  sure that he does.

11         The third argument that the committee has set forth

12  is that a balancing of the harms actually weighs in favor of

13  the debtor.  And the sole reason that they set forth for that

14  argument is that allowing this claim to go forward will

15  increase the claims pool.  However, in and of itself,

16  increasing the claims pool should not be deemed a reason or a

17  factor for not allowing this claim to go forward or allowing

18  this contractual right to be provided for.

19         And, lastly, the debtor has cited what it deems the

20  regular case law, which is two cases.  In re Texaco which we've

21  just discussed, and In re Metro Square.  In both cases, the

22  claimants were attempting to better the position solely based

23  upon the bankruptcy filing of the debtor.  And that's not the

24  case here.  In fact, OMX Timber is not seeking to better its

25  position at all, it's seeking merely to reserve its substantive

112

1    right that it contracted for in its guarantee and in the

2    installment note.  In re Texaco, just to go into not all the

3    details, but just very briefly, sought to accelerate the note

4    to avoid a reduction of the interest rate.  Post-petition the

5    interest rate was going to be reduced from thirteen percent

6    down to seven percent.  The Court had previously permitted a

7    modification of the stay to allow the noteholders to serve a

8    notice of default upon the debtor to preserve their rights.

9    What the Court did not do, though, was to give them that next

10   step to try to better their position and allow for the higher

11   interest rate.  However, what the Court did say is that they

12   could file the claim for the higher interest rate and that

13   would be  a claims objection issue.

14           In re Metro Square the claimant sought to accelerate,

15   to assert a claim against the nondebtor guarantors.  The Court

16   allowed the claimants to file a claim in the full amount.  Just

17   not to use the ipso facto clause to accelerate the debtor to go

18   after the guarantors.  And what the emphasis of that decision

19   was, actually, was that the Court found that the guarantors

20   were vital to the bankruptcy itself because they were the

21   principals of the debtor and that they were going to be

22   providing funding for the reorganization of the debtor.  That

23   was really the basis behind the decision, it had nothing to do

24   with the notice -- whether or not the notice -- the stay could

25   be lifted before the notice.

113

1          As I said, OMX is not seeking to better its position,

2     it's merely seeking to maintain its substantive rights that it

3     contracted for.

4          THE COURT:  Let me ask you this.

5          MR. JURELLER:  Sure.

6          THE COURT:  Since I think everyone recognizes that

7     what we're most focused on for purposes of stay relief is the

8     balance of harms.  What harm does OMX suffer if this motion is

9     denied, since you earlier stated that this is not a critical

10    element in your ability to press your claim?

11         MR. JURELLER:  Well, I think that the harm, Your

12    Honor, is that this is a contractual provision for filing the

13    demand notice within sixty days.  And the harm is that down the

14    road, although we believe the case law supports the filing of

15    the proof of claim, whether or not the stay is lifted, that it

16    could raise questions as to the proof of claim that will be

17    filed.  And this is one instance where a demand notice needs to

18    be served, this is the interest payment default.  There will be

19    other defaults that will be coming in down the road.  There's

20    an interest and principal payment default, which is based upon

21    the other defaults.  There are other defaults that could happen

22    within six months, as interest payments are paid every six

23    months.  So the harm to OMX Timber is that this could create an

24    issue down the road that they were not permitted to follow the

25    contract obligation and could raise a question as to a claim

114

1    which, obviously, is very substantial, 817,500,000 dollar

2    claim, not including accrued interest at this point.  So that's

3    the harm at this point.

4         On the other side, the harm to the debtor, we don't

5    see a harm to the debtor, to tell you the truth.  It's going to

6    be a claim against the estate.  We're not fighting over the

7    claim right now, we're not deeming it allowed, we're not asking

8    for payment.  It's going to be a claim in the regular course of

9    the claims process, just as other people had filed a claim

10   against the estate.  This is just a contractual obligation that

11   we need to meet in order to get there, to not have questions

12   down the road.

13        THE COURT:  Well, it seems to me that you're arguing

14   about harm which is, in affect, equal on both sides of the

15   scale, because either giving your argument it due, your client

16   suffers the harm of being exposed to a defense to the claim or

17   the debtor suffers the harm of losing a defense to the claim.

18   As you say, isn't it in affect the same issue being put on a

19   scale equally?  Because you're talking about not your right to

20   payment which you assert continues regardless of the outcome,

21   you're talking about posturing for purposes of claims

22   litigation at some future date in the case.

23        MR. JURELLER:  Our argument is that notwithstanding

24   the motion today, that the OMX Timber will have the right to

25   file its proof of claim.  And that this is a precautionary

115

1    motion.  There's more of a harm to OMX Timber if it is

2    deemed -- because down the road there could be a question as to

3    whether or not they met a contractual obligation, which the

4    debtor does not have.  The debtors' only argument at this point

5    is whether the claim is for the amount that it's being filed

6    as.

7         THE COURT:  Okay.  The position you're now advancing

8    is somewhat different from the position which was set forth in

9    your papers, I think.

10        MR. JURELLER:  In which way, Your Honor?

11        THE COURT:  Paragraph 12 argues "cause exists to lift

12   the automatic stay because it is necessary for OMX Timber to

13   preserve its right to collect under the guarantee.  In order to

14   hold" -- I skipped a sentence.  "In order to hold LBHI liable

15   on the guarantee OMX Timber II must issue a demand notice by

16   December 27, 2008."  Is it your position, and I don't mean to

17   put you in a position where you're arguing something against

18   something you may have to argue later if I were to deny the

19   rely you seek, but in terms of the balance of the harm

20   equation, is it your position that you may be unable to assert

21   your claim at all if this relief is not granted?

22        MR. JURELLER:  That's not our position.  Our position

23   is a precautionary motion.  Our position based upon the case

24   law is that we feel comfortable with the argument that we'll be

25   able to file the claim notwithstanding the decision on the

116

1    motion.

2         THE COURT:  You'll be filing the claim knowing that

3    it will almost immediately fetch a claim objection that there

4    was a failure on your part to fulfill conditions precedent.

5         MR. JURELLER:  Again, I think this is more --

6         THE COURT:  Is that right?

7         MR. JURELLER:  I'm not backtracking on what I'm

8    saying.  I'm saying this is the motion why we want to file it,

9    why we want to serve the demand notice, because we want to meet

10   those contractual obligations.  But if we were to, again, not

11   be successful on the motion, we believe we may still have

12   rights.  But, again, the word is may still have rights to file

13   the claim.  But certainly there will be arguments out there by

14   the committee or by the debtor that they -- that the claim was

15   not filed properly because we did not meet the contractual

16   obligations, notwithstanding, the In re Texaco case law.

17        So its almost a two-partner.  We want to file the

18   notice to meet our contractual obligations, so we avoid that

19   issue down the road.  Because if we do that, there's not going

20   to be an issue as to whether we met our contractual

21   obligations.  However, if the list stay is not granted, we'll

22   be filing our proof of claim.  Now we will be subject to a

23   fight because there may be a question down the road as to

24   whether or not we had the ability to file a proof of claim,

25   notwithstanding the fact that we didn't serve the demand

117

1    notice.  So I think it's a two-part --

2        THE COURT:  What is the purpose served by the filing

3    of the demand notice?  Transactionally why is it a necessary

4    prerequisite.

5        MR. JURELLER:  I'm going to let Mr. Deveno address

6    that a little bit, but there's other people that are -- other

7    parties that are involved with respect to this transaction.  My

8    understanding of it, and not being privy to the drafting of the

9    whole agreement but reading it, is that OMX Timber needs to

10   file its demand notice within sixty days of the interest rate

11   default.  Then there's a next step where if Lehman Brothers

12   does not make payment, I believe then OMX can now go back after

13   the principal, which is Boise II, we refer to it is.  But in

14   order to get that next step there has to be a proper demand

15   made on Lehman Brothers.  So it's almost like a tiered-type

16   demand that has to be done here.  That's my understanding of

17   it.  And I'll let Mr. Deveno speak a little bit to that.

18       THE COURT:  Okay.  I'll wait to hear more then.

19       MR. JURELLER:  Thank you, Your Honor.

20       THE COURT:  Thank you.  Why don't I hear more from

21   that side of the table, unless you have comments for the

22   committee now.

23       MR. FLECK:  If I may, Your Honor, on behalf of the

24   committee -- Mr. Deveno, I'm not sure if he's going to be

25   speaking as a witness here, he's counsel to the bond trustee,

118

1    not the movant here.

2          THE COURT:  I understand.  I think he's simply

3    standing up to answer a question that --

4          MR. FLECK:  Very well.

5          THE COURT:  -- was pending moments ago.  You're not

6    here to argue but to tell me more about why notice is a

7    required feature of this transaction.

8          MR. DEVENO:  Correct.  Good afternoon, Your Honor.

9    Just for the record, Mark Deveno, Bingham McCutchen on behalf

10   of Wells Fargo as indentured trustee.  In our case, I suppose,

11   we are not a movant or actually a joinder in the motion.  But I

12   think in part because as Mr. Jureller indicated, I think we

13   generally view the motion as protective or somewhat surprised

14   by the objection.  I can walk the Court through a little bit of

15   our thought process on that.  But let me start with -- you

16   always asked a couple of questions of Mr. Jureller related to

17   whether the claim existed without the notice, and related to

18   the intent of the notice and demand provisions.

19         Is there a particular place you'd like me to start,

20   Your Honor, perhaps at one of those questions before --

21         THE COURT:  My focus on this if you know is what

22   purpose is served by the notice provision within the structure

23   of this transaction?  My most naive question is why would

24   anybody put such a provision in a transaction like this?  And

25   if it was being put into the transaction, why wasn't there some

119

1    provision made for what happens in the event that one important

2    party happens to be in bankruptcy.  Because even if the Lehman

3    bankruptcy was not contemplated it certainly was the kid of

4    risk that parties do think about in situations like this.

5          MR. DEVENO:  Sure.  It's a fair question.  And I have

6    to confess, Your Honor, I can't speak from personal knowledge

7    of the issue, I can only speak from a review of the documents

8    having become indentured trustee counsel in the last -- I'm not

9    sure how long it is, let's say few months.  But there -- I

10   think something that may not have come out in the presentation

11   and the materials filed with the Court is the complexity of the

12   overall scope of the transaction, and the fact that there are

13   any number of parties, call it four or five different types of

14   constituents that are all -- you know, have moving parts with

15   sales of assets running one way, installment notes running

16   another, a Lehman credit support to one party and a guarantee

17   to another.  And it's a fairly complex transaction, Your Honor.

18   I think the relevant concept of notice and demand relate to the

19   fact that there are so many parties involved in this complex

20   structure.  And just as a for instance, and it even goes to the

21   point of harm, Your Honor, and harm to OMX, is the relevant

22   installment note that's attached to the motion is the

23   installment note provided by Boise Land to OMX guaranteed by

24   Lehman, that's what the guarantee relates to.  That installment

25   note actually has a provision that it cannot be accelerated

120

1    absent the -- you know, absent making demand on the guarantee.

2    And I think the parties came up with a complex arrangement that

3    reflected the order in which things should happen.  I suspect

4    that's part of the reason for the demand and the notice-type

5    structure.  And it is a guess on my part based on the

6    documents.  But it does go to harm, Your Honor, in the sense

7    that we have a third party out there, a nondebtor unrelated to

8    Lehman whose rights -- you know, OMX is somewhat prejudiced

9    against if they have to sit on their hands during the

10   bankruptcy case and not provide the relevant demand.

11        THE COURT:  Sorry, how are they prejudiced?

12        MR. DEVENO:  In the sense that they are prevented

13   under the relevant terms of the contract, the installment note

14   that was attached to the motion, has a provision that provides

15   that OMX cannot pursue its rights to accelerate against Boise

16   Land and pursue its rights against Boise Land, this nondebtor,

17   until it's made the demand on Lehman.  It's a complex

18   transaction.

19        THE COURT:  Okay.  I hear you.  But isn't that just

20   another example of a complex transaction in which the parties

21   failed to contemplate this eventuality?

22        MR. DEVENO:  Actually, I don't know that that's the

23   case, Your Honor.

24        THE COURT:  Was it contemplated?

25        MR. DEVENO:  I think in a manner of speaking it is.

121

1    One of the interesting things here -- and if I can approach, I

2    actually have a copy of the perspectus that went with the

3    indenture which --

4           THE COURT:  I don't really want to see that now.

5           MR. DEVENO:  And which happens to be underwritten by

6    Lehman and talk about what happens in the even of a Lehman

7    bankruptcy.

8           THE COURT:  I'd be happy to take it, I'm not going to

9    look at it while you're arguing, I'll just hear what you have

10   to say.

11          MR. DEVENO:  Sure.  It's a very short bit of language

12   I was hoping to read to the Court, if there's no objection.

13          THE COURT:  Is this a surprise to the Lehman camp?

14          MR. FLECK:  Yes, Your Honor, we don't have a copy of

15   this document.

16          THE COURT:  I'm not going to look at it if they don't

17   have a copy.

18          MR. DEVENO:  Okay.  I suspect then, Your Honor, you

19   don't want me to read language into the record at this moment

20   as to --

21          THE COURT:  No.  I'm interested in knowing whether or

22   not bankruptcy was, in fact, a contemplated aspect of the

23   structuring of the transaction.  That was a question, and if

24   you can answer that it's fine.

25          MR. DEVENO:  Sure.  Sure.  Then rather than handing

122

1    it up, let me just give it a little color.  Again, remembering

2    this is a complex transaction, various components, including

3    the indenture, as part of the transaction, the indenture was

4    underwritten by Lehman.  And one particular provision of the

5    prospectus relates to the insolvency or financial distress

6    of -- I should pause for a moment just to highlight that

7    there's really two different sets of OMX transactions.  One

8    that involved Wachovia, one that involved Lehman.  They're two

9    separate transactions structured the same, so if you hear me

10   read Wachovia, that's the explanation for it.

11        The section was titled "the insolvency or financial

12   distress of Wachovia or Lehman Brothers could reduce the

13   likelihood of repayment of the applicable offered notes."  And

14   if I go on to read it it says "the only practical remedy

15   available to the indentured trustee upon a default under an

16   installment note is a demand for payment on the applicable

17   guarantee.  The insolvency of Lehman Brothers or any of its

18   subsidiaries or certain financial distress with respect to

19   Lehman Brothers or any of its subsidiaries, could limit Lehman

20   Brothers' ability to perform under the term of the Leman

21   Brothers guarantee.  Such inability to pay under the Lehman

22   Brothers guarantee would reduce the likelihood of repayment of

23   the Class A2 installment note.  And consequently reduce the

24   likelihood of repayment under the Class A2 notes."

25        I think all focused on inability to pay, not a

123

1    concept that the guarantee, itself, somehow became ineffective

2    at the time that a bankruptcy was filed.  And nowhere in that

3    prospectus to my knowledge, Your Honor, is some indication that

4    Lehman Brothers' view was that the guarantee would be coming

5    affective.

6         THE COURT:  It seems to me that it's a risk factor

7    that wasn't fully flushed out.

8         MR. DEVENO:  Well, if I could.  You know, one thing

9    that struck me interesting watching the argument -- and, again,

10   we didn't join the motion because I think we view this as

11   somewhat perfunctory in the sense that --

12        THE COURT:  It's not.  Let me assure you this is not

13   perfunctory.

14        MR. DEVENO:  I understand, Your Honor.  But part of

15   the rationale on that was if the stay motion is I guess denied

16   today, I suspect what OMX will do is not necessarily file it's

17   full proof of claim, I suspect that may shape up over time.  I

18   think if I were in OMX's position I would probably file a proof

19   of claim which attaches the relevant guarantee demand form.  I

20   might later amend it when I have another guarantee demand or

21   otherwise.  But if I look at the technical read of the

22   document, the provision that the -- of the guarantee, I'm

23   sorry.  The provision that the committee focuses, Your Honor,

24   or focuses on, Your Honor, is one sentence that really

25   basically requires that the guarantee demand be made within a

124

1    certain time.  And they try to argue that this means that, you

2    know, with sophisticated parties, aware of automatic stays,

3    they must have known that you couldn't give a demand during a

4    bankruptcy so the guarantee must have been ineffective during a

5    bankruptcy.  I think I contend, Your Honor, that all that OMX

6    needs to do is file a proof of claim attaching that guarantee

7    demand.  And the argue would run as follows:  The only

8    technical requirement of the document is that the guarantee

9    demand be delivered, just to their point that there's no --

10   that these are sophisticated parties.  There's no provision of

11   the guarantee that says the guarantee becomes ineffective, it

12   only requires that the guarantee demand be delivered.  And I

13   think it would be delivered by the proof of claim.  I suspect

14   that proof of claim would later be amended for the next demand,

15   etcetera.  I think that OMX could meet its obligations pretty

16   easily.  And perhaps that's what the parties considered when

17   they structured this.

18         THE COURT:  Well, if that's true then there's no

19   harm.

20         MR. DEVENO:  Well --

21         THE COURT:  If you're right there's no harm.

22         MR. DEVENO:  Yeah.  I mean, I think that's a fair

23   interpretation.  The harm, of course, is the fact that the

24   objection was brought.  And the fact that we're apparently

25   facing an argument that that proof of claim, or otherwise,

125

1    might be ineffective to serve this demand notice.  And I think

2    that's probably why OMX has brought this kind of protective

3    pleading, just to make sure that they don't get tripped up on a

4    technicality.

5         THE COURT:  Okay.  Well, the underlying theme that

6    concerns me, and either you can comment on or others can, is

7    whether this is the motion that you describe as perfunctory and

8    I tell you is not, or whether or not this is an effort to cure

9    a structural defect in the underlying documents, or whether or

10   not this is a means to elevate the position of OMX as claimant?

11   I can't tell yet, based upon the arguments that have been made

12   and the papers that I have reviewed.  Whether the filing of

13   this notice is an express condition precedent to the right to

14   payment or whether it is a mere ministerial act.  And I'm not

15   asking you to respond to that, I'm just telling you and the

16   others in the room, that's a question I still have.

17        MR. DEVENO:  Okay.  Again, I think it's -- I suppose

18   I will respond, I have the podium for a moment longer.  I think

19   in our view, Your Honor, that it is a mere ministerial act in

20   the fact that, again, if you focus on the relevant language

21   being focused solely on a timing issue, a timing of when demand

22   is made, and the fact that that demand could presumably be

23   included within a proof of claim, yes, one could argue that

24   means no harm, just file the proof of claim.  But I think it's

25   also evidence that this could be viewed as just a ministerial

126

1    act, so what harm is caused to anybody by permitting the relief

2    from stay to more formally serve the demand.

3            THE COURT:  Let me assume something with you for a

4    moment.

5            MR. DEVENO:  Sure.

6            THE COURT:  Assume for a moment that Lehman Brothers

7    is not in bankruptcy and you're not before a bankruptcy judge.

8    Assume that there is a failure due to oversight or neglect in

9    giving the notice that you're now seeking to give before

10   December 27th.  Under applicable non-bankruptcy law, does the

11   failure to provide that notice affect the ability of parties

12   who are in a position to pursue a Lehman guarantee to do so?

13           MR. DEVENO:  I suspect contractually the answer is

14   yes, Your Honor.

15           THE COURT:  So then it's not a mere ministerial act.

16   It goes to the substantive rights of the parties.

17           MR. DEVENO:  Well, does it go to the substantive

18   rights of the parties that they have a claim, they need to

19   preserve their claim by providing the demand.

20           THE COURT:  Is it a condition precedent to the claim,

21   or is it a preservation of a right to a claim?

22           MR. DEVENO:  I would argue it's a preservation of the

23   existing claim.

24           THE COURT:  Why?  What do you mean by claim

25   preservation, does that involve moth balls, how do you do that?

127

1          MR. DEVENO:  Well, certainly, Your Honor --

2          THE COURT:  I truly don't understand the term, what

3     do you mean by -- what do you mean by claim preservation?

4          MR. DEVENO:  Certainly, Your Honor, Lehman signed the

5     applicable guarantee.  And at all times absent to bankruptcy,

6     anyway, as the debtors argue, intended to performance upon

7     receiving a demand.  I don't think that fact has changed.  And

8     that demand, as I say, can be provided through a proof of

9     claim, it can be provided through this automatic stay request.

10    And I think that would -- I suppose maybe that results in the

11    same thing as a contingent claim, Your Honor, I struggle to

12    sort of articulate it in the terms you've asked, but certainly

13    there's an existing guarantee.  It seems to be a ministerial

14    act given that it could just be included with a proof of claim,

15    the relevant demand, and it would protect that claim.

16         THE COURT:  Okay, thank you.

17         MR. DEVENO:  Thank you, Your Honor.  Obviously,

18    reserving, Your Honor, to respond after everyone has had a

19    chance to speak.

20         MR. FLECK:  Good afternoon, Your Honor.  For the

21    record, once again, Evan Fleck of Milbank Tweed on behalf of

22    the committee.

23         Your Honor, it doesn't surprise the committee that

24    the OMX trustee believes that this is a ministerial act, the

25    serving a notice of demand with respect to the guarantee.  In

128

1    fact, we understand from debtor's counsel that the OMX trustee

2    has, in fact, served the demand on the debtors in connection

3    with its documents.  And that's a separate issue and that's the

4    reason why I rose to speak before Mr. Deveno spoke, and that

5    will be taken up separately, Your Honor.  But we do recognize

6    that the trustee believes that this is a ministerial act.  The

7    committee was pleased, actually, that OMX recognizes that

8    relief from this Court is required in order to serve a demand

9    with respect to the guarantee.

10           THE COURT:  Let me just stop you for one second.  Are

11   you saying that a demand has already been served?

12           MR. FLECK:  Yes, Your Honor.  We understand --

13           THE COURT:  When did that happen, what does it

14   consist of, is it a stay violation, and does it moot the

15   current motion?

16           MR. FLECK:  Your Honor, we don't believe it moots the

17   current motion.  We learned about it this morning from the

18   debtors.  The debtors' counsel received a copy of the demand

19   notice from the OMX trustee in connection with their documents.

20   I understand that there's a pledge of the underlying note in

21   connection with financing -- the OMX, indentured trustees'

22   financing.  They have certain rights, apparently with a similar

23   structure to make a demand.  And they've sent a demand notice

24   to the debtors.  I don't believe a copy of it is in the

25   courtroom today.  And as I said, Your Honor, we recognize that

1  it hasn't been brought before the Court, although it is

2  relevant, we believe, to the issue that's before us because it

3  deals with the same structure of making a demand against the

4  debtors which we think is a real request for relief from the

5  automatic stay that certainly is not limited.  It's not a

6  limited relief from the stay, it's asking, actually, for quite

7  a significant subsequent relief from this Court, which we

8  believe is to create a one -- an approximately one billion

9  dollar claim against the estates.  That's the reason -- I'm not

10  sure if that addresses Your Honor's question with respect to

11  that.

12          THE COURT:  Well, you've addressed it certainly in

13  part.  I was trying to understand whether or not that notice,

14  which has already been delivered is, in fact, the same notice

15  that would be delivered if this motion for stay relief were

16  granted.  Is it a different notice or the same notice?

17          MR. DEVENO:  I can speak to that.

18          THE COURT:  Let me just find out the answer to that

19  question and we'll go back to the committee after that.

20          MR. DEVENO:  Again, Mark Deveno for the record, Your

21  Honor.  And forgive me, I should have covered this fact as

22  opposed to having it presented in this way.  A demand notice

23  has been -- in theory has been provided by the indentured

24  trustee.  It is -- forgive me for using the word in theory,

25  I'll come back to explaining it.  It's in theory that the

1    relevant demand here, what happens under the documents is the

2    indentured trustee receives a pledge of the guarantee and the

3    installment note.  It receives certain rights to enforce those

4    obligations.  Again, the first of the various potential demands

5    was provided, although it was provided with a remarkably

6    cautious cover letter of -- and I'm pointing out that we've

7    attached the relevant guarantee demand form, but making

8    abundantly clear that there is no actual immediate demand or

9    otherwise being made.  And, again, we'll reserve for another

10   time as to the impact of that.  But I think that the cover

11   letter may in and of itself -- I hate to suggest this on the

12   record, but I think the cover letter in and of itself may raise

13   some question as to whether it was a proper and formal service

14   of the demands since that it's important to us, as indentured

15   trustee, to see OMX be able to deliver as its requested.

16          THE COURT:  I'm confused.  Is the demand that is the

17   subject of the pending motion the same demand that was

18   cautiously delivered to the debtor or is it a different demand?

19          MR. DEVENO:  It's the same -- it's the same first

20   demand.  What OMX has to do is deliver two demands.  A demand

21   in respect of a missed interest payment, followed by a demand

22   in respect of misprinciple and interest.  The demand that has

23   been delivered is a demand in respect of the missed interest

24   payment.

25          THE COURT:  And is that not the same demand which is

131

1    the subject of the pending motion?

2         MR. DEVENO:  It is a demand that's subject of the

3    pending motion, Your Honor.

4         THE COURT:  So when the trustee, however cautiously,

5    delivered this demand, what was counsel and what was the

6    trustee thinking in terms of the relationship between the

7    pending motion and the action that either didn't require stay

8    relief or may expose the trustee to a claim for a stay

9    violation?

10        MR. DEVENO:  Obviously, Your Honor, we'll reserve on

11   that and the issues will play out.  But I will say that it was

12   our view and our impression of where the current motion was, we

13   were -- frankly, we were somewhat surprised when the Friday

14   objection came in.

15        THE COURT:  So when was the demand delivered?

16        MR. DEVENO:  The demand, I believe, was delivered --

17   I don't know if I have it at my fingertips, Your Honor, but I

18   believe it was delivered Thursday of last week.

19        THE COURT:  Mr. Jureller seems to want to speak, too.

20   I think we should -- this is for a relatively contained matter.

21   This is already showing signs of kind of disagreeable disorder.

22   So I think we need to have one person speaking at a time.

23        MR. JURELLER:  Your Honor, John Jureller.  I was just

24   going to address that question.  The demand that was served was

25   a demand that was served by the indentured trustee.  The

132

1    motion, itself, that was filed was filed by OMX, itself.  Two

2    separate entities from my understanding.  So, although, they're

3    similar in that the demands are made to the same party under

4    the same note, the demand that we sought under the motion came

5    from or was hopefully to come from OMX, not from the indentured

6    trustee.

7            THE COURT:  Who has standing to bring this matter

8    before me?  Is this an indentured trustee issue, is this an OMX

9    issue?  And if one has delivered the demand does that moot out

10   the request of the other?

11           MR. JURELLER:  My understanding was that possibly

12   both parties, because it was -- the note was pledge to the

13   indentured trustee as part of the securitization, that both

14   parties possibly had the right to further a demand.  The

15   noteholder is still OMX Timber Finance Investment II LLC.

16   However, it's been pledged, so, therefore, the trustee arguably

17   has standing as well to make a demand for a default under the

18   note.

19           THE COURT:  Well, use the term disorderly to describe

20   the argument.  But it seems to me that transactionally this is

21   more than disorderly.  Ordinarily, one would think that only

22   one party would have the standing to make demands, otherwise

23   there could be conflict.  But we don't need to address that

24   right now.  I think I've heard enough on that score.

25           MR. FLECK:  Your Honor, once again, Evan Fleck.

1            At least with respect to the demand, that is the

2      subject of OMX's motion, the committee is pleased that OMX,

3      based upon its papers, acknowledges that relief from this Court

4      is required in order for it to serve its demand.  And to be

5      clear, Your Honor, the demand -- the guarantee which was

6      attached to the motion states "that it is a demand for payment

7      of all principle outstanding under the installment note, and

8      accrued and unpaid interest payment is due and has not been

9      made by the obligor.  And payment of such amount is demanded of

10     the guarantor."  That's what the note says, that OMX seeks to

11     send to the debtor.  And we agree with OMX that unless this

12     Court finds that there's cause under the Sonnax factors, they

13     cannot transmit that demand to the debtor.

14            In response to Your Honor's question, whether OMX has

15     a claim absent the ability to transmit the demand, the

16     committee believes that there would be no claim without the

17     relief from this Court, and then ultimately sending the demand

18     notice based upon the language of the guarantee.  Which states

19     "guarantor shall have no liability to beneficiary for any

20     guaranteed obligations for which a demand is not delivered to

21     guarantor within the notice period set forth in the guarantee."

22            As has been commented upon in the argument up to this

23     point, this is and was a tremendously sophisticated

24     transaction.  There are several memoranda that were generated

25     internally at Lehman describing the transaction with flow

134

1    charts that run from page to page.  The parties were advised by

2    counsel who clearly understood -- hopefully understood the

3    transactions they were entering into.  And, in fact, did

4    contemplate bankruptcy.  Bankruptcy planning is part of these

5    documents.  In fact, the guarantee specifically talks about

6    bankruptcy and the effect of bankruptcy.  In paragraph 2 at the

7    end it speaks to bankruptcy of the obligor, it doesn't speak to

8    bankruptcy of LBHI.  But there's no allegation that the

9    documents are unclear.  And so it's fair to read from these

10   documents that the parties either did or should have made

11   certain consideration for bankruptcy but drew the documents up

12   as they decided if it was appropriate for the transaction.  And

13   none of us here in the room today were present, I don't think

14   any of us needed to have been present because the documents are

15   unambiguous.  But suffice it to say from the Committee's

16   perspective, presumably, this was the benefit -- this was the

17   benefit of the bargain that was struck.  And by their motion,

18   OMX is seeking to change that bargain.  And is seeking to

19   change the terms.  So that a notice is not required in order to

20   breath life into the guarantee.

21        And, again, looking at the plain language of the

22   guarantee in paragraph 2 it speaks to a number of circumstances

23   where no notice is required.  It lays it out quite explicitly

24   in paragraph 2 of the guarantee.  But the beginning of that

25   paragraph starts "except as set forth in paragraph 3 below."

135

1    And paragraph 3 goes through in painstaking detail what OMX

2    must do and when and to whom in order to serve its demand with

3    respect to the guarantee.  And it's repeated five times in the

4    document.  And we think that that's not an accident, Your

5    Honor.

6           Again, sophisticated parties drew up a document that

7    they believed was appropriate for the transaction.  And we

8    think that the motion that's before the Court today is, in

9    fact, extraordinary.  It's asking this Court to rewrite the

10   document, to write around the automatic stay.

11          THE COURT:  But it's really not doing that, Mr.

12   Fleck.  The motion is asking for the right to do what the

13   document expressly provides.  It's not asking it to be

14   rewritten, it's asking that the automatic stay be lifted so

15   that what the parties contemplated could take place.  I'm not

16   arguing with you, I'm just letting you know that I don't like

17   that argument, particularly.

18          MR. FLECK:  Very well, Your Honor.

19          With respect to the balancing of the harms, we think

20   that is -- we agree with OMX that that is the relevant Sonnax

21   factor.  There's only that possibly could help their argument

22   out of the twelve.  And we think that's it.  But when OMX's

23   counsel said that when you look at -- really, the balancing is

24   with respect to the claim and they would lose out if they don't

25   get a claim, and then there's a claim against LBHI.  And, okay,

136

1    it's a large claim, but just merely adding a claim to the

2    claims pool is not harm to the estate.  We disagree, we think

3    it is.  And it's quite a significant claim.

4           But, in addition, we are cautious and recognize that

5    we should make an argument about floodgates very carefully and

6    only in appropriate circumstances.  But, Your Honor, we do

7    believe in this circumstance there are plenty of disappointed

8    parties who, but for the automatic stay would seek certain

9    remedies from this Court.  And by permitting what OMX is

10   seeking from this Court, the committee is quite concerned about

11   other parties coming forward seeking similar relief.

12          In the context of the balancing of the harms, we

13   think that's quite relevant and certainly weighs against

14   granting the relief under these circumstances.  We understand

15   the committee is cognizant of the fact that the result might be

16   painful economically to OMX.  We cited some cases in our

17   objection reports.  The Second Circuit has recognized that in

18   bankruptcy certainly parties are disappointed by the results

19   economically.  And we think that's the result here that's

20   appropriate.

21          The committee did not pursue this objection lightly

22   but recognized it's in the interest of the unsecured creditors

23   of these estates to allow only those claims that are

24   appropriate.  And legally, where there's a legal right to have

25   claimed to be asserted against the estate to proceed.  And on

137

1    its face, based upon the clear documents, the committee is

2    confident that his claim -- that OMX does not have a claim to

3    assert against these estates as a result of the automatic stay.

4           And for that reason, Your Honor, we request that the

5    motion be denied.  And I'd be happy to respond to any questions

6    from the Court.

7           THE COURT:  It's your position on behalf of the

8    committee that a denial of this motion would mean that OMX is

9    deprived of the ability to pursue its 800 plus million dollar

10   claim against the Lehman estate, is that the direct consequence

11   of your argument?

12          MR. FLECK:  Your Honor, I should be more clear.  The

13   specific relief that we're seeking here is that a claim under

14   the guarantee not be pursued because we feel like the automatic

15   stay prevents OMX from pursuing a claim under the guarantee and

16   stay relief is not appropriate because cause does not exist.

17          If OMX, as it seems that they intend, would like to

18   file a proof of claim in the case and pursue that, there's a

19   process for that and we believe will be dealt with in due

20   course.  But we believe -- we think that the guarantee is

21   written so that they lose their right to a claim if they don't

22   take the action that needs to be taken within this period of

23   time.

24          THE COURT:  What's your position if they don't

25   prevail today but they've done everything that they can

138

1    possibly do to give notice.  In fact, Lehman has noticed.

2    Lehman knows that these parties are asserting rights under this

3    guarantee.  They've given notice directly perhaps as a stay

4    violation through the indentured trustee, and they've given,

5    certainly, notice of their intention to give notice through

6    this motion.  Is it your position that that does nothing in

7    terms of their ability to perfect their claim, because they've

8    done everything that they can do under the circumstances,

9    including even possibly something that isn't allowed as a

10   matter of law?

11        MR. FLECK:  Well, Your Honor, if OMX was able to make

12   an argument that cause exists to lift the stay then we think

13   that they would have a right to assert a claim under the

14   guarantee.  We don't think cause exists and what naturally

15   flows from that is that they do not -- they cannot pursue a

16   claim with respect to the guarantee, with respect to notice.

17        THE COURT:  It sounds like forfeiture to me.  It

18   sounds as if they're unable to get the relief that they seek,

19   your position would be they lose all rights.  Is that your

20   position?

21        MR. FLECK:  Well, they certainly have the right to

22   pursue a proof of claim.  They have a right to file a proof of

23   claim and have that claim adjudicated through a process.  We

24   don't think that the -- we think that at its core, the issue is

25   that the document was written in a way that's unfortunate and

139

1   shouldn't be rewritten to fix the problem.  Obviously,

2   sophisticated parties now and in hindsight, OMX would

3   presumably write a guarantee that doesn't require any action

4   and that if automatically there would be an acceleration, a

5   garden variety guarantee would so provide.  So we all know what

6   everyone was trying to do here and they didn't get it done.

7        There's a significant harm to the estate as a result

8   of curing what certainly was intended to result here.  And we

9   don't believe that the Court should cure that problem for OMX.

10  To be sure, yes, the natural result of what flows from that is

11  it may be that OMX is without a claim.  When the process runs

12  through its natural course, they file a proof of claim and

13  there's an objection, there's an adjudication of that claim.

14  And as Your Honor recognized, there's a condition precedent

15  to -- perhaps a condition precedent to their right to recovery.

16  And that could be adjudicated at a later time.

17        But, yes, the simple answer is that it may be that

18  they are without a claim here.

19        THE COURT:  Okay, thank you.  Mr. Fail, do you have

20  anything to say?

21        MR. FAIL:  Thank you, Your Honor.  Garrett Fail, Weil

22  Gotshal & Manges for the debtors.

23        The debtors filed a joinder in support of the

24  committee's arguments.  And I restate that, again, for the

25  record.  I would simply add, not that I think Your Honor has

140

1    accepted any of counsel's representations or anything that

2    counsel for movant or someone who's joining movant may have

3    read into the record as evidence.  These are facts that were

4    not -- you know, still aren't apparently known to all parties

5    in the courtroom today.  And so, certainly, the debtors would

6    reserve all rights to challenge any allegations of facts that

7    were made by movant's counsel.

8              THE COURT:  Okay.  Anything more?

9              MR. WILAMOWSKY:  Your Honor, if I may just respond to

10   some of the points that -- for the record, I'm sorry, Steven

11   Wilamowsky, Bingham McCutchen LLP on behalf of the indentured

12   trustee.

13             I just wanted to be able to respond to a couple of

14   the points of the committee counsel.  First thing is that both

15   said it and they said it in their pleadings is that well, if

16   OMX wanted to have the benefit of being able to have its

17   guarantee claim even in a bankruptcy it should have drafted

18   around it.  In fact, they used the word draft around in the

19   pleading that says well, I'm sure there are many other

20   disappointed parties that could have -- that are in hindsight

21   sorry that they didn't draft around the automatic stay.  Your

22   Honor, you're not supposed to be able to draft around the

23   automatic stay.  There are a legion of cases that show --

24   render unenforceable attempts to end-run the automatic stay.

25   So it's pretty good indication if there is such an easy way to

1    have end-run the automatic stay in a way that nobody would

2    argue with and that everybody agrees is common.  It's probably

3    a good hint that the purposes of the automatic stay are not

4    being offended because otherwise courts wouldn't enforce it,

5    courts don't allow you to end-run the automatic stay.

6         So, if anything, we think that cuts in favor of the

7    motion because what it demonstrates is that it underscores that

8    no automatic stay policy, no bankruptcy policy is being

9    violated by the request.  And the reason why the bankruptcy

10   policy is not being violated by the request is because it is

11   also well settled that the automatic stay is not intended to

12   affect the substantive -- to impair the substantive rights of

13   the nondebtor parties.  It's intended to be a breathing spell.

14   It's supposed to freeze everything in its tracks.  And it's not

15   supposed to render a party's -- impair a party's substantive

16   claim that they can later assert in the bankruptcy through the

17   process.  And where there is a risk that that substantive claim

18   is not going to be preserved for the purposes of having it

19   available to be adjudicated through the claims process, then

20   that we submit is reason why the motion should be granted.

21        I use an analogy in terms of the prejudice to the

22   debtors in terms of what comes up on a 9006(b) cases all the

23   time, where parties want to come in and file a late claim, and

24   where the debtor asserts that the prejudice is well then

25   there's going to be a claim against me, and if you deny the

142

1   motion there won't be a claim.  Courts routinely have said no,

2   that's not a prejudice.  You've got to show -- you've got to

3   make some kind of argument that's -- you know, sometimes the

4   court will accept a floodgates argument, sometimes the Court

5   will accept an argument based on the settled expectations of

6   the parties, because there's already been a disclosure

7   statement and a plan that's gone out.  But the fact that

8   there's going to be a claim that's going to be added to the

9   pot, that's not a cognizable harm in the context of this kind

10  of a process.  Because it is not the goal of the Bankruptcy

11  Code to impair parties' substantive claims.  The goal of the

12  bankruptcy code is to deal with those claims as they exist

13  under state law.  Take the state law claims and then divide the

14  pot equally or in accordance with Bankruptcy Code priorities.

15          So for that reason, again, Your Honor, we would

16  submit that any prejudice based on the fact that this happens

17  to be a large claim is -- there isn't an even balance as Your

18  Honor suggested.  Well, isn't it even because we're going to

19  have a claim and they're going to avoid the claim?  No, because

20  if we've got a state law claim then we're entitled to be

21  asserted that claim under the Bankruptcy Code.  And if I didn't

22  have the automatic stay somehow we're not going to be able to

23  assert that, then that is a harm that is inuring to the

24  detriment of the parties on this side of the table.  But it's

25  not, I would submit, a cognizable harm the other way to the

143

1    parties on that table.

2         Finally, Your Honor, I would just want to -- Your

3    Honor spoke about the question of whether the demand is

4    ministerial or it's a precondition to the right of payment.

5    And I think that everything that I've been arguing here is

6    let's assume that it's a precondition to a right of payment.  I

7    think that Your Honor can safely for the purposes of granting

8    the motion -- if Your Honor were inclined to grant the motion,

9    Your Honor can do that even by assuming that it is a

10   precondition to a right of payment.

11        But that's exactly the point.  The point is that it

12   would be a precondition to a right of payment.  And by not

13   allowing the OMX to exercise that precondition OMX is being

14   prejudiced.  Nobody's arguing that this is literally a brand

15   new claim.  They talk about it creating a claim, but if it was

16   creating a claim, literally, then there wouldn't be a stay

17   issue at all.  It would be -- nobody's arguing it's a post-

18   petition claim.  Obviously, they would have a right to assert a

19   post-petition claim.  Everybody's agreeing that his is a pre-

20   petition claim that's arising under pre-petition contract.

21   What the demand does, it ripens the claim, it matures, it

22   becomes payable, something happens to the claim.  But it can't

23   be a brand new claim that's being created, the claim has to

24   preexist the bankruptcy, otherwise we could be saying okay,

25   we've got a post-petition claim when nobody's asserting that

144

1    we've got a new post-petition claim.  So it's a claim that

2    exists.  And it's a claim that already exists -- I think that's

3    the point when Your Honor asks what does it mean to preserve a

4    claim?  I think that what it means to preserve a claim is if

5    the claim never existed before then that's a brand new claim.

6    But if the claim did exist and we've got to take steps to make

7    sure that it doesn't go away, that's what I would submit is

8    called preserving a claim.

9           Thank you, Your Honor.

10          THE COURT:  Does the principal obligor continue to

11   exist?  The obligor on the note?

12          MR. WILAMOWSKY:  Yes.

13          THE COURT:  And is that obligor and obligor that has

14   a credit strength to make payments under the note?

15          MR. WILAMOWSKY:  I don't think it's structured that

16   way.

17          MR. JURELLER:  It's my understand that it's more of a

18   -- the way that it was structured it was more of a shell type

19   company, but it does not have the capital strength to make

20   payments under the note.  It's my understanding but I don't

21   speak for that.

22          MR. WILAMOWSKY:  I think, Your Honor -- I think we

23   have Congress to blame for this whole big mess.  Because I

24   think somehow they created the tax advantage status for Timber

25   related access, I guess somebody from the Timber lobby maybe --

145

1        THE COURT:  So why don't you blame them not Congress.

2        MR. WILAMOWSKY:  So how it ended up is that I think

3   this was a vehicle where -- if, Your Honor, we consider it it's

4   very strange, because essentially in order to go against the

5   primary obligor you've got to show that you've made a demand

6   against the guarantor.  I mean, that's highly unusual and I

7   think it's just reflective of the priorities in terms of what

8   was expected out of the transaction, that you'd be able to go

9   to Lehman and assert that claim.

10        THE COURT:  Well, again, assuming that Lehman is not

11   part of this equation, just for purposes of my understanding

12   how this transaction was contemplated initially, was there a

13   ready source of identified cash flow from the borrower in the

14   structure to make the designated payments of principle and

15   interest, under the 2020 loan?  Because I understand the

16   original installments were to go out to the year 2020.

17        MR. DEVENO:  Your Honor, Mark Deveno of Bingham.

18        Oddly enough, the answer is -- oddly enough in the

19   transaction, the answer is yes.  In that credit source was

20   itself Lehman, Boise itself has claims against Lehman.  Again,

21   blame the Timber lobby.

22        MR. WILAMOWSKY:  Oh, okay.  It was a Lehman entity

23   that -- when the whole Lehman enterprise collapsed so,

24   therefore, that naturally created a claim against the

25   guarantee, against LBHI.

146

1          THE COURT:  Yes.  But my question was whether if you

2   assume away for a moment the Lehman guarantee and you were

3   simply looking simplistically at a borrower that presumably had

4   cash flow that matched the obligations at the time that this

5   transaction was set up, is there such a borrower and is it

6   generating cash flow?

7          MR. WILAMOWSKY:  I think the answer is that there is

8   such a borrower, but it's source of cash -- of payment was a

9   different Lehman entity.  And, therefore, it doesn't have any

10  source of cash flow.

11         THE COURT:  Okay.  So that source is dried up.

12         MR. WILAMOWSKY:  Right.

13         THE COURT:  All right, thank you.

14         MR. WILAMOWSKY:  Thank you, Your Honor.

15         THE COURT:  I'm not going to decide this today.  But

16  what I am going to do is to provide that when I do decide it it

17  will relate back to today.

18         This means that the moving party, OMX, has at least

19  done what it needed to do timely to get stay relief that speaks

20  as of a date prior to the notional deadline of December 27.

21         The reason I'm not deciding it today is that I don't

22  have enough information yet.  I've asked any number of

23  questions and the answers are not anything other than lawyers,

24  and that's fine, telling me to the best of their ability what

25  they think the facts are.  But as Mr. Fail has pointed out in

147

1    his comments on behalf of the debtor, the debtor reserves all

2    of its rights to the actual facts and what the evidence would

3    show if we had an evidentiary hearing, which today is not.

4         I think there is a need for an evidentiary hearing in

5    this instance.  And there are a number of questions that I

6    have.  The first general question is to understand the

7    structure more fully than I do now.  Why it was set up the way

8    it was set up, the purposes to be served by the various notice

9    provisions, and a better understanding based upon the

10   underlying transaction documents as to why notice within a

11   certain period of time is deemed to be an important condition

12   to the obligations of Lehman as guarantor.

13        Everybody recognizes that balancing the harms

14   represents the fundamental question here.  And I'm getting

15   mixed messages from the parties as to just what kind of harm

16   that is.  I'd like to know more from the moving party OMX, as

17   to the actual harm to be encountered by virtue of a denial of

18   the requested relief.  I'm particularly troubled by the fact

19   that the indentured trustee appears to have, at least at some

20   level, mooted the motion by delivering under whatever kind of

21   cover letter was carefully created by counsel, what appears to

22   be a demand notice covering the very same subject matters of

23   the pending motion.  Assuming there is efficacy to that demand,

24   and I don't know if there is or there isn't, this is a motion I

25   could easily deny.  To the extent that there's no efficacy the

148

1      notice may be a nullity, or may be liability creating.

2             I want to know a lot more than I know right now as to

3      why that notice was sent and what color of law was cited in the

4      cover letter that gave the trustee the authority to send it in

5      the first instance on Thursday.

6             In terms of the harm to the debtor I think that Mr.

7      Wilamowsky's argument was quite persuasive in suggesting that

8      there is no harm, it's just a claim, one of many.  And that the

9      business of bankruptcy is not to erect artificial barriers to

10     keep legitimate claims outside the bankruptcy court.

11            I'd like to know more from the debtor in particular

12     as to what harm is associated with permitting this claim to be

13     asserted now.  While it's not a matter for an evidentiary

14     hearing, I think it's worth noting that my curiosity has at

15     least been aroused by the role reversal associated with the

16     current controversy.  The principal party opposing this motion

17     for stay relief is not the debtor, it's the creditors'

18     committee.  The debtor joined in the position articulated by

19     the committee, but is hardly carrying the laboring law on this

20     one.  I'd like to know more about the debtor's position.  I

21     understand that the creditors' committee is a watchdog, but

22     this watchdog is doing more than I think is appropriate in this

23     instance.  This is a situation in which the debtor should be

24     asserting positions on behalf of the estate.  For some reason

25     it's in a joinder role, I want to know why.  Is there anyone at

149

1   the debtor who has evaluated this, who has considered whether

2   or not there is actual merit to the harm argument being made by

3   the creditors' committee.  I heard the argument, but I'm not

4   particularly persuaded that there is cognizable harm to the

5   estate, unless this is a situation in which a claim that would

6   not otherwise exist is, in effect, being activated by the

7   demand notice.

8            For that reason, I'd like some supplemental briefing

9   in addition to a further evidentiary hearing.  Are there really

10  only two cases that deal with this subject matter.  Or by

11  analogy are there other situations in which courts have

12  permitted notices to be given, not necessarily in the context

13  of a guarantee, but in other settings.  Or in which other

14  action has been permitted in order to give a claimant the

15  ability to pursue claims in bankruptcy by satisfying non-

16  bankruptcy conditions precedent.

17           I suggest that the parties meet and confer regarding

18  a schedule for both, the evidentiary hearing and supplement

19  briefing, consistent with these remarks.

20           Meanwhile, the automatic stay will continue in affect

21  because I'm not ruling.  But when I do rule, as I will

22  eventually, it will be as of today's date, nunc pro tunc.

23           Any questions?  We're adjourned.

24       (Whereupon these proceedings were concluded at 4:13 p.m.)

25

150

I N D E X

R U L I N G S

| DESCRIPTION | PAGE | LINE |
|---|---|---|

Trustee's motion seeking approval for settlement    59      2

agreement between Barclays, JPMorgan

Chase Bank and the SIPA trustee approved

subject to comments and clarifications

made on the record and to modifications made to

form of order and without prejudice to further

investigation by creditors' committee


Debtors' motion authorizing entry into settlement  61     12

agreement with certain of its French affiliates

approved


LBHI's motion for authorization to assume          61     23

administrative services agreement with Aetna

approved


LBHI's motion for authorization to reject          62      6

prescription drug program master agreement

with Medco approved

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

151

1

2                          I N D E X, cont'd

3

4                          R U L I N G S

5    DESCRIPTION                                    PAGE    LINE

6    Motion to amend orders authorizing sale of      63      17

7    aircraft granted

8

9    Debtors' motion to approve sale of purchased   102      21

10   assets and assumption and assignment of contracts

11   relating to purchased assets approved

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VERITEXT REPORTING COMPANY

212-267-6868                                          516-608-2400

152

1

2                    C E R T I F I C A T I O N

3

4     I, Lisa Bar-Leib, certify that the foregoing transcript is a

5     true and accurate record of the proceedings.

6

7     _____

8     LISA BAR-LEIB

9

10    Veritext LLC

11    200 Old Country Road

12    Suite 580

13    Mineola, NY 11501

14

15    Date:  December 24, 2008

16

17

18

19

20

21

22

23

24

25