**Hearing Date: January 16, 2009 at 10:00 a.m.**
**Objection Deadline: January 2, 2009 at 4:00 p.m.**

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036
(212) 715-9100
Jonathan M. Wagner (JW-7197)
Dana L. Post (DP-3889)

Attorneys for Avenue Investments, L.P.

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| LEHMAN BROTHERS HOLDINGS INC., et al. | ) | Chapter 11 |
| | ) | |
| | ) | Case No. 08-13555 |
| Debtors. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**OBJECTION OF AVENUE INVESTMENTS, L.P. TO**
**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTION 365**
**OF THE BANKRUPTCY CODE APPROVING THE**
**ASSUMPTION OR REJECTION OF OPEN TRADE CONFIRMATIONS**

Avenue Investments, L.P., by its attorneys Kramer Levin Naftalis & Frankel LLP,

respectfully objects to Debtors' Motion For An Order Pursuant To Section 365 of The

Bankruptcy Code Approving the Assumption or Rejection of Open Trade Confirmations.

Preliminary Statement

In April 2008, Lehman Commercial Paper Inc. and Avenue began negotiating the terms

of an agreement pursuant to which Avenue would purchase from LCPI three tranches of

distressed bank debt of Quebecor World Inc. That agreement was never consummated because

between April 2008 and October 3, 2008, when LCPI filed its bankruptcy petition, LCPI and

1

Avenue were unable to agree on material terms of the proposed transaction and never executed a final trade confirmation setting forth the terms of the proposed trade.

On November 5, 2008, the Court so ordered a Stipulation obligating LCPI to notify all parties to open trades by November 7, 2008 whether LCPI would assume, assume and assign, or reject those trades. The Stipulation also directed LCPI to file a motion with respect to those trades by November 14, 2008. In accordance with the deadlines imposed in the Stipulation, LCPI notified Avenue on November 4, 2008 that LCPI intended to reject the purported Quebecor trade. LCPI's motion filed on November 14, 2008 specifically listed that purported trade among the "Rejected Trades" on Exhibit B to the Motion.

Notwithstanding LCPI's representation to Avenue and in its motion that LCPI had determined to reject the purported Quebecor trade, one month later, on December 14, 2008, LCPI filed a Notice of Revised Exhibits and Revised Proposed Order Relating to the Debtors' Motion, which moved the supposed trade from the "Rejected Trades" list to the "Assumed Trades" list. Avenue was not on the service list and received no notice of that filing. Unbeknownst to Avenue, on December 16, 2008 this Court granted the Debtors' Motion, which listed the supposed Quebecor trade as "Assumed."

LCPI's belated effort to assume the purported trade should be rejected. LCPI notified Avenue by the Court-imposed deadline that the alleged trade was being rejected and moved to reject it on November 14, 2008. In light of this Court's strict enforcement of pleading deadlines, coupled with the Debtors' own position that pleading deadlines should be scrupulously enforced, LCPI's motion as to Avenue is untimely and should be denied on that basis alone.

Even had LCPI complied with the Stipulation, LCPI's Motion should be denied on the merits. Quite simply, there is no agreement for LCPI to assume. As underscored by the lack of a

KL3 2693415.6

final signed trade confirmation, there was no meeting of the minds between the parties concerning the terms of the trade. Furthermore, even if somehow a binding agreement existed, the supposed trade lapsed because LCPI committed the first material breach by failing to close the purported transaction in a timely fashion.

For all or any one of these reasons, LCPI's Motion as to Avenue should be denied in its entirety.

## FACTS

A.    Trading of distressed debt

Debt that is said to trade "distressed" is debt which is or is perceived to be in some degree of financial distress that would impair the prospects of full and timely repayment. In contrast, "par" debt is indebtedness that is expected to be paid in full and on a timely basis. Distressed debt transactions involve significantly more documentary protection than par trades because of the distressed nature of the debt. The Loan Syndications and Trading Association, Inc. ("LSTA"), whose members include participants, such as LCPI, in the market for corporate loans and other similar private debt, periodically promulgate standards and documentation to guide the distressed debt trading market and influence industry customs.

Generally, trades of distressed loans begin as oral negotiations between the parties. After due diligence is conducted by the potential buyer, if the trade is to go forward the material terms of the transaction, including among other terms the debt's price and settlement terms, would be agreed to orally by the parties and confirmed with a fully-executed written trade confirmation evidencing the material terms of the transaction. Trades are not consummated and settled, however, until the parties execute a purchase and sale or similar agreement, a lengthy agreement which contains extensive representations, warranties, covenants, indemnifications, and other standard or negotiated provisions.

KL3 2603415.6

Pursuant to LSTA guidelines, the suggested time-frame for parties to settle a distressed debt transaction is twenty business days after the trade date. The LSTA's standard terms and conditions for a distressed debt transaction provide that if no settlement date is specified, the seller and buyer shall use reasonable endeavors to settle the transaction "as soon as practicable after the Trade Date."

B.    Prepetition negotiations between LCPI and Avenue

Avenue is a Delaware limited partnership which trades -- among other instruments and claims -- distressed debt. In April 2008, Avenue and LCPI began negotiating a transaction pursuant to which Avenue would purchase from LCPI three tranches of distressed bank debt of Quebecor in the aggregate face amount of approximately $5 million. The precise amount of Quebecor debt to be sold by LCPI to Avenue was never definitively set.

The parties exchanged a draft trade confirmation dated April 22, 2008 which laid out proposed terms of the trade under consideration. On May 5, 2008, Avenue sent LCPI a signed trade confirmation for the proposed transaction containing revisions inserted by Avenue. (Exh. A, attached). An important term in that revised confirmation added by Avenue was a provision permitting Avenue to purchase the Quebecor debt by "participation" as opposed to by "assignment." Purchasing distressed debt by assignment creates a direct relationship between the lender and the borrower, while a purchase by participation gives the lender only a beneficial interest in the loan. If Avenue were to purchase the loans by assignment, the transaction would become significantly more complex because Avenue would likely be required to have a bank post a letter of credit on its behalf.

Upon receiving the signed trade confirmation from Avenue, LCPI deemed the Avenue confirmation unacceptable with respect to (i) the amount and breakdown of the Quebecor tranches of debt, and (ii) the term permitting the proposed trade to take the form of a

4

participation. On May 14, 2008, LCPI sent a revised draft trade confirmation to Avenue with two blank signature blocks. (Exh. B, attached). The LCPI draft changed the breakdown of the three tranches of debt and increased the face amount of the transaction by $900,000. LCPI also rejected the term inserted by Avenue providing for the ability of Avenue to purchase the debt by participation. After the Avenue side reiterated its prior comments, LCPI on May 22 sent Avenue a draft trade confirmation that again failed to include a provision providing for the purchase by participation as opposed to by assignment. (Exh. C, attached). The draft also reduced the trade amount by $900,000. While the parties continued to negotiate the terms of the proposed transaction, there was no meeting of the minds concerning all terms, nor did the parties ever execute a final trade confirmation. That is where matters stood several months later when LCPI filed its Chapter 11 petition in October 2008.

C.      The LCPI stipulation and rejection of the purported trade

On November 5, 2008, the Court so ordered a Stipulation obligating LCPI to notify all parties to open trades by November 7, 2008 as to whether LCPI would assume, assume and assign, or reject open trades. LCPI submitted the Stipulation in response to a motion filed by parties with open trades with LCPI seeking an order compelling LCPI to assume or reject those open trades.

In accordance with the deadline imposed in the Stipulation, LCPI notified Avenue on November 4, 2008 that LCPI intended to reject the Quebecor transaction the parties had been considering earlier this year. The motion filed by LCPI on November 14, 2008 specifically included this purported trade with Avenue among the "Rejected Trades" in Exhibit B to the Motion.

D.    LCPI's belated effort to assume the purported trade

A month after LCPI filed its motion -- on the afternoon of Sunday, December 14, 2008 -- LCPI filed revised exhibits with the Court unilaterally moving the purported Quebecor trade from the "Rejected Trades" list to the "Assumed Trades" list. Since Avenue was not on the service list, Avenue received no notice of LCPI's filing. And even though LCPI had filed the revised exhibits on December 14, 2008, LCPI failed to advise Avenue of that filing when, in a December 15, 2008 email, LCPI informed Avenue that LCPI now sought to assume the purported trade. (Exh. D, attached).[1]

On December 16, 2008, the Court granted LCPI's Motion, which listed the purported trade with Avenue as "Assumed." When Avenue learned after the December 16 hearing that the Court had granted the Motion listing the supposed Quebecor trade as assumed, Avenue's counsel contacted LCPI. LCPI agreed to vacate the order as to Avenue and to give Avenue until January 2, 2009 to file an objection to the Motion. At the December 22, 2008 hearing, LCPI submitted a proposed Order, entered by the Court on December 23, providing that "The trades with Avenue Investments, L.P. . . . shall be deleted from Exhibit A to the Prior Open Trades Order and shall be treated as if Avenue were a party that timely objected to the relief sought in

---

[1] In that e-mail, LCPI led Avenue to believe that the Revised Exhibits had not yet been filed; LCPI stated that "[o]n or before the Hearing Date, Debtor intends to amend the exhibits to the Motion accordingly." (Exh. D, attached).

In late November, LCPI sent emails to Avenue indicating that LCPI wished to "accept" the proposed transaction with Avenue. Those emails, however, did not constitute notice to Avenue that LCPI would be moving to assume the purported trade. The LCPI e-mails specifically stated that "This communication is for information purposes only and should not be regarded as an offer to sell or as a solicitation of an offer to buy any financial product, an official confirmation of any transaction, or as an official statement of Lehman Brothers." *See Angelo, Gordon & Co. v. Dycom Indus., Inc.,* No. 04 Civ. 1570 (RMB), 2006 WL 870453, at *8-9 (S.D.N.Y. Mar. 31, 2006) (in suit for breach of alleged distressed debt trade, court credits language of boilerplate provisions of email). Nor did the emails state that LCPI intended to move to assume the purported trade.

the Motion; Avenue shall file its objection to the proposed treatment of its Open Trade
Confirmations on or before January 2, 2009, and the objection shall be heard at the January 14,
2009 hearing."

## ARGUMENT

LCPI's Motion should be denied on any one of a number of independent grounds.

*First,* LCPI's attempt to assume the purported transaction with Avenue is untimely. The
Court-ordered Stipulation required LCPI to inform counterparties to open trades by no later than
November 7, 2008 whether LCPI would assume, assume and assign, or reject open trades and to
file its motion by November 14, 2008. It was not until a month after that pleading deadline that
LCPI reversed its position with respect to Avenue. The Court has already made clear that it will
strictly enforce pleading deadlines, and there is every reason the Court should adhere to that
policy here.

*Second,* even if LCPI's change of position was timely and even had LCPI provided
proper notice, no enforceable agreement for the sale of the Quebecor loans exists since there was
no meeting of the minds concerning the proposed transaction. The parties never executed or
finalized the draft trade confirmation precisely because the parties had not reached an agreement
on material terms, including the very subject matter of the trade. The failure to execute the draft
trade confirmation after extensive negotiations over its terms establishes that the parties neither
had a meeting of the minds on all material terms, nor did they intend to be bound by the un-
executed draft trade confirmation.

Finally, *third,* even if there were somehow an enforceable agreement between Avenue
and LCPI, the agreement lapsed on account of the fact that LCPI committed the first material
breach by failing to close in a timely fashion. By the time LCPI filed its Chapter 11 petition in

October 2008, more than five months had passed since the parties first exchanged draft trade confirmations.

## I.

### LCPI's Motion Should Be Denied As Untimely

LCPI's effort to assume the proposed Quebecor trade should be rejected at the outset because LCPI violated the terms of Stipulation "So Ordered" by this Court.

The deadline for LCPI to notify all parties as to whether open trades would be assumed or rejected was November 7, 2008. The deadline for LCPI's motion to assume or reject was November 14. LCPI notified Avenue by the Court-imposed deadline that LCPI had rejected the supposed trade, and the proposed trade was listed on the "Rejected" list LCPI filed on November 14 along with its motion. Not until a month later did LCPI change its mind. The principal purpose for these deadlines was the elimination of the uncertainty created by the impact of LCPI's bankruptcy filing on trades or proposed trades in light of the ever-fluctuating prices in the distressed debt market. Avenue was entitled to rely on the certainty created by those deadlines, to which LCPI had itself agreed. *See Sinicropi v. Milone,* 915 F.2d 66, 68 (2d Cir. 1990) (enforcing court-ordered stipulation when appellees "knowingly and voluntarily enter[ed] into the Stipulation"); *Sanchez v. Maher,* 560 F.2d 1105, 1108 (2d Cir. 1977) (The district court has a "duty to enforce the stipulation which it had approved").

LCPI's untimely about-face is doubly inappropriate in light of LCPI's own position concerning late pleadings. At the December 16 hearing, LCPI opposed a request by a counterparty that the Court consider an objection filed a week after the November 28 deadline. (December 16, 2008 Tr. at 122). The Court agreed with LCPI that pleading deadlines should be strictly enforced:

> [F]rom the perspective of pure judicial administration, even in
> cases much smaller than this, case management deadlines must
> have meaning, and they must have meaning because otherwise,
> there is no order ever. Otherwise, last-minute papers are being
> filed routinely on the eve of every hearing.

(*Id.* at 125). LCPI is thus judicially estopped from taking a different position when its own

untimely pleadings are at issue. *See New Hampshire v. Maine,* 532 U.S. 742, 749 (2001)

(Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and

then relying on a contradictory argument to prevail in another phase"); *Mitchell v.*

*Washingtonville Cent. Sch. Dist.,* 190 F. 3d 1, 6 (2d Cir. 1999) (judicial estoppel applicable when

a party's later position is "clearly inconsistent" with its earlier position, and the party has

succeeded in persuading a court to accept its earlier position).

On this ground alone, LCPI's Motion as to Avenue should be denied.

II.

### No Contract Exists Because
### There Was No Meeting Of The Minds

Even had LCPI timely filed a motion to assume the purported trade with Avenue, LCPI's

motion should still be denied on the merits: no contract exists since, as established by the

absence of an executed trade confirmation, there was no meeting of the minds concerning the

proposed trade.

Section 365(a) of the Bankruptcy Code empowers a debtor in possession, "subject to the

court's approval, [to] assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a). A debtor, however, can accept a contract under this section only if there was

in fact a contract in existence as of the commencement of the bankruptcy case. *See In re III*

*Enters., Inc. V,* 163 B.R. 453, 459 (Bankr. E.D. Pa.) ("It is elementary to observe that, before the

Debtor can assume or reject a contract, or, for that matter, before [a party] can seek to enforce a

KL3 2693415.6

contract, there must be a contract to assume, reject, or enforce."), *aff'd sub. nom., Pueblo Chem., Inc. v. III Enters., Inc. V.*, 169 B.R. 551 (E.D. Pa. 1994); 2 Collier on Bankruptcy, ¶ 365.02, at 365-16 (15th ed. 1993) ("[F]or section 365 to apply, the contract or lease must be in existence.").

It is a bedrock principle of contract law that "[t]o create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are true in agreement with respect to all material terms." *Express Indus. & Terminal Corp. v. D.O.T..*, 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857, 860 (1999). *See also Joseph Martin, Jr. Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109, 436 N.Y.S.2d 247, 249 (1981) ("[B]efore the power of law can be invoked to enforce a promise, it must be sufficiently certain and specific so that what was promised can be ascertained."); *Brands v. Urban*, 182 A.D.2d 287, 289, 587 N.Y.S.2d 698, 700 (2d Dep't 1992) ("It is well established that a contract is unenforceable where there is no meeting of the minds between the parties thereto regarding a material element thereof."). Indeed, "definiteness as to material matters is of the very essence in contract law" because, without it, a court would be forced to intervene and "impos[e] its own conception of what the parties should or might have undertaken, rather than confining itself to the implementation of a bargain to which they have mutually committed themselves." *Schumacher*, 52 N.Y.2d at 109, 436 N.Y.S.2d at 249.[2]

---

[2] New York law governs the parties' dispute since New York is the forum state; Avenue is a Delaware corporation headquartered in New York; LCPI is headquartered in New York; and LCPI is a New York corporation. *See, e.g., Indosuez Int'l Fin. B.V. v. National Reserve Bank*, 98 N.Y.2d 238, 248, 747 N.Y.S.2d 631, 637 (2002) (New York law rather than Russian law applied to 14 non-deliverable forward currency exchange transactions because New York had paramount interest in enforcement of the transactions: parties agreed that payment was to be made in United States dollars, parties relied on New York's experience with and ability to ensure orderly dollar currency transactions by choosing New York law in 10 of the 14 confirmations, and choosing a New York forum in at least six of the confirmations).

KL3 2693415.6

Here, the parties had no binding contract since there was no meeting of the minds with respect to several important terms. Among the open issues were the subject matter of the trade -- the precise amount of debt that Avenue would purchase from LCPI -- and the structure of the transaction -- assignment or participation.

For definitive proof that the parties did not reach agreement on all material terms, the Court need look no further than the absence of a final trade confirmation executed by both parties. That the parties did not execute a final trade confirmation after extensive negotiations over its terms is compelling evidence that the parties did not reach agreement on all material terms and, further, did not intend to enter into a binding transaction without final agreement on all the terms set forth therein. *Angelo, Gordon & Co.*, 2006 WL 870453, at *7 (no agreement for sale of distressed debt where no signed trade confirmation, even though parties had confirmed trade by email; "'there is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents .... In this case, there was never an executed final agreement or a meeting of the minds. Certain material terms were never finalized or agreed to") (citation omitted); *Resurgence Asset Mgmt. v. Bastion Capital Fund, L.P.,* 306 A.D.2d 336, 337, 760 N.Y.S.2d 662, 663 (2d Dep't 2003) (dismissing suit for breach of contract for sale of distressed debt where parties did not sign trade confirmation and were still negotiating its terms).

Moreover, the inclusion of the signature lines on the draft trade confirmation demonstrates that the parties intended to be bound only upon the execution of a document. *See Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT&T Comm'ns, Inc.,* No. 92 Civ. 7862 (KMW), 1994 WL 463014, at *3 (S.D.N.Y. Aug. 24, 1994) (letter characterized as "confirmation" but containing signature line for addressee "tends to show an intention not to be

bound in the absence of a signed writing"); *Technology Fin. Group, Inc. v. Grumman Data Sys. Corp.*, 159 A.D.2d 385, 385, 553 N.Y.S.2d 11, 11 (1st Dep't 1990) (granting summary judgment dismissing contract claim where "the correspondence exchanged by the parties expressed an intention not to be contractually bound unless certain specific documents were executed and until their preliminary negotiations had culminated in the execution of a formal lease agreement."). *Cf. R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984) ("[W]hen a party gives forthright, reasonable signals that it means to be bound only by a written agreement, courts should not frustrate that intent.").

In *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 82-83 (2d Cir. 1985), the Court of Appeals explained why parties are not legally bound by purported oral agreements when, as here, they specifically contemplate execution of a written agreement:

> The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing. That these 'unnoticed' or 'passed by' points of disagreement may in the long view be fairly characterized as minor or technical does not mean that a binding contract was formed prior to the time that they were finally worked out.

(citation omitted). As in *Winston*, when Avenue and LCPI exchanged drafts of the proposed agreement, it become clear that there were material points in disagreement concerning the structure of the transaction that needed to be worked out. To bind Avenue to a contract when there were critical disputed terms would thus "deprive the parties of their right to enter into only the exact contract they desired." *Id.* at 83.

It is also worthy of emphasis that the nature of the parties' proposed transaction – pursuant to which Avenue would purchase a debt with a face amount of more than $5 million – is of the type that courts have required to be reduced to a signed writing in order to be

12

enforceable. *See Angelo, Gordon & Co.,* 2006 WL 870453, at *11 (plaintiff suing to enforce

oral agreement and unsigned trade confirmation for sale of distressed debt "failed to meet its

burden of proving that the distressed debt market considers agreements binding based solely on

phone conversations and emails"). *See also Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.,* 145

F.3d 543, 551 (2d Cir. 1998) (dismissing suit on summary judgment where multi-million dollar

acquisition "clearly was of the type that ordinarily would be committed not only to a writing but

to a formal contract complete with representations and warranties . . . usually found in

sophisticated, formal contracts"); *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257, 262-63 (2d

Cir. 1984) ("The proposed deal involved a $4 million sale of six companies which were

incorporated under the laws of five different countries and which had assets of over $17 million,

sales of $40 million, and profits of $4 million . . . . Thus, the magnitude and complexity of the

deal as reflected in the numerous written contract drafts not only reinforce the parties' stated

intent not to be bound until written contracts were signed, but also reflect a practical business

need to record all the parties' commitments in definitive documents.").

Against this backdrop, our case falls squarely within the ambit of settled authority

uniformly dismissing claims for breach of an alleged distressed debt trade when, as here, there

was no executed trade confirmation and no meeting of the minds. *See Angelo, Gordon & Co. v.*

*Dycom Indus., Inc.,* No. 04 Civ. 1570 (RMB), 2006 WL 870453, at *7 (S.D.N.Y. March 31,

2006) (email confirmations of distressed debt trade not enforceable; "In this [proposed distressed

debt trade], there was never an executed final agreement or a meeting of the minds [because]

[c]ertain material terms were never finalized or agreed to."); *Resurgence Asset Mgmt., LLC v.*

*Bastion Capital Fund, L.P.,* 306 A.D.2d at 337, 760 N.Y.S.2d at 663 (distressed debt trade not

enforceable where trade confirmations were never executed; "The documentary record alone

established that the parties never agreed to all the material terms of the proposed sale [of distressed debt] and therefore the defendants were not contractually bound."). *See also Express Indus. & Terminal Corp. v. D.O.T.*, 93 N.Y.2d at 588-89, 693 N.Y.S.2d at 859 (affirming lower court ruling that that parties "did not reach a meeting of the minds on all essential terms of the [contract]" because they had left "certain important items open for further negotiation").

III.

Even Assuming an Enforceable Contract Existed,
the Motion Should be Denied Because LCPI Committed the First Material Breach

Finally, even if there were somehow an enforceable agreement between the parties, the Court should still deny LCPI's motion. LCPI terminated the purported trade prior to the petition date when it committed a material breach of that supposed agreement by not closing within a commercially reasonable time-frame.

A contract terminated prior to the petition date cannot be assumed. *See, e.g., In re 2903 Wines & Spirits, Inc.*, 45 B.R. 1003, 1008 (S.D.N.Y. 1984) ("[A]n executory contract validly terminated prior to the filing of a bankruptcy petition cannot be resurrected by the filing of the petition."). As set forth above, the time-frame for parties to settle a distressed debt transaction under the LSTA guidelines is twenty business days after the trade date. The LSTA provides that if no settlement date is specified, the buyer and seller shall use reasonable endeavors to settle the transaction "as soon as practicable after the Trade Date." Closing the transaction in the timeframes mandated by the LSTA is material to a distressed debt transaction because, without those timeframes, a buyer would be in the untenable position of having to wait an undefined period of time and bear all the risk of the fluctuations of the market price for the commercial loans at issue; the seller could delay the closing until the market price for the loans made the transaction profitable for the seller and unprofitable for the buyer.

14

LCPI's failure to close the proposed trade and convey to Avenue the debt in question as soon as reasonably practicable was a breach that went to the root of the agreement between the parties -- given the fluctuations in market prices of distressed loans -- and undoubtedly was material. Courts have consistently found in similar circumstances that the failure to close in a timely fashion constitutes a material breach. *See, e.g., In re New Breed Realty Enters., Inc.*, 278 B.R. 314, 322 (Bankr. E.D.N.Y. 2002) ("Cases interpreting New York law are unanimous in holding that the failure to close by the specified closing date in a sales contract that declared time to be of the essence is a material breach which terminates defaulting party's right to enforce the contract."); *Bowery Boy Realty, Inc. v. H.S.N. Realty Corp.*, 55 A.D.3d 766,, 2008 WL 4682639, at *2 (2d Dep't Oct. 21, 2008) (failure to close by scheduled date "would constitute a material breach of the contract"); *Dub v. 47 East 74th St. Corp.*, 204 A.D.2d 145, 145, 611 N.Y.S.2d 198, 198 (1st Dep't 1994) (in an action to recover contract deposit, granting summary judgment to the purchaser where the seller failed to tender performance on the time of the essence date).

Against this backdrop, if the Court were to find that LCPI's belated filing should be excused and, in addition, that an enforceable contract exists between LCPI and Avenue with respect to proposed Quebecor trade, the Court should still deny LCPI's motion because LCPI terminated the purported trade prior to the petition date by failing to close within a commercially reasonable time.

KL3 2693415.6

Conclusion

For these reasons, LCPI's motion should be denied as to Avenue.

Dated: New York, New York
       January 2, 2009

                                      Kramer Levin Naftalis & Frankel LLP


                              By:___/s/ Jonathan M. Wagner
                                 Jonathan M. Wagner (JW-7197)
                                 Dana L. Post (DP-3889)

                               *Attorneys for Avenue Investments, L.P.*

                               1177 Avenue of the Americas
                               New York, New York 10036
                               Telephone:  (212) 715-9100

KL3 2693415.6

# **EXHIBIT A**

**LSTA**                                                   DECEMBER 2006

# LEHMAN COMMERCIAL PAPER INC
### LSTA DISTRESSED TRADE CONFIRMATION

*KL Comments 5-5*

To:   Avenue Investments, LP
      Contact:  George Quijano
      Tel No.:  212-850-7512
      Fax No.:  212-878-3543
      Email:    gquijano@avenuecapital.com

From:  Lehman Commercial Paper Inc.
       Contact:  Martha Martinez           Confirms:  Jessica Markowitz
       Tel No.:  212-526-4220              Tel. No.:  212-526-7596
       Fax No.:  646-758-4993             Fax No.:   646-758-4993
       Email:   marthmar@lehman.com       Email:    jessica.markowitz@lehman.com

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc., (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| Trade Date: | April 22, 2008 |
| Seller: | Lehman Commercial Paper Inc.[2] ☒ Principal[3] ☐ Agent |
| Buyer: | Avenue Investments, LP[4] ☒ Principal[3] ☐ Agent |
| Credit Agreement: | AMENDED AND RESTATED CREDIT AGREEMENT dated as of the 15th day of December 2005 is made among QUEBECOR WORLD INC., a corporation amalgamated under the laws of Canada and having its registered office in Montreal, Province of Quebec, Canada ("QWI" or, sometimes, a "Borrower") and QUEBECOR WORLD (USA) INC., a corporation incorporated under the laws of the State of Delaware, U.S.A. and having its registered office of its state of incorporation in Wilmington, State of Delaware, U.S.A. ("QWUSA" or sometimes, a "Borrower" or a "Restricted Entity") and EACH OF THE FINANCIAL INSTITUTIONS NAMED on the signature pages thereto and ROYAL BANK OF CANADA, a Canadian chartered bank having its head office in Montreal, Province of Quebec, Canada in its capacity as administrative agent for the Lenders (in such capacity, or any successor in such capacity, the |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Sections 11 and 19 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

LSTA EFFECTIVE DECEMBER 2006 Copyright © LSTA 2006. All rights reserved.

2

"Administrative Agent").

| | |
|---|---|
| Borrower: | QUEBECOR WORLD INC.[5] |
| Form of Purchase: | If no election is made, "Assignment" applies. |
| | ☒ Assignment |
| | ☒ Participation |
| | ☐ Other: _____ |

Purchase Amount/
Type of Debt:

| Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|
| $1,230,319.84 | Revolver | Revolver A | N/A |
| $2,761,959.90 | Revolver | Revolver B | N/A |
| $1,017,720.26 | Revolver | Revolver C | N/A |

| | |
|---|---|
| Purchase Rate: | 78.500% |
| Accrued Interest: | ☐ Settled Without Accrued Interest |
| | ☒ Trades Flat |
| Credit Documentation to be provided by Seller: | ☐ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date) |
| | ☒ No |
| LSTA Standard Other Terms of Trade: | ☐ This Transaction shall be subject to the successful completion of the purchase by Seller of the Purchase Amount of the Debt to be sold to Buyer hereunder |
| | ☐ This Transaction shall be subject to the successful completion of the sale by Buyer of the Purchase Amount of the Debt to be purchased from Seller hereunder |
| | ☐ Flip representations shall apply (election is applicable only if Seller is a Riskless Principal (i.e., the first box above has been checked), the settlement of the sale of the Purchase Amount of the Debt to Buyer from Seller occurs no later than one (1) business day after the settlement of the purchase of the Purchase Amount of the Debt by Seller from Seller's immediate prior seller(s) and the other criteria specified in Section 11 of the Standard Terms and Conditions are met) |
| Trade Specific | ☒ Specify Other Terms: |

---

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[6] Specify amount of debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

3

| | |
|---|---|
| **Other Terms of Trade:** | Unless otherwise specified herein, Lehman Commercial Paper Inc. shall not be required to pay (in the aggregate) more than one half of one Agent transfer fee for transactions specified in this or any other confirmation) allocated by an investment manager or advisor to multiple funds or accounts [9] |
| **Subject to:** | Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith. |

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *Jessica Markowitz* at the following fax number(s) or e-mail address(es): Jessica.markowitz@lehman.com.

If you have any questions, please contact *Jessica Markowitz* at *212-526-7598.*

**LEHMAN COMMERCIAL PAPER INC.**

Avenue Investments, LP
By: Avenue Partners, LLC, General Partner

By: _____

By: _____

Name: _____

Name: SONIA E. GARDNER, MEMBER

Title: _____

Title: _____

Date: _____

Date: _____

(..continued)

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

# **<u>EXHIBIT B</u>**

**LSTA**                                          DECEMBER 2006

# LEHMAN COMMERCIAL PAPER INC
## LSTA DISTRESSED TRADE CONFIRMATION

### REVISED 5.14.08

**To:**     Avenue Investments, LP
        Contact:  George Quijano
        Tel No.:  212-850-7512
        Fax No.:  212-878-3543
        Email:    gquijano@avenuecapital.com

**From:** Lehman Commercial Paper Inc.
        Contact:  Martha Martinez        **Confirms:**   Jessica Markowitz
        Tel No.:  212-526-4220            Tel. No.:   212-526-7598
        Fax No.:  646-758-4993           Fax No.:   646-758-4993
        Email:    marthmar@lehman.com     Email:   jessica.markowitz@lehman.com

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| **Trade Date:** | April 22, 2008 |
| **Seller:** | Lehman Commercial Paper Inc.[2] ☒ Principal[3] ☐ Agent |
| **Buyer:** | Avenue Investments, LP[4] ☒ Principal[3] ☐ Agent |
| **Credit Agreement:** | AMENDED AND RESTATED CREDIT AGREEMENT dated as of the 15th day of December 2005 is made among QUEBECOR WORLD INC., a corporation amalgamated under the laws of Canada and having its registered office in Montreal, Province of Quebec, Canada ("QWI" or, sometimes, a "Borrower") and QUEBECOR WORLD (USA) INC., a corporation incorporated under the laws of the State of Delaware, U.S.A. and having its registered office of its state of incorporation in Wilmington, State of Delaware, U.S.A. ("QWUSA" or sometimes, a "Borrower" or a "Restricted Entity") and EACH OF THE FINANCIAL INSTITUTIONS NAMED on the signature pages thereto and ROYAL BANK OF CANADA, a Canadian chartered bank having its head office in Montreal, |

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Sections 11 and 19 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

LSTA EFFECTIVE DECEMBER 2006 Copyright © LSTA 2006. All rights reserved.

2

|  |  |
|---|---|
| | Province of Quebec, Canada in its capacity as administrative agent for the Lenders (in such capacity, or any successor in such capacity, the "Administrative Agent"). |
| **Borrower:** | QUEBECOR WORLD INC. [5] |
| **Form of Purchase:** | If no election is made, "Assignment" applies. |
| | ☒ Assignment |
| | ☐ Participation |
| | ☐ Other: _____ |

**Purchase Amount/
Type of Debt:**

| Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|
| $1,370,720.53 | Revolver | Revolver A | N/A |
| $3,072,369.76 | Revolver | Revolver B | N/A |
| $1,495,015.13 | Revolver | Revolver C | N/A |

| | |
|---|---|
| **Purchase Rate:** | 78.500% |
| **Accrued Interest:** | ☐ Settled Without Accrued Interest |
| | ☒ Trades Flat |
| **Credit Documentation to be provided by Seller:** | ☐ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date) |
| | ☒ No |
| **LSTA Standard Other Terms of Trade:** | ☐ This Transaction shall be subject to the successful completion of the purchase by Seller of the Purchase Amount of the Debt to be sold to Buyer hereunder |
| | ☐ This Transaction shall be subject to the successful completion of the sale by Buyer of the Purchase Amount of the Debt to be purchased from Seller hereunder |
| | ☐ Flip representations shall apply (election is applicable only if Seller is a Riskless Principal (i.e., the first box above has been checked), the settlement of the sale of the Purchase Amount of the Debt to Buyer from Seller occurs no later than one (1) business day after the settlement of the purchase of the Purchase Amount of the Debt by Seller from Seller's immediate prior seller(s) and the other criteria specified in Section 11 of the Standard Terms and Conditions are met) |

---

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

3

| Trade Specific<br>Other Terms of Trade: | ☒ Specify Other Terms: |
|---|---|
| | Unless otherwise specified herein, Lehman Commercial Paper Inc. shall not be required to pay (in the aggregate) more than one half of one Agent transfer fee for transactions specified in this or any other confirmation) allocated by an investment manager or advisor to multiple funds or accounts [9] |
| Subject to: | Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith. |

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *Jessica Markowitz* at the following fax number(s) or e-mail address(es): Jessica.markowitz@lehman.com.

If you have any questions, please contact *Jessica Markowitz* at *212-526-7598*.

**LEHMAN COMMERCIAL PAPER INC.**          **Avenue Investments, LP**
                                         **By: Avenue Partners, LLC, General Partner**


By:_____          By:_____


Name:_____          Name:_____


Title:_____          Title:_____


Date:_____          Date:_____


---

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

# **EXHIBIT C**

# LSTA

**DECEMBER 2006**

# LEHMAN COMMERCIAL PAPER INC

## LSTA DISTRESSED TRADE CONFIRMATION

### REVISED 5.22.08

**To:**    **Avenue Investments, LP**
    **Contact:  George Quijano**
    **Tel No.:   212-850-7512**
    **Fax No.:  212-878-3543**
    **Email:     gquijano@avenuecapital.com**

**From: Lehman Brothers Holdings Inc.**
    **Contact:  Martha Martinez**        **Confirms:   Jessica Markowitz**
    **Tel No.:   212-526-4220**           **Tel. No.:   212-526-7598**
    **Fax No.:  646-758-4993**          **Fax No.:   646-758-4993**
    **Email:     marthmar@lehman.com**    **Email:     jessica.markowitz@lehman.com**

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Distressed Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**             April 22, 2008

**Seller:**                Lehman Brothers Holdings Inc.[2] ☒ Principal[3] ☐ Agent

**Buyer:**                Avenue Investments, LP[4] ☒ Principal[3] ☐ Agent

**Credit Agreement:**      AMENDED AND RESTATED CREDIT AGREEMENT dated as of the 15th day of December 2005 is made among QUEBECOR WORLD INC., a corporation amalgamated under the laws of Canada and having its registered office in Montreal, Province of Quebec, Canada ("QWI" or, sometimes, a "Borrower") and QUEBECOR WORLD (USA) INC., a corporation incorporated under the laws of the State of Delaware, U.S.A. and having its registered office of its state of incorporation in Wilmington, State of Delaware, U.S.A. ("QWUSA" or sometimes, a "Borrower" or a "Restricted Entity") AND EACH OF THE FINANCIAL INSTITUTIONS NAMED on the signature pages thereto and ROYAL BANK OF CANADA, a Canadian chartered bank having its head office in Montreal,

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] If Seller or Buyer is acting as a Riskless Principal, specify this in the "Trade Specific Other Terms of Trade" section below. (See Sections 11 and 19 of the Standard Terms and Conditions.) It is not necessary to identify the third party with respect to a Riskless Principal.

[4] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

**LSTA EFFECTIVE DECEMBER 2006**  Copyright © LSTA 2006. All rights reserved.

Province of Quebec, Canada in its capacity as administrative agent for the Lenders (in such capacity, or any successor in such capacity, the "Administrative Agent").

**Borrower:** QUEBECOR WORLD INC. [5]

**Form of Purchase:** If no election is made, "Assignment" applies.

☒ Assignment

☐ Participation

☐ Other: _____

**Purchase Amount/ Type of Debt:**

| Purchase Amount[6] | Type of Debt[7] | Facility[8] | CUSIP Number |
|---|---|---|---|
| $798,739.80 | Revolver | Revolver A | N/A |
| $355,433.49 | Revolver | Revolver A Cad | |
| $2,586,994.96 | Revolver | Revolver B | N/A |
| $1,258,831.75 | Revolver | Revolver C | N/A |

**Purchase Rate:** 78.500%

**Accrued Interest:**

☐ Settled Without Accrued Interest

☒ Trades Flat

**Credit Documentation to be provided by Seller:**

☐ Yes (only applicable if Buyer was not a lender on Trade Date and made its request on or prior to Trade Date)

☒ No

**LSTA Standard Other Terms of Trade:**

☐ This Transaction shall be subject to the successful completion of the purchase by Seller of the Purchase Amount of the Debt to be sold to Buyer hereunder

☐ This Transaction shall be subject to the successful completion of the sale by Buyer of the Purchase Amount of the Debt to be purchased from Seller hereunder

☐ Flip representations shall apply (election is applicable only if Seller is a Riskless Principal (i.e., the first box above has been checked), the settlement of the sale of the Purchase Amount of the Debt to Buyer from Seller occurs no later than one (1) business day after the settlement of the purchase of the Purchase Amount of the Debt by Seller from Seller's immediate prior seller(s) and the other criteria

---

[5] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[6] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[7] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[8] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

3

specified in Section 11 of the Standard Terms and Conditions are met)

**Trade Specific
Other Terms of Trade:**    ☒ Specify Other Terms:

Unless otherwise specified herein, Lehman Brothers Holdings Inc. shall not be required to pay (in the aggregate) more than one half of one Agent transfer fee for transactions specified in this or any other confirmation) allocated by an investment manager or advisor to multiple funds or accounts [9]

**Subject to:**    Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of *Jessica Markowitz* at the following fax number(s) or e-mail address(es): Jessica.markowitz@lehman.com.

If you have any questions, please contact *Jessica Markowitz* at *212-526-7598*.

**Lehman Brothers Holdings Inc.**    **Avenue Investments, LP
By: Avenue Partners, LLC, General Partner**

By:_____    By:_____

Name:_____    Name:_____

Title:_____    Title:_____

Date:_____    Date:_____

_____

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

**<u>EXHIBIT D</u>**

-----Original Message-----
From: Chen, Tina [mailto:tina.chen@lehman.com]
Sent: Monday, December 15, 2008 10:59 AM
To: George Quijano
Subject: Quebecor World Td 04-22-08

> Ladies and Gentlemen:
> Reference is made to the LSTA Distressed Trade Confirmation dated
> April 22, 2008 (the "Trade Confirmation") between Avenue Investments,
> L.P (the "Counterparty") and Lehman Brothers Holdings Inc. s("LBHI" or
> the "Debtor") pursuant to which Debtor agreed to sell and Counterparty
> agreed to purchase $5,000,003.00  in principal amount of Quebecor
> World Inc. made to the Borrower at a purchase rate of 78.50% (the
> "Trade").
>
> As you are aware, on Spet 15, 2008, the Debtor commenced a voluntary
> case under chapter 11 of title 11 of the United States Code (the
> "Bankruptcy Code") with the United States Bankruptcy Court for the
> Southern District of New York (the "Bankruptcy Court").
>
> By electronic mail correspondence dated November 4, 2008, Debtor
> informed you that it intends to reject the Trade.  In addition, Debtor
> listed the Trade on the list of "Rejected Trades" annexed as Exhibit B
> to the Debtors' Motion for an Order Pursuant to Section 365 of the
> Bankruptcy Code Approving the Assumption or Rejection of Open Trade
> Confirmations (the "Motion").  As you may be aware, Debtor may not
> assume or reject an executory contract without the approval of the
> Bankruptcy Court.  A hearing with respect to the Motion is scheduled
> for December 16, 2008 (the "Hearing Date").
>
> Consistent with Debtor's fiduciary obligation to maximize the value of
> its estate for the benefit of all creditors, Debtor has continued to
> review all of the "Open Trades" (as defined in the Motion) and the
> proposed treatment thereof.
>
> Please take notice that, as a result of its review, Debtor has made
> the determination to assume the Trade Confirmation in accordance with
> its rights under section 365 of the Bankruptcy Code.  Such

1

> determination has been made on the basis that Counterparty will not
> assert any right of recoupment or setoff that it may have under a
> master netting agreement or otherwise with respect to its obligations
> under the Trade Confirmation and that, upon settlement of the Trade
> Confirmation, Counterparty shall pay Debtor in cash or other
> immediately available funds the purchase price set forth in the Trade
> Confirmation in full, without setoff, recoupment or counterclaims of
> any kind whatsoever.
>
> On or before the Hearing Date, Debtor intends to amend the exhibits to
> the Motion accordingly.
>
>
> Thanks and Regards,
> Tina Chen
> LEHMAN BROTHERS HOLDING INC.
> *   tina.chen@lehman.com
> THIS ELECTRONIC CORRESPONDENCE IS SENT TO YOU BY LEHMAN COMMERCIAL
> PAPER INC. A DEBTOR IN POSSESSION UNDER CH. 11 OF THE UNITED STATES
> BANKRUPTCY CODE (THE "DEBTOR"). THE DEBTOR IS IN NOT AFFILIATED IN
> ANY WAY WITH BARCLAYS CAPITAL OR ANY OF ITS AFFILIATES.  PLEASE DIRECT
> ALL REPLIES TO THE DEBTOR.
>
>
>
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This message is intended only for the personal and confidential use of the designated
recipient(s) named above.  If you are not the intended recipient of this message you are
hereby notified that any review, dissemination, distribution or copying of this message is
strictly prohibited.  This communication is for information purposes only and should not
be regarded as an offer to sell or as a solicitation of an offer to buy any financial
product, an official confirmation of any transaction, or as an official statement of
Lehman Brothers.  Email transmission cannot be guaranteed to be secure or error-free.
Therefore, we do not represent that this information is complete or accurate and it should
not be relied upon as such.  All information is subject to change without notice.


--------
IRS Circular 230 Disclosure:
Please be advised that any discussion of U.S. tax matters contained within this
communication (including any attachments) is not intended or written to be used and cannot
be used for the purpose of (i) avoiding U.S. tax related penalties or (ii) promoting,
marketing or recommending to another party any transaction or matter addressed herein.


This message is for the named person's use only. It may contain sensitive and private
proprietary information and/or legally privileged information and/or confidential
information. No confidentiality or privilege is waived or lost by any mistransmission. If
you are not the intended recipient, please immediately delete this message and all copies
and attachments from your system, destroy any hard copies of it and please notify the
sender. Any disclosure, copying,distribution, or use of any contents of the information
received in error is strictly prohibited Information contained in this message must not be
construed as giving investment advice within or outside the United Kingdom. Any opinions
expressed or reflected herein may be changed without notice at any time. The value of all
investments and the income from them can go down as well as up; this may be due in part to
exchange rate fluctuations. Past performance is not necessarily a guide to future
results. Avenue Europe Management, LLP does not warrant the accuracy, adequacy or
completeness of the information and data contained herein and expressly disclaims
liability for errors or omissions in this information and data.  No warranty of any kind,
implied, expressed or statutory, is given in conjunction with the information and data.
(c) 2006.  All rights reserved.
 Although this message has been scanned for viruses by the sender no responsibility can be
accepted by the sender for any viruses included with or in this message.  Avenue Europe
Management, LLP is authorised and regulated by the Financial Services Authority. Avenue
Europe Management, LLP, 4th Floor, 25 Knightsbridge London SW1X 7RZ. Registered in England
no: OC307088