WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                         :

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **Case No. 08-13555 (JMP)** |
| | : | |
| **Debtors.** | : | **(Jointly Administered)** |
| | : | |
| | : | |

------------------------------------------------------------------x

### DEBTORS' RESPONSE IN OPPOSITION TO THE MOTION OF THE NEW YORK STATE COMPTROLLER FOR THE APPOINTMENT OF A TRUSTEE OR, IN THE ALTERNATIVE, AN EXAMINER WITH EXPANDED POWERS

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        The response in opposition of Lehman Brothers Holdings Inc. ("LBHI") and its

affiliated debtors and as debtors in possession, (the "Debtors" and, collectively with their non-

debtor affiliates, "Lehman"), to the motion of New York State Comptroller (the "Comptroller")

for Appointment of a Trustee or, in the Alternative, an Examiner with Expanded Powers (the

"Motion"), dated November 4, 2008, and respectfully represents:

### Preliminary Statement

        1.      There is no basis for the appointment of a trustee in these chapter 11 cases.

The Comptroller has failed to provide an iota of credible evidence to establish cause for the

appointment of a trustee or that such an appointment would be in the interests of the economic

stakeholders of the Debtors' estates, particularly in the perspective that the Debtors have

acknowledged that the appointment of an examiner under section 1104(b) of the Bankruptcy

Code to conduct such investigation of the Debtors and their affairs, as the Court may determine

to be appropriate, is imminent.

2.      The Comptroller's reliance upon unsubstantiated hyperbole of media reports

and unfounded rumors does not establish cause or that the interests of the administration of the

Debtors' estates require the appointment of a trustee.  The Comptroller's motion for the

appointment of a trustee should be denied.

**Cause Does Not Exist for the
Appointment of a Chapter 11 Trustee**

3.      The Comptroller's motion is fatally defective.  In lieu of credible evidence,

the Comptroller has resorted to unfounded accusations, rumors and gross speculation to accuse

the Debtors' management, and in particular, the Chairman and former Chief Executive Officer,

Richard S. Fuld, with gargantuan misconduct, incompetence and mismanagement without a

single shred of substantive supporting proof.  The Comptroller fails to recognize that Lehman

was a victim of a financial tsunami that was beyond its control.  The Comptroller blithely ignores

that under the long term leadership of Mr. Fuld, Lehman had become one of the premier

independent investment banking concerns in the world and had steadily provided significant

returns to its investors, employees and shareholders.  Likewise, the Comptroller is oblivious to

the critical facts that caused the financial meltdown that engulfed Lehman and, generally, the

financial markets, including, *inter alia*, the failure of government authorities to appropriately

regulate and oversee financial markets and the deficiencies of rating agencies.  The unsupported

blunderbuss accusations of the Comptroller are insufficient to establish cause under the

Bankruptcy Code.

> 4.    Section 1104(a) of the Bankruptcy Code provides, in relevant part, that –
>
>> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case.

11 U.S.C. §1104(a).

> 5.    In *In re Smart World Tech., LLC*, 423 F.3d 166, 176 (2d Cir. 2005), the

Court of Appeals stated unequivocally that the appointment of a chapter 11 trustee is an

"extraordinary remedy."  Indeed, it is the strong presumption underlying section 1104(a) of the

Bankruptcy Code and the applicable principles of law that unless there is a clear and convincing

showing of credible evidence establishing cause, the appointment of a trustee should be denied.

*See, e.g., In re Marvel Entm't Group, Inc.*, 140 F.3d 463 (3d Cir. 1996); *In re Ionosphere Clubs,*

*Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (citing H.R. Rep. No. 595, 95th Cong., 1st Sess.

220 (1977), U.S. Code Cong. & Admin. News 1978, pp. 5787, 6179, 6180).

> 6.    The burden is on the Comptroller to demonstrate by "clear and convincing

evidence" that cause exists to appoint a trustee in these cases.  *In re The 1031 Tax Group, LLC*,

374 B.R. 78, 85 (Bankr. S.D.N.Y. 2007).  It is a very substantial burden that cannot be satisfied

by speculation and unsubstantiated hyperbole.  The difficulty of sustaining such burden is

demonstrated by the extensive cases reflecting the denial of motions for the appointment of a

trustee in similarly large and complex cases beset by similarly unfounded assertions of cause.

*See In re Adelphia Commc'ns Corp., et. al.*, 336 B.R. 610, 645-648 (Bankr. S.D.N.Y. 2006)

(denying creditor group's request for appointment of chapter 11 trustee and collecting cases, including, *inter alia*, Enron, World-Com, and Global Crossing, where the appointment of a trustee was either denied for lack of cause or deemed unnecessary where an examiner had been appointed in the particular case.)

7.    The Comptroller has failed to provide any admissible proof upon which an adjudication may be made as to the asserted "fraud, dishonesty, incompetence, or gross mismanagement" on the part of Mr. Fuld or the Board of Directors ("Board") before or after the commencement of the chapter 11 cases.  The Comptroller's litany of purported "facts" may be classified into three general and misinformed grievances: (i) the Board and Mr. Fuld myopically failed to foresee Lehman's inevitable failure; (ii) the Board and Mr. Fuld failed to adequately prepare for, or mitigate the consequences of, such failure; and (iii) the Board and Mr. Fuld are not qualified and ill-suited to supervise Mr. Bryan Marsal, who acted as Chief Restructuring Officer from September 14, 2008 through December 31, 2008 and became the Chief Executive Officer of LBHI on January 1, 2009, in the administration of these extraordinarily complex cases.[1]  There is absolutely no support whatsoever for the purported grievances argued by the Comptroller.

8.    The Comptroller is wearing blinders.  The pertinent facts are of no concern to him.  He ignores actual facts including, that the Chairman of the Federal Reserve System and the United States Treasury Department, as well as others, failed to foresee the oncoming financial tsunami, as did most of the economists and financial analysts.  In March 2007, Ben S.

---

[1]  Indeed, the lead plaintiffs in the prepetition securities class action did not join the Comptroller's request to appoint a chapter 11 trustee in light of Mr. Fuld's imminent departure, concluding that the appointment of an examiner would be in the better interests of the creditors in theses cases.  *See Lead Plaintiffs' Joinder in Motion of New York State Comptroller for Appointment of an Examiner with Expanded Powers* [Dkt. No. 1686] (the "Lead Plaintiffs' Joinder").

Bernanke, the Chairman of the Board of Governors of the Federal Reserve System ("Federal Reserve"), testified that the "principal source" of the slowdown in the U.S. economy's growth, was the result of a "substantial correction in the housing market."[2] He went on to state that, "[a]t this juncture, . . . *the impact on the broader economy and financial markets of the problems in the subprime market seems likely to be contained.*"[3] In July 2007, Mr. Bernanke stated that the subprime crisis would result, at most, in a loss of $50 to 150 billion.[4] Later, in October 2007, Mr. Bernanke remarked that despite the recent turmoil in the financial markets which could be attributed to the subprime crisis, the "banking system [was] healthy."[5] Less than six months later, buttressed by emergency financing of $30 billion provided by the Federal Reserve, Bear Stearns Companies, Inc. was compelled to sell itself to JP Morgan Chase. Notably, the problems of Bear Stearns, in part, may have been triggered by the herd instinct that triggered the proverbial "run on the bank." Mr. Bernanke defended the decision of the Federal Reserve to, in effect, bail out Bear Stearns and its stockholders, by relying upon Depression-era authority that it had not used in over 60 years. Mr. Bernanke testified that:

> [T]he issues raised [by the potential failure of Bear Stearns] extended well beyond the fate of one company. [The U.S.] financial system is extremely complex and interconnected, and Bear Stearns participated extensively in a range of critical markets. With financial conditions fragile, the sudden failure of Bear Stearns likely would have led to a chaotic unwinding of positions in those markets and

---

[2]  Testimony of Chairman Ben S. Bernanke before the Joint Economic Committee of the United States Congress on March 28, 2007, available at: http://www.federalreserve.gov/newsevents/testimony/bernanke20070328a.htm (last viewed Jan. 2, 2009).

[3] *Id.* (emphasis added).

[4]  CNN, *Bernanke: Subprime hit could top $100B*, July 19 2007, available at: http://money.cnn.com/2007/07/19/news/economy/bernanke/index.htm?postversion=2007071916 (last viewed Jan. 2, 2009).

[5] Speech by Chairman Ben S. Bernanke at the Economic Club of New York, New York, October 15, 2007, available at:  http://www.federalreserve.gov/newsevents/speech/bernanke20071015a.htm (last viewed Jan. 2, 2009).

could have severely shaken confidence.  The company's failure could also have cast doubt on the financial positions of some of Bear Stearns' thousands of counterparties and perhaps of companies with similar businesses.  ***Given the current exceptional pressures on the global economy and financial system, the damage caused by a default by Bear Stearns could have been severe and extremely difficult to contain***.  Moreover, the adverse effects would not have been confined to the financial system but would have been felt broadly in the real economy through its effects on asset values and credit availability.  To prevent a disorderly failure of Bear Stearns and the unpredictable but likely severe consequences of such a failure for market functioning and the broader economy, the Federal Reserve, in close consultation with the Treasury Department, agreed to provide funding to Bear Stearns through JPMorgan Chase. [6]

Notwithstanding the crisis precipitated by the near collapse of Bear Stearns and its rescue by the Federal Reserve and U.S. Treasury Department, Mr. Bernanke continued to predict that economic growth in the United States would resume in the second half of 2008.[7]

9.    At the time that the Bear Stearns crisis erupted, its debt to equity ratio was estimated to be 33 to 1.[8]  In contrast, Mr. Fuld and Lehman's management worked diligently through 2008 to significantly reduce Lehman's total leverage and achieved a debt to equity ratio of approximately 21.4:1.  Nevertheless, it was determined that unlike Bear Stearns, Lehman was not eligible for a bailout or support by the federal government.  Importantly, the decision to let Lehman fail was not based upon a determination that its management was either incompetent or had grossly mismanaged Lehman or engaged in fraudulent conduct.  Rather, as Mr. Bernanke recently explained:

> ***Lehman was not allowed to fail . . . in the sense there was some choice being made***.  There was no mechanism, there was no option, there was no set of rules,

---

[6]  Testimony of Chairman Ben S. Bernanke before the Joint Economic Committee of the United States Congress on April 2, 2008, available at:
http://www.federalreserve.gov/newsevents/testimony/bernanke20080402a.htm (last viewed Jan. 2, 2009).

[7]  *Id.*  (emphasis added).

[8]  *See* U.S. Securities and Exchange Commission, Office of the Inspector General, *SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Entity Program, Report No. 446-A-B*, at Appendix IX, 120 (September 25, 2008), available at: http://www.sec.gov/about/oig/audit/2008/446-a.pdf
(last viewed Jan. 2, 2009).

there was no funding to allow [the Federal Reserve] to address [Lehman's] situation. [However,] we recognize . . . that systemic risk is a very serious matter. *We've never felt otherwise; we've never been deluded into thinking that allowing systemically critical firms [such as Lehman] to fail was in any way going to be anything other than a very serious problem*. I do believe we now have some better tools to address it. In the longer term, once again, we need to have resolution authorities that will allow us in a systematic and congressionally approved manner to address the resolution of large, nonbank, . . systemically critical firms.[9]

It was only after the decision not to save Lehman that the Federal Reserve and the U.S. Treasury Department argued that they did not have the adequate "tools" with which to deal with the consequences of the failure of a "systemically critical" firm such as Lehman.

10.    The Federal Reserve and the U.S. Department of the Treasury adopted a different set of criteria for the giant insurance firm American International Group ("AIG"), as they rushed on September 14, 2008 to provide emergency funding of approximately $85 billion (almost three times the amount used to finance the Bear Stearns' bailout) for AIG. The amount increased by an additional $37.8 billion shortly thereafter and has continued to increase.

11.    Subsequent to the Lehman collapse, Henry Paulson, Secretary of the Treasury, with the support of Mr. Bernanke and the Federal Reserve, sought additional "tools" to deal with the negative consequences of the Lehman decision. Those tools have included the "Troubled Assets Relief Program" ("TARP"), which authorizes the use of up to $700 billion in taxpayer funds to, among other things, purchase toxic assets and infuse distressed financial firms with billions of dollars. The disappearance of independent investment banking firms such as Morgan Stanley and Goldman Sachs, who are now bank holding companies, along with the other entities seeking bank holding company status, is demonstrative of the unfortunate fallout from the lack of foresight and misconceptions of the leading financial institutions and experts that

---

[9]  Wall Street Journal, *Fed Chairman's Q&A on Financial Crisis*, October 16, 2008, available at: http://online.wsj.com/article/SB122409761899937343.html (last viewed Jan. 2, 2009).

engulfed Lehman and others.  Mr. Fuld, the Lehman Board and its management, employees,

customers and others are the victims of the foregoing and not the perpetrators.

12.    Mr. Fuld detailed during his Congressional testimony on October 6, 2008

that between 2004 and 2007 Lehman had four consecutive years of record-breaking financial

results.  That between 1994 and 2007, Lehman's market capitalization grew from $2 billion to

$45 billion.[10]  During that time, Lehman's share price escalated from $5 per share to $86 per

share, an average annual return for shareholders of 24.6%.[11]  Consequently, what Lehman's

demise demonstrates is that in a world of complex, extremely large financial transactions –

involving novel and highly esoteric and sophisticated securities that occur trade a velocity of

speed unknown 20 years ago – the manner in which banking businesses are conducted has

changed and, further, the historical model of a large investment bank that does not have

depository accounts may not be able to withstand sudden and severe downturns in the financial

markets.  Thus, the era of independent investment banks may have ended, accelerated perhaps by

the repeal of the Glass-Steagall Act in 1999.  In that context, it must be conceded that a major

factor in the Lehman situation is the economic circumstances of the global economy that

precipitated Lehman's demise.  The Comptroller has failed to demonstrate otherwise or to

establish any indicia of cause to mandate the appointment of a trustee consistent with section

1104(a) of the Bankruptcy Code.

13.    The Comptroller's unsubstantiated statements that Mr. Fuld and the Board

failed to take appropriate action or prepare for the chapter 11 cases is without foundation and

---

[10]   Statement of Richard S. Fuld, Jr. Before the United States House of Representatives Committee on
Oversight and Government Reform, October 6, 2008 at 3-4, available at:
http://oversight.house.gov/documents/20081006125839.pdf [hereinafter, "Fuld Opening Statement"]
(last viewed Jan. 2, 2009).

[11] *Id*. at 4.

contrary to the facts.  Recognizing the potential changing economic climate in 2008, Lehman undertook to strengthen its financial condition by taking actions that included:  (i) closing down its mortgage origination business; (ii) reducing its leveraged loan exposure; (iii) reducing its total assets by $188 billion, by, among other actions, "specifically reducing residential and commercial real-estate assets by 38%;" and (iv) dramatically reducing its net leverage to "one of the best leverages on Wall Street."[12]  In addition, Lehman raised capital, changed its senior management team, and reduced expenses.[13]  Further, in the summer of 2008 and up until the commencement of the LBHI chapter 11 case, Lehman actively pursued purchasers for all or part of its business.

14.    Throughout 2008, Lehman worked closely with the Securities and Exchange Commission ("SEC") and the Federal Reserve in the interests of protecting its business and its economic stakeholders.  Mr. Fuld testified that the agencies:

> actively conducted regular, and at times, daily oversight of [Lehman's] business and balance sheet.  ***Representatives from the SEC and the Fed were in [Lehman's] offices on a regular basis, monitoring [its] daily activities***.  They saw what [Lehman] saw in real time as they reviewed our liquidity, funding, capital, risk management and mark-to-market process. Lehman Brothers had specific, dedicated teams that worked with the SEC and the Fed[eral Reserve] to take them through our finances and risk management, and answer any and all of their questions and provide them with all the information they requested.  These were open conversations with seasoned and dedicated government officials. ***Quarter to quarter, month to month, regulators saw how we reduced our commercial real-estate holdings; how we increased our liquidity pool; how we decreased leverage and strengthened our capital levels***.  They actively reviewed our risk management reports, which included our hedges for each business. They saw our "mark to market" process and how we arrived at our valuations, including our mortgage and commercial real-estate valuations.  They held regular price verification reviews. ***They were privy to everything as it was happening***.[14]

---

[12] *Id*. at 6.

[13] *Id.* at 5.

[14] *Id.* at 6.

After the second quarter of 2008, Lehman developed a "series of options" intended to strengthen the firm, including working with regulators to "develop a plan to separate the vast majority of [its] commercial real estate assets from [its] core business by spinning off those assets to [its] shareholders in an independent, publicly-traded entity."[15]  Unfortunately, Lehman was unable to execute the spin-off because of a "sharp drop in [its] share price following leaks to the press about confidential negotiations with a potential purchaser, and rumors regarding [its] liquidity and capital, "which compelled Lehman to pre-announce" earnings before [it] had a chance to complete those plans or any of the alternatives [it]was] pursuing."[16]  Shortly thereafter, however, Lehman faced an extraordinary run on the bank, similar to what had occurred in relation to Bear Stearns.  It was a major factor that led directly to LBHI's chapter 11 bankruptcy.  Therefore, it was not for a lack of adequate preparation that Lehman faced failure, but because, as this Court has recognized, Lehman "became a victim.  In effect, the only true icon to fail in the tsunami that [had] befallen the credit markets."[17]

15.     Nonetheless, the Comptroller further argues that, as evidence of the alleged misconduct of Mr. Fuld and the Board, that they failed to prepare Lehman for bankruptcy.  The Comptroller's continued myopia reflects his failure to understand that in the financial community the mere suggestion that a major financial firm is considering and pursuing the preparation of a bankruptcy petition would result in a self-fulfilling prophecy.  Any assertions to the contrary would fly in the face of what is known about the way and manner in which financial markets operate.  History demonstrates that the value of a financial firm can dissipate in a matter of a few

---

[15]  Fuld Opening Statement at 7.

[16]  *Id.*

[17]  Hearing Tr. 9/19/2008 at 4:36 pm at 248:21-23 [Dkt No. 318].

days as a result of negative rumors, misperceived facts, and a declining economy.  Bear Stearns

and Lehman are case book examples of this phenomenon.

16.    The Comptroller's additional allegations that the Board is unqualified and ill-

suited to supervise the administration of these cases likewise are without merit.  The

Comptroller's attempts to portray the Board as "good old guy" appointees, with little interest or

qualifications as to the financial services industry, is patently false.  Each member of the Board

was elected by the shareholders of LBHI (presumably including the Comptroller) on the basis of

merit and not pursuant to any machinations by Mr. Fuld.  A review of the directors qualifications

establishes beyond doubt that they are executives with substantial experience in public

management, the financial services industry and the operations of large and complex businesses.

A brief synopsis of each Director's relevant experience is set forth below:

| Director | Relevant Executive and/or Finance Experience |
|---|---|
| Michael Ainslie | • Director, President and Chief Executive Officer of Sotheby's Holdings (1984-1994).<br>• President and Chief Executive Officer of the National Trust for Historic Preservation (1980-1984).<br>• Chief Operating Officer of N-Ren Corp., a Cincinnati-based chemical manufacturer (1975-1980).<br>• President of Palmas Del Mar, a real estate development company (1971-1975).<br>• Mr. Ainslie began his career as an associate with McKinsey & Company. |
| John Akers | • Chief Executive Officer (1985-1993), President (1983-1989), and Chairman (1986-1993), and Director (1983-1993) of International Business Machines Corporation (IBM).<br>• Director of Pepsico Inc. (1991-Present) and Chairman of its Compensation Committee and Member of Nominating and Corporate Governance Committees.<br>• Director of WR Grace & Co. (July 1997-Present).<br>• Director of Springs Industries Inc. (December 1993-Present).<br>• Director of Hallmark Cards, Inc. (Present).<br>• Director of New York Times Co. (1985-2006). |
| Roger Berlind | • Theatrical Producer and Principal of Berlind Productions (1981-Present).<br>• Governor of the League of American Theaters and Producers (Present).<br>• Trustee of Princeton University, the Eugene O'Neill Theater Center and the American Academy of Dramatic Arts (Present). |

| Director | Relevant Executive and/or Finance Experience |
|---|---|
| Thomas Cruikshank | <ul><li>Chief Executive Officer (1983-1995), President (1983-1989), Chairman (1989-1995), and Director (1977-1996) of Halliburton Company.</li><li>Director, The Goodyear Tire & Rubber Company (Present)</li><li>Directors, Williams Companies Inc. (1990-2004).</li></ul> |
| Marsha Johnson Evans | <ul><li>President and Chief Executive Officer of The American Red Cross (Aug. 2002-Present).</li><li>Director of May Department Stores Co. (Aug. 1998-Present).</li><li>Director of Weight Watcher's International Inc. (Feb. 2002-Present).</li><li>Director of Office Depot Inc. (Sept. 2006-Present).</li><li>Outside Director of Huntsman Corp. (Aug. 2005-Present).</li><li>Director of AutoZone Inc. (Feb. 2002-Mar. 2004).</li><li>National Executive Director of Girl Scouts of the U.S.A. (Jan. 1998-July 2002).</li></ul> |
| Sir Christopher Gent | <ul><li>Senior Adviser to Bain & Co.</li><li>Chief Executive Officer of Vodafone Group PLC (Jan. 1997-July 2003).</li><li>Managing Director of Vodafone Limited (Jan. 1985- Dec. 1996).</li><li>Member of the Board of Directors of Vodafone Group (Aug. 1985-July 30, 2003).</li><li>Group Chief Executive Officer (since December 1996) of China Mobile Communications Corporation, a subsidiary of China Mobile Limited (formerly China Mobile Hong Kong Ltd.).</li><li>Director of China Mobile Hong Kong Ltd. (since Feb. 2001)</li><li>Non-Executive Chairman (Jan. 1, 2005-Present) and Deputy Chairman (June 1, 2004-Jan. 1, 2005) of GlaxoSmithKline Plc.</li><li>Non-Executive Director of GlaxoSmithKline Plc (June 1, 2004-Present).</li><li>Director of Ferrari S.P.A. (April 2006-Present).</li><li>Representative Director of Verizon Wireless Capital LLC (April 2000-Present).</li><li>Director of the International Advisory Board of Hakluyt & Co.</li><li>Member of Financial Reporting Council Limited.</li><li>Member of Advisory Board of British-American Business Council.</li></ul> |
| Jerry Grundhofer | <ul><li>Chairman of the Board, Chief Executive Officer and President of US Bank National Association (Cincinnati, OH), a subsidiary of US Bancorp since February 2001.</li><li>Director (1993-Present), Chairman (Dec. 30, 2002-Dec. 2007), Chief Executive Officer (Feb. 2001-Dec. 2006), and President (Feb. 2001-Oct. 2004) of US Bancorp.</li><li>Chairman Emeritus of US Bancorp (Present).</li><li>Chairman of the Board, President and Chief Executive Officer of Firstar Corporation (Nov. 1998-Feb. 2001).</li><li>Chairman of the Board, President and Chief Executive Officer of Star Banc Corporation from (1993-Nov. 1998).</li><li>Independent Director of Ecolab Inc. (1999-Present).</li><li>Director of Ohio National Financial Services and Ohio National Life Insurance Co. (Present).</li><li>Director of The Midland Company (1998-Present).</li></ul> |
| Roland Hernandez | <ul><li>Founding Principal and Chief Executive Officer of Hernandez Media Ventures.</li><li>President and Chief Executive Officer of Telemundo Group, Inc. (1995-1998).</li><li>Director of Telemundo Group Inc. (Aug. 1989-Present).</li><li>Independent Director of Wal-Mart Stores Inc. (1998-Present).</li><li>Director of TV Azteca S.A., C.V.</li></ul> |

| Director | Relevant Executive and/or Finance Experience |
|---|---|
| Henry Kaufman | • President of Henry Kaufman & Company Inc., an investment management and economic and financial consulting firm (April 1988-Present). <br> • For the previous 26 years, Dr. Kaufman was with Salomon Brothers Inc., where he served as a Managing Director, Member of the Executive Committee, and was responsible for Salomon's four research departments. <br> • Served as an economist at the Federal Reserve Bank of New York. <br> • Director of Federal Home Loan Mortgage Corp. <br> • Member of the International Advisory Committee of the Federal Reserve Bank of New York. <br> • Member of the Advisory Committee to the Investment Committee of the International Monetary Fund Staff Retirement Plan. <br> • Treasurer (and former Trustee) of The Economic Club of New York. <br> • Chairman Emeritus and a trustee of the Institute of International Education, Overseer of the Stern School of Business of New York University. |
| John Macomber | • Principal at JDM Investment Group (1992-Present). <br> • Chief Executive Officer at Celanese Corporation (1973-1986). <br> • Former Senior Partner at McKinsey & Co. (1954-1973). <br> • President and Chairman of the Export-Import Bank of the United States (1988-1992). <br> • Present Directorships: AEA Investors Inc., Florida Power & Light, Rand McNally & Company, Mirror Worlds Technology and the National Executive Services Corp. <br> • Past Directorships:  Mettler-Toledo International Inc., The Brown Group, Bristol-Myers Squibb Company, Pilkington Ltd., Chase Manhattan Bank, RJR Nabisco, French American Foundation and Xerox Corporation. |

17.     The Directors' collective experience provides the Debtors and Mr. Marsal, as Chief Executive Officer, with advice and assistance that inures to the benefit of the administration of the chapter 11 cases and their economic stockholders.  The Board's extended business experience and familiarity with the affairs of Lehman is beneficial and advantageous to Mr. Marsal and the administration of the chapter 11 cases, particularly in light of the loss of so many Lehman employees and officers to other employment opportunities.

18.     The Comptroller's arguments as to the competency and independence of Mr. Marsal, similarly, are totally without substance.  Mr. Marsal is an independent fiduciary who has extended substantial efforts first as the Chief Restructuring Officer and now as Chief Executive Officer to preserve, benefit and enhance the assets of these chapter 11 cases.  Mr. Marsal's reputation and that of his firm, Alvarez & Marsal, are beyond reproach.  Mr. Marsal is a recognized professional and expert in the restructuring and winding down of distressed

businesses.  He oversaw the wind down of the international accounting firm of Arthur Anderson

and the reorganization of the giant health care enterprise of Health South, among others.  Alvarez

& Marsal is one of the premier global financial advisory firms.  Mr. Marsal reports directly to the

Board.  Ten of the existing Directors of the Board are independent Directors.  Mr. Fuld is the

only "insider" who serves as a Director.

19.     None of the decisions cited by the Comptroller as authorities in support of

his position for the appointment of a trustee is apposite.  The majority of those decisions *deny* the

request for the appointment of a trustee.  *See In re The 1031 Tax Group, LLC*, 374 B.R 78

(Bankr. S.D.N.Y. 2007) (denying United States Trustee's request for the appointment of a

chapter 11 trustee where newly-appointed postpetition management was independent and

sufficiently insulated from the influence and control of the debtor's sole director, despite

accusations that such director had fraudulently handled the debtor's affairs pre-bankruptcy);

*Schuster v. Fragone*, 266 B.R. 268, 272 (Bankr. D. Conn. 2001) (denying appointment of trustee

on basis that there was insufficient evidence presented as to management's purported

misconduct, and noting that "[s]ince one would expect to find some degree of . . .

mismanagement in most businesses which have been forced to seek the protection of chapter

11," a court had to "find something more aggravated that simple mismanagement to appoint a

trustee.") (citations omitted); *In re Clinton Centrefuge, Inc.*, 85 B.R. 980 (Bankr. E.D. Pa. 1988)

(holding that appointment of a chapter 11 trustee was not warranted, despite debtor's

engagement in postpetition transactions outside the ordinary course of business and without

notice to creditors, where creditors had sufficient opportunity to monitor debtor's conduct); *In re*

*General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr. E.D.N.Y. 1984) (denying request for

appointment of a chapter 11 trustee where there was a lack of evidence of any postpetition wrongdoing by the debtor's management).

20.      The only two decisions cited by the Comptroller in which the appointment of a trustee was granted, *In re Marvel Entm't Group, Inc.*, 140 F.3d 463 (3d Cir. 1996) ("Marvel Entertainment") and *In re Ionosphere Clubs, Inc.*, 113 B.R. 164 (Bankr. S.D.N.Y. 1990) ("Ionosphere"), are unequivocally distinguishable from the case at bar.  Each of these cases implicated factual issues completely different from those that pertain to the instant chapter 11 cases.

21.      In *Marvel Entertainment*, the United States Court of Appeals for the Third Circuit ("Third Circuit") held that it was not an abuse of discretion for the district court to have directed the appointment of a chapter 11 trustee for the debtor where the intense acrimony that permeated the chapter 11 cases made the further administration and prosecution of such cases tenuous.  In *Marvel Entertainment*, the adversity over control of the cases as between the interests controlled by Carl C. Icahn (the "Icahn Interests") and those of the secured lenders had risen to a level that dialog had ceased.  The situation resulted in what the Third Circuit referred to as an anomaly because the Icahn Interests "began to wear two hats: one as creditors of the holding companies that controlled *Marvel*; the other as the debtor-in-possession." *Id.* at 467.  In the aftermath of aborted settlements, the Icahn Interests initiated litigation, asserting claims of breaches of fiduciary duties against the holding companies. *Id.*  No longer willing to sit on the sidelines and watch the Icahn Interests derail the debtors' chapter 11 cases, the statutory creditors' committee in those cases moved for the appointment of a trustee for "cause." *Id.*  As a consequence of determining that there was  no "reasonable likelihood of any cooperation between the parties in the near future," and that the level of acerbities had brought the

administration of the chapter 11 cases to a standstill, the district court found that "cause" existed for the appointment of a trustee. *Id.* at 473.

22.     On appeal, the decision of the district court was affirmed.  After acknowledging that the appointment of a trustee should be the exception rather than the rule in any chapter 11 case, the Third Circuit explained that such "strong presumption" is premised on a debtor's familiarity with the operation of its business that often makes "it the best party to conduct operations" during a chapter 11 case. *Id.* (citations omitted).

23.     The *Marvel Entertainment* case is limited to its unique facts.  It represents the resolution of an intense dispute between creditors of different classes that was counterproductive to the achievement of the objectives of chapter 11, as recognized by the creditors' committee in those cases.  The facts of the Debtors' cases are very different from those presented in *Marvel Entertainment*.  The Debtors, the Creditors' Committee and other parties in interest are working together cooperatively to achieve the best results for the benefit of all economic stakeholders.  Moreover, while the Debtors' cases are not traditional chapter 11 rehabilitation cases, the familiarity and knowledge which has been acquired by Mr. Marsal and the team of over 100 Alvarez & Marsal personnel that are overseeing the administration of the Debtors' estates is very much the same as a traditional chapter 11 debtor in possession.

24.     Similarly, the *Ionosphere* case relied upon by the Comptroller is inapposite. In that case, a trustee was appointed by the Bankruptcy Court after more than 13 months of administration by a debtor in possession that had resulted in increasing losses and erosion of values.  The creditors' committee in that case established that the debtors' creditors had lost all confidence in the debtors' management because, *inter alia*, the debtors and their non-debtor affiliates had consistently failed to properly project the results of their operations and, therefore,

had "repeatedly reneged" on various reorganization plan agreements that they had entered into with the committee. *In re Ionosphere Clubs*, 113 B.R. at 166-67. After four full days of evidentiary hearings on the issue, it was determined that the committee had established "clear and convincing evidence" that "cause" existed to appoint a trustee because the debtors had "continually made operating projections which [they] ha[d] failed to achieve, with the resultant losses being borne by the unsecured creditors." *Id.* at 168.

25.    The chapter 11 cases at bar are not remotely similar to the situations that existed in *Marvel Entertainment* and *Ionosphere*. Under the leadership of Mr. Marsal, the Debtors have undertaken the Herculean task of recovering as much value as can be obtained from the voluminous, complicated and prolix transactions that the Debtors were involved in at the time of the commencement of the chapter 11 cases. The "chaos" that is referred to by the Comptroller and by others in these cases is the result, *inter alia*, of the unfortunate action by the federal government in choosing to let Lehman fail while it bailed out or assisted so many other financial institutions, a decision that caused defaults in millions of esoteric derivatives that upset the financial markets. Thus, the chaos was not caused by the Debtors, but rather in large part resulted from the financial turmoil precipitated by the events that followed September 15, 2008. Manifestly, no "cause" exists in these chapter 11 cases for the appointment of a trustee.

### The Appointment Of A Trustee Is Not
### In The Interests Of Creditors And The Debtors' Estates

26.    Section 1104(a)(2) provides for the appointment of a trustee if such appointment is in the interests of creditors, equity security holders, and other interests of the estate. In determining whether such an appointment would be in the interests of the named parties and the Debtors, a court "engages in a fact-driven analysis, principally balancing the advantages and disadvantages of taking such a step, and mindful of the many cases . . . that have

held that appointment of a trustee is an extraordinary remedy, and should be the exception, rather than the rule." *In re Adelphia Commc'ns Corp, et. al.*, 336 B.R. at 658 (citations omitted).

27.    The Comptroller's motion is devoid of any credible evidence that the appointment of a trustee in the circumstances pertinent to these chapter 11 cases would be in the interests of any parties or stakeholders, let alone their best interests.  The Comptroller focuses on the need for investigation and alludes to pending proceedings by U.S. attorneys and other governmental authorities as to the circumstances surrounding the demise of Lehman.  However, the Comptroller has to acknowledge that investigations are proceeding, including the investigation that has commenced by the appointed Creditors' Committee in these cases, as described in its motion for authority to conduct examinations under Rule 2004 of the Federal Rules of Bankruptcy Procedure.

28.    In addition, by motion dated December 11, 2008 in the proceedings for the liquidation of Lehman Brothers Inc. ("LBI") under the Securities Investor Protection Act of 1970, as amended, James W. Giddens, Esq., Trustee for LBI (the "SIPA Trustee"), is seeking an order granting authority to issue subpoenas for the production of documents and examination of the current and former officers, directors and employees of LBI, as well as other persons.  *See Trustee's Motion for an Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors, and Employees, and Other Persons*, Case No. 08-01420.

29.    In paragraph 13 of his motion, the SIPA Trustee states that in furtherance of his investigatory and reporting obligations, he intends to investigate, *inter alia*:  "The cause of LBI's demise; potential claims of LBI against officers, directors and employees of LBI and others; the facts, circumstances and propriety of the transfer of LBI subsidiaries to LBHI,

including the negotiations of the terms of the transfer agreement and note executed in connection

with the transfer, the means for valuing the subsidiaries pursuant to the transfer, the selection of

those performing the valuation, and the financial and operational impact from the transfers on the

liquidation process; the financial and operational impact of LBI's relationships with its clearing

banks, the DTCC, and its holders of collateral on the liquidation process; the farts,

circumstances, and propriety of intercompany transfers of cash, securities, and liabilities between

LBI and other Lehman entities both before and after the commencement of the Chapter 11

Cases; the financial and operational impact of LBI's prime brokerage relationships on the

liquidation process; the operational hurdles and financial impact from the transfer of LBI's

customer accounts to other entities; the effect of other financial transactions involving the

transfer to or from LBI of assets and liabilities on the ability to liquidate the debtor and the

transfer of customer accounts; and LBI's pre- and post-petition record-keeping practices."

      30.    As a result of motions for the appointment of an examiner pursuant to

section 1104(b) of the Bankruptcy Code, it is inevitable that an examiner will be appointed and

that it will conduct such investigation as the Court may determine appropriate.  In that context,

and given the activities of the Debtors under the direction of Mr. Marsal, the Creditors'

Committee and the SIPA Trustee, as well as the imminent appointment of an examiner, it cannot

be in the interests of the economic stakeholders for the Court to appoint a trustee.  The activities

of such a trustee may well be redundant in the face of what has already occurred in the

administration of the chapter 11 cases.  The appointment of a trustee at this stage in these

exceptional cases would be inimical to the interests of all economic stakeholders and materially

increase the costs and expenses of the administration of these chapter 11 cases, as well as delay

their administration.  The Comptroller has failed in every respect to establish that the

appointment of a trustee would serve the interests of the economic stakeholders.

**The Appointment of an Examiner Pursuant to**
**Section 1104(b) of the Bankruptcy Code Is Appropriate**

31.    In accordance with the applicable authorities decided by the courts of this

district, the appointment of an examiner as requested by parties in interest will occur.  *See In re*

*Loral Space & Comm'cns, Ltd.*, Case No. 04 Civ. 8645RPP, 2004 WL 2979785

(S.D.N.Y. 2004).  The scope of the duties to be discharged by the examiner is left to the

discretion of the Court.  The Debtors have concluded that such scope should be broader than that

which has been requested by, and as agreed to with, The Walt Disney Company.  Accordingly,

the Debtors suggest that any examiner ("Examiner") appointed be charged with the duties to

investigate:

- Whether Lehman Brothers Commercial Corporation ("LBCC") has any

    administrative claims against LBHI resulting from LBHI's cash sweeps of

    LBCC's cash balances, if any, after September 15, 2008, the

    commencement date of LBHI's chapter 11 case.

- An investigation of all voluntary and involuntary transfers to, and

    transactions with, affiliates, insiders and creditors of LBCC or its

    affiliates, in respect of foreign exchange transactions and other assets that

    were in the possession or control of LBCC at any time commencing on

    September 15, 2008 through October 3, 2008, the day that LBCC

    commenced its chapter 11 case.

- Whether LBCC has more than colorable claims against LBHI for potentially insider preferences arising under the Bankruptcy Code or state law.

- Whether LBCC has more than colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law.

- Whether there are more than colorable claims for breach of fiduciary duties and/or aiding or abetting any such breaches against the officers and directors of LBCC and/or other Debtors arising in connection with the financial distress of the Lehman enterprise prior to the commencement of the LBHI chapter 11 case on September 15, 2008.

- Whether assets of LBCC or other direct and indirect subsidiaries of LBHI were transferred to Barclays Capital Inc. as a result of the sale to Barclays Capital Inc. that was approved by order of the Bankruptcy Court dated September 20, 2008, and whether consequences to LBCC of the consummation of the transaction created more than colorable causes of action that inure to the benefit of its creditors.

- The inter-company accounts and transfers among LBHI and its direct and indirect subsidiaries, including but not limited to:  LBI, LBIE, Lehman Brothers Special Finance ("LBSF") and LBCC, during the 30-day period preceding the commencement of the LBHI chapter 11 case on September 15, 2008.

- The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the pre-chapter 11 lenders and/or financial participants including but not limited to, JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York and others.

- The transfer of the capital stock of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc.

- The events that occurred from September 4, 2008 through September 15, 2008 that may have resulted in commencement of the LBI chapter 11 case.

32.    In addition, any order appointing an Examiner should include the following language:

- The Debtors, the Debtors' affiliates and subsidiaries, and the Creditors' Committee are directed to cooperate with the Examiner in conjunction with the performance of any of the Examiner's duties and the Investigation, and the Debtors and the Creditors' Committee shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, or duplication of, the Investigation.

- Until the Examiner has filed his or her report, neither the Examiner nor the Examiner's representatives or agents shall make any public disclosures concerning the performance of the Investigation or the Examiner's duties.

- The Examiner may retain counsel and any professionals, if he or she determines that such retention is necessary to discharge his or her duties,

with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327.

- The Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for their expenses pursuant to the procedures for interim compensation and reimbursement of professionals ordered in these cases. Compensation and reimbursement of the Examiner shall be determined pursuant to 11 U.S.C. § 330, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in 11 U.S.C. § 330.

- The Examiner shall cooperate fully with any governmental agencies (such cooperation shall not be deemed a public disclosure as referenced above) including, but not limited to, any Federal, state or local government agency that currently or in the future may be investigating the Debtors, their management or their financial condition, and the Examiner shall use best efforts to coordinate with such agencies in order to avoid unnecessary interference with, or duplication of, any investigations conducted by such agencies. The Examiner will follow a protocol to be established with the governmental agencies for the sharing of information to the extent that such sharing benefits the Debtors' estates, and such sharing of information shall be subject to appropriate conditions to protect the Debtors' estates.

- The Examiner shall have the standing of a "party-in-interest" with respect to the matters that are within the scope of the Investigation, and shall be entitled to appear and be heard at any and all hearings in these cases.

33.    The Debtors also suggest that the Examiner should be a person having expertise, knowledge and personal and professional experience with the operation and management of financial institutions and their business and practices, and of financial transactions and securities, including highly complex derivatives and other sophisticated and esoteric securities.

34.    Every effort should be made to avoid duplication of efforts and preserve the resources of the Debtors' estates.  In that respect, the appointed Examiner should be directed to use the financial and investigative expertise of Alvarez & Marsal and not engage other financial advisors.  As stated above, Alvarez & Marsal has the financial expertise and experience that will be needed by the examiner and is independent, disinterested and objective.  Use of their expert services, rather than incurring additional expenses for additional advisors, is in the best interests of the estates and their stakeholders.

## Conclusion

35.    The motion of the Comptroller for the appointment of a trustee is devoid of any admissible evidence to establish cause or that the interests of the economic stakeholders of the Debtors would be best served by such appointment as required by section 1104(a)(1) and (2) of the Bankruptcy Code.  As a consequence, the Comptroller's motion should be denied and the Court should direct the appointment of an examiner pursuant to section 1104(b)(1) of the Bankruptcy Code.

WHEREFORE the Debtors respectfully request (i) that the Comptroller's motion for the appointment of a trustee in these chapter 11 cases be denied, (ii) an Examiner be appointed in accordance with section 1104(b) of the Bankruptcy Code, (iii) the examiner be directed to discharge such duties as determined to be appropriate by the Court, and (iv) the Debtors be granted such other and further relief as is just.

Dated: January 5, 2009
       New York, New York

/s/ Harvey R. Miller
Harvey R. Miller
Lori R. Fife
Shai Y. Waisman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession