Hearing Date and Time:  January 28, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  January 23, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Michael P. Kessler

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
|  | : |  |
| In re | : | Chapter 11 Case No. |
|  | : |  |
| **LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, | : | **08-13555 (JMP)** |
|  | : |  |
| Debtors. | : | **(Jointly Administered)** |
|  | : |  |
|  | : |  |

------------------------------------------------------------------x

**NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 365(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 FOR AUTHORIZATION TO (I) ASSUME, AS MODIFIED, CERTAIN LOAN AGREEMENTS, AND (II) CONSUMMATE RELATED LOANS TO BE MADE BY LEHMAN COMMERCIAL PAPER INC. AND OTHER LENDERS TO ARCHSTONE**

PLEASE TAKE NOTICE that a hearing on the annexed Motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for entry of an order, pursuant to sections 105(a), 363(b) and

365(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6004 and 6006

of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing LBHI to

assume, as modified, certain loan agreements and to consummate related loans to be made by

Lehman Commercial Paper Inc. and other lenders to Archstone, as more fully described in the

Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at

the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One

Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **January 28, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Michael P. Kessler, Esq. and James T. Grogan, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis; Esq., (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:  Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official committee of unsecured creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **January 23, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: January 8, 2009
    New York, New York

         /s/ Michael P. Kessler
         Harvey R. Miller
         Michael P. Kessler
         WEIL, GOTSHAL & MANGES LLP
         767 Fifth Avenue
         New York, New York 10153
         Telephone: (212) 310-8000
         Facsimile: (212) 310-8007

         Attorneys for Debtors
         and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Harvey R. Miller
Michael P. Kessler

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                      :

**In re**                             :        **Chapter 11 Case No.**

                                        :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :       **08-13555 (JMP)**

                                        :

                     **Debtors.**       :       **(Jointly Administered)**

                                        :

                                        :
------------------------------------------------------------------x

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a), 363(b) AND 365(a) OF THE
BANKRUPTCY CODE AND BANKRUPTCY RULES 6004 AND 6006 FOR
AUTHORIZATION TO (I) ASSUME, AS MODIFIED, CERTAIN LOAN
AGREEMENTS, AND (II) CONSUMMATE RELATED LOANS TO BE MADE BY
LEHMAN COMMERCIAL PAPER INC. AND OTHER LENDERS TO ARCHSTONE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

                Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-

referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and,

collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully

represent:

**Preliminary Statement**

                1.       Certain of the Debtors and their non-Debtor affiliates have loaned or

invested in excess of $5.5 billion in connection with the leveraged buyout of a publicly-traded

real estate investment trust known as Archstone-Smith Operating Trust (n/k/a Archstone).

Archstone specializes in multi-family residential property ownership, development and

management.  The parties originally contemplated that Archstone would generate sufficient

funds to repay its loans through property sales.  However, demand for real estate assets generally

has softened over the past several months, making it difficult for Archstone to market and

liquidate the properties that it has been holding for sale, with the result that Archstone has a need

for additional liquidity.

2.     To preserve the value of their investment, the Debtors have agreed to

assume certain loan agreements with Archstone, as modified in accordance with the terms of a

term sheet (the "Term Sheet"), that is annexed hereto as Exhibit 1.[1]  Pursuant and subject to the

terms of the Term Sheet, the Debtors and the other lenders to Archstone have proposed to extend

up to an additional $485 million in senior-secured financing to Archstone.  The proposed funding

will provide Archstone with additional time to complete asset sales, with the objective of

allowing the Debtors to preserve their sizeable stake in Archstone's business and properties.

Accordingly, the Debtors request authorization to assume the Archstone loan agreements, as

modified, and to enter into the transactions contemplated by the Term Sheet.

### Background

3.     On September 15, 2008 and periodically thereafter (as applicable, the

"Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court

voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are

being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

---

[1]     Capitalized terms that are used but not defined in this Motion have the meanings ascribed to them in the
Term Sheet.

Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.    On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

5.    On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

## Jurisdiction

6.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Lehman's Business

7.    Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to these chapter 11 filings is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## The Acquisition of Archstone

9.          Archstone owns approximately 300 apartment communities that contain

approximately 70,000 residential units.  For most of 2007 Archstone was the second largest

publicly-traded real estate investment trust in the United States.  On October 5, 2007, a Lehman

affiliate and Tishman Speyer Real Estate Venture VII, L.P. formed a joint venture to take

Archstone private through a leveraged buyout in which other Lehman affiliates and affiliates of

Bank of America, N.A. ("Bank of America") and Barclays Capital, Inc. provided secured

financing and made bridge-equity investments that they intended to resell to other investors.  The

following agreements were integral to the leveraged acquisition of Archstone:  (i) that certain

Amended and Restated Credit Agreement, dated as of November 27, 2007 (as amended, restated,

modified or supplemented from time to time in accordance with its terms, the "ASOT Credit

Agreement") among Archstone, a Maryland real estate investment trust, certain of its affiliates

party thereto as guarantors, Bank of America, Barclays Capital Real Estate Inc. ("Barclays

Capital"), and Lehman Commercial Paper Inc. ("LCPI"), a Debtor, as lenders thereto together

with the other lenders thereunder, LCPI, as administrative agent, Bank of America, as

syndication agent, Lehman Brothers Inc. and Banc of America Securities LLC, as joint lead

arrangers and joint bookrunners, and Barclays Capital, as documentation agent, (ii) that certain

Credit Agreement (Development Loan), dated as of October 5, 2007 (as amended, restated,

modified or supplemented from time to time in accordance with its terms, the "Development

Loan Credit Agreement"), among Tishman Speyer Archstone-Smith Multifamily Holdings I

(Development Borrower), ("DL Borrower"), certain of its affiliates party thereto as guarantors,

Bank of America, Barclays Capital and LCPI as lenders thereunder, LCPI as Administrative

Agent, Bank of America, as syndication agent, Lehman Brothers Inc. and Banc of America

Securities LLC, as joint lead arrangers and joint bookrunners, and Barclays Capital, as

documentation agent, (iii) the Mortgage/Mezzanine Documents (as such term is defined in the

ASOT Credit Agreement and used herein as therein defined), (iv) that certain Loan Agreement,

dated as of October 5, 2007, among Tishman Speyer Archstone-Smith One Superior Place,

L.L.C., Tishman Speyer Archstone-Smith Marina Terrace, L.L.C. and Tishman Speyer

Archstone-Smith Fairfax, L.L.C., as borrower, Lehman Brothers Holdings Inc., Bank of

America, N.A. and Barclays Capital Real Estate Inc., as lenders (the "Ground Lease Loan"), (v)

any and all other documents relating to, evidencing, securing, or otherwise affecting (directly or

indirectly) the loans, commitments and other rights, obligations and liabilities outstanding under

the ASOT Credit Agreement, the Development Loan Credit Agreement, the Ground Lease Loan

or any of the Mortgage/Mezzanine Documents (all such documents together with the ASOT

Credit Agreement, the Development Loan Credit Agreement, and the Mortgage/Mezzanine

Documents collectively, the "Loan Documents"), (vi) the limited partnership agreements of the

Tishman Speyer Archstone-Smith Multifamily JV, L.P., Tishman Speyer Archstone-Smith

Multifamily Parallel JV, L.P., Tishman Speyer Archstone-Smith Multifamily Parallel Fund I JV,

L.P. and Tishman Speyer Archstone-Smith Multifamily Parallel Fund II JV, L.P. (collectively,

the "Funds"), Tishman Speyer Real Estate Venture VII (Governance), L.P. and Tishman Speyer

Real Estate Venture VII Parallel (Governance), L.P., the declaration of trust of Archstone, any

other applicable operating agreements and partnership agreements of affiliates of the foregoing

entities, the Syndication and Modification Agreement dated as of October 5, 2007 by and among

Tishman Speyer Archstone-Smith Multifamily Parallel (GP), L.P., Tishman Speyer Archstone-

Smith Multifamily (GP), L.P., certain affiliates of Tishman Speyer U.S. Value-Added Associates

VII, L.L.C., REPE Archstone GP Holdings LLC, REPE Archstone LP Holdings LLC, Banc of

America Strategic Ventures, Inc., Archstone LB Syndication Partner LLC, BIH ASN LLC and the Funds, and the Bridge Equity Providers Agreement dated October 5, 2007, among Archstone LB Syndication Partner LLC, Banc of America Strategic Ventures, Inc. and BIH ASN LLC (collectively, the "Basic Equity Documents") and (vii) any and all other documents relating to, evidencing, securing, or otherwise affecting (directly or indirectly) the rights, obligations and liabilities of the parties to and under the Basic Equity Documents (all such documents together with the Basic Equity Documents, collectively, the "Equity Documents;" the Loan Documents and the Equity Documents referred to herein collectively as the "Documents").

10.    In total, the acquisition of Archstone was financed by more than $15 billion in secured financing provided by LCPI, Bank of America, and Barclays Capital (collectively, the "Lenders"), Federal Home Loan Mortgage Corporation ("Freddie Mac") and Federal National Mortgage Association ("Fannie Mae").  Such secured financing included a combination of mortgage loans, mezzanine loans, term loans, and revolving loans, as described more fully below:

- **Mortgage Loans**.  The Lenders made mortgage loans in the approximate aggregate principal amount of $9 billion to subsidiaries of Archstone and its affiliates, which were ultimately assigned by the Lenders to either Fannie Mae or Freddie Mac, as the case may be, and which are secured by properties indirectly owned or ground leased by Archstone;

- **Mezzanine Loans**.  The Lenders made mezzanine loans in the approximate aggregate principal amount of $1 billion to certain indirect subsidiaries of Archstone and its affiliates that directly or indirectly own all of the membership interests or general and limited partnership interests, as the case may be, of the borrowers under the mortgage loans assigned to Fannie Mae and Freddie Mac, and which are secured by a pledge of such interests;

- **Term Loans**.  The Lenders made term loans in the approximate aggregate principal amount of $4.8 billion to Archstone, which are secured by direct or indirect security interests in substantially all of the assets of Archstone, subject to certain carve-outs; and

- **Revolving Loans**.  The Lenders made a revolving credit facility in the amount of $750 million available to Archstone, and any borrowings thereunder are secured by security interests directly or indirectly in substantially all of the assets of Archstone, subject to certain carve-outs.

- **Other Loans**.  The Lenders also made a development loan and a ground lease loan in the aggregate amount of $500 million and $76 million, respectively, to affiliates of Archstone.

The Lenders provided such financing to Archstone according to the following proportions: LCPI contributed approximately 47%; Bank of America contributed approximately 28%; and Barclays Capital contributed approximately 25%.  LCPI's roughly 47% current stake in the various secured loans to Archstone amounts to more than $3 billion.  In addition, certain non-Debtor affiliates of LCPI have invested approximately $2.39 billion in equity or bridge equity of Archstone.

## Relief Requested

11.    As noted above, Archstone's business model contemplates that it will regularly sell assets from its holdings to satisfy its liabilities and expand returns from the operation of its properties.  Although Archstone continues to enjoy strong occupancy rates at its properties, demand for the assets it holds for sale has softened in recent months.  To give Archstone the time it needs to explore and consummate asset-sale opportunities, LCPI and the other Lenders propose to provide additional liquidity through the new loan and letter of credit facilities described in the Term Sheet.  Specifically, LCPI and the other Lenders have proposed to modify the existing financing arrangement such that they will lend Archstone up to an additional $485 million on a senior, secured basis.  This new liquidity will also protect the Lenders' substantial investment in Archstone.

12.    Although the Debtors believe that entering into the new loan and letter of credit facilities contemplated in the Term Sheet are ordinary course transactions for which no

Court approval is necessary, in light of the size of the new loan, and out of an abundance of

caution, the Debtors request authority, pursuant to sections 105(a), 363(b), and 365(a) of the

Bankruptcy Code to (a) assume the existing Loan Documents, as modified in accordance with

the Term Sheet in all material respects, and (b) enter into and consummate the transactions and

related documents described in the Term Sheet, together with such other transactions and

documents as are reasonably incidental thereto.

**<u>Terms of the Transaction</u>**

13.    Pursuant and subject to the terms of the Term Sheet, the Lenders have

proposed to provide new financing to Archstone in an aggregate amount of up to $485 million

pursuant to a delayed-draw term loan and letter of credit facilities that will be secured on a first

priority basis by the same assets securing the ASOT Credit Agreement (the "<u>Priority Facility</u>").

The salient terms of the Term Sheet are as follows:[2]

| *Priority Facility* | The Priority Facility will consist of a first priority delayed-draw term loan facility and a letter of credit facility in the sum of (i) $485 million of new financing available for delayed-draw term loans and letters of credit (the "<u>Incremental Portion</u>"), (ii) all amounts funded by the Lenders under the ASOT Credit Agreement after September 14, 2008 and at or prior to the date of closing of the Priority Facility, and (iii) the aggregate face amount of all letters of credit issued under the existing revolving credit facility as of the closing date, with such letters of credit being rolled into and deemed issued under the Priority Facility.  Archstone will be entitled to make requests to draw on the Priority Facility on a monthly basis (except during any period in which Archstone has access to the cash collateral described below) in accordance with a budget approved by the Lenders.  The Priority Facility will become due and payable in full on October 5, 2011. |
| *Commitments* | Each Lender will commit to provide the Priority Facility in accordance with the following percentages: |

---

[2]    This summary is qualified in its entirety by reference to the provisions of the Term Sheet.  The Term Sheet will control in the event that there is any inconsistency between this Motion and the Term Sheet.

| | |
|---|---|
| | Bank of America – 28%<br>Barclays Capital – 25%<br>LCPI – 47%<br><br>If any Lender defaults on its funding or reimbursement obligations with respect to the Incremental Portion, then each non-defaulting Lender's affiliate with a bridge equity investment in Archstone will be entitled to receive a cash distribution in respect of its investment in an amount equal to 7 times the amount funded by such non-defaulting Lender (other than any interest that is accrued and capitalized, as described below, and any portion of such funding used to pay cash interest).<br><br>Upon the closing of the Priority Facility, Archstone and the other obligors under any Loan Document (collectively, the "Loan Parties") and the Lenders will waive any past funding defaults by LCPI under the ASOT Credit Agreement. |
| **_Additional Sources of Liquidity to Archstone_** | Until the closing of the Priority Facility, the existing revolving credit facility will be available to Archstone on the terms and conditions that currently govern such facility. Upon the closing of the Priority Facility, the unused commitments of the Lenders to provide the revolving credit facility will terminate.<br><br>In addition, the Lenders will allow Archstone to access approximately $72 million of existing cash collateral on the later to occur of June 1, 2009 or the date on which $200 million of the Priority Facility has been funded or used to accrue and capitalize interest (as described in more detail below). Such cash collateral will be released to Archstone upon request, provided, the proceeds are used in accordance with the budget approved by the Lenders.<br><br>Archstone is also required, from time to time, to make mandatory prepayments under the existing term loan and revolving credit facilities when it recovers certain proceeds from transactions, such as asset sales. The provisions requiring mandatory prepayments resulting from asset sales will provide that, unless otherwise determined by Lenders holding 76% or more of the outstanding principal balance of the Priority Facility, 50% of the net cash proceeds will be applied to prepay the Priority Facility, or the term and revolving loans made under the ASOT Credit Agreement and the Development Loan Credit Agreement, and the balance will be deposited into a cash reserve. In addition, the provisions requiring mandatory prepayments resulting from refinancings of indebtedness will provide that, unless otherwise determined by Lenders holding 76% or more of the outstanding principal balance of the Priority |

| | |
|---|---|
| | Facility, 100% of the net cash proceeds of will be applied to prepay the Priority Facility, or the term and revolving loans made under the ASOT Credit Agreement and the Development Loan Credit Agreement.  Further, Lenders holding 76% or more of the outstanding principal balance of the Priority Facility will have the right to change the percentage of proceeds required to be applied as other types of mandatory prepayments to the Priority Facility and the term and revolving loans made under the ASOT Credit Agreement and the Development Loan Credit Agreement.  Any such amounts that are not applied as mandatory prepayments will be deposited into the cash reserve.  The cash reserve will be used to fund expenses of Archstone in lieu of fundings under the Priority Facility and allowing Archstone to access the cash collateral described above. |
| *Interest Rate and Payments* | The Priority Facility will bear interest at a rate equal to one month LIBOR plus 3.50% per annum.  LCPI may elect to accrue interest payable on the Priority Facility, the existing term and revolving loans and the existing mezzanine facilities made by it.  All such accrued interest will be capitalized with the outstanding principal balance of the applicable loan.   Notwithstanding any election by LCPI to accrue and capitalize interest on its loans, at any time that interest is paid to the other Lenders from proceeds of the cash reserve or cash collateral described above, interest on LCPI's loans will also be paid in cash on a *pro rata* basis with the other Lenders.  Any such accrued and capitalized interest on the Priority Facility will reduce LCPI's commitment to provide the Priority Facility by a corresponding amount.

In addition to LCPI's right to elect to accrue and capitalize interest, for a period of no more than 6 consecutive calendar months following the date on which the Priority Facility has been fully utilized (or, if later, the first date thereafter on which the cash reserve described above has been reduced to zero), each Lender will either (1) fund the interest payments owing to it on the Priority Facility, the existing term and revolving loans, and the existing mezzanine facilities made by it or (2) permit such interest to accrue and capitalize. |
| *Priority Among the Priority Facility and the Existing Credit Facilities* | The Priority Facility will have priority with respect to both payment and collateral over the existing term and revolving loan facilities extended by the Lenders to Archstone under the ASOT Credit Agreement and the Development Loan Credit Agreement. |
| *Administrative Agent* | On the closing date of the Priority Facility, LCPI will step down as the administrative agent under the ASOT Credit Agreement and the |

| | Development Loan Credit Agreement and, from and after the closing date of the Priority Facility, Bank of America will act as the administrative agent for the ASOT Credit Agreement, the Development Loan Credit Agreement, and the Priority Facility. |
|---|---|
| ***Tishman Speyer Release and Indemnification by Archstone*** | The Lenders and Archstone (and the relevant Affiliates of each of them), on the one hand, and Tishman Speyer U.S. Value-Added Associates VII, L.L.C. ("Tishman Speyer") and its relevant Affiliates and other related parties (the "Tishman Group"), on the other hand, will exchange releases with respect to certain matters in form and substance acceptable to those parties.  In addition, Archstone, but not the Lenders, will indemnify the Tishman Group with respect to certain matters relating to the Loan Parties.  Such indemnities shall be in form and substance acceptable to those parties.  Liabilities or matters arising from fraud, gross negligence, willful misconduct of any member of the Tishman Group, or based upon the breach of any relevant transfer provision by a member of the Tishman Group or any relevant monetary obligation of any member of the Tishman Group, shall be excluded from the foregoing release and indemnities.  The foregoing indemnities will be guaranteed by the Guarantors (as defined in the ASOT Credit Agreement) and will otherwise be on terms satisfactory to the Lenders, Archstone and Tishman Speyer.  Such indemnities may contain provisions regarding the priority of payment of indemnity claims that are satisfactory to the Lenders in their sole discretion.  No existing indemnity or, following agreement on the specific terms and documentation thereof, additional indemnity will be terminated, limited, restricted, conditioned or modified in any manner that is adverse to the indemnified party.  Acceptable arrangements for the continuation of D&O insurance will be put into place. |
| ***Mezzanine Facilities*** | At the closing of the Priority Facility, the Lenders and the lenders under the existing mezzanine facilities will enter into a new intercreditor arrangement whereby recoveries under the existing mezzanine facilities (whether before or after default) will be turned over to the Lenders in exchange for junior participation interests in a corresponding amount of the Priority Facility (other than any recovery by a counterparty to one of the Lenders that cannot be required to comply with the foregoing). |
| ***Affiliate Borrower Loan Documents*** | The Development Loan Credit Agreement will be modified to the extent necessary to facilitate the transactions contemplated by the Term Sheet and the maturity date of the term loan made pursuant to the Development Loan Credit Agreement will be extended to April 1, 2010. |

**The Debtors Should be Authorized to Assume the Loan Documents,
as Modified by the Term Sheet, and to Consummate the Transaction**

14.     The Debtors request authorization to (a) assume the Loan Documents with Archstone, as modified by the Term Sheet in all material respects, pursuant to section 365(a) of the Bankruptcy Code, and (b) consummate the transactions contemplated in the Term Sheet pursuant to sections 105(a) and 363(b) of the Bankruptcy Code.  There is ample support for that request.

15.     Section 365(a) of the Bankruptcy Code provides, in relevant part that a debtor in possession, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  In determining whether an executory contract or unexpired lease should be assumed, courts apply the "business judgment" test.  *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures)*, 4 F.3d 1095, 1099 (2d Cir. 1993); *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) ("More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially"); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("The decision to assume or reject an executory contract is within the sound business judgment of the debtor-in-possession. . . .").  A court, therefore, should approve the assumption of a contract under section 365(a) of the Bankruptcy Code if it finds that a debtor has exercised its sound business judgment in determining that assumption of an agreement is in the best interests of its estate.  *See, e.g., In re Child World, Inc.*, 142 B.R. 87, 89 (Bankr. S.D.N.Y. 1992).

16.     In addition, section 363(b)(1) of the Bankruptcy Code provides, in relevant part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . ." 11 U.S.C. § 363(b)(1).  Although section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale, use or disposition of a debtor's assets, courts in Second Circuit and elsewhere have required such use to be based upon the sound business judgment of the debtor.  *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge determining a section 363(b) application must find from the evidence presented before him a good business reason to grant such application); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063, 1071 (2d Cir. 1983) (same); *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (holding that "bankruptcy court can authorize [an action] under section 363(b)(1) when a sound business purpose dictates such action").

17.     It is generally understood that "[w]hen the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business justification exists, there is a strong presumption that "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'"  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment.  *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

18.     After analyzing various alternatives, the Debtors concluded that the transactions contemplated in the Term Sheet offer the best prospects for protecting the value of the Debtors' approximately $5 billion current stake in Archstone.  In this case, the Debtors believe that an extension of new credit on a priority basis is the most effective manner in which to protect against asset loss and value deterioration.  Archstone's occupancy rates remain strong, but it needs additional time to market and sell assets in accordance with its business plan.  The Lenders believe the value of such assets will be greatly enhanced by an orderly sale process. Accordingly, the proposed Term Sheet represents a rational and targeted plan to address legitimate business concerns, and the Debtors are confident that their proposal will achieve the intended result.

19.     Additionally, the Term Sheet is the product of protracted, arms' length negotiations between the Lenders and Archstone since shortly after the Commencement Date. The Lenders and Archstone have participated in numerous meetings, and each is represented by separate counsel.  After three months of negotiations, the parties have arrived at an agreed set of terms that provides mutually acceptable benefits and burdens to all concerned.  Each of the Lenders continues to hold a direct interest in Archstone's financing obligations.  Although there are numerous counterparties who have purchased ancillary interests in Archstone's obligations, including the acquisition of participation interests and pledges relating to the various loan facilities, it is the Debtors' belief that LCPI and the other Lenders maintain authority to modify the Loan Documents as contemplated in the Term Sheet, and to take the other actions set forth in the Term Sheet.  Specifically, in each instance where an interest in Archstone's financing obligations has been transferred to a third party, (i) the Term Sheet leaves such party's interest unimpaired and therefore its consent is not required, (ii) such party has given consent to the

Lenders to act on their behalf with respect to the transactions at issue here, or (iii) the instrument transferring the interest does not require the Lenders to obtain the consent of such party with respect to the transactions at issue here.  All such third parties are being given notice and an opportunity to object if they dispute the Debtors' position that LCPI and the other Lenders have the authority set forth above.  In addition, the consent of Fannie Mae and Freddie Mac and/or certain other lenders may be required, and, if required, will be obtained prior to consummation of the transactions described in the Term Sheet.

20.    For all of these reasons, the Debtors submit that they should be authorized to lend additional funds to Archstone on the terms and conditions set forth in the Term Sheet.

### Notice

21.    No trustee or examiner has been appointed in these chapter 11 cases.  The Debtors have served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) any party with an interest in the Loan Documents, including all parties to whom an interest in Archstone's financing obligations has been transferred; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Attorney for the Southern District of New York; and (vii) all parties who have requested notice in these chapter 11 cases.  The Debtors submit that no other or further notice need be provided.


[Remainder of page intentionally blank]

22.    No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as the Court deems just and proper.

Dated: January 8, 2009
        New York, New York

/s/ Michael P. Kessler
Harvey R. Miller
Michael P. Kessler
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## **Exhibit 1**

Term Sheet

## Term Sheet with respect to Proposed Transactions

*This Term Sheet (this "Term Sheet") outlines a non-binding proposal with respect to certain transactions (collectively, the "Proposed Transactions") relating to the Amended and Restated Credit Agreement, dated as of November 27, 2007 (as amended, modified or supplemented from time to time, the "ASOT Credit Agreement") among Archstone, a Maryland real estate investment trust (formerly known as Archstone-Smith Operating Trust) ("Borrower"), certain of its affiliates party thereto as guarantors, Bank of America, N.A. ("Bank of America"), Barclays Capital Real Estate Inc. ("Barclays Capital"), Lehman Commercial Paper Inc. ("LCPI") and the other lenders party thereto, LCPI, as administrative agent, and certain other parties. This Term Sheet is intended as an outline for discussion purposes only and does not constitute a commitment to modify or waive any agreement or make any loans or other financial accommodations to any Person. Any such commitment may only be made in a separate writing and pursuant to appropriate internal credit approval which has not yet been obtained. In addition, this Term Sheet does not purport to summarize all of the terms and conditions of the Proposed Transactions, which will be described in greater detail in the definitive legal documentation for the Proposed Transactions. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the ASOT Credit Agreement.*

| | |
|---|---|
| **Incremental Liquidity** | The Revolving Credit Facility would be available to the Borrower in accordance with the existing Loan Documents (modified as contemplated in this Term Sheet) until such time as the Priority Facility (as defined below) becomes effective.<br><br>Concurrently with, and as a condition to the Priority Facility becoming effective (the "Closing"), (i) all outstanding letters of credit outstanding under the Revolving Credit Facility would be "rolled" into and be deemed issued under the Priority Facility and (ii) all unfunded commitments of the Lenders under the Revolving Credit Facility would terminate. Any amounts funded under the Revolving Credit Facility that are not allocated to the Priority Facility shall mature on the Revolving Credit Termination Date (i.e. October 5, 2011).<br><br>All amounts funded by the Lenders under the Revolving Credit Facility between September 14, 2008 and the Closing would be deemed as having been funded after the Closing and would be allocated to the Priority Facility.<br><br>In addition, Borrower would have access to cash collateral currently held in the Expense Reserve Account on the later of June 1, 2009 and the date on which $200 million of borrowings have been funded and/or PIK (as defined below) interest payments have accrued under the Priority Facility. Once such date occurs, funding of the Priority Facility would be suspended until all amounts in the Expense Reserve Account have been utilized.<br><br>The proceeds of the Priority Facility and the Expense Reserve Account would be used for debt service and working capital in accordance, as to both amounts and timing, with a budget |

| | |
|---|---|
| | (the "<u>Budget</u>") satisfactory to the Lenders.  The Budget would be prepared on a cumulative basis and provide for monthly funding by the Lenders in compliance with the Budget (subject to a permitted variance level as to amount and timing).  The Budget will provide amounts for payment of premiums for appropriate and customary insurance for officers and directors.<br><br>As used herein, "<u>Lenders</u>" refers to Bank of America, Barclays Capital and LCPI.  The effectiveness of the Priority Facility shall be subject to all Lenders executing and delivering satisfactory definitive documentation with respect thereto and other conditions to be determined.  Such conditions shall include satisfaction by the Lenders that all lien releases, consents and approvals, including but not limited to court approvals, that are in their respective opinions necessary with respect to the Proposed Transactions have been obtained, including, without limitation, confirmation that (i) all tag-along and ROFO rights applicable to debt or equity of the Borrower or its affiliates are in effect (as described below) and (ii) LCPI or its relevant affiliate will have the right to vote and make all determinations in respect of all interests in any debt or equity of the Borrower or its affiliates that are held by such person notwithstanding any participation interests sold by such person to third parties (other than approximately $8 million of the Fannie Mae Pool 8 Mezzanine Facility). |
| **Defaulting Lender Provisions** | At Closing, Defaulting Lender provisions under the ASOT Credit Agreement shall cease to be applicable, both as to past and future events, the Loan Parties and the Lenders will waive any claims they may have with respect to any past failures to fund under the ASOT Credit Agreement and the Loan Parties will release the Lenders (and their relevant affiliates) from any liabilities for pre-Closing matters relating to the Loan Parties. |
| **Priority Facility** | A delayed-draw term and letter of credit facility with maximum aggregate commitments in an amount equal to the sum of (i) $485 million (available for term loans and letters of credit) (the "<u>Incremental Portion</u>"), (ii) all amounts funded by the Lenders under the ASOT Credit Agreement after September 14, 2008 and at or prior to Closing and (iii) the aggregate face amount of letters of credit ("<u>Existing LCs</u>") issued under the Revolving Credit Facility that are "rolled" |

into the Priority Facility (the "<u>Existing LC Portion</u>"). If any letters of credit are issued under the Incremental Portion and subsequently expire or terminate undrawn, availability under the Incremental Portion would be replenished by a like amount. If any Existing LC expires or terminates (except pursuant to a renewal of such Existing LC), the Existing LC Portion shall be permanently reduced by the undrawn face amount thereof. The Priority Facility would be secured by a first priority, perfected security interest in the same collateral that currently secures the Term Loans. The collateral will include a first mortgage on the North Point Property and all personal property of Borrower used or useful in connection therewith. As a condition to funding of the Priority Facility, all existing liens on the North Point Property would be released and/or assigned to the Administrative Agent, acting as collateral agent in respect of the Priority Facility. Upon sale, the North Point Property shall be released as collateral and, unless otherwise determined by the Super-Majority Lenders (as defined on Annex I hereto), 50% of the net cash proceeds will be applied to prepay the Priority Facility or the Existing Credit Facilities (as defined below) and 50% of the net cash proceeds will be deposited in the Cash Reserve (as defined below).

The maturity date for the Priority Facility would be the same as the maturity date for the Tranche A Term Loan Facility (i.e. October 5, 2011), and would have an interest rate of one month LIBOR plus 3.50% per annum. Such interest rate shall not be retroactive to periods prior to the Closing and the interest rate applicable to the Existing Credit Facilities shall remain unchanged.

At Closing, the Lenders and the lenders under the Mezzanine Facilities shall enter into an intercreditor arrangement whereby recoveries under the Mezzanine Facilities (whether before or after default) will be turned over to the holders of the Priority Facility in exchange for a junior participation in a corresponding amount of the Priority Facility (other than any recovery by a counterparty to one of the Lenders that cannot be required to comply with the foregoing, as disclosed in writing to the Lenders prior to the date of the Proposal Letter). In addition, if requested by the Lenders, the Mezzanine Facilities will be amended in order to make the debt thereunder recourse to the Borrower.

| | |
|---|---|
| **Expense Reserve Account** | A delayed-draw release of proceeds from the Expense Reserve Account in the amount of approximately $72 million. Fundings from the Expense Reserve Account shall not be treated as loans under the Priority Facility.<br><br>Pending Borrower's withdrawal of all funds in the Expense Reserve Account, it will be provided that such cash collateral is for the ratable benefit of the Lenders in accordance with the percentages specified under the heading "Allocations" notwithstanding that any Lender's interest may PIK (as provided below). |
| **Cash Reserve** | Any amounts otherwise required to be applied as mandatory prepayments under the ASOT Credit Agreement that the Borrower is permitted to retain shall instead be deposited with the Administrative Agent (the "Cash Reserve"). The Cash Reserve shall be used to fund expenses of Borrower in lieu of fundings under the Priority Facility or the Expense Reserve Account unless otherwise directed by the Super-Majority Lenders. Fundings from the Cash Reserve shall not be treated as loans under the Priority Facility.<br><br>Pending the funding of the Cash Reserve, it will be provided that such cash collateral is for the ratable benefit of the Lenders in accordance with the percentages specified under the heading "Allocations" notwithstanding that any Lender's interest may PIK (as provided below). |
| **Administrative Agent** | Bank of America would act as Administrative Agent under the Existing Credit Facilities and the Priority Facility. |
| **Allocations** | Commitments in respect of the Incremental Portion and the Existing LC Portion of the Priority Facility would be provided ratably by Bank of America, Barclays Capital and LCPI (their "Ratable Commitments") according to their respective Revolving Credit Commitment percentages under the ASOT Credit Agreement (i.e. 27.7%, 25.0% and 47.3%, respectively).<br><br>Each of Bank of America and Barclays Capital would provide a supplemental commitment in an amount equal to 50% of LCPI's commitment in respect of the Incremental Portion and the Existing LC Portion, and each would be paid at Closing a cash fee of $1,250,000. |

| | |
|---|---|
| **Priority Among Various Facilities** | The Priority Facility would have priority relative to the Term Loans and the portion of the Revolving Credit Facility not included in the Priority Facility (the "Existing Credit Facilities"), and all amounts then due and payable under or in respect of the Priority Facility would be paid prior to the repayment of any amounts owing in respect of the Existing Credit Facilities.<br><br>The Priority Facility would be prior in right to the Existing Credit Facilities with respect to collateral. |
| **Interest Payments** | For a period of no more than six consecutive calendar months following the date on which the Priority Facility has been fully utilized (or, if later, the first date thereafter on which the Cash Reserve has been reduced to zero), each Lender (and its assignees) shall either (i) fund interest payments owing to it on the Existing Credit Facilities, the Mezzanine Facilities and the Priority Facility by making additional loans to the Borrower or (ii) permit such interest to be paid in kind via capitalization of interest ("PIK"). Such six-month period may be extended only with the consent of the Super-Majority Lenders.<br><br>With respect to each Facility (as defined below), LCPI may elect in its sole discretion, by notice to the other Lenders, to PIK all (but not less than all) interest payable to LCPI pursuant to such Facility from and after the date that is 15 days after such notice with respect to such Facility is delivered, provided, that to the extent interest is at any time being paid from the Cash Reserve or the Expense Reserve Account, LCPI shall also be paid its interest in cash on a pro rata basis with the other Lenders. Once a PIK election has been made with respect to a Facility, LCPI would no longer have the right to have any interest under such Facility payable in cash except as set forth in the proviso of the immediately preceding sentence. For all purposes, if LCPI elects to PIK, it will be treated in the same manner as Lenders that fund interest in cash and there shall be no adverse consequence to LCPI for making a PIK election. Notwithstanding the foregoing, if LCPI defaults in any of its funding obligations under the Priority Facility, it shall automatically be deemed to have made a PIK election with respect to all Facilities effective on the date of such default.<br><br>As used herein, "Facilities" refers to the following 4 facilities: |

| | |
|---|---|
| | (i) the Priority Facility, (ii) the Tranche A Term Facility and the portion of the Revolving Credit Facility not included in the Priority Facility (collectively treated as a single Facility), (iii) the Tranche B Term Facility and (iv) the Mezzanine Facility.<br><br>If LCPI defaults in its funding obligations under the Priority Facility, it will not be entitled to cash interest payments from the Expense Reserve Account.<br><br>Any such additional loans or PIK shall be included as part of the Priority Facility and any PIK interest accrued by LCPI shall reduce LCPI's commitment by a corresponding amount.<br><br>Notwithstanding anything to the contrary in this Term Sheet, PIK interest shall not be permitted on approximately $8 million of the Fannie Mae Pool 8 Mezzanine Facility. |
| **Financial Performance Covenants** | A new financial performance covenant will be added requiring that asset sales from January 1, 2009 through the relevant Testing Date generate cumulative Net Cash Proceeds as follows:<br><br><table><tr><td>Testing Date</td><td>Cumulative Proceeds</td></tr><tr><td>March 31, 2010</td><td>$125 million</td></tr><tr><td>June 30, 2010</td><td>$250 million</td></tr><tr><td>September 30, 2010</td><td>$375 million</td></tr><tr><td>December 31, 2010</td><td>$500 million</td></tr></table><br>Any Net Cash Proceeds from the sale of the North Point Property will be included in the foregoing calculation.<br><br>Existing financial covenants (debt service coverage, leverage, and net worth) in the ASOT Credit Agreement will be modified after review of 2009 Budget is complete. |
| **Modification of ASOT Credit Agreement** | The ASOT Credit Agreement and related documentation would be modified as follows:<br><br>1. The definition of "Required Lenders" would be modified such that it refers to Lenders holding a majority of the Loans and Letter of Credit participations outstanding under the Existing Credit Facilities and the Priority Facility. |

2. The voting provisions of Section 10.1 shall be modified to be consistent with Annex I hereto.

3. The Revolving Credit Facility would be available to Borrower as provided above under "Incremental Liquidity" and otherwise in accordance with the existing Loan Documents until Closing, at which time it will be terminated.  (Section 2.4; definition of Revolving Credit Commitment Period)

4. The financial condition covenants would be modified with respect to fiscal periods ending on or prior to the last day of FQ1 2010 based on revised projections supplied by Borrower that assume the interest reserve is set to zero; such projections would be subject to approval of the Lenders in their sole discretion. (Section 7.1 and/or "Cure Period" and/or Section 2.30(c) and/or "Excluded Financial Covenant")

5. Cash collateral currently held in the Expense Reserve Account would be released from time to time as provided above under "Incremental Liquidity" and subject to an agreed upon disbursement mechanism. (Section 2.27)

6. The commitments for future Incremental Term Loans to be made by the Lenders would be terminated. (Section 2.28; Commitment Letter for Incremental Term Loan Facility)

7. The provisions on mandatory prepayment would be modified to eliminate any requirement for a prepayment or collateralization of Loans or Letters of Credit resulting from the incurrence of Indebtedness under the Priority Facility.  In addition, provisions on mandatory prepayment resulting from the proceeds of the sale of properties, casualty events or other similar events would be modified to provide that, unless otherwise determined by the Super-Majority Lenders, 50% of the net cash proceeds will be applied to prepay the Priority Facility or the Existing Credit Facilities and 50% of the net cash proceeds will be deposited in the Cash Reserve (it being understood that 100% of the net cash proceeds of refinancings will be applied to prepay the Priority Facility or the Existing Credit

Facilities).  Also, with respect to other mandatory prepayment, the percentage of proceeds required to be applied as mandatory prepayments may be changed at the direction of the Super-Majority Lenders (but not retroactively), without Borrower consent.  Any amounts permitted to be retained by Borrower rather than applied as mandatory prepayments will be deposited in the Cash Reserve.  (Section 2.12)

8. Negative covenants restricting Indebtedness (Section 7.2), Liens (Section 7.3), Transactions with Affiliates (Section 7.10), Negative Pledges (Section 7.13) and Restrictions on Subsidiary Distributions (Section 7.14) would be modified to the extent necessary to permit the Priority Facility.

9. Negative covenants restricting Fundamental Changes (Section 7.4) and Dispositions (Section 7.5) would be amended to permit dispositions of assets subject to liens under the Priority Facility to the extent such dispositions are permitted under the documentation governing the Priority Facility.

10. Section 10.5 would be amended to provide that the Borrower will reimburse the legal fees of counsel to each Lender (to be included in the Budget) as well as fees of the Financial Advisor.

11. Bank of America would replace LCPI as Administrative Agent pursuant to customary successor agreements and new fee letter (with fees to be in an amount disclosed to the Borrower and each Lender).

12. The Lenders would agree not to exercise their rights pursuant to the Flex Letter until April 1, 2010.

13. The Lenders and the Borrower (and the relevant Affiliates of each of them), on the one hand, and Tishman Speyer U.S. Value-Added Associates VII, L.L.C. ("Tishman Speyer") and its relevant Affiliates and other related parties (the "Tishman Group"), on the other hand, will exchange releases with respect to certain matters in form and substance acceptable to those parties.  In addition, the Borrower, but not the Lenders, will indemnify the Tishman Group with

|  | respect to certain matters relating to the Loan Parties. Such indemnities shall be in form and substance acceptable to those parties.  Liabilities or matters arising from fraud, gross negligence, willful misconduct of any member of the Tishman Group, or based upon the breach of any relevant transfer provision by a member of the Tishman Group or any relevant monetary obligation of any member of the Tishman Group, shall be excluded from the foregoing release and indemnities.  The foregoing indemnities will be guaranteed by the Guarantors and will otherwise be on terms satisfactory to the Lenders, the Borrower and Tishman Speyer.  Such indemnities may contain provisions regarding the priority of payment of indemnity claims that are satisfactory to the Lenders in their sole discretion.  No existing indemnity or, following agreement on the specific terms and documentation thereof, additional indemnity will be terminated, limited, restricted, conditioned or modified in any manner that is adverse to the indemnified party. Acceptable arrangements for the continuation of D&O insurance will be put into place.<br><br>14. It is understood that any changes described in this Term Sheet that would affect the approximately $30 million of Tranche A Term Loans currently believed to be held by Deerfield Asset Management will be made only to the extent permitted by Section 10.1 of the ASOT Credit Agreement as currently in effect. |
|---|---|
| **Modification of Development Loan Credit Agreement and Affiliate Borrower Loan Documents** | The Development Loan Credit Agreement would be modified to the extent necessary to facilitate the transactions contemplated by this Term Sheet.  The maturity date thereof would be extended to April 1, 2010.  It will be clarified that converting PIK interest to cash interest will be a unanimous vote.   Bank of America would replace LCPI as Administrative Agent pursuant to customary successor agreements and new fee letter (with fees to be in an amount disclosed to the Borrower and each Lender).<br><br>The Affiliate Borrower Loan Documents would be modified to the extent necessary to reflect the elimination of the unfunded commitments under the Revolving Credit Facility and the establishment of the Priority Facility. |

| | |
|---|---|
| **Tag-Along and ROFO Rights** | Both the debt and equity documents would provide for tag-along and ROFO rights with respect to each Bridge Equity Provider and each Lender consistent with the mechanism currently set forth in the Bridge Equity Provider agreements. |
| **No Financial Statement Qualifications** | The Lenders shall be satisfied that the Borrower's audited financial statements for FYE 2008 will not contain a "going concern" or like qualification. |
| **Priority of Bridge Equity Returns** | The limited partnership agreements of Tishman Speyer Archstone-Smith Multifamily JV, L.P., Tishman Speyer Archstone-Smith Multifamily Parallel JV, L.P., Tishman Speyer Archstone-Smith Multifamily Parallel Fund I JV, L.P. and Tishman Speyer Archstone-Smith Multifamily Parallel Fund II JV, L.P. (the "Funds") would be amended to modify provisions contained therein relating to priority of distributions and returns to "Bridge Equity Providers" (as defined therein and used herein as therein defined).<br><br>In general terms, these modifications would provide that the Bridge Equity Providers would be entitled under the relevant limited partnership agreement to receive aggregate distributions ("Distributions") in an amount equal to the full amount of their capital contributions, before any holder of sponsor equity interests presently held by Lehman Brothers and Tishman Speyer (or their affiliates), in the respective amounts of approximately $250 million each, is entitled to receive Distributions, whether as a return of capital or otherwise.<br><br>Notwithstanding the foregoing, if any Lender defaults on its funding obligations under the Incremental Portion of the Priority Facility, then each non-defaulting Lender's affiliate that is a Bridge Equity Provider shall be entitled to receive aggregate cash Distributions in respect of its investment in an amount equal to 7.0 times the aggregate amount funded by such non-defaulting Lender under the Incremental Portion (other than PIK and any portion of such fundings used to pay cash interest) (the "Roll-Up") before the affiliate of the defaulting Lender that is a Bridge Equity Provider is entitled to receive any Distributions.  If this paragraph is applicable, after Distributions in the aggregate amount described in the preceding sentence have been made, any remaining Distributions shall be applied as described in the preceding paragraph, with amounts to be paid to the Bridge Equity |

| | |
|---|---|
| | Providers pro rata based on their unreturned capital. An election to PIK by a Lender in accordance with this Term Sheet shall not in and of itself cause such Lender to be a defaulting Lender or otherwise prejudice such Lender in any manner. If LCPI defaults in its funding obligations under the Incremental Portion of the Priority Facility, the Borrower and the other Lenders shall have no remedies against it other than the Roll-Up. If Bank of America or Barclays Capital defaults in its funding obligations under the Incremental Portion of the Priority Facility, the Borrower and the other Lenders shall have no remedies against it other than the Roll-Up to the extent that the non-defaulting Lenders fund the relevant shortfall.<br><br>The foregoing provisions shall not affect the rights of the holders of Scot Sellers' equity and approximately $71 million of syndicated equity to receive Distributions in accordance with the limited partnership agreements as currently in effect. In furtherance of the foregoing, any equity in any of the Funds held indirectly by Scot Sellers through the general partner of such Fund will either be exchanged for direct equity in such Fund or otherwise modified such that it will not be subordinated with the sponsor equity interests as described in the second preceding paragraph. |
| **Equity Syndication Matters** | The Syndication and Modification Agreement and the Limited Partnership Agreements of the Funds shall be amended to (i) delete all references to "Limited Persons", and allow a Syndication Investor to be a Limited Person without the consent of any parties other than the majority of the Bridge Equity Providers, based on the outstanding bridge equity amounts (the "<u>Bridge Majority</u>") and (ii) provide that all decisions to be made by the Bridge Equity Providers shall be made by the Bridge Majority, except for certain matters that require the consent of a different percentage or and/or combination of holders of bridge equity, as specified on Annex I hereto, with each Bridge Equity Provider permitted to act in its sole discretion, rather than by unanimous decision. |
| **Equity Voting Matters** | The Limited Partnership Agreements of the Funds, Tishman Speyer Real Estate Venture VII (Governance), L.P. ("<u>Governance</u>") and Tishman Speyer Real Estate Venture VII Parallel (Governance), L.P. ("<u>Parallel Governance</u>"), the operating agreement of Borrower, any other applicable operating agreements and partnership agreements, and the |

|  | Syndication Agreement shall each be amended so that (i) Borrower shall be operated on a day-to-day basis by the existing Archstone management team ("<u>Management</u>") strictly in accordance with a business plan and operating budget approved as specified in Annex I hereto, (ii) Management will not undertake any Major Matters, Special Major Matters or Major Decisions (as each is currently defined in the Syndication and Modification Agreement and the other applicable organizational documents, but also to include any deviations from the business plan or operating budget) without the consent of the holders of bridge equity specified in Annex I (the "<u>Required Bridge Percentage</u>"), (iii) the Required Bridge Percentage shall have the right to cause Management to undertake any Major Matters, Special Major Matters and Major Decisions, or any other matter concerning the operation of Borrower or any subsidiary, at any time, (iv) the Required Bridge Percentage may change the business plan and operating budget of Borrower and its subsidiaries at any time, in which case Borrower shall be obligated to operate under the modified business plan and operating budget, (v) the boards of directors of Governance and Parallel Governance shall be dissolved and of no further effect, (vi)  Tishman Speyer Development Corp. and its applicable affiliates ("<u>Tishman</u>") shall either be a nominal general partner of Governance and Parallel Governance or, if requested by the Lenders in their sole discretion, cease to be a general partner, and the Required Bridge Percentage shall obtain all of Tishman's rights, Lehman's rights and the Board's rights, to operate Governance, Parallel Governance and their subsidiaries, and none of Tishman, Lehman or the Board shall have any further right to operate Governance or Parallel Governance or any subsidiary thereof (provided that nothing in this clause (vi) shall be deemed to eliminate or modify Lehman's rights as a Bridge Equity Provider or as a Lender), and (vii) all decisions made by the a Bridge Equity Provider shall be in such Bridge Equity Provider's sole discretion. |
|---|---|

**Annex I to Term Sheet**

**Voting Matters in ASOT Credit Agreement**

**Unanimous (100% Lender vote needed)**
- Reduce or forgive principal amount
- Extend maturity date
- Extend amortization
- Reduce interest rate or fees
- Change from current pay to PIK, other than as allowed for under the loan agreement
- Any increase in commitment, other than as allowed for under the loan agreement
- Amend, modify, or waive the percentages of Required Lenders, Majority Facility Lenders, etc in the agreement
- Assignment or transfer of rights of borrower for any of its rights or obligations under the agreements
- Release of all or substantially all of the collateral and the guarantors
- Amend, modify or waive pro-rata treatment and payments
- Impose restriction on assignments or participations that are more restrictive

**Super-Majority (76% Lender vote needed) and each of BofA, Barclays and LCPI; Any Bank with less than $250 million of debt loses its veto right**
- Approval or material modification (more than $10 million in the aggregate) of Annual Budget*
- Release Expense Reserve account except as agreed to upfront
- Modify Performance Hurdle covenant(s)
- Any other matters specified in the Term Sheet

**Majority (51% Lender vote needed)**
- Modify cash sweeps including share of proceeds to go to repay principal, to fund an interest reserve account, or to fund any other escrow account(s) used to fund the ongoing operations of the company.
- Modify Net Worth, Leverage or Debt Service Coverage covenants
- Non-material modifications (less than $10 million in the aggregate) to Annual Budget*
- All other matters not otherwise described above that are currently subject to a Required Lender vote

**Other**
- Amend, modify or waive anything affecting the rights, duties or obligations of the agent without consent of agent
- Amend, modify or waive any letter of credit or Issuing Lender provisions without consent of issuing lender

## Voting Matters in Equity Documents

### Super-Majority (76% of bridge equity vote needed) and each of BofA, Barclays and LCPI; Any Bank with less than $250 million of bridge equity loses its veto right)

- Approval or material modifications (more than $10 million in the aggregate) of Annual Budget*
- Financings or refinancings over $250 million in a single transaction or series of related transactions
- Asset sales over $250 million in a single transaction or series of related transactions
- Delivering Capital Calls to Equity
- Entering into contracts more than $50 million in a single transaction or series of related transactions
- Establishing any reserve accounts over $50 million individually or in the aggregate
- Initiating or settling any litigation more than $100 million individually or in the aggregate
- Settlement of insurance claims, condemnation, or eminent domain in excess of $250 million individually or in the aggregate
- Material tax elections
- Replace or remove accountants of partnership
- Enter into any swap, hedge or other interest rate protection agreements greater than $250 million notional amount in a single transaction or series of related transactions
- Acquire any additional assets over $100 million in a single transaction or series of related transactions
- Modifications to organizational documents
- Any expansion or addition to or development greater than $100 million in a single transaction or series of related transactions
- Entry into a JV entity with a potential capital commitment greater than $250 million
- Make any in-kind distributions
- Approve any merger, recap, reorganization, public or private offering, etc of the partnership or any subsidiary
- Approve, amend or waive the terms of any side letters
- Admit any additional LPs or any members at any subsidiary greater than $100 million
- Other than syndicating bridge equity in accordance with the terms of the Syndication and Modification Agreement and the Bridge Equity Providers Agreement, admit any additional LPs to the partnership or selling or issuing any ownership in the partnership
- Approve any action or inaction that would violate applicable law, any applicable loan document or other material agreement affecting the partnership

- Approve any material changes in the purpose of the partnership or engaging in any material business not related to the purpose of the partnership
- Filing for bankruptcy of any partnership or subsidiary
- Do any act in contravention of the partnership agreement, syndication or modification agreement or any loan documents
- Terminate CEO, COO, or CFO of ASOT or hiring any replacement and term of employment
- Enter into any agreement between the partnership and any partner or any affiliate of any partner as long as it is at market terms
- Any election to exercise rights of GP to issue additional equity or convert to open-ended fund
- Establish or enter into any fund
- Taking actions under JV deals or at a subsidiary level that would otherwise require super-majority approval if taken at the partnership level

**Majority (51% of bridge equity vote needed)**
- Non-material modifications (less than $10 million in the aggregate) to Annual Budget*
- Making loans/extensions of credit
- Financings or refinancings over $25 million but less than $250 million in a single transaction or series of related transactions
- Asset sales over $25 million but less than $250 million in a single transaction or series of related transactions
- Entering into contracts more than $10 million but less than $50 million in a single transaction or series of related transactions
- Establishing any reserve accounts over $10 million but less than $50 million individually or in the aggregate
- Taking actions under JV deals that would otherwise be major matter
- Initiating or settling any litigation more than $5 million but less than $100 million, individually or in the aggregate
- Settlement of insurance claims, condemnation, or eminent domain in excess of $50 million but less than $250 million individually or in the aggregate
- Enter into any swap, hedge or other interest rate protection agreements greater than $75 million notional amount but less than $250 million in a single transaction or series of related transactions
- Acquire any additional assets over $25 million but less than $100 million in a single transaction or series of related transactions
- Sell or dispose of partnership or any subsidiaries (treat same as asset acquisition)
- Any expansion or addition to or development greater than $25 million but less than $100 million in a single transaction or series of related transactions
- Entry into a JV entity greater than $100 million but less than $250 million
- Redeem, purchase or acquire any interest in any subsidiary (treat same as asset acquisition)

- Any act to require partnership from becoming a registered investment company or registered investment advisor
- Approve transfer by JV Partner to the extent such approval is required under partnership agreement
- Taking actions under JV deals or at a subsidiary level that would otherwise require majority approval if taken at the partnership level

**<u>Other</u>**
- Issue or assume or endorse any guarantees for which the LPs would be personally liable without the consent of each LP

\* Annual Budget shall include executive compensation and certain asset sales such as the New York properties not encumbered by Fannie or Freddie mortgages and North Point. Once the Annual Budget has been approved by BofA, Barclays and LCPI, those asset sales and compensation amounts shall be deemed approved as well.