**BINGHAM McCUTCHEN LLP**
399 Park Avenue
New York, NY 10022
(212) 705-7000
Jeffrey S. Sabin
Ronald J. Silverman
Sabin Willett, *admitted pro hac vice*
Rheba Rutkowski, *admitted pro hac vice*

Counsel to Harbinger Capital Partners Special
Situations Fund, L.P. and Harbinger Capital
Partners Master Fund I, Ltd. (f/k/a Harbert
Distressed Investment Master Fund Ltd.)

Hearing Date: January 14, 2009, 10:00 a.m.
Objection Deadline: January 9, 2009, 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :
In re                                         :   Chapter 11
                                              :
LEHMAN BROTHERS HOLDINGS INC., *et al.,*      :   Case No. 08-13555 (JMP)
                                              :
                                   Debtors.   :   (Jointly Administered)
                                              :
---------------------------------------------------------------x

**OBJECTION OF THE HARBINGER FUNDS TO DEBTORS' AMENDED MOTION**
**PURSUANT TO BANKRUPTCY RULE 1007(C) TO FURTHER**
**EXTEND THE TIME TO FILE THE DEBTORS' SCHEDULES,**
**STATEMENTS OF FINANCIAL AFFAIRS, AND RELATED DOCUMENTS**

Harbinger Capital Partners Special Situations Fund, L.P. and Harbinger Capital Partners Master Fund I, Ltd., f/k/a Harbert Distressed Investment Master Fund, Ltd., (collectively, the "Harbinger Funds" or "Harbinger") submit this objection to the Debtors' Amended Motion Pursuant to Bankruptcy Rule 1007(c) to Further Extend the Time to File the Debtors' Schedules, Statements of Financial Affairs, and Related Documents, filed December 30, 2008 [Dkt. No. 2416]. In support of this objection the Harbinger Funds state as follows:

A/72799862.4

## BACKGROUND

1.     The Harbinger Funds are substantial creditors of Lehman Brothers Holdings Inc. ("LBHI"). They are obligees under counterparty arrangements with Lehman Brothers Special Financing Inc. ("LBSF"). LBSF has substantial indebtedness to the Harbinger Funds, in the amount of $269,051,317,[1] pursuant to certain International Swap Dealers Association, Inc. ("ISDA") swap agreements, including that certain Master Agreement dated as of July 28, 2006 by and between LBSF and Harbinger Capital Partners Special Situations Fund, L.P., and that certain Master Agreement dated as of May 20, 2005 by and between LBSF and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund, Ltd.). That indebtedness is, in turn, guaranteed by LBHI.[2]

2.     Bankruptcy Rule 1007(c) requires debtors to file their Schedules 15 days after the commencement of a chapter 11 case. Fed. R. Bankr. P. 1007(c). LBHI's chapter 11 case commenced on September 15, 2008, almost four months ago.

3.     Bankruptcy Rule 1007(c) also permits the Court to extend the 15-day time period upon a showing of cause. Fed. R. Bankr. P. 1007(c). Since the commencement of these chapter 11 cases, the Debtors have moved to extend the deadline to file the required schedules three times. On September 16, 2008, the Court entered an order granting the Debtors' motion for an extension of the time to file their Schedules by an additional 45 days (the "First Extension Motion") [Dkt. No. 5]. On October 28, 2008, the Debtors filed another request for an extension of the deadline to file schedules (the "Second Extension Motion") [Dkt. Nos. 1232, 1244] -- this

---

[1] This figure is exclusive of accrued interest, expenses and other costs and charges (whether arising by contract, applicable law or otherwise) and the Harbinger Funds reserve the right to revise this figure in the future.

[2] LBHI executed guarantees that unconditionally guaranteed "the due and punctual payment of all amounts payable" by LBSF to the Harbinger Funds under the swap agreements. *See* Guarantee at ¶ A (Exhibit A to ISDA Agreement).

time, for 60 days, through and including January 13, 2009 -- relying on the very same reasons cited in the First Extension Motion.  On November 21, 2008, the Court entered an order granting the Second Extension Motion [Dkt. No. 1667] over Harbinger's objection [Dkt. No. 1503].  On December 30, 2008, the Debtors filed the instant motion (the "Third Extension Motion"), seeking to extend the deadline for filing the required schedules "by at least an additional 60 days, through and including March 16, 2009, without prejudice to the Debtors' right to seek further extensions, for cause shown, should it become necessary."  Third Extension Motion at 4.

4.     If the Court grants the Third Extension Motion, the shroud of secrecy that has enveloped these cases for four months, leaving creditors completely in the dark, will remain, and for more than six months, creditors will be without the information they need to assess their rights and claims.  The Debtors' Third Extension Motion is inappropriate and should be denied.  Alternatively, the Court should set one final date by which all schedules and statements of financial affairs must be filed, with no further extensions allowed.

## ARGUMENT

5.     The clear intent of Bankruptcy Rule 1007(c) is to ensure that the required schedules are filed and thus provided to creditors in the early stages of a bankruptcy case.  Although Bankruptcy Rule 1007(c) allows extensions of time, such extensions must be reasonable and may be granted only upon a showing of cause by the Debtors.  The Debtors have failed to show adequate cause for a further extension.

6.     The Debtors' contentions concerning the difficulty of marshalling the data as a result of the size and complexity of these cases, *see* Third Extension Motion ¶¶ 7, 10; lack of resources, *see id.* at ¶ 8; and lack of cooperation from others, *see id.* at ¶ 12, are inconsistent with the Debtors' previous representations to the Court.

7.      On October 16, 2008, the Debtors stated to the Court that the migration of personnel to Barclays Capital Inc. ("Barclays"), and the difficulty in translating expressions of support from senior Barclays management into real-time information flow at the desk level, have slowed the process of gathering and compiling documentation and information in these chapter 11 cases. *See* Oct. 16, 2008 Hrg. Tr. at 68, 71. That same day, the Debtors and the Chief Restructuring Officer, Bryan Marsal of Alvarez & Marsal, advised the Court that they should be in a position to respond to requests for documentation and information and to answer specific inquiries (of creditors) within 45-60 days from the day cooperation begins. *See* Oct. 16, 2008 Hrg. Tr. at 46, 47, 67.

8.      On November 20, 2008, Debtors' counsel reported significant improvements with respect to issues cited by the Debtors as cause justifying the extension sought in the First and Second Extension Motions as well as in the Third Extension Motion. *See generally* Nov. 20 Hrg. Tr. at 10-21. At a minimum, these positive developments indicate that the 45-60-day time frame for responses to creditor requests for documentation and information estimated by Mr. Marsal on October 16 should have commenced on or before November 20. Among other things, Debtors' counsel reported:

- "the administration of the Chapter 11 cases has achieved a level of stabilization," *id.* at 10 ll.11-12;

- "[T]he situation is improving, and over half of the data has been captured to date. The number of crises is diminishing, and there are fewer emergencies as to deteriorating assets. There is complete control over the cash disbursements system and visibility and oversight over nondebtor cash and business activities. A weekly liquidity report is provided to FTI as the financial advisor to the statutory creditors' committee. Capability is being achieved to conduct forensic review and reconstruction of the financial records to bridge the August 31 balance sheet to September 15, 2008. And it's anticipated that the financial statements as of September 15, 2008 will be produced within the very near future. *Id.* at 12 ll.5-17.

- "As of November 10, as a result of active recruiting," the Debtors had "fill[ed] holes as to different aspects of the administration," *id.* at 13 ll.9-11;

- "The target for the year-end is to have a workforce of approximately 620 employees, the largest bulk of whom will be dedicated to working on derivatives transactions. . . . In addition to those employees, . . . there are employees of Barclays Capital who have been dedicated to assist in the administration of the Chapter 11 cases pursuant to the transition services agreement with Barclays Capital as well as the Alvarez & Marsal teams and others." *Id.* at 13 ll.13-20;

- "Since the beginning of November, there has been marked improvement in [Barclays'] performance [under the Transition Services Agreement]. Derivative inventories are substantially marked, loan book has been substantially marked, data capture is working well and financial and accounting issues are a work in process. Barclays has ring fenced . . . approximately 272 employees to support the Chapter 11 administration. *Id.* at 13 ll.25-14 ll.1-7;

- "[D]ata preservation . . . has improved at least a hundred percent. The debtors made an inventory of 400 thousand backup tapes. They have identified file servers containing two petabytes of information and ninety-three key applications. It is expected that the data preservation should be completed by year-end." *Id.* at 20 ll.11-16;

- In connection with discussing the pending Motion to Appoint an Examiner (which the Debtors support) Debtors' counsel also stated the Debtors' view that "it made no sense to have an examiner until you stabilized the system, until you were able to close the books and create a factual basis and a foundation for which the examiner could proceed to do whatever investigation was authorized." *Id.* at 21 ll.11-15.

9. The Court acknowledged these significant improvements in the context of ruling on the Debtors' Second Extension Motion:

> I'm very mindful of Harbinger's early request for information and the fact that, at the time that request was initially made for 2004 discovery, this case was in a different place. And Mr. Miller's opening remarks today made clear that enormous progress has been made even in the last month in terms of stabilizing the business, normalizing its operations. And the ability as a result of the approval today of the debtors' ability to hire new people to deal with the unwind of derivative trades, to me, is a further sign that this a work in progress as to which very substantial work has already been accomplished.

Nov. 20 Tr. at 42 ll.4-14.

A/72799862.4                                   5

10. The Debtors' motions seeking orders (i) establishing procedures concerning the assumption and assignment of prepetition derivative contracts between the Debtors and various counterparties and for the settlement of claims arising from the termination of prepetition derivative contracts [Dkt. No. 2257]; and (ii) approving the assumption or rejection or certain open trade confirmations [Dkt. Nos. 2258 and 2364] (annexing the trades with respect to which the Debtors seek approval to assume or reject), also suggest that the Debtors have made significant progress in marshalling information concerning the Debtors' financial affairs.

11. On November 21, 2008, the Court granted the Debtors' Motion Pursuant to Sections 105(A) and 363(B)(1) of the Bankruptcy Code and Bankruptcy Rule 6004 for Authorization to Implement Recruitment Program, with the goal of (i) retaining approximately 140 of the current employees that remained at the Debtors after the closing of the sale of LBI's assets to Barclays Capital, Inc.; and (ii) recruiting approximately 480 individuals, all or substantially all of whom may be former Lehman employees, to aid in the administration of these chapter 11 cases and the wind-down of Lehman's businesses. *See* Dkt. No. 1662 (Order); Dkt. No. 1278 (Debtors' Motion ¶ 22).

12. The obligations imposed on debtors by the Bankruptcy Code and Rules implement a system of checks and balances that ensure that creditors timely receive information concerning the debtors' financial affairs, and therefore are able to protect their rights and interests. That system is disabled where debtors make only selective disclosures that serve their own interests. *See Siegel v. Weldon*, 184 B.R. 710, 715 (Bankr. D. S. C. 1995) ("The critical time for disclosure is at the time of the filing of a petition and the Debtor has the responsibility to do so. Bankruptcy law requires debtors to be honest and to take seriously the obligation to disclose all matters. The bankruptcy schedules and statements of affairs are carefully designed

to elicit certain information necessary to the proper administration and adjudication of the case. To allow the Debtor to use his discretion in determining the relevant information to disclose would create an end-run around this strictly crafted system.").

13.     The Debtors' argument that "access to their own business records and related information has also been hampered by the sales of their businesses, and the commencement of numerous insolvency proceedings by affiliates outside of the United States," Third Extension Motion ¶ 12, also rings hollow. The Debtors should not be allowed to cite the consequences of their own conduct as "cause" justifying further delay in meeting the obligations imposed on them by the Bankruptcy Code and Rules.

14.     The Debtors' request for yet another extension on the deadline to file schedules and statements of financial affairs is particularly inappropriate in light of the circumstances in which these cases have been conducted to date, in which the Debtors and the Creditors Committee have been exchanging information concerning "the acts, conduct, assets, liabilities and financial condition of the Debtors, [and] the operations of the Debtors' businesses" that others may obtain only on the condition that they sign a confidentiality agreement.[3]

---

[3] *See* Final Cash Management Order [Dkt. No. 1416] at 6-7 (10th decretal paragraph requiring the Debtors to give to the Committee, but not to all creditors, prior notice, supporting documents, and justification as to certain cash transfers from the Debtor to or for the benefit of any affiliate); So Ordered Stipulation and Agreed Order Signed on 10/1/2008 Between the Debtors and the Official Committee of Unsecured Creditors Regarding Creditor Access to Information [Dkt. No. 498] ¶¶ 2-7 (providing, *inter alia*, that the Committee shall not be required to disseminate to any entity, without further order of the Court, information concerning "the acts, conduct, assets, liabilities and financial condition of the Debtors, the operations of the Debtors' businesses and the desirability of the continuance of such businesses, or any other matter relevant to these cases or to the formulation of one or more chapter 11 plans" that the Debtors and the Committee deem to be confidential, unless the creditor agrees to confidentiality and trading restrictions); So Ordered Stipulation and Consent Order Signed on 11/5/2008 (I) Governing Interim Production of Documents and (II) Adjourning Remainder of Motion of Official Committee of Unsecured Creditors of Lehman Brothers Holdings, Inc., et al. for Leave to Conduct Discovery of JPMorgan Chase Bank, N.A. [Dkt. No. 1402] ¶ 2 (JPMorgan's production of certain documents in response

15.     The Debtors' reliance upon cases[4] in which courts in this district have granted extensions of time to large chapter 11 debtors, *see* Third Extension Motion ¶ 13, is misplaced. Those cases involved allegations of fraud and misconduct,[5] which the Debtors in these cases have vehemently denied in opposing the Motion of the New York State Comptroller for the Appointment of a Trustee or, in the Alternative, an Examiner with Expanded Powers [Dkt. No. 2427 ¶¶ 3, 7, 9].

16.     Moreover, all of the cited cases were filed prior to the effective date of the 2005 BAPCPA revisions to the Bankruptcy Code, which (among other things) amended 11 U.S.C. § 1121 to provide that the court may not extend (i) the 120-day exclusivity period provided in section 1121(c)(2) "beyond a date that is 18 months after the date of the order for relief under this chapter," 11 U.S.C. § 1121(d)(2)(A); or (ii) the 180-day exclusivity period provided in section 1121(c)(3) "beyond a date that is 20 months after the date of the order for relief under this chapter," 11 U.S.C. § 1121(d)(2)(B).  The Debtors' cited cases are not subject to the time limitations imposed by 11 U.S.C. § 1121(d)(2). In cases that are subject to these limitations, as are these cases, the lengthy extensions allowed in the Debtors' cited-pre-BAPCPA cases are untenable.

---

to the Committee's Rule 2004 discovery requests subject to a confidentiality agreement).

[4] *In re Northwest Airlines*, Case No. 05 17930 (ALG) (Bankr. S.D.N.Y. Sept. 14, 2005); *In re Adelphia Commc'ns*, Case No. 02-41729 (REG) (Bankr. S.D.N.Y. 2003); *In re Worldcom, Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 21, 2002); *In re Enron Corp.*, Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Dec. 2, 2001).

[5] *See, e.g.*, *In re Worldcom, Inc.*, Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. July 21, 2002), Dkt. No. 1654 ¶ 5, Dkt. No. 1663 ¶ 12, Dkt. No. 2600 ¶ 8 (citing in support of motions to extend the deadline to file schedules "well-publicized allegations of fraud" that forced the debtors to institute "comprehensive internal reviews and financial investigations" and to cooperate "with law enforcement authorities in an effort to fully and accurately restate certain of their financial statements").

17.     The required schedules and statements of financial affairs would at least enable the creditors to determine the starting positions for each debtor as to assets and liabilities. Four months into these cases, the creditors do not have even that basic information. The Court should deny the Debtors' Third Extension Motion and order the Debtors to comply with Bankruptcy Rule 1007(c) forthwith. To the extent any part of the required filings are incomplete, the Debtors should so state in their filing and supplement as soon as possible thereafter (as is ordinarily done in other bankruptcy cases). If the Debtors are continuing to experience problems with accessing documentation and information and procuring the cooperation of third parties, the Debtors have ample and better remedies (such as seeking assistance from this Court) than further delay in filing the schedules.

## REQUEST FOR WAIVER OF MEMORANDUM OF LAW

18.     As there are no novel issues of law presented, the Harbinger Funds respectfully request that the Court waive the requirement that the Harbinger Funds file a memorandum of law in support of this limited objection pursuant to Local Bankruptcy Rule 9013-1(b).

## CONCLUSION

For the foregoing reasons, the Harbinger Funds respectfully request that the Court (i) deny the Third Extension Motion; (ii) in the alternative, set one final date by which all schedules and statements of financial affairs must be filed, with no further extensions allowed; and (iii) grant such other, further relief as the Court deems just and proper.

Dated: New York, New York
January 9, 2009

**BINGHAM McCUTCHEN LLP**

By: /s/ Jeffrey S. Sabin
Jeffrey S. Sabin
Ronald J. Silverman
Sabin Willett, *admitted pro hac vice*
Rheba Rutkowski, *admitted pro hac vice*
399 Park Avenue
New York, New York 10022
Telephone No.: (212) 705-7000
Facsimile No.: (212) 752-5378

*Counsel to Harbinger Capital Partners Special Situations Fund L.P. and Harbinger Capital Partners Master Fund I, Ltd. (f/k/a Harbert Distressed Investment Master Fund Ltd.)*