**Hearing Date: January 14, 2009 at 10:00 a.m. (NYT)**

Dennis F. Dunne
Dennis O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone:  (212) 530-5000

-and-

Paul Aronzon
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone:  (213) 892-4000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
                                                          :
In re:                                                    :          Chapter 11 Case
                                                          :
LEHMAN BROTHERS HOLDINGS INC., et al.,                    :          No. 08-13555 (JMP)
                                                          :
                        Debtors.                          :          (Jointly Administered)
                                                          :
------------------------------------------------------------------- x

## RESPONSE OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF THE WALT DISNEY COMPANY FOR APPOINTMENT OF AN EXAMINER PURSUANT TO SECTION 1104(c)(2) OF BANKRUPTCY CODE AND JOINDERS THERETO

The Official Committee of Unsecured Creditors (the "Committee") appointed in

the chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors-in-

possession (collectively, the "Debtors") hereby responds to the Motion for Appointment of an

Examiner Pursuant to Section 1104(c)(2) of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (as amended, the "Bankruptcy Code"), dated October 20, 2008 (the "Examiner Motion"),

filed by The Walt Disney Company ("Disney"), and joinders thereto, and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By the Examiner Motion, Disney seeks appointment of one or more examiners to launch another broad investigation.  Recognizing that the statutory requirements for the appointment of an Examiner have been met, the Debtors have proposed an even broader investigation by an Examiner.  The Committee agrees that the story of the Debtors' demise and the facts underlying the commencement of these cases should be investigated and reported on to further the Bankruptcy Code's goals of transparency and disclosure to parties in interest as well as to bring to light the facts and circumstances that gave rise to the commencement of these massive cases.  The Committee respectfully submits that any such investigation, which will be conducted at the expense of unsecured creditors, if not properly focused, threatens to disrupt the progress of these cases, including the Committee's investigatory efforts, and to delay and detract from the Debtors' and Committee's efforts to maximize the value of the Debtors' estates for all stakeholders.

2.      The Committee acknowledges that the statute mandates the appointment of an Examiner.  Accordingly, this pleading is exclusively limited to the appropriate charter for the Examiner, a matter which is left to the discretion of the Court.  To a large degree, consensus exists among the parties as to the scope of the Examiner's charge to recommend to this Court.  Specifically, the parties agree that the Examiner should draft a report detailing the events and transactions leading up to the filing of these cases and, in the process, explain why and how Lehman filed when it did.  From the Committees perspective, to the extent the Examiner's charge is broader, it runs up against some countervailing concerns.

a. <u>Duplication</u>.  There are a number of independent investigations that have commenced and will continue.  Needless duplication of these efforts should be avoided.  The Committee has suggested, in proposed language for the order, certain safeguards to minimize this risk (such as drafting a joint work plan with the Examiner and allowing the Committee to continue to lead certain investigations).

b. <u>Potential Claims</u>.  An Examiner generally has no power to commence or prosecute estate causes of action.  The Debtors or the Committee are the parties that may bring such claims.  If the Examiner can analyze the merits of claims and defenses, it risks coloring and potentially hindering the conclusions and work of the parties who could actually prosecute any claims.  Accordingly, the Committee suggests that the Examiner's report be limited to the pertinent facts of Lehman's demise and the myriad transactions that occurred in the days and weeks prior to the filing.

c. <u>Revisiting Prior Orders of the Court</u>.  Whether it is reviewing the derivatives assignments, asset sales, or other authorized post-petition transactions, it is highly unusual to designate such bankruptcy court approved transactions to an examiner for review.  Those matters are typically left to the Debtors and the Committee to ensure compliance and to foster the requisite transparency for creditors and parties in interest.  The Committee is performing exactly that function in these cases.  No reason exists to complicate or replicate that role through an examiner's investigation.

d. <u>Financial Advisor</u>.  The Court has the power to limit or restrict the retention of professionals to assist the examiner.  The Committee proposes that, at least initially, the examiner be directed to utilize the work product of A&M and that A&M be directed to prepare such reports as may be reasonably requested by the Examiner.  A significant amount of A&M's work has related to preserving, collecting, and

organizing relevant data.  It makes little sense to layer in another financial advisor to

duplicate these efforts.  A financial advisor could be appropriate for other purposes,

but none appear present on the Committee's proposed scope.  Accordingly, the

Committee suggests that the retention of a separate financial advisor for the examiner

is unnecessary, but recognizes that the Examiner is free to return to the Court with a

specific request for the retention of a financial advisor if it can show that A&M is

incapable of or unwilling to provide the necessary advice.

e.    Individual Creditor Inquiries.  The Examiner should not be a vehicle for individual

creditors to ask questions of the Debtors that are more appropriately handled through

practice under Rule 2004 of the Federal Rules of Bankruptcy Procedure.

### BACKGROUND

3.    On September 15, 2008 and periodically thereafter, the Debtors

commenced these chapter 11 cases.  The Debtors have been authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a)

and 1108 of the Bankruptcy Code.  On September 17, 2008, the United States Trustee for the

Southern District of New York appointed the Committee.

4.    In the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules for the Southern District of New York in Support of First Day Motions and

Applications (the "Lowitt Aff."), LBHI explained the circumstances that necessitated its

bankruptcy filing, including the rapid continuing diminution in the value of its assets, its

increasing mark-to-market obligations and its plummeting stock price. (Lowitt Aff. at ¶ 27)

(Docket No. 2).

5.    On September 16, 2008, the Debtors, LBI, and Barclays entered into an

Asset Purchase Agreement (as amended and clarified, the "LBI Purchase Agreement") for the

4

purchase and sale of LBI's assets and three real properties including Lehman's headquarters and two data centers.  On September 20, 2008, the Court entered an order (Docket No. 258, the "Sale Order") approving the LBI Purchase Agreement and various transactions contemplated therein (the "LBI Sale").

6.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970, 15 U.S.C. § 78aaa et seq. ("SIPA"), with respect to LBI, a wholly owned subsidiary of LBHI and a registered broker dealer. James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") and is administering LBI's estate.

7.      Since the commencement of the Debtors' cases, the Debtors have completed numerous significant asset sale transactions, including (i) certain assets of the IMD, (ii) Eagle Energy, and (iii) certain membership/equity interests in R3 Capital Management LLC. In addition, the Debtors and the Committee, among many other things, have begun to reconcile the Debtors' book of over one million derivatives contracts, and coordinated the administration of these cases with 76 foreign cases of the Debtors' affiliates.

8.      In the midst of these transactions and the general administration of these chapter 11 cases, the Debtors and the Committee have been inundated with requests for information from parties in interest regarding a multitude of subjects.  In addition, the Committee is aware of pending investigations of the Debtors by the Offices of the United States Attorney in the Southern District of New York, the Eastern District of New York and the District of New Jersey as well as the New Jersey Bureau of Securities Investigation, the Securities and Exchange Commission and the United States Congress.

9.      As has been described to the Court, the Debtors, with the Committee's assistance, have worked to implement processes for retrieving, preserving and sharing the

enormous amount of data that will allow parties to reconstruct transactions and determine pre-bankruptcy events giving rise to causes of action and claims.  In addition, the Committee has commenced the initial phases of a comprehensive investigatory program.  The Committee has spent considerable time reviewing and analyzing certain aspects of the circumstances leading to the commencement of the Debtors' cases as well as the claims of the Debtors' significant creditors, including, without limitation, JPMorgan Chase Bank, N.A. ("JPMC").  For example, on October 2, 2008, the Committee filed a Motion for Leave to Conduct Discovery of JPMC Pursuant to 11 U.S.C. §§ 105(a) and 1103(c) and Federal Rule of Bankruptcy Procedure 2004 (the "JPMC 2004 Motion", Docket No. 566) seeking production of certain documents pertaining to certain transactions and the relationship between LBHI and JPMC.  The Committee and JPMC entered into negotiations regarding the scope of discovery sought by the Committee and, on November 5, 2008, this Court "so ordered" that certain Stipulation and Consent Order (the "JPMC Stipulation", Docket No. 1402) between the Committee and JPMC, pursuant to which JPMC agreed to start producing, on a rolling basis, a subset of the documents the Committee requested in the JPMC 2004 Motion, and the hearing on the balance of that motion was adjourned until February 11, 2009.  Notably, the JPMC Stipulation specifically provides that, in the event an examiner is appointed in these chapter 11 cases to review transactions among the Debtors and JPMC, JPMC may seek relief from its obligations to produce documents thereunder.  See JPMC Stipulation, ¶ 4.

10.     The Committee has dedicated more than 1,000 professional hours to its review and analysis of the potential claims, causes of action, defenses and relationships among JPMC and the estates.  In December 2008, JPMC began producing thousands of pages of documents to the Committee consistent with the JPMC Stipulation, and the Committee has begun reviewing and analyzing those documents.

11.     As the Court is aware, the Committee has also commenced investigations into, and is currently reviewing, among other things, the sale transaction entered into by the Debtors at the commencement of these cases and the implementation thereof.  That investigation was discussed briefly in the Limited Objection of Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al. to SIPA Trustee's Motion Under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Entry of an Order Approving Settlement Agreement, dated December 19, 2008 (the "Committee's SIPA Settlement Objection").  Consistent with the Court's direction during the hearing on the Committee's SIPA Settlement Objection, the Committee has initiated negotiations concerning the consensual production of documents to aid that investigation.

**Examiner Motion**

12.     On October 20, 2008, Disney filed the Examiner Motion, requesting entry of an order appointing one or more examiners (the "Examiner") to conduct an investigation of LBHI and Lehman Brothers Commercial Corp. ("LBCC"), their direct and indirect subsidiaries, and their respective directors and senior officers, in respect of the following issues:

- Intercompany accounts among LBHI and its direct and indirect subsidiaries including LBCC, as of LBHI's petition date;

- Administrative claims LBHI incurred to LBCC and its other direct and indirect subsidiaries since it commenced its chapter 11 case;

- Prepetition acts and omissions from and after March 16, 2008 in respect of LBCC's officers and directors, and LBHI's officers and directors and the officers and directors of LBHI's other direct and indirect subsidiaries impacting their respective fiduciary duties of care, loyalty, and good faith;

- Postpetition acts and omissions in respect of LBHI's officers and directors, LBCC's officers and directors, and the officers and direct indirect subsidiaries impacting their respective fiduciary duties of care, loyalty, and good faith;

- Whether LBCC and LBHI's other direct and indirect subsidiaries took any steps to protect their respective enterprises and constituencies in connection with the sale to Barclays Capital;

- What LBCC and other nondebtor subsidiaries of LBHI did with their cash after LBHI commenced its chapter 11 case;

- What became of LBCC's business, including without limitation, its personnel, client lists, trade secrets, telephone numbers, after September 20, 2008; and

- Is Barclays Capital Inc. operating and/or benefiting from LBCC's business?

13.    Disney asserts that it is a "party in interest" entitled to seek appointment of an examiner under section 1104(c)(2) of the Bankruptcy Code as a holder of claims against both LBHI and LBCC.  According to Disney, following the commencement of LBHI's chapter 11 case on September 15, 2008, Disney settled payment obligations to LBCC by delivering approximately $107 million worth of foreign currencies, and on the same date, LBCC was required to pay Disney approximately $107 million in U.S. currency (after various adjustments), which obligations were guaranteed by LBHI.  As of LBHI's petition date, Disney asserts that is was owed approximately $107 million by LBHI.  As of LBCC's petition date, Disney asserts that is was owed approximately $92 million by LBCC.

## Joinders, Responses and Objections to Examiner Motion

14.    On October 31, 2008, Bank of America, N.A. and certain of its affiliates (collectively, "Bank of America") interposed a joinder to the Examiner Motion (the "Bank of America Joinder", Docket No. 1302).  Bank of America asserts that it is a creditor of LBHI, Lehman Brothers Commodity Services Inc., and Lehman Brothers Special Financing Inc. ("LBSF") and supports the appointment of an Examiner with broad investigatory discretion. Bank of America specifically emphasizes that it believes an Examiner should investigate LBHI and all of its subsidiaries, not only LBCC.[1]

---

[1]    Without basis, Bank of America contends that an Examiner is a more appropriate entity than the Committee to investigate concerns regarding LBHI's subsidiaries because "the Committee is comprised of creditors that principally have a focus on claims at LBHI (as the other Debtors had not yet filed chapter 11 petitions at the time that the Committee was appointed)."  See Bank of America Joinder at 3.  To the contrary, the
(continued)

15.    On October 31, 2008, Harbinger Capital Partners Special Situations Fund,

L.P. and Harbinger Capital Partners Master Fund I, Ltd., f/k/a Harbert Distressed Investment

Master Fund, Ltd. (collectively, "Harbinger") filed a response and joinder to the Examiner

Motion (the "Harbinger Joinder", Docket No. 1310, and, together with the Bank of America

Joinder, the "Joinders").  Harbinger asserts that it holds claims against LBSF and LBHI in the

amount of $269,051,317.  Among other things, Harbinger alleges that the flow of information

among the Debtors, the SIPA Trustee for the liquidation of LBI, the Lehman Brothers Inc.

(Europe) joint administrators and Barclays remains delayed and problematic, hindering the

efforts of creditors to ascertain the status of their claims and the location of their property.

Accordingly, Harbinger proposes that an Examiner might facilitate the sharing of information,

particularly in the cross-border context.[2]  Harbinger suggests that Alvarez & Marsal North

America, LLC ("A&M") should broadly disclose to creditors information concerning the flow

of funds among LBHI and its subsidiaries.  Harbinger also suggests that, in the event that

"meaningful information flow" between the Debtors and LBIE has not been achieved by mid-

December 2008, the Examiner's duties should include facilitating the estates' access to

information needed for the benefit of all stakeholders.

16.    On November 12, 2008, the Office of the United States Trustee filed its

response in support of the Examiner Motion (Docket No. 1468).

---

Committee serves as a fiduciary to, and represents the interests of, all unsecured creditors of the Debtors in
these jointly-administered cases.

[2]    As stated by counsel to the Debtors and the UK administrator on the record of the November 5, 2008
hearing before the Court, the Debtors are working with the SIPA Trustee and the administrators and
liquidators appointed in the insolvency proceedings of Lehman entities abroad to develop protocols and
memoranda of understanding for the cooperative administration of these associated cases.  The Committee
has been involved in the development of these procedures.

17.     On October 31, 2008, the SIPA Trustee filed the Trustee's Objection to

(I) Motion of Walt Disney Company for the Appointment of an Examiner Pursuant to

Section 1104(c)(2) of the Bankruptcy Code and (II) Joinder of Bank of America, N.A. to

Motion (Docket No. 1320), whereby the SIPA Trustee opposes any relief requested in the

Examiner Motion and the Bank of America Joinder that related to appointment of an examiner

to investigate LBI as such an investigation would duplicate the SIPA Trustee's own

investigation and the appointment of an examiner is only authorized under the Bankruptcy Code

in a chapter 11 case (which the SIPA proceeding regarding LBI is not).

### SIPA Trustee's Investigation

18.     On December 11, 2008, the SIPA Trustee filed its Motion for an Order

Granting Authority To Issue Subpoenas for Production of Documents and Examination of

Debtor's Current and Former Officers, Directors and Employees, and Other Persons (the "SIPA

Trustee 2004 Motion"; LBI SIPA Proceeding, Case No. 08-01420, Docket No. 417).  Pursuant

to the SIPA Trustee 2004 Motion, the SIPA Trustee seeks authorization to issue subpoenas for

the production of documents and the examination of the current and former officers, directors,

employees, and affiliates of LBI, and other persons or entities with information relevant to the

Trustee's investigation into the events and circumstances that led to the commencement of the

liquidation of LBI under SIPA.[3]

---

[3]     Specifically, the Trustee asserts that he is empowered and obligated to investigate pursuant to section 78fff-
1(d) of SIPA, inter alia, the following issues: (i) the cause of LBI's demise; (ii) potential claims of LBI
against officers, directors and employees of LBI and others; (iii) the facts, circumstances and propriety of
the transfer of LBI subsidiaries to LBHI, including the negotiations of the terms of the transfer agreement
and note executed in connection with the transfer, the means for valuing the subsidiaries pursuant to the
transfer, the selection of those performing the valuation, and the financial and operational impact from the
transfers on the liquidation process; (iv) the financial and operational impact of LBI's relationships with its
clearing banks, the DTCC, and its holders of collateral on the liquidation process; (v) the facts,
circumstances, and propriety of intercompany transfers of cash, securities, and liabilities between LBI and
other Lehman entities both before and after the commencement of the Chapter 11 Cases; (vi) the financial
and operational impact of LBI's prime brokerage relationships on the liquidation process; (vii) the
operational hurdles and financial impact from the transfer of LBI's customer accounts to other entities;
(continued)

**Debtors' Response to Examiner Motion**

19.    On January 5, 2009, in response to the motion of the New York State

Comptroller for Appointment of a Trustee or, in the Alternative, an Examiner with Expanded

Powers (Docket No. 2427), the Debtors argue that the appointment of an Examiner pursuant to

section 1104(b) of the Bankruptcy Code is appropriate and suggest that any Examiner appointed

be charged with investigating:

A.  Whether LBCC has any administrative claims against LBHI resulting from LBHI's cash sweeps of LBCC's cash balances, if any, after September 15, 2008, the commencement date of LBHI's chapter 11 case.

B.  All voluntary and involuntary transfers to, and transactions with, affiliates, insiders and creditors of LBCC or its affiliates, in respect of foreign exchange transactions and other assets that were in the possession or control of LBCC at any time commencing on September 15, 2008 through October 3, 2008, the day that LBCC commenced its chapter 11 case.

C.  Whether LBCC has more than colorable claims against LBHI for potentially insider preferences arising under the Bankruptcy Code or state law.

D.  Whether LBCC has more than colorable claims against LBHI or any other entities for potentially voidable transfers or incurrences of debt, under the Bankruptcy Code or otherwise applicable law.

E.  Whether there are more than colorable claims for breach of fiduciary duties and/or aiding or abetting any such breaches against the officers and directors of LBCC and/or other Debtors arising in connection with the financial distress of the Lehman enterprise prior to the commencement of the LBHI chapter 11 case on September 15, 2008.

F.  Whether assets of LBCC or other direct and indirect subsidiaries of LBHI were transferred to Barclays Capital Inc. as a result of the sale to Barclays Capital Inc. that was approved by order of the Bankruptcy Court dated September 20, 2008, and whether consequences to LBCC of the consummation of the transaction created more than colorable causes of action that inure to the benefit of its creditors.

G.  The inter-company accounts and transfers among LBHI and its direct and indirect subsidiaries, including but not limited to: LBI, LBIE, LBSF and LBCC, during the

---

(viii) the effect of other financial transactions involving the transfer to or from LBI of assets and liabilities on the ability to liquidate the debtor and the transfer of customer accounts; and (viii) LBI's pre- and post-petition record-keeping practices.

30-day period preceding the commencement of the LBHI chapter 11 case on September 15, 2008.

H.  The transactions and transfers, including but not limited to the pledging or granting of collateral security interest among the debtors and the prechapter 11 lenders and/or financial participants including but not limited to, JPMorgan Chase, Citigroup, Inc., Bank of America, the Federal Reserve Bank of New York and others.

I.  The transfer of the capital stock of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc.

J.  The events that occurred from September 4, 2008 through September 15, 2008 that may have resulted in commencement of the LBI chapter 11 case.

The Debtors also request that any order appointing an Examiner include the following language:

- The Debtors, the Debtors' affiliates and subsidiaries, and the Creditors' Committee are directed to cooperate with the Examiner in conjunction with the performance of any of the Examiner's duties and the Investigation, and the Debtors and the Creditors' Committee shall use their respective best efforts to coordinate with the Examiner to avoid unnecessary interference with, or duplication of, the Investigation.

- Until the Examiner has filed his or her report, neither the Examiner nor the Examiner's representatives or agents shall make any public disclosures concerning the performance of the Investigation or the Examiner's duties.

- The Examiner may retain counsel and any professionals, if he or she determines that such retention is necessary to discharge his or her duties, with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327.

- The Examiner and any professionals retained by the Examiner pursuant to any order of this Court shall be compensated and reimbursed for their expenses pursuant to the procedures for interim compensation and reimbursement of professionals ordered in these cases.  Compensation and reimbursement of the Examiner shall be determined pursuant to 11 U.S.C. § 330, and compensation and reimbursement of the Examiner's professionals shall be determined pursuant to standards equivalent to those set forth in 11 U.S.C. § 330.

- The Examiner shall cooperate fully with any governmental agencies (such cooperation shall not be deemed a public disclosure as referenced above) including, but not limited to, any Federal, state or local government agency that currently or in the future may be investigating the Debtors, their management or their financial condition, and the Examiner shall use best efforts to coordinate with such agencies in order to avoid unnecessary interference with, or duplication of, any investigations conducted by such agencies. The Examiner will follow a protocol to be established with the governmental agencies for the sharing of information to the extent that such

12

sharing benefits the Debtors' estates, and such sharing of information shall be subject to appropriate conditions to protect the Debtors' estates.

- The Examiner shall have the standing of a "party-in-interest" with respect to the matters that are within the scope of the Investigation, and shall be entitled to appear and be heard at any and all hearings in these cases.

20.    The Debtors suggest that the Examiner should be a person having expertise, knowledge and personal and professional experience with the operation and management of financial institutions and their business and practices, and of financial transactions and securities, including highly complex derivatives and other sophisticated and esoteric securities.

21.    Finally the Debtors suggest that every effort should be made to avoid duplication of efforts and preserve the resources of the Debtors' estates. In that respect, the Debtors submit that the appointed Examiner should be directed to use the financial and investigative expertise of A&M and not engage other financial advisors.

## **RESPONSE**

### A.    Court Should Exercise Discretion to Limit Scope of Examiner's Investigation and Report

22.    Bankruptcy Code Section 1104(c)(2) provides for the appointment of an examiner, upon the request of a party in interest or the United States Trustee, where a debtor's unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceeds $5 million.  11 U.S.C. § 1104(c)(2).[4]  However, section 1104(c) explicitly provides that "the

---

[4]    Section 1104(c)(2) of the Bankruptcy Code provides "(c) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if … (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000."  11 U.S.C. § 1104(c)(2).

court shall order the appointment of an examiner to conduct such an investigation of the debtor <u>as is</u> <u>appropriate</u> . . . ." 11 U.S.C. § 1104(c) (emphasis added). It is uniformly acknowledged that the "court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration." <u>Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)</u>, 898 F.2d 498, 501 (6th Cir. 1990).

23.     The purpose of an examiner is to provide the Court and the parties in the case with independent third party input. <u>See</u> <u>U.S. v. Schilling (In re Big Rivers Elec. Corp.)</u>, 355 F.3d 415, 431-32 (6th Cir. 2004). "'An Examiner's legal status is unlike that of any other court-appointed officer which comes to mind . . . . The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders, but he answers solely to the Court.'" <u>Id.</u> (quoting <u>In re Baldwin United Corp.</u>, 46 B.R. 314, 316 (S.D. Ohio 1985)). The examiner owes a fiduciary duty of complete loyalty to the creditors. <u>Big Rivers Elec. Corp.</u>, 355 F.3d at 434.

24.     The Committee recognizes that the appointment of an Examiner is required under the Bankruptcy Code to conduct an appropriate investigation for the benefit of parties in interest. Nonetheless, those interests will be best served by eliminating duplication in the subject matter of the Examiner's investigation. The Committee further submits that the nature and scope of the Examiner's investigation be focused as set forth below to allow the efficient investigation of those <u>facts</u> that are appropriate for an Examiner to investigate, while recognizing the need to conserve estate resources for the benefit of the creditors from whose recoveries the Examiner's investigation will be funded.

i.   **Appointment of Examiner Risks Duplication and Delay**
     **of Pending Investigations that Should be Minimized**

25.      The Debtors are currently subject to numerous Congressional, regulatory,

civil and other investigations.  The Committee and the SIPA Trustee -- parties in interest,

which, unlike any Examiner appointed in these cases, have standing and, indeed, duties to

investigate and pursue claims where appropriate -- have each also initiated their own

comprehensive investigations.  If the Examiner duplicates those efforts, the targets of the

Committee's investigations may become less willing to cooperate with the Committee.  For

example, as noted above, the appointment of an Examiner may thwart the Committee's efforts

to obtain consensual discovery of JPMC pursuant to the JPMC Stipulation because it

specifically provides that, in the event an examiner is appointed in these chapter 11 cases to

review transactions among the Debtors and JPMC, JPMC may seek relief from its obligations to

produce documents thereunder.  See JPMC Stipulation, ¶ 4.

26.      Due to the pendency of numerous ongoing investigations and the potential

for the unnecessary incurrence of significant costs by an Examiner whose scope is not properly

constrained by reasonable limitations, the Court should limit the scope of the Examiner's

mandate.  The Committee submits that the interests of the Debtors' estates and creditors would

best be served by a more focused, exclusively factual investigation of the circumstances leading

to the commencement of these chapter 11 cases, the exact contours of which should be crafted

by the Examiner to complement and avoid replicating the pending investigations following a

review of such pending investigations after appointment of the Examiner.

27.      The Court should therefore exercise its discretion under section 1104(c)(2)

to require any Examiner appointed to conduct an analysis of the pending investigations with an

eye toward avoiding duplication (and subject to certain <u>ex</u> <u>ante</u> limitations as described in

greater detail below) and seek approval of a work plan developed in connection with the

Debtors, the Committee and the SIPA Trustee to narrowly tailor the Examiner's investigation.

Furthermore, the Committee respectfully requests that the Court order the Examiner to

coordinate its investigation with those other investigations currently pending to minimize

unnecessary duplication.

**ii.    Court Should Require Examiner to Seek Approval of Work Plan and Budget
Prior to Initiating Investigation**

28.    Upon appointment of an Examiner, the Court should schedule a further

hearing to consider the Examiner's work plan and budget.  The Court has "broad discretion" to

limit the nature, scope and duration of the examiner's investigation.  In this regard, section 1104

of the Bankruptcy Code explicitly provides that an examiner must only "conduct such

examination of the debtor <u>as is</u> <u>appropriate</u>."  11 U.S.C. § 1104(c)(2) (emphasis added); <u>see also</u>

<u>In re Revco D.S., Inc.</u>, 898 F.2d at 501 (holding that "the bankruptcy court retains <u>broad</u>

<u>discretion</u> to direct the examiner's investigation, including its nature, extent, and duration.)

(emphasis added); <u>Loral Stockholders Protective Comm. v. Loral Space & Commc'ns., Ltd. (In</u>

<u>re Loral Space & Commc'ns., Ltd.)</u>, No. No. 04 Civ. 8645 (RPP) 2004 WL 2979785, *5

(S.D.N.Y. Dec. 23, 2004) ("[I]t is [the] court's duty to fashion the role of an examiner to avoid

substantial interference with the ongoing bankruptcy proceedings.  To that end, the Bankruptcy

Court may exercise its discretion to limit the scope of the examiner's investigation and the

compensation and expenses available to the examiner.")[5]; <u>In re UAL Corp.</u>, 307 B.R. 80, 86

---

[5]    Significantly, in <u>Loral</u>, the Bankruptcy Court limited the examiner's investigation from that sought by the Movants.  Specifically, the Court limited the examination to whether the "Debtors, including their professionals, have used customary and appropriate processes and procedures to value their assets and businesses for purposes of section 1129(b) of the Bankruptcy Code, or, on the contrary, have employed improper processes and procedures in order to arrive at a materially reduced valuation of their assets and businesses for purposes of section 1129(b) of the Bankruptcy Code."  The Court further narrowed the scope of the investigation to provide that "the Examiner shall rely primarily on interviews of the Debtors' management and professionals (but also including of representatives of the Ad Hoc Committee) and review
(continued)

16

(Bankr. N.D. Ill. 2004) ("[T]he court presiding over a large bankruptcy should have the authority to limit examiner investigations to 'appropriate' subjects, methods, and duration ...")[6]; In re Bradlees Stores, Inc., 209 B.R. 36, 39 (Bankr. S.D.N.Y. 1997) ("the bankruptcy court retains broad discretion to direct the examiner's investigation, including its nature, extent, and duration.").

29.     In fact, in Loral Space & Commc'ns, Ltd., the District Court recognized that "it is the court's duty to fashion the role of an examiner to avoid substantial interference with the ongoing bankruptcy proceedings."  2004 WL 2979785 at *4.  To this end, a court "may exercise its discretion to limit the scope of the examiner's investigation and the compensation and expenses available to the examiner."  Id.  This Court should exercise its discretion to schedule a hearing following appointment of an Examiner to consider the appropriate scope of its charter and an appropriate budget for the Examiner's investigation based on the Examiner's proposals.

### iii.     Court Should Limit Examiner's Scope to Investigation of Prepetition Facts and Refrain From Legal Analysis

30.     All parties in interest may benefit from the completion of a thorough investigation and explanation of the factual circumstances surrounding the demise of the Debtors.  However, such a benefit cannot outweigh the potential prejudice to parties in interest that may result if the Examiner -- who, even if granted status as a "party in interest" with a right to be heard as proposed by the Debtors, would not have standing to assert any actions for the

---

of their work product, supplemented, in the exercise of the Examiner's discretion, by confirmatory due diligence; provided that the Examiner shall not conduct his or her own "full blown" valuation of the Debtors' assets and businesses."  See Order dated December 20, 2004, Case No. 03-41710.

[6]     In fact, the Court in UAL suggested in might be appropriate for an examiner to "be directed simply to investigate whether there is good cause to engage in the inquiry suggested by the movant."  307 B.R. at 87.

benefit of the Debtors' estates and creditors -- were to reach legal conclusions that are inconsistent with those reached by those parties capable of commencing and prosecuting such actions.  Accordingly, in addition to ensuring that the scope of the Examiner's investigation does not duplicate currently pending investigations and the budget for the Examiner's investigation is appropriately limited, in order to ensure that the investigation does not hamper the ability of parties with standing to bring actions for the benefit of the Debtors' estates, the Court should exercise its discretion to limit the scope of the Examiner's investigation lest the Examiner's report affect the ability of parties with standing to pursue recoveries for the benefit of the Debtors' estates and creditors.

31.    In this regard, the Committee respectfully submits the Examiner's mandate should (i) be limited to a recounting of the facts and circumstances leading to the commencement of these cases (and excluding the post-petition period), and (ii) not identify, address or analyze any legal claims or defenses in its written report or otherwise.  If limited to a factual report, the Examiner's work may become a touchstone for the various subsequent analyses and investigations without coloring one of the potential outcomes of those investigations.  The following paragraphs of the Debtors' proposed scope are consistent with this request:

G.    The inter-company accounts and transfers among LBHI and its direct and indirect subsidiaries, including but not limited to: LBI, LBIE, LBSF and LBCC, during the 30-day period preceding the commencement of the LBHI chapter 11 case on September 15, 2008.

I.    The transfer of the capital stock of certain subsidiaries of LBI on or about September 19, 2008 to Lehman ALI Inc.

**B.    Scope of Examination Proposed by Debtors is Too Broad In Certain Respects**

32.    As described above, the Debtors have proposed an extremely broad scope for the mandate of any Examiner appointed by this Court.  The Debtors suggest that the

Examiner should not only investigate the factual circumstances leading to the commencement

of these cases, but also the existence of numerous causes of action on behalf of the Debtors'

estates, including the existence of claims and viability of avoidance actions resulting from both

pre-petition and post-petition transfers (including transfers made pursuant to transactions

specifically authorized by this Court).

33.    While the Committee agrees that many, if not all, of the topics enumerated

by the Debtors should be investigated, an Examiner is not the appropriate entity to investigate

the existence of such claims and causes of action.  Rather, principles of efficiency and economy

dictate that the determination of whether the Debtors have viable claims arising from transfers

of their assets should be made by parties in a position to prosecute actions to obtain recoveries

on behalf of the Debtors' estates -- i.e., the Committee, the Debtors and/or the SIPA Trustee.

Otherwise, the Examiner's findings will, at least, be duplicative of the investigations and

analysis that will be conducted by parties that will seek to prosecute such claims.  Accordingly,

the Court should exercise its discretion to limit the scope of any Examiner's investigation to not

identify, address or analyze any legal claims or defenses in his or her written report or

otherwise.

34.    No Financial Advisor Needed At This Time.  The Committee does,

however, agree with the Debtors' proposal that any Examiner not be authorized to retain a

financial advisor, at least initially.  To date, A&M has expended a huge amount of time and

resources compiling data regarding the Debtors' financial affairs and records of transactions; all

at great expense to the Debtors' estates.  While the Committee recognizes the utility of A&M's

efforts and the necessity of expending substantial resources collecting and compiling such data,

the Committee objects to the need for an Examiner to hire another financial advisor to re-create

this enormous task at the expense of the Debtors' creditors.  Absent a reason to question the

probity of the data collection conducted by A&M, the Court must not permit any Examiner

appointed to force the Debtors' creditors to endure the immense costs and delay that would be

occasioned by even partial duplication of such efforts.  Accordingly, the Committee respectfully

submits that the Court should not authorize the Examiner to retain a financial advisor.  If any

Examiner appointed in these cases later determines that reason exists to question A&M's

findings or that a financial examiner is necessary for some other specific task, the Examiner

should then return to the Court to demonstrate the necessity of retaining its own financial

advisor.

### C.   Committee's Proposed Language for Examiner Appointment Order

35.    In respect of the foregoing and in furtherance of the concerns articulated

above, the Committee submits that any Order appointing an Examiner should contain the

following decretal paragraphs:

ORDERED, that within 15 business days after entry of this Order and prior to
commencing the Investigation, the Examiner shall propose a work plan, which shall include his
or her estimated cost for the Investigation.  The Examiner shall (i) consult and cooperate with the
Debtors, the Creditors' Committee and the SIPA Trustee in developing his or her work plan and
(ii) avoid duplication with the ongoing investigations of the Debtors, the Creditors' Committee
and the SIPA Trustee.  The Debtors, the Creditors' Committee, the SIPA Trustee and the
Examiner shall agree on the terms of the work plan.  The work plan shall be subject to approval
of the Court on not less than 10 calendar days' notice to all parties listed on the Master Service
List; and it is further

ORDERED, that the Examiner shall, to the extent possible, avoid duplication of
effort of the Debtors, Creditors' Committee and SIPA Trustee in connection with conducting the
Investigation.  To the extent the Examiner becomes aware of duplication of effort with respect to
any aspect of the Investigation, he or she shall bring such duplication to the attention of counsel
to the Debtors, the Creditors' Committee, the SIPA Trustee and the Court and shall request a
Court conference, at the mutual convenience of the Court and counsel to the Debtors, the
Creditors' Committee and the SIPA Trustee, prior to continuing the potentially duplicative
aspect of the Investigation.  The Examiner shall notify the Debtors, the Creditors' Committee
and the SIPA Trustee in advance of any examination or discovery of any party in connection
with the Investigation and each of the Debtors, the Creditors Committee and the SIPA Trustee
shall be entitled to attend and participate in any such examination or discovery (and receive
copies of any documents produced); and it is further

ORDERED, that the Examiner shall prepare and file a written report, as is required by 11 U.S.C. § 1106(a)(4), within 150 days following approval of the work plan by the Court, unless such time shall be extended by order of the Court, on notice to all parties listed on the Master Service List.  Prior to requesting additional time, the Examiner shall provide notice of such request to counsel to the Debtors, the Creditors' Committee and the SIPA Trustee; and it is further

ORDERED, that all parties may use any documents or other materials disclosed in the Examiner's report in any proceeding in these cases consistent with the Federal Rules of Bankruptcy Procedure and the Federal Rules of Evidence; and it is further

ORDERED, that nothing contained in this Order shall diminish the powers and authority of the Creditors' Committee, including the Creditors' Committee's power to investigate transactions and entities, commence contested matters and adversary proceedings, and object to claims; and it is further

ORDERED, that the Examiner shall have the duties, powers and responsibilities of an examiner under 11 U.S.C. § 1106(b); provided, however, that the scope of the Examiner's duties, unless expanded or limited by further order of this Court, shall be limited to the Investigation, as described herein, and to the preparation of a written report regarding the factual conclusions of such Investigation; and it is further

ORDERED, that in light of the exclusively factual nature of the Investigation, the Examiner shall not identify, address or analyze any legal claims or defenses in his or her written report or otherwise; and it is further

ORDERED, that the Examiner shall not later than 10 calendar days prior to the filing of the Examiner's written report, provide a draft of the report on a confidential basis to counsel to the Debtors and counsel to the Creditors' Committee and counsel to the SIPA Trustee; provided that the Examiner may accept or reject in whole or in part any comments received by such parties; and it is further

ORDERED, that the Examiner may retain legal counsel, but not a financial advisor, if he or she determines that such retention is necessary to discharge his or her duties, with such retention to be subject to Court approval under standards equivalent to those set forth in 11 U.S.C. § 327.  A&M shall make itself available to assist in the Examiner's tasks and shall provide the Examiner with the financial data s/he requires; and it is further

ORDERED, that the Examiner and any legal counsel retained by the Examiner pursuant to an order of this Court shall be compensated and reimbursed for their expenses pursuant to the procedures for interim compensation and reimbursement of professionals established in these cases.  Compensation and reimbursement of expenses of the Examiner shall be determined pursuant to 11 U.S.C. § 330, and compensation and reimbursement of the Examiner's legal counsel shall be determined pursuant to 11 U.S.C. § 330.

**CONCLUSION**

WHEREFORE, the Committee respectfully requests that the Court (i) schedule a

hearing to establish, after consultation with the Debtors and the Committee, an appropriate work

plan and budget for the Examiner's investigation, (ii) limit the scope of the Examiner's

investigation to (a) a recounting of the facts and circumstances leading to the commencement of

these cases, (b) require coordination with the numerous ongoing investigations and minimize

duplication of efforts and expenditure of estate resources, and (c) refrain from identifying,

addressing or analyzing any legal claims or defenses in his or her written report or otherwise, and

(iii) grant such other and further relief as is just.

Dated:   New York, New York
         January 9, 2009

                            **MILBANK, TWEED, HADLEY & McCLOY LLP**

                            By: /s/ Dennis F. Dunne
                                Dennis F. Dunne
                                Dennis O'Donnell
                                Evan R. Fleck
                                1 Chase Manhattan Plaza
                                New York, New York 10005
                                Telephone:  (212) 530-5000

                                -and-

                                Paul Aronzon
                                601 South Figueroa Street, 30th Floor
                                Los Angeles, California 90017
                                Telephone:  (213) 892-4000

                            Counsel for Official Committee of Unsecured
                            Creditors of Lehman Brothers Holdings Inc., et al.