WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
: 
In re                                                            :    Chapter 11
                                                                 :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,    :    Case No. 08-13555 (JMP)
                                                                 :
            Debtors.                                   :    (Jointly Administered)
                                                                 :
                                                                 :
-------------------------------------------------------------------x

**DEBTORS' RESPONSE TO THE MOTION OF BANK OF NEW YORK
MELLON TRUST COMPANY, N.A. FOR EXAMINATION OF DOCUMENTS BY
LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS INC., LEHMAN
BROTHERS COMMODITY SERVICES INC., AND BARCLAYS CAPITAL INC.**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

The response of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated

debtors, as debtors in possession, (the "Debtors" and, collectively with their non-debtor affiliates,

"Lehman"), to the motion of The Bank of New York Mellon Trust Company, N.A. ("BONY")

for order, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, Directing

Examination of, and Production of, Documents by LBHI, Lehman Brothers Inc. ("LBI"),

Lehman Brothers Commodity Services Inc. ("LBCS"), and Barclays Capital Inc. ("Barclays"),

dated November 26, 2008 (the "Motion"), respectfully represent:

**Background**

1. On September 15, 2008 (the "Commencement Date"), LBHI commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Periodically thereafter, certain of LBHI's subsidiaries also commenced voluntary cases under chapter 11 of the Bankruptcy Code.

2. After an evidentiary hearing (the "Sale Hearing") beginning on September 19, 2008, the Court entered an order, dated September 20, 2008 [docket # 258] (the "Sale Order"), approving an asset purchase agreement (the "APA") [Docket No. 280] for the sale (the "Sale") to Barclays of certain assets of the Debtors and LBI.

3. Specifically, the APA provided for the sale of, among other things, the assets of LBHI, LBI, and certain subsidiaries (collectively, the "Sellers") used in connection with the U.S. and Canadian investment banking and capital markets businesses of the Sellers, including the fixed income and equities cash trading, brokerage, dealing, trading, and advisory businesses, investment banking operations and LBI's business as a futures commission merchant (the "Business"). *See* APA at pp. 2 and 6-8. The APA also defined the assets that were excluded from the Sale (the "Excluded Assets"). *See* APA at pp. 2-4.

4. On September 20, 2008, the parties to the APA executed a clarification letter (the "Clarification Letter") [Docket No. 280 Ex. C] that amended and clarified certain terms and the Sellers' and Barclays' intentions under the APA. In particular, the Clarification Letter provided that:

- "**For the avoidance of doubt, the Business [being sold to Barclays] includes LBI's commodities**." Clarification Letter ¶ 1(b) (emphasis supplied).

- "[T]he equity interests and assets of Lehman Brothers Commodity Services, Inc. . . . are Excluded Assets." Clarification Letter ¶ 1(c) (emphasis supplied).

Thus, the APA and Clarification Letter not only expressly excluded LBCS's assets from the Sale but also disclose that Barclays purchased commodities of LBI.

5. The applicable provisions of the APA and the Clarification Letter are consistent with the testimony at the Sale Hearing of Herbert H. McDade, Lehman's former global head of its Equities Division, that the commodities business of LBI was included among the businesses being sold pursuant to the APA. Sale Hearing Transcript [Docket No. 318] at 112:15-25, 113:6-7. The relevant portions of the Sale Hearing Transcript are annexed hereto as Exhibit A. Mr. McDade also testified that a necessary component of the Sale would involve the transfer of approximately 9,000 employees. As with the majority of Lehman's employees, these individuals were employed by LBI and provided services throughout the organization, including services to LBCS. Sale Hearing Transcript at 114-116.

6. On or about October 7, 2008, Barclays issued a press release (the "Press Release") that declared, among other things, that the "Commodities trading previously conducted by Lehman Brothers in North America has similarly been incorporated into the comprehensive suite of commodity products and services offered by Barclays Capital." *See* Motion at Exhibit 1.

**BONY's 2004 Request**

7. Despite the fact that the APA, Clarification Letter, and the Sale Hearing make clear that LBCS's commodities business were not transferred, while LBI's commodities business was sold, BONY purposely reads ambiguity into a single Barclays' Press Release to contend there is a question as to what was transferred. There is no ambiguity and there is no issue that Barclays' Press Release is consistent with all of the evidence adduced in connection

with the Sale.  Nevertheless, by BONY's 2004 request, it seeks to examine, through the production of documents and deposition of individuals of LBHI, LBI, LBCS, and Barclays, whether LBCS's assets were included in the assets transferred to Barclays under the APA simply because Barclays held itself as having acquired "Lehman Brothers" commodities, which it was entitled to receive under the APA.

### LBCS Could Not Transact New Business

8.     Generally, LBHI guaranteed certain LBCS commodity contracts.  The commencement of LBHI's chapter 11 case was an event of default under the terms of certain such contracts.  In response to LBHI's chapter 11 case, various counterparties purportedly terminated their contracts with LBCS.  Moreover, given the fact that LBHI traditionally provided credit support to its subsidiaries and was now in chapter 11, it proved to be impossible for LBCS to generate new business.  In addition, in September of 2008, the New York Mercantile Exchange froze LBCS's ability to trade on such exchange.  Accordingly and as a result of LBHI's chapter 11 case, LBCS's business was not transferred to Barclays in the Sale and, as a result of the commencement of these cases, has been reduced to liquidating contracts, assessing the value of claims resulting from terminated contracts, and collecting termination payments.

### Because Barclays Purchased LBI's Commodities Assets, Not LBCS's Commodities Business,The Examination Request Is Not Warranted And Should Be Denied

9.     There is no basis for BONY's Bankruptcy Rule 2004 request.  BONY attempts to create an issue when none exists by harping on Barclays' Press Release that references "Lehman Brothers" commodities business to assert that LBCS sold its commodities business to Barclays and purposely ignoring that the Business acquired by Barclays included the commodity assets of <u>LBI</u>, not the commodity business of LBCS or any other LBHI subsidiary.

08-13555-mg    Doc 2478    Filed 01/09/09    Entered 01/09/09 17:00:19    Main Document
Pg 5 of 16

10. BONY has the burden to show the need for the discovery it seeks under Bankruptcy Rule 2004. There is nothing in Barclays' Press Release that indicates it acquired the assets of LBCS, and BONY cannot attempt to satisfy that burden by ignoring the fact that LBI owned commodity assets separate and apart from LBCS that were sold to Barclays under the APA. Barclays statements in its news release are entirely consistent with the APA, the Clarification Letter, and the testimony at the Sale Hearing.

11. Contrary to all of the facts of these cases and the clear language of the Press Release, BONY interprets the Press Release to state that "Barclays has employed LBCS's employees since the consummation of the sale." Motion ¶ 12. The Debtors do not dispute that certain of the individuals that provided commodity services to LBI and LBCS were transferred to and hired by Barclays pursuant to the APA. As a result of the dramatic change in LBCS's business resulting from the commencement of these cases and the impediments to generating new business, LBCS's had very little, if any, need for the employees that LBI transferred to Barclays. In all circumstances, however, such employees were not the assets or the business of LBCS. Moreover, it was fully disclosed under the APA and at the Sale Hearing that the substantial majority of the individuals providing services to Lehman's North American broker-dealer operations would be transferred to Barclays. Sale Hearing Transcript at 114-115.

**Any Discovery Should Be Conducted By An Examiner Not BONY**

12. In the event the Court determines it is appropriate to appoint an examiner in connection with the examiner motions and the Court determines that the instant examination request merits investigation, the Debtors suggest that the Court direct such examiner to investigate the assertions in the Motion. In the Debtors' Response In Opposition To The Motion of the New York State Comptroller for the Appointment Of A Trustee Or, In The Alternative, An

Examiner With Expanded Powers, dated January 5, 2009 [Docket No. 2427], the Debtors support the appointment of an examiner and suggest that among the various duties to be charged to an examiner should include the investigation of whether any of the assets of LBHI's subsidiaries were transferred to Barclays as part of the Sale and APA. Because every effort should be made to avoid duplication of efforts and preserve resources of the estates, any investigation of the foregoing issues should be conducted by such examiner, not BONY.

WHEREFORE the Debtors respectfully request for the Court to deny the Motion and grant the Debtors such other and further relief as is just.

Dated: January 9, 2009
      New York, New York

/s/ Shai Y. Waisman
Shai Y. Waisman
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

# EXHIBIT A

**(Sale Hearing Transcript)**

NY2:\1954819\06\15WCJ06!.DOC\58399.0003

1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


            Debtors.



- - - - - - - - - - - - - - - - - - - -x


            United States Bankruptcy Court

            One Bowling Green

            New York, New York


            September 19, 2008

            4:36 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

112

1  here. I'd like to --
2              THE COURT: Well, Mr. Bienenstock is ahead of you.
3  So you're going to have to move to a position where you can
4  both be seen and heard.
5              Mr. Bienenstock, it's your turn.
6              MR. BIENENSTOCK: Thank you, Your Honor.
7  CROSS-EXAMINATION
8  BY MR. BIENENSTOCK:
9  Q.    Good evening, Mr. McDade.
10 A.    Good evening.
11 Q.    My name is Martin Bienenstock, representing the Walt
12 Disney Company. Yesterday, I understand that you were at the
13 information session at Weil Gotshal?
14 A.    That's correct.
15 Q.    And I want to confirm some information given there.
16 Pursuant to the proposed asset purchase agreement here, the
17 businesses that are being -- the Lehman businesses being
18 transferred to Barclays are as follows: Tell me if I'm
19 incorrect, I'll read one at a time. Investment Banking?
20 A.    Correct.
21 Q.    Fixed Income?
22 A.    Correct.
23 Q.    North American Operations?
24 A.    Correct.
25 Q.    Credit?

```
                                                              113
1    A.    Correct.
2    Q.    Lending?
3    A.    Correct.
4    Q.    Municipal Bonds?
5    A.    Yes.
6    Q.    Commodities?
7    A.    Correct.
8    Q.    High Yield?
9    A.    Yes.
10   Q.    Derivatives?
11   A.    Yes.
12   Q.    Government Bonds?
13   A.    Yes.
14   Q.    Interest rates derivatives?
15   A.    Yes.
16   Q.    High grade credit?
17   A.    Yes.
18   Q.    Cash and credit derivatives?
19   A.    Yes.
20   Q.    Money market?
21   A.    Yes.
22   Q.    Commercial paper?
23   A.    That's the same.
24   Q.    Commercial lending?
25   A.    Commercial lending, if you mean the leverage finance
```

114

1  business, yes.
2  Q. Foreign exchange trading?
3  A. Yes.
4  Q. Prime brokerage?
5  A. Yes.
6  Q. Prime services?
7  A. That's the same business.
8  Q. Sorry, I'm not familiar.
9  A. No problem.
10 Q. Cash equities?
11 A. Correct.
12 Q. Convertible bonds?
13 A. Yes.
14 Q. Long/short proprietary trading?
15 A. Yes.
16 Q. Customer options and futures?
17 A. Yes.
18 Q. Equity prime brokerage?
19 A. Yes.
20 Q. And to transfer those businesses, I take it, the one
21 necessary component is the transfer of employees to Barclay?
22 A. Absolutely.
23 Q. And how many employees did you say will be going over to
24 Barclays?
25 A. Approximately 9,000.

115

1  Q. And at Lehman Brothers and its subsidiary entities, do
2  employees work across legal entities in business lines or is
3  there a different employee for each legal entity?
4  A. Most of the employees in the U.S. work for the U.S.
5  broker-dealer, LBI. Most of the LBH employees were actually
6  corporate functions, operations financed technology which
7  supported the capital markets units in particular.
8  Q. So the employees then who worked for Lehman Brothers
9  Commercial Corp. are technically employees of LBI, is that
10 correct?
11 A. Lehman Brothers Commercial Corp.?
12 Q. Yes.
13 A. I'm not familiar with that legal entity.
14 Q. Foreign exchange trading?
15 A. Foreign exchange trading, yes.
16 Q. Okay. And Lehman Brothers Finance, are those employees
17 employees of -- are the employees who operate Lehman Brothers
18 Finance, are they employees of LBI?
19 A. Lehman Brothers Finance, you mean the finance professional
20 staff?
21 Q. I think the technical name is Lehman Brothers Finance S.A.
22 A. Lehman Brothers Finance S.A. is one of our derivative
23 subsidiaries.
24 Q. Okay. And the employees who work that business are
25 employees of LBI?

116

1   A.   Correct.

2   Q.   And the same goes for Lehman Brothers Equity Finance
3   (Cayman) Ltd.?

4   A.   Correct.

5   Q.   And for Lehman Brothers Commercial Corporation Asia Ltd.?

6   A.   Correct.

7   Q.   And for Lehman Brothers Bankhaus A.G. Seoul branch?

8   A.   That's a funding vehicle, it's a bank.

9   Q.   Okay.  And for Lehman Brothers Commodity Services, Inc.?

10  A.   That's correct.

11  Q.   Are you sure you have no recollection of Lehman Brothers
12  Commercial Corp., LBCC?

13  A.   No, I do not.

14  Q.   Okay.  But, in general, the subsidiaries of Lehman
15  Brothers Inc. and Lehman Brothers Holdings Inc. use employees
16  of those two entities?

17  A.   That's correct.

18  Q.   So as a consequence of this asset purchase agreement if
19  it's closed, the businesses and those subsidiaries will have to
20  be wound down, is that fair?

21  A.   The businesses in the subsidiaries?

22  Q.   Yes.

23  A.   The vehicles themselves?

24  Q.   Well, let me ask it this way.  Those subsidiaries will
25  stop transacting new business, I take it?

117

1   A.   If Barclays so chooses, yes, that's correct.  In terms of
2   the process.
3   Q.   Okay.
4   A.   We're still in a period, obviously, of working through the
5   dynamic of how the Barclays/Lehman integration, if it were to
6   happen, would take place.
7   Q.   And along with the sale, what was referred to, I think at
8   the information session, as the infrastructure, which I take it
9   are the data processing and other items that enable the
10  businesses to work, that's being transferred over to Barclays?
11  A.   That's correct.
12  Q.   And that would apply -- and that's the same infrastructure
13  that enables the subsidiary's businesses to work, is that
14  correct?
15  A.   Very different infrastructure, it's trading infrastructure
16  in particular.  So trading platforms.  The reason the data
17  centers are so important is the volume of electronic trading
18  taking place, for example, in equities.  So it's a very
19  different infrastructure.
20  Q.   Okay.  Let me clarify that.  Are you saying that the
21  infrastructure that's moving over to Barclays to cover all the
22  list of businesses that you agreed were being transferred, is
23  different than the infrastructure that helps run the
24  subsidiaries?
25  A.   I'm sorry.  There are different forms of infrastructure,

118

1   it's a broad term covering a lot of different aspects of
2   responsibilities for running these businesses.
3   Q.   But the infrastructure for running all of the businesses
4   we went through at the outset is moving over to Barclays?
5   A.   That's correct.
6   Q.   At I think it's LH 745, the owner of the headquarter
7   building, who was that note payable to?
8   A.   The intercompany?
9   Q.   Yes.
10  A.   I don't know the specifics.
11  Q.   Do you know whether the money will be -- do you know
12  whether that note payable will be satisfied at closing?
13  A.   I believe it's already been -- I believe it was already
14  answered earlier that it was satisfied previously at this
15  point.  I don't know specifically.
16  Q.   There was lawyer's colloquy, but I just want to -- this is
17  the evidence part.
18  A.   I do not know specifically.
19  Q.   Okay.  In running the businesses that we spoke about
20  earlier, would you agree that it's the employees that are
21  critically important?
22  A.   Absolutely.
23  Q.   When you negotiated this deal with Barclays, tell me, were
24  you at the table?
25  A.   Absolutely.

119

1  Q.  Okay.  And who were you negotiating on behalf of?

2  A.  I was negotiating on behalf of the estate.

3  Q.  The estate of LBHI?

4  A.  There were two phases of the negotiation.  The weekend

5  conversations, which obviously did not transpire.  And then

6  this phase of the negotiations.

7  Q.  When you refer to estate, is it fair to say you meant

8  Lehman Brothers Holdings Inc. --

9  A.  Correct.

10  Q.  -- and Lehman Brothers Inc., and Lehman Brothers 745?

11  A.  Correct.

12          MR. BIENENSTOCK:  No further questions, Your Honor.

13          THE COURT:  Thank you.  Mr. Sabin, are you going to

14  question?

15          MR. SABIN:  I do, Your Honor.

16          THE COURT:  What happened to that gentleman that

17  raised his hand and sat down --

18          MR. ROSNER:  I'm sorry.  I think Mr. Sabin was

19  prepared to go next.  So if that's okay with Your Honor, it's

20  certainly okay --

21          THE COURT:  It's perfectly fine.  You just seemed

22  very interested to be the one who was going to take Mr.

23  Bienenstock's spot.

24          MR. ROSNER:  No, it's just sometimes I'm hard to be

25  seen.