**Hearing Date: January 14, 2009, 10:00 a.m**.

ENTWISTLE & CAPPUCCI LLP
Andrew J. Entwistle (AE-6513)
Johnston de F. Whitman, Jr. (JW-5781)
Jonathan H. Beemer (JB-0458)
Joshua K. Porter (KP-2660)
280 Park Avenue, 26th Floor West
New York, New York 10017
Telephone: (212) 894-7200

*Counsel for New York State Comptroller*
*Thomas P. DiNapoli, as Administrative*
*Head of the New York State and Local*
*Retirement Systems and Sole Trustee of*
*the New York State Common Retirement Fund*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
In re:                                                :    Chapter 11
                                                      :
LEHMAN BROTHERS HOLDINGS INC.,                        :    Case No. 08-13555 (JMP)
                                                      :
                              Debtor.                 :    (Jointly Administered)
                                                      :
------------------------------------------------------x

**REPLY IN FURTHER SUPPORT OF THE NEW YORK STATE COMPTROLLER'S
MOTION FOR APPOINTMENT OF A TRUSTEE OR, IN THE ALTERNATIVE, AN
<u>EXAMINER WITH EXPANDED POWERS</u>**

TO THE HONORABLE JAMES M. PECK,
UNITED STATES BANKRUPTCY JUDGE:

New York State Comptroller Thomas P. DiNapoli (the "Comptroller"), as Administrative Head of the New York State and Local Retirement Systems and sole Trustee of the New York State Common Retirement Fund ("NYSCRF"), respectfully submits this reply to the oppositions of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors-in-possession (collectively, the "Company," "Debtors" or "Lehman"), dated January 5, 2009 (the "Opposition" or "Lehman Opp."), and the Official Committee of Unsecured Creditors (the "Committee"),

dated January 9, 2009 (the "Committee Opposition" or "Committee Opp."), to the Motion of the New York State Comptroller for Appointment of a Trustee or, in the Alternative, an Examiner with Expanded Powers, dated November 4, 2008 (the "Motion") (Docket No. 1376), pursuant to Sections 1104(a) and 1104(c) of Title 11 of the United States Code (the "Bankruptcy Code" or "Code"). In further support of the Motion, the Comptroller respectfully represents:

## Preliminary Statement

1. In their Opposition, Debtors concede that appointment of an examiner (the "Lehman Examiner" or "Examiner") under Section 1104(c) of the Bankruptcy Code is required under the circumstances here. (Lehman Opp. ¶ 31).[1] Given Lehman's concession, the fact that Richard Fuld, Jr. resigned as CEO of Lehman following the Comptroller's Motion, and the Court's statements that it, rather than the Debtors or other interested parties, will determine the scope of the examiner's investigatory mandate, the Comptroller defers the portion of his Motion seeking appointment of a Chapter 11 trustee under Section 1104(a) until he has received and reviewed the Lehman Examiner's report or until such other circumstances may indicate that it is appropriate to place the trustee motion back on the Court's calendar. The deferral of the portion of the Motion seeking appointment of a trustee is without waiver of any of the Comptroller's rights.

2. The manifest statutory intent of the Bankruptcy Code favors an examination that has as its hallmarks flexibility, transparency, independence, integrity and freedom from bias. In this regard, Sections 1104(c) and 1106(a)(3) of the Code provide that, subject to the discretion of the Court, an examiner shall investigate, among other things, "any allegations of fraud,

---

[1] The Committee makes a similar concession (albeit while suggesting a remarkably narrow, inappropriate and inefficient structure for the Examiner investigation). (*See* Response of Official Committee of Unsecured Creditors to Motion of the Walt Disney Company for Appointment of an Examiner Pursuant to Section 1104(c)(2) of Bankruptcy Code and Joinders Thereto, dated January 9, 2009 (the "Committee's Disney Response"), ¶¶ 1-2).

-2-

dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor or by current or former management" and all "acts, conduct, assets, liabilities, and financial condition of the debtor [and] operation of the debtor's business."

3. The submissions of the Debtors and the Committee fail to provide any basis to limit the scope of the Lehman Examiner's investigation to anything other than the mandate of Sections 1104(c) and 1106(a)(3). A public report by the Lehman Examiner reflecting the broad investigation that the Code envisions (rather than investigations that *might* be performed by the Committee, the results of which will be confidential) will benefit all interested parties by adding transparency, integrity and flexibility to the proceedings. Moreover, tracking the statutory language in the manner described in the Proposed Order annexed hereto as Exhibit A serves judicial economy and efficiency by reducing both future motion practice seeking to expand the scope of the Examiner's inquiry and the amount of discovery in adversary proceedings.

4. The investigative scope advocated by the Debtors (and the Committee) excludes any mention of an investigation into allegations of fraud, misconduct or mismanagement by Lehman's former senior management -- all areas of inquiry the Code explicitly delineates.[2] In this regard, Debtors fail to: demonstrate why the Court should exclude these statutorily recognized areas of investigation; respond to allegations that Lehman engaged in a pattern of withholding material financial information; and explain why Lehman's senior management recklessly failed to address emerging market conditions until it was too late.[3] Such failure by the

---

[2] The Committee suggests an even narrower scope, limiting the Examiner's investigation to the facts immediately preceding Debtors' petitions and hamstringing the Examiner by requiring work plans and approval from Debtors, the Committee and the SIPA Trustee (appointed in Lehman Brothers Inc.'s ("LBI") bankruptcy case (No. 08-01420)) before an investigation may begin. Such limitations on the Examiner are directly at odds with the notions of flexibility, transparency, and independence embodied in the Code.

[3] Lehman's Opposition makes clear the Debtors' intention to continue the self-serving theme of Mr. Fuld's testimony before the House Committee on Oversight and Government Reform, portraying the Company as the innocent victim of failed government regulation and the purported fickleness of the Federal Reserve. (Lehman Opp.

Debtors compels adherence to the broad statutory mandate.

5.   Lehman is the largest bankruptcy in history. The facts and circumstances that precipitated this failure must be brought fully into the light. *All* interested parties will only benefit from an investigation and public report focused on, among other things, the "incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of Lehman" and its current or former management. 11 U.S.C. § 1104(c). In this regard, the Comptroller respectfully submits that for the reasons set forth herein, the facts currently known and those that have not yet been disclosed (or tested) support appointing an examiner to, among other things:

> investigate all allegations and potential occurrences of pre- and post-petition fraud, dishonesty, incompetence, misconduct, irregularity, or gross mismanagement of the Debtors (as well as all pre-petition professionals involved with the Debtors) by current and former management of the Debtors in the management of the Debtors' affairs, including risk management, liquidity, and hedging (and disclosures made pertaining thereto) in connection with, among other things, mortgage origination, mortgage-backed securities, credit default swaps, and structured finance securities during the time period from January 1, 2004 to the present.

**Unanswered Questions Persist, and All Facts and Circumstances of
Lehman's Demise Should Be Examined**

6.   A broad examination of all pre- and post-petition events in connection with, among other things, Debtors' mortgage origination, mortgage-backed securities, and structured finance securities during the time period from January 1, 2004 to the present is needed precisely because so much is still not publically known about Lehman's demise. The facts known, however, indicate that, contrary to Debtors' and Mr. Fuld's claims, Lehman's collapse

---

¶¶ 3, 9). The preposterous notion that the government has ever been able to adequately circumscribe the fertile minds of investment bankers or their desire to profit today with little or no regard for the long term consequences of their actions stands in stark relief against the fact that Lehman's management intentionally and heedlessly positioned Lehman as the #2 company in the subprime mortgage and securitization industry and that it saw Bear Stearns' failure in July 2007 as an opportunity to supplant Bear Stearns in the #1 position.

-4-

was precipitated by far more than bad luck and fickle regulators. Lehman's management positioned the Company at the forefront of originating and securitizing subprime mortgages, and engaged in a pattern of misleading the public about Lehman's financial condition related to these activities. Despite Debtors' efforts to portray themselves as victims of unforeseeable market conditions, it is plain that Lehman was deeply immersed in the mortgage industry and its management was reckless in its failure to react to changing market conditions in the years leading up to the Company's collapse.

7.      For example, on July 18, 2007 (the day after the subprime-related collapse of two Bear Stearns hedge funds), a spokesman for Lehman publically responded to investor concerns regarding the Company's exposure to subprime debt by stating that "[t]he rumors regarding subprime exposure are ***totally unfounded***."[4] However, it is now known that Lehman had massive exposure to subprime debt which should have given the Company cause for concern. We now know that of the approximately $107 billion in residential mortgages Lehman originated in 2006-2007, approximately $27 billion were subprime and nearly $4 billion of that amount were subprime loans originated ***in the quarter preceding its July 18 announcement***. Lehman's total mortgage-related holdings actually ***increased*** by approximately $10 billion in the six months following the Company's denial of its subprime exposure as it rushed to supplant Bear Stearns as the leading subprime player.[5]

8.      In truth, Lehman had long made massive bets on the subprime and securitization industries. The events occurring in the few days preceding September 15, 2008 were really the post-script to the real story of Lehman's grossly reckless bets on the subprime and securitization

---

[4] (*See* Reuters, July 18, 2008 (http://www.reuters.com/article/gc06/idUSN1834477720070718)) (emphasis added).

[5] (*Compare* Lehman's July 10, 2007 Form 10-Q, p. 20, to Lehman's 2007 Form 10-K, dated January 29, 2008, at 103).

industries, which properly begins in 2003 with Lehman's purchase of a *controlling* interest in Aurora Loan Services LLC ("Aurora") (Lehman first purchased an interest in Aurora in 1997). Aurora became a leading source of non-prime mortgages that were increasingly necessary to feed Lehman's securitization business -- which became one of Lehman's leading profit centers. In fact, between 2004 and 2007, Lehman's second-place position to Bear Stearns in loan securitization was largely due to Aurora, which was the source of nearly one-third of the $480 billion in loans that Lehman securitized.[6]

9. Lehman acquired subprime originator BNC Mortgage LLC ("BNC") in 2004. BNC was destined to become Lehman's primary subprime loan originating platform. Lehman/BNC originated approximately $24 billion in subprime loans in 2005 and $15 billion in 2006. Along with Aurora, BNC was a leading source of grist for Lehman's securitization mill, originating approximately one-fifth of the loans Lehman securitized.

10. Not coincidentally, Lehman's four consecutive years of record-breaking financial results reported between 2004 and 2007 corresponded closely with the Company's massive, wholly reckless and increasing bets on the mortgage and securitization industries. (*See* Lehman Opp. ¶ 12). Of course we now know that a large part of the "success" touted by Mr. Fuld can be directly traced Lehman's failure to properly recognize impairments to its subprime-related holdings. For example, in the Company's 2007 Form 10-K, Lehman recorded only a $1.5 billion net write-down on approximately $70 billion in mortgage/subprime-related assets, as compared to Citigroup Inc.'s $17.4 billion write-down on $37 billion in subprime assets[7] and Merrill Lynch

---

[6] Ironically, the subprime field was wide open for Lehman following Bear Stearns' collapse because most other investment banks took steps to exit the subprime market in mid-2007. The Fuld testimony cited in the Debtors Opposition indicates that Lehman failed to take these critical steps until mid-2008. (Lehman Opp. ¶ 13).

[7] (*See* http://seekingalpha.com/article/60293-citigroup-q4-2007-earnings-call-transcript).

& Co.'s $8.4 billion write-down on $14.7 billion in such assets.[8]

11. Lehman's lack of candor regarding its financial condition continued until its collapse in 2008. For example, in the first half of 2008, Lehman made three separate preferred stock offerings totaling $12 billion, during which Lehman misrepresented its capital needs,[9] its subprime exposure and its abject failure properly to account for its subprime-related impairments.

12. Lehman's Opposition emphasizes that throughout 2008 the SEC and Federal Reserve were in regular contact with the Company and were monitoring its daily activities. Debtors fail to explain why they never informed the public of the SEC or Federal Reserves' oversight -- including their silence during Lehman's $12 billion in stock offerings in the six months preceding Lehman's collapse. The public was also never informed that the Company was engaged in the crash course of subprime damage control that Mr. Fuld described in his Congressional testimony. (*See* Lehman Opp. ¶ 14).

13. Viewed against this background, Debtors' attempt to portray themselves as victims fails to withstand scrutiny. (Lehman Opp. ¶¶ 14-15). Lehman's management and Board did little more than fiddle while the Company burned -- dramatically increasing Lehman's subprime exposure in the six-months following Bear Stearns subprime-related collapse and then failing to make adequate preparations for an orderly bankruptcy. As Lehman's current CEO, Brain Marsal, acknowledged, the first focus in the weeks and months after the Company's

---

[8] (*See* http://www.bloomberg.com/apps/news?pid=20601087&sid=aL9aYm7aCkqY&refer=home).

[9] For example, in connection with its $1.9 billion offering in February 2008, Lehman stated that it "took care of our full year [capital] needs at that point," and in connection with its $4 billion April 2008 offering Lehman's then CFO Erin Callan implied that the Company did not need the capital but that it was only to quiet questions regarding Lehman's balance sheet: "We have not changed our view on our real need for capital, but we have changed our view from a perception perspective." (*See* http://dealbook.blogs.nytimes.com/2008/06/09/lehman-upbeat-words-but-a-grim-reality/). Similar half-truths were made in connection with the $6 billion June 2008 offering.

-7-

collapse was preventing more damage to estates already thrown into chaos by the sudden bankruptcy.[10]

14.   At bottom, the Examiner's investigation should not be limited to the areas suggested by the Debtors or the Committee when the Code contemplates inquiry into any allegations of fraud or misconduct and Lehman's reckless participation in the subprime market and lack of candor in at least 2007 and 2008 has now been exposed by the Congressional testimony of its former CEO and other information slowly becoming public.

### The Proposals by Debtors and the Committee are Wholly Inappropriate

15.   Debtors' concession regarding the propriety of investigating whether Lehman's directors and officers breached their fiduciary duties in connection with Lehman's collapse (Lehman Opp. ¶ 31, bullet 5) does not go far enough. The broader investigation that the Comptroller proposes is consistent with the language and intent of the Code and it best ensures transparency, integrity and flexibility in the process such that all interested parties are provided the fullest possible understanding of the circumstances that caused Lehman's collapse.[11]

16.   Neither the Debtors nor the Committee advance any grounds sufficient to justify limiting the broad scope of investigation contemplated by the Code. This is equally true of the abject lack of any basis for Debtors' suggestion that the Examiner should be "directed to solely rely on Alvarez and Marsal" or to otherwise limit the Examiner's independence by limiting the examiner's authority to retain professionals as needed. (Lehman Opp. ¶ 34). Requiring the Examiner to view all information he or she gathers in the course of the investigation through the

---

[10] (*See* Transcript of October 16, 2008 Hearing (Docket No. 1187) ("Hearing Tr."), at 63-65).

[11] The Debtor proposes certain "suggested" areas of examination to the Court. (Lehman Opp. ¶¶ 31-32). The Comptroller has no objection to the Examiner investigating these areas (or to the areas indentified in the [Proposed] Order that Disney submitted with its Motion (Docket No. 1143)). It would, however, be incomplete and inefficient to limit the Lehman Examiner's investigations solely to the limited areas that the Debtors now propose.

-8-

eyes of Debtors' professionals, including Alvarez and Marsal, runs contrary to what should be the hallmarks of the investigation -- completeness, transparency, integrity, and flexibility. The overall benefit of a broad, independent and unbiased investigation that will bring to light the true facts and circumstances of the events precipitating Lehman's collapse cannot be overemphasized.

17. The only argument offered in opposition to a broad investigation is that a limited scope may save money. This argument misses the mark.[12] Every party in interest is sensitive to the cost of the administration of an estate. A broad investigation and detailed Examiner report comprehensively addressing all relevant issues -- at the outset -- is far more efficient than: requiring interested parties to file future motions to expand the Examiner's mandate; having parties in interest later request piecemeal discovery concerning issues that the Examiner's original mandate foreclosed; or, as the Committee inexplicably suggests, having the Examiner file work plans seeking approval of the Debtors, Committee and SIPA Trustee before proceeding.[13] The cost of empowering the Examiner to investigate the full range of issues enumerated in the Bankruptcy Code is a small price to pay to bring light to the facts and circumstances precipitating these proceedings and will enhance efficient administration of the estate.

18. The Committee's claim that narrowing the Examiner's investigation to the facts

---

[12] We note that the Legislative History to the amendments to Section 1104 makes clear that while due regard to costs is necessary "it is not intended to be a strict cost/benefit analysis." H.R. Rep. No. 595, 95th Cong., 1st Sess. 403 (1977).

[13] The need to avoid duplication is easily addressed by providing that the Examiner should coordinate with other parties that may conduct related investigations -- including the SIPA Trustee and the Committee. Indeed, the SIPA Trustee has already acknowledged his intent to coordinate with any examiner appointed in these proceedings. (*See* Trustee's Motion for an Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and Other Persons, dated December 11, 2008 (Case No. 08-01420 (JMP) (Docket No. 417), at ¶ 22).

and circumstances surrounding the Company's final days so as not to "interfere" with the Committee's investigation is similarly unavailing.[14]  First, in cases such as these, the Code requires the appointment of **both** an unsecured creditors committee and an examiner.  The Code contemplates potential overlap which, in any event, will be minimal here because the Committee has yet to engage in any meaningful investigation in these proceedings.[15]  Of course, the Committee also will have the benefit of the Examiner's investigation and report.[16]  At bottom, the Examiner must be free to investigate the reasons for Lehman's collapse beyond the weeks leading up to Debtors' petitions when the fatal damage to the Company had already occurred.

19.     Finally, the Committee claims that a thorough Examiner investigation would "delay and distract" from the Debtors' and Committee's efforts to maximize the value of the estates.  Ironically, the only discernable "delay and distraction" comes from the Committee's own patently inefficient and unworkable proposal requiring the Examiner to submit a "work plan" for approval by the Debtors, Committee and SIPA Trustee before commencing any investigation.  The Examiner would then be required to notify the entire master service list of the proposed work plan.  Such a procedure invites disagreement among the parties, innumerable comments/objections from other parties in interest, and, ultimately, repeated and inefficient Court intervention.  In an effort to assure complete paralysis of the process, the Committee further proposes requiring the Examiner to notify the Committee, Debtors and SIPA Trustee and

---

[14] Admittedly, it is difficult to discern the exact investigatory scope that the Committee proposes because it does not propose specific language concerning the scope.  The Committee does, however, adopt (only) two paragraphs of the Debtors' proposed order covering:  (i) the inter-company transfers among LBHI and its subsidiaries in the 30-day period preceding the commencement of these cases, and (ii) the transfer of the capital stock of certain of LBI's subsidiaries on September 19, 2008.  (Committee's Disney Response ¶ 31).

[15] With due respect to the Committee, it has provided no information about any investigation it has conducted or will conduct beyond its stipulation with JPMorgan Chase Bank, N.A. to receive documents.  (Committee's Disney Response ¶ 9).

[16] Examiner reports have been of immense value in other complex cases such as *Enron* and *Worldcom* and will no doubt be of comparable value here.

-10-

conduct a conference with the Court each and every time the Examiner becomes aware that he or she might be duplicating an investigatory area. The Comptroller acknowledges that coordination is important when practical, but it must not eviscerate the core idea that any examination should have as its hallmark independence, integrity, transparency, flexibility and completeness.[17]

### The Comptroller Reserves His Rights Regarding His Motion for Appointment of a Trustee

20. For the reasons stated above -- and despite his belief that, as noted, there is currently more than sufficient evidence demonstrating the level of prepetition incompetence and misconduct to satisfy the statutory requirement for appointment of a Trustee -- the Comptroller respectfully elects to defer the portion of his motion seeking appointment of a trustee. However, the Comptroller reserves his right to renew the Motion after receiving and reviewing the Lehman Examiner's report or if other circumstances indicate that it is appropriate to renew his Motion. In this regard, the Comptroller specifically reserves all rights to challenge whether the existing Board should remain in place given the Debtors' expansive description of Alvarez and Marsal's activities in opposition to the Comptroller's Motion.

21. Lehman's Opposition is laden with defensive posturing concerning the Board's involvement, but it fails to answer the most basic and singular question that is the focus of the Comptroller's Motion: why is Lehman's historically large liquidation still being overseen by the same unqualified Board that directed the Company's reckless financial conduct in the first place?

---

[17] It is worth noting that the Committee seeks to limit the Examiner's investigation by invoking fears it will interfere with the SIPA Trustee's investigation (Committee's Disney Response ¶¶ 25, 27, 33, 35), and at the same time seeks to limit the SIPA Trustee's power by invoking the Examiner's investigation. (*See* Response of the Official Committee of Unsecured Creditors to Trustee's Motion for an Order Granting Authority to Issue Subpoenas for the Production of Documents and the Examination of the Debtor's Current and Former Officers, Directors and Employees, and other Persons, dated January 9, 2009 (Case No. 08-01420 (JMP) (Docket No. 533), at ¶¶ 7-8). Of course, the SIPA Trustee has already filed papers in these proceedings expressly advising the Court of its intent to coordinate with the Examiner when appointed and the Examiner here will no doubt do likewise. (*See* footnote 12, *supra*).

The current Board serves no useful purpose in the conduct of the bankruptcy proceedings (suggestions of "institutional knowledge" made by the Debtors as to a principally non-operational board are palpably unavailing).  In fact, the continued participation of the Board directly responsible for Lehman's demise unnecessarily taints the conduct of these proceedings with at least the appearance of self-interest, further underscoring the need for an independent examination.  Moreover, Mr. Marsal has acknowledged that the sudden bankruptcy (which the Directors finally approved only hours before the filing) created a crisis that severely damaged the estate and its administration.  (*See* footnote 10, *supra*).  Nevertheless, Lehman has not adequately justified the Directors' failure to instruct the Company timely to prepare for potential bankruptcy, other than the transparent excuse that the Company was trying to keep Lehman's condition a secret from the financial community until the very last moment.  (Lehman Opp. ¶ 15).

22.     Nor has Lehman effectively answered the Comptroller's questions about the qualifications of the Directors.  Lehman's Opposition contains a chart that further elaborates on the employment history of each Director (Lehman Opp. ¶ 16).  Ironically, the chart underscores the Comptroller's original assertion -- few of the Directors have any experience in the financial industry -- much less the "expertise, knowledge and personal and professional experience with the operation and management of financial institutions and their business and practices, and of financial transactions and securities, including highly complex derivatives and other sophisticated and esoteric securities" that the Debtors now suggest is required in these proceedings.  (Lehman Opp. ¶ 33).

**CONCLUSION**

For all of the foregoing reasons, New York State Comptroller Thomas P. DiNapoli respectfully requests that this Court enter an Order appointing an Examiner to investigate any allegations of potential fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the Debtors or by current or former management and any other areas that the Court deems appropriate as more fully set forth in the [Proposed] Order attached hereto. The Comptroller respectfully reserves his right to renew his Motion for appointment of a trustee until after he receives and reviews the Lehman Examiner's report or if other circumstances indicate that it is appropriate to renew his Motion.

Dated:   New York, New York
         January 13, 2009

ENTWISTLE & CAPPUCCI LLP

By:   /s/ Andrew J. Entwistle
      Andrew J. Entwistle (AE-6513)
      Johnston de F. Whitman, Jr. (JW-5781)
      Jonathan H. Beemer (JB-0458)
      Joshua K. Porter (KP-2660)
        280 Park Avenue, 26th Floor West
        New York, New York 10017
        Telephone: (212) 894-7200

*Counsel for New York State Comptroller*
*Thomas P. DiNapoli, as Administrative*
*Head of the New York State and Local*
*Retirement Systems and Sole Trustee of*
*the New York State Common Retirement Fund*