Hearing Date and Time:  January 28, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time:  January 23, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                                     :
In re                                                :    **Chapter 11 Case No.**
                                                     :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,         :    **08-13555 (JMP)**
                                                     :
                             Debtors.                :    **(Jointly Administered)**
                                                     :
                                                     :
-------------------------------------------------------------------x

### NOTICE OF DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE FOR AUTHORIZATION TO EMPLOY KELLY MATTHEW WRIGHT AS ART CONSULTANT

PLEASE TAKE NOTICE that a hearing on the annexed motion of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11

cases (together, the "Debtors") for authorization to employ Kelly Matthew Wright as an art

consultant (the "Motion"), all as more fully described in the Motion, will be held before the

Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy

Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York,

New York 10004 (the "Bankruptcy Court"), on **January 28, 2009 at 10:00 a.m. (Prevailing**

**Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall

be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York,

shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order

M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy

Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format (with two hard copies delivered directly to Chambers), and shall be served upon:  (i) the

chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004,

Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York

10153, Attn:  Richard P. Krasnow, Esq., attorneys for the Debtors; (iii) the Office of the United

States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street,

21st Floor, New York, New York 10004 Attn:  Andy Velez-Rivera, Esq., Paul Schwartzberg,

Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis; Esq., (iv) Milbank,

Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn:

Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the official

committee of unsecured creditors appointed in these cases; and (v) any person or entity with a

particularized interest in the Motion, so as to be so filed and received by no later than **January**

**23, 2009 at 4:00 p.m. (prevailing Eastern Time)** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received

by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy

Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend

the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: January 14, 2009
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                        :
In re                                   :    Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :    08-13555 (JMP)
                                        :
                Debtors.                :    (Jointly Administered)
                                        :
                                        :
----------------------------------------------------------------x
```

**DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363**
**OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS**
**TO EMPLOY KELLY MATTHEW WRIGHT AS ART CONSULTANT**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

**Background**

1.      Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.

2.      On September 17, 2008, the United States Trustee for the Southern

District of New York (the "U.S. Trustee") appointed a statutory committee of unsecured

creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

3.      On September 19, 2008, a proceeding was commenced under the

Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc.

("LBI").  A trustee appointed under SIPA (the "SIPC Trustee") is administering LBI's estate.

### Jurisdiction

4.      This Court has subject matter jurisdiction to consider and determine this

matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Lehman's Business

5.      Prior to the events leading up to these chapter 11 cases, Lehman was the

fourth largest investment bank in the United States.  For more than 150 years, Lehman has been

a leader in the global financial markets by serving the financial needs of corporations,

governmental units, institutional clients and individuals worldwide.  Its headquarters in New

York and regional headquarters in London and Tokyo are complemented by a network of offices

in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

6.      Additional information regarding the Debtors' businesses, capital

structures, and the circumstances leading to these chapter 11 filings is contained in the Affidavit

of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District

of New York in Support of First-Day Motions and Applications, filed on September 15, 2008

[Docket No. 2].

## Relief Requested

7.      Pursuant to sections 105(a) and 363 of the Bankruptcy Code, the Debtors

request entry of an order authorizing the engagement of Kelly Mathew Wright ("Wright"), *nunc*

*pro tunc* to January 7, 2009, the date of Wright's engagement, in accordance with the fee

structure described below and pursuant to the terms and conditions of an agreement between

Wright and LBHI, dated January 7, 2009, a copy of which is attached hereto as Exhibit A (the

"Agreement").  Pursuant to the proposed engagement, Wright will provide consulting services

with respect to the disposition of the Debtors' corporate art collections and works of lesser value

for which there is not a readily available marketplace (the "Services").

8.      The Services under the Agreement include, but are not limited, to the

following:[1]

- Researching the collections regionally to determine their current market value.
- On site inspection of the collections, to determine condition and organize for viewing.
- Determining which companies are best suited to auction or purchase the works of art.
- Creating appropriate inventories, organizing and conducting viewings.
- Negotiating, analyzing and assisting in finalizing the sales agreements.
- Coordinating and in some instances overseeing the removal of the works of art.
- Tracking all sales and receipt of funds.
- In the event that an item does not sell at auction, arranging a private sale.

---

[1] The following is only a summary of the Services set forth in the Agreement and should not be construed to modify or amend such Agreement.  The actual terms of the Agreement governs the scope of services to be provided to the Debtors by Wright.

### The Retention of Wright

9.      The Debtors believe that Wright is a highly respected and experienced art consultant who is well recognized in his field.  As is reflected in Wright's resume, a copy of which is annexed hereto as <u>Exhibit B</u>, for over 20 years, Wright has worked at auction houses and as an independent appraiser of corporate art.  As indicated, he has provided appraisal and estate liquidation services for a variety of law firms, banks and private clients, including Columbia University.  Further, Wright has worked with Alvarez and Marsal North America, LLC, Chief Restructuring Officers to the Debtors ("<u>A&M</u>"), by assisting A&M with the art disposition in the Arthur Anderson and Warnaco bankruptcies.  The Debtors believe that, due to Wright's years of experience, he has an abundance of contacts in the art world, as well as specialized knowledge concerning the disposition of art in corporate restructurings.

10.      According to the Agreement, Wright will be primarily responsible for researching and coordinating the sale of corporate decorative art, prints, and works of lesser value for which there is not a readily available marketplace.  Since Lehman's core business does not involve the sale of corporate art, Wright will be able to efficiently and effectively dispose of such assets, which in turn will bring cash into the estate for the benefit of all stakeholders.  Accordingly, the Debtors believe that the retention of Wright under the terms set for in the Agreement is appropriate and necessary to enable the Debtors to execute faithfully their duties as debtors and debtors in possession and maximize creditor recoveries.  The Debtors further submit that Wright is well qualified and able to serve as an art consultant to the Debtors.

### Terms of the Retention

11.      The Debtors propose to pay Wright $175 per hour for on site work and $85 per hour for research and reports.  The Debtors believe that Wright's per hour rate is benchmarked as below average cost for these kind of services.  Further, pursuant to the

Agreement, Wright will be reimbursed for all out-of-pocket travel related expenses that are pre-approved and comply with the Debtors' Travel Policy guidelines (as defined in the Agreement).

12.     For art that is sold at auctions, Wright may also receive, in addition to his hourly fees, an "introductory commission" of 2-4% to be paid from the commissions due to the auction house. The Debtors understand that it is customary for auction houses to pay an introductory commission to a consultant such as Wright who acts as an agent on behalf of a client. However, the commission will not apply when items are consigned or sold through an auction house that has an existing relationship with Lehman, e.g., Christies, Sotheby's and Phillips or through dealers or private collectors that LBHI has a pre-existing relationship. For outright sales, Wright may receive a "finder's fee" of 10% that will be paid by the buyer unless items are sold privately to companies or individuals who have an existing relationship with Lehman. Standard hourly rates will apply to Services supplied in support of these auctions or outright sales.

13.     If the Court approves the relief requested herein, the Debtors will employ Wright as an art consultant pursuant to section 363 of the Bankruptcy Code, rather than as a professional under section 327 of the Bankruptcy Code. Accordingly, Wright will not be required to submit fee applications pursuant to sections 330 and 331 of the Bankruptcy Code.

## **Basis for Relief Requested**

14.     Section 363(b)(1) provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Further, pursuant to section 105(a), the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

15.    Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents a reasonable business judgment on the part of the debtor, such use should be approved.  *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

16.    Acting under this directive, bankruptcy courts in this district have authorized a debtor's employment of a broad range of specialists pursuant to section 363 including lobbyists, executive search consultants, corporate officers, and attorneys.  *See, e.g., In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986); *See In re PRC, LLC,* Case No. 08-10239 (MG) (Bankr. S.D.N.Y. 2008); *In re Bally Total Fitness of Greater N.Y., Inc*., Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. 2007); *In re Enron Corp.*, 335 B.R. 22 (Bankr. S.D.N.Y. 2005).  Further, in these chapter 11 cases, the Court entered an order on December 12, 2008 approving the retention of Natixis Capital Markets Inc. as strategic advisor to the Debtors, pursuant to sections 105(a) and 363 of the Bankruptcy Code [Docket No. 2308].  Courts have found retention of such classes of persons appropriate under section 363 where such persons do not play "an intimate role in the reorganization of the debtor's estate." *In re Johns-Manville Corp.*, 60 B.R. at 619-20.  Wright is not being engaged to play an intimate role in the reorganization of the Debtors' estate.  Wright's role is akin to that of the attorneys approved by this court in *In re Enron Corp.* where specialists were brought in to perform a discreet function.

*See* 335 B.R. at 22 (finding appropriate the Debtor's retention of a law firm under 363 of the

Bankruptcy Code to represent employees in relation to a governmental investigation).  However,

distinguished from the attorneys retained in *In re Enron*, Wright is not even providing services

that require a professional degree or licensing.  In sum, Wright is providing discrete, specialized

art consulting services to the Debtors.

17.    As noted above, the Debtors believe that Wright will use his expertise to

assist the Debtors in the disposition of their corporate art collections and works of lesser value

for which there is not a readily available marketplace.  Value realized in such transactions will

inure to the benefit of the Debtors' estates which will more than offset any expenses incurred

through Wright's retention.  Thus, the decision to employ Wright as an art consultant is a sound

exercise of the Debtors' business judgment.

## The Relief Requested is Appropriate

18.    Based upon the foregoing, the Debtors submit that the relief requested

herein is essential, appropriate, and in the best interest of the Debtors' estates and creditors, and

therefore, should be granted.

## Notice

19.    No trustee or examiner has been appointed in these chapter 11 cases.  The

Debtors have served notice of this Motion in accordance with the procedures set forth in the

order entered on September 22, 2008 governing case management and administrative procedures

for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors'

Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service;

(v) the United States Attorney for the Southern District of New York; and (vi) all parties who

have requested notice in these chapter 11 cases.  The Debtors submit that no other or further

notice need be provided.

20.     No previous request for the relief sought herein has been made by the

Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief

requested herein and such other and further relief as it deems just and proper.

Dated:  January 14, 2009
        New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Attorneys for Debtors
and Debtors in Possession

## **Exhibit A**

**(Agreement)**

## MASTER CONSULTING SERVICES AGREEMENT

**Supplier Name: Kelly Mathew Wright**
**Supplier Address: 409 Lincoln Avenue, Portsmouth NH 03801**
**Supplier Jurisdiction of Incorporation: N/A**
**Tax ID or SS# (if applicable): 049684463**
**Telephone #: 603-498-9530**
**Fax #: N/A**
**Consulting Agreement No.: 100000019747**
**Effective Date: January 7, 2009**

THIS MASTER CONSULTING SERVICES AGREEMENT (the "Agreement") is made as of the Agreement Effective Date specified above (the "Effective Date") between Lehman Brothers Holdings Inc., a Delaware corporation, having an office and place of business at 1271 Avenue of the Americas, New York, NY 10020, (the "Customer") and the Supplier specified above (the "Supplier").

1.    Services.    From time to time the parties may, under this Agreement, execute Transaction Schedules pursuant to which Supplier agrees to provide the deliverables (the "Deliverables") and perform the services (collectively with the Deliverables, the "Services") described in such Schedules. Each such Transaction Schedule will be substantially in the form of the attached Exhibit 1 and, together with any other documents attached thereto or incorporated therein by reference will constitute a separate and independent contract for the applicable Deliverables and/or Services between Supplier and Customer (i.e., the Customer entity that is the party to the Transaction Schedule).    Multiple Schedules may be executed and active under this Agreement. If there is a conflict between the provisions of this Agreement and a Transaction Schedule, the terms of the Transaction Schedule shall control; *provided, however,* that, unless the applicable Transaction Schedule has been approved in writing by legal counsel for Customer, a Transaction Schedule may not modify or amend the rights or obligations set forth in the following Sections of this Agreement: "Intellectual Property"; "Warranties"; "Indemnification"; "Confidential Information"; "Relationship of the Parties"; "Limitation of Liability"; and "Insurance".

2.    Acceptance.    The acceptability of Services will be based on Customer' determination that the Services are provided in accordance with the applicable Transaction Schedule, or if the Transaction Schedule fails to provide standards, Customer's reasonable satisfaction with the Services. If any part of the Services is not acceptable, Customer will notify Supplier specifying its reasons in reasonable detail, and Supplier will, at no additional cost, promptly re-perform or conform the Services to the applicable standard. If within ten (10) days of notification by Customer (or such other time period as the parties may agree in writing), any part of the Services is still not acceptable, Customer may terminate the applicable Transaction Schedule, in whole or in part, and receive a prompt refund of all fees for the portion of the Transaction Schedule so terminated and any other Services that are unusable as a result of such rejection. When Services are acceptable to Customer, Customer will notify Supplier in writing of its Acceptance.

3.    Fees.    Supplier shall invoice Customer for fees and applicable taxes (exclusive of corporate business and franchise taxes, taxes based on Supplier's income or gross receipts, withholding taxes and personnel-related taxes) in accordance with the Transaction Schedule. Supplier will not be entitled to reimbursement from Customer for its expenses except as pre-approved in writing in each instance. Invoices shall be sent to Customer at an address designated by Customer. Undisputed invoices shall be payable by Customer within sixty (60) days of receipt. Supplier will provide Customer or its designees access to records relating to this Agreement, including without limitation, payroll records, attendance cards, time tracking sheets and job summaries for audit purposes during the term of each Transaction Schedule and for three (3) years after the date of the final payment under such Transaction Schedule.

4.    Intellectual Property .

      4.1    Supplier acknowledges that Customer will have exclusive, unlimited ownership rights to the works performed or created under each Transaction Schedule and all materials, information and/or Deliverables prepared or developed as a result of the Services provided thereunder, both as individual items and/or as a

U02

combination of components and whether or not the Transaction Schedule is completed.  All of the foregoing will be deemed to be works made for hire and made in the course of Services rendered under the applicable Transaction Schedule and will belong exclusively to Customer from the moment of their creation, with Customer having the sole right to obtain, hold and renew, in its own name and/or for its own benefit, patents, copyrights, trademarks, trade secrets, registrations and/or other appropriate intellectual property rights protection.  To the extent that exclusive title and ownership rights may not originally vest in Customer as contemplated hereunder, Supplier hereby irrevocably assigns, transfers and conveys to Customer all right, title and interest therein. Supplier and its personnel will give Customer, and any Customer designee, all reasonable assistance and execute all documents necessary to assist or enable Customer to perfect, preserve, register, record, enforce and defend its rights in any such works, materials, information and/or Deliverables.  Supplier will, immediately upon request of Customer, or upon the termination, cancellation or expiration of each Transaction Schedule, turn over to Customer all materials, information and/or Deliverables prepared or developed as a result of any Transaction Schedule, and any Customer documents or other materials held by or on behalf of Supplier, together with all copies thereof.  Supplier will enter into written agreements with Supplier Personnel involved in performance under this Agreement as may be necessary to ensure Customer's rights under this Section.

4.2     Nothing herein will be construed to restrict, impair or deprive either party of any of its rights or proprietary interest in intellectual property or technology that existed prior to and independent of the provision of works, materials, information and/or Deliverables prepared under a Transaction Schedule or developed as a result of Services performed under a Transaction Schedule.  Notwithstanding any of the foregoing, if any such pre-existing or independent intellectual property or technology are incorporated into, combined with, or required for the operation or provision of any works, materials, information and/or Deliverables prepared under a Transaction Schedule or developed as a result of Services performed under a Transaction Schedule, then Supplier hereby grants to Customer (and its affiliates and its contractors under contract to provide services to Customer or its affiliates (provided that such contractors' use shall be limited solely to providing such services)), at no additional charge, a non-exclusive, fully paid up, perpetual, irrevocable, assignable (in accordance with the terms hereof), worldwide license to use, execute, copy, perform, distribute copies of, maintain, modify, enhance, and create derivative works of  such independent intellectual property or technology, unless other terms are expressly agreed to by Customer in writing in the applicable Transaction Schedule.

5.     Warranties.  Supplier represents, warrants and covenants that:  (a) the Services will be performed in a high quality, professional manner by qualified personnel; (b) the Services will be provided in accordance with the Transaction Schedule, or if the Transaction Schedule fails to provide standards for any particular functionality, Customer' reasonable satisfaction with the Services; (c) it has the authority to enter into this Agreement, (d) the Services, and Customer' use thereof, do and shall not violate, infringe or misappropriate any patent, published patent application, copyright, trademark, service mark, trade secret or other intellectual property or industrial property rights of any third party or the laws or regulations of any governmental or judicial authority; (e) Customer will receive free and clear title to all Deliverables prepared in connection with this Agreement; and (f) Supplier is familiar with, has complied with, and will comply, in all respects, with the laws and regulations regarding the offering of unlawful or improper inducements (including the U.S. Foreign Corrupt Practices Act, as amended, and other anti-corruption and anti-bribery laws), as applicable to its relationship with Customer, and with any other applicable Customer policies regarding inducements of which Supplier has been given notice.

6.     Indemnity Obligations.

6.1  Supplier will, at its sole cost and expense, indemnify, defend and hold harmless Customer and its affiliates and subsidiaries, and their respective officers, directors, employees, contractors, agents, representatives, successors and assigns (collectively, "Customer Indemnitees") from and against any and all losses, claims, demands or expenses (including reasonable attorneys' fees) suffered or incurred by any of them arising out of or in connection any of the following, whenever made:

(i)  that any products, deliverables, materials and/or any services furnished to or obtained by Customer Indemnitees or the use thereof by Customer Indemnitees, constitutes an infringement, misappropriation or unlawful use or disclosure of any intellectual property rights of a third party; or

(ii) any breaches of Section 5; or

(iii) for death or bodily injury, or the damage, loss or destruction of real or tangible personal property of third parties (including employees of Customer and Supplier and their respective subcontractors) brought against a Customer Indemnitee and alleged to have been caused by the fault or negligence of Supplier, its officers, personnel, agents and/or representatives.

6.2     Supplier agrees to give Customer prompt written notice of any threat, warning or notice of any such claim or action which could have an adverse impact on Customer's use or possession of the deliverables, materials and/or services provided hereunder. Supplier shall have the right to conduct the defense of any such claim or action and, consistent with Customer's rights hereunder, all negotiations for its settlement; provided, however, that Customer may participate in such defense or negotiations to protect its interests and that any settlement shall be for the payment of money by Supplier and shall not obligate or affect Customer in any way, including without limitation, to any determination or admission regarding Customer's interest.

7.     Confidential Information. The exchange of information hereunder will be governed by the Non-Disclosure Agreement dated January 7, 2009 between the parties, attached hereto as Exhibit 2.

8.     Limitations of Liability.  IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR LOST REVENUE, OR FOR ANY INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; *PROVIDED, HOWEVER,* THAT THE FOREGOING LIMITATION OF LIABILITY WILL NOT APPLY TO ANY OF THE FOLLOWING:  (A) SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; (B) A PARTY'S BREACH OF ITS CONFIDENTIALITY OR DATA PROTECTION OBLIGATIONS UNDER THE MASTER AGREEMENT OR ANY TRANSACTION SCHEDULE; OR(C) ANY GROSS NEGLIGENCE OR WILLFUL MISCONDUCT BY A PARTY.

9.     Term.  This Agreement shall commence as of the date first above written and shall continue in effect thereafter unless and until the Agreement is earlier terminated by Customer. The term of each Transaction Schedule shall be as set forth in the applicable Transaction Schedule.  Customer shall have the right to terminate this Agreement or a Transaction Schedule without cause or penalty upon written notice and receive a prorated refund for unused services.

10.     Insurance.  Supplier shall obtain and maintain insurance including but not limited to Workers' Compensation as required by law, $1,000,000 of business auto liability, $1,000,000 professional liability (professional liability insurance shall be obtained within one week of execution of this Master Agreement), $1,000,000 commercial general liability, $2,000,000 umbrella liability.  All such insurance shall name Customer Indemnitees as a Loss Payee or Additional Insured, as appropriate, by endorsement.  All such insurance shall also provide primary coverage without contribution from other insurance and shall include a waiver of your insurer's subrogation rights against Customer Indemnitees.  Each such insurance policy shall be maintained by an insurer having a rating of at least an "A-" in the most currently available A.M. Best's Insurance Reports. At Customer's request, Supplier shall furnish Customer with certificates of insurance evidencing compliance with these provisions.

11.     Supplier Personnel.

11.1     Supplier is responsible for ensuring that Supplier personnel assigned to perform Services have the legal right to work in each country in which they are assigned to work for the duration of their assignments.

11.2     Supplier shall comply with Customer's applicable policies and procedures, including security and work hour policies.

11.3    Prior to assigning any Supplier personnel to perform any Services in Customer's facilities, Customer has the right to perform background checks on Supplier Personnel in accordance with Customer's standard requirements for independent contractors.

11.4    To the extent applicable, the equal employment opportunity and affirmative action requirements set forth in 41 C.F.R. Part 60-1.4(a) (women and minorities), 41 C.F.R. Part 60-250.5(a) (covered veterans) and 41 C.F.R. Part 60-741-5(a) (individuals with disabilities) are hereby incorporated by reference into this Master Agreement.

12.    Relationship of the Parties.  Supplier agrees and represents and warrants that:  (a) it is an independent contractor, (b) Supplier personnel are the responsibility of Supplier and solely employees or independent contractors of Supplier (or its subcontractor), (c) no Supplier personnel are Customer's agents or employees for federal, state, or local tax purposes or any other purposes whatsoever, (d) no Supplier personnel are entitled to any compensation from Customer or to any Customer employee benefits, (e)  Supplier will (or, in the case of its subcontractors, will be responsible for causing the applicable subcontractor to) withhold and pay all applicable taxes, benefits and insurance with respect to such personnel, and (f) Supplier will verify and secure the work eligibility of each Supplier personnel.  Supplier and its employees, agents and subcontractors have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Customer in any manner whatsoever.

13.    General.

13.1  Neither party shall use the other party's name or marks, refer to, or identify the other party or any of its respective affiliate in  publicity releases, promotional or marketing materials, announcements, customer listings, testimonials, or advertising without prior approval.  Notwithstanding the forgoing, Supplier shall be allowed to use Customer's name or marks to perform the services detailed in an active Transaction Schedule approved by both parties.

13.2 If any term, provision or part of this Agreement or any Transaction Schedule is to any extent held invalid, void or unenforceable by a court of competent jurisdiction, the remainder of this Agreement or Transaction Schedule, as applicable, will not be impaired or affected thereby, and each term, provision and part will continue in full force and effect, and will be valid and enforceable to the fullest extent permitted by law.

13.3  Headings in this Agreement and in the Transaction Schedule(s) are for purposes of reference only and will not in any way limit or affect the meaning or interpretation of any of the terms hereof.

13.4 This Agreement constitutes the entire agreement between the parties with respect to its subject matter contained therein, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the parties pertaining to such subject matter.  When executed by both parties, each Transaction Schedule will constitute the entire agreement between the parties with respect to its subject matter, superseding all previous agreements, promises, proposals, representations, understandings and negotiations, whether written or oral, between the parties pertaining to the subject matter thereof.

13.5 No modification or amendment of, or supplement to, this Agreement or any Transaction Schedule, or any provisions thereof, will be binding upon the parties unless made in writing and signed by a duly authorized representative of both parties.

13.6  In all respects this Agreement and each Transaction Schedule will be governed by and construed in accordance with the substantive laws of the State of New York without regard to conflict of law principles.  Any claim or action brought by one of the parties in connection with this Agreement or a Transaction Schedule will be brought in the appropriate Federal or State court located in the County of New York, and the parties irrevocably consent to the exclusive jurisdiction of such court.

13.7 Supplier and its employees, agents and subcontractors have no authority to make commitments or enter into contracts on behalf of, bind or otherwise obligate Customer in any manner whatsoever.

13.8 Any provision of this Agreement or any Transaction Schedule that contemplates performance or observance subsequent to termination or expiration of this Agreement or such Transaction Schedule (including confidentiality and data protection, limitation of liability, indemnification provisions and perpetual licenses) will survive termination or expiration of this Agreement or such Transaction Schedule, as applicable, and continue in full force and effect thereafter.

13.9 Neither the Agreement nor any Transaction Schedule may be supplemented, modified, or governed by any shrink-wrap or click-wrap agreement or any confirmation, acknowledgement, or other sales or shipping form of Supplier, or executed via electronic signature, unless Customer first agrees in a writing that is not an electronic communication to be bound by such purported agreements.

13.10 All notices relating to this Agreement shall be in writing and delivered personally, by overnight delivery service or first class prepaid mail with return receipt requested to the parties at the addresses set forth above, to the attention of, in the case of Customer, Director of Global Sourcing Services and General Counsel.

13.11 Supplier shall not assign, transfer or subcontract this Agreement or the performance of Services without Customer's prior written consent.

(THE NEXT PAGE IS THE SIGNATURE PAGE)

The undersigned parties have caused this Agreement to be executed by their respective duly authorized representatives.

| **Kelly Mathew Wright (SUPPLIER)** | **Lehman Brothers Holdings Inc. (CUSTOMER)** |
| --- | --- |
| By: | By: |
| Name: KELLY WRIGHT | Name: Francisco S Kittredge |
| (Type, Print or Stamp) | (Type, Print or Stamp) |
| Title: OWNER | Title: Managing Director |

## EXHIBIT 2: NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement ("Agreement") is made, as of January 7, 2009, by and between Lehman Brothers Holdings Inc., with an office at 1271 Avenue of the Americas, New York, NY 10020 (together with its affiliated or subsidiary companies, "Lehman") and Kelly Mathew Wright, with an office at the address indicated on the Company signature block below ("Company"). The parties acknowledge and agree that they have been exchanging information since, December 12, 2008, and further acknowledge and agree that all information exchanged since that date shall be deemed "Confidential Information" governed by this Agreement.

WHEREAS Lehman and Company would like to exchange certain information in connection with certain products and services offered by Company, Lehman's business and any related project or work effort (the "Purpose") (for purposes of this Agreement, the word "exchange" shall be construed to include, without limitation, furnishing information, providing access or availability to information or the obtaining of information from any source and by any means, as a result of this Agreement); and

WHEREAS, in connection with such exchange each party may obtain, or be in a position to obtain Confidential Information (as defined); and

WHEREAS, each party wishes to ensure the protection of its Confidential Information;

NOW, THEREFORE, IN CONSIDERATION OF the mutual covenants contained herein and the agreement to exchange information as contemplated hereunder, the parties agree as follows:

1.     **Definition.**  "Confidential Information" of each party includes all information exchanged hereunder specifically relating to the Purpose (as defined above) including: (a) information relating to the past, present and future business activities (including, without limitation, agreements and other business arrangements) of each party, its affiliates and each of their respective employees, customers or third-party contractors, (b) information relating to strategic and other plans, pricing, methods, methodologies, processes, financial data, lists, inventions, customers, suppliers, apparatus, statistics, programs, research, development, technology, network designs, and/or usage data of each party, its affiliates and each of their respective employees, customers or third-party contractors, and (c) the terms and existence of this Agreement or related information.

2.     **Carve-Outs.**  Both parties acknowledge and agree that information shall not be considered "Confidential Information" only to the extent that such information is: (a) currently in the public domain and/or previously known to the receiving party, and in either case, free from any confidentiality obligation; (b) publicly disclosed by or on behalf of the disclosing party either prior to or subsequent to receipt by the receiving party of such information; (c) independently developed by the receiving party without access to or use of the Confidential Information of the disclosing party; or (d) rightfully obtained by the receiving party from a third party lawfully in possession of the Confidential Information who is not bound by confidentiality obligations to the disclosing party. The receiving party may disclose Confidential Information of the disclosing party if the receiving party is required to do so under applicable law, rule or order; provided that the receiving party, where reasonably practicable and to the extent legally permissible, provides the disclosing party with prior written notice of the required disclosure so that the disclosing party may seek a protective order or other appropriate remedy; and provided further that the receiving party discloses no more Confidential Information than is reasonably necessary in order to respond to the required disclosure.

3.     **Obligations.**  Each party agrees to regard and preserve as confidential, all Confidential

1

Information which may be exchanged as a result of this Agreement. In maintaining the confidentiality of Confidential Information hereunder, each party agrees that (a) it shall not, without first obtaining the written consent of the other, disclose or make available to any person, firm or enterprise, reproduce or transmit, or use for its own benefit or the benefit of others, any such Confidential Information, and (b) it shall prevent disclosure to any competitor of the other party (known to be such after reasonable inquiry). Neither party shall, without obtaining the prior written consent of the other party, use such other party's Confidential Information for any purpose other than for evaluation, discussions between the parties, internal planning, the protection of its rights and performance of its duties and obligations under this Agreement, and the provision of other services to the other party. Each party agrees that its own use and/or distribution of the other party's Confidential Information shall be limited to its own employees on a "need to know" basis; provided, however, that Lehman, in addition to its own employees, may, for the avoidance of doubt, also disclose Company's Confidential Information to employees of its parent, subsidiaries and affiliated companies, and to consultants or other persons retained by Lehman for purposes specifically related to Lehman's use or evaluation of such Confidential Information.   Each party shall, in advance, require each of its personnel and/or representatives who obtains or is in a position to obtain any Confidential Information of the other party to execute a confidentiality agreement with confidentiality provisions no less restrictive than those contained in this Agreement. While onsite at the other party's premises, each party shall comply with all policies and procedures of the other party.

4.   **Lehman Sensitive Data.**   Company hereby acknowledges that Lehman is subject to certain privacy and information security laws and regulations, pursuant to which Lehman is required to ensure that Company appropriately safeguards personal or financial information regarding Lehman's former, current or prospective clients or employees ("Lehman Sensitive Data"). To the extent that Company receives any Lehman Sensitive Data as a result of any exchange of information under this Agreement, and notwithstanding anything to the contrary contained in this Agreement, Company agrees that it shall (a) not disclose or use any Lehman Sensitive Data except to the extent necessary to carry out its obligations under this Agreement and for no other purpose, (b) not disclose Lehman Sensitive Data to any third party, including, without limitation, its third party service providers without the prior written consent of Lehman and subject to the further requirements of this Section, (c) employ administrative, technical and physical safeguards to prevent unauthorized use or disclosure of Lehman Sensitive Data, (d) promptly provide such information regarding its privacy and information security systems, policies and procedures as Lehman may request relating to its due diligence and oversight obligations under applicable laws and regulations, (e) in the event of any actual or apparent theft, unauthorized use or disclosure of any Lehman Sensitive Data, immediately commence all reasonable efforts to investigate and correct the causes and remediate the results thereof, and (f) as soon as practicable following discovery of any event described in clause (e) hereof, provide Lehman notice thereof, and such further information and assistance as may be reasonably requested.   With respect to any third party provided access to Lehman Sensitive Data pursuant to subsection (b) of this Section, Company shall enter into a written agreement with such third party requiring safeguarding of Lehman Sensitive Data in a manner no less restrictive than Company's obligations under this Agreement, and including those affirmative obligations described in this Section.

5.   **Independent Parties.**   Neither party shall be required to exchange with the other any particular information, and the exchange of any information by either party is entirely voluntary and is not intended to and shall not create or modify any contractual, fiduciary or other relationship or obligation of any kind beyond the terms of this Agreement.   Nothing contained in this Agreement, nor any exchange of information hereunder, shall grant or confer upon any party any right, license or authority in or to the

2

information exchanged or otherwise. Correspondingly, except as expressly provided herein, neither party shall be liable to the other in any manner whatsoever for any decisions, obligations, costs or expenses incurred, changes in business practices, plans, organization, products, services, or otherwise of the other party, as a result of this Agreement or any exchange of information.

6.      **Return of Information.** At any time at the request and option of the disclosing party, the receiving party agrees to promptly:  (a) return to the disclosing party the Confidential Information and/or Lehman Sensitive Data, as applicable; or (b) destroy or permanently erase (on all forms of recordation) the Confidential Information and/or Lehman Sensitive Data, as applicable and, if requested by the disclosing party, acknowledge in writing that all such Confidential Information and/or Lehman Sensitive Data, as applicable, has been destroyed or permanently erased. Notwithstanding the foregoing, each party may retain copies of the Confidential Information and/or Lehman Sensitive Data, as applicable, to the extent required to comply with applicable legal and regulatory requirements, provided, however, that such Confidential Information and/or Lehman Sensitive Data, as applicable, shall remain subject to the terms and conditions herein.

7.      **Injunctive Relief.** Notwithstanding anything to the contrary contained herein, in the event of a breach or threatened breach by the receiving party of the provisions of this Agreement, the disclosing party may have no adequate remedy in money or damages and, accordingly, may seek injunctive relief, provided, however, that no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach of a provision of this Agreement.

8.      **Title.** The parties acknowledge and agree that any disclosure of Confidential Information, and in the case of Lehman, Lehman Sensitive Data, under this Agreement shall in no way be construed to be an assignment, transfer, or conveyance of title to or ownership rights in such

Confidential Information or Lehman Sensitive Data.

9.      **Assignment.** Neither this Agreement nor any rights and/or obligations hereunder may be assigned (whether by operation of law or otherwise) by either party without the other party's prior written consent, and any such assignment shall be void.  Notwithstanding the foregoing, Lehman may assign this Agreement and any of its rights and/or obligations hereunder upon written notice to Company, to any of its affiliated companies or to an entity with or into which it is merged or consolidated or to which it sells all or substantially all its capital stock or assets associated with the operations related to this Agreement, without the consent of Company. This Agreement shall benefit and be binding upon the parties hereto and their respective successors and assigns.   Each receiving party shall be responsible for acts and omissions of its permitted assigns and disclosees.

10.      **No Publicity.** Neither party shall use the other party's name or marks, refer to, or identify the other party or any of its respective affiliate in publicity releases, promotional or marketing materials, announcements, customer listings, testimonials, or advertising without prior approval. Notwithstanding the forgoing, Supplier shall be allowed to use Customer's name or marks to perform the services detailed in an active Transaction Schedule approved by both parties.

11.      **Severability.** If any information exchanged under this Agreement is held by any court with jurisdiction over the subject matter of this Agreement not to be Confidential Information and/or Lehman Sensitive Data, as applicable, any remaining information that the parties have exchanged and that would otherwise be deemed Confidential Information and/or Lehman Sensitive Data, as applicable, within the meaning of this Agreement will be unimpaired and will continue to be protected as Confidential Information and/or Lehman Sensitive Data, as applicable, in accordance with the terms of this Agreement.  In addition, if any of the provisions of this Agreement are held invalid, illegal or unenforceable, the remaining provisions shall be unimpaired.

3

NDAB
v.09.07

12.    **Governing Law.** In all respects this Agreement shall be governed by the substantive laws of the State of New York without regard to conflict of law principles. Any claim or action brought by one of the parties hereto in connection with this Agreement shall be brought in the appropriate Federal or State court located in the County of New York, and the parties hereto irrevocably consent to the exclusive jurisdiction of such court.

13.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be an original, but which together shall constitute one and the same instrument. This Agreement may be executed and delivered by facsimile. Any facsimile signatures shall have the same legal effect as manual signatures.

14.    **Entire Agreement; Amendment; Waiver.** This Agreement, which constitutes the entire agreement between the parties as to the subject hereof, shall be construed and interpreted fairly, in accordance with the plain meaning of its terms, and there shall be no presumption or inference against the party drafting this Agreement in construing or interpreting the provisions hereof. No modification or amendment of, or supplement to, this Agreement will be binding upon the parties unless made in writing and signed by a duly authorized representative of both parties. At no time will any failure or delay on the part of any party in exercising any right or remedy provided in the Agreement operate as a waiver thereof, nor will any single or partial exercise of or failure to exercise any such right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy provided herein or available at law or in equity.

15.    **Other Agreements.** The termination of any other agreement or business relationship between, or involving both parties, shall not relieve either party of its obligations with respect to the information exchanged pursuant to the terms hereof.

IN WITNESS WHEREOF, the Company hereto has had their duly authorized representative execute this Agreement as of the date first written above.

> **Kelly Matthew Wright**
>
> By: _____
>
> Name: _KELLY WRIGHT_____
>       (Type, Print or Stamp)
>
> Title: _OWNER_____
>
> Address:
> 409 Lincoln Avenue
> Portsmouth, NH 03801

(Company Signature Page to Non-Disclosure Agreement)

4

NDAB
v.09.07

IN WITNESS WHEREOF, Lehman hereto has had their duly authorized representative execute this Agreement as of the date first written above.

Lehman Brothers Holdings Inc.

By:

Name: Francene S K. Fredge
(Type, Print or Stamp)

Title: Authorized Signatory
Managing Director

(Lehman Signature Page to Non-Disclosure Agreement)

**MASTER CONSULTING SERVICES AGREEMENT SCHEDULE**

**Supplier Name:  Kelly Mathew Wright**
**Supplier Address: 409 Lincoln Avenue, Portsmouth NH 03801**
**Supplier Jurisdiction of Incorporation: N/A**
**Tax ID or SS# (if applicable): 049684463**
**Telephone #: 603-498-9530**
**Fax #: N/A**
**Consulting Agreement No.: 100000019747**
**Transaction Schedule No: 1**
**Effective Date: January 7, 2009**

This Transaction Schedule ("**Transaction Schedule**"), made effective as of the Effective Date above, is issued pursuant to the above-referenced Master Consulting Services Agreement (the "**Consulting Agreement**") between the Customer entity executing this Transaction Schedule, as set forth on the signature page below, and the Supplier identified above.  This Transaction Schedule identifies the deliverables and/or services being provided by Supplier.

This Transaction Schedule, when executed by both undersigned parties, together with the above-referenced Consulting Agreement and other documents attached hereto (each of which are incorporated by reference into this Transaction Schedule), constitutes the complete contractual agreement between the undersigned parties with respect to the deliverables and/or services described herein.

Capitalized terms used but not defined in this Transaction Schedule have the meanings given in the Consulting Agreement referenced above.

**Status Reports:** As required by the Customer project manager.

**Pricing (complete A or B below):**

A)  Fixed Price Project:  Not Applicable for this project
B)  Hourly rates charged to Customer: $175.00 on site,  $85.00 for research and reports:

Estimated fees for each location:

| Location | Research | On Site |
|---|---|---|
| 1301 Avenue of the Americas | $85 * 12 (1 ½ days) = $1,020.00 | $175 * 12 (1 ½ days) = $2,100.00 |
| 399 Park Avenue | $85 * 12 (1 ½ days) = $1,020.00 | $175 * 12 (1 ½ days) = $2,100.00 |
| SRI – Clifton Location | $85 * 12 (1 ½ days) = $1,020.00 | $175 * 24 (3 days) = $4,200.00 |
| Estimated Hourly Charges | $3,060.00 | $8,400.00 |
| Total Estimated Hourly Charges: $11,460.00* | | |

* Time that project will take is only estimate and on site and research due diligence may reveal a project of greater time scope.

C)  For auctions, an introductory commission of 2-4% will be paid by the auction house.  However, the commission will not apply when items are consigned or sold through an auction house that has an existing relationship with Customer, e.g., Christies, Sotheby's and Phillips or through dealers or private collectors with whom LBHI has a pre-existing relationship. Standard hourly rates will apply to services supplied in support of these auctions.
D)  For outright sales, a finder's fee of 10% will be paid by the buyer.  However, the finder's fee will not apply if items are sold privately to companies or individuals that have an existing relationship with customer. Standard hourly rates will apply to services supplier in support of these sales.
E)  All travel expenses will be preapproved by Customer's project manager prior to invoice and must follow the Customer's Travel Policy guidelines shown in Attachment 1 of this Transaction Schedule.

**Description of Services and Deliverables:**

The following Services will be offered to Customer:

- Researching the collections regionally to determine their current market value.
- On site inspection, to determine condition and organize for viewing.
- Determining which companies are best suited to auction or purchase the works of art.
- Creating appropriate inventories, organizing and conducting viewings.
- Negotiating, analyzing and assisting in finalizing the sales agreements.
- Coordinating and in some instances overseeing the removal of the works of art.
- Tracking all sales and receipt of funds.
- In the event that an item does not sell at auction, arranging a private sale.

**Milestone/Implementation Schedule (if applicable):**

The services of this Transaction Schedule shall commence on the 12th day of January 2009, and shall continue in effect until and including the 31st day of March 2009, unless earlier terminated in accordance with the terms of the Master Consulting Services Agreement, and thereafter, this Transaction Schedule shall automatically be renewed for additional periods of three (3) months each on the same terms and conditions as are contained in the present Transaction Schedule, except as otherwise mutually agreed to by Supplier and Customer, unless terminated in accordance with the terms of the Master Consulting Services Agreement.

**Schedule of Payments (if applicable):**

Invoices sent to: Francine S. Kittredge
                  Managing Director
                  Lehman Brothers
                  1271 Avenue of the Americas 45th fl
                  New York, NY 10020

**Insurance:**

The services of this Transaction Schedule shall not begin until all insurance requirements of the Master Consulting Services Agreement (Section 10) are fulfilled.

The undersigned parties have caused this Transaction Schedule to be executed by their respective duly authorized representatives

| Kelly Mathew Wright (SUPPLIER) | Lehman Brothers Holdings Inc. (CUSTOMER) |
|---|---|
| By: | By: |
| Name: KELLY WRIGHT (Type, Print or Stamp) | Name: Francine S. Kittredge (Type, Print or Stamp) |
| Title: OWNER | Title: Managing Director |

**Attachment 1 – Travel Policy**

Customer will reimburse Supplier for reasonable travel and living expenses actually incurred by Supplier personnel, (a) Reimbursement for airfares will be limited to business class for intercontinental flights and for intra-continental up to 2300 miles coach-class, above 2300 miles a one class upgrade from coach. (b) Supplier will stay at the most cost-effective hotel, using corporate rates. (c) Meal expenses shall not exceed $75 per diem per person. Supplier will invoice Reimbursable Expenses monthly and will provide actual receipts for all with the associated invoice. Customer will not reimburse Supplier for normal commutation expenses or for travel and living expenses incurred by any assigned personnel performing Services at a Customer facility located in the same metropolitan area as that of such assigned employee's home base. Entertainment by or on behalf of Supplier will be at no cost to Customer.

## **Exhibit B**

**(Wright's Resume)**

# KELLY MATHEW WRIGHT

____ ART • ANTIQUES • APPRAISALS ____

409 LINCOLN AVENUE, PORTSMOUTH NH 03801  603.498.9530  KELWRIGHT@EARTHLINK.NET

## PROFESSIONAL EXPERIENCE

**FREELANCE APPRAISER AND CORPORATE CONSULTANT, 1998-PRESENT:**
*Clients include those mentioned below as well as many private clients*

**Alvarez and Marsal, New York, NY.  2001-2002:** During their restructuring of the global retail and apparel company Warnaco, created a master inventory of hundreds of items of art, furniture and decorative arts from their corporate offices, along with a sales strategy and schedule.

**Alvarez and Marsal, New York, NY.  June 2005-September 2005:** Contracted by Columbia University to manage the closure of Arden House and Homestead conference centers.  For these historic former homes of Edward and Averell Harriman, created a comprehensive Fair Market Value appraisal of all fine art and antique furniture in both facilities totaling over $2 million in inventory.

**BENNETT AUCTIONS, PORTSMOUTH, NH., 2008-PRESENT: APPRAISER AND BUYER**
Duties include: estate appraisals; house calls throughout the greater Boston and New Hampshire Seacoast region; negotiating consignment terms and contracts, as well as outright purchases; auction catalog descriptions and pre-sale estimates.

**COBBLE HILL, PORTSMOUTH NH., 2003-2007: OWNER**
A retail store offering custom high-end upholstered furniture and design services, along with a selection of antiques, art and vintage finds for the home, focussing on mid-century modern. Responsible for all aspects of a small business including: off the floor, custom and internet sales; merchandise acquisition; advertising; store management, customer service, and employees.

**WRIGHT ANTIQUES LLC, BROOKLYN NY., 1998-2003: OWNER**
Provided appraisal and estate liquidation services, for a variety of law firms, banks and private clients.

**STAMFORD AUCTION, STAMFORD CT., 1991-1998: APPRAISER AND BUYER**
Duties included: house calls in the New York Metro area; negotiating consignment terms and contracts, purchasing; overseeing packing and shipping of merchandise; auction catalog descriptions and pre-sale estimates; managing live auctions; photography and advertising.

## EDUCATIONAL BACKGROUND

Courses, seminars and lectures on furniture, fine and decorative arts, 1992-1998:
Appraisal Studies Program at New York University, the Appraisers Association of America, as well as Sotheby's and Christies, New York. USPAP examination, passed May, 1999.

Bachelor of Arts, English Literature, 1988. Vassar College, Poughkeepsie, New York

## PROFESSIONAL ASSOCIATION

*Member of the Appraisers Association of America 2000-2005*