Hearing Date and Time: January 28, 2009 at 10:00 a.m.
Objection Date and Time: January 23, 2009 at 4:00 p.m.

CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois  60603
Telephone:  (312) 845-3000
Facsimile:  (312) 701-2361
James E. Spiotto (admitted pro hac vice)
Ann E. Acker (admitted pro hac vice)
Franklin H. Top, III (admitted pro hac vice)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE<br><br>LEHMAN BROTHERS HOLDINGS INC., ET AL.,<br><br>Debtors. | CHAPTER 11 CASE NO.  08-13555 (JMP)<br><br>(Jointly Administered) |

**LIMITED OBJECTION OF U.S. BANK NATIONAL ASSOCIATION AS TRUSTEE TO THE DEBTORS' MOTION FOR AN ORDER APPROVING CONSENSUAL ASSUMPTION AND ASSIGNMENT OF PREPETITION DERIVATIVE CONTRACTS**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

NOW COMES U.S. Bank National Association, not individually but as Trustee under a variety of trusts (*"U.S. Bank"* or the *"Trustee"*), by and through its counsel, Chapman and Cutler LLP, to object to the Debtors' Motion for an Order Approving Consensual Assumption and Assignment of Prepetition Derivative Contracts (the "*Motion*") and U.S. Bank's objection thereto (the "*Objection*").  In support of its Objection, U.S. Bank states as follows:

2565689.01.04.doc

**SUMMARY OF OBJECTIONS**

1. U.S. Bank has no objection to the Motion to the extent it seeks approval of a process for the truly consensual assumption and assignment of Derivative Contracts (as defined in the Motion) but objects to the Motion on the grounds that the Debtors appear to seek to assume and assign contracts without the counterparty's consent "in accordance with the terms of the Derivative Contracts" and (i) have failed to identify a process for identifying defaults under the relevant Derivative Contract, (ii) have failed to identify a process to cure (or advise how they intend to cure) the defaults under the terms of the Derivative Contracts, and (iii) failed to provide a mechanism to provide adequate assurance that the assignee will perform under the terms of the Derivative Contract. To the extent any such assignment is approved by this Court, the Order should provide that all of the obligations under the terms of the Derivative Contract are being assumed by the Assignee.

2. U.S. Bank has been working with the Debtors to resolve issues in the more than 800 transactions between U.S. Bank and the Debtors, many of which involve Derivative Contracts. U.S. Bank believes this process has generally worked well. It is the expectation of U.S. Bank that this dialogue and cooperation will continue. If U.S. Bank and the Debtors are unable to resolve issues relating to a particular Derivative Contract, that matter will be brought to the attention of this Court. As such, U.S. Bank does not believe any procedures or protocol are necessary with respect to Derivative Contracts in its transactions involving the Debtors.

**BACKGROUND**

3. U.S. Bank National Association serves as Trustee (or some other similar capacity) in over *eight hundred* transactions involving the Debtors in these proceedings. These transactions are generally sophisticated transactions in which the Debtors or an affiliate of the Debtors have multiple roles and responsibilities. These transactions include securitization

transactions in which U.S. Bank serves as custodial or collateral agent; other securitization transactions in which U.S. Bank serves as Trustee; Collateralized Loan Obligations and Collateralized Bond Obligations for which U.S. Bank serves as Trustee (some of which involve complicated credit default swaps); and corporate and municipal debt transactions pursuant to which U.S. Bank serves as a Trustee.  Many of these transactions, in some way, include derivative contracts.  Some of these transactions are described below:

4. *Corporate/Municipal Transactions*.  U.S. Bank serves as Trustee under Indentures for certain bonds or notes issued by municipal or corporate entities. U.S. Bank believes it serves as Trustee for 115 corporate or municipal transactions in which Lehman has provided some sort of investment contract.  It is not clear whether the Debtor includes those types of agreements as a Derivative Contract.

5. In many of these transactions, the issuer of the indebtedness is required to establish a reserve fund which is used in the event that the issuer is unable itself to make a payment of interest on the notes or bonds.  The funds in the reserve account are invested.  In order to insure that the issuer received a set return on the reserve funds, the issuer sometimes entered into forward purchase agreements, or reserve account agreements with one of the Debtors, whereby the Debtors guarantee the issuer a certain return (either through a guaranteed interest rate or an initial payment) in exchange for the right to direct the investment of the reserve fund.  The relevant Debtor either receives the positive difference between the return on the investments and the guaranteed rate or reimburses the reserve account for the negative difference.  In essence, the relevant Debtor is being "loaned" the reserve funds to attempt to make an investment return.  In today's marketplace where even the most conservative investments not only run the risk of the repayment of interest, but a risk in the return of principal, these reserve funds have a real risk for a negative return.  The Issuer, the Trustee and a Lehman

entity, generally Lehman Brothers Special Financing, Inc. are the "counterparties" to these arrangements.

6. *Collateralized Bond Obligations.* In these transactions, the Issuer, a special purpose entity, may be a counterparty to one or more swap transactions, including but not limited to credit default swap agreements, coupon swap agreements or interest rate swaps, with one of the Debtors a counterparty thereto.

7. A Credit Default Swap Agreement is a form of insurance against certain "Credit Events" occurring with respect to a designated portfolio of unrelated notes or indebtedness, including high yield debt. The "Credit Events" typically are bankruptcy of the "reference entity" (the obligation for which the "insurance" is being offered), restructuring or certain defaults related to any such high yield debt.

8. If a Credit Event occurs, the Issuer is required to pay the Debtor counterparty (through one of a number of different mechanisms) the amount of the loss on the indebtedness subject to the Credit Event. The Issuer funds any obligations it may have to the Debtor counterparty from funds it receives through the issuance of notes. The notes are issued pursuant to an Indenture between the Issuer and U.S. Bank as Trustee. There are usually several tranches of notes that are issued under the Indenture, with varying priorities and rights to payment.

9. In exchange for taking on the risk of Credit Events, the Issuer receives periodic payments from the Debtor. The Issuer uses these payments to make payments of interest on any issued notes, or to pay commitment fees to those who have made a commitment to purchase notes. In some cases the Debtors failure to make these periodic payments has rendered the Issuer (generally, a nominal "shell" type entity) unable to make payments on the notes, creating an Event of Default under the Indenture and changing, perhaps permanently, the relative rights of holders of different tranches of notes under the Indenture.

10. In a coupon swap, a Debtor, for a fee, often took on the risk of the failure of a transaction to pay interest on a certain tranche of securities issued in the transaction.

11. As a result, although not a counterparty to the Derivative Contract, the Trustee and the noteholders have a huge interest in what happens to the contract as a result of these bankruptcy proceedings, and if assigned, the identity of the assignee and the ability of such assignee to honor its obligations under the Derivative Contract. U.S. Bank has identified more than 60 collateralized bond obligations or collateralized debt obligations involving a Derivative Contract with one of the Debtors as a counterparty.

12. *Securitization Transactions.* U.S. Bank has identified approximately 46 securitization transactions in which it serves as Trustee for Lehman sponsored mortgage backed securitization transactions. In these transactions a special purpose entity or trust issues various tranches of certificates to fund its purchase of mortgage loans from a Lehman related entity. Some of the tranches are supported by swap agreements, some of which have the applicable special purpose entity or trust and the Debtor as counterparties. In some cases these are interest rate swaps; in other cases these swaps take on the risk of non-payment of certain amounts due and owing a particular tranche of certificates. Of course, the special purpose entity or the trust may have no real interest in the swap arrangement, rather it is the Trustee and the affected tranches of certificateholders that have the real economic interest in connection with the swap agreement.

**THE DEBTORS MAY NOT ASSUME AND ASSIGN ANY AGREEMENT UNTIL ALL DEFAULTS ARE CURED**

13. The Bankruptcy Code requires that as part of the assignment of an executory contract, all defaults must be cured (or that adequate assurance be provided that all defaults will be promptly cured). The Debtors may not assume and assign any executory contract unless they have cured all existing defaults. 11 U.S.C. § 365(b)(1); *Metropolitan Airports Comm. v.*

*Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 496 (7th Cir. 1993); *In re Superior Toy & Mfg. Co.*, 78 F.3d 1169, 1174 (7th Cir. 1996) ("The language of § 365(b)(1) is unequivocal. A party to an executory contract must be paid all amounts due him under the contract before the contract may be assumed."); *see generally In re Burger Boys, Inc.*, 94 F.3d 755 (2d. Cir. 1996).

14.     The Motion is silent as to (a) whether any defaults exist under the terms of these Derivative Contracts, (b) how parties will be notified of such defaults and (c) how the defaults will be cured. The contractual counterparty is entitled to know how such defaults will be cured.

**THE DEBTORS MAY NOT ASSUME AND ASSIGN ANY DERIVATIVE CONTRACT ABSENT ADEQUATE ASSURANCE OF FUTURE PERFORMANCE**

15.     The assignee must provide adequate assurance of future performance of such contract "whether or not there has been a default in such contract or lease." 11 U.S.C. § 365(f)(2)(B). Although the term "adequate assurance of future performance" is not defined in the Bankruptcy Code, adequate assurance of future performance "is to be given a practical, pragmatic construction based upon . . . the circumstances of [the] case." *In re Texas Health Enter., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000) (*quoting In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D.Fla. 1994)).

16.     "Assurance of future performance is adequate 'if performance is likely (i.e., more probable than not)' and the degree of assurance necessary to be deemed adequate 'falls considerably short of an absolute guaranty.'" *Id.* at 835 (*quoting In re PRK Enterprises, Inc.*, 235 B.R. 597, 603 (Bankr. S.D.Tex. 1999)). Courts generally "evaluate the financial condition of the assignee and the likelihood that the non-debtor party will receive the benefit of its bargain from the assignee." *Id.* (*citing In re Casual Male Corp.*, 120 B.R. 256, 264-65 (Bankr. D. Mass 1990).) In particular, courts interpreting the requirement have focused on the assignee's "ability to fulfill the financial obligations" under the contract. *In re Glycogenesys, Inc.*, 352 B.R. 568,

578 (Bankr. D. Mass. 2006) (*citing In re Martin Paint Stores*, 199 B.R. 258 (Bankr. S.D.N.Y. 1996)); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524 (Bankr. D.N.J. 1988); *In re Old South Coors, Inc.*, 27 B.R. 923, 926 (Bankr. N.D. Miss. 1983) (court considered long and successful business experience and financial strength of each proposed assignee in evaluating assignment by debtor in possession of its rights under a beer distributorship agreement). *cf. In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 28-30 (1st Cir. 1984) (in a case decided under Bankruptcy Code Section 365(c)(1)(A) and Rhode Island law, court held that the counterparty to a franchise contract acted reasonably in withholding consent to assignment of a contract where assignee could not meet working capital requirements of the franchise contract). The burden of proving adequate assurance of future performance is on the movant-debtor. *Texas Health*, 246 B.R. at 834.

17.     Again, the Motion is silent with respect to how the Debtors and their unidentified assignee will provide adequate assurance of future performance, under the terms of any Derivative Contract.

### THE DEBTORS ARE PROHIBITED FROM MODIFYING THE TERMS AND CONDITIONS OF ANY OF THE CONTRACTS

18.     While the Motion does not indicate that the Debtors would be assuming any less than the entirety of the obligations under the relevant Derivative Contract, any Order should be clear that this assignment (if approved by this Court) is an assignment of the entirety and that the relevant Debtor is assuming the entirety of the obligations thereunder. The Debtors must assume all of their obligations with respect to a transaction, and cannot cherry pick those rights they want and get rid of the respective obligations. A decision to assume or reject an executory contract is "an all or nothing proposition." *Schlumberger Resource Management Serv., Inc. v. Cellnet Data Sys., Inc. (In re Cellnet Data Sys., Inc.)*, 327 F.2d 242, 249 (3d Cir. 2003). Thus, if a debtor assumes a contract, it must do so *cum onere*, with all the benefits as well as the burdens.

*Cinicola v. Scharffenberger*, 248 F.3d 110, 119-120 (3d Cir. 2001); *American Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 78 (3d Cir. 1999). *See also In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 95 (Bankr. S.D. Fla. 2000). ("It is black letter law that an executory contract must be either assumed in its entirety, *cum onere*, or completely rejected."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("If a debtor chooses to assume . . . an executory contract or unexpired lease, he must assume them according to their terms."). The assumption and assignment of an executory contract does not give the Debtor or the assignee the ability or the right to modify the terms of the agreement being assumed and assigned. *See, e.g., Medtronic Ave., Inc., v. Advanced Cardiovascular Sys., Inc.*, 247 F. 3d 44, 60 (3d Cir. 2001). In the *Medtronic* case, the court explained that:

> [a]n assignment does not modify terms of the underlying contract. It is a separate agreement between the assignor and the assignee which merely transfers the assignor's contract rights, leaving them in full force and effect as to the party changed. An assignment is intended to change only who performs an obligation, not the obligation to be performed.

*Id. See also In re Federal-Mogul Global, Inc.*, No. 05-2423, 2007 U.S. App. LEXIS 6120, at *9 (3d Cir. Mar. 15, 2007) (explaining that debtor is not able to modify obligations in contract assumed and assigned pursuant to Section 365 of the Bankruptcy Code).

19. Unless and until the Debtors provide information with respect to (a) the defaults that exist under an assumed Derivative Contract, (b) how such defaults will be cured and (c) how the assignee will provide adequate assurance of future performance, approval of an assignment and assumption of a Derivative Contract without the consent of the counterparty, is premature.

WHEREFORE U.S. Bank National Association, as Trustee respectfully requests that this Court deny the relief requested in the Motion to the extent it seeks prospective approval of non-consensual assumption and assignments of Derivative Contracts "in accordance with the terms thereof" without providing how defaults under such Derivative Contracts will be cured or without providing adequate assurance of future performance.

        Respectfully submitted,

        U.S. BANK NATIONAL ASSOCIATION, not individually but as Trustee

        By:_____/s/ Ann Acker_____
                One of Its Attorneys

James E. Spiotto
Ann Acker
Franklin H. Top, III
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois 60603
(312) 845-3000