Dennis F. Dunne
Dennis C. O'Donnell
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
                                                                   :
In re:                                                             :   Chapter 11 Case
                                                                   :
LEHMAN BROTHERS HOLDINGS INC., et al.,                             :   No. 08-13555 (JMP)
                                                                   :
                       Debtors.                                    :   (Jointly Administered)
                                                                   :
------------------------------------------------------------------ x


**SUPPLEMENTAL BRIEF OF OFFICIAL COMMITTEE OF UNSECURED
CREDITORS PURSUANT TO STIPULATION, AGREEMENT AND ORDER (A)
RESOLVING IN PART THE MOTION OF DNB NOR BANK ASA FOR ENTRY OF (I)
AN ORDER PURSUANT TO 11 U.S.C. § 362(d) AND FED. R. BANKR. P. 4001
GRANTING RELIEF FROM THE AUTOMATIC STAY TO EFFECT SETOFF OR, IN
THE ALTERNATIVE, (II) AN ORDER PURSUANT TO 11 U.S.C. §§ 361 AND 506(a)
REQUIRING THE DEBTORS TO PROVIDE ADEQUATE PROTECTION AND
<u>(B) FIXING A SCHEDULE FOR SUPPLEMENTAL BRIEFING</u>**

## TABLE OF CONTENTS

Page

RELEVANT UNDISPUTED FACTS ................................................................................................ 1

ISSUE PRESENTED .......................................................................................................................... 2

ARGUMENT ....................................................................................................................................... 2

    I.    Fundamental Bankruptcy Policy Supports that the Moment a Chapter 11 Petition Is Filed Is a Clear Line of Demarcation ....................................................... 3

        A.    Bankruptcy Code Treatment of Payments by Check ................................. 4

    II.    UCC Article 4A, FDIC Regulations On Insolvency, And Bank Practice Regarding Intrabank Transfers All Favor Deeming Seven Million NOK Transfer to Have Occurred After the Petition Time ............................................ 6

        A.    Article 4A of UCC ...................................................................................... 6

        B.    FDIC Insolvency Rule ................................................................................. 8

        C.    Bank Practices ............................................................................................. 9

        D.    Other Jurisdictions .................................................................................... 10

            (i)    UNICITRAL Model Law ............................................................ 10

            (ii)    English Law ................................................................................. 11

            (iii)    Australian Law ............................................................................. 12

    III.    Certainty In Transactions Requires Accounting For Amounts Actually In Accounts As Of Petition Time ........................................................................... 12

CONCLUSION .................................................................................................................................. 15

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in possession (collectively, the "Debtors") hereby files this supplemental brief pursuant to the Stipulation, Agreement and Order, (A) Resolving In Part The Motion Of DnB NOR Bank ASA ("DnB NOR") For Entry Of (i) An Order Pursuant To Section 362(d) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), And Rule 4001 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules") Granting Relief From The Automatic Stay To Effect Setoff Or, In The Alternative, (ii) An Order Pursuant To Sections 361 And 506(a) Of The Bankruptcy Code Requiring The Debtors To Provide Adequate Protection, And (B) Fixing A Schedule For Supplemental Briefing, entered into between the Debtors, the Committee, and DnB NOR (collectively, the "Parties") filed January 22, 2009 [Docket No. 2605] (the "Stipulation").[1]

## RELEVANT UNDISPUTED FACTS

1. On September 12, 2008, Lehman Brothers Commercial Corporation ("LBCC") wired two separate deposit transfer instructions (the "Transfer Instructions") requesting that transfers of 6,865,351.56 NOK, and 200,000 NOK be made from its account to LBHI's '268 Account on September 15, 2008 (together, the "Seven Million NOK Transfer"). Although LBCC sent the Transfer Instructions prior to the fling of LBHI's chapter 11 petition on 1:45 a.m. on September 15, 2008 (the "Petition Time"), the Transfer Instructions indicate that the Seven Million NOK Transfer was to occur on September 15, 2008. Further, the book entries recording the Seven Million NOK Transfer reflect that the Seven Million NOK Transfer was

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Stipulation.

1

credited to the '268 Account on September 15, 2008, at 12:54 p.m. CEST, which equates to 6:54 a.m. EDT, approximately five hours after the Petition Time.

## ISSUE PRESENTED

2.    At issue is whether, for purposes of the mutuality requirement contemplated by section 553 of the Bankruptcy Code, the Seven Million NOK Transfer occurred prior to, or after, the Petition Time.  The significance of this determination is that if the Seven Million NOK Transfer occurred after the Petition Time, the transferred funds represent a postpetition obligation of DnB to LBHI, which obligation may not be set off against DnB's prepetition obligation to LBHI under the Credit Agreement.

## ARGUMENT

3.    Although the Seven Million NOK Transfer was the result of revocable Transfer Instructions transmitted prepetition, the transfer was not completed (nor was it intended to be completed) until after the Petition Time.  This fact makes the Seven Million NOK Transfer ineligible for setoff against the amount owing by LBHI to DnB under the Credit Agreement. This conclusion is supported by: (i) the general bankruptcy law policy of treating events that occur after a petition is filed as postpetition, without regard to the equities of such determination, (ii) UCC Article 4A, which establishes a time when bank transfers are considered "final," (iii) rules governing bank transfers in other jurisdictions, as well as FDIC rules governing insurance and receiverships, (iv) bank practices generally, and (v) the need for certainty in evaluating estate assets in bankruptcies.  Each of these regimes suggest that the Seven Million NOK Transfer occurred after the Petition Time for purposes of setoff or otherwise.

### I. Fundamental Bankruptcy Policy Supports that the Moment a Chapter 11 Petition Is Filed Is a Clear Line of Demarcation

4. Several provisions of the Bankruptcy Code rely on the concept that the time at which the petition is filed is the critical moment in evaluating asset transfers and the existence of estate property and liabilities. Among those sections are those governing the existence of administrative claims, and the avoidance of preferences, fraudulent transfers, and certain postpetition transactions. See 11 U.S.C. §§ 503, 547, 548, 549.

5. For example, the time at which the petition is filed is the significant moment in determining whether administrative expense claims exist under sections 503(b)(1) and 507 of the Bankruptcy Code. 11 U.S.C. §§ 503(b), 507; Vanco Trading v. Monheit (In re A.C.E. Elevator Co.), 347 B.R. 473, 479 (Bankr. S.D.N.Y. 2006) ("the claim will have a first priority only if the transaction giving rise to it occurred post-petition"); In re K Chemical Corp., 188 BR 89 (Bankr. D. Conn. 1995) (no administrative claim for goods supplied several hours before the petition was filed), aff'd, 1999 WL 464531 (D. Conn. 1999).[2]

6. Another example is section 547(b) of the Bankruptcy Code, which allows a debtor to "avoid any transfer of an interest of the debtor in property" that meets certain criteria, one of which is that the transfer was made "on or within 90 days before the filing of a petition." 11 U.S.C. § 547(b). The Bankruptcy Code is clear that a transfer made outside of the "reachback period" is not subject to avoidance as a preference, without regard to the purpose of the transfer. 11 U.S.C. § 547(b). Although this result may not be equitable in cases where a large payment

---

[2] See also In re McLouth 257 B.R. 316 (Bankr. D. Mont. 2000) (automatic stay arises only as of moment that bankruptcy petition is filed, and has no effect on actions occurring on the petition date that precede, by hours, minutes, or seconds, the filing); In re Burgos 263 B.R. 698 (Bankr. D. Conn. 2001) (state court eviction action that was completed about an hour before commencement of bankruptcy case was not affected by automatic stay).

3

was made to a creditor ninety-one days prior to a bankruptcy,[3] the Bankruptcy Code includes a ninety-day reachback period as "an essential element of a preference." See 5 Collier on Bankruptcy ¶ 547.03[6], at 547-40 (15th ed. Rev. 2008). The need to rely on the petition date to calculate whether a transfer is avoidable as a preference highlights the significance of the moment of filing of a petition in bankruptcy. The fact that the Seven Million NOK Transfer occurred after the Petition Time renders the transfer "postpetition" and not subject to setoff against a prepetition obligation.

### A. Bankruptcy Code Treatment of Payments by Check

7. Unlike section 547, section 549 of the Bankruptcy Code allows a debtor to avoid a transfer of property of the estate that occurs "*after* commencement of the case." 11 U.S.C. § 549(a) (emphasis added). As a result, courts often encounter difficulties when the incidents of a transaction straddle the filing of a petition. 5 Collier on Bankruptcy ¶ 547.04[2], at 549-10 (15th ed. Rev. 2008). Indeed, the treatment of checks under sections 547 and 549 of the Bankruptcy Code provides guidance on how courts have dealt with the issue. In Barnhill v. Johnson, 503 U.S. 393 (1992), the Supreme Court held that for purposes of section 547(b), a transfer by check occurs when a check is honored and not when the check is delivered to the creditor. Id.; see also In re Ottoman's, Inc., Nos. 99-13648 (MWV), 01-1210 (MWV) 2002 WL 1011326, at *1-2 (Bankr. D.N.H. Mar. 26, 2002) ("The issue before this Court is whether, pursuant to § 549, a check delivered pre-petition, but honored post-petition, is governed by the date of receipt or the date of honor rule . . . [relying on the date of receipt] would create a safe harbor, unintended by Congress, for checks delivered before the commencement of a bankruptcy

---

[3] Although such transfers may be avoidable as fraudulent transfers under section 548 of the Bankruptcy Code or applicable law, avoidance of fraudulent transfers is also limited by a reachback period. See 11 U.S.C. § 548(a)(1).

case and honored after the petition date because the payment would not be recoverable as a preference or a post-petition transfer."); In re Pittsburgh Corning Corp., Nos. 00-2710, 00-22876 (JFK), 2000 WL 1373001 at *1 (Bankr. W.D. Pa. 2000) ("In light of the Supreme Court's opinion in *Barnhill v. Johnson*, I find that no transfer of property occurred prepetition when the check was delivered"); Wittman v. State Farm Life Ins. Co. (In re Mills), 167 B.R. 663, 664 (Bankr. D. Kan. 1994), aff'd, 176 B.R. 924, 927 (D. Kan. 1994).

8. Although the Seven Million NOK Transfer was not a payment by check, the rule that a transfer of property occurs upon honoring a check and not upon delivery is analogous to the facts of the Disputed Amount. As the Supreme Court held in Barnhill,

> Any chose in action against the debtor that he gained when he received the check cannot be fairly characterized as a conditional right to 'property or ... an interest in property,' since, until the moment of honor, the debtor remained in full control over the account's disposition and the account remained subject to a variety of actions by third parties. In addition, the rule of honor is consistent with § 547(e)(2)(A), which provides that a transfer occurs at the time it 'takes effect between the transferor and the transferee,' particularly since the debtor here retained the ability to stop payment on the check until the very last.

Barnhill v. Johnson, 503 U.S. 393, 394 (1992). The Seven Million NOK Transfer did not occur between the transferor i.e., LBCC, and the transferee, i.e., LBHI, until it took effect between those two parties. Until the Disputed Amount actually appeared in LBHI's account, LBHI was not in control of it (particularly because LBCC had the ability to revoke the Transfer Instructions until such time). Because that did not happen until after the Petition Time, the Disputed Amount is a postpetition obligation of DnB NOR to LBHI.

5

**II.     UCC Article 4A, FDIC Regulations On Insolvency, And
Bank Practice Regarding Intrabank Transfers All Favor Deeming
<u>Seven Million NOK Transfer to Have Occurred After the Petition Time</u>**

**A.     Article 4A of UCC**

9.     Article 4A of the Uniform Commercial Code (the "<u>UCC</u>") governs a wide variety of funds transfers,[4] including intrabank transfers.[5]  In a credit transfer, as here, the instruction to make payment is given by the payor to the payor's bank, which then debits the payor's account and subsequently credits the payee's account.  <u>See</u> Benjamin Geva, <u>Payment Finality and Discharge in Funds Transfers</u>, 83 Chi.-Kent L. Rev. 633, 637 (2008).  Transmission of an instruction may be a direct communication between the sender and the receiving bank or through an intermediary such as SWIFT, as here.[6]  <u>See</u> <u>Id</u>. at 637; Patricia Brumfield Fry, <u>Basic Concepts in Article 4A: Scope and Definitions</u>, 45 Bus. Law 1401, 1406 (1990).

10.     Pursuant to Article 4A of the UCC, a funds transfer is completed by "acceptance" by the beneficiary's bank of a payment order for the benefit of the beneficiary of

---

[4]     Although the Seven Million NOK Transfer was a transfer in a foreign bank, and therefore may not be governed by the UCC, Article 4A is, at least, instructive as to the treatment of bank transfers.

[5]     Article 4A of the UCC governs a specialized method of payment referred to in the Article as a funds transfer but also commonly referred to in the commercial community as a wholesale wire transfer.

Funds transfers are defined as the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order.  The term includes any payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order.  UCC §§ 4A-103, 104(1).

A "funds transfer system" includes organizations that provide only transmission services such as SWIFT (Society for Worldwide Interbank Financial Telecommunication; see discussion below).  <u>See</u> comments to UCC § 4A-105.

[6]     SWIFT is a member-owned cooperative through which certain banks conduct transfers.  Through SWIFT, banks may automate and standardize financial transactions.  SWIFT operates as a data carrier.  See www.swift.com; Flint D, <u>Moving SWIFTly on to Data Protection</u>, 2008 WLNR 24151257 (SWIFT "is an organization that manages international payments between banks and handles transfers to over 8000 financial organizations worldwide"); Donald I. Baker & Roland E. Brandel, <u>The Law of Electronic Fund Transfer Systems</u> ¶ 11.04 (2d ed. 1988).

6

the originator's payment order. UCC §§ 4A-103, 209(b)(1). Here, LBCC was the originator and LBHI is the beneficiary. The Transfer Instructions are therefore "payment orders." Acceptance of a payment order by the beneficiary bank occurs at the earliest of: (i) when the beneficiary bank pays or notifies the beneficiary of receipt of the order, (ii) when the beneficiary bank receives payment from the sender (i.e., the transferor or payor), or (iii) the opening of the bank's next business day following the payment date if a withdrawable credit balance in the sender's account at the beneficiary's bank fully covers the sender's order. See UCC §§ 4A-209(b); see also Benjamin Geva, Payment Finality and Discharge in Funds Transfers 83 Chi.-Kent L. Rev. 633, 645 (2008).

11. Here, LBCC (the transferor) had a withdrawable credit balance in its account at the beneficiary's bank (i.e., DnB NOR). LBCC commenced the transaction by transmitting an instruction to DnB NOR to withdraw funds from its withdrawable account and credit them to the '268 Account. However, because none of the Article 4A requirements for acceptance occurred prepetition, "acceptance" of the payment orders did not occur and the Disputed Amount did not become part of the '268 Account, or property of LBHI's estate, until after the Petition Time. The Transaction Log indicates that the Seven Million NOK Transfer occurred at 6:54 a.m. (EDT) on September 15, 2008.[7] This is the earliest of the three UCC Article 4A requirements for acceptance, and therefore this is when finality of payment occurred. This is also the time that should be used to determine whether the Disputed Amount was a prepetition asset of LBHI. Because the Seven Million NOK Transfer was not accepted until after LBHI filed its petition in bankruptcy, the Disputed Amount was not a prepetition asset of LBHI.

---

[7] Interbank payments of fund transfers occur upon receipt by the receiving bank of final settlement through a funds-transfer system. UCC § 4A-403(a)(1).

7

**B.  FDIC Insolvency Rule**

12.  A recent amendment by the Federal Deposit Insurance Corporation ("<u>FDIC</u>") to part 360 of title 12 of the Code of Federal Regulations in 2008 ("<u>Part 360 Amendment</u>") further supports by analogy the conclusion that the Seven Million NOK Transfer occurred postpetition. Effective August 18, 2008, the FDIC instituted new policies for determining deposit and other liability account balances for insurance coverage and receivership purposes. Under section 360.8 of the Part 360 Amendment, the FDIC established a process whereby account balances are determined for insurance purposes based on a fixed time. The "close-of-business account balance" is defined as

> the closing end-of-day ledger balance of a deposit or other liability account on the day of failure of an insured depository institution determined by using the applicable cutoff times. This balance may be adjusted to reflect steps taken by the receiver to ensure that funds are not received by or removed from the institution after the FDIC cutoff point.

12 U.S.C. § 360.8(b)(3). The cutoff point used to finalize accounts is the earlier of (i) the failed institution's normal cutoff time for a specific type of transaction, or (ii) the FDIC's cutoff point, which the FDIC establishes after its appointment as receiver to the failed institution. <u>Id.</u> Here, because the Petition was filed on a Monday long before the open of business, it is likely the FDIC would establish a time on Friday, September 12, 2008 as the cutoff time.

13.  Implementing sound practices to determine the moment at which an account should become insured is central to the FDIC's purpose. If the '268 Account were an account at a failed bank for which the FDIC acted as receiver, the Seven Million NOK Transfer would not be included in that account for insurance purposes. In other words, if there had been a bank failure instead of a chapter 11 filing, and the FDIC cutoff point had been established instead of an automatic stay being implemented, the Disputed Amount would not be in the '268 Account by the cutoff time. The fact that instructions for the transfer into an account were given

8

prior to the cutoff time would be irrelevant to the FDIC's determination of the appropriate account balance.

14.  Similarly, if the FDIC were to refer to the bank's normal cutoff time, it is still likely that the Disputed Amount would not be deemed a deposit in the '268 Account for insurance purposes. The Transfer Instructions requested DnB NOR to transfer the amount on September 15, 2008. By close of business on September 12, no matter what time DnB NOR concluded its daily transactions, the Disputed Amount would not have been transferred to the '268 Account.

### C. Bank Practices

15.  The Court requested that the Parties' supplemental briefs address "the practices of large financial institutions when it comes to intrabank transfers." Hearing Transcript at 54, lines 15-16. When interpreting the legal effects of banking transactions, courts may consider the practices associated with such transactions. Delbrueck & Co. v. Manufacturers Hanover Trust Co., 609 F.2d 1047, 1051 (2d Cir. 1979) ("The practices associated with banking transactions can be conclusive evidence of the legal effect of those transactions." (citing Indianapolis Morris Plan Corp. v. Karlen, 28 N.Y.2d 30, 36, 268 N.E.2d 362 (1971); and Hanlon v. Union Bank of Medina, 247 N.Y. 389, 391, 160 N.E. 650 (1928)). The results of this analysis bolster the same conclusion as reflected in the analysis above: a transfer is not complete until every step of the banking system's fund transfer process have concluded.

16.  In both interbank and intrabank transfers, banks generally act through a clearing house or a funds-transfer system, such as the SWIFT funds transfer system through which the Seven Million NOK Transfer occurred. When completing transactions, such as the Seven Million NOK Transfer, a party will instruct its bank to make a transfer and the bank notifies SWIFT. A transfer instruction also contains details of when the transfer should occur.

9

In the case of the Seven Million NOK Transfer, the Transfer Instructions indicated that the Seven Million NOK Transfer was to occur on September 15, 2008. Transfer Instructions, Stipulation, Ex. C. Furthermore, as set forth in the Terms and Conditions of the '268 Account, the cutoff for interbank payment transfers is at 12:30 p.m CEST (SWIFT), i.e. 6:30 a.m. EST, and for customer transfers, amounts will be credited to the beneficiary's account on the value date provided, so long as that instructions are received prior to cutoff time on the day of receipt. Stipulation, Ex. B. The value date provided for the Transfer Instructions is September 15, 2008.

17.   Thus, final payment denoting the accountability of a bank to the payee typically marks the absolute discharge of the debt paid by a funds transfer. Payment finality is achieved only upon the conclusion of the entire transfer process, and the irreversibility of the payment process, not by issuing an instruction (particularly one that is revocable). Benjamin Geva, Payment Finality and Discharge in Funds Transfers 83 Chi.-Kent L. Rev. 633, 669 (2008). Accordingly, bank practices dictate that the Disputed Amount was transferred after the Petition Time.

   D.   **Other Jurisdictions**

      (i)   UNICITRAL Model Law

18.   The desire for certainty and uniformity in the law governing wire transfers, which led to the enactment of Article 4A of the UCC, also caused the United Nations Commission on International Trade Law ("UNICITRAL") to finalize, and in 1992 adopt, a Model Law (the "Model Law") of International Credit Transfers.[8] Although the Model Law applies only to credit transfers where a sending bank and receiving bank are in different nations (Article 4A applies to both domestic and international transfers), it was significantly influenced by drafts of Article 4A. See Mark Sneddon, The Effect of Uniform Commercial Code Article

---

[8]   The Model Law unifies the law of credit transfers.

10

4A on the Law of International Credit Transfers, 29 Loy. L.A. L. Rev. 1107, 1126 (1996). Under article 17 of the Model law, a credit transfer is completed when the beneficiary's bank accepts the payment order. Model Law Art. 17. Here, DnB NOR did not accept the payment order in its capacity as LBHI's bank until after the Petition Time.

      (ii)    English Law

    19.    Under English law, finality of payment with respect to an intrabank transfer occurs "at the point where the bank recognizes the beneficiary as its creditor". Roy Goode, Commercial Law 511 (2ded., Penguin Books 1995). See, e.g., Momm v. Barclays Bank International Ltd., (1976) 3 All E.R. 588, 596 (Q.B.D.). Further, interbank payments to the beneficiary's bank via funds-transfer or through a clearing house occurs pursuant to the rules governing the system. Specifically, payment by means of credit to the sending bank's account maintained at the beneficiary's bank occurs when the beneficiary's bank receives the payment order advising it that the payment has been made. Here, no such payment order was received. It is of no moment that the beneficiary's bank has not yet credited the payee's account or notified him of the transaction. See A/S Awilco of Oslo v Fulvia Spa di Navigazione of Calgari [1981] I WLR 314; see also Royal Products v. Midland Bank (1981) 2 Lloyd's Rep. 194, 199 (Q.B.D). An interbank payment by means of a debit posted to the sending bank's account held at the beneficiary's bank is complete when the beneficiary's bank receives such instruction and decides to post such debit. See The Brimnes, Tenax Steamship Co. Ltd v. The Brimnes (Owners) (1973) 1 All E.R. 769, 784 (Q.B.D), aff'd, (1974) 3 All E.R 88 (A.C.); Momm v. Barclays Bank International Ltd., (1976) 3 All E.R. at 598.

    20.    Finally, the English decision of Royal Products Ltd. v Midland Bank Ltd., [1988] 2 Lloyd's Rep 197, summarizes the legal effect of an instruction given by the payor to his own bank to transfer funds from his account to the account of the payee, or to another of his

11

accounts, held at the same or a different bank: "In my judgment they are to be regarded simply as an authority and instruction, from a customer to its bank, to transfer an amount standing to the credit of that customer with that bank to the credit of its account with another bank. . . . It is, in other words, a banking operation, of a kind which is often carried out internally, that is to say, within the same bank or between two branches of the same bank and which, at least from the point of view of the customer, is **no different in nature or quality when . . . it is carried out between different banks**." Id. at 198 (emphasis added). Accordingly, under English law, as under the laws of the United States, the fact that DnB NOR was the bank of the payor and payee does not affect when the Seven Million NOK Transfer took place.

(iii)   Australian Law

21.    Although there is no Australian analogue to Article 4A of the UCC, finality of payment in cases involving fund transfers depends on the rules of the payment system (i.e., the rules that govern checks, BPay and Bulk Electronic Clearing System). See, e.g., Riedell v. Commercial Bank of Australia, Ltd. [1931] VLR 382. Further, under certain statutory laws, payment is final when the payor cannot retrieve the payment by unilateral action. See, e.g., Cheques Act 1986 (Cth) §§ 78, 82, 90 (payment by check can be countermanded up until the time that the check is paid)  Here, the Transfer Instructions remained revocable by LBCC until the time the transfer occurred. Transfer Instructions, Stipulation, Ex. C. Therefore, if it were governed by the Australian Cheques Act, the Seven Million NOK Transfer would not be considered final until after the Petition Time.

### III.  Certainty In Transactions Requires Accounting For Amounts Actually In Accounts As Of Petition Time

22.    As applied in the various bodies of law discussed above, "finality" of payment refers to the point of accountability, the irrevocability of liability, irreversibility of the

12

payment process, and the loss of the right to recover a mistaken payment. Especially in cases under chapter 11 of the Bankruptcy Code, there must be a point which determines when "finality" occurs and acts as a barrier to prevent funds moving in or out of a debtor's estate. The moment a petition is filed is the crucial moment for determining when the automatic stay is invoked, when administrative claims may arise, and many other situations that arise in bankruptcy. 11 U.S.C. §§ 362(a), 503(b)(1), 547-549. It is also the critical moment for determining what amounts are in a debtor's bank account for purposes of setoff under section 553 of the Bankruptcy Code.

23. For a debt to arise prepetition for setoff purposes, all transactions necessary for liability must have occurred before the filing. United States v. Gerth, 991 F.2d 1428, 1433 (8th Cir. 1993) ("For setoff purposes, a debt arises when all transactions necessary for liability occur, regardless of whether the claim was contingent, unliquidated, or unmatured when the petition was filed."). While "dependency on a postpetition event does not prevent a debt from arising prepetition," id., in this case the claim was not contingent on a postpetition event, it simply did not exist until the Disputed Amount was transferred.

24. Courts have held that "setoff applies only to funds deposited in a bank account prior to the . . . petition date." In re Kleather, 208 B.R. 406, 413 (Bankr. S.D. Ohio 1997) (quoting Figgers v. Dayton Power and Light Employees Federal Credit Union (In re Figgers), 121 B.R. 772, 777 (Bankr. S.D. Ohio 1990)) ("In Figgers, the court concluded that '[a]ny other funds in the account represented postpetition amounts, and thereby a postpetition obligation of [the creditor] . . . ").

25. The conclusion advanced by DnB NOR is rendered more untenable by considering the effects that would flow therefrom. For example, if Party A were to instruct her bank to make a revocable transfer to Party B in 365 days, but Party B files a chapter 11 petition

13

one day later, it would strain credibility to argue that such transfer instruction effected the transfer immediately notwithstanding the 364-day delay for the money to change hands. The fact that the Seven Million NOK Transfer Instruction directed that payment occur on the date that turned out to be just hours after LBHI's the bankruptcy filing should not affect the analysis. Until the payment was final and the Disputed Amount actually appeared in the '268 Account, it was not property of LBHI. Since that occurred after the Petition Time, such funds may not be used to set off prepetition indebtedness.

26. At the Hearing, DnB NOR referenced In re BOUSA Inc., No. 89-13380, 2006 WL 2864964 (Bankr. S.D.N.Y. Sept. 29, 2006). In BOUSA, this Court considered, among other things, whether the Department of Homeland Security, US Customs and Border Protection, the Environmental Protection Agency and the Internal Revenue Service (collectively, the "Government") had the right to setoff prepetition settlement payments due to the debtor against a debt owed to the government. The Court held that the Government had the right to offset as the debt arose prepetition and the Government had satisfied the requirement of mutuality. Finding that the Customs' debt to BOUSA was contingent at the commencement of the case and became fixed postpetition (but is characterized as a prepetition debt), the Court stated "for purposes of setoff, a debt arises when all transactions necessary for liability have occurred, regardless of whether the claim was contingent when the petition was filed". In re BOUSA Inc., 2006 WL 2864964, at * 4 (quoting Gerth, 991 F.2d at 1433).

27. BOUSA is inapposite because, in BOUSA, "the Government had performed all acts required for its liability to occur regardless of BOUSA's postpetition [Court of International Trade] litigation". Id. at * 4 (quoting Gerth, 991 F.2d at 1433 ("dependency on a postpetition event does not prevent a debt from arising postpetition . . . . A debt can be absolutely owing prepetition even though that debt would never have come into existence except

14

for postpetition events")). The Seven Million NOK Transfer, on the other hand, was contingent on DnB NOR transferring the funds at a predetermined time in the future. The Seven Million NOK Transfer did not create a contingent obligation. Instead, it was a revocable instruction to DnB NOR to act at a specified future date.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court (a) sustain the Objection, (b) deny relief requested in the DnB NOR Motion (except to the extent resolved in the Stipulation), and (c) grant the Committee such other relief as is just.

Dated: New York, New York
February 2, 2009

**MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP**

By: /s/ Dennis F. Dunne
Dennis F. Dunne
Dennis O'Donnell
Evan R. Fleck
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

15