WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Richard W. Slack

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                                                          :       Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*         :       Case No. 08-13555 (JMP)

                        Debtors.                                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

LEHMAN BROTHERS SPECIAL FINANCING INC.    :

                        Plaintiff,                                    :

            -against-                                                 :       Adversary Proceeding
                                                                                  No.: 09-_____ (JMP)
BALLYROCK ABS CDO 2007-1 LIMITED and WELLS
FARGO BANK, N.A., TRUSTEE
                                                                              :
                        Defendants.
                                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Special Financing Inc. ("LB Special Financing"), a debtor and

debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and

collectively with its non-debtor affiliates "Lehman"), by and through undersigned counsel,

hereby brings this Complaint for declaratory and injunctive relief against Ballyrock ABS CDO 2007 1 Limited ("Ballyrock") and Wells Fargo, N.A., acting in its capacity as trustee (the "Trustee," and together with Ballyrock, "Defendants") under the indenture pursuant to which Ballyrock raised capital through the issuance of notes.

## PRELIMINARY STATEMENT

1.  This adversary proceeding involves contracts and issues that are at the core of the current credit crisis. LB Special Financing and Ballyrock entered into a contract, known as a credit default swap, pursuant to which Ballyrock, a special purpose entity formed solely for this transaction, agreed to pay LB Special Financing if losses were incurred on certain underlying assets ("Credit Default Swap Agreement"). Most of these assets consisted of residential mortgage-backed securities – the now "toxic" assets subject to much press and legislation. In return, LB Special Financing agreed to pay a periodic premium to Ballyrock, similar to an insurance premium. LB Special Financing thus purchased contractual protection that could potentially pay it hundreds of millions of dollars if there were losses with respect to the specified residential mortgage-backed securities, while the investors in Ballyrock[1] stood to profit if there were few or no losses on such securities. Because of the steep decline in the housing market and the ensuing poor performance of residential mortgage-backed securities, LB Special Financing's investment is now worth more than $400 million, while investors in Ballyrock should be expected to receive little or none of their investment since the deal has turned out so badly for them.

2.  LB Special Financing brings this adversary proceeding to protect its contractual right to more than $400 million from Ballyrock, and to enjoin the Trustee from

---

[1] The term "investors" as used throughout this complaint means the holders of rated bonds and certain equity-like securities that were issued by Ballyrock in the form of notes and subordinated notes.

improperly distributing to Ballyrock's investors the remaining assets – over $137 million – that are rightfully the property of LB Special Financing. The Credit Default Swap Agreement at issue is "in the money" to LB Special Financing by more than $400 million.[2] Nevertheless, the Trustee seeks to distribute all the remaining assets of Ballyrock to Ballyrock's investors instead of paying any of them to LB Special Financing. This proposal is based on a purported technical default by LB Special Financing under the Credit Default Swap Agreement that had no economic impact on Ballyrock or its investors. Applicable New York and bankruptcy law prevents this result, which will provide a significant windfall to investors of Ballyrock, including third-party foreign investors, at the expense of LB Special Financing and its creditors.

3. Solely as a result of the bankruptcy of LBHI (the parent of LB Special Financing), Ballyrock purported to terminate the Credit Default Swap Agreement with LB Special Financing on September 16, 2008. As a result of the purported termination of the Credit Default Swap Agreement, the Trustee intends to pay the remaining $137 million to the Ballyrock investors on February 6, 2009. According to the Trustee, after such payment no money will remain to pay LB Special Financing, even though the economics of the transaction are heavily in LB Special Financing's favor. The investors in Ballyrock – who made a poor investment decision – will receive a windfall at the expense of LB Special Financing and its creditors. LB Special Financing thus raises two separate grounds for the relief it seeks. First, even if the termination of the Credit Default Swap Agreement was proper (which as explained below, it was not), the money should be distributed to LB Special Financing instead of providing a windfall to the Ballyrock investors. Second, because the termination of the credit default swap was

---

[2] That is, LB Special Financing was entitled to much larger payments from Ballyrock than premiums due from LB Special Financing to Ballyrock because defaults in the specified mortgage-backed securities had created substantial entitlement to payments to LB Special Financing under formulas in the Credit Default Swap Agreement.

improper, none of the money should be distributed to anyone at this time. LB Special Financing therefore requests declaratory and injunctive relief to prevent the irreparable harm that will be suffered by LB Special Financing if the money is distributed to the Ballyrock investors on February 6, 2009.

## PARTIES

4.   Plaintiff LB Special Financing is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, NY 10020.

5.   Upon information and belief, defendant Ballyrock ABS CDO 2007-1 Limited is a company registered in the Cayman Islands with its principal place of business in the Cayman Islands and may be served with process by serving CT Corporation, 111 Eighth Avenue, New York, NY 10011.

6.   Upon information and belief, defendant Wells Fargo Bank, N.A. is a national banking association with its principal business address at 420 Montgomery Street, San Francisco, California, 94104.

## JURISDICTION AND VENUE

7.   The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b).

8.   Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

9.   The statutory predicates for the relief requested herein are sections 105(a), 362, 541 and 560 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), Rule 65 of the Federal Rules of Civil Procedure, and Rules 7065 and 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

10. In the Indenture, Ballyrock "irrevocably and unconditionally submit[ted]" to the jurisdiction of the United States District Court for the Southern District of New York "in any action or proceeding arising out of or relating to" the Indenture. (Indenture ¶ 14.10.)

## BACKGROUND

11. The Debtors together with their non-debtor affiliates (collectively, "Lehman") were formerly the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America and the Asia Pacific region.

12. Commencing on September 15, 2008, LBHI and certain of its direct and indirect subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. LB Special Financing commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's and LB Special Financing's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

13. LB Special Financing and LBHI are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**A. The Debtor's Interest in the Credit Default Swap is a Substantial Asset of its Estate**

14. On July 12, 2007, LB Special Financing and Ballyrock entered into the Credit Default Swap Agreement. In that agreement, Ballyrock sold credit protection (similar, in concept, to insurance) to LB Special Financing to cover exposure to LB Special Financing

associated with, among other things, defaults and other credit impairments with respect to certain specified residential and commercial mortgage-backed securities. LB Special Financing is obligated to make periodic payments to Ballyrock, called "premiums." In exchange, Ballyrock is obligated to pay LB Special Financing if there is a default in these underlying residential and commercial mortgage-backed securities or if certain credit impairments occur, including failure to pay interest, writedowns of principal, or severe downgrades by rating agencies. LBHI acts as a so-called "credit support provider" (similar to a guarantor) for payments of premiums by LB Special Financing under the Credit Default Swap Agreement. LBHI would owe the premiums only if LB Special Financing did not make its required payments under the Credit Default Swap Agreement.

15. The Credit Default Swap Agreement is part of a complex transaction (the "Transaction") that is structured such that premiums are paid to the Trustee and the Trustee pays the investors. The terms of the obligations between Ballyrock and LB Special Financing are contained in the Credit Default Swap Agreement. The payments to the investors are governed by an indenture (the "Indenture"). The parties do not pay their obligations directly to each other. Rather, the ultimate payments to LB Special Financing on the one hand and the investors in Ballyrock on the other hand flow through the Indenture. LB Special Financing is an express third-party beneficiary to the Indenture. The Trustee holds, *inter alia*, collateral purchased using the proceeds of the money invested into Ballyrock as well as the premium payments made by LB Special Financing under the Credit Default Swap Agreement. This collateral includes asset-backed securities and money-market securities. Ballyrock Investment Advisors LLC was designated to, among other things, manage the collateral (the "Collateral Manager").

16. Upon the proper termination of the Credit Default Swap Agreement, certain payments would be owed by the party "out of the money" to the party "in the money,"

and such amounts, if payable by Ballyrock, would be disbursed by the Trustee from collateral in its possession in accordance with the Indenture. The parties to the Credit Default Swap Agreement specified therein that any termination payments owed under the contract would be governed by the "Second Method." The "Second Method" is a term of art in the derivatives industry. Parties to a 1992 form International Swaps and Derivatives Association, Inc. Master Agreement, under which the Credit Default Swap Agreement was documented, must elect to use either the "First Method" or the "Second Method." The First Method provides that no early termination payments in favor of defaulting counterparties are required to be made. Conversely, the Second Method provides for the calculation and payment of early termination payments regardless of the defaulted status of either party. (*See* Credit Default Swap Agreement Sch. Pts. 1(e)(ii) & 6(e)(i).) Thus, by selecting the Second Method, the parties to the Credit Default Swap Agreement agreed, in structuring the transaction, that termination payments should be made to an "in the money" party such as LB Special Financing even if that party is the defaulting party under the Credit Default Swap Agreement.

**B.     The Trustee Is Disbursing LB Special Financing's Assets**

17.     On September 15, 2008, LBHI commenced its chapter 11 case under the Bankruptcy Code.

18.     The next day, on September 16, 2008, Ballyrock sent a letter to LB Special Financing and LBHI that purported to (i) notify LBHI and LB Special Financing of an event of default under the Credit Default Swap Agreement, and (ii) designate September 16, 2008 as an "early termination date" thereunder (the "September 16 Letter"). Two days later, a notice was sent to Ballyrock's investors stating that LBHI's commencement of its chapter 11 case constituted an event of default under the Credit Default Swap Agreement and relaying that on September 16, 2008, Ballyrock had delivered notice to LB Special Financing and LBHI that

the Credit Default Swap Agreement was terminated along with any related transactions (the "September 18 Letter").

19. In a letter dated October 21, 2008 (the "October 21 Letter"), Ballyrock's investors were informed that substantially all of the collateral had been sold or otherwise disposed of, the proceeds from the sale of the collateral had been collected (the "Collateral Proceeds"), and the Credit Default Swap Agreement had been terminated. The October 21 Letter further stated in conclusory fashion that while the Collateral Manager explored available options for entering into a new credit default swap agreement in replacement of the Credit Default Swap Agreement with LB Special Financing that it purported to have terminated, it would not be possible to enter into such a credit default swap agreement "*on terms that would be economically beneficial or practical to* [*Ballyrock*]." (*See* October 21 Letter.) (emphasis added).

20. On November 6, 2008, the Trustee sent a report (the "Trustee Report") documenting the distribution of the proceeds ("Collateral Proceeds") of the liquidation of Ballyrock's last substantial asset. The Collateral Proceeds totaled $326,766,343.10. The majority of the Collateral Proceeds was distributed to the investors of Ballyrock, and the remainder, over $137 million, was deposited into a low-risk, interest-bearing account (the "Reserve Account"). Even though the Trustee Report indicated that Ballyrock owed LB Special Financing over $404 million, it also stated that no amounts would be paid by Ballyrock to LB Special Financing.

21. By letters dated November 18, 2008 and November 21, 2008 (the "November 18 & 21 Letters"), attorneys for LB Special Financing and LBHI informed the Trustee and Ballyrock, respectively, that the purported termination of the Credit Default Swap Agreement was not made in accordance with the terms of the Indenture and, accordingly, was invalid.

22. On December 4, 2008, counsel for Ballyrock replied to the November 18 &21 Letters asserting that the termination of the Credit Default Swap Agreement was in accordance with its express terms (the "December 4 Letter").

23. On January 20, 2009, attorneys for LBHI and LB Special Financing replied to the December 4 Letter indicating that in addition to those reasons outlined in earlier letters, the purported termination violated the automatic stay provisions of the Bankruptcy Code (the "January 20 Letter").

24. On January 28, 2009, attorneys for LBHI and LB Special Financing sent a letter to counsel for the Trustee requesting the Trustee to postpone the proposed distribution scheduled for February 6, 2009 or interplead the remaining Collateral Proceeds with the Court (the "January 28 Letter").

25. If the proposed distribution were to proceed, the result would be that the vast majority of Ballyrock's investors would receive *all* of the principal and interest due under the notes they purchased from Ballyrock (even though they made a poor investment decision), while LB Special Financing (which made a highly successful investment decision) would receive *nothing* in respect of the credit protection it purchased and for which it paid millions of dollars. This is notwithstanding the fact that, in connection with the purported termination, the Trustee Report indicates a payment is owing to LB Special Financing by Ballyrock in the amount of $404,682,284.07. In other words, LB Special Financing is being penalized solely because of LBHI's bankruptcy filing – which had no economic impact on Ballyrock or its investors.

## COUNT I
*(Declaratory Judgment – The Proposed Distribution Is Improper)*

26. LB Special Financing repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

27. The proposed distribution is improper because it violates the automatic stay. Any action to exercise control over assets of LB Special Financing's estate is subject to the automatic stay upon the commencement of a case under the Bankruptcy Code. The hundreds of millions of dollars at issue represents a substantial asset of LB Special Financing's estate, and any action by a party to exercise control over such asset is subject to the automatic stay. *See* 11 U.S.C. § 362(a).

28. While there are certain exceptions to the automatic stay that pertain to termination, liquidation, and distribution of collateral subject to a swap agreement, those exceptions are inapplicable here. Furthermore, any such termination, liquidation, and distribution must be in the nature of "offset" or "net out." The proposed distribution is not in the nature of "offset" or "net out," and the provisions in the Indenture describing the proposed distribution are not safe-harbored.

29. Even if there were such an exception to the automatic stay (and there is not), the proposed distribution is improper for other reasons. LB Special Financing's position under the Credit Default Swap Agreement is significantly "in the money," by more than $404 million dollars, yet the proposed distribution would wipe out this large gain. The purported rationale is that there has been a breach of the Credit Default Swap Agreement simply because LBHI – the credit support provider for LB Special Financing under the Credit Default Swap Agreement – filed for bankruptcy.[3]

---

[3] Significantly, no notice of termination based on the chapter 11 filing of LB Special Financing has been provided, but even if termination were based on LB Special Financing's bankruptcy, instead of LBHI's bankruptcy filing, the same analysis would apply. At the time of LB Special Financing's filing, either it would have owed no net future payments under the Credit Default Swap Agreement because the underlying residential mortgage-backed securities had deteriorated so drastically, or any amount LB Special Financing potentially could have owed would have equaled an amount far less than the amount of the proposed penalty being imposed on it. In either event, the Credit Default Swap Agreement would have been "in the money" to LB Special Financing.

30. There is no relationship, however, between any damage that could be caused by the purported breach and the penalty – wiping out LB Special Financing's gains under the Credit Default Swap Agreement. When a swap agreement is heavily "in the money," as is LB Special Financing's position, there is no need for credit support for the "in the money" party. Credit support is necessary only if the "in the money" party has a net obligation to its counterparty.

31. A contractual provision that eliminates the "in the money" party's gains under the swap agreement simply because the credit support provider files for bankruptcy does not attempt to approximate actual damages, and instead creates a substantial windfall to the investors who made poor investment decisions at the expense of others, and is therefore unenforceable.

32. Further, such a provision is unenforceable because it seeks to take property of the debtor because of a bankruptcy filing. Property of a debtor becomes property of the estate, "notwithstanding any provision in [an] agreement . . . (B) that is conditioned . . . on the commencement of a case under this title . . . and that effects . . . a forfeiture, modification, or termination of the debtor's interest in property." LB Special Financing's interests are being forfeited because of "the commencement of a case under this title."

33. Moreover, the calculation of the over $404 million payment owed to LB Special Financing already has factored in (1) all moneys owed to Ballyrock before the Credit Default Swap Agreement was terminated, and (2) the present value of all future payments from LB Special Financing under the Credit Default Swap Agreement.

34. The proposed distribution grants a windfall to the investors in Ballyrock at the expense of LB Special Financing and does not attempt to approximate the damages to Ballyrock investors caused by the bankruptcy of LBHI.

35. Further, the proposed distribution violates the terms of the Credit Default Swap Agreement and the intent of the parties which is evidenced by the fact that the parties explicitly rejected the First Method and elected to use the Second Method which contemplates payments upon termination to a defaulting party that is "in the money." (*See* Credit Default Swap Agreement Sch. Pt. 1(e)(ii).)

36. In distributing money to Ballyrock's investors and not distributing any money to LB Special Financing, the First Method – which was explicitly rejected by the parties and is penalizing LB Financing for the technical default due to the bankruptcy of its affiliate – is being employed. Consequently, the proposed distribution results in the evisceration of the express terms for which LB Special Financing contracted in the Credit Default Swap Agreement when it selected the Second Method.

37. For all of the above-stated reasons, the proposed distribution is improper as a matter of law.

38. There is an actual controversy between the parties on this issue because the Trustee intends to distribute money through the proposed distribution without paying LB Special Financing in violation of applicable New York and bankruptcy law, as well as the parties' express election of the Second Method.

39. Accordingly, LB Special Financing is entitled to a declaratory judgment that the proposed distribution is improper.

### COUNT II
*(Declaratory Judgment --*
*The Termination of the Credit Default Swap Agreement Was Improper)*

40. LB Special Financing repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

41. LB Special Financing entered into the Credit Default Swap Agreement with Ballyrock. LB Special Financing is also a third party beneficiary under the Indenture.

42. The Indenture includes provisions that expressly require a substitute party be found for LB Special Financing or the entry into a replacement credit default swap agreement in order to maintain continuity of the transaction before terminating the Credit Default Swap Agreement. Specifically, Section 7.8(a)(xi) of the Indenture provides that: "The Issuer will not . . . terminate the Credit Default Swap Agreement unless (A) no Transactions remain outstanding under (and as defined in) the Credit Default Swap Agreement or (B) the Issuer has entered into a replacement therefor . . . ."

43. Section 7.8(a)(xi) of the Indenture expressly prohibits Ballyrock from terminating the Credit Default Swap Agreement if (i) there are defined transactions that remain outstanding under the Credit Default Swap Agreement, or (ii) Ballyrock has not entered into a replacement agreement.

44. At the time of the purported termination of the Credit Default Swap Agreement, there were transactions that remained outstanding, and no replacement agreement has been executed. (*Compare* September 16 Letter at 1 (indicating September 16, 2008 as the early termination date) and September 18 Letter 1 (same), *with* October 21 Letter at 1 (indicating that substantially all of Ballyrock's assets have been sold as of October 21, 2008.)

45. Likewise, Section 7.5(f) of the Indenture expressly provides that upon termination of the Credit Default Swap Agreement, Ballyrock must enter into a replacement Credit Default Swap Agreement. In particular, upon the purported termination of the Credit Default Swap Agreement, Ballyrock was obligated to use reasonable efforts to enter into a replacement Credit Default Swap Agreement. Ballyrock notified other investors that "[a]fter exploring available options, [Ballyrock] determined that it would not be possible to enter into a

new Credit Default Swap Agreement on terms that would be economically beneficial or practical to the CDO [*i.e.*, Ballyrock]." (*See* October 21 Letter at 1.)

46. LB Special Financing was heavily "in the money" and Ballyrock was heavily "out of the money," and therefore, Ballyrock determined that continuing the Credit Default Swap Agreement by substituting another party in LB Special Financing's place would not be beneficial to Ballyrock. This, however, does not comply with the requirements of Section 7.5(f) of the Indenture.

47. In direct contravention of the express terms of the Indenture, Ballyrock did not use any efforts (and certainly not "reasonable" efforts) to substitute LB Special Financing; rather, Ballyrock merely determined that any such substitution would not be as profitable as termination of the Credit Default Swap Agreement. Had there been a reasonable attempt, qualified and interested third parties would have been willing to act as assignees for LB Special Financing before termination or would have been willing to enter into new swap agreements pursuant to the requirements of the Indenture.

48. Because Ballyrock failed to abide by the express terms of the Indenture, the termination of the Credit Default Swap Agreement was invalid.

49. There is an actual controversy between the parties on this issue because the Trustee intends to distribute money through the proposed distribution as a result of the assertion that the Credit Default Swap Agreement was terminated.

50. Accordingly, LB Special Financing is entitled to a declaratory judgment that the termination of the Credit Default Swap Agreement was invalid.

## COUNT III
### *(Request for Temporary Restraining Order and Preliminary and Permanent Injunction Pursuant to Bankruptcy Rules 7001(7) and 7065 and Bankruptcy Code § 105(a))*

51. LB Special Financing repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

52. For the reasons set forth herein, LB Special Financing seeks immediate and permanent injunctive relief enjoining the Trustee and Ballyrock from taking any action in furtherance of the wrongful termination of the Credit Default Swap Agreement or to disburse any further funds to any party other than LB Special Financing.

53. If the wrongful termination of the Credit Default Swap Agreement is effectuated and funds are disbursed to parties other than LB Special Financing, LB Special Financing will suffer immediate and irreparable injury. LB Special Financing will be prevented from realizing value from the Credit Default Swap Agreement for the benefit of its estate.

54. As a result, LB Special Financing is entitled to an injunction enjoining the Trustee and Ballyrock from taking any action in furtherance of the wrongful termination of the Credit Default Swap Agreement or to disburse any further funds to any party other than LB Special Financing.

**PRAYER FOR RELIEF**

WHEREFORE, LB Special Financing respectfully requests that the Court grant the following relief[4]:

    A.    Entry of a declaratory judgment that:

---

[4] This complaint seeks prospective relief to halt the imminent distribution of money to Ballyrock's investors. LB Special Financing reserves the right to amend the complaint to add additional parties and state causes of action for damages for the prior distributions of money to those investors.

        1.      the proposed distribution on February 6, 2009 to the Ballyrock investors is improper; and

        2.      the termination of the Credit Default Swap Agreement violated the terms of the Indenture and the Credit Default Swap Agreement remains in full effect.

B.      A temporary restraining order and preliminary and permanent injunctive relief, enjoining the Trustee and Ballyrock from taking any action in furtherance of the wrongful attempt to terminate the Credit Default Swap Agreement or to distribute any Collateral Proceeds to the Ballyrock investors.

C.      And for such other relief as the Court deems just and proper.

        Respectfully submitted,

        */s/ Ralph I. Miller*
        Ralph I. Miller
        Richard W. Slack
        WEIL, GOTSHAL & MANGES LLP
        767 Fifth Avenue
        New York, New York 10153
        Telephone: (212) 310-8000
        Facsimile: (212) 310-8007

        Attorneys for Debtors
        and Debtors in Possession

Dated: New York, New York
       February 3, 2009