**Expedited Hearing Requested**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------x
                                        :
In re                                   :   Chapter 11 Case No.
                                        :
LEHMAN BROTHERS HOLDINGS INC., et al.,  :   08-13555 (JMP)
                                        :
                        Debtors.        :   (Jointly Administered)
                                        :
                                        :
------------------------------------------------------------------x
```

## LBHI'S MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE, FOR AUTHORIZATION TO FUND A CAPITAL CONTRIBUTION TO WOODLANDS COMMERCIAL BANK

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion and respectfully represent:

### Preliminary Statement

1.      It is imperative that LBHI be authorized to fund a capital injection into Woodlands Commercial Bank, formerly known as Lehman Brothers Commercial

Bank ("Woodlands" or the "Bank") – its indirect wholly owned non-debtor subsidiary[1] –
to preserve the opportunity to realize the fair value of the Bank's assets and maximize
recoveries to LBHI's creditors.  As of September 30, 2008, the Bank's financial
statements reflected the value of LBHI's equity interest in the Bank at $1 billion.  Since
September 30, 2008, there has been no significant change in the composition of the
Bank's assets or its liabilities.  Indeed, the Bank's current assets include almost $2 billion
in cash or readily liquidable securities.  However, due primarily to certain actions by
Lehman Brothers Inc. ("LBI") surrounding the Bank's purchase of certain municipal
securities on September 12, 2008 through LBI and LBI's failure to deliver the securities,
the Bank's December 31, 2008 financial report reflects a material decrease in the Bank's
capital level to the point that the Bank's regulators now contend the Bank is insufficiently
capitalized as calculated under applicable banking regulations.  Given the Bank's
regulatory position, the Bank found it necessary to enter into a cease and desist order with
its regulators that requires the Bank to raise its capital by no later than February 20, 2009
to satisfy all capital adequacy levels required by the applicable regulations.  Unless the
Bank complies with the cease and desist order, the Bank faces an imminent risk of the
most serious of regulatory actions – the appointment of a receiver.  If a receiver is
appointed, the Bank's assets likely will be seized and subjected to a fire sale liquidation,
and any opportunity to realize the value that could be derived for the benefit of LBHI and
its creditors will be permanently lost.

---

[1] Woodlands is wholly owned by Lehman Brothers Bancorp Inc., which is a wholly owned
subsidiary of LBHI.

## Background

2.        Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.        On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

4.        On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc., a wholly owned subsidiary of LBHI and a registered broker dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") and is administering LBI's estate.

## Jurisdiction

5.        This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Lehman's Business**

6.      Prior to the events leading up to these chapter 11 cases, Lehman
was the fourth largest investment bank in the United States.  For more than 150 years,
Lehman has been a leader in the global financial markets by serving the financial needs
of corporations, governmental units, institutional clients and individuals worldwide.

7.      Additional information regarding the Debtors' businesses, capital
structures, and the circumstances leading to the commencement of these chapter 11 cases
is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local
Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions
and Applications, filed on September 15, 2008 [Docket No. 2].

**Relief Requested**

8.      By this Motion, LBHI seeks authorization, but not direction,
pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rule
6004 to fund capital infusions into the Bank of up to $272 million in cash (the "Capital
Contributions"), of which the initial infusion of up to approximately $200 million would
be made by February 20, 2009.[2]  The initial capital infusion is expected to be made, and
additional capital infusions may be made, in exchange for a first right of recovery on the
Bank's claim against LBI and/or others related to certain municipal securities.
Furthermore, given the exigency of the circumstances and to avoid irreparable harm to its
estate, LBHI requests that the Court waive the requirements of Bankruptcy Rule 6004(g)

---

[2] The initial Capital Contribution will be in the amount necessary to bring the Bank's capital up to
the adequacy level under the regulations and LBHI may, if necessary, make subsequent Capital
Contributions totaling up to $72 million (or the balance of $272 million less the initial
contribution) to ensure that the Bank maintains an adequate capital level.

and direct that the order granting the relief requested herein be effective immediately.  As set forth more fully below, LBHI's decision to fund the Capital Contribution represents a reasonable exercise of its business judgment and should be approved.

### Woodlands Commercial Bank

The Bank's Business

9.    Woodlands is a Utah chartered industrial bank with operations in Salt Lake City, Utah.  Woodlands has been engaged in the business of issuing commercial and real estate loans to major corporations, short-term secured warehouse loans to borrowers, and interest rate products, such as swap or derivative contracts.  The Bank does not conduct retail deposit operations and has no consumer deposit or loan customers.  The Bank has been funded primarily by brokered certificates of deposit, which mature over time on a scheduled basis (the "Deposit Obligations").  Although the Bank's business has benefited from Lehman's extensive business associations and pre-chapter 11 reputation as a leader in the financial industry, Woodlands is an independent subsidiary controlled by an external board of directors.  Two of the Bank's board members are employees of LBHI.

10.    The Bank is subject to the regulatory authority of the Federal Deposit Insurance Corporation (the "FDIC") and the Department of Financial Institutions of the State of Utah (the "Department," and together with the FDIC, the "Regulators").  The FDIC and Department regulations impose strict restrictions on the Bank's operations, including its capital levels.  Most importantly for present purposes, the Bank is required to maintain sufficient levels of capital in order to continue normal operations.  If the Bank is not "adequately capitalized," the FDIC and the Department may take regulatory actions

to restrict Woodlands' activities, including if the Bank is "undercapitalized" or "critically undercapitalized," as defined by the applicable regulations, to appoint the FDIC as a receiver to seize and liquidate the Bank's assets.[3]  To enable the Regulators to monitor the Bank's capital, the Bank is required, among other things, to file quarterly financial reports of its operation and condition (the "Call Reports"), reflecting financial information determined in accordance with generally accepted accounting principles.  As required, the Bank filed its December 31, 2008 Call Report on January 30, 2009.

The Bank's Value

        11.     The Bank is an extremely valuable asset of LBHI's estate.  Just four months ago, the reported value of LBHI's equity interest in the Bank was $1 billion with total assets of approximately $6.4 billion and total liabilities of approximately $5.4 billion.  *See* September 30, 2008 Call Report, Schedule RC.  On that same date, the Bank was considered more than sufficiently capitalized with a total risk based capital ratio of 10.81% -- well within compliance of the FDIC and Department's regulations.

        12.     The Bank's primary asset is its loan portfolio.  On its December 31, 2008 Call Report, the Bank's loan receivables totaled approximately $2.48 billion,

---

[3] Under 12 U.S.C. § 1831o, banks that become less than "adequately capitalized" are subject to increasingly severe federal regulatory actions, including, if the bank becomes "undercapitalized" (i.e., has a capital level below the adequacy level) the appointment of a receiver, and if "critically undercapitalized," the required appointment of a receiver within 90 days.   12 U.S.C. § 1831o(h)(3).  In addition, under Section 7-2-1(1)(f) of the Utah Code, the Department may take possession of a Utah chartered bank and appoint a receiver if "the commissioner, with or without an administrative hearing, finds that: . . . (f) the institution or other person has failed to maintain a minimum amount of capital as required by the department, any state, or the relevant federal regulatory agency."  The FDIC is appointed receiver of such state-chartered bank pursuant to 12 U.S.C. § 1821(c)(3).  The FDIC separately may appoint itself receiver of a state-chartered bank under 12 U.S.C. § 1821(c)(4), based on, among other things, that the institution has become "undercapitalized" as defined in 1831o.  12 U.S.C. § 1821(c)(5)(K)(L).

consisting of approximately $2 billion in commercial and industrial loans, $366 million

in real estate loans, and $55 million in other loans.  In its September 30, 2008 Call

Report, the Bank's loan receivables totaled approximately $3.0 billion and in its June 30,

2008 Call Report they totaled approximately $3.5 billion.  Despite this change in

valuation, the composition and condition of the loan portfolio has not changed materially

during this period (other than routine portfolio adjustments during the June to September

period).  At December 31, 2008, only three loans, representing just 3.5% of the loans

outstanding, have non-accrual status.  The vast majority of the Bank's other loans are

performing as agreed.

       13.     At December 31, 2008, the Bank's other material assets included

derivatives positions with a positive value of approximately $482 million.  In addition, on

December 31, 2008, the Bank had approximately $2.4 billion in cash and readily

liquidable securities.  See December 31, 2008 Call Report, Schedule RC – Balance Sheet.

       14.     The primary liabilities of the Bank consist of fixed interest

payments on Deposit Obligations and unfunded loan commitments.  The Bank has the

capacity to satisfy the contractual and expected maturities on its Deposit Obligations for

at least the next 12 months from its currently available readily liquid assets.  The Bank

has established reserves for its unfunded loan commitments, which it considers adequate

given the low likelihood that such commitments will be drawn upon and its liability

exposure on the commitments.  As discussed below, the Bank has underway a program

for the termination of such commitments, which has been largely successful.  More

generally, the Bank's management believes that the Bank has sufficient resources to fund

all of its current payables.

15.     In its December 31, 2008 Call Report, the value of LBHI's equity in the Bank is reported at approximately $432 million, reflecting total liabilities of approximately $5 billion and total assets of approximately $5.4 billion.  At this level, the Bank is considered undercapitalized under the applicable regulations.  Management of the Bank and LBHI believe that the reported value of the LBHI's equity in the Bank does not reflect the value that can be achieved by LBHI from the Bank and that the diminution since September 30, 2008 in the reported value of the Bank's assets is a function primarily due to the Bank's purchase of certain municipal securities through LBI and of accounting convention.

Delivery to the Bank of the Municipal Securities

16.     In November 2008, the Bank was informed that municipal securities that it had lawfully purchased through its affiliated broker dealer, LBI, on September 12, 2008 for approximately $534 million and that LBI had agreed to segregate had been seized by LBI's clearing bank, JP Morgan Chase ("Chase"), in a purported exercise of Chase's pledge rights.  The Bank has received information, contrary to what the Bank had been told by LBI was to happen at the time the Bank purchased the securities, indicating that the securities had been incorrectly deposited in an account that was allegedly the subject of a pledge agreement between LBI and Chase and that Chase subsequently took possession of virtually all of the securities and sold virtually all of them to third parties.  All of this was done without the Bank's knowledge or consent and is contrary to information previously provided to the Bank (including information reported as of September 30, 2008 on account statements from LBI) to the effect that the securities were being held for the Bank's account in safekeeping by LBI.

17.     The Bank continues to investigate the facts and has demanded a return of the securities or their value from LBI and/or, if appropriate, Chase (the "Municipal Bond Claim").  The Bank has submitted a customer claim to LBI, supported by voluminous materials, which LBI currently has under consideration.  As a result of these circumstances, although the Bank believes it has meritorious claims against LBI and/or Chase for the value of the municipal securities, the Bank determined to reserve 100% of the value of the securities on the December 31, 2008 Call Report because at this time the Bank's ultimate recovery on these securities cannot be assured or estimated. The $534 million reserve for the most part corresponds to the diminution of the Bank's capital position and the reduction of LBHI's equity interest reported since September 30, 2008.

The Effect of Applying Fair Value Accounting

18.     In addition to the circumstances surrounding the Municipal Bond Claim, the Bank's capital position in its December 31, 2008 Call Report differs materially from September 30, 2008 because the Bank's financial statements must apply fair value accounting principles.  Specifically, in 2007, in order to be consistent with the accounting practices of LBHI and its subsidiaries, the Bank adopted the Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 159, Fair Value Option for Financial Assets and Financial Liabilities ("FAS 159").  FAS 159 requires entities that adopt such treatment to measure certain financial instruments and other items at fair value for financial reporting purposes.  For this purpose, "fair value" is the price that would be received to sell assets or paid to transfer a liability in an orderly transaction between market participants at the measurement date and the preferred

method of determining "fair value" is based on comparable market transactions.  Unlike
LBHI's other subsidiaries, however, which held in large part traded securities, most of
the Bank's assets consist of commercial loans that generally are not traded, and thus their
fair value often is difficult to determine.  Under the recent extraordinary credit market
conditions, the Bank's management and LBHI believe that application of the fair value
accounting conventions result in a distortedly negative portrayal of the Bank's financial
position in the Bank's September 30, 2008 and December 31, 2008 Call Reports, as
described below.

19.     To alleviate the diminution of the Bank's capital position reflected
in its Call Reports, the Bank has pursued, but has been unsuccessful in persuading the
Regulators to allow, the application of a methodology other than fair value to its financial
statements.  The Bank also requested funding from the U.S. Department of Treasury
under the Troubled Asset Relief Program to shore up its capital position.  The Bank has
not received an official response from the Treasury Department under that program, but
does not expect to receive funding as the FDIC has formally informed the Bank that it
does not support the Bank's request.  Consequently, in the absence of alternatives
available to the Bank, LBHI seeks authority to invest the Capital Contribution to preserve
the opportunity to realize the value of its equity interest that LBHI believes it otherwise
would be able to achieve.

The Current Crisis

20.     The Bank's December 31, 2008 Call Report shows the Bank's
risk-based capital is approximately $405 million, which produced a total risk-based
capital ratio, as determined under the applicable regulations, at a 5.4% level, leaving the

Bank below the 8% ratio considered adequate under the regulations.  In connection with

the decline in the Bank's capital level, the FDIC on January 30, 2009 presented the Bank

with a cease and desist order requiring, among other things, that the Bank obtain

sufficient capital to achieve an "adequately capitalized" level under the applicable

regulations not later than February 20, 2009 so that it would satisfy the capital adequacy

requirement and to adopt a capital plan to thereafter maintain such capital level.  The

FDIC asked the Bank to stipulate to the entry of the proposed order to avoid the need for

further proceedings.  Based on discussions with the FDIC, the Bank and LBHI concluded

that a failure of the Bank to agree to entry of the proposed order would shortly lead to the

FDIC's seizure of the Bank.  To preserve LBHI's valuable interest in the Bank, LBHI

advised the Bank that, subject to obtaining necessary Bankruptcy Court approval, LBHI

intended to inject sufficient capital into the Bank to permit the Bank to meet the

requirements of the proposed order.  Based on LBHI's stated intentions, the Bank agreed

to issuance of the proposed order, which was issued on February 4, 2009.

    21.  As issued, the cease and desist order (the "C&D Order") requires,

among other things, (i) that the Bank obtain and maintain sufficient capital to become

"adequately capitalized" under applicable regulations, (ii) that the Bank submit a capital

plan to the Regulators by no later than February 19, 2009 demonstrating how the Bank

will maintain compliance with regulations and (iii) that LBHI provide assurances

acceptable to the FDIC of the Bank's performance of such plan.  Unless the Bank

complies with the C&D Order, the Bank's management and LBHI believe the Regulators

will take enforcement action against the Bank, which action will likely result in the

appointment of a receiver to conduct a prompt liquidation of the Bank's assets.  In the

current marketplace, the resulting "fire sale" of the Bank's assets will yield little, if any,

of the value of such assets that LBHI believes could otherwise be recovered.

22.     To comply with the C&D Order, the Bank's management and

LBHI, in consultation with the Creditors' Committee, are working on the development of

a capital plan (the "Plan") that would show how the Bank will be able to maintain its

capital at the "adequately capitalized" level.  Central to this plan is an initial capital

infusion by LBHI of up to approximately $200 million into the Bank so that the Bank

presently reaches the adequacy level and LBHI's agreement to make one or more

subsequent capital infusions, if necessary, of up to a total of $72 million to assure that the

Bank's capital level will be maintained at the adequacy level required by the applicable

regulations.[4]

23.     Material elements of the Plan currently contemplated by the Bank

and LBHI include the following:

- The possible mutually agreed termination of existing participations by the
  Bank in unfunded loan commitments of other subsidiaries of LBHI as to
  which such other subsidiaries, as the "lender of record," have the funding
  obligation to the borrower.  Termination of these commitments may be
  feasible in a short period of time and could materially increase the Bank's
  capital level from the levels reported as of December 31, 2008.

- Continued and accelerated efforts by the Bank with the assistance of LBHI
  to achieve the termination of the Bank's other unfunded loan commitments,
  which would also increase the Bank's capital level from the December 31,
  2008 level.

---

[4] To be clear, the Capital Contribution will be made on a non-refundable basis, but would be
made in exchange for LBHI's right to receive a first right of recovery of any amounts recovered
on account of the Municipal Bond Claim from any party up to the amount of the initial Capital
Contribution made by LBHI and, potentially, any additional Capital Contributions, provided,
however, that any such recovery does not result in noncompliance with the terms of the C&D
Order.  These arrangements will be implemented pursuant to a participation and subordination
agreement between the Bank and LBHI.

- The Bank, with LBHI's assistance, will continue to pursue a recovery on the Municipal Bond Claim. If the Bank's customer claim is not promptly accepted by LBI, the Bank and LBHI will seek an expedited judicial resolution of the claim and intend to seek the FDIC's support in that regard.

In connection with the Plan, LBHI also intends to seek approval from the Regulators for the expansion of the Bank's board in a manner that will include significant representation of LBHI. LBHI expects that the initial Capital Contribution would be made pursuant to an acceptable capital plan having been developed so that LBHI has assurance that the Bank will, with the specified support of LBHI, be able to maintain its capital at the adequacy level provided by the applicable regulations. In considering the making of the Capital Contributions, LBHI has also considered and will continue to consider the current capital condition of Lehman Brothers Bank, FSB ("LBB") and possible undertakings LBHI may have or pursue regarding maintenance of LBB's capital level.[5]

### Sound Business Reasons Support
### LBHI's Decision to Fund the Capital Contribution

24.      Pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, LBHI requests authorization to invest the Capital Contribution to preserve the value of the Bank for the benefit of its creditors. LBHI believes, based on the governing jurisprudence, that it can make the Capital Contribution in the ordinary course of

---

[5] On February 5, 2009, LBB filed its thrift financial report ("TFR") for the quarter ended December 31, 2008. This report showed a value for LBHI's equity interest in LBB of $467 million and a total risk-based capital ratio of 5.94%. Similar to the Bank, LBHI believes that LBB is a valuable asset of the estate and LBB's diminished capital position is not a reflection of its true value, but rather is a result of the application of fair value accounting to LBB's financial statements. Indeed, on LBB's September 30, 2008 TFR, LBHI's equity interest was reported at $1 billion. To preserve the opportunity to realize LBB's fair value, in the near future, LBHI intends to seek authorization to make a similar capital contribution to LBB to maximize recoveries to LBHI's creditors.

business.[6]  Nevertheless, out of an abundance of caution, LBHI seeks authorization to
fund the Capital Contribution to the extent such use of property is out of the ordinary
course of business.

25.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant
part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the
ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  When
considering a transaction outside the ordinary course of business, courts in the Second
Circuit, and others, require that such transaction be based upon the sound business
judgment of the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel
Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d
141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton
State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional
Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780
F.2d 1223, 1226 (5th Cir. 1986).

26.    It is generally understood that "[w]here the debtor articulates a
reasonable basis for its business decisions (as distinct from a decision made arbitrarily or
capriciously), courts will generally not entertain objections to the debtor's conduct." *In*

---

[6]    The United States Court of Appeals for the Second Circuit has adopted a two part test for
determining whether a transaction is in the ordinary course of a debtor's business.  *In re Lavigne*,
114 F.3d 379, 385 (2d Cir. 1997).  The "vertical test" views the transaction from a hypothetical
creditor's point of view and inquires whether the transaction subjects a creditor to economic risks
that differ from the risks such creditor anticipated when it commenced business with the debtor.
*Id.*  The "horizontal test" compares the transaction to those made in the debtor's industry to
determine whether the debtor's transaction is similar to those entered into by others in the
debtor's industry.  *Id.*  Regularity is not a prerequisite for a transaction to be ordinary.  *In re John-
Manville Corp.*, 60 B.R. 612, 618 (Bankr. S.D.N.Y. 1986).  LBHI believes that funding the
Capital Contribution to an operating subsidiary satisfies this two-part test.

*re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).  If a valid business

justification exists, there is a strong presumption that "the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action taken was in

the best interests of the company."  *In re Integrated Res., Inc.*, 147 B.R. 650,

656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del. 1985)),

*appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).  The burden of rebutting this presumption

falls to parties opposing the proposed exercise of a debtor's business judgment.  *Id.*

(citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

27.    There are ample business justifications in support of the Motion.
First and foremost, the Bank's "undercapitalized" position is due substantially to the
circumstances surrounding the Bank's purchase of the municipal bonds through LBI.  As
a result of these unexpected developments, the Bank was forced to reserve the entire
value of the municipal bonds on its December 31, 2008 Call Report notwithstanding the
fact that the Bank has a very strong claim for recovery of the value of the bonds.

28.    In addition, due to fair value accounting requirements, the recorded
value of the Bank's principal assets, the portfolio of its loans, have been artificially
reduced to an unrealistically low level, not because the borrowers' performance on the
loans has become problematic but rather because the credit markets at December 31,
2008 were seized up by a lack of potential buyers.  Indeed, the fair value methodology
also fails to reflect fully the current performance of the loans, which have remained
almost entirely uninterrupted since September 30, 2008, or the near-term maturity date of
the loans, most of which are expected to be paid off in the ordinary course within three
years.

29.     In addition, since the Commencement Date, LBHI and the Bank have been cooperating to terminate the Bank's unfunded loan commitments, including participation agreements with Lehman Commercial Paper Inc.  These actions have been successful and continue to improve the Bank's overall capital position.  For example, since mid-September 2008, the Bank's loan commitment reduction initiative has resulted in the sale or termination of 44 unfunded facilities totaling $3.7 billion.

30.     Once the myth of "undercapitalization" is removed, it becomes abundantly clear that a current seizure and wholesale liquidation of the Bank would be a gross waste of a significant asset of LBHI's estate that could otherwise inure to the benefit of its creditors.  There is no need for an immediate liquidation of the Bank. Notwithstanding the impact of the full reserve for the Bank's municipal bonds and effect of fair value accounting, LBHI's equity interest is still valued at approximately $430 million on the Bank's December 31, 2008 Call Report.  The Bank has sufficient liquid assets to satisfy all of its Deposit Obligations maturing at least over the next 12 months, as well as all of its other liabilities scheduled or expected to become due during this period.  The Capital Contribution will also help further ensure that the Bank is able to fund its cash flow needs without the premature sale of assets under the currently disadvantageous market conditions and will enable the Bank to weather the tsunami that has befallen the capital markets and the unexpected loss of value of the municipal bonds.

31.     For the reasons explained, investing the Capital Contribution is a sound exercise of LBHI's business judgment.  At the very least, by investing the Capital Contribution, LBHI secures sufficient time to permit either a sale of the Bank or a voluntary planned resolution of the Bank's affairs in an orderly and organized fashion.

On the contrary, an immediate liquidation is likely to leave large deficiency claims asserted by the Bank's creditors against LBHI's estate, which could dilute recoveries to LBHI's current stakeholders.

32.    Investing the Capital Contribution is a far better option than the alternative of risking a seizure of the Bank by the Regulators.  If the Regulators are permitted to take over the Bank, not only will LBHI lose the value of the Bank's assets and draw guarantee claims against the estate, but LBHI's estate may also face a potentially very significant claim pursuant to section 365(o) of the Bankruptcy Code. Section 365(o) provides,

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507.  This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(o).

33.    Under section 365(o), if (a) there is a commitment by a debtor to maintain the capital of an insured depository institution and (b) there is a deficiency in capital existing on the date of the petition, then the debtor may be compelled to immediately cure the capital deficiency or convert to a case under chapter 7 and treat the claim as a priority claim under section 507(a)(9) of the Bankruptcy Code.  *See Resolution Trust Corp. v. Firstcorp Inc.* (*In re Firstcorp. Inc.*), 973 F.2d 243 (4th Cir. 1992).  Under

either scenario, if successful, the Regulators could be paid ahead of general unsecured

creditors.

34.    LBHI does not believe that the Regulators could satisfy the

elements of section 365(o) to compel an immediate payment of a capital deficiency of the

Bank.  There is no existing commitment by LBHI to maintain the minimum capital level

of the Bank.  In connection with the Bank's application for deposit insurance, LBHI

submitted a letter, dated May 6, 2005, to the FDIC stating that it "shall ensure that during

the first three years of the Bank's operations the Bank shall maintain leveraged Tier I

capital equal to or exceeding 10% of the Bank's total assets, as shall be reflected on the

Bank's month-end financial statements."  Even assuming that the Court could find the

letter to be a "commitment" under section 365(o), by its own terms, the letter has expired.

The Bank commenced operations on August 24, 2005.  Therefore, the "commitment," if

any, by LBHI to maintain the Bank's capital level expired on August 24, 2008.  During

the purported "commitment" period, the Bank's capital position never fell below the

adequacy level of the applicable regulations.[7]

35.    Assuming *arguendo* that there was an existing "commitment,"

under the present facts there was no deficit in the Bank's capital existing on the date of

LBHI's chapter 11 petition, September 15, 2008, to compel an immediate payment by

LBHI.  As indicated in the Call Report for September 30, 2008, which reflected the

Bank's capital position two weeks subsequent to LBHI's Commencement Date, the Bank

was sufficiently capitalized with a total risk based capital ratio of 10.81%.  *See Firstcorp,*

---

[7] For the same reasons, not only would the Regulators not have an immediate right to cure under
section 365(o), but they also would fail to carry their burden to demonstrate a priority claim under
section 507(a)(9) of the Bankruptcy Code.

*Inc.*, 973 F.2d at 247 (holding that a chapter 11 debtor's obligation to "immediately" cure a deficiency applies to "a deficit under capital maintenance commitment *that exists at the time of a bankruptcy filing*...") (emphasis added).

36.     Although LBHI believes that it could successfully defeat a section 365(o) claim, if one were asserted, the results of litigation are never guaranteed. Moreover, LBHI would have to engage in a very costly and time consuming litigation without the upside of recovering on the Bank's value.  On the other hand, by investing the Capital Contribution, which is likely to be near or less than the amount of any capital funding deficiency claim the Regulators could assert, LBHI avoids the risk of having to make an immediate cure payment to the Regulators while, at the same time, securing an opportunity to realize value on the Bank's equity over time and potentially recovering the Capital Contribution.

37.     In light of the benefits associated with the Motion, LBHI's decision to invest the Capital Contribution represents a sound exercise of its business judgment and should be approved.

38.     In other large chapter 11 cases, this Court has authorized debtors to fund capital contributions to their subsidiaries/affiliates under similar circumstances.  *See In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. 2005) [Docket No. 2661] (approving $45 million capital contribution), [Docket No. 3070] (approving $35 million capital contribution), [Docket No. 3796] (approving $23 million capital contribution), [Docket No. 4313] (approving an aggregate $60 million capital contribution), [Docket No. 4314] (approving $30 million capital contribution); *In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003)

[Docket No. 1051] (approving aggregate $5 million capital contribution), *In re Magellan Health Services, Inc.*, (Case No. 03-40515) (PCB) (Bankr. S.D.N.Y. 2003) [Docket No. 1196] (approving $5.5 million capital contribution).

## Notice

39.    LBHI has served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  LBHI submits that no other or further notice need be provided.

40.    No previous request for the relief sought herein has been made by LBHI to this or any other court.

WHEREFORE LBHI respectfully requests that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: February 6, 2009
      New York, New York

                              /s/ Alfredo R. Perez
                              Alfredo R. Perez

                              WEIL, GOTSHAL & MANGES LLP
                              767 Fifth Avenue
                              New York, New York 10153
                              Telephone: (212) 310-8000
                              Facsimile: (212) 310-8007

                              Attorneys for Debtors
                              and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------------------x
                                                          :
In re                                                     :     **Chapter 11 Case No.**
                                                          :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*              :     **08-13555 (JMP)**
                                                          :
                                  **Debtors.**            :     **(Jointly Administered)**
                                                          :
                                                          :
---------------------------------------------------------------------x

### ORDER GRANTING LBHI'S MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE, FOR AUTHORIZATION TO FUND A CAPITAL CONTRIBUTION TO WOODLANDS COMMERCIAL BANK

Upon the motion, dated February __, 2009 (the "Motion"), of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced

chapter 11 cases, as debtors and debtors-in-possession (collectively, the "Debtors" and,

together with their non-debtor affiliates, "Lehman"), pursuant to sections 105(a) and 363

of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6004 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for authorization to

fund capital contributions to the Bank of up to $272 million in exchange for the purchase

of a first right of recovery on the Bank's claim against Lehman Brothers Inc. or other

parties related to certain municipal securities (the "Capital Contribution"), all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New

York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided

in accordance with the procedures set forth in the order entered September 22, 2008

governing case management and administrative procedures [Docket No. 285] to (i) the

United States Trustee for the Southern District of New York; (ii) the attorneys for the

Official Committee of Unsecured Creditors; (iii) the Securities and Exchange

Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the

Southern District of New York; and (vi) all parties who have requested notice in these

chapter 11 cases, and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion; and the Court

having found and determined that the relief sought in the Motion is in the best interests of

LBHI, its estate and creditors, and all parties in interest and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after

due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the

Bankruptcy Code, LBHI is authorized, but not required, to fund the Capital Contribution;

and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(g) are waived

and this Order shall be effective immediately upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed

good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.

Dated:  February __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE