Alan D. Halperin, Esq.  
Donna H. Lieberman, Esq.  
HALPERIN BATTAGLIA RAICHT, LLP  
555 Madison Avenue – 9th Floor  
New York, New York 10022  
(212) 765-9100  

*Counsel to 1407 Broadway Real Estate LLC  
And PGRS 1407 BWAY LLC*

Hearing Date: March 11, 2009  
Time: 10:00 a.m.

UNITED STATES BANKRUPTCY COURT  
SOUTHERN DISTRICT OF NEW YORK  
---------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | Case No. 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

---------------------------------------------------------x

**MOTION OF 1407 BROADWAY REAL ESTATE LLC AND
PGRS 1407 BWAY LLC FOR AN ORDER
(I) COMPELLING LEHMAN BROTHERS HOLDINGS INC. TO
COMPLY WITH ITS LENDING OBLIGATIONS OR ALTERNATIVELY, (II)
GRANTING 1407 BROADWAY REAL ESTATE LLC AND PGRS 1407 BWAY LLC
<u>RELIEF FROM THE AUTOMATIC STAY</u>**

TO THE HONORABLE JAMES M. PECK,  
UNITED STATES BANKRUPTCY JUDGE:

1407 Broadway Real Estate LLC ("<u>1407 Broadway</u>") and its asset manager, PGRS 1407 BWAY LLC ("<u>PGRS 1407</u>" and together with 1407 Broadway, the "<u>Movants</u>"), by and through their undersigned counsel, make this motion (the "<u>Motion</u>") pursuant to sections 105, 362(d) and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") for entry of an order compelling Lehman Brothers Holdings Inc. ("<u>Lehman</u>"), one of the debtors herein (collectively, the "<u>Debtors</u>") to comply with its obligations to lend under the Loan Agreement (as defined below), or alternatively, granting the Movants relief from the automatic stay to declare

Lehman in default of the Loan and all related documents, suspend payments under the Loan, seek a replacement senior lender for the remaining unfunded portion of the Loan, and pursue other remedies. In support of the Motion, the Movants respectfully represent as follows:

## PRELIMINARY STATEMENT

1.  1407 Broadway is the borrower and Lehman is the lender under a Loan Agreement dated January 4, 2007 and amended on September 10, 2007 (the "Loan Agreement"), pursuant to which Lehman agreed to lend up to $127,250,000 to 1407 Broadway. The amount initially disbursed was $106,000,000, leaving $21,250,000 available for future fundings under the loan, and section 2.18 of the Loan Agreement contemplates that the additional funds will be advanced upon the borrower's request and the submission of a capital improvements budget showing planned uses of the funds. Advances under the Loan Agreement (including the initial advance of $106,000,000) are secured by a Mortgage on the Borrower's Real Estate, an Assignment of Leases and a Rents, Security Agreement and Fixture Financing Statement.

2.  Pursuant to the terms of the September 2007 amendment, Lehman agreed to advance $8.1 million of the remaining $21,250,000 pursuant to the terms of a building loan agreement (the "Building Loan Agreement") that was executed simultaneously with the amendment and made part of the original loan. The Building Loan Agreement states that up to $8.1 million will be loaned by Lehman to finance construction at the property, provided that the borrower is not in default under the loan and has satisfied certain other conditions.

3.  1407 Broadway is and has continuously been in compliance with the loan, including the Building Loan Agreement, and applied for and received approximately $7.7 million of the $8.1 million between September 2007 and September 2008. 1407 Broadway made its twelfth request for additional funding on October 7, 2008, seeking $908,307.82, and followed

that written request with numerous e-mails and telephone calls. Since October, however, Lehman has alternatively ignored the request for funding or indicated that it would fund and then failed to do so. Of the amount requested on October 7th, $390,509.04 is available under the Building Loan Agreement and the rest is available under the broader terms of the Loan Agreement, which still has available funding of $13,150,000.

4. On January 19, 2009, representatives of 1407 Broadway and Lehman discussed Lehman's failure to fund the $908,107.82 draw and 1407's additional funding needs of $1,110,893.37 for capital improvements. During that conversation, 1407 Broadway was informed that Lehman intended to fund and anticipated disbursing all of the requested funds ($2,019,201.29) by approximately January 30th or shortly thereafter. (A written request for the additional funds was issued on January 21, 2009.) As of the date of this Motion, Lehman has not funded either the October or the January draw.

5. 1407 Broadway has satisfied all of the conditions for the requested fundings, including the submission of an updated capital improvements budget, and at no time from October 7, 2008 through the date of this Motion has Lehman suggested in any communication with 1407 Broadway or its asset manager, PGRS 1407, that 1407 Broadway is not entitled to the amount requested. Nonetheless, Lehman has failed to provide the funds.

6. 1407 Broadway owns a subleasehold estate in, and through its asset manager and developer, PGRS 1407, manages, an office building of approximately 1.1 million square feet. The funds to which it is entitled are needed to make building improvements and to build out space for tenants, and both the funding and the use of the funds for these purposes are contemplated in and authorized by the Loan Agreement. Lehman's failure to honor its funding

obligations is not only causing harm to 1407 Broadway, but is, ironically, also negatively affecting the value of Lehman's own collateral.

7.     For these reasons, and as set forth in greater detail below and in the declarations of Victoria Cory, Senior Vice President of Prime Group Realty Trust, and Joseph Teichman, Executive Vice President and General Counsel of The Lightstone Group, the Movants seek the entry of an order compelling Lehman to honor its funding obligations. In the alternative, the Movants seek an order granting them relief from stay as and to the extent necessary to declare Lehman in default of the Loan and all related documents, suspend payments under the Loan, seek a replacement senior lender for the remaining unfunded portion of the Loan, and to pursue other remedies.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (G) and (O). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409. The statutory predicates for the relief sought herein are §§ 362, 365 and 105 of the Bankruptcy Code, as supplemented by Rule 4001 of the Federal Rules of Bankruptcy Procedure.

## STATEMENT OF FACTS

**(a) The Initial Loan**

9.     1407 Broadway is a limited liability company whose ultimate owners are affiliates of The Lightstone Group. On January 4, 2007, 1407 Broadway, as borrower, and Lehman, as lender, entered into a loan agreement in the maximum principal amount of $127,250,000 (previously defined as the Loan Agreement), and 1407 Broadway executed a

promissory note in the same principal amount. The maturity date of the loan is January 9, 2010, with the borrower having the ability to extend the maturity date by up to two years, upon the satisfaction of certain terms and conditions.

10. On or shortly after the closing date of the loan, Lehman advanced only $106,000,000 of the available $127,250,000 to 1407 Broadway. Future fundings under the loan are governed by section 2.8 of the Loan Agreement, which provides in pertinent part that "[U]pon Borrower's request and upon submission of a Capital Improvements Budget acceptable to Lender in Lender's sole discretion, Lender shall advance additional funds equal to 85% of the line item cost set forth in the Capital Improvements Budget and in the aggregate not to exceed $21,250,000". A copy of the Loan Agreement is attached hereto as **Exhibit A**. Section 2.18 further provides that such future fundings may be used for tenant improvements and leasing commissions, and capital improvements at the property owned by the borrower. The property consists of a 1.1 million square foot office building in which 1407 Broadway holds a long-term subleasehold estate and is located at 1407 Broadway in New York City.

11. Pursuant to the terms of the loan, the note and related documents, 1407 Broadway is required to make monthly interest payments and fund a tax escrow and a tenant improvements escrow on a monthly basis. The payments are made through a lockbox arrangement, with tenants at the property making rent payments directly to a lockbox account controlled by Trimont Real Estate Advisors, Inc., as servicing agent for Lehman. Trimont sweeps the account on a monthly basis, with (at the present time) $416,145.12 in interest being paid to Lehman and $472,102.25 going into the tax escrow and $15,198.25 going into the tenant improvements escrow. Any funds in the lockbox account in excess of these amounts are transferred to an operating account for payment of ordinary course operating expenses of the property.

12. The initial loan is secured by a Mortgage in the Property, an Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement dated January 4, 2007, with the amount of the mortgage being $106,000,000.[1] There is also a Reserve and Security Agreement dated as of the same date governing (i) the funding of specified reserve accounts by the borrower, as additional security for Lehman, and (ii) the designated uses of the funds in those accounts.

13. In addition, 1407 Broadway, together with certain of its direct and indirect owners, entered into a Net Profits Agreement with Lehman dated January 4, 2007, pursuant to which 1407 Broadway agreed to pay thirty-five percent (35%) of its Net Profits (as defined in that document) from the property to Lehman, and 1407 Broadway and its direct and indirect owners (as identified in the Net Profits Agreement) granted Lehman a "right of first offer" with respect to any sale of the real property or of certain ownership interests in 1407 Broadway.

**(b) The Loan Amendment/Building Loan Agreement**

14. On September 10, 2007, 1407 Broadway, one of its affiliates, Lightstone Holdings LLC (Lightstone solely in its capacity as limited guarantor) and Lehman entered into an Omnibus Loan Modification Agreement, which recited that Lehman had agreed to make a loan of up to $127,250,000, had loaned $106,000,000 and was prepared to advance an additional $8.1 million, consistent with section 2.8 of the original loan agreement. The amendment modifies the definitions of "loan documents" and "security instruments" to include the loan amendment and the attendant Second Leasehold Mortgage, Assignment of Leases and Rents,

---

[1] The parties entered into separate agreements governing the assignment of leases and rents, the lockbox arrangement and a limited guaranty from one of the borrower's affiliates, Lightstone Holdings LLC. All of these agreements, including the Net Profits Agreement, are attendant to the loan transaction and included in the defined term "Loan".

Security and Fixture Financing Statement dated September 10, 2007, respectively.  (The second mortgage is in the amount of $8.1 million.)

15. Simultaneously with the execution of the amendment, 1407 Broadway and Lehman entered into the Building Loan Agreement, which provided greater detail and specificity than the original loan as to the procedures for requesting the advances of up to $8.1 million, including forms to be used to request advances, certify hard costs, etc. (The Loan Agreement, the Building Loan Agreement and all documents related thereto, including the Net Profits Agreement, hereinafter being the "Loan").  Prior to the execution of the Building Loan Agreement, 1407 Broadway provided Lehman with a budget for capital improvements for the calendar year 2008, and that budget was approved by Lehman.

**(c) The Funding Requests/Lehman's Failure to Fund**

16. As set forth in the Declaration of Victoria A. Cory, Senior Vice President of Prime Group Realty Trust (an affiliate of PGRS 1407), which is attached hereto as **Exhibit B** (the "Cory Declaration"), and the Declaration of Joseph E. Teichman, Executive Vice President and General Counsel of The Lightstone Group ( an affiliate of 1407 Broadway)[2], which is attached hereto as **Exhibit C** (the "Teichman Declaration"), 1407 Broadway made eleven requests for funding between September 2007 and June 2008 pursuant to the budget and the terms of the Loan.  All of those draws were honored by Lehman, and the total amount funded during that period was $7,709,490.96, leaving $390,509.04 available under the Building Loan Agreement and an additional $13,150,000 available under the Loan generally.

17. Upon learning of Lehman's bankruptcy filing in mid-September 2008, the Movants asked their transactional counsel to contact counsel to Lehman, to inquire as to whether

---

[2] Pursuant to the Loan Agreement, notices to borrower 1407 Broadway must be sent "c/o The Lightstone Group" with copies to Prime Group Realty Trust.

any changes would have to be made in the procedures for funding under the Loan. As set forth in the Cory Declaration, the Movants were told to submit requests for funding through Trimont, Lehman's servicing agent, in the same manner as in the past. PGRS 1407 therefore sent a request for funding on October 7, 2008, requesting a draw of $908,307.82 on behalf of 1407 Broadway. The previous requests for funding had also been sent by PGRS 1407, the asset and development manager, on behalf of 1407 Broadway. Cory Declaration, ¶¶ 5-6.

18. After making the formal request, representatives of 1407 Broadway contacted Charles Manna of Lehman, who had originated the Loan on behalf of Lehman and had historically been the individual who handled matters relating to the Loan. In early October, Mr. Manna repeatedly assured the borrower's representatives that final approval of funding would occur in one to two weeks, as the funding already had business approval. Mr. Manna subsequently informed the borrower's representatives, via e-mail dated October 27, 2008 that he hoped to have approval of the draw "in the next few days with funding within one week following approval" and advised that if there was any issue, Lehman would advise 1407 Broadway shortly. Teichman Declaration, ¶ 4.

19. At about that time, the Movants provided Lehman with their revised budget for the end of 2008 and a proposed budget, including a capital expenditures budget, for the year 2009. Cory Declaration, ¶¶ 8, 13. The new budget indicated that the total amount needed for capital expenditures (redevelopment, building improvements, tenant improvements, lease commissions, etc.) for the period September 1, 2008 through December 31, 2009 would be $9,580,303.00, an amount that is well within the lending limits under the Loan.

20. The Movants continued to follow-up with Mr. Manna at Lehman and the individuals at Trimont who had previously been involved in the funding process, and received e-

mail confirmation of receipt of required affidavits, title reports and other documents. By late October and early November, however, responsive e-mails from Trimont apologized for the delay but stated that they could not fund until they heard from Lehman. Cory Declaration, ¶¶ 8-9. The Movants' representatives therefore focused their energies on Lehman, and again inquired about the status of the funding by e-mail dated November 3rd. The e-mail response from Mr. Manna was "we are trying to orchestrate the funding" and on November 13th, Mr. Manna notified Mr. Teichman that "we are hoping to have further discussions Friday" (the next day). Teichman Declaration, ¶ 4.

21.     In late November, perhaps after the Friday discussions referenced by Mr. Manna, there was apparently discussion and agreement among transactional counsel for the parties about recording additional mortgages with each advance, although additional recordings were not required under the Loan. Upon learning of this agreement, Ms. Cory called and e-mailed Mr. Manna about implementing this new arrangement for the benefit of Lehman and moving forward with the funding. Cory Declaration, ¶¶ 10-11. When Ms. Cory did not get any response, Mr. Teichman stepped in, and was able to speak to Mr. Manna on December 4th, now approximately two months after the date of the original funding request. Mr. Teichman was once again advised by Mr. Manna that Lehman wanted to move forward with the lending. Teichman Declaration, ¶¶ 4-5.

22.     There was another communication between the businesspeople involved in this matter on January 6, 2009. On that date, Trimont, Lehman's agent, acknowledged that the 2009 budget had been received on October 30, 2008, and apologetically indicated that there was still no news about the funding of the Loan. Cory Declaration, ¶ 13.

23. Additional communications between the parties occurred on January 19, 2009 and January 21, 2009. Representatives of 1407 Broadway, including Mr. Teichman, spoke to Charles Manna of Lehman on the 19th, about Lehman's failure to meet its October 7, 2008 funding obligations, and about the additional funding needs of 1407 Broadway. Mr. Manna was advised that a thirteenth request for funding was imminent, in the amount of $1,110,893.37, and Mr. Manna responded that Lehman intended to meet its funding obligations. He was "optimistic" that all of the funds requested by and on behalf of 1407 Broadway for capital improvements – a total of $2,019,201.29 at that point – would be disbursed by Lehman by January 30th. The written disbursement request was issued on behalf of 1407 Broadway on January 21, 2009. Teichman Declaration, ¶¶ 6-7, Cory Declaration, ¶ 14.

24. Finally, on January 30th and February 4th, in the absence of any disbursement of funds to 1407 Broadway, representatives of 1407 Broadway again followed up with Mr. Manna. As set forth in the Teichman Declaration, 1407 Broadway was once again assured that Lehman wanted to fund, and that Lehman representatives were hopeful that funding would occur within two weeks. Teichman Declaration, ¶ 8.

25. Throughout the months of trying to obtain the funds to which it was and is entitled, 1407 Broadway was at all times in compliance with the terms of the Loan. Monthly payments were made, and required reports and information (including leasing reports, title commitments and affidavits) were provided. At no time during this process has Lehman notified either the Movants or their representatives of any issues on the borrower's side as to compliance with the Loan, nor has Lehman made any objection to the 2008 budget under which it was lending, the revised budget for September through December 2008 or the proposed budget for 2009. Teichman Declaration; Cory Declaration.

26.     1407 Broadway's budget for 2009 estimates that total capital expenditures for the period September 2008 through December 2009, inclusive of building improvements, tenant build-outs, redevelopment of some of the space and leasing commissions, will be approximately $9.5 million.  With more than $13.5 million in remaining availability under the Loan – of which $908,307.82 was requested on October 7, 2008 and $1,110,893.37 on January 19, 2009 – 1407 Broadway is well within the borrowing limits of the Loan.

27.     The Movants have done their best to get this matter resolved without resorting to the Court, but it is now almost four months since the October 7th funding request was made, and Lehman has not funded the October 7th draw or the subsequent request.  As set forth above and discussed in the Cory Declaration, ¶ 16,  the requested funds are needed to make capital improvements to the building and to do necessary construction – purposes that are important to preserving the value of real estate at any time, and that are even more vital in the current real estate market.  Lehman's failure to comply with its obligations under the Loan is causing harm to its borrower and to the value of Lehman's own collateral.

## RELIEF REQUESTED

28.     By this Motion, the Movants seek an order pursuant to sections 105, 365 and 362(d) of the Bankruptcy Code and Bankruptcy Rule 4001, (i) compelling Lehman to comply with its lending obligations under the Loan, or (ii) in the alternative, granting Movants relief from the automatic stay to take appropriate steps to declare Lehman in default of the Loan and all related documents, suspend payments under the Loan, seek a replacement senior lender for the remaining unfunded portion of the Loan, and to pursue other remedies[3].  Lehman is not complying with its duty to lend, and it must either honor its obligations or 1407 must be able to

---

[3] The Movants reserve their rights to seek damages for Lehman's defaults under the Loan, including but not limited to costs and attorneys' fees attendant to this Motion and other enforcement measures.

obtain alternate lending and pursue its remedies, before 1407 Broadway is further harmed by Lehman's material breaches of its contractual obligations.

## BASIS FOR RELIEF

29.     As sections 365(d)(3) and 365(d)(5) clearly state, a debtor is required to perform its obligations under both unexpired leases and executory contracts during a bankruptcy case, unless and until the debtor rejects those contracts or leases.  11 U.S.C. §§365(d)(3), (5). *In re Chateaugay Corp,* 10 F.3d 944, 955 (2d Cir. 1993); *In re Greystone III Joint Venture*, 995 F.2d 1274, 1281 (5th Cir. 1991); *Boland v. Parmelee*, 1997 WL 642550 (N.D. NY. 1997); *In re Texaco, Inc.,* 254 B.R. 536, 557 (Bankr. S.D.N.Y. 2000).  The Loan has at no time been rejected, and as set forth above and in the Cory and Teichman Declarations, 1407 Broadway continues to comply with all of its obligations as borrower.

30.     1407 Broadway, through its asset manager, properly made a request for funding after Lehman's bankruptcy filing, on October 7, 2008, and has repeatedly communicated with Lehman and Trimont, Lehman's agent, about the ongoing request for funding.  Lehman has been in breach of its obligation to lend since October 2008, and continues to be in breach of its obligations to this date.

31.     Lehman's failure to honor its obligations is causing material harm to 1407 Broadway, as the funds that have been properly requested are needed to make capital improvements to the borrower's property, to build out space in conformity with tenant requirements and generally maintain the building as a first class facility.  The Loan specifically contemplates that additional funding will be provided to 1407 Broadway for precisely these purposes.  *See* Loan Agreement, 2.8.  The Movants therefore respectfully request that the Court enter an order directing Lehman to comply with its contractual obligations.

32.     In the alternative, the Movants seek relief from the automatic stay so that they may declare Lehman in default of the Loan and all related documents, suspend payments under the Loan, seek a replacement senior lender for the remaining unfunded portion of the Loan, and pursue other remedies against Lehman.  1407 Broadway is suffering significant harm from Lehman's failure to comply with its obligations, while Lehman takes advantage of 1407 Broadway's good faith and compliance with its obligations as borrower, including collection of substantial monies.[4]

33.     Section 362(d) of the Bankruptcy Code provides that a party in interest may be granted relief from the automatic stay as follows:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditions such stay – (1) for cause . . .

34.     Whether cause exists to vacate or modify the automatic stay is committed to the sound discretion of the Bankruptcy Court. *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).  The Movants have the initial burden of demonstrating cause. *In re Sonnax Industries, Inc.,* 907 F.2d at 1286.  Once the Movants have satisfied their initial burden, LCPI or any other opposing party has the burden of disproving the existence of cause to lift the automatic stay.  11 U.S.C. § 362(g)(2).

35.     Among the factors identified by the Second Circuit Court of Appeals in determining the existence of cause to lift the automatic stay, the most relevant here include the impact of the stay on the parties and balance of harms.  *In re Sonnax Industries, Inc.,* 907 F.2d at 1286.  In this case, those factors clearly militate in favor of the Movants.

---

[4] Ironically, Lehman has recently filed a lawsuit against one of its borrowers, Kent Swig, asserting that the borrower is in default under two Lehman loans.

36.     1407 Broadway entered into the Loan to acquire its interest in the real property known as 1407 Broadway in New York City, and to insure that it would have adequate funding to make capital improvements and tenant improvements to the property.  To that end, initial lending was in the amount of $106,000,000, although the principal amount available under the Loan was and is $127,250,000.  The difference of $21,250,000 – defined as "future fundings" under the Loan Agreement—was earmarked for precisely the kinds of capital improvements that 1407 Broadway seeks to do.  Both the borrower and the lender implicitly recognized the need for and importance of such expenditures, to preserve and enhance the value of the building and to attract desirable tenants.  The Building Loan Agreement only served to further emphasize the importance of funding for this type of construction and maintenance, earmarking $8.1 million for detailed construction and capital expenditures.  These fundings are material and important components of the entire loan package.

37.     At present, the funding that remains available under the Loan is more than $13.5 million. 1407 Broadway, through its asset manager, has properly sought the disbursement of $2,019,201.29 pursuant to two draws, for precisely the purpose intended and authorized under the Loan.  Yet for almost four months since the first of those two draws, no funds have been forthcoming, although Lehman continues to accept the borrower's payments of more than $900,000 per month, of which $416,000 represents interest payments and approximately $487,000 is deposited into reserves.

38.     1407 Broadway must have funds for building and tenant improvements if it is to properly maintain its building, retain existing tenants and attract new tenants.  The budgets provided, and in the case of the 2008 budget, the budget under which Lehman was funding prior

to its bankruptcy filing, reflect that necessity. Buildings diminish in value and desirability if requisite maintenance, improvements and construction are not timely and properly done.

39. The importance of the lending has been repeatedly communicated to Lehman, but to no avail. Lehman cannot or will not fulfill its responsibilities to the Movants and in failing to meet its funding obligations, it is causing to harm to the borrower and its property, diminishing the ability of 1407 Broadway to maintain the property, and most ironically, putting its own collateral at risk.

40. While Lehman is in place as lender but failing to loan, 1407 Broadway cannot obtain funding elsewhere. Lehman has liens on all of the borrower's assets and controls the cash generated by the property. Therefore, if Lehman is going to continue in its failure to fund, the Movants have no choice but to seek relief from the bankruptcy stay, in order to exercise their remedies against Lehman for breach of contract, and seek a replacement lender.

41. Likewise, a balancing of the harms demonstrates that if the Movants are not granted the relief they requested, Lehman will be enjoying a windfall that neither bankrutpcy law, contract law nor equity permit. It will be getting all of the benefits of its agreement with 1407 Broadway, while it fails to honor any of its obligations. Lehman's continuing failure to lend under the Loan and its continued presence as a non-performing lender harms 1407 Broadway and gives rise to claims against Lehman.

42. The Movants are not proposing self-help, but the exercise of lawful remedies, to limit the harm to the borrower and its property. The Movants respectfully submit that with respect to all of the relief requested, the harm to Movants significantly outweighs any perceived harm to Lehman or its estate and thus establishes the requisite cause for relief from stay under section 362(d)(1) of the Bankruptcy Code.

## NOTICE

43.     Notice of this Motion shall be provided to (i) counsel to the Debtors, (ii) counsel to the Official Committee of Unsecured Creditors; (iii) the office of the United States Trustee; and (iv) all other parties requesting notice under Bankruptcy Rule 2002 in advance of the date of this Motion.  Movants respectfully represent that no other or further notice is warranted and that the notice provided is sufficient.

## WAIVER OF MEMORANDUM OF LAW

44.     Because the Motion sets forth the applicable legal authority and does not raise any novel issues of law, Movants respectfully request that the requirement for a separate memorandum of law contained in Local Rule 9013-1(b) be waived.

## CONCLUSION

**WHEREFORE**, for all of the foregoing reasons, Movants respectfully request that an order, substantially in form attached hereto as **Exhibit "D,"** be entered (a) compelling Lehman to comply with its funding obligations under the Loan, or alternatively (b) granting Movants relief from the automatic stay to pursue their remedies against Lehman; and (c) granting the Movants such other and further relief as is just and proper.

Dated:  New York, New York
            February 6, 2009

Respectfully submitted,

HALPERIN BATTAGLIA RAICHT, LLP
*Counsel to 1407 Broadway Real Estate LLC and PGRS 1407 BWAY LLC*

By:  /s/ Donna H. Lieberman
        Alan D. Halperin, Esq.
        Donna H. Lieberman, Esq.
        555 Madison Avenue – 9th Floor
        New York, New York 10022
        (212) 765-9100