(x)    omitted;

(xi)    The occurrence of a Management Event of Default (as defined in the Assignment of Asset Management Agreement) which remains uncured;

(xii)    If any term, covenant or provision of any of the other Loan Documents specifies a cure period for any breach thereof, if Borrower shall continue to be in default under such term, covenant, or provision of any of the Loan Documents (including this Agreement), beyond such applicable cure periods contained herein or in those documents, or if no cure period is provided by this Agreement or the other Loan Documents, any other default hereunder or thereunder, which default is not cured (i) in the case of any default which can be cured by the payment of a sum of money, within ten (10) days after written notice from Lender to Borrower, or (ii) in the case of any default which cannot be cured by the payment of a sum of money, within thirty (30) days after written notice from Lender to Borrower; provided, however, if such default is reasonably susceptible of cure, but not within such thirty (30) day period, then Borrower may be permitted up to an additional ninety (90) days to cure such default provided that Borrower diligently and continuously pursues such cure;

(xiii)    omitted;

(xiv)    if Borrower violates or does not comply with any of the provisions of Section 4.1(s) or if any general partner, managing member or manager or the SPE Member of Borrower violates or does not comply with any of the provisions of Section 4.1(s);

(xv)    the prohibition, enjoining or interruption of Borrower's right to occupy, use or lease the Property for a continuous period of more than thirty (30) days;

(xvi)    (i) the Condemnation, seizure or appropriation of, or occurrence of an uninsured Casualty with respect to any material portion of the Property; or (ii) the sequestration or attachment of, or any levy or execution upon any of the Property, any other collateral provided by Borrower under any of the Loan Documents, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of thirty (30) days or the sale of the assets affected thereby;

(xvii)    the failure at any time of the Security Instrument to be a valid first Lien upon the Property or any portion thereof, other than as a result of any release or reconveyance of the Security Instrument with respect to all or any portion of the Property pursuant to the terms and conditions of this Agreement;

(xviii)    the discovery of any significant Hazardous Substances in, on or about the Property subsequent to the Closing Date. Any such Hazardous Substances shall be "significant" for this purpose if the presence of said Hazardous Substances, in Lender's sole discretion, have a Material Adverse Effect on the value of the Property;

(xix)    any of the assumptions contained in the Non-Consolidation Opinions delivered to Lender in connection with the Loan, or in any other Non-Consolidation

Opinions delivered subsequent to the closing of the Loan, are or shall become untrue in any material respect;

(xx)    any statements made in any certificates, separateness agreements or similar documents delivered in connection with the Non-Consolidation Opinions (whether delivered in connection with closing the Loan or thereafter), and whether delivered to Lender or the attorneys rendering such Non-Consolidation Opinions, are or shall become untrue in any material respect;

(xxi)    the occurrence of any Recourse Event;

(xxii)    an event occurs which, under the terms of this Agreement or any other Loan Document, is deemed to constitute an "Event of Default".

**Section 7.2**    Remedies.

(a)    Upon the occurrence of any Event of Default, Lender may (but without any obligation to do so) take such action, without notice, demand presentment, protest or other requirements of any kind (all of which are expressly waived by Borrower), as Lender deems advisable to protect and enforce its rights and remedies against Borrower and/or any Borrower Party and in and to the Property, including the following actions, each of which may be pursued concurrently, separately or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(i)    declare the entire Debt to be immediately due and payable; provided, however, if any Event of Default as described in Section 7.1(a)(vi) shall occur, the entire unpaid Debt shall be automatically due and payable without any further notice, demand or other action by Lender;

(ii)    exercise any of the rights or remedies specified in Article X of the Security Instrument or any other provision of the Security Instrument;

(iii)    apply any sums then deposited with Lender or with any Servicer or other third party under the control of Lender and any other sums held in escrow or otherwise by Lender, including the Reserves, in accordance with the terms of this Agreement or any other Loan Document to the payment of the following items in any order in Lender's sole discretion: (i) Taxes and Other Charges; (ii) Insurance Premiums; (iii) interest on the unpaid principal balance of each of the Note; (iv) amortization of the unpaid principal balance of each of the Note; and (v) all other sums payable pursuant to the Note, this Agreement and the other Loan Documents, including advances made by Lender pursuant to the terms of this Agreement;

(iv)    pursue such other rights and remedies as may be available at law (including the Uniform Commercial Code) or in equity, including the right to receive and/or establish a lock box for all Rents, proceeds from the Intangibles (as defined in the Security Instrument) and any other receivables or rights to payments of Borrower relating to the Property;

(v)    with or without actual or threatened waste to the Property, Lender shall, at Lender's sole, absolute and unfettered option and discretion, be entitled, and is hereby expressly and irrevocably authorized, upon application to a court of competent jurisdiction, without notice to Borrower, or any other party (any and all such notice being waived hereby) and without regard to the adequacy of any security for the Debt or the solvency of Borrower or any other party liable for payment of the Debt, to appoint a receiver(s), on an emergency basis or otherwise (and if allowed by applicable law, on an ex parte basis), to take possession of and to operate the Property, and at Lender's option, to collect the Rents. Borrower irrevocably waives all notice of and defenses and objections to the appointment of such receiver. Borrower further irrevocably agrees that the occurrence of any Event of Default per se would create an emergency and the necessity for immediate actions; and

(vi)    pursue any other right or remedy allowed by any Loan Document or applicable law.

(b)    Upon the occurrence and during the continuance of an Event of Default, interest on the outstanding principal balance of the Loan and, to the extent permitted by law, overdue interest and other amounts due in respect of the Loan, shall accrue at the Default Rate, calculated from the date such payment was due without regard to any notice, grace or cure periods contained herein. Interest at the Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of the Debt (or that portion thereof that is then due). To the extent permitted by applicable law, interest at the Default Rate shall be added to the Debt, shall itself accrue interest at the same rate as the Loan and shall be secured by the Security Instrument. This paragraph shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default; the acceptance of any payment by Lender shall not be deemed to cure or constitute a waiver of any Event of Default; and Lender retains its rights under this Agreement and the other Loan Documents to accelerate and to continue to demand payment of the Debt upon the happening of any Event of Default, despite any payments made to Lender after the occurrence of such Event of Default.

(c)    Lender may resort to any remedies and the security given by any of the Loan Documents in whole or in part, and in such portions and in such order as determined by Lender in its sole discretion. No such action shall in any way be considered a waiver of any rights, benefits or remedies evidenced or provided by the Note, the Security Instrument or any of the other Loan Documents. The failure of Lender to exercise any right, remedy or option provided in any of the Loan Documents shall not be deemed a waiver, modification, amendment or estoppel with respect to the enforcement of such right, remedy or option or of any covenant or obligation secured by the Note, the Security Instrument or the other Loan Documents. No acceptance by Lender of any payment after the occurrence of any Event of Default and no payment by Lender of any obligation for which Borrower is liable hereunder shall be deemed to waive or cure any Event of Default, or Borrower's liability to pay such obligation. No sale of all or any portion of the Property, no forbearance on the part of Lender, and no extension of time for the payment of the whole or any portion of the Debt or any other indulgence given by Lender to Borrower, shall operate to release or in any manner affect the interest of Lender in the remaining Property or the liability of Borrower to pay the Debt. No waiver by Lender shall be effective unless it is in writing signed by Lender and then only to the extent specifically stated.

(d)    With respect to Borrower and the Property, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property for the satisfaction of any of the Debt, and Lender may seek satisfaction out of the Property or any part thereof or decline to do so, in Lender's sole and absolute discretion. In addition, to the extent permitted by applicable law, Lender shall have the right from time to time to partially foreclose the Security Instrument in any manner and for any amounts secured by the Security Instrument then due and payable as determined by Lender in Lender's sole and absolute sole discretion including, without limitation, the following circumstances: (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Security Instrument to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire outstanding principal balance of the Loan, Lender may foreclose the Security Instrument to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Security Instrument as Lender may elect. Notwithstanding one or more partial foreclosures, the Property shall remain subject to the Security Instrument to secure payment of sums secured by the Security Instrument and not previously recovered.

(e)    Additionally, upon the occurrence of any Event of Default or if any Borrower Party fails to make any payment or to do any act as required in any of the Loan Documents, Lender may, but without any obligation to do so and without notice to or demand on any Borrower Party and without releasing any Borrower Party from any obligation under the Loan Documents, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose the Loan Documents or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees and disbursements to the extent permitted by law), with interest at the Default Rate (as defined in the Note) for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender, shall constitute a portion of the Debt, shall be secured by the Loan Documents and shall be due and payable to Lender upon demand.

(f)    No delay or omission to exercise any remedy, right or power accruing upon an Event of Default, or the granting of any indulgence or compromise by Lender shall impair any such remedy, right or power hereunder or be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default shall not be construed to be a waiver of any subsequent Default or Event of Default or to impair any remedy, right or power of Lender. Notwithstanding any other provision of this Agreement, Lender reserves the right to seek a deficiency judgment or preserve a deficiency claim in connection with the foreclosure of the Security Instrument to the extent necessary to foreclose on all or any portion of the Property, the Rents or any other collateral.

Section 7.3    Right of Entry. In addition to any other rights or remedies granted under this Agreement, Lender and its agents shall have the right to enter and inspect the Property at any reasonable time during the term of the Loan. The cost of such inspections or audits, including the cost of all follow up or additional investigations or inquiries deemed reasonably necessary by Lender, shall be borne by Borrower. The cost of such inspections, if not paid for by Borrower

following demand, may, at Lender's option, be added to the principal balance of the sums due under the Note and shall bear interest thereafter until paid at the Default Rate.

Section 7.4    Costs of Enforcement.  In the event of the (i) exercise of any remedy by Lender under this Agreement or the other Loan Documents or following the occurrence of an Event of Default, (ii) foreclosure of any mortgage prior to or subsequent to the Security Instrument in which proceeding Lender is made a party, (iii) bankruptcy, insolvency, reorganization, rehabilitation, liquidation or other similar proceeding in respect of any Borrower Party or an assignment by any Borrower Party for the benefit of its creditors, (iv) enforcement of any obligations of or collection of any payments due from any Borrower Party under this Agreement, the other Loan Documents or with respect to the Property, or (v) incurring of any costs or expenses by Lender in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out", then Borrower, its successors or assigns, shall pay to Lender on demand any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting Lender's interest in the Property or in collecting any amount payable hereunder or in enforcing Lender's rights hereunder with respect to the Property, whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such expenses are paid by Borrower; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence or willful misconduct of Lender.  Any cost and expenses due and payable to Lender may be paid from any amounts in the Lockbox Account.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) to the maximum extent allowed by law, Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of Lender's remedies against the Property and the Security Instrument has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Debt or the Debt has been paid in full.

Section 7.5    Violation of Legal Requirements.  If the Property is not in compliance with one, some or all of the Legal Requirements, Lender may impose additional requirements upon Borrower in connection therewith including, without limitation, monetary reserves or financial equivalents.

Section 7.6    Remedies Cumulative.  The rights, powers and remedies of Lender under this Agreement and the other Loan Documents shall be cumulative and not exclusive of any other right, power or remedy which Lender may have against Borrower or any of Borrower Parties pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.  Any and all amounts collected or retained by

Lender after an Event of Default has occurred, including interest at the Default Rate, late charges or any escrowed amount, may be applied by Lender to payment of the Debt in any order or priority that Lender in its sole discretion may elect.

# VIII. SECONDARY MARKET TRANSACTIONS AND CO-LENDING

**Section 8.1** Generally.

**Section 8.1.1** Sale of Note and Securitization. Lender may, without the consent of Borrower or any other Person, at any time, sell, transfer, pledge or assign any of the Note, the Security Instrument and the other Loan Documents, and any or all servicing rights with respect thereto, or grant participations therein (the "**Participations**") or issue mortgage pass-through certificates or other securities ("**Securities**") evidencing a beneficial interest in a rated or unrated public offering or private placement (a "**Securitization**"), in all cases, with or without novation. Lender may forward to each potential purchaser, transferee, assignee, servicer or investor in any Participations, Securitizations or Secondary Market Transaction (collectively, an "**Investor**") or any Rating Agency rating any Securities, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Debt and to Borrower, any Borrower Party, and the Property, whether furnished by Borrower, any Borrower Party or otherwise, as Lender determines necessary or desirable. Lender may also disclose to such parties any lending relationship in addition to the Debt which Lender may have with Borrower and/or any Borrower Party and/or any of their Affiliates. Borrower, on behalf of itself and all Borrower Parties, irrevocably waives any and all rights Borrower or any other Borrower Party may have under applicable state or federal law to prohibit such disclosure, including but not limited to any right of privacy.

**Section 8.1.2** Cooperation. Borrower agrees that the Loan Documents shall be sufficient evidence of the obligations of Borrower to each Investor, and Borrower further agrees to cooperate with Lender in connection with any sale, assignment, conveyance, alienation or pledge or other transfer made or any Securities created pursuant to this Section, including the delivery of an estoppel certificate required in accordance with Section 5.14 and such other documents as may be reasonably requested by Lender. In furtherance of the foregoing, Borrower shall (i) at no cost, expense or liability to Borrower cooperate with Lender so that the Lender may perform or cause to be performed, at Lender's sole expense, such site inspections, appraisals, market studies, environmental reviews and reports (Phase I and, if appropriate, Phase II), engineering reports and other due diligence investigations of the Property, as required by Lender or as may be requested by the Rating Agencies in connection with a Securitization; (ii) at Borrower's expense, cause counsel to render or update opinions (which may be relied upon by any Investor or the Rating Agencies and their respective counsel, agents and representatives) in substantially the same form and substance as those delivered on the Closing Date, with such modifications as may be desired by the Rating Agencies or any Investor; (iii) furnish and the Borrower, on behalf of itself and all Borrower Parties, consents to Lender furnishing to such Investors or such prospective Investors or such Rating Agency any and all information concerning the Property, the Ground Lease, the Sublease, the Leases, the financial condition of Borrower and any Borrower Party as may be reasonably requested by Lender, any Investor, any prospective Investor or any Rating Agency in connection with any sale or transfer of

Participations or Securities; (iv) make such representations and warranties as of the closing of any Securitization with respect to the Property, Borrower, any Borrower Party and the Loan Documents as are customarily provided in securitization transactions and as may be requested by any Investor or the Rating Agencies; (v) execute such amendments to the Loan Documents and Organizational Documents of Borrower or Borrower's direct or indirect members or partners as may be reasonably requested by the Lender or desired by the Rating Agencies or otherwise to effect the Securitization; provided, however, that except as expressly provided in this Agreement, Borrower shall not be required to modify or amend any Loan Document or Organizational Document if such modification or amendment would (A) change the interest rate, the stated maturity or the amortization of principal set forth in the Note, (B) modify or amend any other material economic terms or conditions of the Loan, (C) impose any additional liability on Borrower or Guarantors, or (D) decrease Borrower's or any Guarantor's rights; (vi) have appropriate representatives available for Investor meetings and/or Property tours, (vii) execute documentation reasonably acceptable to Lender and its counsel which establishes a loan agency role (which Agent may be any holder of the Loan) and the right to assign direct interests in the Loan to a syndicate of lenders (provided that it does not increase Borrower's obligations under the Loan) and (viii) cooperate with Lender so that Lender has the ability to tranche the Loan into senior and subordinate claims (each claim to be evidenced by separate notes payable to each syndicate member in the amount of each member's portion of such claim, which new notes shall have an average interest rate equal to the interest rate on the Note as of this date). Prior to an Event of Default, prepayments must be applied to each note on a pro rata basis. Lender may forward to each Investor or any Rating Agency rating such Securities, each prospective Investor, and any organization maintaining databases on the underwriting and performance of commercial mortgage loans, all documents and information which Lender now has or may hereafter acquire relating to the Loan or to Borrower, any Borrower Party, or the Property. Notwithstanding the foregoing, Borrower's obligation under this <u>Section 8.1</u> with respect to costs and expenses shall be limited as set forth in <u>Section 8.18</u>.

      **Section 8.1.3**    <u>Secondary Market Transaction Indemnification</u>. It is understood that the information provided by, or on behalf of, Borrower or any Borrower Party to Lender in connection with the Loan or subsequent to the date hereof which is delivered in connection with any Loan Document may ultimately be incorporated into the offering documents for a Secondary Market Transaction and thus various Investors may also see some or all of such information. Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower and, provided Borrower has had an opportunity to review and comment on such information, Borrower indemnifies Lender as to any actual losses, claims, damages or liabilities that arise out of or are based upon any untrue statement of any material fact contained in such information or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading. Lender may publicize the existence of the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

      **Section 8.1.4**    <u>Splitting the Loan</u>. Lender shall have the right from time to time to sever any of the Note and the other Loan Documents into one or more separate notes (including multiple component notes or tranches which may have different interest rates,

amortization payments, principal amounts and maturities, or resulting in a first or second lien, or resulting in the Loan being recast as a first priority mortgage loan and second priority mortgage loan or as a first priority mortgage loan and one or more mezzanine loans), mortgages and other security documents (the "**Severed Loan Documents**") in such denominations and priorities as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder (and such new notes or modified note shall have the same initial weighted average coupon as the original note and, after an Event of Default, Lender may apply principal, interest rates and amortization of the Loan between the components in a manner specified by Lender in its sole discretion), provided, however, that except as set forth in the previous parenthetical the terms, provisions and clauses of the Severed Loan Documents shall not increase the obligations nor decrease the rights of Borrower and/or Guarantors from those contained in the Note, this Agreement, the Security Instrument and the other Loan Documents. At Lender' expense, Borrower shall cooperate with Lender to effectuate the same and shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents, modifications, amendments, opinions and title insurance as Lender shall reasonably request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender such that the pricing and marketability of the Securities and the size of each class of Securities and the rating assigned to each such class by the Rating Agencies shall provide the most favorable rating levels and achieve the optimum bond execution for the Loan. In the event of any prepayment of the Loan after an Event of Default, Lender shall be entitled to apply the amount of such prepayment to one or more of the new component notes as Lender in its sole discretion decides.

**Section 8.2** Re-Sizing. Borrower further agrees that if, (A) in connection with a securitization of the Loan, it is determined by the Rating Agencies or Lender that a portion of the Securitization would not receive an "investment grade" rating unless the principal amount of the Loan were to be decreased and, as a result, the principal amount of the Mezzanine Loan is to be increased, or (B) in connection with Securitization, it is determined by the Rating Agencies or Lender that, if the principal amount of the Loan were decreased and, as a result the principal amount of the Mezzanine Loan were increased, more "investment grade" rated securities could be issued, or (C) if Lender otherwise elects to increase or decrease the amount of the Loan and/or the Mezzanine Loan in Lender's sole discretion, then at Lender's sole cost and expense, (i) Borrower shall take all actions as are reasonably necessary to effect the "resizing" of the Loan and the Mezzanine Loan, and (ii) Borrower shall exercise commercially reasonable efforts to cause the Mezzanine Borrower to comply with its agreements to effect a "resizing" and (iii) if the Loan is being decreased and the Mezzanine Loan is being correspondingly increased on the date of the "resizing" of the Loan, Borrower shall prepay the amount of such decrease in the principal balance of the Loan to Lender (without premium) and Lender shall simultaneously lend to the Project Owner (by way of a reallocation of the principal amount of the Loan and the Senior Loan) an additional amount equal to the amount of principal reduction of the Loan, provided that Borrower and project Owner shall execute and deliver any and all amendments or modifications to the Loan Documents and the Senior Loan documents reasonably requested by Lender. In connection with the foregoing, Borrower agrees, at Borrower's sole cost and expense, to execute and deliver, and to cause Mezzanine Borrower to execute and deliver, such documents and other agreements reasonably required by Lender and/or Mezzanine Lender to "re-size" the Loan and the Mezzanine Loan, including, an amendment to this Agreement, the Note and the other Loan Documents provided, however, that Borrower shall not be required to execute and

deliver any documents or agreements which would (A) change the stated maturity or the amortization of principal set forth in the Note, provided, however, that the weighted average interest rate applicable to each of the Loan and Mezzanine Loan taken together as of the date of the modification may change so long as the weighted average coupon immediately prior to modification, (B) modify or amend any other material or economic term of the Loan, or (C) in the reasonable judgment of Borrower, increase Borrower's obligation and liabilities under the Loan Documents or decrease the rights of Borrower under the Loan Documents, in each case other than to a de minimis extent. Notwithstanding anything contained in this Section 8.2 to the contrary, Borrower shall not be required to take any action that would result in Borrower breaching any single purpose entity covenants in this Agreement.

**Section 8.3**    Syndication, Co-Lending. The provisions of this Section 8.3 shall apply in the event Lender elects to syndicate the Loan in accordance with the provisions of this Section 8.2, it being agreed that Lender may elect to modify these provisions (or substitute these provisions in their entirety) in its sole and absolute discretion.

**Section 8.3.1**    Assignments and Participations.

(a)    Each Lender shall have the right to assign, transfer, sell, negotiate, pledge or otherwise hypothecate this Agreement and any of its rights and security hereunder and under the other Loan Documents to any other Person (an "**Assignee**") as specified in the Syndication Documents or with the prior written consent of the administrative agent (the "**Agent**") for the Loan, which Agent shall be appointed by Lehman Brothers Holdings Inc. (and which may in Lehman Brothers Holdings Inc.'s sole discretion, be Lehman Brothers Holdings Inc. or any other Person); provided, however, that unless and until the Kamber Litigation is either settled or there has been a final order with respect thereto, Lender agrees that Lehman Brothers Holdings Inc. or its Affiliate shall be the Agent. Any such consent by the Agent may be withheld as specified in the Syndication Documents. The Agent may designate any Assignee accepting an assignment of a specified portion of the Loan to be a Co-Agent, an "Arranger" or similar title, but such designation shall not confer on such Assignee the rights or duties of the Agent, unless so specified in the Syndication Documents. Upon the execution, delivery, approval and acceptance, and upon the effective date specified in the applicable assignment and assumption agreement from the assignor to the Assignee (an "**Assignment and Assumption Agreement**"), (a) the Assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption Agreement, have the rights and obligations of a Lender hereunder and under the other Loan Documents, and Borrower hereby agrees that all of the rights and remedies of Lender in connection with the interest so assigned shall be enforceable against Borrower by an Assignee with the same force and effect and to the same extent as the same would have been enforceable but for such assignment, and (b) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder and under the other Loan Documents have been assigned by it pursuant to such Assignment and Assumption Agreement, relinquish its rights and be released from its obligations hereunder and thereunder.

(b)    Omitted.

(c)    Omitted.

(d)    Omitted.

(e)    Borrower shall use reasonable efforts to cooperate with Agent and each Lender in connection with the assignment of interests under this Agreement or the sale of participations herein subject to the provisions of Section 8.4.

(f)    Omitted.

(g)    Unless otherwise provided in the Syndication Documents, each Lender shall have the right, without the consent of the Borrower, to sell participations to one or more other Lenders (a "**Participant**") in or to all or a portion of its rights and obligations under the Loan and the Loan Documents; provided, however, that (i) such Lender shall remain solely responsible to the other parties hereto for the performance of its obligations under this Agreement, (ii) the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and with regard to any and all payments to be made under this Agreement, and (iii) the holder of any such participation shall not be entitled to voting rights under this Agreement or the other Loan Documents (but such holder may contract with the Lender selling such Participant its interest in such Lender's share of the Loan as to voting of such Lender's interest under Section 8.2.1, provided, that any such agreement by a Lender shall bind only such Lender alone and not Borrower, the other Lenders or the Agent).

(h)    Borrower acknowledges and agrees that Lenders may provide to any Assignee or Participant originals or copies of this Agreement, any other Loan Document and any other documents, instruments, certificates, opinions, insurance policies, letters of credit, reports, requisitions and other materials and information of every nature or description, and may communicate all oral information, at any time submitted by or on behalf of Borrower or any Guarantor or received by any Lender in connection with the Loan or with respect to Borrower, provided that prior to any such delivery or communication, such Assignees or Participants shall agree to preserve the confidentiality of any of the foregoing to the same extent that such Lender agreed to preserve such confidentiality. In order to facilitate assignments to Assignees and sales to Participants, Borrower shall execute such further documents, instruments or agreements as Lenders may reasonably require; provided, that except as set forth in this Agreement, Borrower shall not be required to execute any document or agreement which would materially decrease its rights, or materially increase its obligations, relative to those set forth in this Agreement or any of the other Loan Documents (including financial obligations, personal recourse, representations and warranties and reporting requirements).

**Section 8.4**    Costs of Secondary Market Transactions. Notwithstanding anything to the contrary contained in this Article VIII, Borrower shall not be responsible for any costs and expenses in connection with any Secondary Market Transaction under this Article VIII except that Borrower shall be responsible for its own attorneys' fees, including any costs and expenses with respect to any opinions required by Lender.

## IX.   EXCULPATION.

**Section 9.1**   Non-Recourse Provisions.

(a)   Subject to the qualifications below and the provisions of Sections 9.2, 9.3 and 9.4, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Security Instrument or the other Loan Documents by any action or proceeding wherein a money judgment shall be sought against Borrower or any other Person, except that Lender may bring any foreclosure action, action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon Lender's interest under the Note, this Agreement, the Security Instrument and the other Loan Documents, or in the Property, the Rents or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that except as specifically provided in Sections 9.2 and 9.3, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Security Instrument and the other Loan Documents, agrees, unless deemed necessary by Lender to preserve potential liability of any Person for a Recourse Event, that Lender shall not sue for, seek or demand any deficiency judgment against Borrower or any other Person in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Security Instrument or the other Loan Documents.

(b)   The provisions of this Article IX shall not, however, (i) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (ii) impair the right of Lender to name Borrower or any other Person as a party defendant in any action or suit for foreclosure and sale under the Security Instrument provided no money judgment is sought against them (except as otherwise provided in this Article IX); (iii) affect the validity or enforceability of any guaranty or the Environmental Indemnity made in connection with the Loan or any of the rights and remedies of Lender thereunder; (iv) impair the right of Lender to obtain the appointment of a receiver; (v) impair the enforcement of the Assignment of Leases; (vi) constitute a prohibition against Lender to seek a deficiency judgment against any Person potentially liable therefor in order to fully realize the security granted by the Security Instrument or any other Loan Document or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against the Property; or (vii) prohibit Lender from taking any action to perfect the Liens and security interests of the Loan Documents.

**Section 9.2**   Partial Recourse.  Notwithstanding any provision of this Agreement to the contrary and in addition to the rights of Lender set forth in Section 9.3 (and not in limitation thereof), the provisions of this Article IX shall not constitute a waiver or any limitation in any manner whatsoever of the right of Lender to enforce the liability and/or obligation of Borrower or any other Person liable for the Obligations (including any Guarantor), by money judgment, specific performance or otherwise, to the extent of any Losses incurred by Lender arising out of or attributable to or relating to any of the following (collectively, the **"Partial Recourse Events"** and individually, a **"Partial Recourse Event"**) and Borrower does hereby agree to indemnify, defend and hold harmless against any Losses incurred by Lender arising out of or attributable to or relating to any one or more Partial Recourse Events (i) the gross negligence or willful misconduct of Borrower or any Borrower Party, their agents, managers, officers or employees,

(ii) the intentional physical waste or willful destruction of the Property or any portion thereof or any violation of Section 5.20 or 5.21 of this Agreement; provided, however, any liability under Section 5.21(a) shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (iii) the breach of or failure to comply with any representation, warranty, covenant or indemnification provision of this Agreement or in the Environmental Indemnity, in each case concerning Environmental Laws, Hazardous Substances, Asbestos or any indemnification of Lender with respect thereto in any Loan Document; (iv) the removal or disposal of any portion of the Property after an Event of Default unless such removal or disposal is otherwise expressly permitted by the Loan Documents; (v) the creation of any Liens against the Property or any portion thereof as a result of the failure to pay charges for labor or material; provided, however, any liability arising out of Borrower's failure to pay charges for labor or material shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (vi) Borrower's failure to pay Taxes or Other Charges; provided, however, any liability arising out of Borrower's failure to pay Taxes or Other Charges shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (vii) any violation, breach or failure to comply with Section 10.7; (viii) the misapplication or misappropriation of any Security Deposits, including any Security Deposits collected with respect to the Property which are not delivered to Lender, except to the extent any such Security Deposits were applied in accordance with the terms and conditions of any of the Leases prior to the occurrence of an Event of Default; (ix) any violation, breach of or failure to comply with Section 5.15(a) or 5.23; (x) any violation, breach or failure to comply with Section 12.9 (after an Event of Default) or Sections 5.7 or 5.23; (xi) if Borrower or any Borrower Party intentionally fails to comply with any Legal Requirement; provided, however, this clause (xi) shall not apply to any violation of a Legal Requirement solely resulting from the fact that sufficient cash to allow compliance with the applicable Legal Requirement was not available from the Lockbox Account for such purpose after Borrower advised Lender in writing of the need for such cash in order to comply with the applicable Legal Requirement; provided, however, any liability arising out of Borrower's failure to comply with Legal Requirements shall be limited to the extent cash was available to make such payments pursuant to the Lockbox Agreement for such purpose; (xii) failure to maintain the insurance coverages required by Section 6.1 or any failure of Borrower to pay any deductible under any insurance policy after a loss covered by such Policy; (xiii) Borrower's breach of the provisions of Sections 4.1(s) (other than 4.1(s)(i), (iii), (v) or (ix)); (xiv) intentionally omitted, (xv) any violation, breach or failure by Borrower to comply with the provisions of Sections 27 or 32 of the Purchase Agreement or any Loss resulting from the indemnification provisions thereunder, (xvi) the Borrower's indemnification obligations set forth under Section 31(b) of the Purchase Agreement, (xvii) any amendment or modification of any of the Organizational Documents of Borrower or any of the Borrower Parties shall occur without the prior written consent of Lender; (xviii) any agreement by any of the Borrower Parties to amend, terminate or cancel any Major Lease except in accordance with the Loan Documents; (xix) any Borrower Party, or any Affiliate of any Borrower Party, shall seek a jury trial in any action or proceeding against Lender, whether arising under the Loan Documents or otherwise; or (xx) any Borrower Party, or any Affiliate of any Borrower Party, shall make a counterclaim against Lender, Servicer or their Affiliates in violation of Section 11.1 in any action or proceeding, whether arising under the Loan Documents or otherwise.

**Section 9.3**    Full Recourse.  In addition to the rights of Lender set forth in Section 9.2 (and not in limitation thereof), the Debt shall be fully recourse to Borrower and the provision of Section 9.1(a) shall be wholly inapplicable ab initio, and Borrower shall be fully personally liable for all of the Debt upon the occurrence of any of the following (collectively, the "**Full Recourse Events**", and individually, a "**Full Recourse Event**"):  (A) any fraud or any material intentional misrepresentation or statement by Borrower or any Borrower Party in connection with the Loan if any of the Borrower Parties had actual knowledge that any such representation or statement was not true when made whether made prior to closing of the Loan or after repayment of the Loan; (B) the misappropriation, misapplication or conversion by Borrower (which shall include any use of Loan proceeds other than as specified in the Certificate of Sources and Uses) of (1) any Insurance Proceeds, (2) any Awards, Condemnation Proceeds or other amounts payable in connection with the Condemnation of all or a portion of the Property or (3) any Rents and/or Security Deposits received or collected by any Borrower Party or any Affiliate of any Borrower Party and not applied in accordance with the Loan Documents; (C) Borrower or any of the Borrower Parties in any judicial or quasi judicial case, action or proceeding directly or indirectly contests the validity or enforceability of the Loan Documents or directly or indirectly contests or intentionally hinders, delays or obstructs the pursuit of any rights or remedies by Lender (including the commencement and/or prosecution of a foreclosure action, judicial or non-judicial, the appointment of a receiver for the Property or any enforcement of the terms of the Assignment of Leases) after an Event of Default; provided, however, that this clause (c) shall not apply to any particular Borrower Party or otherwise pertain to any action of any Borrower Party which solely contends and alleges only that as a factual matter all of the Borrower Parties are in fact in full compliance with all Obligations under the Loan Documents and that no Event of Default has occurred and is continuing; (D) any financial information with respect to the Borrower Parties delivered by or on behalf of Borrower or any of the Borrower Parties (whether pursuant to the provisions of Sections 4.1(k) or 5.12 or otherwise) shall be fraudulent in any material respect; (E)  breaches the provisions of Sections 4.1(s)(i) or 4.1(s)(iii)(excluding the cap on trade payables to the extent incurred in good faith in the ordinary course of business); (F) any violation, breach or failure to comply with Sections 5.14(a) or 5.22; (G) any of the events described in Section 7.1(a)(vi) shall occur; or (H) any Borrower Party, or any Affiliate of any Borrower Party, shall make any claim or assertion that is contrary to Sections 12.3, 12.4, 12.10 or 12.11.

Notwithstanding anything set forth in Article IX to the contrary, nothing contained in this Article IX shall alter or limit the liability of any Person under any other environmental indemnity agreement or guaranty agreement given by such other Person to Lender.

**Section 9.4**    No Waiver.  Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents (including the provisions of this Article IX) Lender shall not be deemed to have waived any right which Lender may have under Sections 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents.

## X.    INDEMNIFICATION.

**Section 10.1**    General Indemnification.  In addition to any other indemnifications provided herein or in the other Loan Documents, Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Property or any part thereof or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (d) any failure of the Property to be in compliance with any Legal Requirements; (e) any failure of the Property to comply with any Access Laws; (f) any representation or warranty made in any of the Loan Documents being false or misleading in any material respect as of the date such representation or warranty was made including, without limitation, with respect to the use or intended use of the proceeds of the Loan; (g) any claim by brokers, finders or similar Persons claiming to be entitled to a commission in connection with the Loan (other than one claiming to have dealt exclusively with Lender) or any Lease or other transaction involving the Property; and (h) the claims of any Tenant (except any claims of Tenants first accruing after the date Lender or Lender's Affiliate takes title to the Property or the applicable portion thereof); provided, however, that Borrower shall not have any obligation to Lender hereunder to the extent that such Losses arise from the gross negligence or willful misconduct of Lender.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that Borrower is permitted to pay and satisfy under applicable law and this indemnification provision shall be enforced to the maximum extent allowed by law.  Any amounts payable to Lender by reason of the application of this paragraph shall be secured by the Loan Documents and shall become immediately due and payable and shall bear interest at the Default Rate from the date of demand until paid.  The obligations and liabilities of Borrower under this Section 10.1 shall survive termination, satisfaction, or assignment of this Agreement, the repayment of the Debt and the exercise by Lender of any of its rights or remedies hereunder, including the acquisition of the Property by foreclosure or a conveyance in lieu of foreclosure, except that Borrower shall have no further obligations or liabilities (other than those set forth in the Environmental Indemnity) after Lender takes possession of the Property so long as, at such time, Borrower provides Lender with a written environmental assessment of the Property satisfactory to Lender in its sole discretion.  **WITHOUT LIMITATION TO THE FOREGOING, BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES) WHICH LENDER MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT**

OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY PORTION OF THE PROPERTY. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTIES AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, SATISFACTION, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE SECURITY INSTRUMENT.

Section 10.2   ERISA Indemnification.  Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including attorneys' fees and costs incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 4.1(i) or 5.23.

Section 10.3   Duty to Defend; Attorneys' Fees and Other Fees and Expenses.  Upon written request by any Indemnified Party, Borrower shall defend such Indemnified Party (if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals reasonably approved by the Indemnified Parties. Notwithstanding the foregoing, any of the Indemnified Parties may, in their sole and absolute discretion, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of claim or proceeding. Upon demand, Borrower shall pay or, in the sole and absolute discretion of the Indemnified Parties, reimburse, the Indemnified Parties for the payment of fees and disbursements of attorneys, engineers, environmental consultants, laboratories and other professionals in connection therewith; provided, however, that all of the Indemnified Parties shall be defended by one firm of attorneys unless Lender in good faith determines that more than one law firm should be retained because of conflicts of interest or potential conflicts of interest.

Section 10.4   Changes in Laws Regarding Taxation.  If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay such tax, with interest and penalties thereon, if any. In the event Lender is advised by counsel chosen by Lender that the payment of such tax or interest and penalties by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury, then in any such event, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**Section 10.5**   No Credits on Account of the Debt.  Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of the Loan Documents or the Debt.  In the event such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than ninety (90) days, to declare the Debt immediately due and payable.

**Section 10.6**   Recording of Security Instrument.  Borrower forthwith upon the execution and delivery of this Agreement and thereafter, from time to time upon five (5) Business Days' notice from Lender, will cause the Security Instrument, and any other Loan Document creating a Lien or security interest or evidencing the Lien thereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by Lender or by any present or future law in order to publish notice of and fully to protect the Lien or security interest thereof upon, and the interest of Lender in, the Property or to correct any error in the legal description of the Premises.  Borrower will pay all filing, registration or recording fees, and all expenses incident to the preparation, execution and acknowledgment of the Security Instrument, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document and any instrument of further assurance, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Security Instrument, any mortgage supplemental thereto, any security instrument with respect to the Property, any such other Loan Document or any instrument of further assurance, except where prohibited by law so to do.  Borrower shall hold harmless and indemnify Lender, Servicer, their respective successors and assigns, against any liability incurred by reason of the imposition of any tax on the making and recording of the Security Instrument or any other Loan Document.  If at any time any Governmental Authority shall require revenue or other stamps to be affixed to any of the Loan Documents, or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.  Borrower hereby absolutely and irrevocably appoints Lender as Borrower's true and lawful attorney, coupled with an interest, in Borrower's name and stead to make and execute all documents necessary or desirable to effect the provisions of this Section 10.6 if Borrower fails to do so for five Business Days after demand by Lender.  Borrower hereby ratifies all that Borrower's said attorney shall do by virtue of such power or authority.  Borrower hereby acknowledges and agrees that Borrower shall have no claim or cause of action against Lender arising out of Lender's execution and/or recordation of any instruments by or on behalf of Borrower pursuant to the foregoing power of attorney.

**Section 10.7**   Brokers and Financial Advisors.  Borrower hereby represents that Borrower has not dealt with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower hereby agrees to indemnify, defend and hold Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein.  The provisions of this Section 10.7 shall survive the expiration and termination of this Agreement and the payment of the Debt.

## XI.    WAIVERS

**Section 11.1**    Waiver of Counterclaim.  All amounts due under this Agreement or the other Loan Documents shall be payable without setoff, counterclaim or any deduction whatsoever.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against Borrower by Lender or its agents, including Servicer, or otherwise offset any obligations to make payments required under the Loan Documents.  Any Investor or assignee of Lender's interest in and to the Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which Borrower may otherwise have against any assignor of the Loan Documents, and no such unrelated offset, counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon the Loan Documents, and any such right to interpose or assert any such offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.  If Borrower is indebted to Lender pursuant to more than one note or pursuant to any subordinate loan documents, (i) the preceding provisions shall apply to any note or other loan documents assigned or transferred by Lender, even if one or more notes are retained by Lender, and (ii) Borrower waives and releases any right to assert any claim, cause of action, offset or defense against Lender with respect to the Loan or the Loan Documents which is any way related to such other note or subordinate loan documents.

**Section 11.2**    Marshalling and Other Matters.  Borrower hereby waives, to the extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein and the pleading of any statute of limitations as a defense to payment of the Debt or performance of the Obligations.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of the Security Instrument on behalf of Borrower, and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all Persons to the extent permitted by applicable law.  Borrower hereby waives and renounces all homestead and exemption rights provided by the Constitution and the laws of the United States and of any state, in and to the Property as against the collection of the Debt, or any part thereof.  The interests and rights of Lender under the Note, the Security Instrument or in any of the other Loan Documents shall not be impaired by any indulgence, including (i) any renewal, extension or modification which Lender may grant with respect to any of the Debt, (ii) any surrender, compromise, release, renewal, extension, exchange or substitution which Lender may grant with respect to the Property or any portion thereof; or (iii) any release or indulgence granted to any maker, endorser, Borrower Party or surety of any of the Debt.

**Section 11.3**    Waiver of Notice.  Borrower shall not be entitled to, and hereby waives the right to receive, any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.

**Section 11.4**    Trial by Jury.  **EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND,**

ACTION OR CAUSE OF ACTION (A) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

## XII.    MISCELLANEOUS

**Section 12.1**    Survival. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant to any of the Loan Documents, including the Certificate of Sources and Uses of Funds and the Payment Direction Letter, shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Lender.

**Section 12.2**    Governing Law.

(A)    **THIS AGREEMENT WAS NEGOTIATED IN WHOLE OR IN PART IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT TO THIS AGREEMENT WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT LAWS) AND ANY LEGAL REQUIREMENTS OF THE UNITED STATES OF AMERICA. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT**

AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK. THIS CHOICE OF GOVERNING LAW IS MADE PURSUANT TO NEW YORK GENERAL OBLIGATION LAW SECTION 5-1401.

(B)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, OR AT LENDER'S SOLE OPTION AND ELECTION IN THE STATE WHERE THE PROPERTY IS LOCATED, AND, IN EITHER INSTANCE, BORROWER WAIVES ANY OBJECTIONS WHICH BORROWER MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT HERRICK, FEINSTEIN LLP, 2 PARK AVENUE, NEW YORK, NEW YORK 10016 AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.

BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGE OF ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK, OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(C)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER BROUGHT BY BORROWER AGAINST LENDER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ARISING OUT OF THE LENDER-BORROWER RELATIONSHIP CREATED BY THE LOAN DOCUMENTS (WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE) WHICH IN ANY EVENT SHALL BE SUBJECT TO THE LIMITATIONS OF SECTION 12.21, MAY ONLY BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK AND BORROWER HEREBY WAIVES ANY RIGHT TO BRING ANY CLAIM OR CAUSE OF ACTION IN ANY OTHER JURISDICTION AND HEREBY AGREES NOT TO DO SO.

**Section 12.3**   Modification; Waiver in Writing. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of any other Loan Document, nor consent by Lender to any departure by any Borrower Party from the Obligations, shall in any event be effective unless the same shall be in a writing signed by the Person against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on any Borrower Party shall entitle any Borrower Party to any other or future notice or demand in the same, similar or other circumstances.

**Section 12.4**   Delay Not a Waiver. Neither any failure nor any delay on the part of Lender in insisting upon strict performance or compliance of any term, condition, covenant or agreement, or Lender's delay in exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 12.5**   Notices. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing (including by facsimile) and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, (b) overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (c) by facsimile (with a copy sent contemporaneously by certified or registered United States mail, postage prepaid) answer back acknowledged), addressed as follows:

|  |  |
|---|---|
| If to Borrower: | 1407 Broadway Real Estate LLC |
|  | c/o The Lightstone Group |
|  | 326 Third Street |
|  | Lakewood, New Jersey 08701 |
|  | Attention: David Lichtenstein |
|  | Telephone: (732) 367-0129 |
|  | Facsimile: (732) 363-7183 |

with a copy to:

1407 Broadway Real Estate LLC
c/o The Prime Group Realty Trust
77 West Wacker Driver
Suite 3900
Chicago, Illinois 60601
Attention:  Jeffrey A. Patterson
Telephone:  (312) 917-4234
Facsimile:  (312) 917-1597

with a copy to:

Herrick, Feinstein LLP
2 Park Avenue
New York, New York 10016
Attention:  Sheldon Chanales, Esq.
Telephone:  (212) 592-1472
Facsimile:  (212) 545-3313

If to Lender:    Lehman Brothers Holdings Inc.
399 Park Avenue
8th Floor
New York, New York 10022
Attention:  Charles Manna
Telephone:  (212) 526-4071
Facsimile:  (646) 758-5366
MTS No.:  WH4463

with copies to:

Lehman Brothers Holdings Inc.
399 Park Avenue
8th Floor
New York, New York 10022
Attention:  David Broderick
Telephone:  (212) 526-2453
Facsimile:  (646) 758-5311
MTS No.:  WH4463

and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  W. Michael Bond, Esq.
Telephone:  (212) 310-8035
Facsimile:  (212) 310-8007

with a copy to

Servicer:                    TriMont Real Estate Advisors
Monarch Tower
3424 Peachtree Road NE
Suite 2200
Atlanta, Georgia  30326
Attention:  J. Gregory Winchester
Telephone:  (404) 420-5600
Facsimile:  (404) 420-5610
MTS No.:  WH4463
Asset No.:  1152701

or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section. A notice shall be deemed to have been given: in the case of hand delivery, at the time of delivery; in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day, in the case of facsimile, upon completion of transmission before 5:00 p.m. at the recipient's location (otherwise on the following Business Day) with receipt acknowledged by the recipient thereof (which is confirmed by telephone or by a statement generated by the transmitting machine).

**Section 12.6**  Headings.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. "Section" refers to the entire section and not to any particular subsection, paragraph or other subdivision. Reference to days for performance shall mean calendar days unless Business Days are expressly indicated.

**Section 12.7**  Severability.  If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents.

**Section 12.8**  Preferences.  Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by any of the Borrower Parties to any portion of the

Obligations. To the extent any of the Borrower Parties makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Bankruptcy Law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the Obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

**Section 12.9** Expenses. Subject to the provisions of this Agreement, Borrower covenants and agrees to pay to Lender upon receipt of written notice from Lender for all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees and disbursements) incurred by Lender and/or Servicer in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for the Borrower Parties (including any opinions requested by Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property); (ii) the ongoing performance of and compliance with the respective agreements and covenants of the Borrower Parties contained in this Agreement and the other Loan Documents; (iii) Lender's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents, including Lender's administration and servicing of the Loan; provided, that Borrower shall not be responsible for any servicing fee payable by Lender; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Lender; (v) securing compliance with any requests made by any Borrower Party pursuant to any provision of any of the Loan Documents; (vi) the filing and recording of the Loan Documents, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (vii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting any Borrower Party, this Agreement, the other Loan Documents, the Property, or any other security given for the Loan; (viii) costs incurred by Lender in the review of easements, lot line agreements or similar matters, the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, and other similar items required by Borrower in connection with Borrower's use and enjoyment of the Property; (ix) costs incurred by Lender in responding to any subpoena or participating in, observing or preparing for any deposition or other legal or quasi-legal process; and (x) the amounts described in Section 7.4. Any cost and expenses due and payable to Lender shall be payable within five (5) Business Days of demand, shall be secured by the Loan Documents, and if not paid when due, shall bear interest at the Default Rate until paid.

**Section 12.10** Relationship of Borrower and Lender. The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Note, the Security Instrument, this Agreement and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of the debtor and creditor relationship

established pursuant to the Loan Documents. The relationship of Borrower and Lender is created and governed solely by the Loan Documents.

**Section 12.11** No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)    Any provision herein or in any of the other Loan Documents to the contrary notwithstanding, Lender, by virtue of its acceptance of this Agreement and the making of the Loan or any approval rights Lender may have herein or in any of the Loan Documents shall not be deemed to constitute Lender a mortgagee-in-possession, tenant-in-common, or in control of, or a partner or joint venturer with, or insider (within the meaning of Section 101(31) of the Bankruptcy Code) of, any Borrower Party or any other Person; and Borrower shall indemnify Lender against, shall hold Lender harmless from, and shall reimburse Lender for, any and all claims, demands, judgments, penalties, fines, liabilities, costs, damages and expenses, including court costs and reasonable attorneys' fees incurred by Lender (whether incurred in connection with nonjudicial action, prior to trial, at trial, or on appeal or review) in any action against or involving Lender resulting from such a construction of the Loan Documents.

(b)    Any inspection of the Property, any review or approval of any plans, contracts, subcontracts (including environmental reviews, audits, assessments and/or reports relating to the Property), and review or approval of budgets, expenses or obligations or any analysis of the Property made by Lender or any of its agents, architects or consultants is intended solely for the benefit of Lender and shall not be deemed to create or form the basis of any warranty, representation, covenant, implied promise or liability to Borrower or any of its employees or agents, any guest or invitee upon the Property, or any other Person.

(c)    Except as otherwise provided in Article VIII hereof, this Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and any Servicer appointed by Lender and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender, the Servicer appointed by Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained in the Loan Documents. Except as otherwise provided in Article VIII hereof, all conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

**Section 12.12** Publicity. All news releases, publicity or advertising by the Borrower Parties or their Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents or to Lender, or any of their Affiliates (other than any disclosures required by applicable law, rule or regulation) shall be subject to the prior written approval of Lender.

**Section 12.13** Subrogation. If any or all of the proceeds of the Note have been used to extinguish, extend or renew any Indebtedness heretofore existing against the Property, then, to

the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, Liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such Indebtedness and such former rights, claims, Liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the Lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of the Obligations.

**Section 12.14** Duplicate Originals; Counterparts. This Agreement may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original. This Agreement may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which together shall constitute one agreement. The failure of any party hereto to execute this Agreement, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

**Section 12.15** Liability. If Borrower consists of more than one Person, the obligations and liabilities of each such Person hereunder shall be joint and several. This Agreement shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns forever.

**Section 12.16** Prior Agreements. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, including any term sheets, discussion outlines or commitment letters (as same may be amended) between any of the Borrower Parties and Lender are superseded by the terms of this Agreement and the other Loan Documents.

**Section 12.17** No Usury. Any provision herein, in any Loan Document or any other document executed or delivered in connection with the Loan, or in any other agreement or commitment, whether written or oral, expressed or implied, to the contrary notwithstanding, Lender shall not in any event be entitled to receive or collect, nor shall or may amounts received hereunder be credited, so that Lender shall be paid, as interest, a sum greater than the maximum amount permitted by applicable law to be charged to the Person primarily obligated to pay the Debt and the Obligations at the time in question. If any construction of this Agreement, any other Loan Document, or any other document executed or delivered in connection herewith, indicates a different right given to Lender to ask for, demand or receive any larger sum as interest, such is a mistake in calculation or wording which this clause shall override and control, it being the intention of the Borrower and Lender that this Agreement, any other Loan Document and any other documents executed in connection herewith conform strictly to applicable usury laws. In no event shall the amount treated as the total interest exceed the maximum amount of interest which may be lawfully contracted for, charged, taken, received or reserved by Lender in accordance with the applicable usury laws, taking into account all items which are treated as interest under applicable law, computed in the aggregate over the full term of the Loan evidenced hereby. In the event that the aggregate of all consideration which constitutes interest under applicable law that is taken, reserved, contracted for, charged or received under this Agreement, any other Loan Document and any other documents executed in connection herewith shall ever exceed the maximum nonusurious rate under applicable law, any sum in excess thereof shall be applied to the reduction of the unpaid principal balance of the Debt and the Obligations, and if

the Debt and the Obligations are paid in full, any remaining excess shall be paid to Borrower. In determining whether or not the interest paid or payable, under any specific contingency, exceeds the maximum nonusurious rate under applicable law, if any, the Borrower and Lender shall, to the maximum extent permitted under applicable law, (a) characterize any nonprincipal amount as an expense or fee rather than as interest, (b) exclude voluntary prepayments and the effects thereof, or (c) "spread" the total amount of interest throughout the entire term of the Debt and the Obligations so that the interest rate is uniform throughout the entire term of the Debt and the Obligations; provided, however, that if the Debt and Obligations are paid and performed in full prior to the end of the full contemplated term thereof, and if the interest received for the actual period of existence thereof exceeds the maximum nonusurious rate, if any, Lender shall refund to Borrower the amount of such excess.

**Section 12.18** Construction. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender by virtue of the fact that this Agreement or any of the Loan Documents has originated with Lender as drafter. Borrower acknowledges that Borrower has reviewed this Agreement and the other Loan Documents and has had the opportunity to consult with counsel on same. This Agreement and the other Loan Documents, shall therefore be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of the parties to the Loan Documents. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.

**Section 12.19** Lender's Discretion. Except as otherwise specifically provided herein, whenever pursuant to this Agreement or any of the Loan Documents, Lender may approve or disapprove any act (or any action) or any document, delivery or other item, or where Lender's consent or approval is required in any respect or where any document or other item must be satisfactory to Lender, except in those specific instances where Lender has specifically agreed not to unreasonably withhold Lender's consent pursuant to the terms of this Agreement or any of the Loan Documents, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory or to grant or withhold consent shall be in the sole, absolute and unfettered discretion of Lender, without any express or implied obligation of reasonableness or good faith whatsoever and shall be final and conclusive. Borrower acknowledges and agrees that in no circumstance shall Borrower have any claim or cause of action, in contract or in tort, against Lender as a result of the granting or withholding of any such consent or approval. The inclusion of references to Lender's sole or absolute discretion in any particular provisions of this Agreement or any of the Loan Documents shall not limit or affect the applicability of this Section to all provisions of this Agreement or any of the Loan Documents, including those provisions wherein a specific reference to Lender's sole and absolute discretion is not made. Without limiting the preceding provisions of this Section, in the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or in bad faith or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or in good faith or promptly, Borrower agrees that neither Lender, Servicer nor their agents or employees shall be liable for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence

and strict liability) or any other legal or equitable principles, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Lender has acted reasonably or in good faith shall be determined by an action seeking declaratory judgment.

**Section 12.20** Lender. The rights of Lender pursuant to this Agreement and the other Loan Documents are in addition to all of the rights of Lender or any Affiliate of Lender may now or hereafter have by virtue of any ownership, directly or indirectly, in Borrower or any Affiliate of Borrower. In acting as Lender pursuant to this Agreement or the Loan Documents, Borrower acknowledges that Lender shall owe no duties of any kind to Borrower or any other Person (other than those specifically stated in the Loan Documents) on account of such role of Lender or any Affiliate of Lender or by virtue of any ownership interest in Borrower or such Affiliates (directly or indirectly) or otherwise, and there shall be no limitations on Lender's rights or remedies or Lender's ability to act solely in Lender's best interests or in Lender's discretion, notwithstanding the role of Lender or any such Affiliate of Lender may have by virtue of any ownership interest in Borrower or any Affiliate of Borrower. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to Lender under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by Lender or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire (directly or indirectly) in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies. No assignee of any of Lender's rights with respect to the Loan or the Loan Documents shall be prejudiced or affected by the status of Lender or any such Affiliate of Lender as a member, partner, stockholder or other owner of Borrower or any Affiliate of Borrower or any actions taken or not taken by Lender or its Affiliates prior to the assignment to the then current Lender and upon any such assignment, such assignee shall be in the same position as if such assignee had originated the Loan itself as of the date of such assignment and shall not be subject to any offsets, counterclaims or defenses to which Lehman Brothers Holdings Inc., any other Person which may from time to time be the "Lender" hereunder or their respective Affiliates might be subject. Borrower acknowledges that Lender and its Affiliates engage in the business of real estate financings and other real estate transactions and investments, which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

**Section 12.21** Limitation on Liability. Notwithstanding anything contained herein to the contrary, Borrower agrees that none of Lender, Servicer or their agents or employees shall be liable to Borrower for any monetary damages (including any special, consequential or punitive damages whatsoever), whether in contract, tort (including negligence and strict liability) or any other legal or equitable principle and Borrower's sole remedies shall be limited to commencing an action for specific performance.

**Section 12.22** Lockbox. Borrower, Lender and Servicer have entered in that certain Lockbox, Pledge and Security Agreement (together with any modification, amendment, substitution or replacement thereof, hereinafter collectively referred to as the "**Lockbox Agreement**") which provides, among other things, that all Rents and other sums collected from, or arising with respect to, the Property must be deposited in one or more accounts established in connection with such Lockbox Agreement. The Borrower shall pay all costs and expenses

required under the Lockbox Agreement. Upon the occurrence of an Event of Default, Lender may apply any sums then held pursuant to the Lockbox Agreement to the payment of the Debt in any order in Lender's sole discretion. Until expended or applied, amounts held pursuant to the Lockbox Agreement shall constitute additional security for the Debt.

**Section 12.23** Appointment of Servicer and Delegation of Lender Rights. Borrower acknowledges and agrees that at the option of Lender, the Loan may be serviced by a servicer/trustee (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement between Lender and Servicer; provided, however, such delegation will not release Lender from any of its obligations under the Loan Documents. Borrower shall be responsible for the payment of all out-of-pocket costs and expenses incurred by Servicer (but not fees to Servicer) in connection with the Loan (including the review and approval of or consent to Leases and the negotiation of subordination, non-disturbance and attornment agreements, property inspections, casualty or condemnation matters, or as a result of or in connection with any Default or Event of Default). Any action or inaction taken by the Servicer pursuant to this Agreement and the Loan Documents shall be binding to the same extent as if taken by Lender, and Borrower shall be entitled to rely on all actions and directions given by Servicer with respect to all matters concerning the Loan and Loan Documents unless and until Borrower receives contrary written instructions from the Lender.

## XIII.  NET PROFITS INTEREST

As a material inducement to Lender to make the Loan, Borrower is entering into the Net Profits Agreement.

**[SIGNATURE PAGE FOLLOWS]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**1407 BROADWAY REAL ESTATE LLC,**
a Delaware limited liability company

By:
Name:  David Lichtenstein
Title:  President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By:        _____
Name:    _____
Title:    Authorized Signatory

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**1407 BROADWAY REAL ESTATE LLC,**
a Delaware limited liability company

By: _____
Name: David Lichtenstein
Title:   President

**LENDER:**

**LEHMAN BROTHERS HOLDINGS INC.,**
a Delaware corporation (individually and as lead arranger and administrative agent for itself and certain co-lenders)

By: _____
Name:   Catherine Harnett
Title:   Authorized Signatory

## SCHEDULE I

### Definitions

"**Acceptable Accounting Principles**" shall mean GAAP or such other accounting methods or principles acceptable to Lender from time to time.

"**Acceptable Counterparty**" shall mean any Counterparty to an Interest Rate Cap Agreement that has and shall maintain, until the expiration of the applicable Interest Rate Cap Agreement, a long-term unsecured debt rating of not less than "AA-" from Standard ^ Poor's Ratings Group and "Aa3" from Moody's Investors Services.

"**Access Laws**" shall have the meaning set forth in <u>Section 5.19</u>.

"**Administrative Fee**" shall have the meaning set forth in <u>Section 2.5</u>.

"**Affiliate**" shall mean as to any Person, (i) any Person that directly or indirectly through one or more intermediaries controls or is controlled by or is under common control with such Person, (ii) any Person (directly or indirectly) owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (iii) any officer, director, partner or member (direct or indirect and no matter how remote) of such Person, (iv) if the such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner or member, or (v) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more. Any reference in this Agreement to a "Person and an Affiliate" shall be deemed to refer to such Person and an Affiliate of such Person and any references in this Agreement to a "Person or an Affiliate" shall be deemed to refer to such Person or an Affiliate of such Person. As used in this Agreement, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policy and/or policies of a Person, whether through ownership of voting securities or other ownership interests, by contract or otherwise.

"**Affiliate Agreement**" shall have the meaning set forth in <u>Section 4.1(z)</u>.

"**Affiliate Transaction**" shall mean any contract, agreement or other arrangement between Borrower (or any other Person if such contract, agreement or other arrangement is in any way related to the Property) and any Borrower Party or any Affiliate of a Borrower Party or pursuant to which any Borrower Party or any Affiliate of any Borrower Party or any constituent member, partner or stockholder of Borrower or any Borrower Party or any Affiliate of a Borrower Party (direct or indirect) will receive any benefit of any kind.

"**Agent**" shall have the meaning set forth in <u>Section 8.2.1(a)</u>.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Annual Budget**" shall have the meaning set forth in <u>Section 5.12</u>.

"**Applicable Interest Rate**" shall have the meaning set forth in the Note.

"**Approved Accounting Firm**" shall mean (a) one of the accounting firms commonly known as a "**Big Four**" accounting firm, (b) Grant Thornton, (c) The Schonbraun McCann Group, (d) Amper, Politziner & Mattia or (e) any other certified public accounting firm acceptable to Lender in its sole discretion.

"**Approved Annual Budget**" shall have the meaning set forth in <u>Section 5.12</u>.

"**Asbestos**" shall have the meaning set forth in the Environmental Indemnity.

"**Asset Manager**" shall mean PGRS 1407 Bway LLC, a Delaware limited liability Company.

"**Asset Management Agreement**" shall mean the Asset and Development Advisors Agreement between Borrower and Asset Manager pursuant to which Asset Manager has been engaged to perform asset management and development services relating to the Property.

"**Assignee**" shall have the meaning set forth in <u>Section 8.2.1(a)</u>.

"**Assignment and Assumption Agreement**" shall have the meaning set forth in <u>Section 8.2.1(a)</u>.

"**Assignment of Agreements**" shall mean, with respect to the Property, that certain first priority Assignment of Agreements, Permits and Contracts dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to contracts, Licenses, permits and contracts necessary for the use and operation of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Interest Rate Cap**" shall mean that certain Collateral Assignment of Interest Rate Protection Agreement, made by Borrower to Lender assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to the Interest Rate Cap Agreement as security for the Loan, consented to by the Counterparty, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Leases**" shall mean that certain first priority Absolute Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to the Leases and Rents of the Property as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Asset Management Agreement**" shall mean the Assignment of Asset Management Agreement, dated as of the date hereof, from Borrower, as assignor, to Lender, as assignee, assigning to Lender, subject to the terms thereof, all of Borrower's interest in and to Asset Management Agreement as security for the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall have the meaning set forth in Section 6.1.3(b).

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended from time to time.

"**Bankruptcy Laws**" shall mean the Bankruptcy Code together with any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"**Borrower**" shall have the meaning set forth in the preamble.

"**Borrower Parties**" shall mean the collective reference to Borrower, any guarantor, indemnitor or surety of any of the Obligations and any other Person (other than Lender) that is a party to any of the Loan Documents, other than any Property Manager that is not an Affiliate of Borrower. Individually, each of the Borrower Parties may be referred to herein as a "**Borrower Party**".

"**Business Day**" shall mean a day on which commercial banks are not authorized or required by law to close in the State of New York or in the State where the Property is located.

"**Capital Improvements Budget**" shall mean a budget identifying all of the proposed capital expenditures at the Property approved by Lender and not addressed in the Budget provided to Lender at closing.

"**Casualty**" shall have the meaning set forth in Section 6.1.1(j).

"**Casualty/Condemnation Involuntary Prepayments**" shall have the meaning set forth in Section 2.2.

"**Certificate of Sources and Uses of Funds**" shall mean the Certificate of Sources and Uses of Funds delivered to Lender in connection with the Loan.

"**Closing Date**" shall mean the date of the funding of the Loan.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, and as it may be further amended from time to time, any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Condemnation**" shall have the meaning set forth in Section 6.1.3(a).

"**Condemnation Proceeds**" shall mean any Award in respect of any Condemnation.

"**Consent and Recognition Agreement**" shall mean, collectively, (i) that certain Consent to Assignment of Asset Management Agreement and Estoppel Recognition Agreement dated as of the date hereof, executed by the Asset Manager, in favor of Lender, and (ii) any other consent and recognition agreement delivered to Lender pursuant to the terms hereof.

"**Counterparty**" shall mean an Acceptable Counterparty or any other Person which is the issuer of the Interest Rate Cap Agreement.

"**Debt**" shall mean the outstanding principal amount set forth in, and evidenced by, the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement or any other Loan Document, including, without limitation, all Protective Advances.

"**Default**" shall mean the occurrence of any event under this Agreement or under any other Loan Document which, but for the giving of notice or the passage of time, or both, would be an Event of Default.

"**Default Rate**" shall have the meaning set forth in each of the respective Note.

"**Embargoed Person**" shall have the meaning set forth in Section 5.29(e).

"**Enforcement Costs**" shall mean any and all expenses, including legal expenses, attorneys' fees and expert witness fees, (i) described in Section 7.4 of this Agreement, (ii) incurred or paid by Lender in protecting Lender's interest in the Property, (iii) incurred in collecting any amount payable under this Agreement or the other Loan Documents, or (iv) incurred in enforcing Lender's rights under this Agreement or the other Loan Documents or with respect to the Property, in each of clauses (i) through (iv) whether or not any legal proceeding is commenced hereunder or thereunder and whether or not any Default or Event of Default shall have occurred and is continuing, together with interest thereon at the Default Rate from the date paid or incurred by Lender until such amounts are repaid to Lender.

"**Environmental Indemnity**" shall mean that certain Environmental and Hazardous Substances Indemnification Agreement dated as of the date hereof, executed by the Borrower and Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Laws**" shall have the meaning set forth in the Environmental Indemnity.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall have the meaning set forth in Section 7.1(a).

"**Executive Order**" shall have the meaning set forth in Section 5.29(a).

"**Extension Fee**" shall mean a fee in an amount equal to one eighth of one percent (0.125%) of the sum of the principal balance of the Loan as of the date of transmittal of the Extension Notice.

"**Extension Notice**" shall have the meaning set forth in Section 2.7(a).

"**Financial Statements**" shall mean a balance sheet, income statement and statement of changes in financial position prepared in accordance with Acceptable Accounting Principles, and setting forth all items of income and expense and such other information required under Acceptable Accounting Principles to fairly present the financial position and results of operations of the Borrower and the Property and which shall at a minimum be consistent in scope, form and content with such statements delivered to Lender prior to the Closing Date, unless otherwise agreed by Lender, and which are otherwise reasonably acceptable to Lender.

"**First Extended Maturity Date**" shall mean January 9, 2011.

"**First Extension Option**" shall have the meaning set forth in Section 2.7.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 during the term of the Loan.

"**Full Recourse Event**" shall have the meaning set forth in Section 9.3.

"**Future Fundings**" shall have the meaning set forth in Section 2.8.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report, consistently applied.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever for any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Ground Lease**" shall mean that certain lease dated January 14, 1954 between The Prudential Insurance Company of America, as landlord, and Webb & Knapp, Inc., as tenant, which lease was initially recorded in the Office of the Register of the City of New York, New York County on January 15, 1954 in Liber 4865 of Conveyances, Page 605, as heretofore amended and assigned.

"**Guarantor**" shall mean Lightstone Holdings, LLC, a Delaware limited liability company.

"**Guaranty of Recourse Obligations**" shall mean that certain Guaranty of Recourse Obligations, dated as of the date hereof, executed by Guarantor in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hazardous Substances**" shall have the meaning set forth in the Environmental Indemnity.

"**Improvements**" shall have the meaning set forth in the Security Instrument.

"**Indebtedness**" of a Person, at a particular date, shall mean the sum (without duplication) at such date of (a) all indebtedness or liability for borrowed money; (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the

deferred purchase price of property or services (including trade obligations); (d) obligations under letters of credit; (e) obligations under acceptance facilities; (f) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person, or otherwise to assure a creditor against loss; and (g) obligations secured by any Liens, whether or not the obligations have been assumed.

"**Indemnified Parties**" shall mean (a) Lender, (b) any prior or subsequent owner or holder of the Loan or any Note, (c) any Servicer or prior Servicer of the Loan, (d) any Investor or any prior Investor, (e) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Investor or other third party, (f) any receiver or other fiduciary appointed in a foreclosure or other proceeding, (g) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (h) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or thereafter or as part of or following a foreclosure of the Loan.

"**Independent**" shall mean, when used with respect to any Person, a Person who (a) is in fact independent, (b) does not have any direct financial interest in any Borrower Party, or in any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect), and (c) is not connected with any Borrower Party or any Affiliate of any Borrower Party or any Affiliate of any constituent partner, shareholder, member or beneficiary of any Borrower Party (direct or indirect) as an officer, employee, promoter, underwriter, trustee, partner, member, director or Person performing similar functions. Whenever it is herein provided that any Independent Person's opinion or certificate shall be provided, such opinion or certificate shall state that the Person executing the same has read this definition and is Independent within the meaning thereof.

"**Independent Member**" shall have the meaning set forth in Section 4.1(s)(xxv).

"**Initial Loan Disbursement**" shall have the meaning set forth in Section 2.1.1.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(b).

"**Insurance Proceeds**" shall mean all proceeds received under Policies required to be maintained by Borrower.

"**Interest Rate Cap Agreement**" shall mean the interest rate cap agreement (together with the confirmation and schedules relating thereto) in form and substance reasonably acceptable to Lender, between an Acceptable Counterparty and Borrower obtained by Borrower on or about the date hereof pursuant to Section 2.6. After delivery of a Replacement Interest Rate Cap Agreement to Lender, the term "**Interest Rate Cap Agreement**" shall be deemed to mean such Replacement Interest Rate Cap Agreement.

"**Investor**" shall have the meaning set forth in Section 8.1.1.

"**Kamber Litigation**" shall have the meaning set forth in <u>Section 4.1(ee)</u>.

"**Land**" shall have the meaning set forth in the Security Instrument.

"**Lease**" shall mean any lease, occupancy agreement, sublease, sub-sublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of, any space in the Property, and every modification, amendment, assignment, termination, consent to assignment or other agreement relating to such lease, sublease, sub-sublease or other agreement entered into in connection with such lease, sublease, sub-sublease or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Leasing Guidelines**" shall mean the leasing guidelines set forth in <u>Schedule V</u>.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Property or any part thereof or the construction, use, alteration or operation thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, Licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including (i) Access Laws, (ii) applicable restrictive covenants, zoning ordinances and building codes, (iii) subdivision and land use laws and regulations, (iv) all applicable health and Environmental Laws and regulations, and (v) all standards and regulations of appropriate supervising boards of fire underwriters and similar agencies.

"**Lender**" shall mean Lehman Brothers Holdings Inc., a Delaware corporation, individually and as lead arranger and administrative agent for itself and certain co-lenders; provided, however, with respect to the use of the term in <u>Section 8.2</u>, "Lender" shall mean each lending institution that has entered into an Assignment and Assumption Agreement with Agent.

"**LIBOR Rate**" shall have the meaning set forth in the Note.

"**Licenses**" shall have the meaning set forth in <u>Section 4.1(j)</u>.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting the Property or any portion thereof, or any interest of Borrower therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's or materialmen's liens and other similar liens and encumbrances.

"**Loan**" shall mean the loan made by Lender to Borrower in the original principal amount set forth in, and evidenced by, the Note executed and delivered by Borrower.

"**Loan Documents**" shall mean, collectively, this Agreement, the Certificate of Sources and Uses, the Payment Direction Letter, the Note, the Security Instrument, the Lockbox Agreement, the Assignment of Leases, the Assignment of Agreements, the Environmental Indemnity, the Assignment of Asset Management Agreement, the Consent and Recognition Agreement, the Guaranty of Recourse Obligations, the Reserve Agreement, the Assignment of Interest Rate Cap, all Uniform Commercial Code financing statements filed in connection with the Loan and all other documents evidencing or securing the Loan and executed and/or delivered by one or more of the Borrower Parties in connection with the Loan excluding, however, the Net Profits Agreement. Each of the Loan Documents may be referred to herein individually as a "**Loan Document**".

"**Lockbox Account**" shall have the meaning set forth in the Lockbox Agreement.

"**Lockbox Agreement**" shall have the meaning set forth in Section 12.22.

"**Losses**" shall mean any and all claims, suits, liabilities (including strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs (including any and all costs and expenses incurred in the preservation, restoration and protection of the Property and any and all costs and expenses incurred by Lender to remedy any Partial Recourse Event), any deficiency claim in connection with the foreclosure of the Security Instrument, expenses, diminution in value of the Property, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement, punitive damages, and damages and expenses of whatever kind or nature (including but not limited to attorneys' fees and other costs of defense), including Enforcement Costs or any other amounts actually expended or incurred by Lender in connection with the Loan.

"**Loss Proceeds**" shall mean any and all Casualty insurance proceeds, condemnation awards and any settlement payments made in lieu of either which are made to Borrower in connection with or in respect of the Property.

"**Major Lease**" shall mean any Lease to any Tenant (and/or the Affiliates of such Tenant) covering more than 25,000 total rentable square feet of the Property. For purposes of determining whether a Lease is a Major Lease or a Minor Lease, any expansion rights of the Tenant shall be taken in account as if exercised in determining the rentable area leased by such Tenant.

"**Material Adverse Change**" shall mean a material adverse change in (i) the assets, operations, or financial condition of Borrower or any other Person in question, (ii) the ability to pay the Debt of Borrower or any other Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents or (vi) Lender's Lien on the Property or the priority of such Lien.

"**Material Adverse Effect**" shall mean a material adverse effect on (i) the assets, operations, or financial condition of Borrower or any other Person in question, (ii) the ability to

pay the Debt of Borrower or any other Person in question in accordance with the terms hereof and otherwise comply with the material terms of this Agreement and the Loan Documents, (iii) the Property or the value thereof, (iv) the validity, priority or enforceability of this Agreement or any other Loan Document, (v) the ability of Lender to enforce its rights and remedies pursuant to this Agreement or any other Loan Documents, (vi) Lender's Lien on the Property or the priority of such Lien, or (vii) the Loan.

"**Maturity Date**" shall have the meaning set forth in the Note.

"**Maximum Permitted Trade Payables**" shall mean unsecured trade payables incurred in the ordinary course of operating the Property and customarily satisfied within sixty (60) days in the aggregate amount not to exceed 3% of the Debt.

"**Mezzanine Borrower**" shall mean 1407 Broadway Mezz LLC, a Delaware limited liability company.

"**Mezzanine Lender**" shall mean Lehman Brothers Holdings Inc., in its capacity as holder of the Mezzanine Loan, its successor and/or assigns.

"**Mezzanine Loan**" shall have the meaning set forth in Section 5.22(f).

"**Minor Lease**" means any Lease that is not a Major Lease. For purposes of determining whether a Lease is a Major Lease or a Minor Lease, any expansion rights of the Tenant shall be taken in account as if exercised in determining the rentable area leased by such Tenant.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Net Profits Agreement**" shall mean the Net Profits Agreement dated of even date herewith made by Borrower and various other parties in favor of Lehman Brothers Holdings Inc.

"**Non-Consolidation Opinion**" shall mean an opinion of counsel to the Person in question (satisfactory to Lender in form and substance and from counsel satisfactory to Lender and containing assumptions, limitations and qualifications customary for opinions of such type and satisfactory to Lender) to the effect that a court of competent jurisdiction in a proceeding under the Bankruptcy Code would not consolidate the assets and liabilities of such Person with those of any other Person.

"**Note**" shall mean the Promissory Note dated of even herewith paid by the Borrower in favor of Lender in the original principal amount of $127,250,000.

"**Obligations**" shall mean any and all debt, liabilities and other obligations of Borrower, including all affirmative and negative covenants, to Lender or of any of the Borrower Parties in connection with the Loan or pursuant to the Loan Documents, including, without limiting the generality of the foregoing, the Debt.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower, which is signed by an authorized senior officer of the manager, managing member or general partner of Borrower on behalf of Borrower.

"**Organizational Documents**" shall mean (i) with respect to a corporation, such Person's certificate of incorporation and by-laws, and any shareholder agreement, voting trust or similar arrangement applicable to any of such Person's authorized shares of capital stock, (ii) with respect to a partnership, such Person's certificate of limited partnership, partnership agreement, voting trusts or similar arrangements applicable to any of its partnership interests, (iii) with respect to a limited liability company, such Person's certificate of formation, limited liability company agreement or other document affecting the rights of holders of limited liability company interests, and (iv) any and all agreements between any constituent member, partner or shareholder of Borrower, including any contribution agreement or indemnification agreements. In each case, "Organizational Documents" shall include any indemnity, contribution, shareholders or other agreement among any of the owners of the entity in question.

"**Original Maturity Date**" shall mean January 9, 2010.

"**Origination Fee**" shall mean a fee equal to $1,272,500.00.

"**Other Charges**" shall mean all maintenance charges, charges or amounts payable under any reciprocal easement agreement, ground rents, impositions other than Taxes, and any other charges (including any charges, payments or amounts, for which the failure to pay may give rise to a Lien against the Property), including vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Partial Recourse Event**" shall have the meaning set forth in Section 9.2.

"**Participant**" shall have the meaning set forth in Section 8.2.1(g).

"**Participations**" shall have the meaning set forth in Section 8.1.1.

"**Patriot Act**" shall have the meaning set forth in Section 5.29(a).

"**Payment Date**" shall have the meaning set forth in the Note.

"**Payment Direction Letter**" shall mean the Payment Direction Letter delivered to Lender in connection with the Loan.

"**Percentage**" shall mean with respect to each Lender, the percentage which its Committed Amount constitutes of the maximum amount of the Loan.

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively: (a) the Liens created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, and (d) statutory Liens for labor or materials

securing sums not yet due and payable, provided Borrower has given advance written notice of same to Lender.

**"Permitted Transfer"** shall mean a transaction that would otherwise be a Transfer pursuant to this Agreement, provided the following conditions are satisfied.

(A)(1) David Lichtenstein ("**Original Principal**") and/or one or more of David Lichtenstein's family members or a trust formed for the benefit of such family member, continues to own not less than twenty percent (20%) of the Borrower (whether directly or through one or more Persons); (2) written notice of any transfer pursuant to this proviso is given to Lender together with such documents relating to the transfer as Lender may reasonably require; (3) control over the management and operation of the Property is retained directly or indirectly by David Lichtenstein; (4) in the event that any Person (a "**Principal Transferee**") who does not, as of the Closing Date, own or Control, directly or indirectly, 49% or more of the partnership or membership, as applicable, interests in Borrower acquires, directly or indirectly, 49% or more of the partnership or membership, as applicable, interests in Borrower, Lender is furnished an opinion, in form and substance and from counsel reasonably satisfactory to Lender, substantially similar to the Insolvency Opinion which discusses the substantive non-consolidation of Borrower with the Principal Transferee; (5) no such transfer has any adverse effect either on the Single Purpose Entity status of Borrower under the requirements of any Rating Agency or on the status of Borrower as a continuing legal entity liable for the payment of the Debt and the performance of all other obligations secured hereby; (6) Borrower has delivered a letter from each Rating Agency confirming that any rating issued by the Rating Agency in connection with a Securitization will not, as a result of the transfer, be downgraded from the then current ratings thereof, qualified or withdrawn; and (7) in the event that any Person (together with its Affiliates) acquires a twenty percent (20%) or greater interest, directly or indirectly, in Borrower or there is a change in Control of Borrower, as a result of such transfer, Lender shall have consented to such transfer in its sole and absolute discretion; or

(B)(1) such transfer is made by devise or descent or by operation of law upon the death of a partner, member or shareholder of Borrower or its managing member or any Person owning a direct or indirect legal or beneficial interest in Borrower or its managing member; (2) written notice of any transfer pursuant to this proviso is given to Lender together with such documents relating to the transfer as Lender may reasonably require; (3) control over the management and operation of the Property is retained by the Original Principal at all times prior to the death or legal incapacity of the Original Principal and is thereafter assumed by Persons who are acceptable in all respects to Lender in its sole and absolute discretion; and (4) no such transfer, death or other event has any adverse effect either on the Single Purpose Entity status of Borrower under the requirements of any Rating Agency or on the status of Borrower as a continuing legal entity liable for the payment of the Debt and the performance of all other obligations secured hereby; or

(C) such transfer is (1) an inter vivos or testamentary transfer of all or any portion of the direct or indirect ownership interest in Borrower, is to one or more family members of Original Principal or a trust in which all of the beneficial interest is held by one or more family members of Original Principal or a partnership, limited liability company, corporation or other legal entity in which a majority of the capital and profits interests are held by one or more family

members of Original Principal; or (2) an inter vivos or testamentary transfer or issuance of capital stock (or other ownership interests) in the Borrower, whether direct or indirect to one or more family members of Original Principal, a trust in which all of the beneficial interest is held by one or more family members of Original Principal or a partnership, limited liability company, corporation or other legal entity in which a majority of the capital and profits interests are held by one or more family members of Original Principal; provided, that (i) any inter vivos transfer of all or any portion of the Property or any inter vivos transfer or issuance of capital stock (or other ownership interests) in Borrower (direct or indirect) is made in connection with Original Principal's bona fide, good faith estate planning; (ii) Original Principal does not transfer in excess of 49% of its direct or indirect ownership interest in Borrower or, if Original Principal does transfer in excess of 49% of its direct or indirect ownership interests in Borrower, Lender is furnished an opinion, in form and substance and from counsel reasonably satisfactory to Lender, substantially similar to the Insolvency Opinion which discusses the substantive non-consolidation of Borrower with the proposed transferee; and (iii) control over the management and operation of the Property is retained by the Original Principal at all times prior to the death or legal incapacity of the Original Principal and is thereafter assumed by Persons who are acceptable in all respects to Lender in its sole and absolute discretion. As used herein, "family members" shall include spouses, children and grandchildren.

For purposes of this definition, "Borrower" shall mean individually and/or collectively any of the limited liability companies comprising Borrower.

"**Person**" shall mean any individual, entity, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Policies**" or "**Policy**" shall have the respective meanings set forth in Section 6.1.1(b).

"**Premises**" shall have the meaning set forth in the granting clause of the Security Instrument with respect to the Property.

"**Property**" shall have the meaning set forth in the granting clause of the Security Instrument.

"**Property Management Agreement**" shall mean any property management agreement, construction management agreement, leasing agreement or any other agreement(s) for similar or related services, each of which must be acceptable to Lender, entered into by and between Borrower and the Property Manager, and pursuant to which the Property Manager is to provide management and other services with respect to the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Property Manager**" shall mean the property manager selected or approved by Lender in accordance with this Agreement.

"**Purchase Agreement**" shall mean that certain Sale and Purchase of Leasehold Agreement dated as of October 25, 2006 between Gettinger Associates, L.P., as seller and Lightstone 1407 LLC, as buyer.

"**Qualified Insurer**" shall have the meaning set forth in Section 6.1.1.

"**Qualified Manager**" shall mean (a) prior to any Securitization, a management company approved by Lender (which approval shall not be unreasonably withheld), and (b) following any Securitization, a management company approved by Lender (which approval shall not be unreasonably withheld) and with respect to which Lender shall have received written confirmation from the Rating Agencies that the employment of such management company will not result in a downgrade, withdrawal or qualification of the then current ratings on the Securities.

"**Rating Agency**" shall mean each of S&P, Moody's, Duff & Phelps Credit Rating Co., and Fitch, Inc., or any other nationally-recognized statistical rating agency which has been approved by Lender.

"**Recourse Event**" shall mean any Full Recourse Event or any Partial Recourse Event.

"**Rent(s)**" shall mean all rents (including fixed minimum rent and percentage rent), rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, expense reimbursements and recoveries (including all assignment fees, consent fees, surrender fees, termination fees and the lessor's share (or the share of any Affiliate of any Borrower Party) of any profits from any Tenant subletting or assignment) from Tenants, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, fees, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources (including any Service Rights granted to any Person and any warrants, stock options or other rights granted to Borrower or its Affiliates in connection with any Lease) and proceeds, if any, from business interruption or other loss of income insurance, together with all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including all guarantees, letters of credit (including the proceeds thereof) and any other credit support given by any guarantor in connection therewith, cash or securities deposited under the Leases to secure the performance by the Tenants of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Premises and the Improvements whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt.

"**Replacement Interest Rate Cap Agreement**" shall mean an interest rate cap agreement from an Acceptable Counterparty with terms substantially similar to the Interest Rate Cap Agreement and on the then current standard ISDA form for such product.

"**Replacement Management Agreement**" shall mean either (i) a management agreement with a Qualified Manager substantially in the same form and substance as the Management Agreement, or (ii) a management agreement with a Qualified Manager, which management agreement shall be reasonably acceptable to Lender in form and substance, provided, with respect to this subclause (ii) if a Securitization has occurred, Lender, at its option, may require that Borrower obtain confirmation from the applicable Rating Agencies that such management agreement will not result in a downgrade, withdrawal or qualification of the initial, or if higher, then current rating of the Securities or any class thereof.

"**Reserve Agreement**" shall mean the Reserve and Security Agreement, dated as of the date hereof, among Borrower, Lender and Servicer, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Restoration**" shall have the meaning set forth in Section 6.1.2(a).

"**Secondary Market Transaction**" shall mean any transaction in which Lender (i) sells the Loan, any of the Note and the other Loan Documents to one or more Persons (including any Investors) as a whole loan or a portion thereof, (ii) participates or syndicates the Loan to one or more Investors, (iii) deposits the Loan (or a portion thereof), and the Loan Documents with a trust, which trust may sell certificates to Investors evidencing an ownership interest in the trust assets, including a Securitization, whether or not rated by a Rating Agency (iv) otherwise sells the Loan or interest therein to Investors, or (v) pledges the Loan or any rights thereunder as collateral for any borrowing.

"**Second Extended Maturity Date**" shall mean January 9, 2012.

"**Second Extension Option**" shall have the meaning set forth in Section 2.7.

"**Securities**" shall have the meaning set forth in Section 8.1.

"**Securitization**" shall have the meaning set forth in Section 8.1.

"**Security Deposits**" shall mean all security (whether cash, letter of credit or otherwise) given to Borrower or any agent or Person acting on behalf of Borrower in connection with the Leases.

"**Security Instrument**" shall mean that certain first priority Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Financing Statement, dated as of the date hereof, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Service Rights**" shall mean any agreements, contracts, rights, licenses or other interests of any type (whether exclusive or non-exclusive) granted or given to any Person to provide any products or services to or for or with respect to the Property, any Tenant or any occupants of the Property, including any of the same related to telecommunications, internet products or services, including, but not limited to, personal computer hardware and software, internet hardware and software, internet access services, printers, video display systems, audio

sound systems and communication telephonic devices, as well as related and complementary products and services and any substitutes for, and items that are a technological evolution of, any of the foregoing products.

"**Servicer**" shall mean the servicer, if any, engaged by Lender with respect to the Loan, as more particularly described in <u>Section 12.23</u>.

"**Severed Loan Documents**" shall have the meaning set forth in <u>Section 8.1.4</u>.

"**Single Purpose Entity**" shall mean an entity, other than an individual, that is formed or organized solely for the purpose of holding, directly, an interest in the Borrower, does not engage in any business unrelated to the ownership of such interest, does not have any assets other than those related to the ownership of such interest, has its own separate books and records and its own accounts, and holds itself out as being an entity separate and apart from any other entity, and whose Organizational Documents contain provisions substantively similar to those contained in the Organizational Documents of the Borrower as of the date hereof relating to its purpose and separateness, and the requirement for direct or, if such entity is not a corporation, indirect, consent of an Independent Member to the same types of transactions specified in <u>Section 4.1(s)(xxv)</u>.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of The McGraw-Hill Companies.

"**SPE Member**" shall have the meaning set forth in <u>Section 4.1(s)(xxiv)</u>.

"**Strike Rate**" shall mean a rate per annum equal to six and one half percent (6.50%).

"**Subdivision Map**" shall have the meaning set forth in <u>Section 5.28</u>.

"**Sublease**" shall mean that certain Sub-Lease dated February 1, 1954, between Webb & Knapp, Inc., as Sublessor and Gettinger Associates, L.P., as tenant, which Sub-Lease was recorded in the Office of the Register on February 6, 1954 in Liber 4868 of Conveyances, Page 339, as heretofore amended.

"**Subleasehold Estate**" shall mean the leasehold estate created by the Sublease.

"**Sublessor**" shall mean the Sublessor under the Sublease.

"**Subsidiary**" shall mean, as to any Person, any other Person of which at least a majority of the outstanding voting stock or other ownership interests having by the terms thereof ordinary voting power to elect a majority of the board of directors or similar body of such corporation or other entity (irrespective of whether or not at the time stock of any other class or classes of such corporation or other entity shall or might have voting power by reason of the happening of any contingency) is at the time owned or controlled directly or indirectly by such Person or one or more of its Subsidiaries.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the state where the Property is located and satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Lender.

"**Syndication Documents**" shall mean the collective reference to all co-lending agreements, participation agreements, intercreditor agreements or other agreements of any kind among the Lenders and/or Agent related to the Loan.

"**Tax and Insurance Escrow Fund**" shall have the meaning set forth in Section 6.2.

"**Taxes**" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents now or hereafter levied or assessed or imposed against the Property or any part thereof, including (a) any ad valorem real or tangible personal property taxes levied against the Property and (b) any intangible personal property tax levied or imposed on Lender with respect to its ownership in the Loan.

"**Tenant**" shall mean each Person granted a possessory interest or right to use or occupy all or any portion of the Property pursuant to a Lease.

"**Title Insurance Company**" shall mean a title insurance company or authorized agent acceptable to Lender that issues the Title Insurance Policy.

"**Title Insurance Policy**" shall mean the ALTA (or equivalent if ALTA is not available in the state where the Property is located) loan title insurance policy (or mortgagee title insurance policy or policies acceptable to Lender) issued with respect to the Property and insuring Lender (in an amount satisfactory to Lender) of the validity and priority of the Lien of the Security Instrument, with all endorsements thereto as required by Lender.

"**Transfer**" shall mean any sale, assignment, conveyance, alienation, mortgage, encumbrance, pledge, hypothecation or other transfer, including any swap, derivative or other transaction shifting the risks and rewards of ownership, whether voluntary or involuntary.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the applicable state or commonwealth in which the Property is located, as the same may be amended from time to time.

"**UCC Financing Statement**" shall mean a financing statement as defined by and in accordance with the requirements of the Uniform Commercial Code including all original financing statements or original fixture financing statements and any amendments, renewals, continuations or assignments thereof evidencing a security interest granted to Lender.

## SCHEDULE II

### Conditions Precedent

Each of the following shall be satisfied by Borrower as a condition precedent to the making of the Loan, and shall represent continuing covenants of Borrower after the Closing Date.

(a)    Representations and Warranties; Compliance with Conditions. The representations and warranties of each Borrower Party contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date and no Material Adverse Change shall have occurred and no Default or Event of Default shall have occurred and be continuing; and each Borrower Party shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on their part to be observed or performed.

(b)    Delivery of Loan Documents; Title Insurance; Reports.

(i)    Note, Loan Agreement, Security Instrument, Assignment of Leases, Assignment of Agreements and other Loan Documents. Lender shall have received from Borrower fully executed (and acknowledged if required) counterparts of the Note and all other Loan Documents and evidence that counterparts of the Security Instrument and the Assignment of Leases have been delivered to the Title Insurance Company for recording, so as to effectively create upon such recording valid and enforceable first priority Lien upon the Property, in favor of Lender, subject only to the Permitted Encumbrances.

(ii)    UCCs. Lender shall have received from Borrower (i) such UCC financing statements as Lender shall require, and such financing statements shall have been filed of record in the appropriate filing offices in each of the jurisdictions required by Lender or delivered to the Title Insurance Company for filing so as to effectively create upon such filing a valid and enforceable first priority Lien on the Property in favor of Lender, subject only to the Permitted Encumbrances and (ii) a list of the principal places of business, tax identification numbers, and doing business names for the Borrower and all other information as Lender may require to properly file such UCC financing statements, all certified by the Borrower.

(iii)    Title Insurance. Lender shall have received the Title Insurance Policy dated as of the Closing Date, with co-insurance and/or reinsurance and direct access agreements acceptable to Lender. Such Title Insurance Policy shall (A) provide coverage in amounts satisfactory to Lender, (B) insure Lender that the Security Instrument creates a valid first Lien on the Property free and clear of all exceptions from coverage other than Permitted Encumbrances, (C) contain such endorsements and affirmative coverages as Lender may require and which are available in the state where the Property is located, (D) show good and marketable indefeasible fee simple title to the Property vested in Borrower, (E) name Lender as the insured, and (F) contain no "creditors' rights" exception. The Title Insurance Policy shall be assignable. Lender also shall have received evidence that all premiums in respect of the Title Insurance Policy have been paid. The Lender shall have received satisfactory UCC financing statement, tax lien, judgment, bankruptcy, litigation and other Lien searches and reports conducted by a

search firm acceptable to the Lender with respect to the Property and the Borrower Parties and all other relevant Persons, such searches to be conducted in each of the locations as shall be required by Lender.

(iv)    Survey.  Lender shall have received a current title survey for the Property, certified to the Title Insurance Company and Lender and their successors and assigns pursuant to a certification in the form and content satisfactory to Lender and prepared by a professional and properly licensed land surveyor satisfactory to Lender in accordance with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA, ACSM and NSPS in 1999 (or, if not available, the relevant state equivalent thereof).  If available, the following additional items from Table A thereof should be added to such survey: 2, 3, 4, 6, 7, 8, 9, 10, 11 and 13 or any other additional items required by Lender.  Such survey shall reflect the same legal description contained in the Title Insurance Policy referred to above relating to the Property and shall include, among other things, a metes and bounds description of the real property comprising the Property reasonably satisfactory to Lender.  The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Lender.  The surveyor's certification shall include a statement that the applicable Property is or is not in an area identified by the Federal Emergency Management Agency as an area having special flood hazards.

(v)    Insurance.  Lender shall have received valid certificates of insurance for all Policies required hereunder or under any of the Loan Documents, and evidence of the payment of all premiums payable for the existing policy period, which shall not be less than one year from the Closing Date.

(vi)    Zoning.  Lender shall have received a certificate of occupancy (or the equivalent) from the applicable city or county agency allowing for occupancy and operation of the Property reflecting the use of the Property on the Closing Date for its current and intended use, and, at Lender's option, (A) letters or other evidence with respect to the Property from the appropriate municipal authorities (or other Persons) concerning applicable zoning, subdivision, building, environmental and other laws applicable to the Property, and (B) if available in the state where the Property is located, an ALTA 3.1 zoning endorsement with parking certification for the Title Insurance Policy, and (C) if required by Lender, a zoning opinion letter, in substance satisfactory to Lender.  Lender shall have also received evidence satisfactory to Lender that the Property is independent of any other real property for taxing purposes.

(vii)    Encumbrances.  Borrower shall have taken or caused to be taken such actions in such a manner so that Lender has a valid and perfected first Lien as of the Closing Date on the Property, subject only to applicable Permitted Encumbrances and such other Liens as are permitted pursuant to the Loan Documents, and Lender shall have received satisfactory evidence thereof.

(c)    Delivery of Organizational Documents; Consents.  Borrower shall have delivered or caused to be delivered to Lender certified copies of all Organizational Documents related to the Borrower Parties and if any of the Borrower Parties is a partnership or limited liability company, the partners or members thereof, as Lender may request in its sole discretion,

including good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the entering into of the Loan and incumbency certificates as may be requested by Lender. The Lender shall have received copies of all consents, Licenses and approvals, if any, required in connection with the execution, delivery and performance by the Borrower Parties and the validity and enforceability of the Loan Documents and such consents, Licenses and approvals shall be in full force and effect. Lender shall have received a chart depicting the ownership structure of the Borrower, each constituent partner or member of Borrower (including their respective ownership interests, direct or indirect, and capital contributions), which chart shall identify each Person who owns or controls, directly or indirectly, any such partner or member of Borrower.

(d)    Opinions of Borrower's Counsel. Lender shall have received opinions of counsel to the Borrower Parties (i) with respect to non-consolidation, including such Non-Consolidation Opinions, as Lender or any Rating Agency may require and (ii) with respect to due execution, authority, enforceability (including no usury) of the Loan Documents and such other matters as Lender may require, all such opinions to be in form, scope and substance satisfactory to Lender and Lender's counsel.

(e)    Budgets. Borrower shall have delivered, and Lender shall have approved, a preliminary budget for the remainder of the 2007 Fiscal Year in form and substance satisfactory to Lender in its reasonable discretion on the Closing Date. Within 90 days after the Closing Date, Borrower shall deliver, and Lender shall approve an Annual Budget for the for the remainder of the 2007 Fiscal Year in form and substance satisfactory to Lender in its reasonable discretion (which shall include a budget for such repairs, replacements and reserves as Lender may require).

(f)    Taxes, Insurance Premiums and Other Charges. Borrower shall have paid all Taxes, Insurance Premiums and Other Charges relating to the Property which are due and payable or in arrears, including (i) accrued but unpaid Insurance Premiums, (ii) currently due Taxes (including any in arrears) relating to the Property, and (iii) currently due Other Charges relating to the Property, which amounts may be funded with proceeds of the Loan if such proceeds are sufficient therefor and as set forth in the Certificate of Sources and Uses of Funds.

(g)    Omitted.

(h)    Payments. All payments, deposits or escrows required to be made or established by the Borrower under this Agreement, and the other Loan Documents on or before the Closing Date shall have been paid and Lender shall have received (i) a settlement statement setting forth the disbursement of the Loan in form and content satisfactory to Lender and (ii) tax and insurance bills for the two calendar years prior to the Closing Date.

(i)    Third Party Reports. Lender shall have received a MAI appraisal report (prepared in compliance with FIRREA) (provided that Lender may accept evidence of value other than an MAI appraisal report, as determined by Lender), structural engineering report (identifying, among other things, (i) deferred maintenance for the Property and the cost thereof and (ii) a 10 year schedule of anticipated capital expenditures and the per annum cost thereof) and environmental property condition report (Phase I environmental reports for the Property and,

where environmental consultants recommends, Phase II reports and/or further investigation or as Lender otherwise determines are required); each addressed to Lender and in form and substance satisfactory to Lender and dated within six (6) months of the Closing Date, or if approved by Lender, if such third party reports that are not dated within six (6) months of the Closing Date but are otherwise acceptable to Lender, Borrower has delivered a reliance letter to Lender within six (6) months of the Closing Date that is in form and substance satisfactory to Lender. An appraiser, engineer and environmental specialist, each satisfactory to Lender, shall perform the appraisal and the structural engineering and environmental property condition reports.

(j)    Financial Statements. Lender shall have received copies of certified or audited annual Financial Statements (or statements prepared in accordance with procedures agreed upon by Lender) for each Guarantor and the Property for the preceding two Fiscal Years, to the extent available from the seller of the Property, prepared in accordance with Acceptable Accounting Principles and otherwise in form and content acceptable to Lender.

(k)    Omitted.

(l)    Rent Roll. Lender shall have received a rent roll with respect to the Property (with Lease expiration dates) as of the last full month prior to the Closing Date in form and content acceptable to Lender and certified by Borrower as being true, correct, complete and accurate.

(m)    Leases, Contracts and Permits; Subordination. Lender shall have received copies of all Leases, permits and contracts related to the Property. Lender shall have received appropriate instruments acceptable to Lender subordinating all of the Leases affecting the Property and any other contractual agreements affecting the Property designated by Lender to the Security Instrument. Lender shall have received an agreement to attorn to Lender satisfactory to Lender from every Tenant under a Lease (either by separate instrument or pursuant to the terms of the Lease, as elected by Lender).

(n)    Fees. Lender shall have received the Origination Fee.

(o)    Property Manager Deliveries. Lender shall have received a true, correct and complete fully-executed copy of the Property Management Agreement.

(p)    Asset Manager Deliveries. Lender shall have received a true, correct and complete fully-executed copy of the Asset Management Agreement and an executed Consent and Recognition Agreement from the Asset Manager.

(q)    Costs. Borrower shall have paid all of Lender's cost and expenses associated with the making of the Loan with respect to the Property, including all out-of-pocket due diligence expenses, the cost of all third party reports (such as but not limited to environmental, structural, appraisal and/or market study), legal fees and expenses, survey costs, title costs, etc.

(r)    Separate Lot. Lender shall have received evidence that the Property (x) is comprised of one (1) or more parcels which constitute a separate tax lot or lots and (y) does not constitute a portion of any other tax lot not a part of the Property.

(s)    Utilities/Parking.  Lender shall have received evidence that all utility services (including utility letters) and parking required for the Property are available (which evidence may consist of the survey set forth in clause (c)(iv) above for the Property reflecting such utility services and parking).

(t)    Standard Form Lease.  Borrower shall have delivered to Lender for approval by Lender in Lender's sole discretion, the standard lease form for the Property.

(u)    Further Documents.  Lender or its counsel shall have received such other and further approvals, opinions, documents and information as Lender or its counsel may have reasonably requested in form and substance satisfactory to Lender and its counsel.

(v)    Purchase Agreement.  Borrower shall have delivered a true and correct copy of the Purchase Agreement to Lender, together with all amendments and modifications thereto and a written certification by Borrower that all closing requirements and conditions under such Purchase Agreement have been satisfied by the seller thereunder and have not been waived.

## SCHEDULE III

### Pending Litigation

Kamber Litigation

## SCHEDULE IV

### Disclosure Schedule

Asset Management Agreement.

## SCHEDULE V

### Leasing Guidelines

A.    Proposed Minor Leases.

(a)    Lender's approval shall not be required for any Minor Leases or amendments, extensions, cancellations, terminations or modifications to Minor Leases (collectively a "**Lease or Modification**"), if, but only if, the Lease or Modification meets the following criteria (the "**Leasing Criteria**"):

(1)    The Lease or Modification is being entered into with a Tenant on arms length terms (with no inducements, agreements or other transactions unrelated to the Project, Lease or Modification).

(2)    The rental rate is the per-square-foot market rate per year for comparable office space, and is the per-square-foot market rate per year for comparable retail space.

(3)    The Lease term, including all extension or renewal options shall not exceed ten (10) years.

(4)    The rights of the Tenant to assign the Lease or Modification or sublet any portion of the demised premises under the Lease or Modification (other than to Affiliates of the Tenant or purchasers of a majority of Tenant's stock or assets) shall provide that the Tenant shall remain primarily liable under the Lease or Modification.

(5)    The Lease or Modification shall not conflict with any existing Leases.

(6)    The Lease shall not contain any option to purchase the Subleasehold Estate or any portion thereof.

(7)    The Lease shall be on the standard form lease, with such negotiated revisions as Borrower may reasonably agree and in accordance with the requirements for Leases under Section 5.15(a).

(8)    The Lease shall require the holders of any mortgage to execute a subordination, non-disturbance and attornment agreement in favor of Tenant.

(b)    If the Lease or Modification contains any deviations from the Leasing Criteria set forth above, then such deviations must be approved in writing by Lender, which approval may be granted or withheld in Lender's commercially reasonable discretion.

B.    Major Leases or Major Lease Modifications.  Lender's approval, which approval may be granted or withheld in Lender's commercially reasonable discretion shall be required for any Major Lease or amendments, extensions, cancellations, terminations or modifications to a Major Lease.  Borrower shall submit to Lender a term sheet, which shall contain all of the

material terms of the lease arrangement or the modification with respect to the Major Lease to be approved. If Lender fails to grant or withhold its consent in writing (i) within a period of ten (10) Business Days after it has received a request for consent accompanied by the term sheet and (ii) within an additional period of two (2) Business Days after it has received a second request for consent and which second notice shall advise Lender (in 14-point type or larger) that if Lender fails to respond to Borrower's second request for consent within such two (2) Business Day period Lender shall be deemed to have approved the term sheet with respect to the Major Lease in question, then Lender shall be deemed to have approved the Major Lease in question.

C.    Credit Support. Borrower shall not materially alter, modify, amend, cancel or terminate any guaranty, letter of credit, or other credit support with respect to any Major Lease or Major Lease Modification without the prior written consent of Lender, which approval may be granted or denied in Lender's commercially reasonable discretion.

D.    Assignment and Subletting. Except as set forth in a Lease previously approved by Lender, (i) Borrower shall not consent to any assignment or of any Lease without the prior written consent of Lender if the Lease or Modification would require Lender's approval, and (ii) Borrower shall not permit or allow any assignment or sublease to Borrower, or an Affiliate of Borrower.

E.    Lease Guaranties. Neither Borrower nor any Affiliate shall enter into any agreement in connection with the Project guaranteeing or agreeing to pay rent for any other space for a prospective Tenant without Lender's prior written consent.

F.    Lenders' Approval.    If Lender fails to grant or withhold its consent in writing to any request for consent under this Schedule V (i) within a period of ten (10) Business Days after it has received a request for consent accompanied by such documentation as Lender may reasonably request and (ii) within an additional period of two (2) Business Days after it has received a second request for consent and which second notice shall advise Lender (in 14-point type or larger) that if Lender fails to respond to Borrower's second request for consent within such two (2) Business Day period Lender shall be deemed to have approved the request in question, then Lender shall be deemed to have approved the request in question.