UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | Case No. 08-13555 (JMP) |
| | (Jointly Administered) |
| Debtors. | |

------------------------------------------------------------x

**DECLARATION OF VICTORIA A. CORY IN SUPPORT OF
MOTION OF 1407 BROADWAY REAL ESTATE LLC AND
PGRS 1407 BWAY LLC FOR AN ORDER
(I) COMPELLING LEHMAN BROTHERS HOLDINGS INC. TO
COMPLY WITH ITS LENDING OBLIGATIONS OR ALTERNATIVELY, (II)
GRANTING 1407 BROADWAY REAL ESTATE LLC AND PGRS 1407 BWAY LLC
<u>RELIEF FROM THE AUTOMATIC STAY</u>**

Victoria A. Cory, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1. I am a Senior Vice President of Prime Group Realty Trust ("<u>Prime Group</u>"), and I am in charge of Prime's loan administration, real estate tax and due diligence group. Prime Group is the managing general partner of Prime Group Realty L.P., which is in turn the sole owner of PGRS 1407 BWAY LLC ("<u>PGRS 1407</u>") I submit this declaration in support of the Motion[1] of Prime Group and1407 Broadway Real Estate LLC ("<u>1407 Broadway</u>" and together with PGRS 1407, the "<u>Movants</u>") pursuant to sections 105, 362(d) and 365(c) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") for entry of an order compelling Lehman Brothers Holdings Inc. ("<u>Lehman</u>") to comply with its obligations to lend under the Loan Agreement, or alternatively, granting the Movants relief from the automatic stay. I have

---

[1] Unless defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

73553.2

1

reviewed the Motion and attest to the following facts upon personal knowledge, unless otherwise stated herein.

2.   PGRS 1407 is the asset and development manager of the property owned by the borrower, 1407 Broadway, and is also an affiliate of the borrower's.   In connection with those relationships, I have become generally familiar with the terms of the Loan, and in particular, the Loan Agreement, including the Building Loan Agreement, as PGRS 1407 handles the asset and development management of 1407 Broadway's property and assists 1407 Broadway in complying with its obligations to Lehman under the Loan.

3.   I or someone acting under my supervision is responsible for assembling much of the paperwork that 1407 Broadway is required to provide under the Loan, including budgets, title commitments, leasing reports, insurance, and construction work orders.  In addition, I work regularly with the people who supervise the collection of rents and their deposit into the Lehman/Trimont lockbox account, and the funding of interest payments and the various reserves from the lockbox funds.  After the monthly interest and reserve payments are made, the remaining funds become available to 1407 Broadway, and can be used to pay the ordinary operating expenses of the 1407 Broadway property.

4.   Since May of 2007, I have made multiple requests for "future fundings" (as defined in the Loan Agreement) to Lehman, through its agent, Trimont Real Estate Advisors. I have been authorized to make such requests by and on behalf of 1407 Broadway, and in each instance, I sent a written request for funding, accompanied by a borrowing affidavit and any other documents and budgets called for under the Loan.  Through September of 2008, Lehman honored all of those funding requests, which totaled $7,709,490.96.  As of September 2008,

73553.2

$390,509.04 remained available to 1407 Broadway under the Building Loan Agreement and an additional $13,150,000 was available to 1407 Broadway under the Loan generally.

5. Upon learning of Lehman's bankruptcy filing in mid or late September 2008, I checked about how to proceed with our twelfth request for funding under the Loan and was advised that the procedures for submitting a funding request had not changed, and that the new request should be made through Trimont, in the same manner as in the past.

6. By a letter dated October 7, 2008, I communicated 1407 Broadway's twelfth request for funding under the Loan to Trimont. A copy of that letter is attached as **Exhibit 1** to this Declaration. The request was for $908,307.82 and was well within the borrowing limits under the Loan.

7. As of the date of the twelfth request, to the best of my knowledge, information and belief, 1407 Broadway was not in default under the Loan and had complied with the requirements for funding set out in the Loan Agreement, including the Building Loan Agreement.

8. On October 17, 2008, I exchanged e-mails with Derek Dobson of Trimont. He acknowledged the receipt of paperwork supporting the funding request, and advised me that "everything is good to go" and that he had submitted the funding request to Lehman for approval. I checked in with Mr. Dobson again on October 24th and October 27th, but he advised me that Trimont was still waiting to hear from Lehman about our funding. In late October, I also sent Trimont an updated budget for the last four months of 2008 and a proposed budget for 2009.

9. I exchanged emails with Trimont again on November 7th, once again asking about the status of the funding. Mr. Dobson again replied via e-mail that he was unsure of the timing of the funding and was still waiting to hear from Lehman.

73553.2

3

10. Given Mr. Dobson's responses to my inquiries, I focused my energies on contacting Charles Manna of Lehman. I sent multiple e-mails and left several voicemail messages for Mr. Manna during the last week of November and the first week of December.

11. I received no response to any of my communications, and eventually, I communicated, through my supervisor, my frustration to Joseph Teichman at The Lightstone Group. The Lightstone Group is also affiliated with PGRS 1407 and 1407 Broadway, and Mr. Teichman has assisted us in the past in communicating with Lehman.

12. Mr. Teichman subsequently notified me that he had spoken to Charles Manna of Lehman on December 4th and was scheduled to speak to him again on the 5th. I heard nothing else in the month of December, but in the middle of the month, I did send Trimont the November leasing reports on the 1407 Broadway property.

13. I exchanged e-mails with Bradley Keebler at Trimont on January 6, 2009, and he confirmed that Trimont had received our new budget on October 30, 2008. I received anothert e-mail from Mr. Keebler, also on January 6th, stating that Trimont was continuing to ask Lehman about the funding of the 1407 Broadway loan.

14. On January 19, 2009, I learned that some of my colleagues, including Joseph Teichman, had communicated with Charles Manna of Lehman about both our existing funding request and 1407 Broadway's need for additional monies. I therefore prepared a letter, memorializing the thirteenth request for additional funding in the amount of $1,110,893.37. A copy of that letter, which is dated January 21, 2009, is attached as **Exhibit 2** to this Declaration.

15. To the best of my knowledge, 1407 Broadway has been in compliance with the Loan at all times during this process. Monthly debt service has been paid through the lockbox arrangement, with Trimont sweeping the lockbox account on the 9th day of each month,

73553.2

4

08-13555-mg    Doc 2752-3    Filed 02/06/09    Entered 02/06/09 17:20:47    Exhibit (B)
                         Cory Declaration    Pg 5 of 5

and depositing the required amounts into the tax and leasing escrows, and transferring the interest payment to Lehman. Moreover, the Loan Agreement requires that copies of all notices to 1407 Broadway be sent to Prime Group, and any notices or correspondence about this Loan received by Prime Group would, as a matter of course, be directed to my attention. I have never received any notice of default with respect to the Loan or any notice that the revised 2008 or proposed 2009 budget has been rejected by Lehman.

16. Lehman's continuing failure to fund has become a matter of some urgency, as the requested funds are needed to make capital improvements to the building, do necessary construction for tenants and generally insure that the property is a first class building. While I very much doubt that there would ever be a good time for a lender to breach its lending obligations and obstruct such necessary work, maintaining the building as a first class facility is particularly important in the current real estate market.

Executed on:   February 6, 2009

                                                                                      */s/ Victoria A. Cory*
                                                                                       Victoria A. Cory

73553.2
5