**Expedited Hearing Requested**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Alfredo R. Perez

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                             :
In re                                        :    Chapter 11 Case No.
                                             :
LEHMAN BROTHERS HOLDINGS INC., et al.,       :    08-13555 (JMP)
                                             :
                          Debtors.           :    (Jointly Administered)
                                             :
                                             :
----------------------------------------------------------------x
```

## LBHI'S MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9019 AND 6004, FOR AUTHORIZATION TO INCREASE THE CAPITAL LEVEL OF LEHMAN BROTHERS BANK, FSB THROUGH (I) THE SETTLEMENT OF PENDING DISPUTES AND (II) A DIRECT CAPITAL CONTRIBUTION OF UP TO $15 MILLION

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the

above-referenced chapter 11 cases, as debtors and debtors in possession (together, the

"Debtors" and, collectively with their non-debtor affiliates, "Lehman"), file this Motion

and respectfully represent:

**Preliminary Statement**

1.      It is critical that the regulatory capital level of Lehman Brothers Bank, FSB ("FSB" or the "Bank") – LBHI's indirect wholly owned non-debtor subsidiary – be increased to preserve LBHI's opportunity to realize the fair value of both FSB and Woodlands Commercial Bank in order to maximize recoveries to LBHI's creditors.[1]  As of September 30, 2008, FSB's financial statements of the Bank reported the value of LBHI's equity interest in FSB at $1 billion.  Since September 30, 2008, there has been no significant adverse change in the composition of the Bank's assets or its liabilities.  However, in light of the extraordinary conditions that have befallen the financial markets in the last few months, under the fair value accounting methodology that the Bank is required to apply to its financial reports, as of December 31, 2008, the value of LBHI's equity interest is shown to have materially decreased, primarily because the Bank's loan portfolio is required to be reflected at substantially lower values below those that management of the Bank and LBHI believe could be achieved in an orderly disposition of such assets under normal credit market conditions.

2.      At December 31, 2008, the Bank's capital level was approximately $180 million below the level considered "adequately capitalized" under applicable regulatory requirements.  As a result of the Bank's diminished capital position, on February 4, 2009, the Office of Thrift Supervision (the "OTS") issued a Prompt Corrective Action directive (the "PCA"), requiring the Bank to submit a capital

---

[1] FSB is an affiliate of Woodlands Commercial Bank ("Woodlands"), both of which are wholly owned by Lehman Brothers Bancorp Inc. ("Bancorp"), which is a wholly owned subsidiary of LBHI.  On February 6, 2009, LBHI filed its Motion to Fund a Capital Contribution to Woodlands Commercial Bank (the "Woodlands Motion").  The Woodlands Motion is incorporated by reference herein.

restoration plan demonstrating how the Bank will achieve adequate capital levels required under the applicable regulations by February 28, 2009 and thereafter maintain those levels (the "PCA Plan").  Unless the Bank complies with the PCA, the Bank faces an imminent risk of the most serious of regulatory actions – the appointment of a receiver.  If a receiver is appointed, not only will FSB's assets likely be seized and subjected to a fire sale liquidation, but there is also a risk that Woodlands could be seized pursuant to a statutory cross-liability provision.  As a result, any opportunity to realize the value of both FSB and Woodlands that could be derived for the benefit of LBHI and its creditors will be permanently lost.

### Background

3.     Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.     On September 17, 2008, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

5.      On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"), a wholly owned subsidiary of LBHI and a registered broker dealer.  James W. Giddens, Esq. is the trustee appointed under SIPA (the "SIPA Trustee") and is administering LBI's estate.

## Jurisdiction

6.      This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Lehman's Business

7.      Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

8.      Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

## Relief Requested

9.      By this Motion, LBHI seeks authorization, but not direction, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code and Bankruptcy Rules

9019 and 6004, to increase the Bank's capital through (i) entry into a settlement agreement (the "Settlement Agreement") with the Bank and the Bank's wholly owned subsidiary, Aurora Loan Services, LLC ("Aurora"), pursuant to which LBHI will convey to and confirm Aurora's ownership of certain rights and funds, and (ii) a cash capital contribution to the Bank of up to $15 million (the "Cash Contribution," and, together with the Settlement Agreement, the "Capital Contribution") for the purpose of enabling the Bank to comply with the PCA.[2]  Given the exigency of the circumstances and to avoid irreparable harm to its estate, LBHI further requests that the Court waive the requirements of Bankruptcy Rule 6004(g) and direct that the order granting the relief requested herein be effective immediately.  As set forth more fully below, LBHI's decision to fund the Capital Contribution represents a reasonable exercise of its business judgment and should be approved.[3]

### Lehman Brothers Bank, FSB

The Bank's Business

       10.     FSB is a federally chartered thrift institution headquartered in Wilmington, Delaware.  FSB has operated as a centerpiece of Lehman's multi-asset loan origination, purchasing and servicing business.  The Bank's loan origination business involved issuing residential and commercial mortgage, small business, large corporate,

---

[2] The principal capital adequacy standard requires the Bank to have a total risk-based capital ratio of 8%.  As explained below, the Capital Contribution is expected, based on the Bank's December 31, 2008 TFR, to be sufficient to result in the Bank attaining the capital adequacy level.  The exact amount of the Cash Contribution cannot be determined at this time as it will depend on the final calculation of the value of the benefits Aurora will receive from the Settlement Agreement.

[3] As explained in greater detail below, this Motion and the Woodlands Motion are interrelated.  Accordingly, LBHI has requested that both Motions be heard together on February 17, 2009.

and consumer loans.  Primarily through Aurora, the Bank conducts the ninth largest

residential mortgage loan servicing operation in the U.S., servicing over $116 billion in

outstanding principal amount of residential mortgage loans for over 490,000 borrowers

across the country, including dozens of portfolios of mortgages loans held by various

securitization trusts with which Lehman has been associated (as well as certain loan

portfolios with which Lehman has had no direct association).  Together with its

subsidiaries, the Bank employs approximately 1,600 people.  The Bank has largely been

funded by brokered certificates of deposit, which mature over time on a scheduled basis.

Although the Bank's business has benefited from Lehman's extensive business

associations and pre-chapter 11 reputation as a leader in the financial industry, FSB is an

independent subsidiary controlled by a board of directors, none of whom are currently

directors, officers or employees of LBHI or any of its other subsidiaries.

           11.      The Bank is subject to the regulatory authority of the OTS and its

deposits are insured by the Federal Deposit Insurance Corporation (the "FDIC" and

together with the OTS, the "Regulators").  The OTS and FDIC regulations impose strict

restrictions on the Bank's operations, including its capital requirements.  Most

importantly for present purposes, the Bank is required to maintain sufficient capital levels

to satisfy the risk-based capital requirements in order to continue normal operations.  If

the Bank is not "adequately capitalized," the OTS and FDIC may take further regulatory

actions to restrict or control FSB's activities, including to appoint the FDIC as a receiver

to seize and liquidate the Bank's assets.  To enable the Regulators to monitor the Bank's

capital, the Bank is required, among other things, to file quarterly Thrift Financial

Reports (the "TFRs") that outline its operation and condition.  On February 5, 2009, the

Bank filed its TFR for the quarter ended December 31, 2008. Since September 2008, as the Bank's capital position has diminished, the Bank has become subject to a variety of regulatory restrictions on its operations. Notably, the Bank is not currently permitted to raise funds through issuing brokered certificates of deposits and is significantly restricted in its ability to make new loans and fund existing loan commitments.

The Bank's Value

12.    The Bank is a valuable asset of LBHI's estate. Just four months ago, the value of LBHI's equity interest in the Bank was reported at approximately $1 billion with total assets of approximately $7.2 billion and total liabilities of approximately $6.2 billion. *See* September 30, 2008 TFR, Schedule SC. On that same date, the Bank was considered "well capitalized" with a total risk based capital ratio of 10.57% in full compliance of the OTS and FDIC capital regulations.

13.    The Bank's largest asset is its loan portfolio, which consists of a wide variety of loans, including residential and commercial mortgage loans, small business and other business loans, and student loans. On its December 31, 2008 TFR, the Bank's loan receivables totaled approximately $3.1 billion, consisting of approximately $2 billion in mortgage loans, $415 million in consumer loans, and $723 million in non-mortgage loans. In addition, through Aurora, the Bank operates a mortgage loan servicing operation which collects servicing fees on a monthly basis of approximately $2.6 million. Management of the Bank and LBHI believe this operation has significant going concern value, particularly when taken together with mortgage servicing rights and

other mortgage-related assets owned by LBHI.  On December 31, 2008, the Bank also held $1.5 billion in cash and deposit accounts.[4]

14.     In its December 31, 2008 TFR, the value of LBHI's equity in the Bank is reported at approximately $467 million, reflecting total liabilities of approximately $6 billion and total assets of approximately $6.5 billion.  At this level, the Bank is considered "significantly undercapitalized" under the applicable regulations with a total risk-based capital ratio of 5.94%.  LBHI believes, however, that the reported value of LBHI's equity in the Bank does not reflect the value that can be achieved by LBHI from the Bank and that, with the assistance from LBHI contemplated by this Motion, the Bank and LBHI, in consultation with the Creditors' Committee, will have the opportunity to develop a plan under which the Bank's operations can be refocused and its capital position can not only be stabilized at the adequacy level, as required by the PCA, but also improved.[5]

15.     LBHI and the Bank are also parties to a Master Forward Agreement (the "MFA").  Under the terms of the MFA, LBHI agreed that the Bank may require LBHI to purchase certain of the Bank's loans at the Bank's cost.  Since the Commencement Date, LBHI has not performed under the MFA.  In response, the Bank has filed a proof of claim for breach of the MFA in the approximate amount of at least $2.2 billion against LBHI.

---

[4] Primarily because of Aurora's servicing activities, the Bank's holding of cash and cash equivalents varies significantly over the course of each month and typically is higher at the end of the month than at other times during a month.

[5] LBHI anticipates that it will need to provide additional support to the Bank in order for the Bank to reach a capital level that will permit the Bank to operate in a manner that will allow LBHI to realize the full value of its equity interest in the Bank.

The Effect of Applying Fair Value Accounting

16.    In 2007, in order to be consistent with the accounting practices of LBHI and its subsidiaries, the Bank adopted Financial Accounting Standards Board's Statement of Financial Accounting Standards No. 159, Fair Value Option for Financial Assets and Financial Liabilities ("FAS 159").  FAS 159 requires entities that adopt such treatment to measure certain financial instruments and other items at fair value for financial reporting purposes.  For this purpose, "fair value" is the price that would be received to sell assets in an orderly transaction between market participants at the measurement date.  This election is irreversible by the terms of FAS 159 (except in extraordinary circumstances such as a change in majority ownership).  Unlike LBHI's other subsidiaries, however, which held in large part traded securities, most of the Bank's assets consist of loans that generally are not traded, making their fair value more difficult to determine.  The adoption of FAS 159 by the Bank put it among a minority of financial institutions, the majority of which account for their assets and liabilities using amortized cost or realizable value measures rather than "fair value."  As a result of its required use of fair value accounting, the Bank's reported capital position is more variable and volatile than that of the majority of financial institutions that are not required to use this method of accounting.

17.    The effect of applying fair value accounting on the Bank's capital position during the fourth quarter of 2008 has been devastating.  Specifically, the depreciation in this period in the Bank's loan receivables reflected in the December 31, 2008 TFR as result of the application of fair value accounting approximated $640 million notwithstanding the fact that the composition of the Bank's loan portfolio has not

changed significantly during this period.  Given the current illiquid market conditions,
LBHI considers the application of this "fair value" accounting to assign an artificially
low value on these assets, which LBHI believes does not accurately reflect the Bank's
true financial condition, equity value or prospects.

The Current Crisis

18.    The Bank's December 31, 2008 TFR reports the Bank's total risk-
based capital ratio, as determined under applicable regulations, at a 5.94% level, leaving
the Bank below the 8% ratio required to be considered "adequately capitalized" under
applicable regulations.  In connection with the decline in the Bank's capital level, the
OTS issued the PCA on February 4, 2009.  The PCA requires that the Bank increase its
capital level to return to an "adequately capitalized" status and submit a capital
restoration plan demonstrating how the Bank will achieve capital adequacy by February
28, 2009 and thereafter maintain such status.

19.    Unless the Bank complies with the PCA and develops a capital
plan acceptable to OTS, the Bank and LBHI believe the OTS will take enforcement
action against the Bank, which action may result in the appointment of a receiver to
conduct a prompt liquidation of the Bank's assets.  In the current marketplace, the
resulting "fire sale" of the Bank's assets will yield little, if any, of the value of such assets
that LBHI believes could be achieved from a resolution of the Bank's affairs over time
and may adversely impact the ability of LBHI to realize value on mortgage servicing
rights and other mortgage-related assets owned by LBHI where Aurora carries out the
loan servicing role.  In addition, if a receiver is appointed, LBHI risks the seizure of
Woodlands by the Regulators pursuant to a statutory cross-liability provision.

20.     To alleviate the diminution of the Bank's capital position, LBHI seeks approval of the Settlement Agreement with the Bank's wholly owned subsidiary, Aurora, the economic benefit of which will materially increase the capital position of the Bank and is expected to bring the Bank's capital position close to the adequacy level.  To the extent a deficiency below the capital adequacy level remains after giving effect to the benefit of the Settlement Agreement, LBHI seeks approval to also make the Cash Contribution to the Bank of up to $15 million to remove the deficiency.

21.     In addition to making the Capital Contribution, LBHI, in consultation with the Creditors' Committee, will work with the Bank to develop, as soon as practicable, a capital restoration plan acceptable to the OTS and LBHI.  Pursuant to 12 U.S.C. § 1831o(e)(2)(C)(ii), to be acceptable to the OTS, the capital restoration plan must be accompanied by an undertaking from LBHI providing assurances that the Bank will comply with the capital restoration plan and continuing until the Bank has been adequately capitalized for four consecutive quarters.  Once an acceptable plan has been developed and the assurances on LBHI's part with respect to the plan have been specified, LBHI anticipates seeking approval of the Court for any further material obligations to be undertaken by LBHI in connection with the plan.  For LBHI, the goal of these actions will be to enable the Bank to operate on terms that will permit LBHI to realize over time the value of its equity interest in the Bank, as well as the value of other assets of LBHI that are related to the Bank's operations.[6]

---

[6] LBHI currently anticipates committing in connection with the plan to make additional capital contributions to the Bank under certain circumstances.  Specifically, LBHI anticipates providing a guarantee of the Bank's ability to maintain the Bank's capital at the adequacy level by committing to make capital contributions to the Bank periodically as needed for this purpose, up to a total of

The Settlement Agreement

22.     LBHI is the legal and beneficial holder of certain mortgage

servicing rights (the "MSRs") for a vast portfolio of residential mortgage loans sold by

LBHI to third parties over the years, which are currently being serviced by Aurora in

accordance with various servicing agreements (including sub-servicing agreements with

LBHI) pursuant to appointment by LBHI in connection with the sale of the loans or

similar arrangements (the "Aurora Serviced Loans").   Subject to certain conditions,

LBHI has the right to terminate Aurora's appointment as servicer of these loans.   In

addition to the Aurora Serviced Loans, Aurora services certain residential mortgage loans

pursuant to servicing rights that LBHI purchased from a third party, Residential Funding

Company, LLC (the "RFC Servicing Rights"), on or about February 19, 2008 and had

RFC deliver at that time to Aurora.

23.     Pursuant to terms of the servicing agreements related to the Aurora

Serviced Loans and the RFC Servicing Rights, Aurora collects a servicing fee out of

payments received on the loans for the functions that it performs.   Prior to the

Commencement Date, it was the long-standing practice between Aurora and LBHI for

Aurora to pay a monthly fee (the "Excess Servicing Fees") to LBHI as compensation for

the appointment of Aurora as servicer of the Aurora Serviced Loans and, since February

2008, the RFC loans.   The Excess Servicing Fee has been calculated, in essence, by

---

approximately $137 million in additional capital contributions.  This amount, together with the
Capital Contribution, will approximate 5% of the Bank's assets as reflected in the Bank's
December 31, 2008 TFR, corresponding with the limitation on a holding company's guarantee of
a capital restoration plan established by 12 U.S.C. § 1831o(e)(2)(E).  LBHI may seek Court
approval for further capital contributions to the Bank or the provision of other assistance to the
Bank if it determines that doing so is appropriate in order to facilitate realizing on LBHI's interest
in the Bank.

deducting (i) the aggregate sum of (a) the reasonable costs and expenses incurred by Aurora during the preceding month in servicing loans it was appointed to service by LBHI (the "Monthly Costs") and (b) an amount equal to ten percent of the Monthly Costs, from (ii) the aggregate servicing fees received by Aurora pursuant to the terms of the related servicing agreements.

24.    Since the Commencement Date, payment of the Excess Servicing Fees have come into dispute between Aurora and LBHI and Aurora has discontinued payment for the Excess Servicing Fees.  Aurora contends that payment of the Excess Servicing Fees has not been a matter of contractual obligation and, further, that Aurora may under certain circumstances be entitled to claim against LBHI for the return of Excess Servicing Fees previously paid to LBHI.  Consequently, Aurora currently holds approximately $73 million, based on Aurora's calculation of the Excess Servicing Fees for the months of August 2008 through December 2008, and will hold additional amounts with respect to January and February 2009, which are expected to total approximately $28 million, representing funds that would have been ordinarily paid to LBHI under Aurora and LBHI's prior course of dealing.  In addition, ownership of the RFC Servicing Rights has come into dispute, as Aurora contends that it is entitled to all of the economic benefit of the RFC Servicing Rights delivered to it by RFC in February 2008 and Aurora's rights cannot be terminated by LBHI.  Based on a recent third party appraisal, the RFC Servicing Rights have a value of approximately $89 million.

25.    LBHI disputes Aurora's contentions and believes that it is entitled to the Excess Servicing Fees and that LBHI is the rightful owner of the RFC Servicing Rights, which LBHI contends were delivered to Aurora to hold for LBHI's benefit.  Due

to the uncertainty surrounding the disputes between LBHI and Aurora, Aurora has not

reflected in its September 30, 2008 or December 31, 2008 TFRs any asset value with

respect to the RFC Servicing Rights or the funds it holds with respect to the Excess

Servicing Fees.  Consequently, the value of the Bank's capital (and LBHI's equity

interest in Aurora) does not reflect the value of these assets.  The Bank's management

and LBHI anticipate that, were the RFC Servicing Rights and the Excess Servicing Fees

accrued and which are expected to accrue for the August 2008 through February 2009

period treated as assets of Aurora, the Bank's capital is expected to increase by

approximately $180 million.

       26.     In an effort to resolve both the risks surrounding the Bank's

inadequate capital level and LBHI's disputes with Aurora, the parties have determined to

enter into the Settlement Agreement.  Generally, the Settlement Agreement provides: [7]

- LBHI shall relinquish and transfer and assign to Aurora any and all rights, title and interest that LBHI may have in the RFC Servicing Rights;

- LBHI shall relinquish and transfer and assign to Aurora any and all rights and claims that LBHI may have to the Excess Servicing Fees for the months of August 2008 through February 2009. [8]

As a result of the Settlement Agreement, the Bank, through Aurora, is expected to realize

an economic benefit of approximately $189 million.  The Settlement Agreement is

subject to approval of the OTS.  With the benefit of the Settlement Agreement, the Bank,

---

[7] The salient terms of the Settlement Agreement are summarized for purposes of brevity.  To the extent there is an inconsistency between the language of this Motion and the Settlement Agreement, the terms of the Settlement Agreement shall control.

[8] For the avoidance of doubt, the parties have reserved their rights with respect to Excess Servicing Fees for any period after February 2009 or before August 2008.

based on the Bank's December 31, 2008 TFR, would come close to attaining the 8% total

risk-based capital ratio required for capital adequacy.  In essence, the Settlement

Agreement would allow LBHI to immediately realize the value at issue in its disputed

claims with Aurora to the RFC Servicing Rights and Excess Servicing Fees by

reinvesting that value into the Bank for the benefit of LBHI's creditors.  In addition, as

stated above, LBHI proposes to supplement the value of the Settlement Agreement with a

cash capital contribution to the Bank up to $15 million, if necessary, so that the Bank's

capital reaches the adequacy level.

**Sound Business Reasons Support
LBHI's Decision to Invest the Capital Contribution**

27.     LBHI seeks authorization, pursuant to sections 105(a) and

363(b)(1) of the Bankruptcy Code, to invest the value at issue in the Settlement

Agreement, and, if necessary, the Cash Contribution to the Bank to preserve the value of

the Bank for the benefit of LBHI's creditors.

28.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant

part, "the trustee, after notice and a hearing, may use, sell, or lease, other than in the

ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  When

considering a transaction outside the ordinary course of business, courts in the Second

Circuit, and others, require that such transaction be based upon the sound business

judgment of the debtor.  *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel

Corp.*), 722 F.2d 1063, 1070 (2d Cir. 1983); *accord In re Chateaugay Corp.*, 973 F.2d

141, 143 (2d Cir. 1992); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton

State Bank v. Schipper* (*In Re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Institutional*

*Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc.* (*In re Cont'l Airlines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

29.     It is generally understood that "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). If a valid business justification exists, there is a strong presumption that "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). The burden of rebutting this presumption falls to parties opposing the proposed exercise of a debtor's business judgment. *Id.* (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

30.     There are ample business justifications to support the Capital Contribution by LBHI. First and foremost, failure to increase the Bank's capital level risks not only the value of FSB, but also risks a seizure of Woodlands pursuant a statutory cross-liability provision. Specifically, 12 U.S.C. § 1815(e)(1)(A) provides,

> Any insured depository institution shall be liable for any loss incurred by the [FDIC], or any loss which the [FDIC] reasonably anticipates incurring after August 9, 1989 in connection with —
>> (i) the default of a commonly controlled insured depository institution; or
>> (ii) any assistance provided by the [FDIC] to any commonly controlled depository institution in danger of default.

12 U.S.C. § 1815(e)(1)(A).

31.     If FSB is seized and liquidated in the current marketplace, the FDIC may seek to recover the deficiencies that it covers on behalf of FSB from Woodlands.  As a result, Woodlands' capital level would in all likelihood be rendered inadequate under the applicable regulations, thereby causing it to face the risk of an immediate receivership.  For the reasons stated in the Woodlands Motion, preserving the opportunity to realize the value of Woodlands is crucial to maximizing recoveries to LBHI's creditors.  Thus, in order to protect the value of Woodlands, LBHI must also protect FSB.

32.     In addition to the risk to Woodlands, the Bank's management and LBHI do not believe that the reported value of FSB's assets is a true reflection of the underlying value of such assets that can be achieved if the Bank's affairs can be addressed in an orderly manner under normal market conditions.  With the Capital Contribution to assist in raising the Bank's capital to the adequacy level, the Bank and LBHI will be able to develop a plan for the Bank's continued operation under which the full value of the Bank and of related assets of LBHI (such as the MSRs) can be achieved. This may include refocusing the Bank business on its mortgage loan business.  For the reasons explained, it is not unreasonable to expect achievement of greater value for the Bank's assets over the reasonably foreseeable future as market conditions recover and potential purchasers of the Bank's loan portfolio and of Aurora's servicing operations and LBHI's MSRs and related rights emerge.

33.     Once the pressure of being characterized as undercapitalized is removed, it becomes abundantly clear that current seizure and wholesale liquidation of the Bank would be a gross waste of a significant asset of LBHI's estate that could

otherwise inure to the benefit of its creditors. Even at the diminished values of the Bank's loan portfolio shown on the December 31, 2008 TFR, the value of LBHI's equity position in the Bank exceeds $467 million. At the very least, by investing the Capital Contribution, LBHI secures sufficient time to permit a voluntary planned resolution of the Bank's affairs and a disposition of LBHI's related assets such as the MSR's in an orderly and organized fashion. By contrast, an immediate liquidation is likely to jeopardize the value of Woodlands and leave large deficiency claims asserted by FSB's creditors against LBHI's estate, which could dilute recoveries to LBHI's current stakeholders.

34.    Investing the Capital Contribution is a far better option than risking the seizure of the Bank by the Regulators especially in light of the associated risk to Woodlands. If the Regulators are permitted to take over the Bank, not only will LBHI lose the value of the Bank's assets, draw guarantee claims against the estate, and risk a seizure of Woodlands, but LBHI's estate may also face a potentially very significant claim pursuant to section 365(o) of the Bankruptcy Code. Section 365(o) provides:

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

11 U.S.C. § 365(o).

35.     Under section 365(o), if (a) there is a commitment by a debtor to maintain the capital of an insured depository institution and (b) there is a deficiency in capital existing on the date of the petition, then the debtor may be compelled to immediately cure the capital deficiency or convert to a case under chapter 7 and treat the claim as a priority claim under section 507(a)(9) of the Bankruptcy Code. *See Resolution Trust Corp. v. Firstcorp Inc.* (*In re Firstcorp. Inc.*), 973 F.2d 243 (4th Cir. 1992). Under either scenario, if successful, the Regulators could be paid ahead of general unsecured creditors.

36.     LBHI does not believe that the Regulators could satisfy the elements of section 365(o) to compel an immediate payment of a capital deficiency of the Bank. Even assuming *arguendo* that there was an existing "commitment," under the present facts there was no deficit in the Bank's capital existing on the date of LBHI's chapter 11 petition, September 15, 2008, to compel an immediate payment by LBHI. As indicated on the PCA issued by the OTS, as of September 30, 2008, two weeks after the date of LBHI's petition, the Bank's TFR indicated that the Bank was "well capitalized" and had a total risk-based capital ratio above 10%. *See Firstcorp, Inc.*, 973 F.2d at 247 (holding that a chapter 11 debtor's obligation to "immediately" cure a deficiency applies to "a deficit under capital maintenance commitment *that exists at the time of a bankruptcy filing*...") (emphasis added).

37.     Although LBHI believes that it could successfully defeat a section 365(o) claim, if one were asserted, the results of litigation are never guaranteed. Moreover, LBHI would have to engage in a very costly and time-consuming litigation without the upside of recovering on the Bank's value. On the other hand, by investing

the Capital Contribution, LBHI avoids the risk of having to make an immediate cure

payment to the Regulators, if any, while, at the same time, securing an opportunity to

develop a strategic and capital plan under which LBHI can best realize value from its

equity interest in the Bank and related LBHI assets over time.

38.    In short, entry into the Settlement Agreement is a small price to

pay for the benefit of preserving the value of both FSB and Woodlands.  In light of the

benefits associated with the Motion, LBHI's decision to invest the Capital Contribution

represents a sound exercise of its business judgment and should be approved.

### The Settlement Agreement is
### Reasonable and in the Bests Interests of the Estate

39.  For the reasons explained, the Settlement Agreement is reasonable

and should be approved.  Bankruptcy Rule 9019 provides, in part, that "[o]n motion by

the [debtor-in-possession] and after notice and a hearing, the court may approve a

compromise or settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers bankruptcy

courts to approve settlements "if they are in the best interests of the estate."  *Vaughn v.*

*Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)* 134

B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  A decision to accept or reject a compromise or

settlement is within the sound discretion of the Court.  *Id.; see also* 9 *Collier on*

*Bankruptcy* ¶ 9019.02 (15th ed. rev. 2001).  The settlement need not result in the best

possible outcome for the debtor, but must not "fall beneath the lowest point in the range

of reasonableness." *Drexel Burnham Lambert Group*, 134 B.R. at 505.

40.    Bankruptcy courts have applied the following factors in

determining whether a settlement should be approved:  (i) the probability of success in

litigation, with due consideration for the uncertainty in fact and law; (ii) the complexity

and likely duration of the litigation and any attendant expense, inconvenience, and delay;

(iii) the proportion of creditors who do not object to, or who affirmatively support, the

proposed settlement; and (iv) the extent to which the settlement is truly the product of

arm's-length bargaining and not the product of fraud or collusion.  *See Protective Comm.*

*for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424 (1968)

("There can be no informed and independent judgment as to whether a proposed

compromise is fair and equitable until the bankruptcy judge has apprised himself of all

facts necessary for an intelligent and objective opinion of the probabilities of ultimate

success should the claim be litigated.")*; In re Ashford Hotels, Ltd.*, 226 B.R. 797, 804

(Bankr. S.D.N.Y. 1998); *In re Best Prods. Co.*, 168 B.R. 35, 50 (Bankr. S.D.N.Y. 1994).

      41.   The Settlement Agreement permits LBHI to recover the full value of

its disputed claims to the unpaid Excess Servicing Fees through February 2009 and RFC

Servicing Rights through a reinvestment of that value into the Bank.  That is, instead of

making a direct cash contribution to the Bank, LBHI can achieve its goal by applying the

value of the disputed claims with Aurora to preserve the value of the Bank.  In addition,

the Settlement Agreement allows LBHI to preserve its opportunity to maximize the value

of both FSB and Woodlands.  Lastly, LBHI avoids the risk of costly time-consuming

litigation with Aurora.

      42.   In other large chapter 11 cases, this Court has authorized debtors to

fund capital contributions to their subsidiaries/affiliates under similar circumstances.  *See*

*In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. 2005) [Docket No.

2661] (approving $45 million capital contribution), [Docket No. 3070] (approving $35

million capital contribution), [Docket No. 3796] (approving $23 million capital contribution), [Docket No. 4313] (approving an aggregate $60 million capital contribution), [Docket No. 4314] (approving $30 million capital contribution); *In re Loral Space & Communications Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. 2003) [Docket No. 1051] (approving aggregate $5 million capital contribution), *In re Magellan Health Services, Inc.*, (Case No. 03-40515) (PCB) (Bankr. S.D.N.Y. 2003) [Docket No. 1196] (approving $5.5 million capital contribution).

## **Notice**

43.    LBHI has served notice of this Motion in accordance with the procedures set forth in the order entered on September 22, 2008 governing case management and administrative procedures for these cases [Docket No. 285] on (i) the U.S. Trustee; (ii) the attorneys for the Creditors' Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases.  LBHI submits that no other or further notice need be provided.

44.    No previous request for the relief sought herein has been made by LBHI to this or any other court.

WHEREFORE LBHI respectfully requests that the Court grant the

relief requested herein and such other and further relief as it deems just and proper.

Dated: February 11, 2009
      New York, New York

                   /s/ Alfredo R. Perez
                   Alfredo R. Perez

                   WEIL, GOTSHAL & MANGES LLP
                   767 Fifth Avenue
                   New York, New York 10153
                   Telephone: (212) 310-8000
                   Facsimile: (212) 310-8007

                   Attorneys for Debtors
                   and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                                   :
In re                                                              :    **Chapter 11 Case No.**
                                                                   :
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*,                        :    **08-13555 (JMP)**
                                                                   :
                                          Debtors.                 :    **(Jointly Administered)**
                                                                   :
                                                                   :
-------------------------------------------------------------------x

### ORDER GRANTING LBHI'S MOTION, PURSUANT TO SECTIONS 105(a) AND 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 9019 AND 6004, FOR AUTHORIZATION TO INCREASE THE CAPITAL LEVEL OF LEHMAN BROTHERS BANK, FSB THROUGH (I) THE SETTLEMENT OF PENDING DISPUTES AND (II) A DIRECT CAPITAL CONTRIBUTION OF UP TO $15 MILLION

Upon the motion, dated February __, 2009 (the "Motion"), of Lehman

Brothers Holdings Inc. ("LBHI"), pursuant to sections 105(a) and 363 of title 11 of the

United States Code (the "Bankruptcy Code") and Rules 9019 and 6004 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for authorization to increase

the capital level of its indirect wholly owned non-debtor subsidiary, Lehman Brothers

Bank, FSB, through a settlement agreement with Aurora Loan Services, LLC (the

"Settlement Agreement") and a cash contribution (the "Cash Contribution"), all as more

fully described in the Motion; and the Court having jurisdiction to consider the Motion

and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the

Standing Order M-61 Referring to Bankruptcy Judges for the Southern District of New

York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.);

and consideration of the Motion and the relief requested therein being a core proceeding

pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28

U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the order entered September 22, 2008 governing case management and administrative procedures [Docket No. 285] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Committee of Unsecured Creditors; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of LBHI, its estate and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Settlement Agreement is approved; and it is further

ORDERED that, pursuant to sections 105(a) and 363(b)(1) of the Bankruptcy Code, LBHI is authorized, but not required, to fund the Cash Contribution; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(g) are waived and this Order shall be effective immediately upon its entry; and it is further

ORDERED that notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine

all matters arising from or related to the implementation and/or interpretation of this

Order.

Dated:  February __, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE