Martin Flics, Esq. (#MF 9718)
Mary K. Warren, Esq. (#MW 5215)
LINKLATERS LLP
1345 Avenue of the Americas
New York, NY 10105
(+1) 212 903 9000 (Tel)
(+1) 212 903 9100 (Fax)

Attorneys for the Joint Administrators of Lehman
Brothers International (Europe) (in administration)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

In re                                                          | Chapter 11

LEHMAN BROTHERS HOLDINGS INC., et al.,    | 08-13555 (JMP)

                                       Debtors.    | (Jointly Administered)

------------------------------------------------------x

## DOCUMENTS CONCERNING U.K. ADMINISTRATION OF LEHMAN BROTHERS INTERNATIONAL (EUROPE)

The Joint Administrators of Lehman Brothers International (Europe) ("LBIE") (in administration) (the " Joint Administrators"), by their counsel Linklaters LLP, respectfully state as follows:

1.    During the status report portion of the Court's omnibus hearing in these proceedings held on January 14, 2009, counsel for Lehman Brothers Holdings Inc. ("Debtor LBHI") agreed to provide the Court with a report on the status of Lehman entities subject to international insolvency proceedings.

2.    Although as a member of LBIE's creditors' committee Debtor LBHI has regular access to information about LBIE's estate and its administration, the Joint Administrators wish to assist Debtor LBHI and the Court by submitting the attached documents.

3.      In addition, general information about LBIE's U.K. administration is available publicly on the website maintained by the Joint Administrators (the "U.K. Lehman website") with no restricted access. The link to the U.K. Lehman website is http://www.pwc.co.uk/eng/issues/lehman_update.html. (Note that certain of the documents enclosed herewith have been taken from the portion of the U.K. Lehman website that is password protected and accessible only by parties who have claimed to be creditors of LBIE.)

4.      The attached documents comprise the following:

A.      The order of the English High Court appointing the Joint Administrators for LBIE on September 15, 2008, attached hereto as Exhibit A.

B.      The Joint Administrators' proposals as agreed by LBIE's creditors for achieving the purpose of the administration, dated October 28, 2008, attached hereto as Exhibit B.

C.      A PowerPoint presentation prepared by the Joint Administrators and their staff for the meeting of LBIE creditors on November 14, 2008, attached hereto as Exhibit C.

D.      A summary of matters discussed at the first meeting of the LBIE creditors committee on December 3, 2008, attached hereto as Exhibit D.

E.      A summary of the matters discussed at the second meeting of the LBIE creditors committee on January 22, 2009, attached hereto as Exhibit E.

F.      Press releases and responses to frequently asked questions that have been issued by the Joint Administrators from time to time, attached hereto as Exhibit F.

Dated:    New York, New York
          February 11, 2009

                              Respectfully submitted,

                              Linklaters LLP

                              By:    /s/ Martin Flics
                              Martin Flics, Esq.
                              1345 Avenue of the Americas, 19th Floor
                              New York, NY 10105
                              (212) 903-9000
                              (212) 903-9100 (fax)
                              martin.flics@linklaters.com

                              *Attorneys for the Joint Administrators of
                              Lehman Brothers International (Europe) (in
                              administration)*

**<u>Exhibit A</u>**

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**Before the Honourable Mr Justice Henderson**

**Monday the 15th day of September 2008**

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

Nos 7942 of 2008



---

~~DRAFT~~ ORDER 

---

**UPON THE UNISSUED APPLICATION** of the directors of Lehman Brothers International (Europe) (company number 2538254) of 25 Bank Street, London E14 5LE (the "**Applicants**")

**AND UPON HEARING** Leading Counsel for the Applicants and Leading Counsel for the Financial Services Authority

**AND UPON READING** the evidence

**AND UPON** the Applicants undertaking, through Leading Counsel, to issue the Application and to file the evidence as soon as is reasonably practicable

**AND UPON** the Court being satisfied on the evidence before it that the EC Regulation does not apply

**IT IS ORDERED** that:

1. Anthony Victor Lomas, Steven Anthony Pearson, Dan Yoram Schwarzmann and Michael John Andrew Jervis (the "**Joint Administrators**") of PricewaterhouseCoopers LLP, Plumtree Court, London EC4A, 4HT be appointed as joint administrators of Lehman Brothers International (Europe);

2.    during the period for which this order is in force the affairs, business and property of the Companies be managed by the Joint Administrators in accordance with the Insolvency Act 1986;

3.    any act required or authorised under any enactment to be done by either or all of the Joint Administrators may be done by any one or more of the person for the time being holding that office;

4.    service of the Application on the Joint Administrators and on the FSA be dispensed with;

5.    the time for hearing the Application be abridged, pursuant to rule 12.9(2) of the Insolvency Rules 1986, so as to enable this to be heard today;

6.    the costs of and incidental to this Application be paid as an expense of the administration;

7.    the appointments of the Joint Administrators shall take effect from 07:56am... on 15 September 2008



Nos. 7942.

**IN THE HIGH COURT OF JUSTICE**

**CHANCERY DIVISION**

**COMPANIES COURT**

**Before the Honourable Mr Justice Henderson**

**Monday the 15ᵗʰ day of September 2008**

**IN THE MATTER OF LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

**AND IN THE MATTER OF THE INSOLVENCY ACT 1986**

---

~~DRAFT~~ ORDER

---

Linklaters
One Silk Street
London EC2Y 8HQ

Tel:    +(44) 207 456 2000

Ref:    Euan Clarke

**Exhibit B**



# Lehman Brothers International (Europe) - In Administration

# Joint Administrators' Proposals as agreed by creditors

# The Joint Administrators' proposals for achieving the purpose of administration as agreed by creditors are:

i) The Administrators will continue to manage and finance LBIE's business, affairs and property from asset realisations in such manner as they consider expedient with a view to achieving a better result for LBIE's creditors as a whole than would be likely if LBIE had been immediately liquidated.

ii) The Administrators will identify and return Trust Property in accordance with the Order of the High Court dated 7 October 2008. The Administrators will be looking to have the costs of dealing with Trust Property borne by such assets.

iii) The Administrators may investigate and, if appropriate, pursue any claims that LBIE may have under the Companies Act 1985, the Companies Act 2006 or the Insolvency Act 1986 ("IA86") or otherwise. In addition, the Administrators shall do all such other things and generally exercise all their powers as Administrators as they in their discretion consider desirable in order to achieve the purpose of the Administration or to protect and preserve the assets of LBIE or to maximise their realisations or for any other purpose incidental to these proposals.

iv) The Administrators will at their discretion establish in principle the claims of unsecured creditors for adjudication by a subsequent liquidator or supervisor of a company voluntary arrangement / scheme of arrangement and the costs of so doing shall be met as a cost of the Administration as part of the Administrators' remuneration.

v) The Administrators may at their discretion make an application to court for permission to make distributions to unsecured creditors under Paragraph 65(3) Sch.B1 IA86.

vi) A creditors' committee will be established if sufficient creditors are willing to act on it. The Administrators propose to seek the election of a creditors' committee and to consult with it from time to time. Where the Administrators consider it appropriate, they will seek sanction from the committee to a proposed action rather than convening a meeting of all creditors.

vii) The Administrators will consult with the creditors' committee concerning the necessary steps to extend the Administration beyond the statutory duration of one year if an extension is considered advantageous. The Administrators shall either apply to the court or seek consent from the appropriate classes of creditors for an extension.

viii) The Administrators may use any or a combination of "exit route" strategies in order to bring the Administration to an end. The Administrators wish to retain a number of the options which are available to them, including:-

(a) The Administrators may formulate proposals for a scheme of arrangement under Section 899 of the Companies Act 2006 and if so ordered by the court will put them to meetings of the various classes of creditors. If the scheme of arrangement is approved and sanctioned by the court, the Administration will be brought to an end by notice to the Registrar of Companies on completion of the Administration under Paragraph 84 Sch.B1 IA86, following registration of which LBIE will be dissolved three months later, OR

(b) The Administrators may place LBIE into creditors' voluntary liquidation. In these circumstances, it is proposed that Anthony Victor Lomas, Steven Anthony Pearson and Michael John Andrew Jervis be appointed as Joint Liquidators and any act required or authorised to be done by the Joint Liquidators may be done by either any or all of them. In accordance with Paragraph 83(7) Sch.B1 IA86 and Rule 2.117(3) of the Insolvency Rules 1986, creditors may nominate alternative liquidators, provided that the nomination is made after the receipt of these proposals and before they are approved, OR

(c) The Administrators may formulate a proposal for a company voluntary arrangement ("CVA") and put it to meetings of LBIE's creditors and shareholders for approval. If the CVA is approved, the Administration will be brought to an end by notice to the Registrar of Companies on completion of the Administration under Paragraph 84 Sch.B1 IA86, following registration of which LBIE will be dissolved three months later, OR

(d) The Administrators may apply to the Court to allow the Administrators to distribute surplus funds to unsecured non-preferential creditors. If such permission is given, the Administration will be brought to an end by notice to the Registrar of Companies under Paragraph 84 Sch.B1 IA86, following registration of which LBIE will be dissolved three months later. If permission is not granted the Administrators will place LBIE into creditors' voluntary liquidation or otherwise act in accordance with any order of the court.

ix) The Administrators shall be discharged from liability pursuant to Paragraph 98(1) Sch.B1 IA86 in respect of any action of theirs as Administrators at a time determined by the court.

x) The Administrators' fees will be fixed under Rule 2.106 of the Insolvency Rules 1986 by reference to the time properly given by the Administrators and the various grades of their staff according to their firm's usual charge out rates for work of this nature and that disbursements for services provided by the Administrators' own firm (defined as Category 2 disbursements in Statement of Insolvency Practice No.9) be charged in accordance with the Administrators' firm's policy. It will be for the creditors' committee to fix the basis and level of the Administrators' fees and Category 2 disbursements but if no committee is appointed, it will be for the general body of creditors to determine these instead.

xi) The Administrators will maintain all funds in the estate in the currencies in which such assets have been realised. The Administrators' strategy as regards the selection of an appropriate currency for maintaining estate funds, pending determination and implementation of the appropriate "exit route" will be determined in consultation with the creditors' committee.

**Exhibit C**

# Lehman Brothers International (Europe) (In Administration)

## Meeting of the Creditors

## 14 November 2008

PRICEWATERHOUSECOOPERS

# Agenda

- Important notice

- Context

- Status of key activities

- Run off

- Questions

- Formal business

- End

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

2



# IMPORTANT NOTICE

This presentation has been prepared solely for the statutory purpose of reporting to the creditors of Lehman Brothers International (Europe). It was supplemented by an oral presentation by the Joint Administrators given to the meeting of creditors.

We emphasise that Financial information contained in this presentation is preliminary, based  upon currently available information and has not been subject to audit. It has been provided for illustrative purposes only as there remain a number of material uncertainties. Accordingly, it may be subject to material change and should be regarded with caution. Creditors should not use the data contained in this presentation for the purpose of valuing their claims. All statements are strictly without prejudice to LBIE's rights against any counterparties and no statement is an admission or recognition of the rights of any other party.

The Administrators act at all times as agent of the company and without personal liability.

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

3



# Context

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

4



# Introduction

- Group structure and intercompany balances

- Causes of insolvency

- LBIE Administrator: LBI SIPA Trustee

- Administrators' role and responsibilities

- Headline issues – first 9 weeks

  - identification of assets and liabilities

  - liquidity

  - staff retention

  - business transfer

  - project management

  - communication

- Balance sheet summary

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

5



# LBIE – An Unlimited Liability Company



As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

6



# LBIE's – Fellow Trading Companies



As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# LBIE's Risk Management Counterparties



As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# LBIE's Primary Interco Balances ($bn <u>net</u>)



As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

9



# Balance Sheet Summary – 15 Sept 2008

|  | Financial $bn | Grossed up collateral $bn |
|---|---|---|
| **Assets** |  |  |
| Third Party | 164 | 369 |
| Intercompany | 124 | 222 |
|  | 288 | 591 |
| **Liabilities** |  |  |
| Third Party | (163) | (349) |
| Intercompany | (108) | (225) |
|  | (271) | (574) |
| Capital | (17) | (17) |
|  | (288) | (591) |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

10



# Status of key activities

# Overview

| | | | | | | |
|---|---|---|---|---|---|---|
| **Assets & liabilities** | Inventory | Financing | Derivatives | ETFO's | Cash | Client Positions |
| **Critical Issues** | Identification<br>House vs. Client<br>Contract terms<br>Failed trades<br>Terminations / netting | | | Valuation<br>Intercompany<br>Market intermediary response<br>Regulatory interface<br>Jurisdictional factors | | |
| **Ongoing activities** | Overseas Branches | Coupons & Dividends | Corporate Actions | Agency Roles | | |
| **Run-off Framework** | **Transaction Processing** | | | | | |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

# Inventory

| **Objective** | Identify, control and realise or return all long security positions |
|---|---|

| **Headline data** | • $37.2bn of securities at LBIE managed depots |
|---|---|
| | • $22.3bn of Client Assets |
| | • $4.4bn nominal of Lehman issued securities in House account |
| | • $2.2bn held for other LB entities |
| | • ~100 custodians |
| | • >700 depot accounts |
| | • ~31,000 lines of stock and bonds |
| | • >6,500 reconciliation breaks |
| | • >142,000 failed trades |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Inventory

| Major issues | |
|---|---|
| | • Reconciliation LBIE to Depots |
| | • Determination of House vs. Client |
| | • LBIE vs. other LB group companies |
| | • Valuation |
| | • Holdings liquidated by market intermediaries |
| | • Access to holdings blocked  pending resolution of fails |
| | • Depot accounts suspended by market intermediaries |
| | • LBI / DTCC provided no visibility |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Inventory

| Administrators' principal activities | |
|---|---|
| | • Cancelled SSIs to LBHI |
| | • Contacted ~100 custodians |
| | • Established comprehensive controls to identify and protect Client Assets |
| | • Established front office processes |
| | • Initiated extensive reconciliation & validation exercise |
| | • Retained new global securities custodian |
| | • Commenced controlled stock transfer and liquidation process |
| | • $0.3bn realised to date from House positions |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

15



# Inventory

| **Timescales** | • Avoid asset fire sales<br><br>• Need for certainty over ownership impacts realisation<br><br>• Considered further in Client Assets |
| --- | --- |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

16



# Financing

| Objectives | Recover excess collateral |
| --- | --- |
| | Assess shortfall claims |

| Headline data | • $495bn of gross cash and securities assets |
| --- | --- |
| | • $485bn of gross cash and securities liabilities |
| | • Includes $213bn asset  / $208bn liability intercompany |
| | • After netting, $14bn assets and $4bn liabilities |
| | • ~170 institutional counterparties; >1,000 principals |
| | • 8 Master Lending Agreements |
| | • >55,000 fails |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Financing

| **Major issues** | |
|---|---|
| | • Engine room of LBIE |
| | • Netting - ~$481bn |
| | • Volume of tailored legal agreements |
| | • Extensive valuation and validation exercise |
| | • Counterparty reconciliations |
| | • Impact of failed trades |
| | • Scale of intercompany transactions & status of these entities |
| | • Agent vs. principal |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Financing

| Administrators' principal activities | • Contacted all counterparties |
|---|---|
| | • Requested return of excess collateral |
| | • Commenced reconciliation exercise |
| | • Undertaken review of legal agreements |
| | • Assessing netting |
| | • Established collection function |

| Timescales | • Very extensive exercise |
|---|---|
| | • Impacted by quality and speed of counterparty responses |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Derivatives

| **Objectives** | To recover value from in-the-money positions |
| --- | --- |
| | To determine liabilities in out-of-the money positions |

| **Headline data** | • ~$9bn in-the-money derivative positions |
| --- | --- |
| | • ~$8bn out-of the money derivative positions |
| | • ~87,000 open derivative positions at 15 September |
| | • ~39,000 with other LB entities |
| | • 10,500 agreements |
| | • 3,000 derivative counterparties |
| | • ~13,000 terminated positions at 10 November |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

20



# Derivatives

| Major issues | |
|---|---|
| | • ISDA default terms potentially impacting value & timing |
| | • Significant scale of valuation exercise on OTC positions |
| | • Many back-to-back positions with other LB entities |
| | • Fundamental uncertainty over final close out value |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

21



# Derivatives

| | |
|---|---|
| **Administrators' principal activities** | • Identified strategies to protect value<br><br>• Advised counterparties of need for data preservation<br><br>• Recovered over $0.8bn from ISDAs<br><br>• Implemented framework for terminations<br><br>• Reviewed legal agreements |
| **Timescales** | • Terminations exercise will potentially take years |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

22



# Exchange Traded Futures & Options

| **Objectives** | To novate client positions |
| --- | --- |
| | To optimise value of ETFO positions |

| **Headline data** | • 30 exchanges / clearing houses / brokers |
| --- | --- |
| | • 14 countries |

| **Major issues** | • Very significant risk at outset given market volatility |
| --- | --- |
| | • Need to work collaboratively with exchanges |
| | • Regulator intervention in Korea and Taiwan |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Exchange Traded Futures & Options

| Administrators' principal activities | • Collaborative exercise with LCH & Eurex |
| --- | --- |
| | • Transferred all LCH and Eurex client positions |
| | • Substantially closed House positions; $2.5bn due from exchanges |
| | • Recovered ~ $1.2bn |

| Timescales | • Recover majority of funds in coming months |
| --- | --- |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# House cash

| | |
|---|---|
| **Objective** | Identify and recover House cash balances |
| **Headline data** | • $2.8bn of House cash<br><br>• 90% of House cash at agents<br><br>• ~1,500 LBIE accounts<br><br>• 62 counterparties; 64 countries<br><br>• $0.4bn received by LBHI post Administration |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# House cash

**Major issues**

- No liquidity on appointment – raised $100m

- Most cash balances held as collateral by counterparties

- Complex jurisdictional / regulatory issues to gain recovery

- Set off / lien asserted by market intermediaries

- Extensive reconciliation exercise necessary

- Unable to suspend accounts in some countries

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# House cash

| Administrators' principal activities | • Established banking arrangements with BoE |
| --- | --- |
| | • Established global banking arrangements with commercial bank |
| | • Contacted 62 counterparties |
| | • Suspended payments from most accounts |
| | • Initiated process for recovery of cash across the world |
| | • Commenced extensive reconciliation exercise |
| **Timescales** | • Initial steps have been productive |
| | • Potentially long process to recover funds from certain locations |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Client positions – Client Monies

| Objective | Reconcile and return Client Monies |
|---|---|
| Headline data | • $2.1bn segregated cash at 15 September<br>• Estimated $1.9bn of Client claims<br>• $1bn placed with LB Bankhaus AG<br>• ~1,600 specific Client claims<br>• >$1.5bn received post administration from "Client Asset" positions<br>• LBHI holds ~$0.3bn |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

28



# Client positions – Client Monies

| Major issues | |
|---|---|
| | • Comprehensive FSA rules for accounting for Client Monies |
| | • Monies continue to be paid to old LBIE and LBHI accounts |
| | • Currency issues – 35 currencies vs. 13 currency accounts |
| | • Bankhaus insolvent - status of claim uncertain |
| | • Interest complexities |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

29



# Client positions – Client Monies

| **Administrators' principal activities** | • Dialogue with the FSA |
| --- | --- |
| | • Established Client Money accounts with BoE |
| | • Circularised all parties with Client Monies claims |
| | • Gained control over KBC monies ($0.5bn) |
| | • Sought advice on Bankhaus claims ($1bn) |
| | • Engaged with Bank of America ($0.4bn) |
| | • Established new arrangements for Client coupons & dividends |
| | • Negotiating release of monies held by LBHI |

As stated in the Important Notice at the front of this presentation, creditors should not use
the data contained in this document for the purpose of valuing or otherwise assessing
their claims

30



# Client positions – Client Monies

**Timescales**

- Resolution determined by final treatment by Bankhaus & BoA

- Pre-administration distribution many months

- Post administration client monies follow client assets

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Client positions – Client Assets

| Objectives | Client Assets are identified, protected and returned |
|---|---|
| | Net Client positions are reconciled and managed |

**Headline data**

- 1,700 Client accounts
- $41.4bn in gross Client long positions
- $19.1bn of rehypothecated assets
- $16.7bn in Client shorts
- Includes charge and custody

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

32



# Client positions – Client Assets

| Major issues | |
|---|---|
| | • Minimise risk of disposing of Client positions |
| | • Handle Clients claims fairly |
| | • Establish existence and location of assets |
| | • Various valuation dates and methodologies |
| | • Reconciliation, particularly long positions given fails |
| | • Litigation |
| | • Volume of enquiries / speed of resolution |
| | • Complexity of relationships |
| | • Credit risk management of Prime Services Clients |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Client positions – Client Assets

**Administrators' principal activities**

- Formulated structured approach & confirmed with High Court

- Asserted control over assets

- Suspended some asset sales pending investigations

- Gaining comprehensive understanding of parties rights

- Extensive circularisation process

- Assessing individual Client exposure

- Communicated and implemented framework for return of assets

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Client positions – Client Assets

**Timescales**

- Very complex and time consuming exercise

- Could take years to conclude

- Interim / partial release being explored

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Receipts and payments at 10 Nov 2008

| House receipts and payments | $bn |
|---|---|
| **Receipts** | |
| Realisations | 2.3 |
| Loan to fund initial trading | 0.1 |
| **Total Receipts** | **2.4** |
| | |
| **Payments** | |
| Repayment of loan | (0.1) |
| Employee and other costs | (0.1) |
| **Total Payments** | **(0.2)** |
| **Total house cash** | **2.2** |

| Other balances | $bn |
|---|---|
| **Client designated pre-admininstration** | **0.5** |
| **Client designated post-admininstration** | **0.1** |
| **Dividends, coupons and redemptions** | **1.4** |
| **Corporate actions** | **0.1** |

- Funds held at BoE and other AA rated (or better) financial institutions

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

36



Run off

# Overseas branches

**Business Activity**

- LBIE had branches in 12 countries
- Wide range of business activities conducted locally

**Activity issues**

- Significant business conducted overseas
- Assets held in local territories
- Local regulations impact ability to recover assets
- Significant priority claims could erode asset value
- Controlled run off being implemented
- Local PwC offices critical to preserving value

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

38



# Coupons and dividends

| Business Activity | • Need to manage income on House and Client holdings<br><br>• 4,000 events a month<br><br>• $1.4bn received in first 9 weeks |
|---|---|
| Activity issues | • Need to segregate House from Client<br><br>• Historically swept to LBHI daily<br><br>• Need for new accounts<br><br>• Implement revised processes & controls<br><br>• Currency management |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

39



# Corporate actions

| | |
|---|---|
| **Business Activity** | • Need to manage for House and Client holdings<br><br>• 116 events processed in the first 9 weeks<br><br>• Over $54m in the first 9 weeks |
| **Activity issues** | • Issues as per previous slide<br><br>• Risks associated with actions |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

40



# Agency roles

| | |
|---|---|
| **Business Activity** | • LBIE has various agency roles on securities issues and loan facilities<br><br>• Primarily on Bankhaus and LBCPI issues<br><br>• Roles on Windermere and Excalibur securitisations |
| **Activity issues** | • Provision of consents and waivers requires diligence<br><br>• Third party servicers support process<br><br>• Role of security agent / trustee is onerous<br><br>• Costs of compliance exceed benefits to LBIE<br><br>• Benefits to other LB entities |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

41



# Reorganisation

| Objectives | To reorganise LBIE to facilitate an orderly and value optimising exit & valuation of liabilities |
|---|---|
| Major issues | • Regulatory compliance<br><br>• Management of 1,000 staff<br><br>• Design and implementation of revised reporting & management structure<br><br>• Preserving data and systems<br><br>• Staff reward and incentive frameworks<br><br>• Transition Services Agreements with related entities<br><br>• Cooperation with other LB entities (UK and overseas) |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# Reorganisation

| | |
|---|---|
| **Administrators' principal activities** | • Clear vision developed, objectives being discussed in depth<br><br>• Interim retention processes implemented<br><br>• Working arrangements with LBHI<br><br>• TSA with Nomura |
| **Timescales** | • Clarity reached for run-off as move into 2009<br><br>• Balance the TSA with Nomura with the need to return dedicated staff |

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

43



# Next Steps

- 6 Monthly creditor reporting cycle

- Formation and meetings of creditors Committee

- Website Information

- Counterparty communication

- Applications on notice

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

44



# Formal business

# Proposals

- Summary

i. Continue to manage LBIE's affairs in pursuit of the purpose of the Administration

ii. Identify and return trust property in accordance with the 7 October 2008 order

iii. Investigate assets and exercise powers

iv. Establish claims in principle - adjudicated by a subsequent liquidator / supervisor

v. If appropriate, make a court application for permission to distribute

vi. Establish a Creditors committee and consult with it

vii. Consider extension of the mandatory one year Administration term

viii. Consider alternative exit route strategies to bring Administration to an end

ix. Seek court discharge in due course

x. Fix Administrators fees by reference to time properly incurred

xi. Maintain administration funds in US dollars

- Consider modifications

- Voting majority => 50% by value voting

As stated in the Important Notice at the front of this presentation, creditors should not use
the data contained in this document for the purpose of valuing or otherwise assessing
their claims

# Proposals - Modifications

- The Administrators will maintain all funds in the estate in the currencies in which such assets have been realised.

- The Administrators' strategy as regards the selection of an appropriate currency for maintaining estate funds, pending determination and implementation of the appropriate "exit route" will be determined in consultation with the creditors' committee.

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims

# The Creditors' Committee

- All votes on the nominees to join the Creditors' Committee have been collected and are currently being counted.

- The Administrators will communicate the names of the members of the creditors Committee shortly.

As stated in the Important Notice at the front of this presentation, creditors should not use the data contained in this document for the purpose of valuing or otherwise assessing their claims



# End of LBIE creditors meeting

As stated in the Important Notice at the front of this presentation, creditors should not use
the data contained in this document for the purpose of valuing or otherwise assessing
their claims

49



**Exhibit D**

**Lehman Brothers International (Europe) (In Administration**
**Summary of matters discussed at the first meeting of the Creditors' Committee**

**10am – 5.30pm**
**3 December 2008**

**25 Bank Street, London**

At the 14 November 2008 creditors' meeting, the Chairman undertook to keep creditors informed of the subject matter and frequency of the administrators' meetings with the creditors' committee.

The first of these meetings was held on 3 December.  A full formal record of the minutes of the meeting was made and is retained as part of the record of the estate.  The key non-confidential matters are summarised in this note.

Those present comprised:

<u>Joint Administrators:</u>

Mr. Tony Lomas (meeting Chairman)
Mr. Steven Pearson
Mr. Michael Jervis

<u>Committee members:</u>

| **Creditor** | **Represented by:** |
|---|---|
| Lehman Brothers Holdings Inc. | Mr. D Ehrmann<br>Mr. M Francis |
| Ramius Credit Opportunities Master Fund Ltd | Mr J Solomon<br>Mr. O Littman |
| GLG Euro Long Short Fund | Mr. E Roman<br>Mr. A San Miguel |
| Legal and General Pensions Ltd | Mr. S Bezzina |
| Oceanwood Global Opportunities Master Fund | Mr. W Nicholas |

<u>Linklaters (legal advisers to LBIE and the Joint Administrators)</u>

Mr. R Holden
Mr. A Bugg
Mr. D Ereira
Mr. R Hodgson

<u>Observer</u>

Mr. C Preston, Financial Services Authority

<u>Other</u>

Various members of the Joint Administrators' team and the LBIE team were in attendance, at various times.

Matters covered:

1. **Formalities** – The Chairman summarised the role of the committee, the confidential nature of the matters discussed. He confirmed:

   a. All members have signed confidentiality agreements
   b. The purpose and role of the committee

2. **Depot securities** – a review of the status of house and client securities. Material issues discussed included:

   a. The reconciliation processes (to depot, house vs. client, house vs. other Lehman entities)
   b. Valuation
   c. Securities access issues, including DTC and Euroclear

3. **Valuations** – A discussion on the various bases of valuation applicable to each of the open and terminated asset and liability classes, including longs, shorts, derivatives, failed trades and collateral.

4. **Client assets** – a review and debate on steps taken to date, processes established and issues arising in the administrators' dealings with client monies and assets. Discussion included:

   a. Pre and post administration client monies balances, claims and issues related to the collection and control of client monies accounts.
   b. The implications of currency and interest
   c. The detailed process for the management and reconciliation of client monies and assets
   d. The status of client assets returns from clients and the process of developing prioritisation criteria
   e. An outline of the issues for which further directions from the court may be sought and the assistance from the committee in addressing these issues

5. **Derivatives** – a review of the steps developed and being implemented to recover value from and identify claims in respect of the derivatives book. This included:

   a. Data on the range and extent of live and terminated derivatives
   b. An example of the management information developed to monitor progress
   c. Consideration of issues relating to legal, reconciliation, valuation and technology matters

6. **Intercompany** – a brief overview of the major receivables and payables balances with other group entities. This included:

   a. The number of entities with whom reconciliation is required (280)
   b. Major account balances and relationships and the elements of their claims
   c. Issues impacting reconciliation
   d. Nature and extent of LBHI guarantees

7. **Management model** – a summary of the administrators' operations and governance model was outlined and its role in overseeing the operations of the company was discussed.

8.  **Currency** – the position regarding the issues associated with currency management was discussed. The committee agreed that funds collected and realised in the estate should be held in USD, Euros and GBP. Realisations in other currencies would be converted to one of these currencies as determined by the Administrators.

9.  **Receipts and payments** – an account of house and client money receipts and payments made in the period 15 September to 30 November was tabled. It was noted that:

    a.  Net House cash was $3.1bn (in equivalent currency)
    b.  Pre-administration client monies held were $965m
    c.  Further cash held by third parties was being pursued

10. **Administrators' fees** – an account of the cost of work done and activities performed by the administrators and their staff in the period to 30 November 2008 was provided and discussed:

    a.  A data pack was provided to committee members detailing work done in the period to 30 November 2008,
    b.  Committee members will review ahead of considering the administrators' request to approve remuneration.

. The committee resolved:

1.  THAT, the basis of the Joint Administrators remuneration be fixed by reference to the time properly given by the Joint Administrators and their staff in attending to matters arising in the administration.

2.  THAT, the joint administrators are authorised to draw 75% of their time costs on account of their remuneration following each half monthly time recording period until the date of the next creditors' committee meeting, set for 22 January 2009, and that the balance will remain unpaid until the creditors' committee has approved the joint administrators remuneration for the relevant period.

A further update will be provided to all creditors following the 22 January 2009 committee meeting.

AV Lomas
Joint Administrator & Chairman

Lehman Brothers International (Europe)
(In Administration)

**Exhibit E**

**Lehman Brothers International (Europe) (in administration)**

**Creditors' Committee Meeting**

**Summary Minutes**

**Held:  22 January 2009 - 10am - 4pm**

**Bank St, London**

**Below is set out a summary minute of the second Creditors Committee meeting.  A significant amount of confidential information relating to the case was shared with the committee during the course of the meeting.  Confidential information has been excluded from this summary minute and committee members have provided undertakings to the Administrators to keep such information confidential to themselves.**

**Attendees:**

| | | |
|---|---|---|
| Committee members | - | Alex San-Miguel – GLG Partners, Inc. |
| | - | Owen Littman – Ramius LLC |
| | - | Simon Bezzina – Legal & General Investment Management Ltd |
| | - | Daniel Ehrmann – Lehman Brothers Holdings, Inc. |
| | - | Michael Francis – Lehman Brothers Holdings, Inc. |
| Apologies:: | - | Will Nicholas     - Oceanwood Capital |
| | | |
| Administrators | - | Tony Lomas |
| | - | Steven Pearson |
| | - | Mike Jervis |
| | | |
| Linklaters | - | Richard Holden |
| | - | Tony Bugg |
| | | |
| Lehman | - | Tom Bolland (joint COO with effect from 1 January 2009) |
| | | |
| PwC | - | Jane Woolcott (joint COO with effect from 1 January 2009) |
| | | |
| Others | - | Various Lehman, PwC and Linklaters representatives attended part of the meeting |

*Note:  In the period since the first formal committee meeting, held on 3 December 2008, there have been five separate telephone conference calls in order to discuss specific matters on which the Administrators have sought the committee's views. This ongoing dialogue will continue ahead of the next formal meeting of the committee.*

Detailed updates were given with regard to key activities and issues arising in a number of areas, as follows:

**Administration Project Management**

An overview was given of the revised LBIE management and operating structure.  Projected Focus is directed by the leaders of five activities: House Positions, Counterparties, Trust Property, Treasury and Reporting, These are co-led by LBIE / PwC representatives.  These activities are supported by cross-functional workstreams which are managing (1) Custodians, (2) Failed trades, (3) Corporate Events, (4) Terminations/Valuations, (5) Derivatives, and (6) Financing.

Further support is provided to LBIE by LBL (also in Administration) which continues to be responsible for the administration of human resources, IT, infrastructure and administrative support to all companies under the control of the PwC administrators, including LBIE.  Considerable effort has been

made to adapt LBIE's management and processes to the Administration environment, in an efficient and effective manner, to ensure an appropriate balance between cost control and case progression.

**Trust Property – General**

Client assets

The Administrators have written to approximately 1,700 clients, from which approximately 700 have provided appropriate responses to date.  The committee was provided with an analysis of the responses from clients, which identified various stages of agreement with the underlying clients.

Dedicated resource is deployed in soliciting appropriate responses from the remaining 1,000 client accounts.

The committee was provided with details of the value of assets returned to clients.  A relatively high value of assets has been returned.  To date these have been to clients with relatively simple relationships with LBIE – eg pure custody arrangements. The first return of assets under the "hardship" criteria is imminent *(since concluded).*

An extensive reconciliation exercise is underway, addressing the large population of clients claiming trust property with significant value which continues to be in the control of third parties.

Client monies

c.$950million of pre-administration client segregated monies have been recovered from third parties. A further $1.2billion is being pursued, of which $1billion is held by a Lehman affiliate (Lehman Brothers Bankhaus AG ("Bankhaus")).

$1.3billion of post administration monies relating to securities believed to be client securities has been recovered, of which over $600million has been passed to the underlying client, subject to the terms previously notified to the market.

The quantum of client monies claims against LBIE is not yet finalised and the extent of under-segregation, if any, is not yet known.

**Trust Property – schemes of arrangement**

The outline of a plan has been developed to deal definitively with Trust Property, using "Schemes of Arrangement" ("Schemes") as provided for in the UK Companies Act.

These schemes are planned to be separate, but possibly linked, to deal with Trust assets and client money.  The primary objectives of these Schemes are to:

- set a bar date for the submission of trust claims

- build the process for establishing claim details; and

- return Trust property (assets and monies) to clients as expeditiously as the complexities of the case allow.

As these Schemes are developed, the administrators intend to consult initially with the creditors' committee and, in due course, more widely to ensure popular support for the eventual Schemes proposals.

In their final form, these Schemes will be subject to a formal vote by affected creditors, and to the consent of the UK High Court.  Commercial compromises between a client and LBIE, outside of these potential Schemes will continue.

**House Assets**

A review of the disposal of house assets was provided to the committee.

$750million cash has been realised from House securities (equities and bonds) to date.

There remain 7,600 lines of stocks and bonds to realise, the majority of which are currently under the control of third party custodians and access to which continues to be restricted in many cases.

Remaining House equities are currently valued at approximately $1.5billion and, where possible are in the process of being transferred to the Administrators' new global custodian.

Bonds comprise $9.2billion nominal value relating to external issuers (c.2,000 lines) and $4.1billion nominal value relating to Lehman issuers (c.1,300 lines).  The current market value of these bonds is not yet quantified.  House assets, typically, are illiquid as LBIE had financed its more liquid assets, pre-administration.

The timescale disposal has been governed in large part by the difficulties that have been experienced gaining access to key depots previously used by LBIE pre administration.

**Counterparties (including Financing and ISDAs)**

The committee was provided with a review of the manner in which street counterparties are being managed by LBIE.  The administrators' objective is to reconcile balances with street counterparties, resulting in either the street counterparty making a balancing payment to LBIE or the determination of any unsecured claims against LBIE.  Priority is being given to those counterparties which are believed to be debtors to the estate.

c. $1billion cash has been recovered to date from OTC derivatives.  Some 11,000 derivative trades (ISDAs) remain "live".

$2.3billion cash has been recovered from 8 separate derivative exchanges and $0.2billion remains to be recovered from a further 8 derivative exchanges.

Significant effort is being expended to value collateral positions (excesses and shortfalls) and to value terminated ISDAs.  The Administrators have undertaken to provide guidance to creditors in the near future, regarding the data sources which the Administrators will consider acceptable to be used by counterparties in their calculations in due course.

Approximately 650 third parties (ie excluding affiliates) have financing relationships with LBIE, of which some 300 appear to have the benefit of an aggregate notional $8billion excess collateral provided by LBIE, pre-administration (as valued at 12 September), which is being reconciled and pursued by the LBIE team.

Recovery of this from individual clients is complex as most relationships have many dimensions and valuations methodologies differ from those adopted by LBIE in many cases.  Some $100million has been recovered to date.

In addition, 25 Lehman affiliates had financing relationships with LBIE, of which 9 appear to account for an estimated $5.8billion owed to LBIE.  $4.9billion of this relates to amounts payable by LBI and is being reviewed in the ongoing intercompany account reconciliation process.

Issues are arising from a number of counterparties claiming principal status in circumstances where the documentation indicates an agency role, and vice versa, further complicating the process of reconciling and agreeing net positions with counterparties and pursuing recovery of monies owed to LBIE.

Data quality issues persist with OTC derivative trade reconciliations. 21,000 trades have been terminated by counterparties where valuation statements have been received by LBIE. In respect of another 69,000 trades, termination notices have been received but no valuation statement has been provided by the counterparty. The remaining 29,000 trades appear to remain "live" – ie not terminated by the counterparty.

**Directors' Statement of Affairs**

LBIE's finance team has been retained to close LBIE's books and records. This is required to ensure that the directors' are in a position to prepare and submit a Statement of Affairs, in accordance with the Insolvency Act.

The current head of finance at LBIE informed the committee that LBIE closing routines would normally generate a balance sheet within four weeks of a period end. An estimated 44 operating systems feed the LBIE nominal ledger, less than half of these on a daily basis. Certain of these systems are outside of the administrators' (and LBIEs) immediate control.

A global closure of Lehman books was organised by the finance team, involving extensive cooperation between Lehman accounting functions around the world. Vast numbers of journal vouchers (over 200,000 manual entries) and lines of data have been reviewed and processed in order to close off the LBIE ledger as at 12 September 2008 and to assemble the supporting documentation.

Off balance sheet collateral data has been brought onto the LBIE ledger, to capture all assets and liabilities that were controlled by or owned by LBIE at 12 September 2008.

Having produced a 12 September 2008 balance sheet as a proxy for the position as at 07.56 on 15 September, the directors must now consider whether or not they are able to estimate the likely realisable values of assets and liabilities following administration.

There are a number of very significant matters that are unknown to both the directors and the administrators and that could have a material bearing on the outcome for creditors. The head of finance reported that it may not be possible for clear guidance to be given regarding the likely range of recoveries to unsecured creditors of LBIE, for some considerable time.

**Treasury**

At 15 January 2009, The Administrators held a total of $5.9billion of cash, of which $4.4billion represents house funds and $1.5billion possible client funds.

The Administrators' advised the committee of the investment policy for LBIE house funds. The investment policy is centred on minimising the possible risk of capital. Cash is deposited with 14 global institutions, in addition to being held in accounts with the Bank of England. All market counterparties with whom funds are invested have agreed to non-set off arrangements.

The Administrators reported that currently cash deposits are being made for a maximum period of one week, at institutions with a minimum rating of AA-, which have a maximum credit default swap spread of 200 bps. Certain AAA rated European government bonds are also held.

Client monies are managed separately, are segregated and are subject to more restrictive management and investment policies.

**Any other business – LBI claim filing (question raised by a committee member)**

The Administrators have been in regular dialogue with the LBI SIPA Trustee, through December 2008 and January 2009, regarding the filing of LBIE house and client Trust Property claims against LBI, ahead of the 30 January 2009 LBI imposed bar date.

It has been agreed with the LBI SIPA Trustee that LBIE will file a single omnibus claim on behalf of its clients and that LBIE and LBI will develop protocols to define major reconciliation and claims agreement processes in which they will both cooperate after that date.  The Administrators have notified LBIE creditors of this via their website and, in due course, will gather individual client authorisations which will be passed to the LBI SIPA Trustee.  Whilst an effort is being made to procure signed authorisations ahead of 30 January, the SIPA Trustee has confirmed to the Administrators that individual LBIE client claims will not be invalidated in the event that signed authorisation is provided after 30 January.

The filing deadlines for non-Trust Property claims against LBI and other USA based Lehman entities, including LBHI, are some months off still, and the Administrators have workstreams dealing with the preparation of these claims.

LBIE has a number of Bonds issued by other Lehman entities, which appear to benefit from an LBHI guarantee.  LBIE also appears to have claims against certain other Lehman entities arising out of derivative contracts, which may also be guaranteed by LBHI.  In addition, the administrators have recently become aware of an agreement signed in 2000 between LBIE and LBHI, which purports to allow LBIE to offset amounts receivable from LBI against amounts payable to LBHI.  These matters will be investigated further and legal advice will be taken over the coming months in order to resolve the position. As a result, in due course LBHI may prove to be a debtor in the LBIE estate rather than a creditor.  Creditors will be kept informed of developments on this front in light of the potential materiality of the sums concerned.

**Close**

Committee members requested the next formal meeting be held in approximately six weeks time (*now set for 10 March*), for update conference calls to be held in the intervening period and for a meeting to be convened in the near future at which the committee members and the Administrators will further discuss the provisions of the planned Trust Property Schemes of Arrangement (*now set for 10 February*).

**Exhibit F**

Downloaded on 09/02/2009
Released on 15/09/2008 08:53

15/09/2008 08:53
Lehman Brothers International (Europe) – In administration

Tony Lomas, Steven Pearson, Dan Schwarzmann and Mike Jervis, partners at
PricewaterhouseCoopers LLP, were appointed as joint administrators to Lehman
Brothers International (Europe) ('Lehman Brothers') on 15 September 2008.Lehman
Brothers, the principal UK trading company in the Lehman group, was placed into
administration earlier this morning, together with Lehman Brothers Ltd, LB
Holdings PLC and LB UK RE Holdings Ltd. These are currently the only UK
incorporated companies in administration.The joint administrators have been
appointed to wind down the business in as orderly a manner as possible.Tony
Lomas, joint administrator and partner of PricewaterhouseCoopers LLP emphasised:
"Because the group managed its funding on a global basis the UK trading
operation found itself unable to meet its obligations when the flow of funds
dried up last night. Our priority now is to work with management and trading
counterparties to agree the manner in which the assets and liabilities will be
handled."I would also like to emphasise that a number of group companies remain
solvent and will continue to trade. These companies include LBAM (Europe) and a
series of special purpose vehicles designed to manage portfolios of residential
and commercial real estate assets and non performing loans."ENDS

About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.

For more information contact

Stephanie Howel
BRS PR Manager, PricewaterhouseCoopers LLP
Tel: 020 7213 2421
Email: stephanie.howel@uk.pwc.com

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Downloaded on 09/02/2009
Released on 17/09/2008 12:00

17/09/2008 12:00
Lehman Brothers International (Europe) - in administration - Update

Following the appointment of Tony Lomas, Steven Pearson, Dan Schwarzmann and
Mike Jervis, partners at PricewaterhouseCoopers LLP, as joint administrators to
Lehman Brothers International (Europe) ('Lehman Brothers') on 15 September 2008,
Tony Lomas has the following update:"The last 48 hours has seen a period of
intense activity and we are grateful for the continued support of the management
and staff as we address the complexities of the task."The administrators have
been working to understand the operating position of the company with a view to
identifying how its various holdings can be wound-down in an orderly manner."A
priority has been establishing arrangements to retain staff to ensure the
orderly disposal of assets and we have taken steps to achieve this. We are
currently reviewing various proposals to transact and over the last 24 hours we
have resolved trading issues with the London Clearing House to ensure that
customers begin to transfer trades to third parties."The administrators
recognise the difficulty this situation is creating for the various market
participants and request their patience while the practical matters are resolved
to allow an orderly re-evaluation to be executed."There have been expressions of
interest in LBAM (Europe) and Lehman Brothers Europe Ltd (the asset management
and corporate finance advisory businesses) which are solvent and continue to
operate and we have begun discussions with interested parties."We are also
taking a keen interest in developments with Lehman Brothers in the US."Ends


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Stephanie Howel
BRS PR Manager, PricewaterhouseCoopers LLP
Tel: 020 7213 2421
Email: stephanie.howel@uk.pwc.com

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Natasha Davies
Assurance PR Senior Manager, PricewaterhouseCoopers LLP Media Relations
Tel: 020 7212 3343
Email: natasha.davies@uk.pwc.com

Rebecca Mill

Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Downloaded on 09/02/2009
Released on 17/09/2008 18:51

17/09/2008 18:51
Lehman Brothers International (Europe) - in administration - update

PricewaterhouseCoopers LLP, the administrators of Lehman Brothers International
(Europe), can confirm that salary payments, to all employees who are still
employed by the Companies in Administration, and who have continued to report to
work, will be paid no later than 30 September 2008, a month in
arrears.Unfortunately, due to the timing of the Administration, the
administrators will be unable to process any salary or other employment-related
payments this week. This means that they will not be in a position to make
salary payments on Friday, 19 September 2008.ENDS


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Rebecca Mill
Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Downloaded on 09/02/2009
Released on 19/09/2008 10:30

19/09/2008 10:30
Lehman Brothers International (Europe) - in administration - update

Following the appointment of Tony Lomas, Steven Pearson, Dan Schwarzmann and
Mike Jervis, partners at PricewaterhouseCoopers LLP, as joint administrators to
Lehman Brothers International (Europe) ('Lehman Brothers') on 15 September 2008,
the administrators have the following update:Tony Lomas, partner,
PricewaterhouseCoopers LLP;"While we have a market that continues to trade,
there has never been an event of this kind in which trades have been left
hanging to this extent and therefore counterparties and clearing houses do not
know how to assess the risks they face. There is unprecedented uncertainty and
complexity in the market; nobody designed their systems or transaction
structures to cope with the current situation. As a consequence, there is a high
degree of cautiousness on the part of intermediaries and advisers in the market
on how to proceed which is reflected in the way they are handling trading
issues. Our responsibility is to ensure that we maximise the value of the assets
to Lehman and to avoid preferring one counter party over another."Steven
Pearson, partner, PricewaterhouseCoopers LLP;"As a result of being suspended
from all markets Lehman Brothers was unable to trade, to address this
arrangements have been made to use the brokerage services of other market
participants. This has enabled us to begin realising some of the companies'
proprietary market positions."Dan Schwarzmann, partner, PricewaterhouseCoopers
LLP;"We are in discussions with interested parties to sell the Lehman Brothers
Asset Management and Corporate Finance businesses. Our duty is to maximise value
for creditors and the best way to do this is to keep each team together. In this
way the interests of both staff and creditors are aligned. We are in discussions
with potential partners at present and our aim is to complete a deal in the next
few days so as to create certainty for all involved." Mike Jervis, partner,
PricewaterhouseCoopers LLP;"One of our key priorities is assessing client
accounts. We intend to continue to provide information to the market in this
respect as and when we can, we will report progress." Ends


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Natasha Davies
Assurance PR Senior Manager, PricewaterhouseCoopers LLP Media Relations
Tel: 020 7212 3343

Email: natasha.davies@uk.pwc.com

Rebecca Mill
Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Downloaded on 09/02/2009
Released on 19/09/2008 11:50

19/09/2008 11:50
Administration of Lehman Brothers UK Real Estate Holdings Limited - Update

Following the appointment of Tony Lomas, Steven Pearson, Dan Schwarzmann and
Mike Jervis, partners at PricewaterhouseCoopers LLP, as joint administrators to
Lehman Brothers International (Europe) ('Lehman Brothers') on 15 September 2008,
Barry Gilbertson, partner and real estate specialist, PricewaterhouseCoopers
LLP, has the following update concerning the administration of the real estate
owning entity, Lehman Brothers UK Real Estate Holdings Limited ('LBUKRE'):"Since
appointment on 15 September, despite the complexity of LBUKRE and its trading
activities, the Administrators have made considerable progress in identifying
what assets are under the control of LBUKRE and have taken steps to ensure that
the pace and structure of any disposals optimise the realisations generated for
the creditors of LBUKRE."LBUKRE appears to have more than 200 subsidiary
entities or joint ventures, with property activities covering both investment
and development. These properties are principally located in the UK, but also in
Sweden, France, Finland, Spain, Croatia and several additional European
countries. The total underlying asset value, before allowing for funding
structures, is considered to be in the region of $15 billion."In addition, there
are non-performing loan and mortgage portfolios, together with a limited number
of private equity interests and shareholdings in listed businesses."Our review
of the LBUKRE portfolio will not be completed for several weeks, but we are
gathering all expressions of interest so that we can communicate with interested
parties as soon as we are ready".Any expressions of interest in the tangible
real estate assets should be directed, in the first instance, to
barry.gilbertson@uk.pwc.com and ed.b.cook@uk.pwc.com. At this stage, email is
preferable to a telephone call. All emails will be acknowledged. At this stage,
email is preferable to a telephone call. All emails will be acknowledged.ENDS


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Natasha Davies
Assurance PR Senior Manager, PricewaterhouseCoopers LLP Media Relations
Tel: 020 7212 3343
Email: natasha.davies@uk.pwc.com

Rebecca Mill

Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Downloaded on 09/02/2009
Released on 21/09/2008 21:44

21/09/2008 21:44
Lehman Brothers International (Europe) - client money and assets

The joint administrators (the "Administrators") of Lehman Brothers International
(Europe) ("LBIE") wish to inform affected customers of LBIE about the steps that
are being taken to identify and return client monies and assets held by LBIE.

Background
The Administrators treat the identification and return of client monies and
assets ("Client Assets") of LBIE as a very important and urgent matter. A
procedure for that identification has been agreed with the FSA, with whom the
Administrators have been working very closely in relation to this aspect of the
Administration. We set out below a brief description of that procedure, and
conclude with an update on progress and an indication of a possible timetable
for the return of Client Assets.

LBIE controls Client Assets through other institutions, and in principle it
should be possible for these Client Assets to be returned to clients. However,
prior to doing so the Administrators are obliged to ensure that all Client
Assets are accessible by the Administrators and that they qualify to be treated
as client monies or assets. Subject to these preconditions such Client Assets
should, in due course, be available for return. In addition, in respect of each
client for which Client Assets are held, the Administrators must ensure that
there are no liabilities owed by the client which might give rise to an
entitlement to withhold all or part of a return of the Client Assets in
question. Those steps will ensure no creditors are given preference and is
consistent with the Administrator's duties to preserve and realise the company's
assets for its creditors.

Collecting the information required for these purposes is time consuming. The
business conducted by LBIE is complex, with many hundreds of clients, in
particular prime brokerage clients, dealing with, and receiving services from, a
range of different business units within LBIE, requiring data and input from a
number of different systems.

For certain business units such as prime brokerage clients should be aware that,
in relation to Client Assets provided to LBIE, it was customary for LBIE to have
a right of "re-hypothecation" or right of "use" (referred to below as a "right
of use"). In effect that entitled LBIE to lend such securities in the stock loan
or repo markets, with the result that the assets, once "used", were no longer
held for the client on a segregated basis, and as a result the client may cease
to have any proprietary interest in them.

Process
In summary, the process for the identification and return of Client Assets,
which has been agreed with the FSA, involves the following key steps:1. For
those clients who have the benefit of client money protection, under the FSA
rules, ascertain client money balances held with various institutions in
aggregate and reconcile those balances to LBIE client records.
2. Ensure funds in (1) above are accessible by the Administrators for return.
3. Identify Client Assets in aggregate, and the manner in which the different
types of assets are held. For example, assets may be registered in nominee
names, held via an accountholder in a clearing system and/or third party
custodians may be used.
4. Check documentation with each client for whom Client Assets appear to be
held, including prime brokerage agreements (and any side agreements thereto),

netting agreements, and other relevant documents, to confirm that money received from or on behalf of a particular client is "client money" within the meaning of the FSA rules and to verify related security rights and set off rights in respect of Client Assets.

5. Reconcile the Client Assets by client to the client's claimed position, and identify whether the client has any relevant liabilities. If any such liabilities are identified, then to determine the extent to which such liabilities owed by the client may reduce the amounts properly returnable to the client. It is also necessary to analyse whether LBIE has exercised any "right of use" over Client Assets, and whether assets so used have ceased to be available.

6. In determining the amount potentially returnable, to take account of any unsettled transactions between the client and LBIE, and provide for any potential liabilities of the client resulting from such unsettled transactions. Further steps may be identified as this process is conducted.

Timetable

To complete the above processes will take considerable time. Our current view is that this process could take several months to conclude. Once certain aspects of the process are completed, the Administrator may consider partial returns subject to conditions. We are working closely with the FSA in the conduct of this vital process. We will update clients about progress on an ongoing basis. Further details relating to the administration are included in the PwC website www.pwc.co.ukENDS

About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory services to build public trust and enhance value for its clients and their stakeholders.  More than 155,000 people in 153 countries across our network share their thinking, experience and solutions to develop fresh perspectives and practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited liability partnership in the United Kingdom) or, as the context requires, the PricewaterhouseCoopers global network or other member firms in the network, each of which is a separate and independent legal entity.

For more information contact

Stephanie Howel
BRS PR Manager, PricewaterhouseCoopers LLP
Tel: 020 7213 2421
Email: stephanie.howel@uk.pwc.com

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Downloaded on 09/02/2009
Released on 22/09/2008 12:14

22/09/2008 12:14
Lehman Brothers International (Europe) - in administration - update on sale of
business.

Dan Schwarzmann, joint administrator and partner at PricewaterhouseCoopers LLP,
provides an update on the status of the sales process concerning the investment
banking and equities businesses within Lehman Brothers in the UK and Europe.'We
have now focused on one party as they are interested in acquiring a wider team,
which should result in a better deal for staff and creditors of these
businesses. Given the complexity of Lehman Brothers, these negotiations are
difficult, but I'm hoping to give certainty to all involved as soon as
possible.'Further updates will be circulated as soon as they are available

About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Rebecca Mill
Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Stephanie Howel
BRS PR Manager, PricewaterhouseCoopers LLP
Tel: 020 7213 2421
Email: stephanie.howel@uk.pwc.com

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Downloaded on 09/02/2009
Released on 23/09/2008 14:50

23/09/2008 14:50
PwC administrators save over 2500 city jobs through sale of Lehman Brothers

Tony Lomas, Steven Pearson, Dan Schwarzmann and Mike Jervis, partners at
PricewaterhouseCoopers LLP, and joint administrators to Lehman Brothers
International Europe ('Lehman Brothers') are pleased to announce that following
a week of extensive activity they have successfully completed a sale of the
investment banking and equities businesses of Lehman Brothers to Nomura, the
Asian-based investment bank.Commenting on the sale, Dan Schwarzmann, joint
administrator and partner at PricewaterhouseCoopers LLP said:"The last week has
seen a period of intense activity and with the support of PwC's recovery and
corporate finance teams, as well as the staff at Lehman Brothers, we are
absolutely delighted to be able to confirm that we have secured a sale of the
investment banking and equities businesses of Lehman Brothers in the UK and
Europe."This sale, which is conditional on a number of issues, means the
continuing employment of around 2,500 Lehman's staff, a vast number of whom have
been working with us to get this unprecedented deal done."Mike Jervis, joint
administrator and partner at PricewaterhouseCoopers LLP said:"Clearly we are
very pleased with this outcome which secures the future of so many staff but
there is still a great deal of work to be done on this very complex
administration. The interests of creditors and clients is of paramount
importance. Our priority remains the orderly wind down of the business and we
will be working with many remaining staff as we do this."


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Rebecca Mill
Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Natasha Davies
Assurance PR Senior Manager, PricewaterhouseCoopers LLP Media Relations
Tel: 020 7212 3343
Email: natasha.davies@uk.pwc.com

Downloaded on 09/02/2009
Released on 25/09/2008 09:42

25/09/2008 09:42
Update on OTC cash trades to be settled in CREST

The Administrators of Lehman Brothers International (Europe) (in administration) ("LBIE") wish to update counterparties of LBIE regarding unsettled OTC cash trades that were due to be settled in CREST (Euroclear UK& Ireland).Background The Administrators appreciate the degree of uncertainty in the market created by the unsettled OTC cash trades that were due to be settled in CREST and confirm that they are working closely with CREST and treating the resolution of this as a very important and urgent matter. ProcessCertain counterparties and customers have contacted the Administrators with proposals concerning the possible cancellation of OTC cash unsettled trades. It is currently possible for the Administrators to deal with such proposals in limited circumstances. Accordingly, we request that, until further notice, counterparties contact the Administrators with a proposal if all of the following principles apply:  •  The counterparty will be required to pay a fee, to be agreed with the Administrators.

   • The proposal should concern OTC cash trades that were to be settled in CREST.

   • The unsettled trades must have been executed OTC, and not be subject to the default or other rules of an Exchange or Clearing House.

   • As a precondition for cancellation the counterparty will be required to lodge an amount equivalent to the net value of the cancellation in escrow, to be released on conclusion of the cancellation process.

   • Prior to agreeing to any proposal, the Administrators will require a confidentiality undertaking to be signed.

   • A standard indemnity will be required indemnifying the Administrators. Details will be provided on request.

Once these principles are satisfied, the Administrators will consider a proposal for effecting cancellation of trades. For further details please contact: enquiries.lehmanbrothers@uk.pwc.com ensuring that the subject field is entitled OTC CASH TRADES.


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory services to build public trust and enhance value for its clients and their stakeholders.  More than 155,000 people in 153 countries across our network share their thinking, experience and solutions to develop fresh perspectives and practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited liability partnership in the United Kingdom) or, as the context requires, the PricewaterhouseCoopers global network or other member firms in the network, each of which is a separate and independent legal entity.


For more information contact

Emma Thorogood

UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Downloaded on 09/02/2009
Released on 25/09/2008 09:52

25/09/2008 09:52
Lehman Brothers International (Europe) (in administration) – exchange and
clearing house communications

The joint administrators (the "Administrators") of Lehman Brothers International
(Europe) (in administration) ("LBIE") wish to inform affected clients of LBIE
about the current status of its position with various Recognised Investment
Exchanges ("RIE"), Recognised Overseas Investment Exchanges ("ROIE"), Recognised
Clearing Houses ("RCH") and Recognised Overseas Clearing Houses ("ROCH").An RIE
is an investment exchange, and an RCH is a clearing house, which is recognised
and supervised by the FSA under the Financial Services and Markets Act 2000. The
FSA has also recognised and supervises a number of ROIEs and ROCHs under the
Financial Services and Markets Act 2000. Please note that the list below does
not detail all RIEs, ROIEs, RCHs and ROCHs that LIBE is currently working with.
The Administrators intend to update this communication in the coming days and
weeks with further information.For further details about the rules, regulations
and actions of each RIE, ROIE, RCH and ROCH, please refer to their respective
websites. LCH.ClearnetThe Administrators have been working with LCH.Clearnet to
transfer client positions to other brokers as nominated by LBIE's clients. This
exercise is now concluded. EUREX & Eurex Clearing AGThe Administrators have been
working with Eurex Clearing AG to transfer client positions to other brokers as
nominated by LBIE's clients. This exercise has largely been concluded.Euroclear
UK & Ireland Limited ("EUI")Accounts relating to LBIE and its UK affiliates
remain disabled and all related unsettled instructions remain frozen and will
not be included in CREST settlement processing. For further information
regarding OTC cash trades in CREST please refer to
http://www.pwc.co.uk/eng/issues/Lehman_exchange_update_240908.htmlThe London
Metal Exchange Limited ("LME")Outstanding trades on LME, currently registered
with LCH, will be addressed in the coming days. London Stock Exchange plc
("LSE")LSE issued a default notice on 15 September 2008. The Administrators have
been working with the LSE to provide the relevant data required to ensure the
LSE can calculate the appropriate net settlement due to or from LBIE. This
relates to transactions not cleared through LCH.Clearnet (see LCH.Clearnet
above), but which are subject to the LSE default rules.EDX London Ltd ("EDX")The
Administrators are not aware of any outstanding trades on EDX. LIFFEThe
Administrators are not aware of any outstanding trades on LIFFE. ICE Futures
Europe ("ICE")The Administrators are not aware of any outstanding trades on ICE.
The Administrators would like to thank all the RIEs, ROIEs, RCHs and ROCHs for
their continued co-operation and understanding.Further details relating to the
administration are included on the PwC website www.pwc.co.uk


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Natasha Davies
Assurance PR Senior Manager, PricewaterhouseCoopers LLP Media Relations
Tel: 020 7212 3343
Email: natasha.davies@uk.pwc.com

Rebecca Mill
Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Downloaded on 09/02/2009
Released on 26/09/2008 10:00

26/09/2008 10:00
Lehman Brothers International (Europe) (in administration) - client money and
assets update

Following on from the statement issued on 21 September 2008, the joint
administrators (the "Administrators") of Lehman Brothers International (Europe)
("LBIE") wish to inform clients of LBIE that they are considering, in
consultation with their legal advisors and the FSA, structures which may enable
them to offer counterparties a partial distribution of monies and assets
designated as Client Assets.The Administrators hope to be in a position to
provide further updates on these proposals in due course. Counterparties should
understand that it is likely to take some weeks for these structures to be fully
developed.The Administrators appreciate and acknowledge the significant
difficulties that are being faced by counterparties and can confirm that the
identification and return of Client Assets remains a major priority.ENDS


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.


For more information contact

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Natasha Davies
Assurance PR Senior Manager, PricewaterhouseCoopers LLP Media Relations
Tel: 020 7212 3343
Email: natasha.davies@uk.pwc.com

Rebecca Mill
Financial Services PR Executive, PricewaterhouseCoopers LLP
Tel: 020 7213 5829
Email: rebecca.mill@uk.pwc.com

Downloaded on 09/02/2009
Released on 30/09/2008 16:30

30/09/2008 16:30
30 September 2008: Lehman Brothers (Europe) - In administration - Update

Following the appointment of Tony Lomas, Steven Pearson, Dan Schwarzmann and Mike Jervis, partners at PricewaterhouseCoopers LLP, as joint administrators to Lehman Brothers International (Europe) and Lehman Brothers Limited (together 'Lehman Brothers') on 15 September 2008, the administrators confirmed that a restructuring of the business was necessary and 750 employees have been made redundant with effect from today.
Tony Lomas, partner, PricewaterhouseCoopers LLP, said:
"It is extremely disappointing that despite exhausting all avenues these jobs could not be saved. As we move into our third week, we continue to be focussed on maximising the value of recoveries for creditors, whilst minimising the impact on other stakeholders as much as possible."
Arrangements are being made to ensure that over the coming days, the individuals affected by this have the opportunity to attend a one on one meeting to discuss how this impacts them personally.
Ends


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory services to build public trust and enhance value for its clients and their stakeholders. More than 155,000 people in 153 countries across our network share their thinking, experience and solutions to develop fresh perspectives and practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited liability partnership in the United Kingdom) or, as the context requires, the PricewaterhouseCoopers global network or other member firms in the network, each of which is a separate and independent legal entity.


For more information contact

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Anna White
PR Manager - PricewaterhouseCoopers LLP
Tel: +44 (0) 207 804 7509
Email: anna.r.white@uk.pwc.com

Downloaded on 09/02/2009
Released on 07/10/2008 17:28

07/10/2008 17:28
Lehman Brothers International (Europe) (in Administration) - Client assets
update

The joint administrators (the "Administrators") of Lehman Brothers International
(Europe) (in Administration) ("LBIE") wish to update clients of LBIE about the
position in relation to client monies and assets ("Client Assets") held by LBIE
and what steps have been taken by the Administrators in this area. This update
follows statements made by the Administrators on 21 and 26 September 2008.

In addition to addressing the issue of those Client Assets that in principle
should be available to be returned to clients, the Administrators are very aware
of the existence and issues faced by all of LBIE's unsecured creditors and their
responsibilities to them. The Administrators have sought to adopt a system for
dealing with Client Asset claims in an orderly and efficient manner and one
which, while recognising the importance of dealing with Client Asset claims,
enables them to act with proper regard to the interests of all creditors. In
particular the Administrators wish to assure all creditors that their claims
will be fairly and equitably treated.

This statement addresses only the position in relation to Client Assets. In
order to ensure a planned and organized system for dealing with the large number
of Client Asset claims the Administrators have designed a set of processes and
procedures to deal with the claims in a logical, efficient and fair manner
consistent with the performance of their primary functions of achieving a better
result for LBIE's creditors as a whole than would be achieved on an immediate
winding up.

The Administrators presented these procedures to the High Court on 7 October
2008, at which the FSA was also present, and have obtained an order approving
these steps.
 Background

Since their appointment, the Administrators have treated the identification and
return of Client Assets of LBIE as a very important and urgent matter,
recognising also that it is a complex, highly technical area. The Administrators
fully appreciate the market issues being faced by counterparties and that
subject to certain preconditions being met those assets that are properly Client
Assets should be available to be returned to clients.

Against this background, the Administrators considered it appropriate to seek
direction from the High Court on the development of appropriate procedures to be
adopted to manage Client Asset claims.

The process The process for the identification and return of Client Assets,
which has been approved by the Court, is set out below.
General approach The Administrators will:
i. identify and take appropriate steps to gain control of all property of or
held in the name of or otherwise to the order of Lehman Brothers International
(Europe) ("LBIE") (in administration), whether money, securities or other
contractual rights, that may be subject to trust or proprietary claims (the
"Trust Property");
ii. identify the entire population of counterparties that purport to have
claims, rights or other interests in the Trust Property (the "Trust Claims");

iii. seek to reconcile all of the data and information available to LBIE and the Administrators from the pre-administration records in relation to the Trust Property with the information supplied by counterparties, custodians and any other appropriate sources;

iv. whether by agreement, directions from the Court or otherwise, reach a clear determination of the various legal issues that impact upon the validity of the Trust Claims and the rights of LBIE over the Trust Property;

v. subject to directions from the Court, agree a procedure for making interim distributions of Trust Property to counterparties with valid Trust Claims;

vi. determine the basis upon which the costs and expenses of the Administrators in dealing with and determining all issues in relation to the Trust Property can be discharged from the proceeds of the Trust Property and apply for directions on such matters, as necessary; and

vii. determine the most expedient method of communicating with counterparties in relation to the procedure being adopted by the Administrators, the progress made towards the achievement of the defined objectives and the directions that may be given from time to time by the Court.

Method The Administrators will:

i. deploy dedicated resource comprising partners and employees from PricewaterhouseCoopers LLP and Linklaters LLP (the "Trust Property Team"), to take responsibility for the further development and implementation of a plan designed to achieve the objectives set out in paragraph 1 above; and

ii. set up a discrete sub-committee to monitor the construction and implementation of this scheme and the efficiency and fairness of the methodology. This sub-committee will also review the principles applicable to prioritising the determination of the claims of the particular counterparties by identifying, where appropriate, high profile problems or hardship issues, to ensure that the overriding objective of treating all counterparties fairly is not prejudicial to the interests of a minority or that there is not otherwise a problem that requires specific and accelerated attention. This sub-committee will meet periodically (initially daily) to review the prioritisation and refine the process as events develop.

Key steps.The Trust Property Team will undertake inter alia the following functions:

i. design and install a new IT system onto which it will upload all of the data available from the internal systems of LBIE relating to client deposits and securities that may be Trust Property;

ii. implement a process to reverse or amend the LBIE records for failed or broken trades as a consequence of the Administration, to enable the Trust Property to be more fully identified;

iii. identify the impact of termination notices that have been served post-administration, validate these events and other activities of third parties and either review the clients' valuation of the impact of the termination or undertake a valuation of the impact of termination on the rights of LBIE under various contracts; and

iv. agree a protocol in relation to the implementation of corporate actions that may need to be undertaken in relation to Trust Property, for example, the exercise of voting rights, receipt of dividends, rights issues and other pre-emptive offers, that will have an impact on the ultimate value of the Trust Property.

The Trust Property Team will contact all of the third party custodians, agents, counterparties, exchanges and clearing houses ("Depots") where Trust Property may be located to obtain confirmation of the securities that are being held and to agree a procedure whereby the Administrators can have online access in relation to data regarding the securities and seek to obtain formal written confirmation of the position by security and by Depot. The Administrators will also seek to establish that they have complete or adequate control over the securities for the ultimate benefit of the counterparties with Trust Claims or LBIE and that any liens asserted by the Depots are assessed and valued. Once the data is available, the Trust Property Team will reconcile the books of LBIE to those of the Depots, by security and by Depot, with a view to identifying and

resolving discrepancies. Where appropriate, this process will take account of the interests of LBIE in its "house accounts".

The Administrators will write to all of the counterparties who may have Trust Claims to obtain from them full details of the rights and claims they believe they have in relation to all forms of Trust Property. The Trust Property Team will seek to reconcile all of the data that is obtained in relation to Trust Property as a consequence of the exercise outlined in the paragraph above with the information obtained from counterparties.

Whilst the data reconciliation process is being undertaken, the Administrators have instructed Linklaters to devise a programme to determine by reference inter alia to the various contracts utilised by LBIE in its dealings with all counterparties, the various categories of legal issues that will need to be determined before a proposal for the distribution of the Trust Property can be prepared. The Administrators will consider whether it is possible for this process to take place in parallel to the data collection exercises noted above, or whether it is more appropriate (in some cases) to wait until it is clear that all the legal issues identified need resolution in practice.

Prioritisation The Administrators will, having taken due account of any views of the FSA, identify a set of principles that can be applied when considering prioritising claims, taking into account, where appropriate and consistent with their duties as administrators, the following factors, which include:

i. the quality and timing of data being available to the Administrators;

ii. the speed of response of counterparties in dealing with the Administrators' questions, coupled with the quality and accuracy of the data supplied, the complexity of the data and the legal issues relevant to the determination of a particular claim;

iii. the number of claims that may be made to a particular class or category of Trust Property; the risk of a shortfall of Trust Property;

iv. the cost efficiency and expediency of the relevant process; and

v. market stability and confidence.

Further Directions

The Administrators may from time to time need to seek further directions from the High Court on this process and on particular issues arising from it. We will continue to keep you advised of developments.

Ends


For more information contact

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

Stephanie Howel
BRS PR Manager, PricewaterhouseCoopers LLP
Tel: 020 7213 2421
Email: stephanie.howel@uk.pwc.com

Downloaded on 09/02/2009
Released on 09/10/2008 09:30

09/10/2008 09:30
Lehman Brothers International (Europe) (in administration) - Unsettled OTC
Trades - update

Background Further to the statement issued on 24 September 2008 concerning the
possibility of cancelling unsettled OTC trades, the joint administrators (the
"Administrators") wish to propose a possible approach which would deal with the
legal and operational uncertainties caused by the large number of unsettled
transactions to which LBIE is a party.
Contracts - default rules LBIE was party to a large number of transactions with
a large number of counterparties, which were entered into prior to the date of
LBIE going into Administration (15 September 2008) and which were due to settle
some time after that date, but which remain unsettled today. Many of those
transactions are subject to a legally binding default process that will govern
how those unsettled obligations will be valued and determined. Examples of those
processes are the default rules of a central counterparty (such as LCH.Clearnet,
which apply to contracts registered with the LCH), the default rules of an
Exchange (such as the LSE) which apply (broadly) to other onexchange LSE trades,
and bilateral master agreements (such as ISDA) entered into by many
counterparties and LBIE. In most instances, that will result in a process being
undertaken to convert the respective obligations of LBIE and the counterparty
into a single net cash sum in respect of all of the contracts subject to the
default process in question.
OTC contracts - no default rules Other transactions between LBIE and
counterparties fall outside any such default arrangement - referred to here as
"OTC contracts", though that term excludes in this context contracts executed
off exchange but subject to a binding master agreement with default arrangements
as described above. That therefore could cover pure cash equities trades, or
fixed income trades, executed off exchange and subject only to standard terms of
business. As a result, there is considerable uncertainty as to the legal
obligations, and possible rights and liabilities, associated with those
contracts. The Administrators believe it would be beneficial for a process to be
established which would facilitate the removal of that uncertainty.
Match deletion of settlement instructions on CREST The Administrators are also
aware that uncertainty has been caused by the existence of matched settlement
instructions on CREST in respect of a large number of such OTC contracts. EUI
has today directed all market counterparties with outstanding settlement
instructions of all types involving LBIE to input instructions in the CREST
system to match delete those instructions. For clarification, this instruction
will not, however, cancel the underlying contractual obligations between the
parties in relation to the relevant transactions.
Proposal for bilateral agreed net settlement on OTC contracts In order to deal
with the contractual rights and liabilities associated with OTC contracts, the
general approach which the Administrators propose would be for LBIE and each
counterparty to agree bilaterally that their respective liabilities under their
OTC contracts would be cancelled and replaced by a determination of a net
position between LBIE and the counterparty. The net position would be calculated
in a manner analogous to the approach applied under the LSE default rules -
namely that each contract would be valued by comparing the trade price and its
close-out price as at an agreed valuation date. Note that, as the purpose of
adopting this approach is to provide legal certainty, and a single net position
in respect of all relevant liabilities, it will be a condition of the approach
that all relevant OTC contracts be included in the arrangements, and not only
some. For OTC contracts that were to be settled through a clearing or settlement
system any cancellation will normally need to be subject to the relevant matched
settlement instructions first being duly deleted in accordance with the rules of

that system. For contracts which were to be settled through CREST, this will be
achieved consequent on the directions published by EUI earlier today, as
referred to above.
Valuation date The valuation date would ideally be the date which most
accurately reflects the date that a court would use to value a party's loss on
the relevant trade. In practice, it would be operationally onerous to have
multiple, different valuation dates, and accordingly the Administrators propose
that a single valuation date be adopted for the relevant trades. One option
would be for the parties to adopt a value equivalent to the LSE's "hammer price"
approach in its default rule. It is possible other valuation dates would need to
be adopted, but in principle the Administrators are open to prioritising
operational simplicity in this regard.
Payment of the net sum Where the calculated net position is an amount due to
LBIE, this would be payable in cash by the counterparty, subject to the pre-
existing rights of the counterparty. Where the calculated net position is an
amount due from LBIE, it will represent a claim on the LBIE estate and the
counterparty will rank as an unsecured creditor. The Administrators wish to make
clear that under no circumstances will a net position payable by LBIE rank as an
expense of LBIE's administration.
Operational costs  In order to justify adopting this approach, which will
involve a prioritisation of LBIE's resources to calculate the relevant net sum,
the Administrators need to be able to recover the costs from counterparties
adopting this approach. LBIE would therefore propose to charge a fee equal to 10
basis points multiplied by the notional value of the cancelled trades with the
counterparty in question, which they believe to be a reasonable proxy for the
operational costs in question.
Indemnity The Administrators will ask counterparties to indemnify them from the
risk that this approach is subsequently held to be invalid, or involves the
giving of a preference to any creditors. That indemnity will be in a standard
form.
Legal terms and process Any counterparty which is interested in adopting this
approach should make contact in the manner described below. They will be then
provided with a copy of a standard form legal agreement which will govern the
arrangement and a request for further details of the positions and contracts
affected. Assuming the parties can agree in principle to the approach,
arrangements will then need to be agreed by which the relevant OTC trades are
identified, reconciled and valued.
Process management framework and prioritisation The Administrators intend to
prioritise each counterparty in accordance with the order in which they agree to
the above terms.
Next steps The Administrators confirm that the principles contained in the
update issued on 24 September 2008 continue to apply, but wish to extend the
proposal as described in this update. For further details please contact:
enquiries.lehmanbrothers@uk.pwc.com ensuring that the subject field is entitled
OTC UNSETTLED TRADES.
Further details relating to the administration are included on the PwC website
www.pwc.co.uk ENDS


About PricewaterhouseCoopers
PricewaterhouseCoopers provides industry-focused assurance, tax and advisory
services to build public trust and enhance value for its clients and their
stakeholders.  More than 155,000 people in 153 countries across our network
share their thinking, experience and solutions to develop fresh perspectives and
practical advice.

"PricewaterhouseCoopers" refers to PricewaterhouseCoopers LLP (a limited
liability partnership in the United Kingdom) or, as the context requires, the
PricewaterhouseCoopers global network or other member firms in the network, each
of which is a separate and independent legal entity.

For more information contact

Stephanie Howel
BRS PR Manager, PricewaterhouseCoopers LLP
Tel: 020 7213 2421
Email: stephanie.howel@uk.pwc.com

Emma Thorogood
UK head of media relations, PricewaterhouseCoopers LLP
Tel: 020 7213 8593
Email: emma.thorogood@uk.pwc.com

## 1. What happened to Lehman Brothers and what is PricewaterhouseCooper's involvement?

After an attempt to find a private buyer failed, Lehman Brothers Holding Incorporated (the parent company of the UK Lehman Brothers firms) filed for bankruptcy in the US courts on 15 September. Accordingly at 7.56am on 15 September, four of the UK and European entities of the group were placed into administration.  Four partners of the UK firm of PricewaterhouseCoopers were appointed as administrators for the four Lehman Brothers entities (Lehman Brothers Limited, Lehman Brothers Holdings plc, Lehman Brothers International (Europe) and LB UK RE Holdings Ltd). Since then additional entities have been placed in administration (see below).

## 2. Which Lehman Brothers companies are in administration?

Partners from PricewaterhouseCoopers UK were initially appointed as Administrators to the following Lehman companies:

- Lehman Brothers Limited – the service company for the UK, employing all staff
- Lehman Brothers Holdings plc – an intermediate holding company owning shares in the investment banking and asset management subsidiaries
- Lehman Brothers International (Europe) – the principal UK trading company with overseas branches or representative offices in many other jurisdictions
- LB UK RE Holdings Limited – an intermediate holding company with numerous real estate investment Special Purpose Vehicles (SPVs)

There are many subsidiary companies within the Lehman Brothers group which are either asset owning or dormant companies, the future of which will be decided in the coming months. As well as the above companies, the following additional entities have also now been placed into administration:

- Storm Funding Limited
- Mable Commercial Funding Limited
- Lehman Brothers Europe Limited
- Lehman Brothers UK Holdings Ltd
- LB UK Financing Ltd
- LB SF No. 1
- Cherry Tree Mortgages Limited
- Lehman Brothers Lease and Financing (No 1) Limited
- Zestdew Limited
- Monaco NPL (No 1) Limited
- Lehman Commercial Mortgage Conduit Limited
- LB RE Financing NO. 3 Limited
- Lehman Brothers (PTG) Limited
- Eldon Street Holdings Limited
- LB Holding Intermediate 2 Limited

### 3. What is the role of the Administrators?

Administration is a procedure available in the UK to a company that is insolvent, or is likely to become so. The procedure involves placing the company under the control of one or more insolvency practitioners and the protection of the UK courts.

The Administrators of the Lehman Brothers entities in administration are PricewaterhouseCoopers UK partners who are specifically licensed to accept insolvency appointments. They use the resources of PricewaterhouseCoopers to assist in taking control of the companies' affairs and pursuing the objectives of the administration. Once appointed the PricewaterhouseCoopers UK partners acting as Administrators became officers of the court and have a fiduciary responsibility to protect and realise the assets for the benefits of all creditors. Accordingly, the key objectives of the Administrators are to maximise the values of assets and realise this for the benefit of all creditors. No individual creditor or group of creditors can be preferred in any way. All creditors have to be treated equally.

### 4. What are the guiding principles of administration?

The Administrators have to act under the following guiding principles:

- The primary duty of the Administrators is to realise assets for cash for the benefit of all creditors. They need to obtain the best price for the assets, in the light of the prevailing market for such assets and any special circumstances requiring them to realise assets quickly
- Each legal entity must be treated separately. The Administrators will only convey whatever right, title and interest Lehman Brothers companies in administration have over the asset.
- Creditors of the same type or class (e.g. unsecured) must be dealt with on a *pari passu* or equal basis since the estate is insolvent. The Administrators are officers of the court and have to deal with creditors on an even-handed basis.
- Assets and liabilities which are not owned by the Lehman Brothers companies in administration do not form part of the insolvent estates. The Administrators, therefore, need to determine the status of all assets and liabilities. Where assets are held in trust, the Administrators may deal with them (e.g. return them to the owner), but the Administrators need to ensure that creditors in the same class are not disadvantaged; Administrators may insist that the costs of dealing with this are borne by the owner and not by the rest of the estate.
- Where actions or queries are of no, or minimal, value to creditors, the Administrators reserve the right not to spend any time in dealing with them
- Where the Administrators settle with a counterparty, they may insist on no set- off in relation to pre-administration acts or omissions
- The Administrators act without personal liability.

**5. What is particularly difficult about the Lehman Brothers situation?**

Lehman Brothers was a very significant and complex global organisation, operating in multiple territories and across most areas of financial services. Its collapse also coincided with a period of unprecedented turmoil in financial markets. The US operations of Lehman Brothers, and the UK and European Lehman Brothers' entities in administration, are now being dealt with through separate legal procedures and it is as if they are no longer part of the same group.  This has significant practical consequences for the Administrators in meeting their objectives. As with most global financial services organisations, on a day to day basis Lehman Brothers was previously managed and run mainly along global product lines.  Following Lehman Brothers' bankruptcy in the US, and the UK and European Lehman entities being placed into insolvency proceedings, a legal entity focus is now paramount and all information relating to the group's activities now has to be captured and assessed on a legal entity basis instead.  Funding, and other interdependencies, existed between the US and various UK and European Lehman Brothers' entities and these links are now broken. These factors add further complexity to the administration. The sale of the North American investment banking and capital markets business of Lehman Brothers to Barclays also complicates the situation faced by the Administrators.

**6. What is unusual about this administration?**

Administrators generally have the opportunity to work with a company's directors prior to the decision being made to put the company into administration, often for a period of many weeks.  This was not the case with Lehman Brothers, where a very rapid decision had to be taken to place the relevant entities into administration. Combined with the inherent complexity of the Lehman Brothers' organisation, the Administrators were faced with a significant initial task to stabilise (as far as possible) the entities' operations, to arrange funding and take such other steps as were necessary to enable the entities to continue an appropriate level of activity.

**7. What other PricewaterhouseCoopers resources are involved?**

A very large team of PricewaterhouseCoopers partners and staff have been deployed to assist the Administrators, sourced from a wide range of specialist areas with the firm. This includes partners and staff from the Administrators' own team of specialists as well as partners and staff with detailed banking and capital markets knowledge. These have been involved from the outset in order to help and advise on various specific aspects of the administration, from the operational aspects of capturing and settling trades, to assessing valuation and other asset and liability specific questions, and realising cash for the Lehman Brothers UK estate.

**8. What are the most significant issues faced by the Administrators in relation to the market?**

There are two main issues:  The first is the settlement of trades and the associated issues around failed and open trades including short positions. The second relates to Client Assets and Client Money, in particular in dealing with specific monies or assets that can be categorised as client monies or assets. The Administrators have prioritised both these areas and have been working closely with relevant regulators, including the FSA, their legal advisors, the court and relevant counterparties and exchanges.  Both areas are inherently complex and will take time to resolve. The Administrators are aware of the interest in these areas from  counterparties and other relevant stakeholders.

### 9. What is the position in respect of failed trades?

There are over 140,000 failed LBIE trades globally. Each of the markets on which there are failed trades have their own approaches and rules to deal with failed trades. The timetable for resolving this issue will vary by jurisdiction. Of the 140,000 failed trades approximately 82,500 are in Europe, approximately 12,500 in Americas and approximately 45,000 in Asia. More progress is being made in respect of European fails as LBIE Operations have responsibility for processing these trades prior to LBIE's administration and thus the Administrators had the benefit of data and resources in London.

LBIE failed trades in the US and Asian markets respectively were carried out via locally based affiliates. Resources for these entities are employed outside LBIE and thus outside the Administrators' direct control. The Administrators are working with these entities to obtain assistance in resolving these issues. Some of these entities are also in their own local insolvency proceedings which has added to the complexity of the process.

More detailed information about failed trades is included on the PwC website.

### 10. What is being done in relation to the settlement of trades and failed trades on exchanges?

As with any similar organization, LBIE was involved in high volume trading activities. The settlement of trades, both on exchanges and in the OTC markets, was a key element of its business.

Against this background, subsequent to the administration, the following took place:

(a)        The majority of exchanges froze all LBIE's accounts.

(b)        Several exchanges, clearing houses and counterparties issued Default Notices, resulting in trades being unwound under the legal requirements of their default provisions.  This was made significantly more

complex as some of the Default Notices were legally served on Lehman Brothers' entities outside the UK.

(c)    The non receipt of data that would normally be received and automatically processed in Lehman's books and records resulted in a significant number of trades showing as currently failed or unsettled.

As a result of these factors, significant concerns arose as to which trades were unsettled or failed.  What decisions can be taken by the Administrators are then governed by their need to show that any action taken has a benefit to the creditors, the LBIE estate and that there is no downside impact on the Administrators' and LBIE's position.

The Administrators are working closely with the exchanges, clearing houses and other relevant market participants involved to resolve this situation.  Each exchange, clearing house and central securities depositary has its own procedure in the event of default of a participant and, therefore, different processes are being followed in this regard. In addition, LBIE continues to face limitations on data to confirm positions and client balances as the access to information required to confirm and reconcile positions has been restricted.

### 11. What is the process for settlement of the unsettled trades that were executed on exchanges?

Most exchanges have exercised their default rules and informed counterparties of what action to take. The Joint Administrators are aware that the London Stock Exchange (the "LSE") has exercised a "hammer price" default process which will result in a determination by the LSE of the net cash settlement position between LBIE and each counterparty. That process is ongoing. Several other exchanges default rules require a buy-in process. We recommend that counterparties continue to monitor the websites of the relevant Exchanges for further details.

### 12. What is the relationship between the Administrators and the regulatory bodies?

*The Administrators and the Financial Services Authority (FSA)*

The Administrators are keeping the FSA informed of their activities on a regular basis, with a dedicated team of regulatory professionals working alongside Lehman Brothers Legal & Compliance teams to secure the orderly wind down of FSA authorised and regulated companies.

Lehman Brothers Senior Executives and many staff have FSA Approved Persons status, in addition to any legal and fiduciary duties they may have as Directors.

*The Administrators, European and other International Regulators*

Lehman Brothers has a considerable number of branches and offices throughout Europe and the Rest of the World. The Administrators are working with these offices and, as part of this work, are liaising with enquiries and investigations instigated by international regulators.

**13. How do interested parties register an interest in acquiring assets from Lehman?**

Parties interested in acquiring any or all of the assets of the Lehman Brothers entities in administration can contact the Administrators by clicking here.

**14. How do creditors register a claim and/or ask the Administrators a question?**

Immediately following the Administration event an exceptionally large number of queries were received by the Administrators personal email accounts. The volume meant that these mail accounts became non operational. An exercise to sort and respond to queries sent to these email accounts was then necessary.

To ensure that queries regarding the Lehman entities in administration are dealt with in the most effective manner, the relevant e-mail address from those below should be used and the following information included in the text of any emails:

- Name/Company name;
- Entity to which the query pertains;
- Any relevant event or expiry dates;
- If this relates to specific transactions, please include full details of each transaction (e.g. estimated value, product type, account number, etc.); and
- Full contact details.

Once a query has been submitted it will be dealt with by the relevant team. Those submitting queries will then be contacted by this team. This may take some time. Queries not submitted to these e-mail addresses may not be answered (except those raised prior to 20 September 2008 which are being dealt with).

All enquiries submitted via voicemail to employees at Lehman Brothers or PricewaterhouseCoopers were required to be resubmitted using the e-mail addresses below to ensure each query is properly recorded.

**Business queries**

Fixed Income derivative products - uk.fidotcqueries@lehman.com
Fixed Income cash - uk.fidcashqueries@lehman.com
International Equities - uk.equitycashqueries@lehman.com
Equity derivative products - uk.equityderivativequeries@lehman.com
Prime Brokerage - uk.primeservicesqueries@lehman.com

Commodities - uk.commoditiesqueries@lehman.com
Futures - uk.futuresqueries@lehman.com

**Employee queries**

For all employee related queries, including resignations, please contact:
enquiries.lehmanbrothers@uk.pwc.com

**General Administrator queries**

For any other general queries, the following email address should be used:
enquiries.lehmanbrothers@uk.pwc.com

**Process for registering interest for acquiring assets**

For parties interested in acquiring any or all of the assets of the Lehman
Brothers entities in administration, the email address below should be used:
salesprocess.lehmanbrothers@uk.pwc.com

**Termination notices**

If a query relates to termination notices, it can be sent to
huw.merriman@lehman.com.
(Termination notices have to be communicated in accordance with each
agreement with Lehman Brothers.)

**15. What issues are created by the interdependency between Lehman in
the US and the UK companies in Administration?**

Lehman Brothers was operated as one global business and there were
interdependencies between the US and UK operations and also across other
jurisdictions. This included front office (e.g. trading, confirmations and
settlement) and middle and back office support functions (e.g. finance,
operations, HR). The ongoing challenge is for the operating framework with
the US and UK to work effectively.

**16. Lehman Brothers International (Europe) (LBIE)acted as a clearing
broker for clients on London Clearing House (LCH) and Eurex. Have all
of LBIE's client positions now been transferred to other clearing
brokers?**

The vast majority of client positions have now been transferred to other
clearing brokers. We understand that process was completed on Monday 22
September.

During the week beginning Monday 15 September both LCH and Eurex
issued notices declaring LBIE to be in default under their rules. The default
powers under those rules include the ability to direct the transfer of LBIE client
positions with respect to futures and option transactions to other brokers.

**17. It took several days to complete the transfers - why was that?**

London Clearing House (LCH) and Eurex exercised their legal powers to instruct and direct the transfer of client positions and were provided access to relevant client data to do this. LCH and Eurex assumed responsibility for this transfer. However, for operational reasons it took some time for the transfer process to be completed.

**18. What has happened to the client monies and margins in relation to those client positions transferred and when can clients expect to have those monies returned?**

The vast majority of LBIE client's futures and options positions held at LCH and Eurex have been transferred. However, client monies and margins in respect of those client positions were not transferred at the same time. This is due to Administrators duties to ensure that all such client monies and assets are appropriately identified and have been segregated appropriately in accordance with FSA client money rules. As noted on PricewaterhouseCoopers website the process required to be undertaken to ensure all such client monies are identified and reconciled will take some time.

More detailed information about Client Money and Assets is included on the PwC website.

**19. How long is the Administration likely to last?**

It is not possible at this stage to predict how long the administration will last as the Administrators have only been in place for a short period of time. Although significant progress has already been made (e.g. completion of transaction with Nomura and in realising some other assets), the administration is a very significant and complex exercise and it is likely to be many months before the position becomes clearer.

**20. What will happen to any client related balances which clients believe should have been transferred to them prior to Administration but wasn't because of alleged operational error by Lehman?**

If the transfer was not made prior to the Administration, for whatever reason, the client will have the same recourse as any other client with assets held. The fact that a transfer should have happened does not impact the client's position.

**21. How will short positions be liquidated?  Will these amounts be cash settled or will clients be required to return borrowed securities?**

Under the terms of the stock loan and borrowing agreements, counterparties may take action on short positions in accordance with the underlying agreements.  The PricewaterhouseCoopers team is in the process of taking

advice and obtaining data from clients on the actions that counterparties have taken.

**22. Can the Administrators comment on the size or the relative quality of assets within Lehman?**

The Administrators cannot yet make any comment on what assets may or may not be realisable and at what values. The Administrators will continually focus on maximising the realisable values of all other assets.

**23. What steps have the Administrators taken with regard to client assets?**

The Administrators issued a press release on 10 October which describes the steps taken by them with respect to client assets, the objective of which is the identification and return of those client assets. The priority has always been to develop a logical, efficient and fair process for dealing with client asset claims that have been and continue to be properly registered with the Administrators.

This has been, and remains, a major priority for the Administrators and specifically this includes a High Court approved process and methodology supported by a dedicated and appropriately skilled PwC and Linklaters team, made up of expertise in both administration as well as banking and capital markets technical skills.

For more Questions and Answers on Client Money refer to PwC website.

**24. What process will the Administrators adopt to return Trust Property?**

Full details of the process the Administrators will adopt in accordance with the Court Order dated 7 October 2008 are set out at Client money and assets update .

In summary, the Trust Property Team are now undertaking *inter alia* the following steps, in parallel:

i.        development of an IT system onto which will be uploaded all of the data available from the internal systems of LBIE relating to client deposits and securities that may be Trust Property;

ii.        implementation of a process to reverse or amend the LBIE records for failed or broken trades as a consequence of the Administration, to enable the Trust Property to be more fully identified;

iii.        identification of the impact of termination notices that have been served post-administration, validating these events and other activities of third parties and either reviewing the clients' valuation of the impact of the termination or undertaking a valuation of the impact of termination on the rights of LBIE under various contracts; and

iv.    development of a protocol in relation to the implementation of corporate actions that may need to be undertaken in relation to Trust Property.

The Trust Property Team are in contact with third party custodians, agents, counterparties, exchanges and clearing houses ("Depots") where Trust Property may be located to obtain confirmation of the securities that are being held, to agree a procedure whereby the Administrators can have online access in relation to data regarding the securities and  to obtain formal written confirmation of the position by security and by Depot.

The Administrators are also seeking to establish that they have complete or adequate control over the securities for the ultimate benefit of the counterparties with Trust Claims or LBIE and that any liens asserted by the Depots are assessed and valued. Once the data is available, the Trust Property Team will reconcile the books of LBIE to those of the Depots, by security and by Depot, with a view to identifying and resolving discrepancies. Where appropriate, this process will take account of the interests of LBIE in its "house accounts".

The books of LBIE will be further reconciled to the client position responses obtained through the circularisation of clients.

 Further to the data collection process, Linklaters are reviewing the various contracts utilised by LBIE in its dealings with all counterparties and the various categories of legal issues that will need to be determined before a proposal for the distribution of the Trust Property can be prepared.

**25. I believe I have client assets, but I have not received an information request letter from the Administrators.  How can I inform the Administrators of my positions?**

 If you did not receive a letter or email from the Administrators, please consult the relevant letter and appendix at the following website link:

Client money and assets update 15/10/08

You should return your information by email to clientpositionresponses@lehman.com or by post to Cathy Stewart, Trust Property Team, Lehman Brothers International (Europe) (in administration), 25 Bank Street, London, E14 5LE.

In any correspondence please state the full name of the legal entity concerned and provide a contact name, postal address and e-mail address, if available.


**26. Where are client assets typically located and what issues have arisen?**

Client assets are generally located at sub custodians, settlement agents, exchanges and clearing houses.

- LBIE itself was not a custodian but rather had some 97 relationships with global sub custodians and settlements agents and was active on most of the global exchanges and clearing houses either directly as LBIE or indirectly through brokers. The Administrators have an ongoing dialogue with these institutions and have written to them all to obtain relevant information that can be used to help locate the assets.
- Custodians and settlement agents continue to liquidate LBIE excess collateral required to meet their obligations. Final liquidation statements are being obtained from them.
- Typically the custodians have three LBIE accounts, being house (for the benefit of LBIE), prime brokerage nominees (where LBIE may have a charge over the assets) and safe custody (split into two accounts where one has right of set off against the assets and the other one does not). The Administrators have asked for details of all accounts that exist.

**27. What will happen to the securities that were not transferred because the underlying trade did not settle?**

LBIE will not be settling any unsettled trades. As such, LBIE will not be delivering or accepting delivery of securities under any trade that did not settle prior to LBIE's administration.

**28. What action should LBIE counterparties take in relation to their failed trades with LBIE?**

The Joint Administrators encourage counterparties to reach agreement with LBIE as to the net cash value of their failed or unsettled trade, as the obligations under the underlying contracts are legally binding on both parties to the trade.

As previously advised, counterparties are reminded of the following principles:

- Where a failed trade is subject to the default rules of an Exchange or Central Counterparty (CCP), counterparties should comply with the instructions provided by the relevant Exchange or CCP
- Where unsettled trades are subject to default rules contained within applicable bilateral master agreements (e.g. ISDAs), counterparties should review and comply with those rules. Where the default rules require a termination notice to be issued to LBIE, that notice must be communicated in accordance with your documented agreement with LBIE, in the form specified by that agreement.
- In the case of equities and fixed income trades that were subject to LBIE Terms of Business which do not contain default arrangements (herein referred to as pure OTC contracts- no default rules), counterparties are encouraged to enter into a Settlement Agreement

with LBIE for the cancellation of such trades. The Administrators believe it would be beneficial for a process to be established with counterparties which would facilitate the removal of the potential uncertainties as to the legal obligations, and possible rights and liabilities, associated with those contracts, and how any related settlement instructions in a settlement system should be dealt with.

The Cancellation Proposal is, of course, subject to the applicable laws applying to each unsettled trade and the right of a party to that trade to treat the contract as terminated. The Administrators would remind LBIE's clients and counterparties that it is their responsibility to investigate when a particular trade may be terminated under the law applying to that trade. The Administrators will deal with a client's or counterparty's assertion that a trade has been so terminated on a case-by-case basis.

### 29. What is the process for the cancellation of OTC trades?

Currently, the Joint Administrators propose the following process:

- LBIE counterparty requests cancellation. The request for cancellation should include full details of unsettled trades between LBIE and the Counterparty setting out as much detail as possible from the Counterparty's records to enable reconciliation to trade data held by LBIE, including copies of any contractual agreements and other relevant documentation, as well as confirmation that the Counterparty was acting as principal for each unsettled trade. In addition, the request should include information on any other open positions the Counterparty has with LBIE or confirmation that there is no other indebtedness to/from LBIE.
- Upon receipt of the information noted above, the Counterparty will receive (1) the draft Cancellation Proposal and (2) an e-mail detailing the basis for the operational non-refundable fee (calculated at 10 basis points of the gross value of the unsettled OTC trades), together with LBIE's bank account details.
- The operational fee will be payable by the Counterparty at this stage. As previously reported, the purpose of the operational fee is to cover the costs of making available the necessary resources to agree the Cancellation Proposal now.
- Once agreement of the population of trades subject to the Cancellation Proposal is obtained. The net settlement amount will be calculated and agreed to by LBIE and its Counterparty. The bilateral cancellation will be documented in a settlement agreement referred to as a Cancellation Proposal. The Cancellation Proposal will, in relevant part, terminate the respective obligations of both LBIE and its Counterparty under each unsettled trade and set forth an agreed net trade settlement amount between the parties.
- Where the calculated net position is an amount due to LBIE, this would be payable by the Counterparty, subject to any pre-existing rights of the Counterparty. Where the calculated net position is an amount due from LBIE, it will represent a claim on the LBIE estate and the

Counterparty will rank as an unsecured creditor. The Administrators wish to make clear that under no circumstances will a net position payable by LBIE rank as an expense of LBIE's administration.

### 30. On what basis will valuation of the failed and unsettled trades be made?

Our view is that an appropriate valuation date for failed pure OTC trades is close of business on the date on which the trade would have settled but for LBIE's administration and this is the valuation date that will be used for the purposes of the Settlement Agreement (unless agreed otherwise with a counterparty).

### 31. How is it that a cash settlement amount can be calculated for a failed delivery-vs.-payment (DVP) transaction?

The settlement amount is calculated as if both parties were on an equal footing. For example:

(i) if LBIE was selling securities to Counterparty A, the settlement amount is stated to be the sum of the Trade Value minus the Termination Value, where the Trade Value is the original contract price and the Termination Value is the Closing Price of the securities on the contractual settlement date multiplied by the number of securities which were to be sold. If the value of each security was 100 at the time the contract was made and the Closing Price was 105, then LBIE would owe the counterparty 5 on each security LBIE originally contracted to sell.  If the Closing Price was 95, then the counterparty would owe LBIE on each security LBIE was originally contracted to sell.

 (ii) if LBIE was buying securities from Client A, the settlement amount is stated to be the sum of the Termination Value minus the Trade Value.

### 32. Is there a deadline to agree settlement of failed trades?

No. There is no deadline for submission of the bilateral cancellation request. The administrators will prioritise each counterparty in accordance with the order in which they agree cancellation terms.

### 33. Will LBIE pay amounts due to counterparties if the net settlement amount is in favour of a counterparty?

No. Counterparties are reminded that at this stage the Joint Administrators are not agreeing the amounts payable to counterparties. Rather, they are merely agreeing with the Counterparty the amount payable/receivable by LBIE in respect of unsettled trades. Amounts deemed payable by LBIE form part of the claim counterparties may wish to bring against the LBIE estate. Such claims will represent a general claim against the LBIE estate and the Counterparty will rank as an unsecured claims and therefore do not rank prior in right to any other unsecured creditors. This unsecured claim will need to be

presented to the Administrators in connection with the general administrative proceedings for creditors of the LBIE estate.

## 34. What prioritisation criteria are being adopted by the Administrators?

In their press release dated 10 October the Administrators set out a set of principles to be applied to prioritising claims. This largely revolves around the quality and timing of data provided by counterparties together with simplicity of the case at hand and any associated legal issues. It also involves an analysis of other claims being made over the particular asset class and whether a situation could arise where there is a risk of shortfall of the asset in question to be distributed back to clients. In all cases the Administrators need to examine LBIE's wider relationship with relevant counterparties and ensure there are no offsetting claims against the estate.

In situations where the Administrators make an early return of a client asset, they need to mitigate the risk of competing future claims being made against the asset in question. This involves requiring both an acceptable form of indemnity from the counterparty and a guarantee from a sufficiently well rated institution, such as a AA rated bank to protect against any situation which arises whereby an asset has wrongly been given back to a particular client.

## 35. What practical legal issues arise in relation to client assets?

As well as realising the estate for the benefit of creditors the Administrators are managing for the benefit of clients, the trusts of assets and monies that are owned by clients.

Client monies are subject to a strict set of rules and are held on a pooled basis for all clients with a client money entitlement. This money needs to be identified by the Administrators, collected in from the banks where it is held and then distributed.

In respect of client assets, the Administrators must ascertain what are client assets and what are house assets, by reconciling to third party data and reviewing all relevant contracts. Each counterparty has a suite of contracts and master agreements which can include, amongst others, Prime Brokerage Agreements, Futures Agreements, Stock Lending Agreements, ISDA Master Agreements and Cross Margining and Netting Agreements. These can be in several forms. They may be, and often are, individually modified by agreement or side letter or even e mail. Some of them are subject to New York law and some of them are subject to English law. Their effect and interrelationship has never been tested in a situation like Lehman and complex issues of legal analysis are likely. Significant practical issues therefore arise in identifying and reviewing contracts and understanding all relevant terms. In particular, the extent of any security or hypothecation needs to be verified and checked to ensure that it is compliant with the Agreement and LBIE's rights.

Some of the practical issues and areas of legal analysis likely to arise are:

- At what point does reuse extinguish a client asset claim? What is the situation where assets have been reused in excess of agreed limits?
- To what extent should losses be borne by clients where they share in a pool of securities? For example similar assets can be listed on different markets in different forms? How are shortfalls allocated? What if there has been a series of movements on the account? What if the house also has claims on the pool?
- To what extent can tracing claims be made?
- What is the impact of close out on settling net liabilities between house and client?
- How do foreign laws impact on trust and contractual claims?

**36. Will the Administrators be calling for additional collateral or margin where the net equity has decreased on open trades in relation to prime brokerage clients?**

The Administrators must protect the estate from loss and will have particular regard to the risk of loss from uncovered net credit exposures, further, they must be mindful of LBIE's contractual rights with regard to the ability to request collateral from a counterparty. When evaluating whether LBIE has the right to call for additional collateral as exposures change over time, the Administrators will examine whether the counterparty has other positions with LBIE that mitigate an apparent debit position. This matter remains under consideration whilst the Administrators consider how best to protect the interests of the LBIE estate.

**37. If I have not got all of the information required by the Administrators can I obtain or use information from LBIE?**

As LBIE's books and records were not fully updated from the point of Administration, you cannot rely on any information obtained after 07:56 on 15 September 2008 from Lehman's Live or any other Lehman's source. Therefore, you should not rely on statements produced after this time.  Please provide the Trust Property Team with information which is as complete as possible from your own records.  This will assist the Trust Property Team to develop as full an understanding as possible of your position with LBIE and to compare your information to that held by the Company.

Where possible, please provide information in Microsoft Excel format and send it via email to clientpositionresponses@lehman.com

**38. If I send in all of the information requested by the Administrators, will I get my assets/monies back immediately?**

Due to the complexity and the various stages in the process, it will not be possible to return client assets/monies immediately.

The Administrators and Lehman's staff are actively working through a process to reconcile positions on a client by client basis. In parallel, the aggregate position for all clients needs to be determined and reconciled to the assets held in custody and in the bank accounts.

The Administrators have sought guidance from the Court on how this complex process should be undertaken.  Details can be found at the following PwC website link Client money and assets update .

Additionally, the Administrators need to reconcile actions taken by counterparties (e.g. actions

following default notices) and reflect these before an up to date picture can be produced. This process will necessarily take time to complete.

**39. I have submitted information to the Trust Property Team by email or post.  What work is currently being done with this information?**

The Trust Property Team is currently working through the responses received to date via post and email.  Initially, this entails identifying and responding to queries, and reviewing documents received to check for completeness of the information supplied to the Trust Property Team.

**40. Can you provide me with an estimate of the timeframe for reviewing my account(s) and returning my assets/monies?**

The Trust Property Team is working towards reviewing all accounts and returning assets in an orderly and efficiently manner.

The priority of the Administrators at the moment is to determine the positions of LBIE both in aggregate and also at an individual client level. A joint Lehman's and PwC team is working on reconciling LBIE's books to external custodians and to information received from clients.

The review process is extremely complex and we are presently unable to provide an estimate of the timeframe for returning client assets and monies.

We are mindful of the uncertainty experienced by counterparties and their need to resolve matters as quickly as possible. If it is possible to advance the process in stages, resolving a particular issue that affects a number of accounts in the same way, at the same time, without having to wait for all other issues to be resolved, we will look to do that.

**41. How will the Prioritisation and Hardship Committees function?**

The Administrators will consider the following factors, when assessing a claim for prioritisation:

i.        the quality and timing of data being available to the Administrators;

ii.      the speed of response of counterparties in dealing with the
Administrators' questions, coupled with the quality and accuracy of the data
supplied, the complexity of the data and the legal issues relevant to the
determination of a particular claim;

iii.      the number of claims that may be made to a particular class or
category of Trust Property and; the risk of a shortfall in that particular class of
category of Trust Property;

iv.      the cost efficiency and expediency of the relevant process; and

v.      market stability and confidence.

The Administrators have established a hardship sub-committee and may
prioritise claims presented to it, in line with High Court Order obtained on 7
October 2008.

**42. If my assets have been rehypothecated, will they be returned?**

 Client positions will be reviewed on a case-by-case basis to determine the
extent, if any, of rehypothecation of their assets. Title to securities transfers
when assets are rehypothecated in accordance with Prime Brokerage
agreements and therefore these assets become part of the estate.  If assets
have been rehypothecated, these will not be available for return to you.  The
extent to which your assets could be rehypothecated is set out in your
agreements with LBIE.

**43. I have both long and short positions. Can the Administrator provide
an update as to whether I can at least close my short positions?**

Very few clients have terminated their prime broker agreements. As a result
most clients of LBIE and LBIE itself continue to be exposed to market risk.
Where a client makes a proposition to LBIE, intended to mitigate the market
risk of both parties, the Administrators will enter into bi-lateral conversations
with such counterparties. It must be recognised that if a counterparty seeks to
crystalise a position, the Administrators must be able to demonstrate that
such crystalisation is in the interests of the estate and that the Administrators
are not in fact preferring one creditor over another.

**44. Have the administrators determined the settlement date for claims
due to and from LBIE?**

Under the rules of certain exchanges there is a predefined process for
determining the respective liabilities of each party to a failed transaction and
the Administrators are working with the various exchanges to confirm the
basis of such failed trades. In other circumstances, the contractual position
may dictate the terms under which contracts are terminated and the
Administrators are working through the numerous variants of individual
contractual positions to determine the appropriate settlement date. In respect

of contracts that remain open, these will contain terms in relation to settlement. It is therefore likely that the settlement date of positions will be determined on a case by case basis.

**45. Is it a reasonable assumption to make that counterparties from whom LBIE has borrowed securities will have bought these securities back in?**

We believe this it is. A number of counterparties have confirmed they have closed out the borrowing by buying securities back in.

**46. Is it the intention of the Administrators, where clients have held assets in safe custody accounts and where the Administrators are able to satisfy themselves that there is no other claim to these assets, to release these assets?**

Yes, it is subject to there being no other debit position with the same client, which needs to be taken into account. Some assets, which are held at depots in segregated custody accounts and to which there is no legal right of set off, are currently under consideration for return to clients subject to appropriate indemnities being in place.

**47. Are the Administrators in a position to be able to provide audit confirmation letters to external auditors of counterparties of Lehman UK entities in administration and/or to the counterparties themselves?**

The Administrators are aware of the importance of the audit confirmation process as a form of audit evidence. However, due to the complexity of the administration and the practical difficulties involved in accurately identifying counterparty information, for example due to the volume of failed trades and valuation related issues, the Administrators are not able to provide any third party audit confirmations without there being a risk that the information would be materially misstated. The Administrators also are unable to respond to any audit confirmation requests for entities not in administration.