1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)

          08-01420 (JMP)(SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.

          Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

          Debtor.

- - - - - - - - - - - - - - - - - - - -x

               United States Bankruptcy Court

               One Bowling Green

               New York, New York


               February 11, 2009

               10:01 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2   I.   UNCONTESTED MATTERS:

3   HEARING re Case Conference:  (A) Presentation of Proposed

4   International Case Protocol; (B) Examiner's Proposed Work Plan

5

6   HEARING re Application to Employ Jenner & Block LLP as Counsel

7   to the Examiner

8

9   HEARING re Examiner's Motion for an Order Directing the

10   Production of Documents and Authorizing the Examinations of the

11   Debtors' Current and Former Officers, Directors and Employees,

12   and Other Persons and Entities

13

14   HEARING re Motion of Green Tree Servicing LLC for Bank Order

15   Pursuant to Sections 105(d)(2)(A) and 365 of the Bankruptcy

16   Code Directing Debtor Lehman Brothers Holdings Inc. to Assume

17   Flow Subservicing Agreement and, in the Interim, for Order

18   Granting Adequate Protection Pursuant to Section 364(c) of the

19   Bankruptcy Code

20

21   HEARING re The Midwest Independent System Operators Motion for

22   (I) Relief from the Automatic Stay to Exercise Setoff Rights

23   Pursuant to Section 553 of the Bankruptcy Code and (II) Other

24   Related Relief

25

3

1

2    HEARING re Debtors' Motion for an Order Pursuant to Section 365

3    of the Bankruptcy Code Approving the Assumption or Rejection of

4    Open Trade Confirmations

5

6    HEARING re Notice of Debtors' Second Motion for an Order

7    Pursuant to Section 365 of the Bankruptcy Code Approving the

8    Assumption of Open Trade Confirmations

9

10   SECURITIES INVESTOR PROTECTION CORPORATION PROCEEDINGS:

11   III. UNCONTESTED MATTERS:

12

13   HEARING re Trustee's Motion for Entry of an Order Pursuant to

14   Section 365 of the Bankruptcy Code and Federal Rules of

15   Bankruptcy Procedure 2002, 6006, and 9019 Authorizing the

16   Assumption and Assignment of Debtors Rights and Obligations

17   under a Lease of Nonresidential Real Property Located at 3000

18   Sand Hill Road, Menlo Park, California

19

20   HEARING re Notice of Presentment of Stipulation and Agreed

21   Order Resolving Objection to Assumption and Assignment of

22   Certain Agreements with CA, Inc.

23

24

25

4

1

2    IV.   CONTESTED MATTERS:

3    HEARING re Trustee's Motion for an Order, Pursuant to Section

4    365(d)(4) of the Bankruptcy Code, Extending Time to Assume or

5    Reject Unexpired Leases of Nonresidential Real Property

6

7    HEARING re Trustee's Motion under Fed. R. Bankr. P. 9019(a) for

8    Approval of Settlement and Compromise

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

5

1

2    A P P E A R A N C E S :

3    WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors

5          767 Fifth Avenue

6          New York, NY 10153

7

8    BY:   HARVEY R. MILLER, ESQ.

9          ALFREDO R. PEREZ, ESQ.

10         JACQUELINE MARCUS, ESQ.

11         JOHN W. LUCAS, ESQ.

12

13   HUGHES HUBBARD & REED LLP

14         Attorneys for James W. Giddens, SIPC Trustee

15         One Battery Park Plaza

16         New York, NY 10004

17

18   BY:   JAMES B. KOBAK, JR., ESQ.

19         DAVID W. WILTENBURG, ESQ.

20         JAMES W. GIDDENS, ESQ.

21

22

23

24

25

6

1

2    MILBANK, TWEED, HADLEY & MCCLOY LLP

3         Attorneys for the Official Committee of Unsecured

4          Creditors

5         One Chase Manhattan Plaza

6         New York, NY 10005

7

8    BY:  DENNIS C. O'DONNELL, ESQ.

9         THOMAS A. ARENA, ESQ.

10

11   CLEARY GOTTLIEB STEEN & HAMILTON LLP

12        Attorneys for Barclays Capital Inc.; Goldman Sachs Credit

13         Partners L.P. and GS European Performance Fund Limited;

14         Wachovia Bank, N.A.; Evergreen Investment Management

15         Company, LLC

16        One Liberty Plaza

17        New York, NY 10006

18

19   BY:  LUKE A. BAREFOOT, ESQ.

20        JOEL MOSS, ESQ.

21        LINDSEE P. GRANFIELD, ESQ.

22

23

24

25

7

1

2    UNITED STATES DEPARTMENT OF JUSTICE

3         Office of the United States Trustee

4         33 Whitehall Street

5         Suite 2100

6         New York, NY 10004

7

8    BY:  ANDREW D. VELEZ-RIVERA, ESQ.

9

10    ALSTON & BIRD, LLP

11         Attorneys for Prudential Insurance Company

12         One Atlantic Center

13         1201 West Peachtree Street

14         Atlanta, GA 30309

15

16    BY:  WILLIAM S. SUGDEN, ESQ.

17         (TELEPHONICALLY)

18

19

20

21

22

23

24

25

8

```
 1
 2   BINGHAM MCCUTCHEN LLP
 3         Attorneys for Harbinger Capital Partners Special
 4          Situations Fund, L.P. and Harbinger Capital Master
 5          Fund I, Ltd.; Deutsche Bank AG; Halbis Distressed
 6          Opportunity Master Fund Limited
 7         399 Park Avenue
 8         New York, NY 10022
 9
10   BY:  RHEBA RUTKOWSKI, ESQ.
11         (TELEPHONICALLY)
12
13   CADWALADER, WICKERSHAM & TAFT LLP
14         Attorneys for Citigroup Inc. and all of its affiliates,
15          including Citibank, N.A. and Citibank International plc;
16          Whippoorwill Associates Inc.
17         One World Financial Center
18         New York, NY 10281
19
20   BY:  DERYCK A. PALMER, ESQ.
21         JOHN J. RAPISARDI, ESQ.
22
23
24
25
```

9

1

2    CHAPMAN & CUTLER, LLP

3       Attorneys for US Bank

4       111 West Monroe Street

5       Chicago, IL 60603

6

7    BY:   FRANKLIN H. TOP, III, ESQ.

8       (TELEPHONICALLY)

9

10   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

11      Attorneys for HWA 555 Owners, LLC

12      One New York Plaza

13      New York, NY 10004

14

15   BY:  STEPHANIE J. GOLDSTEIN, ESQ.

16

17   JENNER & BLOCK LLP

18      Attorneys for Anton R. Valukas, Court-appointed

19      Examiner

20      919 Third Avenue

21      37th Floor

22      New York, NY 10022

23

24   BY:  PATRICK J. TROSTLE, ESQ.

25

10

1

2   JENNER & BLOCK LLP

3       Attorneys for Anton R. Valukas, Court-appointed

4       Examiner

5       330 North Wabash Avenue

6       Chicago, IL 60611

7

8   BY:  ANTON R. VALUKAS, ESQ.

9        ROBERT L. BYMAN, ESQ.

10

11  KRAMER LEVIN NAFTALIS & FRANKEL LLP

12      Attorneys for Bank of New York Mellon as Indenture

13       Trustee; York Capital Management, L.P.

14      1177 Avenue of the Americas

15      New York, NY 10036

16

17  BY:  JONATHAN M. WAGNER, ESQ.

18

19  LINKLATERS LLP

20      Attorneys for Joint Administrators of LBIE

21      1345 Avenue of the Americas

22      New York, NY 10105

23

24  BY:  MARTIN N. FLICS, ESQ.

25

11

1

2    LOWENSTEIN & SANDLER PC

3        Co-counsel to Midwest Independent System Operator

4        1251 Avenue of the Americas

5        18th Floor

6        New York, NY 10020

7

8    BY:  BRUCE S. NATHAN, ESQ.

9        DAVID M. BANKER, ESQ.

10

11   PENSION BENEFIT GUARANTEE CORPORATION

12        1200 K Street

13        Washington D.C. 20005

14

15   BY:  COLIN ALBAUGH, ESQ.

16        (TELEPHONICALLY)

17

18   QUINN EMANUEL URQUHART OLIVER & HEDGES, LLP

19        Attorneys for Official Committee of Unsecured Creditors

20        51 Madison Avenue

21        22nd Floor

22        New York, NY 10010

23

24   BY:  JAMES C. TECCE, ESQ.

25

12

1

2    ROPES & GRAY LLP

3         Attorneys for R3 Capital Management LLC; AIB International

4          Finance; Putnam Investment Funds; THL Credit Partners,

5          L.P.; West Corporation

6         One International Place

7         Boston, MA 02110

8

9    BY:  PATRICIA I. CHEN, ESQ.

10        (TELEPHONICALLY)

11

12   REED SMITH LLP

13        Attorneys for Bank of New York

14        355 South Grand Avenue

15        Los Angeles, CA 90071

16

17   BY:  ERIC A. SCHAFFER, ESQ.

18        (TELEPHONICALLY)

19

20   SIDLEY AUSTIN LLP

21        Attorneys for KKR Debt Investors (2006)(Ireland) LP

22        787 Seventh Avenue

23        New York, NY 10019

24

25   BY:  ALEX R. ROVIRA, ESQ.

13

1

2    STEPTOE & JOHNSON, LLP

3         Attorneys for Korea Investment & Securities Co., and

4         True Friend Forth Specialty Co.,

5         2121 Avenue of the Stars

6         Suite 2800

7         Los Angeles, CA 90067

8

9    BY:  KATHERINE C. PIPER, ESQ.

10        (TELEPHONICALLY)

11

12   STUTMAN, TREISTER & GLATT, LLP

13        Attorneys for Baupost Group

14        1901 Avenue of the Stars

15        12th Floor

16        Los Angeles, CA 90067

17

18   BY:  ERIC D. WINSTON, ESQ.

19        GARY KLAUSNER, ESQ.

20        (TELEPHONICALLY)

21

22

23

24

25

14

1

2    WILLKIE FARR & GALLAGHER LLP

3         Attorneys for Green Tree Servicing LLC

4         787 Seventh Avenue

5         New York, NY 10019

6

7    BY:   TERENCE K. MCLAUGHLIN, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15

1                    P R O C E E D I N G S

2              THE COURT:  Be seated.  Good morning.

3              MR. MILLER:  Good morning, Your Honor.

4              THE COURT:  Good morning, Mr. Miller.  How are you?

5              MR. MILLER:  Good, sir.  How are you?

6              THE COURT:  I'm fine, thanks.

7              MR. MILLER:  If Your Honor please, it's not a very

8    long calendar but in the interest of efficiency and economics,

9    Your Honor, I think it might be expedient to take the

10   examiner's matters first.

11             THE COURT:  That'll be fine.

12             MR. MILLER:  Mr. Valukas?

13             MR. VALUKAS:  Good morning, Your Honor.

14             THE COURT:  Good morning.

15             MR. VALUKAS:  Your Honor, we have three matters

16   before Your Honor.  One was the first matter which is the

17   matter of an order authorizing the retention of Jenner & Block

18   as counsel for the examiner.  I've searched long and hard and

19   decided on Jenner & Block as my recommendation.  And we don't

20   have --

21             THE COURT:  Sounds like the first and last choice for

22   you.

23             MR. VALUKAS:  If I want to return to Chicago, yes,

24   Your Honor.

25             THE COURT:  Right.

16

1          MR. VALUKAS:  There are no objections to that.

2          THE COURT:  There are no objections.  I've reviewed

3     the application and unless there are comments from the U.S.

4     trustee's office, I'm prepared to approve it.

5          MR. VELEZ-RIVERA:  We're okay, Your Honor.

6          THE COURT:  Fine.  It's approved.

7          MR. VALUKAS:  Thank you, Your Honor.  The second

8     would be a motion authorizing the issuance of a subpoena

9     pursuant to Rule 2004.  Your Honor, we have the motion.  There

10    are no objections that were filed in connection with this

11    matter and we'd ask that the Court enter that order.

12         THE COURT:  That will be entered as well.  I approve

13    it.

14         MR. VALUKAS:  All right.  The third, Your Honor, is

15    the proposed plan order for purposes of the investigation which

16    we have presented to Your Honor.  Your Honor, we have had the

17    opportunity of meeting with all of the parties privately, that

18    is, say, individually, as well as in a group in trying to craft

19    an order which we thought would produce the results which the

20    parties asked for.

21         There are no objections.  There is, however, a

22    statement made by the debtor-in-possession as their concerns

23    that they would like to have that order include their

24    involvement in the investigation.  That is something to which

25    we object.  I think the order as we propose is the way it

17

1    should be.

2         Putting aside the issue of whether they do or do not

3    have trustee status, the issue here is that much of the

4    activity that would be subject to the investigation would be

5    activity which would be -- which involve, among potentially

6    involved, which doesn't suggest anybody did anything wrong, the

7    board of directors of the debtor and trustee, the individuals

8    who would be subject to the investigation would be, if they

9    were permitted to have access as we went along -- be in a

10   position where their lawyers would be working side by side with

11   us while we conduct the investigation.  I believe that would

12   interfere with our ability to conduct this independently and

13   interfere with our ability to relate to a number of the parties

14   here who are offering cooperation with us.

15        So we would ask that the order be entered as we have

16   suggested it.

17        THE COURT:  I have read your letter.  I've looked at

18   the order and I've looked at your preliminary work plan.  I

19   note that the position of the debtor appears to be stated

20   verbatim within your letter.  But I'm going to ask Mr. Miller

21   or anybody else on his team who's involved in this if there are

22   any comments you think appropriate now for the record.

23        MR. MILLER:  Thank you, Your Honor.  Your Honor, we

24   applaud the ethics that the examiner has made to reach a

25   consensus on the work plan.  As Mr. Valukas has set forth in

18

1    the letter, we've taken the position that the debtors-in-

2    possession, Your Honor, operate qui-trustee under the

3    Bankruptcy Code.  This is an enormous case.  To ask the debtor-

4    in-possession, basically, Your Honor, to wait the nine months

5    until the examiner is finished with his examination, there are

6    processes which the debtor-in-possession has to be -- debtors-

7    in-possession -- excuse me, Your Honor -- have to be involved

8    in.  There's going to be the filing of schedules very shortly.

9    There will be a bar date.  The reconciliation of claims.  And

10   what we provided, Your Honor, if you will look at Mr. Valukas'

11   letter, we said in the last sentence "To the extent that there

12   are any particular areas as to which the examiner believes that

13   participation by the debtors-in-possession would be

14   counterproductive, he may request that the debtors-in-

15   possession not participate and they will defer to the

16   examiner's judgment that such nonparticipation is necessary to

17   the integrity of the investigation."

18          What we are talking about, Your Honor, is a central

19   depository of documents which the examiner will accumulate,

20   many of which, Your Honor, will be coming from the debtors

21   themselves.  Others will be coming from other places, Your

22   Honor.  The LBI trustee is being given the status, Your Honor,

23   of parity with the examiner.  The LBI trustee has complete

24   access to the central depository.  The LBI trustee, I assume,

25   Your Honor, is going to participate in the depositions and the

19

1    interviews.

2         What is going on in this connection, Your Honor, is

3    critical also to the administration of the estate.  We are not

4    asking to interfere with the investigation.  We are deferring

5    to the judgment of the examiner as to when we can participate.

6    But having access, Your Honor, to these documents -- for

7    example, let's take JPMorgan Chase, Your Honor.  A very

8    substantial relationship between LBHI and its subsidiary and

9    affiliate debtors-in-possession with JPMorgan.  We are in

10   constant negotiations with JPMorgan which is holding a very

11   substantial amount of collateral that the debtors-in-possession

12   may claim should be returned to the estate.  The information

13   that is being gathered, and this should be a cooperative

14   effort, should be shared to the extent it can be shared but Mr.

15   Valukas will make a decision whether we should have access to

16   that.  But we shouldn't be precluded, Your Honor.

17        And looking at other cases, Your Honor, such as

18   WorldCom where Governor Thornburg was the examiner, he allowed

19   the debtor-in-possession to attend interviews, to participate

20   in depositions.  We don't want to interfere with the

21   investigation, Your Honor.  But having access to raw materials

22   is very important to the administration of the estate.  And as

23   I said, and I don't want to keep repeating it, Mr. Valukas will

24   exercise the judgment as to when we can have access.  But to

25   create over a nine month period of time a central depository

20

1    with thousands of documents, maybe millions, I don't know, some

2    of which will be very pertinent to what Mr. Marsal is doing in

3    administering this estate.  And I have to say, Your Honor, this

4    is a somewhat unique estate because Mr. Marsal came in after

5    the petitions were filed, essentially.  He is not beholden.  He

6    is not the old management.  He is conducting his own

7    independent investigations.  And the materials that the

8    examiner is going to gather will bear on that, will be part of

9    the administration of this estate.  And it will be very

10   important, Your Honor, in connection with claims reconciliation

11   which we have to get to if we're going to meet Mr. Marsal's

12   projected timetable of eighteen months to two years to propose

13   a plan of reorganization for some of these debtors.

14          So, Your Honor, we're not trying to interfere in the

15   investigation.  Limited access.  We're not going to get the

16   same access as the LBI trustee, which I really think we should

17   have, but we're not going to get that.  But simply to say that

18   we don't have any access to this is just not appropriate, Your

19   Honor.

20          THE COURT:  Okay.  I understand that position.  I'd

21   like to hear, if Mr. Valukas is prepared to actually respond --

22          MR. VALUKAS:  I am.

23          THE COURT:  -- to what you've just heard.  And I'll

24   comment after I've heard your remarks.

25          MR. VALUKAS:  I will.  Your Honor, the order that we

21

1    propose does provide that we will consider sharing information

2    to the extent that we determine that it will not adversely

3    impact the investigation.  Mr. Miller describes Mr. Marsal's

4    role and Mr. Marsal's role is also subject to the investigation

5    which Your Honor has asked us to undertake.  What took place

6    after September 15th is part of the inquiry.  In fact, it's a

7    significant part of the inquiry.  The issue as to what the

8    board did or didn't do in terms of its fiduciary duties is a

9    critical part of the investigation.  Mr. Marsal reports to the

10   board which should be the subject of that investigation.  It

11   would be a very unusual investigation which involved having the

12   lawyers for or the parties who are under investigation and

13   their lawyers working side by side in connection with that.  We

14   have offered to all of the parties the opportunity, in

15   appropriate circumstances, to share information, including

16   documents, if we think it will not interfere with the

17   investigation.

18        We have other parties which the Court has advised us

19   that we need to consult with and we have under any other

20   circumstances, which includes the U.S. Attorney's Office and

21   the SEC.  Our ability to have unfettered discussions with them,

22   share information with them going back and forth, can only be

23   impeded by having at least part of the subject of our

24   investigation -- I'm not suggesting their investigation but the

25   board and the debtors-in-possession -- that those individuals

22

1  would be part of the investigation as it went along can only

2  slow the investigation.  We'll spend our time negotiating.

3          What I've said to Mr. Miller and the others -- and I

4  do understand the need for coordination.  That's why we sat

5  down with the SIPA trustees and worked out a plan which will

6  not duplicate each other's efforts -- is that as we go along,

7  if there are specific things for which they wish access, we

8  will consider that and we will try to find a way to facilitate

9  it.  But we don't want to start out in the beginning where

10  they're side by side with us and then we have to say we'll stop

11  at this point, you can't have that information.  It will not

12  work.

13          THE COURT:  Okay.

14          MR. ARENA:  Your Honor, may I be heard?

15          THE COURT:  Surely.

16          MR. ARENA:  Good morning, Your Honor.  Thomas Arena,

17  Milbank Tweed for the committee.  Your Honor, we view ourselves

18  as similarly situated to the debtor in this issue but we come

19  out in a slightly different place.  Like the debtor, the

20  committee obviously has statutory obligations that it needs to

21  discharge with respect to the creditors in terms of consulting

22  with the debtor to administer the estates and also to

23  investigate potential claims.

24          What we've told the examiner and his counsel is this.

25  We obviously want to work with the examiner.  We do not want to

23

1    impede the examiner's examination in any way.  But we do want

2    to make clear to the Court, as we've made clear to the

3    examiner, that we're reserving our right to come back before

4    the Court to seek an application to obtain access to the

5    document depository on an earlier basis than the examiner might

6    be wishing to give us and also to seek more formal coordination

7    with respect to interviews of witnesses or Rule 2004

8    examinations.

9           So, for now, Your Honor, we've agreed to consent to

10   the work plan but subject to a very big caveat which is we may

11   be back before you because, frankly, Your Honor, we will seek

12   access -- we'd like to seek access to the document depository

13   sooner rather than later.  We're hopeful that we'll ultimately

14   be able to work this issue out with the examiner but we may be

15   back before you.

16          Just one other thing to note, which is in the event

17   that Your Honor were to give the debtor access to the document

18   depository and to permit the debtor to participate in the

19   protocol, we obviously would be making an application in short

20   order to be similarly situated to the debtor in that regard.

21          THE COURT:  Understood.

22          MR. ARENA:  Thank you.

23          THE COURT:  Are there any other parties who

24   participated in the meet and confer session that led to the

25   Jenner & Block letter to me of February 6th who wish to be

24

1    heard at this time?  Happily, apparently, no one else does.

2    But Mr. Miller --

3              MR. MILLER:  May I just say something, Your Honor?

4              THE COURT:  -- is coming in for last licks.

5              MR. MILLER:  Your Honor, I would just note that Your

6    Honor has already authorized the creditors' committee to

7    conduct Rule 2004 examinations with respect to JPMorgan Chase.

8              THE COURT:  Correct.

9              MR. MILLER:  There are other applications for Rule

10   2004 examinations which are not going to be determined today.

11   But there are ongoing other investigations and other activities

12   besides the examiner besides which, Your Honor, this is a

13   somewhat unique examiner in the context that most examiners are

14   appointed and engaged to look at activities that occurred pre-

15   Chapter 11.  That's the function of an examiner under the

16   Bankruptcy Code.  This examiner has a further responsibility,

17   to look into the Barclays transaction and transactions that may

18   have occurred between the 15th and the 22nd or the filing dates

19   of certain of the subsidiaries.  That's a different thing.

20        Now, those areas, Your Honor, to the extent the

21   examiner may want to investigate those, they can be fenced off

22   or re-fenced or whatever the appropriate word is.  That should

23   not limit the debtors-in-possession and it's appropriate maybe

24   for the creditors' committee to have access to other documents.

25   We're not asking to participate in all the interviews and all

25

1   the depositions.  But there are going to be depositions and

2   interviews on general subjects.  And that's what we're asking

3   for, Your Honor.  Thank you.

4           THE COURT:  Okay.  In connection with my

5   consideration of the application for the appointment of the

6   examiner, one of my principal concerns, and I think I was

7   fairly clear on expressing this during the hearing, was to make

8   this as efficient as possible, to minimize duplication of

9   effort and to avoid having the examiner step on the toes of

10  others or to have others step on the toe of the examiner.

11          I am impressed with the letter that I received from

12  Mr. Byman of Jenner & Block dated February 6th along with the

13  preliminary work plan proposed by the examiner.  I am mindful

14  of Mr. Miller's concerns.  This is an unusual circumstance in

15  that Mr. Marsal was appointed to be, in effect, the CRO,

16  responsible officer independent fiduciary in his own right.  We

17  have the committee also with fiduciary duties owed to creditors

18  involved in an examination and an investigation.  We have the

19  SIPA trustee with a statutory obligation to conduct an

20  examination.  And we have the examiner recently appointed with

21  a specified charge which is quite broad.  Additionally, there

22  are still pending within the case a number of adjourned motions

23  for 2004 discovery requested by various individual creditors.

24          I am satisfied, based upon my review of the

25  submissions on behalf of Mr. Valukas as examiner, that the

26

1    proposed preliminary work plan represents a reasonable basis

2    for the examiner to begin and conduct his work.  But I am also

3    satisfied, based upon Mr. Valukas' remarks made this morning in

4    open court and his demeanor in making those remarks, that this

5    is a process that is somewhat fluid.  It is extremely difficult

6    as a conceptual matter to predetermine in advance how parties

7    are going to act with each other in matters of this

8    significance and complexity.  I'm satisfied that Mr. Valukas,

9    as examiner, will exercise reasonable and informed discretion

10   in deciding whether and when to share information with the

11   debtor-in-possession.

12          I hear him loud and clear, however, in saying that he

13   believes it is inappropriate at the outset to have the subject

14   of the examination directly involved in the examination.  For

15   that reason, even though I understand that Mr. Miller, on

16   behalf of his client, is making a reasoned argument that a

17   debtor-in-possession is not to be distinguished from a SIPA

18   trustee in terms of the fiduciary duties owed to creditors and

19   the obligations undertaken.  I nonetheless believe that for

20   purposes of getting this process started that the largely

21   consensual preliminary work plan that has been proposed

22   represents a reasonable and appropriate blueprint for the

23   conduct of this investigation.

24          For that reason, to the extent that Mr. Miller's

25   remarks and the quoted objection, which is really an informal

27

1    one, which appears in the letter that I have reviewed,

2    constitute objections to the preliminary work plan, those

3    objections are overruled.  Nonetheless, I believe that the

4    spirit of cooperation, which has produced this extremely

5    flexible document, is one that I believe should continue and

6    that it makes good sense for this to be a work in progress that

7    is modified as appropriate and that, like many blueprints,

8    involve some field work to make the project appropriately

9    complete.

10        For that reason, I'm going to approach this

11   empirically and assume that the examiner and the other parties

12   in interest who have participated in good faith to generate

13   this plan will continue to talk to each other, will approach

14   issues with an open mind and will, as appropriate, make

15   adjustments.

16        I'm prepared to approve the preliminary work plan in

17   the form that it has been submitted and incorporate for

18   purposes of my approval the general remarks that I've made here

19   this morning.

20        MR. MILLER:  I believe, Your Honor, there is an

21   order --

22        MR. VALUKAS:  There are two orders, Your Honor, I

23   have in connection with the appointment of Jenner & Block and

24   the Rule 2004 motion which I have.  We'll have to modify the

25   order which we have drafted to incorporate the last reference,

28

1    Your Honor.

2         THE COURT:  Just for dealing with the pieces of paper

3    that we have to manage after each one of these hearings, and

4    this is a sign of cooperation between the debtor and the

5    examiner, my suggestion is that you hand those documents to Mr.

6    Miller and that Mr. Miller act as the custodian for purposes of

7    at the end of the hearing passing up everything that we need to

8    consider for entry today.

9         MR. VALUKAS:  Delighted, Your Honor.

10        THE COURT:  Thank you.

11        MR. MILLER:  That's a responsibility, Your Honor.

12        THE COURT:  I'm sure you can handle it.

13        MR. MILLER:  I don't know, Your Honor.  After going

14   down in flames, my partner here says I should leave.

15        Your Honor, just for the record, we note that two

16   additional Chapter 11 petitions were filed on Monday for LB

17   Rose Ranch LCC and Structured Assets Securities Corporation and

18   in due course, Your Honor, we will bring on the motions to

19   incorporate those into the administrative orders.

20        THE COURT:  Fine.

21        MR. MILLER:  At the omnibus hearing, Your Honor, of

22   January 14th, Your Honor inquired as to global protocols and we

23   have a report for Your Honor in the context of a status

24   conference, I would call it, and Mr. Perez and Mr. Ehrmann from

25   Alvarez & Marsal will present that.

29

1          THE COURT:  Fine.  Just so I'm clear that people who

2     are in court have access to the information, I was sent last

3     evening electronically a February 11 slideshow --

4          MR. PEREZ:  Yes, Your Honor.

5          THE COURT:  -- and a February 10 draft of a proposed

6     cross border insolvency protocol.  I just want to make sure

7     that these documents are generally available in court.

8          MR. PEREZ:  Your Honor, they are.  We have copies

9     available.  Last night at the same time that we submitted it to

10    chambers, we submitted it to the various parties in interest

11    electronically as well.  In addition, Your Honor, they're

12    posted to the Lehman website.  So it's all there.  It's

13    available.  We have not filed anything.  This is a prelude to

14    filing something but, at this point, this is really in the

15    nature of a status conference.

16         THE COURT:  I understand.  This is informational

17    only.

18         MR. PEREZ:  Informational only.  Your Honor, my name

19    is Alfredo Perez on behalf of the debtors.  And as a result of

20    the various comments that were made at the last hearing, we

21    thought it would be appropriate to basically inform the Court

22    and the parties as to the very significant steps that have been

23    taken all along and the further, more ambitious, steps that we

24    intend to take.  The purpose of the presentation, as the Court

25    indicated, is really for informational purposes, to really tell

30

1    the Court and the parties that there's been tremendous amount

2    of work done in there -- Mr. Ehrmann, in particular, who kind

3    of heads that effort, will go through the actual work that has

4    been done.  But there's been work both done on the legal side

5    as well as a lot of work done on the business side to deal with

6    the various topics.

7         Your Honor, part of our goal here is to attempt to

8    bring together a multilateral protocol.  As the Court is well

9    aware, there aren't very many multilateral protocols.  Most

10   protocols are bilateral protocols.  There's one in this court,

11   at least one that I know of that this Court has signed, and

12   there have been many instances of bilateral protocols but very

13   few multilateral protocols.

14        THE COURT:  You may be alluding to the protocol that

15   I approved in the Quebecor case.

16        MR. PEREZ:  Exactly, Your Honor.  So, Your Honor,

17   what we would propose to do, and Mr. Ehrmann can speak to what

18   has happened, but what we would propose to do is following this

19   hearing continue the consultation process directly, as we've

20   already done, with the various administrators and receivers.

21   There are really four or five really key ones that control the

22   bulk of the assets -- in an effort to come back to the Court

23   with what I would hope to be a largely consensually document

24   that would allow -- that would change the focus of the case

25   from what it was in the first couple of months to really what

31

1    it needs to be in order to achieve Mr. Marsal's goal and that

2    really has to do with the claims process and with the

3    reconciliation of the intercompany's accounts.  I mean, this is

4    a very complex situation and we really need to think outside

5    the box in order to be able to do that.

6         So to that extent, Your Honor, we obviously welcome

7    everyone's comments.  We would welcome the parties' comments.

8    I'm sure that we will hear from parties in due course with

9    respect to this.  And at some appropriate time in the future,

10   we'll come back with an actual formal motion seeking the

11   Court's approval.  We have not filed any of this on the record

12   but it is available on the website.

13        Your Honor, I'd like to introduce Mr. Ehrmann who

14   I've proffered his testimony before but Mr. Ehrmann is managing

15   director at Alvarez & Marsal.  He has a degree from the

16   University of Paris, a law degree, and he's licensed in New

17   York as well to practice here.  Thank you, Your Honor.

18        THE COURT:  Fine.  Mr. Ehrmann?

19        MR. EHRMANN:  Good morning, Your Honor.

20        THE COURT:  Good morning.

21        MR. EHRMANN:  Daniel Ehrmann from Alvarez & Marsal.

22   I'm primarily in charge of international operations at Lehman

23   Brothers.  What I thought I would do is merely point out to you

24   a couple of sections of the presentation and then highlight a

25   couple of points that are really the takeaways.  I would like

32

1    to point you to pages 18 through 26.  Those pages merely

2    describe the multiple non-U.S. proceedings.  As Your Honor is

3    fully aware, we have about seventy-five proceedings.  The

4    territory that we consider covering are about 650 entities

5    spread over a multitude of countries.  And these pages will

6    summarize for Your Honor the timeline of the various non-U.S.

7    proceedings.

8           Pages 27 to 36 go into quite some detail of the

9    actual timeline of the international operations people within

10   the various territories and basically highlights month by month

11   the progress that we have made.  That timeline again is

12   summarized on page 6.  I think the takeaway there, Your Honor,

13   is that when we started in September, we entered into a chaotic

14   situation where 650 entities were subject to an unprepared

15   bankruptcy filing.  And all of the administrators in the

16   various jurisdictions were trying to really determine what they

17   had and ensure that they would set the stage in order to

18   prepare themselves for phase two of this assignment.  And I

19   believe that today we actually are in this phase two which is

20   going to be focused on asset realization and liabilities,

21   assessment and management.

22          Page 7 summarizes the interactions we've had with the

23   key -- what we qualify as the key administrators, i.e., those

24   administrators that either cover most of the territories or

25   most of the assets.  I think that the relationships have

33

1    significantly evolved over the last four months.  As I pointed

2    out a minute ago initially in this assignment administrators

3    were primarily focused on their own assets, their own

4    territory, wanted to ensure that they would have access to

5    resources, systems and information whereas today, I think

6    they're all looking more outward in order to try and see this

7    case to an end.

8              THE COURT:  May I break in and ask a question --

9              MR. EHRMANN:  Sure.

10             THE COURT:  -- about that change?

11             MR. EHRMANN:  Yep.

12             THE COURT:  Is it implied by that comment that there

13   is an attitude of cooperation which you have seen on a

14   court-to-court and case-to-case basis in which there is a

15   shared recognition that in order to better administer the cases

16   that include interrelationships requires some level of

17   formalized cooperation or is this just a hope?

18             MR. EHRMANN:  I think that there's certainly been an

19   evolution in approach.  And it's interesting to see even the

20   administrators that joined us at a later stage as a result of

21   the proceedings taking place in local jurisdictions in the

22   October/November/December time frame, they all go through the

23   same process which is they are focused inwards and are very

24   resistant or skeptical to -- with respect to a more formal

25   cooperative approach.  And I think as soon as they realize the

34

 1    complexities and the interdependencies of this assignment, they

 2    are more amenable to a more cooperative approach.  I would not

 3    go as far as saying that we will be able to deliver to you in

 4    thirty days a signed protocol, multilateral signed protocol.  I

 5    think that would be hope.

 6         THE COURT:  That would be unrealistic.

 7         MR. EHRMANN:  That's exactly right.  I think what's

 8    important to note, though, today there's an ongoing dialogue

 9    with every single administrator that we have identified in this

10    case.  And the degree of the dialogue, the depth of the

11    dialogue differs obviously among these various administrators.

12    We have made significant progress with PWC that is responsible

13    for the LBIE and subsidiaries.  We actually entered into a

14    formal services agreement which includes information sharing

15    and corporation provisions.  While we have not been able to

16    actually sign a more general broad protocol, we have many

17    instances in which there is a real corporation and a real

18    effort in order to assist other estates in their initiative.

19         We have had an evolving relationship with KPMG that's

20    responsible for primarily the entities in Hong Kong and

21    Singapore.  We actually have there an informal protocol

22    relating to asset management.  The Hong Kong entities cover

23    about six billion dollars of assets.  And we've approached KPMG

24    in asking them to allow us to help them assess those assets and

25    work on disposition strategies relating to those assets in

35

1    order to ensure that the value is preserved for all of the

2    estates and they have been very amenable to that.

3           So while the process may be slower than hoped for,

4    there clearly is a real momentum among the different

5    administrators.  Unfortunately, there is no multilateral

6    platform or forum that we have and these conversations are

7    merely bilateral conversations.

8           THE COURT:  Has this gotten to the level of

9    approaching UNCITRAL?

10          MR. EHRMANN:  Sorry, Your Honor?

11          THE COURT:  Has this gotten to the level of

12   approaching UNCITRAL?  Do you --

13          MR. PEREZ:  Yeah.  We have not, Your Honor.  We have

14   not approached UNCITRAL to see if there would be any interest

15   in doing something.  Obviously, they have a form of protocol or

16   a form of cooperation agreement which has been largely adopted

17   in Chapter 15 and in other provisions.

18          THE COURT:  I'm sorry.  I didn't mean to ask a --

19          MR. EHRMANN:  No.  Please.

20          THE COURT:  -- stumper question.

21          MR. EHRMANN:  I'm a reformed lawyer so I should have

22   known the answer.

23          THE COURT:  Okay.  So the answer is no.

24          MR. EHRMANN:  The answer is no.

25          THE COURT:  All right.

36

1          MR. EHRMANN:   One other section I would like to point

2    you to is section -- sorry -- page 10, Your Honor, and 11.

3    This goes to the shift in needs relating to a protocol.

4    Initially, in the first couple of months, we were primarily

5    focused on a protocol relating to information sharing, data

6    sharing, access to resources and asset preservation.   And the

7    fear was that as a result of these entities splitting up that

8    basically the channel of communication and the repositories of

9    information would basically lie only with certain

10   administrators and we wanted to make sure that all of that

11   information would be shared and that the approach with respect

12   to the actual asset management would be somewhat consistent.

13          Obviously, today we feel that in most proceedings,

14   the administrators have managed to stabilize their operations.

15   Most administrators now have access to information, to

16   resources.   Most of them had actually inventoried their assets.

17   And I believe that, for the most part, they are now ready to

18   enter the second phase which is what do we now do with all of

19   this and how quickly are we going to get there.   And as, I

20   think, Brian Marsal pointed out to you during the hearing of

21   January 14th, we are obviously all dependent on each other in

22   order to resolve, regarding the timeline, a resolution of these

23   proceedings.   And as a result of that, the needs have more

24   become beyond maintaining the information corporation which, I

25   think, is always welcome.   The need is now more geared towards

37

1    coordination regarding proceedings, claims management

2    coordination, intercompany relationship management and, as Your

3    Honor will see when you will review our protocol, we have a few

4    provisions regarding those needs.

5        THE COURT:  Well, I did have a chance to read over

6    the proposed cross border insolvency protocol this morning and

7    I recognize that it has "Draft" stamped all over it and I view

8    it as the start of a process, not necessarily the end of a

9    process.  But I was particularly impressed with the aims of the

10   protocol set forth in Section 1.3 all of which, at least as I

11   review it, appear to be reasonable, appropriate, desirable and

12   necessary aims.

13       MR. EHRMANN:  I would agree.

14       THE COURT:  I thought you might.

15       MR. EHRMANN:  And one last point I would like to

16   make, and that's covered on page 12, we actually have attempted

17   with the key administrators to actually agree to a more formal

18   protocol back in October and November.  That protocol only

19   addressed the initial needs of the case.  Notwithstanding

20   multiple meetings and multiple drafts, we were never able to

21   come to an agreement.  And I think the key reasons behind that

22   were that as time evolved, the need among those administrators

23   with respect to information sharing, corporation, asset

24   preservation reduced because on the ground those steps were

25   actually being implemented.  I think there's also a -- I'll

38

1   call it cultural difference maybe between our proceedings and

2   other foreign proceedings where these protocols are viewed as

3   maybe being in conflict with the administrative statutory roles

4   and even potentially limiting their purview.  And I just want

5   to point out to Your Honor that while we are very excited to go

6   out and have these bilateral conversations and negotiations in

7   this initial round of -- or this initial attempt, we've seen

8   that the resistance is strong to actually come to a formal

9   protocol that actually has some teeth.

10          THE COURT:  I'm not surprised.

11          MR. EHRMANN:  Those are the key points I wanted to

12   highlight to Your Honor unless you have any questions.

13          THE COURT:  No.  It's an extremely helpful report.  I

14   fully understand how ambitious an endeavor this is.  But I also

15   recognize the critical importance of the endeavor.  And I'm

16   satisfied, based upon my review, that as much progress is

17   currently being made as can be expected.

18          MR. EHRMANN:  Thank you, Your Honor.

19          MR. PEREZ:  Your Honor, just by way of closing, thank

20   you very much for allowing us to make the presentation.  And we

21   will seriously explore the possibility of engaging you into

22   trial to see if that would be a way to do it.

23          THE COURT:  I'm not urging that.  I just asked the

24   question because in the ordinary course of cross border

25   insolvency, UNCITRAL has considerable credibility and

39

1    expertise.  It's what they do.

2         MR. PEREZ:  Yes, Your Honor.

3         THE COURT:  And to the extent that other

4    jurisdictions or others involved in cases pending in other

5    jurisdictions have expressed resistance to the notion of a

6    multilateral insolvency protocol that could be perceived as

7    impinging in any way on sovereignty elsewhere, it seems to me

8    that the involvement of a body such as UNCITRAL that routinely

9    deals with harmonizing such differences simply may be a way to

10   move the process forward at the appropriate time.  But by no

11   means in making these remarks am I urging anybody to do

12   anything.  And I recognize that this is a delicate exercise in

13   international diplomacy as well as a delicate exercise in

14   international insolvency.

15        MR. PEREZ:  Thank you, Your Honor.  And we'll

16   obviously explore it and see if that leads to something.

17        THE COURT:  Fine.  Well, I'm most grateful for your

18   report and I see this as something that I'll be learning more

19   about over time.

20        MR. PEREZ:  Thank you, Your Honor.  May we be

21   excused?

22        THE COURT:  You may be excused.

23        MR. PEREZ:  Thank you.

24        THE COURT:  Mr. Flics, do you wish to comment?

25        MR. FLICS:  Your Honor, if it's okay with the Court,

40

1    I thought it might be useful to make a couple of observations.

2              THE COURT:  That'll be fine.

3              MR. FLICS:  Thank you, Your Honor.

4              THE COURT:  You better state your full name, however.

5              MR. FLICS:  Martin Flics of Linklaters LLP, attorneys

6    for the joint administrators of LBIE.  Your Honor, we thought

7    it might be useful in assisting the debtor in giving its report

8    to the Court to provide some information and some observations

9    if I could have just a few minutes to do so.

10             THE COURT:  That'll be fine.

11             MR. FLICS:  First, there has been in the course of

12   the many months of this case now a number of times when I've

13   stood up and there have been comments about the proceedings in

14   the U.K.  And we thought today was a good day perhaps to

15   actually formally provide, in connection with the debtors'

16   report, some documents to the Court and to file on the Court's

17   docket so that people through the U.S. process could have some

18   basic information about the U.K. proceedings.  And so, we will

19   be filing today some documents.  And if I may approach, I'll

20   just hand up to Your Honor, as a reference document, some of

21   these.

22             THE COURT:  Fine.  You may approach.  Thanks.

23             MR. FLICS:  Your Honor, I don't propose to go through

24   the documents that I've handed but, as I indicated, I think

25   both for Your Honor and for parties in interest and to assist

41

1    the debtor in its report they would be useful to have.  As

2    noted, LBHI is a member of the creditors' -- I'm sorry, LBHI is

3    a member of the creditors' committee of LBIE and in that

4    capacity, gets substantial information about the LBIE

5    proceedings.

6           But what I'd like to do in a few minutes is to cover

7    a few key facts about the U.K. proceeding, the status, some of

8    the differences with the U.S. proceeding and then offer some

9    very basic observations about what we've been doing in our

10   approach to some of the issues that are relevant to the report

11   that you just heard.

12          First, Your Honor, the administration proceedings for

13   LBIE and its related companies are the largest financially and

14   most complex insolvency in the history of the United Kingdom.

15   The balance sheet summary for LBIE as of September 15th, 2008

16   from the records of Lehman disclose total assets of 591 billion

17   dollars and total liabilities of 574 billion dollars.  It was

18   reported to the creditors of LBIE on November 14th that there

19   were 495 billion in gross cash and securities assets and 485

20   billion in gross cash and securities liabilities.  That

21   included intercompany assets and liabilities of 213 billion and

22   208 billion, respectively.

23          As at January 15th, 2009, the administrators held a

24   total of 5.9 billion dollars of cash of which 4.4 billion

25   represented house funds and one and a half billion possible

42

1    client funds.

2         Now, Your Honor, with respect to the proceedings in

3    the U.K., as has been mentioned on a number of occasions, on

4    September 15th, a number of partners at Pricewaterhouse, Mssrs.

5    Lomus, Pearson, Jervis and Schwartzmann were together appointed

6    joint administrators.  Subsequent to that time, a number of

7    them, together with other PWC partners, were appointed joint

8    administrators for eighteen other companies.  In accordance

9    with the provisions of the Insolvency Act, their legal status

10   is that of agents of LBIE and officers of the court.

11        With respect to the court proceeding, Mr. Justice

12   Blackburn has been assigned by the High Court of Justice as the

13   judge with responsibility for hearing applications in relation

14   to LBIE and the other Lehman entities subject to administration

15   proceedings.  Unlike the procedures in the U.S. bankruptcy

16   court, the Insolvency Act does not require the U.K.

17   administrators to have regular hearings and the administrators

18   derive their powers and obligations from the Insolvency Act and

19   the proposals for the administration of LBI that were approved

20   by the creditors on November 14th.  In fact, to date, there

21   have only been two preliminary applications made by the joint

22   administrators.  And it is likely that there will be an update

23   hearing in the coming months for the purpose of briefing the

24   judge with respect to the joint administrators' plan to propose

25   a scheme of arrangement for dealing with the distribution of

43

1    client assets and the trust property.

2          So I appreciate your hearing those points just to put

3    that in context.

4          With respect to the cooperation and communication in

5    the course of the case, we appreciate the comments of Mr.

6    Ehrmann and Mr. Perez and the significant actions that are

7    reflected in the presentation that they've made.  In summary,

8    there have been very significant aspects of cooperation with

9    the desire of the administrators to employ a pragmatic approach

10   to resolving issues as they arise under specific agreements.

11         And so, Your Honor has heard before about daily

12   update calls.  You've heard about the TSA.  You've heard about

13   LBHI's participation on the creditors' committee where Alvarez

14   & Marsal has access to detailed analysis of the administration

15   of LBIE, who has participated in meetings and so on.

16         With respect to matters relating to protocol, the

17   word "protocol" in this case has been used in a number of

18   contexts.  It often is used to reflect an agreement.  And in

19   that capacity, we have been -- the administrators have been

20   extremely active, both with LBHI in connection with the TSA and

21   other matters, and also significantly with LBI and the SIPC

22   trustee.

23         In the last six to eight weeks, in connection with

24   the customer claims bar date, the administrators of LBIE and

25   LBI and SIPC entered into an agreement to address some of the

44

1    enormous complexities in the filing of those claims.  And in

2    connection with that agreement, there was an agreement to

3    agree, if you will, as to three further matters, such as the

4    appropriate treatment of duplicative claims filed against LBI

5    by LBIE and LBIE's clients, the appropriate treatment of claims

6    that interplayed across product and across affiliate and

7    inaffiliate netting of setoff rights, and seeking to best

8    address differences in the U.S. and U.K. insolvency regimes in

9    the claims process.  So there's very significant activity along

10   these lines.

11           I will have to say, though, Your Honor, in the spirit

12   of openness, that as noted before, the administrators' approach

13   is to deal with issues as they arise in a pragmatic and

14   hopefully creative fashion.  And I think they've been

15   successful in doing so.  With respect to issues of broader

16   protocols and UNCITRAL, that is not the approach of the joint

17   administrators at this time.

18           And while this is not the time for a legal argument,

19   we've just been all indicating various types of precedents, I

20   would note that ordinarily, at least certainly from the U.K.

21   perspective, protocols have been entered into when the same

22   legal entity has been the subject of proceedings in both

23   jurisdictions.  So the Maxwell example that's been cited a

24   number of times was a case where a company filed in both the

25   U.S. and the subject administration proceedings in the U.K.,

45

1    which creates an inherent conflict, because two courts have to

2    deal with the same assets.

3         Contrary to that, or in distinction to that, Enron,

4    which previously I think held the title of the most complex

5    bankruptcy, also had a, of course, U.S. proceeding and an

6    administration proceeding in the United Kingdom, where Enron

7    was on the creditors' committee of Enron Europe.  And in fact,

8    several of the professionals involved in this very case were

9    involved in that, including the joint administrators.  And that

10   actually worked quite well.

11        So I just wanted to be clear.  Obviously, we're

12   always willing to talk, but our approach is to continue to

13   tackle these issues.  We think we've been successful in

14   tackling them on a pragmatic basis, and that is our intention

15   as to how to continue.

16        THE COURT:  Does this mean, Mr. Flics, that

17   notwithstanding the comment made by Mr. Ehrmann that parties

18   are starting to look outward, that your clients continue to

19   look inward?

20        MR. FLICS:  Well, Your Honor, I wouldn't characterize

21   it as looking inward.  I think we spent, as indicated, about

22   two months working very closely with LBI, and we have agreed to

23   continue to work closely with LBI.  There are billions and

24   billions of dollars of claims that need to be addressed that

25   involve the U.S. and the U.K., LBI as well as LBIE has a very

46

1    strong interest that process.  So I wouldn't say we're looking

2    inward at all.  What we're doing is addressing the important

3    issues, clearly, from the perspective of the duties and

4    responsibilities of the administrators of a U.K. entity that is

5    subject to the laws of the United Kingdom.

6         I mean, Lehman Brothers set up its global enterprise

7    by establishing entities subject to the laws of various

8    jurisdictions, including the insolvency laws.  Through no

9    one's -- well, I don't know whether through anyone's fault, but

10   as a result of the events of September 15th, and the inability

11   to continue the enterprise and operation, those entities became

12   separate, legally separate.  And that is where we stand.

13        The administrators are doing their absolute best to

14   discharge their duties and to cooperate for the benefit of

15   their estate with the parties in this proceeding as

16   appropriate.  And I believe that that is benefited through the

17   TSA and the LBI claims process entities in this proceeding.

18        THE COURT:  Okay.  Well, this isn't a public

19   relations effort.  This is just to report to the Court.  As far

20   as I'm concerned, everybody has reserved all rights, and I view

21   what you said as just that, a reservation of rights.

22        MR. FLICS:  Well, thank you, Your Honor, for giving

23   me the time to do so.

24        THE COURT:  Fine.

25        MR. FLICS:  Thank you.

47

1          MR. KOBAK:  If I may, Your Honor, I just have a

2    couple of observations and a brief update.  James Kobak for the

3    SIPA trustee.

4          THE COURT:  Now, just to be clear, this is in

5    reference to the status report as it relates to the

6    international aspects of the Lehman Brothers proceedings,

7    correct?

8          MR. KOBAK:  That's correct.  But if Your Honor is

9    willing, I also would just report how many claims we've

10   received.

11         THE COURT:  I'm perfectly willing.  But it occurs to

12   me, that, for agenda purposes, that I'd much rather hear that

13   when we get to your phase of the agenda.

14         MR. KOBAK:  Okay.  That's fine, Your Honor.  I just

15   want to make two points.  First of all, the trustee very

16   strongly supports the goals that are set forth in paragraph 1.3

17   which Your Honor referenced.  I will say that in prior

18   discussions, although there was agreement about the goals, when

19   it came to crafting specific procedures, we did have some

20   problems.  I think with time some of those may go away.  But

21   so, there's a big step between agreeing on the general

22   principles and really getting how things are going to operate.

23   And our proceeding is a little bit different from some of the

24   others because of the emphasis on prompt return of customer

25   property and so forth.  So there still are some issues out

48

1    there.

2          With respect to LBIE, I want to endorse everything

3    that Mr. Flics said.  We have been working very hard with him

4    to try to deal with their claim on behalf of their clients, as

5    well as their proprietary claims.  I just want to -- I don't

6    want to put him on the spot, but I do want to report that we

7    have furnished him with a very extensive draft protocol that

8    would deal with some of the issues that he referred to.  I take

9    it from a conversation I had with him in the hall earlier and

10   from his remarks today, that the administrators may not be

11   interested in doing anything quite that formal, but we're still

12   hopeful that we might be able to discuss it and persuade them.

13         That would be essentially a bilateral protocol.  We

14   don't see that in any way as precluding also signing on to some

15   kind of broader multilateral protocols if other parties will

16   agree, or from taking our protocol with them and then adopting

17   it for other procedures.

18         THE COURT:  Well, I appreciate those remarks.  I view

19   your remarks and Mr. Flics' remarks as providing some

20   visibility into what is really an entirely private negotiation.

21   I think it best that this proceeding not become an opportunity

22   to disclose too much about that private issue.

23         MR. KOBAK:  No, I don't.  And I do want to assure

24   Your Honor that we have had a lot of discussions, as everyone

25   has said, on the practical level of working together to resolve

49

1    the claims in some of the cross quarter issues.

2         THE COURT:  I recognize that and I fully understand

3    that there's an awful lot that I don't see and I don't know

4    about, but only assume to be going on because of the nature of

5    the case and its global complexities.  One of the challenges,

6    to state the obvious, is that there's no world bankruptcy court

7    to deal with this issue.

8         MR. KOBAK:  Yes.

9         THE COURT:  And so everybody reserves their rights.

10   We'll continue to proceed as we have been proceeding here under

11   applicable U.S. law, and hopefully parties in interest will

12   recognize that there is some value to cooperative joint action

13   in a manner that doesn't impinge upon the jurisdiction or

14   sovereignty of other pending proceedings, because there'll be a

15   recognition of common purpose.

16        MR. KOBAK:  Thank you, Your Honor.

17        THE COURT:  Thank you.

18        MR. MILLER:  Your Honor, Harvey Miller on behalf of

19   the debtors in possession.  Ultimately, Your Honor, this may

20   turn out to be the prototype for a global multi-debtor

21   bankruptcy system or process to deal with different

22   corporations in different jurisdictions.  We hope we get to

23   that process.  It was nice to hear from Mr. Flics, Your Honor,

24   that the so-called issue of the eight billion dollars no longer

25   seems to be at the forefront.  That was such a big issue at the

50

1    beginning of this case.

2              Returning, Your Honor, to --

3              THE COURT:  Did he actually say that?

4              MR. MILLER:  He didn't say that, but I take silence.

5    Returning to the agenda, Your Honor.  In connection with the

6    LBHI et al. cases, there are no contested matters on today's

7    calendar, Your Honor.  Returning to --

8              THE COURT:  Oh, anyone who wishes to leave is free to

9    go.

10             MR. MILLER:  -- agenda item number 4, Your Honor,

11   which is the motion of Green Tree Servicing LCC in relation to

12   the assumption of a subservicing agreement, the parties have

13   reached an agreement, Your Honor, and a stipulation has been

14   signed and will be presented to the Court for approval.  Under

15   that stipulation, LBHI will assume the agreement at issue and

16   cure all defaults thereunder.  The cure amount, Your Honor, is

17   approximately 57,000 dollars.  And that's to be paid within

18   five days of the date that the order is entered.

19             THE COURT:  That is actually the smallest number I've

20   heard referenced in this case ever.

21             MR. MILLER:  Well, Your Honor, we're trying to make a

22   record someplace.  With that, Your Honor, I would move on to

23   item number 5, which similarly is uncontested.  It is the

24   motion of the Midwest Independent System Operator for relief

25   from the automatic stay to exercise setoff rights.

51

1          The parties have agreed to lift the automatic stay so

2     that they may reconcile the pre-petition claims between the

3     parties.  And during that process, Your Honor, the debtor-in-

4     possession and Midwest Independent System Operator are

5     reserving all rights, claims and defenses, including their

6     rights to challenge the calculation of the amounts owing

7     included in the netting calculations.  So there's an agreement,

8     Your Honor, that provides for netting.  So a stipulation will

9     be submitted, Your Honor.

10          THE COURT:  Fine.  And I take it that the

11     documentation, both with respect to item 4 and item 5, is in

12     process and will not be submitted today, but I can expect it in

13     due course?

14          MR. MILLER:  The documentation will be submitted at

15     this hearing, Your Honor.

16          THE COURT:  Okay.  Fine.

17          MR. MILLER:  And as to items 6 and 7, Your Honor, Ms.

18     Marcus will handle those items.

19          MS. MARCUS:  Good morning, Your Honor.  Jacqueline

20     Marcus, Weil, Gotshal & Manges, on behalf of LBI and the

21     related debtors.

22          THE COURT:  Good morning.

23          MS. MARCUS:  Your Honor, since the January 14th

24     hearing which was the last time you considered these two

25     motions, the debtors have been continuing their efforts to

52

1    settle the disputes with respect to the open trades.  With

2    respect to the first open trades motion, which is item number 6

3    on the agenda, the debtors have reached agreement with the

4    following seven counterparties, each of which is reflected in a

5    letter agreement that has previously been reviewed by the

6    creditors' committee.  Those parties are:  Citibank NA,

7    Citibank International, Goldman Sachs Credit Partners, Goldman

8    Sachs International Bank, GS European Performance Fund Ltd.,

9    KKR Debt Investors (2006) Ireland, and Whippoorwill Investments

10   Inc.  The debtors request that the Court enter an order in the

11   form that we're going to submit at the conclusion of the

12   hearing, or actually later today, that will approve those

13   settlements.

14        The debtors had previously advised the Court that

15   they have reached an impasse with both Field Point and Blue

16   Mountain.  And the Court has directed that we submit pretrial

17   orders as to those parties.  They are not quite finished yet,

18   but we hope to be submitting pretrial orders with respect to

19   those two shortly.

20        THE COURT:  Let me ask you a question about those two

21   exceptions to the rule of consensual resolution.  Would some

22   form of alternative dispute resolution mechanism save time and

23   money?  Or is it the view, based upon your having participated

24   actively and personally in this, that you, in fact, are at such

25   an impasse that having a judicial determination is the

53

1     necessary means to an end?

2          MS. MARCUS:  I think that we need a third party's

3     determination.  Whether it has to be Your Honor or somebody

4     pursuant to an alternative dispute resolution, I guess I'm

5     neutral on.

6          THE COURT:  Well, I would simply suggest that while

7     you're talking with your adversaries about the form of what we

8     call the pretrial order, even though it's a contested matter,

9     that it might be useful to at least explore whether or not, for

10    purposes of saving unnecessary administrative expenses that

11    might otherwise be avoided, that the parties might be willing

12    to submit to mediation.

13         MS. MARCUS:  That's fine, Your Honor.

14         THE COURT:  If not, this is not a direction to

15    mediate.  It's just a musing as to whether or not it's possible

16    to give peace a chance.

17         MS. MARCUS:  And actually, Your Honor's comments are

18    relevant to the third party with whom we've reached an impasse,

19    which is Avenue Investments.  Avenue's counsel is here today,

20    and they have suggested that perhaps some mediation or other

21    alternative dispute resolution would be appropriate.  So we'll

22    definitely pursue that with them.

23         THE COURT:  Okay.  Are you counsel for Avenue?

24         MR. WAGNER:  Yes, Your Honor.  Jonathan Wagner from

25    Kramer Levin.  We did suggest to the debtor that we engage in

54

1   some form of alternative dispute resolution, as a matter of

2   judicial efficiency and to save time and money for both the

3   estate as well as the Court.  And I believe it would be a most

4   fruitful avenue.  If not, or as part as the pretrial schedule,

5   we will set that out both to address the legal and factual

6   issues raised by the objection that was raised.

7          THE COURT:  That sounds fine.

8          MS. MARCUS:  Your Honor, that leaves with respect to

9   the first open trades motion the following unresolved matters.

10  The objection of AIB, which was almost done but not quite

11  signed today.  So we hope we'll have that signed within the --

12  at the end of today.  The objection of Deutsche Bank, with whom

13  the debtors have had productive discussions and hope to reach

14  an agreement.  The objection of Lloyds TSB Bank as to which

15  we're engaged in discussions.  The objection of R3 Capital

16  Management, which we may be able to resolve.  And lastly, the

17  objection of AXA Mezzanine II and MD Mezzanine SA, who have not

18  been willing to engage in discussions, and with whom we will

19  probably either litigate or engage in some type of alternative

20  dispute resolution.

21         THE COURT:  Well, if they're not willing to engage in

22  discussions, it's going to be hard to mediate with them.

23         MS. MARCUS:  Good point, Your Honor.  With respect to

24  the second open trades motion, which is item number 7 on the

25  docket, there are two remaining counterparties:  the Hartford

55

1    Funds and GE Fusion.  With respect to the Hartford Funds, the

2    debtors have just reached an agreement to settle that dispute,

3    and that will be submitted this afternoon in a proposed order.

4    The Hartford Funds are the Hartford Floating Rate Fund, the

5    Hartford High Yield Fund, and Hartford High Yield HLS Fund.

6    With respect --

7         THE COURT:  May I -- I hate to interrupt.  But just

8    something occurs to me.  Is there a settlement paradigm that

9    has been established over time such that parties who are

10   resistant to either discuss the matter or who have, for their

11   own reasons just said no, can be pointed to what has become, in

12   effect, industry standard?

13        MS. MARCUS:  I believe that there's a paradigm, and

14   that has been shared with some of the other counterparties as

15   to the resolution of what was the major issue, which was the

16   setoff issue.

17        THE COURT:  Um-hmm.

18        MS. MARCUS:  I'm fairly certain that these remaining

19   parties don't have setoff arguments, but what they have is very

20   fact-specific arguments about alleged terminations of the

21   trades.

22        THE COURT:  Okay.  I was just --

23        MS. MARCUS:  So as to those entities, it's not really

24   feasible.

25        THE COURT:  I was simply exploring whether there was

56

1    some governing principle that might be applied to these

2    miscellaneous disputes to help get them resolved.  If the

3    answer is no, that's fine.

4            MS. MARCUS:  I think with respect to the ones that

5    are left, it will be difficult to --

6            THE COURT:  Okay.

7            MS. MARCUS:  -- come up with that.

8            THE COURT:  Understood.

9            MS. MARCUS:  With respect to the second motion, as I

10   said, we've reached an agreement with Hartford and we'll submit

11   that in an order later this afternoon.  And the debtors and GE

12   and Fusion have agreed to adjourn that objection until the

13   February 25th hearing, except with respect to one trade, which

14   is the debt of Llondell, which is the subject of a stipulation

15   between LCPI and GE Fusion, which has been signed and will be

16   submitted to the Court later today.  That stipulation provides

17   that that trade is terminated, not assumed not rejected.  And

18   that's where we are with respect to those motions.  If Your

19   Honor has any more questions?

20           THE COURT:  No more questions.  Thank you for that

21   report.

22           MS. MARCUS:  Thank you.

23           MR. MILLER:  Your Honor, just jumping ahead, there

24   are approximately twenty-one matters, Your Honor, on the

25   adjourn list.  Most of those matters, Your Honor, are being

57

1    adjourned to the next omnibus meeting, February 25th.  Several

2    are being adjourned to March 1st.  One matter is being

3    adjourned to next Tuesday, February 17th.  That relates to the

4    Utah Bank.  And there's a motion filed today, Your Honor, in

5    relation to the Thrift institution, a very similar motion,

6    which I assume Your Honor will want to hear on the 17th?

7              THE COURT:  Yes.

8              MR. MILLER:  So, Your Honor, with respect to those

9    matters, I don't think we have to do anything else to go

10   through them other than to note that they've all be adjourned.

11             THE COURT:  That's fine.

12             MR. MILLER:  Then I would turn the lectern over to

13   Mr. Kobak, Your Honor.

14             THE COURT:  Fine.  Thank you, Mr. Miller.

15             MR. MILLER:  Thank you.  And that includes the

16   adversary proceedings, Your Honor.  Those are all adjourned

17   also.

18             MR. KOBAK:  Thank you, Your Honor.  James Kobak,

19   Hughes, Hubbard & Reed, for the SIPA trustee.  Mr. Wiltenburg

20   is going to be handling most of the calendar.  I did want to

21   report briefly that the initial sixty-day period for people to

22   file claims to get maximum SIPA protection, expired at the end

23   of January.  And I thought that you and the audience would be

24   interested to know that we've received approximately 75,000

25   claims.  We don't have a dollar value on that yet, because many

58

1    of them are for securities rather than for a stated dollar

2    value.

3           There are a number of them represented by Barclays

4    and LBIE, as you heard.  We worked out details of their filing

5    an omnibus claim.  So that's another 1,000.  But it is a very

6    substantial volume of claims which I suspect may keep us busy

7    for some time.  Although we have designed procedures with

8    Deloitte and others to deal with them as expeditiously and as

9    efficiently as possible.

10          THE COURT:  Okay.

11          MR. KOBAK:  And now I'll turn the podium over to Mr.

12   Wiltenburg.

13          THE COURT:  Thank you.

14          MR. KOBAK:  Thank you, Your Honor.

15          MR. WILTENBURG:  Good morning, Your Honor.  David

16   Wiltenburg, Hughes, Hubbard & Reed, representing James Giddens

17   as trustee in the LBIE SIPA proceeding.

18          THE COURT:  Good morning.

19          MR. WILTENBURG:  Your Honor, we have, on the SIPA

20   proceeding calendar, two uncontested matters, one matter that

21   has become uncontested due to communications among counsel over

22   the last few days, and a fourth matter that I think will remain

23   contested this morning.

24          Item 8 on the uncontested list is the trustee's

25   motion for entry of an order pursuant to Section 365 of the

59

1   Bankruptcy Code, assuming and assigning debtors' rights and

2   obligations under a certain lease in Menlo Park, California.

3   It's being assigned to an entity called Tenaya Capital LLC.  No

4   objections have been received, and we would propose that the

5   motion may be granted.

6          THE COURT:  It's granted.

7          MR. WILTENBURG:  Item 9, Your Honor, will be

8   presented by counsel for Barclays.

9          MR. BAREFOOT:  Good morning, Your Honor.  Luke

10  Barefoot from Cleary, Gottlieb, Steen & Hamilton LLP, for

11  Barclays Capital, here on the presentment of a stipulation and

12  agreed order between Barclays and CA Inc., formerly known as

13  Computer Associates, on the resolution of an objection they had

14  to the assumption and assignment of an agreement between

15  themselves and LBI to Barclays.

16         THE COURT:  I saw a certification of no objection on

17  the docket this morning.

18         MR. BAREFOOT:  That's correct, Your Honor.  That was

19  filed because this was originally set up on notice of

20  presentment.  But because the presentment date was at the

21  hearing, we, for convenience purposes, put it on the calendar

22  for this morning.

23         THE COURT:  Okay.

24         MR. BAREFOOT:  No objections were filed.  And

25  consistent with your prior direction, I'll leave the

60

1      stipulation and the disk with the debtors.

2              THE COURT:  Fine.

3              MR. BAREFOOT:  Thank you, Your Honor.

4              MR. WILTENBURG:  Your Honor, David Wiltenburg,

5      Hughes, Hubbard & Reed.  If I may, I'd like to address next

6      item 11 on today's calendar, which is the motion pursuant to

7      Bankruptcy Rule 9019 for approval of a settlement among the

8      trustee, Barclays, and the clearing agency, the Depository

9      Trust Corporation and its subsidiaries.

10             Your Honor, as set forth in the moving papers, this

11     is another instance of securities transfers that did not take

12     place as intended in the days immediately following the

13     bankruptcy of LBI.  In this instance, as events developed on

14     the 22nd, which was the Monday after the Friday, it appeared

15     that there was no financial institute or financially

16     responsible party standing behind the obligations of LBI.  And

17     for that reason, it was agreed to wind down, that is, to

18     essentially bring to an end, DTC's acting on behalf of LBI.

19             And that, in turn, led to -- or part of that process

20     was reversal of a series, in fact a fairly extensive series, of

21     so-called ACATs transactions, and those are transactions where

22     a customer of LBI is seeking transfer of its securities and its

23     account to another broker.  Those requests had been coming, of

24     course, in the aftermath of the bankruptcy at LBHI, and there

25     was a substantial volume of that kind of transfer in process on

61

1    September 22nd.

2            Those transfers were reversed.  And what that meant

3    is that the securities that were kind of in motion on their way

4    to other receiving brokers, were brought back by the CNS system

5    that is administered by DTC and its subsidiaries.  And those

6    securities came to rest, or the ones that are the subject of

7    this motion, came to rest in essentially two places.  First,

8    DTC detained two groups of -- what we've described in the

9    motion as two groups of securities.  One is the Exhibit A

10   securities, which remain in the possession of DTC.  And the

11   second in that category are the Exhibit C securities that were

12   detained and then liquidated by DTC.  And as another category,

13   there came into the position of the LBI account, another body

14   of securities that has been described in the motion as the

15   Exhibit B securities.

16           Again, when the dust settled, it turned out that

17   Barclays needed the Exhibit A securities and the Exhibit C

18   securities to satisfy claims of customers whose accounts had

19   been transferred.  So the settlement, broadly considered, tries

20   to put us in the situation that would have prevailed if those

21   ACATs securities had reached their intended destination on

22   September 22nd, and in the following days.

23           And to make that happen, two things need to occur.

24   The Exhibit A securities that remain in the possession of DTC

25   must go to Barclays to be reunited with the customer accounts

62

1    that they are associated with.  With respect to the Exhibit C

2    securities which have been liquidated, those need to be bought

3    back in if the customer claims are going to be satisfied.  And

4    we have some rough numbers to discuss in connection with that

5    buy-in.  And the way the agreement expresses the buy-in, it's

6    called a make-whole payment, which will go to Barclays and then

7    be used to buy the securities back.

8         The formal value of the securities on the 22nd was

9    approximately 221 million dollars.  Those securities were

10   liquidated over the next couple of weeks.  Proceeds were

11   garnered in the amount of about 197 million dollars.  And for

12   clarification of what's in the 9019 application, those proceeds

13   were applied to debts owing from LBI to DTC, debts resulting

14   from the clearance and settlement activity on September 22nd

15   and the following days.

16        Based on estimates that have occurred over the course

17   of the ensuing months up to last Friday, it's believed that the

18   current cost of buying them back will be about 170 million

19   dollars.  So if -- there are, of course, no guarantees.  The

20   market can move again.  But if that estimate holds, the result

21   will be a saving of approximately 26 or 27 million dollars for

22   the estate, comparing the buyback cost with the proceeds that

23   were credited, in effect, to the trustee's account at DTC.

24        Your Honor, we received two limited objections and

25   comments on this proposed settlement, one from the debtor.  And

63

1    as a result of communications we've had, further information

2    and explanation that's been provided, that objection has been

3    withdrawn.

4           THE COURT:  The debtor objection has been withdrawn.

5    That I saw this morning on the docket.

6           MR. WILTENBURG:  Yes.

7           THE COURT:  What's the status of the creditors'

8    committee?

9           MR. WILTENBURG:  The creditors' committee didn't

10   style its response as an objection but reflected the fact that

11   communication was occurring and was expected to continue to

12   occur.  And I hope I'll be able to report that the result has

13   been satisfaction of the committee's concerns.

14          THE COURT:  I think we're about to find that out.

15   What's the committee position?

16          MR. TECCE:  Good morning, Your Honor.  James Tecce of

17   Quinn Emmanuel on behalf of the committee.  With the

18   representations made on the record by Mr. Wiltenburg, our

19   information requests have been answered.  And we had asked that

20   that be presented on the record, and it has.  That resolves our

21   first objection -- or our first concern, rather.  Our second

22   concern was just that the reservation of rights of the

23   committee and the LBHI estates that appeared in the first

24   settlement resolution with Chase back in December, that the

25   same reservation of rights appear in connection with this

64

1    settlement with the same force and effect.

2         As the Court knows, we're investigating the sale

3    transaction.  We want to make sure that we have the same

4    reservation that we obtained previously.  And that was our

5    second concern.

6         THE COURT:  That's fine.  I remember that reservation

7    of rights, and you still have it as far as I'm concerned.

8         MR. TECCE:  Thank you very much.

9         MR. MILLER:  And the debtor also, Your Honor.  The

10   debtor?

11        THE COURT:  You have it, too, Mr. Miller.

12        MR. MILLER:  Thank you.

13        THE COURT:  Thank you.

14        MR. WILTENBURG:  Indeed, Your Honor, the form of

15   order that's been tendered to the Court incorporates a parallel

16   provision to the one that was entered on the prior occasion.

17   So on that basis, Your Honor, I would request that the

18   settlement be approved.

19        THE COURT:  The settlement is approved.

20        MR. WILTENBURG:  Your Honor, the next item on the

21   agenda is the trustee's motion pursuant to Bankruptcy Code

22   Section 365(d)(4) for extension of the trustee's time to assume

23   or reject unexpired leases of nonresidential real property.

24   And the Court is aware of the history of this.  There were

25   originally, I believe, six leases that were scheduled as leases

65

1    as to which this extension of the assume and reject deadline

2    was sought.  We had discussions and issues with one of the

3    landlords with respect to that list.  And it is the landlord of

4    certain property located at 555 California Street in San

5    Francisco.

6            And the issue that's been presented on the objection

7    of that landlord, Your Honor, I think, as you'll see in the

8    papers, we feel misconceives the effect of the Court's prior

9    orders approving the asset sales to Barclays, and especially

10   the portions approving the assumption and assignment of certain

11   executory contracts.  The Second Circuit tells us that there

12   must be notice, a hearing and an order as a prerequisite to the

13   assumption of executory contracts.  That just didn't occur

14   here.

15           There is no order of the Court that contemplates an

16   assumption without assignment of this particular contract.  For

17   whatever reason -- I don't have insight into the minds of the

18   negotiating parties -- they chose, after the sale hearing had

19   occurred in this Court, to take that lease out of the scheme of

20   leases that would be assumed and assigned, and kind of changed

21   the rules as to that one, foreseeing an assumption in

22   connection with a sublease instead of assumption and

23   assignment.

24           That's a much different thing than had been noticed

25   prior to that sale hearing.  It's a different thing than the

66

1    Court approved in the sale approval order that had been

2    entered, I think, originally on the 19th of September.

3            THE COURT:  20th.

4            MR. WILTENBURG:  20th.  Your Honor, the papers review

5    the legal arguments of the parties.  I think we've tried to

6    state the sequence of events and the applicable legal

7    doctrines.  If the Court has any questions, I'd be glad to

8    address them.

9            THE COURT:  No, I've reviewed the papers and I've

10   reviewed the applicable case law.  And I'm fairly well prepared

11   to deal with this now.

12           MR. WILTENBURG:  With that, I'll cede the podium to

13   counsel for the landlord.

14           THE COURT:  Let me ask you, before you cede the

15   podium, you've talked about the deemed assumption issue in

16   connection with the sale order, which you obviously say

17   shouldn't govern here under the Burger Boys' authority from the

18   Second Circuit.  However, you haven't given me an argument why

19   the time should be extended under 365(d)(4), at least you

20   haven't done so orally on today's record.  I assume that you

21   stand on your papers with respect to that?

22           MR. WILTENBURG:  I do, Your Honor.  And I don't

23   believe the landlord has joined issue on that point.  That is,

24   they're approaching this from a different point of view and I

25   think not including that the legal standard applicable to

67

1    extension of time.

2            THE COURT:  But they argue it's already been assumed?

3            MR. WILTENBURG:  Correct.

4            THE COURT:  I understand now.  Okay.  Thank you.

5            MR. WILTENBURG:  Thank you, Your Honor.

6            MS. GOLDSTEIN:  Good morning, Your Honor.  Stephanie

7    Goldstein, Fried, Frank, Harris, Schreiber & Jacobson on behalf

8    of the landlord.  We obviously take great issue with the

9    debtors' statement that there's no order of the Court that

10   contemplates the assumption without the assignment to Barclays.

11   And I think there are a multitude of provisions within the sale

12   order that are --

13           THE COURT:  Let me stop you for a second.

14   Procedurally, how do you get to the position you're seeking to

15   get to in the context of objecting to this motion as opposed to

16   bringing some other kind of proceeding before me?  I just want

17   to understand how you have the legal right to be making what

18   appears to be a different kind of argument in the context of a

19   365(d)(4) extension which is routinely granted under

20   circumstances like this.  I recognize you have a different

21   legal position, but is your objection the right procedural

22   means to present it to me?

23           MS. GOLDSTEIN:  Your Honor --

24           THE COURT:  And if so, why?

25           MS. GOLDSTEIN:  -- Your Honor, our position on that

68

1    is that when the debtors made this motion to extend or assume

2    and they included the lease at 555 California within the

3    context of that motion, that we thought it was inappropriate

4    that it be in there because they had already assumed the lease

5    in the context of the sale order.  And --

6         THE COURT:  Are they acting as if they have assumed

7    it, or are they acting otherwise?

8         MS. GOLDSTEIN:  Until a couple of weeks before the

9    extension motion was filed, until that point in time, they had

10   been acting as if they had assumed the lease.  And in fact, as

11   set forth in the clarification letter on the 20th which says

12   that on the closing date they were going to assume the lease at

13   555 California, and in turn then sublease the premises to

14   Barclays, which the lease required them to do, and then allowed

15   Barclays to remain in the space and continue to use the space,

16   we had thought they were in full compliance with the terms of

17   the clarification order which is part of the purchase

18   agreement, as defined in the sale order, as defined in the

19   motions that were filed to approve the sale order.

20        And so we thought that was sort of a late stage

21   change of strategy in terms of whether or not they were

22   complying with what they had said they were going to do.  And I

23   think in that context, whether or not they can assume or reject

24   as to a multitude of other leases that they took no position

25   on, is not the issue.  The issue here is whether or not in the

69

1    context of a specific lease that they said they were assuming

2    on the closing date, and then got the Court's approval of all

3    of the terms and provisions of the clarification letter which

4    was incorporated into the purchase agreement, that there's

5    nothing here for them to assume -- certainly to assume in the

6    context of our lease.

7           Whether they can -- having assumed, whether they can

8    now reject, I think is a separate issue.  But the notion that

9    they can then decide whether or not to assume a lease that they

10   said they had already assumed on the closing date, we think

11   isn't an issue, and is inappropriate to determine in the

12   context --

13          THE COURT:  I'm asking you a slightly different

14   question.  I understand that you have vigorously argued why you

15   think you're right as a matter of law.  I'm asking you the

16   question as to whether you can properly do that in the context

17   of objecting to a motion to extend under 365(d)(4)?  And I

18   haven't really heard an answer to that.  What gives you the

19   right to be making the argument you're making now in the

20   context of objecting to an extension of time?

21          MS. GOLDSTEIN:  I think in terms of standing, Your

22   Honor, in terms of what the landlord's rights are in the

23   context of the proceedings of the case, were we to then go

24   ahead and not object at this point in time and make these

25   points clear, no doubt, down the road someone would claim that

70

1    we had waived any objection to the fact that they were --

2            THE COURT:  So --

3            MS. GOLDSTEIN:  -- trying to assume or reject --

4            THE COURT:  -- is this more in the nature -- excuse

5    me.  Is this more in the nature of a reservation of rights that

6    you not be deemed to have waived your legal argument that the

7    lease was already assumed?  Or, are you in the context of this

8    objection seeking what amounts to a determination that the

9    lease has actually been assumed?

10           MS. GOLDSTEIN:  Well, you know, not to talk in

11   circles here on it.  But I think in effect, that the landlord

12   has a judiciable controversy when it learns of a position that

13   the debtor is taking that's inconsistent with what we believe

14   the state of affairs was to be, that we clearly have standing

15   to object.  And in terms of an extension application, it's

16   clearly moot as to the landlord in terms of whether or not they

17   have the right to extend the time to assume a lease that

18   they've already assumed.

19           THE COURT:  I understand.  Well, obviously there's a

20   difference of opinion, because the trustee and Barclays alike

21   disagree with you mightily and say that you're wrong as a

22   matter of law under applicable Second Circuit precedent, and

23   that you're wrong as a matter of law fairly reading the sale

24   order, and you're wrong as a matter of law fairly reading the

25   clarification letter.  So they say you're just plain wrong.

71

1    What I'm asking is are you right procedurally in being here now

2    seeking what amounts to a determination that you're right in

3    the context of objecting to an extension of time?

4         MS. GOLDSTEIN:  I think it's implicit, Your Honor, in

5    the notion of whether they can extend time to assume the lease,

6    that they've already assumed the lease.  And I'm not -- I

7    understand we have a difference of opinion with the debtor in

8    terms of what happened prior to their filing of this motion.

9    But I certainly think in terms of whether or not their -- yes,

10   it's generally a matter of course of whether or not you can

11   extend that time within the context here.

12        The question is why are they entitled to extend time

13   to assume a lease that they've already assumed.  And implicit

14   in that is the notion that why do we have to wait to figure out

15   who's right and who's wrong when the issue has been joined

16   and --

17        THE COURT:  Well, it actually hasn't been, in my

18   view.  And I think that you're still not answering the

19   question.  I think you're trying hard to say because you think

20   you're right, you should be deemed right.  But what I'm telling

21   you is that I think that there are other procedural means to

22   determine who is right here.  One would be a declaratory

23   judgment adversary proceeding.  That's one obvious means.

24   Another would be some kind of motion to be brought in court

25   here or elsewhere seeking to enforce the terms of the lease or

72

1    to seek to enforce the terms of the sale order and to take a

2    position which actually gives you the right to get an order

3    that grants you the relief you seek.

4         It's my view, procedurally, that you can't get there

5    from where you are right now, although you have very

6    emphatically and in florid language sought to say why you're so

7    right and why this is such an injustice.  I think you actually

8    overpled your case.  That's just my opinion.

9         I am governed, ultimately, by Second Circuit

10   precedent, and I don't think this is the proper procedural

11   setting in which to argue Burger Boys.  But you know it and I

12   know it.  It's the law.  I am granting the trustee's motion

13   under 365(d)(4) without prejudice to any rights that your

14   client may have with respect to the status of the lease at 555

15   California Street.

16        I understand that you have forcefully argued your

17   client's belief that that lease has been, in fact, already

18   assumed.  In extending the 365(d)(4) period, I do so without

19   prejudice to that legal argument.  And so the parties are free

20   to argue in a proper procedural setting, and I view this as

21   improper, those rights that actually exist under the sale order

22   entered on September 20th.

23        So to the extent that what you did was a fairly thin

24   reservation of rights, I accept it as such.  To the extent what

25   you did was an attempt to get a determination that you in fact

73

1   have an assumed lease, it's the improper procedural vehicle to

2   do so, in my view.  And you're not getting a determination as

3   to that today.

4          MS. GOLDSTEIN:  Thank you, Your Honor.

5          THE COURT:  Does anyone else wish to be heard on this

6   issue?  Fine.

7          MR. MILLER:  Your Honor, I believe that concludes the

8   calendar.

9          THE COURT:  Okay.

10          MR. MILLER:  Your Honor, there's just one other thing

11   that I'd just point out.  There was a motion filed by 25 Broad

12   LLC for leave to conduct 2004 examinations.  That motion's been

13   withdrawn, Your Honor.

14          THE COURT:  Okay.  And I'm not sure who I will see on

15   the 17th, but I will see some people on the 17th, and --

16          MR. MILLER:  Definitely, Your Honor.

17          THE COURT:  -- I'm not sure who from this group will

18   be here, but I look forward to seeing you at 10 a.m.

19          MR. MILLER:  Thank you very much, Your Honor.

20          THE COURT:  Thank you.  We're adjourned.

21          (Whereupon these proceedings were concluded at 11:35 a.m.)

22

23

24

25

74

1

2                         I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                              PAGE    LINE

6    Order authorizing the retention of Jenner &    16      6

7    Block as counsel for the examiner approved

8

9    Motion authorizing the issuance of a subpoena   16      12

10   pursuant to Rule 2004 approved

11

12   Examiner's proposed preliminary work plan       27      16

13   for purposes of investigation approved; debtors'

14   objection overruled

15

16   Motion of Green Tree Servicing LCC in relation  50      19

17   to the assumption of a subservicing agreement

18   approved

19

20   Motion of the Midwest Independent System        51      16

21   Operator for relief from the automatic stay to

22   exercise setoff rights approved

23

24

25

75

1

2                                I N D E X

3

4                              R U L I N G S

5    DESCRIPTION                                      PAGE      LINE

6    Trustee's motion for entry of an order pursuant    59        6

7    to Section 365 of the Bankruptcy Code, assuming

8    and assigning debtors' rights and obligations

9    under a certain lease in Menlo Park, California

10

11   Presentment of stipulation and agreed order        60        2

12   between Barclays and CA Inc. on resolution of

13   objection to assumption and assignment of

14   agreement between themselves and LBI to Barclays

15   granted

16

17   Motion pursuant to Bankruptcy Rule 9019 for        64        19

18   approval of a settlement among the trustee,

19   Barclays, and the clearing agency, the Depository

20   Trust Corporation and its subsidiaries approved

21

22

23

24

25

76

1

2                                 I N D E X

3

4                               R U L I N G S

5       DESCRIPTION                                     PAGE     LINE

6       Trustee's motion pursuant to Bankruptcy Code     72       12

7       Section 365(d)(4) for extension of the trustee's

8       time to assume or reject unexpired leases of

9       nonresidential real property granted without

10      prejudice to rights of landlord with respect

11      to status of lease at 555 California Street

12

13

14

15

16

17

18

19

20

21

22

23

24

25

77

1

2                        C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  February 12, 2009

16

17

18

19

20

21

22

23

24

25