1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555 (JMP)


- - - - - - - - - - - - - - - - - - - -x

In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        February 17, 2009

        10:02 AM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2    Hearing Re LBHI's Motion, Pursuant to Sections 105(a) and 363

3    of the Bankruptcy Code, for Authorization to Fund a Capital

4    Contribution to Woodlands Commercial Bank

5

6    HEARING re LBHI's Motion, Pursuant to Sections 105(a) and 363

7    of the Bankruptcy Code and Bankruptcy Rules 9019 and 6004, for

8    Authorization to Increase the Capital Level of Lehman Brothers

9    Bank, FSB through (i)the Settlement of Pending Disputes; and

10   (ii)a Direct Capital Contribution of up to $15 Million

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Lisa Bar-Leib

3

1

2     A P P E A R A N C E S :

3     WEIL, GOTSHAL & MANGES LLP

4          Attorneys for Debtors

5          767 Fifth Avenue

6          New York, NY 10153

7

8     BY:  ALFREDO R. PEREZ, ESQ.

9

10    HUGHES HUBBARD & REED LLP

11         Attorneys for James W. Giddens, SIPC Trustee

12         One Battery Park Plaza

13         New York, NY 10004

14

15    BY:  JAMES B. KOBAK, JR., ESQ.

16

17    MILBANK, TWEED, HADLEY & MCCLOY LLP

18         Attorneys for the Official Committee of Unsecured

19          Creditors

20         One Chase Manhattan Plaza

21         New York, NY 10005

22

23    BY:  DENNIS C. O'DONNELL, ESQ.

24         EVAN R. FLECK, ESQ.

25

4

1

2     ARNOLD & PORTER LLP

3          Attorneys for Woodlands Commercial Bank

4          399 Park Avenue

5          New York, NY 10022

6

7     BY:   MICHAEL J. CANNING, ESQ.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

PROCEEDINGS

1    THE COURT:  Please be seated.  Mr. Perez?

2    MR. PEREZ:  Good morning, Your Honor.  Alfredo Perez

3  on behalf of the debtors.  First, I want to thank you for

4  hearing this on short notice and on a regular Lehman day.  This

5  is an important motion for the debtor.

6    We're here, Your Honor, on two motions, LBHI's motion

7  to fund a capital contribution to Woodlands Commercial Bank and

8  then LBHI's motion to increase the capital level of Lehman Bank

9  FSB through a settlement of some pending disputes and an

10  additional direct contribution of up to fifteen million

11  dollars.

12    Your Honor, the creditors' committee filed a

13  statement in support of the motion.  I don't know if the

14  Court's had an opportunity to see that.  I have an extra copy

15  if --

16    THE COURT:  I read it.

17    MR. PEREZ:  Thank you, Your Honor.  Your Honor, we

18  have not received any objections to the relief requested.

19  These motions have been the subject of extensive discussion

20  with many, many, many different parties in interest.  We were

21  obviously -- to the extent that there had been an objection, we

22  were prepared to make an evidentiary showing.  And even though

23  we don't have an objection, Your Honor, Mr. Marsal is here and

24  he has prepared a presentation to the Court so that the Court

6

1    understands the importance of the situation and why the debtor

2    is making this business decision to go forward and try to save

3    these two assets.

4         THE COURT:  That's fine.  And candidly, even in the

5    absence of objection, this is the sort of thing that is so

6    significant that I'm delighted that Mr. Marsal is here and can

7    provide a record in support of the relief requested.  And I'm

8    pleased that, in effect, one of the questions I had has been

9    answered which was how are you going to prove this.  And you're

10   ready to do that.

11        MR. PEREZ:  We are ready, Your Honor.  We can

12   certainly do it as -- take his statements in the form of a

13   proffer.  If the Court likes to create an evidentiary record,

14   we can certainly do that.

15        THE COURT:  Well, Mr. Marsal has addressed the Court

16   before without proffers and without being sworn as a witness.

17   And I accept his statements as the functional equivalent of

18   testimony that he would give from the stand if sworn.  And this

19   can be presented in any way that the debtor prefers.

20        MR. PEREZ:  Your Honor, we have prepared a dec for

21   the Court and we --

22        THE COURT:  I've already read it.

23        MR. PEREZ:  Thank you, Your Honor.  We did not

24   present it beforehand.  Just wanted to have it available here

25   for anybody -- and we have extra copies.  But if Mr. Marsal

7

1   could address the Court, that would be great.

2        THE COURT:  Fine.  Mr. Marsal?

3        MR. MARSAL:  Good morning, Your Honor.

4        THE COURT:  Good morning.

5        MR. MARSAL:  Your Honor, I'll try and walk you

6   through this as quickly as I'm sure you would want to see it.

7   What we'd just like to make sure you understand on the bank

8   platform front -- again, this is Brian Marsal.  I'm the chief

9   executive officer of Lehman Brothers.

10       On page 1 of the presentation, Your Honor, it's an

11  organization chart which outlines the banks, the funding

12  vehicles which Lehman Brothers Holdings, through its wholly

13  owned subsidiary, Lehman Brothers Bank Corp., own.  The one on

14  the left, the Utah Bank was in support of the commercial

15  banking operations.  The Thrift was in support of the mortgage

16  banking operations residential.  That's the subject of today's

17  hearing -- of this aspect of the hearing.

18       THE COURT:  What's the box on the right?

19       MR. MARSAL:  The box on the right are two other

20  smaller banks that they had -- they were in the process of

21  selling, Your Honor.  And those were related to the commercial

22  side of the house.  But they're very small and really have no

23  issues today as far as we know.

24       THE COURT:  Okay.

25       MR. MARSAL:  Turning to page 2 of the presentation,

8

1    we're going to cover the Utah Bank.  We lay out some of the

2    essential issues.  The assets of this bank are 5.4 billion, the

3    liabilities, approximately five billion, resulting in an

4    equity -- a realizable equity value of 433 million.  This is

5    being done on a mark-to-market basis which means that the value

6    has been really written down significantly.  We believe that on

7    a hold to maturity basis, there's significantly more equity

8    here.  And we don't see why a hold to maturity would not be

9    relevant as opposed to the -- well, we've taken the more

10    conservative and appropriate accounting policy of marking-to-

11    market which is the 433.

12            On the right, you see the capital levels.  That

13    brings us to a capital level of 5.4 percent.  Eight percent is

14    required by the FDIC.  In order to meet the minimum

15    requirement, a 200 million dollar capital infusion is

16    necessary.

17            Just to focus on the footnotes for a second, the 433

18    million dollars is after a write-down of the muni bonds

19    purchased from Lehman Brothers Inc. for 534 million dollars.

20    And we'll discuss that in more detail as to how that got --

21    that got messed up here.  In terms of the other footnotes, the

22    eight percent is the capital adequacy level established by the

23    FDIC.  And LBHI -- so the footnote C so you -- read this

24    confusing footnote.  We received a PCA, which means a --

25    basically, a notice that we're in serious breach or potential

9

1   default deficiency situation.  When this gets issued as part of

2   any financial plan, the holding company would have to guaranty

3   five percent of whatever the asset base is.  So five percent of

4   the asset base would be 272 million dollars.  We just wanted to

5   put the FDIC on notice that this 200 million dollars we're

6   putting in is part of that 272 million dollars to not make any

7   mistake.  We don't want to be double counted, in other words.

8         Moving on to -- and we hope not to have to put the

9   seventy-two million dollars up, by the way.  But it will be

10   part of any capital plan.  We'll have to guaranty the 272.

11         Going to the next page, how did we get into this fix?

12   The Utah Bank paid cash -- on the Friday before the filing, it

13   paid 534 million dollars worth of cash to LBI.  We surmise, we

14   have not been able to verify this, but what we believe is that

15   there was a major move to mobilize cash within the corporation

16   given what was happening to the liquidity that was being taken

17   by the various clearing banks in the week prior to the

18   proceeding.  To generate that cash, LBI went into the Utah

19   Bank, sold them 534 million dollars worth of munis that they

20   had in inventory, securities that they had in inventory

21   which -- and 534 million was transferred from the Utah Bank to

22   LBI.  LBI was instructed by the Utah Bank to take that money

23   and segregate those munis into a custodial account for the

24   benefit of the Utah Bank.  That was ignored by the LBI in its

25   processing of -- in those days there was utter chaos taking

10

1   place during the 12th and the 15th.  That was ignored and, in

2   fact, the munis were co-mingled.  Rather than the munis being

3   placed in a custodial box for the benefit of Utah, they were

4   placed in the general box -- incorrectly in the general box.

5        On the 19th, JPMorgan seized all securities that were

6   in the general box adding it to their collateral base for the

7   protection of the various clearing risks that they had.

8   Immediately thereafter, a SIPA proceeding was commenced on LBI

9   so the 534 million has sort of been in limbo.

10       In November, we took the problem to the SIPA trustee

11  to explain to the SIPA trustee that the Utah Bank -- if we did

12  not receive this 534 million dollars, we were going to find

13  ourselves in serious trouble with the FDIC.  SIPA trustee

14  responded that they will investigate the matter.

15       In January, the Utah Bank -- actually, we filed a

16  claim with the SIPA trustee -- we went to the FDIC and asked

17  the FDIC if they would please file a formal complaint which

18  would, we think from a statutory standpoint, would have

19  superseded the automatic stay and thus we would have gotten the

20  534.  The FDIC chose not to sue another agency so we're sort of

21  left in a -- as the pickle in the middle, if you will, between

22  two agencies who will not -- one agency who comes to us but

23  will -- the FDIC but will not go to SIPA and demand the 534

24  million dollars.

25       We filed a our accounting report on the Utah Bank

11

1    with the FDIC and the FDIC said you have to write that -- the

2    accountant said you have to write that 534 off until SIPA sends

3    you the cash.  And thus, we find ourselves failing the eight

4    percent capital adequacy test down into the five plus percent

5    range.  The FDIC has notified us that unless we get that up

6    into the eight percent range as of February 20th that they

7    would -- we should expect that they will seize the bank.

8            Moving on, what we propose, Your Honor --

9            THE COURT:  Can I stop you just for one second,

10   please?

11           MR. MARSAL:  Yes.  Yes.

12           THE COURT:  This is all happening on an expedited

13   schedule.  I just want to confirm whether or not the FDIC is

14   represented in court today.  Apparently not.  So I accept your

15   representation that, in fact, February 20th represents a real

16   draconian deadline and that there's no opportunity for further

17   extension of that deadline.  And its seizure represents a

18   material risk absent the relief that's being sought.

19           Additionally, I would note that you made a number of

20   statements of LBHI's legal position concerning this matter.  I

21   also understand that some litigation is at least a possibility

22   if the matter is not resolved.  To the extent that you've made

23   those statements and there's anyone who wishes to cross-

24   examine, I'm just going to state this is not the time for that.

25   And I assume that anything that you've said which is subject to

12

1    further clarification or contradiction will be available for

2    such good faith litigation at the appropriate time in the

3    future.  And just because nobody is questioning you now does

4    not mean that I am absolutely determining what you've said to

5    be true.  I know that you believe it to be true.  But I also

6    understand that this is a very complicated matter.  So I just

7    wanted to make that clear.

8        MR. MARSAL:  Thank you.  In terms of the Utah Bank's

9    solution, Your Honor, what we propose to do is to infuse 200

10   million dollars basically in a participation -- by purchasing a

11   participation in the muni obligation.  So that if and when that

12   muni obligation gets satisfied, what would happen is the first

13   200 million dollars to come back would come back to the estate

14   assuming the eight percent capital level is being maintained.

15   To the extent that that is not maintained, we could not pull

16   the money out of that.  We couldn't find ourselves into a

17   default or inadequacy position by virtue of doing it.

18       We believe this will satisfy the FDIC in terms of the

19   Utah -- in permitting the Utah Bank to continue to operate.  In

20   order to operate at a higher level, in order to begin to try

21   and match -- to try to issue CDs and try and match the runoff

22   of the liabilities with the runoff of the assets, we have to

23   get it to a ten percent capital adequacy level.  We're working

24   on a capital plan to figure out how we do that.  And we'll be

25   back to the court probably with a solution down the road but

13

1   it's not the emergency that today is.  But we'll be working

2   with the FDIC to figure out how we can best match the liability

3   runoff with the asset runoff so we can liquidate this estate in

4   a sensible way.

5        In other actions which are being taken, we continue

6   to reduce the unfunded which reduces the risk to the FDIC.  I

7   think that they're pleased with that runoff.  We have some

8   ideas on how we can expedite that but I think that process

9   continues.

10       I've covered the long term plan.  If we go to the

11   next page, moving to the next bank, which is the Thrift, this,

12   again, was in support of our mortgage banking and servicing

13   operations.  The Thrift has 6.5 billion in assets, six billion

14   of liabilities, roughly a half a billion in equity.  There's

15   less mark-to-market opportunity here, Your Honor, but -- there

16   is a small amount but this is probably closer to real value,

17   460 -- or half a billion dollars is closer to the real value

18   here.  The value on the Utah Bank, again, is probably

19   understated by as much as a half billion dollars.

20       The actual capital in this bank is 5.9 million --

21   excuse me, 5.9 percent.  This, too, is required -- the FDIC

22   requires eight percent.  We'll need 185 million to be infused

23   in order to meet the capital adequacy test.  The office of the

24   Thrift has issued a directive for us to restore this capital.

25   We have, in this case, until the 28th of February to find a

14

1    solution.  We've submitted a plan to solve this problem.  We

2    think this plan will prove to be acceptable to them.  And a

3    failure to reach an agreement with them will result in, we

4    believe, a seizure of the bank.  And the banks are cross-

5    defaulted to one another.  So the seizure of the Thrift would

6    result in the seizure of Utah.

7         The solution, which is on page 8, is to put in 185

8    million in capital but very little of it being cash.  First of

9    all, the Thrift owes Holdings ninety-three million dollars

10   related to the profits on servicing rights.  And again, not to

11   be controversial because, in fairness, I think some of the

12   Thrift people might argue until we get matters straightened

13   out, we're not accepting that this is a real liability or not.

14   But we believe it's a liability and, in fact, it's on the

15   Thrift's books for ninety-three million dollars.  So what we're

16   proposing to do is to take the ninety-three million and simply

17   convert that payable, with all the controversy surrounding it,

18   into capital.  The capital would be, again, -- it would be

19   Holdings capital being converted into Thrift equity.

20        In addition, we would contribute eighty-nine million

21   of servicing rights which are owned by Holdings but which are

22   really tied very closely to the Thrift.  And in the event that

23   the Thrift were seized, it would be a difficult realization on

24   the eighty-nine million dollars.  So we think that's a -- and

25   also a reasonable give-up in terms of a capital infusion.  In

15

1   order to top it off, we would need somewhere between three to

2   fifteen million dollars of additional cash in order to get up

3   to the 185 million dollar level.  It's a little -- the reason

4   it's a range is because some of these values may shift around

5   but that gives us a pretty good -- that gives us enough room to

6   deal with just about anything.

7          Again, here, with the Thrift, we need to develop a

8   long term capital plan.  It would be our objective to get up --

9   get beyond the ten percent threshold and figure out a game plan

10  by which we could match the liquidation of the asset book with

11  the liabilities.  Again, we just believe that we'll do a better

12  job on a liquidation than the FDIC will in both of these

13  properties.  But the intention, Your Honor, at this stage, the

14  intention is to have an orderly liquidation of the portfolio, a

15  repayment of a hundred percent of the liabilities to the

16  various parties and the estate would derive the residual

17  equity.

18         In terms of page 9 -- lays out the economics of this.

19  To the extent that there would be an FDIC -- if we look at the

20  top column -- I mean, if you look at the horizontal, you have

21  Utah Bank, Thrift and Total.  Down the vertical axis, we see

22  Assets, Holdings Equity, the proceeds that we would realize, we

23  believe, from our managing it versus the FDIC's managing it and

24  this is not -- this is just, I think, again, we would manage it

25  over a longer term.  They would manage it in a more immediate

16

1    way which would result in a discount and we think an

2    unnecessary discount.  What we've assumed here is that we would

3    realize basically a hundred percent on the mark-to-market

4    values.  The FDIC, we're assuming, would realize seventy

5    percent of mark-to-market values thus resulting in a deficiency

6    claim on the Utah Bank, hypothetical deficiency claim of

7    somewhere between of approximately 1.2 billion for Utah, 1.5

8    billion for the Thrift for a total of 2.7 billion in

9    hypothetical deficiency claims.

10            Turning the page, what's a deficiency claim?  What's

11   the relevance of this deficiency claim?  We believe that the

12   deficiency claim could be characterized one of two ways, either

13   an unsecured deficiency claim which would be added to the

14   Holdings' deficiency which would be added to the Holdings'

15   unsecured claim pool.  Or, it could be traded as a priority

16   claim under statute.  Now that will be a subject, hopefully,

17   that we can avoid but that is a potential litigation down the

18   road as well as to what the treatment of this claim would be.

19   What we attempted to do is not to argue it out here but rather

20   to lay out what best case and worst case would be for the

21   estate.  Best case for the estate would be for this claim to be

22   treated as a deficiency claim at applying a value of ten cents

23   on the dollar to that deficiency claim.  This would result in a

24   cost to the estate of 1.2 billion dollars.

25            THE COURT:  Now, for purposes of this illustration --

17

1          MR. MARSAL:  Yes.

2          THE COURT:  -- I assume that the ten percent is just

3     that, for purposes of the illustration --

4          MR. MARSAL:  Just that.

5          THE COURT:  -- and is in no way predictive of what

6     unsecured claims may ultimately fetch in this case.

7          MR. MARSAL:  Correct, Your Honor, and I should have

8     said that.  This is just -- we had to have an illus -- we had

9     to have a number.  So we chose a number that was basically the

10    last trading that we -- sort of a weighted average of the

11    trades that seemed to be happening in today's market.

12         THE COURT:  Okay.

13         MR. MARSAL:  The right-hand column, worse case would

14    be for a priority claim treatment which would be a hundred

15    cents on the dollar.  And under that circumstance, in addition

16    to losing the equity that we have in the two properties, we

17    would have to pay the full deficiency claim of 2.7 billion, a

18    hundred cents on the dollar.  That would result in a 3.6

19    billion dollar loss to the estate.  So it is a huge matter to

20    the estate.  And, I mean, one of the things that it's very

21    important from my standpoint and from the estate's standpoint

22    that we get this -- that we really get this SIPA -- SIPA to

23    focus on the legitimacy of this 534 million dollars muni claim.

24    I mean, to the extent that we have that 534 million dollars, I

25    think we satisfy our capital adequacy test and it means, as you

18

1   can see, potentially a three billion dollar avoidance to the

2   estate, of a potential loss and recovery value.

3          This final summary on page 11, it just lays out where

4   we are.  We think that, again, that the deficiency claim is a

5   reasonable estimate on an unsecured basis of the deficiency

6   claim would be a 1.2 billion dollar loss to the estate.  The

7   900 million of equity plus the deficiency claim totals 1.2.

8   Worse case, we think it'll be a 3.6 billion dollar cost to the

9   estate.  Now, this is opposed to our plan which is to have an

10  orderly liquidation by the estate where we think at least 900

11  million dollars will be realized.  As I indicated, we think 900

12  million is on the low side.  We think it's closer to 1.4

13  billion dollars as opposed to 900 million.  And we would avoid

14  any payment of potential deficiency claims.

15         Last but not least, what we have to recognize is that

16  this is really an investment that's being made that would be

17  recovered as part of this liquidation.  So it's an investment

18  that's being made but we should recover it all.  To the extent

19  that we are wrong, then, in fact, this is not an investment but

20  it is a prepayment against the claim.  So either way, we are --

21  I think either way, the decision is the right decision, that

22  that's initially confusing.  We make it what --

23         THE COURT:  I understand.

24         MR. MARSAL:  Okay.

25         THE COURT:  I understand what you've said.

19

1          MR. MARSAL:  Okay.

2          THE COURT:  I do have a question, though.

3          MR. MARSAL:  Yes.

4          THE COURT:  You carefully described in your

5    presentation that you believed that the arrangements that you

6    have outlined will be acceptable to the FDIC.  Do you have any

7    reasonable assurance at this point that they will be accepted?

8    Because there's one concern that I have and it may be that I'm

9    seeing an issue that doesn't exist and that you've already

10   taken into account which is the cross-default aspect of this.

11   I mean, it seems to me that it's at least conceivable that you

12   might go through the steps of saving Utah only to have a

13   problem with Thrift and for the Thrift problem to cross-default

14   to Utah so that the exercise has turned out to be an exercise

15   in futility.  Accordingly, what I'm concerned about is this.

16   To what extent, as you stand here now, are you reasonably

17   confident that the arrangements that you're now describing

18   will, in fact, secure both of these institutions from potential

19   adverse consequences courtesy of the regulators?

20         MR. MARSAL:  The answer to that, Your Honor, the FDIC

21   has been extremely cooperative, very straightforward, and has

22   told us you keep this at an eight percent level, we will give

23   you time.  If it falls below, all bets are off, things

24   deteriorate.  As long as you keep it at an eight percent level,

25   we will permit you to continue with the orderly liquidation of

20

1    the assets.  To the extent that you were to get it up to ten

2    percent and show us an adequate capital plan for the

3    liquidation, we would even consider the reissuance of CDs to

4    help you do this matching.

5              The FDIC, which insures both institutions, is very

6    cooperative.  The difficulty we have is -- the OTS has -- they

7    have been a little circumspect.  And one agency isn't told what

8    to do by the other agency, as you might not be surprised.  So

9    the OTS, they march to their own drummer.  And so, we are

10   trying to pin the OTS down as to whether or not this is an

11   unacceptable arrangement with them.  We believe it will prove

12   to be.  Our concern is -- I think, if Your Honor is asking the

13   question do we put the money in without a clear sign-off from

14   the OTS, my answer would be yes, even if it's a little bit of

15   a, let's say, squirrelly sign-off or a circumspect sign-off on

16   the OTS because I think there's very little down side.  And

17   I -- but I also think that it's very difficult for the OTS with

18   an eight percent capital adequacy in today's market to grab

19   this institution without a hue and cry (echo/gap in audio) if

20   this thing is actually adequately capitalized.  So I would hope

21   that they would look at it that way.  But there's no telling,

22   on the FDIC front, I have a high confidence level.  On the OTS

23   front, I think our confidence level is high -- I mean, is above

24   average but it's not certain.

25              THE COURT:  Okay.  So there's some risk here.

21

1    MR. MARSAL:  Yes.  Yes, Your Honor.

2    THE COURT:  All right.  Thank you.

3    MR. MARSAL:  That's it.

4    THE COURT:  That was a very helpful presentation.

5 There are no objections but I just want to be assured that

6 there is no one else who may have some questions about the

7 presentation that was just made.  I realize that this is

8 unusual.  It's not testimony --

9    MR. PEREZ:  Right.

10    THE COURT:  -- it was a presentation.  I don't hear

11 any -- well, wait a minute.  We have counsel for --

12    MR. KOBAK:  I'm here, Your Honor, for the SIPA

13 trustee.  I have not really questions but a couple of comments

14 I'd like to make at the appropriate time.

15    THE COURT:  Well, this is probably the appropriate

16 time.

17    MR. KOBAK:  Good.  Thank you.

18    THE COURT:  I'm just guessing that it has something

19 to do with some of the things Mr. Marsal said about the

20 municipal securities that seem to have been lost in the

21 process.

22    MR. KOBAK:  That's correct, Your Honor.  James Kobak,

23 Hughes Hubbard & Reed on behalf of the SIPA trustee.  Your

24 Honor, I just wanted to make it very clear.  I think Mr. Marsal

25 sometimes leaves the impression that the trustee isn't focusing

22

1   a lot of attention on this claim or looking at it very

2   expeditiously.

3            THE COURT:  I think he would just like you to look at

4   it as expeditiously --

5            MR. KOBAK:  Yes.

6            THE COURT:  -- as possible.

7            MR. KOBAK:  Well, we are doing that.  We do have some

8   questions about the transaction.  In order to be a customer

9   claim, it has to have been done in the ordinary course of

10  business.  In our view of some of the evidence, it looks like

11  the parties, and that includes the bank, were scrambling around

12  like crazy to find a way to set up a segregated account in

13  time.  They couldn't do it so they permitted this money to be

14  deposited in the Chase account as Your Honor has already heard.

15           We've asked the bank for documents.  There's been a

16  little delay in getting those documents.  We're in the process

17  of reviewing them now.  We do take this very seriously.  Of

18  course, we have a lot of other claimants who come in and say

19  that their business -- and if it's hedge funds, their investors

20  are going to lose their life savings as well.  It is a 500

21  million dollar claim.  The people that instigated this was the

22  treasurer of LBI who is also a member of the board of the bank.

23  So we do think this is something that we have to examine very

24  carefully.  We haven't made any determination yet.  We've told

25  all the parties, including Mr. Marsal and his counsel, that we

23

1   do intend to try to reach our determination as soon as we've

2   got the documents and as soon as possible.

3         So I just wanted to make that very clear that there

4   is a little bit more to the issue here and that we are acting

5   as expeditiously as possible.  Thank you, Your Honor.

6         THE COURT:  I understand.  That's a helpful

7   clarification of your position.  Mr. Perez?

8         MR. PEREZ:  Yes, Your Honor.  Your Honor, I do have

9   two exhibits that I'd like to present to the Court.  Exhibit

10  number 1 is the order to cease and desist issued by the Federal

11  Deposit Insurance Corporation against the Utah Bank.  And in

12  paragraph 1, Your Honor, it says "On or before February 20, the

13  insured institution shall, in a manner acceptable to the

14  regional director of the New York regional office of the FDIC,

15  obtain sufficient capital to meet and maintain the adequately

16  capitalized level for all capital measures."

17        And then a similar document issued by the office of

18  Thrift Supervision, dated February 4th, which would be Exhibit

19  number 2, and in that circumstance it indicates the February

20  28th date to maintain the adequate capital for the Thrift, the

21  FSB.

22        THE COURT:  And you would like these two documents to

23  be deemed part of the record?

24        MR. PEREZ:  Yes, Your Honor.

25        THE COURT:  Is there any objection to my seeing these

24

1        documents?  Fine.  You may hand them up.

2              MR. PEREZ:  Thank you.

3              THE COURT:  It doesn't matter.  You can go either

4        way.  Thanks.

5              MR. PEREZ:  Thank you, Your Honor.  Your Honor, just

6        one last point and perhaps a little bit extraneous.  But to the

7        extent that there's -- there were issues about the municipal

8        bond, Your Honor.  The Utah Bank had, in fact, had an approved

9        business plan with the FDIC which allowed it to purchase and

10       sell municipal bonds and hold them for investment.  And, in

11       fact, earlier in the month of September, LBHI had injected

12       several hundred million dollars of capital into the Utah Bank

13       for the purpose of allowing them to execute on their new

14       business plan.  So we believe it was in the ordinary course of

15       business, Your Honor.

16             I have nothing further to say.

17             THE COURT:  Okay.  Well, all self-serving statements

18       are accepted in that spirit.  I recognize that everybody has

19       chartered some territory for further exploration down the road.

20       But none of that is really part of today's hearing.

21             MR. PEREZ:  It isn't, Your Honor.  And, Your Honor,

22       on the basis of the record, we would request that the Court

23       enter the two orders and approve the compromise.

24             THE COURT:  Let me just find out if the creditors'

25       committee wishes to be heard in connection with this.  I know

25

1    that a statement was filed yesterday on behalf of the

2    committee.

3           MR. O'DONNELL:  Your Honor, Dennis O'Donnell, Milbank

4    Tweed Hadley & McCloy on behalf of the creditors' committee.

5    Yes, Your Honor, we did file a brief statement in support.  And

6    as indicated in there, on balance, we believe that making this

7    investment makes sense.  It was not an easy decision for the

8    committee to make.  However, our advisors have been

9    significantly involved in the process from the beginning.  And

10   looking at all of the pros and cons and some of the issues that

11   you yourself raised, we think that there is potentially value

12   in these banks.  And letting them be seized at this point in

13   time would not ultimately redown to the benefit of all

14   creditors.

15          So again, on balance under all the circumstances with

16   things we can't predict, we think it makes sense to grant these

17   two motions.

18          THE COURT:  All right.  Thank you.  Is there anyone

19   else who wishes to be heard at this point?  Apparently not.

20   I've reviewed the two emergency motions that are being heard

21   today.  And I have considered the statement filed yesterday by

22   the official committee of unsecured creditors in support of

23   these motions.  Additionally, I have reviewed the written

24   presentation prepared by Alvarez & Marsal which has been

25   referenced by Mr. Marsal in his statement made to the Court.

26

1   And I am satisfied that there are sound business reasons that

2   support this action, the proposed action being to make

3   investments in what we've called Utah, meaning Woodlands

4   Commercial Bank, and Thrift, meaning Lehman Brothers Bank FSB.

5   My understanding is that the measures being adopted to assure

6   capital adequacy at this difficult time include, in addition to

7   capital infusions, various means to limit the exposure of these

8   institutions to unfunded obligations to fund loans to third

9   parties.  As a consequence, the overall combination of both

10   capital infusion and reduction of liability is to improve the

11   capital levels of each institution.

12      Mr. Marsal did not reference in his presentation

13   anything about the fair value accounting or at least I don't

14   remember hearing it.  The papers that I have read, however,

15   filed in support of this motion do reference the impact of fair

16   value accounting on the capital adequacy of both institutions.

17      Notwithstanding the fact that there are acknowledged

18   risks associated with moving forward with these transactions,

19   the presentation that has been made makes it abundantly clear

20   that the risk to the estate in not taking these measures now

21   before February 20th or February 28th, depending on the

22   institution, could result in seizure of these institutions and

23   a significant material adverse impact to the investment of LBHI

24   made indirectly in these institutions and, more critically,

25   could result in a very material deficiency claim at the LBHI

27

1    level measured somewhere between 1.2 billion dollars and 3.6

2    billion dollars.  Those are significant numbers.  And the

3    avoidance of such an obviously adverse outcome represents cause

4    for the proposed rescue of these two institutions.

5            Additionally, there is the potential, by virtue of

6    adopting these measures, of preserving LBHI's equity

7    investments in these two institutions so that, on an overall

8    basis, there is no doubt that I have that a presentation has

9    been made with no objection on the record, that this represents

10   an appropriate exercise of business judgment, not without some

11   risk, but certainly an appropriate exercise of business

12   judgment.  For that reason, I'm prepared to approve both

13   motions in the form submitted.  I note that one of them, I

14   think it's the motion in connection with the rescue of the Utah

15   institution has a supplement and a somewhat modified proposed

16   form of order.  I have read the supplement and the proposed

17   order and I'm satisfied that, as amended, the relief requested

18   is sensible and I will approve it.

19           MR. PEREZ:  Thank you, Your Honor.

20           THE COURT:  Is there anything more for today?

21           MR. PEREZ:  Not for us, Your Honor.

22           THE COURT:  Very well.  We're adjourned.  Thank you.

23           MR. PEREZ:  Thank you very much.

24      (Whereupon these proceedings were concluded at 10:39 a.m.)

25

28

1

2                                I N D E X

3

4                              R U L I N G S

5    DESCRIPTION                                        PAGE      LINE

6    LBHI's motion to fund a capital contribution to     27        18

7    Woodlands Commercial Bank approved

8

9    LBHI's motion to increase capital level of          27        18

10   Lehman Bank FSB and an additional contribution

11   of up to fifteen million dollars approved

12

13

14

15

16

17

18

19

20

21

22

23

24

25

29

1

2                    C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:   February 18, 2009

16

17

18

19

20

21

22

23

24

25