# Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
:
In re                                              :    Chapter 11 Case No.
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*,           :    08-13555 (JMP)
:
          Debtors.                                 :    (Jointly Administered)
:
:
---------------------------------------------------------------x

### DECLARATION OF JASON WHITE

Pursuant to 28 U.S.C. § 1746, Jason White declares as follows:

    1.      I am employed by Barclays Capital Inc. ("Barclays") as a Director and Associate General Counsel.

    2.      I make this Declaration in support of Barclays' Motion For Relief Concerning an American Express Contract Erroneously Posted With The Closing Date Contracts.

    3.      On or about October 1, 2008, I spoke with Lindsee Grandfield, outside counsel representing Barclays. After the conversation, I understood that an American Express Travel Related Services Company, Inc ("American Express") contract (the "Contract")[1] with Lehman Brothers Holding Inc. or one of its affiliates had been erroneously listed on a schedule of Non-IT Closing Date Contracts (the "Schedule"). I further understood that the Contract was being removed from the revised Schedule. To give American Express notice of the correction, I called Eugene Chikowski, counsel representing American Express.

---

[1] Since this time, I have come to understand that American Express had two contracts in place with LBHI and LBI—namely, a corporate card contract and a travel services contract—for which a combined cure amount had been listed in one entry on the list of Non-IT Closing Date Contracts.

4.  I spoke with Eugene Chikowski and informed him of the error in the original Schedule and that the Contract would be removed from the revised Schedule. Mr. Chikowski sought to engage me in a substantive conversation regarding the contract and, in particular, working out a larger "business solution" to the situation. I told Mr. Chikowski that I did not have any background on this matter, and that my purpose in calling was simply to inform him of the correction to the Schedule.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of November, 2008.

                                                        /s/ Jason White
                                                        Jason White

# Exhibit B

# (Filed Under Seal)

# Exhibit C

DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000
Martin J. Bienenstock, Esq.
Irena Goldstein, Esq.

FLASTER/GREENBERG, P.C.
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103
Telephone: 215-279-9393
Facsimile: 215-279-9394
Eugene J. Chikowski, Esq.
Greg T. Kupniewski, Esq.

Co-Counsel for American Express Travel Related
 Services Company, Inc.

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| In re: | Chapter 11 |
|---|---|
| LEHMAN BROTHERS HOLDINGS INC., et al. | Case No. 08-13555 (JMP) (Jointly Administered) |
| Debtors. | |

**DECLARATION OF EUGENE J. CHIKOWSKI
IN SUPPORT OF THE RESPONSE OF AMERICAN EXPRESS
TRAVEL RELATED SERVICES COMPANY, INC. TO THE MOTION
OF BARCLAYS CAPITAL, INC. FOR RELIEF CONCERNING AN
AMERICAN EXPRESS CONTRACT ERRONEOUSLY POSTED
WITH THE CLOSING DATE CONTRACTS**

Eugene J. Chikowski, Esq., a shareholder of the law firm Flaster/Greenberg, P.C. ("Flaster Greenberg") and counsel to American Express Travel Related Services Company, Inc. ("AmEx") in the above captioned case, with offices located at 1628 John F. Kennedy Boulevard, Philadelphia, Pennsylvania, declares as follows:

1. AmEx retained Flaster Greenberg as counsel in the bankruptcy case of **Lehman Brothers Holdings, Inc.** ("Debtor") with respect to the Debtor's assumption of two **AmEx** contracts (the "AmEx Corporate Services Contract" and the "AmEx Travel Contract") **and the** contemporaneous assignment of those contracts to Barclays Capital, Inc. ("Barclays").

2. Unless indicated otherwise, the statements made in this declaration are from my own personal knowledge, information and belief.

3. The Debtor filed a motion to approve, *inter alia*, the sale of certain assets to Barclays and the assumption and assignment of certain contracts to Barclays ("Sale Motion"). The Bankruptcy Court entered an order approving the relief requested in the Sale Motion on September 20, 2008 ("Sale Order").

4. Prior to the hearing on the Sale Motion, the Debtors' two contracts with AmEx were identified as "Closing Date Contracts" on the list ("Closing Date Contracts List") posted by the Debtors' claims agent on http://chapter11.epiqsystems.com/Lehman ("Lehman Website"). The Closing Date Contracts List contained proposed cure amounts for each contract. A true and correct copy of the Closing Date Contracts List is attached as Exhibit A.

5. Based on the direction in the Sale Order that consenting non-Debtor parties on the Closing Date Contracts List should provide notice of such consent in writing, I sent a letter on September 22, 2008 to Debtor's counsel, with courtesy copies to Barclays' counsel stating that AmEx consented to the proposed cure with respect to the AmEx Corporate Services Contract appearing on the Closing Date Contracts List ("First Consent Letter"). A true and correct copy of the First Consent Letter is attached as Exhibit B.

6. On September 23, 2008, I received an e-mail response to the First Consent Letter from Mr. Shai Waisman, Debtor's counsel, directing me to follow certain consent procedures

that were posted on the Lehman Website in the interim ("Internet Procedures"). A true and correct copy of the response from Debtor's counsel is attached as Exhibit C.

7. The Internet Procedures directed consenting parties to send a "Consent Form" via facsimile or overnight carrier to Barclays' counsel using a specific address/facsimile number. Although the Internet Procedures reference the "Consent Form" as being attached, such form was not actually attached to the Internet Procedures until September 26, 2008.

8. Based on Mr. Waisman's directions on September 23, 2008 to follow the Internet Procedures in order to consent to the proposed cure, I sent a second letter consenting to the proposed cure for the AmEx Corporate Services Contract on September 26, 2008 using the address and facsimile number posted on the Internet Procedures ("Second Consent Letter"). A true and correct copy of the Second Consent Letter is attached as Exhibit D.

9. Although the First Consent Letter was sufficient notice under the Sale Order to consent to the proposed cure, I nevertheless sent the Second Consent Letter to insure that my client was in technical compliance with the Internet Procedures as fully as possible and to protect my client's right to prompt payment of the appropriate cure.

10. While the Second Consent Letter was in the process of being drafted and approved by my client, the Internet Procedures were updated on the Lehman Website without notice to the parties in interest and not in conjunction with any order of the Bankruptcy Court. The revisions to the Internet Procedures included the addition of a "Consent Form" that the Internet Procedures required all consenting parties to use. Prior to the revisions, the "Consent Form" was referenced in the Internet Procedures, but not attached.

11. Once I became aware that the Internet Procedures had been updated and the "Consent Form" was posted on the Lehman Website, I transmitted a completed Consent Form

-3-

pursuant to the Internet Procedures ("<u>AmEx Consent Form</u>"). Again although the Second Consent Letter was sufficient notice under the Sale Order and the Internet Procedures to consent to the proposed cure, I nevertheless sent the AmEx Consent Form to insure that my client was in technical compliance with the Internet Procedures and to protect my client's right to prompt payment of the appropriate cure. A true and correct copy of the AmEx Consent Form is attached as <u>Exhibit E</u>.

12. During the time I was transmitting the various cure consents, I was also interacting via e-mail and telephone with Ms. Lindsee Granfield, Esq., who is one of Barclays' counsel in the above-captioned case, on multiple occasions between September 23 and 25, 2008. Our interactions involved the disagreement between AmEx and Barclays regarding the appropriate cure payment and our efforts to resolve that dispute. Ms. Granfield did not mention or imply at any point during those interactions that the assumption and assignment of the AmEx Corporate Services Contract was in any way a mistake. Our interactions centered on the appropriate cure amount for that contract.

13. Also during the time I was transmitting the various cure consents, I received a telephone call from Mr. Bryan Alter, in-house counsel for Barclays late in the afternoon of September 25, 2008. Mr. Alter explained that he was assisting Ms. Granfield with regard to the AmEx Corporate Services Contract. He said he wanted AmEx to know Barclays was working on the issue. We exchanged contact information via email and he said that he would be in touch with me in regards to AmEx. Mr. Alter did not mention that the assumption and assignment of the contract was in any way a mistake.

14. After I had sent the Second Consent Letter and transmitted the Consent Form, I received a response from Ms. Granfield via electronic mail ("First Granfield E-Mail Response") on September 29, 2008. The First Granfield E-Mail Response reads:

> Gene:
>
> I am sorry to bother you, but I am concerned that you and Amex did not understand what I told you the business day after you sent your original letter to Harvey Miller re Amex's contract. As I told you then, listing the Amex contract with a cure amount of $18million [sic] was a mistake. Therefore, Barclays cannot accept a cure form notice from Amex that trys [sic] to accept the amount that I told you prior to such attempted acceptance was a mistake. The business folks have got to talk and try to reach an agreed upon resolution. My understanding is that there has already been some contact. This is not meant to raise hackles at Amex, but the clients need to seek to resolve the issue.

First Granfield E-Mail Response, (emphasis added). A true and correct copy of the September 29, 2008 e-mail exchange among Ms. Granfield, Mr. Waisman and myself is attached as Exhibit F.

15. Based on the prior communications between Ms. Granfield and myself, and consistent with the language emphasized in the block quote above, I understood Ms. Granfield's position to be: (i) she had previously informed me that the $18 million proposed cure amount was a "mistake" according to Barclays, and (ii) that she took exception to my filing of consents to the full proposed cure amount.

16. Nothing in Ms. Granfield's response indicated to me that Barclays believed the assumption and assignment of the AmEx Corporate Services Contract was in any way a mistake. I interpreted Ms. Granfield's response to indicate that Barclays believed there was a dispute between the parties about the appropriate cure amount and that Barclays took exception to AmEx filing consents to the full cure amount with knowledge that the parties were in disagreement over such amount. Ms. Granfield said she wanted business people at our respective clients to work

-5-

out a resolution and that she did not want any of the lawyers taking formal action in the bankruptcy case while the direct client-to-client communications were on-going. In fact, the First Granfield E-Mail Response stated that the "business folks have got to talk" and "there has already been some contact" and "the clients need to seek to resolve the issue," which is consistent with the previous communications among the parties.

17. My transmission of the Second Consent Letter and the AmEx Consent Form was not intended to provoke Ms. Granfield or Barclays in any way. I transmitted the First Consent Letter, the Second Consent Letter and the AmEx Consent Form to remain in technical compliance with the Sale Order and the Internet Procedures, which had been modified without notice over the course of the week.

18. Additionally, since the amount of the proposed cure approximated AmEx's calculation of the amount outstanding under the AmEx Corporate Services Contract at the time and since the contract was a single integrated agreement, AmEx is entitled to payment of the entire proposed cure, notwithstanding Barclays' protestations that it was only responsible for curing a subset of the Debtor's obligations under the contract. I, therefore, transmitted the three consents to preserve and protect my client's rights while the parties worked to resolve their dispute over the appropriate cure amount.

19. Based on Barclays' continued unwillingness to pay the proposed cure amount for the AmEx Corporate Services Contract, I forwarded the First Granfield E-Mail Response to Mr. Waisman (with a courtesy copy to Ms. Granfield) and inquired as to whether the Debtor would make up any shortfall between what Barclays would potentially pay and the proposed cure. See Exhibit F.

20.     Ms. Granfield promptly replied again ("Second Granfield E-Mail Response"). See Exhibit F. I understood the Second Granfield E-Mail Response merely reiterated the points she made in the First Granfield E-Mail Response. Once again, Ms. Granfield referenced "decisions out of Barclays and/or discussion going between the business people." Nothing in the First Granfield E-Mail Response or the Second Granfield E-Mail Response stated that Barclays believed the assumption and assignment of the AmEx Corporate Services Contract was in any way a mistake. The only expressed dispute raised by Barclays remained the appropriate amount of the required cure.

21.     After all the cure consents had been transmitted, I received a telephone call from Mr. Jason White, one of Barclays' in-house counsel, during the evening of October 1, 2008 informing me that Barclays intended to amend the Closing Date Contracts List to exclude the AmEx Corporate Service Contract and the AmEx Travel Contract. Mr. White informed me that, based on this revision, Barclays would consider both contracts as having been rejected.

22.     I expressed to Mr. White my surprise at Barclays' apparent change in position, noting that no one had ever contacted me about actually moving forward with any meaningful negotiation. Mr. White informed me that Barclays had determined to "go in another direction," that Barclays no longer wanted to continue a business relationship with AmEx and that Barclays has decided to reject the two AmEx contracts for business reasons. Mr. White was not at liberty to disclose what business person or business people at Barclays had made this decision. At no time did Mr. White state or imply that the assumption and assignment of the AmEx Corporate Services Contract was in any way a mistake.

[SIGNATURE ON FOLLOWING PAGE]

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 27, 2008

Eugene J. Chikowski, Esquire
FLASTER/GREENBERG P.C.
1628 John F. Kennedy Blvd.
Philadelphia, PA 19103

- 8 -

# Exhibit D

# (Filed Under Seal)

# Exhibit E

# (Filed Under Seal)

# Exhibit F
# (Filed under Seal)

# Exhibit G

# ALLEN & OVERY

Rebecca Reilly
Dewey & LeBoeuf LLP
1301 Avenue of the Americas
New York, NY 10019

Allen & Overy LLP
1221 Avenue of the Americas
New York NY 10020

Tel        212 610 6300
Fax        212 610 6399
Direct line  212 756 1144
Laura.Martin@allenovery.com

Our ref    35448-03874 NY:8004676.2

February 4, 2009

**In re Lehman Brothers Holdings Inc., No. 08-13555**

Dear Rebecca:

I am writing to notify you that certain portions of the following documents were inadvertently produced in Barclays' production of January 26, 2009: Barclays-AMEX001020-24, Barclays-AMEX001262 and Barclays-AMEX003481-86.

Pursuant to ¶ 3 of the Stipulated Protective Order, this inadvertent production does not operate as a waiver of any privileges and no use shall be made of these materials.

We are enclosing a CD that contains redacted versions of the inadvertently-produced documents, which have been assigned replacement Bates numbers.

Please confirm that you have received this notice, and that the inadvertently-produced documents will not be used and will be replaced with the enclosed replacement documents.

Truly yours,

Laura Martin

Copy    Irena Goldstein
        Donna Gordon
        Michael Feldberg

Allen & Overy LLP is a limited liability partnership registered in England and Wales with registered number OC306763. It is regulated by the Solicitors Regulation Authority of England and Wales. Allen & Overy LLP is a multi-jurisdictional law firm with lawyers admitted to practice in a variety of jurisdictions. A list of the members of Allen & Overy LLP and their professional qualifications is open to inspection at its registered office, One Bishops Square, London, E1 6AD and at the above address. The term partner is used to refer to a member of Allen & Overy LLP or an employee or consultant with equivalent standing and qualifications.

Allen & Overy LLP or an affiliated undertaking has an office in each of: Abu Dhabi, Amsterdam, Antwerp, Bangkok, Beijing, Bratislava, Brussels, Bucharest (associated office), Budapest, Dubai, Düsseldorf, Frankfurt, Hamburg, Hong Kong, London, Luxembourg, Madrid, Mannheim, Milan, Moscow, Munich, New York, Paris, Prague, Riyadh (associated office), Rome, São Paulo, Shanghai, Singapore, Tokyo and Warsaw.

# Exhibit H

# (Filed Under Seal)

# Exhibit I
# (Filed under Seal)