Hearing Date and Time: March 11, 2009 at 10:00 a.m. (Prevailing Eastern Time)
Objection Date and Time: March 6, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
: 
**In re** : Chapter 11 Case No.
 : 
**LEHMAN BROTHERS HOLDINGS INC.**, *et al.*, : 08-13555 (JMP)
 : 
Debtors. : (Jointly Administered)
 : 
------------------------------------------------------------------x

**NOTICE OF MOTION PURSUANT TO SECTION 345(b) OF
THE BANKRUPTCY CODE FOR AUTHORITY TO (I) MAINTAIN,
CLOSE, AND OPEN NEW BANK ACCOUNTS LOCATED AT
UNAUTHORIZED DEPOSITORIES AND BANK ACCOUNTS LOCATED
AT UNITED STATES TRUSTEE AUTHORIZED DEPOSITORIES,
(II) IMPLEMENT INVESTMENT GUIDELINES, AND (III) TO THE EXTENT
NECESSARY, A WAIVER OF SECTION 345(b) OF THE BANKRUPTCY CODE**

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated as of February 25, 2009 (the "Motion"), of Lehman Brothers Holdings Inc. and its affiliated debtors in the above-referenced chapter 11 cases (together, the "Debtors"), pursuant to section 345(b) of title 11 of the United States Code, for authority to (i) maintain, close and open new bank accounts located at unauthorized depositories and bank accounts located at United States Trustee authorized depositories, (ii) implement investment guidelines, and (iii) to the extent necessary, a waiver of section 345(b) of the Bankruptcy Code, all as more fully described in the Motion, will be held before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States Bankruptcy Court, Alexander Hamilton Customs House, Courtroom 601, One Bowling Green, New York, New York 10004 (the "Bankruptcy Court"), on **March 11, 2009 at 10:00 a.m. (Prevailing Eastern Time)** (the "Hearing").

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion shall be in writing, shall conform to the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the Local Rules of the Bankruptcy Court for the Southern District of New York, shall set forth the name of the objecting party, the basis for the objection and the specific grounds

thereof, shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (which can be found at www.nysb.uscourts.gov) by registered users of the Bankruptcy Court's case filing system and by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format (with two hard copies delivered directly to Chambers), and shall be served upon: (i) the chambers of the Honorable James M. Peck, One Bowling Green, New York, New York 10004, Courtroom 601; (ii) Weil Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Richard P. Krasnow, Esq., Lori R. Fife, Esq., Shai Y. Waisman, Esq., and Jacqueline Marcus, Esq., attorneys for the Debtors; (iii) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), 33 Whitehall Street, 21st Floor, New York, New York 10004 Attn: Andy Velez-Rivera, Esq., Paul Schwartzberg, Esq., Brian Masumoto, Esq., Linda Riffkin, Esq., and Tracy Hope Davis, Esq.; (iv) Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attn: Dennis F. Dunne, Esq., Dennis O'Donnell, Esq., and Evan Fleck, Esq., attorneys for the Official Committee of Unsecured Creditors appointed in these cases; and (v) any person or entity with a particularized interest in the Motion, so as to be so filed and received by no later than **March 6, 2009 at 4:00 p.m. (prevailing Eastern Time)**.

PLEASE TAKE FURTHER NOTICE that if an objection to the Motion is not received by the Objection Deadline, the relief requested shall be deemed unopposed, and the Bankruptcy Court may enter an order granting the relief sought without a hearing.

PLEASE TAKE FURTHER NOTICE that objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: February 25, 2009
    New York, New York

                                            /s/ Richard P. Krasnow
                                            Richard P. Krasnow
                                            Shai Y. Waisman

                                            WEIL, GOTSHAL & MANGES LLP
                                            767 Fifth Avenue
                                            New York, New York 10153
                                            Telephone: (212) 310-8000
                                            Facsimile: (212) 310-8007
                                            Attorneys for Debtors
                                            and Debtors in Possession

Hearing Date and Time: March 11, 2009 at 10:00 am (Prevailing Eastern Time)
Objection Date and Time:  March 6, 2009 at 4:00 p.m. (Prevailing Eastern Time)

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Richard P. Krasnow
Shai Y. Waisman

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
                                                       :
In re                                                  :    Chapter 11 Case No.
                                                       :
LEHMAN BROTHERS HOLDINGS INC., et al.,                 :    08-13555 (JMP)
                                                       :
                        Debtors.                       :    (Jointly Administered)
                                                       :
-----------------------------------------------------------------x
```

**MOTION PURSUANT TO SECTION 345(b) OF THE BANKRUPTCY CODE FOR
AUTHORITY TO (I) MAINTAIN, CLOSE, AND OPEN NEW BANK ACCOUNTS
LOCATED AT UNAUTHORIZED DEPOSITORIES AND BANK ACCOUNTS
LOCATED AT UNITED STATES TRUSTEE AUTHORIZED DEPOSITORIES,
(II) IMPLEMENT INVESTMENT GUIDELINES, AND (III) TO THE EXTENT
NECESSARY, A WAIVER OF SECTION 345(b) OF THE BANKRUPTCY CODE**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as debtors and debtors in possession (together, the "Debtors" and, collectively with their non-debtor affiliates, "Lehman"), respectfully represent:

**Preliminary Statement**

1.    Since the Commencement Date, the Debtors and their professionals have been working diligently to come into compliance with the requirements under section 345 of the Bankruptcy Code and the guidelines ("UST Guidelines") of the office of the United States

Trustee for the Southern District of New York (the "U.S. Trustee") by (i) closing deposit accounts at banks that are not recognized as authorized depositories ("Unauthorized Depositories"), (ii) transferring the funds from these accounts to newly established accounts at banks that are recognized by the U.S. Trustee as authorized depositories ("Authorized Depositories"), (iii) working to ensure that the Authorized Depository banks will not setoff their claims against the deposits in these accounts, and (iv) analyzing a range of investments that are fully backed by the United States government or that have an acceptable risk but also provide the Debtors with a reasonable return on such investments.

2. As an international investment bank, the Debtors regularly purchased and sold assets and transacted other business around the world. They funded these transactions and deposited the proceeds thereof into various deposit accounts established with domestic and foreign financial institutions. The Debtors continue to receive remittances in foreign currencies and incur operating expenses and other transactions cost in foreign countries that are payable in local currency. The Debtors propose to maintain these accounts for the purpose of funding these expenses and to avoid possible adverse tax consequences and the cost associated with converting the currencies into U.S. dollars and then back into local currency. The Debtors are seeking the Court's authorization to maintain these accounts while the Debtors wind-down their affairs abroad and convert and repatriate the foreign currencies when such accounts are not necessary for the operation of their businesses. The remainder of the Debtors' deposit accounts are located at Authorized Depositories and the Debtors are seeking the Court's approval to maintain, close, and open these accounts.

3. Now that the Debtors' operations are stabilized, they propose to implement investment guidelines to invest their excess cash resulting from the operation of their

businesses, various asset sales, and other transactions since the commencement of these chapter 11 cases. In discussions with representatives of the United States Trustee, the Debtors explored various types of investments for their excess cash that aim to comply with the Bankruptcy Code or properly balance the tension between maximizing returns and minimizing risk. Accordingly, the Debtors seek authorization to implement investment guidelines as set forth below.

## Background

4. Commencing on September 15, 2008 and periodically thereafter (as applicable, the "Commencement Date"), LBHI and certain of its subsidiaries commenced with this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. On September 17, 2008, the U.S. Trustee appointed the statutory committee of unsecured creditors pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee").

6. On September 19, 2008, a proceeding was commenced under the Securities Investor Protection Act of 1970 ("SIPA") with respect to Lehman Brothers Inc. ("LBI"). A trustee appointed under SIPA is administering LBI's estate.

7. On January 19, 2009, the U.S. Trustee appointed Anton R. Valukas as examiner in the above-captioned chapter 11 cases (the "Examiner"). By order dated January 20, 2009 [Docket No. 2583], the Court approved the U.S. Trustee's appointment of the Examiner.

**Jurisdiction**

8.    This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

**Lehman's Business**

9.    Prior to the events leading up to these chapter 11 cases, Lehman was the fourth largest investment bank in the United States.  For more than 150 years, Lehman has been a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients and individuals worldwide.

10.    Additional information regarding the Debtors' businesses, capital structures, and the circumstances leading to the commencement of these chapter 11 cases is contained in the Affidavit of Ian T. Lowitt Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York in Support of First-Day Motions and Applications, filed on September 15, 2008 [Docket No. 2].

**Relief Requested**

11.    By this Motion, pursuant to section 345(b) of the Bankruptcy Code, the Debtors are seeking authority (i) to maintain, close, and open new (a) bank accounts not located at U.S. Trustee authorized depositories (the "Unauthorized Depository Accounts") and (b) bank accounts located at U.S. Trustee authorized depositories (the "Authorized Depository Accounts"), (ii) to implement investment guidelines (the "Investment Guidelines"), and (iii) if necessary, a waiver of section 345(b) of the Bankruptcy Code to the extent any of the foregoing is not in compliance with section 345.  Schedules of the Debtors' existing Unauthorized Depository Accounts, Authorized Depository Accounts, and Investment Guidelines are annexed hereto as Exhibit A, Exhibit B, and Exhibit C, respectively.

**The Debtors' Bank Accounts**

12. In the ordinary course of business prior to the Commencement Date, Lehman utilized a centralized cash management system (collectively, the "Cash Management System")[1] to collect and transfer funds generated by their operations and disburse those funds to satisfy the obligations required to operate their various businesses. The Cash Management System facilitated Lehman's cash monitoring, forecasting, and reporting, while ensuring compliance with various regulatory requirements. In connection with the Cash Management System, the Debtors maintained control over the administration of their deposit accounts located at the banks set forth in the Debtors' motion for approval of their Cash Management System.

13. LBHI historically acted essentially as a central banker for Lehman, aggregating excess cash for investment and advancing money to certain subsidiaries to cover shortfalls, primarily through its main prepetition operating accounts. Not all of LBHI's subsidiaries operated under the Cash Management System. Some of the Lehman subsidiaries were less integrated and relied on LBHI only on occasion, while others that operated under the Cash Management System were highly integrated into such system and dependant on LBHI. Pursuant to an order, dated November 6, 2008 [Docket No. 1416] (the "Cash Management Order"), the Court approved the continuation of the Debtors' Cash Management System and extended the Debtors time to comply with section 345(b) of the Bankruptcy Code and the UST Guidelines or to make such other arrangements as agreed with the U.S. Trustee.[2]

---

[1] Lehman's Cash Management System is described in greater detail in the motion for approval of the Debtors' Cash Management System [Docket No. 669] and the supplement thereto [Docket No. 826] (together, the "Cash Management Motion").

[2] Pursuant to an order, dated January 15, 2009 [Docket No. 2551], the Court granted a further extension of the Debtors' time to comply with section 345(b) of the Bankruptcy Code and UST Guidelines, or have made other arrangements acceptable to the U.S. Trustee and this Court.

14.     After the Commencement Date and the entry of the Cash Management Order, the Debtors continued their prepetition cash management practices in accordance with the Cash Management Order given the inefficiencies that would have been caused by immediately changing or establishing a new system that would administer billions of dollars on a world-wide basis.  Since the entry of the Cash Management Order, however, the Debtors have engaged in a thorough analysis of their cash management system to determine what modifications would be necessary for the Debtors to bring their current deposit account arrangements in compliance with section 345(b) of the Bankruptcy Code, and whether they might require a waiver from the Court to the extent such accounts are not in compliance.  The Debtors' proposals in that regard, as set forth below, are the result of this analysis.

A.     The Unauthorized Depository Accounts

15.     Immediately after the Commencement Date, the world-wide Lehman enterprise has undergone substantial changes.  A week after the commencement of LBHI's chapter 11 case, LBHI and LBI sold the North American broker dealer business, the corporate headquarters on Seventh Avenue, and other related assets to Barclays Capital Inc..  In the months that followed, the Debtors sold their interests in R3, Eagle Energy, the Investment Management Division as well as other assets.  During this time, over seventy foreign insolvency proceedings were commenced against certain of LBHI foreign subsidiaries.

16.     As a result of these events, the Debtors and their U.S. and foreign non-Debtor affiliates have been required to commence the wind-up of certain businesses and the sale of assets located in the U.S. and abroad.  Notwithstanding these activities, the Debtors and their U.S. and foreign non-Debtor affiliates continue to transact business in foreign jurisdictions around the world.  In these situations, the Debtors and their U.S. and foreign non-Debtor

affiliates are required to satisfy payroll, operating expenses, and other transaction costs arising from these day-to-day activities in local currency and through local financial institutions.

17.    As of the date hereof, the Debtors maintain approximately $820 million in Unauthorized Depository Accounts. As reflected on Exhibit A, the majority of these accounts are denominated in foreign currencies and deposited with foreign banks. The Debtors are in the process of closing and repatriating the funds in the other Unauthorized Accounts that are denominated in U.S. dollars. It would be costly, inefficient, and could subject the Debtors to certain adverse tax consequences without due consideration as to timing and reason for the repatriation if the Debtors were required immediately to convert the currencies in Unauthorized Depository Accounts and repatriate them to the Debtors' Authorized Depositories located in the U.S. In addition, if all of the Debtors' excess cash were solely in United States currency, then each time the Debtors were required to satisfy the payroll for employees hired in the United Kingdom, Hong Kong, and India to assist in unwinding their estates, they would have to covert their U.S. currency into the local currency and absorb the loss associated with a subsequent conversion. As discussed in more detail in the Cash Management System Motion, some of the Debtors' most valuable assets are their equity interests in their subsidiaries. If the subsidiaries are not funded and cannot satisfy their ordinary course operating expenses in a timely manner, there is a strong likelihood that they will decrease in value, to the detriment of the Debtors' estates and all stakeholders in these chapter 11 cases.

18.    Given these circumstances,, the Debtors request authorization to maintain, close, and open new Unauthorized Depository Accounts as the Debtors determine is necessary in their sole discretion, so the Debtors may both fund their payroll, operating expenses, and other transaction costs, as well as continue to receive payment from counterparties in the currency of

the underlying transactions. As the Debtors wind down their affairs in these locations, they will endeavor to close the Unauthorized Depository Accounts and convert and repatriate the foreign currencies into accounts located at Authorized Depositories. The Debtors believe that the funds deposited in the Unauthorized Depositories are reasonably secure because the bulk of the Debtors' foreign Unauthorized Depository Accounts are located at major financial institutions operating in these countries (including foreign branches of Authorized Depositories). Accordingly, the risk associated with maintaining these accounts is outweighed by the benefits discussed above.

B.      Authorized Depositories

19.     For cash that is deposited with a bank that exceeds the guarantees provided by the United States and its various agencies and instrumentalities, section 345(b) of the Bankruptcy Code requires a debtor to obtain a bond and an undertaking from a corporate surety from the bank holding a debtor's cash deposits unless such bank is an U.S. Trustee Authorized Depository. The U.S. Trustee has published a list of Authorized Depositories and since the Commencement Date, the Debtors have been actively engaged in discussions with certain of these banks to establish accounts for the deposit of the Debtors' cash.

20.     One of the complicating factors in establishing accounts at Authorized Depositories has been that, as a leading worldwide investment bank, Lehman had relationships with virtually every major financial institution in the world. As a result of the commencement of these chapter 11 cases, many banks now assert claims against the Debtors and, therefore, may assert, and in some cases have asserted, setoff rights against any cash deposited by the Debtors. As such, the Debtors can only deposit their cash in U.S. Trustee Authorized Depositories that either (i) have no historical relationship with Lehman or (ii) agree not to setoff against the

Debtors deposits. Taking the foregoing criteria into consideration, including the ability to post collateral for very large deposits, there currently exist only a handful of banks that are available to the Debtors.

21. The Debtors have acted quickly to move their cash deposits to banks that did not have prepetition claims against the Debtors (or relatively small amount of claims) and as such could not assert excessive setoff rights against the Debtors' cash deposits. Since then, and with the benefit of time afforded under the Cash Management Order and the subsequent extensions, the Debtors have identified eligible banks and reached "no setoff" agreements with certain other Authorized Depositories and have established various accounts in the Debtors' names.

22. As of the date hereof, the Debtors maintain in excess of $6 billion in Authorized Depositories. These accounts will enable the Debtors to increase the control and flexibility over their deposits with these banks just as they have with their current bank depositories and aid in the efficient administration of these chapter 11 cases. Moreover, having accounts with more than one Authorized Depository will help diversify their cash deposits and broaden the range of services and investment opportunities available, which in the end will inure to the benefit of all stakeholders in these chapter 11 cases. Accordingly, the Debtors are seeking approval to maintain, close, and open new Authorized Depository Accounts as the Debtors determine is necessary in their sole discretion.

**The Debtors Investment Guidelines**

23. Lehman historically deposited its excess cash nightly in various domestic and overseas investment accounts with banks in the United States and around the world. Immediately after the commencement of these chapter 11 cases, the Debtors discontinued most

of their various investment activities. Now that the Debtors' operations have been stabilized, they intend to resume their investments activities with their excess cash to maximize the value thereon for the benefit of these estates while at the same time taking into account the risk associated with such investments.

24. Since the Commencement Date, the Debtors and their professionals have been working diligently to maximize the value of the Debtors' estates. The Debtors have executed several asset sales, collected settlement payments from counterparties that have terminated certain in-the-money derivative contracts, and have engaged in various other activities that each have generated a substantial amount of cash. As noted above, the flow of money into the Debtors' estates from these and other activities has resulted in a current cash balance that exceeds $6 billion. Given the Debtors' sizeable cash position and the likelihood that more funds will continue to be generated, the Debtors seek authority to invest their excess cash in investments that are fully backed by the United States government or those that have an acceptable risk and also provide the Debtors with a reasonable return on such investments.

25. Nearly all of the Debtors' various Authorized Depository Accounts are demand deposit accounts. These accounts are currently fully guaranteed regardless of the amount on deposit. The funds, however, are not earning interest. Unlike demand deposit accounts, interest bearing accounts are not fully guaranteed by the U.S. government. Given the constraints under section 345 of the Bankruptcy Code and the UST Guidelines, unless the depository bank has a sufficient amount of capital or posts sufficient collateral, the Debtors cannot keep cash in interest bearing accounts. Currently, only one of the Debtors' Authorized Depositories has agreed to post sufficient collateral that will allow the Debtors to deposit their

excess cash in interest bearing accounts. The other banks either do not have sufficient capital or are unwilling to post collateral.

26. Considering the volatility of the international investment markets and the requirements under section 345 of the Bankruptcy Code and the UST Guidelines, the Debtors have carefully scrutinized a number of potential investments and have determined, in the exercise of their business judgment, that it is in the best interest of the Debtors, their estates, and all creditors to invest their excess cash consistent with the proposed Investment Guidelines described herein.

A. <u>United States Guaranteed Investments</u>

27. The Debtors proposed to invest their excess cash in direct obligations of the U.S. government. These investment will include the direct purchase of bills, bonds, notes, and other obligations issued by the United States Federal Treasury. The Debtors also intend to invest their excess cash in Federal agency securities. These investments include indirect obligations of the U.S. Government, such as "Freddie Mac" and "Ginnie Mae."

28. This will provide the greatest amount of return for the Debtors while taking into account the safety of the investments. Moreover, investments in U.S. agency securities are fully guaranteed by the U.S. Government and are in full compliance with section 345 of the Bankruptcy Code. Accordingly, the Debtors are seeking authorization to implement these investments.

B.  <u>Treasury Based Money Market Funds</u>

29. The Debtors propose to invest their excess cash in U.S. Treasury based money market funds. Treasury-based money market funds are investment funds that invest in the U.S. government securities described above.

30. The money market funds are not insured by the U.S. government or the Federal Deposit Insurance Corporation because the investment is in the fund itself, rather than with the U.S. government or federal agency. Because investments in treasury-based money market funds are not in strict compliance with section 345 of the Bankruptcy Code or directly guaranteed by the U.S. government, the Debtors are seeking a waiver of the requirements under section 345(b) of the Bankruptcy Code. The Debtors believe the treasury-based money market funds are safe because the money market fund's value is based solely on U.S. government obligations that are fully guaranteed. Thus, as long as the U.S. government continues to back the underlying securities, the funds should not fail.

31. In addition to the low risks, there are other benefits that flow from the investment in treasury-based money market funds. Unlike "T-bills" or other direct obligations of the U.S. Treasury, the Debtors will have the ability to invest and manage these funds online. This will provide the Debtors with unlimited discretion to redeem their investments in these funds on a daily basis. These investments eliminate the intermediary required with brokerage accounts and reduce transactions costs.

C.  <u>Foreign Investments</u>

32. The Debtors propose to invest the excess cash in their foreign Unauthorized Depository Accounts in low-risk investments such as securities issued by foreign governments, interest bearing accounts, bank-issued certificates of deposit, or funds similar to

the treasury-based money market funds described herein. As noted above, the Debtors need to maintain their foreign currency accounts for the purpose of payroll, operating expenses, and other transaction costs incurred and when receiving foreign currency remittances Thus, the Debtors seek authority to invest overseas temporarily to generate a return on the cash the Debtors need to keep abroad. These investments will allow the Debtors to maximize value for their estates while they wind-down their affairs abroad and eventually repatriate the balance of these funds to Authorized Depositories.

33.  Because these foreign investments are not in strict compliance with section 345 of the Bankruptcy Code or directly guaranteed by the U.S. government, the Debtors are seeking a waiver of the requirements under section 345(b) of the Bankruptcy Code.

**Cause Exists to Authorize Debtors To Maintain, Close, And Open New Accounts At Unauthorized And Authorized Depositories And Approve The Investment Guidelines**

34.  Section 345 of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes deposits or investments of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11 U.S.C. § 345(a) (2000). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain from the entity with which the money is deposited or invested a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303 (2000). Section 9303 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may provide a governmental obligation. 31 U.S.C. § 9303 (2000).

35. The deposit and investment of cash in strict compliance with the requirements of section 345(b) of the Bankruptcy Code would, in large cases such as these, be inconsistent with section 345(a), which permits a debtor in possession to make such investments of money of the estate "as will yield the maximum reasonable net return on such money." 11 U.S.C. § 345(a). Thus, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) of the Bankruptcy Code to provide that its strict investment requirements may be waived or modified if the Court so orders "for cause." 140 Cong. Rec. H 10,767 (Oct. 4, 1994), 1994 WL 545773.

36. The Debtors believe that the Investment Guidelines provide the protection contemplated by section 345(b) of the Bankruptcy Code. The Investment Guidelines permit the Debtors to make investments that will provide the greatest amount of return for the Debtors' estates while at the same time taking into account the risk associated with those investments. Further, the Investment Guidelines limit the Debtors from investing too large of a percentage of their total assets with any one issuer or in any one industry.

37. Strict compliance with the requirements of section 345 of the Bankruptcy Code would not be practical in these chapter 11 cases. The treasury-based money-market funds are highly unlikely to fail and subject to little risk because the underlying securities are fully backed by the U.S. government. The treasury-based money market funds will also allow the Debtors a greater return through the elimination of intermediaries that would be required if they were only permitted to invest in U.S. government securities.

38. The Debtors believe that the benefits of the relief requested herein outweigh any harm to the estate. *See generally In re Serv. Merchandise Co., Inc.*, 240 B.R. 894 (Bankr. M.D. Tenn. 1999) (noting that some of the factors to consider in determining whether

cause exists "for relief from the strictures of § 345(b)" is whether benefits to the debtors outweigh the harm, if any, to the estate). It has been a time consuming process for the Debtors to establish their control over Unauthorized Depository Accounts and to open new Authorized Depository Accounts and to develop the proposed Investment Guidelines. Now that these endeavors are complete they will yield substantial benefit to the estates and all stakeholders in these chapter 11 cases.

39. Upon the commencement of new chapter 11 cases of the Debtors' affiliates, the Debtors will file a notice with the Court that supplements the bank account information set forth on Exhibit A and Exhibit B.

40. For the reasons stated herein, the Debtors submit that ample cause exists to grant the Motion.

**Notice**

41. No trustee has been appointed in these chapter 11 cases. The Debtors have served notice of this Motion in accordance with the procedures set forth in the order entered on February 13, 2009 governing case management and administrative procedures for these cases [Docket No. 2837] on (i) the U.S. Trustee; (ii) the attorneys for the Creditor's Committee; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases. The Debtors submit that no other or further notice need be provided.

42. Other than the motion requesting approval of the Cash Management System and the motion requesting an extension of the Debtors' time to comply with section

345(b) of the Bankruptcy Code and UST Guidelines, no previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as it deems just and proper.

Dated: February 25, 2009
      New York, New York

/s/ Richard P. Krasnow
Richard P. Krasnow
Shai Y. Waisman

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession