SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Douglas P. Bartner (DB-2301)
Brian H. Polovoy (BP-4723)
Solomon J. Noh (SN-0992)

Attorneys for Plaintiff Nomura Global Financial Products Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
:
In re:                                              : Chapter 11
:
LEHMAN BROTHERS HOLDINGS INC., *et al.*,            : Case No. 08 – 13555 (JMP)
:
              Debtors.                : (Jointly Administered)
:
------------------------------------------------------------x
:
NOMURA GLOBAL FINANCIAL PRODUCTS           :
INC.,                                               :
:
              Plaintiff,              :
:
     - against –                                  : Adv. Proc. No. _____
:
LEHMAN BROTHERS SPECIAL FINANCING          :
INC. AND LEHMAN BROTHERS INC.,             :
:
              Defendants.             :
:
------------------------------------------------------------x

## COMPLAINT

Plaintiff NOMURA GLOBAL FINANCIAL PRODUCTS INC. ("Nomura"), for its complaint against Defendants LEHMAN BROTHERS SPECIAL FINANCING INC. ("LBSF") and LEHMAN BROTHERS INC. ("LBI"), alleges through its undersigned counsel as follows:

## Nature of This Action

1. This is an action seeking recovery of payments erroneously made by Nomura to LBSF in the amount of EUR 58,047,522.80, which amounts currently reside in LBI's bank account. These payments were made in error because the agreement providing for such payments had terminated by virtue of the bankruptcy filing of LBSF's "Credit Support Provider," Lehman Brothers Holdings Inc. ("LBHI") shortly before the payments were made.

2. Nomura promptly pursued LBSF to correct the error, but LBSF has given Nomura the runaround. LBSF first told Nomura that it was not sure if Nomura's funds – which were wired to a London account – were in London or in New York. Nomura filed an application in London to freeze its funds. Moments before the London court hearing, however, LBSF said that in fact the funds were in New York. Nomura adjourned the London proceeding and promptly filed suit in New York and obtained a temporary restraining order. In response, LBSF changed its story again and said the funds were in London. Then, on October 3, 2008, LBSF filed for bankruptcy.

3. In an attempt to recover the mistaken payments without litigation, Nomura had several conversations with LBSF following its bankruptcy filing. LBSF directed Nomura to instead pursue LBI, which had acted as clearing agent for LBSF in its business dealings with Nomura, and therefore was and remains in possession of the mistaken payments.

4. At LBSF's request, Nomura approached counsel to the trustee appointed in LBI's liquidation proceeding to demand the return of the mistaken payments. LBI's counsel agreed to consider Nomura's request. For nearly three months, in response to countless requests from Nomura for follow-up, LBI said it was deliberating on Nomura's request. LBI now tells Nomura that it should direct its demand for return of the mistaken payments to LBSF.

5. Having exhausted its attempts to resolve this matter without litigation, Nomura hereby commences this adversary proceeding against LBSF and LBI to recover the mistaken payments.

## Jurisdiction and Venue

6. This adversary proceeding (this "Adversary Proceeding") is brought pursuant to section 105 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 7001 of the Federal Rules of Bankruptcy Procedure.

7. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

8. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

9. Venue is proper in this district under 28 U.S.C. § 1409(a).

## The Parties

10. Plaintiff Nomura is a corporation organized under the laws of Delaware, with its principal business address at 2 World Financial Center, Building B, New York, New York 10281-1198.

11. Upon information and belief, Defendant LBSF is a corporation organized under the laws of Delaware, with its former principal business address at 745 Seventh Avenue, New York, New York 10019 and its current principal business address at 1271 Avenue of the Americas, 45th Floor, New York, New York 10020.

12. Upon information and belief, Defendant LBI is a corporation organized under the laws of Delaware, with its principal business address at 745 Seventh Avenue, New York, New York 10019.

**Statement of Facts**

A.   **The Master Agreement**

13.   On November 1, 2001, Nomura and LBSF entered into an International Swap Dealers Association, Inc. ("ISDA") Master Agreement and Credit Support Annex ("CSA"; together with ISDA, the "Master Agreement") to govern a series of swap transactions the parties would subsequently enter into.

14.   The Master Agreement sets forth the terms and conditions of swap transactions between Nomura and LBSF, including the timing of any payments owed by either party pursuant to any particular swap transaction and the circumstances constituting an event of default.

15.   Specifically, under the CSA, each party was required to make in-kind or cash payments to secure its obligations to the other party in connection with the swap transactions.  (Master Agreement § 2(a); CSA ¶ 2.)  When a transaction resulted in one party (the "Transferor") being obligated to make a net payment to the other party (the "Transferee"), the CSA required the Transferor to make an in-kind or cash payment to the Transferee in an amount determined by the provisions of the CSA and designed to correspond to the Transferee's aggregate net exposure (within certain limits and thresholds) based on the particular swap transaction.  (CSA ¶¶ 2(a); 11.)

16.   Under the Master Agreement, an "Event of Default" with respect to a party occurs when, among other things, any "Credit Support Provider" for either party "institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding up or liquidation" or "seeks or becomes subject to

4

the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets." (Master Agreement, § 5(a)(vii)(4) and (6).)

17. Because the "Automatic Early Termination" provisions of the Master Agreement apply by virtue of Section 1(e) of the Schedule to the Master Agreement, an "Early Termination Date in respect of all outstanding Transactions will occur *immediately* upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), [and] (6)…, and *as of the time immediately preceding* the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4)…." (Master Agreement § 6(a) (emphasis added).)

B.  **The September 15, 2008 Event of Default and Automatic Early Termination**

18. Very early in the morning of September 15, 2008, LBHI filed a petition in the United States Bankruptcy Court for the Southern District of New York seeking relief under Chapter 11 of the Bankruptcy Code (the "Filing").

19. Pursuant to the Schedule to the Master Agreement, LBHI is designated as Credit Support Provider to LBSF. (Master Agreement § 14; Schedule to the Master Agreement at Part 4(g).)

20. Accordingly, the Filing constituted an Event of Default under Section 5(a)(vii)(4) and/or (6) of the Master Agreement. Each of LBSF and LBHI became a Defaulting Party and an Automatic Early Termination occurred. (Master Agreement, § 6(a).) As a result, an Early Termination Date in respect of all outstanding transactions occurred as of the time immediately preceding the Filing.

5

**C.     Payments**

21.    Because all of the transactions under the Master Agreement terminated immediately upon Automatic Early Termination, there was, under the terms of the Master Agreement, no longer any obligation on Nomura to make payments under the Master Agreement or any swap transaction executed thereunder, and no entitlement of LBSF to receive any payments. (Master Agreement §§ 2(a) and 6(c)(ii).)

22.    However, by virtue of pre-matching processes put in place within Nomura on Wednesday, September 10, 2008 and Thursday September 11, 2008, nine payments were released for transfer from Nomura's bank, Bank of America N.A., to an account in the name of LBI at Citibank N.A. in London, on September 15, 2008, *after* the Filing (the "Payments"). This is the account Nomura had been instructed to use to make payment of any sums owing to LBSF.

23.    The Payments were in the following amounts:

| Nomura payment instruction reference | Sum in Euros |
| --- | --- |
| BYHDYTSX | 12,286,126.67 |
| BYHF25VQ | 12,286,126.67 |
| BYHDF1HW | 6,379,335.00 |
| BYHDJDKP | 6,190,317.67 |
| BYHDMRMH | 6,143,063.33 |
| BYHDR3P9 | 6,143,063.33 |
| BYHDVGR3 | 6,143,063.33 |

| | |
|---|---|
| BHJMJM0R | 1,300,511.52 |
| BYHN6QPY | 1,175,915.28 |
| **Total** | **58,047,522.80** |

24.     The Payments were made in error.  Because they were not made pursuant to any contractual or other obligation, LBSF was not entitled to them.

**D.     Nomura Tries to Recall the Payments**

25.     From about midday Monday, September 15, 2008, requests for recall of the Payments were made by Bank of America N.A. on behalf of Nomura.  Citibank N.A. acknowledged the recall requests at 7:34 p.m. London time.  Nomura, through its affiliate Nomura International plc, made further inquiries with Bank of America N.A. on September 16, 17, 18, and 19, 2008 to see if they had more information on the recall request.  Bank of America N.A. said Citibank N.A. was still waiting for the necessary debit authority from their client, LBSF.

26.     Nomura also made several attempts to contact LBSF, beginning on September 21, 2008.  These attempts were successful on September 22, 2008.  On that day, Thomas Salatte of Nomura reached Gregory Eickbush, who identified himself as the head of Lehman's fixed income operations in the U.S.  Mr. Salatte explained the circumstances of the Payments.  Mr. Eickbush replied that he had considered similar requests for repayment, and he asked Nomura to provide all of the relevant transaction information.

27.     Nomura provided that information on September 23, 2008.  Mr. Eickbush replied by a same-day e-mail: "Will revert tomorrow.  Have some process to work through to verify steps given the circumstances."

7

28. On September 24, 2008, Christopher Colin Barlow, on behalf of Nomura, spoke with Mr. Eickbush by phone. Mr. Eickbush explained that LBSF was trying to "resurrect" a lot of its processes that had broken down the previous week. He explained that his team was currently attempting to identify which payments had come in after termination events had occurred. Because many thousands of payments had been received, LBSF wanted to ensure that all counterparties were dealt with in the same way. Mr. Eickbush could not and did not give any assurances that the Payments were being held separately, pending resolution of that process.

29. On the same call, Mr. Eickbush explained that he did not know whether the Payments were in London or New York. He said that he would see if he could find out before he left the office that day.

30. Mr. Eickbush later informed Mr. Barlow that he was unable to find the Payments in New York and that he assumed they would still be in London. However, Mr. Eickbush added that it was difficult to check this because the administrators had "locked everything down" in London. Mr. Eickbush said that he would authorize Citibank N.A. to release information regarding the location of the Payments.

31. As of September 25, 2008, Citibank N.A.'s representative in London had not been authorized to release this information.

32. Accordingly, Nomura submitted in draft unissued form an Application in the High Court of Justice, Queen's Bench Division, Commercial Court for information regarding the location of the Payments with a view to it being heard on September 25, 2008.

33. Shortly before the hearing on Nomura's Application, Mr. Eickbush told Mr. Barlow that the Payments were in a Citibank account in New York. Following receipt of

8

that information, Nomura asked that the matter before the High Court be adjourned. The judge agreed to adjourn the matter generally, with liberty to apply at some later date.

34. Mr. Eickbush later sent an e-mail to Mr. Barlow claiming that "legal counsel is drafting a protocol and policy. As of today, it is still unclear the timing of any actions that we will be allowed to take. As soon as something is available to further clarify the situation I will forward to you."

35. On September 29, 2008, Nomura commenced an action in the Supreme Court of the State of New York for the County of New York (the "New York Action") demanding the return of the Payments.

36. On September 29, 2008, the court in the New York Action issued an order that, among other things, directed LBSF to identify in writing the account number(s) in which the Payments were deposited. By letter dated October 1, 2008, LBSF's counsel informed Nomura's counsel that the Payments were located in "Account GB23CITI18500810640409, fbo SLHIUS3XXXX, Lehman Brothers, Inc., Lehman Brothers, New York, NY, Citibank, N.A., Citigroup Centre, London."

**E.    LBSF Files for Bankruptcy**

37. On October 3, 2008, LBSF filed a petition in bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. LBSF's bankruptcy proceedings are jointly administered with *In re Lehman Brothers Holdings Inc.*, Index No. 08-13555 (JMP).

38. Prior to LBSF's Chapter 11 filing, a liquidation proceeding under the Securities Investor Protection Act of 1970 (as amended, "SIPA") was commenced against LBI.

9

Pursuant to the court order commencing the SIPA proceeding (the "SIPA Order"), James W. Giddens was appointed as the trustee (the "SIPA Trustee") to administer LBI's estate.

F.     **Nomura Attempts a Consensual Resolution**

39.    On or around October 29, 2008, Nomura, through its counsel, Shearman & Sterling LLP ("Shearman & Sterling"), contacted counsel to LBSF, Weil, Gotshal & Manges LLP ("Weil Gotshal"), to demand the prompt return of the Payments.  On November 5, 2008, Weil Gotshal responded that because the Payments were being held in a bank account maintained for the benefit of LBI – which had acted as clearing agent for LBSF on its ISDA transactions with Nomura – Nomura should instead contact LBI's representatives to demand the return of the Payments.

40.    Based on LBSF's advice, on November 6, 2008, Shearman & Sterling contacted counsel to the SIPA Trustee, Hughes Hubbard & Reed LLP ("Hughes Hubbard"), to demand the prompt return of the Payments.  On November 10, 2008, Shearman & Sterling followed up with a formal written demand.

41.    Despite Shearman & Sterling's repeated requests for information beginning on November 6, 2008, and continuing through January 2009, the SIPA Trustee failed to reach a decision on whether to return the Payments to Nomura.  Finally, on February 3, 2009, after nearly three months had elapsed since Nomura made its demand to LBI, Hughes Hubbard responded that the SIPA Trustee currently is not in a position to return the Payments to Nomura on a consensual basis.

42.    Moreover, Hughes Hubbard advised Shearman & Sterling to instead approach LBSF for the return of the Payments, given that LBI was not party to the Master

Agreement. Shearman & Sterling reminded Hughes Hubbard that Nomura already had approached LBSF and had been referred instead to LBI.

### Count I
### (Declaratory Judgment)

43. Nomura repeats and incorporates the allegations in paragraphs 1 through 42 as if fully set forth herein.

44. A substantial and actual controversy exists between Nomura and the Defendants as to Nomura's right to return of the Payments.

45. A declaration of the rights and legal relations of the parties with respect to the Payments is required to clarify and settle the legal issues involved and, in particular, to confirm that Nomura is entitled to return of the Payments.

46. Resolution of this issue will provide certainty to the parties to this Adversary Proceeding and to others as the Defendants liquidate.

47. Pursuant to 28 U.S.C. § 2201 and Fed. R. Bankr. P. 7001, this Court should issue judgment declaring that Nomura is entitled to return of the Payments and granting such other and further relief as may be necessary to enforce Nomura's ownership rights in the Payments.

### Count II
### (Relief from Stay)

48. Nomura repeats and incorporates the allegations in paragraphs 1 through 42 as if fully set forth herein.

49. The Payments do not constitute property of the Defendants' estates pursuant to 11 U.S.C. § 541 (incorporated into SIPA pursuant to section 78fff(b) of SIPA), and,

therefore, the relief sought herein is not subject to the stay as provided in 11 U.S.C. § 362(a) or as set forth in the SIPA Order.

50. Nonetheless, out of an abundance of caution, Nomura seeks relief from the stay to the extent necessary to pursue the relief requested in this Complaint and to obtain possession of the Payments.

51. Because the Payments belong to Nomura and do not constitute property of the Defendants' estates, cause exists for relief from the stay to the extent such relief is required.

### Count III
### (Unjust Enrichment)

52. Nomura repeats and incorporates the allegations in paragraphs 1 through 42 as if set forth fully herein.

53. As aforementioned, Defendants are the recipients of Payments which were inadvertently delivered to them by Nomura.

54. Neither LBSF nor LBI has legal or equitable right, title, or interest in the Payments.

55. Despite due demand by Nomura for an immediate return of the Payments, Defendants unlawfully and improperly continue to withhold or delay the return of the Payments to Nomura.

56. Neither LBSF nor LBI has relied to its detriment on receipt of the Payments.

57. As a result of Defendants' failure to immediately return to Nomura the Payments, which are the sole and absolute property of Nomura, Defendants have been unjustly enriched.  In equity and good conscience, the Payments should be returned to Nomura.

## Count IV
### (Constructive Trust)

58. Nomura repeats and incorporates the allegations in paragraphs 1 through 42 as if set forth fully herein.

59. Although an Automatic Early Termination has occurred and the Payments were made as a result of a mistake of fact easily corrected, Defendants continue to possess funds and interest belonging to Nomura.

60. The funds owed to Nomura are thus held by Defendants in constructive trust. Equity and good conscience dictate that neither LBI nor LBSF should be permitted to keep the Payments.

61. Nomura is entitled to an order requiring Defendants to account for all funds so held in constructive trust.

## Count V
### (Conversion)

62. Nomura repeats and incorporates the allegations in paragraphs 1 through 42 as if set forth fully herein.

63. As set forth above, the Payments, which are the sole and absolute property of Nomura and which were segregated and identifiable at the time payment was made, were inadvertently wired to Defendants.

64. Despite due demand by Nomura and without the authorization and consent of Nomura, Defendants continue to withhold or delay the return of the Payments, and have thereby improperly exercised dominion or a right of ownership over the Payments, which, as stated, belong to Nomura.

## Count VI
## (Money Had and Received)

65. Nomura repeats and incorporates the allegations in paragraphs 1 through 42 as if set forth fully herein.

66. As set forth above, it is undisputed that Nomura was not obligated to make and Defendants were not entitled to receive the Payments, which are the sole and absolute property of Nomura.

67. As such, Defendants received the Payments impressed with a species of trust, and, under principles of equity and good conscience, Defendants should not be permitted to retain the Payments, which are the sole and absolute property of Nomura.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiff Nomura prays for relief and respectfully requests that the Court enter judgment in its favor as follows:

a) Entering a declaratory judgment finding that the Payments are not property of the Defendants' estates and that Nomura retains all title thereto;

b) Ordering Defendants to return the Payments, with interest thereon, in amounts not less than EUR 58,047,522.80;

c) Awarding actual damages resulting from Defendants' unjust enrichment; constructive trust, conversion of funds; and money had and received;

d) Enjoining Defendants from transferring the Payments, or any portion thereof, to any of their affiliates, or without fair consideration;

e) Impressing or imposing a constructive trust on all of the Payments and requiring Defendants to account for such funds;

f) Awarding pre- and post-judgment interest at the maximum lawful rate; and

g) Granting Plaintiff such other and further relief as the Court may deem just and proper.

Dated: New York, New York
February 27, 2009

SHEARMAN & STERLING LLP

By: /s/ Brian H. Polovoy
Douglas P. Bartner (DB-2301)
Brian H. Polovoy (BP-4723)
Solomon J. Noh (SN-0992)

599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

Attorneys for Plaintiff
Nomura Global Financial Products Inc.

15