1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

- - - - - - - - - - - - - - - - - - - -x


In the Matter of:


LEHMAN BROTHERS HOLDINGS, INC., et al.


        Debtors.


- - - - - - - - - - - - - - - - - - - -x


        United States Bankruptcy Court

        One Bowling Green

        New York, New York


        February 26, 2009

        1:59 PM


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

2

1

2      HEARING re AmEx's Motion to Compel Disclosure of Allegedly

3      Privileged Communications and Documents

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25      Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    DEWEY & LEBOEUF LLP

4        Attorneys for American Express Travel Related Services

5         Company, Inc.

6        1301 Avenue of the Americas

7        New York, NY 10019

8

9    BY:   MARTIN J. BIENENSTOCK, ESQ.

10        DONNA L. GORDON, ESQ.

11        ROY TAUB, ESQ.

12

13   ALLEN & OVERY LLP

14        Attorneys for Barclays Capital Inc.

15        1221 Avenue of the Americas

16        New York, NY 10020

17

18   BY:   MICHAEL S. FELDBERG, ESQ.

19        JACOB S. PULTMAN, ESQ.

20        LAURA MARTIN, ESQ., ESQ.

21        BRANDON O'NEIL, ESQ.

22

23

24

25

4

1               P R O C E E D I N G S

2          THE COURT:  Be seated, please.  I think you should

3    come forward if everybody's here on the same matter.  Good

4    afternoon.

5          ALL:  Good afternoon, Your Honor.

6          THE COURT:  I assume AmEx is going first.  Get

7    yourselves settled and comfortable and let's go.

8          MR. BIENENSTOCK:  Good afternoon, Your Honor.  Martin

9    Bienenstock of Dewey & LeBoeuf for AmEx in this --

10         THE COURT:  Good afternoon, Mr. Bienenstock.

11         MR. BIENENSTOCK:  We're here today pursuant to AmEx's

12   motion dated February 20, 2009 for an order compelling certain

13   discovery.  The relief we request is an order compelling

14   Barclays Capital to disclose in discovery communications that

15   we submit that were either not privileged or for which the

16   privilege was waived in connection with a conversation between

17   Lindsee Granfield of Cleary Gottlieb and Mr. White of Barclays

18   Capital and other material and, specifically, a document that

19   was originally produced for us in unredacted form.  It's

20   Barclays' AmEx Bates number 004901-902.  We subsequently

21   received notice from Barclays that it was erroneous not to have

22   redacted a portion; and that portion's been redacted.  We have

23   complied with our understanding of the protective order and

24   don't have that anymore.  We had read it and know what it says

25   but we don't have it anymore.

                                                                    5

1           THE COURT:  Do you remember what it says?

2           MR. BIENENSTOCK:  Yes, Your Honor.

3           THE COURT:  Okay.

4           MR. BIENENSTOCK:  And I'm not going to tell Your

5     Honor what it says but I'll --

6           THE COURT:  I know.  That would violate the

7     protective order.

8           MR. BIENENSTOCK:  I'll have some comments about it

9     later.  To start, the underlying motion in the contested matter

10    is Barclays' request for 60(b) relief.  It should be understood

11    at the outset that nothing we say here is intended to concede

12    or prejudice our other defenses to that motion such as that

13    they have no standing to bring this motion in the first place.

14    But we're in the litigation and we're dealing with the

15    discovery issue.

16          I think there's no question and no one's raised the

17    question that under Rule 26, the discovery AmEx seeks is

18    reasonably calculated to lead to the discovery of admissible

19    evidence.  These are conversations, concededly, by Barclays'

20    counsel with its people talking about the mistake for which

21    they are asking this Court for relief.  And, as Your Honor

22    knows, some mistakes are entitled to relief; other mistakes are

23    not.  The more information you can get about what kind of

24    mistake this was the more likely it is the Court gets to the

25    right answer.  And so, in a perfect world, if the only issue

6

1    was what will get the Court to the right answer, there would be

2    no question that we're entitled to this.  No one's moved, for

3    instance, to deny our compel motion on grounds that it's

4    irrelevant or anything of that sort.

5            What's standing in the way, potentially, of the Court

6    having the benefit of this information is the assertion of the

7    attorney/client privilege.  And I don't have to go into the

8    policies behind that.  We're not here to argue that they're not

9    valid policies.  The only issue is whether it applies here and

10   if it applies, whether it was waived.

11           So our initial contention is that when Barclays

12   submitted to this Court voluntarily a declaration of Mr. White

13   that says in unmistakable terms his understanding of his

14   conversation with Ms. Granfield that a mistake was made, that

15   he has disclosed the substance of a conversation, and he even

16   said things that he went on to do as a result of that

17   conversation, had a communication with a Mr. Chikowski at AmEx,

18   and that having opened the door and given part of an

19   attorney/client communication, if it was that, they cannot now

20   close the door and say we get to use the part that we want but

21   we're not going to tell you the rest.  In sum and substance, I

22   think that capsulizes what we're here about.

23           There are a few things that I would ask the Court to

24   factor into its decision here.  The first is that a constant

25   theme throughout this contested matter is that Ms. Granfield

7

1    had a dual role.  She had a role as a lawyer for Barclays.  But

2    she clearly had a role, based on the defenses that Barclays is

3    now putting up, as a business person.  For instance, one of

4    Barclays' defenses to the instant motion is that her

5    communication with Mr. White simply led to a conversation with

6    Mr. Chikowski and that that's the only reason why they

7    submitted the declaration, to show that Mr. Chikowski was

8    advised.  And that goes to one of their prongs of a 60(b)

9    motion arguing that we were not prejudiced because we were

10   alerted to this mistake on or about October 1.

11        Furthermore, the spreadsheet that they gave us first

12   unredacted and then redacted had the contents of an e-mail from

13   Ms. Granfield.  Again, the spreadsheet is a business document.

14   Ms. Granfield was clearly acting -- and the Court actually saw

15   this up front and has personal knowledge of it, at the hearing.

16   She was acting as a business lawyer, you know, what changes

17   will we accept, what we won't accept.  She was giving

18   instructions to Barclays' personnel:  call Chikowski, do this,

19   do that.  And she was also giving legal advice.  The reason I'm

20   making an issue of this, Your Honor, is that when you have a

21   lawyer who's -- and there's nothing wrong and we're not

22   contending there was anything wrong with her roles and the dual

23   role.  But when you have a lawyer stepping in and out of giving

24   business directions, call Chikowski, put him on notice, tell

25   him -- and dispensing legal advice, there's a high risk that

8

1    it's just too easy for Barclays to say oh, she was acting in

2    her business role now.  That's why Mr. White disclosed a

3    conversation, etcetera.  Oh, but over here, she was acting in

4    her legal role.  She was giving legal advice.  And what she was

5    doing seems to be, in their mind, at their election depending

6    on what's good for Barclays.  There's a danger when you have a

7    lawyer in these two roles that the turning on and off of legal

8    advice and what's privileged and not is an unfair prejudice to

9    the other side.  And that simply exists here.  It's out in the

10   open and we think that when that happens, this Court, as other

11   Courts have done, have to say candidly this lawyer was really a

12   business person and what was said all around can't be said in

13   one instance to be legal advice and in another instance,

14   business factual advice.

15           THE COURT:  I'm interested in the argument you just

16   made, Mr. Bienenstock, in part because I don't recall seeing

17   any emphasis as to that issue in the briefing.  It's a new --

18   it's a fresh point.

19           MR. BIENENSTOCK:  It is and I'm glad Your Honor said

20   that because I will now have an excuse to explain why I'm

21   raising it now when it wasn't raised earlier.

22           THE COURT:  Oh, I'm glad I brought this up.

23           MR. BIENENSTOCK:  It is a point I wanted to make

24   because of the points that were put in Barclays' reply brief

25   filed on February 24, obviously after our moving brief.  And

9

1    I'll point the Court to a few --

2         THE COURT:  So I've stepped right into the trap that

3    you laid for me.

4         MR. BIENENSTOCK:  Well, I didn't mean it as a trap.

5    But if you had not said what Your Honor said, I would have

6    gotten to this anyway.

7         THE COURT:  I figured you would.

8         MR. BIENENSTOCK:  On page 8 of Barclays' reply brief,

9    in footnote 5, they say in the second half of the footnote:

10   "Barclays permitted Mr. White to answer these questions."  This

11   is referring to a deposition and Mr. White, who is a lawyer at

12   Barclays, an in-house lawyer --

13        THE COURT:  I read that deposition.

14        MR. BIENENSTOCK:  Okay.  And he was talking about his

15   conversation with a Ms. Simone Bunger-Pentney at Barclays.  And

16   he gave the full substance of his conversation with Ms.

17   Pentney.  And we pointed out that this is an example that

18   Barclays is conceding that not all conversations between a

19   lawyer and a nonlawyer are attorney/client privileged and this

20   conversation, for instance, was not.  And what Barclays says is

21   the communication was not for the purpose of Mr. White

22   providing legal advice but rather occurred because Mr. White

23   wanted to understand facts concerning the mistake and

24   designation of the American Express contracts before he

25   contacted American Express' outside counsel.

10

1          Well, let's take that, for argument's sake, as a

2     given.  When Lindsee Granfield had a conversation with Mr.

3     White, the purpose they now say was to have him call Mr.

4     Chikowski.  How is that different?  They're saying it wasn't

5     legal advice.  It was -- there was a point to it, a business

6     point:  call Chikowski at AmEx.

7          THE COURT:  I don't mean to break into your argument

8     but one of the things we don't know is what happened during

9     that conversation because of the claimant privilege.  So

10    you're, in effect, putting the business bunny in your own hat.

11    You're saying that because that little phrase, which I suppose

12    somebody who prepared it wishes they had expressed somewhat

13    differently now, was included in the declaration filed by Mr.

14    White, in effect, all aspects of the conversation between

15    Lindsee Granfield and Mr. White are now up for grabs either

16    because it wasn't a privileged conversation at all because she

17    was simply acting as now a purported business advisor as

18    opposed to counsel, which is an interesting notion, or because

19    we're assuming that the information that was imparted is

20    nonprivileged, nonadvisory, kind of directing the troops sort

21    of language, you go out and call Chikowski, as if she's the

22    field general for the deal.  I don't know that any of that's in

23    the record, is it?

24          MR. BIENENSTOCK:  Two things, Your Honor, about what

25    Your Honor just said.  First, we're not making the broad

11

1    statement that everything in that conversation necessarily had

2    to have been business.  But we're saying anything that was said

3    about the mistake, the alleged mistake, that we're entitled to

4    because that was the lead on to why you should call Chikowski.

5            THE COURT:  But what if, just for the sake of

6    argument, and it's purely a hypothetical, she had said, and

7    we'll never know if it stays privileged, Mr. White, we made a

8    terrible mistake here.  The AmEx contract is not assumable as a

9    matter of law.  We've done the research and we're satisfied.

10   Don't tell that to AmEx because we don't want to reveal our

11   litigation positions in advance but tell them a mistake was

12   made.  I'm making all that up.

13           MR. BIENENSTOCK:  Of course.

14           THE COURT:  But let's just assume that that's the

15   nature of the conversation.  That's a lawyer acting as a legal

16   advisor to a client and providing confidential legal strategy

17   as part of the message.  How do we know what's going on here

18   since it's inside a black box?  We don't know what was said.

19           MR. BIENENSTOCK:  Well, we don't know what was said,

20   but the whole reason why we're entitled to know now about

21   whatever was said about the mistake is that they opened the

22   door.  They --

23           THE COURT:  I think that's the part I'm having the

24   most trouble with, just so you know how I'm viewing this, which

25   shouldn't be a surprise because I've sort of revealed my

12

1    thinking on this in conferences that we've had prior to the

2    argument.  It seems like a pretty innocent statement which

3    could have been phrased entirely differently to leave Ms.

4    Granfield out of it.  And it was simply a statement to the

5    effect that a mistake was made.  That's a pretty thin read with

6    which to open a door.  But I'd like to hear how that happens.

7         MR. BIENENSTOCK:  Okay.  Well, the conversation she

8    had was the predicate.  They then made the affirmative decision

9    to come to this Court and instead of submitting a declaration

10   saying in which Mr. White says on such and such day, I called

11   Mr. Chikowski at AmEx and said there was a mistake.  He said, I

12   had a conversation with Lindsee Granfield.  And I reached the

13   understanding that a mistake was made.  And then I called Mr.

14   Chikowski and I told him about that.

15        Had we not brought this up as a subject matter waiver

16   doctrine, I think there can be no question that as far as

17   Barclays is concerned, the White declaration stands for the

18   proposition that this Court should take into account that a

19   mistake was made.  Why did they add that?  They did it so Your

20   Honor would read it.  They didn't --

21        THE COURT:  But --

22        MR. BIENENSTOCK:  It wasn't necessary to the message

23   to Chikowski.

24        THE COURT:  I'm not sure that that's true, though,

25   Mr. Bienenstock.  As I read that declaration, it stands for the

13

1    proposition not that a mistake was made but that Mr. White was

2    in a position to communicate to AmEx the position of Barclays

3    that a mistake was made.  But it doesn't say anything about the

4    cause or nature of the mistake or whether or not the mistake is

5    one that gives rise to 60(b) relief.  It's just, in effect, a

6    statement almost for hearsay purposes, not for proving the

7    truth of anything but just for saying this is our position.

8         MR. BIENENSTOCK:  Well, to Mr. White, it may not have

9    said anything about 60(b) relief or it may have depending on

10   the conversation that we don't know.  But as far as this Court,

11   AmEx and Barclays are concerned, it says legions because they

12   could not have taken it off the list, announced a mistake and

13   not cure it as they had been ordered to do had it not been the

14   type of mistake that would entitle them to 60(b) relief or at

15   least had they not believed that it was.  So when they came to

16   this Court and they said -- and Mr. White says, hey, I had a

17   conversation with Ms. Granfield and a mistake was made, unless

18   he was talking about a mistake entitling Barclays to 60(b)

19   relief, it would be irrelevant and immaterial.  So clearly,

20   they were using it in this court to say it's a mistake that

21   entitles us to relief.

22        THE COURT:  I think I'm not communicating clearly.

23   I'm not disagreeing with anything you've just said, Mr.

24   Bienenstock.  But I don't see the statement that we're now

25   focusing on as going to the question of the nature of the

14

1   mistake or legal rights that might arise by virtue of the

2   mistake so much as when a certain notice was given of legal

3   position, October 1, 2008, which is when all this is being

4   dated.  And so, I hear you but I think you also understand that

5   I'm having some conceptual trouble getting into the text and

6   seeing this as being substantive.  I see it as a notification

7   of a legal position without necessarily going to be merits of

8   the legal position.  But please continue.

9          MR. BIENENSTOCK:  Okay.  Barclays has contended after

10  they saw where we were going that the sole purpose of the

11  declaration was to show that they put Mr. Chikowski on notice

12  and that -- and when Mr. White was deposed, he said, I didn't

13  get my understanding a mistake from Ms. Granfield.  I got it

14  from Ms. Simone -- I think Bunger-Pentney.  I may get the name

15  wrong.

16         THE COURT:  I know who you mean.

17         MR. BIENENSTOCK:  And he recounted his conversation

18  with her and he said very crisply, I asked her if this was a

19  mistake and she put me on hold and she came back and checked

20  the list and said it's not on the list, should not have been

21  assumed.  And then it turned out when we deposed her said not

22  only did she not remember the conversation, she didn't know of

23  any list she could have checked.  This changing story is

24  consistent throughout Barclays' positions.  Clearly, they would

25  like Your Honor to believe what Your Honor said, that this was

15

1    all about putting Mr. Chikowski on notice.  Nothing about legal

2    advice was ever intended; it was a mistake.  But clearly, as

3    far as Mr. White is concerned, either the actual mistake was

4    something that he wasn't satisfied with with Ms. Granfield and

5    believes that he had another conversation to check that out, or

6    he made it up and could have been innocently but just his

7    recollection is totally wrong because it's awfully strange that

8    the person he said he spoke to never remembers the conversation

9    or that there was a list she could have checked and he was

10   quite specific.

11        So given that there's a lot of doubt on his

12   recollection of the mechanics of the mistake, one can only

13   conclude that the declaration he submitted, based on the

14   conversation with Ms. Granfield, was really about urging this

15   Court to believe there was a real mistake entitling Barclays to

16   60(b) relief.

17        On page 9 of Barclays' response at the bottom, they

18   say despite the fact that Barclays has not divulged any legal

19   advice rendered or the content of a communication between Mr.

20   White and Ms. Granfield, they're doing the opposite of what

21   Your Honor is saying.  They have -- there's a declaration that

22   they drafted, that Barclays' lawyers drafted, providing

23   information based on a conversation with Mr. White and Ms.

24   Granfield about a mistake and they say there was no legal

25   advice divulged.  Well, of course there was legal advice.  The

16

1    legal advice that there was a mistake that had to qualify for

2    60(b) relief or they wouldn't be up to this in the first place.

3    So, in effect, their reply brief, by this mistake on page 9, is

4    conceding that if legal advice was given then the waiver does

5    come into place.  And it's so obvious it had to have been given

6    because there was no purpose to have that conversation if the

7    type of mistake wouldn't entitle them to 60(b) relief.

8           THE COURT:  Well, I think the whole sentence or the

9    full introductory clause is simply saying that the conversation

10   is not being relied on to support the claimant mistake.

11          MR. BIENENSTOCK:  And that's another excellent point,

12   Your Honor.  It's not now because they know if they do it now,

13   they lose this motion.  It was when they submitted the

14   declaration.  This is the point, bobbing and weaving.  When one

15   root doesn't work, they cut it off and they go to another.

16   They submitted this declaration in advance of the hearing on

17   mistake, on 60(b) relief.  When that didn't -- when they didn't

18   get the relief they asked for at that hearing then we went into

19   discovery, suddenly that declaration wasn't about mistake

20   anymore.  It was about that they notified Mr. Chikowski.  And

21   now they say and, by the way, it wasn't legal advice.  Well, we

22   know it was legal advice; it had to have been.  Otherwise,

23   there was no point in giving it.

24          And so, it cannot be that the law on the subject

25   matter waiver doctrine is that you haven't waived the doctrine

17

1    if after it's brought to your attention -- you haven't waived

2    the privilege if after it's brought to your attention, you say

3    you'll no longer rely on that.  They did rely on it; that's why

4    it was there.  They were hoping this Court on that day in this

5    courtroom was going to say I read the declaration of Mr. White,

6    he says it was a mistake, that's evidence of mistake.  Weighing

7    everything, I find by the preponderance of the evidence that it

8    was a mistake.

9           THE COURT:  I can tell you, based upon my review of

10   his declaration, I could never have come to that conclusion.

11          MR. BIENENSTOCK:  Thank goodness.  But certainly,

12   that's the only reason they had to put it there.  They had lots

13   of other evidence that they gave that AmEx curtailed service,

14   that they told AmEx.  Lindsee Granfield sent an e-mail, it's in

15   part of that package, to someone that there was a mistake as to

16   the cure amount of eighteen million.  So clearly, that

17   declaration of Mr. White was purely surplusage if it wasn't

18   there to urge mistake.

19          And looked at it a different way, Your Honor, what

20   other evidence had they given of mistake?  They had the

21   Granfield e-mail about the eighteen million cure amount.  But

22   as to mistake of putting it on the list because it's a contract

23   they didn't really want, they had nothing else.  That was the

24   evidence.  And I agree with Your Honor.  They could not have

25   won based on that.  But that could be the only reason why it

18

1    was there, hoping Your Honor would buy that declaration a

2    mistake.

3            Barclays then goes on, on page 11 of its reply, to

4    say "The Second Circuit has explained a party will only be

5    found to have waived its attorney/client privilege by putting a

6    communication at issue by relying on privileged advice from its

7    counsel to make his claim or defense."  Well, as I just

8    explained, given that they had no other evidence of mistake at

9    that hearing where they thought this Court was going to rule up

10   or down, it's clear they were relying on that to certainly

11   help, if not be dispositive, of convincing this Court that

12   there was a mistake.  And now, there's a realignment of the

13   facts given that they know that that would cause a subject

14   matter waiver doctrine to apply.

15           Now just a few other points I wanted to mention, Your

16   Honor.  In respect of the now redacted document, Your Honor, we

17   ask that Your Honor look at that in camera, we do remember what

18   it says.  And I said earlier, I'm obviously not going to state

19   it.  One of the fundamental issues in this case, the legal

20   issues, is whether it's a ministerial computer type mistake, as

21   they originally thought, or whether it's a business judgment

22   mistake where after they make a business judgment, they think

23   about some more and come to a different business judgment.  And

24   as Judge Posner's decision in the UAL Corp. shows, the latter

25   mistake doesn't qualify for 60(b) relief.  And it's logical why

19

1    it couldn't because then anyone could always get that relief.

2    Just say I changed my mind, come to a different business

3    judgment.  When Your Honor sees that, Your Honor will know one

4    way or the other.  On that issue it'll be dispositive.

5         It's on a spreadsheet that was clearly used in

6    Barclays' business.  The notion that it wasn't a series of

7    facts, Barclays reasons one way or the other for doing certain

8    things, is impossible.  They were the factual reasons.  And so

9    on that, what we submit is wasn't privileged in the first

10   place.  And on that, we also ask Your Honor to take into

11   account the fact that Ms. Granfield was acting as business

12   person and lawyer in a dual role.  And while there was nothing

13   wrong with that, that cannot -- if a business person at

14   Barclays had written onto the spreadsheet the business reasons

15   why the contracts were on the assumed list, there'd be no

16   question we'd get that in discovery.  Not basis for redaction.

17   The fact that a lawyer, acting as a business person, was the

18   scribe or wrote those business reasons for them and they put it

19   on a spreadsheet should not make a difference.

20        THE COURT:  Let me ask you a couple of questions

21   about this discreet issue of the one document that was

22   inadvertently delivered and then pulled back and now becomes

23   the subject of this somewhat free standing privilege issue.

24   Assuming for the sake of argument that legal advice of retained

25   counsel is copied into a spreadsheet and is disseminated only

20

1    to individuals who are within the Barclays deal team, and so,

2    in effect, it's the client, it's not your position that the

3    fact that it was copied into a business record deprives it of

4    attorney/client content.

5         MR. BIENENSTOCK:  That's right.

6         THE COURT:  Okay.  Is it your principal argument that

7    the reason that this redacted material, and I have no idea what

8    that material includes at this point, should be revealed to

9    AmEx is that even though the author of that material was

10   Lindsee Granfield acting as outside counsel, that's actually

11   not the capacity in which she wrote it, she was writing it more

12   in the same fashion that a business person for Barclays could

13   write down the same information and that in order to find that

14   it's discoverable, I need to conclude that Lindsee was not

15   acting in a capacity as a lawyer when she wrote that?  Or is

16   there another reason why it should be disclosed?

17        MR. BIENENSTOCK:  I think Your Honor would only need

18   to conclude that what she was writing down was not for the

19   purpose of legal advice; she was writing down Barclays'

20   business reasons.

21        THE COURT:  Okay.

22        MR. BIENENSTOCK:  And Your Honor was actually a

23   personal witness to some of this in the courtroom because on

24   that night of the sale hearing, Your Honor asked her certain

25   questions which were business reasons.  Basically, would

21

1    Barclays go forward this way or that way.  And she responded

2    frequently without taking time to go talk to her client to get

3    directions.

4            THE COURT:  It was a tough night for all of us.

5            MR. BIENENSTOCK:  It was a tough night for all of us.

6    But it further shows that this was a case where you had lawyers

7    in a dual role acting as business persons also and they can't

8    cloak the business function with their attorney role.

9            I think there was just one other point I wanted to

10   make.  My colleague has reminded me that when it comes to a

11   lawyer writing down something or communicating something, for

12   the privilege to attach, there has to be an expectation and

13   some manifestation that there's a privilege as opposed to

14   treating it like any record that can be shown to anyone.  I

15   think by its nature, when Your Honor sees the spreadsheet and

16   everything else, you'll see there's no indication of

17   attorney/client privilege or sensitive document or do not show.

18   This was a business record that could be disclosed to anyone at

19   any time.

20           THE COURT:  By the way, just for my edification --

21           MR. BIENENSTOCK:  Right.

22           THE COURT:  -- can you explain the providence of the

23   document in the sense that how the document was used within

24   Barclays, who received copies of it, whether it was treated as

25   an ordinary business record or whether it was dignified in some

22

1   fashion because of the nature of the subject matter?

2           MR. BIENENSTOCK:  I personally can't but if Your

3   Honor would give me a minute, I can find out.

4           THE COURT:  It may be that Barclays, during their

5   argument, can help me with that question.

6           MR. BIENENSTOCK:  Could I just have one minute?

7           THE COURT:  It's fine.  But I think Mr. Feldberg may

8   turn out to be the best source for information on that.

9       (Pause)

10          MR. BIENENSTOCK:  Your Honor, what we know is that it

11  was disseminated to both people at Lehman and Barclays based on

12  the e-mail addresses that were also there.  We don't know

13  anything more about how they were using the document.

14          THE COURT:  And is there any argument for AmEx that

15  to the extent this was privileged, that the privilege was

16  waived through dissemination to nonclient Lehman?

17          MR. BIENENSTOCK:  Well, that's -- yeah.  That was

18  the --

19          THE COURT:  That's the point.

20          MR. BIENENSTOCK:  That's the point.

21          THE COURT:  Got it.

22          MR. BIENENSTOCK:  Also that it was not expected to be

23  a confidential document.

24          THE COURT:  Okay.

25          MR. BIENENSTOCK:  Thank you.

23

1    THE COURT:  At some point before ruling on this

2    matter, I do want to see the document.  Is there any issue with

3    my seeing in camera the document in question?

4        MR. FELDBERG:  No, Your Honor.  We have the copy for

5    Your Honor.

6        THE COURT:  Fine.  Well, at some point, I'll take a

7    break and I'll take a look at it.

8        MR. FELDBERG:  Your Honor, Michael Feldberg from

9    Allen & Overy for Barclays.  Just to deal with the last point

10   first, if I may, the cover memorandum with respect to the

11   single document that we produced inadvertently if it is

12   challenged in this application, the cover e-mail, which is from

13   an individual at Barclays to a number of individuals, some of

14   whom have Barclays e-mail addresses and some of whom have

15   Lehman e-mail addresses but it may be that a number or perhaps

16   all of the Lehman people, the people with Lehman e-mail

17   addresses, had by that point, September 24th, moved over to

18   Barclays, includes the -- as its last substantive line, and

19   this is on the redacted version, "and a summary of our notes

20   from our meeting with legal and Cleary this morning".  That's

21   the legend that is on the text of the covering e-mail.  That is

22   available.

23       MR. BIENENSTOCK:  Your Honor, I don't want to

24   interrupt.  But just so it's not mistaken, that's not the

25   document we're referring to.

24

1            THE COURT:  Now I'm confused.

2            MR. FELDBERG:  Me, too.

3            THE COURT:  Or Mr. Feldberg is confused.

4            MS. GORDON:  Can I try to clarify, Your Honor?  There

5    was an e-mail that attached a number of different documents.

6    This spreadsheet was entitled "Vendors at Risk".  The e-mail

7    that Mr. Feld -- the document that Mr. Feldberg's talking about

8    was the fourth document that was attached.  That was a summary

9    of a legal conversation between Cleary and Barclays and that

10   was also redacted, subsequently called back.  But that's not

11   the same document that we're talking about here.

12           MR. BIENENSTOCK:  We're talking about the "Vendors at

13   Risk" document.

14           THE COURT:  I understand that.  Let's do the

15   following.  Since I don't think the cover memo, even if it

16   applies to the "Vendors at Risk" document, is all that helpful

17   to determining the question of whether or not the redacted

18   materials should or should not be fully disclosed, I'm going to

19   treat this little episode as if it didn't happen.  And we're

20   going to start over 'cause I don't think it matters.

21           MR. FELDBERG:  Okay.  Fair enough, Your Honor.  Your

22   Honor, we believe the facts lay out as follows.  The principal

23   purpose of the submission of Mr. White's declaration, which was

24   in reply to American Express' response to our Rule 60(b)

25   motion, was to present his view of the conversation that he had

25

1    with Mr. Chikowski on October 1st.  Mr. Chikowski had submitted

2    an earlier declaration recounting his recollection of that

3    conversation.  Mr. White had a different recollection; he

4    presented that view in his declaration.  Now, Mr. White had had

5    no prior contact with this controversy before October 1st.  And

6    there is a paragraph in his declaration in which he says "I

7    spoke with Ms. Granfield.  After the conversation I

8    understood."  It gives context because before that

9    conversation, he knew nothing about this as was made clear in

10   his deposition.  The verbal formula after "I understood" is a

11   form of verbal formula, one of several that are used, to give a

12   little context and to explain without divulging, certainly,

13   without trying to divulge, the content of an otherwise

14   privileged conversation, how we get from A to B.  He learns a

15   little bit about the controversy.  He goes on to have a

16   conversation first with Ms. Bunger-Pentney, as to which we've

17   made no objection to discovery, then with Mr. Chikowski

18   representing American Express, again, a fully discoverable

19   conversation.

20        AmEx argues that the consequence of this is a full

21   subject matter waiver as to all communications on the subject

22   matter of a mistake whether the communication involved factual

23   information, legal advice or whatever.  The heart of the

24   argument that we understood from the papers and a part of

25   counsel's argument today is the notion that Barclays is relying

26

1    on the Granfield/White conversation to establish the fact of

2    mistake and the nature of the mistake.  They're saying we're

3    using the conversation as a sword; therefore, we can't shield

4    it.

5           The simple response to that factual, Your Honor, is

6    that's not what we're doing.  Mr. White is not a witness to the

7    mistake or the nature of the mistake.  He had no involvement in

8    this matter prior to October 1st.  He got involved on October

9    1st, in part on his own initiative because somebody had to call

10   Mr. Chikowski to tell American Express what Barclays' position

11   was.  And he took it upon himself to do that.  And he needed a

12   little bit of understanding so he would be able to engage in

13   that conversation.  He can't be a witness to either the fact of

14   the mistake or the nature of the mistake because he was not

15   involved at that time.  And he was not a decision maker as to

16   what should or should not have been on the closing day

17   contracts list.  Those are, we believe, the pertinent facts.

18          With respect to the law of privilege and how it plays

19   out with these facts, we believe that the law makes clear that

20   while facts themselves are not privileged and witnesses, be

21   they lawyers or lay people, may be asked about their knowledge

22   of facts -- and Mr. White was.  In many places in his

23   deposition -- Your Honor indicated that you've read it so

24   you're familiar with this.  He was asked without objection,

25   without direction not to answer, his understanding of facts at

27

1    various points in time and he answered those questions.  What

2    the law does protect is the communication of information

3    between attorney and client acting in an attorney/client

4    relationship.  There are historical policy reasons for that

5    having to do with the free flow of information between attorney

6    and client and the ability of clients to be candid with counsel

7    and counsel to be candid about what the law requires and

8    permits.  It's the communication of facts that we learn from

9    Upjohn and other cases that we've referred to in our papers, is

10   not privileged -- is -- excuse me, is privileged and cannot be

11   disclosed.

12          Now, AmEx has been free to ask Mr. White his

13   understanding of facts.  We've identified a number of people

14   who were involved in the actual circumstances that led to the

15   mistaken listing of the AmEx contracts.  AmEx has indicated

16   that it would like to take depositions from many of them.  Some

17   of those have happened; some are still to happen.  They are

18   free to inquire of those people what their understanding of the

19   relevant facts were and what they did and how they did it and

20   why they did it, etcetera.  But we have not put the

21   conversation between Granfield and White on October 1st in

22   issue as to our claim of privilege.  We're not relying on it in

23   the way that the Second Circuit in the Erie v. Pritchard case

24   last October says is required for there to be a waiver.  By

25   giving context, by just saying what he knew so that he could

28

1    speak to Mr. Chikowski, even though he had had a conversation

2    with Ms. Granfield, he certainly -- we certainly did not intend

3    to waive.  And this is a form of verbal formula that perhaps

4    won't be used quite as often in the future but is often used to

5    give context to the substance of the communication which was

6    Mr. White's communication with Mr. Chikowski.

7           Sometimes the line isn't as bright as we practicing

8    lawyers would like it to be.  With respect to Mr. White's

9    conversation later that day with Simone Bunger-Pentney, it was

10   our view of that conversation that he was simply trying to get

11   some facts, confirm some facts so that he could have as

12   meaningful a conversation as possible with Mr. Chikowski.  We

13   did not view that conversation as the rendering of legal advice

14   or the seeking of legal advice by Ms. Bunger-Pentney.  And

15   therefore, we made the judgment call, allow the inquiry, don't

16   block it.  It's a judgment call we made.  We believe it's the

17   right call under these facts.  The fact that Ms. Bunger-Pentney

18   does not recall this thirty-five second conversation is, I

19   suppose, part of the evidentiary mix in this case but of no

20   particular significance beyond that.

21           THE COURT:  Well, we don't know yet how significant

22   it is.  We'll find out.

23           MR. FELDBERG:  Right.  But doesn't go to the issue of

24   whether there's been a waiver of some kind.  It's simply Mr.

25   White recalls the conversation.  He recalls it being brief.  We

29

1  made a judgment call that it was not an attorney/client

2  conversation.

3           THE COURT:  Although it was a conversation between an

4  attorney and a business person at the client.

5           MR. FELDBERG:  It certainly was, Your Honor.  We made

6  the judgment that at least as we understood it, it was not a

7  conversation in which the attorney was rendering or the client

8  was seeking legal advice.  And therefore, we allowed the

9  inquiry.

10          THE COURT:  Is it your position that in the context

11 of Lindsee Granfield's discussion with Mr. White, which is the

12 principal focus of all of this energy, that Ms. Granfield was

13 rendering advice to her client or was she potentially, as Mr.

14 Bienenstock suggested, simply in the guise of a lawyer acting

15 really as the business field general of a massive transaction?

16          MR. FELDBERG:  It's our view she was acting as a

17 lawyer, Your Honor, and rendering legal advice.  Now -- and the

18 communications that she engaged in were part of the overall

19 attorney/client relationship and part of the legal advice that

20 she was rendering.  Now, American Express has raised, as we all

21 recognize, a new argument today that that is not in their

22 papers which is that Ms. Granfield was acting under the

23 business person rather than lawyer hat.  While I can't claim

24 that I've read every case there is, I'm not aware of any

25 case --

30

1        THE COURT:  Not only can you not claim it, I know you

2   haven't.

3        MR. FELDBERG:  Fair enough.  I've not read a case

4   that I can think of that stands for the proposition that

5   counsel, in a situation like the one Ms. Granfield found

6   herself in representing a client making an acquisition in the

7   context of a bankruptcy proceeding, is deemed to be acting as a

8   business person as opposed to a lawyer.  If it's appropriate to

9   try to research whether there's any precedent for such an

10  argument, we'll of course do so.  But I can't recall any case

11  that I've come across that stands for that proposition, and I

12  think it would be a surprising notion that a counsel conducting

13  a complex issue, such as the one Ms. Granfield and her

14  colleagues from Cleary Gottlieb were conducting, step in and

15  out of their roles as lawyers and in and out of the role as

16  business person and somehow the Courts are put in the position

17  of having to try to parse which hat counsel was wearing at a

18  particular moment in a particular conversation.  I think that's

19  a difficult task.  I've not seen Courts put in a position of

20  having to try to sort all of that out.  It would be a

21  challenging task to try to do so.

22        It's our position that she was acting as a lawyer.

23  She was Barclays' lawyer.  She had been engaged to give and she

24  did give legal advice.

25        THE COURT:  Anything more?

31

1          MR. FELDBERG:  Unless Your Honor has further

2     questions, I have nothing further.

3          THE COURT:  Nothing at this time.  Mr. Bienenstock,

4     you have anything more?

5          MR. BIENENSTOCK:  Yes, Your Honor.  Going back to the

6     conversation of Ms. Granfield and Mr. White, I want to point

7     the Court's attention to the declaration of Eugene Chikowski

8     dated October 27, 2008 and, specifically, to page 7, paragraph

9     22.  In this declaration, Your Honor, Mr. Chikowski says "Mr.

10    White informed me that Barclays had determined to 'go in

11    another direction' that Barclays no longer wanted to continue a

12    business relationship with AmEx and that Barclays has decided

13    to reject the two AmEx contracts for business reasons."  The

14    paragraph goes on.  So the state of the record before Your

15    Honor now is, number one, Ms. Granfield spoke to Mr. White on

16    October 1.  As Mr. Feldberg noted just a few moments ago, prior

17    to October 1, Mr. White had no knowledge of this alleged

18    mistake or the contracts.  It was the same day that Mr. White

19    picked up the phone and called Mr. Chikowski.  So the only

20    knowledge he could have had about the mistake was what he

21    learned from Ms. Granfield.  At least, he's offered nothing

22    else.  He said that he did confirm with Ms. Simone

23    Bunger-Pentney and, of course, we have that she doesn't

24    remember it.  But clearly, he doesn't say that she gave him any

25    business reasons.

32

1    So the state of the record, as of right this moment,

2    is that Mr. White obviously learned these business reasons from

3    Ms. Granfield.  That is not legal advice; those are facts.

4    Those are exactly the types of things that we're entitled to

5    discover, what were Barclays' business reasons.  So although we

6    submit, as Your Honor knows, that that declaration at that time

7    was being relied on by Barclays to establish a mistake in front

8    of this court, notwithstanding that they've now changed course

9    because that would invoke the subject matter waiver doctrine.

10   Even if Your Honor does not buy the waiver argument at that

11   time, the evidence in front of the Court is that these were

12   business reasons not legal advice being discussed, why Barclays

13   didn't want these contracts.  Those are facts that we're

14   entitled to.

15        THE COURT:  Let me ask you something, Mr.

16   Bienenstock, because I have this mental image of a conduit.

17   And somebody at Barclays is making a business judgment or some

18   group of people at Barclays is making a business judgment

19   concerning those contracts to put on the list or select off the

20   list.  And it's all happening in a very intense environment of

21   getting a deal done at a time of extraordinary emergency which

22   we all recall and we'll probably never forget.

23        But let's just assume something for a moment which I

24   think is probably true.  Business people, not Lindsee

25   Granfield, are in the process of deciding what to include and

33

1   what not to include on the list unless it's being delegated to

2   other people who are subordinate to Lindsee Granfield within

3   Cleary or some other law firm.  As a result of a sudden

4   recognition, and I don't know what the source of that

5   recognition is, someone within Barclays comes to the

6   realization that a terrible mistake has been made.  That's why

7   we're here.  And presumably, through some means of

8   communication, passes that information through a chain of

9   people that ultimately gets to Lindsee or perhaps it goes

10  directly to Lindsee.  I don't know the facts.  She contacts Mr.

11  White.  Mr. White contacts Mr. Chikowski and we have a

12  litigation.

13          To the extent that the information is absolutely

14  accessible from sources within Barclays, those individuals who

15  did the work and who simply said to counsel, we've got to get

16  this to counsel for AmEx.  I guess we have to go through

17  lawyers to do that and that's what they do.  We seem to be

18  threading a needle here.  We're taking information which is, at

19  least in my understanding of how it probably works, completely

20  accessible from nonlawyer sources and we're taking the position

21  that because it passed at one point through the mouthpiece of

22  Lindsee Granfield's telephone that it somehow opens up

23  everything that she ever did as a lawyer with respect to the

24  subject matter.  That seems extreme to me.

25          MR. BIENENSTOCK:  We agree.  And that's not what

34

1    we're asking.

2          THE COURT:  Okay.  What are you asking?

3          MR. BIENENSTOCK:  Okay.  We're asking to go into her

4    conversation with Mr. White on October 1.

5          THE COURT:  Just that?

6          MR. BIENENSTOCK:  And for the other document, the

7    redacted material.  Now, I'd also like to supplement what Your

8    Honor has said as the facts because this is not based on the

9    happenstance that something came through Ms. Granfield's

10   telephone.  Two acts totally in Barclays' control occurred

11   after that.  They submitted a declaration to this Court

12   alleging mistake for the hearing at which they thought this

13   Court was going to deal with the merits.  And there's another

14   fact.  And this is a perfect example of we all sometimes ignore

15   the obvious.  What did Mr. White do with the information he got

16   from Ms. Granfield?  He blabbed it Mr. Chikowski.  Mr.

17   Chikowski's affidavit says he told me about business reasons.

18   The client wasn't treating it as confidential.  The client

19   wasn't treating it as legal advice.  So we have two acts by

20   Barclays, the declaration that they were hoping this Court

21   would buy hook, line and sinker, and Mr. White's blabbing it to

22   Mr. Chikowski who put it into a declaration.  We know the

23   information he got from Mr. White had to come from Ms.

24   Granfield because he had no knowledge before that day.  And the

25   only two conversations he said he had were Granfield and Ms.

35

1    Simone Bunger-Pinkley (sic).  Sorry.

2              THE COURT:  I'm not sure that's her name --

3              MR. BIENENSTOCK:  Okay.

4              THE COURT:  -- but it's close enough.

5              MR. BIENENSTOCK:  Thank you.  So if this were a case

6    where we were saying someone mentioned two business facts to

7    Ms. Granfield, attorney/client waiver, we're entitled to

8    everything, that would be one thing.  But when Ms. Granfield

9    then puts a conversation or a snippet of the conversation with

10   Mr. White in a declaration and Mr. White then takes information

11   he could only have gotten from Ms. Granfield and tells it to

12   AmEx's Mr. Chikowski, now you don't have the attorney/client

13   privilege anymore.  And given that and the fact that all of

14   this that they're asserting has only one impact and that's to

15   stand in the way of this Court getting at the truth, we submit

16   the only right decision for this Court to make on these facts

17   is that we're entitled to the whole story because the Court's

18   entitled to it.

19             THE COURT:  Well, it's an interesting proposition

20   that you're advancing because what you're really telling me is

21   that Mr. Chikowski knows everything that he knows because of

22   what Mr. White told him.  And Mr. White told him what he knew

23   and the only source of what he knew is what Ms. Granfield told

24   him.  So that's the conduit I was talking about.  And, in

25   effect, don't you already know through Mr. Chikowski's own

36

1    recollection, although it may be the subject of a dispute at

2    some point, what it is that Mr. White blabbed?  And so, to the

3    extent that that's already in the record -- I'm having a hard

4    time understanding how you're prejudiced if you don't find out

5    other things that may have been discussed at the same time and

6    in the same conversation.  And I'm not suggesting that you

7    aren't, for Rule 26 purposes, entitled to seek it.  But I'm

8    having a hard time understanding why you need it or why we're

9    spending, frankly, what, with respect to the parties, is a

10   really disproportionate effort to get at one conversation which

11   does not yet to me appear critical to the truth finding

12   process, as you described it, because I see so many other

13   relevant sources of information.  And I totally agree with you

14   that the White affidavit is not self-sustaining for purposes of

15   proving mistake.  At least, wasn't to me.  And the reason we're

16   in this discovery and evidentiary hearing process is, in part,

17   because I really do want to know what the truth is.  But I'm

18   having a hard time understanding how what was said by Ms.

19   Granfield to Mr. White, for how ever long that conversation

20   took place and whatever subjects may have been covered beside

21   mistake advances the ball of getting to the truth.

22        MR. BIENENSTOCK:  Several responses, Your Honor.

23   First, I want to correct something.  I had not said that Mr.

24   Chikowski -- everything he knows comes from Mr. White.  What

25   paragraph 22 of his declaration recounts is what Mr. White

37

1    said.  We know --

2           THE COURT:  I'm sure he knows lots of other things,

3    too.

4           MR. BIENENSTOCK:  Right.  Well, but -- including --

5    could be about this.  But what -- the point was that what Mr.

6    Chikowski learned from Mr. White, Mr. White could only have --

7    on the subject of the AmEx contracts -- could only have been

8    learned from Ms. Granfield because he didn't know about it

9    before that day.  And he didn't learn anything more from the

10   other Barclays employee that he recalls calling.

11          Now to get to Your Honor's inquiries.  There are

12   several things that AmEx has raised in connection with the

13   60(b) motion that are dispositive in the sense that if we win

14   on any one of them, we win.  This is one of them.  If we show

15   that the mistake was a business judgment where they changed

16   their mind, 60(b) doesn't apply to that.  It is true, as Your

17   Honor has just pointed out, that Mr. Chikowski's recollection

18   of what Mr. White said which would be admissible hearsay or not

19   hearsay because it's the statement of a party opponent, would

20   be admissible at trial to show that Barclays decided it did not

21   want the contract for business reasons.  We know Barclays is

22   going to contend, because it is contending, that it's something

23   other than business reasons.  What Ms. Granfield said to Mr.

24   White could, and likely would, based on what we know now, add

25   to our case, perhaps dispositively, that they had a change in

38

1    business judgment.  And that's what this was all about.

2            So what Mr. White told Mr. Chikowski is helpful to

3    us.  I haven't heard Your Honor say Mr. Bienenstock, that's

4    enough, you win, you can go home.  We need potentially more to

5    prevail in this case and it's quite possible that what Ms.

6    Granfield said to Mr. White is exactly what we need that Your

7    Honor would say.  I've heard enough.  That does it.  You don't

8    have a case on 60(b).  So we are prejudiced in not getting to

9    the truth on that issue.  There's no question.

10           And as I said, we're not asking Your Honor to open up

11   the door to make the attorney/client privilege a game of

12   roulette where people can't talk to attorneys because they're

13   worried that it will come out some day.  What we're asking, it

14   would only come out if after the communication exists, the

15   party asserting the privilege provides a declaration and one of

16   its own people then blabs to an outside third party, in fact an

17   adversary, what was said or at least part of what was said.

18   That's the situation we have here.  And we don't think there's

19   any danger that a decision in our favor would erode the

20   attorney/client privilege for those reasons.  These were

21   voluntary acts that Barclays committed for its own interest and

22   now it doesn't want to have the consequences of being able to

23   tell a half story and being forced to tell the whole story.

24   Thank you.

25           THE COURT:  Thank you.  Mr. Feldberg, do you have a

39

1    little bit more?

2          MR. FELDBERG:  Very briefly, Your Honor.  I'm just

3    reading from a portion of AmEx's motion, page 14, footnote 6,

4    as to what they're seeking here:  "This inquiry may encompass

5    the disclosure of legal advice as well as facts communicated

6    about the alleged mistake."  In other words, the inquiry that

7    AmEx's motion is seeking into, for example, the October 1

8    conversation between Ms. Granfield and Mr. White is any facts

9    they discussed, any legal advice rendered.  That's what they're

10   seeking.  From our point of view, to use the phrase that's been

11   used, whatever Mr. White blabbed to Mr. Chikowski --

12         THE COURT:  It's a good phrase.

13         MR. FELDBERG:  It is -- they're entitled to.  They've

14   asked Mr. White; we've asked Mr. Chikowski.  The conversation

15   between Mssrs. White and Chikowski is not privileged.  And for

16   whatever relevance it may turn out to have is fully

17   discoverable.  They're entitled to White's recollection.  We're

18   entitled to Chikowski's, etcetera.  But that -- and that's the

19   state of the record.  Nothing that -- we've heard no case that

20   has been presented in the briefs supports the notion that the

21   communication between Granfield and White on October 1st opened

22   the door to the inquiry AmEx is seeking.  Thank you.

23         THE COURT:  Mr. Feldberg --

24         MR. FELDBERG:  Sure.

25         THE COURT:  -- just before you sit down, I have a

40

1    somewhat unrelated thought.  During the discovery phase of this

2    hotly contested matter, were you asked on behalf of Barclays to

3    identify all witnesses who have knowledge of facts sufficient

4    to prove up your 60(b) claim?

5            MR. FELDBERG:  Yes, we were.

6            THE COURT:  Was Mr. White one of the witnesses

7    identified for that purpose?

8            MR. FELDBERG:  May I confer, Your Honor?

9            THE COURT:  Yes.

10           MR. FELDBERG:  Your Honor, Mr. White was listed in

11   response to an interrogatory.  And I don't have the exact words

12   of the interrogatory in -- the question that was asked to which

13   his name was included as part of the response.  But it was

14   included in the response.

15           THE COURT:  All right.  Without knowing the exact

16   wording of the interrogatory that produced the witness list,

17   he's on that list.

18           MR. FELDBERG:  He's on -- I'm not sure -- Your Honor,

19   I can't recall if it's a witness list or if it's a list of --

20           THE COURT:  Of witnesses.

21           MR. FELDBERG:  -- people with knowledge of certain

22   things, Your Honor.  For example, there's an interrogatory

23   which I do recall which asked for who's responsible for the

24   decision to remove the AmEx contracts from the list.  And I

25   remember the response to that and Mr. White's not one of those

41

1    people.  I don't remember whether it's people with knowledge or

2    people who were going to be called as witnesses.  We can look

3    that up and report back.

4         THE COURT:  I'm not asking that you do any more work

5    on this issue at this moment.  I was just -- you've answered

6    sufficiently for my purposes today.

7         MR. FELDBERG:  Thank you.

8         THE COURT:  What I'd like to have is the document

9    that needs to be reviewed in camera.

10        MR. FELDBERG:  Your Honor, what we propose to do, if

11   it's acceptable to the Court, is in addition to the document

12   that is the subject of this debate, which we would produce both

13   in the form that it was originally produced, unredacted -- the

14   redacted version, if Your Honor would accept it, we would also

15   produce the e-mail from Lindsee Granfield to colleagues at

16   Cleary and an in-house lawyer at Barclays which is the original

17   text which was cut and pasted into the portion of the document

18   that we've redacted out.

19        THE COURT:  Let me understand something about that

20   e-mail you've just referenced.  I assume that e-mail is an

21   otherwise responsive document to a discovery request made by

22   AmEx which has been withheld on the basis of privilege and is

23   on a privilege log, correct?

24        MR. FELDBERG:  Yes, Your Honor.

25        THE COURT:  Well, to the extent that it provides

42

1    meaningful context for what I'm being asked to look at, it

2    seems to me that it's perfectly reasonable for me to look at

3    it.  But I'll ask if AmEx has any objection to my looking at

4    it.

5              MR. BIENENSTOCK:  No objection.

6              THE COURT:  Great.  Here's what we'll do.  I'm

7    confident I can read these documents in only a few minutes.

8    And I probably will want to not only look at the documents but

9    think a little bit about what I've looked at.  So let's take

10   about a fifteen minute break and we'll resume at -- let's call

11   it 3:25.

12             MR. FELDBERG:  May I approach, Your Honor?

13             THE COURT:  You may.  We're adjourned.

14        (Recess from 3:11 p.m. until 3:32 p.m.)

15             THE COURT:  Be seated, please.  Let me start with the

16   redacted document which I've looked at.  And I've looked at

17   three documents:  the original e-mail, which is dated September

18   23, the unredacted version of the spreadsheet, which I have

19   confirmed includes the text verbatim of the substantive

20   portions of the e-mail, and the redacted document, which has

21   effectively obliterated the entire text of that e-mail message.

22             In part because I've had the benefit of the original

23   e-mail, which includes a distribution list that demonstrates

24   this text was circulated to key members of Barclays' deal team

25   in connection with the closing of the acquisition of Lehman

43

1    assets approved on September 20th, and this message was also

2    generated more or less contemporaneously because it's dated

3    just a couple of days later, I'm satisfied that this is a

4    document that includes lots of information that AmEx would want

5    to have available to help it in its case.  But I'm also

6    satisfied that the text should not be disclosed.  There are a

7    couple of reasons why I think that's so.

8            I believe that this fits the broad definition of work

9    product.  Conceivably, it could be in anticipation of

10   litigation but I think that that's not the message here.  The

11   message here is attempting to resolve business differences,

12   practically and amicably.  Obviously, these efforts failed.  To

13   some extent, I view this as being akin to a document that in

14   the ordinary course would be subject to a Federal Rule 408

15   exemption.  It's really talking about how the parties might be

16   able to reconcile their differences and work things out.

17           Moreover, for Lindsee Granfield, who was the lead

18   partner on the deal at the time for Cleary to be inhibited in

19   her ability to communicate with members of her team, both

20   internally and externally, would really be a problem from my

21   perspective.  E-mails like this are generated routinely in

22   large law firms to facilitate the effective rendering of legal

23   services to corporate clients and others.  And I believe that

24   it includes, based upon my reviewing of it, ways to try to

25   resolve this matter.

44

1            It's either subject to an attorney/client privilege

2      or it's subject to what I'm going to call a broad work product

3      doctrine.  But either way, I don't believe it should be

4      discovered at this point.  There may be other implications

5      associated with this document which I would like to explore

6      with counsel privately after this hearing.

7            Now, as for the broader issues of privilege and work

8      product that have been extremely well briefed by both sides and

9      extremely well argued by both sides, for reasons that I

10     probably telegraphed in some of my questions during the

11     argument, I believe that the White declaration that included

12     passing reference to a conversation that he had with Lindsee

13     Granfield on October 1, 2008 didn't open any doors, that Mr.

14     White's statement which included the word "mistake" did not put

15     that conversation at issue for purposes of attorney/client

16     privilege.  I viewed it much more as context than anything

17     else.  And I accept the Barclays arguments, while I've read

18     each of the submissions and many of the attached documents in

19     the declarations filed by Mr. Taub and Mr. Feldberg in support

20     of their respective positions.  I think that they reply

21     memorandum most recently filed by Barclays represents, perhaps

22     with the exception of some of the statements made with regard

23     to work product, a statement of the case that I substantially

24     adopt.

25            The motion is denied.  To the extent that there is

45

1   any desire to seek further review of the denial of that motion,

2   I will prepare a memorandum decision that lays out all of the

3   reasoning in support of the position I've now expressed.

4   However, just for purposes of clarity, while no doubt the

5   decision that I would author would be my own prose, the legal

6   reasoning would be substantially identical to what has been set

7   forth in Barclays' reply memorandum of law that I've received

8   recently.  I note that that's filed under seal and is not

9   generally available publicly.  That's dated February 24.

10           I'm a little concerned about this case, too.  I

11   recognize that a tremendous amount of time and legal resources

12   have been devoted to this particular aspect of the dispute

13   between AmEx and Barclays.  And it's obviously the privilege of

14   counsel to pick the battles you consider worth fighting.  But

15   I'm left with the impression after all this that there's too

16   much adversity in this case.  It's your privilege if you want

17   to keep fighting with each other but it seems shockingly

18   different from the spirit of the e-mail that I just read in

19   chambers.  And that's one of the reasons why I'd like to have a

20   chambers conference with counsel.  Since you're here, I propose

21   that we have it now.  And I'll see you in the conference room

22   which I think you're all familiar with across the hall from my

23   chambers entrance in about five minutes.  We're adjourned.

24       (Whereupon these proceedings were concluded at 3:44 p.m.)

25

46

1

2                              I N D E X

3

4                            R U L I N G S

5    DESCRIPTION                                    PAGE    LINE

6    AmEx's motion for an order compelling Barclays   44      25

7    Capital to disclose in discovery communications

8    between Lindsee Granfield of Cleary Gottlieb

9    and Mr. White of Barclays Capital denied

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

47

1

2                        C E R T I F I C A T I O N

3

4        I, Lisa Bar-Leib, certify that the foregoing transcript is a

5        true and accurate record of the proceedings.

6

7        _____

8        LISA BAR-LEIB

9

10       Veritext LLC

11       200 Old Country Road

12       Suite 580

13       Mineola, NY 11501

14

15       Date:  March 2, 2009

16

17

18

19

20

21

22

23

24

25