WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Robert J. Lemons

Attorneys for Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------x
                                :

**In re**                                 :      **Chapter 11 Case No.**
                                 :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :      **08-13555 (JMP)**
                                 :
                    **Debtors.**        :      **(Jointly Administered)**
                                 :
-------------------------------------------------------------------x

**DEBTORS' REPLY TO RESPONSES TO DEBTORS' MOTION, PURSUANT TO
SECTIONS 105 AND 364 OF THE BANKRUPTCY CODE, FOR AUTHORIZATION
TO GRANT FIRST PRIORITY LIENS IN CASH COLLATERAL POSTED IN
CONNECTION WITH  HEDGING TRANSACTIONS THE DEBTORS ENTER
<u>INTO THROUGH CERTAIN FUTURES AND PRIME BROKERAGE ACCOUNTS</u>**

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

        Lehman Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors in the above-

captioned chapter 11 cases, as debtors in possession (together, the "<u>Debtors</u>"), as and for their

omnibus reply to the responses interposed to the Debtors' motion, dated January 28, 2009 (the

"<u>Motion</u>") [Docket No. 2682], pursuant to sections 105 and 364 of title 11 of the United States

Code (the "<u>Bankruptcy Code</u>"), for authorization to grant first priority liens in collateral posted

in connection with certain hedging transactions, respectfully represent:

## Preliminary Statement

1.       As set forth in the Motion, LBHI and certain of the Debtors seek to enter into hedging transactions with broker-dealers (the "Hedging Transactions") to protect against potential losses from prepetition derivative contracts that were not terminated as a result of the commencement of the Debtors' chapter 11 cases (the "Open Derivative Contracts").  The Debtors entered into Hedging Transactions and posted collateral, granting third parties possessory liens, in the ordinary course of their businesses prior to the commencement of these cases.  Postpetition, the posting of collateral may implicate the requirements of section 364(c) of title 11 of the United States Code (the "Bankruptcy Code").  Accordingly, the Debtors requested Court approval to grant first-priority liens in certain of their assets in connection with the Hedging Transactions.

2.       As described below, the Debtors have resolved objections and responses interposed by (i) the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "Creditors' Committee") [Docket No. 2779], (ii) Bank of China [Docket No. 2744], and (iii) Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P., and Providence TMT Special Situations Fund L.P. (collectively, the "Funds") [Docket No. 2756].  Additionally, as further described below, the Debtors have resolved an informal response by Barclays Bank PLC and Barclays Capital Inc. (together, "Barclays").  A revised proposed order and comparison to the version filed with the Motion are attached hereto as Exhibits A and B, respectively.  The remaining objections of (i) Elliott Associates, L.P., Elliot International, L.P., The Liverpool Limited Partnership, Springfield Associates LLC, and Kensington International Limited (collectively, "Elliott") [Docket Nos.

2745 and 2991], and (ii) The Walt Disney Company ("Disney") [Docket No. 2746] are addressed below and should be overruled.

**Debtors' Reply**

**Resolution of Creditors' Committee's Request**

3.      The Creditors' Committee requested that the Court condition the approval of the Motion on the inclusion of an oversight role for the Committee.  Since the filing of the Motion, the Debtors and the Creditors' Committee engaged in productive discussions and agreed upon a protocol for both the Creditors' Committee's involvement and the parameters to be used by the Debtors in connection with the Hedging Transactions.  The agreement  is reflected in the revised proposed order, which provides that the Debtors' entry into any Hedging Transaction will be subject to the conditions described below (the "Hedging Protocol").  With these changes to the proposed order, the Creditors' Committee supports the relief requested in the Motion.

- All proposed Hedging Transactions will be reviewed by an approval committee (the "Hedging Transactions Committee") established by the Debtors.  The financial advisors to the Creditors' Committee (the "Advisors") will receive notice of, and may attend, all meetings of the Hedging Transactions Committee (each a "Hedging Transactions Meeting")[1] and will have access to the personnel of the Debtors involved with the proposed Hedging Transactions;

- "Open Derivative Position" means, in reference to the Hedging Protocol, an unterminated individual derivative contract or unterminated multiple derivative contracts with one or more counterparties the proposed hedge or hedges for which will be substantially similar and transacted at the same time;

---

[1] For the avoidance of doubt, the Hedging Transactions Committee and Hedging Transactions Meetings will consist of the same members and the same meetings regarding the assumption, assignment, and termination of derivative contracts pursuant to the order dated December 16, 2008 [Docket No. 2257], authorizing the Debtors to establish procedures for the settlement or the assumption and assignment of prepetition derivative contracts.

- With respect to all proposed Hedging Transactions, the Debtors will provide (i) e-mail notification to the Advisors of any Hedging Transactions Meeting regarding the approval of a Hedging Transaction not later than one (1) Business Day[2] prior to such meeting, which e-mail must contain the material terms of the proposed Hedging Transaction and (ii) an information package (the "Information Package") as soon as practicable but not less than three (3) Business Days prior to the Hedging Transaction Meeting that will consist of (a) applicable legal documentation for the Open Derivative Position, (b) valuation statements, (c) valuation inputs and assumptions used by the Hedging Transactions Committee that relate to and were used to determine the Mid-Market Value of the Open Derivative Position and adjustments thereto, and (d) appropriate and customary risk measurement information calculated using standard market conventions;

- Informal discussions among the Debtors and the Advisors relative to hedging Group A Positions (as defined below) will commence no later than five (5) Business Days prior to the relevant Hedging Transaction Meeting;

- The Debtors may enter into a proposed Hedging Transaction for which the receivable of the Open Derivative Position has a mid-market value in favor of the applicable Debtor ("Mid-Market Value") greater than $25,000,000 (a "Group A Position") only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents one (1) Business Day before the Hedging Transaction is scheduled to be executed or two (2) Business Days after a Hedging Transactions Meeting during which such Hedging Transaction was approved or (ii) upon Court approval;

- The Debtors may enter into a proposed Hedging Transaction for which the Open Derivative Position is $25,000,000 or less only (i) if (a) the Advisors receive e-mail notification of the Hedging Transaction, which will include the material terms of the approved Hedging Transaction, (b) at least one (1) member of the Advisors attended the portion of the Hedging Transactions Meeting during which the proposed Hedging Transaction was discussed and approved, and (c) the financial advisors to the Creditors' Committee do not object within six (6) business hours, herein defined as the hours between 9:00 a.m. and 5:00 p.m. (Prevailing Eastern Time) on Business Days, of and after receipt of e-mail notification of the Hedging Transactions

---

[2] A "Business Day" means any calendar day other than (i) a Saturday, Sunday or "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a), or (ii) a day on which banks in New York are permitted to be closed.

Committee's approval of such Hedging Transaction or (ii) upon Court approval;

- After the approval of a proposed Hedging Transaction, any further maintenance of such hedge by the Debtors will not require further approval by the Creditors' Committee or any designated subcommittee thereof or other designee; *provided*, *however*, if a Debtor's original strategy is changed or determined to be inappropriate with respect to a particular Hedging Transaction, the Advisors may commence a review of such Hedging Transaction at the Hedging Transaction Meeting occurring on the next Business Day;

- The Debtors will provide updates regarding (i) the number of Hedging Transactions that have been executed, (ii) the value of the collateral posted in connection with such Hedging Transactions, and (iii) an estimate of the mark to market value of the receivables from the corresponding open trades at least once every three (3) months either during (a) the Debtors' periodic case conferences to the Court, (b) presentations made to the Creditors' Committee that are made public, or (c) other presentations made available to all parties in interest; and

- The Debtors and the Creditors' Committee reserve all rights and remedies with respect to the Hedging Protocol and may seek to amend the Hedging Protocol upon Court approval.

**Resolution of Barclays' Request**

4.       Barclays requested clarification that the relief requested in the Motion will not affect the liens granted to Barclays pursuant to certain orders previously issued by the Court. As reflected in the revised proposed order the Debtors have agreed to establish a segregated bank account and deposit $10.5 million in such account.  Upon the deposit of such funds, the liens granted to Barclays under the LBHI's debtor in possession financing order and the order approving the IMD sale transaction are contemporaneously extinguished and replaced by liens granted in the new account.

**Resolution of Bank of China's and The Funds' Limited Objections**

5.       Both Bank of China and the Funds filed limited objections to the Motion, seeking clarification that the property the Debtors propose to post in connection with the Hedging Transactions is not property they own or property in which they claim an interest

pursuant to prepetition contracts with the Debtors.  The Debtors have revised the proposed order

to clarify that collateral utilized by the Debtors will not include any property in which any entity

other than the Debtors claims an interest.  With these changes to the proposed order, the Bank of

China and the Funds have represented that they no longer oppose the relief requested in the

Motion.

### The Objections of Disney and Elliott Should Be Overruled

6.      Disney and Elliott filed substantially similar objections, suggesting that

additional disclosure was required.

7.      The objections sought identification of the Debtor entities will enter into

the Hedging Transactions.  The Motion seeks authorization for each of the Debtors to enter into

the Hedging Transactions, although the Debtors believe that the majority of the transactions will

be entered into by LBHI, Lehman Brothers Special Finance, Inc., Lehman Brothers Derivative

Products Inc., Lehman Brothers Commodity Services, Lehman Brothers Commercial

Corporation, and Lehman Brothers OTC Derivatives Inc.

8.      The objections questioned whether each Debtor would utilize its own

property and be liable for its own account or whether LBHI would act as a guarantor of the other

Debtor's Hedging Transactions.  In each case, the risk associated with the Hedging Transactions

will be born by the Debtor party entering into the Hedging Transaction.  Each Debtor will utilize

its own assets to satisfy margin requirements and LBHI will not act as a guarantor in other

Debtors' Hedging Transactions.

9.      The objections questioned the nature and type of Open Derivative

Contracts.  The Open Derivative Contracts include forward, futures, option, and swap contracts

in which values are measured against, among other things, commodities, interest rates, currency,

and equities.  The Debtors will examine each potential transaction on a counterparty-by-counterparty basis.

10.     The objections sought an estimation of the value of the Open Derivative Contracts that require hedging and the exposure of the Debtors risk by entering into Hedging Transactions.  The present-day value of the Open Derivative Contracts change as market prices fluctuate.  The Debtors are analyzing the Open Derivative Contracts, determining which ones might require hedging and assessing the terms necessary to provide an effective hedge.  The value of the potential receivable cannot be determined until the Debtors complete their assessment of (i) the terms and nature of the collateral associated with an Open Derivative Contract, (ii) the Debtor-counterparty's ability to recover the receivable under the Open Derivative Contract, (iii) the market conditions around the time the Debtor enters into the Hedging Transaction, (iv) the risk that the counterparty will terminate the Open Derivative Contract or take some other action adverse to the Debtor's interest, and (iv) the creditworthiness of the non-Debtor counterparty.

11.     The potential exposure to each Debtor that enters into a Hedging Transaction will be approximately equal to the value of the collateral posted to satisfy the margin requirements of the Hedging Transaction.  The Debtors believe that this risk is reasonable because any loss under the Hedging Transaction would be offset by the corresponding gain under the Open Derivative Contract.  In addition, if a Debtor assumes and assigns an Open Derivative Contract or collects a receivable owing under such contract, the Debtor will terminate, unwind, or sell its hedging position to a third party, reduce its expenses, and eliminate its exposure or if the hedge is against a group of similarly situated Open Derivative Contracts then the Debtor will

adjust the hedge to correspond to the approximate aggregate value of the group of Open

Derivative Contracts.

12.     A Debtor will not enter into a Hedging Transaction unless and until it

determines the value of the relevant Open Derivative Contracts is sufficiently certain so as to

require protection against adverse market movements.  It is crucial for the Debtors to be situated

to act quickly and consummate Hedging Transaction without the delay associated with motion

practice and the concurrent risk of loss of value in the Open Derivative Contracts.

13.     The Elliott and Disney objections stated that the Motion did not comply

with the requirements of Bankruptcy Rule 4001(c).  The disclosures prescribed by Bankruptcy

Rule 4001(c) are intended to aid the Court and other parties in interest by providing a summary

of the material terms of lengthy and complex loan agreements.  The Debtors seek to enter into

standard futures, ISDA, and other agreements, not complex loan agreements.  The information

provided in the Motion and herein provide the Court and parties in interest with sufficient

information regarding the scope of relief requested and the basis to approve the same.

14.     The objections questioned the involvement of the Creditors' Committee in

Hedging Transactions.  As described above, the Hedging Protocols provide for the participation

of the Creditors' Committee in the approval of potential Hedging Transactions.

15.     It is not necessary to provide any further disclosure regarding which Open

Derivative Contracts require hedging, the specific value of individual Open Derivative Contracts,

or the terms of proposed Hedging Transactions, because such information is commercially

sensitive and would prejudice the Debtors' ability to effectively hedge against the Open

Derivative Contracts.  Moreover, in each case, the advisors of the Creditors' Committee will

have access to these details and will take part in the assessment of the need for and the approval of the proposed Hedging Transactions.

16.    The Debtors further dispute many of the unsubstantiated statements made by Elliott in its objections.  For example, Elliott asserts that the relief requested in the Motion is "extraordinarily broad."  However, the relief requested in the Motion is substantially similar, if not identical, to the relief that has been granted by this Court and others in connection with similar motions to hedge against the future loss of value in contracts.  *See, e.g.*, *In re NRG Energy, Inc., et al.*, Case No. 03-13024 (PCB) (Bankr. S.D.N.Y. June 30, 2003) [Docket No. 414] (approving a motion in which the debtors sought to hedge against the risks associated with their value open derivative contracts); *In re Enron Corp., et al.*, Case No. 01-16034 (ALG) (Bankr. S.D.N.Y. May 14, 2002) [Docket No. 3176] (same); *In re Armstrong World Industries. Inc.*, Case No. 00-04471 (JJF) (Bankr. D. Del. Mar. 7, 2001) [Docket No. 414] (authorizing the debtors to continue their risk hedging facilities).  In each of these cases, the debtors disclosed little or no information regarding the terms of the potential hedges and sought only a comfort order from the Court authorizing them to enter in such transactions to the extent they were outside the ordinary course of business.

17.    Hidden in a footnote in its supplemental objection, Elliott also asserts that the Debtors' "refusal to provide this basic information about their proposed transactions speaks for itself in respect of the Debtors' views of creditors' rights in these cases."  Since the commencement of these cases, the Debtors have made four presentations to the Court, three regarding the state of their estates and another regarding a proposed protocol to aid in the administration and coordination of these chapter 11 cases and the various foreign proceedings pending around the world.  In addition, the United States Trustee conducted its first section 341

meeting during which the Debtors presented a further update regarding the state of their estates and responded to numerous creditor inquiries.  The Debtors also have established websites available to the public that sets forth the various workstreams in these cases that corresponds to the names and contact information of the Debtors' employees and advisors.  The Debtors and their advisors meet on a monthly basis with the Creditors' Committee and its advisors, in addition to meetings with the sub-committee to the Creditors' Committee.  Elliott's unsubstantiated assertions regarding the Debtors' refusal to provide information and treatment of creditors is belied by the facts and the record of these cases.

18.     In a separate footnote, Elliott contends, again without any support, that the Debtors' adjournment of the Motion was caused by a "turf war with the Committee over the protection of the estates" and that such conduct puts the Debtors "at risk of gross mismanagement."  To the contrary, the adjournments of the hearing on the Motion enabled the Debtors and the Creditors Committee to work consensually on a process that will streamline the approval procedure for potential Hedging Transactions and the assumption, assignment, and settlement of derivative contracts.  The time spent will benefit the Debtors' estates and all stakeholders in these cases.  Elliott's attacks grossly misrepresent the business judgment of the Debtors.  They are nothing more than weak attempts to manufacture disputes in the context of an uncontroversial motion and enhance individual creditors' leverage in these cases.

WHEREFORE the Debtors respectfully request that the Court overrule the

unresolved objections and responses, grant the relief requested in the Motion, as modified by the

attached revised proposed order, and such other and further relief as it deems just and proper.

Dated: March 10, 2009
       New York, New York

/s/ Lori R. Fife
Lori R. Fife
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

## EXHIBIT A

**(Revised Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                 :

In re                            :       **Chapter 11 Case No.**
                                   :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :       **08-13555 (JMP)**
                                   :

                    **Debtors.**       :       **(Jointly Administered)**
                                   :
                                   :
-------------------------------------------------------------------x

## ORDER PURSUANT TO SECTIONS 105 AND 364 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO GRANT FIRST PRIORITY LIENS IN CASH COLLATERAL POSTED IN CONNECTION WITH THE HEDGING TRANSACTIONS THE DEBTORS ENTER INTO THROUGH CERTAIN FUTURES AND PRIME BROKERAGE ACCOUNTS

Upon the motion, dated January 28, 2009 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105 and 364 of the Bankruptcy Code, for

authorization to grant first priority liens to broker dealers (the "Broker Dealers") in cash,

securities, and other collateral (the "Collateral") that is posted in connection with hedging

transactions that will include but not limited to over the counter transactions (collectively, the

"Hedging Transactions") the Debtors will enter into through certain futures and prime brokerage

accounts that the Debtors will open pursuant to the terms of those certain Institutional Futures

Account Agreements, Prime Brokerage Account Agreements, and other related agreements

(together, the "Agreements"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered February 13, 2009 governing case management and administrative procedures [Docket No. 2837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Creditors' Committee (the "Creditors' Committee"); (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as modified herein; and it is further

ORDERED that any unresolved objections are overruled; and it is further

ORDERED that the Debtors, subject to the terms of the applicable Agreements and Hedging Transactions, are hereby authorized to post Collateral in connection with those futures, prime brokerage, and over the counter transaction related accounts (together, the "Accounts") to be established with the various Broker Dealers under the terms and conditions set forth in the Agreements; and it is further

ORDERED that the Debtor counterparty to a Hedging Transaction will use only its own assets to post Collateral and shall not be liable for the obligations of the Hedging Transactions of its affiliate Debtors; and it is further

ORDERED that the Debtors shall not post Collateral that exceeds industry standards as adjusted for a debtor in possession; and it is further

ORDERED that the Debtors are authorized to supplement or remove Collateral from the Accounts, as required by the applicable Agreement, Hedging Transaction, or the related agreement to the Hedging Transaction; and it is further

ORDERED that the Debtors are authorized to grant the Broker Dealers first priority liens in the Collateral; and it is further

ORDERED that the Debtors shall not include as Collateral available for use by the Debtors in any Hedging Transaction any property in which any entity claims an ownership interest raised in any objection to the Motion, including, in the case of objectors Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P., and Providence TMT Special Situations Fund L.P. (the "Objecting Funds"), the securities listed on the schedule attached to the October 24, 2008 email from the Objecting Funds' counsel to Debtors' counsel and in the case of objector Bank of China, the Bond identified in its objection; and it is further

ORDERED that the Debtors are hereby authorized to execute and deliver all instruments and documents, and take such other actions, as may be necessary or appropriate to implement and effectuate the Agreements, in the manner set forth herein, including, but not limited to the delivery of the Collateral and granting of first priority liens on the Collateral; and it is further

ORDERED that the Debtors' entry into Hedging Transactions shall be subject to the following (the "Hedging Protocol"):

- All proposed Hedging Transactions will be reviewed by an approval committee (the "Hedging Transactions Committee") established by the Debtors. The financial advisors to the Creditors' Committee (the "Advisors") will receive notice of, and may attend, all meetings of the Hedging Transactions Committee (each a "Hedging Transactions Meeting") [2] and will have access to the personnel of the Debtors involved with the proposed Hedging Transactions;

- "Open Derivative Position" means, in reference to the Hedging Protocol, an unterminated individual derivative contract or unterminated multiple derivative contracts with one or more counterparties the proposed hedge or hedges for which will be substantially similar and transacted at the same time;

- With respect to all proposed Hedging Transactions, the Debtors will provide (i) e-mail notification to the Advisors of any Hedging Transactions Meeting regarding the approval of a Hedging Transaction not later than one (1) Business Day[3] prior to such meeting, which e-mail must contain the material terms of the proposed Hedging Transaction and (ii) an information package (the "Information Package") as soon as practicable but not less than three (3) Business Days prior to the Hedging Transaction Meeting that will consist of (a) applicable legal documentation for the Open Derivative Position, (b) valuation statements, (c) valuation inputs and assumptions used by the Hedging Transactions Committee that relate to and were used to determine the Mid-Market Value of the Open Derivative Position and adjustments thereto, and (d) appropriate and customary risk measurement information calculated using standard market conventions;

- Informal discussions among the Debtors and the Advisors relative to hedging Group A Positions (as defined below) will commence no later than five (5) Business Days prior to the relevant Hedging Transaction Meeting;

---

[2] For the avoidance of doubt, the Hedging Transactions Committee and Hedging Transactions Meetings will consist of the same members and the same meetings regarding the assumption, assignment, and termination of derivative contracts pursuant to the order dated December 16, 2008 [Docket No. 2257], authorizing the Debtors to establish procedures for the settlement or the assumption and assignment of prepetition derivative contracts.

[3] A "Business Day" means any calendar day other than (i) a Saturday, Sunday or "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a), or (ii) a day on which banks in New York are permitted to be closed.

- The Debtors may enter into a proposed Hedging Transaction for which the receivable of the Open Derivative Position has a mid-market value in favor of the applicable Debtor ("Mid-Market Value") greater than $25,000,000 (a "Group A Position") only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents one (1) Business Day before the Hedging Transaction is scheduled to be executed or two (2) Business Days after a Hedging Transactions Meeting during which such Hedging Transaction was approved or (ii) upon Court approval;

- The Debtors may enter into a proposed Hedging Transaction for which the Open Derivative Position is $25,000,000 or less only (i) if (a) the Advisors receive e-mail notification of the Hedging Transaction, which will include the material terms of the approved Hedging Transaction, (b) at least one (1) member of the Advisors attended the portion of the Hedging Transactions Meeting during which the proposed Hedging Transaction was discussed and approved, and (c) the financial advisors to the Creditors' Committee do not object within six (6) business hours, herein defined as the hours between 9:00 a.m. and 5:00 p.m. (Prevailing Eastern Time) on Business Days, of and after receipt of e-mail notification of the Hedging Transactions Committee's approval of such Hedging Transaction or (ii) upon Court approval;

- After the approval of a proposed Hedging Transaction, any further maintenance of such hedge by the Debtors will not require further approval by the Creditors' Committee or any designated subcommittee thereof or other designee; *provided*, *however*, if a Debtor's original strategy is changed or determined to be inappropriate with respect to a particular Hedging Transaction, the Advisors may commence a review of such Hedging Transaction at the Hedging Transaction Meeting occurring on the next Business Day;

- The Debtors will provide updates regarding (i) the number of Hedging Transactions that have been executed, (ii) the value of the collateral posted in connection with such Hedging Transactions, and (iii) an estimate of the mark to market value of the receivables from the corresponding open trades at least once every three (3) months either during (a) the Debtors' periodic case conferences to the Court, (b) presentations made to the Creditors' Committee that are made public, or (c) other presentations made available to all parties in interest; and

- The Debtors and the Creditors' Committee reserve all rights and remedies with respect to the Hedging Protocol and may seek to amend the Hedging Protocol upon Court approval.

ORDERED that entry of this Order is without prejudice to the rights of the Debtors, including, but not limited to, the right to seek further, other, or different relief regarding the Derivative Contracts; and it is further

ORDERED that the Debtors shall have thirty (30) days from the entry of this Order to (i) establish a separate bank account in the name of LBHI titled as the "Barclays First Lien Account" and (ii) deposit $10.5 million in the Barclays First Lien Account.  The first priority liens granted to Barclays Bank PLC and Barclays Capital Inc. (together, "Barclays") pursuant to (a) paragraph 10 of the Interim Order (I) Authorizing Debtor To Obtain Postpetition Financing Pursuant To Sections 363 And 364 Of The Bankruptcy Code, (II) Granting Liens And Superpriority Claims To Postpetition Lenders Pursuant To Section 364 Of The Bankruptcy Code, And (III) Scheduling Final Hearing, dated September 17, 2008 [Docket No. 89] (the "DIP Order") in the Collateral (as defined in the DIP Order) and (b) paragraph 21 of the Order Authorizing And Approving Debtor's Sale Of Purchased Assets And Assumption And Assignment Of Executory Contracts And Unexpired Leases In Connection With Sale of Lehman Brothers' Investment Management Division, dated December 22, 2008 [Docket No. 2350] (the "IMD Sale Order"), shall be contemporaneously extinguished upon the deposit of $10.5 million into the Barclays First Lien Account and replaced by first priority liens against the Barclays First Lien Account in the same priority and to the same extent as granted to Barclays under the DIP Order and IMD Sale Order in the Collateral (as defined in the DIP Order) and under the IMD Sale Order in (x) the proceeds of the sale of the Purchased Assets (as defined in the IMD Sale Order) and (y) all deposit accounts and securities accounts of LBHI (as defined in the IMD Sale Order); and it is further

ORDERED that the Debtors and Barclays agree that the Debtors shall not use the $10.5 million deposited in the Barclays First Lien Account unless (i) the Debtors obtain Court authorization upon notice and hearing or (ii) the Debtors and Barclays consensually resolve any and all of Barclays' claims under  the Senior Secured Superpriority Debtor In Possession Credit Agreement dated as of September 17, 2008 (the "DIP Agreement") and the DIP Order. The Debtors, the Creditors' Committee, and Barclays each reserve their rights with respect to the existence and amount of unpaid Postpetition Obligations (as defined in the DIP Order), and none of Barclays' other rights and remedies under the Postpetition Financing Documents (as defined in the DIP Order) or any other claims that Barclays, on the one hand, and the Debtors, on the other hand, may have against each other shall be affected in any way by this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order and/or the terms of any assumption and assignment consummated in the manner set forth herein.

Dated:  March ___, 2009
      New York, New York

                                 _____
                                 UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT B</u>**

**(Comparison of Revised Proposed Order)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                    :

In re                    :        **Chapter 11 Case No.**
                    :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,   :        **08-13555 (JMP)**
                    :

             **Debtors.**        :        **(Jointly Administered)**
                    :
                    :
-------------------------------------------------------------------x

### ORDER PURSUANT TO SECTIONS 105 AND 364 OF THE BANKRUPTCY CODE AUTHORIZING THE DEBTORS TO GRANT FIRST PRIORITY LIENS IN CASH COLLATERAL POSTED IN CONNECTION WITH THE HEDGING TRANSACTIONS THE DEBTORS ENTER INTO THROUGH CERTAIN FUTURES AND PRIME BROKERAGE ACCOUNTS

Upon the motion, dated January 28, 2009 (the "Motion"),[1] of Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors and debtors-in-possession (collectively, the "Debtors" and, together with their non-

debtor affiliates, "Lehman"), pursuant to sections 105 and 364 of the Bankruptcy Code, for

authorization to grant first priority liens to broker dealers (the "Broker Dealers") in cash,

securities, and other collateral (the "Collateral") that is posted in connection with hedging

transactions (that will include but not limited to over the counter transactions (collectively, the

"Hedging Transactions") the Debtors will enter into through certain futures and prime brokerage

accounts that the Debtors will open pursuant to the terms of those certain Institutional Futures

Account Agreements, Prime Brokerage Account Agreements, and other related agreements

(together, the "Agreements"), all as more fully described in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the Standing Order M-61 Referring to Bankruptcy Judges for the Southern

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

District of New York Any and All Proceedings Under Title 11, dated July 10, 1984 (Ward, Acting C.J.); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and due and proper notice of the Motion having been provided in accordance with the procedures set forth in the amended order entered September 22, 2008February 13, 2009 governing case management and administrative procedures [Docket No. 2852837] to (i) the United States Trustee for the Southern District of New York; (ii) the attorneys for the Official Creditors' Committee (the "Creditors' Committee"); (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the United States Attorney for the Southern District of New York; and (vi) all parties who have requested notice in these chapter 11 cases, and it appearing that no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as modified herein; and it is further

ORDERED that any unresolved objections are overruled; and it is further

ORDERED that the Debtors, subject to the terms of the applicable Agreements and Hedging Transactions, are hereby authorized to post Collateral toin connection with those futures and, prime brokerage, and over the counter transaction related accounts (together, the "Accounts") to be established with the various Broker Dealers under the terms and conditions set forth in the Agreements; and it is further

ORDERED that the Debtor counterparty to a Hedging Transaction will use only its own assets to post Collateral and shall not be liable for the obligations of the Hedging Transactions of its affiliate Debtors; and it is further

ORDERED that the Debtors shall not post Collateral that exceeds industry standards as adjusted for a debtor in possession; and it is further

ORDERED that the Debtors are authorized to supplement or remove Collateral from the Accounts, as required by the applicable Agreement, Hedging Transaction, or the related agreement to the Hedging Transaction; and it is further

ORDERED that the Debtors are authorized to grant the Broker Dealers first priority liens in the Collateral; and it is further

ORDERED that the Debtors shall not include as Collateral available for use by the Debtors in any Hedging Transaction any property in which any entity claims an ownership interest raised in any objection to the Motion, including, in the case of objectors Newport Global Opportunities Fund LP, Newport Global Credit Fund (Master) L.P., PEP Credit Investor L.P., and Providence TMT Special Situations Fund L.P. (the "Objecting Funds"), the securities listed on the schedule attached to the October 24, 2008 email from the Objecting Funds' counsel to Debtors' counsel and in the case of objector Bank of China, the Bond identified in its objection; and it is further

ORDERED that the Debtors are hereby authorized to execute and deliver all instruments and documents, and take such other actions, as may be necessary or appropriate to implement and effectuate the Agreements, in the manner set forth herein, including, but not limited to the delivery of the Collateral and granting of first priority liens on the Collateral; and it is further

ORDERED that the Debtors' entry into Hedging Transactions shall be subject to the following (the "Hedging Protocol"):

- All proposed Hedging Transactions will be reviewed by an approval committee (the "Hedging Transactions Committee") established by the Debtors. The financial advisors to the Creditors' Committee (the "Advisors") will receive notice of, and may attend, all meetings of the Hedging Transactions Committee (each a "Hedging Transactions Meeting") [2] and will have access to the personnel of the Debtors involved with the proposed Hedging Transactions;

- "Open Derivative Position" means, in reference to the Hedging Protocol, an unterminated individual derivative contract or unterminated multiple derivative contracts with one or more counterparties the proposed hedge or hedges for which will be substantially similar and transacted at the same time;

- With respect to all proposed Hedging Transactions, the Debtors will provide (i) e-mail notification to the Advisors of any Hedging Transactions Meeting regarding the approval of a Hedging Transaction not later than one (1) Business Day[3] prior to such meeting, which e-mail must contain the material terms of the proposed Hedging Transaction and (ii) an information package (the "Information Package") as soon as practicable but not less than three (3) Business Days prior to the Hedging Transaction Meeting that will consist of (a) applicable legal documentation for the Open Derivative Position, (b) valuation statements, (c) valuation inputs and assumptions used by the Hedging Transactions Committee that relate to and were used to determine the Mid-Market Value of the Open Derivative Position and adjustments thereto, and (d) appropriate and customary risk measurement information calculated using standard market conventions;

- Informal discussions among the Debtors and the Advisors relative to hedging Group A Positions (as defined below) will commence no later than five (5) Business Days prior to the relevant Hedging Transaction Meeting;

---

[2] For the avoidance of doubt, the Hedging Transactions Committee and Hedging Transactions Meetings will consist of the same members and the same meetings regarding the assumption, assignment, and termination of derivative contracts pursuant to the order dated December 16, 2008 [Docket No. 2257], authorizing the Debtors to establish procedures for the settlement or the assumption and assignment of prepetition derivative contracts.

[3] A "Business Day" means any calendar day other than (i) a Saturday, Sunday or "legal holiday" as defined in Federal Rule of Bankruptcy Procedure 9006(a), or (ii) a day on which banks in New York are permitted to be closed.

- The Debtors may enter into a proposed Hedging Transaction for which the receivable of the Open Derivative Position has a mid-market value in favor of the applicable Debtor ("Mid-Market Value") greater than $25,000,000 (a "Group A Position") only if (i) the Creditors' Committee, a subcommittee, or other designee thereof consents one (1) Business Day before the Hedging Transaction is scheduled to be executed or two (2) Business Days after a Hedging Transactions Meeting during which such Hedging Transaction was approved or (ii) upon Court approval;

- The Debtors may enter into a proposed Hedging Transaction for which the Open Derivative Position is $25,000,000 or less only (i) if (a) the Advisors receive e-mail notification of the Hedging Transaction, which will include the material terms of the approved Hedging Transaction, (b) at least one (1) member of the Advisors attended the portion of the Hedging Transactions Meeting during which the proposed Hedging Transaction was discussed and approved, and (c) financial advisors to the Creditors' Committee do not object within six (6) business hours, herein defined as the hours between 9:00 a.m. and 5:00 p.m. (Prevailing Eastern Time) on Business Days, of and after receipt of e-mail notification of the Hedging Transactions Committee's approval of such Hedging Transaction or (ii) upon Court approval;

- After the approval of a proposed Hedging Transaction, any further maintenance of such hedge by the Debtors will not require further approval by the Creditors' Committee or any designated subcommittee thereof or other designee; *provided, however,* if a Debtor's original strategy is changed or determined to be inappropriate with respect to a particular Hedging Transaction, the Advisors may commence a review of such Hedging Transaction at the Hedging Transaction Meeting occurring on the next Business Day;

- The Debtors will provide updates regarding (i) the number of Hedging Transactions that have been executed, (ii) the value of the collateral posted in connection with such Hedging Transactions, and (iii) an estimate of the mark to market value of the receivables from the corresponding open trades at least once every three (3) months either during (a) the Debtors' periodic case conferences to the Court, (b) presentations made to the Creditors' Committee that are made public, or (c) other presentations made available to all parties in interest; and

- The Debtors and the Creditors' Committee reserve all rights and remedies with respect to the Hedging Protocol and may seek to amend the Hedging Protocol upon Court approval.

ORDERED that entry of this Order is without prejudice to the rights of the Debtors, including, but not limited to, the right to seek further, other, or different relief regarding the Derivative Contracts; and it is further

ORDERED that the Debtors shall have thirty (30) days from the entry of this Order to (i) establish a separate bank account in the name of LBHI titled as the "Barclays First Lien Account" and (ii) deposit $10.5 million in the Barclays First Lien Account. The first priority liens granted to Barclays Bank PLC and Barclays Capital Inc. (together, "Barclays") pursuant to (a) paragraph 10 of the Interim Order (I) Authorizing Debtor To Obtain Postpetition Financing Pursuant To Sections 363 And 364 Of The Bankruptcy Code, (II) Granting Liens And Superpriority Claims To Postpetition Lenders Pursuant To Section 364 Of The Bankruptcy Code, And (III) Scheduling Final Hearing, dated September 17, 2008 [Docket No. 89] (the "DIP Order") in the Collateral (as defined in the DIP Order) and (b) paragraph 21 of the Order Authorizing And Approving Debtor's Sale Of Purchased Assets And Assumption And Assignment Of Executory Contracts And Unexpired Leases In Connection With Sale of Lehman Brothers' Investment Management Division, dated December 22, 2008 [Docket No. 2350] (the "IMD Sale Order"), shall be contemporaneously extinguished upon the deposit of $10.5 million into the Barclays First Lien Account and replaced by first priority liens against the Barclays First Lien Account in the same priority and to the same extent as granted to Barclays under the DIP Order and IMD Sale Order in the Collateral (as defined in the DIP Order) and under the IMD Sale Order in (x) the proceeds of the sale of the Purchased Assets (as defined in the IMD Sale Order) and (y) all deposit accounts and securities accounts of LBHI (as defined in the IMD Sale Order); and it is further

ORDERED that the Debtors and Barclays agree that the Debtors shall not use the $10.5 million deposited in the Barclays First Lien Account unless (i) the Debtors obtain Court authorization upon notice and hearing or (ii) the Debtors and Barclays consensually resolve any and all of Barclays' claims under the Senior Secured Superpriority Debtor In Possession Credit Agreement dated as of September 17, 2008 (the "DIP Agreement") and the DIP Order. The Debtors, the Creditors' Committee, and Barclays each reserve their rights with respect to the existence and amount of unpaid Postpetition Obligations (as defined in the DIP Order), and none of Barclays' other rights and remedies under the Postpetition Financing Documents (as defined in the DIP Order) or any other claims that Barclays, on the one hand, and the Debtors, on the other hand, may have against each other shall be affected in any way by this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order and/or the terms of any assumption and assignment consummated in the manner set forth herein.

Dated: ~~February~~ March ___, 2009
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE